Evan R. Fleck
Andrew C. Harmeyer
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Andrew M. Leblanc
Erin E. Dexter
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Proposed Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,[1] | : | Case No. 24-10118 (MG) |
| Debtors. | : | (Joint Administration Requested) |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**DEBTORS' MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THEM TO (A) MAINTAIN EMPLOYEE PROGRAMS
IN THE ORDINARY COURSE AND (B) PAY PREPETITION EMPLOYEE
OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") respectfully state as follows in support of this motion (the "Motion"):

## RELIEF REQUESTED

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"), (i) authorizing the Debtors to (a) maintain their Employee Programs (as defined herein) in the ordinary course of business and (b) pay prepetition obligations related thereto and (ii) granting related relief. In addition, the Debtors request that this Court schedule a final hearing (the "Final Hearing") within approximately twenty-five days from the date hereof (the "Petition Date") to consider approval of the Motion on a final basis.

## JURISDICTION

2. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.

3. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105(a), 363, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code").

## STATUS OF THE CASE

6. On the Petition Date, each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code with this Court.

7. Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. No creditors' committee has yet been appointed in these cases (the "Chapter 11 Cases"). No trustee or examiner has been appointed.

9. The Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## BACKGROUND

10. The Debtors (collectively, "GOL" or the "Company") are the leading low-cost airline in South America and one of Brazil's largest domestic carriers. Having pioneered the low-cost carrier model in South America upon its founding in 2000, GOL has grown to include over 14,000 employees, a fleet of 141 aircraft, and an extensive flight network focused on routes within Brazil and South America more broadly. GOL's flight network also includes destinations in the United States and the Caribbean.

11. Despite a viable operating business, the Company has faced financial challenges brought on by the lingering effects of the COVID-19 pandemic, during which GOL, like all airlines globally, suffered unprecedented disruption to its business. The substantial decline in air travel demand, resulting operational impediments, and dramatic reduction in revenue and cash generation during the pandemic years led to a significant deterioration of the Company's balance sheet and liquidity.

12. To address these financial challenges, the Company has executed certain transactions and undertaken a number of other efforts, many of which have provided temporary relief, much-needed liquidity at key points in time, and substantial additional benefits. Several post-pandemic factors, however, have nonetheless continued to cause liquidity shortages for GOL, including elevated fuel prices, the consistently low valuation of the Brazilian *real* (BRL) against the U.S. dollar and, more recently, delays in the delivery of new aircraft. The delays in new aircraft deliveries in particular have led to a significant increase in GOL's operating costs and maintenance expenditures which, in turn, have reduced operating capacity. These temporary operational limitations have significantly hampered the Company's ability to generate cash, thereby leading to further operational challenges.

13. As a result, GOL commenced these Chapter 11 Cases to deleverage its balance sheet, improve liquidity, obtain an organized and efficient forum in which to reach agreements with key stakeholders, and emerge as a stronger enterprise.

14. Further information regarding GOL's business, capital structure, the circumstances leading to the commencement of these Chapter 11 Cases, and the facts and circumstances supporting the relief requested in this Motion is set forth in the *Declaration of Joseph W. Bliley in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated by reference herein.

**BACKGROUND RELEVANT TO THE MOTION**

15. The Debtors employ in the aggregate over 14,000 employees (the "Employees"), all of whom receive a compensation and other employment-related benefits from the Debtors. The relief requested herein to continue providing Employees with compensation and other employment-related benefits is necessary for the Debtors to continue operating their business, to

minimize the personal hardship the Employees will suffer if these obligations are not paid when due, and to maintain the Employees' morale to prevent them from seeking alternative employment opportunities at this critical time. Accordingly, the Debtors must continue programs related to, among other items, Compensation, Payroll Processing Fees, Incentive Plans, Paid Leave Obligations, Workers' Compensation Obligations, Employee Benefit Obligations, Reimbursable Business Expenses, Garnishment Deductions, Payroll Tax Obligations, and Severance Obligations (each as defined herein, and collectively, the "Employee Programs") and pay obligations related to the Employee Programs (the "Employee Obligations"). The Debtors expect that approximately $41 million of Employee Obligations will come due in the first thirty days of these Chapter 11 Cases.

16. The aggregate amount of prepetition Employee Obligations that the Debtors seek authority to pay by this Motion is summarized as follows:

| **Employee Obligations** | **Amounts to Be Paid During Interim Period** | **Total Amount Outstanding as of Petition Date**[2] |
|---|---:|---:|
| Employee Compensation | $25 million | $25 million |
| Outsourced Company Compensation | $13.4 million | $19.2 million |
| Director Compensation | $0 | $0 |
| Payroll Processing Fees | $24,000 | $24,000 |
| Incentive Plan Payments | $0 | $0 |
| Paid Leave Obligations (Vacation, Sick, Etc.) | $8 million | $38 million |
| Workers' Compensation Obligations | $0 | $0 |
| Employee Benefits | $3.1 million | $3.1 million |
| Reimbursable Business Expenses | $90,000 | $90,000 |
| Monthly Payroll Tax Obligations | $9 million | $9 million |

[2] Unless stated otherwise herein, all amounts included herein are listed in U.S. dollars, and Brazilian *reals* have been converted to U.S. dollars using an exchange rate of 1 USD: 4.97 BRL on January 23, 2024.

| | | |
|---|---|---|
| Deferred Payroll Tax Obligations | $34 million | $174 million |
| Severance | $150,000 | $150,000 |
| **Total Employee Obligations** | $93 million | $269 million |

### A. Compensation

17. The Debtors pay compensation to Employees, Outsourced Companies, and Directors (each as defined herein) (collectively, the "Compensation").

*i. Employees*

18. The Debtors' Employees serve in a variety of roles, such as pilots, flight attendants, mechanics, customer service agents, sales agents, reservation agents, management and clerical personnel, and others. Approximately 98.5% of Employees are located in Brazil with the remaining 1.5% located at the Debtors' international bases. Approximately 150 Employees are located in Argentina, thirty-seven Employees are located in Uruguay, twelve Employees are located in Paraguay, four Employees are located in the United States (in Florida), and thirteen Employees are located elsewhere. Approximately 1,200 Employees work part time, while the remainder are full-time Employees.

