Evan R. Fleck
Andrew C. Harmeyer
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Andrew M. Leblanc
Erin E. Dexter
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Proposed Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,[1] | : | Case No. 24-10118 (MG) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

-------------------------------------------------------------x

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING
CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES, (D) MODIFYING THE AUTOMATIC STAY, (E) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (F) SCHEDULING
A FINAL HEARING AND (G) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") state

as follows in support of this motion (the "Motion"):

## PRELIMINARY STATEMENT

1.      The proposed DIP Facility is the result of a robust, pre-petition marketing process,

is the best financing option available to the Debtors, and is critical to ensuring that the Debtors

will have the liquidity necessary to continue their operations and have the opportunity to use the

Chapter 11 process to successfully reorganize.

2.      The proposed DIP Facility will provide $950 million of committed new money

postpetition financing, including $350 million upon entry of the Interim Order.  Such financing

will ensure the Debtors' ongoing ability to pay their employees, who are critical to the business,

aircraft counterparties, and other key vendors and counterparties and, thereby, maintain their

ability to continue flights and expeditiously exit the protection of the Court when circumstances

permit.

3.      The Debtors conducted a robust, competitive marketing process and ultimately

selected the DIP Facility offered by members of an *ad hoc* group (the "Abra Ad Hoc Group") of

Abra Noteholders (defined below) and additional Abra Noteholders (collectively, the "Backstop

Noteholders").  During this process, the Debtors solicited financing proposals from over twenty

potential sources of capital, obtained financing proposals from multiple parties, and ultimately

concluded that the DIP Facility presents the most favorable pricing and terms, has the greatest

2

certainty of execution, and provides the best opportunity for the Debtors to successfully reorganize. As further described in the Luth Declaration (defined below), the DIP Facility is the culmination of: (a) arm's-length, good-faith negotiations between the Debtors and the Backstop Noteholders and (b) the Debtors' reasonable and informed determination that the Backstop Noteholders offered the most favorable terms on which to obtain vital postpetition financing.

4.      Because the Debtors were unable to obtain DIP financing on an unsecured basis, the Debtors were required to obtain financing secured by liens on substantially all of their assets, including "priming" liens on certain collateral, including the intellectual property of GOL Linhas Aereas Inteligentes S.A. and GOL Linhas Aereas S.A. and the Smiles loyalty program business. Importantly, the priming aspect of the DIP Facility is fully consensual and the Debtors need not engage in an expensive, uncertain, and time consuming priming dispute to incur the DIP Facility.

5.      The Debtors firmly believe that the DIP Facility will maximize value for their stakeholders and is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the DIP Orders.

## **RELIEF REQUESTED**

6.      The Debtors seek entry of an interim order (the <u>Interim Order</u>")[2] and a final order (the "<u>Final Order</u>" and together with the Interim Order, the "<u>DIP Orders</u>") (i) authorizing the debtors to obtain superpriority, debtor-in-possession ("<u>DIP </u>") financing in the aggregate amount of up to $950 million (the "<u>DIP Facility</u>") pursuant to the Commitment Letter, dated January 25, 2024, attached hereto as **Exhibit A** (the "<u>Commitment Letter</u>", including all annexes and exhibits thereto (including the term sheet attached as Annex C thereto (the "<u>Term Sheet</u>")); (ii) granting

---

[2]     The Debtors continue to negotiate the proposed Interim Order with the relevant parties, and have filed this Motion now in order to provide as much notice as possible of the proposed DIP Facility and the relief requested herein.

liens and providing superpriority administrative expense status to the DIP Facility; (iii) granting adequate protection to prepetition secured parties; (iv) modifying the automatic stay; (v) authorizing the Debtors to use cash collateral; (vi) scheduling a hearing to consider approval of the Motion on a final basis (the "<u>Final Hearing</u>"); and (vii) granting related relief.  The Debtors request that this Court schedule the Final Hearing within approximately twenty-five days from the Petition Date.  In support of this Motion, the Debtors rely on the *Declaration of John E. Luth in Support of Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection to the Prepetition Secured Parties, (D) Modifying the Automatic Stay, (E) Authorizing the Debtors to use Cash Collateral, (F) Scheduling a Final Hearing and (G) Granting Related Relief* (the "<u>Luth Declaration</u>"), submitted substantially contemporaneously herewith, and the First Day Declaration (defined below):[3]

### **<u>JURISDICTION</u>**

7.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012.

8.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The bases for the relief requested herein are sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506 and 507 of title 11

---

[3]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Commitment Letter and the Luth Declaration, as applicable.

of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004(a), 6004(h), 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Bankruptcy Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the Southern District of New York (the "<u>Local Rules</u>").

## STATUS OF THE CASE

11.     On January 25, 2024 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

12.     Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     No creditors' committee has yet been appointed in these cases (the "<u>Chapter 11 Cases</u>").  No trustee or examiner has been appointed.

14.     The Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

## BACKGROUND

15.     The Debtors (collectively, "<u>GOL</u>" or the "<u>Company</u>") are the leading low-cost airline in South America and one of Brazil's largest domestic carriers.  Having pioneered the low-cost carrier model in South America upon its founding in 2000, GOL has grown to include over 14,000 employees, a fleet of 141 aircraft, and an extensive flight network focused on routes within Brazil and South America more broadly.  GOL's flight network also includes destinations in the United States and the Caribbean.

16.     Despite a viable operating business, the Company has faced financial challenges brought on by the lingering effects of the COVID-19 pandemic, during which GOL, like all airlines globally, suffered unprecedented disruption to its business.  The substantial decline in air travel

demand, resulting operational impediments, and dramatic reduction in revenue and cash generation during the pandemic years led to a significant deterioration of the Company's balance sheet and liquidity.

17.     The Debtors have executed certain transactions and undertaken a number of other efforts to address these financial headwinds, many of which have provided temporary relief and much-needed liquidity at key points in time.   Several post-pandemic factors, however, have nonetheless continued to cause liquidity shortages for GOL, including elevated fuel prices, the consistently low valuation of the Brazilian real (BRL) against the U.S. dollar and, more recently, delays in the delivery of new aircraft.  The delays in new aircraft deliveries in particular have led to a significant increase in GOL's operating costs and maintenance expenditures which, in turn, have reduced operating capacity.   These temporary operational limitations have significantly hampered the Company's ability to generate cash, thereby leading to further operational challenges.

18.     As a result, GOL commenced these Chapter 11 Cases to deleverage its balance sheet, improve liquidity, obtain an organized and efficient forum in which to reach agreements with key stakeholders, and emerge as a stronger enterprise.

19.     Further information regarding GOL's business, capital structure, the circumstances leading to the commencement of these Chapter 11 Cases, and the facts and circumstances supporting the relief requested in this Motion is set forth in the *Declaration of Joseph W. Bliley in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [Docket No. 11].

## PREPETITION SECURED INDEBTEDNESS

20.     As more fully set forth in the First Day Declaration, as of December 31, 2023, on a consolidated basis, the Debtors' balance sheet reflected assets and liabilities of approximately $3.5

billion and $8.3 billion, respectively. The Debtors' liabilities include approximately $4.2 billion of outstanding funded indebtedness, of which approximately $2.1 billion (or 50%) was secured by certain assets of the Debtors. The Debtors' secured financings encumber a substantial portion of their assets. An overview of certain of the Debtors' prepetition secured indebtedness related to the priming aspect of the DIP Facility follows:

### A.    Prepetition 8.00% Senior Secured Notes Due 2026

21.    On December 23, 2020, pursuant to the 2026 SSN Indenture,[4] GOL Finance issued $200 million in aggregate principal amount of senior secured notes (the "2026 SSNs"), which bear interest of 8% per annum. On May 6, 2021 and on September 23, 2021, the Debtors issued $300 million and $150 million in aggregate principal amount of additional 2026 SSNs, respectively. The 2026 SSNs are secured by a fiduciary assignment[5] of certain trademarks and intellectual property of GOL and (not including the Smiles loyalty program IP and other Smiles Collateral) and certain spare parts (collectively, the "2026 SSNs Collateral") and will mature on June 30, 2026. As of the Petition Date, the aggregate principal amount of the 2026 SSNs outstanding is approximately $251,170,000.

---

[4]    "2026 SSN Indenture" means that certain Indenture, dated as of December 23, 2020 and as supplemented on March 2, 2023, by and among (a) GOL Finance, (b) the guarantors party thereto, (c) The Bank of New York Mellon, as trustee, registrar, transfer agent and paying agent (in such capacities, the "2026 SSN Trustee"), and TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "2026 SSN Collateral Agent", together with the 2026 SSN Trustee, the "2026 SSN Agents"), attached hereto as **Exhibit B**, as supplemented by the First Supplemental Indenture attached hereto as **Exhibit C**.

[5]    A fiduciary assignment is a type of secured interest in collateral under Brazilian law.

B.    **Prepetition 18.00% Senior Secured Notes Due 2028 and Prepetition 18.00% Exchangeable Senior Secured Notes Due 2028**

22.    On March 2, 2023, in connection with the Abra Transaction,[6] GOL Finance issued to Abra Global Finance ("AGF") an aggregate principal amount of $896,664,000 of senior secured notes maturing in 2028 (the "2028 SSNs"). The 2028 SSNs accrue interest at the rate of 18.00% per annum, comprising 4.50% cash interest and 13.50% PIK interest. From March 2023 to September 2023, the principal amount of the 2028 SSNs increased to a total of $1,292,879,000 through cash disbursements from Abra to the Debtors[7] and the capitalization of accrued PIK interest.

23.    The 2028 SSNs are secured by a fiduciary assignment[8] of (i) certain intellectual property and other assets related to the Smiles loyalty program, intercompany claims, loans and obligations, and all shares of Smiles Fidelidade S.A. (collectively, the "Smiles Collateral"), and (ii) on a *pari passu* basis, the 2026 SSNs Collateral (the "Pari Passu Collateral" and, together with the Smiles Collateral, the "Shared Collateral"). Pursuant to a pledge agreement, GOL Finance, GOL Equity, Parent, GOL Linhas Aéreas S.A., and Smiles Fidelidade S.A. (the "Abra Notes Pledgors") pledged to the Abra Notes Collateral Agent a security interest in all of the Abra Notes Pledgors' right, title, and interest in the Shared Collateral.

24.    In September 2023, as contemplated by the Abra Transaction, $1,180,442,000 in principal amount of the 2028 SSNs were exchanged for the same principal amount of senior

---

[6]    "Abra Transaction" means the transaction in March 2023, whereby Abra Group Limited ("Abra") closed a private placement with investors in Abra and concurrently closed Abra's private investment in GOL Linhas Aéreas Inteligentes S.A. ("Parent"), as further described in the First Day Declaration.

[7]    The 2028 SSNs provide that certain intercompany transfers from Abra to GOL may take the form of additional 2028 SSNs issued, thereby increasing the balance.

[8]    A fiduciary assignment is a type of secured interest in collateral under Brazilian law.

secured exchangeable notes due 2028 issued by GOL Equity (the "2028 ESSNs"). The 2028 ESSNs carry substantially identical interest and security terms as the 2028 SSNs. The 2028 ESSNs, however, are also exchangeable into preferred shares of Parent, subject to certain conditions. AGF holds all outstanding 2028 SSNs and 2028 ESSNs. As of the Petition Date, the aggregate principal amount of 2028 SSNs and 2028 ESSNs outstanding is $270,093,000 and $1,207,445,000, respectively.

25.    Through the Abra Transaction, AGF issued the Abra Notes[9] to international bond investors (principally to members of the Abra Ad Hoc Group). In exchange for these Abra Notes, the Abra Noteholders provided cash and tendered, at a substantial discount, their holdings of GOL bonds. Abra, then, in exchange for GOL privately placing the 2028 SSNs with Abra, enabled GOL to retire nearly $1.1 billion in near-term obligations through Abra's purchase at an average price of 71% of face value of GOL debt and provided the Debtors over $400 million in much-needed liquidity with which to address pressing obligations. Under the DIP Facility, after the Final Funding (defined below) has occurred, Abra will be repaid, as a component of its adequate protection package, $15,000,000 for a bridge loan it provided to the Debtors shortly before the Petition Date.

---

[9]    "Abra Notes" means the notes issued pursuant to the Indentures, each dated as of March 2, 2023, among (a) AGF, as issuer, (b) Abra, as guarantor, (c) the Bank of New York Mellon, as trustee, registrar, paying agent and transfer agent (in such capacities, the "Abra Notes Trustee"), and (d) TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent (the "Abra Notes Collateral Agent", together with the Abra Notes Trustee, the "Abra Notes Agents").

### C.    Intercreditor Agreement and Consent to Priming

26.    In accordance with the Intercreditor Agreement,[10] "the Collateral Agent shall act solely at the direction of the Trustees, on behalf of the Controlling Secured Parties."[11]  The Intercreditor Agreement's definition of "Controlling Secured Parties" states in relevant part that, at any time, "Secured Parties that at such time collectively hold (or represent) more than fifty percent (50%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class[,]" constitute the "Controlling Secured Parties" and may instruct the Collateral Agent.[12]  "Pari Passu Obligations" means the 2026 SSNs and any notes having *pari passu* priority with respect to the Pari Passu Collateral with the 2026 SSNs, which currently are the 2028 SSNs and 2028 ESSNs.[13]

27.    Accordingly, the Intercreditor Agreement provides that, with respect to the Pari Passu Collateral, the 2026 SSN Collateral Agent shall act at the direction of holders of more than 50% of the obligations, in aggregate, under the 2026 SSNs, the 2028 SSNs, and the 2028 ESSNs. Pursuant to these provisions, the Controlling Secured Party has consented to the priming contemplated herein, and the Debtors have also received the requisite consent to priming under the 2028 SSN Note Purchase Agreement[14] and 2028 ESSN Note Purchase Agreement.[15]

---

[10]    "Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of March 2, 2023, and as amended and restated as of September 29, 2023, by and among GOL Finance, GOL Equity Finance, Parent, Tmf Brasil Administração E Gestão De Ativos Ltda., and The Bank of New York Mellon, attached hereto as **Exhibit D**.

[11]    *See* Intercreditor Agreement § 3.02(c).  "Trustees" is defined as the trustee for the 2026 SSNs and the trustee for the 2028 SSNs and 2028 ESSNs.  *Id.* § 1.01.

[12]    *See* Intercreditor Agreement § 1.01.

[13]    *See* 2026 SSN Indenture § 1.01 (Additional Pari Passu Obligations).

[14]    "2028 SSN Note Purchase Agreement" means that certain Senior Secured Note Purchase Agreement, dated as of March 2, 2023, among (a)  GOL Finance, as issuer, (b) the guarantors party thereto, (c) Abra and AGF, as purchasers, and (d) TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent (in such capacity, the "2028 SSN/ESSN Collateral Agent"), attached hereto as **Exhibit E**.

[15]    "2028 ESSN Note Purchase Agreement" means that certain Senior Secured Exchangeable Note Purchase Agreement, dated as of September 29, 2023, among (a) GOL Equity, as issuer, (b) the guarantors party thereto

## CONCISE STATEMENTS REGARDING DIP FACILITY
## PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2[16]

28.     The DIP Facility has been properly evaluated, marketed, and vetted by the Debtors'

independent and disinterested members of the board of directors of Parent (the "Board").  Given

the possibility that Abra would participate in the DIP financing and that the Board included

designees of Abra, the Board, on advice of counsel, implemented measures to make certain that

the Abra designees did not receive information, or participate in deliberations, regarding issues

that might advantage Abra in any negotiations with the Debtors.  Instead, the independent directors

of the Board negotiated with Abra on behalf of the Debtors, and the Abra designees on the Board

were excluded from any discussions during the DIP process that the independent directors

determined, with advice of counsel, might provide Abra with an advantage in negotiations with

the Debtors.

29.     The following chart contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Issuer**<br>Bankruptcy Rule<br>4001(c)(1)(B) | GOL Finance (the "Issuer"). | Term Sheet;<br>"Issuer" (p. 1) |

---

(c) Abra and AGF, as purchasers, and (d) the Prepetition GOL SSN/ESSN Collateral Agent, attached hereto as **Exhibit F**.

[16]  The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the Term Sheet and/or the Interim Order, as applicable.  To the extent there are any inconsistencies between this summary and the provisions of the Term Sheet, DIP Documents or the Interim Order, the provisions of the Term Sheet, Interim Order or the other DIP Documents, as applicable, shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the Term Sheet. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2 herein.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Collateral Agent** | TMF Group New York, LLC or other agent as determined by the Required DIP Noteholders. | Term Sheet; "Collateral Agent" (p. 1) |
| **Trustee** | GLAS. | Term Sheet; "Trustee" (p. 1) |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Each of the other Debtors, other than (i) Capitânia Air Fundo De Investimento Multimercado Crédito Privado Investimento No Exterior and (ii) Sorriso Fundo De Investimento Em Cotas De Fundos De Investimento Multimercado Crédito Privado Investimento No Exterior (the "Guarantors" and, together with the Issuer, the "DIP Notes Parties"). | Term Sheet; "Guarantors" (p. 1) |
| **DIP Noteholders** Bankruptcy Rule 4001(c)(1)(B) | Following the Interim DIP Order Funding Date, each holder of Abra Notes shall have the opportunity to provide a commitment in respect of the DIP Facility in an amount equal to such Abra Bondholder's respective ratable portion of the principal amount of its Abra Notes to the principal amount of the Abra Notes held by all Backstop Parties at such time in accordance with the terms, requirements and procedures set forth in the Commitment Letter (the "Abra Bondholder DIP Facility Election"). All interest accruing on the DIP Facility held by an Initial Commitment Party (as defined in the Commitment Letter) prior to effectiveness of an Additional Commitment (as defined in the Commitment letter) shall be retained by such Initial Commitment Party. All interest accruing on the DIP Facility held by a Backstop Party prior to the consummation of the Abra Noteholder DIP Facility Election shall be retained by such Backstop Party and is not subject to the Abra Noteholder DIP Facility Election. | Term Sheet; "DIP Noteholders" (p. 1-2) |
| **Amount, Type, and Availability** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(1) | A superpriority senior secured priming DIP financing in an aggregate principal amount up to $950 million (the "Total DIP Amount", and any notes issued thereunder, collectively, the "DIP Notes"), subject to the terms and conditions in the Term Sheet, of which (i) up to $350 million shall be provided upon entry by the Bankruptcy Court of the Interim Order, initially in the form of term loans and subsequently refinanced by the issuance of DIP Notes under a note purchase agreement (the "Interim DIP Order Funding"), subject to the satisfaction of the conditions precedent for the Closing Date set forth in the Term Sheet (including the effectiveness of the subordination agreement referenced in clause (viii) of the section titled "Conditions Precedent" in the Term Sheet) and under the DIP Documents, which Interim DIP Order Funding shall be provided by the Initial Commitment Parties as set forth in the Commitment Letter; (ii) up to another $150 million shall be issued upon entry of the Final Order (the "Final Order Funding") subject to the satisfaction of the Brazilian Final DIP Order Funding Condition under the Brazilian Guaranty and Perfection Requirements (each as defined below); and (iii) additional notes may | Term Sheet; "Amount, Type, Availability" (p. 2-3) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | |
| --- | --- |
| | be issued in an aggregate principal amount of up to the remaining Total DIP Amount in one additional issuance (the "Final Funding") subject to the satisfaction of the Brazilian Final Funding Condition (as defined below) under the Brazilian Guaranty and Perfection Requirements; *provided* that in no event shall satisfaction of the Brazilian Post-Closing Covenant (as defined below) under the Brazilian Guaranty and Perfection Requirements be a condition to the Final DIP Order Funding or the Final Funding. As used herein, "Brazilian Guaranty and Perfection Requirements" means the granting and perfection of Brazilian law guarantees and collateral made by each of the Debtors in favor of the DIP Noteholders guaranteeing all DIP Obligations: ... | |

As used herein, "Brazilian Guaranty and Perfection Requirements" means the granting and perfection of Brazilian law guarantees and collateral made by each of the Debtors in favor of the DIP Noteholders guaranteeing all DIP Obligations:

(a)        by each of the Debtors incorporated under Brazilian law entering into Brazilian Guarantee Agreements within five business days after the Interim DIP Order Funding (the requirements of this clause (a), the "Brazilian Guarantee Requirement");

(b)        on a "first-priority" basis with respect to the portion of the Priming Collateral (as defined below) that secures the 2028 SSNs and 2028 ESSNs, as a condition to the Final DIP Order Funding (or the waiver of such funding condition by DIP Noteholders holding at least $66^2/_3\%$ of the aggregate principal amount of DIP Notes and commitments to issue DIP Notes) (the "Brazilian Final DIP Order Funding Condition");

(c)        on a "first-priority" basis with respect to all other Priming Collateral as a condition to the Final Funding (or the waiver of such funding condition by DIP Noteholders holding at least $66^2/_3\%$ of the aggregate principal amount of DIP Notes and commitments to issue DIP Notes) (the "Brazilian Final Funding Condition"); *provided* that if the Debtors have used reasonable best efforts to satisfy the Brazilian Final Funding Condition and have been unable to obtain, despite exerting substantial efforts, any consent, approval or agreement from any third party in order to complete the Brazilian Final Funding Condition, then satisfaction of the Brazilian Final Funding Condition shall no longer be a condition to the Final Funding; *provided, further*, that, in any event, the Debtors shall continue to use reasonable best efforts to obtain such consent, approval or agreement; and

(d)        on a "first-priority" or "second-priority" basis (i.e. "Sobejo" or "Suspensive Condition" for Brazilian law purposes), as applicable, with respect to the assets under clauses (ii) and (iv) of the definition of "Collateral" and the adequate protection liens, on a reasonable best efforts basis within 60 days after the Closing Date (the "Brazilian Post-Closing Covenant"); *provided*, that, in any event, the Debtors shall continue to use reasonable best efforts to obtain such liens even if such liens are not obtained within 60 days after the Closing Date

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | in each case, including the execution and delivery of the applicable Brazilian Agreements (as defined in Annex A to the Term Sheet), all other applicable documents set forth on Annex A to the Term Sheet, any collateral or security agreement in respect of the adequate protection liens on the Collateral and any other documents that the Required DIP Noteholders reasonably request in connection with the DIP Liens on the Collateral, and the filing and registration of each thereof with all the relevant governmental authorities (except for the registration with the INPI listed in item 5 of Annex A), and the execution and delivery of other agreements reasonably requested by the Required DIP Noteholders in connection with any Brazilian Agreement in connection with the foregoing (including intercreditor agreements), in each case as set forth on Annex A to the Term Sheet, all of the foregoing to be in and form and substance reasonably satisfactory to the Required DIP Noteholders. | |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(3) | <u>Interest Rate</u>.  All amounts outstanding under the DIP Facility shall bear interest at the rate equal to 30-day SOFR (subject to a 3.50% per annum SOFR floor, but without any credit spread adjustment), plus 10.50% per annum.  All interest shall be payable monthly in arrears in cash or in kind, at the Issuer's option.<br><br><u>Default Rate</u>.  Upon the occurrence and continuance of an Event of Default (defined below) under the DIP Facility, at the election of the Required DIP Noteholders, all amounts outstanding under the DIP Facility will bear interest at the otherwise applicable interest rate *plus* an additional 2.00% per annum, which shall be payable in cash on demand by the Required DIP Noteholders or the Trustee (or, if no demand is made, payable monthly with the regularly scheduled interest payments). | Term Sheet; "Interest Rate; Default Rate" (p. 4) |
| **Lender Obligations** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(3) | <u>Commitment Fee</u>: 2.00% of the Total DIP Amount.  The Commitment Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date.<br><br><u>Exit Fee</u>: 2.00% of the Total DIP Amount.  The Exit Fee shall be fully earned and due and payable in cash on the Termination Date (defined below).<br><br><u>Backstop Fee</u>: 3.00% of the Total DIP Amount, payable to the Backstop Parties.  The Backstop Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date.<br><br><u>Fronting Fee</u>: 1.00% of the aggregate principal amount of the aggregate amount of each Initial Commitment Party's Initial Commitment that is in excess of its Backstop Commitment (calculated on the basis that each Post-Signing Commitment Party has provided the full amount of its Additional Commitment in accordance with the terms of the | Term Sheet; "Fees" (p. 3-4) |

14

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | Commitment Letter). The Fronting Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date.<br><br>Undrawn Fee: 5.75% per annum on the average daily portion of the Total DIP Amount that from time to time shall not yet have been issued after the date of the Final Order.  The Undrawn Fee shall be due and payable monthly in arrears, in cash or in kind, at the Issuer's option, from the date of the Final Order until the Termination Date.<br><br>Placement Agent Fees: To be mutually agreed. | |
| **DIP and Other Expenses; Indemnity**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(3) | The Debtors shall be jointly and severally liable to pay all reasonable fees, costs, disbursements and expenses of the Collateral Agent, the Trustee and the DIP Noteholders (including, without limitation, the reasonable fees, costs and expenses of legal counsel (limited to (i) one primary counsel for the Collateral Agent, (ii) one primary counsel for the Trustee, (iii) Dechert LLP, as primary counsel for certain DIP Noteholders, and Padis Mattar Advogados, as Brazilian local counsel for certain DIP Noteholders, (iv) one Brazilian local counsel for each of the Collateral Agent and the Trustee taken together, (v) Akin Gump Strauss Hauer & Feld LLP, as counsel to Elliott, (vi) one local counsel for each jurisdiction (other than Brazil), to the extent required, for the Collateral Agent, the Trustee and the DIP Noteholders taken together, (vii) in the event of an actual or potential conflict, additional counsel or local counsel to the extent necessary and (viii) other counsel retained with the prior written consent of the Debtors, not to be unreasonably withheld) and financial advisors (including Houlihan Lokey) in connection with the negotiation, preparation, execution, administration and enforcement of rights and remedies with respect to the DIP Facility, the DIP Documents, and/or the Collateral, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith and otherwise in connection with the Chapter 11 Cases, which fees, costs, disbursements and expenses shall be payable upon the Closing Date and thereafter on a monthly basis (to the extent invoiced).<br><br>The Debtors agree, jointly and severally, to indemnify and hold the Collateral Agent, the Trustee and/or the DIP Noteholders and their respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "Indemnified Person") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, the DIP Documents, the Collateral, the Term Sheet, the transactions contemplated thereby or by any thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, | Term Sheet; "Expenses" (p. 17)<br><br>Term Sheet; "Indemnification" (p. 17-18) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | whether or not any such Indemnified Person is a party thereto and whether or not brought by any Debtor or any other person or entity, except to the extent resulting from the gross negligence or willful misconduct of an Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes, without limitation, indemnification for the Collateral Agent, the Trustee and/or the DIP Noteholders, only in such capacity, exercising discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the Collateral Agent, the Trustee and/or the DIP Noteholders shall each be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of all such counsel (limited to (i) one primary counsel for the Collateral Agent, (ii) one primary counsel for the Trustee, (iii) one primary counsel for the DIP Noteholders and one Brazilian local counsel for the DIP Noteholders, (iv) one Brazilian local counsel for the Collateral Agent and the Trustee, (v) one local counsel for each jurisdiction (other than Brazil), to the extent required, for the Collateral Agent, the Trustee and the DIP Noteholders taken together, (vi) one primary and applicable local counsel for Elliott, (vii) in the event of an actual or potential conflict, additional counsel or local counsel to the extent necessary and (viii) other counsel retained with the prior written consent of the Debtors, not to be unreasonably withheld) and financial advisors (including Houlihan Lokey). | |
| **Collateral and Other Credit Support; Liens and Priorities; Superpriority Administrative Expense Claim;** Bankruptcy Rule 4001(c)(1)(B)(i)-(ii); Local Rule 4001-2(a)(8) | **DIP Liens**<br><br>The DIP Facility shall be secured by liens (collectively, the "DIP Liens") on all of the assets of the Debtors (in each case subject to certain customary exclusions to be agreed and excluding, for the avoidance of doubt, any aircraft or engines owned by lessors and any leasehold interests therein to the extent prohibited by the respective leases), including in any event but not limited to the following (collectively, the "DIP Collateral"):<br><br>  i.  pursuant to section 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected first-priority priming lien on all assets pledged to secure the Debtors' obligations under the 2028 SSNs, the 2028 ESSNs, and, to the extent primed, the 2026 SSNs (collectively, the "Priming Collateral");<br><br>  ii.  pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected first-priority lien on all assets of the Debtors to the extent that such assets are not subject to prior liens in existence as of the Petition Date (including, without limitation, (a) all cash and bank accounts of the Debtors not subject to prior perfected liens (including, without limitation, the Note Proceeds Account) and (b) all | Term Sheet; "Collateral" (p. 7-8)<br><br>Term Sheet; "Superprioirty Claim" (p. 9) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY |
|---|

applicable lease and other contract rights with respect to any aircraft not subject to existing liens);

   iii.   pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, upon entry of the Final Order and to the extent approved by the Bankruptcy Court, a valid perfected first-priority lien on any and all property and proceeds recovered from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "Avoidance Actions"); and

   iv.   pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected second-priority lien on all assets of the Debtors subject to valid perfected liens in existence as of the Petition Date, other than existing liens referred to in clause (i) above (including, without limitation, (a) all accounts receivable owing to Smiles and (b) all applicable lease and other contract rights with respect to any aircraft subject to existing liens).

All of the liens described herein with respect to the DIP Collateral securing the DIP Obligations shall be deemed effective and perfected by entry of the Interim Order and perfected under local law by entry of the Final Order and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements, but without limitation of the right of the Collateral Agent to require any such agreements, and subject in all events to the Brazilian Guaranty and Perfection Requirement.

For the purposes of Brazilian law, any reference to a "second-priority" lien in this Term Sheet shall be interpreted as references to, as applicable, (a) a security interest over future credit rights, revenues and excess proceeds, if any, that a Debtor incorporated under Brazilian law may become entitled in case there are outstanding amounts due to such entities after a foreclosure by a third party lender of a certain collateral interest securing a first-priority secured obligation ("Sobejo"); or (b) a security interest under suspensive condition over certain assets or rights that are subject to a first-priority lien in favor of a third party lender, in accordance with Article 125 of the Brazilian Civil Code ("Suspensive Condition").

**DIP Superpriority Claim**

All obligations and liabilities under the DIP Facility shall at all times, subject to the Carve-Out, be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority claim status over any and all administrative expenses of the kind that are specified in, or contemplated by, sections 105, 326, 328, 330, 331, 503(b), 506(c),

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | 507(a), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code (collectively, the "DIP Superpriority Claim"). | |
| **Adequate Protection**<br>Bankruptcy Rule 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(3); 4001-2(a)(4); 4001-2(a)(16) | The DIP Orders shall include (i) a customary adequate protection package ("Adequate Protection"), reasonably satisfactory to the Required DIP Noteholders, for the holders of the 2028 ESSNs, the 2028 SSNs, and the Abra Noteholders for the protection of their prepetition liens in the collateral securing the prepetition claims under the 2028 ESSNs, 2028 SSNs, and the Abra Notes, to the extent of the diminution of such collateral, including, without limitation, (A) current payment in cash of the Adequate Protection Expenses (as defined below), (B) replacement adequate protection liens on the Collateral, junior to certain other liens, (C) continued payment of paid in kind interest and current payment of all cash-pay interest under the 2028 SSNs, and 2028 ESSNs for the duration of the Chapter 11 Cases, (D) repayment of the Abra prepetition bridge loans to the extent permitted in the Term Sheet, (E) superpriority claims as provided for in section 507(b) of the Bankruptcy Code, and (F) delivery of all financial statements, Budgets, Budget Variance Reports and other information reporting under the DIP; provided that such Adequate Protection liens and claims shall be junior in every respect to the DIP Liens granted to secure the obligations and liabilities owing under the DIP Facility, the DIP Superpriority Claims, and prior payment of the Carve-Out; and (ii) a customary consent to use of cash collateral, reasonably satisfactory to the Required DIP Noteholders, including payment of certain professional fees customary for a DIP financing of this type to the DIP Noteholders.<br><br>To the extent the 2026 SSN Collateral is primed by the DIP Liens, the holders of the 2026 SSNs shall receive, for the protection of their prepetition liens in the 2026 SSN Collateral, customary replacement liens and claims  and reimbursement of certain fees and expenses (excluding any fees and expenses incurred in connection with Prohibited Actions (as defined in the Term Sheet)).<br><br>"Adequate Protection Expenses" means all prepetition and postpetition reasonable and documented fees and expenses (excluding, for the avoidance of doubt, any fees and expenses in connection with any Prohibited Actions (as defined in the Term Sheet) of the holders of the 2028 SSNs, 2028 ESSNs, the Abra Noteholders, and the trustees and collateral agents with respect to the 2028 SSNs, 2028 ESSNs, and the Abra Notes.<br><br>To the extent the 2026 SSN Collateral is primed by the DIP Liens, the holders of the 2026 SSNs shall receive, for the protection of their prepetition liens in the 2026 SSN Collateral securing the 2026 SSNs, customary replacement liens and claims  and reimbursement of certain | Term Sheet; "Adequate Protection" (p. 9) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | fees and expenses (excluding any fees and expenses incurred in connection with Prohibited Actions (as defined in the Term Sheet). | |
| **Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(6)-(7) | Proceeds of the DIP Facility (which proceeds, prior to their use by the Debtors, shall be held in a deposit account maintained with a bank organized in the United States that is subject to the DIP Liens and, within a period after the Closing Date to be agreed, will be either subject to an account control agreement in favor of the Collateral Agent or otherwise under the control of the Collateral Agent (as defined in Article 9 of the New York Uniform Commercial Code) (the "Note Proceeds Account")) will be used only for the following purposes, in each case in accordance with the Approved Budget, subject to variances that are not Prohibited Variances: (i) general corporate and working capital purposes; (ii) costs of the administration of the Chapter 11 Cases; (iii) adequate protection payments as approved by the Bankruptcy Court; (iv) after the Final Funding has occurred, repayment of the Abra prepetition bridge loans made to GOL on or after January 20, 2024 in an aggregate principal amount of no more than $15,000,000; (v) payment of reasonable and documented transaction costs, fees and expenses with respect to the DIP Facility, including reasonable fees and expenses of legal and other professional advisors to the DIP Noteholders, the Collateral Agent and the Trustee; (vi) for contributing equity to subsidiaries of the Debtors as required under the laws of the jurisdiction of formation of such subsidiaries in order to avoid mandated liquidation for having negative net equity; and (vii) for any other purpose approved by the Bankruptcy Court in the DIP Orders or other orders of the Bankruptcy Court not inconsistent with the terms of the DIP Documents. | Term Sheet; "Use of Proceeds" (p. 5) |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall terminate, and all DIP Facility commitments shall terminate, and all DIP Obligations shall be payable in full in cash on the earliest to occur of (the "Termination Date"): (a) twelve (12) months from the Closing Date (as defined below), provided that the Issuer shall be permitted to extend the Termination Date, on not more than two (2) occasions, by up to an additional three (3) months for each extension (a "Maturity Extension", and the Termination Date so extended, the "Scheduled Termination Date") upon payment of an extension fee (payable in kind) in an amount equal to (x) 2.00% of the Total DIP Amount for the first extension and (y) 2.50% of the Total DIP Amount for the second extension, (b) conversion of any of the Chapter 11 Cases to a case under chapter 7 without the prior written consent of the Required DIP Noteholders (as defined below), (c) dismissal of any of the Chapter 11 Cases without the prior written consent of the Required DIP Noteholders, (d) the appointment of a chapter 11 trustee or an examiner with expanded powers, (e) the date of consummation of a sale of all or substantially all assets of the Debtors, (f) the effective date of a chapter 11 plan, and (g) the date the | Term Sheet; "Termination Date Date" (p. 4-5) |

| | SUMMARY OF MATERIAL TERMS OF DIP FACILITY | |
|---|---|---|
| | DIP Obligations become due and payable in full under the DIP Documents, whether by acceleration or otherwise. | |
| **Financial Covenants** Bankruptcy Rule 4001(c)(1)(B) | Minimum Liquidity Covenant: The sum of (x) unrestricted cash-on-hand (and cash equivalents) of the Debtors *plus* (y) so long as no Event of Default has occurred and is continuing, the undrawn amount of the Total DIP Amount shall be not less than the Minimum Liquidity for any period of five (5) consecutive business days. <br><br>"Minimum Liquidity" shall be defined as: <br><br> i.    $200 million for all measurement periods falling between April 1, 2024 and November 30, 2024; and <br><br> ii.    $250 million for all other measurement periods. | Term Sheet; "Financial Covenants" (p. 6) |
| **Reporting** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(9) | The DIP Documents shall contain usual and customary affirmative covenants for transactions of this type, subject to customary qualifications, limitations for materiality and exceptions to be mutually agreed-upon, including, without limitation, delivery of monthly, quarterly and annual financial statements; delivery of Budgets and Budget Variance Reports in accordance herewith; monthly compliance certificates with respect to the Minimum Liquidity Covenant; other information reasonably requested from time to time by the DIP Noteholders; payment of material obligations; tax gross-ups; continuation of business and maintenance of existence and material rights and privileges; use of proceeds; further assurances; additional collateral and guarantors; maintenance of property in present condition and maintenance of insurance; maintenance of books and records; right of the DIP Noteholders, the Collateral Agent or the Trustee (or any representative thereof) to inspect property and books and records, subject to customary limitations; notices of defaults, litigation and other material events; compliance with laws, including environmental laws; and entering into all Brazilian Agreements, and completing their registration with the competent Brazilian registries of deeds and documents, pursuant to Brazilian law in accordance with (and subject to the limitations and qualifications set forth in) the Brazilian Guaranty and Collateral Requirements.. | Term Sheet; "Affirmative Covenants" (p. 14) |
| **Prepayments** Local Rule 4001-2(a)(13) | The DIP Notes shall be subject to customary mandatory redemption provisions for transactions of this type with respect to (i) 100% of the net cash proceeds from the sale of any Collateral, non-ordinary course asset sales, and sales of subsidiaries, in each case subject to any agreed-to dollar baskets, to the extent such proceeds exceed any amounts from such sales assumed in the Approved Budget; (ii) 100% of the net cash proceeds from incurrence of non-permitted indebtedness; (iii) 100% of insurance proceeds available to the Debtors, including condemnation and similar proceeds (but excluding, for the avoidance of doubt, insurance proceeds that have been assigned to lessors or other counterparties), subject to any agreed-to dollar baskets and | Term Sheet; "Mandatory Prepayments" (p. 14) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | replacement rights; and (iv) 100% of the net cash proceeds of other extraordinary receipts (to be defined as tax refunds and litigation settlements), in each case subject to any agreed-to dollar baskets, not provided for or assumed in the Approved Budget. | |
| **Conditions Precedent to Effectiveness of DIP Documentation and each Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Documents shall contain usual and customary conditions for transactions of this type (the first date on which all of such conditions to effectiveness of the DIP Facility shall have been satisfied, or waived by the Required DIP Noteholders, being the "Closing Date"), including, without limitation: <br><br> i.  on or prior to the Interim DIP Order Funding, the New York Law Guarantee Requirement having been satisfied as of the Closing Date; <br><br> ii.  with respect to the Final DIP Order Funding, the preparation, authorization, execution and delivery by the Debtors of notes and applicable security and perfection documentation, closing certificates, organizational documents, and evidence of authorization and good standing (or the equivalent thereof), in each case in customary form and reasonably satisfactory to the Required DIP Noteholders; <br><br> iii.  with respect to the Interim DIP Order Funding, the Interim Order shall have been entered and be in full force and effect; <br><br> iv.  the Trustee and the DIP Noteholders shall have received the Initial Approved Budget; <br><br> v.  with respect each funding, the representations and warranties of the Debtors under the DIP Documents shall be true and correct in all material respects; <br><br> vi.  all fees under the DIP Documents and Professional Fees of the DIP Noteholders, the Collateral Agent and the Trustee shall have been paid or will be paid concurrently with funding of amounts under the DIP on the Closing Date, to the extent invoiced at least one business day in advance; <br><br> vii.  no default or Event of Default shall have occurred or be continuing; <br><br> viii.  there shall not have been any event or occurrence having a Material Adverse Effect (as defined below); and <br><br> ix.  the execution and delivery of a subordination agreement made by Abra Global Finance and Abra (together, the "Abra Entities") in favor of the DIP Noteholders subordinating the claims and liens of the Abra Entities under the 2028 SSNs and 2028 ESSNs to the DIP Obligations and the DIP Liens, including a turnover provision, and providing the exercise of certain remedies upon any Event of Default, to be in form | Term Sheet; "Conditions Precedent" (p. 15) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | and substance reasonably satisfactory to the Required DIP Noteholders. | |
| **Events of Default; Right to Cure** Bankruptcy Rule 4001(c)(1)(B); Local Rules 4001-2(a)(10) and 4002-1(a)(11) | The DIP Documents shall contain usual and customary events of default (any such event, an "Event of Default"), subject to customary cure provisions, qualifications and limitations for materiality to be mutually agreed-upon, which shall include, without limitation: (i) nonpayment of DIP Obligations when due (with a five (5) business day grace period for nonpayment of interest or other amounts (except principal)); (ii) non-performance of covenants and obligations under the DIP Documents (with a thirty (30) day grace period for certain affirmative covenants to be agreed); (iii) material judgments; (iv) default on material postpetition indebtedness and hedge obligations and assumed leases (with a thirty (30) day grace period for assumed leases); (v) breach of any representation or warranty; (vi) material adverse regulatory actions; (vii) the Debtors, directly or indirectly, contesting, delaying, impeding or taking any other action (including the commencement by or on behalf of the Debtors of an avoidance action or other legal proceeding seeking any of the following relief or seeking the entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction) objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens securing the DIP Obligations or the obligations under the 2028 SSNs, 2028 SSNs, 2028 ESSNs, or the Abra Notes or (b) the validity, enforceability, characterization or non-avoidability of any of the DIP Obligations or the obligations under the 2026 SSNs, 2028 SSNs, 2028 ESSNs or the Abra Notes; (viii) entry by the Bankruptcy Court of an order (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Cases, or (d) terminating or modifying (other than extending) the exclusive right of the Debtors to file a plan of reorganization under section 1121 of the Bankruptcy Code; (ix) any Prohibited Variance shall have occurred; (x) any Event of Default under any DIP Order or other DIP Document shall have occurred; (xi) the filing of a chapter 11 plan with respect to the Debtors by any of the Debtors or any of their affiliates that is not an Acceptable Plan; (xii) an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Required DIP Noteholders except in favor of an alternative plan or transaction that repays the DIP Obligations in full in cash on the effective date of such plan; (xiii) the failure to meet any of the Milestones; (xiv) any of the Debtors or any affiliate thereof filing a pleading seeking to vacate or modify any DIP Order over the objection of the Required DIP Noteholders; (xv) the entry of an order without the prior consent of the Required DIP Noteholders amending, supplementing or otherwise | Term Sheet; "Events of Default" (p. 12-13) |

| | SUMMARY OF MATERIAL TERMS OF DIP FACILITY | |
|---|---|---|
| | modifying any DIP Order; (xvi) reversal, vacation or stay of the effectiveness of any DIP Order; (xvii) any sale of all or substantially all assets of the Debtors, unless (a) the proceeds of such sale indefeasibly satisfy the DIP Obligations in full in cash or (b) such sale is supported by the Required DIP Noteholders; (xviii) the granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Debtors above an agreed-upon threshold; (xix) the Debtors' filing of (or failing to object or otherwise supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Noteholders' claims under the DIP facility; (xx) payment of or granting adequate protection with respect to prepetition debt, other than as expressly agreed in the DIP Documents or in any DIP Order; (xxi) cessation of the DIP Liens or the DIP Superpriority Claim to be valid, perfected and enforceable in all respects; (xxii) any uninsured judgments (not otherwise contemplated in the Approved Budget or the first day pleadings) are entered with respect to any postpetition liabilities against any of the Debtors or any of their respective properties in an aggregate amount in excess of an amount to be reasonably agreed prior to the Interim DIP Order Funding; or (xxiii) the commencement of any insolvency proceeding or any proceeding under any debtor relief law in any jurisdiction other than the Chapter 11 Cases (excluding any local proceeding to enforce the automatic stay or other protective provisions granted to the Debtors in the Chapter 11 Cases); or (xxiv) the failure to satisfy the Brazilian Guarantee Requirement | |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B) | The DIP Documents shall contain the following milestones (collectively, the "Milestones") as may be reasonably set forth in the DIP Documents by the DIP Noteholders in consultation with the Debtors and their advisors, which shall include, without limitation, that: <br><br> i. The Debtors shall have proposed a business plan for the reorganization and restructuring of the Debtors' business that is reasonably acceptable to the Required DIP Noteholders by no later than 120 days after the Petition Date; <br><br> ii. The Debtors shall have entered into definitive documentation governing the DIP Facility in the form of a note purchase agreement and/or an indenture on or before the earlier of (x) February 16, 2024 and (y) the date of the hearing for the Final Order; <br><br> iii. No later than 90 days after the Petition Date, the Debtors shall have entered into stipulation agreements for no less than 90 aircraft; | Term Sheet; "Milestones" (p. 6-7) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | iv. The Debtors shall file a motion seeking approval of the DIP on the Petition Date; | |
| | v. The Interim order, in form and substance reasonably acceptable to the Required DIP Noteholders, shall be entered in the Chapter 11 Cases by no later than three (3) business days after the Petition Date (and subject in any event to the availability of the Bankruptcy Court); | |
| | vi. The Final Order shall be entered in the Chapter 11 Cases by no later than 45 days after the Petition Date; | |
| | vii. The Debtors shall file an Acceptable Plan by no later than 260 days after the Petition Date; | |
| | viii. An order approving a disclosure statement for an Acceptable Plan, which disclosure statement shall be reasonably acceptable to the Required DIP Noteholders, shall be entered in the Chapter 11 Cases by no later than 305 days after the Petition Date; | |
| | ix. An order confirming an Acceptable Plan shall be entered in the Chapter 11 Cases by no later than 14 days before the Scheduled Termination Date; and | |
| | x. Such confirmed Acceptable Plan shall become effective by no later than the Scheduled Termination Date; | |
| | In each case, as any such date may be extended with the written consent of the Required DIP Noteholders (which consent may be confirmed via e-mail by counsel on behalf of the Required DIP Noteholders); provided that, to the extent any Maturity Extension is elected by the Issuer, the due dates for the Milestones set forth in clauses (vii) through (x) shall be extended to reflect the same additional period as the extended Termination Date. | |
| | "Acceptable Plan" means a chapter 11 plan of reorganization that (i) shall provide for payment in full in cash of all DIP Obligations on the effective date of such plan to the extent such plan is confirmable (as defined in the Bankruptcy Code) or (ii) is otherwise acceptable to the Required DIP Noteholders (solely with respect to the treatment of their respective claims) and the Debtors; provided that, in connection with any Acceptable Plan under this clause (ii), the Debtors and the DIP Noteholders shall enter into a restructuring support agreement with respect to such treatment of claims. | |
| **Release** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders shall provide the Collateral Agent, the Trustee, the DIP Noteholders, and the Indemnified Persons with customary releases reasonably acceptable to the Collateral Agent, the Trustee and the Required DIP Noteholders and shall contain customary stipulations regarding the prepetition liens of the holders of 2026 SSNs, 2028 | Term Sheet; "Releases" (p. 18) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | SSNs, 2028 ESSNs, and the Abra Noteholders and the amount of their respective allowed claims (including any applicable make-whole amounts or applicable premiums). | |
| **Carve-Out** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(5) | (a) "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 without regard to the notice set forth in clause (iii) below; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) without regard to the notice set forth in clause (iii) below; (iii) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (other than fees or expenses incurred in connection with any Prohibited Actions) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official committee of unsecured creditors (the "Committee"), if one is appointed, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Trustee of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors that are fully earned, due and payable pursuant to the terms of the applicable engagement letters or retention applications prior to the delivery of a Carve-Out Trigger Notice) (such amounts in this clause (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) after the date of delivery of the Carve-Out Trigger Notice (the "Trigger Date"), Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $10,000,000 (the "Post-Carve-Out Trigger Notice Cap") incurred after the first business day following delivery by the Trustee of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise (such amounts in this clause (iv), the "Post-Trigger Notice Professional Fees").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Trustee by email (or other electronic means) to (A) the Debtors and Milbank LLP, (B) counsel to the Trustee, (C) counsel to the Abra Ad Hoc Group, (D) counsel to Elliott, (E) the U.S. Trustee, and (F) lead counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default (but subject to any applicable grace periods, waivers, or forbearances) stating that the Post Carve-Out Trigger Notice Cap is invoked. | Term Sheet; "Carve Out" (p. 9-11) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| | (b) The Carve-Out shall be senior to the DIP Liens and the DIP Superpriority Claim. Notwithstanding anything to the contrary contained in this Term Sheet or any DIP Documents, the security interests, Liens and claims granted to any of the parties (including, without limitation, the DIP Liens and the DIP Superpriority Claim) under, pursuant to or in connection with the DIP Facility, any DIP Document, or this Term Sheet, as applicable, shall be subject to the Carve-Out. | |
| | (c) Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered, (i) the Debtors shall be permitted to pay Pre-Trigger Notice Professional Fees, as the same may become due and payable, including on an interim basis, solely in accordance with orders of the Bankruptcy Court, and (ii) such payments shall not reduce, or be deemed to reduce, the Post-Carve-Out Trigger Notice Cap. | |
| | (d) Any payment or reimbursement made after the Trigger Date in respect of any Post-Trigger Notice Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis. Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the Final Order, the DIP Documents, the Bankruptcy Code and applicable law. | |
| | (e) None of the Trustee, the Collateral Agent, or the DIP Noteholders shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these chapter 11 cases or any successor cases. Nothing in the Term Sheet or otherwise shall be construed to obligate the Trustee, the Collateral Agent or the DIP Noteholders, holders of the 2026 SSNS, holders of the 2028 SSNs, or holders of the 2028 ESSNs, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. | |
| **506(c) Waiver; Waiver of Marshaling; Section 552(b)** Bankruptcy Rule 4001(c)(1)(B) | The Final Order shall include a waiver of any surcharge to the DIP Collateral under sections 506(c) and 552 of the Bankruptcy Code or otherwise for the holders of the 2026 SSNs, 2028 SSNs, 2028 ESSNs, and the Abra Noteholders. The Interim include shall include a waiver of any surcharge to the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise for the DIP Noteholders and Trustee. The Final Order shall include a waiver of any claims by the Debtors under the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Collateral. | Term Sheet; "Section 506(c)/552 Waiver" (p. 18) Term Sheet; "Marshalling Waiver" (p. 18) |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Governing Law** Bankruptcy Rule 4001(c)(1)(B) | New York. | Term Sheet; "Governing Law" (p. 18) |

## DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

30.    In November 2023, the Debtors retained Seabury Securities LLC (together with their subsidiaries and affiliates, collectively "Seabury") to act as their investment banker, financial advisor and lead restructuring advisor in connection with a potential restructuring to be completed either out-of-court, through a chapter 11 proceeding, or through another relevant judicial proceeding. The Seabury team worked closely with the Debtors' management and other professionals with respect to these issues and came to understand the Debtors' capital structure, liquidity needs, and business operations. Through this process, it became clear that the Debtors would need to raise significant capital. The Debtors and Seabury immediately began to explore potential financing partners for either an out-of-court or in-court process.

31.    Initially, the Debtors hoped to achieve an out-of-court solution to their deteriorating liquidity position, and solicited capital for an out-of-court capital raise in the amount of $600 million, which was later upsized to $850 million due to near-term headwinds related to the Company's liquidity outlook and a reduced number of operating aircraft. In January 2024, due to rapidly deteriorating liquidity and in response to lessor feedback received in the course of the Debtors' outreach efforts, it became clear that the Debtors likely would require a chapter 11 process to reorganize, accompanied by DIP financing, as soon as possible to provide the Debtors a much-needed liquidity infusion. However, it quickly became apparent that the lack of readily

available unencumbered collateral made reliance on private market DIP financing especially challenging.

32.    While the Debtors received proposals and detailed indications of interest from certain parties, potential new lenders were unwilling to provide DIP financing on an unsecured basis or secured junior to the prepetition noteholders' liens.  The predominant feedback from these prospective new lenders was that the Debtors did not have sufficient unencumbered collateral with which to secure a DIP facility that would be adequate to meet the Debtors' liquidity needs.  Due to the nature and limited amount of the available collateral, including the complexity of financing transactions related to the fleet of aircraft, the universe of potential transaction partners was extremely limited.  It accordingly became clear to the Debtors that any DIP financing would require a priming position on important collateral of the Debtors, including the Shared Collateral.

33.    In early January 2024, Seabury and GOL completed their 2024 DIP budget and determined that an upsizing of the DIP financing to $950 million was necessary.  Following this adjustment, on January 10, 2024, the Debtors' advisors met with the Abra Ad Hoc Group to discuss a potential proposal.  Between January 7 and January 13, 2024, the Debtors' advisors also met with other interested parties to address additional diligence requests and negotiate certain aspects of their respective term sheets.  Shortly after, on January 17, 2024, the Backstop Noteholders provided an initial letter of intent for a DIP proposal.  On or around January 18, 2024, Seabury followed up with the remaining interested parties to address the DIP commitment size increase ($950 million), a desired maturity with the possibility of extensions, and adjustments surrounding interest rates, fees, and financial covenants.  Ultimately, the Debtors received three letters of intent from parties to provide DIP financing, two of which delivered commitments to provide the $950 million capital infusion that the Debtors required in DIP financing.  While generating multiple

proposals enabled the Debtors to negotiate with the interested parties for improved terms, none of these parties expressed a willingness to provide DIP financing secured by liens junior to the liens of the Debtors' prepetition secured creditors.

34.     While negotiations with these parties were ongoing, the Debtors began to receive pressure from certain lessors.  Certain claimed defaults by these lessors had the potential to jeopardize the Debtors' fleet and affect operations.  Accordingly, the Debtors accelerated their negotiations with their prospective DIP lenders in an effort to secure fully committed DIP financing.  Those efforts were successful, resulting in the proposal before the Court — a $350 million immediate draw to fund operations currently, accompanied by a full commitment for the remaining required DIP amount.

**THE PROPOSED DIP FACILITY IS NECESSARY AND
SUFFICIENT TO MEET THE DEBTORS' LIQUIDITY NEEDS**

35.     The abrupt and acute downturn in the airline industry at the onset of the COVID 19 pandemic and the resulting liquidity crunch has severely impacted the Debtors' ability to fund operations and stay current on their outstanding debt obligations.  As of the date hereof, the Debtors' unrestricted cash on hand is *de minimis*, and the need for liquidity is immediate.  The Debtors currently have negative cash flow, attributable to the seasonality of the Debtors' business during the first quarter of each year where ticket sales generally are lower.  This seasonality is compounded by the impact of additional revenue-generating aircraft being grounded as a result of capital-intensive maintenance requirements and the need to invest substantial capital into the overhaul of its aircraft engines.

36.     Without immediate access to sufficient DIP financing, the Debtors will be unable to continue their operations during these Chapter 11 Cases.  The Debtors need the funding under the DIP Facility to cover payroll obligations, pay suppliers, cover overhead costs, fund capital

expenditures, and make other payments that are essential for the continued management, operation, and preservation of the Debtors' business. The ability to make these payments when due is essential to the continued operation of the Debtors' business during these Chapter 11 Cases. The funds that would be made available to the Debtors under the DIP Facility are therefore necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

37.    If the Debtors cannot quickly access the DIP Facility, based on the Debtors' financial forecasts, the Debtors will not be able to continue to operate their business beyond a very short period of time. This would negatively impact the Debtors' revenue, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders and significantly impair the value of the Shared Collateral. Based on the Debtors' financial forecasts, the liquidity provided by the DIP Facility will allow the Debtors to implement their business plan over the course of these Chapter 11 Cases and weather the current challenges facing the aviation industry.

38.    Furthermore, to avoid a protracted and expensive priming fight, consent is required to grant a senior lien on the Shared Collateral, which consent the Debtors have obtained.

39.    The DIP Facility will provide the Debtors with needed stability and sufficient liquidity to continue to operate their business in the normal course, provide comfort to their employee, customer, and vendor constituencies, and fund the administration of these Chapter 11 Cases. The ability of the Debtors to obtain sufficient working capital and liquidity through the DIP Facility is vital to the preservation and maintenance of the going concern value of the Debtors.

40.    The size of the DIP Facility, combined with access to certain cash receipts, is calculated to permit the Debtors to maintain liquidity sufficient to sustain operations during these Chapter 11 Cases. Based on the Debtors' projected operating cash flow, a DIP Facility funding

new money of approximately $350 million in the interim, accompanied by a full commitment for the remaining required DIP amount, is necessary in order to enable the Debtors to continue operating their business. The $350 million interim draw is sized to addresses the Debtors' predicted liquidity needs for the interim period, and access to this liquidity will enable the Debtors to continue operations during such period.

## THE TERMS OF THE PROPOSED DIP FACILITY ARE FAIR AND REASONABLE

41.     As set forth in the DIP Motion, the DIP Noteholders have agreed to provide $950 million of new money postpetition financing, including $350 million upon entry of the Interim Order, another $150 million upon entry of the Final Order, and an additional $450 million to be disbursed, subject to certain conditions. In the absence of an Event of Default or other defined event, the DIP Facility will mature in twelve months with the ability to extend the Maturity Date twice for an additional 6 months in total. Interest under the DIP Facility will accrue at the rate equal to 30-day SOFR (subject to a 3.50% per annum SOFR floor), plus 10.5% per annum so long as no Event of Default has occurred. All interest shall be payable monthly in arrears in cash and/or in kind at the Debtors' option. Additionally, as set forth in the DIP Motion, the Debtors have agreed, subject to the Court's approval, to pay certain fees in exchange for certain parties providing, agenting, and arranging the DIP Facility. Among others, these fees include a Commitment Fee of 2.0% of the aggregate principal amount of the DIP Facility due and payable on the Closing Date, an Exit Fee of 2.0% of the aggregate principal amount of the DIP Facility due and payable on the Termination Date, and a Backstop Fee of 3.0% of the aggregate principal amount of the DIP Facility due and payable on the Closing Date.

42.     The Debtors are not aware of any financing being available on equal or better terms to the DIP Facility, taken as a whole, particularly due to the fact that the 2026 SSNs, 2028 ESSNs, and the 2028 SSNs are currently secured by prepetition fiduciary assignments of all or portions of

31

the Shared Collateral and the necessary parties have contented to the DIP Facility (including priming). Accordingly, the proposed DIP Facility could avoid untested litigation risks associated with priming fiduciary liens assigned in accordance with Brazilian law on the Shared Collateral. As a result, the DIP Facility, unlike any alternate proposals, is likely more insulted from potential litigation.

43. The Debtors selected the DIP Facility proposed by the DIP Noteholders as the best bid for postpetition financing secured by the available collateral based on multiple factors, including the immediate need to fund operations; the size and certainty of the committed amount; the DIP financing's limited execution risk, including its resolution of any disputes arising from the need to prime the Brazilian fiduciary assignments on the Shared Collateral; the applicable interest rate; the reasonableness of conditions precedent and applicable financial covenants; and the other contractual commitments to which the DIP Noteholders have agreed.

44. The DIP Facility is the best financing option presently available to the Debtors under the circumstances. As set forth in the Luth Declaration, the contemplated pricing, fees, and interest rate are in the aggregate generally consistent with the cost of DIP financings in comparable circumstances, particularly for a distressed borrower with a stated and immediate need for liquidity. The DIP Facility is fair and reasonable under the circumstances and is within the market for comparable DIP financings, especially considering the reduced execution risk.

## **BASIS FOR RELIEF**

### A.      **The Debtors Should Be Authorized to Enter into the DIP Facility, Grant Requested Liens, and Incur Superpriority Claims**

45. The Debtors satisfy the requirements under section 364 of the Bankruptcy Code, to incur the superpriority administrative expenses and liens contemplated by the DIP Facility.

### 1. Superpriority Claims and Non-Priming Liens Are Justified Under Section 364(c) of the Bankruptcy Code

46.     Section 364(c) of the Bankruptcy Code provides, in relevant part, that if the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

> 1. with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> 2. secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> 3. secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

47.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other, less onerous sources of financing); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 631-32 (Bankr. S.D.N.Y. 1992) (section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (Bankr. S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an ordinary administrative expense).

48.     When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an

exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988),

*aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989);

*see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent

the senior lien by establishment of unsuccessful contact with other financial institutions in the

geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's

finding that two national banks refused to grant unsecured loans was sufficient to support

conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 40

(approving financing facility and holding that debtor made reasonable efforts to satisfy standards

of section 364(c) where it approached four lending institutions, was rejected by two, and selected

most favorable of two offers it received).

49.     Courts have articulated a three-part test to determine whether a debtor is entitled to

financing under section 364(c) of the Bankruptcy Code, looking specifically to whether:

> a.  the debtor is unable to obtain unsecured credit under section 364(b) of the
>     Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
>
> b.  the credit transaction is necessary to preserve the assets of the estate; and
>
> c.  the terms of the transaction are fair, reasonable, and adequate, given the
>     circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't*

*Stores*, 115 B.R. at 37-40.  .

50.     The DIP Facility meets each of these factors:

51.     *First*, the Debtors are unable to obtain unsecured credit allowable as an ordinary

administrative expense.

52.     *Second*, the DIP Facility is critical to providing the liquidity necessary for the

Debtors to survive and successfully operate, and to prosecute these Chapter 11 Cases to

completion.    Given the imminent liquidity concerns, the Debtors must secure financing

immediately if they are to continue operating.  The proposed DIP Facility allows the Debtors to maintain operational cash requirements, while ensuring the Company's projected cash balance remains robust in downside scenarios.

53.    *Third*, the DIP Noteholders and the Debtors, each of whom was represented by reputable counsel and financial advisors, have exchanged numerous drafts of term sheets and other documentation with respect to the proposed DIP Facility and have conducted hours of intense negotiations.  Advisors to the DIP Noteholders and advisors to the Debtors were fully engaged in this process, exchanging significant diligence information through a virtual data room, participating in countless conference calls, videoconferences, and negotiations to work toward finalizing DIP financing terms and documentation. This process involved, among other things, extensive evaluation and testing of the Debtors' financial forecasts by the Debtors' and the DIP Noteholders' financial advisors. The negotiations culminated in the proposed DIP Facility.

54.    Because the Debtors received multiple proposals for a total DIP commitment size of $950 million, the Debtors were able to leverage the proposals against each other to obtain overall better DIP financing terms. Indeed, over the course of these negotiations, the Debtors materially improved the terms of the DIP Facility as compared to those originally offered. Notably, Seabury was able to secure: (i) earlier access to the full DIP commitment; (ii) lower borrowing costs; (iii) a lower Backstop Fee (declining from 5.0% to 3.0%); and (iv) a longer overall term for the DIP Facility (including extensions within the control of the Debtors) from nine months to eighteen months.

55.    Therefore, the Debtors have satisfied section 364(c) of the Bankruptcy Code and the Court should authorize the Debtors to incur superpriority claims and non-priming liens in favor of the DIP Facility.

### 2.   Priming Liens Are Justified Under Section 364(c) of the Bankruptcy Code

56.   Section 364(d)(1) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. at 122 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the affected lienholders consent to such priming or (b) such creditors' interests in the collateral are adequately protected.

57.   The requisite prepetition secured parties have consented to priming under the DIP Facility.  Accordingly, although the Debtors are seeking to provide adequate protection to certain of their prepetition secured noteholders under the DIP Orders, this consent relieves the Debtors from any burden to demonstrate adequate protection in connection with the Debtors' incurrence of the priming liens contemplated by the DIP Facility.

### B.   Entry into DIP Facility Is a Sound Exercise of Business Judgment

58.   The Court should also authorize the Debtors' entry into the DIP Facility as a sound exercise of their business judgment.

59.   Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016) ("In determining whether to authorize post-petition financing,

bankruptcy courts will generally defer to the debtor's business judgment."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

60.     The business judgment rule is highly deferential to the decisions of management and a court will not interfere so long as the decision is rational.  *See Quadrant Structured Products Co., Ltd v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014); *In re AMR Corp.*, 485 B.R. 279, 288 (Bankr. S.D.N.Y. 2013) (SHL) (the court will not interfere with the debtors' business judgment absent a showing of bad faith, self-interest, or gross-negligence); *see also In re Helm*, 335 B.R. 528, 538-39 (Bankr. S.D.N.Y. 2006) (CGM) (the business judgment rule requires the court to determine whether a reasonable business person would make a similar decision under similar circumstances). Bankruptcy courts generally will not "second-guess" a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code."  *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513-514 (Bankr. D. Utah. Oct 8, 1981).  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar

decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

61.    In determining whether the Debtors have exercised sound business judgment in entering into the DIP Facility, the Court should consider the economic terms of the DIP Facility under the totality of the circumstances. *See* Hr'g Tr. at 734-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as otherwise); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing debtor may have to enter into "hard" bargains to acquire funds for its reorganization under difficult circumstances).  Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered under the proposed DIP facility.

62.    In *In re ION Media Networks, Inc.*, for example, the Court held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

63.    The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  As further discussed herein and in the Luth Declaration, the DIP Facility is the best financing option presently available to the Debtors under the circumstances.  The financial terms proposed under the DIP Facility are customary and usual for DIP financings of this type.

The DIP Facility was negotiated in good faith and is commercially reasonable, evidencing that the process and the price of the DIP Facility are fair.

64.    Even if the Court were to apply the "entire fairness" standard of review instead of the business judgment standard—which the Debtors submit would not be appropriate here—the DIP Facility clearly satisfies that standard, too.  "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration."  *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).  The Debtors have run an extensive and competitive marketing process and have arrived at a DIP Facility that is an indicator not only of the Debtors' exhaustive marketing process, but also of the market's confidence in the economic and noneconomic terms and overall fairness of the DIP Facility.  During this process, the negotiations between the Debtors and the DIP Noteholders were at all times conducted at arm's-length.   And from an early stage, the Debtors took every precaution to ensure that Abra designees sitting on the Board did not receive information, or participate in deliberations, regarding issues that might advantage Abra in any negotiations with the Debtors.   Instead, the independent directors of the Board negotiated with Abra on behalf of the Debtors, and the Abra designees on the Board were excluded from any discussions during the DIP process that the independent directors determined, with advice of counsel, might provide Abra with an advantage in negotiations with the Debtors.

65.    Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of their business judgment.

### C. The DIP Noteholders, the Trustee, and the Collateral Agent Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code

66.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. 11

U.S.C. § 364(e). Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under this section [364
> of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this
> section of a priority or a lien, does not affect the validity of any debt so incurred, or
> any priority or lien so granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such priority or lien,
> were stayed pending appeal.

*Id*.

67.     The DIP Facility is the culmination of (a) extensive arm's-length, good faith

negotiations between the Debtors and the DIP Noteholders and (b) the Debtors' reasonable and

informed determination that the DIP Noteholders offered the most favorable terms on which to

obtain vital postpetition financing.  The Debtors submit that the terms and conditions of the DIP

Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP

Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further,

no consideration is being provided to the DIP Noteholders, the Trustee, the Collateral Agent, or

any other party to the DIP Facility other than as described herein.  Accordingly, the Court should

find that the obligations and other financial accommodations made to the Debtors under the DIP

Facility have been extended by the Trustee, the Collateral Agent, and the DIP Noteholders in "good

faith" within the meaning of section 364(e) of the Bankruptcy Code and, therefore, the Trustee,

the Collateral Agent, and the DIP Noteholders are entitled to all of the protections afforded thereby.

**D.** **The Debtors Should Be Authorized to Provide the Indemnification and Pay the Fees and Expenses Due Under the DIP Facility**

68.     As described herein, the Debtors have agreed, subject to Court approval, to (a) pay certain fees and expenses to the Collateral Agent, the Trustee, and the DIP Noteholders, (collectively, the "DIP Fees and Expenses") and (b) indemnify the DIP Trustee, the DIP Collateral Agent, and the DIP Noteholders, and certain of their respective advisors, in each case, in exchange for providing the DIP Facility or acting as agent for the DIP Facility (as applicable).

69.     As set forth in the Luth Declaration, the terms of the DIP Facility, including the DIP Fees and Expenses, constitute the best terms on which the Debtors could obtain the postpetition financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases, and are fair and reasonable under the circumstances and are within the market for comparable DIP financings.   The Debtors considered the DIP Fees and Expenses when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain sufficient DIP financing.   The Debtors believe paying the DIP Fees and Expenses to obtain the DIP Facility is in the best interests of their estates.   Accordingly, the Court should authorize the Debtors to pay the DIP Fees and Expenses.

70.     Courts in this district and others have approved the granting of indemnities and the reimbursement of fees and expenses incurred by professionals engaged by third parties when the "reimbursement arrangement was 'in the best interests of the Debtors and all parties in interest,'" including in other large airline cases.   *See, e.g.*, *In re AMR Corp.*, Case No. 11-15643 (SHL) (Bankr. S.D.N.Y. 2011) [Docket No. 4652] (approving reimbursement of hourly fees of counsel and the monthly/success fees of a financial advisor for an ad hoc group of lenders to potentially provide equity and other financing); *In re Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. 2015) [Docket No. 1163] (approving agreement for indemnification and

payment of $60,000 per month in fees to co-lead arrangers under debtors' DIP and exit facilities);

*In re Maxcom Telecomunicaciones*, S.A.B. DE C.V., Case No. 13-11839 (PJW) (Bankr. D. Del.

2013) [Docket No. 109] (approving debtor's entry into indemnification agreement with Citibank

as depository for proposed equity tender offer); *In re Eastman Kodak Co.*, Case No. 12-10202

(ALG) (Bankr. S.D.N.Y. 2012) [Docket No. 2576] (approving debtors' motion to pay $1 million

work fee to Citibank, as agent under the debtors' DIP facility, in connection with negotiating and

structuring an amendment to the DIP facility to permit a maturity extension and a supplemental

DIP facility); *In re Tronox, Inc.*, Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. 2009) [Docket Nos.

870, 997] (authorizing debtors to pay up to $5.5 million in due diligence costs to interested lenders

in connection with exit financing).

71.     Moreover, authorization to pay DIP fees of various types is customarily granted in

this district. *See, e.g.*, *In re Vice Group Holding Inc.*, 23-10738 (JPM) (Bankr. S.D.N.Y. June 13,

2023) [Docket No. 138]; *In re Revlon, Inc.*, 22-10760 (DSJ) (Bankr. S.D.N.Y. Aug. 2, 2022)

[Docket No. 330]; *In re Vewd Software USA, LLC*, 21-12065 (MEW) (Bankr. S.D.N.Y. Feb. 1,

2022) [Docket No. 127]; *In re Philippine Airlines, Inc.*, 21-11569 (SCC) (Bankr. S.D.N.Y. Sept.

30, 2021) [Docket No. 123]; *In re Grupo AeroMexico, S.A.B. de C.V., et al.*, 20-11563 (SCC)

(Bankr. S.D.N.Y. Oct. 13, 2020) [Docket No. 527]; *In re Avianca Holdings, S.A., et al.*, 20-22233

(MG) (Bankr. S.D.N.Y. Oct. 5, 2020) [Docket No. 1031].  Accordingly, the Court should authorize

the Debtors to pay the DIP Fees and Expenses.

### E.    Modification of Automatic Stay Is Warranted

72.     The relief requested herein contemplates a modification of the automatic stay to

permit the Debtors to, among other things: (a) grant the security interests, liens, and superpriority

claims described above, as applicable, and to perform such acts as may be requested to assure the

perfection and priority of such security interests and liens; and (b) payment all amounts required under the DIP Facility.

73.     Stay modifications of this kind are ordinary and standard features of DIP financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.  *See, e.g.*, *In re Vice Group Holding Inc.*, 23-10738 (JPM) (Bankr. S.D.N.Y. June 13, 2023) [Docket No. 138]; *In re Revlon, Inc.*, 22-10760 (DSJ) (Bankr. S.D.N.Y. Aug. 2, 2022) [Docket No. 330]; *In re Vewd Software USA, LLC*, 21-12065 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2022) [Docket No. 127]; *In re Philippine Airlines, Inc.*, 21-11569 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2021) [Docket No. 123]; *In re Grupo AeroMexico, S.A.B. de C.V., et al.*, 20-11563 (SCC) (Bankr. S.D.N.Y. Oct. 13, 2020) [Docket No. 527]; *In re Avianca Holdings, S.A., et al.*, 20-22233 (MG) (Bankr. S.D.N.Y. Oct. 5, 2020) [Docket No. 1031]. Comparable relief should be granted with respect to the DIP Facility.

## RESERVATION OF RIGHTS

74.     Nothing contained herein is intended to be or shall be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' right to dispute any claim; or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission to the validity of any claim or waiver of the Debtors' rights to dispute such claim subsequently.

## REQUEST FOR WAIVER OF STAY

75.     The Debtors request a waiver of the stay of the effectiveness of the DIP Orders under Bankruptcy Rules 4001(a)(3) and 6004(h). Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1)

is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(3).  Bankruptcy Rule 6004(h), in turn, provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h)..

76.     As set forth above, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtors' operations, going concern value and their efforts to pursue a resolution to these Chapter 11 Cases.  Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6004(h).

## NOTICE

77.     42.     The Debtors will provide notice of this Motion to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the U.S. Trustee for the Southern District of New York; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (d) the Office of the U.S. Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the Federal Aviation Administration; (h) the 2026 SSN Agents, (i) the 2028 SSN/ESSN Collateral Agent, (j) the Abra Notes Agents; and (k) any party that has requested service pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

78.     No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Interim Order and

Final Order granting the relief requested herein and granting such other relief as is just and proper.

Dated:  New York, New York
        January 26, 2024

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Andrew C. Harmeyer
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter
**MILBANK LLP**
1850 K St NW, Suite 1100,
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Proposed Counsel for Debtors and
Debtors-in-Possession*

## Exhibit A

**Commitment Letter**

January 25, 2024

GOL Linhas Aéreas Inteligentes S.A.
GOL Equity Finance
GOL Finance
GOL Linhas Aéreas S.A.
Smiles Fidelidade S.A.

**BACKSTOP COMMITMENT LETTER FOR SUPERPRIORITY SENIOR
SECURED PRIMING DEBTOR-IN-POSSESSION FINANCING FACILITY**

Ladies and Gentlemen:

We understand that GOL Linhas Aéreas Inteligentes S.A. (the "***Company***") and certain of its affiliates and subsidiaries (together with the Company, collectively, the "***Debtors***" or "***you***") intend to commence voluntary Chapter 11 cases (the "***Cases***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") and operate as debtors-in-possession under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") during the pendency of such Cases.  In connection with the Cases, each of the parties (the "***Initial Commitment Parties***") set forth on <u>Annex A</u> attached hereto (the "***Initial Commitment Schedule***", and the commitments of each Initial Commitment Party set forth on such <u>Annex A</u>, its "***Initial Commitment***"), each of the parties (the "***Post-Signing Commitment Parties***", together with the Initial Commitment Parties, the "***Backstop Parties***") set forth on <u>Annex B</u> hereto (the "***Backstop Commitment Schedule***" and the commitments of each Backstop Party set forth on such <u>Annex B</u>, its "***Backstop Commitment***") that executes a joinder pursuant to the terms hereof and any Additional Noteholder (as defined below) that executes a joinder pursuant to the terms hereof (collectively with the Backstop Parties, the "***Commitment Parties***", "***we***" or "***us***"), are pleased to advise you of their interest in providing the Debtors with a superpriority senior secured priming debtor-in-possession financing (the "***DIP Facility***" and the notes issued thereunder, the "***DIP Notes***") in an aggregate principal amount of up to $950,000,000 (the "***Total DIP Amount***"), and agreement to severally commit to provide the funding thereof, subject to the terms and conditions set forth in this letter (this "***Commitment Letter***") and the definitive financing agreements and related documentation for the DIP Facility (collectively, the "***DIP Documents***").

Any and all obligations of, and services to be provided by each Backstop Party hereunder may be performed and any and all of its rights hereunder may be exercised by or through any of its respective affiliates or funds it manages or advises.

Upon the terms of this Commitment Letter including <u>Annex C</u> hereto (the "***Term Sheet***"), and subject to the satisfaction or waiver in writing by each of the Backstop Parties of the conditions set forth in Section 3 of this Commitment Letter and in the "Conditions Precedent" section of the Term Sheet, each of Initial Commitment Parties is pleased to inform you of its commitment (the "***Commitment***") to provide, and hereby commits to provide, to the Debtors, the respective portion of the principal amount of the DIP Facility set forth on the Initial Commitment Schedule,

on the terms and subject to the conditions set forth in this Commitment Letter and the Term Sheet. You agree that no indenture trustee, administrative agent, collateral agent, placement agent or any other agent (collectively, "*Agents*") will be appointed, and no titles or compensation will be awarded or paid, on account of the DIP Facility, unless approved by each of the Backstop Parties.

## 1.      Additional Noteholders

The parties hereto agree that each of the Post-Signing Commitment Parties will, by providing written notice to Houlihan Lokey, the financial advisor for the Backstop Parties, by **Monday, January 29, 2024, at 5:00 p.m. ET**, provide its commitment (the "*Additional Commitment*") to the DIP Facility. The Commitments of the Initial Commitment Parties will be reduced by the amount of the Additional Commitment on a pro rata basis based on the amount by which each Initial Commitment Party's Initial Commitment exceeds its Backstop Commitment. It is understood that, if any Post-Signing Commitment Parties fail to so provide their Additional Commitments (an "*Unallocated Additional Commitment*"), the undersigned Initial Commitment Parties severally agree to provide such Unallocated Additional Commitment on a pro rata basis based on their Initial Commitments set forth on the Initial Commitment Schedule. In addition, the parties hereto agree that any additional holder of the Abra Bonds (as defined below) (each, an "*Additional Noteholder*") shall have the opportunity to elect to provide its commitment to the Debtors hereunder with respect to the DIP Facility in an amount equal to such Additional Noteholder's respective ratable portion of the principal amount of its Abra Bonds to the principal amount of the Abra Bonds held by all Backstop Parties hereunder at such time pursuant to procedures to be agreed between the Debtors and the Required DIP Noteholders. It is understood that, if there are no Additional Noteholders, the undersigned Backstop Parties severally agree to provide their respective portions of the Total DIP Amount as set forth on the Backstop Commitment Schedule. Each Post-Signing Commitment Party that agrees to provide an Additional Commitment and each Additional Noteholder that agrees to become a Commitment Party hereunder shall (i) execute a joinder to this Commitment Letter agreeing to be bound to all of the provisions, terms and conditions of this Commitment Letter (including all schedules, annexes and exhibits hereto), without modification, other than the allocations of the DIP Facility set forth on the Initial Commitment Schedule or the Backstop Commitment Schedule, as applicable, which shall be deemed modified to reflect the commitments of such Post-Signing Commitment Parties or such Additional Noteholder(s), and/or (ii) execute such other documentation (including without limitation assignments) as may be needed to implement such Additional Noteholder's ratable funding of its Commitments and allocation of the DIP Facility on a pro rata basis among all of the Backstop Parties and Additional Noteholders, in each case, in a manner reasonably acceptable to all Additional Noteholders and Backstop Parties. "*Abra Bonds*" means, collectively, the (i) Abra Senior Secured Notes due 2028 ("*Abra SSNs*") issued by Abra Global Finance pursuant to the Indenture, dated as of March 2, 2023, and (ii) Abra Senior Secured Exchangeable Notes due 2028 (the "*Abra CSSNs*") issued by Abra Global Finance pursuant to the Indenture, dated as of March 2, 2023.

Any Additional Noteholder that has notified Houlihan Lokey that it can only fund in the form of notes (such noteholders, "*Bond-Only Holders*") will not be required to fund prior to the execution of definitive documentation providing for the DIP Facility to be governed by a note purchase agreement and the interests in the DIP Facility to be represented by notes that will bear CUSIPs and ISINs and which will settle through the Depository Trust Company (such date, the "*Definitive*

***Documentation Date***"). To the extent that any Bond-Only Holders hold Commitments at a time prior to the date of execution of definitive documentation, and such Commitments are either required to be funded or have already been funded, then such Bond-Only Holders will not be required to fund such Commitments or purchase such funded amounts from existing Commitment Parties. Instead, such amounts will be funded by each Commitment Party at such time that is not a Bond-Only Holder, and each Bond-Only Holder agrees that upon the Definitive Documentation Date, it will purchase such funded amounts from each other such Commitment Party holding funded amounts on a pro rata basis based on the amount by which each other Commitment Party's aggregate principal amount of funded amounts exceeds the amount that such party would hold if the Bond-Only Holders had participated in such funded amounts on a pro rata basis.

**2.     Fees.**

As consideration for the several agreements of the Backstop Parties under this Commitment Letter, and subject to the occurrence of the Closing Date (as defined below), the Debtors agree to pay:

(i) to the Initial Commitment Parties (ratably in accordance with the respective percentages set forth in the Initial Commitment Schedule) a fee (and without duplication of the "Fronting Fee" in the Term Sheet, the "***Fronting Fee***") in an amount equal to 1.00% of the aggregate amount of each Initial Commitment Party's Initial Commitment that is in excess of its Backstop Commitment (calculated on the basis that each Post-Signing Commitment Party has provided the full amount of its Additional Commitment in accordance with the terms of this Commitment Letter), which shall be payable in cash or in kind, at the Company's option, and which shall be paid and fully earned upon the Closing Date; and

(ii) to the Backstop Parties (ratably in accordance with the respective percentages set forth in the Backstop Commitment Schedule and in addition to the Fronting Fee paid to the Initial Commitment Parties) a backstop fee (and without duplication of the "Backstop Fee" in the Term Sheet, the "***Backstop Fee***") in an amount equal to 3.00% of the aggregate Total DIP Amount, which shall be payable in cash or in kind, at the Company's option, and which shall be paid and fully earned upon the closing of the DIP Facility (the "***Closing Date***").  All fees set forth in the Term Sheet shall be due and payable as set forth therein.

For the avoidance of doubt, (x) the Post-Signing Commitment Parties shall not be entitled to receive any portion of the Fronting Fee and (y) the Additional Noteholders shall not be entitled to receive any portion of the Fronting Fee or the Backstop Fee.

**3.     Conditions Precedent.**

The Commitment of each of the Backstop Parties hereunder and the agreement of such Backstop Party to perform the services described herein are subject to the satisfaction or waiver in writing (by each of the Backstop Parties) of the following conditions precedent:

(a) the accuracy and completeness, in all material respects, of all representations that the Debtors make to the Backstop Parties in the DIP Documents and in Section 8 of this Commitment Letter; <u>provided</u>, that any of the foregoing representations that are

expressly qualified as to "materiality" or "material adverse effect" shall be accurate and complete in all respects;

(b) since the date of this Commitment Letter, the Debtors are not (x) receiving any proceeds from any offering, placement or arrangement of any debt securities or bank financing (other than the DIP Facility) or (y) issuing, offering, placing or arranging any debt securities or bank financing (other than the DIP Facility), in each case, with respect to debtor-in-possession financing;

(c) the execution and delivery of this Commitment Letter;

(d) the payment in full of all fees, expenses and other amounts payable under and in connection with this Commitment Letter;

(e) execution and delivery of subordination documentation, in form and substance satisfactory to each of the Backstop Parties, subordinating all liens and all claims of Abra under the GOL ESSN and GOL SSN in assets of the Debtors to the liens granted to secure the DIP Facility; and

(f) any other conditions precedent to closing of the DIP Facility set forth in the Term Sheet.

Each Backstop Party acknowledges that the obligations of the Company hereunder are subject to the approval of the United States Bankruptcy Court for the Southern District of New York.

**4.    Commitment Termination.**

Each Backstop Party's Commitment, and this Commitment Letter, will terminate on the earliest of the following to occur: (a) February 29, 2024; (b) the Closing Date; (c) any issuance, placement, incurrence or funding of debt securities or bank financing with respect to debtor-in-possession financing by any of the Debtors with third parties (other than the DIP Facility) or the execution and delivery of definitive documentation relating to any of the foregoing; and (d) (i) the failure of any of the conditions precedent in this Commitment Letter of (ii) the failure of any of the conditions precedent to the effectiveness of the DIP Facility set forth in the Term Sheet to occur within ten (10) days after the Petition Date.  In addition, each Commitment set forth in this Commitment Letter is subject to termination pursuant to the last paragraph of this Commitment Letter.  The date of any termination under this Section 4 is referred to herein as the "***Termination Date***".  Notwithstanding the foregoing, all obligations of the Debtors with respect to the fifth sentence of the second paragraph of Section 13 hereof (and the sections referenced in such fifth sentence), shall survive the expiration or termination of this Commitment Letter.

**5.    Indemnification.**

Whether or not any of the transactions contemplated hereby are consummated, each of the Debtors jointly and severally agree to indemnify and hold harmless each Backstop Party, in each case when acting in such capacities, and each of its respective affiliates and each of their respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives, in each

case when acting in such capacities (each, an "***Indemnified Person***") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel for each such party), joint or several, that may be incurred by or asserted or awarded against any Indemnified Person (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of this Commitment Letter, the Term Sheet or the DIP Documents or the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the DIP Facility, subject to the limitations set forth in the "Indemnification" section of the Term Sheet, *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to any claim, damage, loss, liability or expense to the extent it is found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from the willful misconduct or gross negligence of such Indemnified Person. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective, subject to the proviso to the immediately preceding sentence, whether or not such investigation, litigation or proceeding is brought by any Debtor, any securityholder or creditor of any Debtor, any affiliate of any Debtor, an Indemnified Person or any other person, or an Indemnified Person is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Effective upon the date of effectiveness of the DIP Documents, the provisions of this paragraph 5 shall be replaced and superseded by any indemnification provisions set forth in the definitive documents for the DIP Facility.

Neither any of the Backstop Parties nor any other Indemnified Person, in each case when acting in such capacities, shall be responsible or liable to you or any other person or entity for (w) any determination made by such Indemnified Person (or any other Indemnified Person) pursuant to this Commitment Letter in the absence of gross negligence or willful misconduct by such Indemnified Person (all as determined by a court of competent jurisdiction in a final and non-appealable judgment), (x) any damages arising from the use by persons (other than the Backstop Parties or the Agents) of information or other materials obtained through electronic, telecommunications, internet-based or other information transmission systems (including, but not limited to, IntraLinks, SyndTrak Online or email), except to the extent such damages have resulted solely from the willful misconduct or gross negligence of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (y) any indirect, special, exemplary, incidental, punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) which may be alleged as a result of this Commitment Letter or the financing contemplated hereby.

6.    **Costs and Expenses.**

On the earlier of the Closing Date and the Termination Date, the Debtors, jointly and severally, hereby agree to pay or reimburse each Agent and each Backstop Party for all reasonable and documented costs and expenses incurred by such Agent and such Backstop Party in connection with the DIP Facility and the preparation, negotiation, execution and delivery of this Commitment Letter, the Term Sheet and the DIP Documents and any security arrangements in connection therewith, including, without limitation, the reasonable fees and disbursements of counsel for the Agents and the Backstop Parties, subject to the limitations set forth in the "Expenses" section of the Term Sheet, whether or not any of the transactions contemplated hereby are consummated. The Debtors further jointly and severally agree to pay or reimburse each Agent and each Backstop Party for all

reasonable costs and expenses incurred thereby in connection with the administration, amendment, modification or waiver of the DIP Documents, including, without limitation, the reasonable fees and disbursements of primary counsel and appropriate local counsel and, in the case of an actual or reasonably perceived conflict of interest with respect to any of the Debtors, additional counsel (and appropriate local counsel) for affected parties (whether incurred before or after the date hereof), subject to the limitations set forth in the "Expenses" section of the Term Sheet. The Debtors further agree to pay all costs and expenses of each Agent and each of the Backstop Parties (including, without limitation, fees and disbursements of counsel) incurred in connection with the enforcement, collection or protection of any of its rights and remedies hereunder and under the DIP Documents, subject to the limitations set forth in the "Expenses" section of the Term Sheet. Effective upon the date of effectiveness of the DIP Documents, the provisions of this paragraph 6 shall be replaced and superseded by any expense reimbursement provisions set forth in the definitive documents for the DIP Facility.

## 7.    Confidentiality; Information.

By accepting delivery of this Commitment Letter, each of the Debtors agrees that this Commitment Letter and the Term Sheet are for its confidential use only and that neither its existence nor the terms hereof will be disclosed by it to any person or entity (whether legal or other entity), other than officers, directors, employees, accountants, attorneys and other advisors of the Debtors, and, following the Debtors' acceptance of the provisions hereof and its return of an executed counterpart of this Commitment Letter, any Official Committee of Unsecured Creditors that may be appointed in the Cases and the Office of the United States Trustee, and then only on a confidential and "need to know" basis in connection with the transactions contemplated hereby. Notwithstanding the foregoing or anything to the contrary in the Commitment Letter, (a) following the Debtors' acceptance of the provisions hereof and its return of an executed counterpart of this Commitment Letter, the Debtors may disclose this Commitment Letter and the Term Sheet and the existence thereof in filings with the Bankruptcy Court presiding over the Cases and (b) the Debtors may disclose as compelled in a judicial or administrative proceeding or as otherwise required by law (in which case the Debtors agree to inform the Backstop Parties promptly thereof).

## 8.    Representations and Warranties.

Each of the Debtors hereby represents and warrants that all written information (other than financial projections, estimates, forecasts and budgets and other forward-looking information concerning the Company) that has been or will hereafter be made available to the Agents and/or the Backstop Parties by or on behalf of the Debtors or any of their respective affiliates or representatives in connection with the transactions contemplated hereby (such written information being referred to herein as the "*Information*"), when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made (giving effect to any and all supplements and updates thereto which have been provided prior to the date of such representation). Each of the Debtors further represents and warrants that all financial projections delivered by it or on its behalf were prepared by it in good faith and based on assumptions the Debtors believe were reasonable when made (in light of the circumstances and conditions when prepared); provided, however, that (a) the financial projections relate to future events and are not to be viewed as facts,

(b) the financial projections are subject to significant uncertainties and contingencies, many of which are beyond the Debtors' control, (c) the Debtors make no representation or warranty that such financial projections will be realized and (d) actual results during the period or periods covered by any such financial projections may differ materially from the projected results.  If at any time from the date hereof until the earlier of (x) the Termination Date and (y) the Closing Date any of the representations and warranties in the preceding sentences would be incorrect in any material respect if the Information or financial projections were being furnished, and such representations and warranties were being made, at such time, then the Debtors will promptly supplement the Information or financial projections, as applicable, so that such representations and warranties contained in this paragraph will be correct in all material respects at such time.

In issuing this Commitment Letter and in arranging the DIP Facility, the Agents and the Backstop Parties will be entitled to use, and to rely on the accuracy of, the Information furnished to them by or on behalf of the Debtors and their respective affiliates without responsibility for independent verification thereof and do not assume responsibility for the accuracy or completeness thereof.

## 9.   No Third Party Reliance, Etc.

This Commitment Letter has been and is made solely for the benefit of the parties signatory hereto, the Indemnified Persons, and their respective heirs, successors and assigns, and nothing in this Commitment Letter, expressed or implied, is intended to confer nor does confer on any other person or entity any rights or remedies under or by reason of this Commitment Letter or the agreements of the parties contained herein and may not be relied upon by any person or entity other than you.

## 10.   Sharing Information; Absence of Fiduciary Relationship.

Each Backstop Party reserves the right to employ the services of its affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to its affiliates certain fees payable to it in such manner as it and its affiliates may agree in their sole discretion.  You acknowledge that (i) each Backstop Party may share with any of its affiliates, and such affiliates may share with it, any information related to the transaction, the Debtors (and its respective subsidiaries and affiliates), or any of the matters contemplated hereby and (ii) each Backstop Party and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you or the other Debtors may have conflicting interests regarding the transactions described herein or otherwise.  We will, however, not furnish confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or our other relationships with you to other companies (other than your affiliates).  You also acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by us from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and us is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether we or our affiliates have advised or are advising you on other matters, (b) we, on the one hand, and you, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on our part, (c) you are capable of evaluating and understanding, and you understand and

accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that we and our affiliates are engaged in a broad range of transactions that may involve interests that differ from your interests and that we and our affiliates have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, and (e) you waive, to the fullest extent permitted by law, any claims you may have against us or our affiliates for breach of fiduciary duty or alleged breach of fiduciary duty and agree that we and our affiliates shall have no liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

## 11.    **Assignments.**

The Debtors may not assign this Commitment Letter (including the Term Sheet) or any Commitment hereunder without the prior written consent of each Backstop Party, and any attempted assignment without such consent shall be null and void.  Any and all obligations of, and services to be provided by each Agent or Backstop Party hereunder (including, without limitation, the Commitment thereof) may be performed and any and all rights thereof may be exercised by or through any of their respective affiliates or branches, or managed or advised funds; underlined_provided that with respect to the Commitments, any such assignments thereof will not relieve such Backstop Party from any of its obligations hereunder until such assignee shall have funded the portion of the Commitment so assigned.

## 12.    **Amendments.**

This Commitment Letter and the Term Sheet may not be amended or any provision hereof or thereof waived or modified except by written agreement signed by each party hereto.

## 13.    **GOVERNING LAW, JURISDICTION; WAIVERS.**

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Court shall abstain from or otherwise be unavailable to preside over any such action or proceeding, any New York State court or Federal court of the United States of America sitting in the State of New York, Borough of Manhattan), and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding shall be heard and determined only in such courts located within New York County, provided, however, that each Agent shall be entitled to assert jurisdiction over you and your property in any court in which jurisdiction may be laid over you or your property, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Term Sheet, or the transactions contemplated hereby or thereby in the Bankruptcy Court or any such New York State or Federal court, as the case may be, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties hereto agrees that service of any process,

summons, notice or document by registered mail or overnight courier addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

This Commitment Letter and the Term Sheet shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law to the extent that the application of the laws of another jurisdiction will be required thereby and, to the extent applicable, the United States Bankruptcy Code. This Commitment Letter and the Term Sheet set forth the entire agreement among the parties with respect to the matters addressed herein and therein and supersede all prior communications, written or oral, with respect hereto and thereto. This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same Commitment Letter.  Delivery of an executed counterpart of a signature page to this Commitment Letter by facsimile or electronic transmission (e.g., "pdf") shall be as effective as delivery of a manually executed counterpart of this Commitment Letter.  Sections 4 through and including 10 and 13 through and including 14 and provisions relating to assignment of titles and roles shall survive the expiration or termination of this Commitment Letter whether or not the DIP Documents shall be executed and delivered.  Section headings and paragraph numbers used herein are for convenience of reference only, and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.  Each Agent and each Backstop Party may, in consultation with you, place customary advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of customary information on the Internet or worldwide web as it may choose, and circulate similar promotional materials, after the Closing Date in the form of a "tombstone" or otherwise describing the names of the Debtors and its affiliates (or any of them), and the amount, type and closing date of the transactions contemplated hereby, all at the expense of such Agent or such Backstop Party, as applicable.

Reasonably promptly after the execution of this Commitment Letter, the parties hereto shall proceed with the negotiation of the DIP Documents for the purpose of executing and delivering the DIP Documents on or prior to the earlier of (x) February 16, 2024, and (y) the date of the hearing for the Final DIP Order.

## 14. __WAIVER OF JURY TRIAL.__

**Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter or the Term Sheet or the transaction contemplated hereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof.**

## 15. __PATRIOT Act Notification.__

The Backstop Parties hereby notify the Debtors that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**_PATRIOT Act_**"), the Backstop Parties may be required to obtain, verify and record information that identifies each obligor under the DIP Facility, which information includes the name, address, tax identification number and other information regarding each obligor that will allow each Backstop Party to identify each obligor in accordance with the PATRIOT Act and is effective as to each Backstop Party.

Please indicate your acceptance of the provisions hereof by signing the enclosed copy of this Commitment Letter and returning it at or before 5:00 p.m. (New York City time) on the day immediately following the date hereof, the time at which the several commitments of the Backstop Parties set forth above (if not so accepted by you prior thereto) will terminate.

*[Signature pages follow]*

Very truly yours,

[SIGNATURE PAGES REDACTED]

**Annex A**
**Initial Commitments**



| Total: | $950,000,000.00 | 100.00% |
|---|---|---|

**Annex B**
**Backstop Commitment Schedule[1]**

| Backstop Party | Backstop Allocation Amount | Backstop Allocation Percentage |
|---|---|---|



| Total: | $950,000,000.00 | 100.00% |
|--------|-----------------|---------|

**Annex C**

**Term Sheet**

CONFIDENTIAL; SUBJECT TO FRE408 AND ANALOGOUS PROVISIONS
IN ALL APPLICABLE JURISDICTIONS

**SUPERPRIORITY SENIOR SECURED PRIMING
DEBTOR-IN-POSSESSION FINANCING**

**Summary of Terms and Conditions**

*This term sheet containing the summary of terms and conditions (this "DIP Term Sheet") sets forth the understanding and agreement among the Issuer and Guarantors (each as defined below) and the DIP Noteholders (as defined below) of certain of the terms of the proposed superpriority senior secured priming debtor-in-possession financing facility (the "DIP Facility"), subject to the conditions set forth in the Backstop Commitment Letter to which this DIP Term Sheet is attached and set forth below, among the Debtors, the Trustee and the Collateral Agent (each as defined below).  This DIP Term Sheet will be superseded by the DIP Documents (as defined below) containing more detailed terms, conditions, covenants, representations and warranties and other provisions.*

| | |
|---|---|
| **Issuer** | GOL Finance |
| **Guarantors** | GOL Linhas Aéreas Inteligentes S.A.;<br>GOL Equity Finance;<br>GOL Linhas Aéreas S.A.;<br>Smiles Fidelidade S.A. ("Smiles");<br>and each of the other subsidiaries and affiliates of the foregoing that is a debtor and debtor-in-possession (collectively, the "Guarantors", and together with the Issuer, collectively, the "Debtors") in cases commenced under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Bankruptcy Court (as defined below), other than (i) Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior and Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior and (ii) for the avoidance of doubt, Abra Group Limited ("Abra") and Abra Global Finance.<br><br>On or before the Interim DIP Order Funding, each Guarantor will enter into New York law guarantee agreements in form and substance reasonably satisfactory to the Debtors and the DIP Noteholders in favor of the DIP Noteholders, the Collateral Agent and the Trustee (the "New York Law Guarantee Requirement"); provided that the Debtors shall have received a form of such guarantee on or prior to 7:00 p.m., New York time, on January 26, 2024. |
| **Collateral Agent** | GLAS. |
| **Trustee** | The Bank of New York Mellon or other trustee as determined by the Required DIP Noteholders. |
| **DIP Noteholders** | Following the Interim DIP Order Funding, each holder of (a) the Senior Secured Exchangeable Notes due 2028 issued by Abra Global Finance (the "Abra CSSNs") and/or (b) the Senior Secured Notes due 2028 issued by Abra Global Finance (the "Abra SSNs" and, together with the Abra CSSNs, the "Abra 2028 Notes"; the holders of the Abra 2028 Notes are hereinafter referred to as the "Abra Noteholders") shall have the opportunity to provide a commitment in respect of the DIP Facility in an amount equal to such Abra |

| | |
|---|---|
| | Noteholder's respective ratable portion of the principal amount of its Abra 2028 Notes to the principal amount of the Abra 2028 Notes held by all Backstop Parties (as defined in the Commitment Letter) at such time in accordance with the terms, requirements and procedures set forth in the Commitment Letter (the "Abra Noteholder DIP Facility Election").

All interest accruing on the DIP Facility held by an Initial Commitment Party (as defined in the Commitment Letter) prior to effectiveness of an Additional Commitment (as defined in the Commitment letter) shall be retained by such Initial Commitment Party. All interest accruing on the DIP Facility held by a Backstop Party prior to the consummation of the Abra Noteholder DIP Facility Election shall be retained by such Backstop Party and is not subject to the Abra Noteholder DIP Facility Election.

A placement agent will serve as the initial note purchaser for any applicable DIP Noteholder. |
| **DIP Secured Parties** | The Collateral Agent, the Trustee and the DIP Noteholders. |
| **Amount, Type, Availability** | A superpriority senior secured priming debtor-in-possession financing in an aggregate principal amount up to $950 million (the "Total DIP Amount", and any notes issued thereunder, collectively, the "DIP Notes" or the "DIP Facility" or the "DIP"), subject to the terms and conditions herein, of which (i) up to $350 million shall be provided upon entry by the Bankruptcy Court of the Interim DIP Order (as defined below), initially in the form of term loans and subsequently refinanced by the issuance of DIP Notes under a note purchase agreement (the "Interim DIP Order Funding"), subject to the satisfaction of the conditions precedent for the Closing Date set forth in this Term Sheet (including the effectiveness of the subordination agreement referenced in clause (viii) of the section titled "Conditions Precedent" in this Term Sheet) and under the DIP Documents, which Interim DIP Order Funding shall be provided by the Initial Commitment Parties as set forth in the Commitment Letter; (ii) up to another $150 million shall be issued upon entry by the Bankruptcy Court of the Final DIP Order (as defined below) (the "Final DIP Order Funding") subject to the satisfaction of the Brazilian Final DIP Order Funding Condition under the Brazilian Guaranty and Perfection Requirements (each as defined below); and (iii) additional notes may be issued in an aggregate principal amount of up to the remaining Total DIP Amount in one additional issuance (the "Final Funding") subject to the satisfaction of the Brazilian Final Funding Condition (as defined below) under the Brazilian Guaranty and Perfection Requirements; provided that in no event shall satisfaction of the Brazilian Post-Closing Covenant (as defined below) under the Brazilian Guaranty and Perfection Requirements be a condition to the Final DIP Order Funding or the Final Funding.

As used herein, "Brazilian Guaranty and Perfection Requirements" means the granting and perfection of Brazilian law guarantees and collateral made by each of the Debtors in favor of the DIP Noteholders guaranteeing all DIP Obligations: |

BUSINESS.30903586.25

|  |  |
|---|---|
|  | (a) by each of the Debtors incorporated under Brazilian law entering into Brazilian Guarantee Agreements within five business days after the Interim DIP Order Funding (the requirements of this clause (a), the "Brazilian Guarantee Requirement");

(b) on a "first-priority" basis with respect to the portion of the Priming Collateral that secures the GOL 2028 Notes, as a condition to the Final DIP Order Funding (or the waiver of such funding condition by DIP Noteholders holding at least $66^2/_3$% of the aggregate principal amount of DIP Notes and commitments to issue DIP Notes) (the "Brazilian Final DIP Order Funding Condition");

(c) on a "first-priority" basis with respect to all other Priming Collateral as a condition to the Final Funding (or the waiver of such funding condition by DIP Noteholders holding at least $66^2/_3$% of the aggregate principal amount of DIP Notes and commitments to issue DIP Notes) (the "*Brazilian Final Funding Condition*"); provided that if the Debtors have used reasonable best efforts to satisfy the Brazilian Final Funding Condition and have been unable to obtain, despite exerting substantial efforts, any consent, approval or agreement from any third party in order to complete the Brazilian Final Funding Condition, then satisfaction of the Brazilian Final Funding Condition shall no longer be a condition to the Final Funding; provided, further, that, in any event, the Debtors shall continue to use reasonable best efforts to obtain such consent, approval or agreement; and

(d) on a "first-priority" or "second-priority" basis (i.e. "Sobejo" or "Suspensive Condition" for Brazilian law purposes), as applicable, with respect to the assets under clauses (ii) and (iv) of the definition of "Collateral" and the adequate protection liens, on a reasonable best efforts basis within 60 days after the Closing Date (the "*Brazilian Post-Closing Covenant*"); provided, that, in any event, the Debtors shall continue to use reasonable best efforts to obtain such liens even if such liens are not obtained within 60 days after the Closing Date

in each case, including the execution and delivery of the applicable Brazilian Agreements (as defined in Annex A hereto), all other applicable documents set forth on Annex A, any collateral or security agreement in respect of the adequate protection liens on the Collateral and any other documents that the Required DIP Noteholders reasonably request in connection with the DIP Liens on the Collateral, and the filing and registration of each thereof with all the relevant governmental authorities (except for the registration with the INPI listed in item 5 of Annex A), and the execution and delivery of other agreements reasonably requested by the Required DIP Noteholders in connection with any Brazilian Agreement in connection with the foregoing (including intercreditor agreements), in each case as set forth on Annex A, all of the foregoing to be in and form and substance reasonably satisfactory to the Required DIP Noteholders. |
| **Fees** | Commitment Fee: 2.00% of the Total DIP Amount. The Commitment Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date.

Exit Fee: 2.00% of the Total DIP Amount. The Exit Fee shall be fully earned and due and payable in cash on the Termination Date. |

3

| | |
|---|---|
| | Backstop Fee: 3.00% of the Total DIP Amount, payable to the Backstop Parties.  The Backstop Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date. |
| | Fronting Fee: 1.00% of the aggregate principal amount of the aggregate amount of each Initial Commitment Party's Initial Commitment that is in excess of its Backstop Commitment (calculated on the basis that each Post-Signing Commitment Party has provided the full amount of its Additional Commitment in accordance with the terms of the Commitment Letter). The Fronting Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date. |
| | Undrawn Fee: 5.75% per annum on the average daily portion of the Total DIP Amount that from time to time shall not yet have been issued after the date of the Final DIP Order.  The Undrawn Fee shall be due and payable monthly in arrears, in cash or in kind, at the Issuer's option, from the date of the Final DIP Order until the Termination Date. |
| | Placement Agent Fees: To be mutually agreed. |
| | All fees set forth in this section shall be non-refundable. |
| **Interest Rate; Default Rate** | Interest Rate.  All amounts outstanding under the DIP shall bear interest at the rate equal to 30-day SOFR (subject to a 3.50% per annum SOFR floor, but without any credit spread adjustment), plus 10.50% per annum.   All interest shall be payable monthly in arrears in cash or in kind, at the Issuer's option. |
| | Default Rate.  Upon the occurrence and continuance of an Event of Default under the DIP, at the election of the Required DIP Noteholders, all amounts outstanding under the DIP will bear interest at the otherwise applicable interest rate *plus* an additional 2.00% per annum, which shall be payable in cash on demand by the Required DIP Noteholders or the Trustee (or, if no demand is made, payable monthly with the regularly scheduled interest payments). |
| **Termination Date** | The DIP facility shall terminate, and all DIP commitments shall terminate, and all DIP Obligations shall be payable in full in cash on the earliest to occur of (the "Termination Date"): (a) twelve (12) months from the Closing Date (as defined below), provided that the Issuer shall be permitted to extend the Termination Date, on not more than two (2) occasions, by up to an additional three (3) months for each extension (a "Maturity Extension", and the Termination Date so extended, the "Scheduled Termination Date") upon payment of an extension fee (payable in kind) in an amount equal to (x) 2.00% of the Total DIP Amount for the first extension and (y) 2.50% of the Total DIP Amount for the second extension, (b) conversion of any of the Chapter 11 Cases to a case under chapter 7 without the prior written consent of the Required DIP Noteholders (as defined below), (c) dismissal of any of the Chapter 11 Cases without the prior written consent of the Required DIP Noteholders, (d) the appointment of a chapter 11 trustee or an examiner with expanded powers, (e) the date of consummation of a sale of all or substantially all assets of the Debtors, (f) the effective date of a chapter 11 plan and (g) the date the DIP Obligations become due and payable in full |

| | |
|---|---|
| | under the DIP Documents (as defined below), whether by acceleration or otherwise. |
| **Use of Proceeds** | Proceeds of the DIP (which proceeds, prior to their use by the Debtors, shall be held in a deposit account maintained with a bank organized in the United States that is subject to the DIP Liens and, within a period after the Closing Date to be agreed, will be either subject to an account control agreement in favor of the Collateral Agent or otherwise under the control of the Collateral Agent (as defined in Article 9 of the New York Uniform Commercial Code) (the "Note Proceeds Account")) will be used only for the following purposes, in each case in accordance with the Approved Budget (as defined below), subject to variances that are not Prohibited Variances: (i) general corporate and working capital purposes; (ii) costs of the administration of the Chapter 11 Cases; (iii) adequate protection payments as approved by the Bankruptcy Court; (iv) after the Final Funding has occurred, repayment of the Abra prepetition bridge loans made to GOL on or after January 20, 2024 in an aggregate principal amount of no more than $15,000,000; (v) payment of reasonable and documented transaction costs, fees and expenses with respect to the DIP, including reasonable fees and expenses of legal and other professional advisors to the DIP Noteholders, the Collateral Agent and the Trustee; (vi) for contributing equity to subsidiaries of the Debtors as required under the laws of the jurisdiction of formation of such subsidiaries in order to avoid mandated liquidation for having negative net equity; and (vii) for any other purpose approved by the Bankruptcy Court in the DIP Orders or other orders of the Bankruptcy Court not inconsistent with the terms of the DIP Documents. |
| **Budgets; Budget Variance Reports** | The initial budget shall consist of forecasted receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing on the Closing Date (the "Initial Approved Budget") and shall be updated by Thursday of every two (2) weeks thereafter, which updated budget shall be in form and substance reasonably satisfactory to the Required DIP Noteholders or their financial advisors (each, an "Approved Budget"); provided that, until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect; provided, further, that neither the Initial Approved Budget nor any subsequent Approved Budget shall be modified in any manner without the prior written consent of the Required DIP Noteholders or their financial advisors. |
| | Commencing on the second Friday after the Closing Date, and on every second calendar week thereafter, the Debtors shall deliver to the DIP Noteholders and their advisors a variance report for the immediately preceding two-week period comparing the actual receipts and disbursements of the Debtors, on a line-item basis, from the values set forth in the Approved Budget (each, a "Budget Variance Report"), with an explanation of each Prohibited Variance (as defined below) accompanied by an officer's certificate attesting to the truth and accuracy of such Budget Variance Report. The Debtors shall ensure that there shall be no unfavorable variance of 15% or more (a "Prohibited Variance") from the total operating disbursements in the aggregate (excluding any fees and expenses of legal, financial and other professional advisors) for every two-week period after the Closing Date (the "Variance Period"). |

BUSINESS.30903586.25

| | |
|---|---|
| | For the avoidance of doubt, (i) any delivery of a budget or a Budget Variance Report due on any day that is not a business day shall instead be delivered on the next business day thereafter, (ii) no variance testing, budget restriction or other Events of Default with respect to fees and expenses of legal, financial and other professional advisors shall apply and (iii) any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail (including as communicated by counsel to the DIP Noteholders by e-mail). |
| **Financial Covenant** | Minimum Liquidity Covenant: The sum of (x) unrestricted cash-on-hand (and cash equivalents) of the Debtors _plus_ (y) so long as no Event of Default has occurred and is continuing, the undrawn amount of the Total DIP Amount shall be not less than the Minimum Liquidity for any period of five (5) consecutive business days. |
| | "Minimum Liquidity" shall be defined as: |
| | (i) $200 million for all measurement periods falling between April 1, 2024 and November 30, 2024; and |
| | (ii) $250 million for all other measurement periods. |
| **Milestones** | The DIP Documents shall contain the following milestones (collectively, the "Milestones") as may be reasonably set forth in the DIP Documents by the DIP Noteholders in consultation with the Debtors and their advisors, which shall include, without limitation, that: |
| | i. The Debtors shall have commenced their Chapter 11 Cases in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on or before January 31, 2024 (the "Petition Date"); |
| | ii. The Debtors shall have entered into definitive documentation governing the DIP in the form of a note purchase agreement and/or an indenture on or before the earlier of (x) February 16, 2024 and (y) the date of the hearing for the Final DIP Order; |
| | iii. The Debtors shall have proposed a business plan for the reorganization and restructuring of the Debtors' business that is reasonably acceptable to the Required DIP Noteholders (the "Business Plan") by no later than 120 days after the Petition Date; |
| | iv. No later than 90 days after the Petition Date, the Debtors shall have entered into stipulation agreements for no less than 90 aircraft; |
| | v. The Debtors shall file a motion seeking approval of the DIP on the Petition Date; |
| | vi. An interim order of the Bankruptcy Court, in form and substance reasonably acceptable to the Required DIP Noteholders, approving the DIP on an interim basis (the "Interim DIP Order") shall be entered in the Chapter 11 Cases by no later than three (3) business days after the Petition Date (and subject in any event to the availability of the Bankruptcy Court); |
| | vii. A final order of the Bankruptcy Court, in form and substance reasonably acceptable to the Required DIP Noteholders, approving the DIP on a final basis (the "Final DIP Order", and together with the |

BUSINESS.30903586.25

| | |
|---|---|
| | Interim DIP Order, the "<u>DIP Orders</u>") shall be entered in the Chapter 11 Cases by no later than 45 days after the Petition Date; |
| | viii. The Debtors shall file an Acceptable Plan (as defined below) by no later than 260 days after the Petition Date; |
| | ix. An order (the "<u>Disclosure Statement Order</u>") approving a disclosure statement for an Acceptable Plan, which disclosure statement shall be reasonably acceptable to the Required DIP Noteholders, shall be entered in the Chapter 11 Cases by no later than 305 days after the Petition Date; |
| | x. An order (the "<u>Confirmation Order</u>") confirming an Acceptable Plan shall be entered in the Chapter 11 Cases by no later than 14 days before the Scheduled Termination Date; and |
| | xi. Such confirmed Acceptable Plan shall become effective by no later than the Scheduled Termination Date; |
| | in each case, as any such date may be extended with the written consent of the Required DIP Noteholders (which consent may be confirmed via e-mail by counsel on behalf of the Required DIP Noteholders); <u>provided</u> that, to the extent any Maturity Extension is elected by the Issuer, the due dates for the Milestones set forth in clauses (vii) through (x) shall be extended to reflect the same additional period as the extended Termination Date. |
| | Except as otherwise provided above, all orders entered by the Bankruptcy Court throughout the pendency of the Chapter 11 Cases must be reasonably acceptable to the Required DIP Noteholders. |
| | The Debtors shall provide the DIP Noteholders and the Trustee with drafts of all material pleadings (together with proposed orders attached thereto, as applicable), including all "first day" and "second day" pleadings to be filed in the Chapter 11 Cases, before filing and with reasonable time for the DIP Noteholders and the Trustee to comment thereon, and such material pleadings shall not conflict with the terms of this Term Sheet or the DIP Documents. |
| | "<u>Acceptable Plan</u>" means a chapter 11 plan of reorganization that (i) shall provide for payment in full in cash of all DIP Obligations on the effective date of such plan to the extent such plan is confirmable (as defined in the Bankruptcy Code) or (ii) is otherwise acceptable to the Required DIP Noteholders (solely with respect to the treatment of their respective claims) and the Debtors; <u>provided</u> that, in connection with any Acceptable Plan under this clause (ii), the Debtors and the DIP Noteholders shall enter into a restructuring support agreement with respect to such treatment of claims. |
| **Collateral** | The DIP facility shall be secured by liens (collectively, the "<u>DIP Liens</u>") on all of the assets of the Debtors (in each case subject to certain customary exclusions to be agreed and excluding, for the avoidance of doubt, any aircraft or engines owned by lessors and any leasehold interests therein to the extent prohibited by the respective leases), including in any event but not limited to the following (collectively, the "<u>Collateral</u>"): |
| | i. pursuant to section 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected first-priority priming lien on all assets pledged to secure the Debtors' obligations under the 8.00% Senior Secured Notes due 2026 issued by the Issuer (the "<u>GOL 2026 Notes</u>", |

7

and the holders of the GOL 2026 Notes, the "GOL 2026 Noteholders"), the Senior Secured Notes due 2028 issued by the Issuer (the "GOL SSNs") and the Senior Secured Exchangeable Notes due 2028 issued by GOL Equity Finance (the "GOL ESSNs" and, together with the GOL SSNs, the "GOL 2028 Notes", and the holders of the GOL 2028 Notes, the "GOL 2028 Noteholders") (such assets, including, without limitation, the Smiles IP, the GOL IP and the spare parts listed in the Existing Brazilian Collateral Agreements and all GOL intercompany claims and receivables, including, without limitation, such as are evidenced by the GOL Global Intercompany Notes (as defined in each of the Abra SSN Indenture and the Abra CSSN Indenture), collectively, the "Priming Collateral");

ii.   pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected first-priority lien on all assets of the Debtors to the extent that such assets are not subject to prior liens in existence as of the Petition Date (including, without limitation, (a) all cash and bank accounts of the Debtors not subject to prior perfected liens (including, without limitation, the Note Proceeds Account) and (b) all applicable lease and other contract rights with respect to any aircraft not subject to existing liens);

iii.   pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, upon entry of the Final DIP Order and to the extent approved by the Bankruptcy Court, a valid perfected first-priority lien on any and all property and proceeds recovered from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "Avoidance Actions"); and

iv.   pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected second-priority lien (i.e. "Sobejo" or "Suspensive Condition" for Brazilian law purposes) on all assets of the Debtors subject to valid perfected liens in existence as of the Petition Date, other than existing liens referred to in clause (i) above (including, without limitation, (a) all accounts receivable owing to Smiles and (b) all applicable lease and other contract rights with respect to any aircraft subject to existing liens).

All of the liens described herein with respect to the Collateral securing the DIP Obligations shall be deemed effective and perfected by entry of the Interim DIP Order and perfected under local law by entry of the Final DIP Order and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements, but without limitation of the right of the Collateral Agent to require any such agreements, and subject in all events to the Brazilian Guaranty and Perfection Requirements.

For the purposes of Brazilian law, any reference to a "second-priority" lien in this Term Sheet shall be interpreted as references to, as applicable, (a) a security interest over future credit rights, revenues and excess proceeds, if any, that a Debtor incorporated under Brazilian law may become entitled in case there are outstanding amounts due to such entities after a foreclosure by a third

BUSINESS.30903586.25

| | |
|---|---|
| | party lender of a certain collateral interest securing a first-priority secured obligation ("*Sobejo*"); or (b) a security interest under suspensive condition over certain assets or rights that are subject to a first-priority lien in favor of a third party lender, in accordance with Article 125 of the Brazilian Civil Code ("Suspensive Condition"). |
| **Superpriority Claim** | All obligations and liabilities under the DIP shall at all times, subject to the Carve-Out, be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority claim status over any and all administrative expenses of the kind that are specified in, or contemplated by, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code (collectively, the "Superpriority Claim"). |
| **Adequate Protection** | The DIP Orders shall include (i) a customary adequate protection package ("Adequate Protection"), reasonably satisfactory to the Required DIP Noteholders, for the GOL 2026 Noteholders, the GOL 2028 Noteholders and the Abra Noteholders for the protection of their prepetition liens in the collateral securing the prepetition claims under the GOL 2026 Notes, the GOL 2028 Notes and the Abra Notes, to the extent of the diminution of such collateral, including, without limitation, (A) current payment in cash of the Adequate Protection Expenses (as defined below), (B) replacement adequate protection liens on the Collateral, junior to certain prior liens, (C) continued payment of paid in kind interest and current payment of all cash-pay interest under the GOL 2028 Notes for the duration of the Chapter 11 Cases, (D) repayment of the Abra prepetition bridge loans to the extent permitted hereunder, (E) superpriority claims as provided for in section 507(b) of the Bankruptcy Code and (F) delivery of all financial statements, Budgets, Budget Variance Reports and other information reporting under the DIP; provided that such Adequate Protection liens and claims shall be junior in every respect to the DIP Liens granted to secure the obligations and liabilities owing under the DIP, the Superpriority Claims, and prior payment of the Carve-Out; and (ii) a customary consent to use of cash collateral, reasonably satisfactory to the Required DIP Noteholders, including payment of certain professional fees customary for a debtor-in-possession financing of this type to the DIP Noteholders. For the avoidance of doubt, adequate protection shall only be provided at entities for which holders of the GOL 2026 Notes and GOL 2028 Notes held secured claims as of the Petition Date. |
| | "Adequate Protection Expenses" means all prepetition and postpetition reasonable and documented fees and expenses (excluding, for the avoidance of doubt, any fees and expenses in connection with any Prohibited Actions) of the GOL 2026 Noteholders, the GOL 2028 Noteholders, the Abra Noteholders and the trustees and collateral agents with respect to the GOL 2026 Notes, the GOL 2028 Notes and the Abra Notes. |
| **Carve-Out** | (a)      As used in this Term Sheet, "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 without regard to the notice set forth in clause (iii) below; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) without regard to the notice set forth in clause (iii) below; (iii) to the extent allowed at any time, whether by interim |

BUSINESS.30903586.25

order, final order, procedural order, or otherwise, all unpaid fees and expenses (other than fees or expenses incurred in connection with any Prohibited Actions) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official committee of unsecured creditors (the "Committee"), if one is appointed, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Trustee of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors that are fully earned, due and payable pursuant to the terms of the applicable engagement letters or retention applications prior to the delivery of a Carve-Out Trigger Notice) (such amounts in this clause (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) after the date of delivery of the Carve-Out Trigger Notice (the "Trigger Date"), Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $10,000,000 (the "Post-Carve-Out Trigger Notice Cap") incurred after the first business day following delivery by the Trustee of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise (such amounts in this clause (iv), the "Post-Trigger Notice Professional Fees").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Trustee by email (or other electronic means) to (A) the Debtors and Milbank LLP, (B) counsel to the Trustee, (C) counsel to the ad hoc group of Abra Noteholders, (D) counsel to Elliott Investment Management, L.P. and its affiliates ("Elliott"), (E) the U.S. Trustee, and (F) lead counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default (but subject to any applicable grace periods, waivers, or forbearances) stating that the Post Carve-Out Trigger Notice Cap is invoked.

(b)      The Carve-Out shall be senior to the DIP Liens and the Superpriority Claim.  Notwithstanding anything to the contrary contained in this Term Sheet or any DIP Documents, the security interests, Liens and claims granted to any of the parties (including, without limitation, the DIP Liens and the Superpriority Claim) under, pursuant to or in connection with the DIP facility, any DIP Document, or this Term Sheet, as applicable, shall be subject to the Carve-Out.

(c)      Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered, (i) the Debtors shall be permitted to pay Pre-Trigger Notice Professional Fees, as the same may become due and payable, including on an interim basis, solely in accordance with orders of the Bankruptcy Court, and (ii) such payments shall not reduce, or be deemed to reduce, the Post-Carve-Out Trigger Notice Cap.

(d)      Any payment or reimbursement made after the Trigger Date in respect of any Post-Trigger Notice Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the

BUSINESS.30903586.25

|  | Final DIP Order, the DIP Documents, the Bankruptcy Code and applicable law. |
|  | (e)    None of the Trustee, the Collateral Agent, or the DIP Noteholders shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these chapter 11 cases or any successor cases.  Nothing in this Term Sheet or otherwise shall be construed to obligate the Trustee, the Collateral Agent or the DIP Noteholders, GOL 2026 Noteholders or GOL 2028 Noteholders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. |
| **Prohibited Actions** | No portion of the DIP, the Carve-Out or the Collateral or the proceeds thereof may be used for the payment of the fees and expenses incurred by anyone challenging, or in connection with any challenge of, any liens or claims of Abra Global Finance or Abra in respect of the GOL 2028 Notes, or any liens or claims of the GOL 2026 Noteholders, or any liens or claims of the Abra Noteholders in respect of any assets of the Debtors, or the initiation or prosecution of any claim or cause of action against Abra Global Finance, Abra, the Abra Noteholders, the GOL 2026 Noteholders, the DIP Noteholders, the Collateral Agent or the Trustee (or any of their respective affiliates), including any claim under chapter 5 of the Bankruptcy Code; provided that any Committee may use up to $50,000 in the aggregate to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any such claims or causes of action.  In addition, neither the Carve-Out nor any portion of proceeds under the DIP or proceeds of the Collateral shall be used in connection with preventing, hindering or delaying Abra Global Finance's, Abra's, the Abra Noteholders', the Collateral Agent's, or the Trustee's enforcement or realization upon the Collateral for the benefit of the DIP Noteholders once an Event of Default has occurred under the DIP Documents.  Any challenge period and all related challenge mechanics shall be reasonably satisfactory to the Required DIP Noteholders; provided that such challenge period (i) with respect to the Committee, shall be 60 days following the formation of the Committee and (ii) with respect to all other parties, shall be 75 days following entry of the Interim DIP Order, in each case subject to any order of the Bankruptcy Court modifying such dates. |
| **Documentation Principles** | The DIP shall be documented by this Term Sheet and a superpriority, senior secured priming indenture and/or note purchase agreement, and on the Interim DIP Order Funding, may be documented by a promissory note in a form to be mutually agreed (provided that the Debtors shall have received a form of such promissory note on or prior to 7:00 p.m., New York time, on January 26, 2024) (together with any and all security agreements, the DIP Orders, and other relevant documentation, the "DIP Documents"), in form and substance reasonably acceptable to the Required DIP Noteholders, the Collateral Agent, the Trustee and the Debtors.  It is understood and agreed that no legal opinions shall be required in connection with the DIP Documents, other than customary legal opinions of Brazilian counsel to the Debtors in respect of the validity, enforceability and, as applicable, perfection of all Brazilian Agreements in connection with the Brazilian Guaranty and |

11

| | Perfection Requirements, in form and substance reasonably satisfactory to the Required DIP Noteholders. |
|---|---|
| **Events of Default** | The DIP Documents shall contain usual and customary events of default (any such event, an "<u>Event of Default</u>"), subject to customary cure provisions, qualifications and limitations for materiality to be mutually agreed-upon, which shall include, without limitation: (i) nonpayment of DIP Obligations when due (with a five (5) business day grace period for nonpayment of interest or other amounts (except principal)); (ii) non-performance of covenants and obligations under the DIP Documents (with a thirty (30) day grace period for certain affirmative covenants to be agreed); (iii) material judgments; (iv) default on material post-petition indebtedness and hedge obligations and assumed leases (with a thirty (30) day grace period for assumed leases); (v) breach of any representation or warranty; (vi) material adverse regulatory actions; (vii) the Debtors, directly or indirectly, contesting, delaying, impeding or taking any other action (including the commencement by or on behalf of the Debtors of an avoidance action or other legal proceeding seeking any of the following relief or seeking the entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction) objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens securing the DIP Obligations or the obligations under the GOL 2028 Notes, the GOL 2026 Notes or the Abra 2028 Notes or (b) the validity, enforceability, characterization or non-avoidability of any of the DIP Obligations or the obligations under the GOL 2028 Notes, the GOL 2026 Notes or the Abra 2028 Notes; (viii) entry by the Bankruptcy Court of an order (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Cases, or (d) terminating or modifying (other than extending) the exclusive right of the Debtors to file a plan of reorganization under section 1121 of the Bankruptcy Code; (ix) any Prohibited Variance shall have occurred; (x) any Event of Default under any DIP Order or other DIP Document shall have occurred; (xi) the filing of a chapter 11 plan with respect to the Debtors by any of the Debtors or any of their affiliates that is not an Acceptable Plan; (xii) an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Required DIP Noteholders except in favor of an alternative plan or transaction that repays the DIP Obligations in full in cash on the effective date of such plan; (xiii) the failure to meet any of the Milestones; (xiv) any of the Debtors or any affiliate thereof filing a pleading seeking to vacate or modify any DIP Order over the objection of the Required DIP Noteholders; (xv) the entry of an order without the prior consent of the Required DIP Noteholders amending, supplementing or otherwise modifying any DIP Order; (xvi) reversal, vacation or stay of the effectiveness of any DIP Order; (xvii) any sale of all or substantially all assets of the Debtors, unless (a) the proceeds of such sale indefeasibly satisfy the DIP Obligations in full in cash or (b) such sale is supported by the Required DIP Noteholders; (xviii) the granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Debtors above an agreed-upon threshold; (xix) the Debtors' filing of (or |

BUSINESS.30903586.25

| | |
|---|---|
| | failing to object or otherwise supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Noteholders' claims under the DIP facility; (xx) payment of or granting adequate protection with respect to prepetition debt, other than as expressly agreed in the DIP Documents or in any DIP Order; (xxi) cessation of the DIP Liens or the Superpriority Claim to be valid, perfected and enforceable in all respects; (xxii) any uninsured judgments (not otherwise contemplated in the Approved Budget or the first day pleadings) are entered with respect to any post-petition liabilities against any of the Debtors or any of their respective properties in an aggregate amount in excess of an amount to be reasonably agreed prior to the Interim DIP Order Funding; (xxiii) the commencement of any insolvency proceeding or any proceeding under any debtor relief law in any jurisdiction other than the Chapter 11 Cases (excluding any local proceeding to enforce the automatic stay or other protective provisions granted to the Debtors in the Chapter 11 Cases); or (xxiv) the failure to satisfy the Brazilian Guarantee Requirement. |
| **Remedies** | The DIP Documents shall contain usual and customary remedies and the proposed Interim DIP Order shall provide that upon the occurrence of an Event of Default under the DIP Documents, and following the delivery of five (5) business days' written notice by the Required DIP Noteholders or the Trustee to the Debtors (and their restructuring counsel) thereof (the "Remedies Notice Period"), the Trustee and the DIP Noteholders, in each case, at the direction of the Required DIP Noteholders may exercise all rights and remedies provided for in the DIP Documents, and take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease the issuance by the Debtors of new notes under the DIP; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze all monies and balances in the Debtors' bank accounts in any jurisdiction; (e) immediately set-off any and all amounts in accounts maintained by the Debtors against the DIP Obligations, or otherwise enforce any and all rights against the Collateral in its possession or otherwise, including, without limitation, disposition of the Collateral for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders (as applicable), the DIP Documents or applicable law.  The Debtors shall cooperate with the Required DIP Noteholders, the Collateral Agent and the Trustee in their exercise of rights and remedies, whether against the Collateral or otherwise. <br><br> During the Remedies Notice Period, (i) the Debtors shall be prohibited from issuing any new notes under the DIP and (ii) the only basis on which the Debtors and/or the Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Bankruptcy Court shall be to contest whether an Event of Default has occurred and/or is continuing and the DIP Noteholders shall consent to such emergency hearing.  The proposed Interim DIP Order shall provide that unless, during the Remedies Notice Period, the Bankruptcy Court determines that an Event of Default has not occurred, the automatic stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise, as to the DIP |

13

| | |
|---|---|
| | Noteholders, the Collateral Agent and the Trustee, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. |
| **Mandatory Prepayments** | The notes or loans issued under the DIP Documents shall be subject to customary mandatory redemption provisions for transactions of this type with respect to (i) 100% of the net cash proceeds from the sale of any Collateral, non-ordinary course asset sales, and sales of subsidiaries, in each case subject to any agreed-to dollar baskets, to the extent such proceeds exceed any amounts from such sales assumed in the Approved Budget; (ii) 100% of the net cash proceeds from incurrence of non-permitted indebtedness; (iii) 100% of insurance proceeds available to the Debtors, including condemnation and similar proceeds (but excluding, for the avoidance of doubt, insurance proceeds that have been assigned to lessors or other counterparties), subject to any agreed-to dollar baskets and replacement rights; and (iv) 100% of the net cash proceeds of other extraordinary receipts (to be defined as tax refunds and litigation settlements), in each case subject to any agreed-to dollar baskets, not provided for or assumed in the Approved Budget. |
| **Affirmative Covenants** | Subject to the Documentation Principles, the DIP Documents shall contain usual and customary affirmative covenants for transactions of this type, subject to customary qualifications, limitations for materiality and exceptions to be mutually agreed-upon, including, without limitation, delivery of monthly, quarterly and annual financial statements; delivery of Budgets and Budget Variance Reports in accordance herewith; monthly compliance certificates with respect to the Minimum Liquidity Covenant; other information reasonably requested from time to time by the Required DIP Noteholders; payment of material obligations; tax gross-ups; continuation of business and maintenance of existence and material rights and privileges; use of proceeds; further assurances; additional collateral and guarantors; maintenance of property in present condition and maintenance of insurance; maintenance of books and records; right of the Required DIP Noteholders, the Collateral Agent or the Trustee (or any representative thereof) to inspect property and books and records, subject to customary limitations; notices of defaults, litigation and other material events; compliance with laws, including environmental laws; and the Debtors' use of reasonable best efforts to enter into all Brazilian Agreements, and complete their registration with the competent Brazilian registries of deeds and documents, pursuant to Brazilian law in accordance with (and subject to the limitations and qualifications set forth in) the Brazilian Guaranty and Perfection Requirements. |
| **Negative Covenants** | Subject to the Documentation Principles, the DIP Documents shall contain usual and customary negative covenants for transactions of this type, subject to customary qualifications, limitations for materiality and exceptions to be mutually agreed-upon (and permitting, in any event, entering into lease contracts for the induction of any additional aircraft into the Debtors' fleet in the ordinary course), including, without limitation, that the Debtors shall not (i) incur indebtedness (including guarantee obligations), with exceptions for, without limitation, receivables factoring, aircraft financing leases, financing of aircraft maintenance, engine financings and letter of credit facilities; (ii) incur liens; (iii) merge, consolidate, liquidate, or dissolve; (iv) sell assets not in the ordinary course; (v) make restricted payments (including dividends and |

14

| | |
|---|---|
| | other payments in respect of capital stock); (vi) make investments (including acquisitions), loans and advances; (vii) sale and leaseback transactions, with exceptions for, without limitation, sale and leaseback transactions with respect to all currently scheduled deliveries of Boeing aircraft and other such transactions, in each case, in the ordinary course of business and consistent with past practice; (viii) swap agreements, other than non-speculative, ordinary course swap agreements consistent with past practice; (ix) make optional payments and modifications of subordinated and other debt instruments (including principal payments of intercompany debt); (x) transactions with affiliates; (xi) changes in fiscal year; (xii) negative pledge clauses; (xiii) enter into aircraft lease modifications unless such modifications contain permanent reductions in lease rentals substantially in accordance with the Business Plan on an aggregate basis; and (xiv) induct any off-wing engines or engines subject to scheduled removals within 6 months of the Petition Date and which require a qualifying engine event, unless the Debtors shall have received (A) lessor financing in accordance with the Business Plan or (B) equivalent economic arrangements reasonably acceptable to the Required DIP Noteholders. |
| **Conditions Precedent** | The DIP Documents shall contain usual and customary conditions for transactions of this type (the first date on which all of such conditions to effectiveness of the DIP facility shall have been satisfied, or waived by the Required DIP Noteholders being the "<u>Closing Date</u>"), including, without limitation:<br><br>i.    On or prior to the Interim DIP Order Funding, the New York Law Guarantee Requirement having been satisfied as of the Closing Date;<br><br>ii.    with respect to the Final DIP Order Funding, the preparation, authorization, execution and delivery by the Debtors of notes and applicable security and perfection documentation, closing certificates, organizational documents, and evidence of authorization and good standing (or the equivalent thereof), in each case in customary form and reasonably satisfactory to the Required DIP Noteholders;<br><br>iii.    with respect to the Interim DIP Order Funding, the Interim DIP Order shall have been entered and be in full force and effect;<br><br>iv.    the Trustee and the DIP Noteholders shall have received the Initial Approved Budget;<br><br>v.    with respect to each funding, the representations and warranties of the Debtors under the DIP Documents shall be true and correct in all material respects;<br><br>vi.    all fees under the DIP Documents and Professional Fees of the DIP Noteholders, the Collateral Agent and the Trustee shall have been paid or will be paid concurrently with the funding of amounts under the DIP on the Closing Date, to the extent invoiced at least one business day in advance;<br><br>vii.    no default or Event of Default shall have occurred or be continuing;<br><br>viii.    there shall not have been any event or occurrence having a Material Adverse Effect (as defined below); and |

15

| | |
|---|---|
| | ix.   the execution and delivery of a subordination agreement made by Abra Global Finance and Abra (together, the "Abra Entities") in favor of the DIP Noteholders subordinating the claims and liens of the Abra Entities under the GOL 2028 Notes to the DIP Obligations and the DIP Liens, including a turnover provision, and providing the exercise of certain remedies upon any Event of Default, to be in form and substance reasonably satisfactory to the Required DIP Noteholders. |
| **Representations and Warranties** | The DIP Documents shall contain usual and customary representations and warranties for transactions of this type to be made by the Debtors as of the date they execute the DIP Documents, and as of the date of any issuance of notes thereunder, subject to qualifications, disclosure schedules and limitations for materiality to be mutually agreed-upon (including as to a "Material Adverse Effect" standard), and shall include without limitation: valid existence and good standing; requisite power, due authorization and validity; no conflict with material contracts, orders or applicable law; governmental consents; enforceability of DIP Documents; accuracy of financial statements, projections, budgets and all other information provided; compliance with laws and material contracts; absence of any event or occurrence having a Material Adverse Effect since the Petition Date; no default or Event of Default under the DIP Documents; absence of material litigation; payment of taxes and other material obligations; subsidiaries; ERISA, pension and benefit plans; ownership of assets and necessary rights to intellectual property; insurance; inapplicability of Investment Company Act; regulatory matters; environmental matters; margin stock; labor; and validity, priority and perfection of liens and security interests in the Collateral.

"Material Adverse Effect" means a material adverse effect on (a) the consolidated business, assets, results of operations or financial condition of the Debtors (other than (i) the effect of filing of the Chapter 11 Cases and the events and conditions related to and/or leading up thereto and typically resulting from the filing of the Chapter 11 Cases, (ii) any actions required to be taken under the DIP Documents, (iii) [reserved], (iv) the COVID-19 pandemic, (v) the conflict between Ukraine and Russia, (vi) the conflict in the Middle East, including but not limited to, Israel and Palestine and any escalation thereof), and (vii) any matters or events impacting the airline industry generally, (b) the validity or enforceability of any DIP Document or the validity, enforceability or collectability of any DIP Obligations, (c) the rights and remedies of the Collateral Agent, the Trustee and the DIP Noteholders with respect to matters arising under any DIP Document, taken as a whole, (d) the ability of any of the Debtors to perform its obligations under any DIP Document to which it is a party, or (e) the status, existence, perfection, priority or enforceability of the Collateral Agent's security interests in and liens with respect to any Collateral. |
| **Voting** | All amendments and waivers to the DIP and any DIP Documents shall require the approval of (i) holders holding more than 50% of the aggregate principal amount of DIP Obligations then outstanding, and (ii) at all times while the Backstop Noteholders hold more than 65% of the aggregate principal amount of DIP Obligations then outstanding, Backstop Noteholders holding more |

BUSINESS.30903586.25

| | |
|---|---|
| | than 50% of the aggregate principal amount of DIP Obligations then outstanding held by the Backstop Noteholders (the "<u>Required DIP Noteholders</u>"). |
| **Assignments** | The DIP Noteholders shall be permitted to assign and transfer any notes or other interests it holds in respect of the DIP (other than to direct competitors of the Debtors and their affiliates or LATAM, Azul, Knighthead, Silver Point, Strategic Value Partners, Sixth Street Capital, Sculptor Capital Management, Certares Management or other disqualified institutions to be agreed prior to the Interim DIP Order Funding). |
| **Expenses** | The Debtors shall be jointly and severally liable to pay all reasonable fees, costs, disbursements and expenses of the Collateral Agent, the Trustee and the DIP Noteholders (including, without limitation, the reasonable fees, costs and expenses of legal counsel (limited to (i) one primary counsel for the Collateral Agent, (ii) one primary counsel for the Trustee, (iii) Dechert LLP, as primary counsel for certain DIP Noteholders, and Padis Mattar Advogados, as Brazilian local counsel for certain DIP Noteholders, (iv) one Brazilian local counsel for each of the Collateral Agent and the Trustee, (v) Akin Gump Strauss Hauer & Feld LLP, as counsel to Elliott, (vi) one local counsel for each jurisdiction (other than Brazil), to the extent required, for the Collateral Agent, the Trustee and the DIP Noteholders taken together, (vii) in the event of an actual or potential conflict, additional counsel or local counsel to the extent necessary and (viii) other counsel retained with the prior written consent of the Debtors, not to be unreasonably withheld) and financial advisors (including Houlihan Lokey) in connection with the negotiation, preparation, execution, administration and enforcement of rights and remedies with respect to the DIP, the DIP Documents, and/or the Collateral, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith and otherwise in connection with the Chapter 11 Cases, which fees, costs, disbursements and expenses shall be payable upon the Closing Date and thereafter on a monthly basis (to the extent invoiced). |
| **Indemnification** | The Debtors agree, jointly and severally, to indemnify and hold the Collateral Agent, the Trustee and/or the DIP Noteholders and their respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "<u>Indemnified Person</u>") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP, the DIP Documents, the Collateral, this Term Sheet, the transactions contemplated thereby or hereby or by any thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any such Indemnified Person is a party thereto and whether or not brought by any Debtor or any other person or entity, except to the extent resulting from the gross negligence or willful misconduct of an Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes, without limitation, indemnification for the Collateral Agent, the Trustee and/or the DIP Noteholders, only in such |

BUSINESS.30903586.25

| | |
|---|---|
| | capacity, exercising discretionary rights granted under the DIP. In all such litigation, or the preparation therefor, the Collateral Agent, the Trustee and/or the DIP Noteholders shall each be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of all such counsel (limited to (i) one primary counsel for the Collateral Agent, (ii) one primary counsel for the Trustee, (iii) one primary counsel for the DIP Noteholders and one Brazilian local counsel for the DIP Noteholders, (iv) one Brazilian local counsel for each of the Collateral Agent and the Trustee, (v) one local counsel for each jurisdiction (other than Brazil), to the extent required, for the Collateral Agent, the Trustee and the DIP Noteholders taken together, (vi) one primary and applicable local counsel for Elliott, (vii) in the event of an actual or potential conflict, additional counsel or local counsel to the extent necessary and (viii) other counsel retained with the prior written consent of the Debtors, not to be unreasonably withheld) and financial advisors (including Houlihan Lokey). |
| **Releases** | The DIP Orders shall provide the Collateral Agent, the Trustee, the DIP Noteholders, and the Indemnified Persons with customary releases reasonably acceptable to the Collateral Agent, the Trustee and the Required DIP Noteholders and shall contain customary stipulations regarding the prepetition liens of the GOL 2028 Noteholders, the GOL 2026 Noteholders and the Abra Noteholders and the amount of their respective allowed claims (including any applicable make-whole amounts or applicable premiums). |
| **Section 506(c)/552 Waiver** | The Final DIP Order shall include a waiver of any surcharge to the DIP Collateral under sections 506(c) and 552 of the Bankruptcy Code or otherwise for the 2026 Noteholders and 2028 Noteholders and the Abra Noteholders. The Interim DIP Order shall include a waiver of any surcharge to the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise for the DIP Noteholders and Trustee. |
| **Marshaling Waiver** | The Final DIP Order shall include a waiver of any claims by the Debtors under the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Collateral. |
| **Governing Law** | The laws of the State of New York, except as governed by the Bankruptcy Code. <br><br> The Brazilian Agreements shall be governed by Brazilian law. |

18

CONFIDENTIAL; SUBJECT TO FRE408 AND ANALOGOUS PROVISIONS
IN ALL APPLICABLE JURISDICTIONS

## Annex A

**Brazilian Guaranty and Perfection Requirements**

1.      The Debtors shall obtain the relevant corporate approvals for the execution and delivery of the necessary amendments to the Existing Brazilian Collateral Agreements (as defined below), the New Brazilian Collateral Agreements (as defined below) and the Brazilian Guarantee Agreements (as defined below) and the Debtors incorporated in Brazil shall register such corporate approvals with the relevant Board of Trades (*Junta Comercial)*.

2.      The Debtors and TMF Brasil Administração e Gestão de Ativos Ltda. (the "Brazilian Collateral Agent") shall enter into amendments to each of the GOL Senior Secured Notes due 2028 Collateral to include the DIP as a secured obligation under such collateral agreements.

3.      The Debtors and the Brazilian Collateral Agent shall enter into amendments to each of the GOL Senior Secured Notes due 2026 Collateral to include the DIP as a secured obligation under such collateral agreements.

4.      The Debtors shall register all the amendments to the Existing Brazilian Collateral Agreements and the New Brazilian Collateral Agreements with the competent Brazilian registries of deeds and documents and any other competent Brazilian registry to the extent required by Brazilian law.

5.      The Debtors shall file for registration with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial - INPI)* ("INPI") (a) an amendment to the Smiles Fidelidade Fiduciary Transfer of Intellectual Property Rights Agreement; and (b) the amendments to the GOL Senior Secured Notes due 2026 IP Collateral.  The parties agree that each such amendment shall provide that the Debtors will use all commercially reasonable efforts to obtain such registration after closing, including complying with any eventual requirement made by INPI to complete the registration.

6.      The DIP Noteholders, the Debtors and the Brazilian Collateral Agent (on behalf and for the benefit of Abra) shall enter into an intercreditor agreement to provide that, in the event of an acceleration of the DIP, the DIP Noteholders are granted: (a) the right to foreclose on the security interest granted under the GOL Senior Secured Notes due 2028 Collateral without Abra's consent, and (b) superpriority (first-out) over any and all proceeds arising from the foreclosure of the security interest granted under the GOL Senior Secured Notes due 2028 Collateral.

7.      The Guarantors incorporated in Brazil shall enter into a corporate guarantee agreement (the "Brazilian Guarantee Agreements") for the DIP Obligations for the benefit of the DIP Noteholders and register the Brazilian Guarantee Agreements with the competent Brazilian registries of deeds and documents.

8.      The DIP Noteholders, the Debtors and the Brazilian Collateral Agent (on behalf and for the benefit of Abra and the GOL 2026 Noteholders) shall enter into an amendment to the existing intercreditor agreement to provide that, in the event of an acceleration of the DIP, the DIP Noteholders are granted: (a) the right to foreclose on the security interest granted under the GOL Senior Secured Notes due 2026 Collateral without Abra's or the GOL 2026 Noteholders' consent, and (b) superpriority (first-out) over any and all proceeds from the foreclosure of the security interest granted under the GOL Senior Secured Notes due 2026 Collateral.

9.      The Debtors shall obtain any necessary consents and approvals from relevant third parties to the extent required to execute the Brazilian Collateral Agreements, subject to the limitations and qualifications set forth in the Brazilian Guaranty and Perfection Requirements.

As used in this <u>Annex A</u>, the following terms shall have the following meanings:

"**Brazilian Agreements**" means the Brazilian Guarantee Agreements and the Brazilian Collateral Agreements.

"**Brazilian Collateral Agreements**" means (i) the amendments to the Existing Brazilian Collateral Agreements provided for in this <u>Annex A</u> and (ii) the New Brazilian Collateral Agreements and any further relevant amendments thereto.

"**Existing Brazilian Collateral Agreements**" means the GOL Senior Secured Notes due 2026 Collateral and the GOL Senior Secured Notes due 2028 Collateral, collectively, as defined below:

(a)      "**GOL Senior Secured Notes due 2026 Collateral**" means the GOL Senior Secured Notes due 2026 IP Collateral and the GOL Senior Secured Notes due 2026 Spares Parts Collateral.

(b)      "**GOL Senior Secured Notes due 2026 IP Collateral**" means the following collateral securing the obligations of the GOL 2026 Notes: (i) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, as amended, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLAI, as intervening party; and (ii) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, as amended, among GLAI, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

(c)      "**GOL Senior Secured Notes due 2026 Spare Parts Collateral**" means the following collateral securing the obligations of the GOL 2026 Notes: (i) the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, as amended, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party; and (ii) the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, as amended, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

(d)      "**GOL Senior Secured Notes due 2028 Collateral**" means the following collateral securing the obligations of the GOL 2028 Notes: (i) the Smiles Fidelidade Fiduciary Transfer of Intellectual Property Rights Agreement and (ii) the Smiles Fidelidade Fiduciary Transfer of Shares Agreement.

(e)      "**Smiles Fidelidade Fiduciary Transfer of Intellectual Property Rights Agreement**" means that certain Brazilian law governed agreement dated as of March 2, 2023, as amended, among Smiles Fidelidade, as security provider, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent, GLA and GLAI, as intervening party, with respect to the fiduciary lien over certain intellectual property assets and rights defined therein.

(f)      "**Smiles Fidelidade Fiduciary Transfer of Shares Agreement**" means that certain Brazilian law governed agreement, dated as of March 2, 2023, as amended, among GLA, as security provider, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent,

GLAI and Smiles Fidelidade, as intervening party, with respect to the fiduciary lien over one hundred percent (100%) of Smiles Fidelidade's equity, all of which is owned by GLA.

"**New Brazilian Collateral Agreements**" means any Brazilian law-governed collateral or security interest agreements with respect to:

(a)　　　any collateral or security interest that does not exist as of the Petition Date that might be granted by the Debtors to secure the DIP Obligations in the context of adequate protection liens as approved by the Bankruptcy Court granted for the benefit of the GOL 2028 Noteholders, the Abra Noteholders and/or the GOL 2026 Noteholders, as referred to in the section "Adequate Protection" above;

(b)　　　"first-priority" liens on assets of the Debtors to the extent that such assets are not subject to prior liens in existence as of the Petition Date (including, without limitation, all cash and bank accounts of the Debtors not subject to prior perfected liens (including, without limitation, the Note Proceeds Account)), as referred to in clause (ii) of the definition of "Collateral"; and

(c)　　　"second-priority" liens on assets of the Debtors subject to valid perfected liens in existence as of the Petition Date, other than existing liens on the Priming Collateral (including, without limitation, (a) all accounts receivable owing to Smiles and (b) all applicable lease and other contract rights with respect to any aircraft subject to existing liens), as referred to in clause (iv) of the definition of "Collateral".

The definition of "New Brazilian Collateral Agreements" does not include any amendments to the Existing Brazilian Collateral Agreements to secure the DIP Obligations.

**<u>Exhibit B</u>**

**2026 SSN Indenture**

EXECUTION VERSION

GOL FINANCE
as Issuer

GOL LINHAS AÉREAS INTELIGENTES S.A. and GOL LINHAS AÉREAS S.A.
as Guarantors

THE BANK OF NEW YORK MELLON,
as Trustee, Registrar, Transfer Agent and Paying Agent

and

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

———————————————

**INDENTURE**

Dated as of December 23, 2020

———————————————

8.00% Senior Secured Notes Due 2026

#93484727v11

# TABLE OF CONTENTS

P<small>AGE</small>

## ARTICLE 1
### D<small>EFINITIONS AND</small> O<small>THER</small> P<small>ROVISIONS OF</small> G<small>ENERAL</small> A<small>PPLICATION</small>

SECTION 1.01.    Definitions......................................................................................... 1
SECTION 1.02.    Rules of Construction ....................................................................... 20
SECTION 1.03.    Table of Contents; Headings.............................................................. 21
SECTION 1.04.    Form of Documents Delivered to Trustee .......................................... 21
SECTION 1.05.    Holder Communications; Acts of Holders.......................................... 22

## ARTICLE 2
### T<small>HE</small> N<small>OTES</small>

SECTION 2.01.    Form and Dating ............................................................................... 23
SECTION 2.02.    Execution, Authentication and Delivery............................................. 23
SECTION 2.03.    Transfer Agent, Registrar and Paying Agent...................................... 24
SECTION 2.04.    Paying Agent to Hold Money in Trust................................................ 25
SECTION 2.05.    Payment of Principal and Interest; Principal and Interest Rights
                 Preserved ......................................................................................... 26
SECTION 2.06.    Holder Lists...................................................................................... 26
SECTION 2.07.    Transfer of Notes .............................................................................. 27
SECTION 2.08.    Replacement Notes ........................................................................... 30
SECTION 2.09.    Temporary Notes .............................................................................. 30
SECTION 2.10.    Cancellation...................................................................................... 30
SECTION 2.11.    Defaulted Interest.............................................................................. 31
SECTION 2.12.    CUSIP and ISIN Numbers ................................................................ 31
SECTION 2.13.    Purchases of the Notes by the Company or its Affiliates .................... 31
SECTION 2.14.    One Class of Notes............................................................................ 31
SECTION 2.15.    Additional Notes ............................................................................... 31

## ARTICLE 3
### R<small>EDEMPTION</small>

SECTION 3.01.    Right of Redemption.......................................................................... 32
SECTION 3.02.    Applicability of Article ..................................................................... 34
SECTION 3.03.    Election to Redeem; Notice to Trustee ............................................... 34
SECTION 3.04.    Notice of Redemption by the Company............................................... 35
SECTION 3.05.    Deposit of Redemption Price ............................................................. 36
SECTION 3.06.    Effect of Notice of Redemption ......................................................... 36
SECTION 3.07.    Notes Redeemed in Part..................................................................... 36

## ARTICLE 4
### COVENANTS

SECTION 4.01.    Payment of Principal and Interest Under the Notes ........................................ 37
SECTION 4.02.    Maintenance of Office or Agency .......................................................... 37
SECTION 4.03.    Money for Note Payments to Be Held in Trust ............................................ 37
SECTION 4.04.    Maintenance of Corporate Existence ...................................................... 38
SECTION 4.05.    Payment of Taxes and Claims ............................................................. 39
SECTION 4.06.    Payment of Additional Amounts .......................................................... 39
SECTION 4.07.    Reporting Requirements .................................................................. 41
SECTION 4.08.    Available Information .................................................................... 42
SECTION 4.09.    Limitation on Transactions with Affiliates ............................................. 42
SECTION 4.10.    Collateral .............................................................................. 43
SECTION 4.11.    Additional Pari Passu Obligations. ...................................................... 44
SECTION 4.12.    Certain Assurances ...................................................................... 45
SECTION 4.13.    Appraisals .............................................................................. 46
SECTION 4.14.    Release of Collateral ................................................................... 47
SECTION 4.15.    LTV Ratio ............................................................................... 48
SECTION 4.16.    Negative Pledge ......................................................................... 49
SECTION 4.17.    Maintenance of Asset Collateral ......................................................... 49
SECTION 4.18.    Use and Possession of Spare Parts, Spare Engines, Flight Simulators
                 and Aircraft ............................................................................ 50
SECTION 4.19.    Insurance ............................................................................... 53
SECTION 4.20.    Repurchase of Notes Upon a Change of Control. ........................................... 54
SECTION 4.21.    Offer to Purchase ....................................................................... 54
SECTION 4.22.    Listing ................................................................................. 54

## ARTICLE 5
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 5.01.    Limitation on Consolidation, Merger or Transfer of Assets .............................. 55
SECTION 5.02.    Successor Substituted ................................................................... 56
SECTION 5.03.    Substitution of the Company ............................................................. 56

## ARTICLE 6
### EVENTS OF DEFAULT AND REMEDIES

SECTION 6.01.    Events of Default ....................................................................... 58
SECTION 6.02.    Acceleration of Maturity, Rescission and Amendment ...................................... 61
SECTION 6.03.    Collection Suit by Trustee .............................................................. 62
SECTION 6.04.    Other Remedies .......................................................................... 62
SECTION 6.05.    Trustee May Enforce Claims Without Possession of Notes .................................. 62
SECTION 6.06.    Application of Money Collected .......................................................... 62
SECTION 6.07.    Limitation on Suits ..................................................................... 63
SECTION 6.08.    Contractual Rights of Holders to Receive Principal and Interest ........................ 64

SECTION 6.09.    Restoration of Rights and Remedies ............................................................... 64
SECTION 6.10.    Trustee May File Proofs of Claim ................................................................. 64
SECTION 6.11.    Delay or Omission Not Waiver .................................................................... 65
SECTION 6.12.    Control by Holders ..................................................................................... 65
SECTION 6.13.    Waiver of Past Defaults and Events of Default ........................................... 65
SECTION 6.14.    Rights and Remedies Cumulative .................................................................. 65
SECTION 6.15.    Waiver of Stay or Extension Laws ............................................................... 66

**ARTICLE 7**
TRUSTEE AND AGENTS

SECTION 7.01.    Duties of Trustee and Agents ...................................................................... 66
SECTION 7.02.    Rights of Trustee ........................................................................................ 67
SECTION 7.03.    Individual Rights of Trustee ........................................................................ 70
SECTION 7.04.    Trustee's Disclaimer ................................................................................... 70
SECTION 7.05.    Notice of Defaults and Events of Default ..................................................... 71
SECTION 7.06.    Compensation and Indemnity ...................................................................... 71
SECTION 7.07.    Replacement of Trustee .............................................................................. 72
SECTION 7.08.    Successor Trustee by Merger ...................................................................... 73
SECTION 7.09.    Eligibility; Disqualification ........................................................................ 73
SECTION 7.10.    Patriot Act ................................................................................................. 74
SECTION 7.11.    OFAC Sanctions. ....................................................................................... 74
SECTION 7.12.    Tax Filings (FATCA). ................................................................................ 74

**ARTICLE 8**
DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01.    Discharge of Liability on Notes ................................................................... 74
SECTION 8.02.    Conditions to Defeasance ............................................................................ 75
SECTION 8.03.    Application of Trust Money ......................................................................... 77
SECTION 8.04.    Repayment to Company ............................................................................... 77
SECTION 8.05.    Indemnity for U.S. Governmental Obligations .............................................. 77
SECTION 8.06.    Reinstatement ............................................................................................ 77

**ARTICLE 9**
AMENDMENTS

SECTION 9.01.    Without Consent of Holders ........................................................................ 77
SECTION 9.02.    With Consent of Holders ............................................................................. 79
SECTION 9.03.    Revocation and Effect of Consents and Waivers ........................................... 80
SECTION 9.04.    Notation on or Exchange of Notes ............................................................... 80
SECTION 9.05.    Trustee to Sign Amendments ....................................................................... 81
SECTION 9.06.    Payment for Consent ................................................................................... 81

#93484727v11

## ARTICLE 10
### NOTE GUARANTIES

SECTION 10.01.  The Note Guaranties ................................................................. 81
SECTION 10.02.  Guaranty Unconditional.............................................................. 81
SECTION 10.03.  Discharge; Reinstatement ........................................................... 82
SECTION 10.04.  Waiver by the Guarantors ........................................................... 82
SECTION 10.05.  Subrogation and Contribution...................................................... 82
SECTION 10.06.  Stay of Acceleration.................................................................... 82
SECTION 10.07.  Limitation on Amount of Guaranty .............................................. 83
SECTION 10.08.  Execution and Delivery of Guaranty ............................................ 83
SECTION 10.09.  Release of Guaranty .................................................................... 83

## ARTICLE 11
### MISCELLANEOUS

SECTION 11.01.  Provisions of Indenture and Notes for the Sole Benefit of Parties and
                Holders of Notes ...................................................................... 83
SECTION 11.02.  Notices ....................................................................................... 84
SECTION 11.03.  Officers' Certificate and Opinion of Counsel as to Conditions
                Precedent .................................................................................. 85
SECTION 11.04.  Statements Required in Officers' Certificate or Opinion of Counsel ............ 85
SECTION 11.05.  Rules by Trustee, Registrar, Paying Agent and Transfer Agents .................. 86
SECTION 11.06.  Currency Indemnity .................................................................... 86
SECTION 11.07.  No Recourse Against Others.......................................................... 86
SECTION 11.08.  Legal Holidays ........................................................................... 86
SECTION 11.09.  Governing Law ........................................................................... 87
SECTION 11.10.  Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial .......... 87
SECTION 11.11.  Successors and Assigns................................................................. 89
SECTION 11.12.  Multiple Originals ....................................................................... 89
SECTION 11.13.  Severability Clause ..................................................................... 89
SECTION 11.14.  Force Majeure ........................................................................... 89
SECTION 11.15.  Tax Treatment ........................................................................... 89

## ARTICLE 12
### COLLATERAL AGENT

SECTION 12.01.  Appointment ............................................................................... 90
SECTION 12.02.  Exculpatory Provisions ................................................................ 90
SECTION 12.03.  Resignation ............................................................................... 95
SECTION 12.04.  Fees, Expenses and Indemnification............................................. 96

EXHIBITS:

EXHIBIT A   –   Form of Note

#93484727v11

EXHIBIT B   –   Form of Transfer Notice
EXHIBIT C   –   Form of Certificate for Transfer from Restricted Global Note or Certificated Note Bearing a Securities Act Legend to Regulation S Global Note or Certificated Note Not Bearing a Securities Act Legend
EXHIBIT D   –   Form of Transfer Certificate for Transfer from Regulation S Global Note or Certificated Note Not Bearing a Securities Act Legend to Restricted Global Note or Certificated Note Bearing a Securities Act Legend (During the Restricted Period)
EXHIBIT E   –   Form of Certificate for Removal of the Securities Act Legend on a Certificated Note
EXHIBIT F   –   Form of Intercreditor Agreement

EXHIBIT G   -   Form of GLA Fiduciary Transfer of IP Rights
EXHIBIT H   -   Form of GLAI Fiduciary Transfer of IP Rights
EXHIBIT I   -   Form of Non-Rotables Fiduciary Sale Agreement
EXHIBIT J   -   Form of Rotables Fiduciary Sale Agreement
EXHIBIT K   -   Form of Spare Engine Fiduciary Sale Agreement
EXHIBIT L   -   Form of Flight Simulator Fiduciary Sale Agreement
EXHIBIT M   -   Form of Aircraft Fiduciary Sale Agreement
EXHIBIT N   -   Form of Receivables and Bank Account Pledge Agreement
EXHIBIT O   -   Form of Smiles Fiduciary Transfer IP Agreement
EXHIBIT P   -   Form of Smiles Shares Fiduciary Sale Agreement

#93484727v11

INDENTURE, dated as of December 23, 2020, among GOL FINANCE, a public limited liability company (*société anonyme*) organized and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 ("**Luxembourg**"), as issuer (the "**Company**"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**") and GOL LINHAS AÉREAS S.A. ("**GLA**"), each, a corporation (*sociedade por ações*) organized under the laws of the Federative Republic of Brazil, as guarantors, THE BANK OF NEW YORK MELLON, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as Collateral Agent.

## RECITALS

The Company has duly authorized (i) the issue of 8.00% Senior Secured Notes due 2026, initially in an aggregate principal amount of U.S.$200,000,000.00 (the "**Initial Notes**" and together with any Additional Notes, as hereinafter defined, the "**Notes**") and (ii) the execution and delivery of this Indenture.  All things necessary have been done to make the Notes when executed and authenticated and delivered hereunder and duly issued, the valid obligations of the Company, and to make this Indenture a valid agreement of the Company.

In addition, the Guarantors have duly authorized the execution and delivery of this Indenture as guarantors of the Notes. The Guarantors have done all things necessary to make the Note Guaranties (as hereinafter defined), when the Notes are executed by the Company and authenticated and delivered by the Trustee and duly issued by the Company, the valid obligations of the Guarantors, and to make the Indenture a valid agreement of the Guarantors.

## NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the purchase of the Notes by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders, as follows:

## ARTICLE 1
### Definitions and Other Provisions of General Application

SECTION 1.01.    *Definitions*.

"**Act**" when used with respect to any Holder, has the meaning specified in Section 1.05(b).

"**Additional Amounts**" has the meaning specified in Section 4.06(a).

"**Additional Collateral**" means any of the following: (i) Asset Collateral (other than the Spare Parts comprising Issue Date Collateral), (ii) Eligible Account Receivables Collateral, (iii) Cash Collateral, (iv) Loyalty Receivables, (v) shares of Affiliates or direct or indirect Subsidiaries of GLA or GLAI (including the Smiles Share Collateral) and (vi) Eligible IP Collateral.

"**Additional Indenture**" means any indenture, credit agreement or similar agreement, in each case under which Additional Pari Passu Obligations are being issued or incurred by the Company or an Additional Issuer.

"**Additional Issuer**" means any issuer or borrower of Additional Pari Passu Obligations.

"**Additional Notes**" means any Notes issued pursuant to Section 2.15 of this Indenture in addition to the Initial Notes, having the same terms in all respects as the Initial Notes, except for the issue date, the issue price, the first Payment Date and that interest will accrue on the Additional Notes from their date of issuance.

"**Additional Pari Passu Obligations**" means any Obligations having Pari Passu Lien Priority relative to the Notes Obligations with respect to the Collateral and that is not secured by any other assets; *provided* that the Additional Trustee shall have executed (a) a joinder to the Intercreditor Agreement then in effect, or, (b) if the Intercreditor Agreement is not then in effect, the Intercreditor Agreement.

"**Additional Trustee**" means the trustee, indenture trustee, facility agent, administrative agent or similar agent under any Additional Indenture.

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Affiliate Transaction**" has the meaning specified in Section 4.09.

"**Agents**" means any Registrar, Transfer Agent or Paying Agent appointed pursuant to this Indenture, individually, an "**Agent**."

"**Aircraft**" means any Eligible Aircraft that is owned by GLA or leased to GLA and owned by a special purpose entity in connection with a financing (including any financing by or guaranteed by an export credit agency).

"**Aircraft Fiduciary Sale Agreement**" means any agreement, in the form of Exhibit M that may be entered into by and among GLA, as the fiduciary seller of the Aircraft, the Secured Parties, represented by the Collateral Agent, and GLAI, as intervening party, pursuant to which GLA shall grant a first-priority Lien to the Secured Parties in the Aircraft.

"**Applicable Procedures**" means the applicable procedures of DTC, Euroclear and Clearstream Banking, in each case to the extent applicable.

"**Asset Collateral**" means any Rotable Spare Parts, Non-Rotable Spare Parts, Spare Engines, Aircraft and Flight Simulators, in each case, subject to a first-priority Lien or (in the

#93484727v11

case of Aircraft subject to a Senior Lien) a second-priority perfected Lien granted pursuant to the terms of the Collateral Documents.

"**Authenticating Agent**" has the meaning specified in Section 2.02(b).

"**Authorized Denomination**" has the meaning specified in Section 2.02(a)(iv).

"**Average Exchange Rate**" means, as of any date of determination, the average of the Exchange Rate at 5:00 p.m. (New York City time) on each of the preceding 90 days.

"**Board of Directors**" means the Board of Directors of the Company, or the applicable Guarantor, as the case may be, or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the Secretary, the Assistant Secretary or another Officer or legal counsel performing corporate secretarial functions of the Company or the Guarantors, as applicable to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification and delivered to the Trustee.

"**Brazilian Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil or a day on which banking institutions or trust companies are authorized or obligated by law to close in São Paulo, Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, the United States or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, São Paulo, Brazil, or Luxembourg.

"**Calculation Date**" means each Payment Date, beginning on December 31, 2021.

"**Capital Lease Obligations**" means, with respect to any Person, any obligation which is required to be classified and accounted for as a capital lease on the face of a balance sheet of such Person prepared in accordance with IFRS; the amount of such obligation shall be the capitalized amount thereof, determined in accordance with IFRS; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Cash Collateral**" means all cash and Cash-Equivalents denominated in U.S. Dollars or Reais at any time and from time to time to be deposited in a cash collateral account subject to the first-priority Lien granted pursuant to the terms of the Collateral Documents.

3

"**Cash-Equivalents**" means (1) United States dollars, or money in other currencies received in the ordinary course of business that are convertible into United States dollars within three months, (2) U.S. Government Obligations with maturities not exceeding one year from the date of acquisition (3) (i) demand deposits, (ii) time deposits and certificates of deposit with maturities of one year or less from the date of acquisition, (iii) bankers' acceptances with maturities not exceeding one year from the date of acquisition, and (iv) overnight bank deposits, in each case with any bank or trust company organized or licensed under the laws of the United States or any state thereof having capital, surplus and undivided profits in excess of $500 million whose short-term debt is rated "A-2" or higher by S&P or "P-2" or higher by Moody's, (4) repurchase obligations with a term of not more than seven days for underlying securities of the type described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above, (5) commercial paper rated at least P 1 by Moody's or A 1 by S&P and maturing within six months after the date of acquisition, (6) money market funds at least 95% of the assets of which consist of investments of the type described in clauses (1) through (5) above.

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*)

"**Change of Control**" means (i) the direct or indirect sale or transfer of all or substantially all the assets of GLAI to another Person (in each case, unless such other Person is a Permitted Holder), (ii) the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act, other than Permitted Holders) is or becomes the "beneficial owner" (as such term is used in Rules 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of GLAI; (iii) the first day on which a majority of the Board of Directors of GLAI consists of persons who were elected by shareholders who are not Permitted Holders; or (iv) the Company or any Guarantor, as the case may be, are liquidated or dissolved or adopt a plan of liquidation or dissolution other than in a transaction which complies with the provisions described under Section 5.01.

"**Clearstream Banking**" means Clearstream Banking, *société anonyme*.

"**Collateral**" means the Issue Date Collateral and any Additional Collateral.

"**Collateral Agent**" means (i) the Person named as the "Collateral Agent" in the first paragraph of this Indenture and (ii) any Person appointed as a "Collateral Agent' under any of the Collateral Documents, in each case, until a successor Person shall have become such pursuant to the applicable provisions of this Indenture or the Collateral Documents, and thereafter "Collateral Agent" shall mean the successor serving hereunder or thereunder.

"**Collateral Agent Process Agent**" has the meaning specified in Section 11.10(a).

"**Collateral Documents**" means, collectively,

(i)        each Fiduciary Sale Agreement;

(ii)       each Second Lien Aircraft Mortgage;

#93484727v11

(iii)    the GLA Fiduciary Transfer of IP Rights;

(iv)    the GLAI Fiduciary Transfer of IP Rights;

(v)    each Receivables and Bank Account Pledge Agreement;

(vi)    any security agreement, pledge agreement, assignment agreement, account control agreement, UCC financing statement, fiduciary sale (*alienação fiduciária*), fiduciary assignment (*cessão fiduciária*) or other agreements or documents of any kind required to be delivered in connection with any Collateral and which creates or purports to create a first-priority Lien (or, in respect of Collateral subject to a Senior Lien, a second-priority Lien) in favor of the Secured Parties in such Collateral; and

(vii)    any other document, agreement or instrument required to be delivered in connection with any of the foregoing and which creates or purports to create a first-priority Lien (or, in respect of Collateral subject to a Senior Lien, a second-priority Lien) in any of the Collateral in favor of the Secured Parties.

"**Company**" has the meaning specified in the first paragraph of this Indenture and shall include its successors and assigns.

"**Company and Guarantors Process Agent**" has the meaning specified in Section 11.10(a).

"**Company Order**" means a written order signed in the name of the Company by an Officer.

"**Company Substitution Documents**" has the meaning specified in Section 5.03(a)(i).

"**Corporate Trust Office**" means the office of the Trustee at which at any particular time its corporate trust business shall be principally administered (which office as of the date of this Indenture is located at The Bank of New York Mellon, 240 Greenwich Street, Floor 7E, New York, NY 10286).

"**covenant defeasance option**" has the meaning specified in Section 8.01(b).

"**Custodian**" means any receiver, trustee, assignee, liquidator, custodian or similar official under any bankruptcy law.

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Debt**" means, with respect to any Person, without duplication:

(i)    the principal of and premium, if any, in respect of (a) indebtedness of such Person for money borrowed and (b) indebtedness evidenced by notes, debentures, notes or other similar instruments for the payment of which such Person is responsible or liable;

(ii)    all Capital Lease Obligations of such Person;

5

(iii)    all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable or other short-term obligations to suppliers payable within 180 days, in each case arising in the ordinary course of business);

(iv)    all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (i) through (iii) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt by such Person of a demand for reimbursement following payment on the letter of credit);

(v)    all Hedging Obligations of such Person;

(vi)    all obligations of the type referred to in clauses (i) through (iv) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any guarantee (other than obligations of other Persons that are customers or suppliers of such Person for which such Person is or becomes so responsible or liable in the ordinary course of business to (but only to) the extent that such Person does not, or is not required to, make payment in respect thereof);

(vii)    all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured; and

(viii)    any other obligations of such Person which are required to be, or are in such Person's financial statements, recorded or treated as debt under IFRS.

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**defeasance trust**" has the meaning specified in Section 8.02.

"**Depositary**" means DTC or any successor depositary for the Notes.

"**Designated Location**" means Brazil.

"**DTC**" means The Depository Trust Company.

"**Electronic Means**" shall mean the following communications methods: e-mail, facsimile transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another method or system specified by the Trustee as available for use in connection with its services hereunder.

6

#93484727v11

"**Eligible Account Receivables**" means an account receivable (excluding any credit card receivables) owing to any Guarantor which satisfies the following requirements:

(a)      the account receivable is denominated in Reais or U.S. Dollars;

(b)      the account receivable results from the sale of goods or performance of services by the Guarantors in the ordinary course of its business;

(c)      the account debtor is not claiming any defense to payment of the account receivable, whether well-founded or otherwise, in a court of competent jurisdiction;

(d)      the account receivable is owned by the Guarantors free of any Liens or interests of others, except for the Lien in favor of the Secured Parties and statutory liens or permitted liens (including encumbrances that do not have priority over the Lien in favor of the Secured Parties);

(e)      the account debtor is not an Affiliate or Subsidiary of the Guarantors;

(f)      the account debtor has not (i) applied for, suffered, or consented to the appointment of any trustee, receiver, *administrador judicial*, liquidator, custodian or other similar official of it or any substantial part of its property, (ii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any bankruptcy, insolvency or other similar law now or hereafter in effect, (iii) admitted in writing its inability to pay its debts as they become due, or become generally unable to pay its debts as they become due, (iv) become insolvent, (v) made a general assignment for the benefit of its creditors or (vi) ceased operation of its business; and

(g)      the account receivable is not unpaid 90 days after its due date under the original terms of sale or 90 days of its invoice date, whichever occurs first.

"**Eligible Account Receivables Collateral**" means any Eligible Account Receivables subject to a first-priority perfected Lien granted pursuant to the terms of the Collateral Documents, *provided* that, in respect of any account receivable denominated in Reais, such first-priority perfected Lien shall be granted pursuant to the terms of the Receivables and Bank Account Pledge Agreement.

"**Eligible Account Receivables Collateral Value**" means 80% of the Net Amount of Eligible Receivables Collateral.

"**Eligible Aircraft**" shall mean any Boeing model B737-800, B737-700 or B737- MAX 8 family aircraft operated by GLA.

"**Eligible IP Collateral**" means all rights, owned or purported to be owned, or later developed or acquired and owned or purported to be owned, by Smiles (or its successor) or any of its Subsidiaries, in and to all intellectual property comprising all trademarks, service marks, brand names, designs, and logos that include the word "Smiles" or any successor brand (collectively, the "**Loyalty Trademarks**"), including (i) all causes of action and claims now or hereafter held by Smiles (or its successor) in respect of the Loyalty Trademarks, including,

#93484727v11

without limitation, the right to sue or otherwise recover for any and all past, present and future infringements or dilutions thereof and (ii) all other trademark rights corresponding thereto and all other trademark rights of any kind whatsoever accruing under the Loyalty Trademarks; together, in each case, with the goodwill of the business connected with such use of, and symbolized by, each of the Loyalty Trademarks.

"**Engine**" shall mean an engine used, or intended to be used, to propel an Aircraft, including a part, appurtenance, and accessory of such Engine, powered by jet propulsion and having at least 1750 lb of thrust or its equivalent.

"**Euroclear**" means Euroclear Bank S.A./N.V.

"**Event of Default**" has the meaning specified in Section 6.01.

"**Event of Loss**" means, with respect to the Aircraft, the Airframe or any Engine, any of the following events:  (i) the loss of such property or the use thereof due to the destruction of or damage to such property that renders repair uneconomic or that renders such property permanently unfit for normal use; (ii) any damage or loss to or other circumstance in respect of such property that results in an insurance settlement with respect to such property on the basis of a total loss, or a constructive or arranged total loss; (iii) the confiscation or nationalization of, or requisition of title to, such property by any Government Body; (iv) the theft or disappearance of such property that shall have resulted in the loss of possession of such property by the GLA or any Permitted Lessee for a period in excess of the lesser of sixty (60) days and the balance of any lease term, unless the location of such property is known and GLA or any Permitted Lessee is diligently pursuing recovery of such property (but in no event for a period in excess of 120 days or the balance of any lease term, whichever is shorter); (v) the seizure of, detention or requisition for use of, such property by any Government Body that shall have resulted in the loss of possession of such property by GLA or any Permitted Lessee and such requisition for use shall have continued beyond the earlier of (A) the lesser of the balance of any lease term and sixty (60) consecutive days and (B) the date of receipt of insurance or condemnation proceeds with respect thereto; (vi) as a result of any rule, regulation, order or other action by any governmental entity or court having jurisdiction, the use of such property in the normal conduct of GLA's or any Permitted Lessee's overall air transportation business shall have been prohibited for a period of at least six (6) consecutive months or the balance of any lease term (whichever is shorter) unless GLA or any Permitted Lessee prior to the expiration of such period, shall have undertaken and shall be diligently carrying forward all steps which, in its reasonable judgment, are necessary or desirable to permit the use of such property by GLA or any Permitted Lessee and the prohibition against such use of such property shall have been removed within twelve (12) months of the effectiveness of such rule, regulation, order or other action or by the end of any lease term (if earlier); or (vii) except as expressly provided in any lease, as applicable, with respect to an Engine only, the failure of such Engine to remain attached to the Airframe for sixty (60) consecutive days.  An Event of Loss with respect to the Aircraft shall be deemed to have occurred if an Event of Loss occurs with respect to an Airframe.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

8

"**Exchange Rate**" means, the R$/Dollar rate, expressed as the amount of Reais per one U.S. Dollar as reported by the Central Bank of Brazil on the SISBACEN Data System and on its website (which, at the date hereof, is located at http://www.bcb.gov.br) under the sale index, option "all currencies," or any other official index disclosed by the Central Bank of Brazil that replaces the sale index, option "all currencies".

"**Facsimile Instruction**" shall mean any Written Direction transmitted to the Trustee or any Agent by means of facsimile or other electronic transmission.

"**Facsimile Signature**" shall mean any signature transmitted to the Trustee or any Agent by means of facsimile or other electronic transmission.

"**Fair Market Value**" has the meaning specified in Section 4.13(a).

"**Fiduciary Sale Agreements**" means the collective reference to the Non-Rotables Fiduciary Sale Agreement, the Rotables Fiduciary Sale Agreement, the Spare Engine Fiduciary Sale Agreement, the Aircraft Fiduciary Sale Agreement, the Smiles Fiduciary Transfer IP Agreement, the Flight Simulator Fiduciary Sale Agreement and the Smiles Shares Fiduciary Sale Agreement, in each case, as amended and/or supplemented from time to time, as applicable.

"**Flight Simulator Fiduciary Sale Agreement**" means any agreement, in the form of Exhibit L, that may be entered into by and among GLA, as the fiduciary seller of the Flight Simulators, the Collateral Agent, for the benefit of the Secured Parties as the secured parties thereunder, and GLAI, as intervening party, pursuant to which GLA shall grant a first-priority Lien to the Secured Parties in the Flight Simulators.

"**Flight Simulators**" means the flight simulators and flight training devices owned by GLA or GLAI.

"**GLA**" means Gol Linhas Aéreas S.A and shall include its successors and assigns.

"**GLA Fiduciary Transfer of IP Rights**" means that certain Brazilian law governed fiduciary transfer of intellectual property rights agreement, dated as of the Issue Date, in the form of Exhibit G, by GLA, as security provider, and the Collateral Agent, for the benefit of the Secured Parties, and GLAI, as intervening party.

"**GLAI**" means Gol Linhas Aéreas Inteligentes S.A. and shall include its successors and assigns.

"**GLAI Fiduciary Transfer of IP Rights**" means that certain Brazilian law governed fiduciary transfer of intellectual property rights agreement, dated as of the Issue Date, in the form of Exhibit H, by GLAI, as security provider, and the Collateral Agent, for the benefit of the Secured Parties, and GLA, as intervening party.

"**guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether

9

arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"**Guarantor**" means (i) GLAI, (ii) GLA and (iii) any successor obligor under the Note Guaranties pursuant to Section 5.01, unless and until such Guarantor is released from the Note Guaranty pursuant to this Indenture.

"**Hedging Obligations**" means, with respect to any Person, the obligations of such Person pursuant to any interest rate swap agreement, foreign currency exchange agreement, interest rate collar agreement, option or futures contract or other similar agreement or arrangement designed to protect such Person against changes in interest rates or foreign exchange rates.

"**Holder**" or "**Noteholder**" means the Person in whose name a Note is registered in the Register.

"**IFRS**" means the International Financial Reporting Standards as issued by the International Accounting Standards Board.

"**Incumbency Certificate**" shall mean the lists of authorized signatories of the Company and each Guarantor on file with the Trustee.

"**Indenture**" means this Indenture, as amended or supplemented from time to time in accordance with the provisions hereof.

"**Independent Appraiser**" means Morten, Beyer & Agnew, Inc. or any other Person certified by ISTAT (or any successor organization thereto) selected by the Company (i) engaged in a business which includes appraising aircraft and assets relating to the operation and maintenance of aircraft from time to time, (ii) who does not have any material financial interest in GLA or any of its Affiliates and is not connected with GLA or any of its Affiliates as an officer, director, employee, promoter, underwriter, partner or person performing similar functions and (iii) who is independent from any issuance of Notes.

"**Initial Notes**" has the meaning specified in the first paragraph of the Recitals in this Indenture.

"**Intercompany Agreements**" means GLAI or GLA's rights under currently existing agreements governing the sale, transfer or redemption of miles, licensing of certain intellectual property held by GLAI or GLA, as applicable, or provision of services by GLAI or GLA, as applicable, to Smiles and its subsidiaries in connection with the Loyalty Program, including all rights to receive moneys due and to become due thereunder or pursuant thereto.

#93484727v11

"**Intercreditor Agreement**" means the intercreditor agreement, substantially in the form set forth in Exhibit F, to be entered into, *inter alia*, by the Trustee (subject to customary terms acceptable to the Trustee), the Collateral Agent (subject to customary terms acceptable to the Collateral Agent) and each Additional Trustee for Holders of Additional Pari Passu Obligations that may be incurred after the Issue Date (as may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, including pursuant to any joinder agreement thereto).

"**interest**" means interest on the principal amount of the Notes paid in cash at the rate of 8.00% per annum.

"**ISTAT**" means International Society of Transport Aircraft Trading.

"**issue**" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Debt or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be issued by such Subsidiary at the time it becomes a Subsidiary; and the term "issuance" has a corresponding meaning.

"**Issue Date**" means December 23, 2020.

"**Issue Date Collateral**" means (i) the Asset Collateral on the Issue Date comprising Spare Parts and (ii) the Pledged IP, in each case, subject to the first-priority Lien granted pursuant to the terms of the Collateral Documents. For the avoidance of doubt, the Lien with respect to such Asset Collateral will not apply to any Spare Part (1) so long as it is incorporated in, installed on, attached or appurtenant to, or being used on, an aircraft, engine or Spare Part that is so incorporated, installed, attached, appurtenant or being used, (2) leased to, loaned to, or held on consignment by, GLA, and (3) that is not specifically identified in the Fiduciary Sale Agreements.

"**legal defeasance option**" has the meaning specified in Section 8.01(b).

"**Lien**" means any mortgage, pledge, security interest, encumbrance, conditional sale or other title retention agreement or other similar lien.

"**Loyalty Program**" means the Smiles loyalty program.

"**Loyalty Program Agreements**" means any currently existing, future and successor co-branding, partnering or similar agreements related to or entered into with third parties in connection with the Loyalty Program by the GLA or Smiles and its subsidiaries, including all rights to receive moneys due and to becoming due thereunder or pursuant thereto.

"**Loyalty Receivables**" means, with respect to any period and without duplication, the aggregate amount of Reais-denominated revenues of Smiles under its loyalty program contracts during such period together with all other payments to Smiles under its loyalty program contract during such period.

11

"**LTV Ratio**" means, as of any date of determination, the ratio, expressed as a percentage, of (a) the sum of (i) the aggregate principal amount of Outstanding Notes as of such date *plus* (ii) the aggregate principal amount of any other Pari Passu Obligations as of such date, *divided* by (b) the Total Collateral Value, as of such date.

"**Maturity Date**" means June 30, 2026.

"**Minimum Withholding Level**" has the meaning specified in Section 3.01(c).

"**Net Amount of Eligible Receivables Collateral**" shall mean, at any time, the gross amount of Eligible Account Receivables Collateral (or, if denominated in Reais, the U.S. Dollar Equivalent thereof) less returns, discounts, claims, credits, promotional program allowances, price adjustments and allowances of any nature at any time issued, owing, granted, outstanding, available, or claimed (in each case without duplication, whether as a result of the failure to comply with the criteria set forth in the definition of Eligible Account Receivables or otherwise).

"**Non-Rotable Spare Parts**" means parts often described in the industry as "repairables" and "expendables" or "consumables." Repairables are replaceable parts or components, commonly economical to repair, and subject to being reconditioned to a fully serviceable condition over a period of time less than the life of the flight equipment to which they are related. Examples include many engine blades and vanes, some tires, seats, and galleys. A repairable cannot be a rotable and vice versa. Expendables or consumables consist of items for which no authorized repair procedure exists, and for which cost of repair would normally exceed that of replacement. Expendable items include nuts, bolts, rivets, sheet metal, wire, light bulbs, cable, and hoses.

"**Non-Rotables Fiduciary Sale Agreement**" means the agreement, dated on or about the Issue Date, in the form of Exhibit I, entered into by and among GLA, as the fiduciary seller of the Non-Rotable Spare Parts, the Secured Parties, represented by the Collateral Agent, and GLAI, as intervening party, pursuant to which GLA granted the first-priority Lien to the Secured Parties in the Non-Rotable Spare Parts as currently or in the future indicated in an exhibit to the Non-Rotables Fiduciary Sale Agreement.

"**Note Guaranty**" means each of the guarantees of the Notes by the Guarantors pursuant to this Indenture.

"**Notes**" has the meaning specified in the first paragraph of the Recitals in this Indenture and shall be in the form of Note set forth in Exhibit A.

"**Notes Obligations**" means Obligations in respect of the Notes, this Indenture, the Note Guaranties and the Collateral Documents.

"**Obligations**" means any principal, interest (including any interest, fees and other amounts accruing subsequent to the filing of a petition in bankruptcy, reorganization, arrangement or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest, fees and other amounts is an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, and guarantees of payment of such

#93484727v11

principal, interest, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, payable under the documentation governing any Debt.

"**Officer**" means any director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, of the Company or the Guarantors, as the case may be, or any other Person duly appointed by the shareholders of the Company, or the Guarantors, or the Board of Directors, as the case may be, to perform corporate duties.

"**Officers' Certificate**" means a certificate signed by any of the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or the applicable Guarantor, as the case may be.

"**Opinion of Counsel**" means an opinion of legal counsel of recognized standing (who may be an employee of or counsel to the Company or the Guarantors, *provided* that an Opinion of Counsel delivered pursuant to Section 5.01 and Section 8.02 shall be of an external counsel to, and not an employee of, the Company or the Guarantors, as applicable) and who shall be reasonably acceptable to the Trustee, which opinion is reasonably satisfactory to the Trustee.

"**Outstanding**" means, when used with respect to Notes, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

(i)      Notes theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(ii)      Notes for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company) in trust or set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent) for the Holders of such Notes; *provided* that, if such Notes are to be redeemed pursuant to Article 3, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)      Notes, except to the extent provided in Section 8.01 and Section 8.02, with respect to which the Company has effected legal defeasance and/or covenant defeasance as provided in Article 8; and

(iv)      Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a bona fide purchaser or protected purchaser in whose hands such Notes are valid obligations of the Company;

*provided*, *however*, that in determining whether the Holders of the requisite principal amount of Outstanding Notes have given any request, demand, authorization, direction, consent, notice or waiver hereunder, Notes owned by the Company or any of its Affiliates shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, consent,

13

notice or waiver, only Notes which a Responsible Officer of the Trustee has received written notice at its address specified herein of being so owned shall be so disregarded. Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledge's right so to act with respect to such Notes and that the pledgee is not the Company, or any other obligor upon the Notes or any of its or such other obligor's Affiliates.

"**Pari Passu Lien Priority**" means, relative to specified Debt, having equal Lien priority on specified Collateral (without regard to any waterfall provisions or the ability to exercise remedies) and subject to the Intercreditor Agreement.

"**Pari Passu Obligations**" means (i) the Notes Obligations and (ii) any Additional Pari Passu Obligations.

"**Paying Agent**" means The Bank of New York Mellon, until a successor Paying Agent shall have become such pursuant to the applicable provisions of this Indenture, and, thereafter, "Paying Agent" shall mean such successor Paying Agent.

"**Payment Date**" means each June 30 and December 30 of each year commencing June 30, 2021.

"**Payment Default**" has the meaning specified in Section 6.01(d).

"**Permitted Holders**" means any or all of the following:

(i)        an immediate family member of Messrs. Constantino de Oliveira, Henrique Constantino, Joaquim Constantino Neto and Ricardo Constantino or any Affiliate or immediate family member thereof; immediate family member of a person means the spouse, lineal descendants, father, mother, brother, sister, father-in-law, mother-in-law, brother-in-law and sister-in-law of such person; and

(ii)       any Person the Voting Stock of which (or in the case of a trust, the beneficial interests in which) are owned at least 51% by Persons specified in clause (i).

"**Permitted Liens**" means:

(i)        any Liens on the Collateral securing Pari Passu Obligations;

(ii)       any Senior Liens;

(iii)      Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently pursued; *provided* that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(iv)      Liens imposed by law, in each case, incurred in the ordinary course of business;

(v)       Liens arising by operation of law in connection with judgments, attachments or awards which do not constitute an Event of Default hereunder;

#93484727v11

(vi)    Liens incurred in the ordinary course of business of GLAI or any Significant Subsidiary of GLAI with respect to obligations that do not exceed in the aggregate $30,000,000 at any one time outstanding;

(vii)    with respect to any Loyalty Receivables, (1) licenses and sub-licenses and similar rights as they relate to any Collateral that is Loyalty Program property (A) granted to any Person pursuant to any Intercompany Agreements or (B) as otherwise expressly permitted by the Collateral Documents to be granted to any Person; (2) Liens arising in connection with any Intercompany Agreements and (3) Liens (including all rights) of counterparties to Loyalty Program Agreements under the terms thereof;

(viii)    with respect to any Aircraft, Spare Engines and Flight Simulators:

(1)    the rights of Permitted Lessees and other Persons under leases and other agreements and arrangements to the extent permitted by the terms of Section 4.18;

(2)    Liens for fees or charges of any airport or air navigation authority related to the Aircraft or Spare Engine not yet due and payable by GLA or any Permitted Lessee or which are being contested in good faith, on reasonable grounds and by appropriate proceedings so long as (x) such Liens do not involve any material risk of the sale, seizure, forfeiture or loss of the Aircraft, Spare Engine or any part thereof, title thereto, or any interest therein or the use thereof, and (y) such fees or charges in the aggregate do not exceed U.S.$1,000,000;

(3)    Liens for Taxes payable by the Company, GLA, any lessor leasing such asset to GLA or any Permitted Lessee either not yet overdue or being contested in good faith by appropriate proceedings that do not involve any material likelihood of the sale, seizure, forfeiture, detention or loss of the Flight Simulator, Aircraft, Spare Engine or any part thereof, title thereto, interest therein or use thereof and that do not involve either any potential for criminal liability or the imposition of any Lien for which an adequate bond has not been posted by or on behalf of GLA or GLAI and in the case of such proceedings so long as adequate reserves are maintained in respect of such Taxes in accordance with IFRS;

(4)    materialmen's, mechanics', workmen's, repairmen's, employees' or other like Liens on the Flight Simulator, Aircraft or the Spare Engine arising in the ordinary course of business of GLA or any Permitted Lessee for amounts the payment of which is either not yet due or which are being contested in good faith by appropriate proceedings that do not involve any material likelihood of the sale, seizure, forfeiture, detention or loss of the Flight Simulator, Aircraft, Spare Engine or any part thereof, title thereto, interest therein or use thereof and in the case of such proceedings so long as adequate reserves are maintained in respect of such amounts in accordance with IFRS; and

(5)    salvage or similar rights of insurers under insurance policies maintained pursuant to and in accordance with Section 4.19.

(ix)    Liens arising out of judgments or awards against GLA with respect to which at the time an appeal or proceeding for review is being prosecuted in good faith by appropriate

#93484727v11

proceedings that do not involve any material likelihood of the sale, seizure, forfeiture or loss of any Flight Simulator, Aircraft, Spare Engine or any part thereof that comprises Collateral, any title thereto, interest therein or use thereof and in the case of such proceedings so long as adequate reserves are maintained in respect of such amounts in accordance with IFRS;

(x)    licenses, sublicenses, leases and subleases by any Grantor as they relate to any Aircraft or Spare Engine or any other Additional Collateral and to the extent (A) such licenses, sublicenses, leases or subleases do not interfere in any material respect with the business of GLAI and its Significant Subsidiaries, taken as a whole, and in each case, such license, sublicense, lease or sublease is to be subject to the Liens granted to the Collateral Agent pursuant to the Collateral Documents or (B) otherwise expressly permitted by the Collateral Documents;

(xi)    salvage or similar rights of insurers under insurance policies maintained pursuant to and in accordance with Section 4.19.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"**Pledged IP**" means all worldwide rights, owned or purported to be owned, or later developed or acquired and owned or purported to be owned, by GLAI or any of its subsidiaries, in and to all intellectual property comprising (a) all trademarks, service marks, brand names, designs, and logos that include the word "GOL" or any successor brand (collectively, the "Trademarks") and (b) the "www.voegol.com.br" domain name and similar domain names or any successor domain names (collectively, the "Domain Names"), including (i) all causes of action and claims now or hereafter held by GLA in respect of the Trademarks and Domain Names, including, without limitation, the right to sue or otherwise recover for any and all past, present and future infringements or dilutions thereof and (ii) all other trademark rights corresponding thereto and all other trademark rights of any kind whatsoever accruing under the Trademarks and Domain Names; together, in each case, with the goodwill of the business connected with such use of, and symbolized by, each of the Trademarks and Domain Names.

"**principal**" of a Note means the principal amount of such Note (including any Additional Amounts payable by the Company in respect of such principal).  References to "principal amount" of Notes include any increase in the principal amount of Outstanding Notes due to the issuance of any Additional Notes.

"**Private Placement Memorandum**" means the private placement memorandum dated December 2020 relating to the Notes.

"**Proceeding**" has the meaning specified in Section 11.10(a).

"**Real**", "**Reais**" or "**R$**" means the legal currency of Brazil from time to time.

"**Receivables and Bank Account Pledge Agreement**" means the agreement, in the form of Exhibit N, entered into by and among the Guarantors and/or Smiles and the Secured Parties, represented by the Collateral Agent, pursuant to which the Guarantors and/or Smiles may grant a

16

first-priority perfected Lien to the Eligible Account Receivables and/or the Loyalty Receivables, as the case may be.

"**Record Date**" means, when used with respect to the interest on the Notes payable on any Payment Date, each June 15 and December 15 (whether or not a Business Day), as the case may be, immediately preceding such Payment Date.

"**Redemption Date**" means, when used with respect to any Note to be redeemed pursuant to Article 3, the date fixed for such redemption by or pursuant to this Indenture.

"**Redemption Price**" means, when used with respect to any Notes to be redeemed pursuant to Article 3, the price at which it is to be redeemed pursuant to this Indenture.

"**Register**" has the meaning specified in Section 2.03(a).

"**Registrar**" means The Bank of New York Mellon, until a successor Registrar shall have become such pursuant to the applicable provisions of this Indenture, and, thereafter, "Registrar" shall mean such successor Registrar.

"**Regulation S**" means Regulation S under the Securities Act, as in effect from time to time.

"**Regulation S Note**" means one or more permanent Notes in definitive fully registered form without interest coupons representing Notes sold outside of the United States pursuant to Regulation S.

"**Relevant Date**" means, with respect to any payment on a Note, whichever is the later of:  (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Trustee on or prior to such due date, the date on which notice is given to the Holders that the full amount has been received by the Trustee.

"**Required Holders**" has the meaning specified in Section 6.12.

"**Resale Restriction Termination Date**" means the date on which the Notes will no longer be Restricted Notes for the purpose of the Securities Act.

"**Responsible Officer**" means (a) with respect to the Trustee or any Agent, any officer of the Trustee or such Agent who customarily performs functions similar to those performed by Persons who at the time shall be such officers or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture; and (b) with respect to the Collateral Agent, any officer of the Collateral Agent with direct responsibility for the administration of this Indenture and the Collateral Documents.

"**Restricted Note**" means one or more permanent Notes in definitive fully registered form without interest coupons sold to "qualified institutional buyers" (as such term is defined in Rule 144A) pursuant to Rule 144A.

"**Restricted Period**," with respect to any Notes, means the period of 40 consecutive days beginning on and including the later of (i) the day on which such Notes are first offered to persons other than distributors (as defined in Regulation S under the Securities Act) in reliance on Regulation S and (ii) the date on which the closing of the offering thereof occurs, as notified by the Company to the Trustee in writing.

"**Rotable Spare Parts**" means parts that wear over time and can be economically restored to a serviceable condition and, in the normal course of operations, can be repeatedly reconditioned to a fully serviceable condition over a period approximating the life of the flight equipment to which they are related. Examples include avionics units, landing gears, auxiliary power units and major engine accessories.

"**Rotables Fiduciary Sale Agreement**" means the agreement, dated on or about the Issue Date, in the form of Exhibit J, entered into by and among GLA, as the fiduciary seller of the Rotable Spare Parts, the Secured Parties, represented by the Collateral Agent, and GLAI, as intervening party, pursuant to which GLA granted the first-priority Lien to the Secured Parties in the Rotable Spare Parts as currently or in the future indicated in an exhibit to the Rotables Fiduciary Sale Agreement.

"**Rule 144A**" means Rule 144A under the Securities Act, as in effect from time to time.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Second Lien Aircraft Mortgage**" means any security agreement, mortgage or similar agreement whereby the owner of an Aircraft subject to a Senior Lien grants a Lien over such Aircraft to the Collateral Agent, which Second Lien Aircraft Mortgage shall be substantially in the same form as the security agreement, mortgage or similar agreement creating such Senior Lien.

"**Secured Parties**" means the Holders of the Notes, the Trustee, the Collateral Agent and the Agents.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Securities Act Legend**" means the applicable legend set forth in the form of Note attached hereto as Exhibit A.

"**Senior Lien**" means, with respect to any Eligible Aircraft Collateral, a lien in favor of a security trustee, collateral agent, security agent or other similar agent for the benefit of one or more lenders, noteholders or other creditors in a financing transaction (including a financing transaction by or guaranteed by an export credit agency).

"**Significant Subsidiary**" means any Subsidiary of GLA (or any successor) which at the time of determination either (i) had assets which, as of the date of GLA's (or such successor's) most recent quarterly consolidated balance sheet, constituted at least 10% of GLA's (or such successor's) total assets on a consolidated basis as of such date or (ii) had revenues for the 12 month period ending on the date of GLA's (or such successor's) most recent quarterly

18

consolidated statement of income which constituted at least 10% of GLA's (or such successor's) total revenues on a consolidated basis for such period.

"**Smiles**" means Smiles Fidelidade S.A.

"**Smiles Fiduciary Transfer IP Agreement**" means the agreement, in the form of Exhibit O, entered into by and among Smiles, as the fiduciary seller of the Eligible IP Collateral and the Secured Parties, represented by the Collateral Agent, and the Guarantors (as intervening parties), pursuant to which Smiles shall grant a first-priority Lien to the Eligible IP Collateral as currently or in the future indicated in an exhibit to the Smiles Fiduciary Transfer IP Agreement.

"**Smiles Shares Collateral**" means common shares of Smiles that GLAI owns and the dividends deriving therefrom, subject to a first-priority perfected Lien granted pursuant to the terms of the Smiles Shares Fiduciary Sale Agreement.

"**Smiles Shares Fiduciary Sale Agreement**" means the agreement, in the form of Exhibit P, entered into by and among GLAI, as the fiduciary seller of the Smiles Shares Collateral and the Secured Parties, represented by the Collateral Agent, pursuant to which GLAI shall grant a first-priority Lien to the Smiles Shares Collateral as currently or in the future indicated in an exhibit to the Smiles Shares Fiduciary Sale Agreement.

"**Spare Engines**" means any Engine owned by GLA suitable for installation on an Eligible Aircraft that is owned by GLA.

"**Spare Engine Fiduciary Sale Agreement**" means each agreement, if any, in the form of Exhibit K entered into by and among GLA, as the fiduciary seller of the Spare Engines, the Secured Parties, represented by the Collateral Agent, and GLAI, as intervening party, pursuant to which GLA shall grant a first-priority Lien to the Secured Parties in the Spare Engines.

"**Spare Parts**" means, collectively, Rotable Spare Parts and Non-Rotable Spare Parts.

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Subsidiary**" means, in respect of any specified Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person.

"**Substituted Debtor**" has the meaning specified in Section 5.03(a).

"**Taxing Jurisdiction**" has the meaning specified in Section 4.06(a).

"**Total Collateral Value**" means, on any date of determination:

(1)      the Fair Market Value of any Asset Collateral (including the Issue Date Collateral consisting of Spare Parts), denominated in U.S. Dollars based on the most recent appraisal delivered prior to such date of determination; *provided* that the Fair Market Value of any Asset Collateral subject to a Senior Lien shall be reduced by the principal amount of the Debt secured by such Senior Lien; *plus*

(2)      the Eligible Account Receivables Collateral Value denominated in U.S. Dollars (or, if denominated in Reais, 90% of the U.S. Dollar Equivalent thereof); *plus*

(3)      the face value of the Cash Collateral denominated in U.S. Dollars (or, if denominated in Reais, 90% of the U.S. Dollar Equivalent thereof); *plus*

(4)      the value of the Pledged IP and if applicable, any other Eligible IP Collateral that is part of the Collateral denominated in U.S. Dollars based on the most recent appraisal delivered prior to such date of determination, *plus*

(5)      the value of any pledged shares (including, if applicable, the Smiles Shares Collateral), determined (i) in the case of shares traded on a public exchange, by reference to the trading price at the close of business on the Business Day preceding the date of determination or (ii) in the case of all other shares, by reference to the book value (without duplication) of the issuer of such shares and its assets net of its liabilities, as shown in the most recent quarterly consolidated financial statements of GLAI prepared in accordance with IFRS,

*in each case*, as of such date of determination; *provided* that to the extent that the Fair Market Value of any Non-Rotable Spare Parts that are "expendables" or "consumables" exceeds an amount equal to 30% of the Fair Market Value of all Spare Parts and Spare Engines that comprise Collateral, the Fair Market Value of such Non Rotable Spare Parts that are "expendables" or "consumables" in excess of such 30% shall be disregarded for the purposes of calculating the Fair Market Value of the Asset Collateral.

"**Transfer Agent**" means The Bank of New York Mellon until a successor transfer agent shall have become so appointed pursuant to the applicable provisions of this Indenture and any other Person authorized by the Company to effectuate the exchange or transfer of any Note on behalf of the Company hereunder.

"**Trigger LTV Ratio**" means 65%.

"**Trust Indenture Act**" means the U.S. Trust Indenture Act of 1939, as amended.

"**Trustee**" means The Bank of New York Mellon, until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture and, thereafter, "Trustee" shall mean such successor Trustee.

"**United States**" and "**U.S.**" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

#93484727v11

"**U.S. Dollar Equivalent**" means, on any date of determination, with respect to any amount in Reais, the equivalent in U.S. Dollars of such amount, using the Average Exchange Rate calculated as of such date.

"**U.S. Dollars**" and "**U.S.$**" each mean the currency of the United States.

"**U.S. Government Obligations**" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States is pledged and which are not callable at the issuer's option.

"**Voting Stock**" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"**Wholly Owned Subsidiary**" means a Subsidiary all of the Capital Stock of which (other than directors' qualifying shares) is owned by any Person or another Wholly Owned Subsidiary.

"**Written Direction**" shall mean any written instrument, directing the Trustee or any Agent to take any action that is signed by an authorized representative of the Company. Any such instrument may be transmitted and signed by Facsimile and where manually signed such signature is to appear on the Incumbency Certificate.

SECTION 1.02.  *Rules of Construction*.  (a) For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(i)    the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(ii)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(iii)    "or" is not exclusive; and

(iv)    "including" means including, without limitation;

(v)    any reference to an "Article," a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Indenture.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with IFRS.

(c)    For purposes of the definitions set forth in Section 1.01 and this Indenture generally, all calculations and determinations shall be made in accordance with IFRS and shall be based upon the consolidated financial statements of GLAI and its Subsidiaries prepared in accordance with IFRS.

#93484727v11

SECTION 1.03.    *Table of Contents; Headings*.  The table of contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 1.04.    *Form of Documents Delivered to Trustee*.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company or the applicable Guarantor may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion is based are erroneous.  Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company or the applicable Guarantor stating that the information with respect to such factual matters is in the possession of the Company or the applicable Guarantor, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

SECTION 1.05.    *Holder Communications; Acts of Holders*. (a) The rights of Holders to communicate with other Holders with respect to this Indenture or the Notes are as provided by the Trust Indenture Act, and the Company, the Guarantors and the Trustee shall comply with the requirements of the Trust Indenture Act Sections 312(a) and 312(b).  None of the Company, the Guarantors, the Collateral Agent, or the Trustee will be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

(b)        Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company or the Guarantors, as the case may be.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Holders signing such instrument or instruments.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the

22

Trustee and the Company or the Guarantors, as the case may be, if made in the manner provided in this Section 1.05.

(c)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him or her the execution thereof.  Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee reviewing such instrument or writing deems sufficient.

(d)    The principal amount and serial numbers of Notes held by any Person, and the date of holding the same, shall be proved by the Register.

(e)    If the Company solicits from the Holders of Notes any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall not have any obligation to do so.  Such record date shall be the record date specified in or pursuant to such Board Resolution, which shall be a date not earlier than the date 30 days prior to the first solicitation of Holders generally in connection therewith and not later than the date such solicitation is completed.  If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of Outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the Outstanding Notes shall be computed as of such record date.

(f)    Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Note.

## ARTICLE 2
### THE NOTES

SECTION 2.01.    *Form and Dating*.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Note set forth in Exhibit A, which is hereby incorporated in and expressly made a part of this Indenture.  The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any law, stock exchange

23

rule, agreement to which the Company is subject, if any, or usage; *provided* that any such notation, legend or endorsement is in a form acceptable to the Company.

Each Note shall be dated the date of its authentication.

The Notes shall be printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner permitted by the rules of any stock exchange on which the Notes may be listed, if any, all as determined by the Officers executing such Notes, as evidenced by each such Officer's execution of such Notes.

SECTION 2.02.    *Execution, Authentication and Delivery*.  (a) One Officer of the Company shall sign the Notes for the Company by manual or Facsimile Signature.

(i)      If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

(ii)      A Note shall not be valid until an authorized signatory of the Trustee or an authenticating agent manually or by facsimile signs the certificate of authentication on the Note upon Company Order.  Such signature shall be conclusive evidence that the Note has been authenticated under this Indenture.  Such Company Order shall specify the amount of the Notes to be authenticated and the date on which the original issue of Notes is to be authenticated.

(iii)      The Trustee or an authenticating agent shall authenticate and deliver (A) initially Initial Notes on the Issue Date in an aggregate principal amount of U.S.$200,000,000.00 and (B) any Additional Notes in accordance with Section 2.15.

(iv)      The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "**Authorized Denomination**").

(b)      The Trustee may appoint an authenticating agent, with a copy of such appointment to the Company, to authenticate the Notes (the "**Authenticating Agent**").  Unless limited by the terms of such appointment, an Authenticating Agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by an Authenticating Agent.  An Authenticating Agent has the same rights as any Agent or agent for service of notices and demands.

(i)      Any corporation into which any Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business (and this transaction in particular) of any Authenticating Agent, shall be the successor of such Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Authenticating Agent or such successor corporation.

(ii)      Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Company.  The Trustee may at any time terminate

24

the agency of any Authenticating Agent by giving written notice of termination to such Authenticating Agent and the Company.  Upon receiving such notice of resignation or upon such a termination, the Trustee may appoint a successor Authenticating Agent reasonably acceptable to the Company and shall give written notice of such appointment to the Company.

(iii)    The Company agrees to pay to each Authenticating Agent from time to time reasonable compensation for its services and reimbursement for its reasonable expenses relating thereto.

SECTION 2.03.    *Transfer Agent, Registrar and Paying Agent*.  (a) Subject to such reasonable regulations as the Company may prescribe, the books of the Company for the exchange, registration, and registration of transfer of Notes shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "**Register**").  The Company shall also cause the Trustee to maintain books for the exchange, registration and registration of transfer of Notes. The Trustee shall notify the Registrar and the Registrar shall notify the Trustee, when necessary, upon any exchange, registration or registration of transfer of any Notes and shall cause their respective books to be amended accordingly.  The Company may have one or more co-registrars and one or more additional Transfer Agents or Paying Agents.  The terms "**Transfer Agent**" and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.  The term "**Registrar**" includes any co-registrar.

(b)    The Company shall enter into any appropriate agency agreements with any  Agent not a party to this Indenture, which shall implement the provisions of this Indenture that relate to such Agent.  The Company shall notify the Trustee in writing of the name and address of any such Agent.  If the Company fails to maintain a Registrar or Paying Agent, the Trustee shall act as such and shall be entitled to appropriate compensation therefor pursuant to Section 7.06.  The Company initially appoints the Trustee as Registrar, Transfer Agent and Paying Agent in connection with the Notes.

(c)    The Registrar shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the written request of the Company provided a reasonable amount of time prior to such inspection.  Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such Notes have been replaced.  In the case of the replacement of any of the Notes, the Registrar shall keep a record of the Note so replaced, and the Notes issued in replacement thereof.  In the case of the cancellation of any of the Notes, the Registrar shall keep a record of the Note so cancelled and the date on which such Note was cancelled.  Each Transfer Agent shall notify the Trustee and the Registrar of any transfers or exchanges of Notes effected by it.

(d)    The Registrar shall send a copy of the Register to the Company upon written request of the Company, with such copy to be held by the Company at its registered office. For purposes of Luxembourg law, ownership of the Notes shall be evidenced through registration from time to time at the registered office of the Company, and such registration is a means of evidencing title to the Notes. In case of discrepancies between the Register held by the Registrar

25

and the Register held by the Company at its registered office, the Register held by the Company at its registered office shall prevail for Luxembourg law purposes only.

SECTION 2.04.    *Paying Agent to Hold Money in Trust*.  By 10:00 A.M. New York time, no later than one Business Day prior to each Payment Date on any Note, the Company shall deposit with the Paying Agent or the Trustee in immediately available funds a sum sufficient to pay such principal and interest when so becoming due (including any amounts under Section 4.06).  The Company shall request that the bank through which such payment is to be made agree to supply to the Paying Agent by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by facsimile) of its intention to make such payment.  The Company shall require each Paying Agent not a party to this Indenture to agree in writing that such Paying Agent shall hold in trust, for the benefit of Holders or the Trustee, all money held by such Paying Agent for the payment of principal and interest on the Notes and shall notify the Trustee of any Default by the Company in making any such payment.  The Company at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by it.  Upon complying with this Section 2.04, the Paying Agent shall have no further liability for the money delivered to the Trustee.

Each payment in full of principal, redemption amount, Additional Amounts and/or interest payable under the Notes and this Indenture in respect of any Note made by or on behalf of the Company or the Guarantors to or to the order of the Paying Agent in the manner specified herein or in the Notes on the date due shall be valid and effective to satisfy and discharge the obligation of the Company or the Guarantors, as the case may be, to make payment of principal, redemption amount, Additional Amounts and/or interest payable hereunder and under the Notes on such date; *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Company or the Guarantors, as the case may be, or held by it, on behalf of the Holders hereunder.

SECTION 2.05.    *Payment of Principal and Interest; Principal and Interest Rights Preserved*.  (a) Except as otherwise provided herein for the redemption of the Notes, the payment of principal of or interest on the Notes shall be allocated on a pro rata basis among all Outstanding Notes, without preference or priority of any kind among the Notes.

(b)    Final payments in respect of any certificated Note (whether upon redemption, declaration of acceleration or otherwise) shall be made only against presentation and surrender of such Note at the Corporate Trust Office of the Trustee and, subject to any fiscal or other laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Company.

(c)    Payment of the principal of any certificated Note on a relevant Payment Date shall be made upon presentation and surrender thereof, by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register, or by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York; *provided* that such Holder so elects by giving written notice to such effect designating such account, to the Trustee at least 15 days prior to such Payment Date.

#93484727v11

(d)    Payment of interest on each Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Record Date immediately preceding such Payment Date by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register, or by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York; *provided* that the Holder so elects by giving written notice to such effect designating such account, which is received by the Trustee or a Paying Agent no later than the Record Date immediately preceding such Payment Date. Unless such designation is revoked, any such designation made by such Holder with respect to such Note shall remain in effect with respect to any future payments with respect to such Note payable to such Holder. The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer. On each interest Payment Date with respect to the book-entry notes, the interest payment shall be made to DTC in same day funds in accordance with existing arrangements between the Trustee and DTC.

Notwithstanding the provisions of this Section 2.05, payments on Notes registered in the name of DTC or its nominee shall be effected in accordance with the Applicable Procedures.

SECTION 2.06.    *Holder Lists*.  The Trustee shall preserve in as current a form as is reasonably practicable, the most recent list available to it of the names and addresses of Holders. If the Trustee is not the Registrar, the Company shall furnish to the Trustee in writing, at least ten Business Days before each Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of Holders.

SECTION 2.07.    *Transfer of Notes*.  (a) The registrar will send a copy of the Register to the Company upon written request, with such copy to be held by the Company and at its registered office. For purposes of Luxembourg law, ownership of the Notes will be evidenced through registration from time to time at the registered office of the Company, and such registration is a means of evidencing title to the Notes. In case of discrepancies between the register held by the registrar and the register held by the Company at its registered office, the register held by the Company at its registered office will prevail for Luxembourg law purposes.

(b)    Transfer will be effected without charge by or on behalf of the Company, the Trustee, the registrar or the transfer agents, but upon payment, or the giving of such indemnity as the Trustee, the registrar or the relevant transfer agent may require, in respect of any tax or other governmental charges which may be imposed in relation to it. The Company is not required to transfer or exchange any note selected for redemption.

(c)    Interests in the Regulation S Notes and the Restricted Notes shall be exchangeable or transferable, as the case may be, for physical delivery of non-global, definitive certificated notes ("**Certificated Notes**") if (i) DTC notifies the Company that it is unwilling or unable to continue as Depositary for such Notes, or DTC ceases to be a "clearing agency" registered under the Exchange Act, and a successor depositary is not appointed by the Company within 90 days, or (ii) a Default or an Event of Default has occurred and is continuing with respect to such Notes; *provided* that such transfer or exchange is made in accordance with the provisions of this Indenture and the Applicable Procedures.

27

(i)      Upon receipt of notice by DTC or the Trustee, as the case may be, regarding the occurrence of any of the events described in the preceding paragraph, the Company shall use its best efforts to make arrangements with DTC for the exchange of interests in the Notes for individual Certificated Notes, and cause the requested individual Certificated Notes to be executed and delivered to the Trustee in sufficient quantities and authenticated by the Trustee for delivery to Holders.  In the case of Certificated Notes issued in exchange for the Restricted Global Note, such Certificated Notes shall bear the Securities Act Legend.  Upon the transfer, exchange or replacement of Notes bearing such Securities Act Legend, or upon specific request for removal of the Securities Act Legend on a Note, the Trustee shall deliver only Notes that bear such Securities Act Legend, or shall refuse to remove such Securities Act Legend, as the case may be, unless, subject to the Company's consent, there is delivered to the Trustee a certificate in the form of Exhibit C or Exhibit E, as the case may be, or such satisfactory evidence as may reasonably be required by the Company, which may include an Opinion of Counsel, that neither the Securities Act Legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act.  The Trustee shall exchange a Note bearing the Securities Act Legend for a Note not bearing such Securities Act Legend only if it has been directed to do so in writing by the Company, upon which direction it may conclusively rely.

(ii)      During the Restricted Period, transfers of a beneficial interest in the Regulation S Note to a transferee who takes delivery of such interest in the Restricted Note shall be made only in Authorized Denominations in accordance with the Applicable Procedures and upon receipt by the Trustee or Transfer Agent of a written certification from the transferor of the beneficial interest in the form of Exhibit D to the effect that such transfer is being made to a Person who the transferor reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.  After the Restricted Period, such certification requirement shall no longer apply to such transfers.

(iii)      Transfers by a Holder of a Certificated Note bearing the Securities Act Legend or an owner of a beneficial interest in the Restricted Note to a transferee who takes delivery of such interest in the Regulation S Note or in the form of a Certificated Note not bearing the Securities Act Legend shall be made only in Authorized Denominations upon receipt by the Trustee or Transfer Agent of a written certification from the transferor in the form of Exhibit C to the effect that such transfer is being made in accordance with Regulation S.

(iv)      Beneficial interests in the Notes shall be shown on, and transfers thereof shall be effected only through records maintained by DTC and its direct and indirect participants, including Euroclear and Clearstream Banking. Transfers between participants in DTC shall be effected in the ordinary way in accordance with the Applicable Procedures and shall be settled in DTC's Same Day Funds Settlement System and secondary market trading activity in such Notes shall therefore settle in immediately available funds.  There can be no assurance as to the effect, if any, of settlements in immediately available funds on trading activity in the Notes.  Transfers between

#93484727v11

participants in Euroclear and Clearstream Banking shall be effected in the ordinary way in accordance with Applicable Procedures.

(v)       Certificated Notes may be exchanged or transferred in whole or in part in the principal amount of Authorized Denominations by surrendering such Certificated Notes at the office of the Trustee or any Transfer Agent with a written instrument of transfer as provided in this Indenture in the form of Exhibit B hereto duly executed by the Holder thereof or his attorney duly authorized in writing. In exchange for any Certificated Note properly presented for transfer, within three Business Days, the Trustee shall promptly authenticate and deliver or cause to be authenticated and delivered at the Corporate Trust Office, to the transferee, or send by mail (at the risk of the transferee) to such address as the transferee may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferee, for the same aggregate principal amount as was transferred.  In the case of the transfer of any Certificated Note in part, the Trustee shall also promptly authenticate and deliver or cause to be authenticated and delivered at the Corporate Trust Office, to the transferor, or send by mail (at the risk of the transferor) to such address as the transferor may request, a Certificated Note or Notes, as the case may require, registered in the name of such transferor, for the aggregate principal amount that was not transferred.  No transfer of any Notes shall be made unless the request for such transfer is made by the registered Holder or his attorney duly authorized in writing at the Corporate Trust Office and is accompanied by a completed instrument of transfer in the form of Exhibit B attached to the Note presented for transfer.

(vi)       Transfer, registration and exchange of any Note or Notes shall be permitted and executed as provided in this Section 2.07 without any charge to the Holder of any such Note or Notes other than any taxes or governmental charges or insurance charges payable on transfers or any expenses of delivery by other than regular mail, but subject to such reasonable regulations as the Company, the Agents and the Trustee may prescribe. The costs and expenses of effecting any exchange or registration of transfer pursuant to the foregoing provisions, except for the expense of delivery by other than regular mail (if any) and except for the payment of a sum sufficient to cover any tax or other governmental charges or insurance charges that may be imposed in relation thereto, shall be borne by the Company.  All Certificated Notes issued upon any exchange or registration of transfer of Notes shall be valid obligations of the Company, evidencing the same debt, and entitled to the same benefits, as the Notes surrendered upon exchange or registration of transfer.

(vii)       The Trustee or the Transfer Agent shall effect transfers and exchanges of Notes and Certificated Notes.  In addition, the Registrar shall keep the Register for the ownership, exchange and transfer of any Notes.  The Transfer Agent shall give prompt notice to the Registrar and the Registrar shall likewise give prompt notice to the Trustee of any exchange or transfer of such Notes.  Neither the Trustee nor any Transfer Agent shall register the exchange or the transfer of any Note or Certificated Note (or any portion of a Certificated Note) during the period of 15 days ending on any Payment Date or for the period of 15 days preceding any date of selection of Notes for redemption, or register the transfer or exchange of any Note previously called for redemption.

#93484727v11

(viii)    Upon any such exchange or transfer of all or a portion of any Note for a Certificated Note or an interest in either the Restricted Note or the Regulation S Note for an interest in the other Note, the Note to be so transferred or exchanged shall be marked to reflect the reduction of its principal amount by the aggregate principal amount of such Certificated Note or the interest to be so exchanged for an interest in a Regulation S Note or a Restricted Note, as the case may be.  Until so exchanged in full, the Note shall in all respects be entitled to the same benefits under this Indenture as the Notes authenticated and delivered hereunder.

(ix)    Neither the Trustee nor any Agent shall have any responsibility or obligation to any beneficial owner of an interest in a Note, a member of, or a participant in, DTC or other Person with respect to the accuracy of the records of DTC or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person (other than DTC) of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) to any beneficial owner under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be DTC or its nominee in the case of a Note).  The rights of beneficial owners in any Global Note shall be exercised only through DTC subject to the Applicable Procedures of DTC. The Trustee and each Agent may rely and shall be fully protected in relying upon information furnished by DTC with respect to its members, participants and any beneficial owners.

(x)    Neither the Trustee nor any Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any tax or securities laws with respect to any restrictions on transfer imposed under this Indenture or under applicable law (including any transfers between or among DTC participants, members or beneficial owners in any Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

SECTION 2.08.    *Replacement Notes*.  If any Note at any time becomes mutilated, defaced, destroyed, stolen or lost, such Note may be replaced at the cost of the applicant (including reasonable legal fees of the Company, the Trustee and the Agents) at the office of the Trustee or any Transfer Agent, upon provision of, in the case of destroyed, stolen or lost Notes, evidence satisfactory to the Trustee and the Company that such Note was destroyed, stolen or lost, together with such indemnity as the Trustee and the Company may require.  Mutilated or defaced Notes must be surrendered before replacements shall be issued.

Each Note authenticated and delivered in exchange for or in lieu of any such Note shall carry rights to accrued and unpaid interest and to interest to accrue equivalent to the rights that were carried by such Note before such Note was mutilated, defaced, destroyed, stolen or lost.

Every replacement Note is an additional obligation of the Company and shall be entitled to the benefits of this Indenture.

SECTION 2.09.    *Temporary Notes*.  Subject to the provisions of Section 2.07(a), until Notes are ready for delivery, the Company may prepare and the Trustee shall authenticate temporary Notes.  Temporary Notes shall be substantially in the form of Notes but may have variations that the Company considers appropriate for temporary Notes.  As necessary, the Company shall prepare and the Trustee shall authenticate Notes and deliver them in exchange for temporary Notes at the office or agency of the Company or the Trustee, without charge to the Holder.  Until so exchanged, the temporary Notes shall be entitled to the same benefits under this Indenture as Notes.

SECTION 2.10.    *Cancellation*.  The Company at any time may deliver Notes to the Trustee for cancellation.  The Agents shall forward to the Trustee any Notes surrendered to them for transfer, exchange or payment.  The Trustee and no one else shall cancel and the Trustee shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Notes surrendered for transfer, exchange, payment or cancellation and, if so destroyed, deliver a certificate of such destruction to the Company upon its written request unless the Company directs the Trustee in writing to deliver the cancelled Notes to the Company. The Company may not issue new Notes to replace Notes it has redeemed, paid in full or delivered to the Trustee for cancellation (other than in connection with a transfer or exchange), which shall not prohibit the Company from issuing any Additional Notes. A Note does not cease to be Outstanding because the Company, any Guarantor or any of their Affiliates holds such Note, except that such Notes will not be deemed to be Outstanding for voting purposes pursuant to and in accordance with the definition of "Outstanding" in Section 1.01.

SECTION 2.11.    *Defaulted Interest*.  If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest (plus interest on such defaulted interest at the rate specified in Section 4.01 to the extent lawful) in any lawful manner not inconsistent with the requirements of any stock exchange on which the Notes may be listed, and upon such notice as may be required by such exchange, if, after written notice given by the Company to the Trustee of the proposed payment pursuant to this Section 2.11, such manner of payment shall be deemed practicable by the Trustee.

The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date, which date shall be at least five Business Days prior to the payment date of such defaulted interest.  The Company shall fix or cause to be fixed any such special record date and payment date, and, at least 15 days before any such special record date, the Company shall deliver to each Holder, with a copy to the Trustee, a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.12.    *CUSIP and ISIN Numbers*.  The Company in issuing the Notes may use CUSIP and ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP and ISIN numbers in notices as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice and that reliance may be placed only on the other identification numbers printed on the Notes, and any such notice shall not be affected by

any defect in or omission of such numbers.  The Company shall promptly notify the Trustee in writing of any change in CUSIP or ISIN numbers.

SECTION 2.13.    *Purchases of the Notes by the Company or its Affiliates*.  The Company or any of its Affiliates may at any time purchase Notes at any price.  All Notes so purchased may not be resold, except in compliance with applicable requirements or exemptions under the relevant securities laws.

SECTION 2.14.    *One Class of Notes*. The Initial Notes and any Additional Notes shall vote and consent together on all matters as one class; and none of the Initial Notes or the Additional Notes shall have the right to vote or consent as a separate class on any matter. The Initial Notes and any Additional Notes shall together be deemed to constitute a single class or series for all purposes, under this Indenture.

SECTION 2.15.    *Additional Notes*.  The Company shall be entitled, from time to time, without notice to, or consent of, the Holders of the Notes, to create and issue additional principal amounts of Additional Notes under this Indenture which shall have identical terms as the Initial Notes issued on the Issue Date (in each case, other than with respect to the issue date, issue price, the payment of interest accruing prior to the issue date thereof and the first payment of interest thereon, and any Additional Amounts due with respect thereto, after the issue date thereof), as the case may be, as long as (i) the LTV Ratio shall not exceed the Trigger LTV Ratio after giving effect to the issuance of the Additional Notes, (ii) the Company and the Guarantors shall have entered into additional Collateral Documents and made all necessary filings so that any Additional Collateral required to be delivered in connection with the issuance of any Additional Notes is subject to first priority Liens in favor of the Collateral Agent or, in the case of Aircraft subject to a Senior Lien, a second-priority perfected Lien, for the benefit of the Secured Parties, as Collateral for all of the obligations of the Company and the Guarantors under this Indenture, the Notes and the Guarantees and (iii) no Default or Event of Default has occurred and is continuing or will occur as a result of or immediately after the issuance of the Additional Notes; *provided, however*, that unless such Additional Notes are issued under a separate CUSIP number, such Additional Notes must be fungible with the Initial Notes for U.S. federal income tax purposes.

With respect to any Additional Notes, the Company shall set forth in a Board Resolution and an Officers' Certificate, the following information:

(i)    the aggregate principal amount of such Additional Notes to be authenticated and delivered pursuant to this Indenture;

(ii)    the issue price, the issue date and the "CUSIP" and "ISIN" number of any such Additional Notes and the amount of interest payable on the first Payment Date applicable thereto; and

(iii)    if applicable, the Resale Restriction Termination Date relating to such Additional Notes and the Restricted Period for such Additional Notes.

# ARTICLE 3
REDEMPTION

SECTION 3.01.   *Right of Redemption*.  (a) Except as described in this Section 3.01 and Paragraph 9 of the form of Note set forth in Exhibit A, the Notes may not be redeemed.

(b)   *Optional Redemption*.  (i) After the second anniversary of the Issue Date, the Company may, on any one or more occasions, redeem the Notes at its option, in whole or in part, at the following redemption prices (expressed as a percentage of the principal amount thereof), plus accrued and unpaid interest and any Additional Amounts, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
|---|---|
| On or after December 24, 2022 and prior to December 24, 2023 | 108.000% |
| On or after December 24, 2023 and prior to December 24, 2024 | 104.000% |
| On or after December 24, 2024 | 100.000% |

Any redemption of the Notes by the Company pursuant to this Section 3.01 will be subject to either (i) there being at least US$150 million in aggregate principal amount of Notes (including any Additional Notes) outstanding after such redemption; or (ii) the Company redeeming all the then outstanding principal amount of the Notes.

(c)   *Redemption for Taxation Reasons*.  If as a result of any change in or amendment to the laws (or any rules or regulations thereunder) of a Taxing Jurisdiction, or any amendment to or change in an official interpretation, administration or application of such laws, rules or regulations (including a holding by a court of competent jurisdiction) , which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the Issue Date, in the case of the Company or any Guarantor, or on or after the date a successor to the Company or any Guarantor assumes the obligations under the Notes and this Indenture or any Note Guaranty, in the case of any such successor,  (i) the Company or any successor to the Company has or will become obligated to pay any Additional Amounts in excess of the Additional Amounts the Company or any successor to the Company would be obligated to pay if payments were subject to withholding or deduction at a rate of 0% (or in the case of a successor, the rate of withholding applicable to payments on the Notes in the jurisdiction of the successor to the Company on the date such successor replaces the Company) or (ii) the Guarantors or any successor to the Guarantors has or will become obligated to pay Additional Amounts in excess of the Additional Amounts the Guarantors or any such successor to the  Guarantors would be obligated to pay if payments were subject to withholding or deduction at a rate of 15% or at a rate of 25% in the case that the Holder of the Notes is resident in a tax haven jurisdiction for Brazilian tax purposes (i.e., a country that does not impose any

#93484727v11

income tax or that imposes it at a maximum rate lower than 20% or where the laws impose restrictions on the disclosure of ownership composition or securities ownership) (or in the case of a successor whose jurisdiction is not Brazil, the rate of withholding applicable to payments on the notes in the jurisdiction of the successor to a Guarantor on the date such successor replaces a Guarantor)  (each of the rates in (i) and (ii), a "**Minimum Withholding Level**"), the Company or any successor to the Company may, at its option, redeem all, but not less than all, of the Notes, at a Redemption Price equal to 100.0% of their principal amount, together with accrued and unpaid interest to the Redemption Date, upon delivery of irrevocable notice of redemption to Holders not less than 30 days nor more than 90 days prior to the Redemption Date.  No notice of such redemption may be given earlier than 90 days prior to the earliest date on which either (x) the Company or any successor to the Company would, but for such redemption, become obligated to pay any Additional Amounts above the Minimum Withholding Level, or (y) in the case of payments made under any of the Note Guaranties, the Guarantors or any successor to  the Guarantors  would, but for such redemption, be obligated to pay the Additional Amounts in excess of the Minimum Withholding Level. The Company or any successor to the Company shall not have the right to so redeem the Notes unless (a) it is obligated to pay Additional Amounts which in the aggregate amount exceed the Additional Amounts payable at the Minimum Withholding Level or (b) the Guarantors or any successor to the Guarantors is obliged to pay Additional Amounts which in the aggregate amount exceed the Additional Amounts payable at the Minimum Withholding Level. The Company or any successor to the Company shall not have the right to so redeem the Notes unless (a) it is obligated to pay additional amounts which in the aggregate amount exceed the additional amounts payable at the Minimum Withholding Level or (b) either Guarantor or any successor to the Guarantors is obliged to pay additional amounts which in the aggregate amount exceed the additional amounts payable at the Minimum Withholding Level.  Notwithstanding the foregoing, the Company or any such successor to the Company shall not have the right to so redeem the Notes unless it has taken reasonable measures to avoid the obligation to pay Additional Amounts. For the avoidance of doubt, reasonable measures do not include changing the jurisdiction of incorporation of the Company or any successor to the Company or the jurisdiction of incorporation of the Guarantors or any successor to the Guarantors.

In the event that the Company or any successor to the Company elects to so redeem the Notes pursuant to this Section 3.01, it will deliver to the Trustee: (i) an Officers' Certificate, signed in the name of the Company or any successor to the Company, stating that the Company or any successor to the Company is entitled to redeem the Notes pursuant to their terms and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Company or any successor to the Company to so redeem have occurred or been satisfied; and (ii) an Opinion of Counsel to the effect that (1) the Company, or any successor to the Company, or  the Guarantors, or any successor to  the Guarantors, has or will become obligated to pay Additional Amounts in excess of the Additional Amounts payable at the Minimum Withholding Level, and (2) such obligation is the result of a change in or amendment to the laws (or any rules or regulations thereunder) of a Taxing Jurisdiction, or any amendment to or change in an official interpretation, administration or application of such laws, rules or regulations, as described above.

SECTION 3.02.   *Applicability of Article*.  Redemption of Notes at the option of the Company, as permitted by Section 3.01 or required by any provision of this Indenture, shall be

#93484727v11

made in accordance with such provision and this Article 3.  The redemption of Notes may require the prior approval of the Central Bank.

SECTION 3.03.    *Election to Redeem; Notice to Trustee*.  The election of the Company to redeem the Notes pursuant to Section 3.01(b) or Section 3.01(c) shall be evidenced by a Board Resolution.  In case of any redemption of Notes at the election of the Company, the Company shall, at least 70 days prior to the Redemption Date fixed by the Company (unless a shorter notice shall be satisfactory to the Trustee), notify the Trustee in writing of such Redemption Date.

SECTION 3.04.    *Notice of Redemption by the Company*.  In the case of redemption of Notes pursuant to Section 3.01(b) or Section 3.01(c), notice of redemption shall be given at least 30 but not more than 60 days, in the case of a redemption pursuant to Section 3.01(b), or 90 days, in the case of a redemption pursuant to Section 3.01(c) before the Redemption Date to each Holder of any Note to be redeemed in accordance with Section 11.02 and such notice shall be irrevocable.

The notice shall state:

(i)      the Redemption Date;

(ii)     the Redemption Price;

(iii)    the name and address of the Paying Agents;

(iv)     if less than all outstanding Notes are to be redeemed, the identification of the particular Notes (or portion thereof) to be redeemed, as well as the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption;

(v)      in case any Note is to be redeemed in part only, the notice which relates to such Note shall state that on and after the Redemption Date, upon surrender of such Note, the Holder shall receive, without charge, a new Note or Notes of authorized denominations for the principal amount thereof remaining unredeemed;

(vi)     that Notes called for redemption must be surrendered to a Paying Agent to collect the Redemption Price;

(vii)    that, unless the Company defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(viii)   the Section and applicable paragraph of the Indenture for the related Notes pursuant to which the Notes called for redemption are being redeemed;

(ix)     the CUSIP or ISIN number, if any; and

#93484727v11

(x)    that no representation is made as to the correctness or accuracy of the CUSIP or ISIN number, if any, listed in such notice or printed on the Notes.

At the Company's election and at its request, the Trustee shall give the notice of redemption in the Company's name and at the Company's expense; *provided* that the Company shall deliver to the Trustee, at least 70 days prior to the Redemption Date (unless a shorter time shall be acceptable to the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

SECTION 3.05.    *Deposit of Redemption Price*.  By 10:00 A.M. New York City time, no later than one Business Day prior to the Redemption Date, the Company shall deposit with the Paying Agent money sufficient to pay the Redemption Price of and accrued and unpaid interest on the Notes other than Notes that have been delivered by the Company to the Trustee at least 15 days prior to the Redemption Date for cancellation.  The Company shall request that the bank through which such payment is to be made agree to supply to the Paying Agent by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by facsimile) of its intention to make such payment.

SECTION 3.06.    *Effect of Notice of Redemption*.  Notice of redemption having been given as aforesaid, the Notes shall, on the Redemption Date, become due and payable at the applicable Redemption Price (together with accrued and unpaid interest, if any, to the Redemption Date), and from and after such date (except in the event of a Default in the payment of the Redemption Price and accrued and unpaid interest) such Notes shall cease to bear interest. Upon surrender of any such Note for redemption in accordance with such notice, such Note shall be paid by the Company at the Redemption Price, together with accrued and unpaid interest, if any, to the Redemption Date; *provided*, *however*, that installments of interest whose Payment Date is on or prior to the Redemption Date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Record Dates according to their terms.

If any Note to be redeemed shall not be so paid upon surrender thereof in accordance with the Company's instructions for redemption, the principal shall, until paid, bear interest from the Redemption Date at the rate borne by the Notes.  Upon surrender to the Paying Agent, such Notes shall be paid at the applicable Redemption Price, plus accrued and unpaid interest to the Redemption Date; *provided*, *however*, that installments of interest payable on or prior to the Redemption Date shall be payable to the Holders of such Notes registered as such at the close of business on the relevant Record Date according to their terms.

SECTION 3.07.    *Notes Redeemed in Part*.  If less than all the Notes are to be redeemed, the Trustee shall select the Notes to be redeemed by lot or by any method as the Trustee shall deem fair and appropriate.  Upon surrender of a Note that is redeemed in part, the Company shall execute and the Trustee shall authenticate for the Holder thereof (at the Company's expense) a new Note, equal in a principal amount to the unredeemed portion of the Note surrendered; *provided* that each new Note shall be in a principal amount of U.S.$100,000 or an integral multiple of U.S.$1,000 in excess thereof.

36

For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to redemption of Notes shall relate, in the case of any Note redeemed or to be redeemed only in part, to the portion of the principal amount of such Note which has been or is to be redeemed.

## ARTICLE 4
### COVENANTS

SECTION 4.01.   *Payment of Principal and Interest Under the Notes*.

(a)      The Company shall punctually pay the principal of and interest on the Notes on the dates and in the manner set forth herein and as provided in the Notes.  By 10:00 a.m. (New York City time), no later than one Business Day prior to any Payment Date, the Company shall irrevocably deposit with the Trustee or with the Paying Agent money sufficient to pay such principal and interest.

(b)      The Company shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 2% per annum.

(c)      No interest shall be payable hereunder in excess of the maximum rate permitted by applicable law.

SECTION 4.02.   *Maintenance of Office or Agency*.   The Company shall maintain in each place of payment for the Notes an office or agency where Notes may be presented or surrendered for payment and where notices and demands to or upon the Company (other than the type contemplated in Section 11.10) in respect of the Notes and this Indenture may be served. The Corporate Trust Office of the Trustee shall be such office or agency of the Company, unless the Company shall designate and maintain some other office or agency for one or more of such purposes.  The Company shall give prompt written notice to the Trustee of any change in the location of any such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent to receive all such presentations, surrenders, notices and demands.

SECTION 4.03.   *Money for Note Payments to Be Held in Trust*.

(a)      If the Company shall at any time act as its own Paying Agent, it shall, no later than one Business Day prior to each Payment Date, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided and shall promptly notify the Trustee of its action or failure so to act.

(b)      Whenever the Company shall have one or more Paying Agents for the Notes, it shall, no later than one Business Day prior to each Payment Date, irrevocably deposit with a Paying Agent a sum sufficient to pay such principal and interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal or interest, and (unless

37

such Paying Agent is the Trustee) the Company shall promptly notify the Trustee in writing of such action or any failure so to act.

(c)        Each Paying Agent, subject to the provisions of this Section 4.03, shall:

(i)        hold all sums held by it for the payment of principal of or interest on Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as set forth herein; *provided*, *however*, such sums need not be segregated from other funds held by it, except as required by law;

(ii)        give the Trustee written notice of any Default by the Company (or any other obligor upon the Notes) in the making of any payment of principal or interest; and

(iii)        at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

(d)        The Company shall cause each Paying Agent, other than the Trustee, to execute and deliver an instrument in which such Paying Agent shall agree with the Company to act as a Paying Agent in accordance with this Section 4.03.

(e)        The Company may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Company Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Company or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such sums.

(f)        Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of principal of or interest on any Note and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Company at the written request of the Company, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease; *provided*, *however*, that the Trustee or such Paying Agent, before being required to make any such repayment, shall, upon written request of the Company and at the expense of the Company, cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in the Borough of Manhattan, The City of New York.

SECTION 4.04.    *Maintenance of Corporate Existence*.  Each of the Company and each Guarantor shall, and shall cause each of its respective Subsidiaries to, (i) maintain in effect its corporate existence and all registrations necessary therefor; *provided* that these restrictions shall not prohibit any transactions permitted by Article 5 or the merger of any Subsidiary with or into GLAI or with or into any other Wholly Owned Subsidiary of GLAI; (ii) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and the like necessary in the normal conduct of its business, activities or operations; and (iii) maintain or cause to be

38

maintained in good repair, working order and condition (normal wear and tear excepted) all properties used in its business; *provided*, *however*, that neither GLAI nor its Subsidiaries shall be prevented from discontinuing those operations (including through the transfer or dissolution of a Subsidiary) or suspending the maintenance of those properties (including through the sale thereof) which, in the reasonable judgment of GLAI, are no longer necessary in the conduct of GLAI's business, or that of its Subsidiaries; and *provided*, *further*, that such discontinuation of operations or suspension of maintenance shall not be materially disadvantageous to the Holders of the Notes.

SECTION 4.05.    *Payment of Taxes and Claims*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its property or in respect of any of its franchises, businesses, income or profits before any penalty or interest accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for sums which have become due and payable and which by law have or might become a Lien upon its property; *provided*, *however*, that any such payment shall not be required unless the failure to make such payment would have a material adverse effect upon the financial condition of (i) the Company or (ii) GLAI and its Subsidiaries considered as one enterprise or a material adverse effect on the performance of the Company's or GLAI's obligations hereunder; and *provided*, *further*, that no such charge or claim need be paid while it is being contested in good faith by appropriate proceedings and if appropriate reserves or other provisions are maintained in respect of such amounts in accordance with IFRS.

SECTION 4.06.    *Payment of Additional Amounts*.  (a) All payments by the Company (or any Paying Agent) in respect of the Notes or the Guarantors (or any Paying Agent) in respect of the Note Guaranties will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of Brazil or Luxembourg, or any political subdivision or authority therein or thereof or any other jurisdiction in which the Company or any Guarantor is organized, doing business or otherwise subject to the power to tax (any of the aforementioned being a "**Taxing Jurisdiction**"), unless the Company or the Guarantors (or any Paying Agent) are compelled by law to deduct or withhold such taxes, duties, assessments, or governmental charges. In such event, the Company or  the Guarantors (or any Paying Agent), as applicable, will make such deduction or withholding, and the Company or the Guarantors, as applicable, will make payment of the amount so withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts receivable by Holders of Notes after such withholding or deduction shall equal the respective amounts of principal (and premium, if any) and interest which would have been receivable in respect of the Notes in the absence of such withholding or deduction ("**Additional Amounts**"). Notwithstanding the foregoing, no such Additional Amounts shall be payable:

(i)        to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership, or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member

39

or shareholder) being or having been a citizen or resident thereof, being incorporated in, being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or enforcement of rights under this Indenture and the receipt of payments with respect to the Note;

(ii)    in respect of Notes surrendered or presented for payment (if surrender or presentment is required) more than 30 days after the Relevant Date except to the extent that payments under such Note would have been subject to withholdings and the Holder of such Note would have been entitled to such Additional Amounts, had the Note been surrendered for payment on the last day of such period of 30 days;

(iii)    to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or other governmental charges by reason of such Holder's failure to comply with any certification, identification, documentation or other reporting requirement concerning the nationality, residence, identity or connection with the relevant Taxing Jurisdiction of such Holder, if (1) compliance is required by law as a precondition to, exemption from, or reduction in the rate of, the tax, assessment or other governmental charge and (2) the Company has given the Holders at least 30 days' notice that Holders will be required to comply with such certification, identification, documentation or other reporting requirement;

(iv)    in respect of any estate, inheritance, gift, sales, transfer, excise or personal property or similar tax, assessment or governmental charge;

(v)    in respect of any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal, premium (if any)  or interest on the Note;

(vi)    in respect of any tax imposed on overall net income or any branch profits tax;

(vii)    in respect of any tax imposed pursuant to sections 1471 to 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), any successor law or regulation implementing or complying with, or introduced in order to conform to, such sections or any intergovernmental agreement in respect thereof or any agreement entered into pursuant to section 1471(b)(1) of the Code;

(viii)    in respect of any tax imposed by Luxembourg by virtue of the Luxembourg law of 23 December 2005, as amended from time to time (the "**Relibi Law**"); or

(ix)    in respect of any combination of the above.

(b)    No Additional Amounts shall be paid with respect to any payment on a Note to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment would be required by the relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with

respect to the fiduciary, a member of that partnership or limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member or beneficial owner been the Holder.

(c)       The Notes are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation. Except as specifically provided above, neither the Company nor the Guarantors shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

(d)       In the event that Additional Amounts actually paid with respect to the Notes are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof such Holder is entitled to make claim for a refund or credit of such excess from the authority imposing such withholding tax, then such Holder shall, by accepting such Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Company. However, by making such assignment, the Holder makes no representation or warranty that the Company will be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(e)       The Company and the Guarantors shall provide the Trustee with documentation reasonably satisfactory to the Trustee evidencing the payment of taxes in respect of which the Company or the Guarantors, as applicable, have paid any Additional Amounts. Copies of such documentation shall be made available by the Trustee to the Holders or the Paying Agents, as applicable, upon written request therefor.

(f)       The Company shall also pay any present or future stamp, issue, registration, court or documentary taxes or any excise or property taxes, charges or similar levies (including any penalties, interest and other liabilities relating thereto) which arise in any jurisdiction from the execution, delivery, registration, enforcement or the making of payments in respect of this Indenture, the Notes or the Note Guaranties, excluding any such taxes, charges or similar levies imposed by any jurisdiction that is not a Taxing Jurisdiction other than those resulting from, or required to be paid in connection with, the enforcement of the Notes following the occurrence of any Default or Event of Default.

(g)       Any reference in this Indenture or the Notes to principal, interest or any other amount payable in respect of the Notes by the Company or any of the Note Guaranties by the Guarantors will be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section.

(h)       The obligations of the Company and the Guarantors pursuant to this Section 4.06 shall survive termination or discharge of this Indenture.

SECTION 4.07.    *Reporting Requirements*.  (a) The Company and the Guarantors shall provide the Trustee and the Collateral Agent (in the case of the reports referred to in clauses (iii) and (v) below) with the following reports (and shall also provide the Trustee with sufficient

#93484727v11

copies, as required, of the following reports referred to in clauses (a)(i), (ii), (iii) and (iv) for distribution, at the Company's and the Guarantors' expense, to all Holders upon written request):

(i)    an English language version of GLAI's annual audited consolidated financial information prepared in accordance with IFRS promptly upon such financial statements becoming available but not later than 120 days after the close of its fiscal year;

(ii)    an English language version of GLAI's unaudited quarterly financial statements prepared in accordance with IAS 34 promptly upon such financial statements becoming available but not later than 60 days after the close of each fiscal quarter (other than the last fiscal quarter of its fiscal year);

(iii)    on each Calculation Date and upon the date of delivery of any Additional Collateral, an Officers' Certificate (A) setting forth the LTV Ratio as of such Calculation Date or such other date, as the case may be, accompanied by a reasonably detailed calculation thereof and (B) stating whether a Default or an Event of Default exists on the date of such certificate and, if a Default or an Event of Default exists, setting forth the details thereof and the action which the Company and/or the Guarantors are taking or propose to take with respect thereto;

(iv)    without duplication, English language versions or summaries of such other reports or notices as may be filed or submitted by (and promptly after filing or submission by) the Company or the Guarantors with (a) the CVM, (b) any stock exchange on which the Notes may be listed or (c) the SEC (in each case, to the extent that any such report or notice is generally available to its security holders or the public in Brazil or elsewhere and, in the case of clause (c), is filed or submitted pursuant to Rule 12g3-2(b) under, or Section 13 or 15(d) of, the Exchange Act, or otherwise); and

(v)    upon any officer of the Company or either Guarantor becoming aware of the existence of a Default or an Event of Default, an Officers' Certificate setting forth the details thereof and the action which the Company and/or the Guarantors are taking or propose to take with respect thereto.

(b)    Delivery to the Trustee and the Collateral Agent of the reports and information described herein is for informational purposes only and the Trustee's or Collateral Agent's receipt of such reports shall not constitute or actual constructive notice of any information contained therein or determinable from information contained therein, including the Company's or the Guarantors' compliance with any of their respective covenants in this Indenture (as to which the Trustee is entitled to rely exclusively on Officers' Certificates). The Trustee and the Collateral Agent are under no duty to examine any such reports, information or documents delivered to the Trustee or the Collateral Agent, respectively, to ensure compliance with the provisions of this Indenture or to ascertain the correctness or otherwise of the information or the statements contained therein. The Trustee is entitled to assume such compliance and correctness unless and to the extent a Responsible Officer of the Trustee is informed otherwise in an Officers' Certificate delivered to it pursuant to the terms of this Indenture.

#93484727v11

SECTION 4.08.    *Available Information*.  For so long as any Notes remain outstanding, the Company shall make available to any Holder or beneficial owner of an interest in the Notes, or to any prospective purchasers designated by such noteholder or beneficial owner, upon request of such Holder or beneficial owner, the information required pursuant to Rule 144A(d)(4)(i), during any period in which we are not subject to Section 13 or 15(d) of the Exchange Act, or exempt under Rule 12g3-2(b) of the Exchange Act.

SECTION 4.09.    *Limitation on Transactions with Affiliates*.  Neither the Company nor the Guarantors will, nor will the Company or the Guarantors permit any of their respective Subsidiaries to, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with, or for the benefit of, any Affiliate of the Company or the Guarantors, other than themselves or any of their respective Subsidiaries (an "**Affiliate Transaction**"), unless the terms of the Affiliate Transaction are no less favorable to the Company or the Guarantors or such Subsidiaries than those that could be obtained at the time of the Affiliate Transaction in arm's length dealings with a Person who is not an Affiliate.

SECTION 4.10.    *Collateral*.  (a) On the Issue Date, the Notes Obligations shall be secured, subject to Section 4.10(b) below, by a first priority Lien granted by the Guarantors in the Issue Date Collateral to the Secured Parties, represented by the Collateral Agent, pursuant to the terms of the following Collateral Documents to be entered into on the Issue Date:

(i)    in respect of the Non-Rotable Spare Parts, the Non-Rotables Fiduciary Sale Agreement;

(ii)    in respect of the Rotable Spare Parts, the Rotables Fiduciary Sale Agreement; and

(iii)    in respect of the Pledged IP, the GLA Fiduciary Transfer of IP Rights and the GLAI Fiduciary Transfer of IP Rights.

(b)    On or before the date falling 30 days after the Issue Date, the Company will deliver to the Collateral Agent evidence that the Liens created by the Collateral Documents referred to in Section 4.10(a)(i), (ii) and (iii) have been perfected in accordance with such Collateral Documents.

(c)    GLA shall update the annex of the Rotables Fiduciary Sale Agreement and subject any and all additional Rotable Spare Parts to the Lien granted by the Rotables Fiduciary Sale Agreement by means of an amendment, which must be entered into by GLA and the Collateral Agent by the tenth Business Day of April and October of each year, commencing in April 2021, and registered with the registry of deeds and documents in the jurisdiction of incorporation of each of GLA and the Collateral Agent no later than twenty (20) days after the execution of such amendment.

(d)    GLA shall update the annex of the Non-Rotables Fiduciary Sale Agreement and subject any and all additional Non-Rotable Spare Parts to the Lien granted by the Non-Rotables Fiduciary Sale Agreement by means of an amendment, which must be entered into by GLA and the Collateral Agent by the tenth Business Day of April and October of each year, commencing

in April 2021, and registered with the registry of deeds and documents in the jurisdiction of incorporation of each of GLA and the Collateral Agent no later than twenty (20) days after the execution of such amendment, until release of the Collateral in accordance with Section 4.14.

(e)    On the date of issuance of any Additional Notes in accordance with Section 2.15 and subject to the other terms of this Indenture, including Section 4.15, the Notes Obligations may, at the election of the Company, also be secured by a first priority Lien granted by the Guarantors in any Additional Collateral to the Secured Parties, represented by the Collateral Agent, pursuant to the terms of the Collateral Documents to be entered into on the date of issuance of such Additional Notes.

(f)    By their purchase and acceptance of the Notes, the Holders hereby agree to be bound by and to have authorized and directed the Trustee and the Collateral Agent, as the case may be, to execute and deliver the Intercreditor Agreement, any joinder to the Intercreditor Agreement and any other Collateral Document in which either of the Trustee or the Collateral Agent, as applicable, is named as a party, all without any further direction of the Holders or the Trustee and in each case at the written request of the Company.  It is hereby expressly acknowledged and agreed that, in doing so, the Trustee and the Collateral Agent are not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under, the Intercreditor Agreement or any other Collateral Document, each of the Trustee and the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Indenture (in addition to those that may be granted to it under the terms of such other agreement or agreements).

SECTION 4.11.    *Additional Pari Passu Obligations.*

To the extent not prohibited by the provisions of this Indenture, the Notes or any of the Collateral Documents, the Company may incur Additional Pari Passu Obligations and any such Additional Pari Passu Obligations may be secured by a Lien and may be guaranteed by the Guarantors on a pari passu basis with the Holders of the Notes, in each case under and pursuant to the applicable Collateral Documents and the Intercreditor Agreement; *provided* that:

(i)    immediately prior to the incurrence of such Additional Pari Passu Obligations and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing;

(ii)    immediately prior to the incurrence of such Additional Pari Passu Obligations and immediately after giving effect thereto, the LTV Ratio shall not exceed the Trigger LTV Ratio;

(iii)    the Collateral Agent shall also act as collateral agent on behalf of the holders of the Additional Pari Passu Obligations with respect to the Liens securing the Additional Pari Passu Obligations;

(iv)    the Collateral Agent and the Trustee, on behalf of the Holders and the Additional Trustee, will execute (i) a joinder to the Intercreditor Agreement then in

44

effect, or, (b) if the Intercreditor Agreement is not then in effect, the Intercreditor Agreement, which Intercreditor Agreement will set forth the relative rights and obligations of the holders of Pari Passu Obligations with respect to the Collateral that is permitted to be shared with other creditors pursuant to the terms of this Indenture; provided, the Company shall deliver to each of the Collateral Agent and the Trustee an Officers' Certificate and an Opinion of Counsel of the Company, each stating that all conditions precedent contained in this Indenture and the Collateral Documents to the execution and delivery of the Intercreditor Agreement or the joinder have been satisfied and that such Intercreditor Agreement or joinder is authorized or permitted by this Indenture and the Collateral Documents.

SECTION 4.12.    *Certain Assurances*.  (a) On or prior to the Issue Date, the Collateral Agent and the Trustee shall have received a legal opinion from Brazilian external counsel to the effect that, subject to certain exceptions and qualifications, each of the Collateral Documents required to be executed on such date has been duly authorized, executed and delivered by GLA and/or GLAI, as applicable, and constitutes the legal, valid, and binding obligation of GLA and/or GLAI, as applicable, enforceable against GLA and/or GLAI in accordance with its terms.

(b)    Each of GLA and GLAI shall take, or cause to be taken, all actions necessary, or requested by the Collateral Agent (acting in accordance, exclusively and strictly, with instructions provided by the Trustee as directed by the Required Holders), to maintain each of the Collateral Documents to which it is a party in full force and effect and enforceable in accordance with its terms and to maintain and preserve the Liens created by the Collateral Documents and the priority thereof. In furtherance of the foregoing, GLA and GLAI shall ensure that all of the Collateral intended to be subject to the Liens granted by the Collateral Documents shall become subject to such Liens having the priority contemplated pursuant to the terms of this Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement.

(c)    On the date of issuance of any Additional Notes and at such other times as the Trustee or the Collateral Agent (acting in accordance, exclusively and strictly, with instructions provided by the Trustee, as directed by the Required Holders) may reasonably request in writing, the Company shall furnish, or cause to be furnished, to the Trustee and the Collateral Agent, an Opinion of Counsel stating that, in the Opinion of Counsel, an action has been taken with respect to (1) amending or supplementing any of the Collateral Documents or executing new Collateral Documents in connection with Additional Collateral and providing any notices or acknowledgments, in each case, as is necessary to subject all the Collateral (including any Additional Collateral) to the Liens granted by the Collateral Documents and (2) the recordation of the amendment to any of the Collateral Documents or to the execution of new Collateral Documents and any other requisite documents as are necessary to maintain the Liens purported to be granted by the Collateral Documents or as are necessary to grant Liens over any Additional Collateral and reciting the details of the action or stating that, in the opinion of counsel, no such action is necessary to maintain the Liens. The Opinion of Counsel shall also describe the recordation of the amendment to any of the Collateral Documents or to the execution of any new Collateral Documents and any other requisite documents, or the taking of any other action that will, in the Opinion of Counsel, be required to maintain the Liens purported to be granted by the Collateral Documents or that will be required to grant any Lien in respect of any Additional Collateral after the date of the Opinion of Counsel.

#93484727v11

(d)    Notwithstanding anything to the contrary contained in this Indenture, the Collateral Documents or in applicable law, neither the Trustee nor the Collateral Agent shall have any responsibility or liability, among other things as set forth in this Indenture or the Collateral Documents, for (1) acting or refraining from acting based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to this Indenture and the Collateral Documents; (2) any loss or claim resulting from any act or omission, directly or indirectly, conducted in good faith, except if otherwise determined in a final nonappealable decision by a court of competent jurisdiction that the Trustee or Collateral Agent, as applicable, failed to act in good faith and was grossly negligent; (3) any loss of profits, indirect, consequential, incidental, special, punitive or related losses and/or damages even if previously advised of the likelihood of such loss or damage; (4) preparing, recording or filing any financing or continuation statements or recording or filing any instrument in any public office or for otherwise ensuring the perfection or maintenance of any Lien granted pursuant to, or contemplated by, this Indenture and the Collateral Documents or the existence and enforceability of any insurance on the Collateral; (5) taking any necessary steps to preserve rights against any parties with respect to the Collateral; (6) taking any action to protect against any diminution in value of the Collateral; (7) errors in judgment made in good faith unless the Trustee was grossly negligent in ascertaining the pertinent facts; (8) the Company's and the Guarantors' compliance with any of the covenants set forth in this Indenture and the Collateral Documents, including but not limited to, covenants regarding the granting, perfection or maintenance of any Lien, (9) the market value of the Collateral or its sufficiency to satisfy in full payments due on the Notes Obligations; (10) the accuracy of any representation or warranty of the Company or Guarantor in this Indenture, the Collateral Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Trustee or the Collateral Agent or (11) the effectiveness, genuiness, sufficiency, legality, validity and enforceability of any lien, security interest, Collateral, this Indenture or the Collateral Documents or title, transfer or assignment of any Collateral.

SECTION 4.13.    *Appraisals*.  (a) The Company shall furnish to (A) the Collateral Agent on each Payment Date, (B) the Trustee and Collateral Agent at any time on which Additional Collateral comprising Asset Collateral is required to be delivered in connection with the issuance of any Additional Notes but then solely with respect to such Additional Collateral and (C) the Trustee, at such times upon the request of the Trustee, acting at the direction of the Required Holders, during the continuance of a Default or Event of Default, in each case, until release of the Collateral in accordance with Section 4.14, a certificate of an Independent Appraiser with respect to the Asset Collateral. The Company will make copies of any appraisals made by any Independent Appraiser available on a private, restricted website to which Holders, prospective investors, broker-dealers and securities analysts are given access. The certificates shall state the Independent Appraiser's opinion of the fair market value of the Asset Collateral, determined on the basis of a hypothetical sale negotiated in an arm's length free market transaction between a willing and able seller and a willing and able buyer, neither of whom is under undue pressure to complete the transaction, under then current market conditions (the "**Fair Market Value**").

(b)    Each appraisal shall, in accordance with the Independent Appraiser's customary practice, determine the Fair Market Value by taking at least the following actions with respect to the Asset Collateral (including any Additional Collateral comprising Asset Collateral): (1) in respect of Collateral consisting of Spare Parts only, reviewing a parts inventory report prepared

46

as of the applicable valuation date; (2) reviewing the Independent Appraiser's internal value database for values applicable to the Asset Collateral; (3) in respect of Collateral consisting of Spare Parts only, developing a representative sampling of a reasonable number of the different Spare Parts included in the Asset Collateral for which a market check will be conducted; (4) checking other sources, such as manufacturers, other airlines, U.S. government procurement data and airline parts pooling price lists, for current market prices of the sample parts referred to in clause (3); (5) in respect of Collateral consisting of Spare Parts only, establishing an assumed ratio of serviceable Spare Parts to unserviceable Spare Parts as of the applicable valuation date based upon information provided by GLA and/or GLAI and the Independent Appraiser's limited physical review of such Asset Collateral referred to in the following clause (6); (6) in respect of Collateral consisting of Spare Parts only, visiting at least two locations selected by the Independent Appraiser where Asset Collateral is kept by GLA, provided that at least one such location will be one of the top three locations at which GLA keeps the largest number of Spare Parts comprising Asset Collateral; (7) in respect of Collateral consisting of Spare Parts only, conducting a limited review of the inventory reporting system applicable to such Spare Parts, including checking information reported in such system against information determined through physical inspection pursuant to the preceding clause (6); and (8) reviewing a sampling of the Spare Parts, Spare Engines and Aircraft documents (including tear-down reports).

(c)     The Company is required to furnish to (A) the Collateral Agent on the second Payment Date occurring during each year and (B) the Trustee at such times upon the request of the Trustee, acting at the direction of the Required Holders, during the continuance of a Default or Event of Default, in each case, until release of the Collateral pursuant to Section 4.14, a certificate of an Independent Appraiser with respect to the Pledged IP and, if applicable, any Eligible IP Collateral.

SECTION 4.14.    *Release of Collateral*. Subject to the terms of this Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement, the Company and the Guarantors shall be entitled to the release of the Collateral from the Liens securing the Notes Obligations under any one or more of the following circumstances:

(i)      in accordance with this Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement, if at any time the Collateral Agent (acting in accordance, exclusively and strictly, with instructions provided by the Trustee (acting at the direction of the Required Holders)), forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)     as described in Article 9;

(iii)    upon payment in full of the principal of, together with accrued and unpaid interest on, the Notes and all other Notes Obligations that are due and payable;

(iv)     upon a legal defeasance or covenant defeasance under this Indenture as described in Article 8; or

(v)    except with respect to any Pledged IP and (except in connection with a disposition of Spare Parts pursuant to Section 4.18(e) below) Spare Parts, at any time at the election of the Company;

*in each case*, so long as (A) no Default or Event of Default will exist immediately after such release and (B) the LTV Ratio, immediately after giving effect to such release, will not exceed the Trigger LTV Ratio;

*provided, however,* that, notwithstanding the foregoing, the Liens granted under the Collateral Documents shall terminate in respect of the Notes on the Maturity Date, unless through passage of time, acceleration or otherwise there exist Notes Obligations due and payable on that date, in which case the Liens in the Collateral shall terminate upon satisfaction of such Notes Obligations. As a consequence of the termination, the Collateral shall be automatically released.

SECTION 4.15.    *LTV Ratio*.

(a)    The Company and the Guarantors shall ensure that, on each Calculation Date, the LTV Ratio shall not be greater than the Trigger LTV Ratio.

(b)    If the LTV Ratio is greater than the Trigger LTV Ratio as of any Calculation Date, the Company and the Guarantors shall:

(i)    within 15 Brazilian Business Days from such Calculation Date, enter into and deliver all documents and agreements required to grant a first-priority Lien in any Additional Collateral for the benefit of the Secured Parties in order that the LTV Ratio shall be restored to a level no greater than the Trigger LTV Ratio; and

(ii)    ensure that the first-priority Lien in such Additional Collateral shall be perfected on or prior to the date falling 30 Brazilian Business Days after such Calculation Date (such 15 Brazilian Business Day period, which will automatically be extended to 30 Brazilian Business Days if clause (i) above is complied with, the "**Cure Period**").

(c)    If:

(i)    the Company or the Guarantors fail to restore the LTV Ratio to a level no greater than the Trigger LTV Ratio on or prior to the expiry of the Cure Period in accordance with Section 4.15(b); and

(ii)    the LTV Ratio as of the Calculation Date immediately prior to the commencement of such Cure Period was less than or equal to 70%,

then the Company will pay additional interest on the Outstanding Notes in an amount equal to 2.00% per annum on the outstanding principal amount of the Notes commencing on such Calculation Date, and ending on the date on which the LTV Ratio is restored to a level not exceeding the Trigger LTV Ratio; *provided* that if, as of the next succeeding Calculation Date, the LTV Ratio is greater than the Trigger LTV Ratio, the

48

occurrence of such event on such Calculation Date shall constitute a failure by the Company to comply with its obligations under this Section 4.15(c).

(d)    If:

(i)    the Company or the Guarantors fail to restore the LTV Ratio to a level at least equal to or less than the Trigger LTV Ratio on or prior to the expiry of the Cure Period; and

(ii)    the LTV Ratio was greater than 70% as of the Calculation Date immediately prior to the commencement of such Cure Period,

then, the occurrence of such an event shall, on the date of expiry of the Cure Period, constitute a failure by the Company to comply with its obligations under this Section 4.15(d).

SECTION 4.16.    *Negative Pledge.*  The Company and the Guarantors shall maintain the Collateral free of any Liens, other than Permitted Liens.

SECTION 4.17.    *Maintenance of Asset Collateral.*

(a)    The Company and the Guarantors shall maintain the Asset Collateral in accordance with applicable law, excluding (i) Spare Parts that have become worn out or unfit for use and not reasonably repairable or obsolete, and (ii) Non-Rotable Spare Parts that have been consumed or used in GLA's operations.

(b)    GLA shall maintain all records, logs and other materials required by the Brazilian Civil Aviation Authority (*Agência Nacional de Aviação Civil - ANAC*) to be maintained in respect of the Asset Collateral.

(c)    In respect of any Collateral consisting of Eligible Aircraft, the Company and the Guarantors shall, at the Company's and the Guarantors' cost and expense:

(i)    establish or cause the establishment of a maintenance program for the Aircraft conforming in all material respects with the manufacturer's maintenance planning document and approved by the Brazilian Civil Aviation Authority (collectively, the "**Approved Maintenance Program**"), and ensure that all service, inspection, maintenance, modification, storage, repair and overhaul of the Aircraft is performed in accordance with such Approved Maintenance Program by GLA if so approved by the Brazilian Civil Aviation Authority or by a maintenance facility approved by the Brazilian Civil Aviation Authority (an "**Approved Maintenance Facility**"), *provided* that (A) manuals and technical records shall be kept in the English language and (B) the Company and the Guarantors shall provide a copy of the Approved Maintenance Program to the Trustee upon approval thereof by the Brazilian Civil Aviation Authority, if specifically requested by the Trustee (acting at the direction of the Required Holders), and shall advise the Trustee of any material subsequent changes to such Approved Maintenance Program by issuing revisions thereof approved by the Brazilian Civil Aviation Authority to the Trustee;

49

(ii)     keep the Aircraft in good operating and serviceable condition and repair, and in such condition (including maintenance of the manuals and technical records) as necessary to enable all applicable airworthiness certifications of the Aircraft to be maintained in good standing at all times under the applicable laws except when the Aircraft is undergoing service, maintenance, modification, overhaul, testing or repairs as required or permitted hereunder.

(iii)     maintain, inspect, service, store, repair, modify and overhaul the Aircraft: (A) to comply with all warranty requirements, (B) in accordance with the manufacturer's and engine manufacturer's repair manuals, (C) pursuant to the Approved Maintenance Program and (D) in a manner that does not discriminate against the Aircraft when compared to similar aircraft owned, operated or leased by GLA, without regard to its leased status;

(iv)     procure and maintain in effect with the manufacturer a revision service, if any, for all manuals and technical records, and maintain the manuals and technical records in respect of the Aircraft in such condition to satisfy the standards of the Brazilian Civil Aviation Authority for a certificate of airworthiness for commercial passenger transport;

(v)     procure and maintain in effect with the Manufacturer a revision service, if any, for all Manuals and Technical Records, and maintain the Manuals and Technical Records in such condition to satisfy the standards of the Aviation Authority for a certificate of airworthiness for commercial passenger transport; and

(vi)     comply with all applicable airworthiness directives issued by the Aviation Authority.

(d)     Neither the Trustee nor the Collateral Agent shall bear responsibility or liability for any grounding or suspension of operations of the Aircraft resulting from airworthiness directives, service bulletins, or any repairs or modifications to the Aircraft by GLA or any other Person.

SECTION 4.18.     *Use and Possession of Spare Parts, Spare Engines, Flight Simulators and Aircraft*.

(a)     GLA may not sell, lease, transfer or relinquish possession of any pledged Spare Part or Spare Engine without the prior written consent of the Collateral Agent (acting in accordance, exclusively and strictly, with instructions provided by the Trustee, acting at the direction of the Required Holders), except as permitted by this Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement.

(b)     GLA shall be entitled to deal with the Spare Parts and any Spare Engines that are part of the Collateral in any manner consistent with its ordinary course of business. This includes the right to install on, or use in, any aircraft, engine or Spare Part leased to or owned by GLA any Spare Part or to install on any aircraft leased to or owned by GLA any Spare Engine. GLA may dismantle any Spare Part or Spare Engine that it deems worn out or obsolete, beyond economic repair or unfit or no longer suitable for use and may sell or dispose of any such Spare

50

Part or Spare Engine or any salvage resulting from such dismantling, free from the Liens of the Collateral Documents.

(c)     GLA shall be entitled to deal with the Spare Parts and any Spare Engines that are part of the Collateral in any manner consistent with its ordinary course of business, including the right to install on, or use in, any aircraft, engine or Spare Part leased to or owned by GLA any Spare Part or to install on any aircraft leased to or owned by GLA any Spare Engine. GLA may also subject any Spare Part to a pooling, exchange, borrowing, or maintenance servicing agreement or arrangement customary in the airline industry and entered into in the ordinary course of business, *provided* that (i) there is no detriment to the rights of the Holders and the holders of any Additional Pari Passu Obligations; (ii) it shall not affect the priority or perfection of the Liens of the Collateral Documents or the rights of the Collateral Agent or Trustee; and (iii) all requirements set forth in the Collateral Documents are fully observed by GLA, including but not limited to the subordination to the Collateral Documents of the rights of any lessee, assignee or third party which shall have possession to the Spare Parts and/or Spare Engines.

(d)     So long as no Default or Event of Default shall have occurred and be continuing and subject to the terms of this Indenture, GLA may enter into a lease with respect to any Rotable Spare Part to any certificated air carrier that is not then subject to any bankruptcy, insolvency, liquidation, reorganization, dissolution or similar proceeding and shall not have substantially all of its property in the possession of any liquidator, trustee, receiver or similar person. In the case of any such lease, GLA will include, among other things, in such lease appropriate provisions which (i) make such lease expressly subject and subordinate to all of the terms of this Indenture, including the rights of the Holders in accordance with this Indenture and, if applicable, together with the holders of any Additional Pari Passu Obligations, to avoid such lease in the exercise of its rights to repossession of the Spare Parts thereunder and the requirement that GLA shall remain primarily liable for, among other things, the performance and observance of all terms of this Indenture; (ii) require the lessee to comply with the insurance requirements of this Indenture; (iii) require the lessee to effect all registrations necessary in whatever jurisdiction to perfect and protect the Secured Parties' rights in the Collateral and (iv) require that the Spare Parts subject thereto be used in accordance with the limitations applicable to GLA's use and possession of such Spare Parts provided in this Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement.

(e)     Notwithstanding anything to the contrary in this Section 4.18, GLA will be permitted to dispose of Spare Parts:

(i)     in one or more transactions, if the value of the Spare Parts so disposed (determined by reference to the most recent appraisal delivered before the disposal of the applicable Spare Parts) in aggregate does not exceed 25% of the Fair Market Value of the Spare Parts contained in the Issue Date Collateral (determined by reference to the initial appraisal delivered for such Spare Parts) and

(ii)     in one or more transactions if, (A) any such transaction is in connection with entering into power-by-the-hour agreements, total care agreements, spare parts subscription agreements or similar arrangements with one or more unaffiliated entities, (B) the Fair Market Value of the Spare Parts located in Brazil (determined by reference to

#93484727v11

the most recent appraisal delivered immediately prior to the proposed date of disposal of the applicable Spare Parts) in aggregate does not exceed 75% of the Fair Market Value of the Spare Parts contained in the Issue Date Collateral (determined by reference to the initial appraisal delivered for such Spare Parts) and (C) part of the Collateral includes either Loyalty Receivables or shares of Smiles S.A. (or any successor entity),

in each case, so long as (A) no Default or Event of Default exists or would exist immediately after such transaction and (B) the LTV Ratio, immediately after giving effect to such transaction or transactions, as the case may be, would not exceed the Trigger LTV Ratio.

(f)      GLA shall maintain (i) the Flight Simulators that comprise any part of the Collateral at a Designated Location and (ii) the Aircraft that comprise any part of the Collateral registered with the Brazilian Aeronautical Registry and having a habitual lease, which shall be deemed a Designated Location for such Collateral, without any prejudice to GLA's right to operate such Collateral in the normal course of business in Brazil and other jurisdictions as required.

(g)      Each Spare Engine and each Aircraft that is part of the Collateral may be operated by GLA or, subject to certain restrictions by certain other persons, as set forth in subsection (h) below and including pursuant to a charter or wet lease arrangement, *provided* that (i) GLA's obligations hereunder shall remain in full force and effect notwithstanding any such charter, wet lease or other similar arrangement and (ii) such Person is not then subject to any bankruptcy, insolvency, liquidation, reorganization, dissolution or similar proceeding and shall not have substantially all of its property in the possession of any liquidator, trustee, receiver or similar person.

(h)      GLA may, subject to Section 4.18(i) below:

(i)      subject any Aircraft or Spare Engine to an interchange agreement with or similar arrangements or any maintenance or service arrangement in each case on terms customary in the airline industry and entered into by GLA in the ordinary course of its business with one or more airlines (including the so-called "IATA" engine pool, and any pool maintained by the engine manufacturer): (A) airlines domiciled in the United States or Brazil, (B) major international air carriers domiciled in certain permitted countries or countries that maintain diplomatic relations with the Unites States and Brazil, (C) Affiliates of GLA or (D) the governments of Brazil, Canada, France, Germany, Japan, The Netherlands, Sweden, Switzerland, United Kingdom or the United States (each, a "**Permitted Lessee**");

(ii)      deliver possession of any Aircraft or Spare Engine to any Person for testing, service, repair, reconditioning, restoration, storage, maintenance, overhaul work or other similar purposes or for alterations, modifications or additions to such Aircraft or any such Spare Engine to the extent required or permitted by the terms hereof;

52

(iii)     install any Spare Engines on other aircraft owned or leased by GLA or any Permitted Lessee; and

(iv)     lease any Spare Engine or Aircraft that is part of the Collateral to any Permitted Lessees and to manufacturers in Australia, Brazil, Canada, Denmark, Finland, France, Germany, Iceland, Ireland, Japan Liechtenstein, Luxembourg, Monaco, Netherlands, New Zealand, Norway, Sweden, Switzerland, the United Kingdom and the United States; *provided* that a written record of the location of any such Spare Engine will be kept and made available to the Collateral Agent at any time on request, and *provided, further*, that no such agreement or arrangement contemplates or requires the transfer of title to any such Spare Engine or will derogate in any manner the rights, title and interests of the Trustee or the Collateral Agent;

*provided* that in each case of items (i) through (iii) above (A) there is no detriment to the Secured Parties' position; (B) it shall not affect the priority or perfection of the Liens of the Collateral Documents or the rights of the Collateral Agent or the Trustee and the Liens purported to be granted by the Collateral Documents shall be maintained; (C) all requirements set forth in the Collateral Documents are fully observed by GLA, including that any of the arrangements described in paragraphs (i) through (iii) above shall be subject to and subordinate to the Collateral Documents; and (D) the Company shall furnish, or cause to be furnished, to the Trustee and the Collateral Agent, an Opinion of Counsel, such actions have been taken to satisfy the conditions set forth in sub-paragraphs (A) through (C).

(i)     GLA agrees that the Aircraft and Spare Engines will not be maintained, used, insured or operated (including by any Permitted Lessee) (i) in violation of (in the case of Aircraft) the Certificate of Airworthiness or any license or registration relating to the Aircraft or Spare Engine of, or with, any governmental authority having jurisdiction over GLA, and Permitted Lessee or the Aircraft or Spare Engine, (ii) for any primary purpose other than the commercial transportation of passengers and/or cargo, *provided* that cargo shall be carried only in the cargo hold of the Aircraft, (iii) in violation of the Approved Maintenance Program or any warranty requirements pursuant to the applicable purchase agreement or any other agreement setting forth any other material warranties with respect to the Aircraft, its Airframe, Engines or Parts or the Spare Engines, (iv) for any purpose or in any manner for which it is not designed or reasonably suited or outside the tolerances and limitations for which the Aircraft, Airframe or Spare Engines were designed in accordance with the Approved Maintenance Program, Applicable Law and applicable material warranties, (v) at any time while the Insurances required by Section 4.19 hereof are not in full force and effect, (vi) for any purpose or otherwise in a manner inconsistent with the terms of, or not fully covered by, the Insurances required by Section 4.19 hereof, (vii) in any place inconsistent with the terms of, excluded from coverage by, or not fully covered by, the Insurances required by Section 4.19 hereof (or outside any geographical limit imposed by the Insurances required by Section 4.19 hereof, including without limitation, in or through any recognized or threatened area of hostilities unless fully covered by war risk and allied perils Insurance in amounts and scope required by this Indenture; *provided* that GLA may so operate or permit such operation of the Aircraft or Spare Engine if the Aircraft or Spare Engine is under requisition by, or contract with, a Brazilian governmental authority, so

53

long as no Event of Loss has occurred, or (viii) in violation of any Applicable Law of or by any governmental authority having jurisdiction over the owner of the Aircraft or Spare Engine, any lessor, GLA, any Permitted Lessee or the Aircraft or Spare Engine or any mandatory requirement of the manufacturer or supplier, except for unintentional minor or nonrecurring violations which are cured promptly.

SECTION 4.19.    *Insurance*.

(a)    GLA shall maintain customary insurance covering damage to the Asset Collateral. Such insurance must provide for the reimbursement of GLA's expenditure in repairing or replacing any damaged or destroyed Asset Collateral. If any such Asset Collateral is not repaired or replaced, such insurance must provide for the payment of the amount it would cost to repair or replace such Asset Collateral within a customary number of days after the date of loss, with proper deduction for obsolescence and physical depreciation.

(b)    GLA shall also maintain third party liability insurance with respect to the Asset Collateral in an amount and scope as it customarily maintains for equipment similar to the Asset Collateral and with insurers of nationally or internationally recognized responsibility. GLA may self-insure the risks required to be insured against as described above in respect of any Asset Collateral in such amounts as shall be consistent with its normal practices, except for insurance mandatorily purchased under applicable law. The Collateral Agent will be a beneficiary of any proceeds from insurance claims related to the Asset Collateral.

SECTION 4.20.    *Repurchase of Notes Upon a Change of Control.*    Not later than 30 days following a Change of Control, the Company will make an Offer to Purchase all outstanding Notes at a purchase price equal to 101% of the principal amount plus accrued interest to the date of purchase, pursuant to the procedures set forth in Section 4.21.

SECTION 4.21.    *Offer to Purchase*.  (a) An "**Offer to Purchase**" means an offer by the Company to purchase Notes as required by this Indenture in the event of a Change of Control. The Offer to Purchase must be made by written offer (the "**offer**"), which will specify the principal amount of Notes subject to the offer and the purchase price. The offer must specify an expiration date (the "**expiration date**") not less than 30 days or more than 60 days after the date of the offer and a settlement date for purchase (the "**purchase date**") not more than five Brazilian Business Days after the expiration date. The offer must include information required by the Securities Act, Exchange Act or any other applicable laws. The offer will also contain instructions and materials necessary to enable holders to tender Notes pursuant to the offer.

(b)    A Holder may tender all or any portion of its Notes pursuant to an Offer to Purchase, subject to the requirement that any portion of a Note tendered must be in a multiple of $1,000 principal amount; *provided* that if the Notes are tendered in part, such Holder shall hold in excess of US$100,000. Holders are entitled to withdraw Notes tendered up to the close of business on the expiration date. On the purchase date the purchase price will become due and payable on each Note accepted for purchase pursuant to the Offer to Purchase, and interest on Notes purchased will cease to accrue on and after the purchase date (unless the Company defaults in payment of the purchase price, in which case interest will continue to accrue until the purchase price has been paid).

#93484727v11

(c)      The Company will comply with Rule 14e-1 under the Exchange Act and all other applicable laws in making any Offer to Purchase, and the above procedures will be deemed modified as necessary to permit such compliance.

SECTION 4.22.    *Listing*.  The Company will use commercially reasonable efforts to list the Notes on the SGX-ST after the Issue Date.

# ARTICLE 5
CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 5.01.    *Limitation on Consolidation, Merger or Transfer of Assets*.  Neither the Company nor the Guarantors shall consolidate with or merge with or into, or sell, convey, transfer or dispose of, or lease all or substantially all of its assets as an entirety or substantially as an entirety, in one transaction or a series of related transactions, to, any Person, unless:

(i)      the resulting, surviving or transferee Person (if not the Company or a Guarantor) shall be a Person organized and existing under the laws of Brazil, the United States of America, any State thereof or the District of Columbia, or any other country (or political subdivision thereof) that is a member country of the European Union or of the Organization for Economic Co-operation and Development on the date of this Indenture, and such Person expressly assumes, by an indenture supplemental to this Indenture, executed and delivered to the Trustee, all the obligations of the Company or the Guarantors under this Indenture and the Notes and the Note Guaranties;

(ii)      the resulting, surviving or transferee Person (if not the Company or a Guarantor), if organized and existing under the laws of a jurisdiction other than Brazil or Luxembourg, as applicable, undertakes, in such supplemental indenture, (x) to pay such Additional Amounts in respect of principal (and premium, if any) and interest as may be necessary in order that every net payment made in respect of the Notes and any Note Guaranty after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by such other country or any political subdivision or taxing authority thereof or therein shall not be less than the amount of principal (and premium, if any) and interest then due and payable on the Notes and the Note Guaranties subject to the same exceptions set forth under Section 4.06 and (y) that the provisions set forth in Section 3.01(c) shall apply to such Person, but in both cases, replacing existing references in such Sections to Brazil or Luxembourg, as applicable, or to the Taxing Jurisdiction with references to the jurisdiction of organization of the resulting, surviving or transferee Person as the case may be;

(iii)      immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing; and

(iv)      the Company or the Guarantors shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indenture, if any, comply with this Indenture.

#93484727v11

The Trustee shall  accept such Officers' Certificate and Opinion of Counsel as sufficient evidence of the satisfaction of the conditions precedent set forth in this Section 5.01, in which event it shall be conclusive and binding on the Holders.

Subject to Section 5.01(ii) above and notwithstanding anything else to the contrary contained in the foregoing, any of the Guarantors may consolidate with or merge with the Company or any Subsidiary that becomes a Guarantor concurrently with the relevant transaction.

SECTION 5.02.    *Successor Substituted*.  Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Company or any of the Guarantors in accordance with Section 5.01 in which the Company or any of the Guarantors is not the continuing obligor or Guarantor, as the case may be, under this Indenture, the surviving or transferor Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company or any of the Guarantors, as the case may be, under this Indenture with the same effect as if such successor had been named as the Company or a Guarantor therein. When a successor assumes all the obligations of its predecessor under this Indenture, the Notes and the Note Guaranties, the predecessor shall be released from those obligations; *provided* that in the case of a transfer by lease, the predecessor shall not be released from the payment of principal and interest on the Notes.

SECTION 5.03.    *Substitution of the Company*.  (a) Notwithstanding any other provision contained in this Indenture, the Company may, without the consent of the Holders (and by purchasing or subscribing for any Notes, each Holder expressly consents to it), be replaced and substituted by (x) GLAI or (y) any Wholly Owned Subsidiary of GLAI as principal debtor (in such capacity, the "**Substituted Debtor**") in respect of the Notes; *provided* that:

(i)    such documents shall be executed by the Substituted Debtor, the Company, GLAI and the Trustee as may be necessary to give full effect to the substitution, including a supplemental indenture whereby the Substituted Debtor assumes all the Company's obligations under this Indenture (together, the "**Company Substitution Documents**") and (without limiting the generality of the foregoing) pursuant to which the Substituted Debtor shall undertake in favor of each Secured Party to be bound by the terms and conditions of the Notes and the provisions of this Indenture as fully as if the Substituted Debtor had been named in the Notes and this Indenture as the principal debtor in respect of the Notes in place of the Company (or any previous substitute), and the covenants of GLAI (in the case the Company is substituted by GLAI), the covenants of the Company (in the case the Company is substituted by a Wholly Owned Subsidiary of GLAI), Events of Default and other relevant provisions shall continue to apply to the Company in respect of the Notes as if no such substitution had occurred, it being the intent that the rights of Noteholders in respect of the Notes shall be unaffected by such substitution, subject to clause (b) below;

(ii)    without prejudice to the generality of the preceding paragraph, the Company Substitution Documents shall contain (x) a covenant by the Substituted Debtor and/or such other provisions as may be necessary to ensure that each Holder has the benefit of a covenant in terms corresponding to the obligation of the Company in respect of the payment of Additional Amounts set forth in Section 4.06, with the substitution for

56

the references to Brazil or Luxembourg, as applicable, of references to the territory in which the Substituted Debtor is incorporated, domiciled and/or resident for taxation purposes; *provided* that the Substituted Debtor is incorporated, domiciled or resident for taxation purposes in a territory other than Brazil or Luxembourg, as applicable, and (y) a covenant by the Substituted Debtor and the Company to indemnify and hold harmless each Secured Party against all taxes or duties which arise by reason of a law or regulation having legal effect or being in reasonable contemplation thereof on the date such substitution becomes effective, which may be incurred or levied against each Secured Party as a result of any substitution pursuant to the conditions set forth in this Section 5.03 and which would not have been so incurred or levied had such substitution not been made (and, without limiting the foregoing, any and all taxes or duties which are imposed on any such Holder by any political subdivision or taxing authority of any country in which such Holder resides or is subject to any such tax or duty and which would not have been so imposed had such substitution not been made);

(iii)    each stock exchange which has the Notes listed thereon, if any, shall have confirmed in writing that following the proposed substitution of the Substituted Debtor the Notes would continue to be listed on such stock exchange, or if such confirmation is not received or such continued listing is impracticable or unduly burdensome, the Company or GLAI may de-list the Notes from such exchange on which the Notes are listed; and, in the event of any such de-listing, GLAI shall use commercially reasonable efforts to obtain an alternative admission to listing, trading and/or quotation of the Notes by another listing authority, exchange or system within or outside the European Union as it may reasonably decide; *provided* that if such alternative admission is not available or is, in the Company and GLAI's reasonable opinion, unduly burdensome, the Company and GLAI shall have no further obligation in respect of any listing of the Notes;

(iv)    the Company shall have delivered, or procured the delivery to the Trustee of, an Opinion of Counsel addressed to the Company, the Substituted Debtor and the Trustee from a leading firm of lawyers in the country of incorporation of the Substituted Debtor, to the effect that the Company Substitution Documents constitute legal, valid and binding obligations of the Substituted Debtor and have been duly authorized executed and delivered by the Substituted Debtor, such opinion(s) to be dated as of the date the Company Substitution Documents are executed;

(v)    the Company shall have delivered, or procured the delivery to the Trustee of, an Opinion of Counsel addressed to the Company, the Substituted Debtor and the Trustee from a leading firm of Luxembourg or Brazilian lawyers acting for the Company and GLAI, as the case may be, to the effect that the Company Substitution Documents have been duly authorized, executed and delivered by the Company and that they constitute legal, valid and binding obligations of the Company, such opinion to be dated as of the date the Company Substitution Documents are executed;

(vi)    the Company shall have delivered, or procured the delivery to the Trustee of, an Opinion of Counsel addressed to the Company, the Substituted Debtor and the Trustee from a leading firm of New York lawyers to the effect that the Company Substitution Documents constitute legal, valid and binding obligations of the parties

57

thereto under New York law, such opinion to be dated as of the date the Company Substitution Documents are executed;

(vii)    the Substituted Debtor shall have appointed a process agent in the Borough of Manhattan, The City of New York to receive service of process on its behalf in relation to any legal action or proceedings arising out of or in connection with this Indenture, the Notes or the Company Substitution Documents;

(viii)    there is no outstanding Default or Event of Default in respect of the Notes;

(ix)    the substitution complies with all applicable requirements established under the laws of Brazil, or Luxembourg, as the case may be;

(x)    the substitution shall not result in the Secured Parties failing to maintain a first-priority perfected Lien in the Collateral and shall not otherwise impair or adversely impact the Collateral or the rights of any of the Secured Parties therein or impose any transfer restrictions on any Collateral or hinder or delay any foreclosure on the Collateral or otherwise impair the Collateral Agent's ability to sell or otherwise realize against the Collateral; and

(xi)    each of the Substituted Debtor, GLAI and the Company shall deliver to the Trustee an Officers' Certificate, executed by their respective authorized officers, certifying that the terms of this section have been complied with and attaching copies of all documents contemplated herein.

(b)    Upon the execution of the Company Substitution Documents and the satisfaction of the conditions referred to in Section 5.03(a) above, the Substituted Debtor shall be deemed to be named in the Notes as the principal debtor in place of the Company (or of any previous substitute under these provisions) and the Notes shall thereupon be deemed to be amended to give effect to the substitution. Except as set forth above, the execution of the Company Substitution Documents shall operate to release the Company (or such previous substitute as aforesaid) from all its obligations in respect of the Notes.

(c)    The Company Substitution Documents shall be deposited with and held by the Trustee for so long as any Note remains Outstanding and for so long as any claim made prior to the Maturity Date against the Substituted Debtor or the Company by any Noteholder in relation to the Notes or the Company Substitution Documents shall not have been finally adjudicated, settled or discharged. The Substituted Debtor, GLAI and the Company shall acknowledge in the Company Substitution Documents the right of every Noteholder to the production of the Company Substitution Documents for the enforcement of any of the Notes or the Company Substitution Documents.

(d)    Not later than 10 Business Days after the execution of the Company Substitution Documents, the Substituted Debtor shall give notice thereof to the Noteholders in accordance with the provisions described under Section 11.02.

#93484727v11

## ARTICLE 6
### EVENTS OF DEFAULT AND REMEDIES

SECTION 6.01.    *Events of Default*.  The term "**Event of Default**" means, when used herein, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to, or as a result of any failure to obtain, any authorization, order, rule, regulation, judgment or decree of any governmental or administrative body or court):

(a)    the Company defaults in any payment of interest (including any Additional Amounts) on any Note when the same becomes due and payable, and any such Default continues for a period of 30 days;

(b)    the Company defaults in the payment of the principal (including any Additional Amounts) of any Note when the same becomes due and payable at its Stated Maturity, upon acceleration or redemption or otherwise;

(c)    the Company shall fail to comply with its obligations under Section 4.15(c) or 4.15(d), as the case may be;

(d)    the Guarantors fail to (a) amend the Collateral Documents related to Spare Parts to update the market value thereof, the list of Spare Parts or the location of the Spare Parts, in accordance with the terms and conditions provided for in the Collateral Documents relating to such Spare Parts; or (b) make the necessary fillings, registrations and annotations related to such amendments in accordance with the terms and conditions provided for in the Collateral Documents relating to such Spare Parts;

(e)    any of the Company or the Guarantors fails to comply with any of its covenants or agreements in the Notes, this Indenture or any of the Collateral Documents (other than those referred to in clauses (a), (b), (c) or (d) of this Section 6.01), and such failure continues for 60 days after the notice specified below;

(f)    the Company fails to make an Offer to Purchase and thereafter accept and pay for Notes tendered when and as required pursuant to Section 4.20 and Section 4.21;

(g)    any of the Company, the Guarantors or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by any of the Company, the Guarantors or any such Significant Subsidiary (or the payment of which is guaranteed by the Company, the Guarantor or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of this Indenture, which default (i) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("**Payment Default**") or (ii) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$50,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

#93484727v11

(h)    one or more final non-appealable judgments or decrees for the payment of money of U.S.$50,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against any of the Company, the Guarantors or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed within 30 days following commencement of such enforcement proceedings or (ii) there is a period of 60 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed;

(i)    an involuntary case or other proceeding is commenced against any of the Company, the Guarantors or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, *administrador judicial,* liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against any of the Company, the Guarantors or any Significant Subsidiary under the bankruptcy laws now or hereafter in effect, and such order is not being contested by any of the Company, the Guarantors or any Significant Subsidiary, as the case may be, in good faith, or has not been dismissed, discharged or otherwise stayed, in each case within 60 days of being made;

(j)    any of the Company, the Guarantors or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking liquidation, reorganization, *concordata*, or other relief with respect to itself or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the Company, the Guarantors or any Significant Subsidiary or for all or substantially all of the property of any of the Company, the Guarantors or any Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(k)    any event occurs that under the laws of Brazil or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in any of clause (i) or (j);

(l)    (A) an "Event of Default" occurs under any credit agreement, indenture or similar agreement or instrument evidencing any Additional Pari Passu Obligations or (B) any enforcement action is taken in respect of the Collateral, including the taking of any steps to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral or otherwise exercise any rights or remedies with respect to the Collateral in accordance with any of the Collateral Documents and, if applicable, the Intercreditor Agreement;

(m)    any Note Guaranty ceases to be in full force and effect, other than in accordance the terms of this Indenture, or any of the Guarantors denies or disaffirms its obligations under its Note Guaranty;

60

(n)      GLAI ceases to own directly 100% of the outstanding share capital of the Company; or

(o)      except as expressly permitted by this Indenture and the Collateral Documents, the Collateral Documents shall for any reason cease to be in full force and effect in all material respects, or any of the Company or the Guarantors or any of their Subsidiaries shall so assert, or any Lien created, or purported to be created, by any of the Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby.

A Default under clause (e) of this Section 6.01 shall not constitute an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes, as the case may be, notify the Company and the Guarantors of the Default and the Company and the Guarantors, as the case may be, do not cure such Default within the time specified after receipt of such notice.

Notwithstanding anything contained herein to the contrary, the Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless a Responsible Officer of the Trustee with direct responsibility for this Indenture has received written notice of such Default or Event of Default from the Company, the Guarantors or any Holder and such notice references this Indenture, the Notes and Default of Event of Default.

SECTION 6.02.    *Acceleration of Maturity, Rescission and Amendment*.  If an Event of Default (other than an Event of Default specified in Section 6.01(i), 6.01(j), 6.01(k) or 6.01(l)(B)) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Company and the Trustee and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in Section 6.01(i), 6.01(j), 6.01(k) or 6.01(l)(B) occurs and is continuing, then the principal of and accrued and unpaid interest on all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Company and the Trustee may rescind or annul such declaration if:

(i)      the Company has paid or deposited with the Trustee a sum sufficient to pay (A) all overdue interest on Outstanding Notes, (B) all unpaid principal of the Notes that has become due otherwise than by such declaration of acceleration, (C) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (D) all sums paid or advanced by the Trustee, the Agents and the Collateral Agent hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, the Agents, the Collateral Agent and their agents and counsel; and

61

(ii)    all Events of Default have been cured or waived as provided in Section 6.13 other than the nonpayment of principal that has become due solely because of acceleration.

No such rescission shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

SECTION 6.03.    *Collection Suit by Trustee*.  If an Event of Default specified in Section 6.01(a) or Section 6.01(b) occurs, the Trustee, in its own name as trustee of an express trust, (i) may institute a judicial proceeding for the collection of the whole amount then due and payable on such Notes for principal and interest (including Additional Amounts), and interest on any overdue principal and, to the extent that payment of such interest (including Additional Amounts) shall be legally enforceable, upon any overdue installment of interest (including Additional Amounts), at the rate borne by the Notes, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their respective agents and counsel, (ii) may prosecute such proceeding to judgment or final decree and (iii) may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders by any available proceeding at law or in equity, whether for the specific enforcement of any covenant or agreement in this Indenture, the Collateral Documents or, if applicable, the Intercreditor Agreement or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

SECTION 6.04.    *Other Remedies*.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of or interest (including Additional Amounts) on the Notes or to enforce the performance of any provision of this Indenture, the Notes, the Collateral Documents or, if applicable, the Intercreditor Agreement. Notwithstanding anything to the contrary contained herein, under any Collateral Document or in any other agreement, with respect to the exercise of any rights or remedies of any of the Holders under any of the terms of such agreements, the Trustee, during a Default or an Event of Default, shall not be obligated to act unless directed by the Required Holders. During an Event of Default, the Trustee may (but shall not be obligated to, and shall have no duty to) take such action, or refrain from taking such action, in order to exercise any of the rights or remedies of the Holders absent such direction.

SECTION 6.05.    *Trustee May Enforce Claims Without Possession of Notes*.  All rights of action and claims under this Indenture, the Notes, the Collateral Documents or, if applicable, the Intercreditor Agreement may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name and as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral

#93484727v11

Agent and their respective agents and counsel, be for the ratable benefit of the Secured Parties in respect of which such judgment has been recovered.

SECTION 6.06.    *Application of Money Collected*.  Subject to the proviso set forth below, any money collected by the Trustee and/or the Collateral Agent pursuant to this Article 6 or the Collateral Documents shall be applied in order set forth below:

FIRST, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent, the Trustee and the Agents and any other agent or attorney appointed hereby or under the Collateral Documents, in the case of each of the foregoing, solely in their respective capacity as the Collateral Agent, the Trustee, an Agent or other agent, as applicable (including, costs and expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Indenture or any Collateral Document);

SECOND, on a pro rata basis, to the payment in full to the Holders of all amounts due and unpaid on the Notes for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest; provided, that, the proceeds shall be applied (i) first, to the Holders for amounts due and payable on the Notes for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest and (ii) second, any remaining amounts to the Holders for amounts due and payable on the Notes for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Notes;

THIRD, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses, charges, liabilities, indemnities, fees and other amounts due to Collateral Agent, the Trustee, the Agents and the other Secured Parties (to the extent not paid (x) at priority "first" to the Collateral Agent, the Trustee and the Agents or (y) at priority "second" to the other Secured Parties); and

FOURTH, the balance, if any, after all of the Notes Obligations have been paid in full in cash, to the Company and its successors or assigns, or as a court of competent jurisdiction may otherwise direct;

*provided* that, upon the execution of the Intercreditor Agreement, any money collected by the Trustee or the Collateral Agent shall be applied in accordance with the application of proceeds set forth in the Intercreditor Agreement and this Section 6.06 shall be disregarded.

The Trustee may fix a record date and Payment Date for any payment to Holders pursuant to this Section 6.06.  At least 15 days before such record date, the Trustee shall give to each Holder and the Company a notice that states the record date, the Payment Date and amount to be paid.

SECTION 6.07.    *Limitation on Suits*.  A Holder may not pursue any remedy with respect to this Indenture, the Notes, the Collateral Documents or, if applicable, the Intercreditor Agreement unless:

#93484727v11

(i)    the Holder has previously given to the Trustee written notice stating that an Event of Default has occurred and is continuing;

(ii)    the Holders of at least 25% in principal amount of the Outstanding Notes have made a written request to the Trustee to pursue the remedy in respect of such Event of Default;

(iii)    such Holder or Holders has offered and provided to the Trustee and the Collateral Agent security or indemnity reasonably satisfactory to the Trustee and the Collateral Agent against any cost, loss, liability or expense to be incurred in compliance with such request;

(iv)    the Trustee and the Collateral Agent does not comply with the request within 60 days after receipt of the request and the offer and provision of security or indemnity; and

(v)    no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Holders of a majority in principal amount of the Outstanding Notes.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

SECTION 6.08.    *Contractual Rights of Holders to Receive Principal and Interest*. Notwithstanding any other provision of this Indenture, the Collateral Documents or, if applicable, the Intercreditor Agreement, each Holder shall have the right pursuant to this Section 6.08 to bring suit for the payment of principal of, and interest on its Note, on or after the respective due dates expressed or provided for in such Note.

SECTION 6.09.    *Restoration of Rights and Remedies*.  If the Trustee, the Collateral Agent or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture, the Collateral Documents or, if applicable, the Intercreditor Agreement and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee, the Collateral Agent or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Guarantors, the Trustee, the Collateral Agent and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee, the Collateral Agent and the Holders shall continue as though no such proceeding had been instituted.

SECTION 6.10.    *Trustee May File Proofs of Claim*.  The Trustee may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due to the Trustee hereunder) and the Holders allowed in any judicial proceedings relative to the Company or the Guarantors, their respective creditors or their respective properties and, unless prohibited by law or applicable regulations, may vote on behalf of the Holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each Holder to make payments to the Trustee and, in the

64

event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee and the Collateral Agent any amount due to them for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their respective agents and counsel, and any other amounts due to the Trustee and the Collateral Agent under Section 7.06 and Section 12.04. Nothing herein shall be deemed to authorize the Trustee or the Collateral Agent to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee or the Collateral Agent to vote in respect of the claim of any Holder in any such proceeding.

SECTION 6.11.    *Delay or Omission Not Waiver*.  No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

SECTION 6.12.    *Control by Holders*.  Except as otherwise provided in the Intercreditor Agreement (if applicable), the Holders of a majority in principal amount of the Outstanding Notes ("**Required Holders**") may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Collateral Agent or of exercising any power conferred on the Trustee or the Collateral Agent.  However, the Trustee or the Collateral Agent shall be under no obligation to exercise any of the rights or powers under this Indenture, the Collateral Documents or, if applicable, the Intercreditor Agreement at the request or direction of the Holders if such request or direction conflicts with any law or with this Indenture, the Collateral Documents or, if applicable, the Intercreditor Agreement, as the case may be, or if the Trustee determines it is unduly prejudicial to the rights of other Holders (it being understood that the Trustee shall have no duty to ascertain whether or not such actions or forbearance are unduly prejudicial to such Holders) or would involve the Trustee or the Collateral Agent in personal liability or expense; *provided*, *however*, that the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such request or direction.  Prior to taking any action under this Indenture, the Collateral Documents or, if applicable, the Intercreditor Agreement, each of the Trustee and the Collateral Agent shall be entitled to indemnification satisfactory to it in its sole discretion against all costs, losses, liabilities and expenses that might be caused by taking or not taking such action.

SECTION 6.13.    *Waiver of Past Defaults and Events of Default*.  The Holders of a majority in principal amount of the Outstanding Notes by written notice to the Trustee may waive an existing Default or Event of Default and its consequences except (i) a Default or Event of Default in the payment of the principal of or interest on a Note or (ii) a Default or Event of Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each Holder affected.  When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 6.14.    *Rights and Remedies Cumulative*.  Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section

#93484727v11

2.08, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 6.15.    *Waiver of Stay or Extension Laws*.  The Company and the Guarantors covenant (to the extent that it may lawfully do so) that they shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture, the Notes, the Collateral Documents or, if applicable, the Intercreditor Agreement; and the Company and the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee or to the Collateral Agent, but shall suffer and permit the execution of every such power as though no such law had been enacted.

# ARTICLE 7
## TRUSTEE AND AGENTS

SECTION 7.01.    *Duties of Trustee and Agents*.  (a) If an Event of Default has occurred and is continuing and a Responsible Officer has written notice thereof, the Trustee shall, prior to the receipt of directions, if any, from the Holders of Required Holders, or such other percentage as permitted by this Indenture, exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b)    Except during the continuance of an Event of Default in the case of the Trustee only, (i) the Trustee and each Agent undertake to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee or any Agent; and (ii) in the absence of bad faith on the part of the Trustee or any Agent, the Trustee or such Agent, as the case may be, may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee or such Agent, as the case may be, and conforming to the requirements of this Indenture.  However, in the case of any certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee or any Agent, the Trustee or such Agent, as the case may be, shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of the mathematical calculations or other facts stated therein).

(c)    The Trustee may not be relieved from liability for its own gross negligence or willful misconduct, except that:

(i)    this Section 7.01(c) does not limit the effect of Section 7.01(b);

66

(ii)    neither the Trustee nor any Agent shall be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Trustee or such Agent, as the case may be, was grossly negligent in ascertaining the pertinent facts; and

(iii)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with the direction of the Holders pursuant to Section 6.07 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon it under this Indenture.

(d)    Neither the Trustee nor any Agent shall be liable for interest on any money received by it except as each may agree in writing with the Company.

(e)    Money held in trust by the Trustee or any Agent need not be segregated from other funds except to the extent required by law.

(f)    No provision of this Indenture shall require the Trustee or any Agent to expend or risk its own funds or otherwise incur personal or financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds and/or adequate indemnity against such risk or liability is not satisfactorily assured to it.

SECTION 7.02.    *Rights of Trustee*.  (a) The Trustee and each Agent may rely upon, and shall be protected in acting or refraining from acting based upon, any document (whether in its original or facsimile form) believed by it to be genuine and to have been signed or presented by the proper Person.  Neither the Trustee nor any Agent need investigate any fact or matter stated in any such document.

(b)    Before the Trustee or any Agent acts or refrains from acting, it may require an Officers' Certificate, the written advice of a qualified expert or an Opinion of Counsel.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officers' Certificate, the qualified expert's written advice or Opinion of Counsel.

(c)    The Trustee or any Agent may act through agents and shall not be responsible for the willful misconduct or negligence of any agent appointed with due care.

(d)    Any request, direction, order or demand of any of the Company or any Guarantor mentioned herein shall be sufficiently evidenced by an Officers' Certificate of the Company or such Guarantor, as applicable (unless other evidence in respect thereof be herein specifically prescribed); and any Board Resolution may be evidenced to the Trustee or any Agent by copies thereof certified by the Secretary or an Assistant Secretary (or equivalent officer) of the Company or such Guarantor, as applicable.

(e)    Neither the Trustee nor any Agent shall be under an obligation to exercise any of the trusts or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered to the Trustee or such Agent security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred thereby.

#93484727v11

(f)    Neither the Trustee nor any Agent shall be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided* that the conduct of the Trustee or any such Agent does not constitute willful misconduct, gross negligence as determined in a final nonappealable decision by a court of competent jurisdiction.

(g)    Each of the Trustee and any Agent may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(h)    Neither the Trustee nor any Agent shall be bound to make any investigation into, and may conclusively rely upon, the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document unless, in the case of the Trustee, requested in writing by the Holders of not less than a majority in aggregate principal amount of the Outstanding Notes; *provided* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not satisfactorily assured to the Trustee, the Trustee may require from the Holders indemnity or security satisfactory to the Trustee against such expenses or liabilities as a condition to proceeding. The reasonable expenses of every such investigation shall be paid by the Company and any related fees, costs or expense of the Trustee, shall be reimbursed by the Company upon demand.

(i)    Neither the Trustee nor any Paying Agent shall be required to invest, or shall be under any liability for interest, on any moneys at any time received by it pursuant to any of the provisions of this Indenture or the Notes except as the Trustee or any Paying Agent may otherwise agree with the Company.

(j)    In no event shall the Trustee or any Agent be liable for special, indirect, consequential or punitive loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee or such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)    The permissive rights of the Trustee and the Agents enumerated herein shall not be construed as duties of the Trustee or any Agent.

(l)    The Trustee shall have the right to accept and act upon instructions, including funds transfer instructions ("**Instructions**") given pursuant to this Indenture and delivered using Electronic Means; *provided*, however, that the Company shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such Instructions ("**Authorized Officers**") and containing specimen signatures of such Authorized Officers, which incumbency certificate shall be amended by the Company whenever a person is to be added or deleted from the listing. If the Company elects to give the Trustee Instructions using Electronic Means and the Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such Instructions shall be deemed controlling. The Company understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions and

#93484727v11

that the Trustee shall conclusively presume that directions that purport to have been sent by an Authorized Officer listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Officer.  The Company shall be responsible for ensuring that only Authorized Officers transmit such Instructions to the Trustee and that the Company and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords and/or authentication keys upon receipt by the Company.  The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction. The Company agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Company; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder and under any Collateral Document, each Agent, and each agent, custodian and other Person employed to act hereunder or any of the Collateral Documents.

(n)    The Trustee may at any time request, and the Company and the Guarantors shall, deliver an Incumbency Certificate setting forth the specimen signatures and the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture, which Incumbency Certificate may be signed by any Person authorized to sign an Officers' Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(o)    To the extent that the consent or authorization of the Central Bank or any other Brazilian regulatory authority is required for performance by any of the Company or the Guarantors under the Notes, the respective Note Guaranty, the Collateral Documents or this Indenture, none of the Trustee, the Collateral Agent, or any Agent shall have any duty or obligation to determine whether such approval, consent or authorization is required or any duty or obligation to obtain such consent.  The Company shall notify the Trustee, the Collateral Agent and the Agents  in writing if the approval, consent or authorization of the Central Bank or such other regulatory authority, as applicable, is required for performance by any of the Company or the Guarantors under the Notes, the respective Note Guaranty, the Collateral Documents or this Indenture and whether or not such consent has been obtained by the Company.

(p)    To the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

#93484727v11

(q)      The Trustee shall not be under any obligation to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture of the Company or Guarantors or any Collateral Document, or to inspect the properties, books or records of the Company or any other Person.

(r)      The Trustee shall accept without investigation, requisition or objection such right and title as the Company, or its affiliates, may have to any of the Collateral and shall not be bound or concerned to examine or enquire into or be liable for any defect or failure in the right or title of the Company, or its affiliates, to the Collateral or any part thereof, whether such defect or failure was known to the Trustee or might have been discovered upon examination or enquiry and whether capable of remedy or not, and shall have no responsibility for the validity, value or sufficiency of the Collateral.

(s)      The Trustee is not assuming any obligation under any agreement it is not a party to. No action by the Trustee shall be interpreted as being an agreement to assume, or an assumption of, any obligation under any such other agreement.

(t)      Without limiting actions to be taken in accordance with the written direction of the Required Holders during an Event of Default, by directing the Collateral Agent to take action, the Trustee shall have no duty or obligation to take any enforcement action outside of the United States.

(u)      The Trustee shall not be under any duty to take any discretionary action permitted to be taken by it pursuant to the provisions of this Indenture with respect to the Collateral unless it shall be requested in writing to do so by the Required Holders.

(v)      In connection with any enforcement of Collateral, the Trustee is not responsible for:

(i)      any failure of the Collateral Agent or any other Person to enforce such Collateral within a reasonable time or at all;

(ii)      any failure of the Collateral Agent or any other Person to pay over the proceeds of enforcement of the Collateral;

(iii)      any failure of the Collateral Agent or any other Person to realize such Collateral for the best price obtainable;

(iv)      monitoring activities of the Collateral Agent or any other Person in relation to such enforcement;

(v)      taking any enforcement action itself in relation to the Collateral; or

(vi)      paying any fees, costs or expenses of the Collateral Agent or any other Person.

SECTION 7.03.    *Individual Rights of Trustee*.   The Trustee and any Agent, or any other agent of the Company or of the Trustee, in its individual or any other capacity, may become the

#93484727v11

owner or pledgee of Notes and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee, Agent, or such other agent.

SECTION 7.04.    *Trustee's Disclaimer*.  Neither the Trustee nor any Agent shall be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes, and it shall not be responsible for any statement in the Private Placement Memorandum, this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than, with respect to the Trustee, the Trustee's certificate of authentication.

SECTION 7.05.    *Notice of Defaults and Events of Default*.  If a Default or Event of Default occurs and is continuing, and if it is known to the Responsible Officer, the Trustee shall give notice to each Holder in accordance with Section 11.02 of the Default or Event of Default within 90 days after a Responsible Officer acquires actual knowledge of such Default or Event of Default.  Except in the case of a Default or Event of Default in payment of principal of or interest on any Note, the Trustee may withhold the notice and shall be protected from withholding the notice if and so long as a committee of its Responsible Officers of the Trustee in good faith determines that withholding the notice is in the interests of Holders.  For all purposes of this Indenture and the Notes, the Trustee shall not be deemed to have knowledge of a Default or Event of Default or knowledge of any cure of a Default or Event of Default unless a Responsible Officer of the Trustee with direct responsibility for this Indenture has received a written notice of such Default or Event of Default from the Company, the Guarantors or any Holder.

SECTION 7.06.    *Compensation and Indemnity*.  The Company agrees to pay to the Trustee and each Agent from time to time such compensation as shall be agreed upon in writing for its services.  The Trustee's compensation shall not be limited by any law regarding compensation of a trustee of an express trust.  The Company agrees to advance/reimburse promptly the Trustee and each Agent upon request for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's and each Agent's agents, counsel, accountants and experts.  Payments of any such expenses by the Company to the Trustee or any Agent, as the case may be, shall be made free and clear of and without withholding or deduction for or on account of any present or future taxes, duties, assessments, fees or other governmental charges of whatever nature (and any fines, penalties or interest related thereto) imposed or levied by or on behalf of Brazil, Luxembourg or any political subdivision or authority thereof or therein having power to tax or any other jurisdiction in which the Company or any of the Guarantors is organized, doing business or otherwise subject to the power to tax, unless such withholding or deduction is required by law. In that event, the Company shall pay to the Trustee or Agent, as the case may be, such additional amounts as may be necessary in order that every net payment made by the Company to the Trustee or such Agent, as the case may be, after deducting or withholding for or on account of any present or future tax, duty, assessment, fee or other governmental charge imposed upon or as a result of such payment by Brazil, Luxembourg or any political subdivision or taxing authority thereof or therein or any other jurisdiction in which the Company or any of the Guarantors is organized, doing business or otherwise subject to the power to tax shall not be less than the amount then due and payable to the Trustee or such Agent, as the case may be. Each of the Company and the Guarantors, jointly and severally, shall indemnify and hold each of

71

#93484727v11

the Trustee and each Agent harmless for, from and against any and all damage, loss, liability, cost, claim or expense (including reasonable attorneys' fees and expenses) incurred by it without willful misconduct or gross negligence on its part as determined by a final and non-appealable judgment of a court of competent jurisdiction arising out of and in connection with the administration of this Indenture, the performance of its respective duties hereunder, and the exercise of its rights hereunder including, without limitation, the costs and expenses of defending itself against any claim or liability, enforcing this Indenture (including its indemnity rights) and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture.  Each of the Company and the Guarantors, jointly and severally, undertakes to indemnify the Trustee and each of the Agents and their Affiliates against all damages, losses, liabilities, costs, claims and expenses including any and all tax liabilities (other than with respect to taxes imposed on net income) and associated penalties, costs, claims, actions, damages, expenses or demands which any of them may incur or which may be made against any of them as a result of or in connection with the appointment of or the exercise of the powers and duties or rights by the Trustee or any Agent or its affiliates under this Indenture, except as may result from its own willful misconduct or gross negligence or that of its directors, officers or employees or any of them, in each case as determined by a final and non-appealable judgment of a court of competent jurisdiction.  The Trustee and each Agent shall notify the Company promptly of any claim for which it may seek indemnity.  Failure by the Trustee or such Agent to so notify the Company shall not relieve the Company of its obligations hereunder.

To secure the payment obligations of the Company in this Section 7.06, the Trustee shall have a lien prior to the Notes on all money or property held or collected by the Trustee or any Paying Agent, except that held in trust to pay principal of and interest on particular Notes.

The obligations of the Company pursuant to this Section 7.06 shall survive the payment of the Notes, resignation or removal of the Trustee or any Agent and the satisfaction and discharge of this Indenture.  When the Trustee incurs expenses after the occurrence of a Default or Event of Default specified in Section 6.01(i), (j) or (k), the expenses are intended to constitute expenses of administration under any bankruptcy law.

The Company acknowledges that none of the Trustee, the Collateral Agent or any other Agent makes any representations as to the interpretation or characterization of the transactions herein undertaken for tax or any other purpose, in any jurisdiction.  The Company represents that it has fully satisfied itself as to any tax impact of this Indenture before agreeing to the terms herein, and is responsible for any and all federal, state, local, income, franchise, withholding, value added, sales, use, transfer, stamp or other taxes imposed by any jurisdiction in respect of this Indenture.

The Company agrees to pay any and all present and future stamp, issue, registration, court or other documentary taxes or duties or any excise or property taxes, charges or similar levies (including any penalties, interest and other liabilities relating thereto) which may be payable in connection with the execution, delivery, performance and enforcement of this Indenture by the Trustee, the Collateral Agent or any Agent.

SECTION 7.07.    *Replacement of Trustee*.   The Trustee may resign at any time by so notifying the Company in writing.   The Holders of a majority in principal amount of the Outstanding Notes may remove the Trustee by so notifying the Trustee in writing and may appoint a successor Trustee.   The Company shall remove the Trustee if:

      (i)      the Trustee fails to comply with Section 7.09;

      (ii)      the Trustee is adjudged a bankrupt or insolvent;

      (iii)      a receiver or other public officer takes charge of the Trustee or its property; or

      (iv)      the Trustee otherwise becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee) the Company shall promptly appoint a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Company.   Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.   The successor Trustee shall give a notice of its succession to Holders and the Collateral Agent.   The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the lien provided for in Section 7.06.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company or the Holders of a majority in principal amount of the Outstanding Notes may appoint a successor or petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee fails to comply with Section 7.09, any Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

Notwithstanding the replacement of the Trustee pursuant to this Section 7.07, the obligations of the Company and the Guarantors under Section 7.06 shall continue for the benefit of the retiring Trustee.

SECTION 7.08.    *Successor Trustee by Merger*.   If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business (including this transaction) or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes in the name of the successor to the Trustee; and in all such cases such

#93484727v11

adopted certificates shall have the full force of all provisions within the Notes or in this Indenture relating to the certificate of the Trustee.

SECTION 7.09.    *Eligibility; Disqualification*.  The Trustee hereunder shall at all times be a corporation, bank or trust company organized and doing business under the laws of the United States or any state thereof (i) which is authorized under such laws to exercise corporate trust power, (ii) is subject to supervision or examination by governmental authorities, (iii) shall have at all times a combined capital and surplus of at least U.S.$50,000,000 as set forth in its most recent published annual report of condition and (iv) shall have a Corporate Trust Office in The City of New York.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 7.09, it shall resign immediately in the manner and with the effect specified in Section 7.07.

SECTION 7.10.    *Patriot Act*. The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act (the  "**Patriot Act**"), the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the Patriot Act.

## ARTICLE 8
### DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01.    *Discharge of Liability on Notes*.  (a) When (i) any of the Company or the Guarantors delivers to the Trustee all Outstanding Notes (other than Notes replaced pursuant to Section 2.08) for cancellation or (ii) all Outstanding Notes have become due and payable and the Company or the Guarantors deposit in trust, for the benefit of the Holders, with the Trustee finally collected funds sufficient to pay on the Maturity Date all Outstanding Notes and interest thereon (other than Notes replaced pursuant to Section 2.08) and if in any such case any of the Company or the Guarantors pays all other sums payable hereunder by the Company and the Guarantors, then this Indenture, and the obligations of the Company and the Guarantors pursuant hereto, shall, subject to Section 8.01(c) and 8.06, cease to be of further effect.  The Trustee shall acknowledge satisfaction and discharge of this Indenture on written demand of the Company or the Guarantors accompanied by an Officers' Certificate and an Opinion of Counsel (each stating that all conditions precedent herein provided relating to the satisfaction and discharge of this Indenture have been complied with) and at the cost and expense of the Company or the Guarantors.

(b)    Subject to Section 8.01(c), Section 8.02 and 8.06, any of the Company or the Guarantors at any time may terminate (i) all its obligations under this Indenture and the Notes ("**legal defeasance option**") or (ii) its obligations under Section 4.07,  4.09, and 5.01(iii) and the operation of Section 6.01(e) (with respect to such Section 4.07, 4.09, and 5.01(iii)), Section 6.01(g) and 6.01(h) ("**covenant defeasance option**").  The legal defeasance option may be exercised notwithstanding any prior exercise of the covenant defeasance option.  Upon exercise by the Company or the Guarantors of the legal defeasance option or the covenant defeasance option, the Guarantors' obligations under the respective Note Guaranty will terminate.

#93484727v11

If the legal defeasance option is exercised, payment of the Notes may not be accelerated because of an Event of Default with respect thereto.  If the covenant defeasance option is exercised, payment of the Notes may not be accelerated because of an Event of Default specified in Section 6.01(c) (with respect to such Section 4.07, 4.09, and 5.01(iii)), Section 6.01(g) or 6.01(h).

Upon satisfaction of the conditions set forth herein and upon written request of the Company or the Guarantors, the Trustee shall acknowledge in writing the discharge of the obligations of the Company or the Guarantors hereunder except those specified in Section 8.01(c).

(c)    Notwithstanding Section 8.01(a) and Section 8.01(b), Sections 2.03, 2.04, 2.05, 2.06, 2.07, 2.08, 4.06, 7.06, 7.07, 8.03, 8.04, 8.05, 8.06 and Section 12.04 shall survive until the Notes Obligations have been paid in full.  Thereafter, the obligations of the Company or the Guarantors pursuant to Sections 7.06, 7.07, 8.04, 8.05 and Section 12.04 shall survive. Furthermore, the Guarantors' obligations to pay fully and punctually all amounts payable by the Company or the Guarantors to the Trustee and the Collateral Agent under this Indenture shall survive.

SECTION 8.02.    *Conditions to Defeasance*.  The Company or the Guarantors may exercise the legal defeasance option or the covenant defeasance option only if:

(a)    any of the Company or the Guarantors irrevocably deposits or causes to be deposited with the Trustee as trust funds in trust, specifically pledged as security for, and dedicated solely to, the benefit of the Holders (the "**defeasance trust**"), money or U.S. Government Obligations, or a combination thereof, sufficient for the payment of principal of and interest on all the Notes to the Maturity Date or redemption;

(b)    any of the Company or the Guarantors delivers to the Trustee a certificate from an internationally recognized firm of independent public accountants expressing their opinion that the deposited money and/or U.S. Government Obligations, without consideration of reinvestment and after payment of all federal, state and local taxes or other charges or assessments in respect thereof payable by the Trustee, shall provide cash at such times and in such amounts as shall be sufficient to pay principal of and interest on all the Notes when due to the Maturity Date or on redemption, as the case may be;

(c)    123 days pass after the deposit is made in accordance with the terms of Section 8.02(a) and during such 123-day period no Default or Event of Default specified in Section 6.01(i), (j) or (k) occurs which is continuing at the end of the period;

(d)    no Default or Event of Default has occurred and is continuing on the date of the deposit and after giving effect thereto;

(e)    the deposit does not constitute a default or event of default under any other agreement binding on the Company or the Guarantors;

(f)    any of the Company or the Guarantors delivers to the Trustee an Opinion of Counsel to the effect that the trust resulting from the deposit does not constitute, or is not

#93484727v11

qualified as, a regulated investment company under the U.S. Investment Company Act of 1940, as amended;

(g)    in the case of the legal defeasance option, the Company delivers to the Trustee Luxembourg and Brazilian Opinions of Counsel to the effect that the beneficial owners of the outstanding Notes will not recognize income, gain or loss for Luxembourg or Brazilian federal income tax purposes, as the case may be, as a result of such legal defeasance and will be subject to Luxembourg or Brazilian federal  income tax, as the case may be, on the same amounts, in the same manner, and at the same times as would have been the case if such defeasance had not occurred, and an U.S. Opinion of Counsel stating that: (x) the Company has received from, or there has been published by, the U.S. Internal Revenue Service a ruling or (y) since the Issue Date, there has been a change in applicable U.S. federal income tax law, in either case to the effect that (and based thereon such Opinion of Counsel shall confirm that) the beneficial owners of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such defeasance had not occurred;

(h)    in the case of the covenant defeasance option, the Company delivers to the Trustee Luxembourg and Brazilian Opinions of Counsel to the effect that the beneficial owners of the Outstanding Notes will not recognize income, gain or loss for U.S., Luxembourg or Brazilian federal income tax purposes, as the case may be, as a result of such covenant defeasance and will be subject to U.S., Luxembourg or Brazilian federal income tax, as the case may be, on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred;

(i)    any of the Company or the Guarantors delivers to the Trustee an Opinion of Counsel of recognized standing with respect to Brazilian tax matters and Opinions of Counsel of recognized standing with respect to tax matters of any other jurisdiction in which the Company is conducting business in a manner which causes the beneficial owners of the Notes to be liable for taxes on payments under the Notes for which they would not have been so liable but for such conduct of business in such other jurisdiction, stating that the beneficial owners will not recognize income, gain or loss in the relevant jurisdiction as a result of such deposit and the defeasance and will be subject to taxes in the relevant jurisdiction (including any withholding taxes) on the same amount and in the same manner and at the same times as would otherwise have been the case if such deposit and defeasance had not occurred;

(j)    any of the Company or the Guarantors delivers to the Trustee an Opinion of Counsel, in form and substance reasonably satisfactory to Trustee, to the effect that, after the passage of 123 days following the deposit, the trust funds shall not be subject to any applicable bankruptcy, insolvency, reorganization or similar law affecting creditors' rights generally; and

(k)    any of the Company or the Guarantors delivers to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes as contemplated by this Article 8 have been complied with.

#93484727v11

Before or after a deposit, the Company or the Guarantors may make arrangements satisfactory to the Trustee for the redemption of Notes at a future date in accordance with Article 3.

SECTION 8.03.   *Application of Trust Money*.  The Trustee shall hold in trust money and/or U.S. Government Obligations deposited with it pursuant to Section 8.01 or 8.02.  It shall apply the deposited money and the money from U.S. Government Obligations through the Principal Paying Agent or Paying Agents and in accordance with this Indenture to the payment of principal of and interest on the Notes.

SECTION 8.04.   *Repayment to Company*.  Upon termination of the trust established pursuant to Section 8.02, the Trustee and each Paying Agent shall promptly pay to the Company upon written request, any excess cash or U.S. Government Obligations held by them.

SECTION 8.05.   *Indemnity for U.S. Governmental Obligations.*  The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

SECTION 8.06.   *Reinstatement*.  If the Trustee or any Paying Agent is unable to apply any money and/or U.S. Government Obligations in accordance with this Article 8 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the obligations of the Company and the Guarantors under this Indenture, the Notes and the respective Note Guaranty shall be revived and reinstated as though no deposit had occurred pursuant to this Article 8 until such time as the Trustee or such Paying Agent is permitted to apply all such money and/or U.S. Government Obligations in accordance with this Article 8; *provided*, *however*, that, if any of the Company or the Guarantors has made any payment of principal of or interest on any Notes because of the reinstatement of its obligations, the Company and the Guarantors shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money and/or U.S. Government Obligations held by the Trustee or such Paying Agent.

## ARTICLE 9
### AMENDMENTS

SECTION 9.01.   *Without Consent of Holders*.  The Company, when authorized by a Board Resolution, the Guarantors, the Trustee and the Collateral Agent, as applicable, may amend or supplement this Indenture, the Notes, the Collateral Documents and, if applicable, the Intercreditor Agreement without notice to or consent or vote of any Holder for the following purposes:

(i)      to cure any ambiguity, omission, defect or inconsistency;

(ii)     to add guarantees or collateral with respect to the Notes;

(iii)    to comply with Section 5.01;

#93484727v11

(iv)    to add to the covenants of the Company or the Guarantors for the benefit of the Holders;

(v)    to surrender any right herein conferred upon the Company or the Guarantors;

(vi)    to evidence and provide for the acceptance of an appointment by a successor Trustee;

(vii)    to provide for the issuance of Additional Notes;

(viii)    to allow for a Substituted Debtor, as described under Section 5.03;

(ix)    to provide for any guarantee or collateral of the Notes, to secure the Notes or to confirm and evidence the release, termination or discharge of any Note Guaranty or collateral of the Notes when the release, termination or discharge is permitted by this Indenture, the Collateral Documents or, if applicable, the Intercreditor Agreement, as the case may be; or

(x)    to make any other change that does not materially and adversely affect the rights of any Holder or to conform this Indenture to the section "Description of Notes" in the Private Placement Memorandum;

*provided* that, the Company has delivered to the Trustee and the Collateral Agent (if the Collateral Agent is a party thereto) an Opinion of Counsel and an Officers' Certificate, each stating that such amendment or supplement complies with the provisions of this Section 9.01.

Upon the written request of the Company, accompanied by a Board Resolution authorizing the execution of any supplemental indenture, and upon receipt by the Trustee and the Collateral Agent (if the Collateral Agent is a party thereto) of the documents described in Section 9.05, the Trustee and the Collateral Agent (if the Collateral Agent is a party thereto) shall join with the Company and the Guarantors in the execution of such supplemental indenture and to make any further appropriate agreements and stipulations which may be therein contained, but the Trustee and the Collateral Agent shall not be obligated to enter into any such supplemental indenture which affects its own rights, duties or immunities under this Indenture or otherwise.

The Guarantors must consent to any amendment or supplement hereunder.

SECTION 9.02.    *With Consent of Holders*.  Except as specified in Section 9.01, the Company, when authorized by a Board Resolution, the Guarantors, the Trustee and the Collateral Agent, as applicable, together, may amend or supplement this Indenture, the Notes, the Collateral Documents or, if applicable, the Intercreditor Agreement with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture, the Notes, the Collateral Documents or, if applicable, the Intercreditor Agreement or modifying in any manner the rights of the Holders under this Indenture, the Notes, the Collateral Documents or, if applicable, the Intercreditor Agreement and the Holders of at least a majority in principal amount of the Outstanding Notes may, except as set forth below, waive any past

#93484727v11

Default or Event of Default or compliance with any provision of this Indenture; *provided*, *however*, that, without the consent of each Holder affected, an amendment or waiver may not:

(i)     reduce the principal amount of or change the Stated Maturity of any payment on any Note;

(ii)    reduce the rate of interest on any Note;

(iii)   reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed;

(iv)    reduce the amount payable or change the time of payment of any amount specified in Section 4.21;

(v)     change the currency for payment of principal of, or interest or any Additional Amounts on, any Note;

(vi)    make any change in the provisions of this Indenture relating to the contractual rights of Holders of Notes expressly set forth in this Indenture to institute suit for the enforcement of any right to payment on or with respect to any Note;

(vii)   make any change in the provisions of this Indenture relating to waivers of a Default or Event of Default in payment of principal of and interest on the Notes;

(viii)  reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver;

(ix)    make any change in this first paragraph of this Section 9.02;

(x)     modify or change any provision of this Indenture affecting the ranking of the Notes or any Note Guaranty in a manner adverse to the Holders; or

(xi)    make any change in any Note Guaranty that would adversely affect the Noteholders.

In addition, notwithstanding the foregoing, without the consent of the Holders of at least 66⅔% in aggregate principal amount of Outstanding Notes, no amendment, supplement or waiver may release all or substantially all of the Collateral unless otherwise provided in this Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement.

Upon the written request of the Company, accompanied by a Board Resolution authorizing the execution of any such supplemental indenture, and upon the filing with the Trustee of evidence of the consent of the Holders as aforesaid, and upon receipt by the Trustee and the Collateral Agent (if the Collateral Agent is a party thereto) of the documents described in Section 9.05 hereof, the Trustee shall join (and shall instruct the Collateral Agent to join (if the Collateral Agent is a party thereto)), with the Company and the Guarantors in the execution of such supplemental indenture but the Trustee and the Collateral Agent shall not be obligated to

#93484727v11

enter into any such supplemental indenture which affects its own rights, duties or immunities under this Indenture or otherwise.

The Company shall give to Holders prior written notice of any amendment or waiver proposed to be adopted under this Section 9.02.

It shall not be necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment or waiver under this Section 9.02 becomes effective, the Company shall give to Holders a notice briefly describing such amendment or waiver.  The failure to give such notice to all Holders, or any defect therein, shall not impair or affect the validity of an amendment or waiver under this Section 9.02.

The Guarantors must consent to the amendment, supplement or waiver under this Section 9.02.

SECTION 9.03.    *Revocation and Effect of Consents and Waivers*.  (a) A consent to an amendment or a waiver by a Holder of Notes shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Trustee receives the written notice of revocation at least one Business Day prior to the date the amendment or waiver becomes effective.  After it becomes effective, an amendment or waiver shall bind every Holder.

(b)          The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above in accordance with Section 1.05(e). No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.04.    *Notation on or Exchange of Notes*.  If an amendment changes the terms of a Note, the Company may require the Holder to deliver the Note to the Trustee.  If so instructed by the Company, the Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the Holder.  Alternatively, if the Company so determines, the Company in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment.

SECTION 9.05.    *Trustee to Sign Amendments*.  The Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment, waiver or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. In signing any amendment, waiver or supplement, the Trustee and the Collateral Agent shall be entitled to receive indemnity or security satisfactory to the Trustee and the Collateral Agent, respectively, and to receive, and shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel as conclusive evidence that such amendment, waiver or supplemental indenture is authorized or permitted by this Indenture, that it is not inconsistent herewith, and that it shall be valid and

binding upon the Company in accordance with its terms. No amendment, waiver or supplement of this Indenture, the Intercreditor Agreement, the Collateral Documents, the Notes or the Note Guarantees shall affect the rights, duties, immunities or obligations of the Collateral Agent without the consent of the Collateral Agent.

SECTION 9.06.    *Payment for Consent*.    Neither the Company nor any of its Affiliates shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid or agreed to be paid to all Holders which so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

## ARTICLE 10
### NOTE GUARANTIES

SECTION 10.01.    *The Note Guaranties*.    Subject to the provisions of this Article, GLAI and GLA hereby irrevocably and unconditionally guarantee, on a secured basis, the full and punctual payment (whether at Stated Maturity upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other amounts payable by the Company under this Indenture; *provided, however,* that upon release of the Collateral in accordance with Section 4.14 GLA and GLAI shall guarantee, on a unsecured basis, the full and punctual payment (whether at Stated Maturity upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other amounts payable by the Company under this Indenture.  Upon failure by the Company to pay punctually any such amount, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Indenture.

SECTION 10.02.    *Guaranty Unconditional*.    The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

    (i)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Company under this Indenture or any Note, by operation of law or otherwise;

    (ii)    any modification or amendment of or supplement to this Indenture or any Note;

    (iii)    any change in the corporate existence, structure or ownership of the Company, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Company or its assets or any resulting release or discharge of any obligation of the Company contained in this Indenture or any Note;

    (iv)    the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Company, the Trustee or any other Person, whether in

81

connection with this Indenture or any unrelated transactions; *provided* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(v)     any invalidity or unenforceability relating to or against the Company for any reason of this Indenture or any Note, or any provision of applicable law or regulation purporting to prohibit the payment by the Company of the principal of or interest on any Note or any other amount payable by the Company under this Indenture; or

(vi)    any other act or omission to act or delay of any kind by the Company, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantors' obligations hereunder.

SECTION 10.03.   *Discharge; Reinstatement*.   The Guarantors' obligations hereunder will remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Company under this Indenture have been paid in full.   If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Company under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Company or otherwise, the Guarantors' obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.

SECTION 10.04.   *Waiver by the Guarantors*.   Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company or any other Person.

SECTION 10.05.   *Subrogation and Contribution*.   Upon making any payment with respect to any obligation of the Company under this Article, the Guarantor making such payment will be subrogated to the rights of the payee against the Company with respect to such obligation; *provided* that such Guarantor may not enforce either any right of subrogation, or any right to receive payment in the nature of contribution, or otherwise, from the other Guarantor, with respect to such payment so long as any amount payable by the Company hereunder or under the Notes remains unpaid.

SECTION 10.06.   *Stay of Acceleration*.   If acceleration of the time for payment of any amount payable by the Company under this Indenture or the Notes is stayed upon the insolvency, bankruptcy or reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Guarantors hereunder forthwith on demand by the Trustee or the Holders.

SECTION 10.07.   *Limitation on Amount of Guaranty*.   Notwithstanding anything to the contrary in this Article, each of the Guarantors, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guaranty of each Guarantor not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.   To effectuate that intention, the Trustee, the Holders and

82

each of the Guarantors hereby irrevocably agree that the obligations of each Guarantor under its respective Note Guaranty are limited to the maximum amount that would not render the Guarantors' obligations subject to avoidance under applicable fraudulent conveyance provisions of the laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.

SECTION 10.08.  *Execution and Delivery of Guaranty*.  The execution by each of the Guarantors of this Indenture evidences the respective Note Guaranty of each Guarantor, whether or not the person signing as an Officer of such Guarantor still holds that office at the time of authentication of any Note.  The delivery of any Note by the Trustee after authentication constitutes due delivery of the Note Guaranty set forth in this Indenture on behalf of the Guarantor.

SECTION 10.09.  *Release of Guaranty*.  The Note Guaranty of each of the Guarantors will terminate upon:

(i)      a sale or other disposition (including by way of consolidation or merger) of the Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor (in each case other than to the Company or a Subsidiary) otherwise permitted by this Indenture;

(ii)      if the Note Guaranty was required pursuant to the terms of this Indenture, the cessation of the circumstances requiring the Note Guaranty; or

(iii)      defeasance or discharge of the Notes, as provided in Article 8.

Upon delivery by the Company to the Trustee of an Officers' Certificate and an Opinion of Counsel to the effect that all of the conditions to the release and termination of the Note Guaranty have been satisfied, the Trustee will execute any documents reasonably requested by the Company in writing in order to evidence the release of the Guarantor from its obligations under its Note Guaranty.

## ARTICLE 11
### MISCELLANEOUS

SECTION 11.01.  *Provisions of Indenture and Notes for the Sole Benefit of Parties and Holders of Notes*.  Nothing in this Indenture or the Notes, expressed or implied, shall give to any Person other than the parties hereto and their successors hereunder and the Holders of the Notes any benefit or any legal or equitable right, remedy or claim under this Indenture or the Notes.

SECTION 11.02.  *Notices*.  Any request, demand, authorization, direction, notice, consent, waiver or other communication or document provided or permitted by this Indenture to be made upon, given, provided or furnished to, or filed with, any party to this Indenture shall, except as otherwise expressly provided herein, be in English and writing and shall be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier, telecopier, facsimile or electronic transmission, addressed to the relevant party as follows:

*To the Company and the Guarantors:*

#93484727v11

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attention: Richard F. Lark Jr.
Facsimile: 55-11-5098-7881
Email: rfl@voegol.com.br

With a copy to:
Milbank LLP
Av. Brigadeiro Faria Lima, 4100, 5th Floor
04538-132 – São Paulo, SP
Brasil
Attention: Tobias Stirnberg
Facsimile: 55 11 3927-7702
Email: tstirnberg@milbank.com

*To the Trustee, Registrar, Transfer Agent or Paying Agent:*

The Bank of New York Mellon
Corporate Trust Administration- Global Finance Unit
240 Greenwich Street, 7E
New York, New York 10286
USA
Attention: RM for Gol Finance

*To the Collateral Agent:*

TMF Brasil Administração e Gestão de Ativos Ltda.
Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré,
Barueri –SP, 06460-110, Brazil
São Paulo, SP, Brazil
Attention: Danilo Oliveira / Karla Fernandes
Email: Danilo.Oliveira@tmf-group.com; karla.fernandes@tmf-group.com

Notices or communications to the Company will be deemed given if given to GLAI. All notices to the Trustee and the Collateral Agent shall be deemed delivered upon the Trustee's or Collateral Agent's, respectively, actual receipt thereof.

Any party by written notice to the other parties may designate additional or different addresses for subsequent notices or communications.

Where this Indenture provides for the giving of notice to Holders, such notice shall be deemed to have been given upon (1) in the event of Notes, the mailing of first class mail, postage prepaid, of such notice to Holders of the Notes at their registered addresses as recorded in the Register or (2) in the event of Notes, to the Depositary in accordance with its applicable procedures.

84

#93484727v11

The Company shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law, including, without limitation, those required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 11.03.  *Officers' Certificate and Opinion of Counsel as to Conditions Precedent*.  Upon any request or application by the Company to the Trustee or the Collateral Agent to take or refrain from taking any action under this Indenture or the Collateral Documents, the Company shall furnish to the Trustee or the Collateral Agent, as applicable:

(i)      an Officers' Certificate in form and substance reasonably satisfactory to the Trustee or the Collateral Agent (which shall include the statements set forth in Section 11.04) stating that, in the opinion of the signers, all covenants and conditions precedent, if any, provided for in this Indenture and the Collateral Documents relating to the proposed action have been complied with; and

(ii)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee or the Collateral Agent (which shall include the statements set forth in Section 11.04) stating that, in the opinion of such counsel, all such covenants and conditions precedent have been complied with.

SECTION 11.04.  *Statements Required in Officers' Certificate or Opinion of Counsel*.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture or the Collateral Documents shall include substantially:

(i)      a statement that each Person making or rendering such Officers' Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(ii)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officers' Certificate or Opinion of Counsel are based;

(iii)    a statement that, in the opinion of each such Person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(iv)    a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with.

SECTION 11.05.  *Rules by Trustee, Registrar, Paying Agent and Transfer Agents*.  The Trustee may make reasonable rules for action by or a meeting of Holders.  The Registrar, the Paying Agents and the Transfer Agents may make reasonable rules for their functions.

#93484727v11

SECTION 11.06.  *Currency Indemnity*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with this Indenture, the Notes and the Note Guaranties, including damages.  Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by any Person in respect of any sum expressed to be due to it from the Company or the Guarantors in connection with this Indenture, the Notes and the Note Guaranties will only constitute a discharge to the Company or the Guarantors, as the case may be, to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient, the Company and the Guarantors shall indemnify such recipient against any loss sustained by it as a result, and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient will be deemed to have agreed to repay such excess.  In any event, the Company and the Guarantors shall indemnify the recipient against the cost of making any such purchase.

For the purposes of this Section 11.06, it shall be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).  These indemnities constitute a separate and independent obligation from the other obligations of the Company and the Guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder of a Note and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note.

SECTION 11.07.  *No Recourse Against Others*.  No director, officer, employee or shareholder, as such, of the Company, the Guarantors, the Collateral Agent or the Trustee shall have any liability for any obligations of the Company, the Guarantors, the Collateral Agent or the Trustee, respectively, under this Indenture, the Collateral Documents or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

SECTION 11.08.  *Legal Holidays*.  In any case where any Payment Date shall not be a Business Day, then (notwithstanding any other provision of this Indenture or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Payment Date; *provided* that no interest shall accrue for the period from and after such Payment Date on account of such delay.

#93484727v11

SECTION 11.09.  *Governing Law*.  THIS INDENTURE, THE NOTES AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

The provisions relating to meetings of Holders of the Notes set forth in Articles 470-1 to 470-19 of the Luxembourg Act on commercial companies of August 10, 1915, as amended, shall not apply in respect of the Notes.

SECTION 11.10.  *Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial*. (a) Each of the parties hereto hereby irrevocably submits to the non-exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Indenture, the Notes or the Note Guaranties or any transaction contemplated hereby or thereby (a "**Proceeding**"), and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each of the parties hereto irrevocably waives, to the fullest extent it may do so under applicable law, any objection which it may now or hereafter have to the laying of the venue of any such Proceeding brought in any such court and any claim that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Each of the Company and the Guarantors irrevocably appoints Cogency Global, Inc. (the "**Company and Guarantors Process Agent**"), with an office at 122 East 42nd Street, 18th Floor, New York, NY 10168, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding.  If for any reason such Person shall cease to be such agent for service of process, each of the Company and the Guarantors shall forthwith appoint a new agent of recognized standing for service of process in the State of New York and deliver to the Trustee a copy of the new agent's acceptance of that appointment within 30 days.  The Collateral Agent, at the cost and expense of the Company, irrevocably appoints Cogency Global, Inc. (the "**Collateral Agent Process Agent**"), with an office at 122 East 42nd Street, 18th Floor, New York, NY 10168, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding.  If for any reason such Person shall cease to be such agent for service of process, the Collateral Agent shall forthwith appoint a new agent, at the cost and expense of the Company, of recognized standing for service of process in the State of New York and deliver to the Trustee a copy of the new agent's acceptance of that appointment within 30 days.

(a)      Each of the Company and the Guarantors hereby irrevocably appoints the Company and Guarantors Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York.  Such service shall be made by delivering by hand a copy of such process to the Company or the Guarantors, as the case may be, in care of the Company and Guarantors Process Agent at the address specified above.  Each of the Company and the Guarantors hereby irrevocably authorizes and directs the Company and Guarantors Process Agent to accept such service on its behalf.  Failure of the Company and Guarantors Process Agent to give notice to the Company or the Guarantors, as the case may be, or failure of the Company or the Guarantors, as the case may be, to receive notice of such service

87

of process shall not affect in any way the validity of such service on the Company and Guarantors Process Agent, the Company or the Guarantors.  As an alternative method of service, each of the Company and the Guarantors also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Company or Guarantors, as the case may be, at its address specified in Section 11.02 or at any other address previously furnished in writing by the Company or the Guarantors to the Trustee. Each of the Company and the Guarantors covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Company and Guarantors Process Agent above in full force and effect during the term of the Notes, and to cause the Company and Guarantors Process Agent to continue to act as such.

(b)    The Collateral Agent hereby irrevocably appoints the Collateral Agent Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York.  Such service shall be made by delivering by hand a copy of such process to the Collateral Agent, in care of the Collateral Agent Process Agent at the address specified above.  The Collateral Agent hereby irrevocably authorizes and directs the Collateral Agent Process Agent to accept such service on its behalf.  Failure of the Collateral Agent Process Agent to give notice to the Collateral Agent, or failure of the Collateral Agent, to receive notice of such service of process shall not affect in any way the validity of such service on the Collateral Agent Process Agent or the Collateral Agent.  As an alternative method of service, the Collateral Agent also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Collateral Agent, at its address specified in Section 11.02 or at any other address previously furnished in writing by the Collateral Agent to the Trustee. The Collateral Agent covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Collateral Agent Process Agent above in full force and effect during the term of the Notes, and to cause the Collateral Agent Process Agent to continue to act as such.

(c)    Nothing herein shall affect the right of any party (including the Trustee, the Collateral Agent, any Agent or any Holder) to serve process in any other manner permitted by law or to commence legal proceedings or otherwise bring any claim against any other party or its property in any other court of competent jurisdiction.

(d)    Each of the Company and the Guarantors irrevocably agrees that, in any proceedings anywhere (whether for an injunction, specific performance or otherwise), no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such proceedings, from attachment (whether in aid of execution, before judgment or otherwise) of its assets or from execution of judgment shall be claimed by it or on its behalf or with respect to its assets, except to the extent required by applicable law, any such immunity being irrevocably waived, to the fullest extent permitted by applicable law.  Each of the Company and the Guarantors irrevocably agrees that, where permitted by applicable law, it and its assets are, and shall be, subject to such proceedings, attachment or execution in respect of its obligations under this Indenture, the Notes or the Note Guaranties.

(e)     ALL PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY DO SO UNDER APPLICABLE LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES, THE NOTE GUARANTIES OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

SECTION 11.11.  *Successors and Assigns*.  All covenants and agreements of the Company and the Guarantors in this Indenture, the Notes and the Note Guaranties shall bind their respective successors and assigns, whether so expressed or not.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 11.12.  *Multiple Originals*.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be deemed an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture. The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

SECTION 11.13.  *Severability Clause*.  In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  To the extent permitted by applicable law, the parties hereby waive any provision of law which renders any term or provision hereof invalid or unenforceable in any respect.

SECTION 11.14.  *Force Majeure*.  In no event shall the Trustee, the Collateral Agent or any Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder, under the Intercreditor Agreement, or under any Collateral Document arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, governmental actions, pandemics, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee, the Collateral Agent or such Agent, as applicable shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

## ARTICLE 12
### COLLATERAL AGENT

SECTION 12.01.  *Appointment*.  Each of the Secured Parties (other than the Collateral Agent) hereby appoints the Collateral Agent to act on its behalf as the Collateral Agent under this Indenture, the Intercreditor Agreement, and the Collateral Documents to which the Collateral Agent is a party and authorizes the Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to the Collateral Agent by the terms hereof or thereof.  It is understood and agreed that the use of the term "agent" herein, the Intercreditor Agreement, or in any Collateral Documents (or any other similar term) with reference to the Collateral Agent is

not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

SECTION 12.02.  *Exculpatory Provisions*. (a) The Collateral Agent shall have no duties or obligations except those expressly set forth in this Indenture, the Intercreditor Agreement, and the Collateral Documents to which the Collateral Agent is a party, and no duty, liability or obligation shall be inferred or implied against the Collateral Agent. Without limiting the generality of the foregoing provision, (i) the Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (ii) the Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Indenture, the Intercreditor Agreement, or the Collateral Documents that the Collateral Agent is required to exercise as instructed in writing by the Trustee; (iii) except as expressly provided for in this Indenture, the Intercreditor Agreement, or any Collateral Document to which the Collateral Agent is a party, the Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company or any Guarantor or any of their subsidiaries which is communicated to or obtained by the Collateral Agent or any of its affiliates in any capacity; and (iv) the Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Collateral Agent to liability or otherwise contrary to this Indenture, the Intercreditor Agreement, or any Collateral Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect.

(b)      Notwithstanding any other provision of this Indenture, the Intercreditor Agreement, or the Collateral Documents, the Collateral Agent shall not be liable for any action taken or not taken by it (i) with the written consent or at the written request, written instruction or written direction of the Trustee or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

(c)      The Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until written notice describing such event is received by a Responsible Officer of Collateral Agent from the Trustee, referring to this Indenture, the Notes and Default or Event of Default.

(d)      The Collateral Agent shall not be liable for or have any duty to prove or investigate, or otherwise have any obligation or liability with respect to, (i) any representation or

#93484727v11

warranty provided in or with respect to this Indenture, the Intercreditor Agreement, or any Collateral Document, (ii) the contents of any certificate, report or other document delivered under or with respect to this Indenture, the Intercreditor Agreement, or any Collateral Document, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Indenture, the Intercreditor Agreement, or any Collateral Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, efficacy or authenticity of this Indenture, the Intercreditor Agreement, the Collateral Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Indenture, the Intercreditor Agreement, or any Collateral Document, other than to confirm receipt of items expressly required to be delivered to the Collateral Agent.

(e)    The Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other paper considered by it to be authentic and having been signed or sent by a competent Person. The Collateral Agent may also rely on any statement given to it verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The  Collateral Agent may consult with counsel, independent auditors and other experts chosen by the Collateral Agent, at the Company's expense, and shall not be liable for any act performed or not performed by the Collateral Agent in accordance with the advice of any said counsel, auditor or expert.

(f)    The Collateral Agent may fulfill any and all of its duties and exercise its rights and powers by or through any one or more subagents appointed by it. The Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.  The Collateral Agent shall not be responsible for the supervision, negligence or misconduct of any sub-agents that it selects with due care.

(g)    The Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Indenture, the Intercreditor Agreement, the Collateral Documents and the security provided hereunder or thereunder, for the legality, effectiveness or sufficiency of this Indenture, the Intercreditor Agreement, or the Collateral Documents nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Indenture, the Intercreditor Agreement, or the Collateral Documents. For the avoidance of doubt, no provision in this Indenture, the Intercreditor Agreement or any Collateral Document shall require the Collateral Agent to prepare, file or record any financing statements or continuation statements or other instruments or documents, or to be responsible for maintaining the liens and security interests to be created as described in this Indenture and the Collateral Documents, and such responsibility shall be in charge exclusively of the Company. The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Collateral Agent deals with similar property for the account of other customers in similar transactions.  The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

(h)    The Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each

foreign exchange transaction. In order to effect the transfer of any amounts paid under the terms and conditions of this Indenture or any Collateral Document, the Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian *reais*, in the amount specified by the Company or Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Collateral Agent will transfer the amounts in U.S. Dollars according to the instructions provided by the Company or Trustee. The Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Brazilian Business Day after the Brazilian Business Day on which the Collateral Agent receives from the Company or Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Company or Trustee, at most (i) on the 2nd (second) Brazilian Business Day subsequent to the Brazilian Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Brazilian Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil (ROF), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Company or Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Indenture. The Collateral Agent shall not assume any liability to any Person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Indenture or any Collateral Document.

(i)       The Collateral Agent shall not be obligated to spend or put at risk any of its own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Indenture, under the Intercreditor Agreement, or under the Collateral Documents.

(j)       In no event shall the Collateral Agent be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)       The Collateral Agent shall not incur any obligation for failure to perform any act or duty under this Indenture, the Intercreditor Agreement, or any Collateral Document by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

(l)       The Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Collateral Agent's internal policies with respect to embargoes ("**Embargo Rules**"). Violation of

the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The parties expressly agree that the Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section.

(m)    Any and all payments by the Company and/or the Guarantors to or for the benefit of the Collateral Agent under this Indenture or any Collateral Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, the Company and/or the Guarantors, as the case may be, will immediately pay to the account indicated by the Collateral Agent the additional amount necessary for the amount paid to the Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

(n)    Each Secured Party (other than the Collateral Agent) authorizes and directs the Collateral Agent to enter into the Collateral Documents to which it is a party on the date hereof on behalf of and for the benefit of the Secured Parties.

(o)    Notwithstanding any provision of this Indenture, the Intercreditor Agreement, or the Collateral Documents to the contrary, before taking or omitting any action to be taken or omitted by the Collateral Agent under the terms of this Indenture, the Intercreditor Agreement, and the Collateral Documents, the Collateral Agent may seek the written direction of the Trustee, and the Collateral Agent shall be entitled to rely (and shall be fully protected in so relying) upon such direction. The Collateral Agent is not liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If the Collateral Agent requests such direction with respect to any action, the Collateral Agent is entitled to refrain from such action unless and until the Collateral Agent has received such direction, and the Collateral Agent does not incur liability to any Person by reason of so refraining.  If the Collateral Agent so requests, it must first be indemnified to its satisfaction by the Holders against any and all fees, losses, liabilities and expenses which may be incurred by the Collateral Agent by reason of taking or continuing to take, or omitting, any action directed by the Trustee. Any provision of this Indenture, the Intercreditor Agreement, or the Collateral Documents authorizing the Collateral Agent to take any action does not obligate the Collateral Agent to take such action.

(p)    Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under pursuant to, the Intercreditor Agreement and the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Indenture (in addition to those that may be granted to it under the terms of such other agreement or agreements).

(q)    The Collateral Agent shall have no responsibility for interest or income on any funds held by it under this Indenture, the Intercreditor Agreement, or the Collateral Documents and any funds so held shall be held uninvested pending distribution thereof.

(r)    The Collateral Agent shall be under no obligation to exercise any of the duties or powers vested in it by this Indenture, the Intercreditor Agreement, or the Collateral Documents at

#93484727v11

the request, order, instruction or direction of the Trustee, unless the Holders shall have offered to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against the costs, expenses and liabilities that might be incurred thereby.

(s)      The Collateral Agent may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any affiliate thereof as if the Collateral Agent were not an attorney-in-fact hereunder and without any duty to account therefore to the Secured Parties.

(t)      The Secured Parties understand that the Collateral Agent, acting in its individual capacity, and its affiliates may engage in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (the "**Activities**") and may engage in the Activities with or on behalf of one or more of the Company and its respective affiliates.  Furthermore, the Collateral Agent may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Company and its affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Company or its respective affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of the Company or its affiliates. The Secured Parties understand and agree that in engaging in the Activities, the Collateral Agent may receive or otherwise obtain information concerning the Company or its affiliates (including information concerning the ability of the Company to perform its respective obligations hereunder and under the Intercreditor Agreement and the Collateral Documents) which information may not be available to the Secured Parties. The Collateral Agent shall not have any duty to disclose to the Secured Parties or use on behalf of the Secured Parties, nor be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Company or any of its affiliates) or to account for any revenue or profits obtained in connection with the Activities.

(u)      The Secured Parties further understand that there may be situations where members of the Collateral Agent's group or their respective customers (including the Company and its affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Secured Parties (including the interests of the Secured Parties hereunder , under the Intercreditor Agreement, and under the Collateral Documents). None of (i) this Indenture, the Intercreditor Agreement, or the Collateral Documents, (ii) the receipt by the Collateral Agent of information concerning the Company or any of its affiliates (including information concerning the ability of the Company to perform is obligations under this Indenture) or (iii) any other matter, shall give rise to any fiduciary, equitable or contractual duties (including any duty of trust or confidence) owing by the Collateral Agent to any Secured Party including any such duty that would prevent or restrict the Collateral Agent from acting on behalf of customers (including the Company or its affiliates) or for its own account.

(v)      The Secured Parties confirm to the Collateral Agent that each of them (i) possesses such knowledge and experience in financial and business matters so that it is capable, without reliance on such Collateral Agent, of evaluating the merits and risks (including tax,

legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Indenture or holding the Notes or Additional Pari Passu Obligations, as applicable, and (y) taking or not taking actions hereunder, under the Intercreditor Agreement,  or under the Collateral Documents, (ii) is financially able to bear such risks and (iii) has determined that entering into this Indenture is suitable and appropriate for it.

(w)     Nothing in this Indenture, the Intercreditor Agreement, or in the Collateral Documents shall require the Collateral Agent to carry out any "know your customer" or other checks in relation to the Company or any of its affiliates on behalf of the Secured Parties and the Secured Parties confirm to the Collateral  Agent that such Secured Parties are solely responsible for any such checks such Secured Parties are required to carry out and that such Secured Parties may not rely on any statement in relation to such checks made by such the Collateral Agent.

(x)     The Collateral Agent shall be entitled to rely on any written direction, instruction, request, consent or other written communication from the Trustee without inquiry into whether the Trustee has received any concurrence or direction of any Holders.  The Collateral Agent shall not have any obligation or duty with respect to the identity of any Holder or holder of Additional Pari Passu Obligations or the amount of any Obligations owing to any such Person.

SECTION 12.03.  *Resignation.* Subject to the appointment and acceptance of a successor Collateral Agent as set forth in this Section, the Collateral Agent may resign at any time by notifying the Trustee and the Company. Upon any resignation by the Collateral Agent, the Company shall have the right (*provided* that no Event of Default has occurred and continues) to appoint a successor Collateral Agent or, if an Event of Default has occurred and is continuing, the Required Holders shall have the right to direct the Trustee to appoint a successor Collateral Agent. If no successor has been so appointed and has accepted such appointment within thirty (30) days after the date the Collateral Agent gives notice of its resignation, then the resigning Collateral Agent may (but shall not be obligated to) (a) upon consent (*provided* that no Event of Default or Default has occurred and continues) of the Company (consent of which shall not be unreasonably withheld or delayed), at the cost and expense of the Company, appoint a successor Collateral Agent or (b) petition any court of competent jurisdiction, at the cost and expense of the Company, for the appointment of a successor Collateral Agent. Upon acceptance of a successor Collateral Agent of its appointment as Collateral Agent under this Indenture and the Collateral Documents, such successor will succeed and have all rights, powers, privileges and duties of the resigning Collateral Agent, and the resigning Collateral Agent will be released from its duties and obligations under this Indenture, the Intercreditor Agreement, and the Collateral Documents. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor. Any Person into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any Person succeeding to the business of the Collateral Agent shall be the successor of the Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

SECTION 12.04.  *Fees, Expenses and Indemnification.*

95

(a)      The Company shall pay to the Collateral Agent for its own account fees in the amounts and at the times agreed with the Collateral Agent.

(b)      The Company shall pay or reimburse the Collateral Agent for (i) all reasonable costs and expenses incurred in connection with the development, preparation, negotiation, execution and performance of this Indenture, the Intercreditor Agreement, and the Collateral Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all attorney costs, and (ii) all costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Indenture, the Intercreditor Agreement, or under the Collateral Documents, including all attorney costs and all expenses incurred during any workout, restructuring or negotiations in respect of this Indenture, the Intercreditor Agreement, the Notes or the Collateral Documents.  The foregoing costs and expenses shall include all out-of-pocket expenses incurred by the Collateral Agent under clauses (i) or (ii) above and the cost of counsel, independent public accountants and other outside experts so retained.  All amounts due under this Section shall be payable within five Business Days after demand therefore.

(c)      Each of the Company and the Guarantors, jointly and severally, shall indemnify and hold the Collateral Agent harmless for, from and against any and all damage, loss, liability, cost, claim or expense (including reasonable attorneys' fees and expenses and including all fees, expenses and costs incurred by the Collateral Agent in connection with any dispute, action, claim or suit brought to enforce the right to indemnification) incurred by the Collateral Agent arising out of or in connection with the execution, delivery or administration of this Indenture, the Intercreditor Agreement, and the Collateral Documents or any instrument or agreement contemplated hereby or thereby, the performance of the Collateral Agent's duties hereunder or thereunder, and the exercise of the Collateral Agent's rights hereunder or thereunder including, without limitation, the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Indenture, the Intercreditor Agreement, or the Collateral Documents, except as may result from the Collateral Agent's willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction).

(d)      The agreements in this Section shall survive the termination or satisfaction of this Indenture, the Intercreditor Agreement, the Notes or the Collateral Documents, the resignation or removal of the Collateral Agent and the payment of all Notes Obligations.

#93484727v11

IN WITNESS WHEREOF, the Company has caused this Indenture to be duly executed.

Dated: December 23, 2020

**GOL FINANCE**

By: *Eduardo Bernardes Neto*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
EE5168225EB048D...
Name: Eduardo José Bernardes Neto
Title:  Director

By: *Celso Guimarães Ferrer Junior*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
03E9C83680634BB...
Name:  Celso G. Ferrer Jr.
Title:   Director

DocuSign Envelope ID: 1A6266E8-8ACD-4D4D-A8B0-1339255EF311

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

GOL LINHAS AÉREAS S.A.,
as the Guarantor

By: *Celso Guimarães Ferrer Junior*
03E9C83680634BB...
Name: Celso G. Ferrer Júnior
Title: COO

By: *Eduardo Bernardes Neto*
EE5168225EB048D...
Name: Eduardo José Bernardes Neto
Title: CCO

GOL LINHAS AÉREAS INTELIGENTES S.A.,
as the Guarantor

By: *Celso Guimarães Ferrer Junior*
03E9C83680634BB...
Name: Celso G. Ferrer Júnior
Title: COO

By: *Eduardo Bernardes Neto*
EE5168225EB048D...
Name: Eduardo José Bernardes Neto
Title: CCO

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

THE BANK OF NEW YORK MELLON
as Trustee, Registrar, Transfer Agent and Paying Agent

By: _____    Wanda Camacho

       Name:   Wanda Camacho
       Title:    Vice President

*[Signature page to the Indenture]*

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

By: _____

Name:

Title:

By: _____

Name:

Title:

*[Signature page to the Indenture]*

EXHIBIT A

FORM OF NOTE

[FACE OF NOTE]

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("**DTC**"), TO THE COMPANY NAMED HEREIN (THE "**COMPANY**") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFERS OF THIS NOTE IN WHOLE SHALL BE LIMITED TO TRANSFERS TO A NOMINEE OF DTC OR BY A NOMINEE OF DTC TO DTC OR ANOTHER NOMINEE OF DTC OR BY DTC OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY AND TRANSFERS OF THIS SENIOR NOTE IN PART SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE AND REFERRED TO ON THE REVERSE HEREOF.

THIS NOTE IS A "CONTINGENT PAYMENT DEBT INSTRUMENT" THAT HAS BEEN ISSUED WITH ''ORIGINAL ISSUE DISCOUNT'' FOR PURPOSES OF SECTIONS 1271-1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED. A HOLDER OR BENEFICIAL OWNER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE, YIELD TO MATURITY, COMPARABLE YIELD AND PROJECTED PAYMENT SCHEDULE FOR THIS NOTE BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO THE COMPANY AT THE ADDRESS IN SECTION 11.02 OF THE INDENTURE, ATTN: CHIEF FINANCIAL OFFICER.

[*Include if Note is a Restricted Note, or a Note issued in exchange therefor, as required under this Indenture:* THIS NOTE (AND RELATED NOTE GUARANTIES) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE.  BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER (1) REPRESENTS THAT (A) IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT; OR (B) IT IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND (2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT

A-1

WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT AND ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ONLY (A) TO THE COMPANY, (B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (D) IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.  PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE COMPANY RESERVES THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.  NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY RULE 144 EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

THE FOREGOING LEGEND MAY BE REMOVED FROM THIS NOTE WITH CONSENT OF THE COMPANY AS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN.]

[***Include if Note is Regulation S Note, or a Note issued in exchange therefor, in accordance with this Indenture:***  "THIS NOTE (AND RELATED NOTE GUARANTIES) HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY OTHER SECURITIES LAWS.  THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

THE FOREGOING LEGEND MAY BE REMOVED FROM THIS NOTE AFTER 40 DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DATE ON WHICH THE NOTES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND (B) THE ORIGINAL ISSUE DATE OF THIS NOTE."]

A-2

# GOL FINANCE

8.00% Senior Secured Notes Due 2026

[RESTRICTED NOTE]
[REGULATION S NOTE]
Representing U.S.$_____
8.00% Senior Secured Notes Due 2026

No. [___]

Principal Amount [U.S.$0.00][up to U.S.$_____], as revised by the Schedule of Increases or Decreases in Global Note attached hereto,

| | |
|---|---|
| CUSIP No. 144A: 36254V AC2 / Reg S L4441R AC0 | Principal Amount |
| ISIN No. 144A: US36254VAC28 / Reg S USL4441RAC09 | 144A: U.S.$ [  ] |
| | Reg S: U.S.$ [  ] |

GOL FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg (the "**Company**," which term includes any successor corporation under the Indenture referred to on the reverse hereof), for value received, hereby promises to pay to Cede & Co., or registered assigns, the principal sum of [Zero U.S. Dollars (U.S.$0.00)] up to U.S.$ 200,000,000.00, as revised by the Schedule of Increases or Decreases in Global Note attached hereto, upon presentment and surrender of this Note on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Indenture.

Interest on the outstanding principal amount shall be borne at the rate of 8.00% per annum, payable in interest, semi-annually in arrears on each June 30 and December 30, commencing on June 30, 2021, all subject to and in accordance with the terms and conditions set forth herein and in the Indenture; *provided*, *however*, that in the event that the Company shall at any time default on the payment of interest or such other amounts as any may be payable in respect of the Notes, the Company shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 2% per annum.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless the certificate of authentication herein has been executed by the Trustee or Authenticating Agent by the manual or Facsimile signature of one of its authorized signatories, this Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose.

A-3

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated: December 23, 2020

**GOL FINANCE**

By: _____
   Name:
   Title:


By: _____
   Name:
   Title:


Witnesses:

By: _____
Name:

By: _____
Name:

A-4

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within mentioned Indenture.

THE BANK OF NEW YORK MELLON
as Trustee

By: _____
       Name:
       Title:    Authorized Signatory

A-5

[FORM OF REVERSE SIDE OF NOTE]

8.00% Senior Secured Notes Due 2026

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of 8.00% Senior Secured Notes Due 2026 of the Company.  The Notes constitute secured unsubordinated obligations of the Company, initially in an aggregate principal amount of U.S.$200,000,000.00.

1.    *Indenture.*

The Notes are, and shall be, issued under an Indenture, dated as of December 23, 2020 (the "**Indenture**"), among the Company, the Guarantors party thereto, The Bank of New York Mellon, as trustee (the "**Trustee**"), Registrar, Transfer Agent and Paying Agent (the "**Paying Agent**"), and TMF Brasil Administração e Gestão de Ativos Ltda. as collateral agent (the "**Collateral Agent**").  The terms of the Notes include those stated in the Indenture.  The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Indenture.  Reference is hereby made to the Indenture and all supplemental indentures thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Trustee, the Collateral Agent, each Agent and the Holders of the Notes and the terms upon which the Notes, are, and are to be, authenticated and delivered.  All terms used in this Note that are defined in the Indenture shall have the meanings assigned to them in the Indenture.  Copies of the Indenture and each Note shall be available for inspection at the offices of the Trustee and each Paying Agent.

The Notes are senior obligations of the Company and the Guarantors, secured by the first priority Liens in the Issue Date Collateral. The payment obligations of the Company under the Indenture and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Company is entitled to, without the consent of the Holders thereof, increase the outstanding principal amount of the Notes by issuing Additional Notes under the Indenture on the same terms and conditions as the Notes offered hereby, so long as (i) the LTV Ratio shall not exceed the Trigger LTV Ratio after giving effect to the issuance of the Additional Notes, (ii) the Company and the Guarantors shall have entered into additional Collateral Documents and made all necessary filings so that any Additional Collateral required to be delivered in connection with the issuance of any Additional Notes is subject to first priority Liens in favor of the Collateral Agent or, in the case of Aircraft subject to a Senior Lien, a second-priority perfected Lien, for the benefit of the Secured Parties, as Collateral for all of the obligations of the Company and the Guarantors under this Indenture, the Notes and the Guarantees and (iii) no Default or Event of Default has occurred and is continuing or will occur as a result of or immediately after the issuance of the Additional Notes.

The Indenture imposes certain limitations on the creation of Liens by the Company or its Subsidiaries, and consolidation, merger and certain other transactions involving the Company. In addition, the Indenture requires the maintenance of insurance for the Company and its Subsidiaries, the maintenance of the existence of the Company and its Subsidiaries, the payment

A-6

#93484727v11

of certain taxes and claims and reporting requirements applicable to the Company.  The Indenture also contains provisions related to the Collateral as well as certain assurances, insurance and use and possession related to the Collateral.

The Note is one of the [Initial]* [Additional]† Notes referred to in the Indenture.  The Notes include the Initial Notes issued on the Issue Date together with any Additional Notes issued in accordance with Section 2.15 of the Indenture.  The Initial Notes and the Additional Notes are treated as a single class of securities under the Indenture.  Unless the context otherwise requires, for all purposes of the Indenture and this Note, references to the "Notes" include any Additional Notes actually issued and references to the "principal amount" of the Notes include any increase in the principal amount of Outstanding Notes, including the issuance of any Additional Notes.

    2.    *Principal.*

Unless previously redeemed or purchased and cancelled, the Notes shall be redeemed at 100% of the principal amount thereon on June 30, 2026.

    3.    *Interest.*

The Notes bear interest at the rate of 8.00% per annum from December 23, 2020‡, or from the most recent Payment Date (as defined below) to which interest has been paid or provided for, payable semi-annually in arrears on June 30 and December 30 of each year (each such date, an "**Payment Date**"), commencing on June 30, 2021.  Interest on the Notes shall be computed on the basis of a 360-day year of twelve 30-day months.  The Company shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 2% per annum.

Notwithstanding anything to the contrary, the payment of accrued interest in connection with any redemption as described under Sections 3.01(b) and 3.01(c) of the Indenture will be made solely in cash.

    4.    *Method of Payment.*

Payments of interest in respect of each Note shall be made on each Payment Date by the Paying Agents to the Persons shown on the Register at the close of business on December 15 and June 15, as the case may be (each, a "**Record Date**"), immediately preceding such Payment Date.

---

* Include if Initial Note.

† Include if Additional Note.

‡ With respect to the Initial Notes.

Payments of Interest in respect of each Note shall be made by U.S. Dollar check drawn on a bank in The City of New York and may be mailed to the Holder of such Note at its address appearing in the Register.  Upon written application by the Holder to the specified office of any Paying Agent not less than 15 days before the due date for any payment in respect of a Note, such payment may be made by wire transfer to a U.S. Dollar account maintained by the payee with a bank in The City of New York.  Payments of principal and interest in respect of each Note will be made to the depositary in accordance with its applicable procedures. All payments on this Note are subject in all cases to any applicable tax or other laws and regulations, but without prejudice to the provisions of Paragraph 7 hereof.  Except as provided in Section 2.08 of the Indenture, no fees or expenses shall be charged to the Holders in respect of such payments.

If the Payment Date in respect of any Note is not a Business Day at the place in which it is presented for payment, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest or other payment in respect of any such delay.

If the amount of principal or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of interest, if any, in fact paid.

5.      *Ranking and Collateral.*

The Notes and Note Guaranties are secured by a first priority Lien in the Issue Date Collateral. The payment obligations of the Company under the Indenture and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Liens in the Collateral granted shall terminate in respect of the Notes on the Maturity Date, unless through passage of time, acceleration or otherwise there exists Notes Obligations due and payable on that date, in which case the Liens in the Collateral shall terminate upon satisfaction of such Notes Obligations. As a consequence of the termination, the Collateral shall be automatically released and all of the obligations under the Notes shall become senior unsecured obligations of the Company and the Guarantors and shall effectively rank junior to any senior secured obligations of the Company and the Guarantors to the extent of the value of the assets securing the obligations.

6.      *Registrar, Paying Agent and Transfer Agent.*

The Trustee shall act as Registrar, Transfer Agent and Paying Agent of the Notes.  The Company may appoint and change any Registrar, Paying Agent or Transfer Agent in accordance with the terms of the Indenture.

7.      *Additional Amounts.*

All payments by the Company (or any Paying Agent) in respect of the Notes or any of the Guarantors (or any Paying Agent) in respect of the respective Note Guaranty will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of Brazil or Luxembourg, or any political subdivision or authority therein or thereof or any other jurisdiction in which the Company or any of the Guarantors is organized,

A-8

doing business or otherwise subject to the power to tax (any of the aforementioned being a "**Taxing Jurisdiction**"), unless the Company or any of the Guarantors (or any Paying Agent) is compelled by law to deduct or withhold such taxes, duties, assessments, or governmental charges.  In such event, the Company or any of the Guarantors (or any Paying Agent), as applicable, will make such deduction or withholding, and the Company or any of the Guarantors, as applicable, will make payment of the amount so withheld to the appropriate governmental authority and pay such additional amounts as may be necessary to ensure that the net amounts receivable by Holders of Notes after such withholding or deduction shall equal the respective amounts of principal (and premium, if any) and interest which would have been receivable in respect of the Notes in the absence of such withholding or deduction ("**Additional Amounts**"). Notwithstanding the foregoing, no such Additional Amounts shall be payable:

(i)        to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such Holder, if such Holder is an estate, a trust, a partnership, or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof, being incorporated in, being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than the mere holding of the Note or enforcement of rights under the Indenture and the receipt of payments with respect to the Note;

(ii)        in respect of Notes surrendered or presented for payment (if surrender or presentment is required) more than 30 days after the Relevant Date except to the extent that payments under such Note would have been subject to withholdings and the Holder of such Note would have been entitled to such Additional Amounts, had the Note been surrendered for payment on the last day of such period of 30 days;

(iii)        to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or other governmental charges by reason of such Holder's failure to comply with any certification, identification, documentation or other reporting requirement concerning the nationality, residence, identity or connection with the relevant Taxing Jurisdiction of such Holder, if (1) compliance is required by law as a precondition to, exemption from, or reduction in the rate of, the tax, assessment or other governmental charge and (2) the Company has given the Holders at least 30 days' notice that Holders will be required to comply with such certification, identification, documentation or other reporting requirement;

(iv)        in respect of any estate, inheritance, gift, sales, transfer, excise or personal property or similar tax, assessment or governmental charge;

(v)        in respect of any tax, assessment or other governmental charge which is payable other than by deduction or withholding from payments of principal, premium (if any) or interest on the Note;

A-9

(vi)    in respect of any tax imposed on overall net income or any branch profits tax;

(vii)    in respect of any tax imposed pursuant to sections 1471 to 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), any successor law or regulation implementing or complying with, or introduced in order to conform to, such sections or any intergovernmental agreement in respect thereof or any agreement entered into pursuant to section 1471(b)(1) of the Code;

(viii)    in respect of any tax imposed by Luxembourg by virtue of the Luxembourg law of 23 December 2005, as amended from time to time (the "**Relibi Law**"); or

(ix)    in respect of any combination of the above.

No Additional Amounts shall be paid with respect to any payment on a Note to a Holder who is a fiduciary, a partnership, a limited liability company or other than the sole beneficial owner of that payment to the extent that payment would be required by the relevant Taxing Jurisdiction to be included in the income, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a member of that partnership or limited liability company or a beneficial owner who would not have been entitled to the Additional Amounts had that beneficiary, settlor, member or beneficial owner been the Holder.

The Notes are subject in all cases to any tax, fiscal or other law or regulation or administrative or judicial interpretation.  Except as specifically provided above, neither the Company nor the Guarantors shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

In the event that Additional Amounts actually paid with respect to the Notes are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof such Holder is entitled to make claim for a refund or credit of such excess from the authority imposing such withholding tax, then such Holder shall, by accepting such Notes, be deemed to have assigned and transferred all right, title, and interest to any such claim for a refund or credit of such excess to the Company. However, by making such assignment, the holder makes no representation or warranty that the Company will be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

The Company and the Guarantors shall provide the Trustee with documentation reasonably satisfactory to the Trustee evidencing the payment of taxes in respect of which the Company or the Guarantors, as applicable, have paid any Additional Amounts. Copies of such documentation shall be made available by the Trustee to the Holders or the Paying Agents, as applicable, upon written request therefor.

The Company shall also pay any present or future stamp, issue, registration, court or documentary taxes or any excise or property taxes, charges or similar levies (including any penalties, interest and other liabilities relating thereto) which arise in any jurisdiction from the

A-10

execution, delivery, registration, enforcement or the making of payments in respect of the Indenture, the Notes or the Note Guarantees, excluding any such taxes, charges or similar levies imposed by any jurisdiction that is not a Taxing Jurisdiction other than those resulting from, or required to be paid in connection with, the enforcement of the Notes following the occurrence of any Default or Event of Default.

Any reference in the Indenture or the Notes to principal, interest or any other amount payable in respect of the Notes by the Company or any of the Note Guarantees by the Guarantors will be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Paragraph 7.

The foregoing obligations will survive termination or discharge of the Indenture, payment of the Notes and/or resignation or removal of the Trustee or the Paying Agent.

8.       *Purchases of Notes by the Company or its Affiliates.*

The Company or any of its Affiliates may at any time purchase Notes at any price. All Notes so purchased may not be resold, except in compliance with applicable requirements or exemptions under the relevant securities laws.

9.       *Redemption.*

Except as described in Section 3.01 of the Indenture and this Paragraph 9, the Notes may not be redeemed.

After the second anniversary of the Issue Date, the Company may, on any one or more occasions, redeem the Notes at its option, in whole or in part, at the following redemption prices (expressed as a percentage of the principal amount thereof), plus accrued and unpaid interest and any Additional Amounts, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the periods set forth below:

| Period | Redemption Price |
|---|---|
| On or after December 24, 2022 and prior to December 24, 2023 | 108.000% |
| On or after December 24, 2023 and prior to December 24, 2024 | 104.000% |
| On or after December 24, 2024 | 100.000% |

Any redemption of the Notes by the Company will be subject to either (i) there being at least US$150 million in aggregate principal amount of Notes (including any Additional Notes)

#93484727v11

outstanding after such redemption; or (ii) the Company redeeming all the then outstanding principal amount of the Notes.

If as a result of any change in or amendment to the laws (or any rules or regulations thereunder) of a Taxing Jurisdiction, or any amendment to or change in an official interpretation, administration or application of such laws, rules or regulations (including a holding by a court of competent jurisdiction) , which change or amendment becomes effective or, in the case of a change in official position, is announced on or after the Issue Date, in the case of the Company or any Guarantor, or on or after the date a successor to the Company or any Guarantor assumes the obligations under the Notes and this Indenture or any Note Guaranty, in the case of any such successor,  (i) the Company or any successor to the Company has or will become obligated to pay any Additional Amounts in excess of the Additional Amounts the Company or any successor to the Company would be obligated to pay if payments were subject to withholding or deduction at a rate of 0% (or in the case of a successor, the rate of withholding applicable to payments on the Notes in the jurisdiction of the successor to the Company on the date such successor replaces the Company) or (ii) the Guarantors or any successor to the Guarantors has or will become obligated to pay Additional Amounts in excess of the Additional Amounts the Guarantors or any such successor to the  Guarantors would be obligated to pay if payments were subject to withholding or deduction at a rate of 15% or at a rate of 25% in the case that the Holder of the Notes is resident in a tax haven jurisdiction for Brazilian tax purposes (i.e., a country that does not impose any income tax or that imposes it at a maximum rate lower than 20% or where the laws impose restrictions on the disclosure of ownership composition or securities ownership) (or in the case of a successor whose jurisdiction is not Brazil, the rate of withholding applicable to payments on the notes in the jurisdiction of the successor to a Guarantor on the date such successor replaces a Guarantor)  (each of the rates in (i) and (ii), a "**Minimum Withholding Level**"), the Company or any successor to the Company may, at its option, redeem all, but not less than all, of the Notes, at a Redemption Price equal to 100.0% of their principal amount, together with accrued and unpaid interest to the Redemption Date, upon delivery of irrevocable notice of redemption to Holders not less than 30 days nor more than 90 days prior to the Redemption Date.  No notice of such redemption may be given earlier than 90 days prior to the earliest date on which either (x) the Company or any successor to the Company would, but for such redemption, become obligated to pay any Additional Amounts above the Minimum Withholding Level, or (y) in the case of payments made under any of the Note Guaranties, the Guarantors or any successor to  the Guarantors  would, but for such redemption, be obligated to pay the Additional Amounts in excess of the Minimum Withholding Level. The Company or any successor to the Company shall not have the right to so redeem the Notes unless (a) it is obligated to pay Additional Amounts which in the aggregate amount exceed the Additional Amounts payable at the Minimum Withholding Level or (b) the Guarantors or any successor to the Guarantors is obliged to pay Additional Amounts which in the aggregate amount exceed the Additional Amounts payable at the Minimum Withholding Level. The Company or any successor to the Company shall not have the right to so redeem the Notes unless (a) it is obligated to pay additional amounts which in the aggregate amount exceed the additional amounts payable at the Minimum Withholding Level or (b) either Guarantor or any successor to the Guarantors is obliged to pay additional amounts which in the aggregate amount exceed the additional amounts payable at the Minimum Withholding Level.  Notwithstanding the foregoing, the Company or any such successor to the Company shall not have the right to so redeem the Notes unless it has taken reasonable measures to avoid the obligation to pay Additional

#93484727v11

Amounts. For the avoidance of doubt, reasonable measures do not include changing the jurisdiction of incorporation of the Company or any successor to the Company or the jurisdiction of incorporation of the Guarantors or any successor to the Guarantors.

In the event that the Company or any successor to the Company elects to so redeem the Notes pursuant to this Section 3.01, it will deliver to the Trustee: (i) an Officers' Certificate, signed in the name of the Company or any successor to the Company, stating that the Company or any successor to the Company is entitled to redeem the Notes pursuant to their terms and setting forth a statement of facts showing that the condition or conditions precedent to the right of the Company or any successor to the Company to so redeem have occurred or been satisfied; and (ii) an Opinion of Counsel to the effect that (1) the Company, or any successor to the Company, or the Guarantors, or any successor to the Guarantors, has or will become obligated to pay Additional Amounts in excess of the Additional Amounts payable at the Minimum Withholding Level, and (2) such obligation is the result of a change in or amendment to the laws (or any rules or regulations thereunder) of a Taxing Jurisdiction, or any amendment to or change in an official interpretation, administration or application of such laws, rules or regulations, as described above.

10.    *Denominations; Transfer; Exchange.*

The Notes are in registered form without coupons in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof.

11.    *Persons Deemed Owners.*

The registered Holder of this Note (except as otherwise required by law and subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Payment Date) may be treated as the owner thereof for all purposes.

12.    *Unclaimed Money.*

Subject to applicable law, the Trustee and the Paying Agents shall pay to the Company upon written request any monies held by them for the payment of principal or interest that remains unclaimed for two years, and thereafter, Holders entitled to such monies must look to the Company for payment as general creditors.

13.    *Defeasance.*

Subject to the terms of the Indenture, the Company and any of the Guarantors at any time may terminate some or all of their obligations under the Notes, the Indenture and the Note Guaranties, as the case may be, if the Company or any of the Guarantors irrevocably deposits in trust with the Trustee money and/or U.S. Government Obligations sufficient for the payment of principal of and interest on all the Notes to the Maturity Date or redemption. At such time, the Guarantors' obligations under the Note Guaranties will terminate.

14.    *Amendment; Waiver.*

A-13

Subject to certain exceptions set forth in the Indenture, the Indenture, the Notes, the Collateral Documents and, if applicable, the Intercreditor Agreement may be amended or supplemented with the written consent of the Holders of at least a majority in principal amount of the Outstanding Notes, and any past Default or Event of Default or compliance with any provision of the Indenture may be waived with the consent of the Holders of at least a majority in principal amount of the Outstanding Notes; however, without the consent of each Holder of an Outstanding Note affected thereby, no amendment or waiver may, among other things:

(i)    reduce the principal amount of or change in the Stated Maturity of any payment on any Note;

(ii)    reduce the rate of interest on any Note;

(iii)    reduce the amount payable upon the redemption of any Note or change the time at which any Note may be redeemed;

(iv)    reduce the amount payable or change the time of payment of any amount specified in Section 4.21 of the Indenture;

(v)    change the currency for payment of principal of, or interest or any Additional Amounts on, any Note;

(vi)    make any change in the provisions of the Indenture relating to the contractual rights of the Holders expressly set forth in the Indenture to institute suit for the enforcement of any right to payment on or with respect to any Note;

(vii)    make any change in the provisions of the Indenture relating to waivers of a Default or Event of Default in payment of principal of and interest on the Notes;

(viii)    reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver;

(ix)    make any change to the first paragraph of Section 9.02 of the Indenture;

(x)    modify or change any provision of the Indenture affecting the ranking of the Notes or any of the Note Guaranties in a manner adverse to the Holders; or

(xi)    make any change in any of the Note Guaranties that would adversely affect the Noteholders.

In addition, notwithstanding the foregoing, without the consent of the Holders of at least 66⅔% in aggregate principal amount of the Outstanding Notes, no amendment, supplement or waiver may release all or substantially all of the Collateral unless otherwise provided in the Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement.

The Company, when authorized by a Board Resolution, the Guarantors, the Trustee and the Collateral Agent (acting in accordance, exclusively and strictly, with instructions provided by the Trustee), as applicable, may, without notice to or consent or vote of any Holder, amend the

A-14

Indenture, the Notes, the Collateral Documents and, if applicable, the Intercreditor Agreement, as the case may be, for the following purposes:

(i)        to cure any ambiguity, omission, defect or inconsistency;

(ii)       to add guarantees or collateral with respect to the Notes;

(iii)      to comply with Section 5.01 of the Indenture;

(iv)      to add to the covenants of the Company or the Guarantors for the benefit of the Holders;

(v)       to surrender any right conferred upon the Company or the Guarantors under the Indenture;

(vi)      to evidence and provide for the acceptance of an appointment by a successor Trustee;

(vii)     to provide for the issuance of Additional Notes;

(viii)    to allow for a Substituted Debtor, as described under Section 5.03 of the Indenture;

(ix)      to provide for any guarantee or collateral of the Notes, to secure the Notes or to confirm and evidence the release, termination or discharge of any Note Guaranty of the Notes when such release, termination or discharge is permitted by the Indenture, the Collateral Documents and, if applicable, the Intercreditor Agreement, as the case may be; or

(x)       to make any other change that does not materially and adversely affect the rights of any Holder or to conform the Indenture to the section "Description of Notes" in the Private Placement Memorandum;

*provided* that, in the case of clause (i) and (ii) above, the Company has delivered to the Trustee an Opinion of Counsel and an Officers' Certificate, each stating that such amendment or supplement complies with the provisions of Section 9.01 of the Indenture.

The Guarantors must consent to any amendment, supplement or waiver.

15.    *Defaults and Remedies.*

An "**Event of Default**" occurs if:

(i)        the Company defaults in any payment of interest (including any Additional Amounts) on any Note when the same becomes due and payable, and any such Default continues for a period of 30 days;

A-15

(ii)    the Company defaults in the payment of the principal (including any Additional Amounts) of any Note when the same becomes due and payable at its Stated Maturity, upon acceleration or redemption or otherwise;

(iii)    the Company shall fail to comply with its obligations under Section 4.15(c) or 4.15(d) of the Indenture, as the case may be;

(iv)    the Guarantors fail to (a) amend the Collateral Documents related to Spare Parts to update the market value thereof, the list of Spare Parts or the location of the Spare Parts, in accordance with the terms and conditions provided for in the Collateral Documents relating to such Spare Parts; or (b) make the necessary fillings, registrations and annotations related to such amendments in accordance with the terms and conditions provided for in the Collateral Documents relating to such Spare Parts;

(v)    any of the Company or the Guarantors fails to comply with any of its covenants or agreements in the Notes, the indenture or any of the Collateral Documents (other than those referred to in clauses (a), (b), (c) or (d) of Section 6.01 of the Indenture), and such failure continues for 60 days  after the notice specified below;

(vi)    the Company fails to make an Offer to Purchase and thereafter accept and pay for Notes tendered when and as required pursuant to Section 4.20 and Section 4.21 of the Indenture;

(vii)    any of the Company, the Guarantors or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by any of the Company, the Guarantors or any such Significant Subsidiary (or the payment of which is guaranteed by the Company, the Guarantor or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of this Indenture, which default (i) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("Payment Default") or (ii) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$50,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

(viii)    one or more final non-appealable judgments or decrees for the payment of money of U.S.$50,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against any of the Company, the Guarantors or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed within 30 days following commencement of such enforcement proceedings or (ii) there is a period of 60 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed;

A-16

(ix)    an involuntary case or other proceeding is commenced against any of the Company, the Guarantors or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, *administrador judicial*, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against any of the Company, the Guarantors or any Significant Subsidiary under the bankruptcy laws now or hereafter in effect, and such order is not being contested by any of the Company, the Guarantors or any Significant Subsidiary, as the case may be, in good faith, or has not been dismissed, discharged or otherwise stayed, in each case within 60 days of being made;

(x)    any of the Company, the Guarantors or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking liquidation, reorganization, concordata, or other relief with respect to itself or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the Company, the Guarantors or any Significant Subsidiary or for all or substantially all of the property of any of the Company, the Guarantors or any Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(xi)    any event occurs that under the laws of Brazil or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in any of clause (ix) or (x);

(xii)    (A) an "Event of Default" occurs under any credit agreement, indenture or similar agreement or instrument evidencing any Additional Pari Passu Obligations or (B) any enforcement action is taken in respect of the Collateral, including the taking of any steps to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral or otherwise exercise any rights or remedies with respect to the Collateral in accordance with the any of the Collateral Documents and, if applicable, the Intercreditor Agreement;

(xiii)    any Note Guaranty ceases to be in full force and effect, other than in accordance the terms of this Indenture, or any of the Guarantors denies or disaffirms its obligations under its Note Guaranty;

(xiv)    GLAI ceases to own directly 100% of the outstanding share capital of the Company; or

(xv)    except as expressly permitted by this Indenture and the Collateral Documents, the Collateral Documents shall for any reason cease to be in full force and effect in all material respects, or any of the Company or the Guarantors or any of their Subsidiaries shall so assert, or any Lien created, or purported to be created, by any of the

A-17

Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby.

A Default under clause (v) shall not constitute an Event of Default until the Trustee or the Holders of at least 25% in principal amount of the Outstanding Notes, as the case may be, notify the Company and the Guarantors of the Default and the Company and the Guarantors, as the case may be, do not cure such Default within the time specified after receipt of such notice.

The Trustee is not to be charged with knowledge of any Default or Event of Default or knowledge of any cure of any Default or Event of Default unless a Responsible Officer of the Trustee with direct responsibility for the Indenture has received written notice of such Default or Event of Default from the Company, the Guarantors or any Holder.

If an Event of Default (other than an Event of Default specified in clauses (ix), (x), (xi) or (xii) (B) occurs and is continuing, the Trustee or the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Company and the Trustee and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in clauses (ix), (x), (xi), or (xii) (B) occurs and is continuing, then the principal of, and accrued and unpaid interest on, all Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder.

Neither the Trustee nor the Collateral Agent shall be under any obligation to exercise any of its rights or powers under the Indenture or any of the Collateral Documents or, if applicable, the Intercreditor Agreement at the request or direction of any of the Holders, unless such holders have offered to the Trustee and the Collateral Agent indemnity reasonably satisfactory to the Trustee or the Collateral Agent, respectively. Subject to such provision for the indemnification of the Trustee and the Collateral Agent, the Holders of a majority in aggregate principal amount of the Outstanding Notes will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Collateral Agent or exercising any power conferred on the Trustee or the Collateral Agent.

At any time after a declaration of acceleration has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in the Indenture, the Holders of a majority in principal amount of the Outstanding Notes by written notice to the Company and the Trustee may rescind or annul a declaration of acceleration if (i) the Company has paid or deposited with the Trustee a sum sufficient to pay all overdue interest (including any Additional Amounts) on Outstanding Notes, all unpaid principal of the Notes that has become due otherwise than by such declaration of acceleration, interest on such overdue interest (including any Additional Amounts) as provided in the Indenture, and all sums paid or advanced by the Trustee and the Collateral Agent under the Indenture, the Intercreditor Agreement and the Collateral Documents and the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their respective agents and counsel and (ii) all Events of Default have been cured or waived except nonpayment of principal that has become due solely because of acceleration.

A-18

No such rescission shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

Upon its execution, the Intercreditor Agreement provides for the order of payment in case of collection of any money pursuant to the exercise of remedies under the Indenture or the Collateral Documents.

16.    *Trustee Dealings with the Company.*

Subject to certain limitations imposed by the Indenture, the Trustee, the Collateral Agent and any Agent or co-registrar or any other agent of the Company, the Trustee or the Collateral Agent, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Company or its Affiliates with the same rights it would have if it were not Trustee, Collateral Agent, Agent, or such other agent.

17.    *Governing Law.*

THE INDENTURE, THIS NOTE AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

18.    *No Recourse Against Others.*

No director, officer, employee or shareholder, as such, of the Company or the Trustee shall have any liability for any obligations of the Company under the Notes or any obligations of the Company or the Trustee under the Indenture or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Note, each Holder waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Notes.

19.    *CUSIP and ISIN Numbers.*

Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP or ISIN numbers, as applicable, to be printed on the Notes and has directed the Trustee to use CUSIP or ISIN numbers, as applicable, in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Company shall furnish to any Holder upon written request and without charge a copy of the Indenture, which includes the form of this Note. Requests may be made to:

GOL Linhas Aéreas Inteligentes S.A.
Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attention: Richard F. Lark, Jr.
Facsimile: 55-11-5098-7881

A-19

#93484727v11

## NOTATION OF GUARANTY

For value received, each of the Guarantors (which term includes any successor Person under the Indenture) has unconditionally guaranteed, to the extent set forth in the Indenture and subject to the provisions in the Indenture dated as of December 23, 2020 (as amended from time to time, the "**Indenture**"), among the Company, the Guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as the Collateral Agent, the full and punctual payment (whether upon redemption, acceleration, or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other amounts payable by the Company under the Indenture.  The obligations of each of the Guarantors to the Secured Parties, pursuant to the respective Note Guaranty and the Indenture are expressly set forth in Article 10 of the Indenture and reference is hereby made to the Indenture for the precise terms of the Note Guaranties.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Indenture.

#93484727v11

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of guaranty to be duly executed.

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
Name:
Title:

By: _____
Name:
Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor

By: _____
Name:
Title:

By: _____
Name:
Title:

Witnesses:

By: _____
Name:

By: _____
Name:

#93484727v11

**EXHIBIT B**

FORM OF
TRANSFER NOTICE

       FOR VALUE RECEIVED, the undersigned Holder hereby sell(s), assign(s) and
transfer(s) unto

<u>Insert Taxpayer Identification No.</u>

_____

Please print or typewrite name and address, including postal zip code, of assignee

_____

this Note and all rights hereunder, hereby irrevocably constituting and appointing

_____ attorney to transfer said Note on the books of GOL FINANCE
with full power of substitution in the premises.

_____

       In connection with any transfer of this Note occurring prior to the Resale Restriction
Termination Date[§] [which is during the Restricted Period (as defined in the Indenture governing
the Notes),][**] the undersigned confirms that:

[Check one]

☐    (a)    This Note is being transferred to a person whom the Holder reasonably
believes is a qualified institutional buyer (as defined in Rule 144A under
the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), in a
transaction meeting the requirement of Rule 144A;

☐    (b)    This Note is being transferred in an offshore transaction in accordance
with Rule 904 under the Securities Act;

☐    (c)    This Note is being transferred pursuant to an exemption from registration
under the Securities Act provided by Rule 144 thereunder (if available);

☐    (d)    This Note is being transferred pursuant to an effective registration
statement under the Securities Act; or

_____

[§] *Include in Restricted Note.*

[**] *Include in Regulation S Note.*

B-1

☐    (e)    This Note is being transferred to GOL FINANCE,

in each of cases (a) through (e) above, in accordance with any applicable securities laws of any State of the United States.

If none of the foregoing boxes is checked, the Transfer Agent shall not be obligated to register this Note in the name of any Person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Section 2.07 of the Indenture shall have been satisfied.

Date: _____

_____
NOTICE:  The signature to this assignment must correspond with the name as written upon the face of this instrument in every particular, without alteration, enlargement or any other change whatever.

B-2

**EXHIBIT C**

FORM OF CERTIFICATE
FOR TRANSFER FROM RESTRICTED
NOTE OR CERTIFICATED NOTE BEARING
A SECURITIES ACT LEGEND TO REGULATION S
NOTE OR CERTIFICATED NOTE
NOT BEARING A SECURITIES ACT LEGEND

The Bank of New York Mellon
240 Greenwich Street, 7E
New York, New York 10286
Attn:  Corporate Trust Department

Re:    8.00% Senior Secured Notes Due 2026 (the "**Notes**") of GOL FINANCE

Reference is hereby made to the Indenture, dated December 23, 2020 (the "**Indenture**"), among GOL FINANCE, the Guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Restricted Note] [a Certificated Note bearing a Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest of equal principal amount in the Regulation S Note (ISIN No. ISIN USL4441RAC09) to be held with [Euroclear]* [Clearstream Banking]* (Common Code No. [●]) through DTC] [a Certificated Note of equal principal amount not bearing a Securities Act Legend].  In connection with such transfer, the undersigned does hereby certify that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 903 or 904 of Regulation S under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and, accordingly, the undersigned further certifies that:

(1)    the offer of the Notes was not made to a U.S. Person (as defined under Regulation S);

---

* *Indicate appropriate clearing system.*

#93484727v11

[(2)     at the time the buy order was originated, the transferee was outside the United States or the undersigned and any Person acting on behalf of the undersigned reasonably believed that the transferee was outside the United States;]†

[(2)     the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the undersigned nor any Person acting on behalf of the undersigned knows that the transaction was prearranged with a buyer in the United States;]‡

(3)     no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable;

(4)     the undersigned is not the Company, a distributor, an affiliate of either the Company or a distributor, or a Person acting on behalf of any of the foregoing; and

(5)     the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act.

This certificate and the statements contained herein are made for your benefit and for the benefit of GOL FINANCE.  Terms used in this certificate and not otherwise defined in the Indenture have the meanings set forth in Regulation S.

[INSERT NAME OF TRANSFEROR]

By:     _____

          Name:
          Title:

Dated: _____, _____

cc:     GOL FINANCE

_____

† *Insert one of the two provisions.*

‡ *Insert one of the two provisions.*

C-2

**EXHIBIT D**

FORM OF TRANSFER CERTIFICATE
FOR TRANSFER FROM REGULATION S
NOTE OR CERTIFICATED NOTE NOT BEARING
A SECURITIES ACT LEGEND TO RESTRICTED
NOTE OR CERTIFICATED NOTE BEARING
A SECURITIES ACT LEGEND
(DURING THE RESTRICTED PERIOD)

The Bank of New York Mellon
240 Greenwich Street, 7E
New York, New York 10286
Attn:  Corporate Trust Department

Re:    8.00% Senior Secured Notes Due 2026 (the "**Notes**") of GOL FINANCE

Reference is hereby made to the Indenture, dated December 23, 2020 (the "**Indenture**"), among GOL FINANCE, the Guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Regulation S Global Note (ISIN No. USL4441RAC09)] [a Certificated Note not bearing the Securities Act Legend].

The undersigned has requested a transfer of such [beneficial interest] [Certificated Note] to a Person who shall take delivery thereof in the form of [a beneficial interest in the Restricted Note (CUSIP No. 36254V AC2)] [a Certificated Note bearing the Securities Act Legend].  In connection with such transfer, the undersigned does hereby confirm that such transfer has been effected in accordance with the transfer restrictions set forth in the Indenture and the Notes and pursuant to and in accordance with Rule 144A under the U.S. Securities Act of 1933, as amended, and accordingly, the undersigned represents that:

(1)    the Notes are being transferred to a transferee that the undersigned reasonably believes is purchasing the Notes for its own account or one or more accounts with respect to which the transferee exercises sole investment discretion; and

(2)    the transferee and any such account is a "qualified institutional buyer" within the meaning of Rule 144A, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction.

This certificate and the statements contained herein are made for your benefit and for the benefit of GOL FINANCE.

[INSERT NAME OF TRANSFEROR]

D-1

By: _____
    Name:
    Title:


Dated: _____, _____

cc:    GOL FINANCE

#93484727v11

**EXHIBIT E**

FORM OF CERTIFICATE FOR REMOVAL
OF THE SECURITIES ACT LEGEND ON A CERTIFICATED NOTE

The Bank of New York Mellon
240 Greenwich Street, 7E
New York, New York 10286
Attn:  Corporate Trust Department

      Re:      8.00% Senior Secured Notes Due 2026 (the "**Notes**") of GOL FINANCE

Reference is hereby made to the Indenture, dated December 23, 2020 (the "**Indenture**"), among GOL FINANCE, the Guarantors party thereto, The Bank of New York Mellon, as Trustee, Registrar, Transfer Agent and Paying Agent, and TMF Brasil Administração e Gestão de Ativos Ltda., as Collateral Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$_____ principal amount of Notes which are held in the form of [a beneficial interest in the Restricted Note (CUSIP No. 36254V AC2) with DTC] [[a] Certificated Note(s) in the name of the undersigned.]*

The undersigned has requested for the Securities Act Legend on the Certificated Note(s) to be removed.

In connection with such transfer, the undersigned does hereby certify that such transfer has been effected only (i) in an offshore transaction in accordance with Rule 904 under the Securities Act, (ii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if available) or (iii) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (iii) in accordance with any applicable securities laws of any State of the United States.

---

\* *Indicate form in which Notes are held.*

#93484727v11

This certificate and the statements contained herein are made for your benefit and for the benefit of and GOL FINANCE.

[NAME OF UNDERSIGNED]

By: _____

     Name:

     Title:

Dated: _____, _____

cc:    GOL FINANCE

E-2

**EXHIBIT F**

FORM OF INTERCREDITOR AGREEMENT

#93484727v11

INTERCREDITOR AGREEMENT

dated as of [  ], 202[_]

among

GOL FINANCE
as Senior Secured Notes Issuer

[ADDITIONAL ISSUER]
as Additional Issuer

[GOL LINHAS AÉREAS S.A.][1]
as a Guarantor

[GOL LINHAS AÉREAS INTELIGENTES S.A.][2]
as a Guarantor

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

THE BANK OF NEW YORK MELLON
as Trustee under the Senior Secured Notes Indenture

and

[ADDITIONAL TRUSTEE]
as Trustee under the Additional Indenture

---

[1] To be adjusted if there is a successor obligor.

[2] To be adjusted if there is a successor obligor.

# TABLE OF CONTENTS

PAGE

## ARTICLE I

## DEFINITIONS

SECTION 1.01.   Certain Defined Terms; Construction ................................................................. 1

## ARTICLE II

## PRIORITIES AND AGREEMENTS WITH RESPECT TO THE COLLATERAL

SECTION 2.01.   Priority of Claims ............................................................................................... 8
SECTION 2.02.   Actions With Respect to the Collateral; Prohibition on Contesting Liens ....... 10
SECTION 2.03.   No Interference; Payment Over ....................................................................... 10
SECTION 2.04.   Release of Collateral ....................................................................................... 11
SECTION 2.05.   Certain Agreements With Respect to any Event of Insolvency or
Liquidation ...................................................................................................... 12
SECTION 2.06.   Reinstatement .................................................................................................. 12
SECTION 2.07.   Insurance ......................................................................................................... 12
SECTION 2.08.   Refinancings .................................................................................................... 12

## ARTICLE III

## EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

SECTION 3.01.   Determination of Existence or Amount of Liens and Obligations .................. 12

## ARTICLE IV

## THE COLLATERAL AGENT

SECTION 4.01.   Appointment and Authority ............................................................................ 13
SECTION 4.02.   Rights as a Secured Party ............................................................................... 14
SECTION 4.03.   Exculpatory Provisions ................................................................................... 14
SECTION 4.04.   Reliance by Collateral Agent ......................................................................... 16
SECTION 4.05.   Delegation of Duties ....................................................................................... 16
SECTION 4.06.   Resignation of Collateral Agent ..................................................................... 16
SECTION 4.07.   Non-Reliance on Collateral Agent .................................................................. 17
SECTION 4.08.   Collateral and Guaranty Matters ..................................................................... 17

#93974747v5

## ARTICLE V

## MISCELLANEOUS

SECTION 5.01.   Notices.................................................................................................... 17
SECTION 5.02.   Waivers; Amendment................................................................................ 19
SECTION 5.03.   Parties in Interest..................................................................................... 19
SECTION 5.04.   Effectiveness; Survival of Agreement ..................................................... 19
SECTION 5.05.   Counterparts ............................................................................................ 19
SECTION 5.06.   Severability.............................................................................................. 19
SECTION 5.07.   Governing Law......................................................................................... 19
SECTION 5.08.   Submission To Jurisdiction; Waivers ...................................................... 20
SECTION 5.09.   WAIVER OF JURY TRIAL...................................................................... 20
SECTION 5.10.   Headings.................................................................................................. 21
SECTION 5.11.   Conflicts.................................................................................................. 21
SECTION 5.12.   Relative Rights ........................................................................................ 21
SECTION 5.13.   Integration ............................................................................................... 21
SECTION 5.14.   Further Assurances.................................................................................. 21
SECTION 5.15.   Concerning the Trustee ........................................................................... 21
SECTION 5.16.   Preservation and Protection of the Collateral.......................................... 21

EXHIBIT A    -        Form of Joinder Agreement

#93974747v5

THIS INTERCREDITOR AGREEMENT (as amended or supplemented from time to time, this "**Agreement**") dated as of [    ], 202[_], among:

(1)    GOL FINANCE, a public limited liability company (*société anonyme*) organized and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 (the "**Senior Secured Notes Issuer**");

(2)    [ADDITIONAL ISSUER], a [____] (an "**Additional Issuer**");

(3)    GOL LINHAS AÉREAS S.A., a corporation (*sociedade por ações*) organized under the laws of Brazil ("**GLA**" and a "**Guarantor**");

(4)    GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**" and together with GLA, the "**Guarantors**");

(5)    TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent for the Secured Parties (as defined below) (in such capacity and together with its successors, the "**Collateral Agent**");

(6)    THE BANK OF NEW YORK MELLON, in its capacity as Trustee under the Senior Secured Notes Indenture (in such capacity and including any successors and assigns under the Senior Secured Notes Indenture, the "**Senior Secured Notes Trustee**"); and

(7)    [                    ], in its capacity as Additional Trustee under the Additional Indenture (in such capacity and including any successors and assigns thereunder, an "**Additional Trustee**").[3]

**WHEREAS**:

(A)    The Senior Secured Notes Issuer and the Senior Secured Notes Trustee have, *inter alios*, entered into the Senior Secured Notes Indenture;

(B)    The Additional Issuer and the Additional Trustee party hereto have, *inter alios*, entered into the Additional Indenture to which they are parties; and

(C)    The parties are entering into this Agreement for the purposes of, among other things, setting forth the method of voting and decision making for the Secured Parties and ensuring that the holders of the Senior Secured Notes and the holders of the Additional Pari Passu Obligations receive the benefit of equal and ratable security as contemplated pursuant to the terms and conditions of the Indentures and the Collateral Documents.

---

[3] To be adjusted if the Additional Notes trustee is a different entity.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01.    **Certain Defined Terms; Construction**.

(a)    As used in this Agreement (including the recitals), the following terms have the meanings specified below:

"**Additional Indenture**" means (i) the [indenture, credit agreement or similar document], dated as of the date hereof, entered into by and among an Additional Issuer (which may be the same as the Senior Secured Notes Issuer), the Guarantors, an Additional Trustee, [and any applicable listing agent] and (ii) any other indenture, credit agreement or similar agreement, in each case under which Additional Pari Passu Obligations are being issued or incurred by the Senior Secured Notes Issuer or an Additional Issuer.

"**Additional Issuer**" means (i) the "Additional Issuer" identified in the introductory paragraph of this Agreement and (ii) any other issuer or borrower of Additional Pari Passu Obligations.

"**Additional Pari Passu Obligations**" means (i) the [*describe additional notes being issued*] by the Additional Issuer identified in the introductory paragraph hereof on the date hereof or subsequently as additional notes under the same series and guaranteed by the Guarantors and secured by all or a portion of the Collateral and (ii) any other Additional Pari Passu Obligations as defined in the Senior Secured Notes Indenture.

"**Additional Trustee**" means the trustee, indenture trustee, facility agent, administrative agent or similar agent under any Additional Indenture.

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Agents**" means any Registrar, Transfer Agent or Paying Agent appointed pursuant to the Indentures, individually, an "Agent."

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazilian Bankruptcy Code**" means Law No. 11,101, of February 9, 2005, as amended.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, the United States of America or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, São Paulo, Brazil, or Luxembourg.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Collateral**" means the assets and properties of the Guarantors upon which Liens have been granted to the Collateral Agent, and/or the Secured Parties represented by the Collateral Agent, to secure the Pari Passu Obligations, including without limitation all of the "Collateral" as defined in the Collateral Documents, but excluding all such assets and properties that may, from time to time, be released from such Liens pursuant to and in accordance herewith, with the Indentures and/or with the applicable Collateral Document.

"**Collateral Agent**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Collateral Documents**" has the meaning assigned to such term in the Senior Secured Notes Indenture.

"**Controlling Secured Parties**" means:

(i)     from and including the first date on which an Event of Default shall have occurred to but excluding the ninetieth (90th) day following the occurrence thereof, Secured Parties that at such time collectively hold (or represent) more than fifty per cent (50%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class;

(ii)     if the "Controlling Secured Parties" described in clause (i) above have not directed the Collateral Agent to take any Enforcement Action before the ninetieth (90th) day following the occurrence of an Event of Default, then from and including the ninetieth (90th) day following the occurrence of an Event of Default to but excluding the one hundred and twentieth (120th) day following the occurrence thereof, Secured Parties that at such time collectively hold (or represent) more than thirty-five per cent (35%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class; and

(iii)     if neither the "Controlling Secured Parties" described in clause (i) above nor in clause (ii) above have directed the Collateral Agent to take any Enforcement Action before the one hundred and twentieth (120th) day following the occurrence of an Event of

#93974747v5

Default, then from and including the one hundred and twentieth (120th) day following the occurrence of an Event of Default and at any time thereafter, Secured Parties that at such time collectively hold (or represent) more than twenty-five per cent (25%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class;

**provided** that, notwithstanding clauses (ii) and (iii) above, at any time at which Secured Parties that at such time collectively hold (or represent) more than fifty per cent (50%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class, instruct the Collateral Agent, such Secured Parties shall be the "Controlling Secured Parties".

"**Debtor Relief Laws**" means the Brazilian Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of Brazil or Luxembourg or any other applicable jurisdictions from time to time in effect, as the case may be.

"**Enforcement Action**" means: (a) the taking of any steps (including directing the Collateral Agent through the applicable Trustee) to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral in accordance with any Collateral Document; (b) the exercise of any right of set-off against any of the Issuers or the Guarantors in respect of any Pari Passu Obligation; or (c) the petitioning, applying or voting for, or the taking of any steps (including the appointment of any trustee, liquidator, receiver, administrator or similar officer) in relation to an Event of Insolvency or Liquidation.

"**Event of Default**" means an Event of Default under any Indenture, as applicable.

"**Event of Insolvency or Liquidation**" means any event described in Section 6.01(i), (j) or (k) of the Senior Secured Notes Indenture and any equivalent provisions in any Additional Indenture.

"**GLA**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**GLAI**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Guarantors**" has the meaning assigned to such term in the introductory paragraph of this Agreement [and includes any successor obligor under the Note Guaranties pursuant to [Section 5.01 and Section 5.03] of the Indenture or equivalent provision of any Additional Indenture].

"**Holder**" means the Person in whose name a note representing Pari Passu Obligations is registered in the Register (as defined in the applicable Indenture) and any other holder or record of any Pari Passu Obligations.

#93974747v5

"**Indentures**" means, collectively, the Senior Secured Notes Indenture and any Additional Indenture.

"**Issue Date**" means, with respect to any Pari Passu Obligations, the date of issuance or other incurrence of such Pari Passu Obligations.

"**Issuers**" means, collectively, the Senior Secured Notes Issuer and any Additional Issuer.

"**Lien**" means any mortgage, pledge, security interest, assignment, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof or any agreement to create any mortgage, pledge, security interest, lien, charge, easement or encumbrance of any kind).

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Note Guaranty**" means each of the guarantees of the Pari Passu Obligations by any of the Guarantors pursuant to the Indentures.

"**Outstanding**" means, when used with respect to Pari Passu Obligations, as of the date of determination, all Pari Passu Obligations theretofore authenticated and delivered under the Indentures, except:

(i)      Pari Passu Obligations theretofore cancelled by the applicable Trustee or delivered to the applicable Trustee for cancellation;

(ii)      Pari Passu Obligations for whose payment or redemption money in the necessary amount has been theretofore deposited with the applicable Trustee or any Paying Agent (other than an Issuer) in trust or set aside and segregated in trust by an Issuer (if such Issuer shall act as its own Paying Agent) for the Holders of the Pari Passu Obligations; **provided** that, if such Pari Passu Obligations are to be redeemed or repaid pursuant to Article 3 of the Senior Secured Notes Indenture or equivalent provision in the relevant Additional Indenture, notice of such redemption has been duly given pursuant to such Indenture or provision therefor satisfactory to the applicable Trustee has been made;

(iii)      Pari Passu Obligations, except to the extent provided in Article 8 of the Senior Secured Notes Indenture or the equivalent provision in the applicable Additional Indenture(s), with respect to which the applicable Issuer has effected legal defeasance and/or covenant defeasance in accordance with the terms thereunder; and

(iv)      Pari Passu Obligations in exchange for or in lieu of which other Pari Passu Obligations have been authenticated and delivered pursuant to the Indentures, other than any such Pari Passu Obligations in respect of which there shall have been presented to the applicable Trustee proof satisfactory to it that such Pari Passu Obligations are held by a bona fide purchaser or protected purchaser in whose hands such Pari Passu Obligations are valid obligations of the applicable Issuer;

#93974747v5

**provided**, however, that in determining whether the Holders of the requisite principal amount of Outstanding Pari Passu Obligations have given any request, demand, authorization, direction, consent, notice or waiver under the Indentures, Pari Passu Obligations owned by an Issuer or any Affiliate of an Issuer shall be disregarded and deemed not to be Outstanding, except that, in determining whether the applicable Trustee shall be protected in relying upon any such request, demand, authorization, direction, consent, notice or waiver, only Pari Passu Obligations which a Responsible Officer (as defined under the applicable Indenture) of such Trustee has received written notice at its address specified herein of being so owned shall be so disregarded.  Pari Passu Obligations so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the applicable Trustee the pledgee's right so to act with respect to such Pari Passu Obligations and that the pledgee is not an Issuer, or any other obligor upon the Pari Passu Obligations or any of its or such other obligor's Affiliates.

"**Pari Passu Obligations**" has the meaning assigned to such term in the Senior Secured Notes Indenture.

"**Paying Agent**" means any Person authorized by the Issuers to pay the principal of or interest on any Pari Passu Obligations on behalf of the Issuers under the Indentures, including the Paying Agent in Luxembourg.

"**Person**" means an individual, a corporation, a partnership, limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"**Proceeds**" has the meaning assigned to such term in Section 2.01(a) hereof.

"**Refinance**" means, in respect of any indebtedness, to refinance, extend, renew, defease, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (and/or commitments with respect to such indebtedness), in whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Secured Parties**" has the meaning assigned to such term the Senior Secured Notes Indenture.

"**Senior Secured Notes**" means the [  ]% Senior Secured Notes Due 2026 issued by the Senior Secured Notes Issuer on the Issue Date therefor or subsequently as additional notes of the same series and guaranteed by the Guarantors and secured by the Collateral.

"**Senior Secured Notes Indenture**" means the indenture, dated as of the Issue Date therefor, entered into by and among the Senior Secured Notes Issuer, the Guarantors, The Bank of New York Mellon, as trustee, transfer agent, registrar and paying agent, and the Collateral Agent, relating to the Senior Secured Notes.

#93974747v5

"**Senior Secured Notes Issuer**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Senior Secured Notes Obligations**" means the "Notes Obligations" as defined in the Senior Secured Notes Indenture.

"**Senior Secured Notes Trustee**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Significant Subsidiary**" has the meaning given to such term in the Senior Secured Notes Indenture.

"**Subsidiary**" has the meaning given to such term in the Senior Secured Notes Indenture.

"**Transfer Agent**" has the meaning given to such term in the Senior Secured Notes Indenture or any Additional Indenture, as applicable.

"**Trustee**" means (i) the Senior Secured Notes Trustee and (ii) any Additional Trustee. References to "Trustee" in this Agreement shall mean the Trustee under each of the Indentures, unless the context requires otherwise.

(b)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

## ARTICLE II

## PRIORITIES AND AGREEMENTS WITH RESPECT TO THE COLLATERAL

SECTION 2.01.     **Priority of Claims**.

(a)     Notwithstanding anything contained herein or in the Indentures or in any of the Collateral Documents to the contrary, if an Event of Default has occurred and is continuing, and the Collateral Agent, any Trustee or any Secured Party is taking any Enforcement Action, or any distribution is made in respect of the Collateral as a result of any Event of Insolvency or Liquidation, the proceeds of any sale, collection or other liquidation of the Collateral on account of such enforcement of rights by the Collateral Agent, any Trustee or any Secured Party or any such distribution or payment received by the Collateral Agent, on behalf of the Secured Parties, any Trustee or any Secured Party as a result of any Event of Insolvency or Liquidation (all proceeds of any sale, collection or other liquidation of the Collateral and all such distributions or payments being collectively referred to as "**Proceeds**"), to the extent permitted by applicable law shall be applied in the following order as promptly as is reasonably practicable after the receipt thereof; **provided** that, such amounts shall not be so applied until such time as the amount of the Pari Passu Obligations have been determined in accordance with the terms hereof and under the terms of the Indentures and the Collateral Documents:

FIRST, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent, the Trustees and the other Agents under the Indentures and Collateral Documents and any other agent or attorney appointed thereby in their capacities as such (including, costs and expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Agreement, the Indentures or any Collateral Document);

SECOND, on a pro rata basis, to the payment in full to the Secured Parties of all amounts due and unpaid on the Pari Passu Obligations for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Pari Passu Obligations for principal and interest; **provided**, that, the Proceeds shall be applied (i) first, to the Secured Parties for amounts due and payable on the Pari Passu Obligations for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Pari Passu Obligations for interest and (ii) second, any remaining amounts to the Secured Parties for amounts due and payable on the Pari Passu Obligations for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Pari Passu Obligations;

THIRD, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses, charges, liabilities, indemnities, fees and other amounts due to Collateral Agent, the Trustees, the other Agents and the Secured Parties (other than amounts paid (x) at priority "first" to the Collateral Agent, the Trustees and the other Agents or (y) at priority "second" to the Secured Parties); and

FOURTH, the balance, if any, after all of the Pari Passu Obligations have been paid in full in cash, to the Issuers and their respective successors or assigns, or as a court of competent jurisdiction may otherwise direct;

**provided**, **however**, that the foregoing orders of application above shall not be altered as a result of any Liens under any of the Collateral Documents failing to secure all of the Pari Passu

#93974747v5

Obligations, and the Secured Parties agree that Proceeds from all sources shall be applied to ensure that the foregoing order of application is maintained.

(b)    It is acknowledged that the Pari Passu Obligations may, subject to the limitations set forth in the Indentures, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priority set forth in Section 2.01(a) or the provisions of this Agreement defining the rights of the Secured Parties.

(c)    Notwithstanding (i) the time, order or method of attachment or perfection of any Liens securing any Pari Passu Obligations granted on the Collateral, the time or order of filing of notices of such Liens, financing statements (or similar filings in any applicable jurisdiction), or the giving of or failure to give notice of the acquisition or expected acquisition of purchase money or other Liens, (ii) the manner in which such Lien is acquired, whether by grant, contract, statute or operation of law, subrogation or otherwise, (iii) the fact that the Collateral or any Lien thereof (or any portion thereof) is otherwise subordinated, voided, avoided, invalidated or lapsed and (iv) any applicable law or any provision to the contrary in any Collateral Document or the Indentures, each of the Collateral Agent and the Trustees agree, for themselves and on behalf of each Secured Party, that (1) each Lien created in favor of a Secured Party in the Collateral pursuant to a Collateral Document ranks and shall rank equally in priority to each other Lien created in favor of a Secured Party, and each Secured Party, has and shall have a pro rata entitlement to the Liens (if any) of the other Secured Parties in the Collateral, (2) any Lien (if any) created in favor of a Secured Party and held by such Secured Party in the Collateral shall be for the equal and ratable benefit of all Secured Parties and (3) subject to any mandatory provisions of any applicable law, the Senior Secured Note Obligations and the Additional Pari Passu Obligations rank and shall rank on a pari passu basis with each other.

SECTION 2.02.    **Actions With Respect to the Collateral; Prohibition on Contesting Liens**.

(a)    The Secured Parties shall vote as a single class by reference to the aggregate principal amount of the then Outstanding Pari Passu Obligations on all matters related to the Collateral, including, but not limited to, enforcement of rights in the Collateral. The Collateral Agent shall refrain from taking any action to exercise any rights hereunder and under the Collateral Documents or otherwise with respect to the Collateral unless it is instructed to do so by the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, in accordance with clause (b) below.

(b)    The Collateral Agent shall act at the direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties.  The Collateral Agent may at any time seek the direction of the Trustees, and the Trustees agree to cooperate fully with the Collateral Agent to provide such direction.

(c)    Notwithstanding any other provision of this Agreement or any of the terms of the Indentures or the Collateral Documents, (a) the Collateral Agent shall act solely at the direction of the Trustees, on behalf of the Controlling Secured Parties, and (b) the Collateral

#93974747v5

Agent shall not have any duty, liability or responsibility to take any direction from or recognize any notice or other communication from any Secured Party other than the Trustees.

(d)       Notwithstanding the terms of any Indenture or Collateral Document, in no event shall the Collateral Agent have any duty, responsibility or liability with respect to (A) the identity of any Secured Party, (B) any requirements of the Indentures or Collateral Documents regarding voting or otherwise taking action, including voting percentages or entitlement to vote, (C) whether any Pari Passu Obligation is held by the Issuers or any Affiliate of the Issuers or (D) whether any Secured Party should be disregarded for purposes of voting.

(e)       If less than the Controlling Secured Parties have instructed the Collateral Agent, through the Trustees, to take enforcement action pursuant to clause (b) above, then the Collateral Agent shall not take enforcement action unless and until the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, instruct the Collateral Agent in writing to take such action; **provided** that, the Collateral Agent shall not be obligated to take any action that is (i) contrary to applicable law in any applicable jurisdiction; or (ii) based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to the Indentures and the Collateral Documents.

(f)       Each of the Collateral Agent and each Trustee agree, for itself and on behalf of each Secured Party, that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including in any Event of Insolvency or Liquidation), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; **provided** that nothing in this Agreement shall be construed to prevent or impair the rights of any Secured Party, the Collateral Agent or any Trustee to enforce this Agreement.

SECTION 2.03.    **No Interference; Payment Over**.

(a)       Each Trustee, on behalf of itself and the relevant Secured Parties, and each Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any Pari Passu Obligations or the Indentures or the validity, attachment, perfection or priority of any Lien under the Collateral Documents or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Collateral Agent or any other Secured Party to exercise any right, remedy or power with respect to the Collateral or (B) consent to the exercise by the Collateral Agent or any other Secured Party of any right, remedy or power with respect to the Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Collateral Agent or any other Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to the Collateral, and none of the Collateral Agent, any Trustee or any other Secured Party shall be liable for any action taken or omitted to be taken by the Collateral Agent, such Trustee or such other Secured Party with respect to the Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have the

Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; **provided** that nothing in this Agreement shall be construed to prevent or impair the rights of the Collateral Agent, any Trustee or any other Secured Party to enforce this Agreement.

(b)    The Collateral Agent, on behalf of the relevant Secured Parties, agrees that if it shall obtain possession of the Collateral or shall realize any proceeds or payment in respect of the Collateral, pursuant to the Collateral Documents or the Indentures or by the exercise of any rights available to it under applicable law or in any Event of Insolvency or Liquidation or through any other exercise of remedies, at any time prior to the payment in full of each of the Pari Passu Obligations, then it shall hold the Collateral, proceeds or payment for the other Secured Parties and promptly transfer the Collateral, proceeds or payment, as the case may be, to the Trustees, to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04.    **Release of Collateral**.

(a)    Subject to the terms of the Indentures, the Collateral Documents and this Agreement, the Collateral shall be released from the Liens securing the Pari Passu Obligations under any one or more of the following circumstances:

(i)    in accordance with the Indentures, the Collateral Documents and this Agreement, if at any time the Collateral Agent forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)    [as described in [Article 9] of the Senior Secured Notes Indenture and any equivalent provision in any Additional Indenture];

(iii)    upon the discharge in full of the Pari Passu Obligations;

(iv)    (A) with respect to the Senior Secured Notes Obligations, upon a legal defeasance or covenant defeasance under the Senior Secured Notes Indenture as described in [Article 8] of the Senior Secured Notes Indenture and (B) with respect to any Additional Obligations, upon a legal defeasance or covenant defeasance under the applicable Additional indenture as described in the equivalent provision of such Additional Indenture; or

(v)    Except with respect to the Pledged IP and (unless otherwise permitted under the Indentures) with a disposition of Spare Parts, at any time at the election of the Issuers

in each case, so long as (A) no Default or Event of Default will exist immediately after such release and (B) the LTV Ratio immediately after such release will not exceed the Trigger LTV Ratio.

#93974747v5

(b)    **provided**, **however**, that, notwithstanding the foregoing, the security interest granted under the Collateral Documents will terminate in respect of any Pari Passu Obligations on the maturity date of such Pari Passu Obligations, unless through passage of time, acceleration or otherwise there exists a due and payable payment obligation on the Pari Passu Obligations on that date, in which case the security interest in the Collateral will terminate upon satisfaction of that payment obligation. As a consequence of the termination, the Collateral shall be automatically released. Each Trustee agrees to execute and deliver (at the sole cost and expense of the Issuers and the Guarantors) all such acknowledgments, consents, confirmations, authorizations and other instruments as shall reasonably be requested by the Collateral Agent to evidence and confirm any release of the Collateral provided for in this Section.

SECTION 2.05.    **Certain Agreements With Respect to any Event of Insolvency or Liquidation**.    This Agreement shall continue in full force and effect notwithstanding the commencement of any Event of Insolvency or Liquidation.

SECTION 2.06.    **Reinstatement**. In the event that any of the Pari Passu Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason, be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all Pari Passu Obligations shall again have been paid in full in cash.

SECTION 2.07.    **Insurance**. The Collateral Agent, acting at the written direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, shall have the right, subject to the rights of the Issuers or the Guarantors under the Indentures, to adjust or settle any insurance policy or claim covering or constituting the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Collateral.

SECTION 2.08.    **Refinancings**.    The Pari Passu Obligations may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit such Refinancing under each applicable Indenture) of the other Secured Parties, all without affecting the priorities provided for herein or the other provisions hereof.

SECTION 2.09.    **Additional Trustees**.  Each Additional Trustee (other than the Additional Trustee signing this Agreement on the date hereof) shall, on the date on which it enters into the relevant Additional Indenture, execute a joinder agreement in substantially the form of Exhibit A hereto and deliver a copy thereof to the Collateral Agent and each other Trustee.

## ARTICLE III

## EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

SECTION 3.01.    **Determination of Existence or Amount of Liens and Obligations**.  Whenever the Collateral Agent shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to confirm the existence or amount

of any Pari Passu Obligations or the Collateral subject to the Liens securing any Pari Passu Obligations, the Collateral Agent shall request that such information be furnished to it in writing by the Trustees or GLAI, as set forth in an Officers' Certificate (as defined in the Senior Secured Notes Indenture), and shall be entitled to make such determination on the basis of the information so furnished; **provided**, **however**, that if the Trustees or GLAI shall fail or refuse reasonably promptly to provide the requested information, the Collateral Agent shall have no liability for refusing to take such action until such information is provided. The Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to GLAI, any Secured Party, or any other Person as a result of such determination.

## ARTICLE IV

### THE COLLATERAL AGENT

SECTION 4.01.    **Appointment and Authority**.

(a)    Each Trustee (pursuant to its respective Indenture) and each other Secured Party (other than the Collateral Agent) hereby irrevocably appoints TMF Brasil Administração e Gestão de Ativos Ltda. to act as Collateral Agent on behalf of the Secured Parties hereunder and under each of the Collateral Documents to which the Collateral Agent is a party and authorizes the Collateral Agent to take actions on its behalf and to exercise the Collateral Agent's powers in accordance with the terms hereof or thereof, including for purposes of acquiring, holding and enforcing any and all Liens on the Collateral to secure any of the Pari Passu Obligations, together with such powers and authority as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Collateral Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement, the Senior Secured Notes Indenture and each of the Collateral Documents. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 4.05 for purposes of holding or enforcing any Lien on the Collateral granted under any of the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, shall be entitled to all the rights, protections, immunities and indemnities granted to it under the Indentures and the Collateral Documents, including without limitation all provisions of this Article IV, Article 12 of the Senior Secured Notes Indenture, the equivalent provisions in the Additional Indentures and the applicable provisions of the Collateral Documents (as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" under the Collateral Documents) as if set forth in full herein with respect thereto.

(b)    Each Secured Party and the Trustee on behalf of the relevant Secured Parties acknowledges and agrees that the Collateral Agent shall be entitled, for the benefit of the Secured Parties, to sell, transfer or otherwise dispose of or deal with the Collateral as provided herein and in each applicable Collateral Document, without regard to any rights to which any Secured Party would otherwise be entitled. Without limiting the foregoing, each relevant Secured

#93974747v5

Party agrees that none of the Trustees, the Collateral Agent, the Controlling Secured Parties, or any other Secured Party shall have any duty or obligation first to marshal or realize upon the Collateral securing the Pari Passu Obligations, or to sell, dispose of or otherwise liquidate the Collateral, in any manner that would contravene the express terms of this Agreement. Each Secured Party waives any claim such Secured Parties may now or hereafter have against the Collateral Agent or any Trustee, or any other Secured Party arising out of (i) any actions which the Trustees or the Collateral Agent, or such Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on the Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, the Collateral and actions with respect to the collection of any claim for all or any part of the applicable Pari Passu Obligations from any account debtor, guarantor or any other party) in accordance with the applicable Collateral Document or any other agreement related thereto or to the collection of Pari Passu Obligations or the valuation, use, protection or release of any security for such Pari Passu Obligations, (ii) any election by the Trustees or the Collateral Agent, in any proceeding instituted under the Brazilian Bankruptcy Code or (iii) any borrowing by, or grant of a security interest or administrative expense priority or order granted pursuant to, any Debtor Relief Law by the Issuers, the Guarantors or any Significant Subsidiary, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Collateral Agent and the Trustee shall not accept the Collateral in full or partial satisfaction of any Pari Passu Obligations pursuant to the terms of the Collateral Documents.

SECTION 4.02.    **Rights as a Secured Party**.    The Person serving as the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Secured Party of the Pari Passu Obligations that it holds as any other Secured Party of such Pari Passu Obligations and may exercise the same as though it were not the Collateral Agent and the term "Secured Party" or "Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Collateral Agent hereunder in its individual capacity.

SECTION 4.03.    **Exculpatory Provisions**.

(a)    The Trustee and the Collateral Agent shall not have any duties or obligations except those expressly set forth herein, in the Indentures and in the Collateral Documents to which it is a party. Without limiting the generality of the foregoing, as among the Trustees and the Collateral Agent and the Secured Parties, the Trustees and the Collateral Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the Collateral Documents that, in the case of the Collateral Agent, it is required to exercise as directed in writing by the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties; **provided** that the Trustee and the Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or risk its own funds or that is contrary

#93974747v5

to any Collateral Document (as modified by this Agreement) or applicable law;

(iii)    shall not, except as expressly set forth herein or in the Collateral Documents to which it is a party, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuers, the Guarantors or any of their Affiliates that is communicated to or obtained by the Person serving as the Trustee or Collateral Agent or any of its Affiliates in any capacity;

(iv)    shall not be liable for any action taken or not taken by it (1) (A) in the case of the Collateral Agent, with the consent or at the request or direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties and (B) in the case of the Trustee, at the direction of the Controlling Secured Parties, (2) in the absence of the Trustee's or Collateral Agent's own gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction) or (3) in reliance on a certificate of an authorized officer of the Issuers or the Guarantors, as the case may be, stating that such action is permitted by the terms of this Agreement;

(v)    shall be deemed not to have knowledge of any Event of Default under any of the Pari Passu Obligations unless and until written notice describing such Event of Default and referring to this Agreement is given to the Collateral Agent or Trustee by the Issuers, the Guarantors or, in the case of the Collateral Agent, a Trustee;

(vi)    shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Agreement, the Indentures or the Collateral Documents, (2) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Event of Default or any event that with notice or lapse of time would become an Event of Default, (4) the validity, enforceability, effectiveness or genuineness of this Agreement, the Indentures, the Collateral Documents or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, or (5) the value or the sufficiency of the Collateral for any Pari Passu Obligations; and

(vii)    shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation strikes, work stoppages, governmental actions, accidents, acts of war or terrorism, pandemics, civil or military disturbances, nuclear or

#93974747v5

natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

(b)     Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Trustees or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Trustees or the Collateral Agent, it is understood that in all cases the Trustees and the Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence pursuant to Section 2.02 in respect of such action. The Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

SECTION 4.04.     **Reliance by Collateral Agent and Trustees**.  The Collateral Agent and the Trustees shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Collateral Agent and the Trustees also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Collateral Agent and the Trustees may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in reliance upon the advice of any such counsel, accountants or experts.

SECTION 4.05.     **Delegation of Duties**.  The Collateral Agent and the Trustees may perform any and all of its duties and exercise its rights and powers hereunder, under the Indentures or the Collateral Documents by or through any one or more sub-agents appointed by the Collateral Agent or the Trustees. The Collateral Agent, the Trustees and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Collateral Agent or the Trustees and any such sub-agent.

SECTION 4.06.     **Resignation of Collateral Agent**.  The Collateral Agent may resign pursuant to and in accordance with the terms of the Senior Secured Notes Indenture.

SECTION 4.07.     **Non-Reliance on Collateral Agent and Trustees**.  Each Secured Party (other than the Trustees and the Collateral Agent) acknowledges that it has, independently and without reliance upon the Collateral Agent or any Trustee, any other Secured

#93974747v5

Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the Collateral Documents to which it is a party. Each Secured Party (other than the Trustees and the Collateral Agent) also acknowledges that it will, independently and without reliance upon the Collateral Agent or any Trustee, or any other Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, the Indentures, the Collateral Documents or any related agreement or any document furnished hereunder or thereunder.

SECTION 4.08.    **Collateral and Guaranty Matters**.  Each Trustee, the Issuer and each Secured Party, irrevocably authorizes the Collateral Agent:

(a)    to release any Lien on any property granted to or held by the Collateral Agent under any Collateral Document in accordance with Section 2.04 or upon receipt of a written request and opinion of counsel from the Issuers stating that the release of such Lien is permitted by the terms of this Agreement, each of the Indentures and the Collateral Documents and such other matters as may be requested by the Collateral Agent; and

(b)    to release each Guarantor from its obligations under each Collateral Document upon receipt of a written request and opinion of counsel from the Issuers stating that such release is permitted by the terms of this Agreement, each of the Indentures and the Collateral Documents and such other matters as may be requested by the Collateral Agent.

SECTION 4.09.  **Incorporation by Reference**.

(a)    The Collateral Agent is executing this Agreement solely as collateral agent under the Senior Secured Notes Indenture.  All rights, privileges, protections and immunities (including, without limitation, the right to indemnification) in favor of the Collateral Agent under the Senior Secured Notes Indenture are incorporated herein by reference, mutatis mutandis.

(b)    Each of the Trustees is executing this Agreement solely as Trustees under the Indentures.  All rights, privileges, protections and immunities (including, without limitation, the right to indemnification) in favor of the Trustees under the Indentures are incorporated herein by reference, mutatis mutandis.

# ARTICLE V

## MISCELLANEOUS

SECTION 5.01.    **Notices**. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, or sent to the e-mail address of the applicable recipient specified below, as follows:

(a)    if to the Collateral Agent, to it at the following address:

#93974747v5

TMF Brasil Administração e Gestão de Ativos Ltda.
Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro
Empresarial Tamboré, Barueri –SP, 06460-110, Brazil
São Paulo, SP, Brazil
Attention: Danilo Oliveira / Karla Fernandes
Email:  cts.brazil@tmf-group.com; danilo.oliveira@tmf-group.com;
karla.fernandes@tmf-group.com

(b)    if to the Senior Secured Notes Trustee, to it at the following address:

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: RM for Gol Finance

(c)    if to the Additional Trustee identified in the introductory paragraph hereto, to it at the following address:

[____]

(d)    if to any other Additional Trustee, to it at the address set forth in the applicable joinder agreement;

(e)    if to the Issuers and the Guarantors, at the following address:

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attention: Edmar Prado Lopes Neto
Facsimile: 55-11-5098-7888
Email: elopes@voegol.com.br

with a copy to:

Milbank LLP
Av. Brigadeiro Faria Lima, 4100, 5th Floor
São Paulo, SP
Brasil
Attention: Tobias Stirnberg
Facsimile: 55 11 3927-7702
Email: tstirnberg@milbank.com

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 5.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 5.01. As agreed to between the Collateral Agent and the Trustees from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable party provided from time to time by such party.

SECTION 5.02.    **Waivers; Amendment**.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Trustees and the Collateral Agent.

SECTION 5.03.    **Parties in Interest**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 5.04.    **Effectiveness; Survival of Agreement**. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto on the date hereof and delivery by each of the parties on the date hereof.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.  A party's electronic signature (complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to

#93974747v5

time, or other applicable law) of this Agreement shall have the same validity and effect as a signature affixed by the party's hand.

SECTION 5.06.    **Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07.    **Governing Law**.    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

SECTION 5.08.    **Submission To Jurisdiction; Waivers**.    Each of the Collateral Agent, the Trustees, and Secured Parties, irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its authorized representative) at the address referred to in Section 5.01, except in the case of the Collateral Agent, who has legally, validly, effectively and irrevocably designated, appointed and empowered [\_\_\_], as agent for service of process in any legal suit action or proceeding arising out of or related to this Agreement in any courts of the State of New York, courts of the United States of America for the Southern District of New York, and appellate courts from any thereof, and in the case of the Issuers and the Guarantors, who have legally, validly, effectively and irrevocably designated, appointed and empowered [\_\_\_], as agent for service of process in any legal suit action or proceeding arising out of or related to this Agreement in any courts of the State of New York, courts of the United States of America for the Southern District of New York, and appellate courts from any thereof; and

(d)    agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by Law or shall limit the right of any party hereto (or any Secured Party) to sue in any other jurisdiction.

#93974747v5

SECTION 5.09.    **WAIVER OF JURY TRIAL**.   EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 5.10.    **Headings**.  Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11.    **Conflicts**.   In the event of any conflict or inconsistency between the provisions of this Agreement, the Indentures or any of the Collateral Documents, the provisions of this Agreement shall control.

SECTION 5.12.    **Relative Rights**.  Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Section 2.04), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of any of the Indentures or the Collateral Documents, or permit the Issuers or any of the Guarantors to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the any of the Indentures or the Collateral Documents, (b) impair the obligations of the Issuers or the Guarantors, which are absolute and unconditional, to pay the Pari Passu Obligations as and when they shall become due and payable in accordance with their terms or (c) obligate the Issuers or the Guarantors to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the Indenture or the Collateral Documents.

SECTION 5.13.    **Integration**.   This Agreement together with the Indentures and the Collateral Documents represents the agreement of each of the Issuers, the Guarantors and the Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by the Trustees, Issuers or any of the Guarantors, the Collateral Agent, or any Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the Indentures or the Collateral Documents.

SECTION 5.14.    **Further Assurances**.  Each of the Collateral Agent and each Trustee agrees that it will execute, or will cause to be executed, any and all further documents, agreements and instruments, and take all such further actions, as may be required under any applicable Law, or which the Collateral Agent or the Trustees may reasonably request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for herein.

SECTION 5.15.    **Concerning the Trustee**s.  Notwithstanding any term herein to the contrary, it is hereby expressly agreed and acknowledged that the agreements set forth herein by any Trustee (in its capacity as such) are made solely in its capacity as Trustee under the applicable Indenture and pursuant to the provisions of such Indenture and the direction of the Issuers, the Guarantors and the Secured Parties, and not in its individual capacity. Each Trustee (in its capacity as such) shall not have any duties, obligations, or responsibilities under this Agreement in its capacity as such except as expressly set forth herein, and shall have the benefit of all exculpatory provisions, presumptions, indemnities, protections, benefits, immunities or reliance rights contained in the Indentures in the acceptance, execution, delivery and

performance of this Agreement as though fully set forth herein. Notwithstanding any provision to the contrary, no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise against the Trustees and the Trustees acting under this Agreement shall not have by reason of the Collateral Documents or this Agreement any fiduciary or discretionary duties or obligations.

SECTION 5.16.    **Secured Parties**.    Nothing in this Agreement, including the appointment by the parties hereto of the Collateral Agent to exercise remedies on their behalf as set forth herein, shall be interpreted or construed to impose on any Secured Party any obligation to provide new loans or other forms of financing to or on behalf of the Issuers or the Guarantors, or to extend or renew any existing loans or other forms of financing to or on behalf of the Issuers or the Guarantors, including to permit them to continue their business operations.

[Remainder of this page intentionally left blank]

#93974747v5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**GOL FINANCE**, as Senior Secured Notes Issuer

By: _____
      Name:
      Title:

[____],
as Additional Issuer

By: _____
      Name:
      Title:

**[GOL LINHAS AÉREAS S.A.],**
as a Guarantor

By: _____
       Name:
       Title:

**[GOL LINHAS AÉREAS INTELIGENTES S.A.,]**
as a Guarantor

By:  _____
        Name:
        Title:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO
DE ATIVOS LTDA.,**
as Collateral Agent

By: _____

      Name:

      Title:

**THE BANK OF NEW YORK MELLON**,
as Trustee

By: _____
       Name:
       Title:

[        ],
as Additional Trustee

By: _____
      Name:
      Title:

## EXHIBIT A – FORM OF JOINDER AGREEMENT

To: [ ]

From: [  ]

Date: [ ]

We refer to that Intercreditor Agreement dated [_____], 20[ ] among [   ], [   ] and [   ] (the "**Intercreditor Agreement**"). Terms defined in the Intercreditor Agreement (whether directly or by incorporation) shall have the same meanings in this Joinder Agreement.

This Joinder to Intercreditor Agreement, dated as of [  ], 20[  ] (this "**Joinder**"), is being delivered in connection with the execution and delivery of that certain Additional Indenture dated as of the date hereof (as amended, supplemented or otherwise modified from time to time, the "**Indenture**") among [  ], [  ], each Guarantor (as defined therein) from time to time party thereto, and [  ], in its capacity, as additional trustee (in such capacity, the "**Additional Trustee**") pursuant to which [   ] is issuing [    ] (the "[   ]"), which [   ] constitute Additional Pari Passu Obligations under the Intercreditor Agreement.

The undersigned, [  ] in its capacity as Additional Trustee hereby joins the Intercreditor Agreement as a Trrustee acting for and behalf of [   ] as holders of Additional Pari Passu Obligations under, and as defined in, the Intercreditor Agreement for all purposes thereof on the terms set forth therein, and agrees to be bound by the terms, conditions and provisions of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

The Additional Trustee, on behalf of itself and each holder of Additional Pari Passu Obligations and each holder of Additional Pari Passu Obligations, hereby agrees, that: (a) as set forth in the Intercreditor Agreement and the Collateral Documents, all claims of the holders of such Additional Pari Passu Obligations will be and are secured equally and ratably by all Liens granted to the Collateral Agent, for the benefit of all Secured Parties and that all Liens granted pursuant to the Collateral Documents will be enforceable by the Collateral Agent for the benefit of all Secured Parties equally and ratably as contemplated by the Intercreditor Agreement and the Collateral Documents; (b) the Additional Trustee is bound by the terms, conditions and provisions of the Intercreditor Agreement, including, without limitation, the provisions relating to the application of proceeds from the enforcement of Liens; and (c) the Additional Trustee shall perform its obligations under the Intercreditor Agreement.

The Additional Trustee represents, warrants and acknowledges that, pursuant to the authorizations set forth in the Indenture, it has the authority to bind each of the holders of Additional Pari Passu Obligations to the Intercreditor Agreement and the Collateral Documents.

From this date hereof, references to the Intercreditor Agreement shall mean and include the Intercreditor Agreement as supplemented by this Joinder.

#93974747v5

This Joinder may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute one contract.

THIS JOINDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the parties caused this Joinder to be duly executed and delivered as of the day and year first above written.

Notice address: [Additional Trustee]

[Signature Pages Follow]

#93974747v5

**EXHIBIT G**

FORM OF GLA FIDUCIARY TRANSFER OF IP RIGHTS

#93484727v11

| | |
|---|---|
| **FIDUCIARY TRANSFER OF INTELLECTUAL PROPERTY RIGHTS AGREEMENT** | **CONTRATO DE ALIENAÇÃO FIDUCIÁRIA DE DIREITOS DE PROPRIEDADE INTELECUAL** |

This Fiduciary Transfer of Intellectual Property Rights Agreement ("Agreement") is entered into by and among:

O presente Contrato de Alienação de Direitos Propriedade Intelectual ("Contrato") é celebrado por e entre:

(i)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA" or "Company");

(i)     **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLA" ou "Companhia");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Secured Parties (hereinafter referred to as "Brazilian Collateral Agent");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o nº 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício das Partes Garantidas (doravante designado "Agente de Garantia Brasileiro");

(iii)     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at

(iii)     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Praça Comandante

1

Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

**WHEREAS:**

(i)    GOL Finance, a public limited liability company (*société anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued 8.00% Senior Secured Notes due 2026 ("Notes"), pursuant to an Indenture entered into by Gol Finance and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the Notes ("Offering");

(ii)    the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture ("Secured Parties") as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral provided under this Agreement, as permitted by the terms set forth in the Indenture, in accordance,

Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI")

Cada parte acima também são doravante individualmente designadas como "Parte" e, em conjunto, como "Partes";

**CONSIDERANDO QUE:**

(i)    a GOL Finance, sociedade pública de responsabilidade limitada (*société anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Luxemburgo"), com sede na 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas"), nos termos e condições previstos na Escritura por meio da qual as Notas foram emitidas, celebrada entre a Gol Finance e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e conforme descrito no memorando da colação privada relacionado às Notas("Oferta");

(ii)    o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelos outras partes garantidas descritas na Escritura ("Partes Garantidas") como agente de garantia no Brasil nos termos da Escritura para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e

2

exclusively and strictly, with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms provided for in the Indenture and this Agreement;

(iii)    The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent;

(iv)    in order to secure the satisfaction of all obligations undertaken by Gol Finance, under the terms and conditions of the Indenture, GLA and GLAI ("Guarantors") provided a personal guarantee under the terms of the Indenture ("Guarantees"); and

(v)    in order to guarantee compliance with all obligations undertaken Gol Finance under the terms and conditions of the Indenture and the Guarantors under the Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Intellectual Property (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and

estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii)    A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o Trustee, na qualidade de representante das Partes Garantidas e do Agente de Garantia Brasileiro;

(iv)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, a GLA e a GLAI ("Garantidoras") prestaram garantia pessoal nos termos da Escritura ("Garantias"); e

(v)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e condições da Escritura e dos Garantidores no âmbito das Garantias, a Companhia concordou em conceder às Partes Garantidas, representadas no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre a Propriedade Intelectual (conforme definido abaixo), mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da

3

indirect possession over all the Transferred Assets (as defined below).

**NOW, THEREFORE**, the Parties agree to enter into this Agreement under the following terms and conditions:

### SECTION I
### FIDUCIARY TRANSFER; COLLATERAL

1.1.     In accordance with the provisions herein, in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the terms of the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Guarantees; (c) the faithful and timely fulfillment by Gol Finance and the Guarantors of all agreements, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the referred instruments (jointly, the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance, GLA and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to

posse indireta sobre todas os Bens Alienados (conforme definido abaixo).

**RESOLVEM**, as Partes, celebrar este Contrato, de acordo com os seguintes termos e condições:

### CLÁUSULA I
### ALIENAÇÃO FIDUCIÁRIA; GARANTIA

1.1.     De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias; (c) o fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos, obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela GLA e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação

4

jointly as the "Secured Obligations"), which are summarized in Exhibit I hereto in compliance with the provisions of article 1,362 of the Brazilian Civil Code, the Company, pursuant to and in accordance with the provisions of articles 1,361 *et seq.* of the Civil Code, hereby irrevocably assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional property and indirect possession (the "Fiduciary Transfer") of the intellectual properties owned by the Company as described and listed in Exhibit III hereto ("Intellectual Property"), including, without limitation, the trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (*INPI – Instituto Nacional da Propriedade Industrial*) (hereinafter, the "INPI") (hereinafter referred to as the "Transferred Assets").

1.2.    The Secured Obligations include all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all future and current principal and accessory payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, under or in connection with the Offering or the Indenture.

1.3.    By signing this Agreement and complying with the formalities set forth in Section 2 below, the Fiduciary Transfer shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, shall become the conditional and indirect owner of the Intellectual Property, subject to the terms and conditions of this Agreement.

(sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), que se encontram resumidas no Anexo I a este documento em consonância ao disposto no artigo 1.362 do Código Civil Brasileiro, a Companhia, observado e em conformidade com o disposto nos artigos 1.361 e seguintes do Código Civil, neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a posse indireta e a propriedade resolúvel ("Alienação Fiduciária") de todas propriedades intelectuais de propriedade da Companhia, conforme descritas e listadas no Anexo III deste instrumento ("Propriedade Intelectual"), incluindo, sem limitação, as marcas registradas ou depositadas para registro no INPI - Instituto Nacional de Propriedade Industrial ("INPI") (doravante denominados "Bens Alienados").

1.2.    As Obrigações Garantidas incluem todas e quaisquer obrigações assumidas pela, pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.    Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 2 abaixo, estará constituída a Alienação Fiduciária em nome e benefício das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, tornar-se-á detentor da posse condicional e indireta da Propriedade

5

Intelectual, nos termos e condições acordados neste Contrato.

1.4. The Company agrees and acknowledges that, except to the copyrights, domain names and trade secrets, each of the Intellectual Property listed in Exhibit III is registered or has been submitted for registration before INPI, unless otherwise specified therein.

1.4. A Companhia concorda e reconhece que, exceto por nomes de domínio e direitos autorais, cada Propriedade Intelectual listada no Anexo III está registrada ou foi submetida a registro perante o INPI, salvo indicação em contrário.

1.5. Notwithstanding the provisions of this Agreement, the Company shall have the right to, without any release from or consent by the Secured Parties, by the *Trustee* or the Brazilian Collateral Agent, pursuant to the Indenture, freely use (including by means of licensing) the Transferred Assets, in any manner consistent with the Company's ordinary course of business.

1.5. Sem prejuízo das demais disposições deste Contrato, a Companhia poderá, sem que seja necessária qualquer liberação ou consentimento das Partes Garantidas, do *Trustee*, ou do Agente de Garantia Brasileiro nos termos da Escritura, livremente utilizar (inclusive por meio de licenciamento) os Bens Alienados, de maneira que seja consistente com o curso ordinário dos seus negócios.

## SECTION II
## PERFECTION OF THE COLLATERAL

## CLÁUSULA II
## APERFEIÇOAMENTO DA GARANTIA

2.1. The Company shall, within twenty (20) days from the date hereof or from the date of execution of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or any of its amendments, duly registered with the Registry Offices of Titles and Deeds (*Cartórios de Títulos e Documentos)* of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to take all necessary actions to make such registrations, at its own expense.

2.1. A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou quaisquer aditamentos a este, devidamente registrados nos Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

2.2. Within ten (10) days as from the date of registration of this Agreement or any amendment hereto with the competent Registry Offices of Titles and Deeds (as

2.2. No prazo de 10 (dez) dias contados a partir da data de registro deste Contrato ou qualquer aditamento do mesmo perante os Cartórios de Títulos e Documentos

6

provide for in Section 2.1 above), the Company shall deliver to the Brazilian Collateral Agent evidence that the request for annotation of the security interest over each e Intellectual Property has been filed with the INPI.

2.2.1. The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

2.2.2. All costs and expenses related to the filing and registration of this Agreement as required hereunder (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) shall be borne by the Company, at its own expense.

2.3. If Company fails to timely file this Agreement pursuant to Sections 2.1 and 2.2 above, the Brazilian Collateral Agent is hereby authorized by Company to conduct any such filing directly. The Company shall reimburse the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Sections 2.1 and 2.2 above, without prejudice to any right of the Brazilian Collateral Agent or to

competente (conforme previsto na Cláusula 2.1 acima), a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual foi protocolado perante o INPI.

2.2.1. A Companhia obriga-se, mediante conclusão perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal averbação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

2.2.2. Todos os custos e despesas relacionados ao arquivamento e registro deste Contrato, conforme aqui previstos (incluindo, sem limitação, honorários advocatícios, traduções juramentadas ou relativos a quaisquer outras formalidades que sejam necessárias), serão arcados pela Companhia, às suas próprias expensas.

2.3. Caso a Companhia deixe de registrar ou arquivar este Contrato de acordo com o previsto nas Cláusulas 2.1 e 2.2 acima, o Agente de Garantia Brasileiro fica autorizado pela Companhia a realizar qualquer arquivamento e registro diretamente. A Companhia deverá reembolsar o Agente de Garantia Brasileiro, no prazo de cinco (5) dias a partir do recebimento de uma solicitação por escrito, todos e quaisquer custos (incluindo, sem limitação, honorários advocatícios e despesas com traduções ou com quaisquer outras formalidades que possam ser exigidas nesse sentido) que possam ser desembolsados pelo Agente de Garantia Brasileiro em relação aos

7

any consequences or remedies set forth under this Agreement or the Transaction Documents deriving from such noncompliance by the Company of its obligations hereunder.

arquivamentos e registros descritos nas Cláusulas 2.1 e 2.2 acima, sem prejuízo de outros direitos ou consequências previstos neste Contrato ou nos Documentos da Transação em razão do descumprimento pela Companhia de suas obrigações aqui previstas.

2.4.   Notwithstanding the foregoing, the Company shall:

2.4.   Sem prejuízo do disposto acima, a Companhia deverá:

(i)   diligently comply with any requirements made by the relevant Registry of Deeds and Documents and/or the INPI, as the case may be, and keep the Brazilian Collateral Agent informed on any such requirement; and

(i)   cumprir diligentemente quaisquer exigências apresentadas pelos Cartórios de Registro de Títulos e Documentos competentes e/ou pelo INPI, conforme o caso, e manter o Agente de Garantia Brasileiro informado sobre qualquer exigência; e

(ii)   take any further action pursuant to applicable law required, now or in the future, for the creation, perfection, and/or maintenance of Fiduciary Transfer over the Intellectual Property.

(ii)   tomar quaisquer providências adicionais de acordo com a lei aplicável necessárias, atualmente ou no futuro, para a criação, realização e/ou manutenção da Alienação Fiduciária sobre a Propriedade Intelectual.

## SECTION III
## REPRESENTATIONS AND WARRANTIES

## CLÁUSULA III
## DECLARAÇÕES E GARANTIAS

3.1. The Brazilian Collateral Agent hereby represents and warrants that:

3.1.   O Agente de Garantia Brasileiro neste ato declara e garante que:

(i)   has full powers, authority and ability to execute this Agreement, perform its contractual obligations and enter into this Fiduciary Transfer, as described herein; and

(i)   possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária aqui descrita; e

(ii)   has taken all appropriate measures to authorize the execution and performance of this Agreement.

(ii)   tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

8

3.2.    The Company hereby represents and warrants that:

(i)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Fiduciary Transfer, as described herein;

(ii)    has taken all necessary measures to authorize the execution and performance of this Agreement;

(iii)    this Agreement constitutes a legal, valid and binding obligations, and enforceable against the Company, in accordance with its terms;

(iv)    the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Intellectual Property;

(v)    it is the lawful and exclusive owner of, and has good title to, the Intellectual Property, which comprises all intellectual property owned by the Company. All of the Intellectual Property is duly registered with the INPI and/or other relevant authority with which it is required to be registered with pursuant to the applicable regulations and all fees due for the registration or the

3.2.    A Companhia, neste ato declara que:

(i)    possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária, conforme aqui descrita;

(ii)    tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato;

(iii)    o presente Contrato constitui uma obrigação legal, válida, e exequível contra a Companhia, de acordo com os seus termos;

(iv)    a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Alienação Fiduciária da Propriedade Intelectual;

(v)    é a legítima e exclusiva proprietária e possuidora da Propriedade Intelectual, que representa a totalidade da propriedade intelectual detida pela Companhia. Toda a Propriedade Intelectual está registrada perante o INPI ou outra autoridade competente conforme seja requerido nos termos da regulamentação aplicável e todas as taxas devidas pelo registro ou pela

9

maintenance of the registration of the Transferred Assets with the INPI or with such other relevant authorities have been duly paid by the Company;

(vi)    except for this Fiduciary Transfer, the Intellectual Property is free and clear of any liens, encumbrances and/or security interests and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, pledge or sale of Intellectual Property in the Company's bylaws or in any other document; and, in the event of the enforcement or performance of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(vii)    to best knowledge of the Company there is no procedure, proceeding or claim from third parties or any governmental authority or body that may, in any way, adversely affect the Transferred Assets or this Agreement; and

(viii)    the power of attorney granted under the terms of Section 5.4 and in the form of Exhibit II hereto, was duly issued by the Company and its legal representatives and validly grants the powers set forth therein to the Brazilian Collateral Agent, and the Company did not grant any other power of attorney or similar instrument with similar effect to any other third party in connection with the Transferred Assets described hereof.

3.3.    The representations and warranties provided by the Parties shall survive the termination of this Agreement in the event of

manutenção do registro dos Bens Alienados no INPI ou tais outras atutoridades competentes foram devidamente pagas pela Companhia; e

(vi)    exceto pela presente Alienação Fiduciária, a Propriedade Intelectual está livre e desembaraçada de quaisquer ônus, gravame e/ou garantias e pode ser alienada fiduciariamente, empenhada ou vendida judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda da Propriedade Intelectual no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(vii)    no melhor conhecimento da Companhia, não há procedimento, processo ou reclamação de terceiros ou de qualquer autoridade ou órgão governamental que possa, de alguma forma, afetar adversamente os Bens Alienados ou este Contrato; e

(viii)    a procuração outorgada, nos termos da Cláusula 5.4 abaixo e na forma do Anexo II a este Contrato, foi devidamente assinada pelos representantes legais da Companhia e confere, validamente, os poderes ali indicados ao Agente de Garantia Brasileiro, e a Companhia não outorgou qualquer outra procuração ou instrumento com efeito similar a quaisquer terceiros com relação aos Bens Alienados descritos neste Contrato.

3.3.    As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer

10

any inaccuracy or falsity of their representations and warranties.

inexatidão ou inveracidade de suas declarações e garantias.

## SECTION IV
### ADDITIONAL OBLIGATIONS

## CLÁUSULA IV
### OBRIGAÇÕES ADICIONAIS

4.1.    The Company undertakes to and agrees that, on and after the date hereof and until all Secured Obligations are paid and discharged in full:

4.1.    A Companhia se obriga e concorda que, na data do presente instrumento e até que todas as Obrigações Garantidas sejam integralmente pagas e cumpridas:

(i)    to cooperate with the Brazilian Collateral Agent for the performance and enforcement of this Agreement;

(i)    a cooperar com o Agente de Garantia Brasileiro para o cumprimento e execução deste Contrato;

(ii)    to provide to the Brazilian Collateral Agent, in any case by no later than five (5) Business Days after the receipt of the respective request from the Brazilian Collateral Agent, and at the sole expense of Company, with all information and all documents relating to the Fiduciary Transfer and to the Intellectual Property as requested by the Brazilian Collateral Agent, to determine compliance with this Agreement and/or for the preservation, maintenance and/or enforcement of the Fiduciary Transfer;

(ii)    a apresentar ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento da respectiva solicitação pelo Agente de Garantia Brasileiro, e às expensas exclusivas da Companhia, todas as informações e todos os documentos relacionados à Alienação Fiduciária e aos Bens Alienados solicitados pelo Agente de Garantia Brasileiro, para a determinação do cumprimento deste Contrato e/ou para a preservação, manutenção e/ou execução da Alienação Fiduciária;

(iii)    to maintain always valid, effective and in good standing all authorizations required for the performance of the obligations undertaken in this Agreement and/or any amendment hereto and to take all measures required under applicable law to enforce the provisions hereof and/or of any amendment hereto;

(iii)    a sempre manter válidas, eficazes e em situação regular todas as autorizações necessárias para o cumprimento das obrigações assumidas neste Contrato, e/ou em qualquer aditivo a este, e a adotar todas as medidas necessárias nos termos da lei aplicável para a execução das disposições do presente Contrato e/ou de qualquer aditivo a este;

(iv)    to give written notice to the Brazilian Collateral Agent  no later than two (2) Business Days after becoming aware of any

(iv)    a notificar o Agente de Garantia Brasileiro, por escrito, em prazo não superior a 2 (dois) Dias Úteis após tomar ciência, de

11

event or circumstance which is likely to adversely affect Company's ability to comply with the obligations undertaken herein and/or under any amendment hereto, or that may otherwise adversely affect their compliance with their obligations hereunder and/or under any amendment hereto;

(v)      timely fulfill the obligations of this Agreement;

(vi)      defend itself, the Transferred Assets, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Transferred Assets, this Agreement and / or the fulfillment of the obligations undertaken under the Offering;

(vii)      perform all acts, as well as sign any and all documents, necessary for the registration of this Agreement in the competent Registry Office of Titles and Deeds and INPI pursuant to Sections 2.1 and 2.2 above;

(viii)      not to carry out any act with the purpose to depreciate the Transferred Assets

(ix)      assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any enforcement of the Fiduciary Transfer hereof, and bear all related expenses or that are necessary for such purpose;

---

qualquer evento ou circunstância que possa afetar negativamente a capacidade da Companhia de cumprir as obrigações assumidas no Contrato e/ou em qualquer aditivo a este, ou que possa, de outra forma, afetar negativamente o cumprimento pela Companhia das obrigações previstas neste Contrato e/ou em qualquer aditivo a este;

(v)      cumprir tempestivamente as obrigações desse Contrato;

(vi)      defender, a si mesma, os Bens Alienados, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Bens Alienados, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

(vii)      praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro do Contrato perante os Cartórios de Registro de Títulos e Documentos competentes e o INPI, nos termos das Cláusulas 2.1 e 2.2 acima;

(viii)      a não praticar atos com o propósito de depreciar os Bens Alienados;

(ix)      auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, no caso de eventual excussão da presente Alienação Fiduciária, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

12

(x)    assist, allow and use its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(x)    auxiliar, permitir e enviar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(xi)    comply with all clauses provided for in the Indenture;

(xi)    cumprir com todas as cláusulas previstas na Escritura;

(xii)    notify the Brazilian Collateral Agent of any event which results in a breach of this Agreement or the Indenture or in the inaccuracy of any representation made under this Agreement within two (2) Business Days of its occurrence;

(xii)    notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(xiii)    to pay before the assessment of any current or future fine, penalty, interests or expenses, any contributions or other charges levied on the Transferred Assets that, in case of default in payment, may reasonably be expected to result in (a) a lien over the Transferred Assets, (b) a loss of ownership over the Transferred Assets or (c) a material adverse effect on the Transferred Assets;

(xiii)    a pagar antes do lançamento quaisquer multas, penalidades, juros ou despesas, presentes ou futuras, contribuições ou outros encargos incidentes sobre os Bens Alienados que, caso não sejam pagas, possam razoavelmente resultar (a) na constituição de um ônus ou gravame sobre os Bens Alienados, (b) na perda de propriedade dos Bens Alienados ou (c) em um efeito adverso relevante sobre os Bens Alienados;

(xiv)    not dispose of, assign, transfer, sell or lease the Transferred Assets temporarily to any third party;

(xiv)    não vender, alienar, ceder, transferir ou arrendar os Bens Alienados de forma temporária a qualquer terceiro;

(xv)    to keep the Transferred Assets in fully effectiveness and validity, paying all

(xv)    manter os Bens Alienados plenamente válidos e eficazes, pagando todos os impostos, taxas ou outros custos que

13

taxes, fees or other costs that may be required by the INPI or other relevant authorities;

possam ser exigidos pelo INPI ou outras autoridades competentes;

(xvi)    not to execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties and/or of the Brazilian Collateral Agent to sell or otherwise dispose of any one of the Transferred Assets, in part or in full;

(xvi)    a não celebrar nem autorizar a celebração de qualquer contrato que possa impedir ou restringir os direitos e/ou a capacidade das Partes Garantidas e/ou do Agente de Garantia Brasileiro de vender, alienar ou de outra forma dispor de qualquer dos Bens Alienados, total ou parcialmente;

(xvii)    not create or allow the creation of any liens, encumbrances and/or security interests over the Intellectual Property, except for this Fiduciary Transfer;

(xvii) não criar ou permitir a criação de quaisquer ônus, gravames e/ou garantias, judiciais ou extrajudiciais, sobre a Propriedade Intelectual, exceto pela presente Alienação Fiduciária;

(xviii) in case the INPI or other relevant authorities requests that any amendment are made to this Agreement, including the segregation of security over the Intellectual Property into different and individual instruments in order to conclude registration, the Company shall enter into any and all documents in order to comply with requirements made by the INPI or by such other relevant authorities; and

(xviii) caso o INPI ou outras autoridades competentes solicite que qualquer alteração seja feita a este Contrato, incluindo a segregação da garantia sobre a Propriedade Intelectual em instrumentos diferentes e individuais a fim de concluir o registro, a Companhia deverá celebrar todos e quaisquer documentos a fim de cumprir as exigências feitas pelo INPI ou por tais outras autoridades competentes; e

(xix)    annually renew the Power of Attorney (as defined below) granted under Section 5.4 of this Agreement, with at least thirty (30) days prior to its expiration date, substantially in form of the Exhibit II hereto.

(xix)    renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 5.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo II deste Contrato.

## SECTION V
## FORECLOSURE

## CLÁUSULA V
## EXCUSSÃO

5.1.    In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the

5.1.    Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado

14

Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, notwithstanding any other security granted and provided under the Offering, exercise all powers related to the Transferred Assets and the Fiduciary Transfer created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets; give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture.

5.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf of and for the benefit of the Secured Parties, resulting from the sale of the Transferred Assets, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be

pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, exercer todos os poderes relativos aos Bens Alienados e a Alienação Fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados; dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

5.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação dos Bens Alienados, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o

15

paid in accordance with the provisions of the Indenture.

5.3.    With respect to Clause 5.1 above, in the event of enforcement or execution of this Agreement, the Company shall cause the direct possession of the Intellectual Property to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Trustee.

5.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to Exhibit II to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including, without limitation, as provided for in Clause 5.1 above, and in the signature of the respective exchange agreement necessary for the remittance of any and all financial funds, resulting from the sale of the Transferred Assets, due by the Company to the Secured Parties. The Company hereby acknowledges and agrees that the Brazilian Collateral Agent shall, upon the acceleration of the Secured Obligations, on behalf of the Company, sign instruments for the assignment or transfer of Intellectual Property subject to this Fiduciary Transfer, directly with any third party assignee or buyer, as well as representing the Company before the INPI and/or any other competent governmental authority or body for any formalization purposes, registration and/or perfection of such assignment or transfer.

saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

5.3.    Com relação à Cláusula 5.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Bens Alienados para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*.

5.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a procuração, nos termos do Anexo II a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se limitar a, conforme disposto na Cláusula 5.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Bens Alienados, devidos pela Companhia      às      Partes      Garantidas. A Companhia reconhece e concorda que o Agente de Garantia Brasileiro poderá, mediante a declaração de um vencimento antecipado das Obrigações Garantidas, em nome da Companhia, assinar instrumentos de venda e cessão, tendo por objeto qualquer Propriedade     Intelectual     da     presente Alienação Fiduciária, diretamente com qualquer terceiro comprador ou cessionário, bem como representar a Companhia perante o INPI e/ou qualquer outra autoridade ou órgão governamental competente para fins de qualquer     formalização,     averbação     e

16

aperfeiçoamento de tal cessão ou transferência.

5.4.1    While this Agreement is in force, the Power of Attorney shall be renewed annually by the Company with at least thirty (30) days prior to its expiration date.

5.4.1    Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

5.5.    For the purposes of the enforcement of the Fiduciary Transfer created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, in court and out-of-court.

5.5.    Para fins de excussão da Alienação Fiduciária constituída pelo presente Contrato, as Partes concordam que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

5.6.    Company undertakes to reimburse or pay in advance the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement or payment in advance request, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred or to be incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this Section V hereto.

5.6.    A Companhia se compromete a reembolsar ou pagar adiantado ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento do pedido de reembolso ou pagamento adiantado, por todos os custos e despesas (inclusive despesas e honorários advocatícios) necessários e razoáveis incorridos ou a serem incorridos pelo Agente de Garantia Brasileiro, para matérias e questões relacionadas ao disposto nesta Seção V deste Contrato.

### SECTION VI
### COSTS AND EXPENSES

### CLÁUSULA VI
### CUSTOS E DESPESAS

6.1.    The Company undertakes to pay all notarial and registration fees triggered by this Agreement, as well as all taxes, fees or other costs that may be required by INPI or any other competent authority to keep the

6.1.    A Companhia se obriga a pagar todas as taxas notariais e de registro desencadeadas por este Contrato, bem como todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou qualquer outra

17

Intellectual Property in full effect and validity.

6.2. All expenses incurred by the Brazilian Collateral Agent, acting on behalf and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Transferred Assets, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Company does not timely perform the transfer of the amounts mentioned herein.

6.3. The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the collateral agent services provisions dated November 30, 2020.

6.4. The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless it receives instructions provided by the Trustee, as well as indemnity or guarantee to its satisfaction against the

autoridade competente para manter a Propriedade Intelecual plenamente vigente e válida.

6.2. Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e beneficio das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Bens Alienados, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.3. A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura e da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.4. O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia

18

costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

## SECTION VII
### BRAZILIAN COLLATERAL AGENT

7.1.     The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.2.     The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or

que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

## CLÁUSULA VII
### AGENTE DE GARANTIA BRASILEIRO

7.1.     O Agente de Garantia Brasileiro foi nomeado, de acordo os termo da Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2.     O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou

19

act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a

omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLAI e/ou à Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta

final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

7.3.    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any

dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido

21

liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

7.4.    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.5.    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Company.

prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

22

7.6.    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian *reais*, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil (ROF), as applicable; and (c) will not undertake to perform any foreign

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a

23

exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Section. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7.    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of

7.9.    O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este

any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10.    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 7.10.

7.11.    Any and all payments by Gol Finance, the Company and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any

Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11.    Todos e quaisquer pagamentos pela Gol Finance, pela Companhia e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e

25

taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol Finance, the Company and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.12.    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

7.13.    For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.14.    Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Company. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company

sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Companhia e/ou a GLAI, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação à Oferta.

7.13.    Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14.    Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha

26

(consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor.

ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

## SECTION VIII
## MISCELLANEOUS

## CLÁUSULA VIII
## DISPOSIÇÕES GERAIS

8.1. <u>Definitions</u>. Capitalized terms used in this Agreement and its Exhibits and not otherwise defined herein will have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1.    <u>Definições</u>. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1.   For the purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or a public holiday in Brazil, or that day when commercial banks in the cities of Rio de Janeiro and São Paulo are authorized or required by law to close.

8.2.   Amendments. This Agreement may be amended, replaced, cancelled, renewed or extended, and its terms may be waived, only upon written instrument signed by all Parties.

8.3.   Severability. If any provision of this Agreement is held void or ineffective by court decision, the validity or enforceability of the remaining provisions shall not be affected, and the latter shall remain in full force and effect, being the Parties committed, within the shortest term possible, to engage in good-faith negotiations to replace the ineffective provision by another that, to the greatest extent possible and in a reasonable manner, reaches the intended purposes and effects.

8.4.   Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.1.   When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents

---

8.1.1.   Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados ou obrigados por lei a fechar.

8.2.   Alterações. Este Contrato somente poderá ser aditado, substituído, cancelado, renovado ou prorrogado e seus termos somente poderão ser renunciados, mediante instrumento escrito assinado por todas as Partes.

8.3.   Independência das Cláusulas. Se qualquer disposição deste Contrato for considerada nula ou ineficaz por decisão judicial, a validade ou exequibilidade das remanescentes não será afetada, as quais permanecerão em pleno vigor e vigência, comprometendo-se as Partes, no menor prazo possível, a negociarem, de boa-fé, a substituição da disposição ineficaz por outra que, na máxima extensão possível e de maneira razoável, atenda aos fins e propósitos pretendidos.

8.4.   Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo Trustee.

8.4.1.   Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e

28

necessary for the release of the Transferred Assets from any encumbrance which is still in force in accordance with the provisions herein.

firmarão todos os documentos que se façam necessários para liberação dos Bens Alienados de qualquer gravame que ainda esteja em vigor de acordo com as disposições deste Contrato.

8.5.    Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

8.5.    Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.    Guarantees. The Fiduciary Transfer provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.6.    Garantias. A Alienação Fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.    Notices. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf

8.7.    Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com

29

as attachment, with proof of transmission, and addressed as follows:

comprovante de transmissão, e endereçada da seguinte forma:

For Company:

Para a Companhia:

Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

For the Brazilian Collateral Agent:
Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

Para o Agente de Garantia Brasileiro:
Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

For GLAI:

Para a GLAI:

Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo
São Paulo - SP, Brazil
Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1. Any and all notifications or other communications made pursuant to this Agreement will be considered valid and delivered on the Business Day following the respective receipt, according to the document signed by the recipient or acknowledgment of receipt, as the case may be.

8.7.1. Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

30

8.8.   Specific   Performance.   This Agreement is an extrajudicial instrument (*título executivo extrajudicial*) for all purposes of articles 497, 784 and 815 of the Civil Procedure Code and, for the purposes of this Agreement and of each amendment hereto, the Brazilian Collateral Agent, representing the Secured Parties, under this Agreement may pursue specific performance of the obligations of Company.

8.8.   Execução Específica. Este Contrato constitui um título executivo extrajudicial para todos os fins dos Artigos 497, 784 e 815 do Código de Processo Civil e, para os fins deste Contrato e de todos os aditivos a este Contrato, o Agente de Garantia Brasileiro representando as Partes Garantidas, nos termos deste Contrato, poderá promover a execução específica das obrigações da Companhia.

8.9.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of Brazil.

8.9.   Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil.

8.9.1. In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument (*título executivo extrajudicial*) that may be the subject to enforcement proceedings under the terms of article 784, item III of the Civil Procedure Code.

8.9.1.   Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.   Jurisdiction.   Any disputes or controversies arising from this Agreement will be settled by the court of the City São Paulo, State of São Paulo, which will also be the competent jurisdiction to enforce the obligations established herein.

8.10.   Foro.   Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.   Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.11.   Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e

31

não conflitem com as leis brasileiras aplicáveis

8.12.   Language.   This   Agreement   is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.12.   Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13.   Electronic   Signature.   This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian   Public   Key   Infrastructure (*Infraestrutura   de   Chaves   Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.13.   Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma   irrevogável   e   irretratável,   a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

8.14.   This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties   electronically   executing   this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

8.14.   Este Contrato deverá entrar em vigor a   partir   da   data   aqui   indicada, independentemente de uma ou mais Partes o celebrarem   eletronicamente   em   data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**IN WITNESS WHEREOF**, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, December 23, 2020.
(*remainder of the page intentionally left blank*)

São Paulo, 23 de dezembro de 2020.
(*restante   da   página   intencionalmente deixado em branco*)

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of December 23, 2020*) | *(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 23 de dezembro de 2020*) |

**GOL LINHAS AÉREAS S.A.,**

_____     _____
*Name*/Nome:                        *Name*/Nome:
*Title*/Cargo:                      *Title*/Cargo:

33

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda.. and Gol Linhas Aéreas Inteligentes S.A., dated as of December 23, 2020*) | *(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 23 de dezembro de 2020)* |

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____  _____

*Name*/Nome:                                  *Name*/Nome:

*Title*/Cargo:                                 *Title*/Cargo:

34

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of December 23, 2020*) | *(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 23 de dezembro de 2020*) |

**GOL LINHAS AÉREAS INTELIGENTES S.A.,**

_____     _____
*Name*/Nome:                                              *Name*/Nome:
*Title*/Cargo:                                              *Title*/Cargo:

35

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of December 23, 2020*) | *(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 23 de dezembro de 2020)* |

**WITNESSES/TESTEMUNHAS**


_____          _____
Name/Nome:                                        Name/Nome:
Tax ID /CPF:                                        Tax ID /CPF:
ID/RG:                                                  ID/RG:

| | |
|---|---|
| **EXHIBIT I** | **ANEXO I** |
| to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of December 23, 2020. | ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 23 de dezembro de 2020. |

| | |
|---|---|
| **DESCRIPTION OF SECURED OBLIGATIONS** | **DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |
| Principal Amount: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | Valor Principal: US$ 200.000.000,00 (duzentos milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| Maturity Date: June 30, 2026; | Data de Vencimento: 23 de junho de 2026; |
| Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture; | Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura; |
| Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to the Notes; | Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas; |
| Penalty Clause: not applicable; | Cláusula Penal: não aplicável; |
| Inflation Adjustment Index: not applicable; | Índice de Atualização Monetária: não aplicável; |

37

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura.

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO**

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos

38

450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

39

| EXHIBIT II | ANEXO II |
|---|---|
| to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of December 23, 2020. | ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 23 de dezembro de 2020. |
| **Form of Power of Attorney** | **Modelo de Procuração** |
| **POWER OF ATTORNEY** | **PROCURAÇÃO** |
| By this power of attorney, **GOL LINHAS AÉREAS S.A.**, a corporation organized and existing under the laws of Brazil, headquartered at Senador Salgado Filho Square, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the city of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Fiduciary Transfer of Intellectual Property Rights Agreement entered into on December 23, 2020 between the GRANTOR, the GRANTEE and Gol Linhas Aéreas S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, | Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.,** sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no CNPJ/ME sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.,** sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado em 23 de dezembro de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil, poderes para, no lugar e |

of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

1. practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

(a) to dispose of, sell, assign, transfer, collect, receive, take possession of and/or foreclose all or part of the Transferred Assets or otherwise dispose of, and deliver the Transferred Assets under the Agreement and as established in article 1,364 of the Civil Code, and apply the product received to the payment of the Secured Obligations under the Agreement;

(b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Transferred Assets and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Transferred Assets and represent the GRANTOR before third parties for the purpose of releasing the Fiduciary Transfer, disposal of the Transferred Assets and transfer of the funds resulting from such disposal;

2. sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by

em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1. praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

(a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Bens Alienados ou dispor de qualquer outro modo e entregar os Bens Alienados nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

(b) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Bens Alienados e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com relação aos Bens Alienados e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação dos Bens Alienados e transferência dos recursos resultantes de tal alienação;

2. assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao

the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, the INPI, the Center for Information and Coordination of the Dot BR (*Núcleo de Informação e Coordenação do Ponto BR – NIC.br*), the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

4. to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Transferred Assets, represent the GRANTOR before any competent Registry Office of Deeds and Documents, the INPI and/or any other governmental body in which the Agreement or its respective amendments shall be registered;

5. enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian

exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos, o INPI, o Núcleo de Informação e Coordenação do Ponto BR – NIC.br, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às aos Bens Alienados, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente, INPI e/ou qualquer outro órgão governamental nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5. celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer

authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the Trustee, as provided for in the Agreement; and

6. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement.

Rio de Janeiro, December 23, 2020.

**GOL LINHAS AÉREAS S.A.**
[SIGNATURE FIELD]

---

bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

6. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato.

Rio de Janeiro, 23 dezembro de 2020.

**GOL LINHAS AÉREAS S.A.**
[CAMPO DE ASSINATURA]

- 43 -

**EXHIBIT III/ANEXO III**

**List of Transferred Assets / Lista dos Bens Alienados**

1.    **Internet Domains (Domínios de Internet)**

   **[REPORTS ATTACHED/RELATÓRIOS ANEXOS]**

**EXHIBIT III/ANEXO III**

**List of Transferred Assets / Lista dos Bens Alienados**

2.   **Trademarks**
   **[REPORTS ATTACHED/RELATÓRIOS ANEXOS]**

**EXHIBIT III/ANEXO III**

**List of Transferred Assets / Lista dos Bens Alienados**

**3.    Additional IP [ADDITIONAL IP RIGHTS OTHER THAN THOSE COMPRISED IN THE DEFINITION OF "PLEDGED IP" UNDER THE INDENTURE TO BE CONFIRMED]**

In addition to the Intellectual Property referred to in items 1 and 2 of this <u>Exhibit II</u>, the Transferred Assets, defined in Section 1.1 of this Fiduciary Transfer of Intellectual Property Rights Agreement, includes any and all softwares, whether registered before the INPI or not, owned by the Company on the date hereof (*Além da Propriedade Intelectual referida nos itens 1 e 2 deste <u>Anexo III</u>, os Bens Alienados, definidos na Cláusula 1.1 deste Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual, inclui todos e quaisquer softwares, sejam eles registrados junto ao INPI ou não, detidos pela Companhia nesta data deste instrumento*)

**List of Intellectual Property Registered Abroad (*Relação de Propriedades Intelectuais Registradas no Exterior*)**
**[REPORT ATTACHED/RELATÓRIO ANEXO]**

**EXHIBIT H**

FORM OF GLAI FIDUCIARY TRANSFER OF IP RIGHTS

#93484727v11

| FIDUCIARY TRANSFER OF INTELLECTUAL PROPERTY RIGHTS AGREEMENT | CONTRATO DE ALIENAÇÃO FIDUCIÁRIA DE DIREITOS DE PROPRIEDADE INTELECUAL |
|---|---|

This Fiduciary Transfer of Intellectual Property Rights Agreement ("Agreement") is entered into by and among:

O presente Contrato de Alienação de Direitos Propriedade Intelectual ("Contrato") é celebrado por e entre:

(i) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "GLAI" or "Company");

(i) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade organizada e existente segundo as leis do Brasil, na cidade de São Paulo, Estado de São Paulo, com sede na Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLAI" ou "Companhia");

(ii) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Secured Parties (hereinafter referred to as "Brazilian Collateral Agent");

(ii) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício das Partes Garantidas (doravante designado "Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

(iii) **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the

(iii) **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as

laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

**WHEREAS:**

(i)      GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued 8.00% Senior Secured Notes due 2026 ("Notes"), pursuant to an Indenture entered into by Gol Finance and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the Notes offering ("Offering");

(ii)     the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture ("Secured Parties") as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral provided under

leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("GLA");

Cada parte acima são também doravante individualmente designadas como "Parte" e, em conjunto, como "Partes";

**CONSIDERANDO QUE:**

(i)      a GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo as leis do Grão-Ducado de Luxemburgo, com sede na 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas"), nos termos e condições previstos na escritura por meio da qual as Notas foram emitidas, celebrada entre a Gol Finance e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e no memorando privado de colocação relacionado à oferta das Notas ("Oferta");

(ii)     o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura ("Partes Garantidas") como agente de garantia no Brasil nos termos da Escritura para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente

this Agreement, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms provided for in the Indenture and this Agreement;

(iii)    The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent;

(iv)    in order to secure the satisfaction of all obligations undertaken by Gol Finance, under the terms and conditions of the Indenture, GLAI and Gol Linhas Aéreas S.A. ("GLA" and, together with GLAI, "Guarantors") provided a personal guarantee under the terms of the Indenture ("Guarantees"); and

(v)    in order to guarantee compliance with all obligations undertaken Gol Finance under the terms and conditions of the Indenture and by the Guarantors under the Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Intellectual Property (as defined below), by transferring to the

---

Contrato, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii)    A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o Trustee, na qualidade de representante das Partes Garantidas e do Agente de Garantia Brasileiro;

(iv)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, a GLAI e a Gol Linhas Aéreas S.A. ("GLA" e, em conjunto com a GLAI, "Garantidoras") prestaram garantia pessoal nos termos da Escritura ("Garantias"); e

(v)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e condições da Escritura e pelos Garantidores no âmbito das Garantias, a Companhia concordou em conceder às Partes Garantidas, representadas no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre a Propriedade Intelectual (conforme definido abaixo),

Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Transferred Assets (as defined below) that may be owned by the Company.

.

**NOW, THEREFORE**, the Parties agree to enter into this Agreement under the following terms and conditions:

## SECTION I
## FIDUCIARY TRANSFER;
## COLLATERAL

1.1.    In accordance with the provisions herein, in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the terms of the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Guarantees; (c) the faithful and timely fulfillment by Gol Finance and the Guarantors of all agreements, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the referred instruments (jointly, the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance, the Company and/or GLA to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set

mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todas os Bens Alienados (conforme definido abaixo) que venham a ser de titularidade da Companhia.

**RESOLVEM**, as Partes, celebrar este Contrato, de acordo com os seguintes termos e condições:

## CLÁUSULA I
## ALIENAÇÃO FIDUCIÁRIA;
## GARANTIA

1.1.    De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias; (c) o fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos, obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela Companhia e/ou pela GLA

forth in the Transaction Documents (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "<u>Secured Obligations</u>"), which are summarized in <u>Exhibit I</u> hereto in compliance with the provisions of article 1,362 of the Brazilian Civil Code, the Company, pursuant to and in accordance with the provisions of articles 1,361 *et seq.* of the Civil Code, hereby irrevocably assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional property and indirect possession (the "<u>Fiduciary Transfer</u>") of all and any intellectual properties that may be owned by the Company ("<u>Intellectual Property</u>"), including, without limitation, all trademarks that may be registered or filed for registration with the Brazilian Patent and Trademark Office (*INPI – Instituto Nacional da Propriedade Industrial*) by the Company (hereinafter, the "<u>INPI</u>") (hereinafter referred to as the "<u>Transferred Assets</u>"). The Company undertakes to inform the Brazilian Collateral Agent about any and all Intellectual Property that it may hold in the future, no later than two (2) Business Days from the date of that it acquires ownership thereof.

1.1.1. The Parties undertake to no later than to five (5) Business Days from the date on which the Company becomes the owner of any Intellectual Property, enter into an amendment to this Agreement in form of <u>Exhibit II</u> hereto, in order to include and/or update, as the case maybe, all Intellectual Properties owned by the Company, which on such date, will be subject to the fiduciary assignment created herein.

ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "<u>Obrigações Garantidas</u>"), que se encontram resumidas no <u>Anexo I</u> a este documento em consonância ao disposto no artigo 1.362 do Código Civil Brasileiro, a Companhia, observado e em conformidade com o disposto nos artigos 1.361 e seguintes do Código Civil, neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a posse indireta e a propriedade resolúvel ("<u>Alienação Fiduciária</u>") de todas e quaisquer propriedades intelectuais que venham a ser de propriedade da Companhia ("<u>Propriedade Intelectual</u>"), incluindo, sem limitação, todas as marcas que vierem a ser registradas ou depositadas para registro no INPI - Instituto Nacional de Propriedade Industrial pela Companhia ("<u>INPI</u>") (doravante denominados "<u>Bens Alienados</u>"). A Companhia obriga-se a informar o Agente de Garantia Brasileiro sobre toda e qualquer Propriedade Intelectual que venha a deter no futuro, no prazo de até 2 (dois) Dias Úteis contados da data de sua titularidade.

1.1.1. As Partes obrigam-se a, dentro do prazo de até 5 (cinco) Dias Úteis da data em que a Companhia venha a ser titular de qualquer Propriedade Intelectual, a celebrar um aditivo a este Contrato na forma do <u>Anexo II</u> ao presente Contrato, a fim de incluir e/ou atualizar, conforme o caso, as Propriedades Intelectuais de propriedade da Companhia, as quais, em tal data, serão objeto da alienação fiduciária aqui constituída.

- 5 -

1.2.    The Secured Obligations include all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all future and current principal and accessory payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, under or in connection with the Offering or the Indenture.

1.2.    As Obrigações Garantidas incluem todas e quaisquer obrigações assumidas pela, pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.    By signing this Agreement, the amendment set forth in Section 1.1.1 above and complying with the formalities set forth in Section 2 below, the Fiduciary Transfer shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, shall become the conditional and indirect owner of the Intellectual Property, subject to the terms and conditions of this Agreement.

1.3.    Mediante assinatura do presente Contrato, do aditamento ao presente Contrato previsto na Cláusula 1.1.1 acima e cumprimento das formalidades estabelecidas na Cláusula 2 abaixo, estará constituída a Alienação Fiduciária em nome e benefício das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, tornar-se-á detentor da posse condicional e indireta da Propriedade Intelectual, nos termos e condições acordados neste Contrato.

1.3.    The Company agrees and acknowledges that, all Intellectual Property that will owned by the Company shall be duly registered for registration before INPI, unless otherwise specified therein.

1.3.    A Companhia concorda e reconhece que toda Propriedade Intelectual que venha a ser de titularidade da Companhia será submetida a registro perante o INPI, salvo indicação em contrário neste Contrato.

1.4.    Notwithstanding the provisions of this Agreement, the Company shall have the right to, without any release from or consent by the Secured Parties, by the *Trustee* or the Brazilian Collateral Agent, pursuant to the Indenture, freely use (including by means of licensing) the Transferred Assets, in any manner consistent with the Company's ordinary course of business.

1.4.    Sem prejuízo das demais disposições deste Contrato, a Companhia poderá, sem que seja necessária qualquer liberação ou consentimento das Partes Garantidas, do *Trustee*, ou do Agente de Garantia Brasileiro nos termos da Escritura, livremente utilizar (inclusive por meio de licenciamento) os Bens Alienados, de maneira que seja consistente com o curso ordinário dos seus negócios.

**SECTION II**

**CLÁUSULA II**

**PERFECTION OF THE COLLATERAL**

**APERFEIÇOAMENTO DA GARANTIA**

2.1.     The Company shall, within twenty (20) days from the date hereof or from the date of execution of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or any of its amendments, duly registered with the Registry Office of Titles and Deeds (*Cartório de Títulos e Documentos)* of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to take all necessary actions to make such registrations, at its own expense.

2.1.     A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou quaisquer aditamentos a este, devidamente registrados nos Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

2.2.     Within ten (10) days as from the date of registration of any amendment hereto (including the amendment set forth in Section 1.1.1 above) with the competent Registry Offices of Titles and Deeds (as provide for in Section 2.1 above), the Company shall deliver to the Brazilian Collateral Agent evidence that the request for annotation of the security interest over each e Intellectual Property has been filed with the INPI.

2.2.     No prazo de 10 (dez) dias contados a partir da data de registro de qualquer aditamento deste Contrato (inclusive do aditamento previsto na Cláusula 1.1.1 acima) perante os Cartórios de Títulos e Documentos competente (conforme previsto na Cláusula 2.1 acima), a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual foi protocolado perante o INPI.

2.2.1.  The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

2.2.1.  A Companhia obriga-se, mediante conclusão perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal averbação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

2.2.2.  All costs and expenses related to the filing and registration of this Agreement and any amendment hereto as required hereunder (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in

2.2.2.  Todos os custos e despesas relacionados ao arquivamento e registro deste Contrato e de quaisquer aditamentos a este, conforme aqui previstos (incluindo, sem limitação, honorários advocatícios, traduções juramentadas ou relativos a quaisquer outras

connection therewith) shall be borne by the Company, at its own expense.

2.3. If Company fails to timely file this Agreement and/or any amendment hereto pursuant to Sections 2.1 and 2.2 above, the Brazilian Collateral Agent is hereby authorized by Company to conduct any such filing directly. The Company shall reimburse the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Sections 2.1 and 2.2 above, without prejudice to any right of the Brazilian Collateral Agent or to any consequences or remedies set forth under this Agreement or the Transaction Documents deriving from such noncompliance by the Company of its obligations hereunder.

2.4.    Notwithstanding the foregoing, the Company shall:

(i)    diligently comply with any requirements made by the relevant Registry of Deeds and Documents and/or the INPI, as the case may be, and keep the Brazilian Collateral Agent informed on any such requirement; and

formalidades que sejam necessárias), serão arcados pela Companhia, às suas próprias expensas.

2.3. Caso a Companhia deixe de registrar ou arquivar este Contrato e/ou quaisquer aditamentos de acordo com o previsto nas Cláusulas 2.1 e 2.2 acima, o Agente de Garantia Brasileiro fica autorizado pela Companhia a realizar qualquer arquivamento e registro diretamente. A Companhia deverá reembolsar o Agente de Garantia Brasileiro, no prazo de cinco (5) dias a partir do recebimento de uma solicitação por escrito, todos e quaisquer custos (incluindo, sem limitação, honorários advocatícios e despesas com traduções ou com quaisquer outras formalidades que possam ser exigidas nesse sentido) que possam ser desembolsados pelo Agente de Garantia Brasileiro em relação aos arquivamentos e registros descritos nas Cláusulas 2.1 e 2.2 acima, sem prejuízo de outros direitos ou consequências previstos neste Contrato ou nos Documentos da Transação em razão do descumprimento pela Companhia de suas obrigações aqui previstas.

2.4.    Sem prejuízo do disposto acima, a Companhia deverá:

(i)    cumprir diligentemente quaisquer exigências apresentadas pelos Cartórios de Registro de Títulos e Documentos competentes e/ou pelo INPI, conforme o caso, e manter o Agente de Garantia Brasileiro informado sobre qualquer exigência; e

(ii)    take any further action pursuant to applicable law required, now or in the future, for the creation, perfection, and/or maintenance of Fiduciary Transfer over the Intellectual Property.

(ii)    tomar quaisquer providências adicionais de acordo com a lei aplicável necessárias, atualmente ou no futuro, para a criação, realização e/ou manutenção da Alienação Fiduciária sobre a Propriedade Intelectual.

## SECTION III
## REPRESENTATIONS AND WARRANTIES

## CLÁUSULA III
## DECLARAÇÕES E GARANTIAS

3.1. The Brazilian Collateral Agent hereby represents and warrants that:

3.1.    O Agente de Garantia Brasileiro neste ato declara e garante que:

(i)    has full powers, authority and ability to execute this Agreement, perform its contractual obligations and enter into this Fiduciary Transfer, as described herein; and

(i)    possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária aqui descrita; e

(ii)    has taken all appropriate measures to authorize the execution and performance of this Agreement.

(ii)    tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

3.2.    The Company hereby represents and warrants that:

3.2.    A Companhia, neste ato declara que:

(i)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Fiduciary Transfer, as described herein;

(i)    possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária, conforme aqui descrita;

(ii)    has taken all necessary measures to authorize the execution and performance of this Agreement;

(ii)    tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato;

(iii)    this Agreement constitutes a legal, valid and binding obligations, and enforceable against the Company, in accordance with its terms;

(iii)    o presente Contrato constitui uma obrigação legal, válida, e exequível contra a Companhia, de acordo com os seus termos;

(iv)    the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Intellectual Property;

(v)    except for this Fiduciary Transfer, the Intellectual Property is free and clear of any liens, encumbrances and/or security interests and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, pledge or sale of Intellectual Property in the Company's bylaws or in any other document; and, in the event of the enforcement or performance of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(vi)    to best knowledge of the Company there is no procedure, proceeding or claim from third parties or any governmental authority or body that may, in any way, adversely affect this Agreement; and

(vii)    the power of attorney granted under the terms of Section 5.4 and in the form of Exhibit III hereto, was duly issued by the Company and its legal representatives and validly grants the powers set forth therein to the Brazilian Collateral Agent, and the Company did not grant any other power of

(iv)    a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Alienação Fiduciária da Propriedade Intelectual;

(v)    exceto pela presente Alienação Fiduciária, a Propriedade Intelectual está livre e desembaraçada de quaisquer ônus, gravame e/ou garantias e pode ser alienada fiduciariamente, empenhada ou vendida judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda da Propriedade Intelectual no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(vi)    no melhor conhecimento da Companhia, não há procedimento, processo ou reclamação de terceiros ou de qualquer autoridade ou órgão governamental que possa, de alguma forma, afetar adversamente este Contrato; e

(vii)    a procuração outorgada, nos termos da Cláusula 5.4 abaixo e na forma do Anexo III a este Contrato, foi devidamente assinada pelos representantes legais da Companhia e confere, validamente, os poderes ali indicados ao Agente de Garantia Brasileiro, e a Companhia não outorgou qualquer outra

- 10 -

attorney or similar instrument with similar effect to any other third party in connection with the Transferred Assets described hereof.

procuração ou instrumento com efeito similar a quaisquer terceiros com relação aos Bens Alienados descritos neste Contrato.

3.3.    The representations and warranties provided by the Parties shall survive the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

3.3.    As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

## SECTION IV
### ADDITIONAL OBLIGATIONS

## CLÁUSULA IV
### OBRIGAÇÕES ADICIONAIS

4.1.    The Company undertakes to and agrees that, on and after the date hereof and until all Secured Obligations are paid and discharged in full:

4.1.    A Companhia se obriga e concorda que, na data do presente instrumento e até que todas as Obrigações Garantidas sejam integralmente pagas e cumpridas:

(i)    to cooperate with the Brazilian Collateral Agent for the performance and enforcement of this Agreement;

(i)    a cooperar com o Agente de Garantia Brasileiro para o cumprimento e execução deste Contrato;

(ii)    to provide to the Brazilian Collateral Agent, in any case by no later than five (5) Business Days after the receipt of the respective request from the Brazilian Collateral Agent, and at the sole expense of Company, with all information and all documents relating to the Fiduciary Transfer and to the Intellectual Property as requested by the Brazilian Collateral Agent, to determine compliance with this Agreement and/or for the preservation, maintenance and/or enforcement of the Fiduciary Transfer;

(ii)    a apresentar ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento da respectiva solicitação pelo Agente de Garantia Brasileiro, e às expensas exclusivas da Companhia, todas as informações e todos os documentos relacionados à Alienação Fiduciária e aos Bens Alienados solicitados pelo Agente de Garantia Brasileiro, para a determinação do cumprimento deste Contrato e/ou para a preservação, manutenção e/ou execução da Alienação Fiduciária;

(iii)    to maintain always valid, effective and in good standing all authorizations required for the performance of the obligations undertaken in this Agreement and/or any amendment hereto and to take all measures required under applicable law to

(iii)    a sempre manter válidas, eficazes e em situação regular todas as autorizações necessárias para o cumprimento das obrigações assumidas neste Contrato, e/ou em qualquer aditivo a este, e a adotar todas as medidas necessárias nos termos da lei aplicável para a execução das disposições do

- 11 -

enforce the provisions hereof and/or of any amendment hereto;

(iv)    to give written notice to the Brazilian Collateral Agent no later than two (2) Business Days after becoming aware of any event or circumstance which is likely to adversely affect Company's ability to comply with the obligations undertaken herein and/or under any amendment hereto, or that may otherwise adversely affect their compliance with their obligations hereunder and/or under any amendment hereto;

(v)    timely fulfill the obligations of this Agreement;

(vi)    defend itself, the Transferred Assets, as applicable, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Transferred Assets, this Agreement and / or the fulfillment of the obligations undertaken under the Offering;

(vii)    perform all acts, as well as sign any and all documents, necessary for the registration of this Agreement in the competent Registry Office of Titles and Deeds and INPI, as applicable, pursuant to Sections 2.1 and 2.2 above;

(viii)    not to carry out any act with the purpose to depreciate the Transferred Assets, as applicable;

(ix)    assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the

presente Contrato e/ou de qualquer aditivo a este;

(iv)    a notificar o Agente de Garantia Brasileiro, por escrito, em prazo não superior a 2 (dois) Dias Úteis após tomar ciência, de qualquer evento ou circunstância que possa afetar negativamente a capacidade da Companhia de cumprir as obrigações assumidas no Contrato e/ou em qualquer aditivo a este, ou que possa, de outra forma, afetar negativamente o cumprimento pela Companhia das obrigações previstas neste Contrato e/ou em qualquer aditivo a este;

(v)    cumprir    tempestivamente    as obrigações desse Contrato;

(vi)    defender, a si mesma, os Bens Alienados, conforme o caso, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Bens Alienados, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

(vii)    praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro do Contrato perante os Cartórios de Registro de Títulos e Documentos competentes e o INPI, conforme o caso, nos termos das Cláusulas 2.1 e 2.2 acima;

(viii)    a não praticar atos com o propósito de depreciar os Bens Alienados, conforme aplicável;

(ix)    auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das

- 12 -

| | |
|---|---|
| Secured Parties, in case of any enforcement of the Fiduciary Transfer hereof, and bear all related expenses or that are necessary for such purpose; | Partes Garantidas, no caso de eventual excussão da presente Alienação Fiduciária, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito; |
| (x)    assist, allow and use its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent; | (x)    auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro; |
| (xi)    comply with all clauses provided for in the Indenture; | (xi)    cumprir com todas as cláusulas previstas na Escritura; |
| (xii)    notify the Brazilian Collateral Agent of any event which results in a breach of this Agreement or the Indenture or in the inaccuracy of any representation made under this Agreement within two (2) Business Days of its occurrence; | (xii)    notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência; |
| (xiii)    to pay before the assessment of any current or future fine, penalty, interests or expenses, any contributions or other charges levied on the Transferred Assets that, in case of default in payment, may reasonably be expected to result in (a) a lien over the Transferred Assets, (b) a loss of ownership over the Transferred Assets or (c) a material adverse effect on the Transferred Assets; | (xiii)    a pagar antes do lançamento quaisquer multas, penalidades, juros ou despesas, presentes ou futuras, contribuições ou outros encargos incidentes sobre os Bens Alienados que, caso não sejam pagas, possam razoavelmente resultar (a) na constituição de um ônus ou gravame sobre os Bens Alienados, (b) na perda de propriedade dos Bens Alienados ou (c) em um efeito adverso relevante sobre os Bens Alienados; |

(xiv)   not dispose of, assign, transfer, sell or lease the Transferred Assets temporarily to any third party;

(xv)   to keep the Transferred Assets in fully effectiveness and validity, paying all taxes, fees or other costs that may be required by the INPI or other relevant authorities;

(xvi)   not to execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties and/or of the Brazilian Collateral Agent to sell or otherwise dispose of any one of the Transferred Assets, in part or in full;

(xvii)   not create or allow the creation of any liens, encumbrances and/or security interests over the Intellectual Property, except for this Fiduciary Transfer;

(xviii)   in case the INPI or other relevant authorities requests that any amendment are made to this Agreement, including the segregation of security over the Intellectual Property into different and individual instruments in order to conclude registration, the Company shall enter into any and all documents in order to comply with requirements made by the INPI or by such other relevant authorities; and

(xix)   annually renew the Power of Attorney (as defined below) granted under Section 5.4 of this Agreement, with at least thirty (30) days prior to its expiration date, substantially in form of the Exhibit III hereto.

(xiv)   não vender, alienar, ceder, transferir ou arrendar os Bens Alienados de forma temporária a qualquer terceiro;

(xv)   manter os Bens Alienados plenamente válidos e eficazes, pagando todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou outras autoridades competentes;

(xvi)   a não celebrar nem autorizar a celebração de qualquer contrato que possa impedir ou restringir os direitos e/ou a capacidade das Partes Garantidas e/ou do Agente de Garantia Brasileiro de vender, alienar ou de outra forma dispor de qualquer dos Bens Alienados, total ou parcialmente;

(xvii)   não criar ou permitir a criação de quaisquer ônus, gravames e/ou garantias, judiciais ou extrajudiciais, sobre a Propriedade Intelectual, exceto pela presente Alienação Fiduciária;

(xviii)   caso o INPI ou outras autoridades competentes solicite que qualquer alteração seja feita a este Contrato, incluindo a segregação da garantia sobre a Propriedade Intelectual em instrumentos diferentes e individuais a fim de concluir o registro, a Companhia deverá celebrar todos e quaisquer documentos a fim de cumprir as exigências feitas pelo INPI ou por tais outras autoridades competentes; e

(xix)   renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 5.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo III deste Contrato.

### SECTION V

### CLÁUSULA V

| FORECLOSURE | EXCUSSÃO |
|---|---|

5.1.    Subject to the Section 1.1.1 above, in the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, notwithstanding any other security granted and provided under the Offering, exercise all powers related to the Transferred Assets and the Fiduciary Transfer created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets; give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture.

5.1.    Observado o disposto na Cláusula 1.1.1 acima, caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, exercer todos os poderes relativos aos Bens Alienados e a Alienação Fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados; dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

5.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf of and for the benefit of the Secured Parties, resulting from the sale of the Transferred Assets, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Indenture.

5.3.    With respect to Clause 5.1 above, in the event of enforcement or execution of this Agreement, the Company shall cause the direct possession of the Intellectual Property to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Trustee.

5.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to <u>Exhibit III</u> to this Agreement ("<u>Power of Attorney</u>"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including, without limitation, as provided for in Clause 5.1 above, and in the signature of the respective exchange agreement necessary for the remittance of any and all financial funds, resulting from the sale of the Transferred Assets, due by the Company to the Secured Parties. The Company hereby acknowledges and agrees that the Brazilian Collateral Agent shall, upon the acceleration of the Secured Obligations, on behalf of the Company, sign instruments for the assignment or transfer of Intellectual Property subject to this Fiduciary Transfer, directly with any third party assignee or buyer, as well as representing the

5.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação dos Bens Alienados, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

5.3.    Com relação à Cláusula 5.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Bens Alienados para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*.

5.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a procuração, nos termos do <u>Anexo III</u> a este Contrato ("<u>Procuração</u>"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se limitar a, conforme disposto na Cláusula 5.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Bens Alienados, devidos pela Companhia às Partes Garantidas. A Companhia reconhece e concorda que o Agente de Garantia Brasileiro poderá, mediante a declaração de um vencimento antecipado das Obrigações Garantidas, em nome da Companhia, assinar instrumentos de venda e cessão, tendo por objeto qualquer Propriedade Intelectual da presente Alienação Fiduciária, diretamente com

Company before the INPI and/or any other competent governmental authority or body for any formalization purposes, registration and/or perfection of such assignment or transfer.

qualquer terceiro comprador ou cessionário, bem como representar a Companhia perante o INPI e/ou qualquer outra autoridade ou órgão governamental competente para fins de qualquer formalização, averbação e aperfeiçoamento de tal cessão ou transferência.

5.4.1    While this Agreement is in force, the Power of Attorney shall be renewed annually by the Company with at least thirty (30) days prior to its expiration date.

5.4.1    Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

5.5.    For the purposes of the enforcement of the Fiduciary Transfer created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, in court and out-of-court.

5.5.    Para fins de excussão da Alienação Fiduciária constituída pelo presente Contrato, as Partes concordam que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

5.6.    Company undertakes to reimburse or pay in advance the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement or payment in advance request, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred or to be incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this <u>Section V</u> hereto.

5.6.    A Companhia se compromete a reembolsar ou pagar adiantado ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento do pedido de reembolso ou pagamento adiantado, por todos os custos e despesas (inclusive despesas e honorários advocatícios) necessários e razoáveis incorridos ou a serem incorridos pelo Agente de Garantia Brasileiro, para matérias e questões relacionadas ao disposto nesta <u>Seção V</u> deste Contrato.

**SECTION VI**
**COSTS AND EXPENSES**

**CLÁUSULA VI**
**CUSTOS E DESPESAS**

6.1.    The Company undertakes to pay all notarial and registration fees triggered by this Agreement, as well as all taxes, fees or other costs that may be required by INPI or any other competent authority to keep the Intellectual Property in full effect and validity.

6.2.    All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Transferred Assets, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Company does not timely perform the transfer of the amounts mentioned herein.

6.3.    The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the collateral agent services provisions dated November 30, 2020.

6.1.    A Companhia se obriga a pagar todas as taxas notariais e de registro desencadeadas por este Contrato, bem como todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou qualquer outra autoridade competente para manter a Propriedade Intelecual plenamente vigente e válida.

6.2.    Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Bens Alienados, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.3.    A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura ou da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.4.    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless it receives instructions provided by the Trustee, as well as indemnity or guarantee to its satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

6.4.    O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

## SECTION VII
## BRAZILIAN COLLATERAL AGENT

## CLÁUSULA VII
## AGENTE DE GARANTIA BRASILEIRO

7.1.    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.1.    O Agente de Garantia Brasileiro foi nomeado, de acordo os termo da Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2.    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any

7.2.    O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento,

discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLA and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the

designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLA e/ou à Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a

consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

7.3.    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by

solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer

telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

7.4.    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.5.    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such

declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

responsibility shall be in charge exclusively of the Company.

7.6.    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian *reais*, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil (ROF), as applicable; and (c) will

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e

not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Section. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7.    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of

7.9.    O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este

any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 7.10.

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11.    Any and all payments by Gol Finance, the Company and/or GLA to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature

7.11.    Todos e quaisquer pagamentos pela Gol Finance, pela Companhia e/ou pela GLA para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou

levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol Finance, the Company and/or GLA, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Companhia e/ou a GLA, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação à Oferta.

7.13.    For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.13.    Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14.    Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Company. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), to appoint a successor

7.14.    Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser

agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor.

recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

## SECTION VIII
## MISCELLANEOUS

## CLÁUSULA VIII
## DISPOSIÇÕES GERAIS

8.1. <u>Definitions</u>. Capitalized terms used in this Agreement and its Exhibits and not otherwise defined herein will have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1. <u>Definições</u>. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1. For the purposes of this Agreement, "<u>Business Da</u>y" means any day other than Sunday, Saturday or a public holiday in Brazil, or that day when commercial banks in

8.1.1. Para fins deste Contrato, "<u>Dia Útil</u>" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das

the cities of Rio de Janeiro and São Paulo are authorized or required by law to close.

8.2.    <u>Amendments</u>. This Agreement may be amended, replaced, cancelled, renewed or extended, and its terms may be waived, only upon written instrument signed by all Parties.

8.3.    <u>Severability</u>. If any provision of this Agreement is held void or ineffective by court decision, the validity or enforceability of the remaining provisions shall not be affected, and the latter shall remain in full force and effect, being the Parties committed, within the shortest term possible, to engage in good-faith negotiations to replace the ineffective provision by another that, to the greatest extent possible and in a reasonable manner, reaches the intended purposes and effects.

8.4.    <u>Irrevocability, Effectiveness</u>. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.1.   When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Transferred Assets from any encumbrance which is still in force in accordance with the provisions herein.

cidades do Rio de Janeiro e de São Paulo forem autorizados ou obrigados por lei a fechar.

8.2.    <u>Alterações</u>. Este Contrato somente poderá ser aditado, substituído, cancelado, renovado ou prorrogado e seus termos somente poderão ser renunciados, mediante instrumento escrito assinado por todas as Partes.

8.3.    <u>Independência das Cláusulas</u>. Se qualquer disposição deste Contrato for considerada nula ou ineficaz por decisão judicial, a validade ou exequibilidade das remanescentes não será afetada, as quais permanecerão em pleno vigor e vigência, comprometendo-se as Partes, no menor prazo possível, a negociarem, de boa-fé, a substituição da disposição ineficaz por outra que, na máxima extensão possível e de maneira razoável, atenda aos fins e propósitos pretendidos.

8.4.    <u>Irrevocabilidade, Vigência</u>. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1.   Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação dos Bens Alienados de qualquer gravame que ainda esteja em vigor de acordo com as disposições deste Contrato.

8.5. <u>Amendments, Successors and Assignees</u>. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

8.6. <u>Guarantees</u>. The Fiduciary Transfer provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.7. <u>Notices</u>. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

<u>For Company</u>:

8.5. <u>Aditivos, Sucessores e Cessionários</u>. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6. <u>Garantias</u>. A Alienação Fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7. <u>Notificações</u>. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

<u>Para a Companhia</u>:

- 29 -

Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

For the Brazilian Collateral Agent:
Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

For GLAI:

Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo
São Paulo - SP, Brazil

Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1.    Any and all notifications or other communications made pursuant to this Agreement will be considered valid and delivered on the Business Day following the respective receipt, according to the document signed by the recipient or acknowledgment of receipt, as the case may be.

8.8.    Specific    Performance.    This Agreement is an extrajudicial instrument (*título executivo extrajudicial*) for all purposes of articles 497, 784 and 815 of the Civil Procedure Code and, for the purposes of this Agreement and of each amendment hereto, the Brazilian Collateral Agent, representing the Secured Parties, under this

Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

Para o Agente de Garantia Brasileiro:
Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
Att: Danilo Oliveira / Karla Fernandes

danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

Para a GLAI:

Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo
São Paulo - SP, Brasil

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1.    Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8.    Execução Específica. Este Contrato constitui um título executivo extrajudicial para todos os fins dos Artigos 497, 784 e 815 do Código de Processo Civil e, para os fins deste Contrato e de todos os aditivos a este Contrato, o Agente de Garantia Brasileiro representando as Partes Garantidas, nos termos deste Contrato, poderá promover a

Agreement may pursue specific performance of the obligations of Company.

8.9. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of Brazil.

8.9.1. In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument (*título executivo extrajudicial*) that may be the subject to enforcement proceedings under the terms of article 784, item III of the Civil Procedure Code.

8.10. <u>Jurisdiction.</u> Any disputes or controversies arising from this Agreement will be settled by the court of the City São Paulo, State of São Paulo, which will also be the competent jurisdiction to enforce the obligations established herein.

8.11. Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12. <u>Language</u>. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13. <u>Electronic Signature</u>. This Agreement is executed by the Parties with

execução específica das obrigações da Companhia.

8.9. <u>Lei de Regência</u>. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil.

8.9.1. Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10. <u>Foro.</u> Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11. Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis

8.12. <u>Idioma</u>. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13. <u>Assinatura Eletrônica</u>. Este Contrato é celebrado pelas Partes com assinatura

electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14.    This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

**IN WITNESS WHEREOF**, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

São Paulo, December 23, 2020.

(*remainder of the page intentionally left blank*)

---

eletrônica de acordo com as regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, nos termos da Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

8.14.    Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, 23 de dezembro de 2020.

(*restante da página intencionalmente deixado em branco*)

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of December 23, 2020)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de 23 de dezembro de 2020)*

**GOL LINHAS AÉREAS INTELIGENTES S.A.,**

_____

*Name*/Nome:

*Title*/Cargo:

_____

*Name*/Nome:

*Title*/Cargo:

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of December 23, 2020)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de 23 de dezembro de 2020)*

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____

_____

*Name*/Nome:

*Name*/Nome:

*Title*/Cargo:

*Title*/Cargo:

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of December 23, 2020)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de 23 de dezembro de 2020)*

**GOL LINHAS AÉREAS S.A.,**

_____

*Name*/Nome:

*Title*/Cargo:

_____

*Name*/Nome:

*Title*/Cargo:

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of December 23, 2020)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de 23 de dezembro de 2020)*

**WITNESSES/TESTEMUNHAS**

_____
Name/Nome:
Tax ID /CPF:
ID/RG:

_____
Name/Nome:
Tax ID /CPF:
ID/RG:

| | |
|---|---|
| **EXHIBIT I** | **ANEXO I** |
| to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of December 23, 2020. | ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de 23 de dezembro de 2020. |

| | |
|---|---|
| **DESCRIPTION OF SECURED OBLIGATIONS** | **DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |

| | |
|---|---|
| Principal Amount: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | Valor Principal: até US$ 200.000.000,00 (duzentos milhões de dólares Norte Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| Maturity Date: June 30, 2026; | Data de Vencimento: 30 de junho de 2026; |
| Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture; | Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura; |
| Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes; | Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas; |
| Penalty Clause: not applicable; | Cláusula Penal: não aplicável; |
| Inflation Adjustment Index: not applicable; | Índice de Atualização Monetária: não aplicável; |

- 37 -

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura.

## AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT

## VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Default interest: 1.00% (once percent) per month;

Juros de Mora: 1,00% (um por cento) ao mês;

Penalty Clause: 10.00% (ten percent);

Cláusula Penal: 10,00% (dez por cento);

Inflation Adjustment Index: Not applicable;

Índice de Atualização Monetária: Não aplicável;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das

of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

| EXHIBIT 2 | ANEXO 2 |
|---|---|
| **FORM OF AMENDMENT TO THE FIDUCIARY TRANSFER OF INTELLECTUAL PROPERTY RIGHTS AGREEMENT** | **MODELO DE ADITAMENTO AO CONTRATO DE ALIENAÇÃO FIDUCIÁRIA DE DIREITOS DE PROPRIEDADE INTELECTUAL** |

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

(a) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(a) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

(b) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

- 40 -

and, as intervening and consenting party,

e, como interveniente anuente,

(c)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives ("GLA", jointly with the Company, the "Guarantors"),

(c)     **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no CNPJ/ME sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("GLA" e, juntamente com a Companhia, as "Garantidoras").

**WHEREAS:**

**CONSIDERANDO QUE:**

(i)     on December 23, 2020, the Company, the Brazilian Collateral Agent and GLA entered into a Fiduciary Transfer of Intellectual Property Rights Agreement ("Fiduciary Assignment Agreement"), pursuant to which the Company assigned all the Transferred Assets (as defined in the Fiduciary Assignment Agreement) on a fiduciary basis, to the Secured Parties, as collateral for the Secured Obligations;

(i)     em 23 de dezembro de 2020, a Companhia, o Agente de Garantia Brasileiro e GLA celebraram Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual ("Contrato de Alienação Fiduciária"), nos termos do qual a Companhia concedeu todos os Bens Alienados (conforme definido no Contrato de Alienação Fiduciária), em alienação fiduciária, às Partes Garantidas, como garantia das Obrigações Garantidas;

(ii)    the Parties hereby agree to amend the Fiduciary Assignment Agreement for the purpose of [including the Intellectual Property List] (as defined in the Fiduciary Assignment Agreement) to be delivered on a fiduciary basis, pursuant to

(ii)    as Partes neste ato concordam em aditar o Contrato de Alienação Fiduciária com o objetivo de incluir [a lista de Propriedade Intelectual] (conforme definido no Contrato de Alienação Fiduciária) a serem alienados fiduciariamente, nos

Clause 1.1.1 of the Fiduciary Assignment Agreement.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement" ("Amendment"), according to the following clauses:

## I.      DEFINITIONS

1.1.      For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Fiduciary Assignment Agreement.

## II.      AMENDMENT

2.1.      The Parties expressly agree to [include to the Fiduciary Assignment Agreement the list of the Intellectual Property attached hereto as <u>Exhibit A</u>, for the purpose of formalizing and creating of the fiduciary assignment on the Intellectual Property owned by the Company listed in <u>Annex A</u>.

## III.      MISCELLANEOUS

**3.1.**      <u>Registration of this Amendment.</u> The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located. Within ten (10) days as from the date of registration of this Amendment with the competent Registry Offices of Titles and Deeds, the Company shall deliver to the Brazilian Collateral Agent evidence that the request for

termos da Cláusula 1.1.1 do Contrato de Alienação Fiduciária.

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "Aditamento ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual" ("<u>Aditamento</u>"), que será regido pelas seguintes cláusulas:

## I.      DAS DEFINIÇÕES

1.1.      Para fins deste Aditamento, todos os termos iniciados em letras maiúsculas, não definidos neste Aditivo, têm o significado a eles atribuídos no Contrato de Alienação Fiduciária.

## II.      DO ADITAMENTO

2.1.      As Partes expressamente concordam em incluir a lista de Propriedade Intelectual ao Contrato de Alienação Fiduciária anexa ao presente Aditamento como <u>Anexo A</u>, com o objetivo de formalizar e constituir a alienação fiduciária sobre a Propriedade Intelectual de titularidade da Companhia listadas no <u>Anexo A</u>.

## III.      DISPOSIÇÕES GERAIS

3.1.      <u>Registro do Presente Aditivo</u>. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro que este presente Aditamento foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. No prazo de 10 (dez) dias contados a partir da data de registro deste Aditamento perante os Cartórios de Títulos e Documentos competente, a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de

annotation of the security interest over each e Intellectual Property has been filed with the INPI.

3.1.1. The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

3.2.    Representations and Warranties. The Company hereby represents and warrants that:

(a)    has full powers, authorization and capacity to enter into this Amendment, comply with its contractual obligations and [enter into fiduciary assignment of all the Intellectual Property described in Exhibit A];

(b)    has taken all necessary measures to authorize the execution and performance of this Amendment;

(c)    this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(d)    the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's

que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual foi protocolado perante o INPI.

3.1.1. A Companhia obriga-se, mediante conclusão perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal averbação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

3.2.    Declarações e Garantias. A Companhia neste ato declara e garante que:

(a)    possui plenos poderes, autorização e capacidade de firmar o presente Aditivo, cumprir com suas obrigações contratuais e [celebrar a alienação fiduciária de toda Propriedade Intelectual descrita no Anexo A];

(b)    tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditivo;

(c)    o presente Aditamento constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d)    a celebração do presente Aditamento e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii)

- 43 -

organizational acts, and do not give rise to or impose any encumbrance on its assets[,, except for the Fiduciary Transfer of the Intellectual Property];

qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos[,exceto pela Alienação Fiduciária da Propriedade Intelectual];

(e)    [it is the lawful and exclusive owner of, and has good title to, the Intellectual Property described in Exhibit A hereto, which comprises all intellectual property owned by the Company. All of the Intellectual Property is duly registered with the INPI and/or other relevant authority with which it is required to be registered with pursuant to the applicable regulations and all fees due for the registration or the maintenance of the registration of the Transferred Assets with the INPI or with such other relevant authorities have been duly paid by the Company;] and

(e)    [é a legítima e exclusiva proprietária e possuidora da Propriedade Intelectual descrita no Anexo A, que representa a totalidade da propriedade intelectual detida pela Companhia. Toda a Propriedade Intelectual está registrada perante o INPI ou outra autoridade competente conforme seja requerido nos termos da regulamentação aplicável e todas as taxas devidas pelo registro ou pela manutenção do registro dos Bens Alienados no INPI ou tais outras autoridades competentes foram devidamente pagas pela Companhia;] and

(f)    except for the fiduciary assignment of the Fiduciary Assignment Agreement, the Intellectual Property is free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary assignment, pledge or sale of the Intellectual Property in the Company's by-laws or any other document; and, in the event of enforcement or execution of this Amendment and the Fiduciary Assignment Agreement, their terms and conditions shall prevail over the terms and conditions of any other document.

(f)    exceto pela alienação fiduciária do Contrato de Alienação Fiduciária, a Propriedade Intelectual está livre e desembaraçada de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda da Propriedade Intelectual no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Aditamento e do Contrato de Alienação Fiduciária, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento.

3.3    Other Terms and Conditions. All the terms and conditions of the Fiduciary Assignment Agreement not expressly altered or modified by this Amendment are hereby and from hereof date fully ratified by the Parties and shall remain in full force and effect, as provided for in the Fiduciary Assignment Agreement.

3.3.    Outros Termos e Condições. Todos os termos e condições do Contrato de Alienação Fiduciária não expressamente alterados ou modificados por este Aditamento estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato de Alienação Fiduciária.

3.4    Governing Law. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.4.    Lei de Regência. O presente Aditamento será regido e interpretado de acordo com as leis do Brasil.

3.5    Dispute Resolution. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

3.5.    Solução de Controvérsias. Quaisquer disputas ou controvérsias oriundas do presente Aditamento serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

In witness whereof, the Parties have executed this Amendment in three (3) counterparts of identical content and form, in the presence of the two (2) undersigned witnesses.

E por estarem assim justas e contratadas, as Partes firmam o presente Aditamento em 3 (três) vias de igual teor e forma, na presença das 2 (duas) testemunhas abaixo assinadas.

São Paulo, [●] [●] [●].

São Paulo, [●] de [●] de [●].

**[Signature page]**
**[ page break ]**
[ Exhibit A]

**[página de assinaturas]**
**[quebra de página]**
[Anexo A]

### EXHIBIT A/ANEXO A

**List of Transferred Assets / Lista dos Bens Alienados**

1.    **Internet Domains (Domínios de Internet)**

| Domain Names (Nomes de Domínio) | Owner (Proprietária) | Registrant Name (Nome Registrador) | Registered in (Registrado em) |
|---|---|---|---|
| | | | |

2.    **Trademarks**

| | |
|---|---|
| **Application No. (Nº Solicitação)** | |
| **Logo (Logo)** | |
| **Trademark (Marca Registrada)** | |
| **International Class (Classe Internacional)** | |
| **Presentation (Apresentação)** | |
| **Filling Date (Data de Protocolo)** | |
| **Registration Date (Data de Registro)** | |
| **Expiration Date (Data de Vencimento)** | |
| **Status** | |
| **Owner (Proprietária)** | |

| | |
|---|---|
| **EXHIBIT III** | **ANEXO III** |
| to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of December 23, 2020. | ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de 23 de dezembro de 2020. |
| **Form of Power of Attorney** | **Modelo de Procuração** |
| **POWER OF ATTORNEY** | **PROCURAÇÃO** |

By this power of attorney, **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a corporation organized and existing under the laws of Brazil, headquartered at Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Code 04626-020, in the city of São Paulo, State of São Paulo, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Fiduciary Transfer of Intellectual Property Rights Agreement entered into on December 23, 2020 between the GRANTOR, the GRANTEE and Gol Linhas Aéreas S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in

Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS INTELIGENTES S.A.,** sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.,** sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado em 23 de dezembro de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654,

accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

1.  practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

(a) to dispose of, sell, assign, transfer, collect, receive, take possession of and/or foreclose all or part of the Transferred Assets or otherwise dispose of, and deliver the Transferred Assets under the Agreement and as established in article 1,364 of the Civil Code, and apply the product received to the payment of the Secured Obligations under the Agreement;

(b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Transferred Assets and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Transferred Assets and represent the GRANTOR before third parties for the purpose of releasing the Fiduciary Transfer, disposal of the Transferred Assets and transfer of the funds resulting from such disposal;

2.  sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting

684, 685 e 686, parágrafo único, do Código Civil, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1.  praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

(a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Bens Alienados ou dispor de qualquer outro modo e entregar os Bens Alienados nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

(b) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Bens Alienados e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com relação aos Bens Alienados e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação dos Bens Alienados e transferência dos recursos resultantes de tal alienação;

2.  assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio

- 48 -

abroad any and all financial funds due by the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, the INPI, the Center for Information and Coordination of the Dot BR (*Núcleo de Informação e Coordenação do Ponto BR – NIC.br*), the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

4. to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Transferred Assets, represent the GRANTOR before any competent Registry Office of Deeds and Documents, the INPI and/or any other governmental body in which the Agreement or its respective amendments shall be registered;

5. enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial

necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos, o INPI, o Núcleo de Informação e Coordenação do Ponto BR – NIC.br, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às aos Bens Alienados, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente, INPI e/ou qualquer outro órgão governamental nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5. celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o

institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the Trustee, as provided for in the Agreement; and

Banco Central do Brasil, quaisquer bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

6. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

6. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement.

Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato.

São Paulo, December 23, 2020

São Paulo, 23 de dezembro de 2020.

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

[SIGNATURE FIELD]

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

[CAMPO DE ASSINATURA]

**EXHIBIT I**

FORM OF NON-ROTABLES FIDUCIARY SALE AGREEMENT

**NON-REVOLVING AIRCRAFT SPARE PARTS FIDUCIARY ASSIGNMENT AGREEMENT**

By this private instrument, the parties hereto:

(a)    **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(b)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapos No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

**INSTRUMENTO PARTICULAR DE ALIENAÇÃO FIDUCIÁRIA DE PEÇAS AERONÁUTICAS DE REPOSIÇÃO NÃO-ROTATIVAS**

Pelo presente instrumento particular, as partes:

(a)    **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Comercial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

1

and, as intervening and consenting party,

(c) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors");

Each party above will be also hereinafter referred to as "Party" and collectively as "Parties";

**WHEREAS:**

(i) Gol Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg ("Gol Finance") issued senior debt securities at interest of 8.00% and maturity in 2026 ("Notes"), according to the terms and conditions set forth in the indenture under which the Notes were issued ("Indenture") and as described in the private placement memorandum related to the Notes offering ("Offering");

(ii) the Brazilian Collateral Agent has been duly appointed by the Noteholders and the other secured

---

e, como interveniente anuente,

(c) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI", juntamente com a Companhia, as "Garantidoras");

Cada parte acima também referida como "Parte" e, em conjunto, "Partes";

**CONSIDERANDO QUE:**

(i) a Gol Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas"), nos termos e condições previstos na escritura por meio da qual as Notas foram emitidas ("Escritura") e conforme descrito no memorando de colocação privada relacionado à oferta das Notas ("Oferta");

(ii) o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras

2

parties described in the Indenture ("Secured Parties") as the collateral agent in Brazil pursuant to the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral created by means of this Agreement, as permitted by the terms set forth in the Indenture, in accordance exclusively and strictly with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms set forth in the Indenture and this Agreement;

(iii) in order to ensure compliance with all obligations undertaken by Gol Finance, subject to the terms and conditions of the Indenture, each of the Guarantors provided a personal guarantee under the Indenture ("Personal Guarantees");

(iv) The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent.

partes garantidas descritas na Escritura ("Partes Garantidas") como agente de garantia no Brasil nos termos da Escritura para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii) a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, cada uma das Garantidoras prestou garantia pessoal nos termos da Escritura ("Garantias Fidejussórias");

(iv)    A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o Trustee, na qualidade de representante das

3

Partes Garantidas e do Agente de Garantia Brasileiro.

**(v)** in order to guarantee compliance with all obligations undertaken by Gol Finance under the terms and conditions of the Indenture and by the Guarantors under the Personal Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Non-Revolving Spare Parts (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Non-Revolving Spare Parts (as defined below).

**(V)** a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e condições da Escritura e pelos Garantidores no âmbito das Garantias Fidejussórias, a Companhia concordou em conceder às Partes Garantidas, representados no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre as Peças de Reposição Não-Rotativas (conforme definido abaixo), mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todas as Peças de Reposição Não-Rotativas (conforme definido abaixo).

**NOW, THEREFORE,** the Company, the Brazilian Collateral Agent and GLAI, hereby and pursuant to law agree to enter into this "Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement" ("Agreement"), according to the following clauses:

**RESOLVEM** a Companhia, o Agente de Garantia Brasileiro e a GLAI, neste ato e na melhor forma de direito, celebrar o presente "Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas" ("Contrato"), que será regido pelas seguintes cláusulas:

**SECTION 1 - PURPOSE**

**CLÁUSULA 1 – OBJETO DO CONTRATO**

1.1.    In accordance with the provisions herein, in order to guarantee (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Personal Guarantees; (c) the faithful and timely compliance by Gol Finance and the

1.1.    De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias Fidejussórias; (c) o

4

Guarantors with all contracts, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the said instruments (jointly, the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents relating to the Non-Revolving Spare Parts; and (e) the faithful and timely payment of all other amounts due from time to time by Gol Finance, the Company and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents relating to the Non-Revolving Spare Parts (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "Secured Obligations"), the Company hereby assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional ownership of all Non-Revolving, consumable and non-fungible aircraft spare parts, owned by the Company, and deposited in the locations identified in Exhibit 4 to this Agreement ("Locations") as identified or to be identified in Exhibit 4 to this Agreement ("Non-Revolving Spare Parts"). This fiduciary assignment is created in accordance with article 1,361 *et seq.* of Law No. 10,406, of January 10, 2002, as amended ("Civil Code").

1.1.1. The guarantee established herein does not apply to (a) any Non-Revolving Spare Part while it is incorporated into, installed in, connected to, or being used in, aircrafts, turbines or other Non-Revolving

fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos, obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta, e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação relativos às Peças de Reposição Não-Rotativas; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela Companhia e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação relativos às Peças de Reposição Não-Rotativas (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), a Companhia neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a propriedade resolúvel de todas as peças aeronáuticas de reposição consumíveis não-rotativas e infungíveis, de propriedade da Companhia e depositadas nas localidades identificadas no Anexo 4 deste Contrato ("Localidades"), conforme identificadas ou a serem identificadas no Anexo 4 deste Contrato ("Peças de Reposição Não-Rotativas"). A presente alienação fiduciária é constituída de acordo com o artigo 1.361 e seguintes da Lei n° 10.406, de 10 de janeiro de 2002, conforme alterada ("Código Civil").

1.1.1. A garantia constituída por meio do presente instrumento não se aplica a (a) qualquer Peça de Reposição Não-Rotativa enquanto esta estiver incorporada a, instalada em, conectada a, ou sendo usada em,

5

Spare Parts that are incorporated into, installed in, connected to, or being used, and to (b) any Non-Revolving Spare Part rented to, loaned to or consigned to the Company.

1.2.    As a result of the transfer by the Company of the conditional ownership on the Non-Revolving Spare Parts to the Secured Parties, represented by the Brazilian Collateral Agent, carried out under the terms of the applicable legislation, the Secured Parties, represented by the Brazilian Collateral Agent, become the exclusive owners of the conditional ownership and indirect owners of the Non-Revolving Spare Parts, until full compliance with the Secured Obligations, subject to the terms of Clause 1.7 below.

1.3.    The Secured Obligations include all obligations undertaken by Finance and the Guarantors, as applicable, including all present and future principal and ancillary payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, within the scope of, or in relation to the Offering or the Indenture.

1.3.1.    For the purposes of Article 1,362 of the Civil Code, the main conditions and characteristics of the Secured Obligations are those described in Exhibit 1 to this Agreement.

1.4.    By signing this Agreement and complying with the formalities set forth in Clause 5 below, the fiduciary assignment shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, and the Company shall become the holder of direct

aeronaves, turbinas ou outras Peças de Reposição Não-Rotativas que por sua vez estejam incorporadas, instaladas, conectadas ou sendo utilizadas, e a (b) qualquer Peça de Reposição Não-Rotativa alugada para, emprestada para ou consignada à Companhia.

1.2.    Em decorrência da transferência, pela Companhia, da propriedade resolúvel sobre as Peças de Reposição Não-Rotativas para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, realizada nos termos da legislação aplicável, as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, passam a ser as exclusivas titulares da propriedade resolúvel e possuidoras indiretas das Peças de Reposição Não-Rotativas, até o cumprimento integral das Obrigações Garantidas, observados os termos da Cláusula 1.7 abaixo.

1.3.    As Obrigações Garantidas incluem todas as obrigações assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.1.    Para fins do artigo 1.362 do Código Civil, as principais condições e características das Obrigações Garantidas são aquelas descritas no Anexo 1 ao presente Contrato.

1.4.    Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 5 abaixo, estará constituída a alienação fiduciária em nome e beneficio das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, e a Companhia tornar-se-á

6

possession of the Non-Revolving Spare Parts and the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, shall become the holder of indirect possession of the Non-Revolving Spare Parts, subject to the terms and conditions of this Agreement.

1.5.    Until the tenth (10th) day of the months of April and October of each year, as of April 2021 the Parties undertake to update Exhibit 4 to this Agreement, through the execution of an amendment to this Agreement under the form in Exhibit 2 hereto, in order to update (a) the Locations and/or (b) update and include all the Non-Revolving Spare Parts owned by the Company, which on such date, may be the subject to the fiduciary assignment created herein. The base date of Exhibit 4 to this Agreement is November 30, 2020.

1.6.    According to the report of November 30, 2020, prepared by Morten Beyer & Agnew ("Independent Appraiser"), an independent consulting and property valuation firm in the aviation industry, the estimated fair market value of the Non-Revolving Spare Parts, at July 20 2020, is USD 66,121,473.00 (sixty six million, one hundred and twenty one thousand and four hundred and seventy three dollars) ("Fair Market Value of the Non-Revolving Spare Parts").

1.6.1.    As provided for in the Indenture Gol Finance undertakes to provide to the Brazilian Collateral Agent and the Trustee until the tenth (10th) day of each month of April and October of each year, as of April 2021, a certificate issued by the Independent Appraiser that shall contain its opinion on the fair market value of the Non-Revolving Spare Parts under the fiduciary assignment created under this Clause, and such certificate

detentora da posse direta das Peças de Reposição Não-Rotativas e o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, tornar-se-á detentor da posse indireta das Peças de Reposição Não-Rotativas, nos termos e condições acordados neste Contrato.

1.5.    Até o 10º (décimo) dia dos meses de abril e outubro de cada ano, a partir de abril de 2021, as Partes comprometem-se a atualizar o Anexo 5 deste Contrato, mediante a celebração de um aditivo a este Contrato conforme modelo constante do Anexo 2, a fim de atualizar (a) as Localidades e/ou (b) atualizar e incluir todas as Peças de Reposição Não-Rotativas, de propriedade da Companhia, a quais, em tal data, serão objeto da alienação fiduciária aqui constituída. A data base do Anexo 4 ao presente contrato é 30 de novembro de 2020.

1.6.    De acordo com o relatório de 30 de novembro de 2020, elaborado pela Morten Beyer & Agnew ("Avaliador Independente"), uma empresa independente de consultoria e de avaliação de bens do setor de aviação, o valor justo de mercado estimado das Peças de Reposição Não-Rotativas, em 20 de julho de 2020, é de US$ 66.121.473,00 (sessenta seis milhões, cento e vinte e um mil e quatrocentos e setenta e três dólares) ("Valor de Mercado das Peças de Reposição Não-Rotativas").

1.6.1.    Conforme disposto na Escritura, a Gol Finance compromete-se a fornecer ao Agente de Garantia Brasileiro e ao Trustee até o 10º (décimo) dia de todo mês de abril e outubro de cada ano, a partir de abril de 2021, um certificado emitido pelo Avaliador Independente que deverá conter sua opinião sobre o valor justo de mercado das Peças de Reposição Não-Rotativas objeto da alienação fiduciária criada nos termos desta Cláusula,

7

shall be prepared and issued under the Indenture (each, an "<u>Appraisal Report</u>").

1.7. Without prejudice to the other provisions of this Agreement, the Company may, at its own expense, at any time and from time to time, without any release or consent of the Secured Parties or the Trustee, under the Indenture, or the Brazilian Collateral Agent, (i) transfer the possession of any Non-Revolving Spare Part to the respective manufacturer or to any other organization for the purpose of testing, overhaul, repairs, maintenance, alterations or modifications or to any person for the purpose of transportation for the purposes described herein, in a manner consistent with the ordinary course of business of the Company; (ii) install or use in any aircraft, engine, or other Non-Revolving Spare Part, leased to or owned by the Company; (iii) dismantle any Non-Revolving Spare Part that the Company deems worn out, obsolete, beyond economic repair or no longer suitable for use, and to sell or dispose of any such Non-Revolving Spare Parts or any salvage resulting from such dismantling, free from the fiduciary assignment created under this Agreement; and (iv) subject any Non-Revolving Spare Parts to pooling, exchange, borrowing, or maintenance servicing agreements customary in the airline industry and executed by the Company in the ordinary course of its business, provided that (a) there is no detriment to the Secured Parties' position; and (b) it shall not affect the priority or perfection of fiduciary assignment created under this Agreement or the rights of the Brazilian Collateral Agent or the Trustee.

devendo ser preparado e emitido nos termos da Escritura (cada um, um "<u>Relatório de Avaliação</u>").

1.7. Sem prejuízo das demais disposições deste Contrato, a Companhia poderá, às suas próprias expensas, a qualquer momento e de tempos em tempos, sem que seja necessária qualquer liberação ou consentimento das Partes Garantidas ou do *Trustee*, nos termos da Escritura, ou do Agente de Garantia Brasileiro, (i) transferir a posse de qualquer Peça de Reposição Não-Rotativa ao respectivo fabricante ou a qualquer outra organização para fins de testes, revisão, consertos, manutenção, alterações ou modificações ou para qualquer pessoa com o propósito de transporte para os fins aqui descritos, de maneira que seja consistente com o curso ordinário dos negócios da Companhia; (ii) instalar ou usar em qualquer aeronave ou turbina, ou outra Peça de Reposição Não-Rotativa, alugada para ou de propriedade da Companhia; (iii) desmontar qualquer Peça de Reposição Não-Rotativa que a Companhia julgue desgastada, obsoleta, imprópria ou inadequada para o uso, e vender ou dispor de qualquer dessas Peças de Reposição Não-Rotativas ou de qualquer reaproveitamento resultante desse desmonte, livre da alienação fiduciária criada neste Contrato; e (iv) sujeitar qualquer Peça de Reposição Não-Rotativa a contratos de *pooling*, troca, empréstimo ou de serviços de manutenção usuais no setor de linhas aéreas e celebrados pela Companhia no curso ordinário dos seus negócios, desde que (a) não resulte em qualquer prejuízo aos direitos da Partes Garantidas; e(b) não afete a constituição, aperfeiçoamento ou a prioridade da garantia constituída por meio deste Contrato, ou os direitos do *Trustee* ou do Agente de Garantia Brasileiro.

8

1.8.    The Brazilian Collateral Agent, acting according to the instructions provided by the Trustee, or any third party appointed by the Secured Parties or the Trustee, may, at any time, engage a third party previously indicated by the Trustee, upon notice to the Company at least three (3) Business Days in advance, to examine the Non-Revolving Spare Parts, checking their conditions and existing quantity.

1.8.    O Agente de Garantia Brasileiro, agindo conforme as instruções fornecidas pelo *Trustee*, ou qualquer terceiro nomeado pelas Partes Garantidas ou pelo *Trustee*, poderá, a qualquer tempo, contratar terceiros previamente indicados pelo *Trustee*, mediante aviso à Companhia com antecedência de, ao menos, 3 (três) Dias Úteis, examinar as Peças de Reposição Não-Rotativas, verificando suas condições e quantidade existente.

### SECTION 2 - COMPANY'S OBLIGATIONS

### CLÁUSULA 2 – OBRIGAÇÕES DA COMPANHIA

2.1.    The Company undertakes to:

2.1.    A Companhia obriga-se a:

(a)    refrain from selling, assigning, transferring, creating any charge, renting or otherwise delivering, transferring or giving up ownership of any of the Non-Revolving Spare Parts to any person other than the Secured Parties, represented by the Brazilian Collateral Agent, or otherwise encumbering the Non-Revolving Spare Parts, subject to the criminal implications provided for in article 171, items I and II, of Decree-Law no. 2,848, of December 7, 1940, as amended (Brazilian Criminal Code), except as otherwise permitted under this Agreement;

(a)    abster-se de vender, ceder, transferir, criar qualquer ônus, alugar ou de qualquer outro modo entregar, transferir ou abdicar a posse de qualquer das Peças de Reposição Não-Rotativas a qualquer pessoa que não as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, ou, de outro modo, onerar as Peças de Reposição Não-Rotativas, sujeita às implicações criminais previstas no artigo 171, incisos I e II, do Decreto-lei nº 2.848, de 7 de dezembro de 1940, conforme alterado (Código Penal Brasileiro), exceto conforme permitido de outra maneira nos termos deste Contrato;

(b)    timely fulfill the obligations of this Agreement;

(b)    cumprir tempestivamente as obrigações desse Contrato;

(c)    defend itself, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Non-Revolving Spare Parts

(c)    defender, a si mesma, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar as Peças de

9

| | | | |
|---|---|---|---|
| | assigned on a fiduciary basis, this Agreement and/or the fulfillment of the obligations undertaken under the Offering; | | Reposição Não-Rotativas alienadas fiduciariamente, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta; |
| (d) | practice all acts, as well as sign any and all documents, necessary for the registration of the Non-Revolving Spare Parts fiduciary assignment agreement with the competent Registry Office of Deeds and Documents under this Agreement and the Indenture; | (d) | praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro da alienação fiduciária das Peças de Reposição Não-Rotativas no Cartório de Registro de Títulos e Documentos competente, nos termos deste Contrato e da Escritura; |
| (e) | not perform acts with the purpose of depreciating the value of the Non-Revolving Spare Parts, except as a result of the actions allowed in this Agreement; | (e) | não praticar atos com o propósito de depreciar o valor das Peças de Reposição Não-Rotativas, exceto se em decorrência das ações permitidas neste Contrato; |
| (f) | assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any enforcement and/or sale of the Non-Revolving Spare Parts, and bear all related expenses or that are necessary for such purpose; | (f) | auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, no caso de eventual excussão e/ou venda das Peças de Reposição Não-Rotativas, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito; |
| (g) | assist, allow and make its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent; | (g) | auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro; |

10

(h)   subject to the provisions of Clauses 3.1 and 3.3 below, maintain the custody of the Non-Revolving Spare Parts, acting as trustee of the Non-Revolving Spare Parts and assuming the responsibilities inherent to their conservation, subject to the resulting civil penalties, under the Article 627 et seq. of the Civil Code;

(h)   observado o disposto nas Cláusulas 3.1 e 3.3 abaixo, manter a custódia das Peças de Reposição Não-Rotativas, atuando como fiel depositária das Peças de Reposição Não-Rotativas e assumindo as responsabilidades inerentes à sua conservação, sujeitando-se às sanções civis daí decorrentes, nos termos do artigo 627 e seguintes do Código Civil;

(i)   defend, at its own expense, in a timely and efficient manner, the rights of the Secured Parties, represented by the Brazilian Collateral Agent, related to the Non-Revolving Spare Parts, against any claims of third parties;

(i)   defender, às suas próprias expensas, de uma maneira tempestiva e eficiente, os direitos das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, relativos às Peças de Reposição Não-Rotativas, contra quaisquer reivindicações de terceiros;

(j)   comply with all clauses set forth in the Indenture;

(j)   cumprir com todas as cláusulas previstas na Escritura;

(k)   notify the Brazilian Collateral Agent of any event resulting in violation of this Agreement or the Indenture or in inaccuracy of any statements made under this Agreement within two (2) Business Days of its occurrence;

(k)   notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(l)   maintain the necessary controls to ensure that the spare parts to be stored at the Locations comply with the Company's quality inspection;

(l)   manter os controles necessários para assegurar que as peças de reposição a serem estocadas nas Localidades cumpram com a inspeção de qualidade da Companhia;

(m)   annually renew the Power of Attorney (as defined below) granted under Section 3.4 of this Agreement, with at least thirty (30) days prior to

(m)   renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 3.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do

11

its expiration date, substantially in form of the Exhibit 3 hereto.

*Maintenance*

(n)  keep all Non-Revolving Spare Parts covered by insurance, at all times, against physical damages, including risks insured by extended coverage, as it is prudent and usually practiced by companies of the same or similar size, in the same or similar business, operating predominantly in Brazil, subject to the other criteria established in the Indenture;

(o)  maintain, or cause to maintain, at all times, the Non-Revolving Spare Parts in accordance with all applicable regulations issued by the National Civil Aviation Agency ("ANAC") or any regulation issued by any other applicable aviation authority or any other governmental authority that has jurisdiction over the Company or over any Non-Revolving Spare Parts, including making any modifications, alterations, replacements and/or additions that may be necessary, and shall use, or cause to be used, the same form and the same standard of maintenance with respect to each model of spare part included in this Agreement as are used for the same model of spare parts that are owned by the Company and that are not included in this Agreement;

seu vencimento, substancialmente na forma do Anexo 3 deste Contrato

*Manutenção*

(n)  manter todas as Peças de Reposição Não-Rotativas cobertas por seguro, em todos os momentos, contra danos físicos, inclusive riscos segurados por cobertura estendida, conforme for prudente e usualmente praticado pelas empresas do mesmo porte ou de porte similar, na mesma atividade ou em atividade similar, que operem predominantemente no Brasil, respeitados os demais critérios estabelecidos na Escritura;

(o)  manter, ou fazer com que se mantenham, em todos os momentos, as Peças de Reposição Não-Rotativas de acordo com toda a regulação aplicável expedida pela Agência Nacional de Aviação Civil ("ANAC") ou qualquer norma expedida por qualquer outra autoridade de aviação aplicável ou qualquer outra autoridade governamental que tenha jurisdição sobre a Companhia ou sobre quaisquer Peças de Reposição Não-Rotativas, incluindo a realização de quaisquer modificações, alterações, substituições e/ou adições que venham a ser necessárias, devendo utilizar, ou fazer com que sejam utilizados, a mesma forma e o mesmo padrão de manutenção com respeito a cada modelo de peça de reposição incluída nesse Contrato conforme são utilizados para o mesmo modelo de peças de reposição que sejam de propriedade da Companhia e que não estejam incluídas nesse Contrato;

12

(p)    maintain, or cause to be maintained, all records, histories and other materials required by ANAC or any other applicable aviation authority or any other governmental authority to be maintained with respect to Non-Revolving Spare Parts and not modify its procedures for recording the custody of Non-Revolving Spare Parts if such modification materially diminishes the value of the Non-Revolving Spare Parts as a whole;

(p)    manter, ou fazer com que se mantenham, todos os registros, históricos e outros materiais requeridos pela ANAC ou qualquer outra autoridade de aviação aplicável ou qualquer outra autoridade governamental a serem mantidos em relação às Peças de Reposição Não-Rotativas e não modificar seus procedimentos de registro da custódia das Peças de Reposição Não-Rotativas se tal modificação diminuir materialmente o valor das Peças de Reposição Não-Rotativas, consideradas como um todo;

(q)    maintain, or cause to be maintained, Non-Revolving Spare Parts in good working order and perform necessary maintenance for such purpose, except for (i) Non-Revolving Spare Parts that become worn or unsuitable for use and not reasonably repairable or become obsolete; and (ii) Non-Revolving Spare Parts that are consumed or used in the Company's operations.

(q)    manter, ou fazer com que se mantenham, as Peças de Reposição Não-Rotativas em boas condições de funcionamento e realizar as manutenções que se façam necessárias para tal propósito, exceto no que se refere (i) às Peças de Reposição Não-Rotativas que se tornem gastas ou impróprias para uso e não razoavelmente reparáveis ou que se tornem obsoletas e (ii) as Peças de Reposição Não-Rotativas que forem consumidas ou usadas nas operações da Companhia; e

*Location*

*Localidades*

(r)    keep Non-Revolving Spare Parts at one or more Locations, unless otherwise permitted in this Agreement.

(r)    manter as Peças de Reposição Não-Rotativas em uma ou mais Localidades, exceto se de outro modo permitido neste Contrato.

2.2.    As fully detailed in Clause 2.1 above, the Company is fully responsible for the registration and custody of the Non-Revolving Spare Parts and for their undue or improper use, as well as for any and all costs, indemnities or expenses resulting from personal and/or material damages caused to third parties, and it also undertakes to take all

2.2.    Conforme plenamente detalhado na Cláusula 2.1 acima, a Companhia é integralmente responsável pelo registro e pela custódia das Peças de Reposição Não-Rotativas e por seu uso indevido ou impróprio, bem como por todos e quaisquer custos, indenizações ou despesas decorrentes de danos pessoais e/ou materiais causados a

13

necessary measures to preserve the integrity of the Non-Revolving Spare Parts. The Company shall be solely and exclusively responsible for any damage caused to the Non-Revolving Spare Parts.

2.2.1.   The Company is also responsible for the payment of any and all fines, fees, taxes, licensing expenses and other costs arising from the Non-Revolving Spare Parts.

2.3.     The Company confirms that (a) it has no objection to the Offering; and (b) the Offering and any enforcement, at any time, of the Non-Revolving Spare Parts shall not violate, infringe, contravene, conflict or constitute a default within the scope of (i) any contract to which the Company is a party, (ii) any applicable legislation; (iii) any Company policy or regulation; or (iv) any of the Company's organizational documents.

2.4.     If the Company, GLAI or any of its affiliates (a) changes the Non-Revolving Spare Parts, either in a single operations or in a series of operations, of one or more Locations that are owned or rented by the Company, or (b) acquires, whether in a single purchase or in a series of purchases, new Non-Revolving Spare Parts of a seller or supplier that are, after such operations, stored in another location in Brazil that is not yet considered a Location (but is owned or rented by the Company) the Company shall, within thirty (30) days following the arrival of such Non-Revolving Spare Parts, as applicable, at the respective new location, and provided that after such operation or purchase, it is verified, on the whole, that at such location there are Non-Revolving Spare Parts in value greater than one percent (1%) of the value

terceiros, obrigando-se, ainda, a adotar todas as providências necessárias à preservação da integridade das Peças de Reposição Não-Rotativas. A Companhia será a única e exclusiva responsável por quaisquer danos causados às Peças de Reposição Não-Rotativas.

2.2.1.   A Companhia é responsável, ainda, pelo pagamento de todas e quaisquer multas, taxas, tributos, despesas de licenciamento e outros custos decorrentes das Peças de Reposição Não-Rotativas.

2.3.     A Companhia confirma que (a) não possui qualquer objeção à Oferta; e (b) a Oferta e qualquer excussão, a qualquer tempo, das Peças de Reposição Não-Rotativas não violarão, infringirão, contravirão, conflitarão ou constituirão um inadimplemento no âmbito (i) de qualquer contrato do qual a Companhia seja parte, (ii) de qualquer legislação aplicável; (iii) de qualquer política ou regulamento da Companhia; ou (iv) de qualquer um dos documentos constitutivos da Companhia.

2.4.     Caso a Companhia, a GLAI ou qualquer de suas afiliadas (a) mude as Peças de Reposição Não-Rotativas, seja em um único movimento ou em uma série de movimentos, de uma ou mais Localidades que sejam de propriedade da, ou alugadas pela, Companhia, ou (b) adquira, seja em uma única aquisição ou em uma série de aquisições, novas Peças de Reposição Não-Rotativas de um vendedor ou fornecedor que sejam, após tal aquisição, armazenadas em outro local no Brasil que não seja ainda considerado uma Localidade (mas seja de propriedade ou alugado pela Companhia) a Companhia deve, dentro de 30 (trinta) dias seguintes à chegada dessas Peças de Reposição Não-Rotativas, conforme aplicável, no respectivo novo local, e contanto que após tal movimento ou

14

ascertained for all Non-Revolving Spare Parts as informed in the last Evaluation Report issued, cause the new location to become a Location, updating Exhibit 4 to this Agreement in accordance with the draft amendment contained in Exhibit 2.

aquisição verifique-se, no conjunto, que em tal local há Peças de Reposição Não-Rotativas em valor superior a 1% (um por cento) do valor apurado para todas as Peças de Reposição Não-Rotativas conforme informado no último Relatório de Avaliação emitido, fazer com que o novo local se torne uma Localidade, atualizando o Anexo 4 a este Contrato de acordo com a minuta de aditamento contida no Anexo 2.

2.5.    Except as otherwise authorized under this Agreement or with the approval of the Brazilian Collateral Agent, in accordance exclusively and strictly with the instructions provided by the Trustee, the Company and GLAI undertake not to acquire (and to cause its affiliates not to acquire) non-revolving aircraft spare parts used or to be used in the Company's and GLAI's operations through a company, other than the Company itself.

2.5.    Exceto se de outra forma autorizado nos termos deste Contrato ou mediante aprovação do Agente de Garantia Brasileiro, de acordo, exclusiva e estritamente, com as instruções fornecidas pelo *Trustee*, a Companhia e a GLAI se obrigam a não adquirir (e a fazer com que suas afiliadas não adquiram) peças aeronáuticas de reposição não-rotativas usadas ou a serem usadas nas operações da Companhia e da GLAI por meio de outra sociedade que não seja a própria Companhia.

### SECTION 3 - ENFORCEMENT

### CLÁUSULA 3 – EXCUSSÃO

3.1.    In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, without prejudice to any other security granted and provided under the Offering, exercise all powers related to the Non-Revolving Spare Parts and the fiduciary assignment created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Non-Revolving Spare Parts (provided that, exclusively in the case of extrajudicial sale, provided that according to the highest value

3.1.    Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, exercer todos os poderes relativos às Peças de Reposição Não-Rotativas e à alienação fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, das Peças de Reposição Não-Rotativas (observado que, exclusivamente no caso de venda extrajudicial, desde que de acordo com o

between (a) at least fifty percent (50%) of the Market Value of the Non-Revolving Spare Parts, as updated under the Clause 1.6.1 above and (b) any other price, terms and market conditions at the time of disposal); give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the enforcement or execution, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Non-Revolving Spare Parts, and the Brazilian Collateral Agent shall deliver to the Company the remaining balance, if any, following, in any case, the provisions of the Indenture.

3.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf of and for the benefit of the Secured Parties, resulting from the sale of the Non-Revolving Spare Parts, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Indenture.

3.3.    With respect to Clause 3.1 above, in the event of enforcement or execution of this guarantee, the Company shall cause the direct possession of the Non-Revolving Spare Parts to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian

maior valor entre (a) ao menos 50% (cinquenta por cento) do Valor de Mercado das Peças de Reposição Não-Rotativas, conforme atualizado nos termos da Cláusula 1.6.1 acima e (b) qualquer outro preço, termos e condições de mercado no momento da alienação); dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação das Peças de Reposição Não-Rotativas, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

3.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação das Peças de Reposição Não-Rotativas, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

3.3.    Com relação à Cláusula 3.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta das Peças de Reposição Não-Rotativas para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de

Collateral Agent, as instructed by the Trustee.

3.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to Exhibit 3 to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including, without limitation, as provided for in Clause 3.1 above, and in the signature of the respective exchange contracts necessary for the remittance of any and all financial funds, resulting from the sale of the Non-Revolving Spare Parts, due by the Company to the Secured Parties.

3.4.1.   While this Agreement is in force, the Power of Attorney shall be renewed annually by the Company with at least thirty (30) days prior to its expiration date.

3.5.    For the purposes of the enforcement and/or execution of the fiduciary assignment created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, judicially or extrajudicially.

## SECTION 4 - REPRESENTATIONS AND WARRANTIES

4.1.    The Brazilian Collateral Agent hereby represents and warrants that:

---

Garantia Brasileiro, conforme instruído pelo *Trustee*.

3.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a bastante procuração, nos termos do Anexo 3 a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se limitar a, conforme disposto na Cláusula 3.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação das Peças de Reposição Não-Rotativas, devidos pela Companhia às Partes Garantidas.

3.4.1.   Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

3.5.    Para os propósitos da excussão e/ou da execução da alienação fiduciária constituída nos termos deste Contrato, fica acordado entre as Partes que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

## CLÁUSULA 4 – DECLARAÇÕES E GARANTIAS

4.1.    O Agente de Garantia Brasileiro neste ato declara e garante que:

17

| | | | |
|---|---|---|---|
| (a) | has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Non-Revolving Spare Parts fiduciary assignment agreement, as described herein; and | (a) | possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária das Peças de Reposição Não-Rotativas conforme aqui descrito; e |
| (b) | has taken all appropriate steps to authorize the execution and performance of this Agreement. | (b) | tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato. |

| | | | |
|---|---|---|---|
| 4.2. | The Company hereby represents and warrants that: | 4.2. | A Companhia neste ato declara e garante que: |
| (a) | has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Non-Revolving Spare Parts fiduciary assignment agreement, as described herein; and | (a) | possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária das Peças de Reposição Não-Rotativas conforme aqui descrito; |
| (b) | has taken all necessary steps to authorize the execution and performance of this Agreement; | (b) | tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato; |
| (c) | this Agreement constitutes a legal, valid and enforceable obligation against the Company, in accordance with its terms; | (c) | o presente Contrato constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos; |
| (d) | the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's | (d) | a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e |

18

organizational acts, and do not cause or impose any encumbrance on its assets, except for the fiduciary assignment of the Non-Revolving Spare Parts herein created;

não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela alienação fiduciária das Peças de Reposição Não-Rotativas aqui constituída;

(e) it is the lawful and exclusive owner of the Non-Revolving Spare Parts;

(e) é a legítima e exclusiva proprietária e possuidora das Peças de Reposição Não-Rotativas;

(f) except for this fiduciary assignment, the Non-Revolving Spare Parts are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary assignment, pledge or sale of the Non-Revolving Spare Parts in the Company's by-laws or in any other document; and, in the event of enforcement or execution of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(f) exceto pela presente alienação fiduciária, as Peças de Reposição Não-Rotativas estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda das Peças de Reposição Não-Rotativas no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(g) the records, history and other materials described in Clause 2.1, item (o) above are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Non-Revolving Spare Parts, according to Clause 3.1 above; and

(g) os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o) acima são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, das Peças de Reposição Não-Rotativas, conforme Cláusula 3.1 acima; e

(h) shall maintain the necessary controls to ensure that the spare parts to be deposited at the Locations are subject to the Company's quality inspection

(h) manterá os controles necessários para garantir que as peças de reposição a serem depositadas nas Localidades estejam sujeitas aos procedimentos de inspeção de

19

procedures required by law.

qualidade da Companhia requeridos por lei.

4.3.    The representations and warranties provided by the Parties shall survive after the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

4.3.    As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

## SECTION 5 - AGREEMENT REGISTRATION

## CLÁUSULA 5 – REGISTRO DO CONTRATO

5.1.    The Company shall, within twenty (20) days from this date or from the date of signature of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or its amendments, duly registered with the Registry Office of Deeds and Documents of the of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to perform all acts necessary to make such registrations, at its own expense.

5.1.    A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou seus aditamentos, devidamente registrados nos Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

## SECTION 6 - EXPENSES

## CLÁUSULA 6 – DESPESAS

6.1.    All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Non-Revolving Spare Parts, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured

6.1.    Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e beneficio das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação das Peças de Reposição Não-Rotativas, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente

20

Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Clause if the Company does not timely perform the transfer of the amounts mentioned herein.

6.2.    The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the provision of collateral agent services dated November 30, 2020.

6.3.    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless he receives instructions provided by the Trustee, as well as indemnity or guarantee to his satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

## SECTION 7 - BRAZILIAN COLLATERAL AGENT

7.1    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.2.    A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura e da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.3.    O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

## CLÁUSULA 7 – AGENTE DE GARANTIA BRASILEIRO

7.1.    O Agente de Garantia Brasileiro foi nomeado, de acordo com os termo da Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy,

7.2.    O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia à GLAI e/ou à Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a

22

insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent (including the Valuation Report) and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro

(incluindo o Relatório de Avaliação) e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, declaration, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este

24

legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Company.

7.6    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian reais, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business

Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo)

Day after the business day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil ("ROF"), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Clause. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

7.7    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.8    In no event the Brazilian Collateral Agent shall be liable for special, indirect,

Dia Útil após o dia útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo Trustee, no máximo (i) no 2° (segundo) Dia Útil subsequente ao *Dia Útil* em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo Trustee, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por

punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.9     The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Clause 7.10.

perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.    O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.   O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

27

7.11    Any and all payments by Gol Finance, and/or the Company and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol Finance, the Company and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.12    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

7.13    For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.14    Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Company. Upon any

7.11.    Todos e quaisquer pagamentos pela Gol Finance e/ou pela Companhia e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, Gol Finance, a Companhia e/ou o GLAI, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação à Oferta.

7.13.    Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14.    Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Companhia.

28

withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor.

Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

### SECTION 8 - MISCELLANEOUS

### CLÁUSULA 8 – DISPOSIÇÕES GERAIS

8.1    <u>Definitions.</u> The capitalized words used in this Agreement and its Exhibits and not otherwise defined herein shall have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1.    <u>Definições</u>. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1    For purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or holiday in Brazil, or that day on which commercial banks in the cities of Rio de Janeiro and São Paulo are authorized by law to close.

8.2    Amendments. This Agreement may not be modified or altered, except by written instrument signed by the Parties.

8.3    Severability. If any term, clause, covenant or condition of this Agreement is held invalid, null or unenforceable by court decision, the remaining terms shall remain in full force and effect, thus not being affected, impaired or invalidated and the Parties, as the case may be, will use their best efforts to agree on an alternative legal and feasible method to achieve the original intended result.

8.4    Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.1    When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Non-Revolving Spare Parts from any encumbrance which is still in force in accordance with the provisions herein.

8.5    Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their

8.1.1.    Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados por lei a fechar.

8.2.    Alterações. Este Contrato não poderá ser modificado ou alterado, salvo mediante instrumento escrito e assinado pelas Partes.

8.3.    Independência das Cláusulas. Caso qualquer termo, cláusula, avença ou condição deste Contrato venha a ser considerado inválido, nulo ou inexequível por decisão judicial, os termos restantes deverão continuar em pleno vigor e efeito, não sendo, assim, afetados, prejudicados ou invalidados e as Partes, conforme o caso, envidarão seus melhores esforços para acordar um método alternativo legal e exequível para atingir o resultado original pretendido.

8.4.    Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1.    Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação das Peças de Reposição Não-Rotativas de qualquer gravame que ainda esteja em vigor de acordo com o aqui disposto.

8.5.    Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos

respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

8.6   Guarantees. The fiduciary guarantee provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.7   Notifications. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

(a)   If to the Company:
Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.   Garantias. A garantia fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.   Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

(a)   Se para a Companhia:
Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

31

(b)   If to the Brazilian Collateral Agent:
Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

(c)   If to GLAI:
Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1   Any notification or other communication made under this Agreement will be deemed valid and delivered on the Business Day following the respective receipt, according to the protocol signed by the addressee or notice of receipt, as the case may be.

8.8   Specific Performance and Compliance. For the purposes of this Agreement, all obligations undertaken by the Company under this Agreement shall be valid, effective and enforceable, and in case of non-timely performance of such obligations, the Brazilian Collateral Agent, acting in accordance with the instructions of the Trustee, may bring appropriate judicial proceedings seeking specific performance of such obligations, according to the appropriate procedures established in Law 13,105, of March 13, 2015 ("Code of Civil Procedure"), which include, but are not limited to, legal remedies available in articles 497, 501 and 815 of the Code of Civil Procedure.

8.9   Governing Law. This Agreement shall be governed and construed in

(b)   Se para o Agente de Garantia Brasileiro:
Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

(c)   Se para a GLAI:
Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1.   Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8.   Tutela Específica e Cumprimento. Para os fins deste Contrato, todas as obrigações assumidas pela Companhia sob este Contrato, serão válidas, eficazes e exequíveis, sendo que em caso de não cumprimento tempestivo dessas obrigações, o Agente de Garantia Brasileiro, agindo de acordo com as instruções do Trustee, poderá iniciar processo judicial adequado buscando tutela específica de tais obrigações, conforme os procedimentos apropriados estabelecidos na Lei 13.105, de 13 de março de 2015 ("Código de Processo Civil"), que incluem, mas não se limitam a, remédios jurídicos disponíveis nos artigos 497, 501 e 815 do Código de Processo Civil.

8.9.   Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da

32

accordance with the laws of the Federative Republic of Brazil, and the specific performance of the positive and negative covenants agreed upon herein is permitted.

8.9.1    In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument that may be the subject to the enforcement proceedings under article 784, item III of the Code of Civil Procedure.

8.10    Jurisdiction. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

8.11    Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12.    Language. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13.    Electronic    Signature. This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of

República Federativa do Brasil, sendo permitida a tutela específica das obrigações de fazer e de não fazer aqui pactuadas.

8.9.1.    Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.    Foro. Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.    Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis.

8.12.    Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13.    Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica de acordo com as regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma    irrevogável    e    irretratável,    a

33

August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

8.14.    This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

8.14.    Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

In witness whereof, the Parties have executed this instrument electronically, in the presence of the two (2) undersigned witnesses.

E por estarem assim justas e contratadas, as Partes firmam o presente instrumento eletronicamente, na presença das 2 (duas) testemunhas abaixo assinadas.

São Paulo, December 23, 2020.

São Paulo, 23 de dezembro de 2020.

(The remainder of the page intentionally left blank)

(O restante da página intencionalmente deixado em branco)

34

(*Signature page 1/4 to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23, 2020)*

(*Página de assinatura 1/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020)*

### GOL LINHAS AÉREAS S.A.

_____

_____

*Name*/Nome:
*Title*/Cargo:

*Name*/Nome:
*Title*/Cargo:

35

*(Signature page 2/4 to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23, 2020)*

*(Página de assinatura 2/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020)*

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____

*Name*/Nome:

*Title*/Cargo:

_____

*Name*/Nome:

*Title*/Cargo:

36

*(Signature page 3/4 to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23, 2020)*

*(Página de assinatura 3/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020)*

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

*(Signature page 4/4 to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23, 2020)*

*(Página de assinatura 4/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020)*

**WITNESSES/TESTEMUNHAS**

_____
Name/Nome:
Tax ID /CPF:
ID/RG:

_____
Name/Nome:
Tax ID /CPF:
ID/RG:

38

| | |
|---|---|
| **EXHIBIT 1**<br>**DESCRIPTION OF THE SECURED**<br>**OBLIGATIONS** | **ANEXO 1**<br>**DESCRIÇÃO DAS OBRIGAÇÕES**<br>**GARANTIDAS** |

**GOL FINANCE NOTES**

**NOTAS GOL FINANCE**

Principal Amount: up to USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: US$ 200.000.000,00 (duzentos milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: June 30, 2026;

Data de Vencimento: 30 de junho de 2026;

Interest Rate: 8.00% (eight percent) per annum, calculated and paid under the Indenture;

Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura;

Default Interest: as provided in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes;

Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas;

Penalty Clause: not applicable

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensation and Indemnity, as provided for in Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura.

**AMOUNTS DUE TO THE BRAZILIAN**

**VALORES DEVIDOS AO AGENTE DE**

1

**COLLATERAL AGENT**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

 Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

**GARANTIA BRASILEIRO**

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

| EXHIBIT 2 | ANEXO 2 |
|---|---|
| **FORM OF AMENDMENT TO THE NON-REVOLVING AIRCRAFT SPARE PARTS FIDUCIARY ASSIGNMENT AGREEMENT** | **MODELO DE ADITAMENTO À ALIENAÇÃO FIDUCIÁRIA DE PEÇAS AERONÁUTICAS DE REPOSIÇÃO NÃO-ROTATIVAS** |

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

(a)  **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(a)  **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b)  **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

(b)  **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

(c) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors"),

(c) **GOL LINHAS AÉREAS INTELIGENTES S.A.,** sociedade constituída e existente segundo as leis do Brasil com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI" e, juntamente com a Companhia, as "Garantidoras").

**WHEREAS:**

**CONSIDERANDO QUE:**

(i) on December 23, 2020, the Company, the Brazilian Collateral Agent and GLAI entered into a Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement ("Fiduciary Assignment Agreement"), pursuant to which the Company assigned all the Non-Revolving Aircraft Spare Parts (as defined in the Fiduciary Assignment Agreement) on a fiduciary basis, to the Secured Parties, as collateral for the Secured Obligations;

(i) em 23 de dezembro de 2020, a Companhia, o Agente de Garantia Brasileiro e GLAI celebraram Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas ("Contrato de Alienação Fiduciária"), nos termos do qual a Companhia deu todas as Peças de Reposição Não-Rotativas (conforme definido no Contrato de Alienação Fiduciária), em alienação fiduciária, às Partes Garantidas, como garantia das Obrigações Garantidas;

(ii) the Parties hereby agree to amend the Fiduciary Assignment Agreement for the purpose of amending [the list of the Non-Revolving Spare Parts] {*or*} [list of Locations] {*or*} [the Market Value of the Non-Revolving Spare Parts] (as defined in the Fiduciary Assignment Agreement) delivered on a fiduciary basis, pursuant to Clause 1 of the Fiduciary Assignment Agreement.

(ii) as Partes neste ato concordam em aditar o Contrato de Alienação Fiduciária com o objetivo de alterar [a lista de Peças de Reposição Não-Rotativas] {*ou*} [lista de Localidades] {*ou*} [o Valor de Mercado das Peças de Reposição Não-Rotativas] (conforme definido no Contrato de Alienação Fiduciária) entregues em alienação fiduciária, nos termos da Cláusula 1 do Contrato de Alienação Fiduciária.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement" ("Agreement"), according to the following clauses:

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "Aditivo à Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas" ("Aditivo"), que será regido pelas seguintes cláusulas:

## I.    DEFINITIONS

1.1.    For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Fiduciary Assignment Agreement.

## I.    DAS DEFINIÇÕES

1.1.    Para fins deste Aditivo, todos os termos iniciados em letras maiúsculas, não definidos neste Aditivo, têm o significado a eles atribuídos no Contrato de Alienação Fiduciária.

## II.    AMENDMENT

2.1.    The Parties expressly agree to the [replacement Exhibit 4 previously attached to the Fiduciary Assignment Agreement with the new Exhibit 4, attached to this Amendment as Exhibit 1 for the purpose of updating the list of [Non-Revolving Spare Parts [and] Locations]] {or} [update of clause 1.7 of the Fiduciary Assignment Agreement to reflect the new valuation report prepared pursuant to the Fiduciary Assignment Agreement [and the adjusted Market Value of the Non-Revolving Spare Parts]].

## II.    DO ADITAMENTO

2.1.    As Partes expressamente acordam com a [substituição do Anexo 4 anteriormente anexado ao Contrato de Alienação Fiduciária pelo(s) novo(s) Anexo 4, anexo ao presente Aditivo como Anexo 1, com o objetivo de atualizar a lista de [Peças de Reposição Não-Rotativas [e] Localidades]] {ou} [atualização da cláusula 1.7 do Contrato de Alienação Fiduciária para refletir o novo relatório de avaliação preparado conforme no Contrato de Alienação Fiduciária [e o Valor de Mercado das Peças de Reposição Não-Rotativas atualizado]].

## III.    MISCELLANEOUS

3.1.    Registration of this Amendment. The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the of the cities where the headquarters of each Party is located.

## III.    DISPOSIÇÕES GERAIS

3.1.    Registro do Presente Aditivo. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro que este presente Aditivo foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes.

3.2.    Representations and Warranties. The Company hereby represents and warrants that:

3.2.    Declarações e Garantias. A Companhia neste ato declara e garante que:

(a)    has full powers, authorization and

(a)    possui plenos poderes, autorização e

- 5 -

capacity to enter into this Amendment, comply with its contractual obligations and [enter into fiduciary assignment of the Non-Revolving Spare Parts described in Exhibit 1;

capacidade de firmar o presente Aditivo, cumprir com suas obrigações contratuais e [celebrar a alienação fiduciária das Peças de Reposição Não-Rotativas descritas no Anexo 1;

(b) has taken all necessary measures to authorize the execution and performance of this Amendment;

(b) tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditivo;

(c) this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(c) o presente Aditivo constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d) the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets[, except for the fiduciary assignment of the Non-Revolving Spare Parts herein created;

(d) a celebração do presente Aditivo e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos[, exceto pela alienação fiduciária das Peças de Reposição Não-Rotativas aqui constituída;

(e) is the lawful and exclusive owner of the Non-Revolving Spare Parts described in Exhibit 1;

(e) é a legítima e exclusiva proprietária e possuidora das Peças de Reposição Não-Rotativas descritas no Anexo 1;

(f) except for the fiduciary assignment of the Fiduciary Assignment Agreement, the Non-Revolving Spare Parts are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary assignment, pledge or sale of the Non-Revolving Spare Parts in the

(f) exceto pela alienação fiduciária do Contrato de Alienação Fiduciária, as Peças de Reposição Não-Rotativas estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda das Peças

Company's by-laws or any other document; and, in the event of enforcement or execution of this Amendment and the Fiduciary Assignment Agreement, their terms and conditions shall prevail over the terms and conditions of any other document;

(g)   the records, histories and other materials described in Clause 2.1, item (o), Fiduciary Assignment Agreement are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Non-Revolving Spare Parts, pursuant to Clause 3.1 of the Fiduciary Assignment Agreement; and

(h)   shall maintain the necessary controls to ensure that the spare parts to be deposited at the Locations are subject to the Company's quality inspection procedures required by law.

3.3   <u>Other Terms and Conditions.</u> All the terms and conditions of the Fiduciary Assignment Agreement not expressly altered or modified by this Amendment are hereby and from hereof date fully ratified by the Parties and shall remain in full force and effect, as provided for in the Fiduciary Assignment Agreement.

3.4   <u>Governing Law.</u> This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.5   <u>Dispute Resolution.</u> The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

de Reposição Não-Rotativas no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Aditivo e do Contrato de Alienação Fiduciária, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(g)   os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o), do Contrato de Alienação Fiduciária são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, das Peças de Reposição Rotativas, conforme Cláusula 3.1 do Contrato de Alienação Fiduciária; e

(h)   manterá os controles necessários para garantir que as peças de reposição a serem depositadas nas Localidades estejam sujeitas aos procedimentos de inspeção de qualidade da Companhia requeridos por lei.

3.3.   <u>Outros Termos e Condições.</u> Todos os termos e condições do Contrato de Alienação Fiduciária não expressamente alterados ou modificados por este Aditivo estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato de Alienação Fiduciária.

3.4.   <u>Lei de Regência.</u> O presente Aditivo será regido e interpretado de acordo com as leis do Brasil.

3.5.   <u>Solução de Controvérsias.</u> Quaisquer disputas ou controvérsias oriundas do presente aditivo serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

| | |
|---|---|
| In witness whereof, the Parties have executed this Amendment in three (3) counterparts of identical content and form, in the presence of the two (2) undersigned witnesses. | E por estarem assim justas e contratadas, as Partes firmam o presente Aditivo em 3 (três) vias de igual teor e forma, na presença das 2 (duas) testemunhas abaixo assinadas. |

São Paulo, [●] [●] [●]                    São Paulo, [●] de [●] de [●]

**[Signature page]**                    **[página de assinaturas]**
**[ page break ]**                      **[quebra de página]**
[ Exhibit 1]                            [Anexo 1]

**EXHIBIT 3**
**FORM OF POWER OF ATTORNEY**

**POWER OF ATTORNEY**

By this power of attorney, **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, headquartered at Senador Salgado Filho Square, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, in the city of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into on December 23, 2020 between the GRANTOR, the GRANTEE and Gol Linhas Aéreas Inteligentes S. A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

1.     practice, in place and on behalf of the GRANTOR, any and all acts, according to the

**ANEXO 3**
**MODELO DE PROCURAÇÃO**

**PROCURAÇÃO**

Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.,** sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no CNPJ/ME sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas celebrado em 23 de dezembro de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1.     praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos,

- 9 -

terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

    (a) dispose of, collect, receive, appropriate, transfer and/or enforce the Non-Revolving Spare Parts (or any components thereof) or otherwise dispose of, and deliver the Non-Revolving Spare Parts (or any components thereof) under the Agreement and as established in article 1,364 of the Civil Code, and apply the product thus received to the payment of the Secured Obligations under the Agreement;

    (a) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Non-Revolving Spare Parts and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Non-Revolving Spare Parts and represent the GRANTOR before third parties for the purpose of releasing the fiduciary assignment, disposal of the Non-Revolving Spare Parts and transfer of the funds resulting from such disposal;

2.    sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

3.    to the extent necessary for the exercise of the powers granted herein,

conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

    (a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir as Peças de Reposição Não-Rotativas (ou quaisquer de suas partes) ou dispor de qualquer outro modo e entregar as Peças de Reposição Não-Rotativas (ou qualquer de suas partes) nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

    (b) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor das Peças de Reposição Não-Rotativas e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com respeito às Peças de Reposição Não-Rotativas e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação das Peças de Reposição Não-Rotativas e transferência dos recursos resultantes de tal alienação;

2.    assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3.    na medida necessária ao exercício dos poderes ora conferidos, representar a

- 10 -

represent the GRANTOR before third parties or before any Brazilian governmental federal, state or municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, ANAC, the Brazilian Aeronautical Registry, the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

4.   to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Non-Revolving Spare Parts, represent the GRANTOR before any competent Registry Office of Deeds and Documents in which the Agreement or its respective amendments shall be registered;

5.   agree or settle any insurance policy or demand involving the Non-Revolving Spare Parts in case of any loss under the terms of such policy and approve any premium/claim paid due to conviction or similar procedure affecting the Non-Revolving Spare Parts;

6.   enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the Trustee, as provided for in the Agreement; and

OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos competentes, a ANAC, o Registro Aeronáutico Brasileiro, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4.   na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às Peças de Reposição Não-Rotativas, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5.   ajustar ou liquidar qualquer apólice de seguro ou demanda envolvendo as Peças de Reposição Não-Rotativas caso haja qualquer perda nos termos de tal apólice e aprovar qualquer prêmio/sinistro pago em razão de condenação ou procedimento similar afetando as Peças de Reposição Não-Rotativas;

6.   celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

7. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement.

Rio de Janeiro, December 23, 2020.

**GOL LINHAS AÉREAS S.A.**
[SIGNATURE]

---

7. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato.

Rio de Janeiro, 23 de dezembro de 2020.

**GOL LINHAS AÉREAS S.A.**
[ASSINATURA]

| EXHIBIT 4 | ANEXO 4 |
|---|---|
| **DESCRIPTION OF THE NON-REVOLVING SPARE PARTS AND LOCATIONS ON DECEMBER 23, 2020** | **DESCRIÇÃO DAS PEÇAS DE REPOSIÇÃO NÃO-ROTATIVAS E LOCALIDADES EM 30 DE DEZEMBRO DE 2020** |

**EXHIBIT J**

FORM OF ROTABLES FIDUCIARY SALE AGREEMENT

#93484727v11

| | |
|---|---|
| **REVOLVING AIRCRAFT SPARE PARTS FIDUCIARY ASSIGNMENT AGREEMENT** | **INSTRUMENTO PARTICULAR DE ALIENAÇÃO FIDUCIÁRIA DE PEÇAS AERONÁUTICAS DE REPOSIÇÃO ROTATIVAS** |

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

**(a)**  **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

**(a)**  **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

**(b)**  **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of

**(b)**  **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

1

and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

| | |
|---|---|
| and, as intervening and consenting party, | e, como interveniente anuente, |

**(c)** **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors");

**(c)** **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI", juntamente com a Companhia, as "Garantidoras");

Each party above will be also hereinafter referred to as "Party" and collectively as "Parties";

Cada parte acima também referida como "Parte" e, em conjunto, "Partes";

## WHEREAS:

## CONSIDERANDO QUE:

**(i)** Gol Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg ("Gol Finance") issued senior debt securities at interest of 8.00% and maturity in 2026 ("Notes"), according to the terms and conditions set forth in the indenture under which the Notes were issued ("Indenture") and as described in the private placement memorandum related to the Notes offering ("Offering");

**(i)** a Gol Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas"), nos termos e condições previstos na escritura por meio da qual as Notas foram emitidas ("Escritura") e conforme descrito no memorando de colocação privada relacionado à oferta das Notas ("Oferta");

| | | | |
|---|---|---|---|
| **(ii)** | the Brazilian Collateral Agent has been duly appointed by the Noteholders and the other secured parties described in the Indenture ("Secured Parties") as the collateral agent in Brazil pursuant to the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral created by means of this Agreement, as permitted by the terms set forth in the Indenture, in accordance exclusively and strictly with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms set forth in the Indenture and this Agreement; | **(ii)** | o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura ("Partes Garantidas") como agente de garantia no Brasil nos termos da Escritura para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("_Trustee_") e de acordo com os termos previstos na Escritura e no presente Contrato; |
| **(iii)** | in order to ensure compliance with all obligations undertaken by Gol Finance, subject to the terms and conditions of the Indenture, each of the Guarantors provided a personal guarantee under the Indenture ("Personal Guarantees"); and | **(iii)** | a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, cada uma das Garantidoras prestou garantia pessoal nos termos da Escritura ("Garantias Fidejussórias"); e |
| **(iv)** | The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent; and | **(iv)** | A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o _Trustee_, na qualidade de representante das |

Partes Garantidas e do Agente de Garantia Brasileiro; e

**(v)** in order to guarantee compliance with all obligations undertaken by Gol Finance under the terms and conditions of the Indenture and by the Guarantors under the Personal Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Revolving Spare Parts (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Revolving Spare Parts (as defined below).

**(V)** a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e condições da Escritura e pelos Garantidores no âmbito das Garantias Fidejussórias, a Companhia concordou em conceder às Partes Garantidas, representadas no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre as Peças de Reposição Rotativas (conforme definido abaixo), mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todas as Peças de Reposição Rotativas (conforme definido abaixo).

**NOW, THEREFORE,** the Company, the Brazilian Collateral Agent and GLAI, hereby and pursuant to law agree to enter into this "Revolving Aircraft Spare Parts Fiduciary Assignment Agreement" ("Agreement"), according to the following clauses:

**RESOLVEM** a Companhia, o Agente de Garantia Brasileiro e a GLAI, neste ato e na melhor forma de direito, celebrar o presente "Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas" ("Contrato"), que será regido pelas seguintes cláusulas:

## SECTION 1 - PURPOSE

## CLÁUSULA 1 – OBJETO DO CONTRATO

1.1.    In accordance with the provisions herein, in order to guarantee (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Personal Guarantees; (c) the faithful and timely compliance by Gol Finance and the

1.1.    De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias Fidejussórias; (c) o

Guarantors with all contracts, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the said instruments (jointly, the "<u>Transaction Documents</u>") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents relating to the Revolving Spare Parts; and (e) the faithful and timely payment of all other amounts due from time to time by Gol Gol Finance, the Company and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents relating to the Revolving Spare Parts (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "<u>Secured Obligations</u>"), the Company hereby assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional ownership of all the revolving aircraft spare parts which are non-fungible, owned by the Company, as individually identified or to be identified in <u>Exhibit 4</u> to this Agreement ("<u>Revolving Spare Parts</u>"). This fiduciary assignment is created in accordance with article 1,361 *et seq.* of Law No. 10,406, of January 10, 2002, as amended ("<u>Civil Code</u>").

1.1.1. The guarantee established herein <u>does not apply</u> to (a) any Revolving Spare Part while it is incorporated into, installed in, connected to, or being used in, aircrafts, turbines or other Revolving Spare Parts that are incorporated into, installed in, connected to, or being used, and to (b) any Revolving Spare Part rented to, loaned to or consigned to the Company.

fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos, obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "<u>Documentos da Transação</u>") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação relativos às Peças de Reposição Rotativas; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela Companhia e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação relativos às Peças de Reposição Rotativas (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "<u>Obrigações Garantidas</u>"), a Companhia neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a propriedade resolúvel de todas as peças aeronáuticas de reposição rotativas infungíveis, de propriedade da Companhia, conforme individualmente identificadas ou a serem identificadas no <u>Anexo 4</u> deste Contrato ("<u>Peças de Reposição Rotativas</u>"). A presente alienação fiduciária é constituída de acordo com o artigo 1.361 e seguintes da Lei n° 10.406, de 10 de janeiro de 2002, conforme alterada ("<u>Código Civil</u>").

1.1.1. A garantia constituída por meio do presente instrumento <u>não se aplica</u> a (a) qualquer Peça de Reposição Rotativa enquanto esta estiver incorporada a, instalada em, conectada a, ou sendo usada em, aeronaves, turbinas ou outras Peças de Reposição Rotativas que por sua vez estejam incorporadas, instaladas, conectadas ou sendo utilizadas, e a (b) qualquer Peça de

1.2.    As a result of the transfer by the Company of the conditional ownership on the Revolving Spare Parts to the Secured Parties, represented by the Brazilian Collateral Agent, carried out under the terms of the applicable legislation, the Secured Parties, represented by the Brazilian Collateral Agent, become the exclusive owners of the conditional ownership and indirect owners of the Revolving Spare Parts, until full compliance with the Secured Obligations, subject to the terms of Clause 1.7 below.

1.3.    The Secured Obligations include all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all present and future principal and ancillary payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, within the scope of, or in relation to the Offering or the Indenture.

1.3.1.   For the purposes of Article 1,362 of the Civil Code, the main conditions and characteristics of the Secured Obligations are those described in Exhibit 1 to this Agreement.

1.4.    By signing this Agreement and complying with the formalities set forth in Clause 5 below, the fiduciary assignment shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, and the Company shall become the holder of direct possession of the Revolving Spare Parts and the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, shall become the holder of indirect possession of the Revolving Spare Parts,

Reposição Rotativa alugada para, emprestada para ou consignada à Companhia.

1.2.    Em decorrência da transferência, pela Companhia, da propriedade resolúvel sobre as Peças de Reposição Rotativas por as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, realizada nos termos da legislação aplicável, as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, passam a ser as exclusivas titulares da propriedade resolúvel e possuidoras indiretas das Peças de Reposição Rotativas, até o cumprimento integral das Obrigações Garantidas, observados os termos da Cláusula 1.7 abaixo.

1.3.    As Obrigações Garantidas incluem todas as obrigações assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.1.   Para fins do artigo 1.362 do Código Civil, as principais condições e características das Obrigações Garantidas são aquelas descritas no Anexo 1 ao presente Contrato.

1.4.    Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 5 abaixo, estará constituída a alienação fiduciária em nome e benefício das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, e a Companhia tornar-se-á detentora da posse direta das Peças de Reposição Rotativas e o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, tornar-se-á detentor da posse indireta das Peças de Reposição

subject to the terms and conditions of this Agreement.

1.5.    Until tenth (10th) Business Day of each month of April and October  of each year, as of April 2021, the Parties undertake to update Exhibit 4 to this Agreement, through the execution of an amendment to this Agreement under the form in Exhibit 2 thereto, in order to update (a) the Locations (as defined below) and/or (b) update and include all the Revolving Spare Parts of the same type of ownership of the Company, which on such date, may be the subject to the fiduciary assignment created herein. The base date of Exhibit 4 to this Agreement is November 30, 2020.

1.6.    According to the report of November 30, 2020, prepared by Morten Beyer & Agnew ("Independent Appraiser"), an independent consulting and property valuation firm in the aviation industry, the estimated fair market value of the Revolving Spare Parts, at July 20, 2020, is USD 123,171,427.00 (one hundred and twenty three million, one hundred and seventy seven thousand and four hundred and twenty seven dollars) ("Fair Market Value of the Revolving Spare Parts").

1.6.1.   As provided for in the Indenture, Gol Finance undertakes to provide to the Brazilian Collateral Agent and the Trustee until the tenth (10th) day of each month of April and October of each year, as of April 2021, a certificate issued by the Independent Appraiser that shall contain its opinion on the fair market value of the Revolving Spare Parts under the fiduciary assignment created under this Clause, and such certificate shall be prepared and issued under the Indenture (each, an "Appraisal Report").

Rotativas, nos termos e condições acordados neste Contrato.

1.5.    Até o $10^0$ (décimo) Dia Útil de cada mês de abril e outubro de cada ano, a partir de abril de 2021, as Partes comprometem-se a atualizar o Anexo 4 a este Contrato, mediante a celebração de um aditivo a este Contrato conforme modelo constante do Anexo 2, a fim de atualizar (a) as Localidades (conforme definido abaixo) e/ou (b) atualizar e incluir todas as Peças de Reposição Rotativas do mesmo tipo de propriedade da Companhia, as quais, em tal data, ser objeto da alienação fiduciária aqui constituída. A data base do Anexo 4 ao presente contrato é 30 de novembro de 2020.

1.6.    De acordo com o relatório de 30 de novembro de 2020, elaborado pela Morten Beyer & Agnew ("Avaliador Independente"), uma empresa independente de consultoria e de avaliação de bens do setor de aviação, o valor justo de mercado estimado das Peças de Reposição Rotativas, em 20 de junho de 2020, é de US$ 123.171.427,00 (cento e vinte e três milhões, cento e setenta e um mil e quatrocentos e vinte sete dólares) ("Valor de Mercado das Peças de Reposição Rotativas").

1.6.1.   Conforme disposto na Escritura, a Gol Finance compromete-se a fornecer ao Agente de Garantia Brasileiro e ao Trustee até o 10º (décimo) dia de todo mês de abril e outubro de cada ano, a partir de abril de 2021, um certificado emitido pelo Avaliador Independente que deverá conter sua opinião sobre o valor justo de mercado das Peças de Reposição Rotativas objeto da alienação fiduciária criada nos termos desta Cláusula, devendo ser preparado e emitido nos termos da Escritura (cada um, um "Relatório de Avaliação").

1.7. Without prejudice to the other provisions of this Agreement, the Company may, at its own expense, at any time and from time to time, without any release or consent of the Secured Parties, the Trustee, under the Indenture, or the Brazilian Collateral Agent, (i) transfer the possession of any Revolving Spare Part to the respective manufacturer or to any other organization for the purpose of testing, overhaul, repairs, maintenance, alterations or modifications or to any person for the purpose of transportation for the purposes described herein, in a manner consistent with the ordinary course of business of the Company; (ii) install or use in any aircraft or engine, or other Revolving Spare Part, leased to, or owned by the Company; (iii) dismantle any Revolving Spare Part that the Company deems worn out, obsolete, beyond economic repair or no longer suitable for use, and to sell or dispose of any such Revolving Spare Parts or any salvage resulting from such dismantling, free from the fiduciary assignment created under this Agreement; and (iv) subject any Revolving Spare Parts to pooling, exchange, borrowing or maintenance servicing agreements customary in the airline industry and executed by the Company in the ordinary course of its business, provided that (a) there is no detriment to the Secured Parties' position; and (b) it shall not affect the priority or perfection of fiduciary assignment created under this Agreement or the rights of the Brazilian Collateral Agent or the Trustee.

1.8. The Brazilian Collateral Agent, acting according to the instructions provided by the Trustee, or any third party appointed by the Secured Parties or the Trustee, may, at any time, engage a third party previously indicated by the Trustee, upon notice to the Company at least three (3) Business Days in advance, to examine the Revolving Spare

1.7. Sem prejuízo das demais disposições deste Contrato, a Companhia poderá, às suas próprias expensas, a qualquer momento e de tempos em tempos, sem que seja necessária qualquer liberação ou consentimento das Partes Garantidas, do *Trustee*, nos termos da Escritura, ou do Agente de Garantia Brasileiro, (i) transferir a posse de qualquer Peça de Reposição Rotativa ao respectivo fabricante ou a qualquer outra organização para fins de testes, revisão, consertos, manutenção, alterações ou modificações ou para qualquer pessoa com o propósito de transporte para os fins aqui descritos, de maneira que seja consistente com o curso ordinário dos negócios da Companhia; (ii) instalar ou usar em qualquer aeronave ou turbina, ou outra Peça de Reposição Rotativa, alugada para, ou de propriedade da Companhia; (iii) desmontar qualquer Peça de Reposição Rotativa que a Companhia julgue desgastada, obsoleta, imprópria ou inadequada para o uso, e vender ou dispor de qualquer dessas Peças de Reposição Rotativas ou de qualquer reaproveitamento resultante desse desmonte, livre da alienação fiduciária criada neste Contrato; e (iv) sujeitar qualquer Peça de Reposição Rotativa a contratos de *pooling*, troca, empréstimo ou de serviços de manutenção usuais no setor de linhas aéreas e celebrados pela Companhia no curso ordinário dos seus negócios, desde que (a) não resulte em qualquer prejuízo aos direitos da Partes Garantidas, e (b) não afete a constituição, aperfeiçoamento ou a prioridade da garantia constituída por meio deste Contrato, ou os direitos do *Trustee* ou do Agente de Garantia Brasileiro.

1.8. O Agente de Garantia Brasileiro, agindo conforme as instruções fornecidas pelo *Trustee*, ou qualquer terceiro nomeado pelas Partes Garantidas ou pelo *Trustee*, poderá, a qualquer tempo, contratar terceiros previamente indicados pelo *Trustee*, mediante aviso à Companhia com antecedência de, ao menos, 3 (três) Dias Úteis, examinar as Peças de Reposição

Parts, checking their conditions and existing quantity.

Rotativas, verificando suas condições e quantidade existente.

### SECTION 2 - COMPANY'S OBLIGATIONS

### CLÁUSULA 2 – OBRIGAÇÕES DA COMPANHIA

2.1.    The Company undertakes to

2.1.    A Companhia obriga-se a:

(a)    refrain from selling, assigning, transferring, creating any charge, renting or otherwise delivering, transferring or giving up ownership of any of the Revolving Spare Parts to any person other than the Secured Parties, represented by the Brazilian Collateral Agent, or otherwise encumbering the Revolving Spare Parts, subject to the criminal implications provided for in article 171, items I and II, of Decree-Law no. 2,848, of December 7, 1940, as amended (Brazilian Criminal Code), except as otherwise permitted under this Agreement;

(a)    abster-se de vender, ceder, transferir, criar qualquer ônus, alugar ou de qualquer outro modo entregar, transferir ou abdicar a posse de qualquer das Peças de Reposição Rotativas a qualquer pessoa que não as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, ou, de outro modo, onerar as Peças de Reposição Rotativas, sujeita às implicações criminais previstas no artigo 171, incisos I e II, do Decreto-lei n° 2.848, de 7 de dezembro de 1940, conforme alterado (Código Penal Brasileiro), exceto conforme permitido de outra maneira nos termos deste Contrato;

(b)    timely fulfill the obligations of this Agreement;

(b)    cumprir tempestivamente as obrigações desse Contrato;

(c)    defend itself, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Revolving Spare Parts assigned on a fiduciary basis, this Agreement and/or the fulfillment of the obligations undertaken under the Offering;

(c)    defender, a si mesma, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar as Peças de Reposição Rotativas alienadas fiduciariamente, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

(d)    practice all acts, as well as sign any and all documents, necessary for the

(d)    praticar todos os atos, bem como assinar todo e qualquer documento,

registration of the Revolving Spare Parts fiduciary assignment agreement with the competent Registry Office of Deeds and Documents under this Agreement and the Indenture;

(e) not perform acts with the purpose of depreciating the value of the Revolving Spare Parts, except as a result of the actions allowed in this Agreement;

(f) assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any enforcement and/or sale of the Revolving Spare Parts, and bear all related expenses or that are necessary for such purpose;

(g) assist, allow and make its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(h) subject to the provisions of Clauses 3.1 and 3.3 below, maintain the custody of the Revolving Spare Parts, acting as trustee of the Revolving Spare Parts and assuming the responsibilities inherent to their conservation, subject to the resulting civil penalties, under the Article 627 et seq. of the Civil Code;

necessários para o registro da alienação fiduciária das Peças de Reposição Rotativas no Cartório de Registro de Títulos e Documentos competente, nos termos deste Contrato e da Escritura;

(e) não praticar atos com o propósito de depreciar o valor das Peças de Reposição Rotativas, exceto se em decorrência das ações permitidas neste Contrato;

(f) auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, no caso de eventual excussão e/ou venda das Peças de Reposição Rotativas, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(g) auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo Trustee, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(h) observado o disposto nas Cláusulas 3.1 e 3.3 abaixo, manter a custódia das Peças de Reposição Rotativas, atuando como fiel depositária das Peças de Reposição Rotativas e assumindo as responsabilidades inerentes à sua conservação, sujeitando-se às sanções civis daí

decorrentes, nos termos do artigo 627 e seguintes do Código Civil;

(i) defend, at its own expense, in a timely and efficient manner, the rights of the Secured Parties, represented by the Brazilian Collateral Agent, related to the Revolving Spare Parts, against any claims of third parties;

(i) defender, às suas próprias expensas, de uma maneira tempestiva e eficiente, os direitos das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, relativos às Peças de Reposição Rotativas, contra quaisquer reivindicações de terceiros;

(j) comply with all clauses set forth in the Indenture;

(j) cumprir com todas as cláusulas previstas as Escritura;

(k) notify the Brazilian Collateral Agent of any event resulting in violation of this Agreement or the Indenture or in inaccuracy of any statements made under this Agreement within two (2) Business Days of its occurrence;

(k) notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato, ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(l) maintain the necessary controls to ensure that the spare parts to be stored at the Locations comply with the Company's quality inspection;

(l) manter os controles necessários para assegurar que as peças de reposição a serem estocadas nas Localidades cumpram com a inspeção de qualidade da Companhia;

(m) annually renew the Power of Attorney (as defined below) granted under Section 3.4 of this Agreement, with at least thirty (30) days prior to its expiration date, substantially in form of the Exhibit 3 hereto;

(m) renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 3.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo 3 deste Contrato;

*Maintenance*

*Manutenção*

(n) keep all Revolving Spare Parts covered by insurance, at all times, against physical damages, including risks insured by extended coverage, as it is prudent and usually practiced by companies of the same or similar size, in the same or similar business,

(n) manter todas as Peças de Reposição Rotativas cobertas por seguro, em todos os momentos, contra danos físicos, inclusive riscos segurados por cobertura estendida, conforme for prudente e usualmente praticado pelas empresas do mesmo porte ou

operating predominantly in Brazil, subject to the other criteria established in the Indenture;

de porte similar, na mesma atividade ou em atividade similar, que operem predominantemente no Brasil, respeitados os demais critérios estabelecidos na Escritura;

(o) maintain, or cause to maintain, at all times, the Revolving Spare Parts in accordance with all applicable regulations issued by the National Civil Aviation Agency ("ANAC") or any regulation issued by any other applicable aviation authority or any other governmental authority that has jurisdiction over the Company or over any Revolving Spare Parts, including making any modifications, alterations, replacements and/or additions that may be necessary, and shall use, or cause to be used, the same form and the same standard of maintenance with respect to each model of spare part included in this Agreement as are used for the same model of spare parts that are owned by the Company and that are not included in this Agreement;

(o) manter, ou fazer com que se mantenham, em todos os momentos, as Peças de Reposição Rotativas de acordo com toda a regulação aplicável expedida pela Agência Nacional de Aviação Civil ("ANAC") ou qualquer norma expedida por qualquer outra autoridade de aviação aplicável ou qualquer outra autoridade governamental que tenha jurisdição sobre a Companhia ou sobre quaisquer Peças de Reposição Rotativas, incluindo a realização de quaisquer modificações, alterações, substituições e/ou adições que venham a ser necessárias, devendo utilizar, ou fazer com que sejam utilizados, a mesma forma e o mesmo padrão de manutenção com respeito a cada modelo de peça de reposição incluída nesse Contrato conforme são utilizados para o mesmo modelo de peças de reposição que sejam de propriedade da Companhia e que não estejam incluídas nesse Contrato;

(p) maintain, or cause to be maintained, all records, histories and other materials required by ANAC or any other applicable aviation authority or any other governmental authority to be maintained with respect to Revolving Spare Parts and not modify its procedures for recording the custody of Revolving Spare Parts if such modification materially diminishes the value of the Revolving Spare Parts as a whole;

(p) manter, ou fazer com que se mantenham, todos os registros, históricos e outros materiais requeridos pela ANAC ou qualquer outra autoridade de aviação aplicável ou qualquer outra autoridade governamental a serem mantidos em relação às Peças de Reposição Rotativas e não modificar seus procedimentos de registro da custódia das Peças de Reposição Rotativas se tal modificação diminuir materialmente o valor das Peças de Reposição Rotativas, consideradas como um todo;

(q) maintain, or cause to be maintained, Revolving Spare Parts in good working order and perform necessary maintenance, except for Revolving Spare Parts that become worn or unsuitable for use and not reasonably repairable or become obsolete; and

(q) manter, ou fazer com que se mantenham, as Peças de Reposição Rotativas em boas condições de funcionamento e realizar as manutenções que se façam necessárias, exceto no que se refere às Peças de Reposição Rotativas que se tornem gastas ou impróprias para uso e não razoavelmente reparáveis ou que se tornem obsoletas; e

*Locations*

*Localidades*

(r) keep Revolving Spare Parts at one or more locations indicated in Exhibit 4 to this Agreement ("Locations"), unless otherwise permitted in this Agreement.

(r) manter as Peças de Reposição Rotativas em uma ou mais localidades indicadas no Anexo 4 a este Contrato ("Localidades"), exceto se de outro modo permitido neste Contrato.

2.2. As fully detailed in Clause 2.1 above, the Company is fully responsible for the registration and custody of the Revolving Spare Parts and for their undue or improper use, as well as for any and all costs, indemnities or expenses resulting from personal and/or material damages caused to third parties, and it also undertakes to take all necessary measures to preserve the integrity of the Revolving Spare Parts. The Company shall be solely and exclusively responsible for any damage caused to the Revolving Spare Parts.

2.2. Conforme plenamente detalhado na Cláusula 2.1 acima, a Companhia é integralmente responsável pelo registro e pela custódia das Peças de Reposição Rotativas e por seu uso indevido ou impróprio, bem como por todos e quaisquer custos, indenizações ou despesas decorrentes de danos pessoais e/ou materiais causados a terceiros, obrigando-se, ainda, a adotar todas as providências necessárias à preservação da integridade das Peças de Reposição Rotativas. A Companhia será a única e exclusiva responsável por quaisquer danos causados às Peças de Reposição Rotativas.

2.2.1. The Company is also responsible for the payment of any and all fines, fees, taxes, licensing expenses and other costs arising from the Revolving Spare Parts.

2.2.1. A Companhia é responsável, ainda, pelo pagamento de todas e quaisquer multas, taxas, tributos, despesas de licenciamento e outros custos decorrentes das Peças de Reposição Rotativas.

2.3. The Company confirms that (a) it has no objection to the Offering; and (b) the Offering and any enforcement, at any time, of the Revolving Spare Parts shall not violate, infringe, contravene, conflict or

2.3. A Companhia confirma que (a) não possui qualquer objeção à Oferta; e (b) a Oferta e qualquer excussão, a qualquer tempo, das Peças de Reposição Rotativas não violarão, infringirão, contravirão, conflitarão

constitute a default within the scope of (i) any contract to which the Company is a party, (ii) any applicable legislation; (iii) any Company policy or regulation; or (iv) any of the Company organizational documents.

2.4.    If the Company, GLAI or any of its affiliates (a) changes the Revolving Spare Parts, either in a single operations or in a series of operations, of one or more Locations that are owned or rented by the Company, or (b) acquires, whether in a single purchase or in a series of purchases, new Revolving Spare Parts of a seller or supplier that are, after such operations, stored in another location in Brazil that is not yet considered a Location (but is owned or rented by the Company) the Company shall, within thirty (30) days following the arrival of such Revolving Spare Parts, as applicable, at the respective new location, and provided that after such operation or purchase, it is verified, on the whole, that at such location there are Revolving Spare Parts in value greater than one percent (1%) of the value ascertained for all Revolving Spare Parts as informed in the last Evaluation Report issued, cause the new location to become a Location, updating <u>Exhibit 4</u> to this Agreement in accordance with the draft amendment contained in <u>Exhibit 2</u>.

2.5.    Provided that no Event of Default (as defined in the Indenture) has occurred or is in occurring and subject to the terms set out in the Indenture, the Company may lease any Revolving Spare Parts to any certified airline that is not under bankruptcy, insolvency, liquidation, recovery, dissolution or similar procedure or whose assets are not substantially in the possession of any liquidator, trustee, receiver or similar person. In the case of any of the aforementioned

ou constituirão um inadimplemento no âmbito (i) de qualquer contrato do qual a Companhia seja parte, (ii) de qualquer legislação aplicável; (iii) de qualquer política ou regulamento da Companhia; ou (iv) de qualquer um dos documentos constitutivos da Companhia.

2.4.    Caso a Companhia, a GLAI ou qualquer de suas afiliadas (a) mude as Peças de Reposição Rotativas, seja em um único movimento ou em uma série de movimentos, de uma ou mais Localidades que sejam de propriedade da, ou alugadas pela, Companhia, ou (b) adquira, seja em uma única aquisição ou em uma série de aquisições, novas Peças de Reposição Rotativas de um vendedor ou fornecedor que sejam, após tal aquisição, armazenadas em outro local no Brasil que não seja ainda considerado uma Localidade (mas seja de propriedade ou alugado pela Companhia) a Companhia deve, dentro de 30 (trinta) dias seguintes à chegada dessas Peças de Reposição Rotativas, conforme aplicável, no respectivo novo local, e contanto que após tal movimento ou aquisição verifique-se, no conjunto, que em tal local há Peças de Reposição Rotativas em valor superior a 1% (um por cento) do valor apurado para todas as Peças de Reposição Rotativas conforme informado no último Relatório de Avaliação emitido, fazer com que o novo local se torne uma Localidade, atualizando o <u>Anexo 4</u> a este Contrato de acordo com a minuta de aditamento contida no <u>Anexo 2</u>.

2.5.    Contanto que nenhum Evento de Inadimplemento (conforme definido nas Escritura) tenha ocorrido ou esteja em curso e sujeito aos termos previstos na Escritura, a Companhia pode arrendar ou locar (*lease*) quaisquer Peças de Reposição Rotativas a qualquer companhia aérea certificada que não esteja sob falência, insolvência, liquidação, reorganização, dissolução ou procedimento similar ou cujo patrimônio não esteja substancialmente sob a posse de

leases, the Company will ensure that provisions are adequately included in the respective contracts to: (a) such lease shall be expressly subject and subordinated to all the terms of the Indenture, including the rights of the Secured Parties, represented by the Brazilian Collateral Agent, so as to prevent such lease from obstructing the Company's rights of repossession of the Revolving Spare Parts, and shall require that the Company shall remain the primarily responsible for, among other obligations, the compliance and satisfaction of all the terms of this Agreement and the Indenture; (b) require the lessee to comply with the requirements related to the insurance coverage requirements provided for under the Indenture and this Agreement; (c) require the lessee to effect any and all necessary registrations in any jurisdiction to maintain the creation and perfection of the security interest under this Agreement and to protect the rights of the Secured Parties in relation to the security interest created by this Agreement; and (d) require that the Revolving Spare Parts subject to such lease agreement are used in accordance with the limitations applicable to the Company in relation to the use, possession and location of the Revolving Spare Part in question set forth in this Agreement and the Indenture.

qualquer liquidante, *trustee,* síndico ou pessoa semelhante. No hipótese de quaisquer dos referidos arrendamentos ou locações, a Companhia se assegurará de que sejam adequadamente incluídas, nos respectivos contratos de arrendamento ou locação, disposições no sentido de: (a) fazer com que tal arrendamento ou locação esteja expressamente sujeito e subordinado a todos os termos da Escritura, incluindo os direitos das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, de modo a evitar que tal arrendamento ou locação obste os direitos da Companhia de recuperação da posse das Peças de Reposição Rotativas objeto de arrendamento ou locação, e fazendo com que a Companhia permaneça a principal responsável por, dentre outras obrigações, o cumprimento e observância de todos os termos deste Contrato; (b) exigir que o locatário ou arrendatário cumpra com os requisitos relativos à cobertura de seguro nos termos da Escritura e deste Contrato; (c) exigir que o locatário ou arrendatário realize todos e quaisquer registros necessários em qualquer jurisdição para manter a criação e aperfeiçoamento da garantia objeto deste Contrato e proteger os direitos das Partes Garantidas com relação à garantia constituída por meio deste Contrato; e (d) requerer que as referidas Peças de Reposição Rotativas sejam usadas de acordo com as limitações aplicáveis à Companhia no que se refere ao uso, posse e localização da Peça de Reposição Rotativa em questão previstas neste Contrato e na Escritura.

2.6.    Except as otherwise authorized under this Agreement or with the approval of the Brazilian Collateral Agent, in accordance exclusively and strictly with the instructions provided by the Trustee, the Company and GLAI undertake not to acquire (and to cause its affiliates not to acquire) revolving aircraft spare parts (of the same type as the Revolving Spare Parts) used or to be used in the Company's and GLAI's operations

2.6.    Exceto se de outra forma autorizado nos termos deste Contrato ou mediante aprovação do Agente de Garantia Brasileiro, de acordo, exclusiva e estritamente, com as instruções fornecidas pelo *Trustee*, a Companhia e a GLAI se obrigam a não adquirir (e a fazer com que suas afiliadas não adquiram) peças aeronáuticas de reposição rotativas (do mesmo tipo das Peças de Reposição Rotativas) usadas ou a serem

through a company, other than the Company itself.

usadas nas operações da Companhia e da GLAI por meio de outra sociedade que não seja a própria Companhia.

## SECTION 3 - ENFORCEMENT

## CLÁUSULA 3 – EXCUSSÃO

3.1.    In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, without prejudice to any other security granted and provided under the Offering, exercise all powers related to the Revolving Spare Parts and the fiduciary assignment created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Revolving Spare Parts (provided that, exclusively in the case of extrajudicial sale, provided that according to the highest value between (a) at least fifty percent (50%) of the Market Value of the Revolving Spare Parts, as updated under the Clause 1.6.1 above and (b) any other price, terms and market conditions at the time of disposal); give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the enforcement or execution, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Revolving Spare Parts, and the Brazilian Collateral Agent shall

3.1.    Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contando que o Agente de Garantia Brasileiro seja notificado pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos das Oferta, exercer todos os poderes relativos à Peças de Reposição Rotativas e à alienação fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, das Peças de Reposição Rotativas (observado que, exclusivamente no caso de venda extrajudicial, desde que de acordo com o maior valor entre (a) ao menos 50% (cinquenta por cento) do Valor de Mercado das Peças de Reposição Rotativas, conforme atualizado nos termos da Cláusula 1.6.1 acima e (b) qualquer outro preço, termos e condições de mercado no momento da alienação); dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução,

deliver to the Company the remaining balance, if any, following, in any case, the provisions of the Indenture.

incluindo despesas de câmbio e despesas razoáveis resultantes da alienação das Peças de Reposição Rotativas, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

3.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf of and for the benefit of the Secured Parties, resulting from the sale of the Revolving Spare Parts, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Indenture.

3.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação das Peças de Reposição Rotativas, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

3.3.    With respect to Clause 3.1 above, in the event of enforcement or execution of this guarantee, the Company shall cause the direct possession of the Revolving Spare Parts to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Trustee.

3.3.    Com relação à Cláusula 3.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta das Peças de Reposição Rotativas para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*.

3.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to Exhibit 3 to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including, without limitation, as provided for in Clause 3.1 above, and in the signature of the respective exchange contracts necessary for the remittance of any and all financial funds, resulting from the sale of the Revolving Spare Parts, due by the Company to the Secured Parties.

3.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a bastante procuração, nos termos do Anexo 3 a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se limitar a, conforme disposto na Cláusula 3.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação das Peças de Reposição Rotativas, devidos pela Companhia às Partes Garantidas.

3.4.1.    While this Agreement is in force, the Power of Attorney shall be renewed annually

3.4.1.    Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada

by the Company with at least thirty (30) days prior to its expiration date.

anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

3.5.    For the purposes of the enforcement and/or execution of the fiduciary assignment created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, judicially or extrajudicially.

3.5.    Para os propósitos da excussão e/ou da execução da alienação fiduciária constituída nos termos deste Contrato, fica acordado entre as Partes que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

## SECTION 4 - REPRESENTATIONS AND WARRANTIES

## CLÁUSULA 4 – DECLARAÇÕES E GARANTIAS

4.1.    The Brazilian Collateral Agent hereby represents and warrants that:

4.1.    O Agente de Garantia Brasileiro neste ato declara e garante que:

(a)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Revolving Spare Parts fiduciary assignment agreement, as described herein; and

(a)    possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária das Peças de Reposição Rotativas conforme aqui descrito; e

(b)    has taken all appropriate steps to authorize the execution and performance of this Agreement.

(b)    tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

4.2.    The Company hereby represents and warrants that:

4.2.    A Companhia neste ato declara e garante que:

(a)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Revolving Spare Parts fiduciary assignment agreement, as described herein;

(b)    has taken all necessary steps to authorize the execution and performance of this Agreement;

(c)    this Agreement constitutes a legal, valid and enforceable obligation against the Company, in accordance with its terms;

(d)    the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the fiduciary assignment of the Revolving Spare Parts herein created;

(e)    it is the lawful and exclusive owner of the Revolving Spare Parts;

(f)    except for this fiduciary assignment, the Revolving Spare Parts are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for

(a)    possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária das Peças de Reposição Rotativas conforme aqui descrito;

(b)    tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato;

(c)    o presente Contrato constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d)    a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela alienação fiduciária das Peças de Reposição Rotativas aqui constituída;

(e)    é a legítima e exclusiva proprietária e possuidora das Peças de Reposição Rotativas;

(f)    exceto pela presente alienação fiduciária, as Peças de Reposição Rotativas estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que

the fiduciary assignment, pledge or sale of the Revolving Spare Parts in the Company's by-laws or in any other document; and, in the event of enforcement or execution of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

inexistem restrições para a alienação fiduciária, penhor ou venda das Peças de Reposição Rotativas no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(g)  the records, history and other materials described in Clause 2.1, item (o) above are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Revolving Spare Parts, according to Clause 3.1 above; and

(g)  os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o) acima são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, das Peças de Reposição Rotativas, conforme Cláusula 3.1 acima; e

(h)  shall maintain the necessary controls to ensure that the spare parts to be deposited at the Locations are subject to the Company's quality inspection procedures required by law.

(h)  manterá os controles necessários para garantir que as peças de reposição a serem depositadas nas Localidades estejam sujeitas aos procedimentos de inspeção de qualidade da Companhia requeridos por lei.

4.3.    The representations and warranties provided by the Parties shall survive after the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

4.3.    As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

## SECTION 5 - AGREEMENT REGISTRATION

## CLÁUSULA 5 – REGISTRO DO CONTRATO

5.1.    The Company shall, within twenty (20) days from this date or from the date of signature of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or its amendments, duly registered with the Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located. For such purposes, the

5.1.    A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou seus aditamentos, devidamente registrados nos Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das

Company undertakes to perform all acts necessary to make such registrations, at its own expense.

sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

### SECTION 6 - EXPENSES

### CLÁUSULA 6 – DESPESAS

6.1.    All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Revolving Spare Parts, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Clause if the Company does not timely perform the transfer of the amounts mentioned herein.

6.1.    Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação das Peças de Reposição Rotativas, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.2.    The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the provision of collateral agent services dated November 30, 2020.

6.2.    A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura e da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.3.    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless he receives instructions provided by the Trustee, as well as indemnity or guarantee to his satisfaction against the costs, expenses and obligations he may incur

6.3.    O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos,

in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

## SECTION 7 - BRAZILIAN COLLATERAL AGENT

## CLÁUSULA 7 – AGENTE DE GARANTIA BRASILEIRO

7.1    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.1.    O Agente de Garantia Brasileiro foi nomeado, de acordo com a Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise,

7.2.    O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento,

rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other

expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLAI e/ou à Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a

document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent (including the Valuation Report) and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro (incluindo o Relatório de Avaliação) e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3     The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, declaration, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said

7.3.     O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às

lawyer, auditor or expert.

expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Company.

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

7.6    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a

documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian reais, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil ("ROF"), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this

entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento

Clause. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

7.7     The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.8     In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.9     The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10     The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of

de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7.     O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.     Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.     O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.     O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de

sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Clause 7.10.

sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11   Any and all payments by Gol Finance, the Company and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol Finance, the Company and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.11.   Todos e quaisquer pagamentos pela Gol Finance, pela Companhia e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Companhia e/ou o GLAI, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12   The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to

7.12.   As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão

their respective activities with respect to the Offering.

aplicáveis às suas respectivas atividades com relação à Oferta.

7.13   For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.13.   Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14   Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Company. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its

7.14.   Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações

predecessor, unless otherwise agreed between the Company and such successor.

segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

## SECTION 8 - MISCELLANEOUS

8.1    Definitions. The capitalized words used in this Agreement and its Exhibits and not otherwise defined herein shall have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1.1    For purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or holiday in Brazil, or that day on which commercial banks in the cities of Rio de Janeiro and São Paulo are authorized by law to close.

8.2    Amendments. This Agreement may not be modified or altered, except by written instrument signed by the Parties.

8.3    Severability. If any term, clause, covenant or condition of this Agreement is held invalid, null or unenforceable by court decision, the remaining terms shall remain in full force and effect, thus not being affected, impaired or invalidated and the Parties, as the case may be, will use their best efforts to agree on an alternative legal and feasible method to achieve the original intended result.

8.4    Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral

## CLÁUSULA 8 – DISPOSIÇÕES GERAIS

8.1.    Definições. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles nas Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1.    Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados por lei a fechar.

8.2.    Alterações. Este Contrato não poderá ser modificado ou alterado, salvo mediante instrumento escrito e assinado pelas Partes.

8.3.    Independência das Cláusulas. Caso qualquer termo, cláusula, avença ou condição deste Contrato venha a ser considerado inválido, nulo ou inexequível por decisão judicial, os termos restantes deverão continuar em pleno vigor e efeito, não sendo, assim, afetados, prejudicados ou invalidados e as Partes, conforme o caso, envidarão seus melhores esforços para acordar um método alternativo legal e exequível para atingir o resultado original pretendido.

8.4.    Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por

Agent by the Trustee.

escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1    When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Revolving Spare Parts from any encumbrance which is still in force in accordance with the provisions herein.

8.4.1. Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação das Peças de Reposição Rotativas de qualquer gravame que ainda esteja em vigor de acordo com o aqui disposto.

8.5    Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

8.5.    Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6    Guarantees. The fiduciary guarantee provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.6.    Garantias. A garantia fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7    Notifications. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or

8.7.    Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por

electronically with pdf as attachment, with proof of transmission, and addressed as follows:

via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

(a) <u>If to the Company:</u>
Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(a) <u>Se para a Companhia:</u>
Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(b) <u>If to the Brazilian Collateral Agent:</u>
Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/ karla.fernandes@tmf-group.com

(b) <u>Se para o Agente de Garantia Brasileiro:</u>
Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/ karla.fernandes@tmf-group.com

(c) <u>If to GLAI:</u>
Address: Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(c) <u>Se para a GLAI:</u>
Address: Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1 Any notification or other communication made under this Agreement will be deemed valid and delivered on the Business Day following the respective receipt, according to the protocol signed by the addressee or notice of receipt, as the case may be.

8.7.1. Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8 <u>Specific Performance and Compliance.</u> For the purposes of this Agreement, all obligations undertaken by the

8.8. <u>Tutela Específica e Cumprimento.</u> Para os fins deste Contrato, todas as obrigações assumidas pela Companhia sob

Company under this Agreement shall be valid, effective and enforceable, and in case of non-timely performance of such obligations, the Brazilian Collateral Agent, acting in accordance with the instructions of the Trustee, may bring appropriate judicial proceedings seeking specific performance of such obligations, according to the appropriate procedures established in Law 13,105, of March 13, 2015 ("Code of Civil Procedure"), which include, but are not limited to, legal remedies available in articles 497, 501 and 815 of the Code of Civil Procedure.

8.9    Governing Law. This Agreement shall be governed and construed in accordance with the laws of the Federative Republic of Brazil, and the specific performance of the positive and negative covenants agreed upon herein is permitted.

8.9.1    In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument that may be the subject to the enforcement proceedings under article 784, item III of the Code of Civil Procedure.

8.10    Jurisdiction. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

8.11    Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

este Contrato, serão válidas, eficazes e exequíveis, sendo que em caso de não cumprimento tempestivo dessas obrigações, o Agente de Garantia Brasileiro, agindo de acordo com as instruções do *Trustee*, poderá iniciar processo judicial adequado buscando tutela específica de tais obrigações, conforme os procedimentos apropriados estabelecidos na Lei 13.105, de 13 de março de 2015 ("Código de Processo Civil"), que incluem, mas não se limitam a, remédios jurídicos disponíveis nos artigos 497, 501 e 815 do Código de Processo Civil.

8.9.    Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil, sendo permitida a tutela específica das obrigações de fazer e de não fazer aqui pactuadas.

8.9.1.    Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.    Foro. Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.    Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis.

8.12.  Language.  This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13.  Electronic Signature.  This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14.  This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

In witness whereof, the Parties have executed this instrument electronically, in the presence of the two (2) undersigned witnesses.

São Paulo, December 23, 2020.

*(The remainder of the page intentionally left blank)*

---

8.12.  Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13.  Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica de acordo com as regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

8.14.  Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

E por estarem assim justas e contratadas, as Partes firmam o presente instrumento eletronicamente, na presença das 2 (duas) testemunhas abaixo assinadas.

São Paulo, 23 de dezembro de 2020.

*(O restante da página intencionalmente deixado em branco)*

*(Signature page 1/4 to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23, 2020)*

*(Página de assinatura 1/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020)*

**GOL LINHAS AÉREAS S.A.,**

_____
*Name*/Nome:
*Title*/Cargo:

_____
*Name*/Nome:
*Title*/Cargo:

(*Signature page 2/4 to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23, 2020*)

(*Página de assinatura 2/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020*)

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

(*Signature page 3/4 to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23 2020*)

(*Página de assinatura 3/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020*)

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

(*Signature page 4/4 to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on December 23, 2020*)

(*Página de assinatura 4/4 do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em 23 de dezembro de 2020*)

**WITNESSES/TESTEMUNHAS**

_____
Name/Nome:
Tax ID /CPF:
ID/RG:

_____
Name/Nome:
Tax ID /CPF:
ID/RG:

| | |
|---|---|
| **EXHIBIT 1** | **ANEXO 1** |
| **DESCRIPTION OF THE SECURED OBLIGATIONS** | **DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |

| | |
|---|---|
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |
| **Principal Amount:** USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | **Valor Principal:** até US$ 200.000.000,00 (duzentos milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| **Maturity Date:** June 30, 2026; | **Data de Vencimento:** 30 de junho de 2026; |
| **Interest Rate:** 8.00% (eight percent) per annum, calculated and paid under the Indenture; | **Taxa de Juros:** 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura; |
| **Default Interest:** as provided in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes; | **Juros de Mora:** conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas; |
| **Penalty Clause:** not applicable; | **Cláusula Penal:** não aplicável; |
| **Inflation Adjustment Index:** not applicable; | **Índice de Atualização Monetária:** não aplicável; |
| **Other Commissions and Charges:** (i) Additional Amounts and (ii) Compensation and Indemnity, as provided for in the Indenture, respectively. | **Demais Comissões e Encargos:** (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura. |
| **AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT** | **VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO** |
| Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum; | **Valor:** taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano; |

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

EXHIBIT 2
FORM OF AMENDMENT TO THE
REVOLVING AIRCRAFT SPARE
PARTS FIDUCIARY ASSIGNMENT
AGREEMENT

ANEXO 2
MODELO DE ADITAMENTO À
ALIENAÇÃO FIDUCIÁRIA DE PEÇAS
AERONÁUTICAS DE REPOSIÇÃO
ROTATIVAS

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

(a)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(a)     **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

(b)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

**(c)**     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("<u>GLAI</u>", jointly with the Company, the "<u>Guarantors</u>"),

**(c)**     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("<u>GLAI</u>" e, juntamente com a Companhia, as "<u>Garantidoras</u>").

**WHEREAS:**

**CONSIDERANDO QUE:**

(i)     on December 23, 2020, the Company, the Brazilian Collateral Agent and GLAI entered into a Revolving Aircraft Spare Parts Fiduciary Assignment Agreement ("<u>Fiduciary Assignment Agreement</u>"), pursuant to which the Company assigned all the Revolving Aircraft Spare Parts (as defined in the Fiduciary Assignment Agreement) on a fiduciary basis, to the Secured Parties, as collateral for the Secured Obligations;

(i)     em 23 de dezembro de 2020, a Companhia, o Agente de Garantia Brasileiro e GLAI celebraram Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas ("<u>Contrato de Alienação Fiduciária</u>"), nos termos do qual a Companhia deu todas as Peças de Reposição Rotativas (conforme definido no Contrato de Alienação Fiduciária), em alienação fiduciária, às Partes Garantidas, como garantia das Obrigações Garantidas;

(ii)     the Parties hereby agree to amend the Fiduciary Assignment Agreement for the purpose of amending [the list of the Revolving Spare Parts] {*or*} [list of Locations] {*or*} [the Market

(ii)     as Partes neste ato concordam em aditar o Contrato de Alienação Fiduciária com o objetivo de alterar [a lista de Peças de Reposição Rotativas] *{ou}* [lista de Localidades] *{ou}* [o Valor de

- 42 -

Value of the Revolving Spare Parts] (as defined in the Fiduciary Assignment Agreement) delivered on a fiduciary basis, pursuant to Clause 1 of the Fiduciary Assignment Agreement.

Mercado das Peças de Reposição Rotativas] (conforme definido no Contrato de Alienação Fiduciária) entregues em alienação fiduciária, nos termos da Cláusula 1 do Contrato de Alienação Fiduciária.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "Revolving Aircraft Spare Parts Fiduciary Assignment Agreement" ("Agreement"), according to the following clauses:

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "Aditivo à Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas" ("Aditivo"), que será regido pelas seguintes cláusulas:

## I.    DEFINITIONS

1.1.    For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Fiduciary Assignment Agreement.

## I.    DAS DEFINIÇÕES

1.1.    Para fins deste Aditivo, todos os termos iniciados em letras maiúsculas, não definidos neste Aditivo, têm o significado a eles atribuídos no Contrato de Alienação Fiduciária.

## II.    AMENDMENT

2.1.    The Parties expressly agree to the [replacement of Exhibit 4 previously attached to the Fiduciary Assignment Agreement with the new Exhibit 4, attached to this Amendment as Exhibit 1, for the purpose of updating the list of [Revolving Spare Parts [and] Locations]] {or} [update of clause 1.7 of the Fiduciary Assignment Agreement to reflect the new valuation report prepared pursuant to the Fiduciary Assignment Agreement [and the adjusted Market Value of the Revolving Spare Parts]].

## II.    DO ADITAMENTO

2.1.    As Partes expressamente acordam com a [substituição do Anexo 4 anteriormente anexado ao Contrato de Alienação Fiduciária pelo novo Anexo 4, anexo ao presente Aditivo como Anexo 1, com o objetivo de atualizar a lista de [Peças de Reposição Rotativas [e] Localidades]] {ou} [atualização da cláusula 1.7 do Contrato de Alienação Fiduciária para refletir o novo relatório de avaliação preparado conforme no Contrato de Alienação Fiduciária [e o Valor de Mercado das Peças de Reposição Rotativas atualizado]].

## III.    MISCELLANEOUS

3.1.    Registration of this Amendment. The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered

## III.    DISPOSIÇÕES GERAIS

3.1.    Registro do Presente Aditivo. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro que este presente Aditivo foi

with the Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located.

devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes.

3.2.    <u>Representations and Warranties.</u> The Company hereby represents and warrants that:

3.2.    <u>Declarações e Garantias</u>. A Companhia neste ato declara e garante que:

(a)    has full powers, authorization and capacity to enter into this Amendment, comply with its contractual obligations and [enter into fiduciary assignment of the Revolving Spare Parts described in <u>Exhibit 1</u>];

(a)    possui plenos poderes, autorização e capacidade de firmar o presente Aditivo, cumprir com suas obrigações contratuais e [celebrar a alienação fiduciária das Peças de Reposição Rotativas descritas no <u>Anexo 1</u>];

(b)    has taken all necessary measures to authorize the execution and performance of this Amendment;

(b)    tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditivo;

(c)    this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(c)    o presente Aditivo constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d)    the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets[, except for the fiduciary assignment of the Revolving Spare Parts herein created];

(d)    a celebração do presente Aditivo e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos[, exceto pela alienação fiduciária das Peças de Reposição Rotativas aqui constituída];

(e)    [is the lawful and exclusive owner of

(e)    [é a legítima e exclusiva proprietária

- 44 -

the Revolving Spare Parts described in <u>Exhibit 1</u>;]

e possuidora das Peças de Reposição Rotativas descritas no <u>Anexo 1</u>;]

(f)    except for the fiduciary assignment of the Fiduciary Assignment Agreement, the Revolving Spare Parts are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary assignment, pledge or sale of the Revolving Spare Parts in the Company's by-laws or any other document; and, in the event of enforcement or execution of this Amendment and the Fiduciary Assignment Agreement, their terms and conditions shall prevail over the terms and conditions of any other document;

(f)    exceto pela alienação fiduciária do Contrato de Alienação Fiduciária, as Peças de Reposição Rotativas estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda das Peças de Reposição Rotativas no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Aditivo e do Contrato de Alienação Fiduciária, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(g)    [the records, history and other materials described in Clause 2.1, item (o) of the Fiduciary Assignment Agreement are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Revolving Spare Parts, pursuant to Clause 3.1 of the Fiduciary Assignment Agreement; and]

(g)    [os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o), do Contrato de Alienação Fiduciária são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, das Peças de Reposição Rotativas, conforme Cláusula 3.1 do Contrato de Alienação Fiduciária; e]

(h)    shall maintain the necessary controls to ensure that the spare parts to be deposited at the Locations are subject to the Company's quality inspection procedures required by law.

(h)    manterá os controles necessários para garantir que as peças de reposição a serem depositadas nas Localidades estejam sujeitas aos procedimentos de inspeção de qualidade da Companhia requeridos por lei.

3.3    <u>Other Terms and Conditions.</u> All the terms and conditions of the Fiduciary Assignment Agreement not expressly altered or modified by this Amendment are hereby

3.3.    <u>Outros Termos e Condições.</u> Todos os termos e condições do Contrato de Alienação Fiduciária não expressamente alterados ou modificados por este Aditivo

and from hereof date fully ratified by the Parties and shall remain in full force and effect, as provided for in the Fiduciary Assignment Agreement.

estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato de Alienação Fiduciária.

3.4    Governing Law. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.4.    Lei de Regência. O presente Aditivo será regido e interpretado de acordo com as leis do Brasil.

3.5    Dispute Resolution. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

3.5.    Solução de Controvérsias. Quaisquer disputas ou controvérsias oriundas do presente aditivo serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

In witness whereof, the Parties have executed this Amendment in three (3) counterparts of identical content and form, in the presence of the two (2) undersigned witnesses.

E por estarem assim justas e contratadas, as Partes firmam o presente Aditivo em 3 (três) vias de igual teor e forma, na presença das 2 (duas) testemunhas abaixo assinadas.

São Paulo, [●] [●] [●].

São Paulo, [●] de [●] de [●].

**[Signature page]**
**[ page break ]**
[ Exhibit 1]

**[página de assinaturas]**
**[quebra de página]**
[Anexo 1]

**EXHIBIT 3**
**FORM OF POWER OF ATTORNEY**

**POWER OF ATTORNEY**

By this power of attorney, **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, headquartered at Senador Salgado Filho Square, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the city of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into on December 23, 2020 between the GRANTOR, the GRANTEE and Gol Linhas Aéreas Inteligentes S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

1. practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

**ANEXO 3**
**MODELO DE PROCURAÇÃO**

**PROCURAÇÃO**

Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.,** sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no CNPJ/ME sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.,** sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas celebrado em 23 de dezembro de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1. praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

(a) dispose of, collect, receive, appropriate, transfer and/or enforce the Revolving Spare Parts (or any components thereof) or otherwise dispose of, and deliver the Revolving Spare Parts (or any components thereof) under the Agreement and as established in article 1,364 of the Civil Code, and apply the product thus received to the payment of the Secured Obligations under the Agreement;

(b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Revolving Spare Parts and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Revolving Spare Parts and represent the GRANTOR before third parties for the purpose of releasing the fiduciary assignment, disposal of the Revolving Spare Parts and transfer of the funds resulting from such disposal;

2. sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or

---

(a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir as Peças de Reposição Rotativas (ou quaisquer de suas partes) ou dispor de qualquer outro modo e entregar as Peças de Reposição Rotativas (ou qualquer de suas partes) nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

(a) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor das Peças de Reposição Rotativas e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com respeito às Peças de Reposição Rotativas e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação das Peças de Reposição Rotativas e transferência dos recursos resultantes de tal alienação;

2.assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades

municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, ANAC, the Brazilian Aeronautical Registry, the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos competentes, a ANAC, o Registro Aeronáutico Brasileiro, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Revolving Spare Parts, represent the GRANTOR before any competent Registry Office of Deeds and Documents in which the Agreement or its respective amendments shall be registered;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às Peças de Reposição Rotativas, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5. agree or settle any insurance policy or demand involving the Revolving Spare Parts in case of any loss under the terms of such policy and approve any premium/claim paid due to conviction or similar procedure affecting the Revolving Spare Parts;

5. ajustar ou liquidar qualquer apólice de seguro ou demanda envolvendo as Peças de Reposição Rotativas caso haja qualquer perda nos termos de tal apólice e aprovar qualquer prêmio/sinistro pago em razão de condenação ou procedimento similar afetando as Peças de Reposição Rotativas;

6. enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the

6. celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros

Trustee, as provided for in the Agreement; and

necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

7. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

7. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement.

Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato.

Rio de Janeiro, December 23, 2020.

Rio de Janeiro, 23 de dezembro de 2020.

**GOL LINHAS AÉREAS S.A.**
[SIGNATURE]

**GOL LINHAS AÉREAS S.A.**
[ASSINATURA]

**EXHIBIT 4**
**DESCRIPTION OF REVOLVING
SPARE PARTS AND LOCATIONS ON
DECEMBER 23, 2020**

**ANEXO 4**
**DESCRIÇÃO DAS PEÇAS DE
REPOSIÇÃO ROTATIVAS E
LOCALIDADES EM 23 DE
DEZEMBRO DE 2020**

[ATTACHED LIST]

[LISTA ANEXA]

**EXHIBIT K**

FORM OF ENGINE FIDUCIARY LIEN

#93484727v11

Dated as of _____, 2020

**GOL LINHAS AÉREAS S.A.**
as Security Provider,

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**
as Brazilian Collateral Agent

and, as intervening and consenting party,

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____

**BRAZILIAN LAW ENGINE FIDUCIARY LIEN**
relating to One (1)
[Manufacturer]. Engine model [●]
Manufacturer's Serial No. [●]
_____

**ENGINE FIDUCIARY LIEN**

**Dated: _____, 2020**

**Between:**

(1)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives ("**Security Provider**");

(2)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Zip Code 06.460-110, Centro Empresarial Tamboré, enrolled with the National Register of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) ("**Brazilian Collateral Agent**", which term shall include its successors and assigns); and

(3)     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("**GLAI**").

**Whereas:**

(A)     GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("**Gol Finance**") issued 8.00% Senior Secured Notes due 2026 ("**Notes**"), pursuant to an Indenture entered into by Gol Finance and the Trustee on December 23, 2020 ("**Indenture**") and as described in the private placement memorandum related to the Notes offering ("**Offering**");

(B)     the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture ("**Secured Parties**") as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral provided under this Agreement, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("**Trustee**") and in accordance with the terms of the Indenture and under the terms provided for in this Agreement;

(C)     in order to secure the satisfaction of all obligations undertaken by Gol Finance, under the terms and conditions of the Indenture, Security Provider and GLAI ("**Guarantors**") provided a personal guarantee under the terms of the Indenture ("**Guarantees**");

(D)     The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent;

1

(E)  in order to guarantee compliance with all obligations undertaken by Gol Finance under the terms and conditions of the Indenture and the Guarantees, the Security Provider has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Engine (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Engine (as defined below);

(F)  the Security Provider has the right, title and interest with respect to the Engine; and

(G)  the Parties hereto have agreed to enter into this Brazilian law engine fiduciary lien pursuant to the provisions of Law 7,565 of December 19, 1986, as amended (the "**Brazilian Aeronautical Code**") and the 1948 Convention on the International Recognition of Rights on Aircraft, ratified on July 3, 1953, confirmed by Legislative-Decree No. 17 of April 24, 1953, and made public by Decree No. 33,648 of August 25, 1963, pursuant to which the Security Provider recognizes its debt and grants to the Brazilian Collateral Agent, representing the Secured Parties, a fiduciary lien over the Engine, upon the terms and conditions set forth in this Agreement. As a result of the fiduciary lien on the Engine, the Engine shall be registered in Brazil with the RAB and this Agreement shall be construed in accordance with the terms of articles 148, 149, 150, 151 and 152 of the Brazilian Aeronautical Code.

**It is agreed as follows:**

1    **Definitions and Interpretation**

Except as otherwise defined in this Agreement, all words and expressions defined in the Indenture (including definitions incorporated by reference to another document) shall have the same respective meanings when used in this Agreement.

In this Agreement, the following words and expressions shall, except where the context otherwise requires, have the following respective meanings:

"**Agreement**" means this first priority Brazilian law engine fiduciary lien.

"**Aircraft Protocol**" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements, and revisions thereto (and from and after the effective date of the Cape Town Treaty in the relevant country, means when referring to the Aircraft Protocol with respect to that country, the Aircraft Protocol as in effect in such country, unless otherwise indicated). For Brazilian law purposes, the Aircraft Protocol means the respective Portuguese language text approved by the Presidential Decree 8,008/2013.

"**ANAC**" means the National Agency of Civil Aviation (*Agência Nacional de Aviação Civil*) of Brazil, and/or any other person succeeding to all or any of its functions.

"**Applicable Laws**" shall mean, with respect to any Person or property (including an Engine), all applicable laws, treaties, conventions, ordinances, judgments, decrees, injunctions, writs, rules, regulations, orders, interpretations, licenses, permits and orders of any Government Body in any relevant jurisdiction, in each case applicable to such Person or property (including the Engine).

"**Brazil**" means the Federative Republic of Brazil.

"**Business Day**" shall mean a day (other than a Saturday, Sunday or holiday scheduled by law) on which banks are open for business in New York, New York and São Paulo/SP, Brazil.

"**Cape Town Convention**" means the text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements, and revisions thereto (and from and after the effective date of the Cape Town Treaty in the relevant country, means when referring to the Cape Town Convention with respect to that country, the Cape Town Convention as in effect in such country, unless otherwise indicated). For Brazilian law purposes, the Cape Town Convention means the respective Portuguese language text approved by the Presidential Decree 8,008/2013.

"**Cape Town Treaty**" means, collectively, the (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (b), all amendments, supplements, and revisions thereto.

"**Engine**" means:

(a)    the aircraft engine described in Schedule 1;

(b)    any and all Parts relating thereto; and

(c)    any and all Manuals and Technical Records relating thereto.

"**Event of Default**" shall mean an "Event of Default" as described in the Indenture.

"**Governing Law**" means the laws of Brazil.

"**International Interest**" has the meaning ascribed to the defined term "international interest" (*garantia internacional*) under Chapter I, article 1, item (o), of the Cape Town Convention.

"**International Registry**" has the meaning ascribed to the defined term "international registry" (*registro internacional*) under Chapter I, article 1, item (p), of the Cape Town Convention.

"**Part**" means any part, appliance, accessory, instrument, furnishing, module, component or other item of equipment of whatever nature that may from time to time be incorporated or installed in or attached to the Engine.

"**Parties**" means collectively, the parties to this Agreement (each, a "**Party**").

"**Presidential Decree 8,008/2013**" means the Presidential Decree No. 8,008, issued in May 15, 2013, which incorporated the provisions of the Cape Town Treaty - including the qualifying declarations made by Brazil into binding Brazilian law.

"**RAB**" means the Brazilian Aeronautical Registry (*Registro Aeronáutico Brasileiro*) and/or any other person succeeding to all or any of its functions.

"**Receiver**" means any receiver, "*fiel depositário*", "*administrador*" (for the purposes of article 838, IV, of the Brazilian Civil Procedure Code) and manager or administrative receiver appointed by a relevant court having jurisdiction under this Agreement or under any applicable provisions of the Governing Law.

"**Secured Obligations**" has the meaning ascribed to it in Clause 3 below.

1.2      Unless otherwise specified and except where the context otherwise requires, any reference in this Agreement to:

(a)    any person shall be construed so as to include its successors and permitted assigns and permitted transferees in accordance with their respective interests;

(b)     any document (including this Agreement and each other Transaction Document) shall be construed as a reference to such document as amended, restated, supplemented, varied, transferred or novated from time to time in accordance with its terms and to the extent that such document is at the relevant time in effect;

(c)     any provision of law shall be construed as a reference to that provision as amended, supplemented, varied, re-enacted, replaced or restated from time to time;

(d)     any **applicable law** includes, without limitation, (i) applicable laws, acts, codes, conventions, decrees, decree-laws, legislation, statutes, treaties and similar instruments, (ii) applicable final judgments, orders, determinations or awards of any court from which there is no right of appeal (or, if there is a right of appeal, such appeal is not prosecuted within the allowable time) and (iii) applicable directives, guidance, guidelines, notices, orders, regulations and rules of any relevant governmental authority (whether or not having the force of law but with which, if not having the force of law, compliance is customary);

(e)     a **Clause** shall be construed as a reference to a clause of this Agreement;

(f)     **continuing** shall, in relation to an Event of Default, be construed as a reference to an Event of Default which has not been waived or remedied in accordance with the terms of the Indenture;

(g)     a **person** shall be construed as a reference to any association, company, corporation, firm, governmental authority, individual, joint venture, partnership (including any limited partnership and any limited liability partnership) or trust (in each case whether or not having separate legal personality);

(h)     a **Schedule** shall, subject to any contrary indication, be construed as a reference to a schedule to this Agreement;

(i)     a **successor** shall be construed so as to mean a successor in title of a person and any person who under the applicable laws of its jurisdiction of incorporation or domicile has assumed the rights and obligations of such person or to which, under such laws or by agreement or otherwise, such rights and obligations have been transferred; and

(j)     the **winding-up**, **dissolution**, **administration** or **re-organisation** of a person shall be construed so as to include any equivalent or analogous proceedings under the applicable law of the jurisdiction in which such person is incorporated or formed or any jurisdiction in which such person carries on business including the seeking of liquidation, winding-up, re-organisation, dissolution, administration, arrangement, adjustment, protection or relief of debtors.

1.3     Clause and Schedule headings shall be ignored in the interpretation of this Agreement.

2     **Fiduciary Lien**

2.1     As security for the payment in full (whether at stated maturity, by acceleration or otherwise), performance and discharge of the Secured Obligations from time to time outstanding, the Security Provider hereby absolutely, unconditionally and irrevocably assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional ownership and indirect possession of the Engine, and grants and agrees to grant a security interest and an International Interest in the Engine, in favour of the Brazilian Collateral Agent, as

representative and on behalf of the Secured Parties, its successors and permitted assigns (if applicable).

2.2    The Engine and all Parts, whether or not installed on the airframe, shall remain subject to the Lien created by this Agreement until such time as it is permanently replaced in accordance with the provisions of the Indenture by a replacement engine or part title to which has vested in the Security Provider free and clear of Liens and which shall have become subject to the Lien created by this Fiduciary Lien.

2.3    By signing this Agreement and complying with the formalities set forth in Section 6 below, the Fiduciary Lien shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, which shall become the conditional owner and indirect possessor of the Engine, subject to the terms and conditions of this Agreement.

## 3    Secured Obligations

In accordance with the provisions herein, this Agreement is entered in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the terms of the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Guarantees; (c) the faithful and timely fulfillment by Gol Finance and the Guarantors of all agreements, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the referred instruments (jointly, the "**Transaction Documents**") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance, the Security Provider and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "**Secured Obligations**", which are summarized in Schedule 2 hereto) in compliance with the provisions of article 1,362 of the Brazilian Civil Code and article 149 of the Brazilian Aeronautical Code.

For the purposes of complying with Governing Law, the Parties acknowledge and agree that (a) the amount of the Secured Obligations is US$[●] ([●] U.S. Dollars), and that is a mere good faith estimate which shall not prevail over the exact amount of the Secured Obligations, (b) the schedule of payments under the Indenture is set out in Schedule 2 hereto (which payment schedule is subject to alteration from time to time), (c) the current interest rate applicable to the Secured Obligations is indicated in Schedule 2 hereto (which interest rate is subject to alteration from time to time), (d) the payments with respect to the Secured Obligations shall be made by means of payment to the account of the Brazilian Collateral Agent, acting on behalf of the Secured Parties, and (e) all insurances contracted in connection with the Engine are those described in Schedule 3 hereto.

## 4    Term of Fiduciary Lien

This Agreement shall remain in force and effect until the full and final satisfaction of all Secured Obligations.

## 5    Continued Priority of Security Interest

The Lien created by this Agreement shall at all times be valid, perfected and enforceable against the Security Provider, the Engine and all third parties, in accordance with the terms hereof, as a first priority security Lien for the Secured Obligations.

6        **Perfection of the Lien**

The Security Provider hereby undertakes to: (i) no later than five (5) Business Days counted from the date of execution of this Agreement or of any amendment thereto, (a) file the Engine for registration with the RAB, (b) file this Agreement and its sworn translation into Portuguese or the amendments thereto (as applicable) with the RAB, and (c) provide Brazilian Collateral Agent with the RAB filing receipt immediately after filing, and (ii) no later than two (2) Business Days counted from the date of the completion of each of such registrations, provide evidence of the relevant registrations to the Brazilian Collateral Agent, provided, however, that (i) in any event the completion of such registrations shall occur no later than forty-five (45) days counted as of the execution of this Agreement or the date of execution of any amendment to this Agreement, being agreed that in case the RAB makes additional requirements, the priority over the Fiduciary Lien shall be maintained for a term of thirty (30) days and the date of registration shall retroact to the filing date once the additional requirements are duly complied with; and (ii) under no circumstance shall the filing with the RAB cease to have the priority of the pre-annotation effected thereby.

7        **Authorized Action**

7.1     If the Security Provider fails to timely file this Agreement pursuant to Section 6 above, the Brazilian Collateral Agent is hereby authorized to take any action (including, without limitation, the filing of one or more financing or continuation statements or amendments thereto in the name of the Security Provider and the filing of this Agreement and its sworn translation into Portuguese with the RAB and its International Interest with the International Registry), which the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee may reasonably deem necessary or appropriate to protect and preserve the Lien created by this Agreement in any jurisdiction. A certified or authenticated copy of this Agreement shall be sufficient as evidence of the Lien created by this Agreement. The Security Provider shall cooperate with the Brazilian Collateral Agent by executing and delivering all such instruments and documents as the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee shall reasonably request from time to time in order to record, perfect and keep perfected the Lien created by this Agreement in any jurisdiction over, through or in which the Engine or any portion thereof may be operated, based or positioned at no cost to the Brazilian Collateral Agent. The Security Provider shall reimburse the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Section 6 above.

7.2     This Agreement shall be lodged with the RAB and this Fiduciary Lien shall automatically be deemed fully effective in accordance with the terms hereof in respect of the Engine.

8        **Effectiveness of Security**

8.1     The Lien constituted by this Agreement and hereby acknowledged by the Security Provider, shall:

(a)     be a continuing security for the full and final payment, satisfaction and discharge of the Secured Obligations;

(b)     not be considered as satisfied or discharged by any intermediate payment, satisfaction or settlement of any or all of the Secured Obligations or any other matter or thing

whatsoever, other than the full and final payment and discharge of the Secured Obligations;

(c) be in addition to and shall not operate so as in any way to prejudice or affect or be prejudiced or affected by any Lien, guarantee, indemnity or other right or remedy that the Brazilian Collateral Agent or any of the Secured Parties may now or at any other time have in respect of any or all of the Secured Obligations; and

(d) not be prejudiced by (i) any time or indulgence granted to any person; (ii) any dealing with, exchange, renewal, variation, release or modification of, or any failure or delay by the Brazilian Collateral Agent or any of the Secured Parties in perfecting or enforcing any other Lien, guarantee, indemnity or other right or remedy that the Brazilian Collateral Agent or any of the Secured Parties may now or at any other time have in respect of any or all of the Secured Obligations; (iii) any waiver, act, omission, unenforceability or invalidity of any such other Lien, guarantee, indemnity or other right or remedy; (iv) any termination or amendment of the Indenture in any manner whatsoever; (v) any discharge or variation of the liability of any party to the Indenture or any other person; or (vi) any taking or omitting to take any security from any party to the Indenture or any other person in respect of the obligations of such party or such other person under the Indenture whether contemporaneously with this Fiduciary Lien or otherwise.

8.2 This Agreement and the Lien created hereunder shall extend to and cover any and all amounts and any and all obligations that from time to time constitute the Secured Obligations.

## 9 Representations and Warranties

9.1 The Security Provider hereby makes in favour of the Brazilian Collateral Agent the representations and warranties expressed to be made by it and set out in the Indenture.

9.2 The Security Provider further represents and warrants to the Brazilian Collateral Agent that:

(a) it has good and full legal title to the Engine;

(b) the Engine and any of its Parts are free of any Liens, other than Permitted Liens;

(c) has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations;

(d) has taken all necessary steps to authorize the execution and performance of this Agreement;

(e) this Agreement constitutes a legal, valid and enforceable obligation against the Security Provider, in accordance with its terms;

(f) the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Security Provider, (ii) any applicable law, (iii) any policy or rule of the Security Provider, (iv) the Security Provider's organizational acts, and do not cause or impose any encumbrance on its assets, except for the fiduciary assignment of the Lien herein created; and

(g) the power of attorney granted by the Security Provider hereunder is validly granted and confers upon the Brazilian Collateral Agent the powers expressed therein and the

Security Provider has not granted or may grant any other power of attorney or any instrument with similar effect to third parties regarding the Engine or its Parts.

## 10    Covenants

10.1    The Security Provider acknowledges to the Brazilian Collateral Agent that the amount secured by this Agreement, and in respect of which this Agreement and the Lien created by this Agreement is enforceable, is the full amount of the Secured Obligations for the time being and from time to time.

10.2    The Security Provider hereby undertakes to (i) no later than five (5) Business Days counted from the date of registration of the Engine with the RAB issue an Irrevocable De-registration and Export Request Authorization ("**IDERA**"), in the form of Schedule 4 hereto, in favour of the Brazilian Collateral Agent and file the IDERA with the RAB, and (ii) no later than two (2) Business Days counted from the date of the completion of such registration, provide evidence of the relevant registration to the Brazilian Collateral Agent, provided, however, that the Security Provider shall apply its best efforts for the completion of such registration to occur within forty-five (45) days counted as of the issuance of the IDERA. The Parties hereby acknowledge and agree that the complete registration of the IDERA depends on the actions of the RAB and, therefore, additional time may be needed to perform the registration.

10.3    The Security Provider hereby undertakes to no later than five (5) Business Days counted from the date of execution of this Agreement or of any amendment thereto, provide to the Brazilian Collateral Agent with one original of this Agreement and its sworn translation into Portuguese.

10.4    The Parties intend that this Agreement constitutes an International Interest in the Engine (for the purposes of the Cape Town Convention). Upon execution of this Agreement, the Security Provider shall consent to the registration of the International Interest constituted by this Agreement in relation to the Engine.

10.5    The Security Provider furthermore covenants with the Brazilian Collateral Agent that at all times during the term of this Agreement:

(a)    at any time and from time to time, upon the written and motivated request of the Brazilian Collateral Agent, it shall (at Security Provider's sole cost and expense, provided that such costs and expenses are reasonable) promptly and duly execute, deliver, file and register (or cause to be duly executed, delivered, filed and registered) any and all instruments and documents as the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee may reasonably deem necessary to establish, protect, preserve and/or perfect the Lien of this Agreement;

(b)    it shall duly and promptly pay (or ensure that they are paid) all stamp duties now or hereafter payable on this Fiduciary Lien pursuant to any applicable stamp duty law;

(c)    it shall defend, at its own expenses, the integrity of the obligations and rights agreed under this Fiduciary Lien against any claim or demand from third party;

(d)    it shall remain liable under the Transaction Documents to perform all of the obligations assumed by it thereunder to the same extent as if this Agreement had not been executed and nothing in this Agreement shall relieve the Security Provider, of any of its obligations under the Transaction Documents; and

(e)    it shall ensure that this Agreement is duly recorded and at all times maintained on record as a valid, perfected Fiduciary Lien on the Security Provider's right, title and interest in and to the Engine (except to the extent that such perfection be maintained

solely as a result of the failure by the Brazilian Collateral Agent to execute and deliver any necessary documents).

10.6   The Security Provider may dismantle the Engine solely to the extent that it deems worn out or obsolete, beyond economic repair or unfit or no longer suitable for use and may sell or dispose such Engine or any salvage resulting from such dismantling, free from the security interest created under this Agreement.

## 11   Negative Pledge

11.1   Except as contemplated or permitted under Section 11.2 below or under any Transaction Document to which it is a party, the Security Provider hereby covenants in favour of the Brazilian Collateral Agent that it will not (and will not attempt to) directly or indirectly:

(a)   sell, lease or otherwise dispose or relinquish possession of the Engine (or any Part thereof) or any of its right, title and interest in and to any Transaction Document;

(b)   create, incur, assume, permit, file, authorize or permit to be filed or to be on file in any jurisdiction, any mortgage, financing statement or similar instrument or create, incur, assume or permit or cause to exist any lien in relation to the Engine (or any Part thereof) or any of its right, title and interest, except for the Lien created by this Fiduciary Lien;

(c)   enter into any agreement, or termination, or amendment to any agreement or contract, or take any measure that may materially preclude, restrict, or in any way limit the rights of the Brazilian Collateral Agent with respect to the Engine or the capacity of the Brazilian Collateral Agent to foreclose this collateral; or

(d)   consent to the taking of any such action by any other person,

in each case without the prior written consent of the Brazilian Collateral Agent.

11.2   The Security Provider may (i) subject the Engine to an interchange agreement with (A) airlines domiciled in the United States or Brazil, (B) major international air carriers domiciled in certain permitted countries or countries that maintain diplomatic relations with the Unites States and Brazil, (C) Affiliates of the Security Provider or (D) the governments of Brazil, Canada, France, Germany, Japan, The Netherlands, Sweden, Switzerland, United Kingdom or the United States (each, a "Permitted Lessee"); (ii) install the Engine on other aircraft owned or leased by the Security Provider or any Permitted Lessee; and (iii) lease the Engine to any Permitted Lessees and to manufacturers in Australia, Brazil, Canada, Denmark, Finland, France, Germany, Iceland, Ireland, Japan Liechtenstein, Luxembourg, Monaco, Netherlands, New Zealand, Norway, Sweden, Switzerland, the United Kingdom and the United States, provided that in each case of items (i) through (iii) above (a) there is no detriment to the Secured Parties' position or rights hereunder; (b) it shall not affect the priority or perfection of the liens created hereunder or the rights of the Brazilian Collateral Agent and the security interest purported to be granted by this Agreement shall be maintained; (c) all requirements set forth in this Agreement are fully observed by the Security Provider, including that any of the arrangements described in items (i) through (iii) above shall be subject to and subordinate to the this Agreement and the other Transaction Documents and (d) the Security Provider shall furnish, or cause to be furnished, to the Trustee and the Brazilian Collateral Agent, an opinion of legal counsel stating that, in the opinion of counsel, such actions have been taken to satisfy the conditions set forth in items (a) through (c).

12       **Enforceability of Security**

12.1     In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, will be entitled, to the maximum extent permitted under the Governing Law, including the Cape Town Convention:

(a)     to exercise any and all rights of the Security Provider in relation to the Engine (or any Part thereof);

(b)     to demand in writing that the Security Provider shall promptly deliver possession of the Engine (or Parts thereto, when applicable, as the Brazilian Collateral Agent may so demand) to the Brazilian Collateral Agent, or to its order in the manner and condition reasonably required by, and otherwise in accordance with all the provisions of, this Agreement; or the Brazilian Collateral Agent at its option may enter upon the premises where all or any Part of the Engine is located and take immediate possession of and remove the same by summary proceedings or otherwise (and, at the Brazilian Collateral Agent's option, store the same at the Security Provider's premises until disposal thereof by the Brazilian Collateral Agent), all without liability accruing to the Brazilian Collateral Agent (unless caused by the Brazilian Collateral Agent's gross negligence or willful misconduct according to a final judgment), provided that the Brazilian Collateral Agent shall be responsible for the restoration of damage to property caused by its gross negligence or willful misconduct according to a final judgment; and the Security Provider shall, at the request of the Brazilian Collateral Agent, promptly execute and deliver, or cause to be executed and delivered, to the Brazilian Collateral Agent such instruments or other documents as necessary to enable the Brazilian Collateral Agent or an agent or representative designated by the Brazilian Collateral Agent, at such time or times and place or places as the Brazilian Collateral Agent may specify, to obtain possession of all or any Part of the Engine, the possession of which the Brazilian Collateral Agent shall at the time be entitled to hereunder;

(c)     to sell or otherwise dispose of (and give good title to) or realise the Engine (or any Part thereof);

(d)     at its own discretion (but at the direction of the Trustee), to seek foreclosure in relation to the Engine or any Part thereof by means of a private or judicial sale, pursuant to article 879 of Law No. 13,105, of March 16, 2015, as amended ("**Brazilian Civil Procedure Code**") or other procedure permitted by the Governing Law; or otherwise, appoint, to the extent permitted by the Governing Law, a Receiver of the Engine (or any Part thereof) and to request the removal of any Receiver so appointed and recommend the appointment of another in his place ; to repair and keep in repair the Engine (or any Part thereof) and/or to restore it to the condition and state of repair required to be maintained by the terms of the Indenture and/or any other Transaction Document;

(e)     to insure the Engine (or any Part thereof) against any liability, loss or damage, at the Security Provider's sole cost and expense;

(f)     to collect, receive, compromise or settle, and to give a good release or discharge for, any and all claims in relation to the Engine (or any Part thereof);

(g)     to bring, take, defend, compromise, settle, submit to arbitration or discontinue any and all actions, disputes, proceedings or suits (civil or criminal) in relation to the Engine (or any Part thereof);

(h)     otherwise to put into force and effect all rights, powers and remedies available to the Brazilian Collateral Agent, pursuant to Applicable Laws or otherwise, including all rights and remedies to which a secured party is entitled under the Cape Town Convention;

(i)     to apply to any court of relevant authority for any applicable order in relation to the Engine (or any Part thereof) including without limitation any arrest, attachment, enforcement or execution order and any order for foreclosure absolute so as to vest title to the Engine (or any Part thereof) in the Brazilian Collateral Agent;

(j)     if applicable and at any time necessary, to procure the registration or de-registration of the Engine (or any Part thereof) from the RAB;

(k)     to remove, export and physically transfer the Engine (or any Part thereof) in connection with the foreclosure of the Engine (or any Part thereof), if necessary, and take all actions and measures as may be necessary on the Security Provider's behalf to export and physically transfer the Engine from Brazil;

(l)     to take all actions and measures necessary for the exercise of the powers above before any Brazilian governmental authority, including, but without limitation, the Central Bank of Brazil, RAB, ANAC, the Federal Revenue Service and any customs authority; and/or

(m)     to take all such action and do all such things as the Brazilian Collateral Agent may reasonably (at the direction of the Trustee), consider necessary for or in relation to any of the purposes of this Agreement,

all of which rights, powers and remedies shall be in addition to all other rights, powers and remedies otherwise available to it under the Applicable Laws and each of such right, power and remedy may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Brazilian Collateral Agent. All such right, power and remedy shall be cumulative and not mutually exclusive and the exercise of one shall not be deemed a waiver of the right to exercise any other.

12.2    The Security Provider hereby consents to the exercise by the Brazilian Collateral Agent of any and all of its rights, powers and remedies under and in relation to this Agreement (including without limitation its power of sale) at such times, in such a manner and upon such terms and conditions as it may, in its reasonable discretion (but at the direction of the Trustee), determine and shall not in any circumstances be responsible for any loss occasioned thereby (unless caused by the Brazilian Collateral Agent's gross negligence or wilful misconduct according to a final judgment); provided that the Brazilian Collateral Agent shall not in any circumstances be liable for any special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit).

12.3    Without limiting, and as an addition to, the powers conferred upon the Brazilian Collateral Agent by the Governing Law or the laws of any other jurisdiction, the Brazilian Collateral Agent may at any time after the occurrence and continuance of an Event of Default, exercise against or in respect of the Engine any of the rights, powers, remedies, privileges or discretions conferred from time to time by the Governing Law or any other applicable jurisdiction upon as beneficiary of the Lien created hereunder over the Engine (or any Part thereof).

12.4    The Brazilian Collateral Agent will not be obliged to exercise any right, power or remedy conferred upon it by or under this Agreement or Applicable Laws or to make any enquiry as to the nature or sufficiency of any payment received by the Brazilian Collateral Agent or to make any claim or to take any other action with respect to the Engine. No action taken or omitted to be taken by the Brazilian Collateral Agent in accordance with the terms of this Agreement and/or any other Transaction Document or as permitted by Applicable Laws shall give rise to any defence, counterclaim, right of set-off or other right in favour of the Security Provider or affect in any manner whatsoever any of the Secured Obligations.

12.5    If the proceeds of sale, collection or other realization of or upon the Engine pursuant to Clause 12.1 hereof are insufficient to cover the payment in full of the Secured Obligations, the Security Provider shall not remain liable for any deficiency under the terms of the Indenture, which shall be covered by Gol Finance. The Brazilian Collateral Agent shall not under any circumstances be liable for any loss arising from or in connection with the foreclosure of the Engine by means of a private sale or other permitted means of realisation of the Engine (or any Part thereof) or otherwise for any act, neglect, default or omission for which a beneficiary of a fiduciary lien of property such as the Engine might be liable (unless caused by the Brazilian Collateral Agent's gross negligence or wilful misconduct according to a final judgment) **provided that** the Brazilian Collateral Agent shall not in any circumstances be liable for any special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit); provided further that this Clause 12.5 shall not relieve the Brazilian Collateral Agent of its obligation to account to the Security Provider in relation to its receipt of proceeds from any realisation of the Engine (or any Part thereof) subject to and in accordance with the provisions of the Transaction Documents.

12.6    Upon any sale by the Brazilian Collateral Agent of all or any part of the Brazilian Collateral Agent's right, title and interest in and to the Engine, the purchaser shall not be bound to see or enquire whether the power of sale of the Brazilian Collateral Agent has arisen, the sale shall be deemed for all purposes to be within the power of the Brazilian Collateral Agent and the receipt of the Brazilian Collateral Agent for the purchase amount shall effectively discharge the purchaser who shall not be concerned with the manner of application of the proceeds of sale or be in any way liable therefor.

12.7    To the extent now or at any time hereafter enforceable under the Applicable Laws, the Security Provider covenants that it will not  after the sale or sales of the Engine or any Part thereof, claim or exercise any right under any statute now or hereafter made or enacted by any jurisdiction or otherwise to redeem the property so sold or any part thereof, and hereby expressly waives for itself and on behalf of each and every person claiming through it, except decree or judgment creditors of the Security Provider acquiring any interest in or title to the Engine or any Part thereof subsequent to the date hereof, all benefit and advantage of any such law or laws, and covenants that it will hinder, delay or impede the execution of any power herein granted and delegated to the Brazilian Collateral Agent, but will suffer and permit the execution of every such power as though no such law or laws had been made or enacted.

12.8    The Security Provider  undertakes to reimburse the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this Section 12 hereto.

12.9    Following the occurrence or continuance of an Event of Default, the Brazilian Collateral Agent shall be entitled to apply to any relevant Brazilian judicial authority for the

enforcement of this Agreement in accordance with applicable Brazilian law, by means of an enforcement procedure as provided for by article 784, item V, of the Brazilian Civil Procedure Code, without the need for a prior judgment, with the right to attachment followed by private sale of the Engine or the vesting of title to the Engine in the Brazilian Collateral Agent ("adjudication") (or by such other means as may be permitted or available under applicable Brazilian law).

## 13    Receiver

13.1    The appointment of a Receiver pursuant to Clause 12.1(d) shall comply with the Governing Law and shall be subject to the following provisions:

(a)    such appointment may be made either before or after the Brazilian Collateral Agent will have exercised any of its rights under this Agreement and without prejudice to any of such rights;

(b)    such recommendation or appointment, as applicable, may be made upon such terms and conditions as the Brazilian Collateral Agent may, in its reasonable discretion (but at the direction of the Trustee), determine, subject to the Governing Law;

(c)    the Receiver shall be the agent of the Brazilian Collateral Agent and the Security Provider shall be responsible for its acts, defaults and remuneration, to the extent that the Security Provider is able to control such acts and defaults;

(d)    the Receiver shall not under any circumstances be liable to account as a beneficiary of the fiduciary lien over the Engine or be liable for any loss arising from or in connection with the realisation of the Engine (or any Part thereof) or otherwise for any act or omission for which a such beneficiary of fiduciary property such as the Engine might be liable (unless caused by the Receiver's gross negligence or wilful misconduct);

(e)    the Receiver shall have and be entitled to exercise all such powers as would be conferred on him/her had he/she been directly appointed by the relevant court pursuant to the Governing Law and shall in any event have and be entitled to exercise all the rights, powers and remedies as applicable under the Governing Law to protect the Engine and to prepare and effect its private or judicial sale pursuant to article 879 of the Brazilian Civil Procedure Code, usufruct or other lawful means of realization; and

(f)    without limiting Clause 13.1(b), the remuneration of the Receiver may be reasonably proposed by the Brazilian Collateral Agent and/or fixed directly by the relevant court (and may include a commission calculated by reference to a gross amount of all amounts received or otherwise) but shall be payable by the Security Provider and shall form part of the Secured Obligations.

## 14    Application of Proceeds

15    All proceeds received by the Brazilian Collateral Agent (or any Receiver) in relation to the Engine from the exercise of any rights and remedies provided for in this Agreement shall be applied in or towards the discharge of the Secured Obligations in accordance with the provisions of the Indenture. To the extent that the Secured Obligations have been fully

satisfied and the proceeds mentioned in this Clause exceed the outstanding Secured Obligations, any and all excess shall be immediately returned to the Security Provider.

## 16    Delegation

The Brazilian Collateral Agent will be entitled, at any time and as often as may be necessary, to delegate any or all of the powers and discretions vested in it by this Agreement (including the power vested in it by virtue of Clause 19) in such manner, upon such terms, and to such persons as the Brazilian Collateral Agent may determine in accordance with the provisions of the Indenture.

## 17    Conditional Discharge Only

Any settlement or discharge between the Brazilian Collateral Agent and the Security Provider will be conditional upon no security or payment to any Secured Party by any person under or in relation to the Indenture being avoided or set aside or ordered to be refunded or reduced by virtue of any Applicable Law (including without limitation in the context of any winding-up, dissolution, administration or re-organisation).

## 18    Release of Fiduciary Lien

Following the full and final discharge of the Secured Obligations (as confirmed in written by the Trustee), the Brazilian Collateral Agent will, upon the request and at the cost of the Security Provider and provided that there shall not have occurred and be continuing any Event of Default, release to the Security Provider (without recourse or warranty) such right, title and interest as the Brazilian Collateral Agent may then have in and to the Engine pursuant to this Agreement, free and clear of all Liens created by the Brazilian Collateral Agent or any Secured Party in relation to the Engine. The Brazilian Collateral Agent shall reasonably cooperate with and provide to the Security Provider any and all information and documents reasonably requested in order to register the release of this Agreement before the RAB and the discharge any and all International Interests that may exist under the International Registry.

## 19    Appointment of Attorney

19.1    Security Provider irrevocably appoints the Brazilian Collateral Agent and its successors and assigns to be its true and lawful attorney-in-fact (with full power of substitution and delegation), irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Brazilian Civil Code, *in rem suam* and as a condition of this transaction, for and on behalf of the Security Provider and in its name or otherwise and on its behalf and as the Security Provider's act and deed to sign, seal, execute, deliver and do all such assurances, acts and things which the Brazilian Collateral Agent may reasonably deem to be necessary in order to give full effect to the purposes of this Agreement including, without limitation, to ask, require, demand, receive, compound and give acquittance for any and all amounts and claims for any and all amounts due under or arising out of the Engine, to endorse any *cheque*, draft or other document, instrument or order in connection therewith and to make any claim or to take any action or to institute any suit, legal action or other proceeding which the Brazilian Collateral Agent may reasonably consider to be necessary in connection with the Engine (or any Part thereof), to exercise all rights and perform all acts provided for in article 1,364 of the Brazilian Civil Code and in Clause 12.1 of this Agreement, and generally in the Security Provider's name and on its behalf to exercise all or any of the powers, authorities and discretions conferred by or pursuant to this Agreement or the Applicable Laws on the Brazilian Collateral Agent and, without prejudice to the generality of the foregoing, to seal and deliver and otherwise perfect any deed, assurance, agreement, instrument, act or thing which the Brazilian

Collateral Agent may reasonably deem appropriate for the purpose of exercising any of such powers, authorities and discretions.

The Security Provider and the Brazilian Collateral Agent agree that the power conferred in accordance with this Clause 19.1 shall only be exercisable in circumstances where an Event of Default occurred and is continuing and shall entitle the Brazilian Collateral Agent to carry out any action and exercise any right provided for in Clause 12.1 and to represent the Security Provider before any Brazilian governmental authority, including, but without limitation, the Central Bank of Brazil, RAB, ANAC, the Federal Revenue Service and any customs authority.

19.2     The power conferred in accordance with Clause 19.1:

(a)     shall always be interpreted a general power of attorney under the Governing Law;

(b)     is granted as a condition of this Fiduciary Lien and as a means to perform the obligations established herein and shall be irrevocable, valid, and effective; and

(c)     pursuant to article 684 of the Brazilian Civil Code, is a power coupled with an interest, shall be irrevocable and shall terminate with respect to the Engine only upon the release of the Fiduciary Lien in accordance with the terms of this Agreement.

19.3     The powers conferred on the Brazilian Collateral Agent hereunder are solely to protect the Brazilian Collateral Agent's (acting on behalf of the Secured Parties) interest in the Engine and shall not impose any duty upon it to exercise such powers.

19.4     The Security Provider hereby unconditionally and irrevocably ratifies and confirms and agrees to ratify and confirm whatever any attorney appointed pursuant to Clause 19.1 shall lawfully do or purport to do in the exercise or purported exercise of any or all of the powers, authorities and discretions conferred pursuant to Clause 19.1.

## 20     Further Assurance and Protection of Security

20.1     The Security Provider will take all such action and do all such things as the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee may from time to time reasonably request so as to establish, maintain, perfect, preserve and/or protect the rights of the Brazilian Collateral Agent under or in relation to this Agreement, the Lien created (or intended to be created) by this Agreement and/or the priority (or intended priority) of such Lien.

20.2     The Brazilian Collateral Agent shall, without prejudice to its other rights, powers and remedies under this Agreement, be entitled (but not obliged) to take all such action and do all such things as it may from time to time consider (acting reasonably) necessary so as to establish, maintain, perfect, preserve and/or protect its rights under or in relation to this Agreement, the Lien created (or intended to be created) by this Agreement and/or the priority (or intended priority) of such lien **provided that** the Brazilian Collateral Agent shall, for so long as there shall not have occurred and be continuing an Event of Default, consult in good faith with the Security Provider in relation to the taking of any such action or the doing of any such thing. Any action taken or thing done pursuant to this Clause 20 shall be at the Security Provider's sole cost and expense.

## 21     Miscellaneous

21.1     This Agreement may be executed in any number of counterparts and on separate counterparts, each of which when executed shall constitute an original, but all counterparts shall together constitute one and the same instrument.

21.2     Any amendment, supplement or variation to this Agreement must be in writing and executed by each Party.

21.3     Neither the failure to exercise, nor **the delay in** any exercise of, nor the single or partial exercise of, any right, power or remedy by the Brazilian Collateral Agent under or in relation to this Agreement shall (a) operate as a waiver of such right, power or remedy, (b) prevent any further or other exercise of such right, power or remedy or (c) prevent the exercise of any other right, power or remedy. The rights, powers and remedies of the Brazilian Collateral Agent provided in this Agreement are cumulative and not exclusive of any rights, powers or remedies provided by law.

21.4     Any waiver or consent given by a Party under or in relation to this Agreement must, in order to be effective, be in writing and shall only be effective in the specific circumstances in which it is given.

21.5     If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired.

21.6     The security interest created hereby is cumulative separate to other security interests granted as collateral to the Secured Obligations and therefore may be enforced separately to such other security interests and shall not affect the ability of the Secured Parties to foreclose on such other security interests.

21.7     This Agreement is deemed for all purposes a "Collateral Document" under the terms of the Indenture.

21.8     The Brazilian Collateral Agent may at any time give notice of its resignation and be discharged of its obligations under this Agreement, pursuant to the terms and conditions of the Indenture. The Parties hereby agree to amend this Agreement within five (5) Business Days from the date of the designation of the new appointed collateral agent in order to include the new appointed collateral agent.

## 22      Costs and Expenses

22.1     All fillings, registrations, recordings and other actions necessary or advisable to:

(i)      perfect the granting of the Lien under this Agreement;

(ii)     ensure the Lien granted under this Agreement obtains and continues to have its stated priority;

(iii)    otherwise ensure the validity, effectiveness and enforceability of this Agreement and Transactions Documents; and

(iv)     release and discharge this Fiduciary Lien,

shall be undertaken at the cost of Security Provider.

22.2     All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to (a) the preservation of any of its rights under or in relation to this Agreement, (b) any proposed amendment to this Agreement, (c) any request for a consent or waiver under this Agreement, (d) the enforcement of any of its rights under or in relation to this Agreement, and (e) any and all costs and stamps, registration, and other documentary taxes to which this Agreement is or at any time may be subject. the ("**__Expenses__**")

will be solely and exclusively borne by the Security Provider, and the Security Provider undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Security Provider does not timely perform the transfer of the amounts mentioned herein.

22.3    The Security Provider shall from time to time on first demand pay all RAB and International Registry fees, all transaction costs and all stamp, registration and other documentary taxes to which this Agreement is or at any time may be subject.

22.4    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless it receives instructions provided by the Trustee, as well as indemnity or guarantee to its satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Security Provider.

## 23    Assignments and Transfers

23.1    This Agreement shall be binding upon and inure to the benefit of each Party and its successors and permitted assigns and permitted transferees.

23.2    The Security Provider shall not be entitled to assign and/or transfer any or all of its rights and/or obligations under this Agreement except to the extent permitted under and in accordance with the terms of the Transaction Documents.

23.3    The Brazilian Collateral Agent shall be entitled to assign and/or transfer any or all of its rights and/or obligations under this Agreement without the prior written consent of the Security Provider under the terms of the Transaction Documents, or if such assignment is made at the discretion of a Brazilian governmental authority.

## 24    Notices

24.1    For the purposes of this Agreement and each other Transaction Document, all notices and other communications (including any requests, directions, certifications or modifications of, or waivers or consents under, this Agreement or any other Transaction Document) shall be in writing, in English, and shall be given or made by fax, mail, overnight delivery service or personal delivery and faxed, mailed or delivered to the intended recipient at the address specified below; or, as to any party, at such other address as shall be designated by such party in writing in a notice to each other party hereto. Except as otherwise provided in this Agreement or any other Transaction Document, all such communications shall be deemed to have been duly given when transmitted by fax (provided such transmission by fax is in legible form and is accompanied by or generates a substantially simultaneous confirmation of transmission), or delivered or, in the case of a mailed notice, upon issuance by the relevant postal authority of a receipt confirming delivery, in each case given or addressed as aforesaid.

(a)    **If to the Security Provider:**

Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020, São Paulo - SP, Brazil.

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(b)      **If to the Brazilian Collateral Agent:**

Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil.

Att: Danilo Oliveira / Karla Fernandes (danilo.oliveira@tmf-group.com/ karla.fernandes@tmf-group.com)

24.2    Each such communication shall be deemed to have been given or delivered when despatched (in the case of any communication made by facsimile transmission provided that, if the date of despatch is not a Business Day in the country of the recipient, it shall be deemed to have been given or delivered on the next succeeding Business Day in such country) or (in the case of any communication made by letter) when left at the relevant address, as aforesaid, or (as the case may be) five (5) Business Days after being deposited with a recognised international air courier postage prepaid in an envelope addressed to it at that address provided that any communication or document to be made or delivered to the Brazilian Collateral Agent shall be effective only when received by the Brazilian Collateral Agent and then only if the same is expressly marked for the attention of the department or officer specified above (or such other department or officer as the Brazilian Collateral Agent shall from time to time specify for this purpose).

## 25    Governing Law and Jurisdiction

25.1    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE FEDERATIVE REPUBLIC OF BRAZIL.

25.2    Each Party irrevocably agrees for the benefit of the other Party that the courts of the State of São Paulo, Brazil shall have jurisdiction to hear and determine any suit, action or proceeding ("**Proceedings**"), and to settle any disputes, which may arise out of or in connection with this Agreement and for such purpose irrevocably submits to the jurisdiction of such courts.

25.3    The submission by the Parties to the jurisdiction mentioned in Clause 19.2 shall not (and shall not be construed so as to) limit the right of the Brazilian Collateral Agent to take Proceedings against the Security Provider in any other court of relevant jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not, if and to the extent permitted by Applicable Law.

25.4    The Security Provider hereby consents generally in respect of any Proceedings arising out of or in connection with this Agreement to the giving of any relief or the issue of any process in connection with such Proceedings including, without limitation, the making, enforcement or execution against any property of any order or judgment which may be made or given in such Proceedings.

25.5    The Security Provider hereby irrevocably consents in respect of the proceedings arising out of the enforcement of this Agreement to the application of the provisions of article 879 of the Brazilian Civil Procedure Code.

25.6    To the extent that the Security Provider may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution or

judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), the Security Provider hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the full extent permitted by the laws of such jurisdiction.

## 26    Cape Town Convention; International Interest

26.1    The Parties agree that the Engine (and any Part thereof) shall be subject, to the fullest extent set forth and permitted by law, to the Cape Town Convention and the Aircraft Protocol and in accordance with the declarations lodged by Brazil under the Aircraft Protocol and under the Cape Town Convention at the time of the deposit of its instrument of accession in respect thereof.

26.2    The Parties further agree that (i) this is a security agreement as defined in the Cape Town Convention; (ii) the Engine will be registered on the aircraft engine register of the State of Registration, which is the State of registry for the purposes of the Cape Town Convention; (iii) the international interest of the Brazilian Collateral Agent, acting on behalf of the Secured Parties, shall be registered, with the consent of the Security Provider and the Brazilian Collateral Agent, as an international interest under the Cape Town Convention in the Airframe and the Engines and such registration may be amended or extended prior to its expiry by the Security Provider or the Brazilian Collateral Agent, with the consent in writing of the other; (iv) an Event of Default is an event that constitutes a default or otherwise gives rise, to the fullest extent set forth and permitted by law, to the rights and remedies specified in articles 12 to 15 and 20 of the Cape Town Convention and the Security Provider and the Brazilian Collateral Agent agree that the rights and remedies specified in the said articles and in Clause 12.1 shall be available to the Brazilian Collateral Agent, to the fullest extent set forth and permitted by law; (v) the Security Provider has power to dispose of the Engines for the purpose of Article 10(b) of the Cape Town Convention; and (vi) the Security Provider shall cooperate with the Brazilian Collateral Agent with respect to effecting registration pursuant to the Cape Town Convention of any agreement related to the ranking of priority between the various international interests and/or the interests of the Security Provider and the Brazilian Collateral Agent.

## 27    Brazilian Collateral Agent General Provisions

27.1    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

27.2    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision,

opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Security Provider, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Security Provider's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent (including the Valuation Report) and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

27.3   The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, declaration, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Security Provider's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

27.4   The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

27.5   The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this

Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Security Provider.

27.6    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Security Provider to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian reais, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the business day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil ("ROF"), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Clause. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

27.7    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

27.8    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

27.9    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil

conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

27.10    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("**Embargo Rules**"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Clause 27.10.

27.11    Any and all payments by Gol Finance, and/or the Security Provider and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("**Deductions**"). If any Deductions apply to any payment, Gol Finance, the Security Provider and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

27.12    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

27.13    For the avoidance of doubt, the Security Provider acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

27.14    Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may waive at any time by notifying the Trustee and the Security Provider. Upon any waiver by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Security Provider (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Security Provider (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Security Provider to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Security Provider and such successor.

**IN WITNESS WHEREOF** the Parties have caused this Agreement to be executed as a deed by the duly authorised representatives of the Parties and this Agreement is intended to be and is hereby signed in São Paulo and delivered on the day and year first above written.

[Execution page follows]

**EXECUTION PAGE**

**Brazilian Law Engine Fiduciary Lien**

**The Security Provider**

**GOL LINHAS AÉREAS S.A.**

_____
Name:
Title:

_____
Name:
Title:

**EXECUTION PAGE**

**Brazilian Law Engine Fiduciary Lien**

**The Brazilian Collateral Agent,**

acting on behalf of the Secured Parties

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____
Name:

Title:

**EXECUTION PAGE**

**Brazilian Law Engine Fiduciary Lien**

**The intervening and consenting party,**

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____
Name:
Title:

_____
Name:
Title:

## EXECUTION PAGE

### Brazilian Law Engine Fiduciary Lien

**Witnesses:**

By:_____
Name:
ID

By: _____
Name:
ID

**SCHEDULE 1**

**Engine**

Engine Model: [●]

Serial No.: [●]

Manufacturer: [●]

## SCHEDULE 2

## Secured Obligations

**Indenture**:

Summary of the terms and conditions of the Indenture:

## GOL FINANCE NOTES

Principal Amount: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Maturity Date: June 30, 2026;

Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00% (two percent) per annum higher than the interest rate otherwise applicable to the Notes;

Penalty Clause: not applicable;

Inflation Adjustment Index: not applicable;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided in the Indenture.

## AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

## SCHEDULE 3

### List of Insurances / Reinsurances

**Master Insurer / Reinsurer:** [●].

**Master Insurance / Reinsurance Reference / Policy Number:** [●].

Reference No.: [●]

**SCHEDULE 4**

**Form of IDERA**

| | |
|---|---|
| **AUTORIZAÇÃO IRREVOGÁVEL DE CANCELAMENTO DA MATRÍCULA E DE SOLICITAÇÃO DE EXPORTAÇÃO** | **IRREVOCABLE DE-REGISTRATION AND EXPORT REQUEST AUTHORISATION** |

Anexo a que se refere o Artigo XIII do Protocolo de Aeronaves

Annex referred to in Article XIII of the Aircraft Protocol

[preencher a data]

[insert date]

Destinatário: Agência Nacional de Aviação Civil - ANAC

To: *Agência Nacional de Aviação Civil - ANAC*

Assunto: Autorização Irrevogável de Cancelamento da Matrícula e de Solicitação de Exportação

Re: Irrevocable De-Registration and Export Request Authorisation

O abaixo assinado é operador do motor [●], modelo [●], no qual figura o número de série do fabricante [●] (junto com todos os acessórios, peças e equipamentos instalados, incorporados ou acoplados, o "motor").

The undersigned is the operator of the [●] engine, model [●], bearing manufacturers serial number [●] (together with all installed, incorporated or attached accessories, parts and equipment, the "engine").

O presente instrumento é uma autorização irrevogável de registro e de exportação emitido pelo abaixo assinado em favor da [●] (a "parte autorizada") de acordo com os termos do Artigo XIII do Protocolo à Convenção sobre Garantias Internacionais Incidentes sobre Equipamentos Móveis Relativo a Questões Específicas ao Equipamento Aeronáutico. De acordo com esse Artigo, o abaixo assinado requer:

This instrument is an irrevocable de-registration and export request authorisation issued by the undersigned in favor of [●] (the "authorised party") under the authority of Article XIII of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment. In accordance with that Article, the undersigned hereby requests:

(i) o reconhecimento de que a parte autorizada ou a pessoa certificada como seu representante é a única pessoa habilitada a: fazer exportar e transferir fisicamente o motor da República Federativa do Brasil; e

(i) recognition that the authorised party or the person it certifies as its designee is the sole person entitled to: procure the export and physical transfer of the engine from the Federative Republic of Brazil; and

(ii) a confirmação de que a parte autorizada ou a pessoa certificada como seu representante pode tomar a medida especificada no parágrafo (i) acima mediante solicitação escrita sem o consentimento do abaixo assinado e que, mediante essa solicitação, as autoridades na República Federativa do Brasil deverão cooperar com a parte autorizada com vistas à pronta efetivação das medidas em questão.

Os direitos em favor da parte autorizada estabelecida no presente instrumento não poderão ser revogados pelo abaixo assinado sem o consentimento por escrito da parte autorizada.

Queira confirmar sua concordância com a presente solicitação e com seus termos preenchendo o presente documento de modo adequado no espaço abaixo e depositando-o junto a Agência Nacional de Aviação Civil - ANAC.

**GOL LINHAS AÉREAS S.A.**

Por: _____
Nome:
Cargo:

Por: _____
Nome:
Cargo:

**Testemunhas:**

_____
Nome:
RG:

_____
Nome:
RG:

---

(ii) confirmation that the authorised party or the person it certifies as its designee may take the action specified in clause (i) above on written demand without the consent of the undersigned and that, upon such demand, the authorities in the Federative Republic of Brazil shall co-operate with the authorised party with a view to the speedy completion of such action.

The rights in favor of the authorised party established by this instrument may not be revoked by the undersigned without the written consent of the authorised party.

Please acknowledge your agreement to this request and its terms by appropriate notation in the space provided below and lodging this instrument in *Agência Nacional de Aviação Civil - ANAC*.

**GOL LINHAS AÉREAS S.A.**

By: _____
Name:
Title:

By: _____
Name:
Title:

**Witnesses:**

_____
Name:
ID:

_____
Name:
ID:

| FLIGHT SIMULATORS FIDUCIARY TRANSFER AGREEMENT | INSTRUMENTO PARTICULAR DE ALIENAÇÃO FIDUCIÁRIA DE SIMULADORES DE VOO |
|---|---|

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

(a) **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(a) **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

(b) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

1

| | |
|---|---|
| **(c)** **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("<u>GLAI</u>"); | **(c)** **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("<u>GLAI</u>"); |
| Each party above will be also hereinafter referred to as "<u>Party</u>" and collectively as "<u>Parties</u>"; | Cada parte acima também referida como "<u>Parte</u>" e, em conjunto, "<u>Partes</u>"; |

| | |
|---|---|
| **WHEREAS:** | **CONSIDERANDO QUE:** |
| **(i)** Gol Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg ("<u>Gol Finance</u>") issued senior debt securities at interest of 8.00% and maturity in 2026 ("<u>Notes</u>"), according to the terms and conditions set forth in the indenture under which the Gol Finance Notes were issued ("<u>Indenture</u>") and as described in the private placement memorandum related to the Notes offering ("<u>Offering</u>"); | **(i)** a Gol Finance, , sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("<u>Gol Finance</u>") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("<u>Notas</u>"), nos termos e condições previstos na escritura por meio da qual as Notas Gol Finance foram emitidas ("<u>Escritura</u>") e conforme descrito no memorando de colocação privada relacionado à oferta das Notas ("<u>Oferta</u>"); |
| **(ii)** the Brazilian Collateral Agent has been duly appointed by the Noteholders and the other secured parties described in the Indenture ("<u>Secured Parties</u>") as the collateral agent in Brazil pursuant to the Indenture to perform acts on behalf | **(ii)** o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura ("<u>Partes Garantidas</u>") como agente de garantia no Brasil nos termos da Escritura para |

2

of and for the benefit of the Secured Parties in connection with the collateral created by means of this Agreement, as permitted by the terms set forth in the Indenture, in accordance exclusively and strictly with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms set forth in the Indenture and this Agreement;

praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii)    in order to ensure compliance with all obligations undertaken by Gol Finance, subject to the terms and conditions of the Indenture, each of the Guarantors provided a personal guarantee under the Indenture ("Personal Guarantees");

(iii)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, cada uma das Garantidoras prestou garantia pessoal nos termos das Escritura ("Garantias Fidejussórias");

(iv)    The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent; and

(iv)    A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o Trustee, na qualidade de representante das Partes Garantidas e do Agente de Garantia Brasileiro; e

(v)    in order to guarantee compliance with all obligations undertaken by Gol Finance under the terms and

(V)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e

3

conditions of the Indenture and by the Guarantors under the Personal Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Flight Simulators (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Flight Simulators,

**NOW, THEREFORE,** the Company, the Brazilian Collateral Agent and GLAI, hereby and pursuant to law agree to enter into this "Flight Simulators Fiduciary Transfer Agreement" ("Agreement"), according to the following clauses:

## SECTION 1 - PURPOSE

1.1.    In accordance with the provisions herein, in order to guarantee (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Personal Guarantees; (c) the faithful and timely compliance by Gol Finance and the Guarantors with all contracts, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the said instruments (jointly, the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the

condições da Escritura e pelos Garantidores no âmbito das Garantias Fidejussórias, a Companhia concordou em conceder às Partes Garantidas, representadas no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre os Simuladores de Voo (conforme definido abaixo), mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todos os Simuladores de Voo,

**RESOLVEM** a Companhia, o Agente de Garantia Brasileiro e a GLAI, neste ato e na melhor forma de direito, celebrar o presente "Instrumento Particular de Alienação Fiduciária de Simuladores de Voo" ("Contrato"), que será regido pelas seguintes cláusulas:

## CLÁUSULA 1 – OBJETO DO CONTRATO

1.1.    De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias Fidejussórias; (c) o fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos, obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos

4

faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents relating to the Flight Simulators; and (e) the faithful and timely payment of all other amounts due from time to time by Gol Finance, the Company and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents relating to the Flight Simulators (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "Secured Obligations"), the Company hereby assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional ownership of all the flight simulators, owned by the Company, as individually identified or to be identified in Exhibit 1 to this Agreement, including any and all parts linked or belonging to them ("Flight Simulators"). This fiduciary transfer is created in accordance with article 1,361 *et seq.* of Law No. 10,406, of January 10, 2002, as amended ("Civil Code").

1.2.    As a result of the transfer by the Company of the conditional ownership on the Flight Simulators to the Secured Parties, represented by the Brazilian Collateral Agent, carried out under the terms of the applicable legislation, the Secured Parties, represented by the Brazilian Collateral Agent, become the exclusive owners of the conditional ownership and indirect owners of the Flight Simulators, until full compliance with the Secured Obligations, subject to the terms of Clause 1.7 below.

da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação relativos aos Simuladores de Voo; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela Companhia e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação relativos aos Simuladores de Voo (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), a Companhia neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a propriedade resolúvel de todos os simuladores de voo, de propriedade da Companhia, conforme individualmente identificadas ou a serem identificadas no Anexo 1 deste Contrato, bem como todas e quaisquer peças a estes vinculadas ou pertencentes ("Simuladores de Voo"). A presente alienação fiduciária é constituída de acordo com o artigo 1.361 e seguintes da Lei n° 10.406, de 10 de janeiro de 2002, conforme alterada ("Código Civil").

1.2.    Em decorrência da transferência, pela Companhia, da propriedade resolúvel sobre os Simuladores de Voo para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, realizada nos termos da legislação aplicável, as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, passam a ser as exclusivas titulares da propriedade resolúvel e possuidoras indiretas dos Simuladores de Voo, até o cumprimento integral das Obrigações Garantidas, observados os termos da Cláusula 1.7 abaixo.

5

1.3.    The Secured Obligations include all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all present and future principal and ancillary payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, within the scope of, or in relation to the Offering or the Indenture.

1.3.1.    For the purposes of Article 1,362 of the Civil Code, the main conditions and characteristics of the Secured Obligations are those described in <u>Exhibit 2</u> to this Agreement.

1.4.    By signing this Agreement and complying with the formalities set forth in Clause 5 below, the fiduciary transfer shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, and the Company shall become the holder of direct possession of the Flight Simulators and the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, shall become the holder of indirect possession of the Flight Simulators, subject to the terms and conditions of this Agreement.

1.5.    Except as provided for in Section 1.7 below, the Flight Simulators shall always be kept in the Locations (as defined below). Should the Company need to alter the Location (as defined below) of a Flight Simulator or acquire new Flight Simulators, then immediately prior to on the date that such Location is changed or such new Flight Simulator is acquired , the Parties undertake to update <u>Exhibit 1</u> to this Agreement, through the execution of an amendment to this Agreement under the form in <u>Exhibit 3</u> thereto, in order to update (a) the Locations (as defined below) and/or (b) update and

1.3.    As Obrigações Garantidas incluem todas as obrigações assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.1.    Para fins do artigo 1.362 do Código Civil, as principais condições e características das Obrigações Garantidas são aquelas descritas no <u>Anexo 2</u> ao presente Contrato.

1.4.    Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 5 abaixo, estará constituída a alienação fiduciária em nome e benefício das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, e a Companhia tornar-se-á detentora da posse direta dos Simuladores de Voo e o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, tornar-se-á detentor da posse indireta dos Simuladores de Voo, nos termos e condições acordados neste Contrato.

1.5.    Exceto conforme previsto na Cláusula 1.7 abaixo, os Simuladores de Voo deverão sempre ser mantidos nas Localidades (conforme abaixo definido). Caso a Companhia necessite alterar uma Localidade (conforme abaixo definido) ou adquira novos Simuladores de Voo, então imediatamente antes ou na data em que a Localidade for alterada ou o novo Simulador de Voo for adquirido, as Partes comprometem-se a atualizar o <u>Anexo 1</u> a este Contrato, mediante a celebração de um aditivo a este Contrato conforme modelo constante do <u>Anexo 3</u>, a fim de atualizar (a) as Localidades (conforme

6

include all new Flight Simulators which will become subject to the fiduciary transfer created herein. The base date of <u>Exhibit 1</u> to this Agreement is [●] [●] 2020.

1.6.    [According to the report of [●] [●] 2020, prepared by [●] ("<u>Independent Appraiser</u>"), an independent consulting and property valuation firm in the aviation industry, the estimated fair market value of the Flight Simulators, at [●] 2020, is USD [●] ([●]dollar) ("<u>Fair Market Value of Flight Simulators</u>").

1.6.1.    As provided for in the Indenture, Gol Finance undertakes to provide to the Brazilian Collateral Agent and the Trustee until [●] ([●]) Business Day of each month of [●] and [●] of each year, as of [●] 2020, a certificate issued by the Independent Appraiser that shall contain its opinion on the fair market value of the Flight Simulators under the fiduciary transfer created under this Clause, and such certificate shall be prepared and issued under the Indenture (each, an "<u>Appraisal Report</u>").]

1.7.    The Brazilian Collateral Agent, acting according to the instructions provided by the Trustee, or any third party appointed by the Secured Parties or the Trustee, may, at any time, engage a third party previously indicated by the Trustee, upon notice to the Company at least three (3) Business Days in advance, to examine the Flight Simulators, checking their conditions.

definido abaixo) e/ou (b) incluir todos os novos Simuladores de Voo, que também passarão a ser objeto da alienação fiduciária aqui constituída. A data base do <u>Anexo 1</u> ao presente contrato é [●] de [●] de 2020.

1.6.    [De acordo com o relatório de [●] de [●] de 2020, elaborado pela [●] ("<u>Avaliador Independente</u>"), uma empresa independente de consultoria e de avaliação de bens do setor de aviação, o valor justo de mercado estimado dos Simuladores de Voo, em [●] de 2020, é de US$ [●] ([●] dólares) ("<u>Valor de Mercado dos Simuladores de Voo</u>").

1.6.1.    Conforme disposto na Escritura, a Gol Finance compromete-se a fornecer ao Agente de Garantia Brasileiro e ao *Trustee* até o [●]° ([●]) Dia Útil de todo mês de [●] e [●] de cada ano, a partir de [●] de 2020, um certificado emitido pelo Avaliador Independente que deverá conter sua opinião sobre o valor justo de mercado dos Simuladores de Voo objeto da alienação fiduciária criada nos termos desta Cláusula, devendo ser preparado e emitido nos termos da Escritura (cada um, um "<u>Relatório de Avaliação</u>")].

1.7.    O Agente de Garantia Brasileiro, agindo conforme as instruções fornecidas pelo *Trustee*, ou qualquer terceiro nomeado pelas Partes Garantidas ou pelo *Trustee*, poderá, a qualquer tempo, contratar terceiros previamente indicados pelo *Trustee*, mediante aviso à Companhia com antecedência de, ao menos, 3 (três) Dias Úteis, examinar os Simuladores de Voo, verificando suas condições.

## SECTION 2 - COMPANY'S OBLIGATIONS

## CLÁUSULA 2 – OBRIGAÇÕES DA COMPANHIA

7

2.1.   The Company undertakes to

(a)   refrain from selling, assigning, transferring, creating any charge, renting or otherwise delivering, transferring or giving up ownership of any of the Flight Simulators to any person other than the Secured Parties, represented by the Brazilian Collateral Agent, or otherwise encumbering the Flight Simulators, subject to the criminal implications provided for in article 171, items I and II, of Decree-Law no. 2,848, of December 7, 1940, as amended (Brazilian Criminal Code), except as otherwise permitted under this Agreement;

(b)   timely fulfill the obligations of this Agreement;

(c)   defend itself, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Flight Simulators assigned on a fiduciary basis, this Agreement and/or the fulfillment of the obligations undertaken under the Offering;

(d)    practice all acts, as well as sign any and all documents, necessary for the registration of the Flight Simulators fiduciary transfer agreement with the competent Registry Office of Deeds and Documents under this Agreement and the Indenture;

(e)   not perform acts with the purpose of depreciating the value of the Flight

2.1.   A Companhia obriga-se a:

(a)   abster-se de vender, ceder, transferir, criar qualquer ônus, alugar ou de qualquer outro modo entregar, transferir ou abdicar a posse de qualquer dos Simuladores de Voo a qualquer pessoa que não as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, ou, de outro modo, onerar os Simuladores de Voo, sujeita às implicações criminais previstas no artigo 171, incisos I e II, do Decreto-lei n° 2.848, de 7 de dezembro de 1940, conforme alterado (Código Penal Brasileiro), exceto conforme permitido de outra maneira nos termos deste Contrato;

(b)   cumprir tempestivamente as obrigações desse Contrato;

(c)   defender, a si mesma, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Simuladores de Voo alienados fiduciariamente, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

(d)   praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro da alienação fiduciária dos Simuladores de Voo no Cartório de Registro de Títulos e Documentos competente, nos termos deste Contrato e da Escritura;

(e)   não praticar atos com o propósito de depreciar o valor dos Simuladores de

8

Simulators, except as a result of the actions allowed in this Agreement;

Voo, exceto se em decorrência das ações permitidas neste Contrato;

(f) assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any enforcement and/or sale of the Flight Simulators, and bear all related expenses or that are necessary for such purpose;

(f) auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, no caso de eventual excussão e/ou venda dos Simuladores de Voo, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(g) assist, allow and make its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(g) auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(h) subject to the provisions of Clauses 3.1 and 3.3 below, maintain the custody of the Flight Simulators, acting as trustee of the Flight Simulators and assuming the responsibilities inherent to their conservation, subject to the resulting civil penalties, under the Article 627 et seq. of the Civil Code;

(h) observado o disposto nas Cláusulas 3.1 e 3.3 abaixo, manter a custódia dos Simuladores de Voo, atuando como fiel depositária dos Simuladores de Voo e assumindo as responsabilidades inerentes à sua conservação, sujeitando-se às sanções civis daí decorrentes, nos termos do artigo 627 e seguintes do Código Civil;

(i) defend, at its own expense, in a timely and efficient manner, the rights of the Secured Parties, represented by the Brazilian Collateral Agent, related to the Flight Simulators, against any claims of third parties;

(i) defender, às suas próprias expensas, de uma maneira tempestiva e eficiente, os direitos das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, relativos aos Simuladores de Voo,

9

|  |  |  | contra quaisquer reivindicações de terceiros; |
|---|---|---|---|
| (j) | comply with all clauses set forth in the Indenture; | (j) | cumprir com todas as cláusulas previstas na Escritura; |
| (k) | notify the Brazilian Collateral Agent of any event resulting in violation of this Agreement or the Indenture or in inaccuracy of any statements made under this Agreement within two (2) Business Days of its occurrence; | (k) | notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência; |
| (l) | maintain the necessary qualifications of the Flight Simulators before the National Civil Aviation Agency ("ANAC"), and pay any and all taxes and fees related thereto, including, without limitation, the *Taxa de Fiscalização da Aviação Civil – TFAC*; | (l) | manter os Simuladores de Voo com a qualificação da Agência Nacional de Aviação Civil ("ANAC") válida, mantendo em dia o pagamento de todas as taxas aplicáveis, incluindo, mas não se limitando à Taxa de Fiscalização da Aviação Civil – TFAC; |

| *Maintenance* | | *Manutenção* | |
|---|---|---|---|
| (m) | keep all Flight Simulators covered by insurance, at all times, against physical damages, including risks insured by extended coverage, as it is prudent and usually practiced by companies of the same or similar size, in the same or similar business, operating predominantly in Brazil, subject to the other criteria established in the Indenture; | (m) | manter todos os Simuladores de Voo cobertos por seguro, em todos os momentos, contra danos físicos, inclusive riscos segurados por cobertura estendida, conforme for prudente e usualmente praticado pelas empresas do mesmo porte ou de porte similar, na mesma atividade ou em atividade similar, que operem predominantemente no Brasil, respeitados os demais critérios estabelecidos na Escritura; |
| (n) | maintain, or cause to maintain, at all times, the Flight Simulators in accordance with all applicable regulations, including those of ANAC, as well as accomplish any modifications, alterations, replacements and/or additions that | (n) | manter, ou fazer com que se mantenham, em todos os momentos, os Simuladores de Voo de acordo com toda a regulação aplicável, incluindo aquelas emanadas da ANAC, bem como realizar quaisquer modificações,                 alterações, |

10

may be necessary, and shall use, or cause to be used, the same form and the same standard of maintenance with respect to each model of flight simulators included in this Agreement as are used for the same model of flight simulators that are owned by the Company and that are not included in this Agreement;

substituições e/ou adições que venham a ser necessárias, devendo utilizar, ou fazer com que sejam utilizadas, a mesma forma e o mesmo padrão de manutenção com respeito a cada modelo de simuladores de voo incluída nesse Contrato conforme são utilizados para o mesmo modelo de simuladores de voo que sejam de propriedade da Companhia e que não estejam incluídas nesse Contrato;

(o)    if applicable, maintain, or cause to be maintained, all records, histories and other materials required by ANAC or any other applicable aviation authority or any other governmental authority to be maintained with respect to Flight Simulators and not modify its procedures for recording the custody of Flight Simulators if such modification materially diminishes the value of the Flight Simulators as a whole;

(o)    conforme seja aplicável, manter, ou fazer com que se mantenham, todos os registros, históricos e outros materiais requeridos pela ANAC ou qualquer outra autoridade de aviação aplicável ou qualquer outra autoridade governamental a serem mantidos em relação aos Simuladores de Voo e não modificar seus procedimentos de registro da custódia dos Simuladores de Voo se tal modificação diminuir materialmente o valor dos Simuladores de Voo, consideradas como um todo;

(p)    maintain, or cause to be maintained, Flight Simulators in good working order and perform necessary maintenance; and

(p)    manter, ou fazer com que se mantenham, os Simuladores de Voo em boas condições de funcionamento e realizar as manutenções que se façam necessárias; e

*Locations*

*Localidades*

(q)    keep Flight Simulators at one or more locations indicated in Exhibit 1 to this Agreement ("Locations"), unless otherwise permitted in this Agreement.

(q)    manter os Simuladores de Voo em uma ou mais localidades indicadas no Anexo 1 a este Contrato ("Localidades"), exceto se de outro modo permitido neste Contrato.

2.2.    As fully detailed in Clause 2.1 above, the Company is fully responsible for the

2.2.    Conforme plenamente detalhado na Cláusula 2.1 acima, a Companhia é

11

registration and custody of the Flight Simulators and for their undue or improper use, as well as for any and all costs, indemnities or expenses resulting from personal and/or material damages caused to third parties, and it also undertakes to take all necessary measures to preserve the integrity of the Flight Simulators. The Company shall be solely and exclusively responsible for any damage caused to the Flight Simulators.

2.2.1.    The Company is also responsible for the payment of any and all fines, fees, taxes, licensing expenses and other costs arising from the Flight Simulators.

2.3.    The Company confirms that (a) it has no objection to the Offering; and (b) the Offering and any enforcement, at any time, of the Flight Simulators shall not violate, infringe, contravene, conflict or constitute a default within the scope of (i) any contract to which the Company is a party, (ii) any applicable legislation; (iii) any Company policy or regulation; or (iv) any of the Company organizational documents.

2.4.    Except as otherwise authorized under this Agreement or with the approval of the Brazilian Collateral Agent, in accordance exclusively and strictly with the instructions provided by the Trustee, the Company and GLAI undertake not to acquire (and to cause its affiliates not to acquire) flight simulators (of the same type as the Flight Simulators) used or to be used in the Company's and GLAI's operations through a company, other than the Company itself.

**SECTION 3 - ENFORCEMENT**

integralmente responsável pelo registro e pela custódia dos Simuladores de Voo e por seu uso indevido ou impróprio, bem como por todos e quaisquer custos, indenizações ou despesas decorrentes de danos pessoais e/ou materiais causados a terceiros, obrigando-se, ainda, a adotar todas as providências necessárias à preservação da integridade dos Simuladores de Voo. A Companhia será a única e exclusiva responsável por quaisquer danos causados aos Simuladores de Voo.

2.2.1.    A Companhia é responsável, ainda, pelo pagamento de todas e quaisquer multas, taxas, tributos, despesas de licenciamento e outros custos decorrentes dos Simuladores de Voo.

2.3.    A Companhia confirma que (a) não possui qualquer objeção à Oferta; e (b) a Oferta e qualquer excussão, a qualquer tempo, dos Simuladores de Voo não violarão, infringirão, contrariarão, conflitarão ou constituirão um inadimplemento no âmbito (i) de qualquer contrato do qual a Companhia seja parte, (ii) de qualquer legislação aplicável; (iii) de qualquer política ou regulamento da Companhia; ou (iv) de qualquer um dos documentos constitutivos da Companhia.

2.4.    Exceto se de outra forma autorizado nos termos deste Contrato ou mediante aprovação do Agente de Garantia Brasileiro, de acordo, exclusiva e estritamente, com as instruções fornecidas pelo *Trustee*, a Companhia e a GLAI se obrigam a não adquirir (e a fazer com que suas afiliadas não adquiram) simuladores de voos (do mesmo tipo dos Simuladores de Voo) usadas ou a serem usadas nas operações da Companhia e da GLAI por meio de outra sociedade que não seja a própria Companhia.

**CLÁUSULA 3 – EXCUSSÃO**

3.1.     In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, without prejudice to any other security granted and provided under the Offering, exercise all powers related to the Flight Simulators and the fiduciary transfer created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Flight Simulators (provided that, exclusively in the case of extrajudicial sale, provided that according to the highest value between (a) at least fifty percent (50%) of the Market Value of the Flight Simulators, as updated under the Clause 1.6.1 above and (b) any other price, terms and market conditions at the time of disposal); give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the enforcement or execution, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Flight Simulators, and the Brazilian Collateral Agent shall deliver to the Company the remaining balance, if any, following, in any case, the provisions of the Indenture.

3.1.     Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, exercer todos os poderes relativos aos Simuladores de Voos e à alienação fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Simuladores de Voo (observado que, exclusivamente no caso de venda extrajudicial, desde que de acordo com o maior valor entre (a) ao menos 50% (cinquenta por cento) do Valor de Mercado dos Simuladores de Voo, conforme atualizado nos termos da Cláusula 1.6.1 acima e (b) qualquer outro preço, termos e condições de mercado no momento da alienação); dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Simuladores de Voo, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

13

3.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf of and for the benefit of the Secured Parties, resulting from the sale of the Flight Simulators, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Indenture.

3.3.    With respect to Clause 3.1 above, in the event of enforcement or execution of this guarantee, the Company shall cause the direct possession of the Flight Simulators to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Trustee.

3.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to Exhibit 4 to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including, without limitation, as provided for in Clause 3.1 above, and in the signature of the respective exchange contracts necessary for the remittance of any and all financial funds, resulting from the sale of the Flight Simulators, due by the Company to the Secured Parties.

3.4.1.    While this Agreement is in force, the Power of Attorney shall be renewed annually by the Company at least with thirty (30) days prior to its expiration date.

3.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação dos Simuladores de Voo, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

3.3.    Com relação à Cláusula 3.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Simuladores de Voo para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*.

3.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a bastante procuração, nos termos do Anexo 4 a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se limitar a, conforme disposto na Cláusula 3.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Simuladores de Voo, devidos pela Companhia às Partes Garantidas.

3.4.1.    Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

14

3.5.    For the purposes of the enforcement and/or execution of the fiduciary transfer created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, judicially or extrajudicially.

3.5.    Para os propósitos da excussão e/ou da execução da alienação fiduciária constituída nos termos deste Contrato, fica acordado entre as Partes que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

## SECTION 4 - REPRESENTATIONS AND WARRANTIES

## CLÁUSULA 4 – DECLARAÇÕES E GARANTIAS

4.1.    The Brazilian Collateral Agent hereby represents and warrants that:

4.1.    O Agente de Garantia Brasileiro neste ato declara e garante que:

(a)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Flight Simulators fiduciary transfer agreement, as described herein; and

(a)    possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária dos Simuladores de Voo conforme aqui descrito; e

(b)    has taken all appropriate steps to authorize the execution and performance of this Agreement.

(b)    tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

4.2.    The Company hereby represents and warrants that:

4.2.    A Companhia neste ato declara e garante que:

(a)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Flight Simulators fiduciary transfer agreement, as described herein;

(a)    possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária dos Simuladores de Voo conforme aqui descrito;

15

| | | | |
|---|---|---|---|
| (b) | has taken all necessary steps to authorize the execution and performance of this Agreement; | (b) | tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato; |
| (c) | this Agreement constitutes a legal, valid and enforceable obligation against the Company, in accordance with its terms; | (c) | o presente Contrato constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos; |
| (d) | the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the fiduciary transfer of the Flight Simulators herein created; | (d) | a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela alienação fiduciária dos Simuladores de Voo aqui constituída; |
| (e) | it is the lawful and exclusive owner of the Flight Simulators; | (e) | é a legítima e exclusiva proprietária e possuidora dos Simuladores de Voo; |
| (f) | annually renew the Power of Attorney (as defined below) granted under Section 3.4 of this Agreement, with at least thirty (30) days prior to its expiration date, substantially in form of the <u>Exhibit III</u> hereto; | (f) | renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 3.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do <u>Anexo III</u> deste Contrato; |
| (g) | except for this fiduciary transfer, the Flight Simulators are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the | (g) | exceto pela presente alienação fiduciária, os Simuladores de Voo estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que |

16

fiduciary transfer, pledge or sale of the Flight Simulators in the Company's by-laws or in any other document; and, in the event of enforcement or execution of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(h)    the records, history and other materials described in Clause 2.1, item (o) above are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Flight Simulators, according to Clause 3.1 above; and

(i)    shall maintain the necessary controls to ensure that the flight simulators to be deposited at the Locations are subject to the Company's quality inspection procedures required by law.

4.3.    The representations and warranties provided by the Parties shall survive after the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

## SECTION 5 - AGREEMENT REGISTRATION

5.1.    The Company shall, within twenty (20) days from this date or from the date of signature of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or its amendments, duly registered with the

---

inexistem restrições para a alienação fiduciária, penhor ou venda dos Simuladores de Voo no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(h)    os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o) acima são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, dos Simuladores de Voo, conforme Cláusula 3.1 acima; e

(i)    manterá os controles necessários para garantir que simuladores de voo a serem depositadas nas Localidades estejam sujeitas aos procedimentos de inspeção de qualidade da Companhia requeridos por lei.

4.3.    As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

## CLÁUSULA 5 – REGISTRO DO CONTRATO

5.1.    A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou seus aditamentos, devidamente registrados nos

17

Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to perform all acts necessary to make such registrations, at its own expense.

Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

### SECTION 6 - EXPENSES

### CLÁUSULA 6 – DESPESAS

6.1.    All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Flight Simulators, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Clause if the Company does not timely perform the transfer of the amounts mentioned herein.

6.1.    Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Simuladores de Voo, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.2.    The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the provision of collateral agent services dated November 30, 2020.

6.2.    A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura e da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.3.    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless he receives instructions

6.3.    O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos

provided by the Trustee, as well as indemnity or guarantee to his satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

## SECTION 7 - BRAZILIAN COLLATERAL AGENT

## CLÁUSULA 7 – AGENTE DE GARANTIA BRASILEIRO

7.1    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.1.    O Agente de Garantia Brasileiro foi nomeado, de acordo com os termos da Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or

7.2.    O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra

19

act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is

comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLAI e/ou o Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a

20

delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent (including the Valuation Report) and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro (incluindo o Relatório de Avaliação) e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3     The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, declaration, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him

7.3.     O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na

verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este

22

Transaction Document) and such responsibility shall be in charge exclusively of the Company.

7.6    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian reais, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil ("ROF"), as applicable; and (c) will not undertake to perform any foreign

Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer

23

exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Clause. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

7.7     The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.8     In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.9     The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future

operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7.     O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.     Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.     O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato

24

law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Clause 7.10.

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11    Any and all payments by Gol Finance, the Company and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol

7.11.    Todos e quaisquer pagamentos pela Gol Finance, pela Companhia e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos

25

Finance, the Company and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Companhia e/ou o GLAI, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação à Oferta.

7.13    For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.13.    Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14    Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Company. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days

7.14.    Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado

26

after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor.

pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

## SECTION 8 - MISCELLANEOUS

## CLÁUSULA 8 – DISPOSIÇÕES GERAIS

8.1    Definitions. The capitalized words used in this Agreement and its Exhibits and not otherwise defined herein shall have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1.    Definições. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1  For purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or holiday in Brazil, or that day on which commercial banks in the cities of Rio de Janeiro and São Paulo are authorized by law to close.

8.1.1.  Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados por lei a fechar.

27

8.2    Amendments. This Agreement may not be modified or altered, except by written instrument signed by the Parties.

8.3    Severability. If any term, clause, covenant or condition of this Agreement is held invalid, null or unenforceable by court decision, the remaining terms shall remain in full force and effect, thus not being affected, impaired or invalidated and the Parties, as the case may be, will use their best efforts to agree on an alternative legal and feasible method to achieve the original intended result.

8.4    Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.1    When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Flight Simulators from any encumbrance which is still in force in accordance with the provisions herein.

8.5    Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this

8.2.    Alterações. Este Contrato não poderá ser modificado ou alterado, salvo mediante instrumento escrito e assinado pelas Partes.

8.3.    Independência das Cláusulas. Caso qualquer termo, cláusula, avença ou condição deste Contrato venha a ser considerado inválido, nulo ou inexequível por decisão judicial, os termos restantes deverão continuar em pleno vigor e efeito, não sendo, assim, afetados, prejudicados ou invalidados e as Partes, conforme o caso, envidarão seus melhores esforços para acordar um método alternativo legal e exequível para atingir o resultado original pretendido.

8.4.    Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1.    Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação dos Simuladores de Voo de qualquer gravame que ainda esteja em vigor de acordo com o aqui disposto.

8.5.    Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este

28

Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

8.6    Guarantees. The fiduciary guarantee provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.7    Notifications. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

(a)    If to the Company:
       Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip 04626-020
       São Paulo - SP, Brasil
       Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(b)    If to the Brazilian Collateral Agent:
       Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil Att: Danilo Oliveira / Karla Fernandes

Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.    Garantias. A garantia fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.    Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

(a)    Se para a Companhia:
       Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
       São Paulo - SP, Brasil
       Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(b)    Se para o Agente de Garantia Brasileiro:
       Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
       Att: Danilo Oliveira / Karla

29

danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

Fernandes

danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

(c)     If to GLAI:

Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020

São Paulo - SP, BrasilAttn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(c)     Se para a GLAI:

Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020

São Paulo - SP, Brasil

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1   Any notification or other communication made under this Agreement will be deemed valid and delivered on the Business Day following the respective receipt, according to the protocol signed by the addressee or notice of receipt, as the case may be.

8.7.1.   Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8     Specific Performance and Compliance. For the purposes of this Agreement, all obligations undertaken by the Company under this Agreement shall be valid, effective and enforceable, and in case of non-timely performance of such obligations, the Brazilian Collateral Agent, acting in accordance with the instructions of the Trustee, may bring appropriate judicial proceedings seeking specific performance of such obligations, according to the appropriate procedures established in Law 13,105, of March 13, 2015 ("Code of Civil Procedure"), which include, but are not limited to, legal remedies available in articles 497, 501 and 815 of the Code of Civil Procedure.

8.8.     Tutela Específica e Cumprimento. Para os fins deste Contrato, todas as obrigações assumidas pela Companhia sob este Contrato, serão válidas, eficazes e exequíveis, sendo que em caso de não cumprimento tempestivo dessas obrigações, o Agente de Garantia Brasileiro, agindo de acordo com as instruções do Trustee, poderá iniciar processo judicial adequado buscando tutela específica de tais obrigações, conforme os procedimentos apropriados estabelecidos na Lei 13.105, de 13 de março de 2015 ("Código de Processo Civil"), que incluem, mas não se limitam a, remédios jurídicos disponíveis nos artigos 497, 501 e 815 do Código de Processo Civil.

8.9     Governing Law. This Agreement shall be governed and construed in accordance with the laws of the Federative Republic of Brazil, and the specific performance of the positive and negative

8.9.     Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil, sendo permitida a tutela específica das obrigações de fazer e de não fazer aqui pactuadas.

30

covenants agreed upon herein is permitted.

8.9.1   In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument that may be the subject to the enforcement proceedings under article 784, item III of the Code of Civil Procedure.

8.10   Jurisdiction. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

8.11   Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12.   Language. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13.   Electronic   Signature.   This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian   Public   Key   Infrastructure (*Infraestrutura   de   Chaves   Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness

8.9.1.   Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.   Foro.   Quaisquer   disputas   ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.   Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições do da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis.

8.12.   Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13.   Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma   irrevogável   e   irretratável,   a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14.   This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

8.14.   Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

In witness whereof, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

E por estarem assim justas e contratadas, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, [●]  [●]  20[●].

São Paulo, [●] de [●] de 20[●].

*(The remainder of the page intentionally left blank)*

*(O restante da página intencionalmente deixado em branco)*

| | |
|---|---|
| (*Signature page 1/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020)* | (*Página de assinatura 1/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020)* |

**GOL LINHAS AÉREAS S.A.,**

_____    _____

*Name*/Nome:                          *Name*/Nome:
*Title*/Cargo:                          *Title*/Cargo:

33

| | |
|---|---|
| (*Signature page 2/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020)* | (*Página de assinatura 2/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020*) |

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**


_____        _____
*Name*/Nome:                          *Name*/Nome:
*Title*/Cargo:                         *Title*/Cargo:

34

(*Signature page 3/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020*)

(*Página de assinatura 3/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020*)

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

35

(*Signature page 4/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020*)

(*Página de assinatura 4/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020*)

**WITNESSES/TESTEMUNHAS**

_____

Name/Nome:

Tax ID /CPF:

ID/RG:

_____

Name/Nome:

Tax ID /CPF:

ID/RG:

36

| | |
|---|---|
| **EXHIBIT 1** | **ANEXO 1** |
| **DESCRIPTION OF FLIGHT SIMULATORS AND LOCATIONS ON [●] [●] 2020** | **DESCRIÇÃO DOS SIMULADORES DE VOO E LOCALIDADES EM [●] DE [●] DE 2020** |
| [ATTACHED LIST] | [LISTA ANEXA] |

| | |
|---|---|
| **EXHIBIT 2**<br>**DESCRIPTION OF THE SECURED OBLIGATIONS** | **ANEXO 2**<br>**DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |

**GOL FINANCE NOTES**

**NOTAS GOL FINANCE**

<u>Principal Amount</u>: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

<u>Valor Principal</u>: US$ 200.000.000,00 (duzentos milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

<u>Maturity Date</u>: June 30, 2026;

<u>Data de Vencimento</u>: 23 de junho de 2026;

<u>Interest Rate</u>: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

<u>Taxa de Juros</u>: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura;

<u>Default interest</u>: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to the Notes;

<u>Juros de Mora</u>: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas;

<u>Penalty Clause:</u> not applicable;

<u>Cláusula Penal</u>: não aplicável;

<u>Inflation Adjustment Index</u>: not applicable;

<u>Índice de Atualização Monetária</u>: não aplicável;

<u>Other Commissions and Charges</u>: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

<u>Demais Comissões e Encargos</u>: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura.

1

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO**

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

**EXHIBIT 3**
**FORM OF AMENDMENT TO THE FLIGHT SIMULATORS FIDUCIARY TRANSFER AGREEMENT**

**ANEXO 3**
**MODELO DE ADITAMENTO À ALIENAÇÃO FIDUCIÁRIA DE SIMULADORES DE VOO**

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

(a)    **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(a)    **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

(b)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

**(c)**     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors"),

**(c)**     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI" e, juntamente com a Companhia, as "Garantidoras").

## WHEREAS:

## CONSIDERANDO QUE:

(i)     on [●] [●] 2020, the Company, the Brazilian Collateral Agent and GLAI entered into a Flight Simulators Fiduciary Transfer Agreement ("Fiduciary Transfer Agreement"), pursuant to which the Company assigned all the Flight Simulators (as defined in the Fiduciary Transfer Agreement) on a fiduciary basis, to the Secured Parties, as collateral for the Secured Obligations;

(i)     em [●] de [●] de 2020, a Companhia, o Agente de Garantia Brasileiro e GLAI celebraram Instrumento Particular de Alienação Fiduciária de Simuladores de Voo ("Contrato de Alienação Fiduciária"), nos termos do qual a Companhia deu todas os Simuladores de Voo (conforme definido no Contrato de Alienação Fiduciária), em alienação fiduciária, às Partes Garantidas, como garantia das Obrigações Garantidas;

(ii)     the Parties hereby agree to amend the Fiduciary Transfer Agreement for the purpose of amending [the list of the Flight Simulators] {or} [list of Locations] {or} [the Market Value of the Flight Simulators] (as defined in the Fiduciary Transfer Agreement) delivered

(ii)     as Partes neste ato concordam em aditar o Contrato de Alienação Fiduciária com o objetivo de alterar [a lista de Simuladores de Voo] {ou} [lista de Localidades] {ou} [o Valor de Mercado dos Simuladores de Voo] (conforme definido no Contrato de Alienação Fiduciária) entregues em alienação fiduciária,

on a fiduciary basis, pursuant to Clause 1 of the Fiduciary Transfer Agreement.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "Flight Simulators Fiduciary Transfer Agreement" ("Agreement"), according to the following clauses:

## I.   DEFINITIONS

1.1.    For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Fiduciary Transfer Agreement.

## II.   AMENDMENT

2.1.    The Parties expressly agree to the [replacement of Exhibit 1 previously attached to the Fiduciary Transfer Agreement with the new Exhibit 1, attached to this Amendment as Exhibit 1, for the purpose of updating the list of [Flight Simulators [*and*] Locations]] {*or*} [update of clause 1.7 of the Fiduciary Transfer Agreement to reflect the new valuation report prepared pursuant to the Fiduciary Transfer Agreement [and the adjusted Market Value of the Flight Simulators]].

## III.   MISCELLANEOUS

3.1.    Registration of this Amendment. The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the of the cities where the headquarters of each Party is located.

---

nos termos da Cláusula 1 do Contrato de Alienação Fiduciária.

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "Aditivo à Alienação Fiduciária de Simuladores de Voo" ("Aditivo"), que será regido pelas seguintes cláusulas:

## I.   DAS DEFINIÇÕES

1.1.    Para fins deste Aditivo, todos os termos iniciados em letras maiúsculas, não definidos neste Aditivo, têm o significado a eles atribuídos no Contrato de Alienação Fiduciária.

## II.   DO ADITAMENTO

2.1.    As Partes expressamente acordam com a [substituição do Anexo 1 anteriormente anexado ao Contrato de Alienação Fiduciária pelo novo Anexo 1, anexo ao presente Aditivo como Anexo 1, com o objetivo de atualizar a lista de [Simuladores de Voo *[e]* Localidades]] {*ou*} [atualização da cláusula 1.7 do Contrato de Alienação Fiduciária para refletir o novo relatório de avaliação preparado conforme no Contrato de Alienação Fiduciária [e o Valor de Mercado dos Simuladores de Voo atualizado]].

## III.   DISPOSIÇÕES GERAIS

3.1.    Registro do Presente Aditivo. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro que este presente Aditivo foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes.

3.2.   Representations and Warranties. The Company hereby represents and warrants that:

(a)   has full powers, authorization and capacity to enter into this Amendment, comply with its contractual obligations and [enter into fiduciary transfer of the Flight Simulators described in Exhibit 1];

(b)   has taken all necessary measures to authorize the execution and performance of this Amendment;

(c)   this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(d)   the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets[, except for the fiduciary transfer of the Flight Simulators herein created];

(e)   [is the lawful and exclusive owner of the Flight Simulators described in Exhibit 1;]

(f)   except for the fiduciary transfer of

3.2.   Declarações e Garantias. A Companhia neste ato declara e garante que:

(a)   possui plenos poderes, autorização e capacidade de firmar o presente Aditivo, cumprir com suas obrigações contratuais e [celebrar a alienação fiduciária dos Simuladores de Voo descritas no Anexo 1];

(b)   tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditivo;

(c)   o presente Aditivo constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d)   a celebração do presente Aditivo e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos[, exceto pela alienação fiduciária dos Simuladores de Voo aqui constituída];

(e)   [é a legítima e exclusiva proprietária e possuidora dos Simuladores de Voo descritas no Anexo 1;]

(f)   exceto pela alienação fiduciária do

- 6 -

the Fiduciary Transfer Agreement, the Flight Simulators are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, pledge or sale of the Flight Simulators in the Company's by-laws or any other document; and, in the event of enforcement or execution of this Amendment and the Fiduciary Transfer Agreement, their terms and conditions shall prevail over the terms and conditions of any other document;

(g)    the records, history and other materials described in Clause 2.1, item (o) of the Fiduciary Transfer Agreement are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Flight Simulators, pursuant to Clause 3.1 of the Fiduciary Transfer Agreement; and

(h)    shall maintain the necessary controls to ensure that the flight simulators and related parts to be deposited at the Locations are subject to the Company's quality inspection procedures required by law.

3.3    <u>Other Terms and Conditions.</u> All the terms and conditions of the Fiduciary Transfer Agreement not expressly altered or modified by this Amendment are hereby and from hereof date fully ratified by the Parties and shall remain in full force and effect, as provided for in the Fiduciary Transfer Agreement.

---

Contrato de Alienação Fiduciária, os Simuladores de Voo estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda dos Simuladores de Voo no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Aditivo e do Contrato de Alienação Fiduciária, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(g)    os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o), do Contrato de Alienação Fiduciária são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, dos Simuladores de Voo, conforme Cláusula 3.1 do Contrato de Alienação Fiduciária; e

(h)    manterá os controles necessários para garantir que os simuladores de voo e respectivas peças a serem depositados nas Localidades estejam sujeitas aos procedimentos de inspeção de qualidade da Companhia requeridos por lei.

3.3.    <u>Outros Termos e Condições</u>. Todos os termos e condições do Contrato de Alienação Fiduciária não expressamente alterados ou modificados por este Aditivo estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato de Alienação Fiduciária.

3.4      Governing Law. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.5      Dispute Resolution. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

In witness whereof, the Parties have executed this Amendment in five (5) counterparts of identical content and form, in the presence of the two (2) undersigned witnesses.

São Paulo, [●] [●] [●].


**[Signature page]**
**[ page break ]**
[ Exhibit 1]

3.4.     Lei de Regência. O presente Aditivo será regido e interpretado de acordo com as leis do Brasil.

3.5.     Solução de Controvérsias. Quaisquer disputas ou controvérsias oriundas do presente aditivo serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

E por estarem assim justas e contratadas, as Partes firmam o presente Aditivo em 5 (cinco) vias de igual teor e forma, na presença das 2 (duas) testemunhas abaixo assinadas.

São Paulo, [●] de [●] de [●].


**[página de assinaturas]**
**[quebra de página]**
[Anexo 1]

| | |
|---|---|
| **EXHIBIT 4**<br>**FORM OF POWER OF ATTORNEY** | **ANEXO 4**<br>**MODELO DE PROCURAÇÃO** |
| **POWER OF ATTORNEY** | **PROCURAÇÃO** |

By this power of attorney, **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, headquartered at Senador Salgado Filho Square, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the city of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Flight Simulators Fiduciary Transfer Agreement entered into on [●] [●] 2020 between the GRANTOR, the GRANTEE and Gol Linhas Aéreas Inteligentes S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.,** sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no CNPJ/ME sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.,** sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado em [●] de [●] de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1. practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

1. praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

(a) dispose of, collect, receive, appropriate, transfer and/or enforce the Flight Simulators (or any components thereof) or otherwise dispose of, and deliver the Flight Simulators (or any components thereof) under the Agreement and as established in article 1,364 of the Civil Code, and apply the product thus received to the payment of the Secured Obligations under the Agreement;

(a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Simuladores de Voo (ou quaisquer de suas partes) ou dispor de qualquer outro modo e entregar os Simuladores de Voo (ou qualquer de suas partes) nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

(b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Flight Simulators and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Flight Simulators and represent the GRANTOR before third parties for the purpose of releasing the fiduciary transfer, disposal of the Flight Simulators and transfer of the funds resulting from such disposal;

(a) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Simuladores de Voo e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com relação aos Simuladores de Voo e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação dos Simuladores de Voo e transferência dos recursos resultantes de tal alienação;

2. sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

2.assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades

municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, ANAC, the Brazilian Aeronautical Registry, the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos competentes, a ANAC, o Registro Aeronáutico Brasileiro, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Flight Simulators, represent the GRANTOR before any competent Registry Office of Deeds and Documents in which the Agreement or its respective amendments shall be registered;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação aos Simuladores de Voo, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5. agree or settle any insurance policy or demand involving the Flight Simulators in case of any loss under the terms of such policy and approve any premium/claim paid due to conviction or similar procedure affecting the Flight Simulators;

5. ajustar ou liquidar qualquer apólice de seguro ou demanda envolvendo os Simuladores de Voo caso haja qualquer perda nos termos de tal apólice e aprovar qualquer prêmio/sinistro pago em razão de condenação ou procedimento similar afetando os Simuladores de Voo;

6. enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of

6. celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco

- 11 -

Brazil to make the remittances to the Trustee, as provided for in the Agreement; and

Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

7. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

7. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement.

Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato.

Rio de Janeiro, [●]  [●]  [●].

Rio de Janeiro, [●] de [●] de [●].

**GOL LINHAS AÉREAS S.A.**
[SIGNATURE]

**GOL LINHAS AÉREAS S.A.**
[ASSINATURA]

**EXHIBIT L**

FORM OF FLIGHT SIMULATOR FIDUCIARY TRANSFER

#93484727v11

| FLIGHT SIMULATORS FIDUCIARY TRANSFER AGREEMENT | INSTRUMENTO PARTICULAR DE ALIENAÇÃO FIDUCIÁRIA DE SIMULADORES DE VOO |
|---|---|

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

(a)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(a)     **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

(b)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

1

(c) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI");

Each party above will be also hereinafter referred to as "Party" and collectively as "Parties";

**WHEREAS:**

(i) Gol Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg ("Gol Finance") issued senior debt securities at interest of 8.00% and maturity in 2026 ("Notes"), according to the terms and conditions set forth in the indenture under which the Gol Finance Notes were issued ("Indenture") and as described in the private placement memorandum related to the Notes offering ("Offering");

(ii) the Brazilian Collateral Agent has been duly appointed by the Noteholders and the other secured parties described in the Indenture ("Secured Parties") as the collateral agent in Brazil pursuant to the Indenture to perform acts on behalf

---

(c) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI");

Cada parte acima também referida como "Parte" e, em conjunto, "Partes";

**CONSIDERANDO QUE:**

(i) a Gol Finance, , sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas"), nos termos e condições previstos na escritura por meio da qual as Notas Gol Finance foram emitidas ("Escritura") e conforme descrito no memorando de colocação privada relacionado à oferta das Notas ("Oferta");

(ii) o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura ("Partes Garantidas") como agente de garantia no Brasil nos termos da Escritura para

2

of and for the benefit of the Secured Parties in connection with the collateral created by means of this Agreement, as permitted by the terms set forth in the Indenture, in accordance exclusively and strictly with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms set forth in the Indenture and this Agreement;

praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii) in order to ensure compliance with all obligations undertaken by Gol Finance, subject to the terms and conditions of the Indenture, each of the Guarantors provided a personal guarantee under the Indenture ("Personal Guarantees");

(iii) a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, cada uma das Garantidoras prestou garantia pessoal nos termos das Escritura ("Garantias Fidejussórias");

(iv) The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent; and

(iv) A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o Trustee, na qualidade de representante das Partes Garantidas e do Agente de Garantia Brasileiro; e

(v) in order to guarantee compliance with all obligations undertaken by Gol Finance under the terms and

(V) a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e

3

conditions of the Indenture and by the Guarantors under the Personal Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Flight Simulators (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Flight Simulators,

**NOW, THEREFORE,** the Company, the Brazilian Collateral Agent and GLAI, hereby and pursuant to law agree to enter into this "Flight Simulators Fiduciary Transfer Agreement" ("Agreement"), according to the following clauses:

### SECTION 1 - PURPOSE

1.1.    In accordance with the provisions herein, in order to guarantee (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Personal Guarantees; (c) the faithful and timely compliance by Gol Finance and the Guarantors with all contracts, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the said instruments (jointly, the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the

condições da Escritura e pelos Garantidores no âmbito das Garantias Fidejussórias, a Companhia concordou em conceder às Partes Garantidas, representadas no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre os Simuladores de Voo (conforme definido abaixo), mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todos os Simuladores de Voo,

**RESOLVEM** a Companhia, o Agente de Garantia Brasileiro e a GLAI, neste ato e na melhor forma de direito, celebrar o presente "Instrumento Particular de Alienação Fiduciária de Simuladores de Voo" ("Contrato"), que será regido pelas seguintes cláusulas:

### CLÁUSULA 1 – OBJETO DO CONTRATO

1.1.    De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias Fidejussórias; (c) o fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos, obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos

4

faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents relating to the Flight Simulators; and (e) the faithful and timely payment of all other amounts due from time to time by Gol Finance, the Company and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents relating to the Flight Simulators (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "Secured Obligations"), the Company hereby assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional ownership of all the flight simulators, owned by the Company, as individually identified or to be identified in Exhibit 1 to this Agreement, including any and all parts linked or belonging to them ("Flight Simulators"). This fiduciary transfer is created in accordance with article 1,361 *et seq.* of Law No. 10,406, of January 10, 2002, as amended ("Civil Code").

da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação relativos aos Simuladores de Voo; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela Companhia e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação relativos aos Simuladores de Voo (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), a Companhia neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a propriedade resolúvel de todos os simuladores de voo, de propriedade da Companhia, conforme individualmente identificadas ou a serem identificadas no Anexo 1 deste Contrato, bem como todas e quaisquer peças a estes vinculadas ou pertencentes ("Simuladores de Voo"). A presente alienação fiduciária é constituída de acordo com o artigo 1.361 e seguintes da Lei n° 10.406, de 10 de janeiro de 2002, conforme alterada ("Código Civil").

1.2.     As a result of the transfer by the Company of the conditional ownership on the Flight Simulators to the Secured Parties, represented by the Brazilian Collateral Agent, carried out under the terms of the applicable legislation, the Secured Parties, represented by the Brazilian Collateral Agent, become the exclusive owners of the conditional ownership and indirect owners of the Flight Simulators, until full compliance with the Secured Obligations, subject to the terms of Clause 1.7 below.

1.2.     Em decorrência da transferência, pela Companhia, da propriedade resolúvel sobre os Simuladores de Voo para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, realizada nos termos da legislação aplicável, as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, passam a ser as exclusivas titulares da propriedade resolúvel e possuidoras indiretas dos Simuladores de Voo, até o cumprimento integral das Obrigações Garantidas, observados os termos da Cláusula 1.7 abaixo.

1.3.    The Secured Obligations include all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all present and future principal and ancillary payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, within the scope of, or in relation to the Offering or the Indenture.

1.3.1.    For the purposes of Article 1,362 of the Civil Code, the main conditions and characteristics of the Secured Obligations are those described in Exhibit 2 to this Agreement.

1.4.    By signing this Agreement and complying with the formalities set forth in Clause 5 below, the fiduciary transfer shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, and the Company shall become the holder of direct possession of the Flight Simulators and the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, shall become the holder of indirect possession of the Flight Simulators, subject to the terms and conditions of this Agreement.

1.5.    Except as provided for in Section 1.7 below, the Flight Simulators shall always be kept in the Locations (as defined below). Should the Company need to alter the Location (as defined below) of a Flight Simulator or acquire new Flight Simulators, then immediately prior to on the date that such Location is changed or such new Flight Simulator is acquired , the Parties undertake to update Exhibit 1 to this Agreement, through the execution of an amendment to this Agreement under the form in Exhibit 3 thereto, in order to update (a) the Locations (as defined below) and/or (b) update and

1.3.    As Obrigações Garantidas incluem todas as obrigações assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.1.    Para fins do artigo 1.362 do Código Civil, as principais condições e características das Obrigações Garantidas são aquelas descritas no Anexo 2 ao presente Contrato.

1.4.    Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 5 abaixo, estará constituída a alienação fiduciária em nome e benefício das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, e a Companhia tornar-se-á detentora da posse direta dos Simuladores de Voo e o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, tornar-se-á detentor da posse indireta dos Simuladores de Voo, nos termos e condições acordados neste Contrato.

1.5.    Exceto conforme previsto na Cláusula 1.7 abaixo, os Simuladores de Voo deverão sempre ser mantidos nas Localidades (conforme abaixo definido). Caso a Companhia necessite alterar uma Localidade (conforme abaixo definido) ou adquira novos Simuladores de Voo, então imediatamente antes ou na data em que a Localidade for alterada ou o novo Simulador de Voo for adquirido, as Partes comprometem-se a atualizar o Anexo 1 a este Contrato, mediante a celebração de um aditivo a este Contrato conforme modelo constante do Anexo 3, a fim de atualizar (a) as Localidades (conforme

6

include all new Flight Simulators which will become subject to the fiduciary transfer created herein. The base date of Exhibit 1 to this Agreement is [●] [●] 2020.

1.6.    [According to the report of [●] [●] 2020, prepared by [●] ("Independent Appraiser"), an independent consulting and property valuation firm in the aviation industry, the estimated fair market value of the Flight Simulators, at [●] 2020, is USD [●] ([●]dollar) ("Fair Market Value of Flight Simulators").

1.6.1.    As provided for in the Indenture, Gol Finance undertakes to provide to the Brazilian Collateral Agent and the Trustee until [●] ([●]) Business Day of each month of [●] and [●] of each year, as of [●] 2020, a certificate issued by the Independent Appraiser that shall contain its opinion on the fair market value of the Flight Simulators under the fiduciary transfer created under this Clause, and such certificate shall be prepared and issued under the Indenture (each, an "Appraisal Report").]

1.7.    The Brazilian Collateral Agent, acting according to the instructions provided by the Trustee, or any third party appointed by the Secured Parties or the Trustee, may, at any time, engage a third party previously indicated by the Trustee, upon notice to the Company at least three (3) Business Days in advance, to examine the Flight Simulators, checking their conditions.

definido abaixo) e/ou (b) incluir todos os novos Simuladores de Voo, que também passarão a ser objeto da alienação fiduciária aqui constituída. A data base do Anexo 1 ao presente contrato é [●] de [●] de 2020.

1.6.    [De acordo com o relatório de [●] de [●] de 2020, elaborado pela [●] ("Avaliador Independente"), uma empresa independente de consultoria e de avaliação de bens do setor de aviação, o valor justo de mercado estimado dos Simuladores de Voo, em [●] de 2020, é de US$ [●] ([●] dólares) ("Valor de Mercado dos Simuladores de Voo").

1.6.1.    Conforme disposto na Escritura, a Gol Finance compromete-se a fornecer ao Agente de Garantia Brasileiro e ao Trustee até o [●]° ([●]) Dia Útil de todo mês de [●] e [●] de cada ano, a partir de [●] de 2020, um certificado emitido pelo Avaliador Independente que deverá conter sua opinião sobre o valor justo de mercado dos Simuladores de Voo objeto da alienação fiduciária criada nos termos desta Cláusula, devendo ser preparado e emitido nos termos da Escritura (cada um, um "Relatório de Avaliação")].

1.7.    O Agente de Garantia Brasileiro, agindo conforme as instruções fornecidas pelo Trustee, ou qualquer terceiro nomeado pelas Partes Garantidas ou pelo Trustee, poderá, a qualquer tempo, contratar terceiros previamente indicados pelo Trustee, mediante aviso à Companhia com antecedência de, ao menos, 3 (três) Dias Úteis, examinar os Simuladores de Voo, verificando suas condições.

### SECTION 2 - COMPANY'S OBLIGATIONS

### CLÁUSULA 2 – OBRIGAÇÕES DA COMPANHIA

7

2.1.    The Company undertakes to

(a)    refrain from selling, assigning, transferring, creating any charge, renting or otherwise delivering, transferring or giving up ownership of any of the Flight Simulators to any person other than the Secured Parties, represented by the Brazilian Collateral Agent, or otherwise encumbering the Flight Simulators, subject to the criminal implications provided for in article 171, items I and II, of Decree-Law no. 2,848, of December 7, 1940, as amended (Brazilian Criminal Code), except as otherwise permitted under this Agreement;

(b)    timely fulfill the obligations of this Agreement;

(c)    defend itself, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Flight Simulators assigned on a fiduciary basis, this Agreement and/or the fulfillment of the obligations undertaken under the Offering;

(d)    practice all acts, as well as sign any and all documents, necessary for the registration of the Flight Simulators fiduciary transfer agreement with the competent Registry Office of Deeds and Documents under this Agreement and the Indenture;

(e)    not perform acts with the purpose of depreciating the value of the Flight

2.1.    A Companhia obriga-se a:

(a)    abster-se de vender, ceder, transferir, criar qualquer ônus, alugar ou de qualquer outro modo entregar, transferir ou abdicar a posse de qualquer dos Simuladores de Voo a qualquer pessoa que não as Partes Garantidas, representada pelo Agente de Garantia Brasileiro, ou, de outro modo, onerar os Simuladores de Voo, sujeita às implicações criminais previstas no artigo 171, incisos I e II, do Decreto-lei n° 2.848, de 7 de dezembro de 1940, conforme alterado (Código Penal Brasileiro), exceto conforme permitido de outra maneira nos termos deste Contrato;

(b)    cumprir tempestivamente as obrigações desse Contrato;

(c)    defender, a si mesma, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Simuladores de Voo alienados fiduciariamente, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

(d)    praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro da alienação fiduciária dos Simuladores de Voo no Cartório de Registro de Títulos e Documentos competente, nos termos deste Contrato e da Escritura;

(e)    não praticar atos com o propósito de depreciar o valor dos Simuladores de

8

Simulators, except as a result of the actions allowed in this Agreement;

Voo, exceto se em decorrência das ações permitidas neste Contrato;

(f) assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any enforcement and/or sale of the Flight Simulators, and bear all related expenses or that are necessary for such purpose;

(f) auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e beneficio das Partes Garantidas, no caso de eventual excussão e/ou venda dos Simuladores de Voo, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(g) assist, allow and make its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(g) auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(h) subject to the provisions of Clauses 3.1 and 3.3 below, maintain the custody of the Flight Simulators, acting as trustee of the Flight Simulators and assuming the responsibilities inherent to their conservation, subject to the resulting civil penalties, under the Article 627 et seq. of the Civil Code;

(h) observado o disposto nas Cláusulas 3.1 e 3.3 abaixo, manter a custódia dos Simuladores de Voo, atuando como fiel depositária dos Simuladores de Voo e assumindo as responsabilidades inerentes à sua conservação, sujeitando-se às sanções civis daí decorrentes, nos termos do artigo 627 e seguintes do Código Civil;

(i) defend, at its own expense, in a timely and efficient manner, the rights of the Secured Parties, represented by the Brazilian Collateral Agent, related to the Flight Simulators, against any claims of third parties;

(i) defender, às suas próprias expensas, de uma maneira tempestiva e eficiente, os direitos das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, relativos aos Simuladores de Voo,

9

|  |  |  | contra quaisquer reivindicações de terceiros; |
| (j) | comply with all clauses set forth in the Indenture; | (j) | cumprir com todas as cláusulas previstas na Escritura; |
| (k) | notify the Brazilian Collateral Agent of any event resulting in violation of this Agreement or the Indenture or in inaccuracy of any statements made under this Agreement within two (2) Business Days of its occurrence; | (k) | notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência; |
| (l) | maintain the necessary qualifications of the Flight Simulators before the National Civil Aviation Agency ("ANAC"), and pay any and all taxes and fees related thereto, including, without limitation, the *Taxa de Fiscalização da Aviação Civil – TFAC*; | (l) | manter os Simuladores de Voo com a qualificação da Agência Nacional de Aviação Civil ("ANAC") válida, mantendo em dia o pagamento de todas as taxas aplicáveis, incluindo, mas não se limitando à Taxa de Fiscalização da Aviação Civil – TFAC; |

*Maintenance*

*Manutenção*

|  |  |  |  |
| (m) | keep all Flight Simulators covered by insurance, at all times, against physical damages, including risks insured by extended coverage, as it is prudent and usually practiced by companies of the same or similar size, in the same or similar business, operating predominantly in Brazil, subject to the other criteria established in the Indenture; | (m) | manter todos os Simuladores de Voo cobertos por seguro, em todos os momentos, contra danos físicos, inclusive riscos segurados por cobertura estendida, conforme for prudente e usualmente praticado pelas empresas do mesmo porte ou de porte similar, na mesma atividade ou em atividade similar, que operem predominantemente no Brasil, respeitados os demais critérios estabelecidos na Escritura; |
| (n) | maintain, or cause to maintain, at all times, the Flight Simulators in accordance with all applicable regulations, including those of ANAC, as well as accomplish any modifications, alterations, replacements and/or additions that | (n) | manter, ou fazer com que se mantenham, em todos os momentos, os Simuladores de Voo de acordo com toda a regulação aplicável, incluindo aquelas emanadas da ANAC, bem como realizar quaisquer modificações, alterações, |

10

may be necessary, and shall use, or cause to be used, the same form and the same standard of maintenance with respect to each model of flight simulators included in this Agreement as are used for the same model of flight simulators that are owned by the Company and that are not included in this Agreement;

substituições e/ou adições que venham a ser necessárias, devendo utilizar, ou fazer com que sejam utilizadas, a mesma forma e o mesmo padrão de manutenção com respeito a cada modelo de simuladores de voo incluída nesse Contrato conforme são utilizados para o mesmo modelo de simuladores de voo que sejam de propriedade da Companhia e que não estejam incluídas nesse Contrato;

(o) if applicable, maintain, or cause to be maintained, all records, histories and other materials required by ANAC or any other applicable aviation authority or any other governmental authority to be maintained with respect to Flight Simulators and not modify its procedures for recording the custody of Flight Simulators if such modification materially diminishes the value of the Flight Simulators as a whole;

(o) conforme seja aplicável, manter, ou fazer com que se mantenham, todos os registros, históricos e outros materiais requeridos pela ANAC ou qualquer outra autoridade de aviação aplicável ou qualquer outra autoridade governamental a serem mantidos em relação aos Simuladores de Voo e não modificar seus procedimentos de registro da custódia dos Simuladores de Voo se tal modificação diminuir materialmente o valor dos Simuladores de Voo, consideradas como um todo;

(p) maintain, or cause to be maintained, Flight Simulators in good working order and perform necessary maintenance; and

(p) manter, ou fazer com que se mantenham, os Simuladores de Voo em boas condições de funcionamento e realizar as manutenções que se façam necessárias; e

*Locations*

*Localidades*

(q) keep Flight Simulators at one or more locations indicated in Exhibit 1 to this Agreement ("Locations"), unless otherwise permitted in this Agreement.

(q) manter os Simuladores de Voo em uma ou mais localidades indicadas no Anexo 1 a este Contrato ("Localidades"), exceto se de outro modo permitido neste Contrato.

2.2. As fully detailed in Clause 2.1 above, the Company is fully responsible for the

2.2. Conforme plenamente detalhado na Cláusula 2.1 acima, a Companhia é

11

registration and custody of the Flight Simulators and for their undue or improper use, as well as for any and all costs, indemnities or expenses resulting from personal and/or material damages caused to third parties, and it also undertakes to take all necessary measures to preserve the integrity of the Flight Simulators. The Company shall be solely and exclusively responsible for any damage caused to the Flight Simulators.

2.2.1.    The Company is also responsible for the payment of any and all fines, fees, taxes, licensing expenses and other costs arising from the Flight Simulators.

2.3.    The Company confirms that (a) it has no objection to the Offering; and (b) the Offering and any enforcement, at any time, of the Flight Simulators shall not violate, infringe, contravene, conflict or constitute a default within the scope of (i) any contract to which the Company is a party, (ii) any applicable legislation; (iii) any Company policy or regulation; or (iv) any of the Company organizational documents.

2.4.    Except as otherwise authorized under this Agreement or with the approval of the Brazilian Collateral Agent, in accordance exclusively and strictly with the instructions provided by the Trustee, the Company and GLAI undertake not to acquire (and to cause its affiliates not to acquire) flight simulators (of the same type as the Flight Simulators) used or to be used in the Company's and GLAI's operations through a company, other than the Company itself.

integralmente responsável pelo registro e pela custódia dos Simuladores de Voo e por seu uso indevido ou impróprio, bem como por todos e quaisquer custos, indenizações ou despesas decorrentes de danos pessoais e/ou materiais causados a terceiros, obrigando-se, ainda, a adotar todas as providências necessárias à preservação da integridade dos Simuladores de Voo. A Companhia será a única e exclusiva responsável por quaisquer danos causados aos Simuladores de Voo.

2.2.1.    A Companhia é responsável, ainda, pelo pagamento de todas e quaisquer multas, taxas, tributos, despesas de licenciamento e outros custos decorrentes dos Simuladores de Voo.

2.3.    A Companhia confirma que (a) não possui qualquer objeção à Oferta; e (b) a Oferta e qualquer excussão, a qualquer tempo, dos Simuladores de Voo não violarão, infringirão, contravirão, conflitarão ou constituirão um inadimplemento no âmbito (i) de qualquer contrato do qual a Companhia seja parte, (ii) de qualquer legislação aplicável; (iii) de qualquer política ou regulamento da Companhia; ou (iv) de qualquer um dos documentos constitutivos da Companhia.

2.4.    Exceto se de outra forma autorizado nos termos deste Contrato ou mediante aprovação do Agente de Garantia Brasileiro, de acordo, exclusiva e estritamente, com as instruções fornecidas pelo *Trustee*, a Companhia e a GLAI se obrigam a não adquirir (e a fazer com que suas afiliadas não adquiram) simuladores de voos (do mesmo tipo dos Simuladores de Voo) usadas ou a serem usadas nas operações da Companhia e da GLAI por meio de outra sociedade que não seja a própria Companhia.

**SECTION 3 - ENFORCEMENT**

**CLÁUSULA 3 – EXCUSSÃO**

12

3.1.    In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, without prejudice to any other security granted and provided under the Offering, exercise all powers related to the Flight Simulators and the fiduciary transfer created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Flight Simulators (provided that, exclusively in the case of extrajudicial sale, provided that according to the highest value between (a) at least fifty percent (50%) of the Market Value of the Flight Simulators, as updated under the Clause 1.6.1 above and (b) any other price, terms and market conditions at the time of disposal); give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the enforcement or execution, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Flight Simulators, and the Brazilian Collateral Agent shall deliver to the Company the remaining balance, if any, following, in any case, the provisions of the Indenture.

3.1.    Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, exercer todos os poderes relativos aos Simuladores de Voos e à alienação fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Simuladores de Voo (observado que, exclusivamente no caso de venda extrajudicial, desde que de acordo com o maior valor entre (a) ao menos 50% (cinquenta por cento) do Valor de Mercado dos Simuladores de Voo, conforme atualizado nos termos da Cláusula 1.6.1 acima e (b) qualquer outro preço, termos e condições de mercado no momento da alienação); dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Simuladores de Voo, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

13

3.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf of and for the benefit of the Secured Parties, resulting from the sale of the Flight Simulators, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Indenture.

3.3.    With respect to Clause 3.1 above, in the event of enforcement or execution of this guarantee, the Company shall cause the direct possession of the Flight Simulators to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Trustee.

3.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to Exhibit 4 to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including, without limitation, as provided for in Clause 3.1 above, and in the signature of the respective exchange contracts necessary for the remittance of any and all financial funds, resulting from the sale of the Flight Simulators, due by the Company to the Secured Parties.

3.4.1.    While this Agreement is in force, the Power of Attorney shall be renewed annually by the Company at least with thirty (30) days prior to its expiration date.

3.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação dos Simuladores de Voo, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

3.3.    Com relação à Cláusula 3.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Simuladores de Voo para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*.

3.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a bastante procuração, nos termos do Anexo 4 a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se limitar a, conforme disposto na Cláusula 3.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Simuladores de Voo, devidos pela Companhia às Partes Garantidas.

3.4.1.    Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

14

3.5.    For the purposes of the enforcement and/or execution of the fiduciary transfer created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, judicially or extrajudicially.

3.5.    Para os propósitos da excussão e/ou da execução da alienação fiduciária constituída nos termos deste Contrato, fica acordado entre as Partes que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

## SECTION 4 - REPRESENTATIONS AND WARRANTIES

## CLÁUSULA 4 – DECLARAÇÕES E GARANTIAS

4.1.    The Brazilian Collateral Agent hereby represents and warrants that:

4.1.    O Agente de Garantia Brasileiro neste ato declara e garante que:

(a)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Flight Simulators fiduciary transfer agreement, as described herein; and

(a)    possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária dos Simuladores de Voo conforme aqui descrito; e

(b)    has taken all appropriate steps to authorize the execution and performance of this Agreement.

(b)    tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

4.2.    The Company hereby represents and warrants that:

4.2.    A Companhia neste ato declara e garante que:

(a)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Flight Simulators fiduciary transfer agreement, as described herein;

(a)    possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a alienação fiduciária dos Simuladores de Voo conforme aqui descrito;

15

(b)     has taken all necessary steps to authorize the execution and performance of this Agreement;

(b)     tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato;

(c)     this Agreement constitutes a legal, valid and enforceable obligation against the Company, in accordance with its terms;

(c)     o presente Contrato constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d)     the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the fiduciary transfer of the Flight Simulators herein created;

(d)     a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela alienação fiduciária dos Simuladores de Voo aqui constituída;

(e)     it is the lawful and exclusive owner of the Flight Simulators;

(e)     é a legítima e exclusiva proprietária e possuidora dos Simuladores de Voo;

(f)     annually renew the Power of Attorney (as defined below) granted under Section 3.4 of this Agreement, with at least thirty (30) days prior to its expiration date, substantially in form of the Exhibit III hereto;

(f)     renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 3.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo III deste Contrato;

(g)     except for this fiduciary transfer, the Flight Simulators are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the

(g)     exceto pela presente alienação fiduciária, os Simuladores de Voo estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que

16

fiduciary transfer, pledge or sale of the Flight Simulators in the Company's by-laws or in any other document; and, in the event of enforcement or execution of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(h)     the records, history and other materials described in Clause 2.1, item (o) above are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Flight Simulators, according to Clause 3.1 above; and

(i)     shall maintain the necessary controls to ensure that the flight simulators to be deposited at the Locations are subject to the Company's quality inspection procedures required by law.

4.3.     The representations and warranties provided by the Parties shall survive after the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

## SECTION 5 - AGREEMENT REGISTRATION

5.1.     The Company shall, within twenty (20) days from this date or from the date of signature of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or its amendments, duly registered with the

---

inexistem restrições para a alienação fiduciária, penhor ou venda dos Simuladores de Voo no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(h)     os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o) acima são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, dos Simuladores de Voo, conforme Cláusula 3.1 acima; e

(i)     manterá os controles necessários para garantir que simuladores de voo a serem depositadas nas Localidades estejam sujeitas aos procedimentos de inspeção de qualidade da Companhia requeridos por lei.

4.3.     As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

## CLÁUSULA 5 – REGISTRO DO CONTRATO

5.1.     A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou seus aditamentos, devidamente registrados nos

17

Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to perform all acts necessary to make such registrations, at its own expense.

Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

## SECTION 6 - EXPENSES

6.1.    All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Flight Simulators, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Clause if the Company does not timely perform the transfer of the amounts mentioned herein.

6.2.    The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the provision of collateral agent services dated November 30, 2020.

6.3.    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless he receives instructions

## CLÁUSULA 6 – DESPESAS

6.1.    Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e beneficio das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Simuladores de Voo, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.2.    A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura e da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.3.    O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos

18

provided by the Trustee, as well as indemnity or guarantee to his satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

## SECTION 7 - BRAZILIAN COLLATERAL AGENT

## CLÁUSULA 7 – AGENTE DE GARANTIA BRASILEIRO

7.1    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.1.    O Agente de Garantia Brasileiro foi nomeado, de acordo com os termos da Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or

7.2.    O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra

19

act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is

comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLAI e/ou o Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a

20

delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent (including the Valuation Report) and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro (incluindo o Relatório de Avaliação) e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, declaration, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na

21

verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este

22

Transaction Document) and such responsibility shall be in charge exclusively of the Company.

7.6 The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian reais, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil ("ROF"), as applicable; and (c) will not undertake to perform any foreign

Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

7.6. O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer

23

exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Clause. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future

7.9.    O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato

24

law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Clause 7.10.

7.11    Any and all payments by Gol Finance, the Company and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol

ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11.    Todos e quaisquer pagamentos pela Gol Finance, pela Companhia e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos

25

Finance, the Company and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.12    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

7.13    For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.14    Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Company. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days

("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Companhia e/ou o GLAI, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação à Oferta.

7.13.    Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14.    Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado

26

after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor.

pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

## SECTION 8 - MISCELLANEOUS

## CLÁUSULA 8 – DISPOSIÇÕES GERAIS

8.1    Definitions. The capitalized words used in this Agreement and its Exhibits and not otherwise defined herein shall have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1.    Definições. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1    For purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or holiday in Brazil, or that day on which commercial banks in the cities of Rio de Janeiro and São Paulo are authorized by law to close.

8.1.1.    Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados por lei a fechar.

27

8.2      Amendments. This Agreement may not be modified or altered, except by written instrument signed by the Parties.

8.3      Severability. If any term, clause, covenant or condition of this Agreement is held invalid, null or unenforceable by court decision, the remaining terms shall remain in full force and effect, thus not being affected, impaired or invalidated and the Parties, as the case may be, will use their best efforts to agree on an alternative legal and feasible method to achieve the original intended result.

8.4      Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.1    When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Flight Simulators from any encumbrance which is still in force in accordance with the provisions herein.

8.5      Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this

8.2.     Alterações. Este Contrato não poderá ser modificado ou alterado, salvo mediante instrumento escrito e assinado pelas Partes.

8.3.     Independência das Cláusulas. Caso qualquer termo, cláusula, avença ou condição deste Contrato venha a ser considerado inválido, nulo ou inexequível por decisão judicial, os termos restantes deverão continuar em pleno vigor e efeito, não sendo, assim, afetados, prejudicados ou invalidados e as Partes, conforme o caso, envidarão seus melhores esforços para acordar um método alternativo legal e exequível para atingir o resultado original pretendido.

8.4.     Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1.   Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação dos Simuladores de Voo de qualquer gravame que ainda esteja em vigor de acordo com o aqui disposto.

8.5.     Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este

28

Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

8.6     Guarantees. The fiduciary guarantee provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.7     Notifications. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

(a)     If to the Company:
        Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip 04626-020
        São Paulo - SP, Brasil
        Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(b)     If to the Brazilian Collateral Agent:
        Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil Att: Danilo Oliveira / Karla Fernandes

Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.     Garantias. A garantia fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.     Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

(a)     Se para a Companhia:
        Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
        São Paulo - SP, Brasil
        Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(b)     Se para o Agente de Garantia Brasileiro:
        Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
        Att: Danilo Oliveira / Karla

29

danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

Fernandes

danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

(c)    If to GLAI:

Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020

São Paulo - SP, BrasilAttn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

(c)    Se para a GLAI:

Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020

São Paulo - SP, Brasil

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1 Any notification or other communication made under this Agreement will be deemed valid and delivered on the Business Day following the respective receipt, according to the protocol signed by the addressee or notice of receipt, as the case may be.

8.7.1. Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8 Specific Performance and Compliance. For the purposes of this Agreement, all obligations undertaken by the Company under this Agreement shall be valid, effective and enforceable, and in case of non-timely performance of such obligations, the Brazilian Collateral Agent, acting in accordance with the instructions of the Trustee, may bring appropriate judicial proceedings seeking specific performance of such obligations, according to the appropriate procedures established in Law 13,105, of March 13, 2015 ("Code of Civil Procedure"), which include, but are not limited to, legal remedies available in articles 497, 501 and 815 of the Code of Civil Procedure.

8.8. Tutela Específica e Cumprimento. Para os fins deste Contrato, todas as obrigações assumidas pela Companhia sob este Contrato, serão válidas, eficazes e exequíveis, sendo que em caso de não cumprimento tempestivo dessas obrigações, o Agente de Garantia Brasileiro, agindo de acordo com as instruções do Trustee, poderá iniciar processo judicial adequado buscando tutela específica de tais obrigações, conforme os procedimentos apropriados estabelecidos na Lei 13.105, de 13 de março de 2015 ("Código de Processo Civil"), que incluem, mas não se limitam a, remédios jurídicos disponíveis nos artigos 497, 501 e 815 do Código de Processo Civil.

8.9 Governing Law. This Agreement shall be governed and construed in accordance with the laws of the Federative Republic of Brazil, and the specific performance of the positive and negative

8.9. Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil, sendo permitida a tutela específica das obrigações de fazer e de não fazer aqui pactuadas.

30

covenants agreed upon herein is permitted.

8.9.1   In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument that may be the subject to the enforcement proceedings under article 784, item III of the Code of Civil Procedure.

8.10   Jurisdiction. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

8.11   Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12.   Language. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13.   Electronic   Signature.   This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian   Public   Key   Infrastructure (*Infraestrutura   de   Chaves   Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness

8.9.1.   Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.   Foro. Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.   Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições do da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis.

8.12.   Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13.   Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma   irrevogável   e   irretratável,   a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

31

of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14. This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

8.14. Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

In witness whereof, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

E por estarem assim justas e contratadas, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, [●] [●] 20[●].

São Paulo, [●] de [●] de 20[●].

*(The remainder of the page intentionally left blank)*

*(O restante da página intencionalmente deixado em branco)*

32

| | |
|---|---|
| (*Signature page 1/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020*) | (*Página de assinatura 1/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020*) |

**GOL LINHAS AÉREAS S.A.,**

_____    _____

*Name*/Nome:                                    *Name*/Nome:
*Title*/Cargo:                                   *Title*/Cargo:

33

(*Signature page 2/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020*)

(*Página de assinatura 2/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020*)

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

34

(*Signature page 3/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020*)

(*Página de assinatura 3/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020*)

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

35

(*Signature page 4/4 to the Flight Simulators Fiduciary Transfer Agreement entered into by and between Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. on [●] [●] 2020*)

(*Página de assinatura 4/4 do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. em [●] de [●] de 2020*)

**WITNESSES/TESTEMUNHAS**

_____

Name/Nome:
Tax ID /CPF:
ID/RG:

_____

Name/Nome:
Tax ID /CPF:
ID/RG:

36

| **EXHIBIT 1** | **ANEXO 1** |
|:---:|:---:|
| **DESCRIPTION OF FLIGHT SIMULATORS AND LOCATIONS ON [●] [●] 2020** | **DESCRIÇÃO DOS SIMULADORES DE VOO E LOCALIDADES EM [●] DE [●] DE 2020** |
| [ATTACHED LIST] | [LISTA ANEXA] |

| EXHIBIT 2<br>DESCRIPTION OF THE SECURED<br>OBLIGATIONS | ANEXO 2<br>DESCRIÇÃO DAS OBRIGAÇÕES<br>GARANTIDAS |
|---|---|
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |
| Principal Amount: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | Valor Principal: US$ 200.000.000,00 (duzentos milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| Maturity Date: June 30, 2026; | Data de Vencimento: 23 de junho de 2026; |
| Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture; | Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura; |
| Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to the Notes; | Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas; |
| Penalty Clause: not applicable; | Cláusula Penal: não aplicável; |
| Inflation Adjustment Index: not applicable; | Índice de Atualização Monetária: não aplicável; |
| Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture. | Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura. |

1

## AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

## VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

**EXHIBIT 3**
**FORM OF AMENDMENT TO THE FLIGHT SIMULATORS FIDUCIARY TRANSFER AGREEMENT**

**ANEXO 3**
**MODELO DE ADITAMENTO À ALIENAÇÃO FIDUCIÁRIA DE SIMULADORES DE VOO**

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

(a)    **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ/ME") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

(a)    **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

(b)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) (hereinafter referred to as "Brazilian Collateral Agent");

(b)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido abaixo) ("Agente de Garantia Brasileiro");

and, as intervening and consenting party,

**(c)** **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors"),

e, como interveniente anuente,

**(c)** **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil com sede na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, na cidade de São Paulo, Estado de São Paulo, inscrita no CNPJ/ME sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI" e, juntamente com a Companhia, as "Garantidoras").

**WHEREAS:**

(i) on [●] [●] 2020, the Company, the Brazilian Collateral Agent and GLAI entered into a Flight Simulators Fiduciary Transfer Agreement ("Fiduciary Transfer Agreement"), pursuant to which the Company assigned all the Flight Simulators (as defined in the Fiduciary Transfer Agreement) on a fiduciary basis, to the Secured Parties, as collateral for the Secured Obligations;

(ii) the Parties hereby agree to amend the Fiduciary Transfer Agreement for the purpose of amending [the list of the Flight Simulators] {or} [list of Locations] {or} [the Market Value of the Flight Simulators] (as defined in the Fiduciary Transfer Agreement) delivered

**CONSIDERANDO QUE:**

(i) em [●] de [●] de 2020, a Companhia, o Agente de Garantia Brasileiro e GLAI celebraram Instrumento Particular de Alienação Fiduciária de Simuladores de Voo ("Contrato de Alienação Fiduciária"), nos termos do qual a Companhia deu todas os Simuladores de Voo (conforme definido no Contrato de Alienação Fiduciária), em alienação fiduciária, às Partes Garantidas, como garantia das Obrigações Garantidas;

(ii) as Partes neste ato concordam em aditar o Contrato de Alienação Fiduciária com o objetivo de alterar [a lista de Simuladores de Voo] {ou} [lista de Localidades] {ou} [o Valor de Mercado dos Simuladores de Voo] (conforme definido no Contrato de Alienação Fiduciária) entregues em alienação fiduciária,

- 4 -

on a fiduciary basis, pursuant to Clause 1 of the Fiduciary Transfer Agreement.

nos termos da Cláusula 1 do Contrato de Alienação Fiduciária.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "Flight Simulators Fiduciary Transfer Agreement" ("Agreement"), according to the following clauses:

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "Aditivo à Alienação Fiduciária de Simuladores de Voo" ("Aditivo"), que será regido pelas seguintes cláusulas:

## I. DEFINITIONS

1.1. For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Fiduciary Transfer Agreement.

## I. DAS DEFINIÇÕES

1.1. Para fins deste Aditivo, todos os termos iniciados em letras maiúsculas, não definidos neste Aditivo, têm o significado a eles atribuídos no Contrato de Alienação Fiduciária.

## II. AMENDMENT

2.1. The Parties expressly agree to the [replacement of Exhibit 1 previously attached to the Fiduciary Transfer Agreement with the new Exhibit 1, attached to this Amendment as Exhibit 1, for the purpose of updating the list of [Flight Simulators [*and*] Locations]] {*or*} [update of clause 1.7 of the Fiduciary Transfer Agreement to reflect the new valuation report prepared pursuant to the Fiduciary Transfer Agreement [and the adjusted Market Value of the Flight Simulators]].

## II. DO ADITAMENTO

2.1. As Partes expressamente acordam com a [substituição do Anexo 1 anteriormente anexado ao Contrato de Alienação Fiduciária pelo novo Anexo 1, anexo ao presente Aditivo como Anexo 1, com o objetivo de atualizar a lista de [Simuladores de Voo *[e]* Localidades]] {*ou*} [atualização da cláusula 1.7 do Contrato de Alienação Fiduciária para refletir o novo relatório de avaliação preparado conforme no Contrato de Alienação Fiduciária [e o Valor de Mercado dos Simuladores de Voo atualizado]].

## III. MISCELLANEOUS

3.1. <u>Registration of this Amendment.</u> The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the of the cities where the headquarters of each Party is located.

## III. DISPOSIÇÕES GERAIS

3.1. <u>Registro do Presente Aditivo.</u> A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro que este presente Aditivo foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes.

3.2.  Representations and Warranties. The Company hereby represents and warrants that:

(a) has full powers, authorization and capacity to enter into this Amendment, comply with its contractual obligations and [enter into fiduciary transfer of the Flight Simulators described in Exhibit 1];

(b) has taken all necessary measures to authorize the execution and performance of this Amendment;

(c) this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(d) the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets[, except for the fiduciary transfer of the Flight Simulators herein created];

(e) [is the lawful and exclusive owner of the Flight Simulators described in Exhibit 1;]

(f) except for the fiduciary transfer of

---

3.2.  Declarações e Garantias. A Companhia neste ato declara e garante que:

(a) possui plenos poderes, autorização e capacidade de firmar o presente Aditivo, cumprir com suas obrigações contratuais e [celebrar a alienação fiduciária dos Simuladores de Voo descritas no Anexo 1];

(b) tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditivo;

(c) o presente Aditivo constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d) a celebração do presente Aditivo e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos[, exceto pela alienação fiduciária dos Simuladores de Voo aqui constituída];

(e) [é a legítima e exclusiva proprietária e possuidora dos Simuladores de Voo descritas no Anexo 1;]

(f) exceto pela alienação fiduciária do

the Fiduciary Transfer Agreement, the Flight Simulators are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, pledge or sale of the Flight Simulators in the Company's by-laws or any other document; and, in the event of enforcement or execution of this Amendment and the Fiduciary Transfer Agreement, their terms and conditions shall prevail over the terms and conditions of any other document;

(g) the records, history and other materials described in Clause 2.1, item (o) of the Fiduciary Transfer Agreement are adequate and sufficient for the purpose of disposal, liquidation or sale, whether judicial or extrajudicial, of the Flight Simulators, pursuant to Clause 3.1 of the Fiduciary Transfer Agreement; and

(h) shall maintain the necessary controls to ensure that the flight simulators and related parts to be deposited at the Locations are subject to the Company's quality inspection procedures required by law.

3.3 <u>Other Terms and Conditions.</u> All the terms and conditions of the Fiduciary Transfer Agreement not expressly altered or modified by this Amendment are hereby and from hereof date fully ratified by the Parties and shall remain in full force and effect, as provided for in the Fiduciary Transfer Agreement.

Contrato de Alienação Fiduciária, os Simuladores de Voo estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser alienadas fiduciariamente, empenhadas ou vendidas judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda dos Simuladores de Voo no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Aditivo e do Contrato de Alienação Fiduciária, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(g) os registros, históricos e outros materiais descritos na Cláusula 2.1, item (o), do Contrato de Alienação Fiduciária são adequados e suficientes para fins de alienação, liquidação ou venda, seja judicial ou extrajudicial, dos Simuladores de Voo, conforme Cláusula 3.1 do Contrato de Alienação Fiduciária; e

(h) manterá os controles necessários para garantir que os simuladores de voo e respectivas peças a serem depositados nas Localidades estejam sujeitas aos procedimentos de inspeção de qualidade da Companhia requeridos por lei.

3.3. <u>Outros Termos e Condições</u>. Todos os termos e condições do Contrato de Alienação Fiduciária não expressamente alterados ou modificados por este Aditivo estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato de Alienação Fiduciária.

3.4     Governing Law. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.5     Dispute Resolution. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

In witness whereof, the Parties have executed this Amendment in five (5) counterparts of identical content and form, in the presence of the two (2) undersigned witnesses.

São Paulo, [●] [●] [●].


**[Signature page]**
**[ page break ]**
[ Exhibit 1]

3.4.     Lei de Regência. O presente Aditivo será regido e interpretado de acordo com as leis do Brasil.

3.5.     Solução de Controvérsias. Quaisquer disputas ou controvérsias oriundas do presente aditivo serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

E por estarem assim justas e contratadas, as Partes firmam o presente Aditivo em 5 (cinco) vias de igual teor e forma, na presença das 2 (duas) testemunhas abaixo assinadas.

São Paulo, [●] de [●] de [●].


**[página de assinaturas]**
**[quebra de página]**
[Anexo 1]

- 8 -

**EXHIBIT 4**
**FORM OF POWER OF ATTORNEY**

**POWER OF ATTORNEY**

By this power of attorney, **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, headquartered at Senador Salgado Filho Square, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/0-P, in the city of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Flight Simulators Fiduciary Transfer Agreement entered into on [●] [●] 2020 between the GRANTOR, the GRANTEE and Gol Linhas Aéreas Inteligentes S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

1. practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

**ANEXO 4**
**MODELO DE PROCURAÇÃO**

**PROCURAÇÃO**

Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.,** sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no CNPJ/ME sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Instrumento Particular de Alienação Fiduciária de Simuladores de Voo celebrado em [●] de [●] de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1. praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

- 9 -

(a) dispose of, collect, receive, appropriate, transfer and/or enforce the Flight Simulators (or any components thereof) or otherwise dispose of, and deliver the Flight Simulators (or any components thereof) under the Agreement and as established in article 1,364 of the Civil Code, and apply the product thus received to the payment of the Secured Obligations under the Agreement;

(b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Flight Simulators and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Flight Simulators and represent the GRANTOR before third parties for the purpose of releasing the fiduciary transfer, disposal of the Flight Simulators and transfer of the funds resulting from such disposal;

2. sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or

(a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Simuladores de Voo (ou quaisquer de suas partes) ou dispor de qualquer outro modo e entregar os Simuladores de Voo (ou qualquer de suas partes) nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

(a) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Simuladores de Voo e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com relação aos Simuladores de Voo e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação dos Simuladores de Voo e transferência dos recursos resultantes de tal alienação;

2.assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades

municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, ANAC, the Brazilian Aeronautical Registry, the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos competentes, a ANAC, o Registro Aeronáutico Brasileiro, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Flight Simulators, represent the GRANTOR before any competent Registry Office of Deeds and Documents in which the Agreement or its respective amendments shall be registered;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação aos Simuladores de Voo, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5. agree or settle any insurance policy or demand involving the Flight Simulators in case of any loss under the terms of such policy and approve any premium/claim paid due to conviction or similar procedure affecting the Flight Simulators;

5. ajustar ou liquidar qualquer apólice de seguro ou demanda envolvendo os Simuladores de Voo caso haja qualquer perda nos termos de tal apólice e aprovar qualquer prêmio/sinistro pago em razão de condenação ou procedimento similar afetando os Simuladores de Voo;

6. enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of

6. celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco

- 11 -

Brazil to make the remittances to the Trustee, as provided for in the Agreement; and

Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

7. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

7. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement.

Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato.

Rio de Janeiro, [●]  [●]  [●].

Rio de Janeiro, [●] de [●] de [●].

**GOL LINHAS AÉREAS S.A.**
[SIGNATURE]

**GOL LINHAS AÉREAS S.A.**
[ASSINATURA]

**EXHIBIT M**

FORM OF AIRCRAFT FIDUCIARY LIEN

#93484727v11

Dated as of _____, 2020

**GOL LINHAS AÉREAS S.A.**
as Security Provider

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**
as Brazilian Collateral Agent

and, as intervening and consenting party,

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____

**BRAZILIAN LAW AIRCRAFT FIDUCIARY LIEN**
relating to One (1) [[●] Aircraft]
Each with Two (2) installed [●] Engines
Aircraft Manufacturer's Serial Number [_____]
Brazilian Registration Mark [_____]

_____

**AIRCRAFT FIDUCIARY LIEN**

**Dated: _____, 2020**

**Between:**

**(1)**    **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives ("**Security Provider**");

**(2)**    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined below) ("**Brazilian Collateral Agent**", which term shall include its successors and assigns); and

**(3)**    **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, in the City of São Paulo, State of São Paulo, enrolled with the National Register of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("**GLAI**").

**Whereas:**

(A)    GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("**Gol Finance**") issued 8.00% Senior Secured Notes due 2026 ("**Notes**"), pursuant to an Indenture entered into by Gol Finance and the Trustee on December 23, 2020 ("**Indenture**") and as described in the private placement memorandum related to the Notes offering ("**Offering**");

(B)    the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture ("**Secured Parties**") as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral provided under this Agreement, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("**Trustee**") and in accordance with the terms of the Indenture and under the terms provided for in this Agreement;

(C)    in order to secure the satisfaction of all obligations undertaken by Gol Finance, under the terms and conditions of the Indenture, Security Provider and Gol Linhas Aéreas Inteligentes S.A. ("**GLAI**" and, together with Security Provider, "**Guarantors**") provided a personal guarantee under the terms of the Indenture ("**Guarantees**");

(D)    The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to

1

be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent;

(E)     in order to guarantee compliance with all obligations undertaken by and Gol Finance under the terms and conditions of the Indenture and by the Guarantors under the Guarantees, the Security Provider has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Aircraft (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Aircraft (as defined below);

(F)     the Security Provider has the right, title and interest with respect to the Aircraft; and

(G)     the Parties hereto have agreed to enter into this Brazilian law aircraft fiduciary lien pursuant to the provisions of Law 7,565 of December 19, 1986, as amended (the "**Brazilian Aeronautical Code**") and the 1948 Convention on the International Recognition of Rights on Aircraft, ratified on July 3, 1953, confirmed by Legislative-Decree No. 17 of April 24, 1953, and made public by Decree No. 33,648 of August 25, 1963, pursuant to which the Security Provider recognizes its debt and grants to the Brazilian Collateral Agent, representing the Secured Parties, a fiduciary lien over the Aircraft, upon the terms and conditions set forth in this Agreement. As a result of the fiduciary lien on the Aircraft, this Agreement shall be construed in accordance with the terms of articles 148, 149, 150, 151 and 152 of the Brazilian Aeronautical Code and, subsidiarily, of article 1,361 et seq of the Brazilian Civil Code (as defined below).

**It is agreed as follows:**

1       **Definitions and Interpretation**

Except as otherwise defined in this Agreement, all words and expressions defined in the Indenture (including definitions incorporated by reference to another document) shall have the same respective meanings when used in this Agreement.

In this Agreement, the following words and expressions shall, except where the context otherwise requires, have the following respective meanings:

"**Agreement**" means this first priority Brazilian law aircraft fiduciary lien.

"**Aircraft**" means, together, the Airframe, the Engines, the Parts and the Aircraft Documents.

"**Aircraft Documents**" has the meaning ascribed to the term "Manuals and Technical Records".

"**Airframe**" means the airframe described in Schedule I, including all Parts relating to such airframe, including (i) any and all Parts so long as they are incorporated or installed in or attached to such airframe or so long as title to it remains vested in the Security Provider after removal from such airframe (but excluding any Part installed in or attached to such engines on a temporary basis pursuant to the terms of the Indenture), (ii) any replacement Parts, and (iii) the buyer furnished equipment, but excluding (x) any Part installed in or attached to such Airframe on a temporary basis and (y) engines (other than the Engines), installed in the Airframe.

"**Aircraft Protocol**" means the official English language text of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements, and revisions thereto (and from and after the effective date of the Cape Town Treaty in the relevant country, means when referring to the Aircraft Protocol with respect to that country, the Aircraft Protocol as in effect in such

country, unless otherwise indicated). For Brazilian law purposes, the Aircraft Protocol means the respective Portuguese language text approved by the Presidential Decree 8,008/2013.

"**ANAC**" means the National Agency of Civil Aviation (*Agência Nacional de Aviação Civil*) of Brazil, and/or any other person succeeding to all or any of its functions.

"**Applicable Laws**" shall mean, with respect to any Person or property (including an Aircraft or Engine), all applicable laws, treaties, conventions, ordinances, judgments, decrees, injunctions, writs, rules, regulations, orders, interpretations, licenses, permits and orders of any Government Body in any relevant jurisdiction, in each case applicable to such Person or property (including the Aircraft).

"**Brazil**" means the Federative Republic of Brazil.

"**Business Day**" shall mean a day (other than a Saturday, Sunday or holiday scheduled by law) on which banks are open for business in New York, New York and São Paulo/SP, Brazil.

"**Cape Town Convention**" means the text of the Convention on International Interests in Mobile Equipment, adopted on November 16, 2001, at a diplomatic conference in Cape Town, South Africa, and all amendments, supplements, and revisions thereto (and from and after the effective date of the Cape Town Treaty in the relevant country, means when referring to the Cape Town Convention with respect to that country, the Cape Town Convention as in effect in such country, unless otherwise indicated). For Brazilian law purposes, the Cape Town Convention means the respective Portuguese language text approved by the Presidential Decree 8,008/2013.

"**Cape Town Treaty**" means, collectively, the (a) the Cape Town Convention, (b) the Aircraft Protocol, and (c) all rules and regulations adopted pursuant thereto and, in the case of each of the foregoing described in clauses (a) through (b), all amendments, supplements, and revisions thereto.

"**Engine**" means:

(a)    (1) the aircraft engine described in Schedule 1 (in each case whether or not installed on the Airframe from time to time; (2) any replacement engine which becomes the property of the Security Provider; and (3) any and all Parts which are (i) installed in or attached to such engines on the relevant delivery date (but excluding any Part installed in or attached to such engines on a temporary basis pursuant to the terms of the Indenture) or (ii) installed in or attached to such engines at any time subsequent to the relevant delivery date or (iii) so long as title thereto shall remain vested in the Security Provider in accordance with the terms of the Indenture, removed from such engines;

(b)    any and all Parts relating thereto; and

(c)    any and all Manuals and Technical Records relating thereto.

"**Event of Default**" shall mean an "Event of Default" as described in the Indenture.

"**Governing Law**" means the laws of Brazil.

"**International Interest**" has the meaning ascribed to the defined term "international interest" (*garantia internacional*) under Chapter I, article 1, item (o), of the Cape Town Convention.

"**International Registry**" has the meaning ascribed to the defined term "international registry" (*registro internacional*) under Chapter I, article 1, item (p), of the Cape Town Convention.

"**Part**" means with respect to the Aircraft or any Engine, all appliances, components, parts, instruments (including avionics), appurtenances, accessories, furnishings and/or any other equipment of whatever nature (other than complete Engines for the Aircraft or engines), that may from time to time be incorporated or installed in or attached to the Aircraft or such Engine pursuant to the terms of the Indenture or which remain the property of the Security Provider.

"**Parties**" means collectively, the parties to this Agreement (each, a "**Party**").

"**Presidential Decree 8,008/2013**" means the Presidential Decree No. 8,008, issued in May 15, 2013, which incorporated the provisions of the Cape Town Treaty - including the qualifying declarations made by Brazil into binding Brazilian law.

"**RAB**" means the Brazilian Aeronautical Registry (*Registro Aeronáutico Brasileiro*) and/or any other person succeeding to all or any of its functions.

"**Receiver**" means any receiver, "*fiel depositário*", "*administrador*" (for the purposes of article 838, IV, of the Brazilian Civil Procedure Code) and manager or administrative receiver appointed by a relevant court having jurisdiction under this Agreement or under any applicable provisions of the Governing Law.

"**Secured Obligations**" has the meaning ascribed to it in Clause 3 below.

1.2     Unless otherwise specified and except where the context otherwise requires, any reference in this Agreement to:

(a)     any person shall be construed so as to include its successors and permitted assigns and permitted transferees in accordance with their respective interests;

(b)     any document (including this Agreement and each other Transaction Document) shall be construed as a reference to such document as amended, restated, supplemented, varied, transferred or novated from time to time in accordance with its terms and to the extent that such document is at the relevant time in effect;

(c)     any provision of law shall be construed as a reference to that provision as amended, supplemented, varied, re-enacted, replaced or restated from time to time;

(d)     any **applicable law** includes, without limitation, (i) applicable laws, acts, codes, conventions, decrees, decree-laws, legislation, statutes, treaties and similar instruments, (ii) applicable final judgments, orders, determinations or awards of any court from which there is no right of appeal (or, if there is a right of appeal, such appeal is not prosecuted within the allowable time) and (iii) applicable directives, guidance, guidelines, notices, orders, regulations and rules of any relevant governmental authority (whether or not having the force of law but with which, if not having the force of law, compliance is customary);

(e)     a **Clause** shall be construed as a reference to a clause of this Agreement;

(f)     **continuing** shall, in relation to an Event of Default, be construed as a reference to an Event of Default which has not been waived or remedied in accordance with the terms of the Indenture;

(g)     a **person** shall be construed as a reference to any association, company, corporation, firm, governmental authority, individual, joint venture, partnership (including any limited partnership and any limited liability partnership) or trust (in each case whether or not having separate legal personality);

(h)     a **Schedule** shall, subject to any contrary indication, be construed as a reference to a schedule to this Agreement;

(i)     a **successor** shall be construed so as to mean a successor in title of a person and any person who under the applicable laws of its jurisdiction of incorporation or domicile has assumed the rights and obligations of such person or to which, under such laws or by agreement or otherwise, such rights and obligations have been transferred; and

(j)     the **winding-up**, **dissolution**, **administration** or **re-organisation** of a person shall be construed so as to include any equivalent or analogous proceedings under the applicable law of the jurisdiction in which such person is incorporated or formed or any jurisdiction in which such person carries on business including the seeking of liquidation, winding-up, re-organisation, dissolution, administration, arrangement, adjustment, protection or relief of debtors.

1.3     Clause and Schedule headings shall be ignored in the interpretation of this Agreement.

## 2     Fiduciary Lien

2.1     As security for the payment in full (whether at stated maturity, by acceleration or otherwise), performance and discharge of the Secured Obligations from time to time outstanding, the Security Provider hereby absolutely, unconditionally and irrevocably assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional ownership and indirect possession of the Aircraft, and grants and agrees to grant a security interest and an International Interest in the Aircraft, in favour of the Brazilian Collateral Agent, as representative and on behalf of the Secured Parties, its successors and permitted assigns (if applicable).

2.2     The Engine and all Parts, whether or not installed on the Airframe, shall remain subject to the Lien created by this Agreement until such time as it is permanently replaced in accordance with the provisions of the Indenture by a replacement engine or part title to which has vested in the Security Provider free and clear of Liens and which shall have become subject to the Lien created by this Fiduciary Lien.

2.3     By signing this Agreement and complying with the formalities set forth in Section 6 below, the Fiduciary Lien shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, which shall become the conditional owner and indirect possessor of the Aircraft, subject to the terms and conditions of this Agreement.

2.4     In the event that (a) a replacement engine, title to which has vested in the Security Provider free and clear of any Liens is permanently substituted for an Engine then upon such substitution (i) such replacement Engine shall without further act (but without prejudice to Clause 2.5), become subject to this Agreement and the Lien constituted hereby in favour of the Brazilian Collateral Agent, as representative and on behalf of the Secured Parties, as though it had originally been an Engine, and (ii) such replaced Engine shall thereupon cease to be subject to this Agreement, or (b) a replacement Part, title to which has vested in the Security Provider free and clear of any Liens (other than Permitted Liens) is permanently substituted for a Part, then upon such substitution (i) such replacement Part shall, without further act, become subject to this Agreement and the first priority Lien constituted hereby in favour of the Brazilian Collateral Agent, as representative and on behalf of the Secured Parties, as though it had originally been a Part, and (ii) such replaced Part shall thereupon cease to be subject to this Agreement.

2.5    This Agreement, and the security interest created hereby, is intended to constitute a fiduciary transfer for the purposes of, and to the extent permitted by, and shall be construed in accordance with the terms of articles 72(II) and 148 *et seq.* of the Brazilian Aeronautical Code and, subsidiarily, of article 1,361 et seq of the Brazilian Civil Code (as defined below).

## 3    Secured Obligations

In accordance with the provisions herein, this Agreement is entered in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the terms of the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Guarantees; (c) the faithful and timely fulfillment by Gol Finance and the Guarantors of all agreements, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the referred instruments (jointly, the "**Transaction Documents**") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance, the Security Provider and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "**Secured Obligations**", which are summarized in Schedule 2 hereto) in compliance with the provisions of article 1,362 of the Brazilian Civil Code and article 149 of the Brazilian Aeronautical Code.

For the purposes of complying with Governing Law, the Parties acknowledge and agree that (a) the amount of the Secured Obligations is US$[●] ([●] U.S. Dollars), and that is a mere good faith estimate which shall not prevail over the exact amount of the Secured Obligations, (b) the schedule of payments under the Indenture is set out in Schedule 2 hereto (which payment schedule is subject to alteration from time to time), (c) the current interest rate applicable to the Secured Obligations is indicated in Schedule 2 hereto (which interest rate is subject to alteration from time to time), (d) the payments with respect to the Secured Obligations shall be made by means of payment to the account of the Brazilian Collateral Agent, acting on behalf of the Secured Parties, and (e) all insurances contracted in connection with the Aircraft and Engine are those described in Schedule 3 hereto.

## 4    Term of Fiduciary Lien

This Agreement shall remain in force and effect until the full and final satisfaction of all Secured Obligations.

## 5    Continued Priority of Security Interest

The Lien created by this Agreement shall at all times be valid, perfected and enforceable against the Security Provider, the Aircraft and all third parties, in accordance with the terms hereof, as a first priority security Lien for the Secured Obligations.

## 6    Perfection of the Lien

The Security Provider hereby undertakes to: (i) no later than five (5) Business Days counted from the date of execution of this Agreement or of any amendment thereto, (a) file this Agreement and its sworn translation into Portuguese or the amendments thereto (as applicable) with the RAB, and (c) provide Brazilian Collateral Agent with the RAB filing receipt immediately after filing, and (ii) no later than two (2) Business Days counted from the date of the completion of each of such registrations, provide evidence of the relevant

registrations to the Brazilian Collateral Agent, provided, however, that (i) in any event the completion of such registrations shall occur no later than forty-five (45) days counted as of the execution of this Agreement or the date of execution of any amendment to this Agreement, being agreed that in case the RAB makes additional requirements, the priority over the Fiduciary Lien shall be maintained for a term of thirty (30) days and the date of registration shall retroact to the filing date once the additional requirements are duly complied with; and (ii) under no circumstance shall the filing with the RAB cease to have the priority of the pre-annotation effected thereby.

7       **Authorized Action**

7.1     If the Security Provider fails to timely file this Agreement pursuant to Section 6 above, the Brazilian Collateral Agent is hereby authorized to take any action (including, without limitation, the filing of one or more financing or continuation statements or amendments thereto in the name of the Security Provider and the filing of this Agreement and its sworn translation into Portuguese with the RAB and its International Interest with the International Registry), which the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee may reasonably deem necessary or appropriate to protect and preserve the Lien created by this Agreement in any jurisdiction. A certified or authenticated copy of this Agreement shall be sufficient as evidence of the Lien created by this Agreement. The Security Provider shall cooperate with the Brazilian Collateral Agent by executing and delivering all such instruments and documents as the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee shall reasonably request from time to time in order to record, perfect and keep perfected the Lien created by this Agreement in any jurisdiction over, through or in which the Aircraft (or any portion thereof) may be operated, based or positioned at no cost to the Brazilian Collateral Agent. The Security Provider shall reimburse the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Section 6 above.

7.2     This Agreement shall be lodged with the RAB and this Fiduciary Lien shall automatically be deemed fully effective in accordance with the terms hereof in respect of the Aircraft.

8       **Effectiveness of Security**

8.1     The Lien constituted by this Agreement and hereby acknowledged by the Security Provider, shall:

(a)     be a continuing security for the full and final payment, satisfaction and discharge of the Secured Obligations;

(b)     not be considered as satisfied or discharged by any intermediate payment, satisfaction or settlement of any or all of the Secured Obligations or any other matter or thing whatsoever, other than the full and final payment and discharge of the Secured Obligations;

(c)     be in addition to and shall not operate so as in any way to prejudice or affect or be prejudiced or affected by any Lien, guarantee, indemnity or other right or remedy that the Brazilian Collateral Agent or any of the Secured Parties may now or at any other time have in respect of any or all of the Secured Obligations; and

(d)     not be prejudiced by (i) any time or indulgence granted to any person; (ii) any dealing with, exchange, renewal, variation, release or modification of, or any failure or delay by the Brazilian Collateral Agent or any of the Secured Parties in perfecting or enforcing any other Lien, guarantee, indemnity or other right or remedy that the Brazilian Collateral Agent or any of the Secured Parties may now or at any other time have in respect of any or all of the Secured Obligations; (iii) any waiver, act, omission, unenforceability or invalidity of any such other Lien, guarantee, indemnity or other right or remedy; (iv) any termination or amendment of the Indenture in any manner whatsoever; (v) any discharge or variation of the liability of any party to the Indenture or any other person; or (vi) any taking or omitting to take any security from any party to the Indenture or any other person in respect of the obligations of such party or such other person under the Indenture whether contemporaneously with this Fiduciary Lien or otherwise.

8.2     This Agreement and the Lien created hereunder shall extend to and cover any and all amounts and any and all obligations that from time to time constitute the Secured Obligations.

9       **Representations and Warranties**

9.1     The Security Provider hereby makes in favour of the Brazilian Collateral Agent the representations and warranties expressed to be made by it and set out in the Indenture.

9.2     The Security Provider further represents and warrants to the Brazilian Collateral Agent that:

(a)     it has good and full legal title to the Aircraft, Engine and Parts;

(b)     the Aircraft, Engine and any of its Parts are free of any Liens, other than Permitted Liens;

(c)     has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations;

(d)     has taken all necessary steps to authorize the execution and performance of this Agreement;

(e)     this Agreement constitutes a legal, valid and enforceable obligation against the Security Provider, in accordance with its terms;

(f)     the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Security Provider, (ii) any applicable law, (iii) any policy or rule of the Security Provider, (iv) the Security Provider's organizational acts, and do not cause or impose any encumbrance on its assets, except for the fiduciary assignment of the Lien herein created; and

(g)     the power of attorney granted by the Security Provider hereunder is validly granted and confers upon the Brazilian Collateral Agent the powers expressed therein and the Security Provider has not granted or may grant any other power of attorney or any instrument with similar effect to third parties regarding the Aircraft, the Engine or their respective Parts.

10      **Covenants**

10.1    The Security Provider acknowledges to the Brazilian Collateral Agent that the amount secured by this Agreement, and in respect of which this Agreement and the

Lien created by this Agreement is enforceable, is the full amount of the Secured Obligations for the time being and from time to time.

10.2    The Security Provider hereby undertakes to (i) no later than five (5) Business Days counted from the date of registration of this Agreement with the RAB issue an Irrevocable De-registration and Export Request Authorization ("**IDERA**"), in the form of Schedule 4 hereto, in favour of the Brazilian Collateral Agent and file the IDERA with the RAB, and (ii) no later than two (2) Business Days counted from the date of the completion of such registration, provide evidence of the relevant registration to the Brazilian Collateral Agent, provided, however, that the Security Provider shall apply its best efforts for the completion of such registration to occur within forty-five (45) days counted as of the issuance of the IDERA. The Parties hereby acknowledge and agree that the complete registration of the IDERA depends on the actions of the RAB and, therefore, additional time may be needed to perform the registration.

10.3    The Security Provider hereby undertakes to no later than five (5) Business Days counted from the date of execution of this Agreement or of any amendment thereto, provide to the Brazilian Collateral Agent with one original of this Agreement and its sworn translation into Portuguese;

10.4    The Parties intend that this Agreement constitutes an International Interest in the Aircraft (for the purposes of the Cape Town Convention). Upon execution of this Agreement, the Security Provider shall consent to the registration of the International Interest constituted by this Agreement in relation to the Aircraft.

10.5    The Security Provider furthermore covenants with the Brazilian Collateral Agent that at all times during the term of this Agreement:

(a)    at any time and from time to time, upon the written and motivated request of the Brazilian Collateral Agent, it shall (at Security Provider's sole cost and expense, provided that such costs and expenses are reasonable) promptly and duly execute, deliver, file and register (or cause to be duly executed, delivered, filed and registered) any and all instruments and documents as the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee may reasonably deem necessary to establish, protect, preserve and/or perfect the Lien of this Agreement;

(b)    it shall duly and promptly pay (or ensure that they are paid) all stamp duties now or hereafter payable on this Fiduciary Lien pursuant to any applicable stamp duty law;

(c)    it shall defend, at its own expenses, the integrity of the obligations and rights agreed under this Fiduciary Lien against any claim or demand from third party;

(d)    it shall remain liable under the Transaction Documents to perform all of the obligations assumed by it thereunder to the same extent as if this Agreement had not been executed and nothing in this Agreement shall relieve the Security Provider, of any of its obligations under the Transaction Documents; and

(e)    it shall ensure that this Agreement is duly recorded and at all times maintained on record as a valid, perfected Fiduciary Lien on the Security Provider's right, title and interest in and to the Aircraft (except to the extent that such perfection be maintained solely as a result of the failure by the Brazilian Collateral Agent to execute and deliver any necessary documents).

11      **Negative Pledge**

11.1    Except as contemplated or permitted under any Transaction Document to which it is a party, the Security Provider hereby covenants in favour of the Brazilian Collateral Agent that it will not (and will not attempt to) directly or indirectly:

(a)     sell, lease or otherwise dispose or relinquish possession of the Aircraft (or any Engine or Part thereof) or any of its right, title and interest in and to any Transaction Document;

(b)     create, incur, assume, permit, file, authorize or permit to be filed or to be on file in any jurisdiction, any mortgage, financing statement or similar instrument or create, incur, assume or permit or cause to exist any lien in relation to the Aircraft (or Engine or any Part thereof) or any of its right, title and interest, except for the Lien created by this Fiduciary Lien;

(c)     enter into any agreement, or termination, or amendment to any agreement or contract, or take any measure that may materially preclude, restrict, or in any way limit the rights of the Brazilian Collateral Agent with respect to the Aircraft or the capacity of the Brazilian Collateral Agent to foreclose this collateral; or

(d)     consent to the taking of any such action by any other person,

in each case without the prior written consent of the Brazilian Collateral Agent.

11.2    The Security Provider may lease the Aircraft to any (A) airlines domiciled in the United States or Brazil, (B) major international air carriers domiciled in certain permitted countries or countries that maintain diplomatic relations with the Unites States and Brazil, (C) Affiliates of the Security Provider or (D) the governments of Brazil, Canada, France, Germany, Japan, The Netherlands, Sweden, Switzerland, United Kingdom or the United States and to manufacturers in Australia, Brazil, Canada, Denmark, Finland, France, Germany, Iceland, Ireland, Japan Liechtenstein, Luxembourg, Monaco, Netherlands, New Zealand, Norway, Sweden, Switzerland, the United Kingdom and the United States, provided that (a) there is no detriment to the Secured Parties' position or rights hereunder; (b) it shall not affect the priority or perfection of the liens created hereunder or the rights of the Brazilian Collateral Agent and the security interest purported to be granted by this Agreement shall be maintained; (c) all requirements set forth in this Agreement are fully observed by the Security Provider, including that any of the arrangements described above shall be subject to and subordinate to the this Agreement and the other Transaction Documents and (d) the Security Provider shall furnish, or cause to be furnished, to the Trustee and the Brazilian Collateral Agent, an opinion of legal counsel stating that, in the opinion of counsel, such actions have been taken to satisfy the conditions set forth in items (a) through (c).

12      **Enforceability of Security**

12.1    In the event that the early maturity of the Secured Obligations has been declared under Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, will be entitled, to the maximum extent permitted under the Governing Law, including the Cape Town Convention:

(a)     to exercise any and all rights of the Security Provider in relation to the Aircraft (or any Part thereof);

(b)    to demand in writing that the Security Provider shall promptly deliver possession of the Aircraft (or Parts thereto, when applicable, as the Brazilian Collateral Agent may so demand) to the Brazilian Collateral Agent, or to its order in the manner and condition reasonably required by, and otherwise in accordance with all the provisions of, this Agreement; or the Brazilian Collateral Agent at its option may enter upon the premises where all or any Part of the Aircraft is located and take immediate possession of and remove the same by summary proceedings or otherwise (and, at the Brazilian Collateral Agent's option, store the same at the Security Provider's premises until disposal thereof by the Brazilian Collateral Agent), all without liability accruing to the Brazilian Collateral Agent (unless caused by the Brazilian Collateral Agent's gross negligence or willful misconduct according to a final judgment), provided that the Brazilian Collateral Agent shall be responsible for the restoration of damage to property caused by its gross negligence or willful misconduct according to a final judgment; and the Security Provider shall, at the request of the Brazilian Collateral Agent, promptly execute and deliver, or cause to be executed and delivered, to the Brazilian Collateral Agent such instruments or other documents as necessary to enable the Brazilian Collateral Agent or an agent or representative designated by the Brazilian Collateral Agent, at such time or times and place or places as the Brazilian Collateral Agent may specify, to obtain possession of all or any Part of the Aircraft, the possession of which the Brazilian Collateral Agent shall at the time be entitled to hereunder;

(c)    to sell or otherwise dispose of (and give good title to) or realise the Aircraft (or any Part thereof);

(d)    at its own discretion (but at the direction of the Trustee), to seek foreclosure in relation to the Aircraft or any Part thereof by means of a private or judicial sale, pursuant to article 879 of Law No. 13,105, of March 16, 2015, as amended ("**Brazilian Civil Procedure Code**") or other procedure permitted by the Governing Law; or otherwise, appoint, to the extent permitted by the Governing Law, a Receiver of the Aircraft (or any Part thereof) and to request the removal of any Receiver so appointed and recommend the appointment of another in his place;

(e)    to repair and keep in repair the Aircraft (or any Part thereof) and/or to restore it to the condition and state of repair required to be maintained by the terms of the Indenture and/or any other Transaction Document;

(f)    to insure the Aircraft (or Engine or any Part thereof) against any liability, loss or damage, at the Security Provider's sole cost and expense;

(g)    to collect, receive, compromise or settle, and to give a good release or discharge for, any and all claims in relation to the Aircraft (or Engine or any Part thereof);

(h)    to bring, take, defend, compromise, settle, submit to arbitration or discontinue any and all actions, disputes, proceedings or suits (civil or criminal) in relation to the Aircraft (or Engine or any Part thereof);

(i)    otherwise to put into force and effect all rights, powers and remedies available to the Brazilian Collateral Agent, pursuant to Applicable Laws or otherwise, including all rights and remedies to which a secured party is entitled under the Cape Town Convention;

(j)    to apply to any court of relevant authority for any applicable order in relation to the Aircraft (or any Engine or Part thereof) including without limitation any arrest, attachment, enforcement or execution order and any order for foreclosure absolute so

as to vest title to the Aircraft (or any Engine or Part thereof) in the Brazilian Collateral Agent;

(k)  if applicable and at any time necessary, to procure the registration or de-registration of the Aircraft (or Engine or any Part thereof) from the RAB;

(l)  to remove, export and physically transfer the Aircraft (or Engine or any Part thereof) in connection with the foreclosure of the Aircraft (or any Part thereof), if necessary, and take all actions and measures as may be necessary on the Security Provider's behalf to export and physically transfer the Aircraft from Brazil;

(m)  to take all actions and measures necessary for the exercise of the powers above before any Brazilian governmental authority, including, but without limitation, the Central Bank of Brazil, RAB, ANAC, the Federal Revenue Service and any customs authority; and/or

(n)  to take all such action and do all such things as the Brazilian Collateral Agent may reasonably (at the direction of the Trustee), consider necessary for or in relation to any of the purposes of this Agreement,

all of which rights, powers and remedies shall be in addition to all other rights, powers and remedies otherwise available to it under the Applicable Laws and each of such right, power and remedy may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Brazilian Collateral Agent. All such right, power and remedy shall be cumulative and not mutually exclusive and the exercise of one shall not be deemed a waiver of the right to exercise any other.

12.2  The Security Provider hereby consents to the exercise by the Brazilian Collateral Agent of any and all of its rights, powers and remedies under and in relation to this Agreement (including without limitation its power of sale) at such times, in such a manner and upon such terms and conditions as it may, in its reasonable discretion (but at the direction of the Trustee), determine and shall not in any circumstances be responsible for any loss occasioned thereby (unless caused by the Brazilian Collateral Agent's negligence or wilful misconduct according to a final judgment); provided that the Brazilian Collateral Agent shall not in any circumstances be liable for any special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit).

12.3  Without limiting, and as an addition to, the powers conferred upon the Brazilian Collateral Agent by the Governing Law or the laws of any other jurisdiction, the Brazilian Collateral Agent may at any time after the occurrence and continuance of an Event of Default, exercise against or in respect of the Aircraft (or any Parts thereto) any of the rights, powers, remedies, privileges or discretions conferred from time to time by the Governing Law or any other applicable jurisdiction upon as beneficiary of the Lien created hereunder over the Aircraft (or any Part thereof).

12.4  The Brazilian Collateral Agent will not be obliged to exercise any right, power or remedy conferred upon it by or under this Agreement or Applicable Laws or to make any enquiry as to the nature or sufficiency of any payment received by the Brazilian Collateral Agent or to make any claim or to take any other action with respect to the Aircraft. No action taken or omitted to be taken by the Brazilian Collateral Agent in accordance with the terms of this Agreement and/or any other Transaction Document or as permitted by Applicable Laws shall give rise to any defence, counterclaim, right of set-off or other right in favour of the Security Provider or affect in any manner whatsoever any of the Secured Obligations.

12.5   If the proceeds of sale, collection or other realization of or upon the Aircraft pursuant to Clause 12.1 hereof are insufficient to cover the payment in full of the Secured Obligations, the Security Provider shall not remain liable for any deficiency under the terms of the Indenture, which shall be covered by Gol Finance. The Brazilian Collateral Agent shall not under any circumstances be liable for any loss arising from or in connection with the foreclosure of the Aircraft by means of a private sale or other permitted means of realisation of the Aircraft (or any Part thereof) or otherwise for any act, neglect, default or omission for which a beneficiary of a fiduciary lien of property such as the Aircraft might be liable (unless caused by the Brazilian Collateral Agent's gross negligence or wilful misconduct according to a final judgment) **provided that** the Brazilian Collateral Agent shall not in any circumstances be liable for any special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit); provided further that this Clause 12.5 shall not relieve the Brazilian Collateral Agent of its obligation to account to the Security Provider in relation to its receipt of proceeds from any realisation of the Aircraft (or any Part thereof) subject to and in accordance with the provisions of the Transaction Documents.

12.6   Upon any sale by the Brazilian Collateral Agent of all or any part of the Brazilian Collateral Agent's right, title and interest in and to the Aircraft, the purchaser shall not be bound to see or enquire whether the power of sale of the Brazilian Collateral Agent has arisen, the sale shall be deemed for all purposes to be within the power of the Brazilian Collateral Agent and the receipt of the Brazilian Collateral Agent for the purchase amount shall effectively discharge the purchaser who shall not be concerned with the manner of application of the proceeds of sale or be in any way liable therefor.

12.7   To the extent now or at any time hereafter enforceable under the Applicable Laws, the Security Provider covenants that it will not after the sale or sales of the Aircraft or any Part thereof (including the Engine), claim or exercise any right under any statute now or hereafter made or enacted by any jurisdiction or otherwise to redeem the property so sold or any part thereof, and hereby expressly waives for itself and on behalf of each and every person claiming through it, except decree or judgment creditors of the Security Provider acquiring any interest in or title to the Aircraft or any Part thereof subsequent to the date hereof, all benefit and advantage of any such law or laws, and covenants that it will hinder, delay or impede the execution of any power herein granted and delegated to the Brazilian Collateral Agent, but will suffer and permit the execution of every such power as though no such law or laws had been made or enacted.

12.8   The Security Provider  undertakes to reimburse the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this Section 12 hereto.

12.9   Following the occurrence or continuance of an Event of Default, the Brazilian Collateral Agent shall be entitled to apply to any relevant Brazilian judicial authority for the enforcement of this Agreement in accordance with applicable Brazilian law, by means of an enforcement procedure as provided for by article 784, item V, of the Brazilian Civil Procedure Code, without the need for a prior judgment, with the right to attachment followed by private sale of the Aircraft or the vesting of title to the Aircraft (or any Parts thereto) in the Brazilian Collateral Agent ("adjudication") (or by such other means as may be permitted or available under applicable Brazilian law).

13      **Receiver**

13.1    The appointment of a Receiver pursuant to Clause 12.1(d) shall comply with the Governing Law and shall be subject to the following provisions:

(a)    such appointment may be made either before or after the Brazilian Collateral Agent will have exercised any of its rights under this Agreement and without prejudice to any of such rights;

(b)    such recommendation or appointment, as applicable, may be made upon such terms and conditions as the Brazilian Collateral Agent may, in its reasonable discretion (but at the direction of the Trustee), determine, subject to the Governing Law;

(c)    the Receiver shall be the agent of the Brazilian Collateral Agent and the Security Provider shall be responsible for its acts, defaults and remuneration, to the extent that the Security Provider is able to control such acts and defaults;

(d)    the Receiver shall not under any circumstances be liable to account as a beneficiary of the fiduciary lien over the Aircraft or be liable for any loss arising from or in connection with the realisation of the Aircraft (or any Part thereof) or otherwise for any act or omission for which a such beneficiary of fiduciary property such as the Aircraft might be liable (unless caused by the Receiver's gross negligence or wilful misconduct);

(e)    the Receiver shall have and be entitled to exercise all such powers as would be conferred on him/her had he/she been directly appointed by the relevant court pursuant to the Governing Law and shall in any event have and be entitled to exercise all the rights, powers and remedies as applicable under the Governing Law to protect the Aircraft (or any Part thereof) and to prepare and effect its private or judicial sale pursuant to article 879 of the Brazilian Civil Procedure Code, usufruct or other lawful means of realization; and

(f)    without limiting Clause 13.1(b), the remuneration of the Receiver may be reasonably proposed by the Brazilian Collateral Agent and/or fixed directly by the relevant court (and may include a commission calculated by reference to a gross amount of all amounts received or otherwise) but shall be payable by the Security Provider and shall form part of the Secured Obligations.

14      **Application of Proceeds**

15      All proceeds received by the Brazilian Collateral Agent (or any Receiver) in relation to the Aircraft from the exercise of any rights and remedies provided for in this Agreement shall be applied in or towards the discharge of the Secured Obligations in accordance with the provisions of the Indenture. To the extent that the Secured Obligations have been fully satisfied and the proceeds mentioned in this Clause exceed the outstanding Secured Obligations, any and all excess shall be immediately returned to the Security Provider.

16      **Delegation**

The Brazilian Collateral Agent will be entitled, at any time and as often as may be necessary, to delegate any or all of the powers and discretions vested in it by this Agreement (including the power vested in it by virtue of Clause 19) in such manner, upon such terms, and to such persons as the Brazilian Collateral Agent may determine in accordance with the provisions of the Indenture.

17      **Conditional Discharge Only**

Any settlement or discharge between the Brazilian Collateral Agent and the Security Provider will be conditional upon no security or payment to any Secured Party by any person under or in relation to the Indenture being avoided or set aside or ordered to be refunded or reduced by virtue of any Applicable Law (including without limitation in the context of any winding-up, dissolution, administration or re-organisation).

18      **Release of Fiduciary Lien**

Following the full and final discharge of the Secured Obligations (as confirmed in written by the Trustee), the Brazilian Collateral Agent will, upon the request and at the cost of the Security Provider and provided that there shall not have occurred and be continuing any Event of Default, release to the Security Provider (without recourse or warranty) such right, title and interest as the Brazilian Collateral Agent may then have in and to the Aircraft pursuant to this Agreement, free and clear of all Liens created by the Brazilian Collateral Agent or any Secured Party in relation to the Aircraft. The Brazilian Collateral Agent shall reasonably cooperate with and provide to the Security Provider any and all information and documents reasonably requested in order to register the release of this Agreement before the RAB and the discharge any and all International Interests that may exist under the International Registry.

19      **Appointment of Attorney**

19.1    Security Provider irrevocably appoints the Brazilian Collateral Agent and its successors and assigns to be its true and lawful attorney-in-fact (with full power of substitution and delegation), irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Brazilian Civil Code, *in rem suam* and as a condition of this transaction, for and on behalf of the Security Provider and in its name or otherwise and on its behalf and as the Security Provider's act and deed to sign, seal, execute, deliver and do all such assurances, acts and things which the Brazilian Collateral Agent may reasonably deem to be necessary in order to give full effect to the purposes of this Agreement including, without limitation, to ask, require, demand, receive, compound and give acquittance for any and all amounts and claims for any and all amounts due under or arising out of the Aircraft, to endorse any *cheque*, draft or other document, instrument or order in connection therewith and to make any claim or to take any action or to institute any suit, legal action or other proceeding which the Brazilian Collateral Agent may reasonably consider to be necessary in connection with the Aircraft (or any Part thereof), to exercise all rights and perform all acts provided for in article 1,364 of the Brazilian Civil Code and in Clause 12.1 of this Agreement, and generally in the Security Provider's name and on its behalf to exercise all or any of the powers, authorities and discretions conferred by or pursuant to this Agreement or the Applicable Laws on the Brazilian Collateral Agent and, without prejudice to the generality of the foregoing, to seal and deliver and otherwise perfect any deed, assurance, agreement, instrument, act or thing which the Brazilian Collateral Agent may reasonably deem appropriate for the purpose of exercising any of such powers, authorities and discretions.

The Security Provider and the Brazilian Collateral Agent agree that the power conferred in accordance with this Clause 19.1 shall only be exercisable in circumstances where an Event of Default occurred and is continuing and shall entitle the Brazilian Collateral Agent to carry out any action and exercise any right provided for in Clause 12.1 and to represent the Security Provider before any Brazilian governmental authority, including, but without limitation, the Central Bank of Brazil, RAB, ANAC, the Federal Revenue Service and any customs authority.

19.2    The power conferred in accordance with Clause 19.1:

(a)     shall always be interpreted a general power of attorney under the Governing Law;

(b)     is granted as a condition of this Fiduciary Lien and as a means to perform the obligations established herein and shall be irrevocable, valid, and effective; and

(c)     pursuant to article 684 of the Brazilian Civil Code, is a power coupled with an interest, shall be irrevocable and shall terminate with respect to the Aircraft only upon the release of the Fiduciary Lien in accordance with the terms of this Agreement.

19.3     The powers conferred on the Brazilian Collateral Agent hereunder are solely to protect the Brazilian Collateral Agent's (acting on behalf of the Secured Parties) interest in the Aircraft and shall not impose any duty upon it to exercise such powers.

19.4     The Security Provider hereby unconditionally and irrevocably ratifies and confirms and agrees to ratify and confirm whatever any attorney appointed pursuant to Clause 19.1 shall lawfully do or purport to do in the exercise or purported exercise of any or all of the powers, authorities and discretions conferred pursuant to Clause 19.1.

## 20     Further Assurance and Protection of Security

20.1     The Security Provider will take all such action and do all such things as the Brazilian Collateral Agent in accordance with the instruction provided by the Trustee may from time to time reasonably request so as to establish, maintain, perfect, preserve and/or protect the rights of the Brazilian Collateral Agent under or in relation to this Agreement, the Lien created (or intended to be created) by this Agreement and/or the priority (or intended priority) of such Lien.

20.2     The Brazilian Collateral Agent shall, without prejudice to its other rights, powers and remedies under this Agreement, be entitled (but not obliged) to take all such action and do all such things as it may from time to time consider (acting reasonably) necessary so as to establish, maintain, perfect, preserve and/or protect its rights under or in relation to this Agreement, the Lien created (or intended to be created) by this Agreement and/or the priority (or intended priority) of such lien **provided that** the Brazilian Collateral Agent shall, for so long as there shall not have occurred and be continuing an Event of Default, consult in good faith with the Security Provider in relation to the taking of any such action or the doing of any such thing. Any action taken or thing done pursuant to this Clause 20 shall be at the Security Provider's sole cost and expense.

## 21     Miscellaneous

21.1     This Agreement may be executed in any number of counterparts and on separate counterparts, each of which when executed shall constitute an original, but all counterparts shall together constitute one and the same instrument.

21.2     Any amendment, supplement or variation to this Agreement must be in writing and executed by each Party.

21.3     Neither the failure to exercise, nor **the delay in** any exercise of, nor the single or partial exercise of, any right, power or remedy by the Brazilian Collateral Agent under or in relation to this Agreement shall (a) operate as a waiver of such right, power or remedy, (b) prevent any further or other exercise of such right, power or remedy or (c) prevent the exercise of any other right, power or remedy. The rights, powers and remedies of the Brazilian Collateral Agent provided in this Agreement are cumulative and not exclusive of any rights, powers or remedies provided by law.

21.4    Any waiver or consent given by a Party under or in relation to this Agreement must, in order to be effective, be in writing and shall only be effective in the specific circumstances in which it is given.

21.5    If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired.

21.6    The security interest created hereby is cumulative separate to other security interests granted as collateral to the Secured Obligations and therefore may be enforced separately to such other security interests and shall not affect the ability of the Secured Parties to foreclose on such other security interests.

21.7    This Agreement is deemed for all purposes a "Collateral Document" under the terms of the Indenture.

21.8    The Brazilian Collateral Agent may at any time give notice of its resignation and be discharged of its obligations under this Agreement, pursuant to the terms and conditions of the Indenture. The Parties hereby agree to amend this Agreement within five (5) Business Days from the date of the designation of the new appointed collateral agent in order to include the new appointed collateral agent.

## 22    Costs and Expenses

22.1    All fillings, registrations, recordings and other actions necessary or advisable to:

(i)     perfect the granting of the Lien under this Agreement;

(ii)    ensure the Lien granted under this Agreement obtains and continues to have its stated priority;

(iii)   otherwise ensure the validity, effectiveness and enforceability of this Agreement and Transactions Documents; and

(iv)    release and discharge this Fiduciary Lien,

shall be undertaken at the cost of Security Provider.

22.2    All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to (a) the preservation of any of its rights under or in relation to this Agreement, (b) any proposed amendment to this Agreement, (c) any request for a consent or waiver under this Agreement, (d) the enforcement of any of its rights under or in relation to this Agreement, and (e) any and all costs and stamps, registration, and other documentary taxes to which this Agreement is or at any time may be subject. the ("**Expenses**") will be solely and exclusively borne by the Security Provider, and the Security Provider undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Security Provider does not timely perform the transfer of the amounts mentioned herein.

22.3    The Security Provider shall from time to time on first demand pay all RAB and International Registry fees, all transaction costs and all stamp, registration and other documentary taxes to which this Agreement is or at any time may be subject.

22.4     The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless it receives instructions provided by the Trustee, as well as indemnity or guarantee to its satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Security Provider.

## 23     Assignments and Transfers

23.1     This Agreement shall be binding upon and inure to the benefit of each Party and its successors and permitted assigns and permitted transferees.

23.2     The Security Provider shall not be entitled to assign and/or transfer any or all of its rights and/or obligations under this Agreement except to the extent permitted under and in accordance with the terms of the Transaction Documents.

23.3     The Brazilian Collateral Agent shall be entitled to assign and/or transfer any or all of its rights and/or obligations under this Agreement without the prior written consent of the Security Provider under the terms of the Transaction Documents, or if such assignment is made at the discretion of a Brazilian governmental authority.

## 24     Notices

24.1     For the purposes of this Agreement and each other Transaction Document, all notices and other communications (including any requests, directions, certifications or modifications of, or waivers or consents under, this Agreement or any other Transaction Document) shall be in writing, in English, and shall be given or made by fax, mail, overnight delivery service or personal delivery and faxed, mailed or delivered to the intended recipient at the address specified below; or, as to any party, at such other address as shall be designated by such party in writing in a notice to each other party hereto. Except as otherwise provided in this Agreement or any other Transaction Document, all such communications shall be deemed to have been duly given when transmitted by fax (provided such transmission by fax is in legible form and is accompanied by or generates a substantially simultaneous confirmation of transmission), or delivered or, in the case of a mailed notice, upon issuance by the relevant postal authority of a receipt confirming delivery, in each case given or addressed as aforesaid.

     (a)     **If to the Security Provider:**

          Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo São Paulo - SP, Brazil
Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

     (b)     **If to the Brazilian Collateral Agent:**

          Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil.

          Att: Danilo Oliveira / Karla Fernandes (danilo.oliveira@tmf-group.com/ karla.fernandes@tmf-group.com)

24.2     Each such communication shall be deemed to have been given or delivered when despatched (in the case of any communication made by facsimile transmission provided that, if the date of despatch is not a Business Day in the country of the recipient, it shall be deemed to have been given or delivered on the next succeeding

Business Day in such country) or (in the case of any communication made by letter) when left at the relevant address, as aforesaid, or (as the case may be) five (5) Business Days after being deposited with a recognised international air courier postage prepaid in an envelope addressed to it at that address provided that any communication or document to be made or delivered to the Brazilian Collateral Agent shall be effective only when received by the Brazilian Collateral Agent and then only if the same is expressly marked for the attention of the department or officer specified above (or such other department or officer as the Brazilian Collateral Agent shall from time to time specify for this purpose).

## 25      Governing Law and Jurisdiction

25.1     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE FEDERATIVE REPUBLIC OF BRAZIL.

25.2     Each Party irrevocably agrees for the benefit of the other Party that the courts of the State of São Paulo, Brazil shall have jurisdiction to hear and determine any suit, action or proceeding ("**Proceedings**"), and to settle any disputes, which may arise out of or in connection with this Agreement and for such purpose irrevocably submits to the jurisdiction of such courts.

25.3     The submission by the Parties to the jurisdiction mentioned in Clause 19.2 shall not (and shall not be construed so as to) limit the right of the Brazilian Collateral Agent to take Proceedings against the Security Provider in any other court of relevant jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction, whether concurrently or not, if and to the extent permitted by Applicable Law.

25.4     The Security Provider hereby consents generally in respect of any Proceedings arising out of or in connection with this Agreement to the giving of any relief or the issue of any process in connection with such Proceedings including, without limitation, the making, enforcement or execution against any property of any order or judgment which may be made or given in such Proceedings.

25.5     The Security Provider hereby irrevocably consents in respect of the proceedings arising out of the enforcement of this Agreement to the application of the provisions of article 879 of the Brazilian Civil Procedure Code.

25.6     To the extent that the Security Provider may in any jurisdiction claim for itself or its assets immunity from suit, execution, attachment (whether in aid of execution or judgment or otherwise) or other legal process and to the extent that in any such jurisdiction there may be attributed to itself or its assets such immunity (whether or not claimed), the Security Provider hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the full extent permitted by the laws of such jurisdiction.

## 26      Cape Town Convention; International Interest

26.1     The Parties agree that the Fiduciary Lien created hereunder shall be subject, to the fullest extent set forth and permitted by law, to the Cape Town Convention and the Aircraft Protocol and in accordance with the declarations lodged by Brazil under the Aircraft Protocol and under the Cape Town Convention at the time of the deposit of its instrument of accession in respect thereof.

26.2     The Parties further agree that (i) this is a security agreement as defined in the Cape Town Convention; (ii) the Aircraft will be registered on the aircraft register of the

State of Registration, which is the State of registry for the purposes of the Cape Town Convention; (iii) the Airframe is an airframe and, accordingly, an aircraft object to which this Fiduciary Lien relates for the purposes of the Cape Town Convention and is a [•] aircraft with manufacturer's serial number [•] and registration mark [•] and the Engines are aircraft engines and, accordingly, are also aircraft objects for the purposes of the Cape Town Convention and are a model [•] engines with manufacturer's serial numbers [•] and [•]; (iv) the international interest of the Brazilian Collateral Agent, acting on behalf of the Secured Parties, shall be registered, with the consent of the Security Provider and the Brazilian Collateral Agent, as an international interest under the Cape Town Convention in the Airframe and the Engines and such registration may be amended or extended prior to its expiry by the Security Provider or the Brazilian Collateral Agent, with the consent in writing of the other; (iv) an Event of Default is an event that constitutes a default or otherwise gives rise, to the fullest extent set forth and permitted by law, to the rights and remedies specified in articles 12 to 15 and 20 of the Cape Town Convention and the Security Provider and the Brazilian Collateral Agent agree that the rights and remedies specified in the said articles and in Clause 12.1 shall be available to the Brazilian Collateral Agent, to the fullest extent set forth and permitted by law; (v) the Security Provider has power to dispose of the Airframe and the Engines for the purpose of Article 10(b) of the Cape Town Convention; and (vi) the Security Provider shall cooperate with the Brazilian Collateral Agent with respect to effecting registration pursuant to the Cape Town Convention of any agreement related to the ranking of priority between the various international interests and/or the interests of the Security Provider and the Brazilian Collateral Agent.

## 27      Brazilian Collateral Agent General Provisions

27.1      The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

27.2      The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Security Provider, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to

perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Security Provider's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent (including the Valuation Report) and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

27.3    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, declaration, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Security Provider's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

27.4    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

27.5    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Security Provider.

27.6    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Security Provider to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian reais, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the business day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil ("ROF"), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Clause. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

27.7    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

27.8    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

27.9    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

27.10    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("**Embargo Rules**"). Violation of the Embargo Rules includes, among

others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Clause 27.10.

27.11   Any and all payments by Gol Finance, and/or the Security Provider and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("**Deductions**"). If any Deductions apply to any payment, Gol Finance, the Security Provider and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

27.12   The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

27.13   For the avoidance of doubt, the Security Provider acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

27.14   Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may waive at any time by notifying the Trustee and the Security Provider. Upon any waiver by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Security Provider (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Security Provider (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Security Provider to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Security Provider and such successor.

**IN WITNESS WHEREOF** the Parties have caused this Agreement to be executed as a deed by the duly authorised representatives of the Parties and this Agreement is intended to be and is hereby signed in São Paulo and delivered on the day and year first above written.

*[Execution page follows]*

**EXECUTION PAGE**

**Brazilian Law Aircraft Fiduciary Lien**

**The Security Provider**

**GOL LINHAS AÉREAS S.A.**

_____
Name:
Title:

_____
Name:
Title:

**EXECUTION PAGE**

**Brazilian Law Aircraft Fiduciary Lien**

**The Brazilian Collateral Agent,**

acting on behalf of the Secured Parties

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____
Name:
Title:

**EXECUTION PAGE**

**Brazilian Law Aircraft Fiduciary Lien**

**The intervening and consenting party,**

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____
Name:
Title:

_____
Name:
Title:

## EXECUTION PAGE

### Brazilian Law Aircraft Fiduciary Lien

**Witnesses:**

By:_____
Name:
ID

By: _____
Name:
ID

## SCHEDULE 1

### Description of Airframe and Engine

### Airframe

Manufacturer: [●]

Model: [●]

Registration Mark: [●]

Manufacturer's Serial No.: [●]

Year of Manufacture: [●]

### Engine

Engine Model:

Serial No.:

Manufacturer:

## SCHEDULE 2

## Secured Obligations

**Indenture**:

Summary of the terms and conditions of the Indenture:

## GOL FINANCE NOTES

Principal Amount: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Maturity Date: June 30, 2026;

Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00% (two percent) per annum higher than the interest rate otherwise applicable to the Notes;

Penalty Clause: not applicable;

Inflation Adjustment Index: not applicable;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided in the Indenture.

## AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

## SCHEDULE 3

### List of Insurances / Reinsurances

**Master Insurer / Reinsurer:** [●].

**Master Insurance / Reinsurance Reference / Policy Number:**  [●].

Reference No.: [●]

## SCHEDULE 4

### Form of IDERA

**AUTORIZAÇÃO IRREVOGÁVEL DE CANCELAMENTO DA MATRÍCULA E DE SOLICITAÇÃO DE EXPORTAÇÃO**

Anexo a que se refere o Artigo XIII do Protocolo de Aeronaves

[preencher a data]

Destinatário: Agência Nacional de Aviação Civil - ANAC

Assunto: Autorização Irrevogável de Cancelamento da Matrícula e de Solicitação de Exportação

O abaixo assinado é operador da aeronave [●], modelo [●], no qual figura o número de série do fabricante [●], matrícula [●] (junto com todos os acessórios, peças e equipamentos instalados, incorporados ou acoplados, a "aeronave").

O presente instrumento é uma autorização irrevogável de registro e de exportação emitido pelo abaixo assinado em favor da [●] (a "parte autorizada") de acordo com os termos do Artigo XIII do Protocolo à Convenção sobre Garantias Internacionais Incidentes sobre Equipamentos Móveis Relativo a Questões Específicas ao Equipamento Aeronáutico. De acordo com esse Artigo, o abaixo assinado requer:

(i) o reconhecimento de que a parte autorizada ou a pessoa certificada como seu representante é a única pessoa habilitada a:

(a) requerer o cancelamento da matrícula da aeronave no Registro Aeronáutico Brasileiro

**IRREVOCABLE DE-REGISTRATION AND EXPORT REQUEST AUTHORISATION**

Annex referred to in Article XIII of the Aircraft Protocol

[insert date]

To: *Agência Nacional de Aviação Civil - ANAC*

Re: Irrevocable De-Registration and Export Request Authorisation

The undersigned is the operator of the [●]aircraft, model [●], bearing manufacturers serial number [●] and registration mark [●] (together with all installed, incorporated or attached accessories, parts and equipment, the "aircraft").

This instrument is an irrevocable de-registration and export request authorisation issued by the undersigned in favor of [●] (the "authorised party") under the authority of Article XIII of the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment. In accordance with that Article, the undersigned hereby requests:

(i) recognition that the authorised party or the person it certifies as its designee is the sole person entitled to:

(a) procure the de-registration of the aircraft from the Brazilian Aeronautical

(RAB) mantido pela Agência Nacional de Aviação Civil (ANAC) para os fins do Capítulo III da Convenção de Aviação Civil Internacional, assinada em Chicago, Estado Unidos da América, em 07 de dezembro de 1944; e

(a) fazer exportar e transferir fisicamente a aeronave da República Federativa do Brasil; e

(ii) a confirmação de que a parte autorizada ou a pessoa certificada como seu representante pode tomar a medida especificada no parágrafo (i) acima mediante solicitação escrita sem o consentimento do abaixo assinado e que, mediante essa solicitação, as autoridades na República Federativa do Brasil deverão cooperar com a parte autorizada com vistas à pronta efetivação das medidas em questão.

Os direitos em favor da parte autorizada estabelecida no presente instrumento não poderão ser revogados pelo abaixo assinado sem o consentimento por escrito da parte autorizada.

Queira confirmar sua concordância com a presente solicitação e com seus termos preenchendo o presente documento de modo adequado no espaço abaixo e depositando-o junto a Agência Nacional de Aviação Civil - ANAC.

### GOL LINHAS AÉREAS S.A.

Por: _____
Nome:
Cargo:


Por: _____
Nome:
Cargo:


### Testemunhas:

_____
Nome:
RG:

Registry maintained by the National Agency of Civil Aviation f or the purposes of Chapter III of the Convention on International Civil Aviation, signed at Chicago, on 7 December 1944, and

(b) procure the export and physical transfer of the aircraft from the Federative Republic of Brazil; and

(ii) confirmation that the authorised party or the person it certifies as its designee may take the action specified in clause (i) above on written demand without the consent of the undersigned and that, upon such demand, the authorities in the Federative Republic of Brazil shall co-operate with the authorised party with a view to the speedy completion of such action.

The rights in favor of the authorised party established by this instrument may not be revoked by the undersigned without the written consent of the authorised party.

Please acknowledge your agreement to this request and its terms by appropriate notation in the space provided below and lodging this instrument in *Agência Nacional de Aviação Civil - ANAC.*

### GOL LINHAS AÉREAS S.A.

By: _____
Name:
Title:


By: _____
Name:
Title:


### Witnesses:

_____
Name:
ID:

_____

Nome:
RG:

_____

Name:

ID:

**EXHIBIT N**

FORM OF RECEIVABLES AND BANK ACCOUNT PLEDGE AGREEMENT

| | |
|---|---|
| **RECEIVABLES AND BANK ACCOUNT PLEDGE AGREEMENT** | **CONTRATO DE PENHOR DE RECEBÍVEIS E CONTA BANCÁRIA** |

This Receivables and Bank Account Pledge Agreement (the "Agreement") is entered into by and among:

O presente Contrato de Penhor de Recebíveis e Conta Bancária ("Contrato") é celebrado por e entre:

(i)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 07.575.651/0001-59, acting as pledgor, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA" or "Pledgor");

(i)     **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 07.575.651/0001-59, atuando como empenhante e devedora pignoratícia, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLA" ou "Empenhante");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Zip Code 06.460-110, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Secured Parties (hereinafter referred to as "Brazilian Collateral Agent");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós, n° 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício das Partes Garantidas (doravante designado "Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

(iii)     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of

(iii)     **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade organizada e existente segundo as leis do

Brazil, with its head office in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "<u>GLAI</u>");

Each party above also hereinafter individually referred to as a "<u>Party</u>" and, collectively, as "<u>Parties</u>";

**WHEREAS:**

(i)     GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("<u>Gol Finance</u>") issued 8.00% Senior Secured Notes due 2026 ("<u>Notes</u>"), pursuant to an Indenture entered into by Gol Finance and the Trustee on December 23, 2020 (the "<u>Indenture</u>") and as described in the private placement memorandum related to the Notes offering ("<u>Offering</u>");

(ii)    the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture ("<u>Secured Parties</u>") as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties with in connection with the collateral provided under this Agreement, as permitted by the terms set

Brasil, na cidade de São Paulo, Estado de São Paulo, com sede na Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados (doravante designada "<u>GLAI</u>");

Cada parte acima são também doravante individualmente designadas como "<u>Parte</u>" e, em conjunto, como "<u>Partes</u>";

**CONSIDERANDO QUE:**

(i)     a GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("<u>Gol Finance</u>") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("<u>Notas</u>"), nos termos e condições previstos na escritura por meio da qual as Notas foram emitidas, celebrada entre a Gol Finance e o *Trustee* em 23 de dezembro de 2020 ("<u>Escritura</u>") e no memorando de colocação privada relacionado à oferta das Notas ("<u>Oferta</u>");

(ii)    o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura ("<u>Partes Garantidas</u>") como agente de garantia no Brasil nos termos da Escritura para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido

forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("_Trustee_") and in accordance with the terms provided for in the Indenture and this Agreement;

(iii)   in order to secure the satisfaction of all obligations undertaken by Gol Finance, under the terms and conditions of the Indenture, GLA and GLAI ("_Guarantors_") provided a personal guarantee under the terms of the Indenture ("_Guarantees_");

(iv)   The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent;

(v)   the Pledgor has opened a cash collateral account with [_depositary bank_] ("_Depositary Bank_") under No. [●], pursuant to the "_[●] Agreement_" dated as of [●], 2020, entered by and among the Pledgor, the Depositary Bank and the Brazilian Collateral Agent, as amended from time to time ("_Collateral Account Agreement_" and "_Cash Collateral Account_", respectively);

pelos termos previsto na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("_Trustee_") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii)   a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, a GLA e a GLAI ("_Garantidoras_") prestaram garantia pessoal nos termos da Escritura ("_Garantias Fidejussórias_");

(iv)   A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o _Trustee_, na qualidade de representante das Partes Garantidas e do Agente de Garantia Brasileiro;

(v)   A Empenhante abriu uma conta vinculada junto ao [_banco depositário_] ("_Banco Depositário_") sob o nº. [●], de acordo com o ["_Contrato de Prestação de Serviços de Conta Vinculada_"], datado de [●] de [●] de [●], celebrado por e entre a Empenhante, o Banco Depositário e o Agente de Garantia Brasileiro, conforme aditado de tempos em tempos ("_Contrato de Conta Vinculada_" e "_Conta Vinculada_", respectivamente);

(vi)    the Pledgor agrees to pledge the Pledged Receivables (as defined below) to the Brazilian Collateral Agent, as collateral agent, as representative and for the benefit of the Secured Parties under this Agreement, as collateral for the repayment of the Secured Obligations (as defined below) hereunder; and

(vi)    a Empenhante concorda em empenhar os Recebíveis Empenhados (conforme definidos abaixo) em favor do Agente de Garantia Brasileiro, na qualidade de agente de garantia como representante e em benefício das Partes Garantidas, nos termos deste Contrato, em fiel garantia ao cumprimento das Obrigações Garantidas (conforme definido abaixo) de acordo com o presente instrumento; e

(vii)    the Brazilian Collateral Agent, as collateral agent, as representative and for the benefit of the Secured Parties agrees to receive from Pledgor the Pledged Receivables as collateral securing the Secured Obligations, subject to the terms and conditions set forth in this Agreement.

(vii)    o Agente de Garantia Brasileiro, na qualidade de agente de garantia, como representante e em benefício das Partes Garantidas, concorda em receber da Empenhante os Recebíveis Empenhados em fiel garantia às Obrigações Garantidas, de acordo com os termos e as condições constantes deste Contrato.

**NOW, THEREFORE**, the Parties agree to enter into this Agreement under the following terms and conditions:

**RESOLVEM AS PARTES**, celebrar este Contrato, de acordo com os seguintes termos e condições:

### SECTION I
### PLEDGE

### CLÁUSULA I
### PENHOR

1.1.    In accordance with the provisions hereof, in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or that may be due by Gol Finance to the Secured Parties under the terms of the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or that may be due by each Guarantor to the Secured Parties under the terms of the respective Guarantees; (c) the faithful and timely fulfillment by Gol Finance and the Guarantors of all agreements, obligations and provisions contained in this Agreement and in the other documents related

1.1.    De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias Fidejussórias; (c) o fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos,

to the Offering and each document related to any of the referred instruments (together , the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance to the Secured Parties under the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance, the GLA and / or GLAI to the Collateral Agent, including, without limitation, fees, costs and expenses provided for in the Transaction Documents (with the obligations contained in items "(a)", "(b)", "(c)", "(d)" and "(e)" referred to together as the "Secured Obligations"), the Pledgor pledges, transfers and grants to the Secured Parties, hereby represented by the Collateral Agent, which shall act for the benefit of the Secured Parties, pursuant to and in accordance with the provisions of Articles 1424(iv) and 1,431 *et seq.* of the Civil Code, a first priority pledge and ("Pledge") of **(A)** all and any receivables, credit rights, income, claims, penalties and any other kind of receivable held by the Pledgor related to the agreements and documents listed and described in Exhibit II hereto; **(B)** all sums from indemnifications payable to the Pledgor, including as damages or collateral, from time to time, in connection exclusively with the rights described in item (A), **(C)** all of present and future rights, title and interest in and to the Cash Collateral Account (described in Exhibit II hereto) and all property therein or credited thereto (including (i) any and all amounts deposited or invested from time to time in such account; and (ii) all proceeds of any insurance, indemnity, warranty or guaranty payable to Pledgor from time to time with respect thereto ("Pledged Account" and items (A), (B) and

obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela GLA e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), a Empenhante empenha, transfere e dá às Partes Garantidas, neste ato representadas pelo Agente de Garantia, que atuará em benefício das Partes Garantidas, observado e em conformidade com o disposto nos artigos 1.424, inciso IV, e 1.431 e seguintes do Código Civil, como garantia de penhor em primeiro grau pelo devido cumprimento das Obrigações Garantidas ("Penhor") **(A)** todos e quaisquer recebíveis, direitos creditórios, rendimentos, reivindicações, penalidades e qualquer outro tipo de recebíveis detidos pela Empenhante em relação aos contratos e documentos listados e descritos no Anexo II; **(B)** todos os valores decorrentes de indenizações devidas à Empenhante, inclusive como danos ou garantias, de tempos em tempos, em conexão exclusivamente com os direitos descritos no item (A), **(C)** todos os direitos, títulos e interesses presentes ou futuros com relação à Conta Vinculada (descrita no Anexo II ao presente instrumento) e todos os

(C) collectively hereinafter referred to as "Pledged Receivables").

1.2.    The Secured Obligations include any and all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all future and current principal and accessory payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, under or in connection with the Offering or the Indenture.

1.3.    The main terms and conditions of the Secured Obligations are determined in Exhibit I to this Agreement.

## SECTION II
## PERFECTION OF THE COLLATERAL

2.1.    The Pledgor shall, within twenty (20) days from the date hereof or from the date of execution of any amendments to this Agreement, deliver to the Collateral Agent this Agreement, or any of its amendments, duly registered with the deeds and documents registry office (*Cartório de Registro de Títulos e Documentos*) of the cities where the headquarters of each Party is located. For such purposes, the Pledgor undertakes to take all

valores e bens de tempos em tempos creditados na referida conta, incluindo (i) todo e qualquer valor depositado de tempos em tempos em tal conta ou os investimentos realizados de tempos em tempos com recursos de tal conta; e (ii) todos os proventos de qualquer seguro, indenização ou garantia pagos à Empenhante, de tempos em tempos, em relação a tais direitos ("Conta Empenhada" e itens (A), (B) e (C) conjuntamente doravante referidos como "Recebíveis Empenhados").

1.2.    As Obrigações Garantidas incluem todas e quaisquer obrigações assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.    As principais condições e características das Obrigações Garantidas são aquelas descritas no Anexo I ao presente Contrato.

## CLÁSULA II
## APERFEIÇOAMENTO DA GARANTIA

2.1.    A Empenhante deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou seus aditamentos, devidamente registrados nos Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Empenhante compromete-se a praticar todos os atos necessários para

necessary actions required for such registration at its sole expense.

2.2    No later than [ten (10)] Business Days from the date hereof, the Pledgor shall provide evidence that (i) the counterparties of the agreements listed in Exhibit II hereto have been duly informed of the Pledge and have been given instructions to follow any request from the Brazilian Collateral Agent as to where payments shall be made as they fall due, in accordance with the terms of the notice form attached hereto as Exhibit III ("Notice"), and (ii) that such counterparties (a) have formally acknowledged receipt of such Notice by countersigning it as "agreed and accepted", to the extent that counterparty consent is required under the relevant agreement, or (b) have received such Notices by certified mail, to the extent that counterparty consent is not required under the relevant agreement.

2.3.    All costs and expenses related to the filing and registration of this Agreement as required hereunder, and with sending the Notices (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) shall be borne by the Pledgor, at its own expense.

2.4.    If the Pledgor fails to timely file this Agreement and send the Notices pursuant to Sections 2.1 and 2.2 above, respectively, the Brazilian Collateral Agent is hereby authorized by Pledgor to conduct any such actions directly. The Pledgor shall reimburse

efetuar os referidos registros, às suas próprias expensas.

(i)    No prazo máximo de [10 (dez)] Dias Úteis contados da data do presente instrumento, a Empenhante deverá fornecer comprovação de que (i) as contrapartes dos contratos listados no Anexo II ao presente ato foram devidamente informadas sobre o Penhor e receberam instruções para seguir qualquer solicitação do Agente de Garantia Brasileiro quanto ao local onde devem ser feitos os pagamentos, uma vez vencidos, de acordo com os termos do modelo de notificação anexado ao presente como Anexo III ("Notificação"); e (ii) tais contrapartes (a) reconhecem formalmente o recebimento de tal Notificação com seu "de acordo", na medida que o consentimento da contraparte seja exigido nos termo do contrato com tal contraparte, ou (b) receberam tal Notificação por correio com aviso de recebimento, na medida que o consentimento da contraparte não seja exigido nos termo do contrato com tal contraparte.

2.3.    Todos os custos e despesas relacionados ao arquivamento e registro deste Contrato e ao envio das Notificações, conforme aqui previstos (incluindo, sem limitação, honorários advocatícios, traduções juramentadas ou relativos a quaisquer outras formalidades que sejam necessárias), serão arcados pela Empenhante, às suas próprias expensas.

2.4.    Caso a Empenhante deixe de registrar ou arquivar este Contrato e enviar as Notificações de acordo com o previsto nas Cláusulas 2.1 e 2.2 acima, respectivamente, o Agente de Garantia Brasileiro fica autorizado pela Empenhante

the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Sections 2.1 and 2.2 above, without prejudice to any right of the Brazilian Collateral Agent or to any consequences or remedies set forth under this Agreement or the Transaction Documents deriving from such noncompliance by the Pledgor of its obligations hereunder.

a realizar qualquer arquivamento e registro diretamente. A Empenhante deverá reembolsar o Agente de Garantia Brasileiro, no prazo de cinco (5) dias a partir do recebimento de uma solicitação por escrito, todos e quaisquer custos (incluindo, sem limitação, honorários advocatícios e despesas com traduções ou com quaisquer outras formalidades que possam ser exigidas nesse sentido) que possam ser desembolsados pelo Agente de Garantia Brasileiro em relação aos arquivamentos e registros descritos nas Cláusulas 2.1 e 2.2 acima, sem prejuízo de outros direitos ou consequências previstos neste Contrato ou nos Documentos da Transação em razão do descumprimento pela Companhia de suas obrigações aqui previstas.

2.5.    Without prejudice to the foregoing, Pledgor shall:

2.4.    Sem prejuízo ao acima disposto, a Empenhante deverá:

(i)    diligently comply with any requirements made by the relevant Registry of Deeds and Documents and/or the board of trade, as the case may be, and keep the Brazilian Collateral Agent informed on any such requirement; and

(i)    cumprir diligentemente quaisquer exigências apresentadas pelo Cartório de Registro de Títulos e Documentos e/ou pela junta comercial competente, conforme o caso, e manter o Agente de Garantia Brasileiro informado sobre qualquer exigência; e

(ii)    take any further action pursuant to applicable law required, now or in the future, for the creation, perfection, and/or maintenance of the first rank Pledge over the Pledged Receivables.

(ii)    tomar quaisquer providências adicionais de acordo com a lei aplicável necessárias, atualmente ou no futuro, para a criação, realização e/ou manutenção do Penhor em primeiro grau sobre os Recebíveis Empenhados.

### SECTION III
### REPRESENTATIONS AND WARRANTIES

### CLÁUSULA III
### DECLARAÇÕES E GARANTIAS

3.1. The Brazilian Collateral Agent hereby represents and warrants that:

3.1.    O Agente de Garantia Brasileiro neste ato declara e garante que:

(i)    has full powers, authority and ability to enter into this Agreement, comply with its contractual obligations and to enter into this Pledge, as described herein; and

(i)    possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar o Penhor conforme aqui descrito; e

(ii)    has taken all appropriate measures to authorize the execution and performance of this Agreement.

(ii)    tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

3.2.    The Pledgor hereby represents and warrants that:

3.2.    A Empenhante, neste ato declara que:

(i)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into Pledge as described herein;

(i)    possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar o Penhor, conforme aqui descrito;

(ii)    has taken all necessary measures to authorize the execution and performance of this Agreement;

(ii)    tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato;

(iii)    this Agreement constitutes legal, valid, binding obligations and enforceable against the Pledgor, according with its terms;

(iii)    o presente Contrato constitui uma obrigação legal, válida, e exequível contra a Empenhante, de acordo com os seus termos;

(iv)    the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Pledgor, (ii) any applicable law, (iii) any policy or rule of the Pledgor, (iv) the Pledgor's organizational acts, and do not cause or impose any encumbrance on its assets, except for the Pledge created hereunder;

(iv)    a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Empenhante, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Empenhante, (iv) quaisquer atos constitutivos da Empenhante, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pelo Penhor objeto deste Contrato;

(v)    the Pledgor is the lawful and exclusive owner of, and has good title to, the Pledged Receivables and the Pledged Account;

(v)    é a legítima e exclusiva proprietária e possuidora dos Recebíveis Empenhados e da Conta Empenhada;

- 9 -

(vi)    except for Pledge, the Pledged Receivables are free and clear of any liens, encumbrances and/or guarantees and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary assignment, pledge or sale of Pledged Receivables (including the Pledged Account) in the Pledgor's bylaws or in any other document; and, in the event of the foreclosure or performance of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document.

(vii)    to best knowledge of the Pledgor there is no procedure, proceeding or claim from third parties or any governmental authority or body that may, in any way, adversely affect the Pledged Receivables or this Agreement; and

(viii)    the power of attorney granted under the terms of Section 5.4 and in the form of Exhibit IV hereto, was duly issued by the Company and its legal representatives and validly grants the powers set forth therein to the Brazilian Collateral Agent, and the Pledgor did not grant any other power of attorney or similar instrument with similar effect to any other third party in connection with the Transferred Assets described hereof.

## SECTION IV
### ADDITIONAL OBLIGATIONS; CASH COLLATERAL ACCOUNT

4.1.    The Pledgor undertakes to and agrees that, on and after the date hereof and until all

(vi)    exceto pelo presente Penhor, os Recebíveis Empenhados estão livres e desembaraçadas de quaisquer ônus, gravame e/ou garantias e podem ser cedidos fiduciariamente, empenhados ou vendidos judicial ou extrajudicialmente, sendo que inexistem restrições para a cessão fiduciária, penhor ou venda dos Recebíveis Empenhados (incluindo a Conta Empenhada) no estatuto social da Empenhante ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento.

(vii)    no melhor conhecimento da Empenhante, não há procedimento, processo ou reclamação de terceiros ou de qualquer autoridade ou órgão governamental que possa, de alguma forma, afetar adversamente os Recebíveis Empenhados ou este Contrato; e

(viii)    a procuração outorgada, nos termos da Cláusula 5.4 abaixo e na forma do Anexo IV a este Contrato, foi devidamente assinada pelos representantes legais da Companhia e confere, validamente, os poderes ali indicados ao Agente de Garantia Brasileiro, e a Empenhante não outorgou qualquer outra procuração ou instrumento com efeito similar a quaisquer terceiros com relação aos Recebíveis Empenhados descritos neste Contrato.

## CLÁUSULA IV
### OBRIGAÇÕES ADICIONAIS; CONTA VINCULADA

4.1.    A Empenhante se obriga e concorda que, na data do presente instrumento e até

Secured Obligations are paid and discharged in full:

(i)    to carry out all acts reasonably required by the Brazilian Collateral Agent and to cooperate with the Brazilian Collateral Agent for the performance and enforcement of this Agreement;

(ii)    to provide to the Brazilian Collateral Agent, in any case by no later than five (5) Business Days after the receipt of the respective request from the Brazilian Collateral Agent, and at the sole expense of Pledgor, with all information and all documents relating to the Pledge and to the Pledged Receivables as requested by the Brazilian Collateral Agent, to determine compliance with this Agreement and/or for the preservation, maintenance and/or enforcement of the Pledge;

(iii)    to maintain always valid, effective and in good standing all authorizations required for the performance of the obligations undertaken in this Agreement and/or any amendment hereto and to take all measures required under applicable law to enforce the provisions hereof and/or of any amendment hereto;

(iv)    to give written notice to the Brazilian Collateral Agent no later than two (2) Business Days after becoming aware of any event or circumstance which is likely to adversely affect Pledgor's ability to comply with the obligations undertaken herein and/or under any amendment hereto, or that may otherwise adversely affect their compliance with their obligations hereunder and/or under any amendment hereto;

que todas as Obrigações Garantidas sejam integralmente pagas e cumpridas:

(i)    a praticar todos os atos razoavelmente solicitados pelo Agente de Garantia Brasileiro e a cooperar com o Agente de Garantia Brasileiro para o cumprimento e execução deste Contrato;

(ii)    a apresentar ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento da respectiva solicitação pelo Agente de Garantia Brasileiro, e às expensas exclusivas da Empenhante, todas as informações e todos os documentos relacionados ao Penhor e aos Recebíveis Empenhados solicitados pelo Agente de Garantia Brasileiro, para a determinação do cumprimento deste Contrato e/ou para a preservação, manutenção e/ou execução do Penhor;

(iii)    a sempre manter válidas, eficazes e em situação regular todas as autorizações necessárias para o cumprimento das obrigações assumidas neste Contrato, e/ou em qualquer aditivo a este, e a adotar todas as medidas necessárias nos termos da lei aplicável para a execução das disposições do presente Contrato e/ou de qualquer aditivo a este;

(iv)    a notificar o Agente de Garantia Brasileiro, por escrito, em prazo não superior a 2 (dois) Dias Úteis após tomar ciência, de qualquer evento ou circunstância que possa afetar negativamente a capacidade da Empenhante de cumprir as obrigações assumidas no Contrato e/ou em qualquer aditivo a este, ou que possa, de outra forma, afetar negativamente o cumprimento pela Empenhante das obrigações previstas neste Contrato e/ou em qualquer aditivo a este;

(v)   timely satisfy the obligations of this Agreement;

(vi)   defend itself, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Pledged Receivable, the Pledge Account, this Agreement and / or the fulfillment of the obligations undertaken under the Offering;

(vii)   perform all acts, as well as sign any and all documents, necessary for the registration of this Agreement in the competent Registry of Titles and Documents, under the terms of this Agreement and the Indenture;

(viii)   not to carry out any act nor make any decision which could in any manner be expected to adversely affect the Pledged Receivables and/or the Pledge Account or have a material adverse effect on their value, except if as a result of the actions permitted in this Agreement;

(ix)   assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any foreclosure of the Pledge hereof, and bear all related expenses or that are necessary for such purpose;

(x)   assist, allow and use its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian

(v)   cumprir tempestivamente as obrigações desse Contrato;

(vi)   defender, a si mesma, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Recebíveis Empenhados, a Conta Empenhada, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

(vii)   praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro do Penhor no Cartório de Registro de Títulos e Documentos competente, nos termos deste Contrato e da Escritura;

(viii)   a não praticar nenhum ato nem tomar qualquer decisão que poderia, de qualquer forma, afetar negativamente os Recebíveis Empenhados e/ou a Conta Empenhada e/ou ter algum efeito adverso sobre o valor destas, exceto se em decorrência das ações permitidas neste Contrato;

(ix)   auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, no caso de eventual excussão do presente Penhor, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(x)   auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades

- 12 -

Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(xi)     to defend at its sole expense and in a timely and efficient manner, the rights of the Secured Parties, represented by the Brazilian Collateral Agent, over the Pledged Receivables and the Pledged Account against any third party claims;

(xi)     defender, às suas próprias expensas, de uma maneira tempestiva e eficiente, os direitos das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, relativos aos Recebíveis Empenhados e Conta Empenhada, contra quaisquer reivindicações de terceiros;

(xii)     comply with all clauses provided for in the Indenture;

(xii)     cumprir com todas as cláusulas previstas na Escritura;

(xiii)     notify the Brazilian Collateral Agent of any event which results in a breach of this Agreement or the Indenture or in the inaccuracy of any representation made under this Agreement within two (2) Business Days of its occurrence;

(xiii)     notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(xiv)     to pay before the assessment of any current or future fine, penalty, interests or expenses, any contributions or other charges levied on the Pledged Receivables or the Pledged Account, except to the extent that failure to make such payments would not have an adverse effect on the Pledged Receivables or the Pledged Account; and

(xiv)     a pagar antes do lançamento quaisquer multas, penalidades, juros ou despesas, presentes ou futuras, contribuições ou outros encargos incidentes sobre os Recebíveis Empenhados ou sobre a Conta Empenhada, desde que não esteja sendo contestado de boa-fé, exceto na medida de que a não realização de tal pagamento não afete adversamente os Recebíveis Empenhados ou sobre a Conta Empenhada; e

(xv)     not to execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the

(xv)     a não celebrar nem autorizar a celebração de qualquer contrato que possa impedir ou restringir os direitos e/ou a

Secured Parties and/or of the Brazilian Collateral Agent to sell or otherwise dispose of any one of the Pledged Receivables, in part or in full.

4.2. The Pledgor is also responsible for the payment of any and all fines, fees, taxes, licensing expenses and other costs arising from the Pledged Receivables and the Pledged Account.

4.3. All funds deposited in the Pledge Account shall be subject to the provisions of this Section 4.3. and subitems and any and all instructions by the Parties to the Depositary Bank with respect to any funds deposited in the Pledged Account shall be made in accordance with this Agreement.

4.3.1. Without prejudice to Section V below, unless an Event of Default or a DSCR Cash Trap Event has occurred and is continuing, the Depositary Bank will be authorized to automatically transfer any funds from the Pledged Account to an account of the Pledgor.

4.3.2. If the Brazilian Collateral Agent is informed by the Trustee that an Event of Default or a DSCR Cash Trap Event exists in accordance with the Indenture, the Brazilian Collateral Agent shall promptly instruct the Depositary Bank to immediately cease any and all transfer of funds from the Cash Collateral Account to an account of the Pledgor and not to permit any withdrawals from the Cash Collateral Account by the Pledgor.

capacidade das Partes Garantidas e/ou do Agente de Garantia Brasileiro de vender, alienar ou de outra forma dispor de qualquer Recebível Empenhado, total ou parcialmente.

4.2. A Empenhante é responsável, ainda, pelo pagamento de todas e quaisquer multas, taxas, tributos, despesas de licenciamento e outros custos decorrentes dos Recebíveis Empenhados e da Conta Empenhada.

4.3. Todos os recursos depositados na Conta Empenhada estarão sujeitos às disposições desta Cláusula 4.3 e subitens e todas e quaisquer instruções das Partes ao Banco Depositário com relação a quaisquer recursos depositados na Conta Empenhada deverão ser realizadas de acordo com este Contrato.

4.3.1. Sem prejuízo do disposto na Cláusula V abaixo, enquanto não estiver ocorrendo um Evento de Inadimplemento (*Event of Default*) ou um Evento de Retenção – Índice de Cobertura do Serviço da Dívida (*DSCR Cash Trap Event*), o Banco Depositário estará autorizado a automaticamente transferir recursos da Conta Empenhada a outra conta de titularidade da Empenhante.

4.3.2. Na hipótese de o Agente de Garantia Brasileiro ser informado pelo *Trustee* que um Evento de Inadimplemento (*Event of Default*) ou um Evento de Retenção – Índice de Cobertura do Serviço da Dívida (*DSCR Cash Trap Event*) está ocorrendo nos termos da Escritura, então o Agente de Garantia Brasileiro deverá prontamente instruir o Banco Depositário para que imediatamente cesse todas e quaisquer transferências da Conta Vinculada para contas da

- 14 -

Empenhante e não permita retiradas de recursos da Conta Vinculada pela Empenhante.

4.3.3.    Until the Brazilian Collateral Agent is informed by the Trustee that the Depository Bank can resume transferring funds deposited in the Cash Collateral Account to accounts of the Pledgor pursuant to Section 4.3.4 below, all funds deposited in the Cash Collateral Account will be used in accordance with instructions sent by the Brazilian Collateral Agent to the Depository Bank, which will always be made pursuant to instructions sent by the Trustee to the Brazilian Collateral Agent in accordance with the terms and conditions of the Indenture.

4.3.3.    Até que o Agente de Garantia Brasileiro seja informado pelo *Trustee* que o Banco Depositário pode retomar transferências de recursos depositados na Conta Vinculada a outras contas da Empenhante nos termos da Cláusula 4.3.4 abaixo, todos os recursos depositados na Conta Vinculada deverão ser utilizados de acordo com as instruções enviadas pelo Agente de Garantia Brasileiro ao banco Depositário, as quais serão realizadas de acordo com as instruções enviadas pelo *Trustee* ao Agente de Garantia Brasileiro de acordo com os termos e condições da Escritura.

4.3.4.    The Brazilian Collateral Agent shall, within one (1) Business Day from the receipt of written instruction from the Trustee, inform the Depository Bank that the automatic transfer of funds from the Pledged Account to accounts of the Pledgor can be resumed upon receipt of instructions from the Trustee to that extent in accordance with the Indenture.

4.3.4.    O Agente de Garantia Brasileiro deverá, no prazo de 1 (um) Dia Útil a partir do recebimento de instruções por escrito do *Trustee*, informar o Banco Depositário que as transferências automáticas de recursos depositados na Conta Empenhada para outra conta da Empenhante podem ser retomadas tão logo o Agente de Garantia Brasileiro receba instruções do *Trustee* nesse sentido de acordo com os termos e condições previstos na Escritura.

## SECTION V
## FORECLOSURE

## CLÁUSULA V
## EXCUSSÃO

5.1.    In the event that the acceleration of the Secured Obligations has been declared under any of the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with

5.1.    Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contando que o Agente de Garantia Brasileiro seja notificado pelo *Trustee* , o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*,

the Indenture, shall be entitled to (i) collect and receive the Pledged Receivables, to request to the Pledgor the payment of the Pledge Receivables and to arrange for judicial or extrajudicial foreclosure of the security hereunder, including by means of amicable sale; and (ii) withdraw, collect, receive and transfer irrespectively of any prior or subsequent notice or any other formality, the cash amounts deposited in the Cash Collateral Account; with irrevocable powers to transfer, assign or otherwise dispose of the Pledged Receivables and the rights related to the Pledged Receivables, in accordance with the provisions set forth in Article 1,433, subsection IV, of the Civil Code. The funds received by the Brazilian Collateral Agent resulting from such measures shall be used by the Brazilian Collateral Agent to pay the Secured Obligations, taxes levied on the operations necessary for the removal or foreclosure, including exchange expenses and reasonable expenses resulting from the sale of the Pledged Receivables, and the Brazilian Collateral Agent shall deliver to the Pledgor the outstanding balance, in strict compliance with the Indenture.

em observância à Escritura, terá o direito de (i) cobrar e receber os Recebíveis Empenhados, de solicitar à Empenhante o pagamento dos Recebíveis Empenhados e de obter a excussão judicial ou extrajudicial da garantia aqui prevista, inclusive por meio de venda amigável; e (ii) sacar, coletar, receber, apropriar e transferir, independentemente de qualquer aviso prévio, posterior ou qualquer outra formalidade, os valores depositados na Conta Vinculada; com poderes irrevogáveis para transferir, ceder ou de outra forma alienar os Recebíveis Empenhados e os direitos relacionados aos Recebíveis Empenhados, em conformidade com o disposto no Artigo 1.433, inciso IV, do Código Civil. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Recebíveis Empenhados, devendo o Agente de Garantia Brasileiro entregar à Empenhante o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

5.1.1. The Brazilian Collateral Agent is hereby irrevocably authorized and qualified on and if the early maturity of the Secured Obligations has been declared or that any default (whether or not any foreclosure measure is taken against Pledgor and irrespective of any right that Pledgor may have to any benefit of order or similar right which is hereby waived by Pledgor to the fullest extent permitted by law), accordingly to the instruction of the Trustee, to dispose of, collect, receive, appropriate and/or seize the

5.1.1. O Agente de Garantia Brasileiro fica por este ato irrevogavelmente autorizado e capacitado, caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado (na hipótese ou não sido adotada qualquer medida de excussão contra a Empenhante e independentemente de qualquer direito que a Empenhante possa ter a qualquer benefício de ordem ou direito similar, os quais são neste ato renunciados pela Empenhante, na extensão máxima permitida em lei), de acordo com as

Pledged Receivables (or part thereof), and may promptly amicably sell, assign, grant a call option or options on, or otherwise dispose of and deliver the Pledged Receivables, in full or in part, in the manner, and under the terms and conditions that it deems appropriate, pursuant to the applicable law, regardless of any prior or subsequent notice to Pledgor, pursuant to Article 1,433 of the Civil Code.

instruções do *Trustee*, para alienar, cobrar, receber, apropriar e/ou arrestar os Recebíveis Empenhados (ou parte destes), podendo imediatamente promover, em caráter amigável, a venda, cessão, concessão de opção de compra ou de opções, ou alienar e entregar os Recebíveis Empenhados de qualquer outra forma, total ou parcialmente, da maneira e observados os termos e condições que considerar apropriados, de acordo com a legislação aplicável, independentemente de qualquer notificação prévia ou posterior à Empenhante, observado o disposto no Artigo 1.433 do Código Civil.

5.2.    For the purpose of the foreclosure of the security created hereunder, the Brazilian Collateral Agent has been hereby appointed by the Secured Parties as Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, in court and out-of-court.

5.2.    Para fins de excussão da garantia criada no presente Contrato, o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

5.3.    Pledgor undertakes to pay and reimburse the Brazilian Collateral Agent on the basis of a full indemnity, within five (5) days from the request by Brazilian Collateral Agent , for all costs and expenses (including expenses and fees of counsel) incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this Section VII hereto.

5.3.    A Empenhante se compromete a pagar e a reembolsar o Agente de Garantia Brasileiro a título de indenização integral, no prazo de até 5 (cinco) dias contados da solicitação pelo Agente de Garantia Brasileiro, por todos os custos e despesas (inclusive despesas e honorários advocatícios) incorridos pelo Agente de Garantia Brasileiro, para matérias e questões relacionadas ao disposto nesta Seção VII deste Contrato.

5.4.    In accordance with articles 684 and 1,433, subsection IV, of the Civil Code, and as a means to comply with the obligations set forth herein, Pledgor hereby irrevocably

5.4.    Em consonância com o disposto nos Artigos 684 e 1.433, inciso IV, do Código Civil e para o cumprimento das obrigações aqui estabelecidas, a Empenhante neste ato

appoints the Brazilian Collateral Agent as its attorney-in-fact, and for such purpose Pledgor has executed and delivered to the Brazilian Collateral Agent on the date hereof a power of attorney as set forth under Exhibit V hereto. While this Agreement is in force, the power of attorney must be renewed annually by the Pledgor with at least thirty (30) prior to its expiration date. Pledgor agrees and undertakes to (i) to deliver an equivalent power of attorney to any successor to the Brazilian Collateral Agent, as necessary to ensure that the Brazilian Collateral Agent has powers to carry out the acts and perform the rights and obligations specified herein; and (ii) deliver an equivalent power of attorney to the Brazilian Collateral Agent in case of an amendment to this Agreement, if necessary.

irrevogavelmente nomeia o Agente de Garantia Brasileiro como seu bastante procurador e, para essa finalidade, a Empenhante celebrou e entregou ao Agente de Garantia Brasileiro, na data do presente instrumento, uma procuração, em formato e teor do Anexo V ao presente instrumento. Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Empenhante com pelo menos trinta (30) dias de antecedência da data de seu vencimento. A Empenhante se obriga a: (i) entregar um instrumento de procuração equivalente a qualquer sucessor do Agente de Garantia Brasileiro e conforme necessário para garantir que o Agente de Garantia Brasileiro tenha os poderes para a consecução dos atos e execução dos direitos e obrigações especificados neste Contrato, e (ii) entregar uma procuração equivalente ao Agente de Garantia Brasileiro em caso de aditivo a este Contrato, se necessário.

**SECTION VI**

**EXPENSES**

**CLÁUSULA VI**

**DESPESAS**

6.1.     All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to the sale and others of the Pledged Receivables or the Cash Collateral Account, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Pledgor, and the Pledgor undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that

6.1.     Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda ou outros dos Recebíveis Empenhados ou da Conta Vinculada, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Empenhante, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores

may be disbursed under this Agreement or the Secured Obligations within five (5)days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Pledgor does not timely perform the transfer of the amounts mentioned herein.

razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Empenhante não realize tempestivamente a transferência dos valores aqui mencionados.

6.2.     The compensation of the Brazilian Collateral Agent shall be paid by the Pledgor in accordance with the terms of the Indenture and the proposal for collateral agent services dated November 30, 2020.

6.2.     A remuneração do Agente de Garantia Brasileiro será paga pela Empenhante conforme os termos da Escritura e da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.3.     The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless receives instructions provided by the Trustee, as well as indemnity or guarantee that is satisfactory against the costs, expenses and obligations that it may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Pledgor.

6.3.     O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Empenhante.

#### SECTION VII
#### BRAZILIAN COLLATERAL AGENT

#### CLÁUSULA VII
#### AGENTE DE GARANTIA BRASILEIRO

7.1.     The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction

7.1.     O Agente de Garantia Brasileiro foi nomeado, de acordo com a Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da

Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.2.     The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Pledgor, GLAI and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to

Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2.     O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Empenhante, à GLAI e/ou à Gol Finance ou

perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Pledgor's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent and, cumulatively,

a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Empenhante em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com

the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3.    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Pledgor's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Empenhante, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4.    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5.    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Pledgor.

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Empenhante.

7.6.    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Pledgor to deliver the required documents/information in respect of each foreign exchange transaction, in accordance

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou a Empenhante a entrega de documentos/informações exigidos com relação a cada fechamento de

- 23 -

with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian reais, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil ("ROF"), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the

câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em

impossibility to perform a foreign exchange transaction or transfer, as described in this Section. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7.    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação

7.9.    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or

7.9.    O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a

communication resource from the Federal Reserve or the Central Bank of Brazil).

indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 7.10.

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11.    Any and all payments by Gol Finance, the Pledgor and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol Finance, the Pledgor and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the

7.11.    Todos e quaisquer pagamentos pela Gol Finance, pela Empenhante e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Empenhante e/ou o GLAI,

additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.12.   The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

7.13.   For the avoidance of doubt, the Pledgor acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.14.   Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Pledgor. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Pledgor (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian

conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.   As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação à Oferta.

7.13.   Para que não haja dúvidas, a Empenhante reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14.   Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Empenhante. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Empenhante (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de

Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Pledgor (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Pledgor to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Pledgor and such successor.

Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Empenhante (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Empenhante a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Empenhante e esse sucessor.

### SECTION VIII
#### MISCELLANEOUS

### CLÁUSULA VIII
#### DISPOSIÇÕES GERAIS

8.1. Definitions. Capitalized terms used in this Agreement and its Exhibits and not otherwise defined herein will have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1. Definições. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1. For the purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or a public holiday in Brazil, or that day when commercial banks in the cities of Rio de Janeiro and São Paulo are authorized or required by law to close.

8.1.1. Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados ou obrigados por lei a fechar.

8.2.   Amendments. This Agreement may be amended, replaced, cancelled, renewed or extended, and its terms may be waived, only upon written instrument signed by all Parties.

8.3.   Severability. If any provision of this Agreement is held void or ineffective by court decision, the validity or enforceability of the remaining provisions shall not be affected, and the latter shall remain in full force and effect, being the Parties committed, within the shortest term possible, to engage in good-faith negotiations to replace the ineffective provision by another that, to the greatest extent possible and in a reasonable manner, reaches the intended purposes and effects.

8.4.   Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.1.   When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Pledge.

8.5.   Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made

8.2.   Alterações. Este Contrato somente poderá ser aditado, substituído, cancelado, renovado ou prorrogado e seus termos somente poderão ser renunciados, mediante instrumento escrito assinado por todas as Partes.

8.3.   Independência das Cláusulas. Se qualquer disposição deste Contrato for considerada nula ou ineficaz por decisão judicial, a validade ou exequibilidade das remanescentes não será afetada, as quais permanecerão em pleno vigor e vigência, comprometendo-se as Partes, no menor prazo possível, a negociarem, de boa-fé, a substituição da disposição ineficaz por outra que, na máxima extensão possível e de maneira razoável, atenda aos fins e propósitos pretendidos.

8.4.   Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1.   Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação do Penhor.

8.5.   Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em beneficio das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será

in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Pledgor hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Empenhante neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.    Guarantees. The Pledge provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.6.    Garantias. O Penhor previsto neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.    Notices. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

8.7.    Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

For Pledgor:

Para a Empenhante:

Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil

Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

For the Brazilian Collateral Agent:
Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

Para o Agente de Garantia Brasileiro:
Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
Att: Danilo Oliveira / Karla Fernandes

danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

8.7.1. Any and all notifications or other communications made pursuant to this Agreement will be considered valid and delivered on the Business Day following the respective receipt, according to the document signed by the recipient or acknowledgment of receipt, as the case may be.

8.7.1. Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8. Specific Performance. This Agreement is an extrajudicial instrument (*título executivo extrajudicial*) for all purposes of articles 497, 784 and 815 of the Civil Procedure Code and, for the purposes of this Agreement and of each amendment hereto, the Brazilian Collateral Agent, representing the Secured Parties, under this Agreement may pursue specific performance of the obligations of Pledgor.

8.8. Execução Específica. Este Contrato constitui um título executivo extrajudicial para todos os fins dos Artigos 497, 784 e 815 do Código de Processo Civil e, para os fins deste Contrato e de todos os aditivos a este Contrato, o Agente de Garantia Brasileiro representando as Partes Garantidas, nos termos deste Contrato, poderá promover a execução específica das obrigações da Empenhante.

8.9. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of Brazil.

8.9. Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil.

8.9.1. In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument (*título executivo extrajudicial*) that may be the subject to enforcement proceedings under the terms of article 784, item III of the Civil Procedure Code.

8.9.1. Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10. Jurisdiction. Any disputes or controversies arising from this Agreement

8.10. Foro. Quaisquer disputas ou controvérsias oriundas deste Contrato serão

will be settled by the court of the City of São Paulo, State of São Paulo, which will also be the competent jurisdiction to enforce the obligations established herein.

8.11. Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12. Language. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13. Electronic Signature. This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14. This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of

dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11. Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis

8.12. Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em português irá prevalecer.

8.13. Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

8.14. Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente

execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**IN WITNESS WHEREOF**, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, [date].

São Paulo, [data].

(*remainder of the page intentionally left blank*)

(*restante da página intencionalmente deixado em branco*)

| | |
|---|---|
| *(Signature page of the Receivable and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)* | *(Página de assinaturas do Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de _____. )* |

## GOL LINHAS AÉREAS S.A.,

_____     _____
*Name*/**Nome:**                              *Name*/**Nome:**
*Title*/**Cargo:**                             *Title*/**Cargo:**

*(Signature page of the Receivable and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de _____.)*

## TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.

_____

_____

*Name*/**Nome:**

*Name*/**Nome:**

*Title*/**Cargo:**

*Title*/**Cargo:**

*(Signature page of the Receivable and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A, TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de _____. )*

**GOL LINHAS AÉREAS INTELIGENTES S.A.,**


_____  _____

*Name*/**Nome:**                           *Name*/**Nome:**

*Title*/**Cargo:**                          *Title*/**Cargo:**

*(Signature page of the Receivable and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de _____.)*

**WITNESSES/TESTEMUNHAS**

_____

**Name/Nome:**
**Tax ID /CPF:**
**ID/RG:**

_____

**Name/Nome:**
**Tax ID /CPF:**
**ID/RG:**

| EXHIBIT I | ANEXO I |
|---|---|
| to the Receivable and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____. | ao Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de _____. |

| **DESCRIPTION OF SECURED OBLIGATIONS** | **DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |
|---|---|
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |

**Principal Amount**: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

**Valor Principal**: US$ 200.000.000,00 (duzentos milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

**Maturity Date**: June 30, 2026;

**Data de Vencimento**: 23 de junho de 2026;

**Interest Rate**: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

**Taxa de Juros**: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura;

**Default interest**: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to the Notes;

**Juros de Mora**: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas;

**Penalty Clause**: not applicable;

**Cláusula Penal**: não aplicável;

**Inflation Adjustment Index**: not applicable;

**Índice de Atualização Monetária**: não

aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT**

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Default interest: 1.00% (once percent) per month;

Juros de Mora: 1,00% (um por cento) ao mês;

Penalty Clause: 10.00% (ten percent);

Cláusula Penal: 10,00% (dez por cento);

Inflation Adjustment Index: Not applicable;

Índice de Atualização Monetária: Não aplicável;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00

450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

(cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

| | |
|---|---|
| **Exhibit II** | **Anexo II** |
| **to the Receivable and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.** | **ao Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de _____.** |

<table>
<tr><td></td><td align="center">**RECEBÍVEIS EMPENHADOS**</td></tr>
<tr><td align="center">**PLEDGED RECEIVABLES**</td><td></td></tr>
</table>

| | | | | |
|---|---|---|---|---|
| (i) | [●] | | (i) | [●] |
| (ii) | [●] | | (ii) | [●] |
| (iii) | [●] | | (iii) | [●] |
| (iv) | [●] | | (iv) | [●] |
| (v) | [●] | | (v) | [●] |

**PLEDGED ACCOUNT**      **CONTA EMPENHADA**

| | |
|---|---|
| Bank: [●] | Banco: [●] |
| Bank Account No.: [●] | Nº Conta Corrente: [●] |
| Branch: [●] | Agência: [●] |
| Owner: [●] | Titular: [●] |

| | |
|---|---|
| **Exhibit III** | **Anexo III** |
| to the Receivables and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A. TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____. | ao Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de _____. |

| | |
|---|---|
| **FORM OF NOTICE** | **MODELO DE NOTIFICAÇÃO** |
| [●], [●] | [●] de [●] de [●] |
| To | Para |
| [●] | [●] |
| RE.: Receivables and Bank Account Pledge Agreement | Assunto: Contrato de Penhor de Recebíveis e Conta Bancária |
| Dear Sirs: | Prezados Senhores: |
| We hereby refer to the Receivables and Bank Account Pledge Agreement, entered by and among Gol Linhas Aéreas S.A. ("Pledgor"), a TMF Brasil Administração e Gestão de Ativos Ltda. ("Brazilian Collateral Agent") e a Gol Linhas Aéreas Inteligentes S.A. dated as of [●], [●] ("Agreement"), copy of which is attached hereto as Annex 1. | Referimo-nos ao Contrato de Penhor de Recebíveis e Conta Bancária celebrado entre Gol Linhas Aéreas S.A. ("Empenhante"), a TMF Brasil Administração e Gestão de Ativos Ltda. ("Agente de Garantia Brasileiro") e a Gol Linhas Aéreas Inteligentes S.A. datado de [●] de [●] de [●] ("Contrato"), cuja cópia é apensa como Anexo 1 deste instrumento. |
| Capitalized terms or terms starting with capitalized letters used throughout this notice, but not defined herein shall have the meaning ascribed to them in the Agreement. | Os termos com as iniciais em maiúscula usados nesta notificação, porém não definidos neste instrumento de outra forma, terão o significado a eles atribuído no Contrato. |
| Pursuant to the terms of the Agreement, we hereby inform you of the pledge created over all of the Pledgor's receivables deriving from | Em conformidade com os termos do Contrato, informamos V.Sa. acerca do penhor constituída sobre a totalidade dos recebíveis |

the [*Name of Agreement from which the receivables derive from*], entered between you and the Pledgor on [date] ("<u>Pledged Agreement</u>").

da Empenhante decorrentes do [*Contrato que origina os recebíveis*], celebrado entre a Empenhante e V.Sas. em [●] de [●] de [●] ("<u>Contrato Empenhado</u>").

Due to the creation of the abovementioned pledge, we hereby request that you make any and all payments under the Pledged Agreement to the Cash Collateral Account no. [●], held with Bank [●], agency [●], except if otherwise instructed by the Brazilian Collateral Agent.

Devido à constituição do penhor mencionada acima, solicitamos a V.Sas. depositar todos e quaisquer pagamentos relativos ao Contrato Empenhado na Conta Vinculada no. [●], mantida no Banco [●], agência [●], salvo se de outro modo instruído pelo Agente de Garantia Brasileiro.

This notification is irrevocable and irreversible and may only be amended with the previous written consent of the Brazilian Collateral Agent.

Esta notificação é irrevogável e irretratável e somente poderá ser alterada com anuência prévia por escrito do Agente de Garantia Brasileiro.

Sincerely,

Atenciosamente,

[Pledgor]

[Empenhante]

[Agreed and accepted on [date]

[Ciente e de acordo em [●] de [●] de [●]

_____

_____

[Counterparty]]

[Contraparte]]

| | |
|---|---|
| **Exhibit IV** | **Anexo IV** |
| **to the Receivable and Bank Account Pledge Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of** | **ao Contrato de Penhor de Recebíveis e Conta Bancária celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de** |
| _____ | _____. |

| | |
|---|---|
| **Form of Power of Attorney** | **Modelo de Procuração** |
| **POWER OF ATTORNEY** | **PROCURAÇÃO** |

By virtue of this power of attorney, **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 07.575.651/0001-59 ("Grantor"), hereby irrevocably and irretrievably appoints as its attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Secured Parties ("Grantee"), to the widest extent permissible in law, to be vested in the following powers, in connection with the Receivables and Bank Account Pledge Agreement, dated [●] [●], 20[●], entered into by and among Grantor, Grantee and Gol Linhas Aéreas Inteligentes S.A., ("Agreement") conferring to the Grantee, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Civil Code, powers to, in place and

Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no CNPJ/ME sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "Outorgante"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício das Partes Garantidas, nos termos do Contrato de Penhor de Recebíveis e Conta Bancária celebrado em [●] de [●] de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "Outorgado"), conferindo ao Outorgado, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e

on behalf of the Grantor, perform any of the acts mentioned below:

(a)     to perform all acts, of any nature, required or necessary to formalize, record or file the Agreement, or any amendments to the Agreement, as the case may be, before the Registries of Deeds and Documents specified in the Agreement, the resulting costs to be exclusively borne by the Grantor;

(b)     to carry out any other act as may be necessary under applicable law currently in force for the purpose of formalizing the collateral rights over the Pledged Receivables and to preserve and maintain the collateral set forth in the Agreement;

(c)     to perform all acts of any nature and execute all documents required or necessary to foreclose the collateral which is the subject matter of the Agreement, including but not limited to (i) demand, upon written notice to the debtors of the Pledged Receivables or any other relevant authority, that they pay directly to the Grantee any amounts arising out of the Pledged Receivables and the Cash Collateral Account, as provided in the Agreement; (ii) collect, receive, appropriate, withdraw, transfer and/or realize irrespectively of any prior or subsequent notice or any other formality, the cash amounts deposited in the Bank Accounts; (iii) the disposal of the Pledged Receivables, in or out of court, in part or in full, by means of a public or private transaction, or to carry out its assignment, transfer or otherwise to third parties, at the price and in the form that it may deem best, regardless of any appraisal, auction, or other measures in or out of court; and (iv) apply the proceeds deriving from such foreclosure to the repayment of the Secured

686, parágrafo único, do Código Civil, poderes para, no lugar e em nome da Outorgante, realizar qualquer dos atos mencionados a seguir:

(a)     praticar todos os atos de qualquer natureza exigidos ou necessários para formalizar, averbar, registrar ou protocolar o Contrato, ou quaisquer aditamentos ao referido Contrato, conforme o caso, perante os Cartórios de Registro de Títulos e Documentos indicados no Contrato, sendo os custos correspondentes arcados exclusivamente pelo Outorgante;

(b)     praticar qualquer outro ato que seja necessário, nos termos da legislação aplicável atualmente em vigor, com a finalidade de formalizar os direitos de garantia sobre as os Recebíveis Empenhados e de preservar e manter as garantias previstas no Contrato;

(c)     praticar todos os atos de qualquer natureza que venham a ser exigidos ou necessários para excutir a garantia objeto do Contrato, incluindo, sem limitação, (i) exigir, mediante notificação por escrito aos devedores dos Recebíveis Empenhados, ou qualquer outra autoridade competente, que paguem diretamente ao Outorgado os valores decorrentes dos Recebíveis Empenhados e da Conta Vinculada, conforme previsto no Contrato; (ii) recolher, receber, apropriar, sacar, transferir e / ou realizar, independentemente de qualquer aviso prévio ou subsequente ou qualquer outra formalidade, os valores em dinheiro depositados nas contas bancárias; (iii) a alienação ou venda dos Recebíveis Empenhados, em juízo e fora dele, no todo ou em parte, por meio de operação pública ou privada, ou, ainda, promover a cessão, transferência ou conferência destes a terceiros, ao preço e na forma que entender conveniente, independentemente de qualquer avaliação, leilão, ou outras medidas judiciais e extrajudiciais, e (iv) alocar o produto da excussão

Obligations or, if there is any additional proceed, to allocate such additional proceed to the benefit of the Grantor;

(d)     subject to applicable law, to represent Grantor in any matters connected with the enforcement of the collateral rights conferred under the Agreement before third parties and before any government bodies or authorities, whether Federal, State or Local, including Registries of Deeds and Documents, protest offices, financial institutions, the federal revenue of Brazil and all of their respective sections, departments and subdivisions;

(e)     to represent the Grantor before the Depositary Bank, with powers to give instructions related to the Cash Collateral Account in accordance with the Agreement;

(f)     to perform all acts and execute all documents consistent with the terms and conditions of the Agreement for enforcing the security rights granted under the Agreement;

(g)     perform any acts or sign any documents required, necessary, or convenient to the true and faithful performance of this power of attorney; and

(h)     delegate (*substabelecer*) the powers granted herein or revoke any such delegation.

The terms initiated by capital letter and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

This instrument is issued in an irrevocable and irretrievable manner as a condition of the

na satisfação das Obrigações Garantidas, se houver saldo remanescente, alocá-lo em favor da Outorgante;

(d)     observada a legislação aplicável, representar a Outorgante em quaisquer matérias atinentes à execução dos direitos de garantia conferidos sob o Contrato perante terceiros e, ainda, perante quaisquer órgãos ou autoridades governamentais competentes em instância Federal, Estadual ou Municipal, incluindo Cartórios de Registro de Títulos e Documentos, Cartórios de Protesto, Instituições Financeiras, a Receita Federal do Brasil e todas as suas correspondentes seções, departamentos e subdivisões;

(e)     representar a Outorgante perante o Banco Depositário, com poderes para dar instruções e movimentar a Conta Vinculada nos termos previstos no Contrato;

(f)     praticar todos os atos e firmar todos os documentos condizentes com os termos e condições do Contrato visando à execução dos direitos de garantia conferidos sob o Contrato;

(g) praticar quaisquer atos ou assinar quaisquer documentos exigidos, necessários ou convenientes para o efetivo e fiel cumprimento deste instrumento de procuração; e

(h)     substabelecer os poderes ora conferidos, ou revogar qualquer substabelecimento.

Salvo se de outra forma aqui definidas, as expressões iniciadas em maiúsculas terão o significado a elas atribuído no Contrato.

O presente instrumento é expedido em caráter irrevogável e irretratável como condição ao Contrato e visando assegurar o cumprimento das obrigações nele previstas, consoante o disposto

Agreement and as a means to ensure the performance of the obligations set forth therein, pursuant to the provisions of Articles 684 and 685 of the Civil Code, and shall be valid and remain for a period of one (1) year from the date hereof.

nos Artigos 684 e 685 do Código Civil, permanecendo válido e eficaz pelo prazo de 1 (um) ano contado da presente data.

[*place*], [●] [●], 20[●].

[*local*], [●] [●], 20[●]

**[GOL LINHAS AÉREAS S.A.]**
[SIGNATURE FIELD]

**[GOL LINHAS AÉREAS S.A.]**
[CAMPO DE ASSINATURA]

**EXHIBIT O**

FORM OF SMILES FIDUCIARY TRANSFER IP AGREEMENT

#93484727v11

**FIDUCIARY TRANSFER OF INTELLECTUAL PROPERTY RIGHTS AGREEMENT**

This Fiduciary Transfer of Intellectual Property Rights Agreement ("Agreement") is entered into by and among:

(i)      **SMILES FIDELIDADE S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of São Paulo, State of São Paulo, at Rio Negro Avenue, No. 585, Edificio Padauiri, Block B, 2nd Floor, conj. 21 and 22, Alphaville, Zip Code 06454-000, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 15.912.764/0001-20, herein represented by its undersigned legal representatives (hereinafter referred to as "Smiles" or "Company");

(ii)      **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Secured Parties (hereinafter referred to as "Brazilian Collateral Agent");

and, as intervening and consenting parties,

---

**CONTRATO DE ALIENAÇÃO FIDUCIÁRIA DE DIREITOS DE PROPRIEDADE INTELECUAL**

O presente Contrato de Alienação de Direitos Propriedade Intelectual ("Contrato") é celebrado por e entre:

(i)      **SMILES FIDELIDADE S.A.**, sociedade organizada e existente segundo as leis do Brasil, na cidade de São Paulo, Estado de São Paulo, com sede na Alameda Rio Negro, nº 585, Edificio Padauiri, Bloco B, 2º andar, conjuntos 21 e 22, Alphaville, CEP 06454-000, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o nº 15.912.764/0001-20, neste ato representada por seus representantes legais abaixo assinados (doravante designada "Smiles" ou "Companhia");

(ii)      **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o nº 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício das Partes Garantidas (doravante designado "Agente de Garantia Brasileiro");

e, como intervenientes anuentes,

1

(iii)    **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA");

(iv)    **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "GLAI");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

**WHEREAS:**

(i)    GOL Finance, a public limited liability company (*société anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol

(iii)    **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("GLA");

(iv)    **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade organizada e existente segundo as leis do Brasil, na cidade de São Paulo, Estado de São Paulo, com sede na Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLAI");

Cada uma das partes acima também são doravante individualmente designados como "Parte" e, em conjunto, como "Partes";

**CONSIDERANDO QUE:**

(i)    a GOL Finance, sociedade pública de responsabilidade limitada (*société anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida

2

Finance") issued 8.00% Senior Secured Notes due 2026 ("Notes"), pursuant to an Indenture entered into by Gol Finance and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the Notes offering ("Offering");

(ii)     the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture ("Secured Parties") as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties with in connection with the collateral provided under this Agreement, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms provided for in the Indenture and this Agreement;

(iii)     The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent;

sênior com juros de 8,00% e vencimento em 2026 ("Notas"), nos termos e condições previstos na escritura por meio da qual as Notas foram emitidas, celebrada entre a Gol Finance e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e no memorando de colocação privada relacionado à oferta das Notas ("Oferta");

(ii)     o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura ("Partes Garantidas") como agente de garantia no Brasil nos termos da Escritura para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("*Trustee*") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii)     A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o *Trustee*, na qualidade de representante das Partes Garantidas e do Agente de Garantia Brasileiro;

3

(iv)     in order to secure the satisfaction of all obligations undertaken by Gol Finance, under the terms and conditions of the Indenture, GLA and GLAI ("Guarantors") provided a personal guarantee under the terms of the Indenture ("Guarantees"); and

(v)     in order to guarantee compliance with all obligations undertaken Gol Finance under the terms and conditions of the Indenture and by the Guarantors under the Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Intellectual Property (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Transferred Assets (as defined below).

**NOW, THEREFORE**, the Parties agree to enter into this Agreement under the following terms and conditions:

### SECTION I
### FIDUCIARY TRANSFER; COLLATERAL

1.1.     In accordance with the provisions herein, in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the terms of the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Guarantees; (c) the faithful and

---

(iv)     a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, a GLA e a GLAI ("Garantidoras") prestaram garantia pessoal nos termos da Escritura ("Garantias"); e

(v)     a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e condições da Escritura e pelos Garantidores no âmbito das Garantias, a Companhia concordou em conceder às Partes Garantidas, representadas no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre a Propriedade Intelectual (conforme definido abaixo), mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todas os Bens Alienados (conforme definido abaixo).

**RESOLVEM**, as Partes, celebrar este Contrato, de acordo com os seguintes termos e condições:

### CLÁUSULA I
### ALIENAÇÃO FIDUCIÁRIA; GARANTIA

1.1.     De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos

4

timely fulfillment by Gol Finance and the Guarantors and the Company of all agreements, obligations and provisions contained in this Agreement and in the other documents related to the Offering and each document related to any of the referred instruments (jointly, the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance, the Company, GLA and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "Secured Obligations"), which are summarized in Exhibit I hereto in compliance with the provisions of article 1,362 of the Brazilian Civil Code, the Company, pursuant to and in accordance with the provisions of articles 1,361 *et seq*. of the Civil Code, hereby irrevocably assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional property and indirect possession of the (the "Fiduciary Transfer") intellectual properties owned by the Company as described and listed in Exhibit II hereto ("Intellectual Property"), including, without limitation, the trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (*INPI – Instituto Nacional da Propriedade Industrial*) (hereinafter, the "INPI") (hereinafter referred to as the "Transferred Assets").

das respectivas Garantias; (c) o fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras e pela Companhia de todos os contratos, obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela Companhia, pela GLA e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), que se encontram resumidas no Anexo I a este documento em consonância ao disposto no artigo 1.362 do Código Civil Brasileiro, a Companhia, observado e em conformidade com o disposto nos artigos 1.361 e seguintes do Código Civil, neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a posse indireta e a propriedade resolúvel ("Alienação Fiduciária") de todas propriedades intelectuais de propriedade da Companhia, conforme descritas e listadas no Anexo II deste instrumento ("Propriedade Intelectual"), incluindo, sem limitação, as marcas registradas ou depositadas para registro no INPI - Instituto Nacional de

Propriedade Industrial ("INPI") (doravante denominados "Bens Alienados").

1.2.    The Secured Obligations include all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all future and current principal and accessory payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, under or in connection with the Offering or the Indenture.

1.2.    As Obrigações Garantidas incluem todas e quaisquer obrigações assumidas pela, pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3.    By signing this Agreement and complying with the formalities set forth in Section 2 below, the Fiduciary Transfer shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, shall become the conditional and indirect owner of the Intellectual Property, subject to the terms and conditions of this Agreement.

1.3.    Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 2 abaixo, estará constituída a Alienação Fiduciária em nome e benefício das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, tornar-se-á detentor da posse condicional e indireta da Propriedade Intelectual, nos termos e condições acordados neste Contrato.

1.4.    The Company agrees and acknowledges that, except to the copyrights, domain names and trade secrets, each of the Intellectual Property listed in Exhibit II is registered or has been submitted for registration before INPI, unless otherwise specified therein.

1.4.    A Companhia concorda e reconhece que, exceto por nomes de domínio e direitos autorais, cada Propriedade Intelectual listada no Anexo II está registrada ou foi submetida a registro perante o INPI, salvo indicação em contrário.

1.5.    Notwithstanding the provisions of this Agreement, the Company shall have the right to, without any release from or consent by the Secured Parties, by the *Trustee* or the Brazilian Collateral Agent, pursuant to the Indenture, freely use (including by means of licensing) the Transferred Assets, in any manner consistent with the Company's ordinary course of business.

1.5.    Sem prejuízo das demais disposições deste Contrato, a Companhia poderá, sem que seja necessária qualquer liberação ou consentimento das Partes Garantidas, do *Trustee*, ou do Agente de Garantia Brasileiro nos termos da Escritura, livremente utilizar (inclusive por meio de licenciamento) os Bens Alienados, de maneira que seja

6

consistente com o curso ordinário dos seus negócios.

## SECTION II
## PERFECTION OF THE COLLATERAL

## CLÁUSULA II
## APERFEIÇOAMENTO DA GARANTIA

2.1.     The Company shall, within ten (10) days from the date hereof or from the date of execution of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or any of its amendments, duly registered with the Registry Office of Titles and Deeds (*Cartório de Títulos e Documentos)* of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to take all necessary actions to make such registrations, at its own expense.

2.1.     A Companhia deverá, em 10 (dez) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou quaisquer aditamentos a este, devidamente registrados nos Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

2.2.     Within ten (10) days as from the date of registration of this Agreement or any amendment hereto with the competent Registry Offices of Titles and Deeds (as provide for in Section 2.1 above), the Company shall deliver to the Brazilian Collateral Agent evidence that the request for annotation of the security interest over each e Intellectual Property has been filed with the INPI.

2.2.     No prazo de 10 (dez) dias contados a partir da data de registro deste Contrato ou qualquer aditamento do mesmo perante os Cartórios de Títulos e Documentos competente (conforme previsto na Cláusula 2.1 acima), a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual foi protocolado perante o INPI.

2.2.1.  The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

2.2.1.  A Companhia obriga-se, mediante conclusão perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal averbação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

2.2.2.   All costs and expenses related to the filing and registration of this Agreement as

2.2.2.   Todos os custos e despesas relacionados ao arquivamento e registro deste

7

required hereunder (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) shall be borne by the Company, at its own expense.

2.3. If Company fails to timely file this Agreement pursuant to Sections 2.1 and 2.2 above, the Brazilian Collateral Agent is hereby authorized by Company to conduct any such filing directly. The Company shall reimburse the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Sections 2.1 and 2.2 above, without prejudice to any right of the Brazilian Collateral Agent or to any consequences or remedies set forth under this Agreement or the Transaction Documents deriving from such noncompliance by the Company of its obligations hereunder.

2.4. Notwithstanding the foregoing, the Company shall:

(i) diligently comply with any requirements made by the relevant Registry of Deeds and Documents and/or the INPI, as the case may be, and keep the Brazilian Collateral Agent informed on any such requirement; and

Contrato, conforme aqui previstos (incluindo, sem limitação, honorários advocatícios, traduções juramentadas ou relativos a quaisquer outras formalidades que sejam necessárias), serão arcados pela Companhia, às suas próprias expensas.

2.3. Caso a Companhia deixe de registrar ou arquivar este Contrato de acordo com o previsto nas Cláusulas 2.1 e 2.2 acima, o Agente de Garantia Brasileiro fica autorizado pela Companhia a realizar qualquer arquivamento e registro diretamente. A Companhia deverá reembolsar o Agente de Garantia Brasileiro, no prazo de cinco (5) dias a partir do recebimento de uma solicitação por escrito, todos e quaisquer custos (incluindo, sem limitação, honorários advocatícios e despesas com traduções ou com quaisquer outras formalidades que possam ser exigidas nesse sentido) que possam ser desembolsados pelo Agente de Garantia Brasileiro em relação aos arquivamentos e registros descritos nas Cláusulas 2.1 e 2.2 acima, sem prejuízo de outros direitos ou consequências previstos neste Contrato ou nos Documentos da Transação em razão do descumprimento pela Companhia de suas obrigações aqui previstas.

2.4. Sem prejuízo do disposto acima, a Companhia deverá:

(i) cumprir diligentemente quaisquer exigências apresentadas pelos Cartórios de Registro de Títulos e Documentos competentes e/ou pelo INPI, conforme o caso, e manter o Agente de Garantia Brasileiro informado sobre qualquer exigência; e

8

(ii)     take any further action pursuant to applicable law required, now or in the future, for the creation, perfection, and/or maintenance of Fiduciary Transfer over the Intellectual Property.

(ii)     tomar quaisquer providências adicionais de acordo com a lei aplicável necessárias, atualmente ou no futuro, para a criação, realização e/ou manutenção da Alienação Fiduciária sobre a Propriedade Intelectual.

## SECTION III
## REPRESENTATIONS AND WARRANTIES

## CLÁUSULA III
## DECLARAÇÕES E GARANTIAS

3.1. The Brazilian Collateral Agent hereby represents and warrants that:

3.1.     O Agente de Garantia Brasileiro neste ato declara e garante que:

(i)     has full powers, authority and ability to execute this Agreement, perform its contractual obligations and enter into this Fiduciary Transfer, as described herein; and

(i)     possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária aqui descrita; e

(ii)     has taken all appropriate measures to authorize the execution and performance of this Agreement.

(ii)     tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

3.2.     The Company hereby represents and warrants that:

3.2.     A Companhia, neste ato declara que:

(i)     has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Fiduciary Transfer, as described herein;

(i)     possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária, conforme aqui descrita;

(ii)     has taken all necessary measures to authorize the execution and performance of this Agreement;

(ii)     tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato;

(iii)     this Agreement constitutes a legal, valid and binding obligations, and enforceable against the Company, in accordance with its terms;

(iii)     o presente Contrato constitui uma obrigação legal, válida, e exequível contra a Companhia, de acordo com os seus termos;

9

(iv)     the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Intellectual Property;

(v)     it is the lawful and exclusive owner of, and has good title to, the Intellectual Property, which comprises all intellectual property owned by the Company. All of the Intellectual Property is duly registered with the INPI and/or other relevant authority with which it is required to be registered with pursuant to the applicable regulations and all fees due for the registration or the maintenance of the registration of the Transferred Assets with the INPI or with such other relevant authorities have been duly paid by the Company;

(vi)     except for this Fiduciary Transfer, the Intellectual Property is free and clear of any liens, encumbrances and/or security interests and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, pledge or sale of Intellectual Property in the Company's bylaws or in any other document; and, in the event of the enforcement or performance of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(iv)     a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Alienação Fiduciária da Propriedade Intelectual;

(v)     é a legítima e exclusiva proprietária e possuidora da Propriedade Intelectual, que representa a totalidade da propriedade intelectual detida pela Companhia. Toda a Propriedade Intelectual está registrada perante o INPI ou outra autoridade competente conforme seja requerido nos termos da regulamentação aplicável e todas as taxas devidas pelo registro ou pela manutenção do registro dos Bens Alienados no INPI ou tais outras atutoridades competentes foram devidamente pagas pela Companhia; e

(vi)     exceto pela presente Alienação Fiduciária, a Propriedade Intelectual está livre e desembaraçada de quaisquer ônus, gravame e/ou garantias e pode ser alienada fiduciariamente, empenhada ou vendida judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda da Propriedade Intelectual no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

10

(vii)    to best knowledge of the Company there is no procedure, proceeding or claim from third parties or any governmental authority or body that may, in any way, adversely affect the Transferred Assets or this Agreement; and

(viii)    the power of attorney granted under the terms of Section 5.4 and in the form of Exhibit III hereto, was duly issued by the Company and its legal representatives and validly grants the powers set forth therein to the Brazilian Collateral Agent, and the Company did not grant any other power of attorney or similar instrument with similar effect to any other third party in connection with the Transferred Assets described hereof.

3.3.    The representations and warranties provided by the Parties shall survive the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

### SECTION IV
### ADDITIONAL OBLIGATIONS

4.1.    The Company undertakes to and agrees that, on and after the date hereof and until all Secured Obligations are paid and discharged in full:

(i)    to cooperate with the Brazilian Collateral Agent for the performance and enforcement of this Agreement;

(ii)    to provide to the Brazilian Collateral Agent, in any case by no later than five (5) Business Days after the receipt of the respective request from the Brazilian Collateral Agent, and at the sole expense of

(vii)    no melhor conhecimento da Companhia, não há procedimento, processo ou reclamação de terceiros ou de qualquer autoridade ou órgão governamental que possa, de alguma forma, afetar adversamente os Bens Alienados ou este Contrato; e

(viii)    a procuração outorgada, nos termos da Cláusula 5.4 abaixo e na forma do Anexo III a este Contrato, foi devidamente assinada pelos representantes legais da Companhia e confere, validamente, os poderes ali indicados ao Agente de Garantia Brasileiro, e a Companhia não outorgou qualquer outra procuração ou instrumento com efeito similar a quaisquer terceiros com relação aos Bens Alienados descritos neste Contrato.

3.3.    As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

### CLÁUSULA IV
### OBRIGAÇÕES ADICIONAIS

4.1.    A Companhia se obriga e concorda que, na data do presente instrumento e até que todas as Obrigações Garantidas sejam integralmente pagas e cumpridas:

(i)    a cooperar com o Agente de Garantia Brasileiro para o cumprimento e execução deste Contrato;

(ii)    a apresentar ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento da respectiva solicitação pelo Agente de Garantia Brasileiro, e às expensas exclusivas da

11

Company, with all information and all documents relating to the Fiduciary Transfer and to the Intellectual Property as requested by the Brazilian Collateral Agent, to determine compliance with this Agreement and/or for the preservation, maintenance and/or enforcement of the Fiduciary Transfer;

(iii)    to maintain always valid, effective and in good standing all authorizations required for the performance of the obligations undertaken in this Agreement and/or any amendment hereto and to take all measures required under applicable law to enforce the provisions hereof and/or of any amendment hereto;

(iv)    to give written notice to the Brazilian Collateral Agent no later than two (2) Business Days after becoming aware of any event or circumstance which is likely to adversely affect Company's ability to comply with the obligations undertaken herein and/or under any amendment hereto, or that may otherwise adversely affect their compliance with their obligations hereunder and/or under any amendment hereto;

(v)    timely fulfill the obligations of this Agreement;

(vi)    defend itself, the Transferred Assets, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Transferred Assets, this Agreement and / or the

Companhia, todas as informações e todos os documentos relacionados à Alienação Fiduciária e aos Bens Alienados solicitados pelo Agente de Garantia Brasileiro, para a determinação do cumprimento deste Contrato e/ou para a preservação, manutenção e/ou execução da Alienação Fiduciária;

(iii)    a sempre manter válidas, eficazes e em situação regular todas as autorizações necessárias para o cumprimento das obrigações assumidas neste Contrato, e/ou em qualquer aditivo a este, e a adotar todas as medidas necessárias nos termos da lei aplicável para a execução das disposições do presente Contrato e/ou de qualquer aditivo a este;

(iv)    a notificar o Agente de Garantia Brasileiro, por escrito, em prazo não superior a 2 (dois) Dias Úteis após tomar ciência, de qualquer evento ou circunstância que possa afetar negativamente a capacidade da Companhia de cumprir as obrigações assumidas no Contrato e/ou em qualquer aditivo a este, ou que possa, de outra forma, afetar negativamente o cumprimento pela Companhia das obrigações previstas neste Contrato e/ou em qualquer aditivo a este;

(v)    cumprir tempestivamente as obrigações desse Contrato;

(vi)    defender, a si mesma, os Bens Alienados, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Bens Alienados, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

12

fulfillment of the obligations undertaken under the Offering;

(vii)    perform all acts, as well as sign any and all documents, necessary for the registration of this Agreement in the competent Registry Office of Titles and Deeds and INPI pursuant to Sections 2.1 and 2.2 above;

(viii)    not to carry out any act with the purpose to depreciate the Transferred Assets

(ix)    assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any enforcement of the Fiduciary Transfer hereof, and bear all related expenses or that are necessary for such purpose;

(x)    assist, allow and use its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(xi)    comply with all clauses provided for in the Indenture;

(xii)    notify the Brazilian Collateral Agent of any event which results in a breach of this Agreement or the Indenture or in the inaccuracy of any representation made under

(vii)    praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro do Contrato perante os Cartórios de Registro de Títulos e Documentos competentes e o INPI, nos termos das Cláusulas 2.1 e 2.2 acima;

(viii)    a não praticar atos com o propósito de depreciar os Bens Alienados;

(ix)    auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, no caso de eventual excussão da presente Alienação Fiduciária, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(x)    auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(xi)    cumprir com todas as cláusulas previstas na Escritura;

(xii)    notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das

13

this Agreement within two (2) Business Days of its occurrence;

declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(xiii)   to pay before the assessment of any current or future fine, penalty, interests or expenses, any contributions or other charges levied on the Transferred Assets that, in case of default in payment, may reasonably be expected to result in (a) a lien over the Transferred Assets, (b) a loss of ownership over the Transferred Assets or (c) a material adverse effect on the Transferred Assets;

(xiii)   a pagar antes do lançamento quaisquer multas, penalidades, juros ou despesas, presentes ou futuras, contribuições ou outros encargos incidentes sobre os Bens Alienados que, caso não sejam pagas, possam razoavelmente resultar (a) na constituição de um ônus ou gravame sobre os Bens Alienados, (b) na perda de propriedade dos Bens Alienados ou (c) em um efeito adverso relevante sobre os Bens Alienados;

(xiv)   not dispose of, assign, transfer, sell or lease the Transferred Assets temporarily to any third party;

(xiv)   não vender, alienar, ceder, transferir ou arrendar os Bens Alienados de forma temporária a qualquer terceiro;

(xv)   to keep the Transferred Assets in fully effectiveness and validity, paying all taxes, fees or other costs that may be required by the INPI or other relevant authorities;

(xv)   manter os Bens Alienados plenamente válidos e eficazes, pagando todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou outras autoridades competentes;

(xvi)   not to execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties and/or of the Brazilian Collateral Agent to sell or otherwise dispose of any one of the Transferred Assets, in part or in full;

(xvi)   a não celebrar nem autorizar a celebração de qualquer contrato que possa impedir ou restringir os direitos e/ou a capacidade das Partes Garantidas e/ou do Agente de Garantia Brasileiro de vender, alienar ou de outra forma dispor de qualquer dos Bens Alienados, total ou parcialmente;

(xvii)   not create or allow the creation of any liens, encumbrances and/or security interests over the Intellectual Property, except for this Fiduciary Transfer;

(xvii) não criar ou permitir a criação de quaisquer ônus, gravames e/ou garantias, judiciais ou extrajudiciais, sobre a Propriedade Intelectual, exceto pela presente Alienação Fiduciária;

(xviii) in case the INPI or other relevant authorities requests that any amendment are made to this Agreement, including the

(xviii) caso o INPI ou outras autoridades competentes solicite que qualquer alteração seja feita a este Contrato, incluindo a

14

segregation of security over the Intellectual Property into different and individual instruments in order to conclude registration, the Company shall enter into any and all documents in order to comply with requirements made by the INPI or by such other relevant authorities; and

(xix)   annually renew the Power of Attorney (as defined below) granted under Section 5.4 of this Agreement, with at least thirty (30) days prior to its expiration date, substantially in form of the Exhibit III hereto.

## SECTION V
## FORECLOSURE

5.1.   In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, notwithstanding any other security granted and provided under the Offering, exercise all powers related to the Transferred Assets and the Fiduciary Transfer created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets; give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the

segregação da garantia sobre a Propriedade Intelectual em instrumentos diferentes e individuais a fim de concluir o registro, a Companhia deverá celebrar todos e quaisquer documentos a fim de cumprir as exigências feitas pelo INPI ou por tais outras autoridades competentes; e

(xix)   renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 5.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo III deste Contrato.

## CLÁUSULA V
## EXCUSSÃO

5.1.   Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, exercer todos os poderes relativos aos Bens Alienados e a Alienação Fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados; dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial

15

Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture.

5.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf of and for the benefit of the Secured Parties, resulting from the sale of the Transferred Assets, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Indenture.

5.3.    With respect to Clause 5.1 above, in the event of enforcement or execution of this Agreement, the Company shall cause the direct possession of the Intellectual Property to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Trustee.

5.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to Exhibit III to this Agreement ("Power of Attorney"), to act on behalf of the Company,

ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

5.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação dos Bens Alienados, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

5.3.    Com relação à Cláusula 5.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Bens Alienados para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*.

5.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a procuração, nos termos do Anexo III a este Contrato ("Procuração"), para atuar em nome da Companhia, como

16

as a condition of the transaction set forth in this Agreement, including, without limitation, as provided for in Clause 5.1 above, and in the signature of the respective exchange agreement necessary for the remittance of any and all financial funds, resulting from the sale of the Transferred Assets, due by the Company to the Secured Parties. The Company hereby acknowledges and agrees that the Brazilian Collateral Agent shall, upon the acceleration of the Secured Obligations, on behalf of the Company, sign instruments for the assignment or transfer of Intellectual Property subject to this Fiduciary Transfer, directly with any third party assignee or buyer, as well as representing the Company before the INPI and/or any other competent governmental authority or body for any formalization purposes, registration and/or perfection of such assignment or transfer.

condição da operação prevista neste Contrato, inclusive, sem se limitar a, conforme disposto na Cláusula 5.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Bens Alienados, devidos pela Companhia às Partes Garantidas. A Companhia reconhece e concorda que o Agente de Garantia Brasileiro poderá, mediante a declaração de um vencimento antecipado das Obrigações Garantidas, em nome da Companhia, assinar instrumentos de venda e cessão, tendo por objeto qualquer Propriedade Intelectual da presente Alienação Fiduciária, diretamente com qualquer terceiro comprador ou cessionário, bem como representar a Companhia perante o INPI e/ou qualquer outra autoridade ou órgão governamental competente para fins de qualquer formalização, averbação e aperfeiçoamento de tal cessão ou transferência.

5.4.1   While this Agreement is in force, the Power of Attorney shall be renewed annually by the Company with at least thirty (30) days prior to its expiration date.

5.4.1   Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

5.5.   For the purposes of the enforcement of the Fiduciary Transfer created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, in court and out-of-court.

5.5.   Para fins de excussão da Alienação Fiduciária constituída pelo presente Contrato, as Partes concordam que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

17

5.6.    Company undertakes to reimburse or pay in advance the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement or payment in advance request, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred or to be incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this Section V hereto.

5.6.    A Companhia se compromete a reembolsar ou pagar adiantado ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento do pedido de reembolso ou pagamento adiantado, por todos os custos e despesas (inclusive despesas e honorários advocatícios) necessários e razoáveis incorridos ou a serem incorridos pelo Agente de Garantia Brasileiro, para matérias e questões relacionadas ao disposto nesta Seção V deste Contrato.

### SECTION VI
### COSTS AND EXPENSES

### CLÁUSULA VI
### CUSTOS E DESPESAS

6.1.    The Company undertakes to pay all notarial and registration fees triggered by this Agreement, as well as all taxes, fees or other costs that may be required by INPI or any other competent authority to keep the Intellectual Property in full effect and validity.

6.1.    A Companhia se obriga a pagar todas as taxas notariais e de registro desencadeadas por este Contrato, bem como todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou qualquer outra autoridade competente para manter a Propriedade Intelecual plenamente vigente e válida.

6.2.    All expenses incurred by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Transferred Assets, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this

6.2.    Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Bens Alienados, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser

18

Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Company does not timely perform the transfer of the amounts mentioned herein.

6.3.    The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the collateral agent services provisions dated November 30, 2020.

6.4.    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless it receives instructions provided by the Trustee, as well as indemnity or guarantee to its satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

## SECTION VII
## BRAZILIAN COLLATERAL AGENT

7.1.    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the

desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.3.    A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura e da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.4.    O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

## CLÁUSULA VII
## AGENTE DE GARANTIA BRASILEIRO

7.1.    O Agente de Garantia Brasileiro foi nomeado, de acordo os termo da Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia

Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.2.    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLA and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be

Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2.    O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLA e/ou Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será

20

obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the

obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista

21

event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

7.3.     The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

7.4.     The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.5.     The Brazilian Collateral Agent shall not be liable and makes no representation as

neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3.     O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4.     O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5.     O Agente de Garantia Brasileiro não será responsável e não presta qualquer

22

to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Company.

7.6.    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian *reais*, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments

declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia

23

may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil (ROF), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Section. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

24

7.7.    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.8.    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.9.    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10.    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.    O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação

25

Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 7.10.

7.11.    Any and all payments by Gol Finance, the Company, GLA and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol Finance, the Company, GLA and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.12.    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to

às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11.    Todos e quaisquer pagamentos pela Gol Finance, pela Companhia, pela GLA e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Companhia, a GLA e/ou a GLAI, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão

26

their respective activities with respect to the Offering.

7.13. For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.14. Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the Trustee and the Company. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will

aplicáveis às suas respectivas atividades com relação à Oferta.

7.13. Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14. Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento notificando o *Trustee* e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os

27

be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor.

direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

## SECTION VIII
### MISCELLANEOUS

## CLÁUSULA VIII
### DISPOSIÇÕES GERAIS

8.1. <u>Definitions</u>. Capitalized terms used in this Agreement and its Exhibits and not otherwise defined herein will have the meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

8.1. <u>Definições</u>. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1. For the purposes of this Agreement, "<u>Business Day</u>" means any day other than Sunday, Saturday or a public holiday in Brazil, or that day when commercial banks in the cities of Rio de Janeiro and São Paulo are authorized or required by law to close.

8.1.1. Para fins deste Contrato, "<u>Dia Útil</u>" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados ou obrigados por lei a fechar.

8.2. <u>Amendments</u>. This Agreement may be amended, replaced, cancelled, renewed or extended, and its terms may be waived, only upon written instrument signed by all Parties.

8.2. <u>Alterações</u>. Este Contrato somente poderá ser aditado, substituído, cancelado, renovado ou prorrogado e seus termos somente poderão ser renunciados, mediante instrumento escrito assinado por todas as Partes.

8.3. <u>Severability</u>. If any provision of this Agreement is held void or ineffective by court decision, the validity or enforceability of the remaining provisions shall not be affected, and the latter shall remain in full force and effect, being the Parties committed,

8.3. <u>Independência das Cláusulas</u>. Se qualquer disposição deste Contrato for considerada nula ou ineficaz por decisão judicial, a validade ou exequibilidade das remanescentes não será afetada, as quais permanecerão em pleno vigor e vigência,

28

within the shortest term possible, to engage in good-faith negotiations to replace the ineffective provision by another that, to the greatest extent possible and in a reasonable manner, reaches the intended purposes and effects.

8.4.    Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.1.   When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Transferred Assets from any encumbrance which is still in force in accordance with the provisions herein.

8.5.    Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither

comprometendo-se as Partes, no menor prazo possível, a negociarem, de boa-fé, a substituição da disposição ineficaz por outra que, na máxima extensão possível e de maneira razoável, atenda aos fins e propósitos pretendidos.

8.4.    Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1. Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação dos Bens Alienados de qualquer gravame que ainda esteja em vigor de acordo com as disposições deste Contrato.

8.5.    Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma

29

Party may assign or transfer any of its rights or obligations under this Agreement.

das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.    Guarantees. The Fiduciary Transfer provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.6.    Garantias. A Alienação Fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.    Notices. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

8.7.    Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

For Company:

Para a Companhia:

Address: [Rio Negro Avenue, No. 585, Edifício Padauiri, Block B, conj. 21 and 22, Alphaville, Zip Code 06454-000
São Paulo - SP, Brasil]
Att: [●]

Endereço: Alameda Rio Negro, nº 585, Edifício Padauiri, Bloco B, conjuntos 21 e 22, Alphaville, CEP 06454-000
São Paulo – SP, Brasil
Att: [●]

For the Brazilian Collateral Agent:
Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, São Paulo – SP, 06460-110, Brazil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

Para o Agente de Garantia Brasileiro:
Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, São Paulo – SP, CEP 06.460-010, Brasil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

For GLA:

Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

For GLAI:

Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1. Any and all notifications or other communications made pursuant to this Agreement will be considered valid and delivered on the Business Day following the respective receipt, according to the document signed by the recipient or acknowledgment of receipt, as the case may be.

8.8. Specific Performance. This Agreement is an extrajudicial instrument (*título executivo extrajudicial*) for all purposes of articles 497, 784 and 815 of the Civil Procedure Code and, for the purposes of this Agreement and of each amendment hereto, the Brazilian Collateral Agent, representing the Secured Parties, under this Agreement may pursue specific performance of the obligations of Company.

Para a GLA:

Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

Para a GLAI:

Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1. Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8. Execução Específica. Este Contrato constitui um título executivo extrajudicial para todos os fins dos Artigos 497, 784 e 815 do Código de Processo Civil e, para os fins deste Contrato e de todos os aditivos a este Contrato, o Agente de Garantia Brasileiro representando as Partes Garantidas, nos termos deste Contrato, poderá promover a execução específica das obrigações da Companhia.

31

8.9.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of Brazil.

8.9.1. In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument (*título executivo extrajudicial*) that may be the subject to enforcement proceedings under the terms of article 784, item III of the Civil Procedure Code.

8.10.    Jurisdiction. Any disputes or controversies arising from this Agreement will be settled by the court of the City São Paulo, State of São Paulo, which will also be the competent jurisdiction to enforce the obligations established herein.

8.11.    Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12.    Language. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13.    Electronic    Signature.    This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the

8.9.    Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil.

8.9.1.    Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.    Foro.    Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.    Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis

8.12.    Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13.    Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas

32

Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14.    This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

**IN WITNESS WHEREOF**, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

(*remainder of the page intentionally left blank*)

Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

8.14.    Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

(*restante da página intencionalmente deixado em branco*)

33

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. e a Gol Linhas Aéreas Inteligentes S.A., datado de _____. )*

**SMILES FIDELIDADE S.A.,**

_____

_____

*Name*/Nome:

*Name*/Nome:

*Title*/Cargo:

*Title*/Cargo:

34

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. e a Gol Linhas Aéreas Inteligentes S.A., datado de _____. )*

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____

_____

*Name*/Nome:

*Name*/Nome:

*Title*/Cargo:

*Title*/Cargo:

35

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. e a Gol Linhas Aéreas Inteligentes S.A., datado de _____. )*

**GOL LINHAS AÉREAS S.A.,**

_____       _____

*Name*/Nome:                     *Name*/Nome:
*Title*/Cargo:                    *Title*/Cargo:

36

<table>
<tr><td>

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

</td><td>

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. e a Gol Linhas Aéreas Inteligentes S.A., datado de _____. )*

</td></tr>
</table>

**GOL LINHAS AÉREAS INTELIGENTES S.A.,**


_____         _____

*Name*/Nome:                                     *Name*/Nome:
*Title*/Cargo:                                     *Title*/Cargo:

37

*(Signature page of the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. e a Gol Linhas Aéreas Inteligentes S.A., datado de _____. )*


**WITNESSES/TESTEMUNHAS**


_____          _____

Name/Nome:                                    Name/Nome:
Tax ID /CPF:                                  Tax ID /CPF:
ID/RG:                                        ID/RG:

38

| **EXHIBIT I** | **ANEXO I** |
|---|---|
| **to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.** | **ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. e Gol Linhas Aéreas Inteligentes S.A., datado de _____.** |

| **DESCRIPTION OF SECURED OBLIGATIONS** | **DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |
|---|---|
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |

| | |
|---|---|
| <u>Principal Amount</u>: USD 200,000,000.00 (Two Hundred Million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | <u>Valor Principal:</u> US$ 200.000.000,00 (duzentos milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| <u>Maturity Date</u>: June 30, 2026; | <u>Data de Vencimento</u>: 23 de junho de 2026; |
| <u>Interest Rate</u>: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture; | <u>Taxa de Juros:</u> 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura; |
| <u>Default interest</u>: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to the Notes; | <u>Juros de Mora:</u> conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas; |
| <u>Penalty Clause</u>: not applicable; | <u>Cláusula Penal</u>: não aplicável; |

39

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT**

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Default interest: 1.00% (once percent) per month;

Juros de Mora: 1,00% (um por cento) ao mês;

Penalty Clause: 10.00% (ten percent);

Cláusula Penal: 10,00% (dez por cento);

Inflation Adjustment Index: Not applicable;

Índice de Atualização Monetária: Não aplicável;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem

40

extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

41

**EXHIBIT II/ANEXO II**

**List of Transferred Assets / Lista dos Bens Alienados**

1. **Internet Domains (Domínios de Internet)**

| Domain Names (Nomes de Domínio) | Owner (Proprietária) | Registrant Name (Nome Registrador) | Registered in (Registrado em) |
|---|---|---|---|
|  |  |  |  |

2. **Trademarks**

| # | Application No. (Nº Solicitação) | Logo (Logo) | Trademark (Marca Registrada) | International Class (Classe Internacional) | Presentation (Apresentação) | Filling Date (Data de Protocolo) | Registration Date (Data de Registro) | Expiration Date (Data de Vencimento) | Status | Owner (Proprietária) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 |  |  |  |  |  |  |  |  |  |  |
| 2 |  |  |  |  |  |  |  |  |  |  |
| 3 |  |  |  |  |  |  |  |  |  |  |
| 4 |  |  |  |  |  |  |  |  |  |  |

1

**3.    Additional IP**

In addition to the Intellectual Property referred to in items 1 and 2 of this <u>Exhibit II</u>, the Transferred Assets, defined in Section 1.1 of this Fiduciary Transfer of Intellectual Property Rights Agreement, includes any and all softwares, whether registered before the INPI or not, owned by the Company on the date hereof (*Além da Propriedade Intelectual referida nos itens 1 e 2 deste <u>Anexo II</u>, os Bens Alienados, definidos na Cláusula 1.1 deste Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual, inclui todos e quaisquer softwares, sejam eles registrados junto ao INPI ou não, detidos pela Companhia nesta data deste instrumento*)

[Place and Date] / [*Local e Data*]

_____
[_____]

**List of Intellectual Property Registered Abroad (*Relação de Propriedades Intelectuais Registradas no Exterior*)**

**EXHIBIT III**

**to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A., dated as of _____.**

**Form of Power of Attorney**

**POWER OF ATTORNEY**

By this power of attorney, **SMILES FIDELIDADE S.A.**, a corporation organized and existing under the laws of Brazil, headquartered at Rio Negro Avenue, No. 585, Edifício Padauiri, Block B, 2nd Floor, conj. 21 and 22, Alphaville, Zip Code 06454-000, in the city of São Paulo, State of São Paulo, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No 15.912.764/0001-20, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Fiduciary Transfer of Intellectual Property Rights Agreement entered into on [●], 2020 between the GRANTOR, the

**ANEXO III**

**ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Smiles Fidelidade S.A., TMF Brasil Administração e Gestão de Ativos Ltda., Gol Linhas Aéreas S.A. e Gol Linhas Aéreas Inteligentes S.A., datado de _____.**

**Modelo de Procuração**

**PROCURAÇÃO**

Pelo presente instrumento particular de mandato, **SMILES FIDELIDADE S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Alameda Rio Negro, nº 585, Edifício Padauiri, Bloco B, 2º andar, conjuntos 21 e 22, Alphaville, CEP 06454-000, na cidade de São Paulo, Estado de São Paulo, Brasil, inscrita no CNPJ/ME sob o nº 15.912.764/0001-20, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o nº 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado em [●] de [●] de 2020 entre a OUTORGANTE, o OUTORGADO, Gol Linhas Aéreas S.A. e Gol

GRANTEE, Gol Linhas Aéreas S.A. and Gol Linhas Aéreas Inteligentes S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

1.  practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

(a) to dispose of, sell, assign, transfer, collect, receive, take possession of and/or foreclose all or part of the Transferred Assets or otherwise dispose of, and deliver the Transferred Assets under the Agreement and as established in article 1,364 of the Civil Code, and apply the product received to the payment of the Secured Obligations under the Agreement;

(b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Transferred Assets and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Transferred Assets and represent the GRANTOR before third parties for the purpose of releasing the Fiduciary Transfer, disposal of the Transferred Assets and transfer of the funds resulting from such disposal;

2.  sign, formalize and/or deliver any documents and practice any acts that are

---

Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1.  praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

(a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Bens Alienados ou dispor de qualquer outro modo e entregar os Bens Alienados nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

(b) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Bens Alienados e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com relação aos Bens Alienados e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação dos Bens Alienados e transferência dos recursos resultantes de tal alienação;

2.  assinar, formalizar e/ou entregar quaisquer documentos e praticar

necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, the INPI, the Center for Information and Coordination of the Dot BR (*Núcleo de Informação e Coordenação do Ponto BR – NIC.br*), the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

4. to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Transferred Assets, represent the GRANTOR before any competent Registry Office of Deeds and Documents, the INPI and/or any other governmental body in which the Agreement or its respective amendments shall be registered;

5. enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the

---

quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos, o INPI, o Núcleo de Informação e Coordenação do Ponto BR – NIC.br, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às aos Bens Alienados, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente, INPI e/ou qualquer outro órgão governamental nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5. celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação

exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the Trustee, as provided for in the Agreement; and

6. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement.

---

a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituções financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

6. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato.

| | |
|---|---|
| [*place*], [●] [●], 20[●].<br><br>**SMILES FIDELIDADE S.A.**<br>[SIGNATURE FIELD] | [local], [●] [●], 20[●]<br><br>**SMILES FIDELIDADE S.A.**<br>[CAMPO DE ASSINATURA] |

**EXHIBIT P**

FORM OF SMILES SHARES FIDUCIARY SALE AGREEMENT

#93484727v11

**FIDUCIARY TRANSFER OF SHARES AGREEMENT**

This Fiduciary Transfer of Shares Agreement ("Agreement") is entered into by and among:

(i) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "GLAI" or "Company");

(ii) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Secured Parties (hereinafter referred to as "Brazilian Collateral Agent");

and, as intervening and consenting party,

(iii) **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of

**CONTRATO DE ALIENAÇÃO FIDUCIÁRIA DE AÇÕES**

O presente Contrato de Alienação de Fiduciária de Ações ("Contrato") é celebrado por e entre:

(i) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade organizada e existente segundo as leis do Brasil, na cidade de São Paulo, Estado de São Paulo, com sede na Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLAI" ou "Companhia");

(ii) **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o nº 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício das Partes Garantidas (doravante designado "Agente de Garantia Brasileiro");

e, como interveniente anuente,

(iii) **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Praça Senador

business at Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

**WHEREAS:**

(i)      GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued 8.00% Senior Secured Notes due 2026 ("Notes"), pursuant to an Indenture entered into by Gol Finance and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the Notes offering ("Offering");

(ii)     the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture ("Secured Parties") as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral provided under this Agreement, as permitted by the terms set

Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, na cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia ("CNPJ/ME") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("GLA");

Cada parte acima são também doravante individualmente designadas como "Parte" e, em conjunto, como "Partes";

**CONSIDERANDO QUE:**

(i)      a GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 48 Boulevard Grande-Duchesse Charlotte, PO Box 1330, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas"), nos termos e condições previstos na escritura por meio da qual as Notas foram emitidas, celebrada entre a Gol Finance e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e no memorando privado de colocação relacionado à oferta das Notas ("Oferta");

(ii)     o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura ("Partes Garantidas") como agente de garantia no Brasil nos termos da Escritura para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos

- 2 -

forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms provided for in the Indenture and this Agreement;

(iii)    The Offering is the first offering under group GOL's secured debt issuance program, which is designed to complement Notes and to make group GOL's capital structure more efficient and diverse. This Agreement securing the Notes is available to serve as collateral for other entity of group GOL' secured bond issuances, subject to the applicable collateral ratios and to the terms and conditions of the Notes and in accordance to an intercreditor agreement to be entered into between the Trustee, as the representative of the Secured Parties and the Brazilian Collateral Agent;

(iv)    in order to secure the satisfaction of all obligations undertaken by Gol Finance, under the terms and conditions of the Indenture, GLAI and Gol Linhas Aéreas S.A. ("GLA" and, together with GLAI, "Guarantors") provided a personal guarantee under the terms of the Indenture ("Guarantees"); and

(v) on the date hereof the Company owns [●] ([●]) Shares (as defined below), representing [●]% ([● percent) of the voting and total capital stock of Smiles Fidelidade S.A., a company organized and existing under the laws of Brazil, with its principal place of business at Alameda Rio Negro, nº 585, Edificio Padauiri, Block B, 2nd floor, conj. 21 and 22, Alphaville, CEP 06454-000, in the City of São Paulo, State of São Paulo, and

previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura e no presente Contrato;

(iii)    A Oferta é a primeira oferta dentro do programa de emissão de títulos de dívida com garantia do grupo GOL, que é projetado para complementar as emissões de títulos seniores sem garantia da GOL e para tornar a estrutura de capital do grupo GOL mais eficiente e diversificada. Este Contrato de garantia das Notas está disponível para servir como garantia para emissões de títulos garantidos por outra entidade do grupo GOL, sujeito aos índices de garantia aplicáveis e aos termos e condições das Notas e nos termos de um acordo entre credores a ser celebrado entre o Trustee, na qualidade de representante das Partes Garantidas e do Agente de Garantia Brasileiro;

(iv)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance, sob os termos e condições da Escritura, a GLAI e a Gol Linhas Aéreas S.A. ("GLA" e, em conjunto com a GLAI, "Garantidoras") prestaram garantia pessoal nos termos da Escritura ("Garantias"); e

(v) A Companhia detém, na presente data, [●] ([●]) Ações (conforme abaixo definido), representativas de [●%] (● por cento) do capital social total e votante da Smiles Fidelidade S.A., sociedade constituída e existente de acordo com as leis do Brasil, com sede na Alameda Rio Negro, nº 585, Edificio Padauiri, Bloco B, 2º andar, conjuntos 21 e 22, Alphaville, CEP 06454-000, Cidade de São Paulo, Estado de São

- 3 -

enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 15.912.764/0001-20 ("Smiles"), with trading code "SMLE3" at B3 S.A. – Brasil, Bolsa, Balcão ("B3") and owned by the Company ("Existing Shares");

(vi)    in order to guarantee compliance with all obligations undertaken Gol Finance under the terms and conditions of the Indenture and by the Guarantors under the Guarantees, the Company has agreed to grant in favor of the Secured Parties, represented in Brazil by the Brazilian Collateral Agent, a collateral over the Shares (as defined below), by transferring to the Secured Parties, represented by the Brazilian Collateral Agent, conditional ownership and indirect possession over all the Transferred Assets (as defined below).

**NOW, THEREFORE**, the Parties agree to enter into this Agreement under the following terms and conditions:

## SECTION I
## FIDUCIARY TRANSFER;
## COLLATERAL

1.1.    In accordance with the provisions herein, in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by Gol Finance to the Secured Parties under the terms of the Indenture; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Parties under the respective Guarantees; (c) the faithful and timely fulfillment by Gol Finance and the Guarantors of all agreements, obligations and provisions contained in this Agreement and

Paulo, inscrita no CNPJ/ME sob o nº 15.912.764/0001-20 ("Smiles") com código de negociação "SMLE3" na B3 S.A. – Brasil, Bolsa, Balcão ("B3") e detidas pela Companhia ("Ações Existentes");

(vi)    a fim de garantir o cumprimento de todas as obrigações assumidas pela Gol Finance nos termos e condições da Escritura e pelos Garantidores no âmbito das Garantias, a Companhia concordou em conceder às Partes Garantidas, representadas no Brasil pelo Agente de Garantia Brasileiro, uma garantia real sobre as Ações (conforme definidas abaixo), mediante a transferência às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todos os Bens Alienados (conforme definido abaixo).

**RESOLVEM**, as Partes, celebrar este Contrato, de acordo com os seguintes termos e condições:

## CLÁUSULA I
## ALIENAÇÃO FIDUCIÁRIA;
## GARANTIA

1.1.    De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pela Gol Finance às Partes Garantidas, nos termos da Escritura; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora às Partes Garantidas nos termos das respectivas Garantias; (c) o fiel e tempestivo cumprimento pela Gol Finance e pelas Garantidoras de todos os contratos,

- 4 -

in the other documents related to the Offering and each document related to any of the referred instruments (jointly, the "Transaction Documents") to which they are a party, for the benefit of the Secured Parties; (d) the faithful and timely payment of all other amounts due from time to time by Gol Finance to the Secured Parties pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by Gol Finance, the Company and/or GLA to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents (the obligations contained in the items "(a)", "(b)", "(c)", "(d)" and "(e)" are hereinafter referred to jointly as the "Secured Obligations"), which are summarized in Exhibit I hereto in compliance with the provisions of article 1,362 of the Brazilian Civil Code, the Company, pursuant to and in accordance with the provisions of articles 1,361 et seq. of the Civil Code and articles 40, 100 and 113 of the Law nº 6,404, of December 15, 1976 ("Corporation Law"), hereby irrevocably assigns and transfers to the Secured Parties, represented by the Brazilian Collateral Agent, on a fiduciary basis, the conditional property and indirect possession (the "Fiduciary Transfer") of the Existing Shares, which comprised all outstanding shares issued by Smiles that are owned by the Company, as well as any other shares issued by Smiles that are not fiduciary transferred under this Agreement and that may be owned by the Company ("Additional Shares", and jointly with the Existing Shares, the "Shares"), including all rights and privileges deriving from such Shares by means of any share-split, reverse share-split or share bonus, share exchange or conversion, sale or other disposal of such

obrigações e disposições contidas neste Contrato e nos demais documentos relacionados à Oferta e de cada documento relacionado a qualquer um dos referidos instrumentos (em conjunto, os "Documentos da Transação") dos quais são parte, em benefício das Partes Garantidas; (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pela Gol Finance às Partes Garantidas nos termos dos Documentos da Transação; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pela Gol Finance, pela GLA e/ou pela GLAI ao Agente de Garantia Brasileiro, incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), que se encontram resumidas no Anexo I a este documento em consonância ao disposto no artigo 1.362 do Código Civil Brasileiro, a Companhia, observado e em conformidade com o disposto nos artigos 1.361 e seguintes do Código Civil e nos artigos 40, 100 e 113 da Lei nº 6.404, de 15 de dezembro de 1976 ("Lei das Sociedades por Ações"), neste ato cede e transfere às Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, em caráter fiduciário, a posse indireta e a propriedade resolúvel ("Alienação Fiduciária") das Ações Existentes, que representam a totalidade das ações de emissão da Smiles de titularidade da Companhia, bem como todas as ações que venham a ser emitidas pela Smiles e que não estão alienadas fiduciariamente nos termos deste Contrato e que venham a ser de titularidade da Companhia ("Ações Adicionais" e, em conjunto com as Ações Existentes, "Ações"), incluindo todos os direitos e privilégios resultantes de tais ações,

Shares and any assets or securities into which such Shares are converted, dividends, incomes, yields, interests on equity, bonuses, or any other amounts paid for redemption of shares or capital reduction, free and clear of any liens, charges or judicial or extrajudicial pending matters of any kind, including those of a tax nature, shareholders agreement, options or any other lien at law, other than obligations under this Agreement "Transferred Assets" or "Transferred Shares").

por meio de grupamento de ações, desdobramento de ações ou bonificações, conversão ou permuta de ações, venda ou outra forma de alienação de tais Ações, bem como quaisquer ativos ou valores mobiliários nos quais as Ações sejam convertidas, dividendos, juros sobre o capital próprio, valores mobiliários, bonificações, direitos e quaisquer outros ativos e valores a qualquer tempo recebidos sobre as Ações, todas livres e desembaraçadas de quaisquer ônus, encargos ou questões pendentes de solução judiciais ou extrajudiciais de qualquer espécie, inclusive as de natureza tributária, acordos de acionistas, opções ou outros encargos decorrentes de lei, exceto pelas obrigações previstas neste Contrato (doravante denominados "Bens Alienados" ou "Ações Alienadas").

1.2. The Secured Obligations include all obligations undertaken by Gol Finance and the Guarantors, as applicable, including all future and current principal and accessory payment obligations undertaken or to be undertaken by Gol Finance and the Guarantors, as applicable, under or in connection with the Offering or the Indenture.

1.2. As Obrigações Garantidas incluem todas e quaisquer obrigações assumidas pela, pela Gol Finance e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pela Gol Finance e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação à Oferta ou à Escritura.

1.3. By signing this Agreement and complying with the formalities set forth in Section 2 below, the Fiduciary Transfer shall be created on behalf of and for the benefit of the Secured Parties, represented by the Brazilian Collateral Agent, shall become the conditional and indirect owner of the Transferred Assets, subject to the terms and conditions of this Agreement.

1.3. Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 2 abaixo, estará constituída a Alienação Fiduciária em nome e beneficio das Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, tornar-se-á detentor da posse condicional e indireta dos Bens Alienados, nos termos e condições acordados neste Contrato.

**SECTION II**

**CLÁUSULA II**

**PERFECTION OF THE COLLATERAL**

2.1.  The Company shall, within twenty (20) days from the date hereof or from the date of execution of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or any of its amendments, duly registered with the Registry Office of Titles and Deeds (*Cartório de Títulos e Documentos)* of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to take all necessary actions to make such registrations, at its own expense.

2.2.  No later than one (1) Business Day following the date hereof, notify the Itaú Corretora de Valores S.A., enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 61.194.353/0001-64 with its headquarters at Avenida Brigadeiro Faria Lima, 3.500, 3rd floor, Itaim Bibi, CEP 04538-132 in the City of São Paulo, State of São Paulo, Brazil ("Bookkeeping Institution"), in the form of the notice set forth in Exhibit II hereto, to annotate the Fiduciary Transfer of the Transferred Shares, pursuant to Section 1.1 above, in the books and records of Smiles held with the Bookkeeping Institution pursuant to the terms of this Agreement); and (ii) no later than five (5) Business Days following the date hereof, to deliver to the Brazilian Collateral Agent evidence that the Fiduciary Transfer annotation has been duly performed by the Bookkeeping Institution and confirmation that the notice set forth in Exhibit II hereto has been agreed and accepted by duly empowered representatives of the Bookkeeping Institution.

**APERFEIÇOAMENTO DA GARANTIA**

2.1.  A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou quaisquer aditamentos a este, devidamente registrados nos Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

2.2.  No prazo de até 1 (um) Dia Útil contado da data de assinatura do presente Contrato, notificar o Itaú Corretora de Valores S.A., inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério de Economia (CNPJ/ME) sob o número 61.194.353/0001-64, com sede na Avenida Brigadeiro Faria Lima, 3.500, 3º andar, parte, Itaim Bibi, CEP 04538-132, na Cidade de São Paulo, Estado de São Paulo, Brasila ("Instituição Escrituradora"), mediante envio de notificação na forma do Anexo II ao presente Contrato, para registrar alienação fiduciária das  Ações Alienadas nos termos da Cláusula 1.1 acima, nos livros e registros da Smiles mantidos junto à Instituição Escrituradora nos termos deste Contrato (); e (ii) no prazo de até 5 (cinco) Dias da data de assinatura do presente instrumento, entregar ao Agente de Garantia Brasileiro evidências de que a averbação da Alienação Fiduciária foi devidamente realizada pela Instituição Escrituradora e confirmação de que a notificação na forma do Anexo II foi devidamente aceita por representantes legais da Instituição Escrituradora.

2.2.2.   All costs and expenses related to the filing and registration of this Agreement as required hereunder (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) shall be borne by the Company, at its own expense.

2.3. If Company fails to timely file this Agreement pursuant to Sections 2.1 and 2.2 above, the Brazilian Collateral Agent is hereby authorized by Company to conduct any such filing directly. The Company shall reimburse the Brazilian Collateral Agent, within  five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection  with the filings and registrations described in Sections 2.1 and 2.2 above, without prejudice to any right of the Brazilian Collateral Agent or to any consequences or remedies set forth under this    Agreement    or    the    Transaction Documents    deriving    from    such noncompliance  by  the  Company  of  its obligations hereunder.

2.4.    Notwithstanding the foregoing, the Company shall:

(i)    diligently    comply    with    any requirements made by the relevant Registry of Deeds and Documents, and keep the Brazilian Collateral Agent informed on any such requirement; and

2.2.2. Todos    os    custos    e    despesas relacionados ao arquivamento e registro deste Contrato,    conforme    aqui    previstos (incluindo,    sem    limitação,    honorários advocatícios,    traduções    juramentadas    ou relativos a quaisquer outras formalidades que sejam    necessárias),    serão    arcados    pela Companhia, às suas próprias expensas.

2.3. Caso a Companhia deixe de registrar ou arquivar este Contrato de acordo com o previsto nas Cláusulas 2.1 e 2.2 acima, o Agente de Garantia Brasileiro fica autorizado pela    Companhia    a    realizar    qualquer arquivamento e registro diretamente. A Companhia deverá reembolsar o Agente de Garantia Brasileiro, no prazo de cinco (5) dias a partir do recebimento de uma solicitação por escrito, todos e quaisquer custos (incluindo, sem limitação, honorários advocatícios e despesas com traduções ou com quaisquer outras formalidades que possam ser exigidas nesse sentido) que possam ser desembolsados pelo Agente de Garantia    Brasileiro    em    relação    aos arquivamentos e registros descritos nas Cláusulas 2.1 e 2.2 acima, sem prejuízo de outros direitos ou consequências previstos neste Contrato ou nos Documentos da Transação em razão do descumprimento pela Companhia    de    suas    obrigações    aqui previstas.

2.4.    Sem prejuízo do disposto acima, a Companhia deverá:

(i)    cumprir diligentemente quaisquer exigências apresentadas pelos Cartórios de Registro    de    Títulos    e    Documentos competentes, e manter o Agente de Garantia Brasileiro    informado    sobre    qualquer exigência; e

- 8 -

(ii)     take any further action pursuant to applicable law required, now or in the future, for the creation, perfection, and/or maintenance of Fiduciary Transfer over the Transferred Assets.

(ii)     tomar quaisquer providências adicionais de acordo com a lei aplicável necessárias, atualmente ou no futuro, para a criação, realização e/ou manutenção da Alienação Fiduciária sobre os Bens Alienados.

### SECTION III
### REPRESENTATIONS AND WARRANTIES

### CLÁUSULA III
### DECLARAÇÕES E GARANTIAS

3.1. The Brazilian Collateral Agent hereby represents and warrants that:

3.1.     O Agente de Garantia Brasileiro neste ato declara e garante que:

(i)     has full powers, authority and ability to execute this Agreement, perform its contractual obligations and enter into this Fiduciary Transfer, as described herein; and

(i)     possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária aqui descrita; e

(ii)     has taken all appropriate measures to authorize the execution and performance of this Agreement.

(ii)     tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

3.2.     The Company hereby represents and warrants that:

3.2.     A Companhia, neste ato declara que:

(i)     has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Fiduciary Transfer, as described herein;

(i)     possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Alienação Fiduciária, conforme aqui descrita;

(ii)     has taken all necessary measures to authorize the execution and performance of this Agreement;

(ii)     tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato;

(iii)     this Agreement constitutes a legal, valid and binding obligations, and enforceable against the Company, in accordance with its terms;

(iii)     o presente Contrato constitui uma obrigação legal, válida, e exequível contra a Companhia, de acordo com os seus termos;

(iv)    the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Transferred Assets;

(v)    it is the lawful and exclusive owner of, and has good title to, the Transferred Assets, which comprises all Shares owned by the Company in the capital stock of Smiles;

(vi)    except for this Fiduciary Transfer, the Transferred Assets are free and clear of any liens, encumbrances and/or security interests and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, pledge or sale of Transferred Assets in the Company's bylaws or in any other document; and, in the event of the enforcement or performance of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(vii)    to best knowledge of the Company there is no procedure, proceeding or claim from third parties or any governmental authority or body that may, in any way, adversely affect the Transferred Assets or this Agreement;

(iv)    a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Alienação Fiduciária dos Bens Alienados;

(v)    é a legítima e exclusiva proprietária e possuidora dos Bens Alienados, que representa a totalidade das Ações detida pela Companhia no capital social da Smiles; e

(vi)    exceto pela presente Alienação Fiduciária, os Bens Alienados estão livres e desembaraçados de quaisquer ônus, gravame e/ou garantias e pode ser alienada fiduciariamente, empenhada ou vendida judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, penhor ou venda dos Bens Alienados no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

(vii)    no melhor conhecimento da Companhia, não há procedimento, processo ou reclamação de terceiros ou de qualquer autoridade ou órgão governamental que possa, de alguma forma, afetar adversamente os Bens Alienados ou este Contrato;

(viii)   the Transferred Shares have been duly issued, are fully paid-up and validly existing;

(ix)   the power of attorney granted under the terms of Section 5.4 and in the form of <u>Exhibit III</u> hereto, was duly issued by the Company and its legal representatives and validly grants the powers set forth therein to the Brazilian Collateral Agent, and the Company did not grant any other power of attorney or similar instrument with similar effect to any other third party in connection with the Transferred Assets described hereof.

3.3.   The representations and warranties provided by the Parties shall survive the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

**SECTION IV**
**ADDITIONAL COVENANTS; DIVIDENDS; VOTING RIGHTS**

4.1.   <u>Additional Covenants</u>. The Company undertakes to and agrees that, on and after the date hereof and until all Secured Obligations are paid and discharged in full:

(i)   to cooperate with the Brazilian Collateral Agent for the performance and enforcement of this Agreement;

(ii)   to provide to the Brazilian Collateral Agent, in any case by no later than five (5) Business Days after the receipt of the respective request from the Brazilian Collateral Agent, and at the sole expense of Company, with all information and all documents relating to the Fiduciary Transfer and to the Transferred Assets as requested by the Brazilian Collateral Agent, to determine

(viii)   as Ações Alienadas foram devidamente emitidas, totalmente integralizadas e são válidas e existentes;

(ix)   a procuração outorgada, nos termos da Cláusula 5.4 abaixo e na forma do <u>Anexo III</u> a este Contrato, foi devidamente assinada pelos representantes legais da Companhia e confere, validamente, os poderes ali indicados ao Agente de Garantia Brasileiro, e a Companhia não outorgou qualquer outra procuração ou instrumento com efeito similar a quaisquer terceiros com relação aos Bens Alienados descritos neste Contrato.

3.3.   As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

**CLÁUSULA IV**
**OBRIGAÇÕES ADICIONAIS; DIVIDENDOS; DIREITO DE VOTO**

4.1.   A Companhia se obriga e concorda que, na data do presente instrumento e até que todas as Obrigações Garantidas sejam integralmente pagas e cumpridas:

(i)   a cooperar com o Agente de Garantia Brasileiro para o cumprimento e execução deste Contrato;

(ii)   a apresentar ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento da respectiva solicitação pelo Agente de Garantia Brasileiro, e às expensas exclusivas da Companhia, todas as informações e todos os documentos relacionados à Alienação Fiduciária e aos Bens Alienados solicitados pelo Agente de Garantia Brasileiro, para a

- 11 -

compliance with this Agreement and/or for the preservation, maintenance and/or enforcement of the Fiduciary Transfer;

(iii)    to maintain always valid, effective and in good standing all authorizations required for the performance of the obligations undertaken in this Agreement and/or any amendment hereto and to take all measures required under applicable law to enforce the provisions hereof and/or of any amendment hereto;

(iv)    to give written notice to the Brazilian Collateral Agent no later than two (2) Business Days after becoming aware of any event or circumstance which is likely to adversely affect Company's ability to comply with the obligations undertaken herein and/or under any amendment hereto, or that may otherwise adversely affect their compliance with their obligations hereunder and/or under any amendment hereto;

(v)    timely fulfill the obligations of this Agreement;

(vi)    defend itself, the Transferred Assets, the Secured Parties and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Transferred Assets, this Agreement and / or the fulfillment of the obligations undertaken under the Offering;

(vii)    perform all acts, as well as sign any and all documents, necessary for the registration of this Agreement in the

determinação do cumprimento deste Contrato e/ou para a preservação, manutenção e/ou execução da Alienação Fiduciária;

(iii)    a sempre manter válidas, eficazes e em situação regular todas as autorizações necessárias para o cumprimento das obrigações assumidas neste Contrato, e/ou em qualquer aditivo a este, e a adotar todas as medidas necessárias nos termos da lei aplicável para a execução das disposições do presente Contrato e/ou de qualquer aditivo a este;

(iv)    a notificar o Agente de Garantia Brasileiro, por escrito, em prazo não superior a 2 (dois) Dias Úteis após tomar ciência, de qualquer evento ou circunstância que possa afetar negativamente a capacidade da Companhia de cumprir as obrigações assumidas no Contrato e/ou em qualquer aditivo a este, ou que possa, de outra forma, afetar negativamente o cumprimento pela Companhia das obrigações previstas neste Contrato e/ou em qualquer aditivo a este;

(v)    cumprir tempestivamente as obrigações desse Contrato;

(vi)    defender, a si mesma, os Bens Alienados, as Partes Garantidas e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Bens Alienados, este Contrato e/ou o cumprimento das obrigações assumidas por força da Oferta;

(vii)    praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro do Contrato

- 12 -

competent Registry Office of Titles and Deeds to Sections 2.1 above;

perante os Cartórios de Registro de Títulos e Documentos competentes, nos termos da Cláusula 2.1 acima;

(viii)    not to carry out any act with the purpose to depreciate the Transferred Assets;

(viii)    a não praticar atos com o propósito de depreciar os Bens Alienados;

(ix)    assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, in case of any enforcement of the Fiduciary Transfer hereof, and bear all related expenses or that are necessary for such purpose;

(ix)    auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, no caso de eventual excussão da presente Alienação Fiduciária, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(x)    assist, allow and use its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent, as instructed by the Trustee, may request in order to facilitate the remittance abroad of any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(x)    auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*, venha a solicitar com o propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(xi)    comply with all clauses provided for in the Indenture;

(xi)    cumprir com todas as cláusulas previstas na Escritura;

(xii)    notify the Brazilian Collateral Agent of any event which results in a breach of this Agreement or the Indenture or in the inaccuracy of any representation made under this Agreement within two (2) Business Days of its occurrence;

(xii)    notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou da Escritura ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(xiii)    to pay before the assessment of any current or future fine, penalty, interests or expenses, any contributions or other charges

(xiii)    a pagar antes do lançamento quaisquer multas, penalidades, juros ou despesas, presentes ou futuras, contribuições

levied on the Transferred Assets that, in case of default in payment, may reasonably be expected to result in (a) a lien over the Transferred Assets, (b) a loss of ownership over the Transferred Assets or (c) a material adverse effect on the Transferred Assets;

(xiv)    not dispose of, assign, transfer, sell, lease, or dispose of the Transferred Assets;

(xv)    to keep the Transferred Assets in fully effectiveness and validity, paying all taxes, fees or other costs that may be required by the relevant authorities;

(xvi)    not to execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties and/or of the Brazilian Collateral Agent to sell or otherwise dispose of any one of the Transferred Assets, in part or in full;

(xvii)    the Shares shall remain registered in the books and records of Smiles held with the Bookkeeping Institution, as the bookkeeping institution of the Shares until the termination of this Agreement;

(xviii)    not create or allow the creation of any liens, encumbrances and/or security interests over the Transferred Assets, except for this Fiduciary Transfer;

(xix)    not list the Shares owned by the Company for trading in B3 or any stock exchange or over the counter market, unless instructed by the Brazilian Collateral Agent,

---

ou outros encargos incidentes sobre os Bens Alienados que, caso não sejam pagas, possam razoavelmente resultar (a) na constituição de um ônus ou gravame sobre os Bens Alienados, (b) na perda de propriedade dos Bens Alienados ou (c) em um efeito adverso relevante sobre os Bens Alienados;

(xiv)    não vender, alienar, ceder, transferir, vender ou arrendar os Bens Alienados;

(xv)    manter os Bens Alienados plenamente válidos e eficazes, pagando todos os impostos, taxas ou outros custos que possam ser exigidos pelas autoridades competentes;

(xvi)    a não celebrar nem autorizar a celebração de qualquer contrato que possa impedir ou restringir os direitos e/ou a capacidade das Partes Garantidas e/ou do Agente de Garantia Brasileiro de vender, alienar ou de outra forma dispor de qualquer dos Bens Alienados, total ou parcialmente;

(xvii)    as Ações deverão permanecer registradas nos livros e registros da Smiles na Instituição Escrituradora, na qualidade de instituição escrituradora das Ações, até o término deste Contrato;

(xviii) não criar ou permitir a criação de quaisquer ônus, gravames e/ou garantias, judiciais ou extrajudiciais, sobre os Bens Alienados, exceto pela presente Alienação Fiduciária;

(xix)    não listar as ações detidas pela Companhia para negociação na B3 ou em qualquer bolsa de valores ou mercado de balcão organizado, agindo em nome e benefícios das Partes Garantidas; e

acting on behalf and for the benefit of the Secured Parties; and

(xx)   annually renew the Power of Attorney (as defined below) granted under Section 5.4 of this Agreement, with at least thirty (30) days prior to its expiration date, substantially in form of the Exhibit III hereto.

(xx)   renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 5.4 deste Contrato com pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo III deste Contrato.

4.2.   Dividends. Except if an Event of Default has occurred and is continuing, until the full repayment of the Secured Obligations the Company shall be entitled to receive any payments made to the Company as shareholder of Smiles, including, without limitation, dividends, incomes, yields, interests on equity, bonuses, amounts paid for redemption of shares or capital reduction ("Payments").

4.2.   Dividendos. Exceto se um evento de Inadimplemento (*Event of Default*) estiver ocorrendo, até o pagamento integral das Obrigações Garantidas a Companhia terá direto a receber quaisquer pagamentos que sejam feitos à Companhia na sua qualidade de acionista da Smiles, incluindo, lucros, dividendos, juros sobre capital próprio, bonificações ou quaisquer outros valores, resgates ou reduções de capital ("Pagamentos").

4.2.1. Upon the occurrence and continuance of an Event of Default, the Brazilian Collateral Agent, acting in accordance with the instructions or directions of the Trustee, will be authorized to instruct Smiles and the Bookkeeping Institution to make any and all Payments to an account indicated by the Brazilian Collateral Agent.

4.2.1. Enquanto estiver ocorrendo um evento de Inadimplemento (*Event of Default*), o Agente de Garantia Brasileiro, agindo em nome e benefícios das Partes Garantidas, estará autorizado a instruir à Smiles e à Instituição Escrituradora que realizem todos e quaisquer Pagamentos em uma conta indicada pelo Agente de Garantia Brasileiro.

4.3.   Voting Rights. Except as otherwise provided for in this Agreement or in the Indenture, the Company may freely exercise its voting rights with respect to the Shares for the duration of this Agreement. However, upon the occurrence and continuance of an Event of Default or the acceleration of the maturity of the Secured Obligations, any and all votes cast by the Company as shareholder of Smiles shall be subject to previous approval in writing by the Brazilian Collateral Agent.

4.3.   Direito de Voto. Exceto se de outra forma previsto neste Contrato ou na Escritura, a Companhia poderá exercer livremente seu direito de voto com relação às Ações durante a vigência deste Contrato. Contudo, enquanto estiver ocorrendo um evento de Inadimplemento (*Event of Default*) ou em caso de vencimento antecipado das Obrigações Garantidas, todo e qualquer voto da Companhia com relação às Ações

dependerá do consentimento prévio e por escrito do Agente de Garantia Brasileiro.

### SECTION V
### FORECLOSURE

### CLÁUSULA V
### EXCUSSÃO

5.1.    In the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture, shall be entitled, notwithstanding any other security granted and provided under the Offering, exercise all powers related to the Transferred Assets and the Fiduciary Transfer created under this Agreement, secured by the applicable law, with the possibility of exercising voting rights related to the Transferred Assets, receiving dividends, disposing of, realizing, selling (including by means of amicable sell) or assigning, by private instrument, transaction in stock exchanges, over the counter markets or otherwise, either in full or in part, the Transferred Assets, upon such prices, terms and conditions as the Secured Parties may deem appropriate, as well to practice all necessary acts for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets; give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian

5.1.    Caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo *Trustee*, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo *Trustee*, em observância à Escritura, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, exercer todos os poderes relativos aos Bens Alienados e a Alienação Fiduciária constituída neste Contrato, assegurados pela lei aplicável, com a possibilidade de exercer o direito de voto conferido pelos Bens Alienados, receber dividendos, alienar, converter em bens, vender (inclusive mediante venda amigável) ou ceder, por meio de instrumento particular, operação em bolsa de valores, em mercado de balcão ou outro procedimento, quer a totalidade, quer parte dos Ativos Alienados, consoante preços, termos e condições que possam ser considerados convenientes pelas Partes Garantidas, bem como praticar todos os procedimentos e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados; dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização

- 16 -

Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture.

da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura.

5.2.   If the amount received by the Brazilian Collateral Agent, in strict compliance with the Indenture, on behalf and for the benefit of the Secured Parties, resulting from the sale of the Transferred Assets, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Indenture.

5.2.   Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância à Escritura, em nome e benefício das Partes Garantidas, resultante da alienação dos Bens Alienados, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições da Escritura.

5.3.   With respect to Clause 5.1 above, in the event of enforcement or execution of this Agreement, the Company shall cause the direct possession of the Transferred Assets to be transferred to the Secured Parties, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Trustee.

5.3.   Com relação à Cláusula 5.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Bens Alienados para as Partes Garantidas, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo *Trustee*.

5.4.   The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Civil Code, a power of attorney, pursuant to Exhibit III to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including, without

5.4.   A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil, a procuração, nos termos do Anexo III a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se limitar a,

- 17 -

limitation, as provided for in Clause 5.1 above, and in the signature of the respective exchange agreement necessary for the remittance of any and all financial funds, resulting from the sale of the Transferred Assets, due by the Company to the Secured Parties. The Company hereby acknowledges and agrees that the Brazilian Collateral Agent shall, upon the acceleration of the Secured Obligations, on behalf of the Company, sign instruments for the assignment or transfer of Transferred Assets subject to this Fiduciary Transfer, directly with any third party assignee or buyer, as well as representing the Company before any competent governmental authority or body for any formalization purposes, registration and/or perfection of such assignment or transfer.

conforme disposto na Cláusula 5.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Bens Alienados, devidos pela Companhia às Partes Garantidas. A Companhia reconhece e concorda que o Agente de Garantia Brasileiro poderá, mediante a declaração de um vencimento antecipado das Obrigações Garantidas, em nome da Companhia, assinar instrumentos de venda e cessão, tendo por objeto qualquer dos Bens Alienados da presente Alienação Fiduciária, diretamente com qualquer terceiro comprador ou cessionário, bem como representar a Companhia perante qualquer autoridade ou órgão governamental competente para fins de qualquer formalização, averbação e aperfeiçoamento de tal cessão ou transferência.

5.4.1   While this Agreement is in force, the Power of Attorney shall be renewed annually by the Company at least thirty (30) days prior to its expiration date.

5.4.1   Enquanto este Contrato estiver em vigor, a Procuração deverá ser renovada anualmente pela Companhia com ao menos 30 (trinta) dias de antecedência da data de seu vencimento

5.5.   For the purposes of the enforcement of the Fiduciary Transfer created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Secured Parties as the Brazilian collateral agent in accordance with the provisions of the Indenture, under which the Brazilian Collateral Agent is authorized to represent the Secured Parties and the Trustee, on its behalf and interest, in court and out-of-court.

5.5.   Para fins de excussão da Alienação Fiduciária constituída pelo presente Contrato, as Partes concordam que o Agente de Garantia Brasileiro foi nomeado pelas Partes Garantidas como agente de garantia brasileiro conforme as disposições da Escritura, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar as Partes Garantidas e o *Trustee*, em seu nome e interesse, judicial ou extrajudicialmente.

5.6.   Company undertakes to reimburse or pay in advance the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement

5.6.   A Companhia se compromete a reembolsar ou pagar adiantado ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento do pedido de

or payment in advance request, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred or to be incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this <u>Section V</u> hereto.

reembolso ou pagamento adiantado, por todos os custos e despesas (inclusive despesas e honorários advocatícios) necessários e razoáveis incorridos ou a serem incorridos pelo Agente de Garantia Brasileiro, para matérias e questões relacionadas ao disposto nesta <u>Seção V</u> deste Contrato.

## SECTION VI
### COSTS AND EXPENSES

## CLÁUSULA VI
### CUSTOS E DESPESAS

6.1.    The Company undertakes to pay all notarial and registration fees triggered by this Agreement.

6.1.    A Companhia se obriga a pagar todas as taxas notariais e de registro desencadeadas por este Contrato.

6.2.    All expenses incurred by the Brazilian Collateral Agent, acting on behalf and for the benefit of the Secured Parties under this Agreement, including those related to the sale/negotiation of Transferred Assets, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("<u>Expenses</u>") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Company does not timely perform the transfer of the amounts mentioned herein.

6.2.    Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Bens Alienados, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem corno as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("<u>Despesas</u>"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.3.    The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Indenture and the proposal for the collateral agent services provisions dated November 30, 2020.

6.4.    The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, unless it receives instructions provided by the Trustee, as well as indemnity or guarantee to its satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

**SECTION VII**
**BRAZILIAN COLLATERAL AGENT**

7.1.    The Brazilian Collateral Agent has been appointed, in accordance with the Indenture, by the Secured Parties and is authorized to perform acts on behalf of the Secured Parties and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.2.    The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the

6.3.    A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos da Escritura ou da proposta para prestação de serviços de agente de garantia datada de 30 de novembro de 2020.

6.4.    O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, a menos que ele receba instruções fornecidas pelo *Trustee*, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

**CLÁUSULA VII**
**AGENTE DE GARANTIA BRASILEIRO**

7.1.    O Agente de Garantia Brasileiro foi nomeado, de acordo os termo da Escritura, pelas Partes Garantidas e está autorizado a praticar atos em nome das Partes Garantidas e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2.    O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima,

- 20 -

foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), except for those rights and discretionary powers that are expressly provided for in this Agreement that the Brazilian Collateral Agent is required to exercise as instructed, in writing, by the Trustee, (c) except as expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLA and/or Gol Finance or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the

(a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem exercidos (ou não) pelo Agente de Garantia Brasileiro), exceto por aqueles direitos e poderes discricionários que estiverem expressamente previstos neste Contrato que o Agente de Garantia Brasileiro seja obrigado a exercer conforme instruído, por escrito, pelo *Trustee*, (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLA e/ou à Gol Finance ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento

Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Trustee or in the absence of his own gross negligence, bad faith or willful misconduct, according to a final judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Trustee, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this Agreement and the Indenture, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Indenture, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent and, cumulatively, the period of two (2) Business Days from the occurrence of the respective default without the Brazilian Collateral Agent having notified the Trustee of such default.

7.3.    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request,

de bens da Companhia em violação de qualquer lei de falência, insolvência, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do *Trustee* ou na ausência de sua própria negligência grave, má-fé ou conduta dolosa, conforme sentença judicial transitada em julgado. O Agente de Garantia Brasileiro não será considerado como tendo conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo *Trustee*, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e à Escritura, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou na Escritura, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro e, cumulativamente, ter decorrido o prazo de 2 (dois) Dias Úteis da ocorrência do respectivo inadimplemento sem que o Agente de Garantia Brasileiro tenha notificado o *Trustee* de referido inadimplemento.

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado,

certificate, consent, representation, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Indenture). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by him in accordance with the advice of any said lawyer, auditor or expert.

consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido na Escritura). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4.     The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.     O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5.     The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide any financing statements or continuation statements, or to be responsible for maintaining the guarantee to be created as

7.5.     O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada

described in this Agreement (except the custody of the guarantee provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Company.

7.6.    The Brazilian Collateral Agent may be required to carry out foreign exchange transactions in order to remit funds abroad. For this purpose, the Brazilian Collateral Agent may reasonably require the Trustee and/or the Company to deliver the required documents/information in respect of each foreign exchange transaction, in accordance with the provisions of the Indenture. In order to effect the transfer of any amounts paid under the terms and conditions of this Agreement, the Brazilian Collateral Agent will perform a foreign exchange transaction to convert into dollars any amount in Brazilian *reais*, in the amount specified by the Trustee; except that possible deductions of any commissions or taxes charged on the foreign exchange transactions under discussion and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Trustee. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives from the Trustee the applicable instructions and documents to perform such foreign exchange transaction; (b) will transfer funds, as requested by the Trustee, at most (i) on the 2nd (second) Business Day subsequent to the

segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia.

7.6.    O Agente de Garantia Brasileiro poderá ser obrigado a realizar fechamentos de câmbio a fim de remeter fundos para o exterior. Para esse propósito, o Agente de Garantia Brasileiro poderá razoavelmente requerer ao *Trustee* e/ou à Companhia a entrega de documentos/informações exigidos com relação a cada fechamento de câmbio, de acordo com as disposições da Escritura. A fim de realizar a transferência de quaisquer valores pagos nos termos e condições deste Contrato, o Agente de Garantia Brasileiro realizará uma operação de câmbio para converter em dólares qualquer valor em reais, no valor especificado pelo *Trustee*; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio em discussão e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo *Trustee*. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber do *Trustee* as instruções e documentos aplicáveis para realizar referida operação de câmbio; (b) transferirá fundos, conforme solicitado pelo *Trustee*, no máximo (i) no 2° (segundo) Dia Útil subsequente ao Dia Útil em que os dólares estiverem disponíveis para transferência; e (ii) no 2° (segundo) Dia Útil em que essa transferência for permitida, nos termos do respectivo Registro de Operações

Business Day on which the dollars are available for transfer; and (ii) in the 2nd (second) Business Day in which such transfer is allowed, under the respective Records of Financial Transactions with the Central Bank of Brazil (ROF), as applicable; and (c) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses that could result in possible delays or impediments to the performance of a foreign exchange transaction and/or transfers required by the Trustee, nor as the impossibility to perform a foreign exchange transaction or transfer, as described in this Section. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement.

Financeiras junto ao Banco Central do Brasil ("ROF"), conforme aplicável; e (c) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas que poderiam resultar em possíveis atrasos ou impedimentos à realização de uma operação de câmbio e/ou transferências exigidas pelo *Trustee*, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência conforme descrito nesta Cláusula. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato.

7.7.    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido

informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.     The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10.    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 7.10.

7.9.     O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros- OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11. Any and all payments by Gol Finance, the Company and/or GLA to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, Gol Finance, the Company and/or GLA, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.11. Todos e quaisquer pagamentos pela Gol Finance, pela Companhia e/ou pela GLA para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, a Gol Finance, a Companhia e/ou a GLA, conforme o caso, pagarão imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12. The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Offering.

7.12. As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação à Oferta.

7.13. For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Trustee.

7.13. Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do *Trustee*.

7.14. Subject to the appointment and acceptance of a successor agent as set forth in this Section, the Brazilian Collateral Agent may withdraw at any time by notifying the

7.14. Sujeito à nomeação e à aceitação de um agente sucessor conforme previsto nesta Cláusula, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento

Trustee and the Company. Upon any withdrawal by the Brazilian Collateral Agent, the Trustee shall have the right, upon consent (provided that no Event of Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), to appoint a successor agent. If no successor agent has been so appointed by the Trustee and has accepted such appointment within thirty (30) days after the withdrawal of the Brazilian Collateral Agent gives notice of its withdrawal, then the withdrawing Brazilian Collateral Agent may, upon consent (provided that no Event of Default or Default has occurred and persists) of the Company (consent of which shall not be unreasonably withheld or delayed), appoint a successor agent. Upon acceptance of a successor agent of its appointment as a Brazilian Collateral Agent under this Agreement, such successor will succeed and have all rights, powers, privileges and duties of the withdrawing Brazilian Collateral Agent, and the withdrawing Brazilian Collateral Agent will be released from his duties and obligations under this Agreement. The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor.

notificando o *Trustee* e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, o *Trustee* terá o direito de, mediante o consentimento (desde que nenhum Evento de Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Se nenhum agente sucessor tiver sido assim nomeado pelo *Trustee* e tiver aceitado essa nomeação dentro de 30 (trinta) dias após o Agente de Garantia Brasileiro que se retira entregar notificação de sua renúncia, então o Agente de Garantia Brasileiro que se retira poderá, mediante o consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e persista) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), nomear um agente sucessor. Mediante a aceitação de um agente sucessor de sua nomeação como agente de garantia brasileiro, segundo este Contrato, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro que se retira, e o Agente de Garantia Brasileiro que se retira será liberado de seus deveres e obrigações segundo este Contrato. Os honorários devidos pela Companhia a um agente sucessor serão os mesmos contratados com relação a seu antecessor, a menos que acordado de outra maneira entre a Companhia e esse sucessor.

## SECTION VIII
## MISCELLANEOUS

## CLÁUSULA VIII
## DISPOSIÇÕES GERAIS

8.1. <u>Definitions</u>. Capitalized terms used in this Agreement and its Exhibits and not otherwise defined herein will have the

8.1.    <u>Definições</u>. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles

meaning assigned to them in the Indenture, unless otherwise defined in this Agreement.

na Escritura, exceto se definido de outra maneira neste Contrato.

8.1.1.   For the purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or a public holiday in Brazil, or that day when commercial banks in the cities of Rio de Janeiro and São Paulo are authorized or required by law to close.

8.1.1.   Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados ou obrigados por lei a fechar.

8.2.   Amendments. This Agreement may be amended, replaced, cancelled, renewed or extended, and its terms may be waived, only upon written instrument signed by all Parties.

8.2.   Alterações. Este Contrato somente poderá ser aditado, substituído, cancelado, renovado ou prorrogado e seus termos somente poderão ser renunciados, mediante instrumento escrito assinado por todas as Partes.

8.3.   Severability. If any provision of this Agreement is held void or ineffective by court decision, the validity or enforceability of the remaining provisions shall not be affected, and the latter shall remain in full force and effect, being the Parties committed, within the shortest term possible, to engage in good-faith negotiations to replace the ineffective provision by another that, to the greatest extent possible and in a reasonable manner, reaches the intended purposes and effects.

8.3.   Independência das Cláusulas. Se qualquer disposição deste Contrato for considerada nula ou ineficaz por decisão judicial, a validade ou exequibilidade das remanescentes não será afetada, as quais permanecerão em pleno vigor e vigência, comprometendo-se as Partes, no menor prazo possível, a negociarem, de boa-fé, a substituição da disposição ineficaz por outra que, na máxima extensão possível e de maneira razoável, atenda aos fins e propósitos pretendidos.

8.4.   Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Trustee.

8.4.   Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo *Trustee*.

8.4.1.   When all obligations related to the Secured Obligations have been discharged in

8.4.1.   Quando todas as obrigações relacionadas às Obrigações Garantidas

an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Transferred Assets from any encumbrance which is still in force in accordance with the provisions herein.

8.5.   Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Indenture, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Indenture. Except as provided in the Indenture, neither Party may assign or transfer any of its rights or obligations under this Agreement.

8.6.   Guarantees. The Fiduciary Transfer provided for in this Agreement shall be additional to and independent of any other security that the Secured Parties may at any time be entitled to under the Indenture and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Parties or the Brazilian Collateral Agent to enforce such additional guarantees.

8.7.   Notices. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf

tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação dos Bens Alienados de qualquer gravame que ainda esteja em vigor de acordo com as disposições deste Contrato.

8.5.   Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório à Escritura, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes da Escritura. Salvo nos casos previstos na Escritura, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.   Garantias. A Alienação Fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que as Partes Garantidas possam a qualquer momento ter direito, nos termos da Escritura e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade das Partes Garantidas ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.   Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por

as attachment, with proof of transmission, and addressed as follows:

For Company:

Address: Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

For the Brazilian Collateral Agent:
Address: Alameda Caiapós, No. 243, ground floor, Bl. A, Suite 1, Centro Empresarial Tamboré, Barueri – SP, 06460-110, Brazil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

For GLAI:

Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo
São Paulo - SP, Brazil

Attn: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1. Any and all notifications or other communications made pursuant to this Agreement will be considered valid and delivered on the Business Day following the respective receipt, according to the document signed by the recipient or acknowledgment of receipt, as the case may be.

8.8. Specific Performance. This Agreement is an extrajudicial instrument

via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

Para a Companhia:

Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo - SP, Brasil
Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

Para o Agente de Garantia Brasileiro:
Endereço: Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, Barueri – SP, CEP 06.460-010, Brasil
Att: Danilo Oliveira / Karla Fernandes
danilo.oliveira@tmf-group.com/
karla.fernandes@tmf-group.com

Para a GLAI:

Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo
São Paulo - SP, Brasil

Att: Richard Freeman Lark Jr. - rfl@voegol.com.br / Mario Tswei Liao - mtliao@voegol.com.br

8.7.1. Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8. Execução Específica. Este Contrato constitui um título executivo extrajudicial

(*título executivo extrajudicial*) for all purposes of articles 497, 784 and 815 of the Civil Procedure Code and, for the purposes of this Agreement and of each amendment hereto, the Brazilian Collateral Agent, representing the Secured Parties, under this Agreement may pursue specific performance of the obligations of Company.

para todos os fins dos Artigos 497, 784 e 815 do Código de Processo Civil e, para os fins deste Contrato e de todos os aditivos a este Contrato, o Agente de Garantia Brasileiro representando as Partes Garantidas, nos termos deste Contrato, poderá promover a execução específica das obrigações da Companhia.

8.9.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of Brazil.

8.9.   Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil.

8.9.1. In order to produce the due legal effects, this Agreement, signed by two witnesses, constitutes an extrajudicial enforcement instrument (*título executivo extrajudicial*) that may be the subject to enforcement proceedings under the terms of article 784, item III of the Civil Procedure Code.

8.9.1.   Para que produza os devidos efeitos legais, este Contrato, assinado por duas testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.   Jurisdiction. Any disputes or controversies arising from this Agreement will be settled by the court of the City São Paulo, State of São Paulo, which will also be the competent jurisdiction to enforce the obligations established herein.

8.10.   Foro. Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.   Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Indenture, and all provisions of the Indenture are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.11.   Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos na Escritura, sendo que todas as disposições da Escritura são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis

8.12. <u>Language</u>. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13. <u>Electronic Signature</u>. This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14. This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

**IN WITNESS WHEREOF**, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

(*remainder of the page intentionally left blank*)

8.12. <u>Idioma</u>. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em Português irá prevalecer.

8.13. <u>Assinatura Eletrônica</u>. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

8.14. Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

(*restante da página intencionalmente deixado em branco*)

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer of Shares Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of _____.)* | *(Página de assinaturas do Contrato de Alienação Fiduciária de Ações celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de _____.)* |

## GOL LINHAS AÉREAS INTELIGENTES S.A.,


_____        _____
*Name*/Nome:                                *Name*/Nome:
*Title*/Cargo:                              *Title*/Cargo:

*(Signature page of the Fiduciary Transfer of Shares Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Ações celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de _____.)*

### TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.

_____     _____
*Name*/Nome:                          *Name*/Nome:
*Title*/Cargo:                        *Title*/Cargo:

*(Signature page of the Fiduciary Transfer of Shares Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Ações celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de _____.)*

## GOL LINHAS AÉREAS S.A.,

_____    _____

*Name*/Nome:                                    *Name*/Nome:
*Title*/Cargo:                                     *Title*/Cargo:

*(Signature page of the Fiduciary Transfer of Shares Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of _____.)*

*(Página de assinaturas do Contrato de Alienação Fiduciária de Ações celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de _____.)*

**WITNESSES/TESTEMUNHAS**

_____    _____

Name/Nome:    Name/Nome:

Tax ID /CPF:    Tax ID /CPF:

ID/RG:    ID/RG:

| | |
|---|---|
| **EXHIBIT I** | **ANEXO I** |
| to the Fiduciary Transfer of Shares Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of _____. | ao Contrato de Alienação Fiduciária de Ações celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de _____. |

**DESCRIPTION OF SECURED OBLIGATIONS**

**GOL FINANCE NOTES**

**DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS**

**NOTAS GOL FINANCE**

Principal Amount: USD 200,000,000.00 (Two hundred million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: US$ 200.000.000,00 (duzentos milhões de dólares), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: June 30, 2026;

Data de Vencimento: 30 de junho de 2026;

Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura;

Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes;

Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas;

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na Escritura.

## AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT

## VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Default interest: 1.00% (once percent) per month;

Juros de Mora: 1,00% (um por cento) ao mês;

Penalty Clause: 10.00% (ten percent);

Cláusula Penal: 10,00% (dez por cento);

Inflation Adjustment Index: Not applicable;

Índice de Atualização Monetária: Não aplicável;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00

450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

(cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

**EXHIBIT II**

to the Fiduciary Transfer of Shares Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of _____.

**BOOKKEEPING NOTICE**

São Paulo, [●] 2020.

To

**ITAÚ CORRETORA DE VALORES S.A.**

Attn.: [●]

Dear Sirs:

Reference is made to the Share, Assets and Credit Rights Pledge Agreement, entered into by and among Gol Linhas Aéreas Inteligentes S.A. ("Company") and TMF Brasil Administração e Gestão de Ativos Ltda. ("Brazilian Collateral Agent"), Gol Linhas Aéreas S.A. ("GLA") on [●] [●] (the "Agreement").

The Company, GLA and the Brazilian Collateral Agent hereinafter individually referred to as a "**Party**" and, collectively, as "**Parties**".

The capitalized words used in this notice, but not defined herein, shall have the meanings ascribed to them in the Agreement.

Pursuant to the terms of the Agreement, we hereby inform you of the fiduciary sale created thereunder over (i) [●] ([●]) ordinary shares issued by Smiles Fidelidade S.A., a company organized and existing under the laws of Brazil, with its principal place of business at Alameda

**ANEXO II**

ao Contrato de Alienação Fiduciária de Ações celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de _____.

**NOTIFICAÇÃO DE ESCRITURAÇÃO**

São Paulo, [●] de [●] de 2020.

Para

**ITAÚ CORRETORA DE VALORES S.A.**

At.: [●]

Prezados Senhores:

Referimo-nos ao Contrato de Alienação Fiduciária de Ações, celebrado entre Gol Linhas Aéreas Inteligentes S.A. ("Companhia"), TMF Brasil Administração e Gestão de Ativos Ltda. ("Agente de Garantia Brasileiro") e Gol Linhas Aéreas S.A. ("GLA") em [●] de [●] de [●] ("Contrato").

A Companhia, GLA e o Agente de Garantia Brasileiro doravante individualmente designados como "**Parte**" e, em conjunto, como "**Partes**".

Os termos em letras maiúsculas utilizados nesta notificação, porém não definidos neste instrumento de outra forma, terão os mesmos significados a eles atribuídos no Contrato.

Nos termos do Contrato, vimos por meio da presente notificar V.Sas. sobre a alienação fiduciária constituída sobre (i) [●] ([●]) ações ordinárias emitidas Smiles Fidelidade S.A., sociedade constituída e existente de acordo com as leis do Brasil, com sede na Alameda Rio Negro, nº

Rio Negro, nº 585, Edifício Padauiri, Block B, 2nd floor, conj. 21 and 22, Alphaville, CEP 06454-000, in the City of São Paulo, State of São Paulo, and enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 15.912.764/0001-20 ("**Smiles**"), with trading code "SMLE3" at B3 and owned by the Company and, any Additional Shares (as defined in the Agreement) that may be fiduciary transferred to Brazilian Collateral Agent, as representative and for the benefit of the Secured Parties, pursuant to the Agreement; (ii) all rights and privileges deriving from such shares by means of any share-split, reverse share-split or share bonus, share exchange, sale or other disposal of such Shares and any assets or securities into which such Shares are converted into; (iii) all dividends or interest on capital related to the Transferred Shares and the Additional Shares.

Due to the creation of the abovementioned fiduciary sale, we hereby request you to:

(a) immediately annotate the fiduciary transfer of the Transferred Shares on the Smiles' books and records, as applicable, of the Shares ("**Fiduciary Transfer Annotation**");

(b) no later than two (2) Business Days counted from the date hereof deliver to the Brazilian Collateral Agent evidence that the Fiduciary Transfer Annotation has been duly performed;

(c) maintain the Assigned Shares duly segregated until receipt of written instruction from the Brazilian Collateral Agent acting on behalf of and for the benefit of the Secured Parties, to release the Transferred Shares;

585, Edifício Padauiri, Bloco B, 2º andar, conjuntos 21 e 22, Alphaville, CEP 06454-000, Cidade de São Paulo, Estado de São Paulo, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o nº 15.912.764/0001-20 ("**Smiles**"), com código de negociação "SMLE3" na B3 e detidas pela Companhia quaisquer, Ações Adicionais (conforme definido no Contrato) as quais poderão ser empenhadas em favor do Agente de Garantia Brasileiro, na qualidade de representante e em benefício das Partes Garantidas, nos termos da do Contrato; (ii) todos os direitos e privilégios resultantes de tais ações, tais como, grupamento de ações, desdobramento de ações, bonificação de ações, permuta de ações, venda ou outra forma de alienação de tais Ações e quaisquer bens ou valores mobiliários nos quais tais Ações sejam convertidas; (iii) todos os dividendos ou juros sobre capital próprio oriundos das Ações Alienadas ou das Ações Adicionais.

Em razão da constituição da alienação fiduciária acima descrito, solicitamos à V.Sas. as seguintes providências:

(a) a imediata averbação da alienação fiduciária das Ações Alienadas nos livros e registros da Smiles, conforme aplicável, das Ações ("**Averbação de Alienação Fiduciária**");

(b) no prazo de 2 (dois) Dias Úteis contados da presente data, entregar ao Agente de Garantia Brasileira evidência de que a Averbação de Alienação Fiduciária foi devidamente realizada;

(c) manter as Ações Alienadas devidamente bloqueadas até o recebimento de instrução de liberação das Ações Alienadas enviada, por escrito, pelo Agente de Garantia Brasileiro, agindo em nome e benefícios das Partes Garantidas;

- 42 -

(d) only accept, without requesting the presentation of any document or information, orders from the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, or orders from the Disposer which counts with Brazilian Collateral Agent's prior and written consent, with respect to the Transferred Shares, until formally instructed otherwise by Brazilian Collateral Agent; and

(d) acatar, somente instruções do Agente de Garantia Brasileiro, ou instruções da Alienante que contem com a prévia e expressa concordância do Agente de Garantia Brasileiro, agindo em nome e benefícios das Partes Garantidas, em relação as Ações Alienadas, exceto se instruído de forma diversa pelo Agente de Garantia Brasileiro; e

(e) follow only the instructions from the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties, with respect to the Transferred Shares.

(e) aceitar apenas as instruções do Agente de Garantia Brasileiro, agindo em nome e benefícios das Partes Garantidas, com relação às Ações Alienadas.

This notice shall prevail over the Transferred Shares, until you are duly notified by the Brazilian Collateral Agent of the release of the lien over the Transferred Shares.

As disposições desta notificação prevalecerão com relação às Ações Alienadas, até que o Agente de Garantia Brasileiro envie notificação solicitando a liberação do ônus sobre as Ações Alienadas.

Yours truly,

Atenciosamente,

## GOL LINHAS AÉREAS INTELIGENTES S.A.

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| Title/Cargo: | Title/Cargo: |

| AGREED ON _____/____/_____ | DE ACORDO _____/____/_____ |
|---|---|

## ITAÚ CORRETORA DE VALORES S.A.

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| Title/Cargo: | Title/Cargo: |

| EXHIBIT III | ANEXO III |
|---|---|
| **to the Fiduciary Transfer of Shares Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A., dated as of _____.** | **ao Contrato de Alienação Fiduciária de Ações celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A., datado de _____.** |
| **Form of Power of Attorney** | **Modelo de Procuração** |
| **POWER OF ATTORNEY** | **PROCURAÇÃO** |
| By this power of attorney, **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, s/n, Gate 3, building 24, part, Jardim Aeroporto, Zip Aeroporto 04626-020, enrolled with the National Registry of Legal Entities of the Ministry of Economy (CNPJ/ME) under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Alameda Caiapós No. 243, ground floor, Bl. A, suite 1, Centro Empresarial Tamboré, Zip Code 06.460-110, enrolled with the National Register of Legal Entities of the Ministry of Finance (CNPJ/ME) under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Parties, in accordance with the Fiduciary Transfer of SharesAgreement entered into on [●], 2020 between the GRANTOR, the GRANTEE and Gol Linhas Aéreas S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with articles 653, 654, 684, 685 and 686, sole paragraph, | Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade organizada e existente segundo as leis do Brasil, na cidade de São Paulo, Estado de São Paulo, com sede na Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020, inscrita no Cadastro Nacional De Pessoas Jurídicas do Ministério da Economia (CNPJ/ME) sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Alameda Caiapós nº 243, térreo, Conj. A, Sala 1, Centro Empresarial Tamboré, CEP 06.460-010, inscrita no CNPJ/ME sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício das Partes Garantidas, nos termos do Contrato de Alienação Fiduciária de Ações celebrado em [●] de [●] de 2020 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo |

of the Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts:

1. practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

(a) to dispose of, sell, assign, transfer, collect, receive, take possession of and/or foreclose all or part of the Transferred Assets or otherwise dispose of, and deliver the Transferred Assets under the Agreement and as established in article 1,364 of the Civil Code, and apply the product received to the payment of the Secured Obligations under the Agreement;

(b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Transferred Assets and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, including any order of transfer (OTA) on behalf of the GRANTOR, as well as bring actions with respect to the Transferred Assets and represent the GRANTOR before third parties for the purpose of releasing the Fiduciary Transfer, disposal of the Transferred Assets, in or outside of the stock market, and transfer of the funds resulting from such disposal;

2. sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney,

---

único, do Código Civil, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir:

1. praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

(a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Bens Alienados ou dispor de qualquer outro modo e entregar os Bens Alienados nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

(b) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Bens Alienados e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos, incluindo qualquer ordem de transferência de ações (OTA) em nome da OUTORGANTE, e instaurar ações com relação aos Bens Alienados e representar a OUTORGANTE perante terceiros para fins da liberação da alienação fiduciária, alienação dos Bens Alienados na ou fora da B3 e transferência dos recursos resultantes de tal alienação;

2. assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral

including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Parties, in accordance with the terms and limits of the Agreement;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties, in any corporate books and before any bookkeeping institution and any relevant Registry of Titles and Documents in which the Agreement or any amendments thereto shall be registered, or before any Brazilian governmental federal, state or municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

4. to the extent necessary to ensure the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Transferred Assets, represent the GRANTOR before any competent Registry Office of Deeds and Documents and/or any other governmental body in which the Agreement or its respective amendments shall be registered;

5. enter into exchange transactions and take all necessary actions for such purpose,

---

cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE às Partes Garantidas, de acordo com os termos e limites do Contrato;

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros, em quaisquer livros societários e perante qualquer instituição financeira responsável pela escrituração das Ações e Cartório de Registro de Títulos e Documentos nos quais o Contrato ou suas respectivas alterações estejam registrados, ou perante quaisquer órgãos ou autoridades governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às aos Bens Alienados, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente e/ou qualquer outro órgão governamental nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5. celebrar operações de câmbio e praticar todas as medidas necessárias para tal

including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Financial Transactions with the Central Bank of Brazil (ROF) and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the Trustee, as provided for in the Agreement; and

6. instruct Smiles and the Bookkeeping Institution to make Payments solely in accordance with the Agreement;

7. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Civil Code, in accordance with the terms and conditions set forth in the Agreement.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

---

finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações Financeiras junto ao Banco Central do Brasil (ROF) aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para o *Trustee*, conforme previsto no Contrato; e

6. instruir a Smiles e a Instituição Escrituradora a realizar Pagamentos apenas nos termos do Contrato;

7. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil, de acordo com os termos e condições previstos no Contrato.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

| | |
|---|---|
| The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement. | Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato. |
| [*place*], [●] [●], 20[●]. | [local], [●] [●], 20[●] |
| **GOL LINHAS AÉREAS INTELIGENTES S.A.**<br>[SIGNATURE BLOCK] | **GOL LINHAS AÉREAS INTELIGENTES S.A.**<br>[CAMPO DE ASSINATURA] |

**<u>Exhibit C</u>**

**2026 SSN First Supplement Indenture**

FIRST SUPPLEMENTAL INDENTURE (this "First Supplemental Indenture"), dated as of March 2, 2023, by and among GOL Finance, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg ("**Luxembourg**"), with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 (the "Issuer"), GOL Linhas Aéreas Inteligentes S.A. and GOL Linhas Aéreas S.A. (together, the "Guarantors"), The Bank of New York Mellon, a New York banking corporation, as trustee (the "Trustee"), and TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "Collateral Agent"), each under the Indenture referred to below.

WITNESSETH

WHEREAS, the Issuer and the Guarantors executed and delivered to the Trustee and the Collateral Agent an Indenture, dated as of December 23, 2020 (as it may be amended, supplemented or otherwise modified from time to time, the "Indenture"), providing for the issuance of 8.00% Senior Secured Notes due 2026 (the "2026 Notes");

WHEREAS, Section 9.02 of the Indenture provides that, under certain circumstances, the Issuer, the Guarantors, the Trustee and the Collateral Agent may amend or supplement the Indenture with the consent of the Holders of a majority in aggregate principal amount of the then outstanding 2026 Notes (collectively, the "Consents");

WHEREAS, Abra Global Finance has entered into that certain Transaction Commitment, Exchange and Purchase Agreement, dated as of the date hereof (the "Exchange Agreement"), by and among Abra Global Finance, Abra Group Limited and certain beneficial owners and record holders (collectively, the "Exchanging Holders") of GOL Bonds (as defined in the Exchange Agreement), pursuant to which Abra Global Finance has agreed, subject to the execution, delivery and effectiveness of this First Supplemental Indenture, to exchange the Exchanging Holders' GOL Bonds specified therein for certain new notes (the "New Notes"); and

WHEREAS, the Exchanging Holders, by their election to receive the New Notes, have delivered to the Issuer and the Trustee Consents by or on behalf of Holders of at least a majority in aggregate principal amount of the issued and outstanding 2026 Notes as of the time of the execution of this First Supplemental Indenture to (i) the amendments to the Indenture and the 2026 Notes set forth in this First Supplemental Indenture and (ii) the issuance of the New Notes, including the incurrence of the obligations and liens in respect thereof, in exchange for the GOL Bonds (as defined in the Exchange Agreement).

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Issuer, the Guarantors, the Trustee and the Collateral Agent mutually covenant and agree for the equal and ratable benefit of the Holders of the 2026 Notes as follows:

1.      CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture (as supplemented hereby).

2.       CERTAIN AMENDMENTS TO THE INDENTURE.

(a)      The Indenture is hereby amended by deleting the following Sections and clauses of the Indenture and all references and definitions related solely thereto in their entirety, and replacing all such deleted sections, clauses, references and definitions with "[Intentionally Omitted]":

- Section 4.07 (*Reporting Requirements*)

- Section 4.09 (*Limitation on Transactions with Affiliates*)

- Section 4.15 (*LTV Ratio*)

- Section 4.22 (*Listing*)

(b)      Item (i) of Section 2.15 (*Additional Notes*) is hereby deleted and replaced with "[Intentionally Omitted]".

(c)      Item (ii) of Section 4.11 (*Additional Pari Passu Obligations*) is hereby deleted and replaced with "[Intentionally Omitted]".

(d)      Item (e)(B) of Section 4.18 (*Use and Possession of Spare Parts, Spare Engines, Flight Simulators and Aircraft*) is hereby deleted and replaced with "[Intentionally Omitted]".

(e)      The definition of "Additional Pari Passu Obligations" is hereby amended to read as follows:

"**Additional Pari Passu Obligations**" means any Obligations under (x) the senior secured notes issued pursuant to a note purchase agreement, the form of which is attached as Annex A hereto (the "GOL SSNs"); (y) the exchangeable senior secured notes issued pursuant to a note purchase agreement, the form of which is attached as Annex B hereto (the "GOL ESSNs"); and (z) up to US$275.0 million in debt (the "Additional Pari Passu Debt") as expressly permitted pursuant to Section 7.13(b)(10) under each of the note purchase agreements referenced in clause (x) and clause (y) having Pari Passu Lien Priority relative to the Notes Obligations with respect to the Collateral; *provided* that the Additional Trustee shall have executed (a) a joinder to the Intercreditor Agreement then in effect or (b) if the Intercreditor Agreement is not then in effect, the Intercreditor Agreement.

(f)      The definition of "Secured Parties" is hereby amended to read as follows:

"**Secured Parties**" means the Holders of the Notes, the Trustee, the Collateral Agent, the Agents, the holders of each of the GOL SSNs, the GOL ESSNs and the Additional Pari Passu Debt and, in each case, the related collateral agent.

- 2 -

(g)      Section 4.11(iv) of the Indenture is hereby amended to read as follows:

the Collateral Agent and the Trustee, on behalf of the Holders and the Additional Trustee, will execute (i) a joinder to the Intercreditor Agreement then in effect, or (ii) if the Intercreditor Agreement is not then in effect, the Intercreditor Agreement, which Intercreditor Agreement will set forth the relative rights and obligations of the holders of Pari Passu Obligations with respect to the Collateral that is permitted to be shared with other creditors pursuant to the terms of this Indenture; *provided*, the Company shall deliver to each of the Collateral Agent and the Trustee an Officers' Certificate and an Opinion of Counsel of the Company, each stating that all conditions precedent contained in this Indenture to the execution and delivery of the Intercreditor Agreement or the joinder have been satisfied and that such Intercreditor Agreement or joinder is authorized or permitted by this Indenture.

(h)      Section 6.01 (*Events of Default*) of the Indenture is hereby amended by deleting clauses (c), (g) and (h) thereof in their entirety and replacing such clauses with "[Intentionally Omitted]", and all references in the Indenture to such clauses so deleted are hereby deleted in their entirety.

(i)      The proviso in Section 9.01 of the Indenture is hereby amended to read as follows:

*provided* that, the Company has delivered to the Trustee and the Collateral Agent (if the Collateral Agent is a party thereto) an Opinion of Counsel and an Officers' Certificate, each stating that such amendment or supplement complies with the provisions of this Section 9.01 or with the Collateral Documents, as the case may be.

(j)      Section 9.05 of the Indenture is hereby amended to read as follows:

The Trustee shall sign any amendment authorized pursuant to this Article 9 if the amendment, waiver or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. In signing any amendment, waiver or supplement, the Trustee and the Collateral Agent shall be entitled to receive indemnity or security satisfactory to the Trustee and the Collateral Agent, respectively, and to receive, and shall be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel each stating that such amendment, waiver or supplemental indenture is authorized or permitted by, and is not inconsistent with, the Indenture or the Collateral Documents, as the case may be, and that it shall be valid and binding upon the Company in accordance with its terms. No amendment, waiver or supplement of this Indenture, the Intercreditor Agreement, the Collateral Documents, the Notes or the Note Guarantees shall affect the rights, duties, immunities or obligations of the Collateral Agent without the consent of the Collateral Agent.

(k)    Section 11.03(i) of the Indenture is hereby amended to read as follows:

an Officers' Certificate in form and substance reasonably satisfactory to the Trustee or the Collateral Agent (which shall include the statements set forth in Section 11.04) stating that, in the opinion of the signers, all covenants and conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(l)    The opening language in Section 11.04 of the Indenture is hereby amended to read as follows:

Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture shall include substantially:

(m)    The 2026 Notes are hereby amended to delete all provisions inconsistent with the amendments to the Indenture effective by this First Supplemental Indenture.

(n)    Annex A hereto and Annex B hereto shall be added as Annexes to the Indenture.

3.    EFFECTIVENESS. This First Supplemental Indenture will become effective and binding immediately upon its execution and delivery by the parties hereto.

4.    NO RECOURSE AGAINST OTHERS. No manager, managing director, director, officer, employee, incorporator or equity holder, including members, of the Issuer, any of the Guarantors, any Subsidiary or any direct or indirect parent of the Issuer or of the Guarantors, as such, will have any liability for any obligations of the Issuer or the Guarantors under the 2026 Notes, the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of 2026 Notes by accepting a New Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the New Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

5.    REFERENCE TO AND EFFECT ON THE INDENTURE. On and after the effective date of this First Supplemental Indenture, each reference in the Indenture to "this Indenture," "hereunder," "hereof," or "herein" shall mean and be a reference to the Indenture as supplemented by this First Supplemental Indenture unless the context otherwise requires, and every Holder of the 2026 Notes heretofore or hereafter authenticated and delivered shall be bound hereby. Except as specifically amended above, the Indenture shall remain in full force and effect and is hereby ratified and confirmed.

6.    CONSTRUCTION. Except as otherwise expressly provided or unless the context otherwise requires, the rules of construction set forth in Section 1.02 of the Indenture shall apply to this First Supplemental Indenture *mutatis mutandis*.

7.    NEW YORK LAW TO GOVERN. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS FIRST SUPPLEMENTAL INDENTURE WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF

CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

8.      SEVERABILITY. In case any provision in this First Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

9.      COUNTERPARTS. The parties may sign any number of copies of this First Supplemental Indenture. Each signed copy shall be deemed an original, but all of them together represent the same agreement. Delivery of an executed counterpart of a signature page to this First Supplemental Indenture by facsimile, email or other electronic means shall be effective as delivery of a manually executed counterpart of this First Supplemental Indenture.

10.     EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

11.     THE TRUSTEE AND THE COLLATERAL AGENT. The Trustee and the Collateral Agent shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this First Supplemental Indenture or for or in respect of the recitals and statements contained herein, all of which recitals are made solely by the Issuer and the Guarantors, and none of the Trustee or the Collateral Agent shall assume any responsibility for their correctness.

12.     BENEFITS ACKNOWLEDGED. Each of the Issuer and the Guarantors acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and this First Supplemental Indenture and that the agreements made by it pursuant to this First Supplemental Indenture are knowingly made in contemplation of such benefits.

13.     SUCCESSORS. All agreements of each of the Issuer and the Guarantors in this First Supplemental Indenture shall bind their respective successors, except as otherwise provided in the Indenture. All agreements of the Trustee and the Collateral Agent in this First Supplemental Indenture shall bind their respective successors.

14.     RATIFICATION OF INDENTURE; FIRST SUPPLEMENTAL INDENTURE PART OF INDENTURE. Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect. This First Supplemental Indenture shall form a part of the Indenture for all purposes, and each note issued thereunder heretofore or hereafter authenticated and delivered shall be bound hereby.

15.     By its execution and delivery of this First Supplemental Indenture, the Trustee hereby directs the Collateral Agent to execute and deliver:

(i)  this First Supplemental Indenture;

- 5 -

(ii) the Third Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement, by and among the Collateral Agent and the Guarantors, in the form attached as <u>Annex C</u> hereto (the "<u>GLA Third Amendment</u>");

(iii) the Third Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement, by and among the Collateral Agent and the Guarantors, in the form attached as <u>Annex D</u> hereto (the "<u>GLAI Third Amendment</u>");

(iv) the Fifth Amendment to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, by and among the Collateral Agent and the Guarantors, in the form attached as <u>Annex E</u> hereto (the "<u>Revolving Fifth Amendment</u>");

(v) the Fifth Amendment to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, by and among the Collateral Agent and the Guarantors, in the form attached as <u>Annex F</u> hereto (the "<u>Non-Revolving Fifth Amendment</u>"); and

(vi) the Intercreditor Agreement, by and among the Issuer, the Guarantors, GOL Equity Finance, the Trustee, the Collateral Agent and TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "<u>Additional Trustee</u>"), in the form attached as <u>Annex G</u> hereto (the "<u>Intercreditor Agreement</u>").

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this First Supplemental Indenture to be duly executed, as of the date first above written.

**<u>ISSUER:</u>**

GOL  FINANCE

By: _____

DocuSigned by:
*Celso Guimaraes Ferrer Junior*
03E9C8368063ABB

Name: Celso G. Ferrer Jr.
Title: Director

By: _____

DocuSigned by:
*Eduardo Bernardes Neto*
EE5100225EB040D

Name: Eduardo Bernardes Neto
Title: Director

**GUARANTOR:**

GOL LINHAS AÉREAS INTELIGENTES S.A.

By: _____
Name: Celso G. Ferrer Jr.
Title:  President Director

By: _____
Name: Eduardo Bernades Neto
Title:  Vice President Director

**<u>GUARANTOR:</u>**

GOL LINHAS AÉREAS S.A.

By: _Celso Guimarães Ferrer Junior_ _____

Name: Celso G. Ferrer Jr.

Title:  President Director

By: _Eduardo Bernardes Neto_ _____

Name: Eduardo Bernades Neto

Title:  Vice President Director

*[Signature Page – 2026 Notes First Supplemental Indenture]*

**TRUSTEE:**

THE BANK OF NEW YORK MELLON

By: _____

Name: Francine Kincaid
Title: Vice President

*[Signature Page – 2026 Notes First Supplemental Indenture]*

**COLLATERAL AGENT:**

TMF BRASIL ADMINISTRAÇÃO E GESTÃO
DE ATIVOS LTDA.

By: _____

By: _____
Name:
Title:

Name: KARLA FERNANDES
Title: MANAGING DIRECTOR

**ANNEX A**

**FORM OF SENIOR SECURED NOTE PURCHASE AGREEMENT**

GOL FINANCE
as Company

GOL LINHAS AÉREAS INTELIGENTES S.A.

as Guarantor
and as Registrar, Transfer Agent and Paying Agent

GOL LINHAS AÉREAS S.A.
as Guarantor

and SMILES FIDELIDADE S.A.
as a Springing Guarantor

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

and

ABRA GROUP LIMITED
as Purchaser

**SENIOR SECURED NOTE PURCHASE AGREEMENT**

Dated as of March 2, 2023

_____

Senior Secured Notes due 2028

#4856-1598-7531v19

## TABLE OF CONTENTS

P<small>AGE</small>

### ARTICLE 1
### D<small>EFINITIONS AND</small> O<small>THER</small> P<small>ROVISIONS OF</small> G<small>ENERAL</small> A<small>PPLICATION</small>

SECTION 1.01.   Definitions ................................................................................. 1
SECTION 1.02.   Rules of Construction ................................................................ 21
SECTION 1.03.   Table of Contents; Headings ..................................................... 22
SECTION 1.04.   Form of Documents Delivered ................................................... 23

### ARTICLE 2
### P<small>URCHASE AND</small> S<small>ALE OF</small> T<small>HE</small> N<small>OTES</small>

SECTION 2.01.   Sale and Purchase of the Notes ................................................. 23
SECTION 2.02.   Closing ...................................................................................... 23
SECTION 2.03.   Expenses .................................................................................... 24

### ARTICLE 3
### U<small>SE OF</small> P<small>ROCEEDS</small>

SECTION 3.01.   Net Proceeds ............................................................................. 24

### ARTICLE 4
### T<small>HE</small> N<small>OTES</small>

SECTION 4.01.   Form and Dating ....................................................................... 24
SECTION 4.02.   Execution and Delivery ............................................................. 25
SECTION 4.03.   Registrar, Transfer Agent and Paying Agent ............................ 25
SECTION 4.04.   Paying Agent to Hold Money in Trust ...................................... 26
SECTION 4.05.   Payment of Principal and Interest; Principal and Interest Rights Preserved .. 27
SECTION 4.06.   [Reserved] .................................................................................. 28
SECTION 4.07.   Transfer of Notes ...................................................................... 28
SECTION 4.08.   Replacement Notes .................................................................... 28
SECTION 4.09.   Cancellation ............................................................................... 28
SECTION 4.10.   Defaulted Interest ..................................................................... 29
SECTION 4.11.   No Purchase of the Notes by the Company or its Affiliates ......... 29
SECTION 4.12.   Fundamental Change .................................................................. 29

### ARTICLE 5
### C<small>ONDITIONS TO</small> C<small>LOSING</small>

SECTION 5.01.   Purchaser's Conditions to Issuance of Notes ............................ 29
SECTION 5.02.   Company's Conditions to Issuance of Notes ............................. 32
SECTION 5.03.   Conditions Relating to Collateral .............................................. 32

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

SECTION 6.01.    Representations of the Company and the Guarantors ...................................... 32
SECTION 6.02.    Representations of the Purchaser ........................................................ 38

## ARTICLE 7
### COVENANTS

SECTION 7.01.    Payment of Principal and Interest Under the Notes ...................................... 39
SECTION 7.02.    Maintenance of Office or Agency ......................................................... 39
SECTION 7.03.    Money for Note Payments to Be Held in Trust ............................................. 39
SECTION 7.04.    Maintenance of Corporate Existence ..................................................... 40
SECTION 7.05.    Payment of Taxes and Claims ............................................................ 41
SECTION 7.06.    Payment of Additional Amounts .......................................................... 41
SECTION 7.07.    Collateral and Liens. .................................................................. 43
SECTION 7.08.    Certain Assurances ..................................................................... 45
SECTION 7.09.    Release of Collateral .................................................................. 47
SECTION 7.10.    Maintenance of Collateral .............................................................. 47
SECTION 7.11.    Limitation on Transactions with Affiliates. ............................................ 47
SECTION 7.12.    Limitation on Sale of Assets ........................................................... 49
SECTION 7.13.    Limitation on Debt. .................................................................... 51
SECTION 7.14.    Limitation on Restricted Payments ...................................................... 53
SECTION 7.15.    Non-Compete and Exclusivity ............................................................ 55
SECTION 7.16.    Additional Lines of Business ........................................................... 56
SECTION 7.17.    GLA and IPCO Covenants ................................................................. 56

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.    [Reserved]. ............................................................................ 58
SECTION 8.02.    Limitation on Consolidation, Merger or Transfer of Assets .............................. 58
SECTION 8.03.    Successor Substituted .................................................................. 59

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.    Events of Default ...................................................................... 59
SECTION 9.02.    Acceleration of Maturity, Rescission and Amendment ..................................... 62
SECTION 9.03.    Applicable Premium ..................................................................... 63
SECTION 9.04.    Subrogation Rights ..................................................................... 63
SECTION 9.05.    Application of Money Collected ......................................................... 64
SECTION 9.06.    Limitation on Suits .................................................................... 64
SECTION 9.07.    Contractual Rights of Holders to Receive Principal and Interest ....................... 65
SECTION 9.08.    Restoration of Rights and Remedies ..................................................... 65

#4856-1598-7531v19

SECTION 9.09.  Delay or Omission Not Waiver .......................................................... 65
SECTION 9.10.  Control by Holders .......................................................................... 65
SECTION 9.11.  Rights and Remedies Cumulative ..................................................... 65
SECTION 9.12.  Waiver of Past Defaults and Events of Default .................................. 66
SECTION 9.13.  Waiver of Stay or Extension Laws ..................................................... 66

## ARTICLE 10
### AMENDMENTS

SECTION 10.01.  Without Consent of Holders ............................................................ 66
SECTION 10.02.  With Consent of Holders ................................................................ 67
SECTION 10.03.  Revocation and Effect of Consents and Waivers .............................. 69
SECTION 10.04.  Payment for Consent ..................................................................... 69
SECTION 10.05.  Collateral Agent ............................................................................ 69

## ARTICLE 11
### NOTE GUARANTIES

SECTION 11.01.  The Note Guaranties ...................................................................... 69
SECTION 11.02.  Guaranty Unconditional ................................................................. 70
SECTION 11.03.  Discharge; Reinstatement .............................................................. 70
SECTION 11.04.  Waiver by the Guarantors .............................................................. 70
SECTION 11.05.  Subrogation and Contribution ....................................................... 71
SECTION 11.06.  Stay of Acceleration ...................................................................... 71
SECTION 11.07.  Limitation on Amount of Guaranty ................................................. 71
SECTION 11.08.  Execution and Delivery of Guaranty ............................................... 71
SECTION 11.09.  Release of Guaranty ...................................................................... 71

## ARTICLE 12
### COLLATERAL AGENT

SECTION 12.01.  Appointment .................................................................................. 72
SECTION 12.02.  Exculpatory Provisions .................................................................. 72
SECTION 12.03.  Resignation ................................................................................... 78
SECTION 12.04.  Fees, Expenses and Indemnification ............................................... 79

## ARTICLE 13
### REDEMPTION

SECTION 13.01.  Redemption ................................................................................... 80
SECTION 13.02.  Notice of Optional Redemption ...................................................... 80
SECTION 13.03.  Payment of Notes Called for Redemption ........................................ 80

#4856-1598-7531v19

## ARTICLE 14
### ACTIONS BY HOLDERS

SECTION 14.01.  Action by Holders ......................................................................... 81
SECTION 14.02.  Proof of Execution by Holders ...................................................... 81
SECTION 14.03.  Company-Owned Notes Disregarded ............................................ 81
SECTION 14.04.  Revocation of Consents; Future Holders Bound ........................... 81

## ARTICLE 15
### MISCELLANEOUS

SECTION 15.01.  Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties
and Holders of Notes .................................................................. 82
SECTION 15.02.  Notices ......................................................................................... 82
SECTION 15.03.  Officer's Certificate and Opinion of Counsel as to Conditions Precedent ..... 84
SECTION 15.04.  Statements Required in Officer's Certificate or Opinion of Counsel ............ 84
SECTION 15.05.  Rules by Registrar, Paying Agent and Transfer Agents ................................ 84
SECTION 15.06.  Currency Indemnity ..................................................................... 84
SECTION 15.07.  No Recourse Against Others ........................................................ 85
SECTION 15.08.  Legal Holidays ............................................................................ 85
SECTION 15.09.  Governing Law ............................................................................ 85
SECTION 15.10.  Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial .......... 86
SECTION 15.11.  Successors and Assigns................................................................ 87
SECTION 15.12.  Multiple Originals ....................................................................... 87
SECTION 15.13.  Severability Clause ..................................................................... 88
SECTION 15.14.  Force Majeure ............................................................................. 88
SECTION 15.15.  Acknowledgement ...................................................................... 88

EXHIBITS:

EXHIBIT A    –    Form of Note
EXHIBIT B    –    [Reserved]
EXHIBIT C    –    Collateral Agent KYC Requirements
EXHIBIT D    –    Form of GLA's Smiles Fiduciary Transfer Agreement
EXHIBIT E    –    Form of Exclusivity Side Letter
EXHIBIT F    –    Form of Subordination Agreement
SCHEDULE A    List of Permitted Holders
SCHEDULE B    Smiles Technological Infrastructure Agreements
SCHEDULE C    Relevant Agreements Governing The Sale and Issuance of Miles
SCHEDULE D    Bond Conversion Rates

#4856-1598-7531v19

SENIOR SECURED NOTE PURCHASE AGREEMENT, dated as of March 2, 2023, (this "**Note Purchase Agreement**") among GOL FINANCE, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg ("**Luxembourg**"), with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497, as issuer (the  "**Company**"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**"), as guarantor, registrar, transfer agent and paying agent, GOL LINHAS AÉREAS S.A. ("**GLA**"), a wholly owned subsidiary of GLAI, as guarantor, and SMILES FIDELIDADE S.A., a wholly owned subsidiary of GLA ("**IPCo**") as guarantor, each, a corporation (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "**Purchaser**") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "**Collateral Agent**").

## RECITALS

The Company has duly authorized (i) the issuance and sale of the Notes (as hereinafter defined) and (ii) the execution and delivery of this Note Purchase Agreement.

In addition, the Guarantors have duly authorized the execution and delivery of this Note Purchase Agreement as guarantors of the Notes. The Guarantors have done all things necessary to make the Note Guaranties (as hereinafter defined), when the Notes are executed and duly issued by the Company, the valid obligations of the Guarantors, and to make this Note Purchase Agreement a valid agreement of the Guarantors.

The Company has requested that, immediately upon the satisfaction in full of the conditions precedent set forth in Article 5, as applicable, the Purchaser, purchase the Notes from the Company in the aggregate original principal amount of U.S.$1,430,925,000 on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE, THIS NOTE PURCHASE AGREEMENT WITNESSETH:**

For and in consideration of the premises and the purchase of the Notes by the Purchaser, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders (as defined below), as follows:

## ARTICLE 1
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01.    *Definitions*.

"**Abra Global Finance**" means Abra Global Finance incorporated under the laws of the Cayman Islands.

"**Abra Holders**" means, as of the date of determination, collectively, the holders of the Abra Senior Secured Notes (provided any such Abra Senior Secured Notes remain outstanding)

and the holders of Abra Senior Secured Exchangeable Notes (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Notes**" means, collectively, the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

"**Abra Notes Supermajority Holders**" means, as of the date of determination, collectively, the holders of the Abra Notes holding more than each of (i) 66.67% in principal amount of the outstanding Abra Senior Secured Notes from time to time (provided any such Abra Senior Secured Notes have been issued and remain outstanding) and (ii) 66.67% in principal amount of outstanding Abra Senior Secured Exchangeable Notes from time to time (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Senior Secured Exchangeable Notes**" means the Abra Senior Secured Exchangeable Notes due 2028, issued by Abra Global Finance and guaranteed by the Purchaser, in the aggregate principal amount of U.S.$458,585,447, pursuant to the Abra Senior Secured Exchangeable Notes Indenture.

"**Abra Senior Secured Exchangeable Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Exchangeable Notes entered into by and among Abra Global Finance, as issuer, the Purchaser, as guarantor, The Bank of New York Mellon, as trustee, registrar and paying agent, and TMF Group New York LLC, as collateral agent.

"**Abra Senior Secured Notes**" means the Abra Senior Secured Notes due 2028, issued by Abra Global Finance and guaranteed by the Purchaser, in the aggregate principal amount of up to U.S.$962,254,480, pursuant to the Abra Senior Secured Notes Indenture.

"**Abra Senior Secured Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Notes entered into on March 2, 2023, by and among Abra Global Finance, as issuer, the Purchaser, as guarantor, The Bank of New York Mellon, as trustee, registrar and paying agent, and TMF Group New York LLC, as collateral agent.

"**Accounting Principles**" shall mean the International Financial Reporting Standards promulgated by the International Accounting Standards Board ("**IFRS**"), in effect from time to time as applied by GLAI consistently throughout the relevant periods, including with regard to impairment losses, obsolescence policies for rotables and inventory, and hedging transactions. For clarity, the impact of all hedging transactions shall be included as part of the income or expense item to which it relates, and not in interest or financing expense.

"**Act**" when used with respect to any Holder, has the meaning specified in Section 14.01(a).

"**Activities**" has the meaning specified in Section 12.02(t).

"**Additional Amounts**" has the meaning specified in Section 7.06(a).

"**Additional Assets**" means any assets (other than Debt and Capital Stock) to be used by GLAI or any of its Subsidiaries in a Related Business.

"**Adjusted Operating Expenses**" shall mean, for any reference period, with respect to any Guarantor or any of its Subsidiaries, as applicable, any costs and expenses incurred in services and other transactions required to generate Adjusted Operating Revenues of such Guarantor and its Subsidiaries which are recognized as operating expenses of such Guarantor and its Subsidiaries under the Accounting Principles, as applicable, **(i)** including (a) expenses related to personnel and associated taxes and charges, (b) fuel and lubricant expenses, (c) maintenance expenses, including Normalized aircraft redelivery expenses, (d) expenses related to third party services, (e) passenger and cargo enplanement costs, but excluding costs representing funds collected on behalf of third parties such as airport boarding fees, (f) landing and navigation fees, (g) sales and marketing expenses (h) frequent flyer redemption costs with any third parties or non-consolidated Subsidiaries and (i) other expenses associated with the generation of Adjusted Operating Revenues; and **(ii)** excluding (a) depreciation, (b) amortization, (c) lease payments, (d) interest expenses, (e) non-cash foreign exchange variation, (f) income taxes and social contribution taxes applicable to profits, (g) unpaid maintenance expenses to the extent such provisions are reflected in a Guarantor's or any of its Subsidiaries' Debt calculations, as applicable, in the form of maintenance and/or redelivery provision liabilities. The calculation of Adjusted Operating Expenses of each Guarantor or any of its Subsidiaries, as applicable, shall be based on consistent methodologies and parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor or any of its Subsidiaries for purposes of the definition of Adjusted Operating Expenses, as applicable:

- Restoration maintenance expenses: restoration maintenance expenses shall use an accrual basis of accounting for engines, fuselage, APU, and landing gear.

- Routine maintenance expenses: routine maintenance expenses shall be expensed as incurred.

- Aircraft depreciation: the calculation of residual value and useful life of Aircraft shall reflect the agreed upon contractual provisions of leases or other aircraft financing instruments.

- Losses on sale-leaseback transactions: losses on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- Air traffic liability: shall represent the Guarantors' liability for tickets sold for future travel dates and funds that are past flight date and remain unused as well the Guarantors' liability associated with loyalty related performance obligations. Air traffic liability of each Guarantor shall be calculated assuming passenger ticket breakage at the earlier of 12 months from purchase and the expiration of the applicable ticket or program.

- Pension liability and employee benefits: each Guarantor shall use the same methodology for calculation of pension liabilities and employee benefits to the extent permitted by applicable Law and include it in the profit and loss statement as part of employee expenses.

3

- <u>Expected losses on receivables</u>: expected losses on receivables shall be estimated based on historical experience and in the case of materially large past due receivables, have external auditor input.

- <u>Operating expenses/rental expenses</u>: no operating expenses shall be treated as rental expenses.

- <u>Standard group policies</u>: each airline will conform to standardized group policies about which costs to capitalize versus expense.

"**Adjusted Operating Revenues**" shall mean, for any reference period, the gross inflow of economic benefits (such as cash, receivables, and other assets) arising from ordinary operating activities, recognized as revenues under the Accounting Principles (i) <u>including</u> (a) sales of passenger transportation services and associated revenues, including flight tickets revenues calculated recognizing breakage amounts at the earlier of 12 months from purchase and the expiration of the applicable ticket or program, baggage fees, rescheduling fees, cancellation fees, other related passenger revenues; (b) cargo transportation revenues; (c) frequent flyer revenues calculated recognizing breakage amounts for unredeemed mileage credits at the earlier of 12 months from issue and the expiration of the applicable ticket or program; (d) recovery of or compensation for previously incurred operating expenses; and (e) recovery of or compensation for interrupted services, aircraft delivery delays and unexpected aircraft grounding periods; and (ii) <u>excluding</u> (a) interest revenues, (b) any income associated with non-cash foreign exchange variation, (c) dividends and (d) any revenues passed-through to third parties, such as airport boarding fees. Adjusted Operating Revenues may be reported on each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, as operating revenues on the top line of the income statement or as a deduction from operating costs and expenses and may be subject to timing deferrals or occur in different periods in each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, if the accounting policies of the Guarantors or any of its Subsidiaries have not been conformed. The calculation of Adjusted Operating Revenues of each Guarantor, as applicable, shall be based on consistent methodologies and parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor, as applicable, for purposes of the definition of Adjusted Operating Revenues:

- <u>Gains on sale-leaseback transactions</u>: gains on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- <u>Credit card installment interest</u>: credit card installment interest shall be deducted from revenues (and not reflected as an interest expense).

"**ADS**" means an American Depositary Share, issued pursuant to the Deposit Agreement, representing, as of the date of this Note Purchase Agreement, two Preferred Shares.

"**ADS Depositary**" means The Bank of New York Mellon, as depositary for the ADSs, or any successor under the Deposit Agreement.

4

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Agents**" means any Collateral Agent, Registrar, Transfer Agent or Paying Agent appointed pursuant to this Note Purchase Agreement, individually, an "**Agent**."

"**Aircraft**" shall mean, collectively, any aircraft owned by or leased to a Guarantor or any of its Subsidiaries, as applicable, and any engines, parts, components, instruments, accessories, furnishings and other equipment attached or relating to such aircraft.

"**Aircraft Debt**" means any (i) Debt incurred to finance the acquisition or operation of aircraft, spare parts or engines, secured by aircraft, spare parts or engines the acquisition or operation of which are so financed, (ii) any asset-based Debt on terms that are customary in the aviation industry secured by aircraft, spare parts or engines, and (iii) predelivery payment financing.

"**Aircraft Rentals**" shall mean, with respect to a Guarantor or any of its Subsidiaries, as applicable, the annual aircraft rental expense of such Guarantor or any of its Subsidiaries (subject to Normalization).

"**Anti-Money Laundering Laws**" has the meaning specified in Section 6.01(24).

"**Apostille**" has the meaning specified in Section 6.01(17).

"**Apostille Convention**" has the meaning specified in Section 6.01(17).

"**Applicable Premium**" means the difference (which shall not be less than zero) between (a) the sum (in cash) of the present values of the remaining scheduled payments of principal and interest (including without limitation all PIK Interest) on such Notes (excluding accrued and unpaid interest (other than PIK Interest capitalized prior to the date thereof) to the date when such Notes become due and payable) discounted to the date when such Notes become due and payable on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points, and (b) the principal amount of the Notes then Outstanding.

"**Asset Sale**" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) by GLAI or any of its Subsidiaries outside the ordinary course of business, including any disposition by means of a merger, consolidation, or similar transaction (each referred to for the purposes of this definition as a "disposition"), of:

5

#4856-1598-7531v19

(1)  any shares of a Subsidiary of GLAI (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than GLAI or a Subsidiary thereof);

(2)  all or substantially all the assets of any division or line of business of GLAI or any Subsidiary thereof; or

(3)  any other assets of GLAI or any Subsidiary other than the Collateral;

*provided*, *however*, that Asset Sale will not include:

(a)  a disposition by a Subsidiary to GLAI or to another Subsidiary or by GLAI to a Subsidiary;

(b)  a Restricted Payment that does not violate the covenant described under Section 7.14. Limitation on Restricted Payments;

(c)  the disposition of assets with a Fair Market Value not to exceed U.S.$40.0 million in the aggregate (or the equivalent thereof at the time of determination), except for a disposition of assets expressly provided for in the annual budget or business plan of GLAI or any of its Subsidiaries, as the case may be;

(d)  a disposition of obsolete equipment or other obsolete assets or other property which is no longer useful for GLAI or any of its Subsidiaries in the ordinary course of business;

(e)  the disposition of all or substantially all of the assets of GLAI or any of its Subsidiaries in a manner permitted under the covenant described under Section 8. Consolidation, Merger, Conveyance, Transfer or Lease;

(f)  any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind; or

(g)  sales, transfers or other dispositions of assets for non-cash consideration at least equal to the Fair Market Value (as certificated in a certificate signed by a Responsible Officer) of such assets, to the extent that such non-cash consideration would constitute Additional Assets.

"**Authorized Denomination**" has the meaning specified in Section 4.02(a)(4).

"**Board of Directors**" means the Board of Directors of the Company, or the applicable Guarantor, as the case may be, or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the secretary, the assistant secretary or another Officer or legal counsel performing corporate secretarial functions of the Company or the Guarantors, as applicable to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification.

6

#4856-1598-7531v19

"**Brazilian Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil or a day on which banking institutions or trust companies are authorized or obligated by law to close in São Paulo, Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, England and Wales, the State of New York or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by Law to close in The City of New York, London, São Paulo, Brazil, or Luxembourg.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Cash Interest**" shall have the meaning specified in Section 4.05(d)(i).

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*)

"**close of business**" means 5:00 p.m. (New York City time).

"**Closing**" shall have the meaning specified in Section 2.02.

"**Closing Date**" means the Initial Closing Date or any date thereafter on which the Company and the Purchaser mutually agree to sell and purchase Notes hereunder, as applicable.

"**Closing Location**" shall have the meaning specified in Section 2.02.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the assets and rights that from time to time are subject to a Lien granted by the Company or any Guarantor to the Collateral Agent, for the benefit of the Secured Parties, pursuant to any Collateral Document. The Collateral shall include (i) as further described in GLA's Smiles Fiduciary Transfer Agreement (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program, (ii) all intercompany claims, loans and obligations evidenced by the global intercompany note entered into by the Company and the Guarantors evidencing the loans made by the Company or any Guarantor to any of its respective Affiliates or Subsidiaries, (iii) the guaranty by the GLAI, GLA and IPCo of all of the Company's obligations under this Note Purchase Agreement and the Notes and the other Collateral Documents, (iv) as further described in GOL Senior Secured Notes due 2026 Collateral, all collateral securing the GOL Senior Secured Notes due 2026 on a pari passu basis; (v) as further described in GLA's Fiduciary Transfer of IPCo's Shares Agreement, one hundred percent (100%) of IPCo's equity, totally owned by GLA; and (vi) as further described in IPCo's Smiles Fiduciary Transfer Agreement, all of the assets and rights described in item (1)(i) above transferred to IPCo under suspensive condition pursuant to Section 7.17 below.

7

"**Collateral Agent**" means (i) the Person named as the "Collateral Agent" in the first paragraph of this Note Purchase Agreement and (ii) any Person appointed as a successor "Collateral Agent' under this Note Purchase Agreement and the Collateral Documents, in each case, until a successor Person shall have become such pursuant to the applicable provisions of this Note Purchase Agreement and the Collateral Documents, and thereafter "Collateral Agent" shall mean the successor serving hereunder and thereunder.

"**Collateral Documents**" means (i) the GLA's Smiles Fiduciary Transfer Agreement, (ii) the amendments to GOL Senior Secured Notes due 2026 Collateral (to include the Notes and GOL Senior Secured Notes due 2028 as secured obligations), (iii) the intercreditor agreement between GOL Finance, the Collateral Agent, The Bank of New York Mellon, as trustee of the GOL Senior Secured Notes due 2026 and TMF Brasil Administração Gestão de Ativos Ltda., as collateral agent under the GOL Senior Secured Notes due 2026, (iv) the GLA's Fiduciary Transfer of IPCo's Shares Agreement and (v) the IPCo's Smiles Fiduciary Transfer Agreement. The definition of Collateral Documents shall also include any other agreement designated as a Collateral Document by the parties hereto, as amended from time to time.

"**Company**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**Company and Guarantors Process Agent**" has the meaning specified in Section 15.10(a).

"**Company's Office**" has the meaning specified in Section 4.03(a).

"**Comparable Treasury Issue**" means the United States Treasury security selected by the Company as having a maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes.

"**Comparable Treasury Price**" means with respect to any date when Notes become due and payable, the average of two Reference Treasury Dealer Quotations for the when such Notes become due and payable.

"**Covered Plan**" has the meaning specified in Section 6.02(3).

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Debt**" means, with respect to any Person, without duplication, the Outstanding principal amount of, including any related accrued or outstanding interest, of all (a) debt for borrowed money of such Person or debt issued by such Person in substitution or exchange for borrowed money, (b) debt evidenced by any note, bond, debenture or other debt security, in each case, as of such time of such Person, taking into account the face value of any convertible securities, (c) that portion of the obligations with respect to finance leases in accordance with IFRS (provided, that for the avoidance of doubt, finance leases shall not be double counted with IFRS 16 leases), (d) the net settlement value of all interest rate or currency swaps, collars, caps, and similar hedging obligations or other derivative agreements, including equity derivatives structured as

8

"capped calls" and (e) all reimbursement or other obligations with respect to letters of credit, bank guarantees, bankers acceptances or similar instruments, in each case, solely to the extent drawn. "**Debt**" shall not include (1) customer deposits, (2) advance payments received from customers for the sale, lease or license of goods and services in the ordinary course of business, whether or not such deposits or advance payments have been expensed in accordance with IFRS, (3) non-speculative hedging obligations and (4) current accounts payable and accrued expenses payable within 180 days and incurred in the ordinary course of business.

"**Deductions**" has the meaning specified in Section 12.02(m).

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Deposit Agreement**" means the Amended and Restated Deposit Agreement, dated as of April 17, 2017, by and among GLAI, the ADS Depositary, and the holders from time to time of ADSs issued thereunder, as supplemented by a letter agreement dated as of March 26, 2019, between GLAI and the ADS Depositary, relating to the delivery of ADSs or restricted ADSs, as the case may be, upon exchange of the Notes and, if further amended or supplemented as provided therein, as so amended or supplemented.

"**Designated Bank Account**" means, with respect to any payments made to a Holder pursuant to this Note Purchase Agreement or Notes, the U.S. dollar bank account designated by such Holder at least three Business Days prior to the applicable payment.

"**Disclosure Documents**" shall have the meaning specified in 6.01(23).

"**EBITDAR**" shall mean earnings before interest, taxes, depreciation, amortization and rent and, for the purposes of the Notes, shall be composed of (a) the Adjusted Operating Revenues, net of Sales Taxes, *minus* (b) the Adjusted Operating Expenses.

"**Embargo Rules**" has the meaning specified in Section 12.02(l).

"**Enforceability Exceptions**" shall have the meaning specified in Section 6.01(3).

"**ERISA**" has the meaning specified in Section 6.02(3).

"**Event of Default**" has the meaning specified in Section 9.01.

"**Excess Proceeds**" shall have the meaning specified in Section 7.12(iv).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Exclusivity Side Letter**" means that certain Brazilian law governed side letter, dated as of the date hereof in the form attached hereto as Exhibit E, by and among the Company, the Guarantors and the Purchaser and Abra Global Finance relating to, among other things, the agreements by the Company, the Guarantors and IPCo with respect to the exclusivity of the Loyalty Program.

#4856-1598-7531v19

"**Fair Market Value**" of any property, asset, share of Capital Stock, other security, Investment or other item means, on any date, the fair market value of such property, asset, share of Capital Stock, other security, Investment or other item on that date as determined in good faith by the management of GLAI or a Subsidiary thereof, as the case may be.

"**Federal Reserve System**" means the central banking system of the United States of America.

"**Form of GLA's Smiles Fiduciary Transfer Agreement**" means the "Form of GLA's Smiles Fiduciary Transfer Agreement" attached hereto as Exhibit D.

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

"**Fundamental Change**" means, at any time after the Closing Date, any of the following occurring:

(i)     the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means or by any of the transactions contemplated in this Note Purchase Agreement) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), except for any "person" or "group" that consists solely of one or more Permitted Holders is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the  outstanding Capital Stock;

(ii)     the consummation of any sale, lease or other transfer or disposition in one transaction or a series of transactions, including any split-off or spin-off, to any Person of all or substantially all of the consolidated assets of any of the Guarantors and its Subsidiaries, taken as a whole; or

(iii)     the shareholders of the Company or any of the Guarantors approve any plan or proposal for the liquidation or dissolution of the Company or any of the Guarantors other than in a transaction described in, and that complies with the provisions described under, Article 8 of this Note Purchase Agreement.

"**GLA**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLA's Fiduciary Transfer of IPCo's Shares Agreement**" means that certain Brazilian law governed agreement entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, GLAI and IPCo, as intervening party (as amended from time to time), with respect to the fiduciary lien over one hundred percent (100%) of IPCo's equity, all of which is owned by GLA.

"**GLA's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement, entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, and GLAI, as intervening party (as amended from time to time), with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles

10

Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program.

"**GLAI**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLAI Going Private Process**" means the process of (i) termination of the listing for trading of the Preferred Shares on the B3 S.A. or (ii) deregistration of GLAI as a publicly held company (*companhia aberta*) with the CVM.

"**GLAI Group**" means GLAI and all of its direct and indirect Subsidiaries (including GLA).

"**GOL Bonds**" means the following notes issued by GLAI or its subsidiaries: the GOL Exchangeable Notes due 2024, the GOL Senior Notes due 2025, the GOL Senior Secured Notes due 2026 and the GOL Perpetual Notes existing on the date of this Note Purchase Agreement.

"**GOL Equity Finance**" means GOL Equity Finance, a public limited liability company (*société anonyme*) incorporated and existing under Luxembourg with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 224920.

"**GOL Exchangeable Notes due 2024**" means the 3.75% Exchangeable Senior Notes Due 2024, issued by GOL Equity Finance.

"**GOL Perpetual  Notes**" means the 8.75% Perpetual Notes, issued by the Company.

"**GOL Senior Notes due 2025**" means the 7.000% Senior Notes Due 2025, issued by the Company.

"**GOL Senior Secured Exchangeable Notes due 2028**" means the 18% Senior Secured Exchangeable Notes due 2028, issued by GOL Equity Finance, as of the date hereof.

"**GOL Senior Secured Notes due 2026**" means the 8.00% Senior Secured Notes Due 2026, issued by the Company.

"**GOL Senior Secured Notes due 2026 Collateral**" means the GOL Senior Secured Notes due 2026 IP Collateral  and the GOL Senior Secured Notes due 2026 Spares Parts Collateral.

"**GOL Senior Secured Notes due 2026 IP Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLAI, as intervening party; and (ii) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLAI, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

11

"**GOL Senior Secured Notes due 2026 Spares Parts Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party; (ii) the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

"**GOL Senior Secured Exchangeable Notes NPA**" means the Senior Secured Exchangeable Note Purchase Agreement to be entered into by and among GOL Equity Finance, GLAI, GLA,  IPCo, TMF Brasil Administração e Gestão de Ativos Ltda. and the Purchaser on or about the Initial Closing Date.

"**Governmental Authority**" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"**Guarantor**" means any of (i) GLAI, (ii) GLA, (iii) IPCo and (iv) any successor obligor under the Note Guaranties pursuant to Section 11.01, unless and until such Guarantor is released from the Note Guaranty pursuant to this Note Purchase Agreement.

"**Holder**" means the Person in whose name a Note is registered in the Register.

"**IFRS**" has the meaning set forth in the definition of the term "**Accounting Principles**".

"**Initial Closing Date**" means the date of execution of this Note Purchase Agreement.

"**Institutional Investor**" has the meaning set forth in Section 6.01(19).

"**Interest Payment Date**" means each May 31 and November 30 of each year, beginning on May 31, 2023.

"**Investment**" means:

12

(a) the acquisition or investment in any Person or business (whether by asset or equity purchase, merger, consolidation, amalgamation or otherwise) that holds, directly or indirectly, any interest in, or directly or indirectly operates, any airline, or otherwise where the consideration for the acquisition and any Debt or other assumed actual or contingent liability, together with the amount of any investment in any joint venture, exceeds U.S.$40.0 million (or the equivalent thereof at the time of determination), except as provided for in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(b) the approval or amendment of the annual budget or business plan or any voluntary deviation therefrom in excess of 5% of Adjusted Operating Expenses set out in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(c) any capital expenditure that in the aggregate in any fiscal year is in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination), except for capital expenditures provided for in the annual budget or the business plan of GLAI or any Subsidiary thereof, as the case may be;

(d) any contract that (i) is (x) outside the ordinary course of business, or (y) on terms other than industry standard commercial terms, and (ii) involving an annual payment greater than U.S.$10.0 million (or the equivalent thereof at the time of determination), in each case, except for agreements as provided for in the annual budget or the business plan of GLAI or its Subsidiary, as the case may be; or

(e) any contract, binding agreement or similar or analogous arrangement for the purchase, order or lease of any aircraft.

"**IPCo**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**IPCo's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement entered into by IPCo, as security provider, the Collateral Agent, as security beneficiary, and GLA and GLAI, as intervening parties, with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the Smiles Technological Infrastructure; (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, and advertising materials exclusively related to the Loyalty Program, under suspensive condition according to article 125 of Brazilian Civil Code, corresponding to the transfer of the assets and rights encumbered by the GLA's Smiles Fiduciary Transfer Agreement from GLA to IPCo.

"**issue**" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Debt or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be issued by such Subsidiary at the time it becomes a Subsidiary; and the term "issuance" has a corresponding meaning.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration

13

thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lien**" means any mortgage, pledge, assignment by way of security, charge, security interest, encumbrance, conditional sale or other title retention agreement or other similar lien.

"**Loyalty Program**" means the Smiles loyalty program, and any successor program.

"**Majority Holders**" means Holders of the Notes holding more than 50% in principal amount of the Outstanding Notes.

"**Material Adverse Effect**" means (i) any material adverse effect on the condition (financial or otherwise), business, properties, results of operations or prospects of the Company, the Guarantors and their Subsidiaries, taken as a whole, (ii) any material adverse effect on the ability of the Company, the Guarantors and their Subsidiaries, taken as a whole, to perform their obligations under any Transaction Document, (iii) any material adverse effect upon the binding nature, validity, or enforceability of any of the Transaction Documents or (iv) any material adverse effect on the rights and remedies of the Purchaser or the rights of the Collateral Agent and the Holders in the Collateral, in each case, whether resulting from any single act, omission, situation, status, event or undertaking, or taken together with other such acts, omissions, situations statuses, events or undertakings.

"**Maturity Date**" means the earliest of (a) March 2, 2028, (b) if more than $42.5 million in aggregate principal amount of the GOL Exchangeable Notes due 2024 remains outstanding on the date that is 45 days prior to the maturity of the GOL Exchangeable Notes due 2024 (the "**2024 measurement date**"), the 2024 measurement date or (c) if more than $65 million in aggregate principal amount of the GOL Senior Notes due 2025 remains outstanding on the date that is 45 days prior to the maturity of the GOL Senior Notes due 2025 (the "**2025 measurement date**"), the 2025 measurement date.

"**Net Cash Proceeds**" with respect to any issuance or sale of Capital Stock or sale or other disposition of any assets, means the cash proceeds of such issuance or sale, net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees and expenses actually incurred in connection with such issuance or sale and net of taxes paid or payable in connection with such issuance, sale or disposition.

"**Normalized**" or "**Normalization**" shall mean, for each year:

(a) with respect to aircraft redelivery expenses, the total of the redelivery expenses that a Guarantor or any of its Subsidiaries, as applicable, would be projected to incur on redelivery of each leased aircraft in its fleet, expressed in U.S. Dollars, divided by the expected lease tenor of each aircraft expressed in years, as calculated by an independent third party engaged by each Guarantor or any of its Subsidiaries, as applicable; underlined provided, that for the avoidance of doubt, any redelivery expense accrued in such year under IFRS shall be considered part of and included in the Normalized redelivery expenses figure; and

(b) with respect to any Aircraft Rental, the average annual rental expenses (excluding any refundable payments such as deposits and maintenance reserves, as well as any projected redelivery expenses, but <u>including</u> any one-time or "balloon" rental payments) expected to be incurred during the life of such rental.

"**Note Guaranties**" shall have the meaning specified in Section 11.01.

"**Note Purchase Agreement**" has the meaning specified in the first paragraph of this agreement.

"**Notes**" means the notes issued pursuant to the terms hereof on each Closing Date in an initial aggregate principal amount of up to U.S.$1,430,925,000, and shall be substantially in the Form of Note.

"**Notes Obligations**" means Obligations in respect of the Notes, this Note Purchase Agreement, the Note Guaranties and the Collateral Documents.

"**Obligations**" means any principal, interest (including any interest, fees and other amounts accruing subsequent to the filing of a petition in bankruptcy, reorganization, arrangement or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest, fees and other amounts are an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, payable under the documentation governing any Debt.

"**Officer**" means any director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, of the Company or the Guarantors, as the case may be, or any other Person duly appointed by the shareholders of the Company, or the Guarantors, or the Board of Directors, as the case may be, to perform corporate duties.

"**Officer's Certificate**" means a certificate signed by any of the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or the applicable Guarantor, as the case may be.

"**Opinion of Counsel**" means an opinion of legal counsel of recognized international standing (who may be an employee of or counsel to the Company or the Guarantors, *provided that* an Opinion of Counsel delivered pursuant to Section 7.08 and Section 10.01 shall be of an external counsel to, and not an employee of, the Company or the Guarantors, as applicable).

"**Outstanding**" means, as of the date of determination, all Notes theretofore executed and delivered under this Note Purchase Agreement, except:

(i)     Notes theretofore cancelled by the Company or accepted by the Company for cancellation;

15

(ii)    Notes for whose payment in the necessary amount has been theretofore deposited with the Paying Agent in trust or set aside and segregated in trust by the Company for the Holders of such Notes;

(iii)    Notes required to be cancelled pursuant to Section 4.09; and

(iv)    Notes held by the Company or by any Subsidiary thereof.

"**Paying Agent**" shall have the meaning specified in Section 4.03(a).

"**Payment Default**" has the meaning specified in Section 9.01(e).

"**Permitted Holder**" means (i) each entity listed in Schedule A hereto, and (ii) their Affiliates.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a protected series of a limited liability company or a limited partnership, an association, a trust or any other entity or a government or political subdivision or an agency or instrumentality thereof.

"**PIK Interest**" shall have the meaning specified in Section 4.05(d)(2).

"**Preferred Shares**" means the preferred shares of GLAI, no par value per share.

"**principal**" of a Note means the principal amount of such Note (including any Additional Amounts payable by the Company in respect of such principal).

"**Principal Amount**" has the meaning set forth in Section 2.01.

"**Proceeding**" has the meaning specified in Section 15.10(a).

"**Purchase Price**" has the meaning set forth in Section 2.01.

"**Purchaser**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**Purchaser Deliverables**" means:

(a) the Purchase Price of this Note Purchase Agreement payable by the Purchaser by wire transfer of immediately available funds, to be deposited into such bank accounts as nominated by the Company, on each Closing Date, pursuant to Sections 2.01 and 2.02;

(b) an Internal Revenue Service Form W-9 or W-8 executed by the Purchaser; and

(c) a receipt executed by the Purchaser and delivered to the Company certifying that the Purchaser has received the Notes from the Company on each Closing Date.

"**Purchaser Entity**" means the Purchaser and its Wholly Owned Subsidiaries.

16

"**Purchaser Entity Expenses**" means:

(a)     costs (including all professional fees and expenses) and expenses incurred by any Purchaser Entity in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed or delivered with respect to applicable laws or the respective rules and regulations promulgated thereunder;

(b)     customary indemnification obligations of any Purchaser Entity owing to its directors, officers, employees or other Persons under its articles, charter, by-laws, partnership agreement or other constituent documents or pursuant to written agreements with any such Person;

(c)     obligations of any Purchaser Entity in respect of customary director and officer insurance (including premiums therefor) to the extent relating to GLAI and its Subsidiaries maintained in the ordinary course of business and consistent with past practice;

(d)     (x) general corporate overhead expenses, including professional fees and expenses and (y) other operational expenses, in each case, of any Purchaser Entity incurred in the ordinary course of business and consistent with past practice that are related to the ownership or operation of the business of GLAI or any of its Subsidiaries;

(e)     expenses incurred by any Purchaser Entity in connection with any securities offering, sale, conversion or exchange of Capital Stock or Debt; and

(f)     liabilities incurred by any Purchaser Entity in connection with tax obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any Governmental Authority as a result of the direct or indirect ownership held by such Purchaser Entity in the Capital Stock of GLAI or any of its Subsidiaries.

"**Reais**" means the legal currency of Brazil from time to time.

"**Reference Treasury Dealer**" means any primary United States government securities dealer in New York City selected by the Company.

"**Reference Treasury Dealer Quotations**" means, with respect to each Reference Treasury Dealer and any date when Notes become due and payable, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding the date when such Notes become due and payable.

"**Refinance**" means, in respect of any Debt, to refinance, extend (including pursuant to any defeasance or discharge mechanism), renew, refund, repay, replace, prepay, redeem, defease or retire, or to issue other Debt in exchange or replacement for, such Debt. "Refinanced" and "Refinancing" shall have correlative meanings.

17

"**Refinancing Debt**" means Debt that is incurred to Refinance any Debt of GLAI or any of its Subsidiaries existing on the Initial Closing Date or incurred in compliance with this Note Purchase Agreement (including Debt that Refinances Refinancing Debt); *provided, however,* that:

(i) the Refinancing Debt has a Stated Maturity no earlier than (A) the Stated Maturity of the Debt being Refinanced or (B) the 91st day after the Maturity Date of the Notes;

(ii) such Refinancing Debt is incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount of the Debt being Refinanced when it was initially incurred (or if issued with original issue discount, the aggregate accreted value at the time of Refinancing), plus, in either case, premiums, interest and reasonable expenses incurred in connection therewith;

(iii) if the Debt being Refinanced is Subordinated Obligations, such Refinancing Debt is subordinated in right of payment to the Notes at least to the same extent as the Debt being Refinanced; and

(iv) the Debt being Refinanced may not be secured by any Lien on any Collateral (except and to the extent such Debt was already secured by a Lien on the same Collateral previously securing the Debt so refinanced).

"**Register**" has the meaning specified in Section 4.03(a).

"**Registrar**" has the meaning specified in Section 4.03(a).

"**Regular Record Date**," with respect to any Interest Payment Date, means the May 15 or November 15 (whether or not such day is a Business Day) immediately preceding the applicable May 31 or November 30 Interest Payment Date, respectively.

"**Related Business**" means a business that (i) primarily operates in the airline industry, (ii) primarily supports the airline industry or (ii) primarily supports a business in which GLAI or any of its Subsidiaries already operate.

"**Related-Party Transaction**" has the meaning specified in Section 7.11.

"**Relevant Date**" means, with respect to any payment on a Note, whichever is the later of:  (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Company on or prior to such due date, the date on which notice is given to the Purchaser that the full amount has been received by the Company.

"**Relibi Law**" means any tax imposed by Luxembourg by virtue of the Luxembourg law of 23 December 2005, as amended from time to time.

"**Responsible Officer**" means (a) with respect to the Company or any Agent (other than the Collateral Agent), the chief executive officer, president, chief financial, vice-president, director, officer, treasurer, assistant treasurer, controller or any other authorized signatory of such Person; and (b) with respect to the Collateral Agent, any officer of the Collateral Agent with

18

direct responsibility for the administration of this Note Purchase Agreement and the Collateral Documents.

"**Restricted Payments**" and "**Restricted Payment**" have the meanings specified in Section 7.14(e).

"**Sales Taxes**" shall mean, for any reference period, any taxes on any Adjusted Operating Revenue pursuant to applicable Law, excluding income taxes and other taxes applicable to profits.

"**Sanctioned Country or Region**" shall have the meaning specified in Section 6.01(25).

"**Sanctions**" shall have the meaning specified in Section 6.01(25).

"**Secured Parties**" means the Purchaser and the Collateral Agent.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Series A Abra Senior Note due 2028**"  means the  Senior Unsecured Note due 2028, issued by Abra Group Limited, issued to Abra Global Finance from time to time, in the initial principal amount of up to US$962,254,480.

"**Series B Abra Senior Note due 2028**"  means the Senior Unsecured Note due 2028, issued by Abra Group Limited, issued to Abra Global Finance from time to time, in the initial principal amount of up to US$458,585,447.

"**Significant Subsidiary**" means, with respect to any Person, a Subsidiary of such Person that meets the definition of "significant subsidiary" in Article 1, Rule 1-02(w) of Regulation S-X under the Exchange Act.

"**Smiles Complete Technological Infrastructure**" means any and all computer programs, software, source codes, technology and their respective licenses, copyrights and applications that are used for the operation of the Loyalty Program.

"**Smiles Database, Client and Supplier List**" means all data, information, documents, Smiles Personal Data and any other elements related to the operations of the Loyalty Program, including, but not exclusively, the Loyalty Program's clients list and suppliers lists, as well as any other data, information and document related to GLA's or IPCo's database that is necessary for or related to the operation of the Loyalty Program, as updated or modified from time to time, regardless of where such data, information, documents, Smiles Personal Data or other elements are held now or in the future, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Intellectual Property**" means (i) all the currently existing intellectual property rights owned by GLA, including as universal successor of Smiles Fidelidade S.A., related to the Loyalty Program, corresponding to (a) trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (*INPI – Instituto Nacional da Propriedade Industrial*) owned by GLA; and (b) the Brazilian internet domains owned by GLA, as described in the Exhibit

19

#4856-1598-7531v19

III of GLA's Smiles Fiduciary Transfer Agreement, (ii) as well as any trademarks or Brazilian internet domains that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Operating Manuals**" mean (i) the currently existing manuals, documents and information related to the operation of the Loyalty Program, and its copyrights, as described in the Exhibit VI of GLA's Smiles Fiduciary Transfer Agreement; (ii) as well as any manuals, documents and information related to the operation of the Loyalty Program, and its copyrights that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Personal Data**" means any data or information, as long as owed by or in possession of GLA or IPCo, of an identified or identifiable individual, including of GLA's or IPCo's and its affiliates' clients, and their suppliers, distributors and commercial partners in general, among others, including but not limited to: names, phone numbers, contact information (address, e-mail address, commercial phone number, mobile number, fax), occupation, bank information, account number, total miles and points balance in the Loyalty Program, history of engagement in the Loyalty Program, history of accrual and redemption activity in the Loyalty Program, communication and promotion opt-ins in the Loyalty Program, credit card number, marital or relationship status, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Technological Infrastructure**" means certain six (6) licenses from computer programs and software that are used by GLA as technological instruments for the development of the activities necessary for the operation of the Loyalty Program, as further described in the GLA's Smiles Fiduciary Transfer Agreement.

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Subordinated Obligation**" means any Debt that is subordinate or junior in right of payment to the Notes and the Note Guaranties pursuant to a written agreement.

"**Subsidiary**" means, in respect of any specified Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person.

"**Surviving Person's Tax Jurisdiction**" has the meaning specified in Section 8.02(2).

"**Taxing Jurisdiction**" has the meaning specified in Section 7.06(a).

#4856-1598-7531v19

"**Transaction Documents**"  means, this Note Purchase Agreement, the Notes and the Collateral Documents.

"**Transfer Agent**" has the meaning specified in Section 4.03(a).

"**Treasury Rate**" means, with respect to the date when Notes become due and payable, (1) the yield, under the heading which represents the average for the immediately preceding week, as reported on the most recent H.15 page available through the website of the Board of Governors of the Federal Reserve System, or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded United States Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Maturity Date of the notes to be redeemed, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined, and the Treasury Rate shall be interpolated or extrapolated from such yields on a straight-line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per year equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for the when Notes become due and payable. The Treasury Rate will be calculated on the third Business Day the date when Notes become due and payable.

"**U.S. Dollars**" and "**U.S.$**" each mean the currency of the United States.

"**United States**" and "**U.S.**" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"**Valuation Certification**" means the valuation of the Collateral contained in the closing date valuation therefor prepared by mba Aviation, dated on or prior to the Initial Closing Date.

"**Wholly Owned Subsidiary**" means a Subsidiary all of the Capital Stock of which (other than directors' qualifying shares) is owned by any Person or another Wholly Owned Subsidiary.

SECTION 1.02.    *Rules of Construction*.  (a) For all purposes of this Note Purchase Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(1)    the terms defined in this Note Purchase Agreement have the meanings assigned to them in this Note Purchase Agreement and include the plural as well as the singular;

(2)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Note Purchase Agreement as a whole and not to any particular Article, Section or other subdivision;

(3)    "or" is not exclusive;

21

(4)     any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(5)     "including" means "including, without limitation";

(6)     any reference herein to any Person shall be construed to include such Person's successors and assigns;

(7)     the word "asset" and "property" shall be construed to have the same meaning and effect and to refers to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(8)     any reference to an "Article," a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Note Purchase Agreement.

(b)     All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with IFRS.

(c)     For purposes of the definitions set forth in Section 1.01 and this Note Purchase Agreement generally, all calculations and determinations shall be made in accordance with IFRS and shall be based upon the consolidated financial statements of the GLAI Group prepared in accordance with IFRS.

(d)     With respect to the Company, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque*, *nantissement*, *gage*, *privilège*, *sûreté réelle*, *droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant*, *associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an a*dministrateur* of its general partner, (v) a receiver, *administrative receiver*, administrator, liquidator or the like includes a *juge délégué*, *commissaire*, *juge-commissaire*, *liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*), insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally, (vii) a guarantee includes any guarantee which is independent from the debt to which it relates and any suretyship (*cautionnement*) within the meaning of Articles 2011 and seq. of the Luxembourg Civil Code, (viii) "gross negligence" is a reference to *faute lourde* and willful misconduct is a reference to *faute dolosive* and (ix) an "agent" includes a *mandataire*.

SECTION 1.03.     *Table of Contents; Headings.*  The table of contents and headings of the Articles and Sections of this Note Purchase Agreement have been inserted for convenience of

22

#4856-1598-7531v19

reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 1.04.    *Form of Documents Delivered*.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company or the applicable Guarantor may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company or the applicable Guarantor stating that the information with respect to such factual matters is in the possession of the Company or the applicable Guarantor, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Note Purchase Agreement, they may, but need not, be consolidated and form one instrument.

## ARTICLE 2
### PURCHASE AND SALE OF THE NOTES

SECTION 2.01.    *Sale and Purchase of the Notes*. Subject to the terms and conditions herein set forth, any Closing Date, the Company will issue and sell to the Purchaser, and the Purchaser agrees to purchase from the Company, the aggregate principal amount of Notes of up to U.S.$1,430,925,000 (the "**Principal Amount**"), at the price of  85% of the face value of such Notes (the "**Purchase Price**"), which amount may be paid using GOL Bonds at the cash conversion rates set out in Schedule D.

SECTION 2.02.    *Closing*. The initial sale and purchase of the Notes will take place at a closing (the "**Closing**") at 11:00 a.m., New York City time, on the Initial Closing Date, at the offices of Milbank LLP, 55 Hudson Yards, New York, New York 10001 (the "**Closing Location**"), or at such other time and place as is mutually agreed to by the Company and the Purchaser. Any subsequent sales and purchases of the Notes will take place at such times and at such locations as is mutually agreed to by the Company and the Purchaser. At such times the Company will deliver to the Purchaser the principal amount of Notes, pursuant to the terms set forth in Section 2.01 above (in such permitted denomination or denominations and registered in its name or the name of such nominee or nominees as the Purchaser may request) against payment of such amount by delivery of GOL Bonds or by federal funds wire transfer of immediately available funds to such bank accounts as the Company designates, as applicable.

23

SECTION 2.03.    *Expenses*. The Company and the Guarantors covenant and agree with the Purchaser that the Guarantors will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Company's advisors, if any, in connection with the issue of the Notes; (ii) all other costs and expenses incident to the performance of its obligations hereunder which are not otherwise specifically provided for in this Section 2.03. The obligations of the Company under this Section 2.03 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Note Purchase Agreement, the Notes, and the termination of this Note Purchase Agreement.

## ARTICLE 3
### USE OF PROCEEDS

SECTION 3.01.    *Net Proceeds*.  The Company will apply the net proceeds from the Purchase Price for general corporate purposes, including refinancing certain of the GOL Bonds.  The Company will cancel within 30 days any GOL Bonds contributed by the Purchaser as part of the Purchase Price of the Notes.

## ARTICLE 4
### THE NOTES

SECTION 4.01.    *Form and Dating*.  The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Note Purchase Agreement and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any Law, agreement to which the Company is subject, if any, or usage; *provided that* any such notation, legend or endorsement is in a form acceptable to the Company.

Each Note shall be dated the date of its execution.

Each Note shall represent such principal amount of the Outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of Outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of Outstanding Notes represented thereby may from time to time be increased or reduced to reflect repurchases, cancellations, exchanges for cash, Preferred Shares or a combination thereof, transfers permitted hereby.

Accrued interest on the Notes shall be computed on the basis of a 360 day year composed of twelve 30 day months and, for a partial month, on the basis of the number of days actually elapsed in a 30 day month.

Unless previously exchanged pursuant to this Note Purchase Agreement, the Notes shall constitute direct unconditional senior obligations of the Company and shall rank at least *pari passu* in right of payment with all other present and future senior Debt of the Company and shall rank senior in right of payment to all present and future subordinated Debt of the Company. Subject to the terms hereof, each of the Notes represents the right to receive pro rata payments with respect to the Notes. Each Note shall rank *pari passu* with each other Note and, subject to Section 9.03, be equally and ratably secured by the Collateral. All Notes shall be substantially

24

identical except as to denominations and as expressly permitted in this Note Purchase Agreement.

Upon completion of the perfection requirements set forth in Section 7.07 below, this Note Purchase Agreement shall evidence a first priority continuing Lien on and security interest in the Collateral to secure the full payment of the principal, interest and other amounts of the Notes Obligations.

SECTION 4.02.    *Execution and Delivery*.  (a) Two Officers of the Company shall sign the Notes for the Company by manual or electronic signature.

(1)    If an Officer whose signature is on a Note no longer holds that office at the time the Company delivers the Note, the signature of such Officer shall be valid nevertheless.

(2)    A Note shall not be valid until two authorized signatories of the Company manually or electronically sign the Note.  Such signatures shall be conclusive evidence that the Note has been executed under this Note Purchase Agreement.

(3)    The Company shall execute and deliver the Notes on each Closing Date in an aggregate principal amount corresponding to the Principal Amount.

(4)    The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "**Authorized Denomination**").

SECTION 4.03.    *Registrar, Transfer Agent and Paying Agent*.  (a)Subject to such reasonable rules as the Company may prescribe, the books of the Company for the exchange, registration, and registration of transfer of Notes shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "**Register**"). The pledge of the Notes by the Purchaser to the Collateral Agent under the Abra Senior Secured Exchangeable Notes Indenture and the Abra Senior Secured Notes Indenture shall be noted in the Register on each Closing Date. The Registrar (the "**Registrar**") shall maintain books for the registration of transfer of Notes and cause its books to be amended upon any registration of transfer of any Notes.

Notwithstanding the above an up-to-date copy of the Register shall be kept at any time at the registered office of the Company in Luxembourg.

GLAI will initially act as the Registrar, Transfer Agent, and Paying Agent of the Notes. For so long as GLAI is acting in these roles, all notices required to be delivered to the Registrar, Transfer Agent and Paying Agent pursuant to this Note Purchase Agreement shall be delivered to the Company's Office. The Company's Office will be the office or agency where Notes may be surrendered for registration of transfer or for presentation for payment or repurchase and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be served.

The "**Company's Office**" is located at:

25

#4856-1598-7531v19

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

The Company may at any time, by notice to each Holder, change the address of the Company's Office.

GLAI may have one or more co-registrars and one or more additional Transfer Agents, or Paying Agents.  The terms "**Transfer Agent**," and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.  The term "**Registrar**" includes any co-registrar.

(b)    The Company shall enter into any appropriate agency agreements with any Agent that is not a party to this Note Purchase Agreement, which shall implement the provisions of this Note Purchase Agreement that relate to such Agent.

(c)    The Registrar shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the written request of the Company provided a reasonable amount of time prior to such inspection.  Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such Notes have been replaced.  In the case of the replacement of any of the Notes, the Registrar shall keep a record of the Note so replaced, and the Notes issued in replacement thereof.  In the case of the cancellation of any of the Notes, the Registrar shall keep a record of the Note so cancelled and the date on which such Note was cancelled.  Each Transfer Agent shall notify the Company of any transfers of Notes effected by it.

(d)    All Notes presented or surrendered for registration of transfer, exchange for cash or a combination thereof shall (if so required by the Company) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

(e)    Neither the Company, nor GLAI shall be required to exchange a Note or register a transfer of a Note with respect to (i) Notes that have been surrendered for exchange for cash or, if a portion of any Note is surrendered for exchange for cash, such portion thereof surrendered for exchange for cash, or (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn).

SECTION 4.04.    *Paying Agent to Hold Money in Trust*.

(a)    By 10:00 A.M. New York time, no later than one Business Day prior to each Interest Payment Date on any Note, GLAI shall deposit in immediately available funds a sum sufficient to pay such principal and interest when so becoming due (including any amounts under

26

Section 7.06(a)).  GLAI shall request that the bank through which such payment is to be made agrees to supply to GLAI by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by facsimile) of GLAI's intention to make such payment.  The Company shall require each Paying Agent not a party to this Note Purchase Agreement, if any, to agree in writing that such Paying Agent shall hold in trust, for the benefit of Holders or the Company, all money held by such Paying Agent for the payment of principal, premium, if any, and interest on the Notes.

(b)    Unless the Paying Agent is GLAI, any Subsidiary of GLAI or the Company, each payment in full of principal, Additional Amounts and/or interest payable under the Notes and this Note Purchase Agreement in respect of any Note made by or on behalf of the Company or the Guarantors to or to the order of the Paying Agent in the manner specified herein or in the Notes on the date due shall be valid and effective to satisfy and discharge the obligation of the Company or the Guarantors, as the case may be, to make payment of principal, Additional Amounts and/or interest payable hereunder and under the Notes on such date; *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Company or the Guarantors, as the case may be, or held by it, on behalf of the Holders hereunder.

SECTION 4.05.    *Payment of Principal and Interest; Principal and Interest Rights Preserved*

(a)    Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of the Paying Agent or any other Paying Agent appointed by the Company, if any.

(b)    If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder, and (ii) second, towards payment of principal then due hereunder.

(c)    Payment of interest on each Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder.  The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

(d)    The Notes shall bear interest at an interest rate as follows:

(1)    4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**"); and

(2)    13.50% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth in Section 4.05(e).

27

(e)     GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (i) semi-annually in arrears, on each applicable Interest Payment Date or (ii) on the Maturity Date; *provided that*, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; *provided*, *further*, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of such Note and this Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of this Note Purchase Agreement.

(f)     If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

SECTION 4.06.   *[Reserved].*

SECTION 4.07.   *Transfer of Notes*.  Transfer will be effected without charge by or on behalf of the Company, the Registrar or the Transfer Agents, but upon payment in respect of any tax or other governmental charges which may be imposed in relation to it.

SECTION 4.08.   *Replacement Notes*.  If any Note at any time becomes mutilated, defaced, destroyed, stolen or lost, such Note may be replaced at the cost of the applicant (including properly incurred legal fees of the Company and the Agents) at the Company's Office, upon provision of, in the case of destroyed, stolen or lost Notes, evidence satisfactory to the Company that such Note was destroyed, stolen or lost, together with such indemnity as the Company may require.  Mutilated or defaced Notes must be surrendered before replacements shall be issued.

Each Note executed and delivered in lieu of any such Note shall carry rights to accrued and unpaid interest and to interest to accrue equivalent to the rights that were carried by such Note before such Note was mutilated, defaced, destroyed, stolen or lost.

Every replacement Note is an additional obligation of the Company and shall be entitled to the benefits of this Note Purchase Agreement.

SECTION 4.09.   *Cancellation*.  The Agents shall forward to GLAI any Notes surrendered to them for transfer or payment. GLAI and no one else shall cancel and GLAI shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Notes surrendered for transfer, payment or cancellation. The Company may not issue new Notes to replace Notes it has redeemed, paid in full (other than in connection with a transfer). GLAI shall cancel any Note held by the Company or its Affiliates, except for the Purchaser. A Note shall cease to be deemed Outstanding if held by the Company,

28

any Guarantor or any of their Affiliates (except for the Purchaser) holds such Note, including for voting purposes.

SECTION 4.10.    *Defaulted Interest*.  If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest pursuant to the terms set forth in Section 4.05(e) (plus interest on such defaulted interest at the rate specified in Section 7.01(b) to the extent lawful) in any lawful manner if, after written notice given by the Company to each Holder of the proposed payment pursuant to this Section 4.10, such manner of payment shall be deemed practicable by each Holder.

The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date, pursuant to the terms set forth in Section 4.05(e), which date shall be at least five Business Days prior to the payment date of such defaulted interest.  The Company shall fix or cause to be fixed any such special record date and payment date, and, at least 15 days before any such special record date, the Company shall deliver to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 4.11.    *No Purchase of the Notes by the Company or its Affiliates*.  Except as set forth herein, neither the Company, Guarantor nor any of its respective Affiliates may repurchase or otherwise acquire after the Initial Closing Date any of the Notes prior to the Maturity Date without the prior written consent of the Abra Notes Supermajority Holders.  Any Notes so purchased or acquired with such prior written consent may not be resold and shall be cancelled.

SECTION 4.12.    *Fundamental Change*. Neither the Company, GLAI nor any of its Affiliates may enter into a transaction or a series of transactions that would reasonably be expected to result in a Fundamental Change without the prior written consent of the Abra Notes Supermajority Holders.

## ARTICLE 5
### CONDITIONS TO CLOSING

SECTION 5.01.    *Purchaser's Conditions to Issuance of Notes.*  The obligations of the Purchaser to purchase the Notes shall be subject to the satisfaction, on or prior to any Closing Date, of each of the following conditions (any or all of which may be waived by the Purchaser in writing, in whole or in part, to the extent permitted by applicable Law), each in form and substance satisfactory to the Purchaser and the Abra Notes Supermajority Holders.

(a)      Milbank LLP, U.S. counsel for the Company and the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(b)      NautaDutilh Avocats Luxembourg S.à r.l., Luxembourg legal counsel for the Company, shall have furnished to the Purchaser and the holders of the Abra Senior Secured

29

Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(c)    Lefosse, Brazilian legal counsel for the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser, and the Abra Holders.

(d)    Pursuant to Sections 2.01 and 4.02, the Company shall have authorized, issued and delivered Notes to the Purchaser in an aggregate principal amount corresponding to the Principal Amount subject to original issue discount of 15%.

(e)    The representations and warranties of the Company contained in this Note Purchase Agreement shall be true and correct as of each Closing Date (except to the extent relating specifically to a prior date) in all material respects (provided that if any representation or warranty already includes a materiality or material adverse effect qualifier, such representation or warranty is true and correct in all respects), both before and after giving effect to the purchase of the Notes.

(f)    The Company shall have delivered to the Purchaser a formalities certificate of an Officer, dated as of the Initial Closing Date (and to the extent anything has changed therein, on each subsequent Closing Date), (i) appending a copy the Company's articles of association, (ii) appending a certificate of non-inscription of a judicial decision (*certificat de non-inscription de décision judiciaire*) and an excerpt pertaining to the Company issued by the Luxembourg Register of Commerce and Companies dated no earlier than one Business Day prior to such Closing Date, (iii) appending a copy of the resolutions of the Board of Directors approving the terms of, and the transactions contemplated by, the Transaction Documents and resolving that it executes, delivers and performs the Transaction Documents and authorizes a specified person or persons to execute the Transaction Documents on behalf of the Company, (iv) certifying that each copy document relating to it specified in this paragraph is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than such Closing Date, (v) providing a specimen of the signature of each person authorized by the resolutions referred to in  above in relation to the Transaction Documents, (vi) confirming compliance of the Company with the provisions of the Luxembourg law dated 31 May 1999 of the domiciliation of companies, as amended, (vii) confirming that the Company has not been declared bankrupt (en faillite), and no application has been made by the Company, the relevant director or the Board of Directors in relation to, any declared bankruptcy (*faillite*), voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), suspension of payments (*sursis de paiement*), controlled management (gestion contrôlée), general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Council Regulation N°848/2015 of 20 May 2015 on

30

insolvency proceedings (*recast*) (the "**Regulation**"), (viii) confirming that, to the best of the knowledge of the relevant director and the Board of Directors, no other person entitled has made any corporate action, legal proceedings or other procedure or step in connection with, nor has the Company or the Board of Directors been notified of, any bankruptcy (*faillite*), voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (concordat préventif de la faillite), suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action pauliana*), general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Regulation, (ix) confirming that the Company is not, on the date of such Closing Date and will not, as a result of the entering into the Transaction Documents, be in a state of cessation of payments (*cessation de paiement*) and lose its creditworthiness (*ébranlement de crédit*) and (x) confirming that the Company is up-to-date with its obligations of publication of the annual accounts and does not contravene the provisions of the Luxembourg Code de commerce or the laws governing Luxembourg commercial companies.

(g)    The Company shall have duly executed and delivered to the Purchaser and Collateral Agent counterparts of this Note Purchase Agreement, duly executed by each party thereto (other than the Purchaser), with a copy to be delivered to the Abra Holders.

(h)    The Company shall have delivered to the Purchaser an Officer's Certificate, dated as of the Initial Closing Date, certifying that (i) the conditions specified in this Section 5.01 have been fulfilled, (ii) there has not occurred since February 7, 2023, any event or condition that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and (iii) no Default or Event of Default hereunder exists at the time of the purchase of the Note on the Initial Closing Date.

(i)    Subject to documents and evidences that under the Transaction Documents or applicable law must be delivered after the Initial Closing Date, the Company and the Guarantors shall have duly executed and delivered to the Purchaser and Collateral Agent a copy of each of the Collateral Documents (including without limitation GLA's Smiles Fiduciary Transfer Agreement, GLA's Fiduciary Transfer of IPCo's Shares Agreement and IPCo's Smiles Fiduciary Transfer Agreement) and executed and delivered to the Purchaser a copy of the Exclusivity Side Letter, each duly executed by each party thereto and such evidence as the Purchaser may reasonably require of the effectiveness of the security contemplated thereby and the perfection of the security interest created thereby (except as otherwise described in Section 7.07(c)), including acceptable evidence of payment or arrangements for payment by the Company of all applicable taxes, fees, charges, costs and expenses required for the recording of the Collateral Documents.

(j)    The purchase and sale of the Notes shall not be prohibited or enjoined by any court of any competent jurisdiction.

(k)    The Company shall have delivered, no later than five (5) Business Days prior to the Initial Closing Date, to the Purchasers a valuation report prepared by an independent appraiser with respect to the value of the Loyalty Program and the Collateral granted by the Company and the Guarantors to the Collateral Agent hereunder. As of the Initial Closing Date,

31

#4856-1598-7531v19

the aggregate principal amount of the Notes (as of the Initial Closing Date) plus the aggregate principal amount of the GOL Senior Secured Exchangeable Notes due 2028 (as of the Initial Closing Date) shall not exceed 50% of the value of the Collateral as set forth in the Valuation Certification.

SECTION 5.02.    *Company's Conditions to Issuance of Notes*.  The obligation of the Company to consummate the issuance and sale of the Notes to the Purchaser shall be subject to the satisfaction, on or prior to each Closing Date, of each of the following conditions with respect to the Purchaser (any or all of which may be waived by the Company in writing, in whole or in part, to the extent permitted by applicable Law):

(a)     The representations and warranties of the Purchaser contained in this Note Purchase Agreement shall be true and correct as of the Initial Closing Date.

(b)     The Purchaser shall have delivered, or caused to be delivered, to the Company, on each Closing Date, the Purchaser Deliverables.

(c)     The Company shall have received the Purchase Price, in cash, from the Purchaser.

(d)     The Purchaser shall have duly executed and delivered, or caused to be delivered, to the Company counterpart signatures to this Note Purchase Agreement.

(e)     The Purchaser shall have delivered to the Collateral Agent the "Know-Your-Customer" documents required by the Collateral Agent, as listed in Exhibit C hereto.

(f)     The Purchaser shall have issued the Series A Abra Senior Note due 2028 and the Series B Abra Senior Note due 2028 to Abra Global Finance.

(g)     Abra Global Finance shall have issued the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

SECTION 5.03.    *Conditions Relating to Collateral*.  GLA shall grant and perfect the first priority Lien in the Collateral in accordance with the Collateral Documents, and cause any filings and other actions (including, without limitation, all required registrations, filings and recordations with the applicable notaries or registries) necessary for the creation and perfection of the Lien in the Collateral in favor of the Secured Parties to be completed pursuant to Section 7.07.

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

SECTION 6.01.    *Representations of the Company and the Guarantors*. The Company and, as applicable, each of the Guarantors represents and warrants to, and agrees with, the Purchaser, as of the Initial Closing Date:

32

(1)     *Organization of the Company*.  The Company and each of the Guarantors have been duly incorporated, are validly existing as companies in good standing (where applicable) under the laws of their respective jurisdictions of incorporation, have the corporate power and authority to own their respective property and to conduct their businesses and are duly qualified to transact business and are in good standing (where applicable) in each jurisdiction in which the conduct of their businesses or their ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing (where applicable) would not have a Material Adverse Effect.

(2)     *Authorization of this Note Purchase Agreement*.  This Note Purchase Agreement has been duly authorized, executed and delivered by the Company and each of the Guarantors.

(3)     *Authorization of the Notes*.  The Notes have been duly authorized by the Company and each of the Guarantors, and, when executed and authenticated in accordance with the provisions of this Note Purchase Agreement and issued and delivered to and paid for by the Purchaser in accordance with the terms of this Note Purchase Agreement, will be on Initial Closing Date, valid and binding obligations of the Company and each of the Guarantors, enforceable against the Company and each of the Guarantors in accordance with their terms, subject to (i) applicable bankruptcy, insolvency, judicial or extrajudicial reorganization, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights generally (collectively, the "**Enforceability Exceptions**"); and (ii) equitable principles of general applicability, and will be entitled to the benefits of this Note Purchase Agreement pursuant to which such Notes are to be issued.

(4)     *Authorization of the Transaction Documents*.  Each of the Transaction Documents to which the Company and each of the Guarantors are a party has been duly authorized by the Company and each of the Guarantors, and when executed and delivered by the Company and each of the Guarantors, will be a valid and legally binding agreement of the Company and each of the Guarantors enforceable against the Company and each of the Guarantors in accordance with its terms, subject to (i) the Enforceability Exceptions and equitable principles of general applicability; and (ii) the requirements set forth in Section 6.01(17) with respect to the enforcement and admissibility of this Note Purchase Agreement and the Notes into evidence in Brazil directly before public agencies and courts in Brazil.  When all required filings and recordings with respect to, and deliveries of, the Collateral have been made as required by the Collateral Documents, will create valid, perfected security interests in the Collateral, subject to no prior liens (other than certain other permitted liens and encumbrances permitted under this Note Purchase Agreement) being created and perfected prior to perfection of the security interests in the Collateral.

(5)     *Ranking of the Notes*.  The Notes and the Note Guaranties will constitute direct, unconditional, senior and secured obligations of the Company and the Guarantors, respectively, without any preference among themselves, of the Company and the

#4856-1598-7531v19

Guarantors and will rank senior to all other present and future unsubordinated and secured obligations of the Company and the Guarantors.

(6)     *Non-Contravention*.  The execution and delivery by the Company and each of the Guarantors, and the performance by the Company and each of the Guarantors of their obligations under, this Note Purchase Agreement, the Collateral Documents (including, without limitation, the grant and perfection of liens and security interests in the Collateral pursuant to the terms in the applicable Collateral Documents), as applicable, and the Notes do not contravene any provision of applicable law which would affect the nature of the Notes or the articles of association, bylaws or other organizational documents of the Company and each of the Guarantors, any agreement or other instrument binding upon any of the Company and each of the Guarantors that is material to the Company and each of the Guarantors, (including any agreement for the incurrence of Debt), or any judgment, order or decree of any governmental body, agency or court having jurisdiction over the Company and each of the Guarantors.

(7)     *No Consents Required*.  No consent, approval, authorization or order of, or qualification with, any governmental or regulatory body or agency or any third party (including any lender) is required for the performance by the Company and each of the Guarantors of their respective obligations under the Notes, this Note Purchase Agreement or the Collateral Documents, as applicable.

(8)     *Investment Company Act*.  Neither the Company nor any of the Guarantors is, and after giving effect to the placement and sale of the Notes and the application of the proceeds thereof will not be, required to register as an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

(9)     *Choice of Laws*.  The choice of laws of the State of New York as the governing law of this Note Purchase Agreement is a valid choice of law under the laws of Luxembourg and Brazil will be honored by the courts of Luxembourg and Brazil.

(10)     *No Material Defaults*.  Neither the Company nor any of the Guarantors is (i) in violation of its articles of association, bylaws or other organizational documents; (ii) in default, and no event exists that, with notice or lapse of time or both, would constitute such a default, in the performance or observance by the Company or any of the Guarantors of any material obligation, agreement, covenant or condition contained in any indenture, mortgage, loan agreement or other material agreement or instrument to which it is a party or by which it is bound or to which its property or assets are subject; or (iii) in violation of any applicable law, statute, rule or regulation or any judgment or order of any U.S., Brazilian, Luxembourg court or arbitrator or governmental or regulatory authority, except in connection with clauses (ii) and (iii) for any such default or violation that would not have a Material Adverse Effect.

(11)     *Absence of Exchange Controls*.  No exchange control authorization or any other authorization, approval, consent or license of any Governmental Authority or agency in Luxembourg is required for the payment by the Company or any of the

Guarantors of any amounts in United States dollars under any Transaction Document to which it is a party.

(12)     *Observance of Statutes and Orders*.  Neither the Company nor any of the Guarantors is (i) in violation of any order, judgment, decree or ruling of any court, any arbitrator of any kind or any Governmental Authority or agency in Luxembourg or Brazil or (ii) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority or agency in Luxembourg or Brazil, which violation would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(13)     *Taxes*.  All tax returns required to be filed by the Company and each of the Guarantors have been timely filed and such tax returns have been duly and accurately prepared in all material respects, and all material taxes and other assessments of a similar nature (whether imposed directly or through withholding), including any interest, additions to tax or penalties applicable thereto, due or claimed to be due from the Company and each of the Guarantors (whether or not shown to be payable on such tax returns) have been paid, other than those being contested in good faith and for which adequate reserves have been provided in accordance with IFRS.

(14)     *Tax Residency of the Company*.  The Company is resident for tax purposes solely in Luxembourg.

(15)     *Tax Residency of the Guarantors*.  Each Guarantor is resident for tax purposes solely in Brazil.

(16)     [*Reserved*].

(17)     *Absence of Further Brazilian Law Requirements*. This Note Purchase Agreement is in proper legal form under the laws of Brazil for the enforcement thereof in Brazil against the Company and each of the Guarantors, and it is not necessary in order to ensure the legality, validity, enforcement of this Note Purchase Agreement in Brazil that this Note Purchase Agreement be filed or recorded with any court or other authority in Brazil or that any stamp, issue, registration, documentary or similar taxes or duties be paid in Brazil on or in respect of this Note Purchase Agreement except that, with respect to the enforcement and admissibility of this Note Purchase Agreement into evidence in Brazil directly before the public agencies and courts in Brazil, (i) (a) if the State in which this Note Purchase Agreement was executed is not party to the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents of 5 October 1961 (the "**Apostille Convention**") (1) the signatures of the parties hereto signing outside Brazil should be notarized by a notary public licensed as such under the jurisdiction of signing and (2) the signature of such notary public must be authenticated by a consular official of Brazil, or (b) if the State in which this Note Purchase Agreement was executed is party to the Apostille Convention, an authority designated by such State must issue a certificate that authenticates the origin of this Note Purchase Agreement ("**Apostille**"); and (ii) (a) this Note Purchase Agreement and the Apostille (if applicable) must be translated into the Portuguese language by a sworn translator and (b) this Note Purchase

35

Agreement and the Apostille (if applicable), together with its sworn translation into the Portuguese language, must be registered with the appropriate Registry of Titles and Deeds in Brazil.

(18)    *No Registration/Trust Indenture Act*.  It is not necessary in connection with the offer, sale and delivery of the Notes to the Purchaser in the manner contemplated by this Note Purchase Agreement to register the Notes under the Securities Act or to qualify this Note Purchase Agreement under the U.S. Trust Indenture Act of 1939, as amended.

(19)    *Private Placement by the Company*.  Neither the Company, the Guarantors or anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy the Notes or any similar securities from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchaser which has been offered the Notes at a private sale for investment. Neither the Company, the Guarantors nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to (i) the registration requirements of Section 5 of the Securities Act; (ii) a requirement to produce a prospectus in the United Kingdom; or (iii) the registration requirements of any securities or blue sky laws of any applicable jurisdiction. For the purposes of this clause, "**Institutional Investor**" means (a) a Purchaser, (b) any qualified institutional buyer within the meaning of Rule 144A of the Securities Act, (c) an "accredited investor" within the meaning of Section 501(a)(1), (2), (3), (7) or (8) under the Rule 144A of the Securities Act, (d) a non-U.S. person with any potential offer or purchase being made in an offshore transaction in reliance on Regulation S of the Securities Act.

(20)    *No Restrictions on Subsidiaries of GLAI*. No Subsidiary of GLAI is prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, nor due to any judgment, order or decree of any government authority, agency or court having jurisdiction over such subsidiary, from paying any dividends to GLAI, from making any other distribution on such Subsidiary of GLAI's Capital Stock, from repaying to GLAI any loans or advances to such Subsidiary of GLAI from GLAI in accordance with the terms of any such loan or advance, or from transferring any of such of Subsidiary of GLAI's assets to GLAI or any other Subsidiary of GLAI.

(21)    *Title to Property; Leases*.  The Company and each of the Guarantors have good and sufficient title to their respective material properties as are necessary to the conduct of their operations as presently conducted. The Company and each of the Guarantors have good and sufficient title to the properties described in or referred to in the Collateral Documents, as applicable, free and clear of liens, (i) except for liens established pursuant to the Collateral Documents, and (ii) except such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and each of the Guarantors.

(22)    *Licenses, Permits, Etc*.  The Company and each of the Guarantors own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, including without

#4856-1598-7531v19

limitation, the Smiles Intellectual Property and any other Collateral, without known conflict with the rights of others, except for those conflicts that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(23)  *No Unlawful Payments*.  Except as disclosed in the documents relating to the Company inserted by the Purchaser in a data room, and made available to the Abra Holders (the "**Disclosure Documents**") (including the documents incorporated by reference therein), neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or other person acting on behalf of the Company or the Guarantors, has (i) used any corporate funds of the Company or the Guarantors for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government or regulatory official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption law; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. The Company, the Guarantors and to the knowledge of the Company and the Guarantors, its affiliates have conducted their businesses in compliance with all applicable anti-bribery and anti-corruption laws and have instituted, maintain and enforce, and will continue to maintain and enforce, policies and procedures designed to ensure and which are reasonably expected to continue to ensure compliance with all applicable laws.

(24)  *No Conflict with Money Laundering Laws*.  The operations of the Company and the Guarantors are and have been conducted at all times in compliance with all applicable money laundering statutes, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental or regulatory agency, authority or body or any arbitrator involving the Company or the Guarantors with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(25)  *No Conflict with Sanctions Laws*.  Neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or person acting on behalf of the Company or the Guarantors is currently subject to or the target of any sanctions administered or enforced by the U.S. government, (including, without limitation, the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the U.S. Department of Commerce, the United Nations Security Council, the European Union, Luxembourg or Her Majesty's Treasury of the United Kingdom or

37

other relevant sanctions authority (collectively, "**Sanctions**"), nor is the Company or any of the Guarantors located, organized or resident in a country or territory that is the subject or target of Sanctions, including, without limitation, Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic and the so-called Luhansk People's Republic (each, a "**Sanctioned Country or Region**").  Neither the Company nor the Guarantors will not directly or indirectly use the proceeds of this offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity, (i) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or the target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or Region or (iii) causing a violation by any person (including any person participating in the transaction, whether as underwriter, placement agent, advisor, investor or otherwise) of Sanctions. For the past five years, neither the Company nor the Guarantors has engaged in and is not now engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country or Region.

(26)    The above mentioned representations and warranties under Section 6.01(25)shall only be applicable to any Luxembourg party to the extent that such Luxembourg party will not violate or is exposed to any liability under the Council Regulation (EC) 2271/96 of 22 November 1996 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom or any similar laws or regulations.

SECTION 6.02.    *Representations of the Purchaser*. The Purchaser represents, warrants and agrees that:

(1)    It is purchasing the Notes on its own behalf, as an investment fund or account, as the case may be, duly organized and existing in accordance with the laws of the jurisdiction of its incorporation and it is purchasing the Notes for its own account or for one or more separate accounts maintained by the Purchaser and not with a view to the distribution thereof. The Purchaser has its principal address outside the United States and was located outside the United States at the time any offer to buy the Notes was made to the Purchaser and at the time that this Note Purchase Agreement is executed by the Purchaser.

(2)    The execution, delivery and performance of this Note Purchase Agreement by the Purchaser are within the powers of the Purchaser, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Purchaser is a party or by which the Purchaser is bound, and will not violate any provisions of such entity's organizational documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Note Purchase Agreement is genuine, and the signatory has been duly authorized to execute the same, and this Note Purchase Agreement

constitutes a legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms.

(3)     It is not and, for so long as the Purchaser owns the Notes, will not be acting on behalf of: (a) an "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), which is subject to Title I of ERISA, (b) a plan described in Section 4975(e)(1) of the Code, (c) an entity whose underlying assets include "plan assets" by reason of a plan's investment in such entity (including but not limited to an insurance company general account), or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of the Department of Labor Regulation Section 2510.3-101 (29 C.F.R. Sections 2510.3-101), as modified by Section 3(42) of ERISA (each of categories (a) through (d), a "**Covered Plan**").

(4)     in making the decision to purchase the Notes, it has relied solely upon the independent investigation made by it and an independent assessment of the merits and risks of an investment in the Notes, and such decision to purchase Notes was formed based on such independent investigation of the Company, the Guarantors and the Notes, and such independent assessment of the merits and risks of an investment in the Notes.

## ARTICLE 7
### COVENANTS

SECTION 7.01.    *Payment of Principal and Interest Under the Notes*.

(a)     The Company shall punctually pay the principal of and interest on the Notes on the dates and in the manner set forth herein and as provided in the Notes.  By 10:00 a.m. (New York City time), no later than one Business Day prior to any Interest Payment Date or the Maturity Date, to the extent such amount is payable in cash, GLAI shall irrevocably deposit, or cause to be deposited, with the Paying Agent (unless the Paying Agent is GLAI) money sufficient to pay such principal and interest subject to the terms set forth in Section 4.05(e).

(b)     The Company shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 2.00% per annum pursuant to the terms set forth in Section 4.05(e).

(c)     No interest shall be payable hereunder in excess of the maximum rate permitted by applicable Law.

SECTION 7.02.    *Maintenance of Office or Agency*.  The Company shall maintain an office or agency where Notes may be (i) presented or surrendered for payment or (ii) presented for exchange for cash and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be served.  If at any time the Company shall fail to maintain any such required office or agency, such presentations, surrenders, notices and demands may be made or served at the Company's Office.

SECTION 7.03.    *Money for Note Payments to Be Held in Trust*.

#4856-1598-7531v19

(a)    For so long as the Company acts as Paying Agent, it shall, when electing to pay interest using cash, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, as applicable, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided.

(b)    Whenever the Company shall have one or more Paying Agents for the Notes, it shall, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, irrevocably deposit with a Paying Agent a sum sufficient to pay such principal and interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal or interest.

(c)    Each Paying Agent, subject to the provisions of this Section 7.03, shall:

(1)    hold all sums held by it for the payment of principal or premium, if any, of or interest on the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as set forth herein; *provided*, *however*, such sums need not be segregated from other funds held by it, except as required by Law; and

(2)    at any time during the continuance of any Default by the Company, upon the written request of the Holders, forthwith pay to the Holders all sums so held in trust by such Paying Agent.

(d)    The Company shall cause each Paying Agent to execute and deliver an instrument in which such Paying Agent shall agree with the Company to act as a Paying Agent in accordance with this Section 7.03, except in case the Paying Agent is the Company or an Affiliate of the Company.

(e)    Any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

SECTION 7.04.    *Maintenance of Corporate Existence*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, (i) maintain in effect its corporate existence and all registrations necessary therefor; *provided that* these restrictions shall not prohibit any transactions permitted by Article 8; (ii) not amend, supplement, waive or otherwise modify certain specified provisions of the documents relating to each of the Guarantors' or its Subsidiaries' rights or benefits under its respective organizational documents without the prior written consent of the Purchaser, and the Abra Notes Supermajority Holders, as the case may be, if such amendment, supplement, waiver or modification would materially adversely affect the rights of the Purchaser, or of the then holders of this Note); (iii) not change its corporate form; (iv) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and

#4856-1598-7531v19

the like necessary in the normal conduct of its business, activities or operations; and (v) maintain or cause to be maintained in good repair, working order and condition (normal wear and tear excepted) all properties used in its business; *provided*, *however*, that neither GLAI nor its Subsidiaries shall be prevented from discontinuing those operations (including through the transfer or dissolution of a Subsidiary) or suspending the maintenance of those properties (including through the sale thereof) which, in the reasonable judgment of GLAI, are no longer necessary in the conduct of GLAI's business, or that of its Subsidiaries; and *provided*, *further*, that such discontinuation of operations or suspension of maintenance shall not be materially disadvantageous to the Holders and such operations shall not represent more than 3.5% of the aggregate consolidated gross revenues of GLAI and its Subsidiaries for the most recent fiscal year.

SECTION 7.05.   *Payment of Taxes and Claims*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its property or in respect of any of its franchises, businesses, income or profits before any penalty or interest accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for sums which have become due and payable and which by Law have or might become a Lien upon its property, unless the failure to make such payment could have: (a) a Material Adverse Effect upon the financial condition of (i) the Company or (ii) the GLAI Group considered as one enterprise, or (b) a Material Adverse Effect on the performance of the Company's or GLAI's obligations hereunder; and *provided*, *further*, that no such charge or claim need be paid while it is being contested in good faith by appropriate proceedings and if appropriate reserves or other provisions are maintained in respect of such amounts in accordance with IFRS.

SECTION 7.06.   *Payment of Additional Amounts*.  (a) All payments by GLAI in respect of the Notes or the Guarantors (or any Paying Agent if other than GLAI) in respect of the Note Guarantees or of cash and/or deliveries of Preferred Shares (together with payments of cash in lieu of a fractional Preferred Share) upon exchange, will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of Brazil or Luxembourg, or any political subdivision or authority therein or thereof or any other jurisdiction in which any officer of the Company, the Company or any Guarantor is organized, doing business or otherwise subject to the power to tax (any of the aforementioned being a "**Taxing Jurisdiction**"), unless the Company or the Guarantors (or any Paying Agent if other than GLAI) are compelled by Law to deduct or withhold such taxes, duties, assessments, or governmental charges. In such event, the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will make such deduction or withholding, and the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will timely make payment of the full amount so withheld to the appropriate Governmental Authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders after such withholding or deduction has been made (including such deductions and withholdings applicable to additional sums payable under this Section 7.06) shall equal the respective amounts of principal (and premium, if any) and interest which would have been receivable in respect of the Notes or the payment of cash and/or delivery of Preferred Shares (together with payment in cash in lieu of a fractional Preferred Share) in the absence of such withholding or deduction

41

("**Additional Amounts**"). Notwithstanding the foregoing, no such Additional Amounts shall be payable:

(1)     to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such Holder and the relevant Taxing Jurisdiction, including, without limitation, such Holder being or having been a citizen or resident thereof, being incorporated in, being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than connections arising from such Holder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Note Purchase Agreement, sold or assigned an interest in this Note Purchase Agreement or holding of the Note and the receipt of payments with respect to the Note;

(2)     in respect of Notes surrendered or presented for payment (if surrender or presentment is required) more than 30 days after the Relevant Date except to the extent that payments under such Note would have been subject to withholdings and the Holder of such Note would have been entitled to such Additional Amounts, had the Note been surrendered for payment on the last day of such period of 30 days;

(3)     in respect of any estate, inheritance, gift, sales, transfer, excise or personal property tax;

(4)     in respect of any tax imposed on overall net income or any branch profits tax of a Holder;

(5)     in respect of any tax imposed pursuant to sections 1471 to 1474 of the Code, any successor Law or regulation implementing or complying with, or introduced in order to conform to, such sections *provided, however*, that such Law or regulation is substantively comparable and not materially more onerous to comply with, or any intergovernmental agreement in respect thereof or any agreement entered into pursuant to section 1471(b)(1) of the Code;

(6)     in respect of the Relibi Law; or

(7)     in respect of any combination of the above.

(b)     In the event that Additional Amounts actually paid with respect to the Notes are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof such Holder determines, in its sole discretion exercised in good faith, that it has received a refund of withholding taxes as to which it has received Additional Amounts, it shall pay to the Company an amount equal to such refund (but only to the extent of Additional Amounts received with respect to the withholding taxes giving rise to such refund), net of all out-of-pocket expenses (including taxes) of such Holder and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Company, upon the request of the Holder, shall repay to such

42

Holder the amount paid over pursuant to this paragraph (b) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Holder is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (b), in no event will the Holder be required to pay any amount to the Company pursuant to this paragraph (b) the payment of which would place the Holder in a less favorable net after-tax position than the Holder would have been in if the tax subject to Additional Amounts and giving rise to such refund had not been deducted, withheld or otherwise imposed and the Additional Amounts had never been paid. This paragraph shall not be construed to require any Holder to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Company or any other Person. The Holder makes no representation or warranty that the Company will be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(c)    The Notes are subject in all cases to any tax, fiscal or other Law or regulation or administrative or judicial interpretation. Except as specifically provided above, neither the Company nor the Guarantors shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

(d)    For the avoidance of doubt, the Company shall not pay (and shall not purport to indemnify the Holder for) any stamp, issue, registration, court or documentary taxes or any excise or property taxes, charges or similar levies (including any penalties, interest and other liabilities relating thereto) that may arise or be paid in respect of this Note Purchase Agreement or the Notes.

(e)    Any reference in this Note Purchase Agreement or the Notes to principal, interest or any other amount payable in respect of the Notes by the Company or any of the Note Guaranties by the Guarantors, or the payment of cash and/or the delivery of Preferred Shares by the Company (together with payment of cash in lieu of a fractional Preferred Share), will be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section.

(f)    The obligations of the Company and the Guarantors pursuant to this Section 7.06 shall survive termination of this Note Purchase Agreement.

SECTION 7.07.    *Collateral and Liens.*

(a)    Subject to Sections 5.03, 7.07(b) and 7.07(c), the Notes Obligations shall be secured by a first priority Lien granted by the Guarantors in the Collateral to Collateral Agent on behalf of the Secured Parties pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. The Company and the Guarantors shall not directly or indirectly, create, incur, assume or suffer to exist any Lien on any of the Collateral, other than (i) the Lien granted to the Collateral Agent and (ii) a Lien that is junior in priority to the Lien granted to the Collateral Agent and which is subject to a subordination agreement substantially in the form attached hereto as Exhibit F.

43

(b)    The Company and the Guarantors shall not, and will not permit any Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of the Collateral, except  for the first priority Lien in the Collateral granted by the Guarantors pursuant to Section 7.07(a) above and the Collateral Documents, *provided however*, that the Company and the Guarantors may, without requiring any resolution, approval or consent from the Purchaser or the Collateral Agent, and without implying breach of any representation, warranty or obligation assumed under this Note Purchase Agreement and the Collateral Documents, constitute in favor of any creditors a collateral security under suspensive condition on the Collateral (whether senior or junior), provided that the effectiveness of such collateral security is conditioned upon the indefeasible payment in full or satisfaction of the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes ("**Future Lien**").

(c)    The Company shall ensure that the Lien in the Collateral is duly created, enforceable and perfected, to the extent required by the Collateral Documents. The Guarantors shall:

(1) in relation to the GLA's Smiles Fiduciary Transfer Agreement and IPCo's Smiles Fiduciary Transfer Agreement, as the case may be, (i) no later than twenty (20) days from date of execution of such Collateral Document, register the Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and, (ii) (A) in relation to the GLA's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration, and (B) in relation to the IPCo's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration and the fulfilment of the suspensive condition set forth in IPCo's Smiles Fiduciary Transfer Agreement, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*);

(2) in relation to the GLA's Fiduciary Transfer of IPCo's Shares Agreement (i) no later than twenty (20) days from date of execution of such Collateral Document, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and (ii) within seven (7) business days from the date of execution of such Collateral Document annotate the fiduciary transfer in IPCO's shares register book (*Livro de Registro de Ações Nominativas*;

(3) in relation to the amendment to the Gol Senior Secured Notes due 2026 IP Collateral (i) no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 IP Collateral, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and, (ii) no later than ten (10) days after the date of such registration, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*); and

(4) in relation to the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral, register such Collateral

Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil.

(d)　　The Company and the Guarantors shall not, and shall not permit any Subsidiary to, directly or indirectly (i) take any action with the purpose of depreciating the Collateral, (ii) dispose of, assign, transfer, sell or lease the Collateral to any third party or (iii) execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties to sell or otherwise dispose of the Collateral, in part or in full.

(e)　　The Company and the Guarantors undertake to, and agree that, they will not, and will not permit any Subsidiary to, directly or indirectly, take any action, or cause or contribute for any action to be taken, to (i) contest or in any way impair or harm the Collateral; (ii) interfere with the Secured Parties' right to enforce, sell, assign, transfer, convey or otherwise dispose of the Collateral upon the occurrence of an Event of Default; (iii) diminish, demean, tarnish or dilute the value, distinctiveness, fame, enforceability, validity of, or goodwill associated with, the Collateral; (iv) challenge the enforceability or the validity of the Collateral, (v) use, assign, transfer, convey, sell, dispose, disclose, make available or publish any trade secret, know-how, source code or any kind of confidential information related to the Collateral, or (vi) use or apply for any trademark registration or use any trade address that are identical or similar, in phonetical, graphical or ideological manner, to the Collateral.

(f)　　By their purchase and acceptance of the Notes, the Holders hereby agree that they are bound and that such purchase and acceptance constitutes the authorization and direction to the Collateral Agent to act as collateral agent for the benefit, and in representation, of the Holders, and to execute and deliver this Note Purchase Agreement and the Collateral Documents to which the Collateral Agent is a party. It is hereby expressly acknowledged and agreed that, in doing so, the Collateral Agent is not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under this Note Purchase Agreement and the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

SECTION 7.08.　*Certain Assurances*.

(a)　　On the Initial Closing Date, the Purchaser, the Collateral Agent and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes shall receive an Opinion of Counsel from Lefosse Advogados, as Brazilian counsel to the Company and the Guarantors, in form and substance satisfactory to the Purchaser, to the effect that, subject to certain exceptions and qualifications, the GLA's Smiles Fiduciary Transfer Agreement, the GLA's Fiduciary Transfer of IPCo's Shares Agreement and the amendments to the GOL Senior Secured Notes due 2026 Collateral have been duly authorized, executed and delivered by GLA and/or GLAI, as applicable, and constitutes the legal, valid, and binding obligation of GLA and/or GLAI, as applicable, which will be enforceable against GLA and/or GLAI in accordance with its terms and with Section 7.07(c).

45

(b)      Each of GLA and GLAI shall take, or cause to be taken, all actions necessary to maintain the Collateral Documents to which it is a party in full force and effect and enforceable, in accordance with their terms, and to maintain and preserve the Lien created by the Collateral Documents, in accordance with their terms, and the priority thereof, including (A) making filings and recordations, (B) making payments of fees and other charges on a timely basis, (C) issuing and, if necessary, filing or recording supplemental documentation, including continuation statements, (D) discharging all claims or other Liens adversely affecting the rights of any Secured Party in any Collateral, (E) publishing or otherwise delivering notice to third parties, (F) depositing title documents, (G) amending any Collateral Document to the extent required by applicable Law and (H) taking all other actions either necessary or otherwise requested by the Purchaser to ensure that all Collateral is subject to a valid and enforceable first-priority Lien in favor of the Collateral Agent for the benefit of the Secured Parties. In furtherance of the foregoing, GLA and GLAI shall ensure that all of the Collateral intended to be subject to the Lien granted by the Collateral Documents shall become subject to such Lien having the priority contemplated pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. Moreover, for the avoidance of any doubt, the Collateral Agent has no obligation, liability or responsibility to monitor or ensure that GLA and/or GLAI, as the case may be, maintain such Lien and shall assume that GLA and GLAI are in full compliance with their obligations in connection therewith.

(c)      Notwithstanding anything to the contrary contained in this Note Purchase Agreement, the Collateral Documents or in applicable Law, the Collateral Agent shall not have any responsibility or liability, among other things as set forth in this Note Purchase Agreement or the Collateral Documents, for (1) acting or refraining from acting based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to this Note Purchase Agreement and the Collateral Documents; (2) any loss or claim resulting from any act or omission, directly or indirectly, except if otherwise determined in a final nonappealable decision by a court of competent jurisdiction that the Collateral Agent was grossly negligent; (3) any loss of profits, indirect, consequential, incidental, special, punitive or related losses and/or damages even if previously advised of the likelihood of such loss or damage; (4) preparing, recording or filing any financing or continuation statements or recording or filing any instrument in any public office or for otherwise ensuring the perfection or maintenance of any Lien granted pursuant to, or contemplated by, this Note Purchase Agreement and the Collateral Documents or the existence and enforceability of any insurance on the Collateral; (5) taking any necessary steps to preserve rights against any parties with respect to the Collateral; (6) taking any action to protect against any diminution in value of the Collateral; (7) errors in judgment that do not constitute gross negligence or willful misconduct as determined by a final and non-appealable judgement by a court of competent jurisdiction; (8) the Company's and the Guarantors' compliance with any of the covenants set forth in this Note Purchase Agreement and the Collateral Documents, including but not limited to, covenants regarding the granting, perfection or maintenance of any Lien; (9) the market value of the Collateral or its sufficiency to satisfy in full payments due on the Notes Obligations; (10) the accuracy of any representation or warranty of the Company or Guarantors in this Note Purchase Agreement, the Collateral Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent; or (11) the effectiveness, genuineness, sufficiency, legality, validity and enforceability of any Lien, security interest, Collateral, this Note Purchase Agreement or the Collateral Documents or title, transfer or assignment of any Collateral.

#4856-1598-7531v19

SECTION 7.09.    *Release of Collateral*. Subject to, and to the extent permitted under, the terms of this Note Purchase Agreement and the Collateral Documents, the Company and the Guarantors shall be entitled to the release of the Collateral from the Lien securing the Notes Obligations under any one or more of the following circumstances:

(i)    in accordance with this Note Purchase Agreement and the Collateral Documents, if at any time the Collateral Agent, acting in accordance, exclusively and strictly, with instructions provided by the Purchaser (at the direction of the Abra Notes Supermajority Holders), forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)    as described and pursuant to Article 10; or

(iii)    upon payment in full of the principal of, together with all accrued and unpaid interest on, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

*in each case*, (i) so long as no Default or Event of Default will exist immediately after such release, as applicable; and (ii) provided the Collateral Agent shall have received an Officer's Certificate certifying, and Opinion of Counsel stating, that all conditions precedent provided in this Note Purchase Agreement with respect to the release of Collateral pursuant to this Section 7.09 have been satisfied (and the Collateral Agent shall execute any document requested by the Company or any Guarantor to evidence such release of the Collateral (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or the Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 7.09 and (C) without any recourse, representation or warranty by the Collateral Agent);

*provided, however,* that, notwithstanding the foregoing, the Lien granted under the Collateral Documents shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exist Notes Obligations due and payable on that date, in which case the Lien in the Collateral shall terminate upon satisfaction of such Notes Obligations, all obligations under the Abra Senior Secured Notes and all obligations under the Abra Senior Secured Exchangeable Notes. Upon termination of the Lien granted under the Collateral Documents in respect of the Notes Obligations, the Collateral shall be released in accordance with this Note Purchase Agreement to the Company and the Guarantors, and the Company and the Guarantors shall thereupon grant a Lien in such Collateral in respect of any outstanding obligations under the Abra Notes.

SECTION 7.10.    *Maintenance of Collateral*. The Company and the Guarantors shall, and shall cause its Subsidiaries to, at all times, preserve the Collateral for the benefit of the Secured Parties, not permit the value of the Collateral to be impaired, keep the Collateral free from all Liens or encumbrances other than the Liens and the Future Liens in the Collateral, and maintain the Collateral in accordance with applicable Law and regulations.

SECTION 7.11.    *Limitation on Transactions with Affiliates*.

#4856-1598-7531v19

Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering thereof of any service with any Affiliate of the Company, GLAI or any Subsidiary (a "**Related-Party Transaction**"), except upon fair and reasonable terms that are no less favorable to the Company, GLAI or the Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company, GLAI or such Subsidiary, as the case may be.

(a)      Prior to entering into any Related-Party Transaction or series of Related-Party Transactions (i) with an aggregate value in excess of U.S.$10.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary must deliver to the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) a certificate signed by a Responsible Officer stating that such Related-Party Transaction complies with this covenant, (ii) with an aggregate value in excess of U.S.$20.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the terms of such Related-Party Transaction will be approved by a majority of the members of the Board of Directors of the Company, GLAI or of such Subsidiary (including a majority of the members of the Board of Directors who are disinterested directors with respect to such Related-Party Transaction), the approval to be evidenced by a board resolution that such transaction or series of related transactions are on terms no less favorable to the Company, GLAI or such Subsidiary than could be obtained in a comparable arm's length transaction and satisfy the requirement in clause (i) and (iii) with an aggregate value in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary shall deliver to the Purchaser and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes a written opinion issued by an investment bank of recognized international standing that such Related-Party Transaction is fair to the Guarantor or the relevant Subsidiary from a financial point of view and satisfy the requirements in clause (i) and clause (ii) hereof.

(b)      The foregoing paragraphs do not apply to:

(i)   arm's length transactions in the ordinary course among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries  provided, that any such transaction conducted by any of the Guarantors' shareholders indirectly through any of these entities shall not be exempt from the limitations in this Section 7.11;

(ii)  any transaction among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries for the purpose of managing and paying taxes imminently due and owing by the foregoing parties to any Governmental Authority;

(iii) any transaction in the ordinary course of business between or among the Company, GLAI and any of its Subsidiaries or between or among the Subsidiaries of GLAI;

48

(iv) reasonable fees and compensation paid to, and any customary indemnity or insurance provided on behalf of, officers, directors, employees, consultants or agents of the Company, GLAI or any of its Subsidiaries;

(v) transactions or payments pursuant to any employee, consultant, officer or director compensation or benefit or equity plans, stock options or arrangements entered into in the ordinary course of business and consistent with past practice, customary indemnifications or arrangements or reimbursement of expenses entered into in the ordinary course of business, on market terms and consistent with past practice or industry norms;

(vi) transactions pursuant to any contract or agreement in effect on the Initial Closing Date, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the Company, GLAI and its Subsidiaries than those in effect on the Initial Closing Date;

(vii) loans and advances to employees in the ordinary course of business or consistent with past practices; and

(viii) Restricted Payments that are permitted by the provisions of this Note Purchase Agreement.

SECTION 7.12.    *Limitation on Sale of Assets.* Subject to Section 7.07(d), each of the Company, GLAI or any of its Subsidiaries shall not make any Asset Sales and not permit any of its Subsidiaries to make any Asset Sales, unless:

(i)    the Company, GLAI or such Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value as of the date on which such assets sold or otherwise disposed of;

(ii)    at least 75% of the consideration consists of cash or cash equivalent received at closing, provided that, for purposes of this clause (ii), each of the following shall be deemed cash or cash equivalent: (A) any liabilities of the Company, GLAI or such Subsidiary that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Company, GLAI or such Subsidiary from further liability; and (B) any securities notes or other obligations received by the Company, GLAI or such Subsidiary from such transferee that are, within 120 days after the closing of such Asset Sale, converted by the Company, GLAI or such Subsidiary into cash or cash equivalent, but only to the extent of the cash or cash equivalent actually received in that conversion;

(iii)    Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds may be used to:

49

(A)     to permanently repay Debt, other than Subordinated Obligations, of the Company, GLAI or any of its Subsidiaries (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company, GLAI or any of its Subsidiaries; or

(B)     to acquire (or within such 365-day period, the Company, GLAI or such Subsidiary shall have made a good faith determination to acquire or make capital expenditures, which acquisition shall be consummated, or capital expenditure shall be made prior to the second anniversary of such Asset Sale) (i) all or substantially all of the assets of a Related Business, or a majority of the Capital Stock of another Person that thereupon becomes a Subsidiary engaged in a Related Business, or to make capital expenditures or otherwise acquire assets that are to be used in a Related Business; or (ii) Additional Assets for the Company, GLAI or its Subsidiaries; or

(C) any combination of (A) and (B).

(iv)    The Net Cash Proceeds of an Asset Sale not applied pursuant to paragraph (iii) above shall constitute "**Excess Proceeds**". Excess Proceeds of less than U.S.$25.0 million (or the equivalent thereof at the time of determination) will be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Company must prepay the outstanding amount under the Notes equal to the Net Cash Proceeds of such Asset Sale.

(v)     With respect to paragraph (iv) above, the Company shall notify the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) in writing of any prepayment hereunder by electronic mail or other electronic transmission or by telephone (to be confirmed in writing) no later than 11:00 a.m. five Business Days prior to the date of such prepayment; provided that the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall not accept any prepayment of the Notes without the prior written consent of the Abra Notes Supermajority Holders. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Notes or portion thereof to be prepaid and a reasonably detailed calculation of the amount of such prepayment. Prepayments shall be accompanied by accrued interest on the prepaid amount and shall be without premium or penalty.

Notwithstanding the foregoing, each of the Company, GLAI or any of its Subsidiaries shall not sell, lease, transfer or other dispose of any portion of the Collateral without the prior written consent of the Abra Notes Supermajority Holders; provided, for purposes of any action requested of the Collateral Agent in connection with any release of Collateral, the Collateral Agent shall

have no duty, obligation or liability with respect to the obligations of the Company, GLAI and the Subsidiaries set forth above and the Collateral Agent shall look solely to the provisions of Section 7.09 of this Note Purchase Agreement.

SECTION 7.13.    *Limitation on Debt.*

(a)    Each of the Company, GLAI or any of its Subsidiaries shall not issue, assume, guarantee, incur or otherwise become liable for any new Debt in excess of the lesser of (i) U.S.$100.0 million (or the equivalent thereof at the time of determination) and (ii) 0.2x last 12 months consolidated EBITDAR after giving effect thereto and the application of the proceeds therefrom.  The last 12 months consolidated EBITDAR shall be calculated, on any date of determination, taking into account each of the Adjusted Operating Revenues, Adjusted Operating Expenses and Sales Taxes for the period of four consecutive fiscal quarters ending on, or most recently prior to such date, for which consolidated financial statements of GLAI are publicly available; all on a consolidated basis and in accordance with the Accounting Principles.

(b)    Notwithstanding clause (a) above, the Company, GLAI or any of its Subsidiaries may issue, assume, guarantee, incur or otherwise become liable for the following new Debt:

(1)    intercompany Debt between or among the Company, GLAI and any Subsidiary thereof or between or among their Subsidiaries provided that any Debt made by any Subsidiary to the Company or any Guarantor shall be subordinated to the Notes pursuant to a subordination agreement substantially in the form of Exhibit F and, if owing to the Company or any of the Guarantors, is subject to a Lien granted in favor of the Collateral Agent for the benefit of the Purchaser;

(2)    Debt that is:

i.    represented by the Notes and the Note Guaranties, in each case, issued on the Initial Closing Date;

ii.    outstanding on the Initial Closing Date (other than the Notes and the Notes Guaranties);

iii.    arising in connection with cash management transactions related to the proceeds of the Notes;

iv.    consisting of Refinancing Debt incurred in respect of any Debt described in this clause (b) or the foregoing clause (a); or

v.    consisting of guarantees of any Debt permitted under the Notes;

(3)    Debt in respect of bankers' acceptances, deposits, promissory notes, letters of credit, self-insurance obligations, completion guarantees, performance, surety, appeal or similar bonds and guarantees provided by the Company, GLAI or any Subsidiary in the ordinary course of its business securing the performance of contractual or license obligations of the Company, GLAI or any Subsidiary or Debt with respect to

51

reimbursement type obligations regarding workers' compensation claims or payment obligations with self-insurance or similar requirements in the ordinary course of business;

(4)    Hedging obligations of the Company, GLAI or any Subsidiary thereof (entered into for non-speculative purposes) in the ordinary course of business or directly related to Debt permitted to be incurred by the Company, GLAI or any Subsidiary pursuant to the Notes and Refinancing Debt incurred by the Company, GLAI or a Subsidiary in respect of Debt incurred pursuant to this clause (d);

(5)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Debt is extinguished within five Business Days of its incurrence;

(6)    Debt to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Notes in accordance with its terms (which proceeds shall be thereafter used to defease or satisfy and discharge the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes, in each case, with the prior written consent of the Abra Notes Supermajority Holders);

(7)    Debt consisting of (i) the financing of insurance premiums in the ordinary course of business, (ii) take or pay obligations contained in supply agreements in the ordinary course of business, or (iii) any advance, loan or extension of credit arising in connection with the purchase of inventory, equipment or supplies in the ordinary course of business;

(8)    Debt of the Company, GLAI or any Subsidiary for taxes levied, assessments due, settlements and other   governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(9)    Aircraft Debt; and

(10)    Additional other Debt in an aggregate principal amount not to exceed at any time $275 million which may be secured by a lien ranking *pari passu* with the lien on the collateral securing the GOL Senior Secured Notes due 2026, provided that the incurrence of any such additional Debt shall be subject to the satisfaction of the following terms and conditions:

(A)    until such time as all Collateral and covenants required to be delivered and liens thereon perfected under Section 7.17(o) shall have been delivered and perfected, only $150 million of the foregoing amount shall be able to be utilized;

(B)    such Debt is subject to an intercreditor agreement in form and substance acceptable to the Abra Notes Supermajority Holders in all respects (including without limitation in respect of passivity in any future insolvency, judicial or extrajudicial reorganization or bankruptcy of the Company or the Guarantors);

52

(C)    such Debt shall have a maturity date that is (i) more than one year after the maturity date of the Notes and (ii) more than three months after the maturity date of the Abra Notes;

(D)    such Debt shall have an all-in-yield to maturity lower than that of the Abra Senior Secured Notes, and have a weighted average life no shorter than that of the Abra Senior Secured Notes; and

(E)    up to $200 million of such Debt may be used for future liability management transactions provided that any such liability management transactions involving any refinancing or repurchases of the GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under this Section 7.13(b)(10) or otherwise), shall be at a maximum price of 50 cents.

Notwithstanding the foregoing, neither the Company, GLAI nor any of its Subsidiaries shall incur any Debt or amend existing Debt in a manner that would result in any restrictions on the ability of any Subsidiary of GLAI to repay Debt, advances or loans, or to repay Debt, advances or loans, or to pay dividends or make any other distributions on the Capital Stock of the Subsidiary owned by GLAI or any other Subsidiary to GLAI or any Subsidiary thereof.

SECTION 7.14.    *Limitation on Restricted Payments*. Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly:

(a)    declare or pay any dividend or make any distribution on or in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving the Company, GLAI or such Subsidiary) except dividends or distributions payable solely in the form of its Capital Stock and except dividends or distributions payable to the Company, GLAI or directly or indirectly wholly-owned Subsidiaries of GLAI, in each case with the prior written consent of the Abra Notes Supermajority Holders;

(b)    purchase, redeem, retire or otherwise acquire for value any Capital Stock of GLAI held by Persons other than the Company, GLAI or another Subsidiary (other than a purchase, redemption, retirement or other acquisition for value that would not constitute an Investment);

(c)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Obligations (other than a payment of interest or the purchase, repurchase, redemption, defeasance or other acquisition of Subordinated Obligations made in anticipation of satisfying a sinking fund obligation, a principal installment or a final maturity, in each case, due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition);

(d)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under Section 7.13(b)(10) or otherwise) at a price in excess of 50 cents for every $1.00 of

53

principal amount so purchased, repurchased, redeemed, defeased or otherwise acquired or retired for value; or

(e)      make any Investment in any Person;

(the actions described in clauses (a) through (d) above being herein referred to as "**Restricted Payments**" and each, a "**Restricted Payment**").

The aforementioned provisions will not prohibit:

(1)      any Restricted Payment in exchange for, or out of the proceeds of the substantially concurrent issuance or sale of, Capital Stock of GLAI (other than Capital Stock issued or sold to a Subsidiary of GLAI), in each case with the prior written consent of the Abra Notes Supermajority Holders ;

(2)      any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations made in exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Obligations that is permitted to be incurred pursuant to the covenant described under Section 7.13;

(3)      dividends paid or distributions made after the date of declaration thereof if at such date of declaration such dividend or distribution would have complied with this covenant;

(4)      so long as no Default has occurred and is continuing, any purchase or redemption of Subordinated Obligations from Net Cash Proceeds; provided that the Company, GLAI or the Subsidiary thereof have complied with the covenant described under Section 7.12 and Section 7.13;

(5)      the declaration and payment of distributions to shareholders of the Company, GLAI or any Subsidiary in the form of dividends, interest on shareholders' equity or otherwise in the minimum mandatory amount set forth under applicable Brazilian corporate law;

(6)      repurchases of Capital Stock, in an aggregate amount not to exceed U.S.$10,000,000 in any calendar year (i) deemed to occur upon the exercise of stock options, warrants or other convertible securities if such Capital Stock represents a portion of the exercise price thereof and cash payments in lieu of the issuance of fractional shares, or (ii) from former employees, officers, directors, consultants or other persons who performed services for GLAI or any Subsidiary in connection with the cessation of such employment or service; provided that such repurchases have been approved by the Company's, GLAI's or its Subsidiary's Board of Directors, as applicable;

(7)      the creation, approval or amendment of any management equity incentive plan in the ordinary course of business and consistent with past practice;

(8)      any distributions or payments on or related to convertible or exchangeable securities issued by GLAI or any of its Subsidiaries pursuant to the terms of the

54

Transaction Documents or any other financing existing on the Initial Closing Date (as disclosed in GLAI's Form 20-F filed with the U.S. Securities and Exchange Commission on March 16, 2022 including in Note 16 (Loans and Financing), Note 17 (Leases), Note 18 (Suppliers) and Note 20 (Taxes Payable) to Item 18 (Financial Statements) beginning on page F-50 thereof); and

(9)    dividends, loans, advances or distributions to any Purchaser Entity or other payments by GLAI or any Subsidiary thereof in amounts equal to (without duplication) the amounts required for any Purchaser Entity to pay any Purchaser Entity Expenses.

The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred, issued, purchased, repurchased, redeemed, retired, defeased or otherwise acquired by the Company, GLAI or such Subsidiary, as the case may be, pursuant to such Restricted Payment.

SECTION 7.15.    *Non-Compete and Exclusivity*.

(a)    The Company and Guarantors shall not, and shall ensure that their Subsidiaries do not, directly or indirectly, for their own account or on behalf of or together with any other Person, carry on, own, manage, control, operate, develop, create, invest in, have any financial interest in (as shareholder or otherwise), or participate in or be engaged in (whether as shareholder, advisor, a partner of a partnership firm, designated partner of a limited liability partnership, or proprietor of a proprietorship firm, or any other entity whether registered under applicable Law or otherwise), any undertaking, venture, business or Person (including, but not limited to, any joint venture, partnership or other arrangement of whatsoever nature) that is engaged in a similar business to the Loyalty Program. The Company and the Guarantors further covenant that the Loyalty Program is, and will be, the sole and exclusive loyalty program of GLA, the Company, GLAI and their Subsidiaries; provided that the Loyalty Program may be expanded to be the loyalty program of both the GLAI Group and another airline so long as such expansion is not adverse to GLAI, the GLAI Group or IPCo and the Loyalty Program remains controlled, directly or indirectly, by GLAI.

(b)    Each of the Company and GLAI agree that to the extent that Abra Group Limited provides an officer's certificate to the Company, GLAI or any of their respective Subsidiaries or any of their respective board of directors that it is appropriate to make a filing or enter a plan under applicable Law to restructure its debt (including, without limitation, a "Chapter 11" filing in the United States or a similar filing under Brazilian law), it shall take such actions within the timeframe requested by Abra Group Limited.

(c)    Each of the Company, GLAI and their respective Subsidiaries agree that in connection with any proceedings to restructure its debt (including, without limitation, any proceeding related to bankruptcy, insolvency, judicial or extrajudicial reorganization, restructuring or any proceeding entered into in connection with clause (b) above) it shall not propose a plan or make a filing or otherwise take action that has not been consented to in writing by Abra Group Limited.

#4856-1598-7531v19

SECTION 7.16.    *Additional Lines of Business*. The Company and GLAI shall not, and shall procure that their respective Subsidiaries shall not enter into a line of business that (i) is not the business of operating airlines, (ii) is not primarily related to operating airlines; (iii) is not primarily related to the then current business of the Company and GLAI and their respective Subsidiaries.

SECTION 7.17.    *GLA and IPCO Covenants*.

(a)    IPCo shall not engage in any business or undertake any other activity or obligations except for (i) owning and holding the Smiles' certain assets and rights related to the Loyalty Program (subject to the provisions herein) or that are pledged pursuant to the Collateral Documents and the Smiles Complete Technological Infrastructure\, (ii) operating the Loyalty Program, (iii) guaranteeing the Notes Obligations, (iv) establishing and maintaining its legal existence and otherwise take actions to comply with the terms of this Note Purchase Agreement and the Collateral Documents, in each case to the extent permitted hereby and thereby, and (v) as required by law.

(b)    GLA shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, and any of its positions as counterpart to the current and future commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(c)    [*Reserved*].

(d)    IPCo shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, any of its positions as counterpart to the current and future commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, or any other asset or right owned by IPCo related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(e)    On the Initial Closing Date, GLA shall cause IPCo to (i) enter into a guaranty of the Notes Obligations; and (ii) execute the Exclusivity Side Letter and comply with its obligations thereunder. Within up to 60 days after the Initial Closing Date, GLA shall cause IPCo to enter into the agreement in which IPCo grants to GLA the right to use Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals and the Smiles Technological Infrastructure, provided that such agreement shall expire in December 31st of each year, unless renewed by mutual consent upon renegotiation of its terms and comply with its obligations thereunder ("**GLA/IPCo Agreement**").

(f)    GLA and GLAI shall take all actions to comply with the Exclusivity Side Letter and GLA/IPCo Agreement. Upon an Event of Default, IPCo may only renew the GLA/IPCo

56

Agreement without prior written consent of the Abra Notes Supermajority Holders for an annual payment of at least $200 million for 30 years;

(g)     On the Initial Closing Date, Guarantors shall duly execute and deliver the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement.

(h)     Any future Smiles Intellectual Property shall be owned solely and exclusively by IPCo.

(i)     After the transfer to IPCo provided for in Section 7.17(o) below, any Smiles Intellectual Property and any future Smiles Database, Client and Supplier List and Smiles Operating Manuals shall be owned solely and exclusively by IPCo.

(j)     Any future agreement related to the Smiles Complete Technological Infrastructure shall be entered by IPCo and relevant counterparties, provided that IPCo shall enter into and maintain in effect all relevant agreements related to the Smiles Complete Technological Infrastructure necessary to run the Loyalty Program;

(k)     GLA undertakes not to hire any other service providers or obtain licenses to use software that perform analogous tasks or functions to those included in the Smiles Complete Technological Infrastructure.

(l)     GLA and IPCo, as the case may be, undertake to update the Database, Client and Supplier List in accordance with the periodicity established in its internal policies and controls, even after an acceleration of the Notes.

(m)     Any future agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall include IPCo as a party allowed to issue and sell miles. Provided that no Event of Default has occurred, parties agree that no agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered exclusively by IPCo.

(n)     Upon the occurrence of an Event of Default (or an Event of Default under the GOL Senior Secured Notes NPA), (i) no new agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered into any member of the GLAI Group, except IPCo and (ii) IPCo shall become the sole entity issuing or selling miles in the context of the Loyalty Program under the agreements to which IPCo was included as a party pursuant to item 7.17(m) above and 7.17(o) and 7.17(p) below.

(o)     On or before July 10, 2023, GLA shall (provided that, in any case, such actions shall occur after the execution and delivery of the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement):

(1)     GLA shall transfer to IPCo the ownership of all Smiles Intellectual Property, Smiles Database, Client and Supplier List and the Smiles Operating Manuals;

57

(2)     assign to IPCo all the agreements related to the Smiles Technological Infrastructure listed in Schedule B-1;

(3)     assign to IPCo no fewer than 66% of the agreements listed in Schedule B and any other agreements related to the Smiles Complete Technological Infrastructure executed by GLAI Group between the date hereof and July 10, 2023; and

(4)     amend no fewer than 66% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements, allowed to issue and sell miles in, provided that, the agreements in which IPCo is included represents more than 50% of the total revenues of the commercial agreements listed in Schedule C for the year ended December 31, 2022;

(p)     On or before December 31, 2023 GLA shall:

(1)     assign to IPCo no fewer than 90% of the agreements listed in Schedule B-2 and any other agreements related to the Smiles Complete Technological Infrastructure executed by GLAI Group between the date hereof and July 10, 2023; and

(2)     amend no fewer than 90% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements allowed to issue and sell miles.

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.     *[Reserved]*.

SECTION 8.02.     *Limitation on Consolidation, Merger or Transfer of Assets*.  Until all amounts outstanding under this Note, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes have been paid in full, neither the Company nor the Guarantors shall consolidate with or merge with or into, or sell, convey, transfer or dispose of, or lease all or substantially all of its assets as an entirety or substantially as an entirety, in one transaction or a series of related transactions, to, any Person, unless:

(1)     the resulting, surviving or transferee Person (if not the Company or a Guarantor) shall be a Person organized and existing under the Laws of Brazil, England, the United States of America, any State thereof or the District of Columbia, or any other country (or political subdivision thereof) that is a member country of the European Union or of the Organization for Economic Co-operation and Development, and such Person expressly assumes, by an amendment to this Note Purchase Agreement, executed and delivered to the Company, all the obligations of the Company or the Guarantors under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents;

(2)     the resulting, surviving or transferee Person undertakes, in an amendment to this Note Purchase Agreement, to pay such Additional Amounts in respect of principal (and premium, if any) and interest as may be necessary in order that every net payment

58

made in respect of the Notes and any Note Guaranty after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by the Surviving Person's Tax Jurisdiction (as defined below) such other country or any political subdivision or taxing authority thereof or therein shall not be less than the amount of principal (and premium, if any) and interest then due and payable on the Notes and the Note Guaranties subject to the same exceptions set forth under Section 7.06, but replacing references therein to the Taxing Jurisdiction with references to the jurisdiction in which the resulting, surviving or transferee Person (as the case may be) is incorporated, domiciled and/or resident for taxation purposes (the "**Surviving Person's Tax Jurisdiction**") ; and

(3)    immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

For purposes of this Section 8.02, any sale, lease or other transfer or disposition of the assets of one or more Subsidiaries of the Company, if any, that would, if the Company had held such assets directly, have constituted the sale, lease or other transfer or disposition of all or substantially all of the Company and its Subsidiaries', if any, consolidated assets, taken as a whole, shall be treated as such under this Note Purchase Agreement.

Subject to Section 8.02(2) above and notwithstanding anything else to the contrary contained in the foregoing, any of the Guarantors may consolidate with or merge with the Company or any Subsidiary that becomes a Guarantor concurrently with the relevant transaction.

SECTION 8.03.    *Successor Substituted*.  Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Company or any of the Guarantors in accordance with Section 8.02 in which the Company or any of the Guarantors is not the continuing obligor or Guarantor, as the case may be, under this Note Purchase Agreement, the surviving or transferor Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company or any of the Guarantors, as the case may be, under this Note Purchase Agreement with the same effect as if such successor had been named as the Company or a Guarantor therein. When a successor assumes all the obligations of its predecessor under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents, the predecessor shall be released from those obligations; *provided that* in the case of a transfer by lease, the predecessor shall not be released from the payment of principal and interest on the Notes.

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.    *Events of Default*.  The term "**Event of Default**" means, when used herein with respect to the Notes, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to, or as a result of any failure to obtain, any authorization, order, rule, regulation, judgment or decree of any governmental or administrative body or court):

(a)      default in any payment of interest pursuant to the terms set forth in this Note Purchase Agreement (including any Additional Amounts) on any Note when the same becomes due and payable, and any such Default continues for a period of 30 days;

(b)      default in the payment of the principal (including any Additional Amounts) of any Note when the same becomes due and payable at its Stated Maturity, upon acceleration or otherwise;

(c)      failure by the Company or the Guarantors to comply with its obligations under Article 7;

(d)      any of the Company or the Guarantors fails to comply with any of its covenants or agreements in the Notes, this Note Purchase Agreement, the Note Guaranties or the Collateral Documents (other than those referred to in clause (a), (b) or (c) of this Section 9.01), and such failure continues for 60 days after the notice specified below;

(e)      any of the Company, the Guarantors or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by any of the Company, the Guarantors or any such Significant Subsidiary (or the payment of which is guaranteed by the Company, the Guarantor or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of this Note Purchase Agreement, which default (i) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("**Payment Default**") or (ii) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

(f)      one or more final non-appealable judgments or decrees for the payment of money of U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against any of the Company, the Guarantors or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed within 30 days following commencement of such enforcement proceedings or (ii) there is a period of 50 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed;

(g)      an involuntary case or other proceeding is commenced against any of the Company, the Guarantors or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect seeking the appointment of a trustee, receiver, *administrador judicial,* liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 50 days; or an order for relief is entered against any of the Company, the Guarantors or any Significant

60

Subsidiary under the bankruptcy Laws now or hereafter in effect, and such order is not being contested by any of the Company, the Guarantors or any Significant Subsidiary, as the case may be, in good faith, or has not been dismissed, discharged or otherwise stayed, in each case within 50 days of being made;

(h)    any of the Company, the Guarantors or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking liquidation, reorganization, *concordata*, or other relief with respect to itself or its debts under any applicable bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such Law, (ii) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the Company, the Guarantors or any Significant Subsidiary or for all or substantially all of the property of any of the Company, the Guarantors or any Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(i)    any event occurs that under the Laws of England and Wales, Brazil, Colombia, the Cayman Islands or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in any of clause (g) or (h);

(j)    any Note Guaranty shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect, other than in accordance with the terms of this Note Purchase Agreement, or any of the Guarantors (or any Person on behalf of any Guarantor) denies or disaffirms its obligations under its Note Guaranty;

(k)    all or any portion of a claim asserted by the Purchaser or Majority Holders in any proceeding (including without limitation an insolvency proceeding or judicial or extrajudicial reorganization of any member of the GLAI Group) in respect of the Notes or the GOL Senior Secured Exchangeable Notes due 2028 is either asserted by any member of the GLAI Group or held by any court of competent jurisdiction to be reduced, invalid, disallowed, subordinated or recharacterized as equity, avoided, set aside or otherwise invalidated;

(l)    the Lien granted in favor of, and for the benefit of, the Purchaser or Holders in all or any portion of the Collateral is held by any court of competent jurisdiction to be not perfected or is otherwise unenforceable, *pari passu* or subordinated to any other Lien (including any debtor in possession priming lien), avoided, disallowed, set aside or otherwise invalidated except for Liens expressly permitted hereunder or as otherwise consented to by the Abra Notes Supermajority Holders;

(m)    any enforcement action is taken in respect of the Collateral, including the taking of any steps to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral or otherwise exercise any rights or remedies with respect to the Collateral in accordance with the Collateral Documents;

(n)    it is or becomes unlawful for the Company or the Guarantors to perform any of their respective obligations under the Notes, the Collateral Documents or this Note Purchase Agreement;

(o)    an event of default (as such term is defined in the GOL Senior Secured Exchangeable Notes NPA) with respect to the GOL Senior Secured Exchangeable Notes due 2028 has occurred and is continuing;

(p)    any of the Collateral Documents shall for any reason cease to be in full force and effect in all material respects, or any of the Company or the Guarantors or any of their Subsidiaries shall so assert, or any Lien created, or purported to be created, by the Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby;

(q)    (i) any settlement of any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency, involving payment of damages in excess of US$35.0 million or its equivalent and are not paid (whether in full or in installments in accordance with the terms of such settlement); or (ii) the commencement, settlement or termination or agreement to commence, settle or terminate any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency which could result in the imposition of material injunctive relief (or the agreement to comparable relief) or other material restrictions upon any of the Company, GLAI or any Significant Subsidiary thereof which impositions would cause a Material Adverse Effect; or

(r)    entering into any settlement agreement of a material internal investigation with a Governmental Authority, which would cause a Material Adverse Effect.

SECTION 9.02.    *Acceleration of Maturity, Rescission and Amendment.*  If an Event of Default (other than an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) with respect to the Notes occurs and is continuing, the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Company and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) occurs and is continuing, then the principal of and accrued and unpaid interest on all Notes of shall become and be immediately due and payable without any declaration or notice or other act on the part of any Holder.

At any time after a declaration of acceleration with respect to the Notes has been made and before a judgment or decree for payment of the money due has been obtained as hereinafter provided in this Article, the Majority Holders by written notice to the Company may rescind or annul such declaration if:

(1)    the Company has paid or deposited a sum sufficient to pay (A) all overdue interest on Outstanding Notes, (B) all unpaid principal of the Notes that has become due otherwise than by such declaration of acceleration, (C) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (D) all sums paid or advanced by the Agents and the Collateral Agent hereunder and under the Collateral Documents and the reasonable compensation, expenses, disbursements, indemnities and advances of the Agents, the Collateral Agent and their agents and counsel; and

62

(2)    all Events of Default have been cured or waived as provided in Section 9.12 other than the non-payment of principal that has become due solely because of acceleration.

No such rescission shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

SECTION 9.03.    *Applicable Premium*. Without limiting the generality of the foregoing, it is understood and agreed that if the Notes are accelerated or otherwise become due prior to their Stated Maturity, in each case, in respect of any Event of Default, the Applicable Premium shall also be due and payable in cash to the Holders and shall constitute part of the obligations payable to the Holders in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Holder's loss as a result thereof. If the Applicable Premium becomes due and payable, the principal of the Notes and interest shall accrue on the full principal amount of the Notes (including the Applicable Premium) from and after the applicable triggering event. Any premium payable above shall be presumed to be the liquidated damages sustained by each Holder as the result of the acceleration of the Notes. The Company expressly waives (to the fullest extent it may lawfully do so) the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Applicable Premium in connection with any such acceleration. The Company and each Guarantor hereby agree that the Applicable Premium shall also be payable, without limitation, in any bankruptcy, insolvency, judicial or extrajudicial reorganization or similar proceeding with respect to creditor's rights in any jurisdiction, and shall not contest in any manner the payment thereof in any such circumstance.

SECTION 9.04.    *Subrogation Rights*.  The parties hereto acknowledge and agree that the Abra Holders shall be express third-party beneficiaries to, and shall have all the rights of a third-party beneficiary to, this Note Purchase Agreement. The Abra Notes Supermajority Holders shall have the right to enforce this Note Purchase Agreement in accordance with its terms as if they were original parties hereto, if the Purchaser has not taken any reasonable action and has not continued to diligently enforce its rights under this Note Purchase Agreement for more than 90 calendar days after the relevant Event of Default. The Purchaser, by its execution and delivery of this Note Purchase Agreement agrees to the provisions of this Section 9.04 and hereby directs the Collateral Agent to accept directions received from the Abra Notes Supermajority Holders in respect of the Collateral and the Collateral Documents if the Abra Notes Supermajority Holders exercise the rights set forth in this Section 9.04; provided, (i) the Abra Notes Supermajority Holders shall have the obligations of the Purchaser or the Holders in connection with any such direction to the Collateral Agent, including without limitation the obligation to provide indemnification satisfactory to the Collateral Agent, and the Collateral Agent shall have the same rights and protections as if the Collateral Agent were directed by the Purchaser or the Holders and (ii) the Collateral Agent shall receive and shall be conclusively entitled to rely upon a certificate of the Purchaser at the time of any direction of the Abra Notes Supermajority Holders, which certificate shall certify that such Persons are the Abra Notes Supermajority Holders. Other than as expressly provided in the preceding sentence, in no event shall the Abra Holders have any right to direct or instruct the Collateral Agent. The Collateral Agent is not an agent for the Abra Holders and has no obligation, duty, liability or responsibility to such Abra Holders.

63

#4856-1598-7531v19

SECTION 9.05.    *Application of Money Collected*. Any money collected by the Collateral Agent pursuant to this Article 9 or the Collateral Documents shall be applied in order set forth below:

FIRST, (i) to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent under this Note Purchase Agreement and the Collateral Documents and then (ii) on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the other Agents and any other agent or attorney appointed hereby or under the Collateral Documents, in the case of each of the foregoing, solely in their respective capacity as the Collateral Agent, an Agent or other agent, as applicable (including costs, expenses and legal expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Note Purchase Agreement or the Collateral Documents);

SECOND, on a pro rata basis, to the payment in full to the Holders of all amounts due and unpaid on the Notes for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest; provided, that, the proceeds shall be applied (i) first, to the Holders for amounts due and payable on the Notes for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest and (ii) second, any remaining amounts to the Holders for amounts due and payable on the Notes for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Notes; and

THIRD, the balance, if any, after all of the Notes Obligations have been paid in full in cash, to the Company and its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Company may fix a record date and payment date for any payment to Holders pursuant to this Section 9.05.

SECTION 9.06.    *Limitation on Suits*.  A Holder may not pursue any remedy with respect to this Note Purchase Agreement, the Notes or the Collateral Documents unless:

(1)    the Holder has previously given to the Collateral Agent written notice stating that an Event of Default with respect the Notes has occurred and is continuing;

(2)    the Holders of at least 25% in principal amount of the Outstanding Notes have made a written request to the Collateral Agent to pursue the remedy in respect of such Event of Default;

(3)    such Holder or Holders has offered and provided to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against any cost, loss, liability or expense to be incurred in compliance with such request;

(4)    the Collateral Agent does not comply with the request within 60 days after receipt of the request and the offer and provision of security or indemnity; and

64

(5)      no direction inconsistent with such written request has been given to the Collateral Agent during such 60-day period by the Purchaser.

SECTION 9.07.    *Contractual Rights of Holders to Receive Principal and Interest*. Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, each Holder shall have the right pursuant to this Section 9.07 to bring suit for the payment of principal, premium, if any, and interest on its Note, on or after the respective due dates expressed or provided for in such Note.

SECTION 9.08.    *Restoration of Rights and Remedies*.  If the Collateral Agent (as directed by the Purchaser or the Majority Holders, as provided in this Note Purchase Agreement) or any Holder has instituted any proceeding to enforce any right or remedy under this Note Purchase Agreement or the Collateral Documents and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Collateral Agent or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Guarantors, the Collateral Agent and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Collateral Agent and the Holders shall continue as though no such proceeding had been instituted.

SECTION 9.09.    *Delay or Omission Not Waiver*.  No delay or omission of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article 9 or by Law to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Holders.

SECTION 9.10.    *Control by Holders*.  The Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Company or the Collateral Agent or of exercising any power conferred on the Collateral Agent.  However, the Collateral Agent shall be under no obligation to exercise any of the rights or powers under this Note Purchase Agreement or the Collateral Documents at the request or direction of any Holders if such request or direction conflicts with any Law or with this Note Purchase Agreement or the Collateral Documents or may expose the Collateral Agent to liability.  Prior to taking any action under this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall be entitled to indemnification satisfactory to the Collateral Agent in its sole discretion against all costs, losses, liabilities and expenses that might be caused by taking or not taking such action.

SECTION 9.11.    *Rights and Remedies Cumulative*.  Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 4.08, no right or remedy herein conferred upon or reserved to the Holders or the Purchaser, as the case may be, is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by Law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at Law or in equity or otherwise.  The

65

assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 9.12.   *Waiver of Past Defaults and Events of Default*.  The Purchaser with the prior written consent of the Abra Notes Supermajority Holders) by written notice to the Company may waive an existing Default or Event of Default and its consequences. When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 9.13.   *Waiver of Stay or Extension Laws*.  The Company and the Guarantors covenant (to the extent that it may lawfully do so) that they shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension Law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Note Purchase Agreement, the Notes or the Collateral Documents; and the Company and the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such Law, and shall not hinder, delay or impede the execution of any power herein granted to the Collateral Agent, but shall suffer and permit the execution of every such power as though no such Law had been enacted.

# ARTICLE 10
AMENDMENTS

SECTION 10.01.  *Without Consent of Holders*.  The Company, when authorized by a Board Resolution, the Guarantors and the Collateral Agent may amend or supplement this Note Purchase Agreement, the Notes and the Collateral Documents without notice to or consent or vote of the Purchaser, any Holder of the Notes, or any holder of Abra Senior Secured Exchangeable Notes or Abra Senior Secured Notes, for the following purposes:

> (i)     to cure any ambiguity, omission, defect or inconsistency in this Note Purchase Agreement or in the Notes in a manner that does not adversely affect any Holder in any material respect, as set forth in an Officer's Certificate;

> (ii)    to add guarantees or collateral with respect to the Notes;

> (iii)   to comply with Section 8.02;

> (iv)    to add to the covenants or Events of Default of the Company or the Guarantors for the benefit of the Holders of the Notes;

> (v)     to surrender any right herein conferred upon the Company or the Guarantors;

> (vi)    to provide for any guarantee or collateral of the Notes, to secure such Notes or to confirm and evidence the release, termination or discharge of any Note Guaranty or collateral of the Notes when the release, termination or discharge is expressly permitted by this Note Purchase Agreement or the Collateral Documents, as the case may be;

66

(vii)    to evidence and provide acceptance of appointment by a registrar, paying agent, bid solicitation agent with respect to the Notes or to facilitate the administration of this Note Purchase Agreement; or

(viii)    ministerial amendments to effect the GLAI Going Private Process;

*provided that*, the Company or the applicable Guarantor has delivered to the Purchaser, the Collateral Agent and the Abra Notes Supermajority Holders an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment or supplement pursuant to this Section 10.01 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.01 requested by the Company or any Guarantor (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.01 and (C) without any recourse, representation or warranty by the Collateral Agent).

SECTION 10.02.  *With Consent of Holders*.  Except as specified in Section 10.01, the Company, when authorized by a Board Resolution, the Guarantors, the Collateral Agent (at the direction of the Purchaser) and the Majority Holders may amend or supplement this Note Purchase Agreement, the Notes or the Collateral Documents only with the prior written consent of the Purchaser and the Abra Notes Supermajority Holders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Note Purchase Agreement, the Notes or the Collateral Documents or modifying in any manner the rights of the Holders under this Note Purchase Agreement, the Notes or the Collateral Documents and the Purchaser may, with the prior written consent of the Abra Notes Supermajority Holders, except as set forth below, waive any past Default or Event of Default or compliance with any provision of this Note Purchase Agreement; *provided*, *however*, that, without the consent of each Holder affected or the Abra Notes Supermajority Holders, an amendment or waiver may not:

(i)    reduce the principal amount of or extend the Stated Maturity of any Note;

(ii)    reduce the amount of principal payable upon acceleration of the Maturity Date of any Note;

(iii)    reduce the rate, or extend the stated time for payment, of interest on any Note except as provided for in this Note Purchase Agreement;

(iv)    change the currency for payment of principal of, or interest or any Additional Amounts on, any Note;

(v)    impair the right of any Holder to receive payment of principal and interest on such Holder's Notes on or after due dates therefor or make any change in the provisions of this Note Purchase Agreement relating to the contractual rights of Holders of Notes expressly set forth in this Note Purchase Agreement to institute suit for the enforcement of any right to payment on or with respect to any Note;

67

(vi)    make any change in the provisions of this Note Purchase Agreement relating to waivers of a Default or Event of Default in payment of principal of and interest on the Notes;

(vii)    reduce the principal amount of Notes, Abra Senior Secured Notes or Abra Senior Secured Exchangeable Notes whose holders must consent to any amendment, supplement or waiver;

(viii)    make any change in this first paragraph of this Section 10.02;

(ix)    make any change in Section 9.05 that adversely affects the Holders;

(x)    change the ranking of the Notes or any Note Guaranty relating thereto in a manner adverse to the Holders;

(xi)    make any change in any Note Guaranty that would adversely affect the Holders; or

(xii)    change the definition of "Abra Notes Supermajority Holders" or modify any provision pursuant to which consent of the Abra Notes Supermajority Holders is required for any transaction, action or otherwise.

In addition, notwithstanding the foregoing (and except as provided for in Section 7.09), without the prior written consent of the Purchaser and the Abra Notes Supermajority Holders, no amendment, supplement or waiver may release any portion of the Collateral or permit or suffer to exist any Lien therein other than to secure the Notes Obligations unless otherwise expressly permitted in this Note Purchase Agreement and/or the Collateral Documents.

The Company shall give to Holders and Abra Notes Supermajority Holders prior written notice of any amendment or waiver proposed to be adopted under this Section 10.02. In addition, the Company or the applicable Guarantor shall deliver to the Collateral Agent (if the Collateral Agent is a party thereto) an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment, supplement or waiver pursuant to this Section 10.02 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.02 requested by the Company or any Guarantor (A) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.02 and (B) without any recourse, representation or warranty by the Collateral Agent).

It shall not be necessary for the consent of the Holders or Abra Notes Supermajority Holders under this Section 10.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment or waiver under this Section 10.02 becomes effective, the Company shall give to Holders a notice briefly describing such amendment or waiver.  The failure to give such notice to all Holders and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, or any defect therein, shall not impair or affect the validity of an amendment or waiver under this Section 10.02.

68

SECTION 10.03.  *Revocation and Effect of Consents and Waivers*.  (a) A consent to an amendment or a waiver by a Holder shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Company receives the written notice of revocation at least one Business Day prior to the date the amendment or waiver becomes effective.  After it becomes effective, an amendment or waiver shall bind every Holder.

(b)     The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above in accordance with Section 14.01. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 10.04.  *Payment for Consent*.  Neither the Company nor any of its Affiliates shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Note Purchase Agreement or the Notes unless such consideration is offered to be paid to all Holders which so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

SECTION 10.05.  *Collateral Agent*.  No waiver, modification or amendment of this Note Purchase Agreement or the Collateral Documents may affect or change the rights, obligations, duties, protections or immunities of the Collateral Agent without the written consent of the Collateral Agent. The Collateral Agent may conclusively rely on an Officer's Certificate with respect to whether the consent of Purchaser, any Holders, any holders of the Abra Senior Secured Notes or any holders of the Abra Senior Secured Exchangeable Notes are required in connection with any amendment, supplement or waiver under this Article 10.

## ARTICLE 11
### NOTE GUARANTIES

SECTION 11.01.  *The Note Guaranties*.  Subject to the provisions of this Article, GLAI and GLA hereby irrevocably and unconditionally guarantee (the "**Note Guaranties**"), on a secured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations; *provided, however,* that upon release of the Collateral in accordance with Section 7.09 GLA and GLAI shall guarantee, on a unsecured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  Upon failure by the Company to pay punctually any such amount, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Note Purchase Agreement.

69

SECTION 11.02.  *Guaranty Unconditional*.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

(1)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Company under this Note Purchase Agreement or any Note, by operation of Law or otherwise;

(2)    any modification or amendment of or supplement to this Note Purchase Agreement or any Note;

(3)    any change in the corporate existence, structure or ownership of the Company, or any insolvency, bankruptcy, judicial or extrajudicial reorganization or other similar proceeding affecting the Company or its assets or any resulting release or discharge of any obligation of the Company contained in this Note Purchase Agreement or any Note;

(4)    the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Company or any other Person, whether in connection with this Note Purchase Agreement or any unrelated transactions; *provided that* nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(5)    any invalidity or unenforceability relating to or against the Company for any reason of this Note Purchase Agreement or any Note, or any provision of applicable Law or regulation purporting to prohibit the payment by the Company of the principal of or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement; or

(6)    any other act or omission to act or delay of any kind by the Company or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantors' obligations hereunder.

SECTION 11.03.  *Discharge; Reinstatement*.  The Guarantors' obligations hereunder will remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Company under this Note Purchase Agreement have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, judicial or extrajudicial reorganization of the Company or otherwise, the Guarantors' obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.

SECTION 11.04.  *Waiver by the Guarantors*.  Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company or any other Person.

#4856-1598-7531v19

SECTION 11.05.  *Subrogation and Contribution*.  Upon making any payment with respect to any obligation of the Company under this Article, the Guarantor making such payment will be subrogated to the rights of the payee against the Company with respect to such obligation, limited to the amount of the payment or delivery made by such Guarantor ("**Subrogation Rights**"). The Guarantor hereby irrevocably agrees that the Subrogation Rights may be used at all times by the Guarantors to set-off amounts owed by the Guarantors to the Guarantor under the Notes and the GOL Senior Secured Exchangeable Notes due 2028.

SECTION 11.06.  *Stay of Acceleration*.  If acceleration of the time for payment of any amount payable by the Company under this Note Purchase Agreement or the Notes is stayed upon the insolvency, bankruptcy, judicial or extrajudicial reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of this Note Purchase Agreement are nonetheless payable by the Guarantors hereunder forthwith on demand by the Holders.

SECTION 11.07.  *Limitation on Amount of Guaranty*.  Notwithstanding anything to the contrary in this Article, each of the Guarantors, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guaranty of each Guarantor does not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.  To effectuate that intention, the Holders and each of the Guarantors hereby irrevocably agree that the obligations of each Guarantor under its respective Note Guaranty are limited to the maximum amount that would not render the Guarantors' obligations subject to avoidance under applicable fraudulent conveyance provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.

SECTION 11.08.  *Execution and Delivery of Guaranty*.  The execution by each of the Guarantors of this Note Purchase Agreement on each Closing Date evidences the respective Note Guaranty of each Guarantor, whether or not the person signing as an Officer of such Guarantor still holds that office at the time of execution of any Note.

SECTION 11.09.  *Release of Guaranty*. The Note Guaranty of each of the Guarantors will terminate upon a sale or other disposition (including by way of consolidation or merger) of such Guarantor or the sale or disposition of all or substantially all the assets of such Guarantor (in each case other than to the Company or a Subsidiary) otherwise permitted by this Note Purchase Agreement.

Upon delivery by the Company to the Purchaser and the Collateral Agent of an Officer's Certificate and an Opinion of Counsel, each stating that all of the conditions provided in this Note Purchase Agreement to the release and termination of the Note Guaranty have been satisfied, the Purchaser will execute any documents reasonably requested by the Company in writing in order to evidence the release of such Guarantor from its obligations under its Note Guaranty.

# ARTICLE 12
## COLLATERAL AGENT

SECTION 12.01.  *Appointment*.  Each of the Secured Parties (other than the Collateral Agent) hereby appoints the Collateral Agent as the agent of such Secured Parties under this Note Purchase Agreement and the Collateral Documents to which it is a party and authorizes and directs the Collateral Agent to take such actions on its behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof.  It is understood and agreed that the use of the term "agent" herein or in the Collateral Documents (or any other similar term) with reference to the Collateral Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The Company agrees to pay to the Collateral Agent such fees and expenses (including counsels' fees and expenses) of the Collateral Agent as may be separately agreed in writing and pursuant to the terms of Section 12.04. For the avoidance of any doubt and for the purposes of this Article 12, this Note Purchase Agreement shall prevail in the case of any conflicts between any Collateral Document and this Note Purchase Agreement.

SECTION 12.02. *Exculpatory Provisions*.   (a) The Collateral Agent shall have no duties or obligations except those expressly set forth in this Note Purchase Agreement and the Collateral Documents to which the Collateral Agent is a party, and no duty, liability or obligation shall be inferred or implied against the Collateral Agent. Without limiting the generality of the foregoing provision, (i) the Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists; (ii) the Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Collateral Agent); (iii) except as expressly provided for in this Note Purchase Agreement or the Collateral Documents to which the Collateral Agent is a party, the Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company or any Guarantor or any of their Subsidiaries which is communicated to or obtained by the Collateral Agent or any of its Affiliates in any capacity; and (iv) the Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Collateral Agent to liability or otherwise contrary to this Note Purchase Agreement or the Collateral Documents or applicable Law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect.

(b)      Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall not be liable for any action taken or not taken

72

#4856-1598-7531v19

by it (i) with the written consent or at the written request, written instruction or written direction of the Purchaser, the Majority Holders or the Abra Notes Supermajority Holders (or such other requisite percentage of Holders as may be specified), as applicable, or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

(c)      The Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until written notice by the Purchaser (a copy of which shall be delivered by the Purchaser to the Abra Notes Supermajority Holders) describing such event is received by a Responsible Officer of the Collateral Agent, referring to this Note Purchase Agreement and such Default or Event of Default.

(d)      The Collateral Agent shall not be liable for or have any duty to prove or investigate, or otherwise have any obligation or liability with respect to, (i) any representation or warranty provided in or with respect to this Note Purchase Agreement or the Collateral Documents, (ii) the contents of any certificate, report or other document delivered under or with respect to this Note Purchase Agreement or the Collateral Documents, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Note Purchase Agreement or the Collateral Documents or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, efficacy or authenticity of this Note Purchase Agreement, the Collateral Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Note Purchase Agreement or the Collateral Documents, other than to confirm receipt of items expressly required to be delivered to the Collateral Agent.

(e)      The Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) considered by it to be authentic and having been signed or sent by a competent Person. The Collateral Agent may also rely on any statement given to it verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Collateral Agent may consult with counsel, independent auditors and other experts chosen by the Collateral Agent, at the Company's expense, and the Collateral Agent shall not be liable for any act performed or not performed by the Collateral Agent in accordance with the advice of any said counsel, auditor or expert.

(f)      The Collateral Agent may fulfill any and all of its duties and exercise its rights and powers by or through any one or more subagents appointed by it, at the expense of the Company. The Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.  The exculpatory provisions of this Article 12 shall apply to any such subagent as a third-party beneficiary to the extent applicable. The Collateral Agent shall not be responsible for the supervision, negligence or misconduct of any sub-agents that it selects with due care.

(g)      The Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Note Purchase Agreement, the Collateral Documents, the security provided hereunder or thereunder or the Collateral, for the legality,

73

effectiveness or sufficiency of this Note Purchase Agreement or the Collateral Documents nor for the creation, formalization, ranking, sufficiency or protection of any Liens constituted under this Note Purchase Agreement or the Collateral Documents. For the avoidance of doubt, no provision in this Note Purchase Agreement or the Collateral Documents shall require the Collateral Agent to prepare, file or record any financing statements or continuation statements or other instruments or documents, or to be responsible for maintaining the Liens and security interests to be created as described in this Note Purchase Agreement and the Collateral Documents, and such responsibility shall be in charge exclusively of the Company.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, if applicable, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for the account of other customers in similar transactions.  The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

(h)       In order to effect the transfer of any amounts received as a result of the enforcement of the Collateral Documents, the Collateral Agent may perform a foreign exchange transaction to convert into U.S. Dollars any amount in Reais resulting from such enforcement; except that possible deductions of any commissions or taxes charged on such foreign exchange transactions and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Collateral Agent will transfer the amounts in U.S. Dollars according to the instructions provided by any Holder. The Collateral Agent (a) will only be obliged to perform any foreign exchange transaction it may undertake as of the second (2nd) Brazilian Business Day after the Brazilian Business Day on which the Collateral Agent receives the applicable instructions and documents to perform such foreign exchange transaction; and (b) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Collateral Agent has received (i) all documents and information necessary for the remittance of funds in accordance with applicable foreign exchange regulations and (ii) the payment of the respective commissions, fees and expenses. The Collateral Agent shall not be liable for any losses or damages resulting from possible delays or impediments to the performance of a foreign exchange transaction and/or transfer, nor as the impossibility to perform a foreign exchange transaction or transfer. The Collateral Agent shall not assume any liability to any Person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed in connection with this Note Purchase Agreement or the Collateral Documents or with respect to the transfer of any funds as a result thereof.

(i)       The Collateral Agent shall not be obligated to spend or put at risk any of its own funds or otherwise incur any obligation or liability, financial or otherwise, in performing its duties or exercising its rights under this Note Purchase Agreement or under the Collateral Documents.

(j)       In no event shall the Collateral Agent be liable for special, indirect, punitive, consequential or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)       The Collateral Agent shall not incur any obligation for failure to perform any act or duty under this Note Purchase Agreement or the Collateral Documents by reason of any

occurrence beyond its control (including any act or provision of any current or future Law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve System or the Central Bank).

(l)    The Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo Laws and the Collateral Agent's internal policies with respect to embargoes ("**Embargo Rules**"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The parties expressly agree that the Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 12.02.

(m)    Any and all payments by the Company and/or the Guarantors to or for the benefit of the Collateral Agent under this Note Purchase Agreement or the Collateral Documents shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("**Deductions**") and any other Taxing Jurisdiction, which taxes, expenses or withholdings shall be borne by the Company. If any Deductions apply to any payment, the Company and/or the Guarantors, as the case may be, will immediately pay to the account indicated by the Collateral Agent the additional amount necessary for the amount paid to the Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

(n)    Each Secured Party (other than the Collateral Agent) authorizes and directs the Collateral Agent to enter into the Collateral Documents to which the Collateral Agent is a party on the date hereof on behalf of and for the benefit of the Secured Parties.

(o)    Notwithstanding any provision of this Note Purchase Agreement or the Collateral Documents to the contrary, before taking or omitting any action to be taken or omitted by the Collateral Agent under the terms of this Note Purchase Agreement or any Collateral Document, the Collateral Agent may seek the written direction of the Purchaser or the Majority Holders, as the case may be, and the Collateral Agent shall be entitled to rely (and shall be fully protected in so relying) upon such direction. The Collateral Agent is not liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If the Collateral Agent requests such direction by the Purchaser or the Majority Holders, as the case may be, with respect to any action, the Collateral Agent is entitled to refrain from such action unless and until the Collateral Agent has received such direction, and the Collateral Agent does not incur liability to any Person by reason of so refraining.  If the Collateral Agent so requests, it must first be indemnified to its satisfaction by the Purchaser or the Holders, as the case may be, against any and all fees, losses, liabilities and expenses which may be incurred by the Collateral Agent by reason of taking or continuing to take, or omitting, any action directed by the Purchaser or the Majority Holders. Any provision of this Note Purchase Agreement or the Collateral Documents authorizing the Collateral Agent to take any action does not obligate the Collateral Agent to take

75

such action. The Collateral Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity or security satisfactory to the Collateral Agent against the costs, expenses and liabilities which might be incurred by it in performing such duty or exercising such right or power. In the absence of an express statement in this Note Purchase Agreement or the Collateral Documents regarding which Holders shall direct in any circumstance, the direction of the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall apply and be sufficient for all purposes.

(p)     Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under or pursuant to the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to the Collateral Agent under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

(q)     The Collateral Agent shall have no responsibility for interest or income on any funds held by it under this Note Purchase Agreement or the Collateral Documents and any funds so held shall be held uninvested pending distribution thereof.

(r)     The Collateral Agent shall be under no obligation to exercise any of the duties or powers vested in it by this Note Purchase Agreement or the Collateral Documents at the request, order, instruction or direction of the Holders, unless the Holders shall have offered to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against the costs, expenses and liabilities that might be incurred thereby.

(s)     The Collateral Agent may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Affiliate thereof as if the Collateral Agent were not an attorney-in-fact hereunder and without any duty to account therefore to the Secured Parties.

(t)     The Secured Parties understand that the Collateral Agent, acting in its individual capacity, and its Affiliates may engage in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (the "**Activities**") and may engage in the Activities with or on behalf of one or more of the Company and its respective Affiliates.  Furthermore, the Collateral Agent may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Company and its Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Company or its respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of the Company or its Affiliates. The Secured Parties understand and agree that in engaging in the Activities, the Collateral Agent may receive or otherwise obtain information concerning the Company or its Affiliates (including information concerning the ability of the Company to perform its respective obligations hereunder and under the Collateral Documents) which information may not be available to the Secured Parties. The Collateral Agent shall not have any duty to disclose to the Secured Parties or use on behalf of the Secured Parties, nor be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other

76

condition or creditworthiness of the Company or any of its Affiliates) or to account for any revenue or profits obtained in connection with the Activities.

(u)    The Secured Parties further understand that there may be situations where members of the Collateral Agent's group or their respective customers (including the Company and its Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Secured Parties (including the interests of the Secured Parties hereunder and under the Collateral Documents). None of (i) this Note Purchase Agreement or the Collateral Documents, (ii) the receipt by the Collateral Agent of information concerning the Company or any of its Affiliates (including information concerning the ability of the Company to perform is obligations under this Note Purchase Agreement) or (iii) any other matter, shall give rise to any fiduciary, equitable or contractual duties (including any duty of trust or confidence) owing by the Collateral Agent to any Secured Party including any such duty that would prevent or restrict the Collateral Agent from acting on behalf of customers (including the Company or its Affiliates) or for its own account.

(v)    The Secured Parties (other than the Collateral Agent) confirm to the Collateral Agent that each of them (i) possesses such knowledge and experience in financial and business matters so that it is capable, without reliance on such Collateral Agent, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Note Purchase Agreement or holding the Notes and (y) taking or not taking actions hereunder or under the Collateral Documents, (ii) is financially able to bear such risks and (iii) has determined that entering into this Note Purchase Agreement is suitable and appropriate for it.

(w)    Nothing in this Note Purchase Agreement or in the Collateral Documents shall require the Collateral Agent to carry out any "know your customer" or other checks in relation to the Company or any of its Affiliates on behalf of the Secured Parties and the Secured Parties confirm to the Collateral Agent that such Secured Parties are solely responsible for any such checks such Secured Parties are required to carry out and that such Secured Parties may not rely on any statement in relation to such checks made by such the Collateral Agent.

(x)    The Collateral Agent shall be entitled to rely on any written direction, instruction, request, consent or other written communication from the Purchaser or any Holder. The Collateral Agent shall not have any obligation or duty with respect to the identity of any Holder or the amount of any Obligations owing to any such Person. At any time and from time to time, the Collateral Agent may request information from the Holders or the Company as to the identities of the Holders, their respective Notes and the composition and calculation of the Majority Holders or the Abra Notes Supermajority Holders, and the Holders and the Company shall provide such information. The Collateral Agent shall be entitled to fully rely on such information and shall have no duty, obligation or liability with respect to the identity or amount of Notes held by any Holder or with respect to the calculation of the Majority Holders, the Supermajority Holders or the unanimous vote of Holders.

(y)    The Collateral Agent shall not have any duty, obligation or liability with respect to the identity, calculation or consent or other action of the Abra Holders. Where the consent or other action of the Abra Holders or the Abra Notes Supermajority Holders is required by this

77

Note Purchase Agreement or the Collateral Documents, the Company shall certify to the Collateral Agent that the Company has obtained such consent, or other action, and the Collateral Agent shall be fully entitled to rely on such certification of the Company without any liability.

(z)      Before the Collateral Agent acts or refrains from acting, it may require an Officer's Certificate of the Company, or an Opinion of Counsel satisfactory to the Collateral Agent, with respect to the proposed action or inaction. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion. Whenever in the administration of this Note Purchase Agreement or the Collateral Documents the Collateral Agent shall deem it necessary or desirable that a matter be provided or established prior to taking or suffering or omitting to take any act hereunder or thereunder, such matter (unless other evidence in respect thereof be herein of therein specifically described) may, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Collateral Agent, and such certificate, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, shall be full warrant to the Collateral Agent for any action taken, suffered or omitted to be taken by it under the provision of this Note Purchase Agreement and the Collateral Documents upon the faith thereof.

SECTION 12.03.  *Resignation*. Upon at least thirty (30) days' notice, the Collateral Agent may resign at any time as Collateral Agent under this Note Purchase Agreement and the Collateral Documents by notifying the Purchaser and the Company.  Upon any resignation by the Collateral Agent, the Company shall have the right (provided that no Event of Default has occurred and continues) to appoint a successor Collateral Agent or, if an Event of Default has occurred and is continuing, the Purchaser shall have the right to appoint a successor Collateral Agent. If no successor has been so appointed and has accepted such appointment within thirty (30) days after the date the Collateral Agent gives notice of its resignation, then the resigning Collateral Agent may (but shall not be obligated to) (a) upon consent (provided that no Event of Default or Default has occurred and continues) of the Company (consent of which shall not be unreasonably withheld or delayed), at the cost and expense of the Company, appoint a successor Collateral Agent or (b) petition any court of competent jurisdiction, at the cost and expense of the Company, for the appointment of a successor Collateral Agent. Whether or not a successor has been appointed, the Collateral Agent's resignation shall become effective in accordance with the Collateral Agent's notice of resignation on the date specified in such notice, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents on such date. Upon acceptance of a successor Collateral Agent of its appointment as Collateral Agent under this Note Purchase Agreement and the Collateral Documents, such successor will succeed and have all rights, powers, privileges and duties of the resigning Collateral Agent, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents (if not released sooner, as provided above). The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor. Any Person into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any Person succeeding to the business of the Collateral Agent shall be the successor of the Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on

78

the part of any of the parties hereto, except where an instrument of transfer or assignment is required by Law to effect such succession, anything herein to the contrary notwithstanding.

SECTION 12.04.  *Fees, Expenses and Indemnification*.

(a)  Each of the Company and the Guarantors, jointly and severally, shall pay to the Collateral Agent for its own account fees in the amounts and at the times agreed with the Collateral Agent.

(b)  Each of the Company and the Guarantors, jointly and severally, shall pay or reimburse each of the Purchaser and the Collateral Agent for (1) all reasonable costs and expenses incurred in connection with the development, preparation, negotiation, execution and performance of this Note Purchase Agreement and the Collateral Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all attorney fees and expenses, and (2) all costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Note Purchase Agreement or under the Collateral Documents, including all attorney costs and all expenses incurred during any workout, restructuring or negotiations in respect of this Note Purchase Agreement, the Notes or the Collateral Documents.  The foregoing costs and expenses shall include all out-of-pocket expenses incurred by the Purchaser and Collateral Agent under clause (1) or (2) above and the cost of counsel, independent public accountants and other outside experts so retained.  All amounts due under this Section shall be payable within ten Business Days after demand therefore.

(c)  Each of the Company and the Guarantors, jointly and severally, shall indemnify and hold each of the Purchaser and the Collateral Agent harmless for, from and against any and all damage, loss, liability, cost, claim or expense (including reasonable attorneys' fees and expenses and including all fees, expenses and costs incurred by the Purchaser and/or the Collateral Agent in connection with any dispute, action, claim or suit brought to enforce the right to indemnification) incurred by the Purchaser and/or the Collateral Agent arising out of or in connection with the execution, delivery or administration of this Note Purchase Agreement and the Collateral Documents or any instrument or agreement contemplated hereby or thereby, the performance of the Collateral Agent's duties hereunder or thereunder, and the exercise of each of the Purchaser's and the Collateral Agent's rights hereunder or thereunder including, without limitation, the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Note Purchase Agreement or the Collateral Documents, except, as applicable, as may result from the Purchaser's or the Collateral Agent's respective willful misconduct or gross negligence (as determined by a final and non-appealable judgement by a court of competent jurisdiction).

(d)  To the extent that the Company of the Guarantors for any reason fail to indefeasibly pay any amount required under paragraph (a), (b) or (c) of this Section or under the Collateral Documents to be paid by the Company or the Guarantors to the Collateral Agent (or any sub-agent thereof), the Holders agree to pay to the Collateral Agent (or any sub-agent) such

unpaid amount (including any such unpaid amount in respect of a claim asserted by the Holders); provided that the unpaid amount was incurred by or asserted against the Collateral Agent (or any sub-agent) in its capacity as such.

(e)     The provisions in this Article shall survive the termination or satisfaction of this Note Purchase Agreement, the Notes or the Collateral Documents, the resignation or removal of the Collateral Agent and the payment of all Notes Obligations.

## ARTICLE 13
### REDEMPTION

SECTION 13.01.  *Redemption*.  The Notes shall not be redeemable by the Company prior to the Maturity Date, except as described in this Article 13, and no sinking fund is provided for the Notes.

(a)     Prior to the Maturity Date, the Company may partially or fully redeem the Notes, upon notice as described in Section 13.02, at the redemption price of 100% (expressed as percentages of principal amount of the Notes to be redeemed), plus accrued and unpaid interest thereon; provided that upon such redemption, the Company shall issue GOL Senior Secured Exchangeable Notes due 2028 in an amount equal to, and on a dollar for dollar basis, the aggregate principal amount of the Notes to be redeemed; *provided*, that upon the written request of the Purchaser the Company shall partially or fully redeem the Notes (and issue such GOL Senior Secured Exchangeable Notes due 2028) pursuant to this Section 13.01(a).

(b)     The redemption provided for in clause (a) above is subject to the Company previously (i) obtaining all required corporate approvals; and (ii) having issued the warrants that allow for exchangeability of GOL Senior Secured Exchangeable Notes due 2028 into preferred shares of GLAI in accordance with the terms set forth in the GOL Senior Secured Exchangeable Notes NPA. Should the Company fail to obtain such corporate approvals or to issue such warrants, the Company and the Purchaser shall agree on an indemnity that will equitably compensate the Purchaser for the benefits arising from the conversion of the Notes into GOL Senior Secured Exchangeable Notes due 2028.

SECTION 13.02.  *Notice of Optional Redemption*.  (a) In the event that the Company exercises any redemption right pursuant to Section 13.01, it shall fix a date for redemption and it shall deliver a written notice of such redemption not less than 30 days nor more than 60 days prior to the redemption date to each Holder of Notes.

(b)     Each redemption notice shall specify:

(1)     the redemption date; and

(2)     principal amount of Notes to be redeemed.

SECTION 13.03.  *Payment of Notes Called for Redemption*. (a) If any redemption notice has been given in respect of the Notes in accordance with Section 13.02, the Notes shall become due and payable on the specified redemption date.

#4856-1598-7531v19

# ARTICLE 14

## ACTIONS BY HOLDERS

SECTION 14.01.  *Action by Holders*.  (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Note Purchase Agreement to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Company and, where applicable pursuant to this Note Purchase Agreement, the Guarantors or to the Collateral Agent, as applicable.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Holders signing such instrument or instruments.

(b)     Whenever in this Note Purchase Agreement it is *provided that* the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing.

(c)     Whenever the Company solicits the taking of any action by the Holders of the Notes, the Company may fix, but shall not be required to, in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

SECTION 14.02.  *Proof of Execution by Holders*. When the Company solicits the taking of any action by the Holders of the Notes, proof of the execution of any instrument by a Holder, its agent or proxy, or the Purchaser, shall be sufficient if made in accordance with such reasonable rules as may be prescribed by the Company or in such manner as *shall be satisfactory to the Company.*

SECTION 14.03.  *Company-Owned Notes Disregarded*. In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Note Purchase Agreement, Notes that are owned by the Company, by any Subsidiary thereof or by any of their respective Affiliates shall be disregarded and deemed not to be outstanding for the purpose of any such determination.

SECTION 14.04.  *Revocation of Consents; Future Holders Bound*. At any time prior to (but not after) the evidencing to the Company, as provided in Section 14.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Note Purchase Agreement in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Company at the Company's Office and upon proof of holding as provided in Section 14.02, revoke such action so far as concerns such Note; *provided* that to the extent that the consent of the Abra Notes Supermajority Holders was

81

required or otherwise obtained, the prior written consent of the Abra Notes Supermajority Holders shall be required to revoke any such consent. Except as provided in the previous sentence, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

## ARTICLE 15
### Miscellaneous

SECTION 15.01.  *Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties and Holders of Notes*.  Nothing in this Note Purchase Agreement or the Notes, expressed or implied, shall give to any Person other than the parties hereto and their successors hereunder, the Holders of the Notes and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes, any benefit or any legal or equitable right, remedy or claim under this Note Purchase Agreement or the Notes.

SECTION 15.02.  *Notices*.  Any request, demand, authorization, direction, notice, consent, waiver or other communication or document provided or permitted by this Note Purchase Agreement to be made upon, given, provided or furnished to, or filed with, any party to this Note Purchase Agreement shall, except as otherwise expressly provided herein, be in English and writing and shall be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier, telecopier, facsimile or electronic transmission, addressed to the relevant party as follows:

*To the Company, the Guarantors, the Registrar, the Transfer Agent and the Paying Agent:*

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil

Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

*To the Purchaser:*

1 Ashley Road, 3rd Floor
Altrincham, Cheshire, UK
WA14 2DT
Attention: Richard F. Lark Jr. and Adrian Neuhauser
Email: rfl@voegol.com.br

*To the Collateral Agent:*

Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,
Edifício Jacarandá, Room 3
Zip Code 06460-040
Barueri – SP, Brazil
Attention: Karla Fernandes
Email: karla.fernandes@tmf-group.com

*To the Holders of the Abra Senior Secured Notes:*

c/o The Bank of New York Mellon, as trustee under the Abra Senior Secured
Notes Indenture, for distribution to the holders of the Abra Senior Secured Notes
240 Greenwich Street
New York, NY 10286

*To the Holders of the Abra Senior Secured Exchangeable Notes:*

c/o The Bank of New York Mellon, as Indenture Trustee under the Abra Senior Secured
Exchangeable Notes Indenture, for distribution to the holders of the Abra Senior Secured
Exchangeable Notes
240 Greenwich Street
New York, NY 10286

Notices or communications to the Company will be deemed given if given to GLAI. Notices or communications to Abra Holders will be deemed given if given to The Bank of New York Mellon, in its capacity as Indenture Trustee under the Abra Senior Secured Indenture and in its capacity as Indenture Trustee under the Abra Senior Secured Exchangeable Indentures, in each case, for distribution to the holders of the Abra Notes. All notices to Collateral Agent shall be deemed delivered upon the Collateral Agent's actual receipt thereof.

Any party by written notice to the other parties may designate additional or different addresses for subsequent notices or communications.

Where this Note Purchase Agreement provides for the giving of notice to Holders, such notice shall be deemed to have been given upon the mailing of first class mail, postage prepaid, of such notice to Holders of the Notes at their registered addresses as recorded in the Register and additionally, if such notice is given by the Company to the Purchaser, by email delivery to the Company's primary contact at the Purchaser.

The Company shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law, including, without limitation, those required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed and emailed

#4856-1598-7531v19

to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 15.03.  *Officer's Certificate and Opinion of Counsel as to Conditions Precedent*.  Upon any request or application by the Company to the Collateral Agent to take or refrain from taking any action under this Note Purchase Agreement or the Collateral Documents, the Company shall furnish to the Collateral Agent:

(1)    an Officer's Certificate (which shall include the statements set forth in Section 15.04) stating that, in the opinion of the signers, all covenants and conditions precedent, if any, provided for in this Note Purchase Agreement and, if the action involves any of the Collateral Documents, the applicable Collateral Documents relating to the proposed action have been complied with; and

(2)    an Opinion of Counsel (which shall include the statements set forth in Section 15.04) stating that, in the opinion of such counsel, all such covenants and conditions precedent have been complied with.

SECTION 15.04.  *Statements Required in Officer's Certificate or Opinion of Counsel*. Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Note Purchase Agreement or the Collateral Documents shall include:

(1)    a statement that each Person making or rendering such Officer's Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel are based;

(3)    a statement that, in the opinion of each such Person, such Person has made such examination or investigation as is necessary to enable such Person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)    a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with.

SECTION 15.05.  *Rules by Registrar, Paying Agent and Transfer Agents*.  The Registrar, the Paying Agent and the Transfer Agent may make reasonable rules for their functions.

SECTION 15.06.  *Currency Indemnity*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with this Note Purchase Agreement, the Notes and the Note Guaranties, including damages.  Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by any Person in respect of any sum expressed to be due to it from the Company or the Guarantors in connection with this Note Purchase Agreement,

84

the Notes and the Note Guaranties will only constitute a discharge to the Company or the Guarantors, as the case may be, to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient, the Company and the Guarantors shall indemnify such recipient against any loss sustained by it as a result, and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient will be deemed to have agreed to repay such excess.  In any event, the Company and the Guarantors shall indemnify the recipient against the cost of making any such purchase.

For the purposes of this Section 15.06, it shall be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).  These indemnities constitute a separate and independent obligation from the other obligations of the Company and the Guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder of a Note and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note.

SECTION 15.07.  *No Recourse Against Others*.  No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent, respectively, under this Note Purchase Agreement, the Collateral Documents or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

SECTION 15.08.  *Legal Holidays*.  In any case where any Interest Payment Date or the Maturity Date shall not be a Business Day, then (notwithstanding any other provision of this Note Purchase Agreement or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Interest Payment Date or Maturity Date; *provided that* no default interest shall accrue for the period from and after such Interest Payment Date or Maturity Date on account of such delay.

SECTION 15.09.  *Governing Law*.  THIS NOTE PURCHASE AGREEMENT, THE NOTES AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 (inclusive) of the Luxembourg Act on commercial companies of August 10, 1915, as amended, shall not apply in respect of the Notes.

For purposes solely of Article 9 of Brazilian Decree Law No. 4,657, of September 4, 1942, the transactions contemplated hereby have been constituted and proposed outside of Brazil.

SECTION 15.10.  *Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial*. (a) Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Note Purchase Agreement, the Notes or the Note Guaranties or any transaction contemplated hereby or thereby (a "**Proceeding**"), and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each of the parties hereto irrevocably waives, to the fullest extent it may do so under applicable Law, any objection which it may now or hereafter have to the laying of the venue of any such Proceeding brought in any such court and any claim that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Each of the Company and the Guarantors irrevocably appoints Cogency Global, Inc. (the "**Company and Guarantors Process Agent**"), with an office at 122 East 42nd Street, 18th Floor, New York, NY 10168, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding.  If for any reason such Person shall cease to be such agent for service of process, each of the Company and the Guarantors shall forthwith appoint a new agent of recognized standing for service of process in the State of New York within 30 days.

(b)    Each of the Company and the Guarantors hereby irrevocably appoints the Company and Guarantors Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York.  Such service shall be made by delivering by hand a copy of such process to the Company or the Guarantors, as the case may be, in care of the Company and Guarantors Process Agent at the address specified above.  Each of the Company and the Guarantors hereby irrevocably authorizes and directs the Company and Guarantors Process Agent to accept such service on its behalf.  Failure of the Company and Guarantors Process Agent to give notice to the Company or the Guarantors, as the case may be, or failure of the Company or the Guarantors, as the case may be, to receive notice of such service of process shall not affect in any way the validity of such service on the Company and Guarantors Process Agent, the Company or the Guarantors.  As an alternative method of service, each of the Company and the Guarantors also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Company or Guarantors, as the case may be, at its address specified in Section 15.02 or at any other address previously furnished in writing by the Company or the Guarantors. Each of the Company and the Guarantors covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Company and Guarantors Process Agent above in full force and effect during the term of the Notes, and to cause the Company and Guarantors Process Agent to continue to act as such.

(c)    [*Reserved*]

86

(d)     Exclusively for the purposes of Brazilian law, the Guarantors appoint the Company and Guarantors Process Agent as their agent and attorney-in-fact to receive on behalf of them and their property service of copies of the summons and complaint and any other process which may be served in any Proceeding pursuant to articles 653 et. seq. of the Brazilian Law No. 10,406, of January 10, 2022.

(e)     Nothing herein shall affect the right of any party (including the Collateral Agent, any other Agent or any Holder) to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise bring any claim against any other party or its property in any other court of competent jurisdiction.

(f)     Each of the Company and the Guarantors irrevocably agrees that, in any proceedings anywhere (whether for an injunction, specific performance or otherwise), no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such proceedings, from attachment (whether in aid of execution, before judgment or otherwise) of its assets or from execution of judgment shall be claimed by it or on its behalf or with respect to its assets, except to the extent required by applicable Law, any such immunity being irrevocably waived, to the fullest extent permitted by applicable Law. Each of the Company and the Guarantors irrevocably agrees that, where permitted by applicable Law, it and its assets are, and shall be, subject to such proceedings, attachment or execution in respect of its obligations under this Note Purchase Agreement, the Notes or the Note Guaranties.

(g)     ALL PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY DO SO UNDER APPLICABLE LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS NOTE PURCHASE AGREEMENT, THE NOTES, THE NOTE GUARANTIES OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

SECTION 15.11.  *Successors and Assigns*.  All covenants and agreements of the Company and the Guarantors in this Note Purchase Agreement, the Notes and the Note Guaranties shall bind their respective successors and permitted assigns, whether so expressed or not. The Notes shall not be assigned by the Purchaser unless (i) the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes shall have been indefeasibly paid in full or (ii) as otherwise may be consented to by the Abra Notes Supermajority Holders.

In the event of a transfer, assignment, novation or amendment of the rights and/or the obligations under this Note Purchase Agreement and any other Transaction Documents, all security interests, guarantees and privileges created under or in connection with the Transaction Documents shall automatically and without any formality be preserved for the benefit of the transferee including the trustee under the Abra Senior Secured Notes Indenture and the trustee under the Abra Senior Secured Exchangeable Notes Indenture for the purpose of the provisions of articles 1278 to 1281 of the Luxembourg Civil Code or any other purposes.

SECTION 15.12.  *Multiple Originals*.  The parties may sign any number of copies of this Note Purchase Agreement.  Each signed copy shall be deemed an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Note Purchase

#4856-1598-7531v19

Agreement. The words "execution," "signed," "signature," and words of like import in this Note Purchase Agreement or in any other certificate or document related to this Note Purchase Agreement shall include images of executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as an executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable Law, including, without limitation, any state Law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

SECTION 15.13.  *Severability Clause*.  In case any provision in this Note Purchase Agreement or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. To the extent permitted by applicable Law, the parties hereby waive any provision of Law which renders any term or provision hereof invalid or unenforceable in any respect.

SECTION 15.14.  *Force Majeure*.  In no event shall the Collateral Agent or any other Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder, or under the Collateral Documents arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, governmental actions, pandemics, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent or such other Agent, as applicable shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 15.15.  *Acknowledgement*. Each of the Company and the Guarantors acknowledges that, on the date hereof, the Purchaser has pledged, or will pledge, all of its right, title and interest in the Notes, Notes Obligations and all Collateral therefor, in favor of the collateral agent under the Abra Senior Secured Notes Indenture and the collateral agent under the Abra Senior Secured Exchangeable Notes Indenture as collateral to secure the Purchaser's obligations under the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

GOL FINANCE
as the Company

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent, and Paying Agent

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

SMILES FIDELIDADE S.A.
as Guarantor

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

ABRA GROUP LIMITED
as Purchaser

By: _____

      Name:
      Title:

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase
Agreement to be duly executed as of the date first written above.

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE
ATIVOS LTDA.
as Collateral Agent


By: _____
      Name:
      Title:

**EXHIBIT A**

FORM OF NOTE

**GOL FINANCE**

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 178497

Senior Secured Notes Due 2028

No. [1]

U.S.$ [1,105,169,000]

GOL FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 (the "**Company**", which term includes any successor corporation under the Note Purchase Agreement referred to on the reverse hereof), for value received, hereby promises to pay to Abra Group Limited, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "**Purchaser**"), or registered assigns, the principal sum of U.S.[1,105,169,000], upon presentation and surrender of this Note on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Note Purchase Agreement.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-1

#4856-1598-7531v19

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated: March 2, 2023

**GOL FINANCE**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

Witnesses:

By: _____
Name:

By: _____
Name:

A-2

[FORM OF REVERSE SIDE OF NOTE]

Senior Secured Notes Due 2028

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of Senior Secured Notes Due 2028 of the Company.  The Notes constitute secured unsubordinated obligations of the Company, initially in an aggregate principal amount of U.S.$[1,105,169,000].

1.    *Purchase Agreement.*

Each holder of this security, by accepting the same, agrees to and shall be bound by the provisions hereof and of the Note Purchase Agreement, dated as of March 2, 2023, by and among GOL FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S.Luxembourg*) under number B 178497 (the "Company"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("GLAI"), as guarantor, registrar, transfer agent and paying agent, and GOL LINHAS AÉREAS S.A., a wholly owned subsidiary of GLAI ("GLA" and together with GLAI, the "Guarantors"), each, a public company (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, as guarantors, ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "Purchaser" or "Holder") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "Collateral Agent"), as the same shall be amended from time to time (the "Note Purchase Agreement"). The terms of the Notes include those stated in the Note Purchase Agreement.  The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Note Purchase Agreement.

Reference is hereby made to the Note Purchase Agreement, the Collateral Documents and all amendments and supplements to each of them from time to time (collectively, the "Note Documents") for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Guarantors, the Collateral Agent, each other Agent and the Purchaser as Holder of the Notes and the terms upon which the Notes, are, and are to be, executed and delivered.  The Purchaser waives all notice of the acceptance of the provisions contained herein and in the Note Documents and waives reliance by such Purchaser upon said provisions. All terms used in this Note that are defined in the Note Purchase Agreement shall have the meanings assigned to them in the Note Purchase Agreement.

The Notes are senior obligations of the Company and the Guarantors, secured by a first priority and perfected Lien in the Collateral. The payment obligations of the Company under the Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Note Documents impose certain limitations on assets, debts, Restricted Payments, the creation of Lien by the Company, and consolidation, merger, Related-Party Transactions, and

A-3

certain other transactions involving the Company. In addition, the Note Documents require the maintenance of insurance for the Company, the maintenance of the existence of the Company, the payment of certain taxes and claims and reporting requirements applicable to the Company. The Note Documents also contain provisions related to the Collateral as well as certain assurances, restrictions, and use and possession related to the Collateral.

2. *Principal.*

Unless previously redeemed, exchanged or purchased and cancelled, the Company promises to pay the Holder hereof the total Outstanding principal amount which shall be repaid in cash in a single installment on the Maturity Date, together with all other amounts owed hereunder with respect thereto (including all accrued and unpaid interest that has not yet been added to the total Outstanding principal amount through the Maturity Date).

3. *Interest.*

The Notes shall bear interest at an interest rate as follows:

(1)      4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**");

(2)      13.5% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth below; and

(3)      GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (A) semi-annually in arrears, on each applicable Interest Payment Date or (B) on the Maturity Date; *provided that*, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; *provided*, *further*, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of this Note and the Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of the Note Purchase Agreement.

4. *Method of Payment.*

Any payments of interest or principal in respect of each Note made on an Interest Payment Date or the Maturity Date shall be made by the Company to the Persons shown on the Register at the close of (a) in the case of interest payments, the Regular Record Date or (b) in the case of principal payment, the fifteenth day immediately preceding the Maturity Date, whether or not a Business Day (each, a "**Record Date**"); provided that any PIK Interest payments due with respect to the Notes prior to the Maturity Date will not be payable in cash but in kind and the

A-4

amount of any such interest payment shall, on the Interest Payment Date, be capitalized and automatically added to, and be part of, the Outstanding principal amount of such Note (and shall thereafter constitute principal for all purposes of such Note and the Note Purchase Agreement, and shall accrue interest thereon in accordance with the terms of the Note Purchase Agreement).

Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Company, if any.

If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder and (ii) second, towards payment of principal then due hereunder.

Payment in cash of the principal and premium, if any, of any Note on the Maturity Date shall be made upon presentation and surrender thereof, by wire transfer to the Holder's Designated Bank Account.

If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all cash payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

Payment of interest on any Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date, and if in cash, by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future cash payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder. The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

If any Interest Payment Date in respect of any Note is not a Business Day, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest (other than accrued interest through the date such amount is paid) or other payment in respect of any such delay.

If the amount of principal or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of interest, if any, in fact paid.

All payments on this Note are subject in all cases to any applicable tax or other Laws and regulations, but without prejudice to the provisions of Paragraph 7 hereof. Except as provided in Section 7.06 of the Note Purchase Agreement, no fees or expenses shall be charged to the Purchaser in respect of such payments.

5.    *Ranking and Collateral.*

A-5

#4856-1598-7531v19

The Notes and Note Guaranties are secured by a first priority Lien over the Collateral, subject to the terms and conditions of the Note Purchase Agreement and the Collateral Documents.  The payment obligations of the Company under the Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Lien over the Collateral granted shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exists Notes Obligations due and payable on that date, in which case the Lien over the Collateral shall terminate as set forth in the Note Purchase Agreement.

6.    *Registrar, Transfer Agent and Paying Agent.*

GLAI will initially act as the Registrar, Transfer Agent and Paying Agent of the Notes. The Company may appoint and change any Registrar, Transfer Agent and Paying Agent in accordance with the terms of the Note Purchase Agreement.

7.    *No Purchase of Notes by the Company or its Affiliates.*

The Company or any of its Affiliates (except for the Purchaser) may at any time repurchase Notes in open market purchases or in negotiated transactions at any price.  Any Notes so purchased or acquired may not be resold and shall be cancelled.

8.    *Denominations.*

The Notes are in registered form without coupons in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof.

9.    *Persons Deemed Owners.*

The registered Holder of this Note (except as otherwise required by Law and subject to the right of Holders of record on the relevant Regular Record Date to receive interest due on the relevant Interest Payment Date) may be treated as the owner thereof for all purposes.

10.    *Unclaimed Money.*

Subject to applicable Law, any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

11.    *Amendment; Waiver.*

The Note Purchase Agreement contains provisions permitting amendments, supplements and waivers to these Notes and to the Note Purchase Agreement. Such amendments, supplements and waivers shall be conclusive and binding upon the holder of this Note and upon all future

A-6

holders and owners of this Note and of any Notes issued in conversion or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon this Note or any Note issued in conversion or substitution therefor or upon registration of transfer thereof.

    *12.*    *Defaults and Remedies.*

The Note Purchase Agreement contains certain Events of Default with respect to the Notes and specifies certain remedies, and limitations on remedies, applicable to the Notes.

    *13.*    *Governing Law.*

THE NOTE PURCHASE AGREEMENT, THIS NOTE AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 of the Luxembourg Act on commercial companies of August 10, 1915 (inclusive), as amended, shall not apply in respect of the Notes.

Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any Proceeding and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

    *14.*    *No Recourse Against Others.*

No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent under the Notes or any obligations of the Company, the Guarantors or the Collateral Agent under the Note Purchase Agreement or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

The Company shall furnish to any Holder upon written request and without charge a copy of the Note Purchase Agreement, as amended from time to time, which includes the Form of this Note.  Requests may be made to:

        GOL Linhas Aéreas Inteligentes S.A.
        Praça Comte Linneu Gomes
        S/N, Portaria 3, Jardim Aeroporto
        04626-020 – São Paulo, SP
        Brasil
        Attention:  Celso Ferrer

THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE CODE. FOR INFORMATION

#4856-1598-7531v19

REGARDING THE CLOSING DATE, ISSUE PRICE, AND TO MATURITY, PLEASE CONTACT THE COMPANY AT THE COMPANY'S OFFICE, ATTENTION: CHIEF FINANCIAL OFFICER.

A-8

## NOTATION OF GUARANTY

For value received, each of the Guarantors (which term includes any successor Person under the Note Purchase Agreement) has unconditionally guaranteed, to the extent set forth in the Note Purchase Agreement and subject to the provisions in the Note Purchase Agreement dated as of March 2, 2023 (as amended from time to time, the "**Note Purchase Agreement**"), among the Company, the Guarantors party thereto, the Purchaser and TMF Brasil Administração e Gestão de Ativos Ltda., as the Collateral Agent, the full and punctual payment (whether upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  The obligations of each of the Guarantors to the Secured Parties pursuant to the respective Note Guaranty and the Note Purchase Agreement are expressly set forth in Article 11 of the Note Purchase Agreement and reference is hereby made to the Note Purchase Agreement for the precise terms of the Note Guaranties.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Note Purchase Agreement.

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of guaranty to be duly executed.

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent and Paying Agent

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

Witnesses:

By: _____
      Name:

By: _____
      Name:

A-10

**EXHIBIT B**

**[Reserved]**

B-1

**EXHIBIT C**

**Collateral Agent KYC Requirements**

**1.** Form Compliance Questionnaire fully completed and signed, and any supporting documents required therein.

**2.** Form UBO Declaration completed filled and signed, and any supporting documents required therein.

**3.** By-laws or articles of association duly registered with the respective Chamber of Commerce or similar applicable authority.

**4.** Appointment of Directors or legal representative duly registered with the respective Chamber of Commerce or similar applicable authority.

**5.** Passport copy of the Directors and legal representatives.

**6.** In case the company is represented by Attorney-in-Fact, please provide the Power of Attorney and identification document of the attorney-in-fact.

**7.** Excerpt Chamber of Commerce or similar applicable authority.

B-2

**EXHIBIT D**

**FORM OF
GLA'S SMILES FIDUCIARY TRANSFER AGREEMENT**

C-1

**EXHIBIT E**

**FORM OF**
**FORM OF EXCLUSIVITY SIDE LETTER**

**EXHIBIT F**

**FORM OF
SUBORDINATION AGREEMENT**

**SCHEDULE A**

**Permitted Holders**

1. Mobi Fundo de Investimento em Ações Investimento no Exterior
2. Elliott International, L.P.
3. Elliott Associates, L.P.
4. Kingsland International Group S.A.
5. South Lake One LLC

B-4

**SCHEDULE B-1**

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
|--------|--------------------------------------------|
| 1 | License agreement to use the LIFERAY digital platform, on which the Smiles website was developed |
| 2 | License agreement for the use of the Zendesk platform, through which all customer service is carried out |
| 3 | License agreement for the use of the Pager Duty program, which generates alarms when monitoring transactions in the APM system and sends such alarms to the Slack system |
| 4 | License agreement to use the Slack system |
| 5 | Service contract for the use of the B2E Prevention tool for fraud prevention |
| 6 | License agreement for the B2E Billing software |

#4856-1598-7531v19

**SCHEDULE B-2**

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
|---|---|
| 7 | Service agreement for the use of the AWS Amazon cloud infrastructure, which hosts the LIFERAY platform, and consequently the Smiles website, among other services |
| 8 | License agreement for the use of the ADYEN payment gateway that processes payments within the scope of the product "Clube Smiles" |
| 9 | Service agreement for the use of the Oracle OCI cloud infrastructure, which hosts the Siebel Loyalty platform |
| 10 | Service agreement for the Auth0 software, which controls the logic and authentication control for customers' login on the Smiles website |
| 11 | Amadeus software service contract, which takes care of reservations and fare awards related to other partner airlines |
| 12 | Service agreement with VTEX, responsible for the operation system of the retail platform |
| 13 | Right of use of the Data Lake database, which contains all transactional data used by the Smiles platform |
| 14 | Service agreement with Oracle Responsys for the use of a communication platform with customers |
| 15 | Service provision agreement with Nice, for the platform that hosts the telephony infrastructure used in customer service |
| 16 | Service agreement for the use of Dynatrace's APM tool, which performs real-time predictive and transactional monitoring |
| 17 | Oracle License and Service Agreement (OLSA) V020408 |

#4856-1598-7531v19

**SCHEDULE C**

**Relevant Agreements Governing The Sale and Issuance of Miles**

| Item # | Agreement, License or Contract Description | Counterparties |
|---|---|---|
| 1 | Business Partnership and Assumption of Obligations Agreement No. 2014/001996, as amended from time to time (*Contrato de Parceria Negocial e de Assunção de Obrigações nº 2014/001996*) | Banco do Brasil S.A. |
| 2 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Banco C6 S.A. |
| 3 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Caixa Econômica Federal |
| 4 | Smiles Partnership Agreement SC No. 16620, as amended from time to time (*Contrato de Parceria Smiles SC nº 61620*) | Esfera Fidelidade S.A. |
| 5 | Private Instrument of Partnership and Other Covenants, as amended from time to time (*Instrumento Particular de Parceria e Outras Avenças*) | Livelo S.A. |
| 6 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Nu Pagamentos S.A. |
| 7 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Portoseg S/A Crédito Financiamento e Investimento |
| 8 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Bradesco S.A. and Banco do Brasil S.A. |
| 9 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Santander (Brasil) S.A. |

B-7

**ANNEX B**

---

**FORM OF SENIOR SECURED EXCHANGEABLE NOTE PURCHASE AGREEMENT**

GOL EQUITY FINANCE
as Company

GOL LINHAS AÉREAS INTELIGENTES S.A.

as Guarantor
and as Registrar, Transfer Agent, Exchange Agent and Paying Agent

GOL LINHAS AÉREAS S.A.
as Guarantor

and SMILES FIDELIDADE S.A.
as a Springing Guarantor

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

and

ABRA GROUP LIMITED
as Purchaser

---

**SENIOR SECURED EXCHANGEABLE NOTE PURCHASE AGREEMENT**

Dated as of [●], 2023

_____

Senior Secured Exchangeable Notes due 2028

## TABLE OF CONTENTS

PAGE

### ARTICLE 1
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01.  Definitions...................................................................................... 1
SECTION 1.02.  Rules of Construction ...................................................................... 26
SECTION 1.03.  Table of Contents; Headings............................................................ 28
SECTION 1.04.  Form of Documents Delivered......................................................... 28

### ARTICLE 2
### PURCHASE AND SALE OF THE NOTES

SECTION 2.01.  Sale and Purchase of the Notes........................................................ 28
SECTION 2.02.  Closing ............................................................................................ 28
SECTION 2.03.  Expenses .......................................................................................... 29

### ARTICLE 3
### USE OF PROCEEDS

SECTION 3.01.  Net Proceeds .................................................................................... 29

### ARTICLE 4
### THE NOTES

SECTION 4.01.  Form and Dating .............................................................................. 29
SECTION 4.02.  Execution and Delivery................................................................... 30
SECTION 4.03.  Registrar, Transfer Agent, Exchange Agent and Paying Agent ..... 30
SECTION 4.04.  Paying Agent to Hold Money in Trust............................................. 32
SECTION 4.05.  Payment of Principal and Interest; Principal and Interest Rights Preserved .. 32
SECTION 4.06.  [Reserved]........................................................................................ 33
SECTION 4.07.  Transfer of Notes ............................................................................. 33
SECTION 4.08.  Replacement Notes ........................................................................... 33
SECTION 4.09.  Cancellation ...................................................................................... 33
SECTION 4.10.  Defaulted Interest............................................................................. 34
SECTION 4.11.  No Purchase of the Notes by the Company or its Affiliates ............ 34
SECTION 4.12.  Fundamental Change ........................................................................ 34

### ARTICLE 5
### CONDITIONS TO CLOSING

SECTION 5.01.  Purchaser's Conditions to Issuance of Notes ................................... 34
SECTION 5.02.  Company's Conditions to Issuance of Notes .................................... 37
SECTION 5.03.  Conditions Relating to Collateral.................................................... 37

i

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

SECTION 6.01.   Representations of the Company and the Guarantors ..................................... 38
SECTION 6.02.   Representations of the Purchaser ................................................................ 43

## ARTICLE 7
### COVENANTS

SECTION 7.01.   Payment of Principal and Interest Under the Notes ........................................ 44
SECTION 7.02.   Maintenance of Office or Agency ................................................................. 44
SECTION 7.03.   Money for Note Payments to Be Held in Trust ............................................. 45
SECTION 7.04.   Maintenance of Corporate Existence ........................................................... 45
SECTION 7.05.   Payment of Taxes and Claims ...................................................................... 46
SECTION 7.06.   Payment of Additional Amounts .................................................................. 46
SECTION 7.07.   Collateral and Liens. ................................................................................... 48
SECTION 7.08.   Certain Assurances ...................................................................................... 50
SECTION 7.09.   Release of Collateral .................................................................................. 52
SECTION 7.10.   Maintenance of Collateral ........................................................................... 53
SECTION 7.11.   Limitation on Transactions with Affiliates. .................................................. 53
SECTION 7.12.   Limitation on Sale of Assets ....................................................................... 54
SECTION 7.13.   Limitation on Debt. ..................................................................................... 56
SECTION 7.14.   Limitation on Restricted Payments .............................................................. 58
SECTION 7.15.   Non-Compete and Exclusivity ..................................................................... 60
SECTION 7.16.   Additional Lines of Business ....................................................................... 61
SECTION 7.17.   GLA and IPCO Covenants ........................................................................... 61

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.   [Reserved]. .................................................................................................. 63
SECTION 8.02.   Limitation on Consolidation, Merger or Transfer of Assets........................... 63
SECTION 8.03.   Successor Substituted................................................................................... 64

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.   Events of Default ......................................................................................... 65
SECTION 9.02.   Acceleration of Maturity, Rescission and Amendment .................................. 67
SECTION 9.03.   Applicable Premium ..................................................................................... 68
SECTION 9.04.   Subrogation Rights........................................................................................ 68
SECTION 9.05.   Application of Money Collected.................................................................... 69
SECTION 9.06.   Limitation on Suits ....................................................................................... 70
SECTION 9.07.   Contractual Rights of Holders to Receive Principal and Interest .................. 70
SECTION 9.08.   Restoration of Rights and Remedies.............................................................. 70

SECTION 9.09.   Delay or Omission Not Waiver ................................................................ 70
SECTION 9.10.   Control by Holders ............................................................................ 70
SECTION 9.11.   Rights and Remedies Cumulative .......................................................... 71
SECTION 9.12.   Waiver of Past Defaults and Events of Default ........................................ 71
SECTION 9.13.   Waiver of Stay or Extension Laws ........................................................ 71

## ARTICLE 10
### AMENDMENTS

SECTION 10.01.  Without Consent of Holders ................................................................ 71
SECTION 10.02.  With Consent of Holders .................................................................... 72
SECTION 10.03.  Revocation and Effect of Consents and Waivers ...................................... 74
SECTION 10.04.  Payment for Consent ......................................................................... 74
SECTION 10.05.  Collateral Agent ............................................................................... 75

## ARTICLE 11
### NOTE GUARANTIES

SECTION 11.01.  The Note Guaranties .......................................................................... 75
SECTION 11.02.  Guaranty Unconditional ...................................................................... 75
SECTION 11.03.  Discharge; Reinstatement .................................................................... 76
SECTION 11.04.  Waiver by the Guarantors .................................................................... 76
SECTION 11.05.  Subrogation and Contribution ............................................................... 76
SECTION 11.06.  Stay of Acceleration .......................................................................... 76
SECTION 11.07.  Limitation on Amount of Guaranty ........................................................ 76
SECTION 11.08.  Execution and Delivery of Guaranty ...................................................... 77
SECTION 11.09.  Release of Guaranty .......................................................................... 77

## ARTICLE 12
### COLLATERAL AGENT

SECTION 12.01.  Appointment ................................................................................... 77
SECTION 12.02.  Exculpatory Provisions ...................................................................... 77
SECTION 12.03.  Resignation .................................................................................... 83
SECTION 12.04.  Fees, Expenses and Indemnification ...................................................... 84

## ARTICLE 13
### EXCHANGE OF NOTES

SECTION 13.01.  Right to Exchange. ........................................................................... 85
SECTION 13.02.  Exchange Procedure; Settlement Upon Exchange ...................................... 87
SECTION 13.03.  Adjustment of Exchange Rate ............................................................... 90
SECTION 13.04.  Effects of Recapitalizations, Reclassifications and Changes of the Preferred
                Shares ........................................................................................... 100
SECTION 13.05.  Certain Covenants ............................................................................ 102
SECTION 13.06.  Notice to Holders Prior to Certain Actions .............................................. 103

iii

SECTION 13.07.  Shareholder Rights Plans ............................................................. 103
SECTION 13.08.  Adjustments of Prices .................................................................. 103

## ARTICLE 14
### ACTIONS BY HOLDERS

SECTION 14.01.  Action by Holders ........................................................................ 104
SECTION 14.02.  Proof of Execution by Holders .................................................... 104
SECTION 14.03.  Company-Owned Notes Disregarded .......................................... 104
SECTION 14.04.  Revocation of Consents; Future Holders Bound ......................... 104

## ARTICLE 15
### MISCELLANEOUS

SECTION 15.01.  Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties
                and Holders of Notes ................................................................... 105
SECTION 15.02.  Notices ........................................................................................ 105
SECTION 15.03.  Officer's Certificate and Opinion of Counsel as to Conditions Precedent ... 107
SECTION 15.04.  Statements Required in Officer's Certificate or Opinion of Counsel ........... 107
SECTION 15.05.  Rules by Registrar, Paying Agent, Exchange Agent and Transfer Agents... 107
SECTION 15.06.  Currency Indemnity ..................................................................... 107
SECTION 15.07.  No Recourse Against Others........................................................ 108
SECTION 15.08.  Legal Holidays ............................................................................ 108
SECTION 15.09.  Governing Law ............................................................................ 108
SECTION 15.10.  Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial ......... 109
SECTION 15.11.  Successors and Assigns................................................................ 110
SECTION 15.12.  Multiple Originals........................................................................ 111
SECTION 15.13.  Severability Clause ...................................................................... 111
SECTION 15.14.  Force Majeure ............................................................................. 111
SECTION 15.15.  Acknowledgement ....................................................................... 111

EXHIBITS:

EXHIBIT A        –   Form of Note
ANNEX I          –   Form of Notice of Exchange by the Company upon Satisfaction of the
                     Exchange Price Condition
ANNEX II         –   Form of Notice of Exchange by the Holder
EXHIBIT B        –   [Reserved]
EXHIBIT C        –   Collateral Agent KYC Requirements
EXHIBIT D        –   Form of GLA's Smiles Fiduciary Transfer Agreement
EXHIBIT E        –   Form of Exclusivity Side Letter
EXHIBIT F        –   Form of Subordination Agreement
SCHEDULE A       –   Permitted Holders
SCHEDULE B-1     –   Smiles Technological Infrastructure Agreements
SCHEDULE B-2     –   Smiles Technological Infrastructure Agreements
SCHEDULE C       –   Relevant Agreements Governing The Sale and Issuance of Miles

iv

SENIOR SECURED EXCHANGEABLE NOTE PURCHASE AGREEMENT, dated as of [●], 2023, (this "**Note Purchase Agreement**") among GOL EQUITY FINANCE, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg ("**Luxembourg**"), with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 224920, as issuer (the "**Company**"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**"), as guarantor, registrar, transfer agent, exchange agent and paying agent, GOL LINHAS AÉREAS S.A., ("**GLA**"), a wholly owned subsidiary of GLAI, as guarantor, and SMILES FIDELIDADE S.A., a wholly owned subsidiary of GLA ("**IPCo**"), as guarantor, each, a corporation (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "**Purchaser**") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "**Collateral Agent**").

## RECITALS

The Company has duly authorized (i) the issuance and sale of the Notes (as hereinafter defined) and (ii) the execution and delivery of this Note Purchase Agreement.

In addition, the Guarantors have duly authorized the execution and delivery of this Note Purchase Agreement as guarantors of the Notes. The Guarantors have done all things necessary to make the Note Guaranties (as hereinafter defined), when the Notes are executed and duly issued by the Company, the valid obligations of the Guarantors, and to make this Note Purchase Agreement a valid agreement of the Guarantors.

The Company has requested that, from time to time, upon the satisfaction in full of the conditions precedent set forth in Article 5, as applicable, the Purchaser, purchase the Notes from the Company in the aggregate initial principal amount of up to U.S.$1,430,925,000 on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE, THIS NOTE PURCHASE AGREEMENT WITNESSETH:**

For and in consideration of the premises and the purchase of the Notes by the Purchaser, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders (as defined below), as follows:

## ARTICLE 1
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01.    *Definitions*.

"**Abra Global Finance**" means Abra Global Finance incorporated under the laws of the Cayman Islands.

"**Abra Holders**" means, as of the date of determination, collectively, the holders of the Abra Senior Secured Notes (provided any such Abra Senior Secured Notes remain outstanding)

and the holders of Abra Senior Secured Exchangeable Notes (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Notes**" means, collectively, the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

"**Abra Notes Supermajority Holders**" means, as of the date of determination, collectively, the holders of the Abra Notes holding more than each of (i) 66.67% in principal amount of the outstanding Abra Senior Secured Notes from time to time (provided any such Abra Senior Secured Notes have been issued and remain outstanding) and (ii) 66.67% in principal amount of outstanding Abra Senior Secured Exchangeable Notes from time to time (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Senior Secured Exchangeable Notes**" means the Abra Senior Secured Exchangeable Notes due 2028, issued by Abra Global Finance and guaranteed by the Purchaser, in the aggregate principal amount of U.S.$458,585,447, pursuant to the Abra Senior Secured Exchangeable Notes Indenture.

"**Abra Senior Secured Exchangeable Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Exchangeable Notes entered into on March 2, 2023, by and among Abra Global Finance, as issuer, the Purchaser, as guarantor, The Bank of New York Mellon, as trustee, registrar, paying agent and exchange agent, and TMF Group New York LLC, as collateral agent.

"**Abra Senior Secured Notes**" means the Abra Senior Secured Notes due 2028, issued by Abra Global Finance and guaranteed by the Purchaser, in the aggregate principal amount of U.S.$962,254,480, pursuant to the Abra Senior Secured Notes Indenture.

"**Abra Senior Secured Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Notes entered into on March 2, 2023, by and among Abra Global Finance, as issuer, the Purchaser, as guarantor, The Bank of New York Mellon, as trustee, registrar and paying agent, and TMF Group New York LLC, as collateral agent.

"**Accounting Principles**" shall mean the International Financial Reporting Standards promulgated by the International Accounting Standards Board ("**IFRS**"), in effect from time to time as applied by GLAI consistently throughout the relevant periods, including with regard to impairment losses, obsolescence policies for rotables and inventory, and hedging transactions. For clarity, the impact of all hedging transactions shall be included as part of the income or expense item to which it relates, and not in interest or financing expense.

"**Act**" when used with respect to any Holder, has the meaning specified in Section 14.01(a).

"**Activities**" has the meaning specified in Section 12.02(t).

"**Additional Amounts**" has the meaning specified in Section 7.06(a).

2

"**Additional Assets**" means any assets (other than Debt and Capital Stock) to be used by GLAI or any of its Subsidiaries in a Related Business.

"**Adjusted Operating Expenses**" shall mean, for any reference period, with respect to any Guarantor or any of its Subsidiaries, as applicable, any costs and expenses incurred in services and other transactions required to generate Adjusted Operating Revenues of such Guarantor and its Subsidiaries which are recognized as operating expenses of such Guarantor and its Subsidiaries under the Accounting Principles, as applicable, **(i)** including (a) expenses related to personnel and associated taxes and charges, (b) fuel and lubricant expenses, (c) maintenance expenses, including Normalized aircraft redelivery expenses, (d) expenses related to third party services, (e) passenger and cargo enplanement costs, but excluding costs representing funds collected on behalf of third parties such as airport boarding fees, (f) landing and navigation fees, (g) sales and marketing expenses (h) frequent flyer redemption costs with any third parties or non-consolidated Subsidiaries and (i) other expenses associated with the generation of Adjusted Operating Revenues; and **(ii)** excluding (a) depreciation, (b) amortization, (c) lease payments, (d) interest expenses, (e) non-cash foreign exchange variation, (f) income taxes and social contribution taxes applicable to profits, (g) unpaid maintenance expenses to the extent such provisions are reflected in a Guarantor's or any of its Subsidiaries' Debt calculations, as applicable, in the form of maintenance and/or redelivery provision liabilities. The calculation of Adjusted Operating Expenses of each Guarantor or any of its Subsidiaries, as applicable, shall be based on consistent methodologies and parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor or any of its Subsidiaries for purposes of the definition of Adjusted Operating Expenses, as applicable:

- Restoration maintenance expenses: restoration maintenance expenses shall use an accrual basis of accounting for engines, fuselage, APU, and landing gear.

- Routine maintenance expenses: routine maintenance expenses shall be expensed as incurred.

- Aircraft depreciation: the calculation of residual value and useful life of Aircraft shall reflect the agreed upon contractual provisions of leases or other aircraft financing instruments.

- Losses on sale-leaseback transactions: losses on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- Air traffic liability: shall represent the Guarantors' liability for tickets sold for future travel dates and funds that are past flight date and remain unused as well the Guarantors' liability associated with loyalty related performance obligations. Air traffic liability of each Guarantor shall be calculated assuming passenger ticket breakage at the earlier of 12 months from purchase and the expiration of the applicable ticket or program.

3

- <u>Pension liability and employee benefits</u>: each Guarantor shall use the same methodology for calculation of pension liabilities and employee benefits to the extent permitted by applicable Law and include it in the profit and loss statement as part of employee expenses.

- <u>Expected losses on receivables</u>: expected losses on receivables shall be estimated based on historical experience and in the case of materially large past due receivables, have external auditor input.

- <u>Operating expenses/rental expenses</u>: no operating expenses shall be treated as rental expenses.

- <u>Standard group policies</u>: each airline will conform to standardized group policies about which costs to capitalize versus expense.

"**Adjusted Operating Revenues**" shall mean, for any reference period, the gross inflow of economic benefits (such as cash, receivables, and other assets) arising from ordinary operating activities, recognized as revenues under the Accounting Principles (i) <u>including</u> (a) sales of passenger transportation services and associated revenues, including flight tickets revenues calculated recognizing breakage amounts at the earlier of 12 months from purchase and the expiration of the applicable ticket or program, baggage fees, rescheduling fees, cancellation fees, other related passenger revenues; (b) cargo transportation revenues; (c) frequent flyer revenues calculated recognizing breakage amounts for unredeemed mileage credits at the earlier of 12 months from issue and the expiration of the applicable ticket or program; (d) recovery of or compensation for previously incurred operating expenses; and (e) recovery of or compensation for interrupted services, aircraft delivery delays and unexpected aircraft grounding periods; and (ii) <u>excluding</u> (a) interest revenues, (b) any income associated with non-cash foreign exchange variation, (c) dividends and (d) any revenues passed-through to third parties, such as airport boarding fees. Adjusted Operating Revenues may be reported on each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, as operating revenues on the top line of the income statement or as a deduction from operating costs and expenses and may be subject to timing deferrals or occur in different periods in each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, if the accounting policies of the Guarantors or any of its Subsidiaries have not been conformed. The calculation of Adjusted Operating Revenues of each Guarantor, as applicable, shall be based on consistent methodologies and parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor, as applicable, for purposes of the definition of Adjusted Operating Revenues:

- <u>Gains on sale-leaseback transactions</u>: gains on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- <u>Credit card installment interest</u>: credit card installment interest shall be deducted from revenues (and not reflected as an interest expense).

"**ADS**" means an American Depositary Share, issued pursuant to the Deposit Agreement, representing, as of the date of this Note Purchase Agreement, two Preferred Shares.

4

"**ADS Depositary**" means The Bank of New York Mellon, as depositary for the ADSs, or any successor under the Deposit Agreement.

"**affected day**" has the meaning specified in the definition of the term "Prevailing Exchange Rate."

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Agents**" means any Collateral Agent, Registrar, Transfer Agent, Exchange Agent or Paying Agent appointed pursuant to this Note Purchase Agreement, individually, an "**Agent**."

"**Aircraft**" shall mean, collectively, any aircraft owned by or leased to a Guarantor or any of its Subsidiaries, as applicable, and any engines, parts, components, instruments, accessories, furnishings and other equipment attached or relating to such aircraft.

"**Aircraft Debt**" means any (i) Debt incurred to finance the acquisition or operation of aircraft, spare parts or engines, secured by aircraft, spare parts or engines the acquisition or operation of which are so financed, (ii) any asset-based Debt on terms that are customary in the aviation industry secured by aircraft, spare parts or engines, and (iii) predelivery payment financing.

"**Aircraft Rentals**" shall mean, with respect to a Guarantor or any of its Subsidiaries, as applicable, the annual aircraft rental expense of such Guarantor or any of its Subsidiaries (subject to Normalization).

"**Anti-Money Laundering Laws**" has the meaning specified in Section 6.01(24).

"**Apostille**" has the meaning specified in Section 6.01(17).

"**Apostille Convention**" has the meaning specified in Section 6.01(17).

"**Applicable Premium**" means the difference (which shall not be less than zero) between (a) the sum (in cash) of the present values of the remaining scheduled payments of principal and interest (including without limitation all PIK Interest) on such Notes (excluding accrued and unpaid interest (other than PIK Interest capitalized prior to the date thereof) to the date when such Notes become due and payable) discounted to the date when such Notes become due and payable on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points, and (b) the principal amount of the Notes then Outstanding.

"**Asset Sale**" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) by GLAI or any of its Subsidiaries outside the ordinary course of business, including any disposition by means of a merger, consolidation, or similar transaction (each referred to for the purposes of this definition as a "disposition"), of:

(1)    any shares of a Subsidiary of GLAI (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than GLAI or a Subsidiary thereof);

(2)    all or substantially all the assets of any division or line of business of GLAI or any Subsidiary thereof; or

(3)     any other assets of GLAI or any Subsidiary other than the Collateral;

*provided*, *however*, that Asset Sale will not include:

(a)    a disposition by a Subsidiary to GLAI or to another Subsidiary or by GLAI to a Subsidiary;

(b)    a Restricted Payment that does not violate the covenant described under Section 7.14. Limitation on Restricted Payments;

(c)    the disposition of assets with a Fair Market Value not to exceed U.S.$40.0 million in the aggregate (or the equivalent thereof at the time of determination), except for a disposition of assets expressly provided for in the annual budget or business plan of GLAI or any of its Subsidiaries, as the case may be;

(d)    a disposition of obsolete equipment or other obsolete assets or other property which is no longer useful for GLAI or any of its Subsidiaries in the ordinary course of business;

(e)    the disposition of all or substantially all of the assets of GLAI or any of its Subsidiaries in a manner permitted under the covenant described under Section 8. Consolidation, Merger, Conveyance, Transfer or Lease;

(f)    any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind; or

(g)    sales, transfers or other dispositions of assets for non-cash consideration at least equal to the Fair Market Value (as certificated in a certificate signed by a Responsible Officer) of such assets, to the extent that such non-cash consideration would constitute Additional Assets.

"**Authorized Denomination**" has the meaning specified in Section 4.02(a)(4).

"**B3**" means B3 S.A. – *Brasil, Bolsa, Balcão*, the São Paulo Stock Exchange.

"**Bloomberg**" means Bloomberg L.P.

"**Board of Directors**" means the Board of Directors of the Company, or the applicable Guarantor, as the case may be, or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the secretary, the assistant secretary or another Officer or legal counsel performing corporate secretarial functions of the Company or the Guarantors, as applicable to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification.

"**Brazilian Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil or a day on which banking institutions or trust companies are authorized or obligated by law to close in São Paulo, Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, England and Wales, the State of New York or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by Law to close in The City of New York, London, São Paulo, Brazil, or Luxembourg.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Cash Interest**" shall have the meaning specified in Section 4.05(d)(i).

"**Cash Settlement**" shall have the meaning specified in Section 13.02(a).

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*)

"**Clause A Distribution**" shall have the meaning specified in Section 13.03(c)(1).

"**Clause B Distribution**" shall have the meaning specified in Section 13.03(c)(2).

"**Clause C Distribution**" shall have the meaning specified in Section 13.03(c)(2).

"**close of business**" means 5:00 p.m. (New York City time).

"**Closing**" shall have the meaning specified in Section 2.02.

"**Closing Date**" means the Initial Closing Date or any date thereafter on which the Company and the Purchaser mutually agree to sell and purchase Notes hereunder, as applicable.

"**Closing Location**" shall have the meaning specified in Section 2.02.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the assets and rights that from time to time are subject to a Lien granted by the Company or any Guarantor to the Collateral Agent, for the benefit of the Secured

7

Parties, pursuant to any Collateral Document. The Collateral shall include (i) as further described in GLA's Smiles Fiduciary Transfer Agreement (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program, (ii) all intercompany claims, loans and obligations evidenced by the global intercompany note entered into by the Company and the Guarantors evidencing the loans made by the Company or any Guarantor to any of its respective Affiliates or Subsidiaries, (iii) the guaranty by the GOL entities and IPCo of all of the Company's obligations under this Note Purchase Agreement and the Notes and the other Collateral Documents, (iv) as further described in GOL Senior Secured Notes due 2026 Collateral, all collateral securing the GOL Senior Secured Notes due 2026 on a *pari passu* basis, (v) as further described in GLA's Fiduciary Transfer of IPCo's Shares Agreement, one hundred percent (100%) of IPCo's equity, totally owned by GLA and (vi) as further described in IPCo's Smiles Fiduciary Transfer Agreement, all of the assets and rights described in item (1)(i) above transferred to IPCo under suspensive condition pursuant to Section 7.17 below.

"**Collateral Agent**" means (i) the Person named as the "Collateral Agent" in the first paragraph of this Note Purchase Agreement and (ii) any Person appointed as a successor "Collateral Agent' under this Note Purchase Agreement and the Collateral Documents, in each case, until a successor Person shall have become such pursuant to the applicable provisions of this Note Purchase Agreement and the Collateral Documents, and thereafter "Collateral Agent" shall mean the successor serving hereunder and thereunder.

"**Collateral Documents**" means (i) the GLA's Smiles Fiduciary Transfer Agreement, (ii) the amendments to GOL Senior Secured Notes due 2026 Collateral (to include the Notes and GOL Senior Secured Notes due 2028 as secured obligations), (iii) the intercreditor agreement between GOL Finance, the Collateral Agent, The Bank of New York Mellon, as trustee of the GOL Senior Secured Notes due 2026 and TMF Brasil Administração Gestão de Ativos Ltda., as collateral agent under the GOL Senior Secured Notes due 2026, (iv) the GLA's Fiduciary Transfer of IPCo's Shares Agreement, and (v) the IPCo's Smiles Fiduciary Transfer Agreement. The definition of Collateral Documents shall also include any other agreement designated as a Collateral Document by the parties hereto, as amended from time to time.

"**Combination Settlement**" shall have the meaning specified in Section 13.02(a).

"**Company**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**Company and Guarantors Process Agent**" has the meaning specified in Section 15.10(a).

"**Company's Office**" has the meaning specified in Section 4.03(a).

"**Comparable Treasury Issue**" means the United States Treasury security selected by the Company as having a maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary

8

financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes.

"**Comparable Treasury Price**" means with respect to any date when Notes become due and payable, the average of two Reference Treasury Dealer Quotations for the when such Notes become due and payable.

"**Covered Plan**" has the meaning specified in Section 6.02(3).

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Daily Exchange Value**" means, for each of the 50 consecutive VWAP Trading Days during the Observation Period, 2% of the product of (a) the Exchange Rate on such VWAP Trading Day and (b) the Daily VWAP for such VWAP Trading Day.

"**Daily Measurement Value**" means the Specified Dollar Amount (if any), *divided by* 50.

"**Daily Settlement Amount**," for each of the 50 consecutive VWAP Trading Days during the Observation Period, shall consist of:

(a)      cash in an amount equal to the lesser of (i) the Daily Measurement Value and (ii) the Daily Exchange Value on such VWAP Trading Day; and

(b)      if the Daily Exchange Value on such VWAP Trading Day exceeds the Daily Measurement Value, a number of Preferred Shares equal to (i) the difference between the Daily Exchange Value and the Daily Measurement Value, *divided by* (ii) the Daily VWAP for such VWAP Trading Day.

"**Daily VWAP**" means, for each of the 50 consecutive VWAP Trading Days during the relevant Observation Period, the per Preferred Share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "GOLL4 BZ Equity" (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such VWAP Trading Day (or if such volume-weighted average price is unavailable, the market value of one Preferred Share on such VWAP Trading Day determined, using a volume-weighted average method, by an internationally recognized independent investment banking firm retained for this purpose by the Company).  The "**Daily VWAP**" shall be determined without regard to after-hours trading or any other trading outside of the regular trading session trading hours. The "**Daily VWAP**" for any Trading Day will be expressed in U.S. Dollars and, if expressed in a different currency for such Trading Day as determined above (which, for the avoidance of doubt, will be the case if, at the time the Notes are issued the Preferred Shares are only listed on the B3), will be translated by the Company to U.S. Dollars at the Prevailing Exchange Rate on such Trading Day. For the avoidance of doubt, the "**Daily VWAPs**" (including the "**Daily VWAPs**" used to calculate the Daily Exchange Values, the Daily Settlement Amounts and the daily cash amounts) will be expressed in U.S. Dollars (translated, if necessary, to U.S. Dollars at the Prevailing Exchange Rate).

"**Debt**" means, with respect to any Person, without duplication, the Outstanding principal amount of, including any related accrued or outstanding interest, of all (a) debt for borrowed money of such Person or debt issued by such Person in substitution or exchange for borrowed money, (b) debt evidenced by any note, bond, debenture or other debt security, in each case, as of such time of such Person, taking into account the face value of any convertible securities, (c) that portion of the obligations with respect to finance leases in accordance with IFRS (provided, that for the avoidance of doubt, finance leases shall not be double counted with IFRS 16 leases), (d) the net settlement value of all interest rate or currency swaps, collars, caps, and similar hedging obligations or other derivative agreements, including equity derivatives structured as "capped calls" and (e) all reimbursement or other obligations with respect to letters of credit, bank guarantees, bankers acceptances or similar instruments, in each case, solely to the extent drawn. "**Debt**" shall not include (1) customer deposits, (2) advance payments received from customers for the sale, lease or license of goods and services in the ordinary course of business, whether or not such deposits or advance payments have been expensed in accordance with IFRS, (3) non-speculative hedging obligations and (4) current accounts payable and accrued expenses payable within 180 days and incurred in the ordinary course of business.

"**Deductions**" has the meaning specified in Section 12.02(m).

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Defaulted Amounts**" means any amounts on any Note (including principal and interest) that are payable but are not punctually paid or duly provided for.

"**Deposit Agreement**" means the Amended and Restated Deposit Agreement, dated as of April 17, 2017, by and among GLAI, the ADS Depositary, and the holders from time to time of ADSs issued thereunder, as supplemented by a letter agreement dated as of March 26, 2019, between GLAI and the ADS Depositary, relating to the delivery of ADSs or restricted ADSs, as the case may be, upon exchange of the Notes and, if further amended or supplemented as provided therein, as so amended or supplemented.

"**Designated Bank Account**" means, with respect to any payments made to a Holder pursuant to this Note Purchase Agreement or Notes, the U.S. dollar bank account designated by such Holder at least three Business Days prior to the applicable payment.

"**Disclosure Documents**" shall have the meaning specified in 6.01(23).

"**Distributed Property**" shall have the meaning specified in Section 13.03(c).

"**EBITDAR**" shall mean earnings before interest, taxes, depreciation, amortization and rent and, for the purposes of the Notes, shall be composed of (a) the Adjusted Operating Revenues, net of Sales Taxes, *minus* (b) the Adjusted Operating Expenses.

"**Embargo Rules**" has the meaning specified in Section 12.02(l).

"**Enforceability Exceptions**" shall have the meaning specified in Section 6.01(3).

10

"**ERISA**" has the meaning specified in Section 6.02(3).

"**Event of Default**" has the meaning specified in Section 9.01.

"**Ex-Dividend Date**" means the first date on which the Preferred Shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question, from GLAI or, if applicable, from the seller of the Preferred Shares on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

"**Excess Proceeds**" shall have the meaning specified in Section 7.12(iv).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Exchange Agent**" shall have the meaning specified in Section 4.03(a).

"**Exchange Date**" shall have the meaning specified in Section 13.02(c), except that, as used in Section 13.04, "**Exchange Date**" means, for so long as the Preferred Shares are listed and traded on the B3, the first date on which the Preferred Shares trade on the Relevant Stock Exchange, regular way, reflecting the relevant share split or share combination, as applicable.

"**Exchange Obligation**" shall have the meaning specified in Section 13.01.

"**Exchange Price**" means as of any time, U.S.$1,000, *divided by* the Exchange Rate as of such time.

"**Exchange Rate**" shall have the meaning specified in Section 13.01.

"**Exclusivity Side Letter**" means that certain Brazilian law governed side letter, dated as of the date hereof in the form attached hereto as Exhibit E, by and among the Company, the Guarantors and the Purchaser and Abra Global Finance relating to, among other things, the agreements by the Company, the Guarantors and IPCo with respect to the exclusivity of the Loyalty Program.

"**Expiration Date**" shall have the meaning specified in Section 13.03(e).

"**Fair Market Value**" of any property, asset, share of Capital Stock, other security, Investment or other item means, on any date, the fair market value of such property, asset, share of Capital Stock, other security, Investment or other item on that date as determined in good faith by the management of GLAI or a Subsidiary thereof, as the case may be.

"**Federal Reserve System**" means the central banking system of the United States of America.

"**Form of GLA's Smiles Fiduciary Transfer Agreement**" means the "Form of GLA's Smiles Fiduciary Transfer Agreement" attached hereto as Exhibit D.

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

11

"**Form of Notice of Exchange by the Company**" means the "Form of Notice of Exchange by the Company upon Satisfaction of the Exchange Price Condition" attached hereto as Annex I of the Form of Note.

"**Form of Notice of Exchange by the Holders**" means the "Form of Notice of Exchange by the Holders" attached hereto as Annex II of the Form of Note.

"**Fundamental Change**" means, at any time after the Initial Closing Date, any of the following occurring:

(i)    the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means or by any of the transactions contemplated in this Note Purchase Agreement) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), except for any "person" or "group" that consists solely of one or more Permitted Holders is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the outstanding Capital Stock;

(ii)    the consummation of (1) except as set forth in clause (2) below, any recapitalization, reclassification or change of the Capital Stock (other than changes in par value or resulting from a subdivision or consolidation) as a result of which the Capital Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof); (2) any statutory share exchange, consolidation, merger, merger of shares, as applicable, or other combination involving any of the Guarantors as a result of which the Capital Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof); or (3) any sale, lease or other transfer or disposition in one transaction or a series of transactions, including any split-off or spin-off, to any Person of all or substantially all of the consolidated assets of any of the Guarantors and its Subsidiaries, taken as a whole; *provided*, *however*, that a transaction described in clause (1) or (2) in which the holders of the Capital Stock immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Capital Stock of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions vis-à-vis each other as such ownership immediately prior to such transaction shall not be a Fundamental Change pursuant to this clause (ii); or

(iii)    the shareholders of the Company or any of the Guarantors approve any plan or proposal for the liquidation or dissolution of the Company or any of the Guarantors other than in a transaction described in, and that complies with the provisions described under, Article 8 of this Note Purchase Agreement.

"**GLA**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLA's Fiduciary Transfer of IPCo's Shares Agreement**" means that certain Brazilian law governed agreement entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, GLAI and IPCo, as intervening party (as amended from time to

12

time), with respect to the fiduciary lien over one hundred percent (100%) of IPCo's equity, all of which is owned by GLA.

"**GLA's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement, entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, and GLAI, as intervening party (as amended from time to time), with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program.

"**GLAI**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLAI Going Private Date**" means the date in which the GLAI Going Private Process is concluded.

"**GLAI Going Private Process**" means the process of (i) termination of the listing for trading of the Preferred Shares on the B3 or (ii) deregistration of GLAI as a publicly held company (*companhia aberta*) with the CVM.

"**GLAI Group**" means GLAI and all of its direct and indirect Subsidiaries (including GLA).

"**GOL Bonds**" means the following notes issued by GLAI or its subsidiaries: the GOL Exchangeable Notes due 2024, the GOL Senior Notes due 2025, the GOL Senior Secured Notes due 2026 and the GOL Perpetual Notes existing on the date of this Note Purchase Agreement.

"**GOL Exchangeable Notes due 2024**" means the 3.75% Exchangeable Senior Notes Due 2024, issued by the Company.

"**GOL Finance**" means GOL Finance, a public limited liability company (*société anonyme*) incorporated and existing under the laws of Luxembourg with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 178497.

"**GOL Perpetual Notes**" means the 8.75% Perpetual Notes, issued by GOL Finance.

"**GOL Senior Notes due 2025**" means the 7.000% Senior Notes Due 2025, issued by Gol Finance.

"**GOL Senior Secured Notes due 2026**" means the 8.00% Senior Secured Notes Due 2026, issued by Gol Finance.

"**GOL Senior Secured Notes due 2026 Collateral**" means the GOL Senior Secured Notes due 2026 IP Collateral  and the GOL Senior Secured Notes due 2026 Spares Parts Collateral.

13

"**GOL Senior Secured Notes due 2026 IP Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLAI, as intervening party; and (ii) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLAI, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

"**GOL Senior Secured Notes due 2026 Spares Parts Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party; (ii) the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

"**GOL Senior Secured Notes due 2028**" means the 18% Senior Secured Notes due 2028, issued by GOL Finance, as of the date hereof.

"**GOL Senior Secured Notes NPA**" means the Senior Secured Note Purchase Agreement to be entered into by and among GOL Finance, GLAI, GLA, IPCo, TMF Brasil Administração e Gestão de Ativos Ltda. and the Purchaser on or about the Initial Closing Date.

"**Governmental Authority**" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"**Guarantor**" means any of (i) GLAI, (ii) GLA, (iii) IPCo and (iv) any successor obligor under the Note Guaranties pursuant to Section 11.01, unless and until such Guarantor is released from the Note Guaranty pursuant to this Note Purchase Agreement.

"**Holder**" means the Person in whose name a Note is registered in the Register.

"**IFRS**" has the meaning set forth in the definition of the term "**Accounting Principles**"

14

"**Independent Financial Advisor**" means an independent investment bank or accounting firm of international standing which is experienced in capital markets transactions appointed by the Purchaser.

"**Initial Closing Date**" means the date of execution of this Note Purchase Agreement.

"**Institutional Investor**" has the meaning set forth in Section 6.01(19).

"**Interest Payment Date**" means each May 31 and November 30 of each year, beginning on May 31, 2023.

"**Investment**" means:

(a) the acquisition or investment in any Person or business (whether by asset or equity purchase, merger, consolidation, amalgamation or otherwise) that holds, directly or indirectly, any interest in, or directly or indirectly operates, any airline, or otherwise where the consideration for the acquisition and any Debt or other assumed actual or contingent liability, together with the amount of any investment in any joint venture, exceeds U.S.$40.0 million (or the equivalent thereof at the time of determination), except as provided for in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(b) the approval or amendment of the annual budget or business plan or any voluntary deviation therefrom in excess of 5% of Adjusted Operating Expenses set out in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(c) any capital expenditure that in the aggregate in any fiscal year is in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination), except for capital expenditures provided for in the annual budget or the business plan of GLAI or any Subsidiary thereof, as the case may be;

(d) any contract that (i) is (x) outside the ordinary course of business, or (y) on terms other than industry standard commercial terms, and (ii) involving an annual payment greater than U.S.$10.0 million (or the equivalent thereof at the time of determination), in each case, except for agreements as provided for in the annual budget or the business plan of GLAI or its Subsidiary, as the case may be; or

(e) any contract, binding agreement or similar or analogous arrangement for the purchase, order or lease of any aircraft.

"**IPCo**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**IPCo's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement entered into by IPCo, as security provider, the Collateral Agent, as security beneficiary, and GLA and GLAI, as intervening parties, with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the Smiles Technological Infrastructure; (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, and advertising

15

materials exclusively related to the Loyalty Program, under suspensive condition according to article 125 of Brazilian Civil Code, corresponding to the transfer of the assets and rights encumbered by the GLA's Smiles Fiduciary Transfer Agreement from GLA to IPCo.

"**issue**" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Debt or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be issued by such Subsidiary at the time it becomes a Subsidiary; and the term "issuance" has a corresponding meaning.

"**Last Reported Sale Price**" of the Preferred Shares, on any date, means the closing sale price per Preferred Share on such date (or if no closing sale price per Preferred Share is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date as reported in composite transactions for the B3. If the Preferred Shares are not listed for trading on the B3 or a U.S. national securities exchange on the Relevant Date, the "**Last Reported Sale Price**" shall be the closing sale price per Preferred Share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date reported in composite transactions for the principal Brazilian or U.S. national securities exchange on which the Preferred Shares are traded. If the Preferred Shares are not listed in a principal Brazilian or U.S. national securities exchange, the "Last Reported Sale Price" shall be the last quoted bid price for the Preferred Shares in the over-the-counter market on the Relevant Date as reported by the *Central de Custódia e de Liquidação Financeira de Títulos - CETIP* or a similar organization. If the Preferred Shares are not quoted in the over-the-counter market on the Relevant Date, the "Last Reported Sale Price" shall be the average of the mid-point of the last bid and ask prices for the Preferred Shares on the Relevant Date from each of at least three internationally recognized independent investment banking firms selected by GLAI for this purpose. Any price of the Preferred Shares (or such other security) not in U.S. Dollars shall be converted into U.S. Dollars by the Exchange Agent at the Prevailing Exchange Rate on such Trading Day.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lien**" means any mortgage, pledge, assignment by way of security, charge, security interest, encumbrance, conditional sale or other title retention agreement or other similar lien.

"**Loyalty Program**" means the Smiles loyalty program, and any successor program.

"**Majority Holders**" means Holders of the Notes holding more than 50% in principal amount of the Outstanding Notes.

"**Market Disruption Event**" means, (a) a failure by the Relevant Stock Exchange to open for trading during its regular trading session or (b) the occurrence or existence prior to 1:00 p.m., São Paulo time, on any Scheduled Trading Day for the Preferred Shares for more than one half-hour period in the aggregate during regular trading hours of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the Relevant Stock Exchange or otherwise) in the Preferred Shares or in any options contracts or futures contracts relating to the Preferred Shares.

"**Material Adverse Effect**" means (i) any material adverse effect on the condition (financial or otherwise), business, properties, results of operations or prospects of the Company, the Guarantors and their Subsidiaries, taken as a whole, (ii) any material adverse effect on the ability of the Company, the Guarantors and their Subsidiaries, taken as a whole, to perform their obligations under any Transaction Document, (iii) any material adverse effect upon the binding nature, validity, or enforceability of any of the Transaction Documents or (iv) any material adverse effect on the rights and remedies of the Purchaser or the rights of the Collateral Agent and the Holders in the Collateral, in each case, whether resulting from any single act, omission, situation, status, event or undertaking, or taken together with other such acts, omissions, situations statuses, events or undertakings.

"**Maturity Date**" means the earliest of (a) March 2, 2028, (b) if more than $42.5 million in aggregate principal amount of the GOL Exchangeable Notes due 2024 remains outstanding on the date that is 45 days prior to the maturity of the GOL Exchangeable Notes due 2024 (the "**2024 measurement date**"), the 2024 measurement date or (c) if more than $65 million in aggregate principal amount of the GOL Senior Notes due 2025 remains outstanding on the date that is 45 days prior to the maturity of the GOL Senior Notes due 2025 (the "**2025 measurement date**"), the 2025 measurement date.

"**Net Cash Proceeds**" with respect to any issuance or sale of Capital Stock or sale or other disposition of any assets, means the cash proceeds of such issuance or sale, net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees and expenses actually incurred in connection with such issuance or sale and net of taxes paid or payable in connection with such issuance, sale or disposition.

"**Normalized**" or "**Normalization**" shall mean, for each year:

(a) with respect to aircraft redelivery expenses, the total of the redelivery expenses that a Guarantor or any of its Subsidiaries, as applicable, would be projected to incur on redelivery of each leased aircraft in its fleet, expressed in U.S. Dollars, divided by the expected lease tenor of each aircraft expressed in years, as calculated by an independent third party engaged by each Guarantor or any of its Subsidiaries, as applicable; provided, that for the avoidance of doubt, any redelivery expense accrued in such year under IFRS shall be considered part of and included in the Normalized redelivery expenses figure; and

(b) with respect to any Aircraft Rental, the average annual rental expenses (excluding any refundable payments such as deposits and maintenance reserves, as well as any projected

redelivery expenses, but <u>including</u> any one-time or "balloon" rental payments) expected to be incurred during the life of such rental.

"**Note Guaranties**" shall have the meaning specified in Section 11.01.

"**Note Purchase Agreement**" has the meaning specified in the first paragraph of this agreement.

"**Notes**" means the notes issued pursuant to the terms hereof on each Closing Date in an initial aggregate principal amount of up to U.S.$1,430,925,000, and shall be substantially in the Form of Note.

"**Notes Obligations**" means Obligations in respect of the Notes, this Note Purchase Agreement, the Note Guaranties and the Collateral Documents.

"**Notice of Exchange**" shall have the meaning specified in Section 13.02(b).

"**Obligations**" means any principal, interest (including any interest, fees and other amounts accruing subsequent to the filing of a petition in bankruptcy, reorganization, arrangement or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest, fees and other amounts are an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, payable under the documentation governing any Debt.

"**Observation Period**" with respect to any Note surrendered for exchange means, (i) if the relevant Exchange Date occurs prior to October 1, 2027, the 50 consecutive VWAP Trading Day period beginning on, and including, the second VWAP Trading Day immediately succeeding such Exchange Date; and (ii) if the relevant Exchange Date occurs on or after October 1, 2027, the 50 consecutive VWAP Trading Day period beginning on, and including, the 52nd Scheduled Trading Day immediately preceding the Maturity Date.

"**Officer**" means any director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, of the Company or the Guarantors, as the case may be, or any other Person duly appointed by the shareholders of the Company, or the Guarantors, or the Board of Directors, as the case may be, to perform corporate duties.

"**Officer's Certificate**" means a certificate signed by any of the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or the applicable Guarantor, as the case may be.

"**Opinion of Counsel**" means an opinion of legal counsel of recognized international standing (who may be an employee of or counsel to the Company or the Guarantors, *provided that* an Opinion of Counsel delivered pursuant to Section 7.08 and Section 10.01 shall be of an external counsel to, and not an employee of, the Company or the Guarantors, as applicable).

18

"**Outstanding**" means, as of the date of determination, all Notes theretofore executed and delivered under this Note Purchase Agreement, except:

(i)      Notes theretofore cancelled by the Company or accepted by the Company for cancellation;

(ii)     Notes for whose payment in the necessary amount has been theretofore deposited with the Paying Agent in trust or set aside and segregated in trust by the Company for the Holders of such Notes;

(iii)    Notes exchanged pursuant to Article 13 and required to be cancelled pursuant to Section 4.09; and

(iv)     Notes held by the Company or by any Subsidiary thereof.

"**Paying Agent**" shall have the meaning specified in Section 4.03(a).

"**Payment Default**" has the meaning specified in Section 9.01(f).

"**Permitted Holder**" means (i) each entity listed in Schedule A hereto, and (ii) their Affiliates.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a protected series of a limited liability company or a limited partnership, an association, a trust or any other entity or a government or political subdivision or an agency or instrumentality thereof.

"**Physical Settlement**" shall have the meaning specified in Section 13.02(a).

"**PIK Interest**" shall have the meaning specified in Section 4.05(d)(2).

"**Preferred Shares**" means the preferred shares of GLAI, no par value per share.

"**Preferred Shares Registrar**" means Itaú Corretora de Valores S.A., as registrar of the Preferred Shares and until a successor shall have been appointed and become such pursuant to the applicable provisions of this Note Purchase Agreement, and thereafter, "Preferred Shares Registrar" shall mean or include such successor.

"**Prevailing Exchange Rate**" means, for purposes of translating, as of any date, any amount in Reais into an equivalent amount in U.S. dollars, the spot mid-rate of exchange between such currencies prevailing as of 4:00 p.m., New York City time, on such date, as displayed on, or derived from, Bloomberg page "BFIX" (or, if such page is not available, its equivalent successor page) in respect of such currencies. If such rate cannot be determined as provided in the immediately preceding sentence on such date (which, for the purpose of this definition, will be deemed to be the "**affected day**"), then the Prevailing Exchange Rate for such date will be determined *mutatis mutandis* but with respect to the immediately preceding day on which such rate can be so determined; provided, however, that, if such immediately preceding day is before the fifth day before such affected day, or, if such rate cannot be so determined, then the Prevailing Exchange Rate will be determined in such other manner as prescribed in good

19

faith by the Exchange Agent. The Prevailing Exchange Rate will be determined by the Exchange Agent, except to the extent otherwise specified in this definition.

"**Primary Treasury Dealer**" has the meaning specified in the definition of the term "Reference Treasury Dealer."

"**principal**" of a Note means the principal amount of such Note (including any Additional Amounts payable by the Company in respect of such principal).

"**Principal Amount**" has the meaning set forth in Section 2.01.

"**Proceeding**" has the meaning specified in Section 15.10(a).

"**Purchase Price**" has the meaning set forth in Section 2.01.

"**Purchaser**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**Purchaser Deliverables**" means:

(a) the Purchase Price of this Note Purchase Agreement payable by the Purchaser by wire transfer of immediately available funds, to be deposited into such bank accounts as nominated by the Company, on each Closing Date, pursuant to Sections 2.01 and 2.02;

(b) an Internal Revenue Service Form W-9 or W-8 executed by the Purchaser; and

(c) a receipt executed by the Purchaser and delivered to the Company certifying that the Purchaser has received the Notes from the Company on each Closing Date.

"**Purchaser Entity**" means the Purchaser and its Wholly Owned Subsidiaries.

"**Purchaser Entity Expenses**" means:

(a)    costs (including all professional fees and expenses) and expenses incurred by any Purchaser Entity in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed or delivered with respect to applicable laws or the respective rules and regulations promulgated thereunder;

(b)    customary indemnification obligations of any Purchaser Entity owing to its directors, officers, employees or other Persons under its articles, charter, by-laws, partnership agreement or other constituent documents or pursuant to written agreements with any such Person;

(c)    obligations of any Purchaser Entity in respect of customary director and officer insurance (including premiums therefor) to the extent relating to GLAI and its Subsidiaries maintained in the ordinary course of business and consistent with past practice;

20

(d)      (x) general corporate overhead expenses, including professional fees and expenses and (y) other operational expenses, in each case, of any Purchaser Entity incurred in the ordinary course of business and consistent with past practice that are related to the ownership or operation of the business of GLAI or any of its Subsidiaries;

(e)      expenses incurred by any Purchaser Entity in connection with any securities offering, sale, conversion or exchange of Capital Stock or Debt; and

(f)      liabilities incurred by any Purchaser Entity in connection with tax obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any Governmental Authority as a result of the direct or indirect ownership held by such Purchaser Entity in the Capital Stock of GLAI or any of its Subsidiaries.

"**Reais**" means the legal currency of Brazil from time to time.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Preferred Shares (directly or in the form of Preferred Shares) (or other applicable security) have the right to receive any cash, securities or other property or in which the Preferred Shares (directly or in the form of Preferred Shares) (or such other security) are exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of Preferred Shares (directly or in the form of Preferred Shares) (or such other security) entitled to receive such cash, securities or other property (whether such date is fixed by GLAI's Board of Directors, by statute, by contract or otherwise).

"**Reference Property"** shall have the meaning specified in Section 13.04(a).

"**Reference Treasury Dealer**" means any primary United States government securities dealer in New York City selected by the Company.

"**Reference Treasury Dealer Quotations**" means, with respect to each Reference Treasury Dealer and any date when Notes become due and payable, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding the date when such Notes become due and payable.

"**Refinance**" means, in respect of any Debt, to refinance, extend (including pursuant to any defeasance or discharge mechanism), renew, refund, repay, replace, prepay, redeem, defease or retire, or to issue other Debt in exchange or replacement for, such Debt. "Refinanced" and "Refinancing" shall have correlative meanings.

"**Refinancing Debt**" means Debt that is incurred to Refinance any Debt of GLAI or any of its Subsidiaries existing on the Initial Closing Date or incurred in compliance with this Note Purchase Agreement (including Debt that Refinances Refinancing Debt); *provided, however*, that:

(i) the Refinancing Debt has a Stated Maturity no earlier than (A) the Stated Maturity of the Debt being Refinanced or (B) the 91st day after the Maturity Date of the Notes;

21

(ii) such Refinancing Debt is incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount of the Debt being Refinanced when it was initially incurred (or if issued with original issue discount, the aggregate accreted value at the time of Refinancing), plus, in either case, premiums, interest and reasonable expenses incurred in connection therewith;

(iii) if the Debt being Refinanced is Subordinated Obligations, such Refinancing Debt is subordinated in right of payment to the Notes at least to the same extent as the Debt being Refinanced; and

(iv) the Debt being Refinanced may not be secured by any Lien on any Collateral (except and to the extent such Debt was already secured by a Lien on the same Collateral previously securing the Debt so refinanced).

"**Register**" has the meaning specified in Section 4.03(a).

"**Registrar**" has the meaning specified in Section 4.03(a).

"**Regular Record Date**," with respect to any Interest Payment Date, means the May 15 or November 15 (whether or not such day is a Business Day) immediately preceding the applicable May 31 or November 30 Interest Payment Date, respectively.

"**Related Business**" means a business that (i) primarily operates in the airline industry, (ii) primarily supports the airline industry or (ii) primarily supports a business in which GLAI or any of its Subsidiaries already operate.

"**Related-Party Transaction**" has the meaning specified in Section 7.11.

"**Relevant Date**" means, with respect to any payment on a Note, whichever is the later of:  (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Company on or prior to such due date, the date on which notice is given to the Purchaser that the full amount has been received by the Company.

"**Relevant Stock Exchange**" means B3, or, if the Preferred Shares are not then listed on the B3, the principal securities exchange on which the Preferred Shares are then listed.

"**Relibi Law**" means any tax imposed by Luxembourg by virtue of the Luxembourg law of 23 December 2005, as amended from time to time.

"**Responsible Officer**" means (a) with respect to the Company or any Agent (other than the Collateral Agent), the chief executive officer, president, chief financial, vice-president, director, officer, treasurer, assistant treasurer, controller or any other authorized signatory of such Person; and (b) with respect to the Collateral Agent, any officer of the Collateral Agent with direct responsibility for the administration of this Note Purchase Agreement and the Collateral Documents.

"**Restricted Payments**" and "**Restricted Payment**" have the meanings specified in Section 7.14(d).

"**Sale Price Condition**" shall have the meaning specified in Section 13.01(b).

"**Sales Taxes**" shall mean, for any reference period, any taxes on any Adjusted Operating Revenue pursuant to applicable Law, excluding income taxes and other taxes applicable to profits.

"**Sanctioned Country or Region**" shall have the meaning specified in Section 6.01(25).

"**Sanctions**" shall have the meaning specified in Section 6.01(25).

"**Scheduled Trading Day**" means a day that is scheduled to be a Trading Day on the Relevant Stock Exchange. If the Preferred Shares are not so listed or admitted for trading on a Relevant Stock Exchange, "**Scheduled Trading Day**" means a Business Day.

"**Secured Parties**" means the Purchaser and the Collateral Agent.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Series A Abra Senior Note due 2028**"   means the Senior Unsecured Note due 2028, issued by Abra Group Limited, to Abra Global Finance from time to time.

"**Series B Abra Senior Note due 2028**"   means the Senior Unsecured Note due 2028, issued by Abra Group Limited, to Abra Global Finance from time to time.

"**Settlement Amount**" has the meaning specified in Section 13.02(a)(3).

"**Settlement Method**" means, with respect to any exchange of Notes, Physical Settlement, Cash Settlement or Combination Settlement, as elected (or deemed to have been elected) by the Company.

"**Settlement Notice**" has the meaning specified in Section 13.02(a)(2).

"**Significant Subsidiary**" means, with respect to any Person, a Subsidiary of such Person that meets the definition of "significant subsidiary" in Article 1, Rule 1-02(w) of Regulation S-X under the Exchange Act.

"**Smiles Complete Technological Infrastructure**" means any and all computer programs, software, source codes, technology and their respective licenses, copyrights and applications that are used for the operation of the Loyalty Program.

"**Smiles Database, Client and Supplier List**" means all data, information, documents, Smiles Personal Data and any other elements related to the operations of the Loyalty Program, including, but not exclusively, the Loyalty Program's clients list and suppliers lists, as well as any other data, information and document related to GLA's or IPCo's database that is necessary for or related to the operation of the Loyalty Program, as updated or modified from time to time, regardless of where such data, information, documents, Smiles Personal Data or other elements are held now or in the future, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

23

"**Smiles Intellectual Property**" means (i) all the currently existing intellectual property rights owned by GLA, including as universal successor of Smiles Fidelidade S.A., related to the Loyalty Program, corresponding to (a) trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (*INPI – Instituto Nacional da Propriedade Industrial*) owned by GLA; and (b) the Brazilian internet domains owned by GLA, as described in the Exhibit III of GLA's Smiles Fiduciary Transfer Agreement, (ii) as well as any trademarks or Brazilian internet domains that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Operating Manuals**" mean (i) the currently existing manuals, documents and information related to the operation of the Loyalty Program, and its copyrights, as described in the Exhibit VI of GLA's Smiles Fiduciary Transfer Agreement; (ii) as well as any manuals, documents and information related to the operation of the Loyalty Program, and its copyrights that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Personal Data**" means any data or information, as long as owed by or in possession of GLA or IPCo, of an identified or identifiable individual, including of GLA's or IPCo's and its affiliates' clients, and their suppliers, distributors and commercial partners in general, among others, including but not limited to: names, phone numbers, contact information (address, e-mail address, commercial phone number, mobile number, fax), occupation, bank information, account number, total miles and points balance in the Loyalty Program, history of engagement in the Loyalty Program, history of accrual and redemption activity in the Loyalty Program, communication and promotion opt-ins in the Loyalty Program, credit card number, marital or relationship status, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Technological Infrastructure**" means certain six (6) licenses from computer programs and software that are used by GLA as technological instruments for the development of the activities necessary for the operation of the Loyalty Program, as further described in the GLA's Smiles Fiduciary Transfer Agreement.

"**Specified Corporate Event**" shall have the meaning specified in Section 13.04(a).

"**Specified Dollar Amount**" means the maximum cash amount per U.S.$1,000 principal amount of Notes to be received upon exchange as specified (or deemed specified) in the Settlement Notice related to any exchanged Notes.

"**Spin-Off**" shall have the meaning specified in Section 13.03(c).

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Subordinated Obligation**" means any Debt that is subordinate or junior in right of payment to the Notes and the Note Guarantees pursuant to a written agreement.

"**Subsidiary**" means, in respect of any specified Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person.

"**Surviving Person's Tax Jurisdiction**" has the meaning specified in Section 8.02(2).

"**Taxing Jurisdiction**" has the meaning specified in Section 7.06(a).

"**Total Created Value**" means (A) 50% of (i) the sum of the principal and interest that would have been payable on the repurchased GOL Bonds using the proceeds of the Notes assuming such GOL Bonds were redeemed at par at maturity (or, in the case of the GOL Perpetual Notes, through the tenth anniversary of the date such notes are redeemed), minus the cost to repurchase such GOL Bonds (including, for purposes of this calculation, any cash transaction costs and other cash expenses related thereto) plus (ii) the difference (not less than zero) between the nominal amounts to be paid by GLAI or any of its Subsidiaries using the proceeds of the Notes for any liabilities purchased by GLAI or any of its Subsidiaries (other than the GOL Bonds) minus the cost to purchase such liabilities (including, for purposes of this calculation, any cash transaction costs and other cash expenses related thereto) divided by (B) 1,815,000; provided that Total Created Value shall not exceed [●][1].

"**Trading Day**" means a day on which (i) trading in the Preferred Shares (or other security for which a closing sale price must be determined) generally occurs on a Relevant Stock Exchange or, if the Preferred Shares (or such other security) are not then listed on the Relevant Stock Exchange, on the principal other market on which the Preferred Shares (or such other security) are then traded and (ii) a Last Reported Sale Price of the Preferred Shares (or closing sale price for such other security) is available on such securities exchange or market; *provided that* if the Preferred Shares (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day.

"**Transaction Documents**" means this Note Purchase Agreement, the Notes and the Collateral Documents.

"**Transfer Agent**" has the meaning specified in Section 4.03(a).

"**Treasury Rate**" means, with respect to the date when Notes become due and payable, (1) the yield, under the heading which represents the average for the immediately preceding week, as reported on the most recent H.15 page available through the website of the Board of Governors of the Federal Reserve System, or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields

---

[1] NTD: Amount to be set such that the maximum effect of the Total Created Value is to reduce the premium of the Exchange Rate from 135% to 115%.

on actively traded United States Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Maturity Date of the notes to be redeemed, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined, and the Treasury Rate shall be interpolated or extrapolated from such yields on a straight-line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per year equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for the when Notes become due and payable. The Treasury Rate will be calculated on the third Business Day the date when Notes become due and payable.

"**Trigger Event**" has the meaning specified in Section 13.03(c).

"**U.S. Dollars**" and "**U.S.$**" each mean the currency of the United States.

"**unit of Reference Property**" shall have the meaning specified in Section 13.04(a).

"**United States**" and "**U.S.**" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"**Valuation Certification**" means the valuation of the Collateral contained in the closing date valuation therefor prepared by mba Aviation, dated on or prior to the Initial Closing Date.

"**Valuation Period**" shall have the meaning specified in Section 13.03(c).

"**VWAP Trading Day**" means a day on which (i) there is no Market Disruption Event and (ii) trading in the Preferred Shares generally occurs on the Relevant Stock Exchange; *provided that* if the Preferred Shares are not then listed on any Relevant Stock Exchange, "**VWAP Trading Day**" means a Business Day.

"**Wholly Owned Subsidiary**" means a Subsidiary all of the Capital Stock of which (other than directors' qualifying shares) is owned by any Person or another Wholly Owned Subsidiary.

SECTION 1.02.    *Rules of Construction.*  (a) For all purposes of this Note Purchase Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(1)    the terms defined in this Note Purchase Agreement have the meanings assigned to them in this Note Purchase Agreement and include the plural as well as the singular;

(2)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Note Purchase Agreement as a whole and not to any particular Article, Section or other subdivision;

(3)      "or" is not exclusive;

(4)      any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(5)      "including" means "including, without limitation";

(6)      any reference herein to any Person shall be construed to include such Person's successors and assigns;

(7)      the word "asset" and "property" shall be construed to have the same meaning and effect and to refers to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(8)      any reference to an "Article," a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Note Purchase Agreement.

(b)      All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with IFRS.

(c)      For purposes of the definitions set forth in Section 1.01 and this Note Purchase Agreement generally, all calculations and determinations shall be made in accordance with IFRS and shall be based upon the consolidated financial statements of the GLAI Group prepared in accordance with IFRS.

(d)      With respect to the Company, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque, nantissement, gage, privilège, sûreté réelle, droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant, associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an *administrateur* of its general partner, (v) a receiver, administrative receiver, administrator, liquidator or the like includes a *juge délégué, commissaire, juge-commissaire, liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*), insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*) composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally, (vii) a guarantee includes any guarantee which is independent from the debt to which it relates and any suretyship (*cautionnement*) within the meaning of Articles 2011 and *seq.* of the Luxembourg Civil Code, (viii) "gross negligence" is a reference to *faute lourde* and willful misconduct is a reference to *faute dolosive* and (ix) an "agent" includes a *mandataire.*

27

SECTION 1.03.    *Table of Contents; Headings*.  The table of contents and headings of the Articles and Sections of this Note Purchase Agreement have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 1.04.    *Form of Documents Delivered*.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company or the applicable Guarantor may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company or the applicable Guarantor stating that the information with respect to such factual matters is in the possession of the Company or the applicable Guarantor, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Note Purchase Agreement, they may, but need not, be consolidated and form one instrument.

## ARTICLE 2
### PURCHASE AND SALE OF THE NOTES

SECTION 2.01.    *Sale and Purchase of the Notes*. Subject to the terms and conditions herein set forth, on any Closing Date, the Company will issue and sell to the Purchaser, and the Purchaser agrees to purchase from the Company, the aggregate principal amount of Notes of up to U.S.$ 1,430,925,000 (the "**Principal Amount**"), at the price of 85% of the face value of such Notes (the "**Purchase Price**").

SECTION 2.02.    *Closing* . The initial sale and purchase of the Notes will take place at a closing (the "**Closing**") at 11:00 a.m., New York City time, on the Initial Closing Date at the offices of Milbank LLP, 55 Hudson Yards, New York, New York 10001 (the "**Closing Location**"), or at such other time and place as is mutually agreed to by the Company and the Purchaser. Any subsequent sales and purchases of the Notes will take place at such times and at such locations as is mutually agreed to by the Company and the Purchaser. At such times the Company will deliver to the Purchaser the principal amount of Notes, pursuant to the terms set forth in Section 2.01 above (in such permitted denomination or denominations and registered in its name or the name of such nominee or nominees as the Purchaser may request) against

28

payment of such amount by federal funds wire transfer of immediately available funds to such bank accounts as the Company designates.

SECTION 2.03.   *Expenses*. The Company and the Guarantors covenant and agree with the Purchaser that the Guarantors will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Company's advisors, if any, in connection with the issue of the Notes; (ii) any cost incurred in connection with the listing on any applicable national securities exchange of the Preferred Shares issuable upon exchange of the Notes pursuant to the terms set forth herein; and (iii) all other costs and expenses incident to the performance of its obligations hereunder which are not otherwise specifically provided for in this Section 2.03. The obligations of the Company under this Section 2.03 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Note Purchase Agreement, the Notes, and the termination of this Note Purchase Agreement.

## ARTICLE 3
### USE OF PROCEEDS

SECTION 3.01.   *Net Proceeds*.  The Company will apply the net proceeds from the Purchase Price to refinance in whole or in part, on a dollar for dollar basis, the GOL Senior Secured Notes due 2028.

## ARTICLE 4
### THE NOTES

SECTION 4.01.   *Form and Dating*.  The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Note Purchase Agreement and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any Law, agreement to which the Company is subject, if any, or usage; *provided that* any such notation, legend or endorsement is in a form acceptable to the Company.

Each Note shall be dated the date of its execution.

Each Note shall represent such principal amount of the Outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of Outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of Outstanding Notes represented thereby may from time to time be increased or reduced to reflect repurchases, cancellations, exchanges for cash, Preferred Shares or a combination thereof, transfers or exchanges permitted hereby.

Accrued interest on the Notes shall be computed on the basis of a 360 day year composed of twelve 30 day months and, for a partial month, on the basis of the number of days actually elapsed in a 30 day month.

Unless previously exchanged pursuant to this Note Purchase Agreement, the Notes shall constitute direct unconditional senior obligations of the Company and shall rank at least *pari passu* in right of payment with all other present and future senior Debt of the Company and shall rank senior in right of payment to all present and future subordinated Debt of the Company.

Subject to the terms hereof, each of the Notes represents the right to receive pro rata payments with respect to the Notes. Each Note shall rank *pari passu* with each other Note and, subject to Section 9.03, be equally and ratably secured by the Collateral. All Notes shall be substantially identical except as to denominations and as expressly permitted in this Note Purchase Agreement.

Upon completion of the perfection requirements set forth in Section 7.07 below, this Note Purchase Agreement shall evidence a first priority continuing Lien on and security interest in the Collateral to secure the full payment of the principal, interest and other amounts of the Notes Obligations.

SECTION 4.02.    *Execution and Delivery*.  (a) Two Officers of the Company shall sign the Notes for the Company by manual or electronic signature.

(1)    If an Officer whose signature is on a Note no longer holds that office at the time the Company delivers the Note, the signature of such Officer shall be valid nevertheless.

(2)    A Note shall not be valid until two authorized signatories of the Company manually or electronically sign the Note.  Such signatures shall be conclusive evidence that the Note has been executed under this Note Purchase Agreement.

(3)    The Company shall execute and deliver the Notes on each Closing Date in an aggregate principal amount corresponding to the Principal Amount.

(4)    The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "**Authorized Denomination**").

SECTION 4.03.    *Registrar, Transfer Agent, Exchange Agent and Paying Agent*.  (a) Subject to such reasonable rules as the Company may prescribe, the books of the Company for the exchange, registration, and registration of transfer of Notes shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "**Register**"). The pledge of the Notes by the Purchaser to the Collateral Agent under the Abra Senior Secured Exchangeable Notes Indenture and the Abra Senior Secured Notes Indenture shall be noted in the Register on each Closing Date. The Registrar (the "**Registrar**") shall maintain books for the exchange, registration and registration of transfer of Notes and cause its books to be amended upon any exchange, registration or registration of transfer of any Notes.

Notwithstanding the above an up-to-date copy of the Register shall be kept at any time at the registered office of the Company in Luxembourg.

GLAI will initially act as the Registrar, Transfer Agent, Exchange Agent and Paying Agent of the Notes. For so long as GLAI is acting in these roles, all notices required to be delivered to the Registrar, Transfer Agent, Exchange Agent and Paying Agent pursuant to this Note Purchase Agreement shall be delivered to the Company's Office. The Company's Office will be the office or agency where Notes may be surrendered for registration of transfer or

30

exchange or for presentation for payment or repurchase or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be served.

The "**Company's Office**" is located at:

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

The Company may at any time, by notice to each Holder, change the address of the Company's Office.

GLAI may have one or more co-registrars and one or more additional Transfer Agents, Exchange Agents or Paying Agents. The terms "**Transfer Agent**," "**Exchange Agent**" and "**Paying Agent**" include any additional transfer agent, exchange agent or paying agent, as the case may be. The term "**Registrar**" includes any co-registrar.

(b)     The Company shall enter into any appropriate agency agreements with any Agent that is not a party to this Note Purchase Agreement, which shall implement the provisions of this Note Purchase Agreement that relate to such Agent.

(c)     The Registrar shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the written request of the Company provided a reasonable amount of time prior to such inspection. Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such Notes have been replaced. In the case of the replacement of any of the Notes, the Registrar shall keep a record of the Note so replaced, and the Notes issued in replacement thereof. In the case of the cancellation of any of the Notes, the Registrar shall keep a record of the Note so cancelled and the date on which such Note was cancelled. Each Transfer Agent shall notify the Company of any transfers or exchanges of Notes effected by it.

(d)     All Notes presented or surrendered for registration of transfer, exchange for cash or exchange for Preferred Shares or a combination thereof shall (if so required by the Company) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

(e)     Neither the Company, nor GLAI shall be required to exchange a Note or register a transfer of a Note with respect to (i) Notes that have been surrendered for exchange for cash, Preferred Shares or a combination thereof or, if a portion of any Note is surrendered for exchange for cash, Preferred Shares or a combination thereof, such portion thereof surrendered for exchange for cash, Preferred Shares or a combination thereof or (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn).

31

SECTION 4.04.    *Paying Agent to Hold Money in Trust.*

(a)    By 10:00 A.M. New York time, no later than one Business Day prior to each Interest Payment Date on any Note, GLAI shall deposit in immediately available funds a sum sufficient to pay such principal and interest when so becoming due (including any amounts under Section 7.06(a)).  GLAI shall request that the bank through which such payment is to be made agrees to supply to GLAI by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by facsimile) of GLAI's intention to make such payment.  The Company shall require each Paying Agent not a party to this Note Purchase Agreement, if any, to agree in writing that such Paying Agent shall hold in trust, for the benefit of Holders or the Company, all money held by such Paying Agent for the payment of principal, premium, if any, and interest on the Notes.

(b)    Unless the Paying Agent is GLAI, any Subsidiary of GLAI or the Company, each payment in full of principal, Additional Amounts and/or interest payable under the Notes and this Note Purchase Agreement in respect of any Note made by or on behalf of the Company or the Guarantors to or to the order of the Paying Agent in the manner specified herein or in the Notes on the date due shall be valid and effective to satisfy and discharge the obligation of the Company or the Guarantors, as the case may be, to make payment of principal, Additional Amounts and/or interest payable hereunder and under the Notes on such date; *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Company or the Guarantors, as the case may be, or held by it, on behalf of the Holders hereunder.

SECTION 4.05.    *Payment of Principal and Interest; Principal and Interest Rights Preserved*

(a)    Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of the Paying Agent or any other Paying Agent appointed by the Company, if any.

(b)    If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder, and (ii) second, towards payment of principal then due hereunder.

(c)    Payment of interest on each Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder.  The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

(d)    The Notes shall bear interest at an interest rate as follows:

32

(1)    4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**"); and

(2)    13.50% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth in Section 4.05(e).

(e)    GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (i) semi-annually in arrears, on each applicable Interest Payment Date or (ii) on the Maturity Date; *provided that*, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; *provided, further*, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of such Note and this Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of this Note Purchase Agreement.

(f)    If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

SECTION 4.06.    *[Reserved]*.

SECTION 4.07.    *Transfer of Notes*.  Transfer will be effected without charge by or on behalf of the Company, the Registrar or the Transfer Agents, but upon payment in respect of any tax or other governmental charges which may be imposed in relation to it.

SECTION 4.08.    *Replacement Notes*.  If any Note at any time becomes mutilated, defaced, destroyed, stolen or lost, such Note may be replaced at the cost of the applicant (including properly incurred legal fees of the Company and the Agents) at the Company's Office, upon provision of, in the case of destroyed, stolen or lost Notes, evidence satisfactory to the Company that such Note was destroyed, stolen or lost, together with such indemnity as the Company may require.  Mutilated or defaced Notes must be surrendered before replacements shall be issued.

Each Note executed and delivered in exchange for or in lieu of any such Note shall carry rights to accrued and unpaid interest and to interest to accrue equivalent to the rights that were carried by such Note before such Note was mutilated, defaced, destroyed, stolen or lost.

Every replacement Note is an additional obligation of the Company and shall be entitled to the benefits of this Note Purchase Agreement.

SECTION 4.09.    *Cancellation*.  The Agents shall forward to GLAI any Notes surrendered to them for transfer, exchange or payment. GLAI and no one else shall cancel and GLAI shall destroy in accordance with its customary procedures (subject to the record-retention

33

requirements of the Exchange Act) all Notes surrendered for transfer, exchange, payment or cancellation. The Company may not issue new Notes to replace Notes it has redeemed, paid in full (other than in connection with a transfer or exchange). GLAI shall cancel any Note held by the Company or its Affiliates, except for the Purchaser. A Note shall cease to be deemed Outstanding if held by the Company, any Guarantor or any of their Affiliates (except for the Purchaser) holds such Note, including for voting purposes.

SECTION 4.10.    *Defaulted Interest*.  If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest pursuant to the terms set forth in Section 4.05(e) (plus interest on such defaulted interest at the rate specified in Section 7.01(b) to the extent lawful) in any lawful manner if, after written notice given by the Company to each Holder of the proposed payment pursuant to this Section 4.10, such manner of payment shall be deemed practicable by each Holder.

The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date, pursuant to the terms set forth in Section 4.05(e), which date shall be at least five Business Days prior to the payment date of such defaulted interest.  The Company shall fix or cause to be fixed any such special record date and payment date, and, at least 15 days before any such special record date, the Company shall deliver to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 4.11.    *No Purchase of the Notes by the Company or its Affiliates*.  Except as set forth herein, neither the Company, Guarantor nor any of its respective Affiliates may repurchase or otherwise acquire after the Initial Closing Date any of the Notes prior to the Maturity Date without the prior written consent of the Abra Notes Supermajority Holders.  Any Notes so purchased or acquired with such prior written consent may not be resold and shall be cancelled.

SECTION 4.12.    *Fundamental Change*. Neither the Company, GLAI nor any of its Affiliates may enter into a transaction or a series of transactions that would reasonably be expected to result in a Fundamental Change without the prior written consent of the Abra Notes Supermajority Holders.

### ARTICLE 5
CONDITIONS TO CLOSING

SECTION 5.01.    *Purchaser's Conditions to Issuance of Notes.*  The obligations of the Purchaser to purchase the Notes shall be subject to the satisfaction, on or prior to any Closing Date, of each of the following conditions (any or all of which may be waived by the Purchaser in writing, in whole or in part, to the extent permitted by applicable Law), each in form and substance satisfactory to the Purchaser and the Abra Notes Supermajority Holders.

(a)    Milbank LLP, U.S. counsel for the Company and the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed

34

to the Purchaser, the Collateral Agent, holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(b)      NautaDutilh Avocats Luxembourg S.à r.l., Luxembourg legal counsel for the Company, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(c)      Lefosse, Brazilian legal counsel for the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser, and the Abra Holders.

(d)      Pursuant to Sections 2.01 and 4.02, the Company shall have authorized, issued and delivered Notes to the Purchaser in an aggregate principal amount corresponding to the Principal Amount subject to original issue discount of 85%.

(e)      The representations and warranties of the Company contained in this Note Purchase Agreement shall be true and correct as of each Closing Date (except to the extent relating specifically to a prior date) in all material respects (provided that if any representation or warranty already includes a materiality or material adverse effect qualifier, such representation or warranty is true and correct in all respects), both before and after giving effect to the purchase of the Notes.

(f)      The Company shall have delivered to the Purchaser a formalities certificate of an Officer, dated as of the Initial Closing Date (and to the extent anything has changed therein, on each subsequent Closing Date), (i) appending a copy the Company's articles of association, (ii) appending a certificate of non-inscription of a judicial decision *(certificat de non-*inscription *de décision judiciaire)* and an excerpt pertaining to the Company issued by the Luxembourg Register of Commerce and Companies dated no earlier than one Business Day prior to such Closing Date, (iii) appending a copy of the resolutions of the Board of Directors approving the terms of, and the transactions contemplated by, the Transaction Documents and resolving that it executes, delivers and performs the Transaction Documents and authorises a specified person or persons to execute the Transaction Documents on behalf of the Company, (iv) certifying that each copy document relating to it specified in this paragraph is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than such Closing Date, (v) providing a specimen of the signature of each person authorised by the resolutions referred to in  above in relation to the Transaction Documents, (vi) confirming compliance of the Company with the provisions of the Luxembourg law dated 31 May 1999 of the domiciliation of companies, as amended, (vii) confirming that the Company has not been declared bankrupt *(en faillite)*, and no application has been made by the Company, the relevant director or the Board of Directors in relation to, any declared bankruptcy *(faillite)*, voluntary or judicial liquidation

35

*(liquidation volontaire ou judiciaire)*, administrative dissolution without liquidation *(dissolution administrative sans liquidation)*, composition with creditors *(concordat préventif de la faillite)*, suspension of payments *(sursis de paiement)*, controlled management *(gestion contrôlée)*, general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Council Regulation N°848/2015 of 20 May 2015 on insolvency proceedings (recast) (the "**Regulation**"), (viii) confirming that, to the best of the knowledge of the relevant director and the Board of Directors, no other person entitled has made any corporate action, legal proceedings or other procedure or step in connection with, nor has the Company or the Board of Directors been notified of, any bankruptcy *(faillite)*, voluntary or judicial liquidation *(liquidation volontaire ou judiciaire)*, administrative dissolution without liquidation *(dissolution administrative sans liquidation)*, composition with creditors *(concordat préventif de la faillite)*, suspension of payments *(sursis de paiement)*, controlled management *(gestion contrôlée)*, fraudulent conveyance *(action pauliana)*, general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Regulation (ix) confirming that the Company is not, on the date of such Closing Date and will not, as a result of the entering into the Transaction Documents, be in a state of cessation of payments *(cessation de paiement)* and lose its creditworthiness *(ébranlement de credit)* and (x) confirming that the Company is up-to-date with its obligations of publication of the annual accounts and does not contravene the provisions of the Luxembourg Code de commerce or the laws governing Luxembourg commercial companies.

(g)    The Company shall have duly executed and delivered to the Purchaser and Collateral Agent counterparts of this Note Purchase Agreement, duly executed by each party thereto (other than the Purchaser), with a copy to be delivered to the Abra Holders.

(h)    The Company shall have delivered to the Purchaser an Officer's Certificate, dated as of the Initial Closing Date, certifying that (i) the conditions specified in this Section 5.01 have been fulfilled, (ii) there has not occurred since the date hereof, any event or condition that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and (iii) no Default or Event of Default hereunder exists at the time of the purchase of the Note on the Initial Closing Date.

(i)    Subject to documents and evidences that under the Transaction Documents or applicable law must be delivered after the Initial Closing Date, the Company and the Guarantors shall have duly executed and delivered to the Purchaser and Collateral Agent a copy of each of the Collateral Documents (including without limitation GLA's Smiles Fiduciary Transfer Agreement, GLA's Fiduciary Transfer of IPCo's Shares Agreement and IPCo's Smiles Fiduciary Transfer Agreement) and executed and delivered to the Purchaser a copy of the Exclusivity Side Letter, each duly executed by each party thereto and such evidence as the Purchaser may reasonably require of the effectiveness of the security contemplated thereby and the perfection of the security interest created thereby (except as otherwise described in Section 7.07(c)), including acceptable evidence of payment or arrangements for payment by the Company of all applicable taxes, fees, charges, costs and expenses required for the recording of the Collateral Documents.

36

(j)      The purchase and sale of the Notes shall not be prohibited or enjoined by any court of any competent jurisdiction.

(k)      The Company shall have delivered, no later than five (5) Business Days prior to the Initial Closing Date, to the Purchasers a valuation report prepared by an independent appraiser with respect to the value of the Loyalty Program and the Collateral granted by the Company and the Guarantors to the Collateral Agent hereunder. As of the Initial Closing Date, the aggregate principal amount of the Notes (as of the Initial Closing Date) plus the aggregate principal amount of the GOL Senior Secured Notes 2028 (as of the Initial Closing Date) shall not exceed 50% of the value of the Collateral as set forth in the Valuation Certification.

SECTION 5.02.    *Company's Conditions to Issuance of Notes*.  The obligation of the Company to consummate the issuance and sale of the Notes to the Purchaser shall be subject to the satisfaction, on or prior to each Closing Date, of each of the following conditions with respect to the Purchaser (any or all of which may be waived by the Company in writing, in whole or in part, to the extent permitted by applicable Law):

(a)      The representations and warranties of the Purchaser contained in this Note Purchase Agreement shall be true and correct as of the Initial Closing Date.

(b)      The Purchaser shall have delivered, or caused to be delivered, to the Company, on each Closing Date, the Purchaser Deliverables.

(c)      The Company shall have received the Purchase Price, in cash, from the Purchaser.

(d)      The Purchaser shall have duly executed and delivered, or caused to be delivered, to the Company counterpart signatures to this Note Purchase Agreement.

(e)      The Purchaser shall have delivered to the Collateral Agent the Know-Your-Customer documents required by the Collateral Agent, as listed in Exhibit C hereto.

(f)      The Purchaser shall have issued the Series A Abra Senior Note due 2028 and the Series B Abra Senior Note due 2028 to Abra Global Finance.

(g)      Abra Global Finance shall have issued the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

SECTION 5.03.    *Conditions Relating to Collateral*.  GLA shall grant and perfect the first priority Lien in the Collateral in accordance with the Collateral Documents, and cause any filings and other actions (including, without limitation, all required registrations, filings and recordations with the applicable notaries or registries) necessary for the creation and perfection of the Lien in the Collateral in favor of the Secured Parties to be completed pursuant to Section 7.07.

**ARTICLE 6**

REPRESENTATIONS AND WARRANTIES

SECTION 6.01.   *Representations of the Company and the Guarantors*. The Company and, as applicable, each of the Guarantors represents and warrants to, and agrees with, the Purchaser, as of the Initial Closing Date:

(1)   *Organization of the Company*.  The Company and each of the Guarantors have been duly incorporated, are validly existing as companies in good standing (where applicable) under the laws of their respective jurisdictions of incorporation, have the corporate power and authority to own their respective property and to conduct their businesses and are duly qualified to transact business and are in good standing (where applicable) in each jurisdiction in which the conduct of their businesses or their ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing (where applicable) would not have a Material Adverse Effect.

(2)   *Authorization of this Note Purchase Agreement*.  This Note Purchase Agreement has been duly authorized, executed and delivered by the Company and each of the Guarantors.

(3)   *Authorization of the Notes*.  The Notes have been duly authorized by the Company and each of the Guarantors, and, when executed and authenticated in accordance with the provisions of this Note Purchase Agreement and issued and delivered to and paid for by the Purchaser in accordance with the terms of this Note Purchase Agreement, will be on Initial Closing Date, valid and binding obligations of the Company and each of the Guarantors, enforceable against the Company and each of the Guarantors in accordance with their terms, subject to (i) applicable bankruptcy, insolvency, judicial or extrajudicial reorganization, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights generally (collectively, the "**Enforceability Exceptions**"); and (ii) equitable principles of general applicability, and will be entitled to the benefits of this Note Purchase Agreement pursuant to which such Notes are to be issued.

(4)   *Authorization of the Transaction Documents*.  Each of the Transaction Documents to which the Company and each of the Guarantors are a party has been duly authorized by the Company and each of the Guarantors, and when executed and delivered by the Company and each of the Guarantors, will be a valid and legally binding agreement of the Company and each of the Guarantors enforceable against the Company and each of the Guarantors in accordance with its terms, subject to (i) the Enforceability Exceptions and equitable principles of general applicability; and (ii) the requirements set forth in Section 6.01(17) with respect to the enforcement and admissibility of this Note Purchase Agreement and the Notes into evidence in Brazil directly before public agencies and courts in Brazil.  When all required filings and recordings with respect to, and deliveries of, the Collateral have been made as required by the Collateral Documents, will create valid, perfected security interests in the Collateral, subject to no prior liens (other than certain other permitted liens and encumbrances permitted under this Note

Purchase Agreement) being created and perfected prior to perfection of the security interests in the Collateral.

(5) *Ranking of the Notes*. The Notes and the Note Guaranties will constitute direct, unconditional, senior and secured obligations of the Company and the Guarantors, respectively, without any preference among themselves, of the Company and the Guarantors and will rank senior to all other present and future unsubordinated and secured obligations of the Company and the Guarantors.

(6) *Non-Contravention*. The execution and delivery by the Company and each of the Guarantors, and the performance by the Company and each of the Guarantors of their obligations under, this Note Purchase Agreement, the Collateral Documents (including, without limitation, the grant and perfection of liens and security interests in the Collateral pursuant to the terms in the applicable Collateral Documents), as applicable, and the Notes do not contravene any provision of applicable law which would affect the nature of the Notes or the articles of association, bylaws or other organizational documents of the Company and each of the Guarantors, any agreement or other instrument binding upon any of the Company and each of the Guarantors that is material to the Company and each of the Guarantors, (including any agreement for the incurrence of Debt), or any judgment, order or decree of any governmental body, agency or court having jurisdiction over the Company and each of the Guarantors.

(7) *No Consents Required*. No consent, approval, authorization or order of, or qualification with, any governmental or regulatory body or agency or any third party (including any lender) is required for the performance by the Company and each of the Guarantors of their respective obligations under the Notes, this Note Purchase Agreement or the Collateral Documents, as applicable.

(8) *Investment Company Act*. Neither the Company nor any of the Guarantors is, and after giving effect to the placement and sale of the Notes and the application of the proceeds thereof will not be, required to register as an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

(9) *Choice of Laws*. The choice of laws of the State of New York as the governing law of this Note Purchase Agreement is a valid choice of law under the laws of Luxembourg and Brazil will be honored by the courts of Luxembourg and Brazil.

(10) *No Material Defaults*. Neither the Company nor any of the Guarantors is (i) in violation of its articles of association, bylaws or other organizational documents; (ii) in default, and no event exists that, with notice or lapse of time or both, would constitute such a default, in the performance or observance by the Company or any of the Guarantors of any material obligation, agreement, covenant or condition contained in any indenture, mortgage, loan agreement or other material agreement or instrument to which it is a party or by which it is bound or to which its property or assets are subject; or (iii) in violation of any applicable law, statute, rule or regulation or any judgment or order of any U.S., Brazilian, Luxembourg court or arbitrator or governmental or regulatory authority,

39

except in connection with clauses (ii) and (iii) for any such default or violation that would not have a Material Adverse Effect.

(11)    *Absence of Exchange Controls*.  No exchange control authorization or any other authorization, approval, consent or license of any Governmental Authority or agency in Luxembourg is required for the payment by the Company or any of the Guarantors of any amounts in United States dollars under any Transaction Document to which it is a party.

(12)    *Observance of Statutes and Orders*.  Neither the Company nor any of the Guarantors is (i) in violation of any order, judgment, decree or ruling of any court, any arbitrator of any kind or any Governmental Authority or agency in Luxembourg or Brazil or (ii) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority or agency in Luxembourg or Brazil, which violation would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(13)    *Taxes*.  All tax returns required to be filed by the Company and each of the Guarantors have been timely filed and such tax returns have been duly and accurately prepared in all material respects, and all material taxes and other assessments of a similar nature (whether imposed directly or through withholding), including any interest, additions to tax or penalties applicable thereto, due or claimed to be due from the Company and each of the Guarantors (whether or not shown to be payable on such tax returns) have been paid, other than those being contested in good faith and for which adequate reserves have been provided in accordance with IFRS.

(14)    *Tax Residency of the Company*.  The Company is resident for tax purposes solely in Luxembourg.

(15)    *Tax Residency of the Guarantors*.  Each Guarantor is resident for tax purposes solely in Brazil.

(16)    [*Reserved*].

(17)    *Absence of Further Brazilian Law Requirements*. This Note Purchase Agreement is in proper legal form under the laws of Brazil for the enforcement thereof in Brazil against the Company and each of the Guarantors, and it is not necessary in order to ensure the legality, validity, enforcement of this Note Purchase Agreement in Brazil that this Note Purchase Agreement be filed or recorded with any court or other authority in Brazil or that any stamp, issue, registration, documentary or similar taxes or duties be paid in Brazil on or in respect of this Note Purchase Agreement except that, with respect to the enforcement and admissibility of this Note Purchase Agreement into evidence in Brazil directly before the public agencies and courts in Brazil, (i) (a) if the State in which this Note Purchase Agreement was executed is not party to the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents of 5 October 1961 (the "**Apostille Convention**") (1) the signatures of the parties hereto signing outside Brazil should be notarized by a notary public licensed as such under the jurisdiction of

signing and (2) the signature of such notary public must be authenticated by a consular official of Brazil, or (b) if the State in which this Note Purchase Agreement was executed is party to the Apostille Convention, an authority designated by such State must issue a certificate that authenticates the origin of this Note Purchase Agreement ("**Apostille**"); and (ii) (a) this Note Purchase Agreement and the Apostille (if applicable) must be translated into the Portuguese language by a sworn translator and (b) this Note Purchase Agreement and the Apostille (if applicable), together with its sworn translation into the Portuguese language, must be registered with the appropriate Registry of Titles and Deeds in Brazil.

(18)     *No Registration/Trust Indenture Act.*  It is not necessary in connection with the offer, sale and delivery of the Notes to the Purchaser in the manner contemplated by this Note Purchase Agreement to register the Notes under the Securities Act or to qualify this Note Purchase Agreement under the U.S. Trust Indenture Act of 1939, as amended.

(19)     *Private Placement by the Company.*  Neither the Company, the Guarantors or anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy the Notes or any similar securities from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchaser which has been offered the Notes at a private sale for investment. Neither the Company, the Guarantors nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to (i) the registration requirements of Section 5 of the Securities Act; (ii) a requirement to produce a prospectus in the United Kingdom; or (iii) the registration requirements of any securities or blue sky laws of any applicable jurisdiction. For the purposes of this clause, "**Institutional Investor**" means (a) a Purchaser, (b) any qualified institutional buyer within the meaning of Rule 144A of the Securities Act, (c) an "accredited investor" within the meaning of Section 501(a)(1), (2), (3), (7) or (8) under the Rule 144A of the Securities Act, (d) a non-U.S. person with any potential offer or purchase being made in an offshore transaction in reliance on Regulation S of the Securities Act.

(20)     *No Restrictions on Subsidiaries of GLAI.* No Subsidiary of GLAI is prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, nor due to any judgment, order or decree of any government authority, agency or court having jurisdiction over such subsidiary, from paying any dividends to GLAI, from making any other distribution on such Subsidiary of GLAI's Capital Stock, from repaying to GLAI any loans or advances to such Subsidiary of GLAI from GLAI in accordance with the terms of any such loan or advance, or from transferring any of such of Subsidiary of GLAI's assets to GLAI or any other Subsidiary of GLAI.

(21)     *Title to Property; Leases.*  The Company and each of the Guarantors have good and sufficient title to their respective material properties as are necessary to the conduct of their operations as presently conducted. The Company and each of the Guarantors have good and sufficient title to the properties described in or referred to in the Collateral Documents, as applicable, free and clear of liens, (i) except for liens established pursuant to the Collateral Documents, and (ii) except such as do not

41

materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and each of the Guarantors.

(22)    *Licenses, Permits, Etc.*  The Company and each of the Guarantors own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, including without limitation, the Smiles Intellectual Property and any other Collateral, without known conflict with the rights of others, except for those conflicts that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(23)    *No Unlawful Payments.*  Except as disclosed in the documents relating to the Company inserted by the Purchaser in a data room, and made available to the Abra Holders (the "**Disclosure Documents**") (including the documents incorporated by reference therein), neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or other person acting on behalf of the Company or the Guarantors, has (i) used any corporate funds of the Company or the Guarantors for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government or regulatory official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption law; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. The Company, the Guarantors and to the knowledge of the Company and the Guarantors, its affiliates have conducted their businesses in compliance with all applicable anti-bribery and anti-corruption laws and have instituted, maintain and enforce, and will continue to maintain and enforce, policies and procedures designed to ensure and which are reasonably expected to continue to ensure compliance with all applicable laws.

(24)    *No Conflict with Money Laundering Laws.*  The operations of the Company and the Guarantors are and have been conducted at all times in compliance with all applicable money laundering statutes, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental or regulatory agency, authority or body or any arbitrator involving the Company or the Guarantors with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(25)    *No Conflict with Sanctions Laws.*  Neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or person acting on behalf of the Company or the

42

Guarantors is currently subject to or the target of any sanctions administered or enforced by the U.S. government, (including, without limitation, the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the U.S. Department of Commerce, the United Nations Security Council, the European Union, Luxembourg or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority (collectively, "**Sanctions**"), nor is the Company or any of the Guarantors located, organized or resident in a country or territory that is the subject or target of Sanctions, including, without limitation, Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic and the so-called Luhansk People's Republic (each, a "**Sanctioned Country or Region**").  Neither the Company nor the Guarantors will not directly or indirectly use the proceeds of this offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity, (i) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or the target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or Region or (iii) causing a violation by any person (including any person participating in the transaction, whether as underwriter, placement agent, advisor, investor or otherwise) of Sanctions. For the past five years, neither the Company nor the Guarantors has engaged in and is not now engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country or Region.

(26)    The above mentioned representations and warranties under Section 6.01(25) shall only be applicable to any Luxembourg party to the extent that such Luxembourg party will not violate or is exposed to any liability under the Council Regulation (EC) 2271/96 of 22 November 1996 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom or any similar laws or regulations.

SECTION 6.02.    *Representations of the Purchaser*. The Purchaser represents, warrants and agrees that:

(1)    It is purchasing the Notes on its own behalf, as an investment fund or account, as the case may be, duly organized and existing in accordance with the laws of the jurisdiction of its incorporation and it is purchasing the Notes for its own account or for one or more separate accounts maintained by the Purchaser and not with a view to the distribution thereof. The Purchaser has its principal address outside the United States and was located outside the United States at the time any offer to buy the Notes was made to the Purchaser and at the time that this Note Purchase Agreement is executed by the Purchaser.

(2)    The execution, delivery and performance of this Note Purchase Agreement by the Purchaser are within the powers of the Purchaser, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Purchaser is a party or by

43

which the Purchaser is bound, and will not violate any provisions of such entity's organizational documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Note Purchase Agreement is genuine, and the signatory has been duly authorized to execute the same, and this Note Purchase Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms.

(3)     It is not and, for so long as the Purchaser owns the Notes, will not be acting on behalf of: (a) an "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), which is subject to Title I of ERISA, (b) a plan described in Section 4975(e)(1) of the Code, (c) an entity whose underlying assets include "plan assets" by reason of a plan's investment in such entity (including but not limited to an insurance company general account), or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of the Department of Labor Regulation Section 2510.3-101 (29 C.F.R. Sections 2510.3-101), as modified by Section 3(42) of ERISA (each of categories (a) through (d), a "**Covered Plan**").

(4)     in making the decision to purchase the Notes, it has relied solely upon the independent investigation made by it and an independent assessment of the merits and risks of an investment in the Notes, and such decision to purchase Notes was formed based on such independent investigation of the Company, the Guarantors and the Notes, and such independent assessment of the merits and risks of an investment in the Notes.

## ARTICLE 7
### COVENANTS

SECTION 7.01.    *Payment of Principal and Interest Under the Notes*.

(a)     The Company shall punctually pay the principal of and interest on the Notes on the dates and in the manner set forth herein and as provided in the Notes.  By 10:00 a.m. (New York City time), no later than one Business Day prior to any Interest Payment Date or the Maturity Date, to the extent such amount is payable in cash, GLAI shall irrevocably deposit, or cause to be deposited, with the Paying Agent (unless the Paying Agent is GLAI) money sufficient to pay such principal and interest subject to the terms set forth in Section 4.05(e).

(b)     The Company shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 2.00% per annum pursuant to the terms set forth in Section 4.05(e).

(c)     No interest shall be payable hereunder in excess of the maximum rate permitted by applicable Law.

SECTION 7.02.    *Maintenance of Office or Agency*.  The Company shall maintain an office or agency where Notes may be (i) presented or surrendered for payment or (ii) presented for exchange for cash, Preferred Shares or a combination thereof and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be

44

served.  If at any time the Company shall fail to maintain any such required office or agency, such presentations, surrenders, notices and demands may be made or served at the Company's Office.

SECTION 7.03.   *Money for Note Payments to Be Held in Trust*.

(a)      For so long as the Company acts as Paying Agent, it shall, when electing to pay interest using cash, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, as applicable, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided.

(b)      Whenever the Company shall have one or more Paying Agents for the Notes, it shall, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, irrevocably deposit with a Paying Agent a sum sufficient to pay such principal and interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal or interest.

(c)      Each Paying Agent, subject to the provisions of this Section 7.03, shall:

(1)      hold all sums held by it for the payment of principal or premium, if any, of or interest on the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as set forth herein; *provided*, *however*, such sums need not be segregated from other funds held by it, except as required by Law; and

(2)      at any time during the continuance of any Default by the Company, upon the written request of the Holders, forthwith pay to the Holders all sums so held in trust by such Paying Agent.

(d)      The Company shall cause each Paying Agent to execute and deliver an instrument in which such Paying Agent shall agree with the Company to act as a Paying Agent in accordance with this Section 7.03, except in case the Paying Agent is the Company or an Affiliate of the Company.

(e)      Any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

SECTION 7.04.   *Maintenance of Corporate Existence*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, (i) maintain in effect its corporate existence and all registrations necessary therefor; *provided that* these restrictions shall not prohibit any transactions permitted by Article 8; (ii) not amend, supplement, waive or otherwise modify certain specified provisions of the documents relating to each of the Guarantors' or its

45

Subsidiaries' rights or benefits under its respective organizational documents without the prior written consent of the Purchaser, and the Abra Notes Supermajority Holders, as the case may be, if such amendment, supplement, waiver or modification would materially adversely affect the rights of the Purchaser, or of the then holders of this Note; (iii) not change its corporate form; (iv) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and the like necessary in the normal conduct of its business, activities or operations; and (v) maintain or cause to be maintained in good repair, working order and condition (normal wear and tear excepted) all properties used in its business; *provided*, *however*, that neither GLAI nor its Subsidiaries shall be prevented from discontinuing those operations (including through the transfer or dissolution of a Subsidiary) or suspending the maintenance of those properties (including through the sale thereof) which, in the reasonable judgment of GLAI, are no longer necessary in the conduct of GLAI's business, or that of its Subsidiaries; and *provided*, *further*, that such discontinuation of operations or suspension of maintenance shall not be materially disadvantageous to the Holders and such operations shall not represent more than 3.5% of the aggregate consolidated gross revenues of GLAI and its Subsidiaries for the most recent fiscal year.

SECTION 7.05.    *Payment of Taxes and Claims*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its property or in respect of any of its franchises, businesses, income or profits before any penalty or interest accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for sums which have become due and payable and which by Law have or might become a Lien upon its property, unless the failure to make such payment could have: (a) a Material Adverse Effect upon the financial condition of (i) the Company or (ii) the GLAI Group considered as one enterprise, or (b) a Material Adverse Effect on the performance of the Company's or GLAI's obligations hereunder; and *provided*, *further*, that no such charge or claim need be paid while it is being contested in good faith by appropriate proceedings and if appropriate reserves or other provisions are maintained in respect of such amounts in accordance with IFRS.

SECTION 7.06.    *Payment of Additional Amounts*.  (a) All payments by GLAI in respect of the Notes or the Guarantors (or any Paying Agent if other than GLAI) in respect of the Note Guaranties or of cash and/or deliveries of Preferred Shares (together with payments of cash in lieu of a fractional Preferred Share) upon exchange, will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of Brazil or Luxembourg, or any political subdivision or authority therein or thereof or any other jurisdiction in which any officer of the Company, the Company or any Guarantor is organized, doing business or otherwise subject to the power to tax (any of the aforementioned being a "**Taxing Jurisdiction**"), unless the Company or the Guarantors (or any Paying Agent if other than GLAI) are compelled by Law to deduct or withhold such taxes, duties, assessments, or governmental charges. In such event, the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will make such deduction or withholding, and the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will timely make payment of the full amount so withheld to the appropriate Governmental Authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders after such withholding or deduction has been made (including such deductions and withholdings

46

applicable to additional sums payable under this Section 7.06) shall equal the respective amounts of principal (and premium, if any) and interest which would have been receivable in respect of the Notes or the payment of cash and/or delivery of Preferred Shares (together with payment in cash in lieu of a fractional Preferred Share) in the absence of such withholding or deduction ("**Additional Amounts**"). Notwithstanding the foregoing, no such Additional Amounts shall be payable:

(1)      to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such Holder and the relevant Taxing Jurisdiction, including, without limitation, such Holder being or having been a citizen or resident thereof, being incorporated in, being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than connections arising from such Holder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Note Purchase Agreement, sold or assigned an interest in this Note Purchase Agreement or holding of the Note and the receipt of payments with respect to the Note;

(2)      in respect of Notes surrendered or presented for payment (if surrender or presentment is required) more than 30 days after the Relevant Date except to the extent that payments under such Note would have been subject to withholdings and the Holder of such Note would have been entitled to such Additional Amounts, had the Note been surrendered for payment on the last day of such period of 30 days;

(3)      in respect of any estate, inheritance, gift, sales, transfer, excise or personal property tax;

(4)      in respect of any tax imposed on overall net income or any branch profits tax of a Holder;

(5)      in respect of any tax imposed pursuant to sections 1471 to 1474 of the Code, any successor Law or regulation implementing or complying with, or introduced in order to conform to, such sections *provided, however*, that such Law or regulation is substantively comparable and not materially more onerous to comply with, or any intergovernmental agreement in respect thereof or any agreement entered into pursuant to section 1471(b)(1) of the Code;

(6)      in respect of the Relibi Law; or

(7)      in respect of any combination of the above.

(b)      In the event that Additional Amounts actually paid with respect to the Notes are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof such Holder determines, in its sole discretion exercised in good faith, that it has received a refund of withholding taxes as to which it has received Additional Amounts, it shall pay to the Company an amount equal to such refund

47

(but only to the extent of Additional Amounts received with respect to the withholding taxes giving rise to such refund), net of all out-of-pocket expenses (including taxes) of such Holder and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Company, upon the request of the Holder, shall repay to such Holder the amount paid over pursuant to this paragraph (b) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Holder is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (b), in no event will the Holder be required to pay any amount to the Company pursuant to this paragraph (b) the payment of which would place the Holder in a less favorable net after-tax position than the Holder would have been in if the tax subject to Additional Amounts and giving rise to such refund had not been deducted, withheld or otherwise imposed and the Additional Amounts had never been paid. This paragraph shall not be construed to require any Holder to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Company or any other Person. The Holder makes no representation or warranty that the Company will be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto. In addition, the Company shall pay certain taxes on the issuance or delivery of any Preferred Shares upon conversion of the Notes pursuant to Section 13.02(e).

(c)     The Notes are subject in all cases to any tax, fiscal or other Law or regulation or administrative or judicial interpretation. Except as specifically provided above, neither the Company nor the Guarantors shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

(d)     For the avoidance of doubt, the Company shall not pay (and shall not purport to indemnify the Holder for) any stamp, issue, registration, court or documentary taxes or any excise or property taxes, charges or similar levies (including any penalties, interest and other liabilities relating thereto) that may arise or be paid in respect of this Note Purchase Agreement or the Notes.

(e)     Any reference in this Note Purchase Agreement or the Notes to principal, interest or any other amount payable in respect of the Notes by the Company or any of the Note Guaranties by the Guarantors, or the payment of cash and/or the delivery of Preferred Shares by the Company (together with payment of cash in lieu of a fractional Preferred Share), will be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section.

(f)     The obligations of the Company and the Guarantors pursuant to this Section 7.06 shall survive termination of this Note Purchase Agreement.

SECTION 7.07.   *Collateral and Liens.*

(a)     Subject to Sections 5.03, 7.07(b) and 7.07(c), the Notes Obligations shall be secured by a first priority Lien granted by the Guarantors in the Collateral to Collateral Agent on behalf of the Secured Parties pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. The Company and the Guarantors shall not directly or indirectly, create,

48

incur, assume or suffer to exist any Lien on any of the Collateral, other than (i) the Lien granted to the Collateral Agent and (ii) a Lien that is junior in priority to the Lien granted to the Collateral Agent and which is subject to a subordination agreement substantially in the form attached hereto as Exhibit F.

(b)      The Company and the Guarantors shall not, and will not permit any Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of the Collateral, except  for the first priority Lien in the Collateral granted by the Guarantors pursuant to Section 7.07(a) above and the Collateral Documents, *provided however*, that the Company and the Guarantors may, without requiring any resolution, approval or consent from the Purchaser or the Collateral Agent, and without implying breach of any representation, warranty or obligation assumed under this Note Purchase Agreement and the Collateral Documents, constitute in favor of any creditors a collateral security under suspensive condition on the Collateral (whether senior or junior), provided that the effectiveness of such collateral security is conditioned upon the indefeasible payment in full or satisfaction of the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes ("**Future Lien**").

(c)      The Company shall ensure that the Lien in the Collateral is duly created, enforceable and perfected, to the extent required by the Collateral Documents. The Guarantors shall:

(1)      in relation to the GLA's Smiles Fiduciary Transfer Agreement and IPCo's Smiles Fiduciary Transfer Agreement, as the case may be, (i) no later than twenty (20) days from date of execution of such Collateral Document, register the Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documentos*) in Brazil, and, (ii) (A) in relation to the GLA's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration and, (B) in relation to the IPCo's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration and the fulfilment of the suspensive condition set forth in IPCo's Smiles Fiduciary Transfer Agreement, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*);

(2)      in relation to the GLA's Fiduciary Transfer of IPCo's Shares Agreement (i) no later than twenty (20) days from date of execution of such Collateral Document, register such Collateral Document with the appropriate Registry of Titles and Deeds (Registro de Títulos e Documentos) in Brazil, and (ii) within seven (7) business days from the date of execution of such Collateral Document, annotate the Fiduciary Transfer in IPCO's shares register book (*Livro de Registro de Ações Nominativas*);

(3)      in relation to the amendment to the Gol Senior Secured Notes due 2026 IP Collateral (i) no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 IP Collateral, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and, (ii) no later than ten (10) days after the date of such registration, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the

49

Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*); and

(4)    in relation to the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil.

(d)    The Company and the Guarantors shall not, and shall not permit any Subsidiary to, directly or indirectly (i) take any action with the purpose of depreciating the Collateral, (ii) dispose of, assign, transfer, sell or lease the Collateral to any third party or (iii) execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties to sell or otherwise dispose of the Collateral, in part or in full.

(e)    The Company and the Guarantors undertake to, and agree that, they will not, and will not permit any Subsidiary to, directly or indirectly, take any action, or cause or contribute for any action to be taken, to (i) contest or in any way impair or harm the Collateral; (ii) interfere with the Secured Parties' right to enforce, sell, assign, transfer, convey or otherwise dispose of the Collateral upon the occurrence of an Event of Default; (iii) diminish, demean, tarnish or dilute the value, distinctiveness, fame, enforceability, validity of, or goodwill associated with, the Collateral; (iv) challenge the enforceability or the validity of the Collateral, (v) use, assign, transfer, convey, sell, dispose, disclose, make available or publish any trade secret, know-how, source code or any kind of confidential information related to the Collateral, or (vi) use or apply for any trademark registration or use any trade address that are identical or similar, in phonetical, graphical or ideological manner, to the Collateral.

(f)    By their purchase and acceptance of the Notes, the Holders hereby agree that they are bound and that such purchase and acceptance constitutes the authorization and direction to the Collateral Agent to act as collateral agent for the benefit, and in representation, of the Holders, and to execute and deliver this Note Purchase Agreement and the Collateral Documents to which the Collateral Agent is a party. It is hereby expressly acknowledged and agreed that, in doing so, the Collateral Agent is not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under this Note Purchase Agreement and the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

SECTION 7.08.    *Certain Assurances*.

(a)    On the Initial Closing Date, the Purchaser, the Collateral Agent and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes shall receive an Opinion of Counsel from Lefosse Advogados, as Brazilian counsel to the Company and the Guarantors, in form and substance satisfactory to the Purchaser, to the effect that, subject to certain exceptions and qualifications, the GLA's Smiles Fiduciary Transfer Agreement, the

50

GLA's Fiduciary Transfer of IPCo's Shares Agreement and the amendments to the GOL Senior Secured Notes due 2026 Collateral have been duly authorized, executed and delivered by GLA and/or GLAI, as applicable, and constitutes the legal, valid, and binding obligation of GLA and/or GLAI, as applicable, which will be enforceable against GLA and/or GLAI in accordance with its terms and with Section 7.07(c).

(b)        Each of GLA and GLAI shall take, or cause to be taken, all actions necessary to maintain the Collateral Documents to which it is a party in full force and effect and enforceable, in accordance with their terms, and to maintain and preserve the Lien created by the Collateral Documents, in accordance with their terms, and the priority thereof, including (A) making filings and recordations, (B) making payments of fees and other charges on a timely basis, (C) issuing and, if necessary, filing or recording supplemental documentation, including continuation statements, (D) discharging all claims or other Liens adversely affecting the rights of any Secured Party in any Collateral, (E) publishing or otherwise delivering notice to third parties, (F) depositing title documents, (G) amending any Collateral Document to the extent required by applicable Law and (H) taking all other actions either necessary or otherwise requested by the Purchaser to ensure that all Collateral is subject to a valid and enforceable first-priority Lien in favor of the Collateral Agent for the benefit of the Secured Parties. In furtherance of the foregoing, GLA and GLAI shall ensure that all of the Collateral intended to be subject to the Lien granted by the Collateral Documents shall become subject to such Lien having the priority contemplated pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. Moreover, for the avoidance of any doubt, the Collateral Agent has no obligation, liability or responsibility to monitor or ensure that GLA and/or GLAI, as the case may be, maintain such Lien and shall assume that GLA and GLAI are in full compliance with their obligations in connection therewith.

(c)        Notwithstanding anything to the contrary contained in this Note Purchase Agreement, the Collateral Documents or in applicable Law, the Collateral Agent shall not have any responsibility or liability, among other things as set forth in this Note Purchase Agreement or the Collateral Documents, for (1) acting or refraining from acting based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to this Note Purchase Agreement and the Collateral Documents; (2) any loss or claim resulting from any act or omission, directly or indirectly, except if otherwise determined in a final nonappealable decision by a court of competent jurisdiction that the Collateral Agent was grossly negligent; (3) any loss of profits, indirect, consequential, incidental, special, punitive or related losses and/or damages even if previously advised of the likelihood of such loss or damage; (4) preparing, recording or filing any financing or continuation statements or recording or filing any instrument in any public office or for otherwise ensuring the perfection or maintenance of any Lien granted pursuant to, or contemplated by, this Note Purchase Agreement and the Collateral Documents or the existence and enforceability of any insurance on the Collateral; (5) taking any necessary steps to preserve rights against any parties with respect to the Collateral; (6) taking any action to protect against any diminution in value of the Collateral; (7) errors in judgment that do not constitute gross negligence or willful misconduct as determined by a final and non-appealable judgement by a court of competent jurisdiction; (8) the Company's and the Guarantors' compliance with any of the covenants set forth in this Note Purchase Agreement and the Collateral Documents, including but not limited to, covenants regarding the granting, perfection or maintenance of any Lien; (9) the market value of the Collateral or its sufficiency to

51

satisfy in full payments due on the Notes Obligations; (10) the accuracy of any representation or warranty of the Company or Guarantors in this Note Purchase Agreement, the Collateral Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent; or (11) the effectiveness, genuineness, sufficiency, legality, validity and enforceability of any Lien, security interest, Collateral, this Note Purchase Agreement or the Collateral Documents or title, transfer or assignment of any Collateral.

SECTION 7.09.    *Release of Collateral*. Subject to, and to the extent permitted under, the terms of this Note Purchase Agreement and the Collateral Documents, the Company and the Guarantors shall be entitled to the release of the Collateral from the Lien securing the Notes Obligations under any one or more of the following circumstances:

(i)     in accordance with this Note Purchase Agreement and the Collateral Documents, if at any time the Collateral Agent, acting in accordance, exclusively and strictly, with instructions provided by the Purchaser (at the direction of the Abra Notes Supermajority Holders), forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)    as described and pursuant to Article 10; or

(iii)   upon payment in full of the principal of, together with all accrued and unpaid interest on, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

*in each case*, (i) so long as no Default or Event of Default will exist immediately after such release, as applicable; and (ii) provided the Collateral Agent shall have received an Officer's Certificate certifying, and Opinion of Counsel stating, that all conditions precedent provided in this Note Purchase Agreement with respect to the release of Collateral pursuant to this Section 7.09 have been satisfied (and the Collateral Agent shall execute any document requested by the Company or any Guarantor to evidence such release of the Collateral (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or the Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 7.09 and (C) without any recourse, representation or warranty by the Collateral Agent);

*provided, however,* that, notwithstanding the foregoing, the Lien granted under the Collateral Documents shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exist Notes Obligations due and payable on that date, in which case the Lien in the Collateral shall terminate upon satisfaction of such Notes Obligations, all obligations under the Abra Senior Secured Notes and all obligations under the Abra Senior Secured Exchangeable Notes. Upon termination of the Lien granted under the Collateral Documents in respect of the Notes Obligations, the Collateral shall be released in accordance with this Note Purchase Agreement to the Company and the Guarantors, and the Company and the Guarantors shall thereupon grant a Lien in such Collateral in respect of any outstanding obligations under the Abra Notes.

SECTION 7.10.    *Maintenance of Collateral*. The Company and the Guarantors shall, and shall cause its Subsidiaries to,  at all times, preserve the Collateral for the benefit of the Secured Parties, not permit the value of the Collateral to be impaired, keep the Collateral free from all Liens or encumbrances other than the Liens and the Future Liens in the Collateral, and maintain the Collateral in accordance with applicable Law and regulations.

SECTION 7.11.    *Limitation on Transactions with Affiliates*.

Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering thereof of any service with any Affiliate of the Company, GLAI or any Subsidiary (a "**Related-Party Transaction**"), except upon fair and reasonable terms that are no less favorable to the Company, GLAI or the Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company, GLAI or such Subsidiary, as the case may be.

(a)    Prior to entering into any Related-Party Transaction or series of Related-Party Transactions (i) with an aggregate value in excess of U.S.$10.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary must deliver to the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) a certificate signed by a Responsible Officer stating that such Related-Party Transaction complies with this covenant or (ii) with an aggregate value in excess of U.S.$20.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the terms of such Related-Party Transaction will be approved by a majority of the members of the Board of Directors of the Company, GLAI or of such Subsidiary (including a majority of the members of the Board of Directors who are disinterested directors with respect to such Related-Party Transaction), the approval to be evidenced by a board resolution that such transaction or series of related transactions are on terms no less favorable to the Company, GLAI or such Subsidiary than could be obtained in a comparable arm's length transaction and satisfy the requirements in clauses (i) and (ii) with an aggregate value in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary shall deliver to the Purchaser and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes a written opinion issued by an investment bank of recognized international standing that such Related-Party Transaction is fair to the Guarantor or the relevant Subsidiary from a financial point of view and satisfy the requirements in clause (i) and clause (ii) hereof.

(b)    The foregoing paragraphs do not apply to:

(i)    arm's length transactions in the ordinary course among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries *provided,* that any such transaction conducted by any of the Guarantors' shareholders indirectly through any of these entities shall not be exempt from the limitations in this Section 7.11;

(ii)    any transaction among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries for the

53

purpose of managing and paying taxes imminently due and owing by the foregoing parties to any Governmental Authority;

(iii) any transaction in the ordinary course of business between or among the Company, GLAI and any of its Subsidiaries or between or among the Subsidiaries of GLAI;

(iv) reasonable fees and compensation paid to, and any customary indemnity or insurance provided on behalf of, officers, directors, employees, consultants or agents of the Company, GLAI or any of its Subsidiaries;

(v) transactions or payments pursuant to any employee, consultant, officer or director compensation or benefit or equity plans, stock options or arrangements entered into in the ordinary course of business and consistent with past practice, customary indemnifications or arrangements or reimbursement of expenses entered into in the ordinary course of business, on market terms and consistent with past practice or industry norms;

(vi) transactions pursuant to any contract or agreement in effect on the Initial Closing Date, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the Company, GLAI and its Subsidiaries than those in effect on the Initial Closing Date;

(vii) loans and advances to employees in the ordinary course of business or consistent with past practices; and

(viii) Restricted Payments that are permitted by the provisions of this Note Purchase Agreement.

SECTION 7.12.    *Limitation on Sale of Assets*. Subject to Section 7.07(d), each of the Company, GLAI or any of its Subsidiaries shall not make any Asset Sales and not permit any of its Subsidiaries to make any Asset Sales, unless:

(i)     the Company, GLAI or such Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value as of the date on which such assets sold or otherwise disposed of;

(ii)    at least 75% of the consideration consists of cash or cash equivalent received at closing, provided that, for purposes of this clause (ii), each of the following shall be deemed cash or cash equivalent: (A) any liabilities of the Company, GLAI or such Subsidiary that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Company, GLAI or such Subsidiary from further liability; and (B) any securities notes or other obligations received by the Company, GLAI or such Subsidiary from such transferee that are, within 120 days after the closing of such Asset Sale, converted by the Company, GLAI or

54

such Subsidiary into cash or cash equivalent, but only to the extent of the cash or cash equivalent actually received in that conversion;

(iii)     Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds may be used to:

(A)     to permanently repay Debt, other than Subordinated Obligations, of the Company, GLAI or any of its Subsidiaries (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company, GLAI or any of its Subsidiaries; or

(B)     to acquire (or within such 365-day period, the Company, GLAI or such Subsidiary shall have made a good faith determination to acquire or make capital expenditures, which acquisition shall be consummated, or capital expenditure shall be made prior to the second anniversary of such Asset Sale) (i) all or substantially all of the assets of a Related Business, or a majority of the Capital Stock of another Person that thereupon becomes a Subsidiary engaged in a Related Business, or to make capital expenditures or otherwise acquire assets that are to be used in a Related Business; or (ii) Additional Assets for the Company, GLAI or its Subsidiaries; or

(C)     any combination of (A) and (B).

(iv)     The Net Cash Proceeds of an Asset Sale not applied pursuant to paragraph (iii) above shall constitute "**Excess Proceeds**".  Excess Proceeds of less than U.S.$25.0 million (or the equivalent thereof at the time of determination) will be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Company must prepay the outstanding amount under the Notes equal to the Net Cash Proceeds of such Asset Sale.

(v)     With respect to paragraph (iv) above, the Company shall notify the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) in writing of any prepayment hereunder by electronic mail or other electronic transmission or by telephone (to be confirmed in writing) no later than 11:00 a.m. five Business Days prior to the date of such prepayment; provided that the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall not accept any prepayment of the Notes without the prior written consent of the Abra Notes Supermajority Holders.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Notes or portion thereof to be prepaid and a reasonably detailed calculation of the amount of such prepayment.  Prepayments shall be accompanied by accrued interest on the prepaid amount and shall be without premium or penalty.

Notwithstanding the foregoing, each of the Company, GLAI or any of its Subsidiaries shall not sell, lease, transfer or other dispose of any portion of the Collateral without the prior written consent of the Abra Notes Supermajority Holders; provided, for purposes of any action requested of the Collateral Agent in connection with any release of Collateral, the Collateral Agent shall have no duty, obligation or liability with respect to the obligations of the Company, GLAI and the Subsidiaries set forth above and the Collateral Agent shall look solely to the provisions of Section 7.09 of this Note Purchase Agreement.

SECTION 7.13.    *Limitation on Debt.*

(a)    Each of the Company, GLAI or any of its Subsidiaries shall not issue, assume, guarantee, incur or otherwise become liable for any new Debt in excess of the lesser of (i) U.S.$100.0 million (or the equivalent thereof at the time of determination) and (ii) 0.2x last 12 months consolidated EBITDAR after giving effect thereto and the application of the proceeds therefrom.  The last 12 months consolidated EBITDAR shall be calculated, on any date of determination, taking into account each of the Adjusted Operating Revenues, Adjusted Operating Expenses and Sales Taxes for the period of four consecutive fiscal quarters ending on, or most recently prior to such date, for which consolidated financial statements of GLAI are publicly available; all on a consolidated basis and in accordance with the Accounting Principles.

(b)    Notwithstanding clause (a) above, the Company, GLAI or any of its Subsidiaries may issue, assume, guarantee, incur or otherwise become liable for the following new Debt:

(1)    intercompany Debt between or among the Company, GLAI and any Subsidiary thereof or between or among their Subsidiaries provided that any Debt made by any Subsidiary to the Company or any Guarantor shall be subordinated to the Notes pursuant to a subordination agreement substantially in the form of Exhibit F and, if owing to the Company or any of the Guarantors, is subject to a Lien granted in favor of the Collateral Agent for the benefit of the Purchaser;

(2)    Debt that is:

i.    represented by the Notes and the Note Guaranties, in each case, issued on the Initial Closing Date;

ii.    outstanding on the Initial Closing Date (other than the Notes and the Notes Guaranties);

iii.    arising in connection with cash management transactions related to the proceeds of the Notes;

iv.    consisting of Refinancing Debt incurred in respect of any Debt described in this clause (b) or the foregoing clause (a); or

v.    consisting of guarantees of any Debt permitted under the Notes;

(3)     Debt in respect of bankers' acceptances, deposits, promissory notes, letters of credit, self-insurance obligations, completion guarantees, performance, surety, appeal or similar bonds and guarantees provided by the Company, GLAI or any Subsidiary in the ordinary course of its business securing the performance of contractual or license obligations of the Company, GLAI or any Subsidiary or Debt with respect to reimbursement type obligations regarding workers' compensation claims or payment obligations with self-insurance or similar requirements in the ordinary course of business;

(4)     Hedging obligations of the Company, GLAI or any Subsidiary thereof (entered into for non-speculative purposes) in the ordinary course of business or directly related to Debt permitted to be incurred by the Company, GLAI or any Subsidiary pursuant to the Notes and Refinancing Debt incurred by the Company, GLAI or a Subsidiary in respect of Debt incurred pursuant to this clause (d);

(5)     Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Debt is extinguished within five Business Days of its incurrence;

(6)     Debt to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Notes in accordance with its terms (which proceeds shall be thereafter used to defease or satisfy and discharge the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes , in each case, with the prior written consent of the Abra Notes Supermajority Holders);

(7)     Debt consisting of (i) the financing of insurance premiums in the ordinary course of business, (ii) take or pay obligations contained in supply agreements in the ordinary course of business, or (iii) any advance, loan or extension of credit arising in connection with the purchase of inventory, equipment or supplies in the ordinary course of business;

(8)     Debt of the Company, GLAI or any Subsidiary for taxes levied, assessments due, settlements and other   governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(9)     Aircraft Debt; and

(10)     Additional other Debt in an aggregate principal amount not to exceed at any time $275 million which may be secured by a lien ranking *pari passu* with the lien on the collateral securing the GOL Senior Secured Notes due 2026, provided that the incurrence of any such additional Debt shall be subject to the satisfaction of the following terms and conditions:

(A)     until such time as all Collateral and covenants required to be delivered and liens thereon perfected under Section 7.17(o) shall have been delivered and perfected, only $150 million of the foregoing amount shall be able to be utilized;

57

(B)    such Debt is subject to an intercreditor agreement in form and substance acceptable to the Abra Notes Supermajority Holders in all respects (including without limitation in respect of passivity in any future insolvency, judicial or extrajudicial reorganization or bankruptcy of the Company or the Guarantors);

(C)    such Debt shall have a maturity date that is (i) more than one year after the maturity date of the Notes and (ii) more than three months after the maturity date of the Abra Notes;

(D)    such Debt shall have an all-in-yield to maturity lower than that of the Abra Senior Secured Notes, and have a weighted average life no shorter than that of the Abra Senior Secured Notes; and

(E)    up to $200 million of such Debt may be used for future liability management transactions provided that any such liability management transactions involving any refinancing or repurchases of the GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under this Section 7.13(b)(10) or otherwise), shall be at a maximum price of 50 cents.

Notwithstanding the foregoing, neither the Company, GLAI nor any of its Subsidiaries shall incur any Debt or amend existing Debt in a manner that would result in any restrictions on the ability of any Subsidiary of GLAI to repay Debt, advances or loans, or to repay Debt, advances or loans, or to pay dividends or make any other distributions on the Capital Stock of the Subsidiary owned by GLAI or any other Subsidiary to GLAI or any Subsidiary thereof.

SECTION 7.14.    *Limitation on Restricted Payments*. Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly:

(a)    declare or pay any dividend or make any distribution on or in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving the Company, GLAI or such Subsidiary) except dividends or distributions payable solely in the form of its Capital Stock and except dividends or distributions payable to the Company, GLAI or directly or indirectly wholly-owned Subsidiaries of GLAI , in each case with the prior written consent of the Abra Notes Supermajority Holders;

(b)    purchase, redeem, retire or otherwise acquire for value any Capital Stock of GLAI held by Persons other than the Company, GLAI or another Subsidiary (other than a purchase, redemption, retirement or other acquisition for value that would not constitute an Investment);

(c)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Obligations (other than a payment of interest or the purchase, repurchase, redemption, defeasance or other acquisition of Subordinated Obligations made in anticipation of satisfying a sinking fund obligation, a principal installment or a final maturity, in each case, due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition);

58

(d)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under Section 7.13(b)(10) or otherwise) at a price in excess of 50 cents for every $1.00 of principal amount so purchased, repurchased, redeemed, defeased or otherwise acquired or retired for value; or

(e)    make any Investment in any Person;

(the actions described in clauses (a) through (d) above being herein referred to as "**Restricted Payments**" and each, a "**Restricted Payment**").

The aforementioned provisions will not prohibit:

(1)    any Restricted Payment in exchange for, or out of the proceeds of the substantially concurrent issuance or sale of, Capital Stock of GLAI (other than Capital Stock issued or sold to a Subsidiary of GLAI) , in each case with the prior written consent of the Abra Notes Supermajority Holders;

(2)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations made in exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Obligations that is permitted to be incurred pursuant to the covenant described under Section 7.13;

(3)    dividends paid or distributions made after the date of declaration thereof if at such date of declaration such dividend or distribution would have complied with this covenant;

(4)    so long as no Default has occurred and is continuing, any purchase or redemption of Subordinated Obligations from Net Cash Proceeds; provided that the Company, GLAI or the Subsidiary thereof have complied with the covenant described under Section 7.12 and Section 7.13;

(5)    the declaration and payment of distributions to shareholders of the Company, GLAI or any Subsidiary in the form of dividends, interest on shareholders' equity or otherwise in the minimum mandatory amount set forth under applicable Brazilian corporate law;

(6)    repurchases of Capital Stock, in an aggregate amount not to exceed U.S.$10,000,000 in any calendar year (i) deemed to occur upon the exercise of stock options, warrants or other convertible securities if such Capital Stock represents a portion of the exercise price thereof and cash payments in lieu of the issuance of fractional shares, or (ii) from former employees, officers, directors, consultants or other persons who performed services for GLAI or any Subsidiary in connection with the cessation of such employment or service; provided that such repurchases have been approved by the Company's, GLAI's or its Subsidiary's Board of Directors, as applicable;

(7)     the creation, approval or amendment of any management equity incentive plan in the ordinary course of business and consistent with past practice;

(8)     any distributions or payments on or related to convertible or exchangeable securities issued by GLAI or any of its Subsidiaries pursuant to the terms of the Transaction Documents or any other financing existing on the Initial Closing Date (as disclosed in GLAI's Form 20-F filed with the U.S. Securities and Exchange Commission on March 16, 2022 including in Note 16 (Loans and Financing), Note 17 (Leases), Note 18 (Suppliers) and Note 20 (Taxes Payable) to Item 18 (Financial Statements) beginning on page F-50 thereof); and

(9)     dividends, loans, advances or distributions to any Purchaser Entity or other payments by GLAI or any Subsidiary thereof in amounts equal to (without duplication) the amounts required for any Purchaser Entity to pay any Purchaser Entity Expenses.

The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred, issued, purchased, repurchased, redeemed, retired, defeased or otherwise acquired by the Company, GLAI or such Subsidiary, as the case may be, pursuant to such Restricted Payment.

SECTION 7.15.   *Non-Compete and Exclusivity*.

(a)     The Company and Guarantors shall not, and shall ensure that their Subsidiaries do not, directly or indirectly, for their own account or on behalf of or together with any other Person, carry on, own, manage, control, operate, develop, create, invest in, have any financial interest in (as shareholder or otherwise), or participate in or be engaged in (whether as shareholder, advisor, a partner of a partnership firm, designated partner of a limited liability partnership, or proprietor of a proprietorship firm, or any other entity whether registered under applicable Law or otherwise), any undertaking, venture, business or Person (including, but not limited to, any joint venture, partnership or other arrangement of whatsoever nature) that is engaged in a similar business to the Loyalty Program. The Company and the Guarantors further covenant that the Loyalty Program is, and will be, the sole and exclusive loyalty program of GLA, the Company, GLAI and their Subsidiaries; provided that the Loyalty Program may be expanded to be the loyalty program of both the GLAI Group and another airline so long as such expansion is not adverse to GLAI, the GLAI Group or IPCo and the Loyalty Program remains controlled, directly or indirectly, by GLAI.

(b)     Each of the Company and GLAI agree that to the extent that Abra Group Limited provides an officer's certificate to the Company, GLAI or any of their respective Subsidiaries or any of their respective board of directors that it is appropriate to make a filing or enter a plan under applicable Law to restructure its debt (including, without limitation, a "Chapter 11" filing in the United States or a similar filing under Brazilian law), it shall take such actions within the timeframe requested by Abra Group Limited.

(c)     Each of the Company, GLAI and their respective Subsidiaries agree that in connection with any proceedings to restructure its debt (including, without limitation, any

60

proceeding related to bankruptcy, insolvency, judicial or extrajudicial reorganization, restructuring or any proceeding entered into in connection with clause (b) above) it shall not propose a plan or make a filing or otherwise take action that has not been consented to in writing by Abra Group Limited.

SECTION 7.16.    *Additional Lines of Business*. The Company and GLAI shall not, and shall procure that their respective Subsidiaries shall not enter into a line of business that (i) is not the business of operating airlines, (ii) is not primarily related to operating airlines; (iii) is not primarily related to the then current business of the Company and GLAI and their respective Subsidiaries.

SECTION 7.17.    *GLA and IPCO Covenants.*

(a)    IPCo shall not engage in any business or undertake any other activity or obligations except for (i) owning and holding the Smiles' certain assets and rights related to the Loyalty Program (subject to the provisions herein) or that are pledged pursuant to the Collateral Documents and the Smiles Complete Technological Infrastructure, (ii) operating the Loyalty Program, (iii) guaranteeing the Notes Obligations, (iv) establishing and maintaining its legal existence and otherwise take actions to comply with the terms of this Note Purchase Agreement and the Collateral Documents, in each case to the extent permitted hereby and thereby, and (v) as required by law.

(b)    GLA shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, and any of its positions as counterpart to the current and future commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(c)    [*Reserved*].

(d)    IPCo shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, any of its positions as counterpart to the current and future commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, or any other asset or right owned by IPCo related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(e)    On the Initial Closing Date,  GLA shall cause IPCo to (i) enter into a guaranty of the Notes Obligations; and (ii) execute the Exclusivity Side Letter and comply with its obligations thereunder. Within up to 60 days after the Initial Closing Date, GLA shall cause IPCo to enter into the agreement in which IPCo grants to GLA the right to use Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals and the Smiles Technological Infrastructure, provided that such agreement shall expire in December 31st of each

year, unless renewed by mutual consent upon renegotiation of its terms and comply with its obligations thereunder ("**GLA/IPCo Agreement**").

(f)     GLA and GLAI shall take all actions to comply with the Exclusivity Side Letter and GLA/IPCo Agreement. Upon an Event of Default, IPCo may only renew the GLA/IPCo Agreement without prior written consent of the Abra Notes Supermajority Holders for an annual payment of at least $200 million for 30 years;

(g)     On the Initial Closing Date, Guarantors shall duly execute and deliver the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement.

(h)     any future Smiles Intellectual Property shall be owned solely and exclusively by IPCo.

(i)     After the transfer to IPCo provided for in Section 7.17(o) below, any Smiles Intellectual Property and any future Smiles Database, Client and Supplier List and Smiles Operating Manuals shall be owned solely and exclusively by IPCo.

(j)     any future agreement related to the Smiles Complete Technological Infrastructure shall be entered by IPCo and relevant counterparties, provided that IPCo shall enter into and maintain in effect all relevant agreements related to the Smiles Complete Technological Infrastructure necessary to run the Loyalty Program;

(k)     GLA undertakes not to hire any other service providers or obtain licenses to use software that perform analogous tasks or functions to those included in the Smiles Complete Technological Infrastructure.

(l)     GLA and IPCo, as the case may be, undertake to update the Database, Client and Supplier List in accordance with the periodicity established in its internal policies and controls, even after an acceleration of the Notes.

(m)     any future agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall include IPCo as a party allowed to issue and sell miles. Provided that if no Event of Default has occurred, the parties agree that no agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered into exclusively by IPCo.

(n)     Upon the occurrence of an Event of Default (or an Event of Default under the GOL Senior Secured Notes NPA), (i) no new agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered into any member of the GLAI Group, except IPCo and (ii) IPCo shall become the sole entity issuing or selling miles in the context of the Loyalty Program under the agreements to which IPCo was included as a party pursuant to item 7.17(m) above and 7.17(o) and 7.17(p) below.

(o)      On or before July 10, 2023, GLA shall (provided that, in any case, such actions shall occur after the execution and delivery of the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement):

(1)      GLA shall transfer to IPCo the ownership of all Smiles Intellectual Property, Smiles Database, Client and Supplier List and the Smiles Operating Manuals;

(2)      assign to IPCo all the agreements related to the Smiles Technological Infrastructure listed in Schedule B-1;

(3)      assign to IPCo no fewer than 66% of the agreements listed in Schedule B-2 and any other agreements related to the Smiles Complete Technological Infrastructure executed by GLAI Group between the date hereof and July 10, 2023; and

(4)      amend no fewer than 66% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements allowed to issue and sell miles, in, provided that, the agreements in which IPCo is included represents more than 50% of the total revenues of the commercial agreements listed in Schedule C for the year ended December 31, 2022.

(p)      On or before December 31, 2023 GLA shall:

(1)      assign to IPCo no fewer than 90% of the agreements listed in Schedule B-2 and any other agreements related to the Smiles Complete Technological Infrastructure executed by GLAI Group between the date hereof and July 10, 2023; and

(2)      amend no fewer than 90% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements allowed to issue and sell miles.

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.   *[Reserved]*.

SECTION 8.02.   *Limitation on Consolidation, Merger or Transfer of Assets*.  Until all amounts outstanding under this Note, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes have been paid in full, neither the Company nor the Guarantors shall consolidate with or merge with or into, or sell, convey, transfer or dispose of, or lease all or substantially all of its assets as an entirety or substantially as an entirety, in one transaction or a series of related transactions, to, any Person, unless:

(1)      the resulting, surviving or transferee Person (if not the Company or a Guarantor) shall be a Person organized and existing under the Laws of Brazil, England, the United States of America, any State thereof or the District of Columbia, or any other country (or political subdivision thereof) that is a member country of the European Union or of the Organization for Economic Co-operation and Development, and such Person expressly assumes, by an amendment to this Note Purchase Agreement, executed and

63

delivered to the Company, all the obligations of the Company or the Guarantors under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents;

(2)     the resulting, surviving or transferee Person undertakes, in an amendment to this Note Purchase Agreement, to pay such Additional Amounts in respect of principal (and premium, if any) and interest as may be necessary in order that every net payment made in respect of the Notes and any Note Guaranty after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by the Surviving Person's Tax Jurisdiction (as defined below) such other country or any political subdivision or taxing authority thereof or therein shall not be less than the amount of principal (and premium, if any) and interest then due and payable on the Notes and the Note Guaranties subject to the same exceptions set forth under Section 7.06, but replacing references therein to the Taxing Jurisdiction with references to the jurisdiction in which the resulting, surviving or transferee Person (as the case may be) is incorporated, domiciled and/or resident for taxation purposes (the "**Surviving Person's Tax Jurisdiction**") ; and

(3)     immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

For purposes of this Section 8.02, any sale, lease or other transfer or disposition of the assets of one or more Subsidiaries of the Company, if any, that would, if the Company had held such assets directly, have constituted the sale, lease or other transfer or disposition of all or substantially all of the Company and its Subsidiaries', if any, consolidated assets, taken as a whole, shall be treated as such under this Note Purchase Agreement.

Subject to Section 8.02(2) above and notwithstanding anything else to the contrary contained in the foregoing, any of the Guarantors may consolidate with or merge with the Company or any Subsidiary that becomes a Guarantor concurrently with the relevant transaction.

SECTION 8.03.   *Successor Substituted*.   Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Company or any of the Guarantors in accordance with Section 8.02 in which the Company or any of the Guarantors is not the continuing obligor or Guarantor, as the case may be, under this Note Purchase Agreement, the surviving or transferor Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company or any of the Guarantors, as the case may be, under this Note Purchase Agreement with the same effect as if such successor had been named as the Company or a Guarantor therein. When a successor assumes all the obligations of its predecessor under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents, the predecessor shall be released from those obligations; *provided that* in the case of a transfer by lease, the predecessor shall not be released from the payment of principal and interest on the Notes.

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.   *Events of Default.*  The term "**Event of Default**" means, when used herein with respect to the Notes, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to, or as a result of any failure to obtain, any authorization, order, rule, regulation, judgment or decree of any governmental or administrative body or court):

(a)      default in any payment of interest pursuant to the terms set forth in this Note Purchase Agreement (including any Additional Amounts) on any Note when the same becomes due and payable, and any such Default continues for a period of 30 days;

(b)      default in the payment of the principal (including any Additional Amounts) of any Note when the same becomes due and payable at its Stated Maturity, upon acceleration or otherwise;

(c)      failure by the Company or GLAI to comply with its respective obligation to exchange the Notes in accordance with Article 13 of this Note Purchase Agreement upon exercise by a Holder of its right to exchange the Notes, and such failure continues for a period of three Business Days;

(d)      failure by the Company or the Guarantors to comply with its obligations under Article 7;

(e)      any of the Company or the Guarantors fails to comply with any of its covenants or agreements in the Notes, this Note Purchase Agreement, the Note Guaranties or the Collateral Documents (other than those referred to in clause (a), (b), (c) or (d) of this Section 9.01), and such failure continues for 60 days after the notice specified below;

(f)      any of the Company, the Guarantors or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by any of the Company, the Guarantors or any such Significant Subsidiary (or the payment of which is guaranteed by the Company, the Guarantor or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of this Note Purchase Agreement, which default (i) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("**Payment Default**") or (ii) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

(g)      one or more final non-appealable judgments or decrees for the payment of money of U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against any of the Company, the Guarantors or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment)

65

or otherwise discharged and, in the case of each such judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed within 30 days following commencement of such enforcement proceedings or (ii) there is a period of 50 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed;

(h)      an involuntary case or other proceeding is commenced against any of the Company, the Guarantors or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect seeking the appointment of a trustee, receiver, *administrador judicial,* liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 50 days; or an order for relief is entered against any of the Company, the Guarantors or any Significant Subsidiary under the bankruptcy Laws now or hereafter in effect, and such order is not being contested by any of the Company, the Guarantors or any Significant Subsidiary, as the case may be, in good faith, or has not been dismissed, discharged or otherwise stayed, in each case within 50 days of being made;

(i)      any of the Company, the Guarantors or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking liquidation, reorganization, *concordata*, or other relief with respect to itself or its debts under any applicable bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such Law, (ii) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the Company, the Guarantors or any Significant Subsidiary or for all or substantially all of the property of any of the Company, the Guarantors or any Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(j)      any event occurs that under the Laws of England and Wales, Brazil, Colombia, the Cayman Islands or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in any of clause (h) or (i);

(k)      any Note Guaranty shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect, other than in accordance the terms of this Note Purchase Agreement, or any of the Guarantors (or any Person on behalf of any Guarantor) denies or disaffirms its obligations under its Note Guaranty;

(l)      all or any portion of a claim asserted by the Purchaser or Majority Holders in any proceeding (including without limitation an insolvency proceeding or judicial or extrajudicial reorganization of any member of the GLAI Group) in respect of the Notes or the GOL Senior Secured Notes due 2028 is either asserted by any member of the GLAI Group or held by any court of competent jurisdiction to be reduced, invalid, disallowed, subordinated or recharacterized as equity, avoided, set aside or otherwise invalidated;

(m)      the Lien granted in favor of, and for the benefit of, the Purchaser or Holders in all or any portion of the Collateral is held by any court of competent jurisdiction to be not perfected

66

or is otherwise unenforceable, *pari passu* or subordinated to any other Lien (including any debtor in possession priming lien), avoided, disallowed, set aside or otherwise invalidated except for Liens expressly permitted hereunder or as otherwise consented to by the Abra Notes Supermajority Holders;

(n)    any enforcement action is taken in respect of the Collateral, including the taking of any steps to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral or otherwise exercise any rights or remedies with respect to the Collateral in accordance with the Collateral Documents;

(o)    it is or becomes unlawful for the Company or the Guarantors to perform any of their respective obligations under the Notes, the Collateral Documents or this Note Purchase Agreement;

(p)    an event of default (as such term is defined in the GOL Senior Secured Notes NPA) with respect to the GOL Senior Secured Notes due 2028 has occurred and is continuing;

(q)    any of the Collateral Documents shall for any reason cease to be in full force and effect in all material respects, or any of the Company or the Guarantors or any of their Subsidiaries shall so assert, or any Lien created, or purported to be created, by the Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby;

(r)    (i) any settlement of any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency, involving payment of damages in excess of US$35.0 million or its equivalent and are not paid (whether in full or in installments in accordance with the terms of such settlement); or (ii) the commencement, settlement or termination or agreement to commence, settle or terminate any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency which could result in the imposition of material injunctive relief (or the agreement to comparable relief) or other material restrictions upon any of the Company, GLAI or any Significant Subsidiary thereof which impositions would cause a Material Adverse Effect; or

(s)    entering into any settlement agreement of a material internal investigation with a Governmental Authority, which would cause a Material Adverse Effect.

SECTION 9.02.    *Acceleration of Maturity, Rescission and Amendment*.  If an Event of Default (other than an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) with respect to the Notes occurs and is continuing, the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Company and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) occurs and is continuing, then the principal of and accrued and unpaid interest on all Notes of shall become and be immediately due and payable without any declaration or notice or other act on the part of any Holder.

At any time after a declaration of acceleration with respect to the Notes has been made and before a judgment or decree for payment of the money due has been obtained as hereinafter provided in this Article, the Majority Holders by written notice to the Company may rescind or annul such declaration if:

(1)    the Company has paid or deposited a sum sufficient to pay (A) all overdue interest on Outstanding Notes, (B) all unpaid principal of the Notes that has become due otherwise than by such declaration of acceleration, (C) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (D) all sums paid or advanced by the Agents and the Collateral Agent hereunder and under the Collateral Documents and the reasonable compensation, expenses, disbursements, indemnities and advances of the Agents, the Collateral Agent and their agents and counsel; and

(2)    all Events of Default have been cured or waived as provided in Section 9.12 other than the non-payment of principal that has become due solely because of acceleration.

No such rescission shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

SECTION 9.03.    *Applicable Premium*. Without limiting the generality of the foregoing, it is understood and agreed that if the Notes are accelerated or otherwise become due prior to their Stated Maturity, in each case, in respect of any Event of Default, the Applicable Premium shall also be due and payable in cash to the Holders and shall constitute part of the obligations payable to the Holders in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Holder's loss as a result thereof. If the Applicable Premium becomes due and payable, the principal of the Notes and interest shall accrue on the full principal amount of the Notes (including the Applicable Premium) from and after the applicable triggering event. Any premium payable above shall be presumed to be the liquidated damages sustained by each Holder as the result of the acceleration of the Notes. The Company expressly waives (to the fullest extent it may lawfully do so) the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Applicable Premium in connection with any such acceleration. The Company and each Guarantor hereby agree that the Applicable Premium shall also be payable, without limitation, in any bankruptcy, insolvency, judicial or extrajudicial reorganization or similar proceeding with respect to creditor's rights in any jurisdiction, and shall not contest in any manner the payment thereof in any such circumstance.

SECTION 9.04.    *Subrogation Rights*. The parties hereto acknowledge and agree that the Abra Holders shall be express third-party beneficiaries to, and shall have all the rights of a third-party beneficiary to, this Note Purchase Agreement. The Abra Notes Supermajority Holders shall have the right to enforce this Note Purchase Agreement in accordance with its terms as if they were original parties hereto, if the Purchaser has not taken any reasonable action and has not continued to diligently enforce its rights under this Note Purchase Agreement for more than 90 calendar days after the relevant Event of Default. The Purchaser, by its execution and delivery of this Note Purchase Agreement agrees to the provisions of this Section 9.04 and hereby directs the

Collateral Agent to accept directions received from the Abra Notes Supermajority Holders in respect of the Collateral and the Collateral Documents if the Abra Notes Supermajority Holders exercise the rights set forth in this Section 9.04; *provided*, (i) the Abra Notes Supermajority Holders shall have the obligations of the Purchaser or the Holders in connection with any such direction to the Collateral Agent, including without limitation the obligation to provide indemnification satisfactory to the Collateral Agent, and the Collateral Agent shall have the same rights and protections as if the Collateral Agent were directed by the Purchaser or the Holders and (ii) the Collateral Agent shall receive and shall be conclusively entitled to rely upon a certificate of the Purchaser at the time of any direction of the Abra Notes Supermajority Holders, which certificate shall certify that such Persons are the Abra Notes Supermajority Holders. Other than as expressly provided in the preceding sentence, in no event shall the Abra Holders have any right to direct or instruct the Collateral Agent. The Collateral Agent is not an agent for the Abra Holders and has no obligation, duty, liability or responsibility to such Abra Holders.

SECTION 9.05.    *Application of Money Collected*.  Any money collected by the Collateral Agent pursuant to this Article 9 or the Collateral Documents shall be applied in order set forth below:

FIRST, (i) to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent under this Note Purchase Agreement and the Collateral Documents and then (ii) on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the other Agents and any other agent or attorney appointed hereby or under the Collateral Documents, in the case of each of the foregoing, solely in their respective capacity as the Collateral Agent, an Agent or other agent, as applicable (including costs, expenses and legal expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Note Purchase Agreement or the Collateral Documents);

SECOND, on a pro rata basis, to the payment in full to the Holders of all amounts due and unpaid on the Notes for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest; provided, that, the proceeds shall be applied (i) first, to the Holders for amounts due and payable on the Notes for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest and (ii) second, any remaining amounts to the Holders for amounts due and payable on the Notes for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Notes; and

THIRD, the balance, if any, after all of the Notes Obligations have been paid in full in cash, to the Company and its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Company may fix a record date and payment date for any payment to Holders pursuant to this Section 9.05.

SECTION 9.06.    *Limitation on Suits*.  A Holder may not pursue any remedy with respect to this Note Purchase Agreement, the Notes or the Collateral Documents unless:

(1)    the Holder has previously given to the Collateral Agent written notice stating that an Event of Default with respect the Notes has occurred and is continuing;

(2)    the Holders of at least 25% in principal amount of the Outstanding Notes have made a written request to the Collateral Agent to pursue the remedy in respect of such Event of Default;

(3)    such Holder or Holders has offered and provided to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against any cost, loss, liability or expense to be incurred in compliance with such request;

(4)    the Collateral Agent does not comply with the request within 60 days after receipt of the request and the offer and provision of security or indemnity; and

(5)    no direction inconsistent with such written request has been given to the Collateral Agent during such 60-day period by the Purchaser.

SECTION 9.07.    *Contractual Rights of Holders to Receive Principal and Interest*. Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, each Holder shall have the right pursuant to this Section 9.07 to bring suit for the payment of principal, premium, if any, and interest on its Note, on or after the respective due dates expressed or provided for in such Note.

SECTION 9.08.    *Restoration of Rights and Remedies*.  If the Collateral Agent (as directed by the Purchaser or the Majority Holders, as provided in this Note Purchase Agreement) or any Holder has instituted any proceeding to enforce any right or remedy under this Note Purchase Agreement or the Collateral Documents and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Collateral Agent or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Guarantors, the Collateral Agent and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Collateral Agent and the Holders shall continue as though no such proceeding had been instituted.

SECTION 9.09.    *Delay or Omission Not Waiver*.  No delay or omission of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article 9 or by Law to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Holders.

SECTION 9.10.    *Control by Holders*.  The Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Company or the Collateral Agent or of exercising

70

any power conferred on the Collateral Agent.  However, the Collateral Agent shall be under no obligation to exercise any of the rights or powers under this Note Purchase Agreement or the Collateral Documents at the request or direction of any Holders if such request or direction conflicts with any Law or with this Note Purchase Agreement or the Collateral Documents or may expose the Collateral Agent to liability.  Prior to taking any action under this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall be entitled to indemnification satisfactory to the Collateral Agent in its sole discretion against all costs, losses, liabilities and expenses that might be caused by taking or not taking such action.

SECTION 9.11.    *Rights and Remedies Cumulative*.  Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 4.08 , no right or remedy herein conferred upon or reserved to the Holders or the Purchaser, as the case may be, is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by Law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at Law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 9.12.    *Waiver of Past Defaults and Events of Default*.  The Purchaser (with the prior written consent of the Abra Notes Supermajority Holders) by written notice to the Company may waive an existing Default or Event of Default and its consequences. When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 9.13.    *Waiver of Stay or Extension Laws*.  The Company and the Guarantors covenant (to the extent that it may lawfully do so) that they shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension Law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Note Purchase Agreement, the Notes or the Collateral Documents; and the Company and the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such Law, and shall not hinder, delay or impede the execution of any power herein granted to the Collateral Agent, but shall suffer and permit the execution of every such power as though no such Law had been enacted.

## ARTICLE 10
### AMENDMENTS

SECTION 10.01. *Without Consent of Holders*.  The Company, when authorized by a Board Resolution, the Guarantors and the Collateral Agent may amend or supplement this Note Purchase Agreement, the Notes and the Collateral Documents without notice to or consent or vote of the Purchaser, any Holder of the Notes, or any holder of Abra Senior Secured Exchangeable Notes or Abra Senior Secured Notes, for the following purposes:

> (i)    to cure any ambiguity, omission, defect or inconsistency in this Note Purchase Agreement or in the Notes in a manner that does not adversely affect any Holder in any material respect, as set forth in an Officer's Certificate;

71

(ii)       to add guarantees or collateral with respect to the Notes;

(iii)     to comply with Section 8.02;

(iv)     to add to the covenants or Events of Default of the Company or the Guarantors for the benefit of the Holders of the Notes;

(v)       to surrender any right herein conferred upon the Company or the Guarantors;

(vi)     to provide for any guarantee or collateral of the Notes, to secure such Notes or to confirm and evidence the release, termination or discharge of any Note Guaranty or collateral of the Notes when the release, termination or discharge is expressly permitted by this Note Purchase Agreement or the Collateral Documents, as the case may be;

(vii)    in connection with any Specified Corporate Event, to provide that the Notes are exchangeable into Reference Property, subject to the provisions of Section 13.02, and make such related changes to the terms of the Notes to the extent expressly required by Section 13.06;

(viii)   to evidence and provide acceptance of appointment by a registrar, paying agent, bid solicitation agent or exchange agent with respect to the Notes or to facilitate the administration of this Note Purchase Agreement; or

(ix)     ministerial amendments to effect the GLAI Going Private Process;

*provided that*, the Company or the applicable Guarantor has delivered to the Purchaser, the Collateral Agent and the Abra Notes Supermajority Holders an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment or supplement pursuant to this Section 10.01 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.01 requested by the Company or any Guarantor (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.01 and (C) without any recourse, representation or warranty by the Collateral Agent).

SECTION 10.02.  *With Consent of Holders*.  Except as specified in Section 10.01, the Company, when authorized by a Board Resolution, the Guarantors, the Collateral Agent (at the direction of the Purchaser) and the Majority Holders may amend or supplement this Note Purchase Agreement, the Notes or the Collateral Documents only with the prior written consent of the Purchaser and the Abra Notes Supermajority Holders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Note Purchase Agreement, the Notes or the Collateral Documents or modifying in any manner the rights of the Holders under this Note Purchase Agreement, the Notes or the Collateral Documents and the Purchaser may, with the prior written consent of the Abra Notes Supermajority Holders, except as set forth below, waive any past Default or Event of Default or

compliance with any provision of this Note Purchase Agreement; *provided*, *however*, that, without the consent of each Holder affected or the Abra Notes Supermajority Holders, an amendment or waiver may not:

(i)     reduce the principal amount of or extend the Stated Maturity of any Note;

(ii)    reduce the amount of principal payable upon acceleration of the Maturity Date of any Note;

(iii)   reduce the rate, or extend the stated time for payment, of interest on any Note except as provided for in this Note Purchase Agreement;

(iv)    impair or adversely affect the right of Holders to exchange Notes or otherwise modify the provisions with respect to exchange pursuant to the terms of Article 13, or reduce the Exchange Rate (subject to such modifications as are required under this Note Purchase Agreement);

(v)     change the currency for payment of principal of, or interest or any Additional Amounts on, any Note;

(vi)    impair the right of any Holder to receive payment of principal and interest on such Holder's Notes on or after due dates therefor or make any change in the provisions of this Note Purchase Agreement relating to the contractual rights of Holders of Notes expressly set forth in this Note Purchase Agreement to institute suit for the enforcement of any right to payment on or with respect to any Note;

(vii)   make any change in the provisions of this Note Purchase Agreement relating to waivers of a Default or Event of Default in payment of principal of and interest on the Notes;

(viii)  reduce the principal amount of Notes, Abra Senior Secured Notes or Abra Senior Secured Exchangeable Notes whose holders must consent to any amendment, supplement or waiver;

(ix)    make any change in this first paragraph of this Section 10.02;

(x)     make any change in Section 9.05 that adversely affects the Holders;

(xi)    change the ranking of the Notes or any Note Guaranty relating thereto in a manner adverse to the Holders;

(xii)   make any change in any Note Guaranty that would adversely affect the Holders; or

(xiii)  change the definition of "Abra Notes Supermajority Holders" or modify any provision pursuant to which consent of the Abra Notes Supermajority Holders is required for any transaction, action or otherwise.

In addition, notwithstanding the foregoing (and except as provided for in Section 7.09), without the prior written consent of the Purchaser and the Abra Notes Supermajority Holders, no amendment, supplement or waiver may release any portion of the Collateral or permit or suffer to exist any Lien therein other than to secure the Notes Obligations unless otherwise expressly permitted in this Note Purchase Agreement and/or the Collateral Documents.

The Company shall give to Holders and Abra Notes Supermajority Holders prior written notice of any amendment or waiver proposed to be adopted under this Section 10.02. In addition, the Company or the applicable Guarantor shall deliver to the Collateral Agent (if the Collateral Agent is a party thereto) an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment, supplement or waiver pursuant to this Section 10.02 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.02 requested by the Company or any Guarantor (A) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.02 and (B) without any recourse, representation or warranty by the Collateral Agent).

It shall not be necessary for the consent of the Holders or Abra Notes Supermajority Holders under this Section 10.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment or waiver under this Section 10.02 becomes effective, the Company shall give to Holders a notice briefly describing such amendment or waiver.  The failure to give such notice to all Holders and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, or any defect therein, shall not impair or affect the validity of an amendment or waiver under this Section 10.02.

SECTION 10.03.  *Revocation and Effect of Consents and Waivers*.  (a) A consent to an amendment or a waiver by a Holder shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Company receives the written notice of revocation at least one Business Day prior to the date the amendment or waiver becomes effective.  After it becomes effective, an amendment or waiver shall bind every Holder.

(b)    The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above in accordance with Section 14.01. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 10.04.  *Payment for Consent*.  Neither the Company nor any of its Affiliates shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Note Purchase Agreement or the Notes unless such consideration is offered to be paid to all Holders which so consent, waive or agree to

amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

SECTION 10.05.  *Collateral Agent*.  No waiver, modification or amendment of this Note Purchase Agreement or the Collateral Documents may affect or change the rights, obligations, duties, protections or immunities of the Collateral Agent without the written consent of the Collateral Agent. The Collateral Agent may conclusively rely on an Officer's Certificate with respect to whether the consent of Purchaser, any Holders, any holders of the Abra Senior Secured Notes or any holders of the Abra Senior Secured Exchangeable Notes are required in connection with any amendment, supplement or waiver under this Article 10.

# ARTICLE 11
## NOTE GUARANTIES

SECTION 11.01.  *The Note Guaranties*.  Subject to the provisions of this Article, GLAI and GLA hereby irrevocably and unconditionally guarantee (the "**Note Guaranties**"), on a secured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations; *provided, however,* that upon release of the Collateral in accordance with Section 7.09 GLA and GLAI shall guarantee, on a unsecured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  Upon failure by the Company to pay punctually any such amount, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Note Purchase Agreement.

SECTION 11.02.  *Guaranty Unconditional*.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

(1)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Company under this Note Purchase Agreement or any Note, by operation of Law or otherwise;

(2)     any modification or amendment of or supplement to this Note Purchase Agreement or any Note;

(3)     any change in the corporate existence, structure or ownership of the Company, or any insolvency, bankruptcy, judicial or extrajudicial reorganization or other similar proceeding affecting the Company or its assets or any resulting release or discharge of any obligation of the Company contained in this Note Purchase Agreement or any Note;

(4)     the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Company or any other Person, whether in connection with this Note Purchase Agreement or any unrelated transactions; *provided that* nothing

75

herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(5)     any invalidity or unenforceability relating to or against the Company for any reason of this Note Purchase Agreement or any Note, or any provision of applicable Law or regulation purporting to prohibit the payment by the Company of the principal of or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement; or

(6)     any other act or omission to act or delay of any kind by the Company or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantors' obligations hereunder.

SECTION 11.03.  *Discharge; Reinstatement*.  The Guarantors' obligations hereunder will remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Company under this Note Purchase Agreement have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or judicial or extrajudicial reorganization of the Company or otherwise, the Guarantors' obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.

SECTION 11.04.  *Waiver by the Guarantors*.  Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company or any other Person.

SECTION 11.05.  *Subrogation and Contribution*.  Upon making any payment with respect to any obligation of the Company under this Article, the Guarantor making such payment will be subrogated to the rights of the payee against the Company with respect to such obligation, limited to the amount of the payment or delivery made by such Guarantor ("**Subrogation Rights**").  The Guarantor hereby irrevocably agrees that the Subrogation Rights may be used at all times by the Guarantors to set-off amounts owed by the Guarantors to the Guarantor under the Notes and the GOL Senior Secured Notes due 2028.

SECTION 11.06.  *Stay of Acceleration*.  If acceleration of the time for payment of any amount payable by the Company under this Note Purchase Agreement or the Notes is stayed upon the insolvency, bankruptcy or judicial or extrajudicial reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of this Note Purchase Agreement are nonetheless payable by the Guarantors hereunder forthwith on demand by the Holders.

SECTION 11.07.  *Limitation on Amount of Guaranty*.  Notwithstanding anything to the contrary in this Article, each of the Guarantors, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guaranty of each Guarantor does not constitute a fraudulent conveyance under applicable fraudulent conveyance

76

provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.  To effectuate that intention, the Holders and each of the Guarantors hereby irrevocably agree that the obligations of each Guarantor under its respective Note Guaranty are limited to the maximum amount that would not render the Guarantors' obligations subject to avoidance under applicable fraudulent conveyance provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.

SECTION 11.08.  *Execution and Delivery of Guaranty*.  The execution by each of the Guarantors of this Note Purchase Agreement on each Closing Date evidences the respective Note Guaranty of each Guarantor, whether or not the person signing as an Officer of such Guarantor still holds that office at the time of execution of any Note.

SECTION 11.09.  *Release of Guaranty*. The Note Guaranty of each of the Guarantors will terminate upon a sale or other disposition (including by way of consolidation or merger) of such Guarantor or the sale or disposition of all or substantially all the assets of such Guarantor (in each case other than to the Company or a Subsidiary) otherwise permitted by this Note Purchase Agreement.

Upon delivery by the Company to the Purchaser and the Collateral Agent of an Officer's Certificate and an Opinion of Counsel, each stating that all of the conditions provided in this Note Purchase Agreement to the release and termination of the Note Guaranty have been satisfied, the Purchaser will execute any documents reasonably requested by the Company in writing in order to evidence the release of such Guarantor from its obligations under its Note Guaranty.

# ARTICLE 12
## COLLATERAL AGENT

SECTION 12.01.  *Appointment*.  Each of the Secured Parties (other than the Collateral Agent) hereby appoints the Collateral Agent as the agent of such Secured Parties under this Note Purchase Agreement and the Collateral Documents to which it is a party and authorizes and directs the Collateral Agent to take such actions on its behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof.  It is understood and agreed that the use of the term "agent" herein or in the Collateral Documents (or any other similar term) with reference to the Collateral Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The Company agrees to pay to the Collateral Agent such fees and expenses (including counsels' fees and expenses) of the Collateral Agent as may be separately agreed in writing and pursuant to the terms of Section 12.04. For the avoidance of any doubt and for the purposes of this Article 12, this Note Purchase Agreement shall prevail in the case of any conflicts between any Collateral Document and this Note Purchase Agreement.

SECTION 12.02.  *Exculpatory Provisions*.   (a) The Collateral Agent shall have no duties or obligations except those expressly set forth in this Note Purchase Agreement and the

Collateral Documents to which the Collateral Agent is a party, and no duty, liability or obligation shall be inferred or implied against the Collateral Agent. Without limiting the generality of the foregoing provision, (i) the Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists; (ii) the Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Collateral Agent); (iii) except as expressly provided for in this Note Purchase Agreement or the Collateral Documents to which the Collateral Agent is a party, the Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company or any Guarantor or any of their Subsidiaries which is communicated to or obtained by the Collateral Agent or any of its Affiliates in any capacity; and (iv) the Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Collateral Agent to liability or otherwise contrary to this Note Purchase Agreement or the Collateral Documents or applicable Law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect.

(b)      Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall not be liable for any action taken or not taken by it (i) with the written consent or at the written request, written instruction or written direction of the Purchaser, the Majority Holders or the Abra Notes Supermajority Holders (or such other requisite percentage of Holders as may be specified), as applicable, or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

(c)      The Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until written notice by the Purchaser (a copy of which shall be delivered by the Purchaser to the Abra Notes Supermajority Holders) describing such event is received by a Responsible Officer of the Collateral Agent, referring to this Note Purchase Agreement and such Default or Event of Default.

(d)      The Collateral Agent shall not be liable for or have any duty to prove or investigate, or otherwise have any obligation or liability with respect to, (i) any representation or warranty provided in or with respect to this Note Purchase Agreement or the Collateral Documents, (ii) the contents of any certificate, report or other document delivered under or with respect to this Note Purchase Agreement or the Collateral Documents, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Note Purchase Agreement or the Collateral Documents or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, efficacy or authenticity of this Note Purchase Agreement, the Collateral Documents or any other agreement, instrument or document, or (v) the

78

satisfaction of any condition set forth in this Note Purchase Agreement or the Collateral Documents, other than to confirm receipt of items expressly required to be delivered to the Collateral Agent.

(e)    The Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) considered by it to be authentic and having been signed or sent by a competent Person. The Collateral Agent may also rely on any statement given to it verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Collateral Agent may consult with counsel, independent auditors and other experts chosen by the Collateral Agent, at the Company's expense, and the Collateral Agent shall not be liable for any act performed or not performed by the Collateral Agent in accordance with the advice of any said counsel, auditor or expert.

(f)    The Collateral Agent may fulfill any and all of its duties and exercise its rights and powers by or through any one or more subagents appointed by it, at the expense of the Company. The Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.  The exculpatory provisions of this Article 12 shall apply to any such subagent as a third-party beneficiary to the extent applicable. The Collateral Agent shall not be responsible for the supervision, negligence or misconduct of any sub-agents that it selects with due care.

(g)    The Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Note Purchase Agreement, the Collateral Documents, the security provided hereunder or thereunder or the Collateral, for the legality, effectiveness or sufficiency of this Note Purchase Agreement or the Collateral Documents nor for the creation, formalization, ranking, sufficiency or protection of any Liens constituted under this Note Purchase Agreement or the Collateral Documents. For the avoidance of doubt, no provision in this Note Purchase Agreement or the Collateral Documents shall require the Collateral Agent to prepare, file or record any financing statements or continuation statements or other instruments or documents, or to be responsible for maintaining the Liens and security interests to be created as described in this Note Purchase Agreement and the Collateral Documents, and such responsibility shall be in charge exclusively of the Company.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, if applicable, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for the account of other customers in similar transactions.  The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

(h)    In order to effect the transfer of any amounts received as a result of the enforcement of the Collateral Documents, the Collateral Agent may perform a foreign exchange transaction to convert into U.S. Dollars any amount in Reais resulting from such enforcement; except that possible deductions of any commissions or taxes charged on such foreign exchange transactions and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Collateral Agent will transfer the amounts in U.S. Dollars according to the instructions provided by any Holder. The Collateral Agent (a) will only

be obliged to perform any foreign exchange transaction it may undertake as of the second (2nd) Brazilian Business Day after the Brazilian Business Day on which the Collateral Agent receives the applicable instructions and documents to perform such foreign exchange transaction; and (b) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Collateral Agent has received (i) all documents and information necessary for the remittance of funds in accordance with applicable foreign exchange regulations and (ii) the payment of the respective commissions, fees and expenses. The Collateral Agent shall not be liable for any losses or damages resulting from possible delays or impediments to the performance of a foreign exchange transaction and/or transfer, nor as the impossibility to perform a foreign exchange transaction or transfer. The Collateral Agent shall not assume any liability to any Person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed in connection with this Note Purchase Agreement or the Collateral Documents or with respect to the transfer of any funds as a result thereof.

(i)      The Collateral Agent shall not be obligated to spend or put at risk any of its own funds or otherwise incur any obligation or liability, financial or otherwise, in performing its duties or exercising its rights under this Note Purchase Agreement or under the Collateral Documents.

(j)      In no event shall the Collateral Agent be liable for special, indirect, punitive, consequential or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)      The Collateral Agent shall not incur any obligation for failure to perform any act or duty under this Note Purchase Agreement or the Collateral Documents by reason of any occurrence beyond its control (including any act or provision of any current or future Law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve System or the Central Bank).

(l)      The Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo Laws and the Collateral Agent's internal policies with respect to embargoes ("**Embargo Rules**"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The parties expressly agree that the Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 12.02.

(m)      Any and all payments by the Company and/or the Guarantors to or for the benefit of the Collateral Agent under this Note Purchase Agreement or the Collateral Documents shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("**Deductions**") and any

other Taxing Jurisdiction, which taxes, expenses or withholdings shall be borne by the Company. If any Deductions apply to any payment, the Company and/or the Guarantors, as the case may be, will immediately pay to the account indicated by the Collateral Agent the additional amount necessary for the amount paid to the Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

(n)     Each Secured Party (other than the Collateral Agent) authorizes and directs the Collateral Agent to enter into the Collateral Documents to which the Collateral Agent is a party on the date hereof on behalf of and for the benefit of the Secured Parties.

(o)     Notwithstanding any provision of this Note Purchase Agreement or the Collateral Documents to the contrary, before taking or omitting any action to be taken or omitted by the Collateral Agent under the terms of this Note Purchase Agreement or any Collateral Document, the Collateral Agent may seek the written direction of the Purchaser or the Majority Holders, as the case may be, and the Collateral Agent shall be entitled to rely (and shall be fully protected in so relying) upon such direction. The Collateral Agent is not liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If the Collateral Agent requests such direction by the Purchaser or the Majority Holders, as the case may be, with respect to any action, the Collateral Agent is entitled to refrain from such action unless and until the Collateral Agent has received such direction, and the Collateral Agent does not incur liability to any Person by reason of so refraining.  If the Collateral Agent so requests, it must first be indemnified to its satisfaction by the Purchaser or the Holders, as the case may be, against any and all fees, losses, liabilities and expenses which may be incurred by the Collateral Agent by reason of taking or continuing to take, or omitting, any action directed by the Purchaser or the Majority Holders. Any provision of this Note Purchase Agreement or the Collateral Documents authorizing the Collateral Agent to take any action does not obligate the Collateral Agent to take such action. The Collateral Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity or security satisfactory to the Collateral Agent against the costs, expenses and liabilities which might be incurred by it in performing such duty or exercising such right or power. In the absence of an express statement in this Note Purchase Agreement or the Collateral Documents regarding which Holders shall direct in any circumstance, the direction of the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall apply and be sufficient for all purposes.

(p)     Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under or pursuant to the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to the Collateral Agent under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

(q)     The Collateral Agent shall have no responsibility for interest or income on any funds held by it under this Note Purchase Agreement or the Collateral Documents and any funds so held shall be held uninvested pending distribution thereof.

(r)     The Collateral Agent shall be under no obligation to exercise any of the duties or powers vested in it by this Note Purchase Agreement or the Collateral Documents at the request, order, instruction or direction of the Holders, unless the Holders shall have offered to the

81

Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against the costs, expenses and liabilities that might be incurred thereby.

(s)    The Collateral Agent may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Affiliate thereof as if the Collateral Agent were not an attorney-in-fact hereunder and without any duty to account therefore to the Secured Parties.

(t)    The Secured Parties understand that the Collateral Agent, acting in its individual capacity, and its Affiliates may engage in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (the "**Activities**") and may engage in the Activities with or on behalf of one or more of the Company and its respective Affiliates.  Furthermore, the Collateral Agent may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Company and its Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Company or its respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of the Company or its Affiliates. The Secured Parties understand and agree that in engaging in the Activities, the Collateral Agent may receive or otherwise obtain information concerning the Company or its Affiliates (including information concerning the ability of the Company to perform its respective obligations hereunder and under the Collateral Documents) which information may not be available to the Secured Parties. The Collateral Agent shall not have any duty to disclose to the Secured Parties or use on behalf of the Secured Parties, nor be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Company or any of its Affiliates) or to account for any revenue or profits obtained in connection with the Activities.

(u)    The Secured Parties further understand that there may be situations where members of the Collateral Agent's group or their respective customers (including the Company and its Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Secured Parties (including the interests of the Secured Parties hereunder and under the Collateral Documents). None of (i) this Note Purchase Agreement or the Collateral Documents, (ii) the receipt by the Collateral Agent of information concerning the Company or any of its Affiliates (including information concerning the ability of the Company to perform is obligations under this Note Purchase Agreement) or (iii) any other matter, shall give rise to any fiduciary, equitable or contractual duties (including any duty of trust or confidence) owing by the Collateral Agent to any Secured Party including any such duty that would prevent or restrict the Collateral Agent from acting on behalf of customers (including the Company or its Affiliates) or for its own account.

(v)    The Secured Parties (other than the Collateral Agent) confirm to the Collateral Agent that each of them (i) possesses such knowledge and experience in financial and business matters so that it is capable, without reliance on such Collateral Agent, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Note Purchase Agreement or holding the Notes and (y) taking or not taking

82

actions hereunder or under the Collateral Documents, (ii) is financially able to bear such risks and (iii) has determined that entering into this Note Purchase Agreement is suitable and appropriate for it.

(w)     Nothing in this Note Purchase Agreement or in the Collateral Documents shall require the Collateral Agent to carry out any "know your customer" or other checks in relation to the Company or any of its Affiliates on behalf of the Secured Parties and the Secured Parties confirm to the Collateral Agent that such Secured Parties are solely responsible for any such checks such Secured Parties are required to carry out and that such Secured Parties may not rely on any statement in relation to such checks made by such the Collateral Agent.

(x)     The Collateral Agent shall be entitled to rely on any written direction, instruction, request, consent or other written communication from the Purchaser or any Holder. The Collateral Agent shall not have any obligation or duty with respect to the identity of any Holder or the amount of any Obligations owing to any such Person. At any time and from time to time, the Collateral Agent may request information from the Holders or the Company as to the identities of the Holders, their respective Notes and the composition and calculation of the Majority Holders or the Supermajority Holders, and the Holders and the Company shall provide such information. The Collateral Agent shall be entitled to fully rely on such information and shall have no duty, obligation or liability with respect to the identity or amount of Notes held by any Holder or with respect to the calculation of the Majority Holders, the Supermajority Holders or the unanimous vote of Holders.

(y)     The Collateral Agent shall not have any duty, obligation or liability with respect to the identity, calculation or consent or other action of the Abra Holders. Where the consent or other action of the Abra Holders or the Abra Notes Supermajority Holders is required by this Note Purchase Agreement or the Collateral Documents, the Company shall certify to the Collateral Agent that the Company has obtained such consent, or other action, and the Collateral Agent shall be fully entitled to rely on such certification of the Company without any liability.

(z)     Before the Collateral Agent acts or refrains from acting, it may require an Officer's Certificate of the Company, or an Opinion of Counsel satisfactory to the Collateral Agent, with respect to the proposed action or inaction. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion. Whenever in the administration of this Note Purchase Agreement or the Collateral Documents the Collateral Agent shall deem it necessary or desirable that a matter be provided or established prior to taking or suffering or omitting to take any act hereunder or thereunder, such matter (unless other evidence in respect thereof be herein of therein specifically described) may, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Collateral Agent, and such certificate, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, shall be full warrant to the Collateral Agent for any action taken, suffered or omitted to be taken by it under the provision of this Note Purchase Agreement and the Collateral Documents upon the faith thereof.

SECTION 12.03.  *Resignation*. Upon at least thirty (30) days' notice, the Collateral Agent may resign at any time as Collateral Agent under this Note Purchase Agreement and the

Collateral Documents by notifying the Purchaser and the Company.  Upon any resignation by the Collateral Agent, the Company shall have the right (provided that no Event of Default has occurred and continues) to appoint a successor Collateral Agent or, if an Event of Default has occurred and is continuing, the Purchaser shall have the right to appoint a successor Collateral Agent. If no successor has been so appointed and has accepted such appointment within thirty (30) days after the date the Collateral Agent gives notice of its resignation, then the resigning Collateral Agent may (but shall not be obligated to) (a) upon consent (provided that no Event of Default or Default has occurred and continues) of the Company (consent of which shall not be unreasonably withheld or delayed), at the cost and expense of the Company, appoint a successor Collateral Agent or (b) petition any court of competent jurisdiction, at the cost and expense of the Company, for the appointment of a successor Collateral Agent. Whether or not a successor has been appointed, the Collateral Agent's resignation shall become effective in accordance with the Collateral Agent's notice of resignation on the date specified in such notice, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents on such date. Upon acceptance of a successor Collateral Agent of its appointment as Collateral Agent under this Note Purchase Agreement and the Collateral Documents, such successor will succeed and have all rights, powers, privileges and duties of the resigning Collateral Agent, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents (if not released sooner, as provided above). The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor. Any Person into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any Person succeeding to the business of the Collateral Agent shall be the successor of the Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by Law to effect such succession, anything herein to the contrary notwithstanding.

SECTION 12.04.  *Fees, Expenses and Indemnification*.

(a)      Each of the Company and the Guarantors, jointly and severally, shall pay to the Collateral Agent for its own account fees in the amounts and at the times agreed with the Collateral Agent.

(b)      Each of the Company and the Guarantors, jointly and severally, shall pay or reimburse each of the Purchaser and the Collateral Agent for (1) all reasonable costs and expenses incurred in connection with the development, preparation, negotiation, execution and performance of this Note Purchase Agreement and the Collateral Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all attorney fees and expenses, and (2) all costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Note Purchase Agreement or under the Collateral Documents, including all attorney costs and all expenses incurred during any workout, restructuring or negotiations in respect of this Note Purchase Agreement, the Notes or the Collateral Documents.  The foregoing costs and expenses shall

84

include all out-of-pocket expenses incurred by the Purchaser and Collateral Agent under clause (1) or (2) above and the cost of counsel, independent public accountants and other outside experts so retained.  All amounts due under this Section shall be payable within ten Business Days after demand therefore.

(c)      Each of the Company and the Guarantors, jointly and severally, shall indemnify and hold each of the Purchaser and the Collateral Agent harmless for, from and against any and all damage, loss, liability, cost, claim or expense (including reasonable attorneys' fees and expenses and including all fees, expenses and costs incurred by the Purchaser and/or the Collateral Agent in connection with any dispute, action, claim or suit brought to enforce the right to indemnification) incurred by the Purchaser and/or the Collateral Agent arising out of or in connection with the execution, delivery or administration of this Note Purchase Agreement and the Collateral Documents or any instrument or agreement contemplated hereby or thereby, the performance of the Collateral Agent's duties hereunder or thereunder, and the exercise of each of the Purchaser's and the Collateral Agent's rights hereunder or thereunder including, without limitation, the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Note Purchase Agreement or the Collateral Documents, except, as applicable, as may result from the Purchaser's or the Collateral Agent's respective willful misconduct or gross negligence (as determined by a final and non-appealable judgement by a court of competent jurisdiction).

(d)      To the extent that the Company of the Guarantors for any reason fail to indefeasibly pay any amount required under paragraph (a), (b) or (c) of this Section or under the Collateral Documents to be paid by the Company or the Guarantors to the Collateral Agent (or any sub-agent thereof), the Holders agree to pay to the Collateral Agent (or any sub-agent) such unpaid amount (including any such unpaid amount in respect of a claim asserted by the Holders); provided that the unpaid amount was incurred by or asserted against the Collateral Agent (or any sub-agent) in its capacity as such.

(e)      The provisions in this Article shall survive the termination or satisfaction of this Note Purchase Agreement, the Notes or the Collateral Documents, the resignation or removal of the Collateral Agent and the payment of all Notes Obligations.

## ARTICLE 13
### EXCHANGE OF NOTES

SECTION 13.01.  *Right to Exchange.* Subject to and upon compliance with the provisions of this Article 13, the Company and each Holder of a Note shall have the right, at its option, to exchange all or any portion of such Note, prior to the GLAI Going Private Date, at any time prior to the close of business on the Business Day immediately preceding the date that is 30 days prior to the Maturity Date, at an initial exchange rate of [•][3] Preferred Shares per

---

[3] To be set at 35% premium to trading price as long as the GLAI preferred shares are listed on the B3 and at 35% of the equity value of GLAI in case the GLAI shares are no longer listed.

U.S.$1,000 principal amount of Notes (the "**Exchange Rate**") (plus cash in lieu of any fractional Preferred Share deliverable upon exchange) subject to the adjustments set forth in Section 13.03(a) through (e), and in accordance with, the settlement provisions of Section 13.02 (the "**Exchange Obligation**"). The election of the Company to exchange the Notes shall be subject to satisfaction of the conditions described in Section 13.01(b); *provided* that (i) the Company or any Holder of the Notes, may only exercise the exchange right under this Section 13.01 if all obligations under the Abra Senior Secured Notes due 2028 have been indefeasibly paid in full in cash to all of the holders of those notes and (ii) the aggregate principal amount of Notes that can be exchanged under this Section 13.01 shall be in an amount proportionate to (and be no greater than) the aggregate principal amount of the Abra Senior Secured Exchangeable Notes that have been converted under the Abra Senior Secured Exchangeable Notes Indenture.

(1)     Special Adjustment to Exchange Rate Related to Total Created Value. On the last day of each fiscal quarter following the Initial Closing Date in which the Total Created Value has changed, the Total Created Value (or, for subsequent adjustments, the incremental change to the Total Created Value) shall be added to the Exchange Rate; *provided* that if for any Exchange Date following the date on which the Total Created Value increased, the Company shall make commercially reasonable efforts to give the applicable Holders the benefit of an increased Exchange Rate as provided under this clause 13.01(1) notwithstanding that the Exchange Date be prior to the last day of the applicable fiscal quarter.

(a)     On or after GLAI Going Private Date and prior to the close of business on the Second Business Day immediately preceding the Maturity Date, the Company may require a Holder to surrender all or any portion of a Holder's Notes for exchange at any time. Notwithstanding the foregoing, the Company and each Holder of a Note shall only have the right to exchange all or any portion of any Note or deliver any Notice of Exchange pursuant to this Section 13.01 on, or following the GLAI Going Private Date if (ii) all obligations under the Abra Senior Secured Notes due 2028 have been indefeasibly paid in full in cash to all of the holders of those notes and (ii) the aggregate principal amount of Notes that can be exchanged under this Section 13.01(a) shall be in an amount proportionate to (and be no greater than) the aggregate principal amount of the Abra Senior Secured Exchangeable Notes that have been converted under the Abra Senior Secured Exchangeable Notes Indenture.

(b)     Exchange by the Company upon Satisfaction of the Exchange Price Condition. At any time prior to the close of business on the Business Day immediately preceding the date that is 30 days prior to the Maturity Date and prior to the GLAI Going Private Date, the Company may require a Holder to surrender all or any portion of a Holder's Notes for exchange at any time during any calendar quarter commencing after the calendar quarter ending on December 31, 2023 (and only during such calendar quarter), if the Last Reported Sale Price of the Preferred Shares for at least 20 Trading Days (whether or not consecutive) during the period of 30 consecutive Trading Days ending on the last Trading Day of the immediately preceding calendar quarter is greater than or equal to 130% of the Exchange Price on each applicable Trading Day (the "**Sale Price Condition**"). The Company shall provide written notice to the Holders if the Company has elected to exchange the Notes in accordance with this Section 13.01(b) within ten Business Days after the end of the preceding calendar quarter.

86

(c)      Each Preferred Share issued upon an Exchange of any Note will be fully-paid-up newly issued share and will be subject to the terms of the bylaws and any shareholders' agreement in effect on the Exchange Date, and, except as set out therein, will be duly and validly issued, fully paid, non-assessable, free from preemptive rights and free of any lien or adverse claim. Each Holder whose Notes are being converted shall be deemed to irrevocably authorize and instruct GLAI to apply the moneys payable to that Holder in subscribing for Preferred Shares on exchange of the Notes. If the Preferred Shares are then listed on any securities exchange and have been registered on an effective registration statement with the CVM, then the Company will, to the extent practicable, cause each Preferred Share, when delivered upon an exchange of any Note, to be admitted for listing on such securities exchange.

SECTION 13.02.  *Exchange Procedure; Settlement Upon Exchange*

(a)      Subject to this Section 13.02(a), upon exchange of any Note, the Company shall pay or cause to be delivered, as the case may be, to the exchanging Holder, in respect of each U.S.$1,000 principal amount of Notes being exchanged, cash ("**Cash Settlement**"), Preferred Shares, together with cash, if applicable, in lieu of any fractional Preferred Share deliverable upon exchange in accordance with subsection (1) of this Section 13.02 ("**Physical Settlement**") or a combination of cash and Preferred Shares, together with cash, if applicable, in lieu of any fractional Preferred Share deliverable upon exchange in accordance with subsection (1) of this Section 13.02 ("**Combination Settlement**"), at its election, as set forth in this Section 13.02.

(1)      Except for any exchanges for which the relevant Exchange Date occurs on or after the date that is 30 days prior to the Maturity Date, the Company shall use the same Settlement Method (including the same relative proportion of cash and/or Preferred Shares) for all exchanges with the same Exchange Date, but the Company shall not have any obligation to use the same Settlement Method with respect to exchanges with different Exchange Dates.

(2)      If, in respect of any Exchange Date (or one of the periods described in the third immediately succeeding set of parentheses, as the case may be), the Company elects to deliver a notice (the "**Settlement Notice**") of the relevant Settlement Method in respect of such Exchange Date (or such period, as the case may be), the Company shall deliver such Settlement Notice to exchanging Holders no later than the close of business on the Trading Day immediately following the relevant Exchange Date (or, in the case of any exchanges for which the relevant Exchange Date occurs on or after the date that is 30 days prior to the Maturity Date, no later than the date that is 100 days prior to the Maturity Date). If the Company does not elect a Settlement Method prior to the deadline set forth in the immediately preceding sentence, the Company shall no longer have the right to elect Cash Settlement or Physical Settlement with respect to that Exchange Date and the Company shall be deemed to have elected Combination Settlement in respect of its Exchange Obligation, and the Specified Dollar Amount per U.S.$1,000 principal amount of Notes shall be equal to U.S.$1,000.  Such Settlement Notice shall specify the relevant Settlement Method and in the case of an election of Combination Settlement, the relevant Settlement Notice shall indicate the Specified Dollar Amount per U.S.$1,000 principal amount of Notes.  If the Company delivers a Settlement Notice electing Combination Settlement in respect of its Exchange Obligation but does not indicate a

87

Specified Dollar Amount per U.S.$1,000 principal amount of Notes in such Settlement Notice, the Specified Dollar Amount per U.S.$1,000 principal amount of Notes shall be deemed to be U.S.$1,000.

(3)     The cash, Preferred Shares or combination of cash and Preferred Shares in respect of any exchange of Notes (the "**Settlement Amount**") shall be computed as follows:

(A)          if the Company elects to satisfy its Exchange Obligation in respect of such exchange by Physical Settlement, the Company shall cause to be delivered to the exchanging Holder in respect of each U.S.$1,000 principal amount of Notes being exchanged a number of Preferred Shares equal to the Exchange Rate in effect on the Exchange Date (plus cash in lieu of any fractional Preferred Share deliverable upon exchange);

(B)          if the Company elects to satisfy its Exchange Obligation in respect of such exchange by Cash Settlement, the Company shall pay to the exchanging Holder in respect of each U.S.$1,000 principal amount of Notes being exchanged cash in an amount equal to the sum of the Daily Exchange Values for each of the 50 consecutive VWAP Trading Days during the related Observation Period; and

(C)          if the Company elects (or is deemed to have elected) to satisfy its Exchange Obligation in respect of such exchange by Combination Settlement, the Company shall pay or cause to be delivered, as the case may be, in respect of each U.S.$1,000 principal amount of Notes being exchanged, a Settlement Amount equal to the sum of the Daily Settlement Amounts for each of the (x) 50 consecutive VWAP Trading Days during the related Observation Period (plus cash in lieu of any fractional Preferred Share deliverable upon exchange) or (y) 10 consecutive VWAP Trading Days, in case the payment relating to the Exchange Obligation is due on or after the GLAI Going Private Date.

(4)     The Daily Settlement Amounts (if applicable) and the Daily Exchange Values (if applicable) shall be determined by the Company promptly following the last day of the Observation Period.  Promptly after such determination of the Daily Settlement Amounts or the Daily Exchange Values, as the case may be, and the amount of cash payable in lieu of any fractional Preferred Share deliverable upon exchange, the Company shall notify the Purchaser of the Daily Settlement Amounts or the Daily Exchange Values, as the case may be, and the amount of cash payable in lieu of any fractional Preferred Shares deliverable upon exchange.

(b)     Subject to Section 13.02(e), before the Company or any Holder of a Note shall be entitled to exchange (which exchange is irrevocable) a Note as set forth above, the Company or such Holder, as the case may be, shall (1) complete, sign and deliver an irrevocable notice to the Exchange Agent or the Holder, as the case may be, as set forth in the forms of notices of exchange attached hereto as Annex I and Annex II to the Form of Note, as applicable, (each, a "**Notice of Exchange**") at the office of the Exchange Agent and state in writing therein the principal amount of Notes to be exchanged and the name or names (with addresses) to whom

such Holder wishes the Preferred Shares to be delivered upon settlement of the Exchange Obligation, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the office of the Exchange Agent, (3) if required, furnish appropriate endorsements and transfer documents and (4) if required by Section 13.02(e), pay all transfer or similar taxes. If more than one Note shall be surrendered for exchange at one time by the same Holder, the Exchange Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered.

(c)    A Note shall be deemed to have been exchanged immediately prior to the close of business on the date (the "**Exchange Date**") that the Holder has complied with the requirements set forth in subsection (b) above.  The Company shall pay or deliver, as the case may be, the consideration due in respect of the Exchange Obligation on the second Business Day (after the GLAI Going Private Date) or the fifth Business Day (prior to the GLAI Going Private Date) immediately following the relevant Exchange Date (or on the Maturity Date, in the case of any such exchange occurring after the Regular Record Date immediately preceding the Maturity Date), regardless of the Settlement Method elected by the Company. If any Preferred Shares are due to an exchanging Holder, the Company shall cause to be issued, and deliver or cause to be delivered (if applicable) to such Holder, or such Holder's nominee or nominees, the full number of Preferred Shares to which such Holder shall be entitled in satisfaction of the Company's Exchange Obligation.

(d)    In case any Note shall be surrendered for partial exchange, the Company shall execute and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in Authorized Denominations in an aggregate principal amount equal to the unexchanged portion of the surrendered Note, without payment of any service charge by the exchanging Holder but, if required by the Company, with payment of a sum sufficient to cover any U.S. documentary, stamp or similar issue or transfer tax or similar governmental charge required by Law or that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange being different from the name of the Holder of the old Notes surrendered for such exchange.

(e)    If a Holder submits a Note for exchange, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issuance or delivery of any Preferred Shares upon exchange, unless the tax is due because the Holder requests such Preferred Shares to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax.  The Exchange Agent may refuse to deliver the Preferred Shares being issued in a name other than the Holder's name until the Company receives a sum sufficient to pay any tax that is due by such Holder in accordance with the immediately preceding sentence.

(f)    Except as provided in Section 13.03, no adjustment shall be made for dividends on any Preferred Shares delivered upon the exchange of any Note as provided in this Article 13.

(g)    Upon exchange, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below.  The Company's settlement of the full Exchange Obligation shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including the relevant Exchange

Date. As a result, accrued and unpaid interest, if any, to, but not including, the relevant Exchange Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited. Upon an exchange of Notes into a combination of cash and Preferred Shares, accrued and unpaid interest will be deemed to be paid first out of the cash paid upon such exchange. Notwithstanding the foregoing, if Notes are exchanged after the close of business on a Regular Record Date but prior to the open of business on the immediately following Interest Payment Date, the Holders of such Notes as of the close of business on such Regular Record Date will receive the full amount of interest payable on such Notes on the corresponding Interest Payment Date notwithstanding the exchange. Notes surrendered for exchange during the period from the close of business on any Regular Record Date to the open of business on the immediately following Interest Payment Date must be accompanied by funds equal to the amount of interest payable on the Notes so exchanged on the corresponding Interest Payment Date (regardless of whether the exchanging Holder was the holder of record on the corresponding Regular Record Date); *provided that* no such payment shall be required (1) for exchanges following the Regular Record Date immediately preceding the Maturity Date; or (2) to the extent of any Defaulted Amounts, if any Defaulted Amounts exist at the time of exchange with respect to such Note. Therefore, for the avoidance of doubt, all Holders of record on the Regular Record Date immediately preceding the Maturity Date, described in the immediately preceding sentence shall receive and retain the full interest payment due on the Maturity Date or other applicable Interest Payment Date regardless of whether their Notes have been exchanged following such Regular Record Date. For the further avoidance of doubt, any accrued and unpaid PIK Interest on the Notes that has been capitalized in accordance with Section 4.05(e) shall be paid in full for such capitalized amounts as set forth in Section 4.05(e) and shall not be treated as Outstanding principal amount of the Notes for any purposes under this Note Purchase Agreement.

(h)    The Person in whose name any Preferred Shares shall be deliverable upon exchange shall be treated by GLAI as a holder of record of such Preferred Shares, for purposes of dividends and distributions in respect of such Preferred Shares, as of the close of business on the relevant Exchange Date (if the Company elects to satisfy the related Exchange Obligation by Physical Settlement) or the last VWAP Trading Day of the relevant Observation Period (if the Company elects to satisfy the related Exchange Obligation by Combination Settlement), as the case may be. Upon an exchange of Notes, such Person shall no longer be a Holder of such Notes surrendered for exchange.

(i)    The Company shall not deliver any fractional Preferred Share upon exchange of the Notes and shall instead pay cash in lieu of any fractional Preferred Share deliverable upon exchange based on the Daily VWAP for the relevant Exchange Date (in the case of Physical Settlement) or based on the Daily VWAP for the last VWAP Trading Day of the relevant Observation Period (in the case of Combination Settlement). For each Note surrendered for exchange, if the Company has elected Combination Settlement, the full number of Preferred Shares that shall be delivered upon exchange thereof shall be computed on the basis of the aggregate Daily Settlement Amounts for the relevant Observation Period and any fractional Preferred Shares remaining after such computation shall be paid in cash (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate on the Trading Day immediately before such payment).

SECTION 13.03.  *Adjustment of Exchange Rate*

The Exchange Rate shall be adjusted from time to time if any of the following events occurs, except that the Company shall not make any adjustments to the Exchange Rate if Holders of the Notes participate (other than in the case of a share split or share combination), at the same time and upon the same terms as holders of the Preferred Shares and solely as a result of holding the Notes, in any of the transactions described in this Section 13.03, without having to exchange their Notes, as if they held a number of Preferred Shares equal to the Exchange Rate, *multiplied by* the principal amount (expressed in thousands) of Notes held by such Holder. For the avoidance of doubt, each Last Reported Sale Price used in the calculation of an adjustment to the Exchange Rate will be expressed in U.S. Dollars, translated, if necessary at the Prevailing Exchange Rate as contemplated in the definition of "Last Reported Sale Price", in Section 1.01.

(a)     If, prior to the GLAI Going Private Date, GLAI exclusively issues Preferred Shares as a dividend or distribution on the Preferred Shares, or effects a share split or share combination of the Preferred Shares, the Exchange Rate shall be adjusted based on the following formula:

$$ER' = ER_0 \times \frac{OS'}{OS_0}$$

where,

$ER_0$     =     the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date of such dividend or distribution, or immediately prior to the open of business on the Exchange Date of such share split or share combination, as applicable;

$ER'$     =     the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date or Exchange Date, as applicable;

$OS_0$     =     the number of Preferred Shares outstanding immediately prior to the open of business on such Ex-Dividend Date or Exchange Date, as applicable, (before giving effect to any such dividend, distribution, share split or share combination); and

$OS'$     =     the number of Preferred Shares outstanding immediately after the open of business on such Ex-Dividend Date or Exchange Date, as applicable, after giving effect to such dividend, distribution, share split or share combination.

Any adjustment made under this Section 13.03(a) shall become effective immediately after the open of business on the Ex-Dividend Date for such dividend or distribution, or immediately after the open of business on the Exchange Date for such share split or share combination, as applicable.  If any dividend or distribution of the type described in this Section 13.03(a) is declared but not so paid or made, the Exchange Rate shall be immediately readjusted, effective as of the date GLAI's Board of Directors determines not to pay such dividend or distribution, to the Exchange Rate that would then be in effect if such dividend or distribution had not been declared.

(b)     If, prior to the GLAI Going Private Date, GLAI issues to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs) any rights, options or warrants

91

(other than pursuant to a stockholder rights plan, so long as such rights have not separated from the Preferred Shares) entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Preferred Shares (directly or in the form of ADSs) at a price per Preferred Share (translated, if necessary at the Prevailing Exchange Rate on the Trading Day immediately before the date of announcement of such issuance) that is less than the average of the Last Reported Sale Prices of the Preferred Shares for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance, the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

$ER_0$    =    the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the Preferred Shares for such issuance;

$ER'$    =    the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date;

$OS_0$    =    the number of Preferred Shares outstanding immediately prior to the open of business on such Ex-Dividend Date;

$X$    =    the total number of Preferred Shares (directly or in the form of ADSs) deliverable pursuant to such rights, options or warrants; and

$Y$    =    the number of Preferred Shares equal to (i) the aggregate price payable to exercise such rights, options or warrants (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate), *divided by* (ii) the quotient of (x) the average of the Last Reported Sale Prices of the Preferred Shares (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate) over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of the issuance of such rights, options or warrants, *divided by* (y) the number of Preferred Shares then represented by one ADS (in case ADSs are issued).

Any increase made under this Section 13.03(b) shall be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the open of business on the Ex-Dividend Date for such issuance. To the extent that such rights, options or warrants are not exercised prior to their expiration or the Preferred Shares (directly or in the form of ADSs) are not delivered after the exercise of such rights, options or warrants, the Exchange Rate shall be decreased to the Exchange Rate that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of Preferred Shares actually delivered (directly or in the form of ADSs).  If such rights, options or warrants are not so issued, or if no such rights, options or warrants are exercised prior to their expiration, the Exchange Rate shall be decreased (effective, in the case of the non-issuance of such rights, options or warrants, as of the date GLAI's Board of Directors

92

determines not to issue such rights, options or warrants) to the Exchange Rate that would then be in effect if such Ex-Dividend Date for such issuance had not occurred.

For purposes of this Section 13.03(b), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase Preferred Shares (directly or in the form of ADSs) at a price per Preferred Share (translated to U.S. Dollars at the Prevailing Exchange Rate) that is less than such average of the Last Reported Sale Prices of the Preferred Shares for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement for such issuance (translated to U.S. Dollars at the Prevailing Exchange Rate) and in determining the aggregate offering price of such Preferred Shares (directly or in the form of ADSs), there shall be taken into account any consideration received by GLAI for such rights, options or warrants and any amount payable on exercise or exchange thereof, the value of such consideration, if other than cash (translated to U.S. Dollars at the Prevailing Exchange Rate), to be determined by GLAI's Board of Directors.

(c)    If, prior to the GLAI Going Private Date, GLAI distributes shares of its Capital Stock, evidences of its indebtedness, other assets or property or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs), excluding (i) dividends, distributions or issuances (including share splits) described in Section 13.03(a) or Section 13.03(b), (ii) dividends or distributions paid exclusively in cash described in Section 13.03(d), and (iii) Spin-Offs described below in this Section 13.03(c) (any of such shares of Capital Stock, evidences of indebtedness, other assets or property or rights, options or warrants to acquire Capital Stock or other securities, the "**Distributed Property**"), then the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

$ER_0$    =    the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the Preferred Shares for such distribution;

$ER'$    =    the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date;

$SP_0$    =    the average of the Last Reported Sale Prices of the Preferred Shares (translated, if necessary, into U.S. Dollars at the Prevailing Exchange Rate) over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution; and

$FMV$    =    the fair market value (as determined by GLAI's Board of Directors and translated, if necessary, into in U.S. Dollars at the Prevailing Exchange Rate) of the Distributed Property with respect to each outstanding Preferred Share (directly or in the form of ADSs) on the Ex-Dividend Date for the Preferred Shares for such distribution,.

Any increase made under the portion of this Section 13.03(c) above shall become effective immediately after the open of business on the Ex-Dividend Date for such distribution.  If such distribution is not so paid or made, the Exchange Rate shall be decreased, effective as of the date GLAI's Board of Directors determines not to pay or make such distribution, to be the Exchange Rate that would then be in effect if such distribution had not been declared.  Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "SP0" (as defined above), or if the difference between "FMV" and "SP0" is less than US$1.00, in lieu of the foregoing increase, each Holder of a Note shall receive from GLAI, in respect of each U.S.$1,000 principal amount thereof, at the same time and upon the same terms as holders of the Preferred Shares, a distribution of cash that, in the determination of GLAI, is comparable as a whole in all material respects with the amount of Distributed Property such Holder would have received had such Holder owned a number of Preferred Shares equal to the Exchange Rate in effect on the Ex-Dividend Date for the distribution.  If GLAI's Board of Directors determines the "FMV" (as defined above) of any distribution for purposes of this Section 13.03(c) by reference to the actual or when-issued trading market for any securities, it shall in doing so consider the prices in such market over the same period used in computing the Last Reported Sale Prices of the Preferred Shares over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution.

With respect to an adjustment pursuant to this Section 13.03(c) where there has been a payment of a dividend or other distribution on the Preferred Shares (directly or in the form of ADSs) of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary, Affiliate or other business unit of GLAI, that are, or, when issued, will be, listed or admitted for trading on a U.S. national securities exchange (directly or in the form of ADSs) (a "**Spin-Off**"), the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

$ER_0$     =     the Exchange Rate in effect immediately prior to the end of the Valuation Period;

$ER'$     =     the Exchange Rate in effect immediately after the end of the Valuation Period;

$FMV_0$ =     the average of the Last Reported Sale Prices of the Capital Stock (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate) or similar equity interest distributed to holders of the Preferred Shares (directly or in the form of ADSs) applicable to one Preferred Share (determined by reference to the definition of "Last Reported Sale Price" as set forth in Section 1.01 as if references therein to Preferred Shares were to such Capital Stock or similar equity interest) over the first 10 consecutive Trading Day period after, and including, the Ex-Dividend Date of the Spin-Off (the "**Valuation Period**"); and

$MP_0$     =     the average of the Last Reported Sale Prices of the Preferred Shares over the Valuation Period (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate).

94

Any adjustment to the Exchange Rate under the preceding paragraph shall be made immediately after the close of business on the last Trading Day of the Valuation Period, but shall be given effect as of the open of business on the Ex-Dividend Date for the Spin-Off. Because the adjustment to the Exchange Rate shall be made at the end of the Valuation Period with retroactive effect, the Company shall delay the settlement of any exchange of Notes where the Exchange Date (in the case of Physical Settlement) or the final day of the related Observation Period (in the case of Cash Settlement or Combination Settlement) occurs during the Valuation Period. In such event, the Company shall deliver the consideration due upon exchange on the second Business Day immediately following the last Trading Day of the Valuation Period. If such Spin-Off does not occur, the Exchange Rate shall be decreased to be the Exchange Rate that would then be in effect if such dividend or distribution had not been declared, effective as of the date on which GLAI's Board of Directors determines not to consummate such Spin-Off.

For purposes of this Section 13.03(c) (and subject in all respect to Section 13.07), rights, options or warrants distributed by GLAI to all holders of the Preferred Shares (directly or in the form of ADSs) entitling them to subscribe for or purchase shares of GLAI's Capital Stock, including Preferred Shares (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"): (i) are deemed to be transferred with such Preferred Shares (directly or in the form of ADSs); (ii) are not exercisable; and (iii) are also issued in respect of future issuances of the Preferred Shares (directly or in the form of ADSs), shall be deemed not to have been distributed for purposes of this Section 13.03(c) (and no adjustment to the Exchange Rate under this Section 13.03(c) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exchange Rate shall be made under this Section 13.03(c).  If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the date of this Note Purchase Agreement, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Ex-Dividend Date with respect to new rights, options or warrants with such rights (in which case the existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof).  In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exchange Rate under this Section 13.03(c) was made, (1) in the case of any such rights, options or warrants that shall all have been purchased without exercise by any holders thereof, upon such final purchase (x) the Exchange Rate shall be readjusted as if such rights, options or warrants had not been issued and (y) the Exchange Rate shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per Preferred Share purchase price received by a holder or holders of Preferred Shares (directly or in the form of ADSs) with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Preferred Shares (directly or in the form of ADSs) as of the date of such purchase, and (2) in the case of such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Exchange Rate shall be readjusted as if such rights, options and warrants had not been issued.

For purposes of Section 13.03(a), Section 13.03(b) and this Section 13.03(c), if any dividend or distribution to which this Section 13.03(c) is applicable also includes one or both of:

(1)     a dividend or distribution of Preferred Shares (directly or in the form of ADSs) to which Section 13.03(a) is applicable (the "**Clause A Distribution**"); or

(2)     a dividend or distribution of rights, options or warrants to which Section 13.03(b) is applicable (the "**Clause B Distribution**"),

then, in either case, (1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this Section 13.03(c) is applicable (the "**Clause C Distribution**") and any Exchange Rate adjustment required by this Section 13.03(c) with respect to such Clause C Distribution shall then be made, and (2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Exchange Rate adjustment required by Section 13.03(a) and Section 13.03(b) with respect thereto shall then be made, except that, if determined by the Company (I) the "Ex-Dividend Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Ex-Dividend Date of the Clause C Distribution and (II) any Preferred Shares (directly or in the form of ADSs) included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the open of business on such Ex-Dividend Date or Exchange Date" within the meaning indicated in Section 13.03(a) or "outstanding immediately prior to the open of business on such Ex-Dividend Date" within the meaning indicated in Section 13.03(b).

(d)     If, prior to the GLAI Going Private Date,  any cash dividend or distribution is made to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs), the Exchange Rate shall be adjusted based on the following formula:

$$ER' = ER_0 \times \frac{SP_0}{SP_0 - C}$$

where,

$ER_0$     =     the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the Preferred Shares for such dividend or distribution;

$ER'$     =     the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date;

$SP_0$     =     the Last Reported Sale Price of the Preferred Shares on the Trading Day immediately preceding the Ex-Dividend Date for such dividend or distribution; and

$C$     =     the amount in cash per Preferred Share GLAI distributes (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate on the Trading Day immediately before such Ex-Dividend Date) to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs).

96

Any adjustment pursuant to this Section 13.03(d) shall become effective immediately after the open of business on the Ex-Dividend Date for the Preferred Shares for such dividend or distribution.  If such dividend or distribution is not so paid, the Exchange Rate shall be decreased, effective as of the date GLAI's Board of Directors determines not to make or pay such dividend or distribution, to be the Exchange Rate that would then be in effect if such dividend or distribution had not been declared.  Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "$SP_0$" (as defined above) or if the difference between "C" and "$SP_0$" is less than U.S.$1.00, in lieu of the foregoing increase, each Holder of a Note shall receive, for each U.S.$1,000 principal amount of Notes, at the same time and upon the same terms as holders of the Preferred Shares, the amount of cash that such Holder would have received if such Holder owned a number of Preferred Shares equal to the Exchange Rate on the Ex-Dividend Date for such cash dividend or distribution.

(e)     If, prior to the GLAI Going Private Date, GLAI or any of its Subsidiaries make a payment in respect of a tender or exchange offer for the Preferred Shares (directly or in the form of ADSs), except for a tender or exchange offer in the context of the GLAI Going Private Process, to the extent that the cash and value of any other consideration included in the payment per Preferred Share (translated to U.S. Dollars at the Prevailing Exchange Rate) exceeds (i) the average of the Last Reported Sale Prices of the Preferred Shares over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer (the "**Expiration Date**"), *divided by* (ii) the number of Preferred Shares then represented by one ADS (in case ADSs are issued), the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{AC + (SP' \times OS')}{OS_0 \times SP'}$$

where,

$ER_0$     =     the Exchange Rate in effect immediately prior to the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the Expiration Date;

$ER'$     =     the Exchange Rate in effect immediately after the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the Expiration Date;

$AC$     =     the aggregate value of all cash and any other consideration (as determined by GLAI's Board of Directors), translated to U.S. Dollars at the Prevailing Exchange Rate, paid or payable for Preferred Shares or ADSs, as the case may be, purchased or exchanged in such tender or exchange offer;

$OS_0$     =     the number of Preferred Shares outstanding immediately prior to the Expiration Date (prior to giving effect to the purchase of all Preferred Shares accepted for purchase or exchange, or represented by all ADSs accepted for purchase or exchange, as the case may be, in such tender or exchange offer);

97

OS'    =    the number of Preferred Shares outstanding immediately after the Expiration Date (after giving effect to the purchase of all Preferred Shares accepted for purchase or exchange, or represented by all ADSs accepted for purchase or exchange, as the case may be, in such tender or exchange offer, without duplication); and

SP'    =    (i) the average of the Last Reported Sale Prices of the Preferred Shares (translated, if necessary, into in U.S. Dollars at the Prevailing Exchange Rate) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date, *divided by* (ii) the number of Preferred Shares then represented by one ADS (in case ADSs are issued).

Any adjustment to the Exchange Rate under this Section 13.03(e) shall be made at the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the Expiration Date, but shall be given effect as of the open of business on the Trading Day next succeeding the Expiration Date. Because the adjustment to the Exchange Rate shall be made at the end of the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date with retroactive effect, the Company shall delay the settlement of any exchange of Notes where the Exchange Date (in the case of Physical Settlement) or the final day of the related Observation Period (in the case of Cash Settlement or Combination Settlement) occurs during the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date. In such event, the Company shall deliver the consideration due upon exchange on the second Business Day immediately following the last Trading Day of the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date. For the avoidance of doubt, no adjustment under this Section 13.03(e) shall be made if such adjustment would result in a decrease in the Exchange Rate.  In the event that GLAI or one of its Subsidiaries is obligated to purchase Preferred Shares or ADSs, as the case may be, pursuant to any such tender offer or exchange offer, but GLAI or such Subsidiary is permanently prevented by applicable Law from effecting any such purchases, or all or a portion of such purchases are rescinded, then the Exchange Rate shall again be adjusted to be the Exchange Rate that would then be in effect if such tender offer or exchange offer had not been made or had been made only in respect of the purchases that have been effected.

(f)    On and after the GLAI Going Private Date, if there shall occur any increase in the amount or value of the Capital Stock of GLAI as a result of a recapitalization, merger, consolidation, reclassification, redesignation or subdivision of  any Capital Stock, allotment or issuance of equity securities, rights, or any other increase of the nominal value of the then issued equity securities by way of capitalisation of profits or reserves, including any share premium account or capital redemption reserve, issuance of any options, warrants or any other rights to subscribe for or purchase equity securities or any securities which by their terms of issue carry (directly or indirectly) rights of conversion into, or exchange or subscription for, or the right to otherwise acquire, any equity securities (or the grant of any such rights in respect of existing securities so issued), any cancellation, purchase or redemption of equity securities or any reduction (including, but not limited to, reduction of the nominal value) or repayment of equity securities by the Company (excluding in respect of any deferred shares), the distribution of Distributed Property, tender or exchange offer for the Preferred Shares (directly or in the form of ADSs), conversion or reclassification of equity or like event, then the Exchange Rate shall be

98

adjusted as determined by an Independent Financial Advisor; provided, however, that the Company shall only be required to make an adjustment pursuant to this Section 13.03(f) if such adjustment would result in a change of at least 1% of the Exchange Rate. However, the Company shall carry forward any adjustment that the Company would otherwise have to make and take that adjustment into account in any subsequent adjustment. Notwithstanding the foregoing, all such carried forward adjustments shall be made with respect to the Notes (i) in connection with any subsequent adjustment to the Exchange Rate of at least 1% of the Exchange Rate (when such carried-forward adjustments are taken into account), (ii) on the Exchange Date for any Notes, (iii) prior to the close of business on the Exchange Date in respect of any exchange following a replacement of Preferred Shares by Reference Property consisting solely of cash and (iv) on the date the Company sends a Notice of Exchange pursuant to Section 13.01(b).

(g)    Notwithstanding this Section 13.03 or any other provision of this Note Purchase Agreement or the Notes, if an Exchange Rate adjustment becomes effective on any Ex-Dividend Date, and a Holder that has exchanged its Notes on or after such Ex-Dividend Date and on or prior to the related Record Date would be treated as the record holder of the Preferred Shares as of the related Exchange Date as described under Section 13.02(h)  based on an adjusted Exchange Rate for such Ex-Dividend Date, then, notwithstanding the Exchange Rate adjustment provisions in this Section 13.03, the Exchange Rate adjustment relating to such Ex-Dividend Date shall not be made for such exchanging Holder. Instead, such Holder shall be treated as if such Holder were the record owner of the Preferred Shares on an unadjusted basis and participate in the related dividend, distribution or other event giving rise to such adjustment.

(h)    Except as stated herein, the Company shall not adjust the Exchange Rate for the issuance of Preferred Shares or any securities convertible into or exchangeable for Preferred Shares or the right to purchase Preferred Shares or such convertible or exchangeable securities.

(i)    In addition to those adjustments required by clauses (a), (b), (c), (d), (e) and (f) of this Section 13.03, and to the extent permitted by applicable Law and subject to the applicable rules of any exchange on which any of GLAI's securities are then listed, the Company from time to time may increase the Exchange Rate by any amount for a period of at least 20 Business Days if GLAI's Board of Directors determines that such increase would be in the Company's and/or GLAI's best interest.  In addition, to the extent permitted by applicable Law and subject to the applicable rules of any exchange on which any of GLAI's securities are then listed, the Company may (but is not required to) increase the Exchange Rate to avoid or diminish any income tax to holders of the Preferred Shares or rights to purchase Preferred Shares in connection with a dividend or distribution of Preferred Shares (or rights to acquire Preferred Shares) or similar event.  Whenever the Exchange Rate is increased pursuant to either of the preceding two sentences, the Company shall deliver to the Holder of each Note a notice of the increase at least 15 days prior to the date the increased Exchange Rate takes effect, and such notice shall state the increased Exchange Rate and the period during which it will be in effect.

(j)    Notwithstanding anything to the contrary in this Article 13, the Exchange Rate shall not be adjusted:

(1)    upon the issuance of any Preferred Shares pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on GLAI's

securities and the investment of additional optional amounts in Preferred Shares under any plan;

(2)     upon the issuance of any Preferred Shares or options or rights to purchase those Preferred Shares pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the GLAI Group;

(3)     upon the issuance of any Preferred Shares pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (2) of this subsection and outstanding as of the date the Notes were first issued;

(4)     for repurchases of Preferred Shares (directly or in the form of ADSs) that are not tender or exchange offers referred to in Section 13.03(e) of this Note Purchase Agreement, including structured or derivatives transactions or pursuant to a repurchase program approved by GLAI's Board of Directors;

(5)     solely for a change in the par value of the Preferred Shares; or

(6)     for accrued and unpaid interest, if any.

(k)     All calculations and other determinations under this Article 13 shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000th) of a Preferred Share.  In no event shall the Exchange Rate be adjusted such that the Exchange Price will be less than the par value per Preferred Share.

(l)     Whenever the Exchange Rate is adjusted as herein provided, the Company shall prepare a notice of such adjustment of the Exchange Rate setting forth the adjusted Exchange Rate and the date on which each adjustment becomes effective and shall deliver such notice of such adjustment of the Exchange Rate to each Holder.  Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(m)     For purposes of this Section 13.03, the number of Preferred Shares at any time outstanding shall not include Preferred Shares held in the treasury of GLAI (directly or in the form of ADSs) so long as GLAI does not pay any dividend or make any distribution on Preferred Shares held in the treasury of GLAI (directly or in the form of ADSs), but shall include Preferred Shares issuable in respect of scrip certificates issued in lieu of fractions of Preferred Shares.

SECTION 13.04.  *Effects of Recapitalizations, Reclassifications and Changes of the Preferred Shares*

(a)     In the case of:

(1)     any recapitalization, reclassification or change of the Preferred Shares (other than changes in par value or resulting from a subdivision or combination);

(2)     any consolidation, merger (*fusão* or *incorporação*), merger of shares (*incorporação de ações*) or other combination involving GLAI; or

100

(3)    any sale, lease or other transfer or disposition in one transaction or a series of transactions, including any split-off or spin-off (*cisão*), to any Person of all or substantially all of the consolidated assets of the GLAI Group, taken as a whole,

in each case, as a result of which the Preferred Shares would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "**Specified Corporate Event**" and any such stock, other securities, other property or assets (including cash or any combination thereof) into which the Preferred Shares are converted into or exchanged for, "**Reference Property**", and the amount of Reference Property that a holder of one Preferred Share immediately prior to such Specified Corporate Event would have been entitled to receive upon the occurrence of such Specified Corporate Event, a "**unit of Reference Property**")), then, prior to or at the effective time of such Specified Corporate Event, the Company, GLAI and/or the successor or purchasing corporation, as the case may be, shall execute, without the consent of the Holders, an amendment permitted under Section 10.01(vii) to this Note Purchase Agreement providing that, at and after the effective time of such Specified Corporate Event, the right to exchange each U.S.$1,000 principal amount of Notes for Preferred Shares shall be changed into a right to exchange such principal amount of Notes for the kind and amount of Reference Property that a holder of a number of Preferred Shares equal to the Exchange Rate immediately prior to such Specified Corporate Event would have been entitled to receive upon such Specified Corporate Event. However, at and after the effective time of the Specified Corporate Event, (A) the Company or the successor or purchasing company, as the case may be, shall continue to have the right to determine the form of consideration to be paid or delivered, as the case may be, upon exchange of Notes in accordance with Section 13.02 and (B) (I) any amount payable in cash upon exchange of the Notes in accordance with Section 13.02 shall continue to be payable in cash, (II) any Preferred Shares that would have been deliverable upon exchange of the Notes in accordance with Section 13.02 shall instead be deliverable in the units of Reference Property that a holder of that number of Preferred Shares would have received in such Specified Corporate Event and (III) the Daily VWAP shall be calculated based on the value of a unit of Reference Property; *provided*, *however*, that if the holders of Preferred Shares receive only cash in such Specified Corporate Event, then (i) the consideration due upon exchange of each U.S.$1,000 principal amount of Notes shall be solely cash in an amount equal to the Exchange Rate in effect on the Exchange Date (as may be increased as described under Section 13.03 of this Note Purchase Agreement), *multiplied by* the price paid per Preferred Share in such Specified Corporate Event; and (ii) settlement of the Exchange Obligation shall occur on the second Business Day immediately following the Exchange Date.

If the Specified Corporate Event causes the Preferred Shares to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of holder election), then (i) the Reference Property into which the Notes will be exchangeable shall be deemed to be based on (x) the weighted average of the types and amounts of consideration received by the holders of Preferred Shares that affirmatively make such an election and (y) if no holders of Preferred Shares affirmatively make such an election, the types and amounts of consideration actually received by the holders of the Preferred Shares and (ii) the unit of Reference Property for purposes of the immediately preceding paragraph shall refer to the consideration referred to in clause (1) thereof attributable to one Preferred Share. The Company shall notify the Purchaser, GLAI and the Exchange Agent (if other than GLAI) of such weighted average as soon as practicable after such determination is made.

101

Such amendment to this Note Purchase Agreement described in the second immediately preceding paragraph shall provide for anti-dilution and other adjustments that shall be as nearly equivalent as is possible to the adjustments provided for in this Article 13, it being understood that no such adjustments shall be required with respect to any portion of the Reference Property that does not consist of equity (however evidenced) or depositary receipts in respect thereof.  If, in the case of any Specified Corporate Event, the Reference Property includes shares of stock, other securities or other property or assets (including cash or any combination thereof) of a Person other than the Company or a Guarantor or the successor or purchasing corporation, as the case may be, in such Specified Corporate Event, then such other Person, if it is party to such Specified Corporate Event, shall also execute such amendment to this Note Purchase Agreement, and such amendment to this Note Purchase Agreement shall contain such additional provisions to protect the interests of the Holders of the Notes as GLAI's Board of Directors shall reasonably consider necessary by reason of the foregoing.

(b)      Neither the Company nor any Guarantor shall become a party to any Specified Corporate Event unless its terms are consistent with this Section 13.04.  None of the foregoing provisions shall affect the right of a Holder of Notes to exchange its Notes for cash, Preferred Shares or a combination of cash and Preferred Shares, as applicable, as set forth in Section 13.01 and Section 13.02 prior to the effective date of such Specified Corporate Event.

(c)      If the Notes become exchangeable for Reference Property, the Company shall notify the Purchaser, GLAI and the Exchange Agent (if other than GLAI).

(d)      The above provisions of this section shall similarly apply to successive Specified Corporate Events.

SECTION 13.05.  *Certain Covenants*.

(a)      The Company and each Guarantor covenants that all Preferred Shares delivered upon exchange of Notes shall be duly authorized, fully paid and non-assessable and free from all preemptive or similar rights and from all taxes, liens and charges with respect to the issue thereof.

(b)      GLAI covenants that, if any Preferred Shares to be provided for the purpose of exchange of Notes hereunder require registration with or approval of any Governmental Authority under any federal or state Law before such Preferred Shares may be validly issued upon exchange, GLAI will, to the extent then permitted by applicable Laws and the rules and interpretations of the CVM, secure such registration or approval, as the case may be.

(c)      The Company shall transfer to the Preferred Shares Registrar such Preferred Shares required to be issued, if any, upon exchange of the Notes, together with written delivery instructions (if required by the Preferred Shares Registrar for such Preferred Shares) and any other information or documentation required by the Preferred Shares Registrar in connection with each such issuance, transfer and delivery of Preferred Shares. The Company and each Guarantor covenants to take all actions and obtain all approvals and registrations with respect to the exchange of the Notes for Preferred Shares and the issuance of the Preferred Shares.

(d)      The Company and each Guarantor covenants to take all actions, obtain all approvals and registrations, and execute all ancillary documents with respect to the exchange of the Notes for Preferred Shares and the issuance of Preferred Shares (including by means of the issuance of rights, options or warrants to the subscription of such Preferred Shares) pursuant to the exchange terms and conditions of the Exchange Obligation provided in this Note Purchase Agreement. The Company and each Guarantor further covenants that any issuance of rights, options or warrants associated to the subscription of Preferred Shares in the context of fulfilment of the Exchange Obligation pursuant this Article 13 shall reflect the exchange terms and conditions provided in this Note Purchase Agreement, as applicable.

SECTION 13.06.  *Notice to Holders Prior to Certain Actions*

In case of:

(a)      any action by the Company, GLAI or one of GLAI's Subsidiaries that would require an adjustment in the Exchange Rate pursuant to Section 13.03 or Section 13.08;

(b)      any Specified Corporate Event;

(c)      any voluntary or involuntary dissolution, liquidation or winding-up of the Company, GLAI or any of GLAI's Subsidiaries; or

(d)      the GLAI Going Private Process,

then, in each case (unless notice of such event is otherwise required pursuant to another provision of this Note Purchase Agreement), the Company shall cause to be delivered to each Holder, as promptly as possible but in any event at least 20 days prior to the applicable date hereinafter specified, a notice stating the date on which a record is to be taken for the purpose of such action by the Company, GLAI or one of GLAI's Subsidiaries or, if a record is not to be taken, the date as of which the holders of Preferred Shares of record are to be determined for the purposes of such action by the Company, GLAI or one of GLAI's Subsidiaries.

SECTION 13.07.  *Shareholder Rights Plans.*  If GLAI has a shareholder's rights agreement or a rights plan in effect upon exchange of the Notes, each Preferred Share, if any, delivered upon such exchange shall be entitled to receive the appropriate number of rights, if any, and the certificates representing the Preferred Shares delivered upon such exchange shall bear such legends, if any, in each case as may be provided by the terms of any such shareholder's rights agreement or rights plan, as the same may be amended from time to time.

SECTION 13.08.  *Adjustments of Prices.*  Whenever any provision of this Note Purchase Agreement requires the Company to calculate the Last Reported Sale Prices, the Daily VWAPs, the Daily Exchange Values or the Daily Settlement Amounts over a span of multiple days (including, without limitation, an Observation Period), GLAI's Board of Directors shall make appropriate adjustments to each to account for any adjustment to the Exchange Rate that becomes effective, or any event requiring an adjustment to the Exchange Rate where the Ex-Dividend Date or Expiration Date, as the case may be, of the event occurs at any time during the period when the Last Reported Sale Prices, the Daily VWAPs, the Daily Exchange Values or the Daily Settlement Amounts are to be calculated. For the avoidance of doubt, each Last Reported

103

Sale Price of the Preferred Shares used in the calculation of any adjustment to the Exchange Rate will be expressed in U.S. Dollars (translated, if necessary, to U.S. Dollars at the Prevailing Exchange Rate).

## ARTICLE 14
### ACTIONS BY HOLDERS

SECTION 14.01.  *Action by Holders*.  (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Note Purchase Agreement to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Company and, where applicable pursuant to this Note Purchase Agreement, the Guarantors or to the Collateral Agent, as applicable.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Holders signing such instrument or instruments.

(b)    Whenever in this Note Purchase Agreement it is *provided that* the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing.

(c)    Whenever the Company solicits the taking of any action by the Holders of the Notes, the Company may fix, but shall not be required to, in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

SECTION 14.02.  *Proof of Execution by Holders*. When the Company solicits the taking of any action by the Holders of the Notes, proof of the execution of any instrument by a Holder, its agent or proxy, or the Purchaser, shall be sufficient if made in accordance with such reasonable rules as may be prescribed by the Company or in such manner as *shall be satisfactory to the Company.*

SECTION 14.03.  *Company-Owned Notes Disregarded*. In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Note Purchase Agreement, Notes that are owned by the Company, by any Subsidiary thereof or by any of their respective Affiliates shall be disregarded and deemed not to be outstanding for the purpose of any such determination.

SECTION 14.04.  *Revocation of Consents; Future Holders Bound*. At any time prior to (but not after) the evidencing to the Company, as provided in Section 14.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Note Purchase Agreement in connection with such action, any Holder of a Note that is

104

shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Company at the Company's Office and upon proof of holding as provided in Section 14.02, revoke such action so far as concerns such Note; *provided* that to the extent that the consent of the Abra Notes Supermajority Holders was required or otherwise obtained, the prior written consent of the Abra Notes Supermajority Holders shall be required to revoke any such consent. Except as provided in the previous sentence, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

## ARTICLE 15
### Miscellaneous

SECTION 15.01.  *Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties and Holders of Notes*.  Nothing in this Note Purchase Agreement or the Notes, expressed or implied, shall give to any Person other than the parties hereto and their successors hereunder, the Holders of the Notes and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes, any benefit or any legal or equitable right, remedy or claim under this Note Purchase Agreement or the Notes.

SECTION 15.02.  *Notices*.  Any request, demand, authorization, direction, notice, consent, waiver or other communication or document provided or permitted by this Note Purchase Agreement to be made upon, given, provided or furnished to, or filed with, any party to this Note Purchase Agreement shall, except as otherwise expressly provided herein, be in English and writing and shall be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier, telecopier, facsimile or electronic transmission, addressed to the relevant party as follows:

*To the Company, the Guarantors, the Registrar, the Transfer Agent, the Exchange Agent and the Paying Agent:*

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

*To the Purchaser:*

1 Ashley Road, 3rd Floor
Altrincham, Cheshire, UK
WA14 2DT
Attention: Richard F. Lark Jr. and Adrian Neuhauser
Email: rfl@voegol.com.br

*To the Collateral Agent:*

TMF Brasil Administração e Gestão de Ativos Ltda.

Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,
Edifício Jacarandá, Room 3
Zip Code 06460-040
Barueri – SP, Brazil
Attention: Karla Fernandes
Email: karla.fernandes@tmf-group.com

*To the Holders of the Abra Senior Secured Notes:*

c/o The Bank of New York Mellon, as Indenture Trustee under the Abra Senior Secured
Notes Indenture, for distribution to the holders of the Abra Senior Secured Notes
240 Greenwich Street
New York, NY 10286

*To the Holders of the Abra Senior Secured Exchangeable Notes:*

c/o The Bank of New York Mellon, as Indenture Trustee under the Abra Senior Secured
Exchangeable Notes Indenture, for distribution to the holders of the Abra Senior Secured
Exchangeable Notes
240 Greenwich Street
New York, NY 10286

Notices or communications to the Company will be deemed given if given to GLAI.
Notices or communications to Abra Holders will be deemed given if given to The Bank of New
York Mellon, in its capacity as Indenture Trustee under the Abra Senior Secured Indenture and
in its capacity as Indenture Trustee under the Abra Senior Secured Exchangeable Indentures, in
each case, for distribution to the holders of the Abra Notes. All notices to Collateral Agent shall
be deemed delivered upon the Collateral Agent's actual receipt thereof.

Any party by written notice to the other parties may designate additional or different
addresses for subsequent notices or communications.

Where this Note Purchase Agreement provides for the giving of notice to Holders, such
notice shall be deemed to have been given upon the mailing of first class mail, postage prepaid,
of such notice to Holders of the Notes at their registered addresses as recorded in the Register
and additionally, if such notice is given by the Company to the Purchaser, by email delivery to
the Company's primary contact at the Purchaser.

The Company shall also cause all other such publications of such notices as may be
required from time to time by applicable Brazilian law, including, without limitation, those
required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed and emailed to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 15.03.  *Officer's Certificate and Opinion of Counsel as to Conditions Precedent*.  Upon any request or application by the Company to the Collateral Agent to take or refrain from taking any action under this Note Purchase Agreement or the Collateral Documents, the Company shall furnish to the Collateral Agent:

(1)      an Officer's Certificate (which shall include the statements set forth in Section 15.04) stating that, in the opinion of the signers, all covenants and conditions precedent, if any, provided for in this Note Purchase Agreement and, if the action involves any of the Collateral Documents, the applicable Collateral Documents relating to the proposed action have been complied with; and

(2)      an Opinion of Counsel (which shall include the statements set forth in Section 15.04) stating that, in the opinion of such counsel, all such covenants and conditions precedent have been complied with.

SECTION 15.04.  *Statements Required in Officer's Certificate or Opinion of Counsel*.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Note Purchase Agreement or the Collateral Documents shall include:

(1)      a statement that each Person making or rendering such Officer's Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel are based;

(3)      a statement that, in the opinion of each such Person, such Person has made such examination or investigation as is necessary to enable such Person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)      a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with.

SECTION 15.05.  *Rules by Registrar, Paying Agent, Exchange Agent and Transfer Agents*.  The Registrar, the Paying Agent, the Exchange Agent and the Transfer Agent may make reasonable rules for their functions.

SECTION 15.06.  *Currency Indemnity*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with this Note Purchase Agreement, the Notes and the Note Guaranties, including damages.  Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or of the

enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by any Person in respect of any sum expressed to be due to it from the Company or the Guarantors in connection with this Note Purchase Agreement, the Notes and the Note Guaranties will only constitute a discharge to the Company or the Guarantors, as the case may be, to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient, the Company and the Guarantors shall indemnify such recipient against any loss sustained by it as a result, and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient will be deemed to have agreed to repay such excess.  In any event, the Company and the Guarantors shall indemnify the recipient against the cost of making any such purchase.

For the purposes of this Section 15.06, it shall be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).  These indemnities constitute a separate and independent obligation from the other obligations of the Company and the Guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder of a Note and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note.

SECTION 15.07.  *No Recourse Against Others*.  No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent, respectively, under this Note Purchase Agreement, the Collateral Documents or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

SECTION 15.08.  *Legal Holidays*.  In any case where any Interest Payment Date or the Maturity Date shall not be a Business Day, then (notwithstanding any other provision of this Note Purchase Agreement or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Interest Payment Date or Maturity Date; *provided that* no default interest shall accrue for the period from and after such Interest Payment Date or Maturity Date on account of such delay.

SECTION 15.09.  *Governing Law*.  THIS NOTE PURCHASE AGREEMENT, THE NOTES AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 (inclusive) of the Luxembourg Act on commercial companies of August 10, 1915, as amended, shall not apply in respect of the Notes.

For purposes solely of Article 9 of Brazilian Decree Law No. 4,657, of September 4, 1942, the transactions contemplated hereby have been constituted and proposed outside of Brazil.

SECTION 15.10.  *Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial.* (a) Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Note Purchase Agreement, the Notes or the Note Guaranties or any transaction contemplated hereby or thereby (a "**Proceeding**"), and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each of the parties hereto irrevocably waives, to the fullest extent it may do so under applicable Law, any objection which it may now or hereafter have to the laying of the venue of any such Proceeding brought in any such court and any claim that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Each of the Company and the Guarantors irrevocably appoints Cogency Global, Inc. (the "**Company and Guarantors Process Agent**"), with an office at 122 East 42nd Street, 18th Floor, New York, NY 10168, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding.  If for any reason such Person shall cease to be such agent for service of process, each of the Company and the Guarantors shall forthwith appoint a new agent of recognized standing for service of process in the State of New York within 30 days.

(b)      Each of the Company and the Guarantors hereby irrevocably appoints the Company and Guarantors Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York.  Such service shall be made by delivering by hand a copy of such process to the Company or the Guarantors, as the case may be, in care of the Company and Guarantors Process Agent at the address specified above.  Each of the Company and the Guarantors hereby irrevocably authorizes and directs the Company and Guarantors Process Agent to accept such service on its behalf.  Failure of the Company and Guarantors Process Agent to give notice to the Company or the Guarantors, as the case may be, or failure of the Company or the Guarantors, as the case may be, to receive notice of such service of process shall not affect in any way the validity of such service on the Company and Guarantors Process Agent, the Company or the Guarantors.  As an alternative method of service, each of the Company and the Guarantors also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Company or Guarantors, as the case may be, at its address specified in Section 15.02 or at any other address previously furnished in writing by the Company or the Guarantors. Each of the Company and the Guarantors covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Company and Guarantors Process Agent above in full force and

109

effect during the term of the Notes, and to cause the Company and Guarantors Process Agent to continue to act as such.

(c)    [*Reserved*]

(d)    Exclusively for the purposes of Brazilian law, the Guarantors appoint the Company and Guarantors Process Agent as their agent and attorney-in-fact to receive on behalf of them and their property service of copies of the summons and complaint and any other process which may be served in any Proceeding pursuant to articles 653 et. seq. of the Brazilian Law No. 10,406, of January 10, 2022.

(e)    Nothing herein shall affect the right of any party (including the Collateral Agent, any other Agent or any Holder) to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise bring any claim against any other party or its property in any other court of competent jurisdiction.

(f)    Each of the Company and the Guarantors irrevocably agrees that, in any proceedings anywhere (whether for an injunction, specific performance or otherwise), no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such proceedings, from attachment (whether in aid of execution, before judgment or otherwise) of its assets or from execution of judgment shall be claimed by it or on its behalf or with respect to its assets, except to the extent required by applicable Law, any such immunity being irrevocably waived, to the fullest extent permitted by applicable Law. Each of the Company and the Guarantors irrevocably agrees that, where permitted by applicable Law, it and its assets are, and shall be, subject to such proceedings, attachment or execution in respect of its obligations under this Note Purchase Agreement, the Notes or the Note Guaranties.

(g)    ALL PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY DO SO UNDER APPLICABLE LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS NOTE PURCHASE AGREEMENT, THE NOTES, THE NOTE GUARANTIES OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

SECTION 15.11.  *Successors and Assigns*.  All covenants and agreements of the Company and the Guarantors in this Note Purchase Agreement, the Notes and the Note Guaranties shall bind their respective successors and permitted assigns, whether so expressed or not. The Notes shall not be assigned by the Purchaser unless (i) the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes shall have been indefeasibly paid in full or (ii) as otherwise may be consented to by the Abra Notes Supermajority Holders.

In the event of a transfer, assignment, novation or amendment of the rights and/or obligations under this Note Purchase Agreement and any other Transaction Documents, all security interests, guarantees and privileges created under or in connection with the Transaction Documents shall automatically and without any formality be preserved for the benefit of the transferee including the trustee under the Abra Senior Secured Notes Indenture and the trustee

under the Abra Senior Secured Exchangeable Notes Indenture for the purpose of the provisions of articles 1278 to 1281 of the Luxembourg Civil Code or any other purposes.

SECTION 15.12.  *Multiple Originals*.  The parties may sign any number of copies of this Note Purchase Agreement.  Each signed copy shall be deemed an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Note Purchase Agreement. The words "execution," "signed," "signature," and words of like import in this Note Purchase Agreement or in any other certificate or document related to this Note Purchase Agreement shall include images of executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as an executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable Law, including, without limitation, any state Law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

SECTION 15.13.  *Severability Clause*.  In case any provision in this Note Purchase Agreement or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. To the extent permitted by applicable Law, the parties hereby waive any provision of Law which renders any term or provision hereof invalid or unenforceable in any respect.

SECTION 15.14.  *Force Majeure*.  In no event shall the Collateral Agent or any other Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder, or under the Collateral Documents arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, governmental actions, pandemics, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent or such other Agent, as applicable shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 15.15.  *Acknowledgement*. Each of the Company and the Guarantors acknowledges that, on the date hereof, the Purchaser has pledged, or will pledge, all of its right, title and interest in the Notes, Notes Obligations and all Collateral therefor, in favor of the collateral agent under the Abra Senior Secured Notes Indenture and the collateral agent under the Abra Senior Secured Exchangeable Notes Indenture as collateral to secure the Purchaser's obligations under the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

GOL EQUITY FINANCE
as the Company

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent, Exchange Agent and Paying Agent

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

SMILES FIDELIDADE S.A.
as Guarantor


By:    _____
          Name:
          Title:


By:    _____
          Name:
          Title:

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

ABRA GROUP LIMITED
as Purchaser

By: _____
  Name:
  Title:

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent


By: _____
　　　Name:
　　　Title:

**EXHIBIT A**

FORM OF NOTE

**GOL EQUITY FINANCE**

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 224920

Senior Secured Exchangeable Notes Due 2028

No. [•]

U.S.$ [•]

GOL EQUITY FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 224920 (the "**Company**", which term includes any successor corporation under the Note Purchase Agreement referred to on the reverse hereof), for value received, hereby promises to pay to Abra Group Limited, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "**Purchaser**"), or registered assigns, the principal sum of U.S.$[•], upon presentment and surrender of this Note on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Note Purchase Agreement.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated: [●], 2023

**GOL EQUITY FINANCE**

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


Witnesses:

By: _____
Name:

By: _____
Name:

A-2

[FORM OF REVERSE SIDE OF NOTE]

Senior Secured Exchangeable Notes Due 2028

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of Senior Secured Exchangeable Notes Due 2028 of the Company.  The Notes constitute secured unsubordinated obligations of the Company, initially in an aggregate principal amount of U.S.$[•].

1.    *Purchase Agreement.*

Each holder of this security, by accepting the same, agrees to and shall be bound by the provisions hereof and of the Note Purchase Agreement, dated as of [•], 2023, by and among the GOL EQUITY FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S.Luxembourg*) under number B 224920 (the "Company"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("GLAI"), as guarantor, registrar, transfer agent, exchange agent and paying agent, and GOL LINHAS AÉREAS S.A., a wholly owned subsidiary of GLAI ("GLA" and together with GLAI, the "Guarantors"), each, a corporation (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, as guarantors, ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "Purchaser" or "Holder") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "Collateral Agent"), as the same shall be amended from time to time (the "Note Purchase Agreement"). The terms of the Notes include those stated in the Note Purchase Agreement.  The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Note Purchase Agreement.

Reference is hereby made to the Note Purchase Agreement, the Collateral Documents and all amendments and supplements to each of them from time to time (collectively, the "Note Documents") for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Guarantors, the Collateral Agent, each other Agent and the Purchaser as Holder of the Notes and the terms upon which the Notes, are, and are to be, executed and delivered.  The Purchaser waives all notice of the acceptance of the provisions contained herein and in the Note Documents and waives reliance by such Purchaser upon said provisions. All terms used in this Note that are defined in the Note Purchase Agreement shall have the meanings assigned to them in the Note Purchase Agreement.

The Notes are senior obligations of the Company and the Guarantors, secured by a first priority and perfected Lien in the Collateral. The payment obligations of the Company under the Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Note Documents impose certain limitations on assets, debts, Restricted Payments, the creation of Lien by the Company, and consolidation, merger, Related-Party Transactions, and

A-3

certain other transactions involving the Company. In addition, the Note Documents require the maintenance of insurance for the Company, the maintenance of the existence of the Company, the payment of certain taxes and claims and reporting requirements applicable to the Company. The Note Documents also contain provisions related to the Collateral as well as certain assurances, restrictions, and use and possession related to the Collateral.

2.    *Principal.*

Unless previously redeemed, exchanged or purchased and cancelled, the Company promises to pay the Holder hereof the total Outstanding principal amount which shall be repaid in cash in a single installment on the Maturity Date, together with all other amounts owed hereunder with respect thereto (including all accrued and unpaid interest that has not yet been added to the total Outstanding principal amount through the Maturity Date).

3.    *Interest.*

The Notes shall bear interest at an interest rate as follows:

(1)    4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**");

(2)    13.5% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth below; and

(3)    GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (A) semi-annually in arrears, on each applicable Interest Payment Date or (B) on the Maturity Date; provided that, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; provided, further, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of this Note and the Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of the Note Purchase Agreement.

4.    *Method of Payment.*

Any payments of interest or principal in respect of each Note made on an Interest Payment Date or the Maturity Date shall be made by the Company to the Persons shown on the Register at the close of (a) in the case of interest payments, the Regular Record Date or (b) in the case of principal payment, the fifteenth day immediately preceding the Maturity Date, whether or not a Business Day (each, a "**Record Date**"); provided that any PIK Interest payments due with respect to the Notes prior to the Maturity Date will not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and

A-4

automatically added to, and be part of, the Outstanding principal amount of such Note (and shall thereafter constitute principal for all purposes of such Note and the Note Purchase Agreement, and shall accrue interest thereon in accordance with the terms of the Note Purchase Agreement).

Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Company, if any.

If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder and (ii) second, towards payment of principal then due hereunder.

Payment in cash of the principal and premium, if any, of any Note on the Maturity Date shall be made upon presentation and surrender thereof, by wire transfer to the Holder's Designated Bank Account.

If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all cash payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

Payment of interest on any Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date, and if in cash, by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future cash payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder. The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

If any Interest Payment Date in respect of any Note is not a Business Day, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest (other than accrued interest through the date such amount is paid) or other payment in respect of any such delay.

If the amount of principal or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of interest, if any, in fact paid.

All payments on this Note are subject in all cases to any applicable tax or other Laws and regulations, but without prejudice to the provisions of Paragraph 7 hereof. Except as provided in Section 7.06 of the Note Purchase Agreement, no fees or expenses shall be charged to the Purchaser in respect of such payments.

5.    *Ranking and Collateral.*

The Notes and Note Guaranties are secured by a first priority Lien over the Collateral, subject to the terms and conditions of the Note Purchase Agreement and the Collateral

Documents.  The payment obligations of the Company under the Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Lien over the Collateral granted shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exists Notes Obligations due and payable on that date, in which case the Lien over the Collateral shall terminate as set forth in the Note Purchase Agreement.

6.    *Registrar, Transfer Agent, Exchange Agent and Paying Agent.*

GLAI will initially act as the Registrar, Transfer Agent, Exchange Agent and Paying Agent of the Notes.  The Company may appoint and change any Registrar, Transfer Agent, Exchange Agent and Paying Agent in accordance with the terms of the Note Purchase Agreement.

7.    *No Purchase of Notes by the Company or its Affiliates.*

The Company or any of its Affiliates (except for the Purchaser) may at any time repurchase Notes in open market purchases or in negotiated transactions at any price.  Any Notes so purchased or acquired may not be resold and shall be cancelled.

8.    *Denominations.*

The Notes are in registered form without coupons in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof.

9.    *Persons Deemed Owners.*

The registered Holder of this Note (except as otherwise required by Law and subject to the right of Holders of record on the relevant Regular Record Date to receive interest due on the relevant Interest Payment Date) may be treated as the owner thereof for all purposes.

10.    *Company's and Holders' Right to Exchange*

Subject to the provisions of Article 13 of the Note Purchase Agreement and other provisions of the Note Purchase Agreement, the Company and each Holder shall have the right to exchange such Holder's Notes at the Exchange Rate specified in the Note Purchase Agreement, as adjusted pursuant to the Note Purchase Agreement.

11.    *Unclaimed Money.*

Subject to applicable Law, any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

A-6

12. *Amendment; Waiver.*

The Note Purchase Agreement contains provisions permitting amendments, supplements and waivers to these Notes and to the Note Purchase Agreement. Such amendments, supplements and waivers shall be conclusive and binding upon the holder of this Note and upon all future holders and owners of this Note and of any Notes issued in conversion or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon this Note or any Note issued in conversion or substitution therefor or upon registration of transfer thereof.

13. *Defaults and Remedies.*

The Note Purchase Agreement contains certain Events of Default with respect to the Notes and specifies certain remedies, and limitations on remedies, applicable to the Notes.

14. *Governing Law.*

THE NOTE PURCHASE AGREEMENT, THIS NOTE AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 of the Luxembourg Act on commercial companies of August 10, 1915 (inclusive), as amended, shall not apply in respect of the Notes.

Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any Proceeding and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

15. *No Recourse Against Others.*

No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent under the Notes or any obligations of the Company, the Guarantors or the Collateral Agent under the Note Purchase Agreement or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Note, each Holder waives and releases all such liability. The waiver and release are part of the consideration for the issue of the Notes.

The Company shall furnish to any Holder upon written request and without charge a copy of the Note Purchase Agreement, as amended from time to time, which includes the Form of this Note. Requests may be made to:

> GOL Linhas Aéreas Inteligentes S.A.
> Praça Comte Linneu Gomes
> S/N, Portaria 3, Jardim Aeroporto
> 04626-020 – São Paulo, SP
> Brasil

A-7

Attention:  Celso Ferrer

THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE CODE. FOR INFORMATION REGARDING THE CLOSING DATE, ISSUE PRICE, AND TO MATURITY, PLEASE CONTACT THE COMPANY AT THE COMPANY'S OFFICE, ATTENTION: CHIEF FINANCIAL OFFICER.

## NOTATION OF GUARANTY

For value received, each of the Guarantors (which term includes any successor Person under the Note Purchase Agreement) has unconditionally guaranteed, to the extent set forth in the Note Purchase Agreement and subject to the provisions in the Note Purchase Agreement dated as of [●], 2023 (as amended from time to time, the "**Note Purchase Agreement**"), among the Company, the Guarantors party thereto, the Purchaser and TMF Brasil Administração e Gestão de Ativos Ltda., as the Collateral Agent, the full and punctual payment (whether upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  The obligations of each of the Guarantors to the Secured Parties pursuant to the respective Note Guaranty and the Note Purchase Agreement are expressly set forth in Article 11 of the Note Purchase Agreement and reference is hereby made to the Note Purchase Agreement for the precise terms of the Note Guaranties.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Note Purchase Agreement.

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of guaranty to be duly executed.

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
　　　Name:
　　　Title:

By: _____
　　　Name:
　　　Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent, Exchange Agent and Paying Agent

By: _____
　　　Name:
　　　Title:

By: _____
　　　Name:
　　　Title:

Witnesses:

By: _____
　　　Name:

By: _____
　　　Name:

A-10

**ANNEX I**

## [FORM OF NOTICE OF EXCHANGE BY THE COMPANY UPON SATISFACTION OF THE EXCHANGE PRICE CONDITION]

GOL EQUITY FINANCE

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 224920

Senior Secured Exchangeable Notes Due 2028

To:    [Name of Holder]
       [Address of Holder]
       Attention:  [•]
       Facsimile:  [•]

The Company hereby informs you, as registered holder of U.S.$[•] aggregate principal amount of Notes (the "**Notes**"), that the Company is requiring that the Notes, or the portion hereof (that is U.S.$1,000 principal amount or an integral multiple thereof, so long as the principal amount of the Notes of the beneficial owner hereof not exchanged is at least U.S.$100,000) below designated, for cash, Preferred Shares or a combination of cash and Preferred Shares, as applicable, in accordance with the terms of the Note Purchase Agreement, and directs that any cash payable and any Preferred Shares deliverable upon such exchange, together with any accrued and unpaid capitalized PIK Interest and cash for any fractional Preferred Shares, be issued and delivered to you unless you indicate a different name, all in accordance with the terms of the Note Purchase Agreement referred to in this Note.  Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Note Purchase Agreement.

GLAI has agreed to pay to the Preferred Shares Registrar any fee, costs and expenses required to be paid in connection with the issuance of any Preferred Shares upon exchange of the Notes and the delivery of the Preferred Shares. However, if any Preferred Shares are to be issued in the name of a Person other than the undersigned, you as the Holder will pay all documentary, stamp or similar issue or transfer taxes, if any, in accordance with Section 13.02(e) of the Note Purchase Agreement.

In light of the terms set forth in Section 13.02(b) of the Note Purchase Agreement, we hereby request you to respond, within three Business Days, (a) confirming the principal amount of Notes being exchanged, (b) informing the name or names (with addresses) in which you wish the certificate or certificates for the Preferred Shares to be delivered upon settlement of the Exchange Obligation to be registered, (c) surrender the Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the address

A-11

office of the Company, informed below, and (d) if required, furnish appropriate endorsements and transfer documents.

      Praça Comte Linneu Gomes
      S/N, Portaria 3, Jardim Aeroporto
      04626-020 – São Paulo, SP
      Brasil
      Attn: Mario Tswei Liao
      Email: mtliao@voegol.com.br

      The certificate numbers of the Notes to be exchanged are as set forth below:

_____

*[Signature page follows]*

A-12

**ANNEX II**

**[FORM OF NOTICE OF EXCHANGE BY THE HOLDERS]**

GOL EQUITY FINANCE

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 224920

Senior Secured Exchangeable Notes Due 2028

To:     Gol Linhas Aéreas Inteligentes S.A., as Exchange Agent
        Praça Comte Linneu Gomes
        S/N, Portaria 3, Jardim Aeroporto
        04626-020 – São Paulo, SP
        Brasil
        Attn: Mario Tswei Liao
        Email: mtliao@voegol.com.br

The undersigned registered Holder of this Note hereby irrevocably exercises the option to exchange this Note, or the portion hereof (that is U.S.$1,000 principal amount or an integral multiple thereof, so long as the principal amount of the Notes of the beneficial owner hereof not exchanged is at least U.S.$100,000) below designated, for cash, Preferred Shares or a combination of cash and Preferred Shares, as applicable, in accordance with the terms of the Note Purchase Agreement referred to in this Note, and directs that any cash payable and any Preferred Shares deliverable upon such exchange, together with any cash for any fractional Preferred Share, and any Notes representing any unexchanged principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below, all in accordance with the terms of the Note Purchase Agreement referred to in this Note.  Any amount required to be paid by the undersigned pursuant to Section 13.02(e) of the Note Purchase Agreement accompanies this Note.  Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Note Purchase Agreement.

The Company and GLAI have agreed to pay to the Preferred Shares Registrar any fee, costs and expenses required to be paid in connection with the deposit of any Preferred Shares upon exchanges of Notes and the delivery of Preferred Shares. However, if any Preferred Shares or any portion of this Note not exchanged are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp or similar issue or transfer taxes, if any, in accordance with Section 13.02(d) and Section 13.02(e) of the Note Purchase Agreement.

The certificate numbers of the Notes to be exchanged are as set forth below:

_____

*[Signature page follows]*

A-13

**EXHIBIT B**

**[Reserved]**

**EXHIBIT C**

**Collateral Agent KYC Requirements**

**1.** Form Compliance Questionnaire fully completed and signed, and any supporting documents required therein.

**2.** Form UBO Declaration completed filled and signed, and any supporting documents required therein.

**3.** By-laws or articles of association duly registered with the respective Chamber of Commerce or similar applicable authority.

**4.** Appointment of Directors or legal representative duly registered with the respective Chamber of Commerce or similar applicable authority.

**5.** Passport copy of the Directors and legal representatives.

**6.** In case the company is represented by Attorney-in-Fact, please provide the Power of Attorney and identification document of the attorney-in-fact.

**7.** Excerpt Chamber of Commerce or similar applicable authority.

C-1

**EXHIBIT D**

**FORM OF**
**GLA'S SMILES FIDUCIARY TRANSFER AGREEMENT**

**EXHIBIT E**

**FORM OF**
**EXCLUSIVITY SIDE LETTER**

**EXHIBIT F**

**FORM OF**
**SUBORDINATION AGREEMENT**

**SCHEDULE A**

**Permitted Holders**

1.  Mobi Fundo de Investimento em Ações Investimento no Exterior
2.  Elliott International, L.P.
3.  Elliott Associates, L.P.
4.  Kingsland International Group S.A.
5.  South Lake One LLC

**SCHEDULE B-1**

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
|--------|-------------------------------------------|
| 1 | License agreement to use the LIFERAY digital platform, on which the Smiles website was developed |
| 2 | License agreement for the use of the Zendesk platform, through which all customer service is carried out |
| 3 | License agreement for the use of the Pager Duty program, which generates alarms when monitoring transactions in the APM system and sends such alarms to the Slack system |
| 4 | License agreement to use the Slack system |
| 5 | Service contract for the use of the B2E Prevention tool for fraud prevention |
| 6 | License agreement for the B2E Billing software |

SCHEDULE B-2

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
|--------|--------------------------------------------|
| 7 | Service agreement for the use of the AWS Amazon cloud infrastructure, which hosts the LIFERAY platform, and consequently the Smiles website, among other services |
| 8 | License agreement for the use of the ADYEN payment gateway that processes payments within the scope of the product "Clube Smiles" |
| 9 | Service agreement for the use of the Oracle OCI cloud infrastructure, which hosts the Siebel Loyalty platform |
| 10 | Service agreement for the Auth0 software, which controls the logic and authentication control for customers' login on the Smiles website |
| 11 | Amadeus software service contract, which takes care of reservations and fare awards related to other partner airlines |
| 12 | Service agreement with VTEX, responsible for the operation system of the retail platform |
| 13 | Right of use of the Data Lake database, which contains all transactional data used by the Smiles platform |
| 14 | Service agreement with Oracle Responsys for the use of a communication platform with customers |
| 15 | Service provision agreement with Nice, for the platform that hosts the telephony infrastructure used in customer service |
| 16 | Service agreement for the use of Dynatrace's APM tool, which performs real-time predictive and transactional monitoring |
| 17 | Oracle License and Service Agreement (OLSA) V020408 |

**SCHEDULE C**

**Relevant Agreements Governing The Sale and Issuance of Miles**

| Item # | Agreement, License or Contract Description | Counterparties |
|---|---|---|
| 1 | Business Partnership and Assumption of Obligations Agreement No. 2014/001996, as amended from time to time (*Contrato de Parceria Negocial e de Assunção de Obrigações nº 2014/001996*) | Banco do Brasil S.A. |
| 2 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Banco C6 S.A. |
| 3 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Caixa Econômica Federal |
| 4 | Smiles Partnership Agreement SC No. 16620, as amended from time to time (*Contrato de Parceria Smiles SC nº 61620*) | Esfera Fidelidade S.A. |
| 5 | Private Instrument of Partnership and Other Covenants, as amended from time to time (*Instrumento Particular de Parceria e Outras Avenças*) | Livelo S.A. |
| 6 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Nu Pagamentos S.A. |
| 7 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Portoseg S/A Crédito Financiamento e Investimento |
| 8 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Bradesco S.A. and Banco do Brasil S.A. |
| 9 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Santander (Brasil) S.A. |

**<u>ANNEX C</u>**

**THIRD AMENDMENT TO THE FIDUCIARY TRANSFER OF INTELLECTUAL PROPERTY RIGHTS AGREEMENT**

By this private instrument, the parties hereto:

**(a) GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46- 48/O-P, Zip Code 20021-340, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

**(b) TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, Brazil, at Avenida Marcos Penteado de Ulhoa Rodrigues, No 939, 10th Floor, Room 03, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined in the Intercreditor Agreement) (hereinafter referred to as "Brazilian Collateral Agent");

and, as intervening and consenting party,

**(c) GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo, Zip Code 04626-020, enrolled with the CNPJ under No. 06.164.253/0001-87, herein

**TERCEIRO ADITAMENTO AO CONTRATO DE ALIENAÇÃO FIDUCIÁRIA DE DIREITOS DE PROPRIEDADE INTELECTUAL**

Pelo presente instrumento particular, as partes:

**(a) GOL LINHA AÉREAS S.A.**, sociedade constituída e existente segundo as leis do Brasil com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

**(b) TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, Brasil, na Avenida Marcos Penteado de Ulhoa Rodrigues, n° 939, 10° andar, Sala 03, Edifício Jacarandá, CEP 06460-040, inscrita no CNPJ sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido no Contrato entre Credores) ("Agente de Garantia Brasileiro");

e, como interveniente anuente,

**(c) GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no CNPJ sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais

represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors").

**WHEREAS:**

(i) GOL Finance, a public limited liability company (societé anonyme) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 17 Boulevard Raiffeisen, L-2411, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued 8.00% Senior Secured Notes due 2026 ("2026 Original Notes"), pursuant to an indenture entered into by Gol Finance, the Brazilian Collateral Agent and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the 2026 Original Notes offering ("2020 Offering");

(ii) on December 23, 2020, the Company, the Brazilian Collateral Agent and GLAI entered into a Fiduciary Transfer of Intellectual Property Rights Agreement ("Agreement"), pursuant to which the Company fiduciarily assigned all the Transferred Assets (as defined in the Agreement), to the secured parties defined therein, as collateral for the Secured Obligations ("Collateral");

(iii) on May 6, 2021, Gol Finance issued an additional US$300,000,000.00 of 2026 Notes, under the Indenture (the "1st 2026 Additional Notes"), and as described in the offering memorandum related to the 2026 Additional Notes offering ("1st 2021 Offering"), fungible with the 2026 Original Notes;

**CONSIDERANDO QUE:**

(i) a GOL Finance, sociedade pública de responsabilidade limitada (societé anonyme), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 17 Boulevard Raiffeisen, L-2411, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas Originais 2026"), nos termos e condições previstos na escritura, celebrada entre a Gol Finance, o Agente de Garantia Brasileiro e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e no memorando privado de colocação relacionado à oferta das Notas Originais 2026 ("Oferta 2020");

(ii) em 23 de dezembro de 2020, a Companhia, o Agente de Garantia Brasileiro e a GLAI celebraram Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual ("Contrato"), por meio do qual a Companhia alienou fiduciariamente todos os Bens Alienados (conforme definido no Contrato) às partes garantidas ali definidas, como garantia das Obrigações Garantidas ("Garantia");

(iii) em 6 de maio de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 300.000.000,00, nos termos da Escritura (as "1ªs Notas Adicionais 2026"), e do memorando da oferta relacionado à oferta das Notas Adicionais 2026 ("1ª Oferta 2021"), fungíveis com as Notas Originais 2026;

2

(iv) on May 6, 2021, the Parties entered into the first amendment to the Agreement, in order to update the description of the Secured Obligations, in order to secure the 1st 2026 Additional Notes;

(v) on September 23, 2021, Gol Finance issued an additional US$150,000,000.00 of 2026 Notes, under the Indenture (the "2nd 2026 Additional Notes", and together with the Original Notes and 1st 2026 Additional Notes, the "Notes") and as described in the offering memorandum related to the 2nd 2026 Additional Notes offering ("2nd 2021 Offering" and, together with the 2020 Offering and the 1st 2021 Additional Offering, each hereinafter referred to as "Offering"), fungible with the 2026 Original Notes;

(vi) the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of such secured parties in connection with the collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms provided for in the Indenture, the Agreement and this Amendment;

(vii) on September 23, 2021, the Parties entered into a Second Amendment to the Agreement pursuant to which the Parties agreed to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the 2nd 2026 Additional Notes;

(viii) on March 2, 2023, GOL Finance issued 18.00% senior secured note, in an aggregate principal amount of up to US$ 1,430,925,000.00, due 2028 ("GOL SSN"), pursuant to a note

(iv) em 6 de maio de 2021, as Partes celebraram o primeiro aditamento ao Contrato, com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 1ªs Notas Adicionais 2026;

(v) em 23 de setembro de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 150.000.000,00, nos termos da Escritura (as "2ªs Notas Adicionais 2026", e em conjunto com as Notas Originais e as 1ªs Notas Adicionais 2026, as "Notas") e do memorando da oferta relacionado à oferta das 2ª Notas Adicionais 2026 ("2ª Oferta 2021" e, em conjunto com a Oferta 2020 e a 1ª Oferta Adicional 2021, cada uma doravante designada como "Oferta"), fungíveis com as Notas Originais 2026;

(vi) o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas nas Escritura como agente de garantia no Brasil nos termos da Escritura, para praticar atos em nome e em benefício de tais partes garantidas com relação à garantia constituída por meio do Contrato e deste Aditamento, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura, Contrato e deste Aditamento;

(vii) em 23 de setembro de 2021, as Partes celebraram o Segundo Aditamento ao Contrato, por meio do qual concordaram em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 2ªs Notas Adicionais 2026;

(viii) em 2 de março de 2023, a GOL Finance emitiu uma nota sênior garantida com valor principal agregado de até US$ 1.430.925.000,00 e juros de 18,00%, com vencimento em 2028

purchase agreement (the "GOL SSN NPA") with, among others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "GOL SSN Collateral Agent");

(ix) GOL Equity Finance, a public limited liability company (*societé anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 224920 ("Gol Equity Finance") will issue 18.00% senior secured exchangeable note of aggregate principal amount of up to US$ 1,430,925,000.00, due 2028 ("GOL ESSN", jointly with GOL SSN, the "New Notes"), under the terms of the corporate approval of March 1, 2023, pursuant to a note purchase agreement (the "GOL ESSN NPA" and, jointly with the GOL SSN NPA, the "Note Purchase Agreements") with, among others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "GOL ESSN Collateral Agent" and, jointly with the GOL SSN Collateral Agent, the "New Notes Collateral Agent");

(x) the New Notes Collateral Agent was duly appointed by the holders of the New Notes and the other secured parties described in the Note Purchase Agreements as a collateral agent in Brazil under the terms of the Note Purchase Agreements to perform acts on behalf of and for the benefit of such secured parties in connection with the collateral provided under the Note Purchase Agreements and related collateral documents, as permitted by the terms set forth in the Note Purchase Agreements, in accordance, exclusively and strictly, with instructions provided by the requisite holders of the New

("GOL SSN"), de acordo com um contrato de compra de notas (o "GOL SSN NPA") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "Agente de Garantia GOL SSN");

(ix) a GOL Equity Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Luxemburgo"), com sede na 17 Boulevard Raiffeisen, L-2411, Luxemburgo, registrada no Registro Comercial de Luxemburgo (R.S.C. Luxembourg) sob o número B 224920 ("Gol Equity Finance") emitirá uma nota sênior garantida permutável com valor principal agregado de até US$ 1.430.925.000,00 e juros de 18,00%, com vencimento em 2028 ("GOL ESSN", e, em conjunto com GOL SSN, as "Novas Notas"), nos termos da aprovação societária de 1º de março de 2023, de acordo com um contrato de compra de notas (o "GOL ESSN NPA" e, juntamente com o GOL SSN NPA, o "Contratos de Compra de Notas") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "Agente de Garantia GOL ESSN" e, juntamente com o Agente de Garantia GOL SSN, o "Agente de Garantia das Novas Notas");

(x) o Agente de Garantia das Novas Notas foi devidamente nomeado pelos titulares das Novas Notas e pelas outras partes garantidas descritas nos Contratos de Compra de Notas como agente de garantia no Brasil, sob os termos do Contrato de Compra de Notas, para praticar atos em nome e em benefício de tais partes garantidas com relação à garantia constituída por meio dos Contratos de Compra de Notas e em relação aos documentos de garantia, conforme permitido pelos termos previstos nos Contratos de Compra de Notas, de acordo, exclusiva e estritamente, com as instruções fornecidas pelos titulares necessários das Notas Novas e de acordo com os

4

Notes and in accordance with the terms provided for in the Note Purchase Agreements;

(xi) on March 2, 2023, GOL Finance, the Company, GLAI, the Trustee and the Brazilian Collateral Agent entered into the First Supplemental Indenture, by means of which the Brazilian Collateral Agent was directed by the Trustee to execute and deliver this Amendment;

(xii) on March 2, 2023, GOL Finance, Gol Equity Finance, the Company, GLAI, the Trustee, the Brazilian Collateral Agent and the New Notes Collateral Agent entered into an Intercreditor Agreement (the "Intercreditor Agreement"), by means of which the Brazilian Collateral Agent was duly appointed by the Trustee and the New Notes Collateral Agent as a collateral agent in Brazil under the terms of the Intercreditor Agreement to perform acts on behalf of and for the benefit of the secured parties under the Indenture and the Note Purchase Agreements in connection with the collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Intercreditor Agreement, in accordance, exclusively and strictly, with instructions of the Trustees (as defined in the Intercreditor Agreement), acting at the direction of and on behalf of the Controlling Secured Parties (as defined in the Intercreditor Agreement), as provided for in the Intercreditor Agreement; and

(xiii) as a result of the foregoing, the Parties hereby agree to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the New Notes.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "*Third Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement*" ("Amendment"), according to the following clauses:

termos previstos nos Contratos de Compra de Notas;

(xi) em 2 de março de 2023, a GOL Finance, a Companhia, a GLAI, o *Trustee* e o Agente de garantia Brasileiro celebraram o Primeiro Suplemento à Escritura, por meio do qual o Agente de Garantia Brasileiro foi instruído pelo *Trustee* a assinar e entregar este Aditamento;

(xii) em 2 de março de 2023, a GOL Finance, a Gol Equity Finance, a Companhia, a GLAI, o *Trustee*, o Agente de Garantia Brasileiro e o Agente de Garantia das Novas Notas celebraram um Contrato entre Credores (o "Contrato entre Credores"), por meio do qual o Agente de Garantia Brasileiro foi devidamente nomeado pelo *Trustee* e pelo Agente de Garantia das Novas Notas como agente de garantia no Brasil, sob os termos do Contrato entre Credores para realizar atos em nome e em benefício das partes garantidas sob a Escritura e os Contratos de Compra de Notas em conexão com as garantias fornecidas sob o Contrato e este Aditamento, conforme permitido pelos termos estabelecidos no Contrato entre Credores, de acordo, exclusiva e estritamente, com instruções do *Trustee* (conforme definido no Contrato entre Credores), agindo sob a direção e em nome das Partes Garantidas Controladoras (conforme definido no Contrato entre Credores), conforme previsto no Contrato entre Credores; e

(xiii) em razão do exposto acima, as Partes neste ato concordam em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as Novas Notas.

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "*Terceiro Aditamento ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual*" ("Aditamento"), que será regido pelas seguintes cláusulas:

## I.    DEFINITIONS

1.1. For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Agreement.

## II.    AMENDMENT

2.1. As a consequence of the issuance of the New Notes, the Parties expressly agree that, as of the date hereof and by means of this Amendment, the (i) Exhibit I of the Agreement shall be replaced by Exhibit A hereto, so that the GOL ESSN, when effectively issued, will be automatically included in this Collateral, regardless of any additional amendment; and (ii) all references in the Agreement to the Notes shall be read and understood as references to the 2026 Original Notes, the 1st 2026 Additional Notes, the 2nd 2026 Additional Notes and the New Notes, collectively, as well as all references to the Indenture shall be read and construed as a joint reference to the Indenture and the Note Purchase Agreements, as the case may be, in all cases subject to the terms of the Intercreditor Agreement.

2.2. Additionally, due to the updating of the Secured Obligations, the Parties agree that the amounts resulting from the foreclosure of the Collateral shall be destined to the proportional payment of the Secured Obligations, in such a way that Section 5.1 shall be in effect with the following wording:

*"5.1. Subject to the Section 1.1.1 above and in all cases subject to the Intercreditor Agreement, in the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in*

## I.    DAS DEFINIÇÕES

1.1. Para fins deste Aditamento, todos os termos iniciados em letras maiúsculas, não definidos neste Aditamento, têm o significado a eles atribuídos no Contrato.

## II.    DO ADITAMENTO

2.1. As Partes, em razão da emissão das Novas Notas, a partir desta data e por meio do presente Aditamento, (i) substituem o Anexo I ao Contrato pelo Anexo A ao presente Aditamento, sendo certo que a GOL ESSN, quando efetivamente emitida estará automaticamente incluída nesta Garantia, independentemente de qualquer aditamento adicional; e (ii) concordam que todas as referências às Notas constantes do Contrato deverão ser lidas e interpretadas como uma referência conjunta às Notas Originais 2026, às 1ªs Notas Adicionais 2026, às 2ªs Notas Adicionais 2026 e às Novas Notas, bem como todas as referências à Escritura deverão ser lidas e interpretadas como uma referência conjunta à Escritura e aos Contratos de Compra de Notas, conforme o caso, em todos os casos sujeito aos termos do Contrato entre Credores.

2.2. Adicionalmente, em razão da atualização das Obrigações Garantidas, as Partes consignam que as verbas resultantes da excussão da Garantia serão destinadas para o pagamento proporcional das Obrigações Garantidas, de modo que a Cláusula 5.1. passa a viger com a seguinte redação:

*"5.1. Observado o disposto na Cláusula 1.1.1 acima e em todos os casos sujeito aos termos do Contrato entre Credores, caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo Trustee, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as*

6

*compliance with the Indenture and the Intercreditor Agreement, shall be entitled, notwithstanding any other security granted and provided under the Offering, to exercise all powers related to the Transferred Assets and the Fiduciary Transfer created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets; and to give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the proportional payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture and the Intercreditor Agreement."*

*instruções fornecidas pelo Trustee, em observância à Escritura e ao Contrato entre Credores, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, para exercer todos os poderes relativos aos Bens Alienados e a Alienação Fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados; e para dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento proporcional das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura e do Contrato entre Credores."*

### III.   MISCELLANEOUS

### III.   DISPOSIÇÕES GERAIS

3.1. *Registration of this Amendment*. The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located. Within ten (10) days as from the date of registration of this Amendment with the competent Registry Offices of Titles and Deeds,

3.1. *Registro do Presente Aditamento*. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro de que o presente Aditamento foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. No prazo de 10 (dez) dias contados a partir da data de registro deste Aditamento perante os Cartórios de Títulos e

the Company shall deliver to the Brazilian Collateral Agent evidence that the request for annotation of the security interest over each e Intellectual Property has been filed with the INPI.

3.1.1. The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

3.2.    Representations and Warranties. The Company hereby represents and warrants that:

(a)    has full powers, authorization and capacity to enter into this Amendment and comply with its contractual obligations;

(b)    has taken all necessary measures to authorize the execution and performance of this Amendment;

(c)    this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(d)    the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Non-Revolving Spare Parts;

Documentos competente, a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual foi protocolado perante o INPI.

3.1.1. A Companhia obriga-se, mediante conclusão perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal averbação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

3.2.    Declarações e Garantias. A Companhia neste ato declara e garante que:

(a)    possui plenos poderes, autorização e capacidade de firmar o presente Aditamento e cumprir com suas obrigações contratuais;

(b)    tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditamento;

(c)    o presente Aditamento constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d)    a celebração do presente Aditamento e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer

8

(e)     all other representations and warrants provided by the Company in the Agreement are valid and correct as of this date.

3.3 Other Terms and Conditions. All the terms and conditions of the Agreement not expressly changed or modified by this Amendment are hereby and on the date hereof fully ratified by the Parties and shall remain in full force and effect, as provided for in the Agreement.

3.4 Governing Law. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.5 Dispute Resolution. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

3.6. Language. This Amendment is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

3.7.     Electronic Signature. This Amendment is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

gravame sobre seus ativos, exceto pela Alienação Fiduciária das Peças de Reposição Não-Rotativas;

(e) todas as demais declarações e garantias prestadas pela Companhia no Contrato são válidas e verdadeiras nesta data.

3.3. Outros Termos e Condições. Todos os termos e condições do Contrato não expressamente alterados ou modificados por este Aditamento estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato.

3.4. Lei de Regência. O presente Aditamento será regido e interpretado de acordo com as leis do Brasil.

3.5. Solução de Controvérsias. Quaisquer disputas ou controvérsias oriundas do presente Aditamento serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

3.6. Idioma. Este Aditamento é assinado em inglês e em português. Em caso de discrepância, a versão em português irá prevalecer.

3.7.     Assinatura Eletrônica. Este Aditamento é celebrado pelas Partes com assinatura eletrônica de acordo com as regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP- Brasil, nos termos da Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

9

3.7.1. This Amendment is effective as of the date indicated herein, regardless of one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Amendment in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below

**IN WITNESS WHEREOF**, the Parties execute this Amendment electronically, in the presence of the two (2) undersigned witnesses.

São Paulo, March 2, 2023.

3.7.1.   Este Aditamento deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Aditamento num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Aditamento eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, 2 de março de 2023.

*(Signature page of the Third Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A.)*

*(Página de assinaturas do Terceiro Aditamento ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A.)*

### GOL LINHAS AÉREAS S.A.

_____          _____

Name/Nome:                               Name/Nome:

*Title*/Cargo:                           *Title*/Cargo:

### TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as Brazilian Collateral Agent for the Secured Parties under the 2026 Original Notes

_____          _____

Name/Nome:                               Name/Nome:

*Title*/Cargo:                           *Title*/Cargo:

### TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as New Notes Collateral Agent for the Secured Parties under the New Notes

_____          _____

Name/Nome:                               Name/Nome:

*Title*/Cargo:                           *Title*/Cargo:

### GOL LINHAS AÉREAS INTELIGENTES S.A.

_____          _____

Name/Nome:                               Name/Nome:

*Title*/Cargo:                           *Title*/Cargo:

**WITNESSES/TESTEMUNHAS**

 

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| Tax ID/CPF: | Tax ID/CPF: |
| ID/RG: | ID/RG: |

| | |
|---|---|
| **EXHIBIT A**<br>to the Third Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas AéreasS.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A. | **ANEXO A**<br>ao Terceiro Aditamento ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A. |

| | |
|---|---|
| **EXHIBIT I** | **ANEXO I** |
| **DESCRIPTION       OF       SECURED OBLIGATIONS** | **DESCRIÇÃO DAS   OBRIGAÇÕES GARANTIDAS** |

| | |
|---|---|
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |

Principal Amount: USD 150,000,000.00 (one hundred and fifty million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: US$ 150.000.000,00 (cento e cinquenta milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: June 30, 2026;

Data de Vencimento: 30 de junho de 2026;

Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura;

Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes;

Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas;

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice  de Atualização Monetária:       não aplicável;

Other Commissions and   Charges:   (i) Additional Amounts and (ii) Compensations and   Indemnities   (Compensation   and Indemnity), as provided, in the Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais (Additional Amounts)   e   (ii) Compensações e   Indenizações (*Compensation and Indemnity*), conforme previstos na Escritura.

| | |
|---|---|
| **AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE NOTES** | **VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO ÀS NOTAS GOL FINANCE** |

<u>Amount</u>: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

<u>Valor</u>: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

<u>Expiration Date</u>: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

<u>Data de Vencimento</u>: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

<u>Default interest</u>: 1.00% (once percent) per month;

<u>Juros de Mora</u>: 1,00% (um por cento) ao mês;

<u>Penalty Clause</u>: 10.00% (ten percent);

<u>Cláusula Penal</u>: 10,00% (dez por cento);

<u>Inflation Adjustment Index</u>: Not applicable;

<u>Índice de Atualização Monetária</u>: Não aplicável;

<u>Other Commissions and Charges</u>: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man- hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

<u>Demais Comissões e Encargos</u>: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

### GOL FINANCE SENIOR SECURED NOTE

### NOTA SÊNIOR GARANTIDA GOL FINANCE

<u>Principal Amount</u>: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

<u>Valor Principal</u>: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: March 2, 2028;

Data de Vencimento: 2 de março de 2028;

Interest Rate: 18.00% (eighteen per cent) per year, calculated and paid in accordance with GOL SSN;

Taxa de Juros: 18,00% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL SSN;

Default interest: as provided for in GOL SSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL SSN;

Juros de Mora: conforme previsto na GOL SSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN;

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL SSN.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity)*, conforme previstos na GOL SSN.

## GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE

## NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: March 2, 2028;

Data de Vencimento: 2 de março, 2028;

Interest Rate: 18% (eighteen per cent) per year, calculated and paid in accordance with GOL ESSN;

Taxa de Juros: 18% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL ESSN;

Default interest: as provided for in GOL ESSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL ESSN;

Juros de Mora: conforme previsto na GOL ESSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN;

15

Penalty Clause: not applicable;

Inflation Adjustment Index: not applicable;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL ESSN.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE SENIOR SECURED NOTE AND TO THE GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE**

Amount: USD 10,000.00 (ten Thousand U.S. dollars) set-up fee and USD 12,000.00 (twelve thousand U.S. Dollars) per annum;

Payment Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (one percent) per month;
Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

Cláusula Penal: não aplicável;

Índice de Atualização Monetária: não aplicável;

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na GOL ESSN.

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO À NOTA SÊNIOR GARANTIDA GOL FINANCE E À NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE**

Valor: taxa de contratação de US$ 10.000,00 (dez mil dólares dos Estados Unidos) e US$ 12.000,00 (doze mil dólares Norte-Americanos) por ano;

Data de Vencimento 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

**<u>ANNEX D</u>**

**THIRD AMENDMENT TO THE FIDUCIARY TRANSFER OF INTELLECTUAL PROPERTY RIGHTS AGREEMENT**

By this private instrument, the parties hereto:

**(a) GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo, Zip Code 04626-020, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ") under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

**(b) TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Avenida Marcos Penteado de Ulhoa Rodrigues, No 939, 10th Floor, Room 03, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined in the Intercreditor Agreement) (hereinafter referred to as "Brazilian Collateral Agent");

and, as intervening and consenting party,

**(c) GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46- 48/0-P, Zip Code 20021-340, enrolled with the CNPJ under No. 07.575.651/0001-59, herein represented by its

**TERCEIRO ADITAMENTO AO CONTRATO DE ALIENAÇÃO FIDUCIÁRIA DE DIREITOS DE PROPRIEDADE INTELECTUAL**

Pelo presente instrumento particular, as partes:

**(a) GOL LINHA AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ") sob o n° 06.164.253/0001- 87, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

**(b) TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Avenida Marcos Penteado de Ulhoa Rodrigues, n° 939, 10° andar, Sala 03, Edifício Jacarandá, CEP 06460-040, inscrita no CNPJ sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido no Contrato entre Credores) ("Agente de Garantia Brasileiro");

e, como interveniente anuente,

**(c) GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no CNPJ sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("GLA" e, juntamente com a

undersigned legal representatives ("GLA", jointly with the Company, the "Guarantors").

Companhia, as "Garantidoras").

**WHEREAS:**

**CONSIDERANDO QUE:**

(i) GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 17 Boulevard Raiffeisen, L-2411, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued 8.00% Senior Secured Notes due 2026 ("2026 Original Notes"), pursuant to an indenture entered into by Gol Finance, the Brazilian Collateral Agent and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the 2026 Original Notes offering ("2020 Offering");

(i) a GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 17 Boulevard Raiffeisen, L-2411, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas Originais 2026"), nos termos e condições previstos na escritura, celebrada entre a Gol Finance, o Agente de Garantia Brasileiro e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e no memorando privado de colocação relacionado à oferta das Notas Originais 2026 ("Oferta 2020");

(ii) on December 23, 2020, the Company, the Brazilian Collateral Agent and GLA entered into a Fiduciary Transfer of Intellectual Property Rights Agreement ("Agreement"), pursuant to which the Company fiduciarily assigned all the Transferred Assets (as defined in the Agreement), to the secured parties defined therein, as collateral for the Secured Obligations ("Collateral");

(ii) em 23 de dezembro de 2020, a Companhia, o Agente de Garantia Brasileiro e a GLA celebraram Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual ("Contrato"), por meio do qual a Companhia alienou fiduciariamente todos os Bens Alienados (conforme definido no Contrato) às partes garantidas ali definidas, como garantia das Obrigações Garantidas ("Garantia");

(iii) on May 6, 2021, Gol Finance issued an additional US$300,000,000.00 of 2026 Notes, under the Indenture (the "1st 2026 Additional Notes"), and as described in the offering memorandum related to the 2026 Additional Notes offering ("1st 2021 Offering"), fungible with the 2026 Original Notes;

(iii) em 6 de maio de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 300.000.000,00, nos termos da Escritura (as "1ªs Notas Adicionais 2026"), e do memorando da oferta relacionado à oferta das Notas Adicionais 2026 ("1ª Oferta 2021"), fungíveis com as Notas Originais 2026;

(iv) on May 6, 2021, the Parties entered into the first amendment to the Agreement, in order to

(iv) em 6 de maio de 2021, as Partes celebraram o primeiro aditamento ao Contrato, com o

2

update the description of the Secured Obligations, in order to secure the 1st 2026 Additional Notes;

(v) on September 23, 2021, Gol Finance issued an additional US$150,000,000.00 of 2026 Notes, under the Indenture (the "2nd 2026 Additional Notes", and together with the Original Notes and 1st 2026 Additional Notes, the "Notes") and as described in the offering memorandum related to the 2nd 2026 Additional Notes offering ("2nd 2021 Offering" and, together with the 2020 Offering and the 1st 2021 Additional Offering, each hereinafter referred to as "Offering"), fungible with the 2026 Original Notes;

(vi) the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of such secured parties in connection with the collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms provided for in the Indenture, the Agreement and this Amendment;

(vii) on September 23, 2021, the Parties entered into a Second Amendment to the Agreement pursuant to which the Parties agreed to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the 2nd 2026 Additional Notes;

(viii) on March 2, GOL Finance issued 18.00% senior secured note, in an aggregate principal amount of up to US$ 1,430,925,000.00, due 2028 ("GOL SSN"), pursuant to a note purchase agreement (the "GOL SSN NPA") with, among

objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 1ªs Notas Adicionais 2026;

(v) em 23 de setembro de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 150.000.000,00, nos termos da Escritura (as "2ªs Notas Adicionais 2026", e em conjunto com as Notas Originais e as 1ªs Notas Adicionais 2026, as "Notas") e do memorando da oferta relacionado à oferta das 2ª Notas Adicionais 2026 ("2ª Oferta 2021" e, em conjunto com a Oferta 2020 e a 1ª Oferta Adicional 2021, cada uma doravante designada como "Oferta"), fungíveis com as Notas Originais 2026;

(vi) o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas na Escritura como agente de garantia no Brasil nos termos da Escritura, para praticar atos em nome e em benefício de tais partes garantidas com relação à garantia constituída por meio do Contrato e deste Aditamento, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura, Contrato e deste Aditamento;

(vii) em 23 de setembro de 2021, as Partes celebraram o Segundo Aditamento ao Contrato, por meio do qual concordaram em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 2ªs Notas Adicionais 2026;

(viii) em 2 de março de 2023, a GOL Finance emitiu uma nota sênior garantida com valor principal agregado de até US$ 1.430.925.000,00 e juros de 18,00%, com vencimento em 2028 ("GOL SSN"), de acordo com um contrato de

others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "GOL SSN Collateral Agent");

(ix) GOL Equity Finance, a public limited liability company (*societé anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 224920 ("Gol Equity Finance") will issue 18.00% senior secured exchangeable note of aggregate principal amount of up to US$ 1,430,925,000.00 due 2028 ("GOL ESSN", jointly with GOL SSN, the "New Notes"), under the terms of the corporate approval of March 1, 2023, pursuant to a note purchase agreement (the "GOL ESSN NPA" and, jointly with the GOL SSN NPA, the "Note Purchase Agreements") with, among others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "GOL ESSN Collateral Agent" and, jointly with the GOL SSN Collateral Agent, the "New Notes Collateral Agent");

(x) the New Notes Collateral Agent was duly appointed by the holders of the New Notes and the other secured parties described in the Note Purchase Agreements as a collateral agent in Brazil under the terms of the Note Purchase Agreements to perform acts on behalf of and for the benefit of such secured parties in connection with the collateral provided under the Note Purchase Agreements and related collateral documents, as permitted by the terms set forth in the Note Purchase Agreements, in accordance, exclusively and strictly, with instructions provided by the requisite holders of the New Notes and in accordance with the terms provided for in the Note Purchase Agreements;

compra de notas (o "GOL SSN NPA") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "Agente de Garantia GOL SSN");

(ix) a GOL Equity Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Luxemburgo"), com sede na 17 Boulevard Raiffeisen, L-2411, Luxemburgo, registrada no Registro Comercial de Luxemburgo (R.S.C. Luxembourg) sob o número B 224920 ("Gol Equity Finance") emitirá uma nota sênior garantida permutável com valor principal agregado de até US$ 1.369.875.000,00 e juros de 18,00%, com vencimento em 2028 ("GOL ESSN", e, em conjunto com GOL SSN, as "Novas Notas"), nos termos da aprovação societária de 1º de março de 2023, de acordo com um contrato de compra de notas (o "GOL ESSN NPA" e, juntamente com o GOL SSN NPA, o "Contratos de Compra de Notas") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "Agente de Garantia GOL ESSN" e, juntamente com o Agente de Garantia GOL SSN, o "Agente de Garantia das Novas Notas");

(x) o Agente de Garantia das Novas Garantias foi devidamente nomeado pelos titulares das Novas Notas e pelas outras partes garantidas descritas nos Contratos de Compra de Notas como agente de garantia no Brasil, sob os termos do Contrato de Compra de Notas, para praticar atos em nome e em benefício de tais partes garantidas com relação à garantia constituída por meio dos Contratos de Compra de Notas e em relação aos documentos de garantia, conforme permitido pelos termos previstos nos Contratos de Compra de Notas, de acordo, exclusiva e estritamente, com as instruções fornecidas pelos titulares necessários das Notas Novas e de acordo com os

(xi) on March 2, 2023, GOL Finance, the Company, GLA, the Trustee and the Brazilian Collateral Agent entered into the First Supplemental Indenture, by means of which the Brazilian Collateral Agent was directed by the Trustee to execute and deliver this Amendment;

(xii) on March 2, 2023, GOL Finance, Gol Equity Finance, the Company, GLA, the Trustee, the Brazilian Collateral Agent and the New Notes Collateral Agent entered into an Intercreditor Agreement (the "Intercreditor Agreement"), by means of which the Brazilian Collateral Agent was duly appointed by the Trustee and the New Notes Collateral Agent as a collateral agent in Brazil under the terms of the Intercreditor Agreement to perform acts on behalf of and for the benefit of the secured parties under the Indenture and the Note Purchase Agreements in connection with the collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Intercreditor Agreement, in accordance, exclusively and strictly, with instructions of the Trustees (as defined in the Intercreditor Agreement), acting at the direction of and on behalf of the Controlling Secured Parties (as defined in the Intercreditor Agreement), as provided for in the Intercreditor Agreement; and

(xiii) as a result of the foregoing, the Parties hereby agree to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the New Notes.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "*Third Amendment to the Fiduciary Transfer of Intellctual Property Rights Agreement*" ("Amendment"), according to the following clauses:

termos previstos nos Contratos de Compra de Notas;

(xi) em 2 de março de 2023, a GOL Finance, a Companhia, a GLA, o *Trustee* e o Agente de garantia Brasileiro celebraram o Primeiro Suplemento à Escritua, por meio do qual o Agente de Garantia Brasileiro foi instruído pelo *Trusteee* a assinar e entregar este Aditamento;

(xii) em 2 de março de 2023, a GOL Finance, a Gol Equity Finance, a Companhia, a GLA, o *Trustee*, o Agente de Garantia Brasileiro e o Agente de Garantia das Novas Notas celebraram um Contrato entre Credores (o "Contrato entre Credores"), por meio do qual o Agente de Garantia Brasileiro foi devidamente nomeado pelo *Trustee* e pelo Agente de Garantia das Novas Notas como agente de garantia no Brasil, sob os termos do Contrato entre Credores para realizar atos em nome e em benefício das partes garantidas sob a Escritura e os Contratos de Compra de Notas em conexão com as garantias fornecidas sob o Contrato e este Aditamento, conforme permitido pelos termos estabelecidos no Contrato entre Credores, de acordo, exclusiva e estritamente, com instruções do *Trustee* (conforme definido no Contrato entre Credores), agindo sob a direção e em nome das Partes Garantidas Controladoras (conforme definido no Contrato entre Credores), conforme previsto no Contrato entre Credores; e

(xiii) em razão do exposto acima, as Partes neste ato concordam em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as Novas Notas.

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "*Terceiro Aditamento ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual*" ("Aditamento"), que será regido pelas seguintes cláusulas:

## I.   DEFINITIONS

1.1. For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Agreement.

## II.   AMENDMENT

2.1. As a consequence of the issuance of the New Notes, the Parties expressly agree that, as of the date hereof and by means of this Amendment, the (i) Exhibit I of the Agreement shall be replaced by Exhibit A hereto, so that the GOL ESSN, when effectively issued, will be automatically included in this Collateral, regardless of any additional amendment; and (ii) all references in the Agreement to the Notes shall be read and understood as references to the 2026 Original Notes, the 1st 2026 Additional Notes, the 2nd 2026 Additional Notes and the New Notes, collectively, as well as all references to the Indenture shall be read and construed as a joint reference to the Indenture and the Note Purchase Agreement, as the case may be, in all cases subject to the terms of the Intercreditor Agreement.

2.2. Additionally, due to the updating of the Secured Obligations, the Parties agree that the amounts resulting from the foreclosure of the Collateral shall be destined to the proportional payment of the Secured Obligations, in such a way that Section 5.1 shall be in effect with the following wording:

*"5.1. Subject to the Section 1.1.1 above and in all cases subject to the Intercreditor Agreement, in the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in*

## I.   DAS DEFINIÇÕES

1.1. Para fins deste Aditamento, todos os termos iniciados em letras maiúsculas, não definidos neste Aditamento, têm o significado a eles atribuídos no Contrato.

## II.   DO ADITAMENTO

2.1. As Partes, em razão da emissão das Novas Notas, a partir desta data e por meio do presente Aditamento, (i) substituem o Anexo I ao Contrato pelo Anexo A ao presente Aditamento, sendo certo que a GOL ESSN, quando efetivamente emitida estará automaticamente incluída nesta Garantia, independentemente de qualquer aditamento adicional; e (ii) concordam que todas as referências às Notas constantes do Contrato deverão ser lidas e interpretadas como uma referência conjunta às Notas Originais 2026, às 1ªs Notas Adicionais 2026, às 2ªs Notas Adicionais 2026 e às Novas Notas, bem como todas as referências à Escritura deverão ser lidas e interpretadas como uma referência conjunta à Escritura e aos Contratos de Compra de Notas, conforme o caso, em todos os casos sujeito aos termos do Contrato entre Credores.

2.2. Adicionalmente, em razão da atualização das Obrigações Garantidas, as Partes consignam que as verbas resultantes da excussão da Garantia serão destinadas para o pagamento proporcional das Obrigações Garantidas, de modo que a Cláusula 5.1. passa a viger com a seguinte redação:

*"5.1. Observado o disposto na Cláusula 1.1.1 acima e em todos os casos sujeito aos termos do Contrato entre Credores, caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo Trustee, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as*

6

compliance with the Indenture and the Intercreditor Agreement, shall be entitled, notwithstanding any other security granted and provided under the Offering, to exercise all powers related to the Transferred Assets and the Fiduciary Transfer created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets; and to give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the proportional payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture and the Intercreditor Agreement."

instruções fornecidas pelo Trustee, em observância à Escritura e ao Contrato entre Credores, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, para exercer todos os poderes relativos aos Bens Alienados e a Alienação Fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados; e para dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento proporcional das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura e do Contrato entre Credores."

### III. MISCELLANEOUS

3.1. Registration of this Amendment. The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located. Within ten (10) days as from the date of registration of this Amendment with the competent Registry Offices of Titles and Deeds,

### III. DISPOSIÇÕES GERAIS

3.1. Registro do Presente Aditamento. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro de que o presente Aditamento foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. No prazo de 10 (dez) dias contados a partir da data de registro deste Aditamento perante os Cartórios de Títulos e

the Company shall deliver to the Brazilian Collateral Agent evidence that the request for annotation of the security interest over each e Intellectual Property has been filed with the INPI.

3.1.1. The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

3.2. <u>Representations and Warranties</u>. The Company hereby represents and warrants that:

(a) has full powers, authorization and capacity to enter into this Amendment and comply with its contractual obligations;

(b) has taken all necessary measures to authorize the execution and performance of this Amendment;

(c) this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(d) the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Non-Revolving Spare Parts;

Documentos competente, a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual foi protocolado perante o INPI.

3.1.1. A Companhia obriga-se, mediante conclusão perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal averbação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

3.2. <u>Declarações e Garantias</u>. A Companhia neste ato declara e garante que:

(a) possui plenos poderes, autorização e capacidade de firmar o presente Aditamento e cumprir com suas obrigações contratuais;

(b) tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditamento;

(c) o presente Aditamento constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d) a celebração do presente Aditamento e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer

8

(e)    all other representations and warrants provided by the Company in the Agreement are valid and correct as of this date.

3.3 <u>Other Terms and Conditions</u>. All the terms and conditions of the Agreement not expressly changed or modified by this Amendment are hereby and on the date hereof fully ratified by the Parties and shall remain in full force and effect, as provided for in the Agreement.

3.4 <u>Governing Law</u>. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.5 <u>Dispute Resolution</u>. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

3.6. <u>Language</u>. This Amendment is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

3.7.    <u>Electronic Signature</u>. This Amendment is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

gravame sobre seus ativos, exceto pela Alienação Fiduciária das Peças de Reposição Não-Rotativas;

(e)  todas as demais declarações e garantias prestadas pela Companhia no Contrato são válidas e verdadeiras nesta data.

3.3.  <u>Outros Termos e Condições</u>. Todos os termos e condições do Contrato não expressamente alterados ou modificados por este Aditamento estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato.

3.4. <u>Lei de Regência</u>. O presente Aditamento será regido e interpretado de acordo com as leis do Brasil.

3.5.  <u>Solução de Controvérsias</u>. Quaisquer disputas ou controvérsias oriundas do presente Aditamento serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

3.6. <u>Idioma</u>. Este Aditamento é assinado em inglês e em português. Em caso de discrepância, a versão em português irá prevalecer.

3.7.    <u>Assinatura Eletrônica</u>. Este Aditamento é celebrado pelas Partes com assinatura eletrônica de acordo com as regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP- Brasil, nos termos da Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

3.7.1. This Amendment is effective as of the date indicated herein, regardless of one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Amendment in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below

**IN WITNESS WHEREOF**, the Parties execute this Amendment electronically, in the presence of the two (2) undersigned witnesses.

São Paulo, March 2, 2023.

3.7.1.  Este Aditamento deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Aditamento num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Aditamento eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, 2 de março de 2023.

*(Signature page of the Third Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A.)*

*(Página de assinaturas do Terceiro Aditamento ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A.)*

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

Name/Nome:

Name/Nome:

*Title*/Cargo:

*Title*/Cargo:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as Brazilian Collateral Agent for the Secured Parties under the 2026 Original Notes**

Name/Nome:

Name/Nome:

*Title*/Cargo:

*Title*/Cargo:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as New Notes Collateral Agent for the Secured Parties under the New Notes**

Name/Nome:

Name/Nome:

*Title*/Cargo:

*Title*/Cargo:

**GOL LINHAS AÉREAS S.A.**

Name/Nome:

Name/Nome:

*Title*/Cargo:

*Title*/Cargo:

**WITNESSES/TESTEMUNHAS**

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| Tax ID/CPF: | Tax ID/CPF: |
| ID/RG: | ID/RG: |

| | |
|---|---|
| **EXHIBIT A** | **ANEXO A** |
| **to the Third Amendment to the Fiduciary Transfer of Intellectual Property Rights Agreement entered into by and among Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas S.A.** | **ao Terceiro Aditamento ao Contrato de Alienação Fiduciária de Direitos de Propriedade Intelectual celebrado por e entre Gol Linhas Aéreas Inteligentes S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas S.A.** |

| | |
|---|---|
| **EXHIBIT I** | **ANEXO I** |
| **DESCRIPTION OF SECURED OBLIGATIONS** | **DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |

| | |
|---|---|
| **GOL FINANCE NOTES** | **NOTAS GOL FINANCE** |

| | |
|---|---|
| Principal Amount: USD 150,000,000.00 (one hundred and fifty million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | Valor Principal: US$ 150.000.000,00 (cento e cinquenta milhões de dólares Norte Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| Maturity Date: June 30, 2026; | Data de Vencimento: 30 de junho de 2026; |
| Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture; | Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura; |
| Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes; | Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas; |
| Penalty Clause: not applicable; | Cláusula Penal: não aplicável; |
| Inflation Adjustment Index: not applicable; | Índice de Atualização Monetária: não aplicável; |
| Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture. | Demais Comissões e Encargos: (i) Montantes Adicionais (Additional Amounts) e (ii) Compensações e Indenizações (*Compensation and Indemnity*), conforme previstos na Escritura. |

13

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE NOTES**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (once percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man- hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

**GOL FINANCE SENIOR SECURED NOTE**

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

---

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO ÀS NOTAS GOL FINANCE**

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

**NOTA SÊNIOR GARANTIDA GOL FINANCE**

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

14

| | |
|---|---|
| Maturity Date: March 2, 2028; | Data de Vencimento: 2 de março de 2028; |
| Interest Rate: 18.00% (eighteen per cent) per year, calculated and paid in accordance with GOL SSN; | Taxa de Juros: 18,00% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL SSN; |
| Default interest: as provided for in GOL SSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL SSN; | Juros de Mora: conforme previsto na GOL SSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN; |
| Penalty Clause: not applicable; | Cláusula Penal: não aplicável; |
| Inflation Adjustment Index: not applicable; | Índice de Atualização Monetária: não aplicável; |
| Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL SSN. | Demais Comissões e Encargos: (i) Montantes Adicionais (Additional Amounts) e (ii) Compensações e Indenizações (Compensation and Indemnity), conforme previstos na GOL SSN. |

### GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE

### NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE

| | |
|---|---|
| Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| Maturity Date: March 2, 2028; | Data de Vencimento: 2 de março, 2028; |
| Interest Rate: 18% (eighteen per cent) per year, calculated and paid in accordance with GOL ESSN; | Taxa de Juros: 18% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL ESSN; |
| Default interest: as provided for in GOL ESSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL ESSN; | Juros de Mora: conforme previsto na GOL ESSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN; |

Penalty Clause: not applicable;

Inflation Adjustment Index: not applicable;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL ESSN.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE SENIOR SECURED NOTE AND TO THE GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE**

Amount: USD 10,000.00 (ten Thousand U.S. dollars) set-up fee and USD 12,000.00 (twelve thousand U.S. Dollars) per annum;

Payment Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (one percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

Cláusula Penal: não aplicável;

Índice de Atualização Monetária: não aplicável;

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na GOL ESSN.

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO À NOTA SÊNIOR GARANTIDA GOL FINANCE E À NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE**

Valor: taxa de contratação de US$ 10.000,00 (dez mil dólares Norte-Americanos) e US$ 12.000,00 (doze mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

16

## ANNEX E

**FIFTH AMENDMENT TO THE REVOLVING AIRCRAFT SPARE PARTS FIDUCIARY ASSIGNMENT AGREEMENT**

**QUINTO ADITAMENTO AO INSTRUMENTO PARTICULAR DE ALIENAÇÃO FIDUCIÁRIA DE PEÇAS AERONÁUTICAS DE REPOSIÇÃO ROTATIVAS**

By this private instrument, the parties hereto:

Pelo presente instrumento particular, as partes:

**(a)    GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46- 48/0-P, Zip Code 20021-340, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

**(a)    GOL LINHAS    AÉREAS S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

**(b)    TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, Brazil, at Avenida Marcos Penteado de Ulhoa Rodrigues, No 939, 10th Floor, Room 03, Edifício Jacanandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined in the Intercreditor Agreement) (hereinafter referred to as "Brazilian Collateral Agent");

**(b) TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, Brasil, na Avenida Marcos Penteado de Ulhoa Rodrigues, nº 939, 10º andar, Sala 03, Edifício Jacanandá, CEP 06460-040, inscrita CNPJ sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido no Contrato entre Credores) ("Agente de Garantia Brasileiro");

and, as intervening and consenting party,

e, como interveniente anuente,

**(c)    GOL    LINHAS    AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo, Zip Code 04626-020, enrolled with the CNPJ under No 06.164.253/0001-87, herein

**(c)    GOL    LINHAS    AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no CNPJ sob o n° 06.164.253/0001- 87, neste ato representada por seus representantes

represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors").

**WHEREAS:**

(i)    GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued 8.00% Senior Secured Notes due 2026 ("2026 Original Notes"), pursuant to an indenture entered into by Gol Finance, the Brazilian Collateral Agent and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the 2026 Original Notes offering ("2020 Offering");

(ii) on December 23, 2020, the Company, the Brazilian Collateral Agent and GLAI entered into a Revolving Aircraft Spare Parts Fiduciary Assignment Agreement ("Agreement"), pursuant to which the Company fiduciarily assigned all the Revolving Spare Parts (as defined in the Agreement) on a fiduciary basis, to the Secured Parties, as collateral for the Secured Obligations ("Collateral");

(iii) on April 28, 2021, the Parties entered into a First Amendment to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, pursuant to which the Parties agreed to amend the Agreement for the purposes of (i) amending the list of the Revolving Spare Parts and the list of Locations (as defined in the Agreement) fiduciarily assigned, pursuant to Clause 1.5 of the Agreement; and (ii) ratifying Clause 1.6.1 of the Agreement in order to reflect the provisions set forth in the Indenture;

legais abaixo assinados ("GLAI", juntamente com a Companhia, as "Garantidoras").

**CONSIDERANDO QUE:**

(i)    a GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 17, Boulevard Raiffeisen, L-2411, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas Originais 2026"), nos termos e condições previstos na escritura, celebrada entre a Gol Finance, o Agente de Garantia Brasileiro e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e no memorando privado de colocação relacionado à oferta das Notas Originais 2026 ("Oferta 2020");

(ii) em 23 de dezembro de 2020, a Companhia, o Agente de Garantia Brasileiro e a GLAI celebraram o Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas ("Contrato"), por meio do qual a Companhia alienou fiduciariamente todas as Peças de Reposição Rotativas (conforme definido no Contrato) às Partes Garantidas, como garantia das Obrigações Garantidas ("Garantia");

(iii) em 28 de abril de 2021, as Partes celebraram o Primeiro Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas, por meio do qual concordaram em aditar o Contrato com o objetivo de (i) alterar a lista de Peças de Reposição Rotativas e a lista de Localidades (conforme definido no Contrato) alienadas fiduciariamente, nos termos da Cláusula 1.5 do Contrato; e (ii) retificar a Cláusula 1.6.1 do Contrato a fim de refletir o disposto na Escritura;

2

(iv) on May 6, 2021, Gol Finance issued an additional US$300,000,000.00 of 2026 Notes, under the Indenture (the "1st 2026 Additional Notes"), and as described in the offering memorandum related to the 2026 Additional Notes offering ("1st 2021 Offering"), fungible with the 2026 Original Notes;

(v) on May 6, 2021, the Parties entered into the second amendment to the Agreement, in order to update the description of the Secured Obligations, in order to secure the 1st 2026 Additional Notes;

(vi) on September 22, 2021, the Parties entered into a Third Amendment to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, pursuant to which the Parties agreed to amend the Agreement for the purposes of amending the list of Revolving Spare Parts and the list of Locations (as defined in the Agreement) delivered on a fiduciary basis, as well as list of Locations and the Market Value of the Revolving Spare Parts fiduciarily assigned, based on the Appraisal Report issued by the Independent Appraiser, pursuant to Clause 1.6.1. of the Fiduciary Assignment Agreement;

(vii) on September 23, 2021, Gol Finance issued an additional US$ 150,000,000.00 of 2026 Notes, under the Indenture (the "2nd 2026 Additional Notes", and together with the Original Notes and the 1st 2026 Additional Notes, the "Notes") and as described in the offering memorandum related to the 2nd 2026 Additional Notes offering ("2nd 2021 Offering" and, together with the 2020 Offering and the 1st 2021 Additional Offering, each hereinafter referred to as "Offering"), fungible with the 2026 Original Notes;

(viii) the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture as a collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for

(iv) em 6 de maio de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 300.000.000,00, nos termos da Escritura (as "1ªs Notas Adicionais 2026"), e do memorando da oferta relacionado à oferta das Notas Adicionais 2026.1 ("1ª Oferta 2021"), fungíveis com as Notas Originais 2026;

(v) em 6 de maio de 2021, as Partes celebraram o segundo aditamento ao Contrato, com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 1ªs Notas Adicionais 2026;

(vi) em 22 de setembro de 2021, as Partes celebraram o Terceiro Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas, por meio do qual concordaram em aditar o Contrato com o objetivo de alterar a lista de Peças de Reposição Rotativas, bem como a lista de Localidades e o Valor de Mercado das Peças de Reposição Rotativas alienadas fiduciariamente, de acordo com o Relatório de Avaliação preparado pelo Avaliador Independente, nos termos da Cláusula 1.6.1. do Contrato de Alienação Fiduciária;

(vii) em 23 de setembro de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 150.000.000,00, nos termos da Escritura (as "2ªs Notas Adicionais 2026", e em conjunto com as Notas Originais e as 1ªs Notas Adicionais 2026, as "Notas") e do memorando da oferta relacionado à oferta das 2ªs Notas Adicionais 2026 ("2ª Oferta 2021" e, em conjunto com a Oferta 2020 e a 1ª Oferta Adicional 2021, cada uma doravante designada como "Oferta"), fungíveis com as Notas Originais 2026;

(viii) o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas nas Escritura como agente de garantia no Brasil nos termos da Escritura, para praticar atos em nome

the benefit of such secured parties in connection with the collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("Trustee") and in accordance with the terms provided for in the Indenture, the Agreement and this Amendment;

(ix) on September 23, 2021, the Parties entered into a Fourth Amendment to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, pursuant to which the Parties agreed to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the 2nd 2026 Additional Notes;

(x) on March 2, 2023, GOL Finance issued 18.00% senior secured note, in an aggregate principal amount of up to US$ 1,430,925,000.00 due 2028 ("GOL SSN"), pursuant to a note purchase agreement (the "GOL SSN NPA") with, among others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "GOL SSN Collateral Agent");

(xi) GOL Equity Finance, a public limited liability company (societé anonyme) incorporated and existing under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 224920 ("Gol Equity Finance") will issue 18.00% senior secured exchangeable note of aggregate principal amount of up to US$ 1,430,925,000.00 due 2028 ("GOL ESSN", jointly with GOL SSN, the "New Notes"), under the terms of the corporate approval of March 1, 2023, pursuant to a note purchase agreement (the "GOL ESSN NPA" and, jointly with the GOL

e em benefício de tais partes garantidas com relação à garantia constituída por meio do Contrato e deste Aditamento, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("Trustee") e de acordo com os termos previstos na Escritura, Contrato e deste Aditamento;

(ix) em 23 de setembro de 2021, as Partes celebraram Quarto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas, por meio do qual concordaram em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 2ªs Notas Adicionais 2026;

(x) em 2 de março de 2023, a GOL Finance emitiu uma nota sênior garantida com valor principal agregado de até US$ 1.430.925.000,00 e juros de 18,00% com vencimento em 2028 ("GOL SSN"), de acordo com um contrato de compra de notas (o "GOL SSN NPA") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "Agente de Garantia GOL SSN");

(xi) a GOL Equity Finance, sociedade pública de responsabilidade limitada (societé anonyme), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Luxemburgo"), com sede na 17 Boulevard Raiffeisen, L-2411, Luxemburgo, registrada no Registro Comercial de Luxemburgo (R.S.C. Luxemburgo) sob o número B 224920 ("Gol Equity Finance") emitirá uma nota sênior garantida permutável com valor principal agregado de até US$ 1.430.925.000,00 e juros de 18,00%, com vencimento em 2028 ("GOL ESSN", e, em conjunto com GOL SSN, as "Novas Notas"), nos termos da aprovação societária de 1º de março de 2023, de acordo com um contrato de compra de

SSN NPA, the "Note Purchase Agreements") with, among others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "GOL ESSN Collateral Agent" and, jointly with the GOL SSN Collateral Agent, the "New Notes Collateral Agent");

(xii) the New Notes Collateral Agent was duly appointed by the holders of the New Notes and the other secured parties described in the Note Purchase Agreements as a collateral agent in Brazil under the terms of the Note Purchase Agreements to perform acts on behalf of and for the benefit of such secured parties in connection with the collateral provided under the Note Purchase Agreements and related collateral documents, as permitted by the terms set forth in the Note Purchase Agreements, in accordance, exclusively and strictly, with instructions provided by the requisite holders of the New Notes and in accordance with the terms provided for in the Note Purchase Agreements;

(xiii) on March 2, 2023, GOL Finance, the Company, GLAI, the Trustee and the Brazilian Collateral Agent entered into the First Supplemental Indenture, by means of which the Brazilian Collateral Agent was directed by the Trustee to execute and deliver this Amendment;

(xiv) on March 2, 2023, GOL Finance, Gol Equity Finance, the Company, GLAI, the Trustee, the Brazilian Collateral Agent and the New Notes Collateral Agent entered into an Intercreditor Agreement (the "Intercreditor Agreement"), by means of which the Brazilian Collateral Agent was duly appointed by the Trustee and the New Notes Collateral Agent as a collateral agent in Brazil under the terms of the Intercreditor Agreement to perform acts on behalf of and for the benefit of the secured parties under the Indenture and the Note Purchase Agreements in connection with the

notas (o "GOL ESSN NPA" e, juntamente com o GOL SSN NPA, o "Contratos de Compra de Notas") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "Agente de Garantia GOL ESSN" e, juntamente com o Agente de Garantia GOL SSN, o "Agente de Garantia das Novas Notas");

(xii) o Agente de Garantia das Novas Notas foi devidamente nomeado pelos titulares das Novas Notas e pelas outras partes garantidas descritas nos Contratos de Compra de Notas como agente de garantia no Brasil, sob os termos do Contrato de Compra de Notas, para praticar atos em nome e em benefício de tais partes garantidas com relação à garantia constituída por meio dos Contratos de Compra de Notas e em relação aos documentos de garantia, conforme permitido pelos termos previstos nos Contratos de Compra de Notas, de acordo, exclusiva e estritamente, com as instruções fornecidas pelos titulares necessários das Notas Novas e de acordo com os termos previstos nos Contratos de Compra de Notas;

(xiii) em 2 de março de 2023, a GOL Finance, a Companhia, a GLAI, o *Trustee* e o Agente de garantia Brasileiro celebraram o Primeiro Suplemento à Escritura, por meio do qual o Agente de Garantia Brasileiro foi instruído pelo *Trustee* a assinar e entregar este Aditamento;

(xiv) em 2 de março de 2023, a GOL Finance, a Gol Equity Finance, a Companhia, a GLAI, o *Trustee*, o Agente de Garantia Brasileiro e o Agente de Garantia das Novas Notas celebraram um Contrato entre Credores (o "Contrato entre Credores"), por meio do qual o Agente de Garantia Brasileiro foi devidamente nomeado pelo *Trustee* e pelo Agente de Garantia das Novas Notas como agente de garantia no Brasil, sob os termos do Contrato entre Credores para realizar atos em nome e em benefício das partes garantidas sob a Escritura e os Contratos de Compra de Notas em conexão com as garantias

collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Intercreditor Agreement, in accordance, exclusively and strictly, with instructions of the Trustees (as defined in the Intercreditor Agreement), acting at the direction of and on behalf of the Controlling Secured Parties (as defined in the Intercreditor Agreement), as provided for in the Intercreditor Agreement; and

(xv) as a result of the foregoing, the Parties hereby agree to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the New Notes.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "*Fifth Amendment to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement*" ("Amendment"), according to the following clauses:

## I.    DEFINITIONS

1.1. For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Agreement.

## II.    AMENDMENT

2.1. As a consequence of the issuance of the New Notes, the Parties expressly agree that, as of the date hereof and by means of this Amendment, the (i) Exhibit I of the Agreement shall be replaced by Exhibit A hereto, so that the GOL ESSN, when effectively issued, will be automatically included in this Collateral, regardless of any additional amendment; and (ii) all references in the Agreement to the Notes shall be read and understood as references to the 2026 Original Notes, the 1st 2026 Additional Notes, the 2nd 2026 Additional Notes and the New Notes, collectively, as well as all references to the Indenture shall be read and construed as a joint reference to the Indenture and the Note

---

fornecidas sob o Contrato e este Aditamento, conforme permitido pelos termos estabelecidos no Contrato entre Credores, de acordo, exclusiva e estritamente, com instruções do *Trustee* (conforme definido no Contrato entre Credores), agindo sob a direção e em nome das Partes Garantidas Controladoras (conforme definido no Contrato entre Credores), conforme previsto no Contrato entre Credores; e

(xv) em razão do exposto acima, as Partes neste ato concordam em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as Novas Notas.

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "*Quinto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas*" ("Aditamento"), que será regido pelas seguintes cláusulas;

## I.    DAS DEFINIÇÕES

1.1. Para fins deste Aditamento, todos os termos iniciados em letras maiúsculas, não definidos neste Aditamento, têm o significado a eles atribuídos no Contrato.

## II.    DO ADITAMENTO

2.1. As Partes, em razão da emissão das Novas Notas, a partir desta data e por meio do presente Aditamento, (i) substituem o Anexo I ao Contrato pelo Anexo A ao presente Aditamento, sendo certo que a GOL ESSN, quando efetivamente emitida estará automaticamente incluída nesta Garantia, independentemente de qualquer aditamento adicional; e (ii) concordam que todas as referências às Notas constantes do Contrato deverão ser lidas e interpretadas como uma referência conjunta às Notas Originais 2026, às 1ªs Notas Adicionais 2026, às 2ªs Notas Adicionais 2026 e às Novas Notas, bem como todas as referências à Escritura deverão ser lidas e interpretadas como uma referência conjunta à

6

Purchase Agreement, as the case may be, in all cases subject to the terms of the Intercreditor Agreement.

2.2 Additionally, due to the updating of the Secured Obligations, the Parties agree that the amounts resulting from the foreclosure of the Collateral shall be destined to the proportional payment of the Secured Obligations, in such a way that Clause 3.1 shall be in effect with the following wording:

"*3.1. In all cases subject to the Intercreditor Agreement, in the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture and the Intercreditor Agreement, shall be entitled, without prejudice to any other security granted and provided under the Offering, to exercise all powers related to the Revolving Spare Parts and the fiduciary assignment created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Revolving Spare Parts (provided that, Exclusively in the case of extrajudicial sale, provided that according to the highest value between (a) at least fifty percent (50%) of the Market Value of the Revolving Spare Parts, as updated under the Clause 1.6.1 above and (b) any other price, terms and market conditions at the time of disposal); and to give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the proportional payment of*

Escritura e aos Contratos de Compra de Notas, conforme o caso, em todos os casos sujeito aos termos do Contrato entre Credores.

2.2. Adicionalmente, em razão da atualização das Obrigações Garantidas, as Partes consignam que as verbas resultantes da excussão da Garantia serão destinadas para o pagamento proporcional das Obrigações Garantidas, de modo que a Cláusula 3.1. passa a viger com a seguinte redação:

"*3.1. Em todos os casos sujeito aos termos do Contrato entre Credores, caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo Trustee, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo Trustee, em observância à Escritura e ao Contrato entre Credores, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos das Oferta, para exercer todos os poderes relativos à Peças de Reposição Rotativas e à alienação fiduciária constituída nes*te *Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, das Peças de Reposição Rotativas (observado que, exclusivamente no caso de venda extrajudicial, desde que de acordo com o maior valor entre (a) ao menos 50% (cinquenta por cento) do Valor de Mercado das Peças de Reposição Rotativas, conforme atualizado nos termos da Cláusula 1.6.1 acima e (b) qualquer outro preço, termos e condições de mercado no momento da alienação); e para dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso*

7

*the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Revolving Spare Parts, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture and the Intercreditor Agreement.".*

*prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento proporcional das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação das Peças de Reposição Rotativas, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura e do Contrato entre Credores.".*

## III.   MISCELLANEOUS

3.1.   <u>Registration of this Amendment</u>. The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located.

3.2.   <u>Representations and Warranties</u>. The Company hereby represents and warrants that:

(a) has full powers, authorization and capacity to enter into this Amendment and comply with its contractual obligations;

(b) has taken all necessary measures to authorize the execution and performance of this Amendment;

(c) this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(d) the execution of this Amendment and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation

## III.   DISPOSIÇÕES GERAIS

3.1.   <u>Registro do Presente Aditamento</u>. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro de que o presente Aditamento foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes.

3.2.   <u>Declarações e Garantias</u>. A Companhia neste ato declara e garante que:

(a) possui plenos poderes, autorização e capacidade de firmar o presente Aditamento e cumprir com suas obrigações contratuais;

(b) tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditamento;

(c) o presente Aditamento constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d) a celebração do presente Aditamento e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual

8

previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Revolving Spare Parts;

(e) all other representations and warrants provided by the Company in the Agreement are valid and correct as of this date.

3.3 <u>Other Terms and Conditions</u>. All the terms and conditions of the Agreement not expressly changed or modified by this Amendment are hereby and on the date hereof fully ratified by the Parties and shall remain in full force and effect, as provided for in the Agreement.

3.4 <u>Governing Law</u>. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.5 <u>Dispute Resolution</u>. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

3.6. <u>Language</u>. This Amendment is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

3.7. <u>Electronic Signature</u>. This Amendment is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties

ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Alienação Fiduciária das Peças de Reposição Rotativas;

(e) todas as demais declarações e garantias prestadas pela Companhia no Contrato são válidas e verdadeiras nesta data.

3.3. <u>Outros Termos e Condições</u>. Todos os termos e condições do Contrato não expressamente alterados ou modificados por este Aditamento estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato.

3.4. <u>Lei de Regência</u>. O presente Aditamento será regido e interpretado de acordo com as leis do Brasil.

3.5. <u>Solução de Controvérsias</u>. Quaisquer disputas ou controvérsias oriundas do presente Aditamento serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

3.6. <u>Idioma</u>. Este Aditamento é assinado em inglês e em português. Em caso de discrepância, a versão em português irá prevalecer.

3.7. <u>Assinatura Eletrônica</u>. Este Aditamento é celebrado pelas Partes com assinatura eletrônica de acordo com as regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP- Brasil, nos termos da Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das

recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

3.7.1. This Amendment is effective as of the date indicated herein, regardless of one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Amendment in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below

3.7.1. Este Aditamento deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Aditamento num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**IN WITNESS WHEREOF**, the Parties execute this Amendment electronically, in the presence of the two (2) undersigned witnesses.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Aditamento eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, March 2, 2023.

São Paulo, 2 de março de 2023.

(*Signature page of the Fifth Amendment to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A.*)

(*Página de assinaturas do Quinto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A.*)

**GOL LINHAS AÉREAS S.A.**

Name/Nome:

*Title*/Cargo:

Name/Nome:

*Title*/Cargo:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as Brazilian Collateral Agent for the Secured Parties under the 2026 Original Notes**

Name/Nome:

*Title*/Cargo:

Name/Nome:

*Title*/Cargo:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as New Notes Collateral Agent for the Secured Parties under the New Notes**

Name/Nome:

*Title*/Cargo:

Name/Nome:

*Title*/Cargo:

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

Name/Nome:

*Title*/Cargo:

Name/Nome:

*Title*/Cargo:

**WITNESSES/TESTEMUNHAS**

_____    _____

Name/Nome:                          Name/Nome:

Tax ID/CPF:                         Tax ID/CPF:

ID/RG:                              ID/RG:

EXHIBIT A to the Fifth Amendment to the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A.

ANEXO A ao Quinto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Rotativas celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A.

## EXHIBIT I

## ANEXO I

DESCRIPTION OF SECURED OBLIGATIONS

DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS

### GOL FINANCE NOTES

### NOTAS GOL FINANCE

Principal Amount: USD 150,000,000.00 (one hundred and fifty million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: US$ 150.000.000,00 (cento e cinquenta milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: June 30, 2026;

Data de Vencimento: 30 de junho de 2026;

Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura;

Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes;

Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas;

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais (Additional Amounts) e (ii) Compensações e Indenizações (*Compensation and Indemnity*), conforme previstos na Escritura.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE NOTES**

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO ÀS NOTAS GOL FINANCE**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Default interest: 1.00% (once percent) per month;

Juros de Mora: 1,00% (um por cento) ao mês;

Penalty Clause: 10.00% (ten percent);

Cláusula Penal: 10,00% (dez por cento);

Inflation Adjustment Index: Not applicable;

Índice de Atualização Monetária: Não aplicável;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man- hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

### GOL FINANCE SENIOR SECURED NOTE

### NOTA SÊNIOR GARANTIDA GOL FINANCE

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: March 2, 2028

Data de Vencimento: 2 de março de 2028;

Interest Rate: 18.00% (eighteen per cent) per year, calculated and paid in accordance with GOL SSN;

Taxa de Juros: 18,00% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL SSN;

Default interest: as provided for in GOL SSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL SSN;

Juros de Mora: conforme previsto na GOL SSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN;

Penalty Clause: not applicable

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL SSN.

Demais Comissões e Encargos: (i) Montantes Adicionais (*Additional Amounts*) e (ii) Compensações e Indenizações (*Compensation and Indemnity*), conforme previstos na GOL SSN.

### GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE

### NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: até US$ 11.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: March 2, 2028

Data de Vencimento: 2 de março, 2028;

Interest Rate: 18% (eighteen per cent) per year, calculated and paid in accordance with GOL ESSN;

Taxa de Juros: 18% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL ESSN;

Default interest: as provided for in GOL ESSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL ESSN;

Juros de Mora: conforme previsto na GOL ESSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN;

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL ESSN.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na GOL ESSN.

15

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE SENIOR SECURED NOTE AND TO THE GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE**

Amount: USD 10,000.00 (ten Thousand U.S. dollars) set-up fee and USD 12,000.00 (twelve thousand U.S. Dollars) per annum;

Payment Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (one percent) per month;
Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

---

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO À NOTA SÊNIOR GARANTIDA GOL FINANCE E À NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE**

Valor: taxa de contratação de US$ 10.000,00 (dez mil dólares Norte-Americanos) e US$ 12.000,00 (doze mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

16

**<u>ANNEX F</u>**

**FIFTH AMENDMENT TO THE NON-REVOLVING AIRCRAFT SPARE PARTS FIDUCIARY ASSIGNMENT AGREEMENT**

By this private instrument, the parties hereto:

**(a)    GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46- 48/0-P, Zip Code 20021-340, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "Company");

**(b)    TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, Brazil, at Avenida Marcos Penteado de Ulhoa Rodrigues, No 939, 10th Floor, Room 03, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, herein represented by its undersigned legal representatives, acting on behalf of and for the benefit of the Secured Parties (as defined in the Intercreditor Agreement) (hereinafter referred to as "Brazilian Collateral Agent");

and, as intervening and consenting party,

**(c)    GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo, Zip Code 04626-020, enrolled with the CNPJ under No 06.164.253/0001-87, herein

**QUINTO ADITAMENTO AO INSTRUMENTO PARTICULAR DE ALIENAÇÃO FIDUCIÁRIA DE PEÇAS AERONÁUTICAS DE REPOSIÇÃO NÃO-ROTATIVAS**

Pelo presente instrumento particular, as partes:

**(a)    GOL LINHAS AÉREAS S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados ("Companhia");

**(b) TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, Brasil, na Avenida Marcos Penteado de Ulhoa Rodrigues, nº 939, 10º andar, Sala 03, Edifício Jacarandá, CEP 06460-040, inscrita no CNPJ sob o n° 23.103.490/0001-57, neste ato representada por seus representantes legais abaixo assinados, agindo em nome e em benefício das Partes Garantidas (conforme definido no Contrato entre Credores) ("Agente de Garantia Brasileiro");

e, como interveniente anuente,

**(c)    GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no CNPJ sob o n° 06.164.253/0001- 87, neste ato representada por seus representantes

represented by its undersigned legal representatives ("GLAI", jointly with the Company, the "Guarantors").

**WHEREAS:**

(i)    GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued 8.00% Senior Secured Notes due 2026 ("2026 Original Notes"), pursuant to an indenture entered into by Gol Finance, the Brazilian Collateral Agent and the Trustee on December 23, 2020 ("Indenture") and as described in the private placement memorandum related to the 2026 Original Notes offering ("2020 Offering");

(ii) on December 23, 2020, the Company, the Brazilian Collateral Agent and GLAI entered into a Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement ("Agreement"), pursuant to which the Company fiduciarily assigned all the Non-Revolving Spare Parts (as defined in the Agreement), on a fiduciary basis, to the Secured Parties, as collateral for the Secured Obligations ("Collateral");

(iii) on April 28, 2021, the Parties entered into a First Amendment to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, pursuant to which the Parties agreed to amend the Agreement for the purposes of (i) amending the list of the Non-Revolving Spare Parts and the list of Locations (as defined in the Agreement) fiduciarily assigned, pursuant to Clause 1.5 of the Agreement; and (ii) ratifying Clause 1.6.1 of the Agreement in order to reflect the provisions set forth in the Indenture;

legais abaixo assinados ("GLAI", juntamente com a Companhia, as "Garantidoras").

**CONSIDERANDO QUE:**

(i)    a GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 17, Boulevard Raiffeisen, L-2411, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu títulos de dívida sênior com juros de 8,00% e vencimento em 2026 ("Notas Originais 2026"), nos termos e condições previstos na escritura, celebrada entre a Gol Finance, o Agente de Garantia Brasileiro e o *Trustee* em 23 de dezembro de 2020 ("Escritura") e no memorando privado de colocação relacionado à oferta das Notas Originais 2026 ("Oferta 2020");

(ii) em 23 de dezembro de 2020, a Companhia, o Agente de Garantia Brasileiro e a GLAI celebraram o Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas ("Contrato"), por meio do qual a Companhia alienou fiduciariamente todas as Peças de Reposição Não-Rotativas (conforme definido no Contrato), em base fiduciária, às Partes Garantidas, como garantia das Obrigações Garantidas ("Garantia");

(iii) em 28 de abril de 2021, as Partes celebraram o Primeiro Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas, por meio do qual concordaram em aditar o Contrato com o objetivo de (i) alterar a lista de Peças de Reposição Não-Rotativas e a lista de Localidades (conforme definido no Contrato) alienadas fiduciariamente, nos termos da Cláusula 1.5 do Contrato; e (ii) retificar a Cláusula 1.6.1 do Contrato a fim de refletir o disposto na Escritura;

2

(iv) on May 6, 2021, Gol Finance issued an additional US$300,000,000.00 of 2026 Notes, under the Indenture (the "1st 2026 Additional Notes"), and as described in the offering memorandum related to the 2026.1 Additional Notes offering ("1st 2021 Offering"), fungible with the 2026 Original Notes;

(v) on May 6, 2021, the Parties entered into the second amendment to the Agreement, in order to update the description of the Secured Obligations, in order to secure the 1st 2026 Additional Notes;

(vi) on September 22, 2021, the Parties entered into a Third Amendment to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, pursuant to which the Parties agreed to amend the Agreement for the purposes of amending the list of Non-Revolving Spare Parts and the list of Locations (as defined in the Agreement) delivered on a fiduciary basis, as well as list of Locations and the Market Value of the Non-Revolving Spare Parts fiduciarily assigned, based on the Appraisal Report issued by the Independent Appraiser, pursuant to Clause 1.6.1. of the Fiduciary Assignment Agreement;

(vii) on September 23, 2021, Gol Finance issued an additional US$ 150,000,000.00 of 2026 Notes, under the Indenture (the "2nd 2026 Additional Notes", and together with the Original Notes and 1st 2026 Additional Notes, the "Notes") and as described in the offering memorandum related to the 2nd 2026 Additional Notes offering ("2nd 2021 Offering" and, together with the 2020 Offering and the 1st 2021 Additional Offering, each hereinafter referred to as "Offering"), fungible with the 2026 Original Notes;

(viii) the Brazilian Collateral Agent was duly appointed by the Notes holders and the other secured parties described in the Indenture as a

(iv) em 6 de maio de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 300.000.000,00, nos termos da Escritura (as "1ªs Notas Adicionais 2026"), e do memorando da oferta relacionado à oferta das Notas Adicionais 2026.1 ("1ª Oferta 2021"), fungíveis com as Notas Originais 2026;

(v) em 6 de maio de 2021, as Partes celebraram o segundo aditamento ao Contrato, com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 1ªs Notas Adicionais 2026;

(vi) em 22 de setembro de 2021, as Partes celebraram o Terceiro Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas, por meio do qual concordaram em aditar o Contrato com o objetivo de alterar a lista de Peças de Reposição Não Rotativas, e a Lista de Localidades (conforme definido no Contrato) entregue em base fiduciária, bem como a lista de Localidades e o Valor de Mercado das Peças de Reposição Não Rotativas alienadas fiduciariamente, de acordo com o Relatório de Avaliação preparado pelo Avaliador Independente, nos termos da Cláusula 1.6.1. do Contrato de Alienação Fiduciária;

(vii) em 23 de setembro de 2021, a Gol Finance emitiu Notas Originais 2026 adicionais no valor de US$ 150.000.000,00, nos termos da Escritura (as "2ªs Notas Adicionais 2026", e em conjunto com as Notas Originais e as 1ªs Notas Adicionais 2026, as "Notas") e do memorando da oferta relacionado à oferta das 2ª Notas Adicionais 2026 ("2ª Oferta 2021" e, em conjunto com a Oferta 2020 e a 1ª Oferta Adicional 2021, cada uma doravante designada como "Oferta"), fungíveis com as Notas Originais 2026;

(viii) o Agente de Garantia Brasileiro foi devidamente nomeado pelos titulares das Notas e pelas outras partes garantidas descritas nas

3

collateral agent in Brazil under the terms of the Indenture to perform acts on behalf of and for the benefit of the Secured Parties in connection with the collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Indenture, in accordance, exclusively and strictly, with instructions provided by The Bank of New York Mellon ("_Trustee_") and in accordance with the terms provided for in the Indenture, the Agreement and this Amendment;

(ix)  on September 23, 2021, the Parties entered into a Fourth Amendment to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, pursuant to which the Parties agreed to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the 2nd 2026 Additional Notes;

(x)    on March 2, 2023, GOL Finance issued 18.00% senior secured note, in an aggregate principal amount of up to US$ 1,430,925,000.00 due 2028 ("_GOL SSN_"), pursuant to a note purchase agreement (the "_GOL SSN NPA_") with, among others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "_GOL SSN Collateral Agent_");

(xi) GOL Equity Finance, a public limited liability company (societé anonyme) incorporated and existing under the laws of the Grand Duchy of Luxembourg ("_Luxembourg_"), having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 224920 ("_Gol Equity Finance_") will issue 18.00% senior secured exchangeable note of aggregate principal amount of up to US$ 1,430,925,000.00 due 2028 ("_GOL ESSN_", jointly with GOL SSN, the "_New Notes_") under the terms of the corporate approval of March 1, 2023, pursuant to a note purchase agreement (the

Escritura como agente de garantia no Brasil nos termos da Escritura, para praticar atos em nome e em benefício das Partes Garantidas com relação à garantia constituída por meio do Contrato e deste Aditamento, conforme permitido pelos termos previstos na Escritura, de acordo, exclusiva e estritamente, com instruções fornecidas pelo The Bank of New York Mellon ("_Trustee_") e de acordo com os termos previstos na Escritura, Contrato e deste Aditamento;

(ix) em 23 de setembro de 2021, as Partes celebraram Quarto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas, por meio do qual concordaram em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as 2ªs Notas Adicionais 2026;

(x) em 2 de março de 2023, a GOL Finance emitiu uma nota sênior garantida com valor principal agregado de até US$ 1.430.925.000,00 e juros de 18,00%, com vencimento em 2028 ("_GOL SSN_"), de acordo com um contrato de compra de notas (o "_GOL SSN NPA_") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "_Agente de Garantia GOL SSN_");

(xi) a GOL Equity Finance, sociedade pública de responsabilidade limitada (societé anonyme), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("_Luxemburgo_"), com sede na 17 Boulevard Raiffeisen, L-2411, Luxemburgo, registrada no Registro Comercial de Luxemburgo (R.S.C. Luxembourg) sob o número B 224920 ("_Gol Equity Finance_") emitirá uma nota sênior garantida permutável com valor principal agregado de até US$ 1.430.925.000,00 e juros de 18,00%, com vencimento em 2028 ("_GOL ESSN_", e, em conjunto com GOL SSN, as "_Novas Notas_"), nos termos da aprovação

"GOL ESSN NPA" and, jointly with the GOL SSN NPA, the "Note Purchase Agreements") with, among others, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent (the "GOL ESSN Collateral Agent" and, jointly with the GOL SSN Collateral Agent, the "New Notes Collateral Agent");

(xi) the New Notes Collateral Agent was duly appointed by the holders of the New Notes and the other secured parties described in the Note Purchase Agreements as a collateral agent in Brazil under the terms of the Note Purchase Agreements to perform acts on behalf of and for the benefit of such secured parties in connection with the collateral provided under the Note Purchase Agreements and related collateral documents, as permitted by the terms set forth in the Note Purchase Agreements, in accordance, exclusively and strictly, with instructions provided by the requisite holders of the New Notes and in accordance with the terms provided for in the Note Purchase Agreements;

(xii) on March 2, 2023, GOL Finance, the Company, GLAI, the Trustee and the Brazilian Collateral Agent entered into the First Supplemental Indenture, by means of which the Brazilian Collateral Agent was directed by the Trustee to execute and deliver this Amendment;

(xiii) on March 2, 2023, GOL Finance, Gol Equity Finance, the Company, GLAI, the Trustee, the Brazilian Collateral Agent and the New Notes Collateral Agent entered into an Intercreditor Agreement (the "Intercreditor Agreement"), by means of which the Brazilian Collateral Agent was duly appointed by the Trustee and the New Notes Collateral Agent as a collateral agent in Brazil under the terms of the Intercreditor Agreement to perform acts on behalf of and for the benefit of the secured

societária de 1º de março, de acordo com um contrato de compra de notas (o "GOL ESSN NPA" e, juntamente com o GOL SSN NPA, o "Contratos de Compra de Notas") com, entre outros, a TMF Brasil Administração e Gestão de Ativos Ltda., como agente de garantia (o "Agente de Garantia GOL ESSN" e, juntamente com o Agente de Garantia GOL SSN, o "Agente de Garantia das Novas Notas");

(xi)    o Agente de Garantia das Novas Notas foi devidamente nomeado pelos titulares das Novas Notas e pelas outras partes garantidas descritas nos Contratos de Compra de Notas como agente de garantia no Brasil, sob os termos do Contrato de Compra de Notas, para praticar atos em nome e em benefício de tais partes garantidas com relação à garantia constituída por meio dos Contratos de Compra de Notas e em relação aos documentos de garantia, conforme permitido pelos termos previstos nos Contratos de Compra de Notas, de acordo, exclusiva e estritamente, com as instruções fornecidas pelos titulares necessários das Notas Novas e de acordo com os termos previstos nos Contratos de Compra de Notas;

(xii) em 2 de março de 2023, a GOL Finance, a Companhia, a GLAI, o *Trustee* e o Agente de garantia Brasileiro celebraram o Primeiro Suplemento à Escritura, por meio do qual o Agente de Garantia Brasileiro foi instruído pelo *Trustee* a assinar e entregar este Aditamento;

(xiii) em 2 de março de 2023, a GOL Finance, a Gol Equity Finance, a Companhia, a GLAI, o *Trustee*, o Agente de Garantia Brasileiro e o Agente de Garantia das Novas Notas celebraram um Contrato entre Credores (o "Contrato entre Credores"), por meio do qual o Agente de Garantia Brasileiro foi devidamente nomeado pelo *Trustee* e pelo Agente de Garantia das Novas Notas como agente de garantia no Brasil, sob os termos do Contrato entre Credores para realizar atos em nome e em benefício das partes

parties under the Indenture and the Note Purchase Agreements in connection with the collateral provided under the Agreement and this Amendment, as permitted by the terms set forth in the Intercreditor Agreement, in accordance, exclusively and strictly, with instructions of the Trustees (as defined in the Intercreditor Agreement), acting at the direction of and on behalf of the Controlling Secured Parties (as defined in the Intercreditor Agreement), as provided for in the Intercreditor Agreement; and

(xiv) as a result of the foregoing, the Parties hereby agree to amend the Agreement in order to update the description of the Secured Obligations, in order to secure the New Notes.

**NOW, THEREFORE**, the Parties hereby and pursuant to law agree to enter into this "*Fifth Amendment to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement*" ("Amendment"), according to the following clauses:

## I.    DEFINITIONS

1.1. For the purposes of this Amendment, all capitalized words not defined herein have the meaning assigned to them in the Agreement.

## II.    AMENDMENT

2.1. As a consequence of the issuance of the New Notes, the Parties expressly agree that, as of the date hereof and by means of this Amendment, the (i) Exhibit I of the Agreement shall be replaced by Exhibit A hereto, so that the GOL ESSN, when effectively issued, will be automatically included in this Collateral, regardless of any additional amendment; and (ii) all references in the Agreement to the Notes shall be read and understood as references to the 2026 Original Notes, the 1st 2026 Additional Notes, the 2nd 2026 Additional Notes and the New Notes, collectively, as well as all references to

garantidas sob a Escritura e os Contratos de Compra de Notas em conexão com as garantias fornecidas sob o Contrato e este Aditamento, conforme permitido pelos termos estabelecidos no Contrato entre Credores, de acordo, exclusiva e estritamente, com instruções do *Trustee* (conforme definido no Contrato entre Credores), agindo sob a direção e em nome das Partes Garantidas Controladoras (conforme definido no Contrato entre Credores), conforme previsto no Contrato entre Credores; e

(xiv) em razão do exposto acima, as Partes neste ato concordam em aditar o Contrato com o objetivo de atualizar a descrição das Obrigações Garantidas e garantir as Novas Notas.

**RESOLVEM**, as Partes neste ato e na melhor forma de direito, celebrar o presente "*Quinto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas*" ("Aditamento"), que será regido pelas seguintes cláusulas;

## I.    DAS DEFINIÇÕES

1.1. Para fins deste Aditamento, todos os termos iniciados em letras maiúsculas, não definidos neste Aditamento, têm o significado a eles atribuídos no Contrato.

## II.    DO ADITAMENTO

2.1. As Partes, em razão da emissão das Novas Notas, a partir desta data e por meio do presente Aditamento, (i) substituem o Anexo I ao Contrato pelo Anexo A ao presente Aditamento, sendo certo que a GOL ESSN, quando efetivamente emitida estará automaticamente incluída nesta Garantia, independentemente de qualquer aditamento adicional; e (ii) concordam que todas as referências às Notas constantes do Contrato deverão ser lidas e interpretadas como uma referência conjunta às Notas Originais 2026, às 1ªs Notas Adicionais 2026, às 2ªs Notas Adicionais 2026 e às Novas Notas, bem como

6

the Indenture shall be read and construed as a joint reference to the Indenture and the Note Purchase Agreement, as the case may be, in all cases subject to the terms of the Intercreditor Agreement.

2.2 Additionally, due to the updating of the Secured Obligations, the Parties agree that the amounts resulting from the foreclosure of the Collateral shall be destined to the proportional payment of the Secured Obligations, in such a way that Clause 3.1 shall be in effect with the following wording:

"*3.1. In all cases subject to the Intercreditor Agreement, in the event that the early maturity of the Secured Obligations has been declared under the Indenture, provided that the Brazilian Collateral Agent is notified by the Trustee, the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Secured Parties and in accordance with the instructions provided by the Trustee, in compliance with the Indenture and the Intercreditor Agreement, shall be entitled, without prejudice to any other security granted and provided under the Offering, to exercise all powers related to the Non-Revolving Spare Parts and the fiduciary assignment created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Non-Revolving Spare Parts (provided that, exclusively in the case of extrajudicial sale, provided that according to the highest value between (a) at least fifty percent (50%) of the Market Value of the Non-Revolving Spare Parts, as updated under the Clause 1.6.1 above and (b) any other price, terms and market conditions at the time of disposal); and to give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting*

todas as referências à Escritura deverão ser lidas e interpretadas como uma referência conjunta à Escritura e aos Contratos de Compra de Notas, conforme o caso, em todos os casos sujeito aos termos do Contrato entre Credores.

2.2. Adicionalmente, em razão da atualização das Obrigações Garantidas, as Partes consignam que as verbas resultantes da excussão da Garantia serão destinadas para o pagamento proporcional das Obrigações Garantidas, de modo que a Cláusula 3.1. passa a viger com a seguinte redação:

"*3.1. Em todos os casos sujeito aos termos do Contrato entre Credores, caso o vencimento antecipado das Obrigações Garantidas tenha sido declarado, nos termos da Escritura, contanto que o Agente de Garantia Brasileiro seja notificado pelo Trustee, o Agente de Garantia Brasileiro, agindo em nome e benefício das Partes Garantidas e de acordo com as instruções fornecidas pelo Trustee, em observância à Escritura e ao Contrato entre Credores, terá o direito de, sem prejuízo de qualquer outra garantia outorgada e prestada nos termos da Oferta, para exercer todos os poderes relativos às Peças de Reposição Não-Rotativas e à alienação fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, das Peças de Reposição Não-Rotativas (observado que, exclusivamente no caso de venda extrajudicial, desde que de acordo com o maior valor entre (a) ao menos 50% (cinquenta por cento) do Valor de Mercado das Peças de Reposição Não-Rotativas, conforme atualizado nos termos da Cláusula 1.6.1 acima e (b) qualquer outro preço, termos e condições de mercado no momento da alienação); e para dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública,*

*from such measures shall be used by the Brazilian Collateral Agent for the proportional payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Non-Revolving Spare Parts, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of the Indenture and the Intercreditor Agreement.".*

## III.   MISCELLANEOUS

3.1.   <u>Registration of this Amendment</u>. The Company undertakes, within twenty (20) days from the date of signature, to submit evidence to the Brazilian Collateral Agent that this Amendment has been duly registered with the Registry Office of Deeds and Documents of the cities where the headquarters of each Party is located.

3.2.   <u>Representations and Warranties</u>. The Company hereby represents and warrants that:

(a) has full powers, authorization and capacity to enter into this Amendment and comply with its contractual obligations;

(b) has taken all necessary measures to authorize the execution and performance of this Amendment;

(c) this Amendment constitutes a legal, valid and enforceable obligation against the Company, according to its terms;

(d) the execution of this Amendment and the performance of its obligations do not

*avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento proporcional das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação das Peças de Reposição Não-Rotativas, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições da Escritura e do Contrato entre Credores."*

## III.   DISPOSIÇÕES GERAIS

3.1.   <u>Registro do Presente Aditamento</u>. A Companhia compromete-se, dentro de 20 (vinte) dias a contar da data de assinatura, apresentar evidências ao Agente de Garantia Brasileiro de que o presente Aditamento foi devidamente registrado no Cartório de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes.

3.2.   <u>Declarações e Garantias</u>. A Companhia neste ato declara e garante que:

(a) possui plenos poderes, autorização e capacidade de firmar o presente Aditamento e cumprir com suas obrigações contratuais;

(b) tomou todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Aditamento;

(c) o presente Aditamento constitui uma obrigação legal, válida e exequível contra a Companhia, de acordo com seus termos;

(d) a celebração do presente Aditamento e o cumprimento de suas obrigações não

8

infringe, violate, conflict with or constitute a default under (i) any legal or contractual provision or any obligation previously undertaken by the Company, (ii) any applicable law, (iii) any policy or rule of the Company, (iv) the Company's organizational acts, and do not give rise to or impose any encumbrance on its assets, except for the Fiduciary Transfer of the Non-Revolving Spare Parts;

(e) all other representations and warrants provided by the Company in the Agreement are valid and correct as of this date.

3.3 Other Terms and Conditions. All the terms and conditions of the Agreement not expressly changed or modified by this Amendment are hereby and on the date hereof fully ratified by the Parties and shall remain in full force and effect, as provided for in the Agreement.

3.4 Governing Law. This Amendment shall be governed by and construed in accordance with the laws of Brazil.

3.5 Dispute Resolution. The parties elect the district court of the City of São Paulo, State of São Paulo as competent court to settle any disputes or controversies arising out of this Agreement and to enforce the obligations established herein.

3.6. Language. This Amendment is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

3.7. Electronic Signature. This Amendment is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de*

infringem, violam, conflitam com, ou constituem um inadimplemento sob (i) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (ii) qualquer lei aplicável, (iii) qualquer política ou regra da Companhia, (iv) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Alienação Fiduciária das Peças de Reposição Não-Rotativas;

(e) todas as demais declarações e garantias prestadas pela Companhia no Contrato são válidas e verdadeiras nesta data.

3.3. Outros Termos e Condições. Todos os termos e condições do Contrato não expressamente alterados ou modificados por este Aditamento estão, através deste e na presente data, integralmente ratificados pelas Partes e deverão permanecer em pleno vigor e efeito conforme previsto no Contrato.

3.4. Lei de Regência. O presente Aditamento será regido e interpretado de acordo com as leis do Brasil.

3.5. Solução de Controvérsias. Quaisquer disputas ou controvérsias oriundas do presente Aditamento serão dirimidas pelo foro da cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

3.6. Idioma. Este Aditamento é assinado em inglês e em português. Em caso de discrepância, a versão em português irá prevalecer.

3.7. Assinatura Eletrônica. Este Aditamento é celebrado pelas Partes com assinatura eletrônica de acordo com as regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP- Brasil, nos termos da Medida Provisória Nº

9

*Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos fins legais.

3.7.1.  This Amendment is effective as of the date indicated herein, regardless of one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Amendment in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below

3.7.1.  Este Aditamento deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Aditamento num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**IN WITNESS WHEREOF**, the Parties execute this Amendment electronically, in the presence of the two (2) undersigned witnesses.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Aditamento eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, March 2, 2023.

São Paulo, 2 de março de 2023.

10

*(Signature page of the Fifth Amendment to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A.)*

*(Página de assinaturas do Quinto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A.)*

**GOL LINHAS AÉREAS S.A.**

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| *Title*/Cargo: | *Title*/Cargo: |

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as Brazilian Collateral Agent for the Secured Parties under the 2026 Original Notes**

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| *Title*/Cargo: | *Title*/Cargo: |

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as New Notes Collateral Agent for the Secured Parties under the New Notes**

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| *Title*/Cargo: | *Title*/Cargo: |

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| *Title*/Cargo: | *Title*/Cargo: |

11

**WITNESSES/TESTEMUNHAS**

| | |
|---|---|
| Name/Nome: | Name/Nome: |
| Tax ID/CPF: | Tax ID/CPF: |
| ID/RG: | ID/RG: |

EXHIBIT A to the Fifth Amendment to the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A.

ANEXO A ao Quinto Aditamento ao Instrumento Particular de Alienação Fiduciária de Peças Aeronáuticas de Reposição Não-Rotativas celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A.

### EXHIBIT I

### DESCRIPTION OF SECURED OBLIGATIONS

### ANEXO I

### DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS

#### GOL FINANCE NOTES

#### NOTAS GOL FINANCE

Principal Amount: USD 150,000,000.00 (one hundred and fifty million U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: US$ 150.000.000,00 (cento e cinquenta milhões de dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: June 30, 2026;

Data de Vencimento: 30 de junho de 2026;

Interest Rate: 8.00% (eight per cent) per year, calculated and paid in accordance with the Indenture;

Taxa de Juros: 8,00% (oito por cento) ao ano, calculados e pagos nos termos da Escritura;

Default interest: as provided for in the Indenture, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest applicable do the Notes;

Juros de Mora: conforme previsto na Escritura, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável às Notas;

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in the Indenture.

Demais Comissões e Encargos: (i) Montantes Adicionais (Additional Amounts) e (ii) Compensações e Indenizações (*Compensation and Indemnity*), conforme previstos na Escritura.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE NOTES**

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO ÀS NOTAS GOL FINANCE**

Amount: USD 18,000.00 (eighteen Thousand U.S. dollars) set-up fee and USD 25,000.00 (twenty five thousand U.S. Dollars) per annum;

Valor: taxa de contratação de US$ 18.000,00 (dezoito mil dólares Norte-Americanos) e US$ 25.000,00 (vinte e cinco mil dólares Norte-Americanos) por ano;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Default interest: 1.00% (once percent) per month;

Juros de Mora: 1,00% (um por cento) ao mês;

Penalty Clause: 10.00% (ten percent);

Cláusula Penal: 10,00% (dez por cento);

Inflation Adjustment Index: Not applicable;

Índice de Atualização Monetária: Não aplicável;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man- hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

### GOL FINANCE SENIOR SECURED NOTE

### NOTA SÊNIOR GARANTIDA GOL FINANCE

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: March 2, 2028;

Data de Vencimento: 2 de março de 2028;

14

Interest Rate: 18.00% (eighteen per cent) per year, calculated and paid in accordance with GOL SSN;

Default interest: as provided for in GOL SSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL SSN;

Penalty Clause: not applicable;

Inflation Adjustment Index: not applicable;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL SSN.

Taxa de Juros: 18,00% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL SSN;

Juros de Mora: conforme previsto na GOL SSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN;

Cláusula Penal: não aplicável;

Índice de Atualização Monetária: não aplicável;

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na GOL SSN.

## GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE

## NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: March 2, 2028;

Data de Vencimento: 2 de março, 2028;

Interest Rate: 18% (eighteen per cent) per year, calculated and paid in accordance with GOL ESSN;

Taxa de Juros: 18% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL ESSN;

Default interest: as provided for in GOL ESSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL ESSN;

Juros de Mora: conforme previsto na GOL ESSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN;

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

15

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL ESSN.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na GOL ESSN.

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT IN RELATION TO THE GOL FINANCE SENIOR SECURED NOTE AND TO THE GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE**

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO EM RELAÇÃO À NOTA SÊNIOR GARANTIDA GOL FINANCE E À NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE**

Amount: USD 10,000.00 (ten Thousand U.S. dollars) set-up fee and USD 12,000.00 (twelve thousand U.S. Dollars) per annum;

Valor: taxa de contratação de US$ 10.000,00 (dez mil dólares Norte-Americanos) e US$ 12.000,00 (doze mil dólares Norte-Americanos) por ano;

Payment Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Default interest: 1.00% (one percent) per month;
Penalty Clause: 10.00% (ten percent);

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Inflation Adjustment Index: Not applicable;

Índice de Atualização Monetária: Não aplicável;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

**ANNEX G**

INTERCREDITOR AGREEMENT

dated as of March 2, 2023

among

**GOL FINANCE**
as Senior Secured Notes Issuer

**GOL FINANCE**
as Additional Issuer

**GOL LINHAS AÉREAS S.A.**
as a Guarantor

**GOL LINHAS AÉREAS INTELIGENTES S.A.**
as a Guarantor

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**
as Collateral Agent

**THE BANK OF NEW YORK MELLON**
as Trustee under the Senior Secured Notes Indenture

and

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**
as Collateral Agent under the SSN Note Purchase Agreement

# TABLE OF CONTENTS

PAGE

## ARTICLE I

### DEFINITIONS

SECTION 1.01.   Certain Defined Terms; Construction ................................................................. 1

## ARTICLE II

### PRIORITIES AND AGREEMENTS WITH RESPECT TO THE COLLATERAL

SECTION 2.01.   Priority of Claims ............................................................................ 8
SECTION 2.02.   Actions With Respect to the Collateral; Prohibition on Contesting Liens ....... 10
SECTION 2.03.   No Interference; Payment Over ................................................................. 10
SECTION 2.04.   Release of Collateral ........................................................................... 11
SECTION 2.05.   Certain Agreements With Respect to any Event of Insolvency or
Liquidation ......................................................................................... 12
SECTION 2.06.   Reinstatement ...................................................................................... 12
SECTION 2.07.   Insurance ............................................................................................. 12
SECTION 2.08.   Refinancings ........................................................................................ 12

## ARTICLE III

### EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

SECTION 3.01.   Determination of Existence or Amount of Liens and Obligations .................. 12

## ARTICLE IV

### THE COLLATERAL AGENT

SECTION 4.01.   Appointment and Authority .................................................................... 13
SECTION 4.02.   Rights as a Secured Party ....................................................................... 14
SECTION 4.03.   Exculpatory Provisions .......................................................................... 14
SECTION 4.04.   Reliance by Collateral Agent .................................................................. 16
SECTION 4.05.   Delegation of Duties .............................................................................. 16
SECTION 4.06.   Resignation of Collateral Agent .............................................................. 16
SECTION 4.07.   Non-Reliance on Collateral Agent ........................................................... 17
SECTION 4.08.   Collateral and Guaranty Matters ............................................................. 17

## ARTICLE V

## MISCELLANEOUS

SECTION 5.01.  Notices .................................................................................................... 17
SECTION 5.02.  Waivers; Amendment ............................................................................... 19
SECTION 5.03.  Parties in Interest ..................................................................................... 19
SECTION 5.04.  Effectiveness; Survival of Agreement .................................................... 19
SECTION 5.05.  Counterparts ............................................................................................. 19
SECTION 5.06.  Severability ............................................................................................... 19
SECTION 5.07.  Governing Law ......................................................................................... 19
SECTION 5.08.  Submission To Jurisdiction; Waivers .................................................... 20
SECTION 5.09.  WAIVER OF JURY TRIAL .................................................................. 20
SECTION 5.10.  Headings .................................................................................................... 21
SECTION 5.11.  Conflicts .................................................................................................... 21
SECTION 5.12.  Relative Rights ......................................................................................... 21
SECTION 5.13.  Integration ................................................................................................ 21
SECTION 5.14.  Further Assurances .................................................................................. 21
SECTION 5.15.  Concerning the Trustee ........................................................................... 21
SECTION 5.16.  Preservation and Protection of the Collateral ..................................... 21

THIS INTERCREDITOR AGREEMENT (as amended or supplemented from time to time, this "**Agreement**") dated as of March 2, 2023, among:

(1)     GOL FINANCE, a public limited liability company (*société anonyme*) organized and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 (the "**Senior Secured Notes Issuer**");

(2)     GOL FINANCE, as additional issuer (the "**Additional Issuer**");

(3)     GOL LINHAS AÉREAS S.A., a corporation (*sociedade por ações*) organized under the laws of Brazil ("**GLA**" and a "**Guarantor**");

(4)     GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**" and together with GLA, the "**Guarantors**");

(5)     TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent for the Secured Parties (as defined below) (in such capacity and together with its successors, the "**Collateral Agent**");

(6)     THE BANK OF NEW YORK MELLON, in its capacity as Trustee under the Senior Secured Notes Indenture (in such capacity and including any successors and assigns under the Senior Secured Notes Indenture, the "**Senior Secured Notes Trustee**"); and

(7)     TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., in its capacity as collateral agent under a senior secured note purchase agreement, dated as of the date of this Agreement regarding certain senior secured notes due 2028 issued by the Additional Issuer (the "**SSN Note Purchase Agreement**") (in such capacity and including any successors and assigns thereunder, an "**Additional Trustee**").

**WHEREAS**:

(A)     The Senior Secured Notes Issuer and the Senior Secured Notes Trustee have, *inter alios*, entered into the Senior Secured Notes Indenture;

(B)     The Additional Issuer and the Additional Trustee party hereto have, *inter alios*, entered into the SSN Note Purchase Agreement to which they are parties; and

(C)     The parties are entering into this Agreement for the purposes of, among other things, setting forth the method of voting and decision making for the Secured Parties and ensuring that the holders of the Senior Secured Notes and the holders of the Additional Pari Passu Obligations receive the benefit of equal and ratable security as contemplated pursuant to the terms and conditions of the Indentures and the Collateral Documents.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

# ARTICLE I

## DEFINITIONS

SECTION 1.01.     **Certain Defined Terms; Construction**.

(a)     As used in this Agreement (including the recitals), the following terms have the meanings specified below:

"**Additional Issuer**" means (i) the "Additional Issuer" identified in the introductory paragraph of this Agreement and (ii) any other issuer or borrower of Additional Pari Passu Obligations.

"**Additional Pari Passu Obligations**" means (i) any senior secured notes issued by the Additional Issuer identified in the introductory paragraph hereof on the date hereof or subsequently as additional notes under the same series and guaranteed by the Guarantors and secured by all or a portion of the Collateral and (ii) any other Additional Pari Passu Obligations as defined in the Senior Secured Notes Indenture.

"**Additional Trustee**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Agents**" means any Registrar, Transfer Agent or Paying Agent appointed pursuant to the Indentures, individually, an "Agent."

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazilian Bankruptcy Code**" means Law No. 11,101, of February 9, 2005, as amended.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, the United States of America or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, São Paulo, Brazil, or Luxembourg.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Collateral**" means the assets and properties of the Guarantors upon which Liens have been granted to the Collateral Agent, and/or the Secured Parties represented by the Collateral Agent, to secure the Pari Passu Obligations, including without limitation all of the "Collateral" as defined in the Collateral Documents, but excluding all such assets and properties that may, from time to time, be released from such Liens pursuant to and in accordance herewith, with the Indentures and/or with the applicable Collateral Document.

"**Collateral Agent**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Collateral Documents**" has the meaning assigned to such term in the Senior Secured Notes Indenture.

"**Controlling Secured Parties**" means:

(i)      from and including the first date on which an Event of Default shall have occurred to but excluding the ninetieth (90th) day following the occurrence thereof, Secured Parties that at such time collectively hold (or represent) more than fifty per cent (50%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class;

(ii)      if the "Controlling Secured Parties" described in clause (i) above have not directed the Collateral Agent to take any Enforcement Action before the ninetieth (90th) day following the occurrence of an Event of Default, then from and including the ninetieth (90th) day following the occurrence of an Event of Default to but excluding the one hundred and twentieth (120th) day following the occurrence thereof, Secured Parties that at such time collectively hold (or represent) more than thirty-five per cent (35%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class; and

(iii)      if neither the "Controlling Secured Parties" described in clause (i) above nor in clause (ii) above have directed the Collateral Agent to take any Enforcement Action before the one hundred and twentieth (120th) day following the occurrence of an Event of Default, then from and including the one hundred and twentieth (120th) day following the occurrence of an Event of Default and at any time thereafter, Secured Parties that at such time collectively hold (or represent) more than twenty-five per cent (25%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class;

**provided** that, notwithstanding clauses (ii) and (iii) above, at any time at which Secured Parties that at such time collectively hold (or represent) more than fifty per cent (50%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the

Collateral, voting as a single class, instruct the Collateral Agent, such Secured Parties shall be the "Controlling Secured Parties".

"**Debtor Relief Laws**" means the Brazilian Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of Brazil or Luxembourg or any other applicable jurisdictions from time to time in effect, as the case may be.

"**Enforcement Action**" means: (a) the taking of any steps (including directing the Collateral Agent through the applicable Trustee) to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral in accordance with any Collateral Document; (b) the exercise of any right of set-off against any of the Issuers or the Guarantors in respect of any Pari Passu Obligation; or (c) the petitioning, applying or voting for, or the taking of any steps (including the appointment of any trustee, liquidator, receiver, administrator or similar officer) in relation to an Event of Insolvency or Liquidation.

"**Event of Default**" means an Event of Default under any Indenture, as applicable.

"**Event of Insolvency or Liquidation**" means any event described in Section 6.01(i), (j) or (k) of the Senior Secured Notes Indenture and any equivalent provisions in the Note Purchase Agreement.

"**GLA**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**GLAI**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Guarantors**" has the meaning assigned to such term in the introductory paragraph of this Agreement and includes any successor obligor under the Note Guaranties pursuant to Section 5.01 and Section 5.03 of the Indenture or equivalent provision of the Note Purchase Agreement.

"**Holder**" means the Person in whose name a note representing Pari Passu Obligations is registered in the Register (as defined in the applicable Indenture) and any other holder or record of any Pari Passu Obligations.

"**Indentures**" means, collectively, the Senior Secured Notes Indenture and the Note Purchase Agreement.

"**Issue Date**" means, with respect to any Pari Passu Obligations, the date of issuance or other incurrence of such Pari Passu Obligations.

"**Issuers**" means, collectively, the Senior Secured Notes Issuer and any Additional Issuer.

"**Lien**" means any mortgage, pledge, security interest, assignment, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof or any agreement to create any mortgage, pledge, security interest, lien, charge, easement or encumbrance of any kind).

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Note Guaranty**" means each of the guarantees of the Pari Passu Obligations by any of the Guarantors pursuant to the Indentures.

"**Note Purchase Agreement**" means (i) the SSN Note Purchase Agreement, and (ii) any other indenture, credit agreement or similar agreement, in each case under which Additional Pari Passu Obligations are being issued or incurred by the Senior Secured Notes Issuer or an Additional Issuer.

"**Outstanding**" means, when used with respect to Pari Passu Obligations, as of the date of determination, all Pari Passu Obligations theretofore authenticated and delivered under the Indentures, except:

(i)    Pari Passu Obligations theretofore cancelled by the applicable Trustee or delivered to the applicable Trustee for cancellation;

(ii)    Pari Passu Obligations for whose payment or redemption money in the necessary amount has been theretofore deposited with the applicable Trustee or any Paying Agent (other than an Issuer) in trust or set aside and segregated in trust by an Issuer (if such Issuer shall act as its own Paying Agent) for the Holders of the Pari Passu Obligations; **provided** that, if such Pari Passu Obligations are to be redeemed or repaid pursuant to Article 3 of the Senior Secured Notes Indenture or equivalent provision in the Note Purchase Agreement, notice of such redemption has been duly given pursuant to such Indenture or provision therefor satisfactory to the applicable Trustee has been made;

(iii)    Pari Passu Obligations, except to the extent provided in Article 8 of the Senior Secured Notes Indenture or the equivalent provision in the Note Purchase Agreement, with respect to which the applicable Issuer has effected legal defeasance and/or covenant defeasance in accordance with the terms thereunder; and

(iv)    Pari Passu Obligations in exchange for or in lieu of which other Pari Passu Obligations have been authenticated and delivered pursuant to the Indentures, other than any such Pari Passu Obligations in respect of which there shall have been presented to the applicable Trustee proof satisfactory to it that such Pari Passu Obligations are held by a bona fide purchaser or protected purchaser in whose hands such Pari Passu Obligations are valid obligations of the applicable Issuer;

**provided**, however, that in determining whether the Holders of the requisite principal amount of Outstanding Pari Passu Obligations have given any request, demand, authorization, direction, consent, notice or waiver under the Indentures, Pari Passu Obligations owned by an Issuer or any Affiliate of an Issuer shall be disregarded and deemed not to be Outstanding, except that, in determining whether the applicable Trustee shall be protected in

relying upon any such request, demand, authorization, direction, consent, notice or waiver, only Pari Passu Obligations which a Responsible Officer (as defined under the applicable Indenture) of such Trustee has received written notice at its address specified herein of being so owned shall be so disregarded.  Pari Passu Obligations so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the applicable Trustee the pledgee's right so to act with respect to such Pari Passu Obligations and that the pledgee is not an Issuer, or any other obligor upon the Pari Passu Obligations or any of its or such other obligor's Affiliates.

"**Pari Passu Obligations**" has the meaning assigned to such term in the Senior Secured Notes Indenture.

"**Paying Agent**" means any Person authorized by the Issuers to pay the principal of or interest on any Pari Passu Obligations on behalf of the Issuers under the Indentures, including the Paying Agent in Luxembourg.

"**Person**" means an individual, a corporation, a partnership, limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"**Proceeds**" has the meaning assigned to such term in Section 2.01(a) hereof.

"**Refinance**" means, in respect of any indebtedness, to refinance, extend, renew, defease, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (and/or commitments with respect to such indebtedness), in whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Secured Parties**" has the meaning assigned to such term the Senior Secured Notes Indenture.

"**Senior Secured Notes**" means the 8.00% Senior Secured Notes Due 2026 issued by the Senior Secured Notes Issuer on the Issue Date therefor or subsequently as additional notes of the same series and guaranteed by the Guarantors and secured by the Collateral.

"**Senior Secured Notes Indenture**" means the indenture, dated as of the Issue Date therefor, entered into by and among the Senior Secured Notes Issuer, the Guarantors, The Bank of New York Mellon, as trustee, transfer agent, registrar and paying agent, and the Collateral Agent, relating to the Senior Secured Notes.

"**Senior Secured Notes Issuer**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Senior Secured Notes Obligations**" means the "Notes Obligations" as defined in the Senior Secured Notes Indenture.

"**Senior Secured Notes Trustee**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Significant Subsidiary**" has the meaning given to such term in the Senior Secured Notes Indenture.

"**Subsidiary**" has the meaning given to such term in the Senior Secured Notes Indenture.

"**Transfer Agent**" has the meaning given to such term in the Senior Secured Notes Indenture or the Note Purchase Agreement, as applicable.

"**Trustee**" means (i) the Senior Secured Notes Trustee and (ii) any Additional Trustee. References to "Trustee" in this Agreement shall mean the Trustee under each of the Indentures, unless the context requires otherwise.

(b)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

With respect to the Senior Secured Notes Issuer and to the Additional Issuer, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque*, *nantissement*, *gage*, *privilège*, *sûreté réelle*, *droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant*, *associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an a*dministrateur* of its general partner, (v) a receiver, *administrative receiver*, administrator, liquidator or the like includes a *juge délégué*, *commissaire*, *juge-commissaire*, *liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*),

insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally, (vii) a guarantee includes any guarantee which is independent from the debt to which it relates and any suretyship (*cautionnement*) within the meaning of Articles 2011 and seq. of the Luxembourg Civil Code, (viii) "gross negligence" is a reference to *faute lourde* and willful misconduct is a reference to *faute dolosive* and (ix) an "agent" includes a *mandataire*.

# ARTICLE II

## PRIORITIES AND AGREEMENTS WITH RESPECT TO THE COLLATERAL

SECTION 2.01.     **Priority of Claims**.

(a)     Notwithstanding anything contained herein or in the Indentures or in any of the Collateral Documents to the contrary, if an Event of Default has occurred and is continuing, and the Collateral Agent, any Trustee or any Secured Party is taking any Enforcement Action, or any distribution is made in respect of the Collateral as a result of any Event of Insolvency or Liquidation, the proceeds of any sale, collection or other liquidation of the Collateral on account of such enforcement of rights by the Collateral Agent, any Trustee or any Secured Party or any such distribution or payment received by the Collateral Agent, on behalf of the Secured Parties, any Trustee or any Secured Party as a result of any Event of Insolvency or Liquidation (all proceeds of any sale, collection or other liquidation of the Collateral and all such distributions or payments being collectively referred to as "**Proceeds**"), to the extent permitted by applicable law shall be applied in the following order as promptly as is reasonably practicable after the receipt thereof; **provided** that, such amounts shall not be so applied until such time as the amount of the Pari Passu Obligations have been determined in accordance with the terms hereof and under the terms of the Indentures and the Collateral Documents:

FIRST, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent, the Trustees and the other Agents under the Indentures and Collateral Documents and any other agent or attorney appointed thereby in their capacities as such (including, costs and expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Agreement, the Indentures or any Collateral Document);

SECOND, on a pro rata basis, to the payment in full to the Secured Parties of all amounts due and unpaid on the Pari Passu Obligations for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Pari Passu Obligations for principal and interest; **provided**, that, the Proceeds shall be applied (i) first, to the Secured Parties for amounts due and payable on the Pari Passu

Obligations for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Pari Passu Obligations for interest and (ii) second, any remaining amounts to the Secured Parties for amounts due and payable on the Pari Passu Obligations for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Pari Passu Obligations;

THIRD, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses, charges, liabilities, indemnities, fees and other amounts due to Collateral Agent, the Trustees, the other Agents and the Secured Parties (other than amounts paid (x) at priority "first" to the Collateral Agent, the Trustees and the other Agents or (y) at priority "second" to the Secured Parties); and

FOURTH, the balance, if any, after all of the Pari Passu Obligations have been paid in full in cash, to the Issuers and their respective successors or assigns, or as a court of competent jurisdiction may otherwise direct;

**provided**, **however**, that the foregoing orders of application above shall not be altered as a result of any Liens under any of the Collateral Documents failing to secure all of the Pari Passu Obligations, and the Secured Parties agree that Proceeds from all sources shall be applied to ensure that the foregoing order of application is maintained.

(b)    It is acknowledged that the Pari Passu Obligations may, subject to the limitations set forth in the Indentures, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priority set forth in Section 2.01(a) or the provisions of this Agreement defining the rights of the Secured Parties.

(c)    Notwithstanding (i) the time, order or method of attachment or perfection of any Liens securing any Pari Passu Obligations granted on the Collateral, the time or order of filing of notices of such Liens, financing statements (or similar filings in any applicable jurisdiction), or the giving of or failure to give notice of the acquisition or expected acquisition of purchase money or other Liens, (ii) the manner in which such Lien is acquired, whether by grant, contract, statute or operation of law, subrogation or otherwise, (iii) the fact that the Collateral or any Lien thereof (or any portion thereof) is otherwise subordinated, voided, avoided, invalidated or lapsed and (iv) any applicable law or any provision to the contrary in any Collateral Document or the Indentures, each of the Collateral Agent and the Trustees agree, for themselves and on behalf of each Secured Party, that (1) each Lien created in favor of a Secured Party in the Collateral pursuant to a Collateral Document ranks and shall rank equally in priority to each other Lien created in favor of a Secured Party, and each Secured Party, has and shall have a pro rata entitlement to the Liens (if any) of the other Secured Parties in the Collateral, (2) any Lien (if any) created in favor of a Secured Party and held by such Secured Party in the Collateral shall be for the equal and ratable benefit of all Secured Parties and (3) subject to any mandatory provisions of any applicable law, the Senior Secured Note Obligations and the Additional Pari Passu Obligations rank and shall rank on a pari passu basis with each other.

SECTION 2.02.    **Actions With Respect to the Collateral; Prohibition on Contesting Liens**.

(a)    The Secured Parties shall vote as a single class by reference to the aggregate principal amount of the then Outstanding Pari Passu Obligations on all matters related to the Collateral, including, but not limited to, enforcement of rights in the Collateral. The Collateral Agent shall refrain from taking any action to exercise any rights hereunder and under the Collateral Documents or otherwise with respect to the Collateral unless it is instructed to do so by the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, in accordance with clause (b) below.

(b)    The Collateral Agent shall act at the direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties.  The Collateral Agent may at any time seek the direction of the Trustees, and the Trustees agree to cooperate fully with the Collateral Agent to provide such direction.

(c)    Notwithstanding any other provision of this Agreement or any of the terms of the Indentures or the Collateral Documents, (a) the Collateral Agent shall act solely at the direction of the Trustees, on behalf of the Controlling Secured Parties, and (b) the Collateral Agent shall not have any duty, liability or responsibility to take any direction from or recognize any notice or other communication from any Secured Party other than the Trustees.

(d)    Notwithstanding the terms of any Indenture or Collateral Document, in no event shall the Collateral Agent have any duty, responsibility or liability with respect to (A) the identity of any Secured Party, (B) any requirements of the Indentures or Collateral Documents regarding voting or otherwise taking action, including voting percentages or entitlement to vote, (C) whether any Pari Passu Obligation is held by the Issuers or any Affiliate of the Issuers or (D) whether any Secured Party should be disregarded for purposes of voting.

(e)    If less than the Controlling Secured Parties have instructed the Collateral Agent, through the Trustees, to take enforcement action pursuant to clause (b) above, then the Collateral Agent shall not take enforcement action unless and until the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, instruct the Collateral Agent in writing to take such action; **provided** that, the Collateral Agent shall not be obligated to take any action that is (i) contrary to applicable law in any applicable jurisdiction; or (ii) based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to the Indentures and the Collateral Documents.

(f)    Each of the Collateral Agent and each Trustee agree, for itself and on behalf of each Secured Party, that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including in any Event of Insolvency or Liquidation), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; **provided** that nothing in this Agreement shall be construed to prevent or impair the rights of any Secured Party, the Collateral Agent or any Trustee to enforce this Agreement.

SECTION 2.03.    **No Interference; Payment Over**.

(a)    Each Trustee, on behalf of itself and the relevant Secured Parties, and each Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or

enforceability of any Pari Passu Obligations or the Indentures or the validity, attachment, perfection or priority of any Lien under the Collateral Documents or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Collateral Agent or any other Secured Party to exercise any right, remedy or power with respect to the Collateral or (B) consent to the exercise by the Collateral Agent or any other Secured Party of any right, remedy or power with respect to the Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Collateral Agent or any other Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to the Collateral, and none of the Collateral Agent, any Trustee or any other Secured Party shall be liable for any action taken or omitted to be taken by the Collateral Agent, such Trustee or such other Secured Party with respect to the Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have the Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; **provided** that nothing in this Agreement shall be construed to prevent or impair the rights of the Collateral Agent, any Trustee or any other Secured Party to enforce this Agreement.

(b)      The Collateral Agent, on behalf of the relevant Secured Parties, agrees that if it shall obtain possession of the Collateral or shall realize any proceeds or payment in respect of the Collateral, pursuant to the Collateral Documents or the Indentures or by the exercise of any rights available to it under applicable law or in any Event of Insolvency or Liquidation or through any other exercise of remedies, at any time prior to the payment in full of each of the Pari Passu Obligations, then it shall hold the Collateral, proceeds or payment for the other Secured Parties and promptly transfer the Collateral, proceeds or payment, as the case may be, to the Trustees, to be distributed in accordance with the provisions of Section 2.01 hereof.

SECTION 2.04.    **Release of Collateral**.

(a)      Subject to the terms of the Indentures, the Collateral Documents and this Agreement, the Collateral shall be released from the Liens securing the Pari Passu Obligations under any one or more of the following circumstances:

(i)      in accordance with the Indentures, the Collateral Documents and this Agreement, if at any time the Collateral Agent forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)      as described in Article 9 of the Senior Secured Notes Indenture;

(iii)      upon the discharge in full of the Pari Passu Obligations;

(iv)     (A) with respect to the Senior Secured Notes Obligations, upon a legal defeasance or covenant defeasance under the Senior Secured Notes Indenture as described in Article 8 of the Senior Secured Notes Indenture and (B) with respect to any Additional Obligations, upon a legal defeasance or covenant defeasance under the Note Purchase Agreement; or

(v)      Except with respect to the Pledged IP and (unless otherwise permitted under the Indentures) with a disposition of Spare Parts, at any time at the election of the Issuers

in each case, so long as (A) no Default or Event of Default will exist immediately after such release and (B) the LTV Ratio immediately after such release will not exceed the Trigger LTV Ratio.

(b)      **provided**, **however**, that, notwithstanding the foregoing, the security interest granted under the Collateral Documents will terminate in respect of any Pari Passu Obligations on the maturity date of such Pari Passu Obligations, unless through passage of time, acceleration or otherwise there exists a due and payable payment obligation on the Pari Passu Obligations on that date, in which case the security interest in the Collateral will terminate upon satisfaction of that payment obligation. As a consequence of the termination, the Collateral shall be automatically released. Each Trustee agrees to execute and deliver (at the sole cost and expense of the Issuers and the Guarantors) all such acknowledgments, consents, confirmations, authorizations and other instruments as shall reasonably be requested by the Collateral Agent to evidence and confirm any release of the Collateral provided for in this Section.

SECTION 2.05.    **Certain Agreements With Respect to any Event of Insolvency or Liquidation**.    This Agreement shall continue in full force and effect notwithstanding the commencement of any Event of Insolvency or Liquidation.

SECTION 2.06.    **Reinstatement**. In the event that any of the Pari Passu Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason, be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all Pari Passu Obligations shall again have been paid in full in cash.

SECTION 2.07.    **Insurance**. The Collateral Agent, acting at the written direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, shall have the right, subject to the rights of the Issuers or the Guarantors under the Indentures, to adjust or settle any insurance policy or claim covering or constituting the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Collateral.

SECTION 2.08.    **Refinancings**.    The Pari Passu Obligations may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit such Refinancing under each applicable

Indenture) of the other Secured Parties, all without affecting the priorities provided for herein or the other provisions hereof.

# ARTICLE III

## EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

SECTION 3.01.    **Determination of Existence or Amount of Liens and Obligations**.  Whenever the Collateral Agent shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to confirm the existence or amount of any Pari Passu Obligations or the Collateral subject to the Liens securing any Pari Passu Obligations, the Collateral Agent shall request that such information be furnished to it in writing by the Trustees or GLAI, as set forth in an Officers' Certificate (as defined in the Senior Secured Notes Indenture), and shall be entitled to make such determination on the basis of the information so furnished; **provided**, **however**, that if the Trustees or GLAI shall fail or refuse reasonably promptly to provide the requested information, the Collateral Agent shall have no liability for refusing to take such action until such information is provided. The Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to GLAI, any Secured Party, or any other Person as a result of such determination.

# ARTICLE IV

## THE COLLATERAL AGENT

SECTION 4.01.    **Appointment and Authority**.

(a)    Each Trustee (pursuant to its respective Indenture) and each other Secured Party (other than the Collateral Agent) hereby irrevocably appoints TMF Brasil Administração e Gestão de Ativos Ltda. to act as Collateral Agent on behalf of the Secured Parties hereunder and under each of the Collateral Documents to which the Collateral Agent is a party and authorizes the Collateral Agent to take actions on its behalf and to exercise the Collateral Agent's powers in accordance with the terms hereof or thereof, including for purposes of acquiring, holding and enforcing any and all Liens on the Collateral to secure any of the Pari Passu Obligations, together with such powers and authority as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Collateral Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement, the Senior Secured Notes Indenture and each of the Collateral Documents. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 4.05 for purposes of holding or enforcing any Lien on the Collateral granted under any of the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, shall be entitled to all the rights, protections, immunities and indemnities granted to it under the Indentures and the Collateral Documents, including without limitation all provisions of this Article IV, Article 12 of the Senior Secured

Notes Indenture, the equivalent provisions in the Note Purchase Agreement and the applicable provisions of the Collateral Documents (as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" under the Collateral Documents) as if set forth in full herein with respect thereto.

(b)    Each Secured Party and the Trustee on behalf of the relevant Secured Parties acknowledges and agrees that the Collateral Agent shall be entitled, for the benefit of the Secured Parties, to sell, transfer or otherwise dispose of or deal with the Collateral as provided herein and in each applicable Collateral Document, without regard to any rights to which any Secured Party would otherwise be entitled. Without limiting the foregoing, each relevant Secured Party agrees that none of the Trustees, the Collateral Agent, the Controlling Secured Parties, or any other Secured Party shall have any duty or obligation first to marshal or realize upon the Collateral securing the Pari Passu Obligations, or to sell, dispose of or otherwise liquidate the Collateral, in any manner that would contravene the express terms of this Agreement. Each Secured Party waives any claim such Secured Parties may now or hereafter have against the Collateral Agent or any Trustee, or any other Secured Party arising out of (i) any actions which the Trustees or the Collateral Agent, or such Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on the Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, the Collateral and actions with respect to the collection of any claim for all or any part of the applicable Pari Passu Obligations from any account debtor, guarantor or any other party) in accordance with the applicable Collateral Document or any other agreement related thereto or to the collection of Pari Passu Obligations or the valuation, use, protection or release of any security for such Pari Passu Obligations, (ii) any election by the Trustees or the Collateral Agent, in any proceeding instituted under the Brazilian Bankruptcy Code or (iii) any borrowing by, or grant of a security interest or administrative expense priority or order granted pursuant to, any Debtor Relief Law by the Issuers, the Guarantors or any Significant Subsidiary, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Collateral Agent and the Trustee shall not accept the Collateral in full or partial satisfaction of any Pari Passu Obligations pursuant to the terms of the Collateral Documents.

SECTION 4.02.    **Rights as a Secured Party**.    The Person serving as the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Secured Party of the Pari Passu Obligations that it holds as any other Secured Party of such Pari Passu Obligations and may exercise the same as though it were not the Collateral Agent and the term "Secured Party" or "Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Collateral Agent hereunder in its individual capacity.

SECTION 4.03.    **Exculpatory Provisions**.

(a)    The Trustee and the Collateral Agent shall not have any duties or obligations except those expressly set forth herein, in the Indentures and in the Collateral Documents to which it is a party. Without limiting the generality of the foregoing, as among the Trustees and the Collateral Agent and the Secured Parties, the Trustees and the Collateral Agent:

(i)      shall not be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the Collateral Documents that, in the case of the Collateral Agent, it is required to exercise as directed in writing by the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties; **provided** that the Trustee and the Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or risk its own funds or that is contrary to any Collateral Document (as modified by this Agreement) or applicable law;

(iii)    shall not, except as expressly set forth herein or in the Collateral Documents to which it is a party, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuers, the Guarantors or any of their Affiliates that is communicated to or obtained by the Person serving as the Trustee or Collateral Agent or any of its Affiliates in any capacity;

(iv)     shall not be liable for any action taken or not taken by it (1) (A) in the case of the Collateral Agent, with the consent or at the request or direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties and (B) in the case of the Trustee, at the direction of the Controlling Secured Parties, (2) in the absence of the Trustee's or Collateral Agent's own gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction) or (3) in reliance on a certificate of an authorized officer of the Issuers or the Guarantors, as the case may be, stating that such action is permitted by the terms of this Agreement;

(v)      shall be deemed not to have knowledge of any Event of Default under any of the Pari Passu Obligations unless and until written notice describing such Event of Default and referring to this Agreement is given to the Collateral Agent or Trustee by the Issuers, the Guarantors or, in the case of the Collateral Agent, a Trustee;

(vi)     shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Agreement, the Indentures or the Collateral Documents, (2) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Event of Default or any event that with notice or lapse of time would become an Event of Default, (4) the validity, enforceability, effectiveness or

genuineness of this Agreement, the Indentures, the Collateral Documents or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, or (5) the value or the sufficiency of the Collateral for any Pari Passu Obligations; and

(vii)    shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation strikes, work stoppages, governmental actions, accidents, acts of war or terrorism, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

(b)    Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Trustees or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Trustees or the Collateral Agent, it is understood that in all cases the Trustees and the Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence pursuant to Section 2.02 in respect of such action. The Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

SECTION 4.04.    **Reliance by Collateral Agent and Trustees**.  The Collateral Agent and the Trustees shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Collateral Agent and the Trustees also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Collateral Agent and the Trustees may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in reliance upon the advice of any such counsel, accountants or experts.

SECTION 4.05.    **Delegation of Duties**.  The Collateral Agent and the Trustees may perform any and all of its duties and exercise its rights and powers hereunder, under the Indentures or the Collateral Documents by or through any one or more sub-agents appointed by

the Collateral Agent or the Trustees. The Collateral Agent, the Trustees and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Collateral Agent or the Trustees and any such sub-agent.

SECTION 4.06.    **Resignation of Collateral Agent**.  The Collateral Agent may resign pursuant to and in accordance with the terms of the Senior Secured Notes Indenture.

SECTION 4.07.    **Non-Reliance on Collateral Agent and Trustees**.  Each Secured Party (other than the Trustees and the Collateral Agent) acknowledges that it has, independently and without reliance upon the Collateral Agent or any Trustee, any other Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the Collateral Documents to which it is a party. Each Secured Party (other than the Trustees and the Collateral Agent) also acknowledges that it will, independently and without reliance upon the Collateral Agent or any Trustee, or any other Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, the Indentures, the Collateral Documents or any related agreement or any document furnished hereunder or thereunder.

SECTION 4.08.    **Collateral and Guaranty Matters**.  Each Trustee, the Issuer and each Secured Party, irrevocably authorizes the Collateral Agent:

(a)    to release any Lien on any property granted to or held by the Collateral Agent under any Collateral Document in accordance with Section 2.04 or upon receipt of a written request and opinion of counsel from the Issuers stating that the release of such Lien is permitted by the terms of this Agreement and each of the Indentures; and

(b)    to release each Guarantor from its obligations under each Collateral Document upon receipt of a written request and opinion of counsel from the Issuers stating that such release is permitted by the terms of this Agreement and each of the Indentures.

SECTION 4.09.  **Incorporation by Reference**.

(a)    The Collateral Agent is executing this Agreement solely as collateral agent under the Senior Secured Notes Indenture.  All rights, privileges, protections and immunities (including, without limitation, the right to indemnification) in favor of the Collateral Agent under the Senior Secured Notes Indenture are incorporated herein by reference, mutatis mutandis.

(b)    Each of the Trustees is executing this Agreement solely as Trustees under the Indentures.  All rights, privileges, protections and immunities (including, without limitation, the right to indemnification) in favor of the Trustees under the Indentures are incorporated herein by reference, mutatis mutandis.

## ARTICLE V

## MISCELLANEOUS

SECTION 5.01.    **Notices**. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, or sent to the e-mail address of the applicable recipient specified below, as follows:

(a)    if to the Collateral Agent, to it at the following address:

TMF Brasil Administração e Gestão de Ativos Ltda.
Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,
Edifício Jacarandá, Room 3
Zip Code 06460-040
Barueri – SP, Brazil
Attention: Karla Fernandes
Email: karla.fernandes@tmf-group.com

(b)    if to the Senior Secured Notes Trustee, to it at the following address:

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: RM for Gol Finance

(c)    if to the Additional Trustee identified in the introductory paragraph hereto, to it at the following address:

TMF Brasil Administração e Gestão de Ativos Ltda.
Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,
Edifício Jacarandá, Room 3
Zip Code 06460-040
Barueri – SP, Brazil
Attention: Karla Fernandes
Email: karla.fernandes@tmf-group.com

(d)    if to any other Additional Trustee, to it at the address set forth in the applicable joinder agreement;

(e)    if to the Issuers and the Guarantors, at the following address:

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attention: Edmar Prado Lopes Neto
Facsimile: 55-11-5098-7888
Email: elopes@voegol.com.br

with a copy to:

Milbank LLP
Av. Brigadeiro Faria Lima, 4100, 5th Floor
São Paulo, SP
Brasil
Attention: Tobias Stirnberg
Facsimile: 55 11 3927-7702
Email: tstirnberg@milbank.com

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 5.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 5.01. As agreed to between the Collateral Agent and the Trustees from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable party provided from time to time by such party.

SECTION 5.02.    **Waivers; Amendment**.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)        Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Trustees and the Collateral Agent.

SECTION 5.03.    **Parties in Interest**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 5.04.    **Effectiveness; Survival of Agreement**. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto on the date hereof and delivery by each of the parties on the date hereof.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 5.05.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.  A party's electronic signature (complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law) of this Agreement shall have the same validity and effect as a signature affixed by the party's hand.

SECTION 5.06.    **Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 5.07.    **Governing Law**.    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

SECTION 5.08.    **Submission To Jurisdiction; Waivers**.    Each of the Collateral Agent, the Trustees, and Secured Parties, irrevocably and unconditionally:

(a)        submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)        consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or

proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its authorized representative) at the address referred to in Section 5.01, except in the case of the Collateral Agent, who has legally, validly, effectively and irrevocably designated, appointed and empowered Cogency Global, Inc., as agent for service of process in any legal suit action or proceeding arising out of or related to this Agreement in any courts of the State of New York, courts of the United States of America for the Southern District of New York, and appellate courts from any thereof, and in the case of the Issuers and the Guarantors, who have legally, validly, effectively and irrevocably designated, appointed and empowered Cogency Global, Inc., as agent for service of process in any legal suit action or proceeding arising out of or related to this Agreement in any courts of the State of New York, courts of the United States of America for the Southern District of New York, and appellate courts from any thereof; and

(d)    agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by Law or shall limit the right of any party hereto (or any Secured Party) to sue in any other jurisdiction.

SECTION 5.09.    **WAIVER OF JURY TRIAL**.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 5.10.    **Headings**.  Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 5.11.    **Conflicts**.  In the event of any conflict or inconsistency between the provisions of this Agreement, the Indentures or any of the Collateral Documents, the provisions of this Agreement shall control.

SECTION 5.12.    **Relative Rights**.  Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Section 2.04), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of any of the Indentures or the Collateral Documents, or permit the Issuers or any of the Guarantors to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the any of the Indentures or the Collateral Documents, (b) impair the obligations of the Issuers or the Guarantors, which are absolute and unconditional, to pay the Pari Passu Obligations as and when they shall become due and payable in accordance with their terms or (c) obligate the Issuers or the Guarantors to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the Indenture or the Collateral Documents.

SECTION 5.13.    **Integration**.   This Agreement together with the Indentures and the Collateral Documents represents the agreement of each of the Issuers, the Guarantors and the Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by the Trustees, Issuers or any of the Guarantors, the Collateral Agent, or any Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the Indentures or the Collateral Documents.

SECTION 5.14.    **Further Assurances**.   Each of the Collateral Agent and each Trustee agrees that it will execute, or will cause to be executed, any and all further documents, agreements and instruments, and take all such further actions, as may be required under any applicable Law, or which the Collateral Agent or the Trustees may reasonably request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for herein.

SECTION 5.15.    **Concerning the Trustee**s.   Notwithstanding any term herein to the contrary, it is hereby expressly agreed and acknowledged that the agreements set forth herein by any Trustee (in its capacity as such) are made solely in its capacity as Trustee under the applicable Indenture and pursuant to the provisions of such Indenture and the direction of the Issuers, the Guarantors and the Secured Parties, and not in its individual capacity.  Each Trustee (in its capacity as such) shall not have any duties, obligations, or responsibilities under this Agreement in its capacity as such except as expressly set forth herein, and shall have the benefit of all exculpatory provisions, presumptions, indemnities, protections, benefits, immunities or reliance rights contained in the Indentures in the acceptance, execution, delivery and performance of this Agreement as though fully set forth herein. Notwithstanding any provision to the contrary, no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise against the Trustees and the Trustees acting under this Agreement shall not have by reason of the Collateral Documents or this Agreement any fiduciary or discretionary duties or obligations.

SECTION 5.16.    **Secured Parties**.   Nothing in this Agreement, including the appointment by the parties hereto of the Collateral Agent to exercise remedies on their behalf as set forth herein, shall be interpreted or construed to impose on any Secured Party any obligation to provide new loans or other forms of financing to or on behalf of the Issuers or the Guarantors, or to extend or renew any existing loans or other forms of financing to or on behalf of the Issuers or the Guarantors, including to permit them to continue their business operations.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**GOL FINANCE**
as Senior Secured Notes Issuer

By: _____
      Name:
      Title:

**GOL FINANCE**
as Additional Issuer


By: _____
        Name:
        Title:

**GOL LINHAS AÉREAS S.A.**
as a Guarantor

By: _____
Name:
Title:

**GOL LINHAS AÉREAS INTELIGENTES S.A**.
as a Guarantor

By: _____
      Name:
      Title:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**
as Collateral Agent

By: _____
      Name:
      Title:

**THE BANK OF NEW YORK MELLON**
as Trustee

By: _____
      Name:
      Title:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO
DE ATIVOS LTDA.**
as Additional Trustee

By: _____
Name:
Title:

**<u>Exhibit D</u>**

**Intercreditor Agreement**

*Executed*

INTERCREDITOR AGREEMENT

dated as of March 2, 2023, and amended and restated as of September 29, 2023

among

GOL FINANCE
as Senior Secured Notes Issuer

GOL EQUITY FINANCE

as Senior Secured Exchangeable Notes Issuer

GOL FINANCE
as Additional Issuer

GOL LINHAS AÉREAS S.A.
as a Guarantor

GOL LINHAS AÉREAS INTELIGENTES S.A.
as a Guarantor

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

THE BANK OF NEW YORK MELLON
as Trustee under the Senior Secured Notes Indenture

and

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent under the SSN Note Purchase Agreement

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent under the ESSN Note Purchase Agreement

# TABLE OF CONTENTS

PAGE

## ARTICLE I

### DEFINITIONS

SECTION 1.01.  Certain Defined Terms; Construction ................................................................ 2

## ARTICLE II

### AMENDMENT AND RESTATEMENT

SECTION 2.01.  Amendment and Restatement of Original Agreement; No Novation ................ 8

## ARTICLE III

### PRIORITIES AND AGREEMENTS WITH RESPECT TO THE COLLATERAL

SECTION 3.01.  Priority of Claims ............................................................................................ 8
SECTION 3.02.  Actions With Respect to the Collateral; Prohibition on Contesting Liens ...... 10
SECTION 3.03.  No Interference; Payment Over ...................................................................... 11
SECTION 3.04.  Release of Collateral ...................................................................................... 12
SECTION 3.05.  Certain Agreements With Respect to any Event of Insolvency or
                       Liquidation ................................................................................................. 13
SECTION 3.06.  Reinstatement ................................................................................................ 13
SECTION 3.07.  Insurance ........................................................................................................ 13
SECTION 3.08.  Refinancings ................................................................................................... 13

## ARTICLE IV

### EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

SECTION 4.01.  Determination of Existence or Amount of Liens and Obligations ................... 13

## ARTICLE V

### THE COLLATERAL AGENT

SECTION 5.01.  Appointment and Authority ............................................................................ 14
SECTION 5.02.  Rights as a Secured Party .............................................................................. 15
SECTION 5.03.  Exculpatory Provisions .................................................................................. 15
SECTION 5.04.  Reliance by Collateral Agent and Trustees .................................................... 17
SECTION 5.05.  Delegation of Duties ...................................................................................... 17
SECTION 5.06.  Resignation of Collateral Agent ..................................................................... 17

Error! Unknown document property name.

SECTION 5.07. Non-Reliance on Collateral Agent and Trustees............................................... 17
SECTION 5.08. Collateral and Guaranty Matters ..................................................................... 17
SECTION 5.09. Incorporation by Reference ............................................................................. 18

## ARTICLE VI

## MISCELLANEOUS

SECTION 6.01. Notices .............................................................................................................. 18
SECTION 6.02. Waivers; Amendment....................................................................................... 20
SECTION 6.03. Parties in Interest............................................................................................. 20
SECTION 6.04. Effectiveness; Survival of Agreement ............................................................ 20
SECTION 6.05. Counterparts ..................................................................................................... 20
SECTION 6.06. Severability ...................................................................................................... 21
SECTION 6.07. Governing Law................................................................................................. 21
SECTION 6.08. Submission To Jurisdiction; Waivers ............................................................. 21
SECTION 6.09. WAIVER OF JURY TRIAL ........................................................................... 22
SECTION 6.10. Headings........................................................................................................... 22
SECTION 6.11. Conflicts ........................................................................................................... 22
SECTION 6.12. Relative Rights ................................................................................................ 22
SECTION 6.13. Integration ........................................................................................................ 22
SECTION 6.14. Further Assurances........................................................................................... 22
SECTION 6.15. Concerning the Trustee .................................................................................... 22
SECTION 6.16. Secured Parties ................................................................................................. 23

Error! Unknown document property name.

THIS INTERCREDITOR AGREEMENT (as amended or supplemented from time to time, this "**Agreement**") dated as of March 2, 2023 (the "**Original Date**"), as amended and restated as of September 29, 2023, among:

(1)     GOL FINANCE, a public limited liability company (*société anonyme*) organized and existing under the laws of the Grand Duchy of Luxembourg, with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 (the "**Senior Secured Notes Issuer**");

(2)     GOL FINANCE, as additional issuer ("**Gol Finance**" or an "**Additional Issuer**", as the case may be);

(3)     GOL EQUITY FINANCE, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg, with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 224920 ("**Gol Equity Finance**" or an "**Additional Issuer**", as the case may be);

(3)     GOL LINHAS AÉREAS S.A., a corporation (*sociedade por ações*) organized under the laws of Brazil ("**GLA**" and a "**Guarantor**");

(4)     GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**" and together with GLA, the "**Guarantors**");

(5)     TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent for the Secured Parties (as defined below) (in such capacity and together with its successors, the "**Collateral Agent**");

(6)     THE BANK OF NEW YORK MELLON, in its capacity as Trustee under the Senior Secured Notes Indenture (in such capacity and including any successors and assigns under the Senior Secured Notes Indenture, the "**Senior Secured Notes Trustee**"); and

(7)     TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., in its capacities as (i) collateral agent under a senior secured note purchase agreement, dated as of March 2, 2023 regarding certain senior secured notes due 2028 issued by Gol Finance (the "**SSN Note Purchase Agreement**"), and (ii) collateral agent under a senior secured exchangeable note purchase agreement, dated as of the date hereof regarding certain senior secured exchangeable notes due 2028 issued by Gol Equity Finance (the "**ESSN Note Purchase Agreement**") (in such capacities and including any successors and assigns thereunder, an "**Additional Trustee**").

**WHEREAS**:

(A)     The Senior Secured Notes Issuer and the Senior Secured Notes Trustee have, *inter alios*, entered into the Senior Secured Notes Indenture;

(B)     The Additional Issuer and the Additional Trustee party hereto have, *inter alios*, entered into the SSN Note Purchase Agreement and into the ESSN Note Purchase Agreement to which they are parties;

(C)     The parties are entering into this Agreement for the purposes of, among other things, setting forth the method of voting and decision making for the Secured Parties and ensuring that the holders of the Senior Secured Notes and the holders of the Additional Pari Passu Obligations receive the benefit of equal and ratable security as contemplated pursuant to the terms and conditions of the Indentures and the Collateral Documents; and

(D)     The parties are entering into this Amendment do not intend that this Amendment shall constitute a novation of the Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**ARTICLE I**

**DEFINITIONS**

SECTION 1.01.    **Certain Defined Terms; Construction**.

(a)     As used in this Agreement (including the recitals), the following terms have the meanings specified below:

"**Additional Issuer**" means (i) the "Additional Issuer" identified in the introductory paragraph of this Agreement and (ii) any other issuer or borrower of Additional Pari Passu Obligations.

"**Additional Pari Passu Obligations**" means (i) any senior secured notes issued by the Additional Issuer identified in the introductory paragraph hereof on the Original Date, the date hereof or subsequently as additional notes under the same series and guaranteed by the Guarantors and secured by all or a portion of the Collateral and (ii) any other Additional Pari Passu Obligations as defined in the Senior Secured Notes Indenture.

"**Additional Trustee**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

Error! Unknown document property name.

"**Agents**" means any Registrar, Transfer Agent or Paying Agent appointed pursuant to the Indentures, individually, an "Agent."

"**Agreement**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Amendment**" means the amendment and restatement of this Agreement dated as of the date hereof.

"**Brazil**" means the Federative Republic of Brazil.

"**Brazilian Bankruptcy Code**" means Law No. 11,101, of February 9, 2005, as amended.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, the United States of America or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by law to close in The City of New York, São Paulo, Brazil, or Luxembourg.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Collateral**" means the assets and properties of the Guarantors upon which Liens have been granted to the Collateral Agent, and/or the Secured Parties represented by the Collateral Agent, to secure the Pari Passu Obligations, including without limitation all of the "Collateral" as defined in the Collateral Documents, but excluding all such assets and properties that may, from time to time, be released from such Liens pursuant to and in accordance herewith, with the Indentures and/or with the applicable Collateral Document.

"**Collateral Agent**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Collateral Documents**" has the meaning assigned to such term in the Senior Secured Notes Indenture.

"**Controlling Secured Parties**" means:

(i)    from and including the first date on which an Event of Default shall have occurred to but excluding the ninetieth (90th) day following the occurrence thereof, Secured Parties that at such time collectively hold (or represent) more than fifty per cent (50%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class;

(ii)   if the "Controlling Secured Parties" described in clause (i) above have not directed the Collateral Agent to take any Enforcement Action before the ninetieth (90th) day

Error! Unknown document property name.

following the occurrence of an Event of Default, then from and including the ninetieth (90th) day following the occurrence of an Event of Default to but excluding the one hundred and twentieth (120th) day following the occurrence thereof, Secured Parties that at such time collectively hold (or represent) more than thirty-five per cent (35%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class; and

(iii)    if neither the "Controlling Secured Parties" described in clause (i) above nor in clause (ii) above have directed the Collateral Agent to take any Enforcement Action before the one hundred and twentieth (120th) day following the occurrence of an Event of Default, then from and including the one hundred and twentieth (120th) day following the occurrence of an Event of Default and at any time thereafter, Secured Parties that at such time collectively hold (or represent) more than twenty-five per cent (25%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class;

**provided** that, notwithstanding clauses (ii) and (iii) above, at any time at which Secured Parties that at such time collectively hold (or represent) more than fifty per cent (50%) of the aggregate principal amount of the then Outstanding Pari Passu Obligations secured by the Collateral, voting as a single class, instruct the Collateral Agent, such Secured Parties shall be the "Controlling Secured Parties".

"**Debtor Relief Laws**" means the Brazilian Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of Brazil or Luxembourg or any other applicable jurisdictions from time to time in effect, as the case may be.

"**Enforcement Action**" means: (a) the taking of any steps (including directing the Collateral Agent through the applicable Trustee) to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral in accordance with any Collateral Document; (b) the exercise of any right of set-off against any of the Issuers or the Guarantors in respect of any Pari Passu Obligation; or (c) the petitioning, applying or voting for, or the taking of any steps (including the appointment of any trustee, liquidator, receiver, administrator or similar officer) in relation to an Event of Insolvency or Liquidation.

"**Event of Default**" means an Event of Default under any Indenture, as applicable.

"**Event of Insolvency or Liquidation**" means any event described in Section 6.01(i), (j) or (k) of the Senior Secured Notes Indenture and any equivalent provisions in the Note Purchase Agreement.

"**GLA**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**GLAI**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

Error! Unknown document property name.

"**Guarantors**" has the meaning assigned to such term in the introductory paragraph of this Agreement and includes any successor obligor under the Note Guaranties pursuant to Section 5.01 and Section 5.03 of the Indenture or equivalent provision of the Note Purchase Agreement.

"**Holder**" means the Person in whose name a note representing Pari Passu Obligations is registered in the Register (as defined in the applicable Indenture) and any other holder or record of any Pari Passu Obligations.

"**Indentures**" means, collectively, the Senior Secured Notes Indenture and the Note Purchase Agreement.

"**Issue Date**" means, with respect to any Pari Passu Obligations, the date of issuance or other incurrence of such Pari Passu Obligations.

"**Issuers**" means, collectively, the Senior Secured Notes Issuer and any Additional Issuer.

"**Lien**" means any mortgage, pledge, security interest, assignment, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof or any agreement to create any mortgage, pledge, security interest, lien, charge, easement or encumbrance of any kind).

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Note Guaranty**" means each of the guarantees of the Pari Passu Obligations by any of the Guarantors pursuant to the Indentures.

"**Note Purchase Agreement**" means (i) the SSN Note Purchase Agreement, (ii) the ESSN Note Purchase Agreement, and (iii) any other indenture, credit agreement or similar agreement, in each case under which Additional Pari Passu Obligations are being issued or incurred by the Senior Secured Notes Issuer or an Additional Issuer.

"**Outstanding**" means, when used with respect to Pari Passu Obligations, as of the date of determination, all Pari Passu Obligations theretofore authenticated and delivered under the Indentures, except:

(i)    Pari Passu Obligations theretofore cancelled by the applicable Trustee or delivered to the applicable Trustee for cancellation;

(ii)    Pari Passu Obligations for whose payment or redemption money in the necessary amount has been theretofore deposited with the applicable Trustee or any Paying Agent (other than an Issuer) in trust or set aside and segregated in trust by an Issuer (if such Issuer shall act as its own Paying Agent) for the Holders of the Pari Passu Obligations; **provided** that, if such Pari Passu Obligations are to be redeemed or repaid pursuant to Article 3 of the Senior Secured Notes Indenture or equivalent provision in the Note Purchase Agreement, notice of such redemption has been duly given pursuant to such Indenture or provision therefor satisfactory to the applicable Trustee has been made;

Error! Unknown document property name.

(iii)    Pari Passu Obligations, except to the extent provided in Article 8 of the Senior Secured Notes Indenture or the equivalent provision in the Note Purchase Agreement, with respect to which the applicable Issuer has effected legal defeasance and/or covenant defeasance in accordance with the terms thereunder; and

(iv)    Pari Passu Obligations in exchange for or in lieu of which other Pari Passu Obligations have been authenticated and delivered pursuant to the Indentures, other than any such Pari Passu Obligations in respect of which there shall have been presented to the applicable Trustee proof satisfactory to it that such Pari Passu Obligations are held by a bona fide purchaser or protected purchaser in whose hands such Pari Passu Obligations are valid obligations of the applicable Issuer;

**provided**, however, that in determining whether the Holders of the requisite principal amount of Outstanding Pari Passu Obligations have given any request, demand, authorization, direction, consent, notice or waiver under the Indentures, Pari Passu Obligations owned by an Issuer or any Affiliate of an Issuer shall be disregarded and deemed not to be Outstanding, except that, in determining whether the applicable Trustee shall be protected in relying upon any such request, demand, authorization, direction, consent, notice or waiver, only Pari Passu Obligations which a Responsible Officer (as defined under the applicable Indenture) of such Trustee has received written notice at its address specified herein of being so owned shall be so disregarded. Pari Passu Obligations so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the applicable Trustee the pledgee's right so to act with respect to such Pari Passu Obligations and that the pledgee is not an Issuer, or any other obligor upon the Pari Passu Obligations or any of its or such other obligor's Affiliates.

"**Pari Passu Obligations**" has the meaning assigned to such term in the Senior Secured Notes Indenture.

"**Paying Agent**" means any Person authorized by the Issuers to pay the principal of or interest on any Pari Passu Obligations on behalf of the Issuers under the Indentures, including the Paying Agent in Luxembourg.

"**Person**" means an individual, a corporation, a partnership, limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"**Proceeds**" has the meaning assigned to such term in Section 3.01(a) hereof.

"**Refinance**" means, in respect of any indebtedness, to refinance, extend, renew, defease, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (and/or commitments with respect to such indebtedness), in whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "**Refinanced**" and "**Refinancing**" have correlative meanings.

Error! Unknown document property name.

"**Secured Parties**" has the meaning assigned to such term the Senior Secured Notes Indenture.

"**Senior Secured Notes**" means the 8.00% Senior Secured Notes Due 2026 issued by the Senior Secured Notes Issuer on the Issue Date therefor or subsequently as additional notes of the same series and guaranteed by the Guarantors and secured by the Collateral.

"**Senior Secured Notes Indenture**" means the indenture, dated as of the Issue Date therefor, entered into by and among the Senior Secured Notes Issuer, the Guarantors, The Bank of New York Mellon, as trustee, transfer agent, registrar and paying agent, and the Collateral Agent, relating to the Senior Secured Notes.

"**Senior Secured Notes Issuer**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Senior Secured Notes Obligations**" means the "Notes Obligations" as defined in the Senior Secured Notes Indenture.

"**Senior Secured Notes Trustee**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Significant Subsidiary**" has the meaning given to such term in the Senior Secured Notes Indenture.

"**Subsidiary**" has the meaning given to such term in the Senior Secured Notes Indenture.

"**Transfer Agent**" has the meaning given to such term in the Senior Secured Notes Indenture or the Note Purchase Agreement, as applicable.

"**Trustee**" means (i) the Senior Secured Notes Trustee and (ii) any Additional Trustee. References to "Trustee" in this Agreement shall mean the Trustee under each of the Indentures, unless the context requires otherwise.

(b)　　The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v)

Error! Unknown document property name.

unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

With respect to the Senior Secured Notes Issuer and to the Additional Issuer, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque*, *nantissement*, *gage*, *privilège*, *sûreté réelle*, *droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant*, *associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an a*dministrateur* of its general partner, (v) a receiver, *administrative receiver*, administrator, liquidator or the like includes a *juge délégué*, *commissaire*, *juge-commissaire*, *liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*), insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally, (vii) a guarantee includes any guarantee which is independent from the debt to which it relates and any suretyship (*cautionnement*) within the meaning of Articles 2011 and seq. of the Luxembourg Civil Code, (viii) "gross negligence" is a reference to *faute lourde* and willful misconduct is a reference to *faute dolosive* and (ix) an "agent" includes a *mandataire*.

## ARTICLE II

## AMENDMENT AND RESTATEMENT

SECTION 2.01.    **Amendment and Restatement of Original Agreement; No Novation**

Subject to the terms and conditions set forth in this Amendment, and in reliance upon the representation and warranties set forth in the Indenture and in the Note Purchase Agreement, effective as of the date hereof, the Agreement is amended and restated in its entirety hereby.

## ARTICLE III

## PRIORITIES AND AGREEMENTS WITH RESPECT TO THE COLLATERAL

SECTION 3.01.    **Priority of Claims**.

(a)    Notwithstanding anything contained herein or in the Indentures or in any of the Collateral Documents to the contrary, if an Event of Default has occurred and is continuing, and the Collateral Agent, any Trustee or any Secured Party is taking any

Error! Unknown document property name.

Enforcement Action, or any distribution is made in respect of the Collateral as a result of any Event of Insolvency or Liquidation, the proceeds of any sale, collection or other liquidation of the Collateral on account of such enforcement of rights by the Collateral Agent, any Trustee or any Secured Party or any such distribution or payment received by the Collateral Agent, on behalf of the Secured Parties, any Trustee or any Secured Party as a result of any Event of Insolvency or Liquidation (all proceeds of any sale, collection or other liquidation of the Collateral and all such distributions or payments being collectively referred to as "**Proceeds**"), to the extent permitted by applicable law shall be applied in the following order as promptly as is reasonably practicable after the receipt thereof; **provided** that, such amounts shall not be so applied until such time as the amount of the Pari Passu Obligations have been determined in accordance with the terms hereof and under the terms of the Indentures and the Collateral Documents:

> FIRST, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent, the Trustees and the other Agents under the Indentures and Collateral Documents and any other agent or attorney appointed thereby in their capacities as such (including, costs and expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Agreement, the Indentures or any Collateral Document);

> SECOND, on a pro rata basis, to the payment in full to the Secured Parties of all amounts due and unpaid on the Pari Passu Obligations for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Pari Passu Obligations for principal and interest; **provided**, that, the Proceeds shall be applied (i) first, to the Secured Parties for amounts due and payable on the Pari Passu Obligations for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Pari Passu Obligations for interest and (ii) second, any remaining amounts to the Secured Parties for amounts due and payable on the Pari Passu Obligations for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Pari Passu Obligations;

> THIRD, on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses, charges, liabilities, indemnities, fees and other amounts due to Collateral Agent, the Trustees, the other Agents and the Secured Parties (other than amounts paid (x) at priority "first" to the Collateral Agent, the Trustees and the other Agents or (y) at priority "second" to the Secured Parties); and

> FOURTH, the balance, if any, after all of the Pari Passu Obligations have been paid in full in cash, to the Issuers and their respective successors or assigns, or as a court of competent jurisdiction may otherwise direct;

**provided**, **however**, that the foregoing orders of application above shall not be altered as a result of any Liens under any of the Collateral Documents failing to secure all of the Pari Passu Obligations, and the Secured Parties agree that Proceeds from all sources shall be applied to ensure that the foregoing order of application is maintained.

Error! Unknown document property name.

(b)    It is acknowledged that the Pari Passu Obligations may, subject to the limitations set forth in the Indentures, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priority set forth in Section 3.01(a) or the provisions of this Agreement defining the rights of the Secured Parties.

(c)    Notwithstanding (i) the time, order or method of attachment or perfection of any Liens securing any Pari Passu Obligations granted on the Collateral, the time or order of filing of notices of such Liens, financing statements (or similar filings in any applicable jurisdiction), or the giving of or failure to give notice of the acquisition or expected acquisition of purchase money or other Liens, (ii) the manner in which such Lien is acquired, whether by grant, contract, statute or operation of law, subrogation or otherwise, (iii) the fact that the Collateral or any Lien thereof (or any portion thereof) is otherwise subordinated, voided, avoided, invalidated or lapsed and (iv) any applicable law or any provision to the contrary in any Collateral Document or the Indentures, each of the Collateral Agent and the Trustees agree, for themselves and on behalf of each Secured Party, that (1) each Lien created in favor of a Secured Party in the Collateral pursuant to a Collateral Document ranks and shall rank equally in priority to each other Lien created in favor of a Secured Party, and each Secured Party, has and shall have a pro rata entitlement to the Liens (if any) of the other Secured Parties in the Collateral, (2) any Lien (if any) created in favor of a Secured Party and held by such Secured Party in the Collateral shall be for the equal and ratable benefit of all Secured Parties and (3) subject to any mandatory provisions of any applicable law, the Senior Secured Note Obligations and the Additional Pari Passu Obligations rank and shall rank on a pari passu basis with each other.

SECTION 3.02.    **Actions With Respect to the Collateral; Prohibition on Contesting Liens**.

(a)    The Secured Parties shall vote as a single class by reference to the aggregate principal amount of the then Outstanding Pari Passu Obligations on all matters related to the Collateral, including, but not limited to, enforcement of rights in the Collateral. The Collateral Agent shall refrain from taking any action to exercise any rights hereunder and under the Collateral Documents or otherwise with respect to the Collateral unless it is instructed to do so by the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, in accordance with clause (b) below.

(b)    The Collateral Agent shall act at the direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties.  The Collateral Agent may at any time seek the direction of the Trustees, and the Trustees agree to cooperate fully with the Collateral Agent to provide such direction.

(c)    Notwithstanding any other provision of this Agreement or any of the terms of the Indentures or the Collateral Documents, (a) the Collateral Agent shall act solely at the direction of the Trustees, on behalf of the Controlling Secured Parties, and (b) the Collateral Agent shall not have any duty, liability or responsibility to take any direction from or recognize any notice or other communication from any Secured Party other than the Trustees.

Error! Unknown document property name.

(d)    Notwithstanding the terms of any Indenture or Collateral Document, in no event shall the Collateral Agent have any duty, responsibility or liability with respect to (A) the identity of any Secured Party, (B) any requirements of the Indentures or Collateral Documents regarding voting or otherwise taking action, including voting percentages or entitlement to vote, (C) whether any Pari Passu Obligation is held by the Issuers or any Affiliate of the Issuers or (D) whether any Secured Party should be disregarded for purposes of voting.

(e)    If less than the Controlling Secured Parties have instructed the Collateral Agent, through the Trustees, to take enforcement action pursuant to clause (b) above, then the Collateral Agent shall not take enforcement action unless and until the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, instruct the Collateral Agent in writing to take such action; **provided** that, the Collateral Agent shall not be obligated to take any action that is (i) contrary to applicable law in any applicable jurisdiction; or (ii) based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to the Indentures and the Collateral Documents.

(f)    Each of the Collateral Agent and each Trustee agree, for itself and on behalf of each Secured Party, that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including in any Event of Insolvency or Liquidation), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; **provided** that nothing in this Agreement shall be construed to prevent or impair the rights of any Secured Party, the Collateral Agent or any Trustee to enforce this Agreement.

SECTION 3.03.    **No Interference; Payment Over**.

(a)    Each Trustee, on behalf of itself and the relevant Secured Parties, and each Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any Pari Passu Obligations or the Indentures or the validity, attachment, perfection or priority of any Lien under the Collateral Documents or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Collateral by the Collateral Agent, (iii) except as provided in Section 3.02, it shall have no right to (A) direct the Collateral Agent or any other Secured Party to exercise any right, remedy or power with respect to the Collateral or (B) consent to the exercise by the Collateral Agent or any other Secured Party of any right, remedy or power with respect to the Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Collateral Agent or any other Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to the Collateral, and none of the Collateral Agent, any Trustee or any other Secured Party shall be liable for any action taken or omitted to be taken by the Collateral Agent, such Trustee or such other Secured Party with respect to the Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have the Collateral or any part thereof marshaled upon any foreclosure or other disposition of the Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; **provided** that

Error! Unknown document property name.

nothing in this Agreement shall be construed to prevent or impair the rights of the Collateral Agent, any Trustee or any other Secured Party to enforce this Agreement.

(b)     The Collateral Agent, on behalf of the relevant Secured Parties, agrees that if it shall obtain possession of the Collateral or shall realize any proceeds or payment in respect of the Collateral, pursuant to the Collateral Documents or the Indentures or by the exercise of any rights available to it under applicable law or in any Event of Insolvency or Liquidation or through any other exercise of remedies, at any time prior to the payment in full of each of the Pari Passu Obligations, then it shall hold the Collateral, proceeds or payment for the other Secured Parties and promptly transfer the Collateral, proceeds or payment, as the case may be, to the Trustees, to be distributed in accordance with the provisions of Section 3.01 hereof.

SECTION 3.04.     **Release of Collateral**.

(a)     Subject to the terms of the Indentures, the Collateral Documents and this Agreement, the Collateral shall be released from the Liens securing the Pari Passu Obligations under any one or more of the following circumstances:

(i)     in accordance with the Indentures, the Collateral Documents and this Agreement, if at any time the Collateral Agent forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)     as described in Article 9 of the Senior Secured Notes Indenture;

(iii)     upon the discharge in full of the Pari Passu Obligations;

(iv)     (A) with respect to the Senior Secured Notes Obligations, upon a legal defeasance or covenant defeasance under the Senior Secured Notes Indenture as described in Article 8 of the Senior Secured Notes Indenture and (B) with respect to any Additional Obligations, upon a legal defeasance or covenant defeasance under the Note Purchase Agreement; or

(v)     Except with respect to the Pledged IP and (unless otherwise permitted under the Indentures) with a disposition of Spare Parts, at any time at the election of the Issuers

in each case, so long as (A) no Default or Event of Default will exist immediately after such release and (B) the LTV Ratio immediately after such release will not exceed the Trigger LTV Ratio.

(b)     **provided**, **however**, that, notwithstanding the foregoing, the security interest granted under the Collateral Documents will terminate in respect of any Pari Passu Obligations on the maturity date of such Pari Passu Obligations, unless through passage of time, acceleration or otherwise there exists a due and payable payment obligation on the Pari Passu Obligations on that date, in which case the security interest in the Collateral will terminate upon satisfaction of that payment obligation. As a consequence of the termination, the Collateral shall

Error! Unknown document property name.

be automatically released. Each Trustee agrees to execute and deliver (at the sole cost and expense of the Issuers and the Guarantors) all such acknowledgments, consents, confirmations, authorizations and other instruments as shall reasonably be requested by the Collateral Agent to evidence and confirm any release of the Collateral provided for in this Section.

SECTION 3.05.    **Certain Agreements With Respect to any Event of Insolvency or Liquidation**.    This Agreement shall continue in full force and effect notwithstanding the commencement of any Event of Insolvency or Liquidation.

SECTION 3.06.    **Reinstatement**. In the event that any of the Pari Passu Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason, be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all Pari Passu Obligations shall again have been paid in full in cash.

SECTION 3.07.    **Insurance**. The Collateral Agent, acting at the written direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, shall have the right, subject to the rights of the Issuers or the Guarantors under the Indentures, to adjust or settle any insurance policy or claim covering or constituting the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Collateral.

SECTION 3.08.    **Refinancings**.    The Pari Passu Obligations may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit such Refinancing under each applicable Indenture) of the other Secured Parties, all without affecting the priorities provided for herein or the other provisions hereof.

## ARTICLE IV

## EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

SECTION 4.01.    **Determination of Existence or Amount of Liens and Obligations**.  Whenever the Collateral Agent shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to confirm the existence or amount of any Pari Passu Obligations or the Collateral subject to the Liens securing any Pari Passu Obligations, the Collateral Agent shall request that such information be furnished to it in writing by the Trustees or GLAI, as set forth in an Officers' Certificate (as defined in the Senior Secured Notes Indenture), and shall be entitled to make such determination on the basis of the information so furnished; **provided**, **however**, that if the Trustees or GLAI shall fail or refuse reasonably promptly to provide the requested information, the Collateral Agent shall have no liability for refusing to take such action until such information is provided. The Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to GLAI, any Secured Party, or any other Person as a result of such determination.

Error! Unknown document property name.

# ARTICLE V

## THE COLLATERAL AGENT

SECTION 5.01.    **Appointment and Authority**.

(a)    Each Trustee (pursuant to its respective Indenture) and each other Secured Party (other than the Collateral Agent) hereby irrevocably appoints TMF Brasil Administração e Gestão de Ativos Ltda. to act as Collateral Agent on behalf of the Secured Parties hereunder and under each of the Collateral Documents to which the Collateral Agent is a party and authorizes the Collateral Agent to take actions on its behalf and to exercise the Collateral Agent's powers in accordance with the terms hereof or thereof, including for purposes of acquiring, holding and enforcing any and all Liens on the Collateral to secure any of the Pari Passu Obligations, together with such powers and authority as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Collateral Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement, the Senior Secured Notes Indenture and each of the Collateral Documents. In this connection, the Collateral Agent and any co-agents, sub-agents and attorneys-in-fact appointed by the Collateral Agent pursuant to Section 5.05 for purposes of holding or enforcing any Lien on the Collateral granted under any of the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties, shall be entitled to all the rights, protections, immunities and indemnities granted to it under the Indentures and the Collateral Documents, including without limitation all provisions of this Article IV, Article 12 of the Senior Secured Notes Indenture, the equivalent provisions in the Note Purchase Agreement and the applicable provisions of the Collateral Documents (as though such co-agents, sub-agents and attorneys-in-fact were the "Collateral Agent" under the Collateral Documents) as if set forth in full herein with respect thereto.

(b)    Each Secured Party and the Trustee on behalf of the relevant Secured Parties acknowledges and agrees that the Collateral Agent shall be entitled, for the benefit of the Secured Parties, to sell, transfer or otherwise dispose of or deal with the Collateral as provided herein and in each applicable Collateral Document, without regard to any rights to which any Secured Party would otherwise be entitled. Without limiting the foregoing, each relevant Secured Party agrees that none of the Trustees, the Collateral Agent, the Controlling Secured Parties, or any other Secured Party shall have any duty or obligation first to marshal or realize upon the Collateral securing the Pari Passu Obligations, or to sell, dispose of or otherwise liquidate the Collateral, in any manner that would contravene the express terms of this Agreement. Each Secured Party waives any claim such Secured Parties may now or hereafter have against the Collateral Agent or any Trustee, or any other Secured Party arising out of (i) any actions which the Trustees or the Collateral Agent, or such Secured Party takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on the Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, the Collateral and actions with respect to the collection of any claim for all or any part of the applicable Pari Passu Obligations from any account debtor, guarantor or any other party) in accordance with the applicable Collateral Document or any other agreement related thereto or to

Error! Unknown document property name.

the collection of Pari Passu Obligations or the valuation, use, protection or release of any security for such Pari Passu Obligations, (ii) any election by the Trustees or the Collateral Agent, in any proceeding instituted under the Brazilian Bankruptcy Code or (iii) any borrowing by, or grant of a security interest or administrative expense priority or order granted pursuant to, any Debtor Relief Law by the Issuers, the Guarantors or any Significant Subsidiary, as debtor-in-possession. Notwithstanding any other provision of this Agreement, the Collateral Agent and the Trustee shall not accept the Collateral in full or partial satisfaction of any Pari Passu Obligations pursuant to the terms of the Collateral Documents.

SECTION 5.02.    **Rights as a Secured Party**.    The Person serving as the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Secured Party of the Pari Passu Obligations that it holds as any other Secured Party of such Pari Passu Obligations and may exercise the same as though it were not the Collateral Agent and the term "Secured Party" or "Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Collateral Agent hereunder in its individual capacity.

SECTION 5.03.    **Exculpatory Provisions**.

(a)    The Trustee and the Collateral Agent shall not have any duties or obligations except those expressly set forth herein, in the Indentures and in the Collateral Documents to which it is a party. Without limiting the generality of the foregoing, as among the Trustees and the Collateral Agent and the Secured Parties, the Trustees and the Collateral Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether an Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the Collateral Documents that, in the case of the Collateral Agent, it is required to exercise as directed in writing by the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties; **provided** that the Trustee and the Collateral Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or risk its own funds or that is contrary to any Collateral Document (as modified by this Agreement) or applicable law;

(iii)    shall not, except as expressly set forth herein or in the Collateral Documents to which it is a party, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Issuers, the Guarantors or any of their Affiliates that is communicated to or obtained by the Person serving as the Trustee or Collateral Agent or any of its Affiliates in any capacity;

(iv)    shall not be liable for any action taken or not taken by it (1) (A) in the case of the Collateral Agent, with the consent or at the request or direction of

Error! Unknown document property name.

the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties and (B) in the case of the Trustee, at the direction of the Controlling Secured Parties, (2) in the absence of the Trustee's or Collateral Agent's own gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction) or (3) in reliance on a certificate of an authorized officer of the Issuers or the Guarantors, as the case may be, stating that such action is permitted by the terms of this Agreement;

(v)        shall be deemed not to have knowledge of any Event of Default under any of the Pari Passu Obligations unless and until written notice describing such Event of Default and referring to this Agreement is given to the Collateral Agent or Trustee by the Issuers, the Guarantors or, in the case of the Collateral Agent, a Trustee;

(vi)       shall not be responsible for or have any duty to ascertain or inquire into (1) any statement, warranty or representation made in or in connection with this Agreement, the Indentures or the Collateral Documents, (2) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Event of Default or any event that with notice or lapse of time would become an Event of Default, (4) the validity, enforceability, effectiveness or genuineness of this Agreement, the Indentures, the Collateral Documents or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, or (5) the value or the sufficiency of the Collateral for any Pari Passu Obligations; and

(vii)      shall in no event be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation strikes, work stoppages, governmental actions, accidents, acts of war or terrorism, pandemics, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

(b)        Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Trustees or the Collateral Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Trustees or the Collateral Agent, it is understood that in all cases the Trustees and the Collateral Agent shall be fully justified in failing or refusing to take any such action if it shall not

Error! Unknown document property name.

have received written instruction, advice or concurrence pursuant to Section 3.02 in respect of such action. The Collateral Agent shall have no liability for any failure or delay in taking any actions contemplated above as a result of a failure or delay on the part of the Trustees, acting at the direction of and on behalf of the Controlling Secured Parties to provide such instruction, advice or concurrence. This provision is intended solely for the benefit of the Collateral Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

SECTION 5.04.    **Reliance by Collateral Agent and Trustees**.  The Collateral Agent and the Trustees shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Collateral Agent and the Trustees also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Collateral Agent and the Trustees may consult with legal counsel, independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in reliance upon the advice of any such counsel, accountants or experts.

SECTION 5.05.    **Delegation of Duties**.  The Collateral Agent and the Trustees may perform any and all of its duties and exercise its rights and powers hereunder, under the Indentures or the Collateral Documents by or through any one or more sub-agents appointed by the Collateral Agent or the Trustees. The Collateral Agent, the Trustees and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Collateral Agent or the Trustees and any such sub-agent.

SECTION 5.06.    **Resignation of Collateral Agent**.  The Collateral Agent may resign pursuant to and in accordance with the terms of the Senior Secured Notes Indenture.

SECTION 5.07.    **Non-Reliance on Collateral Agent and Trustees**.  Each Secured Party (other than the Trustees and the Collateral Agent) acknowledges that it has, independently and without reliance upon the Collateral Agent or any Trustee, any other Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the Collateral Documents to which it is a party. Each Secured Party (other than the Trustees and the Collateral Agent) also acknowledges that it will, independently and without reliance upon the Collateral Agent or any Trustee, or any other Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, the Indentures, the Collateral Documents or any related agreement or any document furnished hereunder or thereunder.

SECTION 5.08.    **Collateral and Guaranty Matters**.  Each Trustee, the Issuer and each Secured Party, irrevocably authorizes the Collateral Agent:

Error! Unknown document property name.

(a)    to release any Lien on any property granted to or held by the Collateral Agent under any Collateral Document in accordance with Section 3.04 or upon receipt of a written request and opinion of counsel from the Issuers stating that the release of such Lien is permitted by the terms of this Agreement and each of the Indentures; and

(b)    to release each Guarantor from its obligations under each Collateral Document upon receipt of a written request and opinion of counsel from the Issuers stating that such release is permitted by the terms of this Agreement and each of the Indentures.

SECTION 5.09.    **Incorporation by Reference**.

(a)    The Collateral Agent is executing this Agreement solely as collateral agent under the Senior Secured Notes Indenture.  All rights, privileges, protections and immunities (including, without limitation, the right to indemnification) in favor of the Collateral Agent under the Senior Secured Notes Indenture are incorporated herein by reference, mutatis mutandis.

(b)    Each of the Trustees is executing this Agreement solely as Trustees under the Indentures.  All rights, privileges, protections and immunities (including, without limitation, the right to indemnification) in favor of the Trustees under the Indentures are incorporated herein by reference, mutatis mutandis.

# ARTICLE VI

# MISCELLANEOUS

SECTION 6.01.    **Notices**. All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, or sent to the e-mail address of the applicable recipient specified below, as follows:

(a)    if to the Collateral Agent, to it at the following address:

TMF Brasil Administração e Gestão de Ativos Ltda.
Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,
Edificio Jacarandá, Room 3
Zip Code 06460-040
Barueri – SP, Brazil
Attention: Diogo Malheiros, Leone Azevedo, Lesli Gonzalez, Natalia Monte
Email: diogo.malheiros@tmf-group.com; leone.azevedo@tmf-group.com; lesli.gonzalez@tmf-group.com; natalia.monte@tmf-group.com; CTS.Brazil@tmf-group.com

(b)    if to the Senior Secured Notes Trustee, to it at the following address:

Error! Unknown document property name.

The Bank of New York Mellon
240 Greenwich Street – 7E
New York, New York 10286
USA
Attention: RM for Gol Finance


       (c)     if to the Additional Trustee identified in the introductory paragraph hereto, to it at the following address:

        TMF Brasil Administração e Gestão de Ativos Ltda.

        Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,

        Edifício Jacarandá, Room 3

        Zip Code 06460-040

        Barueri – SP, Brazil

        Attention: Diogo Malheiros, Leone Azevedo, Lesli Gonzalez, Natalia Monte

        Email: diogo.malheiros@tmf-group.com; leone.azevedo@tmf-group.com; lesli.gonzalez@tmf-group.com; natalia.monte@tmf-group.com; CTS.Brazil@tmf-group.com


       (d)     if to any other Additional Trustee, to it at the address set forth in the applicable joinder agreement;

       (e)     if to the Issuers and the Guarantors, at the following address:


        Praça Comte Linneu Gomes
        S/N, Portaria 3, Jardim Aeroporto
        04626-020 – São Paulo, SP
        Brasil
        Attention: Edmar Prado Lopes Neto
        Facsimile: 55-11-5098-7888
        Email: elopes@voegol.com.br

        with a copy to:

        Milbank LLP
        Av. Brigadeiro Faria Lima, 4100, 5th Floor
        São Paulo, SP
        Brasil
        Attention: Tobias Stirnberg
        Facsimile: 55 11 3927-7702
        Email: tstirnberg@milbank.com

Error! Unknown document property name.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 6.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 6.01. As agreed to between the Collateral Agent and the Trustees from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable party provided from time to time by such party.

SECTION 6.02.    **Waivers; Amendment**.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Trustees and the Collateral Agent.

SECTION 6.03.    **Parties in Interest**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 6.04.    **Effectiveness; Survival of Agreement**. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto on the date hereof and delivery by each of the parties on the date hereof.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 6.05.    **Counterparts**. This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.  A party's electronic signature (complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to

Error! Unknown document property name.

time, or other applicable law) of this Agreement shall have the same validity and effect as a signature affixed by the party's hand.

SECTION 6.06.   **Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 6.07.   **Governing Law**.   THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK.

SECTION 6.08.   **Submission To Jurisdiction; Waivers**.   Each of the Collateral Agent, the Trustees, and Secured Parties, irrevocably and unconditionally:

(a)   submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)   consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)   agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its authorized representative) at the address referred to in Section 6.01, except in the case of the Collateral Agent, who has legally, validly, effectively and irrevocably designated, appointed and empowered Cogency Global, Inc., as agent for service of process in any legal suit action or proceeding arising out of or related to this Agreement in any courts of the State of New York, courts of the United States of America for the Southern District of New York, and appellate courts from any thereof, and in the case of the Issuers and the Guarantors, who have legally, validly, effectively and irrevocably designated, appointed and empowered Cogency Global, Inc., as agent for service of process in any legal suit action or proceeding arising out of or related to this Agreement in any courts of the State of New York, courts of the United States of America for the Southern District of New York, and appellate courts from any thereof; and

(d)   agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by Law or shall limit the right of any party hereto (or any Secured Party) to sue in any other jurisdiction.

Error! Unknown document property name.

SECTION 6.09.    **WAIVER OF JURY TRIAL**.    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 6.10.    **Headings**.    Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 6.11.    **Conflicts**.    In the event of any conflict or inconsistency between the provisions of this Agreement, the Indentures or any of the Collateral Documents, the provisions of this Agreement shall control.

SECTION 6.12.    **Relative Rights**.    Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Section 3.04), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of any of the Indentures or the Collateral Documents, or permit the Issuers or any of the Guarantors to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the any of the Indentures or the Collateral Documents, (b) impair the obligations of the Issuers or the Guarantors, which are absolute and unconditional, to pay the Pari Passu Obligations as and when they shall become due and payable in accordance with their terms or (c) obligate the Issuers or the Guarantors to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the Indenture or the Collateral Documents.

SECTION 6.13.    **Integration**.    This Agreement together with the Indentures and the Collateral Documents represents the agreement of each of the Issuers, the Guarantors and the Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by the Trustees, Issuers or any of the Guarantors, the Collateral Agent, or any Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the Indentures or the Collateral Documents.

SECTION 6.14.    **Further Assurances**.    Each of the Collateral Agent and each Trustee agrees that it will execute, or will cause to be executed, any and all further documents, agreements and instruments, and take all such further actions, as may be required under any applicable Law, or which the Collateral Agent or the Trustees may reasonably request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for herein.

SECTION 6.15.    **Concerning the Trustee**s.    Notwithstanding any term herein to the contrary, it is hereby expressly agreed and acknowledged that the agreements set forth herein by any Trustee (in its capacity as such) are made solely in its capacity as Trustee under the applicable Indenture and pursuant to the provisions of such Indenture and the direction of the Issuers, the Guarantors and the Secured Parties, and not in its individual capacity. Each Trustee (in its capacity as such) shall not have any duties, obligations, or responsibilities under this Agreement in its capacity as such except as expressly set forth herein, and shall have the benefit of all exculpatory provisions, presumptions, indemnities, protections, benefits, immunities or reliance rights contained in the Indentures in the acceptance, execution, delivery and

Error! Unknown document property name.

performance of this Agreement as though fully set forth herein. Notwithstanding any provision to the contrary, no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise against the Trustees and the Trustees acting under this Agreement shall not have by reason of the Collateral Documents or this Agreement any fiduciary or discretionary duties or obligations.

SECTION 6.16.    **Secured Parties**.    Nothing in this Agreement, including the appointment by the parties hereto of the Collateral Agent to exercise remedies on their behalf as set forth herein, shall be interpreted or construed to impose on any Secured Party any obligation to provide new loans or other forms of financing to or on behalf of the Issuers or the Guarantors, or to extend or renew any existing loans or other forms of financing to or on behalf of the Issuers or the Guarantors, including to permit them to continue their business operations.

[Remainder of this page intentionally left blank]

**Error! Unknown document property name.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**GOL FINANCE**
as Senior Secured Notes Issuer

By:

Name:
Title:

**GOL FINANCE**
as Additional Issuer

By: _____   _____
Name:
Title:

**GOL EQUITY FINANCE**

as Additional Issuer

By: _____       _____

Name: Joost Mees                    Gilles Francois

Title: Director                     Director

*[Signature page to Intercreditor Agreement]*

**GOL LINHAS AÉREAS S.A.**
as a Guarantor

By:

Name:
Title:

**GOL LINHAS AÉREAS INTELIGENTES S.A**.
as a Guarantor

By:

Name:
Title:

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**
as Collateral Agent

By: _____

Name: Lesli Gonzalez
Title:  attorney in fact

Leone Azevedo
attorney in fact

**THE BANK OF NEW YORK MELLON**
as Trustee

By: _____

Name:  Francine Kincaid

Title:  Vice President

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as Collateral Agent under the SSN Note Purchase Agreement,** as Additional Trustee

By: _____

Name: Lesli Gonzalez          Leone Azevedo

Title: attorney in fact        attorney in fact

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO
DE ATIVOS LTDA., as Collateral Agent under
the ESSN Note Purchase Agreement,**
as Additional Trustee

By: _____

Name: Lésli Gonzalez        Leone Azevedo
Title: attorney in fact        attorney in fact

## Exhibit E

**2028 SSN Note Purchase Agreement**

---

## SENIOR SECURED NOTE PURCHASE AGREEMENT

GOL FINANCE
as Company

GOL LINHAS AÉREAS INTELIGENTES S.A.

as Guarantor
and as Registrar, Transfer Agent and Paying Agent

GOL LINHAS AÉREAS S.A.
as Guarantor

and SMILES FIDELIDADE S.A.
as a Springing Guarantor

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

and

ABRA GROUP LIMITED
as Purchaser

---

## SENIOR SECURED NOTE PURCHASE AGREEMENT

Dated as of March 2, 2023

_____

Senior Secured Notes due 2028

#4856-1598-7531v19

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01.    Definitions................................................................................................ 1
SECTION 1.02.    Rules of Construction ............................................................... 21
SECTION 1.03.    Table of Contents; Headings................................................... 22
SECTION 1.04.    Form of Documents Delivered.......................................................... 23

## ARTICLE 2
### PURCHASE AND SALE OF THE NOTES

SECTION 2.01.    Sale and Purchase of the Notes................................................ 23
SECTION 2.02.    Closing .................................................................................... 23
SECTION 2.03.    Expenses ................................................................................. 24

## ARTICLE 3
### USE OF PROCEEDS

SECTION 3.01.    Net Proceeds ........................................................................... 24

## ARTICLE 4
### THE NOTES

SECTION 4.01.    Form and Dating ...................................................................... 24
SECTION 4.02.    Execution and Delivery............................................................ 25
SECTION 4.03.    Registrar, Transfer Agent and Paying Agent .................................. 25
SECTION 4.04.    Paying Agent to Hold Money in Trust....................................... 26
SECTION 4.05.    Payment of Principal and Interest; Principal and Interest Rights Preserved .. 27
SECTION 4.06.    [Reserved]................................................................................ 28
SECTION 4.07.    Transfer of Notes .................................................................... 28
SECTION 4.08.    Replacement Notes ................................................................. 28
SECTION 4.09.    Cancellation ........................................................................... 28
SECTION 4.10.    Defaulted Interest.................................................................... 29
SECTION 4.11.    No Purchase of the Notes by the Company or its Affiliates ............ 29
SECTION 4.12.    Fundamental Change ............................................................... 29

## ARTICLE 5
### CONDITIONS TO CLOSING

SECTION 5.01.    Purchaser's Conditions to Issuance of Notes............................. 29
SECTION 5.02.    Company's Conditions to Issuance of Notes............................. 32
SECTION 5.03.    Conditions Relating to Collateral............................................. 32

i

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

SECTION 6.01.    Representations of the Company and the Guarantors ...................................... 32
SECTION 6.02.    Representations of the Purchaser ................................................................... 38

## ARTICLE 7
### COVENANTS

SECTION 7.01.    Payment of Principal and Interest Under the Notes ....................................... 39
SECTION 7.02.    Maintenance of Office or Agency .................................................................. 39
SECTION 7.03.    Money for Note Payments to Be Held in Trust .............................................. 39
SECTION 7.04.    Maintenance of Corporate Existence .............................................................. 40
SECTION 7.05.    Payment of Taxes and Claims ........................................................................ 41
SECTION 7.06.    Payment of Additional Amounts .................................................................... 41
SECTION 7.07.    Collateral and Liens. ..................................................................................... 43
SECTION 7.08.    Certain Assurances ........................................................................................ 45
SECTION 7.09.    Release of Collateral ..................................................................................... 47
SECTION 7.10.    Maintenance of Collateral ............................................................................. 47
SECTION 7.11.    Limitation on Transactions with Affiliates. ................................................... 47
SECTION 7.12.    Limitation on Sale of Assets ......................................................................... 49
SECTION 7.13.    Limitation on Debt. ....................................................................................... 51
SECTION 7.14.    Limitation on Restricted Payments ................................................................ 53
SECTION 7.15.    Non-Compete and Exclusivity ...................................................................... 55
SECTION 7.16.    Additional Lines of Business ......................................................................... 56
SECTION 7.17.    GLA and IPCO Covenants ............................................................................ 56

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.    [Reserved]. .................................................................................................... 58
SECTION 8.02.    Limitation on Consolidation, Merger or Transfer of Assets ........................... 58
SECTION 8.03.    Successor Substituted ..................................................................................... 59

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.    Events of Default ........................................................................................... 59
SECTION 9.02.    Acceleration of Maturity, Rescission and Amendment ................................... 62
SECTION 9.03.    Applicable Premium ...................................................................................... 63
SECTION 9.04.    Subrogation Rights......................................................................................... 63
SECTION 9.05.    Application of Money Collected..................................................................... 64
SECTION 9.06.    Limitation on Suits ........................................................................................ 64
SECTION 9.07.    Contractual Rights of Holders to Receive Principal and Interest ................... 65
SECTION 9.08.    Restoration of Rights and Remedies ............................................................. 65

SECTION 9.09.   Delay or Omission Not Waiver.................................................................. 65
SECTION 9.10.   Control by Holders............................................................................... 65
SECTION 9.11.   Rights and Remedies Cumulative ............................................................ 65
SECTION 9.12.   Waiver of Past Defaults and Events of Default ........................................... 66
SECTION 9.13.   Waiver of Stay or Extension Laws ........................................................... 66

## **ARTICLE 10**
### AMENDMENTS

SECTION 10.01.  Without Consent of Holders .................................................................. 66
SECTION 10.02.  With Consent of Holders ...................................................................... 67
SECTION 10.03.  Revocation and Effect of Consents and Waivers........................................ 69
SECTION 10.04.  Payment for Consent............................................................................ 69
SECTION 10.05.  Collateral Agent.................................................................................. 69

## **ARTICLE 11**
### NOTE GUARANTIES

SECTION 11.01.  The Note Guaranties ............................................................................ 69
SECTION 11.02.  Guaranty Unconditional........................................................................ 70
SECTION 11.03.  Discharge; Reinstatement ..................................................................... 70
SECTION 11.04.  Waiver by the Guarantors ..................................................................... 70
SECTION 11.05.  Subrogation and Contribution ................................................................ 71
SECTION 11.06.  Stay of Acceleration............................................................................. 71
SECTION 11.07.  Limitation on Amount of Guaranty .......................................................... 71
SECTION 11.08.  Execution and Delivery of Guaranty ........................................................ 71
SECTION 11.09.  Release of Guaranty ............................................................................. 71

## **ARTICLE 12**
### COLLATERAL AGENT

SECTION 12.01.  Appointment ...................................................................................... 72
SECTION 12.02.  Exculpatory Provisions ........................................................................ 72
SECTION 12.03.  Resignation ....................................................................................... 78
SECTION 12.04.  Fees, Expenses and Indemnification........................................................ 79

## **ARTICLE 13**
### REDEMPTION

SECTION 13.01.  Redemption ....................................................................................... 80
SECTION 13.02.  Notice of Optional Redemption .............................................................. 80
SECTION 13.03.  Payment of Notes Called for Redemption .................................................. 80

iii

## ARTICLE 14
### ACTIONS BY HOLDERS

SECTION 14.01. Action by Holders ........................................................................ 81
SECTION 14.02. Proof of Execution by Holders ................................................... 81
SECTION 14.03. Company-Owned Notes Disregarded ......................................... 81
SECTION 14.04. Revocation of Consents; Future Holders Bound .......................... 81

## ARTICLE 15
### MISCELLANEOUS

SECTION 15.01. Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties
and Holders of Notes .................................................................. 82
SECTION 15.02. Notices ................................................................................... 82
SECTION 15.03. Officer's Certificate and Opinion of Counsel as to Conditions Precedent ..... 84
SECTION 15.04. Statements Required in Officer's Certificate or Opinion of Counsel ........... 84
SECTION 15.05. Rules by Registrar, Paying Agent and Transfer Agents ................................. 84
SECTION 15.06. Currency Indemnity ....................................................................... 84
SECTION 15.07. No Recourse Against Others .............................................................. 85
SECTION 15.08. Legal Holidays ............................................................................. 85
SECTION 15.09. Governing Law ............................................................................. 85
SECTION 15.10. Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial .......... 86
SECTION 15.11. Successors and Assigns .................................................................... 87
SECTION 15.12. Multiple Originals .......................................................................... 87
SECTION 15.13. Severability Clause ......................................................................... 88
SECTION 15.14. Force Majeure ............................................................................... 88
SECTION 15.15. Acknowledgement ........................................................................ 88

EXHIBITS:

EXHIBIT A   –   Form of Note
EXHIBIT B   –   [Reserved]
EXHIBIT C   –   Collateral Agent KYC Requirements
EXHIBIT D   –   Form of GLA's Smiles Fiduciary Transfer Agreement
EXHIBIT E   –   Form of Exclusivity Side Letter
EXHIBIT F   –   Form of Subordination Agreement
SCHEDULE A   List of Permitted Holders
SCHEDULE B   Smiles Technological Infrastructure Agreements
SCHEDULE C   Relevant Agreements Governing The Sale and Issuance of Miles
SCHEDULE D   Bond Conversion Rates

#4856-1598-7531v19

SENIOR SECURED NOTE PURCHASE AGREEMENT, dated as of March 2, 2023, (this "**Note Purchase Agreement**") among GOL FINANCE, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg ("**Luxembourg**"), with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497, as issuer (the "**Company**"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**"), as guarantor, registrar, transfer agent and paying agent, GOL LINHAS AÉREAS S.A. ("**GLA**"), a wholly owned subsidiary of GLAI, as guarantor, and SMILES FIDELIDADE S.A., a wholly owned subsidiary of GLA ("**IPCo**") as guarantor, each, a corporation (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "**Purchaser**") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "**Collateral Agent**").

## RECITALS

The Company has duly authorized (i) the issuance and sale of the Notes (as hereinafter defined) and (ii) the execution and delivery of this Note Purchase Agreement.

In addition, the Guarantors have duly authorized the execution and delivery of this Note Purchase Agreement as guarantors of the Notes. The Guarantors have done all things necessary to make the Note Guaranties (as hereinafter defined), when the Notes are executed and duly issued by the Company, the valid obligations of the Guarantors, and to make this Note Purchase Agreement a valid agreement of the Guarantors.

The Company has requested that, immediately upon the satisfaction in full of the conditions precedent set forth in Article 5, as applicable, the Purchaser, purchase the Notes from the Company in the aggregate original principal amount of U.S.$1,430,925,000 on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE, THIS NOTE PURCHASE AGREEMENT WITNESSETH:**

For and in consideration of the premises and the purchase of the Notes by the Purchaser, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders (as defined below), as follows:

## ARTICLE 1
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01.    *Definitions*.

"**Abra Global Finance**" means Abra Global Finance incorporated under the laws of the Cayman Islands.

"**Abra Holders**" means, as of the date of determination, collectively, the holders of the Abra Senior Secured Notes (provided any such Abra Senior Secured Notes remain outstanding)

and the holders of Abra Senior Secured Exchangeable Notes (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Notes**" means, collectively, the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

"**Abra Notes Supermajority Holders**" means, as of the date of determination, collectively, the holders of the Abra Notes holding more than each of (i) 66.67% in principal amount of the outstanding Abra Senior Secured Notes from time to time (provided any such Abra Senior Secured Notes have been issued and remain outstanding) and (ii) 66.67% in principal amount of outstanding Abra Senior Secured Exchangeable Notes from time to time (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Senior Secured Exchangeable Notes**" means the Abra Senior Secured Exchangeable Notes due 2028, issued by Abra Global Finance and guaranteed by the Purchaser, in the aggregate principal amount of U.S.$458,585,447, pursuant to the Abra Senior Secured Exchangeable Notes Indenture.

"**Abra Senior Secured Exchangeable Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Exchangeable Notes entered into by and among Abra Global Finance, as issuer, the Purchaser, as guarantor, The Bank of New York Mellon, as trustee, registrar and paying agent, and TMF Group New York LLC, as collateral agent.

"**Abra Senior Secured Notes**" means the Abra Senior Secured Notes due 2028, issued by Abra Global Finance and guaranteed by the Purchaser, in the aggregate principal amount of up to U.S.$962,254,480, pursuant to the Abra Senior Secured Notes Indenture.

"**Abra Senior Secured Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Notes entered into on March 2, 2023, by and among Abra Global Finance, as issuer, the Purchaser, as guarantor, The Bank of New York Mellon, as trustee, registrar and paying agent, and TMF Group New York LLC, as collateral agent.

"**Accounting Principles**" shall mean the International Financial Reporting Standards promulgated by the International Accounting Standards Board ("**IFRS**"), in effect from time to time as applied by GLAI consistently throughout the relevant periods, including with regard to impairment losses, obsolescence policies for rotables and inventory, and hedging transactions. For clarity, the impact of all hedging transactions shall be included as part of the income or expense item to which it relates, and not in interest or financing expense.

"**Act**" when used with respect to any Holder, has the meaning specified in Section 14.01(a).

"**Activities**" has the meaning specified in Section 12.02(t).

"**Additional Amounts**" has the meaning specified in Section 7.06(a).

"**Additional Assets**" means any assets (other than Debt and Capital Stock) to be used by GLAI or any of its Subsidiaries in a Related Business.

2

"**Adjusted Operating Expenses**" shall mean, for any reference period, with respect to any Guarantor or any of its Subsidiaries, as applicable, any costs and expenses incurred in services and other transactions required to generate Adjusted Operating Revenues of such Guarantor and its Subsidiaries which are recognized as operating expenses of such Guarantor and its Subsidiaries under the Accounting Principles, as applicable, **(i)** including (a) expenses related to personnel and associated taxes and charges, (b) fuel and lubricant expenses, (c) maintenance expenses, including Normalized aircraft redelivery expenses, (d) expenses related to third party services, (e) passenger and cargo enplanement costs, but excluding costs representing funds collected on behalf of third parties such as airport boarding fees, (f) landing and navigation fees, (g) sales and marketing expenses (h) frequent flyer redemption costs with any third parties or non-consolidated Subsidiaries and (i) other expenses associated with the generation of Adjusted Operating Revenues; and **(ii)** excluding (a) depreciation, (b) amortization, (c) lease payments, (d) interest expenses, (e) non-cash foreign exchange variation, (f) income taxes and social contribution taxes applicable to profits, (g) unpaid maintenance expenses to the extent such provisions are reflected in a Guarantor's or any of its Subsidiaries' Debt calculations, as applicable, in the form of maintenance and/or redelivery provision liabilities. The calculation of Adjusted Operating Expenses of each Guarantor or any of its Subsidiaries, as applicable, shall be based on consistent methodologies and parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor or any of its Subsidiaries for purposes of the definition of Adjusted Operating Expenses, as applicable:

- Restoration maintenance expenses: restoration maintenance expenses shall use an accrual basis of accounting for engines, fuselage, APU, and landing gear.

- Routine maintenance expenses: routine maintenance expenses shall be expensed as incurred.

- Aircraft depreciation: the calculation of residual value and useful life of Aircraft shall reflect the agreed upon contractual provisions of leases or other aircraft financing instruments.

- Losses on sale-leaseback transactions: losses on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- Air traffic liability: shall represent the Guarantors' liability for tickets sold for future travel dates and funds that are past flight date and remain unused as well the Guarantors' liability associated with loyalty related performance obligations. Air traffic liability of each Guarantor shall be calculated assuming passenger ticket breakage at the earlier of 12 months from purchase and the expiration of the applicable ticket or program.

- Pension liability and employee benefits: each Guarantor shall use the same methodology for calculation of pension liabilities and employee benefits to the extent permitted by applicable Law and include it in the profit and loss statement as part of employee expenses.

3

- <u>Expected losses on receivables</u>: expected losses on receivables shall be estimated based on historical experience and in the case of materially large past due receivables, have external auditor input.

- <u>Operating expenses/rental expenses</u>: no operating expenses shall be treated as rental expenses.

- <u>Standard group policies</u>: each airline will conform to standardized group policies about which costs to capitalize versus expense.

"**Adjusted Operating Revenues**" shall mean, for any reference period, the gross inflow of economic benefits (such as cash, receivables, and other assets) arising from ordinary operating activities, recognized as revenues under the Accounting Principles (i) <u>including</u> (a) sales of passenger transportation services and associated revenues, including flight tickets revenues calculated recognizing breakage amounts at the earlier of 12 months from purchase and the expiration of the applicable ticket or program, baggage fees, rescheduling fees, cancellation fees, other related passenger revenues; (b) cargo transportation revenues; (c) frequent flyer revenues calculated recognizing breakage amounts for unredeemed mileage credits at the earlier of 12 months from issue and the expiration of the applicable ticket or program; (d) recovery of or compensation for previously incurred operating expenses; and (e) recovery of or compensation for interrupted services, aircraft delivery delays and unexpected aircraft grounding periods; and (ii) <u>excluding</u> (a) interest revenues, (b) any income associated with non-cash foreign exchange variation, (c) dividends and (d) any revenues passed-through to third parties, such as airport boarding fees. Adjusted Operating Revenues may be reported on each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, as operating revenues on the top line of the income statement or as a deduction from operating costs and expenses and may be subject to timing deferrals or occur in different periods in each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, if the accounting policies of the Guarantors or any of its Subsidiaries have not been conformed. The calculation of Adjusted Operating Revenues of each Guarantor, as applicable, shall be based on consistent methodologies and parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor, as applicable, for purposes of the definition of Adjusted Operating Revenues:

- <u>Gains on sale-leaseback transactions</u>: gains on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- <u>Credit card installment interest</u>: credit card installment interest shall be deducted from revenues (and not reflected as an interest expense).

"**ADS**" means an American Depositary Share, issued pursuant to the Deposit Agreement, representing, as of the date of this Note Purchase Agreement, two Preferred Shares.

"**ADS Depositary**" means The Bank of New York Mellon, as depositary for the ADSs, or any successor under the Deposit Agreement.

#4856-1598-7531v19

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Agents**" means any Collateral Agent, Registrar, Transfer Agent or Paying Agent appointed pursuant to this Note Purchase Agreement, individually, an "**Agent**."

"**Aircraft**" shall mean, collectively, any aircraft owned by or leased to a Guarantor or any of its Subsidiaries, as applicable, and any engines, parts, components, instruments, accessories, furnishings and other equipment attached or relating to such aircraft.

"**Aircraft Debt**" means any (i) Debt incurred to finance the acquisition or operation of aircraft, spare parts or engines, secured by aircraft, spare parts or engines the acquisition or operation of which are so financed, (ii) any asset-based Debt on terms that are customary in the aviation industry secured by aircraft, spare parts or engines, and (iii) predelivery payment financing.

"**Aircraft Rentals**" shall mean, with respect to a Guarantor or any of its Subsidiaries, as applicable, the annual aircraft rental expense of such Guarantor or any of its Subsidiaries (subject to Normalization).

"**Anti-Money Laundering Laws**" has the meaning specified in Section 6.01(24).

"**Apostille**" has the meaning specified in Section 6.01(17).

"**Apostille Convention**" has the meaning specified in Section 6.01(17).

"**Applicable Premium**" means the difference (which shall not be less than zero) between (a) the sum (in cash) of the present values of the remaining scheduled payments of principal and interest (including without limitation all PIK Interest) on such Notes (excluding accrued and unpaid interest (other than PIK Interest capitalized prior to the date thereof) to the date when such Notes become due and payable) discounted to the date when such Notes become due and payable on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points, and (b) the principal amount of the Notes then Outstanding.

"**Asset Sale**" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) by GLAI or any of its Subsidiaries outside the ordinary course of business, including any disposition by means of a merger, consolidation, or similar transaction (each referred to for the purposes of this definition as a "disposition"), of:

5

(1) any shares of a Subsidiary of GLAI (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than GLAI or a Subsidiary thereof);

(2) all or substantially all the assets of any division or line of business of GLAI or any Subsidiary thereof; or

(3)   any other assets of GLAI or any Subsidiary other than the Collateral;

*provided*, *however*, that Asset Sale will not include:

(a) a disposition by a Subsidiary to GLAI or to another Subsidiary or by GLAI to a Subsidiary;

(b) a Restricted Payment that does not violate the covenant described under Section 7.14. Limitation on Restricted Payments;

(c) the disposition of assets with a Fair Market Value not to exceed U.S.$40.0 million in the aggregate (or the equivalent thereof at the time of determination), except for a disposition of assets expressly provided for in the annual budget or business plan of GLAI or any of its Subsidiaries, as the case may be;

(d) a disposition of obsolete equipment or other obsolete assets or other property which is no longer useful for GLAI or any of its Subsidiaries in the ordinary course of business;

(e) the disposition of all or substantially all of the assets of GLAI or any of its Subsidiaries in a manner permitted under the covenant described under Section 8. Consolidation, Merger, Conveyance, Transfer or Lease;

(f) any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind; or

(g) sales, transfers or other dispositions of assets for non-cash consideration at least equal to the Fair Market Value (as certificated in a certificate signed by a Responsible Officer) of such assets, to the extent that such non-cash consideration would constitute Additional Assets.

"**Authorized Denomination**" has the meaning specified in Section 4.02(a)(4).

"**Board of Directors**" means the Board of Directors of the Company, or the applicable Guarantor, as the case may be, or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the secretary, the assistant secretary or another Officer or legal counsel performing corporate secretarial functions of the Company or the Guarantors, as applicable to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification.

6

"**Brazilian Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil or a day on which banking institutions or trust companies are authorized or obligated by law to close in São Paulo, Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, England and Wales, the State of New York or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by Law to close in The City of New York, London, São Paulo, Brazil, or Luxembourg.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Cash Interest**" shall have the meaning specified in Section 4.05(d)(i).

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*)

"**close of business**" means 5:00 p.m. (New York City time).

"**Closing**" shall have the meaning specified in Section 2.02.

"**Closing Date**" means the Initial Closing Date or any date thereafter on which the Company and the Purchaser mutually agree to sell and purchase Notes hereunder, as applicable.

"**Closing Location**" shall have the meaning specified in Section 2.02.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the assets and rights that from time to time are subject to a Lien granted by the Company or any Guarantor to the Collateral Agent, for the benefit of the Secured Parties, pursuant to any Collateral Document. The Collateral shall include (i) as further described in GLA's Smiles Fiduciary Transfer Agreement (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program, (ii) all intercompany claims, loans and obligations evidenced by the global intercompany note entered into by the Company and the Guarantors evidencing the loans made by the Company or any Guarantor to any of its respective Affiliates or Subsidiaries, (iii) the guaranty by the GLAI, GLA and IPCo of all of the Company's obligations under this Note Purchase Agreement and the Notes and the other Collateral Documents, (iv) as further described in GOL Senior Secured Notes due 2026 Collateral, all collateral securing the GOL Senior Secured Notes due 2026 on a pari passu basis; (v) as further described in GLA's Fiduciary Transfer of IPCo's Shares Agreement, one hundred percent (100%) of IPCo's equity, totally owned by GLA; and (vi) as further described in IPCo's Smiles Fiduciary Transfer Agreement, all of the assets and rights described in item (1)(i) above transferred to IPCo under suspensive condition pursuant to Section 7.17 below.

7

#4856-1598-7531v19

"**Collateral Agent**" means (i) the Person named as the "Collateral Agent" in the first paragraph of this Note Purchase Agreement and (ii) any Person appointed as a successor "Collateral Agent' under this Note Purchase Agreement and the Collateral Documents, in each case, until a successor Person shall have become such pursuant to the applicable provisions of this Note Purchase Agreement and the Collateral Documents, and thereafter "Collateral Agent" shall mean the successor serving hereunder and thereunder.

"**Collateral Documents**" means (i) the GLA's Smiles Fiduciary Transfer Agreement, (ii) the amendments to GOL Senior Secured Notes due 2026 Collateral (to include the Notes and GOL Senior Secured Notes due 2028 as secured obligations), (iii) the intercreditor agreement between GOL Finance, the Collateral Agent, The Bank of New York Mellon, as trustee of the GOL Senior Secured Notes due 2026 and TMF Brasil Administração Gestão de Ativos Ltda., as collateral agent under the GOL Senior Secured Notes due 2026, (iv) the GLA's Fiduciary Transfer of IPCo's Shares Agreement and (v) the IPCo's Smiles Fiduciary Transfer Agreement. The definition of Collateral Documents shall also include any other agreement designated as a Collateral Document by the parties hereto, as amended from time to time.

"**Company**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**Company and Guarantors Process Agent**" has the meaning specified in Section 15.10(a).

"**Company's Office**" has the meaning specified in Section 4.03(a).

"**Comparable Treasury Issue**" means the United States Treasury security selected by the Company as having a maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes.

"**Comparable Treasury Price**" means with respect to any date when Notes become due and payable, the average of two Reference Treasury Dealer Quotations for the when such Notes become due and payable.

"**Covered Plan**" has the meaning specified in Section 6.02(3).

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Debt**" means, with respect to any Person, without duplication, the Outstanding principal amount of, including any related accrued or outstanding interest, of all (a) debt for borrowed money of such Person or debt issued by such Person in substitution or exchange for borrowed money, (b) debt evidenced by any note, bond, debenture or other debt security, in each case, as of such time of such Person, taking into account the face value of any convertible securities, (c) that portion of the obligations with respect to finance leases in accordance with IFRS (provided, that for the avoidance of doubt, finance leases shall not be double counted with IFRS 16 leases), (d) the net settlement value of all interest rate or currency swaps, collars, caps, and similar hedging obligations or other derivative agreements, including equity derivatives structured as

8

"capped calls" and (e) all reimbursement or other obligations with respect to letters of credit, bank guarantees, bankers acceptances or similar instruments, in each case, solely to the extent drawn. "**Debt**" shall not include (1) customer deposits, (2) advance payments received from customers for the sale, lease or license of goods and services in the ordinary course of business, whether or not such deposits or advance payments have been expensed in accordance with IFRS, (3) non-speculative hedging obligations and (4) current accounts payable and accrued expenses payable within 180 days and incurred in the ordinary course of business.

"**Deductions**" has the meaning specified in Section 12.02(m).

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Deposit Agreement**" means the Amended and Restated Deposit Agreement, dated as of April 17, 2017, by and among GLAI, the ADS Depositary, and the holders from time to time of ADSs issued thereunder, as supplemented by a letter agreement dated as of March 26, 2019, between GLAI and the ADS Depositary, relating to the delivery of ADSs or restricted ADSs, as the case may be, upon exchange of the Notes and, if further amended or supplemented as provided therein, as so amended or supplemented.

"**Designated Bank Account**" means, with respect to any payments made to a Holder pursuant to this Note Purchase Agreement or Notes, the U.S. dollar bank account designated by such Holder at least three Business Days prior to the applicable payment.

"**Disclosure Documents**" shall have the meaning specified in 6.01(23).

"**EBITDAR**" shall mean earnings before interest, taxes, depreciation, amortization and rent and, for the purposes of the Notes, shall be composed of (a) the Adjusted Operating Revenues, net of Sales Taxes, *minus* (b) the Adjusted Operating Expenses.

"**Embargo Rules**" has the meaning specified in Section 12.02(l).

"**Enforceability Exceptions**" shall have the meaning specified in Section 6.01(3).

"**ERISA**" has the meaning specified in Section 6.02(3).

"**Event of Default**" has the meaning specified in Section 9.01.

"**Excess Proceeds**" shall have the meaning specified in Section 7.12(iv).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Exclusivity Side Letter**" means that certain Brazilian law governed side letter, dated as of the date hereof in the form attached hereto as Exhibit E, by and among the Company, the Guarantors and the Purchaser and Abra Global Finance relating to, among other things, the agreements by the Company, the Guarantors and IPCo with respect to the exclusivity of the Loyalty Program.

"**Fair Market Value**" of any property, asset, share of Capital Stock, other security, Investment or other item means, on any date, the fair market value of such property, asset, share of Capital Stock, other security, Investment or other item on that date as determined in good faith by the management of GLAI or a Subsidiary thereof, as the case may be.

"**Federal Reserve System**" means the central banking system of the United States of America.

"**Form of GLA's Smiles Fiduciary Transfer Agreement**" means the "Form of GLA's Smiles Fiduciary Transfer Agreement" attached hereto as Exhibit D.

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

"**Fundamental Change**" means, at any time after the Closing Date, any of the following occurring:

(i)        the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means or by any of the transactions contemplated in this Note Purchase Agreement) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), except for any "person" or "group" that consists solely of one or more Permitted Holders is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the  outstanding Capital Stock;

(ii)       the consummation of any sale, lease or other transfer or disposition in one transaction or a series of transactions, including any split-off or spin-off, to any Person of all or substantially all of the consolidated assets of any of the Guarantors and its Subsidiaries, taken as a whole; or

(iii)      the shareholders of the Company or any of the Guarantors approve any plan or proposal for the liquidation or dissolution of the Company or any of the Guarantors other than in a transaction described in, and that complies with the provisions described under, Article 8 of this Note Purchase Agreement.

"**GLA**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLA's Fiduciary Transfer of IPCo's Shares Agreement**" means that certain Brazilian law governed agreement entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, GLAI and IPCo, as intervening party (as amended from time to time), with respect to the fiduciary lien over one hundred percent (100%) of IPCo's equity, all of which is owned by GLA.

"**GLA's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement, entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, and GLAI, as intervening party (as amended from time to time), with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles

10

Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program.

"**GLAI**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLAI Going Private Process**" means the process of (i) termination of the listing for trading of the Preferred Shares on the B3 S.A. or (ii) deregistration of GLAI as a publicly held company (*companhia aberta*) with the CVM.

"**GLAI Group**" means GLAI and all of its direct and indirect Subsidiaries (including GLA).

"**GOL Bonds**" means the following notes issued by GLAI or its subsidiaries: the GOL Exchangeable Notes due 2024, the GOL Senior Notes due 2025, the GOL Senior Secured Notes due 2026 and the GOL Perpetual Notes existing on the date of this Note Purchase Agreement.

"**GOL Equity Finance**" means GOL Equity Finance, a public limited liability company (*société anonyme*) incorporated and existing under Luxembourg with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 224920.

"**GOL Exchangeable Notes due 2024**" means the 3.75% Exchangeable Senior Notes Due 2024, issued by GOL Equity Finance.

"**GOL Perpetual  Notes**" means the 8.75% Perpetual Notes, issued by the Company.

"**GOL Senior Notes due 2025**" means the 7.000% Senior Notes Due 2025, issued by the Company.

"**GOL Senior Secured Exchangeable Notes due 2028**" means the 18% Senior Secured Exchangeable Notes due 2028, issued by GOL Equity Finance, as of the date hereof.

"**GOL Senior Secured Notes due 2026**" means the 8.00% Senior Secured Notes Due 2026, issued by the Company.

"**GOL Senior Secured Notes due 2026 Collateral**" means the GOL Senior Secured Notes due 2026 IP Collateral  and the GOL Senior Secured Notes due 2026 Spares Parts Collateral.

"**GOL Senior Secured Notes due 2026 IP Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLAI, as intervening party; and (ii) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLAI, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

11

"**GOL Senior Secured Notes due 2026 Spares Parts Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party; (ii) the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

"**GOL Senior Secured Exchangeable Notes NPA**" means the Senior Secured Exchangeable Note Purchase Agreement to be entered into by and among GOL Equity Finance, GLAI, GLA,  IPCo, TMF Brasil Administração e Gestão de Ativos Ltda. and the Purchaser on or about the Initial Closing Date.

"**Governmental Authority**" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"**Guarantor**" means any of (i) GLAI, (ii) GLA, (iii) IPCo and (iv) any successor obligor under the Note Guaranties pursuant to Section 11.01, unless and until such Guarantor is released from the Note Guaranty pursuant to this Note Purchase Agreement.

"**Holder**" means the Person in whose name a Note is registered in the Register.

"**IFRS**" has the meaning set forth in the definition of the term "**Accounting Principles**".

"**Initial Closing Date**" means the date of execution of this Note Purchase Agreement.

"**Institutional Investor**" has the meaning set forth in Section 6.01(19).

"**Interest Payment Date**" means each May 31 and November 30 of each year, beginning on May 31, 2023.

"**Investment**" means:

12

(a) the acquisition or investment in any Person or business (whether by asset or equity purchase, merger, consolidation, amalgamation or otherwise) that holds, directly or indirectly, any interest in, or directly or indirectly operates, any airline, or otherwise where the consideration for the acquisition and any Debt or other assumed actual or contingent liability, together with the amount of any investment in any joint venture, exceeds U.S.$40.0 million (or the equivalent thereof at the time of determination), except as provided for in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(b) the approval or amendment of the annual budget or business plan or any voluntary deviation therefrom in excess of 5% of Adjusted Operating Expenses set out in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(c) any capital expenditure that in the aggregate in any fiscal year is in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination), except for capital expenditures provided for in the annual budget or the business plan of GLAI or any Subsidiary thereof, as the case may be;

(d) any contract that (i) is (x) outside the ordinary course of business, or (y) on terms other than industry standard commercial terms, and (ii) involving an annual payment greater than U.S.$10.0 million (or the equivalent thereof at the time of determination), in each case, except for agreements as provided for in the annual budget or the business plan of GLAI or its Subsidiary, as the case may be; or

(e) any contract, binding agreement or similar or analogous arrangement for the purchase, order or lease of any aircraft.

"**IPCo**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**IPCo's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement entered into by IPCo, as security provider, the Collateral Agent, as security beneficiary, and GLA and GLAI, as intervening parties, with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the Smiles Technological Infrastructure; (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, and advertising materials exclusively related to the Loyalty Program, under suspensive condition according to article 125 of Brazilian Civil Code, corresponding to the transfer of the assets and rights encumbered by the GLA's Smiles Fiduciary Transfer Agreement from GLA to IPCo.

"**issue**" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Debt or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be issued by such Subsidiary at the time it becomes a Subsidiary; and the term "issuance" has a corresponding meaning.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration

thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lien**" means any mortgage, pledge, assignment by way of security, charge, security interest, encumbrance, conditional sale or other title retention agreement or other similar lien.

"**Loyalty Program**" means the Smiles loyalty program, and any successor program.

"**Majority Holders**" means Holders of the Notes holding more than 50% in principal amount of the Outstanding Notes.

"**Material Adverse Effect**" means (i) any material adverse effect on the condition (financial or otherwise), business, properties, results of operations or prospects of the Company, the Guarantors and their Subsidiaries, taken as a whole, (ii) any material adverse effect on the ability of the Company, the Guarantors and their Subsidiaries, taken as a whole, to perform their obligations under any Transaction Document, (iii) any material adverse effect upon the binding nature, validity, or enforceability of any of the Transaction Documents or (iv) any material adverse effect on the rights and remedies of the Purchaser or the rights of the Collateral Agent and the Holders in the Collateral, in each case, whether resulting from any single act, omission, situation, status, event or undertaking, or taken together with other such acts, omissions, situations statuses, events or undertakings.

"**Maturity Date**" means the earliest of (a) March 2, 2028, (b) if more than $42.5 million in aggregate principal amount of the GOL Exchangeable Notes due 2024 remains outstanding on the date that is 45 days prior to the maturity of the GOL Exchangeable Notes due 2024 (the "**2024 measurement date**"), the 2024 measurement date or (c) if more than $65 million in aggregate principal amount of the GOL Senior Notes due 2025 remains outstanding on the date that is 45 days prior to the maturity of the GOL Senior Notes due 2025 (the "**2025 measurement date**"), the 2025 measurement date.

"**Net Cash Proceeds**" with respect to any issuance or sale of Capital Stock or sale or other disposition of any assets, means the cash proceeds of such issuance or sale, net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees and expenses actually incurred in connection with such issuance or sale and net of taxes paid or payable in connection with such issuance, sale or disposition.

"**Normalized**" or "**Normalization**" shall mean, for each year:

(a) with respect to aircraft redelivery expenses, the total of the redelivery expenses that a Guarantor or any of its Subsidiaries, as applicable, would be projected to incur on redelivery of each leased aircraft in its fleet, expressed in U.S. Dollars, divided by the expected lease tenor of each aircraft expressed in years, as calculated by an independent third party engaged by each Guarantor or any of its Subsidiaries, as applicable; provided, that for the avoidance of doubt, any redelivery expense accrued in such year under IFRS shall be considered part of and included in the Normalized redelivery expenses figure; and

14

(b) with respect to any Aircraft Rental, the average annual rental expenses (excluding any refundable payments such as deposits and maintenance reserves, as well as any projected redelivery expenses, but including any one-time or "balloon" rental payments) expected to be incurred during the life of such rental.

"**Note Guaranties**" shall have the meaning specified in Section 11.01.

"**Note Purchase Agreement**" has the meaning specified in the first paragraph of this agreement.

"**Notes**" means the notes issued pursuant to the terms hereof on each Closing Date in an initial aggregate principal amount of up to U.S.$1,430,925,000, and shall be substantially in the Form of Note.

"**Notes Obligations**" means Obligations in respect of the Notes, this Note Purchase Agreement, the Note Guaranties and the Collateral Documents.

"**Obligations**" means any principal, interest (including any interest, fees and other amounts accruing subsequent to the filing of a petition in bankruptcy, reorganization, arrangement or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest, fees and other amounts are an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, payable under the documentation governing any Debt.

"**Officer**" means any director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, of the Company or the Guarantors, as the case may be, or any other Person duly appointed by the shareholders of the Company, or the Guarantors, or the Board of Directors, as the case may be, to perform corporate duties.

"**Officer's Certificate**" means a certificate signed by any of the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or the applicable Guarantor, as the case may be.

"**Opinion of Counsel**" means an opinion of legal counsel of recognized international standing (who may be an employee of or counsel to the Company or the Guarantors, *provided that* an Opinion of Counsel delivered pursuant to Section 7.08 and Section 10.01 shall be of an external counsel to, and not an employee of, the Company or the Guarantors, as applicable).

"**Outstanding**" means, as of the date of determination, all Notes theretofore executed and delivered under this Note Purchase Agreement, except:

(i)     Notes theretofore cancelled by the Company or accepted by the Company for cancellation;

#4856-1598-7531v19

(ii)    Notes for whose payment in the necessary amount has been theretofore deposited with the Paying Agent in trust or set aside and segregated in trust by the Company for the Holders of such Notes;

(iii)    Notes required to be cancelled pursuant to Section 4.09; and

(iv)    Notes held by the Company or by any Subsidiary thereof.

"**Paying Agent**" shall have the meaning specified in Section 4.03(a).

"**Payment Default**" has the meaning specified in Section 9.01(e).

"**Permitted Holder**" means (i) each entity listed in Schedule A hereto, and (ii) their Affiliates.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a protected series of a limited liability company or a limited partnership, an association, a trust or any other entity or a government or political subdivision or an agency or instrumentality thereof.

"**PIK Interest**" shall have the meaning specified in Section 4.05(d)(2).

"**Preferred Shares**" means the preferred shares of GLAI, no par value per share.

"**principal**" of a Note means the principal amount of such Note (including any Additional Amounts payable by the Company in respect of such principal).

"**Principal Amount**" has the meaning set forth in Section 2.01.

"**Proceeding**" has the meaning specified in Section 15.10(a).

"**Purchase Price**" has the meaning set forth in Section 2.01.

"**Purchaser**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**Purchaser Deliverables**" means:

(a) the Purchase Price of this Note Purchase Agreement payable by the Purchaser by wire transfer of immediately available funds, to be deposited into such bank accounts as nominated by the Company, on each Closing Date, pursuant to Sections 2.01 and 2.02;

(b) an Internal Revenue Service Form W-9 or W-8 executed by the Purchaser; and

(c) a receipt executed by the Purchaser and delivered to the Company certifying that the Purchaser has received the Notes from the Company on each Closing Date.

"**Purchaser Entity**" means the Purchaser and its Wholly Owned Subsidiaries.

16

"**Purchaser Entity Expenses**" means:

(a)    costs (including all professional fees and expenses) and expenses incurred by any Purchaser Entity in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed or delivered with respect to applicable laws or the respective rules and regulations promulgated thereunder;

(b)    customary indemnification obligations of any Purchaser Entity owing to its directors, officers, employees or other Persons under its articles, charter, by-laws, partnership agreement or other constituent documents or pursuant to written agreements with any such Person;

(c)     obligations of any Purchaser Entity in respect of customary director and officer insurance (including premiums therefor) to the extent relating to GLAI and its Subsidiaries maintained in the ordinary course of business and consistent with past practice;

(d)    (x) general corporate overhead expenses, including professional fees and expenses and (y) other operational expenses, in each case, of any Purchaser Entity incurred in the ordinary course of business and consistent with past practice that are related to the ownership or operation of the business of GLAI or any of its Subsidiaries;

(e)    expenses incurred by any Purchaser Entity in connection with any securities offering, sale, conversion or exchange of Capital Stock or Debt; and

(f)    liabilities incurred by any Purchaser Entity in connection with tax obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any Governmental Authority as a result of the direct or indirect ownership held by such Purchaser Entity in the Capital Stock of GLAI or any of its Subsidiaries.

"**Reais**" means the legal currency of Brazil from time to time.

"**Reference Treasury Dealer**" means any primary United States government securities dealer in New York City selected by the Company.

"**Reference Treasury Dealer Quotations**" means, with respect to each Reference Treasury Dealer and any date when Notes become due and payable, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding the date when such Notes become due and payable.

"**Refinance**" means, in respect of any Debt, to refinance, extend (including pursuant to any defeasance or discharge mechanism), renew, refund, repay, replace, prepay, redeem, defease or retire, or to issue other Debt in exchange or replacement for, such Debt. "Refinanced" and "Refinancing" shall have correlative meanings.

17

"**Refinancing Debt**" means Debt that is incurred to Refinance any Debt of GLAI or any of its Subsidiaries existing on the Initial Closing Date or incurred in compliance with this Note Purchase Agreement (including Debt that Refinances Refinancing Debt); *provided, however,* that:

(i) the Refinancing Debt has a Stated Maturity no earlier than (A) the Stated Maturity of the Debt being Refinanced or (B) the 91st day after the Maturity Date of the Notes;

(ii) such Refinancing Debt is incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount of the Debt being Refinanced when it was initially incurred (or if issued with original issue discount, the aggregate accreted value at the time of Refinancing), plus, in either case, premiums, interest and reasonable expenses incurred in connection therewith;

(iii) if the Debt being Refinanced is Subordinated Obligations, such Refinancing Debt is subordinated in right of payment to the Notes at least to the same extent as the Debt being Refinanced; and

(iv) the Debt being Refinanced may not be secured by any Lien on any Collateral (except and to the extent such Debt was already secured by a Lien on the same Collateral previously securing the Debt so refinanced).

"**Register**" has the meaning specified in Section 4.03(a).

"**Registrar**" has the meaning specified in Section 4.03(a).

"**Regular Record Date**," with respect to any Interest Payment Date, means the May 15 or November 15 (whether or not such day is a Business Day) immediately preceding the applicable May 31 or November 30 Interest Payment Date, respectively.

"**Related Business**" means a business that (i) primarily operates in the airline industry, (ii) primarily supports the airline industry or (ii) primarily supports a business in which GLAI or any of its Subsidiaries already operate.

"**Related-Party Transaction**" has the meaning specified in Section 7.11.

"**Relevant Date**" means, with respect to any payment on a Note, whichever is the later of:  (i) the date on which such payment first becomes due; and (ii) if the full amount payable has not been received by the Company on or prior to such due date, the date on which notice is given to the Purchaser that the full amount has been received by the Company.

"**Relibi Law**" means any tax imposed by Luxembourg by virtue of the Luxembourg law of 23 December 2005, as amended from time to time.

"**Responsible Officer**" means (a) with respect to the Company or any Agent (other than the Collateral Agent), the chief executive officer, president, chief financial, vice-president, director, officer, treasurer, assistant treasurer, controller or any other authorized signatory of such Person; and (b) with respect to the Collateral Agent, any officer of the Collateral Agent with

18

direct responsibility for the administration of this Note Purchase Agreement and the Collateral Documents.

"**Restricted Payments**" and "**Restricted Payment**" have the meanings specified in Section 7.14(e).

"**Sales Taxes**" shall mean, for any reference period, any taxes on any Adjusted Operating Revenue pursuant to applicable Law, excluding income taxes and other taxes applicable to profits.

"**Sanctioned Country or Region**" shall have the meaning specified in Section 6.01(25).

"**Sanctions**" shall have the meaning specified in Section 6.01(25).

"**Secured Parties**" means the Purchaser and the Collateral Agent.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

" **Series A Abra Senior Note due 2028**"  means the  Senior Unsecured Note due 2028, issued by Abra Group Limited, issued to Abra Global Finance from time to time, in the initial principal amount of up to US$962,254,480.

" **Series B Abra Senior Note due 2028**"  means the Senior Unsecured Note due 2028, issued by Abra Group Limited, issued to Abra Global Finance from time to time, in the initial principal amount of up to US$458,585,447.

"**Significant Subsidiary**" means, with respect to any Person, a Subsidiary of such Person that meets the definition of "significant subsidiary" in Article 1, Rule 1-02(w) of Regulation S-X under the Exchange Act.

"**Smiles Complete Technological Infrastructure**" means any and all computer programs, software, source codes, technology and their respective licenses, copyrights and applications that are used for the operation of the Loyalty Program.

"**Smiles Database, Client and Supplier List**" means all data, information, documents, Smiles Personal Data and any other elements related to the operations of the Loyalty Program, including, but not exclusively, the Loyalty Program's clients list and suppliers lists, as well as any other data, information and document related to GLA's or IPCo's database that is necessary for or related to the operation of the Loyalty Program, as updated or modified from time to time, regardless of where such data, information, documents, Smiles Personal Data or other elements are held now or in the future, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Intellectual Property**" means (i) all the currently existing intellectual property rights owned by GLA, including as universal successor of Smiles Fidelidade S.A., related to the Loyalty Program, corresponding to (a) trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (*INPI – Instituto Nacional da Propriedade Industrial*) owned by GLA; and (b) the Brazilian internet domains owned by GLA, as described in the Exhibit

19

III of GLA's Smiles Fiduciary Transfer Agreement, (ii) as well as any trademarks or Brazilian internet domains that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Operating Manuals**" mean (i) the currently existing manuals, documents and information related to the operation of the Loyalty Program, and its copyrights, as described in the Exhibit VI of GLA's Smiles Fiduciary Transfer Agreement; (ii) as well as any manuals, documents and information related to the operation of the Loyalty Program, and its copyrights that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Personal Data**" means any data or information, as long as owed by or in possession of GLA or IPCo, of an identified or identifiable individual, including of GLA's or IPCo's and its affiliates' clients, and their suppliers, distributors and commercial partners in general, among others, including but not limited to: names, phone numbers, contact information (address, e-mail address, commercial phone number, mobile number, fax), occupation, bank information, account number, total miles and points balance in the Loyalty Program, history of engagement in the Loyalty Program, history of accrual and redemption activity in the Loyalty Program, communication and promotion opt-ins in the Loyalty Program, credit card number, marital or relationship status, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Technological Infrastructure**" means certain six (6) licenses from computer programs and software that are used by GLA as technological instruments for the development of the activities necessary for the operation of the Loyalty Program, as further described in the GLA's Smiles Fiduciary Transfer Agreement.

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Subordinated Obligation**" means any Debt that is subordinate or junior in right of payment to the Notes and the Note Guaranties pursuant to a written agreement.

"**Subsidiary**" means, in respect of any specified Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person.

"**Surviving Person's Tax Jurisdiction**" has the meaning specified in Section 8.02(2).

"**Taxing Jurisdiction**" has the meaning specified in Section 7.06(a).

#4856-1598-7531v19

"**Transaction Documents**" means, this Note Purchase Agreement, the Notes and the Collateral Documents.

"**Transfer Agent**" has the meaning specified in Section 4.03(a).

"**Treasury Rate**" means, with respect to the date when Notes become due and payable, (1) the yield, under the heading which represents the average for the immediately preceding week, as reported on the most recent H.15 page available through the website of the Board of Governors of the Federal Reserve System, or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded United States Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Maturity Date of the notes to be redeemed, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined, and the Treasury Rate shall be interpolated or extrapolated from such yields on a straight-line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per year equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for the when Notes become due and payable. The Treasury Rate will be calculated on the third Business Day the date when Notes become due and payable.

"**U.S. Dollars**" and "**U.S.$**" each mean the currency of the United States.

"**United States**" and "**U.S.**" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"**Valuation Certification**" means the valuation of the Collateral contained in the closing date valuation therefor prepared by mba Aviation, dated on or prior to the Initial Closing Date.

"**Wholly Owned Subsidiary**" means a Subsidiary all of the Capital Stock of which (other than directors' qualifying shares) is owned by any Person or another Wholly Owned Subsidiary.

SECTION 1.02.    *Rules of Construction*.  (a) For all purposes of this Note Purchase Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(1)    the terms defined in this Note Purchase Agreement have the meanings assigned to them in this Note Purchase Agreement and include the plural as well as the singular;

(2)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Note Purchase Agreement as a whole and not to any particular Article, Section or other subdivision;

(3)    "or" is not exclusive;

21

(4)     any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(5)     "including" means "including, without limitation";

(6)     any reference herein to any Person shall be construed to include such Person's successors and assigns;

(7)     the word "asset" and "property" shall be construed to have the same meaning and effect and to refers to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(8)     any reference to an "Article," a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Note Purchase Agreement.

(b)     All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with IFRS.

(c)     For purposes of the definitions set forth in Section 1.01 and this Note Purchase Agreement generally, all calculations and determinations shall be made in accordance with IFRS and shall be based upon the consolidated financial statements of the GLAI Group prepared in accordance with IFRS.

(d)     With respect to the Company, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque*, *nantissement*, *gage*, *privilège*, *sûreté réelle*, *droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant*, *associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an a*dministrateur* of its general partner, (v) a receiver, *administrative receiver*, administrator, liquidator or the like includes a *juge délégué*, *commissaire*, *juge-commissaire*, *liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*), insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally, (vii) a guarantee includes any guarantee which is independent from the debt to which it relates and any suretyship (*cautionnement*) within the meaning of Articles 2011 and seq. of the Luxembourg Civil Code, (viii) "gross negligence" is a reference to *faute lourde* and willful misconduct is a reference to *faute dolosive* and (ix) an "agent" includes a *mandataire*.

SECTION 1.03.     *Table of Contents; Headings*.  The table of contents and headings of the Articles and Sections of this Note Purchase Agreement have been inserted for convenience of

22

reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 1.04.   *Form of Documents Delivered*.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company or the applicable Guarantor may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company or the applicable Guarantor stating that the information with respect to such factual matters is in the possession of the Company or the applicable Guarantor, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Note Purchase Agreement, they may, but need not, be consolidated and form one instrument.

## ARTICLE 2
### PURCHASE AND SALE OF THE NOTES

SECTION 2.01.   *Sale and Purchase of the Notes*. Subject to the terms and conditions herein set forth, any Closing Date, the Company will issue and sell to the Purchaser, and the Purchaser agrees to purchase from the Company, the aggregate principal amount of Notes of up to U.S.$1,430,925,000 (the "**Principal Amount**"), at the price of  85% of the face value of such Notes (the "**Purchase Price**"), which amount may be paid using GOL Bonds at the cash conversion rates set out in Schedule D.

SECTION 2.02.   *Closing*. The initial sale and purchase of the Notes will take place at a closing (the "**Closing**") at 11:00 a.m., New York City time, on the Initial Closing Date, at the offices of Milbank LLP, 55 Hudson Yards, New York, New York 10001 (the "**Closing Location**"), or at such other time and place as is mutually agreed to by the Company and the Purchaser. Any subsequent sales and purchases of the Notes will take place at such times and at such locations as is mutually agreed to by the Company and the Purchaser. At such times the Company will deliver to the Purchaser the principal amount of Notes, pursuant to the terms set forth in Section 2.01 above (in such permitted denomination or denominations and registered in its name or the name of such nominee or nominees as the Purchaser may request) against payment of such amount by delivery of GOL Bonds or by federal funds wire transfer of immediately available funds to such bank accounts as the Company designates, as applicable.

SECTION 2.03.    *Expenses*. The Company and the Guarantors covenant and agree with the Purchaser that the Guarantors will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Company's advisors, if any, in connection with the issue of the Notes; (ii) all other costs and expenses incident to the performance of its obligations hereunder which are not otherwise specifically provided for in this Section 2.03. The obligations of the Company under this Section 2.03 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Note Purchase Agreement, the Notes, and the termination of this Note Purchase Agreement.

## ARTICLE 3
### USE OF PROCEEDS

SECTION 3.01.    *Net Proceeds*.  The Company will apply the net proceeds from the Purchase Price for general corporate purposes, including refinancing certain of the GOL Bonds.  The Company will cancel within 30 days any GOL Bonds contributed by the Purchaser as part of the Purchase Price of the Notes.

## ARTICLE 4
### THE NOTES

SECTION 4.01.    *Form and Dating*.  The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Note Purchase Agreement and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any Law, agreement to which the Company is subject, if any, or usage; *provided that* any such notation, legend or endorsement is in a form acceptable to the Company.

Each Note shall be dated the date of its execution.

Each Note shall represent such principal amount of the Outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of Outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of Outstanding Notes represented thereby may from time to time be increased or reduced to reflect repurchases, cancellations, exchanges for cash, Preferred Shares or a combination thereof, transfers permitted hereby.

Accrued interest on the Notes shall be computed on the basis of a 360 day year composed of twelve 30 day months and, for a partial month, on the basis of the number of days actually elapsed in a 30 day month.

Unless previously exchanged pursuant to this Note Purchase Agreement, the Notes shall constitute direct unconditional senior obligations of the Company and shall rank at least *pari passu* in right of payment with all other present and future senior Debt of the Company and shall rank senior in right of payment to all present and future subordinated Debt of the Company. Subject to the terms hereof, each of the Notes represents the right to receive pro rata payments with respect to the Notes. Each Note shall rank *pari passu* with each other Note and, subject to Section 9.03, be equally and ratably secured by the Collateral. All Notes shall be substantially

24

identical except as to denominations and as expressly permitted in this Note Purchase Agreement.

Upon completion of the perfection requirements set forth in Section 7.07 below, this Note Purchase Agreement shall evidence a first priority continuing Lien on and security interest in the Collateral to secure the full payment of the principal, interest and other amounts of the Notes Obligations.

SECTION 4.02.    *Execution and Delivery.*  (a) Two Officers of the Company shall sign the Notes for the Company by manual or electronic signature.

(1)    If an Officer whose signature is on a Note no longer holds that office at the time the Company delivers the Note, the signature of such Officer shall be valid nevertheless.

(2)    A Note shall not be valid until two authorized signatories of the Company manually or electronically sign the Note.  Such signatures shall be conclusive evidence that the Note has been executed under this Note Purchase Agreement.

(3)    The Company shall execute and deliver the Notes on each Closing Date in an aggregate principal amount corresponding to the Principal Amount.

(4)    The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "**Authorized Denomination**").

SECTION 4.03.    *Registrar, Transfer Agent and Paying Agent.*  (a)Subject to such reasonable rules as the Company may prescribe, the books of the Company for the exchange, registration, and registration of transfer of Notes shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "**Register**"). The pledge of the Notes by the Purchaser to the Collateral Agent under the Abra Senior Secured Exchangeable Notes Indenture and the Abra Senior Secured Notes Indenture shall be noted in the Register on each Closing Date. The Registrar (the "**Registrar**") shall maintain books for the registration of transfer of Notes and cause its books to be amended upon any registration of transfer of any Notes.

Notwithstanding the above an up-to-date copy of the Register shall be kept at any time at the registered office of the Company in Luxembourg.

GLAI will initially act as the Registrar, Transfer Agent, and Paying Agent of the Notes. For so long as GLAI is acting in these roles, all notices required to be delivered to the Registrar, Transfer Agent and Paying Agent pursuant to this Note Purchase Agreement shall be delivered to the Company's Office. The Company's Office will be the office or agency where Notes may be surrendered for registration of transfer or for presentation for payment or repurchase and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be served.

The "**Company's Office**" is located at:

#4856-1598-7531v19

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

The Company may at any time, by notice to each Holder, change the address of the Company's Office.

GLAI may have one or more co-registrars and one or more additional Transfer Agents, or Paying Agents.  The terms "**Transfer Agent**," and "**Paying Agent**" include any additional transfer agent or paying agent, as the case may be.  The term "**Registrar**" includes any co-registrar.

(b)    The Company shall enter into any appropriate agency agreements with any Agent that is not a party to this Note Purchase Agreement, which shall implement the provisions of this Note Purchase Agreement that relate to such Agent.

(c)    The Registrar shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the written request of the Company provided a reasonable amount of time prior to such inspection.  Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled, and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such Notes have been replaced.  In the case of the replacement of any of the Notes, the Registrar shall keep a record of the Note so replaced, and the Notes issued in replacement thereof.  In the case of the cancellation of any of the Notes, the Registrar shall keep a record of the Note so cancelled and the date on which such Note was cancelled.  Each Transfer Agent shall notify the Company of any transfers of Notes effected by it.

(d)    All Notes presented or surrendered for registration of transfer, exchange for cash or a combination thereof shall (if so required by the Company) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

(e)    Neither the Company, nor GLAI shall be required to exchange a Note or register a transfer of a Note with respect to (i) Notes that have been surrendered for exchange for cash or, if a portion of any Note is surrendered for exchange for cash, such portion thereof surrendered for exchange for cash, or (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn).

SECTION 4.04.    *Paying Agent to Hold Money in Trust*.

(a)    By 10:00 A.M. New York time, no later than one Business Day prior to each Interest Payment Date on any Note, GLAI shall deposit in immediately available funds a sum sufficient to pay such principal and interest when so becoming due (including any amounts under

Section 7.06(a)).  GLAI shall request that the bank through which such payment is to be made agrees to supply to GLAI by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by facsimile) of GLAI's intention to make such payment.  The Company shall require each Paying Agent not a party to this Note Purchase Agreement, if any, to agree in writing that such Paying Agent shall hold in trust, for the benefit of Holders or the Company, all money held by such Paying Agent for the payment of principal, premium, if any, and interest on the Notes.

(b)     Unless the Paying Agent is GLAI, any Subsidiary of GLAI or the Company, each payment in full of principal, Additional Amounts and/or interest payable under the Notes and this Note Purchase Agreement in respect of any Note made by or on behalf of the Company or the Guarantors to or to the order of the Paying Agent in the manner specified herein or in the Notes on the date due shall be valid and effective to satisfy and discharge the obligation of the Company or the Guarantors, as the case may be, to make payment of principal, Additional Amounts and/or interest payable hereunder and under the Notes on such date; *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Company or the Guarantors, as the case may be, or held by it, on behalf of the Holders hereunder.

SECTION 4.05.    *Payment of Principal and Interest; Principal and Interest Rights Preserved*

(a)     Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of the Paying Agent or any other Paying Agent appointed by the Company, if any.

(b)     If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder, and (ii) second, towards payment of principal then due hereunder.

(c)     Payment of interest on each Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder.  The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

(d)     The Notes shall bear interest at an interest rate as follows:

(1)     4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**"); and

(2)     13.50% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth in Section 4.05(e).

27

(e)    GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (i) semi-annually in arrears, on each applicable Interest Payment Date or (ii) on the Maturity Date; *provided that*, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; *provided*, *further*, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of such Note and this Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of this Note Purchase Agreement.

(f)    If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

SECTION 4.06.    *[Reserved].*

SECTION 4.07.    *Transfer of Notes*.  Transfer will be effected without charge by or on behalf of the Company, the Registrar or the Transfer Agents, but upon payment in respect of any tax or other governmental charges which may be imposed in relation to it.

SECTION 4.08.    *Replacement Notes*.  If any Note at any time becomes mutilated, defaced, destroyed, stolen or lost, such Note may be replaced at the cost of the applicant (including properly incurred legal fees of the Company and the Agents) at the Company's Office, upon provision of, in the case of destroyed, stolen or lost Notes, evidence satisfactory to the Company that such Note was destroyed, stolen or lost, together with such indemnity as the Company may require.  Mutilated or defaced Notes must be surrendered before replacements shall be issued.

Each Note executed and delivered in lieu of any such Note shall carry rights to accrued and unpaid interest and to interest to accrue equivalent to the rights that were carried by such Note before such Note was mutilated, defaced, destroyed, stolen or lost.

Every replacement Note is an additional obligation of the Company and shall be entitled to the benefits of this Note Purchase Agreement.

SECTION 4.09.    *Cancellation*.  The Agents shall forward to GLAI any Notes surrendered to them for transfer or payment. GLAI and no one else shall cancel and GLAI shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Notes surrendered for transfer, payment or cancellation. The Company may not issue new Notes to replace Notes it has redeemed, paid in full (other than in connection with a transfer). GLAI shall cancel any Note held by the Company or its Affiliates, except for the Purchaser. A Note shall cease to be deemed Outstanding if held by the Company,

28

any Guarantor or any of their Affiliates (except for the Purchaser) holds such Note, including for voting purposes.

SECTION 4.10.   *Defaulted Interest*.  If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest pursuant to the terms set forth in Section 4.05(e) (plus interest on such defaulted interest at the rate specified in Section 7.01(b) to the extent lawful) in any lawful manner if, after written notice given by the Company to each Holder of the proposed payment pursuant to this Section 4.10, such manner of payment shall be deemed practicable by each Holder.

The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date, pursuant to the terms set forth in Section 4.05(e), which date shall be at least five Business Days prior to the payment date of such defaulted interest.  The Company shall fix or cause to be fixed any such special record date and payment date, and, at least 15 days before any such special record date, the Company shall deliver to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 4.11.   *No Purchase of the Notes by the Company or its Affiliates*.  Except as set forth herein, neither the Company, Guarantor nor any of its respective Affiliates may repurchase or otherwise acquire after the Initial Closing Date any of the Notes prior to the Maturity Date without the prior written consent of the Abra Notes Supermajority Holders.  Any Notes so purchased or acquired with such prior written consent may not be resold and shall be cancelled.

SECTION 4.12.   *Fundamental Change*. Neither the Company, GLAI nor any of its Affiliates may enter into a transaction or a series of transactions that would reasonably be expected to result in a Fundamental Change without the prior written consent of the Abra Notes Supermajority Holders.

## ARTICLE 5
### CONDITIONS TO CLOSING

SECTION 5.01.   *Purchaser's Conditions to Issuance of Notes.*  The obligations of the Purchaser to purchase the Notes shall be subject to the satisfaction, on or prior to any Closing Date, of each of the following conditions (any or all of which may be waived by the Purchaser in writing, in whole or in part, to the extent permitted by applicable Law), each in form and substance satisfactory to the Purchaser and the Abra Notes Supermajority Holders.

(a)        Milbank LLP, U.S. counsel for the Company and the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(b)        NautaDutilh Avocats Luxembourg S.à r.l., Luxembourg legal counsel for the Company, shall have furnished to the Purchaser and the holders of the Abra Senior Secured

#4856-1598-7531v19

Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(c)    Lefosse, Brazilian legal counsel for the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser, and the Abra Holders.

(d)    Pursuant to Sections 2.01 and 4.02, the Company shall have authorized, issued and delivered Notes to the Purchaser in an aggregate principal amount corresponding to the Principal Amount subject to original issue discount of 15%.

(e)    The representations and warranties of the Company contained in this Note Purchase Agreement shall be true and correct as of each Closing Date (except to the extent relating specifically to a prior date) in all material respects (provided that if any representation or warranty already includes a materiality or material adverse effect qualifier, such representation or warranty is true and correct in all respects), both before and after giving effect to the purchase of the Notes.

(f)    The Company shall have delivered to the Purchaser a formalities certificate of an Officer, dated as of the Initial Closing Date (and to the extent anything has changed therein, on each subsequent Closing Date), (i) appending a copy the Company's articles of association, (ii) appending a certificate of non-inscription of a judicial decision (*certificat de non-inscription de décision judiciaire*) and an excerpt pertaining to the Company issued by the Luxembourg Register of Commerce and Companies dated no earlier than one Business Day prior to such Closing Date, (iii) appending a copy of the resolutions of the Board of Directors approving the terms of, and the transactions contemplated by, the Transaction Documents and resolving that it executes, delivers and performs the Transaction Documents and authorizes a specified person or persons to execute the Transaction Documents on behalf of the Company, (iv) certifying that each copy document relating to it specified in this paragraph is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than such Closing Date, (v) providing a specimen of the signature of each person authorized by the resolutions referred to in  above in relation to the Transaction Documents, (vi) confirming compliance of the Company with the provisions of the Luxembourg law dated 31 May 1999 of the domiciliation of companies, as amended, (vii) confirming that the Company has not been declared bankrupt (en faillite), and no application has been made by the Company, the relevant director or the Board of Directors in relation to, any declared bankruptcy (*faillite*), voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), suspension of payments (*sursis de paiement*), controlled management (gestion contrôlée), general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Council Regulation N°848/2015 of 20 May 2015 on

30

insolvency proceedings (*recast*) (the "**Regulation**"), (viii) confirming that, to the best of the knowledge of the relevant director and the Board of Directors, no other person entitled has made any corporate action, legal proceedings or other procedure or step in connection with, nor has the Company or the Board of Directors been notified of, any bankruptcy (*faillite*), voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (concordat préventif de la faillite), suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action pauliana*), general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Regulation, (ix) confirming that the Company is not, on the date of such Closing Date and will not, as a result of the entering into the Transaction Documents, be in a state of cessation of payments (*cessation de paiement*) and lose its creditworthiness (*ébranlement de credit*) and (x) confirming that the Company is up-to-date with its obligations of publication of the annual accounts and does not contravene the provisions of the Luxembourg Code de commerce or the laws governing Luxembourg commercial companies.

(g)     The Company shall have duly executed and delivered to the Purchaser and Collateral Agent counterparts of this Note Purchase Agreement, duly executed by each party thereto (other than the Purchaser), with a copy to be delivered to the Abra Holders.

(h)     The Company shall have delivered to the Purchaser an Officer's Certificate, dated as of the Initial Closing Date, certifying that (i) the conditions specified in this Section 5.01 have been fulfilled, (ii) there has not occurred since February 7, 2023, any event or condition that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and (iii) no Default or Event of Default hereunder exists at the time of the purchase of the Note on the Initial Closing Date.

(i)     Subject to documents and evidences that under the Transaction Documents or applicable law must be delivered after the Initial Closing Date, the Company and the Guarantors shall have duly executed and delivered to the Purchaser and Collateral Agent a copy of each of the Collateral Documents (including without limitation GLA's Smiles Fiduciary Transfer Agreement, GLA's Fiduciary Transfer of IPCo's Shares Agreement and IPCo's Smiles Fiduciary Transfer Agreement) and executed and delivered to the Purchaser a copy of the Exclusivity Side Letter, each duly executed by each party thereto and such evidence as the Purchaser may reasonably require of the effectiveness of the security contemplated thereby and the perfection of the security interest created thereby (except as otherwise described in Section 7.07(c)), including acceptable evidence of payment or arrangements for payment by the Company of all applicable taxes, fees, charges, costs and expenses required for the recording of the Collateral Documents.

(j)     The purchase and sale of the Notes shall not be prohibited or enjoined by any court of any competent jurisdiction.

(k)     The Company shall have delivered, no later than five (5) Business Days prior to the Initial Closing Date, to the Purchasers a valuation report prepared by an independent appraiser with respect to the value of the Loyalty Program and the Collateral granted by the Company and the Guarantors to the Collateral Agent hereunder. As of the Initial Closing Date,

31

the aggregate principal amount of the Notes (as of the Initial Closing Date) plus the aggregate principal amount of the GOL Senior Secured Exchangeable Notes due 2028 (as of the Initial Closing Date) shall not exceed 50% of the value of the Collateral as set forth in the Valuation Certification.

SECTION 5.02. *Company's Conditions to Issuance of Notes*. The obligation of the Company to consummate the issuance and sale of the Notes to the Purchaser shall be subject to the satisfaction, on or prior to each Closing Date, of each of the following conditions with respect to the Purchaser (any or all of which may be waived by the Company in writing, in whole or in part, to the extent permitted by applicable Law):

(a)    The representations and warranties of the Purchaser contained in this Note Purchase Agreement shall be true and correct as of the Initial Closing Date.

(b)    The Purchaser shall have delivered, or caused to be delivered, to the Company, on each Closing Date, the Purchaser Deliverables.

(c)    The Company shall have received the Purchase Price, in cash, from the Purchaser.

(d)    The Purchaser shall have duly executed and delivered, or caused to be delivered, to the Company counterpart signatures to this Note Purchase Agreement.

(e)    The Purchaser shall have delivered to the Collateral Agent the "Know-Your-Customer" documents required by the Collateral Agent, as listed in Exhibit C hereto.

(f)    The Purchaser shall have issued the Series A Abra Senior Note due 2028 and the Series B Abra Senior Note due 2028 to Abra Global Finance.

(g)    Abra Global Finance shall have issued the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

SECTION 5.03. *Conditions Relating to Collateral*. GLA shall grant and perfect the first priority Lien in the Collateral in accordance with the Collateral Documents, and cause any filings and other actions (including, without limitation, all required registrations, filings and recordations with the applicable notaries or registries) necessary for the creation and perfection of the Lien in the Collateral in favor of the Secured Parties to be completed pursuant to Section 7.07.


# ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

SECTION 6.01. *Representations of the Company and the Guarantors*. The Company and, as applicable, each of the Guarantors represents and warrants to, and agrees with, the Purchaser, as of the Initial Closing Date:

32

(1)    *Organization of the Company*.  The Company and each of the Guarantors have been duly incorporated, are validly existing as companies in good standing (where applicable) under the laws of their respective jurisdictions of incorporation, have the corporate power and authority to own their respective property and to conduct their businesses and are duly qualified to transact business and are in good standing (where applicable) in each jurisdiction in which the conduct of their businesses or their ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing (where applicable) would not have a Material Adverse Effect.

(2)    *Authorization of this Note Purchase Agreement*.  This Note Purchase Agreement has been duly authorized, executed and delivered by the Company and each of the Guarantors.

(3)    *Authorization of the Notes*.  The Notes have been duly authorized by the Company and each of the Guarantors, and, when executed and authenticated in accordance with the provisions of this Note Purchase Agreement and issued and delivered to and paid for by the Purchaser in accordance with the terms of this Note Purchase Agreement, will be on Initial Closing Date, valid and binding obligations of the Company and each of the Guarantors, enforceable against the Company and each of the Guarantors in accordance with their terms, subject to (i) applicable bankruptcy, insolvency, judicial or extrajudicial reorganization, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights generally (collectively, the "**Enforceability Exceptions**"); and (ii) equitable principles of general applicability, and will be entitled to the benefits of this Note Purchase Agreement pursuant to which such Notes are to be issued.

(4)    *Authorization of the Transaction Documents*.  Each of the Transaction Documents to which the Company and each of the Guarantors are a party has been duly authorized by the Company and each of the Guarantors, and when executed and delivered by the Company and each of the Guarantors, will be a valid and legally binding agreement of the Company and each of the Guarantors enforceable against the Company and each of the Guarantors in accordance with its terms, subject to (i) the Enforceability Exceptions and equitable principles of general applicability; and (ii) the requirements set forth in Section 6.01(17) with respect to the enforcement and admissibility of this Note Purchase Agreement and the Notes into evidence in Brazil directly before public agencies and courts in Brazil.  When all required filings and recordings with respect to, and deliveries of, the Collateral have been made as required by the Collateral Documents, will create valid, perfected security interests in the Collateral, subject to no prior liens (other than certain other permitted liens and encumbrances permitted under this Note Purchase Agreement) being created and perfected prior to perfection of the security interests in the Collateral.

(5)    *Ranking of the Notes*.  The Notes and the Note Guaranties will constitute direct, unconditional, senior and secured obligations of the Company and the Guarantors, respectively, without any preference among themselves, of the Company and the

Guarantors and will rank senior to all other present and future unsubordinated and secured obligations of the Company and the Guarantors.

(6)    *Non-Contravention*.  The execution and delivery by the Company and each of the Guarantors, and the performance by the Company and each of the Guarantors of their obligations under, this Note Purchase Agreement, the Collateral Documents (including, without limitation, the grant and perfection of liens and security interests in the Collateral pursuant to the terms in the applicable Collateral Documents), as applicable, and the Notes do not contravene any provision of applicable law which would affect the nature of the Notes or the articles of association, bylaws or other organizational documents of the Company and each of the Guarantors, any agreement or other instrument binding upon any of the Company and each of the Guarantors that is material to the Company and each of the Guarantors, (including any agreement for the incurrence of Debt), or any judgment, order or decree of any governmental body, agency or court having jurisdiction over the Company and each of the Guarantors.

(7)    *No Consents Required*.  No consent, approval, authorization or order of, or qualification with, any governmental or regulatory body or agency or any third party (including any lender) is required for the performance by the Company and each of the Guarantors of their respective obligations under the Notes, this Note Purchase Agreement or the Collateral Documents, as applicable.

(8)    *Investment Company Act*.  Neither the Company nor any of the Guarantors is, and after giving effect to the placement and sale of the Notes and the application of the proceeds thereof will not be, required to register as an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

(9)    *Choice of Laws*.  The choice of laws of the State of New York as the governing law of this Note Purchase Agreement is a valid choice of law under the laws of Luxembourg and Brazil will be honored by the courts of Luxembourg and Brazil.

(10)    *No Material Defaults*.  Neither the Company nor any of the Guarantors is (i) in violation of its articles of association, bylaws or other organizational documents; (ii) in default, and no event exists that, with notice or lapse of time or both, would constitute such a default, in the performance or observance by the Company or any of the Guarantors of any material obligation, agreement, covenant or condition contained in any indenture, mortgage, loan agreement or other material agreement or instrument to which it is a party or by which it is bound or to which its property or assets are subject; or (iii) in violation of any applicable law, statute, rule or regulation or any judgment or order of any U.S., Brazilian, Luxembourg court or arbitrator or governmental or regulatory authority, except in connection with clauses (ii) and (iii) for any such default or violation that would not have a Material Adverse Effect.

(11)    *Absence of Exchange Controls*.  No exchange control authorization or any other authorization, approval, consent or license of any Governmental Authority or agency in Luxembourg is required for the payment by the Company or any of the

Guarantors of any amounts in United States dollars under any Transaction Document to which it is a party.

(12)    *Observance of Statutes and Orders*.  Neither the Company nor any of the Guarantors is (i) in violation of any order, judgment, decree or ruling of any court, any arbitrator of any kind or any Governmental Authority or agency in Luxembourg or Brazil or (ii) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority or agency in Luxembourg or Brazil, which violation would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(13)    *Taxes*.  All tax returns required to be filed by the Company and each of the Guarantors have been timely filed and such tax returns have been duly and accurately prepared in all material respects, and all material taxes and other assessments of a similar nature (whether imposed directly or through withholding), including any interest, additions to tax or penalties applicable thereto, due or claimed to be due from the Company and each of the Guarantors (whether or not shown to be payable on such tax returns) have been paid, other than those being contested in good faith and for which adequate reserves have been provided in accordance with IFRS.

(14)    *Tax Residency of the Company*.  The Company is resident for tax purposes solely in Luxembourg.

(15)    *Tax Residency of the Guarantors*.  Each Guarantor is resident for tax purposes solely in Brazil.

(16)    [*Reserved*].

(17)    *Absence of Further Brazilian Law Requirements*. This Note Purchase Agreement is in proper legal form under the laws of Brazil for the enforcement thereof in Brazil against the Company and each of the Guarantors, and it is not necessary in order to ensure the legality, validity, enforcement of this Note Purchase Agreement in Brazil that this Note Purchase Agreement be filed or recorded with any court or other authority in Brazil or that any stamp, issue, registration, documentary or similar taxes or duties be paid in Brazil on or in respect of this Note Purchase Agreement except that, with respect to the enforcement and admissibility of this Note Purchase Agreement into evidence in Brazil directly before the public agencies and courts in Brazil, (i) (a) if the State in which this Note Purchase Agreement was executed is not party to the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents of 5 October 1961 (the "**Apostille Convention**") (1) the signatures of the parties hereto signing outside Brazil should be notarized by a notary public licensed as such under the jurisdiction of signing and (2) the signature of such notary public must be authenticated by a consular official of Brazil, or (b) if the State in which this Note Purchase Agreement was executed is party to the Apostille Convention, an authority designated by such State must issue a certificate that authenticates the origin of this Note Purchase Agreement ("**Apostille**"); and (ii) (a) this Note Purchase Agreement and the Apostille (if applicable) must be translated into the Portuguese language by a sworn translator and (b) this Note Purchase

35

Agreement and the Apostille (if applicable), together with its sworn translation into the Portuguese language, must be registered with the appropriate Registry of Titles and Deeds in Brazil.

(18)     *No Registration/Trust Indenture Act*.  It is not necessary in connection with the offer, sale and delivery of the Notes to the Purchaser in the manner contemplated by this Note Purchase Agreement to register the Notes under the Securities Act or to qualify this Note Purchase Agreement under the U.S. Trust Indenture Act of 1939, as amended.

(19)     *Private Placement by the Company*.  Neither the Company, the Guarantors or anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy the Notes or any similar securities from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchaser which has been offered the Notes at a private sale for investment. Neither the Company, the Guarantors nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to (i) the registration requirements of Section 5 of the Securities Act; (ii) a requirement to produce a prospectus in the United Kingdom; or (iii) the registration requirements of any securities or blue sky laws of any applicable jurisdiction. For the purposes of this clause, "**Institutional Investor**" means (a) a Purchaser, (b) any qualified institutional buyer within the meaning of Rule 144A of the Securities Act, (c) an "accredited investor" within the meaning of Section 501(a)(1), (2), (3), (7) or (8) under the Rule 144A of the Securities Act, (d) a non-U.S. person with any potential offer or purchase being made in an offshore transaction in reliance on Regulation S of the Securities Act.

(20)     *No Restrictions on Subsidiaries of GLAI*. No Subsidiary of GLAI is prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, nor due to any judgment, order or decree of any government authority, agency or court having jurisdiction over such subsidiary, from paying any dividends to GLAI, from making any other distribution on such Subsidiary of GLAI's Capital Stock, from repaying to GLAI any loans or advances to such Subsidiary of GLAI from GLAI in accordance with the terms of any such loan or advance, or from transferring any of such of Subsidiary of GLAI's assets to GLAI or any other Subsidiary of GLAI.

(21)     *Title to Property; Leases*.  The Company and each of the Guarantors have good and sufficient title to their respective material properties as are necessary to the conduct of their operations as presently conducted. The Company and each of the Guarantors have good and sufficient title to the properties described in or referred to in the Collateral Documents, as applicable, free and clear of liens, (i) except for liens established pursuant to the Collateral Documents, and (ii) except such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and each of the Guarantors.

(22)     *Licenses, Permits, Etc*.  The Company and each of the Guarantors own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, including without

36

limitation, the Smiles Intellectual Property and any other Collateral, without known conflict with the rights of others, except for those conflicts that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(23)     *No Unlawful Payments*.  Except as disclosed in the documents relating to the Company inserted by the Purchaser in a data room, and made available to the Abra Holders (the "**Disclosure Documents**") (including the documents incorporated by reference therein), neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or other person acting on behalf of the Company or the Guarantors, has (i) used any corporate funds of the Company or the Guarantors for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government or regulatory official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption law; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. The Company, the Guarantors and to the knowledge of the Company and the Guarantors, its affiliates have conducted their businesses in compliance with all applicable anti-bribery and anti-corruption laws and have instituted, maintain and enforce, and will continue to maintain and enforce, policies and procedures designed to ensure and which are reasonably expected to continue to ensure compliance with all applicable laws.

(24)     *No Conflict with Money Laundering Laws*.  The operations of the Company and the Guarantors are and have been conducted at all times in compliance with all applicable money laundering statutes, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental or regulatory agency, authority or body or any arbitrator involving the Company or the Guarantors with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(25)     *No Conflict with Sanctions Laws*.  Neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or person acting on behalf of the Company or the Guarantors is currently subject to or the target of any sanctions administered or enforced by the U.S. government, (including, without limitation, the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the U.S. Department of Commerce, the United Nations Security Council, the European Union, Luxembourg or Her Majesty's Treasury of the United Kingdom or

other relevant sanctions authority (collectively, "**Sanctions**"), nor is the Company or any of the Guarantors located, organized or resident in a country or territory that is the subject or target of Sanctions, including, without limitation, Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic and the so-called Luhansk People's Republic (each, a "**Sanctioned Country or Region**").  Neither the Company nor the Guarantors will not directly or indirectly use the proceeds of this offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity, (i) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or the target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or Region or (iii) causing a violation by any person (including any person participating in the transaction, whether as underwriter, placement agent, advisor, investor or otherwise) of Sanctions. For the past five years, neither the Company nor the Guarantors has engaged in and is not now engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country or Region.

(26)    The above mentioned representations and warranties under Section 6.01(25)shall only be applicable to any Luxembourg party to the extent that such Luxembourg party will not violate or is exposed to any liability under the Council Regulation (EC) 2271/96 of 22 November 1996 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom or any similar laws or regulations.

SECTION 6.02.    *Representations of the Purchaser*. The Purchaser represents, warrants and agrees that:

(1)    It is purchasing the Notes on its own behalf, as an investment fund or account, as the case may be, duly organized and existing in accordance with the laws of the jurisdiction of its incorporation and it is purchasing the Notes for its own account or for one or more separate accounts maintained by the Purchaser and not with a view to the distribution thereof. The Purchaser has its principal address outside the United States and was located outside the United States at the time any offer to buy the Notes was made to the Purchaser and at the time that this Note Purchase Agreement is executed by the Purchaser.

(2)    The execution, delivery and performance of this Note Purchase Agreement by the Purchaser are within the powers of the Purchaser, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Purchaser is a party or by which the Purchaser is bound, and will not violate any provisions of such entity's organizational documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Note Purchase Agreement is genuine, and the signatory has been duly authorized to execute the same, and this Note Purchase Agreement

38

constitutes a legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms.

(3)    It is not and, for so long as the Purchaser owns the Notes, will not be acting on behalf of: (a) an "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), which is subject to Title I of ERISA, (b) a plan described in Section 4975(e)(1) of the Code, (c) an entity whose underlying assets include "plan assets" by reason of a plan's investment in such entity (including but not limited to an insurance company general account), or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of the Department of Labor Regulation Section 2510.3-101 (29 C.F.R. Sections 2510.3-101), as modified by Section 3(42) of ERISA (each of categories (a) through (d), a "**Covered Plan**").

(4)    in making the decision to purchase the Notes, it has relied solely upon the independent investigation made by it and an independent assessment of the merits and risks of an investment in the Notes, and such decision to purchase Notes was formed based on such independent investigation of the Company, the Guarantors and the Notes, and such independent assessment of the merits and risks of an investment in the Notes.

**ARTICLE 7**
COVENANTS

SECTION 7.01.    *Payment of Principal and Interest Under the Notes.*

(a)    The Company shall punctually pay the principal of and interest on the Notes on the dates and in the manner set forth herein and as provided in the Notes.  By 10:00 a.m. (New York City time), no later than one Business Day prior to any Interest Payment Date or the Maturity Date, to the extent such amount is payable in cash, GLAI shall irrevocably deposit, or cause to be deposited, with the Paying Agent (unless the Paying Agent is GLAI) money sufficient to pay such principal and interest subject to the terms set forth in Section 4.05(e).

(b)    The Company shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 2.00% per annum pursuant to the terms set forth in Section 4.05(e).

(c)    No interest shall be payable hereunder in excess of the maximum rate permitted by applicable Law.

SECTION 7.02.    *Maintenance of Office or Agency.*  The Company shall maintain an office or agency where Notes may be (i) presented or surrendered for payment or (ii) presented for exchange for cash and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be served.  If at any time the Company shall fail to maintain any such required office or agency, such presentations, surrenders, notices and demands may be made or served at the Company's Office.

SECTION 7.03.    *Money for Note Payments to Be Held in Trust.*

39

(a)      For so long as the Company acts as Paying Agent, it shall, when electing to pay interest using cash, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, as applicable, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided.

(b)      Whenever the Company shall have one or more Paying Agents for the Notes, it shall, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, irrevocably deposit with a Paying Agent a sum sufficient to pay such principal and interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal or interest.

(c)      Each Paying Agent, subject to the provisions of this Section 7.03, shall:

(1)      hold all sums held by it for the payment of principal or premium, if any, of or interest on the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as set forth herein; *provided*, *however*, such sums need not be segregated from other funds held by it, except as required by Law; and

(2)      at any time during the continuance of any Default by the Company, upon the written request of the Holders, forthwith pay to the Holders all sums so held in trust by such Paying Agent.

(d)      The Company shall cause each Paying Agent to execute and deliver an instrument in which such Paying Agent shall agree with the Company to act as a Paying Agent in accordance with this Section 7.03, except in case the Paying Agent is the Company or an Affiliate of the Company.

(e)      Any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

SECTION 7.04.    *Maintenance of Corporate Existence*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, (i) maintain in effect its corporate existence and all registrations necessary therefor; *provided that* these restrictions shall not prohibit any transactions permitted by Article 8; (ii) not amend, supplement, waive or otherwise modify certain specified provisions of the documents relating to each of the Guarantors' or its Subsidiaries' rights or benefits under its respective organizational documents without the prior written consent of the Purchaser, and the Abra Notes Supermajority Holders, as the case may be, if such amendment, supplement, waiver or modification would materially adversely affect the rights of the Purchaser, or of the then holders of this Note; (iii) not change its corporate form; (iv) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and

40

the like necessary in the normal conduct of its business, activities or operations; and (v) maintain or cause to be maintained in good repair, working order and condition (normal wear and tear excepted) all properties used in its business; *provided*, *however*, that neither GLAI nor its Subsidiaries shall be prevented from discontinuing those operations (including through the transfer or dissolution of a Subsidiary) or suspending the maintenance of those properties (including through the sale thereof) which, in the reasonable judgment of GLAI, are no longer necessary in the conduct of GLAI's business, or that of its Subsidiaries; and *provided*, *further*, that such discontinuation of operations or suspension of maintenance shall not be materially disadvantageous to the Holders and such operations shall not represent more than 3.5% of the aggregate consolidated gross revenues of GLAI and its Subsidiaries for the most recent fiscal year.

SECTION 7.05.    *Payment of Taxes and Claims*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its property or in respect of any of its franchises, businesses, income or profits before any penalty or interest accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for sums which have become due and payable and which by Law have or might become a Lien upon its property, unless the failure to make such payment could have: (a) a Material Adverse Effect upon the financial condition of (i) the Company or (ii) the GLAI Group considered as one enterprise, or (b) a Material Adverse Effect on the performance of the Company's or GLAI's obligations hereunder; and *provided*, *further*, that no such charge or claim need be paid while it is being contested in good faith by appropriate proceedings and if appropriate reserves or other provisions are maintained in respect of such amounts in accordance with IFRS.

SECTION 7.06.    *Payment of Additional Amounts*.  (a) All payments by GLAI in respect of the Notes or the Guarantors (or any Paying Agent if other than GLAI) in respect of the Note Guarantees or of cash and/or deliveries of Preferred Shares (together with payments of cash in lieu of a fractional Preferred Share) upon exchange, will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of Brazil or Luxembourg, or any political subdivision or authority therein or thereof or any other jurisdiction in which any officer of the Company, the Company or any Guarantor is organized, doing business or otherwise subject to the power to tax (any of the aforementioned being a "**Taxing Jurisdiction**"), unless the Company or the Guarantors (or any Paying Agent if other than GLAI) are compelled by Law to deduct or withhold such taxes, duties, assessments, or governmental charges. In such event, the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will make such deduction or withholding, and the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will timely make payment of the full amount so withheld to the appropriate Governmental Authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders after such withholding or deduction has been made (including such deductions and withholdings applicable to additional sums payable under this Section 7.06) shall equal the respective amounts of principal (and premium, if any) and interest which would have been receivable in respect of the Notes or the payment of cash and/or delivery of Preferred Shares (together with payment in cash in lieu of a fractional Preferred Share) in the absence of such withholding or deduction

41

("**Additional Amounts**"). Notwithstanding the foregoing, no such Additional Amounts shall be payable:

(1)    to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such Holder and the relevant Taxing Jurisdiction, including, without limitation, such Holder being or having been a citizen or resident thereof, being incorporated in, being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than connections arising from such Holder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Note Purchase Agreement, sold or assigned an interest in this Note Purchase Agreement or holding of the Note and the receipt of payments with respect to the Note;

(2)    in respect of Notes surrendered or presented for payment (if surrender or presentment is required) more than 30 days after the Relevant Date except to the extent that payments under such Note would have been subject to withholdings and the Holder of such Note would have been entitled to such Additional Amounts, had the Note been surrendered for payment on the last day of such period of 30 days;

(3)    in respect of any estate, inheritance, gift, sales, transfer, excise or personal property tax;

(4)    in respect of any tax imposed on overall net income or any branch profits tax of a Holder;

(5)    in respect of any tax imposed pursuant to sections 1471 to 1474 of the Code, any successor Law or regulation implementing or complying with, or introduced in order to conform to, such sections *provided, however*, that such Law or regulation is substantively comparable and not materially more onerous to comply with, or any intergovernmental agreement in respect thereof or any agreement entered into pursuant to section 1471(b)(1) of the Code;

(6)    in respect of the Relibi Law; or

(7)    in respect of any combination of the above.

(b)    In the event that Additional Amounts actually paid with respect to the Notes are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof such Holder determines, in its sole discretion exercised in good faith, that it has received a refund of withholding taxes as to which it has received Additional Amounts, it shall pay to the Company an amount equal to such refund (but only to the extent of Additional Amounts received with respect to the withholding taxes giving rise to such refund), net of all out-of-pocket expenses (including taxes) of such Holder and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Company, upon the request of the Holder, shall repay to such

42

Holder the amount paid over pursuant to this paragraph (b) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Holder is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (b), in no event will the Holder be required to pay any amount to the Company pursuant to this paragraph (b) the payment of which would place the Holder in a less favorable net after-tax position than the Holder would have been in if the tax subject to Additional Amounts and giving rise to such refund had not been deducted, withheld or otherwise imposed and the Additional Amounts had never been paid. This paragraph shall not be construed to require any Holder to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Company or any other Person. The Holder makes no representation or warranty that the Company will be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto.

(c)     The Notes are subject in all cases to any tax, fiscal or other Law or regulation or administrative or judicial interpretation. Except as specifically provided above, neither the Company nor the Guarantors shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

(d)     For the avoidance of doubt, the Company shall not pay (and shall not purport to indemnify the Holder for) any stamp, issue, registration, court or documentary taxes or any excise or property taxes, charges or similar levies (including any penalties, interest and other liabilities relating thereto) that may arise or be paid in respect of this Note Purchase Agreement or the Notes.

(e)     Any reference in this Note Purchase Agreement or the Notes to principal, interest or any other amount payable in respect of the Notes by the Company or any of the Note Guaranties by the Guarantors, or the payment of cash and/or the delivery of Preferred Shares by the Company (together with payment of cash in lieu of a fractional Preferred Share), will be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section.

(f)     The obligations of the Company and the Guarantors pursuant to this Section 7.06 shall survive termination of this Note Purchase Agreement.

SECTION 7.07.    *Collateral and Liens.*

(a)     Subject to Sections 5.03, 7.07(b) and 7.07(c), the Notes Obligations shall be secured by a first priority Lien granted by the Guarantors in the Collateral to Collateral Agent on behalf of the Secured Parties pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. The Company and the Guarantors shall not directly or indirectly, create, incur, assume or suffer to exist any Lien on any of the Collateral, other than (i) the Lien granted to the Collateral Agent and (ii) a Lien that is junior in priority to the Lien granted to the Collateral Agent and which is subject to a subordination agreement substantially in the form attached hereto as Exhibit F.

(b)    The Company and the Guarantors shall not, and will not permit any Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of the Collateral, except  for the first priority Lien in the Collateral granted by the Guarantors pursuant to Section 7.07(a) above and the Collateral Documents, *provided however*, that the Company and the Guarantors may, without requiring any resolution, approval or consent from the Purchaser or the Collateral Agent, and without implying breach of any representation, warranty or obligation assumed under this Note Purchase Agreement and the Collateral Documents, constitute in favor of any creditors a collateral security under suspensive condition on the Collateral (whether senior or junior), provided that the effectiveness of such collateral security is conditioned upon the indefeasible payment in full or satisfaction of the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes ("**Future Lien**").

(c)    The Company shall ensure that the Lien in the Collateral is duly created, enforceable and perfected, to the extent required by the Collateral Documents. The Guarantors shall:

(1) in relation to the GLA's Smiles Fiduciary Transfer Agreement and IPCo's Smiles Fiduciary Transfer Agreement, as the case may be, (i) no later than twenty (20) days from date of execution of such Collateral Document, register the Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and, (ii) (A) in relation to the GLA's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration, and (B) in relation to the IPCo's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration and the fulfilment of the suspensive condition set forth in IPCo's Smiles Fiduciary Transfer Agreement, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*);

(2) in relation to the GLA's Fiduciary Transfer of IPCo's Shares Agreement (i) no later than twenty (20) days from date of execution of such Collateral Document, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and (ii) within seven (7) business days from the date of execution of such Collateral Document annotate the fiduciary transfer in IPCO's shares register book (*Livro de Registro de Ações Nominativas*;

(3) in relation to the amendment to the Gol Senior Secured Notes due 2026 IP Collateral (i) no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 IP Collateral, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and, (ii) no later than ten (10) days after the date of such registration, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*); and

(4) in relation to the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral, register such Collateral

44

Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documentos*) in Brazil.

(d)       The Company and the Guarantors shall not, and shall not permit any Subsidiary to, directly or indirectly (i) take any action with the purpose of depreciating the Collateral, (ii) dispose of, assign, transfer, sell or lease the Collateral to any third party or (iii) execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties to sell or otherwise dispose of the Collateral, in part or in full.

(e)       The Company and the Guarantors undertake to, and agree that, they will not, and will not permit any Subsidiary to, directly or indirectly, take any action, or cause or contribute for any action to be taken, to (i) contest or in any way impair or harm the Collateral; (ii) interfere with the Secured Parties' right to enforce, sell, assign, transfer, convey or otherwise dispose of the Collateral upon the occurrence of an Event of Default; (iii) diminish, demean, tarnish or dilute the value, distinctiveness, fame, enforceability, validity of, or goodwill associated with, the Collateral; (iv) challenge the enforceability or the validity of the Collateral, (v) use, assign, transfer, convey, sell, dispose, disclose, make available or publish any trade secret, know-how, source code or any kind of confidential information related to the Collateral, or (vi) use or apply for any trademark registration or use any trade address that are identical or similar, in phonetical, graphical or ideological manner, to the Collateral.

(f)       By their purchase and acceptance of the Notes, the Holders hereby agree that they are bound and that such purchase and acceptance constitutes the authorization and direction to the Collateral Agent to act as collateral agent for the benefit, and in representation, of the Holders, and to execute and deliver this Note Purchase Agreement and the Collateral Documents to which the Collateral Agent is a party. It is hereby expressly acknowledged and agreed that, in doing so, the Collateral Agent is not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under this Note Purchase Agreement and the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

SECTION 7.08.    *Certain Assurances.*

(a)       On the Initial Closing Date, the Purchaser, the Collateral Agent and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes shall receive an Opinion of Counsel from Lefosse Advogados, as Brazilian counsel to the Company and the Guarantors, in form and substance satisfactory to the Purchaser, to the effect that, subject to certain exceptions and qualifications, the GLA's Smiles Fiduciary Transfer Agreement, the GLA's Fiduciary Transfer of IPCo's Shares Agreement and the amendments to the GOL Senior Secured Notes due 2026 Collateral have been duly authorized, executed and delivered by GLA and/or GLAI, as applicable, and constitutes the legal, valid, and binding obligation of GLA and/or GLAI, as applicable, which will be enforceable against GLA and/or GLAI in accordance with its terms and with Section 7.07(c).

45

(b)        Each of GLA and GLAI shall take, or cause to be taken, all actions necessary to maintain the Collateral Documents to which it is a party in full force and effect and enforceable, in accordance with their terms, and to maintain and preserve the Lien created by the Collateral Documents, in accordance with their terms, and the priority thereof, including (A) making filings and recordations, (B) making payments of fees and other charges on a timely basis, (C) issuing and, if necessary, filing or recording supplemental documentation, including continuation statements, (D) discharging all claims or other Liens adversely affecting the rights of any Secured Party in any Collateral, (E) publishing or otherwise delivering notice to third parties, (F) depositing title documents, (G) amending any Collateral Document to the extent required by applicable Law and (H) taking all other actions either necessary or otherwise requested by the Purchaser to ensure that all Collateral is subject to a valid and enforceable first-priority Lien in favor of the Collateral Agent for the benefit of the Secured Parties. In furtherance of the foregoing, GLA and GLAI shall ensure that all of the Collateral intended to be subject to the Lien granted by the Collateral Documents shall become subject to such Lien having the priority contemplated pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. Moreover, for the avoidance of any doubt, the Collateral Agent has no obligation, liability or responsibility to monitor or ensure that GLA and/or GLAI, as the case may be, maintain such Lien and shall assume that GLA and GLAI are in full compliance with their obligations in connection therewith.

(c)        Notwithstanding anything to the contrary contained in this Note Purchase Agreement, the Collateral Documents or in applicable Law, the Collateral Agent shall not have any responsibility or liability, among other things as set forth in this Note Purchase Agreement or the Collateral Documents, for (1) acting or refraining from acting based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to this Note Purchase Agreement and the Collateral Documents; (2) any loss or claim resulting from any act or omission, directly or indirectly, except if otherwise determined in a final nonappealable decision by a court of competent jurisdiction that the Collateral Agent was grossly negligent; (3) any loss of profits, indirect, consequential, incidental, special, punitive or related losses and/or damages even if previously advised of the likelihood of such loss or damage; (4) preparing, recording or filing any financing or continuation statements or recording or filing any instrument in any public office or for otherwise ensuring the perfection or maintenance of any Lien granted pursuant to, or contemplated by, this Note Purchase Agreement and the Collateral Documents or the existence and enforceability of any insurance on the Collateral; (5) taking any necessary steps to preserve rights against any parties with respect to the Collateral; (6) taking any action to protect against any diminution in value of the Collateral; (7) errors in judgment that do not constitute gross negligence or willful misconduct as determined by a final and non-appealable judgement by a court of competent jurisdiction; (8) the Company's and the Guarantors' compliance with any of the covenants set forth in this Note Purchase Agreement and the Collateral Documents, including but not limited to, covenants regarding the granting, perfection or maintenance of any Lien; (9) the market value of the Collateral or its sufficiency to satisfy in full payments due on the Notes Obligations; (10) the accuracy of any representation or warranty of the Company or Guarantors in this Note Purchase Agreement, the Collateral Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent; or (11) the effectiveness, genuineness, sufficiency, legality, validity and enforceability of any Lien, security interest, Collateral, this Note Purchase Agreement or the Collateral Documents or title, transfer or assignment of any Collateral.

46

#4856-1598-7531v19

SECTION 7.09.    *Release of Collateral*. Subject to, and to the extent permitted under, the terms of this Note Purchase Agreement and the Collateral Documents, the Company and the Guarantors shall be entitled to the release of the Collateral from the Lien securing the Notes Obligations under any one or more of the following circumstances:

(i)    in accordance with this Note Purchase Agreement and the Collateral Documents, if at any time the Collateral Agent, acting in accordance, exclusively and strictly, with instructions provided by the Purchaser (at the direction of the Abra Notes Supermajority Holders), forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)    as described and pursuant to Article 10; or

(iii)    upon payment in full of the principal of, together with all accrued and unpaid interest on, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

*in each case*, (i) so long as no Default or Event of Default will exist immediately after such release, as applicable; and (ii) provided the Collateral Agent shall have received an Officer's Certificate certifying, and Opinion of Counsel stating, that all conditions precedent provided in this Note Purchase Agreement with respect to the release of Collateral pursuant to this Section 7.09 have been satisfied (and the Collateral Agent shall execute any document requested by the Company or any Guarantor to evidence such release of the Collateral (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or the Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 7.09 and (C) without any recourse, representation or warranty by the Collateral Agent);

*provided, however,* that, notwithstanding the foregoing, the Lien granted under the Collateral Documents shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exist Notes Obligations due and payable on that date, in which case the Lien in the Collateral shall terminate upon satisfaction of such Notes Obligations, all obligations under the Abra Senior Secured Notes and all obligations under the Abra Senior Secured Exchangeable Notes. Upon termination of the Lien granted under the Collateral Documents in respect of the Notes Obligations, the Collateral shall be released in accordance with this Note Purchase Agreement to the Company and the Guarantors, and the Company and the Guarantors shall thereupon grant a Lien in such Collateral in respect of any outstanding obligations under the Abra Notes.

SECTION 7.10.    *Maintenance of Collateral*. The Company and the Guarantors shall, and shall cause its Subsidiaries to, at all times, preserve the Collateral for the benefit of the Secured Parties, not permit the value of the Collateral to be impaired, keep the Collateral free from all Liens or encumbrances other than the Liens and the Future Liens in the Collateral, and maintain the Collateral in accordance with applicable Law and regulations.

SECTION 7.11.    *Limitation on Transactions with Affiliates*.

#4856-1598-7531v19

Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering thereof of any service with any Affiliate of the Company, GLAI or any Subsidiary (a "**Related-Party Transaction**"), except upon fair and reasonable terms that are no less favorable to the Company, GLAI or the Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company, GLAI or such Subsidiary, as the case may be.

(a)      Prior to entering into any Related-Party Transaction or series of Related-Party Transactions (i) with an aggregate value in excess of U.S.$10.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary must deliver to the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) a certificate signed by a Responsible Officer stating that such Related-Party Transaction complies with this covenant, (ii) with an aggregate value in excess of U.S.$20.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the terms of such Related-Party Transaction will be approved by a majority of the members of the Board of Directors of the Company, GLAI or of such Subsidiary (including a majority of the members of the Board of Directors who are disinterested directors with respect to such Related-Party Transaction), the approval to be evidenced by a board resolution that such transaction or series of related transactions are on terms no less favorable to the Company, GLAI or such Subsidiary than could be obtained in a comparable arm's length transaction and satisfy the requirement in clause (i) and (iii) with an aggregate value in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary shall deliver to the Purchaser and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes a written opinion issued by an investment bank of recognized international standing that such Related-Party Transaction is fair to the Guarantor or the relevant Subsidiary from a financial point of view and satisfy the requirements in clause (i) and clause (ii) hereof.

(b)      The foregoing paragraphs do not apply to:

(i)    arm's length transactions in the ordinary course among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries  provided, that any such transaction conducted by any of the Guarantors' shareholders indirectly through any of these entities shall not be exempt from the limitations in this Section 7.11;

(ii)   any transaction among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries for the purpose of managing and paying taxes imminently due and owing by the foregoing parties to any Governmental Authority;

(iii)  any transaction in the ordinary course of business between or among the Company, GLAI and any of its Subsidiaries or between or among the Subsidiaries of GLAI;

#4856-1598-7531v19

(iv) reasonable fees and compensation paid to, and any customary indemnity or insurance provided on behalf of, officers, directors, employees, consultants or agents of the Company, GLAI or any of its Subsidiaries;

(v) transactions or payments pursuant to any employee, consultant, officer or director compensation or benefit or equity plans, stock options or arrangements entered into in the ordinary course of business and consistent with past practice, customary indemnifications or arrangements or reimbursement of expenses entered into in the ordinary course of business, on market terms and consistent with past practice or industry norms;

(vi) transactions pursuant to any contract or agreement in effect on the Initial Closing Date, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the Company, GLAI and its Subsidiaries than those in effect on the Initial Closing Date;

(vii) loans and advances to employees in the ordinary course of business or consistent with past practices; and

(viii) Restricted Payments that are permitted by the provisions of this Note Purchase Agreement.

SECTION 7.12.    *Limitation on Sale of Assets*. Subject to Section 7.07(d), each of the Company, GLAI or any of its Subsidiaries shall not make any Asset Sales and not permit any of its Subsidiaries to make any Asset Sales, unless:

(i)    the Company, GLAI or such Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value as of the date on which such assets sold or otherwise disposed of;

(ii)    at least 75% of the consideration consists of cash or cash equivalent received at closing, provided that, for purposes of this clause (ii), each of the following shall be deemed cash or cash equivalent: (A) any liabilities of the Company, GLAI or such Subsidiary that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Company, GLAI or such Subsidiary from further liability; and (B) any securities notes or other obligations received by the Company, GLAI or such Subsidiary from such transferee that are, within 120 days after the closing of such Asset Sale, converted by the Company, GLAI or such Subsidiary into cash or cash equivalent, but only to the extent of the cash or cash equivalent actually received in that conversion;

(iii)    Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds may be used to:

49

(A)     to permanently repay Debt, other than Subordinated Obligations, of the Company, GLAI or any of its Subsidiaries (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company, GLAI or any of its Subsidiaries; or

(B)     to acquire (or within such 365-day period, the Company, GLAI or such Subsidiary shall have made a good faith determination to acquire or make capital expenditures, which acquisition shall be consummated, or capital expenditure shall be made prior to the second anniversary of such Asset Sale) (i) all or substantially all of the assets of a Related Business, or a majority of the Capital Stock of another Person that thereupon becomes a Subsidiary engaged in a Related Business, or to make capital expenditures or otherwise acquire assets that are to be used in a Related Business; or (ii) Additional Assets for the Company, GLAI or its Subsidiaries; or

(C) any combination of (A) and (B).

(iv)     The Net Cash Proceeds of an Asset Sale not applied pursuant to paragraph (iii) above shall constitute "**Excess Proceeds**".  Excess Proceeds of less than U.S.$25.0 million (or the equivalent thereof at the time of determination) will be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Company must prepay the outstanding amount under the Notes equal to the Net Cash Proceeds of such Asset Sale.

(v)     With respect to paragraph (iv) above, the Company shall notify the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) in writing of any prepayment hereunder by electronic mail or other electronic transmission or by telephone (to be confirmed in writing) no later than 11:00 a.m. five Business Days prior to the date of such prepayment; provided that the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall not accept any prepayment of the Notes without the prior written consent of the Abra Notes Supermajority Holders.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Notes or portion thereof to be prepaid and a reasonably detailed calculation of the amount of such prepayment.  Prepayments shall be accompanied by accrued interest on the prepaid amount and shall be without premium or penalty.

Notwithstanding the foregoing, each of the Company, GLAI or any of its Subsidiaries shall not sell, lease, transfer or other dispose of any portion of the Collateral without the prior written consent of the Abra Notes Supermajority Holders; provided, for purposes of any action requested of the Collateral Agent in connection with any release of Collateral, the Collateral Agent shall

have no duty, obligation or liability with respect to the obligations of the Company, GLAI and the Subsidiaries set forth above and the Collateral Agent shall look solely to the provisions of Section 7.09 of this Note Purchase Agreement.

SECTION 7.13.    *Limitation on Debt.*

(a)    Each of the Company, GLAI or any of its Subsidiaries shall not issue, assume, guarantee, incur or otherwise become liable for any new Debt in excess of the lesser of (i) U.S.$100.0 million (or the equivalent thereof at the time of determination) and (ii) 0.2x last 12 months consolidated EBITDAR after giving effect thereto and the application of the proceeds therefrom.  The last 12 months consolidated EBITDAR shall be calculated, on any date of determination, taking into account each of the Adjusted Operating Revenues, Adjusted Operating Expenses and Sales Taxes for the period of four consecutive fiscal quarters ending on, or most recently prior to such date, for which consolidated financial statements of GLAI are publicly available; all on a consolidated basis and in accordance with the Accounting Principles.

(b)    Notwithstanding clause (a) above, the Company, GLAI or any of its Subsidiaries may issue, assume, guarantee, incur or otherwise become liable for the following new Debt:

(1)    intercompany Debt between or among the Company, GLAI and any Subsidiary thereof or between or among their Subsidiaries provided that any Debt made by any Subsidiary to the Company or any Guarantor shall be subordinated to the Notes pursuant to a subordination agreement substantially in the form of Exhibit F and, if owing to the Company or any of the Guarantors, is subject to a Lien granted in favor of the Collateral Agent for the benefit of the Purchaser;

(2)    Debt that is:

i.    represented by the Notes and the Note Guaranties, in each case, issued on the Initial Closing Date;

ii.    outstanding on the Initial Closing Date (other than the Notes and the Notes Guaranties);

iii.    arising in connection with cash management transactions related to the proceeds of the Notes;

iv.    consisting of Refinancing Debt incurred in respect of any Debt described in this clause (b) or the foregoing clause (a); or

v.    consisting of guarantees of any Debt permitted under the Notes;

(3)    Debt in respect of bankers' acceptances, deposits, promissory notes, letters of credit, self-insurance obligations, completion guarantees, performance, surety, appeal or similar bonds and guarantees provided by the Company, GLAI or any Subsidiary in the ordinary course of its business securing the performance of contractual or license obligations of the Company, GLAI or any Subsidiary or Debt with respect to

51

reimbursement type obligations regarding workers' compensation claims or payment obligations with self-insurance or similar requirements in the ordinary course of business;

(4)     Hedging obligations of the Company, GLAI or any Subsidiary thereof (entered into for non-speculative purposes) in the ordinary course of business or directly related to Debt permitted to be incurred by the Company, GLAI or any Subsidiary pursuant to the Notes and Refinancing Debt incurred by the Company, GLAI or a Subsidiary in respect of Debt incurred pursuant to this clause (d);

(5)     Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Debt is extinguished within five Business Days of its incurrence;

(6)     Debt to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Notes in accordance with its terms (which proceeds shall be thereafter used to defease or satisfy and discharge the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes, in each case, with the prior written consent of the Abra Notes Supermajority Holders);

(7)     Debt consisting of (i) the financing of insurance premiums in the ordinary course of business, (ii) take or pay obligations contained in supply agreements in the ordinary course of business, or (iii) any advance, loan or extension of credit arising in connection with the purchase of inventory, equipment or supplies in the ordinary course of business;

(8)     Debt of the Company, GLAI or any Subsidiary for taxes levied, assessments due, settlements and other   governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(9)     Aircraft Debt; and

(10)     Additional other Debt in an aggregate principal amount not to exceed at any time $275 million which may be secured by a lien ranking *pari passu* with the lien on the collateral securing the GOL Senior Secured Notes due 2026, provided that the incurrence of any such additional Debt shall be subject to the satisfaction of the following terms and conditions:

(A)     until such time as all Collateral and covenants required to be delivered and liens thereon perfected under Section 7.17(o) shall have been delivered and perfected, only $150 million of the foregoing amount shall be able to be utilized;

(B)     such Debt is subject to an intercreditor agreement in form and substance acceptable to the Abra Notes Supermajority Holders in all respects (including without limitation in respect of passivity in any future insolvency, judicial or extrajudicial reorganization or bankruptcy of the Company or the Guarantors);

52

(C)      such Debt shall have a maturity date that is (i) more than one year after the maturity date of the Notes and (ii) more than three months after the maturity date of the Abra Notes;

(D)      such Debt shall have an all-in-yield to maturity lower than that of the Abra Senior Secured Notes, and have a weighted average life no shorter than that of the Abra Senior Secured Notes; and

(E)      up to $200 million of such Debt may be used for future liability management transactions provided that any such liability management transactions involving any refinancing or repurchases of the GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under this Section 7.13(b)(10) or otherwise), shall be at a maximum price of 50 cents.

Notwithstanding the foregoing, neither the Company, GLAI nor any of its Subsidiaries shall incur any Debt or amend existing Debt in a manner that would result in any restrictions on the ability of any Subsidiary of GLAI to repay Debt, advances or loans, or to repay Debt, advances or loans, or to pay dividends or make any other distributions on the Capital Stock of the Subsidiary owned by GLAI or any other Subsidiary to GLAI or any Subsidiary thereof.

SECTION 7.14.    *Limitation on Restricted Payments*. Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly:

(a)      declare or pay any dividend or make any distribution on or in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving the Company, GLAI or such Subsidiary) except dividends or distributions payable solely in the form of its Capital Stock and except dividends or distributions payable to the Company, GLAI or directly or indirectly wholly-owned Subsidiaries of GLAI, in each case with the prior written consent of the Abra Notes Supermajority Holders;

(b)      purchase, redeem, retire or otherwise acquire for value any Capital Stock of GLAI held by Persons other than the Company, GLAI or another Subsidiary (other than a purchase, redemption, retirement or other acquisition for value that would not constitute an Investment);

(c)      purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Obligations (other than a payment of interest or the purchase, repurchase, redemption, defeasance or other acquisition of Subordinated Obligations made in anticipation of satisfying a sinking fund obligation, a principal installment or a final maturity, in each case, due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition);

(d)      purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under Section 7.13(b)(10) or otherwise) at a price in excess of 50 cents for every $1.00 of

#4856-1598-7531v19

principal amount so purchased, repurchased, redeemed, defeased or otherwise acquired or retired for value; or

(e)      make any Investment in any Person;

(the actions described in clauses (a) through (d) above being herein referred to as "**Restricted Payments**" and each, a "**Restricted Payment**").

The aforementioned provisions will not prohibit:

(1)      any Restricted Payment in exchange for, or out of the proceeds of the substantially concurrent issuance or sale of, Capital Stock of GLAI (other than Capital Stock issued or sold to a Subsidiary of GLAI), in each case with the prior written consent of the Abra Notes Supermajority Holders ;

(2)      any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations made in exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Obligations that is permitted to be incurred pursuant to the covenant described under Section 7.13;

(3)      dividends paid or distributions made after the date of declaration thereof if at such date of declaration such dividend or distribution would have complied with this covenant;

(4)      so long as no Default has occurred and is continuing, any purchase or redemption of Subordinated Obligations from Net Cash Proceeds; provided that the Company, GLAI or the Subsidiary thereof have complied with the covenant described under Section 7.12 and Section 7.13;

(5)      the declaration and payment of distributions to shareholders of the Company, GLAI or any Subsidiary in the form of dividends, interest on shareholders' equity or otherwise in the minimum mandatory amount set forth under applicable Brazilian corporate law;

(6)      repurchases of Capital Stock, in an aggregate amount not to exceed U.S.$10,000,000 in any calendar year (i) deemed to occur upon the exercise of stock options, warrants or other convertible securities if such Capital Stock represents a portion of the exercise price thereof and cash payments in lieu of the issuance of fractional shares, or (ii) from former employees, officers, directors, consultants or other persons who performed services for GLAI or any Subsidiary in connection with the cessation of such employment or service; provided that such repurchases have been approved by the Company's, GLAI's or its Subsidiary's Board of Directors, as applicable;

(7)      the creation, approval or amendment of any management equity incentive plan in the ordinary course of business and consistent with past practice;

(8)      any distributions or payments on or related to convertible or exchangeable securities issued by GLAI or any of its Subsidiaries pursuant to the terms of the

54

Transaction Documents or any other financing existing on the Initial Closing Date (as disclosed in GLAI's Form 20-F filed with the U.S. Securities and Exchange Commission on March 16, 2022 including in Note 16 (Loans and Financing), Note 17 (Leases), Note 18 (Suppliers) and Note 20 (Taxes Payable) to Item 18 (Financial Statements) beginning on page F-50 thereof); and

(9)     dividends, loans, advances or distributions to any Purchaser Entity or other payments by GLAI or any Subsidiary thereof in amounts equal to (without duplication) the amounts required for any Purchaser Entity to pay any Purchaser Entity Expenses.

The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred, issued, purchased, repurchased, redeemed, retired, defeased or otherwise acquired by the Company, GLAI or such Subsidiary, as the case may be, pursuant to such Restricted Payment.

SECTION 7.15.    *Non-Compete and Exclusivity.*

(a)     The Company and Guarantors shall not, and shall ensure that their Subsidiaries do not, directly or indirectly, for their own account or on behalf of or together with any other Person, carry on, own, manage, control, operate, develop, create, invest in, have any financial interest in (as shareholder or otherwise), or participate in or be engaged in (whether as shareholder, advisor, a partner of a partnership firm, designated partner of a limited liability partnership, or proprietor of a proprietorship firm, or any other entity whether registered under applicable Law or otherwise), any undertaking, venture, business or Person (including, but not limited to, any joint venture, partnership or other arrangement of whatsoever nature) that is engaged in a similar business to the Loyalty Program. The Company and the Guarantors further covenant that the Loyalty Program is, and will be, the sole and exclusive loyalty program of GLA, the Company, GLAI and their Subsidiaries; provided that the Loyalty Program may be expanded to be the loyalty program of both the GLAI Group and another airline so long as such expansion is not adverse to GLAI, the GLAI Group or IPCo and the Loyalty Program remains controlled, directly or indirectly, by GLAI.

(b)     Each of the Company and GLAI agree that to the extent that Abra Group Limited provides an officer's certificate to the Company, GLAI or any of their respective Subsidiaries or any of their respective board of directors that it is appropriate to make a filing or enter a plan under applicable Law to restructure its debt (including, without limitation, a "Chapter 11" filing in the United States or a similar filing under Brazilian law), it shall take such actions within the timeframe requested by Abra Group Limited.

(c)     Each of the Company, GLAI and their respective Subsidiaries agree that in connection with any proceedings to restructure its debt (including, without limitation, any proceeding related to bankruptcy, insolvency, judicial or extrajudicial reorganization, restructuring or any proceeding entered into in connection with clause (b) above) it shall not propose a plan or make a filing or otherwise take action that has not been consented to in writing by Abra Group Limited.

SECTION 7.16.    *Additional Lines of Business.* The Company and GLAI shall not, and shall procure that their respective Subsidiaries shall not enter into a line of business that (i) is not the business of operating airlines, (ii) is not primarily related to operating airlines; (iii) is not primarily related to the then current business of the Company and GLAI and their respective Subsidiaries.

SECTION 7.17.    *GLA and IPCO Covenants.*

(a)    IPCo shall not engage in any business or undertake any other activity or obligations except for (i) owning and holding the Smiles' certain assets and rights related to the Loyalty Program (subject to the provisions herein) or that are pledged pursuant to the Collateral Documents and the Smiles Complete Technological Infrastructure\, (ii) operating the Loyalty Program, (iii) guaranteeing the Notes Obligations, (iv) establishing and maintaining its legal existence and otherwise take actions to comply with the terms of this Note Purchase Agreement and the Collateral Documents, in each case to the extent permitted hereby and thereby, and (v) as required by law.

(b)    GLA shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, and any of its positions as counterpart to the current and future commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(c)    [*Reserved*].

(d)    IPCo shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, any of its positions as counterpart to the current and future commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, or any other asset or right owned by IPCo related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(e)    On the Initial Closing Date, GLA shall cause IPCo to (i) enter into a guaranty of the Notes Obligations; and (ii) execute the Exclusivity Side Letter and comply with its obligations thereunder. Within up to 60 days after the Initial Closing Date, GLA shall cause IPCo to enter into the agreement in which IPCo grants to GLA the right to use Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals and the Smiles Technological Infrastructure, provided that such agreement shall expire in December 31st of each year, unless renewed by mutual consent upon renegotiation of its terms and comply with its obligations thereunder ("**GLA/IPCo Agreement**").

(f)    GLA and GLAI shall take all actions to comply with the Exclusivity Side Letter and GLA/IPCo Agreement. Upon an Event of Default, IPCo may only renew the GLA/IPCo

56

Agreement without prior written consent of the Abra Notes Supermajority Holders for an annual payment of at least $200 million for 30 years;

(g)     On the Initial Closing Date, Guarantors shall duly execute and deliver the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement.

(h)     Any future Smiles Intellectual Property shall be owned solely and exclusively by IPCo.

(i)     After the transfer to IPCo provided for in Section 7.17(o) below, any Smiles Intellectual Property and any future Smiles Database, Client and Supplier List and Smiles Operating Manuals shall be owned solely and exclusively by IPCo.

(j)     Any future agreement related to the Smiles Complete Technological Infrastructure shall be entered by IPCo and relevant counterparties, provided that IPCo shall enter into and maintain in effect all relevant agreements related to the Smiles Complete Technological Infrastructure necessary to run the Loyalty Program;

(k)     GLA undertakes not to hire any other service providers or obtain licenses to use software that perform analogous tasks or functions to those included in the Smiles Complete Technological Infrastructure.

(l)     GLA and IPCo, as the case may be, undertake to update the Database, Client and Supplier List in accordance with the periodicity established in its internal policies and controls, even after an acceleration of the Notes.

(m)     Any future agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall include IPCo as a party allowed to issue and sell miles. Provided that no Event of Default has occurred, parties agree that no agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered exclusively by IPCo.

(n)     Upon the occurrence of an Event of Default (or an Event of Default under the GOL Senior Secured Notes NPA), (i) no new agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered into any member of the GLAI Group, except IPCo and (ii) IPCo shall become the sole entity issuing or selling miles in the context of the Loyalty Program under the agreements to which IPCo was included as a party pursuant to item 7.17(m) above and 7.17(o) and 7.17(p) below.

(o)     On or before July 10, 2023, GLA shall (provided that, in any case, such actions shall occur after the execution and delivery of the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement):

(1)     GLA shall transfer to IPCo the ownership of all Smiles Intellectual Property, Smiles Database, Client and Supplier List and the Smiles Operating Manuals;

(2)    assign to IPCo all the agreements related to the Smiles Technological Infrastructure listed in Schedule B-1;

(3)    assign to IPCo no fewer than 66% of the agreements listed in Schedule B and any other agreements related to the Smiles Complete Technological Infrastructure executed by GLAI Group between the date hereof and July 10, 2023; and

(4)    amend no fewer than 66% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements, allowed to issue and sell miles in, provided that, the agreements in which IPCo is included represents more than 50% of the total revenues of the commercial agreements listed in Schedule C for the year ended December 31, 2022;

(p)    On or before December 31, 2023 GLA shall:

(1)    assign to IPCo no fewer than 90% of the agreements listed in Schedule B-2 and any other agreements related to the Smiles Complete Technological Infrastructure executed by GLAI Group between the date hereof and July 10, 2023; and

(2)    amend no fewer than 90% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements allowed to issue and sell miles.

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.    *[Reserved]*.

SECTION 8.02.    *Limitation on Consolidation, Merger or Transfer of Assets*.  Until all amounts outstanding under this Note, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes have been paid in full, neither the Company nor the Guarantors shall consolidate with or merge with or into, or sell, convey, transfer or dispose of, or lease all or substantially all of its assets as an entirety or substantially as an entirety, in one transaction or a series of related transactions, to, any Person, unless:

(1)    the resulting, surviving or transferee Person (if not the Company or a Guarantor) shall be a Person organized and existing under the Laws of Brazil, England, the United States of America, any State thereof or the District of Columbia, or any other country (or political subdivision thereof) that is a member country of the European Union or of the Organization for Economic Co-operation and Development, and such Person expressly assumes, by an amendment to this Note Purchase Agreement, executed and delivered to the Company, all the obligations of the Company or the Guarantors under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents;

(2)    the resulting, surviving or transferee Person undertakes, in an amendment to this Note Purchase Agreement, to pay such Additional Amounts in respect of principal (and premium, if any) and interest as may be necessary in order that every net payment

58

made in respect of the Notes and any Note Guaranty after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by the Surviving Person's Tax Jurisdiction (as defined below) such other country or any political subdivision or taxing authority thereof or therein shall not be less than the amount of principal (and premium, if any) and interest then due and payable on the Notes and the Note Guaranties subject to the same exceptions set forth under Section 7.06, but replacing references therein to the Taxing Jurisdiction with references to the jurisdiction in which the resulting, surviving or transferee Person (as the case may be) is incorporated, domiciled and/or resident for taxation purposes (the "**Surviving Person's Tax Jurisdiction**") ; and

(3)    immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

For purposes of this Section 8.02, any sale, lease or other transfer or disposition of the assets of one or more Subsidiaries of the Company, if any, that would, if the Company had held such assets directly, have constituted the sale, lease or other transfer or disposition of all or substantially all of the Company and its Subsidiaries', if any, consolidated assets, taken as a whole, shall be treated as such under this Note Purchase Agreement.

Subject to Section 8.02(2) above and notwithstanding anything else to the contrary contained in the foregoing, any of the Guarantors may consolidate with or merge with the Company or any Subsidiary that becomes a Guarantor concurrently with the relevant transaction.

SECTION 8.03.    *Successor Substituted*.   Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Company or any of the Guarantors in accordance with Section 8.02 in which the Company or any of the Guarantors is not the continuing obligor or Guarantor, as the case may be, under this Note Purchase Agreement, the surviving or transferor Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company or any of the Guarantors, as the case may be, under this Note Purchase Agreement with the same effect as if such successor had been named as the Company or a Guarantor therein. When a successor assumes all the obligations of its predecessor under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents, the predecessor shall be released from those obligations; *provided that* in the case of a transfer by lease, the predecessor shall not be released from the payment of principal and interest on the Notes.

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.    *Events of Default*.   The term "**Event of Default**" means, when used herein with respect to the Notes, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to, or as a result of any failure to obtain, any authorization, order, rule, regulation, judgment or decree of any governmental or administrative body or court):

#4856-1598-7531v19

(a)    default in any payment of interest pursuant to the terms set forth in this Note Purchase Agreement (including any Additional Amounts) on any Note when the same becomes due and payable, and any such Default continues for a period of 30 days;

(b)    default in the payment of the principal (including any Additional Amounts) of any Note when the same becomes due and payable at its Stated Maturity, upon acceleration or otherwise;

(c)    failure by the Company or the Guarantors to comply with its obligations under Article 7;

(d)    any of the Company or the Guarantors fails to comply with any of its covenants or agreements in the Notes, this Note Purchase Agreement, the Note Guaranties or the Collateral Documents (other than those referred to in clause (a), (b) or (c) of this Section 9.01), and such failure continues for 60 days after the notice specified below;

(e)    any of the Company, the Guarantors or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by any of the Company, the Guarantors or any such Significant Subsidiary (or the payment of which is guaranteed by the Company, the Guarantor or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of this Note Purchase Agreement, which default (i) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("**Payment Default**") or (ii) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

(f)    one or more final non-appealable judgments or decrees for the payment of money of U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against any of the Company, the Guarantors or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed within 30 days following commencement of such enforcement proceedings or (ii) there is a period of 50 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed;

(g)    an involuntary case or other proceeding is commenced against any of the Company, the Guarantors or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect seeking the appointment of a trustee, receiver, *administrador judicial,* liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 50 days; or an order for relief is entered against any of the Company, the Guarantors or any Significant

#4856-1598-7531v19

Subsidiary under the bankruptcy Laws now or hereafter in effect, and such order is not being contested by any of the Company, the Guarantors or any Significant Subsidiary, as the case may be, in good faith, or has not been dismissed, discharged or otherwise stayed, in each case within 50 days of being made;

(h)       any of the Company, the Guarantors or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking liquidation, reorganization, *concordata*, or other relief with respect to itself or its debts under any applicable bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such Law, (ii) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the Company, the Guarantors or any Significant Subsidiary or for all or substantially all of the property of any of the Company, the Guarantors or any Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(i)       any event occurs that under the Laws of England and Wales, Brazil, Colombia, the Cayman Islands or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in any of clause (g) or (h);

(j)       any Note Guaranty shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect, other than in accordance with the terms of this Note Purchase Agreement, or any of the Guarantors (or any Person on behalf of any Guarantor) denies or disaffirms its obligations under its Note Guaranty;

(k)       all or any portion of a claim asserted by the Purchaser or Majority Holders in any proceeding (including without limitation an insolvency proceeding or judicial or extrajudicial reorganization of any member of the GLAI Group) in respect of the Notes or the GOL Senior Secured Exchangeable Notes due 2028 is either asserted by any member of the GLAI Group or held by any court of competent jurisdiction to be reduced, invalid, disallowed, subordinated or recharacterized as equity, avoided, set aside or otherwise invalidated;

(l)       the Lien granted in favor of, and for the benefit of, the Purchaser or Holders in all or any portion of the Collateral is held by any court of competent jurisdiction to be not perfected or is otherwise unenforceable, *pari passu* or subordinated to any other Lien (including any debtor in possession priming lien), avoided, disallowed, set aside or otherwise invalidated except for Liens expressly permitted hereunder or as otherwise consented to by the Abra Notes Supermajority Holders;

(m)       any enforcement action is taken in respect of the Collateral, including the taking of any steps to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral or otherwise exercise any rights or remedies with respect to the Collateral in accordance with the Collateral Documents;

(n)       it is or becomes unlawful for the Company or the Guarantors to perform any of their respective obligations under the Notes, the Collateral Documents or this Note Purchase Agreement;

(o)    an event of default (as such term is defined in the GOL Senior Secured Exchangeable Notes NPA) with respect to the GOL Senior Secured Exchangeable Notes due 2028 has occurred and is continuing;

(p)    any of the Collateral Documents shall for any reason cease to be in full force and effect in all material respects, or any of the Company or the Guarantors or any of their Subsidiaries shall so assert, or any Lien created, or purported to be created, by the Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby;

(q)    (i) any settlement of any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency, involving payment of damages in excess of US$35.0 million or its equivalent and are not paid (whether in full or in installments in accordance with the terms of such settlement); or (ii) the commencement, settlement or termination or agreement to commence, settle or terminate any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency which could result in the imposition of material injunctive relief (or the agreement to comparable relief) or other material restrictions upon any of the Company, GLAI or any Significant Subsidiary thereof which impositions would cause a Material Adverse Effect; or

(r)    entering into any settlement agreement of a material internal investigation with a Governmental Authority, which would cause a Material Adverse Effect.

SECTION 9.02.    *Acceleration of Maturity, Rescission and Amendment*.  If an Event of Default (other than an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) with respect to the Notes occurs and is continuing, the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Company and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) occurs and is continuing, then the principal of and accrued and unpaid interest on all Notes of shall become and be immediately due and payable without any declaration or notice or other act on the part of any Holder.

At any time after a declaration of acceleration with respect to the Notes has been made and before a judgment or decree for payment of the money due has been obtained as hereinafter provided in this Article, the Majority Holders by written notice to the Company may rescind or annul such declaration if:

(1)    the Company has paid or deposited a sum sufficient to pay (A) all overdue interest on Outstanding Notes, (B) all unpaid principal of the Notes that has become due otherwise than by such declaration of acceleration, (C) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (D) all sums paid or advanced by the Agents and the Collateral Agent hereunder and under the Collateral Documents and the reasonable compensation, expenses, disbursements, indemnities and advances of the Agents, the Collateral Agent and their agents and counsel; and

(2)    all Events of Default have been cured or waived as provided in Section 9.12 other than the non-payment of principal that has become due solely because of acceleration.

No such rescission shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

SECTION 9.03.    *Applicable Premium*. Without limiting the generality of the foregoing, it is understood and agreed that if the Notes are accelerated or otherwise become due prior to their Stated Maturity, in each case, in respect of any Event of Default, the Applicable Premium shall also be due and payable in cash to the Holders and shall constitute part of the obligations payable to the Holders in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Holder's loss as a result thereof. If the Applicable Premium becomes due and payable, the principal of the Notes and interest shall accrue on the full principal amount of the Notes (including the Applicable Premium) from and after the applicable triggering event. Any premium payable above shall be presumed to be the liquidated damages sustained by each Holder as the result of the acceleration of the Notes. The Company expressly waives (to the fullest extent it may lawfully do so) the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Applicable Premium in connection with any such acceleration. The Company and each Guarantor hereby agree that the Applicable Premium shall also be payable, without limitation, in any bankruptcy, insolvency, judicial or extrajudicial reorganization or similar proceeding with respect to creditor's rights in any jurisdiction, and shall not contest in any manner the payment thereof in any such circumstance.

SECTION 9.04.    *Subrogation Rights*.  The parties hereto acknowledge and agree that the Abra Holders shall be express third-party beneficiaries to, and shall have all the rights of a third-party beneficiary to, this Note Purchase Agreement. The Abra Notes Supermajority Holders shall have the right to enforce this Note Purchase Agreement in accordance with its terms as if they were original parties hereto, if the Purchaser has not taken any reasonable action and has not continued to diligently enforce its rights under this Note Purchase Agreement for more than 90 calendar days after the relevant Event of Default. The Purchaser, by its execution and delivery of this Note Purchase Agreement agrees to the provisions of this Section 9.04 and hereby directs the Collateral Agent to accept directions received from the Abra Notes Supermajority Holders in respect of the Collateral and the Collateral Documents if the Abra Notes Supermajority Holders exercise the rights set forth in this Section 9.04; provided, (i) the Abra Notes Supermajority Holders shall have the obligations of the Purchaser or the Holders in connection with any such direction to the Collateral Agent, including without limitation the obligation to provide indemnification satisfactory to the Collateral Agent, and the Collateral Agent shall have the same rights and protections as if the Collateral Agent were directed by the Purchaser or the Holders and (ii) the Collateral Agent shall receive and shall be conclusively entitled to rely upon a certificate of the Purchaser at the time of any direction of the Abra Notes Supermajority Holders, which certificate shall certify that such Persons are the Abra Notes Supermajority Holders. Other than as expressly provided in the preceding sentence, in no event shall the Abra Holders have any right to direct or instruct the Collateral Agent. The Collateral Agent is not an agent for the Abra Holders and has no obligation, duty, liability or responsibility to such Abra Holders.

63

#4856-1598-7531v19

SECTION 9.05.    *Application of Money Collected*. Any money collected by the Collateral Agent pursuant to this Article 9 or the Collateral Documents shall be applied in order set forth below:

FIRST, (i) to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent under this Note Purchase Agreement and the Collateral Documents and then (ii) on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the other Agents and any other agent or attorney appointed hereby or under the Collateral Documents, in the case of each of the foregoing, solely in their respective capacity as the Collateral Agent, an Agent or other agent, as applicable (including costs, expenses and legal expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Note Purchase Agreement or the Collateral Documents);

SECOND, on a pro rata basis, to the payment in full to the Holders of all amounts due and unpaid on the Notes for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest; provided, that, the proceeds shall be applied (i) first, to the Holders for amounts due and payable on the Notes for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest and (ii) second, any remaining amounts to the Holders for amounts due and payable on the Notes for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Notes; and

THIRD, the balance, if any, after all of the Notes Obligations have been paid in full in cash, to the Company and its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Company may fix a record date and payment date for any payment to Holders pursuant to this Section 9.05.

SECTION 9.06.    *Limitation on Suits*.  A Holder may not pursue any remedy with respect to this Note Purchase Agreement, the Notes or the Collateral Documents unless:

(1)    the Holder has previously given to the Collateral Agent written notice stating that an Event of Default with respect the Notes has occurred and is continuing;

(2)    the Holders of at least 25% in principal amount of the Outstanding Notes have made a written request to the Collateral Agent to pursue the remedy in respect of such Event of Default;

(3)    such Holder or Holders has offered and provided to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against any cost, loss, liability or expense to be incurred in compliance with such request;

(4)    the Collateral Agent does not comply with the request within 60 days after receipt of the request and the offer and provision of security or indemnity; and

64

(5)      no direction inconsistent with such written request has been given to the Collateral Agent during such 60-day period by the Purchaser.

SECTION 9.07.    *Contractual Rights of Holders to Receive Principal and Interest*. Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, each Holder shall have the right pursuant to this Section 9.07 to bring suit for the payment of principal, premium, if any, and interest on its Note, on or after the respective due dates expressed or provided for in such Note.

SECTION 9.08.    *Restoration of Rights and Remedies*.  If the Collateral Agent (as directed by the Purchaser or the Majority Holders, as provided in this Note Purchase Agreement) or any Holder has instituted any proceeding to enforce any right or remedy under this Note Purchase Agreement or the Collateral Documents and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Collateral Agent or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Guarantors, the Collateral Agent and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Collateral Agent and the Holders shall continue as though no such proceeding had been instituted.

SECTION 9.09.    *Delay or Omission Not Waiver*.  No delay or omission of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article 9 or by Law to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Holders.

SECTION 9.10.    *Control by Holders*.  The Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Company or the Collateral Agent or of exercising any power conferred on the Collateral Agent.  However, the Collateral Agent shall be under no obligation to exercise any of the rights or powers under this Note Purchase Agreement or the Collateral Documents at the request or direction of any Holders if such request or direction conflicts with any Law or with this Note Purchase Agreement or the Collateral Documents or may expose the Collateral Agent to liability.  Prior to taking any action under this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall be entitled to indemnification satisfactory to the Collateral Agent in its sole discretion against all costs, losses, liabilities and expenses that might be caused by taking or not taking such action.

SECTION 9.11.    *Rights and Remedies Cumulative*.  Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 4.08, no right or remedy herein conferred upon or reserved to the Holders or the Purchaser, as the case may be, is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by Law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at Law or in equity or otherwise.  The

65

assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 9.12.    *Waiver of Past Defaults and Events of Default*.  The Purchaser with the prior written consent of the Abra Notes Supermajority Holders) by written notice to the Company may waive an existing Default or Event of Default and its consequences. When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 9.13.    *Waiver of Stay or Extension Laws*.  The Company and the Guarantors covenant (to the extent that it may lawfully do so) that they shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension Law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Note Purchase Agreement, the Notes or the Collateral Documents; and the Company and the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such Law, and shall not hinder, delay or impede the execution of any power herein granted to the Collateral Agent, but shall suffer and permit the execution of every such power as though no such Law had been enacted.

## ARTICLE 10
### AMENDMENTS

SECTION 10.01.  *Without Consent of Holders*.  The Company, when authorized by a Board Resolution, the Guarantors and the Collateral Agent may amend or supplement this Note Purchase Agreement, the Notes and the Collateral Documents without notice to or consent or vote of the Purchaser, any Holder of the Notes, or any holder of Abra Senior Secured Exchangeable Notes or Abra Senior Secured Notes, for the following purposes:

(i)     to cure any ambiguity, omission, defect or inconsistency in this Note Purchase Agreement or in the Notes in a manner that does not adversely affect any Holder in any material respect, as set forth in an Officer's Certificate;

(ii)    to add guarantees or collateral with respect to the Notes;

(iii)   to comply with Section 8.02;

(iv)    to add to the covenants or Events of Default of the Company or the Guarantors for the benefit of the Holders of the Notes;

(v)     to surrender any right herein conferred upon the Company or the Guarantors;

(vi)    to provide for any guarantee or collateral of the Notes, to secure such Notes or to confirm and evidence the release, termination or discharge of any Note Guaranty or collateral of the Notes when the release, termination or discharge is expressly permitted by this Note Purchase Agreement or the Collateral Documents, as the case may be;

66

> (vii)    to evidence and provide acceptance of appointment by a registrar, paying agent, bid solicitation agent with respect to the Notes or to facilitate the administration of this Note Purchase Agreement; or

> (viii)    ministerial amendments to effect the GLAI Going Private Process;

*provided that*, the Company or the applicable Guarantor has delivered to the Purchaser, the Collateral Agent and the Abra Notes Supermajority Holders an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment or supplement pursuant to this Section 10.01 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.01 requested by the Company or any Guarantor (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.01 and (C) without any recourse, representation or warranty by the Collateral Agent).

SECTION 10.02.  *With Consent of Holders*.  Except as specified in Section 10.01, the Company, when authorized by a Board Resolution, the Guarantors, the Collateral Agent (at the direction of the Purchaser) and the Majority Holders may amend or supplement this Note Purchase Agreement, the Notes or the Collateral Documents only with the prior written consent of the Purchaser and the Abra Notes Supermajority Holders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Note Purchase Agreement, the Notes or the Collateral Documents or modifying in any manner the rights of the Holders under this Note Purchase Agreement, the Notes or the Collateral Documents and the Purchaser may, with the prior written consent of the Abra Notes Supermajority Holders, except as set forth below, waive any past Default or Event of Default or compliance with any provision of this Note Purchase Agreement; *provided*, *however*, that, without the consent of each Holder affected or the Abra Notes Supermajority Holders, an amendment or waiver may not:

> (i)    reduce the principal amount of or extend the Stated Maturity of any Note;

> (ii)    reduce the amount of principal payable upon acceleration of the Maturity Date of any Note;

> (iii)    reduce the rate, or extend the stated time for payment, of interest on any Note except as provided for in this Note Purchase Agreement;

> (iv)    change the currency for payment of principal of, or interest or any Additional Amounts on, any Note;

> (v)    impair the right of any Holder to receive payment of principal and interest on such Holder's Notes on or after due dates therefor or make any change in the provisions of this Note Purchase Agreement relating to the contractual rights of Holders of Notes expressly set forth in this Note Purchase Agreement to institute suit for the enforcement of any right to payment on or with respect to any Note;

    (vi)      make any change in the provisions of this Note Purchase Agreement relating to waivers of a Default or Event of Default in payment of principal of and interest on the Notes;

    (vii)     reduce the principal amount of Notes, Abra Senior Secured Notes or Abra Senior Secured Exchangeable Notes whose holders must consent to any amendment, supplement or waiver;

    (viii)    make any change in this first paragraph of this Section 10.02;

    (ix)      make any change in Section 9.05 that adversely affects the Holders;

    (x)       change the ranking of the Notes or any Note Guaranty relating thereto in a manner adverse to the Holders;

    (xi)      make any change in any Note Guaranty that would adversely affect the Holders; or

    (xii)     change the definition of "Abra Notes Supermajority Holders" or modify any provision pursuant to which consent of the Abra Notes Supermajority Holders is required for any transaction, action or otherwise.

In addition, notwithstanding the foregoing (and except as provided for in Section 7.09), without the prior written consent of the Purchaser and the Abra Notes Supermajority Holders, no amendment, supplement or waiver may release any portion of the Collateral or permit or suffer to exist any Lien therein other than to secure the Notes Obligations unless otherwise expressly permitted in this Note Purchase Agreement and/or the Collateral Documents.

The Company shall give to Holders and Abra Notes Supermajority Holders prior written notice of any amendment or waiver proposed to be adopted under this Section 10.02. In addition, the Company or the applicable Guarantor shall deliver to the Collateral Agent (if the Collateral Agent is a party thereto) an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment, supplement or waiver pursuant to this Section 10.02 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.02 requested by the Company or any Guarantor (A) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.02 and (B) without any recourse, representation or warranty by the Collateral Agent).

It shall not be necessary for the consent of the Holders or Abra Notes Supermajority Holders under this Section 10.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment or waiver under this Section 10.02 becomes effective, the Company shall give to Holders a notice briefly describing such amendment or waiver. The failure to give such notice to all Holders and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, or any defect therein, shall not impair or affect the validity of an amendment or waiver under this Section 10.02.

#4856-1598-7531v19

SECTION 10.03.  *Revocation and Effect of Consents and Waivers*.  (a) A consent to an amendment or a waiver by a Holder shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Company receives the written notice of revocation at least one Business Day prior to the date the amendment or waiver becomes effective.  After it becomes effective, an amendment or waiver shall bind every Holder.

(b)      The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above in accordance with Section 14.01. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 10.04.  *Payment for Consent*.  Neither the Company nor any of its Affiliates shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Note Purchase Agreement or the Notes unless such consideration is offered to be paid to all Holders which so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

SECTION 10.05.  *Collateral Agent*.  No waiver, modification or amendment of this Note Purchase Agreement or the Collateral Documents may affect or change the rights, obligations, duties, protections or immunities of the Collateral Agent without the written consent of the Collateral Agent. The Collateral Agent may conclusively rely on an Officer's Certificate with respect to whether the consent of Purchaser, any Holders, any holders of the Abra Senior Secured Notes or any holders of the Abra Senior Secured Exchangeable Notes are required in connection with any amendment, supplement or waiver under this Article 10.

## ARTICLE 11
### NOTE GUARANTIES

SECTION 11.01.  *The Note Guaranties*.  Subject to the provisions of this Article, GLAI and GLA hereby irrevocably and unconditionally guarantee (the "**Note Guaranties**"), on a secured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations; *provided, however,* that upon release of the Collateral in accordance with Section 7.09 GLA and GLAI shall guarantee, on a unsecured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  Upon failure by the Company to pay punctually any such amount, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Note Purchase Agreement.

SECTION 11.02.  *Guaranty Unconditional*.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

(1)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Company under this Note Purchase Agreement or any Note, by operation of Law or otherwise;

(2)    any modification or amendment of or supplement to this Note Purchase Agreement or any Note;

(3)    any change in the corporate existence, structure or ownership of the Company, or any insolvency, bankruptcy, judicial or extrajudicial reorganization or other similar proceeding affecting the Company or its assets or any resulting release or discharge of any obligation of the Company contained in this Note Purchase Agreement or any Note;

(4)    the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Company or any other Person, whether in connection with this Note Purchase Agreement or any unrelated transactions; *provided that* nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(5)    any invalidity or unenforceability relating to or against the Company for any reason of this Note Purchase Agreement or any Note, or any provision of applicable Law or regulation purporting to prohibit the payment by the Company of the principal of or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement; or

(6)    any other act or omission to act or delay of any kind by the Company or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantors' obligations hereunder.

SECTION 11.03.  *Discharge; Reinstatement*.  The Guarantors' obligations hereunder will remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Company under this Note Purchase Agreement have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, judicial or extrajudicial reorganization of the Company or otherwise, the Guarantors' obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.

SECTION 11.04.  *Waiver by the Guarantors*.  Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company or any other Person.

#4856-1598-7531v19

SECTION 11.05.  *Subrogation and Contribution*.  Upon making any payment with respect to any obligation of the Company under this Article, the Guarantor making such payment will be subrogated to the rights of the payee against the Company with respect to such obligation, limited to the amount of the payment or delivery made by such Guarantor ("**Subrogation Rights**"). The Guarantor hereby irrevocably agrees that the Subrogation Rights may be used at all times by the Guarantors to set-off amounts owed by the Guarantors to the Guarantor under the Notes and the GOL Senior Secured Exchangeable Notes due 2028.

SECTION 11.06.  *Stay of Acceleration*.  If acceleration of the time for payment of any amount payable by the Company under this Note Purchase Agreement or the Notes is stayed upon the insolvency, bankruptcy, judicial or extrajudicial reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of this Note Purchase Agreement are nonetheless payable by the Guarantors hereunder forthwith on demand by the Holders.

SECTION 11.07.  *Limitation on Amount of Guaranty*.  Notwithstanding anything to the contrary in this Article, each of the Guarantors, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guaranty of each Guarantor does not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.  To effectuate that intention, the Holders and each of the Guarantors hereby irrevocably agree that the obligations of each Guarantor under its respective Note Guaranty are limited to the maximum amount that would not render the Guarantors' obligations subject to avoidance under applicable fraudulent conveyance provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.

SECTION 11.08.  *Execution and Delivery of Guaranty*.  The execution by each of the Guarantors of this Note Purchase Agreement on each Closing Date evidences the respective Note Guaranty of each Guarantor, whether or not the person signing as an Officer of such Guarantor still holds that office at the time of execution of any Note.

SECTION 11.09.  *Release of Guaranty*. The Note Guaranty of each of the Guarantors will terminate upon a sale or other disposition (including by way of consolidation or merger) of such Guarantor or the sale or disposition of all or substantially all the assets of such Guarantor (in each case other than to the Company or a Subsidiary) otherwise permitted by this Note Purchase Agreement.

Upon delivery by the Company to the Purchaser and the Collateral Agent of an Officer's Certificate and an Opinion of Counsel, each stating that all of the conditions provided in this Note Purchase Agreement to the release and termination of the Note Guaranty have been satisfied, the Purchaser will execute any documents reasonably requested by the Company in writing in order to evidence the release of such Guarantor from its obligations under its Note Guaranty.

# ARTICLE 12
## COLLATERAL AGENT

SECTION 12.01.  *Appointment*.  Each of the Secured Parties (other than the Collateral Agent) hereby appoints the Collateral Agent as the agent of such Secured Parties under this Note Purchase Agreement and the Collateral Documents to which it is a party and authorizes and directs the Collateral Agent to take such actions on its behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof.  It is understood and agreed that the use of the term "agent" herein or in the Collateral Documents (or any other similar term) with reference to the Collateral Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The Company agrees to pay to the Collateral Agent such fees and expenses (including counsels' fees and expenses) of the Collateral Agent as may be separately agreed in writing and pursuant to the terms of Section 12.04. For the avoidance of any doubt and for the purposes of this Article 12, this Note Purchase Agreement shall prevail in the case of any conflicts between any Collateral Document and this Note Purchase Agreement.

SECTION 12.02.  *Exculpatory Provisions*.   (a) The Collateral Agent shall have no duties or obligations except those expressly set forth in this Note Purchase Agreement and the Collateral Documents to which the Collateral Agent is a party, and no duty, liability or obligation shall be inferred or implied against the Collateral Agent. Without limiting the generality of the foregoing provision, (i) the Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists; (ii) the Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Collateral Agent); (iii) except as expressly provided for in this Note Purchase Agreement or the Collateral Documents to which the Collateral Agent is a party, the Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company or any Guarantor or any of their Subsidiaries which is communicated to or obtained by the Collateral Agent or any of its Affiliates in any capacity; and (iv) the Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Collateral Agent to liability or otherwise contrary to this Note Purchase Agreement or the Collateral Documents or applicable Law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect.

(b)      Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall not be liable for any action taken or not taken

72

#4856-1598-7531v19

by it (i) with the written consent or at the written request, written instruction or written direction of the Purchaser, the Majority Holders or the Abra Notes Supermajority Holders (or such other requisite percentage of Holders as may be specified), as applicable, or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

(c)      The Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until written notice by the Purchaser (a copy of which shall be delivered by the Purchaser to the Abra Notes Supermajority Holders) describing such event is received by a Responsible Officer of the Collateral Agent, referring to this Note Purchase Agreement and such Default or Event of Default.

(d)      The Collateral Agent shall not be liable for or have any duty to prove or investigate, or otherwise have any obligation or liability with respect to, (i) any representation or warranty provided in or with respect to this Note Purchase Agreement or the Collateral Documents, (ii) the contents of any certificate, report or other document delivered under or with respect to this Note Purchase Agreement or the Collateral Documents, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Note Purchase Agreement or the Collateral Documents or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, efficacy or authenticity of this Note Purchase Agreement, the Collateral Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Note Purchase Agreement or the Collateral Documents, other than to confirm receipt of items expressly required to be delivered to the Collateral Agent.

(e)      The Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) considered by it to be authentic and having been signed or sent by a competent Person. The Collateral Agent may also rely on any statement given to it verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Collateral Agent may consult with counsel, independent auditors and other experts chosen by the Collateral Agent, at the Company's expense, and the Collateral Agent shall not be liable for any act performed or not performed by the Collateral Agent in accordance with the advice of any said counsel, auditor or expert.

(f)      The Collateral Agent may fulfill any and all of its duties and exercise its rights and powers by or through any one or more subagents appointed by it, at the expense of the Company. The Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.  The exculpatory provisions of this Article 12 shall apply to any such subagent as a third-party beneficiary to the extent applicable. The Collateral Agent shall not be responsible for the supervision, negligence or misconduct of any sub-agents that it selects with due care.

(g)      The Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Note Purchase Agreement, the Collateral Documents, the security provided hereunder or thereunder or the Collateral, for the legality,

73

effectiveness or sufficiency of this Note Purchase Agreement or the Collateral Documents nor for the creation, formalization, ranking, sufficiency or protection of any Liens constituted under this Note Purchase Agreement or the Collateral Documents. For the avoidance of doubt, no provision in this Note Purchase Agreement or the Collateral Documents shall require the Collateral Agent to prepare, file or record any financing statements or continuation statements or other instruments or documents, or to be responsible for maintaining the Liens and security interests to be created as described in this Note Purchase Agreement and the Collateral Documents, and such responsibility shall be in charge exclusively of the Company.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, if applicable, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for the account of other customers in similar transactions.  The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

(h)       In order to effect the transfer of any amounts received as a result of the enforcement of the Collateral Documents, the Collateral Agent may perform a foreign exchange transaction to convert into U.S. Dollars any amount in Reais resulting from such enforcement; except that possible deductions of any commissions or taxes charged on such foreign exchange transactions and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Collateral Agent will transfer the amounts in U.S. Dollars according to the instructions provided by any Holder. The Collateral Agent (a) will only be obliged to perform any foreign exchange transaction it may undertake as of the second (2nd) Brazilian Business Day after the Brazilian Business Day on which the Collateral Agent receives the applicable instructions and documents to perform such foreign exchange transaction; and (b) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Collateral Agent has received (i) all documents and information necessary for the remittance of funds in accordance with applicable foreign exchange regulations and (ii) the payment of the respective commissions, fees and expenses. The Collateral Agent shall not be liable for any losses or damages resulting from possible delays or impediments to the performance of a foreign exchange transaction and/or transfer, nor as the impossibility to perform a foreign exchange transaction or transfer. The Collateral Agent shall not assume any liability to any Person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed in connection with this Note Purchase Agreement or the Collateral Documents or with respect to the transfer of any funds as a result thereof.

(i)       The Collateral Agent shall not be obligated to spend or put at risk any of its own funds or otherwise incur any obligation or liability, financial or otherwise, in performing its duties or exercising its rights under this Note Purchase Agreement or under the Collateral Documents.

(j)       In no event shall the Collateral Agent be liable for special, indirect, punitive, consequential or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)       The Collateral Agent shall not incur any obligation for failure to perform any act or duty under this Note Purchase Agreement or the Collateral Documents by reason of any

#4856-1598-7531v19

occurrence beyond its control (including any act or provision of any current or future Law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve System or the Central Bank).

(l)    The Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo Laws and the Collateral Agent's internal policies with respect to embargoes ("**Embargo Rules**"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The parties expressly agree that the Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 12.02.

(m)    Any and all payments by the Company and/or the Guarantors to or for the benefit of the Collateral Agent under this Note Purchase Agreement or the Collateral Documents shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("**Deductions**") and any other Taxing Jurisdiction, which taxes, expenses or withholdings shall be borne by the Company. If any Deductions apply to any payment, the Company and/or the Guarantors, as the case may be, will immediately pay to the account indicated by the Collateral Agent the additional amount necessary for the amount paid to the Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

(n)    Each Secured Party (other than the Collateral Agent) authorizes and directs the Collateral Agent to enter into the Collateral Documents to which the Collateral Agent is a party on the date hereof on behalf of and for the benefit of the Secured Parties.

(o)    Notwithstanding any provision of this Note Purchase Agreement or the Collateral Documents to the contrary, before taking or omitting any action to be taken or omitted by the Collateral Agent under the terms of this Note Purchase Agreement or any Collateral Document, the Collateral Agent may seek the written direction of the Purchaser or the Majority Holders, as the case may be, and the Collateral Agent shall be entitled to rely (and shall be fully protected in so relying) upon such direction. The Collateral Agent is not liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If the Collateral Agent requests such direction by the Purchaser or the Majority Holders, as the case may be, with respect to any action, the Collateral Agent is entitled to refrain from such action unless and until the Collateral Agent has received such direction, and the Collateral Agent does not incur liability to any Person by reason of so refraining.  If the Collateral Agent so requests, it must first be indemnified to its satisfaction by the Purchaser or the Holders, as the case may be, against any and all fees, losses, liabilities and expenses which may be incurred by the Collateral Agent by reason of taking or continuing to take, or omitting, any action directed by the Purchaser or the Majority Holders. Any provision of this Note Purchase Agreement or the Collateral Documents authorizing the Collateral Agent to take any action does not obligate the Collateral Agent to take

75

such action. The Collateral Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity or security satisfactory to the Collateral Agent against the costs, expenses and liabilities which might be incurred by it in performing such duty or exercising such right or power. In the absence of an express statement in this Note Purchase Agreement or the Collateral Documents regarding which Holders shall direct in any circumstance, the direction of the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall apply and be sufficient for all purposes.

(p)      Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under or pursuant to the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to the Collateral Agent under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

(q)      The Collateral Agent shall have no responsibility for interest or income on any funds held by it under this Note Purchase Agreement or the Collateral Documents and any funds so held shall be held uninvested pending distribution thereof.

(r)      The Collateral Agent shall be under no obligation to exercise any of the duties or powers vested in it by this Note Purchase Agreement or the Collateral Documents at the request, order, instruction or direction of the Holders, unless the Holders shall have offered to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against the costs, expenses and liabilities that might be incurred thereby.

(s)      The Collateral Agent may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Affiliate thereof as if the Collateral Agent were not an attorney-in-fact hereunder and without any duty to account therefore to the Secured Parties.

(t)      The Secured Parties understand that the Collateral Agent, acting in its individual capacity, and its Affiliates may engage in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (the "**Activities**") and may engage in the Activities with or on behalf of one or more of the Company and its respective Affiliates.  Furthermore, the Collateral Agent may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Company and its Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Company or its respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of the Company or its Affiliates. The Secured Parties understand and agree that in engaging in the Activities, the Collateral Agent may receive or otherwise obtain information concerning the Company or its Affiliates (including information concerning the ability of the Company to perform its respective obligations hereunder and under the Collateral Documents) which information may not be available to the Secured Parties. The Collateral Agent shall not have any duty to disclose to the Secured Parties or use on behalf of the Secured Parties, nor be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other

76

condition or creditworthiness of the Company or any of its Affiliates) or to account for any revenue or profits obtained in connection with the Activities.

(u)      The Secured Parties further understand that there may be situations where members of the Collateral Agent's group or their respective customers (including the Company and its Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Secured Parties (including the interests of the Secured Parties hereunder and under the Collateral Documents). None of (i) this Note Purchase Agreement or the Collateral Documents, (ii) the receipt by the Collateral Agent of information concerning the Company or any of its Affiliates (including information concerning the ability of the Company to perform is obligations under this Note Purchase Agreement) or (iii) any other matter, shall give rise to any fiduciary, equitable or contractual duties (including any duty of trust or confidence) owing by the Collateral Agent to any Secured Party including any such duty that would prevent or restrict the Collateral Agent from acting on behalf of customers (including the Company or its Affiliates) or for its own account.

(v)      The Secured Parties (other than the Collateral Agent) confirm to the Collateral Agent that each of them (i) possesses such knowledge and experience in financial and business matters so that it is capable, without reliance on such Collateral Agent, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Note Purchase Agreement or holding the Notes and (y) taking or not taking actions hereunder or under the Collateral Documents, (ii) is financially able to bear such risks and (iii) has determined that entering into this Note Purchase Agreement is suitable and appropriate for it.

(w)      Nothing in this Note Purchase Agreement or in the Collateral Documents shall require the Collateral Agent to carry out any "know your customer" or other checks in relation to the Company or any of its Affiliates on behalf of the Secured Parties and the Secured Parties confirm to the Collateral Agent that such Secured Parties are solely responsible for any such checks such Secured Parties are required to carry out and that such Secured Parties may not rely on any statement in relation to such checks made by such the Collateral Agent.

(x)      The Collateral Agent shall be entitled to rely on any written direction, instruction, request, consent or other written communication from the Purchaser or any Holder. The Collateral Agent shall not have any obligation or duty with respect to the identity of any Holder or the amount of any Obligations owing to any such Person. At any time and from time to time, the Collateral Agent may request information from the Holders or the Company as to the identities of the Holders, their respective Notes and the composition and calculation of the Majority Holders or the Abra Notes Supermajority Holders, and the Holders and the Company shall provide such information. The Collateral Agent shall be entitled to fully rely on such information and shall have no duty, obligation or liability with respect to the identity or amount of Notes held by any Holder or with respect to the calculation of the Majority Holders, the Supermajority Holders or the unanimous vote of Holders.

(y)      The Collateral Agent shall not have any duty, obligation or liability with respect to the identity, calculation or consent or other action of the Abra Holders. Where the consent or other action of the Abra Holders or the Abra Notes Supermajority Holders is required by this

77

#4856-1598-7531v19

Note Purchase Agreement or the Collateral Documents, the Company shall certify to the Collateral Agent that the Company has obtained such consent, or other action, and the Collateral Agent shall be fully entitled to rely on such certification of the Company without any liability.

(z)    Before the Collateral Agent acts or refrains from acting, it may require an Officer's Certificate of the Company, or an Opinion of Counsel satisfactory to the Collateral Agent, with respect to the proposed action or inaction. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion. Whenever in the administration of this Note Purchase Agreement or the Collateral Documents the Collateral Agent shall deem it necessary or desirable that a matter be provided or established prior to taking or suffering or omitting to take any act hereunder or thereunder, such matter (unless other evidence in respect thereof be herein of therein specifically described) may, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Collateral Agent, and such certificate, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, shall be full warrant to the Collateral Agent for any action taken, suffered or omitted to be taken by it under the provision of this Note Purchase Agreement and the Collateral Documents upon the faith thereof.

SECTION 12.03.  *Resignation*. Upon at least thirty (30) days' notice, the Collateral Agent may resign at any time as Collateral Agent under this Note Purchase Agreement and the Collateral Documents by notifying the Purchaser and the Company.  Upon any resignation by the Collateral Agent, the Company shall have the right (provided that no Event of Default has occurred and continues) to appoint a successor Collateral Agent or, if an Event of Default has occurred and is continuing, the Purchaser shall have the right to appoint a successor Collateral Agent. If no successor has been so appointed and has accepted such appointment within thirty (30) days after the date the Collateral Agent gives notice of its resignation, then the resigning Collateral Agent may (but shall not be obligated to) (a) upon consent (provided that no Event of Default or Default has occurred and continues) of the Company (consent of which shall not be unreasonably withheld or delayed), at the cost and expense of the Company, appoint a successor Collateral Agent or (b) petition any court of competent jurisdiction, at the cost and expense of the Company, for the appointment of a successor Collateral Agent. Whether or not a successor has been appointed, the Collateral Agent's resignation shall become effective in accordance with the Collateral Agent's notice of resignation on the date specified in such notice, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents on such date. Upon acceptance of a successor Collateral Agent of its appointment as Collateral Agent under this Note Purchase Agreement and the Collateral Documents, such successor will succeed and have all rights, powers, privileges and duties of the resigning Collateral Agent, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents (if not released sooner, as provided above). The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor. Any Person into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any Person succeeding to the business of the Collateral Agent shall be the successor of the Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on

78

the part of any of the parties hereto, except where an instrument of transfer or assignment is required by Law to effect such succession, anything herein to the contrary notwithstanding.

SECTION 12.04.  *Fees, Expenses and Indemnification*.

(a)     Each of the Company and the Guarantors, jointly and severally, shall pay to the Collateral Agent for its own account fees in the amounts and at the times agreed with the Collateral Agent.

(b)     Each of the Company and the Guarantors, jointly and severally, shall pay or reimburse each of the Purchaser and the Collateral Agent for (1) all reasonable costs and expenses incurred in connection with the development, preparation, negotiation, execution and performance of this Note Purchase Agreement and the Collateral Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all attorney fees and expenses, and (2) all costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Note Purchase Agreement or under the Collateral Documents, including all attorney costs and all expenses incurred during any workout, restructuring or negotiations in respect of this Note Purchase Agreement, the Notes or the Collateral Documents.  The foregoing costs and expenses shall include all out-of-pocket expenses incurred by the Purchaser and Collateral Agent under clause (1) or (2) above and the cost of counsel, independent public accountants and other outside experts so retained.  All amounts due under this Section shall be payable within ten Business Days after demand therefore.

(c)     Each of the Company and the Guarantors, jointly and severally, shall indemnify and hold each of the Purchaser and the Collateral Agent harmless for, from and against any and all damage, loss, liability, cost, claim or expense (including reasonable attorneys' fees and expenses and including all fees, expenses and costs incurred by the Purchaser and/or the Collateral Agent in connection with any dispute, action, claim or suit brought to enforce the right to indemnification) incurred by the Purchaser and/or the Collateral Agent arising out of or in connection with the execution, delivery or administration of this Note Purchase Agreement and the Collateral Documents or any instrument or agreement contemplated hereby or thereby, the performance of the Collateral Agent's duties hereunder or thereunder, and the exercise of each of the Purchaser's and the Collateral Agent's rights hereunder or thereunder including, without limitation, the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Note Purchase Agreement or the Collateral Documents, except, as applicable, as may result from the Purchaser's or the Collateral Agent's respective willful misconduct or gross negligence (as determined by a final and non-appealable judgement by a court of competent jurisdiction).

(d)     To the extent that the Company of the Guarantors for any reason fail to indefeasibly pay any amount required under paragraph (a), (b) or (c) of this Section or under the Collateral Documents to be paid by the Company or the Guarantors to the Collateral Agent (or any sub-agent thereof), the Holders agree to pay to the Collateral Agent (or any sub-agent) such

unpaid amount (including any such unpaid amount in respect of a claim asserted by the Holders); provided that the unpaid amount was incurred by or asserted against the Collateral Agent (or any sub-agent) in its capacity as such.

(e)     The provisions in this Article shall survive the termination or satisfaction of this Note Purchase Agreement, the Notes or the Collateral Documents, the resignation or removal of the Collateral Agent and the payment of all Notes Obligations.

# ARTICLE 13
## REDEMPTION

SECTION 13.01.  *Redemption*.  The Notes shall not be redeemable by the Company prior to the Maturity Date, except as described in this Article 13, and no sinking fund is provided for the Notes.

(a)     Prior to the Maturity Date, the Company may partially or fully redeem the Notes, upon notice as described in Section 13.02, at the redemption price of 100% (expressed as percentages of principal amount of the Notes to be redeemed), plus accrued and unpaid interest thereon; provided that upon such redemption, the Company shall issue GOL Senior Secured Exchangeable Notes due 2028 in an amount equal to, and on a dollar for dollar basis, the aggregate principal amount of the Notes to be redeemed; *provided*, that upon the written request of the Purchaser the Company shall partially or fully redeem the Notes (and issue such GOL Senior Secured Exchangeable Notes due 2028) pursuant to this Section 13.01(a).

(b)     The redemption provided for in clause (a) above is subject to the Company previously (i) obtaining all required corporate approvals; and (ii) having issued the warrants that allow for exchangeability of GOL Senior Secured Exchangeable Notes due 2028 into preferred shares of GLAI in accordance with the terms set forth in the GOL Senior Secured Exchangeable Notes NPA. Should the Company fail to obtain such corporate approvals or to issue such warrants, the Company and the Purchaser shall agree on an indemnity that will equitably compensate the Purchaser for the benefits arising from the conversion of the Notes into GOL Senior Secured Exchangeable Notes due 2028.

SECTION 13.02.  *Notice of Optional Redemption*.  (a) In the event that the Company exercises any redemption right pursuant to Section 13.01, it shall fix a date for redemption and it shall deliver a written notice of such redemption not less than 30 days nor more than 60 days prior to the redemption date to each Holder of Notes.

(b)     Each redemption notice shall specify:

(1)     the redemption date; and

(2)     principal amount of Notes to be redeemed.

SECTION 13.03.  *Payment of Notes Called for Redemption*. (a) If any redemption notice has been given in respect of the Notes in accordance with Section 13.02, the Notes shall become due and payable on the specified redemption date.

#4856-1598-7531v19

# ARTICLE 14
## ACTIONS BY HOLDERS

SECTION 14.01. *Action by Holders*. (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Note Purchase Agreement to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Company and, where applicable pursuant to this Note Purchase Agreement, the Guarantors or to the Collateral Agent, as applicable. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Holders signing such instrument or instruments.

(b)     Whenever in this Note Purchase Agreement it is *provided that* the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing.

(c)     Whenever the Company solicits the taking of any action by the Holders of the Notes, the Company may fix, but shall not be required to, in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

SECTION 14.02. *Proof of Execution by Holders*. When the Company solicits the taking of any action by the Holders of the Notes, proof of the execution of any instrument by a Holder, its agent or proxy, or the Purchaser, shall be sufficient if made in accordance with such reasonable rules as may be prescribed by the Company or in such manner as *shall be satisfactory to the Company.*

SECTION 14.03. *Company-Owned Notes Disregarded*. In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Note Purchase Agreement, Notes that are owned by the Company, by any Subsidiary thereof or by any of their respective Affiliates shall be disregarded and deemed not to be outstanding for the purpose of any such determination.

SECTION 14.04. *Revocation of Consents; Future Holders Bound*. At any time prior to (but not after) the evidencing to the Company, as provided in Section 14.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Note Purchase Agreement in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Company at the Company's Office and upon proof of holding as provided in Section 14.02, revoke such action so far as concerns such Note; *provided* that to the extent that the consent of the Abra Notes Supermajority Holders was

81

required or otherwise obtained, the prior written consent of the Abra Notes Supermajority Holders shall be required to revoke any such consent. Except as provided in the previous sentence, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

## ARTICLE 15
### MISCELLANEOUS

SECTION 15.01.  *Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties and Holders of Notes*.  Nothing in this Note Purchase Agreement or the Notes, expressed or implied, shall give to any Person other than the parties hereto and their successors hereunder, the Holders of the Notes and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes, any benefit or any legal or equitable right, remedy or claim under this Note Purchase Agreement or the Notes.

SECTION 15.02.  *Notices*.  Any request, demand, authorization, direction, notice, consent, waiver or other communication or document provided or permitted by this Note Purchase Agreement to be made upon, given, provided or furnished to, or filed with, any party to this Note Purchase Agreement shall, except as otherwise expressly provided herein, be in English and writing and shall be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier, telecopier, facsimile or electronic transmission, addressed to the relevant party as follows:

*To the Company, the Guarantors, the Registrar, the Transfer Agent and the Paying Agent:*

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil

Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

*To the Purchaser:*

1 Ashley Road, 3rd Floor
Altrincham, Cheshire, UK
WA14 2DT
Attention: Richard F. Lark Jr. and Adrian Neuhauser
Email: rfl@voegol.com.br

#4856-1598-7531v19

*To the Collateral Agent:*

Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,
Edifício Jacarandá, Room 3
Zip Code 06460-040
Barueri – SP, Brazil
Attention: Karla Fernandes
Email: karla.fernandes@tmf-group.com

*To the Holders of the Abra Senior Secured Notes:*

c/o The Bank of New York Mellon, as trustee under the Abra Senior Secured
Notes Indenture, for distribution to the holders of the Abra Senior Secured Notes
240 Greenwich Street
New York, NY 10286

*To the Holders of the Abra Senior Secured Exchangeable Notes:*

c/o The Bank of New York Mellon, as Indenture Trustee under the Abra Senior Secured
Exchangeable Notes Indenture, for distribution to the holders of the Abra Senior Secured
Exchangeable Notes
240 Greenwich Street
New York, NY 10286

Notices or communications to the Company will be deemed given if given to GLAI. Notices or communications to Abra Holders will be deemed given if given to The Bank of New York Mellon, in its capacity as Indenture Trustee under the Abra Senior Secured Indenture and in its capacity as Indenture Trustee under the Abra Senior Secured Exchangeable Indentures, in each case, for distribution to the holders of the Abra Notes. All notices to Collateral Agent shall be deemed delivered upon the Collateral Agent's actual receipt thereof.

Any party by written notice to the other parties may designate additional or different addresses for subsequent notices or communications.

Where this Note Purchase Agreement provides for the giving of notice to Holders, such notice shall be deemed to have been given upon the mailing of first class mail, postage prepaid, of such notice to Holders of the Notes at their registered addresses as recorded in the Register and additionally, if such notice is given by the Company to the Purchaser, by email delivery to the Company's primary contact at the Purchaser.

The Company shall also cause all other such publications of such notices as may be required from time to time by applicable Brazilian law, including, without limitation, those required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed and emailed

to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 15.03.  *Officer's Certificate and Opinion of Counsel as to Conditions Precedent*.  Upon any request or application by the Company to the Collateral Agent to take or refrain from taking any action under this Note Purchase Agreement or the Collateral Documents, the Company shall furnish to the Collateral Agent:

(1)    an Officer's Certificate (which shall include the statements set forth in Section 15.04) stating that, in the opinion of the signers, all covenants and conditions precedent, if any, provided for in this Note Purchase Agreement and, if the action involves any of the Collateral Documents, the applicable Collateral Documents relating to the proposed action have been complied with; and

(2)    an Opinion of Counsel (which shall include the statements set forth in Section 15.04) stating that, in the opinion of such counsel, all such covenants and conditions precedent have been complied with.

SECTION 15.04.  *Statements Required in Officer's Certificate or Opinion of Counsel*.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Note Purchase Agreement or the Collateral Documents shall include:

(1)    a statement that each Person making or rendering such Officer's Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel are based;

(3)    a statement that, in the opinion of each such Person, such Person has made such examination or investigation as is necessary to enable such Person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)    a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with.

SECTION 15.05.  *Rules by Registrar, Paying Agent and Transfer Agents*.  The Registrar, the Paying Agent and the Transfer Agent may make reasonable rules for their functions.

SECTION 15.06.  *Currency Indemnity*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with this Note Purchase Agreement, the Notes and the Note Guaranties, including damages.  Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by any Person in respect of any sum expressed to be due to it from the Company or the Guarantors in connection with this Note Purchase Agreement,

84

the Notes and the Note Guaranties will only constitute a discharge to the Company or the Guarantors, as the case may be, to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient, the Company and the Guarantors shall indemnify such recipient against any loss sustained by it as a result, and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient will be deemed to have agreed to repay such excess. In any event, the Company and the Guarantors shall indemnify the recipient against the cost of making any such purchase.

For the purposes of this Section 15.06, it shall be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Company and the Guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder of a Note and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note.

SECTION 15.07.  *No Recourse Against Others*.  No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent, respectively, under this Note Purchase Agreement, the Collateral Documents or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting a Note, each Holder shall waive and release all such liability. The waiver and release shall be part of the consideration for the issue of the Notes.

SECTION 15.08.  *Legal Holidays*.  In any case where any Interest Payment Date or the Maturity Date shall not be a Business Day, then (notwithstanding any other provision of this Note Purchase Agreement or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Interest Payment Date or Maturity Date; *provided that* no default interest shall accrue for the period from and after such Interest Payment Date or Maturity Date on account of such delay.

SECTION 15.09.  *Governing Law*.  THIS NOTE PURCHASE AGREEMENT, THE NOTES AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 (inclusive) of the Luxembourg Act on commercial companies of August 10, 1915, as amended, shall not apply in respect of the Notes.

#4856-1598-7531v19

For purposes solely of Article 9 of Brazilian Decree Law No. 4,657, of September 4, 1942, the transactions contemplated hereby have been constituted and proposed outside of Brazil.

SECTION 15.10.  *Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial*. (a) Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Note Purchase Agreement, the Notes or the Note Guaranties or any transaction contemplated hereby or thereby (a "**Proceeding**"), and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  Each of the parties hereto irrevocably waives, to the fullest extent it may do so under applicable Law, any objection which it may now or hereafter have to the laying of the venue of any such Proceeding brought in any such court and any claim that any such Proceeding brought in any such court has been brought in an inconvenient forum.  Each of the Company and the Guarantors irrevocably appoints Cogency Global, Inc. (the "**Company and Guarantors Process Agent**"), with an office at 122 East 42nd Street, 18th Floor, New York, NY 10168, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding.  If for any reason such Person shall cease to be such agent for service of process, each of the Company and the Guarantors shall forthwith appoint a new agent of recognized standing for service of process in the State of New York within 30 days.

(b)     Each of the Company and the Guarantors hereby irrevocably appoints the Company and Guarantors Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York.  Such service shall be made by delivering by hand a copy of such process to the Company or the Guarantors, as the case may be, in care of the Company and Guarantors Process Agent at the address specified above.  Each of the Company and the Guarantors hereby irrevocably authorizes and directs the Company and Guarantors Process Agent to accept such service on its behalf.  Failure of the Company and Guarantors Process Agent to give notice to the Company or the Guarantors, as the case may be, or failure of the Company or the Guarantors, as the case may be, to receive notice of such service of process shall not affect in any way the validity of such service on the Company and Guarantors Process Agent, the Company or the Guarantors.  As an alternative method of service, each of the Company and the Guarantors also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Company or Guarantors, as the case may be, at its address specified in Section 15.02 or at any other address previously furnished in writing by the Company or the Guarantors. Each of the Company and the Guarantors covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Company and Guarantors Process Agent above in full force and effect during the term of the Notes, and to cause the Company and Guarantors Process Agent to continue to act as such.

(c)     [*Reserved*]

(d)     Exclusively for the purposes of Brazilian law, the Guarantors appoint the Company and Guarantors Process Agent as their agent and attorney-in-fact to receive on behalf of them and their property service of copies of the summons and complaint and any other process which may be served in any Proceeding pursuant to articles 653 et. seq. of the Brazilian Law No. 10,406, of January 10, 2022.

(e)     Nothing herein shall affect the right of any party (including the Collateral Agent, any other Agent or any Holder) to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise bring any claim against any other party or its property in any other court of competent jurisdiction.

(f)     Each of the Company and the Guarantors irrevocably agrees that, in any proceedings anywhere (whether for an injunction, specific performance or otherwise), no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such proceedings, from attachment (whether in aid of execution, before judgment or otherwise) of its assets or from execution of judgment shall be claimed by it or on its behalf or with respect to its assets, except to the extent required by applicable Law, any such immunity being irrevocably waived, to the fullest extent permitted by applicable Law.  Each of the Company and the Guarantors irrevocably agrees that, where permitted by applicable Law, it and its assets are, and shall be, subject to such proceedings, attachment or execution in respect of its obligations under this Note Purchase Agreement, the Notes or the Note Guaranties.

(g)     ALL PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY DO SO UNDER APPLICABLE LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS NOTE PURCHASE AGREEMENT, THE NOTES, THE NOTE GUARANTIES OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

SECTION 15.11.  *Successors and Assigns*.  All covenants and agreements of the Company and the Guarantors in this Note Purchase Agreement, the Notes and the Note Guaranties shall bind their respective successors and permitted assigns, whether so expressed or not. The Notes shall not be assigned by the Purchaser unless (i) the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes shall have been indefeasibly paid in full or (ii) as otherwise may be consented to by the Abra Notes Supermajority Holders.

In the event of a transfer, assignment, novation or amendment of the rights and/or the obligations under this Note Purchase Agreement and any other Transaction Documents, all security interests, guarantees and privileges created under or in connection with the Transaction Documents shall automatically and without any formality be preserved for the benefit of the transferee including the trustee under the Abra Senior Secured Notes Indenture and the trustee under the Abra Senior Secured Exchangeable Notes Indenture for the purpose of the provisions of articles 1278 to 1281 of the Luxembourg Civil Code or any other purposes.

SECTION 15.12.  *Multiple Originals*.  The parties may sign any number of copies of this Note Purchase Agreement.  Each signed copy shall be deemed an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Note Purchase

87

Agreement. The words "execution," "signed," "signature," and words of like import in this Note Purchase Agreement or in any other certificate or document related to this Note Purchase Agreement shall include images of executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as an executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable Law, including, without limitation, any state Law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

SECTION 15.13.  *Severability Clause*.  In case any provision in this Note Purchase Agreement or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. To the extent permitted by applicable Law, the parties hereby waive any provision of Law which renders any term or provision hereof invalid or unenforceable in any respect.

SECTION 15.14.  *Force Majeure*.  In no event shall the Collateral Agent or any other Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder, or under the Collateral Documents arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, governmental actions, pandemics, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent or such other Agent, as applicable shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 15.15.  *Acknowledgement*. Each of the Company and the Guarantors acknowledges that, on the date hereof, the Purchaser has pledged, or will pledge, all of its right, title and interest in the Notes, Notes Obligations and all Collateral therefor, in favor of the collateral agent under the Abra Senior Secured Notes Indenture and the collateral agent under the Abra Senior Secured Exchangeable Notes Indenture as collateral to secure the Purchaser's obligations under the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

#4856-1598-7531v19

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

GOL FINANCE
as the Company

By: _____
Name: Celso G. Ferrer Jr.
Title:   Director

By: _____
Name:   Eduardo Bernardes Neto
Title:   Director

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
Name: Celso G. Ferrer Jr.
Title:  President Director

By: _____
Name: Eduardo Bernades Neto
Title:  Vice President Director

*[Signature Page – GOL Senior Secured Note Purchase Agreement]*

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent, and
Paying Agent

By: _____
        Name: Celso G. Ferrer Jr.
        Title:  President Director

By: _____
        Name: Eduardo Bernades Neto
        Title:  Vice President Director

*[Signature Page – GOL Senior Secured Note Purchase Agreement]*

SMILES FIDELIDADE S.A.
as Guarantor

By: _____
Name: Celso Guimarães Ferrer Junior
Title: Chief Executive Officer

By: _____
Name: Eduardo José Bernardes Neto
Title: Officer without specific designation

Signature Page – GOL Senior Secured Note Purchase Agreement

ABRA GROUP LIMITED
as Purchaser

By: _____

Name: Richard F. Lark, Jr.

Title:   Director

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**
as Collateral Agent

By: _____

Name: KARLA FERNANDEZ

Title: MANAGING DIRECTOR

By: _____
    Name:
    Title:

*[Signature Page – GOL Senior Secured Note Purchase Agreement]*

**EXHIBIT A**

FORM OF NOTE

**GOL FINANCE**

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 178497

Senior Secured Notes Due 2028

No. 1

U.S.$ 1,105,169,000

GOL FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 (the "**Company**", which term includes any successor corporation under the Note Purchase Agreement referred to on the reverse hereof), for value received, hereby promises to pay to Abra Group Limited, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "**Purchaser**"), or registered assigns, the principal sum of U.S.1,105,169,000, upon presentment and surrender of this Note on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Note Purchase Agreement.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-1

#4856-1598-7531v19

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated: March 2, 2023

**GOL FINANCE**

By: _____
  Name:
  Title:


By: _____
  Name:
  Title:


Witnesses:

By: _____
Name:

By: _____
Name:

#4856-1598-7531v19

FORM OF REVERSE SIDE OF NOTE

Senior Secured Notes Due 2028

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of Senior Secured Notes Due 2028 of the Company.  The Notes constitute secured unsubordinated obligations of the Company, initially in an aggregate principal amount of U.S.$[1,105,169,000].

*1.      Purchase Agreement.*

Each holder of this security, by accepting the same, agrees to and shall be bound by the provisions hereof and of the Note Purchase Agreement, dated as of March 2, 2023, by and among GOL FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S.Luxembourg*) under number B 178497 (the "Company"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**"), as guarantor, registrar, transfer agent and paying agent, and GOL LINHAS AÉREAS S.A., a wholly owned subsidiary of GLAI ("**GLA**" and together with GLAI, the "**Guarantors**"), each, a corporation (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, as guarantors, ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser (the "**Purchaser**" or "**Holder**") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "**Collateral Agent**"), as the same shall be amended from time to time (the "**Note Purchase Agreement**"). The terms of the Notes include those stated in the Note Purchase Agreement.  The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Note Purchase Agreement.

Reference is hereby made to the Note Purchase Agreement, the Collateral Documents and all amendments and supplements to each of them from time to time (collectively, the "**Note Documents**") for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Guarantors, the Collateral Agent, each other Agent and the Purchaser as Holder of the Notes and the terms upon which the Notes, are, and are to be, executed and delivered.  The Purchaser waives all notice of the acceptance of the provisions contained herein and in the Note Documents and waives reliance by such Purchaser upon said provisions. All terms used in this Note that are defined in the Note Purchase Agreement shall have the meanings assigned to them in the Note Purchase Agreement.

The Notes are senior obligations of the Company and the Guarantors, secured by a first priority and perfected Lien in the Collateral. The payment obligations of the Company under the Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Note Documents impose certain limitations on assets, debts, Restricted Payments, the creation of Lien by the Company, and consolidation, merger, Related-Party Transactions, and

A-3

certain other transactions involving the Company.  In addition, the Note Documents require the maintenance of insurance for the Company, the maintenance of the existence of the Company, the payment of certain taxes and claims and reporting requirements applicable to the Company. The Note Documents also contain provisions related to the Collateral as well as certain assurances, restrictions, and use and possession related to the Collateral.

2.    *Principal.*

Unless previously redeemed, exchanged or purchased and cancelled, the Company promises to pay the Holder hereof the total Outstanding principal amount which shall be repaid in cash in a single installment on the Maturity Date, together with all other amounts owed hereunder with respect thereto (including all accrued and unpaid interest that has not yet been added to the total Outstanding principal amount through the Maturity Date).

3.    *Interest.*

The Notes shall bear interest at an interest rate as follows:

(1)    4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**");

(2)    13.5% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth below; and

(3)    GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (A) semi-annually in arrears, on each applicable Interest Payment Date or (B) on the Maturity Date; *provided that*, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; *provided*, *further*, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of this Note and the Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of the Note Purchase Agreement.

4.    *Method of Payment.*

Any payments of interest or principal in respect of each Note made on an Interest Payment Date or the Maturity Date shall be made by the Company to the Persons shown on the Register at the close of (a) in the case of interest payments, the Regular Record Date or (b) in the case of principal payment, the fifteenth day immediately preceding the Maturity Date, whether or not a Business Day (each, a "**Record Date**"); provided that any PIK Interest payments due with respect to the Notes prior to the Maturity Date will not be payable in cash but in kind and the

A-4

amount of any such interest payment shall, on the Interest Payment Date, be capitalized and automatically added to, and be part of, the Outstanding principal amount of such Note (and shall thereafter constitute principal for all purposes of such Note and the Note Purchase Agreement, and shall accrue interest thereon in accordance with the terms of the Note Purchase Agreement).

Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Company, if any.

If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder and (ii) second, towards payment of principal then due hereunder.

Payment in cash of the principal and premium, if any, of any Note on the Maturity Date shall be made upon presentation and surrender thereof, by wire transfer to the Holder's Designated Bank Account.

If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all cash payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

Payment of interest on any Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date, and if in cash, by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future cash payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder. The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

If any Interest Payment Date in respect of any Note is not a Business Day, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest (other than accrued interest through the date such amount is paid) or other payment in respect of any such delay.

If the amount of principal or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of interest, if any, in fact paid.

All payments on this Note are subject in all cases to any applicable tax or other Laws and regulations, but without prejudice to the provisions of Paragraph 7 hereof. Except as provided in Section 7.06 of the Note Purchase Agreement, no fees or expenses shall be charged to the Purchaser in respect of such payments.

5.    *Ranking and Collateral.*

#4856-1598-7531v19

The Notes and Note Guaranties are secured by a first priority Lien over the Collateral, subject to the terms and conditions of the Note Purchase Agreement and the Collateral Documents.  The payment obligations of the Company under the Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Lien over the Collateral granted shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exists Notes Obligations due and payable on that date, in which case the Lien over the Collateral shall terminate as set forth in the Note Purchase Agreement.

6.    *Registrar, Transfer Agent and Paying Agent.*

GLAI will initially act as the Registrar, Transfer Agent and Paying Agent of the Notes. The Company may appoint and change any Registrar, Transfer Agent and Paying Agent in accordance with the terms of the Note Purchase Agreement.

7.    *No Purchase of Notes by the Company or its Affiliates.*

The Company or any of its Affiliates (except for the Purchaser) may at any time repurchase Notes in open market purchases or in negotiated transactions at any price.  Any Notes so purchased or acquired may not be resold and shall be cancelled.

8.    *Denominations.*

The Notes are in registered form without coupons in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof.

9.    *Persons Deemed Owners.*

The registered Holder of this Note (except as otherwise required by Law and subject to the right of Holders of record on the relevant Regular Record Date to receive interest due on the relevant Interest Payment Date) may be treated as the owner thereof for all purposes.

10.    *Unclaimed Money.*

Subject to applicable Law, any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

11.    *Amendment; Waiver.*

The Note Purchase Agreement contains provisions permitting amendments, supplements and waivers to these Notes and to the Note Purchase Agreement. Such amendments, supplements and waivers shall be conclusive and binding upon the holder of this Note and upon all future

holders and owners of this Note and of any Notes issued in conversion or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon this Note or any Note issued in conversion or substitution therefor or upon registration of transfer thereof.

12.    *Defaults and Remedies.*

The Note Purchase Agreement contains certain Events of Default with respect to the Notes and specifies certain remedies, and limitations on remedies, applicable to the Notes.

13.    *Governing Law.*

THE NOTE PURCHASE AGREEMENT, THIS NOTE AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 of the Luxembourg Act on commercial companies of August 10, 1915 (inclusive), as amended, shall not apply in respect of the Notes.

Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any Proceeding and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

14.    *No Recourse Against Others.*

No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent under the Notes or any obligations of the Company, the Guarantors or the Collateral Agent under the Note Purchase Agreement or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

The Company shall furnish to any Holder upon written request and without charge a copy of the Note Purchase Agreement, as amended from time to time, which includes the Form of this Note.  Requests may be made to:

> GOL Linhas Aéreas Inteligentes S.A.
> Praça Comte Linneu Gomes
> S/N, Portaria 3, Jardim Aeroporto
> 04626-020 – São Paulo, SP
> Brasil
> Attention:  Celso Ferrer

THIS NOTE IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE CODE. FOR INFORMATION

#4856-1598-7531v19

REGARDING THE CLOSING DATE, ISSUE PRICE, AND TO MATURITY, PLEASE CONTACT THE COMPANY AT THE COMPANY'S OFFICE, ATTENTION: CHIEF FINANCIAL OFFICER.

A-8

NOTATION OF GUARANTY

For value received, each of the Guarantors (which term includes any successor Person under the Note Purchase Agreement) has unconditionally guaranteed, to the extent set forth in the Note Purchase Agreement and subject to the provisions in the Note Purchase Agreement dated as of March 2, 2023 (as amended from time to time, the "**Note Purchase Agreement**"), among the Company, the Guarantors party thereto, the Purchaser and TMF Brasil Administração e Gestão de Ativos Ltda., as the Collateral Agent, the full and punctual payment (whether upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  The obligations of each of the Guarantors to the Secured Parties pursuant to the respective Note Guaranty and the Note Purchase Agreement are expressly set forth in Article 11 of the Note Purchase Agreement and reference is hereby made to the Note Purchase Agreement for the precise terms of the Note Guaranties.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Note Purchase Agreement.

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of guaranty to be duly executed.

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent and Paying Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Witnesses:

By: _____
     Name:

By: _____
     Name:

A-10

**EXHIBIT B**

**[Reserved]**

B-1

#4856-1598-7531v19

**EXHIBIT C**

**Collateral Agent KYC Requirements**

**1.** Form Compliance Questionnaire fully completed and signed, and any supporting documents required therein.

**2.** Form UBO Declaration completed filled and signed, and any supporting documents required therein.

**3.** By-laws or articles of association duly registered with the respective Chamber of Commerce or similar applicable authority.

**4.** Appointment of Directors or legal representative duly registered with the respective Chamber of Commerce or similar applicable authority.

**5.** Passport copy of the Directors and legal representatives.

**6.** In case the company is represented by Attorney-in-Fact, please provide the Power of Attorney and identification document of the attorney-in-fact.

**7.** Excerpt Chamber of Commerce or similar applicable authority.

B-2

**EXHIBIT D**

**FORM OF
GLA'S SMILES FIDUCIARY TRANSFER AGREEMENT**

C-1

#4856-1598-7531v19

| | |
|---|---|
| **FIDUCIARY TRANSFER AND ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS AND ASSETS AGREEMENT AND OTHER COVENANTS** | **CONTRATO DE ALIENAÇÃO E CESSÃO FIDUCIÁRIA DE BENS E DIREITOS DE PROPRIEDADE INTELECUAL E OUTRAS AVENÇAS** |

This Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants ("Agreement") is entered into by and among:

O presente Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças ("Contrato") é celebrado por e entre:

(i)    **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46-48/O-P, Zip Code 20021-340 enrolled with the National Registry of Legal Entities of the Ministry of Finance ("CNPJ") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA" or "Company");

(i)    **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ") sob o nº 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLA" ou "Companhia");

(ii)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Purchaser (hereinafter referred to as "Brazilian Collateral Agent");

(ii)    **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Avenida Marcos Penteado de Ulhoa Rodrigues, nº 939, 10º andar, Edifício Jacarandá, Sala 3, CEP 06460-040, inscrita no CNPJ sob o nº 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício do Comprador (doravante designado "Agente de Garantia Brasileiro");

(iii)    **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company

(iii)    **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade

1

organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo, Zip Code 04626-020, enrolled with the CNPJ under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

Terms not defined herein shall have the meaning provided in the Notes (as defined below).

**WHEREAS:**

(i) GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 17 Boulevard Raiffeisen, L-2411, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued up to US$ 1,430,925,000.00 of aggregate principal amount of 18.00% Senior Secured Note due 2028 ("GOL SSN"), under the terms of the respective note purchase agreement dated as of March 2, 2023;

(ii) GOL Equity Finance, a public limited liability company (*societé anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and

constituída e existente segundo as leis do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no CNPJ sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI");

Cada parte acima também são doravante individualmente designadas como "Parte" e, em conjunto, como "Partes";

Os termos aqui não definidos terão os significados a eles atribuídos nas Notas (conforme definido abaixo).

**CONSIDERANDO QUE:**

(i) A GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 17 Boulevard Raiffeisen, L-2411, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu até US$ 1.430.925.000,00 de valor principal agregado de título de dívida sênior com juros de 18,00% e vencimento em 2028 ("GOL SSN"), nos termos do contrato de compra de notas (*note purchase agreement*) datado de 2 de março de 2023;

(ii) GOL Equity Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Luxemburgo"), com sede na 17 Boulevard Raiffeisen, L-2411, Luxemburgo, registrada no Registro Comercial de Luxemburgo (*R.S.C. Luxembourg*) sob o número B

2

Companies (R.C.S. Luxembourg) under number B 224920 ("Gol Equity Finance" or, together with Gol Finance, the "Issuers") will issue up to US$ 1,430,925,000.00 of aggregate principal amount of 18% senior secured exchangeable note due 2028 ("GOL ESSN", jointly with GOL SSN, the "Notes"), under the terms of the corporate approval of dated March 1, 2023 and respective senior secured note purchase agreement to be entered into by and among Gol Equity Finance and the Parties;

(iii)    the Brazilian Collateral Agent was duly appointed by the Purchaser (as defined in the Notes; together with the Brazilian Collateral Agent, the "Secured Party") as a collateral agent in Brazil under the terms of the Notes to perform acts on behalf of and for the benefit of the Purchaser in connection with the collateral provided under this Agreement, as permitted by the terms set forth in the Notes;

(iv)    in order to secure the satisfaction of all obligations undertaken by the Issuers, under the terms and conditions of the Notes, GLA and GLAI ("Guarantors") provided a personal guarantee under the terms of the Notes ("Guarantees"); and

(v)    in order to secure the compliance with all obligations undertaken by the Issuers under the terms and conditions of the Notes and the Guarantors under the Guarantees, the Company has agreed to grant in favor of the Secured Party, represented in Brazil by the Brazilian Collateral Agent, a security interest in the form of fiduciary transfer and fiduciary assignment, as applicable (as provided under article 1,361 *et al* of Law No. 10,406/2002 ("Brazilian Civil Code") over the Transferred

224920 ("Gol Equity Finance" ou, em conjunto com a Gol Finance, as "Emissoras") emitirá até US$ 1.430.925.000,00 de valor principal agregado de 18% de *senior secured exchangeable note* com vencimento em 2028 ("GOL ESSN", e, em conjunto com GOL SSN, as "Notas"), nos termos da aprovação societária datada de 1º de março de 2023 e respectivo contrato de compra de notas (*senior secured note purchase agreement*) a ser celebrado entre Gol Equity Finance e as Partes;

(iii)    o Agente de Garantia Brasileiro foi devidamente nomeado pelo Comprador (conforme definido nas Notas; junto com o Agente de Garantia Brasileiro, a "Parte Garantida") como agente de garantia no Brasil nos termos das Notas para praticar atos em nome e em benefício do Comprador com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos nas Notas;

(iv)    a fim de garantir o cumprimento de todas as obrigações assumidas pelas Emissoras, sob os termos e condições das Notas, a GLA e a GLAI ("Garantidoras") prestaram garantia pessoal nos termos das Notas ("Garantias"); e

(v)    a fim de garantir o cumprimento de todas as obrigações assumidas pelas Emissoras nos termos e condições das Notas e das Garantidoras no âmbito das Garantias, a Companhia concordou em conceder à Parte Garantida, representada no Brasil pelo Agente de Garantia Brasileiro, uma garantia real na forma de alienação fiduciária e de cessão fiduciária, conforme aplicável (conforme previsto no artigo 1.361 e seguintes da Lei nº 10.406/2002 ("Código

3

Assets and Assigned Rights (as defined below), by transferring to the Secured Party, represented by the Brazilian Collateral Agent, conditional ownership thereto and indirect possession over all the Transferred Assets and Assigned Rights.

**NOW, THEREFORE**, the Parties agree to enter into this Agreement under the following terms and conditions:

**SECTION I**
**FIDUCIARY TRANSFER AND ASSIGNMENT; COLLATERAL**

1.1. In accordance with the provisions herein, in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by the Issuers to the Secured Party under the terms of the Notes and this Agreement; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Party under the respective Guarantees; (c) the faithful and timely fulfillment by the Issuers and the Guarantors of all agreements, obligations and provisions contained in the Transaction Documents (as defined in the Notes); (d) the faithful and timely payment of all other amounts due from time to time by the Issuers to the Purchaser pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by the Issuers, GLA and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents (the obligations contained in the

Civil Brasileiro") sobre os Bens Alienados e Direitos Cedidos (conforme definido abaixo), mediante a transferência de sua propriedade resolúvel à Parte Garantida, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todos os Bens Alienados e Direitos Cedidos.

**RESOLVEM**, as Partes, celebrar este Contrato, de acordo com os seguintes termos e condições:

**CLÁUSULA I**
**ALIENAÇÃO E CESSÃO FIDUCIÁRIA; GARANTIA**

1.1. De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pelas Emissoras à Parte Garantida, nos termos das Notas e deste Contrato; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora à Parte Garantida nos termos das respectivas Garantias; (c) o fiel e tempestivo cumprimento pelas Emissoras e pelas Garantidoras de todos os contratos, obrigações e disposições contidas nos Documentos da Transação *(Transaction Documents)* (conforme definido nas Notas); (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pelas Emissoras ao Comprador nos termos dos Documentos da Transação; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pelas Emissoras, pela GLA e/ou pela GLAI ao Agente de Garantia Brasileiro,

4

items "(a)", "(b)", "(c)", "(d)" and (e)" are hereinafter referred to jointly as the "Secured Obligations"), which are summarized in Exhibit I hereto in compliance with the provisions of article 1,362 of the Brazilian Civil Code, the Company, pursuant to and in accordance with the provisions of articles 1,361 *et seq*. of the Brazilian Civil Code, so that the GOL ESSN, when effectively issued by Gol Equity Finance, will be automatically included in this fiduciary lien, regardless of any additional amendment, hereby irrevocably assigns, sells and transfers, as the case may be, to the Secured Party, represented by the Brazilian Collateral Agent, the fiduciary ownership, the conditional property and the indirect possession of the assets and rights indicated below, free and clear of any liens, encumbrances or restrictions, under the terms and conditions set forth in this Agreement (the "Fiduciary Lien"):

(i) as fiduciary assignment, the Intellectual Property (as defined below), described and listed in Exhibit III hereto;

(ii) in fiduciary assignment, the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure (as defined below), described and listed in Exhibit V hereto; and

(iii) in fiduciary assignment, the right to use and the contractual position, as applicable, the Databases, Customer and Supplier Lists (as defined below), Operating Manuals (as

incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "Obrigações Garantidas"), que se encontram resumidas no Anexo I a este documento em consonância ao disposto no artigo 1.362 do Código Civil Brasileiro, a Companhia, observado e em conformidade com o disposto nos artigos 1.361 e seguintes do Código Civil Brasileiro, sendo certo que a GOL ESSN, quando efetivamente emitida pela Gol Equity Finance estará automaticamente incluída nesta garantia fiduciária, independentemente de qualquer aditamento adicional, neste ato cede, aliena e transfere, conforme o caso, à Parte Garantida, representada pelo Agente de Garantia Brasileiro, a propriedade fiduciária, o domínio resolúvel e a posse indireta dos bens e direitos indicados abaixo, livres e desembaraçados de quaisquer ônus, gravames ou restrições, nos termos e condições previstos neste Contrato ("Garantia Fiduciária"):

(i) em alienação fiduciária, a Propriedade Intelectual (conforme definido abaixo) descrita e listada no Anexo III deste Contrato;

(ii) em cessão fiduciária, o direito de uso e posição contratual, conforme aplicável, da Infraestrutura Tecnológica Smiles (conforme definido abaixo) descrita e listada no Anexo V deste Contrato; e

(iii) em cessão fiduciária, o direito de uso e posição contratual, conforme aplicável, da Bases de Dados, Listas de Clientes e Fornecedores (conforme definido abaixo),

5

defined below), and all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program (as defined below);

Manuais Operacionais (conforme definido abaixo), e todos os segredos de negócio, direitos autorais, registráveis ou não, correspondências, materiais publicitários, existentes e futuros, exclusivamente relacionados ao Programa de Fidelidade (conforme definido abaixo);

(all the assets and rights referred to above, hereinafter referred to as the "<u>Transferred Assets and Assigned Rights</u>").

(todos os bens e direitos acima referidos, doravante denominados "<u>Bens Alienados e Direitos Cedidos</u>").

For the sake of clarification, the Parties hereby ratify that (i) the Transferred Assets and Assigned Rights are, for all purposes, distinguished and nonfungible in view of the fact that they represent the totality of the intellectual property rights and data and information related to the Loyalty Program or used in its operation, and (ii) the Transferred Assets and Assigned Rights do not include (a) existing or future business partnership agreements entered into by GLA, GLAI or companies from its economic group, with third parties, including but not limited to financial institutions, and (b) any receivables resulting from any agreements entered into by GLA, GLAI or companies from its economic group, with any third parties, including but not limited to financial institutions.

Para fins de esclarecimento, as Partes confirmam que (i) os Bens Alienados e Direitos Cedidos são, para todos os fins de direito, considerados distinguidos e infungibilizados devido ao fato de representarem a totalidade dos bens e direitos de propriedade intelectual, bem como dos dados e informações relacionados ao Programa de Fidelidade ou utilizados na sua operação, e (ii) não integram os Bens Alienados e Direitos Cedidos quaisquer (a) contratos de parceria comercial que existam ou venham a existir, firmados pela GLA, pela GLAI ou empresas de seu grupo econômico com terceiros, incluindo, mas não se limitando com instituições financeiras, e (b) quaisquer recebíveis oriundos de quaisquer contratos firmados pela GLA, pela GLAI ou empresas de seu grupo econômico com quaisquer terceiros incluindo, mas não se limitando com instituições financeiras.

1.1.1 For the purposes of this Agreement, "<u>Loyalty Program</u>" shall mean Smiles loyalty program or any program that may replace it or succeed it.

1.1.1 Para os fins deste Contrato, "<u>Programa de Fidelidade</u>" significa o programa de fidelidade Smiles, ou qualquer outro programa que venha a substituí-lo.

1.1.2 For the purposes of this Agreement, "<u>Intellectual Property</u>" shall mean all the currently existing intellectual property rights

1.1.2 Para os fins deste Contrato, "<u>Propriedade Intelectual</u>" significa toda propriedade intelectual existente de

6

owned by the Company including as universal successor of Smiles Fidelidade S.A., related the Loyalty Program, described and listed in Exhibit III hereto, including: (a) the trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (INPI – *Instituto Nacional da Propriedade Industrial*) ("INPI") owned by the Company ("Trademarks"); and (b) the Brazilian internet domains owned by the Company ("Domains"), as well as any future Trademarks or Domains that become property of the Company, observed, in this last case, that the collateral will be granted after such intellectual property becomes property of the Company and always observing the terms of Section 1.2.

1.1.3 For the purposes of this Agreement, "Smiles Technological Infrastructure" shall mean the licenses from computer programs and software that are used by the Company as technological instruments for the development of the activities necessary for the operation of the Loyalty Program listed in Exhibit V hereto.

1.1.3.1 The Company undertakes not to hire any other service providers or obtain licenses to use software that perform analogous tasks or functions to those included in the Smiles Technological Infrastructure from the date of the incorporation of the IPCo.

1.1.4. For purposes of this Agreement, "Database, Client and Supplier List" means all data, information, documents, Personal Data (as defined below) and any other

titularidade da Companhia, inclusive como sucessora universal da Smiles Fidelidade S.A., referentes ao Programa de Fidelidade conforme descrita e listada no Anexo III deste Contrato: (a) as marcas registradas ou depositadas para registro no INPI - Instituto Nacional de Propriedade Industrial ("INPI") de titularidade da Companhia ("Marcas"); e (b) os domínios de internet brasileiros de titularidade da Companhia ("Domínios"), bem como as Marcas e Domínios que venham a se tornar titularidade da Companhia, observado, que, neste último caso, a garantia somente será outorgada após tal propriedade intelectual passar a ser de titularidade da Companhia, devendo-se observar o disposto na Cláusula 1.2.

1.1.3 Para os fins deste Contrato, "Infraestrutura Tecnológica Smiles" significa as licenças de programas de computador, softwares ou contratos de prestação de serviço que sejam utilizados pela Companhia como instrumentos tecnológicos para desenvolvimento da atividade necessária à operação do Programa de Fidelidade listadas no Anexo V deste Contrato.

1.1.3.1 A Companhia obriga-se a não contratar quaisquer outros prestadores de serviços ou obter licença de uso de *softwares* que exerçam tarefas ou funções análogas aquelas englobadas na Infraestrutura Tecnológica Smiles a partir da constituição da IPCo.

1.1.4. Para os fins deste Contrato, "Bases de Dados, Listas de Clientes e Fornecedores" significam todos os dados, informações, documentos, Dados Pessoais (conforme

elements related to the operations of the Loyalty Program, including, but not exclusively, the Loyalty Program's clients list and suppliers lists, as well as any other data, information and document related to the database of the Company that is necessary for or related to the operation of the Loyalty Program, as updated or modified from time to time, regardless of where such data, information, documents, Personal Data or other elements are held now or in the future.

definido abaixo) e quaisquer outros elementos que sirvam para a operação do Programa de Fidelidade, inclusive, mas sem se limitar, a lista de clientes filiados ao Programa de Fidelidade e lista de seus fornecedores, bem como todo e qualquer outro dado, informação ou documento relativo à base de dados pertencente à Companhia que seja necessário ou relacionado à operação do Programa de Fidelidade, conforme atualizadas ou modificadas de tempos em tempos, independentemente de onde tais dados, informações, documentos, Dados Pessoais e quaisquer outros elementos sejam mantidos pela Companhia atualmente ou no futuro.

1.1.4.1. The Company undertakes to update the Database, Client and Supplier List in accordance with the periodicity established in its internal policies and controls, even after an acceleration of the Secured Obligations, provided that any and all updates will be automatically incorporated to the Database, Client and Supplier List assigned on a fiduciary basis pursuant to this Agreement.

1.1.4.1. A Companhia se compromete a atualizar as Bases de Dados, Listas de Clientes e Fornecedores na periodicidade estabelecida por suas políticas e controles internos, mesmo após eventual vencimento antecipado das Obrigações Garantidas, observado que todas as atualizações efetuadas serão automaticamente incorporadas nas Bases de Dados, Listas e Clientes e Fornecedores cedidos fiduciariamente através deste Contrato.

1.1.5. For purposes of this Agreement, "Operating Manuals" mean the currently existing manuals, documents and information related to the operation of the Loyalty Program, and their respective copyrights related to these, owned by the Company, (listed in Exhibit VI hereto), as well as manuals, documents and information related to the operation of the Loyalty Program, and their respective copyrights related to these, as they become property of the Company, observed, in this last case, that

1.1.5. Para os fins deste Contrato, "Manuais Operacionais" significam os manuais, documentos e informações, presentes, relacionados a operação do Programa de Fidelidade, e os respectivos direitos autorais relacionados a estes, de titularidade da Companhia, (conforme listados no Anexo VI deste Contrato), bem como manuais, documentos e informações, relacionados a operação do Programa de Fidelidade, e os respectivos direitos autorais relacionados a estes que venham a se tornar titularidade da

8

the collateral will be granted automatically after such assets becomes property of the Company and always observing the terms of Section 1.2.

1.2. The Transferred Assets and Assigned Rights indicated in items (i) and (iii) of Section 1.1 above that become owned by, or licensed to the Company as from the date hereof ("Additional Assets and Rights") will be automatically included as part of the security interest created by this Agreement as soon as they become property of the Company (and after any third party approval deemed legally or contractually necessary, if any), without the need for the execution of an amendment to this Agreement. In case after the execution of this Agreement the Company becomes the holder or licensee, as applicable of new Additional Assets and Rights, as well as any patents related to the Loyalty Program, the Parties undertake to formalize the extension of the Fiduciary Transfer to the Additional Assets and Rights by entering into an amendment to this Agreement, to be entered by the parties hereto no later than thirty (30) days after the date on which these Additional Assets and Rights become owned by and/or licensed to the Company, amending Exhibit III or Exhibit VI hereto to include such Additional Assets and Rights, substantially in accordance with Exhibit IV, which shall be registered as provided for in Sections 2.1 and 2.2 below, the Company shall use its best efforts and fulfill all requirements presented to complete the perfection in the shortest possible time.

Companhia, observado, que, neste último caso, a garantia será outorgada automaticamente após tais bens passarem a ser de titularidade da Companhia, devendo-se observar o disposto na Cláusula 1.2.

1.2. Os Bens Alienados e Direitos Cedidos, indicados nos itens (i) e (iii) da Cláusula 1.1 acima que venham a se tornar de titularidade da, ou licenciada à Companhia a partir da presente data ("Bens e Direitos Adicionais"), estarão automaticamente onerados pela garantia criada pelo presente Contrato assim que se tornarem de titularidade da, ou licenciada à Companhia (e após obtidas eventuais anuências de terceiros, caso legal ou contratualmente necessárias), sem a necessidade da celebração de uma alteração deste Contrato. Caso após a assinatura desde Contrato a Companhia passe a deter a titularidade ou a licença, conforme o caso, de Bens e Direitos Adicionais, bem como de quaisquer patentes relacionadas ao Programa de Fidelidade, as Partes se obrigam a formalizar a extensão da Garantia Fiduciária a estes Bens e Direitos Adicionais por meio da celebração de aditamento a este Contrato, a ser celebrado em entre as Partes em até 30 (trinta) dias contados da data em que a Companhia passar a deter estes Bens e Direitos Adicionais, para alterar o Anexo III ou Anexo VI a este Contrato, substancialmente nos termos do Anexo IV, o qual deverá ser registrado conforme previsto nas Cláusulas 2.1 e 2.2 abaixo, sendo certo que a Companhia deverá empenhar os melhores esforços e atender todas as exigências apresentadas para que o registro seja concluído no menor prazo possível.

9

1.3. The Secured Obligations include all obligations undertaken by the Issuers and the Guarantors, as applicable, including all future and current principal and accessory payment obligations undertaken or to be undertaken by the Issuers and the Guarantors, as applicable, under or in connection with the Notes and this Agreement.

1.3. As Obrigações Garantidas incluem todas e quaisquer obrigações assumida pelas Emissoras e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pelas Emissoras e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação às Notas e a este Contrato.

1.4. By signing this Agreement and complying with the formalities set forth in Section 2 below, the Fiduciary Lien shall be created on behalf of and for the benefit of the Secured Party, represented by the Brazilian Collateral Agent, shall become the conditional and indirect owner of the Transferred Assets and Assigned Rights, subject to the terms and conditions of this Agreement.

1.4. Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 2 abaixo, estará constituída a Garantia Fiduciária em nome e benefício da Parte Garantida, representada pelo Agente de Garantia Brasileiro, que tornar-se-á detentora da posse condicional e indireta dos Bens Alienados e Direitos Cedidos, nos termos e condições acordados neste Contrato.

1.5. The Company hereby declares that each of the registrable Intellectual Property listed in Exhibit III is duly registered or has been submitted for registration before INPI, and all fees due for the registration or the maintenance of the registration of the Intellectual Property with the INPI have been duly paid by the Company, unless otherwise specified in Exhibit III. In addition, the Company hereby declares and confirms that it has obtained all required authorizations for the granting of this Fiduciary Lien over the existing Transferred Assets and Assigned Rights, and that it has in its files all contracts, assignment agreements and other documentation (as applicable) to evidence that the Company has full title and ownership to, and/or the right to burden and assign, the existing Transferred Assets and Assigned

1.5. A Companhia neste ato declara que cada Propriedade Intelectual listada no Anexo III passível de registro está devidamente registrada ou foi submetida a registro perante o INPI, e todas as taxas devidas pelo registro ou pela manutenção do registro das Propriedades Intelectuais no INPI foram devidamente pagas pela Companhia, salvo indicação em contrário no Anexo III. Além disso, a Companhia desde já declara e confirma que obteve todas as autorizações necessárias para concessão desta Garantia Fiduciária sobre os Bens Alienados e Direitos Cedidos existentes, e que possui em seus arquivos todos os contratos, termos de cessão e demais documentos (conforme aplicável) para comprovar que a Companhia é a única e exclusiva titular da, e/ou possui plenos direitos para onerar e ceder os Bens

10

Rights according to the term of this Agreement.

1.5.1. The Company hereby confirms that it complies with Brazilian General Data Protection Law – Federal Law No. 13,709/2018, and all its regulation, further amendments and other associated legislation (collectively the "LGPD") and that, considering the existence of Personal Data (as defined below) in the Database, Client and Supplier List the Company, without prejudice of the fiduciary assignment created under this Agreement, hereby confirms that it has all authorizations that may be necessary to create and perfect the fiduciary assignment set forth in Section 1.1(ii), and undertakes to, as may be necessary, (i) perform all acts to satisfy all legal requirements to ensure the legality and the effectiveness of the transfer of the Personal Data contained in the Transferred Assets and/or the Assigned Right, and (ii) obtain the authorizations and consents required under the LGPD, if applicable, for the fulfillment of the transfer of such Personal Data in case of foreclosure of the collateral created pursuant to this Agreement, according to the terms set forth herein. "Personal Data" are any data or information, as long as owed or in possession by the Company, of an identified or identifiable individual, including of the Company's and Loyalty Program' clients, and their suppliers, distributors and commercial partners in general, among others, including but not limited to: names, phone numbers, contact information (address, e-mail address, commercial phone number, mobile number, fax), occupation, bank information, account number, total miles and points balance in the Loyalty

Alienados e Direitos Cedidos existentes de acordo com o disposto neste Contrato.

1.5.1. A Companhia neste ato confirma que cumpre a Lei Geral de Proteção de Dados Pessoais do Brasil – Lei nº 13.709/2018, e toda sua regulamentação, alterações posteriores e demais normas correlatas (em conjunto "LGPD") e que, considerando a existência de Dados Pessoais na Bases de Dados, Listas de Clientes e Fornecedores, sem prejuízo da cessão fiduciária constituída por este Contrato, a Companhia desde já confirma ter as autorizações necessárias para a constituição e aperfeiçoamento da cessão fiduciária prevista na Cláusula 1.1(ii) acima, e se obriga a, conforme necessário, (i) praticar todos os atos para atender aos requisitos legais para garantir a legalidade e a efetivação da transferência desses Dados Pessoais contidos no Bem Alienado e/ou no Direito Cedido e para obter as autorizações e permissões necessárias e exigidas pela LGPD, caso aplicável, para efetivar transferência desses Dados Pessoais na hipótese de excussão da garantia constituída através deste Contrato, nos termos aqui previstos. "Dados Pessoais" são quaisquer dados ou informações, desde que detidos pela ou de posse da Companhia, de um indivíduo identificado ou identificável, inclusive de clientes da Companhia e do Programa de Fidelidade, e dos representantes das empresas a elas relacionadas, direta ou indiretamente, e dos seus respectivos fornecedores, distribuidores e parceiros comerciais em geral, dentre outros, incluindo, mas não se limitando a: nomes, números de telefone, informações de contato (endereço, endereço de e-mail, número de telefone comercial, número de telefone móvel, número de fax), emprego, dados

Program, history of engagement in the Loyalty Program, history of accrual and redemption activity in the Loyalty Program, communication and promotion opt-ins in the Loyalty Program, credit card number, marital or relationship status etc.

1.6. Notwithstanding the provisions of this Agreement, the Company shall have the right to, without any release from or consent by the Secured Party or the Brazilian Collateral Agent, pursuant to the Notes, freely use (including by means of licensing) the Transferred Assets and Assigned Rights, in a manner consistent with the Company's ordinary course of business.

1.7. Without prejudice to the other provisions of this Agreement, in case of the occurrence of an event of acceleration of any Secured Obligation the Company and the Guarantors hereby agree and accept that any and all use of any of the Transferred Assets and Assigned Rights (including, without limitations, any use of the Trademarks and Domains, operation of the Smiles Technology Infrastructure, utilization of the Database, Client and Suppliers List, as well as of the utilization of the Operating Manuals, release of new brands, marketing campaigns, characters, themes, partnerships, as well as the development of any new intellectual property) will be subject to the Brazilian Security Agent prior written instructions and approvals, in accordance with the Secured Party's guidance, until such default is cured by the Company (if such a

bancários, número da conta no Programa de Fidelidade, saldo total de milhas e pontuação no Programa de Fidelidade, histórico de contratação de terceiros no Programa de Fidelidade, histórico de acúmulo e resgate de milhas no Programa de Fidelidade, *opt-ins* de comunicação e promoção no Programa de Fidelidade, número de cartão de crédito, estado civil ou de relacionamento etc.

1.6. Sem prejuízo das demais disposições deste Contrato, a Companhia poderá, sem que seja necessária qualquer liberação ou consentimento da Parte Garantida ou do Agente de Garantia Brasileiro nos termos das Notas, livremente utilizar (inclusive por meio de licenciamento) os Bens Alienados e Direitos Cedidos, de maneira que seja consistente com o curso ordinário dos seus negócios.

1.7. Sem prejuízo das demais disposições deste Contrato, em caso de vencimento antecipado de qualquer Obrigação Garantida a Companhia e as Garantidoras desde já concordam e aceitam que toda e qualquer utilização de qualquer dos Bens Alienados e Direitos Cedidos (incluindo, sem limitação, utilização das Marcas e Domínios, operação da Infraestrutura Tecnológica Smiles, utilização das Bases de Dados, Listas de Clientes e Fornecedores, bem como utilização dos Manuais Operacionais, lançamento de novas marcas, campanhas publicitárias, personagens, temas, parcerias e, ainda, o desenvolvimento de qualquer nova propriedade intelectual) estará sujeita à instrução e aprovação prévia e expressa do Agente de Garantia Brasileiro, conforme orientações da Parte Garantida, até que a violação em questão seja sanada pela Companhia (se passível de saneamento) ou

12

cure is possible) or until the foreclosure of this Agreement pursuant to Section 5 hereto, as applicable.

1.8. Without prejudice to the other provisions of this Agreement, without requiring any resolution, approval or consent from the Secured Party or the Brazilian Collateral Agent, and without implying breach of any representation, warranty or obligation assumed under the Notes and this Agreement, the Company may transfer ownership of any of the Transferred Assets and Assigned Rights, at any time, by a dropdown, to a wholly-owned subsidiary of the Company ("Dropdown" and "IPCo"), as long as, prior to such transfer, (1) the Company enters into a fiduciary assignment agreement over the totality of IPCo's shares and securing the obligations of the Notes, and (2) IPCo enters into a fiduciary assignment of the assets and rights to be transferred, under terms and conditions equivalent to this Agreement, with its effectiveness conditioned exclusively to the completion of the transfer of those rights and assets of the Company to IPCo.

1.8.1. The Brazilian Collateral Agent is hereby authorized to and shall execute any amendment to this Agreement to enable the Dropdown without the need for any further instruction or confirmation of any third parties, including the Secured Party, according to the terms set forth in this Agreement.

até que ocorra a excussão nos termos da Cláusula 5 deste Contrato, conforme aplicável.

1.8. Sem prejuízo das demais disposições deste Contrato, sem que seja necessária qualquer deliberação, aprovação ou consentimento da Parte Garantida ou do Agente de Garantia Brasileiro e sem que implique a violação de qualquer declaração, garantia ou obrigação assumidas nos termos das Notas e deste Contrato, a Companhia poderá transferir a titularidade de quaisquer dos Bens Alienados e Direitos Cedidos, a qualquer tempo, através de *dropdown*, para subsidiária integral da Companhia ("Dropdown" e "IPCo"), desde que, anteriormente à referida transferência, seja celebrado (1) pela Companhia, contrato de alienação fiduciária sobre a totalidade do capital social da IPCo, garantindo as obrigações das Notas, e (2) pela IPCo, contrato de alienação fiduciária e cessão fiduciária dos bens e direitos a serem transferidos, em termos equivalentes aos deste Contrato, com a eficácia condicionada exclusivamente à efetivação da transferência de tais bens e direitos da Companhia para IPCo.

1.8.1. O Agente de Garantia Brasileiro está, pelo presente Contrato, autorizado a e deverá firmar o aditamento a este Contrato para viabilizar o Dropdown sem a necessidade de qualquer autorização ou confirmação adicional de quaisquer terceiros, inclusive da Parte Garantida, observados os termos dispostos neste Contrato.

## SECTION II
## PERFECTION OF THE COLLATERAL

## CLÁUSULA II
## APERFEIÇOAMENTO DA GARANTIA

13

2.1.     The Company shall, within twenty (20) days from the date hereof or from the date of execution of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or any of its amendments, duly registered with the Registry Offices of Titles and Deeds (*Cartórios de Títulos e Documentos)* of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to take all necessary actions to make such registrations, at its own expense.

2.2.     Within fifteen (15) days as from the date of registration of this Agreement or any amendment hereto with the competent Registry Offices of Titles and Deeds (as provide for in Section 2.1 above), the Company shall deliver to the Brazilian Collateral Agent evidence that the request for annotation of the security interest over each e Intellectual Property filed or registered with the INP has been filed with the INPI.

2.2.1. The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

2.3.     All costs and expenses related to the filing and registration of this Agreement as required hereunder (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith)

2.1.     A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou quaisquer aditamentos a este, devidamente registrados nos Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

2.2.     No prazo de 15 (quinze) dias contados a partir da data de registro deste Contrato ou qualquer aditamento do mesmo perante os Cartórios de Títulos e Documentos competente (conforme previsto na Cláusula 2.1 acima), a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual registrada ou depositada no INPI foi protocolado perante o INPI.

2.2.1. A Companhia obriga-se, mediante conclusão da anotação perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal anotação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

2.3.     Todos os custos e despesas relacionados ao arquivamento e registro deste Contrato, conforme aqui previstos (incluindo, sem limitação, honorários advocatícios, traduções juramentadas ou relativos a quaisquer outras formalidades que

14

shall be borne by the Company, at its own expense.

2.4. If Company fails to timely file or obtain the registration and/or annotation of this Agreement pursuant to Sections 2.1 and 2.2 above, the Brazilian Collateral Agent is hereby authorized by Company to conduct any such filing directly. The Company shall reimburse the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees, official fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Sections 2.1 and 2.2 above, without prejudice to any right of the Brazilian Collateral Agent or to any consequences or remedies set forth under this Agreement or the Transaction Documents deriving from such noncompliance by the Company of its obligations hereunder.

2.5.    Notwithstanding the foregoing, the Company shall:

(i)    diligently comply with any requirements made by the relevant Registry of Deeds and Documents and/or the INPI, as the case may be, and keep the Brazilian Collateral Agent informed on any such requirement; and

sejam necessárias), serão arcados pela Companhia, às suas próprias expensas.

2.4. Caso a Companhia deixe de solicitar ou obter o registro e/ou a anotação deste Contrato tempestivamente de acordo com o previsto nas Cláusulas 2.1 e 2.2 acima, o Agente de Garantia Brasileiro fica autorizado pela Companhia a realizar qualquer pedido de anotação e registro diretamente. A Companhia deverá reembolsar o Agente de Garantia Brasileiro, no prazo de 5 (cinco) dias a partir do recebimento de uma solicitação por escrito, todos e quaisquer custos (incluindo, sem limitação, honorários advocatícios, taxas oficiais e despesas com traduções ou com quaisquer outras formalidades que possam ser exigidas nesse sentido) que possam ser desembolsados pelo Agente de Garantia Brasileiro em relação aos arquivamentos e registros descritos nas Cláusulas 2.1 e 2.2 acima, sem prejuízo de outros direitos ou consequências previstos neste Contrato ou nos Documentos da Transação em razão do descumprimento pela Companhia de suas obrigações aqui previstas.

2.5.    Sem prejuízo do disposto acima, a Companhia deverá:

(i)    cumprir diligentemente quaisquer exigências apresentadas pelos Cartórios de Registro de Títulos e Documentos competentes e/ou pelo INPI, conforme o caso, e manter o Agente de Garantia Brasileiro informado sobre qualquer exigência; e

15

(ii)     take any further action pursuant to applicable law required, now or in the future, for the creation, perfection, and/or maintenance of Fiduciary Lien over the Transferred Assets and Assigned Rights.

(ii)     tomar quaisquer providências adicionais de acordo com a lei aplicável necessárias, atualmente ou no futuro, para a criação, realização e/ou manutenção da Garantia Fiduciária sobre os Bens Alienados e Direitos Cedidos.

## SECTION III
## REPRESENTATIONS AND WARRANTIES

## CLÁUSULA III
## DECLARAÇÕES E GARANTIAS

3.1. The Brazilian Collateral Agent hereby represents and warrants that:

3.1.     O Agente de Garantia Brasileiro neste ato declara e garante que:

(i)     has full powers, authority and ability to execute this Agreement, perform its contractual obligations and enter into this Fiduciary Lien, as described herein; and

(i)     possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Garantia Fiduciária aqui descrita; e

(ii)     has taken all appropriate measures to authorize the execution and performance of this Agreement.

(ii)     tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

3.2.     The Company and GLAI, hereby represent and warrant, individually, that:

3.2.     A Companhia e a GLAI, neste ato declaram, individualmente, que:

(i)     has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Fiduciary Lien, as described herein; and

(i)     possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Garantia Fiduciária, conforme aqui descrita; e

(ii)     has taken or will take all necessary measures to authorize the execution and performance of this Agreement.

(ii)     tomou e tomará todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato.

3.3.     The Company hereby represents and warrants that:

3.3.     A Companhia neste ato declara que:

(i)     this Agreement constitutes a legal, valid and binding obligations, and

(i)     o presente Contrato constitui uma obrigação legal, válida, e exequível contra a Companhia, de acordo com os seus termos;

16

enforceable against the Company, in accordance with its terms;

(ii)     the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (a) any legal or contractual provision or any obligation previously undertaken by the Company, (b) any applicable law, (c) any policy or rule of the Company, (d) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the Fiduciary Lien of the Transferred Assets and Assigned Rights;

(iii)     it is the lawful and exclusive owner of, and has good title and/or license to, the Transferred Assets and Assigned Rights, which comprises all intellectual property rights and data and information related to the Loyalty Program, business and operation thereof, in Brazil.

(iv)     except for this Fiduciary Lien, the Transferred Assets and Assigned Rights are free and clear of any liens, encumbrances and/or security interests and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, fiduciary assignment, pledge or sale of Transferred Assets and Assigned Rights in the Company's bylaws or in any other document; and, in the event of the enforcement or performance of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(ii)     a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (a) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (b) qualquer lei aplicável, (c) qualquer política ou regra da Companhia, (d) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Garantia Fiduciária dos Bens Alienados e Direitos Cedidos;

(iii)     é a legítima e exclusiva proprietária, licenciada e/ou possuidora dos Bens Alienados e Direitos Cedidos, que representam a totalidade dos direitos e ativos de propriedade intelectual e dados e informações relacionados ao Programa de Fidelidade e respectivo negócio e operação no Brasil.

(iv)     exceto pela presente Garantia Fiduciária, os Bens Alienados e Direitos Cedidos estão livres e desembaraçados de quaisquer ônus, gravame e/ou garantias e pode ser alienada fiduciariamente, empenhada ou vendida judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, cessão fiduciária, penhor ou venda dos Bens Alienados e Direitos Cedidos no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

17

(v)      to best knowledge of the Company there is no procedure, proceeding or claim from third parties or any governmental authority or body that may, in any way, adversely affect the Transferred Assets and Assigned Rights or this Agreement;

(vi)     the Transferred Assets and Assigned Rights are not essential to the Company's business activities and will not be at any time essential to the Company's business actives and the Assignor will not, in any event, challenge that such Transferred Assets and Assigned Rights are essential to its business activities; and

(vii)    the power of attorney granted under the terms of Section 5.4 and in the form of Exhibit II hereto, was duly issued by the Company and its legal representatives and validly grants the powers set forth therein to the Brazilian Collateral Agent, and the Company did not grant any other power of attorney or similar instrument with similar effect to any other third party in connection with the Transferred Assets and Assigned Rights described hereof.

3.3.     The representations and warranties provided by the Parties shall survive the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

## SECTION IV
## ADDITIONAL OBLIGATIONS

4.1.     The Company undertakes to and agrees that, on and after the date hereof and

---

(v)      no melhor conhecimento da Companhia, não há procedimento, processo ou reclamação de terceiros ou de qualquer autoridade ou órgão governamental que possa, de alguma forma, afetar adversamente os Bens Alienados e Direitos Cedidos ou este Contrato;

(vi)     os Bens Alienados e Direitos Cedidos não são essenciais à atividade empresarial da Companhia e não serão, em nenhum momento, essenciais à atividade empresarial da Companhia e a Companhia não irá, em hipótese alguma, contestar que tais Bens Alienados e Direitos Cedidos sejam essenciais às suas atividades empresariais; e

(vii)    a procuração outorgada, nos termos da Cláusula 5.4 abaixo e na forma do Anexo II a este Contrato, foi devidamente assinada pelos representantes legais da Companhia e confere, validamente, os poderes ali indicados ao Agente de Garantia Brasileiro, e a Companhia não outorgou qualquer outra procuração ou instrumento com efeito similar a quaisquer terceiros com relação aos Bens Alienados e Direitos Cedidos descritos neste Contrato.

3.3.     As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

## CLÁUSULA IV
## OBRIGAÇÕES ADICIONAIS

4.1.     A Companhia se obriga e concorda que, na data do presente instrumento e até

until all Secured Obligations are paid and discharged in full:

(i)    to cooperate with the Brazilian Collateral Agent for the performance and enforcement of this Agreement;

(ii)    to provide to the Brazilian Collateral Agent, in any case by no later than five (5) Business Days after the receipt of the respective request from the Brazilian Collateral Agent, and at the sole expense of Company, with all information and all documents relating to the Fiduciary Lien and to the Transferred Assets and Assigned Rights as requested by the Brazilian Collateral Agent, to determine compliance with this Agreement and/or for the preservation, maintenance and/or enforcement of the Fiduciary Lien;

(iii)    to maintain always valid, effective and in good standing all the Transferred Assets and Assigned Rights and all authorizations required for the performance of the obligations undertaken in this Agreement and/or any amendment hereto and to take all measures required under applicable law to enforce the provisions hereof and/or of any amendment hereto;

(iv)    to give written notice to the Brazilian Collateral Agent no later than five (5) Business Days after becoming aware of any event or circumstance which is likely to adversely affect Company's ability to comply with the obligations undertaken herein and/or under any amendment hereto, or that may otherwise adversely affect their compliance with their obligations hereunder and/or under any amendment hereto;

que todas as Obrigações Garantidas sejam integralmente pagas e cumpridas:

(i)    a cooperar com o Agente de Garantia Brasileiro para o cumprimento e execução deste Contrato;

(ii)    a apresentar ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento da respectiva solicitação pelo Agente de Garantia Brasileiro, e às expensas exclusivas da Companhia, todas as informações e todos os documentos relacionados à Garantia Fiduciária e aos Bens Alienados e Direitos Cedidos solicitados pelo Agente de Garantia Brasileiro, para a determinação do cumprimento deste Contrato e/ou para a preservação, manutenção e/ou execução da Garantia Fiduciária;

(iii)    a sempre manter válidas, eficazes e em situação regular todos os Bens Alienados e Direitos Cedidos e todas as autorizações necessárias para o cumprimento das obrigações assumidas neste Contrato, e/ou em qualquer aditivo a este, e a adotar todas as medidas necessárias nos termos da lei aplicável para a execução das disposições do presente Contrato e/ou de qualquer aditivo a este;

(iv)    a notificar o Agente de Garantia Brasileiro, por escrito, em prazo não superior a 5 (cinco) Dias Úteis após tomar ciência, de qualquer evento ou circunstância que possa afetar negativamente a capacidade da Companhia de cumprir as obrigações assumidas no Contrato e/ou em qualquer aditivo a este, ou que possa, de outra forma, afetar negativamente o cumprimento pela

Companhia das obrigações previstas neste Contrato e/ou em qualquer aditivo a este;

(v)     timely fulfill the obligations of this Agreement;

(v)     cumprir tempestivamente as obrigações desse Contrato;

(vi)     defend itself, the Transferred Assets and Assigned Rights, the Secured Party and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Transferred Assets and Assigned Rights, this Agreement and / or the fulfillment of the obligations undertaken under the Notes;

(vi)     defender, a si mesma, os Bens Alienados e Direitos Cedidos, a Parte Garantida e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Bens Alienados e Direitos Cedidos, este Contrato e/ou o cumprimento das obrigações assumidas por força das Notas;

(vii)     perform all acts, as well as sign any and all documents, necessary for the registration of this Agreement in the competent Registry Office of Titles and Deeds and INPI pursuant to Sections 2.1 and 2.2 above;

(vii)     praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro do Contrato perante os Cartórios de Registro de Títulos e Documentos competentes e o INPI, nos termos das Cláusulas 2.1 e 2.2 acima;

(viii)     not to carry out any act with the purpose of reducing the value of the Transferred Assets and Assigned Rights;

(viii)     a não praticar atos com o propósito de diminuir o valor dos Bens Alienados e Direitos Cedidos;

(ix)     assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Purchaser, in case of any enforcement of the Fiduciary Lien hereof, and bear all related expenses or that are necessary for such purpose;

(ix)     auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício do Comprador, no caso de eventual excussão da presente Garantia Fiduciária, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(x)     assist, allow and use its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent may request in order to facilitate the remittance abroad of

(x)     auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro venha a solicitar com o

20

any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(xi)    comply with all clauses provided for in the Notes;

(xii)    notify the Brazilian Collateral Agent of any event which results in a breach of this Agreement or the Notes or in the inaccuracy of any representation made under this Agreement within two (2) Business Days of its occurrence;

(xiii)    to pay any current or future fine, penalty, interests or expenses, any contributions or other charges levied on the Transferred Assets and Assigned Rights that, in case of default in payment, may reasonably be expected to result in (a) a lien over the Transferred Assets and Assigned Rights, (b) a loss of ownership over the Transferred Assets and Assigned Rights or (c) a material adverse effect on the Transferred Assets and Assigned Rights;

(xiv)    not dispose of, assign, transfer, sell or lease the Transferred Assets and Assigned Rights, even if under suspensive condition, to any third party, including by means of a corporate reorganization that is not permitted according to the Notes;

(xv)    to keep the Transferred Assets and Assigned Rights in fully effectiveness and validity, paying all taxes, fees or other costs that may be required by the INPI or other relevant authorities, including maintaining

propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(xi)    cumprir com todas as cláusulas previstas nas Notas;

(xii)    notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou das Notas ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(xiii)    a pagar quaisquer multas, penalidades, juros ou despesas, presentes ou futuras, contribuições ou outros encargos incidentes sobre os Bens Alienados e Direitos Cedidos que, caso não sejam pagas, possam razoavelmente resultar (a) na constituição de um ônus ou gravame sobre os Bens Alienados e Direitos Cedidos, (b) na perda de propriedade dos Bens Alienados e Direitos Cedidos ou (c) em um efeito adverso relevante sobre os Bens Alienados e Direitos Cedidos;

(xiv)    não vender, alienar, ceder, transferir ou arrendar os Bens Alienados e Direitos Cedidos, ainda que sob condição suspensiva, a qualquer terceiro, inclusive por meio da realização de qualquer reorganização societária não permitida nos termos das Notas;

(xv)    manter os Bens Alienados e Direitos Cedidos plenamente válidos e eficazes, pagando todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou outras autoridades competentes, incluindo a

21

regular and effective use of the Transferred Assets and Assigned Rights for defense in cancellation due to non-use procedures;

(xvi) not to execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Party and/or of the Brazilian Collateral Agent to sell or otherwise dispose of any one of the Transferred Assets and Assigned Rights, in part or in full;

(xvii) not create or allow the creation of any liens, encumbrances and/or security interests over the Transferred Assets and Assigned Rights, even if under suspensive condition, except for this Fiduciary Lien or as permitted in Section 1.8 of this Agreement;

(xviii) in case the INPI or other relevant authorities requests that any amendment are made to this Agreement, including the segregation of security over the Intellectual Property into different and individual instruments in order to conclude registration, the Company shall enter into any and all documents in order to comply with requirements made by the INPI or by such other relevant authorities;

(xix) to the extent that any additional registration becomes required for the perfection of this Fiduciary Lien (in addition to those provided for in Section II above), carry-out such registration as promptly as possible; and

(xx) annually renew the Power of Attorney (as defined below) granted under Section 5.4 of this Agreement, with at least

manutenção do uso regular e efetivo dos Bens Alienados e Direitos Cedidos para defesa em procedimentos de caducidade;

(xvi) a não celebrar nem autorizar a celebração de qualquer contrato que possa impedir ou restringir os direitos e/ou a capacidade da Parte Garantida e/ou do Agente de Garantia Brasileiro de vender, alienar ou de outra forma dispor de qualquer dos Bens Alienados e Direitos Cedidos, total ou parcialmente;

(xvii) não criar ou permitir a criação de quaisquer ônus, gravames e/ou garantias, judiciais ou extrajudiciais, sobre os Bens Alienados e Direitos Cedidos, ainda que sob condição suspensiva, exceto pela presente Garantia Fiduciária ou como previsto na Cláusula 1.8 deste Contrato;

(xviii) caso o INPI ou outras autoridades competentes solicite que qualquer alteração seja feita a este Contrato, incluindo a segregação da garantia sobre a Propriedade Intelectual em instrumentos diferentes e individuais a fim de concluir o registro, a Companhia deverá celebrar todos e quaisquer documentos a fim de cumprir as exigências feitas pelo INPI ou por tais outras autoridades competentes;

(xix) caso qualquer registro adicional venha a ser requerido por lei para aperfeiçoamento da presente Garantia Fiduciária (além daqueles previstos na Cláusula II acima), realizar com a maior brevidade possível tal registro; e

(xx) renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 5.4 deste Contrato com

22

thirty (30) days prior to its expiration date, substantially in form of Exhibit II hereto.

4.2. The Company undertakes to and agrees that, in the event of enforcement or execution of this collateral, not to do, or cause or contribute to be done, any act or thing to (i) contest or in any way impair or harm any Transferred Assets and Assigned Rights; (ii) interfere with Secured Party and/or of the Brazilian Collateral Agent right to enforce, sell, explore or dispose of the Transferred Assets and Assigned Rights; (iii) diminish, demean, tarnish or dilute the value, distinctiveness, fame, enforceability, validity of, or goodwill associated with, the Transferred Assets and Assigned Rights; (iv) challenge the enforceability or the validity of the Transferred Assets and Assigned Rights , (v) use, explore, dispose, disclose, make available or publish any trade secret, know-how, source code or any kind of confidential information related to the Transferred Assets and Assigned Rights, or (vi) use or apply for any trademark registration or use any trade dress thar are identical or similar, in phonetical, graphical or ideological manner, to the Transferred Assets and Assigned Rights.

**SECTION V**
**FORECLOSURE**

5.1.     In the event of acceleration of the Secured Obligations under the terms of the Notes, the Brazilian Collateral Agent, acting on behalf of and for the benefit and in accordance with the instructions of the Purchaser, in compliance with this Agreement and the Notes, shall be entitled,

---

pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo II deste Contrato.

4.2. A Companhia se obriga e concorda que, em caso de excussão ou execução desta garantia, não fará, ou causará ou contribuirá para ser feito, qualquer ato ou coisa para (i) contestar ou de qualquer forma prejudicar ou danificar quaisquer Bens Alienados e Direitos Cedidos; (ii) interferir no direito da Parte Garantida e/ou do Agente de Garantia Brasileiro de fazer valer, vender, explorar ou alienar os Bens Alienados e Direitos Cedidos; (iii) diminuir, rebaixar, manchar ou diluir o valor, distintividade, fama, exequibilidade, validade ou *goodwill* associado aos Bens Alienados e Direitos Cedidos; (iv) contestar a exequibilidade ou a validade dos direitos dos Bens Alienados e Direitos Cedidos, (v) usar, explorar, dispor, divulgar, disponibilizar ou publicar qualquer segredo comercial, know-how, código fonte ou qualquer tipo de informação confidencial relacionada aos Bens Alienados e Direitos Cedidos, ou (vi) usar ou solicitar qualquer registro de marca ou usar qualquer identidade visual que seja idêntica ou semelhante, fonética, gráfica ou ideologicamente, aos Bens Alienados e Direitos Cedidos.

**CLÁUSULA V**
**EXCUSSÃO**

5.1.     Em caso de vencimento antecipado das Obrigações Garantidas, nos termos das Notas, o Agente de Garantia Brasileiro, agindo em nome e benefício e conforme instruções do Comprador, em observância a este Contrato e às Notas, terá o direito de, sem prejuízo de qualquer outra garantia

23

notwithstanding any other security granted and provided under the Notes, exercise all powers related to the Transferred Assets and Assigned Rights and the Fiduciary Lien created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets and Assigned Rights; give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets and Assigned Rights, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of this Agreement and the Notes.

outorgada e prestada nos termos das Notas, exercer todos os poderes relativos aos Bens Alienados e Direitos Cedidos e a Garantia Fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados e Direitos Cedidos; dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados e Direitos Cedidos, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições deste Contrato e das Notas.

5.1.1 The Brazilian Collateral Agent, acting on behalf and for the benefit and in accordance with the instructions of the Secured Party, is authorized to remit the proceeds from the sale of the Transferred Assets and Assigned Rights by any means authorized by the Central Bank of Brazil (or other competent authority) elected or deemed by the Brazilian Collateral Agent to be legal and/or valid. If requested or instructed by the Brazilian Collateral Agent, acting on behalf of and for the benefit and in accordance with

5.1.1 O Agente de Garantia Brasileiro, agindo em nome e benefício e conforme instruções da Parte Garantida, está autorizado a providenciar a remessa dos recursos oriundos da venda dos Bens Alienados e Direitos Cedidos por quaisquer meios autorizados pelo Banco Central do Brasil (ou outra autoridade competente) que o Agente de Garantia Brasileiro entenda ser legal e/ou válido. Caso necessário ou instruído pelo Agente de Garantia Brasileiro, agindo em nome e benefício e conforme instruções da

the instructions of the Secured Party, the Company shall promptly collaborate for such remittance to occur, as well as follow solely and exclusively instructions from the Brazilian Collateral Agent to sign any and all documents and contracts, including without limitation any foreign exchange contract, for purposes of remittance abroad of financial resources originated from the sale of the Transferred Assets and Assigned Rights, according to the terms and limits of this Agreement.

5.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Notes, on behalf of and for the benefit of the Secured Party, resulting from the sale of the Transferred Assets and Assigned Rights, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Notes.

5.3.    With respect to Section 5.1 above, in the event of enforcement or execution of this Agreement, the Company shall cause the direct possession of the Transferred Assets and Assigned Rights to be transferred to the Secured Party, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Purchaser.

5.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Brazilian Civil Code, a power of attorney, pursuant to Exhibit II to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including,

Parte Garantida, a Companhia obriga-se a prontamente colaborar para que tal remessa seja realizada, bem como acatar única e exclusivamente instruções do Agente de Garantia Brasileiro para assinar quaisquer contratos e documentos, incluindo, sem limitação, eventuais contratos de câmbio necessários para fins de remessa ao exterior de recursos financeiros oriundos da venda dos Bens Alienados e Direitos Cedidos, de acordo com os termos e limites deste Contrato.

5.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância às Notas, em nome e benefício da Parte Garantida, resultante da alienação dos Bens Alienados e Direitos Cedidos, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições das Notas.

5.3.    Com relação à Cláusula 5.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Bens Alienados e Direitos Cedidos para a Parte Garantida, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo Comprador.

5.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil Brasileiro, a procuração, nos termos do Anexo II a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se

25

without limitation, as provided for in Section 5.1 above, and in the signature of the respective exchange agreement necessary for the remittance of any and all financial funds, resulting from the sale of the Transferred Assets and Assigned Rights, due by the Company to the Secured Party. The Company hereby acknowledges and agrees that the Brazilian Collateral Agent shall, upon the acceleration of the Secured Obligations, on behalf of the Company, sign instruments for the assignment or transfer any Transferred Assets and Assigned Rights , directly with any third party assignee or buyer, as well as representing the Company before the INPI and/or any other competent governmental authority or body for any formalization purposes, registration and/or perfection of such assignment or transfer.

limitar a, conforme disposto na Cláusula 5.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Bens Alienados e Direitos Cedidos, devidos pela Companhia à Parte Garantida. A Companhia reconhece e concorda que o Agente de Garantia Brasileiro poderá, mediante a declaração de um vencimento antecipado das Obrigações Garantidas, em nome da Companhia, assinar instrumentos de venda e cessão, tendo por objeto qualquer dos Bens Alienados e Direitos Cedidos, diretamente com qualquer terceiro comprador ou cessionário, bem como representar a Companhia perante o INPI e/ou qualquer outra autoridade ou órgão governamental competente para fins de qualquer formalização, averbação e aperfeiçoamento de tal cessão ou transferência.

5.4.1    While this Agreement is in force and until the full and complete performance of the Secured Obligations, the Power of Attorney shall be renewed annually by the Company with at least thirty (30) days prior to its expiration date.

5.4.1    Enquanto este Contrato estiver em vigor e até o pagamento total das Obrigações Garantidas, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

5.5.    For the purposes of the enforcement of the Fiduciary Lien created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Purchaser as the Brazilian collateral agent in accordance with the provisions of the Notes, under which the Brazilian Collateral Agent is authorized to represent the Secured Party, on its behalf and interest, in court and out-of-court.

5.5.    Para fins de excussão da Garantia Fiduciária constituída pelo presente Contrato, as Partes concordam que o Agente de Garantia Brasileiro foi nomeado pelo Comprador como agente de garantia brasileiro conforme as disposições das Notas, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar a Parte Garantida, em seu nome e interesse, judicial ou extrajudicialmente.

26

5.6. The Fiduciary Lien created by this Agreement shall be cumulative, in addition to, and independent of, every other security interest created in relation to the Secured Obligations.

5.7. The Company and GLAI hereby waive any rights and legal or contractual privileges which may affect the validity, effectiveness, enforceability and full transfer of the Transferred Assets and Assigned Rights in the event of foreclosure.

5.8.    Company undertakes to reimburse or pay in advance the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement or payment in advance request, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred or to be incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this Section V hereto.

5.6. A Garantia Fiduciária criada por este Contrato será cumulativa, somando-se a, e independente de qualquer outra garantia criada em relação às Obrigações Garantidas.

5.7. A Companhia e a GLAI neste ato renunciam a quaisquer direitos e privilégios, legais ou contratuais, que possam afetar a validade, efetividade, aplicabilidade e transferência total dos Bens Alienados e Direitos Cedidos em caso de excussão.

5.8.    A Companhia se compromete a reembolsar ou pagar adiantado ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento do pedido de reembolso ou pagamento adiantado, por todos os custos e despesas (inclusive despesas e honorários advocatícios) necessários e razoáveis incorridos ou a serem incorridos pelo Agente de Garantia Brasileiro, para matérias e questões relacionadas ao disposto nesta Cláusula V deste Contrato.

**SECTION VI**
**COSTS AND EXPENSES**

**CLÁUSULA VI**
**CUSTOS E DESPESAS**

6.1.    The Company undertakes to pay all notarial and registration fees triggered by this Agreement, as well as all taxes, fees or other costs that may be required by INPI or any other competent authority to keep the Fiduciary Lien the Intellectual Property and the other Transferred Assets and Assigned Rights in full effect and validity.

6.1.    A Companhia se obriga a pagar todas as taxas notariais e de registro desencadeadas por este Contrato, bem como todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou qualquer outra autoridade competente para manter a Garantia Fiduciária a Propriedade Intelectual e os demais Bens Alienados e Direitos Cedidos plenamente vigentes e válidos.

6.2. All expenses incurred by the Brazilian Collateral Agent, acting on behalf and for the benefit of the Purchaser under this Agreement, including those related to the sale/negotiation of Transferred Assets and Assigned Rights, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Company does not timely perform the transfer of the amounts mentioned herein.

6.3. The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Notes and the proposal for the collateral agent services provisions to be executed.

6.4. The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, as well as indemnity or guarantee to its satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

6.2. Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício do Comprador, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Bens Alienados e Direitos Cedidos, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem como as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.3. A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos das Notas e da proposta para prestação de serviços de agente de garantia a ser celebrada.

6.4. O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

28

## SECTION VII
## BRAZILIAN COLLATERAL AGENT

7.1. The Brazilian Collateral Agent has been appointed, in accordance with the Notes, by the Purchaser and is authorized to perform acts on behalf of the Secured Party and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.2. The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), (c) except as

## CLÁUSULA VII
## AGENTE DE GARANTIA BRASILEIRO

7.1. O Agente de Garantia Brasileiro foi nomeado, de acordo com os termos das Notas, pelo Comprador e está autorizado a praticar atos em nome da Parte Garantida e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2. O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem

29

expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLAI and/or the Issuers or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Purchaser or in the absence of his own gross negligence, or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Purchaser, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this

exercidos (ou não) pelo Agente de Garantia Brasileiro), (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLAI e/ou às Emissoras ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, recuperação judicial ou extrajudicial, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, recuperação judicial ou extrajudicial, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do Comprador ou na ausência de sua própria negligência grave ou conduta dolosa, conforme sentença judicial transitada em julgado proferida por um juízo competente. O Agente de Garantia Brasileiro não será considerado como tendo

Agreement and the Notes, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Notes, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent .

conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo Comprador, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e às Notas, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou nas Notas, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro.

7.3.    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Notes). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido nas Notas). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros

31

him in accordance with the advice of any said lawyer, auditor or expert.

especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4.    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5.    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide or file any financing statements or continuation statements, or to be responsible for maintaining the security to be created as described in this Agreement (except the custody of the any security provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Company. The Brazilian Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Transferred Assets and Assigned Rights in its possession, if applicable, shall be to deal with

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente ou arquive declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia. O único dever do Agente de Garantia Brasileiro com relação à custódia, guarda e preservação física dos Bens Transferidos e Direitos Cedidos em sua

32

it in the same manner as the Brazilian Collateral Agent deals with similar property for the account of other customers in similar transactions. The Brazilian Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

7.6. In order to effect the transfer of any amounts received as a result of the enforcement of this Agreement, the Brazilian Collateral Agent may perform a foreign exchange transaction to convert into dollars any amount in Brazilian *reais*, resulting from such enforcement; except that possible deductions of any commissions or taxes charged such foreign exchange transactions and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Purchaser. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives the applicable instructions and documents to perform such foreign exchange transaction; and (b) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds in accordance with applicable foreign exchange regulations; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses or damages resulting from

posse, se aplicável, será tratá-los da mesma forma que o Agente de Garantia Brasileiro lida com bens similares como representante de outros clientes em transações semelhantes. O Agente de Garantia Brasileiro responderá apenas pelos valores que efetivamente receber em decorrência do exercício de seus direitos e poderes.

7.6. A fim de realizar a transferência de quaisquer valores recebidos em decorrência da excussão deste Contrato, o Agente de Garantia Brasileiro poderá realizar uma operação de câmbio para converter em dólares qualquer valor em reais decorrente da referida excussão; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo Comprador. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber as instruções e documentos aplicáveis para realizar referida operação de câmbio; e (b) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos, de acordo com a regulamentação de câmbio aplicável; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas decorrentes de possíveis atrasos ou

possible delays or impediments to the performance of a foreign exchange transaction and/or transfer, nor as the impossibility to perform a foreign exchange transaction or transfer. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement or with respect to the transfer of any funds as a result hereof.

impedimentos à realização de uma operação de câmbio e/ou transferências, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato ou a qualquer transferência de quaisquer fundos como resultado desse Contrato.

7.7.   The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.7.   O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.   In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.8.   Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.   The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other

7.9.   O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a

34

transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10.    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control – OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 7.10.

7.11.    Any and all payments by the Issuers, the Company and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, the Issuers, the Company and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral

indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros – OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11.    Todos e quaisquer pagamentos pelas Emissoras, pela Companhia e/ou pela GLAI para o em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, as Emissoras, a Companhia e/ou a GLAI, conforme o caso, pagará

35

Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.12.    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Notes.

7.13.    For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Purchaser.

7.14.    Upon at least thirty (30) days' notice, the Brazilian Collateral Agent may resign at any time as Brazilian Collateral Agent under this Agreement and the other Transaction Documents by notifying the Purchaser and the Company. Upon any resignation by the Brazilian Collateral Agent, any obligor under the Notes shall have the right (provided that no Event of Default has occurred and continues), to appoint a successor collateral agent or, if an Event of Default has occurred and is continuing, the Purchaser shall have the right to appoint a successor collateral agent. If no successor has been so appointed and has accepted such appointment within thirty (30) days after the date the Brazilian

imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação às Notas.

7.13.    Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do Comprador.

7.14.    Com pelo menos 30 (trinta) dias de antecedência, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento como Agente de Garantia Brasileiro de acordo com este Contrato e com outros Documentos da Transação notificando o Comprador e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, qualquer devedor das Notas terá o direito de (desde que nenhum Evento de Inadimplemento tenha ocorrido e continue), nomear um agente sucessor ou, se um Evento de Inadimplemento tiver ocorrido e continuando, o Comprador terá o direito de nomear um agente de garantia sucessor. Se nenhum agente de garantia brasileiro

36

Collateral Agent gives notice of its resignation, then the resigning Brazilian Collateral Agent may (but shall not be obligated to) (a) upon consent (provided that no Event of Default or Default has occurred and continues) of the Company (consent of which shall not be unreasonably withheld or delayed), at the cost and expense of the Company, appoint a successor collateral agent or (b) petition any court of competent jurisdiction, at the cost and expense of the Company, for the appointment of a successor collateral agent. Whether or not a successor has been appointed, the Brazilian Collateral Agent's resignation shall become effective in accordance with the Brazilian Collateral Agent's notice of resignation on the date specified in such notice, and the resigning Brazilian Collateral Agent will be released from its duties and obligations under this Agreement and the other Transaction Documents on such Date. Upon acceptance of a successor collateral agent of its appointment as a Brazilian Collateral Agent under this Agreement and the other Transaction Documents, such successor will succeed and have all rights, powers, privileges and duties of the resigning Brazilian Collateral Agent, and the resigning Brazilian Collateral Agent will be released from its duties and obligations under the Notes and this Agreement (if not released sooner, as provided above). The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor. Any Person into which the Brazilian Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the

sucessor tiver sido nomeado e aceitado tal nomeação dentro de 30 (trinta) dias após a data em que o Agente de Garantia Brasileiro renunciante notificou sua renúncia, então o Agente de Garantia Brasileiro renunciante poderá (mas não será obrigado a) (a) mediante consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e continue) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), ao custo e às expensas da Companhia nomear um agente de garantia sucessor ou (b) peticionar a qualquer tribunal competente, às custas e despesas da Companhia, a nomeação de um agente de garantia sucessor. Quer tenha ou não sido nomeado um sucessor, a renúncia do Agente de Garantia Brasileiro entrará em vigor de acordo com o aviso de renúncia do Agente de Garantia Brasileiro na data especificada em tal aviso, e o Agente de Garantia Brasileiro renunciante será liberado de seus deveres e obrigações nos termos deste Contrato e dos demais Documentos da Transação em tal data. Mediante a aceitação de um agente de garantia sucessor de sua nomeação como agente de garantia brasileiro, nos termos deste Contrato e dos Documentos da Transação, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro renunciante, e o Agente de Garantia Brasileiro renunciante será liberado de seus deveres e obrigações nos termos das Notas e deste Contrato (se não for liberado antes, como previsto acima). Os honorários devidos pela Companhia ao agente de garantia sucessor serão os mesmos contratados com relação ao Agente de Garantia Brasileiro renunciante, salvo se acordado de outra maneira entre a Companhia e tal agente de

37

Brazilian Collateral Agent shall be a party, or any Person succeeding to the corporate trust business of the Brazilian Collateral Agent shall be the successor of the Brazilian Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the Parties hereto, except where an instrument of transfer or assignment is required by Law to effect such succession, anything herein to the contrary notwithstanding.

garantia brasileiro sucessor. Qualquer Pessoa na qual o Agente de Garantia Brasileiro possa ser fundido ou incorporado, ou qualquer Pessoa resultante de qualquer fusão, conversão, combinação, consolidação, transformação ou incorporação, conforme aplicável, em que o Agente de Garantia Brasileiro seja parte, ou qualquer Pessoa que suceda os deveres fiduciários do Agente de Garantia Brasileiro será o sucessor do Agente de Garantia Brasileiro nos termos deste Contrato e das Notas, sem necessidade de assinatura ou arquivamento de qualquer documento com qualquer Parte deste Contrato ou qualquer outro ato por parte de qualquer uma das Partes, exceto quando um instrumento de transferência ou cessão for exigido por Lei para efetuar tal sucessão, não obstante qualquer disposição em contrário.

## SECTION VIII
## MISCELLANEOUS

## CLÁUSULA VIII
## DISPOSIÇÕES GERAIS

8.1. <u>Definitions</u>. Capitalized terms used in this Agreement and its Exhibits and not otherwise defined herein will have the meaning assigned to them in the Notes, unless otherwise defined in this Agreement.

8.1. <u>Definições</u>. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles nas Notas, exceto se definido de outra maneira neste Contrato.

8.1.1. For the purposes of this Agreement, "<u>Business Day</u>" means any day other than Sunday, Saturday or a public holiday in Brazil, or that day when commercial banks in the cities of Rio de Janeiro and São Paulo are authorized or required by law to close.

8.1.1. Para fins deste Contrato, "<u>Dia Útil</u>" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados ou obrigados por lei a fechar.

8.2. <u>Amendments</u>. This Agreement may be amended, replaced, cancelled, renewed or

8.2. <u>Alterações</u>. Este Contrato somente poderá ser aditado, substituído, cancelado, renovado ou prorrogado e seus termos

38

extended, and its terms may be waived, only upon written instrument signed by all Parties.

8.3.    <u>Severability</u>. If any provision of this Agreement is held void or ineffective by court decision, the validity or enforceability of the remaining provisions shall not be affected, and the latter shall remain in full force and effect, being the Parties committed, within the shortest term possible, to engage in good-faith negotiations to replace the ineffective provision by another that, to the greatest extent possible and in a reasonable manner, reaches the intended purposes and effects.

8.4.    <u>Irrevocability, Effectiveness</u>. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Purchaser.

8.4.1.    When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Transferred Assets and Assigned Rights from any encumbrance which is still in force in accordance with the provisions herein.

8.5.    <u>Amendments, Successors and Assignees</u>. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and

somente poderão ser renunciados, mediante instrumento escrito assinado por todas as Partes.

8.3.    <u>Independência das Cláusulas</u>. Se qualquer disposição deste Contrato for considerada nula ou ineficaz por decisão judicial, a validade ou exequibilidade das remanescentes não será afetada, as quais permanecerão em pleno vigor e vigência, comprometendo-se as Partes, no menor prazo possível, a negociarem, de boa-fé, a substituição da disposição ineficaz por outra que, na máxima extensão possível e de maneira razoável, atenda aos fins e propósitos pretendidos.

8.4.    <u>Irrevocabilidade, Vigência</u>. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo Comprador.

8.4.1.    Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação dos Bens Alienados e Direitos Cedidos de qualquer gravame que ainda esteja em vigor de acordo com as disposições deste Contrato.

8.5.    <u>Aditivos, Sucessores e Cessionários</u>. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições

39

provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Notes, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Notes. Except as provided in the Notes, neither Party may assign or transfer any of its rights or obligations under this Agreement.

aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório às Notas, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes das Notas. Salvo nos casos previstos nas Notas, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.   Guarantees. The Fiduciary Lien provided for in this Agreement shall be additional to and independent of any other security that the Secured Party may at any time be entitled to under the Notes and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Party or the Brazilian Collateral Agent to enforce such additional guarantees.

8.6.   Garantias. A Garantia Fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que a Parte Garantida possa a qualquer momento ter direito, nos termos das Notas e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade da Parte Garantida ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.   Notices. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

8.7.   Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

For Company:

Para a Companhia:

Address: Comandante Linneu Gomes Square, s/n, Gate 3, Building 24, part, Jardim Aeroporto, Zip Code 04626-020
São Paulo – SP, Brasil
Att: Mario Tswei Liao – mtliao@voegol.com.br

Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo – SP, Brasil
Att: Mario Tswei Liao – mtliao@voegol.com.br

40

For the Brazilian Collateral Agent:

Address: Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edificio Jacarandá, Zip Code 06460-040, Barueri – SP, Brazil

Att: Karla Fernandes

karla.fernandes@tmf-group.com

For GLAI:

Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo

São Paulo – SP, Zip Code 04626-020, Brazil

Att:   Mario   Tswei   Liao   – mtliao@voegol.com.br

8.7.1.  Any and all notifications or other communications made pursuant to this Agreement will be considered valid and delivered on the Business Day following the respective receipt, according to the document signed by the recipient or acknowledgment of receipt, as the case may be.

8.8.   Specific   Performance.   This Agreement is an extrajudicial instrument (*título executivo extrajudicial*) for all purposes of articles 497, 784 and 815 of the Civil Procedure Code and, for the purposes of this Agreement and of each amendment hereto, the Brazilian Collateral Agent, representing the Purchaser, under this Agreement may pursue specific performance of the obligations of Company.

8.9.   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of Brazil.

8.9.1. In order to produce the due legal effects, this Agreement, signed by two

---

Para o Agente de Garantia Brasileiro:

Endereço:  Avenida  Marcos  Penteado  de Ulhoa Rodrigues, nº 939, 10º andar, Edifício Jacarandá, Sala 3, CEP 06460-040, Barueri – SP, Brasil

Att: Karla Fernandes

karla.fernandes@tmf-group.com

Para a GLAI:

Praça  Comandante  Linneu  Gomes,  Portaria 3, Prédio 24, Campo Belo

São Paulo – SP, Brasil

Att:   Mario   Tswei   Liao   – mtliao@voegol.com.br

8.7.1.   Toda e qualquer notificação ou outra comunicação  efetuada  nos  termos  do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento,  conforme  protocolo  assinado pelo  destinatário  ou  aviso  de  recebimento, conforme o caso.

8.8.   Execução Específica. Este Contrato constitui um título executivo extrajudicial para todos os fins dos artigos 497, 784 e 815 do Código de Processo Civil e, para os fins deste Contrato e de todos os aditivos a este Contrato, o Agente de Garantia Brasileiro representando  o  Comprador,  nos  termos deste Contrato, poderá promover a execução específica das obrigações da Companhia.

8.9.   Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil.

8.9.1.   Para que produza os devidos efeitos legais,  este  Contrato,  assinado  por  duas

41

witnesses, constitutes an extrajudicial enforcement instrument (*título executivo extrajudicial*) that may be the subject to enforcement proceedings under the terms of article 784, item III of the Civil Procedure Code.

8.10.    Jurisdiction.    Any disputes or controversies arising from this Agreement will be settled by the court of the City São Paulo, State of São Paulo, which will also be the competent jurisdiction to enforce the obligations established herein.

8.11.    Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Notes, and all provisions of the Notes are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12.    Language.    This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13.    Electronic    Signature.    This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness

testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10.    Foro.    Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11.    Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos nas Notas, sendo que todas as disposições das Notas são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis

8.12.    Idioma. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em português irá prevalecer.

8.13.    Assinatura Eletrônica. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos os fins legais.

42

of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14.    This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

**IN WITNESS WHEREOF**, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

São Paulo, March 2, 2023.

(*remainder of the page intentionally left blank*)

8.14.    Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, 2 de março de 2023.

(*restante da página intencionalmente deixado em branco*)

*(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023*)

*(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023)*

### GOL LINHAS AÉREAS S.A.

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023*) | *(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023)* |

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____     _____
*Name*/Nome:                          *Name*/Nome:
*Title*/Cargo:                        *Title*/Cargo:

*(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023)*

*(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023)*

## GOL LINHAS AÉREAS INTELIGENTES S.A.

_____

*Name*/Nome:
*Title*/Cargo:

_____

*Name*/Nome:
*Title*/Cargo:

46

*(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023)*

*(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023)*

**WITNESSES/TESTEMUNHAS**

_____

Name/Nome:

Tax ID /CPF:

ID/RG:

_____

Name/Nome:

Tax ID /CPF:

ID/RG:

| | |
|---|---|
| **EXHIBIT I** | **ANEXO I** |

**EXHIBIT I**

to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023.

**DESCRIPTION OF SECURED OBLIGATIONS**

**GOL FINANCE SENIOR SECURED NOTE**

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Maturity Date: March 2, 2028;

Interest Rate: 18.00% (eighteen per cent) per year, calculated and paid in accordance with GOL SSN;

Default interest: as provided for in the GOL SSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL SSN;

Penalty Clause: not applicable;

---

**ANEXO I**

ao Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023.

**DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS**

**NOTA SÊNIOR GARANTIDA GOL FINANCE**

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Data de Vencimento: 2 de março de 2028;

Taxa de Juros: 18,00% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL SSN;

Juros de Mora: conforme previsto na GOL SSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN;

Cláusula Penal: não aplicável;

48

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL SSN.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na GOL SSN.

### GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE

### NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Data de Vencimento: 2 de março, 2028;

Maturity Date: March 2, 2028;

Interest Rate: 18% (eighteen per cent) per year, calculated and paid in accordance with GOL ESSN;

Taxa de Juros: 18% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL ESSN;

Default interest: as provided for in GOL ESSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL ESSN;

Juros de Mora: conforme previsto na GOL ESSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL ESSN

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

49

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT**

Amount: USD 10,000.00 (ten Thousand U.S. dollars) set-up fee and USD 12,000.00 (twelve thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (one percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO**

Valor: taxa de contratação de US$ 10.000,00 (dez mil dólares Norte-Americanos) e US$ 12.000,00 (doze mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

50

| EXHIBIT II | ANEXO II |
|---|---|
| **to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023.** | **ao Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023.** |
| **Form of Power of Attorney** | **Modelo de Procuração** |
| **POWER OF ATTORNEY** | **PROCURAÇÃO** |
| By this power of attorney, **GOL LINHAS AÉREAS S.A.**, a corporation organized and existing under the laws of Brazil, headquartered in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46-48/0-P, Zip Code 20021-340, enrolled with the National Register of Legal Entities of the Ministry of Finance ("CNPJ") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GRANTOR"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Party, in accordance with the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into on March 2, 2023 among the GRANTOR, the GRANTEE and Gol Linhas Aéreas S.A. ("Agreement") (hereinafter referred to as the "GRANTEE"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with | Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "OUTORGANTE"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Avenida Marcos Penteado de Ulhoa Rodrigues, n° 939, 10° andar, Edifício Jacarandá, Sala 3, CEP 06460-040, inscrita no CNPJ sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício da Parte Garantida, nos termos do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado em 2 de março de 2023 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("Contrato") (doravante denominado "OUTORGADO"), conferindo ao |

| | |
|---|---|
| articles 653, 654, 684, 685 and 686, sole paragraph, of the Brazilian Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts: | OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil Brasileiro, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir: |

1. practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows:

   (a) to dispose of, sell, assign, transfer, collect, receive, take possession of and/or foreclose all or part of the Transferred Assets and Assigned Rights or otherwise dispose of, and deliver the Transferred Assets and Assigned Rights under the Agreement and as established in article 1,364 of the Brazilian Civil Code, and apply the product received to the payment of the Secured Obligations under the Agreement;

   (b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Transferred Assets and Assigned Rights and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Transferred Assets and Assigned Rights and represent the GRANTOR before third parties for the purpose of releasing the Fiduciary Lien, disposal of the Transferred Assets and Assigned Rights and transfer of the funds resulting from such disposal;

1. praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem:

   (a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Bens Alienados e Direitos Cedidos ou dispor de qualquer outro modo e entregar os Bens Alienados e Direitos Cedidos nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil Brasileiro, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato;

   (b) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Bens Alienados e Direitos Cedidos e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com relação aos Bens Alienados e Direitos Cedidos e representar a OUTORGANTE perante terceiros para fins da liberação da Garantia Fiduciária, alienação e cessão dos Bens Alienados e Direitos Cedidos e transferência dos recursos resultantes de tal alienação;

2.  sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Party, in accordance with the terms and limits of the Agreement;

3.  to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, the INPI, the Center for Information and Coordination of the Dot BR (*Núcleo de Informação e Coordenação do Ponto BR – NIC.br*), the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

4.  to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Transferred Assets and Assigned Rights, represent the GRANTOR before any competent Registry Office of Deeds and Documents, the INPI and/or any other governmental body in which the Agreement or its respective amendments shall be registered;

2.  assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE à Parte Garantida, de acordo com os termos e limites do Contrato;

3.  na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos, o INPI, o Núcleo de Informação e Coordenação do Ponto BR – NIC.br, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4.  na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às aos Bens Alienados e Direitos Cedidos, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente, INPI e/ou qualquer outro órgão governamental nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

<table>
<tr>
<td>

5. enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Foreign Capital Operations with the Central Bank of Brazil and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the Secured Party, as provided for in the Agreement; and

6. exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Brazilian Civil Code, in accordance with the terms and conditions set forth in the Agreement.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Brazilian Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

</td>
<td>

5. celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituições financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações de Capital Estrangeiro junto ao Banco Central do Brasil aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para a *Parte Garantida*, conforme previsto no Contrato; e

6. exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil Brasileiro, de acordo com os termos e condições previstos no Contrato.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil Brasileiro. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

</td>
</tr>
</table>

- 54 -

| | |
|---|---|
| The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement. | Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato. |
| Rio de Janeiro, [•], 2023. | Rio de Janeiro, [•] de 2023. |
| **GOL LINHAS AÉREAS S.A.**<br>[SIGNATURE FIELD] | **GOL LINHAS AÉREAS S.A.**<br>[CAMPO DE ASSINATURA] |

**EXHIBIT III/ANEXO III**

**List of Intelectual Property / Lista das Propriedades Intelectuais**

1. **Internet Domains (*Domínios de Internet*)**

   **(LIST OF ASSETS BELOW / LISTA DE ATIVOS A SEGUIR)**

2. **Trademarks** *(Marcas Registradas)*

    **(LIST OF ASSETS BELOW / LISTA DE ATIVOS A SEGUIR)**

**EXHIBIT IV/ANEXO IV**

**Form of Amendment to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants / Modelo de Aditamento do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças**

**[•] AMENDMENT TO THE FIDUCIARY TRANSFER AND ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS AND ASSETS AGREEMENT AND OTHER COVENANTS**

This Amendment to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants ("Amendment") is entered into by and among:

(i)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46-48/O-P, Zip Code 20021-340 enrolled with the National Registry of Legal Entities of the Ministry of Finance ("CNPJ" under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA" or "Company");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Purchaser

**[•] ADITAMENTO AO CONTRATO DE ALIENAÇÃO E CESSÃO FIDUCIÁRIA DE BENS E DIREITOS DE PROPRIEDADE INTELECTUAL E OUTRAS AVENÇAS**

O presente Aditamento ao Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças ("Aditamento") é celebrado por e entre:

(i)     **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ" sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLA" ou "Companhia");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Avenida Marcos Pentado de Ulhoa Rodrigues, nº 939, 10º andar, Edifício Jacarandá, Sala 3, CEP 06460-040, inscrita no CNPJ sob o nº 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício do Comprador

(hereinafter referred to as "Brazilian Collateral Agent");

(iii) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, Zip Code 04626-020, enrolled with CNPJ under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

**WHEREAS:**

(i)         [●]

(ii) As security for the Secured Obligations, the Parties entered into the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants , dated of March 2, 2023 ("Agreement"), through which the Company granted to the Secured Party (represented by the Brazilian Collateral Agent) a fiduciary lien over of the intellectual properties related to the Smiles loyalty/fidelity program owned by the Company, including as universal successor of Smiles Fidelidade S.A., according to the terms and conditions set forth in the Agreement; and

(iii)     Pursuant to Section 1.2 of the Agreement, the Company wishes to formalize the extension the Fiduciary Transfer (as defined in the Agreement) created in the Agreement to the Additional Assets and Rights (as defined in the Agreement) by entering into this Amendment, and perfect such Fiduciary Lien by taking, with respect to this Amendment, the actions provided for in Section

(doravante designado "Agente de Garantia Brasileiro");

(iii) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no CNPJ sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI");

Cada parte acima também são doravante individualmente designadas como "Parte" e, em conjunto, como "Partes";

**CONSIDERANDO QUE:**

(i)         [●]

(ii) Como garantia das Obrigações Garantidas, as Partes celebraram o Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças, datado de 2 de março de 2023 ("Contrato"), através do qual a Companhia constituiu em favor da Parte Garantida (representada pelo Agente de Garantia Brasileiro) uma garantia fiduciária sobre suas propriedades intelectuais, inclusive como sucessora universal da Smiles Fidelidade S.A., referentes ao programa de fidelidade Smiles, segundo os termos e condições estabelecidos no Contrato; e

(iii)     De acordo com a Cláusula 1.2 do Contrato, a Companhia deseja formalizar a extensão da Garantia Fiduciária (conforme definida no Contrato) criada no Contrato aos Bens e Direitos Adicionais (conforme definido no Contrato), celebrando este Aditamento e aperfeiçoar tal Garantia Fiduciária tomando, com respeito a este Aditamento, as medidas

2.1 of the Agreement (or any other action required to be taken pursuant to the then applicable laws).

**NOW, THEREFORE**, the Parties agree to enter into this Amendment under the following terms and conditions:

1   All capitalized terms used and not defined herein shall have the respective meanings set forth in the Agreement.

2   The Company hereby transfers, pursuant to Section 1.2 of the Agreement, irrevocably assigns, sells and transfers, as the case may be, to the Secured Party, represented by the Brazilian Collateral Agent, pursuant to the provisions of articles 1,361 et seq. of the Brazilian Civil Code, and under the same conditions as provided for in the Agreement, the fiduciary ownership, the conditional property and the indirect possession of all Additional Assets and Rights listed in Appendix A hereto (and which were not originally included in the Agreement, nor in any subsequent amendment thereto), free and clear of any liens, encumbrances or restrictions, under the terms and conditions set forth in the Agreement. The Parties' rights and obligations under the Agreement shall be applicable *mutatis mutandis* to the Additional Assets and Rights transferred hereunder and such Additional Assets and Rights shall be treated as "Transferred Assets and Assigned Rights" for all purposes of the Agreement. In addition, the Company lists in Appendix A hereto all other Transferred Assets and Assigned Rights already granted as collateral until the present date, so that Appendix A hereto

previstas na Cláusula 2.1 do Contrato (ou qualquer outra medida que deva ser tomada de acordo com as leis aplicáveis na ocasião).

**RESOLVEM**, as Partes, celebrar este Aditamento, de acordo com os seguintes termos e condições:

1   Todos os termos iniciados em maiúscula utilizados e não diversamente definidos neste documento terão os respectivos significados estabelecidos no Contrato.

2   A Companhia pela presente na forma da Cláusula 1.2 do Contrato, cede, aliena e transfere, conforme o caso, à Parte Garantida, representada pelo Agente de Garantia Brasileiro transfere, segundo o disposto nos artigos 1.361 e seguintes do Código Civil Brasileiro e sob as mesmas condições previstas no Contrato, a propriedade fiduciária, o domínio resolúvel e a posse indireta dos Bens e Direitos Adicionais listados no Apêndice A deste documento (e que não foram originalmente incluídos no Contrato, nem em qualquer alteração posterior ao mesmo), livres e desembaraçados de quaisquer ônus, gravames ou restrições, nos termos e condições previstos no Contrato. Os direitos e obrigações das Partes nos termos do Contrato serão aplicáveis *mutatis mutandis* aos Bens e Direitos Adicionais ora transferidos e tais Bens e Direitos Adicionais serão tratados como "Bens Alienados e Direitos Cedidos" para todos os fins do Contrato. Além disso, a Companhia lista no Apêndice A deste documento todos os demais Bens Alienados e Direitos Cedidos já dados em garantia até a presente data, de modo que o Apêndice A deste documento atualiza e substitui o Anexo III do Contrato.

updates and replaces Exhibit III to the Agreement.

3    In consideration of the foregoing, the undersigned hereby agree to replace Exhibit III of the Agreement, which shall become effective as of the present date in the form of Appendix A hereto, being an inseparable part of the Agreement for all purposes.

4    The Company hereby declares to the Secured Party and to the Brazilian Collateral Agent that the representations and warranties made by it in the Agreement are true and correct as if made on the date hereof and apply *mutatis mutandis* to this Amendment and to the Additional Assets and Rights transferred herein, as if they were fully written here.

5    All provisions of the Agreement that have not been expressly amended or modified herein shall remain in full force and effect pursuant to the terms of the Agreement and shall apply *mutatis mutandis* to this Amendment as if they were fully written here.

6    This Amendment shall be governed and construed in accordance with the laws of the Federative Republic of Brazil.

7    The Parties hereby elect the courts of the City of Sao Paulo, State of Sao Paulo, as competent to hear any lawsuits or proceedings aimed at resolving any dispute or controversy arising from this Amendment, without prejudice to any other Court that may have jurisdiction over it.

3    Em consideração ao acima exposto, os signatários concordam em substituir o Anexo III do Contrato, que passará a viger na presente data na forma do Apêndice A deste documento, constituindo parte inseparável do Contrato para todos os fins.

4    A Companhia neste ato declara à Parte Garantida e ao Agente de Garantia Brasileiro que as declarações e garantias por ela prestadas no Contrato são verdadeiras e corretas como se fossem feitas na data do presente e se aplicam *mutatis mutandis* a este Aditamento e aos Bens e Direitos Adicionais aqui transferidos, como se fossem totalmente escritas aqui.

5    Todas as disposições do Contrato que não tenham sido expressamente alteradas ou modificadas neste ato permanecerão em pleno vigor e efeito nos termos do Contrato e aplicar-se-ão *mutatis mutandis* a este Aditamento como se estivessem aqui integralmente reproduzidas.

6    Este Aditamento será regido e interpretado de acordo com as leis da República Federativa do Brasil.

7    As Partes elegem os tribunais da Cidade de São Paulo, Estado de São Paulo, como competentes para conhecer de qualquer ação ou procedimento que tenha por objetivo resolver qualquer disputa ou controvérsia decorrente desta Alteração, sem prejuízo de qualquer outro tribunal que possa ter jurisdição sobre ela.

For the purposes of the law, the Parties execute this Amendment in the presence of 2 (two) undersigned witnesses.

*(Include the signatures of the parties and witnesses)*

_____

**(●)**

**Appendix A**

**[include relevant exhibit]**

Para os efeitos da lei, as Partes celebram esta Alteração na presença de duas (2) testemunhas abaixo assinadas.

*(Incluir as assinaturas das partes e das testemunhas).*

_____

**(●)**

**Apêndice A**

**[incluir anexo relevante]**

**EXHIBIT V/ANEXO V**

**List of Smiles Technological Infrastructure Assets/ Lista de Ativos da Infraestrutura Tecnológica Smiles**

| | |
|---|---|
| The license agreement to use the LIFERAY digital platform, on which the Smiles website was developed; | Contrato de licença de uso da plataforma digital LIFERAY, em que foi desenvolvido o site Smiles; |
| License agreement for the use of the Zendesk platform, through which all customer service is carried out; | Contrato de licença de uso da plataforma Zendesk, por meio da qual é feito todo o atendimento aos clientes; |
| License agreement for the use of the Pager Duty program, which generates alarms when monitoring transactions in the APM system and sends such alarms to the Slack system; | Contrato de licença de uso do programa Pager Duty, que gera alarmes ao efetuar o acompanhamento de transações no sistema APM e envia tais alarmes ao sistema Slack; |
| License agreement to use the Slack system; | Contrato de licença de uso do sistema Slack; |
| Service contract for the use of the B2E Prevention tool for fraud prevention; and | Contrato de prestação de serviço para utilização da ferramenta B2E Prevenção, para prevenção de fraude; e |
| License agreement for the B2E Billing software. | Contrato de licença de uso do software B2E Faturamento. |

**EXHIBIT VI/ANEXO VI**

**List of Operating Manuals / Lista de Manuais Operacionais**

- Smiles Program Regulation;

- Smiles Club Regulation;

- Main Smiles Program Operational and Commercial Rules.

- Regulamento do Programa Smiles;

- Regulamento do Clube Smiles;

- Principais Regras Operacionais e Comerciais do Programa Smiles.

**EXHIBIT E**

**FORM OF**
**FORM OF EXCLUSIVITY SIDE LETTER**

#4856-1598-7531v19

GOL EQUITY FINANCE
GOL LINHAS AÉREAS INTELIGENTES S.A.
GOL LINHAS AÉREAS S.A.

March 2, 2023

Abra Global Finance
Abra Group Limited
1 Ashley Road, Third Floor
Altrincham, Cheshire, WA14 2DT, United Kingdom

      Re:    Smiles Loyalty Program

Ladies and gentlemen:

Each of undersigned, GOL Equity Finance, GOL Linhas Aereas Inteligentes S.A., GOL Linhas Aereas S.A., Smiles Fidelidade S.A. (collectively, the "GOL Entities"), hereby, jointly and severally, agrees for your benefit that:

(a) it shall not, and shall ensure that their respective subsidiaries do not, directly or indirectly, for their own account or on behalf of or together with any other person or entity, carry on, own, manage, control, operate, develop, create, invest in, have any financial interest in (as shareholder or otherwise), or participate in or be engaged in (whether as shareholder, advisor, a partner of a partnership firm, designated partner of a limited liability partnership, or proprietor of a proprietorship firm, or any other entity whether registered under applicable law or otherwise), any undertaking, venture, business, person or entity (including, but not limited to, any joint venture, partnership or other arrangement of whatsoever nature) that is engaged in a similar business to the Smiles loyalty program or any successor program (the "Loyalty Program"); and

(b)    the Loyalty Program is, and will be, the sole and exclusive loyalty program of each of the GOL Entities and their respective subsidiaries; provided that the Loyalty Program may be expanded to be the loyalty program of both the GOL Entities (and their respective subsidiaries) and another airline so long as such expansion is not adverse to any of the GOL Entities.

Upon a breach of any of the foregoing, each of the GOL Entities hereby agrees, jointly and severally, to pay you an amount equal to USD 3,500,000,000.00 (three billion five hundred million dollars), which is the amount of the appraised value of the Loyalty Program as of the date hereof. The foregoing amount constitutes a reasonable estimate of the losses that will be suffered by you by reason of any such breach and the GOL Entities hereby agree that they will not seek revision of such amount, including on the grounds of excessiveness. In case the actual losses suffered by you exceed the foregoing amount, the penalty clause will be considered as the minimum compensation due to you.

Each party hereto acknowledges and agrees that each of the agreements set forth herein is an integral part of this letter agreement between the parties hereto. This letter agreement shall be governed by, and construed in accordance with, the laws of Brazil. Each party hereto irrevocably

1

and unconditionally submits to the exclusive jurisdiction of the courts of São Paulo, SP, in any action or proceeding arising out of or relating to this letter agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court. Each of the parties hereto hereby irrevocably waives, to the fullest extent by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

No party hereto may assign this letter agreement or any rights or obligations under it and any such purported assignment shall be null and void. Each GOL Entity will, jointly and severally, indemnify, defend and hold you, your officers, employees and agents harmless against all obligations, demands, claims, and liabilities asserted by any party in connection with this letter agreement and all losses or expenses incurred, or paid by you from, following, or consequential to the breach by any of the GOL Entities of its agreement set forth in this letter agreement by you (including without limitation attorneys' fees and expenses in connection with the foregoing).

Each provision of this letter agreement is severable from every other provision in determining the enforceability of any provision. This letter agreement may not be amended in any respect by the parties hereto without the prior written consent of (i) The Bank of New York Mellon, as indenture trustee (the "CSSN Indenture Trustee") under the Indenture, dated as of March 2, 2023 (as may be amended, modified or supplemented from time to time the "CSSN Indenture"), made by Abra Global Finance as issuer of the Senior Secured Exchangeable Notes due 2028 and (ii) The Bank of New York Mellon, as indenture trustee under the Indenture, dated as of March 2, 2023 (as may be amended, modified or supplemented from time to time the "SSN Indenture"), made by Abra Global Finance as issuer of the Senior Secured Notes due 2028 (the "SSN Indenture Trustee" and together with the CSSN Indenture Trustee, the "Indenture Trustees"), which Indenture Trustees shall be express and intended third party beneficiaries hereunder for all purposes. This letter agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, are an original, and all taken together, are one agreement.

GOL EQUITY FINANCE

By:
    Name:
    Title:


By:
    Name:
    Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.

BUSINESS.29886148.3

By:
 Name:
 Title:


By:
 Name:
 Title:


GOL LINHAS AÉREAS S.A.


By:
 Name:
 Title:


By:
 Name:
 Title:


SMILES FIDELIDADE S.A.


Name:
Title:


Name:
Title:


ACKNOWLEDGED AND AGREED:

ABRA GLOBAL FINANCE


By: _____
 Name:
 Title:


3

ACKNOWLEDGED AND AGREED:

ABRA GROUP LIMITED


By: _____
       Name:
       Title:

**EXHIBIT F**

**FORM OF
SUBORDINATION AGREEMENT**

FORM OF

SUBORDINATON AGREEMENT

Among

**GOL FINANCE,**
as Company,

**GOL LINHAS AÉREAS S.A.,**
as Guarantor,

**ABRA GROUP LIMITED,**
as Senior Priority Representative for the Senior Secured Note Purchase Agreement Secured
Parties,

[ ● ],
as Subordinated Priority Representative for the Subordinated Parties,

and

each additional Representative from time to time party hereto

dated as of [ ● ], 2[ ● ]

BUSINESS.29957598.2

**SUBORDINATION AGREEMENT** dated as of [ ● ], 2[ ● ] (this "Agreement"), among GOL FINANCE, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg ("**Luxembourg**"), with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 as issuer (the "**Company**" or the "**Issuer**"), the Guarantors, ABRA GROUP LIMITED., as Senior Priority Representative for the Secured Parties (in such capacity and together with its successors in such capacity, the "Senior Agent"), [ ● ], as Subordinated Priority Representative for the Subordinated Parties (in such capacity and together with its successors in such capacity, the "Subordinated Agent"), and each additional Senior Priority Representative and Subordinated Priority Representative that from time to time becomes a party hereto pursuant to Section 8.09.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Senior Agent (for itself and on behalf of the Secured Parties), the Subordinated Agent (for itself and on behalf of the Subordinated Parties) and each additional Subordinated Priority Representative (for itself and on behalf of the Additional Subordinated Parties under the applicable Additional Subordinated Debt Facility) agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01    *Certain Defined Terms*. Capitalized terms used but not otherwise defined herein have the meanings set forth in the Senior Secured Note Purchase Agreement or, if defined in the New York UCC, the meanings specified therein. As used in this Agreement, the following terms have the meanings specified below:

"Additional Subordinated Debt" means any Debt that is issued or guaranteed by the Issuer, Guarantor and/or any other Guarantor which Debt and Guarantees are unsecured and subordinated in right of payment priority to the Senior Priority Obligations; provided, however, that (i) such Debt is permitted to be incurred by each Senior Priority Debt Document and Subordinated Priority Debt Document and (ii) the Representative for the holders of such Debt shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof. Additional Subordinated Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Guarantors issued in exchange therefor.

"Additional Subordinated Debt Documents" means, with respect to any series, issue or class of Additional Subordinated Debt, the promissory notes, credit agreements, loan agreements, note purchase agreements, indentures or other operative agreements evidencing or governing such Debt.

"Additional Subordinated Debt Facility" means each credit agreement, loan agreement, note purchase agreement, indenture or other governing agreement with respect to any Additional Subordinated Debt.

"Additional Subordinated Debt Obligations" means, with respect to any series, issue or class of Additional Subordinated Debt, (a) all principal of, and premium and interest

2

(including, without limitation, any interest which accrues after the commencement of any Bankruptcy Case or which would accrue but for the operation of Bankruptcy Laws, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional Subordinated Debt, (b) all other amounts payable to the related Additional Subordinated Parties under the related Additional Subordinated Debt Documents and (c) any renewals or extensions of the foregoing.

"Additional Subordinated Parties" means, with respect to any series, issue or class of Additional Subordinated Debt, the holders of such Debt or any other Additional Subordinated Debt Obligation, the Representative with respect thereto, any trustee or agent therefor under any related Additional Subordinated Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Issuer or any Guarantor under any related Additional Subordinated Debt Documents.

"Agreement" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Bankruptcy Case" means a case under the Bankruptcy Code or any other Bankruptcy Law.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Laws" means the Bankruptcy Code, and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Class Debt" has the meaning assigned to such term in Section 8.09.

"Class Debt Parties" has the meaning assigned to such term in Section 8.09.

"Class Debt Representatives" has the meaning assigned to such term in Section 8.09.

"Closing Date" means [_____], 2023.

"Credit Party" means the Issuer or any guarantor under any Debt Facility.

"Debt Facility" means any Senior Priority Debt Facility and any Subordinated Debt Facility.

"DIP Financing" has the meaning assigned to such term in Section 6.01.

"Discharge of Senior Priority Obligations" means the payment in full of all Senior Priority Obligations; provided that the Discharge of Senior Priority Obligations shall not be deemed to have occurred in connection with a Refinancing of such Senior Priority Obligations.

3

"<u>Disposition</u>" means any conveyance, sale, lease, assignment, transfer, license or other disposition.

"<u>Guarantor</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Insolvency or Liquidation Proceeding</u>" means:

(1)    any case commenced by or against the Issuer or any other Credit Party under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Issuer or any other Credit Party, any receivership or assignment for the benefit of creditors relating to the Issuer or any other Credit Party or any similar case or proceeding relative to the Issuer or any other Credit Party or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Issuer or any other Credit Party, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of the Issuer or any other Credit Party are determined and any payment or distribution is or may be made on account of such claims.

"<u>Issuer</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Joinder Agreement</u>" means a supplement to this Agreement in the form of Annex II hereof required to be delivered by a Representative to the Senior Priority Representative or Subordinated Representative, as the case may be, pursuant to <u>Section 8.09</u> hereof in order to include an additional Debt Facility hereunder and to become the Representative hereunder for the Subordinated Secured Parties, as the case may be, under such Debt Facility.

"<u>Lien</u>" has the meaning assigned to such term in the Senior Priority Indenture.

"<u>New York UCC</u>" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"<u>Officer's Certificate</u>" has the meaning assigned to such term in <u>Section 8.08</u>.

"<u>Person</u>" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority (as defined in the Senior Priority Indenture as in effect on the date hereof).

"<u>Recovery</u>" has the meaning assigned to such term in <u>Section 6.04</u>.

"<u>Refinance</u>" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for

4

such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, issuers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, loan agreement, note purchase agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Representatives" means the Senior Priority Representatives and the Subordinated Representatives.

"SEC" means the United States Securities and Exchange Commission and any successor agency thereto.

"Senior Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement and shall include any successor as provided in the Senior Priority Indenture.

"Senior Priority Debt Documents" means the documents governing any Senior Priority Debt Facility.

"Senior Priority Debt Facilities" means the Senior Priority Indenture and any Additional Senior Debt Facilities.

"Senior Priority Indenture" means that certain Note Purchase Agreement, dated as of March 1, 2023, governing the Issuer's Senior Secured Notes due 2028, among the Issuer, the Guarantor, the other parties thereto, the Holders from time-to-time party thereto and TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent.

"Senior Priority Obligations" means the "Obligations" as defined in the Senior Priority Indenture.

"Senior Parties" means any holders, lenders, agents or trustees under any Senior Priority Debt Facility.

"Senior Priority Intercreditor Agreement" means (i) each intercreditor agreement substantially in the form of the Intercreditor Agreement (as defined in the Senior Priority Indenture) or (ii) a customary intercreditor agreement in form and substance reasonably acceptable to the Senior Priority Representative with respect to each Senior Priority Debt Facility in existence at the time such intercreditor agreement is entered into and the Issuer, and which provides that the Liens securing all Debt covered thereby shall be of equal priority (but without regard to the control of remedies).

"Senior Priority Representative" means the Senior Agent.

BUSINESS.29957598.2

"Subordinated Indenture" means that certain Subordinated Indenture, dated as of [ ● ], among Guarantor, the Issuer, the holders from time-to-time party thereto, The Bank of New York Mellon, as trustee, and the other parties thereto.

"Subordinated Documents" means the [__] and the other "Loan/Credit Documents" as defined in the [___].

"Subordinated Obligations" means the "Obligations" as defined in the Subordinated Indenture.

"Subordinated Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement and shall include any successor administrative agent as provided in the Subordinated Indenture.

"Subordinated Class Debt" has the meaning assigned to such term in Section 8.09.

"Subordinated Class Debt Parties" has the meaning assigned to such term in Section 8.09.

"Subordinated Class Debt Representative" has the meaning assigned to such term in Section 8.09.

"Subordinated Debt Documents" means (a) the Subordinated Indenture Documents and (b) any Additional Subordinated Debt Documents.

"Subordinated Debt Facilities" means the Subordinated Indenture and any Additional Subordinated Debt Facilities.

"Subordinated Debt Obligations" means the Subordinated Indenture Obligations and any Additional Subordinated Debt Obligations.

"Subordinated Enforcement Date" means, with respect to any Subordinated Representative, the date which is 150 days after the occurrence of both (i) an Event of Default (under and as defined in the Subordinated Debt Document for which such Subordinated Representative has been named as Representative) and (ii) the Senior Priority Representative's and each other Representative's receipt of written notice from such Subordinated Representative that (x) that an Event of Default (under and as defined in the Subordinated Debt Document for which such Subordinated Representative has been named as Representative) has occurred and is continuing and (y) the Subordinated Debt Obligations of the series with respect to which such Subordinated Representative is the Subordinated Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Subordinated Debt Document; provided that the Subordinated Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any collateral (1) at any time the Senior Priority Representative has commenced and is diligently pursuing any enforcement action with respect to such collateral or (2) at any time any Credit Party which has granted a security interest in all or any material portion of the collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

6

"Subordinated Representative" means (i) in the case of any Subordinated Obligations, the Subordinated Agent and (ii) in the case of any Additional Subordinated Debt Facility and the Additional Subordinated Secured Parties thereunder, the trustee, administrative agent or similar agent under such Additional Subordinated Debt Facility that is named as the Representative in respect of such Additional Subordinated Debt Facility in the applicable Joinder Agreement.

"Subordinated Parties" means any holders, lenders, agents or trustees under any Subordinated Debt Facility.

"Secured Obligations" means the Senior Priority Obligations and the Subordinated Debt Obligations.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Issuer.

"Uniform Commercial Code" or "UCC" means, unless otherwise specified, the Uniform Commercial Code as from time to time in effect in the State of New York.

Section 1.02    *Terms Generally*. The rules of interpretation set forth in Section 1.01 of the Senior Priority Indenture are incorporated herein *mutatis mutandis*.

With respect to the Issuer, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque*, *nantissement*, *gage*, *privilège*, *sûreté réelle*, *droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant*, *associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an a*dministrateur* of its general partner, (v) a receiver, *administrative receiver*, administrator, liquidator or the like includes a *juge délégué*, *commissaire*, *juge-commissaire*, *liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*), insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally.

BUSINESS.29957598.2

## ARTICLE 2
## SUBORDINATION

Section 2.01    *Subordination*. Notwithstanding any provisions of any Subordinated Debt Documents to the contrary, the Subordinated Debt Obligations shall be subordinate and junior in right of payment to all Senior Debt Obligations, to the extent and in the manner provided for in this Agreement, and each Subordinated Secured Party under its Subordinated Debt Facility, by acceptance thereof, whether upon original issuance, transfer, assignment or exchange, agrees to be bound by the provisions of this Agreement.

Section 2.02    *Nature Of Senior Lender Claims*. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, acknowledges that:

(a)      the terms of the Senior Priority Debt Documents and the Senior Priority Obligations may be amended, restated, amended and restated, supplemented or otherwise modified, and the Senior Priority Obligations, or a portion thereof, may be Refinanced from time to time, and

(b)      the aggregate amount of the Senior Priority Obligations may be increased with notice to but without consent by the Subordinated Representatives or the Subordinated Secured Parties and without affecting the provisions hereof, except as otherwise expressly set forth herein. The subordination provided for in <u>Section 2.01</u> shall not be altered or otherwise affected by any amendment, restatement, amendment and restatement, supplement or other modification, or any Refinancing, of either the Senior Priority Obligations or the Subordinated Debt Obligations, or any portion thereof.

Section 2.03    *Prohibition On Contesting*. Each of the Subordinated Representatives, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it shall not (and hereby waives any right to), directly or indirectly, contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority, amount, characterization or enforceability of either the Senior Priority Obligations or any Lien securing any Senior Priority Obligations held (or purported to be held) by or on behalf of any Senior Priority Representative or any of the other Senior Parties or other agent or trustee therefor.

Section 2.04    *No New Liens*. The parties hereto agree that, so long as the Discharge of Senior Priority Obligations has not occurred, none of the Credit Parties shall grant any additional Liens on any asset or property of any Credit Party to secure any Subordinated Debt Obligation.

Section 2.05    *No Demand or Setoff.*  Each of the Subordinated Representatives, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it shall not (and hereby waives any right to), ask, demand, sue for, take or knowingly receive from the Issuer or any loan party, by setoff or in any other manner, the whole or any part of the Subordinated Debt Obligations.

BUSINESS.29957598.2

ARTICLE 3
ENFORCEMENT

Section 3.01    *Exercise Of Remedies*.

(a)    So long as the Discharge of Senior Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Issuer or any other Credit Party, (i) neither any Subordinated Representative nor any Subordinated Secured Party will (x) exercise or seek to exercise any rights or remedies (including setoff) in respect of any Subordinated Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or other action brought by any Senior Priority Representative or any Senior Priority Secured Party in respect of the Senior Priority Obligations, the exercise of any right by any Senior Priority Representative or any Senior Priority Secured Party (or any agent or sub-agent on their behalf) in respect of the Senior Priority Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Senior Priority Representative or any Senior Priority Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party of any rights and remedies under the Senior Priority Debt Documents or otherwise in respect of the Senior Priority Obligations, or (z) object to the forbearance by the Senior Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies in respect of Senior Priority Obligations and (ii) except as otherwise provided herein, the Senior Priority Representatives and the Senior Parties shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions of any collateral without any consultation with or the consent of any Subordinated Representative or any Subordinated Secured Party; provided, however, that (A) in any Insolvency or Liquidation Proceeding commenced by or against Guarantor, the Issuer or any other Credit Party, any Subordinated Representative may file a claim or statement of interest with respect to the Subordinated Debt Obligations under its Subordinated Debt Facility, (B) [reserved], (C) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Subordinated Secured Parties, if any, in each case in accordance with the terms of this Agreement; (D) [reserved]; (E) accelerate any Subordinated Debt Obligations, (F) any Subordinated Representative and the Subordinated Secured Parties may exercise their rights and remedies as unsecured creditors, as provided in <u>Section 5.04</u>, (G) any Subordinated Representative may exercise the rights and remedies provided for in <u>Section 6.03</u> and (H) from and after the Subordinated Enforcement Date, the Subordinated Representative may exercise or seek to exercise any rights or remedies (including setoff) in respect of any Subordinated Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), but only so long as (1) the Senior Priority Representative has not commenced and is not diligently pursuing any enforcement action or (2) any Credit Party which has granted a security interest securing any Senior Debt Obligations is not then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding. In exercising rights and remedies with respect to any collateral, the Senior Priority Representatives and the Senior Parties may enforce the provisions of the Senior Priority Debt Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent

9

appointed by them to sell or otherwise dispose of collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)      So long as the Discharge of Senior Priority Obligations has not occurred, each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it will not take or receive any collateral or any proceeds thereof in connection with the exercise of any right or remedy (including setoff) with respect to any collateral in respect of Subordinated Debt Obligations.

(c)      Subject to the proviso in clause (ii) of Section 3.01(a), (i) each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that neither such Subordinated Representative nor any such Subordinated Secured Party will take any action that would hinder any exercise of remedies undertaken by any Senior Priority Representative or any Senior Priority Secured Party with respect to any collateral under the Senior Priority Debt Documents, including any Disposition of collateral, whether by foreclosure or otherwise, and (ii) each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, hereby waives any and all rights it or any such Subordinated Secured Party may have to object to the manner in which the Senior Priority Representatives or the Senior Parties seek to enforce or collect the Senior Priority Obligations or the Liens securing such obligations, regardless of whether any action or failure to act by or on behalf of any Senior Priority Representative or any other Senior Priority Secured Party is adverse to the interests of the Subordinated Secured Parties.

(d)      Each Subordinated Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Subordinated Debt Document shall be deemed to restrict in any way the rights and remedies of the Senior Priority Representatives or the Senior Parties with respect to any collateral as set forth in this Agreement and the Senior Priority Debt Documents.

(e)      Until the Discharge of Senior Priority Obligations, the Senior Priority Representative shall have the exclusive right to exercise any right or remedy with respect to any collateral and shall have the exclusive right to determine and direct the time, method and place for exercising such right or remedy or conducting any proceeding with respect thereto.

(f)      The Senior Representative shall have no obligation to any Subordinated Secured Party with respect to the collateral or the Subordinated Debt Obligations.

(g)      Nothing in this Agreement shall prohibit the receipt by the agent for the Subordinated Parties of the required payments of interest and other amounts owed in respect of the Subordinated Obligations so long as such receipt is permitted by this Agreement and is not the direct or indirect result of the exercise of remedies or an enforcement action or in contravention of this Agreement or the Senior Priority Debt Documents

Section 3.02    _Cooperation_. Subject to the proviso in clause (ii) of Section 3.01(a), each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its

10

Subordinated Debt Facility, agrees that, unless and until the Discharge of Senior Priority Obligations has occurred, it will not commence, or join with any Person (other than the Senior Parties and the Senior Priority Representatives upon the request of the Senior Priority Representative) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding in respect of the Subordinated Debt Obligations.

Section 3.03  *Actions Upon Breach*. Should any Subordinated Representative or any Subordinated Secured Party, contrary to this Agreement, in any way take, attempt to take or threaten to take any action with respect to any collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement) or fail to take any action required by this Agreement, any Senior Priority Representative or other Senior Priority Secured Party (in its or their own name or in the name of the Issuer or any other Credit Party) or the Issuer may obtain relief against such Subordinated Representative or such Subordinated Secured Party by injunction, specific performance or other appropriate equitable relief. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Facility, hereby (i) agrees that the Senior Parties' damages from the actions of the Subordinated Representatives or any Subordinated Secured Party may at that time be difficult to ascertain and may be irreparable and waives any defense that Guarantor, the Issuer, any other Credit Party or the Senior Parties cannot demonstrate damage or be made whole by the awarding of damages and (ii) irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by any Senior Priority Representative or any other Senior Priority Secured Party.

## ARTICLE 4
## PAYMENTS

Section 4.01  *Application Of Proceeds*. So long as the Discharge of Senior Priority Obligations has not occurred and regardless of whether an Insolvency or Liquidation Proceeding has been commenced, any collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such collateral upon the exercise of remedies shall be applied by the Senior Priority Representative to the Senior Priority Obligations in such order as specified in the relevant Senior Priority Debt Documents and, if applicable, the Senior Priority Intercreditor Agreement, until the Discharge of Senior Priority Obligations has occurred.

Section 4.02  *Payments Over*. So long as the Discharge of Senior Priority Obligations has not occurred, any collateral, proceeds thereof, or any payments in cash in respect of any principal of any Subordinated Debt Obligations received by any Subordinated Representative or any Subordinated Secured Party shall be segregated and held in trust for the benefit of and promptly paid over to the Senior Priority Representative for the benefit of the Senior Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The Senior Priority Representative is hereby authorized to make any such endorsements as agent for each of the Subordinated Representatives or any such Subordinated Secured Party. This authorization is coupled with an interest and is irrevocable.

ARTICLE 5
OTHER AGREEMENTS

Section 5.01    *[Reserved]*.

Section 5.02    *[Reserved]*.

Section 5.03    *Certain Amendments*.

(a)    [Reserved]

(b)    [Reserved[

(c)    The Senior Priority Debt Documents may be amended, restated, amended and restated, waived, supplemented or otherwise modified in accordance with their terms, and the indebtedness under the Senior Priority Debt Documents may be Refinanced, in each case, without the consent of any Subordinated Representative or Subordinated Secured Party; provided, however, that, without the consent of (x) the Subordinated Priority Representative, acting with the consent of the Supermajority Holders (as such term is defined in the Subordinated Indenture) and (y) each other Subordinated Representative (acting with the consent of the requisite holders of each series of Additional Subordinated Debt), no such amendment, restatement, amendment and restatement, waiver, supplement or modification shall contravene any provision of this Agreement.

(d)    The Subordinated Debt Documents may be amended, restated, waived, supplemented or otherwise modified in accordance with their terms, and the indebtedness under the Subordinated Debt Documents may be refinanced, renewed, extended or replaced, in each case, without the consent of any Senior Priority Representative or Senior Priority Secured Party; provided, that if the Senior Parties change or add any negative covenant or event of default in the Senior Priority Debt Facilities, the Subordinated Debt Documents may be amended by the Subordinated Secured Parties to make such corresponding changes or additions in the Subordinated Debt Documents, so long as such changes to the Subordinated Debt Documents maintain any appropriate cushions to the Senior Priority Debt Documents consistent with those in existence as of the date hereof; provided, however, that, without the consent of (x) the Senior Priority Representative, acting with the consent of the Supermajority Holders (as such term is defined in the Senior Priority Indenture) and (y) each other Senior Priority Representative (acting with the consent of the requisite holders of each series of Additional Senior Priority Debt), no such amendment, restatement, supplement or modification shall contravene any provision of this Agreement.

Section 5.04    *Rights As Unsecured Creditors*. Notwithstanding anything to the contrary in this Agreement, the Subordinated Representatives and the Subordinated Secured Parties may exercise rights and remedies as unsecured creditors against Guarantor, the Issuer and any other Credit Party in accordance with the terms of the Subordinated Debt Documents and applicable law so long as such rights and remedies do not violate any express provision of this Agreement. Nothing in this Agreement shall prohibit the receipt by any Subordinated Representative or any Subordinated Secured Party of the required payments of interest, fees and other amounts due under the Subordinated Debt Documents so long as such receipt is not the direct or indirect result of the exercise by a Subordinated Representative or any Subordinated Secured Party of rights or remedies

12

in respect of collateral or in respect of payments of principal prohibited hereunder. In the event any Subordinated Representative or any Subordinated Secured Party becomes a judgment Lien creditor in respect of collatearl as a result of its enforcement of its rights as an unsecured creditor in respect of Subordinated Debt Obligations, such judgment Lien shall be subordinated to the Liens securing Senior Priority Obligations. Nothing in this Agreement shall impair or otherwise adversely affect any rights or remedies the Senior Priority Representatives or the Senior Parties may have with respect to any collateral.

Section 5.05   *[Reserved]*.

Section 5.06   *When Discharge Of Senior Priority Obligations Deemed To Not Have Occurred*. If, at any time after the Discharge of Senior Priority Obligations has occurred, Guarantor, the Issuer or any Subsidiary incurs any Senior Priority Obligations (other than in respect of the payment of indemnities surviving the Discharge of Senior Priority Obligations), then such Discharge of Senior Priority Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Senior Priority Obligations) and the applicable agreement governing such Senior Priority Obligations shall automatically be treated as a Senior Priority Debt Document for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of any collateral set forth herein and the agent, representative or trustee for the holders of such Senior Priority Obligations shall be the Senior Priority Representative for all purposes of this Agreement. Upon receipt of notice of such incurrence (including the identity of the new Senior Priority Representative), each Subordinated Representative (including the Subordinated Representative) shall promptly (a) enter into such documents and agreements (at the expense of the Issuer), including amendments, supplements or modifications to this Agreement, as the Issuer or such new Senior Priority Representative shall reasonably request in writing in order to provide the new Senior Priority Representative the rights of a Senior Priority Representative contemplated hereby, (b) deliver to such Senior Priority Representative, to the extent that it is legally permitted to do so, all collateral, including all proceeds thereof, held or controlled by such Subordinated Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to collateral, (c) notify any applicable insurance carrier that it is no longer entitled to be a loss payee or additional insured under the insurance policies of any Credit Party issued by such insurance carrier and (d) notify any governmental authority involved in any condemnation or similar proceeding involving a Credit Party that the new Senior Priority Representative is entitled to approve any awards granted in such proceeding.

Section 5.07   *[Reserved]*.

Section 5.08   *Purchase Option.*

(a)   Without prejudice to the enforcement of the Senior Parties, the Senior Parties agree that following: (i) a payment default under the Senior Priority Debt Documents that has not been cured (or waived by the Senior Parties) within 60 days of the occurrence thereof, (ii)

BUSINESS.29957598.2

an acceleration of the Senior Priority Senior Lien Obligations in accordance with the terms of the Senior Priority Debt Documents, (iii) the commencement of any Insolvency or Liquidation Proceeding or (iv) the exercise of any enforcement action by the Senior Parties in respect of a material portion of the collateral (each, a "Purchase Event"), the Subordinated Secured Parties may, at their sole expense and effort, upon notice from the Subordinated Representative at the direction of such Subordinated Secured Parties to the Issuer or Guarantor or other Credit Party and the Senior Priority Representative, irrevocably elect to acquire from the Senior Parties, without warranty or representation or recourse from or to the Senior Parties, all (but not less than all) of the Senior Priority Debt Obligations and all rights of the Senior Parties under the Senior Priority Debt Documents; _provided,_ that (w) any such purchase option must be exercised within fifteen (15) days after the initial occurrence of any Purchase Event, (x) the Senior Priority Representative and the Senior Parties shall retain all rights to be indemnified or to be held harmless by the Issuer or Guarantor or other Credit Party in accordance with the terms of the Senior Priority Debt Documents, (y) such assignment shall not conflict with any law, rule or regulation or order of any court or other governmental authority having jurisdiction, and (z) the Subordinated Secured Parties shall have paid to the Senior Priority Representative, for the account of the Senior Parties, in immediately available funds, an amount equal to the amount that would be required if the Notes were optionally redeemed prior to the Maturity Date plus all accrued and unpaid interest thereon plus all accrued and unpaid fees (including reasonable attorney's fees and costs) and premiums (including any prepayment premium under the Senior Priority Debt Documents)) and any breakage costs and expenses plus all the other Senior Priority Obligations then outstanding.

(b)    In order to effectuate the foregoing, the Senior Agent  shall calculate, upon the written request of the Subordinated Representative from time to time, the amount in cash that would be necessary to so purchase the Senior Priority Secured Obligations.

(c)    If the right set forth in this Section 5.08 is exercised: (i) the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the notice set forth in the first sentence of this Section 5.08, (ii) such purchase of the Senior Priority Obligations shall be exercised pursuant to documentation mutually and reasonably acceptable to each of the Senior Priority Representative and the Subordinated Representative, and (iii) such Senior Priority Obligations shall be purchased pro rata among the Subordinated Secured Parties according to such Subordinated Secured Parties' portion of the Subordinated Obligations outstanding on the date of purchase pursuant to this Section 5.08.

(d)    In the event that any one or more of the Subordinated Secured Parties exercises the purchase option set forth in this Section 5.08: (i) the Senior Priority Representative shall have the right, but not the obligation, to immediately resign under the Senior Priority Collateral Documents upon the closing of such purchase and (ii) the purchasing Subordinated Secured Parties shall have the right, but not the obligation, to require the Senior Agent to immediately resign under the Senior Priority Collateral Documents upon the closing of such purchase.

## ARTICLE 6
### INSOLVENCY OR LIQUIDATION PROCEEDINGS

Section 6.01    _Financing Issues_.

14

(a)    Until the Discharge of Senior Priority Obligations has occurred, if Guarantor, the Issuer or any other Credit Party shall be subject to any Insolvency or Liquidation Proceeding, then each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that (A) subject to Section 6.01(b), if any Senior Priority Representative or any Senior Priority Secured Party shall desire to consent (or not object) to the sale, use or lease of cash or other collateral or to consent (or not object) to Guarantor's, the Issuer's or any other Credit Party's obtaining financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law (any such financing, a "DIP Financing"), it will raise no objection to and will not otherwise contest such sale, use or lease of such cash or other collateral or such DIP Financing, and except to the extent permitted by the proviso in clause (ii) of Section 3.01(a) and Section 6.03, will not request adequate protection or any other relief in connection therewith and (y) any "carve-out" for professional and United States Trustee fees agreed to by the Senior Priority Representatives, (B) it will raise no objection to (and will not otherwise contest) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Priority Obligations made by any Senior Priority Representative or any other Senior Priority Secured Party, (C) it will raise no objection to (and will not otherwise contest) any lawful exercise by any Senior Priority Secured Party of the right to credit bid Senior Priority Obligations at any sale in foreclosure of collateral, (D) it will raise no objection to (and will not otherwise contest) any other request for judicial relief made in any court by any Senior Priority Secured Party relating to the lawful enforcement of any Lien on collateral and (E) it will raise no objection to (and will not otherwise contest or oppose and shall be deemed to have consented to) any order relating to a Disposition of assets of any Credit Party for which any Senior Priority Representative has consented. Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that notice received three Business Days prior to the entry of an order approving such usage of cash or other collateral or approving such financing shall be adequate notice.

(b)    Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility agrees that it will not provide, or offer to provide, any DIP Financing to the Issuer unless no Senior Priority Secured Party shall have offered to provide a DIP Financing, or agreed to support a DIP Financing provided by another Person, that would satisfy the terms set forth in this Section 6.01 (the "Subordinated DIP Financing Proposal Condition"). If the Subordinated DIP Financing Proposal Condition is satisfied on or prior to the date of the hearing to approve DIP Financing for the Guarantor, the Issuer or any other Credit Party for the Subordinated Secured Parties may propose a DIP Financing, which may be secured by Liens equal or senior in priority to or on a pari passu basis with the Liens securing any of the Senior Priority Debt Facilities, so long as such DIP Financing does not compel the Guarantor, the Issuer or any other Credit Party to seek confirmation of a specific plan of reorganization and such DIP Financing does not "roll-up" or require the payment of any of the Subordinated Debt Obligations.

Section 6.02    *Relief From The Automatic Stay*. Until the Discharge of Senior Priority Obligations has occurred, each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding or take any action in derogation thereof without the prior written consent of the Senior Priority Representative.

15

Section 6.03    *Adequate Protection*. Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that none of them shall object, contest or support any other Person objecting to or contesting (a) any request by any Senior Priority Representative or any Senior Parties for adequate protection, (b) any objection by any Senior Priority Representative or any Senior Parties to any motion, relief, action or proceeding based on any Senior Priority Representative's or Senior Priority Secured Party's claiming a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts of any Senior Priority Representative or any other Senior Priority Secured Party under Section 506(b) or 506(c) of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law. N

Section 6.04    *Preference Issues*. If any Senior Priority Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of Guarantor, the Issuer or any other Credit Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason (any such amount, a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Senior Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Parties shall be entitled to the benefits of this Agreement until a Discharge of Senior Priority Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, hereby agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

Section 6.05    *[Reserved]*.

Section 6.06    *No Waivers Of Rights Of Senior Parties*. Nothing contained herein shall, except as expressly provided herein, prohibit or in any way limit any Senior Priority Representative or any other Senior Priority Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Subordinated Secured Party, including the seeking by any Subordinated Secured Party of adequate protection or the asserting by any Subordinated Secured Party of any of its rights and remedies under the Subordinated Debt Documents or otherwise.

Section 6.07    *Application*. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law, shall be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding.  All references herein to any Credit Party shall include such Credit Party as a debtor-in-possession and any receiver or trustee for such Credit Party.

16

Section 6.08    *Other Matters*.

To the extent that any Subordinated Representative or any Subordinated Secured Party has or acquires rights under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law with respect to any of the collateral, such Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, agrees not to assert any such rights without the prior written consent of each Senior Priority Representative, provided that if requested by any Senior Priority Representative, such Subordinated Representative shall timely exercise such rights in the manner requested by the Senior Priority Representatives (acting unanimously), including any rights to payments in respect of such rights.

Section 6.09    *506(c) Claims*. Until the Discharge of Senior Priority Obligations has occurred, each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it will not assert or enforce any claim under Section 506(c) of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law senior to or on a parity with the Liens securing the Senior Priority Obligations for costs or expenses of preserving or disposing of any collateral.

Section 6.10    *Reorganization Securities*. If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of both the Senior Priority Obligations and the Subordinated Debt Obligations, then, to the extent the debt obligations distributed on account of the Senior Priority Obligations and on account of the Subordinated Debt Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

ARTICLE 7
RELIANCE; ETC

Section 7.01    *Reliance*. The consent by the Senior Parties to the execution and delivery of the Subordinated Debt Documents to which the Senior Parties have consented and all loans and other extensions of credit made or deemed made on and after the date hereof by the Senior Parties to Guarantor, the Issuer or any Subsidiary shall be deemed to have been given and made in reliance upon this Agreement. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Parties have, independently and without reliance on any Senior Priority Representative or other Senior Priority Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Subordinated Debt Documents to which they are party or by which they are bound, this Agreement and the transactions contemplated hereby and thereby, and they will continue to make their own credit decision in taking or not taking any action under the Subordinated Debt Documents or this Agreement.

Section 7.02    *No Warranties Or Liability*. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, acknowledges

BUSINESS.29957598.2

and agrees that neither any Senior Priority Representative nor any other Senior Priority Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Senior Priority Debt Documents, the ownership of any collateral or the perfection or priority of any Liens thereon. The Senior Parties will be entitled to manage and supervise their respective loans and extensions of credit under the Senior Priority Debt Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the Senior Parties may manage their loans and extensions of credit without regard to any rights or interests that the Subordinated Representatives and the Subordinated Secured Parties have , except as otherwise provided in this Agreement. Neither any Senior Priority Representative nor any other Senior Priority Secured Party shall have any duty to any Subordinated Representative or Subordinated Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreement with Guarantor, the Issuer or any Subsidiary (including the Subordinated Debt Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Agreement, the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectability of any of the Senior Priority Obligations, the Subordinated Debt Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) any Credit Party's title to or right to transfer any of the collateral or (c) any other matter except as expressly set forth in this Agreement.

Section 7.03    *Obligations Unconditional*. All rights, interests, agreements and obligations of the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any Senior Priority Debt Document or any Subordinated Debt Document;

(b)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Priority Obligations or Subordinated Debt Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the Senior Priority Indenture or any other Senior Priority Debt Document or of the terms of any Subordinated Debt Document;

(c)    any exchange of any security interest in any collateral or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Priority Obligations or Subordinated Debt Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of Guarantor, the Issuer or any other Credit Party; or

(e)    any other circumstances that otherwise might constitute a defense available to, or a discharge of, (i) Guarantor, the Issuer or any other Credit Party in respect of the Senior Priority Obligations or (ii) any Subordinated Representative or Subordinated Secured Party in respect of this Agreement.

ARTICLE 8
MISCELLANEOUS

Section 8.01    _Conflicts_. Subject to Section 8.18, in the event of any conflict between the provisions of this Agreement and the provisions of any Senior Priority Debt Document or any Subordinated Debt Document, the provisions of this Agreement shall govern. Notwithstanding the foregoing, the relative rights and obligations of the Senior Priority Representatives and the Senior Parties (as amongst themselves) with respect to any collateral shall be governed by the terms of the Senior Priority Intercreditor Agreement and in the event of any conflict between the Senior Priority Intercreditor Agreement and this Agreement, the provisions of the Senior Priority Intercreditor Agreement shall control.

Section 8.02    _Continuing Nature Of This Agreement; Severability_. Subject to Section 6.04, this Agreement shall continue to be effective until the Discharge of Senior Priority Obligations shall have occurred. This is a continuing agreement of subordination, and the Senior Parties may continue, at any time and without notice to the Subordinated Representatives or any Subordinated Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of Guarantor, the Issuer or any Subsidiary constituting Senior Priority Obligations in reliance hereon. The terms of this Agreement shall survive and continue in full force and effect in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

If all or any portion of the Senior Priority Obligations are Refinanced (the "Refinancing Indebtedness"): (i) the Refinancing Indebtedness and all other obligations under the loan documents evidencing such Refinancing Indebtedness (the "Refinancing Documents") shall automatically be treated as Senior Priority Obligations for all purposes of this Agreement, (ii) the Refinancing Documents shall automatically be treated as the Senior Priority Indenture and the other Senior Priority Debt Documents for all purposes of this Agreement and (iii) the agent or purchaser under the Refinancing Documents (the "New Agent") shall be deemed to be the Senior Agent for all purposes of this Agreement. The Subordinated Agent and the Subordinated Representative shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Issuer, the other loan parties or such New Agent may reasonably request in order to provide to the New Agent the rights and powers contemplated hereby, in each case consistent in all material respects with the terms of this Agreement

Section 8.03    _Amendments; Waivers_.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies

19

that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    This Agreement may be amended in writing signed by each Representative (in each case, acting in accordance with the documents governing the applicable Debt Facility); provided that any such amendment, supplement or waiver which by the terms of this Agreement requires the Issuer's consent or which increases the obligations or reduces the rights of Guarantor, the Issuer or any Credit Party, shall require the consent of the Issuer. Any such amendment, supplement or waiver shall be in writing and shall be binding upon the Senior Parties and the Subordinated Secured Parties and their respective successors and assigns.

(c)    Notwithstanding the foregoing, without the consent of any Secured Party, any Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 8.09 of this Agreement and, upon such execution and delivery, such Representative and the Secured Parties and Senior Priority Obligations or Subordinated Debt Obligations of the Debt Facility for which such Representative is acting shall be subject to the terms hereof.

Section 8.04    *Information Concerning Financial Condition Of Guarantor, The Issuer And The Subsidiaries*. The Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of Guarantor, the Issuer and the Subsidiaries and all endorsers or guarantors of the Senior Priority Obligations or the Subordinated Debt Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Senior Priority Obligations or the Subordinated Debt Obligations. The Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any Senior Priority Representative, any Senior Priority Secured Party, any Subordinated Representative or any Subordinated Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

Section 8.05    *Subrogation*. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Senior Priority Obligations has occurred.

Section 8.06   *Application Of Payments*. Except as otherwise provided herein, all payments received by the Senior Parties may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Priority Obligations as the Senior Parties, in their sole discretion, deem appropriate, consistent with the terms of the Senior Priority Debt Documents. Except as otherwise provided herein, each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, assents to any such extension or postponement of the time of payment of the Senior Priority Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the Senior Priority Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

Section 8.07   *Additional Credit Parties*. Guarantor and the Issuer agree that, if any Subsidiary shall become a Credit Party after the date hereof, they will promptly cause such Subsidiary to become party hereto by executing and delivering an instrument in the form of Annex I. Upon such execution and delivery, such Subsidiary will become a Credit Party hereunder with the same force and effect as if originally named as a Credit Party herein. The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the Subordinated Representative and the Senior Priority Representative. The rights and obligations of each Credit Party hereunder shall remain in full force and effect notwithstanding the addition of any new Credit Party as a party to this Agreement.

Section 8.08   *[Reserved]*.

Section 8.09   *Additional Debt Facilities*.

(a)     To the extent, but only to the extent, permitted by the provisions of the Senior Priority Debt Documents and the Subordinated Debt Documents, the Issuer, Guarantor or any other Credit Party may incur or issue and sell one or more series or classes of Additional Subordinated Debt (the "Subordinated Class Debt"), which shall be unsecured, if and subject to the condition that the Representative of any such Subordinated Class Debt (each, a "Subordinated Class Debt Representative"), acting on behalf of the holders of such Subordinated Class Debt (such Representative and holders in respect of any Subordinated Class Debt being referred to as the "Subordinated Class Debt Parties"), becomes a party to this Agreement by satisfying conditions (i) through (iii), as applicable, of the immediately succeeding paragraph, and Section 8.09(b). In order for a Subordinated Class Debt Representative to become a party to this Agreement:

(i)      such Subordinated Class Debt Representative shall have executed and delivered a Joinder Agreement substantially in the form of Annex II (with such changes as may be reasonably approved by the Senior Priority Representative and such Subordinated Class Debt Representative) pursuant to which it becomes a Representative hereunder, and the Subordinated Class Debt in respect of which such Subordinated Class Debt Representative is the Representative and the related Subordinated Class Debt Parties become subject hereto and bound hereby;

(ii)     the Issuer shall have delivered to the Senior Priority Representative an Officer's Certificate stating that the conditions set forth in this Section 8.09 are satisfied with respect to such Subordinated Class Debt and, if requested, true and complete copies

of each of the Subordinated Debt Documents relating to such Subordinated Class Debt, certified as being true and correct by an Authorized Officer of the Issuer; and

(iii)    the Subordinated Debt Documents relating to such Subordinated Class Debt shall provide, or shall be amended on terms and conditions reasonably approved by the Senior Priority Representative and such Subordinated Class Debt Representative, that each Subordinated Class Debt Party with respect to such Subordinated Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Subordinated Class Debt.

Section 8.10    *Consent To Jurisdiction; Waivers*. Each Representative, on behalf of itself and the Secured Parties of the Debt Facility for which it is acting, irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York in the County of New York, the courts of the United States of America for the Southern District of New York in the County of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Representative) at the address referred to in Section 8.11;

(d)    agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by law; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.10 any special, exemplary, punitive or consequential damages.

Section 8.11    *Notices*. All notices, requests, demands and other communications provided for or permitted hereunder shall be in writing and shall be sent:

(i)    if to Guarantor, the Issuer or any Credit Party, to the Guarantor, at its address at:

   to Abra Group Limited
   1 Ashley Road, Third Floor
   Altrincham, Cheshire, WA14 2DT, United Kingdom
   Attention: Chief Financial Officer

(ii)    if to the Senior Agent, to it at:

to Abra Group Limited
1 Ashley Road, Third Floor
Altrincham, Cheshire, WA14 2DT, United Kingdom
Attention: Chief Financial Officer

(iii)    if to the Senior Priority Representative, to it at:


[Corporate Trust Office]



(iv)    if to the Subordinated Priority Representative, to it at:

[ ● ]

(v)    if to any other Representative, to it at the address specified by it in the Joinder Agreement delivered by it pursuant to <u>Section 8.09</u>.

Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this <u>Section 8.11</u> or in accordance with the latest unrevoked direction from such party given in accordance with this <u>Section 8.11</u>. As agreed to among the parties hereto from time to time, notices and other communications may also be delivered by e-mail to the email address of a representative of the applicable Person provided from time to time by such Person.

Section 8.12    <u>*Further Assurances*</u>. Each Senior Priority Representative, on behalf of itself and each Senior Priority Secured Party under the Senior Priority Debt Facility for which it is acting, and each Subordinated Representative, on behalf of itself, and each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other parties hereto may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

Section 8.13    <u>*Governing Law; Waiver Of Jury Trial*</u>.

**(A)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

**(B)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

Section 8.14    *Binding On Successors And Assigns*. This Agreement shall be binding upon the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives, the Subordinated Secured Parties, Guarantor, the Issuer, the other Credit Parties party hereto and their respective successors and assigns.

Section 8.15    *Section Titles*. The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

Section 8.16    *Counterparts*. This Agreement may be executed in one or more counterparts, including by means of facsimile or other electronic method, each of which shall be an original and all of which shall together constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 8.17    *Authorization*. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The Senior Priority Representative represents and warrants that this Agreement is binding upon the Senior Priority Indenture Secured Parties. The Subordinated Priority Representative represents and warrants that this Agreement is binding upon the Subordinated Indenture Secured Parties.

Section 8.18    *No Third Party Beneficiaries; Successors And Assigns*. The priorities set forth in this Agreement and the rights and benefits hereunder in respect of such priorities shall inure solely to the benefit of the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties, and their respective permitted successors and assigns, and no other Person (including the Credit Parties, or any trustee, receiver, debtor in possession or bankruptcy estate in a bankruptcy or like proceeding) shall have or be entitled to assert such rights; provided, however, notwithstanding the foregoing, the parties hereto acknowledge and agree that the Abra Holders shall be the express third-party beneficiaries to, and shall have all the rights of a third-party beneficiary to, this Agreement.

Section 8.19    *Effectiveness*. This Agreement shall become effective when executed and delivered by the parties hereto.

Section 8.20    *Senior Agent And Representative*. It is understood and agreed that (a) the Senior Priority Representative is entering into this Agreement in its capacity as trustee under the Senior Priority Indenture and the provisions of Article VII of the Senior Priority Indenture applicable to the Trustee (as defined therein) thereunder shall also apply to the Senior Priority Representative hereunder, (b) the Subordinated Priority Representative is entering into this Agreement in its capacity as trustee under the Subordinated Indenture and the provisions of [Article VII] of the Subordinated Indenture applicable to the Trustee (as defined therein) thereunder shall also apply to the Subordinated Priority Representative hereunder and (c) each other Representative party hereto is entering into this Agreement in its capacity as purchaser, trustee or agent for the secured parties referenced in the applicable Additional Senior Priority Debt Document or Additional Subordinated Debt Document (as applicable) and the corresponding

24

exculpatory and liability-limiting provisions of such agreement applicable to such Representative thereunder shall also apply to such Representative hereunder.

Section 8.21    _Relative Rights_. Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Sections 5.01(a), 5.01(d) or 5.03(b)), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of the Senior Priority Indenture, any other Senior Priority Debt Document or any Subordinated Debt Documents, or permit Guarantor, the Issuer or any other Credit Party to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the Senior Priority Indenture or any other Senior Priority Debt Document or any Subordinated Debt Documents, (b) change the relative priorities of the Senior Priority Obligations as among the Senior Parties, (c) otherwise change the relative rights of the Senior Parties as among such Senior Parties or (d) obligate Guarantor, the Issuer or any other Credit Party to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the Senior Priority Indenture or any other Senior Priority Debt Document or any Subordinated Debt Document.

Section 8.22    _Survival Of Agreement_. All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

25

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

THE BANK IF NEW YORK MELLON, as First-Lien Trustee

By: _____
     Name:
     Title:

[ ● ], as Subordinated Priority Representative

By: _____
     Name:
     Title:

*[Signature Page to Subordination Agreement]*

[ ● ], as Guarantor

By: _____
     Name:
     Title:


[ ● ], as the Issuer

By: _____
     Name:
     Title:


*[Signature Page to Subordination Agreement]*

ANNEX I

[FORM OF] SUPPLEMENT NO. [ ● ] dated as of [ ● ] to the SUBORDINATION AGREEMENT dated as of [ ● ] (the "Subordination Agreement"), among ABRA GROUP LIMITED, incorporated under the laws of England and Wales with registered number 13926427, as guarantor ("Guarantor"), ABRA GLOBAL FINANCE, incorporated as an exempted company under the laws of the Cayman Islands with registered number 395290, as issuer(the "Issuer"), THE BANK OF NEW YORK MELLON, a New York banking corporation, as trustee under the Senior Priority Indenture, dated [_____], 2023 and [_____], 2023, respectively, or any successor thereof, as Trustee under the Subordinated Indenture, and the additional Representatives from time to time a party thereto.

A.     Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Subordination Agreement.

B.     The Credit Parties have entered into the Subordination Agreement. Pursuant to the Senior Priority Indenture Agreement, certain Additional Senior Priority Debt Documents and certain Subordinated Debt Documents, certain newly acquired or organized Subsidiaries of the Issuer are required to enter into the Subordination Agreement. Section 8.07 of the Subordination Agreement provides that such Subsidiaries may become party to the Subordination Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "New Credit Party") is executing this Supplement in accordance with the requirements of the Senior Priority Indenture, the Subordinated Debt Documents and Additional Senior Priority Debt Documents.

Accordingly, the Senior Priority Representative and the New Subsidiary Credit Party agree as follows:

SECTION 1.   In accordance with Section 8.07 of the Subordination Agreement, the New Credit Party by its signature below becomes a Credit Party under the Subordination Agreement with the same force and effect as if originally named therein as a Credit Party, and the New Credit Party hereby agrees to all the terms and provisions of the Subordination Agreement applicable to it as a Credit Party thereunder. Each reference to a "Credit Party" in the Subordination Agreement shall be deemed to include the New Credit Party. The Subordination Agreement is hereby incorporated herein by reference.

SECTION 2.   The New Credit Party represents and warrants to the Senior Priority Representative and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 3.   This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Senior Priority Representative shall have received a counterpart of this Supplement that bears the signature of the New Credit Party. Delivery of an executed signature page to this Supplement by facsimile transmission or other

Annex I-1

electronic method shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.   Except as expressly supplemented hereby, the Subordination Agreement shall remain in full force and effect.

SECTION 5.   **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.   In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Subordination Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.   All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Subordination Agreement. All communications and notices hereunder to the New Credit Party shall be given to it in care of the Issuer as specified in the Subordination Agreement.

SECTION 8.   The Issuer agrees to reimburse the Senior Priority Representative for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Senior Priority Representative.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Annex I-2

IN WITNESS WHEREOF, the New Credit Party, and the Senior Priority Representative have duly executed this Supplement to the Subordination Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY CREDIT PARTY],

By: _____
    Name:
    Title:

Acknowledged by:

[ ● ], as Senior Priority Representative,

By: _____
    Name:
    Title:

[ ● ], as Subordinated Representative,

By: _____
    Name:
    Title:

Annex I-3

**ANNEX II**

[FORM OF] REPRESENTATIVE SUPPLEMENT NO. [ ● ] dated as of [ ● ], to the SUBORDINATION AGREEMENT dated as of [ ● ] (the "Subordination Agreement"), among ABRA GROUP LIMITED, incorporated under the laws of England and Wales with registered number 13926427, as guarantor ("Guarantor"), ABRA GLOBAL FINANCE, incorporated as an exempted company under the laws of the Cayman Islands with registered number 395290, as issuer(the "Issuer"), THE BANK OF NEW YORK MELLON, a New York banking corporation, as trustee under the Senior Priority Indenture, dated [_____], 2023 and [_____], 2023, respectively, or any successor thereof, as Trustee under the Subordinated Indenture, and the additional Representatives from time to time a party thereto.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Subordination Agreement.

B.    As a condition to the ability of the Issuer, Guarantor or any other Credit Party to incur Subordinated Class Debt, the Subordinated Class Representative in respect of such Subordinated Class Debt is required to become a Representative under, and such Subordinated Class Debt and the Subordinated Class Debt Parties in respect thereof are required to become subject to and bound by, the Subordination Agreement. Section 8.09 of the Subordination Agreement provides that such Subordinated Class Debt Representative may become a Representative under, and such Subordinated Class Debt and such Subordinated Class Debt Parties may become subject to and bound by, the Subordination Agreement, pursuant to the execution and delivery by the Subordinated Class Debt Representative of an instrument in the form of this Representative Supplement and the satisfaction of the other conditions set forth in Section 8.09 of the Subordination Agreement. The undersigned Subordinated Class Debt Representative (the "New Representative") is executing this Supplement in accordance with the requirements of the Senior Priority Debt Documents and the Subordinated Debt Documents.

Accordingly, the Senior Priority Representative and the New Representative agree as follows:

SECTION 1.    In accordance with Section 8.09 of the Subordination Agreement, the New Representative by its signature below becomes a Representative under, and the related Subordinated Class Debt and Subordinated Class Debt Parties become subject to and bound by, the Subordination Agreement with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such Subordinated Class Debt Parties, hereby agrees to all the terms and provisions of the Subordination Agreement applicable to it as a Subordinated Representative and to the Subordinated Class Debt Parties that it represents as Subordinated Secured Parties. Each reference to a "Representative" or "Subordinated Representative" in the Subordination Agreement shall be deemed to include the New Representative. The Subordination Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Representative represents and warrants to the Senior Priority Representative and the other Secured Parties that (i) it has full power and authority to enter into this Representative Supplement, in its capacity as [agent] [trustee], (ii) this Representative

Annex II-1

Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Subordinated Debt Documents relating to such Subordinated Class Debt provide that, upon the New Representative's entry into this Agreement, the Subordinated Class Debt Parties in respect of such Subordinated Class Debt will be subject to and bound by the provisions of the Subordination Agreement as Subordinated Secured Parties.

SECTION 3.   This Representative Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Representative Supplement shall become effective when the Senior Priority Representative shall have received a counterpart of this Representative Supplement that bears the signature of the New Representative. Delivery of an executed signature page to this Representative Supplement by facsimile transmission or other electronic method shall be effective as delivery of a manually signed counterpart of this Representative Supplement.

SECTION 4.   Except as expressly supplemented hereby, the Subordination Agreement shall remain in full force and effect.

SECTION 5.   **THIS REPRESENTATIVE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.   In case any one or more of the provisions contained in this Representative Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Subordination Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.   All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Subordination Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8.   The Issuer agrees to reimburse the Senior Priority Representative for its reasonable out-of-pocket expenses in connection with this Representative Supplement, including the reasonable fees, other charges and disbursements of counsel for the Senior Priority Representative.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

Annex II-2

IN WITNESS WHEREOF, the New Representative and the Senior Priority Representative have duly executed this Representative Supplement to the Subordination Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as [ ● ] for the holders of [ ● ],

By: _____
        Name:
        Title:

Address for notices:

attention of: _____

Telecopy: _____

[ ● ],
as Senior Priority Representative,

By: _____
        Name:
        Title:

Annex II-3

Acknowledged by:

[ ● ]

By:  _____
Name:
Title:


[ ● ]

By:  _____
Name:
Title:


THE CREDIT PARTIES
LISTED ON SCHEDULE I HERETO

By:  _____
Name:
Title:

Annex II-4

## SCHEDULE I
## CREDIT PARTIES

**SCHEDULE A**

**Permitted Holders**

1. Mobi Fundo de Investimento em Ações Investimento no Exterior
2. Elliott International, L.P.
3. Elliott Associates, L.P.
4. Kingsland International Group S.A.
5. South Lake One LLC

**SCHEDULE B-1**

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
|--------|--------------------------------------------|
| 1 | License agreement to use the LIFERAY digital platform, on which the Smiles website was developed |
| 2 | License agreement for the use of the Zendesk platform, through which all customer service is carried out |
| 3 | License agreement for the use of the Pager Duty program, which generates alarms when monitoring transactions in the APM system and sends such alarms to the Slack system |
| 4 | License agreement to use the Slack system |
| 5 | Service contract for the use of the B2E Prevention tool for fraud prevention |
| 6 | License agreement for the B2E Billing software |

B-5

**SCHEDULE B-2**

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
|--------|--------------------------------------------|
| 7 | Service agreement for the use of the AWS Amazon cloud infrastructure, which hosts the LIFERAY platform, and consequently the Smiles website, among other services |
| 8 | License agreement for the use of the ADYEN payment gateway that processes payments within the scope of the product "Clube Smiles" |
| 9 | Service agreement for the use of the Oracle OCI cloud infrastructure, which hosts the Siebel Loyalty platform |
| 10 | Service agreement for the Auth0 software, which controls the logic and authentication control for customers' login on the Smiles website |
| 11 | Amadeus software service contract, which takes care of reservations and fare awards related to other partner airlines |
| 12 | Service agreement with VTEX, responsible for the operation system of the retail platform |
| 13 | Right of use of the Data Lake database, which contains all transactional data used by the Smiles platform |
| 14 | Service agreement with Oracle Responsys for the use of a communication platform with customers |
| 15 | Service provision agreement with Nice, for the platform that hosts the telephony infrastructure used in customer service |
| 16 | Service agreement for the use of Dynatrace's APM tool, which performs real-time predictive and transactional monitoring |
| 17 | Oracle License and Service Agreement (OLSA) V020408 |

#4856-1598-7531v19

**SCHEDULE C**

**Relevant Agreements Governing The Sale and Issuance of Miles**

| Item # | Agreement, License or Contract Description | Counterparties |
|---|---|---|
| 1 | Business Partnership and Assumption of Obligations Agreement No. 2014/001996, as amended from time to time (*Contrato de Parceria Negocial e de Assunção de Obrigações nº 2014/001996*) | Banco do Brasil S.A. |
| 2 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Banco C6 S.A. |
| 3 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Caixa Econômica Federal |
| 4 | Smiles Partnership Agreement SC No. 16620, as amended from time to time (*Contrato de Parceria Smiles SC nº 61620*) | Esfera Fidelidade S.A. |
| 5 | Private Instrument of Partnership and Other Covenants, as amended from time to time (*Instrumento Particular de Parceria e Outras Avenças*) | Livelo S.A. |
| 6 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Nu Pagamentos S.A. |
| 7 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Portoseg S/A Crédito Financiamento e Investimento |
| 8 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Bradesco S.A. and Banco do Brasil S.A. |
| 9 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Santander (Brasil) S.A. |

#4856-1598-7531v19

## Exhibit F

**2028 ESSN Note Purchase Agreement**

*Executed*

---

**SENIOR SECURED EXCHANGEABLE NOTE PURCHASE AGREEMENT**

GOL EQUITY FINANCE
as Company

GOL LINHAS AÉREAS INTELIGENTES S.A.

as Guarantor
and as Registrar, Transfer Agent, Exchange Agent and Paying Agent

GOL LINHAS AÉREAS S.A.
as Guarantor

and SMILES FIDELIDADE S.A.
as a Springing Guarantor

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

ABRA GLOBAL FINANCE
as Purchaser

and

ABRA GROUP LIMITED
as Purchaser

---

**SENIOR SECURED EXCHANGEABLE NOTE PURCHASE**

**AGREEMENT** Dated as of September 29, 2023

_____

Senior Secured Exchangeable Notes due 2028

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01.    Definitions ................................................................... 2
SECTION 1.02.    Rules of Construction ....................................................... 27
SECTION 1.03.    Table of Contents; Headings ................................................ 28
SECTION 1.04.    Form of Documents Delivered ............................................... 28

## ARTICLE 2
### PURCHASE AND SALE OF THE NOTES

SECTION 2.01.    Sale and Purchase of the Notes ............................................ 29
SECTION 2.02.    Closing ..................................................................... 29
SECTION 2.03.    Expenses ................................................................... 29

## ARTICLE 3
### USE OF PROCEEDS

SECTION 3.01.    Net Proceeds ............................................................... 29

## ARTICLE 4
### THE NOTES

SECTION 4.01.    Form and Dating ........................................................... 29
SECTION 4.02.    Execution and Delivery ..................................................... 30
SECTION 4.03.    Registrar, Transfer Agent, Exchange Agent and Paying Agent ................. 31
SECTION 4.04.    Paying Agent to Hold Money in Trust ....................................... 32
SECTION 4.05.    Payment of Principal and Interest; Principal and Interest Rights Preserved .. 33
SECTION 4.06.    [Reserved] .................................................................. 33
SECTION 4.07.    Transfer of Notes .......................................................... 34
SECTION 4.08.    Replacement Notes .......................................................... 34
SECTION 4.09.    Cancellation ................................................................ 34
SECTION 4.10.    Defaulted Interest ......................................................... 34
SECTION 4.11.    No Purchase of the Notes by the Company or its Affiliates ................... 34
SECTION 4.12.    Fundamental Change ......................................................... 35

## ARTICLE 5
### CONDITIONS TO CLOSING

SECTION 5.01.    Purchaser's Conditions to Issuance of Notes ............................... 35
SECTION 5.02.    Company's Conditions to Issuance of Notes ................................. 37
SECTION 5.03.    Conditions Relating to Collateral .......................................... 38

i

## ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

SECTION 6.01.   Representations of the Company and the Guarantors .................................... 38
SECTION 6.02.   Representations of the Purchaser ................................................................... 44

## ARTICLE 7
### COVENANTS

SECTION 7.01.   Payment of Principal and Interest Under the Notes ...................................... 44
SECTION 7.02.   Maintenance of Office or Agency .................................................................. 45
SECTION 7.03.   Money for Note Payments to Be Held in Trust .............................................. 45
SECTION 7.04.   Maintenance of Corporate Existence ............................................................ 46
SECTION 7.05.   Payment of Taxes and Claims ....................................................................... 46
SECTION 7.06.   Payment of Additional Amounts ................................................................... 47
SECTION 7.07.   Collateral and Liens. ..................................................................................... 49
SECTION 7.08.   Certain Assurances ........................................................................................ 51
SECTION 7.09.   Release of Collateral ..................................................................................... 52
SECTION 7.10.   Maintenance of Collateral ............................................................................ 53
SECTION 7.11.   Limitation on Transactions with Affiliates. .................................................. 53
SECTION 7.12.   Limitation on Sale of Assets ......................................................................... 55
SECTION 7.13.   Limitation on Debt. ....................................................................................... 56
SECTION 7.14.   Limitation on Restricted Payments ............................................................... 59
SECTION 7.15.   Non-Compete and Exclusivity ...................................................................... 60
SECTION 7.16.   Additional Lines of Business ........................................................................ 61
SECTION 7.17.   GLA and IPCO Covenants ............................................................................ 61

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.   [Reserved]. ..................................................................................................... 64
SECTION 8.02.   Limitation on Consolidation, Merger or Transfer of Assets .......................... 64
SECTION 8.03.   Successor Substituted ..................................................................................... 65

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.   Events of Default ........................................................................................... 65
SECTION 9.02.   Acceleration of Maturity, Rescission and Amendment .................................. 68
SECTION 9.03.   Applicable Premium ...................................................................................... 68
SECTION 9.04.   Subrogation Rights ......................................................................................... 69
SECTION 9.05.   Application of Money Collected ..................................................................... 69
SECTION 9.06.   Limitation on Suits ........................................................................................ 70
SECTION 9.07.   Contractual Rights of Holders to Receive Principal and Interest .................. 70
SECTION 9.08.   Restoration of Rights and Remedies .............................................................. 71

ii

SECTION 9.09.   Delay or Omission Not Waiver..................................................................... 71
SECTION 9.10.   Control by Holders................................................................................... 71
SECTION 9.11.   Rights and Remedies Cumulative ................................................................ 71
SECTION 9.12.   Waiver of Past Defaults and Events of Default ............................................. 71
SECTION 9.13.   Waiver of Stay or Extension Laws .............................................................. 71

## ARTICLE 10
### AMENDMENTS

SECTION 10.01.  Without Consent of Holders ..................................................................... 72
SECTION 10.02.  With Consent of Holders ......................................................................... 73
SECTION 10.03.  Revocation and Effect of Consents and Waivers........................................... 75
SECTION 10.04.  Payment for Consent................................................................................ 75
SECTION 10.05.  Collateral Agent..................................................................................... 75

## ARTICLE 11
### NOTE GUARANTIES

SECTION 11.01.  The Note Guaranties ................................................................................ 75
SECTION 11.02.  Guaranty Unconditional............................................................................ 76
SECTION 11.03.  Discharge; Reinstatement ......................................................................... 76
SECTION 11.04.  Waiver by the Guarantors ......................................................................... 76
SECTION 11.05.  Subrogation and Contribution .................................................................... 77
SECTION 11.06.  Stay of Acceleration................................................................................ 77
SECTION 11.07.  Limitation on Amount of Guaranty ............................................................. 77
SECTION 11.08.  Execution and Delivery of Guaranty ........................................................... 77
SECTION 11.09.  Release of Guaranty ................................................................................ 77

## ARTICLE 12
### COLLATERAL AGENT

SECTION 12.01.  Appointment .......................................................................................... 78
SECTION 12.02.  Exculpatory Provisions ............................................................................ 78
SECTION 12.03.  Resignation ........................................................................................... 84
SECTION 12.04.  Fees, Expenses and Indemnification............................................................ 85

## ARTICLE 13
### EXCHANGE OF NOTES

SECTION 13.01.  Right to Exchange.................................................................................... 86
SECTION 13.02.  Exchange Procedure; Settlement Upon Exchange........................................... 87
SECTION 13.03.  Adjustment of Exchange Rate .................................................................... 91
SECTION 13.04.  Effects of Recapitalizations, Reclassifications and Changes of the Preferred
                Shares................................................................................................. 101
SECTION 13.05.  Certain Covenants ................................................................................. 103
SECTION 13.06.  Notice to Holders Prior to Certain Actions.................................................. 103

SECTION 13.07.  Shareholder Rights Plans ........................................................................ 104
SECTION 13.08.  Adjustments of Prices .......................................................................... 104

## ARTICLE 14
### ACTIONS BY HOLDERS

SECTION 14.01.  Action by Holders ................................................................................. 104
SECTION 14.02.  Proof of Execution by Holders ............................................................ 105
SECTION 14.03.  Company-Owned Notes Disregarded .................................................. 105
SECTION 14.04.  Revocation of Consents; Future Holders Bound ................................ 105

## ARTICLE 15
### MISCELLANEOUS

SECTION 15.01.  Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties
                and Holders of Notes ............................................................................ 105
SECTION 15.02.  Notices ................................................................................................. 106
SECTION 15.03.  Officer's Certificate and Opinion of Counsel as to Conditions Precedent ... 108
SECTION 15.04.  Statements Required in Officer's Certificate or Opinion of Counsel ........... 108
SECTION 15.05.  Rules by Registrar, Paying Agent, Exchange Agent and Transfer Agents ... 108
SECTION 15.06.  Currency Indemnity ............................................................................. 108
SECTION 15.07.  No Recourse Against Others ................................................................ 109
SECTION 15.08.  Legal Holidays .................................................................................... 109
SECTION 15.09.  Governing Law .................................................................................... 109
SECTION 15.10.  Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial ......... 110
SECTION 15.11.  Successors and Assigns ....................................................................... 111
SECTION 15.12.  Multiple Originals ............................................................................... 112
SECTION 15.13.  Severability Clause ............................................................................. 112
SECTION 15.14.  Force Majeure ..................................................................................... 112
SECTION 15.15.  Acknowledgement ............................................................................... 112

EXHIBITS:

EXHIBIT A          –   Form of Note
ANNEX I            –   Form of Notice of Exchange by the Company upon Satisfaction of the
                       Exchange Price Condition
ANNEX II           –   Form of Notice of Exchange by the Holder
EXHIBIT B          –   [Reserved]
EXHIBIT C          –   Collateral Agent KYC Requirements
EXHIBIT D          –   Form of GLA's Smiles Fiduciary Transfer Agreement
EXHIBIT E          –   Form of Exclusivity Side Letter
EXHIBIT F          –   Form of Subordination Agreement
SCHEDULE A         –   Permitted Holders
SCHEDULE B-1       –   Smiles Technological Infrastructure Agreements
SCHEDULE B-2       –   Smiles Technological Infrastructure Agreements
SCHEDULE C         –   Relevant Agreements Governing The Sale and Issuance of Miles

iv

SENIOR SECURED EXCHANGEABLE NOTE PURCHASE AGREEMENT, dated as of September 29, 2023, (this "**Note Purchase Agreement**") among GOL EQUITY FINANCE, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg ("**Luxembourg**"), with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 224920, as issuer (the "**Company**"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("**GLAI**"), as guarantor, registrar, transfer agent, exchange agent and paying agent, GOL LINHAS AÉREAS S.A., ("**GLA**"), a wholly owned subsidiary of GLAI, as guarantor, and SMILES FIDELIDADE S.A., a wholly owned subsidiary of GLA ("**IPCo**"), as guarantor, each, a corporation (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, ABRA GLOBAL FINANCE, an exempted company organized under the Laws of the Cayman Islands, with registered office at Willow House, Cricket Square, 4th Floor, Grand Cayman KY1-9010, Caymen Islands, as purchaser ("**Abra Global Finance**"), ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser ("**Abra**", each of Abra and Abra Global Finance being collectively and individually a "**Purchaser**") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "**Collateral Agent**").

## RECITALS

The Company has duly authorized (i) the issuance and sale of the Notes (as hereinafter defined) and (ii) the execution and delivery of this Note Purchase Agreement.

In addition, the Guarantors have duly authorized the execution and delivery of this Note Purchase Agreement as guarantors of the Notes. The Guarantors have done all things necessary to make the Note Guaranties (as hereinafter defined), when the Notes are executed and duly issued by the Company, the valid obligations of the Guarantors, and to make this Note Purchase Agreement a valid agreement of the Guarantors.

The Company has requested that, from time to time, upon the satisfaction in full of the conditions precedent set forth in Article 5, as applicable, the Purchaser, purchase the Notes from the Company in the aggregate initial principal amount of up to U.S.$1,430,925,000 on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE, THIS NOTE PURCHASE AGREEMENT WITNESSETH:**

For and in consideration of the premises and the purchase of the Notes by the Purchaser, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders (as defined below), as follows:

# ARTICLE 1

### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 1.01.   *Definitions*.

"**Abra Global Finance**" means Abra Global Finance incorporated under the laws of the Cayman Islands.

"**Abra Holders**" means, as of the date of determination, collectively, the holders of the Abra Senior Secured Notes (provided any such Abra Senior Secured Notes remain outstanding) and the holders of Abra Senior Secured Exchangeable Notes (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Notes**" means, collectively, the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

"**Abra Notes Supermajority Holders**" means, as of the date of determination, collectively, the holders of the Abra Notes holding more than each of (i) 66.67% in principal amount of the outstanding Abra Senior Secured Notes from time to time (provided any such Abra Senior Secured Notes have been issued and remain outstanding) and (ii) 66.67% in principal amount of outstanding Abra Senior Secured Exchangeable Notes from time to time (provided any such Abra Senior Secured Exchangeable Notes remain outstanding).

"**Abra Senior Secured Exchangeable Notes**" means the Abra Senior Secured Exchangeable Notes due 2028, issued by Abra Global Finance and guaranteed by Abra, in the aggregate principal amount of U.S.$458,585,447, pursuant to the Abra Senior Secured Exchangeable Notes Indenture.

"**Abra Senior Secured Exchangeable Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Exchangeable Notes entered into on March 2, 2023, by and among Abra Global Finance, as issuer, Abra, as guarantor, The Bank of New York Mellon, as trustee, registrar, paying agent and exchange agent, and TMF Group New York LLC, as collateral agent.

"**Abra Senior Secured Notes**" means the Abra Senior Secured Notes due 2028, issued by Abra Global Finance and guaranteed by Abra, in the aggregate principal amount of U.S.$962,254,480, pursuant to the Abra Senior Secured Notes Indenture.

"**Abra Senior Secured Notes Indenture**" means the indenture relating to the issuance of the Abra Senior Secured Notes entered into on March 2, 2023, by and among Abra Global Finance, as issuer, Abra, as guarantor, The Bank of New York Mellon, as trustee, registrar and paying agent, and TMF Group New York LLC, as collateral agent.

"**Accounting Principles**" shall mean the International Financial Reporting Standards promulgated by the International Accounting Standards Board ("**IFRS**"), in effect from time to time as applied by GLAI consistently throughout the relevant periods, including with regard to impairment losses, obsolescence policies for rotables and inventory, and hedging transactions.

2

For clarity, the impact of all hedging transactions shall be included as part of the income or expense item to which it relates, and not in interest or financing expense.

"**Act**" when used with respect to any Holder, has the meaning specified in Section 14.01(a).

"**Activities**" has the meaning specified in Section 12.02(t).

"**Additional Amounts**" has the meaning specified in Section 7.06(a).

"**Additional Assets**" means any assets (other than Debt and Capital Stock) to be used by GLAI or any of its Subsidiaries in a Related Business.

"**Adjusted Operating Expenses**" shall mean, for any reference period, with respect to any Guarantor or any of its Subsidiaries, as applicable, any costs and expenses incurred in services and other transactions required to generate Adjusted Operating Revenues of such Guarantor and its Subsidiaries which are recognized as operating expenses of such Guarantor and its Subsidiaries under the Accounting Principles, as applicable, **(i)** including (a) expenses related to personnel and associated taxes and charges, (b) fuel and lubricant expenses, (c) maintenance expenses, including Normalized aircraft redelivery expenses, (d) expenses related to third party services, (e) passenger and cargo enplanement costs, but excluding costs representing funds collected on behalf of third parties such as airport boarding fees, (f) landing and navigation fees, (g) sales and marketing expenses (h) frequent flyer redemption costs with any third parties or non-consolidated Subsidiaries and (i) other expenses associated with the generation of Adjusted Operating Revenues; and **(ii)** excluding (a) depreciation, (b) amortization, (c) lease payments, (d) interest expenses, (e) non-cash foreign exchange variation, (f) income taxes and social contribution taxes applicable to profits, (g) unpaid maintenance expenses to the extent such provisions are reflected in a Guarantor's or any of its Subsidiaries' Debt calculations, as applicable, in the form of maintenance and/or redelivery provision liabilities. The calculation of Adjusted Operating Expenses of each Guarantor or any of its Subsidiaries, as applicable, shall be based on consistent methodologies and parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor or any of its Subsidiaries for purposes of the definition of Adjusted Operating Expenses, as applicable:

- Restoration maintenance expenses: restoration maintenance expenses shall use an accrual basis of accounting for engines, fuselage, APU, and landing gear.

- Routine maintenance expenses: routine maintenance expenses shall be expensed as incurred.

- Aircraft depreciation: the calculation of residual value and useful life of Aircraft shall reflect the agreed upon contractual provisions of leases or other aircraft financing instruments.

3

- <u>Losses on sale-leaseback transactions</u>: losses on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- <u>Air traffic liability</u>: shall represent the Guarantors' liability for tickets sold for future travel dates and funds that are past flight date and remain unused as well the Guarantors' liability associated with loyalty related performance obligations. Air traffic liability of each Guarantor shall be calculated assuming passenger ticket breakage at the earlier of 12 months from purchase and the expiration of the applicable ticket or program.

- <u>Pension liability and employee benefits</u>: each Guarantor shall use the same methodology for calculation of pension liabilities and employee benefits to the extent permitted by applicable Law and include it in the profit and loss statement as part of employee expenses.

- <u>Expected losses on receivables</u>: expected losses on receivables shall be estimated based on historical experience and in the case of materially large past due receivables, have external auditor input.

- <u>Operating expenses/rental expenses</u>: no operating expenses shall be treated as rental expenses.

- <u>Standard group policies</u>: each airline will conform to standardized group policies about which costs to capitalize versus expense.

"**Adjusted Operating Revenues**" shall mean, for any reference period, the gross inflow of economic benefits (such as cash, receivables, and other assets) arising from ordinary operating activities, recognized as revenues under the Accounting Principles (i) <u>including</u> (a) sales of passenger transportation services and associated revenues, including flight tickets revenues calculated recognizing breakage amounts at the earlier of 12 months from purchase and the expiration of the applicable ticket or program, baggage fees, rescheduling fees, cancellation fees, other related passenger revenues; (b) cargo transportation revenues; (c) frequent flyer revenues calculated recognizing breakage amounts for unredeemed mileage credits at the earlier of 12 months from issue and the expiration of the applicable ticket or program; (d) recovery of or compensation for previously incurred operating expenses; and (e) recovery of or compensation for interrupted services, aircraft delivery delays and unexpected aircraft grounding periods; and (ii) <u>excluding</u> (a) interest revenues, (b) any income associated with non-cash foreign exchange variation, (c) dividends and (d) any revenues passed-through to third parties, such as airport boarding fees. Adjusted Operating Revenues may be reported on each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, as operating revenues on the top line of the income statement or as a deduction from operating costs and expenses and may be subject to timing deferrals or occur in different periods in each of the Guarantors' or any of its Subsidiaries financial statements, as applicable, if the accounting policies of the Guarantors or any of its Subsidiaries have not been conformed. The calculation of Adjusted Operating Revenues of each Guarantor, as applicable, shall be based on consistent methodologies and

4

parameters. Independent of the Accounting Principles, the following shall apply consistently to each Guarantor, as applicable, for purposes of the definition of Adjusted Operating Revenues:

- <u>Gains on sale-leaseback transactions</u>: gains on sale-leaseback or off market-return conditions shall be amortized over the life of the applicable aircraft lease.

- <u>Credit card installment interest</u>: credit card installment interest shall be deducted from revenues (and not reflected as an interest expense).

"**ADS**" means an American Depositary Share, issued pursuant to the Deposit Agreement, representing, as of the date of this Note Purchase Agreement, two Preferred Shares.

"**ADS Depositary**" means The Bank of New York Mellon, as depositary for the ADSs, or any successor under the Deposit Agreement.

"**affected day**" has the meaning specified in the definition of the term "Prevailing Exchange Rate."

"**Affiliate**" means, with respect to any specified Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person or (b) any other Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise, and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Agents**" means any Collateral Agent, Registrar, Transfer Agent, Exchange Agent or Paying Agent appointed pursuant to this Note Purchase Agreement, individually, an "**Agent**."

"**Aircraft**" shall mean, collectively, any aircraft owned by or leased to a Guarantor or any of its Subsidiaries, as applicable, and any engines, parts, components, instruments, accessories, furnishings and other equipment attached or relating to such aircraft.

"**Aircraft Debt**" means any (i) Debt incurred to finance the acquisition or operation of aircraft, spare parts or engines, secured by aircraft, spare parts or engines the acquisition or operation of which are so financed, (ii) any asset-based Debt on terms that are customary in the aviation industry secured by aircraft, spare parts or engines, and (iii) predelivery payment financing.

"**Aircraft Rentals**" shall mean, with respect to a Guarantor or any of its Subsidiaries, as applicable, the annual aircraft rental expense of such Guarantor or any of its Subsidiaries (subject to Normalization).

"**Anti-Money Laundering Laws**" has the meaning specified in Section 6.01(12).

"**Apostille**" has the meaning specified in Section 6.01(17).

5

"**Apostille Convention**" has the meaning specified in Section 6.01(17).

"**Applicable Premium**" means the difference (which shall not be less than zero) between (a) the sum (in cash) of the present values of the remaining scheduled payments of principal and interest (including without limitation all PIK Interest) on such Notes (excluding accrued and unpaid interest (other than PIK Interest capitalized prior to the date thereof) to the date when such Notes become due and payable) discounted to the date when such Notes become due and payable on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points, and (b) the principal amount of the Notes then Outstanding.

"**Asset Sale**" means any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions) by GLAI or any of its Subsidiaries outside the ordinary course of business, including any disposition by means of a merger, consolidation, or similar transaction (each referred to for the purposes of this definition as a "disposition"), of:

(1) any shares of a Subsidiary of GLAI (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than GLAI or a Subsidiary thereof);

(2) all or substantially all the assets of any division or line of business of GLAI or any Subsidiary thereof; or

(3) any other assets of GLAI or any Subsidiary other than the Collateral;

*provided*, *however*, that Asset Sale will not include:

(a) a disposition by a Subsidiary to GLAI or to another Subsidiary or by GLAI to a Subsidiary;

(b) a Restricted Payment that does not violate the covenant described under Section 7.14. Limitation on Restricted Payments;

(c) the disposition of assets with a Fair Market Value not to exceed U.S.$40.0 million in the aggregate (or the equivalent thereof at the time of determination), except for a disposition of assets expressly provided for in the annual budget or business plan of GLAI or any of its Subsidiaries, as the case may be;

(d) a disposition of obsolete equipment or other obsolete assets or other property which is no longer useful for GLAI or any of its Subsidiaries in the ordinary course of business;

(e) the disposition of all or substantially all of the assets of GLAI or any of its Subsidiaries in a manner permitted under the covenant described under Section 8. Consolidation, Merger, Conveyance, Transfer or Lease;

(f) any surrender or waiver of contract rights pursuant to a settlement, release, recovery on or surrender of contract, tort or other claims of any kind; or

6

(g) sales, transfers or other dispositions of assets for non-cash consideration at least equal to the Fair Market Value (as certificated in a certificate signed by a Responsible Officer) of such assets, to the extent that such non-cash consideration would constitute Additional Assets.

"**Authorized Denomination**" has the meaning specified in Section 4.02(a)(4).

"**B3**" means B3 S.A. – *Brasil, Bolsa, Balcão*, the São Paulo Stock Exchange.

"**Bloomberg**" means Bloomberg L.P.

"**Board of Directors**" means the Board of Directors of the Company, or the applicable Guarantor, as the case may be, or any committee thereof duly authorized to act on behalf of such Board of Directors.

"**Board Resolution**" means a copy of a resolution certified by the secretary, the assistant secretary or another Officer or legal counsel performing corporate secretarial functions of the Company or the Guarantors, as applicable to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification.

"**Brazilian Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil or a day on which banking institutions or trust companies are authorized or obligated by law to close in São Paulo, Brazil.

"**Business Day**" means any day other than a Saturday, a Sunday or a legal holiday in Brazil, England and Wales, the State of New York or Luxembourg or a day on which banking institutions or trust companies are authorized or obligated by Law to close in The City of New York, London, São Paulo, Brazil, or Luxembourg.

"**Capital Stock**" means, with respect to any Person, any and all shares of stock, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated, whether voting or non-voting), such Person's equity including any preferred stock, but excluding any debt securities convertible into or exchangeable for such equity.

"**Cash Interest**" shall have the meaning specified in Section 4.05(d)(i).

"**Cash Settlement**" shall have the meaning specified in Section 1.01(a).

"**Central Bank**" means the Central Bank of Brazil (*Banco Central do Brasil*)

"**Clause A Distribution**" shall have the meaning specified in Section 1.01(c)(1).

"**Clause B Distribution**" shall have the meaning specified in Section 1.01(c)(2).

"**Clause C Distribution**" shall have the meaning specified in Section 1.01(c)(2).

"**close of business**" means 5:00 p.m. (New York City time).

"**Closing**" shall have the meaning specified in Section 2.02.

"**Closing Date**" means the Initial Closing Date or any date thereafter on which the Company and the Purchaser mutually agree to sell and purchase Notes hereunder, as applicable.

"**Closing Location**" shall have the meaning specified in Section 2.02.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Collateral**" means all the assets and rights that from time to time are subject to a Lien granted by the Company or any Guarantor to the Collateral Agent, for the benefit of the Secured Parties, pursuant to any Collateral Document. The Collateral shall include (i) as further described in GLA's Smiles Fiduciary Transfer Agreement (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program, (ii) all intercompany claims, loans and obligations evidenced by the global intercompany note entered into by the Company and the Guarantors evidencing the loans made by the Company or any Guarantor to any of its respective Affiliates or Subsidiaries, (iii) the guaranty by the GOL entities and IPCo of all of the Company's obligations under this Note Purchase Agreement and the Notes and the other Collateral Documents, (iv) as further described in GOL Senior Secured Notes due 2026 Collateral, all collateral securing the GOL Senior Secured Notes due 2026 on a *pari passu* basis, (v) as further described in GLA's Fiduciary Transfer of IPCo's Shares Agreement, one hundred percent (100%) of IPCo's equity, totally owned by GLA and (vi) as further described in IPCo's Smiles Fiduciary Transfer Agreement, all of the assets and rights described in item (1)(i) above transferred to IPCo under suspensive condition pursuant to Section 7.17 below.

"**Collateral Agent**" means (i) the Person named as the "Collateral Agent" in the first paragraph of this Note Purchase Agreement and (ii) any Person appointed as a successor "Collateral Agent' under this Note Purchase Agreement and the Collateral Documents, in each case, until a successor Person shall have become such pursuant to the applicable provisions of this Note Purchase Agreement and the Collateral Documents, and thereafter "Collateral Agent" shall mean the successor serving hereunder and thereunder.

"**Collateral Documents**" means (i) the GLA's Smiles Fiduciary Transfer Agreement, (ii) the amendments to GOL Senior Secured Notes due 2026 Collateral (to include the Notes and GOL Senior Secured Notes due 2028 as secured obligations), (iii) the intercreditor agreement between the Company, GOL Finance, the Collateral Agent, The Bank of New York Mellon, as trustee of the GOL Senior Secured Notes due 2026, TMF Brasil Administração Gestão de Ativos Ltda., as collateral agent under the GOL Senior Secured Notes due 2026 and TMF Brasil Administração Gestão de Ativos Ltda., as collateral agent under the Gol Senior Secured Notes NPA, dated as of March 2, 2023 and amended and restated as of the date hereof, (iv) the GLA's Fiduciary Transfer of IPCo's Shares Agreement, and (v) the IPCo's Smiles Fiduciary Transfer Agreement. The definition of Collateral Documents shall also include any other agreement designated as a Collateral Document by the parties hereto, as amended from time to time.

8

"**Combination Settlement**" shall have the meaning specified in Section 1.01(a).

"**Company**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**Company and Guarantors Process Agent**" has the meaning specified in Section 15.10(a).

"**Company's Office**" has the meaning specified in Section 4.03(a).

"**Comparable Treasury Issue**" means the United States Treasury security selected by the Company as having a maturity comparable to the remaining term of the Notes to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of such Notes.

"**Comparable Treasury Price**" means with respect to any date when Notes become due and payable, the average of two Reference Treasury Dealer Quotations for the when such Notes become due and payable.

"**Covered Plan**" has the meaning specified in Section 6.02(3).

"**CVM**" means the Brazilian Securities Commission (*Comissão de Valores Mobiliários*).

"**Daily Exchange Value**" means, for each of the 50 consecutive VWAP Trading Days during the Observation Period, 2% of the product of (a) the Exchange Rate on such VWAP Trading Day and (b) the Daily VWAP for such VWAP Trading Day.

"**Daily Measurement Value**" means the Specified Dollar Amount (if any), *divided by* 50.

"**Daily Settlement Amount**," for each of the 50 consecutive VWAP Trading Days during the Observation Period, shall consist of:

(a)      cash in an amount equal to the lesser of (i) the Daily Measurement Value and (ii) the Daily Exchange Value on such VWAP Trading Day; and

(b)      if the Daily Exchange Value on such VWAP Trading Day exceeds the Daily Measurement Value, a number of Preferred Shares equal to (i) the difference between the Daily Exchange Value and the Daily Measurement Value, *divided by* (ii) the Daily VWAP for such VWAP Trading Day.

"**Daily VWAP**" means, for each of the 50 consecutive VWAP Trading Days during the relevant Observation Period, the per Preferred Share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "GOLL4 BZ Equity" (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such VWAP Trading Day (or if such volume-weighted average price is unavailable, the market value

9

of one Preferred Share on such VWAP Trading Day determined, using a volume-weighted average method, by an internationally recognized independent investment banking firm retained for this purpose by the Company).  The "**Daily VWAP**" shall be determined without regard to after-hours trading or any other trading outside of the regular trading session trading hours. The "**Daily VWAP**" for any Trading Day will be expressed in U.S. Dollars and, if expressed in a different currency for such Trading Day as determined above (which, for the avoidance of doubt, will be the case if, at the time the Notes are issued the Preferred Shares are only listed on the B3), will be translated by the Company to U.S. Dollars at the Prevailing Exchange Rate on such Trading Day. For the avoidance of doubt, the "**Daily VWAPs**" (including the "**Daily VWAPs**" used to calculate the Daily Exchange Values, the Daily Settlement Amounts and the daily cash amounts) will be expressed in U.S. Dollars (translated, if necessary, to U.S. Dollars at the Prevailing Exchange Rate).

"**Debt**" means, with respect to any Person, without duplication, the Outstanding principal amount of, including any related accrued or outstanding interest, of all (a) debt for borrowed money of such Person or debt issued by such Person in substitution or exchange for borrowed money, (b) debt evidenced by any note, bond, debenture or other debt security, in each case, as of such time of such Person, taking into account the face value of any convertible securities, (c) that portion of the obligations with respect to finance leases in accordance with IFRS (provided, that for the avoidance of doubt, finance leases shall not be double counted with IFRS 16 leases), (d) the net settlement value of all interest rate or currency swaps, collars, caps, and similar hedging obligations or other derivative agreements, including equity derivatives structured as "capped calls" and (e) all reimbursement or other obligations with respect to letters of credit, bank guarantees, bankers acceptances or similar instruments, in each case, solely to the extent drawn. "**Debt**" shall not include (1) customer deposits, (2) advance payments received from customers for the sale, lease or license of goods and services in the ordinary course of business, whether or not such deposits or advance payments have been expensed in accordance with IFRS, (3) non-speculative hedging obligations and (4) current accounts payable and accrued expenses payable within 180 days and incurred in the ordinary course of business.

"**Deductions**" has the meaning specified in Section 12.02(m).

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Defaulted Amounts**" means any amounts on any Note (including principal and interest) that are payable but are not punctually paid or duly provided for.

"**Deposit Agreement**" means the Amended and Restated Deposit Agreement, dated as of April 17, 2017, by and among GLAI, the ADS Depositary, and the holders from time to time of ADSs issued thereunder, as supplemented by a letter agreement dated as of March 26, 2019, between GLAI and the ADS Depositary, relating to the delivery of ADSs or restricted ADSs, as the case may be, upon exchange of the Notes and, if further amended or supplemented as provided therein, as so amended or supplemented.

10

"**Designated Bank Account**" means, with respect to any payments made to a Holder pursuant to this Note Purchase Agreement or Notes, the U.S. dollar bank account designated by such Holder at least three Business Days prior to the applicable payment.

"**Disclosure Documents**" shall have the meaning specified in Section 1.01(c)6.01(23).

"**Distributed Property**" shall have the meaning specified in Section 1.01(c).

"**EBITDAR**" shall mean earnings before interest, taxes, depreciation, amortization and rent and, for the purposes of the Notes, shall be composed of (a) the Adjusted Operating Revenues, net of Sales Taxes, *minus* (b) the Adjusted Operating Expenses.

"**Embargo Rules**" has the meaning specified in Section 12.02(l).

"**Enforceability Exceptions**" shall have the meaning specified in Section 6.01(3).

"**ERISA**" has the meaning specified in Section 6.02(3).

"**Event of Default**" has the meaning specified in Section 9.01.

"**Ex-Dividend Date**" means the first date on which the Preferred Shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question, from GLAI or, if applicable, from the seller of the Preferred Shares on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

"**Excess Proceeds**" shall have the meaning specified in Section 7.12(iv).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Exchange Agent**" shall have the meaning specified in Section 4.03(a).

"**Exchange Date**" shall have the meaning specified in Section 1.01(c), except that, as used in Section 1.01(m), "**Exchange Date**" means, for so long as the Preferred Shares are listed and traded on the B3, the first date on which the Preferred Shares trade on the Relevant Stock Exchange, regular way, reflecting the relevant share split or share combination, as applicable.

"**Exchange Obligation**" shall have the meaning specified in Section 13.01.

"**Exchange Price**" means as of any time, U.S.$1,000, *divided by* the Exchange Rate as of such time.

"**Exchange Rate**" shall have the meaning specified in Section 13.01.

"**Exclusivity Side Letter**" means that certain Brazilian law governed side letter, dated as of March 2, 2023 attached hereto as Exhibit E, by and among the Company, the Guarantors and Abra and Abra Global Finance relating to, among other things, the agreements by the Company, the Guarantors and IPCo with respect to the exclusivity of the Loyalty Program.

"**Expiration Date**" shall have the meaning specified in Section 1.01(e).

"**Fair Market Value**" of any property, asset, share of Capital Stock, other security, Investment or other item means, on any date, the fair market value of such property, asset, share of Capital Stock, other security, Investment or other item on that date as determined in good faith by the management of GLAI or a Subsidiary thereof, as the case may be.

"**Federal Reserve System**" means the central banking system of the United States of America.

"**Form of GLA's Smiles Fiduciary Transfer Agreement**" means the "Form of GLA's Smiles Fiduciary Transfer Agreement" attached hereto as Exhibit D.

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

"**Form of Notice of Exchange by the Company**" means the "Form of Notice of Exchange by the Company upon Satisfaction of the Exchange Price Condition" attached hereto as **Error! Reference source not found.** of the Form of Note.

"**Form of Notice of Exchange by the Holders**" means the "Form of Notice of Exchange by the Holders" attached hereto as **Error! Reference source not found.** of the Form of Note.

"**Fundamental Change**" means, at any time after the Initial Closing Date, any of the following occurring:

(i)    the consummation of any transaction (including, without limitation, by merger, consolidation, acquisition or any other means or by any of the transactions contemplated in this Note Purchase Agreement) as a result of which any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), except for any "person" or "group" that consists solely of one or more Permitted Holders is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the outstanding Capital Stock;

(ii)    the consummation of (1) except as set forth in clause (2) below, any recapitalization, reclassification or change of the Capital Stock (other than changes in par value or resulting from a subdivision or consolidation) as a result of which the Capital Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof); (2) any statutory share exchange, consolidation, merger, merger of shares, as applicable, or other combination involving any of the Guarantors as a result of which the Capital Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof); or (3) any sale, lease or other transfer or disposition in one transaction or a series of transactions, including any split-off or spin-off, to any Person of all or substantially all of the consolidated assets of any of the Guarantors and its Subsidiaries, taken as a whole; *provided*, *however*, that a transaction described in clause (1) or (2) in which the holders of the Capital Stock immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Capital Stock of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions vis-à-vis each other as such ownership

12

immediately prior to such transaction shall not be a Fundamental Change pursuant to this clause (ii); or

(iii)    the shareholders of the Company or any of the Guarantors approve any plan or proposal for the liquidation or dissolution of the Company or any of the Guarantors other than in a transaction described in, and that complies with the provisions described under, Article 8 of this Note Purchase Agreement.

"**GLA**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLA's Fiduciary Transfer of IPCo's Shares Agreement**" means that certain Brazilian law governed agreement, dated as of March 2, 2023, entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, GLAI and IPCo, as intervening party (as amended from time to time), with respect to the fiduciary lien over one hundred percent (100%) of IPCo's equity, all of which is owned by GLA.

"**GLA's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement, dated as of March 2, 2023, entered into by GLA, as security provider, the Collateral Agent, as security beneficiary, and GLAI, as intervening party (as amended from time to time), with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure, (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program.

"**GLAI**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**GLAI Going Private Date**" means the date in which the GLAI Going Private Process is concluded.

"**GLAI Going Private Process**" means the process of (i) termination of the listing for trading of the Preferred Shares on the B3 or (ii) deregistration of GLAI as a publicly held company (*companhia aberta*) with the CVM.

"**GLAI Group**" means GLAI and all of its direct and indirect Subsidiaries (including GLA).

"**GOL Bonds**" means the following notes issued by GLAI or its subsidiaries: the GOL Exchangeable Notes due 2024, the GOL Senior Notes due 2025, the GOL Senior Secured Notes due 2026 and the GOL Perpetual Notes existing on the date of this Note Purchase Agreement.

"**GOL Exchangeable Notes due 2024**" means the 3.75% Exchangeable Senior Notes Due 2024, issued by the Company.

"**GOL Finance**" means GOL Finance, a public limited liability company (*société anonyme*) incorporated and existing under the laws of Luxembourg with registered office at 17,

13

Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (R.C.S. Luxembourg) under number B 178497.

"**GOL Perpetual Notes**" means the 8.75% Perpetual Notes, issued by GOL Finance.

"**GOL Senior Notes due 2025**" means the 7.000% Senior Notes Due 2025, issued by Gol Finance.

"**GOL Senior Secured Notes due 2026**" means the 8.00% Senior Secured Notes Due 2026, issued by Gol Finance.

"**GOL Senior Secured Notes due 2026 Collateral**" means the GOL Senior Secured Notes due 2026 IP Collateral  and the GOL Senior Secured Notes due 2026 Spares Parts Collateral.

"**GOL Senior Secured Notes due 2026 IP Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLAI, as intervening party; and (ii) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, among GLAI, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

"**GOL Senior Secured Notes due 2026 Spares Parts Collateral**" means the following collateral securing the obligations of GOL Senior Secured Notes due 2026: (i) the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party; (ii) the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

"**GOL Senior Secured Notes due 2028**" means the 18% Senior Secured Notes due 2028, issued by GOL Finance, as of March 2, 2023.

"**GOL Senior Secured Notes NPA**" means the Senior Secured Note Purchase Agreement, dated as of March 2, 2023, entered into by and among GOL Finance, GLAI, GLA, IPCo, TMF Brasil Administração e Gestão de Ativos Ltda. and the Purchaser.

"**GOL Senior Secured Notes NPA Initial Closing Date**" means March 2, 2023.

"**Governmental Authority**" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any Person and any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply

14

funds for the purchase or payment of) such Debt or other obligation of such Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take or pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "guarantee" used as a verb has a corresponding meaning.

"**Guarantor**" means any of (i) GLAI, (ii) GLA, (iii) IPCo and (iv) any successor obligor under the Note Guaranties pursuant to Section 11.01, unless and until such Guarantor is released from the Note Guaranty pursuant to this Note Purchase Agreement.

"**Holder**" means the Person in whose name a Note is registered in the Register.

"**IFRS**" has the meaning set forth in the definition of the term "**Accounting Principles**"

"**Independent Financial Advisor**" means an independent investment bank or accounting firm of international standing which is experienced in capital markets transactions appointed by the Purchaser.

"**Initial Closing Date**" means the date of execution of this Note Purchase Agreement.

"**Institutional Investor**" has the meaning set forth in Section 6.01(19).

"**Interest Payment Date**" means each May 31 and November 30 of each year, beginning on November 30, 2023.

"**Investment**" means:

(a) the acquisition or investment in any Person or business (whether by asset or equity purchase, merger, consolidation, amalgamation or otherwise) that holds, directly or indirectly, any interest in, or directly or indirectly operates, any airline, or otherwise where the consideration for the acquisition and any Debt or other assumed actual or contingent liability, together with the amount of any investment in any joint venture, exceeds U.S.$40.0 million (or the equivalent thereof at the time of determination), except as provided for in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(b) the approval or amendment of the annual budget or business plan or any voluntary deviation therefrom in excess of 5% of Adjusted Operating Expenses set out in the annual budget or business plan of GLAI or any Subsidiary thereof, as the case may be;

(c) any capital expenditure that in the aggregate in any fiscal year is in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination), except for capital expenditures provided for in the annual budget or the business plan of GLAI or any Subsidiary thereof, as the case may be;

(d) any contract that (i) is (x) outside the ordinary course of business, or (y) on terms other than industry standard commercial terms, and (ii) involving an annual payment greater than U.S.$10.0 million (or the equivalent thereof at the time of determination), in each case, except for agreements as provided for in the annual budget or the business plan of GLAI or its Subsidiary, as the case may be; or

(e) any contract, binding agreement or similar or analogous arrangement for the purchase, order or lease of any aircraft.

"**IPCo**" has the meaning specified in the first paragraph of this Note Purchase Agreement and shall include its successors and assigns.

"**IPCo's Smiles Fiduciary Transfer Agreement**" means that certain Brazilian law governed agreement, dated as of March 2, 2023, entered into by IPCo, as security provider, the Collateral Agent, as security beneficiary, and GLA and GLAI, as intervening parties, with respect to the fiduciary lien over (a) the Smiles Intellectual Property, (b) the Smiles Technological Infrastructure; (c) the Smiles Database, Client and Supplier List, (d) the Smiles Operating Manuals, (e) all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, and advertising materials exclusively related to the Loyalty Program, under suspensive condition according to article 125 of Brazilian Civil Code, corresponding to the transfer of the assets and rights encumbered by the GLA's Smiles Fiduciary Transfer Agreement from GLA to IPCo.

"**issue**" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Debt or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be issued by such Subsidiary at the time it becomes a Subsidiary; and the term "issuance" has a corresponding meaning.

"**Last Reported Sale Price**" of the Preferred Shares, on any date, means the closing sale price per Preferred Share on such date (or if no closing sale price per Preferred Share is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date as reported in composite transactions for the B3. If the Preferred Shares are not listed for trading on the B3 or a U.S. national securities exchange on the Relevant Date, the "**Last Reported Sale Price**" shall be the closing sale price per Preferred Share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date reported in composite transactions for the principal Brazilian or U.S. national securities exchange on which the Preferred Shares are traded. If the Preferred Shares are not listed in a principal Brazilian or U.S. national securities exchange, the "Last Reported Sale Price" shall be the last quoted bid price for the Preferred Shares in the over-the-counter market on the Relevant Date as reported by the *Central de Custódia e de Liquidação Financeira de Títulos - CETIP* or a similar organization. If the Preferred Shares are not quoted in the over-the-counter market on the Relevant Date, the "Last Reported Sale Price" shall be the average of the mid-point of the last bid and ask prices for the Preferred Shares on the Relevant Date from each of at least three internationally recognized independent investment banking firms selected by GLAI for this purpose. Any price of the Preferred Shares (or such other security) not in U.S. Dollars shall be

16

converted into U.S. Dollars by the Exchange Agent at the Prevailing Exchange Rate on such Trading Day.

"**Laws**" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**Lien**" means any mortgage, pledge, assignment by way of security, charge, security interest, encumbrance, conditional sale or other title retention agreement or other similar lien.

"**Loyalty Program**" means the Smiles loyalty program, and any successor program.

"**Majority Holders**" means Holders of the Notes holding more than 50% in principal amount of the Outstanding Notes.

"**Market Disruption Event**" means, (a) a failure by the Relevant Stock Exchange to open for trading during its regular trading session or (b) the occurrence or existence prior to 1:00 p.m., São Paulo time, on any Scheduled Trading Day for the Preferred Shares for more than one half-hour period in the aggregate during regular trading hours of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the Relevant Stock Exchange or otherwise) in the Preferred Shares or in any options contracts or futures contracts relating to the Preferred Shares.

"**Material Adverse Effect**" means (i) any material adverse effect on the condition (financial or otherwise), business, properties, results of operations or prospects of the Company, the Guarantors and their Subsidiaries, taken as a whole, (ii) any material adverse effect on the ability of the Company, the Guarantors and their Subsidiaries, taken as a whole, to perform their obligations under any Transaction Document, (iii) any material adverse effect upon the binding nature, validity, or enforceability of any of the Transaction Documents or (iv) any material adverse effect on the rights and remedies of the Purchaser or the rights of the Collateral Agent and the Holders in the Collateral, in each case, whether resulting from any single act, omission, situation, status, event or undertaking, or taken together with other such acts, omissions, situations statuses, events or undertakings.

"**Maturity Date**" means the earliest of (a) March 2, 2028, (b) if more than $42.5 million in aggregate principal amount of the GOL Exchangeable Notes due 2024 remains outstanding on the date that is 45 days prior to the maturity of the GOL Exchangeable Notes due 2024 (the "**2024 measurement date**"), the 2024 measurement date or (c) if more than $65 million in aggregate principal amount of the GOL Senior Notes due 2025 remains outstanding on the date that is 45 days prior to the maturity of the GOL Senior Notes due 2025 (the "**2025 measurement date**"), the 2025 measurement date.

"**Net Cash Proceeds**" with respect to any issuance or sale of Capital Stock or sale or other disposition of any assets, means the cash proceeds of such issuance or sale, net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or

17

commissions and brokerage, consultant and other fees and expenses actually incurred in connection with such issuance or sale and net of taxes paid or payable in connection with such issuance, sale or disposition.

"**Normalized**" or "**Normalization**" shall mean, for each year:

(a) with respect to aircraft redelivery expenses, the total of the redelivery expenses that a Guarantor or any of its Subsidiaries, as applicable, would be projected to incur on redelivery of each leased aircraft in its fleet, expressed in U.S. Dollars, divided by the expected lease tenor of each aircraft expressed in years, as calculated by an independent third party engaged by each Guarantor or any of its Subsidiaries, as applicable; provided, that for the avoidance of doubt, any redelivery expense accrued in such year under IFRS shall be considered part of and included in the Normalized redelivery expenses figure; and

(b) with respect to any Aircraft Rental, the average annual rental expenses (excluding any refundable payments such as deposits and maintenance reserves, as well as any projected redelivery expenses, but including any one-time or "balloon" rental payments) expected to be incurred during the life of such rental.

"**Note Guaranties**" shall have the meaning specified in Section 11.01.

"**Note Purchase Agreement**" has the meaning specified in the first paragraph of this agreement.

"**Notes**" means the notes issued pursuant to the terms hereof on each Closing Date in an initial aggregate principal amount of up to U.S.$1,430,925,000, and shall be substantially in the Form of Note.

"**Notes Obligations**" means Obligations in respect of the Notes, this Note Purchase Agreement, the Note Guaranties and the Collateral Documents.

"**Notice of Exchange**" shall have the meaning specified in Section 1.01(b).

"**Obligations**" means any principal, interest (including any interest, fees and other amounts accruing subsequent to the filing of a petition in bankruptcy, reorganization, arrangement or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest, fees and other amounts are an allowed claim under applicable state, federal or foreign law), premium, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, and guarantees of payment of such principal, interest, penalties, fees, indemnifications, reimbursements, expenses, damages and other liabilities, payable under the documentation governing any Debt.

"**Observation Period**" with respect to any Note surrendered for exchange means, (i) if the relevant Exchange Date occurs prior to October 1, 2027, the 50 consecutive VWAP Trading Day period beginning on, and including, the second VWAP Trading Day immediately succeeding such Exchange Date; and (ii) if the relevant Exchange Date occurs on or after October 1, 2027, the 50 consecutive VWAP Trading Day period beginning on, and including, the 52nd Scheduled Trading Day immediately preceding the Maturity Date.

18

"**Officer**" means any director, the president or chief executive officer, any vice president, the chief financial officer, the treasurer or any assistant treasurer, or the secretary or any assistant secretary, of the Company or the Guarantors, as the case may be, or any other Person duly appointed by the shareholders of the Company, or the Guarantors, or the Board of Directors, as the case may be, to perform corporate duties.

"**Officer's Certificate**" means a certificate signed by any of the chief executive officer, the chief operating officer, the chief financial officer, the chief accounting officer, the treasurer, a director, the general counsel or any vice president of the Company or the applicable Guarantor, as the case may be.

"**Opinion of Counsel**" means an opinion of legal counsel of recognized international standing (who may be an employee of or counsel to the Company or the Guarantors, *provided that* an Opinion of Counsel delivered pursuant to Section 7.08 and Section 10.01 shall be of an external counsel to, and not an employee of, the Company or the Guarantors, as applicable).

"**Outstanding**" means, as of the date of determination, all Notes theretofore executed and delivered under this Note Purchase Agreement, except:

(i)     Notes theretofore cancelled by the Company or accepted by the Company for cancellation;

(ii)     Notes for whose payment in the necessary amount has been theretofore deposited with the Paying Agent in trust or set aside and segregated in trust by the Company for the Holders of such Notes;

(iii)     Notes exchanged pursuant to Article 13 and required to be cancelled pursuant to Section 4.09; and

(iv)     Notes held by the Company or by any Subsidiary thereof.

"**Paying Agent**" shall have the meaning specified in Section 4.03(a).

"**Payment Default**" has the meaning specified in Section 9.01(f).

"**Permitted Holder**" means (i) each entity listed in Schedule A hereto, and (ii) their Affiliates.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a protected series of a limited liability company or a limited partnership, an association, a trust or any other entity or a government or political subdivision or an agency or instrumentality thereof.

"**Physical Settlement**" shall have the meaning specified in Section 1.01(a).

"**PIK Interest**" shall have the meaning specified in Section 4.05(d)(2).

"**Preferred Shares**" means the preferred shares of GLAI, no par value per share.

19

"**Preferred Shares Registrar**" means Itaú Corretora de Valores S.A., as registrar of the Preferred Shares and until a successor shall have been appointed and become such pursuant to the applicable provisions of this Note Purchase Agreement, and thereafter, "Preferred Shares Registrar" shall mean or include such successor.

"**Prevailing Exchange Rate**" means, for purposes of translating, as of any date, any amount in Reais into an equivalent amount in U.S. dollars, the spot mid-rate of exchange between such currencies prevailing as of 4:00 p.m., New York City time, on such date, as displayed on, or derived from, Bloomberg page "BFIX" (or, if such page is not available, its equivalent successor page) in respect of such currencies. If such rate cannot be determined as provided in the immediately preceding sentence on such date (which, for the purpose of this definition, will be deemed to be the "**affected day**"), then the Prevailing Exchange Rate for such date will be determined *mutatis mutandis* but with respect to the immediately preceding day on which such rate can be so determined; provided, however, that, if such immediately preceding day is before the fifth day before such affected day, or, if such rate cannot be so determined, then the Prevailing Exchange Rate will be determined in such other manner as prescribed in good faith by the Exchange Agent. The Prevailing Exchange Rate will be determined by the Exchange Agent, except to the extent otherwise specified in this definition.

"**Primary Treasury Dealer**" has the meaning specified in the definition of the term "Reference Treasury Dealer."

"**principal**" of a Note means the principal amount of such Note (including any Additional Amounts payable by the Company in respect of such principal).

"**Principal Amount**" has the meaning set forth in Section 2.01.

"**Proceeding**" has the meaning specified in Section 15.10(a).

"**Purchase Price**" has the meaning set forth in Section 2.01.

"**Purchaser**" means each of Abra and/or Abra Global Finance, as the case may be, and shall include its successors and assigns.

"**Purchaser Deliverables**" means:

(a) the Purchase Price of this Note Purchase Agreement payable by the Purchaser by wire transfer of immediately available funds, to be deposited into such bank accounts as nominated by the Company, on each Closing Date, pursuant to Sections 2.01 and 2.02;

(b) an Internal Revenue Service Form W-9 or W-8 executed by the Purchaser; and

(c) a receipt executed by the Purchaser and delivered to the Company certifying that the Purchaser has received the Notes from the Company on each Closing Date.

"**Purchaser Entity**" means Abra and its Wholly Owned Subsidiaries.

"**Purchaser Entity Expenses**" means:

20

(a)    costs (including all professional fees and expenses) and expenses incurred by any Purchaser Entity in connection with reporting obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, including in respect of any reports filed or delivered with respect to applicable laws or the respective rules and regulations promulgated thereunder;

(b)    customary indemnification obligations of any Purchaser Entity owing to its directors, officers, employees or other Persons under its articles, charter, by-laws, partnership agreement or other constituent documents or pursuant to written agreements with any such Person;

(c)    obligations of any Purchaser Entity in respect of customary director and officer insurance (including premiums therefor) to the extent relating to GLAI and its Subsidiaries maintained in the ordinary course of business and consistent with past practice;

(d)    (x) general corporate overhead expenses, including professional fees and expenses and (y) other operational expenses, in each case, of any Purchaser Entity incurred in the ordinary course of business and consistent with past practice that are related to the ownership or operation of the business of GLAI or any of its Subsidiaries;

(e)    expenses incurred by any Purchaser Entity in connection with any securities offering, sale, conversion or exchange of Capital Stock or Debt; and

(f)    liabilities incurred by any Purchaser Entity in connection with tax obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any Governmental Authority as a result of the direct or indirect ownership held by such Purchaser Entity in the Capital Stock of GLAI or any of its Subsidiaries.

"**Reais**" means the legal currency of Brazil from time to time.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Preferred Shares (directly or in the form of Preferred Shares) (or other applicable security) have the right to receive any cash, securities or other property or in which the Preferred Shares (directly or in the form of Preferred Shares) (or such other security) are exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of Preferred Shares (directly or in the form of Preferred Shares) (or such other security) entitled to receive such cash, securities or other property (whether such date is fixed by GLAI's Board of Directors, by statute, by contract or otherwise).

"**Reference Property"** shall have the meaning specified in Section 13.04(a).

"**Reference Treasury Dealer**" means any primary United States government securities dealer in New York City selected by the Company.

"**Reference Treasury Dealer Quotations**" means, with respect to each Reference Treasury Dealer and any date when Notes become due and payable, the average, as determined by the Company, of the bid and asked prices for the Comparable Treasury Issue (expressed in

each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding the date when such Notes become due and payable.

"**Refinance**" means, in respect of any Debt, to refinance, extend (including pursuant to any defeasance or discharge mechanism), renew, refund, repay, replace, prepay, redeem, defease or retire, or to issue other Debt in exchange or replacement for, such Debt. "Refinanced" and "Refinancing" shall have correlative meanings.

"**Refinancing Debt**" means Debt that is incurred to Refinance any Debt of GLAI or any of its Subsidiaries existing on the Initial Closing Date or incurred in compliance with this Note Purchase Agreement (including Debt that Refinances Refinancing Debt); *provided, however*, that:

(i) the Refinancing Debt has a Stated Maturity no earlier than (A) the Stated Maturity of the Debt being Refinanced or (B) the 91st day after the Maturity Date of the Notes;

(ii) such Refinancing Debt is incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount of the Debt being Refinanced when it was initially incurred (or if issued with original issue discount, the aggregate accreted value at the time of Refinancing), plus, in either case, premiums, interest and reasonable expenses incurred in connection therewith;

(iii) if the Debt being Refinanced is Subordinated Obligations, such Refinancing Debt is subordinated in right of payment to the Notes at least to the same extent as the Debt being Refinanced; and

(iv) the Debt being Refinanced may not be secured by any Lien on any Collateral (except and to the extent such Debt was already secured by a Lien on the same Collateral previously securing the Debt so refinanced).

"**Register**" has the meaning specified in Section 4.03(a).

"**Registrar**" has the meaning specified in Section 4.03(a).

"**Regular Record Date**," with respect to any Interest Payment Date, means the May 15 or November 15 (whether or not such day is a Business Day) immediately preceding the applicable May 31 or November 30 Interest Payment Date, respectively.

"**Related Business**" means a business that (i) primarily operates in the airline industry, (ii) primarily supports the airline industry or (iii) primarily supports a business in which GLAI or any of its Subsidiaries already operate.

"**Related-Party Transaction**" has the meaning specified in Section 7.11.

"**Relevant Date**" means, with respect to any payment on a Note, whichever is the later of: (i) the date on which such payment first becomes due; and (ii) if the full amount payable has

not been received by the Company on or prior to such due date, the date on which notice is given to the Purchaser that the full amount has been received by the Company.

"**Relevant Stock Exchange**" means B3, or, if the Preferred Shares are not then listed on the B3, the principal securities exchange on which the Preferred Shares are then listed.

"**Relibi Law**" means any tax imposed by Luxembourg by virtue of the Luxembourg law of 23 December 2005, as amended from time to time.

"**Responsible Officer**" means (a) with respect to the Company or any Agent (other than the Collateral Agent), the chief executive officer, president, chief financial, vice-president, director, officer, treasurer, assistant treasurer, controller or any other authorized signatory of such Person; and (b) with respect to the Collateral Agent, any officer of the Collateral Agent with direct responsibility for the administration of this Note Purchase Agreement and the Collateral Documents.

"**Restricted Payments**" and "**Restricted Payment**" have the meanings specified in Section 7.14(d).

"**Sale Price Condition**" shall have the meaning specified in Section 1.01(b).

"**Sales Taxes**" shall mean, for any reference period, any taxes on any Adjusted Operating Revenue pursuant to applicable Law, excluding income taxes and other taxes applicable to profits.

"**Sanctioned Country or Region**" shall have the meaning specified in Section 6.01(25).

"**Sanctions**" shall have the meaning specified in Section 6.01(25).

"**Scheduled Trading Day**" means a day that is scheduled to be a Trading Day on the Relevant Stock Exchange. If the Preferred Shares are not so listed or admitted for trading on a Relevant Stock Exchange, "**Scheduled Trading Day**" means a Business Day.

"**Secured Parties**" means the Purchaser and the Collateral Agent.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended.

"**Series A Abra Senior Note due 2028**" means the Senior Unsecured Note due 2028, issued by Abra Group Limited, to Abra Global Finance from time to time.

"**Series B Abra Senior Note due 2028**" means the Senior Unsecured Note due 2028, issued by Abra Group Limited, to Abra Global Finance from time to time.

"**Settlement Amount**" has the meaning specified in Section 1.01(a)(3).

"**Settlement Method**" means, with respect to any exchange of Notes, Physical Settlement, Cash Settlement or Combination Settlement, as elected (or deemed to have been elected) by the Company.

23

"**Settlement Notice**" has the meaning specified in Section 1.01(a)(2).

"**Significant Subsidiary**" means, with respect to any Person, a Subsidiary of such Person that meets the definition of "significant subsidiary" in Article 1, Rule 1-02(w) of Regulation S-X under the Exchange Act.

"**Smiles Complete Technological Infrastructure**" means any and all computer programs, software, source codes, technology and their respective licenses, copyrights and applications that are used for the operation of the Loyalty Program.

"**Smiles Database, Client and Supplier List**" means all data, information, documents, Smiles Personal Data and any other elements related to the operations of the Loyalty Program, including, but not exclusively, the Loyalty Program's clients list and suppliers lists, as well as any other data, information and document related to GLA's or IPCo's database that is necessary for or related to the operation of the Loyalty Program, as updated or modified from time to time, regardless of where such data, information, documents, Smiles Personal Data or other elements are held now or in the future, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Intellectual Property**" means (i) all the currently existing intellectual property rights owned by GLA, including as universal successor of Smiles Fidelidade S.A., related to the Loyalty Program, corresponding to (a) trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (*INPI – Instituto Nacional da Propriedade Industrial*) owned by GLA; and (b) the Brazilian internet domains owned by GLA, as described in the Exhibit III of GLA's Smiles Fiduciary Transfer Agreement, (ii) as well as any trademarks or Brazilian internet domains that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Operating Manuals**" mean (i) the currently existing manuals, documents and information related to the operation of the Loyalty Program, and its copyrights, as described in the Exhibit VI of GLA's Smiles Fiduciary Transfer Agreement; (ii) as well as any manuals, documents and information related to the operation of the Loyalty Program, and its copyrights that become GLA's or IPCo's property, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Personal Data**" means any data or information, as long as owed by or in possession of GLA or IPCo, of an identified or identifiable individual, including of GLA's or IPCo's and its affiliates' clients, and their suppliers, distributors and commercial partners in general, among others, including but not limited to: names, phone numbers, contact information (address, e-mail address, commercial phone number, mobile number, fax), occupation, bank information, account number, total miles and points balance in the Loyalty Program, history of engagement in the Loyalty Program, history of accrual and redemption activity in the Loyalty Program, communication and promotion opt-ins in the Loyalty Program, credit card number, marital or relationship status, as further described in the GLA's Smiles Fiduciary Transfer Agreement and the IPCo's Smiles Fiduciary Transfer Agreement, as the case may be.

"**Smiles Technological Infrastructure**" means certain six (6) licenses from computer programs and software that are used by GLA as technological instruments for the development of the activities necessary for the operation of the Loyalty Program, as further described in the GLA's Smiles Fiduciary Transfer Agreement.

"**Specified Corporate Event**" shall have the meaning specified in Section 1.01(a).

"**Specified Dollar Amount**" means the maximum cash amount per U.S.$1,000 principal amount of Notes to be received upon exchange as specified (or deemed specified) in the Settlement Notice related to any exchanged Notes.

"**Spin-Off**" shall have the meaning specified in Section 1.01(c).

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency unless such contingency has occurred).

"**Subordinated Obligation**" means any Debt that is subordinate or junior in right of payment to the Notes and the Note Guarantees pursuant to a written agreement.

"**Subsidiary**" means, in respect of any specified Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person.

"**Surviving Person's Tax Jurisdiction**" has the meaning specified in Section 8.02(2).

"**Taxing Jurisdiction**" has the meaning specified in Section 7.06(a).

"**Total Created Value**" means (A) 50% of (i) the sum of the principal and interest that would have been payable on the repurchased GOL Bonds using the proceeds of the Notes assuming such GOL Bonds were redeemed at par at maturity (or, in the case of the GOL Perpetual Notes, through the tenth anniversary of the date such notes are redeemed), minus the cost to repurchase such GOL Bonds (including, for purposes of this calculation, any cash transaction costs and other cash expenses related thereto) plus (ii) the difference (not less than zero) between the nominal amounts to be paid by GLAI or any of its Subsidiaries using the proceeds of the Notes for any liabilities purchased by GLAI or any of its Subsidiaries (other than the GOL Bonds) minus the cost to purchase such liabilities (including, for purposes of this calculation, any cash transaction costs and other cash expenses related thereto) divided by (B) 1,228,877; provided that Total Created Value shall not exceed 126.050 Preferred Shares.

"**Trading Day**" means a day on which (i) trading in the Preferred Shares (or other security for which a closing sale price must be determined) generally occurs on a Relevant Stock Exchange or, if the Preferred Shares (or such other security) are not then listed on the Relevant Stock Exchange, on the principal other market on which the Preferred Shares (or such other

25

security) are then traded and (ii) a Last Reported Sale Price of the Preferred Shares (or closing sale price for such other security) is available on such securities exchange or market; *provided that* if the Preferred Shares (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day.

"**Transaction Documents**"  means this Note Purchase Agreement, the Notes and the Collateral Documents.

"**Transfer Agent**" has the meaning specified in Section 4.03(a).

"**Treasury Rate**" means, with respect to the date when Notes become due and payable, (1) the yield, under the heading which represents the average for the immediately preceding week, as reported on the most recent H.15 page available through the website of the Board of Governors of the Federal Reserve System, or any successor publication which is published weekly by the Board of Governors of the Federal Reserve System and which establishes yields on actively traded United States Treasury securities adjusted to constant maturity under the caption "Treasury Constant Maturities," for the maturity corresponding to the Comparable Treasury Issue (if no maturity is within three months before or after the Maturity Date of the notes to be redeemed, yields for the two published maturities most closely corresponding to the Comparable Treasury Issue shall be determined, and the Treasury Rate shall be interpolated or extrapolated from such yields on a straight-line basis, rounding to the nearest month) or (2) if such release (or any successor release) is not published during the week preceding the calculation date or does not contain such yields, the rate per year equal to the semi-annual equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for the when Notes become due and payable. The Treasury Rate will be calculated on the third Business Day the date when Notes become due and payable.

"**Trigger Event**" has the meaning specified in Section 1.01(c).

"**U.S. Dollars**" and "**U.S.$**" each mean the currency of the United States.

"**unit of Reference Property**" shall have the meaning specified in Section 1.01(a).

"**United States**" and "**U.S.**" means the United States of America (including the States and the District of Columbia) and its territories, its possessions and other areas subject to its jurisdiction.

"**Valuation Certification**" means the valuation of the Collateral contained in the closing date valuation therefor prepared by mba Aviation, dated on or prior to the Initial Closing Date.

"**Valuation Period**" shall have the meaning specified in Section 1.01(c).

"**VWAP Trading Day**" means a day on which (i) there is no Market Disruption Event and (ii) trading in the Preferred Shares generally occurs on the Relevant Stock Exchange; *provided that* if the Preferred Shares are not then listed on any Relevant Stock Exchange, "**VWAP Trading Day**" means a Business Day.

"**Wholly Owned Subsidiary**" means a Subsidiary all of the Capital Stock of which (other than directors' qualifying shares) is owned by any Person or another Wholly Owned Subsidiary.

SECTION 1.02.    *Rules of Construction*.  (a) For all purposes of this Note Purchase Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(1)    the terms defined in this Note Purchase Agreement have the meanings assigned to them in this Note Purchase Agreement and include the plural as well as the singular;

(2)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Note Purchase Agreement as a whole and not to any particular Article, Section or other subdivision;

(3)    "or" is not exclusive;

(4)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(5)    "including" means "including, without limitation";

(6)    any reference herein to any Person shall be construed to include such Person's successors and assigns;

(7)    the word "asset" and "property" shall be construed to have the same meaning and effect and to refers to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(8)    any reference to an "Article," a "Section" or an "Exhibit" refers to an Article, a Section or an Exhibit, as the case may be, of this Note Purchase Agreement.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with IFRS.

(c)    For purposes of the definitions set forth in Section 1.01 and this Note Purchase Agreement generally, all calculations and determinations shall be made in accordance with IFRS and shall be based upon the consolidated financial statements of the GLAI Group prepared in accordance with IFRS.

(d)    With respect to the Company, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque, nantissement, gage, privilège, sûreté réelle, droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited

27

partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant, associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an *administrateur* of its general partner, (v) a receiver, administrative receiver, administrator, liquidator or the like includes a *juge délégué, commissaire, juge-commissaire, liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*), insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*) composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally, (vii) a guarantee includes any guarantee which is independent from the debt to which it relates and any suretyship (*cautionnement*) within the meaning of Articles 2011 and *seq*. of the Luxembourg Civil Code, (viii) "gross negligence" is a reference to *faute lourde* and willful misconduct is a reference to *faute dolosive* and (ix) an "agent" includes a *mandataire*.

SECTION 1.03.    *Table of Contents; Headings*.  The table of contents and headings of the Articles and Sections of this Note Purchase Agreement have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 1.04.    *Form of Documents Delivered*.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Officer of the Company or the applicable Guarantor may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate or opinion is based are erroneous. Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer or Officers of the Company or the applicable Guarantor stating that the information with respect to such factual matters is in the possession of the Company or the applicable Guarantor, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Note Purchase Agreement, they may, but need not, be consolidated and form one instrument.

## ARTICLE 2
### PURCHASE AND SALE OF THE NOTES

SECTION 2.01.    *Sale and Purchase of the Notes*. Subject to the terms and conditions herein set forth, on any Closing Date, the Company will issue and sell to the Purchaser, and the Purchaser agrees to purchase from the Company, the aggregate principal amount of Notes of up to U.S.$ 1,430,925,000 (the "**Principal Amount**"), at the price of 100% of the face value of such Notes (the "**Purchase Price**").

SECTION 2.02.    *Closing* . The initial sale and purchase of the Notes will take place at a closing (the "**Closing**") at 11:00 a.m., New York City time, on the Initial Closing Date at the offices of Milbank LLP, 55 Hudson Yards, New York, New York 10001 (the "**Closing Location**"), or at such other time and place as is mutually agreed to by the Company and the Purchaser. Any subsequent sales and purchases of the Notes will take place at such times and at such locations as is mutually agreed to by the Company and the Purchaser. At such times the Company will deliver to the Purchaser the principal amount of Notes, pursuant to the terms set forth in Section 2.01 above (in such permitted denomination or denominations and registered in its name or the name of such nominee or nominees as the Purchaser may request) against payment of such amount by federal funds wire transfer of immediately available funds to such bank accounts as the Company designates.

SECTION 2.03.    *Expenses*. The Company and the Guarantors covenant and agree with the Purchaser that the Guarantors will pay or cause to be paid the following: (i) the fees, disbursements and expenses of the Company's advisors, if any, in connection with the issue of the Notes; (ii) any cost incurred in connection with the listing on any applicable national securities exchange of the Preferred Shares issuable upon exchange of the Notes pursuant to the terms set forth herein; and (iii) all other costs and expenses incident to the performance of its obligations hereunder which are not otherwise specifically provided for in this Section 2.03. The obligations of the Company under this Section 2.03 will survive the payment or transfer of any Note, the enforcement, amendment or waiver of any provision of this Note Purchase Agreement, the Notes, and the termination of this Note Purchase Agreement.

## ARTICLE 3
### USE OF PROCEEDS

SECTION 3.01.    *Net Proceeds*.  The Company will apply the net proceeds from the Purchase Price to refinance in whole or in part, on a dollar for dollar basis, the GOL Senior Secured Notes due 2028.

## ARTICLE 4
### THE NOTES

SECTION 4.01.    *Form and Dating*.  The Notes may have such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Note Purchase Agreement and may have such letters, numbers or other marks of identification and such notations, legends or endorsements as may be required to comply with any Law, agreement to

which the Company is subject, if any, or usage; *provided that* any such notation, legend or endorsement is in a form acceptable to the Company.

Each Note shall be dated the date of its execution.

Each Note shall represent such principal amount of the Outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of Outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of Outstanding Notes represented thereby may from time to time be increased or reduced to reflect repurchases, cancellations, exchanges for cash, Preferred Shares or a combination thereof, transfers or exchanges permitted hereby.

Accrued interest on the Notes shall be computed on the basis of a 360 day year composed of twelve 30 day months and, for a partial month, on the basis of the number of days actually elapsed in a 30 day month.

Unless previously exchanged pursuant to this Note Purchase Agreement, the Notes shall constitute direct unconditional senior obligations of the Company and shall rank at least *pari passu* in right of payment with all other present and future senior Debt of the Company and shall rank senior in right of payment to all present and future subordinated Debt of the Company. Subject to the terms hereof, each of the Notes represents the right to receive pro rata payments with respect to the Notes. Each Note shall rank *pari passu* with each other Note and, subject to Section 9.03, be equally and ratably secured by the Collateral. All Notes shall be substantially identical except as to denominations and as expressly permitted in this Note Purchase Agreement.

Upon completion of the perfection requirements set forth in Section 7.07 below, this Note Purchase Agreement shall evidence a first priority continuing Lien on and security interest in the Collateral to secure the full payment of the principal, interest and other amounts of the Notes Obligations.

SECTION 4.02.    *Execution and Delivery*.  (a) Two Officers of the Company shall sign the Notes for the Company by manual or electronic signature.

(1)    If an Officer whose signature is on a Note no longer holds that office at the time the Company delivers the Note, the signature of such Officer shall be valid nevertheless.

(2)    A Note shall not be valid until two authorized signatories of the Company manually or electronically sign the Note.  Such signatures shall be conclusive evidence that the Note has been executed under this Note Purchase Agreement.

(3)    The Company shall execute and deliver the Notes on each Closing Date in an aggregate principal amount corresponding to the Principal Amount.

(4)    The Notes shall be issued in fully registered form without coupons attached in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof (each, an "**Authorized Denomination**").

SECTION 4.03.    *Registrar, Transfer Agent, Exchange Agent and Paying Agent.*  (a) Subject to such reasonable rules as the Company may prescribe, the books of the Company for the exchange, registration, and registration of transfer of Notes shall be kept at the office of the Registrar (such books maintained in such office and in any other office or agency designated for such purpose being herein referred to as the "**Register**"). The pledge of the Notes by the Purchaser to the Collateral Agent under the Abra Senior Secured Exchangeable Notes Indenture and the Abra Senior Secured Notes Indenture shall be noted in the Register on each Closing Date. The Registrar (the "**Registrar**") shall maintain books for the exchange, registration and registration of transfer of Notes and cause its books to be amended upon any exchange, registration or registration of transfer of any Notes.

Notwithstanding the above an up-to-date copy of the Register shall be kept at any time at the registered office of the Company in Luxembourg.

GLAI will initially act as the Registrar, Transfer Agent, Exchange Agent and Paying Agent of the Notes. For so long as GLAI is acting in these roles, all notices required to be delivered to the Registrar, Transfer Agent, Exchange Agent and Paying Agent pursuant to this Note Purchase Agreement shall be delivered to the Company's Office. The Company's Office will be the office or agency where Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be served.

The "**Company's Office**" is located at:

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

The Company may at any time, by notice to each Holder, change the address of the Company's Office.

GLAI may have one or more co-registrars and one or more additional Transfer Agents, Exchange Agents or Paying Agents.  The terms "**Transfer Agent**," "**Exchange Agent**" and "**Paying Agent**" include any additional transfer agent, exchange agent or paying agent, as the case may be.  The term "**Registrar**" includes any co-registrar.

(b)    The Company shall enter into any appropriate agency agreements with any Agent that is not a party to this Note Purchase Agreement, which shall implement the provisions of this Note Purchase Agreement that relate to such Agent.

(c)    The Registrar shall keep a record of all the Notes and shall make such record available during regular business hours for inspection upon the written request of the Company provided a reasonable amount of time prior to such inspection.  Such books and records shall include notations as to whether such Notes have been redeemed, or otherwise paid or cancelled,

31

and, in the case of mutilated, destroyed, defaced, stolen or lost Notes, whether such Notes have been replaced.  In the case of the replacement of any of the Notes, the Registrar shall keep a record of the Note so replaced, and the Notes issued in replacement thereof.  In the case of the cancellation of any of the Notes, the Registrar shall keep a record of the Note so cancelled and the date on which such Note was cancelled.  Each Transfer Agent shall notify the Company of any transfers or exchanges of Notes effected by it.

(d)      All Notes presented or surrendered for registration of transfer, exchange for cash or exchange for Preferred Shares or a combination thereof shall (if so required by the Company) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

(e)      Neither the Company, nor GLAI shall be required to exchange a Note or register a transfer of a Note with respect to (i) Notes that have been surrendered for exchange for cash, Preferred Shares or a combination thereof or, if a portion of any Note is surrendered for exchange for cash, Preferred Shares or a combination thereof, such portion thereof surrendered for exchange for cash, Preferred Shares or a combination thereof or (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn).

SECTION 4.04.    *Paying Agent to Hold Money in Trust*.

(a)      By 10:00 A.M. New York time, no later than one Business Day prior to each Interest Payment Date on any Note, GLAI shall deposit in immediately available funds a sum sufficient to pay such principal and interest when so becoming due (including any amounts under Section 7.06(a)).  GLAI shall request that the bank through which such payment is to be made agrees to supply to GLAI by 10:00 A.M. (New York time) two Business Days prior to the due date from any such payment an irrevocable confirmation (by facsimile) of GLAI's intention to make such payment.  The Company shall require each Paying Agent not a party to this Note Purchase Agreement, if any, to agree in writing that such Paying Agent shall hold in trust, for the benefit of Holders or the Company, all money held by such Paying Agent for the payment of principal, premium, if any, and interest on the Notes.

(b)      Unless the Paying Agent is GLAI, any Subsidiary of GLAI or the Company, each payment in full of principal, Additional Amounts and/or interest payable under the Notes and this Note Purchase Agreement in respect of any Note made by or on behalf of the Company or the Guarantors to or to the order of the Paying Agent in the manner specified herein or in the Notes on the date due shall be valid and effective to satisfy and discharge the obligation of Company or the Guarantors, as the case may be, to make payment of principal, Additional Amounts and/or interest payable hereunder and under the Notes on such date; *provided*, *however*, that the liability of the Paying Agent hereunder shall not exceed any amounts paid to it by the Company or the Guarantors, as the case may be, or held by it, on behalf of the Holders hereunder.

32

SECTION 4.05.    *Payment of Principal and Interest; Principal and Interest Rights Preserved*

(a)    Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of the Paying Agent or any other Paying Agent appointed by the Company, if any.

(b)    If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder, and (ii) second, towards payment of principal then due hereunder.

(c)    Payment of interest on each Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder.  The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

(d)    The Notes shall bear interest at an interest rate as follows:

(1)    4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**"); and

(2)    13.50% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth in Section 4.05(e).

(e)    GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (i) semi-annually in arrears, on each applicable Interest Payment Date or (ii) on the Maturity Date; *provided that*, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; *provided*, *further*, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of such Note and this Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of this Note Purchase Agreement.

(f)    If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

SECTION 4.06.    *[Reserved].*

33

SECTION 4.07.    *Transfer of Notes*.  Transfer will be effected without charge by or on behalf of the Company, the Registrar or the Transfer Agents, but upon payment in respect of any tax or other governmental charges which may be imposed in relation to it.

SECTION 4.08.    *Replacement Notes*.  If any Note at any time becomes mutilated, defaced, destroyed, stolen or lost, such Note may be replaced at the cost of the applicant (including properly incurred legal fees of the Company and the Agents) at the Company's Office, upon provision of, in the case of destroyed, stolen or lost Notes, evidence satisfactory to the Company that such Note was destroyed, stolen or lost, together with such indemnity as the Company may require.  Mutilated or defaced Notes must be surrendered before replacements shall be issued.

Each Note executed and delivered in exchange for or in lieu of any such Note shall carry rights to accrued and unpaid interest and to interest to accrue equivalent to the rights that were carried by such Note before such Note was mutilated, defaced, destroyed, stolen or lost.

Every replacement Note is an additional obligation of the Company and shall be entitled to the benefits of this Note Purchase Agreement.

SECTION 4.09.    *Cancellation*.  The Agents shall forward to GLAI any Notes surrendered to them for transfer, exchange or payment. GLAI and no one else shall cancel and GLAI shall destroy in accordance with its customary procedures (subject to the record-retention requirements of the Exchange Act) all Notes surrendered for transfer, exchange, payment or cancellation. The Company may not issue new Notes to replace Notes it has redeemed, paid in full (other than in connection with a transfer or exchange). GLAI shall cancel any Note held by the Company or its Affiliates, except for the Purchaser. A Note shall cease to be deemed Outstanding if held by the Company, any Guarantor or any of their Affiliates (except for the Purchaser) holds such Note, including for voting purposes.

SECTION 4.10.    *Defaulted Interest*.  If the Company defaults in a payment of interest on the Notes, the Company shall pay the defaulted interest pursuant to the terms set forth in Section 4.05(e) (plus interest on such defaulted interest at the rate specified in Section 7.01(b) to the extent lawful) in any lawful manner if, after written notice given by the Company to each Holder of the proposed payment pursuant to this Section 4.10, such manner of payment shall be deemed practicable by each Holder.

The Company may pay the defaulted interest to the Persons who are Holders on a subsequent special record date, pursuant to the terms set forth in Section 4.05(e), which date shall be at least five Business Days prior to the payment date of such defaulted interest.  The Company shall fix or cause to be fixed any such special record date and payment date, and, at least 15 days before any such special record date, the Company shall deliver to each Holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 4.11.    *No Purchase of the Notes by the Company or its Affiliates*.  Except as set forth herein, neither the Company, Guarantor nor any of its respective Affiliates may repurchase or otherwise acquire after the Initial Closing Date any of the Notes prior to the

34

Maturity Date without the prior written consent of the Abra Notes Supermajority Holders.  Any Notes so purchased or acquired with such prior written consent may not be resold and shall be cancelled.

SECTION 4.12.   *Fundamental Change.* Neither the Company, GLAI nor any of its Affiliates may enter into a transaction or a series of transactions that would reasonably be expected to result in a Fundamental Change without the prior written consent of the Abra Notes Supermajority Holders.


# ARTICLE 5
### CONDITIONS TO CLOSING

SECTION 5.01.   *Purchaser's Conditions to Issuance of Notes.*  The obligations of the Purchaser to purchase the Notes shall be subject to the satisfaction, on or prior to any Closing Date, of each of the following conditions (any or all of which may be waived by the Purchaser in writing, in whole or in part, to the extent permitted by applicable Law), each in form and substance satisfactory to the Purchaser and the Abra Notes Supermajority Holders.

(a)      Milbank LLP, U.S. counsel for the Company and the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(b)      NautaDutilh Avocats Luxembourg S.à r.l., Luxembourg legal counsel for the Company, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser and the Abra Holders.

(c)      Lefosse, Brazilian legal counsel for the Guarantors, shall have furnished to the Purchaser and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes its written opinion, dated each Closing Date addressed to the Purchaser, the Collateral Agent, and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes in form and substance reasonably satisfactory to the Purchaser, and the Abra Holders.

(d)      Pursuant to Sections 2.01 and 4.02, the Company shall have authorized, issued and delivered Notes to the Purchaser in an aggregate principal amount corresponding to the Principal Amount.

(e)      The representations and warranties of the Company contained in this Note Purchase Agreement shall be true and correct as of each Closing Date (except to the extent relating specifically to a prior date) in all material respects (provided that if any representation or

35

warranty already includes a materiality or material adverse effect qualifier, such representation or warranty is true and correct in all respects), both before and after giving effect to the purchase of the Notes.

(f)      The Company shall have delivered to the Purchaser a formalities certificate of an Officer, dated as of the Initial Closing Date (and to the extent anything has changed therein, on each subsequent Closing Date), (i) appending a copy the Company's articles of association, (ii) appending a certificate of non-inscription of a judicial decision *(certificat de non-inscription de décision judiciaire)* and an excerpt pertaining to the Company issued by the Luxembourg Register of Commerce and Companies dated no earlier than one Business Day prior to such Closing Date, (iii) appending a copy of the resolutions of the Board of Directors approving the terms of, and the transactions contemplated by, the Transaction Documents and resolving that it executes, delivers and performs the Transaction Documents and authorises a specified person or persons to execute the Transaction Documents on behalf of the Company, (iv) certifying that each copy document relating to it specified in this paragraph is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than such Closing Date, (v) providing a specimen of the signature of each person authorised by the resolutions referred to in  above in relation to the Transaction Documents, (vi) confirming compliance of the Company with the provisions of the Luxembourg law dated 31 May 1999 of the domiciliation of companies, as amended, (vii) confirming that the Company has not been declared bankrupt *(en faillite)*, and no application has been made by the Company, the relevant director or the Board of Directors in relation to, any declared bankruptcy *(faillite)*, voluntary or judicial liquidation *(liquidation volontaire ou judiciaire)*, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors *(concordat préventif de la faillite)*, suspension of payments *(sursis de paiement)*, controlled management *(gestion contrôlée)*, general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Council Regulation N°848/2015 of 20 May 2015 on insolvency proceedings (recast) (the "**Regulation**"), (viii) confirming that, to the best of the knowledge of the relevant director and the Board of Directors, no other person entitled has made any corporate action, legal proceedings or other procedure or step in connection with, nor has the Company or the Board of Directors been notified of, any bankruptcy *(faillite)*, voluntary or judicial liquidation *(liquidation volontaire ou judiciaire)*, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors *(concordat préventif de la faillite)*, suspension of payments *(sursis de paiement)*, controlled management *(gestion contrôlée)*, fraudulent conveyance *(action pauliana)*, general settlement with creditors, reorganization or similar legal provisions affecting the rights of creditors generally in Luxembourg or abroad, or any analogous procedure in any jurisdiction, nor subject to any proceedings under the Regulation (ix) confirming that the Company is not, on the date of such Closing Date and will not, as a result of the entering into the Transaction Documents, be in a state of cessation of payments *(cessation de paiement)* and lose its creditworthiness *(ébranlement de crédit)* and (x) confirming that the Company is up-to-date with its obligations of publication of the annual accounts and does not contravene the provisions of the Luxembourg Code de commerce or the laws governing Luxembourg commercial companies.

(g)      The Company shall have duly executed and delivered to the Purchaser and Collateral Agent counterparts of this Note Purchase Agreement, duly executed by each party

36

thereto (other than the Purchaser), with a copy to be delivered by the Company to the Abra Holders.

(h)     The Company shall have delivered to the Purchaser an Officer's Certificate, dated as of the Initial Closing Date, certifying that (i) the conditions specified in this Section 5.01 have been fulfilled, (ii) there has not occurred since the date hereof, any event or condition that has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and (iii) no Default or Event of Default hereunder exists at the time of the purchase of the Note on the Initial Closing Date.

(i)     Subject to documents and evidences that under the Transaction Documents or applicable law must be delivered after the Initial Closing Date, the Company and the Guarantors shall have duly executed and delivered to the Purchaser and Collateral Agent a copy of each of the Collateral Documents (including without limitation GLA's Smiles Fiduciary Transfer Agreement, GLA's Fiduciary Transfer of IPCo's Shares Agreement and IPCo's Smiles Fiduciary Transfer Agreement) and executed and delivered to the Purchaser a copy of the Exclusivity Side Letter, each duly executed by each party thereto and such evidence as the Purchaser may reasonably require of the effectiveness of the security contemplated thereby and the perfection of the security interest created thereby (except as otherwise described in Section 7.07(c)), including acceptable evidence of payment or arrangements for payment by the Company of all applicable taxes, fees, charges, costs and expenses required for the recording of the Collateral Documents.

(j)     The purchase and sale of the Notes shall not be prohibited or enjoined by any court of any competent jurisdiction.

(k)     The Company shall have delivered, no later than five (5) Business Days prior to the GOL Senior Secured Notes NPA Initial Closing Date, to the Purchasers a valuation report prepared by an independent appraiser with respect to the value of the Loyalty Program and the Collateral granted by the Company and the Guarantors to the Collateral Agent hereunder. As of the Initial Closing Date, the aggregate principal amount of the Notes (as of the Initial Closing Date) plus the aggregate principal amount of the GOL Senior Secured Notes 2028 (as of the Initial Closing Date) shall not exceed 50% of the value of the Collateral as set forth in the Valuation Certification.

SECTION 5.02.   *Company's Conditions to Issuance of Notes*.  The obligation of the Company to consummate the issuance and sale of the Notes to the Purchaser shall be subject to the satisfaction, on or prior to each Closing Date, of each of the following conditions with respect to the Purchaser (any or all of which may be waived by the Company in writing, in whole or in part, to the extent permitted by applicable Law):

(a)     The representations and warranties of the Purchaser contained in this Note Purchase Agreement shall be true and correct as of the Initial Closing Date.

(b)     The Purchaser shall have delivered, or caused to be delivered, to the Company, on each Closing Date, the Purchaser Deliverables.

(c)     The Company shall have received the Purchase Price, in cash, from the Purchaser.

(d)    The Purchaser shall have duly executed and delivered, or caused to be delivered, to the Company counterpart signatures to this Note Purchase Agreement.

(e)    The Purchaser shall have delivered to the Collateral Agent the Know-Your-Customer documents required by the Collateral Agent, as listed in Exhibit C**Exhibit** hereto.

(f)    Abra shall have issued the Series A Abra Senior Note due 2028 and the Series B Abra Senior Note due 2028 to Abra Global Finance.

(g)    Abra Global Finance shall have issued the Abra Senior Secured Exchangeable Notes and the Abra Senior Secured Notes.

SECTION 5.03.   *Conditions Relating to Collateral*.  GLA shall grant and perfect the first priority Lien in the Collateral in accordance with the Collateral Documents, and cause any filings and other actions (including, without limitation, all required registrations, filings and recordations with the applicable notaries or registries) necessary for the creation and perfection of the Lien in the Collateral in favor of the Secured Parties to be completed pursuant to Section 7.07.

# ARTICLE 6
### REPRESENTATIONS AND WARRANTIES

SECTION 6.01.   *Representations of the Company and the Guarantors*. The Company and, as applicable, each of the Guarantors represents and warrants to, and agrees with, the Purchaser, as of the Initial Closing Date:

(1)    *Organization of the Company*.  The Company and each of the Guarantors have been duly incorporated, are validly existing as companies in good standing (where applicable) under the laws of their respective jurisdictions of incorporation, have the corporate power and authority to own their respective property and to conduct their businesses and are duly qualified to transact business and are in good standing (where applicable) in each jurisdiction in which the conduct of their businesses or their ownership or leasing of property requires such qualification, except to the extent that the failure to be so qualified or be in good standing (where applicable) would not have a Material Adverse Effect.

(2)    *Authorization of this Note Purchase Agreement*.  This Note Purchase Agreement has been duly authorized, executed and delivered by the Company and each of the Guarantors.

(3)    *Authorization of the Notes*.  The Notes have been duly authorized by the Company and each of the Guarantors, and, when executed and authenticated in accordance with the provisions of this Note Purchase Agreement and issued and delivered to and paid for by the Purchaser in accordance with the terms of this Note Purchase Agreement, will be on Initial Closing Date, valid and binding obligations of the Company and each of the Guarantors, enforceable against the Company and each of the Guarantors in accordance with their terms, subject to (i) applicable bankruptcy, insolvency, judicial or extrajudicial reorganization, fraudulent conveyance,

38

reorganization, moratorium and similar laws affecting creditors' rights generally (collectively, the "**Enforceability Exceptions**"); and (ii) equitable principles of general applicability, and will be entitled to the benefits of this Note Purchase Agreement pursuant to which such Notes are to be issued.

(4)     *Authorization of the Transaction Documents*.  Each of the Transaction Documents to which the Company and each of the Guarantors are a party has been duly authorized by the Company and each of the Guarantors, and when executed and delivered by the Company and each of the Guarantors, will be a valid and legally binding agreement of the Company and each of the Guarantors enforceable against the Company and each of the Guarantors in accordance with its terms, subject to (i) the Enforceability Exceptions and equitable principles of general applicability; and (ii) the requirements set forth in Section 6.01(17) with respect to the enforcement and admissibility of this Note Purchase Agreement and the Notes into evidence in Brazil directly before public agencies and courts in Brazil.  When all required filings and recordings with respect to, and deliveries of, the Collateral have been made as required by the Collateral Documents, will create valid, perfected security interests in the Collateral, subject to no prior liens (other than certain other permitted liens and encumbrances permitted under this Note Purchase Agreement) being created and perfected prior to perfection of the security interests in the Collateral.

(5)     *Ranking of the Notes*.  The Notes and the Note Guaranties will constitute direct, unconditional, senior and secured obligations of the Company and the Guarantors, respectively, without any preference among themselves, of the Company and the Guarantors and will rank senior to all other present and future unsubordinated and secured obligations of the Company and the Guarantors.

(6)     *Non-Contravention*.  The execution and delivery by the Company and each of the Guarantors, and the performance by the Company and each of the Guarantors of their obligations under, this Note Purchase Agreement, the Collateral Documents (including, without limitation, the grant and perfection of liens and security interests in the Collateral pursuant to the terms in the applicable Collateral Documents), as applicable, and the Notes do not contravene any provision of applicable law which would affect the nature of the Notes or the articles of association, bylaws or other organizational documents of the Company and each of the Guarantors, any agreement or other instrument binding upon any of the Company and each of the Guarantors that is material to the Company and each of the Guarantors, (including any agreement for the incurrence of Debt), or any judgment, order or decree of any governmental body, agency or court having jurisdiction over the Company and each of the Guarantors.

(7)     *No Consents Required*.  No consent, approval, authorization or order of, or qualification with, any governmental or regulatory body or agency or any third party (including any lender) is required for the performance by the Company and each of the Guarantors of their respective obligations under the Notes, this Note Purchase Agreement or the Collateral Documents, as applicable.

(8)     *Investment Company Act*.  Neither the Company nor any of the Guarantors is, and after giving effect to the placement and sale of the Notes and the application of the proceeds thereof will not be, required to register as an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

(9)     *Choice of Laws*.  The choice of laws of the State of New York as the governing law of this Note Purchase Agreement is a valid choice of law under the laws of Luxembourg and Brazil will be honored by the courts of Luxembourg and Brazil.

(10)     *No Material Defaults*.  Neither the Company nor any of the Guarantors is (i) in violation of its articles of association, bylaws or other organizational documents; (ii) in default, and no event exists that, with notice or lapse of time or both, would constitute such a default, in the performance or observance by the Company or any of the Guarantors of any material obligation, agreement, covenant or condition contained in any indenture, mortgage, loan agreement or other material agreement or instrument to which it is a party or by which it is bound or to which its property or assets are subject; or (iii) in violation of any applicable law, statute, rule or regulation or any judgment or order of any U.S., Brazilian, Luxembourg court or arbitrator or governmental or regulatory authority, except in connection with clauses (ii) and (iii) for any such default or violation that would not have a Material Adverse Effect.

(11)     *Absence of Exchange Controls*.  No exchange control authorization or any other authorization, approval, consent or license of any Governmental Authority or agency in Luxembourg is required for the payment by the Company or any of the Guarantors of any amounts in United States dollars under any Transaction Document to which it is a party.

(12)     *Observance of Statutes and Orders*.  Neither the Company nor any of the Guarantors is (i) in violation of any order, judgment, decree or ruling of any court, any arbitrator of any kind or any Governmental Authority or agency in Luxembourg or Brazil or (ii) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority or agency in Luxembourg or Brazil, which violation would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(13)     *Taxes*.  All tax returns required to be filed by the Company and each of the Guarantors have been timely filed and such tax returns have been duly and accurately prepared in all material respects, and all material taxes and other assessments of a similar nature (whether imposed directly or through withholding), including any interest, additions to tax or penalties applicable thereto, due or claimed to be due from the Company and each of the Guarantors (whether or not shown to be payable on such tax returns) have been paid, other than those being contested in good faith and for which adequate reserves have been provided in accordance with IFRS.

(14)     *Tax Residency of the Company*.  The Company is resident for tax purposes solely in Luxembourg.

40

(15)     *Tax Residency of the Guarantors*.  Each Guarantor is resident for tax purposes solely in Brazil.

(16)     [*Reserved*].

(17)     *Absence of Further Brazilian Law Requirements*.  This Note Purchase Agreement is in proper legal form under the laws of Brazil for the enforcement thereof in Brazil against the Company and each of the Guarantors, and it is not necessary in order to ensure the legality, validity, enforcement of this Note Purchase Agreement in Brazil that this Note Purchase Agreement be filed or recorded with any court or other authority in Brazil or that any stamp, issue, registration, documentary or similar taxes or duties be paid in Brazil on or in respect of this Note Purchase Agreement except that, with respect to the enforcement and admissibility of this Note Purchase Agreement into evidence in Brazil directly before the public agencies and courts in Brazil, (i) (a) if the State in which this Note Purchase Agreement was executed is not party to the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents of 5 October 1961 (the "**Apostille Convention**") (1) the signatures of the parties hereto signing outside Brazil should be notarized by a notary public licensed as such under the jurisdiction of signing and (2) the signature of such notary public must be authenticated by a consular official of Brazil, or (b) if the State in which this Note Purchase Agreement was executed is party to the Apostille Convention, an authority designated by such State must issue a certificate that authenticates the origin of this Note Purchase Agreement ("**Apostille**"); and (ii) (a) this Note Purchase Agreement and the Apostille (if applicable) must be translated into the Portuguese language by a sworn translator and (b) this Note Purchase Agreement and the Apostille (if applicable), together with its sworn translation into the Portuguese language, must be registered with the appropriate Registry of Titles and Deeds in Brazil.

(18)     *No Registration/Trust Indenture Act*.  It is not necessary in connection with the offer, sale and delivery of the Notes to the Purchaser in the manner contemplated by this Note Purchase Agreement to register the Notes under the Securities Act or to qualify this Note Purchase Agreement under the U.S. Trust Indenture Act of 1939, as amended.

(19)     *Private Placement by the Company*.  Neither the Company, the Guarantors or anyone acting on its behalf has offered the Notes or any similar securities for sale to, or solicited any offer to buy the Notes or any similar securities from, or otherwise approached or negotiated in respect thereof with, any Person other than the Purchaser which has been offered the Notes at a private sale for investment. Neither the Company, the Guarantors nor anyone acting on its behalf has taken, or will take, any action that would subject the issuance or sale of the Notes to (i) the registration requirements of Section 5 of the Securities Act; (ii) a requirement to produce a prospectus in the United Kingdom; or (iii) the registration requirements of any securities or blue sky laws of any applicable jurisdiction. For the purposes of this clause, "**Institutional Investor**" means (a) a Purchaser, (b) any qualified institutional buyer within the meaning of Rule 144A of the Securities Act, (c) an "accredited investor" within the meaning of Section 501(a)(1), (2), (3), (7) or (8) under the Rule 144A of the Securities Act, (d) a non-U.S. person with

41

any potential offer or purchase being made in an offshore transaction in reliance on Regulation S of the Securities Act.

(20)    *No Restrictions on Subsidiaries of GLAI*. No Subsidiary of GLAI is prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, nor due to any judgment, order or decree of any government authority, agency or court having jurisdiction over such subsidiary, from paying any dividends to GLAI, from making any other distribution on such Subsidiary of GLAI's Capital Stock, from repaying to GLAI any loans or advances to such Subsidiary of GLAI from GLAI in accordance with the terms of any such loan or advance, or from transferring any of such of Subsidiary of GLAI's assets to GLAI or any other Subsidiary of GLAI.

(21)    *Title to Property; Leases*.  The Company and each of the Guarantors have good and sufficient title to their respective material properties as are necessary to the conduct of their operations as presently conducted. The Company and each of the Guarantors have good and sufficient title to the properties described in or referred to in the Collateral Documents, as applicable, free and clear of liens, (i) except for liens established pursuant to the Collateral Documents, and (ii) except such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and each of the Guarantors.

(22)    *Licenses, Permits, Etc*.  The Company and each of the Guarantors own or possess all licenses, permits, franchises, authorizations, patents, copyrights, proprietary software, service marks, trademarks and trade names, or rights thereto, including without limitation, the Smiles Intellectual Property and any other Collateral, without known conflict with the rights of others, except for those conflicts that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(23)    *No Unlawful Payments*.  Except as disclosed in the documents relating to the Company inserted by the Purchaser in a data room, and made available to the Abra Holders (the "**Disclosure Documents**") (including the documents incorporated by reference therein), neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or other person acting on behalf of the Company or the Guarantors, has (i) used any corporate funds of the Company or the Guarantors for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government or regulatory official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-bribery or anti-corruption law; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. The Company, the Guarantors and to the knowledge of the Company and the Guarantors, its affiliates have

conducted their businesses in compliance with all applicable anti-bribery and anti-corruption laws and have instituted, maintain and enforce, and will continue to maintain and enforce, policies and procedures designed to ensure and which are reasonably expected to continue to ensure compliance with all applicable laws.

(24)    *No Conflict with Money Laundering Laws*.  The operations of the Company and the Guarantors are and have been conducted at all times in compliance with all applicable money laundering statutes, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental or regulatory agency, authority or body or any arbitrator involving the Company or the Guarantors with respect to the Anti-Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(25)    *No Conflict with Sanctions Laws*.  Neither the Company nor the Guarantors, nor to the knowledge of the Company or the Guarantors, any director, officer, agent, employee, affiliate or person acting on behalf of the Company or the Guarantors is currently subject to or the target of any sanctions administered or enforced by the U.S. government, (including, without limitation, the Office of Foreign Assets Control of the U.S. Treasury Department or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the U.S. Department of Commerce, the United Nations Security Council, the European Union, Luxembourg or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority (collectively, "**Sanctions**"), nor is the Company or any of the Guarantors located, organized or resident in a country or territory that is the subject or target of Sanctions, including, without limitation, Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of Ukraine, the so-called Donetsk People's Republic and the so-called Luhansk People's Republic (each, a "**Sanctioned Country or Region**").  Neither the Company nor the Guarantors will not directly or indirectly use the proceeds of this offering, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity, (i) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or the target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or Region or (iii) causing a violation by any person (including any person participating in the transaction, whether as underwriter, placement agent, advisor, investor or otherwise) of Sanctions. For the past five years, neither the Company nor the Guarantors has engaged in and is not now engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country or Region.

(26)    The above mentioned representations and warranties under Section 6.01(25) shall only be applicable to any Luxembourg party to the extent that such Luxembourg party will not violate or is exposed to any liability under the Council Regulation (EC) 2271/96 of 22 November 1996 protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom or any similar laws or regulations.

43

SECTION 6.02.    *Representations of the Purchaser.* The Purchaser represents, warrants and agrees that:

(1)    It is purchasing the Notes on its own behalf, as an investment fund or account, as the case may be, duly organized and existing in accordance with the laws of the jurisdiction of its incorporation and it is purchasing the Notes for its own account or for one or more separate accounts maintained by the Purchaser and not with a view to the distribution thereof. The Purchaser has its principal address outside the United States and was located outside the United States at the time any offer to buy the Notes was made to the Purchaser and at the time that this Note Purchase Agreement is executed by the Purchaser.

(2)    The execution, delivery and performance of this Note Purchase Agreement by the Purchaser are within the powers of the Purchaser, have been duly authorized and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Purchaser is a party or by which the Purchaser is bound, and will not violate any provisions of such entity's organizational documents, including, without limitation, its incorporation or formation papers, bylaws, indenture of trust or partnership or operating agreement, as may be applicable. The signature on this Note Purchase Agreement is genuine, and the signatory has been duly authorized to execute the same, and this Note Purchase Agreement constitutes a legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms.

(3)    It is not and, for so long as the Purchaser owns the Notes, will not be acting on behalf of: (a) an "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), which is subject to Title I of ERISA, (b) a plan described in Section 4975(e)(1) of the Code, (c) an entity whose underlying assets include "plan assets" by reason of a plan's investment in such entity (including but not limited to an insurance company general account), or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of the Department of Labor Regulation Section 2510.3-101 (29 C.F.R. Sections 2510.3-101), as modified by Section 3(42) of ERISA (each of categories (a) through (d), a "**Covered Plan**").

(4)    in making the decision to purchase the Notes, it has relied solely upon the independent investigation made by it and an independent assessment of the merits and risks of an investment in the Notes, and such decision to purchase Notes was formed based on such independent investigation of the Company, the Guarantors and the Notes, and such independent assessment of the merits and risks of an investment in the Notes.

## ARTICLE 7
### COVENANTS

SECTION 7.01.    *Payment of Principal and Interest Under the Notes.*

(a)      The Company shall punctually pay the principal of and interest on the Notes on the dates and in the manner set forth herein and as provided in the Notes.  By 10:00 a.m. (New York City time), no later than one Business Day prior to any Interest Payment Date or the Maturity Date, to the extent such amount is payable in cash, GLAI shall irrevocably deposit, or cause to be deposited, with the Paying Agent (unless the Paying Agent is GLAI) money sufficient to pay such principal and interest subject to the terms set forth in Section 4.05(e).

(b)      The Company shall pay interest on overdue principal or installments of interest, to the extent lawful, at the rate borne by the Notes plus 2.00% per annum pursuant to the terms set forth in Section 4.05(e).

(c)      No interest shall be payable hereunder in excess of the maximum rate permitted by applicable Law.

SECTION 7.02.    *Maintenance of Office or Agency*.  The Company shall maintain an office or agency where Notes may be (i) presented or surrendered for payment or (ii) presented for exchange for cash, Preferred Shares or a combination thereof and where notices and demands to or upon the Company in respect of the Notes and this Note Purchase Agreement may be served.  If at any time the Company shall fail to maintain any such required office or agency, such presentations, surrenders, notices and demands may be made or served at the Company's Office.

SECTION 7.03.    *Money for Note Payments to Be Held in Trust*.

(a)      For so long as the Company acts as Paying Agent, it shall, when electing to pay interest using cash, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, as applicable, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal and interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided.

(b)      Whenever the Company shall have one or more Paying Agents for the Notes, it shall, no later than one Business Day prior to each Interest Payment Date or the Maturity Date, irrevocably deposit with a Paying Agent a sum sufficient to pay such principal and interest so becoming due, such sum to be held in trust for the benefit of the Persons entitled to such principal or interest.

(c)      Each Paying Agent, subject to the provisions of this Section 7.03, shall:

(1)      hold all sums held by it for the payment of principal or premium, if any, of or interest on the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as set forth herein; *provided*, *however*, such sums need not be segregated from other funds held by it, except as required by Law; and

(2)      at any time during the continuance of any Default by the Company, upon the written request of the Holders, forthwith pay to the Holders all sums so held in trust by such Paying Agent.

45

(d)    The Company shall cause each Paying Agent to execute and deliver an instrument in which such Paying Agent shall agree with the Company to act as a Paying Agent in accordance with this Section 7.03, except in case the Paying Agent is the Company or an Affiliate of the Company.

(e)    Any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

SECTION 7.04.    *Maintenance of Corporate Existence*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, (i) maintain in effect its corporate existence and all registrations necessary therefor; *provided that* these restrictions shall not prohibit any transactions permitted by Article 8; (ii) not amend, supplement, waive or otherwise modify certain specified provisions of the documents relating to each of the Guarantors' or its Subsidiaries' rights or benefits under its respective organizational documents without the prior written consent of the Purchaser, and the Abra Notes Supermajority Holders, as the case may be, if such amendment, supplement, waiver or modification would materially adversely affect the rights of the Purchaser, or of the then holders of this Note; (iii) not change its corporate form; (iv) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and the like necessary in the normal conduct of its business, activities or operations; and (v) maintain or cause to be maintained in good repair, working order and condition (normal wear and tear excepted) all properties used in its business; *provided*, *however*, that neither GLAI nor its Subsidiaries shall be prevented from discontinuing those operations (including through the transfer or dissolution of a Subsidiary) or suspending the maintenance of those properties (including through the sale thereof) which, in the reasonable judgment of GLAI, are no longer necessary in the conduct of GLAI's business, or that of its Subsidiaries; and *provided*, *further*, that such discontinuation of operations or suspension of maintenance shall not be materially disadvantageous to the Holders and such operations shall not represent more than 3.5% of the aggregate consolidated gross revenues of GLAI and its Subsidiaries for the most recent fiscal year.

SECTION 7.05.    *Payment of Taxes and Claims*.  Each of the Company and each Guarantor shall, and shall cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its property or in respect of any of its franchises, businesses, income or profits before any penalty or interest accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for sums which have become due and payable and which by Law have or might become a Lien upon its property, unless the failure to make such payment could have: (a) a Material Adverse Effect upon the financial condition of (i) the Company or (ii) the GLAI Group considered as one enterprise, or (b) a Material Adverse Effect on the performance of the Company's or GLAI's obligations hereunder; and *provided*, *further*, that no such charge or claim need be paid while it is being contested in good faith by

46

appropriate proceedings and if appropriate reserves or other provisions are maintained in respect of such amounts in accordance with IFRS.

SECTION 7.06.    *Payment of Additional Amounts*.  (a) All payments by GLAI in respect of the Notes or the Guarantors (or any Paying Agent if other than GLAI) in respect of the Note Guaranties or of cash and/or deliveries of Preferred Shares (together with payments of cash in lieu of a fractional Preferred Share) upon exchange, will be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments, or other governmental charges of whatever nature imposed or levied by or on behalf of Brazil or Luxembourg, or any political subdivision or authority therein or thereof or any other jurisdiction in which any officer of the Company, the Company or any Guarantor is organized, doing business or otherwise subject to the power to tax (any of the aforementioned being a "**Taxing Jurisdiction**"), unless the Company or the Guarantors (or any Paying Agent if other than GLAI) are compelled by Law to deduct or withhold such taxes, duties, assessments, or governmental charges. In such event, the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will make such deduction or withholding, and the Company or the Guarantors (or any Paying Agent if other than GLAI), as applicable, will timely make payment of the full amount so withheld to the appropriate Governmental Authority and pay such additional amounts as may be necessary to ensure that the net amounts received by Holders after such withholding or deduction has been made (including such deductions and withholdings applicable to additional sums payable under this Section 7.06) shall equal the respective amounts of principal (and premium, if any) and interest which would have been receivable in respect of the Notes or the payment of cash and/or delivery of Preferred Shares (together with payment in cash in lieu of a fractional Preferred Share) in the absence of such withholding or deduction ("**Additional Amounts**"). Notwithstanding the foregoing, no such Additional Amounts shall be payable:

(1)    to, or to a third party on behalf of, a Holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such Holder and the relevant Taxing Jurisdiction, including, without limitation, such Holder being or having been a citizen or resident thereof, being incorporated in, being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein, other than connections arising from such Holder having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Note Purchase Agreement, sold or assigned an interest in this Note Purchase Agreement or holding of the Note and the receipt of payments with respect to the Note;

(2)    in respect of Notes surrendered or presented for payment (if surrender or presentment is required) more than 30 days after the Relevant Date except to the extent that payments under such Note would have been subject to withholdings and the Holder of such Note would have been entitled to such Additional Amounts, had the Note been surrendered for payment on the last day of such period of 30 days;

47

(3)    in respect of any estate, inheritance, gift, sales, transfer, excise or personal property tax;

(4)    in respect of any tax imposed on overall net income or any branch profits tax of a Holder;

(5)    in respect of any tax imposed pursuant to sections 1471 to 1474 of the Code, any successor Law or regulation implementing or complying with, or introduced in order to conform to, such sections *provided, however*, that such Law or regulation is substantively comparable and not materially more onerous to comply with, or any intergovernmental agreement in respect thereof or any agreement entered into pursuant to section 1471(b)(1) of the Code;

(6)    in respect of the Relibi Law; or

(7)    in respect of any combination of the above.

(b)    In the event that Additional Amounts actually paid with respect to the Notes are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the Holder of such Notes, and, as a result thereof such Holder determines, in its sole discretion exercised in good faith, that it has received a refund of withholding taxes as to which it has received Additional Amounts, it shall pay to the Company an amount equal to such refund (but only to the extent of Additional Amounts received with respect to the withholding taxes giving rise to such refund), net of all out-of-pocket expenses (including taxes) of such Holder and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). The Company, upon the request of the Holder, shall repay to such Holder the amount paid over pursuant to this paragraph (b) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such Holder is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (b), in no event will the Holder be required to pay any amount to the Company pursuant to this paragraph (b) the payment of which would place the Holder in a less favorable net after-tax position than the Holder would have been in if the tax subject to Additional Amounts and giving rise to such refund had not been deducted, withheld or otherwise imposed and the Additional Amounts had never been paid. This paragraph shall not be construed to require any Holder to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Company or any other Person. The Holder makes no representation or warranty that the Company will be entitled to receive such claim for refund or credit and incurs no other obligation (including, for the avoidance of doubt, any filing or other action) with respect thereto. In addition, the Company shall pay certain taxes on the issuance or delivery of any Preferred Shares upon conversion of the Notes pursuant to Section 1.01(e).

(c)    The Notes are subject in all cases to any tax, fiscal or other Law or regulation or administrative or judicial interpretation. Except as specifically provided above, neither the Company nor the Guarantors shall be required to make a payment with respect to any tax, assessment or governmental charge imposed by any government or a political subdivision or taxing authority thereof or therein.

48

(d)    For the avoidance of doubt, the Company shall not pay (and shall not purport to indemnify the Holder for) any stamp, issue, registration, court or documentary taxes or any excise or property taxes, charges or similar levies (including any penalties, interest and other liabilities relating thereto) that may arise or be paid in respect of this Note Purchase Agreement or the Notes.

(e)    Any reference in this Note Purchase Agreement or the Notes to principal, interest or any other amount payable in respect of the Notes by the Company or any of the Note Guaranties by the Guarantors, or the payment of cash and/or the delivery of Preferred Shares by the Company (together with payment of cash in lieu of a fractional Preferred Share), will be deemed also to refer to any Additional Amount, unless the context requires otherwise, that may be payable with respect to that amount under the obligations referred to in this Section.

(f)    The obligations of the Company and the Guarantors pursuant to this Section 7.06 shall survive termination of this Note Purchase Agreement.

SECTION 7.07.    *Collateral and Liens.*

(a)    Subject to Sections 5.03, 7.07(b) and 7.07(c), the Notes Obligations shall be secured by a first priority Lien granted by the Guarantors in the Collateral to Collateral Agent on behalf of the Secured Parties pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. The Company and the Guarantors shall not directly or indirectly, create, incur, assume or suffer to exist any Lien on any of the Collateral, other than (i) the Lien granted to the Collateral Agent and (ii) a Lien that is junior in priority to the Lien granted to the Collateral Agent and which is subject to a subordination agreement substantially in the form attached hereto as Exhibit F.

(b)    The Company and the Guarantors shall not, and will not permit any Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of the Collateral, except  for the first priority Lien in the Collateral granted by the Guarantors pursuant to Section 7.07(a) above and the Collateral Documents, *provided however*, that the Company and the Guarantors may, without requiring any resolution, approval or consent from the Purchaser or the Collateral Agent, and without implying breach of any representation, warranty or obligation assumed under this Note Purchase Agreement and the Collateral Documents, constitute in favor of any creditors a collateral security under suspensive condition on the Collateral (whether senior or junior), provided that the effectiveness of such collateral security is conditioned upon the indefeasible payment in full or satisfaction of the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes ("**Future Lien**").

(c)    The Company shall ensure that the Lien in the Collateral is duly created, enforceable and perfected, to the extent required by the Collateral Documents. The Guarantors shall:

(1)    in relation to the GLA's Smiles Fiduciary Transfer Agreement and IPCo's Smiles Fiduciary Transfer Agreement, as the case may be, (i) no later than twenty (20) days from date of execution of such Collateral Document, register the Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e*

49

*Documents*) in Brazil, and, (ii) (A) in relation to the GLA's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration, (B) in relation to the IPCo's Smiles Fiduciary Transfer Agreement, no later than fifteen (15) days after the date of such registration and the fulfilment of the suspensive condition set forth in IPCo's Smiles Fiduciary Transfer Agreement, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*);

(2)     in relation to the GLA's Fiduciary Transfer of IPCo's Shares Agreement (i) no later than twenty (20) days from date of execution of such Collateral Document, register such Collateral Document with the appropriate Registry of Titles and Deeds (Registro de Títulos e Documents) in Brazil, and (ii) within seven (7) business days from the date of execution of such Collateral Document, annotate the Fiduciary Transfer in IPCO's shares register book (*Livro de Registro de Ações Nominativas*);

(3)     in relation to the amendment to the Gol Senior Secured Notes due 2026 IP Collateral (i) no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 IP Collateral, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil, and, (ii) no later than ten (10) days after the date of such registration, deliver to the Collateral Agent evidence that the request for annotation of the security interest in the Collateral has been filed with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial*); and

(4)     in relation to the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral no later than twenty (20) days from date of execution of the amendment to the Gol Senior Secured Notes due 2026 Spare Parts Collateral, register such Collateral Document with the appropriate Registry of Titles and Deeds (*Registro de Títulos e Documents*) in Brazil.

(d)     The Company and the Guarantors shall not, and shall not permit any Subsidiary to, directly or indirectly (i) take any action with the purpose of depreciating the Collateral, (ii) dispose of, assign, transfer, sell or lease the Collateral to any third party or (iii) execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Parties to sell or otherwise dispose of the Collateral, in part or in full.

(e)     The Company and the Guarantors undertake to, and agree that, they will not, and will not permit any Subsidiary to, directly or indirectly, take any action, or cause or contribute for any action to be taken, to (i) contest or in any way impair or harm the Collateral; (ii) interfere with the Secured Parties' right to enforce, sell, assign, transfer, convey or otherwise dispose of the Collateral upon the occurrence of an Event of Default; (iii) diminish, demean, tarnish or dilute the value, distinctiveness, fame, enforceability, validity of, or goodwill associated with, the Collateral; (iv) challenge the enforceability or the validity of the Collateral, (v) use, assign, transfer, convey, sell, dispose, disclose, make available or publish any trade secret, know-how, source code or any kind of confidential information related to the Collateral, or (vi) use or apply

for any trademark registration or use any trade address that are identical or similar, in phonetical, graphical or ideological manner, to the Collateral.

(f)      By their purchase and acceptance of the Notes, the Holders hereby agree that they are bound and that such purchase and acceptance constitutes the authorization and direction to the Collateral Agent to act as collateral agent for the benefit, and in representation, of the Holders, and to execute and deliver this Note Purchase Agreement and the Collateral Documents to which the Collateral Agent is a party. It is hereby expressly acknowledged and agreed that, in doing so, the Collateral Agent is not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose. Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under this Note Purchase Agreement and the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to it under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

SECTION 7.08.    *Certain Assurances*.

(a)      On the Initial Closing Date, the Purchaser, the Collateral Agent and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes shall receive an Opinion of Counsel from Lefosse Advogados, as Brazilian counsel to the Company and the Guarantors, in form and substance satisfactory to the Purchaser, to the effect that, subject to certain exceptions and qualifications, the GLA's Smiles Fiduciary Transfer Agreement, the GLA's Fiduciary Transfer of IPCo's Shares Agreement and the amendments to the GOL Senior Secured Notes due 2026 Collateral have been duly authorized, executed and delivered by GLA and/or GLAI, as applicable, and constitutes the legal, valid, and binding obligation of GLA and/or GLAI, as applicable, which will be enforceable against GLA and/or GLAI in accordance with its terms and with Section 7.07(c).

(b)      Each of GLA and GLAI shall take, or cause to be taken, all actions necessary to maintain the Collateral Documents to which it is a party in full force and effect and enforceable, in accordance with their terms, and to maintain and preserve the Lien created by the Collateral Documents, in accordance with their terms, and the priority thereof, including (A) making filings and recordations, (B) making payments of fees and other charges on a timely basis, (C) issuing and, if necessary, filing or recording supplemental documentation, including continuation statements, (D) discharging all claims or other Liens adversely affecting the rights of any Secured Party in any Collateral, (E) publishing or otherwise delivering notice to third parties, (F) depositing title documents, (G) amending any Collateral Document to the extent required by applicable Law and (H) taking all other actions either necessary or otherwise requested by the Purchaser to ensure that all Collateral is subject to a valid and enforceable first-priority Lien in favor of the Collateral Agent for the benefit of the Secured Parties. In furtherance of the foregoing, GLA and GLAI shall ensure that all of the Collateral intended to be subject to the Lien granted by the Collateral Documents shall become subject to such Lien having the priority contemplated pursuant to the terms of this Note Purchase Agreement and the Collateral Documents. Moreover, for the avoidance of any doubt, the Collateral Agent has no obligation, liability or responsibility to monitor or ensure that GLA and/or GLAI, as the case may be,

maintain such Lien and shall assume that GLA and GLAI are in full compliance with their obligations in connection therewith.

(c)      Notwithstanding anything to the contrary contained in this Note Purchase Agreement, the Collateral Documents or in applicable Law, the Collateral Agent shall not have any responsibility or liability, among other things as set forth in this Note Purchase Agreement or the Collateral Documents, for (1) acting or refraining from acting based on any unlawful, ambiguous or inaccurate instruction, notice, demand, notification or other document pursuant to this Note Purchase Agreement and the Collateral Documents; (2) any loss or claim resulting from any act or omission, directly or indirectly, except if otherwise determined in a final nonappealable decision by a court of competent jurisdiction that the Collateral Agent was grossly negligent; (3) any loss of profits, indirect, consequential, incidental, special, punitive or related losses and/or damages even if previously advised of the likelihood of such loss or damage; (4) preparing, recording or filing any financing or continuation statements or recording or filing any instrument in any public office or for otherwise ensuring the perfection or maintenance of any Lien granted pursuant to, or contemplated by, this Note Purchase Agreement and the Collateral Documents or the existence and enforceability of any insurance on the Collateral; (5) taking any necessary steps to preserve rights against any parties with respect to the Collateral; (6) taking any action to protect against any diminution in value of the Collateral; (7) errors in judgment that do not constitute gross negligence or willful misconduct as determined by a final and non-appealable judgement by a court of competent jurisdiction; (8) the Company's and the Guarantors' compliance with any of the covenants set forth in this Note Purchase Agreement and the Collateral Documents, including but not limited to, covenants regarding the granting, perfection or maintenance of any Lien; (9) the market value of the Collateral or its sufficiency to satisfy in full payments due on the Notes Obligations; (10) the accuracy of any representation or warranty of the Company or Guarantors in this Note Purchase Agreement, the Collateral Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent; or (11) the effectiveness, genuineness, sufficiency, legality, validity and enforceability of any Lien, security interest, Collateral, this Note Purchase Agreement or the Collateral Documents or title, transfer or assignment of any Collateral.

SECTION 7.09.    *Release of Collateral*. Subject to, and to the extent permitted under, the terms of this Note Purchase Agreement and the Collateral Documents, the Company and the Guarantors shall be entitled to the release of the Collateral from the Lien securing the Notes Obligations under any one or more of the following circumstances:

(i)      in accordance with this Note Purchase Agreement and the Collateral Documents, if at any time the Collateral Agent, acting in accordance, exclusively and strictly, with instructions provided by the Purchaser (at the direction of the Abra Notes Supermajority Holders), forecloses upon or otherwise exercises remedies against the Collateral resulting in the sale or disposition thereof;

(ii)      as described and pursuant to Article 10; or

(iii)    upon payment in full of the principal of, together with all accrued and unpaid interest on, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

*in each case*, (i) so long as no Default or Event of Default will exist immediately after such release, as applicable; and (ii) provided the Collateral Agent shall have received an Officer's Certificate certifying, and Opinion of Counsel stating, that all conditions precedent provided in this Note Purchase Agreement with respect to the release of Collateral pursuant to this Section 7.09 have been satisfied (and the Collateral Agent shall execute any document requested by the Company or any Guarantor to evidence such release of the Collateral (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or the Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 7.09 and (C) without any recourse, representation or warranty by the Collateral Agent);

*provided, however,* that, notwithstanding the foregoing, the Lien granted under the Collateral Documents shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exist Notes Obligations due and payable on that date, in which case the Lien in the Collateral shall terminate upon satisfaction of such Notes Obligations, all obligations under the Abra Senior Secured Notes and all obligations under the Abra Senior Secured Exchangeable Notes. Upon termination of the Lien granted under the Collateral Documents in respect of the Notes Obligations, the Collateral shall be released in accordance with this Note Purchase Agreement to the Company and the Guarantors, and the Company and the Guarantors shall thereupon grant a Lien in such Collateral in respect of any outstanding obligations under the Abra Notes.

SECTION 7.10.    *Maintenance of Collateral*. The Company and the Guarantors shall, and shall cause its Subsidiaries to,  at all times, preserve the Collateral for the benefit of the Secured Parties, not permit the value of the Collateral to be impaired, keep the Collateral free from all Liens or encumbrances other than the Liens and the Future Liens in the Collateral, and maintain the Collateral in accordance with applicable Law and regulations.

SECTION 7.11.    *Limitation on Transactions with Affiliates*.

Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering thereof of any service with any Affiliate of the Company, GLAI or any Subsidiary (a "**Related-Party Transaction**"), except upon fair and reasonable terms that are no less favorable to the Company, GLAI or the Subsidiary than could be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company, GLAI or such Subsidiary, as the case may be.

(a)    Prior to entering into any Related-Party Transaction or series of Related-Party Transactions (i) with an aggregate value in excess of U.S.$10.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary must deliver to the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) a certificate signed by a Responsible Officer stating that such Related-Party Transaction complies

53

with this covenant or (ii) with an aggregate value in excess of U.S.$20.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the terms of such Related-Party Transaction will be approved by a majority of the members of the Board of Directors of the Company, GLAI or of such Subsidiary (including a majority of the members of the Board of Directors who are disinterested directors with respect to such Related-Party Transaction), the approval to be evidenced by a board resolution that such transaction or series of related transactions are on terms no less favorable to the Company, GLAI or such Subsidiary than could be obtained in a comparable arm's length transaction and satisfy the requirements in clauses (i) and (ii) with an aggregate value in excess of U.S.$40.0 million (or the equivalent thereof at the time of determination) in any 12-month period, the Company, GLAI or such Subsidiary shall deliver to the Purchaser and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes a written opinion issued by an investment bank of recognized international standing that such Related-Party Transaction is fair to the Guarantor or the relevant Subsidiary from a financial point of view and satisfy the requirements in clause (i) and clause (ii) hereof.

(b)      The foregoing paragraphs do not apply to:

(i)    arm's length transactions in the ordinary course among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries *provided,* that any such transaction conducted by any of the Guarantors' shareholders indirectly through any of these entities shall not be exempt from the limitations in this Section 7.11;

(ii)   any transaction among and between any of the Company, the Guarantors, Avianca Group International Limited and any of their respective Subsidiaries for the purpose of managing and paying taxes imminently due and owing by the foregoing parties to any Governmental Authority;

(iii)  any transaction in the ordinary course of business between or among the Company, GLAI and any of its Subsidiaries or between or among the Subsidiaries of GLAI;

(iv)   reasonable fees and compensation paid to, and any customary indemnity or insurance provided on behalf of, officers, directors, employees, consultants or agents of the Company, GLAI or any of its Subsidiaries;

(v)    transactions or payments pursuant to any employee, consultant, officer or director compensation or benefit or equity plans, stock options or arrangements entered into in the ordinary course of business and consistent with past practice, customary indemnifications or arrangements or reimbursement of expenses entered into in the ordinary course of business, on market terms and consistent with past practice or industry norms;

(vi)   transactions pursuant to any contract or agreement in effect on the Initial Closing Date, as amended, modified or replaced from time to time so long as the amended, modified or new agreements, taken as a whole, are no less favorable to the

Company, GLAI and its Subsidiaries than those in effect on the Initial Closing Date;

(vii) loans and advances to employees in the ordinary course of business or consistent with past practices; and

(viii) Restricted Payments that are permitted by the provisions of this Note Purchase Agreement.

SECTION 7.12.    *Limitation on Sale of Assets.* Subject to Section 7.07(d), each of the Company, GLAI or any of its Subsidiaries shall not make any Asset Sales and not permit any of its Subsidiaries to make any Asset Sales, unless:

(i)      the Company, GLAI or such Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value as of the date on which such assets sold or otherwise disposed of;

(ii)     at least 75% of the consideration consists of cash or cash equivalent received at closing, provided that, for purposes of this clause (ii), each of the following shall be deemed cash or cash equivalent: (A) any liabilities of the Company, GLAI or such Subsidiary that are assumed by the transferee of any such assets pursuant to a customary novation agreement that releases the Company, GLAI or such Subsidiary from further liability; and (B) any securities notes or other obligations received by the Company, GLAI or such Subsidiary from such transferee that are, within 120 days after the closing of such Asset Sale, converted by the Company, GLAI or such Subsidiary into cash or cash equivalent, but only to the extent of the cash or cash equivalent actually received in that conversion;

(iii)    Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds may be used to:

(A)      to permanently repay Debt, other than Subordinated Obligations, of the Company, GLAI or any of its Subsidiaries (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company, GLAI or any of its Subsidiaries; or

(B)      to acquire (or within such 365-day period, the Company, GLAI or such Subsidiary shall have made a good faith determination to acquire or make capital expenditures, which acquisition shall be consummated, or capital expenditure shall be made prior to the second anniversary of such Asset Sale) (i) all or substantially all of the assets of a Related Business, or a majority of the Capital Stock of another Person that thereupon becomes a Subsidiary engaged in a Related Business, or to make capital expenditures or otherwise acquire assets that are to be used in a Related Business; or (ii) Additional Assets for the Company, GLAI or its Subsidiaries; or

55

(C)     any combination of (A) and (B).

(iv)     The Net Cash Proceeds of an Asset Sale not applied pursuant to paragraph (iii) above shall constitute "**Excess Proceeds**".  Excess Proceeds of less than U.S.$25.0 million (or the equivalent thereof at the time of determination) will be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds such amount, the Company must prepay the outstanding amount under the Notes equal to the Net Cash Proceeds of such Asset Sale.

(v)     With respect to paragraph (iv) above, the Company shall notify the Purchaser (or if the Purchaser is no longer a Holder, the Majority Holders) in writing of any prepayment hereunder by electronic mail or other electronic transmission or by telephone (to be confirmed in writing) no later than 11:00 a.m. five Business Days prior to the date of such prepayment; provided that the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall not accept any prepayment of the Notes without the prior written consent of the Abra Notes Supermajority Holders.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Notes or portion thereof to be prepaid and a reasonably detailed calculation of the amount of such prepayment.  Prepayments shall be accompanied by accrued interest on the prepaid amount and shall be without premium or penalty.

Notwithstanding the foregoing, each of the Company, GLAI or any of its Subsidiaries shall not sell, lease, transfer or other dispose of any portion of the Collateral without the prior written consent of the Abra Notes Supermajority Holders; provided, for purposes of any action requested of the Collateral Agent in connection with any release of Collateral, the Collateral Agent shall have no duty, obligation or liability with respect to the obligations of the Company, GLAI and the Subsidiaries set forth above and the Collateral Agent shall look solely to the provisions of Section 7.09 of this Note Purchase Agreement.

SECTION 7.13.    *Limitation on Debt.*

(a)     Each of the Company, GLAI or any of its Subsidiaries shall not issue, assume, guarantee, incur or otherwise become liable for any new Debt in excess of the lesser of (i) U.S.$100.0 million (or the equivalent thereof at the time of determination) and (ii) 0.2x last 12 months consolidated EBITDAR after giving effect thereto and the application of the proceeds therefrom.  The last 12 months consolidated EBITDAR shall be calculated, on any date of determination, taking into account each of the Adjusted Operating Revenues, Adjusted Operating Expenses and Sales Taxes for the period of four consecutive fiscal quarters ending on, or most recently prior to such date, for which consolidated financial statements of GLAI are publicly available; all on a consolidated basis and in accordance with the Accounting Principles.

(b)     Notwithstanding clause (a) above, the Company, GLAI or any of its Subsidiaries may issue, assume, guarantee, incur or otherwise become liable for the following new Debt:

(1)    intercompany Debt between or among the Company, GLAI and any Subsidiary thereof or between or among their Subsidiaries provided that any Debt made by any Subsidiary to the Company or any Guarantor shall be subordinated to the Notes pursuant to a subordination agreement substantially in the form of Exhibit F and, if owing to the Company or any of the Guarantors, is subject to a Lien granted in favor of the Collateral Agent for the benefit of the Purchaser;

(2)    Debt that is:

        i.    represented by the Notes and the Note Guaranties, in each case, issued on the Initial Closing Date;

        ii.    outstanding on the Initial Closing Date (other than the Notes and the Notes Guaranties);

        iii.    arising in connection with cash management transactions related to the proceeds of the Notes;

        iv.    consisting of Refinancing Debt incurred in respect of any Debt described in this clause (b) or the foregoing clause (a); or

        v.    consisting of guarantees of any Debt permitted under the Notes;

(3)    Debt in respect of bankers' acceptances, deposits, promissory notes, letters of credit, self-insurance obligations, completion guarantees, performance, surety, appeal or similar bonds and guarantees provided by the Company, GLAI or any Subsidiary in the ordinary course of its business securing the performance of contractual or license obligations of the Company, GLAI or any Subsidiary or Debt with respect to reimbursement type obligations regarding workers' compensation claims or payment obligations with self-insurance or similar requirements in the ordinary course of business;

(4)    Hedging obligations of the Company, GLAI or any Subsidiary thereof (entered into for non-speculative purposes) in the ordinary course of business or directly related to Debt permitted to be incurred by the Company, GLAI or any Subsidiary pursuant to the Notes and Refinancing Debt incurred by the Company, GLAI or a Subsidiary in respect of Debt incurred pursuant to this clause (d);

(5)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Debt is extinguished within five Business Days of its incurrence;

(6)    Debt to the extent that the net proceeds thereof are promptly deposited to defease or to satisfy and discharge the Notes in accordance with its terms (which proceeds shall be thereafter used to defease or satisfy and discharge the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes , in each case, with the prior written consent of the Abra Notes Supermajority Holders);

(7)      Debt consisting of (i) the financing of insurance premiums in the ordinary course of business, (ii) take or pay obligations contained in supply agreements in the ordinary course of business, or (iii) any advance, loan or extension of credit arising in connection with the purchase of inventory, equipment or supplies in the ordinary course of business;

(8)      Debt of the Company, GLAI or any Subsidiary for taxes levied, assessments due, settlements and other   governmental charges required to be paid as a matter of law or regulation in the ordinary course of business;

(9)      Aircraft Debt; and

(10)     Additional other Debt in an aggregate principal amount not to exceed at any time $275 million which may be secured by a lien ranking *pari passu* with the lien on the collateral securing the GOL Senior Secured Notes due 2026, provided that the incurrence of any such additional Debt shall be subject to the satisfaction of the following terms and conditions:

(A)      until such time as all Collateral and covenants required to be delivered and liens thereon perfected under Section 7.17(o) shall have been delivered and perfected, only $150 million of the foregoing amount shall be able to be utilized;

(B)      such Debt is subject to an intercreditor agreement in form and substance acceptable to the Abra Notes Supermajority Holders in all respects (including without limitation in respect of passivity in any future insolvency, judicial or extrajudicial reorganization or bankruptcy of the Company or the Guarantors);

(C)      such Debt shall have a maturity date that is (i) more than one year after the maturity date of the Notes and (ii) more than three months after the maturity date of the Abra Notes;

(D)      such Debt shall have an all-in-yield to maturity lower than that of the Abra Senior Secured Notes, and have a weighted average life no shorter than that of the Abra Senior Secured Notes; and

(E)      up to $200 million of such Debt may be used for future liability management transactions provided that any such liability management transactions involving any refinancing or repurchases of the GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under this Section 7.13(b)(10) or otherwise), shall be at a maximum price of 50 cents.

Notwithstanding the foregoing, neither the Company, GLAI nor any of its Subsidiaries shall incur any Debt or amend existing Debt in a manner that would result in any restrictions on the ability of any Subsidiary of GLAI to repay Debt, advances or loans, or to repay Debt,

advances or loans, or to pay dividends or make any other distributions on the Capital Stock of the Subsidiary owned by GLAI or any other Subsidiary to GLAI or any Subsidiary thereof.

SECTION 7.14.    *Limitation on Restricted Payments*. Each of the Company, GLAI or any of its Subsidiaries shall not directly or indirectly:

(a)    declare or pay any dividend or make any distribution on or in respect of its Capital Stock (including any payment in connection with any merger or consolidation involving the Company, GLAI or such Subsidiary) except dividends or distributions payable solely in the form of its Capital Stock and except dividends or distributions payable to the Company, GLAI or directly or indirectly wholly-owned Subsidiaries of GLAI , in each case with the prior written consent of the Abra Notes Supermajority Holders;

(b)    purchase, redeem, retire or otherwise acquire for value any Capital Stock of GLAI held by Persons other than the Company, GLAI or another Subsidiary (other than a purchase, redemption, retirement or other acquisition for value that would not constitute an Investment);

(c)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Obligations (other than a payment of interest or the purchase, repurchase, redemption, defeasance or other acquisition of Subordinated Obligations made in anticipation of satisfying a sinking fund obligation, a principal installment or a final maturity, in each case, due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition);

(d)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any GOL Exchangeable Notes due 2024 or GOL Senior Notes due 2025 (whether funded by debt raised under Section 7.13(b)(10) or otherwise) at a price in excess of 50 cents for every $1.00 of principal amount so purchased, repurchased, redeemed, defeased or otherwise acquired or retired for value; or

(e)    make any Investment in any Person;

(the actions described in clauses (a) through (d) above being herein referred to as "**Restricted Payments**" and each, a "**Restricted Payment**").

The aforementioned provisions will not prohibit:

(1)    any Restricted Payment in exchange for, or out of the proceeds of the substantially concurrent issuance or sale of, Capital Stock of GLAI (other than Capital Stock issued or sold to a Subsidiary of GLAI) , in each case with the prior written consent of the Abra Notes Supermajority Holders;

(2)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations made in exchange for, or out of the proceeds of the substantially concurrent sale of, Subordinated Obligations that is permitted to be incurred pursuant to the covenant described under Section 7.13;

59

(3)     dividends paid or distributions made after the date of declaration thereof if at such date of declaration such dividend or distribution would have complied with this covenant;

(4)     so long as no Default has occurred and is continuing, any purchase or redemption of Subordinated Obligations from Net Cash Proceeds; provided that the Company, GLAI or the Subsidiary thereof have complied with the covenant described under Section 7.12 and Section 7.13;

(5)     the declaration and payment of distributions to shareholders of the Company, GLAI or any Subsidiary in the form of dividends, interest on shareholders' equity or otherwise in the minimum mandatory amount set forth under applicable Brazilian corporate law;

(6)     repurchases of Capital Stock, in an aggregate amount not to exceed U.S.$10,000,000 in any calendar year (i) deemed to occur upon the exercise of stock options, warrants or other convertible securities if such Capital Stock represents a portion of the exercise price thereof and cash payments in lieu of the issuance of fractional shares, or (ii) from former employees, officers, directors, consultants or other persons who performed services for GLAI or any Subsidiary in connection with the cessation of such employment or service; provided that such repurchases have been approved by the Company's, GLAI's or its Subsidiary's Board of Directors, as applicable;

(7)     the creation, approval or amendment of any management equity incentive plan in the ordinary course of business and consistent with past practice;

(8)     any distributions or payments on or related to convertible or exchangeable securities issued by GLAI or any of its Subsidiaries pursuant to the terms of the Transaction Documents or any other financing existing on the Initial Closing Date (as disclosed in GLAI's Form 20-F filed with the U.S. Securities and Exchange Commission on March 16, 2022 including in Note 16 (Loans and Financing), Note 17 (Leases), Note 18 (Suppliers) and Note 20 (Taxes Payable) to Item 18 (Financial Statements) beginning on page F-50 thereof); and

(9)     dividends, loans, advances or distributions to any Purchaser Entity or other payments by GLAI or any Subsidiary thereof in amounts equal to (without duplication) the amounts required for any Purchaser Entity to pay any Purchaser Entity Expenses.

The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred, issued, purchased, repurchased, redeemed, retired, defeased or otherwise acquired by the Company, GLAI or such Subsidiary, as the case may be, pursuant to such Restricted Payment.

SECTION 7.15.   *Non-Compete and Exclusivity.*

(a)     The Company and Guarantors shall not, and shall ensure that their Subsidiaries do not, directly or indirectly, for their own account or on behalf of or together with any other

60

Person, carry on, own, manage, control, operate, develop, create, invest in, have any financial interest in (as shareholder or otherwise), or participate in or be engaged in (whether as shareholder, advisor, a partner of a partnership firm, designated partner of a limited liability partnership, or proprietor of a proprietorship firm, or any other entity whether registered under applicable Law or otherwise), any undertaking, venture, business or Person (including, but not limited to, any joint venture, partnership or other arrangement of whatsoever nature) that is engaged in a similar business to the Loyalty Program. The Company and the Guarantors further covenant that the Loyalty Program is, and will be, the sole and exclusive loyalty program of GLA, the Company, GLAI and their Subsidiaries; provided that the Loyalty Program may be expanded to be the loyalty program of both the GLAI Group and another airline so long as such expansion is not adverse to GLAI, the GLAI Group or IPCo and the Loyalty Program remains controlled, directly or indirectly, by GLAI.

(b)        Each of the Company and GLAI agree that to the extent that Abra Group Limited provides an officer's certificate to the Company, GLAI or any of their respective Subsidiaries or any of their respective board of directors that it is appropriate to make a filing or enter a plan under applicable Law to restructure its debt (including, without limitation, a "Chapter 11" filing in the United States or a similar filing under Brazilian law), it shall take such actions within the timeframe requested by Abra Group Limited.

(c)        Each of the Company, GLAI and their respective Subsidiaries agree that in connection with any proceedings to restructure its debt (including, without limitation, any proceeding related to bankruptcy, insolvency, judicial or extrajudicial reorganization, restructuring or any proceeding entered into in connection with clause (b) above) it shall not propose a plan or make a filing or otherwise take action that has not been consented to in writing by Abra Group Limited.

SECTION 7.16.    *Additional Lines of Business*. The Company and GLAI shall not, and shall procure that their respective Subsidiaries shall not enter into a line of business that (i) is not the business of operating airlines, (ii) is not primarily related to operating airlines; (iii) is not primarily related to the then current business of the Company and GLAI and their respective Subsidiaries.

SECTION 7.17.    *GLA and IPCO Covenants.*

(a)        IPCo shall not engage in any business or undertake any other activity or obligations except for (i) owning and holding the Smiles' certain assets and rights related to the Loyalty Program (subject to the provisions herein) or that are pledged pursuant to the Collateral Documents and the Smiles Complete Technological Infrastructure, (ii) operating the Loyalty Program, (iii) guaranteeing the Notes Obligations, (iv) establishing and maintaining its legal existence and otherwise take actions to comply with the terms of this Note Purchase Agreement and the Collateral Documents, in each case to the extent permitted hereby and thereby, and (v) as required by law.

(b)        GLA shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, and any of its positions as counterpart to the current and future

61

commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(c)     [*Reserved*].

(d)     IPCo shall not grant any lien over the Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals, the Smiles Complete Technological Infrastructure, any of its positions as counterpart to the current and future commercial agreements (including with financial institutions and credit card companies) related to the Loyalty Program, or any other asset or right owned by IPCo related to the Loyalty Program, except for the Collateral provided under the Collateral Documents; *provided* that nothing in this section should be understood as limitation to GLA's ability to create liens in receivables deriving from the commercial agreements.

(e)     On the GOL Senior Secured Notes NPA Initial Closing Date,  GLA shall have caused IPCo to (i) enter into a guaranty of the Notes Obligations; and (ii) execute the Exclusivity Side Letter and comply with its obligations thereunder. Within up to 60 days after the GOL Senior Secured Notes NPA Initial Closing Date, GLA shall have caused IPCo to enter into the agreement in which IPCo grants to GLA the right to use Smiles Intellectual Property, the Smiles Database, Client and Supplier List, the Smiles Operating Manuals and the Smiles Technological Infrastructure, provided that such agreement shall expire in December 31st of each year, unless renewed by mutual consent upon renegotiation of its terms and comply with its obligations thereunder ("**GLA/IPCo Agreement**").

(f)     GLA and GLAI shall take all actions to comply with the Exclusivity Side Letter and GLA/IPCo Agreement. Upon an Event of Default, IPCo may only renew the GLA/IPCo Agreement without prior written consent of the Abra Notes Supermajority Holders for an annual payment of at least $200 million for 30 years;

(g)     On the GOL Senior Secured Notes NPA Initial Closing Date, Guarantors shall have duly executed and delivered the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement.

(h)     any future Smiles Intellectual Property shall be owned solely and exclusively by IPCo.

(i)     After the transfer to IPCo provided for in Section 7.17(o) below, any Smiles Intellectual Property and any future Smiles Database, Client and Supplier List and Smiles Operating Manuals shall be owned solely and exclusively by IPCo.

(j)     any future agreement related to the Smiles Complete Technological Infrastructure shall be entered by IPCo and relevant counterparties, provided that IPCo shall enter into and maintain in effect all relevant agreements related to the Smiles Complete Technological Infrastructure necessary to run the Loyalty Program;

(k)      GLA undertakes not to hire any other service providers or obtain licenses to use software that perform analogous tasks or functions to those included in the Smiles Complete Technological Infrastructure.

(l)      GLA and IPCo, as the case may be, undertake to update the Database, Client and Supplier List in accordance with the periodicity established in its internal policies and controls, even after an acceleration of the Notes.

(m)      any future agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall include IPCo as a party allowed to issue and sell miles. Provided that if no Event of Default has occurred, the parties agree that no agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered into exclusively by IPCo.

(n)      Upon the occurrence of an Event of Default (or an Event of Default under the GOL Senior Secured Notes NPA), (i) no new agreement with financial institutions and credit card companies governing the issuance or sale of miles in the context of the Loyalty Program shall be entered into any member of the GLAI Group, except IPCo and (ii) IPCo shall become the sole entity issuing or selling miles in the context of the Loyalty Program under the agreements to which IPCo was included as a party pursuant to item 7.17(m) above and 7.17(o) and 7.17(p) below.

(o)      On or before July 10, 2023, GLA shall (provided that, in any case, such actions shall occur after the execution and delivery of the IPCo's Smiles Fiduciary Transfer Agreement and the GLA's Fiduciary Transfer of IPCo's Shares Agreement):

(1)      have transferred to IPCo the ownership of all Smiles Intellectual Property, Smiles Database, Client and Supplier List and the Smiles Operating Manuals;

(2)      have assigned to IPCo all the agreements related to the Smiles Technological Infrastructure listed in Schedule B-1;

(3)      have assigned to IPCo no fewer than 66% of the agreements listed in Schedule B-2 and any other agreements related to the Smiles Complete Technological Infrastructure executed by GLAI Group between the GOL Senior Secured Notes NPA Initial Closing Date and July 10, 2023; and

(4)      have amended no fewer than 66% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements allowed to issue and sell miles, in, provided that, the agreements in which IPCo is included represents more than 50% of the total revenues of the commercial agreements listed in Schedule C for the year ended December 31, 2022.

(p)      On or before December 31, 2023 GLA shall:

(1)      assign to IPCo no fewer than 90% of the agreements listed in Schedule B-2 and any other agreements related to the Smiles Complete Technological Infrastructure

63

executed by GLAI Group between the GOL Senior Secured Notes NPA Initial Closing Date and July 10, 2023; and

(2)      amend no fewer than 90% of the commercial agreements related to the Loyalty Program listed in Schedule C to include IPCo as a party of such agreements allowed to issue and sell miles.

## ARTICLE 8
### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 8.01.    *[Reserved]*.

SECTION 8.02.    *Limitation on Consolidation, Merger or Transfer of Assets*.  Until all amounts outstanding under this Note, the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes have been paid in full, neither the Company nor the Guarantors shall consolidate with or merge with or into, or sell, convey, transfer or dispose of, or lease all or substantially all of its assets as an entirety or substantially as an entirety, in one transaction or a series of related transactions, to, any Person, unless:

(1)      the resulting, surviving or transferee Person (if not the Company or a Guarantor) shall be a Person organized and existing under the Laws of Brazil, England, the United States of America, any State thereof or the District of Columbia, or any other country (or political subdivision thereof) that is a member country of the European Union or of the Organization for Economic Co-operation and Development, and such Person expressly assumes, by an amendment to this Note Purchase Agreement, executed and delivered to the Company, all the obligations of the Company or the Guarantors under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents;

(2)      the resulting, surviving or transferee Person undertakes, in an amendment to this Note Purchase Agreement, to pay such Additional Amounts in respect of principal (and premium, if any) and interest as may be necessary in order that every net payment made in respect of the Notes and any Note Guaranty after deduction or withholding for or on account of any present or future tax, duty, assessment or other governmental charge imposed by the Surviving Person's Tax Jurisdiction (as defined below) such other country or any political subdivision or taxing authority thereof or therein shall not be less than the amount of principal (and premium, if any) and interest then due and payable on the Notes and the Note Guaranties subject to the same exceptions set forth under Section 7.06, but replacing references therein to the Taxing Jurisdiction with references to the jurisdiction in which the resulting, surviving or transferee Person (as the case may be) is incorporated, domiciled and/or resident for taxation purposes (the "**Surviving Person's Tax Jurisdiction**") ; and

(3)      immediately prior to such transaction and immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing.

For purposes of this Section 8.02, any sale, lease or other transfer or disposition of the assets of one or more Subsidiaries of the Company, if any, that would, if the Company had held

such assets directly, have constituted the sale, lease or other transfer or disposition of all or substantially all of the Company and its Subsidiaries', if any, consolidated assets, taken as a whole, shall be treated as such under this Note Purchase Agreement.

Subject to Section 8.02(2) above and notwithstanding anything else to the contrary contained in the foregoing, any of the Guarantors may consolidate with or merge with the Company or any Subsidiary that becomes a Guarantor concurrently with the relevant transaction.

SECTION 8.03.    *Successor Substituted*.  Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Company or any of the Guarantors in accordance with Section 8.02 in which the Company or any of the Guarantors is not the continuing obligor or Guarantor, as the case may be, under this Note Purchase Agreement, the surviving or transferor Person shall succeed to, and be substituted for, and may exercise every right and power of, the Company or any of the Guarantors, as the case may be, under this Note Purchase Agreement with the same effect as if such successor had been named as the Company or a Guarantor therein. When a successor assumes all the obligations of its predecessor under this Note Purchase Agreement, the Notes and the Note Guaranties and the Collateral Documents, the predecessor shall be released from those obligations; *provided that* in the case of a transfer by lease, the predecessor shall not be released from the payment of principal and interest on the Notes.

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES

SECTION 9.01.    *Events of Default*.  The term "**Event of Default**" means, when used herein with respect to the Notes, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to, or as a result of any failure to obtain, any authorization, order, rule, regulation, judgment or decree of any governmental or administrative body or court):

(a)    default in any payment of interest pursuant to the terms set forth in this Note Purchase Agreement (including any Additional Amounts) on any Note when the same becomes due and payable, and any such Default continues for a period of 30 days;

(b)    default in the payment of the principal (including any Additional Amounts) of any Note when the same becomes due and payable at its Stated Maturity, upon acceleration or otherwise;

(c)    failure by the Company or GLAI to comply with its respective obligation to exchange the Notes in accordance with Article 13 of this Note Purchase Agreement upon exercise by a Holder of its right to exchange the Notes, and such failure continues for a period of three Business Days;

(d)    failure by the Company or the Guarantors to comply with its obligations under Article 7;

(e)    any of the Company or the Guarantors fails to comply with any of its covenants or agreements in the Notes, this Note Purchase Agreement, the Note Guaranties or the Collateral

65

Documents (other than those referred to in clause (a), (b), (c) or (d) of this Section 9.01), and such failure continues for 60 days after the notice specified below;

(f)    any of the Company, the Guarantors or any Significant Subsidiary defaults under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Debt for money borrowed by any of the Company, the Guarantors or any such Significant Subsidiary (or the payment of which is guaranteed by the Company, the Guarantor or any such Significant Subsidiary) whether such Debt or guarantee now exists, or is created after the date of this Note Purchase Agreement, which default (i) is caused by failure to pay principal of or premium, if any, or interest on such Debt after giving effect to any grace period provided in such Debt on the date of such default ("**Payment Default**") or (ii) results in the acceleration of such Debt prior to its express maturity and, in each case, the principal amount of any such Debt, together with the principal amount of any other such Debt under which there has been a Payment Default or the maturity of which has been so accelerated, totals U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate;

(g)    one or more final non-appealable judgments or decrees for the payment of money of U.S.$35,000,000 (or the equivalent thereof at the time of determination) or more in the aggregate are rendered against any of the Company, the Guarantors or any Significant Subsidiary and are not paid (whether in full or in installments in accordance with the terms of the judgment) or otherwise discharged and, in the case of each such judgment or decree, either (i) an enforcement proceeding has been commenced by any creditor upon such judgment or decree and is not dismissed within 30 days following commencement of such enforcement proceedings or (ii) there is a period of 50 days following such judgment during which such judgment or decree is not discharged, waived or the execution thereof stayed;

(h)    an involuntary case or other proceeding is commenced against any of the Company, the Guarantors or any Significant Subsidiary with respect to it or its debts under any bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect seeking the appointment of a trustee, receiver, *administrador judicial,* liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 50 days; or an order for relief is entered against any of the Company, the Guarantors or any Significant Subsidiary under the bankruptcy Laws now or hereafter in effect, and such order is not being contested by any of the Company, the Guarantors or any Significant Subsidiary, as the case may be, in good faith, or has not been dismissed, discharged or otherwise stayed, in each case within 50 days of being made;

(i)    any of the Company, the Guarantors or any Significant Subsidiary (i) commences a voluntary case or other proceeding seeking liquidation, reorganization, *concordata*, or other relief with respect to itself or its debts under any applicable bankruptcy, insolvency, judicial or extrajudicial reorganization or other similar Law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such Law, (ii) consents to the appointment of or taking possession by a receiver, *administrador judicial*, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the Company, the Guarantors or any Significant Subsidiary or for all or substantially all of the property of any of the Company, the

66

Guarantors or any Significant Subsidiary or (iii) effects any general assignment for the benefit of creditors;

(j)       any event occurs that under the Laws of England and Wales, Brazil, Colombia, the Cayman Islands or any political subdivision thereof or any other country has substantially the same effect as any of the events referred to in any of clause (h) or (i);

(k)       any Note Guaranty shall be held in any judicial proceeding to be unenforceable or invalid or shall cease for any reason to be in full force and effect, other than in accordance the terms of this Note Purchase Agreement, or any of the Guarantors (or any Person on behalf of any Guarantor) denies or disaffirms its obligations under its Note Guaranty;

(l)       all or any portion of a claim asserted by the Purchaser or Majority Holders in any proceeding (including without limitation an insolvency proceeding or judicial or extrajudicial reorganization of any member of the GLAI Group) in respect of the Notes or the GOL Senior Secured Notes due 2028 is either asserted by any member of the GLAI Group or held by any court of competent jurisdiction to be reduced, invalid, disallowed, subordinated or recharacterized as equity, avoided, set aside or otherwise invalidated;

(m)       the Lien granted in favor of, and for the benefit of, the Purchaser or Holders in all or any portion of the Collateral is held by any court of competent jurisdiction to be not perfected or is otherwise unenforceable, *pari passu* or subordinated to any other Lien (including any debtor in possession priming lien), avoided, disallowed, set aside or otherwise invalidated except for Liens expressly permitted hereunder or as otherwise consented to by the Abra Notes Supermajority Holders;

(n)       any enforcement action is taken in respect of the Collateral, including the taking of any steps to foreclose, enforce or require the foreclosure or enforcement against any of the Collateral or otherwise exercise any rights or remedies with respect to the Collateral in accordance with the Collateral Documents;

(o)       it is or becomes unlawful for the Company or the Guarantors to perform any of their respective obligations under the Notes, the Collateral Documents or this Note Purchase Agreement;

(p)       an event of default (as such term is defined in the GOL Senior Secured Notes NPA) with respect to the GOL Senior Secured Notes due 2028 has occurred and is continuing;

(q)       any of the Collateral Documents shall for any reason cease to be in full force and effect in all material respects, or any of the Company or the Guarantors or any of their Subsidiaries shall so assert, or any Lien created, or purported to be created, by the Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby;

(r)       (i) any settlement of any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency, involving payment of damages in excess of US$35.0 million or its equivalent and are not paid (whether in full or in installments in accordance with the terms of such settlement); or (ii) the commencement,

67

settlement or termination or agreement to commence, settle or terminate any litigation, arbitration proceeding or administrative proceeding or investigation of, or before, any court, arbitral body or agency which could result in the imposition of material injunctive relief (or the agreement to comparable relief) or other material restrictions upon any of the Company, GLAI or any Significant Subsidiary thereof which impositions would cause a Material Adverse Effect; or

(s)    entering into any settlement agreement of a material internal investigation with a Governmental Authority, which would cause a Material Adverse Effect.

SECTION 9.02.    *Acceleration of Maturity, Rescission and Amendment*.  If an Event of Default (other than an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) with respect to the Notes occurs and is continuing, the Holders of not less than 25% in principal amount of the Outstanding Notes may declare all unpaid principal of and accrued and unpaid interest on all Notes to be due and payable immediately, by a notice in writing to the Company and upon any such declaration such amounts shall become due and payable immediately.  If an Event of Default specified in Section 9.01(g), 9.01(h) or 9.01(i) occurs and is continuing, then the principal of and accrued and unpaid interest on all Notes of shall become and be immediately due and payable without any declaration or notice or other act on the part of any Holder.

At any time after a declaration of acceleration with respect to the Notes has been made and before a judgment or decree for payment of the money due has been obtained as hereinafter provided in this Article, the Majority Holders by written notice to the Company may rescind or annul such declaration if:

(1)    the Company has paid or deposited a sum sufficient to pay (A) all overdue interest on Outstanding Notes, (B) all unpaid principal of the Notes that has become due otherwise than by such declaration of acceleration, (C) to the extent that payment of such interest on the Notes is lawful, interest on such overdue interest (including any Additional Amounts) as provided herein and (D) all sums paid or advanced by the Agents and the Collateral Agent hereunder and under the Collateral Documents and the reasonable compensation, expenses, disbursements, indemnities and advances of the Agents, the Collateral Agent and their agents and counsel; and

(2)    all Events of Default have been cured or waived as provided in Section 9.12 other than the non-payment of principal that has become due solely because of acceleration.

No such rescission shall affect any subsequent Default or Event of Default or impair any right consequent thereto.

SECTION 9.03.    *Applicable Premium*. Without limiting the generality of the foregoing, it is understood and agreed that if the Notes are accelerated or otherwise become due prior to their Stated Maturity, in each case, in respect of any Event of Default, the Applicable Premium shall also be due and payable in cash to the Holders and shall constitute part of the obligations payable to the Holders in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each

Holder's loss as a result thereof. If the Applicable Premium becomes due and payable, the principal of the Notes and interest shall accrue on the full principal amount of the Notes (including the Applicable Premium) from and after the applicable triggering event. Any premium payable above shall be presumed to be the liquidated damages sustained by each Holder as the result of the acceleration of the Notes. The Company expressly waives (to the fullest extent it may lawfully do so) the provisions of any present or future statute or law that prohibits or may prohibit the collection of the Applicable Premium in connection with any such acceleration. The Company and each Guarantor hereby agree that the Applicable Premium shall also be payable, without limitation, in any bankruptcy, insolvency, judicial or extrajudicial reorganization or similar proceeding with respect to creditor's rights in any jurisdiction, and shall not contest in any manner the payment thereof in any such circumstance.

SECTION 9.04.    *Subrogation Rights*. The parties hereto acknowledge and agree that the Abra Holders shall be express third-party beneficiaries to, and shall have all the rights of a third-party beneficiary to, this Note Purchase Agreement. The Abra Notes Supermajority Holders shall have the right to enforce this Note Purchase Agreement in accordance with its terms as if they were original parties hereto, if the Purchaser has not taken any reasonable action and has not continued to diligently enforce its rights under this Note Purchase Agreement for more than 90 calendar days after the relevant Event of Default. The Purchaser, by its execution and delivery of this Note Purchase Agreement agrees to the provisions of this Section 9.04 and hereby directs the Collateral Agent to accept directions received from the Abra Notes Supermajority Holders in respect of the Collateral and the Collateral Documents if the Abra Notes Supermajority Holders exercise the rights set forth in this Section 9.04; *provided*, (i) the Abra Notes Supermajority Holders shall have the obligations of the Purchaser or the Holders in connection with any such direction to the Collateral Agent, including without limitation the obligation to provide indemnification satisfactory to the Collateral Agent, and the Collateral Agent shall have the same rights and protections as if the Collateral Agent were directed by the Purchaser or the Holders and (ii) the Collateral Agent shall receive and shall be conclusively entitled to rely upon a certificate of the Purchaser at the time of any direction of the Abra Notes Supermajority Holders, which certificate shall certify that such Persons are the Abra Notes Supermajority Holders. Other than as expressly provided in the preceding sentence, in no event shall the Abra Holders have any right to direct or instruct the Collateral Agent. The Collateral Agent is not an agent for the Abra Holders and has no obligation, duty, liability or responsibility to such Abra Holders.

SECTION 9.05.    *Application of Money Collected*.  Any money collected by the Collateral Agent pursuant to this Article 9 or the Collateral Documents shall be applied in order set forth below:

FIRST, (i) to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the Collateral Agent under this Note Purchase Agreement and the Collateral Documents and then (ii) on a pro rata basis, to the payment of all costs (including out-of-pocket costs), expenses (including attorneys' fees), charges, liabilities, indemnities, fees and other amounts due to the other Agents and any other agent or attorney appointed hereby or under the Collateral Documents, in the case of each of the foregoing, solely in their respective capacity as the Collateral Agent, an Agent or other agent, as applicable (including costs, expenses and legal

69

expenses incurred in connection with any realization or enforcement of the Collateral taken in accordance with the terms of this Note Purchase Agreement or the Collateral Documents);

SECOND, on a pro rata basis, to the payment in full to the Holders of all amounts due and unpaid on the Notes for principal and interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and interest; provided, that, the proceeds shall be applied (i) first, to the Holders for amounts due and payable on the Notes for all interest ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for interest and (ii) second, any remaining amounts to the Holders for amounts due and payable on the Notes for principal ratably, without preference or priority of any kind, according to the principal amount due and payable on the Notes; and

THIRD, the balance, if any, after all of the Notes Obligations have been paid in full in cash, to the Company and its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Company may fix a record date and payment date for any payment to Holders pursuant to this Section 9.05.

SECTION 9.06.    *Limitation on Suits*.  A Holder may not pursue any remedy with respect to this Note Purchase Agreement, the Notes or the Collateral Documents unless:

> (1)     the Holder has previously given to the Collateral Agent written notice stating that an Event of Default with respect the Notes has occurred and is continuing;

> (2)     the Holders of at least 25% in principal amount of the Outstanding Notes have made a written request to the Collateral Agent to pursue the remedy in respect of such Event of Default;

> (3)     such Holder or Holders has offered and provided to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against any cost, loss, liability or expense to be incurred in compliance with such request;

> (4)     the Collateral Agent does not comply with the request within 60 days after receipt of the request and the offer and provision of security or indemnity; and

> (5)     no direction inconsistent with such written request has been given to the Collateral Agent during such 60-day period by the Purchaser.

SECTION 9.07.    *Contractual Rights of Holders to Receive Principal and Interest*. Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, each Holder shall have the right pursuant to this Section 9.07 to bring suit for the payment of principal, premium, if any, and interest on its Note, on or after the respective due dates expressed or provided for in such Note.

SECTION 9.08.    *Restoration of Rights and Remedies*.  If the Collateral Agent (as directed by the Purchaser or the Majority Holders, as provided in this Note Purchase Agreement) or any Holder has instituted any proceeding to enforce any right or remedy under this Note Purchase Agreement or the Collateral Documents and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Collateral Agent or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Guarantors, the Collateral Agent and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Collateral Agent and the Holders shall continue as though no such proceeding had been instituted.

SECTION 9.09.    *Delay or Omission Not Waiver*.  No delay or omission of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article 9 or by Law to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Holders.

SECTION 9.10.    *Control by Holders*.  The Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) may direct in writing the time, method and place of conducting any proceeding for any remedy available to the Company or the Collateral Agent or of exercising any power conferred on the Collateral Agent.  However, the Collateral Agent shall be under no obligation to exercise any of the rights or powers under this Note Purchase Agreement or the Collateral Documents at the request or direction of any Holders if such request or direction conflicts with any Law or with this Note Purchase Agreement or the Collateral Documents or may expose the Collateral Agent to liability.  Prior to taking any action under this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall be entitled to indemnification satisfactory to the Collateral Agent in its sole discretion against all costs, losses, liabilities and expenses that might be caused by taking or not taking such action.

SECTION 9.11.    *Rights and Remedies Cumulative*.  Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 4.08 , no right or remedy herein conferred upon or reserved to the Holders or the Purchaser, as the case may be, is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by Law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at Law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 9.12.    *Waiver of Past Defaults and Events of Default*.  The Purchaser (with the prior written consent of the Abra Notes Supermajority Holders) by written notice to the Company may waive an existing Default or Event of Default and its consequences. When a Default or Event of Default is waived, it is deemed cured, but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any consequent right.

SECTION 9.13.    *Waiver of Stay or Extension Laws*.  The Company and the Guarantors covenant (to the extent that it may lawfully do so) that they shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or

extension Law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Note Purchase Agreement, the Notes or the Collateral Documents; and the Company and the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such Law, and shall not hinder, delay or impede the execution of any power herein granted to the Collateral Agent, but shall suffer and permit the execution of every such power as though no such Law had been enacted.

# ARTICLE 10
AMENDMENTS

SECTION 10.01.  *Without Consent of Holders*.  The Company, when authorized by a Board Resolution, the Guarantors and the Collateral Agent may amend or supplement this Note Purchase Agreement, the Notes and the Collateral Documents without notice to or consent or vote of the Purchaser, any Holder of the Notes, or any holder of Abra Senior Secured Exchangeable Notes or Abra Senior Secured Notes, for the following purposes:

(i)      to cure any ambiguity, omission, defect or inconsistency in this Note Purchase Agreement or in the Notes in a manner that does not adversely affect any Holder in any material respect, as set forth in an Officer's Certificate;

(ii)     to add guarantees or collateral with respect to the Notes;

(iii)    to comply with **Error! Reference source not found.**;

(iv)     to add to the covenants or Events of Default of the Company or the Guarantors for the benefit of the Holders of the Notes;

(v)      to surrender any right herein conferred upon the Company or the Guarantors;

(vi)     to provide for any guarantee or collateral of the Notes, to secure such Notes or to confirm and evidence the release, termination or discharge of any Note Guaranty or collateral of the Notes when the release, termination or discharge is expressly permitted by this Note Purchase Agreement or the Collateral Documents, as the case may be;

(vii)    in connection with any Specified Corporate Event, to provide that the Notes are exchangeable into Reference Property, subject to the provisions of Section 13.02, and make such related changes to the terms of the Notes to the extent expressly required by Section 13.06;

(viii)   to evidence and provide acceptance of appointment by a registrar, paying agent, bid solicitation agent or exchange agent with respect to the Notes or to facilitate the administration of this Note Purchase Agreement; or

(ix)     ministerial amendments to effect the GLAI Going Private Process;

*provided that*, the Company or the applicable Guarantor has delivered to the Purchaser, the Collateral Agent and the Abra Notes Supermajority Holders an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment or supplement pursuant to this Section 10.01 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.01 requested by the Company or any Guarantor (A) without any consent of the holders of the Abra Senior Secured Notes, the holders of the Abra Senior Secured Exchangeable Notes, the Holders or Purchaser, (B) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.01 and (C) without any recourse, representation or warranty by the Collateral Agent).

SECTION 10.02.  *With Consent of Holders*.  Except as specified in Section 10.01, the Company, when authorized by a Board Resolution, the Guarantors, the Collateral Agent (at the direction of the Purchaser) and the Majority Holders may amend or supplement this Note Purchase Agreement, the Notes or the Collateral Documents only with the prior written consent of the Purchaser and the Abra Notes Supermajority Holders for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Note Purchase Agreement, the Notes or the Collateral Documents or modifying in any manner the rights of the Holders under this Note Purchase Agreement, the Notes or the Collateral Documents and the Purchaser may, with the prior written consent of the Abra Notes Supermajority Holders, except as set forth below, waive any past Default or Event of Default or compliance with any provision of this Note Purchase Agreement; *provided*, *however*, that, without the consent of each Holder affected or the Abra Notes Supermajority Holders, an amendment or waiver may not:

(i)      reduce the principal amount of or extend the Stated Maturity of any Note;

(ii)     reduce the amount of principal payable upon acceleration of the Maturity Date of any Note;

(iii)    reduce the rate, or extend the stated time for payment, of interest on any Note except as provided for in this Note Purchase Agreement;

(iv)    impair or adversely affect the right of Holders to exchange Notes or otherwise modify the provisions with respect to exchange pursuant to the terms of Article 13, or reduce the Exchange Rate (subject to such modifications as are required under this Note Purchase Agreement);

(v)     change the currency for payment of principal of, or interest or any Additional Amounts on, any Note;

(vi)    impair the right of any Holder to receive payment of principal and interest on such Holder's Notes on or after due dates therefor or make any change in the provisions of this Note Purchase Agreement relating to the contractual rights of Holders of Notes expressly set forth in this Note Purchase Agreement to institute suit for the enforcement of any right to payment on or with respect to any Note;

(vii)    make any change in the provisions of this Note Purchase Agreement relating to waivers of a Default or Event of Default in payment of principal of and interest on the Notes;

(viii)    reduce the principal amount of Notes, Abra Senior Secured Notes or Abra Senior Secured Exchangeable Notes whose holders must consent to any amendment, supplement or waiver;

(ix)    make any change in this first paragraph of this Section 10.02;

(x)    make any change in Section 9.05 that adversely affects the Holders;

(xi)    change the ranking of the Notes or any Note Guaranty relating thereto in a manner adverse to the Holders;

(xii)    make any change in any Note Guaranty that would adversely affect the Holders; or

(xiii)    change the definition of "Abra Notes Supermajority Holders" or modify any provision pursuant to which consent of the Abra Notes Supermajority Holders is required for any transaction, action or otherwise.

In addition, notwithstanding the foregoing (and except as provided for in Section 7.09), without the prior written consent of the Purchaser and the Abra Notes Supermajority Holders, no amendment, supplement or waiver may release any portion of the Collateral or permit or suffer to exist any Lien therein other than to secure the Notes Obligations unless otherwise expressly permitted in this Note Purchase Agreement and/or the Collateral Documents.

The Company shall give to Holders and Abra Notes Supermajority Holders prior written notice of any amendment or waiver proposed to be adopted under this Section 10.02. In addition, the Company or the applicable Guarantor shall deliver to the Collateral Agent (if the Collateral Agent is a party thereto) an Opinion of Counsel and an Officer's Certificate, each stating that all conditions precedent provided in this Note Purchase Agreement with respect to the execution and delivery of such amendment, supplement or waiver pursuant to this Section 10.02 have been satisfied (and the Collateral Agent shall execute any document pursuant to this Section 10.02 requested by the Company or any Guarantor (A) based solely on the Officer's Certificate and Opinion of Counsel delivered pursuant to this Section 10.02 and (B) without any recourse, representation or warranty by the Collateral Agent).

It shall not be necessary for the consent of the Holders or Abra Notes Supermajority Holders under this Section 10.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment or waiver under this Section 10.02 becomes effective, the Company shall give to Holders a notice briefly describing such amendment or waiver. The failure to give such notice to all Holders and the holders of the Abra Senior Secured Notes and holders of the Abra Senior Secured Exchangeable Notes, or any defect therein, shall not impair or affect the validity of an amendment or waiver under this Section 10.02.

74

SECTION 10.03.  *Revocation and Effect of Consents and Waivers*.  (a) A consent to an amendment or a waiver by a Holder shall bind the Holder and every subsequent Holder of that Note or portion of the Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such Holder or subsequent Holder may revoke the consent or waiver as to such Holder's Note or portion of the Note if the Company receives the written notice of revocation at least one Business Day prior to the date the amendment or waiver becomes effective.  After it becomes effective, an amendment or waiver shall bind every Holder.

(b)      The Company may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action described above in accordance with Section 14.01. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 10.04.  *Payment for Consent*.  Neither the Company nor any of its Affiliates shall, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Note Purchase Agreement or the Notes unless such consideration is offered to be paid to all Holders which so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

SECTION 10.05.  *Collateral Agent*.  No waiver, modification or amendment of this Note Purchase Agreement or the Collateral Documents may affect or change the rights, obligations, duties, protections or immunities of the Collateral Agent without the written consent of the Collateral Agent. The Collateral Agent may conclusively rely on an Officer's Certificate with respect to whether the consent of Purchaser, any Holders, any holders of the Abra Senior Secured Notes or any holders of the Abra Senior Secured Exchangeable Notes are required in connection with any amendment, supplement or waiver under this Article 10.

## ARTICLE 11
### NOTE GUARANTIES

SECTION 11.01.  *The Note Guaranties*.  Subject to the provisions of this Article, GLAI and GLA hereby irrevocably and unconditionally guarantee (the "**Note Guaranties**"), on a secured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations; *provided, however,* that upon release of the Collateral in accordance with Section 7.09 GLA and GLAI shall guarantee, on a unsecured basis, the full and punctual payment (whether at Stated Maturity upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  Upon failure by the Company to pay punctually any such amount, the Guarantors shall forthwith on demand pay the amount not so paid at the place and in the manner specified in this Note Purchase Agreement.

SECTION 11.02.  *Guaranty Unconditional*.  The obligations of the Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

(1)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Company under this Note Purchase Agreement or any Note, by operation of Law or otherwise;

(2)     any modification or amendment of or supplement to this Note Purchase Agreement or any Note;

(3)     any change in the corporate existence, structure or ownership of the Company, or any insolvency, bankruptcy, judicial or extrajudicial reorganization or other similar proceeding affecting the Company or its assets or any resulting release or discharge of any obligation of the Company contained in this Note Purchase Agreement or any Note;

(4)     the existence of any claim, set-off or other rights which the Guarantors may have at any time against the Company or any other Person, whether in connection with this Note Purchase Agreement or any unrelated transactions; *provided that* nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(5)     any invalidity or unenforceability relating to or against the Company for any reason of this Note Purchase Agreement or any Note, or any provision of applicable Law or regulation purporting to prohibit the payment by the Company of the principal of or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement; or

(6)     any other act or omission to act or delay of any kind by the Company or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to the Guarantors' obligations hereunder.

SECTION 11.03.  *Discharge; Reinstatement*.  The Guarantors' obligations hereunder will remain in full force and effect until the principal of, premium, if any, and interest on the Notes and all other amounts payable by the Company under this Note Purchase Agreement have been paid in full.  If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Company under this Note Purchase Agreement is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or judicial or extrajudicial reorganization of the Company or otherwise, the Guarantors' obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.

SECTION 11.04.  *Waiver by the Guarantors*.  Each of the Guarantors irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company or any other Person.

SECTION 11.05.  *Subrogation and Contribution*.  Upon making any payment with respect to any obligation of the Company under this Article, the Guarantor making such payment will be subrogated to the rights of the payee against the Company with respect to such obligation, limited to the amount of the payment or delivery made by such Guarantor ("**Subrogation Rights**").  The Guarantor hereby irrevocably agrees that the Subrogation Rights may be used at all times by the Guarantors to set-off amounts owed by the Guarantors to the Guarantor under the Notes and the GOL Senior Secured Notes due 2028.

SECTION 11.06.  *Stay of Acceleration*.  If acceleration of the time for payment of any amount payable by the Company under this Note Purchase Agreement or the Notes is stayed upon the insolvency, bankruptcy or judicial or extrajudicial reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of this Note Purchase Agreement are nonetheless payable by the Guarantors hereunder forthwith on demand by the Holders.

SECTION 11.07.  *Limitation on Amount of Guaranty*.  Notwithstanding anything to the contrary in this Article, each of the Guarantors, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Note Guaranty of each Guarantor does not constitute a fraudulent conveyance under applicable fraudulent conveyance provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.  To effectuate that intention, the Holders and each of the Guarantors hereby irrevocably agree that the obligations of each Guarantor under its respective Note Guaranty are limited to the maximum amount that would not render the Guarantors' obligations subject to avoidance under applicable fraudulent conveyance provisions of the Laws of Brazil, Luxembourg, the United States Bankruptcy Code or any comparable provision of state law.

SECTION 11.08.  *Execution and Delivery of Guaranty*.  The execution by each of the Guarantors of this Note Purchase Agreement on each Closing Date evidences the respective Note Guaranty of each Guarantor, whether or not the person signing as an Officer of such Guarantor still holds that office at the time of execution of any Note.

SECTION 11.09.  *Release of Guaranty*. The Note Guaranty of each of the Guarantors will terminate upon a sale or other disposition (including by way of consolidation or merger) of such Guarantor or the sale or disposition of all or substantially all the assets of such Guarantor (in each case other than to the Company or a Subsidiary) otherwise permitted by this Note Purchase Agreement.

Upon delivery by the Company to the Purchaser and the Collateral Agent of an Officer's Certificate and an Opinion of Counsel, each stating that all of the conditions provided in this Note Purchase Agreement to the release and termination of the Note Guaranty have been satisfied, the Purchaser will execute any documents reasonably requested by the Company in writing in order to evidence the release of such Guarantor from its obligations under its Note Guaranty.

# ARTICLE 12

COLLATERAL AGENT

SECTION 12.01.  *Appointment*.  Each of the Secured Parties (other than the Collateral Agent) hereby appoints the Collateral Agent as the agent of such Secured Parties under this Note Purchase Agreement and the Collateral Documents to which it is a party and authorizes and directs the Collateral Agent to take such actions on its behalf and to exercise such powers as are expressly delegated to the Collateral Agent by the terms hereof or thereof.  It is understood and agreed that the use of the term "agent" herein or in the Collateral Documents (or any other similar term) with reference to the Collateral Agent is not intended to connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The Company agrees to pay to the Collateral Agent such fees and expenses (including counsels' fees and expenses) of the Collateral Agent as may be separately agreed in writing and pursuant to the terms of Section 12.04. For the avoidance of any doubt and for the purposes of this Article 12, this Note Purchase Agreement shall prevail in the case of any conflicts between any Collateral Document and this Note Purchase Agreement.

SECTION 12.02.  *Exculpatory Provisions*.   (a) The Collateral Agent shall have no duties or obligations except those expressly set forth in this Note Purchase Agreement and the Collateral Documents to which the Collateral Agent is a party, and no duty, liability or obligation shall be inferred or implied against the Collateral Agent. Without limiting the generality of the foregoing provision, (i) the Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists; (ii) the Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Collateral Agent); (iii) except as expressly provided for in this Note Purchase Agreement or the Collateral Documents to which the Collateral Agent is a party, the Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company or any Guarantor or any of their Subsidiaries which is communicated to or obtained by the Collateral Agent or any of its Affiliates in any capacity; and (iv) the Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Collateral Agent to liability or otherwise contrary to this Note Purchase Agreement or the Collateral Documents or applicable Law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign Law, current or thereafter in effect.

(b)      Notwithstanding any other provision of this Note Purchase Agreement or the Collateral Documents, the Collateral Agent shall not be liable for any action taken or not taken

78

by it (i) with the written consent or at the written request, written instruction or written direction of the Purchaser, the Majority Holders or the Abra Notes Supermajority Holders (or such other requisite percentage of Holders as may be specified), as applicable, or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.

(c)     The Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until written notice by the Purchaser (a copy of which shall be delivered by the Purchaser to the Abra Notes Supermajority Holders) describing such event is received by a Responsible Officer of the Collateral Agent, referring to this Note Purchase Agreement and such Default or Event of Default.

(d)     The Collateral Agent shall not be liable for or have any duty to prove or investigate, or otherwise have any obligation or liability with respect to, (i) any representation or warranty provided in or with respect to this Note Purchase Agreement or the Collateral Documents, (ii) the contents of any certificate, report or other document delivered under or with respect to this Note Purchase Agreement or the Collateral Documents, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Note Purchase Agreement or the Collateral Documents or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, efficacy or authenticity of this Note Purchase Agreement, the Collateral Documents or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Note Purchase Agreement or the Collateral Documents, other than to confirm receipt of items expressly required to be delivered to the Collateral Agent.

(e)     The Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) considered by it to be authentic and having been signed or sent by a competent Person. The Collateral Agent may also rely on any statement given to it verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Collateral Agent may consult with counsel, independent auditors and other experts chosen by the Collateral Agent, at the Company's expense, and the Collateral Agent shall not be liable for any act performed or not performed by the Collateral Agent in accordance with the advice of any said counsel, auditor or expert.

(f)     The Collateral Agent may fulfill any and all of its duties and exercise its rights and powers by or through any one or more subagents appointed by it, at the expense of the Company. The Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.  The exculpatory provisions of this Article 12 shall apply to any such subagent as a third-party beneficiary to the extent applicable. The Collateral Agent shall not be responsible for the supervision, negligence or misconduct of any sub-agents that it selects with due care.

(g)     The Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Note Purchase Agreement, the Collateral Documents, the security provided hereunder or thereunder or the Collateral, for the legality,

79

effectiveness or sufficiency of this Note Purchase Agreement or the Collateral Documents nor for the creation, formalization, ranking, sufficiency or protection of any Liens constituted under this Note Purchase Agreement or the Collateral Documents. For the avoidance of doubt, no provision in this Note Purchase Agreement or the Collateral Documents shall require the Collateral Agent to prepare, file or record any financing statements or continuation statements or other instruments or documents, or to be responsible for maintaining the Liens and security interests to be created as described in this Note Purchase Agreement and the Collateral Documents, and such responsibility shall be in charge exclusively of the Company.  The Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, if applicable, shall be to deal with it in the same manner as the Collateral Agent deals with similar property for the account of other customers in similar transactions.  The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

(h)      In order to effect the transfer of any amounts received as a result of the enforcement of the Collateral Documents, the Collateral Agent may perform a foreign exchange transaction to convert into U.S. Dollars any amount in Reais resulting from such enforcement; except that possible deductions of any commissions or taxes charged on such foreign exchange transactions and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Collateral Agent will transfer the amounts in U.S. Dollars according to the instructions provided by any Holder. The Collateral Agent (a) will only be obliged to perform any foreign exchange transaction it may undertake as of the second (2nd) Brazilian Business Day after the Brazilian Business Day on which the Collateral Agent receives the applicable instructions and documents to perform such foreign exchange transaction; and (b) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Collateral Agent has received (i) all documents and information necessary for the remittance of funds in accordance with applicable foreign exchange regulations and (ii) the payment of the respective commissions, fees and expenses. The Collateral Agent shall not be liable for any losses or damages resulting from possible delays or impediments to the performance of a foreign exchange transaction and/or transfer, nor as the impossibility to perform a foreign exchange transaction or transfer. The Collateral Agent shall not assume any liability to any Person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed in connection with this Note Purchase Agreement or the Collateral Documents or with respect to the transfer of any funds as a result thereof.

(i)      The Collateral Agent shall not be obligated to spend or put at risk any of its own funds or otherwise incur any obligation or liability, financial or otherwise, in performing its duties or exercising its rights under this Note Purchase Agreement or under the Collateral Documents.

(j)      In no event shall the Collateral Agent be liable for special, indirect, punitive, consequential or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)      The Collateral Agent shall not incur any obligation for failure to perform any act or duty under this Note Purchase Agreement or the Collateral Documents by reason of any

occurrence beyond its control (including any act or provision of any current or future Law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other transfer or communication resource from the Federal Reserve System or the Central Bank).

(l)     The Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo Laws and the Collateral Agent's internal policies with respect to embargoes ("**Embargo Rules**"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control - OFAC or controlled by legal entities, countries or individuals on that list. The parties expressly agree that the Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 12.02.

(m)     Any and all payments by the Company and/or the Guarantors to or for the benefit of the Collateral Agent under this Note Purchase Agreement or the Collateral Documents shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("**Deductions**") and any other Taxing Jurisdiction, which taxes, expenses or withholdings shall be borne by the Company. If any Deductions apply to any payment, the Company and/or the Guarantors, as the case may be, will immediately pay to the account indicated by the Collateral Agent the additional amount necessary for the amount paid to the Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

(n)     Each Secured Party (other than the Collateral Agent) authorizes and directs the Collateral Agent to enter into the Collateral Documents to which the Collateral Agent is a party on the date hereof on behalf of and for the benefit of the Secured Parties.

(o)     Notwithstanding any provision of this Note Purchase Agreement or the Collateral Documents to the contrary, before taking or omitting any action to be taken or omitted by the Collateral Agent under the terms of this Note Purchase Agreement or any Collateral Document, the Collateral Agent may seek the written direction of the Purchaser or the Majority Holders, as the case may be, and the Collateral Agent shall be entitled to rely (and shall be fully protected in so relying) upon such direction. The Collateral Agent is not liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If the Collateral Agent requests such direction by the Purchaser or the Majority Holders, as the case may be, with respect to any action, the Collateral Agent is entitled to refrain from such action unless and until the Collateral Agent has received such direction, and the Collateral Agent does not incur liability to any Person by reason of so refraining.  If the Collateral Agent so requests, it must first be indemnified to its satisfaction by the Purchaser or the Holders, as the case may be, against any and all fees, losses, liabilities and expenses which may be incurred by the Collateral Agent by reason of taking or continuing to take, or omitting, any action directed by the Purchaser or the Majority Holders. Any provision of this Note Purchase Agreement or the Collateral Documents authorizing the Collateral Agent to take any action does not obligate the Collateral Agent to take

81

such action. The Collateral Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity or security satisfactory to the Collateral Agent against the costs, expenses and liabilities which might be incurred by it in performing such duty or exercising such right or power. In the absence of an express statement in this Note Purchase Agreement or the Collateral Documents regarding which Holders shall direct in any circumstance, the direction of the Purchaser (or, if the Purchaser is no longer a Holder, the Majority Holders) shall apply and be sufficient for all purposes.

(p)        Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under or pursuant to the Collateral Documents, the Collateral Agent shall have all of the rights, immunities, indemnities and other protections granted to the Collateral Agent under this Note Purchase Agreement (in addition to those that may be granted to it under the terms of such other agreement or agreements).

(q)        The Collateral Agent shall have no responsibility for interest or income on any funds held by it under this Note Purchase Agreement or the Collateral Documents and any funds so held shall be held uninvested pending distribution thereof.

(r)        The Collateral Agent shall be under no obligation to exercise any of the duties or powers vested in it by this Note Purchase Agreement or the Collateral Documents at the request, order, instruction or direction of the Holders, unless the Holders shall have offered to the Collateral Agent security or indemnity reasonably satisfactory to the Collateral Agent against the costs, expenses and liabilities that might be incurred thereby.

(s)        The Collateral Agent may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Affiliate thereof as if the Collateral Agent were not an attorney-in-fact hereunder and without any duty to account therefore to the Secured Parties.

(t)        The Secured Parties understand that the Collateral Agent, acting in its individual capacity, and its Affiliates may engage in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (the "**Activities**") and may engage in the Activities with or on behalf of one or more of the Company and its respective Affiliates.  Furthermore, the Collateral Agent may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Company and its Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Company or its respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of the Company or its Affiliates. The Secured Parties understand and agree that in engaging in the Activities, the Collateral Agent may receive or otherwise obtain information concerning the Company or its Affiliates (including information concerning the ability of the Company to perform its respective obligations hereunder and under the Collateral Documents) which information may not be available to the Secured Parties. The Collateral Agent shall not have any duty to disclose to the Secured Parties or use on behalf of the Secured Parties, nor be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other

condition or creditworthiness of the Company or any of its Affiliates) or to account for any revenue or profits obtained in connection with the Activities.

(u)     The Secured Parties further understand that there may be situations where members of the Collateral Agent's group or their respective customers (including the Company and its Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Secured Parties (including the interests of the Secured Parties hereunder and under the Collateral Documents). None of (i) this Note Purchase Agreement or the Collateral Documents, (ii) the receipt by the Collateral Agent of information concerning the Company or any of its Affiliates (including information concerning the ability of the Company to perform is obligations under this Note Purchase Agreement) or (iii) any other matter, shall give rise to any fiduciary, equitable or contractual duties (including any duty of trust or confidence) owing by the Collateral Agent to any Secured Party including any such duty that would prevent or restrict the Collateral Agent from acting on behalf of customers (including the Company or its Affiliates) or for its own account.

(v)     The Secured Parties (other than the Collateral Agent) confirm to the Collateral Agent that each of them (i) possesses such knowledge and experience in financial and business matters so that it is capable, without reliance on such Collateral Agent, of evaluating the merits and risks (including tax, legal, regulatory, credit, accounting and other financial matters) of (x) entering into this Note Purchase Agreement or holding the Notes and (y) taking or not taking actions hereunder or under the Collateral Documents, (ii) is financially able to bear such risks and (iii) has determined that entering into this Note Purchase Agreement is suitable and appropriate for it.

(w)     Nothing in this Note Purchase Agreement or in the Collateral Documents shall require the Collateral Agent to carry out any "know your customer" or other checks in relation to the Company or any of its Affiliates on behalf of the Secured Parties and the Secured Parties confirm to the Collateral Agent that such Secured Parties are solely responsible for any such checks such Secured Parties are required to carry out and that such Secured Parties may not rely on any statement in relation to such checks made by such the Collateral Agent.

(x)     The Collateral Agent shall be entitled to rely on any written direction, instruction, request, consent or other written communication from the Purchaser or any Holder. The Collateral Agent shall not have any obligation or duty with respect to the identity of any Holder or the amount of any Obligations owing to any such Person. At any time and from time to time, the Collateral Agent may request information from the Holders or the Company as to the identities of the Holders, their respective Notes and the composition and calculation of the Majority Holders or the Supermajority Holders, and the Holders and the Company shall provide such information. The Collateral Agent shall be entitled to fully rely on such information and shall have no duty, obligation or liability with respect to the identity or amount of Notes held by any Holder or with respect to the calculation of the Majority Holders, the Supermajority Holders or the unanimous vote of Holders.

(y)     The Collateral Agent shall not have any duty, obligation or liability with respect to the identity, calculation or consent or other action of the Abra Holders. Where the consent or other action of the Abra Holders or the Abra Notes Supermajority Holders is required by this

83

Note Purchase Agreement or the Collateral Documents, the Company shall certify to the Collateral Agent that the Company has obtained such consent, or other action, and the Collateral Agent shall be fully entitled to rely on such certification of the Company without any liability.

(z)     Before the Collateral Agent acts or refrains from acting, it may require an Officer's Certificate of the Company, or an Opinion of Counsel satisfactory to the Collateral Agent, with respect to the proposed action or inaction. The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion. Whenever in the administration of this Note Purchase Agreement or the Collateral Documents the Collateral Agent shall deem it necessary or desirable that a matter be provided or established prior to taking or suffering or omitting to take any act hereunder or thereunder, such matter (unless other evidence in respect thereof be herein of therein specifically described) may, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Collateral Agent, and such certificate, in the absence of gross negligence or willful misconduct on the part of the Collateral Agent, shall be full warrant to the Collateral Agent for any action taken, suffered or omitted to be taken by it under the provision of this Note Purchase Agreement and the Collateral Documents upon the faith thereof.

SECTION 12.03.  *Resignation*. Upon at least thirty (30) days' notice, the Collateral Agent may resign at any time as Collateral Agent under this Note Purchase Agreement and the Collateral Documents by notifying the Purchaser and the Company.  Upon any resignation by the Collateral Agent, the Company shall have the right (provided that no Event of Default has occurred and continues) to appoint a successor Collateral Agent or, if an Event of Default has occurred and is continuing, the Purchaser shall have the right to appoint a successor Collateral Agent. If no successor has been so appointed and has accepted such appointment within thirty (30) days after the date the Collateral Agent gives notice of its resignation, then the resigning Collateral Agent may (but shall not be obligated to) (a) upon consent (provided that no Event of Default or Default has occurred and continues) of the Company (consent of which shall not be unreasonably withheld or delayed), at the cost and expense of the Company, appoint a successor Collateral Agent or (b) petition any court of competent jurisdiction, at the cost and expense of the Company, for the appointment of a successor Collateral Agent. Whether or not a successor has been appointed, the Collateral Agent's resignation shall become effective in accordance with the Collateral Agent's notice of resignation on the date specified in such notice, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents on such date. Upon acceptance of a successor Collateral Agent of its appointment as Collateral Agent under this Note Purchase Agreement and the Collateral Documents, such successor will succeed and have all rights, powers, privileges and duties of the resigning Collateral Agent, and the resigning Collateral Agent will be released from its duties and obligations under this Note Purchase Agreement and the Collateral Documents (if not released sooner, as provided above). The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor. Any Person into which the Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Collateral Agent shall be a party, or any Person succeeding to the business of the Collateral Agent shall be the successor of the Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on

84

the part of any of the parties hereto, except where an instrument of transfer or assignment is required by Law to effect such succession, anything herein to the contrary notwithstanding.

SECTION 12.04.  *Fees, Expenses and Indemnification*.

(a)      Each of the Company and the Guarantors, jointly and severally, shall pay to the Collateral Agent for its own account fees in the amounts and at the times agreed with the Collateral Agent.

(b)      Each of the Company and the Guarantors, jointly and severally, shall pay or reimburse each of the Purchaser and the Collateral Agent for (1) all reasonable costs and expenses incurred in connection with the development, preparation, negotiation, execution and performance of this Note Purchase Agreement and the Collateral Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated hereby or thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all attorney fees and expenses, and (2) all costs and expenses incurred in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Note Purchase Agreement or under the Collateral Documents, including all attorney costs and all expenses incurred during any workout, restructuring or negotiations in respect of this Note Purchase Agreement, the Notes or the Collateral Documents.  The foregoing costs and expenses shall include all out-of-pocket expenses incurred by the Purchaser and Collateral Agent under clause (1) or (2) above and the cost of counsel, independent public accountants and other outside experts so retained.  All amounts due under this Section shall be payable within ten Business Days after demand therefore.

(c)      Each of the Company and the Guarantors, jointly and severally, shall indemnify and hold each of the Purchaser and the Collateral Agent harmless for, from and against any and all damage, loss, liability, cost, claim or expense (including reasonable attorneys' fees and expenses and including all fees, expenses and costs incurred by the Purchaser and/or the Collateral Agent in connection with any dispute, action, claim or suit brought to enforce the right to indemnification) incurred by the Purchaser and/or the Collateral Agent arising out of or in connection with the execution, delivery or administration of this Note Purchase Agreement and the Collateral Documents or any instrument or agreement contemplated hereby or thereby, the performance of the Collateral Agent's duties hereunder or thereunder, and the exercise of each of the Purchaser's and the Collateral Agent's rights hereunder or thereunder including, without limitation, the costs and expenses of defending itself against any claim or liability and of complying with any process served upon it or any of its officers in connection with the exercise or performance of any of its powers or duties under this Note Purchase Agreement or the Collateral Documents, except, as applicable, as may result from the Purchaser's or the Collateral Agent's respective willful misconduct or gross negligence (as determined by a final and non-appealable judgement by a court of competent jurisdiction).

(d)      To the extent that the Company of the Guarantors for any reason fail to indefeasibly pay any amount required under paragraph (a), (b) or (c) of this Section or under the Collateral Documents to be paid by the Company or the Guarantors to the Collateral Agent (or any sub-agent thereof), the Holders agree to pay to the Collateral Agent (or any sub-agent) such

85

unpaid amount (including any such unpaid amount in respect of a claim asserted by the Holders); provided that the unpaid amount was incurred by or asserted against the Collateral Agent (or any sub-agent) in its capacity as such.

(e)     The provisions in this Article shall survive the termination or satisfaction of this Note Purchase Agreement, the Notes or the Collateral Documents, the resignation or removal of the Collateral Agent and the payment of all Notes Obligations.

## ARTICLE 13
### EXCHANGE OF NOTES

SECTION 13.01.  *Right to Exchange.* Subject to and upon compliance with the provisions of this Article 13, the Company and each Holder of a Note shall have the right, at its option, to exchange all or any portion of such Note, prior to the GLAI Going Private Date, at any time prior to the close of business on the Business Day immediately preceding the date that is 30 days prior to the Maturity Date, at an exchange rate of 840.336 Preferred Shares per U.S.$1,000 principal amount of Notes (the "**Exchange Rate**") consisting of an initial exchange rate of 714.286 Preferred Shares per U.S.$1,000 principal amount of Notes as adjusted by the Total Created Value realized prior to the Initial Closing Date (plus cash in lieu of any fractional Preferred Share deliverable upon exchange) subject to the adjustments set forth in Section 1.01(a) through (e), and in accordance with, the settlement provisions of Section 13.02 (the "**Exchange Obligation**"). The election of the Company to exchange the Notes shall be subject to satisfaction of the conditions described in Section 1.01(b); *provided* that (i) the Company or any Holder of the Notes, may only exercise the exchange right under this Section 13.01 if all obligations under the Abra Senior Secured Notes due 2028 have been indefeasibly paid in full in cash to all of the holders of those notes and (ii) the aggregate principal amount of Notes that can be exchanged under this Section 13.01 shall be in an amount proportionate to (and be no greater than) the aggregate principal amount of the Abra Senior Secured Exchangeable Notes that have been converted under the Abra Senior Secured Exchangeable Notes Indenture.

(1)     Special Adjustment to Exchange Rate Related to Total Created Value. On the last day of each fiscal quarter following the Initial Closing Date in which the Total Created Value has changed, the Total Created Value (or, for subsequent adjustments, the incremental change to the Total Created Value) shall be added to the Exchange Rate; *provided* that if for any Exchange Date following the date on which the Total Created Value increased, the Company shall make commercially reasonable efforts to give the applicable Holders the benefit of an increased Exchange Rate as provided under this clause 13.01(1) notwithstanding that the Exchange Date be prior to the last day of the applicable fiscal quarter.

(a)     On or after GLAI Going Private Date and prior to the close of business on the Second Business Day immediately preceding the Maturity Date, the Company may require a Holder to surrender all or any portion of a Holder's Notes for exchange at any time. Notwithstanding the foregoing, the Company and each Holder of a Note shall only have the right to exchange all or any portion of any Note or deliver any Notice of Exchange pursuant to this

Section 13.01 on, or following the GLAI Going Private Date if (ii) all obligations under the Abra Senior Secured Notes due 2028 have been indefeasibly paid in full in cash to all of the holders of those notes and (ii) the aggregate principal amount of Notes that can be exchanged under this Section 13.01(a) shall be in an amount proportionate to (and be no greater than) the aggregate principal amount of the Abra Senior Secured Exchangeable Notes that have been converted under the Abra Senior Secured Exchangeable Notes Indenture.

(b)      _Exchange by the Company upon Satisfaction of the Exchange Price Condition_. At any time prior to the close of business on the Business Day immediately preceding the date that is 30 days prior to the Maturity Date and prior to the GLAI Going Private Date, the Company may require a Holder to surrender all or any portion of a Holder's Notes for exchange at any time during any calendar quarter commencing after the calendar quarter ending on December 31, 2023 (and only during such calendar quarter), if the Last Reported Sale Price of the Preferred Shares for at least 20 Trading Days (whether or not consecutive) during the period of 30 consecutive Trading Days ending on the last Trading Day of the immediately preceding calendar quarter is greater than or equal to 130% of the Exchange Price on each applicable Trading Day (the "**Sale Price Condition**"). The Company shall provide written notice to the Holders if the Company has elected to exchange the Notes in accordance with this Section 1.01(b) within ten Business Days after the end of the preceding calendar quarter.

(c)      Each Preferred Share issued upon an Exchange of any Note will be fully-paid-up newly issued share and will be subject to the terms of the bylaws and any shareholders' agreement in effect on the Exchange Date, and, except as set out therein, will be duly and validly issued, fully paid, non-assessable, free from preemptive rights and free of any lien or adverse claim. Each Holder whose Notes are being converted shall be deemed to irrevocably authorize and instruct GLAI to apply the moneys payable to that Holder in subscribing for Preferred Shares on exchange of the Notes. If the Preferred Shares are then listed on any securities exchange and have been registered on an effective registration statement with the CVM, then the Company will, to the extent practicable, cause each Preferred Share, when delivered upon an exchange of any Note, to be admitted for listing on such securities exchange.

SECTION 13.02.  _Exchange Procedure; Settlement Upon Exchange_

(a)      Subject to this Section 1.01(a), upon exchange of any Note, the Company shall pay or cause to be delivered, as the case may be, to the exchanging Holder, in respect of each U.S.$1,000 principal amount of Notes being exchanged, cash ("**Cash Settlement**"), Preferred Shares, together with cash, if applicable, in lieu of any fractional Preferred Share deliverable upon exchange in accordance with subsection (1) of this Section 13.02 ("**Physical Settlement**") or a combination of cash and Preferred Shares, together with cash, if applicable, in lieu of any fractional Preferred Share deliverable upon exchange in accordance with subsection (1) of this Section 13.02 ("**Combination Settlement**"), at its election, as set forth in this Section 13.02.

(1)      Except for any exchanges for which the relevant Exchange Date occurs on or after the date that is 30 days prior to the Maturity Date, the Company shall use the same Settlement Method (including the same relative proportion of cash and/or Preferred Shares) for all exchanges with the same Exchange Date, but the Company shall not have

any obligation to use the same Settlement Method with respect to exchanges with different Exchange Dates.

(2)      If, in respect of any Exchange Date (or one of the periods described in the third immediately succeeding set of parentheses, as the case may be), the Company elects to deliver a notice (the "**Settlement Notice**") of the relevant Settlement Method in respect of such Exchange Date (or such period, as the case may be), the Company shall deliver such Settlement Notice to exchanging Holders no later than the close of business on the Trading Day immediately following the relevant Exchange Date (or, in the case of any exchanges for which the relevant Exchange Date occurs on or after the date that is 30 days prior to the Maturity Date, no later than the date that is 100 days prior to the Maturity Date). If the Company does not elect a Settlement Method prior to the deadline set forth in the immediately preceding sentence, the Company shall no longer have the right to elect Cash Settlement or Physical Settlement with respect to that Exchange Date and the Company shall be deemed to have elected Combination Settlement in respect of its Exchange Obligation, and the Specified Dollar Amount per U.S.$1,000 principal amount of Notes shall be equal to U.S.$1,000.  Such Settlement Notice shall specify the relevant Settlement Method and in the case of an election of Combination Settlement, the relevant Settlement Notice shall indicate the Specified Dollar Amount per U.S.$1,000 principal amount of Notes.  If the Company delivers a Settlement Notice electing Combination Settlement in respect of its Exchange Obligation but does not indicate a Specified Dollar Amount per U.S.$1,000 principal amount of Notes in such Settlement Notice, the Specified Dollar Amount per U.S.$1,000 principal amount of Notes shall be deemed to be U.S.$1,000.

(3)      The cash, Preferred Shares or combination of cash and Preferred Shares in respect of any exchange of Notes (the "**Settlement Amount**") shall be computed as follows:

(A)            if the Company elects to satisfy its Exchange Obligation in respect of such exchange by Physical Settlement, the Company shall cause to be delivered to the exchanging Holder in respect of each U.S.$1,000 principal amount of Notes being exchanged a number of Preferred Shares equal to the Exchange Rate in effect on the Exchange Date (plus cash in lieu of any fractional Preferred Share deliverable upon exchange);

(B)            if the Company elects to satisfy its Exchange Obligation in respect of such exchange by Cash Settlement, the Company shall pay to the exchanging Holder in respect of each U.S.$1,000 principal amount of Notes being exchanged cash in an amount equal to the sum of the Daily Exchange Values for each of the 50 consecutive VWAP Trading Days during the related Observation Period; and

(C)            if the Company elects (or is deemed to have elected) to satisfy its Exchange Obligation in respect of such exchange by Combination Settlement, the Company shall pay or cause to be delivered, as the case may be, in respect of each U.S.$1,000 principal amount of Notes being exchanged, a Settlement Amount equal to the sum of the Daily Settlement Amounts for each of the (x) 50

consecutive VWAP Trading Days during the related Observation Period (plus cash in lieu of any fractional Preferred Share deliverable upon exchange) or (y) 10 consecutive VWAP Trading Days, in case the payment relating to the Exchange Obligation is due on or after the GLAI Going Private Date.

(4)     The Daily Settlement Amounts (if applicable) and the Daily Exchange Values (if applicable) shall be determined by the Company promptly following the last day of the Observation Period.  Promptly after such determination of the Daily Settlement Amounts or the Daily Exchange Values, as the case may be, and the amount of cash payable in lieu of any fractional Preferred Share deliverable upon exchange, the Company shall notify the Purchaser of the Daily Settlement Amounts or the Daily Exchange Values, as the case may be, and the amount of cash payable in lieu of any fractional Preferred Shares deliverable upon exchange.

(b)     Subject to Section 1.01(e), before the Company or any Holder of a Note shall be entitled to exchange (which exchange is irrevocable) a Note as set forth above, the Company or such Holder, as the case may be, shall (1) complete, sign and deliver an irrevocable notice to the Exchange Agent or the Holder, as the case may be, as set forth in the forms of notices of exchange attached hereto as **Error! Reference source not found.** and **Error! Reference source not found.** to the Form of Note, as applicable, (each, a "**Notice of Exchange**") at the office of the Exchange Agent and state in writing therein the principal amount of Notes to be exchanged and the name or names (with addresses) to whom such Holder wishes the Preferred Shares to be delivered upon settlement of the Exchange Obligation, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the office of the Exchange Agent, (3) if required, furnish appropriate endorsements and transfer documents and (4) if required by Section 1.01(e), pay all transfer or similar taxes. If more than one Note shall be surrendered for exchange at one time by the same Holder, the Exchange Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered.

(c)     A Note shall be deemed to have been exchanged immediately prior to the close of business on the date (the "**Exchange Date**") that the Holder has complied with the requirements set forth in subsection (b) above.  The Company shall pay or deliver, as the case may be, the consideration due in respect of the Exchange Obligation on the second Business Day (after the GLAI Going Private Date) or the fifth Business Day (prior to the GLAI Going Private Date) immediately following the relevant Exchange Date (or on the Maturity Date, in the case of any such exchange occurring after the Regular Record Date immediately preceding the Maturity Date), regardless of the Settlement Method elected by the Company. If any Preferred Shares are due to an exchanging Holder, the Company shall cause to be issued, and deliver or cause to be delivered (if applicable) to such Holder, or such Holder's nominee or nominees, the full number of Preferred Shares to which such Holder shall be entitled in satisfaction of the Company's Exchange Obligation.

(d)     In case any Note shall be surrendered for partial exchange, the Company shall execute and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in Authorized Denominations in an aggregate principal amount equal to the

89

unexchanged portion of the surrendered Note, without payment of any service charge by the exchanging Holder but, if required by the Company, with payment of a sum sufficient to cover any U.S. documentary, stamp or similar issue or transfer tax or similar governmental charge required by Law or that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange being different from the name of the Holder of the old Notes surrendered for such exchange.

(e)       If a Holder submits a Note for exchange, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issuance or delivery of any Preferred Shares upon exchange, unless the tax is due because the Holder requests such Preferred Shares to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax.  The Exchange Agent may refuse to deliver the Preferred Shares being issued in a name other than the Holder's name until the Company receives a sum sufficient to pay any tax that is due by such Holder in accordance with the immediately preceding sentence.

(f)       Except as provided in Section 13.03, no adjustment shall be made for dividends on any Preferred Shares delivered upon the exchange of any Note as provided in this Article 13.

(g)       Upon exchange, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below.  The Company's settlement of the full Exchange Obligation shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including the relevant Exchange Date. As a result, accrued and unpaid interest, if any, to, but not including, the relevant Exchange Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited.  Upon an exchange of Notes into a combination of cash and Preferred Shares, accrued and unpaid interest will be deemed to be paid first out of the cash paid upon such exchange.  Notwithstanding the foregoing, if Notes are exchanged after the close of business on a Regular Record Date but prior to the open of business on the immediately following Interest Payment Date, the Holders of such Notes as of the close of business on such Regular Record Date will receive the full amount of interest payable on such Notes on the corresponding Interest Payment Date notwithstanding the exchange.  Notes surrendered for exchange during the period from the close of business on any Regular Record Date to the open of business on the immediately following Interest Payment Date must be accompanied by funds equal to the amount of interest payable on the Notes so exchanged on the corresponding Interest Payment Date (regardless of whether the exchanging Holder was the holder of record on the corresponding Regular Record Date); *provided that* no such payment shall be required (1) for exchanges following the Regular Record Date immediately preceding the Maturity Date; or (2) to the extent of any Defaulted Amounts, if any Defaulted Amounts exist at the time of exchange with respect to such Note.  Therefore, for the avoidance of doubt, all Holders of record on the Regular Record Date immediately preceding the Maturity Date, described in the immediately preceding sentence shall receive and retain the full interest payment due on the Maturity Date or other applicable Interest Payment Date regardless of whether their Notes have been exchanged following such Regular Record Date. For the further avoidance of doubt, any accrued and unpaid PIK Interest on the Notes that has been capitalized in accordance with **Error! Reference source not found.** shall be paid in full for such capitalized amounts as set forth in Section 4.05(e) and shall not be treated as Outstanding principal amount of the Notes for any purposes under this Note Purchase Agreement.

90

(h)      The Person in whose name any Preferred Shares shall be deliverable upon exchange shall be treated by GLAI as a holder of record of such Preferred Shares, for purposes of dividends and distributions in respect of such Preferred Shares, as of the close of business on the relevant Exchange Date (if the Company elects to satisfy the related Exchange Obligation by Physical Settlement) or the last VWAP Trading Day of the relevant Observation Period (if the Company elects to satisfy the related Exchange Obligation by Combination Settlement), as the case may be.  Upon an exchange of Notes, such Person shall no longer be a Holder of such Notes surrendered for exchange.

(i)      The Company shall not deliver any fractional Preferred Share upon exchange of the Notes and shall instead pay cash in lieu of any fractional Preferred Share deliverable upon exchange based on the Daily VWAP for the relevant Exchange Date (in the case of Physical Settlement) or based on the Daily VWAP for the last VWAP Trading Day of the relevant Observation Period (in the case of Combination Settlement). For each Note surrendered for exchange, if the Company has elected Combination Settlement, the full number of Preferred Shares that shall be delivered upon exchange thereof shall be computed on the basis of the aggregate Daily Settlement Amounts for the relevant Observation Period and any fractional Preferred Shares remaining after such computation shall be paid in cash (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate on the Trading Day immediately before such payment).

SECTION 13.03.  *Adjustment of Exchange Rate*

The Exchange Rate shall be adjusted from time to time if any of the following events occurs, except that the Company shall not make any adjustments to the Exchange Rate if Holders of the Notes participate (other than in the case of a share split or share combination), at the same time and upon the same terms as holders of the Preferred Shares and solely as a result of holding the Notes, in any of the transactions described in this Section 13.03, without having to exchange their Notes, as if they held a number of Preferred Shares equal to the Exchange Rate, *multiplied by* the principal amount (expressed in thousands) of Notes held by such Holder. For the avoidance of doubt, each Last Reported Sale Price used in the calculation of an adjustment to the Exchange Rate will be expressed in U.S. Dollars, translated, if necessary at the Prevailing Exchange Rate as contemplated in the definition of "Last Reported Sale Price", in Section 1.01.

(a)      If, prior to the GLAI Going Private Date, GLAI exclusively issues Preferred Shares as a dividend or distribution on the Preferred Shares, or effects a share split or share combination of the Preferred Shares, the Exchange Rate shall be adjusted based on the following formula:

$$ER' = ER_0 \times \frac{OS'}{OS_0}$$

where,

$ER_0$      =      the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date of such dividend or distribution, or immediately prior to the open of business on the Exchange Date of such share split or share combination, as applicable;

ER'    =    the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date or Exchange Date, as applicable;

$OS_0$    =    the number of Preferred Shares outstanding immediately prior to the open of business on such Ex-Dividend Date or Exchange Date, as applicable, (before giving effect to any such dividend, distribution, share split or share combination); and

OS'    =    the number of Preferred Shares outstanding immediately after the open of business on such Ex-Dividend Date or Exchange Date, as applicable, after giving effect to such dividend, distribution, share split or share combination.

Any adjustment made under this Section 1.01(a) shall become effective immediately after the open of business on the Ex-Dividend Date for such dividend or distribution, or immediately after the open of business on the Exchange Date for such share split or share combination, as applicable.  If any dividend or distribution of the type described in this Section 1.01(a) is declared but not so paid or made, the Exchange Rate shall be immediately readjusted, effective as of the date GLAI's Board of Directors determines not to pay such dividend or distribution, to the Exchange Rate that would then be in effect if such dividend or distribution had not been declared.

        (b)    If, prior to the GLAI Going Private Date, GLAI issues to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs) any rights, options or warrants (other than pursuant to a stockholder rights plan, so long as such rights have not separated from the Preferred Shares) entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Preferred Shares (directly or in the form of ADSs) at a price per Preferred Share (translated, if necessary at the Prevailing Exchange Rate on the Trading Day immediately before the date of announcement of such issuance) that is less than the average of the Last Reported Sale Prices of the Preferred Shares for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance, the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

$ER_0$    =    the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the Preferred Shares for such issuance;

ER'    =    the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date;

$OS_0$    =    the number of Preferred Shares outstanding immediately prior to the open of business on such Ex-Dividend Date;

92

X = the total number of Preferred Shares (directly or in the form of ADSs) deliverable pursuant to such rights, options or warrants; and

Y = the number of Preferred Shares equal to (i) the aggregate price payable to exercise such rights, options or warrants (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate), *divided by* (ii) the quotient of (x) the average of the Last Reported Sale Prices of the Preferred Shares (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate) over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of the issuance of such rights, options or warrants, *divided by* (y) the number of Preferred Shares then represented by one ADS (in case ADSs are issued).

Any increase made under this Section 1.01(b) shall be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the open of business on the Ex-Dividend Date for such issuance.  To the extent that such rights, options or warrants are not exercised prior to their expiration or the Preferred Shares (directly or in the form of ADSs) are not delivered after the exercise of such rights, options or warrants, the Exchange Rate shall be decreased to the Exchange Rate that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of Preferred Shares actually delivered (directly or in the form of ADSs).  If such rights, options or warrants are not so issued, or if no such rights, options or warrants are exercised prior to their expiration, the Exchange Rate shall be decreased (effective, in the case of the non-issuance of such rights, options or warrants, as of the date GLAI's Board of Directors determines not to issue such rights, options or warrants) to the Exchange Rate that would then be in effect if such Ex-Dividend Date for such issuance had not occurred.

For purposes of this Section 1.01(b), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase Preferred Shares (directly or in the form of ADSs) at a price per Preferred Share (translated to U.S. Dollars at the Prevailing Exchange Rate) that is less than such average of the Last Reported Sale Prices of the Preferred Shares for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement for such issuance (translated to U.S. Dollars at the Prevailing Exchange Rate) and in determining the aggregate offering price of such Preferred Shares (directly or in the form of ADSs), there shall be taken into account any consideration received by GLAI for such rights, options or warrants and any amount payable on exercise or exchange thereof, the value of such consideration, if other than cash (translated to U.S. Dollars at the Prevailing Exchange Rate), to be determined by GLAI's Board of Directors.

(c) If, prior to the GLAI Going Private Date, GLAI distributes shares of its Capital Stock, evidences of its indebtedness, other assets or property or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs), excluding (i) dividends, distributions or issuances (including share splits) described in Section 1.01(a) or Section 1.01(b), (ii) dividends or distributions paid exclusively in cash described in Section 1.01(d), and (iii) Spin-Offs described below in this Section 1.01(c) (any of such shares of Capital Stock, evidences of indebtedness, other assets or property or rights, options or warrants to acquire Capital Stock or other securities,

the "**Distributed Property**"), then the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

$ER_0$    =    the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the Preferred Shares for such distribution;

$ER'$    =    the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date;

$SP_0$    =    the average of the Last Reported Sale Prices of the Preferred Shares (translated, if necessary, into in U.S. Dollars at the Prevailing Exchange Rate) over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution; and

$FMV$    =    the fair market value (as determined by GLAI's Board of Directors and translated, if necessary, into in U.S. Dollars at the Prevailing Exchange Rate) of the Distributed Property with respect to each outstanding Preferred Share (directly or in the form of ADSs) on the Ex-Dividend Date for the Preferred Shares for such distribution,.

Any increase made under the portion of this Section 1.01(c) above shall become effective immediately after the open of business on the Ex-Dividend Date for such distribution.  If such distribution is not so paid or made, the Exchange Rate shall be decreased, effective as of the date GLAI's Board of Directors determines not to pay or make such distribution, to be the Exchange Rate that would then be in effect if such distribution had not been declared.  Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "SP0" (as defined above), or if the difference between "FMV" and "SP0" is less than US$1.00, in lieu of the foregoing increase, each Holder of a Note shall receive from GLAI, in respect of each U.S.$1,000 principal amount thereof, at the same time and upon the same terms as holders of the Preferred Shares, a distribution of cash that, in the determination of GLAI, is comparable as a whole in all material respects with the amount of Distributed Property such Holder would have received had such Holder owned a number of Preferred Shares equal to the Exchange Rate in effect on the Ex-Dividend Date for the distribution.  If GLAI's Board of Directors determines the "FMV" (as defined above) of any distribution for purposes of this Section 1.01(c) by reference to the actual or when-issued trading market for any securities, it shall in doing so consider the prices in such market over the same period used in computing the Last Reported Sale Prices of the Preferred Shares over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution.

With respect to an adjustment pursuant to this Section 1.01(c) where there has been a payment of a dividend or other distribution on the Preferred Shares (directly or in the form of ADSs) of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary, Affiliate or other business unit of GLAI, that are, or, when issued, will be, listed or

admitted for trading on a U.S. national securities exchange (directly or in the form of ADSs) (a "**Spin-Off**"), the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

$ER_0$   =   the Exchange Rate in effect immediately prior to the end of the Valuation Period;

$ER'$   =   the Exchange Rate in effect immediately after the end of the Valuation Period;

$FMV_0$ =   the average of the Last Reported Sale Prices of the Capital Stock (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate) or similar equity interest distributed to holders of the Preferred Shares (directly or in the form of ADSs) applicable to one Preferred Share (determined by reference to the definition of "Last Reported Sale Price" as set forth in Section 1.01 as if references therein to Preferred Shares were to such Capital Stock or similar equity interest) over the first 10 consecutive Trading Day period after, and including, the Ex-Dividend Date of the Spin-Off (the "**Valuation Period**"); and

$MP_0$   =   the average of the Last Reported Sale Prices of the Preferred Shares over the Valuation Period (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate).

Any adjustment to the Exchange Rate under the preceding paragraph shall be made immediately after the close of business on the last Trading Day of the Valuation Period, but shall be given effect as of the open of business on the Ex-Dividend Date for the Spin-Off. Because the adjustment to the Exchange Rate shall be made at the end of the Valuation Period with retroactive effect, the Company shall delay the settlement of any exchange of Notes where the Exchange Date (in the case of Physical Settlement) or the final day of the related Observation Period (in the case of Cash Settlement or Combination Settlement) occurs during the Valuation Period. In such event, the Company shall deliver the consideration due upon exchange on the second Business Day immediately following the last Trading Day of the Valuation Period. If such Spin-Off does not occur, the Exchange Rate shall be decreased to be the Exchange Rate that would then be in effect if such dividend or distribution had not been declared, effective as of the date on which GLAI's Board of Directors determines not to consummate such Spin-Off.

For purposes of this Section 1.01(c) (and subject in all respect to Section 13.07), rights, options or warrants distributed by GLAI to all holders of the Preferred Shares (directly or in the form of ADSs) entitling them to subscribe for or purchase shares of GLAI's Capital Stock, including Preferred Shares (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"): (i) are deemed to be transferred with such Preferred Shares (directly or in the form of ADSs); (ii) are not exercisable; and (iii) are also issued in respect of future issuances of the Preferred Shares (directly or in the form of ADSs), shall be deemed not to have been distributed for purposes of this Section 1.01(c) (and no adjustment to the Exchange Rate under this Section 1.01(c) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or

95

warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exchange Rate shall be made under this Section 1.01(c).  If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the date of this Note Purchase Agreement, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Ex-Dividend Date with respect to new rights, options or warrants with such rights (in which case the existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof).  In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exchange Rate under this Section 1.01(c) was made, (1) in the case of any such rights, options or warrants that shall all have been purchased without exercise by any holders thereof, upon such final purchase (x) the Exchange Rate shall be readjusted as if such rights, options or warrants had not been issued and (y) the Exchange Rate shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per Preferred Share purchase price received by a holder or holders of Preferred Shares (directly or in the form of ADSs) with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Preferred Shares (directly or in the form of ADSs) as of the date of such purchase, and (2) in the case of such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Exchange Rate shall be readjusted as if such rights, options and warrants had not been issued.

For purposes of Section 1.01(a), Section 1.01(b) and this Section 1.01(c), if any dividend or distribution to which this Section 1.01(c) is applicable also includes one or both of:

> (1)    a dividend or distribution of Preferred Shares (directly or in the form of ADSs) to which Section 1.01(a) is applicable (the "**Clause A Distribution**"); or

> (2)    a dividend or distribution of rights, options or warrants to which Section 1.01(b) is applicable (the "**Clause B Distribution**"),

then, in either case, (1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this Section 1.01(c) is applicable (the "**Clause C Distribution**") and any Exchange Rate adjustment required by this Section 1.01(c) with respect to such Clause C Distribution shall then be made, and (2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Exchange Rate adjustment required by Section 1.01(a) and Section 1.01(b) with respect thereto shall then be made, except that, if determined by the Company (I) the "Ex-Dividend Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Ex-Dividend Date of the Clause C Distribution and (II) any Preferred Shares (directly or in the form of ADSs) included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the open of business on such Ex-Dividend Date or Exchange Date" within the meaning indicated in Section 1.01(a) or

"outstanding immediately prior to the open of business on such Ex-Dividend Date" within the meaning indicated in Section 1.01(b).

(d)     If, prior to the GLAI Going Private Date,  any cash dividend or distribution is made to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs), the Exchange Rate shall be adjusted based on the following formula:

$$ER' = ER_0 \times \frac{SP_0}{SP_0 - C}$$

where,

$ER_0$     =     the Exchange Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the Preferred Shares for such dividend or distribution;

$ER'$     =     the Exchange Rate in effect immediately after the open of business on such Ex-Dividend Date;

$SP_0$     =     the Last Reported Sale Price of the Preferred Shares on the Trading Day immediately preceding the Ex-Dividend Date for such dividend or distribution; and

$C$     =     the amount in cash per Preferred Share GLAI distributes (in U.S. Dollars or as converted to U.S. Dollars based on the Prevailing Exchange Rate on the Trading Day immediately before such Ex-Dividend Date) to all or substantially all holders of the Preferred Shares (directly or in the form of ADSs).

Any adjustment pursuant to this Section 1.01(d) shall become effective immediately after the open of business on the Ex-Dividend Date for the Preferred Shares for such dividend or distribution.  If such dividend or distribution is not so paid, the Exchange Rate shall be decreased, effective as of the date GLAI's Board of Directors determines not to make or pay such dividend or distribution, to be the Exchange Rate that would then be in effect if such dividend or distribution had not been declared.  Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "$SP_0$" (as defined above) or if the difference between "C" and "$SP_0$" is less than U.S.$1.00, in lieu of the foregoing increase, each Holder of a Note shall receive, for each U.S.$1,000 principal amount of Notes, at the same time and upon the same terms as holders of the Preferred Shares, the amount of cash that such Holder would have received if such Holder owned a number of Preferred Shares equal to the Exchange Rate on the Ex-Dividend Date for such cash dividend or distribution.

(e)     If, prior to the GLAI Going Private Date, GLAI or any of its Subsidiaries make a payment in respect of a tender or exchange offer for the Preferred Shares (directly or in the form of ADSs), except for a tender or exchange offer in the context of the GLAI Going Private Process, to the extent that the cash and value of any other consideration included in the payment per Preferred Share (translated to U.S. Dollars at the Prevailing Exchange Rate) exceeds (i) the average of the Last Reported Sale Prices of the Preferred Shares over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer (the

97

"**Expiration Date**"), *divided by* (ii) the number of Preferred Shares then represented by one ADS (in case ADSs are issued), the Exchange Rate shall be increased based on the following formula:

$$ER' = ER_0 \times \frac{AC + (SP' \times OS')}{OS_0 \times SP'}$$

where,

$ER_0$ =      the Exchange Rate in effect immediately prior to the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the Expiration Date;

$ER'$ =      the Exchange Rate in effect immediately after the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the Expiration Date;

$AC$ =      the aggregate value of all cash and any other consideration (as determined by GLAI's Board of Directors), translated to U.S. Dollars at the Prevailing Exchange Rate, paid or payable for Preferred Shares or ADSs, as the case may be, purchased or exchanged in such tender or exchange offer;

$OS_0$ =      the number of Preferred Shares outstanding immediately prior to the Expiration Date (prior to giving effect to the purchase of all Preferred Shares accepted for purchase or exchange, or represented by all ADSs accepted for purchase or exchange, as the case may be, in such tender or exchange offer);

$OS'$ =      the number of Preferred Shares outstanding immediately after the Expiration Date (after giving effect to the purchase of all Preferred Shares accepted for purchase or exchange, or represented by all ADSs accepted for purchase or exchange, as the case may be, in such tender or exchange offer, without duplication); and

$SP'$ =      (i) the average of the Last Reported Sale Prices of the Preferred Shares (translated, if necessary, into in U.S. Dollars at the Prevailing Exchange Rate) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date, *divided by* (ii) the number of Preferred Shares then represented by one ADS (in case ADSs are issued).

Any adjustment to the Exchange Rate under this Section 1.01(e) shall be made at the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the Expiration Date, but shall be given effect as of the open of business on the Trading Day next succeeding the Expiration Date. Because the adjustment to the Exchange Rate shall be made at the end of the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date with retroactive effect, the Company shall delay the settlement of any exchange of Notes where the Exchange Date (in the case of Physical Settlement) or the final day of the related Observation Period (in the case of Cash Settlement or Combination Settlement) occurs during the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date. In

such event, the Company shall deliver the consideration due upon exchange on the second Business Day immediately following the last Trading Day of the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date. For the avoidance of doubt, no adjustment under this Section 1.01(e) shall be made if such adjustment would result in a decrease in the Exchange Rate.  In the event that GLAI or one of its Subsidiaries is obligated to purchase Preferred Shares or ADSs, as the case may be, pursuant to any such tender offer or exchange offer, but GLAI or such Subsidiary is permanently prevented by applicable Law from effecting any such purchases, or all or a portion of such purchases are rescinded, then the Exchange Rate shall again be adjusted to be the Exchange Rate that would then be in effect if such tender offer or exchange offer had not been made or had been made only in respect of the purchases that have been effected.

(f)      On and after the GLAI Going Private Date, if there shall occur any increase in the amount or value of the Capital Stock of GLAI as a result of a recapitalization, merger, consolidation, reclassification, redesignation or subdivision of  any Capital Stock, allotment or issuance of equity securities, rights, or any other increase of the nominal value of the then issued equity securities by way of capitalisation of profits or reserves, including any share premium account or capital redemption reserve, issuance of any options, warrants or any other rights to subscribe for or purchase equity securities or any securities which by their terms of issue carry (directly or indirectly) rights of conversion into, or exchange or subscription for, or the right to otherwise acquire, any equity securities (or the grant of any such rights in respect of existing securities so issued), any cancellation, purchase or redemption of equity securities or any reduction (including, but not limited to, reduction of the nominal value) or repayment of equity securities by the Company (excluding in respect of any deferred shares), the distribution of Distributed Property, tender or exchange offer for the Preferred Shares (directly or in the form of ADSs), conversion or reclassification of equity or like event, then the Exchange Rate shall be adjusted as determined by an Independent Financial Advisor; provided, however, that the Company shall only be required to make an adjustment pursuant to this Section 13.03(f) if such adjustment would result in a change of at least 1% of the Exchange Rate. However, the Company shall carry forward any adjustment that the Company would otherwise have to make and take that adjustment into account in any subsequent adjustment. Notwithstanding the foregoing, all such carried forward adjustments shall be made with respect to the Notes (i) in connection with any subsequent adjustment to the Exchange Rate of at least 1% of the Exchange Rate (when such carried-forward adjustments are taken into account), (ii) on the Exchange Date for any Notes, (iii) prior to the close of business on the Exchange Date in respect of any exchange following a replacement of Preferred Shares by Reference Property consisting solely of cash and (iv) on the date the Company sends a Notice of Exchange pursuant to Section 13.01(b).

(g)      Notwithstanding this Section 13.03 or any other provision of this Note Purchase Agreement or the Notes, if an Exchange Rate adjustment becomes effective on any Ex-Dividend Date, and a Holder that has exchanged its Notes on or after such Ex-Dividend Date and on or prior to the related Record Date would be treated as the record holder of the Preferred Shares as of the related Exchange Date as described under Section 13.02(h)  based on an adjusted Exchange Rate for such Ex-Dividend Date, then, notwithstanding the Exchange Rate adjustment provisions in this Section 13.03, the Exchange Rate adjustment relating to such Ex-Dividend Date shall not be made for such exchanging Holder. Instead, such Holder shall be treated as if

99

such Holder were the record owner of the Preferred Shares on an unadjusted basis and participate in the related dividend, distribution or other event giving rise to such adjustment.

(h)     Except as stated herein, the Company shall not adjust the Exchange Rate for the issuance of Preferred Shares or any securities convertible into or exchangeable for Preferred Shares or the right to purchase Preferred Shares or such convertible or exchangeable securities.

(i)     In addition to those adjustments required by clauses (a), (b), (c), (d), (e) and **Error! Reference source not found.** of this Section 13.03, and to the extent permitted by applicable Law and subject to the applicable rules of any exchange on which any of GLAI's securities are then listed, the Company from time to time may increase the Exchange Rate by any amount for a period of at least 20 Business Days if GLAI's Board of Directors determines that such increase would be in the Company's and/or GLAI's best interest.  In addition, to the extent permitted by applicable Law and subject to the applicable rules of any exchange on which any of GLAI's securities are then listed, the Company may (but is not required to) increase the Exchange Rate to avoid or diminish any income tax to holders of the Preferred Shares or rights to purchase Preferred Shares in connection with a dividend or distribution of Preferred Shares (or rights to acquire Preferred Shares) or similar event.  Whenever the Exchange Rate is increased pursuant to either of the preceding two sentences, the Company shall deliver to the Holder of each Note a notice of the increase at least 15 days prior to the date the increased Exchange Rate takes effect, and such notice shall state the increased Exchange Rate and the period during which it will be in effect.

(j)     Notwithstanding anything to the contrary in this Article 13, the Exchange Rate shall not be adjusted:

(1)     upon the issuance of any Preferred Shares pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on GLAI's securities and the investment of additional optional amounts in Preferred Shares under any plan;

(2)     upon the issuance of any Preferred Shares or options or rights to purchase those Preferred Shares pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the GLAI Group;

(3)     upon the issuance of any Preferred Shares pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (2) of this subsection and outstanding as of the date the Notes were first issued;

(4)     for repurchases of Preferred Shares (directly or in the form of ADSs) that are not tender or exchange offers referred to in Section 1.01(e) of this Note Purchase Agreement, including structured or derivatives transactions or pursuant to a repurchase program approved by GLAI's Board of Directors;

(5)     solely for a change in the par value of the Preferred Shares; or

(6)     for accrued and unpaid interest, if any.

(k)    All calculations and other determinations under this Article 13 shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000th) of a Preferred Share.  In no event shall the Exchange Rate be adjusted such that the Exchange Price will be less than the par value per Preferred Share.

(l)    Whenever the Exchange Rate is adjusted as herein provided, the Company shall prepare a notice of such adjustment of the Exchange Rate setting forth the adjusted Exchange Rate and the date on which each adjustment becomes effective and shall deliver such notice of such adjustment of the Exchange Rate to each Holder.  Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(m)    For purposes of this Section 13.03, the number of Preferred Shares at any time outstanding shall not include Preferred Shares held in the treasury of GLAI (directly or in the form of ADSs) so long as GLAI does not pay any dividend or make any distribution on Preferred Shares held in the treasury of GLAI (directly or in the form of ADSs), but shall include Preferred Shares issuable in respect of scrip certificates issued in lieu of fractions of Preferred Shares.

SECTION 13.04.  *Effects of Recapitalizations, Reclassifications and Changes of the Preferred Shares*

(a)    In the case of:

(1)    any recapitalization, reclassification or change of the Preferred Shares (other than changes in par value or resulting from a subdivision or combination);

(2)    any consolidation, merger (*fusão* or *incorporação*), merger of shares (*incorporação de ações*) or other combination involving GLAI; or

(3)    any sale, lease or other transfer or disposition in one transaction or a series of transactions, including any split-off or spin-off (*cisão*), to any Person of all or substantially all of the consolidated assets of the GLAI Group, taken as a whole,

in each case, as a result of which the Preferred Shares would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "**Specified Corporate Event**" and any such stock, other securities, other property or assets (including cash or any combination thereof) into which the Preferred Shares are converted into or exchanged for, "**Reference Property**", and the amount of Reference Property that a holder of one Preferred Share immediately prior to such Specified Corporate Event would have been entitled to receive upon the occurrence of such Specified Corporate Event, a "**unit of Reference Property**")), then, prior to or at the effective time of such Specified Corporate Event, the Company, GLAI and/or the successor or purchasing corporation, as the case may be, shall execute, without the consent of the Holders, an amendment permitted under Section 10.01(vii) to this Note Purchase Agreement providing that, at and after the effective time of such Specified Corporate Event, the right to exchange each U.S.$1,000 principal amount of Notes for Preferred Shares shall be changed into a right to exchange such principal amount of Notes for the kind and amount of Reference Property that a holder of a number of Preferred Shares equal to the Exchange Rate immediately prior to such Specified Corporate Event would have been entitled to receive upon such Specified Corporate Event. However, at and after the effective time of the

101

Specified Corporate Event, (A) the Company or the successor or purchasing company, as the case may be, shall continue to have the right to determine the form of consideration to be paid or delivered, as the case may be, upon exchange of Notes in accordance with Section 13.02 and (B) (I) any amount payable in cash upon exchange of the Notes in accordance with Section 13.02 shall continue to be payable in cash, (II) any Preferred Shares that would have been deliverable upon exchange of the Notes in accordance with Section 13.02 shall instead be deliverable in the units of Reference Property that a holder of that number of Preferred Shares would have received in such Specified Corporate Event and (III) the Daily VWAP shall be calculated based on the value of a unit of Reference Property; *provided*, *however*, that if the holders of Preferred Shares receive only cash in such Specified Corporate Event, then (i) the consideration due upon exchange of each U.S.$1,000 principal amount of Notes shall be solely cash in an amount equal to the Exchange Rate in effect on the Exchange Date (as may be increased as described under Section 13.03 of this Note Purchase Agreement), *multiplied by* the price paid per Preferred Share in such Specified Corporate Event; and (ii) settlement of the Exchange Obligation shall occur on the second Business Day immediately following the Exchange Date.

If the Specified Corporate Event causes the Preferred Shares to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of holder election), then (i) the Reference Property into which the Notes will be exchangeable shall be deemed to be based on (x) the weighted average of the types and amounts of consideration received by the holders of Preferred Shares that affirmatively make such an election and (y) if no holders of Preferred Shares affirmatively make such an election, the types and amounts of consideration actually received by the holders of the Preferred Shares and (ii) the unit of Reference Property for purposes of the immediately preceding paragraph shall refer to the consideration referred to in clause (1) thereof attributable to one Preferred Share. The Company shall notify the Purchaser, GLAI and the Exchange Agent (if other than GLAI) of such weighted average as soon as practicable after such determination is made.

Such amendment to this Note Purchase Agreement described in the second immediately preceding paragraph shall provide for anti-dilution and other adjustments that shall be as nearly equivalent as is possible to the adjustments provided for in this Article 13, it being understood that no such adjustments shall be required with respect to any portion of the Reference Property that does not consist of equity (however evidenced) or depositary receipts in respect thereof. If, in the case of any Specified Corporate Event, the Reference Property includes shares of stock, other securities or other property or assets (including cash or any combination thereof) of a Person other than the Company or a Guarantor or the successor or purchasing corporation, as the case may be, in such Specified Corporate Event, then such other Person, if it is party to such Specified Corporate Event, shall also execute such amendment to this Note Purchase Agreement, and such amendment to this Note Purchase Agreement shall contain such additional provisions to protect the interests of the Holders of the Notes as GLAI's Board of Directors shall reasonably consider necessary by reason of the foregoing.

(b)      Neither the Company nor any Guarantor shall become a party to any Specified Corporate Event unless its terms are consistent with this Section 1.01(m).  None of the foregoing provisions shall affect the right of a Holder of Notes to exchange its Notes for cash, Preferred Shares or a combination of cash and Preferred Shares, as applicable, as set forth in Section 13.01 and Section 13.02 prior to the effective date of such Specified Corporate Event.

(c)      If the Notes become exchangeable for Reference Property, the Company shall notify the Purchaser, GLAI and the Exchange Agent (if other than GLAI).

(d)      The above provisions of this section shall similarly apply to successive Specified Corporate Events.

SECTION 13.05.  *Certain Covenants*.

(a)      The Company and each Guarantor covenants that all Preferred Shares delivered upon exchange of Notes shall be duly authorized, fully paid and non-assessable and free from all preemptive or similar rights and from all taxes, liens and charges with respect to the issue thereof.

(b)      GLAI covenants that, if any Preferred Shares to be provided for the purpose of exchange of Notes hereunder require registration with or approval of any Governmental Authority under any federal or state Law before such Preferred Shares may be validly issued upon exchange, GLAI will, to the extent then permitted by applicable Laws and the rules and interpretations of the CVM, secure such registration or approval, as the case may be.

(c)      The Company shall transfer to the Preferred Shares Registrar such Preferred Shares required to be issued, if any, upon exchange of the Notes, together with written delivery instructions (if required by the Preferred Shares Registrar for such Preferred Shares) and any other information or documentation required by the Preferred Shares Registrar in connection with each such issuance, transfer and delivery of Preferred Shares. The Company and each Guarantor covenants to take all actions and obtain all approvals and registrations with respect to the exchange of the Notes for Preferred Shares and the issuance of the Preferred Shares.

(d)      The Company and each Guarantor covenants to take all actions, obtain all approvals and registrations, and execute all ancillary documents with respect to the exchange of the Notes for Preferred Shares and the issuance of Preferred Shares (including by means of the issuance of rights, options or warrants to the subscription of such Preferred Shares) pursuant to the exchange terms and conditions of the Exchange Obligation provided in this Note Purchase Agreement. The Company and each Guarantor further covenants that any issuance of rights, options or warrants associated to the subscription of Preferred Shares in the context of fulfilment of the Exchange Obligation pursuant this Article 13 shall reflect the exchange terms and conditions provided in this Note Purchase Agreement, as applicable.

SECTION 13.06.  *Notice to Holders Prior to Certain Actions*

In case of:

(a)      any action by the Company, GLAI or one of GLAI's Subsidiaries that would require an adjustment in the Exchange Rate pursuant to Section 13.03 or Section 13.08;

(b)      any Specified Corporate Event;

(c)      any voluntary or involuntary dissolution, liquidation or winding-up of the Company, GLAI or any of GLAI's Subsidiaries; or

(d)     the GLAI Going Private Process,

then, in each case (unless notice of such event is otherwise required pursuant to another provision of this Note Purchase Agreement), the Company shall cause to be delivered to each Holder, as promptly as possible but in any event at least 20 days prior to the applicable date hereinafter specified, a notice stating the date on which a record is to be taken for the purpose of such action by the Company, GLAI or one of GLAI's Subsidiaries or, if a record is not to be taken, the date as of which the holders of Preferred Shares of record are to be determined for the purposes of such action by the Company, GLAI or one of GLAI's Subsidiaries.

SECTION 13.07.  *Shareholder Rights Plans.*  If GLAI has a shareholder's rights agreement or a rights plan in effect upon exchange of the Notes, each Preferred Share, if any, delivered upon such exchange shall be entitled to receive the appropriate number of rights, if any, and the certificates representing the Preferred Shares delivered upon such exchange shall bear such legends, if any, in each case as may be provided by the terms of any such shareholder's rights agreement or rights plan, as the same may be amended from time to time.

SECTION 13.08.  *Adjustments of Prices.*  Whenever any provision of this Note Purchase Agreement requires the Company to calculate the Last Reported Sale Prices, the Daily VWAPs, the Daily Exchange Values or the Daily Settlement Amounts over a span of multiple days (including, without limitation, an Observation Period), GLAI's Board of Directors shall make appropriate adjustments to each to account for any adjustment to the Exchange Rate that becomes effective, or any event requiring an adjustment to the Exchange Rate where the Ex-Dividend Date or Expiration Date, as the case may be, of the event occurs at any time during the period when the Last Reported Sale Prices, the Daily VWAPs, the Daily Exchange Values or the Daily Settlement Amounts are to be calculated. For the avoidance of doubt, each Last Reported Sale Price of the Preferred Shares used in the calculation of any adjustment to the Exchange Rate will be expressed in U.S. Dollars (translated, if necessary, to U.S. Dollars at the Prevailing Exchange Rate).

## ARTICLE 14
### ACTIONS BY HOLDERS

SECTION 14.01.  *Action by Holders.*  (a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Note Purchase Agreement to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders or by agents duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Company and, where applicable pursuant to this Note Purchase Agreement, the Guarantors or to the Collateral Agent, as applicable.  Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "**Act**" of the Holders signing such instrument or instruments.

(b)     Whenever in this Note Purchase Agreement it is *provided that* the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of

such specified percentage have joined therein may be evidenced by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing.

(c)    Whenever the Company solicits the taking of any action by the Holders of the Notes, the Company may fix, but shall not be required to, in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

SECTION 14.02.  *Proof of Execution by Holders*. When the Company solicits the taking of any action by the Holders of the Notes, proof of the execution of any instrument by a Holder, its agent or proxy, or the Purchaser, shall be sufficient if made in accordance with such reasonable rules as may be prescribed by the Company or in such manner as *shall be satisfactory to the Company*.

SECTION 14.03.  *Company-Owned Notes Disregarded*. In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Note Purchase Agreement, Notes that are owned by the Company, by any Subsidiary thereof or by any of their respective Affiliates shall be disregarded and deemed not to be outstanding for the purpose of any such determination.

SECTION 14.04.  *Revocation of Consents; Future Holders Bound*. At any time prior to (but not after) the evidencing to the Company, as provided in Section 14.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Note Purchase Agreement in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Company at the Company's Office and upon proof of holding as provided in Section 14.02, revoke such action so far as concerns such Note; *provided* that to the extent that the consent of the Abra Notes Supermajority Holders was required or otherwise obtained, the prior written consent of the Abra Notes Supermajority Holders shall be required to revoke any such consent. Except as provided in the previous sentence, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

## ARTICLE 15
### Miscellaneous

SECTION 15.01.  *Provisions of Purchase Agreement and Notes for the Sole Benefit of Parties and Holders of Notes*.  Nothing in this Note Purchase Agreement or the Notes, expressed or implied, shall give to any Person other than the parties hereto and their successors hereunder, the Holders of the Notes and the holders of the Abra Senior Secured Notes and the holders of the Abra Senior Secured Exchangeable Notes, any benefit or any legal or equitable right, remedy or claim under this Note Purchase Agreement or the Notes.

SECTION 15.02.  *Notices*.  Any request, demand, authorization, direction, notice, consent, waiver or other communication or document provided or permitted by this Note Purchase Agreement to be made upon, given, provided or furnished to, or filed with, any party to this Note Purchase Agreement shall, except as otherwise expressly provided herein, be in English and writing and shall be deemed to have been received only upon actual receipt thereof by prepaid first class mail, courier, telecopier, facsimile or electronic transmission, addressed to the relevant party as follows:

*To the Company:*

17, Boulevard F.W. Raiffeisen, L-2411
Luxembourg
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

*To the Guarantors, the Registrar, the Transfer Agent, the Exchange Agent and the Paying Agent:*

Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

*To the Purchaser:*

1 Ashley Road, 3rd Floor
Altrincham, Cheshire, UK
WA14 2DT
Attention: Richard F. Lark Jr. and Adrian Neuhauser
Email: rflark@abragroup.net

ABRA Global Finance

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands
Attention: Richard F. Lark Jr. and Adrian Neuhauser
Email: rflark@abragroup.net

*To the Collateral Agent:*

TMF Brasil Administração e Gestão de Ativos Ltda.

Avenida Marcos Penteado de Ulhoa Rodrigues No. 939, 10th Floor,
Edifício Jacarandá, Room 3
Zip Code 06460-040
Barueri – SP, Brazil
Attention: Diogo Malheiros, Leone Azevedo, Lesli Gonzalez, Natalia Monte
Email: diogo.malheiros@tmf-group.com; leone.azevedo@tmf-group.com;
lesli.gonzalez@tmf-group.com; natalia.monte@tmf-group.com; CTS.Brazil@tmf-group.com

*To the Holders of the Abra Senior Secured Notes:*

c/o The Bank of New York Mellon, as Indenture Trustee under the Abra Senior Secured
Notes Indenture, for distribution to the holders of the Abra Senior Secured Notes
240 Greenwich Street
New York, NY 10286

*To the Holders of the Abra Senior Secured Exchangeable Notes:*

c/o The Bank of New York Mellon, as Indenture Trustee under the Abra Senior Secured
Exchangeable Notes Indenture, for distribution to the holders of the Abra Senior Secured
Exchangeable Notes
240 Greenwich Street
New York, NY 10286

Notices or communications to the Company will be deemed given if given to GLAI.
Notices or communications to Abra Holders will be deemed given if given to The Bank of New
York Mellon, in its capacity as Indenture Trustee under the Abra Senior Secured Indenture and
in its capacity as Indenture Trustee under the Abra Senior Secured Exchangeable Indentures, in
each case, for distribution to the holders of the Abra Notes. All notices to Collateral Agent shall
be deemed delivered upon the Collateral Agent's actual receipt thereof.

Any party by written notice to the other parties may designate additional or different
addresses for subsequent notices or communications.

Where this Note Purchase Agreement provides for the giving of notice to Holders, such
notice shall be deemed to have been given upon the mailing of first class mail, postage prepaid,
of such notice to Holders of the Notes at their registered addresses as recorded in the Register
and additionally, if such notice is given by the Company to the Purchaser, by email delivery to
the Company's primary contact at the Purchaser.

The Company shall also cause all other such publications of such notices as may be
required from time to time by applicable Brazilian law, including, without limitation, those
required under the applicable regulations issued by the CVM.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed and emailed to a Holder in the manner provided above, it is duly given, whether or not the addressee receives it.

SECTION 15.03.  *Officer's Certificate and Opinion of Counsel as to Conditions Precedent*.  Upon any request or application by the Company to the Collateral Agent to take or refrain from taking any action under this Note Purchase Agreement or the Collateral Documents, the Company shall furnish to the Collateral Agent:

(1)      an Officer's Certificate (which shall include the statements set forth in Section 15.04) stating that, in the opinion of the signers, all covenants and conditions precedent, if any, provided for in this Note Purchase Agreement and, if the action involves any of the Collateral Documents, the applicable Collateral Documents relating to the proposed action have been complied with; and

(2)      an Opinion of Counsel (which shall include the statements set forth in Section 15.04) stating that, in the opinion of such counsel, all such covenants and conditions precedent have been complied with.

SECTION 15.04.  *Statements Required in Officer's Certificate or Opinion of Counsel*. Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Note Purchase Agreement or the Collateral Documents shall include:

(1)      a statement that each Person making or rendering such Officer's Certificate or Opinion of Counsel has read such covenant or condition and the related definitions;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such Officer's Certificate or Opinion of Counsel are based;

(3)      a statement that, in the opinion of each such Person, such Person has made such examination or investigation as is necessary to enable such Person to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)      a statement as to whether or not, in the opinion of each such Person, such covenant or condition has been complied with.

SECTION 15.05.  *Rules by Registrar, Paying Agent, Exchange Agent and Transfer Agents*.  The Registrar, the Paying Agent, the Exchange Agent and the Transfer Agent may make reasonable rules for their functions.

SECTION 15.06.  *Currency Indemnity*.  U.S. Dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with this Note Purchase Agreement, the Notes and the Note Guaranties, including damages.  Any amount received or recovered in a currency other than U.S. Dollars (whether as a result of, or of the

enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Company or otherwise) by any Person in respect of any sum expressed to be due to it from the Company or the Guarantors in connection with this Note Purchase Agreement, the Notes and the Note Guaranties will only constitute a discharge to the Company or the Guarantors, as the case may be, to the extent of the U.S. Dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that U.S. Dollar amount is less than the U.S. Dollar amount expressed to be due to the recipient, the Company and the Guarantors shall indemnify such recipient against any loss sustained by it as a result, and if the amount of U.S. Dollars so purchased is greater than the sum originally due to such recipient, such recipient will be deemed to have agreed to repay such excess.  In any event, the Company and the Guarantors shall indemnify the recipient against the cost of making any such purchase.

For the purposes of this Section 15.06, it shall be sufficient for the recipient to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of U.S. Dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. Dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above).  These indemnities constitute a separate and independent obligation from the other obligations of the Company and the Guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder of a Note and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note.

SECTION 15.07.  *No Recourse Against Others*.  No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent, respectively, under this Note Purchase Agreement, the Collateral Documents or the Notes or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder shall waive and release all such liability.  The waiver and release shall be part of the consideration for the issue of the Notes.

SECTION 15.08.  *Legal Holidays*.  In any case where any Interest Payment Date or the Maturity Date shall not be a Business Day, then (notwithstanding any other provision of this Note Purchase Agreement or of the Notes) payment of interest or principal need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the Interest Payment Date or Maturity Date; *provided that* no default interest shall accrue for the period from and after such Interest Payment Date or Maturity Date on account of such delay.

SECTION 15.09.  *Governing Law*.  THIS NOTE PURCHASE AGREEMENT, THE NOTES AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 (inclusive) of the Luxembourg Act on commercial companies of August 10, 1915, as amended, shall not apply in respect of the Notes.

For purposes solely of Article 9 of Brazilian Decree Law No. 4,657, of September 4, 1942, the transactions contemplated hereby have been constituted and proposed outside of Brazil.

SECTION 15.10.  *Consent to Jurisdiction; Waiver of Immunities; Waiver of Jury Trial.* (a) Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any suit, action or proceeding or arbitral award arising out of or relating to this Note Purchase Agreement, the Notes or the Note Guaranties or any transaction contemplated hereby or thereby (a "**Proceeding**"), and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. Each of the parties hereto irrevocably waives, to the fullest extent it may do so under applicable Law, any objection which it may now or hereafter have to the laying of the venue of any such Proceeding brought in any such court and any claim that any such Proceeding brought in any such court has been brought in an inconvenient forum. Each of the Company and the Guarantors irrevocably appoints Cogency Global, Inc. (the "**Company and Guarantors Process Agent**"), with an office at 122 East 42nd Street, 18th Floor, New York, NY 10168, as its authorized agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any Proceeding.  If for any reason such Person shall cease to be such agent for service of process, each of the Company and the Guarantors shall forthwith appoint a new agent of recognized standing for service of process in the State of New York within 30 days.

(b)     Each of the Company and the Guarantors hereby irrevocably appoints the Company and Guarantors Process Agent as its agent to receive, on behalf of itself and its property, service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in such New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York.  Such service shall be made by delivering by hand a copy of such process to the Company or the Guarantors, as the case may be, in care of the Company and Guarantors Process Agent at the address specified above.  Each of the Company and the Guarantors hereby irrevocably authorizes and directs the Company and Guarantors Process Agent to accept such service on its behalf.  Failure of the Company and Guarantors Process Agent to give notice to the Company or the Guarantors, as the case may be, or failure of the Company or the Guarantors, as the case may be, to receive notice of such service of process shall not affect in any way the validity of such service on the Company and Guarantors Process Agent, the Company or the Guarantors.  As an alternative method of service, each of the Company and the Guarantors also irrevocably consents to the service of any and all process in any such Proceeding by the delivery by hand of copies of such process to the Company or Guarantors, as the case may be, at its address specified in Section 15.02 or at any other address previously furnished in writing by the Company or the Guarantors. Each of the Company and the Guarantors covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Company and Guarantors Process Agent above in full force and

110

effect during the term of the Notes, and to cause the Company and Guarantors Process Agent to continue to act as such.

(c)       [*Reserved*]

(d)       Exclusively for the purposes of Brazilian law, the Guarantors appoint the Company and Guarantors Process Agent as their agent and attorney-in-fact to receive on behalf of them and their property service of copies of the summons and complaint and any other process which may be served in any Proceeding pursuant to articles 653 et. seq. of the Brazilian Law No. 10,406, of January 10, 2022.

(e)       Nothing herein shall affect the right of any party (including the Collateral Agent, any other Agent or any Holder) to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise bring any claim against any other party or its property in any other court of competent jurisdiction.

(f)       Each of the Company and the Guarantors irrevocably agrees that, in any proceedings anywhere (whether for an injunction, specific performance or otherwise), no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such proceedings, from attachment (whether in aid of execution, before judgment or otherwise) of its assets or from execution of judgment shall be claimed by it or on its behalf or with respect to its assets, except to the extent required by applicable Law, any such immunity being irrevocably waived, to the fullest extent permitted by applicable Law.  Each of the Company and the Guarantors irrevocably agrees that, where permitted by applicable Law, it and its assets are, and shall be, subject to such proceedings, attachment or execution in respect of its obligations under this Note Purchase Agreement, the Notes or the Note Guaranties.

(g)       ALL PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THEY MAY DO SO UNDER APPLICABLE LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS NOTE PURCHASE AGREEMENT, THE NOTES, THE NOTE GUARANTIES OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

SECTION 15.11.  *Successors and Assigns*.  All covenants and agreements of the Company and the Guarantors in this Note Purchase Agreement, the Notes and the Note Guaranties shall bind their respective successors and permitted assigns, whether so expressed or not. The Notes shall not be assigned by the Purchaser unless (i) the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes shall have been indefeasibly paid in full or (ii) as otherwise may be consented to by the Abra Notes Supermajority Holders.

In the event of a transfer, assignment, novation or amendment of the rights and/or obligations under this Note Purchase Agreement and any other Transaction Documents, all security interests, guarantees and privileges created under or in connection with the Transaction Documents shall automatically and without any formality be preserved for the benefit of the transferee including the trustee under the Abra Senior Secured Notes Indenture and the trustee

under the Abra Senior Secured Exchangeable Notes Indenture for the purpose of the provisions of articles 1278 to 1281 of the Luxembourg Civil Code or any other purposes.

SECTION 15.12.  *Multiple Originals*.  The parties may sign any number of copies of this Note Purchase Agreement.  Each signed copy shall be deemed an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Note Purchase Agreement. The words "execution," "signed," "signature," and words of like import in this Note Purchase Agreement or in any other certificate or document related to this Note Purchase Agreement shall include images of executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as an executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable Law, including, without limitation, any state Law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

SECTION 15.13.  *Severability Clause*.  In case any provision in this Note Purchase Agreement or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. To the extent permitted by applicable Law, the parties hereby waive any provision of Law which renders any term or provision hereof invalid or unenforceable in any respect.

SECTION 15.14.  *Force Majeure*.  In no event shall the Collateral Agent or any other Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder, or under the Collateral Documents arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, governmental actions, pandemics, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Collateral Agent or such other Agent, as applicable shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

SECTION 15.15.  *Acknowledgement*. Each of the Company and the Guarantors acknowledges that, on the date hereof, the Purchaser has pledged, or will pledge, all of its right, title and interest in the Notes, Notes Obligations and all Collateral therefor, in favor of the collateral agent under the Abra Senior Secured Notes Indenture and the collateral agent under the Abra Senior Secured Exchangeable Notes Indenture as collateral to secure the Purchaser's obligations under the Abra Senior Secured Notes and the Abra Senior Secured Exchangeable Notes.

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

GOL EQUITY FINANCE
as the Company

By: _____

*Gilles Francois*
E2DFA2F0501E44B...

Name: Gilles Francois
Title: Director

By: _____

*Joost Mees*
4C93CF1A28B34C8...

Name: Joost Mees
Title: Director

[*Signature Page to SSEN Note Purchase Agreement*]

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

GOL LINHAS AÉREAS
S.A. as Guarantor


By: _____
Name: Mario Tsuwei Liao
Title: Executive Vice President


By: _____
Name: Carla Patricia Cabral da Fonseca
Title: Vice President Director

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent,
Exchange Agent and Paying Agent

By: _____
Name: Mario Tsuwei Liao
Title: Executive Vice President

By: _____
Name: Carla Patricia Cabral da Fonseca
Title: Vice President Director

DocuSign Envelope ID: 02D36BA3-5A3C-4900-BE73-B2D46B76535E

SMILES FIDELIDADE S.A.
as Springing Guarantor

By: _____
Name: Mario Tsuwei Liao
Title: Executive Vice President

By: _____
Name: Carla Patricia Cabral da Fonseca
Title: Vice President Director

[*Signature Page to SSEN Note Purchase Agreement*]

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

ABRA GLOBAL FINANCE
as Purchaser

By: _Richard F. Lark, Jr._

Name: Richard F. Lark, Jr.

Title: President

[*Signature Page to SSEN Note Purchase Agreement*]

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

ABRA GROUP LIMITED
as Purchaser

By: _____
    *Richard F. Lark, Jr.*
    Name: Richard F. Lark, Jr.
    Title: President

IN WITNESS WHEREOF, the parties hereto have caused this Note Purchase Agreement to be duly executed as of the date first written above.

TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.
as Collateral Agent

By: _____

Name:

Title:

**EXHIBIT A**

FORM OF NOTE

**GOL EQUITY FINANCE**

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 224920

Senior Secured Exchangeable Notes Due 2028

No. [●]

U.S.$[●]

GOL EQUITY FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 224920 (the "**Company**", which term includes any successor corporation under the Note Purchase Agreement referred to on the reverse hereof), for value received, hereby promises to pay to ABRA GLOBAL FINANCE, an exempted company organized under the Laws of the Cayman Islands, with registered office at Willow House, Cricket Square, 4th Floor, Grand Cayman KY1-9010, Caymen Islands, as purchaser ("**Abra Global Finance**"), ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser ("**Abra**", each of Abra and Abra Global Finance being collectively and individually a "**Purchaser**"), or registered assigns, the principal sum of U.S.$[●], upon presentment and surrender of this Note on such date or dates as the then relevant principal sum may become payable in accordance with the provisions hereof and in the Note Purchase Agreement.

Reference is hereby made to the further provisions of this Note set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

A-1

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

Dated: [●], 2023

**GOL EQUITY FINANCE**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Witnesses:

By: _____
Name:

By: _____
Name:

A-2

[FORM OF REVERSE SIDE OF NOTE]

Senior Secured Exchangeable Notes Due 2028

TERMS AND CONDITIONS OF THE NOTES

This Note is one of a duly authorized issue of Senior Secured Exchangeable Notes Due 2028 of the Company.  The Notes constitute secured unsubordinated obligations of the Company, initially in an aggregate principal amount of U.S.$[•].

1.    *Purchase Agreement.*

Each holder of this security, by accepting the same, agrees to and shall be bound by the provisions hereof and of the Note Purchase Agreement, dated as of [•], 2023, by and among the GOL EQUITY FINANCE, a public limited liability company (*société anonyme*) incorporated in the Grand Duchy of Luxembourg, having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, registered with the Luxembourg Register of Commerce and Companies (*R.C.S.Luxembourg*) under number B 224920 (the "Company"), GOL LINHAS AÉREAS INTELIGENTES S.A. ("GLAI"), as guarantor, registrar, transfer agent, exchange agent and paying agent, and GOL LINHAS AÉREAS S.A., a wholly owned subsidiary of GLAI ("GLA" and together with GLAI, the "Guarantors"), each, a corporation (*sociedade por ações*) organized under the Laws of the Federative Republic of Brazil, as guarantors, ABRA GLOBAL FINANCE, an exempted company organized under the Laws of the Cayman Islands, with registered office at Willow House, Cricket Square, 4th Floor, Grand Cayman KY1-9010, Caymen Islands, as purchaser ("Abra Global Finance"), ABRA GROUP LIMITED, a private limited company organized under the Laws of England and Wales, with registered office at 1 Ashley Road, 3rd Floor, Altrincham, Cheshire, United Kingdom, as purchaser ("Abra", each of Abra and Abra Global Finance being collectively and individually a "Purchaser" or "Holder") and TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA., as collateral agent (the "Collateral Agent"), as the same shall be amended from time to time (the "Note Purchase Agreement"). The terms of the Notes include those stated in the Note Purchase Agreement.  The Holders of the Notes shall be entitled to the benefit of, be bound by and be deemed to have notice of, all provisions of the Note Purchase Agreement.

Reference is hereby made to the Note Purchase Agreement, the Collateral Documents and all amendments and supplements to each of them from time to time (collectively, the "Note Documents") for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Guarantors, the Collateral Agent, each other Agent and the Purchaser as Holder of the Notes and the terms upon which the Notes, are, and are to be, executed and delivered.  The Purchaser waives all notice of the acceptance of the provisions contained herein and in the Note Documents and waives reliance by such Purchaser upon said provisions. All terms used in this Note that are defined in the Note Purchase Agreement shall have the meanings assigned to them in the Note Purchase Agreement.

The Notes are senior obligations of the Company and the Guarantors, secured by a first priority and perfected Lien in the Collateral. The payment obligations of the Company under the

A-3

Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Note Documents impose certain limitations on assets, debts, Restricted Payments, the creation of Lien by the Company, and consolidation, merger, Related-Party Transactions, and certain other transactions involving the Company. In addition, the Note Documents require the maintenance of insurance for the Company, the maintenance of the existence of the Company, the payment of certain taxes and claims and reporting requirements applicable to the Company. The Note Documents also contain provisions related to the Collateral as well as certain assurances, restrictions, and use and possession related to the Collateral.

2.     *Principal.*

Unless previously redeemed, exchanged or purchased and cancelled, the Company promises to pay the Holder hereof the total Outstanding principal amount which shall be repaid in cash in a single installment on the Maturity Date, together with all other amounts owed hereunder with respect thereto (including all accrued and unpaid interest that has not yet been added to the total Outstanding principal amount through the Maturity Date).

3.     *Interest.*

The Notes shall bear interest at an interest rate as follows:

(1)     4.50% per year shall be payable entirely in cash semi-annually in arrears on each Interest Payment Date ("**Cash Interest**");

(2)     13.5% per year shall be payable in cash or in kind ("**PIK Interest**"), at the sole election of the Company, as set forth below; and

(3)     GLAI, at its option, may elect to pay in cash all or a portion of any accrued but unpaid PIK Interest on the Outstanding principal amount of the Notes (A) semi-annually in arrears, on each applicable Interest Payment Date or (B) on the Maturity Date; provided that, unless GLAI makes such election to make interest payments in cash, any PIK Interest payments due with respect to the Notes prior to the Maturity Date shall not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and added to, and be part of, the Outstanding principal amount of such Note; provided, further, that any such PIK Interest payment shall be capitalized automatically on such Interest Payment Date and shall thereafter constitute principal for all purposes of this Note and the Note Purchase Agreement, and shall accrue interest thereon on the aggregate principal amount of the Notes on each applicable Interest Payment Date in accordance with the terms of the Note Purchase Agreement.

4.     *Method of Payment.*

Any payments of interest or principal in respect of each Note made on an Interest Payment Date or the Maturity Date shall be made by the Company to the Persons shown on the

A-4

Register at the close of (a) in the case of interest payments, the Regular Record Date or (b) in the case of principal payment, the fifteenth day immediately preceding the Maturity Date, whether or not a Business Day (each, a "**Record Date**"); provided that any PIK Interest payments due with respect to the Notes prior to the Maturity Date will not be payable in cash but in kind and the amount of any such interest payment shall, on the Interest Payment Date, be capitalized and automatically added to, and be part of, the Outstanding principal amount of such Note (and shall thereafter constitute principal for all purposes of such Note and the Note Purchase Agreement, and shall accrue interest thereon in accordance with the terms of the Note Purchase Agreement).

Final payments in respect of any Note shall be made subject only to any fiscal or other Laws and regulations applicable thereto, at the specified offices of any other Paying Agent appointed by the Company, if any.

If at any time insufficient funds are received by and available to the Purchaser to pay fully all amounts of principal and interest then due in cash hereunder, such funds shall be applied (i) first, towards payment of interest then due hereunder and (ii) second, towards payment of principal then due hereunder.

Payment in cash of the principal and premium, if any, of any Note on the Maturity Date shall be made upon presentation and surrender thereof, by wire transfer to the Holder's Designated Bank Account.

If a Holder fails to designate a Designated Bank Account or such account is unable to accept wire transfers, then all cash payments shall instead be made by U.S. Dollar check drawn on a bank in The City of New York and mailed to the Person entitled thereto at its address as it appears on the Register.

Payment of interest on any Interest Payment Date with respect to any Note shall be made to the Person in whose name such Note is registered on the Regular Record Date immediately preceding such Interest Payment Date, and if in cash, by wire transfer to the Holder's Designated Bank Account. A designation made by a Holder with respect to its Designated Bank Account shall remain in effect with respect to any future cash payments (including payments with respect to interest, principal, premium, if any, and Additional Amounts) with respect to such Note payable to such Holder. The Company shall pay any administrative costs imposed by banks in connection with making payments by wire transfer.

If any Interest Payment Date in respect of any Note is not a Business Day, the Holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day at such place and shall not be entitled to any further interest (other than accrued interest through the date such amount is paid) or other payment in respect of any such delay.

If the amount of principal or interest which is due on the Notes is not paid in full, the Registrar shall annotate the Register with a record of the amount of interest, if any, in fact paid.

All payments on this Note are subject in all cases to any applicable tax or other Laws and regulations, but without prejudice to the provisions of Paragraph **Error! Reference source not found.** hereof. Except as provided in Section 7.06 of the Note Purchase Agreement, no fees or expenses shall be charged to the Purchaser in respect of such payments.

5.      *Ranking and Collateral.*

The Notes and Note Guaranties are secured by a first priority Lien over the Collateral, subject to the terms and conditions of the Note Purchase Agreement and the Collateral Documents.  The payment obligations of the Company under the Note Purchase Agreement and the Notes are guaranteed by the Guarantors pursuant to the terms of the Note Guaranties.

The Lien over the Collateral granted shall terminate in respect of the Notes on the Stated Maturity, unless through passage of time, acceleration or otherwise there exists Notes Obligations due and payable on that date, in which case the Lien over the Collateral shall terminate as set forth in the Note Purchase Agreement.

6.      *Registrar, Transfer Agent, Exchange Agent and Paying Agent.*

GLAI will initially act as the Registrar, Transfer Agent, Exchange Agent and Paying Agent of the Notes.  The Company may appoint and change any Registrar, Transfer Agent, Exchange Agent and Paying Agent in accordance with the terms of the Note Purchase Agreement.

7.      *No Purchase of Notes by the Company or its Affiliates.*

The Company or any of its Affiliates (except for the Purchaser) may at any time repurchase Notes in open market purchases or in negotiated transactions at any price.  Any Notes so purchased or acquired may not be resold and shall be cancelled.

8.      *Denominations.*

The Notes are in registered form without coupons in minimum denominations of U.S.$100,000 and integral multiples of U.S.$1,000 in excess thereof.

9.      *Persons Deemed Owners.*

The registered Holder of this Note (except as otherwise required by Law and subject to the right of Holders of record on the relevant Regular Record Date to receive interest due on the relevant Interest Payment Date) may be treated as the owner thereof for all purposes.

10.     *Company's and Holders' Right to Exchange*

Subject to the provisions of Article 13 of the Note Purchase Agreement and other provisions of the Note Purchase Agreement, the Company and each Holder shall have the right to exchange such Holder's Notes at the Exchange Rate specified in the Note Purchase Agreement, as adjusted pursuant to the Note Purchase Agreement.

11.     *Unclaimed Money.*

Subject to applicable Law, any money and Preferred Shares held by any Paying Agent (other than GLAI), in trust for the payment of principal of, accrued and unpaid interest on or the consideration due upon exchange of any Note and remaining unclaimed for two years after such

A-6

principal, interest or consideration due upon exchange has become due and payable shall be paid to GLAI at the written request of GLAI, or (if then held by GLAI) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to GLAI for payment thereof, and all liability of GLAI as trustee thereof, shall thereupon cease.

12. *Amendment; Waiver.*

The Note Purchase Agreement contains provisions permitting amendments, supplements and waivers to these Notes and to the Note Purchase Agreement. Such amendments, supplements and waivers shall be conclusive and binding upon the holder of this Note and upon all future holders and owners of this Note and of any Notes issued in conversion or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon this Note or any Note issued in conversion or substitution therefor or upon registration of transfer thereof.

13. *Defaults and Remedies.*

The Note Purchase Agreement contains certain Events of Default with respect to the Notes and specifies certain remedies, and limitations on remedies, applicable to the Notes.

14. *Governing Law.*

THE NOTE PURCHASE AGREEMENT, THIS NOTE AND THE NOTE GUARANTIES SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Articles 470-1 to 470-19 of the Luxembourg Act on commercial companies of August 10, 1915 (inclusive), as amended, shall not apply in respect of the Notes.

Each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan in The City of New York with respect to actions brought against it as a defendant in respect of any Proceeding and irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

15. *No Recourse Against Others.*

No director, officer, employee or shareholder, as such, of the Company, the Guarantors or the Collateral Agent shall have any liability for any obligations of the Company, the Guarantors or the Collateral Agent under the Notes or any obligations of the Company, the Guarantors or the Collateral Agent under the Note Purchase Agreement or for any claim based on, in respect of or by reason of such obligations or their creation.  By accepting a Note, each Holder waives and releases all such liability.  The waiver and release are part of the consideration for the issue of the Notes.

The Company shall furnish to any Holder upon written request and without charge a copy of the Note Purchase Agreement, as amended from time to time, which includes the Form of this Note.  Requests may be made to:

GOL Linhas Aéreas Inteligentes S.A.
Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attention:  Celso Ferrer


FOR INFORMATION REGARDING THE CLOSING DATE, ISSUE PRICE, AND TO MATURITY, PLEASE CONTACT THE COMPANY AT THE COMPANY'S OFFICE, ATTENTION: CHIEF FINANCIAL OFFICER.

## NOTATION OF GUARANTY

For value received, each of the Guarantors (which term includes any successor Person under the Note Purchase Agreement) has unconditionally guaranteed, to the extent set forth in the Note Purchase Agreement and subject to the provisions in the Note Purchase Agreement dated as of September 29, 2023 (as amended from time to time, the "**Note Purchase Agreement**"), among the Company, the Guarantors party thereto, the Purchaser and TMF Brasil Administração e Gestão de Ativos Ltda., as the Collateral Agent, the full and punctual payment (whether upon acceleration or otherwise) of the principal of, premium, if any, and interest on, and all other amounts payable under, each Note, and the full and punctual payment of all other Notes Obligations.  The obligations of each of the Guarantors to the Secured Parties pursuant to the respective Note Guaranty and the Note Purchase Agreement are expressly set forth in Article 11 of the Note Purchase Agreement and reference is hereby made to the Note Purchase Agreement for the precise terms of the Note Guaranties.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Note Purchase Agreement.

IN WITNESS WHEREOF, each of the Guarantors has caused this notation of guaranty to be duly executed.

GOL LINHAS AÉREAS S.A.
as Guarantor

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.
as Guarantor, Registrar, Transfer Agent, Exchange Agent and Paying Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Witnesses:

By: _____
     Name:

By: _____
     Name:

A-10

**ANNEX I**

**[FORM OF NOTICE OF EXCHANGE BY THE COMPANY UPON SATISFACTION OF THE EXCHANGE PRICE CONDITION]**

GOL EQUITY FINANCE

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 224920

Senior Secured Exchangeable Notes Due 2028

To:    [Name of Holder]
       [Address of Holder]
       Attention:  [•]
       Facsimile:  [•]

The Company hereby informs you, as registered holder of U.S.$[•] aggregate principal amount of Notes (the "**Notes**"), that the Company is requiring that the Notes, or the portion hereof (that is U.S.$1,000 principal amount or an integral multiple thereof, so long as the principal amount of the Notes of the beneficial owner hereof not exchanged is at least U.S.$100,000) below designated, for cash, Preferred Shares or a combination of cash and Preferred Shares, as applicable, in accordance with the terms of the Note Purchase Agreement, and directs that any cash payable and any Preferred Shares deliverable upon such exchange, together with any accrued and unpaid capitalized PIK Interest and cash for any fractional Preferred Shares, be issued and delivered to you unless you indicate a different name, all in accordance with the terms of the Note Purchase Agreement referred to in this Note.  Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Note Purchase Agreement.

GLAI has agreed to pay to the Preferred Shares Registrar any fee, costs and expenses required to be paid in connection with the issuance of any Preferred Shares upon exchange of the Notes and the delivery of the Preferred Shares. However, if any Preferred Shares are to be issued in the name of a Person other than the undersigned, you as the Holder will pay all documentary, stamp or similar issue or transfer taxes, if any, in accordance with Section 1.01(e) of the Note Purchase Agreement.

In light of the terms set forth in Section 1.01(b) of the Note Purchase Agreement, we hereby request you to respond, within three Business Days, (a) confirming the principal amount of Notes being exchanged, (b) informing the name or names (with addresses) in which you wish the certificate or certificates for the Preferred Shares to be delivered upon settlement of the Exchange Obligation to be registered, (c) surrender the Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the address

A-11

office of the Company, informed below, and (d) if required, furnish appropriate endorsements and transfer documents.

 Praça Comte Linneu Gomes
S/N, Portaria 3, Jardim Aeroporto
04626-020 – São Paulo, SP
Brasil
Attn: Mario Tswei Liao
Email: mtliao@voegol.com.br

 The certificate numbers of the Notes to be exchanged are as set forth below:

_____

    [*Signature page follows*]

ANNEX II

### [FORM OF NOTICE OF EXCHANGE BY THE HOLDERS]

GOL EQUITY FINANCE

*société anonyme*

17, Boulevard Raiffeisen, L-2411 Luxembourg

R.C.S. Luxembourg B 224920

Senior Secured Exchangeable Notes Due 2028

To:     Gol Linhas Aéreas Inteligentes S.A., as Exchange Agent
        Praça Comte Linneu Gomes
        S/N, Portaria 3, Jardim Aeroporto
        04626-020 – São Paulo, SP
        Brasil
        Attn: Mario Tswei Liao
        Email: mtliao@voegol.com.br

The undersigned registered Holder of this Note hereby irrevocably exercises the option to exchange this Note, or the portion hereof (that is U.S.$1,000 principal amount or an integral multiple thereof, so long as the principal amount of the Notes of the beneficial owner hereof not exchanged is at least U.S.$100,000) below designated, for cash, Preferred Shares or a combination of cash and Preferred Shares, as applicable, in accordance with the terms of the Note Purchase Agreement referred to in this Note, and directs that any cash payable and any Preferred Shares deliverable upon such exchange, together with any cash for any fractional Preferred Share, and any Notes representing any unexchanged principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below, all in accordance with the terms of the Note Purchase Agreement referred to in this Note.  Any amount required to be paid by the undersigned pursuant to Section 1.01(e) of the Note Purchase Agreement accompanies this Note.  Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Note Purchase Agreement.

The Company and GLAI have agreed to pay to the Preferred Shares Registrar any fee, costs and expenses required to be paid in connection with the deposit of any Preferred Shares upon exchanges of Notes and the delivery of Preferred Shares. However, if any Preferred Shares or any portion of this Note not exchanged are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp or similar issue or transfer taxes, if any, in accordance with Section 1.01(d) and Section 1.01(e) of the Note Purchase Agreement.

The certificate numbers of the Notes to be exchanged are as set forth below:

_____

*[Signature page follows]*

A-13

**EXHIBIT B**

**[Reserved]**

**EXHIBIT C**

**Collateral Agent KYC Requirements**

**1.** Form Compliance Questionnaire fully completed and signed, and any supporting documents required therein.

**2.** Form UBO Declaration completed filled and signed, and any supporting documents required therein.

**3.** By-laws or articles of association duly registered with the respective Chamber of Commerce or similar applicable authority.

**4.** Appointment of Directors or legal representative duly registered with the respective Chamber of Commerce or similar applicable authority.

**5.** Passport copy of the Directors and legal representatives.

**6.** In case the company is represented by Attorney-in-Fact, please provide the Power of Attorney and identification document of the attorney-in-fact.

**7.** Excerpt Chamber of Commerce or similar applicable authority.

**EXHIBIT D**

**FORM OF
GLA'S SMILES FIDUCIARY TRANSFER AGREEMENT**

**FIDUCIARY TRANSFER AND ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS AND ASSETS AGREEMENT AND OTHER COVENANTS**

This Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants ("Agreement") is entered into by and among:

(i)      **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46-48/O-P, Zip Code 20021-340 enrolled with the National Registry of Legal Entities of the Ministry of Finance ("CNPJ") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA" or "Company");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Purchaser (hereinafter referred to as "Brazilian Collateral Agent");

(iii)    **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company

**CONTRATO DE ALIENAÇÃO E CESSÃO FIDUCIÁRIA DE BENS E DIREITOS DE PROPRIEDADE INTELECUAL E OUTRAS AVENÇAS**

O presente Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças ("Contrato") é celebrado por e entre:

(i)      **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ") sob o nº 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLA" ou "Companhia");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Avenida Marcos Penteado de Ulhoa Rodrigues, nº 939, 10º andar, Edifício Jacarandá, Sala 3, CEP 06460-040, inscrita no CNPJ sob o nº 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício do Comprador (doravante designado "Agente de Garantia Brasileiro");

(iii)    **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade

1

organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo, Zip Code 04626-020, enrolled with the CNPJ under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

Terms not defined herein shall have the meaning provided in the Notes (as defined below).

**WHEREAS:**

(i) GOL Finance, a public limited liability company (*societé anonyme*) incorporated under the laws of the Grand Duchy of Luxembourg, having its registered office at 17 Boulevard Raiffeisen, L-2411, registered with the Luxembourg Register of Commerce and Companies under number B 178.497 ("Gol Finance") issued up to US$ 1,430,925,000.00 of aggregate principal amount of 18.00% Senior Secured Note due 2028 ("GOL SSN"), under the terms of the respective note purchase agreement dated as of March 2, 2023;

(ii) GOL Equity Finance, a public limited liability company (*societé anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg ("Luxembourg"), having its registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg and registered with the Luxembourg Register of Commerce and

constituída e existente segundo as leis do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no CNPJ sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI");

Cada parte acima também são doravante individualmente designadas como "Parte" e, em conjunto, como "Partes";

Os termos aqui não definidos terão os significados a eles atribuídos nas Notas (conforme definido abaixo).

**CONSIDERANDO QUE:**

(i) A GOL Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo, com sede na 17 Boulevard Raiffeisen, L-2411, registrada no Registro Comercial de Luxemburgo sob o número B 178.497 ("Gol Finance") emitiu até US$ 1.430.925.000,00 de valor principal agregado de título de dívida sênior com juros de 18,00% e vencimento em 2028 ("GOL SSN"), nos termos do contrato de compra de notas (*note purchase agreement*) datado de 2 de março de 2023;

(ii) GOL Equity Finance, sociedade pública de responsabilidade limitada (*societé anonyme*), constituída de acordo com as leis do Grão-Ducado de Luxemburgo ("Luxemburgo"), com sede na 17 Boulevard Raiffeisen, L-2411, Luxemburgo, registrada no Registro Comercial de Luxemburgo (*R.S.C. Luxembourg*) sob o número B

2

Companies (R.C.S. Luxembourg) under number B 224920 ("Gol Equity Finance" or, together with Gol Finance, the "Issuers") will issue up to US\$ 1,430,925,000.00 of aggregate principal amount of 18% senior secured exchangeable note due 2028 ("GOL ESSN", jointly with GOL SSN, the "Notes"), under the terms of the corporate approval of dated March 1, 2023 and respective senior secured note purchase agreement to be entered into by and among Gol Equity Finance and the Parties;

(iii)    the Brazilian Collateral Agent was duly appointed by the Purchaser (as defined in the Notes; together with the Brazilian Collateral Agent, the "Secured Party") as a collateral agent in Brazil under the terms of the Notes to perform acts on behalf of and for the benefit of the Purchaser in connection with the collateral provided under this Agreement, as permitted by the terms set forth in the Notes;

(iv)    in order to secure the satisfaction of all obligations undertaken by the Issuers, under the terms and conditions of the Notes, GLA and GLAI ("Guarantors") provided a personal guarantee under the terms of the Notes ("Guarantees"); and

(v)    in order to secure the compliance with all obligations undertaken by the Issuers under the terms and conditions of the Notes and the Guarantors under the Guarantees, the Company has agreed to grant in favor of the Secured Party, represented in Brazil by the Brazilian Collateral Agent, a security interest in the form of fiduciary transfer and fiduciary assignment, as applicable (as provided under article 1,361 *et al* of Law No. 10,406/2002 ("Brazilian Civil Code") over the Transferred

224920 ("Gol Equity Finance" ou, em conjunto com a Gol Finance, as "Emissoras") emitirá até US\$ 1.430.925.000,00 de valor principal agregado de 18% de *senior secured exchangeable note* com vencimento em 2028 ("GOL ESSN", e, em conjunto com GOL SSN, as "Notas"), nos termos da aprovação societária datada de 1º de março de 2023 e respectivo contrato de compra de notas (*senior secured note purchase agreement*) a ser celebrado entre Gol Equity Finance e as Partes;

(iii)    o Agente de Garantia Brasileiro foi devidamente nomeado pelo Comprador (conforme definido nas Notas; junto com o Agente de Garantia Brasileiro, a "Parte Garantida") como agente de garantia no Brasil nos termos das Notas para praticar atos em nome e em benefício do Comprador com relação à garantia constituída por meio do presente Contrato, conforme permitido pelos termos previstos nas Notas;

(iv)    a fim de garantir o cumprimento de todas as obrigações assumidas pelas Emissoras, sob os termos e condições das Notas, a GLA e a GLAI ("Garantidoras") prestaram garantia pessoal nos termos das Notas ("Garantias"); e

(v)    a fim de garantir o cumprimento de todas as obrigações assumidas pelas Emissoras nos termos e condições das Notas e das Garantidoras no âmbito das Garantias, a Companhia concordou em conceder à Parte Garantida, representada no Brasil pelo Agente de Garantia Brasileiro, uma garantia real na forma de alienação fiduciária e de cessão fiduciária, conforme aplicável (conforme previsto no artigo 1.361 e seguintes da Lei nº 10.406/2002 ("Código

3

Assets and Assigned Rights (as defined below), by transferring to the Secured Party, represented by the Brazilian Collateral Agent, conditional ownership thereto and indirect possession over all the Transferred Assets and Assigned Rights.

**NOW, THEREFORE**, the Parties agree to enter into this Agreement under the following terms and conditions:

## SECTION I
## FIDUCIARY TRANSFER AND ASSIGNMENT; COLLATERAL

1.1. In accordance with the provisions herein, in order to secure (a) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by the Issuers to the Secured Party under the terms of the Notes and this Agreement; (b) the faithful and timely payment of the principal, interest and charges, as well as all other amounts due or to be due by each Guarantor to the Secured Party under the respective Guarantees; (c) the faithful and timely fulfillment by the Issuers and the Guarantors of all agreements, obligations and provisions contained in the Transaction Documents (as defined in the Notes); (d) the faithful and timely payment of all other amounts due from time to time by the Issuers to the Purchaser pursuant to the Transaction Documents; and (e) the faithful and timely payment of all other amounts due, from time to time, by the Issuers, GLA and/or GLAI to the Brazilian Collateral Agent, including, without limitation, the fees, costs and expenses set forth in the Transaction Documents (the obligations contained in the

Civil Brasileiro") sobre os Bens Alienados e Direitos Cedidos (conforme definido abaixo), mediante a transferência de sua propriedade resolúvel à Parte Garantida, representadas pelo Agente de Garantia Brasileiro, da propriedade resolúvel e da posse indireta sobre todos os Bens Alienados e Direitos Cedidos.

**RESOLVEM**, as Partes, celebrar este Contrato, de acordo com os seguintes termos e condições:

## CLÁUSULA I
## ALIENAÇÃO E CESSÃO FIDUCIÁRIA; GARANTIA

1.1. De acordo com o aqui disposto, a fim de garantir (a) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos pelas Emissoras à Parte Garantida, nos termos das Notas e deste Contrato; (b) o fiel e tempestivo pagamento do principal, dos juros e dos encargos, bem como de todos os demais valores devidos ou que venham a ser devidos por cada Garantidora à Parte Garantida nos termos das respectivas Garantias; (c) o fiel e tempestivo cumprimento pelas Emissoras e pelas Garantidoras de todos os contratos, obrigações e disposições contidas nos Documentos da Transação *(Transaction Documents)* (conforme definido nas Notas); (d) o fiel e tempestivo pagamento de todos os outros valores devidos, de tempos em tempos, pelas Emissoras ao Comprador nos termos dos Documentos da Transação; e (e) o fiel e tempestivo pagamento de todos os demais valores devidos, de tempos em tempos, pelas Emissoras, pela GLA e/ou pela GLAI ao Agente de Garantia Brasileiro,

4

items "(a)", "(b)", "(c)", "(d)" and (e)" are hereinafter referred to jointly as the "<u>Secured Obligations</u>"), which are summarized in <u>Exhibit I</u> hereto in compliance with the provisions of article 1,362 of the Brazilian Civil Code, the Company, pursuant to and in accordance with the provisions of articles 1,361 *et seq.* of the Brazilian Civil Code, so that the GOL ESSN, when effectively issued by Gol Equity Finance, will be automatically included in this fiduciary lien, regardless of any additional amendment, hereby irrevocably assigns, sells and transfers, as the case may be, to the Secured Party, represented by the Brazilian Collateral Agent, the fiduciary ownership, the conditional property and the indirect possession of the assets and rights indicated below, free and clear of any liens, encumbrances or restrictions, under the terms and conditions set forth in this Agreement (the "<u>Fiduciary Lien</u>"):

incluindo, sem limitação, as taxas, custos e despesas previstos nos Documentos da Transação (sendo as obrigações contidas nos itens "(a)", "(b)", "(c)", "(d)" e "(e)" referidas em conjunto como as "<u>Obrigações Garantidas</u>"), que se encontram resumidas no <u>Anexo I</u> a este documento em consonância ao disposto no artigo 1.362 do Código Civil Brasileiro, a Companhia, observado e em conformidade com o disposto nos artigos 1.361 e seguintes do Código Civil Brasileiro, sendo certo que a GOL ESSN, quando efetivamente emitida pela Gol Equity Finance estará automaticamente incluída nesta garantia fiduciária, independentemente de qualquer aditamento adicional, neste ato cede, aliena e transfere, conforme o caso, à Parte Garantida, representada pelo Agente de Garantia Brasileiro, a propriedade fiduciária, o domínio resolúvel e a posse indireta dos bens e direitos indicados abaixo, livres e desembaraçados de quaisquer ônus, gravames ou restrições, nos termos e condições previstos neste Contrato ("<u>Garantia Fiduciária</u>"):

(i) as fiduciary assignment, the Intellectual Property (as defined below), described and listed in Exhibit III hereto;

(i) em alienação fiduciária, a Propriedade Intelectual (conforme definido abaixo) descrita e listada no Anexo III deste Contrato;

(ii) in fiduciary assignment, the right to use and the contractual position, as applicable, related to the Smiles Technological Infrastructure (as defined below), described and listed in <u>Exhibit V</u> hereto; and

(ii) em cessão fiduciária, o direito de uso e posição contratual, conforme aplicável, da Infraestrutura Tecnológica Smiles (conforme definido abaixo) descrita e listada no <u>Anexo V</u> deste Contrato; e

(iii) in fiduciary assignment, the right to use and the contractual position, as applicable, the Databases, Customer and Supplier Lists (as defined below), Operating Manuals (as

(iii) em cessão fiduciária, o direito de uso e posição contratual, conforme aplicável, da Bases de Dados, Listas de Clientes e Fornecedores (conforme definido abaixo),

5

defined below), and all currently existing and future trade secrets, copyrights, registrable or not, the correspondence, advertising materials, exclusively related to the Loyalty Program (as defined below);

Manuais Operacionais (conforme definido abaixo), e todos os segredos de negócio, direitos autorais, registráveis ou não, correspondências, materiais publicitários, existentes e futuros, exclusivamente relacionados ao Programa de Fidelidade (conforme definido abaixo);

(all the assets and rights referred to above, hereinafter referred to as the "Transferred Assets and Assigned Rights").

(todos os bens e direitos acima referidos, doravante denominados "Bens Alienados e Direitos Cedidos").

For the sake of clarification, the Parties hereby ratify that (i) the Transferred Assets and Assigned Rights are, for all purposes, distinguished and nonfungible in view of the fact that they represent the totality of the intellectual property rights and data and information related to the Loyalty Program or used in its operation, and (ii) the Transferred Assets and Assigned Rights do not include (a) existing or future business partnership agreements entered into by GLA, GLAI or companies from its economic group, with third parties, including but not limited to financial institutions, and (b) any receivables resulting from any agreements entered into by GLA, GLAI or companies from its economic group, with any third parties, including but not limited to financial institutions.

Para fins de esclarecimento, as Partes confirmam que (i) os Bens Alienados e Direitos Cedidos são, para todos os fins de direito, considerados distinguidos e infungibilizados devido ao fato de representarem a totalidade dos bens e direitos de propriedade intelectual, bem como dos dados e informações relacionados ao Programa de Fidelidade ou utilizados na sua operação, e (ii) não integram os Bens Alienados e Direitos Cedidos quaisquer (a) contratos de parceria comercial que existam ou venham a existir, firmados pela GLA, pela GLAI ou empresas de seu grupo econômico com terceiros, incluindo, mas não se limitando com instituições financeiras, e (b) quaisquer recebíveis oriundos de quaisquer contratos firmados pela GLA, pela GLAI ou empresas de seu grupo econômico com quaisquer terceiros incluindo, mas não se limitando com instituições financeiras.

1.1.1 For the purposes of this Agreement, "Loyalty Program" shall mean Smiles loyalty program or any program that may replace it or succeed it.

1.1.1 Para os fins deste Contrato, "Programa de Fidelidade" significa o programa de fidelidade Smiles, ou qualquer outro programa que venha a substituí-lo.

1.1.2 For the purposes of this Agreement, "Intellectual Property" shall mean all the currently existing intellectual property rights

1.1.2 Para os fins deste Contrato, "Propriedade Intelectual" significa toda propriedade intelectual existente de

6

owned by the Company including as universal successor of Smiles Fidelidade S.A., related the Loyalty Program, described and listed in Exhibit III hereto, including: (a) the trademarks registered or filed for registration with the Brazilian Patent and Trademark Office (INPI – *Instituto Nacional da Propriedade Industrial*) ("INPI") owned by the Company ("Trademarks"); and (b) the Brazilian internet domains owned by the Company ("Domains"), as well as any future Trademarks or Domains that become property of the Company, observed, in this last case, that the collateral will be granted after such intellectual property becomes property of the Company and always observing the terms of Section 1.2.

titularidade da Companhia, inclusive como sucessora universal da Smiles Fidelidade S.A., referentes ao Programa de Fidelidade conforme descrita e listada no Anexo III deste Contrato: (a) as marcas registradas ou depositadas para registro no INPI - Instituto Nacional de Propriedade Industrial ("INPI") de titularidade da Companhia ("Marcas"); e (b) os domínios de internet brasileiros de titularidade da Companhia ("Domínios"), bem como as Marcas e Domínios que venham a se tornar titularidade da Companhia, observado, que, neste último caso, a garantia somente será outorgada após tal propriedade intelectual passar a ser de titularidade da Companhia, devendo-se observar o disposto na Cláusula 1.2.

1.1.3 For the purposes of this Agreement, "Smiles Technological Infrastructure" shall mean the licenses from computer programs and software that are used by the Company as technological instruments for the development of the activities necessary for the operation of the Loyalty Program listed in Exhibit V hereto.

1.1.3 Para os fins deste Contrato, "Infraestrutura Tecnológica Smiles" significa as licenças de programas de computador, softwares ou contratos de prestação de serviço que sejam utilizados pela Companhia como instrumentos tecnológicos para desenvolvimento da atividade necessária à operação do Programa de Fidelidade listadas no Anexo V deste Contrato.

1.1.3.1 The Company undertakes not to hire any other service providers or obtain licenses to use software that perform analogous tasks or functions to those included in the Smiles Technological Infrastructure from the date of the incorporation of the IPCo.

1.1.3.1 A Companhia obriga-se a não contratar quaisquer outros prestadores de serviços ou obter licença de uso de *softwares* que exerçam tarefas ou funções análogas aquelas englobadas na Infraestrutura Tecnológica Smiles a partir da constituição da IPCo.

1.1.4. For purposes of this Agreement, "Database, Client and Supplier List" means all data, information, documents, Personal Data (as defined below) and any other

1.1.4. Para os fins deste Contrato, "Bases de Dados, Listas de Clientes e Fornecedores" significam todos os dados, informações, documentos, Dados Pessoais (conforme

7

elements related to the operations of the Loyalty Program, including, but not exclusively, the Loyalty Program's clients list and suppliers lists, as well as any other data, information and document related to the database of the Company that is necessary for or related to the operation of the Loyalty Program, as updated or modified from time to time, regardless of where such data, information, documents, Personal Data or other elements are held now or in the future.

definido abaixo) e quaisquer outros elementos que sirvam para a operação do Programa de Fidelidade, inclusive, mas sem se limitar, a lista de clientes filiados ao Programa de Fidelidade e lista de seus fornecedores, bem como todo e qualquer outro dado, informação ou documento relativo à base de dados pertencente à Companhia que seja necessário ou relacionado à operação do Programa de Fidelidade, conforme atualizadas ou modificadas de tempos em tempos, independentemente de onde tais dados, informações, documentos, Dados Pessoais e quaisquer outros elementos sejam mantidos pela Companhia atualmente ou no futuro.

1.1.4.1. The Company undertakes to update the Database, Client and Supplier List in accordance with the periodicity established in its internal policies and controls, even after an acceleration of the Secured Obligations, provided that any and all updates will be automatically incorporated to the Database, Client and Supplier List assigned on a fiduciary basis pursuant to this Agreement.

1.1.4.1. A Companhia se compromete a atualizar as Bases de Dados, Listas de Clientes e Fornecedores na periodicidade estabelecida por suas políticas e controles internos, mesmo após eventual vencimento antecipado das Obrigações Garantidas, observado que todas as atualizações efetuadas serão automaticamente incorporadas nas Bases de Dados, Listas e Clientes e Fornecedores cedidos fiduciariamente através deste Contrato.

1.1.5. For purposes of this Agreement, "Operating Manuals" mean the currently existing manuals, documents and information related to the operation of the Loyalty Program, and their respective copyrights related to these, owned by the Company, (listed in Exhibit VI hereto), as well as manuals, documents and information related to the operation of the Loyalty Program, and their respective copyrights related to these, as they become property of the Company, observed, in this last case, that

1.1.5. Para os fins deste Contrato, "Manuais Operacionais" significam os manuais, documentos e informações, presentes, relacionados a operação do Programa de Fidelidade, e os respectivos direitos autorais relacionados a estes, de titularidade da Companhia, (conforme listados no Anexo VI deste Contrato), bem como manuais, documentos e informações, relacionados a operação do Programa de Fidelidade, e os respectivos direitos autorais relacionados a estes que venham a se tornar titularidade da

8

the collateral will be granted automatically after such assets becomes property of the Company and always observing the terms of Section 1.2.

1.2. The Transferred Assets and Assigned Rights indicated in items (i) and (iii) of Section 1.1 above that become owned by, or licensed to the Company as from the date hereof ("Additional Assets and Rights") will be automatically included as part of the security interest created by this Agreement as soon as they become property of the Company (and after any third party approval deemed legally or contractually necessary, if any), without the need for the execution of an amendment to this Agreement. In case after the execution of this Agreement the Company becomes the holder or licensee, as applicable of new Additional Assets and Rights, as well as any patents related to the Loyalty Program, the Parties undertake to formalize the extension of the Fiduciary Transfer to the Additional Assets and Rights by entering into an amendment to this Agreement, to be entered by the parties hereto no later than thirty (30) days after the date on which these Additional Assets and Rights become owned by and/or licensed to the Company, amending Exhibit III or Exhibit VI hereto to include such Additional Assets and Rights, substantially in accordance with Exhibit IV, which shall be registered as provided for in Sections 2.1 and 2.2 below, the Company shall use its best efforts and fulfill all requirements presented to complete the perfection in the shortest possible time.

Companhia, observado, que, neste último caso, a garantia será outorgada automaticamente após tais bens passaram a ser de titularidade da Companhia, devendo-se observar o disposto na Cláusula 1.2.

1.2. Os Bens Alienados e Direitos Cedidos, indicados nos itens (i) e (iii) da Cláusula 1.1 acima que venham a se tornar de titularidade da, ou licenciada à Companhia a partir da presente data ("Bens e Direitos Adicionais"), estarão automaticamente onerados pela garantia criada pelo presente Contrato assim que se tornarem de titularidade da, ou licenciada à Companhia (e após obtidas eventuais anuências de terceiros, caso legal ou contratualmente necessárias), sem a necessidade da celebração de uma alteração deste Contrato. Caso após a assinatura desde Contrato a Companhia passe a deter a titularidade ou a licença, conforme o caso, de Bens e Direitos Adicionais, bem como de quaisquer patentes relacionadas ao Programa de Fidelidade, as Partes se obrigam a formalizar a extensão da Garantia Fiduciária a estes Bens e Direitos Adicionais por meio da celebração de aditamento a este Contrato, a ser celebrado em entre as Partes em até 30 (trinta) dias contados da data em que a Companhia passar a deter estes Bens e Direitos Adicionais, para alterar o Anexo III ou Anexo VI a este Contrato, substancialmente nos termos do Anexo IV, o qual deverá ser registrado conforme previsto nas Cláusulas 2.1 e 2.2 abaixo, sendo certo que a Companhia deverá empenhar os melhores esforços e atender todas as exigências apresentadas para que o registro seja concluído no menor prazo possível.

9

1.3. The Secured Obligations include all obligations undertaken by the Issuers and the Guarantors, as applicable, including all future and current principal and accessory payment obligations undertaken or to be undertaken by the Issuers and the Guarantors, as applicable, under or in connection with the Notes and this Agreement.

1.4.     By signing this Agreement and complying with the formalities set forth in Section 2 below, the Fiduciary Lien shall be created on behalf of and for the benefit of the Secured Party, represented by the Brazilian Collateral Agent, shall become the conditional and indirect owner of the Transferred Assets and Assigned Rights, subject to the terms and conditions of this Agreement.

1.5.     The Company hereby declares that each of the registrable Intellectual Property listed in Exhibit III is duly registered or has been submitted for registration before INPI, and all fees due for the registration or the maintenance of the registration of the Intellectual Property with the INPI have been duly paid by the Company, unless otherwise specified in Exhibit III. In addition, the Company hereby declares and confirms that it has obtained all required authorizations for the granting of this Fiduciary Lien over the existing Transferred Assets and Assigned Rights, and that it has in its files all contracts, assignment agreements and other documentation (as applicable) to evidence that the Company has full title and ownership to, and/or the right to burden and assign, the existing Transferred Assets and Assigned

1.3. As Obrigações Garantidas incluem todas e quaisquer obrigações assumida pelas Emissoras e pelas Garantidoras, conforme aplicável, incluindo todas as obrigações de pagamento de principal e acessório, futuras e atuais, assumidas ou que venham a ser assumidas pelas Emissoras e pelas Garantidoras, conforme aplicável, no âmbito das, ou com relação às Notas e a este Contrato.

1.4.     Mediante assinatura do presente Contrato e cumprimento das formalidades estabelecidas na Cláusula 2 abaixo, estará constituída a Garantia Fiduciária em nome e benefício da Parte Garantida, representada pelo Agente de Garantia Brasileiro, que tornar-se-á detentora da posse condicional e indireta dos Bens Alienados e Direitos Cedidos, nos termos e condições acordados neste Contrato.

1.5.     A Companhia neste ato declara que cada Propriedade Intelectual listada no Anexo III passível de registro está devidamente registrada ou foi submetida a registro perante o INPI, e todas as taxas devidas pelo registro ou pela manutenção do registro das Propriedades Intelectuais no INPI foram devidamente pagas pela Companhia, salvo indicação em contrário no Anexo III. Além disso, a Companhia desde já declara e confirma que obteve todas as autorizações necessárias para concessão desta Garantia Fiduciária sobre os Bens Alienados e Direitos Cedidos existentes, e que possui em seus arquivos todos os contratos, termos de cessão e demais documentos (conforme aplicável) para comprovar que a Companhia é a única e exclusiva titular da, e/ou possui plenos direitos para onerar e ceder os Bens

10

Rights according to the term of this Agreement.

1.5.1.   The Company hereby confirms that it complies with Brazilian General Data Protection Law – Federal Law No. 13,709/2018, and all its regulation, further amendments and other associated legislation (collectively the "LGPD") and that, considering the existence of Personal Data (as defined below) in the Database, Client and Supplier List the Company, without prejudice of the fiduciary assignment created under this Agreement, hereby confirms that it has all authorizations that may be necessary to create and perfect the fiduciary assignment set forth in Section 1.1(ii), and undertakes to, as may be necessary, (i) perform all acts to satisfy all legal requirements to ensure the legality and the effectiveness of the transfer of the Personal Data contained in the Transferred Assets and/or the Assigned Right, and (ii) obtain the authorizations and consents required under the LGPD, if applicable, for the fulfillment of the transfer of such Personal Data in case of foreclosure of the collateral created pursuant to this Agreement, according to the terms set forth herein. "Personal Data" are any data or information, as long as owed or in possession by the Company, of an identified or identifiable individual, including of the Company's and Loyalty Program' clients, and their suppliers, distributors and commercial partners in general, among others, including but not limited to: names, phone numbers, contact information (address, e-mail address, commercial phone number, mobile number, fax), occupation, bank information, account number, total miles and points balance in the Loyalty

Alienados e Direitos Cedidos existentes de acordo com o disposto neste Contrato.

1.5.1.   A Companhia neste ato confirma que cumpre a Lei Geral de Proteção de Dados Pessoais do Brasil – Lei nº 13.709/2018, e toda sua regulamentação, alterações posteriores e demais normas correlatas (em conjunto "LGPD") e que, considerando a existência de Dados Pessoais nas Bases de Dados, Listas de Clientes e Fornecedores, sem prejuízo da cessão fiduciária constituída por este Contrato, a Companhia desde já confirma ter as autorizações necessárias para a constituição e aperfeiçoamento da cessão fiduciária prevista na Cláusula 1.1(ii) acima, e se obriga a, conforme necessário, (i) praticar todos os atos para atender aos requisitos legais para garantir a legalidade e a efetivação da transferência desses Dados Pessoais contidos no Bem Alienado e/ou no Direito Cedido e para obter as autorizações e permissões necessárias e exigidas pela LGPD, caso aplicável, para efetivar transferência desses Dados Pessoais na hipótese de excussão da garantia constituída através deste Contrato, nos termos aqui previstos. "Dados Pessoais" são quaisquer dados ou informações, desde que detidos pela ou de posse da Companhia, de um indivíduo identificado ou identificável, inclusive de clientes da Companhia e do Programa de Fidelidade, e dos representantes das empresas a elas relacionadas, direta ou indiretamente, e dos seus respectivos fornecedores, distribuidores e parceiros comerciais em geral, dentre outros, incluindo, mas não se limitando a: nomes, números de telefone, informações de contato (endereço, endereço de e-mail, número de telefone comercial, número de telefone móvel, número de fax), emprego, dados

11

Program, history of engagement in the Loyalty Program, history of accrual and redemption activity in the Loyalty Program, communication and promotion opt-ins in the Loyalty Program, credit card number, marital or relationship status etc.

1.6.    Notwithstanding the provisions of this Agreement, the Company shall have the right to, without any release from or consent by the Secured Party or the Brazilian Collateral Agent, pursuant to the Notes, freely use (including by means of licensing) the Transferred Assets and Assigned Rights, in a manner consistent with the Company's ordinary course of business.

1.7. Without prejudice to the other provisions of this Agreement, in case of the occurrence of an event of acceleration of any Secured Obligation the Company and the Guarantors hereby agree and accept that any and all use of any of the Transferred Assets and Assigned Rights (including, without limitations, any use of the Trademarks and Domains, operation of the Smiles Technology Infrastructure, utilization of the Database, Client and Suppliers List, as well as of the utilization of the Operating Manuals, release of new brands, marketing campaigns, characters, themes, partnerships, as well as the development of any new intellectual property) will be subject to the Brazilian Security Agent prior written instructions and approvals, in accordance with the Secured Party's guidance, until such default is cured by the Company (if such a

bancários, número da conta no Programa de Fidelidade, saldo total de milhas e pontuação no Programa de Fidelidade, histórico de contratação de terceiros no Programa de Fidelidade, histórico de acúmulo e resgate de milhas no Programa de Fidelidade, *opt-ins* de comunicação e promoção no Programa de Fidelidade, número de cartão de crédito, estado civil ou de relacionamento etc.

1.6.    Sem prejuízo das demais disposições deste Contrato, a Companhia poderá, sem que seja necessária qualquer liberação ou consentimento da Parte Garantida ou do Agente de Garantia Brasileiro nos termos das Notas, livremente utilizar (inclusive por meio de licenciamento) os Bens Alienados e Direitos Cedidos, de maneira que seja consistente com o curso ordinário dos seus negócios.

1.7. Sem prejuízo das demais disposições deste Contrato, em caso de vencimento antecipado de qualquer Obrigação Garantida a Companhia e as Garantidoras desde já concordam e aceitam que toda e qualquer utilização de qualquer dos Bens Alienados e Direitos Cedidos (incluindo, sem limitação, utilização das Marcas e Domínios, operação da Infraestrutura Tecnológica Smiles, utilização das Bases de Dados, Listas de Clientes e Fornecedores, bem como utilização dos Manuais Operacionais, lançamento de novas marcas, campanhas publicitárias, personagens, temas, parcerias e, ainda, o desenvolvimento de qualquer nova propriedade intelectual) estará sujeita à instrução e aprovação prévia e expressa do Agente de Garantia Brasileiro, conforme orientações da Parte Garantida, até que a violação em questão seja sanada pela Companhia (se passível de saneamento) ou

12

cure is possible) or until the foreclosure of this Agreement pursuant to <u>Section 5</u> hereto, as applicable.

1.8. Without prejudice to the other provisions of this Agreement, without requiring any resolution, approval or consent from the Secured Party or the Brazilian Collateral Agent, and without implying breach of any representation, warranty or obligation assumed under the Notes and this Agreement, the Company may transfer ownership of any of the Transferred Assets and Assigned Rights, at any time, by a dropdown, to a wholly-owned subsidiary of the Company ("<u>Dropdown</u>" and "<u>IPCo</u>"), as long as, prior to such transfer, (1) the Company enters into a fiduciary assignment agreement over the totality of IPCo's shares and securing the obligations of the Notes, and (2) IPCo enters into a fiduciary assignment of the assets and rights to be transferred, under terms and conditions equivalent to this Agreement, with its effectiveness conditioned exclusively to the completion of the transfer of those rights and assets of the Company to IPCo.

1.8.1. The Brazilian Collateral Agent is hereby authorized to and shall execute any amendment to this Agreement to enable the Dropdown without the need for any further instruction or confirmation of any third parties, including the Secured Party, according to the terms set forth in this Agreement.

até que ocorra a excussão nos termos da Cláusula 5 deste Contrato, conforme aplicável.

1.8. Sem prejuízo das demais disposições deste Contrato, sem que seja necessária qualquer deliberação, aprovação ou consentimento da Parte Garantida ou do Agente de Garantia Brasileiro e sem que implique a violação de qualquer declaração, garantia ou obrigação assumidas nos termos das Notas e deste Contrato, a Companhia poderá transferir a titularidade de quaisquer dos Bens Alienados e Direitos Cedidos, a qualquer tempo, através de *dropdown*, para subsidiária integral da Companhia ("<u>Dropdown</u>" e "<u>IPCo</u>"), desde que, anteriormente à referida transferência, seja celebrado (1) pela Companhia, contrato de alienação fiduciária sobre a totalidade do capital social da IPCo, garantindo as obrigações das Notas, e (2) pela IPCo, contrato de alienação fiduciária e cessão fiduciária dos bens e direitos a serem transferidos, em termos equivalentes aos deste Contrato, com a eficácia condicionada exclusivamente à efetivação da transferência de tais bens e direitos da Companhia para IPCo.

1.8.1. O Agente de Garantia Brasileiro está, pelo presente Contrato, autorizado a e deverá firmar o aditamento a este Contrato para viabilizar o Dropdown sem a necessidade de qualquer autorização ou confirmação adicional de quaisquer terceiros, inclusive da Parte Garantida, observados os termos dispostos neste Contrato.

## SECTION II
## PERFECTION OF THE COLLATERAL

## CLÁUSULA II
## APERFEIÇOAMENTO DA GARANTIA

13

2.1.    The Company shall, within twenty (20) days from the date hereof or from the date of execution of any amendments to this Agreement, deliver to the Brazilian Collateral Agent this Agreement, or any of its amendments, duly registered with the Registry Offices of Titles and Deeds (*Cartórios de Títulos e Documentos)* of the cities where the headquarters of each Party is located. For such purposes, the Company undertakes to take all necessary actions to make such registrations, at its own expense.

2.2.    Within fifteen (15) days as from the date of registration of this Agreement or any amendment hereto with the competent Registry Offices of Titles and Deeds (as provide for in Section 2.1 above), the Company shall deliver to the Brazilian Collateral Agent evidence that the request for annotation of the security interest over each e Intellectual Property filed or registered with the INP has been filed with the INPI.

2.2.1. The Company undertakes upon completion of the annotation with the INPI, to promptly inform and deliver evidence to the Brazilian Collateral Agent of completion of such annotation, as well as to, upon request, provide the Brazilian Collateral Agent with any update on the annotation process upon written request by the Brazilian Collateral Agent.

2.3.    All costs and expenses related to the filing and registration of this Agreement as required hereunder (including, without limitation, legal fees and expenses with translations or with any other formalities that may be required in connection therewith)

2.1.    A Companhia deverá, em 20 (vinte) dias a partir da presente data ou a partir da data de assinatura de quaisquer aditamentos a este Contrato, entregar ao Agente de Garantia Brasileiro este Contrato, ou quaisquer aditamentos a este, devidamente registrados nos Cartórios de Registro de Títulos e Documentos das cidades dos domicílios das sedes das Partes. Para tais propósitos, a Companhia compromete-se a praticar todos os atos necessários para efetuar os referidos registros, às suas próprias expensas.

2.2.    No prazo de 15 (quinze) dias contados a partir da data de registro deste Contrato ou qualquer aditamento do mesmo perante os Cartórios de Títulos e Documentos competente (conforme previsto na Cláusula 2.1 acima), a Companhia deverá entregar ao Agente de Garantia Brasileiro evidência de que o pedido de anotação da alienação fiduciária sobre cada Propriedade Intelectual registrada ou depositada no INPI foi protocolado perante o INPI.

2.2.1. A Companhia obriga-se, mediante conclusão da anotação perante o INPI, prontamente informar e entregar ao Agente de Garantia Brasileiro evidências de tal anotação, bem como fornecer ao Agente de Garantia Brasileiro qualquer atualização que lhe seja solicitada sobre o processo de anotação, mediante solicitação por escrito do Agente de Garantia Brasileiro.

2.3.    Todos os custos e despesas relacionados ao arquivamento e registro deste Contrato, conforme aqui previstos (incluindo, sem limitação, honorários advocatícios, traduções juramentadas ou relativos a quaisquer outras formalidades que

14

shall be borne by the Company, at its own expense.

2.4. If Company fails to timely file or obtain the registration and/or annotation of this Agreement pursuant to Sections 2.1 and 2.2 above, the Brazilian Collateral Agent is hereby authorized by Company to conduct any such filing directly. The Company shall reimburse the Brazilian Collateral Agent, within five (5) days from the receipt of a written request, any and all costs (including, without limitation, legal fees, official fees and expenses with translations or with any other formalities that may be required in connection therewith) that may be disbursed by the Brazilian Collateral Agent in connection with the filings and registrations described in Sections 2.1 and 2.2 above, without prejudice to any right of the Brazilian Collateral Agent or to any consequences or remedies set forth under this Agreement or the Transaction Documents deriving from such noncompliance by the Company of its obligations hereunder.

2.5.    Notwithstanding the foregoing, the Company shall:

(i)    diligently comply with any requirements made by the relevant Registry of Deeds and Documents and/or the INPI, as the case may be, and keep the Brazilian Collateral Agent informed on any such requirement; and

sejam necessárias), serão arcados pela Companhia, às suas próprias expensas.

2.4. Caso a Companhia deixe de solicitar ou obter o registro e/ou a anotação deste Contrato tempestivamente de acordo com o previsto nas Cláusulas 2.1 e 2.2 acima, o Agente de Garantia Brasileiro fica autorizado pela Companhia a realizar qualquer pedido de anotação e registro diretamente. A Companhia deverá reembolsar o Agente de Garantia Brasileiro, no prazo de 5 (cinco) dias a partir do recebimento de uma solicitação por escrito, todos e quaisquer custos (incluindo, sem limitação, honorários advocatícios, taxas oficiais e despesas com traduções ou com quaisquer outras formalidades que possam ser exigidas nesse sentido) que possam ser desembolsados pelo Agente de Garantia Brasileiro em relação aos arquivamentos e registros descritos nas Cláusulas 2.1 e 2.2 acima, sem prejuízo de outros direitos ou consequências previstos neste Contrato ou nos Documentos da Transação em razão do descumprimento pela Companhia de suas obrigações aqui previstas.

2.5.    Sem prejuízo do disposto acima, a Companhia deverá:

(i)    cumprir diligentemente quaisquer exigências apresentadas pelos Cartórios de Registro de Títulos e Documentos competentes e/ou pelo INPI, conforme o caso, e manter o Agente de Garantia Brasileiro informado sobre qualquer exigência; e

15

(ii)    take any further action pursuant to applicable law required, now or in the future, for the creation, perfection, and/or maintenance of Fiduciary Lien over the Transferred Assets and Assigned Rights.

(ii)    tomar quaisquer providências adicionais de acordo com a lei aplicável necessárias, atualmente ou no futuro, para a criação, realização e/ou manutenção da Garantia Fiduciária sobre os Bens Alienados e Direitos Cedidos.

## SECTION III
## REPRESENTATIONS AND WARRANTIES

## CLÁUSULA III
## DECLARAÇÕES E GARANTIAS

3.1. The Brazilian Collateral Agent hereby represents and warrants that:

3.1.    O Agente de Garantia Brasileiro neste ato declara e garante que:

(i)    has full powers, authority and ability to execute this Agreement, perform its contractual obligations and enter into this Fiduciary Lien, as described herein; and

(i)    possui plenos poderes, autorização e capacidade para firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Garantia Fiduciária aqui descrita; e

(ii)    has taken all appropriate measures to authorize the execution and performance of this Agreement.

(ii)    tomou todas as devidas medidas para autorizar a celebração e o cumprimento do presente Contrato.

3.2.    The Company and GLAI, hereby represent and warrant, individually, that:

3.2.    A Companhia e a GLAI, neste ato declaram, individualmente, que:

(i)    has full powers, authorization and capacity to execute this Agreement, perform its contractual obligations and enter into the Fiduciary Lien, as described herein; and

(i)    possui plenos poderes, autorização e capacidade de firmar o presente Contrato, cumprir com suas obrigações contratuais e celebrar a Garantia Fiduciária, conforme aqui descrita; e

(ii)    has taken or will take all necessary measures to authorize the execution and performance of this Agreement.

(ii)    tomou e tomará todas as medidas necessárias para autorizar a celebração e o cumprimento do presente Contrato.

3.3.    The Company hereby represents and warrants that:

3.3.    A Companhia neste ato declara que:

(i)    this Agreement constitutes a legal, valid and binding obligations, and

(i)    o presente Contrato constitui uma obrigação legal, válida, e exequível contra a Companhia, de acordo com os seus termos;

16

enforceable against the Company, in accordance with its terms;

(ii)     the execution of this Agreement and the performance of its obligations do not infringe, violate, conflict with or constitute a default under (a) any legal or contractual provision or any obligation previously undertaken by the Company, (b) any applicable law, (c) any policy or rule of the Company, (d) the Company's organizational acts, and do not cause or impose any encumbrance on its assets, except for the Fiduciary Lien of the Transferred Assets and Assigned Rights;

(iii)     it is the lawful and exclusive owner of, and has good title and/or license to, the Transferred Assets and Assigned Rights, which comprises all intellectual property rights and data and information related to the Loyalty Program, business and operation thereof, in Brazil.

(iv)     except for this Fiduciary Lien, the Transferred Assets and Assigned Rights are free and clear of any liens, encumbrances and/or security interests and may be assigned on a fiduciary basis, pledged or sold judicially or extrajudicially, and there are no restrictions for the fiduciary transfer, fiduciary assignment, pledge or sale of Transferred Assets and Assigned Rights in the Company's bylaws or in any other document; and, in the event of the enforcement or performance of this Agreement, its terms and conditions shall prevail over the terms and conditions of any other document;

(ii)     a celebração do presente Contrato e o cumprimento de suas obrigações não infringem, violam, conflitam com, ou constituem um inadimplemento sob (a) qualquer disposição legal ou contratual ou qualquer obrigação anteriormente assumida pela Companhia, (b) qualquer lei aplicável, (c) qualquer política ou regra da Companhia, (d) quaisquer atos constitutivos da Companhia, e não enseja ou impõem qualquer gravame sobre seus ativos, exceto pela Garantia Fiduciária dos Bens Alienados e Direitos Cedidos;

(iii)     é a legítima e exclusiva proprietária, licenciada e/ou possuidora dos Bens Alienados e Direitos Cedidos, que representam a totalidade dos direitos e ativos de propriedade intelectual e dados e informações relacionados ao Programa de Fidelidade e respectivo negócio e operação no Brasil.

(iv)     exceto pela presente Garantia Fiduciária, os Bens Alienados e Direitos Cedidos estão livres e desembaraçados de quaisquer ônus, gravame e/ou garantias e pode ser alienada fiduciariamente, empenhada ou vendida judicial ou extrajudicialmente, sendo que inexistem restrições para a alienação fiduciária, cessão fiduciária, penhor ou venda dos Bens Alienados e Direitos Cedidos no estatuto social da Companhia ou em qualquer outro documento; e, no caso de excussão ou execução do presente Contrato, seus termos e condições prevalecerão sobre os termos e condições de qualquer outro documento;

17

(v)    to best knowledge of the Company there is no procedure, proceeding or claim from third parties or any governmental authority or body that may, in any way, adversely affect the Transferred Assets and Assigned Rights or this Agreement;

(vi)    the Transferred Assets and Assigned Rights are not essential to the Company's business activities and will not be at any time essential to the Company's business actives and the Assignor will not, in any event, challenge that such Transferred Assets and Assigned Rights are essential to its business activities; and

(vii)    the power of attorney granted under the terms of Section 5.4 and in the form of Exhibit II hereto, was duly issued by the Company and its legal representatives and validly grants the powers set forth therein to the Brazilian Collateral Agent, and the Company did not grant any other power of attorney or similar instrument with similar effect to any other third party in connection with the Transferred Assets and Assigned Rights described hereof.

3.3.    The representations and warranties provided by the Parties shall survive the termination of this Agreement in the event of any inaccuracy or falsity of their representations and warranties.

## SECTION IV
### ADDITIONAL OBLIGATIONS

4.1.    The Company undertakes to and agrees that, on and after the date hereof and

(v)    no melhor conhecimento da Companhia, não há procedimento, processo ou reclamação de terceiros ou de qualquer autoridade ou órgão governamental que possa, de alguma forma, afetar adversamente os Bens Alienados e Direitos Cedidos ou este Contrato;

(vi)    os Bens Alienados e Direitos Cedidos não são essenciais à atividade empresarial da Companhia e não serão, em nenhum momento, essenciais à atividade empresarial da Companhia e a Companhia não irá, em hipótese alguma, contestar que tais Bens Alienados e Direitos Cedidos sejam essenciais às suas atividades empresariais; e

(vii)    a procuração outorgada, nos termos da Cláusula 5.4 abaixo e na forma do Anexo II a este Contrato, foi devidamente assinada pelos representantes legais da Companhia e confere, validamente, os poderes ali indicados ao Agente de Garantia Brasileiro, e a Companhia não outorgou qualquer outra procuração ou instrumento com efeito similar a quaisquer terceiros com relação aos Bens Alienados e Direitos Cedidos descritos neste Contrato.

3.3.    As declarações e garantias prestadas pelas Partes subsistirão após o término do presente Contrato, no caso de qualquer inexatidão ou inveracidade de suas declarações e garantias.

## CLÁUSULA IV
### OBRIGAÇÕES ADICIONAIS

4.1.    A Companhia se obriga e concorda que, na data do presente instrumento e até

18

until all Secured Obligations are paid and discharged in full:

(i) to cooperate with the Brazilian Collateral Agent for the performance and enforcement of this Agreement;

(ii) to provide to the Brazilian Collateral Agent, in any case by no later than five (5) Business Days after the receipt of the respective request from the Brazilian Collateral Agent, and at the sole expense of Company, with all information and all documents relating to the Fiduciary Lien and to the Transferred Assets and Assigned Rights as requested by the Brazilian Collateral Agent, to determine compliance with this Agreement and/or for the preservation, maintenance and/or enforcement of the Fiduciary Lien;

(iii) to maintain always valid, effective and in good standing all the Transferred Assets and Assigned Rights and all authorizations required for the performance of the obligations undertaken in this Agreement and/or any amendment hereto and to take all measures required under applicable law to enforce the provisions hereof and/or of any amendment hereto;

(iv) to give written notice to the Brazilian Collateral Agent no later than five (5) Business Days after becoming aware of any event or circumstance which is likely to adversely affect Company's ability to comply with the obligations undertaken herein and/or under any amendment hereto, or that may otherwise adversely affect their compliance with their obligations hereunder and/or under any amendment hereto;

que todas as Obrigações Garantidas sejam integralmente pagas e cumpridas:

(i) a cooperar com o Agente de Garantia Brasileiro para o cumprimento e execução deste Contrato;

(ii) a apresentar ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento da respectiva solicitação pelo Agente de Garantia Brasileiro, e às expensas exclusivas da Companhia, todas as informações e todos os documentos relacionados à Garantia Fiduciária e aos Bens Alienados e Direitos Cedidos solicitados pelo Agente de Garantia Brasileiro, para a determinação do cumprimento deste Contrato e/ou para a preservação, manutenção e/ou execução da Garantia Fiduciária;

(iii) a sempre manter válidas, eficazes e em situação regular todos os Bens Alienados e Direitos Cedidos e todas as autorizações necessárias para o cumprimento das obrigações assumidas neste Contrato, e/ou em qualquer aditivo a este, e a adotar todas as medidas necessárias nos termos da lei aplicável para a execução das disposições do presente Contrato e/ou de qualquer aditivo a este;

(iv) a notificar o Agente de Garantia Brasileiro, por escrito, em prazo não superior a 5 (cinco) Dias Úteis após tomar ciência, de qualquer evento ou circunstância que possa afetar negativamente a capacidade da Companhia de cumprir as obrigações assumidas no Contrato e/ou em qualquer aditivo a este, ou que possa, de outra forma, afetar negativamente o cumprimento pela

19

Companhia das obrigações previstas neste Contrato e/ou em qualquer aditivo a este;

(v)      timely fulfill the obligations of this Agreement;

(v)      cumprir     tempestivamente     as obrigações desse Contrato;

(vi)     defend itself, the Transferred Assets and Assigned Rights, the Secured Party and the Brazilian Collateral Agent in a timely and effective manner, from any act, action, procedure, proceeding or claim from third parties that may, in any way, affect the Transferred Assets and Assigned Rights, this Agreement and / or the fulfillment of the obligations undertaken under the Notes;

(vi)     defender, a si mesma, os Bens Alienados e Direitos Cedidos, a Parte Garantida e o Agente de Garantia Brasileiro de forma tempestiva e eficaz, de qualquer ato, ação, procedimento, processo ou demanda de terceiros que possa, de qualquer forma, afetar os Bens Alienados e Direitos Cedidos, este Contrato e/ou o cumprimento das obrigações assumidas por força das Notas;

(vii)    perform all acts, as well as sign any and all documents, necessary for the registration of this Agreement in the competent Registry Office of Titles and Deeds and INPI pursuant to Sections 2.1 and 2.2 above;

(vii)    praticar todos os atos, bem como assinar todo e qualquer documento, necessários para o registro do Contrato perante os Cartórios de Registro de Títulos e Documentos competentes e o INPI, nos termos das Cláusulas 2.1 e 2.2 acima;

(viii)   not to carry out any act with the purpose of reducing the value of the Transferred Assets and Assigned Rights;

(viii)   a não praticar atos com o propósito de diminuir o valor dos Bens Alienados e Direitos Cedidos;

(ix)     assist in what is necessary, as requested by the Brazilian Collateral Agent, acting on behalf of and for the benefit of the Purchaser, in case of any enforcement of the Fiduciary Lien hereof, and bear all related expenses or that are necessary for such purpose;

(ix)     auxiliar no que for preciso, conforme solicitado pelo Agente de Garantia Brasileiro, agindo em nome e benefício do Comprador, no caso de eventual excussão da presente Garantia Fiduciária, arcando com todas as despesas relacionadas ou que se fizerem necessárias para tal propósito;

(x)      assist, allow and use its best efforts to cause the Brazilian Collateral Agent to receive the proper registrations with the Brazilian monetary authorities, that the Brazilian Collateral Agent may request in order to facilitate the remittance abroad of

(x)      auxiliar, permitir e envidar seus melhores esforços para fazer com que o Agente de Garantia Brasileiro receba os devidos registros junto às autoridades monetárias brasileiras, que o Agente de Garantia Brasileiro venha a solicitar com o

20

any and all financial funds resulting from the enforcement of the guarantee created under this Agreement by the Brazilian Collateral Agent;

(xi)    comply with all clauses provided for in the Notes;

(xii)    notify the Brazilian Collateral Agent of any event which results in a breach of this Agreement or the Notes or in the inaccuracy of any representation made under this Agreement within two (2) Business Days of its occurrence;

(xiii)    to pay any current or future fine, penalty, interests or expenses, any contributions or other charges levied on the Transferred Assets and Assigned Rights that, in case of default in payment, may reasonably be expected to result in (a) a lien over the Transferred Assets and Assigned Rights, (b) a loss of ownership over the Transferred Assets and Assigned Rights or (c) a material adverse effect on the Transferred Assets and Assigned Rights;

(xiv)    not dispose of, assign, transfer, sell or lease the Transferred Assets and Assigned Rights, even if under suspensive condition, to any third party, including by means of a corporate reorganization that is not permitted according to the Notes;

(xv)    to keep the Transferred Assets and Assigned Rights in fully effectiveness and validity, paying all taxes, fees or other costs that may be required by the INPI or other relevant authorities, including maintaining

propósito de facilitar a remessa ao exterior de todos e quaisquer recursos financeiros resultantes da excussão da garantia constituída pelo presente Contrato pelo Agente de Garantia Brasileiro;

(xi)    cumprir com todas as cláusulas previstas nas Notas;

(xii)    notificar o Agente de Garantia Brasileiro sobre qualquer evento que resulte em violação deste Contrato ou das Notas ou em imprecisão de quaisquer das declarações feitas nos termos deste Contrato dentro de 2 (dois) Dias Úteis contados de sua ocorrência;

(xiii)    a pagar quaisquer multas, penalidades, juros ou despesas, presentes ou futuras, contribuições ou outros encargos incidentes sobre os Bens Alienados e Direitos Cedidos que, caso não sejam pagas, possam razoavelmente resultar (a) na constituição de um ônus ou gravame sobre os Bens Alienados e Direitos Cedidos, (b) na perda de propriedade dos Bens Alienados e Direitos Cedidos ou (c) em um efeito adverso relevante sobre os Bens Alienados e Direitos Cedidos;

(xiv)    não vender, alienar, ceder, transferir ou arrendar os Bens Alienados e Direitos Cedidos, ainda que sob condição suspensiva, a qualquer terceiro, inclusive por meio da realização de qualquer reorganização societária não permitida nos termos das Notas;

(xv)    manter os Bens Alienados e Direitos Cedidos plenamente válidos e eficazes, pagando todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou outras autoridades competentes, incluindo a

21

regular and effective use of the Transferred Assets and Assigned Rights for defense in cancellation due to non-use procedures;

(xvi)   not to execute nor authorize the execution of any agreement which could restrict or reduce the rights or the ability of the Secured Party and/or of the Brazilian Collateral Agent to sell or otherwise dispose of any one of the Transferred Assets and Assigned Rights, in part or in full;

(xvii)   not create or allow the creation of any liens, encumbrances and/or security interests over the Transferred Assets and Assigned Rights, even if under suspensive condition, except for this Fiduciary Lien or as permitted in Section 1.8 of this Agreement;

(xviii)  in case the INPI or other relevant authorities requests that any amendment are made to this Agreement, including the segregation of security over the Intellectual Property into different and individual instruments in order to conclude registration, the Company shall enter into any and all documents in order to comply with requirements made by the INPI or by such other relevant authorities;

(xix) to the extent that any additional registration becomes required for the perfection of this Fiduciary Lien (in addition to those provided for in Section II above), carry-out such registration as promptly as possible; and

(xx)   annually renew the Power of Attorney (as defined below) granted under Section 5.4 of this Agreement, with at least

---

manutenção do uso regular e efetivo dos Bens Alienados e Direitos Cedidos para defesa em procedimentos de caducidade;

(xvi)   a não celebrar nem autorizar a celebração de qualquer contrato que possa impedir ou restringir os direitos e/ou a capacidade da Parte Garantida e/ou do Agente de Garantia Brasileiro de vender, alienar ou de outra forma dispor de qualquer dos Bens Alienados e Direitos Cedidos, total ou parcialmente;

(xvii) não criar ou permitir a criação de quaisquer ônus, gravames e/ou garantias, judiciais ou extrajudiciais, sobre os Bens Alienados e Direitos Cedidos, ainda que sob condição suspensiva, exceto pela presente Garantia Fiduciária ou como previsto na Cláusula 1.8 deste Contrato;

(xviii)  caso o INPI ou outras autoridades competentes solicite que qualquer alteração seja feita a este Contrato, incluindo a segregação da garantia sobre a Propriedade Intelectual em instrumentos diferentes e individuais a fim de concluir o registro, a Companhia deverá celebrar todos e quaisquer documentos a fim de cumprir as exigências feitas pelo INPI ou por tais outras autoridades competentes;

(xix) caso qualquer registro adicional venha a ser requerido por lei para aperfeiçoamento da presente Garantia Fiduciária (além daqueles previstos na Cláusula II acima), realizar com a maior brevidade possível tal registro; e

(xx)   renovar, anualmente, a Procuração (conforme definida abaixo) outorgada nos termos da Cláusula 5.4 deste Contrato com

22

thirty (30) days prior to its expiration date, substantially in form of Exhibit II hereto.

4.2. The Company undertakes to and agrees that, in the event of enforcement or execution of this collateral, not to do, or cause or contribute to be done, any act or thing to (i) contest or in any way impair or harm any Transferred Assets and Assigned Rights; (ii) interfere with Secured Party and/or of the Brazilian Collateral Agent right to enforce, sell, explore or dispose of the Transferred Assets and Assigned Rights; (iii) diminish, demean, tarnish or dilute the value, distinctiveness, fame, enforceability, validity of, or goodwill associated with, the Transferred Assets and Assigned Rights; (iv) challenge the enforceability or the validity of the Transferred Assets and Assigned Rights , (v) use, explore, dispose, disclose, make available or publish any trade secret, know-how, source code or any kind of confidential information related to the Transferred Assets and Assigned Rights, or (vi) use or apply for any trademark registration or use any trade dress thar are identical or similar, in phonetical, graphical or ideological manner, to the Transferred Assets and Assigned Rights.

pelo menos 30 (trinta) dias de antecedência do seu vencimento, substancialmente na forma do Anexo II deste Contrato.

4.2. A Companhia se obriga e concorda que, em caso de excussão ou execução desta garantia, não fará, ou causará ou contribuirá para ser feito, qualquer ato ou coisa para (i) contestar ou de qualquer forma prejudicar ou danificar quaisquer Bens Alienados e Direitos Cedidos; (ii) interferir no direito da Parte Garantida e/ou do Agente de Garantia Brasileiro de fazer valer, vender, explorar ou alienar os Bens Alienados e Direitos Cedidos; (iii) diminuir, rebaixar, manchar ou diluir o valor, distintividade, fama, exequibilidade, validade ou *goodwill* associado aos Bens Alienados e Direitos Cedidos; (iv) contestar a exequibilidade ou a validade dos direitos dos Bens Alienados e Direitos Cedidos, (v) usar, explorar, dispor, divulgar, disponibilizar ou publicar qualquer segredo comercial, know-how, código fonte ou qualquer tipo de informação confidencial relacionada aos Bens Alienados e Direitos Cedidos, ou (vi) usar ou solicitar qualquer registro de marca ou usar qualquer identidade visual que seja idêntica ou semelhante, fonética, gráfica ou ideologicamente, aos Bens Alienados e Direitos Cedidos.

## SECTION V
## FORECLOSURE

## CLÁUSULA V
## EXCUSSÃO

5.1.    In the event of acceleration of the Secured Obligations under the terms of the Notes, the Brazilian Collateral Agent, acting on behalf of and for the benefit and in accordance with the instructions of the Purchaser, in compliance with this Agreement and the Notes, shall be entitled,

5.1.    Em caso de vencimento antecipado das Obrigações Garantidas, nos termos das Notas, o Agente de Garantia Brasileiro, agindo em nome e benefício e conforme instruções do Comprador, em observância a este Contrato e às Notas, terá o direito de, sem prejuízo de qualquer outra garantia

23

notwithstanding any other security granted and provided under the Notes, exercise all powers related to the Transferred Assets and Assigned Rights and the Fiduciary Lien created under this Agreement, secured by the applicable law and necessary for the disposal, liquidation or sale, judicial or extrajudicial, at its own discretion, of the Transferred Assets and Assigned Rights; give release and sign any document or instrument, regardless of its special nature, as necessary to enforce the acts mentioned herein, regardless of auction, public auction, prior evaluation or any judicial or extrajudicial measure, or any authorization by the Company or prior written notice to the Company. The amounts resulting from such measures shall be used by the Brazilian Collateral Agent for the payment of the Secured Obligations, the taxes levied on the operations necessary for the removal or enforcement, including foreign exchange expenses and reasonable expenses resulting from the disposal of the Transferred Assets and Assigned Rights, and the Brazilian Collateral Agent shall deliver to the Company the outstanding balance, if any, following, in any case, the provisions of this Agreement and the Notes.

5.1.1 The Brazilian Collateral Agent, acting on behalf and for the benefit and in accordance with the instructions of the Secured Party, is authorized to remit the proceeds from the sale of the Transferred Assets and Assigned Rights by any means authorized by the Central Bank of Brazil (or other competent authority) elected or deemed by the Brazilian Collateral Agent to be legal and/or valid. If requested or instructed by the Brazilian Collateral Agent, acting on behalf of and for the benefit and in accordance with

outorgada e prestada nos termos das Notas, exercer todos os poderes relativos aos Bens Alienados e Direitos Cedidos e a Garantia Fiduciária constituída neste Contrato, assegurados pela lei aplicável e necessários à alienação, liquidação ou venda, judicial ou extrajudicial, a seu próprio critério, dos Bens Alienados e Direitos Cedidos; dar quitação e assinar qualquer documento ou instrumento, independentemente de sua natureza especial, conforme se faça necessário para fazer valer os atos aqui mencionados, independentemente de leilão, hasta pública, avaliação prévia ou qualquer medida judicial ou extrajudicial, ou de qualquer autorização da Companhia ou aviso prévio por escrito à Companhia. As verbas resultantes de tais providências deverão ser utilizadas pelo Agente de Garantia Brasileiro para pagamento das Obrigações Garantidas, dos tributos incidentes sobre as operações necessárias à excussão ou execução, incluindo despesas de câmbio e despesas razoáveis resultantes da alienação dos Bens Alienados e Direitos Cedidos, devendo o Agente de Garantia Brasileiro entregar à Companhia o saldo remanescente, se houver, observando, em todo caso, as disposições deste Contrato e das Notas.

5.1.1 O Agente de Garantia Brasileiro, agindo em nome e benefício e conforme instruções da Parte Garantida, está autorizado a providenciar a remessa dos recursos oriundos da venda dos Bens Alienados e Direitos Cedidos por quaisquer meios autorizados pelo Banco Central do Brasil (ou outra autoridade competente) que o Agente de Garantia Brasileiro entenda ser legal e/ou válido. Caso necessário ou instruído pelo Agente de Garantia Brasileiro, agindo em nome e benefício e conforme instruções da

24

the instructions of the Secured Party, the Company shall promptly collaborate for such remittance to occur, as well as follow solely and exclusively instructions from the Brazilian Collateral Agent to sign any and all documents and contracts, including without limitation any foreign exchange contract, for purposes of remittance abroad of financial resources originated from the sale of the Transferred Assets and Assigned Rights, according to the terms and limits of this Agreement.

5.2.    If the amount received by the Brazilian Collateral Agent, in strict compliance with the Notes, on behalf of and for the benefit of the Secured Party, resulting from the sale of the Transferred Assets and Assigned Rights, is not sufficient to pay all the Secured Obligations, the outstanding balance shall be paid in accordance with the provisions of the Notes.

5.3.    With respect to Section 5.1 above, in the event of enforcement or execution of this Agreement, the Company shall cause the direct possession of the Transferred Assets and Assigned Rights to be transferred to the Secured Party, represented by the Brazilian Collateral Agent, if so requested by the Brazilian Collateral Agent, as instructed by the Purchaser.

5.4.    The Company hereby irrevocably and irreversibly grants to the Brazilian Collateral Agent, pursuant to articles 653, 654, 684, 685 and 686, sole paragraph of the Brazilian Civil Code, a power of attorney, pursuant to Exhibit II to this Agreement ("Power of Attorney"), to act on behalf of the Company, as a condition of the transaction set forth in this Agreement, including,

Parte Garantida, a Companhia obriga-se a prontamente colaborar para que tal remessa seja realizada, bem como acatar única e exclusivamente instruções do Agente de Garantia Brasileiro para assinar quaisquer contratos e documentos, incluindo, sem limitação, eventuais contratos de câmbio necessários para fins de remessa ao exterior de recursos financeiros oriundos da venda dos Bens Alienados e Direitos Cedidos, de acordo com os termos e limites deste Contrato.

5.2.    Se o montante recebido pelo Agente de Garantia Brasileiro, em estrita observância às Notas, em nome e benefício da Parte Garantida, resultante da alienação dos Bens Alienados e Direitos Cedidos, não for suficiente para pagamento da totalidade das Obrigações Garantidas, o saldo devedor em aberto deverá ser pago de acordo com as disposições das Notas.

5.3.    Com relação à Cláusula 5.1 acima, a Companhia fará com que seja transferida, em caso de excussão ou execução desta garantia, a posse direta dos Bens Alienados e Direitos Cedidos para a Parte Garantida, representadas pelo Agente de Garantia Brasileiro, se assim solicitado pelo Agente de Garantia Brasileiro, conforme instruído pelo Comprador.

5.4.    A Companhia, neste ato, outorga, de forma irrevogável e irretratável, ao Agente de Garantia Brasileiro, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único do Código Civil Brasileiro, a procuração, nos termos do Anexo II a este Contrato ("Procuração"), para atuar em nome da Companhia, como condição da operação prevista neste Contrato, inclusive, sem se

25

without limitation, as provided for in Section 5.1 above, and in the signature of the respective exchange agreement necessary for the remittance of any and all financial funds, resulting from the sale of the Transferred Assets and Assigned Rights, due by the Company to the Secured Party. The Company hereby acknowledges and agrees that the Brazilian Collateral Agent shall, upon the acceleration of the Secured Obligations, on behalf of the Company, sign instruments for the assignment or transfer any Transferred Assets and Assigned Rights , directly with any third party assignee or buyer, as well as representing the Company before the INPI and/or any other competent governmental authority or body for any formalization purposes, registration and/or perfection of such assignment or transfer.

limitar a, conforme disposto na Cláusula 5.1 acima, e na assinatura dos respectivos contratos de câmbio necessários para a remessa de todos e quaisquer recursos financeiros, resultantes da alienação dos Bens Alienados e Direitos Cedidos, devidos pela Companhia à Parte Garantida. A Companhia reconhece e concorda que o Agente de Garantia Brasileiro poderá, mediante a declaração de um vencimento antecipado das Obrigações Garantidas, em nome da Companhia, assinar instrumentos de venda e cessão, tendo por objeto qualquer dos Bens Alienados e Direitos Cedidos, diretamente com qualquer terceiro comprador ou cessionário, bem como representar a Companhia perante o INPI e/ou qualquer outra autoridade ou órgão governamental competente para fins de qualquer formalização, averbação e aperfeiçoamento de tal cessão ou transferência.

5.4.1    While this Agreement is in force and until the full and complete performance of the Secured Obligations, the Power of Attorney shall be renewed annually by the Company with at least thirty (30) days prior to its expiration date.

5.4.1    Enquanto este Contrato estiver em vigor e até o pagamento total das Obrigações Garantidas, a Procuração deverá ser renovada anualmente pela Companhia com pelo menos 30 (trinta) dias de antecedência da data de seu vencimento.

5.5.    For the purposes of the enforcement of the Fiduciary Lien created hereunder, it is agreed between the Parties that the Brazilian Collateral Agent has been appointed by the Purchaser as the Brazilian collateral agent in accordance with the provisions of the Notes, under which the Brazilian Collateral Agent is authorized to represent the Secured Party, on its behalf and interest, in court and out-of-court.

5.5.    Para fins de excussão da Garantia Fiduciária constituída pelo presente Contrato, as Partes concordam que o Agente de Garantia Brasileiro foi nomeado pelo Comprador como agente de garantia brasileiro conforme as disposições das Notas, nos termos dos quais o Agente de Garantia Brasileiro está autorizado a representar a Parte Garantida, em seu nome e interesse, judicial ou extrajudicialmente.

5.6. The Fiduciary Lien created by this Agreement shall be cumulative, in addition to, and independent of, every other security interest created in relation to the Secured Obligations.

5.7. The Company and GLAI hereby waive any rights and legal or contractual privileges which may affect the validity, effectiveness, enforceability and full transfer of the Transferred Assets and Assigned Rights in the event of foreclosure.

5.8. Company undertakes to reimburse or pay in advance the Brazilian Collateral Agent, no later than five (5) Business Days as of the receipt of the relevant reimbursement or payment in advance request, for all necessary and reasonably costs and expenses (including expenses and fees of counsel) incurred or to be incurred by the Brazilian Collateral Agent for matters and issues in connection with the provisions of this Section V hereto.

5.6. A Garantia Fiduciária criada por este Contrato será cumulativa, somando-se a, e independente de qualquer outra garantia criada em relação às Obrigações Garantidas.

5.7. A Companhia e a GLAI neste ato renunciam a quaisquer direitos e privilégios, legais ou contratuais, que possam afetar a validade, efetividade, aplicabilidade e transferência total dos Bens Alienados e Direitos Cedidos em caso de excussão.

5.8. A Companhia se compromete a reembolsar ou pagar adiantado ao Agente de Garantia Brasileiro, em até 5 (cinco) Dias Úteis contados do recebimento do pedido de reembolso ou pagamento adiantado, por todos os custos e despesas (inclusive despesas e honorários advocatícios) necessários e razoáveis incorridos ou a serem incorridos pelo Agente de Garantia Brasileiro, para matérias e questões relacionadas ao disposto nesta Cláusula V deste Contrato.

## SECTION VI
### COSTS AND EXPENSES

## CLÁUSULA VI
### CUSTOS E DESPESAS

6.1. The Company undertakes to pay all notarial and registration fees triggered by this Agreement, as well as all taxes, fees or other costs that may be required by INPI or any other competent authority to keep the Fiduciary Lien the Intellectual Property and the other Transferred Assets and Assigned Rights in full effect and validity.

6.1. A Companhia se obriga a pagar todas as taxas notariais e de registro desencadeadas por este Contrato, bem como todos os impostos, taxas ou outros custos que possam ser exigidos pelo INPI ou qualquer outra autoridade competente para manter a Garantia Fiduciária a Propriedade Intelectual e os demais Bens Alienados e Direitos Cedidos plenamente vigentes e válidos.

6.2. All expenses incurred by the Brazilian Collateral Agent, acting on behalf and for the benefit of the Purchaser under this Agreement, including those related to the sale/negotiation of Transferred Assets and Assigned Rights, for payment of reasonable commissions or fees and any expenses incurred with remittances, exchange, taxes, as well as the expenses required for protection and regularization of its credit and guarantees, including, as applicable, the registration of this Agreement with the competent registry offices ("Expenses") will be solely and exclusively borne by the Company, and the Company undertakes to transfer to the Brazilian Collateral Agent all reasonable amounts that may be disbursed under this Agreement or the Secured Obligations within five (5) days in advance. The Brazilian Collateral Agent shall not be liable for failure to comply with any measure mentioned in this Section if the Company does not timely perform the transfer of the amounts mentioned herein.

6.3. The remuneration of the Brazilian Collateral Agent shall be paid by the Company in accordance with the terms of the Notes and the proposal for the collateral agent services provisions to be executed.

6.4. The Brazilian Collateral Agent may refuse to perform any duty or exercise any right or power, as well as indemnity or guarantee to its satisfaction against the costs, expenses and obligations he may incur in performing such duty or exercising such right or power. Such costs or expenses incurred shall be fully borne by the Company.

6.2. Todas as despesas incorridas pelo Agente de Garantia Brasileiro, agindo em nome e benefício do Comprador, nos termos do presente Contrato, inclusive relativas à venda/negociação dos Bens Alienados e Direitos Cedidos, para pagamento de comissões ou honorários razoáveis e qualquer despesa incorrida com remessas, câmbio, tributos, bem como as despesas exigidas para proteção e regularização do seu crédito e garantias, inclusive, conforme aplicável, o registro do presente Contrato nos registros competentes ("Despesas"), serão de total e exclusiva responsabilidade da Companhia, que se compromete a transferir ao Agente de Garantia Brasileiro todos os valores razoáveis que poderão vir a ser desembolsados em função do presente Contrato ou das Obrigações Garantidas, com 5 (cinco) dias de antecedência. O Agente de Garantia Brasileiro não será responsável pela falha no cumprimento de qualquer medida mencionada nesta Cláusula caso a Companhia não realize tempestivamente a transferência dos valores aqui mencionados.

6.3. A remuneração do Agente de Garantia Brasileiro será paga pela Companhia conforme os termos das Notas e da proposta para prestação de serviços de agente de garantia a ser celebrada.

6.4. O Agente de Garantia Brasileiro poderá se recusar a cumprir qualquer dever ou exercer qualquer direito ou poder, bem como indenização ou garantia que lhe seja satisfatória contra os custos, despesas e obrigações em que possa incorrer no cumprimento do referido dever ou exercício do referido direito ou referido poder. Tais custos ou despesas incorridos serão de plena responsabilidade da Companhia.

28

## SECTION VII
## BRAZILIAN COLLATERAL AGENT

7.1. The Brazilian Collateral Agent has been appointed, in accordance with the Notes, by the Purchaser and is authorized to perform acts on behalf of the Secured Party and to exercise the powers delegated to it herein, and in conjunction with such acts and powers as are reasonably inherent therein, including, without limitation, the signature and delivery of the Transaction Documents to which the Brazilian Collateral Agent is a party, and the performance of its obligations as expressly set forth in this Agreement.

7.2. The Brazilian Collateral Agent shall have no duties or obligations except those expressly set forth in this Agreement, and no duty, liability or obligation shall be inferred or implied against the Brazilian Collateral Agent. Without limiting the generality of the foregoing provision, (a) the Brazilian Collateral Agent shall not be subject to any fiduciary or other implied duty, regardless of whether an Event of Default has occurred and persists, (b) the Brazilian Collateral Agent shall have no duty to perform any discretionary act or exercise any discretionary powers (by consent, designation, specification, requirement or approval, notice, request or other communication, or other instruction given or act to be performed or to be (or not) suffered or omitted by the Brazilian Collateral Agent, or any option, decision, opinion, acceptance, exercise of judgment, expression of satisfaction or other discretionary exercise, rights or remedies to be exercised (or not) by the Brazilian Collateral Agent), (c) except as

## CLÁUSULA VII
## AGENTE DE GARANTIA BRASILEIRO

7.1. O Agente de Garantia Brasileiro foi nomeado, de acordo com os termos das Notas, pelo Comprador e está autorizado a praticar atos em nome da Parte Garantida e a exercer os poderes que aqui lhe são delegados, e em conjunto com tais atos e poderes que lhes forem razoavelmente inerentes, incluindo, sem se limitar a, a assinatura e entrega dos Documentos da Transação dos quais o Agente de Garantia Brasileiro é parte, e o cumprimento de suas obrigações conforme expressamente estabelecido nesse Contrato.

7.2. O Agente de Garantia Brasileiro não terá quaisquer deveres ou obrigações, exceto por aqueles expressamente previstos neste Contrato, e nenhum dever, responsabilidade ou obrigação será inferido ou estará implícito contra o Agente de Garantia Brasileiro. Sem limitar a generalidade da disposição acima, (a) o Agente de Garantia Brasileiro não estará sujeito a nenhum dever fiduciário ou outro dever implícito, independentemente de um Evento de Inadimplemento ter ocorrido e persistir, (b) o Agente de Garantia Brasileiro não terá qualquer dever de praticar qualquer ato discricionário ou de exercer quaisquer poderes discricionários (por consentimento, designação, especificação, exigência ou aprovação, notificação, solicitação ou outra comunicação, ou outra instrução dada ou ato a ser praticado ou a ser (ou não) sofrido ou omitido pelo Agente de Garantia Brasileiro, ou a qualquer opção, decisão, opinião, aceitação, exercício de julgamento, expressão de satisfação ou outro exercício discricionário, direitos ou remédios a serem

29

expressly provided for in this Agreement, the Brazilian Collateral Agent shall have no duty to disclose, and shall not be liable for the non-disclosure of, any information concerning the Company, GLAI and/or the Issuers or any of their subsidiaries which is communicated to or obtained by the Brazilian Collateral Agent or any of its affiliates in any capacity, and (d) the Brazilian Collateral Agent shall not be obligated to perform any act which, in its opinion or in the opinion of its attorney, may expose the Brazilian Collateral Agent to liability or otherwise contrary to any Transaction Document or applicable law, including, for the avoidance of doubt, any act that may be in violation of automatic suspension under any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect or that may cause the Company's assets to lapse, change or be closed in violation of any bankruptcy, insolvency, judicial or extrajudicial reorganization, judicial liquidation or similar federal, state or foreign law, current or thereafter in effect. The Brazilian Collateral Agent shall not be liable for any act performed or not performed by him with the consent or at the request of the Purchaser or in the absence of his own gross negligence, or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment. The Brazilian Collateral Agent shall not be deemed to have knowledge of any Event of Default, unless and until the respective written notice is delivered to the Brazilian Collateral Agent by the Purchaser, and the Brazilian Collateral Agent shall not be liable for or have any duty to prove or investigate (i) any representation or warranty provided in or with respect to this

exercidos (ou não) pelo Agente de Garantia Brasileiro), (c) exceto conforme expressamente previsto neste Contrato, o Agente de Garantia Brasileiro não terá qualquer dever de divulgar, e não será responsável pela não divulgação de, quaisquer informações referentes à Companhia, à GLAI e/ou às Emissoras ou a quaisquer de suas subsidiárias que sejam comunicadas ou obtidas pelo Agente de Garantia Brasileiro ou por quaisquer de suas afiliadas em qualquer qualidade, e (d) o Agente de Garantia Brasileiro não será obrigado a praticar qualquer ato que, em sua opinião ou na opinião de seu advogado, possa expor o Agente de Garantia Brasileiro a responsabilidade ou que seja contrário a qualquer Documento da Transação ou legislação aplicável, inclusive, para que não haja dúvidas, qualquer ato que possa estar em violação da suspensão automática segundo qualquer lei de falência, insolvência, recuperação judicial ou extrajudicial, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor ou que possa causar uma caducidade, alteração ou encerramento de bens da Companhia em violação de qualquer lei de falência, insolvência, recuperação judicial ou extrajudicial, liquidação judicial ou lei similar, federal, estadual ou estrangeira, atual ou posteriormente em vigor. O Agente de Garantia Brasileiro não será responsável por qualquer ato praticado ou não praticado por ele com o consentimento ou mediante a solicitação do Comprador ou na ausência de sua própria negligência grave ou conduta dolosa, conforme sentença judicial transitada em julgado proferida por um juízo competente. O Agente de Garantia Brasileiro não será considerado como tendo

30

Agreement and the Notes, (ii) the contents of any certificate, report or other document delivered under or with respect to this Agreement, (iii) the performance or fulfillment of any of the obligations, agreements or other terms or conditions set forth in this Agreement, (iv) the validity, enforceability, efficacy or authenticity of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in this Agreement or in the Notes, except in the event of not receiving in a timely manner any document that should have been delivered to the Brazilian Collateral Agent .

conhecimento de nenhum Evento de Inadimplemento, a menos e até que a respectiva notificação por escrito seja entregue ao Agente de Garantia Brasileiro pelo Comprador, e o Agente de Garantia Brasileiro não será responsável nem terá qualquer dever de comprovar ou investigar (i) qualquer declaração ou garantia prestada em ou com relação a este Contrato e às Notas, (ii) o conteúdo de qualquer certificado, relatório ou outro documento entregue segundo este Contrato ou com relação a ele, (iii) o cumprimento ou observância de quaisquer das obrigações, acordos ou outros termos ou condições estabelecidos neste Contrato, (iv) a validade, exequibilidade, eficácia ou autenticidade deste Contrato ou de qualquer outro contrato, instrumento ou documento, ou (v) a satisfação de qualquer condição prevista neste Contrato ou nas Notas, exceto no caso de não receber tempestivamente qualquer documento que deveria ter sido entregue ao Agente de Garantia Brasileiro.

7.3.    The Brazilian Collateral Agent shall have the right to rely on, and shall not incur any liability for, any notification, request, certificate, consent, representation, instrument, document or other paper considered by him to be authentic and having been signed or sent by a competent Person (as defined in the Notes). The Brazilian Collateral Agent may also rely on any statement given to him verbally or by telephone and deemed to have been given by the competent Person, and shall not incur any liability for it. The Brazilian Collateral Agent may consult a lawyer, independent auditors and other experts chosen by him, at the Company's expense, and shall not be liable for any act performed or not performed by

7.3.    O Agente de Garantia Brasileiro terá o direito de se basear, e não incorrerá qualquer responsabilidade por isso, em qualquer notificação, solicitação, certificado, consentimento, declaração, instrumento, documento ou outro escrito considerado por ele como sendo autêntico e tendo sido assinado ou enviado por uma Pessoa competente (conforme definido nas Notas). O Agente de Garantia Brasileiro também poderá se basear em qualquer declaração prestada a ele verbalmente ou por telefone e considerada como tendo sido prestada pela Pessoa competente, e não incorrerá qualquer responsabilidade por isso. O Agente de Garantia Brasileiro poderá consultar advogado, auditores independentes e outros

31

him in accordance with the advice of any said lawyer, auditor or expert.

especialistas escolhidos por ele, às expensas da Companhia, e não será responsável por qualquer ato praticado ou não praticado por ele de acordo com a assessoria de qualquer referido advogado, auditor ou especialista.

7.4.    The Brazilian Collateral Agent may fulfill any and all of his duties and exercise his rights and powers by or through any one or more subagents appointed by him. The Brazilian Collateral Agent and any subagent may fulfill any and all of their duties and exercise their rights and powers through their related parties.

7.4.    O Agente de Garantia Brasileiro poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por ou por meio de qualquer um ou mais subagentes nomeados por ele. O Agente de Garantia Brasileiro e qualquer subagente poderá cumprir todos e quaisquer de seus deveres e exercer seus direitos e poderes por meio de suas partes relacionadas.

7.5.    The Brazilian Collateral Agent shall not be liable and makes no representation as to the existence, authenticity, value or protection of this Agreement and the security provided under this Agreement, for the legality, effectiveness or sufficiency of this Agreement nor for the creation, formalization, ranking, sufficiency or protection of any liens constituted under this Agreement. For the avoidance of doubt, no provision in this Agreement shall require the Brazilian Collateral Agent to provide or file any financing statements or continuation statements, or to be responsible for maintaining the security to be created as described in this Agreement (except the custody of the any security provided under this Agreement in its possession and the accounting for cash values actually received by it under this Agreement or any other Transaction Document) and such responsibility shall be in charge exclusively of the Company. The Brazilian Collateral Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Transferred Assets and Assigned Rights in its possession, if applicable, shall be to deal with

7.5.    O Agente de Garantia Brasileiro não será responsável e não presta qualquer declaração quanto à existência, autenticidade, valor ou proteção deste Contrato e da garantia prestada segundo este Contrato, pela legalidade, eficácia ou suficiência deste Contrato nem pela criação, formalização, prioridade, suficiência ou proteção de quaisquer gravames constituídos segundo este Contrato. Para que não haja dúvidas, nenhuma disposição neste Contrato exigirá que o Agente de Garantia Brasileiro apresente ou arquive declarações de financiamento ou declarações de continuação, ou que seja responsável por manter a garantia a ser constituída conforme descrito neste Contrato (exceto a custódia da garantia prestada segundo este Contrato em seu poder e a contabilidade de valores em dinheiro efetivamente recebidos por ele segundo este Contrato ou qualquer outro Documento da Transação) e essa responsabilidade será exclusivamente da Companhia. O único dever do Agente de Garantia Brasileiro com relação à custódia, guarda e preservação física dos Bens Transferidos e Direitos Cedidos em sua

it in the same manner as the Brazilian Collateral Agent deals with similar property for the account of other customers in similar transactions. The Brazilian Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of its rights and powers.

7.6.    In order to effect the transfer of any amounts received as a result of the enforcement of this Agreement, the Brazilian Collateral Agent may perform a foreign exchange transaction to convert into dollars any amount in Brazilian *reais*, resulting from such enforcement; except that possible deductions of any commissions or taxes charged such foreign exchange transactions and/or any other withholding or charge levied on the corresponding payments may be applicable, and upon such deductions, the Brazilian Collateral Agent will transfer the amounts in dollars according to the instructions provided by the Purchaser. The Brazilian Collateral Agent (a) will only be obliged to perform any foreign exchange transaction as of the 2nd (second) Business Day after the Business Day on which the Brazilian Collateral Agent receives the applicable instructions and documents to perform such foreign exchange transaction; and (b) will not undertake to perform any foreign exchange transaction or transfer of funds, unless the Brazilian Collateral Agent has received (i) all documents and information deemed necessary for the remittance of funds in accordance with applicable foreign exchange regulations; and (ii) the payment of the respective commissions, fees and expenses. The Brazilian Collateral Agent shall not be liable for any losses or damages resulting from

posse, se aplicável, será tratá-los da mesma forma que o Agente de Garantia Brasileiro lida com bens similares como representante de outros clientes em transações semelhantes. O Agente de Garantia Brasileiro responderá apenas pelos valores que efetivamente receber em decorrência do exercício de seus direitos e poderes.

7.6.    A fim de realizar a transferência de quaisquer valores recebidos em decorrência da excussão deste Contrato, o Agente de Garantia Brasileiro poderá realizar uma operação de câmbio para converter em dólares qualquer valor em reais decorrente da referida excussão; ressalvado que possíveis deduções de quaisquer comissões ou tributos cobrados sobre as operações de câmbio e/ou qualquer outra retenção ou encargo cobrado sobre os pagamentos correspondentes poderão ser aplicáveis, e mediante tais deduções, o Agente de Garantia Brasileiro transferirá os valores em dólares de acordo com as instruções fornecidas pelo Comprador. O Agente de Garantia Brasileiro (a) somente será obrigado a realizar qualquer operação de câmbio a partir do 2° (segundo) Dia Útil após o Dia Útil em que o Agente de Garantia Brasileiro receber as instruções e documentos aplicáveis para realizar referida operação de câmbio; e (b) não assumirá a obrigação de realizar qualquer operação de câmbio ou transferir fundos, a menos que o Agente de Garantia Brasileiro tenha recebido (i) todos os documentos e informações considerados necessários para a remessa de fundos, de acordo com a regulamentação de câmbio aplicável; e (ii) o pagamento das respectivas comissões, honorários e despesas. O Agente de Garantia Brasileiro não será responsável por quaisquer perdas decorrentes de possíveis atrasos ou

33

possible delays or impediments to the performance of a foreign exchange transaction and/or transfer, nor as the impossibility to perform a foreign exchange transaction or transfer. The Brazilian Collateral Agent shall not assume any liability to the Parties or any other person with respect to the performance of a foreign exchange transaction and the rates related to any foreign exchange transaction to be performed with respect to this Agreement or with respect to the transfer of any funds as a result hereof.

7.7.    The Brazilian Collateral Agent shall not be obligated to spend or put at risk any own funds or otherwise incur any obligation, financial or otherwise, in performing its duties under this Agreement or under the Transaction Documents.

7.8.    In no event the Brazilian Collateral Agent shall be liable for special, indirect, punitive or unforeseen loss or damage of any nature (including lost profits) regardless of whether the Brazilian Collateral Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.9.    The Brazilian Collateral Agent shall not incur any obligation for failure to perform any act or to perform any duty, obligation or liability under this Agreement by reason of any occurrence beyond its control (including any act or provision of any current or future law, regulation, governmental authorization, any acts of God or war, civil conflict, local or national disturbance or disaster, any act of terrorism or the unavailability of an electronic or mechanical transfer or other

impedimentos à realização de uma operação de câmbio e/ou transferências, nem como a impossibilidade de realizar um fechamento de câmbio ou uma transferência. O Agente de Garantia Brasileiro não assumirá qualquer responsabilidade perante as Partes ou qualquer outra pessoa com relação ao fechamento de câmbio e às taxas relacionadas a qualquer operação de câmbio a ser realizada com relação a este Contrato ou a qualquer transferência de quaisquer fundos como resultado desse Contrato.

7.7.    O Agente de Garantia Brasileiro não será obrigado a despender ou pôr em risco qualquer fundo próprio ou, de outra maneira, a incorrer em qualquer obrigação, financeira ou de outra natureza, no cumprimento de seus deveres segundo este Contrato ou segundo os Documentos da Transação.

7.8.    Em hipótese alguma o Agente de Garantia Brasileiro será responsável por perda ou dano especial, indireto, punitivo ou imprevisto de qualquer natureza (inclusive lucros cessantes), independentemente de o Agente de Garantia Brasileiro ter sido informado da probabilidade dessa perda ou dano e independentemente da forma de ação.

7.9.    O Agente de Garantia Brasileiro não incorrerá qualquer obrigação por não praticar qualquer ato ou não cumprir qualquer dever, obrigação ou responsabilidade segundo este Contrato em razão de qualquer ocorrência fora de seu controle (inclusive qualquer ato ou disposição de qualquer atual ou futura lei, regulamento, autorização governamental, qualquer caso fortuito ou guerra, conflito civil, distúrbio local ou nacional ou desastre, qualquer ato de terrorismo ou a

34

transfer or communication resource from the Federal Reserve or the Central Bank of Brazil).

7.10.    The Brazilian Collateral Agent shall have the right, unilaterally and without notice, to withdraw or fail to comply with any obligation that may result in a violation of sanctions imposed by the United States of America, the European Union, local embargo laws and the Brazilian Collateral Agent's internal policies with respect to embargoes ("Embargo Rules"). Violation of the Embargo Rules includes, among others, receiving or transferring funds to any legal entity, country or individual named on the Specially Designated Citizens List of the Office of Foreign Assets Control – OFAC or controlled by legal entities, countries or individuals on that list. The Parties expressly agree that the Brazilian Collateral Agent shall not be liable for the failure to effect and/or delay in the receipt or payment of any amount under the conditions described in this Section 7.10.

7.11.    Any and all payments by the Issuers, the Company and/or GLAI to or for the benefit of the Brazilian Collateral Agent under this Agreement or any other Transaction Document shall be made free and clear, and without deduction, of any taxes, expenses or withholdings of any nature levied by the Brazilian government and/or any of its departments ("Deductions"). If any Deductions apply to any payment, the Issuers, the Company and/or GLAI, as the case may be, will immediately pay to the account indicated by the Brazilian Collateral

indisponibilidade de recurso de transferência eletrônica ou mecânica ou outro recurso de transferência ou de comunicação do Federal Reserve ou do Banco Central do Brasil).

7.10.    O Agente de Garantia Brasileiro terá o direito de, unilateralmente e sem aviso prévio, retirar-se ou não cumprir qualquer obrigação que possa resultar em violação de sanções impostas pelos Estados Unidos da América, pela União Europeia, por leis de embargo locais e por políticas internas do Agente de Garantia Brasileiro com relação a embargos ("Normas de Embargo"). Violação às Normas de Embargo inclui, entre outros, receber ou transferir recursos a qualquer pessoa jurídica, país ou pessoa física indicada na lista de cidadãos especialmente designados do Escritório de Controle de Ativos Estrangeiros – OFAC ou controlados por pessoas jurídicas, países ou pessoas físicas que façam parte dessa lista. As Partes acordam expressamente que o Agente de Garantia Brasileiro não será responsável pela não efetuação e/ou pelo atraso no recebimento ou no pagamento de qualquer valor sob as condições descritas nesta Cláusula 7.10.

7.11.    Todos e quaisquer pagamentos pelas Emissoras, pela Companhia e/ou pela GLAI para ou em benefício do Agente de Garantia Brasileiro sob este Contrato ou qualquer outro Documento da Transação serão efetuados livres e desembaraçados, e sem dedução, de quaisquer impostos, despesas ou retenções de qualquer natureza cobrados pelo governo brasileiro e/ou por quaisquer de seus departamentos ("Deduções"). Se quaisquer Deduções se aplicarem a qualquer pagamento, as Emissoras, a Companhia e/ou a GLAI, conforme o caso, pagará

35

Agent the additional amount necessary for the amount paid to the Brazilian Collateral Agent to be equal to the amount it would have received without the applicable Deductions.

7.12.    The exclusionary provisions of the preceding paragraphs shall apply to any subagents and affiliates and their respective directors, officers, member partners, employees, agents and advisors of the Brazilian Collateral Agent, and shall apply to their respective activities with respect to the Notes.

7.13.    For the avoidance of doubt, the Company acknowledges and agrees that the Brazilian Collateral Agent will only act under this Agreement or under any other Transaction Document to which it is a party, as expressly provided for in this Agreement and in the applicable Transaction Document or upon instructions or directions of the Purchaser.

7.14.    Upon at least thirty (30) days' notice, the Brazilian Collateral Agent may resign at any time as Brazilian Collateral Agent under this Agreement and the other Transaction Documents by notifying the Purchaser and the Company. Upon any resignation by the Brazilian Collateral Agent, any obligor under the Notes shall have the right (provided that no Event of Default has occurred and continues), to appoint a successor collateral agent or, if an Event of Default has occurred and is continuing, the Purchaser shall have the right to appoint a successor collateral agent. If no successor has been so appointed and has accepted such appointment within thirty (30) days after the date the Brazilian

imediatamente, à conta indicada pelo Agente de Garantia Brasileiro, o valor adicional necessário para que o valor pago ao Agente de Garantia Brasileiro seja igual ao valor que ele teria recebido sem as Deduções aplicáveis.

7.12.    As disposições excludentes dos parágrafos anteriores serão aplicáveis a quaisquer subagentes e às afiliadas e respectivos conselheiros, diretores, sócios membros, funcionários, agentes e assessores do Agente de Garantia Brasileiro, e serão aplicáveis às suas respectivas atividades com relação às Notas.

7.13.    Para que não haja dúvidas, a Companhia reconhece e concorda que o Agente de Garantia Brasileiro somente atuará segundo este Contrato ou segundo qualquer outro Documento da Transação do qual ele seja uma parte, conforme expressamente previsto neste Contrato e no Documento da Transação aplicável ou mediante instruções ou direcionamentos do Comprador.

7.14.    Com pelo menos 30 (trinta) dias de antecedência, o Agente de Garantia Brasileiro poderá renunciar a qualquer momento como Agente de Garantia Brasileiro de acordo com este Contrato e com outros Documentos da Transação notificando o Comprador e a Companhia. Mediante qualquer renúncia pelo Agente de Garantia Brasileiro, qualquer devedor das Notas terá o direito de (desde que nenhum Evento de Inadimplemento tenha ocorrido e continue), nomear um agente sucessor ou, se um Evento de Inadimplemento tiver ocorrido e continuando, o Comprador terá o direito de nomear um agente de garantia sucessor. Se nenhum agente de garantia brasileiro

36

Collateral Agent gives notice of its resignation, then the resigning Brazilian Collateral Agent may (but shall not be obligated to) (a) upon consent (provided that no Event of Default or Default has occurred and continues) of the Company (consent of which shall not be unreasonably withheld or delayed), at the cost and expense of the Company, appoint a successor collateral agent or (b) petition any court of competent jurisdiction, at the cost and expense of the Company, for the appointment of a successor collateral agent. Whether or not a successor has been appointed, the Brazilian Collateral Agent's resignation shall become effective in accordance with the Brazilian Collateral Agent's notice of resignation on the date specified in such notice, and the resigning Brazilian Collateral Agent will be released from its duties and obligations under this Agreement and the other Transaction Documents on such Date. Upon acceptance of a successor collateral agent of its appointment as a Brazilian Collateral Agent under this Agreement and the other Transaction Documents, such successor will succeed and have all rights, powers, privileges and duties of the resigning Brazilian Collateral Agent, and the resigning Brazilian Collateral Agent will be released from its duties and obligations under the Notes and this Agreement (if not released sooner, as provided above). The fees due by the Company to a successor agent will be the same as those contracted in relation to its predecessor, unless otherwise agreed between the Company and such successor. Any Person into which the Brazilian Collateral Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the

sucessor tiver sido nomeado e aceitado tal nomeação dentro de 30 (trinta) dias após a data em que o Agente de Garantia Brasileiro renunciante notificou sua renúncia, então o Agente de Garantia Brasileiro renunciante poderá (mas não será obrigado a) (a) mediante consentimento (desde que nenhum Evento de Inadimplemento ou Inadimplemento tenha ocorrido e continue) da Companhia (consentimento esse que não deverá ser recusado ou adiado sem motivo razoável), ao custo e às expensas da Companhia nomear um agente de garantia sucessor ou (b) peticionar a qualquer tribunal competente, às custas e despesas da Companhia, a nomeação de um agente de garantia sucessor. Quer tenha ou não sido nomeado um sucessor, a renúncia do Agente de Garantia Brasileiro entrará em vigor de acordo com o aviso de renúncia do Agente de Garantia Brasileiro na data especificada em tal aviso, e o Agente de Garantia Brasileiro renunciante será liberado de seus deveres e obrigações nos termos deste Contrato e dos demais Documentos da Transação em tal data. Mediante a aceitação de um agente de garantia sucessor de sua nomeação como agente de garantia brasileiro, nos termos deste Contrato e dos Documentos da Transação, esse sucessor sucederá e passará a ter todos os direitos, poderes, privilégios e deveres do Agente de Garantia Brasileiro renunciante, e o Agente de Garantia Brasileiro renunciante será liberado de seus deveres e obrigações nos termos das Notas e deste Contrato (se não for liberado antes, como previsto acima). Os honorários devidos pela Companhia ao agente de garantia sucessor serão os mesmos contratados com relação ao Agente de Garantia Brasileiro renunciante, salvo se acordado de outra maneira entre a Companhia e tal agente de

37

Brazilian Collateral Agent shall be a party, or any Person succeeding to the corporate trust business of the Brazilian Collateral Agent shall be the successor of the Brazilian Collateral Agent hereunder without the execution or filing of any paper with any party hereto or any further act on the part of any of the Parties hereto, except where an instrument of transfer or assignment is required by Law to effect such succession, anything herein to the contrary notwithstanding.

garantia brasileiro sucessor. Qualquer Pessoa na qual o Agente de Garantia Brasileiro possa ser fundido ou incorporado, ou qualquer Pessoa resultante de qualquer fusão, conversão, combinação, consolidação, transformação ou incorporação, conforme aplicável, em que o Agente de Garantia Brasileiro seja parte, ou qualquer Pessoa que suceda os deveres fiduciários do Agente de Garantia Brasileiro será o sucessor do Agente de Garantia Brasileiro nos termos deste Contrato e das Notas, sem necessidade de assinatura ou arquivamento de qualquer documento com qualquer Parte deste Contrato ou qualquer outro ato por parte de qualquer uma das Partes, exceto quando um instrumento de transferência ou cessão for exigido por Lei para efetuar tal sucessão, não obstante qualquer disposição em contrário.

## SECTION VIII
## MISCELLANEOUS

## CLÁUSULA VIII
## DISPOSIÇÕES GERAIS

8.1. Definitions. Capitalized terms used in this Agreement and its Exhibits and not otherwise defined herein will have the meaning assigned to them in the Notes, unless otherwise defined in this Agreement.

8.1. Definições. Os termos em letra maiúscula usados neste Contrato e em seus Anexos e não definidos de outra forma neste Contrato terão o significado atribuído a eles nas Notas, exceto se definido de outra maneira neste Contrato.

8.1.1.   For the purposes of this Agreement, "Business Day" means any day other than Sunday, Saturday or a public holiday in Brazil, or that day when commercial banks in the cities of Rio de Janeiro and São Paulo are authorized or required by law to close.

8.1.1.   Para fins deste Contrato, "Dia Útil" significa qualquer outro dia que não seja domingo, sábado ou feriado no Brasil, ou aquele dia em que os bancos comerciais das cidades do Rio de Janeiro e de São Paulo forem autorizados ou obrigados por lei a fechar.

8.2.     Amendments. This Agreement may be amended, replaced, cancelled, renewed or

8.2.     Alterações. Este Contrato somente poderá ser aditado, substituído, cancelado, renovado ou prorrogado e seus termos

38

extended, and its terms may be waived, only upon written instrument signed by all Parties.

somente poderão ser renunciados, mediante instrumento escrito assinado por todas as Partes.

8.3.    Severability. If any provision of this Agreement is held void or ineffective by court decision, the validity or enforceability of the remaining provisions shall not be affected, and the latter shall remain in full force and effect, being the Parties committed, within the shortest term possible, to engage in good-faith negotiations to replace the ineffective provision by another that, to the greatest extent possible and in a reasonable manner, reaches the intended purposes and effects.

8.3.    Independência das Cláusulas. Se qualquer disposição deste Contrato for considerada nula ou ineficaz por decisão judicial, a validade ou exequibilidade das remanescentes não será afetada, as quais permanecerão em pleno vigor e vigência, comprometendo-se as Partes, no menor prazo possível, a negociarem, de boa-fé, a substituição da disposição ineficaz por outra que, na máxima extensão possível e de maneira razoável, atenda aos fins e propósitos pretendidos.

8.4.    Irrevocability, Effectiveness. This Agreement is irrevocable and irreversible, binding upon the Parties and their successors and assigns under any title, and shall remain in force until full and complete performance of the Secured Obligations and the respective written notice to the Brazilian Collateral Agent by the Purchaser.

8.4.    Irrevocabilidade, Vigência. Este Contrato é celebrado em caráter irrevogável e irretratável, obrigando as Partes e seus sucessores e legítimos cessionários, a qualquer título, permanecendo em vigor até o pleno e integral cumprimento das Obrigações Garantidas e da respectiva notificação, por escrito, ao Agente de Garantia Brasileiro pelo Comprador.

8.4.1.    When all obligations related to the Secured Obligations have been discharged in an irreversible manner, the Parties shall take all measures and sign all documents necessary for the release of the Transferred Assets and Assigned Rights from any encumbrance which is still in force in accordance with the provisions herein.

8.4.1.    Quando todas as obrigações relacionadas às Obrigações Garantidas tiverem sido quitadas de modo irreversível, as Partes tomarão todas as medidas e firmarão todos os documentos que se façam necessários para liberação dos Bens Alienados e Direitos Cedidos de qualquer gravame que ainda esteja em vigor de acordo com as disposições deste Contrato.

8.5.    Amendments, Successors and Assignees. This Agreement binds and inures for the benefit of the Parties and their respective successors and assigns. Any and all amendment or change in the terms and

8.5.    Aditivos, Sucessores e Cessionários. O presente Contrato obriga e reverte em benefício das Partes e de seus respectivos sucessores e cessionários. Todo e qualquer aditivo ou alteração dos termos e disposições

39

provisions hereof shall be valid only if made in writing and signed by the Parties. Considering that this Agreement is an additional instrument to the Notes, the Company hereby consents and undertakes to enter into any amendments necessary to this Agreement, in a commercially appropriate manner, to reflect the assignment of rights and obligations arising from the Notes. Except as provided in the Notes, neither Party may assign or transfer any of its rights or obligations under this Agreement.

aqui pactuadas somente será válido se efetuado por escrito e assinado pelas Partes. Considerando que o presente Contrato é acessório às Notas, a Companhia neste ato consente e se compromete a celebrar quaisquer aditivos necessários a este Contrato, de maneira comercialmente adequada, para refletir a cessão dos direitos e obrigações decorrentes das Notas. Salvo nos casos previstos nas Notas, nenhuma das Partes poderá ceder ou transferir quaisquer de seus direitos ou obrigações nos termos do presente Contrato.

8.6.    Guarantees. The Fiduciary Lien provided for in this Agreement shall be additional to and independent of any other security that the Secured Party may at any time be entitled to under the Notes and therefore may be enforced separately and independently from any other guarantees and shall not affect the ability of the Secured Party or the Brazilian Collateral Agent to enforce such additional guarantees.

8.6.    Garantias. A Garantia Fiduciária prevista neste Contrato será adicional e independente de qualquer outra garantia que a Parte Garantida possa a qualquer momento ter direito, nos termos das Notas e, portanto, pode ser excutida separadamente e de forma independente a quaisquer outras garantias e não afetará a capacidade da Parte Garantida ou do Agente de Garantia Brasileiro de excutir tais garantias adicionais.

8.7.    Notices. Any notification or other communication provided herein must be made in writing, in Portuguese, by registered letter, with acknowledgment of receipt, or transmitted via fax or electronically with pdf as attachment, with proof of transmission, and addressed as follows:

8.7.    Notificações. Qualquer notificação ou outra comunicação aqui prevista deverá ser feita por escrito, em português, por meio de carta registrada, com aviso de recebimento, ou transmitida via fax ou por via eletrônica com pdf como anexo, com comprovante de transmissão, e endereçada da seguinte forma:

For Company:

Para a Companhia:

Address: Comandante Linneu Gomes Square, s/n, Gate 3, Building 24, part, Jardim Aeroporto, Zip Code 04626-020
São Paulo – SP, Brasil
Att: Mario Tswei Liao – mtliao@voegol.com.br

Endereço: Praça Comandante Linneu Gomes, sem número, Portão 3, prédio 24, parte, Jardim Aeroporto, CEP 04626-020
São Paulo – SP, Brasil
Att: Mario Tswei Liao – mtliao@voegol.com.br

40

| | |
|---|---|
| For the Brazilian Collateral Agent: | Para o Agente de Garantia Brasileiro: |
| Address: Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edificio Jacarandá, Zip Code 06460-040, Barueri – SP, Brazil | Endereço: Avenida Marcos Penteado de Ulhoa Rodrigues, nº 939, 10º andar, Edificio Jacarandá, Sala 3, CEP 06460-040, Barueri – SP, Brasil |
| Att: Karla Fernandes | Att: Karla Fernandes |
| karla.fernandes@tmf-group.com | karla.fernandes@tmf-group.com |
| For GLAI: | Para a GLAI: |
| Comandante Linneu Gomes Square, Gate 3, Building 24, Campo Belo | Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo |
| São Paulo – SP, Zip Code 04626-020, Brazil | São Paulo – SP, Brasil |
| Att: Mario Tswei Liao – mtliao@voegol.com.br | Att: Mario Tswei Liao – mtliao@voegol.com.br |

8.7.1. Any and all notifications or other communications made pursuant to this Agreement will be considered valid and delivered on the Business Day following the respective receipt, according to the document signed by the recipient or acknowledgment of receipt, as the case may be.

8.8. Specific Performance. This Agreement is an extrajudicial instrument (*título executivo extrajudicial*) for all purposes of articles 497, 784 and 815 of the Civil Procedure Code and, for the purposes of this Agreement and of each amendment hereto, the Brazilian Collateral Agent, representing the Purchaser, under this Agreement may pursue specific performance of the obligations of Company.

8.9. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of Brazil.

8.9.1. In order to produce the due legal effects, this Agreement, signed by two

8.7.1. Toda e qualquer notificação ou outra comunicação efetuada nos termos do presente Contrato será considerada válida e entregue no Dia Útil seguinte ao respectivo recebimento, conforme protocolo assinado pelo destinatário ou aviso de recebimento, conforme o caso.

8.8. Execução Específica. Este Contrato constitui um título executivo extrajudicial para todos os fins dos artigos 497, 784 e 815 do Código de Processo Civil e, para os fins deste Contrato e de todos os aditivos a este Contrato, o Agente de Garantia Brasileiro representando o Comprador, nos termos deste Contrato, poderá promover a execução específica das obrigações da Companhia.

8.9. Lei de Regência. Este Contrato será regido e interpretado de acordo com as leis da República Federativa do Brasil.

8.9.1. Para que produza os devidos efeitos legais, este Contrato, assinado por duas

41

witnesses, constitutes an extrajudicial enforcement instrument (*título executivo extrajudicial*) that may be the subject to enforcement proceedings under the terms of article 784, item III of the Civil Procedure Code.

8.10. <u>Jurisdiction.</u> Any disputes or controversies arising from this Agreement will be settled by the court of the City São Paulo, State of São Paulo, which will also be the competent jurisdiction to enforce the obligations established herein.

8.11. Acting under or by virtue of this Agreement, the Brazilian Collateral Agent shall be entitled to all rights, authority, privileges and immunities set forth in the Notes, and all provisions of the Notes are hereby incorporated by reference, with the same force and effect as if they were set forth herein in their entirety, provided that such rights, authority, privileges and immunities are in accordance with and do not conflict with applicable Brazilian laws.

8.12. <u>Language</u>. This Agreement is executed in the English and Portuguese languages. In case of a discrepancy, the Portuguese language version shall prevail.

8.13. <u>Electronic Signature</u>. This Agreement is executed by the Parties with electronic signatures with a digital certificate issued pursuant to the rules set forth by the Brazilian Public Key Infrastructure (*Infraestrutura de Chaves Públicas Brasileira ICP-Brasil*), in accordance with the Provisional Measure No. 2.200-2, as of August 24th, 2001. The Parties recognize, on an irrevocable and irreversible basis, the authenticity, validity, and full effectiveness

testemunhas, constitui título executivo extrajudicial que poderá ser objeto de processo de execução nos termos do artigo 784, inciso III do Código de Processo Civil.

8.10. <u>Foro.</u> Quaisquer disputas ou controvérsias oriundas deste Contrato serão dirimidas pelo foro da comarca da Cidade de São Paulo, Estado de São Paulo, que também será o foro competente para fazer valer as obrigações aqui estabelecidas.

8.11. Agindo sob ou em virtude deste Contrato, o Agente de Garantia Brasileiro terá direito a todos os direitos, autoridade, privilégios e imunidades previstos nas Notas, sendo que todas as disposições das Notas são aqui incorporadas por referência, com a mesma força e efeito como se estivessem aqui estabelecidas na sua totalidade, desde que tais direitos, autoridade, privilégios e imunidades estejam de acordo e não conflitem com as leis brasileiras aplicáveis

8.12. <u>Idioma</u>. Este Contrato é assinado em inglês e em português. Em caso de discrepância, a versão em português irá prevalecer.

8.13. <u>Assinatura Eletrônica</u>. Este Contrato é celebrado pelas Partes com assinatura eletrônica nos termos das regras expedidas pela Infraestrutura de Chaves Públicas Brasileira ICP-Brasil, de acordo com a Medida Provisória Nº 2.200-2 de 24 de agosto de 2001. As Partes reconhecem, de forma irrevogável e irretratável, a autenticidade, validade e plena eficácia das assinaturas eletrônicas nos termos aqui previstos, para todos os fins legais.

42

of the electronic signatures pursuant to the terms set forth herein, for all legal purposes.

8.14.    This Agreement is effective as of the date indicated herein, regardless if one or more Parties electronically executes it on a different date. Notwithstanding any of the parties electronically executing this Agreement in a different place, the place of execution shall be deemed, for all purposes, to be the City of São Paulo, State of São Paulo, as indicated below.

8.14.    Este Contrato deverá entrar em vigor a partir da data aqui indicada, independentemente de uma ou mais Partes o celebrarem eletronicamente em data diferente. Não obstante, caso qualquer das Partes celebre eletronicamente o presente Contrato num local diferente, o local de celebração será considerado, para todos os efeitos, como sendo a Cidade de São Paulo, Estado de São Paulo, conforme indicado abaixo.

**IN WITNESS WHEREOF**, the Parties execute this Agreement electronically, in the presence of the two (2) undersigned witnesses.

**E, POR ESTAREM ASSIM JUSTAS E CONTRATADAS**, as Partes assinam este Contrato eletronicamente, na presença das 2 (duas) testemunhas abaixo-assinadas.

São Paulo, March 2, 2023.

(*remainder of the page intentionally left blank*)

São Paulo, 2 de março de 2023.

(*restante da página intencionalmente deixado em branco*)

43

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023)* | *(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023)* |

### GOL LINHAS AÉREAS S.A.

_____     _____
*Name*/Nome:                                        *Name*/Nome:
*Title*/Cargo:                                        *Title*/Cargo:

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023*) | *(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023)* |

**TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**

_____    _____
*Name*/Nome:                       *Name*/Nome:
*Title*/Cargo:                      *Title*/Cargo:

45

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023*) | *(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023*) |

**GOL LINHAS AÉREAS INTELIGENTES S.A.**

_____       _____

*Name*/Nome:                                    *Name*/Nome:
*Title*/Cargo:                                    *Title*/Cargo:

46

| | |
|---|---|
| *(Signature page of the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023)* | *(Página de assinaturas do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023)* |

**WITNESSES/TESTEMUNHAS**

_____      _____

Name/Nome:                              Name/Nome:

Tax ID /CPF:                            Tax ID /CPF:

ID/RG:                                  ID/RG:

| | |
|---|---|
| **EXHIBIT I** | **ANEXO I** |
| to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023. | ao Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023. |

| | |
|---|---|
| **DESCRIPTION OF SECURED OBLIGATIONS** | **DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS** |
| **GOL FINANCE SENIOR SECURED NOTE** | **NOTA SÊNIOR GARANTIDA GOL FINANCE** |

| | |
|---|---|
| Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option; | Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas"; |
| Maturity Date: March 2, 2028; | Data de Vencimento: 2 de março de 2028; |
| Interest Rate: 18.00% (eighteen per cent) per year, calculated and paid in accordance with GOL SSN; | Taxa de Juros: 18,00% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL SSN; |
| Default interest: as provided for in the GOL SSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL SSN; | Juros de Mora: conforme previsto na GOL SSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL SSN; |
| Penalty Clause: not applicable; | Cláusula Penal: não aplicável; |

48

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

Other Commissions and Charges: (i) Additional Amounts and (ii) Compensations and Indemnities (Compensation and Indemnity), as provided, in GOL SSN.

Demais Comissões e Encargos: (i) Montantes Adicionais *(Additional Amounts)* e (ii) Compensações e Indenizações *(Compensation and Indemnity),* conforme previstos na GOL SSN.

## GOL EQUITY FINANCE SENIOR SECURED EXCHANGEABLE NOTE

## NOTA SÊNIOR GARANTIDA PERMUTÁVEL GOL EQUITY FINANCE

Principal Amount: up to USD 1,430,925,000.00 (one billion, four hundred thirty million, nine hundred twenty-five thousand U.S. dollar), which conversion must be made at the closing exchange rate of the sale of U.S. dollars for Brazilian Reais, as disclosed through the Central Bank of Brazil website on exchange rates under the "All currencies" option;

Valor Principal: até US$ 1.430.925.000,00 (um bilhão e quatrocentos e trinta milhões e novecentos e vinte e cinco mil dólares Norte-Americanos), cuja conversão deve ser realizada pela cotação de fechamento da taxa de câmbio de venda de Dólares dos Estados Unidos da América por Reais, conforme divulgada por meio da página da internet do Banco Central do Brasil sobre taxas de câmbio na opção "Todas as moedas";

Maturity Date: March 2, 2028;

Data de Vencimento: 2 de março, 2028;

Interest Rate: 18% (eighteen per cent) per year, calculated and paid in accordance with GOL ESSN;

Taxa de Juros: 18% (dezoito por cento) ao ano, calculados e pagos nos termos da GOL ESSN;

Default interest: as provided for in GOL ESSN, will accrue on overdue principal and interest at a rate of 2.00 (two percent) per annum higher than the interest rate otherwise applicable to GOL ESSN;

Juros de Mora: conforme previsto na GOL ESSN, incidirá sobre o principal e juros vencidos a uma taxa de 2,00 (dois por cento) ao ano mais alta do que a taxa de juros aplicável à GOL ESSN

Penalty Clause: not applicable;

Cláusula Penal: não aplicável;

Inflation Adjustment Index: not applicable;

Índice de Atualização Monetária: não aplicável;

49

**AMOUNTS DUE TO THE BRAZILIAN COLLATERAL AGENT**

Amount: USD 10,000.00 (ten Thousand U.S. dollars) set-up fee and USD 12,000.00 (twelve thousand U.S. Dollars) per annum;

Expiration Date: five (5) days after the signing of this Agreement and, thereafter, on the same date of subsequent years until the expiration of the Notes or while the Brazilian Collateral Agent is in the exercise of its duties;

Default interest: 1.00% (one percent) per month;

Penalty Clause: 10.00% (ten percent);

Inflation Adjustment Index: Not applicable;

Other Commissions and Charges: In the event of exclusion of the guarantee provided by means of this Agreement, or in the event of participation in meetings or conferences call, as well as the fulfillment of extraordinary requests, USD 150.00 (one hundred and fifty U.S. Dollars) to USD 450.00 (four hundred U.S. Dollars) per man-hour of work shall be due (a) in the execution of the guarantees, (b) in meetings with the Parties and (c) implementation of the decisions taken in such meetings; to be paid within 5 (five) Business Days after the sending of the statements of hours worked.

**VALORES DEVIDOS AO AGENTE DE GARANTIA BRASILEIRO**

Valor: taxa de contratação de US$ 10.000,00 (dez mil dólares Norte-Americanos) e US$ 12.000,00 (doze mil dólares Norte-Americanos) por ano;

Data de Vencimento: 5 (cinco) dias após a assinatura do presente Contrato e, posteriormente, na mesma data dos anos subsequentes até o vencimento das Notas ou enquanto o Agente de Garantia Brasileiro estiver no exercício de suas funções;

Juros de Mora: 1,00% (um por cento) ao mês;

Cláusula Penal: 10,00% (dez por cento);

Índice de Atualização Monetária: Não aplicável;

Demais Comissões e Encargos: No caso excussão da garantia constituída por meio do presente Contrato, ou no caso de participação em reuniões ou conferências telefônicas, bem como atendimento às solicitações extraordinárias serão devidos US$ 150,00 (cento e cinquenta dólares Norte Americanos) a US$ 450,00 (quatrocentos dólares Norte Americanos) por hora-homem de trabalho dispendidas (a) na execução das garantias, (b) em reuniões com as Partes e (c) implementação das decisões tomadas em tais reuniões; a serem pagos dentro de 5 (cinco) Dias Úteis após o envio dos demonstrativos de horas trabalhadas.

50

| EXHIBIT II | ANEXO II |
|---|---|
| **to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into by and among Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. and Gol Linhas Aéreas Inteligentes S.A., dated as of March 2, 2023.** | **ao Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado por e entre Gol Linhas Aéreas S.A., TMF Brasil Administração e Gestão de Ativos Ltda. e Gol Linhas Aéreas Inteligentes S.A., datado de 2 de março de 2023.** |
| **Form of Power of Attorney** | **Modelo de Procuração** |
| **POWER OF ATTORNEY** | **PROCURAÇÃO** |
| By this power of attorney, **GOL LINHAS AÉREAS S.A.**, a corporation organized and existing under the laws of Brazil, headquartered in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46-48/0-P, Zip Code 20021-340, enrolled with the National Register of Legal Entities of the Ministry of Finance ("<u>CNPJ</u>") under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "<u>GRANTOR</u>"), irrevocably appoints and constitutes as its true and lawful attorney-in-fact **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, at Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, as local collateral agent for the benefit of the Secured Party, in accordance with the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants entered into on March 2, 2023 among the GRANTOR, the GRANTEE and Gol Linhas Aéreas S.A. ("<u>Agreement</u>") (hereinafter referred to as the "<u>GRANTEE</u>"), conferring upon the GRANTEE, irrevocably and irreversibly, in accordance with | Pelo presente instrumento particular de mandato, **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, Brasil, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("<u>CNPJ</u>") sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante denominada "<u>OUTORGANTE</u>"), irrevogavelmente nomeia e constitui como seu bastante procurador **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Avenida Marcos Penteado de Ulhoa Rodrigues, n° 939, 10° andar, Edifício Jacarandá, Sala 3, CEP 06460-040, inscrita no CNPJ sob o n° 23.103.490/0001-57, na qualidade de agente de garantia local em benefício da Parte Garantida, nos termos do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças celebrado em 2 de março de 2023 entre a OUTORGANTE, o OUTORGADO e a Gol Linhas Aéreas Inteligentes S.A. ("<u>Contrato</u>") (doravante denominado "<u>OUTORGADO</u>"), conferindo ao |

| | |
|---|---|
| articles 653, 654, 684, 685 and 686, sole paragraph, of the Brazilian Civil Code, the powers to, in place and on behalf of the GRANTOR, practice any of the following acts: | OUTORGADO, em caráter irrevogável e irretratável, de acordo com os artigos 653, 654, 684, 685 e 686, parágrafo único, do Código Civil Brasileiro, poderes para, no lugar e em nome da OUTORGANTE, realizar qualquer dos atos mencionados a seguir: |
| 1. practice, in place and on behalf of the GRANTOR, any and all acts, according to the terms and conditions of the Agreement, that are necessary or that are requested to extrajudicially enforce the Agreement, including as follows: | 1. praticar, no lugar e em nome da OUTORGANTE, todos e quaisquer atos, conforme os termos e condições do Contrato, que se façam necessários ou que sejam solicitados para fazer valer extrajudicialmente o Contrato, inclusive os que seguem: |
| (a) to dispose of, sell, assign, transfer, collect, receive, take possession of and/or foreclose all or part of the Transferred Assets and Assigned Rights or otherwise dispose of, and deliver the Transferred Assets and Assigned Rights under the Agreement and as established in article 1,364 of the Brazilian Civil Code, and apply the product received to the payment of the Secured Obligations under the Agreement; | (a) alienar, cobrar, receber, apropriar-se, transferir e/ou excutir os Bens Alienados e Direitos Cedidos ou dispor de qualquer outro modo e entregar os Bens Alienados e Direitos Cedidos nos termos do Contrato e conforme estabelecido no artigo 1.364 do Código Civil Brasileiro, e aplicar o produto assim recebido no pagamento das Obrigações Garantidas, nos termos do Contrato; |
| (b) sign, formalize and/or deliver any instruments for the transfer or otherwise dispose of the Transferred Assets and Assigned Rights and perform all related acts, including, without limitation, enter into any contracts and other instruments or agreements, as well as bring actions with respect to the Transferred Assets and Assigned Rights and represent the GRANTOR before third parties for the purpose of releasing the Fiduciary Lien, disposal of the Transferred Assets and Assigned Rights and transfer of the funds resulting from such disposal; | (b) assinar, formalizar e/ou entregar quaisquer instrumentos para a transferência ou de outro modo dispor dos Bens Alienados e Direitos Cedidos e praticar todos os atos correlatos, incluindo, sem limitação, celebrar quaisquer contratos e outros instrumentos ou acordos e instaurar ações com relação aos Bens Alienados e Direitos Cedidos e representar a OUTORGANTE perante terceiros para fins da liberação da Garantia Fiduciária, alienação e cessão dos Bens Alienados e Direitos Cedidos e transferência dos recursos resultantes de tal alienação; |

2. sign, formalize and/or deliver any documents and practice any acts that are necessary for the full, faithful and complete performance of this power of attorney, including acts related to exchange contracts necessary for the purpose of remitting abroad any and all financial funds due by the GRANTOR to the Secured Party, in accordance with the terms and limits of the Agreement;

3. to the extent necessary for the exercise of the powers granted herein, represent the GRANTOR before third parties or before any Brazilian governmental federal, state or municipal agencies or authorities, including, but not limited to, the National Treasury, the Central Bank of Brazil, any Boards of Trade, the competent Registry Offices of Deeds and Documents, the INPI, the Center for Information and Coordination of the Dot BR (*Núcleo de Informação e Coordenação do Ponto BR – NIC.br*), the Federal Revenue Service or other tax authorities, customs authorities and financial institutions;

4. to the extent necessary to guarantee the formalization, registration, release or priority of the guarantees conferred upon the GRANTEE or any of its successors and assignees, in relation to the Transferred Assets and Assigned Rights, represent the GRANTOR before any competent Registry Office of Deeds and Documents, the INPI and/or any other governmental body in which the Agreement or its respective amendments shall be registered;

2. assinar, formalizar e/ou entregar quaisquer documentos e praticar quaisquer atos que se fizerem necessários para o pleno, fiel e integral cumprimento deste mandato, inclusive atos relativos a contratos de câmbio necessários para fins de remessa ao exterior de todos e quaisquer recursos financeiros devidos pela OUTORGANTE à Parte Garantida, de acordo com os termos e limites do Contrato;

3. na medida necessária ao exercício dos poderes ora conferidos, representar a OUTORGANTE perante terceiros ou perante quaisquer órgãos ou autoridades governamentais brasileiras, nas esferas federal, estadual ou municipal, incluindo, mas não se limitando, o Tesouro Nacional, o Banco Central do Brasil, qualquer das Juntas Comerciais, os Cartórios de Registros de Títulos e Documentos, o INPI, o Núcleo de Informação e Coordenação do Ponto BR – NIC.br, a Receita Federal ou outras autoridades tributárias, autoridades aduaneiras e instituições financeiras;

4. na medida necessária para garantir a formalização, registro, liberação ou prioridade das garantias conferidas ao OUTORGADO ou de qualquer de seus sucessores e cessionários, em relação às aos Bens Alienados e Direitos Cedidos, representar a OUTORGANTE perante qualquer Cartório de Registro de Títulos e Documentos competente, INPI e/ou qualquer outro órgão governamental nos quais o Contrato ou suas respectivas alterações deverão ser registrados;

5.  enter into exchange transactions and take all necessary actions for such purpose, including, but not limited to, sign the exchange contracts and related documents, enter into any exchange transactions on behalf of the GRANTEE before the Central Bank of Brazil, any banks or financial institutions in Brazil or any other Brazilian authority, as well as consult the applicable Records of Foreign Capital Operations with the Central Bank of Brazil and, as the case may be, generate the necessary registrations with the Central Bank of Brazil to make the remittances to the Secured Party, as provided for in the Agreement; and

6.  exercise all other acts and enter into all other contracts and instruments necessary specifically for the compliance with the Agreement, and exercise all rights and acts provided for in article 1,364 of the Brazilian Civil Code, in accordance with the terms and conditions set forth in the Agreement.

The powers granted herein are additional to those granted by the GRANTOR to the GRANTEE under the Agreement, and do not cancel or revoke said powers. This power of attorney is granted as a condition for the Agreement and for the specific purpose of complying with the terms thereof, in accordance with article 684 and the sole paragraph of article 686 of the Brazilian Civil Code. This power of attorney shall be valid for a period of one (1) year from the date hereof.

This power of attorney shall be governed by the laws of the Federative Republic of Brazil.

---

5.  celebrar operações de câmbio e praticar todas as medidas necessárias para tal finalidade, incluindo, mas sem limitação a, assinar os contratos de câmbio e respectivos documentos relacionados, celebrar quaisquer operações de câmbio em nome do OUTORGADO perante o Banco Central do Brasil, quaisquer bancos ou instituções financeiras no Brasil ou qualquer outra autoridade brasileira, bem como consultar os Registros de Operações de Capital Estrangeiro junto ao Banco Central do Brasil aplicáveis e, conforme o caso, gerar os registros necessários junto ao Banco Central do Brasil para efetuar as remessas para a *Parte Garantida*, conforme previsto no Contrato; e

6.  exercer todos os demais atos e celebrar todos os demais contratos e instrumentos necessários para o fim específico do cumprimento do Contrato, e exercer todos os direitos e atos previstos no artigo 1.364 do Código Civil Brasileiro, de acordo com os termos e condições previstos no Contrato.

Os poderes ora outorgados são adicionais àqueles outorgados pelo OUTORGANTE ao OUTORGADO no Contrato, e não cancelam ou revogam os referidos poderes. O presente instrumento é lavrado como uma condição para o Contrato e com o fim específico do cumprimento de seus termos, de acordo com o artigo 684 e o parágrafo único do artigo 686 do Código Civil Brasileiro. Este instrumento será válido pelo período de 1 (um) ano a contar da presente data.

O presente instrumento será regido pelas leis da República Federativa do Brasil.

| | |
|---|---|
| The capitalized words used in this power of attorney but not defined herein will have the meanings assigned to them in the Agreement. | Os termos grafados ou iniciados em letras maiúsculas usados nesta procuração, porém, não definidos neste instrumento terão os significados a eles atribuídos no Contrato. |
| Rio de Janeiro, [●], 2023. | Rio de Janeiro, [●] de 2023. |
| **GOL LINHAS AÉREAS S.A.**<br>[SIGNATURE FIELD] | **GOL LINHAS AÉREAS S.A.**<br>[CAMPO DE ASSINATURA] |

**EXHIBIT III/ANEXO III**

**List of Intelectual Property / Lista das Propriedades Intelectuais**

1.  **Internet Domains (*Domínios de Internet*)**

**(LIST OF ASSETS BELOW / LISTA DE ATIVOS A SEGUIR)**

2.   **Trademarks** *(Marcas Registradas)*

   **(LIST OF ASSETS BELOW / LISTA DE ATIVOS A SEGUIR)**

**EXHIBIT IV/ANEXO IV**

**Form of Amendment to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants / Modelo de Aditamento do Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças**

| | |
|---|---|
| **[•] AMENDMENT TO THE FIDUCIARY TRANSFER AND ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS AND ASSETS AGREEMENT AND OTHER COVENANTS** | **[•] ADITAMENTO AO CONTRATO DE ALIENAÇÃO E CESSÃO FIDUCIÁRIA DE BENS E DIREITOS DE PROPRIEDADE INTELECTUAL E OUTRAS AVENÇAS** |

This Amendment to the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants ("Amendment") is entered into by and among:

O presente Aditamento ao Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças ("Aditamento") é celebrado por e entre:

(i)     **GOL LINHAS AÉREAS S.A.**, a company organized and existing under the laws of Brazil, with its head office in the City of Rio de Janeiro, State of Rio de Janeiro, at Senador Salgado Filho Square, s/n, Back Office Management Room, Public Area, Hubs 46-48/O-P, Zip Code 20021-340 enrolled with the National Registry of Legal Entities of the Ministry of Finance ("CNPJ" under No. 07.575.651/0001-59, herein represented by its undersigned legal representatives (hereinafter referred to as "GLA" or "Company");

(i)     **GOL LINHAS AÉREAS S.A.**, sociedade organizada e existente segundo as leis do Brasil, com sede na Cidade do Rio de Janeiro, Estado do Rio de Janeiro, na Praça Senador Salgado Filho, s/n, Sala de Gerência Back Office, área pública, eixos 46-48/O-P, CEP 20021-340, inscrita no Cadastro Nacional de Pessoas Jurídicas do Ministério da Fazenda ("CNPJ" sob o n° 07.575.651/0001-59, neste ato representada por seus representantes legais abaixo assinados (doravante designada "GLA" ou "Companhia");

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, a limited liability company (*sociedade limitada*) headquartered in the City of Barueri, State of São Paulo, Avenida Marcos Pentado de Ulhoa Rodrigues, No. 939, 10th Floor, Room 3, Edifício Jacarandá, Zip Code 06460-040, enrolled with the CNPJ under No. 23.103.490/0001-57, acting as collateral agent, as representative and for the benefit of the Purchaser

(ii)     **TMF BRASIL ADMINISTRAÇÃO E GESTÃO DE ATIVOS LTDA.**, sociedade limitada com sede na Cidade de Barueri, Estado de São Paulo, na Avenida Marcos Pentado de Ulhoa Rodrigues, nº 939, 10º andar, Edifício Jacarandá, Sala 3, CEP 06460-040, inscrita no CNPJ sob o nº 23.103.490/0001-57, atuando na qualidade de agente de garantia, na qualidade de representante e em benefício do Comprador

(hereinafter referred to as "Brazilian Collateral Agent");

(iii) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, a company organized and existing under the laws of Brazil, with its principal place of business in the City of São Paulo, State of São Paulo, at Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, Zip Code 04626-020, enrolled with CNPJ under No. 06.164.253/0001-87, herein represented by its undersigned legal representatives ("GLAI");

Each party above also hereinafter individually referred to as a "Party" and, collectively, as "Parties";

**WHEREAS:**

(i)    [•]

(ii) As security for the Secured Obligations, the Parties entered into the Fiduciary Transfer and Assignment of Intellectual Property Rights and Assets Agreement and Other Covenants , dated of March 2, 2023 ("Agreement"), through which the Company granted to the Secured Party (represented by the Brazilian Collateral Agent) a fiduciary lien over of the intellectual properties related to the Smiles loyalty/fidelity program owned by the Company, including as universal successor of Smiles Fidelidade S.A., according to the terms and conditions set forth in the Agreement; and

(iii)    Pursuant to Section 1.2 of the Agreement, the Company wishes to formalize the extension the Fiduciary Transfer (as defined in the Agreement) created in the Agreement to the Additional Assets and Rights (as defined in the Agreement) by entering into this Amendment, and perfect such Fiduciary Lien by taking, with respect to this Amendment, the actions provided for in Section

(doravante designado "Agente de Garantia Brasileiro");

(iii) **GOL LINHAS AÉREAS INTELIGENTES S.A.**, sociedade constituída e existente segundo as leis do Brasil, com sede na Cidade de São Paulo, Estado de São Paulo, na Praça Comandante Linneu Gomes, Portaria 3, Prédio 24, Campo Belo, CEP 04626-020, inscrita no CNPJ sob o n° 06.164.253/0001-87, neste ato representada por seus representantes legais abaixo assinados ("GLAI");

Cada parte acima também são doravante individualmente designadas como "Parte" e, em conjunto, como "Partes";

**CONSIDERANDO QUE:**

(i)    [•]

(ii) Como garantia das Obrigações Garantidas, as Partes celebraram o Contrato de Alienação e Cessão Fiduciária de Bens e Direitos de Propriedade Intelectual e Outras Avenças, datado de 2 de março de 2023 ("Contrato"), através do qual a Companhia constituiu em favor da Parte Garantida (representada pelo Agente de Garantia Brasileiro) uma garantia fiduciária sobre suas propriedades intelectuais, inclusive como sucessora universal da Smiles Fidelidade S.A., referentes ao programa de fidelidade Smiles, segundo os termos e condições estabelecidos no Contrato; e

(iii)    De acordo com a Cláusula 1.2 do Contrato, a Companhia deseja formalizar a extensão da Garantia Fiduciária (conforme definida no Contrato) criada no Contrato aos Bens e Direitos Adicionais (conforme definido no Contrato), celebrando este Aditamento e aperfeiçoar tal Garantia Fiduciária tomando, com respeito a este Aditamento, as medidas

2.1 of the Agreement (or any other action required to be taken pursuant to the then applicable laws).

**NOW, THEREFORE**, the Parties agree to enter into this Amendment under the following terms and conditions:

1   All capitalized terms used and not defined herein shall have the respective meanings set forth in the Agreement.

2   The Company hereby transfers, pursuant to Section 1.2 of the Agreement, irrevocably assigns, sells and transfers, as the case may be, to the Secured Party, represented by the Brazilian Collateral Agent, pursuant to the provisions of articles 1,361 et seq. of the Brazilian Civil Code, and under the same conditions as provided for in the Agreement, the fiduciary ownership, the conditional property and the indirect possession of all Additional Assets and Rights listed in Appendix A hereto (and which were not originally included in the Agreement, nor in any subsequent amendment thereto), free and clear of any liens, encumbrances or restrictions, under the terms and conditions set forth in the Agreement. The Parties' rights and obligations under the Agreement shall be applicable *mutatis mutandis* to the Additional Assets and Rights transferred hereunder and such Additional Assets and Rights shall be treated as "Transferred Assets and Assigned Rights" for all purposes of the Agreement. In addition, the Company lists in Appendix A hereto all other Transferred Assets and Assigned Rights already granted as collateral until the present date, so that Appendix A hereto

previstas na Cláusula 2.1 do Contrato (ou qualquer outra medida que deva ser tomada de acordo com as leis aplicáveis na ocasião).

**RESOLVEM**, as Partes, celebrar este Aditamento, de acordo com os seguintes termos e condições:

1   Todos os termos iniciados em maiúscula utilizados e não diversamente definidos neste documento terão os respectivos significados estabelecidos no Contrato.

2   A Companhia pela presente na forma da Cláusula 1.2 do Contrato, cede, aliena e transfere, conforme o caso, à Parte Garantida, representada pelo Agente de Garantia Brasileiro transfere, segundo o disposto nos artigos 1.361 e seguintes do Código Civil Brasileiro e sob as mesmas condições previstas no Contrato, a propriedade fiduciária, o domínio resolúvel e a posse indireta dos Bens e Direitos Adicionais listados no Apêndice A deste documento (e que não foram originalmente incluídos no Contrato, nem em qualquer alteração posterior ao mesmo), livres e desembaraçados de quaisquer ônus, gravames ou restrições, nos termos e condições previstos no Contrato. Os direitos e obrigações das Partes nos termos do Contrato serão aplicáveis *mutatis mutandis* aos Bens e Direitos Adicionais ora transferidos e tais Bens e Direitos Adicionais serão tratados como "Bens Alienados e Direitos Cedidos" para todos os fins do Contrato. Além disso, a Companhia lista no Apêndice A deste documento todos os demais Bens Alienados e Direitos Cedidos já dados em garantia até a presente data, de modo que o Apêndice A deste documento atualiza e substitui o Anexo III do Contrato.

updates and replaces Exhibit III to the Agreement.

3    In consideration of the foregoing, the undersigned hereby agree to replace Exhibit III of the Agreement, which shall become effective as of the present date in the form of Appendix A hereto, being an inseparable part of the Agreement for all purposes.

4    The Company hereby declares to the Secured Party and to the Brazilian Collateral Agent that the representations and warranties made by it in the Agreement are true and correct as if made on the date hereof and apply *mutatis mutandis* to this Amendment and to the Additional Assets and Rights transferred herein, as if they were fully written here.

5    All provisions of the Agreement that have not been expressly amended or modified herein shall remain in full force and effect pursuant to the terms of the Agreement and shall apply *mutatis mutandis* to this Amendment as if they were fully written here.

6    This Amendment shall be governed and construed in accordance with the laws of the Federative Republic of Brazil.

7    The Parties hereby elect the courts of the City of Sao Paulo, State of Sao Paulo, as competent to hear any lawsuits or proceedings aimed at resolving any dispute or controversy arising from this Amendment, without prejudice to any other Court that may have jurisdiction over it.

3    Em consideração ao acima exposto, os signatários concordam em substituir o Anexo III do Contrato, que passará a viger na presente data na forma do Apêndice A deste documento, constituindo parte inseparável do Contrato para todos os fins.

4    A Companhia neste ato declara à Parte Garantida e ao Agente de Garantia Brasileiro que as declarações e garantias por ela prestadas no Contrato são verdadeiras e corretas como se fossem feitas na data do presente e se aplicam *mutatis mutandis* a este Aditamento e aos Bens e Direitos Adicionais aqui transferidos, como se fossem totalmente escritas aqui.

5    Todas as disposições do Contrato que não tenham sido expressamente alteradas ou modificadas neste ato permanecerão em pleno vigor e efeito nos termos do Contrato e aplicar-se-ão *mutatis mutandis* a este Aditamento como se estivessem aqui integralmente reproduzidas.

6    Este Aditamento será regido e interpretado de acordo com as leis da República Federativa do Brasil.

7    As Partes elegem os tribunais da Cidade de São Paulo, Estado de São Paulo, como competentes para conhecer de qualquer ação ou procedimento que tenha por objetivo resolver qualquer disputa ou controvérsia decorrente desta Alteração, sem prejuízo de qualquer outro tribunal que possa ter jurisdição sobre ela.

- 61 -

For the purposes of the law, the Parties execute this Amendment in the presence of 2 (two) undersigned witnesses.

*(Include the signatures of the parties and witnesses)*

_____

**(●)**
**Appendix A**
**[include relevant exhibit]**

Para os efeitos da lei, as Partes celebram esta Alteração na presença de duas (2) testemunhas abaixo assinadas.

*(Incluir as assinaturas das partes e das testemunhas).*

_____

**(●)**
**Apêndice A**
**[incluir anexo relevante]**

**EXHIBIT V/ANEXO V**

**List of Smiles Technological Infrastructure Assets/ Lista de Ativos da
Infraestrutura Tecnológica Smiles**

| | |
|---|---|
| The license agreement to use the LIFERAY digital platform, on which the Smiles website was developed; | Contrato de licença de uso da plataforma digital LIFERAY, em que foi desenvolvido o site Smiles; |
| License agreement for the use of the Zendesk platform, through which all customer service is carried out; | Contrato de licença de uso da plataforma Zendesk, por meio da qual é feito todo o atendimento aos clientes; |
| License agreement for the use of the Pager Duty program, which generates alarms when monitoring transactions in the APM system and sends such alarms to the Slack system; | Contrato de licença de uso do programa Pager Duty, que gera alarmes ao efetuar o acompanhamento de transações no sistema APM e envia tais alarmes ao sistema Slack; |
| License agreement to use the Slack system; | Contrato de licença de uso do sistema Slack; |
| Service contract for the use of the B2E Prevention tool for fraud prevention; and | Contrato de prestação de serviço para utilização da ferramenta B2E Prevenção, para prevenção de fraude; e |
| License agreement for the B2E Billing software. | Contrato de licença de uso do software B2E Faturamento. |

**EXHIBIT VI/ANEXO VI**

**List of Operating Manuals / Lista de Manuais Operacionais**

- Smiles Program Regulation;

- Smiles Club Regulation;

- Main Smiles Program Operational and Commercial Rules.

- Regulamento do Programa Smiles;

- Regulamento do Clube Smiles;

- Principais Regras Operacionais e Comerciais do Programa Smiles.

**EXHIBIT E**

**FORM OF**
**EXCLUSIVITY SIDE LETTER**

GOL EQUITY FINANCE
GOL LINHAS AÉREAS INTELIGENTES S.A.
GOL LINHAS AÉREAS S.A.

March 2, 2023

Abra Global Finance
Abra Group Limited
1 Ashley Road, Third Floor
Altrincham, Cheshire, WA14 2DT, United Kingdom

      Re:    Smiles Loyalty Program

Ladies and gentlemen:

    Each of undersigned, GOL Equity Finance, GOL Linhas Aereas Inteligentes S.A., GOL Linhas Aereas S.A., Smiles Fidelidade S.A. (collectively, the "GOL Entities"), hereby, jointly and severally, agrees for your benefit that:

    (a) it shall not, and shall ensure that their respective subsidiaries do not, directly or indirectly, for their own account or on behalf of or together with any other person or entity, carry on, own, manage, control, operate, develop, create, invest in, have any financial interest in (as shareholder or otherwise), or participate in or be engaged in (whether as shareholder, advisor, a partner of a partnership firm, designated partner of a limited liability partnership, or proprietor of a proprietorship firm, or any other entity whether registered under applicable law or otherwise), any undertaking, venture, business, person or entity (including, but not limited to, any joint venture, partnership or other arrangement of whatsoever nature) that is engaged in a similar business to the Smiles loyalty program or any successor program (the "Loyalty Program"); and

    (b)    the Loyalty Program is, and will be, the sole and exclusive loyalty program of each of the GOL Entities and their respective subsidiaries; provided that the Loyalty Program may be expanded to be the loyalty program of both the GOL Entities (and their respective subsidiaries) and another airline so long as such expansion is not adverse to any of the GOL Entities.

    Upon a breach of any of the foregoing, each of the GOL Entities hereby agrees, jointly and severally, to pay you an amount equal to USD 3,500,000,000.00 (three billion five hundred million dollars), which is the amount of the appraised value of the Loyalty Program as of the date hereof. The foregoing amount constitutes a reasonable estimate of the losses that will be suffered by you by reason of any such breach and the GOL Entities hereby agree that they will not seek revision of such amount, including on the grounds of excessiveness. In case the actual losses suffered by you exceed the foregoing amount, the penalty clause will be considered as the minimum compensation due to you.

    Each party hereto acknowledges and agrees that each of the agreements set forth herein is an integral part of this letter agreement between the parties hereto. This letter agreement shall be governed by, and construed in accordance with, the laws of Brazil. Each party hereto irrevocably

1

and unconditionally submits to the exclusive jurisdiction of the courts of São Paulo, SP, in any action or proceeding arising out of or relating to this letter agreement, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court. Each of the parties hereto hereby irrevocably waives, to the fullest extent by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

No party hereto may assign this letter agreement or any rights or obligations under it and any such purported assignment shall be null and void. Each GOL Entity will, jointly and severally, indemnify, defend and hold you, your officers, employees and agents harmless against all obligations, demands, claims, and liabilities asserted by any party in connection with this letter agreement and all losses or expenses incurred, or paid by you from, following, or consequential to the breach by any of the GOL Entities of its agreement set forth in this letter agreement by you (including without limitation attorneys' fees and expenses in connection with the foregoing).

Each provision of this letter agreement is severable from every other provision in determining the enforceability of any provision. This letter agreement may not be amended in any respect by the parties hereto without the prior written consent of (i) The Bank of New York Mellon, as indenture trustee (the "CSSN Indenture Trustee") under the Indenture, dated as of March 2, 2023 (as may be amended, modified or supplemented from time to time the "CSSN Indenture"), made by Abra Global Finance as issuer of the Senior Secured Exchangeable Notes due 2028 and (ii) The Bank of New York Mellon, as indenture trustee under the Indenture, dated as of March 2, 2023 (as may be amended, modified or supplemented from time to time the "SSN Indenture"), made by Abra Global Finance as issuer of the Senior Secured Notes due 2028 (the "SSN Indenture Trustee" and together with the CSSN Indenture Trustee, the "Indenture Trustees"), which Indenture Trustees shall be express and intended third party beneficiaries hereunder for all purposes. This letter agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, are an original, and all taken together, are one agreement.

GOL EQUITY FINANCE

By:
    Name:
    Title:

By:
    Name:
    Title:

GOL LINHAS AÉREAS INTELIGENTES S.A.

By:
    Name:
    Title:


By:
    Name:
    Title:


GOL LINHAS AÉREAS S.A.


By:
    Name:
    Title:


By:
    Name:
    Title:


SMILES FIDELIDADE S.A.


Name:
Title:


Name:
Title:


ACKNOWLEDGED AND AGREED:

ABRA GLOBAL FINANCE


By: _____
    Name:
    Title:

3

ACKNOWLEDGED AND AGREED:

ABRA GROUP LIMITED

By: _____
      Name:
      Title:

4

**EXHIBIT F**

**FORM OF
SUBORDINATION AGREEMENT**

FORM OF

SUBORDINATON AGREEMENT

Among

GOL FINANCE,
as Company,

GOL LINHAS AÉREAS S.A.,
as Guarantor,

ABRA GROUP LIMITED,
as Senior Priority Representative for the Senior Secured Note Purchase Agreement Secured
Parties,

[ ● ],
as Subordinated Priority Representative for the Subordinated Parties,

and

each additional Representative from time to time party hereto

dated as of [ ● ], 2[ ● ]

BUSINESS.29957598.2

**SUBORDINATION AGREEMENT** dated as of [ ● ], 2[ ● ] (this "Agreement"), among GOL FINANCE, a public limited liability company (*société anonyme*) incorporated and existing under the Laws of the Grand Duchy of Luxembourg ("**Luxembourg**"), with registered office at 17, Boulevard Raiffeisen, L-2411 Luxembourg, Luxembourg and registered with the Luxembourg Register of Commerce and Companies (*R.C.S. Luxembourg*) under number B 178497 as issuer (the "**Company**" or the "**Issuer**"), the Guarantors, ABRA GROUP LIMITED., as Senior Priority Representative for the Secured Parties (in such capacity and together with its successors in such capacity, the "Senior Agent"), [ ● ], as Subordinated Priority Representative for the Subordinated Parties (in such capacity and together with its successors in such capacity, the "Subordinated Agent"), and each additional Senior Priority Representative and Subordinated Priority Representative that from time to time becomes a party hereto pursuant to Section 8.09.

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Senior Agent (for itself and on behalf of the Secured Parties), the Subordinated Agent (for itself and on behalf of the Subordinated Parties) and each additional Subordinated Priority Representative (for itself and on behalf of the Additional Subordinated Parties under the applicable Additional Subordinated Debt Facility) agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01    *Certain Defined Terms*. Capitalized terms used but not otherwise defined herein have the meanings set forth in the Senior Secured Note Purchase Agreement or, if defined in the New York UCC, the meanings specified therein. As used in this Agreement, the following terms have the meanings specified below:

"Additional Subordinated Debt" means any Debt that is issued or guaranteed by the Issuer, Guarantor and/or any other Guarantor which Debt and Guarantees are unsecured and subordinated in right of payment priority to the Senior Priority Obligations; provided, however, that (i) such Debt is permitted to be incurred by each Senior Priority Debt Document and Subordinated Priority Debt Document and (ii) the Representative for the holders of such Debt shall have become party to this Agreement pursuant to, and by satisfying the conditions set forth in, Section 8.09 hereof. Additional Subordinated Debt shall include any Registered Equivalent Notes and Guarantees thereof by the Guarantors issued in exchange therefor.

"Additional Subordinated Debt Documents" means, with respect to any series, issue or class of Additional Subordinated Debt, the promissory notes, credit agreements, loan agreements, note purchase agreements, indentures or other operative agreements evidencing or governing such Debt.

"Additional Subordinated Debt Facility" means each credit agreement, loan agreement, note purchase agreement, indenture or other governing agreement with respect to any Additional Subordinated Debt.

"Additional Subordinated Debt Obligations" means, with respect to any series, issue or class of Additional Subordinated Debt, (a) all principal of, and premium and interest

2

(including, without limitation, any interest which accrues after the commencement of any Bankruptcy Case or which would accrue but for the operation of Bankruptcy Laws, whether or not allowed or allowable as a claim in any such proceeding) payable with respect to, such Additional Subordinated Debt, (b) all other amounts payable to the related Additional Subordinated Parties under the related Additional Subordinated Debt Documents and (c) any renewals or extensions of the foregoing.

"Additional Subordinated Parties" means, with respect to any series, issue or class of Additional Subordinated Debt, the holders of such Debt or any other Additional Subordinated Debt Obligation, the Representative with respect thereto, any trustee or agent therefor under any related Additional Subordinated Debt Documents and the beneficiaries of each indemnification obligation undertaken by the Issuer or any Guarantor under any related Additional Subordinated Debt Documents.

"Agreement" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Bankruptcy Case" means a case under the Bankruptcy Code or any other Bankruptcy Law.

"Bankruptcy Code" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Laws" means the Bankruptcy Code, and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Class Debt" has the meaning assigned to such term in Section 8.09.

"Class Debt Parties" has the meaning assigned to such term in Section 8.09.

"Class Debt Representatives" has the meaning assigned to such term in Section 8.09.

"Closing Date" means [_____], 2023.

"Credit Party" means the Issuer or any guarantor under any Debt Facility.

"Debt Facility" means any Senior Priority Debt Facility and any Subordinated Debt Facility.

"DIP Financing" has the meaning assigned to such term in Section 6.01.

"Discharge of Senior Priority Obligations" means the payment in full of all Senior Priority Obligations; provided that the Discharge of Senior Priority Obligations shall not be deemed to have occurred in connection with a Refinancing of such Senior Priority Obligations.

3

"Disposition" means any conveyance, sale, lease, assignment, transfer, license or other disposition.

"Guarantor" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Insolvency or Liquidation Proceeding" means:

(1)    any case commenced by or against the Issuer or any other Credit Party under any Bankruptcy Law, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of the Issuer or any other Credit Party, any receivership or assignment for the benefit of creditors relating to the Issuer or any other Credit Party or any similar case or proceeding relative to the Issuer or any other Credit Party or its creditors, as such, in each case whether or not voluntary;

(2)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to the Issuer or any other Credit Party, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(3)    any other proceeding of any type or nature in which substantially all claims of creditors of the Issuer or any other Credit Party are determined and any payment or distribution is or may be made on account of such claims.

"Issuer" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Joinder Agreement" means a supplement to this Agreement in the form of Annex II hereof required to be delivered by a Representative to the Senior Priority Representative or Subordinated Representative, as the case may be, pursuant to Section 8.09 hereof in order to include an additional Debt Facility hereunder and to become the Representative hereunder for the Subordinated Secured Parties, as the case may be, under such Debt Facility.

"Lien" has the meaning assigned to such term in the Senior Priority Indenture.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Officer's Certificate" has the meaning assigned to such term in Section 8.08.

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority (as defined in the Senior Priority Indenture as in effect on the date hereof).

"Recovery" has the meaning assigned to such term in Section 6.04.

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for

4

such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, issuers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, loan agreement, note purchase agreement, indenture or other agreement. "Refinanced" and "Refinancing" have correlative meanings.

"Registered Equivalent Notes" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act of 1933, substantially identical notes (having the same Guarantees) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the SEC.

"Representatives" means the Senior Priority Representatives and the Subordinated Representatives.

"SEC" means the United States Securities and Exchange Commission and any successor agency thereto.

"Senior Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement and shall include any successor as provided in the Senior Priority Indenture.

"Senior Priority Debt Documents" means the documents governing any Senior Priority Debt Facility.

"Senior Priority Debt Facilities" means the Senior Priority Indenture and any Additional Senior Debt Facilities.

"Senior Priority Indenture" means that certain Note Purchase Agreement, dated as of March 1, 2023, governing the Issuer's Senior Secured Notes due 2028, among the Issuer, the Guarantor, the other parties thereto, the Holders from time-to-time party thereto and TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent.

"Senior Priority Obligations" means the "Obligations" as defined in the Senior Priority Indenture.

"Senior Parties" means any holders, lenders, agents or trustees under any Senior Priority Debt Facility.

"Senior Priority Intercreditor Agreement" means (i) each intercreditor agreement substantially in the form of the Intercreditor Agreement (as defined in the Senior Priority Indenture) or (ii) a customary intercreditor agreement in form and substance reasonably acceptable to the Senior Priority Representative with respect to each Senior Priority Debt Facility in existence at the time such intercreditor agreement is entered into and the Issuer, and which provides that the Liens securing all Debt covered thereby shall be of equal priority (but without regard to the control of remedies).

"Senior Priority Representative" means the Senior Agent.

"Subordinated Indenture" means that certain Subordinated Indenture, dated as of [ ● ], among Guarantor, the Issuer, the holders from time-to-time party thereto, The Bank of New York Mellon, as trustee, and the other parties thereto.

"Subordinated Documents" means the [__] and the other "Loan/Credit Documents" as defined in the [___].

"Subordinated Obligations" means the "Obligations" as defined in the Subordinated Indenture.

"Subordinated Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement and shall include any successor administrative agent as provided in the Subordinated Indenture.

"Subordinated Class Debt" has the meaning assigned to such term in Section 8.09.

"Subordinated Class Debt Parties" has the meaning assigned to such term in Section 8.09.

"Subordinated Class Debt Representative" has the meaning assigned to such term in Section 8.09.

"Subordinated Debt Documents" means (a) the Subordinated Indenture Documents and (b) any Additional Subordinated Debt Documents.

"Subordinated Debt Facilities" means the Subordinated Indenture and any Additional Subordinated Debt Facilities.

"Subordinated Debt Obligations" means the Subordinated Indenture Obligations and any Additional Subordinated Debt Obligations.

"Subordinated Enforcement Date" means, with respect to any Subordinated Representative, the date which is 150 days after the occurrence of both (i) an Event of Default (under and as defined in the Subordinated Debt Document for which such Subordinated Representative has been named as Representative) and (ii) the Senior Priority Representative's and each other Representative's receipt of written notice from such Subordinated Representative that (x) that an Event of Default (under and as defined in the Subordinated Debt Document for which such Subordinated Representative has been named as Representative) has occurred and is continuing and (y) the Subordinated Debt Obligations of the series with respect to which such Subordinated Representative is the Subordinated Representative are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Subordinated Debt Document; provided that the Subordinated Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any collateral (1) at any time the Senior Priority Representative has commenced and is diligently pursuing any enforcement action with respect to such collateral or (2) at any time any Credit Party which has granted a security interest in all or any material portion of the collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

6

"Subordinated Representative" means (i) in the case of any Subordinated Obligations, the Subordinated Agent and (ii) in the case of any Additional Subordinated Debt Facility and the Additional Subordinated Secured Parties thereunder, the trustee, administrative agent or similar agent under such Additional Subordinated Debt Facility that is named as the Representative in respect of such Additional Subordinated Debt Facility in the applicable Joinder Agreement.

"Subordinated Parties" means any holders, lenders, agents or trustees under any Subordinated Debt Facility.

"Secured Obligations" means the Senior Priority Obligations and the Subordinated Debt Obligations.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Issuer.

"Uniform Commercial Code" or "UCC" means, unless otherwise specified, the Uniform Commercial Code as from time to time in effect in the State of New York.

Section 1.02    *Terms Generally*. The rules of interpretation set forth in Section 1.01 of the Senior Priority Indenture are incorporated herein *mutatis mutandis*.

With respect to the Issuer, any reference to: (i) a "Lien", a lien or security interest includes any *hypothèque*, *nantissement*, *gage*, *privilège*, *sûreté réelle*, *droit de rétention* and any type of real security or agreement or arrangement having a similar effect and any transfer of title by way of security, (ii) a Person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*), (iii) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts consolidés*) or limited partnership agreement (*contrat social*), (iv) a director, officer, manager or managing member includes a *gérant*, *associé commandité-gérant* or an *administrateur* or, in case of a partnership, a *gérant* or an a*dministrateur* of its general partner, (v) a receiver, *administrative receiver*, administrator, liquidator or the like includes a *juge délégué*, *commissaire*, *juge-commissaire*, *liquidateur* or *curateur*, (vi) a winding-up, administration or dissolution includes bankruptcy (*faillite*), insolvency, judicial or extrajudicial reorganization, liquidation, administrative dissolution without liquidation (*dissolution administrative sans liquidation*), composition with creditors (*concordat préventif de la faillite*), moratorium or suspension of payments (*sursis de paiement*), controlled management (*gestion contrôlée*), fraudulent conveyance (*action paulienne*), general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally.

7

# ARTICLE 2
## SUBORDINATION

Section 2.01    *Subordination*. Notwithstanding any provisions of any Subordinated Debt Documents to the contrary, the Subordinated Debt Obligations shall be subordinate and junior in right of payment to all Senior Debt Obligations, to the extent and in the manner provided for in this Agreement, and each Subordinated Secured Party under its Subordinated Debt Facility, by acceptance thereof, whether upon original issuance, transfer, assignment or exchange, agrees to be bound by the provisions of this Agreement.

Section 2.02    *Nature Of Senior Lender Claims*. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, acknowledges that:

(a)        the terms of the Senior Priority Debt Documents and the Senior Priority Obligations may be amended, restated, amended and restated, supplemented or otherwise modified, and the Senior Priority Obligations, or a portion thereof, may be Refinanced from time to time, and

(b)        the aggregate amount of the Senior Priority Obligations may be increased with notice to but without consent by the Subordinated Representatives or the Subordinated Secured Parties and without affecting the provisions hereof, except as otherwise expressly set forth herein. The subordination provided for in Section 2.01 shall not be altered or otherwise affected by any amendment, restatement, amendment and restatement, supplement or other modification, or any Refinancing, of either the Senior Priority Obligations or the Subordinated Debt Obligations, or any portion thereof.

Section 2.03    *Prohibition On Contesting*. Each of the Subordinated Representatives, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it shall not (and hereby waives any right to), directly or indirectly, contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, extent, perfection, priority, amount, characterization or enforceability of either the Senior Priority Obligations or any Lien securing any Senior Priority Obligations held (or purported to be held) by or on behalf of any Senior Priority Representative or any of the other Senior Parties or other agent or trustee therefor.

Section 2.04    *No New Liens*. The parties hereto agree that, so long as the Discharge of Senior Priority Obligations has not occurred, none of the Credit Parties shall grant any additional Liens on any asset or property of any Credit Party to secure any Subordinated Debt Obligation.

Section 2.05    *No Demand or Setoff.*  Each of the Subordinated Representatives, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it shall not (and hereby waives any right to), ask, demand, sue for, take or knowingly receive from the Issuer or any loan party, by setoff or in any other manner, the whole or any part of the Subordinated Debt Obligations.

BUSINESS.29957598.2

ARTICLE 3
ENFORCEMENT

Section 3.01    *Exercise Of Remedies*.

(a)      So long as the Discharge of Senior Priority Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Issuer or any other Credit Party, (i) neither any Subordinated Representative nor any Subordinated Secured Party will (x) exercise or seek to exercise any rights or remedies (including setoff) in respect of any Subordinated Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), (y) contest, protest or object to any foreclosure proceeding or other action brought by any Senior Priority Representative or any Senior Priority Secured Party in respect of the Senior Priority Obligations, the exercise of any right by any Senior Priority Representative or any Senior Priority Secured Party (or any agent or sub-agent on their behalf) in respect of the Senior Priority Obligations under any lockbox agreement, control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which any Senior Priority Representative or any Senior Priority Secured Party either is a party or may have rights as a third party beneficiary, or any other exercise by any such party of any rights and remedies under the Senior Priority Debt Documents or otherwise in respect of the Senior Priority Obligations, or (z) object to the forbearance by the Senior Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies in respect of Senior Priority Obligations and (ii) except as otherwise provided herein, the Senior Priority Representatives and the Senior Parties shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition or restrictions of any collateral without any consultation with or the consent of any Subordinated Representative or any Subordinated Secured Party; provided, however, that (A) in any Insolvency or Liquidation Proceeding commenced by or against Guarantor, the Issuer or any other Credit Party, any Subordinated Representative may file a claim or statement of interest with respect to the Subordinated Debt Obligations under its Subordinated Debt Facility, (B) [reserved], (C) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Subordinated Secured Parties, if any, in each case in accordance with the terms of this Agreement; (D) [reserved]; (E) accelerate any Subordinated Debt Obligations, (F) any Subordinated Representative and the Subordinated Secured Parties may exercise their rights and remedies as unsecured creditors, as provided in Section 5.04, (G) any Subordinated Representative may exercise the rights and remedies provided for in Section 6.03 and (H) from and after the Subordinated Enforcement Date, the Subordinated Representative may exercise or seek to exercise any rights or remedies (including setoff) in respect of any Subordinated Debt Obligations, or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), but only so long as (1) the Senior Priority Representative has not commenced and is not diligently pursuing any enforcement action or (2) any Credit Party which has granted a security interest securing any Senior Debt Obligations is not then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding. In exercising rights and remedies with respect to any collateral, the Senior Priority Representatives and the Senior Parties may enforce the provisions of the Senior Priority Debt Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent

9

appointed by them to sell or otherwise dispose of collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured lender under the Uniform Commercial Code of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)    So long as the Discharge of Senior Priority Obligations has not occurred, each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it will not take or receive any collateral or any proceeds thereof in connection with the exercise of any right or remedy (including setoff) with respect to any collateral in respect of Subordinated Debt Obligations.

(c)    Subject to the proviso in clause (ii) of Section 3.01(a), (i) each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that neither such Subordinated Representative nor any such Subordinated Secured Party will take any action that would hinder any exercise of remedies undertaken by any Senior Priority Representative or any Senior Priority Secured Party with respect to any collateral under the Senior Priority Debt Documents, including any Disposition of collateral, whether by foreclosure or otherwise, and (ii) each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, hereby waives any and all rights it or any such Subordinated Secured Party may have to object to the manner in which the Senior Priority Representatives or the Senior Parties seek to enforce or collect the Senior Priority Obligations or the Liens securing such obligations, regardless of whether any action or failure to act by or on behalf of any Senior Priority Representative or any other Senior Priority Secured Party is adverse to the interests of the Subordinated Secured Parties.

(d)    Each Subordinated Representative hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Subordinated Debt Document shall be deemed to restrict in any way the rights and remedies of the Senior Priority Representatives or the Senior Parties with respect to any collateral as set forth in this Agreement and the Senior Priority Debt Documents.

(e)    Until the Discharge of Senior Priority Obligations, the Senior Priority Representative shall have the exclusive right to exercise any right or remedy with respect to any collateral and shall have the exclusive right to determine and direct the time, method and place for exercising such right or remedy or conducting any proceeding with respect thereto.

(f)    The Senior Representative shall have no obligation to any Subordinated Secured Party with respect to the collateral or the Subordinated Debt Obligations.

(g)    Nothing in this Agreement shall prohibit the receipt by the agent for the Subordinated Parties of the required payments of interest and other amounts owed in respect of the Subordinated Obligations so long as such receipt is permitted by this Agreement and is not the direct or indirect result of the exercise of remedies or an enforcement action or in contravention of this Agreement or the Senior Priority Debt Documents

Section 3.02    _Cooperation_. Subject to the proviso in clause (ii) of Section 3.01(a), each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its

10

Subordinated Debt Facility, agrees that, unless and until the Discharge of Senior Priority Obligations has occurred, it will not commence, or join with any Person (other than the Senior Parties and the Senior Priority Representatives upon the request of the Senior Priority Representative) in commencing, any enforcement, collection, execution, levy or foreclosure action or proceeding in respect of the Subordinated Debt Obligations.

Section 3.03 *Actions Upon Breach*. Should any Subordinated Representative or any Subordinated Secured Party, contrary to this Agreement, in any way take, attempt to take or threaten to take any action with respect to any collateral (including any attempt to realize upon or enforce any remedy with respect to this Agreement) or fail to take any action required by this Agreement, any Senior Priority Representative or other Senior Priority Secured Party (in its or their own name or in the name of the Issuer or any other Credit Party) or the Issuer may obtain relief against such Subordinated Representative or such Subordinated Secured Party by injunction, specific performance or other appropriate equitable relief. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Facility, hereby (i) agrees that the Senior Parties' damages from the actions of the Subordinated Representatives or any Subordinated Secured Party may at that time be difficult to ascertain and may be irreparable and waives any defense that Guarantor, the Issuer, any other Credit Party or the Senior Parties cannot demonstrate damage or be made whole by the awarding of damages and (ii) irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by any Senior Priority Representative or any other Senior Priority Secured Party.

ARTICLE 4
PAYMENTS

Section 4.01 *Application Of Proceeds*. So long as the Discharge of Senior Priority Obligations has not occurred and regardless of whether an Insolvency or Liquidation Proceeding has been commenced, any collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such collateral upon the exercise of remedies shall be applied by the Senior Priority Representative to the Senior Priority Obligations in such order as specified in the relevant Senior Priority Debt Documents and, if applicable, the Senior Priority Intercreditor Agreement, until the Discharge of Senior Priority Obligations has occurred.

Section 4.02 *Payments Over*. So long as the Discharge of Senior Priority Obligations has not occurred, any collateral, proceeds thereof, or any payments in cash in respect of any principal of any Subordinated Debt Obligations received by any Subordinated Representative or any Subordinated Secured Party shall be segregated and held in trust for the benefit of and promptly paid over to the Senior Priority Representative for the benefit of the Senior Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The Senior Priority Representative is hereby authorized to make any such endorsements as agent for each of the Subordinated Representatives or any such Subordinated Secured Party. This authorization is coupled with an interest and is irrevocable.

ARTICLE 5
OTHER AGREEMENTS

Section 5.01    *[Reserved]*.

Section 5.02    *[Reserved]*.

Section 5.03    *Certain Amendments*.

(a)        [Reserved]

(b)        [Reserved[

(c)        The Senior Priority Debt Documents may be amended, restated, amended and restated, waived, supplemented or otherwise modified in accordance with their terms, and the indebtedness under the Senior Priority Debt Documents may be Refinanced, in each case, without the consent of any Subordinated Representative or Subordinated Secured Party; provided, however, that, without the consent of (x) the Subordinated Priority Representative, acting with the consent of the Supermajority Holders (as such term is defined in the Subordinated Indenture) and (y) each other Subordinated Representative (acting with the consent of the requisite holders of each series of Additional Subordinated Debt), no such amendment, restatement, amendment and restatement, waiver, supplement or modification shall contravene any provision of this Agreement.

(d)        The Subordinated Debt Documents may be amended, restated, waived, supplemented or otherwise modified in accordance with their terms, and the indebtedness under the Subordinated Debt Documents may be refinanced, renewed, extended or replaced, in each case, without the consent of any Senior Priority Representative or Senior Priority Secured Party; *provided*, that if the Senior Parties change or add any negative covenant or event of default in the Senior Priority Debt Facilities, the Subordinated Debt Documents may be amended by the Subordinated Secured Parties to make such corresponding changes or additions in the Subordinated Debt Documents, so long as such changes to the Subordinated Debt Documents maintain any appropriate cushions to the Senior Priority Debt Documents consistent with those in existence as of the date hereof; provided, however, that, without the consent of (x) the Senior Priority Representative, acting with the consent of the Supermajority Holders (as such term is defined in the Senior Priority Indenture) and (y) each other Senior Priority Representative (acting with the consent of the requisite holders of each series of Additional Senior Priority Debt), no such amendment, restatement, supplement or modification shall contravene any provision of this Agreement.

Section 5.04    *Rights As Unsecured Creditors*. Notwithstanding anything to the contrary in this Agreement, the Subordinated Representatives and the Subordinated Secured Parties may exercise rights and remedies as unsecured creditors against Guarantor, the Issuer and any other Credit Party in accordance with the terms of the Subordinated Debt Documents and applicable law so long as such rights and remedies do not violate any express provision of this Agreement. Nothing in this Agreement shall prohibit the receipt by any Subordinated Representative or any Subordinated Secured Party of the required payments of interest, fees and other amounts due under the Subordinated Debt Documents so long as such receipt is not the direct or indirect result of the exercise by a Subordinated Representative or any Subordinated Secured Party of rights or remedies

12

in respect of collateral or in respect of payments of principal prohibited hereunder. In the event any Subordinated Representative or any Subordinated Secured Party becomes a judgment Lien creditor in respect of collatearl as a result of its enforcement of its rights as an unsecured creditor in respect of Subordinated Debt Obligations, such judgment Lien shall be subordinated to the Liens securing Senior Priority Obligations. Nothing in this Agreement shall impair or otherwise adversely affect any rights or remedies the Senior Priority Representatives or the Senior Parties may have with respect to any collateral.

Section 5.05   *[Reserved]*.

Section 5.06   *When Discharge Of Senior Priority Obligations Deemed To Not Have Occurred*. If, at any time after the Discharge of Senior Priority Obligations has occurred, Guarantor, the Issuer or any Subsidiary incurs any Senior Priority Obligations (other than in respect of the payment of indemnities surviving the Discharge of Senior Priority Obligations), then such Discharge of Senior Priority Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of Senior Priority Obligations) and the applicable agreement governing such Senior Priority Obligations shall automatically be treated as a Senior Priority Debt Document for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of any collateral set forth herein and the agent, representative or trustee for the holders of such Senior Priority Obligations shall be the Senior Priority Representative for all purposes of this Agreement. Upon receipt of notice of such incurrence (including the identity of the new Senior Priority Representative), each Subordinated Representative (including the Subordinated Representative) shall promptly (a) enter into such documents and agreements (at the expense of the Issuer), including amendments, supplements or modifications to this Agreement, as the Issuer or such new Senior Priority Representative shall reasonably request in writing in order to provide the new Senior Priority Representative the rights of a Senior Priority Representative contemplated hereby, (b) deliver to such Senior Priority Representative, to the extent that it is legally permitted to do so, all collateral, including all proceeds thereof, held or controlled by such Subordinated Representative or any of its agents or bailees, including the transfer of possession and control, as applicable, of collateral, together with any necessary endorsements and notices to depositary banks, securities intermediaries and commodities intermediaries, and assign its rights under any landlord waiver or bailee's letter or any similar agreement or arrangement granting it rights or access to collateral, (c) notify any applicable insurance carrier that it is no longer entitled to be a loss payee or additional insured under the insurance policies of any Credit Party issued by such insurance carrier and (d) notify any governmental authority involved in any condemnation or similar proceeding involving a Credit Party that the new Senior Priority Representative is entitled to approve any awards granted in such proceeding.

Section 5.07   *[Reserved]*.

Section 5.08   *Purchase Option.*

(a)   Without prejudice to the enforcement of the Senior Parties, the Senior Parties agree that following: (i) a payment default under the Senior Priority Debt Documents that has not been cured (or waived by the Senior Parties) within 60 days of the occurrence thereof, (ii)

13

an acceleration of the Senior Priority Senior Lien Obligations in accordance with the terms of the Senior Priority Debt Documents, (iii) the commencement of any Insolvency or Liquidation Proceeding or (iv) the exercise of any enforcement action by the Senior Parties in respect of a material portion of the collateral (each, a "Purchase Event"), the Subordinated Secured Parties may, at their sole expense and effort, upon notice from the Subordinated Representative at the direction of such Subordinated Secured Parties to the Issuer or Guarantor or other Credit Party and the Senior Priority Representative, irrevocably elect to acquire from the Senior Parties, without warranty or representation or recourse from or to the Senior Parties, all (but not less than all) of the Senior Priority Debt Obligations and all rights of the Senior Parties under the Senior Priority Debt Documents; _provided,_ that (w) any such purchase option must be exercised within fifteen (15) days after the initial occurrence of any Purchase Event, (x) the Senior Priority Representative and the Senior Parties shall retain all rights to be indemnified or to be held harmless by the Issuer or Guarantor or other Credit Party in accordance with the terms of the Senior Priority Debt Documents, (y) such assignment shall not conflict with any law, rule or regulation or order of any court or other governmental authority having jurisdiction, and (z) the Subordinated Secured Parties shall have paid to the Senior Priority Representative, for the account of the Senior Parties, in immediately available funds, an amount equal to the amount that would be required if the Notes were optionally redeemed prior to the Maturity Date plus all accrued and unpaid interest thereon plus all accrued and unpaid fees (including reasonable attorney's fees and costs) and premiums (including any prepayment premium under the Senior Priority Debt Documents)) and any breakage costs and expenses plus all the other Senior Priority Obligations then outstanding.

(b)      In order to effectuate the foregoing, the Senior Agent  shall calculate, upon the written request of the Subordinated Representative from time to time, the amount in cash that would be necessary to so purchase the Senior Priority Secured Obligations.

(c)      If the right set forth in this Section 5.08 is exercised: (i) the parties shall endeavor to close promptly thereafter but in any event within ten (10) Business Days of the notice set forth in the first sentence of this Section 5.08, (ii) such purchase of the Senior Priority Obligations shall be exercised pursuant to documentation mutually and reasonably acceptable to each of the Senior Priority Representative and the Subordinated Representative, and (iii) such Senior Priority Obligations shall be purchased pro rata among the Subordinated Secured Parties according to such Subordinated Secured Parties' portion of the Subordinated Obligations outstanding on the date of purchase pursuant to this Section 5.08.

(d)      In the event that any one or more of the Subordinated Secured Parties exercises the purchase option set forth in this Section 5.08: (i) the Senior Priority Representative shall have the right, but not the obligation, to immediately resign under the Senior Priority Collateral Documents upon the closing of such purchase and (ii) the purchasing Subordinated Secured Parties shall have the right, but not the obligation, to require the Senior Agent to immediately resign under the Senior Priority Collateral Documents upon the closing of such purchase.

## ARTICLE 6
## INSOLVENCY OR LIQUIDATION PROCEEDINGS

Section 6.01     _Financing Issues_.

14

(a)      Until the Discharge of Senior Priority Obligations has occurred, if Guarantor, the Issuer or any other Credit Party shall be subject to any Insolvency or Liquidation Proceeding, then each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that (A) subject to Section 6.01(b), if any Senior Priority Representative or any Senior Priority Secured Party shall desire to consent (or not object) to the sale, use or lease of cash or other collateral or to consent (or not object) to Guarantor's, the Issuer's or any other Credit Party's obtaining financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law (any such financing, a "DIP Financing"), it will raise no objection to and will not otherwise contest such sale, use or lease of such cash or other collateral or such DIP Financing and, except to the extent permitted by the proviso in clause (ii) of Section 3.01(a) and Section 6.03, will not request adequate protection or any other relief in connection therewith and (y) any "carve-out" for professional and United States Trustee fees agreed to by the Senior Priority Representatives, (B) it will raise no objection to (and will not otherwise contest) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Senior Priority Obligations made by any Senior Priority Representative or any other Senior Priority Secured Party, (C) it will raise no objection to (and will not otherwise contest) any lawful exercise by any Senior Priority Secured Party of the right to credit bid Senior Priority Obligations at any sale in foreclosure of collateral, (D) it will raise no objection to (and will not otherwise contest) any other request for judicial relief made in any court by any Senior Priority Secured Party relating to the lawful enforcement of any Lien on collateral and (E) it will raise no objection to (and will not otherwise contest or oppose and shall be deemed to have consented to) any order relating to a Disposition of assets of any Credit Party for which any Senior Priority Representative has consented. Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that notice received three Business Days prior to the entry of an order approving such usage of cash or other collateral or approving such financing shall be adequate notice.

(b)      Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility agrees that it will not provide, or offer to provide, any DIP Financing to the Issuer unless no Senior Priority Secured Party shall have offered to provide a DIP Financing, or agreed to support a DIP Financing provided by another Person, that would satisfy the terms set forth in this Section 6.01 (the "Subordinated DIP Financing Proposal Condition").  If the Subordinated DIP Financing Proposal Condition is satisfied on or prior to the date of the hearing to approve DIP Financing for the Guarantor, the Issuer or any other Credit Party for the Subordinated Secured Parties may propose a DIP Financing, which may be secured by Liens equal or senior in priority to or on a pari passu basis with the Liens securing any of the Senior Priority Debt Facilities, so long as such DIP Financing does not compel the Guarantor, the Issuer or any other Credit Party to seek confirmation of a specific plan of reorganization and such DIP Financing does not "roll-up" or require the payment of any of the Subordinated Debt Obligations.

        Section 6.02    *Relief From The Automatic Stay*. Until the Discharge of Senior Priority Obligations has occurred, each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding or take any action in derogation thereof without the prior written consent of the Senior Priority Representative.

BUSINESS.29957598.2

Section 6.03    *Adequate Protection*. Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, agrees that none of them shall object, contest or support any other Person objecting to or contesting (a) any request by any Senior Priority Representative or any Senior Parties for adequate protection, (b) any objection by any Senior Priority Representative or any Senior Parties to any motion, relief, action or proceeding based on any Senior Priority Representative's or Senior Priority Secured Party's claiming a lack of adequate protection or (c) the payment of interest, fees, expenses or other amounts of any Senior Priority Representative or any other Senior Priority Secured Party under Section 506(b) or 506(c) of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law. N

Section 6.04    *Preference Issues*. If any Senior Priority Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay any amount to the estate of Guarantor, the Issuer or any other Credit Party (or any trustee, receiver or similar Person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason (any such amount, a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then the Senior Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Senior Parties shall be entitled to the benefits of this Agreement until a Discharge of Senior Priority Obligations with respect to all such recovered amounts. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Each Subordinated Representative, for itself and on behalf of each Subordinated Secured Party under its Subordinated Debt Facility, hereby agrees that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

Section 6.05    *[Reserved]*.

Section 6.06    *No Waivers Of Rights Of Senior Parties*. Nothing contained herein shall, except as expressly provided herein, prohibit or in any way limit any Senior Priority Representative or any other Senior Priority Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any Subordinated Secured Party, including the seeking by any Subordinated Secured Party of adequate protection or the asserting by any Subordinated Secured Party of any of its rights and remedies under the Subordinated Debt Documents or otherwise.

Section 6.07    *Application*. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law, shall be effective before, during and after the commencement of any Insolvency or Liquidation Proceeding.  All references herein to any Credit Party shall include such Credit Party as a debtor-in-possession and any receiver or trustee for such Credit Party.

16

Section 6.08    _Other Matters_.

To the extent that any Subordinated Representative or any Subordinated Secured Party has or acquires rights under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law with respect to any of the collateral, such Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, agrees not to assert any such rights without the prior written consent of each Senior Priority Representative, provided that if requested by any Senior Priority Representative, such Subordinated Representative shall timely exercise such rights in the manner requested by the Senior Priority Representatives (acting unanimously), including any rights to payments in respect of such rights.

Section 6.09    _506(c) Claims_. Until the Discharge of Senior Priority Obligations has occurred, each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it will not assert or enforce any claim under Section 506(c) of Title 11 of the United States Code or any similar provision of any other Bankruptcy Law senior to or on a parity with the Liens securing the Senior Priority Obligations for costs or expenses of preserving or disposing of any collateral.

Section 6.10    _Reorganization Securities_. If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of both the Senior Priority Obligations and the Subordinated Debt Obligations, then, to the extent the debt obligations distributed on account of the Senior Priority Obligations and on account of the Subordinated Debt Obligations are secured by Liens upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

ARTICLE 7
RELIANCE; ETC

Section 7.01    _Reliance_. The consent by the Senior Parties to the execution and delivery of the Subordinated Debt Documents to which the Senior Parties have consented and all loans and other extensions of credit made or deemed made on and after the date hereof by the Senior Parties to Guarantor, the Issuer or any Subsidiary shall be deemed to have been given and made in reliance upon this Agreement. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Parties have, independently and without reliance on any Senior Priority Representative or other Senior Priority Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Subordinated Debt Documents to which they are party or by which they are bound, this Agreement and the transactions contemplated hereby and thereby, and they will continue to make their own credit decision in taking or not taking any action under the Subordinated Debt Documents or this Agreement.

Section 7.02    _No Warranties Or Liability_. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, acknowledges

BUSINESS.29957598.2

and agrees that neither any Senior Priority Representative nor any other Senior Priority Secured Party has made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Senior Priority Debt Documents, the ownership of any collateral or the perfection or priority of any Liens thereon. The Senior Parties will be entitled to manage and supervise their respective loans and extensions of credit under the Senior Priority Debt Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate, and the Senior Parties may manage their loans and extensions of credit without regard to any rights or interests that the Subordinated Representatives and the Subordinated Secured Parties have , except as otherwise provided in this Agreement. Neither any Senior Priority Representative nor any other Senior Priority Secured Party shall have any duty to any Subordinated Representative or Subordinated Secured Party to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of an event of default or default under any agreement with Guarantor, the Issuer or any Subsidiary (including the Subordinated Debt Documents), regardless of any knowledge thereof that they may have or be charged with. Except as expressly set forth in this Agreement, the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties have not otherwise made to each other, nor do they hereby make to each other, any warranties, express or implied, nor do they assume any liability to each other with respect to (a) the enforceability, validity, value or collectability of any of the Senior Priority Obligations, the Subordinated Debt Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) any Credit Party's title to or right to transfer any of the collateral or (c) any other matter except as expressly set forth in this Agreement.

Section 7.03    *Obligations Unconditional*. All rights, interests, agreements and obligations of the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties hereunder shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any Senior Priority Debt Document or any Subordinated Debt Document;

(b)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the Senior Priority Obligations or Subordinated Debt Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the Senior Priority Indenture or any other Senior Priority Debt Document or of the terms of any Subordinated Debt Document;

(c)    any exchange of any security interest in any collateral or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Senior Priority Obligations or Subordinated Debt Obligations or any guarantee thereof;

(d)    the commencement of any Insolvency or Liquidation Proceeding in respect of Guarantor, the Issuer or any other Credit Party; or

(e)    any other circumstances that otherwise might constitute a defense available to, or a discharge of, (i) Guarantor, the Issuer or any other Credit Party in respect of the Senior Priority Obligations or (ii) any Subordinated Representative or Subordinated Secured Party in respect of this Agreement.

## ARTICLE 8
## MISCELLANEOUS

Section 8.01    _Conflicts_. Subject to Section 8.18, in the event of any conflict between the provisions of this Agreement and the provisions of any Senior Priority Debt Document or any Subordinated Debt Document, the provisions of this Agreement shall govern. Notwithstanding the foregoing, the relative rights and obligations of the Senior Priority Representatives and the Senior Parties (as amongst themselves) with respect to any collateral shall be governed by the terms of the Senior Priority Intercreditor Agreement and in the event of any conflict between the Senior Priority Intercreditor Agreement and this Agreement, the provisions of the Senior Priority Intercreditor Agreement shall control.

Section 8.02   _Continuing Nature Of This Agreement; Severability_. Subject to Section 6.04, this Agreement shall continue to be effective until the Discharge of Senior Priority Obligations shall have occurred. This is a continuing agreement of subordination, and the Senior Parties may continue, at any time and without notice to the Subordinated Representatives or any Subordinated Secured Party, to extend credit and other financial accommodations and lend monies to or for the benefit of Guarantor, the Issuer or any Subsidiary constituting Senior Priority Obligations in reliance hereon. The terms of this Agreement shall survive and continue in full force and effect in any Insolvency or Liquidation Proceeding. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

If all or any portion of the Senior Priority Obligations are Refinanced (the "Refinancing Indebtedness"): (i) the Refinancing Indebtedness and all other obligations under the loan documents evidencing such Refinancing Indebtedness (the "Refinancing Documents") shall automatically be treated as Senior Priority Obligations for all purposes of this Agreement, (ii) the Refinancing Documents shall automatically be treated as the Senior Priority Indenture and the other Senior Priority Debt Documents for all purposes of this Agreement and (iii) the agent or purchaser under the Refinancing Documents (the "New Agent") shall be deemed to be the Senior Agent for all purposes of this Agreement.  The Subordinated Agent and the Subordinated Representative shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the Issuer, the other loan parties or such New Agent may reasonably request in order to provide to the New Agent the rights and powers contemplated hereby, in each case consistent in all material respects with the terms of this Agreement

Section 8.03   _Amendments; Waivers_.

(a)      No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies

19

that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)      This Agreement may be amended in writing signed by each Representative (in each case, acting in accordance with the documents governing the applicable Debt Facility); provided that any such amendment, supplement or waiver which by the terms of this Agreement requires the Issuer's consent or which increases the obligations or reduces the rights of Guarantor, the Issuer or any Credit Party, shall require the consent of the Issuer. Any such amendment, supplement or waiver shall be in writing and shall be binding upon the Senior Parties and the Subordinated Secured Parties and their respective successors and assigns.

(c)      Notwithstanding the foregoing, without the consent of any Secured Party, any Representative may become a party hereto by execution and delivery of a Joinder Agreement in accordance with Section 8.09 of this Agreement and, upon such execution and delivery, such Representative and the Secured Parties and Senior Priority Obligations or Subordinated Debt Obligations of the Debt Facility for which such Representative is acting shall be subject to the terms hereof.

Section 8.04    *Information Concerning Financial Condition Of Guarantor, The Issuer And The Subsidiaries*. The Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties shall each be responsible for keeping themselves informed of (a) the financial condition of Guarantor, the Issuer and the Subsidiaries and all endorsers or guarantors of the Senior Priority Obligations or the Subordinated Debt Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Senior Priority Obligations or the Subordinated Debt Obligations. The Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties shall have no duty to advise any other party hereunder of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any Senior Priority Representative, any Senior Priority Secured Party, any Subordinated Representative or any Subordinated Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to any other party, it shall be under no obligation to (i) make, and the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties shall not make or be deemed to have made, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) provide any additional information or to provide any such information on any subsequent occasion, (iii) undertake any investigation or (iv) disclose any information that, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

Section 8.05    *Subrogation*. Each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, hereby waives any rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Senior Priority Obligations has occurred.

Section 8.06  *Application Of Payments*. Except as otherwise provided herein, all payments received by the Senior Parties may be applied, reversed and reapplied, in whole or in part, to such part of the Senior Priority Obligations as the Senior Parties, in their sole discretion, deem appropriate, consistent with the terms of the Senior Priority Debt Documents. Except as otherwise provided herein, each Subordinated Representative, on behalf of itself and each Subordinated Secured Party under its Subordinated Debt Facility, assents to any such extension or postponement of the time of payment of the Senior Priority Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security that may at any time secure any part of the Senior Priority Obligations and to the addition or release of any other Person primarily or secondarily liable therefor.

Section 8.07  *Additional Credit Parties*. Guarantor and the Issuer agree that, if any Subsidiary shall become a Credit Party after the date hereof, they will promptly cause such Subsidiary to become party hereto by executing and delivering an instrument in the form of Annex I. Upon such execution and delivery, such Subsidiary will become a Credit Party hereunder with the same force and effect as if originally named as a Credit Party herein. The execution and delivery of such instrument shall not require the consent of any other party hereunder, and will be acknowledged by the Subordinated Representative and the Senior Priority Representative. The rights and obligations of each Credit Party hereunder shall remain in full force and effect notwithstanding the addition of any new Credit Party as a party to this Agreement.

Section 8.08  *[Reserved]*.

Section 8.09  *Additional Debt Facilities*.

(a)    To the extent, but only to the extent, permitted by the provisions of the Senior Priority Debt Documents and the Subordinated Debt Documents, the Issuer, Guarantor or any other Credit Party may incur or issue and sell one or more series or classes of Additional Subordinated Debt (the "Subordinated Class Debt"), which shall be unsecured, if and subject to the condition that the Representative of any such Subordinated Class Debt (each, a "Subordinated Class Debt Representative"), acting on behalf of the holders of such Subordinated Class Debt (such Representative and holders in respect of any Subordinated Class Debt being referred to as the "Subordinated Class Debt Parties"), becomes a party to this Agreement by satisfying conditions (i) through (iii), as applicable, of the immediately succeeding paragraph, and Section 8.09(b). In order for a Subordinated Class Debt Representative to become a party to this Agreement:

(i)    such Subordinated Class Debt Representative shall have executed and delivered a Joinder Agreement substantially in the form of Annex II (with such changes as may be reasonably approved by the Senior Priority Representative and such Subordinated Class Debt Representative) pursuant to which it becomes a Representative hereunder, and the Subordinated Class Debt in respect of which such Subordinated Class Debt Representative is the Representative and the related Subordinated Class Debt Parties become subject hereto and bound hereby;

(ii)    the Issuer shall have delivered to the Senior Priority Representative an Officer's Certificate stating that the conditions set forth in this Section 8.09 are satisfied with respect to such Subordinated Class Debt and, if requested, true and complete copies

21

of each of the Subordinated Debt Documents relating to such Subordinated Class Debt, certified as being true and correct by an Authorized Officer of the Issuer; and

(iii)     the Subordinated Debt Documents relating to such Subordinated Class Debt shall provide, or shall be amended on terms and conditions reasonably approved by the Senior Priority Representative and such Subordinated Class Debt Representative, that each Subordinated Class Debt Party with respect to such Subordinated Class Debt will be subject to and bound by the provisions of this Agreement in its capacity as a holder of such Subordinated Class Debt.

Section 8.10     *Consent To Jurisdiction; Waivers*. Each Representative, on behalf of itself and the Secured Parties of the Debt Facility for which it is acting, irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York in the County of New York, the courts of the United States of America for the Southern District of New York in the County of New York, and appellate courts from any thereof;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Representative) at the address referred to in Section 8.11;

(d)     agrees that nothing herein shall affect the right of any other party hereto (or any Secured Party) to effect service of process in any other manner permitted by law; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 8.10 any special, exemplary, punitive or consequential damages.

Section 8.11     *Notices*. All notices, requests, demands and other communications provided for or permitted hereunder shall be in writing and shall be sent:

(i)     if to Guarantor, the Issuer or any Credit Party, to the Guarantor, at its address at:

     to Abra Group Limited
1 Ashley Road, Third Floor
Altrincham, Cheshire, WA14 2DT, United Kingdom
Attention: Chief Financial Officer

(ii)     if to the Senior Agent, to it at:

22

> to Abra Group Limited
> 1 Ashley Road, Third Floor
> Altrincham, Cheshire, WA14 2DT, United Kingdom
> Attention: Chief Financial Officer

(iii)    if to the Senior Priority Representative, to it at:

[Corporate Trust Office]

(iv)    if to the Subordinated Priority Representative, to it at:

[ ● ]

(v)    if to any other Representative, to it at the address specified by it in the Joinder Agreement delivered by it pursuant to Section 8.09.

Unless otherwise specifically provided herein, all notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 8.11 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 8.11. As agreed to among the parties hereto from time to time, notices and other communications may also be delivered by e-mail to the email address of a representative of the applicable Person provided from time to time by such Person.

Section 8.12    *Further Assurances*. Each Senior Priority Representative, on behalf of itself and each Senior Priority Secured Party under the Senior Priority Debt Facility for which it is acting, and each Subordinated Representative, on behalf of itself, and each Subordinated Secured Party under its Subordinated Debt Facility, agrees that it will take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other parties hereto may reasonably request to effectuate the terms of, and the Lien priorities contemplated by, this Agreement.

Section 8.13    *Governing Law; Waiver Of Jury Trial*.

**(A)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

**(B)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

23

Section 8.14    *Binding On Successors And Assigns*. This Agreement shall be binding upon the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives, the Subordinated Secured Parties, Guarantor, the Issuer, the other Credit Parties party hereto and their respective successors and assigns.

Section 8.15    *Section Titles*. The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

Section 8.16    *Counterparts*. This Agreement may be executed in one or more counterparts, including by means of facsimile or other electronic method, each of which shall be an original and all of which shall together constitute one and the same document. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 8.17    *Authorization*. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement. The Senior Priority Representative represents and warrants that this Agreement is binding upon the Senior Priority Indenture Secured Parties. The Subordinated Priority Representative represents and warrants that this Agreement is binding upon the Subordinated Indenture Secured Parties.

Section 8.18    *No Third Party Beneficiaries; Successors And Assigns*. The priorities set forth in this Agreement and the rights and benefits hereunder in respect of such priorities shall inure solely to the benefit of the Senior Priority Representatives, the Senior Parties, the Subordinated Representatives and the Subordinated Secured Parties, and their respective permitted successors and assigns, and no other Person (including the Credit Parties, or any trustee, receiver, debtor in possession or bankruptcy estate in a bankruptcy or like proceeding) shall have or be entitled to assert such rights; provided, however, notwithstanding the foregoing, the parties hereto acknowledge and agree that the Abra Holders shall be the express third-party beneficiaries to, and shall have all the rights of a third-party beneficiary to, this Agreement.

Section 8.19    *Effectiveness*. This Agreement shall become effective when executed and delivered by the parties hereto.

Section 8.20    *Senior Agent And Representative*. It is understood and agreed that (a) the Senior Priority Representative is entering into this Agreement in its capacity as trustee under the Senior Priority Indenture and the provisions of Article VII of the Senior Priority Indenture applicable to the Trustee (as defined therein) thereunder shall also apply to the Senior Priority Representative hereunder, (b) the Subordinated Priority Representative is entering into this Agreement in its capacity as trustee under the Subordinated Indenture and the provisions of [Article VII] of the Subordinated Indenture applicable to the Trustee (as defined therein) thereunder shall also apply to the Subordinated Priority Representative hereunder and (c) each other Representative party hereto is entering into this Agreement in its capacity as purchaser, trustee or agent for the secured parties referenced in the applicable Additional Senior Priority Debt Document or Additional Subordinated Debt Document (as applicable) and the corresponding

24

exculpatory and liability-limiting provisions of such agreement applicable to such Representative thereunder shall also apply to such Representative hereunder.

Section 8.21    *Relative Rights*. Notwithstanding anything in this Agreement to the contrary (except to the extent contemplated by Sections 5.01(a), 5.01(d) or 5.03(b)), nothing in this Agreement is intended to or will (a) amend, waive or otherwise modify the provisions of the Senior Priority Indenture, any other Senior Priority Debt Document or any Subordinated Debt Documents, or permit Guarantor, the Issuer or any other Credit Party to take any action, or fail to take any action, to the extent such action or failure would otherwise constitute a breach of, or default under, the Senior Priority Indenture or any other Senior Priority Debt Document or any Subordinated Debt Documents, (b) change the relative priorities of the Senior Priority Obligations as among the Senior Parties, (c) otherwise change the relative rights of the Senior Parties as among such Senior Parties or (d) obligate Guarantor, the Issuer or any other Credit Party to take any action, or fail to take any action, that would otherwise constitute a breach of, or default under, the Senior Priority Indenture or any other Senior Priority Debt Document or any Subordinated Debt Document.

Section 8.22    *Survival Of Agreement*. All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

25

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

THE BANK IF NEW YORK MELLON, as First-Lien Trustee

By: _____
     Name:
     Title:

[ ● ], as Subordinated Priority Representative

By: _____
     Name:
     Title:

*[Signature Page to Subordination Agreement]*

BUSINESS.29957598.2

[ ● ], as Guarantor

By: _____
   Name:
   Title:

[ ● ], as the Issuer

By: _____
   Name:
   Title:

*[Signature Page to Subordination Agreement]*

ANNEX I

[FORM OF] SUPPLEMENT NO. [ ● ] dated as of [ ● ] to the SUBORDINATION AGREEMENT dated as of [ ● ] (the "Subordination Agreement"), among ABRA GROUP LIMITED, incorporated under the laws of England and Wales with registered number 13926427, as guarantor ("Guarantor"), ABRA GLOBAL FINANCE, incorporated as an exempted company under the laws of the Cayman Islands with registered number 395290, as issuer(the "Issuer"), THE BANK OF NEW YORK MELLON, a New York banking corporation, as trustee under the Senior Priority Indenture, dated [____], 2023 and [____], 2023, respectively, or any successor thereof, as Trustee under the Subordinated Indenture, and the additional Representatives from time to time a party thereto.

A.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Subordination Agreement.

B.      The Credit Parties have entered into the Subordination Agreement. Pursuant to the Senior Priority Indenture Agreement, certain Additional Senior Priority Debt Documents and certain Subordinated Debt Documents, certain newly acquired or organized Subsidiaries of the Issuer are required to enter into the Subordination Agreement. Section 8.07 of the Subordination Agreement provides that such Subsidiaries may become party to the Subordination Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "New Credit Party") is executing this Supplement in accordance with the requirements of the Senior Priority Indenture, the Subordinated Debt Documents and Additional Senior Priority Debt Documents.

Accordingly, the Senior Priority Representative and the New Subsidiary Credit Party agree as follows:

SECTION 1.   In accordance with Section 8.07 of the Subordination Agreement, the New Credit Party by its signature below becomes a Credit Party under the Subordination Agreement with the same force and effect as if originally named therein as a Credit Party, and the New Credit Party hereby agrees to all the terms and provisions of the Subordination Agreement applicable to it as a Credit Party thereunder. Each reference to a "Credit Party" in the Subordination Agreement shall be deemed to include the New Credit Party. The Subordination Agreement is hereby incorporated herein by reference.

SECTION 2.   The New Credit Party represents and warrants to the Senior Priority Representative and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

SECTION 3.   This Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Senior Priority Representative shall have received a counterpart of this Supplement that bears the signature of the New Credit Party. Delivery of an executed signature page to this Supplement by facsimile transmission or other

Annex I-1

electronic method shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.  Except as expressly supplemented hereby, the Subordination Agreement shall remain in full force and effect.

SECTION 5.  **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.  In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Subordination Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.  All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Subordination Agreement. All communications and notices hereunder to the New Credit Party shall be given to it in care of the Issuer as specified in the Subordination Agreement.

SECTION 8.  The Issuer agrees to reimburse the Senior Priority Representative for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Senior Priority Representative.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Annex I-2

IN WITNESS WHEREOF, the New Credit Party, and the Senior Priority Representative have duly executed this Supplement to the Subordination Agreement as of the day and year first above written.

[NAME OF NEW SUBSIDIARY CREDIT PARTY],

By: _____
     Name:
     Title:

Acknowledged by:

[ ● ], as Senior Priority Representative,

By: _____
     Name:
     Title:

[ ● ], as Subordinated Representative,

By: _____
     Name:
     Title:

Annex I-3

**ANNEX II**

[FORM OF] REPRESENTATIVE SUPPLEMENT NO. [ ● ] dated as of [ ● ], to the SUBORDINATION AGREEMENT dated as of [ ● ] (the "Subordination Agreement"), among ABRA GROUP LIMITED, incorporated under the laws of England and Wales with registered number 13926427, as guarantor ("Guarantor"), ABRA GLOBAL FINANCE, incorporated as an exempted company under the laws of the Cayman Islands with registered number 395290, as issuer(the "Issuer"), THE BANK OF NEW YORK MELLON, a New York banking corporation, as trustee under the Senior Priority Indenture, dated [____], 2023 and [____], 2023, respectively, or any successor thereof, as Trustee under the Subordinated Indenture, and the additional Representatives from time to time a party thereto.

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Subordination Agreement.

B.      As a condition to the ability of the Issuer, Guarantor or any other Credit Party to incur Subordinated Class Debt, the Subordinated Class Representative in respect of such Subordinated Class Debt is required to become a Representative under, and such Subordinated Class Debt and the Subordinated Class Debt Parties in respect thereof are required to become subject to and bound by, the Subordination Agreement. Section 8.09 of the Subordination Agreement provides that such Subordinated Class Debt Representative may become a Representative under, and such Subordinated Class Debt and such Subordinated Class Debt Parties may become subject to and bound by, the Subordination Agreement, pursuant to the execution and delivery by the Subordinated Class Debt Representative of an instrument in the form of this Representative Supplement and the satisfaction of the other conditions set forth in Section 8.09 of the Subordination Agreement. The undersigned Subordinated Class Debt Representative (the "New Representative") is executing this Supplement in accordance with the requirements of the Senior Priority Debt Documents and the Subordinated Debt Documents.

Accordingly, the Senior Priority Representative and the New Representative agree as follows:

SECTION 1.   In accordance with Section 8.09 of the Subordination Agreement, the New Representative by its signature below becomes a Representative under, and the related Subordinated Class Debt and Subordinated Class Debt Parties become subject to and bound by, the Subordination Agreement with the same force and effect as if the New Representative had originally been named therein as a Representative, and the New Representative, on behalf of itself and such Subordinated Class Debt Parties, hereby agrees to all the terms and provisions of the Subordination Agreement applicable to it as a Subordinated Representative and to the Subordinated Class Debt Parties that it represents as Subordinated Secured Parties. Each reference to a "Representative" or "Subordinated Representative" in the Subordination Agreement shall be deemed to include the New Representative. The Subordination Agreement is hereby incorporated herein by reference.

SECTION 2.   The New Representative represents and warrants to the Senior Priority Representative and the other Secured Parties that (i) it has full power and authority to enter into this Representative Supplement, in its capacity as [agent] [trustee], (ii) this Representative

Annex II-1

Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of such Agreement and (iii) the Subordinated Debt Documents relating to such Subordinated Class Debt provide that, upon the New Representative's entry into this Agreement, the Subordinated Class Debt Parties in respect of such Subordinated Class Debt will be subject to and bound by the provisions of the Subordination Agreement as Subordinated Secured Parties.

SECTION 3.   This Representative Supplement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Representative Supplement shall become effective when the Senior Priority Representative shall have received a counterpart of this Representative Supplement that bears the signature of the New Representative. Delivery of an executed signature page to this Representative Supplement by facsimile transmission or other electronic method shall be effective as delivery of a manually signed counterpart of this Representative Supplement.

SECTION 4.   Except as expressly supplemented hereby, the Subordination Agreement shall remain in full force and effect.

SECTION 5.   **THIS REPRESENTATIVE SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.   In case any one or more of the provisions contained in this Representative Supplement should be held invalid, illegal or unenforceable in any respect, no party hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Subordination Agreement shall not in any way be affected or impaired. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.   All communications and notices hereunder shall be in writing and given as provided in Section 8.11 of the Subordination Agreement. All communications and notices hereunder to the New Representative shall be given to it at the address set forth below its signature hereto.

SECTION 8.   The Issuer agrees to reimburse the Senior Priority Representative for its reasonable out-of-pocket expenses in connection with this Representative Supplement, including the reasonable fees, other charges and disbursements of counsel for the Senior Priority Representative.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

Annex II-2

IN WITNESS WHEREOF, the New Representative and the Senior Priority Representative have duly executed this Representative Supplement to the Subordination Agreement as of the day and year first above written.

[NAME OF NEW REPRESENTATIVE], as [ ● ] for the holders of [ ● ],

By: _____
     Name:
     Title:

Address for notices:

attention of: _____

Telecopy: _____

[ ● ],
as Senior Priority Representative,

By: _____
     Name:
     Title:

Annex II-3

Acknowledged by:

[ ● ]

By: _____
    Name:
    Title:


[ ● ]

By: _____
    Name:
    Title:


THE CREDIT PARTIES
LISTED ON SCHEDULE I HERETO


By: _____
    Name:
    Title:


Annex II-4

## SCHEDULE I
## CREDIT PARTIES

**SCHEDULE A**

**Permitted Holders**

1.  Mobi Fundo de Investimento em Ações Investimento no Exterior
2.  Elliott International, L.P.
3.  Elliott Associates, L.P.
4.  Kingsland International Group S.A.
5.  South Lake One LLC

**SCHEDULE B-1**

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
| --- | --- |
| 1 | License agreement to use the LIFERAY digital platform, on which the Smiles website was developed |
| 2 | License agreement for the use of the Zendesk platform, through which all customer service is carried out |
| 3 | License agreement for the use of the Pager Duty program, which generates alarms when monitoring transactions in the APM system and sends such alarms to the Slack system |
| 4 | License agreement to use the Slack system |
| 5 | Service contract for the use of the B2E Prevention tool for fraud prevention |
| 6 | License agreement for the B2E Billing software |

**SCHEDULE B-2**

**Smiles Technological Infrastructure Agreements**

| Item # | Agreement, License or Contract Description |
|--------|-------------------------------------------|
| 7 | Service agreement for the use of the AWS Amazon cloud infrastructure, which hosts the LIFERAY platform, and consequently the Smiles website, among other services |
| 8 | License agreement for the use of the ADYEN payment gateway that processes payments within the scope of the product "Clube Smiles" |
| 9 | Service agreement for the use of the Oracle OCI cloud infrastructure, which hosts the Siebel Loyalty platform |
| 10 | Service agreement for the Auth0 software, which controls the logic and authentication control for customers' login on the Smiles website |
| 11 | Amadeus software service contract, which takes care of reservations and fare awards related to other partner airlines |
| 12 | Service agreement with VTEX, responsible for the operation system of the retail platform |
| 13 | Right of use of the Data Lake database, which contains all transactional data used by the Smiles platform |
| 14 | Service agreement with Oracle Responsys for the use of a communication platform with customers |
| 15 | Service provision agreement with Nice, for the platform that hosts the telephony infrastructure used in customer service |
| 16 | Service agreement for the use of Dynatrace's APM tool, which performs real-time predictive and transactional monitoring |
| 17 | Oracle License and Service Agreement (OLSA) V020408 |

**SCHEDULE C**

**Relevant Agreements Governing The Sale and Issuance of Miles**

| Item # | Agreement, License or Contract Description | Counterparties |
|---|---|---|
| 1 | Business Partnership and Assumption of Obligations Agreement No. 2014/001996, as amended from time to time (*Contrato de Parceria Negocial e de Assunção de Obrigações n° 2014/001996*) | Banco do Brasil S.A. |
| 2 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Banco C6 S.A. |
| 3 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Caixa Econômica Federal |
| 4 | Smiles Partnership Agreement SC No. 16620, as amended from time to time (*Contrato de Parceria Smiles SC n° 61620*) | Esfera Fidelidade S.A. |
| 5 | Private Instrument of Partnership and Other Covenants, as amended from time to time (*Instrumento Particular de Parceria e Outras Avenças*) | Livelo S.A. |
| 6 | Miles Accumulation Partnership Agreement, as amended from time to time (*Contrato de Parceria de Acúmulo de Milhas*) | Nu Pagamentos S.A. |
| 7 | Smiles Partnership Agreement, as amended from time to time (*Contrato de Parceria Smiles*) | Portoseg S/A Crédito Financiamento e Investimento |
| 8 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Bradesco S.A. and Banco do Brasil S.A. |
| 9 | Credit Card Issuance Partnership Agreement, as amended from time to time (*Contrato de Parceria para Emissão de Cartões de Crédito*) | Banco Santander (Brasil) S.A. |