UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                        :

In re:                                 :     Chapter 11
                                          :

GOL LINHAS AÉREAS INTELIGENTES S.A.,   :     Case No. 24-10118 (MG)
*et al.*,[1]                                   :
                                          :     (Jointly Administered)
                    Debtors.       :
                                          :
------------------------------------------------------------------x

## INTERIM ORDER (A) AUTHORIZING
## THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
## (B) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
## ADMINISTRATIVE EXPENSE STATUS, (C) GRANTING ADEQUATE PROTECTION
## TO THE PREPETITION SECURED PARTIES, (D) MODIFYING THE AUTOMATIC
## STAY, (E) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
## (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

Upon the motion (the "DIP Motion")[2] of GOL Linhas Aéreas Inteligentes S.A. ("GLAI")

and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), in the above-captioned cases (the "Chapter 11 Cases") and pursuant

to sections 105, 361, 362, 363, 364(c)(1)-(3), 364(d)(1), 364(e), 503, 506(c), 507 and 552 of title

11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), Rules 2002,

4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), Rules 2002-1 and 4001-2 of the Local Rules for the United States Bankruptcy Court for

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2]     Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the DIP Motion.

the Southern District of New York (together, the "Bankruptcy Local Rules"), seeking entry of this

interim order (the "Interim Order") *inter alia*:

(i)     authorizing GOL Finance (Luxembourg) (the "Borrower") and the DIP Guarantors (as defined below) to obtain postpetition, superpriority, senior secured, priming debtor-in-possession financing (the "DIP Financing") subject to the terms and conditions set forth in that certain Superpriority Senior Secured Priming Debtor-in-Possession Term Sheet attached hereto as Exhibit 1 (as amended, supplemented or otherwise modified from time to time, the "DIP Term Sheet"), which provides for:

(a)     upon entry of the Interim Order, term loans in an aggregate principal amount of $350,000,000 (the "Interim DIP Loans"), which shall subsequently be exchanged for or refinanced by, on a cashless basis, the issuance of $350,000,000 of notes (the "Initial DIP Notes") under and subject to the terms and conditions of the Superpriority Senior Secured Priming Debtor-in-Possession Note Purchase Agreement (as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Note Purchase Agreement");

(b)     upon entry of the Final Order (as defined below):

1.   additional notes in an aggregate principal amount of $150,000,000 (the "Final DIP Notes") under and subject to the satisfaction of the terms and conditions of the DIP Note Purchase Agreement; and

2.   additional notes (the "Additional DIP Notes," and collectively with the Initial DIP Notes and the Final DIP Notes, the "DIP Notes") in an aggregate principal amount that will not, when combined with all Initial DIP Notes and Final DIP Notes, exceed $950,000,000 in aggregate principal amount in one additional issuance under and subject to the satisfaction of the terms and conditions of the DIP Note Purchase Agreement;

which (i) DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement) and other DIP Documents (as defined below) shall govern the terms and conditions of the DIP Financing, and (ii) DIP Note Purchase Agreement shall be by and among the Borrower, as borrower, the DIP Guarantors, as guarantors, the several financial institutions or entities from time to time party thereto as the holders of the DIP Notes (the "DIP Noteholders" and, together with the lenders under the Interim DIP Loan, the "DIP Lenders"), TMF Group New York, LLC, as collateral agent (in such capacity, together with its successors and permitted assigns, the "DIP Collateral Agent"), GLAS Trust Company LLC, as trustee, paying agent, transfer agent, and registrar for the DIP Notes (in such capacities, the "DIP Trustee" and, together with the DIP Collateral Agent, the "DIP Agents" and, together with the DIP Lenders and all holders of all other DIP Obligations (as defined below), the "DIP Secured Parties");

(ii)     approving the terms of, and authorizing the Debtors to perform all obligations under, the DIP Term Sheet;

(iii)    authorizing the Debtors to execute and enter into, upon finalization thereof, the DIP Note Purchase Agreement, which shall supersede the DIP Term Sheet and which shall contain terms and conditions consistent in all material respects with those set forth herein and in the DIP Term Sheet and otherwise in form and substance reasonably acceptable to the Debtors and the Required DIP Lenders (as defined below) and to perform all such other and further acts as may be required, necessary, or desirable in connection with the DIP Note Purchase Agreement;

(iv)     providing for GLAI, GOL Equity Finance ("GOL Equity"), GOL Linhas Aéreas S.A. ("GLA"), Smiles Fidelidade S.A. ("IPCo"), and each of the other subsidiaries and affiliates of the foregoing that is a Debtor other than (i) Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior and (ii) Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (the "DIP Guarantors" and, together with the Borrower, the "DIP Obligors") to jointly and severally guarantee on a senior secured superpriority basis any borrowing under the Interim DIP Loans and the DIP Notes, and the other DIP Obligations, including authorization for the DIP Guarantors to enter into New York law governed guarantees and Brazilian Guarantee Agreements as set forth in the DIP Term Sheet;

(v)      granting to the DIP Collateral Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected DIP Liens (as defined below) on all of the DIP Collateral (as defined below), including: (A) senior secured priming superpriority liens on and security interests in assets of the Debtors consisting of the Prepetition GOL/Abra Secured Notes Collateral (as defined below) and, upon entry of the Final Order, all other Prepetition Secured Notes Collateral (as defined below) (the period prior to entry of the Final Order, the "Interim Period") pursuant to section 364(d)(1) of the Bankruptcy Code; (B) senior secured superpriority liens on and security interests in all unencumbered assets of the Debtors (including without limitation all cash and bank accounts of the Debtors and applicable lease and other contract rights with respect to any aircraft not subject to existing liens) including, subject only to and effective upon entry of the Final Order, any Avoidance Proceeds (as defined below) pursuant to section 364(c)(2) of the Bankruptcy Code; and (C) junior secured superpriority liens on and security interests in all assets of the Debtors subject to (1) Permitted Priority Liens (as defined below) (other than the Primed Liens (as defined below)) and (2) solely during the Interim Period with respect to the GOL 2026 Notes Collateral, the Prepetition GOL/Abra Secured Notes Liens and the GOL 2026 Notes Liens, pursuant to section 364(c)(3) of the Bankruptcy Code, to secure the DIP Obligations, in each case subject to the Carve Out (as defined below);

(vi)     authorizing the DIP Obligors to execute and deliver (A) an intercreditor agreement with respect to the Prepetition Secured Notes Collateral by and among the DIP Obligors (as defined below), the DIP Collateral Agent, and the Prepetition Secured

3

Notes Collateral Agents (as defined below) (as amended, supplemented or otherwise modified from time to time, the "DIP Intercreditor Agreement"), (B) the Additional Collateral Perfection Documents (as defined below) and (C) all other documentation, including security agreements, trust agreements, pledge agreements, control agreements, mortgages, guarantees, promissory notes, certificates, hedging agreements, instruments, notes, financing statements, each fee letter entered into by any Debtor in connection with the DIP Financing (the "Fee Letters"), and such other documentation which may be necessary or required to implement the DIP Financing and perform thereunder and/or that may be reasonably requested by the DIP Agents, in each case, as provided under the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement) and all other documentation and as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Term Sheet, the DIP Note Purchase Agreement, and this Interim Order, the "DIP Documents");

(vii)   authorizing the Debtors to borrow funds under the Interim DIP Loans pursuant to the terms set forth in the DIP Term Sheet and this Interim Order,

(viii)  authorizing the Debtors to incur the obligations under the Interim DIP Loans and issue the DIP Notes and incur the obligations thereunder, and incur other loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, administrative agency fees and other fees payable pursuant to the Fee Letters and the DIP Term Sheet), costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute), in each case, due or payable under the DIP Documents (collectively, the "DIP Obligations") and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(ix)    subject to the Carve Out (as defined below), granting to the DIP Agents for the benefit of the DIP Secured Parties allowed superpriority administrative expense claims status in each of the Chapter 11 Cases and any Successor Cases (as defined below) pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(x)     upon entry of the Interim Order (as to the DIP Secured Parties, in their capacity as such) and the Final Order (as to the Prepetition Secured Parties, in their capacity as such), and subject to the Carve Out (as defined below), authorizing the Debtors to waive (A) their right to surcharge the Prepetition Secured Notes Collateral and the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code and (B) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)    upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and with respect to any of the Prepetition

Secured Notes Collateral (including Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined below);

(xii) authorizing the Debtors to use proceeds of the DIP Financing solely in accordance with this Interim Order, the DIP Documents and the Approved Budget (subject to Permitted Variances (as defined below));

(xiii) authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xiv) subject to the restrictions set forth in the DIP Documents and this Interim Order, authorizing the Debtors to use the Prepetition Secured Notes Collateral (as defined below), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Secured Notes Documents (as defined below), and provide Adequate Protection (as defined below) to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral), resulting from the imposition of the Automatic Stay (as defined below), the Debtors' use, sale or lease of the Prepetition Secured Notes Collateral (including Cash Collateral) or the priming of the Prepetition GOL/Abra Secured Parties' respective interests in the Prepetition Secured Notes Collateral (including Cash Collateral);

(xv) vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents and the Final Order and to deliver any notices of termination described below and as further set forth herein;

(xvi) waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and the Final Order; and

(xvii) scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Financing and use of Cash Collateral pursuant to a proposed final order (the "Final Order"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Joseph W. Bliley in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 11] (the "First Day Declaration"), the *Declaration of John E. Luth in Support of Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors-In-Possession to Obtain Postpetition Financing, (B) Authorizing the*

*Debtors- In-Possession to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay,  (F) Scheduling a Final Hearing and (G) Granting Related Relief* [Docket No. 41] (the " Luth Declaration"), the available DIP Documents and the evidence submitted and arguments made at the interim hearing held on January 29, 2024 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d) and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors and their estates and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.     *Petition Date*.  On January 25, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").  On January 26, 2024, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B.     *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

C.     *Jurisdiction and Venue*.  This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363, 364(c)(1)-(3), 364(d)(1), 364(e), 503, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rules 2002-1 and 4001-2.

D.     *Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Creditors' Committee").

E.     *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate, and sufficient notice of the DIP Motion and the Interim Hearing,

the best available under the circumstances per the Debtors' belief, has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice of the DIP Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

   F. *Debtors' Stipulations*.  Without prejudice to the rights of any other party in interest (but subject to the limitations thereon contained in paragraph 25 below), and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate and agree that:

    (a) *GOL Senior Secured Notes due 2028*.

     (i) Pursuant to that certain Senior Secured Note Purchase Agreement, dated as of March 2, 2023 (as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "GOL SSN Purchase Agreement"), the GOL SSN Collateral Documents, and the other Transaction Documents (as defined in the GOL SSN Purchase Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "GOL SSN Documents"), among (a)  GOL Finance, as issuer (in such capacity, the "GOL SSN Issuer"), (b) the GOL SSN/ESSN Guarantors (as defined below), (c) Abra Group Limited ("Abra") and Abra Global Finance ("AGF") as purchasers (collectively, the "GOL SSN Purchasers"), and (d) TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent (in such capacity, the "Prepetition GOL SSN/ESSN Collateral Agent"), the GOL SSN Issuer issued the Senior Secured Notes due 2028 in an aggregate principal amount of $896,664,000  (the "GOL SSNs") to the GOL SSN Purchasers, a portion of which were subsequently redeemed and retired in connection with the GOL ESSN Issuance and Redemption (as defined below).

(ii)     Pursuant to the GOL SSN Purchase Agreement, each of GLA, GLAI, and IPCo (the "GOL SSN/ESSN Guarantors") guaranteed, on a joint and several basis, the GOL SSN Issuer's obligations under the GOL SSNs, the GOL SSN Purchase Agreement, and the other GOL SSN Documents.

(iii)    As of the Petition Date, the GOL SSN Issuer and the GOL SSN/ESSN Guarantors were jointly and severally indebted to the GOL SSN Purchasers, without defense, counterclaim, or offset of any kind, for not less than $270,093,000 in aggregate principal amount and $6,638,250.99 of accrued and unpaid interest as of the Petition Date on account of the outstanding GOL SSNs (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the GOL SSN Issuer's or the GOL SSN/ESSN  Guarantors' obligations pursuant to, or secured by, the GOL SSN Documents, including all Obligations (as defined in the GOL SSN Purchase Agreement), and all interest, fees, prepayment premiums, early termination fees, costs, and other charges, the "GOL SSN Obligations").

(iv)    Pursuant to the Collateral Documents (as defined in the GOL SSN Purchase Agreement) (the "GOL SSN Collateral Documents"), prior to the Petition Date, the GOL SSN Issuer and the GOL SSN/ESSN Guarantors in their capacities as "Grantors" (as defined in the GOL SSN Collateral Documents) or words of similar effect granted to the Prepetition GOL SSN/ESSN Collateral Agent, for the benefit of Prepetition GOL SSN/ESSN Collateral Agent and the GOL SSN Purchasers, first priority security interests in and continuing liens (the "GOL SSN

Liens") on the "Collateral" (as defined in the GOL SSN Purchase Agreement) (the "GOL SSN Collateral").

      (b)    *GOL Senior Secured Exchangeable Notes due 2028.*

      (i)    Pursuant to that certain Senior Secured Exchangeable Note Purchase Agreement, dated as of September 29, 2023 (as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "GOL ESSN Purchase Agreement"), the GOL ESSN Collateral Documents, and the other Transaction Documents (as defined in the GOL ESSN Purchase Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "GOL ESSN Documents" and, together with the GOL SSN Documents, the "Prepetition GOL SSN/ESSN Documents"), among (a) GOL Equity, as issuer (in such capacity, the "GOL ESSN Issuer"), (b) the GOL SSN/ESSN Guarantors, as guarantors (c) Abra and AGF, as purchasers (together, the "GOL ESSN Purchasers"), and (d) the Prepetition GOL SSN/ESSN Collateral Agent, as collateral agent, the GOL ESSN Issuer issued Senior Secured Exchangeable Notes due 2028 in an aggregate principal amount of $1,180,442,000 (the "GOL ESSNs" and, together with the GOL SSNs, the "Prepetition GOL SSN/ESSNs") a portion of which were issued in exchange for the redemption and retirement of $1,180,442,000 aggregate principal amount of GOL SSNs (the "GOL ESSN Issuance and Redemption").

      (ii)    Pursuant to the GOL ESSN Purchase Agreement, the GOL SSN/ESSN Guarantors guaranteed, on a joint and several basis, the GOL ESSN Issuer's obligations under the GOL ESSNs, the GOL ESSN Purchase Agreement, and the other GOL ESSN Documents.

(iii)     As of the Petition Date, the GOL ESSN Issuer and the GOL SSN/ESSN Guarantors were jointly and severally indebted to the GOL SSN/ESSN Purchasers, without defense, counterclaim, or offset of any kind, for not less than $1,207,445,000 in aggregate principal amount and $32,601,015 of accrued and unpaid interest as of the Petition Date on account of the outstanding GOL ESSNs (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the GOL ESSN Issuer's or the GOL SSN/ESSN Guarantors' obligations pursuant to, or secured by, the GOL ESSN Documents, including all Obligations (as defined in the GOL ESSN Purchase Agreement), and all interest, fees, prepayment premiums, early termination fees, costs, and other charges, the "GOL ESSN Obligations" and, together with the GOL SSN Obligations, the "Prepetition GOL SSN/ESSN Obligations").

(iv)     Pursuant to the Collateral Documents (as defined in the GOL ESSN Purchase Agreement) (the "GOL ESSN Collateral Documents" and together with the GOL SSN Collateral Documents, the "Prepetition GOL SSN/ESSN Collateral Documents"), prior to the Petition Date, the GOL ESSN Issuer and the GOL SSN/ESSN Guarantors in their capacities as "Grantors" (as defined in the GOL ESSN Collateral Documents) or words of similar effect granted to the Prepetition GOL SSN/ESSN Collateral Agent, for the benefit of the Prepetition GOL SSN/ESSN Collateral Agent and the holders of the GOL ESSNs, first priority security interests in and continuing liens (the "GOL ESSN Liens" and, together with the GOL SSN Liens, the "Prepetition GOL SSN/ESSN Liens") on the "Collateral" (as defined in the GOL ESSN Purchase

Agreement) (the "GOL ESSN Collateral" and, together with the GOL SSN Collateral, the "Prepetition GOL SSN/ESSN Collateral").

    (c)    *GOL Senior Secured Notes due 2026*

    (i)    Pursuant to that certain Indenture, dated as of December 23, 2020 (as amended by that First Supplemental Indenture dated as of March 2, 2023, and as may have been further amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "GOL 2026 Notes Indenture") and any other agreements and documents executed or delivered in connection therewith, each as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "GOL 2026 Notes Documents"), among (a) GOL Finance, as issuer (in such capacity, the "GOL 2026 Notes Issuer"), (b) GLAI and GLA, as guarantors (in such capacity, the "GOL 2026 Notes Guarantors"), (c) the Bank of New York Mellon, as trustee, transfer agent and paying agent (in such capacity, the "GOL 2026 Notes Trustee"), and (d) TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent (in such capacity, the "GOL 2026 Notes Collateral Agent" and, together with the GOL 2026 Trustee, the "GOL 2026 Notes Agents," and together with the holders of GOL 2026 Notes, the "GOL 2026 Note Secured Parties"), the GOL 2026 Notes Issuer issued the 8% Senior Secured Notes due 2026 in an aggregate principal amount of $650,000,0000 (the "GOL 2026 Notes").

    (ii)    Pursuant to the GOL 2026 Notes Indenture, the GOL 2026 Notes Guarantors guaranteed, on a joint and several basis, the obligations under the GOL 2026 Notes, the GOL 2026 Notes Indentures, and the other GOL 2026 Notes Documents.

    (iii)    As of the Petition Date, the GOL 2026 Notes Issuer and the GOL 2026 Notes Guarantors were jointly and severally indebted to the holders of the GOL 2026 Notes, for

not less than $251,170,000 in aggregate principal amount and $1,339,573.33 of accrued and unpaid interest as of the Petition Date on account of the outstanding GOL 2026 Notes (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the GOL 2026 Notes Issuer's or the GOL 2026 Notes Guarantors' obligations pursuant to, or secured by, the GOL 2026 Notes Documents, including all Obligations (as defined in the GOL 2026 Notes Indentures), and all interest, fees, prepayment premiums, early termination fees, costs, and other charges, the "GOL 2026 Notes Obligations").

(iv)    Pursuant to the Collateral Documents (as defined in the GOL 2026 Notes Indentures) (the "GOL 2026 Notes Collateral Documents"), prior to the Petition Date, the GOL 2026 Notes Issuer and the GOL 2026 Notes Guarantors granted to the GOL 2026 Notes Collateral Agent, for the benefit of GOL 2026 Notes Collateral Agent, the GOL 2026 Notes Trustee, and the holders of the GOL 2026 Notes, first priority security interests in and continuing liens (the "GOL 2026 Notes Liens") on the "Collateral" (as defined in the GOL 2026 Notes Indentures) (the "GOL 2026 Notes Collateral") which is comprised entirely of the Shared GOL IP and Spare Parts Collateral (as defined below), on a *pari passu* basis with the Prepetition GOL SSN/ESSN Liens on such collateral.

(d)    *GOL Prepetition Intercreditor Agreement*

(v)    Pursuant to the certain Intercreditor agreement, dated as of March 2, 2023, as amended and restated as of September 29, 2023 (and as may have been amended, restated,

amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "GOL Prepetition Intercreditor Agreement") among, *inter alia*, (a) the GOL SSN Issuer, (b) the GOL ESSN Issuer, (c) the GOL 2026 Notes Issuer, (d) TMF Brasil Administração e Gestão De Ativos Ltda., in its capacities as Prepetition GOL SSN/ESSN Collateral Agent and as GOL 2026 Notes Collateral Agent, (e) the GOL 2026 Notes Trustee, (f) GLA, as guarantor, and (g) GLAI, as guarantor, among other things, the parties thereto agreed to specific voting and decision making provisions for the parties thereto with respect to the Prepetition GOL SSN/ESSN Liens and GOL 2026 Notes Liens securing the Prepetition GOL SSN/ESSN Obligations and the GOL 2026 Notes Obligations, respectively, that encumber (x) the intellectual property of GOL Linhas Aereas Inteligentes S.A. and GOL Linhas Aereas S.A. (the "GOL IP Collateral") and (y) certain spare parts of GOL Linhas Aereas Inteligentes S.A. and GOL Linhas Aereas S.A. (the "Spare Parts Collateral" and together with the GOL IP Collateral, the "Shared GOL IP and Spare Parts Collateral") and provisions with respect to any enforcement thereon and the distribution of any proceeds thereof.

