**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GOL LINHAS AÉREAS INTELIGENTES<br>S.A., *et al.*,<br><br>                                    Debtors. | **FOR PUBLICATION**<br><br>Case No. 24-10118 (MG)<br><br>(Jointly Administered) |

**MEMORANDUM OPINION APPROVING SETTLEMENTS BUT**
**STRIKING THE LOCKUP PROVISIONS FROM STIPULATIONS WITH LESSORS**

*A P P E A R A N C E S:*

MILBANK LLP
*Attorneys to the Debtors*
55 Hudson Yards
New York, NY 10001
By:    Evan R. Fleck, Esq.
        Lauren C. Doyle, Esq.
        Bryan V. Uelk, Esq.

1850 K St. NW, Suite 1100
Washington, DC 20006
By:    Evan R. Fleck, Esq.
        Andrew M. Leblanc, Esq.
        Erin E. Dexter, Esq.

2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
By:    Gregory A. Bray, Esq.

                and

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
By:    Kathryn A. Coleman, Esq.
        Christopher C. Gartman, Esq.

WILLKIE FARR & GALLAGHER LLP
*Attorneys to the Official Committee of Unsecured Creditors*
787 Seventh Avenue
New York, New York 10019
By:    Brett H. Miller, Esq.
        Todd M. Goren, Esq.
        Craig A. Damast, Esq.
        James H. Burbage, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
*William K. Harrington, United States Trustee, Region 2*
1 Bowling Green, Room 534
New York, NY 10004
By:    Annie Wells, Esq.
        Brian S. Matsumoto, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

A "lockup" agreement binding a significant group of creditors to a debtor's plan that has

yet to be filed, negotiated, or even contemplated through a disclosure statement can run afoul of

section 1125 of the Bankruptcy Code. The consequences of violating section 1125 can be

severe, including "designation" (disregarding) of votes, thus disenfranchising creditors. But not

all agreements to support a plan before a disclosure statement is approved are problematic. The

Code and caselaw *encourage* debtors and creditors to negotiate the terms of a plan and promise

their support, and agreements to do so—often called Plan Support Agreements or Restructuring

Support Agreements ("RSAs")—are common. The provision at issue here is an impermissible

lockup, not a common RSA.

On March 28, 2024 and April 1, 2024, debtors GOL Linhas Aéreas Inteligentes S.A., *et*

*al.* ("GOL" or the "Debtors") filed four[1] Motions (the "Motions") seeking approval to enter into

certain agreements and stipulations (the "Stipulations") with various aircraft lessor counterparties

---

[1]    A fifth motion, with counterparties UMB Bank, N.A. and Zephyrus Capital Aviation Partners 2A Limited, was also filed on March 29, 2024 (ECF Doc. # 389); however, it did not contain the Lockup Provision at issue and is not the subject of this Opinion.

(collectively, the "Counterparties"), all of which included a provision that the Counterparties would support any plan later filed by the Debtors so long as it embodied the terms of the Stipulations (the "Lockup Provision"). The Motions are supported by the declaration of Gregory Ethier ("Ethier Declaration"), annexed as Exhibit C to each Motion.

The Motions are as follows: the *Debtors' Motion for Entry of an Order (i) Approving the Global Restructuring Term Sheet with AerCap Ireland Limited, (ii) Authorizing and Approving the Amendment and Assumption of Certain Aircraft and Engine Leases, (iii) Authorizing Entry into the Definitive Documentation, (iv) Approving the Settlement, and (v) Granting Related Relief* (the "AerCap Motion," ECF Doc. # 379), with Counterparty AerCap Ireland Limited ("AerCap") and certain related parties; and the other three, all titled *Debtors' Motion for Approval of Stipulation and Order Between Debtors and Counterparties Concerning Certain Aircraft and Engines*, made with the following counterparties: the Bank of Utah, N.A. (the "BofU Motion," ECF Doc. # 380); CDB Aviation Lease Finance DAC (the "CDB Motion," ECF Doc. # 382); and SMBC Aviation Capital Ltd. (the "SMBC Motion," ECF Doc. # 395).

The Lockup Provision was the subject of two discovery conferences held on March 28, 2024 and April 4, 2024.[2] The Committee and the United States Trustee (the "UST") both filed objections[3] to the Lockup Provision ("Committee Objection, ECF Doc. # 405; UST Objection, ECF Doc. # 406). The Debtors filed an omnibus reply (the "Reply," ECF Doc. # 443). Obviously aware that the Lockup Provision was problematic under existing caselaw, the Debtors

---

[2]    The Official Committee of Unsecured Creditors (the "Committee) wanted discovery of documents and witnesses in connection with the Lockup Provision. The Debtors opposed discovery and argued that the issues could be resolved as a matter of law. The Court denied discovery but stated that Committee's counsel could cross-examine the Debtors' declarant, Gregory Ethier, during the hearing.

[3]    Delta Airlines, Inc. also filed a limited objection and reservation of rights (ECF Doc. # 404) unrelated to the Lockup Provision.

and their counterparties agreed that the Court could approve the Stipulations, but could strike the Lockup Provisions.

The Court held a hearing on the Motions on April 10, 2024 (the "Hearing"). The Ethier Declaration was admitted in evidence without objection, and Mr. Ethier was cross-examined by the Committee's counsel. At the conclusion of the Hearing, the Court approved the economic terms of the Motions. However, the Court ruled that the Lockup Provision was unenforceable and ordered it severed from the Stipulations.[4] The Court stated that an Opinion explaining its ruling would follow. This Opinion explains the Court's reasoning for **SUSTAINING** the Objections of the Committee and the UST.

