**Hearing Date and Time: July 1, 2024 at 2:00 PM (ET)**
**Objection Deadline: June 24, 2024 at 4:00 PM (ET)**

Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re:                                                         :   Chapter 11
                                                               :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                           :   Case No. 24-10118 (MG)
*et al.*,[1]                                                   :
                                                               :
                                         Debtors.              :   (Jointly Administered)
                                                               :
---------------------------------------------------------------x

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
CONFIRMING THE DEBTORS' AUTHORITY TO MAKE INCENTIVE
PLAN PAYMENTS TO THEIR NON-INSIDER EMPLOYEES DURING
THE CHAPTER 11 CASES IN ACCORDANCE WITH THE WAGES ORDER**

        **PLEASE TAKE NOTICE** that a hearing (the "Hearing") will be held **on July 1, 2024 at 2:00 p.m. (prevailing Eastern time)** before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004 to consider *Debtors' Motion for Entry of an Order Confirming the Debtors' Authority to Make Incentive Plan Payments to Their Non-Insider Employees During the Chapter 11 Cases in Accordance with the Wages Order* (the "Motion").

        **PLEASE TAKE FURTHER NOTICE** that the Hearing will take place in a hybrid fashion both in person and via Zoom for Government.  Those wishing to participate in the Hearing in person may appear before the Court in Courtroom No. 523, located at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004.  For those wishing to participate remotely, the Hearing will be conducted using Zoom for Government.  Parties wishing to appear at the Hearing, whether in person or via Zoom for Government, need to make an electronic appearance (an "eCourtAppearance") through the Court's website at https://www.nysb.uscourts.gov/ecourt-appearances no later than 4:00 p.m. (prevailing Eastern time) on June 28, 2024.

        **PLEASE TAKE FURTHER NOTICE** that any objections or responses to the relief requested in the Motion shall: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York, and the *Final Order Implementing Certain Notice and Case Management Procedures* [Docket No. 175]; (iii) be filed electronically with this Court on the docket of *In re GOL Linhas Aéreas Inteligentes S.A.*, Case No. 24-10118 (MG) by registered users of this Court's electronic filing system (which is available on this Court's website at http://www.nysb.uscourts.gov); and (iv) be served so as to be actually received by **June 24, 2024 at 4:00 p.m. (prevailing Eastern time)**, by: (a) the Chambers of the Honorable Martin Glenn, Chief United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004; (b) the Debtors, c/o GOL Linhas Aéreas Inteligentes S.A., Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Brazil (Attn: Joseph W. Bliley, Chief Restructuring Officer); (c) Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Evan R. Fleck, Esq., Lauren C. Doyle, Esq., and Bryan V. Uelk, Esq.), counsel for the Debtors; (d) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, One Bowling Green, Suite 534, New York, NY 10004-1408 (Attn: Annie Wells, Esq. and Brian Masumoto, Esq.); (e) the Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549; (f) the Federal Aviation Administration, 800 Independence Ave., S.W. Washington, DC 20591 (Attn: Office of the Chief Counsel); (g) the U.S. Attorney's Office for the Southern District of New York, One St. Andrew's Plaza, New York, NY 10007; and (h) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Brett H. Miller, Esq., Todd M. Goren, Esq., Craig A. Damast, Esq., and James H. Burbage, Esq.), counsel for the Official Committee of Unsecured Creditors.

**PLEASE TAKE FURTHER NOTICE** that your rights may be affected.  You should read the Motion carefully and discuss the relief requested with your attorney, if you have one in connection with the chapter 11 cases.  (If you do not have an attorney, you may wish to consult with one.)

**PLEASE TAKE FURTHER NOTICE** that if you do not want the Court to grant the relief requested in the Motion, or if you want the Court to consider your view on the Motion, then you or your attorney must attend the Hearing.  If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter orders granting the relief requested in the Motion with no further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing.

[*Remainder of page intentionally left blank*]

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion can be viewed and/or obtained by: (i) accessing the Court's website at http://www.nysb.uscourts.gov, (ii) from the Debtors' claims and noticing agent, Kroll, at https://cases.ra.kroll.com/GOL, or by calling 844.553.2247 (U.S./Canada) (toll free) or +1.646.777.2315 (International) or by e-mail via GOLInfo@ra.kroll.com.  Note that a PACER password is needed to access documents on the Court's website.

Dated:  New York, New York
        June 10, 2024

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

**Hearing Date and Time: July 1, 2024 at 2:00 PM (ET)**
**Objection Deadline: June 24, 2024 at 4:00 PM (ET)**

Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,[1] | : Case No. 24-10118 (MG) |
| | : |
| | : (Jointly Administered) |
| Debtors. | : |
| | : |

---------------------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
CONFIRMING THE DEBTORS' AUTHORITY TO MAKE INCENTIVE
PLAN PAYMENTS TO THEIR NON-INSIDER EMPLOYEES DURING
THE CHAPTER 11 CASES IN ACCORDANCE WITH THE WAGES ORDER**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (the "Motion"):

**RELIEF REQUESTED**

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), confirming the Debtors' authority to make payments under their

Incentive Plans (as defined herein) during the pendency of these cases in accordance with the Final

Wages Order (as defined herein) without further order of the Court.[2]

2.      In support of the relief requested, the Debtors rely on the *Declaration of Joseph W.
Bliley in Support of Debtors' Motion for Entry of an Order Confirming the Debtors' Authority to
Make Incentive Plan Payments to Their Non-Insider Employees During the Chapter 11 Cases in
Accordance with the Wages Order* (the "Bliley Declaration"), attached hereto as **Exhibit B**, the
*Declaration of Zachary P. Georgeson in Support of Debtors' Motion for Entry of an Order
Confirming the Debtors' Authority to Make Incentive Plan Payments to Their Non-Insider
Employees During the Chapter 11 Cases in Accordance with the Wages Order* (the
"Georgeson Declaration"), attached hereto as **Exhibit C**, and the *Declaration of Aloizio Ribeiro
Lima in Support of Debtors' Motion for Entry of an Order Confirming the Debtors' Authority to
Make Incentive Plan Payments to Their Non-Insider Employees During the Chapter 11 Cases in
Accordance with the Wages Order* (the "Lima Declaration"), attached hereto as **Exhibit D**.

---

[2]     For the avoidance of doubt, by this Motion, the Debtors are not seeking authorization to pay any bonuses to an
        "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). None of the Debtors'
        directors, officers, or persons with the ability to direct control over the Debtors will receive any bonuses or
        incentive payments under the Incentive Plans.  To the extent the Debtors decide to pay any bonus or other
        incentive payment to any Insider, the Debtors will seek approval under a separate motion.

3.      The Debtors have discussed the relief requested herein with counsel for the Official Committee of Unsecured Creditors (the "Committee"), and the Committee has no objection to the relief requested herein.

## JURISDICTION

4.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.

5.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105(a), 363, and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## STATUS OF THE CASES

8.      On January 25, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.      The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases (the "Chapter 11 Cases") are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order (i) Directing Joint Administration of Chapter 11 Cases and (ii) Granting Related Relief* [Docket No. 58].  On February 9, 2024, the U.S. Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee.  *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 114].  On February 13, 2024, the U.S. Trustee filed a notice amending the composition of the Committee.  *See Am. Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 134].  No trustee or examiner has been appointed in these cases.

10.     Further information regarding the Debtors' business, capital structure, and the facts and circumstances leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Joseph W. Bliley in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 11].

## **BACKGROUND RELEVANT TO THE MOTION**

### A.     The Incentive Plans

11.     As described in *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing Them to (a) Maintain Employee Programs in the Ordinary Course and (b) Pay Prepetition Employee Obligations Related Thereto and (ii) Granting Related Relief* [Docket No. 3] (the "Wages Motion"), the Debtors have approximately 14,000 employees (the "Employees"), the vast majority of whom are based in Brazil.  In the ordinary course of business (and for as long as the Debtors have been in operation), the Debtors maintain certain Incentive Plans (described more fully below) that are used to supplement their Employees' base wages and incentivize them to achieve improved performance for the business as a whole.  Programs of this type are common in Brazil, where employee compensation is generally comprised of base monthly wages and variable incentive payments.  *See* Georgeson Decl. ¶ 15.  The Debtors have maintained similar incentive programs since they began operations in 2001 and have made modifications to their programs over time to reflect business needs and market practices.  Bliley Decl. ¶ 4.  The current Incentive Plans include (i) a revenue sharing program, (ii) an incentive bonus program, (iii) an operational supervisor incentive program, and (iv) an operational reward program (collectively, the "Incentive Plans").[3]

---

[3]     The Wages Motion also described a Quarterly Bonus Program (as defined in the Wages Motion).  The Debtors are not seeking authority to make payments under the Quarterly Bonus Program as part of this Motion.

### i.    *Revenue Sharing Program*

12.    The Debtors maintain a cash-based revenue sharing program (the "Revenue Sharing Program").[4]  Under Brazilian law, employers are generally required to make distributions to their employees based on the employers' overall financial and operational performance.  Lima Decl. ¶ 14.  All of the Debtors' Employees hired before September 2023 are eligible for this program.  Bliley Decl. ¶ 5.  Under the Revenue Sharing Program, a portion of the Debtors' annual profits, as calculated pursuant to the terms of certain formulas set forth in the CBAs (as defined below),[5] is distributed to eligible Employees, and the overall amount paid increases or decreases annually based on reaching specific metrics for the Debtors' financial and operational performance.  *Id.*  The Debtors' performance is measured by various factors, including EBITDA margin, net promoter scores (measuring customer loyalty), on-time performance, fleet performance, certain safety indicators, cost control and reduction, and reductions in baggage mishandling.  *Id.*  Metrics are set in the spring of the applicable plan year, the results are assessed in the spring following the applicable plan year, and payments are typically made in the second quarter of each year.  *Id.*  The average payment made to Employees under the Revenue Sharing Program is approximately $1,700[6] annually based on payments that have been and are expected to be made in 2024.  *Id.*  The Debtors expect to make only one additional payment under the Revenue Sharing Program in 2024 of approximately $1.4 million, which payment will be made in July 2024.

---

[4]    The Debtors are required to make payments to Brazilian Employees under the Revenue Sharing Program pursuant to clauses 5.1.1, 5.1.3, and 5.1.5 of the six collective bargaining agreements with the Employees' labor unions to which the Debtors are a party (the "CBAs").

[5]    Payments are calculated pursuant to clauses 5.3 through 5.4.3 of the CBAs.

[6]    Unless stated otherwise herein, all amounts included herein are listed in U.S. dollars, and Brazilian reals have been converted to U.S. dollars using an exchange rate of 1 USD: 5.3 BRL on June 5, 2024.

*Id.* The Debtors estimate that the aggregate amount of payments under the Revenue Sharing Program will be approximately $26.8 million in 2025, subject to actual 2024 year-end results. *Id.*

### ii.    *Incentive Bonus Program*

13. Approximately 200 of the Debtors' senior non-insider Employees are eligible for cash incentive bonuses (the "Incentive Bonus Program").[7] Bliley Decl. ¶ 6. These Employees, all of whom play a key role in the Debtors' business operations, and in particular the Debtors' overall performance, serve in management roles in various departments related to commercial, strategy, finance, fleet, operations, supply chain, and human resources, among others. *Id.* The Incentive Bonus Program is intended to compensate covered Employees for successfully helping the Debtors achieve various corporate targets, including revenue and EBITDA metrics, fleet performance, and cost control and reduction, as well as additional targets tailored to the departments in which the Employees work. *Id.* Achievement of these metrics by the covered Employee is determined at the end of the first quarter of the following year. *Id.* Following such determination, payment is made to Employees annually in the second quarter of that year. *Id.* The average payout per Employee under the Incentive Bonus Program based on payments made in 2024 is approximately $19,000. *Id.* The Debtors do not expect to make any additional payments under the Incentive Bonus Program in 2024. *Id.* The Debtors estimate that the aggregate amount of such bonuses in 2025 will be approximately $8.5 million, subject to actual 2024 year-end results. *Id.*

### iii.    *Operational Supervisor Incentive Program*

14. The Debtors maintain an operational supervisor incentive program for approximately 425 Employees who serve in operational supervisory roles related to airport, crew,

---

[7]    Clause 5.5 of the CBAs allows the Debtors to make payments under the Incentive Bonus Program. Although payments under the Incentive Bonus Program are not expressly required under the CBAs, the Debtors are required to make these payments to Brazilian Employees under Brazilian labor law, as companies that offer an incentive bonus program to their employees are required to make payments thereunder. *See* Lima Decl. ¶ 6, 14.

cargo, and maintenance services, call centers, and warehouses (the "Operational Supervisor Incentive Program").[8]  Bliley Decl. ¶ 7.  Semi-annual payments are made based on the achievement of the applicable metrics determined at the end of the prior two quarters, such as on-time performance, cost control and reduction, and reductions in baggage mishandling. *Id.*  The Debtors did not make any payments under the Operational Supervisor Incentive Program in the first half of 2024, since the target metrics for the payments were not achieved.  *Id.*  The Debtors expect to pay approximately $240,000 semi-annually in 2024 and 2025 under this program.  *Id.*  The average payout to covered Employees under the Operational Supervisor Incentive Program is approximately $600 per semester based on expected payments for the remainder of 2024.  *Id.*

      iv.    *Operational Reward Program*

15.    Approximately 11,100 of the Debtors' employees who serve in various operational roles related to airport, crew, cargo, and maintenance services, call centers, and warehouses are eligible to participate in the operational reward program (the "Operational Reward Program").[9]  Bliley Decl. ¶ 8.  Payments are calculated in the spring and fall of each year based on short-term operational targets, such as on-time performance, cost control and reduction, and reductions in baggage mishandling.  *Id.*  The Debtors expect to pay approximately $3.4 million semi-annually[10] under the Operational Reward Program.  *Id.*  Payments are made in the spring and fall of each year, and the Debtors expect that the average payment for each applicable Employee in the fall of 2024 will be $300.  *Id.*

---

[8]    Clause 5.1.2 of the CBAs requires the Debtors to make payments under this program to Employees in Brazil.

[9]    Clauses 5.1.2 and 5.1.4 of the CBAs requires the Debtors to make payments under this program to Employees in Brazil.

[10]    The Wages Motion incorrectly stated that payments would be made in quarterly installments.

16.     Payments under the Incentive Plans for each individual Employee are calculated as a multiple of the Employee's monthly salary, and such multiple varies based on the Employee's position.  Bliley Decl. ¶ 9.  The Employees' unions must approve the payments for all Employees before the Debtors remit such payments.  *See id.*  The total Incentive Plan payments range from 5% to 65% of Employees' total compensation, averaging 12% of total compensation.  *Id.*  If the Debtors fail to make payments under the Incentive Plans, the Employees would likely seek employment elsewhere, as they expected these payments as an important component of their overall compensation.  *Id.* at 15.  Further, as discussed below, failure to make payments under the Incentive Plans could expose the Debtors to liability.  The Incentive Plans are therefore integral to the Debtors' continued successful operations going forward throughout these Chapter 11 Cases.

**B.     The CBAs and Brazilian Law**

17.     As indicated above, the Incentive Plans are a product of six CBAs between the Debtors and the Employees' labor unions.  *See* Lima Decl. ¶ 6.  A copy of one such CBA with the Union of Aviation Workers in the State of São Paulo, the Union of Aviation Workers of the Municipalities of Campinas, Sorocaba and Jundiaí, the Union of Aviation Workers of Minas Gerais, the Union of Aviation Workers in the State of Alagoas, and the Union of Aviation Workers in the State of Amazonas for the January 1, 2023 to December 31, 2023 term governing payments to be made in 2024, as translated from Portuguese to English is attached hereto as **Exhibit E**.  The Debtors' other CBAs include substantially the same terms for Incentive Plan payments.[11]  *Id.*  The current CBAs cover payments in 2024 based on 2023 year-end financial results of the Debtors.  *Id.* at 11.

---

[11]    The unions that are party to the additional CBAs are the Union of Aviation Workers in Gaurulhos, the Union of Aviation Workers in Pernambuco, the Union of Workers in Air Transport Companies in the City of Rio de Janeiro, the Union of Aviation Workers in Porto Alegre, and the National Union of Aviation Workers.  *See* Lima Decl. ¶ 6.

18.     Brazilian companies enter into collective bargaining agreements with various Brazilian labor unions in the ordinary course of business. Lima Decl. ¶ 10. As set forth in the Lima Declaration, the Brazilian Federal Constitution establishes labor unions for various sectors and territories to represent both employees and employers. *Id.* at 7. Employer unions and employee unions enter into general collective bargaining agreements with each other that apply to all employers and employees within the specified territory and sector that the unions represent. *Id.* at 8. The unions protect the rights of all employees within the applicable sector, regardless of whether the employees are directly associated with the union. *See id.*

19.     Brazilian companies may also negotiate directly with their employees' unions to enter into specific collective bargaining agreements to, among other things, modify the terms and conditions for compensation. *See* Lima Decl. ¶ 9–10. These agreements allow companies to establish employee compensation terms that better suit their needs or to grant different or additional rights to their employees represented by the applicable union. *Id.* at 9. In fact, one reason that companies enter into these specific collective bargaining agreements is to establish incentive plans. *Id.* at 10. The terms of specific collective bargaining agreements for Brazilian companies are typically the product of significant negotiations between the companies and the labor unions. *Id.*

20.     The CBAs govern the Debtors' Brazilian Employees' compensation, including the Incentive Plans, and protect the rights of all of the Debtors' Employees and former employees that were still Employees during the term of the applicable CBA. *See* CBA, cl. 6; Lima Decl. ¶ 6, 11. The Debtors negotiate the CBAs with the unions each year. *Id.* at 11. The CBAs are expected to be renewed for 2024 on substantially the same terms as 2023—and on a yearly basis thereafter.

Bliley Decl. ¶ 9.  The Debtors have entered into collective bargaining agreements since the Debtors began operations in 2001.  *Id.*

21.    The terms of the CBAs are also similar to collective bargaining agreements of other airlines that operate in Brazil, such as TAM Aviação Executiva e Táxi Aéreo S/A.  Lima Decl. ¶ 13.  Additionally, both Delta Air Lines, Inc. and United Airlines, Inc. have collective bargaining agreements with their Brazilian employees that mandate incentive programs.  *Id.* Moreover, other large Brazilian companies in different sectors have specific CBAs with incentive provisions similar to those in the Debtors' CBAs, like Petróleo Brasileiro S.A. – PETROBRAS (oil sector), Vale S/A (mining sector), and XP Investimentos Corretora de Câmbio, Títulos e Valores Mobiliários S/A (brokerage firm).  *Id.*

22.    The Debtors are required to make payments under the Incentive Plans pursuant to Brazilian law.  Lima Decl. ¶ 14.  Under the Brazilian Federal Constitution, employers are generally required to make distributions to their employees based on the employers' overall financial and operational performance.  *Id.*  Additionally, if an employer offers an incentive program to their employees pursuant to a collective bargaining agreement or otherwise, Brazilian labor laws require that the employer make such payments.  *Id.*  There are no exceptions for nonpayment of the Incentive Plans under the CBAs or Brazilian law due to the Chapter 11 Cases.  *Id.*  Thus, failure to make payments under the Incentive Plans could expose the Debtors to liability in excess of the amounts owed to Employees under such plans.  *Id.*

23.    If the Debtors do not make payments under the Incentive Plans, the labor unions could initiate collective actions, or Employees may initiate individual lawsuits, in Brazilian labor

courts.[12]  Lima Decl. ¶ 15.  If any such actions are initiated, the Debtors would likely be held liable

for both the Incentive Plan payment plus damages under Brazilian labor laws, as Brazilian courts

are protective of employees.  *Id.*  Additionally, it is possible that labor unions may initiate a civil

action or that Employees may initiate collective actions in Brazil claiming collective moral

damages in the event that the Debtors do not make Incentive Plan payments as required under

CBAs.  *Id.*  If the Debtors fail to comply with a Brazilian court order to make payments, Brazilian

courts could even issue judgment liens on the Debtors' property, seize the Debtors' assets, and

freeze the Debtors' bank accounts for non-payment of Incentive Plan obligations.  *Id.*  Moreover,

it is possible that the Employees, in conjunction with the unions, could initiate a shutdown of the

Debtors operations or go on strike if they do not receive the Incentive Plan payments that they are

entitled to.  *Id.*

### C.    Procedural Background

24.    On February 27, 2024, the Court granted the *Final Order (i) Authorizing the

Debtors to (a) Maintain Employee Programs in the Ordinary Course and (b) Pay Prepetition

Employee Obligations Related Thereto and (ii) Granting Related Relief* [Docket No. 198] (the

"<u>Final Wages Order</u>").  Although the Debtors believe they have authority to make payments under

the Incentive Plans pursuant to the Final Wages Order, the Debtors are nevertheless filing this

Motion out of an abundance of caution at the request of the U.S. Trustee.

25.    The Final Wages Order provides that "[t]he Debtors are authorized, but not

directed, (i) to pay and/or honor the Employee Obligations that become due and owing in the

ordinary course of business and (ii) to continue their practices and policies with respect to the

---

[12]    Nothing contained herein waives any rights, claims, or defenses that the Debtors may assert to the extent such
litigation is filed against the Debtors in Brazil.

Employee Programs as such practices and policies were in effect as of the Petition Date, and as such programs may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business." Final Wages Order ¶ 2. "Employee Programs" include the Incentive Plans, and "Employee Obligations" include obligations related to the Employee Programs. *See* Wages Motion ¶ 15.

26. No formal objections or other responsive pleadings were filed in connection with the Wages Motion. The Debtors received informal comments from the U.S. Trustee and the Committee, and such comments were included in the form of the Final Wages Order. Bliley Decl. ¶ 10. Specifically, at the request of the U.S. Trustee, the Debtors agreed to revise the proposed Final Wages Order to, among other things, (i) require the Debtors to provide the U.S. Trustee and the Committee with at least five business days' notice prior to making payments under an Incentive Plan,[13] and (ii) include a reservation of the rights of the U.S. Trustee and the Committee to seek additional disclosures in connection with, or object to, Incentive Plan payments.[14] *See* Final Wages Order ¶ 7. Since the entry of the Final Wages Order, the Debtors have abided by its terms, including providing five business days' notice to the U.S. Trustee and the Committee before making any Incentive Plan payments. Bliley Decl. ¶ 10.

27. On April 16, 2024, the Debtors provided the U.S. Trustee with notice via email of their intent to make certain payments under the Revenue Sharing Program and the Incentive Bonus Program in April 2024. Bliley Decl. ¶ 11. Subsequently, at the request of the U.S. Trustee to counsel, the Debtors provided the U.S. Trustee with a list of the Employees, their job titles, and

---

[13] "[T]he Debtors shall provide the Committee and U.S. Trustee with at least five (5) business days' notice prior to making payments . . . (ii) under an Incentive Plan, provided that such reporting shall be limited to the aggregate amount of such payments and the total number of Employees receiving such payments." Final Wages Order ¶ 7.

[14] "The rights of the Committee and the U.S. Trustee to seek additional disclosures in connection [with the Incentive Plans], and to object to any such payments are expressly reserved, and shall not be prejudiced by entry of the Interim Order or this Final Order." Final Wages Order ¶ 7.

the proposed payment amounts for each of the Employees proposed to receive the largest payments in April under the Revenue Sharing Program and the Incentive Bonus Program. *Id.* Over the course of the following week, the Debtors provided the U.S. Trustee with additional information regarding Employees proposed to receive the largest April payments under the Revenue Sharing Program and the Incentive Bonus Program including such Employees' salary, date of employment, and job duties and responsibilities, as well as confirmation that none of them were appointed by, sit on, or report to any Debtor board of directors. *Id.* The Debtors also provided the U.S. Trustee with a list of the Debtors' Insiders. *Id.* The Debtors provided the U.S. Trustee with a comprehensive discussion detailing, among other things, the metrics and targets which Employees must satisfy to be eligible to receive payments under the Revenue Sharing Program and the Incentive Bonus Program, the timing of payments each year under the Revenue Sharing Program and the Incentive Bonus Program, and the fact that payments under the Revenue Sharing Program and the Incentive Bonus Program are required by the CBAs and Brazilian law. *Id.* The Debtors shared substantially similar information regarding the Incentive Plan payments with the Committee, and the Committee has been supportive of the Debtors making the payments. *Id.* Subject to an initial request by the U.S. Trustee to "hold back" 25% of the proposed April payments under the Revenue Sharing Program and the Incentive Bonus Program for further review, the U.S. Trustee ultimately had no objection to the Debtors making the April payments under the Revenue Sharing Program and the Incentive Bonus Program. *Id.*

28.    On April 27, 2024, the Debtors formally notified the U.S. Trustee and the Committee of their intent to make payments under the Revenue Sharing Program to an additional subset of Employees and under the Operational Reward Program in May and June 2024. Bliley Decl. ¶ 12. Again, the Debtors provided the U.S. Trustee with a description of the metrics and

targets associated with the Operational Reward Program, confirmation that payments under the Operational Reward Program are required by the CBAs and Brazilian law, and a list of the employees that were proposed to receive the largest payments in May and June 2024 under the Revenue Sharing Program and the Operational Reward Program, along with their titles, to whom they report, and their proposed incentive payment amounts. *Id.* The U.S. Trustee followed up with additional diligence questions regarding the Revenue Sharing Program and the Operational Reward Program, which the Debtors answered.[15] *Id.* Ultimately, the U.S. Trustee did not raise an objection to the proposed May and June payments, and the Debtors made the May payments as contemplated. *Id.*

29.     On May 15, 2024, the U.S. Trustee requested that the Debtors seek Court authority to make Incentive Plan payments under section 503(c) of the Bankruptcy Code through a new motion and that failure to do so could result in an objection from the U.S. Trustee to the Debtors' payment of their Incentive Plan obligations. Bliley Decl. ¶ 13. The Debtors now file this Motion at the request of the U.S. Trustee seeking confirmation of their authority to make Incentive Plan payments, including the payments that the Debtors contemplated making in June 2024.

## BASIS FOR RELIEF

**A.     The Debtors Are Authorized to Make Payments Under the Incentive Plans Under Section 363 of the Bankruptcy Code.**

30.     Maintaining the Incentive Plans and making payments to Employees thereunder is within the ordinary course of the Debtors' business and is therefore authorized by section 363(c)(1) of the Bankruptcy Code. Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in

---

[15] The Debtors have not included the specific detailed information that the Debtors provided to the U.S. Trustee and Committee's advisors in this Motion, as public disclosure of such information could materially harm the Debtors by disclosing specific compensation matters to both other Employees and competitors.

possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

31.    Making Incentive Plan payments is both consistent with the Debtors' past practice and consistent with industry standards.  The Incentive Plans are preexisting programs that the Debtors maintain in the ordinary course of business.  *See* Bliley Decl. ¶ 4, 14.  The Debtors have maintained similar incentive programs since they began operations in 2001 and have made modifications to such programs over time to reflect business needs in the ordinary course.  *Id.* at 4.

32.    Additionally, the Incentive Plans are an essential component of the Employees' overall compensation package, representing on average approximately 12% of Employees' total compensation.  *See* Bliley Decl. ¶ 9.  This payment structure consisting of both monthly wages and variable incentive payments as parts of an employee's overall compensation package is ordinary course in the Brazilian labor market.  *See* Georgeson Decl. ¶ 15.  As stated in the Georgeson Declaration, the Incentive Plans are consistent with both Brazilian market practices and practices among comparable bankruptcy cases reviewed by Willis Towers Watson U.S. LLC ("WTW").  *See id.* at 12, 15.  Further, as stated in the Lima Declaration, Brazilian employers are required to make incentive distributions to their employees based on the employers' overall financial and operational performance, and such terms for distributions are set forth in collective bargaining agreements.  Lima Decl. ¶ 14.  Moreover, the terms of the Debtors' CBAs are consistent with collective bargaining agreements of other airlines and large companies operating in Brazil. *See id.* at 13.  Thus, the Debtors should be authorized to continue making payments to Employees under the Incentive Plans in the ordinary course of business because this is consistent with both the Debtors' past practice and industry standards.

33.    To the extent that the Court may find Incentive Plan payments to be outside the ordinary course of business, the payments should be approved under section 363(b)(1) of the Bankruptcy Code as a sound exercise of the Debtors' business judgment.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that the debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's sound business judgment.  *See, e.g.*, *Off. Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay)*, 973 F.2d 141, 143 (2d Cir. 1992) (affirming the bankruptcy court's approval of the debtors' asset sale pursuant to section 363(b) as a reasonable exercise of business judgment); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (holding that the application of section 363(b) must be supported by "some articulated business justification, other than appeasement of major creditors"); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason"); *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.").

34.    Once a debtor articulates a valid business justification, a strong presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and quotations omitted), appeal dismissed, 3 F.3d 49 (2d Cir.

1993).  This rule applies with full force to questions of employee compensation.  *See In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) (finding that "the business judgment standard under section 363(b)" applies to employee compensation and benefit matters).  For example, this Court approved incentive payments as a valid exercise of debtors' business judgment where (i) the compensation package offered by the debtors consisted of a below-market base salary supplemented by incentive payments, (ii) the incentive payments were negotiated prepetition, (iii) such incentive payments were consistent with historic practices, and (iv) the creditors' committee approved of the incentive payments.  *In re Mesa Air Grp., Inc.*, 10-10018 (MG), 2010 WL 3810899, at *3–4 (Bankr. S.D.N.Y. Sept. 24, 2010).

35.    The Debtors submit that making payments to Employees under the Incentive Plans is a sound exercise of the Debtors' business judgment, as it is in the best interests of their estates and stakeholders.  First, failure to make Incentive Plan payments could lead Employees to seek alternative employment opportunities since Incentive Plan payments represent a significant portion of Employees' overall compensation.  *See* Bliley Decl. ¶ 9, 15.  In the Brazilian labor market, incentive programs are an important component of overall compensation.  *See* Georgeson Decl. ¶ 15.  The Debtors' Employees expect to receive both their salaries and their Incentive Plan payments, as the Incentive Plans range from 5% to 65% of Employees' overall compensation package, averaging 12% of total compensation.  *See* Bliley Decl. ¶ 9.  Second, Incentive Plan payments are calculated based on applicable operational and financial targets and therefore, incentivize Employees to perform their jobs diligently and efficiently, which is especially critical to preserve value for the Debtors' estates during these Chapter 11 Cases.  *See id.* at 5, 6, 7, 8, 15.

36.    Third, failure to make payments under the Incentive Plans as required by the CBAs and Brazilian labor laws will expose the Debtors to significant liability.  *See* Lima Decl. ¶ 14–15.

17

If Employees do not receive these payments, the Employees individually or collectively or the unions collectively could commence labor lawsuits against the Debtors. *Id.* at 15. Brazilian labor laws and Brazilian labor courts favor employees. *See id.* As such, the Debtors would nevertheless likely be required by Brazilian labor courts to make Incentive Plan payments plus pay damages and/or collective moral damages. *See id.* Brazilian labor courts could even issue judgment liens on the Debtors' property, seize the Debtors' assets, and freeze the Debtors' bank accounts if the Debtors do not make Incentive Plan payments pursuant to a court order. *Id.* Moreover, Employees, in conjunction with the unions, could even initiate a shutdown of the Debtors operations or go on strike. *Id.* Accordingly, the Debtors submit that continuing the Incentive Plans is a sound exercise of their business judgment.

### B.    The Requested Relief Is Consistent with Section 503(c) of the Bankruptcy Code.

37.    The Debtors do not believe that section 503(c) of the Bankruptcy Code is the applicable Bankruptcy Code provision with respect to the Incentive Plans, as they are preexisting plans for non-insider Employees that the Debtors maintain in the ordinary course of business. Nevertheless, the Incentive Plan payments satisfy section 503(c) of the Bankruptcy Code. Section 503(c)(3) permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3).[16] Whether such payments are "justified by the facts and circumstances" of the case is to be determined by application of the business judgment rule. *See Velo Holdings*, 472 B.R. at 212 ("[T]he 'facts and circumstances' language of 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *Borders Grp.*, 453 B.R. at 473–74 (evaluating

---

[16]    Notably, section 503(c), makes clear that payments that are made in the "ordinary course" would not be subject to a separate standard under section 503(c).

the debtors' key employee retention program under business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing factors that may be considered in determining whether compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3)).   Accordingly, the determination of whether an incentive plan is justified by the facts and circumstances of a particular case is the same as the analysis of whether the implementation of such program is a result of the exercise of the debtor's sound business judgment.

38.   When determining whether a compensation proposal and the process for its development meet the "sound business judgment" test for the purpose of approving a compensation plan under section 503(c)(3) of the Bankruptcy Code, courts in the Second Circuit have generally utilized the six factors identified in *In re Dana Corp.*: (i) whether the plan is calculated to achieve the desired performance; (ii) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (iii) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (iv) whether the plan is consistent with industry standards; (v) whether the debtor performed due diligence in investigating the need for the plan; and (vi) whether the debtor received independent advice in performing due diligence regarding, creating, and authorizing the plan (the "Dana Factors").   358 B.R. at 576–77; *see also In re Residential Cap., LLC*, 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013); *Borders Grp.*, 453 B.R. at 473–74.

39.   No single factor is dispositive, and the Court has discretion to weigh each of these factors based on the specific facts and circumstances before it.   *See, e.g.*, *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013).   Even the total absence of any one factor may be permissible so long as the presence of other factors ensured "that the [d]ebtors' interests were

sufficiently protected." *Borders Grp.*, 453 B.R. at 477; *see also In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 154 (Bankr. E.D.N.Y. 2012) (noting that "the relatively modest size of the proposed bonus payouts made the retention of independent legal counsel economically inefficient"). Moreover, the Dana Factors arose from an incentive program formulated during a chapter 11 case and as such, may not be as easily applied to programs formulated prepetition. *See generally Dana Corp.*, 358 B.R. 567. The Debtors respectfully submit that the Incentive Plans satisfy the Dana Factors.

         *i.*     *There Is a Relationship Between Payments Under the Incentive Plans and Incentivizing Employees' Job Performance.*

40.     The targets under the Incentive Plans are designed to maximize profitability and reduce costs. *See* Bliley Decl. ¶ 15. The participants in the Incentive Plans have specific target incentive payouts for achieving desired results, which are defined as a multiple of monthly salary that varies by the level of the eligible participants. Georgeson Decl. ¶ 15. Payouts under the Incentive Plans are contingent on the achievement of goals set on various incentive metrics, including financial measures and operating performance. *Id.*

41.     Specifically, Revenue Sharing Program payments available for all Employees hired before September 2023 are based on measures such as EBITDA margin, net promoter scores (measuring customer loyalty), on-time performance, fleet performance, certain safety indicators, cost control and reduction, and reductions in baggage mishandling. Bliley Decl. ¶ 5. Incentive Bonus Program payments for senior Employees are calculated based on revenue and EBITDA metrics, fleet performance, and cost control and reduction. *Id.* at 6. Additionally, payments under the Operational Supervisor Incentive Program and the Operational Reward Program for those Employees in operational supervisory and operational roles, respectively, are based on factors such

as on-time performance, cost control and reduction, and reduction in baggage mishandling.  *Id.*
at 7, 8.

42.      As set forth in the Georgeson Declaration, the use of a combination of financial and
operational metrics creates incentives for successful financial outcomes and effective operation of
the business.  Georgeson Decl. ¶ 15.  Tailoring the design of programs based on the specific roles
and responsibilities of eligible employees ensures the effectiveness of the programs in motivating
the desired behavior and outcomes.  *Id.*  Thus, there is a relationship between the Incentive Plans
and Employees' performance.

  ii. *The Cost of the Incentive Plans Is Fair and Reasonable in the Context of the*
   *Debtors' Assets, Liabilities, and Earning Potential.*

43.      The estimated annual cost of the Incentive Plans is approximately $42 million.[17]
Bliley Decl. ¶ 16.  By comparison, as of year-end 2023, the Debtors' annual revenues totaled
approximately $3.7 billion, and their total assets equaled approximately $3.5 billion.  *Id.*  Thus,
the estimated annual cost of all of the Incentive Plans is only approximately 1.1% of the Debtors'
annual revenues and 1.2% of the Debtors' total assets.  *Id.*  The potential cost of losing these
Employees if they were not paid their incentive payments under the Incentive Plans during the
Debtors' restructuring would be devastating to the Debtors' business.  *Id.*  The Incentive Plans
range from 5% to 65% of Employees' expected compensation package, averaging 12% of a
covered Employee's total compensation.  *Id.* at 9.  Failure to receive nearly 12% of one's
anticipated compensation could lead to a mass exodus of the Debtors' Employees.  *Id.* at 16.

44.      Furthermore, if the Debtors do not make Incentive Plan payments, Brazilian
Employees individually or the labor unions collectively could file suit for a violation of the CBAs

---

[17]    The estimated annual approximate cost of (i) the Revenue Sharing Program is $26.8 million, (ii) the Incentive
Bonus Program is $8.5 million, (iii) the Operational Supervisor Incentive Program is $480,000, and (iv) the
Operational Reward Program is $6.8 million.  Bliley Decl. ¶ 5, 6, 7, 8.

and/or Brazilian labor laws. Lima Decl. ¶ 15. As Brazilian labor laws and labor courts are favorable towards employees, the Debtors could be ordered to make such Incentive Plan payments plus damages. *Id.* Thus, the cost of making payments under the Incentive Plans is far less than the cost of payments and damages that the Debtors may be ordered to pay by Brazilian labor courts and the litigation costs attendant thereto. As such, the Debtors believe that the cost of the Incentive Plans is fair and reasonable.

> iii. *The Scope of Each Incentive Plan Is Fair and Reasonable and Does Not Unfairly Discriminate Among Employees.*

45. As set forth in the Georgeson Declaration, the scope and design of the Incentive Plans are reasonable and within the range of both normal course Brazilian market practices and observed practices among comparable bankruptcy cases reviewed by WTW. Georgeson Decl. ¶ 15. The Debtors maintain several Incentive Plans for specific groups of Employees. *See* Bliley Decl. ¶ 5–8. All Employees hired before September of the previous year are eligible for the Revenue Sharing Program; approximately 200 senior Employees who serve in leadership roles in various departments related to commercial, strategy, finance, fleet, operations, supply chain, and human resources, among others, are eligible for the Incentive Bonus Program; approximately 425 Employees in operational supervisory roles related to airport, crew, cargo, and maintenance services, call centers, and warehouses are eligible for the Operational Supervisor Incentive Program; and approximately 11,100 Employees in various operational roles are eligible for the Operational Reward Program. *Id.* As set forth in the Georgeson Declaration, the use of multiple incentive programs specifically designed to motivate and reward distinct groups of employees with specific roles and responsibilities is common market practice and ensures the effectiveness of the programs in motivating the desired behavior and outcomes. Georgeson Decl. ¶ 15.

46.     Additionally, the Incentive Plans are covered by the heavily-negotiated CBAs between the Debtors and multiple labor unions on behalf of all Brazilian Employees and/or are mandated by Brazilian law.  *See* Lima Decl. ¶ 6, 10, 14.  Since the labor unions are advocating on behalf of all Employees, the negotiation process ensures that the Incentive Plans are fair and reasonable.  Additionally, Brazilian labor laws and the CBAs protect the rights of all Brazilian Employees to receive the Incentive Plan payments.  *Id.* ¶ 15.  Thus, the scope of eligibility for each Incentive Plan is fair and reasonable and complies with the CBAs and Brazilian labor law.

     *iv.*    *The Incentive Plans Are Consistent with Industry Practice.*

47.     Both the scope and design of the Incentive Plans are reasonable and consistent with Brazilian market practices and practices among the bankruptcy cases reviewed by WTW.  Georgeson Decl. ¶ 15.  The Brazilian market and the bankruptcy cases reviewed by WTW compensate employees with a combination of monthly salaries and incentive plans.  *Id.*  In fact, over 95% of Brazilian companies with performance-based employee incentive plans established defined target incentive opportunities for plan participants, similar to the Debtors' Incentive Plans.  *See id.*  The metrics used by the Debtors for calculating Incentive Plan payments are common, as incentive programs typically reward performance at an overall organizational level as well as at a department, functional unit, and/or team level.  *Id.*  Additionally, the use of multiple incentive programs specifically tailored for distinct groups of employees based on their roles and responsibilities is also consistent with industry practice.  *Id.*

48.     Further, the Incentive Plans are negotiated and required by the CBAs as part of Employees' overall compensation.  Bliley Decl. ¶ 9.  Brazilian employer and employee labor unions enter into general collective bargaining agreements setting market terms for all employees within the applicable sector and region.  *See* Lima Decl. ¶ 8.  As an alternative, individual companies may negotiate specific collective bargaining agreements with employee labor unions,

as the Debtors did. *See id.* at 9–10. Companies in Brazil frequently negotiate directly with the unions to enter into specific collective bargaining agreements to modify the terms and conditions for compensation, including to establish incentive plans. *Id.* at 10. The terms of the Debtors' CBAs are consistent with collective bargaining agreements of other airlines and large companies operating in Brazil. *See id.* at 13. Above all else, under the Brazilian Federal Constitution, employers must make incentive distributions to their employees based on the employers' overall financial and operational performance. *Id.* at 14. Thus, the Incentive Plans are reasonably consistent with industry practice.

     *v.*     *The Debtors Performed Due Diligence.*

     49.     The Debtors perform due diligence in negotiating the Incentive Plans with the labor unions. Bliley Decl. ¶ 9. The Incentive Plans are renewed on a yearly basis after the Debtors heavily negotiate the terms of the CBAs with their Employees' labor unions. *See id.* Additionally, the Incentive Plans are a continuation of preexisting programs that were negotiated prepetition and approved by the Debtors' board of directors. *Id.* at 14. Although the Debtors have made necessary modifications to their incentive programs over time, the Debtors have maintained similar incentive programs since they began operations. *Id.* at 4. Additionally, the Debtors have not made any modifications to the Incentive Plans since the Petition Date. *Id.* at 14. Thus, the Incentive Plans satisfy the "test of time" in that these are programs that the Debtors have implemented in the ordinary course of business. *In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("[T]hese are not 'new' compensation programs but, instead, are nearly identical to plans previously used, and approved by a compensation committee and board of directors. In other words, the Plans have satisfied the independent 'test of time.'").

     *vi.*     *The Debtors Received Input Regarding the Incentive Plans from Various Parties.*

50.     The Debtors have maintained the Incentive Plans in the ordinary course of business since they began operations in 2001, subject to certain modifications that have been made from time to time to meet business needs.  Bliley Decl. ¶ 4.  As such, the advice the Debtors received in initially developing the Incentive Plans is unknown.  *Id.* at 4 n.3.  Nevertheless, the Debtors negotiate the terms of the Incentive Plans with the Employees' labor unions each year.  *See id.* at 9.  Moreover, WTW has subsequently reviewed the Incentive Plans and determined that such plans are reasonable.  Georgeson Decl. ¶ 16.

51.     Thus, payments under the Incentive Plans are justified by the facts and circumstances of these cases, and the requirements of section 503(c)(3) of the Bankruptcy Code are satisfied.

**C.**     **Nothing in the Bankruptcy Code Prohibits Approval of Payments Under the Incentive Plans.**

52.     Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code prohibit certain payments to "insiders."  Section 503(c)(1) prohibits retention payments to "insiders," and section 503(c)(2) prohibits severance payments to "insiders."  The Incentive Plan payments are not prohibited by section 503(c)(1) or (c)(2) of the Bankruptcy Code.

     *i.*     *The Employees Eligible for the Incentive Plans Are Not Insiders.*

53.     Section 503(c)(1) and (c)(2) do not prevent the Court from granting the requested relief because none of the Employees who will receive payments under the Incentive Plans are "insiders" within the contemplation of section 503(c) of the Bankruptcy Code.  The Bankruptcy Code defines an "insider" of a corporate debtor to include, among others, a "director of the debtor," an "officer of the debtor," and a "person in control of the debtor."  11 U.S.C. § 101(31).  None of

the Employees who will receive payments under the Incentive Plans are directors, officers, or controlling persons of any Debtor. Bliley Decl. ¶ 17.

54.    Although certain Employees eligible for the Incentive Plans hold titles such as "director" and "executive," it is well-established that an employee's job title, alone, does not make such employee an "insider." As such, numerous courts have concluded that an employee should qualify as an "insider" only if the employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Velo Holdings*, 472 B.R. at 212 (citations omitted). Additionally, bankruptcy courts have concluded that certain employees given "director-level" titles were not insiders because "[c]ompanies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive." *Borders Grp.*, 453 B.R. at 469; *see also Glob. Aviation Holdings*, 478 B.R. at 148–49 (finding director-level employees to not be insiders because they did not have the responsibilities of a corporate director).

55.    The Employees' titles are designed to demonstrate their skill and expertise, supporting the credibility they need in the industry to perform their respective roles. Bliley Decl. ¶ 17. Their knowledge and expertise support such titles—but none of the Employees have discretionary decision-making authority on issues of policy, the overall direction of the company, or control over any material corporate transaction. *Id.* Rather, the scope of the authority of each Employee is limited and subject to the ultimate oversight and approval by the Debtors' executive officers and board of directors. *Id.* Moreover, none of the Employees receiving the Incentive Plan payments were appointed by, or directly report to, any board of directors of the Debtors. *Id.*; *see also Borders Grp.*, 453 B.R. at 468–69 (quoting *Office of the U.S. Trustee v. Fieldstone Mortg. Co.*, No. 08-755, 2008 WL 4826291, at *3 n.12 (D. Md. Nov. 5, 2008)) (noting that "board appointment

or election is frequently identified as distinguishing 'officer' positions from other titled positions within a corporation").  Additionally, the Debtors shared information with the U.S. Trustee and the Committee regarding the Employees eligible to receive payments under the Incentive Plans, including their job titles, job duties, who they report to, salary, and proposed payment amounts, and neither the U.S. Trustee nor the Committee has objected to such payments on the basis that any Employee is an Insider.  *See* Bliley Decl. ¶ 11–12.  Thus, none of the Employees eligible for the Incentive Plans are "insiders" of the Debtors, and the restrictions of sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code are inapplicable to the Incentive Plans.

ii.    *None of the Payments Under the Incentive Plans Are Retention or Severance Payments.*

56.    Even if Incentive Plan payments were to "insiders," the payments are incentive-based payments, rather than retention or severance payments, so the payments are not prohibited by section 503(c)(1) or (c)(2) of the Bankruptcy Code.

57.    If a compensation plan "is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)."  *In re Residential Cap., LLC*, 478 B.R. 154, 171 (Bankr. S.D.N.Y. 2012); *see also Mesa Air*, 2010 WL 3810899, at *4 (approving an incentive plan that was tied to performance goals, "including maintenance of flight schedules, efficient return of aircraft, securing aircraft equipment at reduced rates and negotiation or reduced rates for aircraft of the Debtors that were no longer in service").  Payments under each Incentive Plan are calculated based on certain, specific financial and operational metrics.  *See* Bliley Decl. ¶ 5–8.  Thus, even if Insiders were eligible for the Incentive Plans, the Incentive Plans are primarily incentivizing, rather than retentive, so section 503(c)(1) of the Bankruptcy Code does not prohibit Incentive Plan payments.

58.    Moreover, none of the payments under the Incentive Plans are severance payments. Employees are entitled to Incentive Plan payments under the CBAs and as required by Brazilian labor law as compensation principally for work performed by the Employees during the term of their employment with the Debtors.  Lima Decl. ¶ 12.  Thus, even if Insiders were eligible for the Incentive Plans, the Incentive Plans are incentive payments, rather than severance payments, and are not prohibited by section 503(c)(2) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

59.    Nothing contained herein is intended to be or shall be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's right to dispute any claim; or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission to the validity of any claim or waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE

60.    Notice of this Motion has been provided in accordance with the procedures set forth in the *Final Order Implementing Certain Notice and Case Management Procedures* [Docket No. 175].  The Debtors respectfully submit that no further notice is required.

## NO PRIOR REQUEST

61.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Order granting the relief requested herein and granting such other relief as is just.

Dated:  New York, New York
       June 10, 2024

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

## EXHIBIT A

**Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
In re:                                                            :    Chapter 11
                                                                  :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                             :    Case No. 24-10118 (MG)
*et al.*,[1]                                                       :
                                                                  :
                              Debtors.                            :    (Jointly Administered)
                                                                  :
------------------------------------------------------------------x

### ORDER CONFIRMING
### THE DEBTORS' AUTHORITY TO MAKE INCENTIVE
### PLAN PAYMENTS TO THEIR NON-INSIDER EMPLOYEES DURING
### THE CHAPTER 11 CASES IN ACCORDANCE WITH THE WAGES ORDER

Upon consideration of the motion (the "Motion")[2] of the above-captioned Debtors, seeking

entry of an order pursuant to sections 105(a), 363, and 503(c) of the Bankruptcy Code confirming

the Debtors' authority to make payments under their Incentive Plans during the Chapter 11 Cases

in accordance with the Final Wages Order without further order of the Court, as described more

fully in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order*

*of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and it appearing that venue of these

Chapter 11 Cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A);
GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A.
(N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo
S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A);
Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento
no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu
Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the Motion, the Bliley Declaration, the Georgeson Declaration, and the Lima Declaration; and upon the statements of counsel in support of the relief requested in the Motion at the hearing before the Court; and all of the proceedings had before the Court; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to sections 363 and 503(c) of the Bankruptcy Code, the Debtors are authorized, but not directed, to make payments under their Incentive Plans during the pendency of these Chapter 11 Cases without further order of the Court.

3.      The Debtors are authorized, but not directed, to continue their practices and policies with respect to the Incentive Plans as such practices and policies were in effect as of the Petition Date, and as such programs may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business.

4.      Except as otherwise modified herein, the terms of the Final Wages Order shall continue in full force and effect.  To the extent of any conflict between the terms of the Final Wages Order and the terms of this Order, the terms of this Order shall govern.

5.      Payments permitted hereunder shall be subject to and in compliance with the Approved Budget (as defined in the Final DIP Order[3]) (subject to permitted variances) and nothing herein shall constitute a waiver by the DIP Lenders (as defined in the Final DIP Order) of any

---

[3]      "Final DIP Order" means the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection to the Prepetition Secured Parties, (D) Modifying the Automatic Stay, (E) Authorizing the Debtors to Use Cash Collateral, and (F) Granting Related Relief* [Docket No. 207].

default under the terms of the Final DIP Order or any DIP Documents (as defined in the Final DIP Order); *provided*, *however*, that nothing in this paragraph shall prohibit or restrict the Debtors from making any payments permitted hereunder, or relieve the Debtors from their obligation to make such payments, to the extent required by or provided for in this Order or the CBAs (as renewed, amended, supplemented, and/or modified).

6.      Nothing contained in this Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity or priority of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any claim, (c) a promise or requirement to pay any prepetition claim, or (d) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party.

7.      Notwithstanding any applicability of Bankruptcy Rule 6004, this Order shall be immediately effective and enforceable upon its entry.

8.      The Debtors are authorized and empowered to take all actions necessary to implement the relief requested in this Order.

9.      This Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the implementation of this Order.

Dated: _____, 2024       _____
       New York, New York                       THE HONORABLE MARTIN GLENN
                                                CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**Bliley Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :
In re:                                        :      Chapter 11
                                              :
GOL LINHAS AÉREAS INTELIGENTES S.A.,          :      Case No. 24-10118 (MG)
*et al.*,[1]                                   :
                                              :
                        Debtors.              :      (Jointly Administered)
                                              :
------------------------------------------------------------x

### DECLARATION OF JOSEPH W. BLILEY
### IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
### CONFIRMING THE DEBTORS' AUTHORITY TO MAKE INCENTIVE
### PLAN PAYMENTS TO THEIR NON-INSIDER EMPLOYEES DURING
### THE CHAPTER 11 CASES IN ACCORDANCE WITH THE WAGES ORDER

I, Joseph W. Bliley, make this declaration under 28 U.S.C. § 1746:

1.      I am the Chief Restructuring Officer of GOL Linhas Aéreas Inteligentes S.A.

("GOL"), one of the above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), and have served in this position since December 17, 2023.

2.      I have more than twenty-five years of experience in the financial sector and was

most recently a Managing Director and Co-Head of Global Financial Services Investment

Banking at Lincoln International, based in New York, New York.  Previously, I held senior

positions in Investment Banking at Stephens, Inc. and Bank of America where I was a Managing

Director in the Corporate Finance and Restructuring group.  Throughout my career, I have

worked with companies and their stakeholders in a variety of complex transactions, including

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A);
GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A.
(N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo
S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A);
Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento
no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu
Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

recapitalizations, in court and out of court restructurings, mergers, divestitures, and initial public offerings.  My experience is global, having worked in New York and Europe with companies throughout the world, including in Latin America.

3.      I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of an Order Confirming the Debtors' Authority to Make Incentive Plan Payments to Their Non-Insider Employees During the Chapter 11 Cases in Accordance with the Wages Order* (the "Motion").[2]  Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team.  If called to testify, I would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or my opinions based upon my professional experience.

## THE INCENTIVE PLANS

4.      The Debtors have approximately 14,000 Employees, the vast majority of whom are based in Brazil.  Employees' compensation consists of both monthly salary and incentive payments.  The Debtors maintain these programs in the ordinary course of business.  The Debtors have maintained similar incentive programs since they began operations in 2001 and have made modifications to such programs over time to reflect business needs and market practices.[3]  Below is a summary of each of the Incentive Plans.

5.      *Revenue Sharing Program.*  The Debtors maintain a cash-based Revenue Sharing Program.  All of the Debtors' Employees hired before September 2023 are eligible for this

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings set forth in the Motion.

[3]    Because the Debtors have maintained these programs since they began operations, the advice the Debtors received in initially developing the Incentive Plans is unknown.

2

program.  Under the Revenue Sharing Program, a portion of the Debtors' annual profits, as calculated pursuant to the terms of certain formulas set forth in the CBAs, is distributed to eligible Employees, and the overall amount paid increases or decreases annually based on reaching specific metrics for the Debtors' financial and operational performance.  The Debtors' performance is measured by various factors, including EBITDA margin, net promoter scores (measuring customer loyalty), on-time performance, fleet performance, certain safety indicators, cost control and reduction, and reductions in baggage mishandling.  Metrics are set in the spring of the applicable plan year, the results are assessed in the spring following the applicable plan year, and payments are typically made in the second quarter of each year.  The average payment made to Employees under the Revenue Sharing Program is approximately $1,700 annually based on payments that have been and are expected to be made in 2024.  The Debtors expect to make only one additional payment under the Revenue Sharing Program in 2024 of approximately $1.4 million, which payment will be made in July 2024.  The Debtors estimate that the aggregate amount of payments under the Revenue Sharing Program will be approximately $26.8 million in 2025, subject to actual 2024 year-end results.

6.      *Incentive Bonus Program.*  Approximately 200 of the Debtors' senior non-insider Employees are eligible for the Incentive Bonus Program.  These Employees, all of whom play a key role in the Debtors' business operations, and in particular the Debtors' overall performance, serve in management roles in various departments related to commercial, strategy, finance, fleet, operations, supply chain, and human resources, among others.  The Incentive Bonus Program is intended to compensate covered Employees for successfully helping the Debtors achieve various corporate targets, including revenue and EBITDA metrics, fleet performance, and cost control and reduction, as well as additional targets tailored to the

3

departments in which the Employees work.  Achievement of these metrics by the covered Employee is determined at the end of the first quarter of the following year.  Following such determination, payment is made to Employees annually in the second quarter of that year.  The average payout per Employee under the Incentive Bonus Program based on payments made in 2024 is approximately $19,000.  The Debtors do not expect to make any additional payments under the Incentive Bonus Program in 2024.  The Debtors estimate that the aggregate amount of such bonuses in 2025 will be approximately $8.5 million, subject to actual 2024 year-end results.

7. *Operational Supervisor Incentive Program.*  The Debtors maintain an Operational Incentive Program for approximately 425 Employees who serve in operational supervisory roles related to airport, crew, cargo, and maintenance services, call centers, and warehouses.  Semi-annual payments are made based on the achievement of the applicable metrics determined at the end of the prior two quarters, such as on-time performance, cost control and reduction, and reductions in baggage mishandling.  The Debtors did not and will not make any payments under the Operational Supervisor Incentive Program in the first half of 2024, since the target metrics for the payments were not achieved.  The Debtors expect to pay approximately $240,000 semi-annually in 2024 and 2025 under this program.  The average payout to covered Employees under the Operational Supervisor Incentive Program is approximately $600 per semester based on expected payments for the remainder of 2024.

8. *Operational Reward Program.*  Approximately 11,100 of the Debtors' Employees who serve in various operational roles related to airport, crew, cargo, and maintenance services, call centers, and warehouses are eligible to participate in the Operational Reward Program.  Payments are calculated in the spring and fall of each year based on short-

term operational targets, such as on-time performance, cost control and reduction, and reductions in baggage mishandling. The Debtors expect to pay approximately $3.4 million semi-annually under the Operational Reward Program. Payments are made in the spring and fall of each year, and the Debtors expect that the average payment for each applicable Employee in the fall of 2024 will be $300.

9.     The Debtors are required to make Incentive Plan payments as part of Employees' overall compensation pursuant to six CBAs that are heavily negotiated with ten labor unions. The CBAs are effective from January 1, 2023, to December 31, 2023, and govern payments to be made in 2024. The Debtors perform due diligence in negotiating the Incentive Plans with the labor unions. The Debtors expect to renew the CBAs for 2024 on substantially the same terms as 2023—and on a yearly basis thereafter. In fact, the Debtors have entered into collective bargaining agreements since the Debtors began operations in 2001. Additionally, payment amounts for all Employees under the Incentive Plans must be approved by the labor unions. Payments for each individual Employee under the Incentive Plans are calculated as a multiple of the Employee's monthly salary, and such multiple varies based on the Employee's position. Incentive Plan payments range from 5% to 65% of Employees' total compensation, averaging 12% of total compensation.

**PROCEDURAL HISTORY**

10.     The Debtors believe that they have authority to make payments under the Incentive Plans pursuant to the Final Wages Order. Prior to entry of the Final Wages Order, the Debtors received informal comments from the U.S. Trustee and the Committee, and such comments were included in the form of the Final Wages Order. Since the entry of the Final Wages Order, the Debtors have abided by its terms, including providing five business days'

notice to the U.S. Trustee and the Committee before making any Incentive Plan payments.

11.    On April 16, 2024, the Debtors provided the U.S. Trustee with notice via email of their intent to make certain payments under the Revenue Sharing Program and the Incentive Bonus Program in April 2024.  Subsequently, at the request of the U.S. Trustee to counsel, the Debtors provided the U.S. Trustee with a list of the Employees, their job titles, and the proposed payment amounts for each of the Employees proposed to receive the largest payments in April under the Revenue Sharing Program and the Incentive Bonus Program.  Over the course of the following week, the Debtors provided the U.S. Trustee with additional information regarding Employees proposed to receive April payments under the Revenue Sharing Program and the Incentive Bonus Program including such Employees' salary, date of employment, and job duties and responsibilities, as well as confirmation that none of them were appointed by, sit on, or report to any Debtor board of directors.  The Debtors also provided the U.S. Trustee with a list of the Debtors' Insiders.   The Debtors provided the U.S. Trustee with a comprehensive discussion detailing, among other things, the metrics and targets which Employees must satisfy to be eligible to receive payments under the Revenue Sharing Program and the Incentive Bonus Program, the timing of payments each year under the Revenue Sharing Program and the Incentive Bonus Program, and the fact that payments under the Revenue Sharing Program and the Incentive Bonus Program are required by the CBAs and Brazilian law.  The Debtors shared substantially similar information regarding the Incentive Plan payments with the Committee, and the Committee has been supportive of the Debtors making the payments.  Subject to an initial request by the U.S. Trustee to "hold back" 25% of the proposed April payments under the Revenue Sharing Program and the Incentive Bonus Program, the U.S. Trustee ultimately had no objection to the Debtors making the April payments under the Revenue Sharing Program and

the Incentive Bonus Program.

12. On April 27, 2024, the Debtors formally notified the U.S. Trustee and the Committee of their intent to make payments under the Revenue Sharing Program to an additional subset of Employees and under the Operational Reward Program in May and June 2024. Again, the Debtors provided the U.S. Trustee with a description of the metrics and targets associated with the Operational Reward Program, confirmation that payments under the Operational Reward Program are required by the CBAs and Brazilian law, and a list of the employees that were proposed to receive the largest payments in May and June 2024 under the Revenue Sharing Program and the Operational Reward Program, along with their titles, to whom they report, and their proposed incentive payment amounts. The U.S. Trustee followed up with additional diligence questions regarding the Revenue Sharing Program and the Operational Reward Program which the Debtors answered. Ultimately, the U.S. Trustee did not raise an objection to the proposed May and June payments, and the Debtors made the May payments as contemplated.

13. On May 15, 2024, the U.S. Trustee requested that the Debtors seek Court authority to make Incentive Plan payments under section 503(c) of the Bankruptcy Code through a new motion and that failure to do so could result in an objection from the U.S. Trustee to the Debtors' payment of their Incentive Plan obligations. Thus, the Debtors are filing the Motion at the request of the U.S. Trustee.

## THE REASONABLENESS OF THE INCENTIVE PLANS

14. I believe that the Incentive Plans are justified by the facts and circumstances of these Chapter 11 Cases and are within the Debtors' sound and reasonable business judgment. The Incentive Plans are a continuation of preexisting programs that were negotiated prepetition and approved by the Debtors' board of directors. The Debtors have not made any modifications

to the Incentive Plans since the Petition Date.

15.     Employees expect to receive both their monthly salaries and their incentive payments as part of their overall compensation package.  If the Debtors fail to make payments under the Incentive Plans, the Employees may seek employment elsewhere, as they expected these payments as an important component of their overall compensation.  The Incentive Plans incentivize Employees to perform their jobs diligently and efficiently—maximizing profitability and reducing costs—which is especially critical to preserving value for the Debtors' estates during these Chapter 11 Cases.

16.     The estimated annual cost of the Incentive Plans is approximately $42 million. By comparison, as of year-end 2023, the Debtors' annual revenues totaled approximately $3.7 billion, and their total assets equaled approximately $3.5 billion.  Thus, the estimated annual cost of all of the Incentive Plans is only approximately 1.1% of the Debtors' annual revenues and 1.2% of the Debtors' total assets.  On the other hand, the potential cost of losing these Employees if they were not paid their incentive payments under the Incentive Plans during the Debtors' restructuring would be devastating to the Debtors' business.  Failure to receive nearly 12% of one's anticipated compensation could lead to a mass exodus of the Debtors' Employees.

17.     None of the Employees who will receive payments under the Incentive Plans are directors, officers, or controlling persons of any Debtor.  Certain Employees hold titles such as "director" or "executive"; however, these titles are designed to demonstrate their skill and expertise, supporting the credibility they need in the industry to perform their respective roles. None of these Employees have discretionary decision-making authority on policy issues, the overall direction of the Debtors' control, or any material corporate transaction.  Rather, the scope of the authority of each Employee is limited and subject to the ultimate oversight and approval

8

by the Debtors' executive officers and boards of directors.  Additionally, none of the Employees

were appointed by, or directly report to, any board of directors of the Debtors.

## **CONCLUSION**

18.      Based on the foregoing, I believe that the Incentive Plans are justified by the facts

and circumstances of these Chapter 11 Cases, and the continuation of the Incentive Plans is in

the best interests of the Debtors, their estates, and their stakeholders.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my information, knowledge, and belief.

Dated: June 10, 2024

/s/ Joseph W. Bliley
Joseph W. Bliley
Chief Restructuring Officer
GOL Linhas Aéreas Inteligentes S.A.

## **EXHIBIT C**

**Georgeson Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
                                  :

In re:                              :     Chapter 11
                                    :

GOL LINHAS AÉREAS INTELIGENTES S.A.,   :     Case No. 24-10118 (MG)
*et al.*,[1]                               :
                                    :

                 Debtors.            :     (Jointly Administered)
                                    :
----------------------------------------------------------x

## DECLARATION OF ZACHARY P. GEORGESON
## IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER
## CONFIRMING THE DEBTORS' AUTHORITY TO MAKE INCENTIVE
## PLAN PAYMENTS TO THEIR NON-INSIDER EMPLOYEES DURING
## THE CHAPTER 11 CASES IN ACCORDANCE WITH THE WAGES ORDER

I, Zachary P. Georgeson, make this declaration under 28 U.S.C. § 1746:

1.      I am a Managing Director at Willis Towers Watson U.S. LLC ("WTW"), an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. On December 3, 2023, GOL Linhas Aéreas Inteligentes S.A., one of the above-captioned debtors and debtors-in-possession (collectively, "GOL" or the "Debtors"), engaged WTW to provide certain compensation consulting services.

2.      I submit this declaration (the "Declaration") in support of *Debtors' Motion for Entry of an Order Confirming the Debtors' Authority to Make Incentive Plan Payments to Their Non-Insider Employees During the Chapter 11 Cases in Accordance with the Wages Order* (the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

"Motion").[2]

3.      Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge; my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; information obtained from members of the Debtors' management team and advisors; my review of the Debtors' business and compensation practices; research conducted by myself and my team into compensation practices for similarly situated companies; my and my team's research into the ordinary course incentive-based plans among firms that went through chapter 11 proceedings; my experience in developing such plans; my experience working with similarly situated companies that have sought relief under chapter 11; as well as research conducted by myself and my team into local Brazilian market employee compensation practices, including guidance and counsel my team and I received from our local market counterparts on prevalent compensation practices in the Brazilian market.  I am over the age of eighteen, and, if called upon to testify, I would testify competently to the facts and opinions set forth in this declaration.

4.      For the reasons described below, it is my opinion that the scope and design of current ordinary course incentive-based plans GOL has in place are reasonable and generally consistent with market practice and my experience with similarly situated companies that have sought relief under chapter 11.

### BACKGROUND AND QUALIFICATIONS

5.      I received my Bachelor's degree in Finance from Indiana University Bloomington in 2002.  After working at Deloitte Consulting LLP and Capital H Group, I joined WTW in 2008, and have since been employed by WTW.

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings set forth in the Motion.

6.      WTW is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation. Services offered by WTW include actuarial, compensation, performance management, employee benefits design, communication and administration, organizational communication, human resources effectiveness, and reinsurance and risk management.

7.      As the Co-Chair of WTW's North America Executive Compensation and Board Advisory practice, my responsibilities at WTW have primarily involved providing expert compensation advise to Compensation Committees and executive management teams at mid- and large-sized companies. I routinely work with public and private companies across various industries regarding compensation philosophy development, pay competitiveness, incentive plan design, and other compensation related analyses. I have worked with numerous Fortune 1000 companies and have participated in the development and design of over 100 management and employee incentive plans for companies in and outside of bankruptcy.

8.      I am highly experienced in advising clients regarding compensation matters, specifically within the context of a restructuring or bankruptcy, with approximately twenty-two years of experience in the field. During this time, I have worked closely with a range of companies undergoing financial restructurings to develop a variety of prepetition and post-petition compensation arrangements, including compensation programs for senior executives and non-executive employees. Specifically, I have led or co-led the review, design, and evaluation of key employee incentive programs, key employee retention programs, and other similar programs in a number of recent chapter 11 cases, including Aegean Marine, Akorn, American Airlines, American Tire Distributors, AppHarvest, Aspect Software, Avaya, Avianca S.A., Blockfi, Bonanza Creek, Breitburn Energy, Caesars Entertainment Operating Company,

California Pizza Kitchen, Carestream Health, Chaparral Energy, Chesapeake Energy, Cineworld, ConvergeOne, Cumulus Media, David's Bridal, Energy Future Holdings, EXCO Resources, Fieldwood Energy, Frontier Communications, Full Beauty Brands, GenOn Energy, Gymboree, Hornbeck Offshore, iHeartMedia, Intelsat, Invacare, JCPenney, Jones Energy, Lannett, McDermott, NanoString, Nordic Aviation, Oasis Petroleum, OneWeb, Pier One, RadioShack, Republic Airways, Sabine Oil & Gas, Samson Resources, Sheridan Production, Southeastern Grocers, Speedcast, Stage Stores, Takata, Talen, Teligent, Tops Grocers, Westmoreland, and Windstream Holdings.  I am also currently active in a variety of restructuring matters that are not yet in the public domain.

## WTW's INVOLVEMENT WITH THE DEBTORS

9.    Since WTW was retained by the Debtors on December 3, 2023, I familiarized myself with the Debtors' operations, business, and restructuring efforts.  At the outset of our engagement, WTW discussed with the Debtors and their advisors the Debtors' operational history, financial performance, restructuring process, and various other issues and areas of concern regarding the Debtors' workforce and employee programs.  WTW reviewed the structure of the Debtors' prepetition base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

## OVERVIEW OF ORDINARY COURSE INCENTIVE PLANS

10.    Pursuant to the Motion, the Debtors are seeking approval to maintain the ordinary course employee compensation programs for the non-insider Employees.  In particular, I understand that in the ordinary course of business, the Debtors maintain certain incentive plans for different categories of non-insider Employees.  These incentive plans (collectively, the

"Incentive Plans") include:

    a. *Revenue Sharing Program*: Cash payment paid annually to majority of eligible Employees (approximately 14,000 employees hired before September 2023) based on the Debtors' achievement of corporate financial and operational results.

    b. *Incentive Bonus Program*: Cash bonus paid annually for a limited number of senior Employees (approximately 200 employees) with payments based on department-specific operational and financial targets.

    c. *Operational Supervisor Incentive Program*: Cash payment paid semi-annually to Employees serving in operational supervisor roles related to airport, crew, cargo, maintenance services, call centers, and warehouses (approximately seventy employees). Payments are based on targets linked to short-term individual operational indicators, such as on-time performance, cost control and reduction, and reductions in baggage mishandling.

    d. *Operational Reward Program*: Cash payment paid in semi-annual installments to Employees in various operational roles related to airport, crew, cargo and maintenance services, call centers, and warehouses (approximately 11,100 employees). Payments are based on short-term operational targets, such as on-time performance, cost control and reduction, and reductions in baggage mishandling, that are reviewed semiannually.

11.    WTW understands that these Incentive Plans represent qualified "Profits and Results Sharing Programs" under Brazilian labor laws. The Debtors seek the authority to continue the Incentive Plans at their reasonable discretion and consistent with their prepetition practices in order to retain valuable Employees and preserve employee morale as the Debtors seek to implement a successful reorganization.

## ASSESSMENT OF THE INCENTIVE PLANS

12.    In assessing the reasonableness of the Incentive Plans, I worked with my team to review the practices among recent bankruptcy cases, focusing on the airline industry and large, capital-intensive companies headquartered in Latin America. Specifically, we reviewed the following ten bankruptcy cases which disclosed maintaining ordinary course non-insider incentive plans: Automotores Gildemeister SpA (2021), Avianca Holdings S.A. (2020), Grupo

Aeroméxico, S.A.B. de C.V. (2020), Grupo Posadas, S.A.B. de C.V. (2021), LATAM Airlines Group S.A. (2020), Philippine Airlines, Inc. (2021), Republic Airways Holdings Inc. (2016), SAS AB (publ) (2022), Ultrapetrol (Bahamas) Limited (2022), WOM S.A. (2024).

13.     Additionally, my team and I reviewed available market data on normal course incentive plan practices in the Brazilian market.  This included the review of available incentive plan design survey data.  In addition, my team and I consulted with WTW's local Brazilian market compensation expert, who provided further commentary and context on typical Brazilian compensation market practices, including insights on legislative and union-based factors that inform compensation programs and practices in the Brazilian market.

14.     I also relied upon my significant consulting experience in the analysis and design of incentive programs generally at dozens of other companies.

15.     Based on my and my team's review, summarized below are our observations:

a.     The scope and design of the Incentive Plans are reasonable and within the range of both normal course local market practices and observed practices among the bankruptcy cases reviewed.

b.     Incentive compensation programs, in addition to monthly wages, are a common part of employee compensation programs in the Brazilian labor market, as over 90% of companies surveyed by WTW operate incentive programs for employees.  Additionally, in all ten of the bankruptcy cases reviewed, normal course incentives for the broad-based employee populations were maintained postpetition.

c.     Eligibility for incentive compensation programs typically includes senior management employees, middle managers and senior professionals, supervisory and professional employees, and technical and business support employees.

d.     The use of multiple incentive programs specifically designed to motivate and reward distinct groups of employees is common market practice.  Tailoring the design of programs based on the specific roles and responsibilities of eligible employees ensures the effectiveness of the programs in motivating the desired behavior and outcomes.  As observed in the bankruptcy cases, the number of continued non-insider incentive programs ranged from one to five, with

incentive programs tailored to certain roles (e.g., pilot plan, airport employee plan, etc.).

e. Payouts under the Incentive Plans are contingent on the achievement of goals set on various incentive metrics. These metrics represent the Debtors' performance, measured based on financial and operational metrics, as well as departmental, functional unit, or team specific results. It is common for employee incentive plans to reward performance at an overall organizational level as well as at a department, functional unit, and/or team level.

f. The metrics used as the basis for plan payouts include financial measures such as revenue, EBITDA, costs, and operating budgets. In addition, payouts are contingent on goals established for operating performance including measures such as on time flight performance, aircraft turnaround times, fuel consumption, baggage handling, safety, and customer service. The use of a combination of financial and operational measures, including industry specific metrics, in employee incentive programs is common and creates incentives for successful financial outcomes and effective operation of the business.

g. The participants in the Incentive Plans have specific target incentive payouts for achieving desired results, which are defined as a multiple of monthly salary. These incentive targets vary by the level of the eligible participants. Available market data indicates that over 95% of Brazilian companies with performance-based employee incentive plans established defined target incentive opportunities for plan participants.

h. As required for qualification under Brazilian labor law as Profits and Results Sharing Programs, payouts under the plans are made in no more than two installments within a calendar year.

## **CONCLUSION**

16. Based on my education, experience with employee incentive compensation programs employed by chapter 11 debtors and in the normal course, and the work I have done in these Chapter 11 Cases, I believe that the design, and structure of the non-insider Incentive Plans are reasonable given the facts and circumstances of these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: June 10, 2024                              /s/ *Zachary P. Georgeson*
                                                  Zachary P. Georgeson
                                                  Managing Director
                                                  Willis Towers Watson U.S. LLC

## **EXHIBIT D**

**Lima Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                               :

In re:                              :    Chapter 11

                               :

GOL LINHAS AÉREAS INTELIGENTES S.A.,  :    Case No. 24-10118 (MG)
*et al.*,[1]                            :

                               :

                Debtors.        :    (Jointly Administered)

                               :
---------------------------------------------------------------x

**DECLARATION OF ALOIZIO RIBEIRO LIMA**
**IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**CONFIRMING THE DEBTORS' AUTHORITY TO MAKE INCENTIVE**
**PLAN PAYMENTS TO THEIR NON-INSIDER EMPLOYEES DURING**
**THE CHAPTER 11 CASES IN ACCORDANCE WITH THE WAGES ORDER**

I, Aloizio Ribeiro Lima, make this declaration under 28 U.S.C. § 1746:

1.      I am a partner at Lefosse Advogados ("Lefosse"). I joined Lefosse's practice in 2014. I have over thirty years of experience in labor and employment law in Brazil. At Lefosse, I have advised numerous national and international companies in preventative and litigation matters, both administrative and judicial, in the Brazilian labor courts.

2.      Lefosse has been engaged by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") as their Brazilian counsel for general corporate matters, including labor and employment matters, since 2012. I lead Lefosse's labor team in providing labor and employment advice to the Debtors.

3.      I submit this declaration (the "Declaration") in support of the *Debtors' Motion*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

*for Entry of an Order Confirming the Debtors' Authority to Make Incentive Plan Payments to Their Non-Insider Employees During the Chapter 11 Cases in Accordance with the Wages Order* (the "<u>Motion</u>").[2]  I am not being specifically compensated for this testimony other than through payments received by Lefosse as a professional retained by the Debtors.  I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors.

4.    Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' compensation programs gained throughout Lefosse's engagement by the Debtors, my discussions with the Debtors' senior management, other members of the Lefosse team, and the Debtors' other advisors, my review of relevant documents, and my opinion based upon my experience.  If called to testify, I would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or my opinions based upon my related professional experience.

5.    I am fluent in Portuguese and English.  While I consider my English to be fluent and I make this Declaration without the aid of a translator, if called upon to testify, I would testify to the matters addressed in this Declaration with the aid of a translator, as English is my second language.

<b><u>BRAZILIAN LABOR LAWS</u></b>

6.    As described in the Wages Motion, the Debtors maintain three Incentive Plans for their Employees (the Revenue Sharing Plan, the Operational Supervisor Incentive Program, and the Operational Reward Program), each of which are provided for pursuant to the terms of their CBA with the Union of Aviation Workers in the State of São Paulo, the Union of Aviation Workers of the Municipalities of Campinas, Sorocaba and Jundiaí, the Union of Aviation

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings set forth in the Motion.

Workers of Minas Gerais, the Union of Aviation Workers in the State of Alagoas, the Union of Aviation Workers in the State of Amazonas, the CBA with the Union of Aviation Workers in Gaurulhos, the CBA with the Union of Aviation Workers in Pernambuco, the CBA with the Union of Workers in Air Transport Companies in the City of Rio de Janeiro, the CBA with the Union of Aviation Workers in Porto Alegre, and the CBA with the National Union of Aviation Workers (collectively, the "Unions").  The CBAs govern the Debtors' incentive payment obligations to their current Employees and former employes that were still Employees during the term of the applicable CBA.  The CBAs include substantially the same terms for Incentive Plan payments.  The Debtors also maintain a fourth incentive plan, the Incentive Bonus Program, which is not required under the CBAs, but for which the Debtors were permitted by the CBAs to provide their Employees, and for which, like the other Incentive Plans, the Debtors are required to perform and make payments under in accordance with its terms under Brazilian law.

7.      The Brazilian Federal Constitution mandates that both employees and employers in various sectors must be represented by their respective unions within a designated territory. CONSTITUIÇÃO FEDERAL [C.F.] [CONSTITUTION] art. 8 (Braz.).[3]  Typically, such unions represent employees within a state, but there are also unions for municipalities.  For example, aviation workers in the state of São Paulo are represented by one union, while aviation workers in the state of Alagoas are represented by another union.  Employers are also represented by unions in the same respect, so aviation employers in the state of São Paulo are represented by one union,

---

[3]      Article 8 of the Brazilian Federal Constitution provides:  "Professional or trade union association is free, observing the following: I - the law cannot require State authorization for the foundation of a union, except for registration with the competent authority, with public authorities prohibited from interfering in or intervening in union organization; II - the creation of more than one union organization, at any level, representing a professional or economic category, in the same territorial base, is prohibited. This base will be defined by the interested workers or employers and cannot be smaller than a municipality; III - it is the union's role to defend the collective or individual rights and interests of the category, including in judicial or administrative matters . . . ."

while aviation employers in the state of Alagoas are represented by another union.

8.     A general collective bargaining agreement ("General CBA") between an employer union and an employee union applies to all employees within the specified territory and sector that the unions represent. CONSOLIDAÇÃO DAS LEIS DO TRABALHO [C.L.T.] [LABOR CODE] art. 611 (Braz.).[4] Therefore, the employees within the territory and sector represented by the union are entitled to any rights in the General CBA, regardless of whether the employees are directly associated with the union (i.e., voluntarily pay additional union fees).

9.     Brazilian companies also have the option to directly negotiate with their employees' unions in each state to establish specific collective bargaining agreements ("Specific CBAs"). _Id._ art. 611, § 1.[5] These agreements allow companies to establish employee compensation terms that better suit their needs or to grant different or additional rights to their employees represented by the applicable union. The provisions of Specific CBAs supersede those in the General CBA.

10.     In the ordinary course of business, both small and large Brazilian companies enter into Specific CBAs with the labor unions. Companies frequently choose to negotiate Specific CBAs, since more often than not, the General CBA includes terms that are overly broad, or the company wants to modify the terms of compensation for their employees. The terms of such Specific CBAs for large Brazilian companies are typically the product of significant negotiations between the companies and the labor unions. Although incentive plans may be included in a

---

[4]    Article 611 of the Brazilian Labor Code states: "A Collective Bargaining Agreement is a normative agreement through which two or more unions representing economic and professional categories stipulate working conditions applicable, within the scope of their respective representations, to individual labor relations."

[5]    Section 1 of Article 611 of the Brazilian Labor Code provides: "It is allowed for unions representing professional categories to enter into Collective Agreements with one or more companies of the corresponding economic category, stipulating working conditions applicable within the company or to the respective labor relations of the parties involved."

General CBA, Brazilian companies typically enter into Specific CBAs to establish such incentive plans. *See generally* C.L.T. art. 620 (specifying that "the conditions established in a collective bargaining agreement will always prevail over those stipulated in a collective labor convention").[6]  Additionally, Brazilian law permits incentive payment agreements to be executed either directly with the employees' union or through an internal commission of employees with the assistance of the employees' representative union. *See* CÓDIGO CIVIL [C.C.] [CIVIL CODE] Lei No. 10,101/00, art. 2.[7]

11.     The Debtors are a party to CBAs that govern their current and former Employees' incentive compensation.  The CBAs protect the rights of all of the Debtors' Employees.  The Debtors re-negotiate the terms of the CBAs on a yearly basis with the Unions that represent the Debtors' Employees in the various regions in Brazil in which the Debtors operate.  The Debtors' current CBAs with the Unions cover payments in 2024 calculated based on 2023 year-end financial results of the Debtors.

12.     The CBAs governs payments to Employees under the Incentive Plans.  Clauses 5.1.1, 5.1.3, and 5.1.5 of the CBAs require the Debtors to make payments under the Revenue Sharing Program, which is described in paragraphs 36–37 of the Wages Motion.  Clause 5.1.2 of the CBAs requires the Debtors to make payments under the Operational Reward Program, which is described in paragraph 41 of the Wages Motion, and clauses 5.1.2 and 5.1.4 of the

---

[6]     A "collective labor convention" is a General CBA.

[7]     Article 2 of Law No. 10,101/00 of the Brazilian Civil Code provides:  "Profit-sharing shall be negotiated between the company and its employees through one of the following procedures, chosen by mutual agreement between the parties: : . . . I. *A parity commission chosen by the parties, which shall also include a representative appointed by the respective union*; : . . . II. *Collective agreement or convention*. : . . . §1. The instruments resulting from the negotiation must contain clear and objective rules regarding the establishment of substantive rights to profit-sharing and procedural rules, including mechanisms for verifying the information related to the fulfillment of the agreement, the frequency of distribution, the duration period, and deadlines for agreement review. . . . " (emphasis added).

CBAs require the Debtors to make payments under the Operational Supervisor Incentive Program, which is described in paragraph 40 of the Wages Motion. In addition, clause 5.5 of the CBAs allows the Debtors to make payments under the Incentive Bonus Program, which is described in paragraph 38 of the Wages Motion. Employees are entitled to Incentive Plan payments under the CBAs and as required by Brazilian labor law as compensation principally for work performed by the Employees during the term of their employment with the Debtors.

13.    The terms of the CBAs are similar to collective bargaining agreements of other airlines that operate in Brazil, such as TAM Aviação Executiva e Táxi Aéreo S/A ("TAM"). The Debtors' CBAs and TAM's collective bargaining agreement have similar provisions, such as: (i) validity only for one year, (ii) goals correlated to EBIDTA margin, (iii) a minimum EBITDA to trigger payments, (iv) different incentive payment amounts depending on EBITDA margin reached, and (v) similar maximum incentive payment amounts employees may reach. The Debtors' CBAs have additional corporate goals and other goals related to specific sectors, so the Debtors' CBAs are more comprehensive than TAM's collective bargaining agreement. Additionally, Delta Air Lines, Inc. and United Airlines, Inc. also have collective bargaining agreements with their Brazilian employees that mandate incentive programs.[8] Other large Brazilian companies in different sectors also have Specific CBAs with incentive program provisions similar to those in the Debtors' CBAs, like: (i) Petróleo Brasileiro S.A. – PETROBRAS (oil sector) (similar corporate targets for employees to receive incentive payments and payment caps), (ii) Vale S/A (mining sector) (distinct corporate metrics and

---

[8]    *See Delta Airlines Aprova Acordo de PLR*, Sindicato dos Aeroviários de Guarulhos (Feb. 11, 2020), https://sindigru.org.br/2020/02/11/delta-airlines-aprova-acordo-de-plr/ (announcing an incentive program with payments equal to 16.6% of employees' annual earnings); *Sindigru Garante PLR para os Aeroviários na United Airlines*, Sindicato Dos Aeroviários de Guarulhos (Jan. 21, 2016), https://sindigru.org.br/2016/01/21/sindigru-garante-plr-para-os-aeroviarios-na-united-airlines/ (informing Brazilian airline workers at United Airlines that a profit sharing agreement was reached between the Sindigru union and the airlines).

formulas for calculating incentive payment amounts), and (iii) XP Investimentos Corretora de Câmbio, Títulos e Valores Mobiliários S/A (brokerage firm) (incentive payments tied to EBITDA metrics and corporate goals).

14.    The Debtors are required to make payments under the Incentive Plans pursuant to Brazilian law.  In fact, employers are required by the Brazilian Federal Constitution to make distributions to their employees based on the employers' overall financial and operational performance. C.F. art. 7, XI.[9]  Additionally, if an employer offers an incentive program to their employees pursuant to a collective bargaining agreement or otherwise, Brazilian labor laws require that the employer make such payments.  *See id.* art. 5, XXXVI.[10]  Thus, the Debtors cannot revoke Incentive Plan payments without exposure to lawsuits under Brazilian labor laws. There are no exceptions for nonpayment of the Incentive Plans under the CBAs or Brazilian law due to the Chapter 11 Cases.  Thus, failure to make payments under the Incentive Plans could expose the Debtors to liability in excess of the amounts owed to Employees under such plans.

15.    If the Debtors do not make payments under the Incentive Plans, the labor unions could initiate collective actions, or Employees may initiate individual lawsuits, in Brazilian labor courts.  C.F. art. 8, III;[11] *id.* art. 7, XXIX.[12]  In this scenario, the Debtors would likely be held

---

[9]    Article 7, XI, of the Brazilian Federal Constitution provides:  "The rights of urban and rural workers, in addition to others aimed at improving their social condition, include: . . . XI - Participation in profits or results, not linked to remuneration, and, exceptionally, participation in the company's management, as defined by law."

[10]   Article 7, XXXVI, of the Brazilian Federal Constitution states:  "All persons are equal before the law, without distinction of any kind, guaranteeing to Brazilians and foreign residents in the country the inviolability of the right to life, liberty, equality, security, and property, as follows: . . . XXXVI - the law shall not harm vested rights, perfect legal acts, and res judicata."

[11]   Article 8 of the Brazilian Federal Constitution asserts:  "Professional or trade union association is free, observing the following: . . . III - it is the union's role to defend the collective or individual rights and interests of the category, including in judicial or administrative matters. . . ."

[12]   Article 7, XI, of the Brazilian Federal Constitution provides:  "The rights of urban and rural workers, in addition to others aimed at improving their social condition, include: . . . XXIX - lawsuit concerning credits resulting from employment relationships, with a five-year statute of limitations for urban and rural workers, up to a limit of two years after the termination of the employment contract."

liable for both the Incentive Plan payment plus damages under Brazilian labor laws.  *See* C.C. Lei No. 10.406/02 art. 402, 403, 404.[13]  Additionally, it is possible that Unions may initiate civil actions or that Employees may initiate collective actions in Brazil claiming collective moral damages in the event that the Debtors do not make Incentive Plan payments as required under CBAs.  *See* C.F. art. 170;[14] *see also* C.C. Lei No. 7.347/85 art.11.[15]  If the Debtors fail to comply with a court order to make payments, Brazilian courts could even issue judgment liens on the Debtors' property, seize the Debtors' assets, and freeze the Debtors' bank accounts for non-payment of Incentive Plan obligations.  It is also possible that the Employees, in conjunction with the Unions, may decide to initiate a shutdown of the Debtors' operations or engage in a strike if the Employees do not receive their Incentive Plan payments.  Finally, it is also worth noting that Brazilian courts are protective of employees, and as such, the Debtors may face challenges in attempting to use the Chapter 11 Cases as a defense to avoid payment.

---

[13]   As per Articles 402, 403, and 404 of Law No. 10.406/02 of the Brazilian Civil Code:

> Art. 402.  Except as expressly provided by law, damages owed to the creditor include, in addition to what he has actually lost, what he reasonably failed to profit from.

> Art. 403.  Even if the non-performance results from the debtor's fraud, damages only include actual damages and lost profits resulting directly and immediately from it, without prejudice to the provisions of procedural law.

> Art. 404.  Damages in obligations to pay in money shall be paid with monetary adjustment according to officially established indexes, including interest, costs, and attorney's fees, without prejudice to the conventional penalty.

> Sole paragraph.  If it is proven that the default interest does not cover the damage, and there is no conventional penalty, the judge may grant the creditor additional compensation.

[14]   Article 170 of the Brazilian Federal Constitution states:  "The economic order, based on the valorization of human labor and on free enterprise, aims to ensure everyone a dignified existence, in accordance with the dictates of social justice, . . . ."

[15]   Article 11 of the Law No. 7.347/85 of the Brazilian Civil Code ("Law of Public Civil Action") provides:  "In actions aimed at enforcing an obligation to do or not to do, the judge shall order the performance of the due activity or the cessation of the harmful activity, under penalty of specific enforcement or imposition of a daily fine, if sufficient or compatible, without the need for a request from the plaintiff."  Article 21 of the Law of Public Civil Action states:  "The defense of diffuse, collective, and individual rights and interests shall be subject, as applicable . . . ."

## **<u>CONCLUSION</u>**

16.     Based on the foregoing, I believe that the Debtors should be permitted to pay

Employees under the Incentive Plans during these Chapter 11 Cases.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my information, knowledge, and belief.

Dated: June 10, 2024

*/s/ Aloizio Ribeiro Lima*

Aloizio Ribeiro Lima
Partner
Lefosse Advogados

**<u>EXHIBIT E</u>**

**CBA**

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D

[GOL logo]

## COLLECTIVE BARGAINING AGREEMENT ON PROFIT SHARING – 2023

The **UNION OF AIRLINE EMPLOYEES OF THE STATE OF SÃO PAULO (***SINDICATO DOS AEROVIÁRIOS NO ESTADO DE SÃO PAULO***)**, a private legal entity, enrolled with the Corporate Taxpayers' Registry (CNPJ/MF) under No. 60.423.027/0001-19, headquartered at Avenida Washington Luiz, 6979, Congonhas, city of São Paulo, state of São Paulo, 04627-005, hereby represented by its President, Mr. Claudio de Carvalho, enrolled with the Individual Taxpayers' Registry (CPF) under No. 076.921.278-67;

the **UNION OF AIRLINE EMPLOYEES OF THE CITIES OF CAMPINAS, SOROCABA AND JUNDIAÍ (***SINDICATO DOS AEROVIÁRIOS DOS MUNICÍPIOS DE CAMPINAS, SOROCABA E JUNDIAÍ***)**, a private legal entity, enrolled with the Corporate Taxpayers' Registry (CNPJ/MF) under No. 16.775.221/0001-71, headquartered at Rua Saldanha Marinho, 1131, Botafogo, city of Campinas, state of São Paulo, 13013-081, hereby represented by its President, Mr. José Oliveira Silva, enrolled with the Individual Taxpayers' Registry (CPF) under No. 932.244.788-53;

the **UNION OF AIRLINE EMPLOYEES OF THE STATE OF MINAS GERAIS (***SINDICATO DOS AEROVIÁRIOS DE MINAS GERAIS***)**, a private legal entity, enrolled with the Corporate Taxpayers' Registry (CNPJ/MF) under No. 03.006.937/0001-62, headquartered at Rua Cacuera, 529, Jaraguá, city of Belo Horizonte, state of Minas Gerais, 31270-460, hereby represented by its President, Mr. Paulo de Tarso Gonçalves Junior, enrolled with the Individual Taxpayers' Registry (CPF) under No. 032.322.466-05;

the **UNION OF AIRLINE EMPLOYEES OF THE STATE OF ALAGOAS (***SINDICATO DOS AEROVIÁRIOS NO ESTADO DE ALAGOAS***)**, a private legal entity, enrolled with the Corporate Taxpayers' Registry (CNPJ/MF) under No. 19.539.351/0001-01, headquartered at Avenida Presidente Fernando Color de Melo, 109, city of Rio Largo, state of Alagoas, 57100-000, hereby represented by its President, Mr. Cristiano Calheiros de Lima, enrolled with the Individual Taxpayers' Registry (CPF) under No. 032.463.164-22;

the **UNION OF AIRLINE EMPLOYEES OF THE STATE OF AMAZONAS (***SINDICATO DOS AEROVIÁRIOS NO ESTADO DE AMAZONAS***)**, a private legal entity, enrolled with the Corporate Taxpayers' Registry (CNPJ/MF) under No. 01.472.553/0001-00, headquartered at Rua Coronel Francelino de Araújo, 51, block 70, suite 7, second floor, Cidade Nova 1, hereby represented by Mr. Williney Conegundes de Almeida, enrolled with the Individual Taxpayers' Registry (CPF/MF) under No. 604.973.602/25; hereinafter referred to as "UNIONS" and, on the other side,

**GOL LINHAS AÉREAS S/A**, headquartered at Avenida Vinte de Janeiro, passenger terminal No. 2 of the Antônio Carlos Jobim International Airport, city of Rio de Janeiro, state of Rio de Janeiro, 21941-570, enrolled with the Corporate Taxpayers' Registry (CNPJ/MF) under No. 07.575.651/0001-59, hereby represented pursuant to its bylaws; hereinafter referred to as "COMPANY,"

enter into this **COLLECTIVE BARGAINING AGREEMENT ON PROFIT SHARING – 2023**, pursuant to article 7, items XIII and XXVI, and article 8, items III and VI, of the Brazilian Federal Constitution, and articles 611 to 620 of the Brazilian Labor Law (*Consolidação das Leis do Trabalho*) ("CLT"), subject to all formal requirements set forth in article 613 of the CLT, known to the interested parties and fully approved at the Permanent Plebiscitary Extraordinary Meeting (*Assembleia Geral Extraordinária Plebiscitária Permanente*), held from **May 19 to May 25, 2023**, pursuant to article 612 of the CLT, as follows:

## SECTION 1 – EFFECTIVENESS

This agreement is effective for 12 months, from January 1, 2023, irrespective of subsequent execution, to December 31, 2023.

## SECTION 2 – APPLICABILITY

This Collective Bargaining Agreement applies to GOL's employees and the entire category of AIRLINE EMPLOYEES, pursuant to Law No. 1,232/1962.

**Voegol.com.br**                    [digital initials]                    Page 1 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D

[GOL logo]

## SECTION 3 – PAYMENT EXCLUSION

In the event of a large-scale plane crash, this profit-sharing program will become infeasible, irrespective of the achieved result and time of occurrence, and the relevant assessment of profits and any payments will cease.

**SOLE PARAGRAPH**. The characterization of the event is under the responsibility of the Aviation Accident Investigation and Prevention Center (*Centro de Investigação e Prevenção de Acidentes Aeronáuticos* – CENIPA).

## SECTION 4 – PROFIT-SHARING PROGRAM

GOL agrees to make payments under the Profit-Sharing Program ("PSP") to airline employees covered by this agreement, as an incentive regarding quality and productivity in fiscal year 2023, pursuant to this instrument and the rules set forth herein, which must be fully met, pursuant to article 7, item XI, of the Brazilian Federal Constitution and Law No. 10,101, dated December 19, 2000.

## SECTION 5 – THE STRUCTURE OF THE PROFIT-SHARING SYSTEM

**5.1.** The Program sets forth semi-annual targets, as follows:

**5.1.1.** <u>Corporate PSP</u>: the Corporate PSP is subject to a trigger (EBITDA), tied to the achievement of corporate targets, and applicable to all working airline employees for an indefinite term, with an annual payment on a single date, after the assessment of profits for the first and second semesters of 2023, as defined in this agreement. For information on the achievement range, see item 5.3.

**5.1.2.** <u>Operating PSP</u>: the Operating PSP is not subject to the EBITDA margin and is tied to the achievement of operating targets, applicable to working airline employees, for an indefinite term, who perform operating functions, with semi-annual payments of up to 25% of their base salary, limited to 50% of the base salary per year.

**5.1.3.** <u>Administrative and Leadership PSP</u>: the Administrative and Leadership PSP is not subject to the EBITDA margin and is tied to the achievement of administrative targets, applicable to working employees, for an indefinite term, who perform administrative or leadership functions, limited to 50% per year of the salary multiple based on the hierarchical level. The salary multiple will be equal to or above one base salary. Payments will be made annually on a single date, after the assessment of profits for the first and second semesters of 2023, as defined in this agreement.

**5.1.4.** <u>Sales PSP</u>: the Sales PSP is not subject to the EBITDA margin and corporate targets, and is applicable to Commercial and Sales Executives, tied to the achievement of indicators related to GOL's Revenue, Customers and Portfolio. Payments will be made annually in two installments. GOL's written communications represent evidence of targets and results.

**5.1.5.** <u>Business Unit PSP</u>: the Business Unit PSP is not subject to the EBITDA margin and corporate targets, and is applicable to employees who have no direct or indirect influence on GOL's corporate trigger, tied to the achievement of indicators related to revenue, productivity, invoicing, customers, projects, sales, partnerships and financial operations, among others. In this case, employees will be previously informed about their classification under the program. Amounts paid will be determined based on the final financial result and salary targets will be based on hierarchical level, in amounts equal to or above one base salary. Payments will be made annually on a single date, after the assessment of profits for the first and second semesters of 2023, as defined in this agreement.

**5.2.** GOL agrees to pay to its airline employees PSP amounts pursuant to this agreement, which amounts will not be a part of their compensation, for all legal purposes.

**5.2.1.** The total PSP provided for in this Agreement comprises corporate targets (applicable to all areas, except Commercial and Sales Executives), in addition to the specific targets for each Group: Administrative, Leadership and Operating Groups.

**Voegol.com.br**                    [digital initials]                    Page 2 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D
[GOL logo]

**5.2.2.** The Business Unit PSP comprises targets and metrics set forth by management and subject to revenue and invoicing.

**5.3.** The payment of the Corporate PSP, based on trigger and corporate targets, will only be made if GLAI's minimum EBITDA (earnings before interest, taxes, depreciation and amortization) margin is achieved. The achievement of the EBITDA margin will correspond to 50% of the calculation and the other 50% will correspond to pre-established Corporate targets, assessed and informed on a semi-annual basis, weighted based on the semi-annual weight:

### 5.3.1. First Semester of 2023, with a 40% weight:

**5.3.1.1.** EBITDA (Trigger) equal to or above 17.5% in the first semester of the fiscal year, *i.e.*, the trigger applies as of the achievement of 17.5% of the margin, with the payment of up to 10% of one base salary. The distribution of the Corporate PSP will follow a linear growth curve until the achievement of 21.9% of the margin, allowing the payment of up to 20% of one salary.

Corporate targets tied to the EBITDA trigger correspond to the other 50% of the calculation, allowing the payment of an additional amount of up to 20%. If the trigger is not achieved, this installment will not be payable, even if the result is equal to or above 100%.

### 5.3.2. Second Semester of 2023, with a 60% weight:

**5.3.2.1.** EBITDA (Trigger) equal to or above 24% in the second semester of the fiscal year, *i.e.*, the trigger applies as of the achievement of 24% of the margin, with the payment of up to 15% of one base salary. The distribution of the Corporate PSP will follow a linear growth curve until the achievement of 28% of the margin, allowing the payment of up to 30% of one base salary.

Corporate targets tied to the EBITDA trigger correspond to the other 50% of the calculation, allowing the payment of an additional amount of up to 30%. If the trigger is not achieved, this installment will not be payable, even if the result is equal to or above 100%.

**5.3.3.** Targets, as well as calculation and payment, are independent, *i.e.*, amounts will be assessed and paid in each semester based on semi-annual achievement, on a cumulative basis. Corporate PSP will not be paid if the corporate trigger is not simultaneously achieved in both semesters.

**5.4.** The calculation of the amount payable to airline employees as Corporate PSP is set forth in the table below, based on the percentages to be achieved for each of the corporate targets and the relevant weights for the calculation of the payable Corporate PSP, as proposed for each semester of 2023 by GOL:

**Table for the distribution of the Corporate Target for the First Semester of 2023**

| Indicators | Unit | Decimal places | Weight | Minimum | | Target | | Over-achievement | |
|---|---|---|---|---|---|---|---|---|---|
| EBITDA margin (Trigger and Corporate) | % | 1 | 40% | < | 50.0% | >= | 100.0% | >= | 140.0% |
| Results indices | | | 60% | | | | | | |
| Use of Operating Fleet | h/ aircraft | 2 | 10% | < | 10.52 | >= | 11.08 | >= | 11.63 |
| Cask Ex-Fuel | R$ c | 2 | 30% | < | 20.58 | >= | 19.60 | >= | 18.62 |
| Net Rask | R$ c | 2 | 30% | < | 37.24 | >= | 39.20 | >= | 41.16 |
| Smiles Corporate | Pts | 0 | 10% | < | 80 | >= | 100 | >= | 120 |
| Generation of Free Cash Flow | R$ million | 1 | 20% | < | 0.0 | >= | 100.0 | >= | 276.9 |
| Customers indices | | | 30% | | | | | | |
| Digital channels NPS | pts | 0 | 30% | < | 5 | >= | 14 | >= | 24 |
| NPS | pts | 0 | 15% | < | 43 | >= | 45 | >= | 47 |
| Self-service index | % | 1 | 25% | < | 68.0 | >= | 70.0 | >= | 72.0 |
| D0 punctuality | % | 1 | 15% | < | 67.7 | >= | 68.7 | >= | 71.8 |
| D15 punctuality | % | 1 | 15% | < | 83.3 | >= | 84.3 | >= | 87.4 |
| NODSO* (TOTAL AND PER GROUP) | # | 0 | 10% | < | 94 | >= | 100 | >= | 120 |

**Voegol.com.br**                    [digital initials]                    Page 3 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D
[GOL logo]

*Translator's note: NODSO (*nível ótimo de desempenho de segurança operacional*): optimum level of operating safety performance.

**Table for the distribution of the Corporate Target for the Second Semester of 2023**

| Indicators | Unit | Decimal places | Weight | Minimum | | Target | | Over-achievement | |
|---|---|---|---|---|---|---|---|---|---|
| EBITDA margin (Trigger and Corporate) | % | 1 | 60% | < | 50.00% | >= | 110.00% | >= | 140.00% |
| Results indices | | | 60% | | | | | | |
| Use of Operating Fleet | h/ aircraft | 2 | 10% | < | 10.72 | >= | 11.28 | >= | 11.84 |
| Cask Ex-Fuel | R$ c | 2 | 30% | < | 21.00 | >= | 20.00 | >= | 18.7 |
| Net Rask | R$ c | 2 | 30% | < | 41.00 | >= | 43.00 | >= | 45.00 |
| Smiles Corporate | Pts | 0 | 10% | < | 80 | >= | 100 | >= | 120 |
| Generation of Free Cash Flow | R$ million | 1 | 20% | < | 0 | >= | 100 | >= | 276.9 |
| Customers indices | | | 30% | | | | | | |
| Digital channels NPS | pts | 0 | 30% | < | 5 | >= | 14 | >= | 24 |
| NPS | pts | 0 | 15% | < | 37 | >= | 39 | >= | 41 |
| Self-service index | % | 1 | 25% | < | 70 | >= | 72 | >= | 74 |
| D0 punctuality | % | 1 | 15% | < | 60.1 | >= | 62.8 | >= | 65.9 |
| D15 punctuality | % | 1 | 15% | < | 77.0 | >= | 80.1 | >= | 82.8 |
| NODSO* (TOTAL AND PER GROUP) | # | 0 | 10% | < | 94 | >= | 100 | >= | 120 |

*Translator's note: NODSO (*nível ótimo de desempenho de segurança operacional*): optimum level of operating safety performance.

**5.4.2.** If at least one or more components of the Corporate Target Indices are not FULLY achieved, the relevant weight will not be taken into account in the determination of the total amount payable as Corporate PSP (minimum corporate target not achieved = 0 'zero').

**5.4.3.** For purposes of calculation of:
(i)     Operating and Administrative PSP: maximum achievement of 100%;
(ii)    Leadership PSP: maximum achievement of 154%, upon achievement of the engagement accelerator of 10%.

**5.5.** Once the projected EBITDA results and other corporate targets are achieved, airline employees holding Technical Leadership positions (Specialists, Consultants, Doctors and Engineers), and Administrative and Management Leadership positions (Supervisors, Coordinators, Managers, Executive Managers, Officers, Executive Officers, Vice Presidents and President) may receive an additional payment, for each level based on salary multiples with target multiples equal to and/or above one base salary for all levels of the group, in accordance with the Balance Scorecard (BSC) method and performance indicators.

**5.5.1.** The results of the achieved Corporate and Individual targets (BSC) are validated by Members of Management and reviewed by the Performance Assessment Committee, and are included in the calculation of the total amount payable as Corporate PSP, based on the analysis of proportionality and eligible participants.

**5.5.2.** Information on targets is available to all airline employees who have individual, administrative and leadership targets. Monitoring through a target management tool is available at: bsc.voegol.com.br.

**5.5.3.** PSP Calculation

**(A)** EBITDA
**(B)** Corporate
**(C)** Corporate Result
**(D)** 1st Semester (Weight)
**(E)** 2nd Semester (Weight)
**(F)** Base Salary
**(G)** Salary Target
**(H)** Corporate Target
**(I)** Operating Target
**(J)** Administrative and Leadership Target

**(K)** Corporate Result
**(L)** Operating Result
**(M)** Administrative and Leadership Result
**(N)** Individual Targets Result (BSC)
**(O)** Corporate Weight: **60% to 100%**
**(P)** Individual Weight: **0% to 40%**
**(Q)** Corporate PSP
**(R)** Operating PSP
**(S)** Administrative and Leadership PSP
**(T)** Total PSP

**Voegol.com.br**                    [digital initials]                    Page 4 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D
[GOL logo]

**Corporate Result**
**C=(A*50%)+(B*50%)**
**D=(C*40%)**
**E=(C*60%)**

**5.5.3.1.** Corporate PSP – covers all GOL's employees: $Q_t= Q_{1st}+ Q_{2nd}$

a) First Semester of 2023: $Q_{1st}= F*G*H*K*D*(O+(N*P))$

b) Second Semester of 2023: $Q_{2nd}=F*G*H*K*E*(O+(N*P))$

**5.5.3.2.**    Operating PSP based on area and function: $R_t= R_{1st}+R_{2nd}$

a) First Semester of 2023: $R_{1st}= (F*I*L)/2$

b) First Semester of 2023: $R_{2nd}= (F*I*L)/2$

**5.5.3.3.** Administrative and Leadership PSP based on function: $S_t= S_{1st}+ S_{2nd}$

a) First Semester of 2023: $S_{1st}= (F*G*J*M)/2$

b) First Semester of 2023: $S_{2nd}= (F*G*J*M)/2$

**5.5.3.4.** Annual Total PSP: **$T= Q_t+R_t+S_t$**

a)  For purposes of calculation, we consider zero employees who are not classified in one or more topics (Q; R and S).

**5.6.** Commercial and Sales Executives are entitled to receive Sales PSP, in semi-annual payments, based on the achievement of individual targets, and airline employees are eligible to this program, not subject to the corporate, administrative and leadership targets set forth in items 5.1 to 5.5.

**5.6.1.** Positions eligible to Sales PSP are: Commercial Executives (I, II and III) and Sales Executives (I, II and III).

**5.6.2.** Item 5.5 does not apply to the assessment of Sales PSP.

**5.6.3.** The Target attributed to Commercial and Sales Executives is tied to specific individual and cross-cutting indicators that are aligned with GOL's revenue guidelines.

| Eligible | Target Achievement | Limit Result (semester) |
|---|---|---|
| Sales and Commercial Executives | 90% | 0.5 salary |
| | 100% | 1.0 salary |
| | 120% | 1.5 salaries |

**5.6.4.** Specific individual indicators that refer to Net Sales Revenue, sales volume and portfolio quality are available in the in-house portal (*Programa Vendas Mais*).

**5.7.** Commercial or Sales Executives who overachieve targets by at least 10% and rank first in their comparison group will receive two additional salaries per semester.

**5.8.** Operating PSP: effective from January 1, 2023 to December 31, 2023.

**5.8.1.** Eligible Participants: employees of operating areas subject to a shift work regime, in Airports, Maintenance (Hangar and Line), CRC, GOLLOG, Warehouses, CCO, Shifts and Operations.

**Voegol.com.br**                    [digital initials]                                                    Page 5 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D

[GOL logo]

**5.8.2.** The payment of Operating PSP is subject to the achievement of specific targets of operating areas, corresponding to up to three indicators, not tied to GLAI's EBITDA (earnings before interest, taxes, depreciation and amortization) margin and corporate targets, corresponding to up to 50% of one base salary per year. The specific targets of operating areas will be established, assessed and informed on a semi-annual basis, and may be quarterly reviewed, without prejudice to gains. Payments of up to 25% of the base salary will be made every six months, and the second installment of up to 25% will be paid together with the Corporate PSP in the year subsequent to the fiscal year 2023. If targets are not established, amounts will not be payable under this program.

**5.9.** Administrative and Leadership PSP: effective from January 1, 2023 to December 31, 2023.

**5.9.1.** Eligible Participants: Administrative and Leadership employees.

**5.9.2.** The payment of Administrative and Leadership PSP is subject to the achievement of administrative indicators, not tied to GLAI's EBITDA (earnings before interest, taxes, depreciation and amortization) margin, and may be reviewed and renegotiated every semester, limited to 50% per year of the salary multiple for the relevant hierarchical level. The salary multiple will be equal to or above one salary. Payments will be made annually on a single date, after the assessment of the first and second semesters of 2023, as defined in this agreement. If targets are not established, amounts will not be payable under this program.

## SECTION 6 – ELIGIBILITY CRITERIA

### 6.1. Corporate, Operating, Administrative and Leadership PSP

**6.1.1.** The following are entitled to fully receive PSP:

a) airline employees who worked (working employees and employees on holidays) the entire semester from January 1, 2023 to June 30, 2023 and from July 1, 2023 to December 31, 2023 ("Covered Period").

b) employees on maternity leave during the Covered Period.

**6.1.2.** Airline employees hired in the Period from January 1, 2023 to June 30, 2023, first semester, and from July 1, 2023 to December 31, 2023, second semester, will receive their PSP in proportion to their period of work, as well as the achieved results, in the relevant period. The assessment of the number of supplementary months in the *pro rata temporis* calculation considers periods equal to or above 15 days as a worked month.

**6.1.3.** Employees who are dismissed during the Covered Period are subject to the following criteria:

a) employes who are dismissed with cause in any period will not be entitled to receive PSP;

b) employees who resign or are dismissed (without cause) will be entitled to receive PSP in proportion to the worked period;

**6.1.4.** Payments of PSP to dismissed employees who are entitled to this payment will be made by July 31, 2024.

**6.1.4.1.** The PSP amount will be deposited in the bank account included on GOL's records. In the event of changes, the dismissed airline employee must open a ticket by e-mail sent to atendimentodesligados@voegol.com.br by June 30, 2024. If the relevant banking institution returns the PSP amount due to failure to identify the account, the airline employee must update his or her data to receive the PSP amount by December 10, 2024. After this date, the airline employee will no longer be entitled to receive the PSP amount, which will be paid pursuant to eligibility criteria.

**6.1.5.** Trainees, self-employed workers, apprentices, temporary workers and third parties will not be entitled to receive PSP amounts.

**Voegol.com.br**                    [digital initials]                    Page 6 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D
[GOL logo]

**6.1.6.** Airline employees who have more than three unjustified work absences discounted from their Electronic Card Time during the Covered Period will not be entitled to receive PSP amounts. If airline employees have three or fewer absences, they will be entitled to receive full PSP amounts.

**6.1.7.** The airline employees entitled to receive PSP amounts, in proportion to the relevant worked periods, are those who, during the Covered Period, were:

a) on leave for any reason for 16 days or more, except employees on maternity leave;

b) on unpaid leave;

c) reinstated.

**6.1.8.** Airline employees on Disability Retirement are not entitled to receive PSP amounts.

## SECTION 7 – CONDITIONS FOR THE CALCULATION AND PAYMENT OF INCENTIVES

**7.1.** The calculation of the individual amount of incentives will be based on a single criterion, provided that the relevant targets are fully achieved, taking into account the base salary:

**7.1.1.** First Semester of 2023: Base Salary on June 30, 2023;

**7.1.2.** Second Semester of 2023: Base Salary on December 31, 2023;

**7.1.3.** The amounts paid as PSP will derive from up to two programs.

**7.2.** The amount of incentives offered to the airline employees covered by this agreement will include: base salaries in June 2023 for the first semester, and base salaries in December 2023 for the second semester, excluding, for all purposes and effects, any amounts paid as overtime, night-shift premium, replacement premium, premium for dangerous work, vacation, 13th salary, sales commission for 2023, and labor, social security and FGTS charges related to any period in 2023.

**7.3.** In the event of promotion of airline employees to Management and Technical Leadership positions during the Covered Period, the incentive amount will be calculated in proportion to the number of months worked in each of the relevant positions.

**7.3.1.** Promotions to Management and Technical Leadership positions from April to June for the first semester and/or October to December for the second semester will be based on the payment of the previous position, in the relevant semester.

**7.4.** The incentive amounts of airline employees who are transferred between areas will be calculated based on their allocation to the relevant area on June 30, 2023, for the first semester, and December 31, 2023, for the second semester.

**7.5.** The payment of Corporate PSP for 2023 and Operating, Administrative and Leadership PSP for the second semester of 2023 will be made by May 31, 2024, in a single installment, and the amounts for the first semester of 2023 will be deposited by October 31, 2023.

**7.5.1.** These payments will be made separately from the monthly payroll, upon deposit in the usual individual bank accounts of airline employees, and confirmed upon inclusion of these amounts in the paycheck specifically issued for this purpose.

## SECTION 8 – OBLIGATIONS

GOL agrees to comply with the terms of this agreement and the general labor protection provisions set forth in applicable law in favor of airline employees.

**SOLE PARAGRAPH.** In the absence of any complaint within 30 days from the receipt of an installment, payments will be considered correct and settled.

**Voegol.com.br**                     [digital initials]                                    Page 7 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil

DocuSign Envelope ID: 4DF358B7-A2EE-49DE-A813-AD6CEDC1DE6D
[GOL logo]

## SECTION 9 – NON-APPLICATION OF CHARGES

Pursuant to Law No. 10,101/2000, which provides for workers' profit sharing and other measures, the PSP under this agreement will be fully taxed, based on the progressive income tax table in effect.

**SOLE PARAGRAPH.** Pursuant to article 3, head provision, of the aforementioned law, the amounts paid as Profit Sharing to airline employees under this Agreement do not complement or replace the compensation payable as salary by GOL to its airline employees, and are not subject to any labor, social security or FGTS charges or to the principle of habituality.

## SECTION 10 – DEPOSIT AND REGISTRATION

In order to produce legal effects and become binding among the relevant workers, the parties will file and request the registration of this Collective Bargaining Agreement, through the *MEDIADOR* System, available at the electronic address of the Ministry of Labor and Employment on the internet (www.mte.gov.br), pursuant to article 614 of the CLT and SRT/MTE Normative Instruction No. 06/2007.

## SECTION 11 – EXTENSION AND REVIEW

The validity of this Collective Bargaining Agreement may be limited to the previously established period, and will be considered expressly terminated upon expiration, with no repercussion to future periods. This Collective Bargaining Agreement may be reviewed, in whole or in part, upon a Meeting of the parties, pursuant to article 615 and following of the CLT.

**SOLE PARAGRAPH**. The review instrument must be filed, for purposes of registration and filing, at the entity with which it was originally filed, subject to Section 10 above.

## SECTION 12 – JURISDICTION

The Labor Courts of the city of São Paulo, state of São Paulo, will be competent to settle any disputes arising in relation to the enforcement of this Collective Bargaining Agreement.

NOW THEREFORE, the parties executed this Agreement to produce all legal effects.

São Paulo, May 25, 2023.

By
**GOL LINHAS AÉREAS S.A.**

*/digital signature/*

By
**SINDICATO DOS AEROVIÁRIOS NO ESTADO DE SÃO PAULO**
*/digital signature/*

By
**SINDICATO DOS AEROVIÁRIOS DOS MUNICÍPIOS DE CAMPINAS, SOROCABA E JUNDIAÍ**
*/digital signature/*

By
**SINDICATO DOS AEROVIÁRIOS DE MINAS GERAIS**
*/digital signature/*

By
**SINDICATO DOS AEROVIÁRIOS NO ESTADO DE ALAGOAS**
*/digital signature/*

By
**SINDICATO DOS AEROVIÁRIOS NO ESTADO DE AMAZONAS**
*/digital signature/*

**Voegol.com.br**                    [digital initials]                    Page 8 of 8
Pça. Comandante Linneu Gomes. s/n – Portaria 3
04626-020 – Jd. Aeroporto – São Paulo, SP – Brasil