**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*, | Case No. 24-10118 (MG) |
| Debtors. | (Jointly Administered) |

**MEMORANDUM OPINION AND ORDER**
**AUTHORIZING GOL TO MAKE INCENTIVE PAYMENTS**

*A P P E A R A N C E S :*

MILBANK LLP
*Attorneys to the Debtors*
55 Hudson Yards
New York, NY 10001
By:    Evan R. Fleck, Esq.
          Lauren C. Doyle, Esq.
          Bryan V. Uelk, Esq.

1850 K St. NW, Suite 1100
Washington, DC 20006
By:    Andrew M. Leblanc, Esq.
          Erin E. Dexter, Esq.

2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
By:    Gregory A. Bray, Esq.


OFFICE OF THE UNITED STATES TRUSTEE
*William K. Harrington, United States Trustee, Region 2*
1 Bowling Green, Room 534
New York, NY 10004
By:    Annie Wells, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

On June 10, 2024, debtors GOL Linhas Aéreas Inteligentes S.A., *et al.* (the "Debtors" or "GOL") filed a motion (the "Motion," ECF Doc. # 704) seeking entry of an order confirming the Debtors' authority to make payments under their Incentive Plans (as defined below) in accordance with the *Final Order (i) Authorizing the Debtors to (a) Maintain Employee Programs in the Ordinary Course and (b) Pay Prepetition Employee Obligations Related Thereto and (ii) Granting Related Relief* (the "Final Wages Order," ECF Doc. # 198) without further order of the Court.  The Motion is supported by the declarations of Joseph W. Bliley (the "Bliley Decl.," Motion Ex. B); Zachary P. Georgeson (the "Georgeson Decl.," Motion Ex. C); and Aloizio Ribeiro Lima (the "Lima Decl.," Motion Ex. D).  Also annexed to the Motion as Exhibit E is an English translation of a 2023 collective bargaining agreement ("CBA") between the Debtors and various unions.

The U.S. Trustee (the "UST") filed a Response and Reservation of Rights (the "UST Response," ECF Doc. # 734).  The Response does not object to the present payments, but argues that going forward, requests of this type should be made by a section 503(c) motion.  The Debtor filed a reply in further support of the Motion (the "Reply," ECF Doc. # 749).

The Court held a hearing on the Motion on July 1, 2024 (the "Hearing").  For the reasons explained below, the Motion is **GRANTED.**

### I.    BACKGROUND

#### A.  The Debtors' Prepetition Employee Programs

The Debtors employ approximately 14,000 employees (the "Employees"), all of whom receive compensation and other employment-related benefits from the Debtors.  (Motion ¶ 11.)

In the ordinary course of business (and for as long as the Debtors have been in operation), the Debtors have maintained certain programs to supplement their Employees' base wages and incentivize them, including (i) a revenue sharing program, (ii) an incentive bonus program, (iii) an operational supervisor incentive program, and (iv) an operational reward program (collectively, the "Incentive Plans"). (*Id.*) Payments under the Incentive Plans (the "Incentive Payments") for each individual Employee are calculated as a multiple of the Employee's monthly salary, and such multiple varies based on the Employee's position. (*Id.* ¶ 16 (citing Bliley Decl. ¶ 9).) The total Incentive Payments range from 5% to 65% of Employees' total compensation, averaging 12% of total compensation. (*Id.* ¶ 16.)

The Debtors have maintained similar incentive programs under CBAs since they began operations in 2001 and have made modifications to their programs over time to reflect business needs and market practices. (*Id.* ¶ 11 (citing Bliley Decl. ¶ 4); *id.* ¶ 20.) Programs of this type are common in Brazil, where employee compensation is generally comprised of base monthly wages and variable incentive payments. (*Id.* (citing Georgeson Decl. ¶ 15).) In fact, the Debtors are required to make payments under the Incentive Plans pursuant to Brazilian law. (*Id.* ¶ 22 (citing Lima Decl. ¶ 14).) The Brazilian Constitution generally requires employers to make distributions to their employees based on the employers' overall financial and operational performance, and if an employer offers an incentive program to their employees pursuant to a CBA (as the Debtors do), Brazilian labor laws require that the employer make such payments. (*Id.*) Neither the CBA nor Brazilian law contain exceptions for nonpayment of the Incentive Plans due to chapter 11 cases. (*Id.*)

3

1.  Revenue Sharing Program

The first of the Debtors' Incentive Plans is a cash-based revenue sharing program (the "Revenue Sharing Program").  Under the Revenue Sharing Program, the Debtors share a portion of annual profits with employees, calculated pursuant to the terms of certain formulas set forth in the six CBAs to which the Debtors are a party.  (*Id.* ¶ 12.)  The overall amount paid increases or decreases annually based on reaching specific metrics for the Debtors' financial and operational performance.  (*Id.*)

The average payment made to each Employee under the Revenue Sharing Program is approximately $1,700 annually.  (*Id.*)  The Debtors expect to make only one additional payment under the Revenue Sharing Program this year, of approximately $1.4 million, in July 2024.  (*Id.*) The Debtors estimate that the aggregate of payments under the Revenue Sharing Program will be approximately $26.8 million in 2025, subject to 2024 year-end results.  (*Id.*)

2.  Incentive Bonus Program

The Debtors also maintain a cash incentive bonus program (the "Incentive Bonus Program").  (*Id.* ¶ 13 (citing Bliley Decl. ¶ 6).)  Approximately 200 of the Debtors' senior non-insider Employees, who serve in management roles in various departments including commercial, strategy, finance, fleet, operations, supply chain, and human resources, are eligible for the Incentive Bonus Program.  (*Id.*)

The average payout per Employee under the Incentive Bonus Program based on payments made in 2024 is approximately $19,000.  (*Id.*)  The Debtors do not expect to make any additional payments under the Incentive Bonus Program in 2024.  (*Id.*)  They estimate that the aggregate amount of such bonuses in 2025 will be approximately $8.5 million, subject to actual 2024 year-end results.  (*Id.*)

### 3. Operational Supervisor Incentive Program

Third, the Debtors maintain an operational supervisor incentive program for approximately 425 Employees who serve in operational supervisory roles related to airport, crew, cargo, and maintenance services, call centers, and warehouses (the "Operational Supervisor Incentive Program"). (*Id.* ¶ 14.)

The Debtors did not make any payments under the Operational Supervisor Incentive Program in the first half of 2024, as the target metrics for the payments were not achieved. (*Id.*) The Debtors expect to pay approximately $240,000 semi-annually in 2024 and 2025 under this program. (*Id.*) The average payout to covered Employees under the Operational Supervisor Incentive Program is approximately $600 semi-annually based on expected payments for the remainder of 2024. (*Id.*)

### 4. Operational Reward Program

Lastly, the Debtors maintain an operational reward program for approximately 11,100 Employees who serve in various operational roles related to airport, crew, cargo, maintenance services, call centers, and warehouses (the "Operational Reward Program"). (*Id.* ¶ 15).

Payments are calculated in the spring and fall of each year based on short-term operational targets, such as on-time performance, cost control and reduction, and reductions in baggage mishandling. (*Id.*) The Debtors expect to pay approximately $3.4 million semi-annually under the Operational Reward Program. (*Id.*) Payments are made in the spring and fall of each year, and the Debtors expect that the average payment for each eligible Employee in the fall of 2024 will be $300. (*Id.*)

### B.  The First-Day Wages Motion and Final Wages Order

On January 25, 2024 (the "Petition Date"), the Debtors filed a voluntary petition for relief under the Bankruptcy Code.  (*Id.* ¶ 8.)  One of the Debtors' first-day motions was the *Motion for Entry of Interim and Final Orders (i) Authorizing Them to (a) Maintain Employee Programs in the Ordinary Course and (b) Pay Prepetition Employee Obligations Related Thereto and (ii) Granting Related Relief* (the "Wages Motion," ECF Doc. # 3).

Part of the relief requested in the Wages Motion was to maintain and continue paying Employee Obligations (which includes obligations related to the "Employee Programs" defined to include the Incentive Plans) in the ordinary course of business.  (Wages Motion ¶¶ 1, 15.)  On February 27, 2024, the Court entered an order granting the requested relief on a final basis (*see* Final Wages Order).  The Final Wages Order specifically authorized the Debtors:

> (i) to pay and/or honor the Employee Obligations that become due and owing in the ordinary course of business and (ii) to continue their practices and policies with respect to the Employee Programs as such practices and policies were in effect as of the Petition Date, and as such programs may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business.

(Final Wages Order ¶ 2.)

At the request of the U.S Trustee (the "UST"), the Final Wages Order also included the following notice requirements and reservation of rights:

> The Debtors shall not, without further order of the Court, (a) make any payment of prepetition Employee Obligations that are in excess of the priority cap of section 507(a)(4) of the Bankruptcy Code to any insider (as that term is defined in section 101 of the Bankruptcy Code) (a "Statutory Insider"), (b) make any severance payment to any Statutory Insider, or (c) make any payments pursuant to any Incentive Plans to any Statutory Insider; provided, however, that the Debtors shall provide the Committee and U.S. Trustee with at least five (5) business days' notice prior to making payments (i) to any Employee in excess of $50,000 on account of Severance Obligations and (ii) under an Incentive Plan, provided that such reporting shall be limited to the aggregate amount of such payments and the total number of Employees receiving such payments.  The rights of the

> Committee and the U.S. Trustee to seek additional disclosures in connection
> therewith, and to object to any such payments are expressly reserved, and
> shall not be prejudiced by entry of the Interim Order or this Final Order.

(*Id.* ¶ 7.)

In accordance with the Final Wages Order, on April 16, 2024, the Debtors provided the UST with notice of their intent to make certain payments under the Revenue Sharing Program and the Incentive Bonus Program in April 2024. (Motion ¶ 27.)  At the UST's request, they also provided the names of the specific Employees, their job titles, the payment amounts and timing, their salaries, date of employment, and job duties and responsibilities, the metrics and payment eligibility targets, as well as confirmation that none of them were appointed by, sit on, or report to any Debtor board of directors and that the payments were required by the CBAs and Brazilian law. (*Id.*)  Subject to an initial request by the UST to "hold back" 25% of the proposed April payments under the Revenue Sharing Program and the Incentive Bonus Program for further review, the UST ultimately had no objection to the payments. (*Id.*)  The Debtors went through a substantially similar process for the May and June payments. (*Id.* ¶ 28.)

On May 15, 2024, the UST requested that the Debtors seek Court authority to make Incentive Payments under section 503(c) of the Bankruptcy Code through a new motion and that failure to do so could result in an objection to the Debtors' Incentive Payments. (*Id.* ¶ 29.)  This precipitated the instant Motion.

**C. The Motion**

The Motion seeks entry of an order confirming the Debtors' authority to make payments under their Incentive Plans during the pendency of these cases in accordance with the Final Wages Order without further order of the Court. (*Id.* ¶ 1.)  The Debtors argue that the Incentive Payments are also authorized by section 363(c)(1) of the Bankruptcy Code as payments in the ordinary course of business, or in the alternative, under section 363(b)(1) as an exercise of their

business judgment.  (*Id.* ¶¶ 30, 33.)  They also argue that nothing in section 503(c) prohibits the payments.  (*Id.* ¶ 37.)

       1.  <u>Argument that the Incentive Payments are Permitted Under Section 363</u>

The Debtors argue that the Incentive Payments are consistent with the Debtors' past practice and with industry standards, and should be approved under section 363(c).  (*Id.* ¶ 31.) The Incentive Plans are preexisting programs that the Debtors maintain in the ordinary course of business.  (*Id.* (citing Bliley Decl. ¶¶ 4, 14).)  The Debtors have maintained similar incentive programs since they began operations in 2001 and have made modifications to such programs over time to reflect business needs in the ordinary course.  (*Id.*)  Further, Brazilian law requires employers to make incentive distributions to their employees, and such terms for distributions are set forth in the CBAs.  (*Id.* ¶ 32.)  The terms of the Debtors' CBAs are consistent with collective bargaining agreements of other airlines and large companies operating in Brazil.  (*Id.*) Thus, the Debtors argue that they should be authorized to continue making payments to Employees under the Incentive Plans in the ordinary course of business because this is consistent with both the Debtors' past practice and industry standards, and thus permissible under section 363(c).  (*Id.*)

In the alternative, the Debtors argue if the Court finds Incentive Payments to be *outside* the ordinary course of business, they should nevertheless be approved under section 363(b)(1) of the Bankruptcy Code as a sound exercise of the Debtors' business judgment.  (*Id.* ¶ 33.)  *First*, they argue, failure to make Incentive Payments could lead Employees to seek alternative employment opportunities since Incentive Payments represent a significant portion of Employees' overall compensation.  (*Id.* ¶ 35 (citing Bliley Decl. ¶¶ 9, 15).)  *Second*, Incentive Payments are calculated based on applicable operational and financial targets, and therefore

incentivize Employees to perform their jobs diligently and efficiently, which is especially critical to preserving value for the Debtors' estates. (*Id.*) *Third*, failure to make payments under the Incentive Plans as required by the CBAs and Brazilian labor laws will expose the Debtors to significant liability. (*Id.* ¶ 36 (citing Lima Decl. ¶¶ 14–15).) Moreover, the Employees, in conjunction with the unions, could even initiate a shutdown of the Debtors operations or go on strike if they did not receive their payments. (*Id.* (citing Lima Decl. ¶ 15).) Accordingly, the Debtors submit that making the Incentive Payments is a sound exercise of their business judgment.

2.    <u>Argument that the Incentive Payments are Consistent with Sections 503(c)</u>

The Debtors do not believe that section 503(c) of the Bankruptcy Code is the applicable provision under which to seek approval of the Incentive Payments, as the Incentive Plans are preexisting plans for non-insider Employees that the Debtors maintain in the ordinary course of business. (*Id.* ¶ 37.) Nevertheless, they argue, the Incentive Payments satisfy section 503(c) of the Bankruptcy Code. (*Id.*)

The Debtors submit that, although certain Employees eligible for the Incentive Plans hold titles such as "director" and "executive," none are "insiders" as defined by the Bankruptcy Code. (*Id.* ¶ 53 (citing 11 U.S.C. § 101(31)).) None of them, the Debtors aver, "have discretionary decision-making authority on issues of policy, the overall direction of the company, or control over any material corporate transaction," and the scope of their authority "is limited and subject to the ultimate oversight and approval by the Debtors' executive officers and board of directors. (*Id.* ¶ 55.) Additionally, the Debtors shared the relevant Employee information with the UST and the Committee, and neither has objected to such payments on the basis that any Employee is an insider. (*Id.*) And, even if the Employees were insiders, they would not be prohibited by

sections 503(c)(1) or (2), as they are *incentive* payments rather than retention or severance payments.  (*Id.* ¶¶ 56–58.)

The Debtors submit that the Incentive Payments are also not barred either by section 503(c)(3), which covers transfers "outside the ordinary course of business and not justified by the facts and circumstances of the case," because the standard is substantially the same as the business judgment standard, which they satisfy; and they further satisfy the specific *Dana* factors (discussed below) applicable to a compensation plan under section 503(c)(3).  (*Id.* ¶ 38.)

### D.  The UST Response

The UST contests the proposition that the Final Wages Motion and section 363 of the Bankruptcy Code grant the Debtors the authority to make future payments under the Incentive Plans.  (UST Response at 4.)  Rather, the UST argues, approval for such payments must be sought under section 503(c).  (*Id.* at 5.)  While the UST clarifies that it is not "objecting to the [Motion] *per se*," because it had "determined that the Debtors had satisfied their burden under Section 503(c)" for the payments made to date, it argues that there is "insufficient information" to justify "*prospective* approval from this Court for all future payments under the Incentive Plans."  (*Id.* at 6 (emphasis in original).)

The UST Response also highlights "several misleading data points" in the Motion.  (*Id.* at 5.)  First, it notes that while "the Debtors assert that the average payout per Employee is approximately $19,000 . . . , information provided to the [UST] by the Debtors show that top recipients of the cash incentives under this program received amounts well in excess of $19,000, while most received much less."  (*Id.*)  Next, it highlights the Debtors' "admission" that the payments under one of the programs, the Incentive Bonus Program, is not mandated by any CBA.  (*Id.* at 6 (citing Motion at 6 n.7).)  Lastly, it notes an inconsistency in the Debtors'

description of the timing of payments under the Incentive Bonus Program: namely, the Debtors

state in the Motion that payment is made "annually in the second quarter of th[e] year," while the

Wages Motion provided that the bonuses would "become due in September 2024." (*Id.* at 6

(citing Motion ¶ 13, Wages Motion ¶ 38).)

### E. The Debtors' Reply

On June 28, 2024, the Debtors filed a reply in further support of the Motion (the "Reply,"

ECF Doc. # 749). The Reply reiterates that the Incentive Payments satisfy the relevant legal

standard, which evaluates the payments *outside* of the context of bankruptcy under the "vertical"

and "horizontal" tests. (Reply ¶ 3 (citing *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,

114 F.3d 379, 384–85 (2d Cir. 1997).) Further, the Debtors argue, they have "complied with the

notice requirements in the Final Wages Order and addressed the U.S. Trustee's additional

diligence requests," and as such, the UST should not be permitted to reserve a "blanket"

reservation of rights "so broad that it leaves the Debtors and their Employees without the finality

they need and deserve." (*Id.* ¶ 6.) However, they have "no issue" with the UST reserving rights

to "revisit payments in future Incentive Plan years" if there is "material change either in the

Debtors' Incentive Plans, the payments to be made thereunder, or the facts and circumstances of

these." (*Id.* ¶ 7.)

Lastly, the Debtors address the "inconsistencies" flagged by the UST. *First*, they confirm

that the mathematical average of $19,000 was correctly reported, and there is "nothing inaccurate

or misleading about providing an average figure when providing public and summary details."

(*Id.* ¶ 8.) *Second*, while they acknowledge that, while payments under the Incentive Bonus

Program are "permitted" rather than required under the CBA, they *are* required by Brazilian law.

(*Id.*) *Lastly*, they clarify regarding the timing of payments under the Incentive Bonus Program

payments. While they typically make Incentive Bonus Program payments in the second quarter

of each year, they Debtors delayed making the payments from the spring of 2023 until

September due to liquidity issues. (*Id.*) While preparing the Wages Motion, the Debtors had

assumed that they would once again wait until September to make the payments. (*Id.*) However,

this year, because the Debtors are able to achieve significant tax savings by making Incentive

Bonus Program payments in the spring, they are reverting to their typical payment schedule.

(*Id.*)

## II.    <u>LEGAL STANDARD</u>

### A.  Payments Under Section 363

Section 363 of the Bankruptcy Code provides, in relevant part:

> (b)
>> (1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .
>
> [ . . . ]
> (c)
>> (1) . . . unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. §§ 363(b)(1), (c)(1).

To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code,

the Second Circuit requires a debtor to show that the decision was based on the debtor's sound

business judgment. *See, e.g.*, *Off. Comm. of Unsecured Creditors v. LTV Corp. (In re*

*Chateaugay)*, 973 F.2d 141, 145 (2d Cir. 1992) (affirming the bankruptcy court's approval of the

debtors' asset sale pursuant to section 363(b) as a reasonable exercise of business judgment).

This rule applies with full force to questions of employee compensation. *See In re Velo*

*Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) (finding that "the business judgment standard under section 363(b)" applies to employee compensation and benefit matters).

Once a debtor articulates a valid business justification, a strong presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

1.  Transactions in the Ordinary Course of Business

The term "ordinary" under section 363 is not defined by either the Bankruptcy Code or its legislative history. *In re Endo Int'l plc*, No. 22-22549 (JLG), 2022 WL 16935997, at *6 (Bankr. S.D.N.Y. Nov. 14, 2022). However, the term "ordinary course of business" is generally understood to encompass the reasonable expectations of interested parties regarding the types of transactions the debtor would typically engage in during its regular, daily operations. *Id.*; *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983) ("The touchstone of 'ordinariness' is [] the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business."). Thus, the key to determining whether a transaction falls within the ordinary course of business is "to distinguish between routine operations (which a debtor can pursue without the need for individualized court approval) and transactions that are sufficiently unusual, unique or significant from the perspective of creditors that they require court approval." *Endo*, 2022 WL 16935997, at *6 (citation omitted).

"[T]wo tests have emerged to determine whether a transaction is 'ordinary.'  These tests are (1) the 'creditor's expectation test' also known as the 'vertical test,' and (2) the 'industry-wide test' also called the 'horizontal test.'"  *Lavigne*, 114 F.3d at 384.  The "vertical" test examines the transaction from the perspective of a hypothetical creditor and inquires whether it poses "economic risks of a nature different from those he accepted when he decided to enter into a contract with the debtor."  *Id.* at 385 (internal citation and quotation marks omitted).  The "horizontal" test examines the transaction with an industry-wide perspective, and inquires whether it is "of a type that other similar businesses would engage in as ordinary business."  *Id.*

### B.  Payments Under Section 503(c)

Section 503(c) of the Bankruptcy Code provides, in relevant part:

> (c) Notwithstanding [the administrative expenses in] subsection (b), there shall neither be allowed, nor paid—
>
> > (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent [certain exceptions];
> >
> > (2) a severance payment to an insider of the debtor, unless [certain conditions are met];
> >
> > (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

### 1.  Insiders Under Section 503(c)(1)

The Bankruptcy Code defines an "insider" of a corporate debtor to include, among others, a "director of the debtor," an "officer of the debtor," and a "person in control of the debtor."  11 U.S.C. § 101(31)(B).  Numerous courts have concluded that an employee should qualify as an "insider" only if the employee has "at least a controlling interest in the debtor or . . .

exercise[s] sufficient authority over the debtor so as to unqualifiably [sic] dictate corporate

policy and the disposition of corporate assets." *Velo Holdings*, 472 B.R. at 208 (citations

omitted). Additionally, bankruptcy courts have concluded that certain employees given

"director-level" titles were not insiders because "[c]ompanies often give employees the title

'director' or 'director-level,' but do not give them decision-making authority akin to an

executive." *In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011).

### 2. Retention and Severance Payments Versus Incentive Payments

If a compensation plan "is designed to motivate employees to achieve specified

performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)." *In re

Residential Cap., LLC*, 478 B.R. 154, 171 (Bankr. S.D.N.Y. 2012); *see also In re Mesa Air Grp.,

Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving

an incentive plan that was tied to performance goals, "including maintenance of flight schedules,

efficient return of aircraft, securing aircraft equipment at reduced rates and negotiation or

reduced rates for aircraft of the Debtors that were no longer in service").

### 3. Payments Justified by Facts and Circumstances

In the Second Circuit, whether such payments are "justified by the facts and

circumstances" of the case is to be determined by application of the business judgment rule. *See

Velo Holdings*, 472 B.R. at 212 ("[T]he 'facts and circumstances' language of 503(c)(3) creates a

standard no different than the business judgment standard under section 363(b)."); *Borders Grp.*,

453 B.R. at 473–74 (evaluating the debtors' key employee retention program under the business

judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing

factors that may be considered in determining whether compensation proposal meets the "sound

business judgment test" in accordance with section 503(c)(3)). *But see In re Pilgrim's Pride*

*Corp.*, 401 B.R. 229, 236 (Bankr. N.D. Tex. 2009) ("On the other hand, some courts have held that section 503(c)(3) sets a higher bar than the simple business judgment test.") (citing cases from other circuits).

When determining whether a compensation proposal and the process for its development meet the "sound business judgment" test for the purpose of approving a compensation plan under section 503(c)(3) of the Bankruptcy Code, courts in the Second Circuit have generally utilized the six factors identified in *Dana*: (i) whether the plan is calculated to achieve the desired performance; (ii) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (iii) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (iv) whether the plan is consistent with industry standards; (v) whether the debtor performed due diligence in investigating the need for the plan; and (vi) whether the debtor received independent advice in performing due diligence regarding, creating, and authorizing the plan (the "*Dana* Factors"). *Dana*, 358 B.R. at 576–77; see also *In re Residential Cap., LLC*, 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying *Dana* factors); *Borders Grp.*, 453 B.R. at 473–74 (same).

### III.   <u>DISCUSSION</u>

The Debtors seek permission to pay their Employees, the same way they have been paying them for decades, as mandated by their CBAs and Brazilian law, and as explicitly authorized by the Final Wages Order. Section 503 of the Bankruptcy Code is inapplicable.

For reasons discussed in more detail below, the Motion is **GRANTED**.

#### A.  The Incentive Payments Are Made in the Ordinary Course of Business

The UST argues that the Incentive Payments should not be "considered payments in the ordinary course of business, unless it is the Debtors' ordinary course of business to be operating

in U.S. bankruptcy proceedings." (UST Response at 4–5.) This is a puzzling assertion, as it seemingly implies that the Debtor did *not* make the Incentive Payments *outside* of bankruptcy, which is plainly incorrect. Rather, under both the "vertical" and "horizontal" tests, the Incentive Payments are clearly made in the ordinary course of business.

### 1. The Incentive Payments Satisfy the Vertical Test

Under the vertical test, the court considers whether the Incentive Payments would subject a hypothetical creditor to economic risks of a different nature than they would have accepted when first contracting with the Debtors. *Lavigne*, 114 F.3d at 385. The Debtors have maintained the Incentive Plans as long as they have been in operation, making modifications over time to reflect business needs and market practices. (Motion ¶ 11.) Thus, any creditor who chose to contract with the Debtors was aware that they regularly made the Incentive Payments, and would reasonably expect them to continue doing so. Accordingly, the Incentive Payments satisfy the vertical test.

### 2. The Incentive Payments Satisfy the Horizontal Test

Under the horizontal test, the court takes an industry-wide perspective and inquires whether comparable businesses commonly make payments similar to the Incentive Payments. *Lavigne*, 114 F.3d at 385.

Here, the Brazilian Federal Constitution establishes labor unions for various sectors and territories to represent both employees and employers. (Motion ¶ 18 (citing Lima Decl. ¶ 18).) These unions negotiate and enter into CBAs, which govern compensation (including incentive plans). (*Id.* ¶ 20.) The terms of the Debtors' CBAs are similar to those of other airlines that operate in Brazil, such as TAM Aviação Executiva e Táxi Aéreo S/A. (*Id.* ¶ 21 (citing Lima Decl. ¶ 13).) The Incentive Plans have been analyzed by Willis Towers Watson U.S. LLC

("WTW"), a firm that performs expert analysis of executive and management compensation, which found them to be "consistent with both Brazilian market practices and practices among comparable bankruptcy cases reviewed by [WTW]." (*Id.* ¶ 32 (citing Georgeson Decl. ¶¶ 12, 15.)  The Debtors also negotiate and renew the Incentive Plans on a yearly basis to ensure they stay within this range. (*Id.* ¶ 49.)

Further, Brazilian law requires the Debtors to make payments under the Incentive Plans: the Brazilian Federal Constitution requires employers "to make distributions to their employees based on the employers' overall financial and operational performance," and Brazilian labor laws require an employer to make payments under an incentive plan included in a CBA. (*Id.* ¶ 22 (citing Lima Decl. ¶ 14).)

Accordingly, comparing the Debtors to similar businesses—large Brazilian airlines that follow Brazilian law—the Incentive Payments satisfy the horizontal test.

### B.  The Final Wages Order Authorizes the Incentive Payments

The Final Wages Order specifically authorizes the Debtors:

> (i) to pay and/or honor the Employee Obligations that become due and owing in the ordinary course of business and (ii) to continue their practices and policies with respect to the Employee Programs as such practices and policies were in effect as of the Petition Date, and as such programs may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business.

(Final Wages Order ¶ 2.)

"Employee Obligations" was defined in the Wages Motion as obligations related to the "Employee Programs," which in turn included the Incentive Plans. (*See* Wages Motion ¶¶ 15, 32.)  As discussed above, the Incentive Payments (made pursuant to the Incentive Plans) are in the ordinary course of business.  Accordingly, the Final Wages Order authorizes the Incentive Payments, and the Court could grant the Motion on that basis alone.

### C. The Bankruptcy Code Authorizes the Incentive Payments

Though the Final Wages Order is grounds to grant the Motion, the Incentive Payments are also authorized under section 363(b) of the Bankruptcy Code. Section 503(c) is inapplicable.

#### 1. The Payments are Authorized by Section 363

Section 363(c) authorizes use of estate property in the ordinary course of business without notice and a hearing. 11 U.S.C. § 363(c)(1). In *Endo*, Judge Garrity found that a debtor's contested benefit plans, which applied to all non-insider employees, were in the ordinary course of its business as they were "justified by the facts and circumstances of the case." *Endo*, 2022 WL 16935997 at *12 ("The Contested Benefit Plans are consistent with industry standards . . . market surveys [indicated that the grant] . . . [was] 'reasonably sized as a percentage of base salary and of target total direct compensation' after comparing it with incentive pay practices at other public companies."). The *Endo* court also noted that the plan had been regularly operated for at least seven years. *Id.* at *8.

Here, as in *Endo*, the Debtors have demonstrated that that the Incentive Plans and the payments thereunder are paid in the ordinary course of business, are consistent with industry standards, and have been maintained continuously since 2001 (much longer than seven years). (Motion ¶¶ 11, 18–22.) The Debtors could thus have made the Incentive Payments pursuant to section 363 of the Bankruptcy Code.

#### 2. Section 503(c) is Inapplicable

The UST argues that any payments "on account of a debtor's bonus programs are governed by standards under Section 503(c) of the Bankruptcy Code." (UST Response at 5.) This blanket assertion paints with too broad a brush, and ultimately has no foundation in the law. Further, the cases it cites are inapt: *Global Home Products* concerned "Key Employee Retention

Plan[s]," which are indisputably covered by 503(c)(1) and not at issue in this case. (*See* UST

Response at 5 (citing *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del.

2007).) *Pilgrim's Pride* analyzed the "purchase by a debtor of a non-competition agreement,"

which is also not at issue in this case. (*Id.* (citing *Pilgrim's Pride Corp.*, 401 B.R. at 234).) The

UST cites no cases where comparable incentive plans or payments thereunder were found to

violate section 503(c).

### a.   *Sections 503(c)(1) and (2) Are Inapplicable*

Sections 503(c)(1) and (c)(2) bar, respectively, *retention* and *severance* payments to

*insiders* of the debtor (unless certain conditions are met). 11 U.S.C. §§ 503(c)(1)–(2). The

Employees to which the Debtors seek to make the Incentive Payments are not insiders, and the

Incentive Payments are not retention or severance payments. (*Id.* ¶¶ 55–56.) The UST does not

attempt to argue these points. Clearly, sections 503(c)(1) and (c)(2) are inapplicable.

### b.   *Section 503(c)(3) is Inapplicable, or in the Alternative, Satisfied*

Section 503(c)(3) bars transfers "outside the ordinary course of business and not justified

by the circumstances of the case." 11 U.S.C. § 503(c)(3). The UST's only hint of an argument

that this section could apply is the baffling assertion that the Incentive Payments should not be

considered ordinary course "unless it is the Debtors' ordinary course of business to be operating

in U.S. bankruptcy proceedings." (UST Response at 4–5.) However, as discussed, the Incentive

Payments are *in* the ordinary course of business. Thus, section 503(c)(3) is in applicable.

Further, even if the Incentive Payments were *not* in the ordinary course, they would be

justified by the circumstances of these cases under the *Dana* factors: (1) the Incentive Payments

are contingent on the achievement of goals set on various incentive metrics, including financial

measures and operating performance (Motion ¶ 40); (2) the annual cost of about $42 million is

fair and reasonable in the context of annual revenues of approximately $3.7 billion (*id.* ¶ 43); the

scope and design of the Incentive Plans are reasonable and within the range of both normal

course Brazilian market practices and observed practices among comparable bankruptcy cases

(*id.* ¶ 45); they are consistent with industry practice (*id.* ¶ 47); the Debtors perform due diligence

in negotiating the Incentive Plans with the labor unions (*id.* ¶ 49); and the Debtors receive input

from the labor unions with whom they negotiate the plans each year (*id.* ¶ 50).  *See Dana*, 358

B.R. at 576–77.

    Thus, even if section 503(c)(3) applied, it would authorize the Incentive Payments.

    **D.  The Debtor Satisfactorily Addressed UST's "Misleading Data Points"**

    First, the UST notes the disparity between the Debtors' alleged average payout per

Employee, which is approximately $19,000, and the information provided to the UST by the

Debtors, indicating that top recipients received "amounts well in excess of $19,000, while most

received much less." (UST Response at 5.)  The Debtors had stated that their *average* payout per

Employee is approximately $19,000, not the maximum payout, and confirmed in their Reply that

"the mathematical average was accurately reported."  (Reply ¶ 8.) Averages can include figures

"well in excess of" the average.  Thus, the UST's first point boils down to the fact that the

average is not the same as the median or mode.

    The UST's second point is that the Debtors "admit" that the payments under the Incentive

Bonus Program are not mandated by any CBA.  (UST Response at 6.)  However, these payments

are still required for Brazilian Employees under Brazilian labor law, and still clearly made in the

ordinary course of business.  (Motion ¶ 22; Reply ¶ 8).

    Last, the UST raised a question about "inconsistency" in the Debtors' description of the

timing of payments under the Incentive Bonus Program.  (*See* UST Response at 6.)  There was

nothing nefarious about this; as the Debtors clarified, their statements in the Wages Motion were based on the assumption that they would continue encountering liquidity issues, but have reverted to their typical payment schedule in light of certain tax benefits. (Reply ¶ 8.)

## IV.   **CONCLUSION**

For the reasons detailed above, the Motion is **GRANTED**.


**IT IS SO ORDERED.**


Dated:   July 2, 2024
         New York, New York


_____
*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge