**Hearing Date and Time: July 31, 2024 at 11:00 a.m. (ET)**
**Objection Deadline: July 24, 2024 at 4:00 p.m. (ET)**

Evan R. Fleck                         Andrew M. Leblanc
Lauren C. Doyle                       Erin E. Dexter (admitted *pro hac vice*)
Bryan V. Uelk                         **MILBANK LLP**
**MILBANK LLP**                       1850 K St. NW, Suite 1100
55 Hudson Yards                       Washington, DC 20006
New York, NY 10001                    Telephone: (202) 835-7500
Telephone: (212) 530-5000             Facsimile:  (202) 263-7586
Facsimile:  (212) 530-5219

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
In re:                                                            :    Chapter 11
                                                                  :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                              :    Case No. 24-10118 (MG)
*et al.*,[1]                                                      :
                                                                  :
                                         Debtors.                 :    (Jointly Administered)
                                                                  :
------------------------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
STIPULATION AND (I) AUTHORIZING THE DEBTORS TO (A) USE
COLLATERAL, INCLUDING CASH COLLATERAL, AND GRANT ADEQUATE
PROTECTION IN CONNECTION WITH CERTAIN PREPETITION DEBENTURES;
(B) AMEND TERMS OF CERTAIN PREPETITION DEBENTURES;
(C) ESTABLISH PROCEDURES FOR EXTENDING THE EXPIRATION DATE OF,
AND REIMBURSING THE ISSUING BANKS FOR DRAWN, EXISTING
PREPETITION LETTERS OF CREDIT; AND (D) ENTER INTO A NEW FACTORING
AGREEMENT; (II) APPROVING THE CONSENSUAL ASSUMPTION OF CERTAIN
PREPETITION FACTORING AGREEMENTS, AS AMENDED; (III) MODIFYING
THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing (the "Hearing") will be held **on July 31, 2024
at 11:00 a.m. (prevailing Eastern time)** before the Honorable Martin Glenn, Chief United States
Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One
Bowling Green, New York, NY 10004 to consider *Debtors' Motion for Entry of an Order
Approving Stipulation and (I) Authorizing the Debtors to (A) Use Collateral, Including Cash
Collateral, and Grant Adequate Protection in Connection with Certain Prepetition Debentures;
(B) Amend Terms of Certain Prepetition Debentures; (C) Establish Procedures for Extending the
Expiration Date of, and Reimbursing the Issuing Banks for Drawn, Existing Prepetition Letters of
Credit; and (D) Enter into a New Factoring Agreement; (II) Approving the Consensual
Assumption of Certain Prepetition Factoring Agreements, as Amended; (III) Modifying the
Automatic Stay; and (IV) Granting Related Relief* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that the Hearing will take place in a hybrid
fashion both in person and via Zoom for Government. Those wishing to participate in the Hearing
in person may appear before the Court in Courtroom No. 523, located at the United States
Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY
10004. For those wishing to participate remotely, the Hearing will be conducted using Zoom for
Government. Parties wishing to appear at the Hearing, whether in person or via Zoom for
Government, need to make an electronic appearance (an "eCourtAppearance") through the Court's
website at https://www.nysb.uscourts.gov/ecourt-appearances no later than 4:00 p.m. (prevailing
Eastern time) on July 30, 2024.

**PLEASE TAKE FURTHER NOTICE** that any objections or responses to the relief
requested in the Motion shall: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy
Procedure, the Local Bankruptcy Rules for the Southern District of New York, all General Orders
applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of
New York, and the *Final Order Implementing Certain Notice and Case Management Procedures*
[Docket No. 175]; (iii) be filed electronically with this Court on the docket of *In re GOL Linhas
Aéreas Inteligentes S.A.*, Case No. 24-10118 (MG) by registered users of this Court's electronic
filing system (which is available on this Court's website at http://www.nysb.uscourts.gov); and
(iv) be served so as to be actually received by **July 24, 2024 at 4:00 p.m. (prevailing Eastern
time)**, by: (a) the Chambers of the Honorable Martin Glenn, Chief United States Bankruptcy
Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling
Green, New York, NY 10004; (b) the Debtors, c/o GOL Linhas Aéreas Inteligentes S.A., Praça
Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo,

2

Brazil (Attn: Joseph W. Bliley, Chief Restructuring Officer); (c) Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Evan R. Fleck, Esq., Lauren C. Doyle, Esq., and Bryan V. Uelk, Esq.), counsel for the Debtors; (d) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, One Bowling Green, Suite 534, New York, NY 10004-1408 (Attn: Annie Wells, Esq. and Brian Masumoto, Esq.); (e) the Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549; (f) the Federal Aviation Administration, 800 Independence Ave., S.W. Washington, DC 20591 (Attn: Office of the Chief Counsel); (g) the U.S. Attorney's Office for the Southern District of New York, One St. Andrew's Plaza, New York, NY 10007; (h) Baker & McKenzie LLP, 452 Fifth Avenue, New York, NY 10018 (Attn.: Debra A. Dandeneau, Esq. and Daniela Fonseca Puggina, Esq.), counsel for Banco do Brasil S.A.; (i) Steptoe LLP, 1330 Connecticut Avenue, NW, Washington, DC 20036 (Attn.: Jeffery Reisner, Esq. and Joshua R. Taylor, Esq.), counsel for Banco Santander (Brasil) S.A.; (j) the Law Offices of Richard J. Corbi PLLC, 1501 Broadway, 12th Floor, New York, NY 10036 (Attn.: Richard J. Corbi, Esq.) and MB Scanlon PLLC, 4301 50th St., Suite 102, NW, Washington, D.C. 20016 (Attn.: Gabriela Menna Barreto Scanlon, Esq.) counsel for Banco Bradesco S.A.; and (k) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Brett H. Miller, Esq., Todd M. Goren, Esq., Craig A. Damast, Esq., and James H. Burbage, Esq.), counsel for the Official Committee of Unsecured Creditors.

   **PLEASE TAKE FURTHER NOTICE** that your rights may be affected. You should read the Motion carefully and discuss the relief requested with your attorney, if you have one in connection with the chapter 11 cases. (If you do not have an attorney, you may wish to consult with one.)

   **PLEASE TAKE FURTHER NOTICE** that if you do not want the Court to grant the relief requested in the Motion, or if you want the Court to consider your view on the Motion, then you or your attorney must attend the Hearing. If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter orders granting the relief requested in the Motion with no further notice or opportunity to be heard.

   **PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing.

*[Remainder of Page Intentionally Left Blank]*

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion can be viewed and/or obtained by: (i) accessing the Court's website at http://www.nysb.uscourts.gov; or (ii) from the Debtors' claims and noticing agent, Kroll, at https://cases.ra.kroll.com/GOL, or by calling 844.553.2247 (U.S./Canada) (toll free) or +1.646.777.2315 (International) or by e-mail via GOLInfo@ra.kroll.com.  Note that a PACER password is needed to access documents on the Court's website.

Dated:  New York, New York
        July 9, 2024

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:   (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
1850 K St NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

**Hearing Date and Time: July 31, 2024 at 11:00 a.m. (ET)**
**Objection Deadline: July 24, 2024 at 4:00 p.m. (ET)**

Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,[1] | : | Case No. 24-10118 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
STIPULATION AND (I) AUTHORIZING THE DEBTORS TO (A) USE
COLLATERAL, INCLUDING CASH COLLATERAL, AND GRANT ADEQUATE
PROTECTION IN CONNECTION WITH CERTAIN PREPETITION DEBENTURES;
(B) AMEND TERMS OF CERTAIN PREPETITION DEBENTURES;
(C) ESTABLISH PROCEDURES FOR EXTENDING THE EXPIRATION DATE OF,
AND REIMBURSING THE ISSUING BANKS FOR DRAWN, EXISTING
PREPETITION LETTERS OF CREDIT; AND (D) ENTER INTO A NEW FACTORING
AGREEMENT; (II) APPROVING THE CONSENSUAL ASSUMPTION OF CERTAIN
PREPETITION FACTORING AGREEMENTS, AS AMENDED; (III) MODIFYING
THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"[2]), state

as follows in support of this motion (the "Motion"):

**RELIEF REQUESTED**

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Proposed Order"): (i) approving the stipulation attached to the Proposed Order as

Exhibit A (the "Stipulation")[3] by and among the Relevant Debtors and each of Banco Santander

S.A. (Brasil) ("Santander"), Banco do Brasil S.A. ("BdoB"), and Banco Bradesco S.A. ("Bradesco"

and, together with Santander and BdoB, the "Factoring Banks"); (ii) authorizing the Debtors to

(a) use collateral, including cash collateral, and grant adequate protection in connection with the

Prepetition Debentures (as defined below), (b) amend certain terms of the Prepetition Debentures

to, *inter alia*, permit the factoring of the collateral thereunder to any of the Factoring Banks, (c)

establish procedures in connection with extending the expiration date or the renewal or continuation

of any prepetition letters of credit issued by the Factoring Banks, (d) enter into a new factoring

agreement with Bradesco, and (e) enter into the Stipulation with the Factoring Banks providing for

---

[2]     Unless clearly specified otherwise, the relief requested herein is only with respect to GOL Linhas Aéreas
Inteligentes S.A. (the "Guarantor") and GOL Linhas Aéreas S.A. ("GOL Linhas" and, together with the
Guarantor, the "Relevant Debtors").

[3]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Stipulation or
Proposed Order.

certain proposed treatment of the Prepetition Debentures, Letters of Credit, and Factoring Agreements (each as defined herein) under a chapter 11 plan; (iii) approving the consensual assumption of certain Factoring Agreements, as amended in accordance with the terms set forth in the Stipulation; (iv) providing adequate protection; (v) modifying the automatic stay to the extent set forth herein; and (vi) granting related relief.   In further support of the requested relief, the Debtors are submitting the *Declaration of Joseph W. Bliley in Support of  Debtors' Motion for Entry of an Order Approving Stipulation and (I) Authorizing the Debtors to (A) Use Collateral, Including Cash Collateral, and Grant Adequate Protection in Connection with Certain Prepetition Debentures; (B) Amend Terms of Certain Prepetition Debentures; (C) Establish Procedures for Extending the Expiration Date of, and Reimbursing the Issuing Banks for Drawn, Existing Prepetition Letters of Credit; and (D) Enter into a New Factoring Agreement; (II) Approving The Consensual Assumption of Certain Prepetition Factoring Agreements, as Amended; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (the "Bliley Declaration") attached hereto as **Exhibit B**.

## JURISDICTION

2.       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012.

3.       This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.       Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.       The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 365, 503, 507, and 553 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of

the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

## BACKGROUND

6.      On January 25, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      The Debtors' cases (the "Chapter 11 Cases") are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 58].

9.      On February 9, 2024, the Office of the United States Trustee for the Southern District of New York appointed an official committee of unsecured creditors in these cases, whose composition was amended on February 13, 2024.  See *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 114]; *Amended Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 134].  No trustee or examiner has been appointed in the Chapter 11 Cases.

10.     Further information regarding the Debtors' businesses, their capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Joseph W. Bliley in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 11].

## BACKGROUND RELEVANT TO THE MOTION

### A.      The Prepetition Debentures with the Factoring Banks

11.     On October 28, 2018, April 16, 2020, and October 1, 2020, GOL Linhas issued, in

three series, its seventh issuance of simple, non-convertible secured debentures, with additional security interest and guarantee, in an aggregate principal amount, as of the Petition Date, of R$411,125,967.60 (equivalent to US$83,562,188.54)[4] plus interest in the aggregate amount, as of the Petition Date, of R$259,464.06 (equivalent to US$52,736.60) (as amended, the "7a Debentures").  On October 27, 2021, GOL Linhas issued its eighth issuance of simple, non-convertible secured debentures, with additional security interest and guarantee, in an aggregate principal amount, as of the Petition Date, of R$445,340,923.24 (equivalent to US$90,516,447.81) plus interest in the aggregate amount, as of the Petition Date, of R$281,057.33 (equivalent to US$57,125.47) (as amended, the "8a Debentures" and together with the 7a Debentures, the "Prepetition Debentures").  GOL Linhas Aéreas Inteligentes S.A. has guaranteed the full and prompt payment of the Prepetition Debentures.  In connection with the relief requested in this Motion, the Debtors have stipulated that the Prepetition Debentures are secured by an unavoidable, perfected, valid and enforceable first priority security interest in (through a "fiduciary assignment" granted under Brazilian law of) certain Visa®-branded debit and credit card receivables (as more fully set forth in the Prepetition Debentures, the "Visa Receivables"), together with all proceeds of the Visa Receivables received prior to and after the Petition Date.[5]  The Visa Receivables and their proceeds, including any payments received on the Visa Receivables and their proceeds from the factoring of the Visa Receivables with BdoB (the "Prepetition Debentures Collateral") are held by BdoB in its capacity as the collateral agent (the "Prepetition Debentures Collateral Agent") under the Prepetition Debentures for the benefit of the Factoring Banks before they were transferred to

---

[4]    The exchange rate herein used is the exchange rate in effect as of the Petition Date, as used in the Debtors' Schedules and Statements of Financial Affairs, which is 1 USD: 4.92 BRL.

[5]    All statements in connection with the validity and priority of the Brazilian Banks' various claims, liens, and rights are subject to entry of the Proposed Order, the approval of the Stipulation, and qualified by the terms and conditions referenced in the Proposed Order and Stipulation.

the Debtors' operating accounts.  As of the Petition Date, no other party has an interest in the Prepetition Debentures Collateral that was superior to the interests of the Factoring Banks.

12.    The Prepetition Debentures, and the Total Debentures Claim (defined below) are secured by the fiduciary assignment of Visa Receivables.  As provided in the *Oitavo Aditamento ao Contrato de Constituição de Cessão Fiduciária em Garantia de Direitos Creditórios sob Condição Suspensiva e Outras Avenças*, between GOL Linhas and BdoB, the Visa Receivables constitute "all and any credit rights held by GOL Linhas Aéreas S.A. arising from sales paid with Visa credit and debit cards, including all and any current and/or future credit rights."

13.    The 7a Debentures are held by Bradesco and BdoB.  As of the Petition Date, the aggregate amount owed under the 7a Debentures was R$411,385,431.67 (equivalent to US$83,614,925.14) (the "Aggregate 7a Debentures Claim"), comprised of R$411,125,967.60 (equivalent to US$83,562,188.54) in principal amount of the 7a Debentures and R$259,464.06 (equivalent to US$52,736.60) in accrued interest.  BdoB holds approximately 54.7% of the 7a Debentures  (or  R$225,024,568.07  (equivalent  to  US$45,736,700.83)  of  the  Aggregate  7a Debentures Principal Claim) (the "BdoB 7a Debentures Principal Claim").  BdoB has claims against the Relevant Debtors for other amounts owed under the *Instrumento Particular de Escritura da 7a (Sétima) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Três Séries, da Espécie Quirografária, com Garantia Adicional Fidejussória e Real, para Distribuição Pública com Esforços Restritos de Distribuição da GOL Linhas Aéreas S.A.*, including fees, expenses, interest, late payment interest, and fines (collectively, with the BdoB 7a Debentures Principal Claim, the "BdoB 7a Debentures Claim").  Bradesco holds approximately 45.3% of the 7a Debentures  (or R$186,101,399.54)  (equivalent to US$37,825,487.71) of the Aggregate 7a Debentures Claim (the "Bradesco 7a Debentures Principal Claim").  Bradesco has claims against

the Relevant Debtors for other amounts owed under the *Instrumento Particular de Escritura da 7a (Sétima) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Três Séries, da Espécie Quirografária, com Garantia Adicional Fidejussória e Real, para Distribuição Pública com Esforços Restritos de Distribuição da GOL Linhas Aéreas S.A.*, including fees, expenses, interest, late payment interest, and fines (collectively, with the Bradesco 7a Debentures Principal Claim, the "Bradesco 7a Debentures Claim").

14.    The 8a Debentures are held by BdoB and Santander.  As of the Petition Date, the aggregate amount owed under the 8a Debentures was R$445,621,980.57 (equivalent to US$90,573,573.29) (the "Aggregate 8a Debentures Claim"), comprised of R$445,340,923.24 (equivalent to US$90,516,447.81) in principal amount of the 8a Debentures and R$281,057.33 (equivalent to US$57,125.47) in accrued interest.  BdoB holds approximately 32.8% of the 8a Debentures  (or  R$146,126,429.94)  (equivalent  to  US$29,700,493.89)  of  the  Aggregate  8a Debentures Principal Claim) (the "BdoB 8a Debentures Principal Claim").  BdoB has claims against the Relevant Debtors for other amounts owed under the *Instrumento Particular de Escritura da 8a (Oitava) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Série Única, da Espécie Quirografáriao, com Garantia Adicional Fidejussória e Real, para Distribuição Pública com Esforços Restritos de Distribuição da GOL Linhas Aéreas S.A.,* and respective amendments, including fees, expenses, interest, late payment interest, and fines (collectively, with the BdoB 8a Debentures Principal Claim, the "BdoB 8a Debentures Claim").  Santander holds approximately 67.2%  of  the  8a  Debentures  (or  R$299.214.493.30)  (equivalent  to  US$60.815.953.92)  of  the Aggregate 8a Debentures Claim (the "Santander 8a Debentures Principal Claim").  Santander has claims against the Relevant Debtors for other amounts owed under the *Instrumento Particular de Escritura da 8a (Oitava) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Série*

*Única, da Espécie Quirografáriao, com Garantia Adicional Fidejussória e Real, para Distribuição Pública com Esforços Restritos de Distribuição da GOL Linhas Aéreas S.A.,* and respective amendments, including fees, expenses, interest, late payment interest, and fines (collectively, with the Santander 8a Debentures Principal Claim, the "Santander 8a Debentures Claim").  Payment of the 8a Debentures is subordinated to payment of the 7a Debentures.  The "Total Debentures Claim" is equal to the sum of the Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim.

15.    The proceeds of the Visa Receivables are "cash collateral" of the Factoring Banks within the meaning of section 363(a) of the Bankruptcy Code (the "Debentures Cash Collateral") that is subject to valid, enforceable, non-avoidable and perfected first-priority liens in favor of the Factoring Banks that were in existence on the Petition Date.  Pursuant to the Stipulation, the Relevant Debtors and the Factoring Banks have agreed on the terms of adequate protection to be provided with respect to the Debtors' consensual use of the Visa Receivables and the Debentures Cash Collateral pursuant to the terms of the Proposed Order and the other obligations of the Debtors set forth therein in exchange for the various agreements of the Factoring Banks, including the agreement to provide postpetition factoring and Letter of Credit renewals.

16.    In addition, the Debtors believe that the continued support of the Factoring Banks is critical to the Debtors' restructuring efforts in the Chapter 11 Cases.  Accordingly, the Relevant Debtors have negotiated with the Factoring Banks with respect to certain payments to be made during the Chapter 11 Cases and the proposed repayment terms for the Aggregate 7a Debenture Claim and the Aggregate Prepetition 8a Debenture Claim under a potential chapter 11 plan.  The terms of such proposed treatment are set forth in the Stipulation.  The Factoring Banks have agreed, so long as no Event of Default occurs under the Proposed Order, to the proposed treatment of the Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim as set forth in the

Stipulation.  The Factoring Banks and the Relevant Debtors also have agreed to amend the terms of the Prepetition Debentures, as described in the Stipulation, and have executed the documents needed to amend the Prepetition Debentures (the "Debenture Amendments").

**B.    The Factoring Agreements**

17.    On July 11, 2016, BdoB and GOL Linhas entered into that certain Contract of Assignment and Acquisition of Credit Rights Originated from Credit Card Sales (as amended through the Petition Date, the "BdoB Factoring Agreement") pursuant to which GOL Linhas sold certain of its debit and credit card receivables, including the Visa Receivables (collectively, the "Receivables") to BdoB in exchange for an immediate cash payment.  Immediately prior to the Petition Date, the Debtors had continued to sell Receivables to BdoB pursuant to the terms of the BdoB Factoring Agreement.

18.    On November 30, 2023, Santander and GOL Linhas entered into that certain Termo De Adesão Às Condições Gerais De Cessão De Crédito De Recebíveis De Cartões De Crédito Sem E/Ou Com Coobrigação, Autorização De Contato Na Mesa De Atendimento E Outras Avenças (as amended through the Petition Date, the "Santander Factoring Agreement") pursuant to which GOL Linhas would sell certain of its Receivables to Santander in exchange for an immediate cash payment.  Although Receivables were never factored under the Santander Factoring Agreement, the Debtors and Santander agree that it remains in force.

19.    Most of the Debtors' ticket sales (as is common throughout Brazil) are sold in installments (usually up to 12 installments).  This structure results in a significant delay in the Debtors receiving full payment for ticket sales, including from credit card issuers.  This makes factoring agreements such as the BdoB Factoring Agreement and the Santander Factoring Agreement essential to merchants such as GOL Linhas.  Because factoring is not available to the

Debtors from other banks in the volumes required to ensure necessary cash flows to operate, it is critical to the Debtors' ability to anticipate cash flows, maintain their cash management system, and continue their overall operations that the Debtors continue to sell Receivables under the BdoB Factoring Agreement and be able to sell Receivables under the Santander Factoring Agreement.

20.     On February 27, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to Continue to (a) Use Existing Cash Management Systems, Bank Accounts, and Business Forms, (b) Factor Their Receivables, (c) Engage in Intercompany Transactions, and (d) Pay Service Charges; (II) Granting Administrative Expense Status to Intercompany Claims; (III) Waiving Compliance with Requirements of 11 U.S.C. § 345; and (IV) Granting Related Relief.* [Docket No. 190] (the "Final Cash Management Order"), authorizing the Debtors to continue selling the Receivables free and clear of any and all liens, claims, interests, or encumbrances.

21.     Although BdoB has indicated that it is unwilling to continue performance under the BdoB Factoring Agreement absent the agreement set forth in the Stipulation and entry of the Proposed Order, BdoB agreed to make purchases of, and has purchased, from GOL Linhas an aggregate of R$113,115,023.47 (equivalent to US$22,990,858.43) of Receivables after the Petition Date based upon the Relevant Debtors' assurances that the Relevant Debtors would negotiate in good faith to enter into the Stipulation and seek entry of the Proposed Order.  Similarly, Santander has indicated that it is unwilling to continue performance under the Santander Factoring Agreement absent the agreement set forth in the Stipulation and entry of the Proposed Order.

22.     Pursuant to the Stipulation, Bradesco has agreed to enter into a new factoring agreement (in the form annexed to the Stipulation, the "Bradesco Factoring Agreement" and together with the Santander Factoring Agreement and the BdoB Factoring Agreement, the "Factoring Agreements") to purchase Receivables.  Pursuant to the Stipulation, the Relevant

Debtors and BdoB and Santander, respectively, have agreed, subject to entry of the Proposed Order, to amend the BdoB Factoring Agreement and the Santander Factoring Agreement to make certain changes to take into account the pendency of the Chapter 11 Cases and to reflect the entry into the Bradesco Factoring Agreement.

23.    BdoB and Santander have consented to GOL Linhas assuming the BdoB Factoring Agreement and the Santander Factoring Agreement, respectively, under section 365(a) of the Bankruptcy Code.  Other than payment of a commitment fee and attorneys' fees, as more fully set forth in the Proposed Order, BdoB and Santander are not requiring any "cure" of any obligation or payment as a condition to assumption of their Factoring Agreements  in exchange for GOL Linhas agreeing to honor any chargeback, indemnity requests, or other obligations arising under the Factoring Agreements, in the ordinary course of business, as and when they arise.

24.    In addition, the Factoring Banks have agreed to amend the provisions of the Prepetition Debentures that currently provide that the Visa Receivables may only be sold to BdoB pursuant to the terms of the BdoB Factoring Agreement to allow the Visa Receivables to be sold to Santander and Bradesco up to the limits agreed to, and subject to maintaining the relevant percentages set forth, in the Stipulation or the Factoring Agreements.

25.    Subject to the terms of the Proposed Order, including that there has been no Event of Default, the Factoring Banks have consented to the Debtors' use of the proceeds of any Visa Receivables factored pursuant to the terms of the Factoring Agreements for any purposes permitted under the Bankruptcy Code.

**C.    The Prepetition Letters of Credit**

26.     As of the Petition Date, each of the Factoring Banks had issued standby letters of credit to the Debtors' aircraft lessors in an aggregate face amount of approximately US$85 million

11

to secure the Debtors' payment of rent, maintenance, and similar charges under the applicable leases.

27.     As of the Petition Date and the date of the Stipulation, an aggregate of US$17,566,700 in face amount of standby letters of credit issued by BdoB were outstanding (the "BdoB Letters of Credit").  Part of the aggregate face amount of the BdoB Letters of Credit is secured by an unavoidable, perfected, valid, and enforceable first priority security interest (through a "fiduciary assignment" granted under Brazilian law) in certain rights on certificates of deposit (the "BdoB L/C Collateral").  The BdoB Letters of Credit will begin to expire in October of 2024 unless BdoB agrees to extend the expiration dates of such letters of credit.  Moreover, the BdoB Letters of Credit do not allow the beneficiaries to draw on the BdoB Letters of Credit if they expire. For each of the BdoB Letters of Credit, GOL Linhas has entered into a *Contrato de Outorga de Garantia e Contragarantia* (each, a "BdoB Reimbursement Agreement" and collectively, the "BdoB Reimbursement Agreements") pursuant to which GOL Linhas has agreed to reimburse BdoB for draws under such BdoB Letter of Credit, and pay amounts in addition to reimbursement of the face amount of the BdoB Letter of Credit, as specified in the applicable BdoB Reimbursement Agreement.  The full amount drawn under a BdoB Letter of Credit, together with any other amounts payable with respect to such drawn BdoB Letter of Credit under the applicable BdoB Reimbursement Agreement, is referred to herein as the "BdoB Reimbursement Amount."  BdoB has a claim against GOL Linhas for amounts due or that might become due with respect to the BdoB Letters of Credit and the BdoB Reimbursement Agreements (the "BdoB Letter of Credit Claim").

28.     As of the Petition Date, Santander had issued and there were outstanding standby letters of credit in the aggregate face amount of US$57,567,208.00 (the "Santander Letters of Credit").  Part of the aggregate face amount is secured by an unavoidable, perfected, valid, and

enforceable first priority security interest (through a "fiduciary assignment" granted under Brazilian law) in time deposit accounts and certificates of deposit to Santander (the "Santander L/C Collateral" and, together with the BdoB L/C Collateral, the "L/C Accounts").   Specifically, according to the respective fiduciary assignment in connection with the Santander Letters of Credit, the Santander Letters of Credit are secured by an unavoidable, perfected, valid, and enforceable first priority security interest (through a "fiduciary assignment" granted under Brazilian law) of credit rights arising from investments in the form of time deposits and/or Certificate of Deposit, in the amount equivalent to approximately 50% of the obligation in the Santander Letters of Credit. As a result of the commencement of the Chapter 11 Cases, certain of the Debtors' lessors drew on Santander Letters of Credit in amounts totaling US$13,332,503.00 in aggregate face amount as of May 21, 2024 (the "Drawn Santander Letters of Credit").   As set forth herein, the Relevant Debtors shall reimburse the Drawn Santander Letters of Credit pursuant to direct deposit in the amount of US$13,332,503.00 to an account designated by Santander, and to the extent any such amounts are not reimbursed in accordance with the Proposed Order, the Relevant Debtors consent to Santander using funds in the applicable L/C Accounts to offset such amounts and modification of the automatic stay to permit such relief.   Accordingly, as of April 30, 2024, an aggregate of US$44,234,704.04 in face amount of Santander Letters of Credit are outstanding.   The Santander Letters of Credit have already begun expiring and will continue to expire throughout 2024 unless Santander agrees to extend the expiration dates of such letters of credit.   Moreover, the Santander Letters of Credit do not allow the beneficiaries to draw on the Santander Letters of Credit if they expire.   For each of the Santander Letters of Credit, GOL Linhas has entered into a *Contrato de Prestação de Garantia* (each a "Santander Reimbursement Agreement" and collectively, the "Santander Reimbursement Agreements") pursuant to which GOL Linhas has agreed to reimburse

Santander for draws under such Santander Letter of Credit, and pay other amounts specified in the applicable Santander Reimbursement Agreement. The amount owed by GOL Linhas with respect to any drawn Santander Letters of Credit, including the full amount drawn under a Santander Letter of Credit and any other amounts owed under the applicable Santander Letter of Credit and Santander Reimbursement Agreement is referred to herein as the "Santander Reimbursement Amount." Santander has claims against GOL Linhas for amounts due with respect to the Drawn Santander Letters of Credit and for amounts that are due or might become due with respect to the Santander Letters of Credit and the Santander Reimbursement Agreements, including the Santander Reimbursement Amount (the "Santander Letter of Credit Claim").

29.     As of the Petition Date and as of the date of the Stipulation, Bradesco had issued and outstanding standby letters of credit in the aggregate face amount of US$10 million (the "Bradesco Letters of Credit"). The Bradesco Letters of Credit will expire on July 14, 2024, November 16, 2024, and December 5, 2024, unless Bradesco agrees to extend the expiration dates of such letters of credit. Moreover, the Bradesco Letters of Credit do not allow the beneficiaries to draw on the Bradesco Letters of Credit if expire. In each of the Bradesco Letters of Credit, named *Instrumento Particular para Concessão de Garantia* (each, a "Bradesco Reimbursement Agreement" and collectively, the "Bradesco Reimbursement Agreements"), GOL Linhas has agreed to reimburse Bradesco for draws under the respective Bradesco Letter of Credit, and pay other amounts specified in such Bradesco Reimbursement Agreement. The full amount drawn under the Bradesco Letters of Credit, including any other amounts owed under the applicable Bradesco Reimbursement Agreements, is referred to herein as the "Bradesco Reimbursement Amounts." Bradesco has a claim against GOL Linhas for amounts due or that might be due with respect to the Bradesco Letters of Credit and the Bradesco Reimbursement Agreements (the

"Bradesco Letter of Credit Claim" and collectively, with the BdoB Letter of Credit Claim and the Santander Letter of Credit Claim, the "Letter of Credit Claims").

30.     The BdoB Letters of Credit, the Santander Letters of Credit, and the Bradesco Letters of Credit are collectively referred to herein as the "Letters of Credit." A schedule of each of the outstanding Letters of Credit is included on Exhibit B to the Proposed Order. The BdoB Reimbursement Agreements, the Santander Reimbursement Agreements, and the Bradesco Reimbursement Agreements are collectively referred to herein as the "Reimbursement Agreements." The BdoB Reimbursement Amount, the Santander Reimbursement Amount, and the Bradesco Reimbursement Amount are collectively referred to herein as the "Reimbursement Amounts."

31.     In the ordinary course of business, GOL Linhas maintains the L/C Accounts, including time deposit accounts and/or certificates of deposit at certain of the Factoring Banks that have been granted to the applicable Factoring Bank to secure its respective Letters of Credit, and each such bank has a right to offset amounts held in the applicable Factoring Bank's L/C Accounts against any reimbursement claims against GOL Linhas for amounts drawn on the Letters of Credit. The BdoB Letters of Credit and Santander Letters of Credit are secured (through a "fiduciary assignment" granted under Brazilian law) by an unavoidable, perfected, valid and enforceable first priority security interest (through a "fiduciary assignment" granted under Brazilian law) in the applicable L/C Accounts and the proceeds thereof. As of the Petition Date, no other party had a superior interest in the L/C Accounts or the proceeds thereof to the interests, as applicable, of the Factoring Banks. The cash in the L/C Accounts is "cash collateral" of the Factoring Banks within the meaning of section 363(a) of the Bankruptcy Code (the "L/C Cash Collateral") that is subject to valid, enforceable, non-avoidable and perfected first-priority liens in existence on the Petition

Date.  The Factoring Banks do not consent to, and the Debtors are not seeking authority for, the use of any of the L/C Cash Collateral by the Debtors.

32.    In connection with the settlement of issues arising in respect of the Letters of Credit and the Factoring Banks' agreement to renew expiring Letters of Credit, the Debtors acknowledge the validity and priority of the "fiduciary assignment" (granted under Brazilian law) in the L/C Accounts and L/C Cash Collateral asserted by the Factoring Banks and seek to modify the automatic stay to permit the Factoring Banks to exercise their rights and remedies, subject to the terms and conditions of the Proposed Order.

## BANKRUPTCY RULE 4001 AND LOCAL RULE 400-2 CONCISE STATEMENT

33.    In accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2, summarized below are the material terms of the Proposed Order and Stipulation, with references to the applicable paragraphs of the Proposed Order and/or Stipulation where applicable.[6]

    (a)    **Treatment of Prepetition Debentures** (Order ¶ K; Stipulation § II)

        (i)    The terms of the Prepetition Debentures shall be amended to allow the Visa Receivables to be sold to all of the Factoring Banks in such amounts as set forth in the Stipulation and provide for the changes described in the Stipulation.

        (ii)    The Relevant Debtors will use commercially reasonable efforts (in all cases subject to their fiduciary duties) to provide treatment of the Prepetition Debenture Claims under a chapter 11 plan for the Relevant Debtors (the "Chapter 11 Plan") on terms that are no less favorable than the Proposed Plan Terms (as defined in the Stipulation).  The Chapter 11 Plan will not contain any terms that materially adversely affect the Factoring Banks or are inconsistent with the Proposed Plan Terms.

        (iii)    So long as no Event of Default has occurred under the Proposed Order, then each of the Factoring Banks agrees to:

---

[6]    Any summary or description of the Stipulation and Proposed Order included this Motion is qualified in its entirety by the provisions of the Proposed Order and Stipulation, as applicable.

(a) use commercially reasonable efforts to support the Chapter 11 Plan containing the Proposed Plan Terms and to seek to obtain the required internal approvals to vote in favor of such Chapter 11 Plan, subject to receipt of a court-approved Disclosure Statement under section 1125 of the Bankruptcy Code;

(b) not object to the treatment of its 7a Debentures Claim and 8a Debentures Claim under a Chapter 11 Plan on the terms described in the Stipulation; *provided that*, notwithstanding anything to the contrary in the Proposed Order or the Stipulation, if the class of 7a Debentures holders and 8a Debentures holders under the Chapter 11 Plan votes to reject the Chapter 11 Plan, the Debtors reserve all rights to propose an alternative treatment for such class; and

(c) not, directly or indirectly, (A) support or encourage the termination or modification of any of the Debtors' exclusive periods for filing a Chapter 11 Plan or (B) take any other action that is inconsistent with the Stipulation, the Chapter 11 Plan, or the Proposed Order or is reasonably likely to prevent, hinder, interfere with, delay, or impede the implementation or consummation of the Chapter 11 Plan.

(b) **Use of Factoring Banks' Prepetition Debentures Collateral** (Order ¶¶ I, J, 22, 26)

(i) The Factoring Banks are consenting to the Relevant Debtors' use of the Prepetition Debentures Collateral (including the Debentures Cash Collateral) exclusively pursuant to the terms of the Proposed Order, including without limitation, the proceeds from the sale of any Visa Receivables factored pursuant to the terms of the Factoring Agreements.

(ii) Upon an Automatic Event of Default (as outline in bullet (g) below), the Relevant Debtors shall have no right to continue to use the Debentures Cash Collateral.

(iii) Upon an Optional Event of Default (as outlined in bullet (g) below), any two of the Factoring Banks, by written notice to the Debtors (which may be given by email), may withdraw their consent to the use of the Debentures Cash Collateral or any Visa Receivables.

(c) **Factoring Agreements** (Order ¶¶ L-V; Stipulation § III)

(i) The Factoring Banks shall make factoring available to the Debtors in the Factoring Amounts and the proportions and on the terms set forth in the Stipulation.

(ii) The BdoB Factoring Agreement and Santander Factoring Agreement shall be amended to incorporate the terms and conditions described in the Stipulation and such other provisions as each Factoring Bank and GOL

17

Linhas may agree.  Santander and BdoB have consented to the assumption of their respective Factoring Agreements, as amended, so long as GOL Linhas complies with its obligations under the Proposed Order and the Factoring Agreements relating to chargebacks, indemnity, or other required payments as and when they arise.  Bradesco and GOL Linhas will enter into the Bradesco Factoring Agreement, which will incorporate the terms and conditions described in the Stipulation and such other provisions as may be agreed.

(d)     **Reimbursement of Drawn Letters of Credit** (Order ¶¶ W-EE; Stipulation § IV)

(i)     Each of the Factoring Banks agrees that, so long as no Automatic Event of Default has occurred, no event has occurred that would allow a Factoring Bank to suspend performance under the Stipulation or Proposed Order, and no Optional Event of Default has been declared, then, no later than thirty (30) days prior to the scheduled expiration date of an outstanding Letter of Credit, it will renew such outstanding Letter of Credit if, prior to such date, such Factoring Bank receives a written request from GOL Linhas to renew such Letter of Credit.  If GOL Linhas timely requests a renewal of a Letter of Credit, then the Factoring Banks have agreed that the applicable bank will renew such Letter of Credit for a period not to exceed one year (or longer, if GOL Linhas so requests and the Factoring Bank agrees to such longer period in its sole discretion), with all the other original terms and conditions of the Letter of Credit to be maintained.  In exchange, GOL Linhas has agreed to pay the Factoring Banks the applicable Reimbursement Amount owed for any Letter of Credit drawn prior to entry of the Proposed Order.

(ii)    In addition, if any Letter of Credit is drawn after the Petition Date, the Factoring Bank shall use funds from its respective L/C Accounts securing the respective Letter of Credit to satisfy the reimbursement obligation of GOL Linhas with respect to the Letters of Credit.  GOL Linhas shall satisfy any shortfall with respect to such Reimbursement Amount within two (2) Business Days of written notice (which may be given by email).

(e)     **Proposed Adequate Protection** (Order ¶ 6)

As adequate protection for any diminution in value of their respective interests in the Prepetition Debentures Collateral as of the Petition Date and as consideration for the agreement of the Factoring Banks to allow the Relevant Debtors to use the Debentures Cash Collateral and the Visa Receivables pursuant to the Proposed Order, provide additional liquidity and funding to the Relevant Debtors by entering into the Factoring Agreements, and  renew the Letters of Credit, the Relevant Debtors have agreed to the following:

(i)     the Prepetition Debentures Collateral Agent, for the benefit of itself and the other holders of the Prepetition Debentures, shall be granted an

18

unavoidable, valid, perfected, and enforceable replacement security interest in (through a "fiduciary assignment" granted under Brazilian law), to the extent of any diminution in value of the Prepetition Debentures as of the Petition Date, all Debentures Cash Collateral and all Visa Receivables (including all proceeds thereof and profits generated therefrom) created from and after the Petition Date that secure (or would have secured, but for the commencement of the Chapter 11 Cases) the amounts due under the Prepetition Debentures (the "Adequate Protection Liens"), which shall be first priority liens on and security interests in the Visa Receivables and the Debentures Cash Collateral and shall not be made junior to or *pari passu* with any lien or security interest heretofore or hereafter granted or created in any of the Chapter 11 Cases or any successor cases and shall, automatically upon entry of the Proposed Order, be valid and enforceable against the applicable Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases, without any further action by any party;

(ii)     the Prepetition Debentures Collateral Agent, for the benefit of itself and the other holders of the Prepetition Debentures, shall have an allowed superpriority administrative expense (the "Adequate Protection Claim") against GOL Linhas and the Guarantor, which shall have priority under section 507(b) of the Bankruptcy Code, subject to the Carve-Out;

(iii)    the Relevant Debtors shall pay the Factoring Banks the 10% Debenture Amortization Payment, the 90% Debenture Amortization Payment, and monthly accrued and unpaid interest due under the Prepetition Debentures at the current non-default contractual rate of Certificado de Depósito Interbancário ("CDI") rate plus 5.25% (which payment will be treated as interest);

(iv)     during the Chapter 11 Cases, the consolidated balance of cash and cash equivalents (excluding any restricted cash and measured as of the last Business Day of each month) (the "Unrestricted Cash Balance") of all Debtors shall not be less than R$1.0 billion; and

(v)      GOL Linhas will, within ten (10) days after the end of each month, provide each of the Factoring Banks with a written report showing the Unrestricted Cash Balance as of the end of such month.

(f)      **Transaction and Attorneys' Fees** (Order ¶ 19)

As part of the cure required to assume the BdoB Factoring Agreement and the Santander Factoring Agreement (each as amended by the Stipulation), as consideration for the Bradesco Factoring Agreement, the Factoring Banks' renewal of the Letters of Credit and other agreements in the Stipulation, and as additional adequate protection, each of the Factoring Banks shall be entitled to receive the following:

    (i)     an upfront transaction fee equal to one percent (1.0%) of the Total Debentures Claim payable no later than five (5) Business Days after the entry of the Proposed Order, which fee will be allocated *pro rata* among each of the Factoring Banks in accordance with their respective holdings of the Prepetition Debentures and will not be deducted from the Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim;

    (ii)    a yearly commitment fee equal to one half of a percent (0.5%) of the maximum Factoring Amount that each such Factoring Bank has agreed to purchase, payable no later than five (5) Business Days after the entry of the Proposed Order and on each anniversary thereafter until the earlier of the (1) termination of the Factoring Banks' commitment to provide new factoring under the Stipulation and Proposed earlier and (2) Plan Effective Date; and

    (iii)    payments of the reasonable and documented fees and expenses of one U.S. and one non-U.S. outside legal counsel for each of the Factoring Banks designated in the Stipulation incurred in connection with (1) the negotiation of the Stipulation and the Proposed Order; (2) the exercise of any rights and remedies permitted under the Proposed Order, the Stipulation, the Letters of Credit, Reimbursement Agreements, or the Factoring Agreements, and (3) such other actions as may be reasonably necessary to ensure the protection of the rights and interests of the Factoring Banks with respect to the Proposed Order, the Stipulation, the Letters of Credit, Factoring Agreements, Reimbursement Agreements, or Prepetition Debentures.

(g)    **Events of Default** (Order ¶¶ 22-23)

    (i)     Each of the following will constitute an Automatic Event of Default under the Proposed Order and the Stipulation:

        (a)   (i) entry of an order by the Court (1) appointing a chapter 11 trustee or an examiner with expanded powers relating to the operation of the Relevant Debtors' businesses in the Chapter 11 Cases, (2) converting the Relevant Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or (3) reversing, amending, supplementing, staying, vacating, or otherwise modifying the Proposed Order or the Stipulation without the written consent of each of the Factoring Banks, and (ii) either such order has not been stayed by the time within which to file a notice of appeal has expired or such order has been affirmed by a final, non-appealable order of an appellate court;

        (b)   the occurrence of a "DIP Event of Default" *and* the DIP Secured Parties have validly terminated the DIP Commitments (each as defined in the Final DIP Order) and begun exercising remedies;

(c)    entry of an order by another court of competent jurisdiction reversing, amending, supplementing, staying, vacating, or otherwise modifying the Proposed Order or the Stipulation (including, without limitation, any finding that any lien is senior to priority to the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts), or the Adequate Protection Liens granted hereunder, or finding that the fiduciary assignment of the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts) or any of the Adequate Protection Liens granted hereunder is invalid in whole or material part) without the written consent of each of the Factoring Banks, and either (i) such order has not been stayed or reversed within 45 days of the entry thereof or (ii) such order has been affirmed by a final, non-appealable order of an appellate court;

(d)    announcement by the Relevant Debtors that they have permanently discontinued substantially all scheduled passenger services; and

(e)    substantial consummation of a sale of all or substantially all assets of the Relevant Debtors.

(ii)    Each of the following will constitute an Optional Event of Default under the Proposed Order and the Stipulation:

(a)    any Debtor files a motion or other pleading, commences a proceeding, or solicits, supports, or encourages any other party to file a motion or pleading or to commence a proceeding seeking appointment of a chapter 11 trustee or an examiner with expanded powers relating to the operation of the Relevant Debtors' businesses in the Chapter 11 Cases, and such matter or proceeding remains pending for more than thirty (30) days;

(b)    the failure of GOL Linhas to recompose the collateral coverage ratio set forth in section 2.8 et seq. of the Prepetition Debentures Collateral Agreement within the time frame and on the conditions set forth therein;

(c)    filing of a motion by any party seeking a finding that any lien or interest is senior to priority to the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts), or the Adequate Protection Liens or challenging the fiduciary assignment of the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts), and the Debtors fail to file an objection to such motion within twenty (20) days of notice of such motion or thereafter fail to diligently prosecute such objection;

(d)    entry of an order by a court of competent jurisdiction finding that any lien is senior to priority to the Prepetition Debentures Collateral, the

21

L/C Cash Collateral (or the L/C Accounts), or the Adequate Protection Liens granted hereunder, or finding that the fiduciary assignment of the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts) or any of the Adequate Protection Liens granted hereunder is invalid in whole or material part, and either (i) such order has not been stayed by the time within which to file a notice of appeal has expired or (ii) such order has been affirmed by a final, non-appealable order of an appellate court;

(e) either (x) a chapter 11 plan is proposed by or with the consent of the Relevant Debtors or (y) a disclosure statement is approved with respect to any chapter 11 plan that does not satisfy the requirements in subsections (i) and (ii) and a disclosure statement for a plan supported by the Relevant Debtors has not been approved, and in either case, such plan either (i) does not provide for treatment of the Debentures Claims as set forth herein and in the Stipulation or (ii) is less favorable than the proposed treatment described herein and in the Stipulation and such default remains uncured for ten (10) days following written notice;

(f) any Factoring Bank has an outstanding and past due Reimbursement Amount after reimbursing itself pursuant to paragraph 18 of the Proposed Order and GOL Linhas has failed to pay such outstanding Reimbursement Amount within two (2) Business Days following written notice;

(g) GOL Linhas fails to make the payments pursuant to paragraph 6 of the Proposed Order and such default remains uncured for three (3) Business Days following written notice;

(h) the Relevant Debtors fail to make (i) payments to the Factoring Banks due under their applicable Factoring Agreements or (ii) any other payments due under the Proposed Order within five (5) Business Days following written notice;

(i) after the entry of the Proposed Order, any of the Relevant Debtors otherwise defaults on its non-pecuniary obligations arising after the entry of the Proposed Order, to a Factoring Bank under the Stipulation, the Proposed Order, the Factoring Bank's applicable Reimbursement Agreement or Letters of Credit, or the applicable Factoring Agreement, and such default remains uncured for ten (10) days following written notice; *provided that* such default is not caused by the filing of the Chapter 11 Cases or a cross-default under any agreement that is not the subject of the Proposed Order or the Stipulation;

(j)    the Relevant Debtors fail to comply with (i) paragraph 6.e of the Proposed Order or (ii) paragraph 6.f. of the Proposed Order (and such failure to report remains uncured for ten (10) calendar days following written notice); and

(k)    the Debtors, on a consolidated basis, fail to maintain a "flight regularity" of at least 96%, measured monthly by averaging the flight regularity for the prior two months; *provided that*, this requirement shall be waived during extreme weather events that directly affect the Relevant Debtors' business operations until the Relevant Debtors can return to their ordinary course business operations.

## **BASIS FOR RELIEF**

A.    **Reimbursement of the Banks for Draws Under Prepetition L/Cs Is Reasonable, Necessary, and Appropriate**

34.    Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession, "after notice and a hearing, to use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  *See In re Diocese of Buffalo*, 637 B.R. 701, 703 (Bankr. W.D.N.Y. 2022) ("Pursuant to 11 U.S.C. § 363(b)(1), the [Debtors] may conduct such a sale[ of, or use or lease estate property,] only after notice and a hearing.").  In order to justify such use, the debtor must demonstrate a valid business justification therefor.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").  Similarly, section 503(c)(3) of the Bankruptcy Code requires that postpetition use of estate property be "justified by the facts and circumstances of the case."  In this district, "[c]ourts have held that the 'facts and circumstances' language of [11 U.S.C. §] 503(c)(3) creates a standard no different than the business judgment standard under [11 U.S.C. §] 363(b)."  *See In re Borders Grp., Inc.*, 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011).  The Second Circuit requires that "transactions under section 363 be based on the sound business judgment of the debtor or trustee."  *See In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y.

2012).   Generally, courts will not entertain objections to the debtor's conduct when the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously).   *Id*.   Under section 363, "[t]he business judgment rule's presumption shields corporate decision-makers and their decisions from judicial second-guessing[.]"   *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992)).   If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction.   *See In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) (citing *In re Integrated Res., Inc*., 147 B.R. 650, 656 (S.D.N.Y. 1992)).

35.    Here, there is ample business justification for the Debtors to agree to reimburse the Factoring Banks for the draws on prepetition Letters of Credit. The Letters of Credit are a critical component of the Debtors' operations—they secure the Debtors' payment of rent, maintenance, and similar charges under the applicable leases with the Debtors' aircraft lessors.  If the Letters of Credit are not timely renewed, the Debtors will be in breach of those leases, thereby detrimentally affecting the Debtors' ability to operate.   Further, reimbursing the Factoring Banks for drawn Letters of Credit will not result in a net loss to the Debtors' estates.  The Debtors intend to continue complying with their obligations under the applicable leases pursuant to the stipulations entered into with their aircraft lessors, in which case no Letters of Credit will be drawn. As such, any draw on a Letter of Credit would be the equivalent of a missed lease payment that the Debtors likely intended to pay, in the first instance.

36.    Finally, it is essential to the preservation of the Debtors' going concern value that they have sufficient ability to liquidate their credit and debit card receivables on a current basis,

without having to wait for those receivables to otherwise become available.  As discussed above, the Debtors need cash flow from the Factoring Agreements to properly operate their business, anticipate cash flow, and timely satisfy various financial obligations and covenants.  Accordingly, the Debtors conducted months long, good-faith, arms-length negotiations with the Factoring Banks to expeditiously reinstate the Factoring Agreements (and, with respect to Bradesco, enter into a new Factoring Agreement) and meet the Debtors' essential liquidity needs.  As a condition to amending and continuing performance under the BdoB and Santander Factoring Agreements and entering into the Bradesco Factoring Agreement, the Factoring Banks have requested assurances that they will be compensated for any exposure they may face in connection with the Debtors' obligations under the Letters of Credit, whether such obligations were incurred pre or postpetition.  The Debtors believe such conditions as negotiated under the Factoring Agreements are in the best interests of the Debtors and align with industry standards.

37.    Additionally, under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code."  11 U.S.C. § 105(a); *see also CoServ*, 273 B.R. at 497 (sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor in possession to pay prepetition claims). Courts have interpreted Bankruptcy Code section 105 to authorize postpetition payment of prepetition claims when the payments are essential to the continued operation of a debtor's business and critical to preserving the going concern value of the debtor's estate, as is the case here.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 496–97 (Bankr. N.D. Tex. 2002) ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").

**B.      Assumption of BdoB Factoring Agreement and Santander Factoring Agreement is Justified under Sections 363(b) and 365(a).**

38.      The consensual assumption of the BdoB Factoring Agreement and the Santander Factoring Agreement, and payment of the commitment and attorney's fees in connection therewith, is fair, equitable, reasonable, and the product of the Debtors' exercise of their sound business judgment.  Therefore, such relief is justified under sections 105(a), 363(b), and 365(a) of the Bankruptcy Code.

39.      Section 365 of the Bankruptcy Code allows a debtor in possession (with bankruptcy court approval) to maximize the value of its estates by, among other things, assuming executory contracts and unexpired leases. *See* 11 U.S.C. § 365(a); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521–22 (1984); *Orion Pictures Corp. v Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993). In determining whether to permit a debtor to assume or reject a contract or lease,  "the debtor's interests are paramount." C*OR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic  Co.)*, 524 F.3d 373, 383 (2d Cir. 2008). Accordingly, the decision to assume or reject an executory  contract or unexpired lease is governed by the business judgment rule, which requires that a debtor  determine that the requested assumption would be beneficial to its estates. *See Grp. of Institutional Invs. v. Chicago, M., St. P. & P.R. Co.*, 318 U.S. 523, 550 (1943) (finding that the question of  assumption "is one of business judgment"); *In re Penn Traffic*, 524 F.3d at 383 (same); *In re Old Carco LLC*, 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009) (same); *In re Helm*, 335 B.R. 528, 538  (Bankr. S.D.N.Y. 2006) (same).

40.      The Debtors respectfully submit assuming the BdoB Factoring Agreement and Santander Factoring Agreement, and making the necessary payments in connection therewith, represents a sound exercise of their business judgment and is justified under sections 365(a) of the Bankruptcy Code.  As discussed above, the Debtors need cash flow from these Factoring

Agreements to properly operate their business, anticipate cash flow, and timely satisfy various financial obligations and covenants. Moreover, as a condition to the consensual assumption, BdoB and Santander are requiring payment of a commitment fee and attorneys' fees.

41.    Accordingly, the Debtors submit that assumption of these Factoring Agreements and payment of the fees in connection therewith are in the best interests of the Debtors' estates and satisfy the business judgment standard.

   **C.    Granting Superpriority Administrative Expense Claims Under 364(c) for Reimbursement Amounts With Respect to Letters of Credit Renewed Postpetition is Reasonable and Appropriate.**

42.    The Factoring Banks have agreed, to the extent a Letter of Credit is set to expire during the pendency of the Chapter 11 Cases, to extend the maturity date for the period set forth in the applicable Letter of Credit on substantially similar terms and conditions as existed as of the Petition Date. The extension of the maturity date for any Letter of Credit constitutes a postpetition extension of credit to and for the benefit of the Relevant Debtors, as contemplated by section 364 of the Bankruptcy Code.

43.    Accordingly, granting priority and granting liens are both appropriate under section 364(c)(1) of the Bankruptcy Code, which provides, in relevant part that "the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title."

   **D.    The Proposed Adequate Protection Is Reasonable and Appropriate.**

44.    Section 363(e) of the Bankruptcy Code provides that, on request of a secured creditor, "notwithstanding any other provision" of section 363, the court must "prohibit or condition" the use, sale, or lease of estate property "as is necessary to provide adequate protection" of such creditor's security interest.11 U.S.C. § 363(e). Although the Bankruptcy Code does not define the term "adequate protection," it provides a non-exhaustive list of types of adequate

27

protection, including "cash payment or periodic cash payments," "additional or replacement liens," and "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. 11 U.S.C. § 361(1), (3); *see also In re Woodcrest Club, Inc.*, 2010 Bankr. LEXIS 5692 at *14 (Bankr. E.D.N.Y. 2010) (granting adequate protection in the form of cash payment under the pre-petition contractual rate and of a right to monitor the collateral).

45.     While section 361 of the Bankruptcy Code sets forth three non-exclusive forms of adequate protection, the concept of adequate protection is designed to give the "parties and the courts flexibility by allowing such other relief [that] will result in the realization by the protected entity of the value of its interest in the property involved." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (emphasis added) (quoting H. Rep. No. 95-595, 95th Cong., 1st Sess. (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296 (1978)). Thus, the goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interests that results from the debtor's use of its cash collateral. *See e.g.*, *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996); *see also In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd* on other grounds, 89 B.R. 336 (S.D.N.Y. 1988).

46.     Moreover, courts regularly authorize the use of cash collateral to enhance or preserve a debtor's going concern value. *See, e.g.*, *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was used to pay normal operating and maintenance expenditures on the collateral property); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditors' secured position would be enhanced by the continued operation of the debtors' business);

*In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is no actual diminution of value of collateral and the debtor can operate profitably post-petition, then the secured creditor is adequately protected).

47.    In exchange for the Debtors' use of the Debentures Cash Collateral—which is critical to the Debtors' ability to operate—the proposed adequate protection provides the Factoring Banks with the Adequate Protection Liens and Adequate Protection Claims, in each case, to the extent of any diminution in value and amended amortization and interest payments.  The Relevant Debtors are also agreeing to maintain a consolidated cash balance of all Debtors during these cases of at least R$1 billion, measured monthly, and provide the Factoring Banks with a written report showing such balance as of the end of the month.  The terms and conditions on which the Debtors may use the Debentures Cash Collateral were designed to meet the dual goals of sections 361 and 363 of the Bankruptcy Code, and the proposed adequate protection package is reasonable and appropriate given the circumstances of these cases.

**E.    The Proposed Setoff Is Reasonable and Appropriate**

48.    Section 553(a) of the Bankruptcy Code provides that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement . . . . " 11 U.S.C. § 553(a).

49.    The Factoring Banks' setoff rights are governed by certain Brazilian law-governed agreements, which provide that, if the Debtors do not make reimbursement payments in connection with the draws on the Letters of Credit, the Factoring Banks are authorized to use funds in the L/C Accounts to pay themselves the amount disbursed under drawn Letters of Credit.  Accordingly, it

is reasonable and appropriate to allow the Factoring Banks to exercise these setoff rights as permitted under the Proposed Order.

### F.    The Automatic Stay Should Be Modified

50.    Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).

51.    Section 362(d)(1) of the Bankruptcy Code, however, permits a debtor or other parties in interest to request modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).  Section 362(d)(1) does not define what constitutes "cause" for relief from the automatic stay.  *See In re Touloumis*, 170 B.R. 825, 828 (Bankr. S.D.N.Y. 1994).  Under section 362(d)(1), "cause" is an intentionally broad and flexible concept which must be determined on a case-by-case basis."  *See In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (quoting *In re Brown*, 311 B.R. 409, 412–13 (E.D. Pa. 2004)).  The decision whether to grant relief from the automatic stay falls within the discretion of the bankruptcy court.  *See In re Burger Boys, Inc.*, 183 B.R. 682, 687–688 (S.D.N.Y. 1994).

52.    On a case-by-case basis, courts in the Second Circuit consider the twelve factors established in *Sonnax Industries* when determining whether relief from the automatic stay is appropriate.  *See In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1287 (2d Cir. 1990); *see also In re Lehman Bros. Holdings Inc.*, 435 B.R. 122, 138 (S.D.N.Y. 2010) ("*Sonnax* . . . is routinely referenced as the leading relief from stay precedent in this Circuit.").  The twelve *Sonnax* factors are:

(1)    whether relief would result in a partial or complete resolution of the issues;

(2)     lack of any connection with or interference with the bankruptcy case;

(3)     whether the other proceeding involves the debtor as a fiduciary;

(4)     whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5)     whether the debtor's insurer has assumed full responsibility for defending it;

(6)     whether the action primarily involves third parties;

(7)     whether litigation in another forum would prejudice the interests of other creditors;

(8)     whether the judgment claim arising from the other action is subject to equitable subordination;

(9)     whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10)    the interests of judicial economy and the expeditious and economical resolution of litigation;

(11)    whether the parties are ready for trial in the other proceeding; and

(12)    impact of the stay on the parties and the balance of harms.

*See In re Sonnax Industries*, 907 F.2d at 1287.  Notably, not all of the *Sonnax* factors are relevant in every case.  *See In re Bogdanovich*, 292 F.3d 104, 110 (2d Cir. 2002) (citing *In re Mazzeo*, 167 F.3d 139, 143 (2d Cir. 1999)).  Additionally, the Court need not assign equal weight to each factor.  *See In re Keene Corp.*, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).  Only the relevant factors need to be considered.  *See In re Touloumis*, 170 B.R. at 828.

53.     Here, certain provisions in the Proposed Order contemplate a modification of the automatic stay, including in order to permit (i) the Relevant Debtors to provide the adequate protection described herein and otherwise implement the terms of the Proposed Order; and (ii) the Factoring Banks to exercise their rights and remedies permitted under the Proposed Order upon an Event of Default, including (A) withdrawing consent for the Debtors' use of the Prepetition Debentures Collateral, (B) terminating factoring and no longer renewing Letters of Credit, (C) setting off reimbursement amounts against collateral pledged as security for the Letters of Credit, and (D) setting off amounts owed by the Relevant Debtors under the Factoring Agreements against proceeds held by the Relevant Debtors.

54.     Such stay modification, in the Debtors' business judgment, is reasonable under the circumstances as a necessary component of the overall adequate protection package the Debtors have agreed to provide to the Factoring Banks.  And, as discussed above, the agreement with the Factoring Banks significantly benefits the Debtors' estates by laying the foundation for a confirmable plan and providing access to factoring, extending the amortization of the Prepetition Debentures, and ensuring that Letters of Credit will be renewed.  Importantly, many of the relevant *Sonnax* factors are present here.  Specifically, the stay modification will resolve many, if not all, of the concerns at issue for the parties involved, will have limited or no interference in the Chapter 11 Cases, and is a net positive with regard to judicial economy, and the impact of the stay on the parties and balance of harms is non-existent.

55.     Accordingly, the Debtors request that the Court authorize the modification of the automatic stay as set forth in the Proposed Order.

### G.     The Plan-Related Provisions Are Appropriate and Reasonable.

56.     Finally, the plan-related provisions included in the Stipulation are appropriate and reasonable. First, the terms are fully consensual. Second, these provisions represent an arm's length global settlement to resolve key issues between the Factoring Banks and the Relevant Debtors and are a significant element in the development of the Debtors' chapter 11 plan.  Third, the provisions are limited in scope and impact only the Factoring Banks (a group of secured creditors); the provisions do not bind other creditors because the Factoring Banks are the sole creditors holding the claims against the Debtors in respect of these prepetition notes.  Moreover, the Debtors have

prepared their business plan[7] so the Factoring Banks have information upon which to support the proposed treatment.

57.    Accordingly, the Debtors submit that the plan support provision is reasonable and in the best interests of their estates and request that the Court approve the Stipulation in its entirety, including the plan support provision therein.

## **MOTION PRACTICE**

58.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

## **NOTICE**

59.    Notice of this Application will be provided in accordance with the procedures set forth in the *Final Order Implementing Certain Notice and Case Management Procedures* [Docket No. 175].  The Debtors respectfully submit that no further notice is required.

## **NO PRIOR REQUEST**

60.    No prior request for the relief sought in this Motion has been made to this or to any other court.

*[Remainder of page intentionally left blank]*

---

[7]    A copy of the publicly-filed business plan can be found on the Debtors' case website at: https://cases.ra.kroll.com/GOL/.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed

Order and grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       July 9, 2024

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
1850 K St NW, Suite 1100,
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                        :    Case No. 24-10118 (MG)
et al.,[1]                                                  :
                                                            :    (Jointly Administered)
                                         Debtors.           :
                                                            :
------------------------------------------------------------x
```

**ORDER APPROVING STIPULATION AND (I) AUTHORIZING THE DEBTORS TO
(A) USE COLLATERAL, INCLUDING CASH COLLATERAL, AND GRANT
ADEQUATE PROTECTION IN CONNECTION WITH CERTAIN PREPETITION
DEBENTURES; (B) AMEND TERMS OF CERTAIN PREPETITION DEBENTURES;
(C) ESTABLISH PROCEDURES FOR EXTENDING THE EXPIRATION DATE OF,
AND REIMBURSING THE ISSUING BANKS FOR DRAWN, EXISTING
PREPETITION LETTERS OF CREDIT; AND (D) ENTER INTO A NEW FACTORING
AGREEMENT; (II) APPROVING THE CONSENSUAL ASSUMPTION OF CERTAIN
PREPETITION FACTORING AGREEMENTS, AS AMENDED; (III) MODIFYING
THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")[2] have

filed that certain *Debtors' Motion for Entry of an Order Approving Stipulation and (I) Authorizing*

*the Debtors to (A) Use Collateral, Including Cash Collateral, and Grant Adequate Protection in*

*Connection with Certain Prepetition Debentures; (B) Amend Terms of Certain Prepetition*

*Debentures; (C) Establish Procedures for Extending the Expiration Date of, and Reimbursing the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A);
GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A.
(N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo
S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A);
Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento
no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu
Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2]    Unless clearly specified otherwise herein, the terms of this Order and the Stipulation shall only apply to GOL
Linhas Aéreas Inteligentes S.A. (the "***Guarantor***") and GOL Linhas Aéreas S.A. ("***GOL Linhas***" and, together
with the Guarantor, the "***Relevant Debtors***").

*Issuing Banks for Drawn, Existing Prepetition Letters of Credit; and (D) Enter into a New Factoring Agreement; (II) Approving the Consensual Assumption of Certain Prepetition Factoring Agreements, as Amended; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. [●]] (the "***Motion***") seeking entry of an agreed Order (the "***Order***") reflecting, among other things, the terms of a stipulation, dated July 9, 2024, a copy of which is attached hereto as Exhibit "A" (the "***Stipulation***") by and among the Relevant Debtors and each of Banco Santander S.A. (Brasil) ("***Santander***"), Banco do Brasil S.A, ("BdoB"), and Banco Bradesco S.A. ("Bradesco" and, together with Santander and BdoB, the "***Factoring Banks***") pursuant to sections 105(a), 361, 362, 363, 364, 365, 503, 507, and 553 of title 11 of the United States Code (the "***Bankruptcy Code***"); Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"); and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "***Local Rules***"), seeking the following relief:

(i)        authorizing the Debtors to (a) use collateral, including cash collateral, and grant adequate protection in connection with the Prepetition Debentures (as hereinafter defined); (b) amend certain terms of the Prepetition Debentures to, inter alia, permit the factoring of the collateral thereunder to any of the Factoring Banks; (c) establish procedures in connection with extending the expiration date or the renewal or continuation of any prepetition letters of credit issued by the Factoring Banks; (d) enter into a new factoring agreement with Bradesco; and (e) enter into the Stipulation with the Factoring Banks providing for certain proposed treatment of the Prepetition Debentures, Letters of Credit, and Factoring Agreements (each as hereinafter defined) under a chapter 11 plan;

(ii)       approving, with the consent of BdoB, the assumption of the BdoB Factoring Agreement (as hereinafter defined), as amended in accordance with the terms set forth in the

Stipulation;

(iii)   approving, with the consent of Santander, the assumption of the Santander Factoring Agreement (as hereinafter defined), as amended in accordance with the terms set forth in the Stipulation;

(iv)   providing adequate protection;

(v)    modifying the automatic stay to the extent set forth herein; and

(vi)   granting related relief.

After due deliberation, including consideration of the Motion, the Stipulation, the declaration submitted in connection with the Motion, and the testimony adduced at the hearing, if any, on the Motion, and sufficient cause appearing therefor,

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**It is hereby FOUND, CONCLUDED, AND ADJUDGED as follows:[3]**

A.      On January 25, 2024 (the "***Petition Date***"), each of the Debtors filed with the Bankruptcy Court for the Southern District of New York (the "***Court***")[4] a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' cases (the "***Chapter 11 Cases***") are being jointly administered under Case No. 24-10118 (MG). The Debtors are continuing to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

---

[3]     The following constitute the Court's findings of fact and conclusions of law. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[4]     References to the "Court" refer to the United States Bankruptcy Court for the Southern District of New York or any other court of competent jurisdiction that presides over all or any part of the Debtors' cases under the Bankruptcy Code.

B.    The Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court may enter a final order consistent with Article III of the United States Constitution. Venue of the Chapter 11 Cases and the Motion in this District are proper pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364, 365, 503, 507, and 553 of the Bankruptcy Code; Bankruptcy Rules 2002 and 4001; and Local Rule 4001-2.

C.    Under the circumstances of the Chapter 11 Cases, proper, timely, adequate and sufficient notice of the Motion, the hearing, if any, and the Order has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is required.

**The Prepetition Debentures with the Factoring Banks**

D.    On October 28, 2018, April 16, 2020, and October 1, 2020, GOL Linhas issued, in three series, its seventh issuance of simple, non-convertible secured debentures, with additional security interest and guarantee, in an aggregate principal amount, as of the Petition Date, of R$411,125,967.60 (equivalent to USD $83,562,188.54[5]), and an aggregate interest in an amount, as of the Petition Date, of R$259,464.06 (equivalent to US$52,736.60) (as amended, the "*7a Debentures*"). On October 27, 2021, GOL Linhas issued its eighth issuance of simple, non-convertible secured debentures, with additional security interest and guarantee, in an aggregate principal amount, as of the Petition Date, of R$445,340,923.24 (equivalent to US$90,516,447.81), and an aggregate interest in an amount, as of the Petition Date, of R$281,057.33 (equivalent to US$57,125.47) (as amended, the "*8a Debentures*" and, together with the 7a Debentures, the

---

[5]    The exchange rate herein used in this Order is the exchange rate in effect as of the Petition Date, as used in the Debtors' Schedules and Statements of Financial Affairs, which is 1 USD: 4.92 BRL.

"*Prepetition Debentures*"). GOL Linhas Aéreas Inteligentes S.A. has guaranteed the full and prompt payment of the Prepetition Debentures. The Prepetition Debentures are secured by an unavoidable, perfected, valid, and enforceable first priority security interest in (through a "fiduciary assignment" granted under Brazilian law of) certain Visa®-branded debit and credit card receivables (as more fully set forth in the Prepetition Debentures, the "*Visa Receivables*"), together with all proceeds of the Visa Receivables (including any payments received on the Visa Receivables and proceeds from the factoring of the Visa Receivables with BdoB) (together with the Visa Receivables, the "*Prepetition Debentures Collateral*"). Prepetition, the cash proceeds generated from the Visa Receivables were deposited in an account controlled by BdoB in its capacity as the collateral agent (the "*Prepetition Debentures Collateral Agent*") under the Prepetition Debentures for the benefit of the Factoring Banks before they were transferred to the Debtors' operating accounts. As of the Petition Date, no other party had an interest in the Prepetition Debentures Collateral that was superior to the interests of the Factoring Banks.

E.      The Prepetition Debentures and the Total Debentures Claim (defined below) are secured by the fiduciary assignment of Visa Receivables. As provided in the *Oitavo Aditamento ao Contrato de Constituição de Cessão Fiduciária em Garantia de Direitos Creditórios sob Condição Suspensiva e Outras Avenças*, between GOL Linhas and BdoB, the Visa Receivables constitute "all and any credit rights held by GOL Linhas Aéreas S.A. arising from sales paid with Visa credit and debit cards, including all and any current and/or future credit rights." In connection with the settlement of issues arising in respect of the Debtors' use of the Debentures Cash Collateral and the Factoring Banks' agreement to provide factoring and renew outstanding Letters of Credit (as hereinafter defined), the Debtors acknowledge the validity and priority of the fiduciary assignment in the Prepetition Debentures Collateral asserted by the Factoring Banks and

that the automatic stay is modified to permit the Factoring Banks to exercise their rights and remedies subject to the terms and conditions of this Order.

F.      The 7a Debentures are held by Bradesco and BdoB. As of the Petition Date, the aggregate amount owed under the 7a Debentures was R$411,385,431.67 (equivalent to US$83,614,925.14) (the "***Aggregate 7a Debentures Claim***"), comprised of R$411,125,967.60 (equivalent to US$83,562,188.54) in principal amount of the 7a Debentures and R$259,464.06 (equivalent to US$52,736.60) in accrued interest. BdoB holds approximately 54.7% of the 7a Debentures (or R$225,024,568.07 (equivalent to USD $45,736,700.83) of the Aggregate 7a Debentures Principal Claim) (the "***BdoB 7a Debentures Principal Claim***"). BdoB has claims against the Relevant Debtors for other amounts owed under the *Instrumento Particular de Escritura da 7a (Sétima) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Três Séries, da Espécie Quirografária, com Garantia Adicional Fidejussória e Real, para Distribuição Pública com Esforços Restritos de Distribuição da GOL Linhas Aéreas S.A.*, including fees, expenses, interest, late payment interest, and fines (collectively, with the BdoB 7a Debentures Principal Claim, the "***BdoB 7a Debentures Claim***"). Bradesco holds approximately 45.3% of the 7a Debentures (or R$186,101,399.54 (equivalent to US$37,825,487.71) of the Aggregate 7a Debentures Claim) (the "***Bradesco 7a Debentures Principal Claim***"), and Bradesco has claims against the Relevant Debtors for other amounts owed under the *Instrumento Particular de Escritura da 7a (Sétima) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Três Séries, da Espécie Quirografária, com Garantia Adicional Fidejussória e Real, para Distribuição Pública com Esforços Restritos de Distribuição da GOL Linhas Aéreas S.A.*, including fees, expenses, interest, late payment interest, and fines (collectively, with the Bradesco 7a Debentures Principal Claim, the "***Bradesco 7a Debentures Claim***").

G.       The 8a Debentures are held by Santander and BdoB. As of the Petition Date, the

aggregate amount owed under the 8a Debentures was R$445,621,980.57 (equivalent to

US$90,573,573.29) (the "*Aggregate 8a Debentures Claim*"), comprised of R$445,340,923.24

(equivalent to US$90,516,447.81) in principal amount of the 8a Debentures and R$281,057.33

(equivalent to US$57,125.47) in accrued interest. BdoB holds approximately 32.8% of the 8a

Debentures (or R$146,126,429.94 (equivalent to US$29,700,493.89) of the Aggregate 8a

Debentures Principal Claim) (the "*BdoB 8a Debentures Principal Claim*"). BdoB has claims

against the Relevant Debtors for other amounts owed under the *Instrumento Particular de

Escritura da 8a (Oitava) Emissão de Debêntures Simples, Não Conversíveis em Ações, em Série

Única, da Espécie Quirografáriao, com Garantia Adicional Fidejussória e Real, para

Distribuição Pública com Esforços Restritos de Distribuição da GOL Linhas Aéreas S.A.,* and

respective amendments, including fees, expenses, interest, late payment interest, and fines

(collectively, with the BdoB 8a Debentures Principal Claim, the "*BdoB 8a Debentures Claim*").

Santander holds approximately 67.2% of the 8a Debentures (or R$299.214.493.30 (equivalent to

US$60.815.953.92) of the Aggregate 8a Debentures Claim) (the "*Santander 8a Debentures

Principal Claim*"), and Santander has claims against the Relevant Debtors for other amounts owed

under the *Instrumento Particular de Escritura da 8a (Oitava) Emissão de Debêntures Simples,

Não Conversíveis em Ações, em Série Única, da Espécie Quirografáriao, com Garantia Adicional

Fidejussória e Real, para Distribuição Pública com Esforços Restritos de Distribuição da GOL

Linhas Aéreas S.A.,* and respective amendments, including fees, expenses, interest, late payment

interest, and fines (collectively, with the Santander 8a Debentures Principal Claim, the "*Santander

8a Debentures Claim*"). Payment of the 8a Debentures is subordinated to payment of the 7a

Debentures. The "***Total Debentures Claim***" is equal to the sum of the Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim.

H.      The proceeds of the Visa Receivables are "cash collateral" of the Factoring Banks within the meaning of section 363(a) of the Bankruptcy Code (the "***Debentures Cash Collateral***") that is subject to valid, enforceable, non-avoidable and perfected first-priority liens in favor of the Factoring Banks that were in existence on the Petition Date. Accordingly, pursuant to section 363(c)(2)(a) of the Bankruptcy Code, the Debtors may not use the Debentures Cash Collateral without the consent of the Factoring Banks or entry of an order of the Court authorizing the use of the Debentures Cash Collateral subject to the provision of adequate protection to the Factoring Banks as a condition to the Debtors using the Debentures Cash Collateral, including, without limitation, the factoring of the Visa Receivables and using the proceeds thereof.

I.      Pursuant to the Stipulation, the Relevant Debtors and the Factoring Banks have agreed on the terms of adequate protection to be provided with respect to the Debtors' consensual use of the Visa Receivables and the Debentures Cash Collateral pursuant to the terms of this Order and the other obligations of the Debtors set forth herein in exchange for the various agreements of the Factoring Banks set forth in the Stipulation, including the agreement to provide postpetition factoring and Letter of Credit renewals.

J.      In addition, the Debtors believe that the continued support of the Factoring Banks is critical to the Debtors' restructuring efforts in the Chapter 11 Cases. Accordingly, the Relevant Debtors have negotiated with the Factoring Banks with respect to certain payments to be made during the Chapter 11 Cases and the proposed repayment terms for the Aggregate 7a Debenture Claim and the Aggregate Prepetition 8a Debenture Claim under a potential chapter 11 plan. The terms of such proposed treatment are set forth in the Stipulation. The Factoring Banks have agreed,

so long as no Automatic Event of Default or Optional Event of Default, as each such term is

defined below (each, an "***Event of Default***"), occurs under this Order, to the treatment of the

Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim as set forth in Stipulation.

K.    The Factoring Banks and the Relevant Debtors also have agreed to amend the terms

of the Prepetition Debentures, as described in the Stipulation and, prior to the date of this Order,

have executed the documents needed to amend the Prepetition Debentures (the "***Debenture***

***Amendments***").  The effectiveness of the Debenture Amendments, however, is subject to entry of

this Order and the terms hereof.  Notwithstanding anything herein to the contrary, the effectiveness

of the Debenture Amendments with respect to the terms of paragraph 6.d. hereof that are applicable

from and after the effective date of a chapter 11 plan for the Relevant Debtors shall also be subject

to the confirmation and effective date of such plan, which shall provide for the treatment of the

BdoB 7a Debentures Claim, Bradesco 7a Debentures Claim, Santander 8a Debentures Claim, and

BdoB 8a Debentures Claim (collectively, the "***Debenture Claims***") as set forth in the Debenture

Amendments subject to paragraph 28 hereof.

**The Factoring Agreements**

L.    On July 11, 2016, BdoB and GOL Linhas entered into that certain *Contract of*

*Assignment and Acquisition of Credit Rights Originated from Credit Card Sales* (as amended

through the Petition Date, the "***BdoB Factoring Agreement***") pursuant to which GOL Linhas sold

certain of its debit and credit card receivables, including the Visa Receivables (collectively, the

"***Receivables***") to BdoB in exchange for an immediate cash payment. Immediately prior to the

Petition Date, the Debtors had continued to sell Receivables to BdoB pursuant to the terms of the

BdoB Factoring Agreement.

M.    Prior to the Petition Date, on November 30, 2023, Santander and GOL Linhas

entered into that certain *Termo De Adesão Às Condições Gerais De Cessão De Crédito De*

*Recebíveis De Cartões De Crédito Sem E/Ou Com Coobrigação, Autorização De Contato Na Mesa De Atendimento E Outras Avenças* (as amended through the Petition Date, the "**Santander Factoring Agreement**") pursuant to which GOL Linhas would sell certain of its Receivables to Santander in exchange for an immediate cash payment. Although Receivables were never factored under the Santander Factoring Agreement, it remains in force.

N.     Most of the Debtors' ticket sales (as is common throughout Brazil) are sold in installments (usually up to 12 installments). This structure results in a significant delay in the Debtors receiving full payment for ticket sales, including from credit card issuers. This makes factoring agreements such as the BdoB Factoring Agreement and the Santander Factoring Agreement essential to merchants such as GOL Linhas. Because the BdoB Factoring Agreement and the Santander Factoring Agreement are not available to the Debtors from other banks in the volumes required to ensure necessary cash flows to operate, it is critical to the Debtors' ability to anticipate cash flows, maintain their cash management system, and continue their overall operations that the Debtors continue to sell Receivables under the BdoB Factoring Agreement and be able to sell Receivables under the Santander Factoring Agreement.

O.     Section 365(c)(2) of the Bankruptcy Code prohibits debtors from assuming any contract that is a contract to extend financial accommodations to or for the benefit of a debtor absent consent of the affected secured creditor. In light of this provision, the Debtors may not assume the BdoB Factoring Agreement or compel postpetition performance by BdoB thereunder without the consent of BdoB and may not assume the Santander Factoring Agreement or compel postpetition performance by Santander thereunder without the consent of Santander.

P.     On January 29, 2024, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtors to Continue to (a) Use Existing Cash Management Systems, Bank*

*Accounts, and Business Forms, (b) Factor Their Receivables, (c) Engage in Intercompany Transactions, and (d) Pay Service Charges; (II) Granting Administrative Expense Status to Intercompany Claims; (III) Waiving Compliance with Requirements of 11 U.S.C. § 345; and (IV) Granting Related Relief.* [Docket No. 71], authorizing the Debtors to continue selling the Receivables free and clear of any and all liens, claims, interests, or encumbrances. On February 27, 2024, the Court entered the *Final Order (I) Authorizing the Debtors to Continue to (a) Use Existing Cash Management Systems, Bank Accounts, and Business Forms, (b) Factor Their Receivables, (c) Engage in Intercompany Transactions, and (d) Pay Service Charges; (II) Granting Administrative Expense Status to Intercompany Claims; (III) Waiving Compliance with Requirements of 11 U.S.C. § 345; and (IV) Granting Related Relief* [Docket No. 190] (the "***Final Cash Management Order***"), authorizing the Debtors to continue selling the Receivables free and clear of any and all liens, claims, interests, or encumbrances.

Q.    Although BdoB has indicated that it is unwilling to continue performance under the BdoB Factoring Agreement absent the agreement set forth in the Stipulation and entry of this Order, BdoB agreed to purchase, and has purchased, from GOL Linhas an aggregate of R$113,115,023.47 (equivalent to US$22,990,858.43) of Receivables after the Petition Date based upon the Relevant Debtors' assurances that the Relevant Debtors would negotiate in good faith to enter into the Stipulation and seek entry of this Order. Similarly, Santander has indicated that it is unwilling to continue performance under the Santander Factoring Agreement absent the agreement set forth in the Stipulation and entry of this Order.

R.    Pursuant to the Stipulation, Bradesco has agreed to enter into a new factoring agreement (in the form annexed to the Stipulation, the "***Bradesco Factoring Agreement***" and together with the Santander Factoring Agreement and the BdoB Factoring Agreement, the

"*Factoring Agreements*") to purchase Receivables. Pursuant to the Stipulation, the Relevant Debtors and BdoB and Santander, respectively, have agreed, subject to entry of this Order, to amend the BdoB Factoring Agreement and the Santander Factoring Agreement to make certain changes to take into account the pendency of the Chapter 11 Cases and to reflect the entry into the Bradesco Factoring Agreement. BdoB has consented to GOL Linhas assuming the BdoB Factoring Agreement under section 365(a) of the Bankruptcy Code. Other than payment of a commitment fee and attorneys' fees, as more fully set forth in this Order, BdoB is not requiring any "cure" of any obligation or payment as a condition to assumption of the BdoB Factoring Agreement in exchange for GOL Linhas agreeing to honor any chargeback, indemnity requests, or other obligations arising under the Factoring Agreements, in the ordinary course of business, whether relating to Receivables sold thereunder before or after the Petition Date. Santander has consented to GOL Linhas assuming the Santander Factoring Agreement under section 365(a) of the Bankruptcy Code. Other than payment of a commitment fee and attorneys' fees, as more fully set forth in this Order, Santander is not requiring any "cure" of any obligation or payment as a condition to assumption of the Santander Factoring Agreement in exchange for GOL Linhas agreeing to honor and comply with any obligations under the Santander Factoring Agreement relating to chargebacks, indemnity, or other required payments and obligations as and when they arise.

S.      In addition, the Factoring Banks have agreed to amend the provisions of the Prepetition Debentures that currently provide that the Visa Receivables may only be sold to BdoB pursuant to the terms of the BdoB Factoring Agreement to allow the Visa Receivables to be sold to Santander and Bradesco up to the limits imposed by, and subject to maintaining the relevant

percentages set forth in, the Stipulation or the Factoring Agreements.[6] To reflect and guarantee compliance with all the conditions set out herein, the Parties have amended and signed, subject to entry of this Order, the necessary instruments, especially those regulated under Brazilian law, including, without limitation, the debenture issue deed and respective collaterals and the Factoring Agreements or amendments to the Factoring Agreements. In accordance with the Stipulation, such amended instruments will only be effective as of the date this Order is signed.

T.      The Factoring Agreements, subject to the terms thereof, permit the factoring of the Receivables. Any Receivables to be sold to the Factoring Banks under the Factoring Agreements shall be sold and transferred to the Factoring Banks free and clear of any and all liens, claims, interests, or encumbrances. Any liens, claims, interests or encumbrances with respect to any factored Receivables shall attach to the cash proceeds from the sale of the Receivables to a Factoring Bank and to any payments received on the Receivables that are not sold to the same extent, validity, and priority as immediately prior to such factoring.

U.      Subject to the terms of this Order, including that there has been no Event of Default, the Factoring Banks consent to the Debtors' use of, and the Debtors shall be authorized to use, the proceeds of any Visa Receivables factored pursuant to the terms of the Factoring Agreements for any purposes permitted under the Bankruptcy Code.

---

[6]     As set forth in the Stipulation, the Factoring Banks are committing to make factoring available to the Debtors, (A) in the following amounts of outstanding exposure for each Factoring Bank: (i) R$1,300 million from BdoB; (ii) R$350 million from Santander; and (iii) R$220 million from Bradesco; and (B) in the following proportions: (i) 69.5% by BdoB; (ii) 18.7% by Santander; and (iii) 11.8% by Bradesco. The Debtors have agreed to use their reasonable best efforts to maintain the proportion indicated between the Factoring Banks, *provided that* nothing herein shall require the Debtors to commit to factoring in any set amount so long as it does not exceed the amounts agreed to by each of the Factoring Banks. The Debtors and Factoring Banks have also agreed that, in order to monitor the proportions between the Factoring Banks, the Debtors undertake to send each of the Factoring Banks a weekly report indicating the proportion of the receivables balance made available and anticipated by each bank. The Debtors shall have no obligation to draw on these factoring commitments.

V.       The obligations of the Relevant Debtors under the Factoring Agreements, including

any chargeback, indemnity requests, or other obligations, are an actual, necessary cost and expense

of preserving the estate as contemplated by section 503 of the Bankruptcy Code, and the

obligations under such Factoring Agreements shall constitute an allowed administrative expense

under section 503(b)(1) of the Bankruptcy Code against the Relevant Debtors.

**The Prepetition Letters of Credit**

W.       As of the Petition Date, each of the Factoring Banks had issued standby letters of

credit to the Debtors' aircraft lessors in an aggregate face amount of approximately US$85 million

to secure the Debtors' payment of rent, maintenance, and similar charges under the applicable

leases.

X.       As of the Petition Date and the date of the Stipulation, an aggregate of

US$17,566,700 in face amount of standby letters of credit issued by BdoB were outstanding (the

"***BdoB Letters of Credit***"). A schedule of the outstanding BdoB Letters of Credit is included on

Exhibit "B" hereto. Part of the aggregate face amount of the BdoB Letters of Credit is secured by

an unavoidable, perfected, valid, and enforceable first priority security interest (through a

"fiduciary assignment" granted under Brazilian law) in certain rights on certificates of deposit (the

"***BdoB L/C Collateral***").   The BdoB Letters of Credit will begin to expire in October of 2024

unless BdoB agrees to extend the expiration dates of such letters of credit. Moreover, the BdoB

Letters of Credit do not allow the beneficiaries to draw on the BdoB Letters of Credit if they expire.

For each of the BdoB Letters of Credit, GOL Linhas has entered into a *Contrato de Outorga de*

*Garantia e Contragarantia* (each, a "***BdoB Reimbursement Agreement***" and collectively, the

"***BdoB Reimbursement Agreements***") pursuant to which GOL Linhas has agreed to reimburse

BdoB for draws under such BdoB Letter of Credit and pay amounts in addition to reimbursement

of the face amount of the BdoB Letter of Credit, as specified in the applicable BdoB

Reimbursement Agreement. The full amount drawn under a BdoB Letter of Credit, together with any other amounts payable with respect to such drawn BdoB Letter of Credit under the applicable BdoB Reimbursement Agreement is referred to herein as the "***BdoB Reimbursement Amount***." BdoB has a claim against GOL Linhas for amounts due or that might become due with respect to the BdoB Letters of Credit and the BdoB Reimbursement Agreements (the "***BdoB Letter of Credit Claim***").

Y.       As of the Petition Date, Santander had issued and there were outstanding standby letters of credit in the aggregate face amount of US$57,567,208.00 (the "***Santander Letters of Credit***"), which have been listed on Exhibit "B."  Part of the aggregate face amount is secured by an unavoidable, perfected, valid, and enforceable first priority security interest (through a "fiduciary assignment" granted under Brazilian law) in time deposit accounts and certificates of deposit to Santander (the "***Santander L/C Collateral***" and, together with the BdoB L/C Collateral, the "***L/C Accounts***"). Specifically, according to the respective fiduciary assignment in connection with the Santander Letters of Credit listed in Exhibit "B," the Santander Letters of Credit are secured by an unavoidable, perfected, valid, and enforceable first priority security interest (through a "fiduciary assignment" granted under Brazilian law) of credit rights arising from investments in the form of time deposits and/or Certificate of Deposit, in the amount equivalent to approximately 50% of the obligation in the Santander Letters of Credit. As a result of the commencement of the Chapter 11 Cases, certain of the Debtors' lessors drew on Santander Letters of Credit in amounts totaling US$13,332,503.00 in aggregate face amount as of May 21, 2024 (the "***Drawn Santander Letters of Credit***"). As set forth herein, the Relevant Debtors shall reimburse the Drawn Santander Letters of Credit pursuant to direct deposit in the amount of US$13,332,503.00 to an account designated by Santander, and to the extent any such amounts are not reimbursed in accordance

with this Order, Relevant Debtors consent to Santander using funds in its applicable L/C Accounts to offset such amounts and modification of the automatic stay to permit such relief. Accordingly, as of April 30, 2024, an aggregate of US$44,234,704.04 in face amount of Santander Letters of Credit are outstanding. The Santander Letters of Credit have already begun expiring and will continue to expire throughout 2024 unless Santander agrees to extend the expiration dates of such letters of credit. Moreover, the Santander Letters of Credit do not allow the beneficiaries to draw on the Santander Letters of Credit if they expire. For each of the Santander Letters of Credit, GOL Linhas has entered into a *Contrato de Prestação de Garantia* (each a "***Santander Reimbursement Agreement***" and collectively, the "***Santander Reimbursement Agreements***") pursuant to which GOL Linhas has agreed to reimburse Santander for draws under such Santander Letter of Credit, and pay other amounts specified in the applicable Santander Reimbursement Agreement. The amount owed by GOL Linhas with respect to any drawn Santander Letters of Credit, including the full amount drawn under a Santander Letter of Credit and any other amounts owed under the applicable Santander Letter of Credit and Santander Reimbursement Agreement is referred to herein as the "***Santander Reimbursement Amount***." Santander has claims against GOL Linhas for amounts due with respect to the Drawn Santander Letters of Credit and for amounts that are due or might become due with respect to the Santander Letters of Credit and the Santander Reimbursement Agreements, including the Santander Reimbursement Amount (the "***Santander Letter of Credit Claim***").

Z.      As of the Petition Date and as of the date of the Stipulation, Bradesco had issued and had outstanding standby letters of credit in the aggregate face amount of US$10 million (the "***Bradesco Letters of Credit***"), which have been listed on Exhibit "B." The Bradesco Letters of Credit will expire on July 14, 2024, November 16, 2024, and December 5, 2024, unless Bradesco

agrees to extend the expiration dates of such letters of credit. Moreover, the Bradesco Letters of Credit do not allow the beneficiaries to draw on the Bradesco Letters of Credit if expire. In each of the Bradesco Letters of Credit, named *Instrumento Particular para Concessão de Garantia* (each, a "***Bradesco Reimbursement Agreement***" and collectively, the "***Bradesco Reimbursement Agreements***"), GOL Linhas has agreed to reimburse Bradesco for draws under the respective Bradesco Letter of Credit, and pay other amounts specified in such Bradesco Reimbursement Agreement. The full amount drawn under the Bradesco Letters of Credit, including any other amounts owed under the applicable Bradesco Reimbursement Agreements, is referred to herein as the "***Bradesco Reimbursement Amounts***." Bradesco has a claim against GOL Linhas for amounts due or that might be due with respect to the Bradesco Letters of Credit and the Bradesco Reimbursement Agreements (the "***Bradesco Letter of Credit Claim***" and collectively with the BdoB Letter of Credit Claim and the Santander Letter of Credit Claim, the "***Letter of Credit Claims***").

AA.    The BdoB Letters of Credit, the Santander Letters of Credit, and the Bradesco Letters of Credit are collectively referred to herein as the "***Letters of Credit***," and the BdoB Reimbursement Agreements, the Santander Reimbursement Agreements, and the Bradesco Reimbursement Agreements are collectively referred to herein as the "***Reimbursement Agreements***." The BdoB Reimbursement Amount, the Santander Reimbursement Amount, and the Bradesco Reimbursement Amount are collectively referred to herein as the "***Reimbursement Amounts***."

BB.    In the ordinary course of business, GOL Linhas maintains the L/C Accounts, including time deposit accounts and/or certificates of deposit at certain of the Factoring Banks that have been granted to the applicable Factoring Bank to secure its respective Letters of Credit, and

each such bank has a right to offset amounts held in the applicable Factoring Bank's L/C Accounts against any reimbursement claims against GOL Linhas for amounts drawn on the Letters of Credit and this Order recognizes and permits such rights to offset such amounts. The BdoB Letters of Credit and Santander Letters of Credit are secured (through a "fiduciary assignment" granted under Brazilian law) by an unavoidable, perfected, valid and enforceable first priority security interest (through a "fiduciary assignment" granted under Brazilian law) in the applicable L/C Accounts and the proceeds thereof. As of the Petition Date, no other party had a superior interest in the L/C Accounts or the proceeds thereof to the interests, as applicable, of the Factoring Banks. The cash in the L/C Accounts are "cash collateral" of the Factoring Banks within the meaning of section 363(a) of the Bankruptcy Code (the "*L/C Cash Collateral*") that is subject to valid, enforceable, non-avoidable and perfected first-priority liens in existence on the Petition Date. Accordingly, pursuant to section 363(c)(2)(a) of the Bankruptcy Code, the Debtors may not use the L/C Cash Collateral without the consent of the Factoring Banks or entry of an order of the Court authorizing the use of the L/C Cash Collateral absent the provision of adequate protection to the Factoring Banks as a condition to using the L/C Cash Collateral. The Factoring Banks do not consent to, and no authority is provided for, the use of any of the L/C Cash Collateral by the Debtors. In connection with the settlement of issues arising in respect of the Letters of Credit and the Factoring Banks' agreement to renew expiring Letters of Credit, the Debtors acknowledge the validity and priority of the "fiduciary assignment" (granted under Brazilian law) in the L/C Accounts and L/C Cash Collateral asserted by the Factoring Banks and that the automatic stay is modified to permit the Factoring Banks to exercise their rights and remedies, subject to the terms and conditions of this Order.

CC.    GOL Linhas has requested, and the Factoring Banks have agreed, that, subject to the terms and conditions set forth in the Stipulation and this Order (including that no Event of Default has occurred), to the extent a Letter of Credit is set to expire during the pendency of the Chapter 11 Cases, to extend the maturity date for the period set forth in the applicable Letter of Credit on substantially similar terms and conditions as existed as of the Petition Date. The extension of the maturity date for any Letter of Credit constitutes a postpetition extension of credit to and for the benefit of the Relevant Debtors, as contemplated by section 364 of the Bankruptcy Code. The extension of the maturity date for any Letter of Credit is an actual, necessary cost and expense of preserving the estate as contemplated by section 503 of the Bankruptcy Code, and the obligations under such renewed Letter of Credit shall constitute an allowed administrative expense under section 503(b)(1) of the Bankruptcy Code against the Relevant Debtors.

DD.    In exchange, GOL Linhas has agreed to pay the Factoring Banks the applicable Reimbursement Amount owed for any Letter of Credit drawn prior to entry of this Order, including payment to Santander in the amount of US$13,332,503.00 with respect to the Drawn Santander Letters of Credit, within two (2) Business Days[7] of entry of this Order. Additionally, with respect to each Drawn Santander Letters of Credit, the automatic stay is lifted solely with respect to the L/C Accounts and L/C Cash Collateral to permit and authorize Santander to use the existing L/C Cash Collateral in its respective L/C Accounts to reimburse the amount of US$13,332,503.00 within two (2) Business Days of entry of this Order if GOL Linhas does not make full payment as set forth in the preceding sentence. In addition, GOL Linhas has agreed that, if any Letter of Credit is drawn after the Petition Date, the Factoring Bank shall use funds from its respective L/C

---

[7]    As used herein, a "Business Day" means a day other than (a) a Saturday or Sunday or (b) any other day on which commercial banks in the United States or in Brazil are authorized or required by law to close.

Accounts securing the respective Letter of Credit to satisfy the reimbursement obligation of GOL

Linhas with respect to the Letters of Credit. GOL Linhas shall be required to satisfy any shortfall

with respect to such Reimbursement Amount within two (2) Business Days of written notice

(which may be given by email). Any Reimbursement Amounts, which shall not exceed in the

aggregate $85 million in face amount plus the other amounts payable under the applicable

Reimbursement Agreements (the "***Aggregate Letter of Credit Reimbursement Cap***"), will

constitute an allowed administrative expense, immediately junior to the administrative expense

claims of the DIP Lenders, and a claim against GOL Linhas secured by the L/C Accounts, L/C

Cash Collateral, and the proceeds thereof as set forth herein.

EE.    GOL Linhas, subject to the terms and conditions set forth herein, consents to the

applicable Factoring Bank's relief from the automatic stay to use such Factoring Bank's respective

L/C Cash Collateral in the L/C Accounts for any amounts owed to such bank on account of a drawn

Letter of Credit. GOL Linhas agrees to reimburse the issuing Factoring Bank for any shortfall on

the amounts owed to such bank not satisfied by the Factoring Bank's L/C Cash Collateral in the

L/C Accounts pursuant to the terms of this Order. Moreover, as reflected in this Order, GOL Linhas

has agreed that, to the extent that the expiration date of any Letter of Credit is extended after the

Petition Date but then subsequently drawn by the beneficiary, any Reimbursement Amount for

such Letter of Credit will constitute a superpriority administrative expense under section 364(c)(1)

of the Bankruptcy Code that is junior to the superpriority claims of the DIP Lenders.

**The Relief Requested Is Warranted**

FF.    Based on the record before the Court, the terms set forth in this Order are fair,

reasonable, the best available under the circumstances, have been fully disclosed, reflect the

Relevant Debtors' exercise of prudent business judgment consistent with their fiduciary duties,

have been negotiated at arms' length and in good faith, and are in the best interests of the Relevant Debtors and their respective estates.

GG.    After consideration of the Motion, the Stipulation, the declaration submitted in connection with the Motion, and the testimony adduced at the hearing, if any, the relief requested in the Motion constitutes a reasonable exercise of the Relevant Debtors' business judgment and is in the best interest of the Relevant Debtors' respective estates.

## DECRETAL PROVISIONS

Based upon the foregoing and after due deliberation thereon; and good and sufficient cause appearing therefor, **IT IS HEREBY DECREED, ORDERED, AND ADJUDGED AS FOLLOWS:**

1.    *Motion*. The Motion is GRANTED as set forth herein. Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.

2.    *Stipulation*. The Stipulation is APPROVED, and the Relevant Debtors are AUTHORIZED to enter into the Stipulation.

**Use of Cash Collateral and Adequate Protection with Respect to the Prepetition Debentures**

3.    Each of the BdoB 7a Debentures Claim, Bradesco 7a Debentures Claim, Santander 8a Debentures Claim, and BdoB 8a Debentures Claim is deemed ALLOWED as against the Relevant Debtors in the amounts set forth in paragraphs F and G, which shall not exceed the Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim. The Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim are allowed secured claims. Each of BdoB, Santander, and Bradesco shall not be required to file proofs of claim, including any administrative expense proof of claim, with respect to their respective Debentures Claims.

4.    The Debenture Amendments as set forth herein are APPROVED, and the Relevant Debtors are hereby AUTHORIZED to take such other and further steps as are reasonable to

effectuate such amendments.

5.        *Use of the Prepetition Debentures Collateral*. Pursuant to sections 105(a), 363(b), and 363(c)(2) of the Bankruptcy Code, the Relevant Debtors are hereby authorized to use the Prepetition Debentures Collateral exclusively pursuant to the terms of this Order, including without limitation, the proceeds from the sale of any Visa Receivables factored pursuant to the terms of the Factoring Agreements.

6.        *Entitlement to Adequate Protection.* Pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, as adequate protection for any diminution in value of their respective interests in the Prepetition Debentures Collateral as of the Petition Date and as consideration for the agreement by the Factoring Banks to (i) allow the Relevant Debtors to use the Debentures Cash Collateral and the Visa Receivables pursuant to this Order, (ii) provide additional liquidity and funding to the Relevant Debtors by entering into the Factoring Agreements, and (iii) renew the Letters of Credit, the Factoring Banks are hereby granted the following:

a.    *Adequate Protection Liens*. The Prepetition Debentures Collateral Agent, for the benefit of itself and the other holders of the Prepetition Debentures, shall have  an unavoidable, valid, perfected, and enforceable replacement security interest in (through a "fiduciary assignment" granted under Brazilian law), to the extent of any diminution in the value of the Prepetition Debentures Collateral as of the Petition Date, all Debentures Cash Collateral and all Visa Receivables (including all proceeds thereof and profits generated therefrom) created from and after the Petition Date that secure (or would have secured, but for the commencement of the Chapter 11 Cases) the amounts due under the Prepetition Debentures (the

22

"***Adequate Protection Liens***").

b.  The Adequate Protection Liens shall be first priority liens on and security interests in the Visa Receivables and the Debentures Cash Collateral and shall not be made junior to or *pari passu* with any lien or security interest heretofore or hereafter granted or created in any of the Chapter 11 Cases or any successor cases and shall, automatically upon entry of this Order, be valid and enforceable against the applicable Relevant Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases, without any further action by any party.

c.  *Adequate Protection Claim*. The Prepetition Debentures Collateral Agent is hereby granted, for the benefit of itself and the other holders of the Prepetition Debentures, to the extent of any diminution in the value of the Prepetition Debentures Collateral as of the Petition Date, an allowed superpriority administrative expense (the "***Adequate Protection Claim***") against GOL Linhas and the Guarantor, which shall have priority under section 507(b) of the Bankruptcy Code, subject to the Carve Out.

d.  *Postpetition Payments on the Debentures*. As set forth in the Debenture Amendments, on August 27, 2024, and on the 27th day of each month following entry of this Order until July 31, 2025, GOL Linhas shall pay to the holders of the Prepetition Debentures, *pro rata* in accordance with their respective aggregate holdings of the Prepetition Debentures, R$7,137,224.09 (the "***10% Debenture Amortization Payment***"), which payment will be applied to reduce the Total Prepetition Debentures Claim.  From and after August 1, 2025, through December

31, 2027, on the 27th day of each month, GOL Linhas shall pay to the holders of the Prepetition Debentures, *pro rata* in accordance with their respective holdings, R$26,580,006.96 (the "**90% Debenture Amortization Payment**").  Beginning on July 31, 2024, the Prepetition Debentures, as amended, will accrue interest at the CDI rate plus 5.25%.[8] Concurrently with the payment of the 10% Debenture Amortization Payment (or 90% Debenture Amortization Payment), GOL Linhas also will pay monthly accrued interest due under the Prepetition Debentures, as amended, at the current non-default contractual rate of Certificado de Depósito Interbancário ("**CDI**") rate plus 5.25%, which payment will be treated as interest; *provided, however, that*, concurrently with the first payment of the 10% Debenture Amortization Payment following entry of this Order, GOL Linhas will pay all accrued and unpaid interest due under the Prepetition Debentures prior to the entry of this Order at the CDI rate plus 5.00%. The foregoing payments shall be administrative expenses of the estate of each of the Relevant Debtors; *provided that*, with respect to any Debenture Amendments addressing terms on and after the effective of a chapter 11 plan, such amendments shall be subject to the confirmation and effective date of such plan, which shall provide for the treatment of the Debenture Claims as set forth in the Debenture Amendments subject to paragraph 28 hereof.

e.   *Maintenance of Minimum Cash Balance.* During the Chapter 11 Cases, the consolidated balance of cash and cash equivalents (excluding any restricted cash

---

[8]   If this Order is not entered by July 31, 2024, the Factoring Banks and the Relevant Debtors shall amend the terms of the applicable definitive documentation to provide that interest will begin accruing at the CDI rate plus 5.25% on the date that this Order is entered by the Court.

and measured as of the last Business Day of each month) ("***Unrestricted Cash***

***Balance***") of all Debtors shall not be less than R$1.0 billion.

f.   *Regular Reporting.* GOL Linhas will, within ten (10) days after the end of each

month, provide each of the Factoring Banks with a written report showing the

Unrestricted Cash Balance as of the end of such month.

**Approval of the Consensual Assumption of the BdoB Factoring Agreement and the Santander Factoring Agreement, each as Amended**

7.      Pursuant to section 365(a) of the Bankruptcy Code, the consensual assumption by

GOL Linhas of the BdoB Factoring Agreement, as amended by the Stipulation, is APPROVED,

and such assumption shall be effective immediately upon entry of this Order, without the need for

any further action by BdoB or GOL Linhas.

8.      The obligations of GOL Linhas as a condition to the consensual assumption of the

BdoB Factoring Agreement are set forth in paragraph 19 of this Order. In addition to the

obligations set forth in paragraph 19, GOL Linhas shall honor and comply with any obligations

under the BdoB Factoring Agreement relating to chargebacks, indemnity, or other required

payments as and when they arise, regardless of whether such obligations relate to Receivables sold

before or after the Petition Date.

9.      Pursuant to section 365(a) of the Bankruptcy Code, the consensual assumption by

GOL Linhas of the Santander Factoring Agreement, as amended by the Stipulation, is

APPROVED, and such assumption shall be effective immediately upon entry of this Order,

without the need for any further action by Santander or GOL Linhas**.**

10.     The obligations of GOL Linhas as a condition to the consensual assumption of the

Santander Factoring Agreement are set forth in paragraph 19 of this Order. In addition to the

obligations set in paragraph 19, GOL Linhas shall honor and comply with any obligations under

the Santander Factoring Agreement relating to chargebacks, indemnity, or other required payments or obligations as and when they arise.

**Authorization to Enter into the Bradesco Factoring Agreement**

11.    Pursuant to section 363(b)-(c) of the Bankruptcy Code, GOL Linhas be, and it hereby is, AUTHORIZED to enter into the Bradesco Factoring Agreement. GOL Linhas shall honor and comply with any obligations under the Bradesco Factoring Agreement relating to chargebacks, indemnity, or other required payments as and when they arise.

**Sale of Receivables Free and Clear of Any Existing Liens**

12.    Pursuant to this Order, the Final Cash Management Order, and section 363(f) of the Bankruptcy Code, the sale of Receivables to BdoB after the Petition Date and prior to the date hereof and to any of the Factoring Banks from and after the date hereof WAS, IS, AND WILL BE free and clear of any lien, claim, encumbrance, or interest in such Receivables of any entity. Any liens, claims, interests, or encumbrances with respect to any factored Receivables shall attach to the cash proceeds generated from the sale of the Receivables to a Factoring Bank and to any payments received on the Receivables not sold to the same extent, validity, and priority as they existed immediately prior to such factoring.

13.    The obligations of the Relevant Debtors under the Factoring Agreements, including any chargeback, indemnity requests, or other obligations are an actual, necessary cost and expense of preserving the estate as contemplated by section 503 of the Bankruptcy Code and the obligations under such Factoring Agreements, shall constitute an allowed administrative expense under section 503(b)(1) of the Bankruptcy Code against the Relevant Debtors.

**Renewal of Letters of Credit and Reimbursement of Drawn Letters of Credit**

14.    Pursuant to sections 363(d), 503(b)(1), and 507(a) of the Bankruptcy Code, GOL Linhas is AUTHORIZED to, and SHALL, reimburse the Factoring Banks the Reimbursement

Amounts for any Letters of Credit drawn prior to the date hereof, including payment to Santander in the amount of US$13,332,503.00 with respect to the Drawn Santander Letters of Credit, which reimbursement shall be made within two (2) Business Days after the date of the entry of this Order via direct deposit into a bank account designated by Santander.

15.    If any Letter of Credit is drawn from and after the date hereof, GOL Linhas shall, subject to and in accordance with paragraph 18 of this Order, pay the issuer of such Letter of Credit the applicable Reimbursement Amount, subject to the Aggregate Letter of Credit Reimbursement Cap.  Any Reimbursement Amount owed by GOL Linhas to the applicable issuer with respect to a Letter of Credit that has not been renewed during the pendency of the Chapter 11 Cases but is drawn also will constitute an allowed administrative expense under section 503(b)(1) of the Bankruptcy Code against GOL Linhas.

16.    Any Reimbursement Amount owed by GOL Linhas to the applicable Factoring Bank with respect to a Letter of Credit that the Factoring Bank has renewed during the pendency of the Chapter 11 Cases shall constitute a "superpriority" administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code that is junior to the superpriority administrative expense claims of the DIP Lenders.  Any such Reimbursement Amount also will be secured in first priority by the L/C Accounts and the L/C Cash Collateral.

17.    The Factoring Banks shall not be required to file proofs of claim, including any administrative expense proof of claim, with respect to their respective BdoB Letter of Credit Claim, Bradesco Letter of Credit Claim, and Santander Letter of Credit Claim and each such prepetition claim shall be deemed allowed; *provided that* the Relevant Debtors reserve all rights with respect to the amount of such claim; *provided further* that the amount of the claim with respect to the Drawn Santander Letters of Credit shall be determined in accordance with the terms of the

applicable Letter of Credit.

18.     To the extent that any additional Letters of Credit are drawn during the Chapter

11 Cases, each Factoring Bank shall use funds from its respective L/C Accounts securing the

respective Letters of Credit to satisfy the reimbursement obligation of GOL Linhas with respect to

the Letters of Credit, including any unpaid Reimbursement Amounts. GOL Linhas shall be

required to satisfy any shortfall with respect to such Reimbursement Amount from the L/C

Accounts within two (2) Business Days of written notice, which may be by email, thereof by the

issuing Factoring Bank. The automatic stay imposed by section 362 of the Bankruptcy Code is

hereby vacated and modified to permit such use of the Factoring Bank's respective L/C Cash

Collateral in the L/C Accounts pledged as collateral for such Factoring Bank for a drawn Letter of

Credit to reimburse the Factoring Bank for the amounts owed thereto. For the avoidance of doubt,

with respect to each Drawn Santander Letters of Credit, the automatic stay is modified, and

Santander is authorized and permitted to use and apply the existing L/C Cash Collateral in its

respective L/C Accounts with respect to the Drawn Santander Letters of Credit to reimburse the

amount of US$13,332,503.00, if GOL Linhas does not make payment in full on account of the

Drawn Santander Letters of Credit in accordance with paragraph 14 of this Order.

**Payment of Transaction and Attorneys' Fees**

19.     As part of the cure required to assume the BdoB Factoring Agreement (as

amended by the Stipulation) and the Santander Factoring Agreement (as amended by the

Stipulation), consideration for Bradesco entering into the Bradesco Factoring Agreement,

consideration for the Factoring Banks to renew the Letters of Credit, additional consideration for

the agreements of the Factoring Banks to take the actions described herein and in the Stipulation,

and as additional adequate protection, each of the Factoring Banks shall be entitled to receive the

following: (i) no later than five (5) Business Days after the entry of this Order, an upfront

transaction fee equal to one percent (1.0%) of the Total Debentures Claim, which fee will be allocated *pro rata* among each of the Factoring Banks in accordance with their respective holdings of the Prepetition Debentures and will not be deducted from the Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim; (ii) no later than five (5) Business Days after the entry of this Order, a yearly commitment fee equal to half of a percent (.5%) of the maximum amount of Credit Rights (as such term is defined in the Stipulation) such Factoring Bank has agreed to purchase; *provided that* the obligation to pay this fee shall terminate upon the earlier of (A) the termination of the Factoring Banks' commitment to provide new factoring under this Order and the Stipulation, and (B) the effective date of a chapter 11 plan for the Relevant Debtors; and (iii) payments of the reasonable and documented fees and expenses of outside legal counsel for each of the Factoring Banks; *provided*, *however*, that each of the Factoring Banks may designate no more than one non-U.S. firm and one U.S. firm for reimbursement, which counsel are designated in the Stipulation. If any changes in such designated counsel occur, the applicable Factoring Bank shall only be entitled to reimbursement or payment of fees with respect to such substitute from and after providing GOL Linhas with written notice, which may be by email, of such replacement counsel. The fees and expenses of outside counsel to be reimbursed under this Order will be those incurred in connection with (i) the negotiation of the Stipulation and this Order; (ii) the exercise of any rights and remedies permitted under this Order, the Stipulation, the Letters of Credit, Reimbursement Agreements, or the Factoring Agreements, and (iii) such other actions as may be reasonably necessary to ensure the protection of the rights and interests of the Factoring Banks with respect to this Order, the Stipulation, the Letters of Credit, Factoring Agreements, Reimbursement Agreements, or Prepetition Debentures.

20.    The Factoring Banks shall submit a summary invoice to the Debtors, the Office

of the United States Trustee for the Southern District of New York, counsel to the Official
Committee of Unsecured Creditors (the "***Creditors' Committee***"), and counsel to the DIP Lenders
(as defined in the DIP Motion) (each of the foregoing, a "***Review Party***" and collectively, the
"***Review Parties***"), which shall include a narrative summary of the work completed (but which
shall not be required to contain time entries and which may be redacted (without the need to file a
motion for authorization for such redactions) or modified to the extent necessary to delete any
information subject to the attorney-client privilege, any information constituting attorney work
product, or any other confidential information, and the provision of their invoices shall not
constitute any waiver of the attorney client privilege or of any benefits of the attorney work product
doctrine), which may come directly from counsel retained by the Factoring Banks or from a
Factoring Bank if such bank already has paid its counsel's fees and expenses.

21.     Any objections raised by a Review Party with respect to such invoices must be in
writing and state with particularity the grounds therefor and must be submitted to the applicable
professional within ten (10) Business Days after the receipt by the Review Parties (the "***Review
Period***"). Upon request in writing by a Review Party to an applicable professional within the
Review Period, such professional shall promptly provide additional reasonably requested detail
regarding its invoice to such Review Party, including time entries if requested (which time entries
may be redacted for privilege, provided that the U.S. Trustee may request unredacted time entries
and all parties' rights to oppose such request for unredacted time entries are preserved). If no
written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review
Period, the Debtors shall pay such invoices within five (5) Business Days. If no objection is
received to a professional's invoice is received within the Review Period, the Debtors shall
reimburse any such fees and expenses after receipt of a summary invoice.  If an objection to a

professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. No attorney or advisor to the Factoring Banks shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

**Events of Default**

22.     Each of the following will constitute an "***Automatic Event of Default***" under this Order and the Stipulation:

a.  entry of an order by the Court appointing a chapter 11 trustee or an examiner with expanded powers relating to the operation of the Relevant Debtors' businesses in the Chapter 11 Cases, and either (i) such order has not been stayed by the time within which to file a notice of appeal has expired or (ii) such order has been affirmed by a final, non-appealable order of an appellate court;

b.  entry of an order by the Court converting the Relevant Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code and either (i) such order has not been stayed by the time within which to file a notice of appeal has expired or (ii) such order has been affirmed by a final, non-appealable order of an appellate court;

c.  (i) the occurrence of a "DIP Event of Default" (as such term is defined in that certain *Final Order (I) Authorizing the Debtors in Possession to Obtain Postpetition Financing, (II) Authorizing the Debtors in Possession to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 207] (the "***Final DIP Order***"), *and*

31

(ii) the DIP Secured Parties (as defined in the Final DIP Order) have validly terminated the DIP Commitments (as defined in the Final DIP Order) and begun exercising remedies;

d.  entry of an order by the Court reversing, amending, supplementing, staying, vacating, or otherwise modifying this Order or the Stipulation without the written consent of each of the Factoring Banks, and either (i) such order has not been stayed by the time within which to file a notice of appeal has expired or (ii) such order has been affirmed by a final, non-appealable order of an appellate court;

e.  entry of an order by another court of competent jurisdiction reversing, amending, supplementing, staying, vacating, or otherwise modifying this Order or the Stipulation (including, without limitation, any finding that any lien is senior to priority to the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts), or the Adequate Protection Liens granted hereunder, or finding that the fiduciary assignment of the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts) or any of the Adequate Protection Liens granted hereunder is invalid in whole or material part) without the written consent of each of the Factoring Banks, and either (i) such order has not been stayed or reversed within 45 days of the entry thereof or (ii) such order has been affirmed by a final, non-appealable order of an appellate court;

f.  announcement by the Relevant Debtors that they have permanently discontinued substantially all scheduled passenger services; and

g.  substantial consummation of a sale of all or substantially all assets of the Relevant Debtors.

Upon the occurrence of an Automatic Event of Default, the Debtors automatically, and without any notice, shall have no right to continue to use the Debentures Cash Collateral pursuant to the terms of this Order; the Factoring Banks shall have no further obligations to the Relevant Debtors under their respective Factoring Agreements; the Factoring Banks shall have no further obligations to renew any Letters of Credit; the Factoring Banks shall have no further obligations to the Relevant Debtors under the Stipulation and this Order; and, the Factoring Banks may exercise any and all available rights and remedies permitted by this Order in accordance with the applicable agreements and the law.

23.    Each of the following will constitute an "***Optional Event of Default***" under this Order and the Stipulation:

    a.    any Debtor files a motion or other pleading, commences a proceeding, or solicits, supports, or encourages any other party to file a motion or pleading or to commence a proceeding seeking appointment of a chapter 11 trustee or an examiner with expanded powers relating to the operation of the Relevant Debtors' businesses in the Chapter 11 Cases, and such matter or proceeding remains pending for more than thirty (30) days;

    b.    the failure of GOL Linhas to recompose the collateral coverage ratio set forth in section 2.8 et seq. of the Prepetition Debentures Collateral Agreement within the time frame and on the conditions set forth therein;

    c.    filing of a motion by any party seeking a finding that any lien or interest is senior to priority to the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts), or the Adequate Protection Liens or challenging the fiduciary assignment of the Prepetition Debentures Collateral, the L/C Cash Collateral (or

the L/C Accounts), and the Debtors fail to file an objection to such motion within twenty (20) days of notice of such motion or thereafter fail to diligently prosecute such objection;

d.  entry of an order by a court of competent jurisdiction finding that any lien is senior to priority to the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts), or the Adequate Protection Liens granted hereunder, or finding that the fiduciary assignment of the Prepetition Debentures Collateral, the L/C Cash Collateral (or the L/C Accounts) or any of the Adequate Protection Liens granted hereunder is invalid in whole or material part, and either (i) such order has not been stayed by the time within which to file a notice of appeal has expired or (ii) such order has been affirmed by a final, non-appealable order of an appellate court;

e.  either (x) a chapter 11 plan is proposed by or with the consent of the Relevant Debtors or (y) a disclosure statement is approved with respect to any chapter 11 plan that does not satisfy the requirements in subsections (i) and (ii) and a disclosure statement for a plan supported by the Relevant Debtors has not been approved, and in either case, such plan either (i) does not provide for treatment of the Debentures Claims as set forth herein and in the Stipulation or (ii) is less favorable than the proposed treatment described herein and in the Stipulation and such default remains uncured for ten (10) days following written notice, which may be by email, thereof by the Factoring Banks to the Relevant Debtors;

f.  any Factoring Bank has an outstanding and past due Reimbursement Amount after reimbursing itself pursuant to paragraph 18 hereof and GOL Linhas has failed to pay such outstanding Reimbursement Amount within two (2) Business Days

34

following written notice (including notice by email) thereof by the Factoring Banks to the Relevant Debtors;

g.  GOL Linhas fails to make the payments pursuant to paragraph 6 hereof and such default remains uncured for three (3) Business Days following written notice, which may be by email, thereof by the Factoring Banks to the Relevant Debtors;

h.  the Relevant Debtors fail to make payments to the Factoring Banks due under their applicable Factoring Agreements subject to the terms thereof;

i.  the Relevant Debtors fail to make any other payments due under this Order within five (5) Business Days following written notice, which may be by email, thereof by the Factoring Banks to the Relevant Debtors;

j.  after the entry of this Order, any of the Relevant Debtors otherwise defaults on its non-pecuniary obligations arising after the entry of this Order, to a Factoring Bank under the Stipulation, this Order, the Factoring Bank's applicable Reimbursement Agreement or Letters of Credit, or the applicable Factoring Agreement, and such default remains uncured for ten (10) days following written notice, which may be by email, thereof by the Factoring Banks to the Relevant Debtors; *provided that* such default is not caused by the filing of the Chapter 11 Cases nor a cross-default under any agreement that is not the subject of this Order or the Stipulation;

k.  the Relevant Debtors fail to comply with paragraph 6.e of this Order;

l.  the Relevant Debtors fail to comply with paragraph 6.f., and such failure to report remains uncured for ten (10) calendar days following written notice, which may be by email, thereof by the Factoring Banks to the Relevant Debtors; and

m.  the Debtors, on a consolidated basis, fail to maintain a "flight regularity" of at least

96%, measured monthly by averaging the flight regularity for the prior two months;

*provided that*, this requirement shall be waived during extreme weather events that

directly affect the Relevant Debtors' business operations until the Relevant Debtors

can return to their ordinary course business operations.

24.     ***Declaring Optional Event of Default***.  In order for the Factoring Banks to declare

an Optional Event of Default on account of the Relevant Debtors' failure to make a payment due

pursuant to the terms hereof, the affected Factoring Bank(s) must provide the Relevant Debtors

with written notice thereof, which notice may be rescinded and such default waived by such

affected Factoring Bank(s).   In order for the Factoring Banks to declare any other Optional Event

of Default, at least two of the three Factoring Banks must provide the Relevant Debtors with

written notice thereof, which notice may be rescinded and such default waived by the same two

Factoring Banks.

25.     ***Suspension of Performance.*** Subject to paragraph 24, upon (i) the entry of an order

under paragraph 22.e until the stay or reversal of such order, (ii) the occurrence of an Optional

Event of Default, or (iii) the occurrence of an event that, with the passage of time, the giving of

notice, or both, would constitute an Optional Event of Default if not cured or waived within such

period, any of the Factoring Banks may thereafter immediately suspend performance of its

obligations set forth in the Stipulation relating to the renewal of the Letters of Credit and/or its

obligations under the applicable Factoring Agreement.

26.     **Termination.** Upon the occurrence of an Optional Event of Default and provision

of written notice in accordance with paragraph 24 hereof, any Factoring Bank thereafter, upon five

(5) Business Days' written notice (the "***Notice Period***"), which notice may be by email, to the

Relevant Debtors and to the other Factoring Banks, acting in its sole discretion, may elect to terminate any such obligations and exercise its other rights permitted under this Order with respect to its respective Letters of Credit, Reimbursement Agreements, Factoring Agreement, and its agreements under the Stipulation, including its agreements to (x) provide factoring, or (y) renew the Letters of Credit. In addition, following the occurrence of an Optional Event of Default and subject to the expiration of the Notice Period, any two of the Factoring Banks, by written notice to the Debtors (which may be given by email), may withdraw their consent to the use of the Debentures Cash Collateral or any Visa Receivables.

27.    **No Further Injunctive Relief.** No party in interest (including, without limitation, the Debtors or the Official Committee of Unsecured Creditors) may seek any relief from the Court or a Brazilian Court requesting an injunction against the exercise of any such rights except in the case that the Relevant Debtors or the Official Committee of Unsecured Creditors argue that an Optional Event of Default did not occur or that such Factoring Bank(s) is violating the terms of this Order or the Stipulation.

28.    Upon the Factoring Banks' cessation of factoring or renewal of Letters of Credit *and* withdrawal by the Factoring Banks of their consent to the Debtors' use of the Debentures Cash Collateral hereunder, the Debtors' prospective obligations herein and in the Stipulation shall be terminated and of no further force and effect, and the Debtors reserve their right to seek nonconsensual use of the Debentures Cash Collateral, and the Factoring Banks reserve their right to oppose such use or request additional adequate protection. For the avoidance of doubt, the Debtors shall be required to comply with the provisions contained in paragraph 6(a)-(d) hereof until and unless the Factoring Banks, following the occurrence of an Optional Event of Default, withdraw their consent to the Debtors' continued use of the Debentures Cash Collateral for general

corporate purposes (or any other purpose permitted by the Bankruptcy Code).

**Exercise of Remedies Upon Event of Default.**

29.     Upon termination by a Factoring Bank of its obligations relating to the Letters of Credit and/or its obligations under the applicable Factoring Agreement, in each case, pursuant to the terms of this Order, the Factoring Bank shall be authorized, subject to the terms of this Order, to declare a default under and exercise any of its rights and remedies against the Relevant Debtors as provided in its respective Letters of Credit, Factoring Agreement, and Reimbursement Agreement. With respect to any Letters of Credit drawn during the Chapter 11 Cases, such Factoring Bank may only use the funds in its respective L/C Accounts and its respective L/C Cash Collateral to offset any damages incurred in respect of such Letters of Credit, or  Reimbursement Agreement.

30.     Subject to the terms of this Order and the provisions of the Bankruptcy Code, (i) all of the Factoring Banks' and the Relevant Debtors' rights, claims, remedies and defenses, including in respect of the Letters of Credit, Reimbursement Agreements, Factoring Agreements or Prepetition Debentures, and any amendments or related documents to the foregoing, are reserved and shall not be deemed to be modified or waived, (ii) all such rights, remedies, and any obligations that the Relevant Debtors or the Factoring Banks may have in respect of the Letters of Credit, Reimbursement Agreements, Factoring Agreements or Prepetition Debentures, and any amendments or related documents to the foregoing, shall remain in full force and effect, and (iii) the governing laws of the Letters of Credit, Reimbursement Agreements, Factoring Agreements or Prepetition Debentures, and any amendments or related documents to the foregoing, which are all governed by the laws of Brazil, shall not be deemed to be modified.

31.     For the avoidance of doubt and notwithstanding anything herein to the contrary, (i) other than with respect to the Factoring Banks terminating the Relevant Debtors' authorization

to use the Debentures Cash Collateral, the Factoring Banks shall not be authorized to exercise any remedies under the Prepetition Debentures upon an Event of Default, and (ii) for Letters of Credit drawn during the Chapter 11 Cases, the Factoring Banks shall not be authorized to exercise any rights or remedies on account of the Relevant Debtors' obligations under the Letters of Credit against any assets that are not pledged as collateral for those obligations.

**Modification of the Automatic Stay.**

32.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified solely to the extent necessary to effectuate all of the terms and provisions of this Order and the Stipulation, including to permit GOL Linhas to grant the Adequate Protection Liens and permit the Factoring Banks to exercise any rights and remedies in the Stipulation and pursuant to the Factoring Agreements, in each case, as provided herein.  Upon the occurrence of an Automatic Event of Default or upon the occurrence Optional Event of Default and provision of written notice in accordance with paragraph 24 hereof, the Factoring Banks reserve their right to seek further relief from the automatic stay and all such rights to seek further relief from the automatic stay are preserved, and the Debtors reserve their right to oppose such relief.

**Retention of Jurisdiction.**

33.    This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of the Stipulation and this Order. Any request for relief brought before the Court to resolve a dispute arising from or related to this Order shall be brought on proper notice and in accordance with the Bankruptcy Rules and the Local Rules.

**Approved Budget.**

34.    Payments permitted hereunder shall be subject to and in compliance with the Approved Budget (as defined in the Final DIP Order) (subject to permitted variances) and nothing herein shall constitute a waiver by the DIP Lenders (as defined in the Final DIP Order) of any

default under the terms of the Final DIP Order or any DIP Documents (as defined in the Final DIP Order); *provided,* however, that nothing in this paragraph shall prohibit or restrict the Debtors from making any payments permitted hereunder or under the Stipulation, or relieve the Debtors from their obligation to make such payments, to the extent required by or provided for herein or in the Stipulation.

**Immediate Effect of Order.**

35.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any Local Rule, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

36.    The Debtors, with the written consent of the Factoring Banks, are authorized to amend, supplement, or modify the terms of the Letters of Credit, Reimbursement Agreements, Factoring Agreements, Prepetition Debentures, and any amendments or related documents to the foregoing, without further order of this Court.

Dated: _____, 2024
New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT "A"**

**STIPULATION**

**Stipulation**

This Stipulation, entered into on July 9, 2024, is by and among each of the Relevant Debtors[1] and the Factoring Banks (collectively, the "**_Parties_**").

## I.    Effectiveness of this Stipulation

A.    Each of the Parties agrees to cooperate to seek entry of the Proposed Order by the Court and to take such other actions as are reasonably necessary to effectuate the agreements set forth in this Stipulation. This Stipulation will be effective on the date the Court enters the Proposed Order (the "**_Stipulation Effective Date_**"). Moreover, the obligations of the Factoring Banks hereunder are subject to the Parties having fully executed the Prepetition Debentures Amendments, the BdoB Factoring Agreement Amendment, the Santander Factoring Agreement Amendment, and the Bradesco Factoring Agreement (as each such term is defined below) (the "**_Definitive Documents Condition Precedent_**").

B.    If the Definitive Documents Condition Precedent is not satisfied as of the date of any scheduled hearing on the Motion requesting entry of the Proposed Order or as of the date on which the Debtors may ask the Court to enter the Proposed Order as a result of no objections to the Motion having been filed, then the Debtors will adjourn such hearing or delay requesting entry of the Proposed Order until such date as the Definitive Documents Condition Precedent has been satisfied. If the Court does not enter the Proposed Order within 60 days after the filing of the Motion (or such later date as all the Parties may agree in writing), or the Court refuses to enter the Proposed Order, this Stipulation will be void and of no force and effect, and the Parties will have all their rights, remedies, and defenses.

C.    The Parties adopt the Findings of Fact and Conclusions of Law set forth in the Proposed Order as if set forth in full herein. Moreover, the Decretal Provisions of the Proposed Order shall be treated as part of the agreements of the Parties as if set forth in full herein.

## II.    Prepetition Debentures

A.    Each of the 7a Debentures and the 8a Debentures will be amended to provide for the following provisions (the "**_Prepetition Debentures Amendments_**"):

1.    allowing the Visa Receivables to be sold to all of the Factoring Banks,

---

[1]    Each capitalized term used but not defined in this Stipulation has the meaning ascribed to such term in the proposed _Order Approving Stipulation and (I) Authorizing the Debtors to (A) Use Collateral, Including Cash Collateral, and Grant Adequate Protection in Connection with Certain Prepetition Debentures; (B) Amend Terms of Certain Prepetition Debentures; (C) Establish Procedures for Extending the Expiration Date of, and Reimbursing the Issuing Banks for Drawn, Existing Prepetition Letters of Credit; And (D) Enter into a New Factoring Agreement; (II) Approving the Consensual Assumption of Certain Prepetition Factoring Agreements, as Amended; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief_ to which this Stipulation is attached as Exhibit "A" (as amended with the consent of each of the Parties, each in its sole discretion, the "**_Proposed Order_**").

in such amounts as needed for the Factoring Banks to provide factoring services as set forth in this Stipulation (the "***Factoring Amounts***"); and

2.      providing for the changes to the terms of the 7a Debentures and the 8a Debentures described in Section II.B of this Stipulation.

The Parties will negotiate in good faith to draft amendments to the 7a Debentures and 8a Debentures that are consistent with the above terms and are otherwise in form and substance satisfactory to the Parties (the "***Prepetition Debentures Amendments***").

B.      *Adequate Protection*. The Relevant Debtors will provide the Factoring Banks with adequate protection as set forth in the Proposed Order.

C.      *Treatment of the Prepetition Debentures Under a Chapter 11 Plan*. The Debtors will use commercially reasonable efforts (in all cases subject to their fiduciary duties) to provide treatment of the Prepetition Debenture Claims under a chapter 11 plan for the Relevant Debtors (the "***Chapter 11 Plan***") on terms that are no less favorable than the following terms (the "***Proposed Plan Terms***"):

1.      On the effective date of the Chapter 11 Plan (the "***Plan Effective Date***"), Prepetition Debentures Amendments shall become binding obligations of the reorganized Debtors (the "***Restructured Debentures***").

2.      The Restructured Debentures will accrue interest at the current non-default contractual rate equal to the Certificado de Depósito Interbancário rate (the "***CDI Rate***") plus 5.25%. Interest on the Restructured Debentures will be payable monthly in arrears.

3.      Within ten (10) days after the end of each month, GOL Linhas will provide the Factoring Banks with a report showing the Unrestricted Cash Balance as of the end of such month.

4.      From August 27, 2024, through July 31, 2025, GOL Linhas will pay the 10% Debenture Amortization Payment in equal instalments on the 27th day of each month.

5.      From and after August 1, 2025, through December 31, 2027 (the "***Second Amortization Period***"), GOL Linhas will make the 90% Debenture Amortization Payment in equal installments on the 27th day of each month.  If, however, at any time during the Chapter 11 Cases the Unrestricted Cash Balance is less than R$1 billion, then the Second Amortization Period will begin on the month immediately following the receipt of the report showing such Unrestricted Cash Balance.

6.      Payment of the Restructured Debentures will be secured by a first priority lien on and fiduciary assignment (granted under Brazilian law) of the Visa

Receivables (including those generated from and after the Plan Effective Date) or such other credit or debit card receivables as set forth in the Prepetition Debentures or as the Factoring Banks may have agreed to accept as collateral in place of the Visa Receivables; *provided that*, under the Restructured Debentures, GOL Linhas shall have the same rights, as modified herein and pursuant to the Proposed Order, to factor the Visa Receivables (or such other receivables as are substituted for the Visa Receivables under the Restructured Debentures) as currently exist in the 7a Debentures and the 8a Debentures.

7.      The Guarantor, as reorganized, will continue to guarantee payments on the Restructured Debentures.

8.      The Restructured Debentures will contain such other terms and conditions as may reasonably be needed to permit the Factoring Banks to sell the Restructured Debentures in the market, including updates to the events of early maturity, considering the Chapter 11 Plan; *provided that* such terms and conditions are not inconsistent with the terms of the Proposed Order or this Stipulation.

9.      The Chapter 11 Plan will not contain any terms that materially adversely affect the Factoring Banks or are inconsistent with the foregoing Proposed Plan Terms.

D.      *The Factoring Banks' Obligations in Relation to GOL Debtors' Restructuring.* So long as no Automatic Event of Default or Optional Event of Default has occurred under the Order (including that the Chapter 11 Plan contains terms that are no less favourable to the Factoring Banks than the Proposed Plan Terms and the other terms in the Stipulation and the Proposed Order, including with respect to the Factoring Agreements and Letters of Credit), then each of the Factoring Banks agrees to act as follows:

1.      use commercially reasonable efforts to support the Chapter 11 Plan containing the Proposed Plan Terms and to seek to obtain the required internal approvals to vote in favour of such Chapter 11 Plan subject to receipt of a court-approved Disclosure Statement under section 1125 of the Bankruptcy Code;

2.      not object to the treatment of its 7a Debentures Claim and 8a Debentures Claim under a Chapter 11 Plan on the terms described in this Stipulation; *provided that*, notwithstanding anything to the contrary in the Proposed Order or this Stipulation, if the class of 7a Debentures holders and 8a Debentures holders under the Chapter 11 Plan vote to reject the Chapter 11 Plan, the Debtors reserve all rights to propose an alternative treatment for such class; and

3.      not, directly or indirectly, (A) support or encourage the termination or modification of any of the Debtors' exclusive periods for filing a Chapter 11 Plan or (B) take any other action that is inconsistent with this Stipulation, the Chapter 11

Plan, or the Proposed Order or is reasonably likely to prevent, hinder, interfere with, delay, or impede the implementation or consummation of the Chapter 11 Plan.

III.    **Factoring Agreements**[2]

A.    The Factoring Banks shall make factoring available to the Debtors, (A) in the following amounts of outstanding exposure for each Factoring Bank (each, the "Factoring Amount"): (i) R$1,300 million from BdoB; (ii) R$350 million from Santander; and (iii) R$220 million from Bradesco; and (B) in the following proportions: (i) 69.5% by BdoB; (ii) 18.7% by Santander; and (iii) 11.8% by Bradesco. The Relevant Debtors shall use their reasonable best efforts to maintain the proportion indicated between the Factoring Banks, *provided that* the Relevant Debtors shall not be required to commit to factoring in any set amount so long as it does not exceed the Factoring Amount agreed to by each of the Factoring Banks. The Relevant Debtors shall undertake to send each of the Factoring Banks a weekly report indicating the proportion of the receivables balance made available and anticipated by each bank.  For the avoidance of doubt, the Relevant Debtors shall have no obligation to draw on these factoring commitments.

B.    *Amendments to the BdoB Factoring Agreement:* The BdoB Factoring Agreement will be amended, in form and substance acceptable to each of BdoB and GOL Linhas, to incorporate the terms and conditions described below, together with such other provisions as BdoB and GOL Linhas may agree (the "***BdoB Factoring Agreement Amendment***"). The BdoB Factoring Agreement Amendment is attached as Exhibit "1" hereto.

1.    If utilized in the BdoB Factoring Agreement Amendment, the following terms shall substantially have the definition described below:

"***Bankruptcy Approval Date***" – the date on which the Bankruptcy Court signs the Bankruptcy Court Order.

"***Bankruptcy Code***" – title 11 of the United States Code.

"***Bankruptcy Court***" – the United States Bankruptcy Court for the Southern District of New York, which currently is overseeing Assignor's case under chapter 11 of the Bankruptcy Code, or such other court to which such chapter 11 case is transferred or otherwise assumes jurisdiction over such case.

"***Bankruptcy Court Order***" – the order of the Bankruptcy Court that, among other things, approves the Stipulation and approves the assumption by

---

[2]    The description of the terms of the amendments to the BdoB Factoring Agreement and the Santander Factoring Agreement and the terms of the new Bradesco Factoring Agreement contained in this Stipulation are intended to highlight some of the key terms and are qualified in their entirety by the terms of the Proposed Order and the actual terms of such agreements and any applicable amendments.

Assignor of this Agreement, as amended by the Stipulation, under section 365(a) of the Bankruptcy Code.

"***Credit Right Requirements***" – for an individual Credit Right, payment date equal to or less than 300 days and for all Credit Rights outstanding as of any given date (taking into account any Credit Rights to be purchased on such date), an weighted average payment date no greater than 80 days.

"***DIP Financing***" – the financing approved by the Bankruptcy Court pursuant to that certain *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection to the Prepetition Secured Parties, (D) Modifying the Automatic Stay, (E) Authorizing the Debtors to Use Cash Collateral, and (F) Granting Related Relief* [Docket No. 207].

"***BdoB Limit Value***" – An amount of R$1.3 billion.

"***Outstanding Credit Rights***" – at any time, the unpaid portion of Credit Rights purchased by Assignee, Banco Santander S.A., and Banco Bradesco S.A.

"***Stipulation***" – the Stipulation among the Assignor, the Guarantor, the Assignee, Banco Santander S.A., and Banco Bradesco S.A.

2.      The "CONTRACT INFORMATION" shall be amended to replace the reference to the "Amount: BRL 1,900,000,000.00 (one billion nine hundred million reais)" to "Amount: the BdoB Limit Value."

3.      The "CONTRACT INFORMATION" shall be amended to specify the following "Due date": "This Contract shall terminate upon the earliest to occur of the following: (a) the date that is three (3) years from the Stipulation Effective Date, (b) the occurrence of an "Automatic Event of Default" under the Bankruptcy Court Order, (c) the election by Assignee to terminate this Agreement upon the occurrence of an "Optional Event of Default" under the Bankruptcy Court Order, and (d) the occurrence of the "Plan Effective Date," as such term is defined in the Stipulation.

4.      Cost: No more than the CDI Rate + 5.0%.

5.      The material terms of the BdoB Factoring Agreement Amendment are set forth below:

a)      Assignee shall have no obligation to purchase any Credit Right unless the Credit Right satisfies the Credit Right Requirements and, following the purchase of such Credit Right, the portfolio of purchased Credit Rights will satisfy the Credit Right Requirements.

b)      Subject to the limits and conditions of the Bankruptcy Court Order, Assignee may debit any account (including checking accounts) maintained by Assignor with Assignee to reimburse Assignee for any chargebacks. If insufficient funds are available in Assignor's accounts to satisfy a chargeback, then, following notice from Assignee to Assignor, Assignor will immediately reimburse Assignee (including through other cash resources).

c)      Assignor will send (or cause to be sent) on a weekly basis a chargeback report in a form satisfactory to Assignee prepared by Cielo S.A. showing the chargebacks for the prior week, including the number and amount of chargeback requests.

d)      Within ten (10) business days after the end of each month, Assignor will send to Assignee a monthly flight performance report, which will compare the published flight network and the performed flight network and otherwise be in form and substance satisfactory to Assignee.

e)      Assignee may, in its sole discretion, suspend the purchase of Credit Rights if the weekly chargeback rate exceeds 0.8% and will have no obligation to continue purchasing Credit Rights until the chargeback rate is less than or equal to 0.8% for two consecutive weeks *and* Assignor has provided Assignee with an adequate explanation for the increase in chargebacks and a detailed action plan to ensure a chargeback rate consistent with this Agreement.

f)      The Relevant Debtors shall use their reasonable best efforts to ensure that Assignee shall purchase approximately 69.5% of the aggregate Credit Rights purchased at any time by Assignee, Banco Santander (Brasil) S.A., and Banco Bradesco S.A, and Assignee shall have no obligation to purchase any Credit Rights if, after giving effect to such purchase, Assignee's share of the aggregate Credit Rights purchased by such parties would exceed the lesser of the BdoB Limit Value and 69.5% of the aggregate Credit Rights.  By Monday of each week, Assignor shall provide Assignee with a report showing, for each of Assignee, Banco Santander (Brasil) S.A. and Banco Bradesco S.A., the Outstanding Credit Rights held as of the end of the prior week and the total amount anticipated to be owned by each of Assignee, Banco Santander (Brasil) S.A., and Banco Bradesco S.A.  The Assignor may, at its discretion, provide a report on any weekday showing the Outstanding Credit Rights held as of the end of a given day by each of Assignee, Banco Santander (Brasil) S.A., and Banco Bradesco S.A. If the report shows that Assignee's share of the aggregate Credit Rights

purchased by such parties does not exceed the lesser of the BdoB Limit Value and 69.5% of the aggregate Credit Rights, the Assignee's obligation to purchase any Credit Rights shall be automatically reinstated.

g)      If there is a change or transfer, for any reason, of shareholding control or ownership of shares in the Assignor, and in the event of incorporation, spin-off, merger or corporate reorganization of the Assignor, provided that Assignee has not been notified in this regard within at least thirty (30) days in advance of the corporate act filing and provided that Assignee has not agreed to it in writing. Termination may occur, also at the discretion of Assignee, if once notified regarding the corporate proposal, it does not agree with such corporate change, and, in this case, termination may occur at any time, either before or after the implementation of the corporate change. It is hereby agreed between the Parties that a change of control or corporate reorganization occurring during the term and in accordance with the Chapter 11 proceeding shall not constitute an event of early termination of this contract and shall not require the consent of or prior notification to Assignee under the terms of the BdoB Factoring Agreement.

6.      Factoring Fee: one half of a percentage (0.5%) of the BdoB Limit Value per year on the terms set forth in Section III.E of the Stipulation.

C.      *Bradesco Factoring Agreement.* Bradesco and GOL Linhas will enter into a factoring agreement in form and substance acceptable to each of Bradesco and GOL Linhas, which will incorporate the terms and conditions described below, together with such other provisions as Bradesco and GOL Linhas may agree (the "***Bradesco Factoring Agreement***"). The material terms of the Bradesco Factoring Agreement are set forth below, and the Bradesco Factoring Agreement is attached as Exhibit "2":

1.      Cost: CDI + 5.00% per year.

2.      As agreed between the Parties within the scope of and approved by the Bankruptcy Court Order, the Bradesco Factoring Agreement is part of a series of commercial measures that shall be adopted by the Parties to balance the Assignor's liabilities with the Assignee and other financial institutions, and guarantee and promote the activity carried out by the Assignor.  In this regard, the Maximum Volume corresponds to the maximum total of 11.8% of the total value of Credit Rights that shall be transferred by the Assignor, which shall not exceed R$ 220,000,000.00 (two hundred million reais) ("Bradesco Maximum Volume").  The remaining value is subject to an operation concluded with

Banco do Brasil S.A., in the proportion of 69.5%, and Banco Santander (Brasil) S.A., in the proportion of 18.7%.

3.      The Relevant Debtors shall use their reasonable best efforts to ensure that Bradesco shall purchase approximately 11.8% of the aggregate Credit Rights purchased at any time by Bradesco, Banco do Brasil S.A, and Banco Santander (Brasil) S.A., and Bradesco shall have no obligation to purchase any Credit Rights if, after giving effect to such purchase, Bradesco's share of the aggregate Credit Rights purchased by such parties would exceed the lesser of the Bradesco Maximum Volume and 11.8% of the aggregate Credit Rights.  By Monday of each week, the Relevant Debtors shall provide Bradesco with a report showing, for each of Bradesco, Banco do Brasil S.A, and Banco Santander (Brasil) S.A., the Outstanding Credit Rights held as of the end of the prior week and the total amount anticipated to be owned by each of Bradesco, Banco do Brasil S.A., and Banco Santander (Brasil) S.A.  The Relevant Debtors may, at their discretion, provide a report on any weekday showing the Outstanding Credit Rights held as of the end of a given day by each of Bradesco, Banco do Brasil S.A., and Banco Santander (Brasil) S.A.  If the report shows that Bradesco's share of the aggregate Credit Rights purchased by such parties does not exceed the lesser of the Bradesco Maximum Volume and 11.8% of the aggregate Credit Rights, Bradesco's obligation to purchase any Credit Rights shall be automatically reinstated.

4.      Assignment of Credit under the Bradesco Factoring Agreement shall be subject to and conditioned upon the full satisfaction and maintenance, or the express written waiver by the Assignee, at its sole discretion, of the following cumulative conditions precedent ("Conditions Precedent"):

        a)      Analysis of the Credit to be acquired and approval of the operation by Bradesco;
        b)      Approval by the north American Court of the Southern District of New York or any other court ("Court") of competent jurisdiction over all and any proceeding of the Assignor under the US Bankruptcy law, of the agreement entered into between the Assignor, Bradesco, Banco do Brasil S.A., and Banco Santander (Brasil) S.A. ("Stipulation");
        c)      Disbursement of the total amounts owed to the Assignor in a funding operation carried out within the scope of Chapter 11, with third parties, in a total value of one billion US dollars (USD1,000,000,000.00) ("DIP Financing"); and
        d)      The compliance with all Assignor's obligations set forth in the Bradesco Factoring Agreement, including, but not limited to, those established in clause 2.10 of the Bradesco Factoring Agreement.

5.      If the Conditions Precedent established above are not fulfilled,

Assignee shall not be obliged to acquire any Credit Rights that the Assignor intends to assign, and may refuse to conclude each Assignment operation in a justified manner, not subject to the payment of any fine, penalty or compensation for such refusals. However, the Assignee shall comply with the settlement of the assignments of Credit Rights that it has accepted, in accordance with the terms of this Agreement.

6.      In the event of cancellation of the sales/services that gave rise to the Credits transferred to the Assignee ("Chargeback"), the Assignor hereby authorizes the Assignee to debit the amounts due against the account indicated in the Table III set forth in the Bradesco Factoring Agreement, considering that such compensation shall occur exclusively in accordance with and within the limits permitted by the Bankruptcy Court Order.

7.      The sales/service provision cancellation volume shall be determined weekly by the payment institution responsible for the sales operations, Cielo S.A. – Payment Institution and shall be reported to the Assignor and, in turn, forwarded to the Assignee.

8.      Assignor shall request the responsible payment institution for the weekly report mentioned in clause 2.10.2 of the Bradesco Factoring Agreement, and forward the aforementioned report to the Assignee, on a weekly basis, and, in the event of a request by the payment institution, to change the frequency of preparation and forwarding of the report, in which case the Assignee shall be notified in advance so that the necessary adjustments can be made by the parties in the Bradesco Factoring Agreement.

9.      Assignor undertakes to undertake greater efforts to maintain the calculated index based on the volume of sales/service provision cancellations and the total sales volume less than or equal to 0.8% weekly ("Chargeback Index Limit").

a)      If the Chargeback Index Limit is exceeded, Assignee may, at its own discretion, refuse assignment operation requests and shall not be obliged to resume them, except for the exclusive case that the Chargeback Index Limit is again complied by the Assignor in the minimum period of two consecutive weeks (14 days – "Minimum Period"), counting from the date on which non-compliance with the Chargeback Index Limit was verified.

b)      the resumption of the assignment operations, after compliance with the Chargeback Index Limit and exceeding the Minimum Period, the Assignor shall notify the Assignee of the achievement of the

conditions established for the Minimum Period and provide the Assignee with clarifications regarding the reason for the increase in the Chargeback Index Limit, and the measures adopted that shall reduce the sales/service provision cancellation rate.

10.     The Assignor undertakes to maintain, throughout the effective term of the Bradesco Factoring Agreement, regularity of flights, at a rate calculated based on total flights, at 96%, and a minimum fleet of ninety (90) aircraft in operation, except when extreme weather conditions directly affect the normal course of the Assignor's business operations, in accordance with the provisions of the Bankruptcy Court Order.

11.     The indexes and numbers indicated in clause 2.10.4 of the Bradesco Factoring Agreement shall be determined in the Assignor's monthly performance report, which shall be mandatory for preparation and submission to the Assignee.  The report, which shall be sent monthly to the Assignee, on a date to be defined between the parties, shall make a comparison between the estimated air network for the month and the performed network, based on the number of aircraft and flights, estimated and executed by the Assignor, within ten (10) days from the last day of each month, the first of which shall be presented within thirty (30) calendar days from the signing of the Bradesco Factoring Agreement, in accordance with the requirements set forth in the Bankruptcy Court Order.

12.     If there is a change or transfer, for any reason, of shareholding control or ownership of shares in the Assignor, and in the event of incorporation, spin-off, merger or corporate reorganization of the Assignor, provided that Assignee has not been notified in this regard within at least thirty (30) days in advance of the corporate act filing and provided that Assignee has not agreed to it in writing. Termination may occur, also at the discretion of Assignee, if once notified regarding the corporate proposal, it does not agree with such corporate change, and, in this case, termination may occur at any time, either before or after the implementation of the corporate change. It is hereby agreed between the Parties that a change of control or corporate reorganization occurring during the term and in accordance with the Chapter 11 proceeding shall not constitute an event of early termination of this contract and shall not require the consent of or prior notification to Assignee under the terms of the Bradesco Factoring Agreement.

13.     Operation fee of 0.5% per year applied on the Bradesco Maximum Volume on the terms set forth in Section III.E of the Stipulation.

    D.     *Amendments to Santander Factoring Agreement.* The Santander Factoring Agreement will be amended, in form and substance acceptable to each of Santander and

GOL Linhas, to incorporate the terms and conditions described below, together with such other provisions as Santander and GOL Linhas may agree (the "***Santander Factoring Agreement Amendment***"). The material terms of the Santander Factoring Agreement Amendment are set forth below, and the Santander Factoring Agreement Amendment is attached as Exhibit "3":

      1.      The Relevant Debtors shall use their reasonable best efforts to ensure that Santander shall purchase approximately 18.7% of the aggregate Credit Rights purchased at any time by Santander, Banco do Brasil S.A, and Banco Bradesco S.A., and Santander shall have no obligation to purchase any Credit Rights if, after giving effect to such purchase, Santander's share of the aggregate Credit Rights purchased by such parties would exceed the lesser of the Santander Limit Value (as defined below) and 18.7% of the aggregate Credit Rights.   By Monday of each week, the Relevant Debtors shall provide Santander with a report showing, for each of Santander, Banco do Brasil S.A, and Banco Bradesco S.A., the Outstanding Credit Rights held as of the end of the prior week and the total amount anticipated to be owned by each of Santander, Banco do Brasil S.A., and Banco Bradesco S.A.  The Relevant Debtors may, at their discretion, provide a report on any weekday showing the Outstanding Credit Rights held as of the end of a given day by each of Santander, Banco do Brasil S.A., and Banco Bradesco S.A. If the report and/or the reports obtained from the ACCREDITING AUTHORITY or the other banks that have agreed to acquire the Credit Rights, under the terms of the Stipulation shows that Santander's share of the aggregate Credit Rights purchased by such parties does not exceed the lesser of the Santander Limit Value and 18.7% of the aggregate Credit Rights, Santander's obligation to purchase any Credit Rights shall be automatically reinstated.

      2.      In addition, Santander's obligation to purchase any Credit Rights is subject, at all times, to an aggregated amount of R$350 million (the "***Santander Limit Value***").

      3.      Cost: No more than the CDI Rate + 5.0% per year.

      4.      Operation fee: 0.5% per year applied on the Santander Limit Value on the terms set forth in Section III.E of the Stipulation.

      5.      The definition of "CREDIT" shall be amended to "net credit, processed and confirmed electronically by the ACCREDITING AUTHORITY Cielo S.A. – Instituição de Pagamento resulting from transactions involving the sale of goods and/or services to clients, credit and/or debit card holders, who were previously registered by the ACCREDITING AUTHORITY in a REGISTRY SYSTEM, which have an average expiration date of eighty (80) days and a maximum of three hundred (300) days."

6.      Add the following Conditions Precedent:

a)      "2.4.1. Analysis of the CREDIT to be acquired and approval of the operation by SANTANDER";

b)      "2.4.2. Approval by the north American Court of the Southern District of New York or any other court ("Court") of competent jurisdiction over all and any proceeding of the CLIENT under the US Bankruptcy law, of the agreement entered into between the CLIENT, SANTANDER, Banco do Brasil S.A., and Banco Bradesco S.A. ("Stipulation")";

c)      "2.4.3. Disbursement of the total amounts owed to the CLIENT in a funding operation carried out within the scope of Chapter 11, with third parties, in a total value of one billion US dollars (USD1,000,000,000.00) ("DIP Financing")"; and

d)      "2.4.4. The compliance with all Assignor's obligations set forth in these General Conditions, including, but not limited to, those established in clause 7 below."

7.      Amend certain provisions to provide the following terms:

a)      "6. Term of Effectiveness. Subject to the terms and conditions of the Order, these General Conditions shall be in force until the Effective Date of the Chapter 11 Plan ("Plan Effective Date", as defined in the Stipulation). However, these General Conditions may be renewed after the Effective Date of the Chapter 11 Plan (as defined in the Stipulation), by mutual agreement between the Parties or terminated by either Party, at any time and without any lien, upon communication within 30 days in advance. In this case, all clauses and conditions shall continue to apply to the CREDIT assignments that, until then, have already been contracted until the final payment of the CREDIT to SANTANDER. Without prejudice to any provision to the contrary, on the Effective Date of the Chapter 11 Plan, SANTANDER shall have no obligation to provide new financial conditions as those established under the terms of these General Conditions."

8.      Add the following provisions:

a)      "4.1.1. In the event the amounts due cannot be offset for any reason, including, but not limited to, the insufficient balance in the account indicated by the CLIENT in the moment of the contracting, the CLIENT authorizes the compensation, under the terms of article 368 et seq. of the Brazilian Civil Code, of the respective values on the

investments, observed that such compensation must occur exclusively in accordance and in the limits authorized by the Order."

b)     "6.1. In addition to the cases provided for by law, the General Conditions may be terminated, in which case the defaulting party shall also be liable for any resulting losses and damages, in the following cases, observed the terms and conditions of the Order:

(i)    if any of the parties go bankrupt, request judicial recovery or initiate extrajudicial recovery procedures, have its bankruptcy or liquidation requested, or enter into a state of insolvency, including Chapter 7 under the north American jurisdiction, considering the US Bankruptcy Law, except for Chapter 11 of the CLIENT in the Southern District of New York, already in progress on the signature date of these General Conditions;

(ii)   if there is a change or transfer, for any reason, of shareholding control or ownership of shares in the CLIENT, and in the event of incorporation, spin-off, merger or corporate reorganization of the CLIENT, provided that SANTANDER has not been notified in this regard within at least thirty (30) days in advance of the corporate act filing and provided that SANTANDER has not agreed to it in writing. Termination may occur, also at the discretion of SANTANDER, if once notified regarding the corporate proposal, it does not agree with such corporate change, and, in this case, termination may occur at any time, either before or after the implementation of the corporate change. It is hereby agreed between the Parties that a change of control or corporate reorganization occurring during the term and in accordance with the Chapter 11 proceeding shall not constitute an event of early termination of this contract and shall not require the consent of or prior notification to SANTANDER under the terms of these General Conditions;

(iii)  non-compliance by the parties with any obligation assumed in these General Conditions, including, but not limited to, the default of the obligations set forth in clause 7 below;

(iv)   in cases of revocation of the environmental license, when applicable, and a final and unappealable conviction, due to the practice by the CLIENT of acts that involve child labor, work similar to slavery, criminal profit from prostitution or

damage to the environment;

(v)  without prejudice to the deadlines for its settlement provided for in the respective instruments or the granting of an additional deadline by the creditor, in the event of default on any debt with financial institutions or in the capital market, local or international, of the CLIENT, its parent company, subsidiaries or affiliates, in an amount, unit or aggregate, exceeding R$ 50,000,000.00 (fifty million reais) subsequent to the filing of Chapter 11 and which is not related to the filing of Chapter 11 or to a cross-default, unless, (a) within 15 (fifteen) Business Days, in a timely manner, the CLIENT files an appeal, embargo or other appropriate measure challenging the default and, cumulatively, that such appeal, embargo or other appropriate measure obtains judicial relief that suspends such payment; or (b) if there has been an agreement with the respective creditor within 15 (fifteen) Business Days of the respective default. "

c)      "7.1. As referred to in clause 4 above, in the event of cancellation of the sales/rendering of services that originated the CREDIT transferred to SANTANDER ("Chargeback"), the CLIENT hereby authorizes SANTANDER to debit the amounts due against the account maintained with SANTANDER and of its ownership, indicated in the moment of the contracting, observed that such compensation must occur exclusively in accordance and in the limits authorized by the Order."

d)      "7.2. The sales/rendering of service cancellation volume shall be determined weekly by the payment institution responsible for the sales operations, Cielo S.A. – Instituição de Pagamento (CNPJ nº 01.027.058/0001-91), and shall be reported to the CLIENT and, in turn, forwarded to SANTANDER."

e)      "7.2.2. The CLIENT undertakes to undertake the best efforts to maintain the calculated index based on the volume of sales/rendering of services cancellations and the total sales volume less than or equal to 0.8% weekly ("Chargeback Index Limit")."

E.      *Factoring Agreement Commitment Fee*.  No later than five (5) Business Days after the entry of the Proposed Order and on each anniversary thereafter until the earlier of (i) the termination of the Factoring Banks commitment to provide new factoring under the terms of the Proposed Order and this Stipulation and (ii) the Plan Effective Date GOL Linhas shall pay to each of the Factoring Banks a yearly commitment fee equal to one half of a

percent (0.5%) of the maximum Factoring Amount that each such Factoring Bank has agreed to purchase. For the avoidance of doubt, the second commitment fee will be due 12 months after payment of the first fee.

IV.    **Letters of Credit**

A.    Each of the Factoring Banks agrees that, so long as no Automatic Event of Default has occurred under the Proposed Order, no event has occurred that would allow a Factoring Bank to suspend its performance under this Stipulation or the Order, and no Optional Event of Default has been declared under the Proposed Order, no later than thirty (30) days prior to the scheduled expiration date of an outstanding Letter of Credit, it will renew such outstanding Letter of Credit if, prior to such date, such Factoring Bank receives a written request from GOL Linhas to renew such Letter of Credit.

B.    If GOL Linhas timely requests a renewal of a Letter of Credit, then the applicable Factoring Bank will renew such Letter of Credit for a period not to exceed one year (or longer, if GOL Linhas so requests and the Factoring Bank agrees to such longer period in its sole discretion), with all the other original terms and conditions of the Letter of Credit to be maintained.

C.    From and after the earlier of the Plan Effective Date and the entry of an order by the Court approving a sale of substantially all of the assets of the Debtors or a change in the equity ownership of greater than 50% (other than pursuant to an order confirming the Chapter 11 Plan), the Factoring Banks will not have any obligation to renew any outstanding Letters of Credit.

D.    For the avoidance of doubt, the Factoring Banks have agreed only to renew outstanding Letters of Credit. Nothing in this Stipulation or the Order is intended to obligate a Factoring Bank to issue any new letters of credit.

V.    **Notice of Events of Default**

A.    If any Factoring Bank(s) declare an "Optional Event of Default" in accordance with the Proposed Order with respect to its Letters of Credit, Reimbursement Agreement, or Factoring Agreement or with respect to the Prepetition Debentures, such bank(s) will provide notice to the other Factoring Banks and their respective counsel in accordance with the Proposed Order.

B.    GOL Linhas will give each of the Factoring Banks and their respective counsel written notice, which notice may be given by email, of the occurrence of an Event of Default or an event that, with the passage of time or the giving of notice, could give rise to an Optional Event of Default within five days of such occurrence.

C.    All notices must be given to the persons identified in section VII.E below.

D.    Notwithstanding anything to the contrary herein, during the pendency of the

Chapter 11 Cases, the Factoring Banks' notice, scope, and exercise of remedies under the definitive documents relating to the Letters of Credit, Reimbursement Agreements, and Factoring Agreements will be solely as provided in the Proposed Order.

**VI.    Filing of the Motion with the Bankruptcy Court**

A.    Within five (5) Business Days after the execution of this Stipulation by all the Parties, the Relevant Debtors will file the Motion with the Court, which must be in form and substance reasonably satisfactory to the Factoring Banks. Counsel to the Relevant Debtors will provide each of the Factoring Banks and their respective counsel a draft of the Motion no later than two (2) Business Days prior to its filing.

VII.    **Miscellaneous**

A.    If, during the pendency of the Chapter 11 Cases, any terms and conditions set forth in this Stipulation, the Proposed Order, and/or the definitive documents relating to the Letters of Credit, Reimbursement Agreements, Factoring Agreements, and/or the Prepetition Debentures are inconsistent or in conflict, the Proposed Order shall govern. In the event that any terms and conditions set forth in this Stipulation and the definitive documents relating to the Letters of Credit, Reimbursement Agreements, Factoring Agreements, and/or the Prepetition Debentures, are inconsistent or in conflict, the definitive documents shall govern.

B.    *Delivery of Business Plan to the Factoring Banks*. The Debtors will provide the Factoring Banks with a copy of the "Business Plan" (as defined in the Final DIP Order).

C.    *Monthly Meeting with the Factoring Banks*. The Debtors and their advisers will meet with the Factoring Banks (and, at the option of the Factoring Banks, the legal counsel to the Factoring Banks and counsel to the Relevant Debtors) on at least a monthly basis to update, and discuss with, the Factoring Banks the Debtors' business operations, as well as the status of, and key developments in, the Chapter 11 Cases.

D.    *Counsel for the Factoring Banks*.  In accordance with the Proposed Order, the Factoring Banks designate the following U.S. counsel and non-U.S. counsel with respect to

the Debtors' obligations to reimburse such counsel's fees pursuant to paragraph 19 of the Proposed Order subject to the terms thereof:

    1.    BdoB: Baker McKenzie

    2.    Santander: Steptoe LLP as US counsel and SOB Advogados as non-U.S. counsel.

    3.    Bradesco: The Law Offices of Richard J. Corbi and Gabriela Scanlon as US counsel, and SOB Advogados as non- U.S. counsel.

E.    Any notice required to be given in this Stipulation or in the Order must be in writing and may be given by email or by guaranteed overnight delivery at the addresses set forth below. Notices sent by email will be deemed to have been duly given when sent. Notices sent by guaranteed overnight delivery will be deemed to have been duly given on the first Business Day following the date of deposit with the guaranteed overnight delivery service. The addresses for notice are as follows:

    1.    Debtors:

    a) Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil

    b) Milbank LLP

    55 Hudson Yards
    New York, NY 10001
    Attention: Lauren Doyle
    Email: ldoyle@milbank.com

    -and-

    2029 Century Park East, Floor 33
    Los Angeles, CA 90067
    Attention: Gregory Bray; Jordyn Paperny
    Email: gbray@milbank.com; jpaperny@milbank.com

    2.    Counsel to the Official Committee of Unsecured Creditors:

    a)    Willkie Farr & Gallagher LLP
    787 Seventh Avenue
    New York, New York 10019
    Attention: Brett H. Miller; Todd M. Goren; Craig A. Damas;
        James H. Burbage

Email: bmiller@willkie.com; tgoren@willkie.com;
cdamast@willkie.com; jburbage@willkie.com

3.    Counsel to the DIP Lenders:

a)    Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Attention: Allan S. Brilliant; Stephen Wolpert; Eric Hilmo;
Donghao (Helen) Yan
Email: allan.brilliant@dechert.com;
stephen.wolpert@dechert.com;
eric.hilmo@dechert.com; helen.yan@dechert.com

b)    Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Ira S. Dizengoff; Philip C. Dublin; Zach Lanier; Omid
Rahnama
Email: idizengoff@akingump.com; pdublin@akingump.com;
zlanier@akingump.com; orahnama@akingump.com

c)    Hogan Lovells US LLP

390 Madison Avenue
New York, New York 10017
Attention: John D. Beck; Pieter Van Tol; Jennifer Y. Lee
Email: john.beck@hoganlovells.com;
pieter.vantol@hoganlovells.com;
jennifer.lee@hoganlovells.com

-and-

1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Attention: David P. Simonds; Edward J. McNeilly
Email: david.simonds@hoganlovells.com;
edward.mcneilly@hoganlovells.com

4.      BdoB:

    a)      Banco do Brasil S.A.
        Avenida Paulista, 2163 – 10. Andar – Bela Vista
        São Paulo (SP) – CEP 01311-933
        Gecor Atacado Recuperação Judicial
        Attention: Gerente Geral
        Email: gecor.4913@bb.com.br

    b)      Counsel to BdoB:

        Baker & McKenzie LLP
        1111 Brickell Avenue, Suite 1700
        Miami, Florida 33131
        Attention: Daniela Fonseca-Puggina
        Email: daniela.fonsecapuggina@bakermckenzie.com

        Baker & McKenzie LLP
        452 Fifth Avenue
        New York, NY 10018
        Attention: Debra A. Dandeneau
        Email: debra.dandeneau@bakermckenzie.com

5.      Bradesco:

    a)      Banco Bradesco S.A.

        Av. Brigadeiro Faria Lima, 3950, 9th floor, São Paulo, SP, Brazil,
        Zip Code 04543-011
        E-mail: gustavo.calogeras@bradesco.com.br e
        At.: Gustavo Calógeras

        And

        Cidade de Deus, s/n, Prédio Prata, $2^{o}$ andar
        Osasco, SP, Brazil,
        Zip Code: 06029-900
        E-mail: marcio.bonilha@bradesco.com.br
        At.: Marcio Bonilha

    b)      Counsel to Bradesco:

The Law Offices of Richard J. Corbi PLLC
1501 Broadway, 12th Floor
New York, NY 10036
Attention: Richard Corbi
Email: rcorbi@corbilaw.com

MB Scanlon
4301 50th Street NW, Suite 102
Washington, D.C. 20016
Attention: Gabriela Scanlon
Email: gabriela@mbscanlon.com

Sacramone Orleans e Bragança Advogados
Rua Doutor Eduardo de Souza Aranha, nº 387, cj. 121
Vila Nova Conceição, São Paulo, SP, Brazil,
Zip Code 04543-011
Attention: contato@sobadv.com.br

6.    Santander:

   a)    Banco Santander (Brasil) S.A.

Avenida Presidente Juscelino Kubitschek, 2041 and 2235, Block
A, São Paulo, SP, Brazil,
Zip Code 04543-011
Email: thmartins@santander.com.br;
bruna.trevisan@santander.com.br e
celso.aoki@santander.com.br
Attn.: Thiago Franco Martins; Bruna Rabello de Freitas e Celso
Massao Aoki

b)    Counsel to Santander:

Steptoe LLP
1330 Connecticut Ave., NW
Washington DC 20036
Attn:    Fernando Merino
        Joshua Taylor
Email: fmerino@steptoe.com
        jrtaylor@steptoe.com

Steptoe LLP
633 West Fifth Street
Suite 1900
Los Angeles, CA 90071
Attn: Jeffrey Reisner
Email: jreisner@steptoe.com

Sacramone Orleans e Bragança Advogados
Rua Doutor Eduardo de Souza Aranha, nº 387, cj. 121
Vila Nova Conceição, São Paulo, SP, Brazil,
Zip Code 04543-011
Attention: contato@sobadv.com.br

Sacramone Orleans e Bragança Advogados
Rua Doutor Eduardo de Souza Aranha, nº 387, cj. 121
Vila Nova Conceição, São Paulo, SP, Brazil,
Zip Code 04543-011
Attention: contato@sobadv.com.br

F.    *Severability.* If the Court determines Section II.D of this Stipulation to be
prohibited, unenforceable, invalid, or ineffective, then such provision shall be prohibited,
unenforceable, invalidated, or ineffective without invalidating the remaining provisions of
this Stipulation or the Order and shall not affect the viability or enforceability of such other
provisions or the Order. If the Court determines that any other provision of this Stipulation
(including the Order, which is deemed a part hereof) is prohibited, unenforceable, invalid, or

ineffective, then, at the option of any of the Parties for whose benefit such provision is included, which option shall be exercised by written notice to the other Parties within two (2) Business Days after any such determination, then this Stipulation shall be deemed null and void, the Proposed Order shall not be entered (or, if entered, shall be rescinded), and the Parties shall be restored to all their rights, remedies, and defenses.

*[Signature pages to follow]*

By:

*Eduardo Guardiano Leme Gotilla*
E9E4B7417469404...

Eduardo Guardiano Leme Gotilla
CFO
**GOL LINHAS AÉREAS INTELIGENTES S.A.**
Praça Comte. Linneu Gomes, s/n, Portaria 3,
Jardim Aeroporto
CEP 04626-020
São Paulo/ SP
Telephone: +55 11 5098-2686
Email: eggotilla@voegol.com.br

By:

*Eduardo Guardiano Leme Gotilla*
E9E4B7417469404...

Eduardo Guardiano Leme Gotilla
CFO
**GOL LINHAS AÉREAS S.A.**
Praça Comte. Linneu Gomes, s/n, Portaria 3,
Jardim Aeroporto
CEP 04626-020
São Paulo/ SP
Telephone: +55 11 5098-2686
Email: eggotilla@voegol.com.br

By:

*RENATA DOMINGUES DA FONSECA GUINESI*
A6F0094C2668440...

Renata Domingues da Fonseca Guinesi
Vice President
**GOL LINHAS AÉREAS INTELIGENTES S.A.**
Praça Comte. Linneu Gomes, s/n, Portaria 3,
Jardim Aeroporto
CEP 04626-020
São Paulo/ SP
Telephone: +55 11 5098-2686
Email: rddfonseca@voegol.com.br

By:

*RENATA DOMINGUES DA FONSECA GUIN*
A6F0094C2668440...

Renata Domingues da Fonseca Guinesi
Vice President
**GOL LINHAS AÉREAS S.A.**
Praça Comte. Linneu Gomes, s/n, Portaria 3,
Jardim Aeroporto
CEP 04626-020
São Paulo/ SP
Telephone: +55 11 5098-2686
Email: rddfonseca@voegol.com.br

By: _____

**BANCO DO BRASIL S.A.**
Rodrigo Franco de Souza Leite
Telephone: +55 (11) 4297-9910
email: gecor.4913@bb.com.br

By: _____
**BANCO SANTANDER (BRASIL) S.A.**
Joao Guilherme Bertti Targino
E-mail: jtargino@santander.com.br
Document number: 325.129.948-48
Telephone +55 (11) 4004-2125
Av. Presidente Juscelino Kubitschek, 2041 and 2235, Block A, São Paulo, SP, Brazil, Zip Code 04543-011

By: _____
**BANCO SANTANDER (BRASIL) S.A.**
Eliana Dozol
E-mail: eliana.dozol@toolsds.com
Document number: 277.460.768-07
Telephone +55 (11) 4004-2125
Av. Presidente Juscelino Kubitschek, 2041 and 2235, Block A, São Paulo, SP, Brazil, Zip Code 04543-011

Clicksign 36fabcf7-a808-48f2-a0c4-a252215ebdc0

# Clicksign

## SAN_GOL - Signature Pages to Stipulation.pdf

Documento número #36fabcf7-a808-48f2-a0c4-a252215ebdc0

**Hash do documento original (SHA256):** 9b94c66028cd646682688b82f92217151183d6ed4c73319e7c6463f2d2049ad8

## Assinaturas

**Eliana Dozol**
CPF: 277.460.768-07

Assinou como credor(a) em 08 jul 2024 às 18:26:23

**João Guilherme Bertti Targino**
CPF: 325.129.948-48

Assinou como credor(a) em 08 jul 2024 às 18:27:26

## Log

| | |
|---|---|
| 08 jul 2024, 18:17:47 | Operador com email ana.andriolli@sobadv.com.br na Conta 7e555494-3430-4bf4-b61a-023ebb0dd192 criou este documento número 36fabcf7-a808-48f2-a0c4-a252215ebdc0. Data limite para assinatura do documento: 07 de agosto de 2024 (18:16). Finalização automática após a última assinatura: habilitada. Idioma: Português brasileiro. |
| 08 jul 2024, 18:17:48 | Operador com email ana.andriolli@sobadv.com.br na Conta 7e555494-3430-4bf4-b61a-023ebb0dd192 adicionou à Lista de Assinatura: eliana.dozol@toolsds.com para assinar como credor(a), via E-mail, com os pontos de autenticação: Token via E-mail; Nome Completo; CPF; endereço de IP. Dados informados pelo Operador para validação do signatário: nome completo Eliana Dozol e CPF 277.460.768-07. |
| 08 jul 2024, 18:17:48 | Operador com email ana.andriolli@sobadv.com.br na Conta 7e555494-3430-4bf4-b61a-023ebb0dd192 adicionou à Lista de Assinatura: jtargino@santander.com.br para assinar como credor(a), via E-mail, com os pontos de autenticação: Token via E-mail; Nome Completo; CPF; endereço de IP. Dados informados pelo Operador para validação do signatário: nome completo João Guilherme Bertti Targino e CPF 325.129.948-48. |
| 08 jul 2024, 18:26:23 | Eliana Dozol assinou como credor(a). Pontos de autenticação: Token via E-mail eliana.dozol@toolsds.com. CPF informado: 277.460.768-07. IP: 24.239.160.204. Componente de assinatura versão 1.907.0 disponibilizado em https://app.clicksign.com. |
| 08 jul 2024, 18:27:26 | João Guilherme Bertti Targino assinou como credor(a). Pontos de autenticação: Token via E-mail jtargino@santander.com.br. CPF informado: 325.129.948-48. IP: 24.239.168.82. Componente de assinatura versão 1.907.0 disponibilizado em https://app.clicksign.com. |
| 08 jul 2024, 18:27:26 | Processo de assinatura finalizado automaticamente. Motivo: finalização automática após a última assinatura habilitada. Processo de assinatura concluído para o documento número 36fabcf7-a808-48f2-a0c4-a252215ebdc0. |



**Clicksign**

Datas e horários em GMT  -03:00 Brasilia
Log gerado em 08 de julho de 2024. Versão v1.41.0.

**ICP Brasil**

**Documento assinado com validade jurídica.**

Para conferir a validade, acesse https://www.clicksign.com/validador e utilize a senha gerada pelos signatários ou envie este arquivo em PDF.

As assinaturas digitais e eletrônicas têm validade jurídica prevista na Medida Provisória nº. 2200-2 / 2001

Este Log é exclusivo e deve ser considerado parte do documento nº 36fabcf7-a808-48f2-a0c4-a252215ebdc0, com os efeitos prescritos nos Termos de Uso da Clicksign, disponível em www.clicksign.com.



By: _____

**BANCO BRADESCO S.A.**
Verci Andre Marin
E-mail: andre.marin@bradesco.com.br
Document number: 059.545.919-62
Telephone +55 (11) 96449-0306
Av. Brigadeiro Faria Lima, 3950 – 9° floor
Sao Paulo, SP, Brazil, Zip Code 04543-011


By: _____

**BANCO BRADESCO S.A.**
Gustavo Momesso Calógeras
E-mail: gustavo.calogeras@bradesco.com.br
Document number: 330.390.648-35
Telephone +55 (11) 3847-9149
Av. Brigadeiro Faria Lima, 3950 – 9° floor
Sao Paulo, SP, Brazil, Zip Code 04543-011

## <u>Exhibit 1</u>

**BdoB Factoring Agreement Amendment**

Quarto Aditamento de retificação e ratificação ao Contrato de Cessão e Aquisição de Direitos Creditórios Oriundos de Vendas com Cartões de Crédito nº 265.901.308, celebrado entre Gol Linhas Aéreas S.A. e o Banco do Brasil S.A., em 11/07/2016, no valor original de R$ 1.900.000.000,00 com vencimento final originalmente em 11/01/2017

**PREÂMBULO**

**1. CESSIONÁRIO: BANCO DO BRASIL S.A.**, sociedade de economia mista, com sede em Brasília, Capital Federal, Setor de Autarquias Norte (SAUN), Quadra 05, Lote B, Edifício Banco do Brasil, CEP: 70.040-912, inscrita no Cadastro Nacional de Pessoa Jurídica do Ministério da Fazenda (CNPJ/MF) sob o nº. 00.000.000/0001-91, por sua Agência Large Corporate 3132 (SP), inscrita no Cadastro Nacional da Pessoa Jurídica do Ministério da Fazenda (CNPJ/MF) sob o nº. 00.000.000/5046-61, neste ato representado pelo(s) senhor(es) abaixo assinado(s) e qualificado(s).

**2. CEDENTE: GOL LINHAS AÉREAS S.A.**, sociedade anônima de capital fechado, com sede no Rio de Janeiro (RJ), na Praça Senador Salgado Filho, s/nº., Térreo Area Pública, Ent. Eixos 46-48 O-P SL Gerência Back Off. – Centro – CEP 20.021-340, inscrita no Cadastro Nacional da Pessoa Jurídica do Ministério da Fazenda (CNPJ/MF) sob o nº. 07.575.651/0001-59, neste ato representado pelo(s) senhor(es) abaixo assinado(s) e qualificado(s).

**CLÁUSULA PRIMEIRA: FINALIDADE –** O presente instrumento tem por objeto retificar e ratificar, na forma das Cláusulas abaixo, o Contrato de Cessão de Aquisição de Direitos Creditórios Oriundos de vendas com Cartões de Crédito nº. 265.901.308, com limite original de R$ 1.900.000.000,00 (um bilhão e novecentos milhões de reais), firmado entre as partes aos 11/7/2016 e registrado no 4º Ofício de Registro de Títulos e Documentos do Rio de Janeiro – RJ ("4º CRTD-RJ") sob o nº. 1.000.487 e no 10º Oficial de Registro de Títulos e Documentos e Civil de Pessoa Jurídica da Capital – SP ("10º CRTD-SP") sob o nº. 2.109.761; seu 1º Aditamento celebrado em 13/6/2017, registrado no 4º CRTD-RJ sob o nº. 1.003.651; seu 2º Aditamento celebrado em 13/12/2017, registrado no 4º CRTD-RJ sob o nº. 1.008.546 e no 10º CRTD-SP sob o nº. 2.146.836; e seu 3º Aditamento celebrado em 14/12/2022, registrado no 4º CRTD-RJ sob o nº. 1.055.082 e no 10º CRTD-SP sob o nº. 2.244.554; tendo o presente aditamento ("4º Aditamento") a finalidade de (i) alterar o item 3 da Introdução "Dados do Contrato" (alterar o valor limite); (ii) alterar o Preâmbulo; (iii) alterar a Cláusula Primeira – Cessão e Aquisição dos Créditos; (iv) alterar o caput da Cláusula Segunda – Proposta; (v) alterar a Cláusula Sétima – Tarifas; (vi) alterar a Cláusula Oitava – Condições para Aquisição de Recebíveis; (vii) alterar a Cláusula Décima – Vigência e Renovação do Contrato; (viii) alterar a Cláusula Décima Segunda – Suspensão da Aquisição de Créditos; (ix) alterar a Cláusula Décima Quarta – Formalização dos Créditos; (x) alterar a Cláusula Décima Quinta – Autorizações Especiais; e (xi) incluir a Cláusula Vigésima Primeira – Condição Suspensiva.

**CLÁUSULA SEGUNDA – O CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar o vencimento e o valor limite para R$ 1.300.000.000,00 (um bilhão e trezentos milhões de reais), alterando o item "3. DADOS DO CONTRATO" da INTRODUÇÃO, que passará a ter a seguinte redação:

"*3. DADOS DO CONTRATO:*
*Valor limite: R$ 1.300.000.000,00 (um bilhão e trezentos milhões de reais). Quando da liquidação de cada operação de cessão, seu valor de principal voltará a integrar mencionado Valor Limite.*
*Vencimento: este CONTRATO vencerá mediante a ocorrência de um dos seguintes eventos, o que ocorrer primeiro: (i) na ocorrência de um "Evento de Inadimplemento Automático" (Automatic Event of Default), conforme disposto na Order (conforme definido no Preâmbulo); (ii) caso o CESSIONÁRIO decida rescindir esse Contrato em decorrência de um "Evento de Inadimplemento Opcional" nos termos da Order (conforme definido no Preâmbulo); (iii) o decurso de 3 (anos) contados da vigência do Stipulation (conforme definido no Preâmbulo) ("Stipulation Effective Date", conforme definido no Stipulation); e (iv) mediante a vigência de um Plano de Chapter 11 (respectivamente, "Chapter 11 Plan" e "Plan Effective Date", conforme definidos no Stipulation)."*

**CLÁUSULA TERCEIRA – O CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar o **PREÂMBULO** deste **CONTRATO**, que passará a ter a seguinte redação:

"*PREÂMBULO – O Banco do Brasil S.A., sociedade de economia mista, com sede em Brasília, Capital Federal, aqui denominado CESSIONÁRIO, por sua agência acima, representada pelos(as) senhores(as) no final assinados(as) e, de outro lado, o CEDENTE acima qualificado, representado pelos(as) senhores(as) abaixo assinados(as), têm justas e acordadas as seguintes cláusulas, considerando que:*
*a) o CEDENTE, por conta da execução de suas atividades sociais, é legítimo titular de direitos creditórios, oriundos das vendas que tenham sido realizadas por seu estabelecimento e mediante a aceitação, como meio de pagamento, de Cartão de Crédito processados por Credenciadoras integrantes do Sistema de Controle de Garantias – SCG;*
*b) os direitos creditórios do CEDENTE são exigíveis com base no "CONTRATO DE AFILIAÇÃO" da(s) Credenciadora(s) e seus aditivos;*
*c) o CEDENTE deseja ceder parte (ou a totalidade) de seu direito aos créditos em favor do CESSIONÁRIO, incluindo todas as prerrogativas e garantias a estes inerentes, respondendo pela sua existência e correta formalização;*
*d) o CEDENTE iniciou processo de proteção contra falência regido pelo Capítulo 11 do Código de Falência dos Estados Unidos da América, processado no Case nº 24-10118 (MG) ("Chapter 11"), perante*

*Tribunal de Falências do Distrito Sul de Nova Iorque ("Tribunal de Falência de NY");*

e)  *o CEDENTE, o CESSIONÁRIO, o Banco Bradesco S.A. ("Bradesco") e o Banco Santander S.A. ("Santander" e, em conjunto com o CESSIONÁRIO e o Bradesco, os "Bancos Brasileiros") ajuizaram no processo do Chapter 11, um pedido conjunto ao Tribunal de Falência de NY de aprovação de uma ordem judicial ("Order") refletindo os termos de um acordo de reestruturação de dívidas celebrado entre o CEDENTE e os Bancos Brasileiros ("Stipulation"), estando tal pleito pendente de apreciação e aprovação pelo Tribunal de Falência de NY no momento da celebração do 4º Aditamento ao presente CONTRATO;*

f)  *sob a condição precedente de serem aprovadas pelo Tribunal de Falência de NY, sem quaisquer ressalvas que afetem substancialmente as condições pactuadas com os Bancos Brasileiros, a Order e o Stipulation, o CESSIONÁRIO se dispõe a adquirir tais créditos, até o valor estipulado no Item 3 acima e mediante determinados termos e condições previstos neste CONTRATO.*

**CLÁUSULA QUARTA –** O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação da Cláusula Primeira do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

*"CLÁUSULA PRIMEIRA – CESSÃO E AQUISIÇÃO DOS CRÉDITOS – O CEDENTE, na qualidade de titular dos direitos creditórios ora transacionados, os cede e os transfere ao CESSIONÁRIO, como cedidos e transferidos estão, em caráter irrevogável e irretratável, por esta e na melhor forma de direito, nos exatos valores que se tornarem exigíveis, os direitos creditórios decorrentes das vendas que tenham sido realizadas por seu estabelecimento mediante a aceitação de Cartão de Crédito como meio de pagamento ("Recebíveis"), discriminados na PROPOSTA PARA CESSÃO E AQUISIÇÃO DE DIREITOS CREDITÓRIOS ORIUNDOS DE VENDAS COM CARTÕES DE CRÉDITO, doravante denominada PROPOSTA, na forma da CLÁUSULA SEGUNDA – PROPOSTA e até o limite indicado no item 3 da INTRODUÇÃO, ambos deste CONTRATO.*

*PARÁGRAFO PRIMEIRO – TRUE SALE – Para fins de clareza, o negócio jurídico descrito no caput desta Cláusula Primeira tem natureza de verdadeira compra-e-venda de Recebíveis pelo CESSIONÁRIO ("True Sale"), transmitindo-se a este último, de pleno direito, a plena e exclusiva titularidade/propriedade dos Recebíveis por ele efetivamente adquiridos nos termos deste CONTRATO.*

*PARÁGRAFO SEGUNDO – O CESSIONÁRIO e o CEDENTE reconhecem que todos os Recebíveis adquiridos pelo CESSIONÁRIO sob o presente CONTRATO, tanto passados quanto futuros, passam a*

*integrar o patrimônio do **CESSIONÁRIO**, de forma automática, desde o momento em que realizado o pagamento previsto na **CLÁUSULA QUINTA – LIBERAÇÃO DO VALOR DA AQUISIÇÃO.***

*__PARÁGRAFO TERCEIRO__ – Fica estipulado que o limite indicado no item 3 da **INTRODUÇÃO** não obriga o **CEDENTE** a ceder seus Recebíveis como não obriga o **CESSIONÁRIO** a efetuar a aquisição dos Recebíveis, exceto, neste último caso, se satisfeitas as condições previstas neste Contrato.*

*__PARÁGRAFO QUARTO__ – O **CEDENTE** se compromete a envidar os seus melhores esforços para garantir que o **CESSIONÁRIO** adquira aproximadamente 69,5% do total dos direitos creditórios agregados cedidos a qualquer momento aos Bancos Brasileiros, de modo que o **CESSIONÁRIO** não terá obrigação de adquirir novos direitos creditórios se o **CESSIONÁRIO** tiver adquirido Recebíveis agregados que tenham excedido o menor valor entre (i) o Valor Limite do **CESSIONÁRIO**, e (ii) 69,5% do total dos direitos creditórios cedidos a todos os Bancos Brasileiros. Na segunda-feira de cada semana, o **CEDENTE** deverá enviar ao **CESSIONÁRIO** relatório indicando o volume de direitos creditórios não liquidados cedidos a cada um dos Bancos Brasileiros no final da semana anterior e o valor total previsto para ser adquirido por cada um dos Bancos Brasileiros. O **CEDENTE** pode, a seu critério, fornecer um relatório atualizado a qualquer tempo, indicando ao **CESSIONÁRIO** o volume total dos direitos creditórios não liquidados cedidos a cada Banco Brasileiro. Fica certo que, se o relatório demonstrar que a participação do **CESSIONÁRIO** no total dos direitos creditórios cedidos aos Bancos Brasileiros não exceder o menor valor entre (i) o Valor Limite do **CESSIONÁRIO**, e (ii) do total dos direitos creditórios cedidos a todos os Bancos Brasileiros, a obrigação de adquirir quaisquer direitos creditórios será automaticamente reestabelecida."*

**CLÁUSULA QUINTA –** O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação do caput e parágrafo segundo da Cláusula Segunda do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

*"__CLÁUSULA SEGUNDA – PROPOSTA__ – A efetiva cessão e aquisição dos direitos creditórios será efetuada mediante apresentação, pelo CEDENTE, e aceitação, pelo CESSIONÁRIO, de PROPOSTA onde estarão indicados, segregados e individualizados os créditos cedidos, o proprietário do esquema (bandeira), o valor da aquisição, o deságio aplicado, bem como outras informações e específicas sobre cada operação de cessão de créditos realizada. Em conformidade com o disposto na Order, o deságio será limitado à taxa máxima correspondente à taxa média diária dos depósitos interfinanceiros ("CDI") do dia em que o preço da cessão for pago ao CEDENTE, over extra grupo, expressa na forma de percentual ao ano, calculadas e divulgadas diariamente pela B3*

*– Brasil, Bolsa, Balcão, acrescida de sobretaxa equivalente a 5,00% (cinco por cento) ao ano.*

*[...]*

**PARÁGRAFO SEGUNDO –** *A remessa da PROPOSTA ocorrerá por borderô, assinado via ICP Brasil, pela CEDENTE ocorrerá por meio de seus representantes devidamente autorizados, para efeitos do inciso I do Artigo 428 do Código Civil, observados os demais PARÁGRAFOS desta Cláusula, os quais estão autorizados a negociar em nome da CEDENTE.”*

**CLÁUSULA SEXTA –** O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação da Cláusula Sétima do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

*"**CLÁUSULA SÉTIMA – TARIFAS –** A execução pelo **CESSIONÁRIO** da prestação dos serviços decorrentes deste Contrato será remunerada pelo **CEDENTE** com o pagamento de tarifas equivalentes a 0,5% (cinco décimos por cento) incidentes sobre o Valor Limite deste CONTRATO, livres de impostos (gross-up) (“Tarifa de Estruturação”), a ser paga por meio de débito em conta corrente mantida pelo **CEDENTE** junto ao **CESSIONÁRIO**, sendo que o primeiro pagamento da Tarifa de Estruturação ocorrerá até o 5º dia útil após a emissão da Order pelo Tribunal de Falência de NY homologando a Sitpulation e, posteriormente, em periodicidade anual, no último dia útil do mês aniversário aplicável, sendo certo que o segundo pagamento só será devido 12 (doze) meses após o primeiro pagamento, observado que referida Tarifa de Estruturação somente será devida até o que ocorrer primeiro entre (i) o término do compromisso do **CESSIONÁRIO** de adquirir os Recebíveis, nos termos da Order e do Stipulation, ou (ii) ocorrência do Plan Effective Date.*

*PARÁGRAFO SEGUNDO – Observados os termos e condições da Order, O **CEDENTE** autoriza expressamente o **CESSIONÁRIO** a debitar o valor correspondente à Tarifa de Estruturação de que trata esta Cláusula, na conta corrente indicada no item 2 da INTRODUÇÃO, entendido que todos os referidos débitos serão informados ao **CEDENTE** mediante aviso de débito e/ou aviso no extrato de conta corrente. Se insuficientes os fundos da conta do CEDENTE, o CESSIONÁRIO poderá, a seu exclusivo critério, deduzir os valores da Tarifa de Estruturação referida nesta CLÁUSULA do preço a ser pago pelos Recebíveis que forem subsequentemente adquiridos pelo CESSIONÁRIO nos termos deste CONTRATO, caso venham a ser adquiridos.”*

**CLÁUSULA SÉTIMA** – O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação da Cláusula Oitava do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

> *"**CLÁUSULA OITAVA – CONDIÇÕES PARA AQUISIÇÃO DE RECEBÍVEIS** – Além das demais condições previstas neste CONTRATO, as aquisições de Recebíveis pelo **CESSIONÁRIO** dependem da existência do(s) Termo(s) de Autorização de Manutenção de Domicílio Bancário ("Termo(s) de Autorização"), firmado(s) pelo **CEDENTE**, com prazo de vigência superior à data de liquidação do último Recebível adquirido pelo **CESSIONÁRIO** – sendo certo que referidos Termo(s) de Autorização integra(m) o presente CONTRATO, formando com ele um todo indivisível para todos os fins de direito.*
>
> ***PARÁGRAFO PRIMEIRO*** *– O **CESSIONÁRIO** não estará obrigado:*
> a) *a adquirir Recebível cujo prazo individual de pagamento pelo respectivo devedor seja superior a 300 (trezentos) dias corridos, contado tal prazo da data da apresentação da PROPOSTA ao CESSIONÁRIO ("Data da PROPOSTA"); e*
> b) *a adquirir conjunto de Recebíveis cujo prazo médio ponderado de pagamento pelos respectivos devedores seja superior a 80 (oitenta) dias corridos, contado tal prazo da Data da PROPOSTA;*

**CLÁUSULA OITAVA** – O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação da Cláusula Décima do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

> *"**CLÁUSULA DÉCIMA – VIGÊNCIA E RENOVAÇÃO DO CONTRATO** – Não havendo manifestação em contrário de qualquer das partes, o presente **CONTRATO** terá vigência desde a contratação, observado o disposto na **CLÁUSULA VIGÉSIMA PRIMEIRA** – CONDIÇÃO SUSPENSIVA, até a data de vencimento descrito no item 3 da INTRODUÇÃO.*
>
> ***PARÁGRAFO PRIMEIRO*** *– Observado os termos e condições da Order, este **CONTRATO** poderá ser resilido a qualquer tempo por qualquer das partes interessadas, mediante prévio aviso, expresso e escrito, com prazo de 10 (dez) dias, permanecendo em vigor todas as obrigações até então assumidas pelas partes e porventura pendentes de adimplemento.*
>
> ***PARÁGRAFO SEGUNDO*** *– Este **CONTRATO** será automaticamente resolvido, de pleno direito e independentemente de notificação judicial ou extrajudicial do **CEDENTE**, na ocorrência qualquer Evento de Vencimento Antecipado Automático ("Automatic Event of Default") previsto na Order aprovada pelo Tribunal de Falência de NY.*

*PARÁGRAFO TERCEIRO – Na ocorrência de qualquer Evento de Vencimento Antecipado Opcional ("Optional Event of Default") previsto na Order aprovada pelo Tribunal de Falências de NY, ou mediante a ocorrência de qualquer evento previsto na CLÁUSULA DÉCIMA SEGUNDA – SUSPENSÃO DE AQUISIÇÃO DE CRÉDITOS deste CONTRATO, o CESSIONÁRIO poderá, a seu exclusivo critério, resolver de pleno direito este CONTRATO, mediante prévia notificação extrajudicial do CEDENTE, observados os termos e condições da Order, até a ocorrência do Plan Effective Date.*

*PARÁGRAFO QUARTO – O CONTRATO poderá ser automaticamente e sucessivamente prorrogado por períodos de 180 (cento e oitenta) dias, esclarecido que as prorrogações serão comunicadas ao CEDENTE pelo CESSIONÁRIO mediante correspondência específica, ou através de comunicação inserida no extrato de conta corrente do CEDENTE.*

*PARÁGRAFO QUINTO – Na hipótese de continuidade automática do CONTRATO, conforme a previsão do PARÁGRAFO QUARTO desta CLÁUSULA, a realização de qualquer novo ato entre as partes, que venha a caracterizar a cessão ou aquisição de direitos creditórios, nos termos deste CONTRATO, será entendida como anuência do CEDENTE às novas condições contratuais porventura incidentes, mantidas as demais cláusulas e condições pactuadas."*

**CLÁUSULA NONA** – O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação da Cláusula Décima Segunda do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

*"CLÁUSULA DÉCIMA SEGUNDA – SUSPENSÃO DA AQUISIÇÃO DE CRÉDITOS – O CESSIONÁRIO poderá suspender imediatamente a aquisição de direitos creditórios, a seu exclusivo critério e independentemente de aviso à CEDENTE, na ocorrência de quaisquer das seguintes hipóteses:*
  a) *o CEDENTE deixar de apresentar ao CESSIONÁRIO, no prazo por este indicado, a documentação que, a critério do CESSIONÁRIO, seja necessária para a renovação do valor limite estabelecido no item 3 da Introdução;*
  b) *o CEDENTE for negativado em quaisquer órgãos de proteção ao crédito ou no cadastro de emitentes de cheques sem fundos (CCF);*
  c) *o CEDENTE tiver encerrada(s) sua(s) conta(s) corrente(s) em qualquer estabelecimento de crédito, em decorrência de normas emanadas do Banco Central do Brasil;*
  d) *o CEDENTE alterar junto à(s) Credenciadora(s) a(s) conta(s) para crédito dos Recebíveis objeto da cessão, observado que a manutenção de contas domicílio junto ao Banco Santander e Banco Bradesco e a cessão de Recebíveis a estes bancos nos*

termos previstos na Order não configurará uma hipótese de SUSPENSÃO DA AQUISIÇÃO DE CRÉDITOS;

e) o **CEDENTE** deixar de cumprir a obrigação descrita no PARÁGRAFO TERCEIRO da CLÁUSULA DÉCIMA QUARTA deste **CONTRATO** (Relatório Semanal de Chargebacks);

f) o volume de Chargebacks deferidos na semana (com suspensão de débito(s) ou restituição de valores relativos à(s) transações comerciais originárias dos Recebíveis cedidos) exceder o percentual de 0,8% (oito décimos por cento) do valor total de Recebíveis adquiridos pelo **CESSIONÁRIO** e até que o volume de Chargebacks volte a ser inferior ou igual a 0,8% (oito décimos por cento) durante 14 (catorze) dias consecutivos e o **CEDENTE** tenha fornecido ao **CESSIONÁRIO** esclarecimentos acerca da razão do aumento dos Chargebacks, bem como as medidas adotadas que reduzirão o volume de Chargeback;

g) o **CEDENTE** deixar de fornecer ao **CESSIONÁRIO**, em até 10 (dez) dias após o fim de cada mês, relatório mensal de performance de voos, em forma e conteúdo satisfatórios ao **CESSIONÁRIO**, contendo comparativo entre a lista de voos previstos e a lista de voos realizados pela **CEDENTE** no respectivo mês ("Relatório Mensal de Voos");

h) ocorrer(em) modificação(ões) significativa(s) nas condições de mercado de Cartões de Crédito que coloquem em risco o fiel cumprimento das condições estipuladas neste **CONTRATO**;

i) ocorrer qualquer alteração material nas condições econômico-financeiras do **CEDENTE** que possa prejudicar seus resultados ou a condução de suas atividades de modo que impacte a sua capacidade de honrar as obrigações assumidas neste **CONTRATO**;

j) ocorra qualquer Evento de Vencimento Antecipado Automático ("Automatic Event of Default") ou qualquer Evento de Vencimento Antecipado Opcional ("Optional Event of Default"), conforme previstos na Order aprovada pelo Tribunal de Falência de NY;

k) autoridade ou órgão competente concluir que o CEDENTE e/ou seus dirigentes praticou(aram) crime(s) contra o meio ambiente previstos na Lei nº 9.605 de 12 de fevereiro de 1998, crime(s) de "lavagem" ou ocultação de bens, direitos e valores, nos termos da Lei nº. 9.613 de 3 de março de 1998 e/ou atos lesivos contra a administração pública, nacional ou estrangeira, na forma da Lei nº. 12.846 de 1 de agosto de 2013;

l) o CESSIONÁRIO constatar que adquiriu ou estará adquirindo, mediante aceitação de qualquer PROPOSTA, volume total de Recebíveis superior ao Valor Limite deste CONTRATO;

m) se houver mudança ou transferência, a qualquer título, do controle acionário ou da titularidade das quotas sociais da **CEDENTE**, bem como se houver a sua incorporação, cisão, fusão ou reorganização societária, sem que o **CESSIONÁRIO** tenha sido notificado a esse

*respeito com no mínimo 30 (trinta) dias de antecedência do protocolo da movimentação societária, e sem que o CESSIONÁRIO tenha concordado com ela por escrito. A rescisão poderá ocorrer, também a critério do CESSIONÁRIO, se uma vez notificado a respeito da proposta de movimentação societária, não concordar com ela, e, nesta hipótese, a rescisão poderá ocorrer a qualquer tempo, seja antes ou após a efetivação da movimentação societária. Fica desde já acordado entre as Partes que uma alteração de controle ou reorganização societária que ocorra durante a vigência e em conformidade com o procedimento de Chapter 11 não configurará um evento de rescisão antecipada deste CONTRATO e não necessitará de anuência do ou notificação prévia ao CESSIONÁRIO nos termos deste CONTRATO.*

**CLÁUSULA DÉCIMA** – O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação da Cláusula Décima Quarta do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

*"**CLÁUSULA DÉCIMA QUARTA – FORMALIZAÇÃO DOS CRÉDITOS** – O **CEDENTE** se responsabiliza perante o **CESSIONÁRIO** pela existência e correta formalização dos Recebíveis cedidos e transferidos e declara que estes se encontram livres e desembaraçados de ônus ou restrições de qualquer espécie, e que, consequentemente, podem ser livremente negociados. Não obstante o disposto nesta cláusula, caso a **CEDENTE** venha a constituir ou tenha constituído garantias reais sobre o direito de recebimento dos Recebíveis, referidos instrumentos deverão permitir expressamente as aquisições previstas neste Contrato e o pagamento do valor integral dos Recebíveis, livres de quaisquer ônus, diretamente ao **CESSIONÁRIO** (ou outros credores que tenham realizado antecipações dos Recebíveis no âmbito da Order.*

*<b>PARÁGRAFO PRIMEIRO</b> – Concluída a operação e sobrevindo a constatação de inexistência do Recebível, vício ou má-fé na sua constituição ou a existência de ônus ou gravames, bem como na hipótese de cancelamento das vendas/prestações de serviços que originaram os Recebíveis cedidos ao **CESSIONÁRIO** ("<u>Chargeback</u>"), fica o **CEDENTE** obrigado a reembolsar o valor de face pago pelo **CESSIONÁRIO** pelo(s) Recebível(is) afetado(s) pelas circunstâncias acima descritas, acrescido da taxa vigente na data de aquisição de tais Recebíveis, conforme PARÁGRAFO PRIMEIRO da CLÁUSULA QUINTA – LIBERAÇÃO DO VALOR DE AQUISIÇÃO ("<u>Taxa de Remuneração</u>"), de juros de mora de 1% (um por cento ao mês) e de multa moratória correspondente a 2% (dois por cento) do valor de face dos Recebíveis, incidindo tais encargos desde a data do crédito de valores ao **CEDENTE** pela aquisição de tais Recebíveis ("<u>Data de Aquisição</u>"), até seu efetivo pagamento ao **CESSIONÁRIO**, sem prejuízo da responsabilização civil e penal dos*

*responsáveis, incluindo-se indenização por perdas e danos, estando, observados os limites e condições da Order, o **CESSIONÁRIO** autorizado a debitar na conta corrente indicada no item 2 da INTRODUÇÃO ou em qualquer conta corrente mantida pela **CEDENTE** no Banco do Brasil S.A. para pagamento do valor correspondente ao Recebível inexistente, onerado, anulado ou viciado, acrescido da multa acima indicada, encargos financeiros contratados para o período de adimplência, mais juros moratórios de 1% (um por cento) ao mês, com base na Resolução 4.558 de 23.2.2017, do Conselho Monetário Nacional, acrescidos de juros de mora de 1% (um por cento) ao ano a contar do crédito dos valores à cedente, até seu efetivo débito em conta corrente, sem prejuízo da responsabilização civil e penal dos responsáveis, incluindo-se indenização por perdas e danos.*

***PARÁGRAFO SEGUNDO*** *– O **CEDENTE** autoriza o **CESSIONÁRIO**, de forma expressa, irretratável e irrevogável, a debitar os valores referidos no PARÁGRAFO PRIMEIRO desta Cláusula ("Valor de Reembolso Corrigido") na conta corrente indicada no item 2 da INTRODUÇÃO, observados os limites e condições da Order.*

***PARÁGRAFO TERCEIRO*** *– O volume de Chargebacks deverá ser semanalmente apurado pela instituição de pagamento responsável pelas operações de vendas, Cielo S.A. – Instituição de Pagamento, CNPJ º 01.027.058/0001-91 ("CREDENCIADORA"), devendo ser reportado ao **CEDENTE** e, por sua vez, repassado no relatório ao **CESSIONÁRIO**. O **CEDENTE** se obriga a entregar semanalmente ao **CESSIONÁRIO**, no último dia útil da semana subsequente ao seu recebimento, "Relatório Semanal de Chargebacks", consistente em relatório circunstanciado dos Chargebacks realizados na semana anterior envolvendo Recebíveis adquiridos pelo **CESSIONÁRIO**, contendo, minimamente, as seguintes informações, desde que disponibilizadas pela CREDENCIADORA responsável pelo Relatório Semanal de Chargebacks: (i) identificação e valor de cada transação comercial originária de Recebível adquirido pelo **CESSIONÁRIO** questionada em procedimento de Chargeback; (ii) data do questionamento da transação comercial; (iii) data da aprovação da restituição e/ou suspensão de cobrança de valores relativos à transação comercial questionada; (iv) valor total de transações questionadas em procedimento de Chargeback; e (v) valor total de Chargebacks aprovados, com restituição e/ou suspensão de cobrança da transação comercial questionada. Na hipótese de ser requerida, pela instituição de pagamento CREDENCIADORA responsável pelo Relatório Semanal de Chargebacks, a alteração da periodicidade para elaboração e encaminhamento do relatório, esta alteração deverá ser previamente notificada ao **CESSIONÁRIO**, para que as devidas adaptações possam ser feitas pelas partes a este Contrato."*

**CLÁUSULA DÉCIMA PRIMEIRA –** O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado alterar a redação da Cláusula Décima Quinta do **CONTRATO** ora aditado, que passará a ter a seguinte redação:

> *"CLÁUSULA DÉCIMA QUINTA – AUTORIZAÇÕES ESPECIAIS – O CEDENTE autoriza o CESSIONÁRIO a:*
>
> a) *Observados os limites e condições da Order, debitar na conta corrente indicada no item 2 da INTRODUÇÃO, eventuais diferenças apuradas na liquidação pelo repasse a menor dos valores creditados pela(s) Credenciadora(s), decorrentes da inexistência, Chargeback, de vício ou má-fé na sua constituição, ou ainda decorrentes da existência de ônus ou gravames sobre os Recebíveis efetivamente cedidos ao CESSIONÁRIO, em conformidade com a CLÁUSULA DÉCIMA QUARTA – FORMALIZAÇÃO DOS CRÉDITOS;*
>
> b) *processar diretamente na conta corrente do CEDENTE todo o movimento contábil relativo ao registro e liquidação dos direitos creditórios cedidos.*
>
> *PARÁGRAFO PRIMEIRO – Observados os limites e condições da Order, verificada a indisponibilidade e/ou insuficiência de valores na conta do CEDENTE para os débitos referidos na alínea "a" do caput desta cláusula, conforme autorizado no âmbito do Chapter 11, quaisquer outros recursos obtidos pelo CEDENTE, poderão ser utilizados para pagamento dos valores devidos ao CESSIONÁRIO por força das obrigações estabelecidas neste instrumento. Caso o CEDENTE não realize os pagamentos previstos neste Convênio na forma desta Cláusula Décima Quinta, o CESSIONÁRIO contabilizará os valores não debitados, acrescidos dos encargos devidos no período, em conta gráfica, à parte, vinculada a este CONTRATO. A partir do inadimplemento, sobre os valores inadimplidos serão exigidos:*
>
> a) *Taxa de Remuneração, incidente sobre o valor inadimplido desde a Data de Aquisição até a data do efetivo pagamento ao CESSIONÁRIO;*
>
> b) *Juros moratórios de 1% (um por cento) ao mês, ou fração, incidentes sobre o valor inadimplido; e*
>
> c) *Multa de 2% (dois por cento), calculada e exigida nos pagamentos parciais, sobre os valores amortizados, e na liquidação final, sobre o saldo devedor da dívida.*

**CLÁUSULA DÉCIMA SEGUNDA –** O **CESSIONÁRIO** e o **CEDENTE** têm justo e acordado incluir a **CLÁUSULA VIGÉSIMA PRIMEIRA** e a **CLÁUSULA VIGÉSIMA SEGUNDA** no **CONTRATO** ora aditado, que terão as seguintes redações:

> *"CLÁUSULA VIGÉSIMA PRIMEIRA – CONDIÇÃO SUSPENSIVA – O presente contrato é celebrado sob condição suspensiva, nos termos do artigo 125 do Código Civil, permanecendo sua vigência e eficácia suspensas até a ocorrência do evento de início de vigência do Order e do*

*Stipulation, decorrente da sua aprovação sem quaisquer ressalvas que conflitem substancialmente com as disposições deste Contrato, pelo Tribunal de Falência de NY, em forma e conteúdo.*

***CLÁUSULA VIGÉSIMA SEGUNDA – PREVALÊNCIA DE DISPOSIÇÕES** – As Partes desde já acordam que no caso de quaisquer termos e condições estabelecidos no Stipulation, na Order e/ou neste CONTRATO serem inconsistentes ou contraditórios, prevalecerão, durante a vigência do Chapter 11 e até a ocorrência do Plan Effective Date, os termos e condições dispostos na Order, inclusive com relação ao exercício de remédios previstos em caso de inadimplementos. Caso quaisquer termos e condições estabelecidos no Stipulation e neste CONTRATO sejam inconsistentes ou contraditórios, prevalecerão, durante a vigência do Chapter 11 e até a ocorrência do Plan Effective Date, os temos e condições previstos neste CONTRATO."*

Assim ajustados, o **CESSIONÁRIO** e o **CEDENTE**, declarando não haver intenção de novar, ratificam o Contrato de Cessão e Aquisição de Direitos Creditórios Oriundos de Vendas com Cartões de Crédito nº 265.901.308, em todos os seus termos, cláusulas e condições não expressamente alterados neste 4º Aditamento, que àquele se integra, formando um todo único e indivisível para todos os fins de direito e será averbado à margem do registro no 4º Ofício de Registro de Títulos e Documentos – RJ.

E por estarem assim justas e contratadas, as Partes firmam o presente 4º Aditamento em 1 (uma) via, com a utilização de processo de certificação disponibilizado pela Infraestrutura de Chaves Públicas Brasileira – ICP-Brasil e a intermediação de entidade certificadora devidamente credenciada e autorizada a funcionar no país, de acordo com a Medida Provisória nº 2.200-2, de 24 de agosto de 2001, em conjunto com as 2 (duas) testemunhas abaixo assinadas.

São Paulo (SP), [•] de julho de 2024.

**CESSIONÁRIO**
**BANCO DO BRASIL S.A.**
Agência Large Corporate 3132 (SP)
CNPJ/MF: 00.000.000/5046-61


_____          _____
CPF:                                      CPF:

**CEDENTE:**
**GOL LINHAS AEREAS S.A.**
CNPJ/MF: 07.575.651/0001-59


_____          _____
CPF:                                     CPF:



**TESTEMUNHAS**

_____          _____
Nome:                                    Nome:
CPF:                                     CPF:

## **Exhibit 2**

**Bradesco Factoring Agreement**

 

Imprimir    Limpar

| Agência | Díg | Conta | Dig | CPF/CNPJ/MF | Nº Documento |
|---------|-----|-------|-----|-------------|--------------|
|         |     |       |     |             |              |

## Convênio para Realização de Cessão de Crédito sem Coobrigação - Cartões de Crédito

**Nº**

### I - Cessionário

| 1 - Razão Social | 2 - CNPJ/MF |
|------------------|-------------|
| **Banco Bradesco S.A** | **60.746.948/0001-12** |

| 3 - Nome da Agência |
|---------------------|
|                     |

| 4 - Endereço | Número | Complemento |
|--------------|--------|-------------|
|              |        |             |

| 5 - Bairro | Cidade | CEP | 6 - UF |
|------------|--------|-----|--------|
|            |        |     |        |

### II - Cedente

| 1 - Razão Social/Nome | 2 - CPF/CPNJ/MF |
|-----------------------|-----------------|
| Gol Linhas Aéreas S.A. | 07.575.651/0001-59 |

| 3 - Endereço | Número | Complemento |
|--------------|--------|-------------|
| PC SENADOR SALGADO FILHO | S/N | EIXOS 46-48 |

| 4 – Bairro | Cidade | CEP | 5 – UF |
|------------|--------|-----|--------|
| CENTRO | Rio de Janeiro | 20.021-340 | RJ |

### III - Dados da Instituição Financeira para Liquidação Financeira dos Créditos Cedidos

| 1 - Banco | 2 – Agência | Díg. | 3 – Conta | Díg. |
|-----------|-------------|------|-----------|------|
| 237 | 2372 | | 0005736 | 3 |

### IV- Autorizações

1- Autorização para débitos sobre Limite de Crédito

☐ Sim    ☐ X Não

2 - Autorização para débitos na conta de forma parcial

☐ X Sim    ☐ Não




## Convênio para Realização de Cessão de Crédito

Nº

---

**V - Programação das Cessões de Crédito**

☐ Segunda-feira  ☐ Terça-feira  ☐ Quarta-feira  ☐ Quinta-feira  ☐ Sexta-feira  ☐ X Todos os
☐ dias  Indicação de 5 dias dentro do mês:

| 1 - Valor máximo da programação | 2 - Percentual da programação |
|---|---|
| R$ | Até        % |

**Considerando que:**

a) a Cedente, no exercício de suas atividades comerciais, vende mercadorias e/ou presta serviços a seus clientes, mediante pagamentos parcelados, por meio da utilização de cartões de crédito e/ou débito de titularidade dos respectivos clientes, ensejando-lhe créditos líquidos, processados e confirmados eletronicamente pela Cielo S.A. – Instituição de Pagamento ("Direitos Creditórios" ou "Crédito", no singular ou "Créditos", no plural) decorrentes das referidas prestações de serviços e/ou das vendas realizadas por meio deste instrumento de pagamento;

b) os Créditos consistem nos direitos creditórios presentes relativos a obrigações de pagamento de credenciadoras e subcredenciadores para com o estabelecimento comercial, na condição de usuário final recebedor, constituídos no âmbito de arranjo de pagamento baseado em conta pós-paga ("cartões de crédito") e de depósito à vista;

c) a Cedente pretende ceder determinados Créditos de sua titularidade ao Cessionário. O prazo máximo de vencimento dos créditos estará limitado a 300 (trezentos) dias e o prazo médio dos Créditos limitados a 80 (oitenta) dias;

d) o Cessionário poderá adquirir, a seu critério, os referidos Créditos por meio das operações de "Cessão de Crédito Sem Coobrigação" ("Cessão", no singular, e "Cessões", no plural);

e) os Créditos objetos de cada operação de Cessão estão registrados em sistema de registro destinado ao registro de ativos financeiros operado por entidade registradora autorizada pelo Banco Central do Brasil ("Sistema de Registro");

f) as solicitações e respectivas contratações das operações de Cessão poderão ser realizadas pela Cedente por meio das Agências Bancárias e dos canais eletrônicos disponibilizados pelo Cessionário ("Canais de Atendimento"); e

g) O presente convênio é firmado no âmbito do procedimento n. 24-10118-MG, requerido pela Cedente perante a jurisdição norte-americana, em atenção ao Chapter 11 da US Bankruptcy law ("Chapter 11"), no qual foi firmado acordo ("Stipulation"), homologado por meio de decisão judicial ("Order");

Resolvem as Partes, por seus representantes legais infra-assinados, celebrar este Convênio para Realização de Cessão de Crédito sem Coobrigação - Cartões de Crédito ("Convênio"), nos seguintes termos e condições:

**1 - Do Objeto**

**1.1** Este Convênio tem por objeto disciplinar os direitos e as obrigações a que ficarão submetidos o Cessionário e a Cedente a partir de cada operação de Cessão realizada com base nos seus termos, até o volume máximo de R$ 220.000.000,00 (duzentos e vinte milhões de Reais), conforme aprovado em acordo celebrado no âmbito do procedimento de Chapter 11 ("Volume Máximo"). Quando da liquidação de cada operação de Cessão, seu valor de principal voltará a integrar mencionado Volume Máximo.

 

## Convênio para Realização de Cessão de Crédito

Nº

1.1.1 Conforme acordado entre as Partes no âmbito do Stipulation (conforme cláusula 2.2.2) e homologado pela Order, este Convênio faz parte de uma série de medidas comerciais que serão adotadas pelas Partes para o fim de equalizar o passivo da Cedente com o Cessionário e demais instituições financeiras, bem como garantir e fomentar a operação da atividade desenvolvida pela Cedente. Nesse sentido, o Volume Máximo corresponde ao total máximo de 11,8% do valor total dos Direitos Creditórios que serão cedidos pela Cedente, sendo que o restante será objeto de operação celebrada com o Banco do Brasil S.A., na proporção de 69,5%, e Banco Santander (Brasil) S.A., na proporção de 18,7%.

1.1.2. Durante o período em que permanecer vigente este Convênio nos termos da Order, o Cedente assume o compromisso de enviar melhores esforços para garantir a manutenção das proporções indicadas na cláusula 1.1.1 acima, sendo certo que o CESSIONÁRIO não terá nenhuma obrigação de adquirir novos Direitos Creditórios se o CESSIONÁRIO tiver adquirido Direitos Creditórios agregados que atinjam o menor valor entre (i) o Volume Máximo, e (ii) 11,8% do total dos direitos creditórios não liquidados cedidos a todos os bancos que celebraram o Stipulation. Na segunda-feira de cada semana, o Cedente deverá enviar ao Cessionário relatório indicando o volume total de direitos creditórios não liquidados cedidos a cada banco com quem celebrou o Stipulation no final da semana anterior e o valor total previsto para ser adquirido por cada banco com quem celebrou o Stipulation.

1.1.3. Sem prejuízo da obrigação de envio de relatório prevista no item 1.1.2 acima, o CEDENTE pode, a seu critério, fornecer um relatório atualizado a qualquer tempo, indicando ao CESSIONÁRIO o volume total de direitos creditórios não liquidados cedidos a cada banco com quem celebrou o Stipulation. Fica certo que, se esses relatórios e/ou aqueles obtidos juntos à Credenciadora ou aos demais bancos que se obrigaram a adquirir os créditos, nos termos do Stipulation, demonstrarem que a participação do CESSIONÁRIO no total dos direitos creditórios não liquidados cedidos a cada banco com quem celebrou o Stipulation, não excede o menor valor entre (i) o Volume Máximo, e (ii) 11,8% do total dos direitos creditórios cedidos a todos os bancos que celebraram o Stipulation, a obrigação de adquirir quaisquer novos Direitos Creditórios se mantém, nos termos previstos no Stipulation.

1.2 Caso não observadas as Condições Precedentes estabelecidas na cláusula 2.2 abaixo, o Cessionário não estará obrigado a adquirir quaisquer Direitos Creditórios que a Cedente pretende ceder, podendo recusar-se a celebrar de forma justificada cada operação de Cessão, sem necessidade de pagamento de qualquer multa, penalidade ou indenizações por tais recusas, devendo, todavia, honrar a liquidação do valor das cessões dos Direitos Creditórios que tenha aceito, conforme os termos deste Convênio.

## 2 - Das Condições para Realização das Operações de Cessão de Crédito Sem Coobrigação

**2.1** A Cedente, a cada operação de Cessão, realizará a cessão e a transferência ao Cessionário, em caráter irrevogável e irretratável, da totalidade dos Créditos por este último adquirido, passando o Cessionário a ser o único e legítimo titular dos Créditos e das respectivas garantias, direitos, prerrogativas e privilégios deles decorrentes, após o pagamento do preço de Cessão em favor da Cedente.

**2.2** As operações de Cessão de que tratam este Convênio estarão sujeitas e condicionadas à plena satisfação e manutenção, ou a renúncia expressa e por escrito do Cessionário, a seu exclusivo critério, cumulativamente das seguintes condições precedentes ("Condições Precedentes"):

**2.2.1**  À  análise dos Créditos a serem adquiridos e aprovação da operação pelo Cessionário;

**2.2.2**  À homologação pela Corte norte-americana do Distrito Sul de Nova Iorque, ou qualquer outro tribunal ("*Juízo*") de jurisdição competente sobre todo e qualquer procedimento da Cedente sob a US Bankruptcy law  do acordo firmado entre o Cessionário, o Cedente, o Banco do Brasil S.A. e o Banco Santander (Brasil) S.A. ("*Stipulation*");





**Convênio para Realização de Cessão de Crédito**                    Nº

**2.2.3**   Ao desembolso da integralidade dos valores devidos à Cedente em operação de financiamento realizado no curso do processo de Chapter 11, com terceiros, no valor total de USD 1.000.000.000,00 (um bilhão de dólares americanos) ("Financiamento DIP");

**2.2.4**   Ao adimplemento de todas as obrigações da Cedente previstas neste Convênio, em especial, mas não se limitando, àquelas estabelecidas na cláusula 2.10 abaixo.

**2.3**  Observado o disposto na cláusula 2.3.1 abaixo, as condições de cada operação de Cessão, incluindo o seu preço e o valor do deságio, serão informadas à Cedente previamente a sua contratação, independentemente da forma de contratação e do Canal de Atendimento utilizado.

**2.3.1** Cada Cessão, a ser contratada de tempos em tempos, será formalizada conforme Anexo I. O "Preço de Cessão", devido pelo CESSIONÁRIO ao CEDENTE, será apurado com base no valor dos Créditos, aplicado a respectiva taxa pré-fixada linear 360 (equivalente a "CDI + 5,00% ao ano") e seus respectivos prazos de vencimento.

A conversão para taxa pré-fixada será feita considerando a curva de certificados de depósito interfinanceiro – CDI, obtida internamente pela tesouraria do CESSIONÁRIO, no momento do envio do Retorno da Cotação ao CEDENTE, incluindo o horário em que o CESSIONÁRIO consultou referida curva CDI levando em conta os Direitos Creditórios apresentados pela CEDENTE em uma determinada Cotação.

**2.3.2** Adicionalmente, também será devida anualmente pela Cedente ao Cessionário, em razão das operações de Cessão, Fee de Estruturação de 0,5% sobre o Volume Máximo estabelecido na clausula 1.1. O Fee de Estruturação deverá ser pago pela Cedente anualmente por meio de débito em conta corrente mantida pelo Cedente junto ao Cessionário, indicada no Quadro-III, (i) pela primeira vez, até o 5º dia útil após a assinatura, pelo Juízo, da Order, e (ii) após o primeiro pagamento, a cada 12 (doze) meses contados da data do primeiro pagamento ("Fee de Estruturação"). O pagamento do Fee de Estruturação será devido até, o que ocorrer primeiro (i) o término do compromisso do Cessionário de adquirir os Direitos Creditórios, nos termos da Order; ou (ii) a Data Efetiva do Plano de Chapter 11 ("Plan Effective Date", conforme definido no Stipulation).

**2.3.2.1** O Fee de Estruturação será acrescido de eventuais taxas e tributos aplicáveis e devidos – *gross up* – os quais serão de exclusiva responsabilidade daquele que a lei definir como contribuinte.

**2.4** Os valores dos Créditos cedidos no âmbito deste Convênio serão creditados pelo Cessionário na conta corrente de titularidade da Cedente, indicada no Quadro-III, no ato da contratação de cada operação de Cessão de Crédito, sendo que após a constatação de que o crédito foi efetivado na sua conta corrente, a Cedente outorgará ao Cessionário total e rasa quitação de cada Cessão realizada, para nada mais reclamar ou repetir.

**2.5** A Cedente, neste ato, assume, sob as penas da lei, a qualidade de fiel depositária, de todos os contratos, notificações e eventuais documentos que instrumentalizam os Créditos que venham a ser cedidos, obrigando-se a guardá-los e conservá-los pelo período de 11 (onze) anos, contados do vencimento de cada operação, com rigorosa observância do art. 627 e seguintes do Código Civil, bem como a entregá-los no prazo de 05 (cinco) dias úteis ou em prazo inferior, caso assim estabelecido/exigido pelo competente órgão regulador/fiscalizador, quando solicitado pelo Cessionário, sem prejuízo da responsabilidade por eventuais perdas e danos. Nenhuma remuneração será devida à Cedente pelo encargo assumido, cujas despesas serão por ela suportadas.

**2.5.1** A Cedente obriga-se a apresentar os documentos descritos no "caput", mediante solicitação escrita do Cessionário, no prazo máximo de 5 (cinco) dias úteis, respeitado eventual prazo inferior, caso assim estabelecido/exigido pelo competente órgão fiscalizador/regulador, contados da data do recebimento do pedido, sob pena de responder por qualquer tributo e eventuais encargos ou multa que venha a ser exigido do Cessionário, em decorrência da não apresentação dos documentos para atendimento à solicitação de fiscalização, sem prejuízo da responsabilidade por eventuais perdas e danos.

**2.6** Caso a Cedente receba qualquer valor relacionado aos Créditos cedidos a partir do pagamento do preço descrito na cláusula 2.4 acima de forma distinta da prevista neste Convênio, obriga-se, no prazo máximo





**Convênio para Realização de Cessão de Crédito**                    **Nº**

de 2 (dois) Dias Úteis a repassá-los ao Cessionário assim que tiver ciência do recebimento de tais valores.

**2.7** A Cedente declara que é titular dos Créditos cedidos a que se refere esta operação e que caso venha a constituir ou tenha constituído garantias reais sobre o direito de recebimento dos Créditos, referidos contratos deverão permitir expressamente as antecipações previstas neste Convênio e o pagamento do valor integral dos Créditos, livres de quaisquer ônus, diretamente ao Cessionário (ou outros credores que tenham realizado antecipações de outros créditos) em conformidade com o procedimento de Chapter 11.

**2.8** A Cedente se responsabiliza, sob as penas da lei, neste ato, pela existência e legitimidade dos Créditos que serão cedidos ao amparo deste Convênio, em conformidade com o artigo 295 do Código Civil, não respondendo, todavia, pela sua boa ou má liquidação, sem prejuízo do previsto na cláusula 2.10.1 e seguintes. A Cedente garante, neste ato, que os Créditos a serem cedidos são oriundos de serviços por ela prestados e/ou de mercadorias por ela negociadas, declarando, ainda, que, no melhor do seu conhecimento, tais Créditos não são objetos de qualquer contestação por parte dos devedores, na data das operações de Cessão.

**2.8.1** Na hipótese de restar comprovado que os Créditos adquiridos pelo Cessionário, no âmbito deste Convênio, são inexistentes em razão da constatação de vícios na sua origem, motivados por fraude, ou ainda, por conta dos cancelamentos das vendas/prestações de serviços que originaram os Créditos cedidos ao Cessionário, a Cedente ficará responsável, única e exclusivamente, pelo ressarcimento das diferenças e/ou divergências advindas de tais situações, ficando o Cessionário isento de quaisquer ônus delas decorrentes.

**2.8.2.1** Em ocorrendo as hipóteses previstas no item 2.8.1 acima, a Cedente autoriza o Cessionário a debitar os valores devidos da conta indicada no Quadro III, de sua titularidade, observado que tal compensação deverá ocorrer exclusivamente conforme e nos limites permitidos pela Order.

**2.8.2.2** Na impossibilidade de compensação dos valores devidos da conta indicada no Quadro III, por qualquer razão, incluindo, mas não se limitando, à insuficiência de saldo em conta corrente, a Cedente autoriza, desde já, a compensação na forma do artigo 368 e seguintes do Código Civil Brasileiro, dos respectivos valores sobre as aplicações, observado que tal compensação deverá ocorrer exclusivamente conforme e nos limites permitidos pela Order.

**2.8.2.3** Conforme autorizado no âmbito do Chapter 11, diante da insuficiência de saldo para compensação e pagamento do Cessionário, quaisquer outros recursos obtidos pelo Cedente, inclusive durante do Chapter 11, poderão ser utilizados para pagamento dos valores devidos ao Cessionário por força das obrigações estabelecidas neste instrumento.

**2.8.2.4** Não obstante o disposto acima, as partes concordam que o Cessionário não poderá utilizar ou reter parte ou a totalidade dos recursos a serem desembolsados em favor do Cedente como pagamento do Preço de Cessão para realizar a compensação descrita nesta cláusula 2.8, caso os direitos creditórios do Cedente relacionados ao recebimento do Preço de Cessão estejam onerados em favor de quaisquer credores, de forma que, neste caso, o Preço de Cessão deverá ser integralmente pago ao Cedente ou a referido credor, conforme instruções do Cedente.

**2.8.2** Na ocorrência dos eventos listados no item 2.8.1, fica o Cessionário também autorizado pela Cedente a realizar débitos parciais na conta indicada no Quadro III, desde que a Cedente tenha assim livremente optado por meio Quadro IV-2, observado que tal compensação deverá ocorrer exclusivamente conforme e nos limites permitidos pela Order.

**2.8.3** As autorizações concedidas pela Cedente ao Cessionário, nesta cláusula e respectivos subitens, vigorarão até o prazo previsto na cláusula 7.1.

**2.9** Os valores das tarifas, quando devidas, serão os constantes na Tabela de Tarifas de Serviços Bancários afixada nas Agências do Cessionário e no site www.bradesco.com.br nos termos das normas editadas pelo Conselho





**Convênio para Realização de Cessão de Crédito**                    Nº

Monetário Nacional e pelo Banco Central do Brasil, assim como nos canais de atendimento,  quando as operações forem por meio deles contratadas.

**2.10**        Adicionalmente, e sem prejuízo das demais obrigações da Cedente estabelecidas neste Convênio, e enquanto vigorar o Convênio, a Cedente se obriga, a, sob pena de suspensão das operações de Cessão de Crédito, ao seguinte:

**2.10.1**        Conforme estipulado na cláusula 2.8.1 acima, na hipótese de cancelamento das vendas/prestações de serviços que originaram os Créditos cedidos ao Cessionário ("Chargeback"), a Cedente, desde já, autoriza o Cessionário a debitar os valores devidos da conta indicada no Quadro III, de sua titularidade, observado que tal compensação deverá ocorrer exclusivamente conforme e nos limites permitidos pela Order.

**2.10.2**        O volume de cancelamentos das vendas/prestações de serviços deverá ser semanalmente apurado pela instituição de pagamento responsável pelas operações de vendas, Cielo S.A. – Instituição de Pagamento (CNPJ º 01.027.058/0001-91), devendo ser reportado à Cedente e, por sua vez, repassado o relatório ao Cessionário.

**2.10.2.1** É responsabilidade da Cedente o requerimento à instituição de pagamento responsável do relatório semanal mencionado na cláusula 2.10.2 acima, e o encaminhamento do mencionado relatório ao Cessionário, semanalmente, sendo que, na hipótese de ser requerida, pela instituição de pagamento, a alteração da periodicidade para elaboração e encaminhamento do relatório, deverá ser previamente notificado o Cessionário a respeito, para que as devidas adaptações possam ser feitas pelas partes a este Convênio.

**2.10.2.2** A Cedente compromete-se a envidar os melhores esforços para manter o índice apurado com base no volume de cancelamentos das vendas/prestações de serviços e no volume total de vendas, menor ou igual a 0,8% semanalmente ("Índice Limite de Chargeback").

**2.10.2.3** Caso o Índice Limite de Chargeback seja ultrapassado, o Cessionário poderá, a seu exclusivo critério, recusar as solicitações de operação de Cessão e não será obrigado a retomá-las, salvo na exclusiva hipótese de o Índice Limite de Chargeback voltar a ser observado pela Cedente, no prazo mínimo de duas semanas (14 dias corridos – "Período Mínimo") consecutivos, contados a partir da data em que verificada o descumprimento ao Índice Limite de Chargeback.

**2.10.2.4** Para a retomada das operações de Cessão, após adimplemento do Índice Limite de Chargeback e ultrapassado o Período Mínimo, a Cedente deverá notificar ao Cessionário o atingimento das condições estabelecidas para o Período Mínimo e prestar ao Cessionário esclarecimentos acerca da razão do aumento do Índice Limite de Chargeback, bem como das medidas adotadas que reduzirão o índice de cancelamento de vendas/prestações de serviços.

**2.10.3**        A Cedente obriga-se a, em até 90 (noventa) dias corridos contados da data da assinatura deste Convênio, firmar acordos com os proprietários das aeronaves no âmbito do Chapter 11, que representem, no mínimo, 80% da sua frota total de aeronaves. Os acordos deverão ser realizados e apresentados no processo de Chapter 11 e serão apurados pelo Cessionário, devendo, contudo, a Cedente encaminhar ao Cessionário notificação de adimplemento da obrigação, tão logo atingido o total de 80%.

**2.10.4**        A Cedente obriga-se a manter, durante todo o período em que perdurar o Convênio, regularidade de voos, em índice apurado com base no total de voos, em 96%, e frota mínima de 90 (noventa) aeronaves em operação, exceto quando condições climáticas extremas afetarem diretamente o curso normal das operações comerciais da Cedente, em conformidade com o disposto na Order.

**2.10.4.1**        Os índices e números indicados na cláusula 2.10.4 acima deverão ser apurados em relatório mensal de performance da Cedente, que será de sua obrigatoriedade a elaboração e envio ao Cessionário.





## Convênio para Realização de Cessão de Crédito

Nº

O relatório, que deverá ser encaminhado mensalmente ao Cessionário, em data a ser definida entre as partes, deverá efetuar comparação entre a malha aérea estimada para o mês e a malha performada, com base em número de aeronaves e voos, estimados e executados pela Cedente, em até 10 (dez) dias contados do último dia de cada mês, devendo o primeiro ser apresentado em até 30 (trinta) dias corridos a contar da assinatura do presente instrumento, conforme os requisitos previstos na Order.

### 3 - Da Instituição Financeira para Liquidação Financeira dos Créditos Cedidos

**3.1** Em decorrência da(s) contratação(ões) da(s) operação(ões) de Cessão de Crédito, a Cedente designou  o Cessionário, como instituição financeira para efeito de liquidação financeira dos recebíveis de arranjo de pagamento (Créditos), objeto das operações de Cessão realizadas com base neste Convênio, conforme  indicado no Quadro III, nos termos da Resolução CMN n.º 4.734/2019.

**3.2** A Cedente obriga-se a manter o direcionamento dos Créditos cedidos, nos termos deste Convênio,  de forma única e exclusiva, na conta indicada no Quadro III, mantida no Cessionário, até a sua liquidação,  ficando desde já estabelecido que o Cessionário está sendo designado pela Cedente como a Instituição Financeira que receberá, exclusivamente, a liquidação financeira dos Créditos cedidos  por meio deste Convênio, sem prejuízo da permissão estabelecida na Order relacionada à cessão de Créditos aos demais credores.

### 4 - Das Autorizações

**4.1**  A Cedente autoriza expressamente o Cessionário a enviar ao Sistema de Registro, as informações  sobre  os contratos das operações de Cessão dos Créditos celebradas com base neste Convênio ("CAC's"), incluindo as informações deste Convênio.

**4.2**  A Cedente está ciente dos procedimentos abaixo indicados e, para tanto, autoriza o Credor  expressamente a:

**(i)** informar no Sistema de Registro, onde estejam registrados os Créditos (recebíveis de arranjo de pagamento) objeto das operações de Cessão deste Convênio, a alteração na titularidade efetiva dos referidos Créditos, no mesmo dia em que elas forem contratadas;

**(ii)** dar o comando para que o Sistema de Registro altere a titularidade dos Créditos cedidos para o Cessionário, conforme regulamento do Sistema de Registro em que eles estejam registrados;

**(iii)** prover as informações atualizadas sobre os contratos que formalizam as operações de Cessão dos Créditos celebradas com base neste Convênio, necessárias para o cumprimento, pelo Sistema de Registro,  de suas atribuições, incluindo as informações relativas:

**a)** à especificação dos Créditos (recebíveis de arranjo de pagamento constituídos) que sejam objeto das operações de Cessão;

**b)** à existência de autorização da Cedente para envio, ao Sistema de Registro, das informações dos contratos  que formalizam as operações de Cessão dos Créditos celebradas com base neste Convênio, assim como as  oriundas deste Convênio;

**c)** à especificação da conta indicada no Quadro III, mantida no Cessionário, para liquidação financeira dos Créditos objeto das operações de Cessão.

**4.3** O Cessionário autorizado a visualizar o Recebíveis de Arranjo de Pagamento da Cedente, nas  agendas de recebíveis, por meio do Sistema de Registro, deve disponibilizar à Cedente, no mínimo, as informações sobre o valor de recebíveis constituídos a serem liquidados em cada dia, desagregado por:  I - valor de recebíveis bloqueados no dia que já tenham sido objeto de negociação; e II - valor de recebíveis  livres para negociação no

 

**Convênio para Realização de Cessão de Crédito**           **Nº**

dia. As consultas às informações aqui tratadas ocorrerão por meio do gerente de relacionamento da Cedente.

**4.4** A agenda de recebíveis que poderá ser acessada pelo Cessionário, mediante autorização da Cedente, consiste no conjunto de unidades de recebíveis caracterizadas pelo(a) mesmo(a): (i) número de inscrição no CNPJ ou no CPF do usuário final recebedor (Cedente); (ii) identificação do arranjo de pagamento; e (iii) identificação da instituição credenciadora ou subcredenciadoras.

**4.5** A unidade de recebíveis que compõe a agenda de recebíveis pode ser entendida como o ativo financeiro composto por recebíveis de arranjo de pagamento, caracterizados pelo(a) mesmo(a): (i) número de inscrição no Cadastro Nacional da Pessoa Jurídica (CNPJ) ou no Cadastro de Pessoas Físicas (CPF) do usuário final recebedor; (ii) identificação do arranjo de pagamento; (iii) identificação da instituição credenciadora ou subcredenciadora; e (iv) a data de liquidação.

**5 - Das Condições para Contratação na Agência Bancária**

5.1 - O Cedente, solicita cotação para a Tesouraria do Cessionário, com as informações descritas no Anexo I, deste contrato;

5.2 - A Tesouraria do Cessionário retornará ao Cedente, por meio de arquivo eletrônico, a cotação, contendo as informações referentes aos vencimentos dos créditos, prazos, valores dos Créditos, Credenciadora, Bandeiras e preço de aquisição dos créditos, a qual poderá ser Aceita pelo Cedente por meio de arquivo eletrônico/e-mail.

5.3 - Se o pedido de cotação de Créditos a serem cedidos for solicitado pelo Cedente até às 12 horas, o Cessionário encaminhará o(s) Termo(s) de Cessão na mesma data, na forma do Anexo II, devendo o Cedente devolver referido documento (Anexo II) ao Cessionário, com o devido "De Acordo / Aceite", via e-mail, até as 15:30 horas do mesmo dia, sendo que após a devida formalização do(s) Termo(s) de Cessão e envio no horário indicado, o Cessionário creditará na conta corrente de titularidade da Cedente o preço de cada Cessão de Crédito realizada, correspondente ao valor dos Créditos cedidos, e desde que não haja rejeição por parte do Sistema de Registro na entidade registradora autorizada pelo banco Central do Brasil ("Sistema de Registro").

5.4 - A Cedente desde já reconhece, de forma irrevogável e irretratável, para todos os fins de direito, a legitimidade, validade e legalidade das operações de Cessão de Créditos para as quais foram dados o aceite, e o Cessionário somente acatará tais ordens, desde que as mensagens eletrônicas (e-mail) sejam trocadas pelos funcionários definidos e devidamente identificados no quadro abaixo e mediante a assinatura e envio do respectivo Termo de Cessão, na forma do Anexo II:

*FUNCIONÁRIOS DA CEDENTE AUTORIZADOS PARA COTAÇÕES:*

| Endereço de e-mail: | Nome dos Funcionários: |
| --- | --- |
| *<RALFSILVA@voegol.com.br>* | *Ramon Lopes Ferreira da Silva* |
| *<JLMPARESCHI@voegol.com.br>* | *Juliana Ladeia Molina Pareschi* |
| *<LUCLSILVA@voegol.com.br>* | *Lucas Lopes da Silva* |
| *<nbvalente@voegol.com.br>* | *Nivaldo Borges Valente* |
| *<largsantos@voegol.com.br>* | *Larissa Gabriele Tenorio dos Santos* |
| *<rsagonzaga@voegol.com.br>* | *Rodrigo Saback Antonio Gonzaga* |





## Convênio para Realização de Cessão de Crédito

Nº

| | |
|---|---|
| <TAMENDONCA@voegol.com.br> | Tatiane de Araujo Mendonça |
| <jsbaumgratz@voegol.com.br> | Joelmir Silvestre Baumgratz |

***FUNCIONÁRIOS DO CEDENTE AUTORIZADOS PARA "DE ACORDO" NO TERMO DE CESSÃO***

| Endereço de e-mail: | Nome dos Funcionários: |
|---|---|
| <RALFSILVA@voegol.com.br> | Ramon Lopes Ferreira da Silva |
| <JLMPARESCHI@voegol.com.br> | Juliana Ladeia Molina Pareschi |
| <LUCLSILVA@voegol.com.br> | Lucas Lopes da Silva |
| <nbvalente@voegol.com.br> | Nivaldo Borges Valente |
| <largsantos@voegol.com.br> | Larissa Gabriele Tenorio dos Santos |
| <rsagonzaga@voegol.com.br> | Rodrigo Saback Antonio Gonzaga |
| <TAMENDONCA@voegol.com.br> | Tatiane de Araujo Mendonça |
| <jsbaumgratz@voegol.com.br> | Joelmir Silvestre Baumgratz |

***FUNCIONÁRIOS DO CESSIONÁRIO:***

| Endereço de e-mail: | Nome dos Funcionários: |
|---|---|
| mesa.cotacaoatacado@bradesco.com.br | Mesa Cotação Atacado |
| cessaocredito@bradesco.com.br | Operação de Negócios |
| andreiac.santos@bradesco.com.br | Andreia Ciboto dos Santos |
| graciana.freitas@bradesco.com.br | Graciana Oliveira Freitas |
| gustavo.calogeras@bradesco.com.br | Gustavo Momesso Calogeras |
| antonio.n.ferreira@bradesco.com.br | Antonio Nicolau Ferreira |

5.4.1. Fica ajustado que as Partes poderão incluir e/ou excluir endereços de e-mails de suas respectivas listas de Remetentes Autorizados mediante celebração de aditivo.

5.4.2. As Partes reconhecem como verdadeiros e válidos todas as comunicações eletrônicas (incluindo e-mails) produzidos e trocados entre seus Remetentes Autorizados nos termos deste Contrato, sendo certo que cada Parte assume os respectivos riscos e ônus comuns a utilização destas tecnologias.

**6 - Dos Demais Canais de Contratação**

**6.1** As operações de Cessão de Crédito também poderão ser realizadas pela Cedente, por meio de canais eletrônicos de atendimento disponibilizados pelo Cessionário, a ser por ela livremente escolhido, sendo que o Cessionário, a seu critério, poderá ampliar ou reduzir esses meios de acordo com seus interesses. Substituição do item 6.2, conforme texto abaixo.





**Convênio para Realização de Cessão de Crédito**          Nº

**6.2** Previamente a cada contratação, serão demonstradas e escolhidas pela Cedente, as bandeiras dos Créditos que pretende ceder, a credenciadora de cartões de crédito e/ou débito, as formas de pagamento, o valor do deságio, o preço da cessão, as tarifas e as demais condições e despesas a ela relacionados, ressaltando que em se tratando de atendimento realizado por meio da Central de Atendimento do Cessionário, todas as ligações telefônicas serão gravadas e armazenadas pelo Cessionário no prazo legal, com o que a Cedente desde já tem ciência e concorda plenamente.

**6.3** A Cedente declara admitir e reconhecer como válida, a contratação de cada operação da Cessão que venha a ser realizada no canal eletrônico do Cessionário, bem como que os registros eletrônicos e telefônicos entre as Partes são provas irrefutáveis e legalmente aceitas para sua contratação, produzindo as operações todos os legais e regulares efeitos.

**6.4** A cada operação de Cessão de Crédito, contratada por meio de canal eletrônico do Cessionário, serão aplicadas todas as disposições contratuais e as condições dispostas neste Convênio e nos Regulamentos disponibilizados nos respectivos canais, considerados parte integrantes e indissociáveis deste Convênio.

**6.5.1** Da Programação das Cessões: A Cedente poderá programar o dia ou os dias da semana e do mês que pretende receber os Créditos das operações de Cessão, de forma total ou parcial, podendo a programação ser diária (todos os dias da semana), semanal (escolher um ou mais dias da semana), mensal (escolha de até 5 dias do mês), por intermédio do processo automático.

**6.5.2** Em razão da faculdade prevista nesta cláusula, a Cedente, neste ato, opta pelo recebimento dos créditos no(s) dia(s) assinalado(s) no Quadro V, até o valor ou o percentual nele indicado pela Cedente (itens 1 e 2), a depender da sua escolha, sobre sua agenda de recebíveis, que deverá estar disponível e livre para movimentação.

**6.5.3** A Cedente poderá solicitar a alteração, ativação ou desativação da sua opção, sempre que julgar necessário, por meio da Central de Atendimento, mediante comunicação ao Cessionário com antecedência mínima de 1 (um) dia, ciente que este pedido estará sujeito à análise e à aprovação do Cessionário, em se tratando de solicitação de alteração ou ativação da programação dos Créditos.

**6.5.3** O Cessionário fica isento de toda e qualquer responsabilidade por eventuais problemas que vierem a ocorrer quando da transmissão e/ou atualização das informações de crédito enviadas pelas Empresas Administradoras de Cartões de Crédito ou de débito eletrônico, inclusive pela não realização do crédito na conta indicada no Quadro III, correspondente às vendas efetuadas.

**6.5.4** A operação que estiver programada e coincidir com dia considerado feriado será creditada no próximo dia útil.

**6.5.5** O valor relativo à operação será creditado na conta corrente da Cedente no mesmo dia da solicitação, desde que: (i) esta tenha sido feita no período das 9:30h às 17 h e (ii) o Sistema de Registro confirme a existência dos recebíveis cedidos ao Cessionário, dessa mesma data. A operação poderá ser autorizada ou recusada pelo Cessionário, após a análise que deverá estar em conformidade com seus critérios para a concessão de crédito.

**6.5.6** Nos dias que as antecipações não estiverem programadas, a Cedente poderá efetuar a antecipação pelas Agências Bancárias ou pelos Canais de Atendimento disponibilizados pelo Cessionário.

**6.5.7** Em razão do valor do deságio ter como base o dia da efetivação da programação das Cessões, o Cessionário poderá alterar o referido valor do deságio para adequá-lo ao vigente no mercado financeiro para as operações da espécie, sendo permitido à Cedente consultá-lo a qualquer momento por meio do canal. Não havendo concordância quanto à sua eventual alteração, a Cedente poderá proceder o cancelamento da realização da operação por meio do canal de atendimento eleito.





## Convênio para Realização de Cessão de Crédito

Nº

### 7 - Disposições Gerais

**7.1** Respeitados os termos e condições da Order, este Convênio vigorará até a Data Efetiva do Plano de Chapter 11 ("Plan Effective Date" conforme definido na Stipulation). No entanto, este Convênio poderá ser renovado após a Data Efetiva do Plano de Chapter 11 (conforme definido na Stipulation), de comum acordo entre as Partes, ou resilido a qualquer momento, por qualquer das Partes, sem direito a compensações ou indenizações, mediante denúncia escrita com 30 (trinta) dias de antecedência, contados do recebimento do comunicado pela outra parte, de modo que todas as cláusulas e condições continuarão aplicáveis às cessões dos Créditos que, até então, já tiverem sido contratadas até final pagamento dos Créditos ao Cessionário. Sem prejuízo de qualquer disposição em contrário, na Data Efetiva do Plano de Chapter 11 (conforme definido na Stipulation), o Cessionário não terá qualquer obrigação de fornecer novas condições financeiras conforme as estabelecidas nos termos da Stipulation.

**7.2** Além das hipóteses previstas em lei, este Convênio poderá ser rescindido, respondendo, ainda, a parte infratora, por eventuais perdas e danos decorrentes, nas seguintes hipóteses previstas e de acordo com os termos e condições da Order:

(i) se quaisquer das partes falirem, requererem recuperação judicial ou iniciar procedimentos de recuperação extrajudicial, tiverem sua falência ou liquidação requerida, ou entrar em estado de insolvência, incluindo Chapter 7 sob a jurisdição norte-americana, considerando a US Bankruptcy Law, exceto pelo Chapter 11, já em curso na data de assinatura deste Convênio;

(ii) se houver mudança ou transferência, a qualquer título, do controle acionário ou da titularidade das ações da Cedente, bem como se houver a sua incorporação, cisão, fusão ou reorganização societária, sem que o Cessionário tenha sido notificado a esse respeito com no mínimo 30 (trinta) dias de antecedência do protocolo da movimentação societária e sem que o Cessionário tenha concordado com ela por escrito. A rescisão poderá ocorrer, também a critério do Cessionário, se uma vez notificado a respeito da proposta de movimentação societária, não concordar com ela e, nesta hipótese, a rescisão poderá ocorrer a qualquer tempo, seja antes ou após a efetivação da movimentação societária. Fica desde já acordado entre as Partes que uma alteração de controle ou reorganização societária que ocorra durante a vigência e em conformidade com o procedimento de Chapter 11 não configurará um evento de rescisão antecipada deste contrato e não necessitará de anuência do ou notificação prévia ao Cessionário nos termos deste contrato;

(iii) não cumprimento pelas partes de qualquer obrigação assumida neste Convênio, incluindo mas não se limitando ao inadimplemento das obrigações previstas na cláusula 2.10 acima;

(iv) nos casos de cassação da licença ambiental, quando aplicável, e de sentença condenatória transitada em julgado, em razão de prática pela Cedente, de atos que importem trabalho infantil, trabalho análogo ao escravo, proveito criminoso da prostituição ou danos ao meio ambiente;

(v) sem prejuízo dos prazos para seu saneamento previstos nos respectivos instrumentos ou da concessão de prazo adicional por parte do credor, caso haja inadimplemento de qualquer dívida com instituições financeiras ou no mercado de capitais, local ou internacional, da Cedente, sua controladora, controladas ou coligadas, em valor, unitário ou agregado, superior a R$ 50.000.000,00 (cinquenta milhões de reais) posterior a instauração do Chapter 11 e que não seja relacionado à instauração do Chapter 11 nem a um cross-default, exceto se, (a) no prazo de 15 (quinze) Dias Úteis, de forma tempestiva, a Cedente apresente recurso, embargo ou outra medida cabível questionando o inadimplemento e, cumulativamente, que tal recurso, embargo ou outra medida cabível obtenha tutela jurisdicional que suspenda tal pagamento; ou (b) se não houve acordo com o respectivo credor em até 15 (quinze) Dias Úteis a contar do respectivo inadimplemento.

**7.3** Adicionalmente, e sem prejuízo das demais obrigações da Cedente estabelecidas neste Convênio, a Cedente





## Convênio para Realização de Cessão de Crédito

Nº

se obriga a:

a) observar a legislação ambiental aplicável;

b) observar a legislação trabalhista, especialmente as normas relativas à saúde e segurança ocupacional e a inexistência de trabalho análogo ao escravo ou infantil;

c) monitorar suas atividades de forma a identificar e mitigar impactos ambientais não antevistos no momento da contratação deste Convênio;

d) monitorar seus fornecedores diretos e relevantes no que diz respeito a impactos ambientais, respeito às legislações social e trabalhista, normas de saúde e segurança ocupacional, bem como a inexistência de trabalho análogo ao escravo ou infantil.

**7.4** A Cedente declara ser a titular e/ou beneficiária final efetivo de todos os valores e investimentos movimentados ou detidos por intermédio deste Convênio, que são verdadeiras e completas as informações prestadas, que são lícitos à origem da renda, faturamento e patrimônio, bem como tem ciência do art. 11, II da Lei nº 9.613/98, com as alterações posteriores, introduzidas, inclusive, pela Lei nº 12.863/12 e dos arts. 297, 298 e 299 do Código Penal, devendo manter atualizadas as informações ora declaradas, comprometendo-se a prestar nova declaração caso qualquer uma das situações acima se altere, no prazo máximo de 10 dias, ou quando solicitado pelo Cessionário.

**7.5** A omissão ou tolerância das Partes em exigir o estrito cumprimento dos termos e condições deste Convênio não constituirá novação ou renúncia, nem afetará os seus direitos que poderão ser exercidos a qualquer tempo.

**7.6** - Eventuais inclusões de outras cláusulas, exclusões ou alterações das já existentes serão consignadas em aditivo a este Convênio devidamente assinado pelas Partes.

**7.7** Todas as despesas para a regularização e registro deste Convênio e seus aditivos, se houver, serão de responsabilidade da Cedente.

**7.8** Todos os tributos incidentes ou que venham a incidir sobre a presente operação serão de responsabilidade exclusiva da parte que legalmente for considerada contribuinte.

**7.9** O Cessionário poderá ceder, no todo ou em parte, os créditos ora adquiridos, observado que, durante a vigência do Chapter 11, referidas cessões estarão limitadas aos termos e condições da Order.

**7.10** O Cessionário declara que cumpre toda a legislação aplicável sobre segurança da informação, privacidade e proteção de dados, inclusive (sempre e quando aplicáveis) a Constituição Federal, o Código de Defesa do Consumidor, o Código Civil, o Marco Civil da Internet (Lei Federal n. 12.965/2014), seu decreto regulamentador (Decreto 8.771/2016), a Lei Geral de Proteção de Dados (Lei Federal n. 13.709/2018), e demais normas setoriais ou gerais sobre o tema, comprometendo-se a tratar os dados pessoais coletados por meio deste instrumento para a sua execução e somente nos estritos limites e finalidades aqui previstos, como controlador de dados pessoais ou por meio de seus operadores, nos termos da lei aplicável; ou com o devido embasamento legal, sem transferi-los a qualquer terceiro, exceto se expressamente autorizado pelo titular dos dados, por este ou outro instrumento ou, ainda, para o cumprimento de obrigação legal ou regulatória ou em caso de decisão judicial que obrigue o fornecimento.

**7.11** Os dados pessoais previstos neste Convênio serão utilizados única e exclusivamente para cumprir com a finalidade a que se destinam e em respeito a toda a legislação aplicável sobre segurança da informação, privacidade e proteção de dados, inclusive, mas não se limitando a Lei Geral de Proteção de Dados (Lei




## Convênio para Realização de Cessão de Crédito

Nº

Federal n. 13.709/2018).

**7.12** O Cessionário declara que os dados pessoais tratados em razão do Contrato, não obstante o encerramento   da relação jurídica, serão retidos para o cumprimento de obrigações legais ou regulatórias, bem como para resguardar os direitos do Cessionário em eventual ação judicial ou procedimento administrativo, observados  os prazos prescricionais previstos na legislação vigente, assegurada a privacidade e a proteção dos dados  pessoais do titular bem como os direitos previstos no artigo 18 da Lei Geral de Proteção de Dados.

**7.13** A tolerância de uma das Partes pelo não cumprimento de obrigações contratuais pela parte contrária será considerada mera liberalidade e não importará novação, perdão ou alteração contratual.

**7.14** Todos os avisos, notificações ou comunicações que, de acordo com este Convênio, devam ser feitos por escrito, serão considerados válidos mediante o envio de correio eletrônico com aviso de recebimento e confirmação de leitura ou através de carta registrada com aviso de recebimento, remetida aos endereços das Partes indicados no Preâmbulo, ou a qualquer outro endereço posteriormente comunicado, por escrito, pela destinatária a outra parte.

**7.15** Qualquer comunicação será considerada válida e eficaz em relação à outra parte, Cedente ou Cessionário, quando enviada por comunicação eletrônica com aviso de entrega, em qualquer dos endereços abaixo listados:

- Para o **CESSIONÁRIO**:
  Endereço: Av. Brigadeiro Faria Lima, 3950 – 9° andar
  São Paulo, SP, Brasil, CEP: 04543-011
  E-mail: gustavo.calogeras@bradesco.com.br
  At.: Gustavo Calógeras
  E

  Endereço: Cidade de Deus, s/n, Prédio Prata, 2° andar
  Osasco, SP, Brasil, CEP: 06029-900
  E-mail: marcio.bonilha@bradesco.com.br
  At.: Marcio Bonilha

- Para a **CEDENTE**:
  Endereço: Praça Senador Salgado Filho Centro - Rio de Janeiro, RJ, CEP 20021-340
  E-mail:     tesouraria@voegol.com.br;      jsbaumgratz@voegol.com.br;      e
  TAMENDONCA@voegol.com.br.
  At.: Joelmir e Tatiane.

**7.16** A Cedente obriga-se a informar ao Cessionário, por escrito, toda e qualquer modificação em seus dados cadastrais, sob pena de serem consideradas como efetuadas 2 (dois) dias após a expedição qualquer Comunicação enviada aos endereços constantes.

**7.17** Não se presume a renúncia a qualquer dos direitos decorrentes do presente Convênio, desta forma, nenhum atraso, omissão ou liberalidade no exercício de qualquer direito, faculdade ou remédio que caiba ao Cessionário, em razão de qualquer inadimplemento das obrigações da Cedente previstas neste Convênio, prejudicará tais direitos, faculdades ou remédios, ou será interpretado como constituindo uma renúncia aos mesmos ou concordância com tal inadimplemento, nem constituirá novação ou modificação de quaisquer outras obrigações assumidas pela Cedente neste Convênio ou precedente no tocante a qualquer outro inadimplemento ou atraso.





**Convênio para Realização de Cessão de Crédito**

Nº

**7.18** Este Convênio constitui um título executivo extrajudicial nos termos dos incisos III e XII do artigo 784 do Código de Processo Civil, reconhecendo as Partes desde já que, independentemente de quaisquer outras medidas cabíveis, as obrigações assumidas nos termos deste Convênio comportam execução específica, submetendo-se às disposições dos artigos 815 e seguintes do Código de Processo Civil, sem prejuízo do direito de declarar o vencimento antecipado nos termos deste Convênio.

**7.19** A invalidade ou nulidade, no todo ou em parte, de quaisquer das cláusulas deste Convênio não afetará as demais, que permanecerão válidas e eficazes até o cumprimento, pelas Partes, de todas as suas obrigações aqui previstas. Consequentemente, eventual invalidade ou suspensão dos efeitos, no todo ou em parte, de uma ou mais Garantias não afetará as demais, que permanecerão válidas e eficazes. Ocorrendo a declaração de invalidade ou nulidade de qualquer cláusula deste Convênio, as partes se obrigam a negociar, no menor prazo possível, em substituição à cláusula declarada inválida ou nula, a inclusão, neste Convênio, de termos e condições válidos que reflitam os termos e condições da cláusula invalidada ou nula, observados a intenção e o objetivo das partes quando da negociação da cláusula invalidada ou nula e o contexto em que se insere.

**7.20** Fica eleito o Foro da Comarca de São Paulo, como competente para dirimir as questões oriundas deste Convênio, por mais privilegiado que seja ou venha a ser.

**7.21** O presente Convênio será regido e interpretado em conformidade com as leis da República Federativa do Brasil.

**7.22** Exceto se de outra forma especificamente disposto neste Convênio, os prazos estabelecidos na presente Convênio serão computados de acordo com a regra prescrita no artigo 132 do Código Civil, sendo excluído o dia do começo e incluído o do vencimento.

**7.23** As Partes desde já acordam que o presente Convênio e demais documentos correlatos poderão ser assinados eletronicamente pelos seus respectivos signatários. Neste caso, todos os signatários deverão assinar este Convênio por meio de plataforma eletrônica, nos termos do artigo 10$^{\circ}$, parágrafo segundo, da Medida Provisória 2.200-2 de 24 de agosto de 2001 e demais alterações posteriores, com o uso de certificado digital. As Partes reconhecem também que eventual divergência entre as datas deste Convênio e a data que figure nos elementos indicativos de sua formalização eletrônica ou digital existe apenas em virtude de procedimentos formais, valendo para todos os fins de direito as datas registradas no Convênio em si abaixo para regrar os eventos dessa operação (por exemplo: incidência de encargos, vigência, contabilização etc.).

**7.24** As Partes desde já acordam que no caso de quaisquer termos e condições estabelecidos no Stipulation, na Order e/ou neste Convênio serem inconsistentes ou conflitantes, prevalecerão os termos e condições dispostos na Order, inclusive com relação ao exercício de remédios previstos em caso de inadimplementos, durante a tramitação do Chapter 11. Caso quaisquer termos e condições estabelecidos no Stipulation e neste Convênio sejam inconsistentes ou conflitantes, prevalecerão os termos e condições previstos neste Convênio, durante a tramitação do Chapter 11. Após o fim do Chapter 11, prevalecerão os termos deste instrumento.

E, por estarem assim, justas e contratadas, as Partes firmam este Convênio em 3 (três) vias de igual teor, juntamente com as 2 (duas) testemunhas abaixo nomeadas.

Local:_____Data: _____

_____    _____
**Banco Bradesco S.A.**                        **Cedente**





**Convênio para Realização de Cessão de Crédito**     **Nº**

**Testemunhas**

Nome: _____    Nome: _____
CPF/MF:                                   CPF/MF:

 

**Convênio para Realização de Cessão de Crédito**

Nº

**ANEXO I**
**COTAÇÃO DE CESSÕES**

De:
Para: mesa.cotacaoatacado@bradesco.com.br, gustavo.calogeras@bradesco.com.br
Ref: Cotação de Cessão de Crédito vinculado ao "Convênio de Cessão de Crédito sem Coobrigação – Cartões de Crédito" formalizado em __/__/____
Data Cotação:

Solicitamos cotação conforme créditos descritos abaixo:

**Características dos Créditos:**

| Credenciadora 1 | Bandeira 1 | Vencimento | Valor Cedido |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total | | | |

| Credenciadora 1 | Bandeira 2 | Vencimento | Valor Cedido |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total | | | |

| Credenciadora 2 | Bandeira 1 | Vencimento | Valor Cedido |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total | | | |

| Credenciadora 3 | Bandeira 1 | Vencimento | Valor Cedido |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total | | | |

| Total Geral | |
|---|---|

 

**Convênio para Realização de Cessão de Crédito**                    **Nº**

<u>ANEXO II</u>

**TERMO DE CESSÃO DE CRÉDITO**

Nos termos do "Convênio de Cessão de Crédito sem Coobrigação – Cartões de Crédito" ("**Convênio**") celebrado entre << Nome do Cedente>> doravante simplesmente denominado "**CEDENTE**" e o Banco Bradesco S.A. (doravante simplesmente denominado "**CESSIONÁRIO**") o **CESSIONÁRIO** vem apresentar o presente Termo de Cessão para estabelecer que a cessão, sem coobrigação, dos direitos creditórios indicados na planilha abaixo ("**Direitos Creditórios**") conforme respectiva Contratação de Cessão ocorreu com as seguintes condições:

a. **Valor Total dos Direitos Creditórios:** R$ [...] ([...] reais)
b. **Preço de Aquisição Total:** R$ [...] ([...] reais)
c. **Data Cessão:**

Este Termo de Cessão é regido pelas disposições constantes do Convênio.

Os termos e expressões iniciados em letras maiúsculas terão o significado que lhes for atribuído no Convênio ou no presente Termo de Cessão, conforme o caso

| Credenciadora | Bandeira | Vencimento | Valor Crédito Cedido R$ | Preço Cessão R$ |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | **TOTAL** | | |

_____

**CEDENTE**

_____

**BANCO BRADESCO S.A.**





**Convênio para Realização de Cessão de Crédito**

**Nº**

## Exhibit 3

**Santander Factoring Agreement Amendment**



## ADITAMENTO Nº 1 ÀS CONDIÇÕES GERAIS DE CESSÃO DE CRÉDITO DE RECEBÍVEIS DE CARTÕES DE CRÉDITO SEM COOBRIGAÇÃO – DEMAIS CREDENCIADORAS ("ANTECIPAÇÃO SEM COOBRIGAÇÃO – DEMAIS CREDENCIADORAS") – 07.575.651/0001-59

**IDENTIFICAÇÃO DO INSTRUMENTO EPIGRAFADO ADITADO:**

| | |
|---|---|
| *1.* | ***SANTANDER: BANCO SANTANDER (BRASIL) S.A.,*** *com sede na Avenida Presidente Juscelino Kubitschek, 2041 e 2235, Bloco A, São Paulo/SP, CEP 04543-011, CNPJ nº 90.400.888/0001-42.* |
| *2.* | ***CLIENTE: GOL LINHAS AÉREAS S.A.,*** *com sede na Praça Senador Salgado Filho, s/n, Térreo Aérea Pública entre Eixos 046-048/O, Rio de Janeiro/RJ, CEP 20021-340, CNPJ: 07.575.651/0001-59* |

**CONSIDERANDO QUE:**

(i) o **SANTANDER** e o **CLIENTE** ("Partes") celebraram, em 30/11/2023, o Termo de Adesão às Condições Gerais de Cessão de Crédito de Recebíveis de Cartões de Crédito Sem e/ou Com Coobrigação, Autorização de Contato na Mesa de Atendimento e Outras Avenças ("Termo"), por meio do qual o **CLIENTE** aderiu às Condições Gerais de Cessão de Crédito de Recebíveis de Cartões de Crédito Sem Coobrigação – Demais Credenciadoras ("Condições Gerais"); e

(ii) o **SANTANDER** e o **CLIENTE**, no âmbito do procedimento nº. 24-10118-MG, requerido pela **CLIENTE** perante a jurisdição norte-americana, em atenção ao Chapter 11 da US Bankruptcy law ("Chapter 11"), firmaram acordo ("Stipulation"), homologado por meio de decisão judicial ("Order"), que resultou nas alterações das condições comerciais que devem ser refletidas nas Condições Gerais;

**RESOLVEM** as Partes celebrar o presente aditamento às Condições Gerais ("Aditamento"), que se regerá mediante as seguintes cláusulas:

## 1. ADITAMENTO

**1.1.** Fica alterado o item 1.4 das Condições Gerais, que passará a vigorar com a seguinte nova redação:

> "*1.4. CRÉDITOS: são os créditos líquidos, processados e confirmados eletronicamente pela CREDENCIADORA Cielo S.A. – Instituição de Pagamento decorrentes de transações de vendas de bens e/ou serviços a clientes, portadores de cartões de crédito e/ou débito, que foram previamente registrados pelas CREDENCIADORAS em um SISTEMA DE REGISTRO, que tenham prazo médio de vencimento de 80 (oitenta) dias e máximo de 300 (trezentos) dias.*"

**1.2.** Fica alterado o item 2 e subitens seguintes das Condições Gerais, que passarão a vigorar com a seguinte nova redação:

> "*2. OBJETO. O SANTANDER poderá adquirir os CRÉDITOS que o CLIENTE pretenda ceder, até o volume máximo de R$ 350.000.000,00 (trezentos e cinquenta milhões de reais), conforme aprovado em acordo celebrado no âmbito do procedimento de Chapter 11 ("Volume Máximo"). Quando da liquidação de cada operação de Cessão, seu valor de principal voltará a integrar mencionado Volume Máximo.*
>
> *2.1 Conforme acordado entre as Partes no âmbito do Stipulation (conforme cláusula 2.4.2) e homologado pela Order, este Aditamento faz parte de uma série de medidas comerciais que serão adotadas pelas Partes para o fim de equalizar o passivo do CLIENTE com o SANTANDER e demais instituições financeiras, bem como garantir e fomentar a operação da atividade desenvolvida pelo CLIENTE. Nesse sentido, o Volume Máximo corresponde ao total máximo de 18,7% do valor total dos*

*CRÉDITOS que serão cedidos pelo CLIENTE, sendo que o restante será objeto de operação celebrada com o Banco do Brasil S.A., na proporção de 69,5%, e Banco Bradesco S.A., na proporção de 11,8%.*

*2.1.1 Durante o período em que permanecer vigente estas Condições Gerais e nos termos da Order, o CLIENTE assume o compromisso de enviar melhores esforços para garantir a manutenção das proporções indicadas na cláusula 2.1 acima, sendo certo que o SANTANDER não terá nenhuma obrigação de adquirir novos CRÉDITOS se o SANTANDER tiver adquirido CRÉDITOS agregados que atingirem o menor valor entre (i) o Volume Máximo, e (ii) 18,7% do total dos direitos creditórios não liquidados cedidos a todos os bancos que celebraram o Stipulation. Na segunda-feira de cada semana, o CLIENTE deverá enviar ao SANTANDER relatório indicando o volume total de direitos creditórios não liquidados cedidos a cada banco com quem celebrou o Stipulation no final da semana anterior e o valor total previsto para ser adquirido por cada banco com quem celebrou o Stipulation.*

*2.1.2. Sem prejuízo da obrigação de envio de relatório prevista no item 2.1.1 acima, o CLIENTE pode, a seu critério, fornecer um relatório atualizado a qualquer tempo, indicando ao SANTANDER o volume total de direitos creditórios não liquidados cedidos a cada banco com quem celebrou o Stipulation. Fica certo que, se esses relatórios e/ou aqueles obtidos junto à Credenciadora ou aos demais bancos que se obrigaram a adquirir os créditos, nos termos do Stipulation demonstrarem que a participação do SANTANDER no total dos direitos creditórios não liquidados cedidos a cada banco com quem celebrou o Stipulation, não excede o menor valor entre (i) o Volume Máximo, e (ii) 18,7% do total dos direitos creditórios cedidos a todos os bancos que celebraram o Stipulation, a obrigação de adquirir quaisquer novos CRÉDITOS se mantém, nos termos previstos no Stipulation.*

*2.2 As cessões de CRÉDITOS incluem todos os direitos, prerrogativas e garantias que o acompanham, respondendo o CLIENTE apenas pela existência e correta formalização dos CRÉDITOS, em conformidade com o artigo 295 do Código Civil Brasileiro e com o disposto na Cláusula 4 abaixo, sem prejuízo do previsto na cláusula 7.1 e seguintes.*

*2.3 O CLIENTE declara que é titular dos CRÉDITOS cedidos a que se refere esta operação e que, caso venha a constituir ou tenha constituído garantias reais sobre o direito de recebimento dos CRÉDITOS, referidos contratos deverão permitir expressamente as antecipações previstas neste Contrato e o pagamento do valor integral dos CRÉDITOS, livres de quaisquer ônus, diretamente ao SANTANDER (ou outros credores que tenham realizado antecipações de outros créditos) em conformidade com cláusula 2.6. abaixo.*

*2.3. As solicitações de que tratam essas Condições Gerais estão condicionadas à plena satisfação e manutenção, ou a renúncia expressa e por escrito do SANTANDER, a seu exclusivo critério, cumulativamente das seguintes condições precedentes ("Condições Precedentes"):*

*2.3.1 Análise dos CRÉDITOS a serem adquiridos e aprovação da operação pelo SANTANDER;*

*2.3.2 À homologação pela Corte norte-americana do Distrito Sul de Nova Iorque, ou qualquer outro tribunal ("Juízo") de jurisdição competente sobre todo e qualquer procedimento do CLIENTE sob a US Bankruptcy law do acordo firmado entre o CLIENTE, o SANTANDER, o Banco do Brasil S.A. e o Banco Bradesco S.A. ("Stipulation");*

*2.3.3 Ao desembolso da integralidade dos valores devidos ao CLIENTE em operação de financiamento realizado no curso do processo de Chapter 11, com terceiros, no valor total de USD 1.000.000.000,00 (um bilhão de dólares americanos) ("Financiamento DIP");*

*2.3.4 Ao adimplemento de todas as obrigações da Cedente previstas nestas Condições Gerais, em especial, mas não se limitando, àquelas estabelecidas na cláusula 7 abaixo.*

◆ **Santander**

> *2.4 A cessão aprovada será formalizada nos canais de comunicação disponíveis, em instrumento específico, que integrará estas Condições Gerais, e no qual constarão as condições pactuadas, tais como: taxa e Preço da Cessão, as datas de vencimento dos **CRÉDITOS** cedidos e a especificação dos **CRÉDITOS** cedidos.*
>
> *2.5 O **SANTANDER** na qualidade de cessionário, receberá diretamente das **CREDENCIADORAS**, nas datas de seus respectivos vencimentos, os valores dos **CRÉDITOS** cedidos.*

**1.3.** Ficam alterados o item 3 e respectivos subitens das Condições Gerais, que passarão a vigorar com a seguinte nova redação:

> *"3. **PREÇO DE CESSÃO**. A cada operação de cessão será aplicada a Taxa da Cessão conforme as políticas de precificação do **SANTANDER** vigentes à época e condições estabelecidas entre as Partes, exceto enquanto estiver vigente o compromisso de o **SANTANDER** adquirir os **CRÉDITOS**, de acordo com o previsto na cláusula 6 das Condições Gerais, alterada por meio deste Aditamento, período no qual será aplicada a Taxa de Cessão descrita na subcláusula 3.1.1. e a Tarifa de Antecipação, descrita na subcláusula 3.2. Quando o **CEDENTE** for pessoa jurídica, será devida também a Tarifa de Contratação de acordo com o valor vigente à época, se aplicável.*
>
> *3.1. A Taxa da Cessão incidirá da data da operação de cessão até a data de pagamento de cada **CRÉDITO** originalmente acordada com as **CREDENCIADORAS** ("Data de Vencimento do **CRÉDITO**").*
>
> *3.1.1 Enquanto estiver vigente o compromisso de o **SANTANDER** adquirir os **CRÉDITOS**, de acordo com o previsto na cláusula 6 das Condições Gerais, a Taxa de Cessão equivalerá a taxa média diária dos depósitos interfinanceiros ("CDI") da data da operação de cessão, over extra grupo, expressa na forma de percentual ao ano, base de 252 (duzentos e cinquenta e dois) dias úteis, calculadas e divulgadas diariamente pela B3 – Brasil, Bolsa, Balcão, acrescida de sobretaxa equivalente a 5,00% (cinco por cento) ao ano ("Taxa Prefixada"), base de 252 (duzentos e cinquenta e dois) dias úteis, de forma cumulativa (CDI + Taxa Prefixada) pro rata temporis.*
>
> *3.2. Adicionalmente, também será devido pela **CLIENTE** ao **SANTANDER**, em razão das operações de cessão, taxa anual da operação no valor de 0,5% (meio por cento) aplicada sobre o **VOLUME MÁXIMO**, que deverá ser paga por meio de débito em conta corrente mantida pela **CLIENTE** junto ao **SANTANDER**, indicada no momento da contratação, ou em qualquer outra conta indicada pelo **SANTANDER** à **CLIENTE**, (i) pela primeira vez, até o 5º dia útil após a assinatura, pelo Juízo, da Order, e (ii) após o primeiro pagamento, a cada 12 (doze) meses contados da data do primeiro pagamento ("Tarifa Antecipação"). O pagamento da Tarifa de Antecipação será devido até, o que ocorrer primeiro (i) o término do compromisso do **SANTANDER** de adquirir os **CRÉDITOS**, nos termos da Order; ou (ii) a Data Efetiva do Plano de Chapter 11 ("Plan Effective Date", conforme definido no Stipulation).*
>
> *3.3. O **SANTANDER** creditará o Preço da Cessão na conta corrente da **CLIENTE**, indicada no momento da contratação, que corresponde ao Valor Total dos **CRÉDITOS**, já deduzida o Taxa de Cessão e a Tarifa Antecipação, esta última somente quando devida nos termos da Cláusula 3.2. acima, servindo o lançamento a crédito como plena, geral e irrevogável quitação da **CLIENTE** ao **SANTANDER** e do **SANTANDER** à **CLIENTE**, exceto, neste último caso, pelo disposto na Cláusula 4 abaixo."*

**1.4.** Fica alterado o item 4.1 e subitens seguintes das Condições Gerais, que passarão a vigorar com a seguinte nova redação:

> *4.1. Nesta hipótese, o **CLIENTE** autoriza o **SANTANDER** a compensar o valor devido e seus acréscimos com qualquer valor que o **CLIENTE** tenha depositado, empenhado ou entregue ao **SANTANDER**, a qualquer título, com preferência em relação a qualquer outro débito pendente de realização e/ou a realizar a compensação com quaisquer outros créditos que venham a ser devidos ao **CLIENTE** pelo **SANTANDER** ou pelas **CREDENCIADORAS**; observado que tal compensação deverá ocorrer*



*exclusivamente conforme e nos limites permitidos pela Order, exclusivamente na conta indicada pelo **CLIENTE** no momento da contratação Essa autorização perdurará até a liquidação de todas as operações de cessão de crédito contratadas.*

*4.1.1 Na impossibilidade de compensação dos valores devidos, por qualquer razão, incluindo, mas não se limitando, à insuficiência de saldo na conta corrente indicada pelo **CLIENTE** no momento da contratação, o **CLIENTE** autoriza, desde já, a compensação na forma do artigo 368 e seguintes do Código Civil Brasileiro, dos respectivos valores sobre as aplicações, observado que tal compensação deverá ocorrer exclusivamente conforme e nos limites permitidos pela Order.*

*4.1.2   Não havendo saldo suficiente em conta corrente indicada pelo **CLIENTE** no momento da contratação, mantida junto ao **SANTANDER,** para compensação dos valores devidos conforme item 4.1.1 acima, o **SANTANDER** notificará o **CLIENTE** para que realize o pagamento em até 2 (dois) dias corridos contados do recebimento da respectiva notificação.*

*4.1.3   Conforme autorizado no âmbito do Chapter 11, diante da insuficiência de saldo para compensação e pagamento do **SANTANDER**, quaisquer outros recursos obtidos pelo Cedente, inclusive durante o Chapter 11, poderão ser utilizados para pagamento dos valores devidos ao **SANTANDER** por força das obrigações estabelecidas nestas Condições Gerais.*

*4.1.4   Não obstante o disposto acima, em especial na cláusula 3 e respectivas subcláusulas seguintes, as partes concordam que o **SANTANDER** não poderá utilizar ou reter parte ou a totalidade dos recursos a serem desembolsados em favor do **CLIENTE** como pagamento do Preço de Cessão para realizar a compensação descrita nesta cláusula 4, caso os direitos creditórios do **CLIENTE** relacionados ao recebimento do Preço de Cessão venham a ser onerados, em favor de quaisquer credores, de forma que, neste caso, o Preço de Cessão deverá ser integralmente pago ao **CLIENTE.***

*4.3. O **CLIENTE** responde integralmente por quaisquer despesas, inclusive de cobrança e honorários advocatícios, perdas ou prejuízos que o **SANTANDER** vier a sofrer ou a realizar, em decorrência de medidas judiciais ou extrajudiciais, em razão das transações a que se referem os **CRÉDITOS**. Da mesma forma, o **CLIENTE** será ressarcido das despesas que incorrer caso tenha que recorrer a procedimento extrajudicial ou judicial para que o **SANTANDER** cumpra as obrigações assumidas neste contrato.*

*4.4. Ainda nesta hipótese de inexistência dos **CRÉDITOS**, as **CREDENCIADORAS** poderão assumir a obrigação de pagar ao **SANTANDER** os valores dos **CRÉDITOS** cedidos e manterão o direito de ressarcirem-se junto ao **CLIENTE** dos pagamentos feitos por elas ao **SANTANDER**, podendo, inclusive, efetuarem a cobrança por todos os meios legais admitidos e realizar a compensação com quaisquer outros créditos que venham a ser devidos ao **CLIENTE**.*

*4.5. A exclusão de um dos **CRÉDITOS** por ocasião de má formalização ou constituição não afeta o restante dos **CRÉDITOS** objeto da cessão.*

*4.6 Caso o **CLIENTE** receba qualquer valor relacionado aos **CRÉDITOS** de forma distinta da prevista nestas Condições Gerais, obriga-se repassá-los em até 2 (dois) Dias Úteis ao **SANTANDER** assim que tiver ciência do recebimento de tais valores*

*4.7 Em conformidade com o disposto na Cláusula 7.1 destas Condições Gerais, na hipótese de inadimplemento dos **CRÉDITOS** adquiridos e, portanto, não recebimento pelo **SANTANDER** dos valores devidos em razão das vendas/prestações de serviços que originaram os **CRÉDITOS**, o **CLIENTE** ficará responsável, única e exclusivamente, pelo ressarcimento das diferenças e/ou divergências advindas de tais situações, ficando o **SANTANDER** isento de quaisquer ônus delas decorrentes."*

**1.5.** Fica alterado o item 6 das Condições Gerais, que passará a vigorar com a seguinte nova redação:



*"**6. VIGÊNCIA.** Respeitados os termos e condições da Order, estas Condições Gerais vigorarão até a Data Efetiva do Plano de Chapter 11 ("Plan Effective Date", conforme definido na Stipulation). No entanto, estas Condições Gerais poderão ser renovadas após a Data Efetiva do Plano de Chapter 11 (conforme definido na Stipulation), de comum acordo entre as Partes ou rescindidas, por qualquer das Partes, a qualquer tempo e sem qualquer ônus, mediante comunicação com 30 dias de antecedência. Nesta hipótese, todas as cláusulas e condições continuarão aplicáveis às cessões dos **CRÉDITOS** que, até então, já tiverem sido contratadas até final pagamento dos **CRÉDITOS** ao **SANTANDER**. Sem prejuízo de qualquer disposição em contrário, na Data Efetiva do Plano de Chapter 11, o **SANTANDER** não terá qualquer obrigação de fornecer novas condições financeiras conforme as estabelecidas nos termos destas Condições Gerais."*

*6.1 Além das hipóteses previstas em lei, as Condições Gerais poderão ser rescindidas, respondendo, ainda, a parte infratora, por eventuais perdas e danos decorrentes, nas seguintes hipóteses, observados os termos e condições da Order:*

*a)      se quaisquer das partes falirem, requererem recuperação judicial ou iniciar procedimentos de recuperação extrajudicial, tiverem sua falência ou liquidação requerida, ou entrar em estado de insolvência, incluindo Chapter 7 sob a jurisdição norte-americana, considerando a US Bankruptcy Law, exceto pelo Chapter 11 do **CLIENTE** no Distrito Sul de Nova Iorque, já em curso na data de assinatura destas Condições Gerais;*

*b)      se houver mudança ou transferência, a qualquer título, do controle acionário ou da titularidade das quotas sociais da **CLIENTE**, bem como se houver a sua incorporação, cisão, fusão ou reorganização societária, sem que o **SANTANDER** tenha sido notificado a esse respeito com no mínimo 30 (trinta) dias de antecedência do protocolo da movimentação societária, e sem que o **SANTANDER** tenha concordado com ela por escrito. A rescisão poderá ocorrer, também a critério do **SANTANDER**, se uma vez notificado a respeito da proposta de movimentação societária, não concordar com ela, e, nesta hipótese, a rescisão poderá ocorrer a qualquer tempo, seja antes ou após a efetivação da movimentação societária. Fica desde já acordado entre as Partes que uma alteração de controle ou reorganização societária que ocorra durante a vigência e em conformidade com o procedimento de Chapter 11 não configurará um evento de rescisão antecipada deste contrato e não necessitará de anuência do ou notificação prévia ao **SANTANDER** nos termos destas Condições Gerais;*

*c)      não cumprimento pelas partes de qualquer obrigação assumida nestas Condições Gerais, incluindo, mas não se limitando a, o inadimplemento das obrigações previstas na cláusula 7 abaixo;*

*d)      nos casos de cassação da licença ambiental, quando aplicável, e de sentença condenatória transitada em julgado, em razão de prática pelo **CLIENTE**, de atos que importem trabalho infantil, trabalho análogo ao escravo, proveito criminoso da prostituição ou danos ao meio ambiente;*

*e)      sem prejuízo dos prazos para seu saneamento previstos nos respectivos instrumentos ou da concessão de prazo adicional por parte do credor, caso haja inadimplemento de qualquer dívida com instituições financeiras ou no mercado de capitais, local ou internacional, do **CLIENTE**, sua controladora, controladas ou coligadas, em valor, unitário ou agregado, superior a R$ 50.000.000,00 (cinquenta milhões de reais) posterior à instauração do Chapter 11 e que não seja relacionado à instauração do Chapter 11 nem a um cross-default, exceto se, (a) no prazo de 15 (quinze) Dias Úteis, de forma tempestiva, o **CLIENTE** apresente recurso, embargo ou outra medida cabível questionando o inadimplemento e, cumulativamente, que tal recurso, embargo ou outra medida cabível obtenha tutela jurisdicional que suspenda tal pagamento; ou (b) se houve acordo com o respectivo credor em até 15 (quinze) Dias Úteis a contar do respectivo inadimplemento."*

**1.6.** Fica alterado o item 7 das Condições Gerais, que passará a vigorar com a seguinte nova redação:

*"**7. OBRIGAÇÕES DO CLIENTE**: Adicionalmente, e sem prejuízo das demais obrigações do **CLIENTE** estabelecidas nestas Condições Gerais, o **CLIENTE** se obriga a, até o fim da vigência das Condições Gerais (estabelecido na cláusula 6 acima), sob pena de suspensão das operações de cessão de crédito, ao seguinte:*



*7.1 Conforme estipulado na cláusula 4 acima, na hipótese de cancelamento das vendas/prestações de serviços que originaram os **CRÉDITOS** cedidos ao **SANTANDER** ("Chargeback"), o **CLIENTE**, desde já, autoriza o **SANTANDER** a debitar os valores devidos na conta corrente mantida junto ao **SANTANDER** e de sua titularidade, indicada no momento da contratação, observado que tal compensação deverá ocorrer exclusivamente conforme e nos limites permitidos pela Order.*

*7.2 O volume de cancelamentos das vendas/prestações de serviços deverá ser semanalmente apurado pela instituição de pagamento responsável pelas operações de vendas, Cielo S.A. – Instituição de Pagamento (CNPJ nº 01.027.058/0001-91), devendo ser reportado ao **CLIENTE** e, por sua vez, repassado o relatório ao **SANTANDER**.*

*7.2.1 É responsabilidade do **CLIENTE** o requerimento à instituição de pagamento responsável do relatório semanal mencionado na cláusula 7.2 acima, e o encaminhamento do mencionado relatório ao **SANTANDER**, semanalmente, sendo que, na hipótese de ser requerida, pela instituição de pagamento, a alteração da periodicidade para elaboração e encaminhamento do relatório, deverá ser previamente notificado o **SANTANDER** a respeito, para que as devidas adaptações possam ser feitas pelas partes a esta Condições Gerais.*

*7.2.2 O **CLIENTE** compromete-se a enviar os melhores esforços para manter o índice apurado com base no volume de cancelamentos das vendas/prestações de serviços e no volume total de vendas, menor ou igual a 0,8% semanalmente ("Índice Limite de Chargeback").*

*7.2.3 Caso o Índice Limite de Chargeback seja ultrapassado, o **SANTANDER** poderá, a seu exclusivo critério, recusar as solicitações de operação de cessão e não será obrigado a retomá-las, salvo na exclusiva hipótese de o Índice Limite de Chargeback voltar a ser observado pelo **CLIENTE**, no prazo mínimo de duas semanas (14 dias corridos – "Período Mínimo") consecutivos, contados a partir da data em que verificada o descumprimento ao Índice Limite de Chargeback.*

*7.2.4 Para a retomada das operações de cessão, após adimplemento do Índice Limite de Chargeback e ultrapassado o Período Mínimo, o **CLIENTE** deverá notificar ao **SANTANDER** o atingimento das condições estabelecidas para o Período Mínimo e prestar ao **SANTANDER** esclarecimentos acerca da razão do aumento do Índice Limite de Chargeback, bem como das medidas adotadas que reduzirão o índice de cancelamento de vendas/prestações de serviços. Desde que retomado o Índice Limite de Chargeback e ultrapassado o Período Mínimo, o **SANTANDER** reestabelecerá as operações de cessão."*

*7.3 O **CLIENTE** obriga-se a, em até 90 (noventa) dias corridos contados da data da assinatura destas Condições Gerais, firmar acordos com os proprietários das aeronaves no âmbito do Chapter 11, que representem, no mínimo, 80% da sua frota total de aeronaves. Os acordos deverão ser realizados e aprovados/homologados no processo de Chapter 11 e serão apurados pelo **SANTANDER**, devendo, contudo, o **CLIENTE** encaminhar ao **SANTANDER** notificação de adimplemento da obrigação, tão logo atingido o total de 80%.*

*7.4 O **CLIENTE** obriga-se a manter, durante todo o período em que perdurar estas Condições Gerais, regularidade de voos, em índice apurado com base no total de voos, em 96%, e frota mínima de 90 (noventa) aeronaves em operação, exceto quando condições climáticas extremas afetarem diretamente o curso normal das operações comerciais do **CLIENTE**, em conformidade com o disposto na Order.*

*7.4.1 Os índices e números indicados na cláusula 7.4 acima deverão ser apurados em relatório mensal de performance do **CLIENTE**, que será de sua obrigatoriedade a elaboração e envio ao **SANTANDER**. O relatório, que deverá ser encaminhado mensalmente ao **SANTANDER**, em até 10 (dez) dias contados do último dia de cada mês, devendo o primeiro ser apresentado em até 30 (trinta) dias corridos a contar da assinatura do presente instrumento, deverá efetuar comparação entre a malha aérea estimada para o mês e a malha performada, com base em número de aeronaves e voos, estimados e executados pelo **CLIENTE**, conforme requisitos previstos na Order.*



> *7.5 O **CLIENTE** obriga-se observar a legislação ambiental aplicável; a legislação trabalhista, especialmente as normas relativas à saúde e segurança ocupacional e a inexistência de trabalho análogo ao escravo ou infantil; monitorar suas atividades de forma a identificar e mitigar impactos ambientais não antevistos no momento da contratação destas Condições Gerais; e monitorar seus fornecedores diretos e relevantes no que diz respeito a impactos ambientais, respeito às legislações social e trabalhista, normas de saúde e segurança ocupacional, bem como a inexistência de trabalho análogo ao escravo ou infantil, conforme exigido pela legislação e regulamentação aplicáveis ao **CLIENTE**."*

**1.7.** É inserido o item 8 das Condições Gerais, que vigorará com a seguinte nova redação:

> *"**8. DISPOSIÇÕES GERAIS**.*
>
> *8.1. O **SANTANDER** poderá ceder, transferir, empenhar ou, por qualquer outra forma, alienar ou dispor dos direitos e garantias referentes a estas Condições Gerais, observado que, durante a vigência do Chapter 11, referidas ações estarão limitadas aos termos e condições da Order.*
>
> *8.2. Nos termos da Lei Geral de Proteção de Dados (Lei nº 13.709/18), o **CLIENTE** reconhece que o **SANTANDER** poderá realizar o tratamento de Dados Pessoais com finalidades específicas e de acordo com as bases legais previstas na respectiva Lei, tais como: para o devido cumprimento das obrigações legais e regulatórias, para o exercício regular de direitos e para a proteção do crédito, bem como, sempre que necessário, para a execução dos contratos firmados com seus clientes ou para atender aos interesses legítimos do **SANTANDER**, de seus clientes ou de terceiros. Para qualquer outra finalidade, para a qual o consentimento do titular deve ser coletado, o tratamento estará condicionado à manifestação livre, informada e inequívoca do titular. Para fins do quanto disposto nesta cláusula, "Dados Pessoais" se refere a todas as informações relacionadas aos representantes legais do **CLIENTE**.*
>
> *8.2.1. O **CLIENTE** está ciente de que o **SANTANDER**, na condição de controlador de dados nos termos da legislação aplicável, poderá, quando for o caso, tratar, coletar, armazenar e compartilhar com as sociedades sob controle direto ou indireto do **SANTANDER**, bem como sociedades controladoras, coligadas ou sob controle comum ("Sociedades do Conglomerado Santander"), sempre com a estrita observância à Lei, os Dados Pessoais e informações cadastrais, financeiras e de operações ativas e passivas e serviços contratados para: (i) garantir maior segurança e prevenir fraudes; (ii) assegurar sua adequada identificação, qualificação e autenticação; (iii) prevenir atos relacionados à lavagem de dinheiro e outros atos ilícitos; (iv) realizar análises de risco de crédito; (v) aperfeiçoar o atendimento e os produtos e serviços prestados; (vi) fazer ofertas de produtos e serviços adequados e relevantes aos seus interesses e necessidades de acordo com o perfil da empresa; e (vii) outras hipóteses baseadas em finalidades legítimas como apoio e promoção de atividades de **SANTANDER** e das Sociedades do Conglomerado Santander ou para a prestação de serviços em benefício do **CLIENTE** para concessão de benefícios e ofertas de produtos e serviços que possam ser de interesse do **CLIENTE**.*
>
> *8.3. O **SANTANDER** poderá compartilhar Dados Pessoais estritamente necessários para atender a finalidades específicas, com fornecedores e prestadores de serviços, incluindo empresas de telemarketing, de processamento de dados, de tecnologia voltada à prevenção a fraudes, correspondentes bancários e empresas ou escritórios especializados em cobrança de dívidas ou para fins de cessão de seus créditos.*
>
> *8.4. O **SANTANDER** poderá fornecer Dados Pessoais sempre que estiver obrigado, seja em virtude de disposição legal, ato de autoridade competente ou ordem judicial.*
>
> *8.5. A informar aos órgãos de proteção ao crédito, tais como SERASA e SPC, os dados relativos à falta de pagamento de obrigações assumidas junto ao **SANTANDER**.*

**Santander**

8.6. Mesmo após o término destas Condições Gerais, os Dados Pessoais e outras informações a ele relacionadas poderão ser conservados pelo **SANTANDER** para cumprimento de obrigações legais e regulatórias, bem como para o exercício regular de direitos pelo **SANTANDER**, pelos prazos previstos na legislação vigente.

8.7. O **CLIENTE** autoriza o **SANTANDER** a enviar informações referentes aos **CRÉDITOS** cedidos para qualquer SISTEMA DE REGISTRO, inclusive para alterar a titularidade dos **CRÉDITOS** cedidos, nos termos da regulamentação vigente.

8.7.1. O **CLIENTE** autoriza ainda o **SANTANDER** a enviar informações cadastrais e referentes aos **CRÉDITOS** cedidos para as **CREDENCIADORAS**.

8.8. O **CLIENTE** declara que se não for o usuário final recebedor, nos termos da Lei nº 12.865/2013, os recursos de cada cessão dos **CRÉDITOS** serão exclusivamente destinados para cumprir ou assegurar o cumprimento das obrigações de liquidação entre os participantes do arranjo de pagamento, referentes às transações de pagamento, até o recebimento pelo usuário final recebedor.

8.9. O **CLIENTE** declara e se obriga a não utilizar, de forma direta ou indireta, os recursos disponibilizados em razão da operação ora realizada para a prática de ato previsto na Lei nº 12.846/2013, que atente contra o patrimônio público nacional ou estrangeiro, contra princípios da administração pública ou contra os compromissos internacionais assumidos pelo Brasil ou, ainda, para finalidades que possam causar danos sociais e em projetos que não atendam rigorosamente a Política Nacional de Meio Ambiente e as normas legais e regulamentares que regem tal política.

8.10. Os tributos devidos serão de exclusiva responsabilidade daquele que a lei definir como contribuinte.

8.11. Nas contratações não presenciais o **CLIENTE** poderá solicitar a desistência em até 07 dias contados do recebimento do Preço da Cessão, mediante a devolução do Preço da Cessão ao **SANTANDER**, acrescido de eventuais tributos e dos juros devidos até a data da efetiva devolução.

8.11.1. O **CLIENTE** autoriza, neste ato, para os fins específicos de desistência da contratação e de modo irretratável e irrevogável, o **SANTANDER** a debitar em conta de titularidade do **CLIENTE** junto ao **SANTANDER,** indicada no momento da contratação, o Preço da Cessão, acrescido de eventuais tributos e dos juros devidos até a data da efetiva devolução.

8.12 A tolerância de uma das **PARTES** pelo não cumprimento de obrigações contratuais pela parte contrária será considerada mera liberalidade e não importará novação, perdão ou alteração contratual.

8.13 Todos os avisos, notificações ou comunicações que, de acordo com estas Condições Gerais e/ou Termo, devam ser feitos por escrito, serão considerados válidos mediante o envio de correio eletrônico com aviso de recebimento e confirmação de leitura ou por meio de carta registrada com aviso de recebimento, remetida aos endereços das **PARTES** indicados no Preâmbulo, ou a qualquer outro endereço posteriormente comunicado, por escrito, pela destinatária a outra parte.

8.13.1 Qualquer comunicação será considerada válida e eficaz em relação à outra parte, **CLIENTE** ou **SANTANDER**, quando enviada por comunicação eletrônica com aviso de entrega, em qualquer dos endereços abaixo listados:

- Para o **SANTANDER**:
  Endereço: Avenida Presidente Juscelino Kubitschek, 2235 e 2240 – 23 andar – Vila Olimpia – São Paulo/SP
  E-mail: thmartins@santander.com.br; bruna.trevisan@santander.com.br e celso.aoki@santander.com.br
  At.: Thiago Franco Martins; Bruna Rabello de Freitas e Celso Massao Aoki
- Para o **CLIENTE**:
  Endereço: Praça Senador Salgado Filho Centro - Rio de Janeiro, RJ, CEP 20021-340
  E-mail: Tesouraria@voegol.com.br, jsbaumgratz@voegol.com.br e TAMENDONCA@voegol.com.br



*At.: Joelmir e Tatiane.*

*8.13.2 O **CLIENTE** obriga-se a informar ao **SANTANDER**, por escrito, toda e qualquer modificação em seus dados cadastrais, sob pena de serem consideradas como efetuadas 2 (dois) dias após a expedição qualquer Comunicação enviada aos endereços constantes.*

*8.14 Não se presume a renúncia a qualquer dos direitos decorrentes das presentes Condições Gerais, desta forma, nenhum atraso, omissão ou liberalidade no exercício de qualquer direito, faculdade ou remédio que caiba ao **SANTANDER**, em razão de qualquer inadimplemento das obrigações do **CLIENTE** previstas nestas Condições Gerais, prejudicará tais direitos, faculdades ou remédios, ou será interpretado como constituindo uma renúncia aos mesmos ou concordância com tal inadimplemento, nem constituirá novação ou modificação de quaisquer outras obrigações assumidas pelo **CLIENTE** nestas Condições Gerais ou precedente no tocante a qualquer outro inadimplemento ou atraso.*

*8.15 Estas Condições Gerais constituem em conjunto com o Termo um título executivo extrajudicial nos termos dos incisos III do artigo 784 do Código de Processo Civil, reconhecendo as **PARTES** desde já que, independentemente de quaisquer outras medidas cabíveis, as obrigações assumidas nos termos destas Condições Gerais comportam execução específica, submetendo-se às disposições dos artigos 815 e seguintes do Código de Processo Civil, sem prejuízo do direito de declarar o vencimento antecipado nos termos destas Condições Gerais.*

*8.16 A invalidade ou nulidade, no todo ou em parte, de quaisquer das cláusulas destas Condições Gerais não afetará as demais, que permanecerão válidas e eficazes até o cumprimento, pelas **PARTES**, de todas as suas obrigações aqui previstas. Consequentemente, eventual invalidade ou suspensão dos efeitos, no todo ou em parte, não afetará as demais, que permanecerão válidas e eficazes. Ocorrendo a declaração de invalidade ou nulidade de qualquer cláusula destas Condições Gerais, as **PARTES** se obrigam a negociar, no menor prazo possível, em substituição à cláusula declarada inválida ou nula, a inclusão, nestas Condições Gerais, de termos e condições válidos que reflitam os termos e condições da cláusula invalidada ou nula, observados a intenção e o objetivo das partes quando da negociação da cláusula invalidada ou nula e o contexto em que se insere.*

*8.17 Estas presentes Condições Gerais entraram em vigor na presente data e, desde que cumpridas as Condições Precedentes.*

*8.18 Fica eleito o Foro da Comarca de São Paulo, como competente para dirimir as questões oriundas destas Condições Gerais, por mais privilegiado que seja ou venha a ser.*

*8.19 As presentes Condições Gerais serão regidas e interpretadas em conformidade com as leis da República Federativa do Brasil.*

*8.20 Exceto se de outra forma especificamente disposto nestas Condições Gerais, os prazos estabelecidos nas presentes Condições Gerais serão computados de acordo com a regra prescrita no artigo 132 do Código Civil, sendo excluído o dia do começo e incluído o do vencimento.*

*8.21 As **PARTES** desde já acordam que as presentes Condições Gerais e demais documentos correlatos poderão ser assinados eletronicamente pelos seus respectivos signatários. Neste caso, todos os signatários deverão assinar estas Condições Gerais por meio de plataforma eletrônica, nos termos do artigo 10º, parágrafo segundo, da Medida Provisória 2.200-2 de 24 de agosto de 2001 e demais alterações posteriores, com o uso de certificado digital. As Partes reconhecem também que eventual divergência entre as datas destas Condições Gerais e a data que figure nos elementos indicativos de sua formalização eletrônica ou digital existe apenas em virtude de procedimentos formais, valendo para todos os fins de direito as datas registradas nas Condições Gerais em si abaixo para regrar os eventos dessa operação (por exemplo: incidência de encargos, vigência, contabilização etc.).*



---

*8.22 As Partes desde já acordam que no caso de quaisquer termos e condições estabelecidos no Stipulation, na Order e/ou nestas Condições Gerais serem inconsistentes ou conflitantes, prevalecerão os termos e condições dispostos na Order, inclusive com relação ao exercício de remédios previstos em caso de inadimplementos, durante o período de tramitação do Chapter 11. Caso quaisquer termos e condições estabelecidos no Stipulation e nestas Condições Gerais sejam inconsistentes ou conflitantes, prevalecerão, durante o período de tramitação do Chapter 11, os termos e condições previstos nestas Condições Gerais. Após o fim do Chapter 11, prevalecerão os termos deste instrumento.*

*E, por estarem assim, justas e contratadas, as **PARTES** firmam estas Condições Gerais em 2 (duas) vias de igual teor, juntamente com as 2 (duas) testemunhas abaixo nomeadas.*

---

## 2. DISPOSIÇÕES GERAIS

**2.1.** O **CLIENTE** concorda com as novas disposições estabelecidas neste aditamento, obrigando-se a cumpri-las em sua íntegra e ratifica todas as demais cláusulas das Condições Gerais, permanecendo inalteradas as cláusulas não alteradas por este aditamento.

**2.2**. Todas as despesas incorridas pelo **SANTANDER** na formalização e/ou no registro deste aditamento perante as Registradoras serão imediatamente (i) pagas pelo **CLIENTE** ou (ii) reembolsadas por este ao **SANTANDER**.

**2.3.** O presente aditamento, que passa a inseparavelmente integrar o Termo e as Condições Geais, (i) não tem o ânimo de novar as obrigações assumidas pelas Partes no Termo e/ou nas Condições Gerais, e (ii) será regido e interpretado de acordo com as leis da República Federativa do Brasil.

**2.4.** Os termos iniciados em letra maiúscula empregados neste aditamento, salvo se de outra forma definidos, terão os significados a eles atribuídos no Termo.

**2.5.** As Partes declaram ter livremente assinado este aditamento, celebrado em caráter irrevogável e irretratável, obrigando as Partes, seus herdeiros e sucessores a qualquer título.

**2.6.** As Partes reconhecem que este aditamento poderá ser assinado eletronicamente, que, nesta hipótese, se dará mediante a utilização de assinatura eletrônica, em conformidade com as disposições da MP nº 2.200-2/2001/01, em especial o § 2º do artigo 10, ou com a utilização de assinatura digital, com certificado digital emitido no padrão ICP-Brasil, sendo, em qualquer uma das hipóteses, plenamente válida e aceita pelas partes.

**2.6.1.** O **CLIENTE** compromete-se, a critério do **SANTANDER**, sempre que utilizadas ferramentas e/ou plataformas de assinatura eletrônica contratadas pelo **CLIENTE**, a fornecer todos e quaisquer indícios técnicos e societários que garantam a legitimidade, integridade e autenticidade dos atos praticados ao longo do fluxo de assinatura, incluindo, sem limitação, o laudo probatório/pericial contendo, no mínimo, informações sobre (i) identificação e autenticação dos signatários, (ii) identificação da ação efetuada, (iii) data e hora dos eventos de assinatura realizados, com a indicação do tempo em relação ao fuso horário oficial do Brasil (caracterizado pela hora de Greenwich 'menos três horas', nos termos do Decreto nº 2.784/13, (iv) respectivo código de identificação hash e a qual conjunto ou documento ele se refere, e (iv) o endereço de Protocolo da Internet ("Endereço IP") dos eventos de assinatura eletrônica, sem prejuízo de demais informações solicitadas pelo **SANTANDER**.

**2.6.2.** Em caso de assinatura física, este instrumento poderá ser assinado em 2 (duas) vias de igual teor e forma e para um só efeito.

**Santander**

**2.7.** Fica eleito o foro do local de celebração do Instrumento para dirimir eventuais controvérsias deste aditamento.

E, por estarem justas e contratadas, assinam este aditamento na presença das testemunhas abaixo.

São Paulo, 9 de julho de 2024.

(*Propositalmente em branco. Assinaturas iniciam na próxima página*)

(*Página de assinaturas do Aditamento Nº 1 às Condições Gerais de Cessão de Crédito de Recebíveis de Cartões de Crédito Sem Coobrigação – Demais Credenciadoras – 07.575.651/0001-59*)

_____          _____
**GOL LINHAS AÉREAS S.A.**                                          **BANCO SANTANDER (BRASIL) S.A**.

**TESTEMUNHAS:**

_____          _____
Nome:                                                                              Nome:
CPF:                                                                                CPF:

Central de Atendimento Santander Empresarial 4004 2125 (Capital e Regiões Metropolitanas) e 0800 726 2125 (Demais Localidades) - SAC – Serviço de Atendimento ao Consumidor 0800 762 7777 -Ouvidoria: Se não ficar satisfeito com a solução apresentada 0800 726 0322 - Disponível de segunda a sexta-feira, das 8h às 22h, e aos sábados, das 9h às 14h, exceto feriado. 0800 771 0301 - Pessoas com deficiência auditiva e de fala.

**EXHIBIT "B"**

*BdoB Letters of Credit*

| Amount (USD) | Expiration Date | Number |
|---|---|---|
| 1.400.000,00 | 11/24/2024 | 7191736416 |
| 3.000.000,00 | 01/11/2025 | 7191027883 |
| 4.166.700,00 | 11/24/2024 | 7191736329 |
| 9.000.000,00 | 10/25/2024 | 7191678820 |

*Santander Letters of Credit*

| Amount (USD) | Number | Expiration date |
|---|---|---|
| 2.900.000,00 | 309330 | 24/04/2024 |
| 735.094,00 | 352287 | 14/03/2024 |
| 580.000,00 | 10204286 | 24/10/2024 |
| 510.263,00 | 10204287 | 24/10/2024 |
| 3.000.000,00 | 10204292 | 24/10/2024 |
| 3.000.000,00 | 10204293 | 24/10/2024 |
| 511.981,00 | 10204294 | 24/10/2024 |
| 900.000,00 | 10204295 | 24/10/2024 |
| 618.000,00 | 10204298 | 24/10/2024 |
| 618.000,00 | 10204299 | 24/10/2024 |
| 480.000,00 | 10432363 | 24/10/2024 |
| 634.384,00 | 10432364 | 24/10/2024 |
| 634.000,00 | 10432366 | 24/10/2024 |

| Amount (USD) | Number | Expiration date |
|---|---|---|
| 631.260,00 | 10435553 | 24/10/2024 |
| 634.410,00 | 10435612 | 24/10/2024 |
| 659.105,00 | 10435659 | 24/10/2024 |
| 719.600,00 | 10435714 | 24/10/2024 |
| 714.560,00 | 10435769 | 24/10/2024 |
| 719.600,00 | 10435864 | 24/10/2024 |
| 365.733,00 | 10435966 | 24/10/2024 |
| 326.715,00 | 10435993 | 24/10/2024 |
| 482.000,00 | 10695694 | 14/04/2024 |
| 482.000,00 | 10695709 | 14/04/2024 |
| 4.500.000,00 | 10869301 | 27/06/2024 |
| 6.000.000,00 | 10871391 | 27/06/2024 |
| 4.000.000,00 | 10999780 | 25/08/2024 |
| 4.000.000,00 | 10999783 | 25/08/2024 |
| 6.000.000,00 | 10999784 | 25/08/2024 |
| 1.500.000,00 | 11068022 | 17/10/2024 |
| 1.500.000,00 | 11068040 | 17/10/2024 |
| 1.500.000,00 | 11068047 | 17/10/2024 |
| 4.690.000,00 | 11318342 | 19/01/2024 |
| 615.166,00 | 11912826 | 10/02/2024 |
| 607.337,00 | 11912827 | 10/02/2024 |
| 610.000,00 | 11912828 | 10/02/2024 |
| 235.000,00 | 11264527 | 13/12/2024 |

| **Amount (USD)** | **Number** | **Expiration date** |
|---|---|---|
| 235.000,00 | 11264604 | 13/12/2024 |
| 345.000,00 | 11264614 | 13/12/2024 |
| 373.000,00 | 11264718 | 13/12/2024 |

*Bradesco Letters of Credit*

| **Amount (USD)** | **Number** | **Expiration date** |
|---|---|---|
| 3.000.000,00 | 1172302979 | 12/05/2024 |
| 3.000.000,00 | 1172302982 | 11/16/2024 |
| 4.000.000,00 | 1171700302 | 07/14/2024 |

**<u>Exhibit B</u>**

**Bliley Declaration**

Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

Andrew M. Leblanc
Erin E. Dexter
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------x
                                                    :
In re:                                              :   Chapter 11
                                                    :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                :   Case No. 24-10118 (MG)
et al.,[1]                                          :
                                                    :   (Joint Administration Requested)
                              Debtors.              :
                                                    :
--------------------------------------------------------------x
```

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**DECLARATION OF JOSEPH W. BLILEY IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
STIPULATION AND (I) AUTHORIZING THE DEBTORS TO (A) USE
COLLATERAL, INCLUDING CASH COLLATERAL, AND GRANT ADEQUATE
PROTECTION IN CONNECTION WITH CERTAIN PREPETITION DEBENTURES;
(B) AMEND TERMS OF CERTAIN PREPETITION DEBENTURES;
(C) ESTABLISH PROCEDURES FOR EXTENDING THE EXPIRATION DATE OF,
AND REIMBURSING THE ISSUING BANKS FOR DRAWN, EXISTING
PREPETITION LETTERS OF CREDIT; AND (D) ENTER INTO A NEW FACTORING
AGREEMENT; (II) APPROVING THE CONSENSUAL ASSUMPTION OF CERTAIN
PREPETITION FACTORING AGREEMENTS, AS AMENDED; (III) MODIFYING
THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF**

I, Joseph W. Bliley, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of GOL Linhas Aéreas Inteligentes S.A.

("GOL Linhas"), one of the above-captioned debtors and debtors-in-possession (collectively with

GOL Linhas, the "Debtors"), and have served in this position since December 17, 2023.

2.      I have more than twenty-five years of experience in the financial sector.  Most

recently, before my current role at GOL Linhas, I was a Managing Director and Co-Head of Global

Financial Services Investment Banking at Lincoln International, based in New York, New York.

Previously, I held senior positions in Investment Banking at Stephens, Inc. and Bank of America,

N.A., where I was a Managing Director in the Corporate Finance and Restructuring group.

Throughout my career, I have worked with companies and their stakeholders in a variety of

complex transactions, including recapitalizations, in-court and out-of-court restructurings,

mergers, divestitures, and initial public offerings.  My experience is global, having worked in New

York and Europe with companies throughout the world, including in Latin America.

3.      I submit this Declaration in support of the Debtors' Motion for Entry of an Order

Approving Stipulation and (I) Authorizing the Debtors to (A) Use Collateral, Including Cash

Collateral, and Grant Adequate Protection in Connection with Certain Prepetition Debentures; (B)

Amend Terms of Certain Prepetition Debentures; (C) Establish Procedures for Extending the

Expiration Date of, and Reimbursing the Issuing Banks for Drawn, Existing Prepetition Letters of Credit; and (D) Enter into a New Factoring Agreement; (II) Approving the Consensual Assumption of Certain Prepetition Factoring Agreements, as Amended; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief  (the "<u>Motion</u>"), filed contemporaneously herewith.[2]

4.     Except as otherwise indicated herein, the facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances; my discussions with the Debtors' senior management; my review of relevant documents; information provided to me by my colleagues, the Debtors, the Debtors' advisors and professionals, and/or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the airline industry.  If called to testify, I would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents, or my opinions based upon my related professional experience.

5.     I am not being specifically compensated for this testimony. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.

## I.     THE PREPETITION DEBENTURES WITH THE FACTORING BANKS

6.     On October 28, 2018, April 16, 2020, and October 1, 2020, GOL Linhas issued, in three series, the 7a Debentures in an aggregate principal amount, as of the Petition Date, of R$411,125,967.60 (equivalent to US$83,562,188.54)[3] and an aggregate interest in the amount, as of the Petition Date, of R$259,464.06 (equivalent to US$52,736.60).  On October 27, 2021, GOL Linhas issued the 8a Debentures in an aggregate principal amount, as of the Petition Date, of R$445,340,923.24 (equivalent to US$90,516,447.81) and an aggregate interest in the amount, as

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Stipulation, as applicable.

[3]     The exchange rate herein used is the exchange rate in effect as of the Petition Date, as used in the Debtors' Schedules and Statements of Financial Affairs, which is 1 USD: 4.92 BRL.

of the Petition Date, of R$281,057.33 (equivalent to US$57,125.47). GOL Linhas has guaranteed the full and prompt payment of the Prepetition Debentures.

7.      In connection with the relief requested in the Motion, the Debtors have agreed to stipulate pursuant, and subject, to the terms of the Proposed Order and the Stipulation and in exchange for the Agreements of the Factoring Banks set forth therein, that the Prepetition Debentures are secured by an unavoidable, perfected, valid and enforceable first priority security interest in (through a "fiduciary assignment" granted under Brazilian law) the Visa Receivables, together with all proceeds of the Visa Receivables received prior to and after the Petition Date. The Prepetition Debentures Collateral is held in a bank account at BdoB in its capacity as the collateral agent under the Prepetition Debentures for the benefit of the Factoring Banks before the Prepetition Debenture Collateral is transferred to the Debtors' operating accounts. To my knowledge, as of the Petition Date, no other party has an interest in the Prepetition Debentures Collateral that is superior to the interests of the Factoring Banks.

8.      Pursuant to the Stipulation, the Relevant Debtors and the Factoring Banks have agreed on the terms of adequate protection to be provided with respect to the Debtors' consensual use of the Visa Receivables and the Debentures Cash Collateral pursuant to the terms of the Proposed Order and the other obligations of the Debtors set forth therein in exchange for the various agreements of the Factoring Banks, including the agreement to provide postpetition factoring and Letter of Credit renewals.

9.      Additionally, subject to the terms of the Proposed Order, the Factoring Banks have consented to the Debtors' use of the proceeds of any Visa Receivables factored pursuant to the terms of the Factoring Agreements for any purposes permitted under the Bankruptcy Code.

10.     I believe that the use of the Debentures Cash Collateral and the continued support of the Factoring Banks is critical to the Debtors' restructuring efforts in the Chapter 11 Cases.  In exchange for the Debtors' use of the Debentures Cash Collateral—which is critical to the Debtors' operations—the proposed adequate protection provides the Factoring Banks with the Adequate Protection Liens and Adequate Protection Claims, in each case, to the extent of any diminution in value and amended amortization and interest payments.  I understand that the Relevant Debtors are also agreeing to maintain a consolidated cash balance of all Debtors during these cases of at least R$1 billion, measured monthly, and provide the Factoring Banks with a written report showing such balance as of the end of the month.  I believe the terms and conditions on which the Debtors may use the Debentures Cash Collateral as set forth in the Proposed Order and Stipulation were designed to meet the dual goals of sections 361 and 363 of the Bankruptcy Code, and the proposed adequate protection package is reasonable and appropriate given the circumstances of these cases.

11.     In addition, the Factoring Banks have made clear to the Debtors that providing the Factoring Banks with the Adequate Protection Liens and Adequate Protection Claims, in each case, to the extent of any diminution in value and amended amortization and interest payments, is a critical component of the consensual terms of the Stipulation and Proposed Order.  In addition, the Factoring Banks have agreed, so long as no Automatic Event of Default or Optional Event of Default has occurred under the Proposed Order (including that the Chapter 11 Plan contains terms that are no less favorable to the Factoring Banks than the Proposed Plan Terms and the other terms in the Stipulation and the Proposed Order, including with respect to the Factoring Agreements and Letters of Credit), not to object to the proposed treatment of the Aggregate 7a Debentures Claim and the Aggregate 8a Debentures Claim as set forth in the Stipulation.

5

## II.    THE FACTORING AGREEMENTS

12.    Prior to the Petition Date, the Debtors routinely engaged in factoring as part of the Debtors' daily operations.  In Brazil, most of the Debtors' credit card receivables cannot be converted into cash for at least thirty-one days.  Because of this delay between the time that a credit card receivable is recognized and when it can be converted into cash, the Debtors entered into the factoring arrangements to provide immediate liquidity for the Debtors' business needs.  I understand that factoring is a customary practice in Brazil and the Debtors have historically relied upon the Factoring Agreements as a key source of liquidity to maintain ordinary course operations and avoid disruptions.

13.    On July 11, 2016, BdoB and GOL Linhas entered into the BdoB Factoring Agreement, pursuant to which GOL Linhas sold the Receivables to BdoB in exchange for an immediate cash payment.  Immediately prior to the Petition Date, the Debtors had continued to sell Receivables to BdoB pursuant to the terms of the BdoB Factoring Agreement.  Although BdoB has indicated that it is unwilling to continue performance under the BdoB Factoring Agreement absent the agreement set forth in the Stipulation and entry of the Proposed Order, BdoB agreed to make purchases of, and has purchased, from GOL Linhas an aggregate of R$113,115,023.47 (equivalent to US$22,990,858.43) of Receivables after the Petition Date based upon the Relevant Debtors' assurances that the Relevant Debtors would negotiate in good faith to enter into the Stipulation and seek entry of the Proposed Order.

14.    On November 30, 2023, Santander and GOL Linhas entered into the Santander Factoring Agreement, pursuant to which GOL Linhas would sell Receivables to Santander in exchange for immediate cash payment.  Although Receivables were never factored under the Santander Factoring Agreement, the Debtors and Santander agree that it remains in force.

6

Santander has indicated that it is unwilling to continue performance under the Santander Factoring Agreement absent the agreement set forth in the Stipulation and entry of the Proposed Order.

15.     I understand that BdoB and Santander have consented to GOL Linhas assuming the BdoB Factoring Agreement and the Santander Factoring Agreement and that, other than payment of a commitment fee and attorneys' fees, they are not requiring any "cure" of any obligation or payment as a condition to such assumption.  In exchange, GOL Linhas has agreed to honor any chargeback, indemnity requests, or other obligations arising under the Factoring Agreements, in the ordinary course of business, as and when they arise.  I believe that the consensual assumption of the BdoB Factoring Agreement and the Santander Factoring Agreement, and payment of the commitment and attorney's fees in connection therewith, is fair, equitable, reasonable, and the product of the Debtors' exercise of their sound business judgment.

16.     While Bradesco and GOL Linhas do not have a prepetition factoring agreement, Bradesco has agreed, pursuant to the Stipulation, to enter into a new factoring agreement (the Bradesco Factoring Agreement) to purchase Receivables.  Pursuant to the Stipulation, the Relevant Debtors and BdoB and Santander, respectively, have agreed, subject to entry of the Proposed Order, to amend their respective factoring agreements to make certain changes to take into account the pendency of the Chapter 11 Cases and to reflect the entry into the Bradesco Factoring Agreement.

17.     I believe that these Factoring Agreements are essential to the Debtors' business operation and critical to the Debtors' ability to anticipate cash flows, maintain their cash management system, and continue their overall operations.  Because factoring is not available to the Debtors from other banks in the volumes required to ensure necessary cash flows to operate, it is imperative that the Debtors continue to sell Receivables under the BdoB Factoring Agreement

7

and be able to sell Receivables under the Santander Factoring Agreement and the Bradesco Factoring Agreement. Accordingly, the Debtors engaged in several months' long, good faith, arms-length negotiations with the Factoring Banks to expeditiously reinstate the Factoring Agreements (and, with respect to Bradesco, enter into a new Factoring Agreement) and meet the Debtors' essential liquidity needs.

**III.**       **THE PREPETITION LETTERS OF CREDIT**

18.     In the ordinary course of business, GOL Linhas maintains the L/C Accounts, including time deposit accounts and/or certificates of deposit at certain of the Factoring Banks that have been granted to the applicable Factoring Bank to secure its respective Letters of Credit, and each such bank has a right to offset amounts held in the applicable Factoring Bank's L/C Accounts against any reimbursement claims against GOL Linhas for amounts drawn on the Letters of Credit.

19.     As of the Petition Date, each of the Factoring Banks had issued standby letters of credit to the Debtors' aircraft lessors in an aggregate face amount of approximately US$85 million, which Letters of Credit are set to expire during these cases.

20.     As of the Petition Date and the date of the Stipulation, an aggregate of US$17,566,700 in face amount of BdoB Letters of Credit were outstanding. Part of that amount is secured by the BdoB L/C Collateral. BdoB Letters of Credit will begin to expire in October of 2024, unless BdoB agrees to extend the expiration dates of such letters of credit. Moreover, the BdoB Letters of Credit do not allow the beneficiaries to draw on the BdoB Letters of Credit if they expire. Pursuant to the Reimbursement Agreements entered into for each BdoB Letter of Credit, GOL Linhas has agreed to reimburse BdoB for draws under such BdoB Letter of Credit, and pay amounts in addition to reimbursement of the face amount of the BdoB Letter of Credit, as specified in the applicable BdoB Reimbursement Agreement. I understand that BdoB has a claim against

GOL Linhas for amounts due or that might become due with respect to the BdoB Letters of Credit and the BdoB Reimbursement Agreements.

21.      As of the Petition Date, Santander had issued and there were outstanding Santander Letters of Credit in the aggregate face amount of US$57,567,208.00.  Part of that amount is secured by the L/C Collateral.  As a result of the commencement of the Chapter 11 Cases, certain of the Debtors' lessors drew on Santander Letters of Credit in amounts totaling US$13,332,503.00 in aggregate face amount as of May 21, 2024.  Accordingly, as of April 30, 2024, an aggregate of US$44,234,704.04 in face amount of Santander Letters of Credit are outstanding.  The Santander Letters of Credit have already begun expiring and will continue to expire throughout 2024 unless Santander agrees to extend the expiration dates of such letters of credit.  Moreover, the Santander Letters of Credit do not allow the beneficiaries to draw on the Santander Letters of Credit if they expire.  I understand that Santander has claims against GOL Linhas for amounts due with respect to the Drawn Santander Letters of Credit and for amounts that are due or might become due with respect to the Santander Letters of Credit and the Santander Reimbursement Agreements, including the Santander Reimbursement Amount.

22.      As of the Petition Date and as of the date of the Stipulation, Bradesco had issued and outstanding standby letters of credit in the aggregate face amount of US$10 million.  The Bradesco Letters of Credit will expire on July 14, 2024, November 16, 2024, and December 5, 2024, unless Bradesco agrees to extend the expiration dates of such letters of credit.  Moreover, the Bradesco Letters of Credit do not allow the beneficiaries to draw on the Bradesco Letters of Credit if expire.  In the Bradesco Reimbursement Agreements, GOL Linhas has agreed to reimburse Bradesco for draws under the respective Bradesco Letter of Credit, and pay other amounts specified in such Bradesco Reimbursement Agreement.  I understand that Bradesco has

9

a claim against GOL Linhas for amounts due or that might be due with respect to the Bradesco Letters of Credit and the Bradesco Reimbursement Agreements.

23.    The Letters of Credit are a critical component of the Debtors' operations, as they secure the Debtors' payment of rent, maintenance, and similar charges under the applicable leases with the Debtors' aircraft lessors.  If the Letters of Credit are not timely renewed, the Debtors may be in breach of their aircraft leases, thereby detrimentally affecting the Debtors' ability to operate. As a condition to amending and continuing performance under the BdoB and Santander Factoring Agreements and entering into the Bradesco Factoring Agreement, the Factoring Banks have insisted on the Reimbursement Agreements and requested assurances that they will be compensated for any exposure they may face in connection with the Debtors' obligations under the Letters of Credit, whether such obligations were incurred pre or postpetition.  Accordingly, it is essential that the Debtors are able to reimburse the Factoring Banks for drawn Letters of Credit so that the Factoring Banks continue to renew the Letters of Credit.  I believe that such conditions as negotiated under the Factoring Agreements are in the best interests of the Debtors and align with industry standards.

24.    Further, I do not believe that reimbursing the Factoring Banks for drawn Letters of Credit will result in a net loss to the Debtors' estates.  The Debtors intend to continue complying with their obligations under the applicable leases pursuant to the stipulations entered into with their aircraft lessors, in which case no Letters of Credit will be drawn.  As such, any draw on a Letter of Credit would be the equivalent of a missed lease payment that the Debtors likely intended to pay.

25.    Lastly, I believe it is essential to the preservation of the Debtors' going concern value that they have sufficient ability to liquidate their credit and debit card receivables on a current

10

basis, without having to wait for those receivables to otherwise become available.  As discussed above, the Factoring Banks insisted on the Reimbursement Agreements as a necessary condition to recommencing the Factoring Agreements and the Debtors rely on the cash flow from the Factoring Agreements to properly operate their business, anticipate cash flow, and timely satisfy various financial obligations and covenants.

## IV.        THE REQUESTED RELIEF IS WARRANTED

26.    I believe that the plan-related provisions set forth in the Stipulation and Proposed Order are appropriate, fair, and reasonable.  The agreement with the Factoring Banks significantly benefits the Debtors' estates by providing access to factoring, extending out the amortization of the Prepetition Debentures, and ensuring that Letters of Credit will be renewed.  I understand that the provisions set forth in the Stipulation and Proposed Order are fully consensual and are the best available terms under the circumstances, have been negotiated at arms' length and in good faith, and resolve key issues between the Factoring Banks and the Relevant Debtors.  I believe the consensual terms represent a significant element in the development of the Debtors' chapter 11 plan, reflect the Relevant Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are in the best interests of the Relevant Debtors and their respective estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: July 9, 2024

*/s/ Joseph W. Bliley*
Joseph W. Bliley
Chief Restructuring Officer
GOL Linhas Aéreas Inteligentes S.A.