19. In the ordinary course of business, the Debtors have made payroll payments to Employees on the fifth business day of every month, in most cases by direct deposit bank transfer to Employee accounts.

20. In addition to their normal salaries, Employees in Brazil also receive extra compensation for working night shifts, working in high-risk positions, and having specialized training, among other required benefits, as applicable, as required by Brazilian labor laws. Additionally, Employees in the United States are reimbursed for their health insurance premiums through their monthly compensation, and Employees in Argentina, Paraguay, Bolivia, and Colombia receive meal vouchers included in their payroll.

21. Further, sixty-two sales Employees are eligible to receive commissions in addition to their salaries. Commissions are based on achievement of certain sales targets. Only commercial executives who have been in such role for at least three months are eligible for commissions. The Debtors pay Employees approximately $40,000 in commissions on average per month.

22. The Debtors' average gross monthly payroll to Employees is approximately $29 million. The Debtors estimate that approximately $25 million in prepetition wages, salaries, and other non-incentive compensation for Employees may remain unpaid by relevant Debtors as of the Petition Date because (a) the Debtors' chapter 11 petitions were filed during one or more of the Debtors' regular salary payroll periods; (b) some direct deposit transfers (or, in rare instances, payroll checks) made or issued prior to the Petition Date may not have cleared the banking system (or been presented for payment) as of the Petition Date; and/or (c) Employees have not yet been paid all their salaries and wages for services previously performed on behalf of the Debtors.

23. The Debtors seek authority to pay the Compensation in the ordinary course of business. Paying the Compensation is justified by the Employees' critical importance to the Debtors' business operations and the need to avoid Employees seeking alternative employment options should such payment not be made.

24. The Debtors believe that all of the Employees would have a priority claim of less than $15,150 pursuant to section 507(a)(4) of the Bankruptcy Code with respect to all of their earned but unpaid prepetition compensation. Accordingly, such amounts would ultimately have to be paid to the Employees in full prior to the payment of general unsecured claims under any

plan of reorganization. Thus, paying the Compensation now merely affects timing of the payment of these claims, not whether the claims will be paid.

*ii. Outsourced Companies*

25. In addition, the Debtors rely on services provided by individuals supplied by outsourced companies in Brazil and other countries (the "Outsourced Companies") to perform a range of functions in several areas of their operations, such as (i) call centers, (ii) security services, (iii) certain maintenance and repair operations, (iv) certain airport services related to ground handling and ramp services and check in and gate services, and (v) cleaning services.

26. The Debtors pay the Outsourced Companies with whom they contract. These companies, in turn, pay the individuals providing the services. The Debtors' average gross monthly payments to the Outsourced Companies is approximately $11 million.

27. If the Outsourced Companies are not paid, they will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable them to meet their own financial obligations. Despite the global reach of the automatic stay, many Outsourced Companies have little or no direct connection to the United States or might otherwise be ignorant of the automatic stay. Thus, if the Outsourced Companies are not paid, it is possible that they will no longer continue to be available to the Debtors, which could put the Debtors at serious risk given the vital role such Outsourced Companies play in the Debtors' daily operations.

28. Accordingly, by this Motion, the Debtors request authority, but not direction, to pay any outstanding prepetition amounts owed to the Outsourced Companies, which the Debtors estimate to be approximately $19.2 million, and to continue performance under the contracts with the Outsourced Companies. Nothing herein, however, shall be deemed to be a request to assume such contracts.

*iii. Director Compensation*

29. GOL Linhas Aéreas Inteligentes S.A. maintains a board of directors, which includes a total of nine non-Employee individuals (each, a "Director"). Directors are entitled to fixed monthly fees for serving on the board as well as reimbursement of reasonable out-of-pocket expenses in connection with travel related to their Director duties (the "Director Compensation").

30. The Debtors do not believe that any prepetition amounts are owing on account of Director Compensation. However, out of an abundance of caution, the Debtors seek authority, pursuant to the Final Order, to pay any prepetition amounts owed on account of Director Compensation and to continue to pay Director Compensation on a postpetition basis in the ordinary course of business and consistent with past practices.

*iv. Payroll Processing Fees*

31. The Debtors outsource the administration of certain Compensation for certain Employees to several payroll processors. These payroll processors administer the funds made available by the Debtors on account of Compensation through direct deposit and remit certain of the Debtors' Monthly Payroll Tax Obligations (as defined herein) to the applicable taxing authorities. The Debtors pay these payroll processors approximately $41,000 per month in service fees (the "Payroll Processing Fees"). As of the Petition Date, the Debtors estimate that they owe approximately $24,000 on account of Payroll Processing Fees. The Debtors seek authority to pay the Payroll Processing Fees in the ordinary course and consistent with past practice, including those Payroll Processing Fees that accrued prepetition.

**B. Incentive Plans**

32. In the ordinary course of business, the Debtors maintain certain incentive plans for different categories of non-insider Employees (the "Non-Insider Employees"). These

incentive plans include (i) a revenue sharing program, (ii) an incentive bonus program, (iii) a quarterly bonus program, (iv) an operational supervisor bonus, and (v) an operational reward program (collectively, the "Incentive Plans"). The Debtors seek the authority to continue the Incentive Plans at their reasonable discretion and consistent with their prepetition practices in order to retain valuable Employees and preserve employee morale as the Debtors seek to implement a successful reorganization.[3]

33. Importantly, many of the Debtors' direct competitors offer comparable types of incentive compensation plans. Continuation of the Incentive Plans is critical to the Debtors' ability to remain a competitive employer and to avoid a potential loss of Employees. As such, the Incentive Plans are integral to the Debtors' operations going forward and are critical to the Debtors' ability to motivate, reward, and retain their Non-Insider Employees.

34. The Debtors estimate that approximately $36.6 million will come due in 2024 on account of the Incentive Plans. The Debtors seek to continue the Incentive Plans in the ordinary course of the Debtors' business, and to pay all prepetition amounts due and owing under the Incentive Plans.

35. For the avoidance of doubt, by this Motion, the Debtors are not seeking authorization to pay any bonuses to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors' business is organized such that it is governed by a board of directors and managed by certain officers, who may be considered Insiders under section 101(31) of the Bankruptcy Code. These individuals will not receive any bonuses or incentive payments under the Incentive Plans. To the extent the Debtors decide to pay any bonus or other incentive payment to any Insider, they will seek approval under a separate motion.

---

[3] Additionally, the Debtors anticipate seeking authority to pay Non-Insider Employees pursuant to a key employee retention plan through a separate motion to be filed at a later date in these Chapter 11 Cases.

*i. Revenue Sharing Program*

36. Employees hired before September 2023 (over 14,000 Employees) are eligible to receive a cash bonus under a revenue sharing program (the "Revenue Sharing Program"). The Revenue Sharing Program is negotiated with a commission formed by Employees and approved by labor unions for the benefit of all unionized and non-unionized Employees. Under the program, a portion of the Debtors' revenue is distributed to eligible Employees based on achievement of corporate revenue targets as of spring 2024, and another portion is distributed based on the Debtors' achievement of operational targets set for each department, such as on-time performance, fleet performance, cost control and reduction, and reductions in baggage mishandling.

37. The Debtors paid approximately $11 million to Non-Insider Employees in 2023 on account of the Revenue Sharing Program. The Debtors expect to pay approximately $19.3 million to Non-Insider Employees that remain at the Company in April 2024 under this program. Continuing the Revenue Sharing Program is essential to maintaining Employee morale and avoiding business disruption during the Debtors' restructuring.

*ii. Incentive Bonus Program*

38. Approximately 200 Non-Insider Employees are eligible for cash incentive bonuses (the "Incentive Bonus Program"). These Non-Insider Employees receive bonuses under the Incentive Bonus Program based on operational and financial targets as applicable to each department. These targets include, but are not limited to, revenue and EBITDA metrics, fleet performance, and cost control and reduction. The bonuses under the Incentive Bonus Program will become due in September 2024. The Debtors estimate that the aggregate amount of such bonuses will be approximately $3 million. By way of comparison, the Debtors paid $1.5 million under the Incentive Bonus Program in 2023.

*iii. Quarterly Bonus Program*

39. Approximately 450 Non-Insider Employees are eligible to receive quarterly cash bonuses (the "Quarterly Bonus Program"). These Non-Insider Employees are eligible to receive bonuses under the Quarterly Bonus Program based on continued service in good standing, including individual performance reviews, as well as targets of the Debtors related to financial and operational performance. The performance reviews consider the Non-Insider Employees' revenue generation, cost control and reduction, and aircraft turnaround time, among other considerations. Participants forfeit any unpaid amount if they are terminated for cause or voluntarily resign, but those participants who are involuntarily terminated are entitled to the payment for the quarter in which termination occurred. The Debtors estimate that the total cost of the Quarterly Bonus Program is $6.4 million annually, or $1.6 million quarterly.

*iv. Operational Supervisor Bonus*

40. The Debtors maintain an operational supervisor bonus program for approximately seventy operational supervisors (the "Operational Supervisor Bonus Program"). These Non-Insider Employees serve in operational supervisory roles related to airport, crew, cargo, and maintenance services, call centers, and warehouses. The payments under the Operational Supervisor Bonus Program are based on targets linked to short-term individual operational indicators, such as on-time performance, cost control and reduction, and reductions in baggage mishandling. The Debtors paid approximately $400,000 in 2023 under the Operational Supervisor Bonus Program and expect to pay approximately $600,000 in 2024 in two semiannual installments.

*v. Operational Reward Program*

41. Approximately 11,100 Non-Insider Employees in various operational roles related to airport, crew, cargo and maintenance services, call centers, and warehouses are eligible to

participate in the operational reward program (the "Operational Reward Program"). Payments under the Operational Reward Program are based on short-term operational targets, such as on-time performance, cost control and reduction, and reductions in baggage mishandling, that are reviewed semiannually (or quarterly, if needed). In 2023, the Debtors paid approximately $3.5 million under the Operational Reward Program and expect to pay approximately $7.3 million in 2024 in four quarterly installments.

**C. Paid Leave Obligations**

*i. Vacation Obligations*

42. Employees are entitled to paid vacation time (the "Vacation Obligations"). In some cases, eligibility for paid vacation requires completion of a probationary or minimum period of active service in the employment of the Debtors, as specified by the applicable collective bargaining agreements, individual agreements, or company policy. Employees accrue a specified number of vacation days or fraction of days, based on years of service, for each month of active service. To the extent required by the applicable collective bargaining agreement and/or applicable non-bankruptcy law, upon separation from the Debtors, an Employee may be entitled to a cash payment based on accrued but unused vacation time.

43. Below is a summary of the applicable Vacation Obligations in the jurisdictions in which the Debtors have Employees:

- Brazilian labor laws require employers to provide employees with thirty days of vacation per year, which cannot be rolled over, along with a vacation bonus equal to one-third of the Employees' monthly salary. The Debtors' Employees located in Brazil may cash out up to ten days of vacation time annually.
- The Debtors' Employees in Florida are similarly entitled to thirty days of vacation per year, which cannot be cashed out or rolled over.
- Employees in Argentina have differing numbers of vacation days based on the length of their employment pursuant to a collective bargaining agreement. For example, Employees who have worked for three years are entitled to

fifteen calendar days of vacation per year, while Employees who have worked for over twenty years are entitled to twenty-eight business days of vacation per year. Based on Argentinian labor laws, Employees can only take their vacation days during certain months out of the year. Further, Employees can roll over one-third of any vacation days not taken to the following year.

- Employees located in other jurisdictions, including Bolivia, Colombia, Mexico, Uruguay, Paraguay, and the Dominican Republic, are also entitled to vacation days, the number of which typically varies based on the length of employment.

44. The Debtors estimate that their average monthly cost on account of Vacation Obligations is approximately $3 million. Taking into account (i) the vacation time earned but unused as of the Petition Date and (ii) the amounts that would be earned postpetition, the Debtors estimate that, going forward, they may owe approximately $34 million to Employees on account of Vacation Obligations. Most of the Vacation Obligations do not involve a cash outlay for the Debtors, except for those Employees that may cash out vacation time.

*ii. Sick Leave Obligations*

45. In addition, under the applicable collective bargaining agreements, company policies, and/or applicable labor laws, Employees are entitled to paid sick leave (the "Sick Leave Obligations"). In most instances, the payment of Sick Leave Obligations is required by the applicable laws of the jurisdictions in which Employees are located. Sick leave benefits may be earned at various rates based on hours worked per month and may be carried forward from year to year, subject to the local labor laws and economic protections afforded employees in the various jurisdictions in which the Debtors operate.

46. For example, Brazilian labor laws require fifteen days of paid sick leave. Argentinian labor laws require up to one year of paid sick leave in certain circumstances. The Debtors also pay for sick leave for their Employees in Bolivia, Colombia, Mexico, Paraguay, the Dominican Republic, and Uruguay.

47. The Debtors estimate that the average monthly cost related to paid sick leave is approximately $20,000. The Debtors estimate that, as of the Petition Date, they owe approximately $20,000 in Sick Leave Obligations. The Sick Leave Obligations cannot be cashed out and therefore, do not require any cash outlay by the Debtors in addition to regular payroll.

*iii. Other Obligations*

48. Brazilian labor law requires additional obligations (the "Brazilian Labor Law Obligations"), including an annual Christmas bonus, known as the "thirteenth month salary." This is an additional months' salary, paid in two installments.

49. Employees are also paid for time off during certain holidays (collectively, the "Holiday Obligations" and together with the Vacation Obligations, Sick Leave Obligations, and Brazilian Labor Law Obligations, the "Paid Leave Obligations"). In Brazil and in other jurisdictions, the Debtors pay Employees for time off taken during holidays according to local labor laws.

50. The Debtors request authorization to continue honoring all prepetition and postpetition Paid Leave Obligations, in the ordinary course of business. The Debtors reserve the right to (a) prohibit Employees from cashing out, where applicable, any prepetition accrued Paid Leave Obligation benefits and (b) limit the amount paid to Employees on account of the Paid Leave Obligations. The Debtors also request that, in the event an Employee uses, or is paid cash on account of, his or her Paid Leave Obligations from and after the Petition Date, such vacation days, sick days, or holidays shall first be applied against vacation days, sick days, and holidays accruing postpetition and thereafter to vacation days, sick days, and holidays accruing prepetition.

**D. Workers' Compensation Plans**

51. The Debtors provide workers' compensation benefits and foreign equivalents to their Employees (the "Workers' Compensation Obligations"). These benefits are administered by the respective insurers (the "Workers' Compensation Plans") covering the countries in which Employees are located. Failure to maintain these benefits could result in administrative or legal proceedings and material fines against the Debtors and their officers and directors. As of the Petition Date, the Debtors provided benefits on account of Workers' Compensation Obligations to approximately four Employees. The Debtors estimate that they do not currently owe any amounts on account of Workers' Compensation Obligations as of the Petition Date.

52. The Debtors seek authority to continue paying any prepetition and all postpetition undisputed amounts on account of the Workers' Compensation Obligations, including, without limitation, any payments for workers' compensation claims, fees owed for administrative costs, and other amounts required in connection with the Debtors' workers' compensation programs, as such amounts become due in the ordinary course of the Debtors' business. The Debtors will continue contesting in good faith, as appropriate in the Debtors' business judgment, the disputed amounts on account of the Workers' Compensation Obligations.

**E. Employee Benefits**

53. The Debtors also maintain various plans and policies pursuant to which Employees are provided with health insurance, life insurance, and other benefits (collectively, the "Employee Benefits" and the amounts owed on account thereof, the "Employee Benefit Obligations"). The Debtors seek the authority, but not the direction, to (i) satisfy Employee Benefit Obligations relating to prepetition periods and (ii) continue providing Employee Benefits going forward.

54. The table below summarizes the approximate monthly cost of each of the Employee Benefit Obligations as well as the Debtors' estimate of the unpaid prepetition obligations associated with each category:

| Employee Benefit | Approx. Monthly Cost to Debtors | Approx. Amount Outstanding Prepetition |
|---|---:|---:|
| Health Insurance | $800,000 | $700,000 |
| Life Insurance | $10,000 | $10,000 |
| Meal Vouchers | $2.5 million | $2.1 million |
| Transportation Vouchers | $270,000 | $220,000 |
| Other Benefits | $20,000 | $20,000 |
| **Total:** | $3.6 million | $2.97 million |

55. The table below summarizes the types of benefits and the corresponding benefits provider based on the location of eligible Employees:

| Location of Eligible Employees | Type of Benefits | Benefits Provider |
|---|---|---|
| Brazil | Health Insurance | Bradesco |
| | | Central Nacional Unimed (CNU) |
| | | Unimed BH |
| | Life Insurance | Sul America |
| | Meal and Food Vouchers | Ben Visa Vale / CAJU |
| | Transportation Vouchers | Various |
| | Other Benefits | Various |
| Uruguay | Meal Vouchers | Luncheon Tickets SA |
| All locations | Travel Benefits | Not Applicable |

*i. Health Care Coverage and Life Insurance*

56. The Debtors provide primary health care coverage for their Employees, including coverage for certain medical expenses. The Debtors pay health care insurance premiums monthly.

57. The Debtors also provide basic life insurance to their Employees. The Debtors pay life insurance premiums monthly.

*ii. Meal and Transportation Vouchers*

58. The Debtors provide meal and transportation vouchers to their Brazilian Employees in accordance with local laws and collective bargain agreement requirements. The Debtors fund prepaid cards on a monthly basis that may be used by these Employees only for meals and transportation. Any unused amounts related to meal vouchers roll over to the next month.

*iii. Other Benefits*

59. Certain Employees who have been working for at least three months are also eligible for certain travel benefits (the "Travel Benefits"). Through the Travel Benefits, Employees may receive standby flight tickets to be used on the Debtors' flights. The Debtors incur no additional cost to provide this benefit, as the seats would otherwise be unoccupied.

60. The Debtors offer additional benefits to their Employees, including, but not limited to, childcare assistance, payroll loans, and gym memberships (together with the Travel Benefits, the "Other Benefits"). The Debtors estimate that, as of the Petition Date, they owed approximately $20,000 on account of the Other Benefits.

**F. Reimbursable Business Expenses**

61. As is customary for businesses comparable to the Debtors', the Debtors reimburse their Employees for certain expenses incurred in the performance of their duties. Reimbursable business expenses are ordinary course expenses that the Debtors' Employees incur in performing their job functions, such as, among others, expenses related to business trips, external meetings, and client visits, including items such as meals, transportation, laundry, accommodation, parking, and mileage (collectively, the "Reimbursable Business Expenses").

62. In incurring Reimbursable Business Expenses, Employees may use either their personal credit cards or prepaid cards issued to them by the Debtors. To be reimbursed for

business expenses charged to a personal card, the Employee must submit an expense report. Such expenses are typically approved in five days. The Employee is then reimbursed on the seventh, seventeenth, or twenty-seventh day of the month following approval. It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, Employees for such expenses.

63. The average monthly cost of Reimbursable Business Expenses is $160,000. The Debtors estimate that, as of the Petition Date, they owe approximately $150,000 account of Reimbursable Business Expenses.

**G. Employee Payroll Deductions and Payroll Tax Obligations**

64. Periodically, the Debtors are presented with garnishment or child support orders requiring withholding of certain amounts from an Employee's wages and remitting such amounts to the appropriate third parties (the "Garnishment Deductions"). The average amount withheld on account of the Garnishment Deductions per month is approximately $200,000. Payment of these obligations is made from amounts otherwise payable to the Employee and is not an incremental cost obligation of the Debtors' estates.

65. In addition, the Debtors are required by law to withhold from Employees' salaries and wages certain amounts related to various taxes, and to remit the same to the appropriate taxing authorities (the "Monthly Payroll Tax Obligations"). In Brazil, for example, the Debtors incur a portion of taxes related to the National Social Security Institute (*Instituto Nacional de Seguridade Social*, or "INSS") equal to 20% of Employee wages. The Debtors are also obligated to deduct between 7.5% and 14% (subject to a cap) from Employees' paychecks related to Employees' obligations to pay INSS taxes, as well as certain income taxes. Further, the Debtors are obligated to deposit the equivalent of 8% of each Brazilian Employee's monthly salary into a

special severance fund in the name of the Employee to be paid out to the Employee upon termination without cause, known as *Fundo de Garantia do Tempo e Serviço* (FGTS).

66. On average, the Debtors pay approximately $12 million in Monthly Payroll Tax Obligations. As of the Petition Date, the Debtors estimate that they owed approximately $9 million in Monthly Payroll Tax Obligations.[4]

67. Additionally, the Debtors owe additional taxes (i) pursuant to payment plans with the Brazilian federal government for certain INSS tax obligations with which amounts incurred are paid in monthly installments, extending up to sixty months and (ii) past due amounts for certain FGTS tax obligations (the "Deferred Payroll Tax Obligations" and together with the Monthly Payroll Tax Obligations, the "Payroll Tax Obligations"). The Debtors estimate that the monthly payments made pursuant to the payment plans amounts to approximately $3.1 million per month. As of the Petition Date, the Debtors estimate that they owed approximately $174 million in Deferred Payroll Tax Obligations.

**H. Severance Plans**

68. In some of the countries in which the Debtors operate, local laws require them to pay certain amounts to Employees when they are terminated without cause (the "Severance Obligations").

69. In Brazil, Employees may be terminated without cause, provided the Debtors provide sufficient notice or pay the Employees in lieu of such notice period. If a Brazilian Employee is terminated without cause whether or not notice is provided, the Debtors are required

---

[4] The Debtors have not yet been able to determine whether there are additional Payroll Tax Obligations outstanding as of the Petition Date. The Debtors seek permission to pay any subsequently determined undisputed amounts that may be due and owing.

to pay an additional 40% to the total FGTS balance. Upon termination, the Employee may access the FGTS funds.

70. In other jurisdictions, the Debtors abide by applicable local labor laws regarding severance plans. For example, in Argentina, similar to Brazil, Employees may be terminated without cause at any time so long as Employees receive sufficient notice (based on tenure) or are paid in lieu of such notice. In addition to any notice period payment, Employees receive one month's salary for each year of service. The Debtors do not pay their Employees severance in the United States.

71. The Debtors may also owe certain senior executives additional severance payments in the event of their termination based on their tenure and applicable non-compete agreements. The Debtors do not presently owe any amounts on account of such severance for senior executives.

72. The Severance Obligations arise in the ordinary course of the Debtors' business and their payment is necessary to sustain the morale of the Employees during these Chapter 11 Cases. The Debtors believe that continuation of the existing severance programs is advisable, but reserve the right to make modifications in the event such modifications become necessary or otherwise advisable in the Debtors' business judgment.

73. The Debtors cannot accurately estimate the amount of Severance Obligations that may become payable during the pendency of these Chapter 11 Cases. However, by way of example, the Debtors' recent average monthly cost in the last twelve months on account of Severance Obligations is approximately $170,000.

74. The Debtors request authority, but not direction, to continue honoring the Severance Obligations in the ordinary course of business and at their sole discretion, including

paying any amounts that accrued prepetition. To the extent that severance is payable pursuant to an employment agreement, the Debtors do not seek, by this Motion, to either make such payment or assume such agreement. The Debtors will not make any severance payments to Insiders other than in full compliance with section 503(c)(2) of the Bankruptcy Code.

## BASIS FOR RELIEF

### A. The Debtors Are Authorized to Continue Their Employee Programs Postpetition in the Ordinary Course of Business.

75. The Debtors believe that maintaining their Employee Programs and making payments related thereto postpetition fall within the ordinary course of their business and are therefore authorized by section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The Debtors believe that any action to supplement, modify, extend, or reduce any of the Employee Programs is likewise in the ordinary course. However, the Debtors have included a request to continue the Employee Programs going forward out of an abundance of caution.

### B. The Debtors Should Be Authorized to Pay Prepetition Employee Obligations.

76. Courts generally acknowledge that it is proper to authorize the payment of prepetition obligations in appropriate circumstances. *See, e.g.*, *GLM DFW, Inc. v. Windstream Holdings Inc. (In re Windstream Holdings, Inc.)*, 614 B.R. 441, 456 (S.D.N.Y. 2020) (citing *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989)) (recognizing existence of judicial power to authorize debtor in reorganization case to pay prepetition claims where such payment "is essential to the continued operation of the debtor"); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien

claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories rooted in sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

77. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors-in-possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

78. Additionally, the Court may grant the authority to pay or otherwise honor prepetition Employee Obligations under section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) and noting that relief is appropriate where payment is needed for the debtor to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); *see also Armstrong*, 29 B.R. at 397 (relying on section 363

to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). The business judgment standard only requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.

79. In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See Windstream*, 614 B.R. at 456–57; *Ionosphere Clubs*, 98 B.R. at 175–76. Courts may also use their equitable powers to authorize payment of prepetition obligations pursuant to the "necessity of payment" doctrine (also referred to as the "doctrine of necessity"). *Ionosphere Clubs*, 98 B.R. at 176; s*ee also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991).

80. The Debtors submit that the payment of the Employee Obligations represents a sound exercise of their business judgment, is necessary to avoid immediate and irreparable harm to their estates, and is therefore justified under sections 105(a), 363(b), 1107, and 1108 of the Bankruptcy Code, as well as the doctrine of necessity. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment

opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering their ability to operate their business and likely diminishing stakeholder confidence in the Debtors' ability to successfully reorganize.

81. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting (and value destructive) at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, the Debtors must retain their workforce by, among other things, continuing to honor all Employee Obligations.

82. In addition, Employees expect and require their wages to arrive on a timely basis. The majority of Employees rely exclusively on their compensation and benefits to satisfy their daily living expenses. Failure to satisfy such obligations will cause Employees undue hardship and jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' business and when the Debtors need Employees to perform their jobs at peak efficiency. Employee attrition would be severely disruptive to the Debtors' operations and force the Debtors to incur additional expenses to find appropriate and experienced replacements at this critical juncture.

83. Furthermore, if this Court does not authorize the Debtors to honor their Employee Benefit Obligations, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied. Consequently, Employees will be exposed to significant hardship if the Debtors are not permitted to honor their obligations to the Employees.

84. Moreover, Brazilian labor laws allow the Debtors' Brazilian Employees to file labor lawsuits against the Debtors demanding payment for any unpaid labor right at any time

during their employment. Given the limited fees for counsel and the abundance of representatives who specialize in filing small claims against Brazilian employers, there are limited barriers to filing lawsuits, so many labor lawsuits are filed against the Debtors in Brazilian courts on a regular basis. To avoid such litigation, the Debtors should be authorized to pay prepetition Employee Obligations.

85. Similar relief has been granted by courts in this District in large chapter 11 cases, including in cases involving airlines. *See, e.g.*, *In re Benitago Inc.*, No. 23-11394 (SHL) (Bankr. S.D.N.Y. Sept. 28, 2023) [ECF No. 68] (final order authorizing debtors to pay prepetition wages); *In re Voyager Aviation Holdings, LLC*, No. 23-11177 (JPM) (Bankr. S.D.N.Y. Sept. 1, 2023) [ECF No. 151] (same); *In re SAS AB*, No. 22-10925 (MEW) (Bankr. S.D.N.Y. Aug. 4, 2022) [ECF No. 175] (same); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. June 17, 2020) [ECF No. 291] (same); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG) (Bankr. S.D.N.Y. June 28, 2020) [ECF No. 392] (same). Thus, this Court should grant the relief requested herein.

### C. Certain Claims on Account of the Employee Obligations Are Entitled to Priority Treatment Under the Bankruptcy Code.

86. Additionally, Employee Obligations related to compensation and health benefits are entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code up to a statutory cap of $15,150 per Employee. The Debtors are also required to pay priority claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B). Thus, the Employee Obligations will, in all events, have to be paid in full before unsecured claims may receive a distribution. Thus, the relief sought herein with respect to these Employee Obligations affects only the timing of payment and does not have any negative impact on recoveries of general

unsecured creditors. Indeed, the Debtors submit that payment of these Employee Obligations at this time only enhances the value of their estates for the benefit of all stakeholders.

**D. Payment of Certain Employee Obligations Is Required by Law.**

87. The Debtors also seek authority to pay the Payroll Tax Obligations and Garnishment Deductions to the appropriate third-party payees. Governments and judicial authorities mandate that such amounts be deducted from Employees' wages and to pay such amounts to the appropriate taxing authority. *See, e.g.*, 26 U.S.C. §§ 6672, 7501(a). Further, these obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes). Because the Payroll Tax Obligations and Garnishment Deductions are not property of the Debtors' estates, the Debtors request authorization to transmit these amounts to the proper parties in the ordinary course of business.

88. Similarly, federal, state, and applicable foreign laws require the Debtors to maintain the Workers' Compensation Plans. If the Debtors fail to maintain the Workers' Compensation Plans, the Debtors may be prohibited from operating in the applicable jurisdictions. Payment of all obligations related to the Workers' Compensation Plans is therefore crucial to the Debtors' continued operations and the success of these Chapter 11 Cases.

89. In addition, local labor laws and legal requirements in various jurisdictions in which the Debtors operate outside of the United States may require the payment of various employee obligations, even in the event of insolvency. Accordingly, non-payment of the vast majority of the Employee Obligations would not only result in disastrous consequences for the

Debtors in terms of business disruption and employee morale, it would also likely violate multiple local labor laws and legal requirements.

**E. The Court Should Authorize and Direct Banks and Other Financial Institutions to Honor and Pay Checks Issued and Make Other Transfers to Pay Employee Obligations.**

90. As a result of the commencement of these Chapter 11 Cases, and in the absence of an order of the Court providing otherwise, the Debtors' checks, wire transfers, and direct deposit transfers on account of the Employee Obligations may be dishonored or rejected by the Debtors' banks and other financial institutions (collectively, the "Disbursement Banks"). The Debtors request that the Court authorize and direct the Disbursement Banks to honor and pay all prepetition and postpetition checks issued or to be issued, and fund transfers requested or to be requested, by the Debtors on account of the Employee Obligations that were not honored or paid as of the Petition Date. The Debtors also seek authority to issue new postpetition checks, or initiate new fund transfers, on account of the Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

91. The Debtors represent that each of these checks or transfers is or will be drawn on the Disbursement Accounts and can be identified as relating directly to the payment of the Employee Obligations. Accordingly, the Debtors believe that prepetition checks and transfers other than those for Employee Obligations will not be honored inadvertently.

92. Authorization to pay amounts on account of the Employee Obligations shall not be deemed to constitute postpetition assumption or adoption of any contract, program, or policy pursuant to section 365 of the Bankruptcy Code. The Debtors are in the process of reviewing these matters and reserve all their rights with respect thereto. Moreover, authorization to pay all amounts on account of Employee Obligations shall not affect the Debtors' right to contest the

amount or validity of any Employee Obligations, including, without limitation, the Payroll Tax Obligations that may be due to any domestic or foreign taxing authority.

## RESERVATION OF RIGHTS

93. Nothing contained herein is intended to be or shall be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' right to dispute any claim; or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission to the validity of any claim or waiver of the Debtors' rights to dispute such claim subsequently.

## BANKRUPTCY RULE 6003 IS SATISFIED AND REQUEST FOR WAIVER OF STAY

94. The Debtors further submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein and in the First Day Declaration, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

95. Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

Fed. R. Bankr. P. 6003.

96. As described herein, any delay in paying the Employee Obligations will adversely impact the Debtors' relationship with the Employees and will irreparably impair the Employees'

morale, dedication, confidence, and cooperation. Employee support for the Debtors' reorganization efforts is critical. At this early stage, the Debtors simply cannot risk the substantial damage to their business that would inevitably attend any decline in the Employees' morale (and inevitable subsequent attrition) attributable to the Debtors' failure to pay wages, salaries, benefits, and similar items. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and therefore, Bankruptcy Rule 6003(b) is satisfied.

97. The Debtors further seek a waiver of any stay of the effectiveness of an order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtors' operations, going concern value, and their efforts to pursue a resolution to these Chapter 11 Cases.

98. Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

**NOTICE**

99. The Debtors will provide notice of this Motion to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the U.S. Trustee for the Southern District of New York; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (d) the Office of the U.S. Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the Federal

Aviation Administration; (h) the Disbursement Banks; and (i) any party that has requested service pursuant to Bankruptcy Rule 2002.

100. In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

**NO PRIOR REQUEST**

101. No prior request for the relief sought in this Motion has been made to this or to any other court.

[*Remainder of page intentionally left blank*]

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Interim Order and Final Order granting the relief requested herein and granting such other relief as is just and proper.

Dated: New York, New York
January 25, 2024

**MILBANK LLP**

*<u>/s/ Evan R. Fleck</u>*

Evan R. Fleck
Andrew C. Harmeyer
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter
**MILBANK LLP**
1850 K St NW, Suite 1100,
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Proposed Counsel for Debtors and Debtors-in-Possession*

# EXHIBIT A

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,[1] | : | Case No. 24-10118 (MG) |
| Debtors. | : | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) MAINTAIN EMPLOYEE PROGRAMS IN THE ORDINARY COURSE AND (B) PAY PREPETITION EMPLOYEE OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above-captioned Debtors, seeking entry of an interim order pursuant to sections 105(a), 363, and 507 of the Bankruptcy Code (i) authorizing the Debtors to (a) maintain their Employee Programs in the ordinary course of business and (b) pay prepetition obligations related thereto and (ii) granting related relief, all as described more fully in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and it appearing that venue of these Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. §

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

157(b); and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the Motion and the First Day Declaration; and upon the statements of counsel in support of the relief requested in the Motion at the hearing before the Court; and all of the proceedings had before the Court; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

1. On an interim basis, the Motion is GRANTED to the extent set forth herein.

2. The Final Hearing shall be held on _________, 2024, at__:__ _.m., prevailing Eastern Time. Any objections to the granting of the relief granted herein on a final basis or other responses to the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _________, 2024, and shall be served on: (a) the Office of the United States Trustee for the Southern District of New York, (b) the Debtors, (c) proposed counsel to the Debtors, (d) counsel to any statutory committee appointed in these cases, and (e) those parties requesting notice pursuant to Bankruptcy Rule 2002. In the event no objections to entry of a final order are timely received, this Court may enter the Final Order without conducting the Final Hearing.

3. The Debtors are authorized, but not directed, (i) to pay and/or honor the Employee Obligations that become due and owing in the ordinary course of business and consistent with past practices in an amount not to exceed $93 million and (ii) to continue their practices and policies with respect to the Employee Programs as such practices and policies were in effect as of the Petition Date, and as such programs may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors’ business.

4. The Debtors are also authorized, but not directed, to pay the prepetition Employee Obligations without further order of the Bankruptcy Court; *provided*, *however*, that notwithstanding any other provision of this Interim Order, prior to entry of the Final Order, the Debtors shall not pay to any Employee or Outsourced Company any amounts on account of prepetition compensation obligations in excess of $15,150 or that otherwise exceed the amounts set forth in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code.

5. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Plan in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Plan and pay all prepetition amounts relating thereto in the ordinary course. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Plan.

6. No payment to any Employee, Outsourced Company, or other party may be made pursuant to this Interim Order to the extent that it is a transfer in derogation of section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code under a separate motion.

7. The Debtors are authorized to forward any unpaid amounts on account of Payroll Tax Obligations or any other funds collected on behalf of a third party to the appropriate taxing authorities or other recipients in accordance with the Debtors' prepetition policies and practices.

8. Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

9. All applicable Disbursement Banks and other financial institutions are authorized and directed, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor, and pay any and all prepetition and postpetition checks issued or to be issued, and fund

transfers requested or to be requested, by the Debtors on account of the prepetition Employee Obligations that were not honored or paid as of the Petition Date, whether those checks were presented or fund transfers requested prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

10. Nothing contained in the Motion or this Interim Order, nor any payment made pursuant to the authority granted by this Interim Order, shall constitute or be construed as (a) an implication or admission as to the validity of any claim against the Debtors or a waiver of the obligation of any claimant to file a proof of claim, (b) a promise to pay any claim or a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action, (d) a concession by the Debtors that any lien (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved), or (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code or as affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

11. Notwithstanding the relief granted in this Interim Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any interim or final order entered by the Court approving the Debtors' entry into any postpetition debtor in possession financing facility, and any budget or cash flow forecasts in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith (in either case, the "DIP Order"). To the extent that there is any inconsistency between the terms of the DIP Order (if any) and any action taken or proposed to be taken hereunder, the

terms of the DIP Order (if any) shall control. Nothing contained in this Order shall constitute an approval or grant of authority to use cash collateral.

12. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party.

13. This Interim Order is effective from the date of entry through this Court's disposition of the Motion on a final basis; *provided* that the Court's ultimate disposition of the Motion on the final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

14. Bankruptcy Rule 6003(b) has been satisfied because the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

15. Notwithstanding any applicability of Bankruptcy Rule 6004, this Interim Order shall be immediately effective and enforceable upon its entry.

16. The Debtors are authorized and empowered to take all actions necessary to implement the relief requested in this Interim Order.

17. This Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the implementation of this Interim Order.

Dated: ____________________, 2024
New York, New York

____________________________________
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

**Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,[1] | : | Case No. 24-10118 (MG) |
| Debtors. | : | (Joint Administration Requested) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) MAINTAIN EMPLOYEE PROGRAMS IN THE ORDINARY COURSE AND (B) PAY PREPETITION EMPLOYEE OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] of the above-captioned Debtors, seeking entry of a final order pursuant to sections 105(a), 363, and 507 of the Bankruptcy Code (i) authorizing the Debtors to (a) maintain their Employee Programs in the ordinary course of business and (b) pay prepetition obligations related thereto and (ii) granting related relief, all as described more fully in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and it appearing that venue of these Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. §

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

2 Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

157(b); and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the Motion and the First Day Declaration; and upon the statements of counsel in support of the relief requested in the Motion at the hearing before the Court; and all of the proceedings had before the Court; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED on a final basis.

2. The Debtors are authorized, but not directed, (i) to pay and/or honor the Employee Obligations that become due and owing in the ordinary course of business and (ii) to continue their practices and policies with respect to the Employee Programs as such practices and policies were in effect as of the Petition Date, and as such programs may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business.

3. The Debtors are also authorized, but not directed, to pay the prepetition Employee Obligations without further order of the Bankruptcy Court.

4. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Plan in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Plan and pay all prepetition amounts relating thereto in the ordinary course. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Plan.

5. No payment to any Employee, Outsourced Company, or other party may be made pursuant to this Final Order to the extent that it is a transfer in derogation of section 503(c) of the

Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code under a separate motion.

6. The Debtors are authorized to forward any unpaid amounts on account of Payroll Tax Obligations or any other funds collected on behalf of a third party to the appropriate taxing authorities or other recipients in accordance with the Debtors' prepetition policies and practices.

7. All applicable Disbursement Banks and other financial institutions are authorized and directed, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor, and pay any and all prepetition and postpetition checks issued or to be issued, and fund transfers requested or to be requested, by the Debtors on account of the prepetition Employee Obligations that were not honored or paid as of the Petition Date, whether those checks were presented or fund transfers requested prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

8. Nothing contained in the Motion or this Final Order, nor any payment made pursuant to the authority granted by this Final Order, shall constitute or be construed as (a) an implication or admission as to the validity of any claim against the Debtors or a waiver of the obligation of any claimant to file a proof of claim, (b) a promise to pay any claim or a waiver of the Debtors' rights to dispute the amount of, basis for, or validity of any claim against the Debtors, (c) a waiver of any claims or causes of action, (d) a concession by the Debtors that any lien (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved), or (e) an approval, assumption, adoption, or rejection of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code or as affecting the

Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.

9. Notwithstanding the relief granted in this Final Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any interim or final order entered by the Court approving the Debtors' entry into any postpetition debtor in possession financing facility, and any budget or cash flow forecasts in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith (in either case, the "DIP Order"). To the extent that there is any inconsistency between the terms of the DIP Order (if any) and any action taken or proposed to be taken hereunder, the terms of the DIP Order (if any) shall control. Nothing contained in this Order shall constitute an approval or grant of authority to use cash collateral.

10. Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party.

11. Notwithstanding any applicability of Bankruptcy Rule 6004, this Final Order shall be immediately effective and enforceable upon its entry.

12. The Debtors are authorized and empowered to take all actions necessary to implement the relief requested in this Final Order.

13. This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Final Order.

Dated: ____________________, 2024
New York, New York

____________________________________
UNITED STATES BANKRUPTCY JUDGE