(e)     *GOL Pledges in Favor of Abra Notes*

(i)     Pursuant to that certain Pledge and Security Agreement (Senior Secured Notes), dated as of March 2, 2023 (the "Abra SSN Pledge Agreement"), and that certain Pledge and Security Agreement (Senior Secured Exchangeable Notes), dated as of March 2, 2023 (the "Abra CSSN Pledge Agreement" and, together with the Abra SSN Pledge Agreement, the "Abra Pledge Agreements," and collectively with the Prepetition GOL SSN/ESSN Documents, the GOL 2026 Notes Documents, and the GOL Prepetition Intercreditor Agreement, the "Prepetition Secured Notes Documents") among (a) AGF, (b) Abra, (c) GOL Finance, (d) GOL Equity, (e) GLAI, (f) GLA, (g) IPCo, and (h) the Abra Notes Collateral Agent (as defined below) (GOL

Finance, GOL Equity, GLAI, GLA, and IPCo (such entities, collectively, the "Debtor Abra Notes Pledgors," and the Debtor Abra Notes Pledgors together with AGF and Abra, the "Abra Notes Pledgors") pledged, granted and collaterally assigned by way of security to the Abra Notes Collateral Agent, for the benefit of the holders of the Abra Notes (as defined below), a continuing security interest in and continuing lien (such liens granted by the Debtor Abra Notes Pledgors, the "Prepetition Debtor Abra Notes Pledged Liens" and, together with the Prepetition GOL SSN/ESSN Liens, the "Prepetition GOL/Abra Secured Notes Liens," and collectively with the GOL 2026 Notes Liens, the "Prepetition Secured Notes Liens") on all of the Abra Notes Pledgors' right, title and interest in, to and under the Collateral (as defined in the Abra Pledge Agreements) (such collateral pledged by the Debtor Abra Notes Pledgors, the "Debtor Abra Notes Pledged Collateral" and, together with the Prepetition GOL SSN/ESSN Collateral, the "Prepetition GOL/Abra Secured Notes Collateral" and, collectively with the GOL 2026 Notes Collateral, the "Prepetition Secured Notes Collateral").

    (f)    *Abra Senior Secured Notes and Senior Secured Exchangeable Notes due 2028*.

    (i)    Pursuant to those certain Indentures, each dated as of March 2, 2023 (as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date, the "Abra SSN Indenture" and the "Abra CSSN Indenture," respectively, and together the "Abra Notes Indentures") and the other Transaction Documents (as defined in the Abra Pledge Agreements) and any other agreements and documents executed or delivered in connection therewith, each as may have been amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the Petition Date (collectively, the "Abra Notes Documents"), among (a) AGF, as issuer (in such capacity, the "Abra Notes Issuer"), (b) Abra, as guarantor (in such capacity, the "Abra

Notes Guarantor"), (c) the Bank of New York Mellon, as trustee, registrar, paying agent and transfer agent (in such capacities, the "Abra Notes Trustee"), and (d) TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent (in such capacity, the "Abra Notes Collateral Agent"[4] and, together with the Abra Notes Trustee, the "Abra Notes Agents" and, the Abra Notes Agents together with the Prepetition GOL SSN/ESSN Collateral Agent, and the GOL 2026 Notes Agents, the "Prepetition Agents"), the Abra Notes Issuer issued Senior Secured Notes due 2028 in an initial aggregate principal amount of $960,741,472 (the "Abra SSNs") and Senior Secured Exchangeable Notes due 2028 in an initial aggregate principal amount of $458,344,682 (the "Abra CSSNs" and, together with the Abra SSNs, the "Abra Notes" and the Abra Notes together with the GOL SSNs, GOL ESSNs, and the 2026 Notes, and the "Prepetition Secured Notes").

(ii)     As of the Petition Date, the Abra Notes Issuer and the Abra Notes Guarantor were jointly and severally indebted to the holders of the Abra Notes, for not less than $1,004,010,434 in aggregate principal amount and $7,376,688.66 of accrued and unpaid interest as of the Petition Date on account of the outstanding Abra SSN, and for not less than $477,575,647 in aggregate principal amount and $1,525,590.00 of accrued and unpaid interest as of the Petition Date on account of the outstanding Abra CSSN (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Abra Notes Issuer's or the Abra Notes Guarantors'

---

[4] The Abra Notes Collateral Agent, the Prepetition GOL SSN/ESSN Collateral Agent, and the GOL 2026 Notes Collateral Agent shall be referred to collectively herein as the "Prepetition Secured Notes Collateral Agents."

obligations pursuant to, or secured by, the Abra Notes Documents, including all Obligations (as defined in Abra Notes Indentures), and all interest, fees, prepayment premiums, early termination fees, costs, and other charges (the "Abra Notes Obligations").  With respect to the Debtors, the holders of the Abra Notes Obligations have recourse solely to the Debtor Abra Notes Pledged Collateral (such limited recourse Abra Notes Obligations, together with the Prepetition GOL SSN/ESSN Obligations, the ("Prepetition GOL/Abra Secured Note Obligations" and, collectively with the GOL 2026 Notes Obligations, the "Prepetition Secured Notes Obligations").

(iii)    The Abra Notes Agents, the holders of Abra Notes, the holders of the GOL SSNs, the holders of the GOL ESSNs, and the Prepetition GOL SSN/ESSN Collateral Agent, collectively, shall be referred to herein as the "Prepetition GOL/Abra Secured Parties".

(iv)    The Prepetition Agents, together with the holders of the Prepetition Secured Notes and all other holders of Prepetition Secured Notes Obligations (as defined below), shall be referred to herein as the "Prepetition Secured Parties."

(g)    *Validity, Perfection, and Priority of Prepetition Secured Notes Liens and Prepetition Secured Notes Obligations*.  The Debtors acknowledge and agree that as of the Petition Date (a) the Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral were and continue to be valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Secured Notes Liens were senior in priority over any and all other liens on the applicable Prepetition Secured Notes Collateral, subject only to liens over the assets of the Debtors senior by operation of law or otherwise permitted to be senior by the Prepetition Secured Notes Documents and solely to the extent any such liens were valid, enforceable, non-avoidable and perfected liens in existence on the Petition Date (including valid

liens in existence on the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (the "Permitted Priority Liens"); (c) the Prepetition Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations of the applicable Debtors (in the case of the Abra Notes Obligations, solely with recourse to the Debtor Abra Notes Pledged Collateral) enforceable in accordance with the terms of the applicable Prepetition Secured Notes Documents; (f) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Secured Notes Liens or Prepetition Secured Notes Obligations exist, and no portion of the Prepetition Secured Notes Liens or Prepetition Secured Notes Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (g) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Secured Notes Documents; and (h) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Notes Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Secured Notes Liens securing the Prepetition Secured Notes Obligations.

(h)     *No Control.*  None of the Prepetition Secured Parties or the DIP Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors

by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Secured Notes Documents.

(i)      *No Claims or Causes of Action.*  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties under any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

G.      *Cash Collateral.*  As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of the Prepetition Secured Parties (including the proceeds of Prepetition Secured Notes Collateral) or the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.  The Debtors' use of Cash Collateral shall be subject to the terms of this Interim Order and the Debtors' authority to use Cash Collateral of the Prepetition Secured Parties and the DIP Secured Parties, as applicable, may be terminated in accordance with paragraphs and 3 and 9 hereof.

H.      *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)      Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the terms and conditions set forth in the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement).

(ii)      The Debtors have an immediate and critical need to obtain the DIP Financing and to use Prepetition Secured Notes Collateral (including Cash Collateral) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy

other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The

incurrence of new debt under the DIP Financing and use of Cash Collateral is necessary and vital

to the preservation and maintenance of the going concern value of the Debtors.  Immediate and

irreparable harm will be caused to the Debtors and their estates if immediate financing is not

obtained and permission to use Cash Collateral is not granted.  The terms of the proposed financing

are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are

supported by reasonably equivalent value and fair consideration.  The Adequate Protection

provided in this Interim Order and other benefits and privileges contained herein are consistent

with and authorized by the Bankruptcy Code.

(iii)    The DIP Financing is the best source of debtor-in-possession financing

currently available to the Debtors.  Given their current financial condition, financing arrangements,

capital structure and the circumstances of these Chapter 11 Cases, the Debtors have been and

continue to be unable to obtain financing from sources on terms more favorable than the DIP

Financing.  Further, all Prepetition Secured Parties, as applicable, are adequately protected and/or

have consented or are deemed to have consented (including by virtue of the GOL Prepetition

Intercreditor Agreement and/or any other applicable Prepetition Secured Notes Documents) to the

Debtors incurring the DIP Financing, the priming of the Prepetition GOL/Abra Secured Notes

Liens on the Prepetition GOL/Abra Secured Notes Collateral and the use of Cash Collateral, on

the terms and subject to the conditions set forth in the DIP Term Sheet, the DIP Documents and

this Interim Order.   The Debtors have also been unable to obtain: (a) unsecured credit allowable

solely under Bankruptcy Code section 503(b)(1) as an administrative expense; (b) unsecured credit

having priority over that of administrative expenses of the kind specified in Bankruptcy Code

sections 503(b), 507(a) and 507(b); (c) credit secured solely by a lien on property of the Debtors

and their estates that is not otherwise subject to a lien; or (d) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein; (2) superpriority claims and priming liens to the extent set forth in this Interim Order, the DIP Term Sheet, and the DIP Documents; and (3) the other protections set forth in this Interim Order, in each case, subject to the Carve Out.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds and profits generated from the Prepetition Secured Notes Collateral and acquire equipment, inventory and other personal property, certain of which constitute Prepetition Secured Notes Collateral under the Prepetition Secured Notes Documents that are subject to the Prepetition Secured Notes Liens as set forth in the Prepetition Secured Notes Documents.

(v)    The Debtors desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitutes Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code. Certain prepetition rents, income, offspring, products, proceeds and profits in existence as of the Petition Date also constitute Cash Collateral.

(vi)    Based on the DIP Motion, the First Day Declaration, the Luth Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraph 15 of this Interim Order (the "Adequate Protection"), and the terms on which the DIP Obligors may continue to use the Prepetition Secured Notes Collateral pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent

business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(vii)    The DIP Financing, the Adequate Protection and the use of the Prepetition Secured Notes Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Obligors, the DIP Secured Parties, and the Prepetition Secured Parties. All of the DIP Obligors' obligations and indebtedness arising under, in respect of or in connection with the DIP Financing and the DIP Documents, including, without limitation: all loans made to and guarantees issued by the DIP Obligors pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(viii)    The Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the DIP Obligors' continued use of the Prepetition Secured Notes Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and the DIP Obligors' continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens (as defined below)), in accordance with the terms hereof, and the Prepetition Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of sections 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(ix)    The Prepetition Secured Parties are entitled to the Adequate Protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed Adequate Protection arrangements and of the use of the Prepetition Secured Notes Collateral are fair and reasonable, reflect the DIP Obligors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Secured Notes Collateral (including the use of Cash Collateral); *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Prepetition Secured Notes Collateral (including Cash Collateral) other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order to the extent such consent has been or will be given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Secured Notes Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the GOL Prepetition Intercreditor Agreement, to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

(x)    The Prepetition GOL/Abra Secured Parties would not otherwise consent to the use of their Prepetition Secured Notes Collateral (including Cash Collateral), subordination of their liens to the DIP Liens (as defined below), and the DIP Lenders would not be willing to provide the DIP Financing or extend credit to the DIP Obligors thereunder without the agreement

of the Debtors to consent to the jurisdiction of this Court in all matters arising out of or relating to the Interim DIP Loans, the DIP Notes, the DIP Documents and the DIP Liens.

(xi)    The Debtors have prepared and delivered to the DIP Agents and the advisors to the DIP Lenders an initial budget, a copy of which is attached hereto as Exhibit 2 (the "Initial DIP Budget"). The Initial DIP Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week from the first date (the "Closing Date") on which all of such conditions to effectiveness of the DIP Financing shall have been satisfied, or waived by "Required DIP Noteholders" (as defined in the DIP Term Sheet) (the "Required DIP Lenders") through and including the end of the thirteen (13) weeks following the Closing Date. The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances. The DIP Agents and the DIP Lenders are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (as defined below) (subject to the Permitted Variances) as provided in the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement), the other DIP Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(xii)    The provisions of Bankruptcy Code section 506(c) with respect to the DIP Collateral are hereby waived by the Debtors and their estates as to the DIP Secured Parties (solely in their capacities as such). The equitable doctrine of "marshalling" or similar doctrine with respect to the DIP Collateral shall be waived by the Debtors and their estates as to the DIP Secured Parties (solely in their capacities as such) upon entry of the Final Order. Upon entry of the Final Order, the Debtors waive, for the benefit of the Prepetition GOL/Abra Secured Parties (solely in their capacities as such), (a) the provisions of Bankruptcy Code section 506(c), (b) any "equities of the case" exception under Bankruptcy Code section 552(b) and (c) the equitable doctrine of

"marshaling" or any similar doctrine with respect to the Prepetition GOL/Abra Secured Parties'

Prepetition Secured Notes Collateral or the DIP Collateral, as applicable.

I.      *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order

pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Absent granting the relief set forth in this

Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation

of the DIP Financing and the use of Prepetition Secured Notes Collateral, in accordance with this

Interim Order and the DIP Documents, are therefore in the best interests of the DIP Obligors'

estates and consistent with the Debtors' exercise of their fiduciary duties.

J.      *Permitted Priority Liens; Continuation of Prepetition Secured Notes Liens*.

Nothing herein shall constitute a finding or ruling by this Court that any lien over the assets of the

Debtors alleged to be a Permitted Priority Lien is valid, senior, enforceable, prior, perfected or

non-avoidable.   Moreover, nothing herein shall prejudice the rights of any party-in-interest,

including, but not limited to, the Debtors, the DIP Agents, the DIP Lenders, the Prepetition Secured

Parties or a Creditors' Committee (if any) to challenge the validity, priority, enforceability,

seniority, avoidability, perfection or extent of any alleged Permitted Priority Lien (other than any

Primed Lien).  The right of a seller of goods to reclaim such goods under section 546(c) of the

Bankruptcy Code is not a Permitted Priority Lien and is expressly subject to the DIP Liens (as

defined below).  The Prepetition Secured Notes Liens granted to secure the Prepetition Secured

Notes Obligations and the DIP Liens granted to secure the DIP Obligations are continuing liens

and the Prepetition Secured Notes Collateral or the DIP Collateral, as applicable, is and will

continue to be encumbered by the applicable liens.  All Prepetition Secured Notes Liens and DIP

Liens encumbering the assets of the Debtors shall be subject to the terms of the DIP Intercreditor

Agreement.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein on an interim basis, entry into the DIP Facility is authorized and approved and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Documents.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.      *Authorization of the DIP Financing and the DIP Documents.*

(a)      The DIP Obligors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Debtors are hereby authorized and shall pay, in accordance with this Interim Order, any principal, interest, fees, expenses and other amounts described in the DIP Term Sheet, the other DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein, DIP Term Sheet or in the other DIP Documents) subject to and in accordance with the terms hereof and thereof.

(b)      Subject to the terms of the DIP Documents and this Interim Order, the Borrower is  hereby authorized to borrow the Interim DIP Loans pursuant to, and subject to any limitations on, or conditions in, the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement), and upon such borrowing, each DIP Guarantor is hereby

deemed to guarantee payment in respect of the Borrower's obligations with respect to such borrowing, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, subject to and in accordance with the Approved Budget (subject to the Permitted Variances), including, without limitation, to provide working capital for the Debtors and to pay interest, fees and expenses and provide adequate protection and make other payments in accordance with this Interim Order and the DIP Documents, as set forth in the DIP Documents.

(c)     In furtherance of the foregoing and without further approval of this Court, each DIP Obligor is authorized to perform all acts, to make, execute and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents) and to pay all fees and expenses in connection with or that may be reasonably required, necessary, or desirable for the DIP Obligors' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and/or performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Obligors and the DIP Agents (acting in accordance with the terms of the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement), including without limitation, with the consent of the Required DIP Noteholders, as applicable)), may agree.  No further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and for

payment of any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided* that, any amendments, waivers, or other modifications to the DIP Financing or the DIP Documents shall require the consent of the Required DIP Lenders and the Debtors; *provided, further,* that, for the avoidance of doubt, updates and supplements to the Approved Budget required to be delivered by the DIP Obligors under the DIP Documents shall not be considered amendments or modifications to the Approved Budget or the DIP Documents;

        (iii)     the non-refundable payment to the DIP Agents and the DIP Lenders, as the case may be, of all fees, including placement agent fees, structuring fees, administrative agent's or collateral agent's fees, upfront fees, closing fees and professional fees payable under the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement) or the Fee Letters (which fees shall be irrevocable and shall be deemed to have been approved upon entry of this Interim Order, whether or not the fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement) or the other DIP Documents (or in any separate letter agreements, including, without limitation, the Fee Letters between any or

all DIP Obligors, on the one hand, and any of the DIP Agents and/or DIP Lenders, on the other, in connection with the DIP Financing) the costs and expenses as may be due from time to time under the DIP Documents, and the reasonable and documented fees and out-of-pocket expenses of the following professionals retained by, or on behalf of, any of the DIP Agents or DIP Lenders:  (A) Dechert LLP, legal counsel to an ad hoc group of DIP Lenders and Abra Noteholders (the "Ad Hoc Group of Abra Noteholders"), (B) Houlihan Lokey, as financial advisor to Dechert LLP as counsel to the Ad Hoc Group of Abra Noteholders, (C) a single legal counsel to the DIP Collateral Agent, (D) a single legal counsel to the DIP Trustee, (E) Padis Mattar Advogados, as Brazilian legal counsel to the DIP Lenders, (F) Akin Gump Strauss Hauer & Feld LLP, as legal counsel to Elliott Investment Management L.P. and its affiliates ("Elliott"), (G) in each foreign jurisdiction that the Ad Hoc Group of Abra Noteholders reasonably determines is necessary, a single law firm as legal counsel to the Ad Hoc Group of Abra Noteholders, and (H) in each foreign jurisdiction that Elliott reasonably determines is necessary, a single law firm as legal counsel to the Elliott, in each case, with respect to the preceding clauses (A) – (H), as provided for in the DIP Documents (the "DIP Fees and Expenses") and in accordance with applicable engagement letters, Fee Letters, or similar agreements without the need to file retention motions or fee applications; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein.

(d)    From and after the Petition Date, the Debtors shall use the proceeds of the extensions of the DIP Financing only for the purposes specifically set forth in the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement), and (until entry

of the Final Order) this Interim Order, and in compliance with the Approved Budget (subject to the Permitted Variances).

    3.    *DIP Obligations*.

    (a)    The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations. Upon entry of this Interim Order and the occurrence of the Closing Date, the DIP Obligations (including, without limitation, the Debtors' obligations to exchange or refinance the Interim DIP Loans with the DIP Notes on the terms set forth in the DIP Term Sheet) shall constitute legal, valid, binding and non-avoidable obligations of the DIP Obligors, enforceable against each DIP Obligor (and in the case of the Debtors, their estates) in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order and the occurrence of the Closing Date, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to any of the DIP Agents or DIP Lenders, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, interest, costs, fees, expenses and other amounts under the DIP Documents (including this Interim Order). The DIP Obligors shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall cease following both (i)(a) a violation by the DIP Obligors of any of the terms of this Interim Order (which violation, for the avoidance of doubt, shall not be considered contempt of Court) or (b) the occurrence of any Event of Default (as defined in the DIP Term

Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement)) (each such event or condition, an "DIP Event of Default") subject to any applicable grace periods, waivers, or forbearances and (ii) the Termination Declaration Date (as defined below). Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agents and/or the DIP Lenders (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.    *Carve Out*.

(a)    *Carve Out*. As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, compensation or procedural order, or otherwise, all unpaid fees and expenses (other than fees or expenses incurred in connection with any Prohibited Actions (as defined below)) (the "Allowed Professional Fees") incurred or accrued by persons or firms retained by the Debtors pursuant to

section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and a Creditors'

Committee, if applicable, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee

Professionals," and, together with the Debtor Professionals, the "Professional Persons") at any

time before or on the first business day following delivery by the DIP Agents (acting at the

direction of the Required DIP Lenders) of a Carve Out Trigger Notice (as defined below), whether

allowed by the Court prior to, on, or after delivery of a Carve Out Trigger Notice (including any

restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors

that are fully earned, due and payable pursuant to the terms of the applicable engagement letters

or retention applications prior to the delivery of a Carve Out Trigger Notice) (such amounts set

forth in this clause (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) Allowed

Professional Fees of Professional Persons in an aggregate amount not to exceed $10,000,000

incurred or accrued after the first business day following delivery by the DIP Agents (acting at the

direction of the Required DIP Lenders, as applicable) of the Carve Out Trigger Notice (the

"Trigger Date"), to the extent allowed at any time, whether by interim order, compensation or

procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out

Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a

written notice delivered by email (or other electronic means) by the DIP Agents (at the direction

of the Required DIP Lenders) to the Debtors, their lead restructuring counsel, legal counsel to the

Creditors' Committee (if appointed), and the U.S. Trustee, which notice may be delivered only

following the occurrence and during the continuation of a DIP Event of Default and acceleration

of the DIP Obligations under the DIP Term Sheet (and, upon finalization and execution thereof,

the DIP Note Purchase Agreement), but subject to any applicable grace periods, waivers, or forbearances, stating that the Post-Carve Out Trigger Notice Cap has been invoked.[5]

(b)     *Carve Out Priority*.  Notwithstanding anything to the contrary in this Interim Order, any DIP Document, or otherwise, the Carve Out shall be senior to all liens and claims (including administrative and superpriority claims) against the Debtors that secure the DIP Obligations, the Prepetition Secured Notes Obligations, the Adequate Protection Obligations and all other liens or claims (including administrative and superpriority claims), including all other forms of adequate protection, liens or claims (including administrative and superpriority claims) granted by the Debtors and recognized as valid herein or otherwise.

(c)     *No Obligation to Pay Allowed Professional Fees*.  None of the DIP Agents, DIP Lenders, or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Debtor Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Debtor Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(d)     *Payment of Carve Out on or After the Termination Declaration Date*.  Any payment or reimbursement made after the Trigger Date in respect of any Post-Trigger Notice Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out from a draw on the DIP Commitments shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the

---

[5]     Dechert NTD:  Carve-out reserve was proposed in the term sheet but not accepted.

protections granted under this Interim Order, the Final Order, the DIP Documents, the Bankruptcy Code and applicable law.

(e)      Delivery of the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize any available cash held by the Debtors to fund the Carve Out.  Until the Carve Out has been fully funded, any proceeds of the Prepetition Secured Notes Collateral or DIP Collateral received by any Prepetition Secured Party or DIP Secured Party, whether in connection with the exercise of any right or remedy (including setoff) or otherwise received by a Prepetition Secured Party or DIP Secured Party, shall be segregated and held in trust for the benefit of and forthwith paid over to the Debtors to fund the Carve Out

(f)      Notwithstanding the foregoing, so long as a Carve Out Trigger Notice has not been delivered, (i) the Debtors shall be permitted to pay Pre-Trigger Notice Professional Fees, as the same may become due and payable, including on an interim basis, solely in accordance with orders of the Bankruptcy Court, and (ii) such payments shall not reduce, or be deemed to reduce, the Post-Carve Out Trigger Notice Cap.

5.      *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors in each of the Chapter 11 Cases and any Successor Cases on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate

Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions") but, subject to the entry of the Final Order, including any proceeds, rights, interests, or other property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds")) in accordance with the DIP Documents and this Interim Order, subject only to the Permitted Priority Liens and the Carve Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The DIP Superpriority Claims of each DIP Lender shall be *pari passu* in right of payment with one another, and all DIP Superpriority Claims shall be senior to the Adequate Protection Obligations including the 507(b) Claims (as defined below).  No other superpriority claims equal or senior to the DIP Superpriority Claims shall be granted or allowed in these Chapter 11 Cases, and the Debtors will not seek any other postpetition debtor-in-possession financing other than under the DIP Financing approved hereunder, except as otherwise expressly permitted by the DIP Documents or with the prior written consent of the Required DIP Lenders.

6.    *DIP Liens*.  As security for the DIP Obligations, effective automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution,

recordation or filing by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, notation of certificates of title for titled goods or other similar documents, or the possession or control by the DIP Agents of, or over, any DIP Collateral, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all liens and security interests granted to the DIP Collateral Agent, for its benefit and for the benefit of the DIP Secured Parties, pursuant to this Interim Order and the DIP Documents, the "DIP Liens") are hereby granted to the DIP Collateral Agent for its own benefit and the benefit of the DIP Secured Parties (all property identified in clauses (a) through (c) below, in each case subject to the Carve Out, being collectively referred to as the "DIP Collateral"):

(a)     *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, as of the Petition Date, was not subject to Permitted Priority Liens, including, without limitation, any and all unencumbered cash of the Debtors (whether maintained with any of the DIP Agents or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing (the "Unencumbered Property"), in each case

other than the Avoidance Actions (but, for the avoidance of doubt, upon entry of a Final Order, "Unencumbered Property" shall include Avoidance Proceeds);

(b)      *Liens Priming Certain Prepetition Secured Parties' Liens*.   Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected, priming security interest in and lien upon the Prepetition Secured Notes Collateral, regardless of where located, regardless of whether or not any Prepetition Secured Notes Liens on the assets are voided, avoided, invalidated, lapsed or unperfected (the "DIP Priming Liens") in accordance with the priorities set forth in Exhibit 3.   The DIP Priming Liens shall prime in all respects the interests of the Prepetition GOL/Abra Secured Parties arising from current and future liens of the Prepetition GOL/Abra Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition GOL/Abra Secured Parties) that encumber the Prepetition GOL/Abra Secured Notes Collateral (the "Primed Liens") and, solely upon entry of a Final Order, shall prime in all respects (and the Primed Liens shall include) the interests of the GOL 2026 Notes Secured Parties arising from current and future liens of the GOL 2026 Notes Secured Parties (including, without limitation, the Adequate Protection Liens granted to the GOL 2026 Notes Secured Parties) that encumber the GOL 2026 Notes Collateral.   Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (i) subject and junior to the Carve Out, (ii) junior to the Permitted Priority Liens (other than the Primed Liens), and (iii) senior in all respects to (A) the Adequate Protection Liens and (B) during the Interim Period, the Prepetition GOL/Abra Secured Notes Liens and, upon entry of a Final Order, all Prepetition Secured Notes Liens;

(c)      *Liens Junior to Certain Other Liens*.   Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and

lien upon all tangible and intangible prepetition and postpetition property of each Debtor that is (i) subject to the Permitted Priority Liens (other than the Primed Liens), which shall be junior to such Permitted Priority Liens (other than the Primed Liens) and (ii) solely during the Interim Period with respect to the GOL 2026 Notes Collateral, subject to the GOL 2026 Notes Liens and the Prepetition GOL/Abra Secured Notes Liens (collectively, the "Non-Primed Liens"); *provided* that, for the avoidance of doubt, upon entry of a Final Order, the GOL 2026 Notes Liens and the Prepetition GOL/Abra Secured Notes Liens shall be Primed Liens.

(d)      *Liens Senior to Certain Other Liens*.  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in these Chapter 11 Cases or in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate liens of the DIP Obligors or security interests of the DIP Obligors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof in the Chapter 11 Cases or any Successor Cases.  The DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The DIP Liens shall not be subject to Bankruptcy Code section 510, 549, or 550.

(e)      Notwithstanding anything in this Interim Order to the contrary, during the

Interim Period, the DIP Collateral shall not include (i) any aircraft or engines owned by lessors

and any leasehold interests with respect thereto to the extent prohibited from being DIP Collateral

by the respective leases and (ii) any property excluded from DIP Collateral under the DIP Term

Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement).

7.      *No Obligation to Extend Credit.*  The DIP Secured Parties shall have no obligation

to make any loan or advance or purchase any note under the DIP Term Sheet and DIP Documents

unless all of the conditions precedent under the DIP Term Sheet, the other DIP Documents and

this Interim Order have been satisfied in full or waived by the Required DIP Lenders, as applicable

and, in accordance with the terms of the DIP Term Sheet and the relevant DIP Documents.

8.      *No Monitoring Obligation*.  The DIP Secured Parties shall have no obligation or

responsibility to monitor the Debtors' use of the DIP Financing, and the DIP Secured Parties may

rely upon the Debtors' representation that the use of the DIP Financing at any time is in accordance

with the requirements of this Interim Order, the DIP Term Sheet and the other DIP Documents.

9.      *Protection of DIP Lenders' Rights*.

(a)      So long as there are any DIP Obligations outstanding or the DIP Lenders

have any outstanding commitments with respect to the DIP Financing (the "DIP Commitments")

under the DIP Documents, subject to the DIP Intercreditor Agreement and unless the DIP Agents

(acting at the direction of the Required DIP Lenders) have otherwise provided their written

consent, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to

foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition

Secured Notes Documents or this Interim Order, or otherwise seek to exercise or enforce any rights

or remedies against the DIP Collateral, including in connection with the Adequate Protection

Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens

on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent

remaining after indefeasible payment in cash in full of the DIP Obligations and termination of the

DIP Commitments), to the extent the transfer, disposition, sale or release is authorized under the

DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings,

mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their

security interests in the DIP Collateral other than as necessary to give effect to this Interim Order,

other than, solely as to this clause (iii), the DIP Collateral Agent and the Prepetition Secured Notes

Collateral Agents executing the DIP Intercreditor Agreement and the other DIP Documents and

the DIP Collateral Agent and the Prepetition Secured Notes Collateral Agents filing financing

statements or other documents to perfect the liens granted pursuant to this Interim Order or the

DIP Documents; and (iv) deliver or cause to be delivered, at the DIP Obligors' cost and expense,

any termination statements, releases and/or assignments in favor of the DIP Agents or the DIP

Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or

assignment of liens on any portion of the DIP Collateral subject to any sale or court-approved

disposition.

(b)    To the extent any Prepetition Secured Party has possession of any

Prepetition Secured Notes Collateral or DIP Collateral or has control with respect to any

Prepetition Secured Notes Collateral or DIP Collateral, or has been noted as secured party on any

certificate of title for a titled good constituting Prepetition Secured Notes Collateral or DIP

Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or

notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for

the benefit of the DIP Agents and the DIP Lenders, and such Prepetition Secured Party and the

Prepetition Agents shall comply with the instructions of the DIP Collateral Agent with respect to the exercise of such control.

(c)     Any proceeds of Prepetition Secured Notes Collateral subject to the Primed Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Secured Notes Collateral or otherwise received by any of the Prepetition Agents (other than as Adequate Protection in accordance with this Interim Order), shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agents for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements.  Any proceeds of Prepetition Secured Notes Collateral subject to DIP Liens received by, (i) during the Interim Period, any Prepetition GOL/Abra Secured Party and (ii) upon entry of a Final Order, any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to (x) during the Interim Period, the Prepetition GOL/Abra Secured Notes Collateral and (y) from and after entry of a Final Order, the Prepetition Secured Notes Collateral or otherwise received by any of the applicable Prepetition Agents, shall be segregated and held in trust and forthwith paid over to the DIP Agents in the same form as received with any necessary endorsements for application in accordance with this Interim Order and, once executed, the DIP Intercreditor Agreement.  The DIP Agents are hereby authorized to make any such endorsements as agent for each of the applicable Prepetition Agents or any applicable Prepetition Secured Parties.  The authorizations in this paragraph are coupled with an interest and are irrevocable.

(d)     The Automatic Stay is hereby modified to the extent necessary to permit each applicable DIP Agent (acting at the direction of the Required DIP Lenders) to take any or all of the following actions, at the same time or different times, in each case without further order or

41

application of the Court and immediately upon the occurrence of a DIP Event of Default: (i) deliver a notice of a DIP Event of Default to the Debtors; (ii) declare the termination, reduction or restriction of any further DIP Commitments to the extent any such DIP Commitments remains; (iii) declare the termination of the DIP Documents as to any future obligation of the DIP Agents and the DIP Lenders (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations); and (iv) declare all applicable DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the DIP Obligors; *provided* that such declaration shall be subject to the Carve Out and effective five (5) business days following delivery of a notice of a DIP Event of Default by the DIP Agents to the Debtors (and their lead restructuring counsel) (the "Remedies Notice Period") (any such declaration of the foregoing (i) through (iv), a "Termination Declaration" and the date of such Termination Declaration, the "Termination Declaration Date").

(e)     The Termination Declaration shall be given by electronic mail (or other electronic means) to the Debtors (and their lead restructuring counsel), counsel to a Creditors' Committee (if appointed), and to the U.S. Trustee.  The Automatic Stay otherwise applicable to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties is hereby modified so that, following the Remedies Notice Period: the applicable DIP Agents acting at the direction of the Required DIP Lenders shall be authorized and entitled, without further notice to the Debtors or any other interested party but subject to and in accordance with the terms of the DIP Documents, exercise their rights and remedies in accordance with the respective DIP Documents and this Interim Order (including, without limitation, to declare all DIP Obligations immediately due and payable and charge default interest under the DIP Documents) and shall be permitted to satisfy the relevant DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to and consistent with

(i) the Carve Out, (ii) this Interim Order, and (iii) the DIP Documents (including the DIP Intercreditor Agreement), as applicable.

(f)      Following expiration of the Remedies Notice Period, whether or not the maturity of any of the DIP Obligations shall have been accelerated, the Automatic Stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise will automatically be terminated with respect to the DIP Agents and DIP Lenders who shall be permitted to proceed to protect, enforce and exercise all other rights and remedies provided for in the DIP Documents and under applicable law, including, but not limited to, by (i) immediately terminating and/or revoking the Debtors' right under this Interim Order and any other DIP Documents, as applicable, to use any Cash Collateral or proceeds of the DIP Financing (except for the Carve Out or toward satisfaction of the DIP Obligations as provided in this Interim Order and the applicable DIP Documents), (ii) bringing any action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in any such DIP Document or any instrument pursuant to which such DIP Obligations are evidenced, (iii) foreclosing on all of or any portion of the DIP Collateral including freezing any Cash Collateral held in the Debtors' accounts, (iv) immediately setting-off any and all amounts in accounts maintained by the Debtors against the DIP Obligations, or otherwise enforcing any and all rights against any DIP Collateral in the possession of the DIP Agents, including, without limitation, disposition of the DIP Collateral and application of net cash proceeds thereof to satisfaction of the DIP Obligations, and (v) taking any other actions or exercising any other rights or remedies permitted under this Interim Order, the DIP Documents, or applicable law, in each case, without further notice to or order of the court unless the Debtors, the Creditors' Committee (if appointed), any other party in interest, and/or the U.S. Trustee have obtained an order of the Court preventing such action.

(g)      During the Remedies Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Financing or the issuance of new notes under the DIP Financing, and (ii) the only basis on which the Debtors, the Creditors' Committee (if appointed), any other party in interest, and the U.S. Trustee shall be entitled to seek an emergency hearing (a "Remedies Hearing") within the Remedies Notice Period with the Court shall be to contest whether a DIP Event of Default has occurred and/or is continuing, and the DIP Agents and the DIP Lenders shall consent to such emergency hearing.  Except as expressly provided herein, the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties.  If no Remedies Hearing takes place within the Remedies Notice Period or if no order of the Court enjoining the exercise of remedies is entered prior to the end of the Remedies Notice Period, the Debtors shall cooperate with the Required DIP Lenders, and the DIP Agents in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.

(h)      Each applicable DIP Agent, acting at the direction of the Required DIP Lenders, may declare the termination, reduction or restriction of any further DIP Commitments to the extent any such DIP Commitments remain, upon the occurrence of a DIP Event of Default, including if any of the Debtors, without the prior written consent of the Required DIP Lenders (which consent may be confirmed via e-mail by counsel on behalf of the DIP Lenders), fails to meet any of the Milestones set forth and as defined in the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement); in each case, as any such date may be extended with the written consent of the Required DIP Lenders.

(i)        No rights, protections or remedies of the DIP Secured Parties granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

10.    *Limitation on Charging Expenses Against Collateral.*    In accordance with Bankruptcy Local Rule 4001-2(g)(9), except to the extent of the Carve Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Secured Parties in respect of the DIP Collateral or, upon entry of the Final Order, the Prepetition Secured Parties in respect of the Prepetition Secured Notes Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agents or the Prepetition Agents, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral or Prepetition Secured Notes Collateral under section 506(c) of the Bankruptcy Code or otherwise.

11.    *No Marshaling*.  In accordance with Bankruptcy Local Rule 4001-2(g)(9), in no event shall the DIP Agent, the DIP Lenders or, subject to entry of the Final Order, the Prepetition Agents or the Prepetition Secured Parties, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Secured Notes Obligations, or the Prepetition Secured Notes Collateral.  Subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Agents or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Secured Notes Collateral.

12.    *Payments Free and Clear*.  Any and all payments or proceeds remitted to, by or through the DIP Agents on behalf of the DIP Secured Parties pursuant to the provisions of this Interim Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability.

13.    *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, the DIP Documents, and the Approved Budget (subject to the Permitted Variances), to use all Cash Collateral; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth, (b) except on the terms and conditions of this Interim Order, the DIP Obligors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court and (c) following the occurrence of a DIP Event of Default, the Debtors' use of Cash Collateral of the Prepetition Secured Parties shall terminate simultaneously with the termination of the Debtors' authority to use Cash Collateral of the DIP Secured Parties following the Cash Collateral Notice Period.  The Debtors shall deposit all proceeds of the DIP Financing into a newly created deposit account (the "DIP Cash Account") maintained at a bank organized in the United States, which account shall either be subject to an

46

account control agreement in favor of the DIP Agent or otherwise under the control of the DIP

Agent in accordance with NY UCC Section 9-104.  Withdrawals from the DIP Cash Account shall

only be made subject to and in accordance with the Approved Budget.

14.     *Disposition of DIP Collateral*.  The Debtors shall not sell, transfer, lease, encumber

or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the

DIP Agent and the Required DIP Lenders (and no such consent shall be implied, from any other

action, inaction or acquiescence by the DIP Agent or the Required DIP Lenders, or an order of this

Court), except: (a) as otherwise provided for in the DIP Documents and this Interim Order, or (b)

as otherwise permitted by an order of the Court and consented to by the DIP Agents and the

Required DIP Lenders.  If the DIP Agent and the Required DIP Lenders consent to a transfer of

DIP Collateral free and clear of the DIP Liens, then (i) such DIP Collateral shall also be transferred

free and clear of all Adequate Protection Liens and (ii) to the extent the DIP Liens attach to the

proceeds of such transfer, such released Adequate Protection Liens shall also attach to such

proceeds in accordance with the priorities set forth in Exhibit 3

15.     *Adequate Protection of Prepetition Secured Parties*.  Each Prepetition Secured

Party is entitled, pursuant to sections 361, 362, 363, 364(d)(1) and 507 of the Bankruptcy Code, to

adequate protection of its respective interests in all Prepetition Secured Notes Collateral pledged

by the applicable Debtors in an amount equal to the aggregate diminution in the value of its

respective interests in such Prepetition Secured Notes Collateral from and after the Petition Date

(the "Diminution in Value"), if any, for any reason provided for under the Bankruptcy Code,

including, without limitation, any diminution resulting from the sale, lease or use by the DIP

Obligors of the Prepetition Secured Notes Collateral, the priming of the Prepetition Secured Notes

Liens by the DIP Priming Liens pursuant to the DIP Documents and this Interim Order, the

payment of any amounts under the Carve Out, and the imposition of the Automatic Stay. In consideration of the foregoing, the applicable Prepetition Agents, for the benefit of the applicable Prepetition Secured Parties, are hereby granted the following as adequate protection to the extent of the applicable Prepetition Secured Party's Diminution in Value for the priming of the respective Prepetition Secured Notes Liens and use of the respective Prepetition Secured Notes Collateral and to secure repayment of an amount equal to any applicable Diminution in Value (collectively, the "Adequate Protection Obligations"), in each case, in accordance with the priorities set forth in Exhibit 3:

(a)      *Prepetition Secured Notes Adequate Protection Liens*.

(i)      The Abra Notes Collateral Agent, for itself and for the benefit of the holders of Abra Notes, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), a valid, perfected replacement security interest in and lien upon any DIP Collateral pledged to secure the DIP Obligations by the Debtor Abra Notes Pledgors, which liens shall be subject and subordinate to (A) the Carve Out, (B) the Non-Primed Liens, and (C) the DIP Liens (the "Abra Note Adequate Protection Liens") and shall otherwise have the priority ascribed to such Abra Note Adequate Protection Liens in Exhibit 3.

(ii)      The Prepetition GOL SSN/ESSN Collateral Agent, for itself and for the benefit of the holders of the Prepetition GOL SSN/ESSNs, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), a valid, perfected replacement security interest in and lien upon any of the DIP Collateral pledged to secure the DIP Obligations by the Debtors that are obligors on the Prepetition GOL SSN/ESSNs,

48

which liens shall be subject and subordinate to (A) the Carve Out, (B) the Non-Primed Liens, and (C) the DIP Liens (the "GOL SSN/ESSN Adequate Protection Liens") and shall otherwise have the priority ascribed to such GOL SSN/ESSN Adequate Protection Liens in Exhibit 3.

(iii)     The GOL 2026 Notes Collateral Agent, for itself and for the benefit of the holders of the GOL 2026 Notes, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), a valid, perfected replacement security interest in and lien upon all of the DIP Collateral pledged to secure the DIP Obligations by the Debtors that are obligors on the GOL 2026 Notes, which liens shall be subject and subordinate only to (A) the Carve Out, (B) the Permitted Priority Liens and (C)(i) solely during the Interim Period with respect to the GOL 2026 Notes Collateral, the Prepetition GOL/Abra Secured Notes Liens and the GOL 2026 Notes Liens and (ii) solely upon entry of the Final Order, the DIP Liens (the "GOL 2026 Notes Adequate Protection Liens" and, together with the Abra Note Adequate Protection Liens and the GOL SSN/ESSN Adequate Protection Liens, the "Adequate Protection Liens"), and shall otherwise have the priority ascribed to such GOL 2026 Notes Adequate Protection Liens in Exhibit 3.

(b)     *Prepetition Secured Notes Section 507(b) Claims*.  Each of the Prepetition Agents, for itself and for the benefit of the other Prepetition Secured Parties for which it serves as agent, is hereby granted, subject to the Carve Out, an allowed superpriority administrative expense claim against each of the Debtors that are obligors (or with respect to the Abra Notes, the Debtor Abra Notes Pledgors) for the respective Prepetition Secured Notes (on a joint and several basis) as provided for in section 507(b) of the Bankruptcy Code in the amount of any applicable Diminution in Value, with, except as set forth in this Interim Order, priority in payment over any and all

administrative expenses of the kind specified or ordered pursuant to any provision of the
Bankruptcy Code (the "507(b) Claims"); which 507(b) Claims shall have recourse to and be
payable from all of the DIP Collateral in respect of the Debtors that are obligors on the applicable
Prepetition Secured Notes (or, with respect to the Abra Notes, the Debtor Abra Notes Pledgors),
subject to the priorities applicable to each respective Prepetition Agent's Adequate Protection
Liens and as further set forth on Exhibit 3.  The 507(b) Claims shall be subject and subordinate
only to the Carve Out and the DIP Superpriority Claims.  Except to the extent expressly set forth
in this Interim Order, the Final Order or the DIP Documents, the Prepetition Secured Parties shall
not receive or retain any payments, property or other amounts in respect of the 507(b) Claims
unless and until the DIP Obligations (other than contingent indemnification obligations as to which
no claim has been asserted) have indefeasibly been paid in cash in full and all DIP Commitments
have been terminated.  For the avoidance of doubt, no Prepetition Agent or other Prepetition
Secured Party shall assert its 507(b) Claims until entry of the Final Order.

(c)     *Prepetition Secured Parties Fees and Expenses*.  The DIP Obligors shall
provide as additional adequate protection for the Prepetition GOL/Abra Secured Parties (the
below, the "Adequate Protection Fees and Expenses") in the form of:

(i)     current cash payments of all reasonable and documented out-of-
pocket prepetition and postpetition fees and expenses of:  (A) Dechert LLP, legal counsel to the
Ad Hoc Group of Abra Noteholders, (B) Houlihan Lokey, as financial advisor to Dechert LLP as
counsel to the Ad Hoc Group of Abra Noteholders, (C) a single law firm as legal counsel to the
Abra Notes Collateral Agent, (D) a single law firm as legal counsel to the Abra Notes Trustee, (E)
Padis Mattar Advogados, as Brazilian legal counsel to the Ad Hoc Group of Abra Noteholders,
and (F) in each foreign jurisdiction that the Ad Hoc Group of Abra Noteholders reasonably

determines is necessary, a single law firm as legal counsel to the Ad Hoc Group of Abra Noteholders, in each case with respect to the preceding clauses (A) – (F) incurred since December 1, 2023 and relating in any way to the provision of legal services related to the Prepetition Secured Notes, the Debtors, or the Chapter 11 Cases to the Ad Hoc Group of Abra Noteholders and, with respect to any financial advisor or investment banker, in accordance with applicable engagement letters, fee letters, or similar agreements; and

(ii)     current cash payments of all reasonable and documented out-of-pocket prepetition and postpetition fees and expenses of: (A) Wachtell, Lipton, Rosen & Katz, legal counsel to Abra, (B) Rothschild & Co., as financial advisor to Abra, (C) a single law firm as legal counsel to the Prepetition GOL SSN/ESSN Collateral Agent, (D) Pinheiro Guimarães, as Brazilian legal counsel to Abra, and (E) in each foreign jurisdiction that Abra reasonably determines is necessary, a single law firm as legal counsel to Abra, in each case with respect to the preceding clauses (A) – (E), incurred since December 1, 2023 and relating in any way to the provision of legal services related to the Prepetition GOL SSN/ESSNs, the Debtors, or the Chapter 11 Cases to Abra and, with respect to any financial advisor or investment banker, in accordance with applicable engagement letters, fee letters, or similar agreements.

(iii)     Notwithstanding anything to the contrary set forth herein, the Adequate Protection Fees and Expenses shall not include, and the Debtors shall not pay to any Prepetition Secured Parties, any fees or expenses incurred in connection with (i) contesting any relief sought in the DIP Motion or (ii) any Prohibited Actions (as defined in the DIP Term Sheet). The Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in paragraph 23 of this Interim Order.

(d)     *Payment of Interest*.  As adequate protection for the Diminution in Value of their respective interests in the Prepetition GOL SSN/ESSN Collateral from and after the Petition Date, as provided in the Bankruptcy Code, the DIP Obligors shall provide to the GOL SSN Purchaser and the GOL ESSN Purchaser current payment in cash of all cash-pay interest under the Prepetition GOL SSNs and Prepetition GOL ESSNs, respectively, and current payment in kind of all non-cash pay interest under the Prepetition GOL SSNs and Prepetition GOL ESSNs, in each case, at the non-default interest rates provided for in, and otherwise in accordance with the terms of, the Prepetition GOL SSN/ESSN Documents.

(e)     *Repayment of Abra Bridge Loan*.  As adequate protection for the Diminution in Value of their respective interests in the Debtor Abra Notes Pledged Collateral from and after the Petition Date, as provided in the Bankruptcy Code, the DIP Obligors shall repay (upon or promptly after the Final Funding) the prepetition bridge loans made by Abra to GOL on or after January 20, 2024 to the extent permitted under and subject to the terms and conditions of, the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement).

16.     *Budget*.

(a)     The Initial DIP Budget attached hereto at Exhibit 2 shall be updated by Thursday of every two (2) weeks after the Closing Date, which updated budget shall be in form and substance reasonably satisfactory to the Required DIP Lenders or their financial advisors and subject to any permitted variances (each, an "Approved Budget"); *provided* that, until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect; *provided*, *further*, that neither the Initial Approved Budget nor any subsequent Approved Budget shall be modified

in any manner without the prior written consent of the Required DIP Lenders or their financial advisors. For the avoidance of doubt, the Initial DIP Budget shall constitute an Approved Budget.

(b)    Commencing on the second Friday after the Closing Date, and on every second calendar week thereafter, the Debtors shall deliver to the financial advisor to the DIP Lenders a variance report for the immediately preceding two-week period comparing the actual receipts and disbursements of the Debtors, on a line-item basis, from the values set forth in the Approved Budget (each, a "Budget Variance Report"), with an explanation of each Prohibited Variance (as defined below) accompanied by an officer's certificate attesting to the truth and accuracy of such Budget Variance Report. The Debtors shall ensure that there shall be no unfavorable variance of 15% or more (a "Prohibited Variance," and any variance that is not a Prohibited Variance, a "Permitted Variance") from the total operating disbursements in the aggregate (excluding any fees and expenses of legal, financial and other professional advisors), for every two-week period after the Closing Date (the "Variance Period"). For the avoidance of doubt, (i) any delivery of a budget or a Budget Variance Report due on any day that is not a business day shall instead be delivered on the next business day thereafter, (ii) no variance testing, budget restriction or other Events of Default with respect to fees and expenses of legal, financial and other professional advisors shall apply, and (iii) any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail (including as communicated by counsel to the DIP Lenders by e-mail).

17.    *Prepetition Secured Parties' Information Rights and Financial Reporting.* The Debtors shall continue to provide the Prepetition Agents, the Prepetition Secured Parties, and the Ad Hoc Group of Abra Noteholders (through its counsel), with financial and other reporting substantially in compliance with the Prepetition Secured Notes Documents and all budgets,

reports, financial statements, notices and other information provided to the DIP Lenders in writing pursuant to the DIP Documents.

18.      *The DIP Intercreditor Agreement*.  To the extent provided in this Interim Order, each of the Prepetition Secured Parties are deemed to consent to and agree not to contest: (a) the grant of all DIP Liens, (b) the priming by the DIP Liens of the Prepetition GOL/Abra Secured Notes Liens granted by the Debtors, (c) the execution of the DIP Documents, including the DIP Intercreditor Agreement, and (d) the DIP Obligors' compliance with the terms thereof and of this Interim Order, in each case subject to the terms of this Interim Order.

19.      *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described Adequate Protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the Adequate Protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties holding interests that are secured by Primed Liens.

20.      *Recharacterization of Adequate Protection Payments*.  All Adequate Protection payments are subject to recharacterization as principal payments under the applicable Prepetition Secured Notes Documents in the event of a final determination by order of the Court that the Prepetition Secured Party that received the Adequate Protection payment at issue is undersecured.

21.      *Perfection of DIP Liens and Adequate Protection Liens*.

(a)      Without in any way limiting the automatically effective perfection of the DIP Liens granted pursuant to paragraph 6 hereof and the Adequate Protection Liens granted pursuant to paragraph 15 hereof, the DIP Agents, on behalf of the DIP Secured Parties, and the applicable Prepetition Agents, on behalf of the Prepetition Secured Parties, are hereby authorized, but not required (except to the extent required herein and in the DIP Documents), to file or record

(and to execute in the name of the DIP Obligors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate and perfect the liens and security interests granted to them hereunder or under the DIP Documents, in each case subject to the terms of the DIP Documents ("Perfection Actions").  Whether or not the DIP Agents, on behalf of the DIP Lenders, or the Prepetition Agents, on behalf of the Prepetition Secured Parties, shall, in their sole discretion, choose to take such Perfection Actions, the DIP Liens and Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of the DIP Agents or the Prepetition Agents, each of the Prepetition Secured Parties and the DIP Obligors, without any further consent of any party, is authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further validate, perfect, preserve and enforce the DIP Liens. Notwithstanding anything to the contrary herein, the Debtors organized in Brazil shall execute and deliver the Brazilian Guarantee Agreements (as defined in the DIP Term Sheet), the DIP Intercreditor Agreement, and local collateral documents as provided and on the timeline set forth in the DIP Term Sheet and the DIP Documents (the "Additional Collateral Perfection Documents"), including to take Perfection Actions consisting of filing and recordation of such Additional Collateral Perfection Documents with applicable registries to perfect the DIP Liens securing the DIP Obligations and the Adequate Protection Liens securing the Adequate Protection

Obligations, which Perfection Actions consisting of filings and recordations with applicable registries shall be (x) consistent with the Brazilian Guaranty and Perfection Requirements (as set forth in the DIP Term Sheet), and (y) otherwise acceptable to the Required DIP Lenders in their sole discretion. The Additional Collateral Perfection Documents in respect of the Adequate Protection Liens shall be substantially consistent with those in respect of the DIP Liens, in each case modified *mutatis mutandi* to grant and perfect the Adequate Protection Liens or otherwise in form and substance acceptable to the Prepetition GOL SSN/ESSN Collateral Agent (acting with the prior written consent of the Abra Notes Supermajority Holders (as defined in the Prepetition GOL SSN/ESSN Documents)). Any enforcement of the Adequate Protection Liens shall be subject to the provisions of the DIP Intercreditor Agreement. All documents implementing the Perfection Actions described in this Interim Order will be deemed to have been recorded and filed as of the Petition Date, or as otherwise provided in the Additional Collateral Perfection Documents or the DIP Documents.

(b)     A copy of this Interim Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a copy of this Interim Order for filing and/or recording, as applicable. The Automatic Stay shall be modified to the extent necessary to permit the applicable DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

22.     *Preservation of Rights Granted Under this Interim Order*.

(a)     Other than (1) the Carve Out, (2) the Permitted Priority Liens (other than the Primed Liens), and (3) solely to the extent granted by the Court pursuant to the Cash Collateral

Motion[6], (a) replacement liens (the "Lessor Adequate Protection Liens") granted solely on those assets that served as collateral for the obligations under the AerCap Secured Obligations Agreements and the Secured Amortizing Notes (each as defined in the Cash Collateral Motion) as of the Petition Date  and any proceeds, products, offspring, or profits of such collateral generated after the Petition Date (such collateral, the "Prepetition Lessor Collateral") and solely to extent the security interests on such assets constitute Permitted Priority Liens (such liens, the "Permitted Priority Lessor Liens") and (b) superpriority administrative expense claims against each of the Debtors that are obligors under the AerCap Secured Obligations Agreements and the Secured Amortizing Notes as provided for in section 507(b) of the Bankruptcy Code in the amount of any applicable diminution in value in the respective secured parties' interests in the AerCap Prepetition Collateral or Secured Amortizing Notes Prepetition Collateral (the "Lessor 507(b) Claims"), which Lessor 507(b) Claims shall not be senior to any 507(b) Claims against such Debtor obligors, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agents and the DIP Lenders or the Prepetition Agents and the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to

---

[6]    AerCap Prepetition Collateral and Secured Amortizing Notes Prepetition Collateral have the meanings ascribed to them in the *Debtors' Motion (I) Authorizing the Debtors to (A) Utilize Cash Collateral and (B) Grant Adequate Protection (II) Vacating or Modifying the Automatic Stay and (II) Granting Related Relief* [Docket No. 25] (the "Cash Collateral Motion")

or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Obligors; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Obligors.

(b)    The occurrence of any DIP Event of Default, shall, after notice by the DIP Agents (acting in accordance with the terms of this Interim Order and the DIP Documents) in writing to the Borrower, constitute an event of default under this Interim Order and, upon any such DIP Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Term Sheet (and, upon finalization and execution thereof, the DIP Note Purchase Agreement).   Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full or otherwise satisfied in accordance with this Interim Order or the DIP Documents (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the

58

validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any reversal, modification, vacatur or stay of any use of Cash Collateral, DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the DIP Obligors to the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay, such use of Cash Collateral, DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order

approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code

(except to the extent permitted by the DIP Documents); (iii) the entry of an order confirming a

chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the

Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or

Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP

Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11

Cases cease to be jointly administered and in any superseding chapter 7 cases under the

Bankruptcy Code, and (x) the DIP Liens and the DIP Superpriority Claims, and all other rights

and remedies of the DIP Agent and the DIP Lenders, granted by the provisions of this Interim

Order and the DIP Documents shall continue in full force and effect until consummation of a

chapter 11 plan of reorganization with respect to the Debtors or, the DIP Obligations are

indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP

Commitments have been terminated and (y) the Adequate Protection Liens and the Adequate

Protection Obligations and all other rights and remedies of the Prepetition Agents and the

Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents

shall continue in full force and effect until the earlier of (A) consummation of a chapter 11 plan of

reorganization and (B) the Prepetition Secured Notes Obligations and all Adequate Protection

Obligations have been indefeasibly paid in full, it being understood and agreed that the Adequate

Protection Obligations may be satisfied under a chapter 11 plan of reorganization in a manner

agreed to by (1) with respect to the Adequate Protection Obligations owing to holders of the GOL

SSNs, holders of at least 66 and 2/3% of the aggregate principal amount of the GOL SSNs, (2)

with respect to the Adequate Protection Obligations owing to holders of the GOL ESSNs, holders

of at least 66 and 2/3% of the aggregate principal amount of the GOL ESSNs, (3) with respect to

the Adequate Protection Obligations owing to holders of the GOL 2026 Notes, holders of at least

66 and 2/3% of the aggregate principal amount of the GOL 2026 Notes, (4) with respect to the

Adequate Protection Obligations owing to holders of the Abra SSNs, holders of at least 66 and

2/3% of the aggregate principal amount of the Abra SSNs, and (5) with respect to the Adequate

Protection Obligations owing to holders of the Abra CSSNs, holders of at least 66 and 2/3% of the

aggregate principal amount of the Abra CSSNs.

23.     *Payment of Fees*.   The Debtors are authorized to and shall pay the DIP Fees and

Expenses, as provided in the DIP Term Sheet and the other DIP Documents.   Subject to the review

procedures set forth in this paragraph 23, payment of all DIP Fees and Expenses and Adequate

Protection Fees and Expenses shall not be subject to allowance or review by the Court unless

disputed in accordance with this paragraph 23.   Professionals for the DIP Secured Parties, Abra,

the applicable Prepetition Agents, and the Ad Hoc Group of Abra Noteholders shall not be required

to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek

payment of fees and expenses from the Debtors after the initial funding of the DIP Financing prior

to confirmation of a chapter 11 plan, each professional shall provide summary copies of its

invoices (which shall not be required to contain time entries and which may be redacted or

modified to the extent necessary to delete any information subject to the attorney-client privilege,

any information constituting attorney work product, or any other confidential information, and the

provision of their invoices shall not constitute any waiver of the attorney client privilege or of any

benefits of the attorney work product doctrine) to the Debtors, the Creditors' Committee (if

appointed), the U.S. Trustee, and, if required by the Court, the Court (together, the "Review

Parties").   Any objections raised by the Debtors, the Creditors' Committee (if appointed), or the

U.S. Trustee with respect to such invoices must be in writing and state with particularity the

grounds therefor and must be submitted to the applicable professional within ten (10) business

days after the receipt by the Review Parties (the "Review Period"). Upon request in writing by a

Review Party to an applicable professional within the Review Period, such professional shall

promptly provide additional reasonably requested detail regarding its invoice to such Review

Party, including time entries if requested (which time entries may be redacted for privilege,

provided that the U.S. Trustee may request unredacted time entries and all parties' rights to oppose

such request for unredacted time entries are preserved). If no written objection is received by

12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the DIP Obligors shall

pay such invoices within five (5) business days. If an objection to a professional's invoice is

received within the Review Period, the DIP Obligors shall promptly pay the undisputed amount of

the invoice and this Court shall have jurisdiction to determine the disputed portion of such invoice

if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the

Debtors are authorized to and shall pay, upon the initial funding of the DIP Financing, the DIP

Fees and Expenses and Adequate Protection Fees and Expenses incurred on or prior to such date

without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the

Prepetition GOL/Abra Secured Parties to first deliver a copy of its invoice or other supporting

documentation to the Review Parties (other than the Debtors). No attorney or advisor to the DIP

Secured Parties or any Prepetition Secured Party for whom the Debtors are obligated to pay

Adequate Protection Fees and Expenses or DIP Fees and Expenses pursuant to this Interim Order

shall be required to file an application seeking compensation for services or reimbursement of

expenses with the Court. Any and all fees, costs, and expenses paid prior to the Petition Date by

any of the Debtors to (i) the DIP Secured Parties in connection with or with respect to the DIP

Financing; and (ii) the Prepetition Secured Parties in connection or with respect to these matters,

are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

24.     *Limits to Lender Liability.*   So long as the DIP Secured Parties or Prepetition GOL/Abra Secured Parties comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties or the Prepetition GOL/Abra Secured Parties, as applicable shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or the Prepetition GOL/Abra Secured Notes Collateral, as applicable, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral (including the Prepetition GOL/Abra Secured Notes Collateral) shall be borne by the DIP Obligors.

25.     *Effect of Stipulations on Third Parties.*

(a)     The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto in all circumstances and for all purposes.

(b)     The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order with respect to the Prepetition Secured Parties shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (i) such committee or any other party in interest with requisite standing (subject in all respects to

any agreement or applicable law that may limit or affect such entity's right or ability to do so) has

timely filed an adversary proceeding or contested matter (subject to the limitations contained

herein, including, inter alia, in this paragraph) by no later than (A)(x) with respect to the Creditors'

Committee (if appointed), sixty (60) calendar days after the entry of the Final Order, and (y) with

respect to all other parties in interest (other than the Debtors and the Creditors' Committee), (i) to

the extent a Committee is appointed, seventy five (75) calendar days after the Petition Date, and

(ii) to the extent no Committee is appointed, seventy five (75) calendar days after the entry of the

Final Order, (B) any later date that as has been agreed to, in writing, by the Prepetition Agents

(with the consent of the Supermajority Holders (as defined in the GOL SSN Purchase Agreement

and the GOL ESSN Purchase Agreement)), and (C) any later date as has been ordered by the Court

for cause upon a motion filed and served within any applicable period of time set forth in this

paragraph (the time period established by the foregoing clauses (A), (B), and (C), the "Challenge

Period"), (1) objecting to or challenging the amount, validity, perfection, enforceability, priority

or extent of the Prepetition Secured Note Obligations or the Prepetition Secured Notes Liens, or

(2) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or

conveyances, other avoidance power claims or any other claims, counterclaims or causes of action,

objections, contests or defenses (collectively, the "Challenges") against the Prepetition Secured

Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals,

employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants,

representatives and other professionals and the respective successors and assigns thereof, in each

case in their respective capacity as such (each, a "Representative" and, collectively, the

"Representatives") in connection with matters related to the Prepetition Secured Notes Documents

governing the Prepetition Secured Note Obligations, the Prepetition Secured Notes Liens and the

Prepetition Secured Notes Collateral; and (ii) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.

(c)     If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (i) the Debtors' stipulations, admissions, agreements and releases with respect to the Prepetition Secured Parties contained in this Interim Order shall be binding on all parties in interest; (ii) the obligations of the obligors under the Prepetition Secured Notes Documents governing the Prepetition Secured Notes Obligations, including the Prepetition Secured Notes Obligations (as applicable), shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (iii) the Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (iv) the Prepetition Secured Notes Obligations and the Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and

any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Secured Notes Documents, the Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens and the Prepetition Secured Notes Collateral shall be deemed forever waived, released and barred.

(d)    If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases with respect to the Prepetition Secured Parties contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Secured Notes Documents, the Prepetition Secured Notes Obligations, or the Prepetition Secured Notes Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

26.    *Release and Indemnification.*  Effective as of the date of entry of this Interim Order

(subject to a Challenge commenced prior to the expiration of the Challenge Period, other than with

respect to the DIP Secured Parties and the Debtors, each in their capacities as such),

(a)    each of the Debtors and the Debtors' estates, on its own behalf and on behalf

of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby

absolutely, unconditionally and irrevocably releases and forever discharges and acquits the

Prepetition GOL/Abra Secured Parties, the DIP Secured Parties, the Ad Hoc Group of Abra

Noteholders (including any former, current, or future members), and each of their respective

Representatives (as defined below), each in their capacities as such (collectively, the "Released

Parties"), from any and all obligations and liabilities to the Debtors and the Debtors' estates (and

their successors and assigns) and from any and all claims, counterclaims, demands, defenses,

offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the

Petition Date including, without limitation, any Avoidance Actions or actions for

recharacterization or equitable subordination (collectively, the "Released Claims") of any kind,

nature or description, whether matured or unmatured, known or unknown, asserted or unasserted,

foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or

unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any

state, federal, or foreign local law or otherwise, arising out of or related to (as applicable) (x) the

Debtors, the Chapter 11 Cases; and (y) the Prepetition Secured Notes Documents, the DIP

Documents, the obligations owing and the financial obligations made thereunder, the negotiation

thereof and of the deal reflected thereby, and the obligations and financial obligations made

thereunder; in each case that the Debtors at any time had, now have or may have, or that their

successors or assigns hereafter can or may have against any of the Released Parties for or by reason

of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order; *provided* that, for the avoidance of doubt, nothing in this paragraph 26(a) shall impair the rights of any party in interest provided for in paragraph 25 of this Interim Order; *provided, further* that the releases set forth in this paragraph 26(a) shall not release any claims against a Released Party or liabilities that a court of competent jurisdiction determines results from the bad faith, fraud, gross negligence or willful misconduct of such Released Party.  For the avoidance of doubt, nothing in this release shall relieve the DIP Secured Parties or the Debtors of their obligations under the DIP Documents.

(b)    The Debtors agree, jointly and severally, to indemnify and hold the DIP Secured Parties and their respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "Indemnified Person") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Financing, the DIP Documents, the DIP Liens, the DIP Collateral, the DIP Term Sheet, the transactions contemplated thereby or hereby or by any thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any such Indemnified Person is a party thereto and whether or not brought by any Debtor or any other person or entity, except to the extent resulting from the bad faith, fraud, gross negligence or willful misconduct of an Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction.  In all such litigation, or the preparation therefor, the DIP Secured Parties shall each be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors

agree to pay promptly the reasonable and documented fees and out-of-pocket expenses of one legal U.S. counsel and one legal counsel in each foreign jurisdiction as reasonably necessary in connection with such litigation for all Indemnified Persons; *provided* that, to the extent an Indemnified Person reasonably determines upon advice of counsel (which may include internal counsel) that there may be one or more legal defenses available to it which are different from or in addition to those available to the other Indemnified Persons in such litigation, the Debtors agree to pay promptly the reasonable and documented fees and out-of-pocket expenses of one additional U.S. legal counsel and one legal counsel in each foreign jurisdiction as reasonably necessary in connection with such litigation for such Indemnified Person in connection with such litigation.

27. *Limitation on Use of DIP Financing Proceeds and Collateral.* Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no proceeds of the DIP Financing, DIP Collateral, Prepetition Secured Notes Collateral or any portion of the Carve Out may be used directly or indirectly for any of the following (each such prohibited use, a "Prohibited Action"),

(a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, in each case in their respective capacity as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Notes Obligations, the Prepetition Secured Notes Liens, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the

DIP Obligations, the Prepetition Secured Notes Obligations and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations or the Prepetition Secured Notes Obligations granted under this Interim Order, the Final Order, the DIP Documents, or the applicable Prepetition Secured Notes Documents, including, in the case of each of (i) and (ii), without limitation, any claims or challenges relating to the allocation of value as between encumbered or unencumbered assets of the Debtors or claims alleged for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise *provided* that, notwithstanding anything to the contrary herein, the Creditors' Committee may use the proceeds of the DIP Collateral or Prepetition Secured Notes Collateral to investigate but not to prosecute (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000;

(b)    Except for the Debtors' right to contest whether a DIP Event of Default has occurred and/or is continuing during the Remedies Notice Period under paragraph 9(d) hereof, to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties', the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization on the Prepetition Secured Notes Obligations, Prepetition Secured Notes Collateral, DIP Obligations, DIP Collateral, the Adequate Protection Obligations, the 507(b) Claims and Adequate Protection Liens and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the applicable Prepetition Secured Notes Documents and this Interim Order;

(c)    to seek to subordinate, recharacterize, disallow, or avoid any of the DIP Obligations or the Prepetition Secured Notes Obligations;

(d)      to seek to modify any of the rights and remedies granted to the Prepetition

Secured Parties, the DIP Agents, or the DIP Lenders under this Interim Order, the Prepetition

Secured Notes Documents or the DIP Documents, as applicable;

(e)      to apply to the Court for authority to approve superpriority claims or grant

liens (other than (1) the liens permitted pursuant to the DIP Documents, (2) the Lessor Adequate

Protection Liens to the extent provided herein, and (3) the Lessor 507(b) Claims to the extent

provided herein) or security interests in the DIP Collateral or any portion thereof that are, in each

case, senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection

Liens and 507(b) Claims granted to the Prepetition Secured Parties; or

(f)      to pay or to seek to pay any amount on account of any claims arising prior

to the Petition Date unless such payments are approved or authorized by the Court, agreed to in

writing by the Required DIP Lenders, expressly permitted under this Interim Order or permitted

under the DIP Documents (including the Approved Budget (subject to the Permitted Variances)),

in each case unless all DIP Obligations, Prepetition Secured Notes Obligations, Adequate

Protection Obligations and claims granted to the DIP Agent, DIP Lenders or Prepetition Secured

Parties under this Interim Order, have been refinanced or paid in full in cash or otherwise agreed

to in writing by the DIP Secured Parties.

28.      *Interim Order Governs*.  In the event of any inconsistency between the provisions

of this Interim Order and the DIP Documents (including, but not limited to, with respect to the

Adequate Protection Obligations) or any other order entered by this Court (other than the Final

Order, when entered), the provisions of this Interim Order shall govern.  Notwithstanding anything

to the contrary in any other order entered by this Court, any payment made pursuant to any

authorization contained in any other order entered by this Court shall be consistent with and subject

to the requirements set forth in this Interim Order (or Final Order, when entered) and the DIP Documents, including, without limitation, the Approved Budget (subject to the Permitted Variances).

29.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee (if appointed), any other statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agents, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Collateral or the Prepetition Secured Notes Collateral by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors; *provided further* that, for the avoidance of doubt, nothing in this paragraph 29 shall impair the rights of any party in interest provided for in paragraph 25 of this Interim Order.

30.     *Exculpation*.  Nothing in this Interim Order, the DIP Documents, the Prepetition Secured Notes Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition

or postpetition activities of the DIP Obligors in the operation of their businesses, or in connection with their restructuring efforts.  Except as provided under the applicable DIP Documents or Prepetition Secured Notes Documents and applicable law, (a) the DIP Secured Parties and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for: (i) the safekeeping of the DIP Collateral or Prepetition Secured Notes Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral and Prepetition Secured Notes Collateral shall be borne by the Debtors.

31.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the Prepetition Secured Notes Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties, Prepetition Agents or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the DIP Obligors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

32.    *Master Proof of Claim*.  The Prepetition Agents, and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any

Successor Case in order to assert claims or interests on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Secured Notes Obligations arising under the Prepetition Secured Notes Documents, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Secured Notes Documents.  The statements of claim in respect of such indebtedness set forth in this Interim Order, together with any evidence accompanying the DIP Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agents is authorized to file in the Debtors' lead chapter 11 case *In re GOL Linhas Aéreas Inteligentes S.A.*, Case No. 24-10118, a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective claims or interests arising under the applicable Prepetition Secured Notes Documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim by any of the Prepetition Agents, it shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors with respect to the applicable Prepetition Secured Notes Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 32 and each Master Proof

of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Agents. The DIP Agents and the DIP Lenders shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the Interim Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status and priority.

33.     *Insurance*.  To the extent that any of the Prepetition Agents is listed as loss payee under the Borrowers' or the DIP Guarantors' insurance policies, the applicable DIP Agents are also deemed to be the loss payee under such insurance policies and, subject to this Interim Order, shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and to the payment of the applicable Prepetition Secured Notes Obligations.

34.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and, solely with respect to the Debtors' authority to use the Prepetition Secured Notes Collateral (including Cash Collateral) as provided in this Interim Order, shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal

Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

35.    *Modification of DIP Documents and Approved Budget*.  The DIP Obligors are hereby authorized to enter into agreements with the DIP Secured Parties providing for any consensual modifications to the Approved Budget or one or more amendments, waivers, consents or other modifications to and under the DIP Documents, or of any other amendments or modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Documents, and no further approval of the Court shall be required for non-material amendments, waivers, consents or other modifications to or under the DIP Documents; *provided*, *however*, that the Debtors shall provide notice of any material amendment, waiver, consent or other modification to the DIP Documents to counsel to a Creditors' Committee (if any) and to the U.S. Trustee (collectively, the "Notice Parties") three calendar days prior to the effective thereof, to the extent practicable.  If no objections are timely received (or if the U.S. Trustee or the Creditors' Committee indicate via electronic mail or otherwise that they have no objection) to a material amendment within three calendar days from the date of delivery of such notice, the Debtors may proceed to execute such amendment, which shall become effective immediately upon execution.

36.    *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

37.    *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible

payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the

DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed

to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the

benefit of the applicable DIP Agents and the DIP Lenders and shall immediately turn over the

proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance

with the DIP Documents and this Interim Order.

38.     *Credit Bidding*.    Each of the DIP Agents (at the direction of the Required DIP

Lenders) and the Prepetition GOL SSN/ESSN Collateral Agent (with the consent of the Abra

Notes Supermajority Holders (as defined in the Prepetition GOL SSN/ESSN Documents)), shall

have the right to "credit bid" up to the full amount of the DIP Obligations or the Prepetition GOL

SSN/ESSN Obligations, as applicable, in connection with any sale or other disposition of all or

any portion of the DIP Collateral or the Prepetition Secured Notes Collateral, respectively,

including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or

included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii)

of the Bankruptcy Code, in each case, in accordance with this Interim Order, the DIP Documents,

and the Prepetition GOL SSN/ESSN Documents, and the DIP Agents (at the direction of the

Required DIP Lenders) shall automatically be deemed a "qualified bidder" with respect to any

disposition of DIP Collateral and the Prepetition GOL SSN/ESSN Collateral Agent (with the

consent of the Abra Notes Supermajority Holders (as defined in the Prepetition GOL SSN/ESSN

Documents)) shall automatically be deemed a "qualified bidder" with respect to any disposition of

Prepetition GOL SSN/ESSN Collateral under or pursuant to (a) section 363 of the Bankruptcy

Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy

Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of

the Bankruptcy Code (subject in each case to the DIP Intercreditor Agreement); *provided* that nothing in this paragraph 38 shall impair the rights of any party in interest provided for in paragraph 25 of this Interim Order.  The DIP Agents (at the direction of the Required DIP Lenders) shall have the absolute right to assign, transfer, sell or otherwise dispose of its rights to credit bid, except as may be prohibited by the DIP Documents or as precluded by any sale procedures order entered by the Court.

39.    *Miscellaneous*.

(a)    Upon request of any of the DIP Agents or the Ad Hoc Group of Abra Noteholders, the Debtors' advisors shall make themselves reasonably available (including as required under the DIP Documents) to discuss significant items and developments in the Chapter 11 Cases, including with respect to any material contracts, any material litigation, and any material operational or regulatory matters.

(b)    Notwithstanding anything to the contrary in this Interim Order, any DIP Document, the DIP Term Sheet, or otherwise, this Interim Order, the DIP Documents, and the DIP Term Sheet shall not restrict the Debtors' ability to grant the Lessor Adequate Protection Liens or Lessor 507(b) Claims to the extent set forth herein.

40.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

41.    *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct or indirect incidental beneficiary.

42.    *Necessary Action*.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all actions as are necessary or appropriate to implement the

terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

43.    *Retention of Jurisdiction*.  The Court shall retain exclusive jurisdiction to resolve any and all disputes arising under or related to the Interim DIP Loan, the DIP Notes, the DIP Documents, and/or the provisions of this Interim Order, and to enforce all of the conditions of the DIP Documents and this Interim Order.  The provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

44.    *DIP Note Purchase Agreement*.  No later than the earlier of (i) February 16, 2024 and (ii) the date scheduled for the Final Hearing, the Debtors shall execute and enter into a final version of the DIP Note Purchase Agreement, including all schedules to the DIP Note Purchase Agreement; *provided* that the Debtors shall consult with the DIP Secured Parties regarding the filing of any schedules in redacted form with the Court and nothing in this paragraph 44 shall impair the rights of the Debtors or the DIP Secured Parties to seek relief to file any of the schedules to the DIP Note Purchase Agreement in redacted form or under seal.

45.    *Final Hearing*.  The Final Hearing is scheduled for February 20, 2024 at 2:00 p.m. before this Court.

46.    *Objections*.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon (a) the U.S. Trustee; (b) entities listed as holding the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) proposed counsel to the Debtors, Milbank LLP, 55 Hudson Yards, New

York, NY 10001 (Attn.: Evan R. Fleck, Andrew Harmeyer, and Bryan Uelk); (d) counsel to the

Prepetition Agent and DIP Collateral Agent; (e) counsel to the Ad Hoc Group of Abra Noteholders

and DIP Lenders, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY

10036 (Attn.: Allan Brilliant and Eric Hilmo); (f) counsel to Elliott Investment Management L.P.,

Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York,

NY 10036 (Attn.: Ira Dizengoff, Philip Dublin and Zach Lanier); (g) the Creditors' Committee (if

appointed) and its legal counsel, (h) the Internal Revenue Service; (i) the Securities and Exchange

Commission; and (j) any other party that has filed a request for notices with this Court pursuant to

Bankruptcy Rule 2002, with a copy to the Court's chamber, in each case to allow actual receipt by

the foregoing no later than February 13, 2024 at 4:00 p.m., prevailing Eastern Time, and otherwise

in conformity with the Court's order establishing notice and case management procedures.

47.     The Debtors shall promptly serve copies of this Interim Order (which shall

constitute adequate notice of the Final Hearing) to the parties having been given notice of the

Interim Hearing and to any party that has filed a request for notices with this Court.


**IT IS SO ORDERED.**

Dated:  January 29, 2024
         New York, New York


                              _____/s/ Martin Glenn_____
                                     MARTIN GLENN
                              Chief United States Bankruptcy Judge

**EXHIBIT 1**

**DIP Term Sheet**

SUBJECT TO FRE408 AND ANALOGOUS PROVISIONS IN ALL
APPLICABLE JURISDICTIONS

**SUPERPRIORITY SENIOR SECURED PRIMING
DEBTOR-IN-POSSESSION FINANCING**

**Summary of Terms and Conditions**

*This term sheet containing the summary of terms and conditions (this "DIP Term Sheet") sets forth the
understanding and agreement among the Issuer and Guarantors (each as defined below) and the DIP
Noteholders (as defined below) of certain of the terms of the proposed superpriority senior secured priming
debtor-in-possession financing facility (the "DIP Facility"), subject to the conditions set forth in the
Backstop Commitment Letter to which this DIP Term Sheet is attached and set forth below, among the
Debtors, the Trustee and the Collateral Agent (each as defined below).  This DIP Term Sheet will be
superseded by the DIP Documents (as defined below) containing more detailed terms, conditions,
covenants, representations and warranties and other provisions.*

| | |
|---|---|
| **Issuer** | GOL Finance (Luxembourg) |
| **Guarantors** | GOL Linhas Aéreas Inteligentes S.A.; GOL Equity Finance; GOL Linhas Aéreas S.A.; Smiles Fidelidade S.A. ("Smiles"); and each of the other subsidiaries and affiliates of the foregoing that is a debtor and debtor-in-possession (collectively, the "Guarantors", and together with the Issuer, collectively, the "Debtors") in cases commenced under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Bankruptcy Court (as defined below), other than (i) Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior and Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior and (ii) for the avoidance of doubt, Abra Group Limited ("Abra") and Abra Global Finance.<br><br>On or before the Interim DIP Order Funding, each Guarantor will enter into New York law guarantee agreements in form and substance reasonably satisfactory to the Debtors and the DIP Noteholders in favor of the DIP Noteholders, the Collateral Agent and the Trustee (the "New York Law Guarantee Requirement"); provided that the Debtors shall have received a form of such guarantee on or prior to 7:00 p.m., New York time, on January 26, 2024. |
| **Collateral Agent** | TMF Group New York, LLC or other agent as determined by the Required DIP Noteholders. |
| **Trustee** | GLAS Trust Company LLC or other trustee as determined by the Required DIP Noteholders. |
| **DIP Noteholders** | Following the Interim DIP Order Funding, each holder of (a) the Senior Secured Exchangeable Notes due 2028 issued by Abra Global Finance (the "Abra CSSNs") and/or (b) the Senior Secured Notes due 2028 issued by Abra Global Finance (the "Abra SSNs" and, together with the Abra CSSNs, the "Abra 2028 Notes"; the holders of the Abra 2028 Notes are hereinafter referred to as the "Abra Noteholders") shall have the opportunity to provide a commitment in respect of the DIP Facility in an amount equal to such Abra |

| | |
|---|---|
| | Noteholder's respective ratable portion of the principal amount of its Abra 2028 Notes to the principal amount of the Abra 2028 Notes held by all Backstop Parties (as defined in the Commitment Letter) at such time in accordance with the terms, requirements and procedures set forth in the Commitment Letter (the "Abra Noteholder DIP Facility Election"). <br><br> All interest accruing on the DIP Facility held by an Initial Commitment Party (as defined in the Commitment Letter) prior to effectiveness of an Additional Commitment (as defined in the Commitment Letter) shall be retained by such Initial Commitment Party. All interest accruing on the DIP Facility held by a Backstop Party prior to the consummation of the Abra Noteholder DIP Facility Election shall be retained by such Backstop Party and is not subject to the Abra Noteholder DIP Facility Election. <br><br> A placement agent will serve as the initial note purchaser for any applicable DIP Noteholder. |
| **DIP Secured Parties** | The Collateral Agent, the Trustee and the DIP Noteholders. |
| **Amount, Type, Availability** | A superpriority senior secured priming debtor-in-possession financing in an aggregate principal amount up to $950 million (the "Total DIP Amount", and any notes issued thereunder, collectively, the "DIP Notes" or the "DIP Facility" or the "DIP"), subject to the terms and conditions herein, of which (i) up to $350 million shall be provided upon entry by the Bankruptcy Court of the Interim DIP Order (as defined below), initially in the form of term loans and subsequently refinanced by the issuance of DIP Notes under a note purchase agreement (the "Interim DIP Order Funding"), subject to the satisfaction of the conditions precedent for the Closing Date set forth in this Term Sheet (including the effectiveness of the subordination agreement referenced in clause (viii) of the section titled "Conditions Precedent" in this Term Sheet) and under the DIP Documents, which Interim DIP Order Funding shall be provided by the Initial Commitment Parties as set forth in the Commitment Letter; (ii) up to another $150 million shall be issued upon entry by the Bankruptcy Court of the Final DIP Order (as defined below) (the "Final DIP Order Funding") subject to the satisfaction of the Brazilian Final DIP Order Funding Condition under the Brazilian Guaranty and Perfection Requirements (each as defined below); and (iii) additional notes may be issued in an aggregate principal amount of up to the remaining Total DIP Amount in one additional issuance (the "Final Funding") subject to the satisfaction of the Brazilian Final Funding Condition (as defined below) under the Brazilian Guaranty and Perfection Requirements; provided that in no event shall satisfaction of the Brazilian Post-Closing Covenant (as defined below) under the Brazilian Guaranty and Perfection Requirements be a condition to the Final DIP Order Funding or the Final Funding. <br><br> As used herein, "DIP Obligations" means, at any time, all indebtedness and other obligations (including, without limitation, principal, interest, fees and expenses) owing under the DIP at such time. <br><br> As used herein, "Brazilian Guaranty and Perfection Requirements" means the granting and perfection of Brazilian law guarantees and collateral made by |

each of the Debtors in favor of the DIP Noteholders guaranteeing all DIP Obligations:

(a)      by each of the Debtors incorporated under Brazilian law entering into Brazilian Guarantee Agreements within five business days after the Interim DIP Order Funding (the requirements of this clause (a), the "Brazilian Guarantee Requirement");

(b)      on a "first-priority" basis with respect to the portion of the Priming Collateral that secures the GOL 2028 Notes, as a condition to the Final DIP Order Funding (or the waiver of such funding condition by DIP Noteholders holding at least $66^2/_3\%$ of the aggregate principal amount of DIP Notes and commitments to issue DIP Notes) (the "Brazilian Final DIP Order Funding Condition");

(c)      on a "first-priority" basis with respect to all other Priming Collateral as a condition to the Final Funding (or the waiver of such funding condition by DIP Noteholders holding at least $66^2/_3\%$ of the aggregate principal amount of DIP Notes and commitments to issue DIP Notes) (the "Brazilian Final Funding Condition"); provided that if the Debtors have used reasonable best efforts to satisfy the Brazilian Final Funding Condition and have been unable to obtain, despite exerting substantial efforts, any consent, approval or agreement from any third party in order to complete the Brazilian Final Funding Condition, then satisfaction of the Brazilian Final Funding Condition shall no longer be a condition to the Final Funding; provided, further, that, in any event, the Debtors shall continue to use reasonable best efforts to obtain such consent, approval or agreement; and

(d)      on a "first-priority" or "second-priority" basis (i.e. "Sobejo" or "Suspensive Condition" for Brazilian law purposes), as applicable, with respect to the assets under clauses (ii) and (iv) of the definition of "Collateral" and the adequate protection liens, on a reasonable best efforts basis within 60 days after the Closing Date (the "Brazilian Post-Closing Covenant"); provided that, in any event, the Debtors shall continue to use reasonable best efforts to obtain such liens even if such liens are not obtained within 60 days after the Closing Date;

in each case, including the execution and delivery of the applicable Brazilian Agreements (as defined in Annex A hereto), all other applicable documents set forth on Annex A, any collateral or security agreement in respect of the adequate protection liens on the Collateral and any other documents that the Required DIP Noteholders reasonably request in connection with the DIP Liens on the Collateral, and the filing and registration of each thereof with all the relevant governmental authorities (except for the registration with the INPI listed in item 5 of Annex A), and the execution and delivery of other agreements reasonably requested by the Required DIP Noteholders in connection with any Brazilian Agreement in connection with the foregoing (including intercreditor agreements), in each case as set forth on Annex A, all of the foregoing to be in and form and substance reasonably satisfactory to the Required DIP Noteholders.

| | |
|---|---|
| **Fees** | Commitment Fee: 2.00% of the Total DIP Amount.  The Commitment Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date. |

| | |
|---|---|
| | <u>Exit Fee</u>: 2.00% of the Total DIP Amount. The Exit Fee shall be fully earned and due and payable in cash on the Termination Date. |
| | <u>Backstop Fee</u>: 3.00% of the Total DIP Amount, payable to the Backstop Parties. The Backstop Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date. |
| | <u>Fronting Fee</u>: 1.00% of the aggregate principal amount of the aggregate amount of each Initial Commitment Party's Initial Commitment that is in excess of its Backstop Commitment (calculated on the basis that each Post-Signing Commitment Party has provided the full amount of its Additional Commitment in accordance with the terms of the Commitment Letter). The Fronting Fee shall be fully earned and due and payable in cash or in kind, at the Issuer's option, on the Closing Date. |
| | <u>Undrawn Fee</u>: 5.75% per annum on the average daily portion of the Total DIP Amount that from time to time shall not yet have been issued after the date of the Final DIP Order. The Undrawn Fee shall be due and payable monthly in arrears, in cash or in kind, at the Issuer's option, from the date of the Final DIP Order until the Termination Date. |
| | <u>Placement Agent Fees</u>: To be mutually agreed. |
| | All fees set forth in this section shall be non-refundable. |
| **Interest Rate; Default Rate** | <u>Interest Rate</u>. All amounts outstanding under the DIP shall bear interest at the rate equal to 30-day SOFR (subject to a 3.50% per annum SOFR floor, but without any credit spread adjustment), plus 10.50% per annum. All interest shall be payable monthly in arrears in cash or in kind, at the Issuer's option. |
| | <u>Default Rate</u>. Upon the occurrence and continuance of an Event of Default under the DIP, at the election of the Required DIP Noteholders, all amounts outstanding under the DIP will bear interest at the otherwise applicable interest rate *plus* an additional 2.00% per annum, which shall be payable in cash on demand by the Required DIP Noteholders or the Trustee (or, if no demand is made, payable monthly with the regularly scheduled interest payments). |
| **Termination Date** | The DIP facility shall terminate, and all DIP commitments shall terminate, and all DIP Obligations shall be payable in full in cash on the earliest to occur of (the "<u>Termination Date</u>"): (a) twelve (12) months from the Closing Date (as defined below), <u>provided</u> that the Issuer shall be permitted to extend the Termination Date, on not more than two (2) occasions, by up to an additional three (3) months for each extension (a "<u>Maturity Extension</u>", and the Termination Date so extended, the "<u>Scheduled Termination Date</u>") upon payment of an extension fee (payable in kind) in an amount equal to (x) 2.00% of the Total DIP Amount for the first extension and (y) 2.50% of the Total DIP Amount for the second extension, (b) conversion of any of the Chapter 11 Cases to a case under chapter 7 without the prior written consent of the Required DIP Noteholders, (c) dismissal of any of the Chapter 11 Cases without the prior written consent of the Required DIP Noteholders, (d) the appointment of a chapter 11 trustee or an examiner with expanded powers, (e) the date of consummation of a sale of all or substantially all assets of the Debtors, (f) the effective date of a chapter 11 |

| | plan and (g) the date the DIP Obligations become due and payable in full under the DIP Documents (as defined below), whether by acceleration or otherwise. |
|---|---|
| **Use of Proceeds** | Proceeds of the DIP (which proceeds, prior to their use by the Debtors, shall be held in a deposit account maintained with a bank organized in the United States that is subject to the DIP Liens and, within a period after the Closing Date to be agreed, will be either subject to an account control agreement in favor of the Collateral Agent or otherwise under the control of the Collateral Agent (as defined in Article 9 of the New York Uniform Commercial Code) (the "Note Proceeds Account")) will be used only for the following purposes, in each case in accordance with the Approved Budget (as defined below), subject to variances that are not Prohibited Variances: (i) general corporate and working capital purposes; (ii) costs of the administration of the Chapter 11 Cases; (iii) adequate protection payments as approved by the Bankruptcy Court; (iv) after the Final Funding has occurred, repayment of the Abra prepetition bridge loans made to GOL on or after January 20, 2024 in an aggregate principal amount of no more than $15,000,000; (v) payment of reasonable and documented transaction costs, fees and expenses with respect to the DIP, including reasonable fees and expenses of legal and other professional advisors to the DIP Noteholders, the Collateral Agent and the Trustee; (vi) for contributing equity to subsidiaries of the Debtors as required under the laws of the jurisdiction of formation of such subsidiaries in order to avoid mandated liquidation for having negative net equity; and (vii) for any other purpose approved by the Bankruptcy Court in the DIP Orders or other orders of the Bankruptcy Court not inconsistent with the terms of the DIP Documents. |
| **Budgets; Budget Variance Reports** | The initial budget shall consist of forecasted receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing on the Closing Date (the "Initial Approved Budget") and shall be updated by Thursday of every two (2) weeks thereafter, which updated budget shall be in form and substance reasonably satisfactory to the Required DIP Noteholders or their financial advisors (each, an "Approved Budget"); provided that, until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect; provided, further, that neither the Initial Approved Budget nor any subsequent Approved Budget shall be modified in any manner without the prior written consent of the Required DIP Noteholders or their financial advisors. |
| | Commencing on the second Friday after the Closing Date, and on every second calendar week thereafter, the Debtors shall deliver to the DIP Noteholders and their advisors a variance report for the immediately preceding two-week period comparing the actual receipts and disbursements of the Debtors, on a line-item basis, from the values set forth in the Approved Budget (each, a "Budget Variance Report"), with an explanation of each Prohibited Variance (as defined below) accompanied by an officer's certificate attesting to the truth and accuracy of such Budget Variance Report. The Debtors shall ensure that there shall be no unfavorable variance of 15% or more (a "Prohibited Variance") from the total operating disbursements in the aggregate (excluding any fees and expenses of legal, financial |

| | |
|---|---|
| | and other professional advisors) for every two-week period after the Closing Date (the "Variance Period"). |
| | For the avoidance of doubt, (i) any delivery of a budget or a Budget Variance Report due on any day that is not a business day shall instead be delivered on the next business day thereafter, (ii) no variance testing, budget restriction or other Events of Default with respect to fees and expenses of legal, financial and other professional advisors shall apply and (iii) any reference to "written consent" or "written approval" hereunder shall include consent or approval granted by e-mail (including as communicated by counsel to the DIP Noteholders by e-mail). |
| **Financial Covenant** | Minimum Liquidity Covenant: The sum of (x) unrestricted cash-on-hand (and cash equivalents) of the Debtors *plus* (y) so long as no Event of Default has occurred and is continuing, the undrawn amount of the Total DIP Amount shall be not less than the Minimum Liquidity for any period of five (5) consecutive business days. |
| | "Minimum Liquidity" shall be defined as: |
| | (i) $200 million for all measurement periods falling between April 1, 2024 and November 30, 2024; and |
| | (ii) $250 million for all other measurement periods. |
| **Milestones** | The DIP Documents shall contain the following milestones (collectively, the "Milestones") as may be reasonably set forth in the DIP Documents by the DIP Noteholders in consultation with the Debtors and their advisors, which shall include, without limitation, that: |
| | i.    The Debtors shall have commenced their Chapter 11 Cases in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on or before January 31, 2024 (the "Petition Date"); |
| | ii.    The Debtors shall have entered into definitive documentation governing the DIP in the form of a note purchase agreement and/or an indenture on or before the earlier of (x) February 16, 2024 and (y) the date of the hearing for the Final DIP Order; |
| | iii.    The Debtors shall have proposed a business plan for the reorganization and restructuring of the Debtors' business that is reasonably acceptable to the Required DIP Noteholders (the "Business Plan") by no later than 120 days after the Petition Date; |
| | iv.    No later than 90 days after the Petition Date, the Debtors shall have entered into stipulation agreements for no less than 90 aircraft; |
| | v.    The Debtors shall file a motion seeking approval of the DIP on the Petition Date; |
| | vi.    An interim order of the Bankruptcy Court, in form and substance reasonably acceptable to the Required DIP Noteholders, approving the DIP on an interim basis (the "Interim DIP Order") shall be entered in the Chapter 11 Cases by no later than three (3) business days after the Petition Date (and subject in any event to the availability of the Bankruptcy Court); |

6

|  | vii. | A final order of the Bankruptcy Court, in form and substance reasonably acceptable to the Required DIP Noteholders, approving the DIP on a final basis (the "Final DIP Order", and together with the Interim DIP Order, the "DIP Orders") shall be entered in the Chapter 11 Cases by no later than 45 days after the Petition Date; |
|  | viii. | The Debtors shall file an Acceptable Plan (as defined below) by no later than 260 days after the Petition Date; |
|  | ix. | An order (the "Disclosure Statement Order") approving a disclosure statement for an Acceptable Plan, which disclosure statement shall be reasonably acceptable to the Required DIP Noteholders, shall be entered in the Chapter 11 Cases by no later than 305 days after the Petition Date; |
|  | x. | An order (the "Confirmation Order") confirming an Acceptable Plan shall be entered in the Chapter 11 Cases by no later than 14 days before the Scheduled Termination Date; and |
|  | xi. | Such confirmed Acceptable Plan shall become effective by no later than the Scheduled Termination Date; |
|  | | in each case, as any such date may be extended with the written consent of the Required DIP Noteholders (which consent may be confirmed via e-mail by counsel on behalf of the Required DIP Noteholders); provided that, to the extent any Maturity Extension is elected by the Issuer, the due dates for the Milestones set forth in clauses (vii) through (x) shall be extended to reflect the same additional period as the extended Termination Date. |
|  | | Except as otherwise provided above, all orders entered by the Bankruptcy Court throughout the pendency of the Chapter 11 Cases must be reasonably acceptable to the Required DIP Noteholders. |
|  | | The Debtors shall provide the DIP Noteholders and the Trustee with drafts of all material pleadings (together with proposed orders attached thereto, as applicable), including all "first day" and "second day" pleadings to be filed in the Chapter 11 Cases, before filing and with reasonable time for the DIP Noteholders and the Trustee to comment thereon, and such material pleadings shall not conflict with the terms of this Term Sheet or the DIP Documents. |
|  | | "Acceptable Plan" means a chapter 11 plan of reorganization that (i) shall provide for payment in full in cash of all DIP Obligations on the effective date of such plan to the extent such plan is confirmable (as defined in the Bankruptcy Code) or (ii) is otherwise acceptable to the Required DIP Noteholders (solely with respect to the treatment of their respective claims) and the Debtors; provided that, in connection with any Acceptable Plan under this clause (ii), the Debtors and the DIP Noteholders shall enter into a restructuring support agreement with respect to such treatment of claims. |
| **Collateral** | | The DIP facility shall be secured by liens (collectively, the "DIP Liens") on all of the assets of the Debtors (in each case subject to certain customary exclusions to be agreed and excluding, for the avoidance of doubt, any aircraft or engines owned by lessors and any leasehold interests therein to the extent prohibited by the respective leases), including in any event but not limited to the following (collectively, the "Collateral"): |

i.   pursuant to section 364(d)(1) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected first-priority priming lien on all assets pledged to secure the Debtors' obligations under the 8.00% Senior Secured Notes due 2026 issued by the Issuer (the "GOL 2026 Notes", and the holders of the GOL 2026 Notes, the "GOL 2026 Noteholders"), the Senior Secured Notes due 2028 issued by the Issuer (the "GOL SSNs") and the Senior Secured Exchangeable Notes due 2028 issued by GOL Equity Finance (the "GOL ESSNs" and, together with the GOL SSNs, the "GOL 2028 Notes", and the holders of the GOL 2028 Notes, the "GOL 2028 Noteholders") (such assets, including, without limitation, the Smiles IP, the GOL IP and the spare parts listed in the Existing Brazilian Collateral Agreements and all GOL intercompany claims and receivables, including, without limitation, such as are evidenced by the GOL Global Intercompany Notes (as defined in each of the Abra SSN Indenture and the Abra CSSN Indenture), collectively, the "Priming Collateral");

ii.   pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected first-priority lien on all assets of the Debtors to the extent that such assets are not subject to prior liens in existence as of the Petition Date (including, without limitation, (a) all cash and bank accounts of the Debtors not subject to prior perfected liens (including, without limitation, the Note Proceeds Account) and (b) all applicable lease and other contract rights with respect to any aircraft not subject to existing liens);

iii.   pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve-Out, upon entry of the Final DIP Order and to the extent approved by the Bankruptcy Court, a valid perfected first-priority lien on any and all property and proceeds recovered from claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "Avoidance Actions"); and

iv.   pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out, a valid perfected second-priority lien (i.e. "Sobejo" or "Suspensive Condition" for Brazilian law purposes) on all assets of the Debtors subject to valid perfected liens in existence as of the Petition Date, other than existing liens referred to in clause (i) above (including, without limitation, (a) all accounts receivable owing to Smiles and (b) all applicable lease and other contract rights with respect to any aircraft subject to existing liens).

All of the liens described herein with respect to the Collateral securing the DIP Obligations shall be deemed effective and perfected by entry of the Interim DIP Order and perfected under local law by entry of the Final DIP Order and without the necessity of the execution of security agreements, pledge agreements, financing statements or other agreements, but without limitation of the right of the Collateral Agent to require any such agreements, and subject in all events to the Brazilian Guaranty and Perfection Requirements.

8

| | |
|---|---|
| | For the purposes of Brazilian law, any reference to a "second-priority" lien in this Term Sheet shall be interpreted as references to, as applicable, (a) a security interest over future credit rights, revenues and excess proceeds, if any, that a Debtor incorporated under Brazilian law may become entitled in case there are outstanding amounts due to such entities after a foreclosure by a third party lender of a certain collateral interest securing a first-priority secured obligation ("*Sobejo*"); or (b) a security interest under suspensive condition over certain assets or rights that are subject to a first-priority lien in favor of a third party lender, in accordance with Article 125 of the Brazilian Civil Code ("Suspensive Condition"). |
| **Superpriority Claim** | All obligations and liabilities under the DIP shall at all times, subject to the Carve-Out, be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having a superpriority claim status over any and all administrative expenses of the kind that are specified in, or contemplated by, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code (collectively, the "Superpriority Claim"). |
| **Adequate Protection** | The DIP Orders shall include (i) a customary adequate protection package ("Adequate Protection"), reasonably satisfactory to the Required DIP Noteholders, for the GOL 2026 Noteholders, the GOL 2028 Noteholders and the Abra Noteholders for the protection of their prepetition liens in the collateral securing the prepetition claims under the GOL 2026 Notes, the GOL 2028 Notes and the Abra Notes, to the extent of the diminution of such collateral, including, without limitation, (A) current payment in cash of the Adequate Protection Expenses (as defined below), (B) replacement adequate protection liens on the Collateral, junior to certain prior liens, (C) continued payment of paid in kind interest and current payment of all cash-pay interest under the GOL 2028 Notes for the duration of the Chapter 11 Cases, (D) repayment of the Abra prepetition bridge loans to the extent permitted hereunder, (E) superpriority claims as provided for in section 507(b) of the Bankruptcy Code and (F) delivery of all financial statements, Budgets, Budget Variance Reports and other information reporting under the DIP; provided that such Adequate Protection liens and claims shall be junior in every respect to the DIP Liens granted to secure the obligations and liabilities owing under the DIP, the Superpriority Claims, and prior payment of the Carve-Out; and (ii) a customary consent to use of cash collateral, reasonably satisfactory to the Required DIP Noteholders, including payment of certain professional fees customary for a debtor-in-possession financing of this type to the DIP Noteholders. For the avoidance of doubt, adequate protection shall only be provided at entities for which holders of the GOL 2026 Notes and GOL 2028 Notes held secured claims as of the Petition Date.

"Adequate Protection Expenses" means all prepetition and postpetition reasonable and documented fees and expenses (excluding, for the avoidance of doubt, any fees and expenses in connection with any Prohibited Actions) of the GOL 2026 Noteholders, the GOL 2028 Noteholders, the Abra Noteholders and the trustees and collateral agents with respect to the GOL 2026 Notes, the GOL 2028 Notes and the Abra Notes. |
| **Carve-Out** | (a)    As used in this Term Sheet, "Carve-Out" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. |

Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 without regard to the notice set forth in clause (iii) below; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Bankruptcy Code section 726(b) without regard to the notice set forth in clause (iii) below; (iii) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (other than fees or expenses incurred in connection with any Prohibited Actions) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official committee of unsecured creditors (the "Committee"), if one is appointed, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Trustee of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors that are fully earned, due and payable pursuant to the terms of the applicable engagement letters or retention applications prior to the delivery of a Carve-Out Trigger Notice) (such amounts in this clause (iii), the "Pre-Trigger Notice Professional Fees"); and (iv) after the date of delivery of the Carve-Out Trigger Notice (the "Trigger Date"), Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $10,000,000 (the "Post-Carve-Out Trigger Notice Cap") incurred after the first business day following delivery by the Trustee of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise (such amounts in this clause (iv), the "Post-Trigger Notice Professional Fees").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the Trustee by email (or other electronic means) to (A) the Debtors and Milbank LLP, (B) counsel to the Trustee, (C) counsel to the ad hoc group of Abra Noteholders, (D) counsel to Elliott Investment Management, L.P. and its affiliates ("Elliott"), (E) the U.S. Trustee, and (F) lead counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default (but subject to any applicable grace periods, waivers, or forbearances) stating that the Post Carve-Out Trigger Notice Cap is invoked.

(b)     The Carve-Out shall be senior to the DIP Liens and the Superpriority Claim.  Notwithstanding anything to the contrary contained in this Term Sheet or any DIP Documents, the security interests, Liens and claims granted to any of the parties (including, without limitation, the DIP Liens and the Superpriority Claim) under, pursuant to or in connection with the DIP facility, any DIP Document, or this Term Sheet, as applicable, shall be subject to the Carve-Out.

(c)     Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered, (i) the Debtors shall be permitted to pay Pre-Trigger Notice Professional Fees, as the same may become due and payable, including on an interim basis, solely in accordance with orders of the Bankruptcy Court, and (ii) such payments shall not reduce, or be deemed to reduce, the Post-Carve-Out Trigger Notice Cap.

|  | (d)    Any payment or reimbursement made after the Trigger Date in respect of any Post-Trigger Notice Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under the Final DIP Order, the DIP Documents, the Bankruptcy Code and applicable law. |
|  | (e)    None of the Trustee, the Collateral Agent, or the DIP Noteholders shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these chapter 11 cases or any successor cases.  Nothing in this Term Sheet or otherwise shall be construed to obligate the Trustee, the Collateral Agent or the DIP Noteholders, GOL 2026 Noteholders or GOL 2028 Noteholders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. |
| **Prohibited Actions** | No portion of the DIP, the Carve-Out or the Collateral or the proceeds thereof may be used for the payment of the fees and expenses incurred by anyone challenging, or in connection with any challenge of, any liens or claims of Abra Global Finance or Abra in respect of the GOL 2028 Notes, or any liens or claims of the GOL 2026 Noteholders, or any liens or claims of the Abra Noteholders in respect of any assets of the Debtors, or the initiation or prosecution of any claim or cause of action against Abra Global Finance, Abra, the Abra Noteholders, the GOL 2026 Noteholders, the DIP Noteholders, the Collateral Agent or the Trustee (or any of their respective affiliates), including any claim under chapter 5 of the Bankruptcy Code; provided that any Committee may use up to $50,000 in the aggregate to investigate (but not otherwise commence any challenge or object to or otherwise prosecute) any such claims or causes of action.  In addition, neither the Carve-Out nor any portion of proceeds under the DIP or proceeds of the Collateral shall be used in connection with preventing, hindering or delaying Abra Global Finance's, Abra's, the Abra Noteholders', the Collateral Agent's, or the Trustee's enforcement or realization upon the Collateral for the benefit of the DIP Noteholders once an Event of Default has occurred under the DIP Documents.  Any challenge period and all related challenge mechanics shall be reasonably satisfactory to the Required DIP Noteholders; provided that such challenge period (i) with respect to the Committee, shall be 60 days following the formation of the Committee and (ii) with respect to all other parties, shall be 75 days following entry of the Interim DIP Order, in each case subject to any order of the Bankruptcy Court modifying such dates. |
| **Documentation Principles** | The DIP shall be documented by this Term Sheet and a superpriority, senior secured priming indenture and/or note purchase agreement, and on the Interim DIP Order Funding, may be documented by a promissory note in a form to be mutually agreed (provided that the Debtors shall have received a form of such promissory note on or prior to 7:00 p.m., New York time, on January 26, 2024) (together with any and all security agreements, the DIP Orders, and other relevant documentation, the "<u>DIP Documents</u>"), in form and substance reasonably acceptable to the Required DIP Noteholders, the |

|  | Collateral Agent, the Trustee and the Debtors. It is understood and agreed that no legal opinions shall be required in connection with the DIP Documents, other than customary legal opinions of Brazilian counsel to the Debtors in respect of the validity, enforceability and, as applicable, perfection of all Brazilian Agreements in connection with the Brazilian Guaranty and Perfection Requirements, in form and substance reasonably satisfactory to the Required DIP Noteholders. |
|---|---|
| **Events of Default** | The DIP Documents shall contain usual and customary events of default (any such event, an "Event of Default"), subject to customary cure provisions, qualifications and limitations for materiality to be mutually agreed-upon, which shall include, without limitation: (i) nonpayment of DIP Obligations when due (with a five (5) business day grace period for nonpayment of interest or other amounts (except principal)); (ii) non-performance of covenants and obligations under the DIP Documents (with a thirty (30) day grace period for certain affirmative covenants to be agreed); (iii) [reserved]; (iv) default on material post-petition indebtedness and hedge obligations and assumed leases (with a thirty (30) day grace period for assumed leases); (v) breach of any representation or warranty; (vi) material adverse regulatory actions; (vii) the Debtors, directly or indirectly, contesting, delaying, impeding or taking any other action (including the commencement by or on behalf of the Debtors of an avoidance action or other legal proceeding seeking any of the following relief or seeking the entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction) objecting, challenging, invalidating, avoiding, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (a) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens securing the DIP Obligations or the obligations under the GOL 2028 Notes, the GOL 2026 Notes or the Abra 2028 Notes or (b) the validity, enforceability, characterization or non-avoidability of any of the DIP Obligations or the obligations under the GOL 2028 Notes, the GOL 2026 Notes or the Abra 2028 Notes; (viii) entry by the Bankruptcy Court of an order (a) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Cases, or (d) terminating or modifying (other than extending) the exclusive right of the Debtors to file a plan of reorganization under section 1121 of the Bankruptcy Code; (ix) any Prohibited Variance shall have occurred; (x) any Event of Default under any DIP Order or other DIP Document shall have occurred; (xi) the filing of a chapter 11 plan with respect to the Debtors by any of the Debtors or any of their affiliates that is not an Acceptable Plan; (xii) an Acceptable Plan is withdrawn or modified in any respect without the prior written consent of the Required DIP Noteholders except in favor of an alternative plan or transaction that repays the DIP Obligations in full in cash on the effective date of such plan; (xiii) the failure to meet any of the Milestones; (xiv) any of the Debtors or any affiliate thereof filing a pleading seeking to vacate or modify any DIP Order over the objection of the Required DIP Noteholders; (xv) the entry of an order without the prior consent of the Required DIP Noteholders amending, supplementing or otherwise modifying any DIP Order; (xvi) reversal, vacation or stay of the effectiveness of any DIP Order; (xvii) any sale of all or substantially all assets of the Debtors, unless |

| | |
|---|---|
| | (a) the proceeds of such sale indefeasibly satisfy the DIP Obligations in full in cash or (b) such sale is supported by the Required DIP Noteholders; (xviii) the granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Debtors above $10,000,000 in the aggregate; (xix) the Debtors' filing of (or failing to object or otherwise supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Noteholders' claims under the DIP facility; (xx) payment of or granting adequate protection with respect to prepetition debt, other than as expressly agreed in the DIP Documents or in any DIP Order; (xxi) cessation of the DIP Liens or the Superpriority Claim to be valid, perfected and enforceable in all respects; (xxii) any uninsured judgments (not otherwise contemplated in the Approved Budget or the first day pleadings) are entered with respect to any post-petition liabilities against any of the Debtors or any of their respective properties in an aggregate amount in excess of $50,000,000; (xxiii) the commencement of any insolvency proceeding or any proceeding under any debtor relief law in any jurisdiction other than the Chapter 11 Cases (excluding any local proceeding to enforce the automatic stay or other protective provisions granted to the Debtors in the Chapter 11 Cases); or (xxiv) the failure to satisfy the Brazilian Guarantee Requirement. |
| **Remedies** | The DIP Documents shall contain usual and customary remedies and the proposed Interim DIP Order shall provide that upon the occurrence of an Event of Default under the DIP Documents, and following the delivery of five (5) business days' written notice by the Required DIP Noteholders or the Trustee to the Debtors (and their restructuring counsel) thereof (the "Remedies Notice Period"), the Trustee and the DIP Noteholders, in each case, at the direction of the Required DIP Noteholders may exercise all rights and remedies provided for in the DIP Documents, and take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease the issuance by the Debtors of new notes under the DIP; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze all monies and balances in the Debtors' bank accounts in any jurisdiction; (e) immediately set-off any and all amounts in accounts maintained by the Debtors against the DIP Obligations, or otherwise enforce any and all rights against the Collateral in its possession or otherwise, including, without limitation, disposition of the Collateral for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the DIP Orders (as applicable), the DIP Documents or applicable law.  The Debtors shall cooperate with the Required DIP Noteholders, the Collateral Agent and the Trustee in their exercise of rights and remedies, whether against the Collateral or otherwise. <br><br> During the Remedies Notice Period, (i) the Debtors shall be prohibited from issuing any new notes under the DIP and (ii) the only basis on which the Debtors and/or the Committee (if appointed) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Bankruptcy Court shall be to contest whether an Event of Default has occurred and/or is continuing and the DIP Noteholders shall consent to such emergency |

| | |
|---|---|
| | hearing. The proposed Interim DIP Order shall provide that unless, during the Remedies Notice Period, the Bankruptcy Court determines that an Event of Default has not occurred, the automatic stay imposed under section 105 or section 362(a) of the Bankruptcy Code or otherwise, as to the DIP Noteholders, the Collateral Agent and the Trustee, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. |
| **Mandatory Prepayments** | The notes or loans issued under the DIP Documents shall be subject to customary mandatory redemption provisions for transactions of this type with respect to (i) 100% of the net cash proceeds from the sale of any Collateral, non-ordinary course asset sales, and sales of subsidiaries, in each case subject to any agreed-to dollar baskets, to the extent such proceeds exceed any amounts from such sales assumed in the Approved Budget; (ii) 100% of the net cash proceeds from incurrence of non-permitted indebtedness; (iii) 100% of insurance proceeds available to the Debtors, including condemnation and similar proceeds (but excluding, for the avoidance of doubt, insurance proceeds that have been assigned to lessors or other counterparties), subject to any agreed-to dollar baskets and replacement rights; and (iv) 100% of the net cash proceeds of other extraordinary receipts (to be defined as tax refunds and litigation settlements), in each case subject to any agreed-to dollar baskets, not provided for or assumed in the Approved Budget. |
| **Affirmative Covenants** | Subject to the Documentation Principles, the DIP Documents shall contain usual and customary affirmative covenants for transactions of this type, subject to customary qualifications, limitations for materiality and exceptions to be mutually agreed-upon, including, without limitation, delivery of monthly, quarterly and annual financial statements; delivery of Budgets and Budget Variance Reports in accordance herewith; monthly compliance certificates with respect to the Minimum Liquidity Covenant; other information reasonably requested from time to time by the Required DIP Noteholders; payment of material obligations; tax gross-ups; continuation of business and maintenance of existence and material rights and privileges; use of proceeds; further assurances; additional collateral and guarantors; maintenance of property in present condition and maintenance of insurance; maintenance of books and records; right of the Required DIP Noteholders, the Collateral Agent or the Trustee (or any representative thereof) to inspect property and books and records, subject to customary limitations; notices of defaults, litigation and other material events; compliance with laws, including environmental laws; and the Debtors' use of reasonable best efforts to enter into all Brazilian Agreements, and complete their registration with the competent Brazilian registries of deeds and documents, pursuant to Brazilian law in accordance with (and subject to the limitations and qualifications set forth in) the Brazilian Guaranty and Perfection Requirements. |
| **Negative Covenants** | Subject to the Documentation Principles, the DIP Documents shall contain usual and customary negative covenants for transactions of this type, subject to customary qualifications, limitations for materiality and exceptions to be mutually agreed-upon (and permitting, in any event, entering into lease contracts for the induction of any additional aircraft into the Debtors' fleet in the ordinary course), including, without limitation, that the Debtors shall not (i) incur indebtedness (including guarantee obligations), with exceptions for, |

<table>
<tr><td></td><td>

without limitation, receivables factoring, aircraft financing leases, financing of aircraft maintenance, engine financings and letter of credit facilities; (ii) incur liens; (iii) merge, consolidate, liquidate, or dissolve; (iv) sell assets not in the ordinary course; (v) make restricted payments (including dividends and other payments in respect of capital stock); (vi) make investments (including acquisitions), loans and advances; (vii) sale and leaseback transactions, with exceptions for, without limitation, sale and leaseback transactions with respect to all currently scheduled deliveries of Boeing aircraft and other such transactions, in each case, in the ordinary course of business and consistent with past practice; (viii) swap agreements, other than non-speculative, ordinary course swap agreements consistent with past practice; (ix) make optional payments and modifications of subordinated and other debt instruments (including principal payments of intercompany debt); (x) transactions with affiliates; (xi) changes in fiscal year; (xii) negative pledge clauses; (xiii) enter into aircraft lease modifications unless such modifications contain permanent reductions in lease rentals substantially in accordance with the Business Plan on an aggregate basis; and (xiv) induct any off-wing engines or engines subject to scheduled removals within 6 months of the Petition Date and which require a qualifying engine event, unless the Debtors shall have received (A) lessor financing in accordance with the Business Plan or (B) equivalent economic arrangements reasonably acceptable to the Required DIP Noteholders.

</td></tr>
<tr><td>

**Conditions Precedent**

</td><td>

The DIP Documents shall contain usual and customary conditions for transactions of this type (the first date on which all of such conditions to effectiveness of the DIP facility shall have been satisfied, or waived by the Required DIP Noteholders being the "<u>Closing Date</u>"), including, without limitation:

    i.    On or prior to the Interim DIP Order Funding, the New York Law Guarantee Requirement having been satisfied as of the Closing Date;

    ii.    with respect to the Final DIP Order Funding, the preparation, authorization, execution and delivery by the Debtors of notes and applicable security and perfection documentation, closing certificates, organizational documents, and evidence of authorization and good standing (or the equivalent thereof), in each case in customary form and reasonably satisfactory to the Required DIP Noteholders;

    iii.    with respect to the Interim DIP Order Funding, the Interim DIP Order shall have been entered and be in full force and effect;

    iv.    the Trustee and the DIP Noteholders shall have received the Initial Approved Budget;

    v.    with respect to each funding, the representations and warranties of the Debtors under the DIP Documents shall be true and correct in all material respects;

    vi.    all fees under the DIP Documents and Professional Fees of the DIP Noteholders, the Collateral Agent and the Trustee shall have been paid or will be paid concurrently with the funding of amounts under the DIP on the Closing Date, to the extent invoiced at least one business day in advance;

</td></tr>
</table>

|  | vii. | no default or Event of Default shall have occurred or be continuing; |
|---|---|---|
|  | viii. | there shall not have been any event or occurrence having a Material Adverse Effect (as defined below); and |
|  | ix. | the execution and delivery of a subordination agreement made by Abra Global Finance and Abra (together, the "Abra Entities") in favor of the DIP Noteholders subordinating the claims and liens of the Abra Entities under the GOL 2028 Notes to the DIP Obligations and the DIP Liens, including a turnover provision, and providing the exercise of certain remedies upon any Event of Default, to be in form and substance reasonably satisfactory to the Required DIP Noteholders. |
| **Representations and Warranties** | The DIP Documents shall contain usual and customary representations and warranties for transactions of this type to be made by the Debtors as of the date they execute the DIP Documents, and as of the date of any issuance of notes thereunder, subject to qualifications, disclosure schedules and limitations for materiality to be mutually agreed-upon (including as to a "Material Adverse Effect" standard), and shall include without limitation: valid existence and good standing; requisite power, due authorization and validity; no conflict with material contracts, orders or applicable law; governmental consents; enforceability of DIP Documents; accuracy of financial statements, projections, budgets and all other information provided; compliance with laws and material contracts; absence of any event or occurrence having a Material Adverse Effect since the Petition Date; no default or Event of Default under the DIP Documents; absence of material litigation; payment of taxes and other material obligations; subsidiaries; ERISA, pension and benefit plans; ownership of assets and necessary rights to intellectual property; insurance; inapplicability of Investment Company Act; regulatory matters; environmental matters; margin stock; labor; and validity, priority and perfection of liens and security interests in the Collateral. | |
|  | "Material Adverse Effect" means a material adverse effect on (a) the consolidated business, assets, results of operations or financial condition of the Debtors (other than (i) the effect of filing of the Chapter 11 Cases and the events and conditions related to and/or leading up thereto and typically resulting from the filing of the Chapter 11 Cases, (ii) any actions required to be taken under the DIP Documents, (iii) [reserved], (iv) the COVID-19 pandemic, (v) the conflict between Ukraine and Russia, (vi) the conflict in the Middle East, including but not limited to, Israel and Palestine and any escalation thereof), and (vii) any matters or events impacting the airline industry generally, (b) the validity or enforceability of any DIP Document or the validity, enforceability or collectability of any DIP Obligations, (c) the rights and remedies of the Collateral Agent, the Trustee and the DIP Noteholders with respect to matters arising under any DIP Document, taken as a whole, (d) the ability of any of the Debtors to perform its obligations under any DIP Document to which it is a party, or (e) the status, existence, perfection, priority or enforceability of the Collateral Agent's security interests in and liens with respect to any Collateral. | |

| | |
|---|---|
| **Voting** | All amendments and waivers to the DIP and any DIP Documents shall require the approval of (i) holders holding more than 50% of the aggregate principal amount of DIP Obligations then outstanding, and (ii) at all times while the Backstop Noteholders hold more than 65% of the aggregate principal amount of DIP Obligations then outstanding, Backstop Noteholders holding more than 50% of the aggregate principal amount of DIP Obligations then outstanding held by the Backstop Noteholders (the "Required DIP Noteholders"). |
| **Assignments** | The DIP Noteholders shall be permitted to assign and transfer any notes or other interests it holds in respect of the DIP (other than to direct competitors of the Debtors and their affiliates or LATAM, Azul, Knighthead, Silver Point, Strategic Value Partners, Sixth Street Capital, Sculptor Capital Management, Certares Management or other disqualified institutions to be agreed prior to the Interim DIP Order Funding). |
| **Expenses** | The Debtors shall be jointly and severally liable to pay all reasonable fees, costs, disbursements and expenses of the Collateral Agent, the Trustee and the DIP Noteholders (including, without limitation, the reasonable fees, costs and expenses of legal counsel (limited to (i) one primary counsel for the Collateral Agent, (ii) one primary counsel for the Trustee, (iii) Dechert LLP, as primary counsel for certain DIP Noteholders, and Padis Mattar Advogados, as Brazilian local counsel for certain DIP Noteholders, (iv) one Brazilian local counsel for each of the Collateral Agent and the Trustee, (v) Akin Gump Strauss Hauer & Feld LLP, as counsel to Elliott, (vi) one local counsel for each jurisdiction (other than Brazil), to the extent required, for the Collateral Agent, the Trustee and the DIP Noteholders taken together, (vii) in the event of an actual or potential conflict, additional counsel or local counsel to the extent necessary and (viii) other counsel retained with the prior written consent of the Debtors, not to be unreasonably withheld) and financial advisors (including Houlihan Lokey) in connection with the negotiation, preparation, execution, administration and enforcement of rights and remedies with respect to the DIP, the DIP Documents, and/or the Collateral, including, without limitation, on account of due diligence therefor and negotiation thereof, and search, filing and recording fees associated therewith and otherwise in connection with the Chapter 11 Cases, which fees, costs, disbursements and expenses shall be payable upon the Closing Date and thereafter on a monthly basis (to the extent invoiced). |
| **Indemnification** | The Debtors agree, jointly and severally, to indemnify and hold the Collateral Agent, the Trustee and/or the DIP Noteholders and their respective partners (general and limited), shareholders, directors, members, principals, agents, advisors, officers, professionals (including, without limitation, counsel), subsidiaries and affiliates (each, in such capacity only, an "Indemnified Person") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions, causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP, the DIP Documents, the Collateral, this Term Sheet, the transactions contemplated thereby or hereby or by any thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not |

|  | any such Indemnified Person is a party thereto and whether or not brought by any Debtor or any other person or entity, except to the extent resulting from the gross negligence or willful misconduct of an Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes, without limitation, indemnification for the Collateral Agent, the Trustee and/or the DIP Noteholders, only in such capacity, exercising discretionary rights granted under the DIP. In all such litigation, or the preparation therefor, the Collateral Agent, the Trustee and/or the DIP Noteholders shall each be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of all such counsel (limited to (i) one primary counsel for the Collateral Agent, (ii) one primary counsel for the Trustee, (iii) one primary counsel for the DIP Noteholders and one Brazilian local counsel for the DIP Noteholders, (iv) one Brazilian local counsel for each of the Collateral Agent and the Trustee, (v) one local counsel for each jurisdiction (other than Brazil), to the extent required, for the Collateral Agent, the Trustee and the DIP Noteholders taken together, (vi) one primary and applicable local counsel for Elliott, (vii) in the event of an actual or potential conflict, additional counsel or local counsel to the extent necessary and (viii) other counsel retained with the prior written consent of the Debtors, not to be unreasonably withheld) and financial advisors (including Houlihan Lokey). |
|---|---|
| **Releases** | The DIP Orders shall provide the Collateral Agent, the Trustee, the DIP Noteholders, and the Indemnified Persons with customary releases reasonably acceptable to the Collateral Agent, the Trustee and the Required DIP Noteholders and shall contain customary stipulations regarding the prepetition liens of the GOL 2028 Noteholders, the GOL 2026 Noteholders and the Abra Noteholders and the amount of their respective allowed claims (including any applicable make-whole amounts or applicable premiums). |
| **Section 506(c)/552 Waiver** | The Final DIP Order shall include a waiver of any surcharge to the DIP Collateral under sections 506(c) and 552 of the Bankruptcy Code or otherwise for the 2026 Noteholders and 2028 Noteholders and the Abra Noteholders. The Interim DIP Order shall include a waiver of any surcharge to the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise for the DIP Noteholders and Trustee. |
| **Marshaling Waiver** | The Final DIP Order shall include a waiver of any claims by the Debtors under the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Collateral. |
| **Governing Law** | The laws of the State of New York, except as governed by the Bankruptcy Code.

The Brazilian Agreements shall be governed by Brazilian law. |

**SUBJECT TO FRE408 AND ANALOGOUS PROVISIONS IN ALL
APPLICABLE JURISDICTIONS**

<u>**Annex A**</u>

**Brazilian Guaranty and Perfection Requirements**

1.  The Debtors shall obtain the relevant corporate approvals for the execution and delivery of the necessary amendments to the Existing Brazilian Collateral Agreements (as defined below), the New Brazilian Collateral Agreements (as defined below) and the Brazilian Guarantee Agreements (as defined below) and the Debtors incorporated in Brazil shall register such corporate approvals with the relevant Board of Trades (*Junta Comercial)*.

2.  The Debtors and TMF Brasil Administração e Gestão de Ativos Ltda. (the "<u>Brazilian Collateral Agent</u>") shall enter into amendments to each of the GOL Senior Secured Notes due 2028 Collateral to include the DIP as a secured obligation under such collateral agreements.

3.  The Debtors and the Brazilian Collateral Agent shall enter into amendments to each of the GOL Senior Secured Notes due 2026 Collateral to include the DIP as a secured obligation under such collateral agreements.

4.  The Debtors shall register all the amendments to the Existing Brazilian Collateral Agreements and the New Brazilian Collateral Agreements with the competent Brazilian registries of deeds and documents and any other competent Brazilian registry to the extent required by Brazilian law.

5.  The Debtors shall file for registration with the Brazilian National Institute of Industrial Property (*Instituto Nacional da Propriedade Industrial - INPI*) ("<u>INPI</u>") (a) an amendment to the Smiles Fidelidade Fiduciary Transfer of Intellectual Property Rights Agreement; and (b) the amendments to the GOL Senior Secured Notes due 2026 IP Collateral.  The parties agree that each such amendment shall provide that the Debtors will use all commercially reasonable efforts to obtain such registration after closing, including complying with any eventual requirement made by INPI to complete the registration.

6.  The DIP Noteholders, the Debtors and the Brazilian Collateral Agent (on behalf and for the benefit of Abra) shall enter into an intercreditor agreement to provide that, in the event of an acceleration of the DIP, the DIP Noteholders are granted: (a) the right to foreclose on the security interest granted under the GOL Senior Secured Notes due 2028 Collateral without Abra's consent, and (b) superpriority (first-out) over any and all proceeds arising from the foreclosure of the security interest granted under the GOL Senior Secured Notes due 2028 Collateral.

7.  The Guarantors incorporated in Brazil shall enter into a corporate guarantee agreement (the "<u>Brazilian Guarantee Agreements</u>") for the DIP Obligations for the benefit of the DIP Noteholders and register the Brazilian Guarantee Agreements with the competent Brazilian registries of deeds and documents.

8.  The DIP Noteholders, the Debtors and the Brazilian Collateral Agent (on behalf and for the benefit of Abra and the GOL 2026 Noteholders) shall enter into an amendment to the existing intercreditor agreement to provide that, in the event of an acceleration of the DIP, the DIP Noteholders are granted: (a) the right to foreclose on the security interest granted under the GOL Senior Secured Notes due 2026 Collateral without Abra's or the GOL 2026 Noteholders' consent, and (b) superpriority (first-out) over any and all proceeds from the foreclosure of the security interest granted under the GOL Senior Secured Notes due 2026 Collateral.

9.      The Debtors shall obtain any necessary consents and approvals from relevant third parties to the extent required to execute the Brazilian Collateral Agreements, subject to the limitations and qualifications set forth in the Brazilian Guaranty and Perfection Requirements.

As used in this <u>Annex A</u>, the following terms shall have the following meanings:

"**Brazilian Agreements**" means the Brazilian Guarantee Agreements and the Brazilian Collateral Agreements.

"**Brazilian Collateral Agreements**" means (i) the amendments to the Existing Brazilian Collateral Agreements provided for in this <u>Annex A</u> and (ii) the New Brazilian Collateral Agreements and any further relevant amendments thereto.

"**Existing Brazilian Collateral Agreements**" means the GOL Senior Secured Notes due 2026 Collateral and the GOL Senior Secured Notes due 2028 Collateral, collectively, as defined below:

(a)      "**GOL Senior Secured Notes due 2026 Collateral**" means the GOL Senior Secured Notes due 2026 IP Collateral and the GOL Senior Secured Notes due 2026 Spares Parts Collateral.

(b)      "**GOL Senior Secured Notes due 2026 IP Collateral**" means the following collateral securing the obligations of the GOL 2026 Notes: (i) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, as amended, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLAI, as intervening party; and (ii) the Fiduciary Transfer of Intellectual Property Rights Agreement, dated as of December 23, 2020, as amended, among GLAI, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

(c)      "**GOL Senior Secured Notes due 2026 Spare Parts Collateral**" means the following collateral securing the obligations of the GOL 2026 Notes: (i) the Non-Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, as amended, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party; and (ii) the Revolving Aircraft Spare Parts Fiduciary Assignment Agreement, dated as of December 23, 2020, as amended, among GLA, TMF Brasil Administração e Gestão de Ativos Ltda., and GLA, as intervening party.

(d)      "**GOL Senior Secured Notes due 2028 Collateral**" means the following collateral securing the obligations of the GOL 2028 Notes: (i) the Smiles Fidelidade Fiduciary Transfer of Intellectual Property Rights Agreement and (ii) the Smiles Fidelidade Fiduciary Transfer of Shares Agreement.

(e)      "**Smiles Fidelidade Fiduciary Transfer of Intellectual Property Rights Agreement**" means that certain Brazilian law governed agreement dated as of March 2, 2023, as amended, among Smiles Fidelidade, as security provider, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent, GLA and GLAI, as intervening party, with respect to the fiduciary lien over certain intellectual property assets and rights defined therein.

(f)      "**Smiles Fidelidade Fiduciary Transfer of Shares Agreement**" means that certain Brazilian law governed agreement, dated as of March 2, 2023, as amended, among GLA, as security provider, TMF Brasil Administração e Gestão de Ativos Ltda., as collateral agent,

GLAI and Smiles Fidelidade, as intervening party, with respect to the fiduciary lien over one hundred percent (100%) of Smiles Fidelidade's equity, all of which is owned by GLA.

"**New Brazilian Collateral Agreements**" means any Brazilian law-governed collateral or security interest agreements with respect to:

(a)      any collateral or security interest that does not exist as of the Petition Date that might be granted by the Debtors to secure the DIP Obligations in the context of adequate protection liens as approved by the Bankruptcy Court granted for the benefit of the GOL 2028 Noteholders, the Abra Noteholders and/or the GOL 2026 Noteholders, as referred to in the section "Adequate Protection" above;

(b)      "first-priority" liens on assets of the Debtors to the extent that such assets are not subject to prior liens in existence as of the Petition Date (including, without limitation, all cash and bank accounts of the Debtors not subject to prior perfected liens (including, without limitation, the Note Proceeds Account)), as referred to in clause (ii) of the definition of "Collateral"; and

(c)      "second-priority" liens on assets of the Debtors subject to valid perfected liens in existence as of the Petition Date, other than existing liens on the Priming Collateral (including, without limitation, (a) all accounts receivable owing to Smiles and (b) all applicable lease and other contract rights with respect to any aircraft subject to existing liens), as referred to in clause (iv) of the definition of "Collateral".

The definition of "New Brazilian Collateral Agreements" does not include any amendments to the Existing Brazilian Collateral Agreements to secure the DIP Obligations.

**EXHIBIT 2**

**Initial DIP Budget**

| DIP Budget as of Jan 28, 2024 | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(USD $M)* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* |
| Week Ending: | 02/02/24 | 02/09/24 | 02/16/24 | 02/23/24 | 03/01/24 | 03/08/24 | 03/15/24 | 03/22/24 | 03/29/24 | 04/05/24 | 04/12/24 | 04/19/24 | 04/26/24 |
| **Operating Receipts** | | | | | | | | | | | | | |
| Net Passenger Receipts | 7 | 3 | 2 | 20 | 40 | 28 | 26 | 25 | 51 | 46 | 43 | 44 | 44 |
| Net Other Receipts | 4 | 12 | 13 | 15 | 62 | 13 | 13 | 20 | 50 | 35 | 10 | 20 | 10 |
| **Total Operating Receipts** | **10** | **15** | **15** | **35** | **102** | **41** | **40** | **45** | **100** | **81** | **53** | **64** | **53** |
| | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Fleet Rental Payments | - | - | - | - | - | (0) | - | (0) | (78) | (8) | (3) | (5) | (20) |
| Other Operating Disbursements | (68) | (78) | (69) | (65) | (82) | (78) | (43) | (53) | (76) | (124) | (58) | (59) | (80) |
| **Total Operating Disbursements** | **(68)** | **(78)** | **(69)** | **(65)** | **(82)** | **(78)** | **(43)** | **(54)** | **(154)** | **(132)** | **(60)** | **(64)** | **(100)** |
| | | | | | | | | | | | | | |
| **Operating Cash Flow** | **(57)** | **(63)** | **(55)** | **(30)** | **20** | **(37)** | **(3)** | **(8)** | **(54)** | **(51)** | **(8)** | **(0)** | **(46)** |
| | | | | | | | | | | | | | |
| Restructuring-Related Disbursements | - | - | (12) | - | - | - | - | (26) | - | - | - | (8) | - |
| DIP and Other Financing-Related Net Cash Flows | 350 | - | 153 | - | 458 | - | - | - | - | 11 | 11 | 11 | 11 |
| Other Disbursements and Deposits (net) | (27) | (15) | (14) | (18) | (12) | (1) | (4) | (1) | (36) | 2 | (4) | (6) | (3) |
| **Net Cash Flow** | **266** | **(78)** | **72** | **(48)** | **467** | **(38)** | **(7)** | **(36)** | **(89)** | **(37)** | **(0)** | **(3)** | **(38)** |
| | | | | | | | | | | | | | |
| **Cash and Equivalents - Available Cash** | | | | | | | | | | | | | |
| Beginning Balance | 69 | 335 | 257 | 329 | 281 | 748 | 710 | 703 | 667 | 577 | 540 | 540 | 537 |
| Net Cash Flow | 266 | (78) | 72 | (48) | 467 | (38) | (7) | (36) | (89) | (37) | (0) | (3) | (38) |
| F/X Effect of Account Revaluation | | | | | | | | | | | | | |
| **Available Cash Ending Balance** | **335** | **257** | **329** | **281** | **748** | **710** | **703** | **667** | **577** | **540** | **540** | **537** | **499** |
| | | | | | | | | | | | | | |
| Restricted Cash | 55 | 55 | 54 | 54 | 54 | 54 | 56 | 56 | 56 | 60 | 61 | 59 | 60 |
| **Total Cash Ending Balance** | **389** | **312** | **383** | **335** | **802** | **764** | **758** | **722** | **633** | **601** | **601** | **597** | **559** |

**EXHIBIT 3**

The DIP Liens, the Adequate Protection Liens and Prepetition Secured Notes Liens shall in each case be subject to the Carve Out and otherwise have the following priority on the DIP Collateral and applicable Prepetition Secured Notes Collateral at the applicable Debtor entities obligated on the DIP Facility or the applicable Prepetition Secured Obligation or that have pledged assets to secure a Prepetition Secured Obligation, in each case subject to the terms of applicable intercreditor agreements:

| DIP Collateral (other than Prepetition Secured Notes Collateral and Secured Amortizing Notes Prepetition Collateral) | Prepetition GOL SSN/ESSN Collateral (other than GOL 2026 Notes Collateral) | Debtor Abra Notes Pledged Collateral (other than GOL 2026 Notes Collateral and GOL SSN/ESSN Collateral) | GOL 2026 Notes Collateral | Prepetition Lessor Collateral |
|---|---|---|---|---|
| Carve Out | Carve Out | Carve Out | Carve Out | Carve Out |
| Permitted Priority Liens | Permitted Priority Liens | Permitted Priority Liens | Permitted Priority Liens | Lessor Adequate Protection Liens |
| DIP Liens | DIP Liens | DIP Liens | Prepetition GOL/Abra Secured Notes Liens and GOL 2026 Notes Liens | Permitted Priority Lessor Liens |
| Adequate Protection Liens | Abra Note Adequate Protection Liens and GOL SSN/ESSN Adequate Protection Liens | Abra Note Adequate Protection Liens | DIP Liens | Permitted Priority Liens |
| | Prepetition GOL/Abra Secured Notes Liens | Prepetition Debtor Abra Notes Pledged Liens | Adequate Protection Liens | DIP Liens |
| | GOL 2026 Notes Adequate Protection Liens | GOL SSN/ESSN Adequate Protection Liens and GOL 2026 Notes Adequate Protection Liens | | Adequate Protection Liens |