## I.    BACKGROUND

### A.  The Chapter 11 Cases

On January 25, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 9, 2024, the UST appointed the Committee. (*See* ECF Doc, # 114)

The Debtors are in the process of negotiating agreements governing their fleet of aircraft on terms consistent with the Debtors' commercial objectives. (AerCap Motion ¶ 10.) Pursuant to the terms of their DIP loan, the Debtors are required to meet certain milestones, including entry into lease modification agreements for 65 aircraft by April 24, 2024, and for 90 aircraft by May 24, 2024. (Committee Objection ¶ 10.) The Motions are a step towards that goal.

---

[4]    Severance of the Lockup Provision while leaving the economic terms in place, if the Court found them unenforceable, was contemplated and explicitly agreed by the Motions. Orders to this effect have been entered. (*See* ECF Doc. ## 475, 477, 478, 491.)

B.    **The Motions**

The Motions seeks approval of Stipulations resolving certain disputes relating to, among other things, unpaid basic and deferred rent, maintenance reserves, cash collateral, the retention and application of security deposits, and the amendment and assumption of various aircraft and engine leases.  No party objected to the economic terms of the Stipulations.

1.   The Lockup Provision

The Lockup Provision in the AerCap Motion (reproduced for each Counterparty to the other Motions) reads as follows:

> If a disclosure statement for a Chapter 11 Plan is approved by the Bankruptcy Court, AerCap agrees that, after its vote has been properly solicited, it shall vote (a) to accept the Chapter 11 Plan so long as (i) the Chapter 11 Plan, and a disclosure statement filed by the Debtors (the "Disclosure Statement") (A) is not inconsistent with the terms contained in the Term Sheet, the Definitive Documentation or the Approval Order; (B) no Events of default have occurred and are continuing in respect of any postpetition obligations of the applicable Debtor under the Leases (as amended herein, as applicable), the Definitive Documentation or any other lease ("Other Lease") entered into by Debtors and AerCap; (C) the Chapter 11 Plan provides for the vesting of the Definitive Documentation, including each of the Leases and guarantees, and any Other Lease or other agreement or guarantee in the applicable reorganized Debtor; and (D) the Chapter 11 Plan provides for the exculpation of AerCap; and (ii) (x) as of the effective date of the Chapter 11 Plan, the Debtors' Liquidity shall be no less than US$500,000,000 and (y) as of the effective date of the Chapter 11 Plan, the Projected Leverage Ratio for the calendar year ending 2026 shall be equal to or less than 3.5:1; and (b) against any other plan of reorganization filed by any party other than the Debtors, and shall not, in any material fashion, directly or indirectly support the filing of any such plan of reorganization by any party other than the Debtors.
>
> If any AerCap entity sells, assigns, or otherwise transfers any claim against the Debtors to another person, such person shall execute a joinder to this paragraph prior to such transaction.  This Term Sheet is not intended, and shall not be deemed or construed to be, a solicitation for votes in favor of the Chapter 11 Plan for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  The votes of holders of claims and interests in the Chapter 11 Cases will not be solicited until such holders who are entitled to vote on the Chapter 11 Plan have received the Chapter 11 Plan,

the Disclosure Statement and related ballots, and other solicitation materials or the equivalent. For the avoidance of doubt, AerCap shall not be obligated to support any Chapter 11 Plan filed by the Debtors if such plan, related Disclosure Statement, proposed confirmation order, or other related document (by amendment or otherwise) is not consistent with the terms of the Term Sheet, the leases (as amended herein, as applicable) or the other Definitive Documentation and provided further that AerCap shall be provided with the opportunity (but not the obligation) to participate in any rights offering or similar financing transaction offered in connection with the Chapter 11 Plan to any other group or class of unsecured creditors of the Debtors, provided further that nothing shall prohibit AerCap from filing any objection, action or otherwise seeking any relief or otherwise being heard by the Court on any matter in the Chapter 11 Cases that (in AerCap's sole discretion) impairs AerCap's interests, rights, remedies, or claims in a manner inconsistent with this Term Sheet or the Definitive Documentation. The foregoing provision shall only apply to obligations and claims that arise out of or relate to this Term Sheet and the Definitive Documentation. Furthermore, the foregoing provision shall not be enforceable if the Court determines at the hearing to approve the motion in respect of this Term Sheet that such provision violates applicable law, or declines to approve the motion because of this provision.

(AerCap Motion at 15–16; *see also* CDB Motion, Ex. B, App'x 5; BofU Motion, Ex. B, App'x 4; SMBC Motion, Exs. B-1, B-2, B-3, App'x 7.)

### C. The Objections

1. The Committee Objection

The Committee Objection argues that the Court should not approve the Lockup Provision. The Committee alleges that the Lockup Provision (1) is an improper vote solicitation in violation of section 1125(b) of the Bankruptcy Code, orchestrated by the Debtors in the shadow of a potential bid from a competitor, and (2) should be evaluated by a higher standard than the business judgment rule.

*a. Alleged 1125(b) Violation*

The Committee argues that the Lockup Provision—which requires lessors to support any plan proposed by the Debtors so long as it "reflects the economic substance of the corresponding

Aircraft Agreement and the Debtors meet two seemingly arbitrary financial conditions"—is an impermissible solicitation of creditor votes at this stage, before even a plan term sheet, let alone a disclosure statement, has been filed. (Committee Objection ¶ 17.)

The Committee relies chiefly on *In re SAS AB*, No. 22-10925 (MEW) (Bankr. S.D.N.Y. Sept. 28, 2022), where Judge Wiles *sua sponte* raised concerns about a lockup provision included in a settlement with pilots before a plan was contemplated and ultimately denied the motion in a bench ruling. (*Id.* ¶¶ 18–19.) The Committee also argues that the chapter 11 cases of *In re LATAM Airlines Grp., S.A.*, before Judge Garrity, also support their position. (*Id.* ¶ 20.) There, the debtors had entered into similar lockup agreements with creditors, to which the UST and committee objected under section 1125(b). (*Id.*) Prior to the disclosure statement hearing, the debtors disclaimed the lockups at issue. (*Id.*) Although Judge Garrity did not have to rule on them, the Committee argues that his dicta aligned with Judge Wiles' reasoning on the impermissibility of such lockups. (*Id.*)

The Committee further argues that the conditions which "nominally qualify" the lessors' obligation to vote—the approval of a disclosure statement, a minimum liquidity and leverage ratio—are "meaningless" and "illusory," because the Debtors would not be able to solicit votes to confirm a plan if these supposed "conditions" were not met. (*Id.* ¶¶ 22–23.) Rather, the Committee alleges, the Lockup Provision is a strategic power play by the Debtors to shift bargaining dynamics influenced by (1) transactions with Abra Group Limited ("Abra"), the Debtors' largest secured lender, and (2) a potential purchase bid by Azul Linhas Aéreas Brasileiras S/A ("Azul"), a competitor of the Debtors. (*Id.* ¶¶ 24–25.) The Committee is investigating the Abra transactions, including how they may affect Abra's claims, and argues that the Court should view the Debtors' efforts to create "creeping support" for any plan of their

choosing with "significant caution." (*Id.* ¶ 24.) The Committee further suggests that, in the face

of an Azul bid, the Debtors could use the Lockup Provision as "a quasi-poison pill that would

thwart any such outside bidders and allow Abra to retain control." (*Id.* ¶ 25.)

Lastly, the Committee argues that each authority relied on by the Debtors is inapplicable

or distinguishable. (*Id.* ¶ 26.) Taken together, the Committee argues, they "demonstrate that

bankruptcy courts will approve plan support agreements only when the supporting creditors

understand what their claim treatment will look like under a chapter 11 plan, either through a

disclosure statement or at the very least a term sheet outlining the structure of a plan," which is

not the case here. (*Id.*)

### b. *Argument Against Applying the Business Judgment Standard*

Second, the Committee argues that because creditor voting is a "fundamental bankruptcy

right," the Court should view any "attempt . . . to impair that right" with "inherent skepticism."

(*Id.* ¶ 27.) Rather than evaluate the Motions under the deferential business judgment standard,

the Committee argues, the Court should "separately evaluate whether the inclusion of this term is

reasonable under the circumstances." (*Id.* ¶ 28.)

The Committee argues that the Lockup Provision is not reasonable for three reasons.

*First*, it improperly transfers the lessors' right to vote to the Debtors, thus impairing the rights of

other unsecured creditors. (*Id.*) *Second*, the inclusion of the severance language—which allows

the Court to strike the Lockup Provision without impacting the economic substance of the deal—

demonstrates that, according to the Committee, it is not a critical component of the agreements.

(*Id.*) The Committee argues it should be stricken because it does not provide any concrete

benefits other than allowing the Debtors to impermissibly exert outsize control over the plan

process. (*Id.*) *Third*, the Lockup Provision implicates whether the Debtors negotiated the

settlements in good faith, because "trading of consideration for a plan vote constitutes a bad faith

solicitation and runs afoul of section 1126(e) of the Bankruptcy Code." (*Id.* ¶ 29.)

### 2. The UST Objection

The UST Objection largely echoes the concerns in the Committee Objection, also arguing

that the Lockup Provision is an improper solicitation in violation of section 1125(b) that has no

meaningful termination provisions, and is distinguishable from permissible plan support

agreements. The UST urges the Court to excise the Lockup Provision, allowing the Debtors to

keep the economic benefits of their deals and stay on track with their milestones without opening

the "floodgates" for the Debtors to "embark on a tactic of strong-arming enough unsecured

creditors . . . into supporting an unknown plan." (UST Objection at 2.)

The UST argues that the Debtors are many months away from filing a plan, but the

Lockup Provision requires the lessors to support *any* future plan filed by the Debtors without any

meaningful termination outs or ability to reconsider their votes after receiving adequate

information. (*Id.* at 6–7.) This, the UST argues, is "exactly the harm that Congress sought to

prevent by [enacting] Section 1125(b)—i.e., the locked-in vote in favor of a plan based on no

information at all." (*Id.* at 7.) Permitting the Lockup Provisions, the UST argues, would

(1) disenfranchise creditor constituents, (2) undercut the value and leverage of other creditors in

the same class who are not locked-up, and (3) diminish the utility of the Committee and its

ability to carry out its fiduciary duties. (*Id.* at 9.)

Permissible agreements, the UST argues, all contained meaningful "outs." (*Id.* at 7.)

This one does not. Echoing the Committee's concern, the UST argues that the "hollow"

termination outs "offer no protection at all," and are "nothing more than the tautological benefits

of the bargains struck," akin to the "meaningless" outs rejected by Judge Wiles in *SAS*. The

liquidity threshold and leverage ratio "make little sense because those are measured as of the effective date of the plan," well after the lessors cast their vote.  (*Id.* at 9.)

### D.  The Reply

The Debtors argue in their Reply that the Lockup Provision *is* permissible, because it is consistent with the caselaw on section 1125(b) and aligns with the provisions regularly approved in this district, and that concerns regarding coercion are unwarranted.  They argue that the Lockup Provision is crucial to "delivering the certainty" they need to move these cases forward; without it, the Counterparties would be free to re-trade their deal and "extract additional concessions" with the voting leverage they would gain.  (Reply ¶ 4.)

They argue the Lock Provision is permissible under existing caselaw because it is (1) conditioned on the approval of a disclosure statement, feasibility thresholds, fairness to the Counterparty, and on the plan embodying the agreed-upon settlement or stipulation terms; and (2) does not contain a specific performance clause.  (*Id.* ¶¶ 12–13.)  The Debtors contend that courts in this district regularly approve similar provisions, in cases such as *In re Grupo Aeroméxico, S.A.B. de C.V.*, No. 20-11563 (SCC) (Bankr. S.D.N.Y.); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y.); and *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y.).[5]  The Debtors further argue that the Counterparties, through their sophistication, have enough information to understand what their claim treatment will look like, though they maintain that this is not the relevant inquiry.  (*Id.* ¶ 18.)

Lastly, Debtors refute the notion that there was anything coercive about the negotiations that would justify imposing a high standard of scrutiny.  (*Id.* ¶ 20.)  The Debtors maintain that the Counterparties, who "hold the keys" to the aircraft required to operate the business, have

---

[5]    None of these cases resulted in written opinions.  Only in *Aeroméxico*, where an objection was raised, were the provisions discussed in any detail during the hearing.

ample leverage which they exercised to reach settlements that are "highly favorable" to them.

(*Id.* ¶ 21.)

## II.    <u>LEGAL STANDARD</u>

### A.  Settlements under Rule 9019

Rule 9019(a) of the Bankruptcy Rules govern the approval of compromises and

settlements, and provides as follows:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement. Notice shall be given to creditors, the
> United States Trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

"[S]ettlements . . . are favored in bankruptcy and, in fact, encouraged." *In re Chemtura

Corp.*, 439 B.R. 561, 595 (Bankr. S.D.N.Y. 2010).  However, before approving a settlement, a

court must determine that it "is fair and equitable and in the best interests of the estate." *In re

Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (internal

quotation marks omitted) (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry,

Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

The Second Circuit in *Motorola v. Off. Comm. of Unsecured Creditors (In re Iridium

Operating LLC)*, 478 F.3d 452 (2d Cir. 2007), outlined seven factors to be considered by a court

in deciding whether to approve a compromise or settlement:

> (1) the balance between the litigation's possibility of success and the
> settlement's future benefits; (2) the likelihood of complex and protracted
> litigation, "with its attendant expense, inconvenience, and delay," including
> the difficulty in collecting on the judgment; (3) "the paramount interests of
> the creditors," including each affected class's relative benefits "and the
> degree to which creditors either do not object to or affirmatively support the
> proposed settlement;" (4) whether other parties in interest support the
> settlement; (5) the "competency and experience of counsel" supporting, and
> "[t]he experience and knowledge of the bankruptcy court judge" reviewing,

the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors;" and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Iridium*, 478 F.3d at 462.

In considering a proposed settlement, "the bankruptcy court does not substitute its judgment for that of the trustee." *Depo v. Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384 (N.D.N.Y. 1987), *aff'd sub nom. Depo v. Lincoln Bank*, 863 F.2d 45 (2d Cir. 1988) (citations omitted). The bankruptcy court is not required "to decide the numerous questions of law and fact raised by [objectors] . . . . [R]ather [the Court should] canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re Bell & Beckwith*, 77 B.R. 606, 612 (Bankr. N.D. Ohio), *aff'd*, 87 B.R. 472 (N.D. Ohio 1987). Settlements and compromises are "favored in bankruptcy" as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 10 Collier on Bankruptcy ¶ 9019.01 (16th 2019)).

"[W]hile the 'approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored.'" *JPMorgan Chase Bank, N.A. v. Charter Communs. Operating, LLC (In re Charter Communs.)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (quoting *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y 2009)). In addition, the court may "give weight to the informed judgments of the trustee or debtor-in-possession and their counsel that a compromise is fair and equitable." *In re Kerner*, 599 B.R. 751, 756 (Bankr. S.D.N.Y. 2019) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 505). But settlements cannot be allowed to trample on the rights and protections expressly created by section 1125 of the Bankruptcy Code.

### B.  Solicitation under Section 1125

Section 1125(b) of the Bankruptcy Code governs postpetition disclosure and solicitation.

It provides, in relevant part:

> (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.  The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

11 U.S.C. § 1125(b).

The word "solicitation" is not defined in the Code.  *In re Residential Cap., LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) ("*ResCap*").  However, caselaw indicates it should "relate to the formal polling process in which the ballot and disclosure statement are actually presented to creditors with respect to a specific plan."  7 COLLIER ON BANKRUPTCY ¶ 1125.05 (16th 2024).

#### 1.  Restructuring Support Agreements

Entering plan or restructuring support agreements has become common practice.  7 COLLIER ON BANKRUPTCY ¶ 1125.05 (16th 2024).  The classic RSA outlines the basic elements of a plan and may provide a timetable, thus creating a "base camp" for parties when there is no obvious path to an easily confirmable plan.  *See* Douglas G. Baird, *Bankruptcy's Quiet Revolution*, 91 AM. BANKR. L.J. 593, 604 (2017).

While RSAs can be problematic in certain circumstances (for example, the so-called *sub rosa* plan), they are generally approved in this district and others.  *See ResCap*, 2013 WL 3286198, at *20.  In approving such agreements over objections that they are improper solicitations under section 1125, courts generally consider two policy objectives: *first*, providing

adequate and accurate information to creditors (which, in turn, is influenced by a creditor's relative sophistication), and *second*, encouraging productive negotiations. *See Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988) ("'[S]olicitation' must be read narrowly. A broad reading of § 1125 can seriously inhibit free creditor negotiations."); *In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999) (analyzing the purpose of section 1125 as "discourag[ing] the undesirable practice of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests") (internal citation and quotation marks omitted).

These considerations are illustrated by a review of three cases considering classic RSAs.

### a.  *Heritage Org.*

In *In re Heritage Org., L.L.C.*, 376 B.R. 783 (Bankr. N.D. Tex. 2007), certain creditors had negotiated a term sheet for a liquidating plan, including a support provision, and ultimately jointly filed a disclosure statement and plan reflecting their agreed-upon terms. *Heritage*, 376 B.R. at 787. The court, relying on the narrow definition of solicitation in *Century Glove*, found no improper solicitation had occurred. Based on the underlying purpose of section 1125, to "discourage the undesirable practice of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests," the court reasoned that it would be "absurd" to read section 1125(b) to "require a creditor intending to jointly propose a plan to draft a disclosure statement, get it approved, and then mail it to himself before agreeing to vote for it, under penalty of disenfranchisement." *Id.* at 791, 794 (quoting *Clamp-All*, 233 B.R. at 208).

Again, relying on *Century Glove*, the court also considered the objective of fostering open negotiations. *Id.* at 792 ("[W]e find no principled, predicable difference between

negotiation and solicitation of future acceptances . . . the harm [of potentially inadequate disclosure] is further limited by free and open negotiations between creditors.") (citation omitted).

### b. Indianapolis Downs

In *In re Indianapolis Downs, LLC.*, 486 B.R. 286 (Bankr. D. Del. 2013), the court reached the same conclusion as *Heritage* under similar facts. Following months of negotiations, the debtors and certain creditors agreed on a fulsome RSA containing broad strokes of a plan, contemplating a market test and, in the alternative, a recapitalization. The court, relying on *Century Glove* and *Heritage*, denied the motion to designate the votes of creditors that signed the RSA based on improper solicitation because it would be "demonstrably inconsistent with the purposes of the bankruptcy code." *Indianapolis Downs*, 486 B.R. at 295.

*First*, the court reasoned, "Congress intended that creditors have the opportunity to negotiate with debtors and amongst each other; to the extent that those negotiations bear fruit, a narrow construction of 'solicitation' affords these parties the opportunity to memorialize their agreements in a way that allows a Chapter 11 case to move forward." *Id.* *Second*, "the interests that § 1125 and the disclosure requirements are intended to protect," *i.e.* ill-informed creditors acting against their own interests, were "not at material risk in this case" because the parties were "all sophisticated financial players . . . represented by able and experienced professionals." *Id.*

### c. ResCap

Lastly, in *ResCap*, this Court approved a complex and highly negotiated RSA, following months of court-supervised mediation, that "embod[ied] numerous settlements and resolutions of extremely complicated legal and factual disputes that must be resolved to achieve a confirmable plan." *ResCap*, 2013 WL 3286198, at *2. The Court found no improper solicitation because

there were "numerous termination events that allow a party to withdraw," and the agreement to

vote was conditioned on the approval of a disclosure statement. *Id.* at *20. Further, the Court

relied on the narrow reading of "solicitation" from *Century Glove*, which supports the goal of

open negotiation. *Id.* at *19–20.

Taken together, these cases lay out the ingredients of a classic and unquestionably legal

RSA: informed creditors knowingly and rationally agreeing to a particular plan structure or

features and signing onto an agreement that creates consensus and moves the case forward.

2. <u>Plan Support Provisions</u>

In contrast to classic RSAs, parties sometimes negotiate plan support provisions—or

"lockups"—that bind creditors to vote in a particular way. These may crop up as additional

features to agreements completely unrelated to the ultimate structure of a plan. Such provisions

have elicited mixed reactions from courts.

However, under the majority view, PSAs or lockups are not *per se* improper. In

examining the reasoning of courts that have rejected or approved lockups, the key factors that

courts consider are (1) whether there is sufficient *information* about the plan itself that creditors

were committing to vote for, and (2) whether creditors had meaningful *choice*—either to

willingly agree during the negotiation phase, or to rescind based on information that later became

available.

a. *Cases Disallowing Plan Support Provisions*

In *NII Holdings*, Judge Walrath considered a lockup agreement which included specific

performance provisions and bound signatories to vote in favor of any plan the debtor proposed.

(Oct. 22, 2002 Hr'g Tr., *In re NII Holdings*, Case No. 14-10979 (Bankr. D. Del. 2002).) Judge

Walrath ruled that the lockup was an improper solicitation in violation of the Bankruptcy Code,

stating that "to find that obtaining a lock-up agreement in this form is not a solicitation of a vote would mean eviscerating [section 1125] from the Bankruptcy Code completely." (*Id.* at 60:19–23.)  Judge Walrath announced a "bright line" rule for her court: no post-petition plan support agreements, period.[6]  (*Id.* at 62:1–6.)

In *In re SAS*, Judge Wiles also found a lockup provision, baked into a lease assumption agreement and obligating creditors to vote for *any* plan the debtors might propose, to be a violation of section 1125.  (Sept. 28, 2022 Hr'g Tr. at 10:5–9, *In re SAS*, Case No. 22-10925 (Bankr. S.D.N.Y. 2022).)  He rejected the attempt to use "the claims process to buy a vote with no particular plan terms and without regard to whether there might be aspect[s] of the plan that the claimant might legitimately have other opinions about," characterizing it as a "naked voting requirement." (*Id.* at 18:1–5, 19:25.)

In distinguishing the lockup from permissible RSAs, Judge Wiles focused on function rather than form: "[T]his is called an RSA, but it's not.  It doesn't even remotely resemble anything that I've ever seen as an RSA and certainly is not of the kind of agreement that Courts have allowed under the *Indianapolis Downs* case [or] the *ResCap* case." (*Id.* at 17:20–24.)  Judge Wiles also focused on the "purpose of those cases," which was "to allow people to have discussions and negotiations about the structure of a plan and how a Debtor will be capitalized and operated going forward.  There's nothing like that in here." (*Id.* at 19:15–18.)

While the *SAS* and the *NII* transcripts illustrate many of the same concerns, and ultimately reach the same conclusion, the distinctiveness of Judge Walrath's approach in the *NII* case—announcing a clear-cut rule prohibiting lockup provisions post-petition—has a broader sweep, seemingly covering even common RSAs which are regularly approved in this district and

---

[6]  While the Court respectfully disagrees that a bright-line prohibition is necessary or appropriate in all circumstances, the result here, invalidating this specific Lockup Provision, does not require adoption of such a rule.

others, which facilitate and foster the negotiation process and information sharing.  In contrast, Judge Wiles' analysis in *SAS* recognized the routine approval of RSAs post-petition, differentiating the lockup at issue by emphasizing the absence of crucial information regarding plan terms and the lack of viable options to rescind the agreement.  This nuanced approach highlights the importance of transparency and flexibility in such arrangements.  The lockups at issue in *SAS* lacked both (1) *any* information about the plan terms, and (2) *any* meaningful outs or options to rescind the agreements, regardless of whether the claimants may later have legitimate objections.

### b.   Cases Permitting Plan Support Provisions

In *Kellogg Square*, the debtor negotiated a settlement and amended agreement with a utility provider, which included a plan support provision.  *In re Kellogg Square P'ship*, 160 B.R. 336, 338–39 (Bankr. D. Minn. 1993).  During the negotiations, the debtor provided the utility company with a preliminary draft of its amended disclosure statement.  The agreement was formally executed after the disclosure statement was approved.  The utility company then voted for the plan, which incorporated the terms of the settlement.  Another creditor objected and moved to designate the utility company's vote on the basis that it had been improperly solicited.

In overruling the motion, the court began from the principle that "the law should favor settlements."  *Id.* at 339.  Following the narrow *Century Glove* reading of "solicitation," it rejected the principle that presentation of a draft disclosure statement violated section 1125(b).  *Id.* at 340.  Importantly, the court effectively read an "out" into the agreement: "for the purposes of §§ 1125(b) and 1126(e), the act by which the Debtor 'solicited' [the utility company's] vote must be *deemed to have taken place* after the Court approved the amended disclosure statement."  *Id.* at 340 (emphasis added).  This was because, the court reasoned, the agreement "remained

executory" until the ballot was actually filed.  *Id.*  If the final disclosure statement had "revealed

information that materially bore on [the utility company's] interests" which the debtor had not

disclosed, the utility company "would have had a right under general, nonbankruptcy law to

*repudiate the agreement via rescission, and then to cast a rejecting ballot*."  *Id.* at 339–40

(emphasis added).

Thus, the *Kellogg Square* court shared Judge Wiles' concern about locking creditors into

voting for a plan potentially against their interests.  The concern in *SAS* was based on a complete

lack of information; that same concern also applies to potential misinformation or incomplete

information.  Recognizing the goal of negotiation among sophisticated parties, the *Kellogg

Square* court refused to clog the flow of information by punishing the debtor for sharing a draft

disclosure statement.  Yet, if the final court-approved disclosure statement had contained

surprises or other previously undisclosed information, the *Kellogg Square* court was clear that

the utility company would be fully within its rights to rescind the agreement and reject the plan.

*Id.* at 340.  The *Kellogg Square* lockup was permissible because creditors had (1) the benefit of

meaningful *information* from the draft disclosure statement, and (2) the option to *rescind* the

agreement if the true plan terms materially differed from what they had agreed to.

In *In re Grupo Aeroméxico*, the committee objected to plan support provisions in claim

settlement agreements between the debtors and the creditors.  (*See* Nov. 16, 2021 Hr'g. Tr., *In re

Grupo Aeroméxico, S.A.B. de C.V., et al.*, Case No. 20-11563 (Bankr. S.D.N.Y. 2021).)  Judge

Chapman approved the provisions, reasoning that the counterparties were "sophisticated folks

who are making a decision about whether to agree to it or not.  They've made an economic

decision.  Presumably, they've analyzed the risk."  (*Id.* at 39:22–25.)  Further, at the time of the

objections, the court had already approved several settlements containing similar provisions

without objections. (*See id.* at 36:18). Judge Chapman found it "significant" that while some settlements contained the provision, some did not, which cut against any "indication . . . of coercion" or that the debtors had conditioned the settlement on the inclusion of the provision. (*Id.* at 36:15–16, 53:17–22.)

While the *SAS* and *Aeroméxico* decisions seem to point in opposite directions, the status of the two cases when the lockups were presented for approval were very different. Judge Wiles denied the *SAS* lockups in September 2022, only a few months after the case had been filed in July 2022. The *SAS* debtors did not file a disclosure statement until 2023. (*See* Case No. 22-10925 ECF Doc. # 1732.) In contrast, the *Aeroméxico* debtors had been in bankruptcy for over a year, and a disclosure statement had been on file for over a month when Judge Chapman approved the lockups in November 2021. (*See* Case No. 20-11563 ECF Doc. # 1807.)

Consequently, Judge Chapman's heavy reliance on the parties' sophistication carried more force as the counterparties had a clearer idea of what they were signing up for. The check was not blank. Judge Chapman concluded that sophisticated parties could weigh risks and assess the Debtors' proposed plan terms to make a calculated and informed decision. Many parties, in fact, exercised this discretion, as reflected by the several agreements that did *not* contain the lockup, demonstrating that creditors also had a *meaningful choice* to reject the provision, even during the negotiation stage. Thus, the court concluded, the *Aeroméxico* lockup was permissible because there was sufficient (1) *information* and (2) evidence of *meaningful choice*, both before and after the disclosure statement was on file.

## C. The Business Judgment Rule

The standard used for judicial approval of the use of estate property outside of the ordinary course of business is the business judgment of the debtor. *In re Genco Shipping &*

*Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (collecting cases).  The business

judgment rule is deferential, a presumption "shield[ing] corporate decision makers and their

decisions from judicial second-guessing when the following elements are present: (1) a business

decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and

commentators, no abuse of discretion or waste of corporate assets."  *In re Integrated Res., Inc.*,

147 B.R. 650, 656 (S.D.N.Y. 1992).  Courts are "loath" to interfere with such decisions absent a

showing of bad faith, self-interest, or gross negligence.  *Id.*

Parties opposing the proposed exercise of a debtor's business judgment have the burden

of rebutting the presumption of validity.  *Genco Shipping & Trading*, 509 B.R. at 464.  If the

presumption of validity is rebutted, the court examines the transaction with heightened scrutiny,

under the "entire fairness" standard.  *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr.

S.D.N.Y. 2010).  This standard examines "whether the process and price of a proposed

transaction not only appear fair but are fair and whether fiduciary duties were properly taken into

consideration."  *Id.*

### III.    DISCUSSION

While the economic terms of the Motions satisfy the *Iridium* factors and were approved,

the Lockup Provision contains neither (1) adequate (or any) information about the plan terms,

nor (2) any evidence of meaningful choice.  Beyond its effects on the Counterparties, the Lockup

Provision risks disenfranchising the voices and votes of smaller creditors.  If the Debtors had

been permitted to lock in the requisite votes for a cramdown, they would have no incentive to

engage with or negotiate with other creditors whose votes they might otherwise have courted.

The Debtors' speculative concerns about future renegotiations of terms are not a basis to read

section 1125(b) out of the Bankruptcy Code.

In making this ruling, the Court need not evaluate whether the Stipulations should be evaluated under the business judgment or entire fairness standard.

### A.  The Economic Terms of the Stipulations Are Approved

The Stipulations resolve a host of issues with critical counterparties and move the Debtors towards their DIP milestones.  The economic terms embodied in the Stipulations are reasonable, satisfy the *Iridium* factors, and have not generated any objections.  Accordingly, the Court has entered orders **APPROVING** the economic terms of the Motions.

### B.  The UST and Committee Objections to the Lockup Are Sustained

The Lockup Provision is clearly not a classic RSA of the type approved in cases like *Heritage*, *Indianapolis Downs*, or *ResCap*.  It does not outline the broad structure or features of a plan.  It does not provide a "base camp" around which creditors can rally.  It does not facilitate the flow of information.

Rather, the Lockup Provision is a bonus feature, affixed to unrelated stipulations regarding aircraft and engine leases, of the type that reach mixed results under judicial scrutiny. Examining the circumstances, reasoning and outcomes of those cases, the Court should consider (1) whether the Counterparties had adequate information about the terms of a potential plan, and (2) whether the Counterparties had meaningful choice or "outs."  The Counterparties had neither. Further, the Court raised concerns at the Hearing that the Debtors may have bought the requisite votes to confirm a plan without input from, or regard for, any other creditors, essentially disenfranchising their votes at a nascent stage in these cases.  (*See* Apr. 10, 2024 Hr'g Tr. at 49:12–16.)

The Lockup Provision thus undoes the Bankruptcy Code's careful allocations of creditor rights and ultimately constitutes an improper solicitation in violation of section 1125(b).

1.   Counterparties Have No Information About Potential Plan Terms

These cases are in their infancy.  Like the *SAS* debtors at the time of Judge Wiles'

decision, the Debtors are *months away* from filing a disclosure statement, in contrast to

*Aeroméxico*, where a disclosure statement was on file when objections were raised, or *Kellogg*

*Square*, where the debtor had shared a draft disclosure statement.  This is also in contrast to *In re*

*AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y.), which the Debtors cite in their Reply to

bolster their argument for the Lockup Provision because no disclosure statement was yet on file.

(*See* Reply ¶ 15.)  There, an agreement containing a plan support provision was approved the

same day as the disclosure statement; however, the provision was "based on the [plan] term

sheet," and counterparties had been "been in daily contact . . . turning drafts of the plan, turning

drafts of the disclosure statement," which contained anticipated recoveries and projected stock

prices.  (June 4, 2013 Hr'g Tr. at 10:3–12, 10:17–18, *In re AMR Corp.*, No. 11-15463 (Bankr.

S.D.N.Y.).)  There was thus clearly sufficient information in that case.

The Court here is faced with a binary choice framed by the Debtors: approve the

Stipulations with the Lockup Provision intact, or approve them with the Lockup Provision

excised.  The Court rejects the former and embraces the latter.  The Court declines to opine on

the exact amount of information or stage of a case at which a plan support provision becomes

permissible (and has stated on the record that citing to uncontested orders entered in other cases

is generally unpersuasive).  However, here, the lack of *any* adequate information about plan

terms clearly runs head-on into the purpose and goals of section 1125(b).

2.  <u>Counterparties Have No Meaningful "Outs"</u>

The main concern articulated by Judge Wiles—that the debtors were attempting to extract a blank check for any plan they proposed, with no meaningful outs—applies with equal force here.

The Lockup Provision mandates votes for *any* plan the Debtors may later propose, so long as it embodies the terms of the Stipulations.  These terms are only part of what will certainly be a broader plan structure.  The Lockup Provision contains no meaningful "outs" for creditors to void the blank check they are writing.  As the Committee and UST point out, the "conditions" to the agreement are hollow and illusory, or tautological results of being in chapter 11.  The Lockup Provision provides that a disclosure statement must be approved by the Court: this is a requirement of the Bankruptcy Code, not a termination provision.  The Lockup Provision requires the Debtors to hit certain liquidity and leverage ratios; but these ratios are measured as of the *effective* date, after a plan has been solicited, confirmed, and implemented.  Further, the agreement only requires the Debtors to list them in the disclosure statement as targets or projections.[7]  However, if it turns out that these goals were projected but not hit, there would be no way to unscramble the egg.  Further, setting aside the logistical impossibility, counterparties may have legitimate objections based on other grounds besides liquidity and leverage.  Yet the Lockup Provision snuffs out any ability to vote accordingly.

As the Court remarked during the April 2, 2024 discovery conference, there is a crucial difference between agreeing that settlement terms *must be included in any plan*, and agreeing to vote for *any plan that includes* the settlement terms.  (*See* Apr. 2, 2024 Hr'g. Tr. 25:24–25, 26:1–

---

[7]      (*See* Apr. 10, 2024 Hr'g Tr. at 49:12–16 (LeBlanc) (stating that if the disclosure statement "says [the Debtors are] going to have 400 million dollars of liquidity," *i.e.* does not *project* that the targets will be met, counterparties would be released from the Lockup Provision.)

5.)  The Lockup Provision requires the latter; it ties the creditors' hands, requiring their vote without regard for any legitimate concerns they may have with the plan (unrelated to the terms of the Stipulations) and without any ability to rescind or terminate the agreement.

Clearly, there are no meaningful "outs."  Without any information about plan terms, or any history of similar agreements without the Lockup Provision to demonstrate any meaningful choice, the Lockup Provision fails on the second prong of consideration.

### C.  Sophistication is Relevant, but Is Not *Carte Blanche* to Circumvent Section 1125

Creditor sophistication is a highly relevant factor in assessing the permissibility of plan support provisions.  However, no level of sophistication allows parties to circumvent the Bankruptcy Code or use its provisions as bargaining chips.  *Cf. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 467–468 (2017) (disapproving of attempts to make an "end run" around or "short-circuit" the requirements and safeguards of chapter 11).  A creditor's sophistication is not an excuse to strip away provisions of the Bankruptcy Code which protect it; on the flipside, neither is it a golden ticket to strike a creative deal that may trample the statutory rights of *other* creditors.

#### 1.   Section 1125 Protects Even Sophisticated Counterparties

Relying on sophistication *alone*, in the absence of any information or evidence of meaningful choice, could lead to an undesirable result even when assuming perfect rationality of every actor.  Though each counterparty may wish to avoid the situation where the debtor has complete control over their class of votes, each would wish to retain the benefit of *their* bargain.  They would thus face a coordination game with other members of their class where each would rationally choose to sign the deal, lest they be left out in the cold.  The result would be a "tragedy of the commons": the debtor achieves complete control over a class, a result which each

counterparty may have been able to foresee, but which none would rationally cede their own bargain to avoid. Section 1125(b) guards against this result. By tying the hands of all parties, the Code solves the coordination game that could exist—even among sophisticated parties—thus serving as a bulwark against the tragedy of the commons.

### 2. Section 1125 Protects Unsophisticated Parties

On the flipside, creditor sophistication is not a free pass to strike a deal that runs roughshod over the rights of others. The Lockup Provision would grant the Debtors the votes needed to propose and confirm essentially any plan they wished as long as the Stipulation terms are included in the plan, obviating the need to deal with any other, smaller creditors. It would thus taint the voting process by effectively silencing the votes of all creditors besides the Counterparties.

### D. Speculative Concerns Are Not a Basis to Ignore 1125

In the Reply and during the Hearing, the Debtors argued that the Lockup Provision was essential to ensure "certainty" that their agreements with the Counterparties were "the full, final, and complete deal." (Reply ¶ 4.) They expressed concerns that without the Lockup Provision, they would "have no assurance that additional concessions will not be demanded" by the Counterparties (or a successor in interest) in exchange for their vote. (*Id.*; *see also* Apr. 10, 2024 Hr'g Tr. at 60:7–10 (Leblanc) ("Half the bets are off . . . . The other half of the bet is how do you use the leverage that you have in the plan negotiation process.").)

This is a speculative and hypothetical concern. When questioned at the Hearing about any cases where this had occurred, counsel for the Debtors was unable to "point [the Court] to a circumstance in which those facts have arisen." (Apr. 10, 2024 Hr'g Tr. at 56:7–13.) Counsel for the Committee was similarly unaware of any such cases. (*See id.* at 89:13–16 ("The Court: Is

there any decisional law where a group of creditors that have settled during the case have tried to re-trade the case before a plan is voted on?  Mr. Miller: No. I have none.").)

The Stipulations without the lockups have been approved.  If the Counterparties seek to back out or renegotiate the agreements, the law provides the Debtors with remedies to enforce them.

Even assuming this concern of re-trading the deal was as pressing and imminent as the Debtors contend, it does not erase section 1125(b).  The Court cannot waive compliance with the Bankruptcy Code to provide the Debtors with more "certainty" or "finality" in their deal.  These speculative concerns do not trump the statute.

## IV.    CONCLUSION

For the reasons explained above, the economic terms of the Motions are **APPROVED**, and the UST and Committee Objections to the Lockup Provision are **SUSTAINED**.

The Orders approving the Stipulations without the Lockup Provision have already been entered.

Dated:    April 22, 2024
           New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge