**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOL LINHAS AÉREAS INTELIGENTES S.A., | ) | |
| et al.,[1] | ) | Case No. 24-10118 (MG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date:  March 18, 2025** |
| | ) | **Hearing Time:  10:00 a.m.** |
| | ) | |

**LIMITED OBJECTION BY THE SECURITIES AND EXCHANGE COMMISSION TO APPROVAL OF THE AMENDED DISCLOSURE STATEMENT AND CONFIRMATION OF THE DEBTORS' AMENDED PLAN CONTAINING THIRD PARTY RELEASES**

The U.S. Securities and Exchange Commission (the "SEC"), a creditor and a statutory party in interest in these cases[2] and the federal agency responsible for enforcing the federal securities laws, objects to the approval of the Disclosure Statement and confirmation of the Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. ("GLAI") and its Debtor Affiliates, filed December 9, 2024, as further amended through the filing of an Amended Disclosure Statement and Amended Plan on January 24, 2024 (the "Amended Disclosure Statement" and "Amended Plan").  In the SEC's view, the Amended Plan contains a nonconsensual third-party release, which is prohibited under the Supreme Court's ruling in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). The release is nonconsensual as it

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2] 11 U.S.C. § 1109(a) provides that "[t]he Securities and Exchange Commission may raise and appear and be heard on any issue in a case under this chapter. . . ."

applies to holders of various unsecured notes, including the 2024 Senior Exchangeable Notes,

2025 Senior Notes and Perpetual Notes[3] (the "Public Noteholder(s)") because failure by a Public

Noteholder to return an opt-out form is insufficient evidence of consent to a third party release.[4]

## BACKGROUND

1.      GLAI is a Brazilian corporation and a public reporting company under section

12(g) of the Securities Exchange Act of 1934 (Amended Disc. St. at 14.).  Its preferred shares are

traded on the São Paulo Stock Exchange. (*Id.*)  The company issued American Depository

Receipts ("ADRs") through The Bank of New York Mellon, as depositary bank, which represent

preferred shares and are traded under the symbol "GOL" on the New York Stock Exchange. (*Id.*)

As of November 2024, GLAI had 2,863,682,500 shares of common stock outstanding and

338,594,338 shares of preferred stock outstanding (including preferred shares represented by

ADRs and 2,109 preferred shares held by GLAI as treasury shares). (*Id.*) In addition, GLAI has

approximately $537 million in a variety of series of outstanding unsecured notes held by the

Public Noteholders. (Amended Disc. St. at 18.)

2.      GLAI filed its Chapter 11 petition on January 25, 2024, to restructure its balance

sheet, reduce outstanding obligations, and raise new capital for future growth. (Amended Disc.

St. at 20.)

## THE PLAN

3.      The Amended Plan seeks to reduce GLAI's debt by converting up to $1.7 billion

of its prepetition funded debt into equity, transferring most of the new equity to its major secured

---

[3] Unless separately defined herein, capitalized terms have the meanings ascribed to them in the Amended Plan.

[4] While The Bank of New York Melon, the indenture trustee for the Public Noteholders' indenture, is a member of
the Official Committee of Unsecured Creditors, which is a party to the plan support agreement ("PSA"), the Public
Noteholders are not parties to the PSA. (Amended Disc. St. Exh. E at p. 286 of 521)

creditor, Abra, and raising up to $1.85 billion in new capital for the emerging reorganized

debtors. (Amended Disc. St. at 31-32.)   Holders of General Unsecured Claims, which include

the Public Noteholders, will receive equity valued up to approximately $235 million and possibly

more, as described more fully in the Amended Plan. (*Id*.)

4.     The Public Noteholders in Class 9 are impaired and entitled to vote on the Plan.

(Amended Disc. St. at 41-43.) Holders of Equity Interests (Class 13) are deemed to reject and

thus not entitled to vote on the Plan. (Amended Disc. St. at 47.)

5.     The Amended Plan contains a third-party release provision (the "Release") that

purports to release claims by non-debtors, including the Public Noteholders, against other non-

debtors. (Amended Plan at Art. IX. E.)  Affected creditors will be bound and deemed to consent

to the Release if they: (i) vote in favor of the Amended Plan; or (ii) abstain from voting or vote to

reject the Amended Plan, and do not submit an opt-out form. (Amended Plan at Art. I, ¶223,

definition of "Releasing Parties")[5]  Accordingly, Public Noteholders who vote in favor of the

Amended Plan, abstain from voting and do not submit an opt-out form, or who vote to reject but

do not affirmatively opt-out of the Release, will all be bound by the Release.

6.     The Release would bar these Public Noteholders from a broadly defined list of

Released Parties, including: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Committee

and its members; (iv) the other Consenting Stakeholders to the PSA; (v) the Agents/Trustees; and

(vi) as to each such entity, its "Related Parties," which would include, among others, current and

former officers and directors, as well as assorted professionals and a host of other non-debtors.

(Amended Plan at Art. I, ¶ 221, including within the definition of Related Parties "financial

---

[5] GLAI's public equity holders and others deemed to reject the Amended Plan are not bound by the Release.
(Amended Plan, Art. I, ¶223)

advisers, attorneys, accountants, investment bankers . . . and other professionals and advisors
…").

## **DISCUSSION**

7.       The SEC objects to the Amended Plan because the Release is prohibited under the
Supreme Court's ruling in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("*Purdue*").
The Release is nonconsensual as it applies to Public Noteholders because failure to return a
ballot or to affirmatively opt out of the Release on a returned ballot is insufficient evidence of
consent.[6]

### **Failure to Opt-Out of a Third-Party Release is Insufficient Evidence of Consent**

8.       In *Purdue,* the United States Supreme Court altered the legal landscape for third-
party releases. The Court identified the question as "whether a court in bankruptcy may
effectively extend to *nondebtors* the benefits of a Chapter 11 discharge usually reserved for
*debtors[,]*" *id.* at 215 (emphasis in original) and answered in the negative.

9.       Nothing in the Bankruptcy Code "authorize[s] a release and injunction that, as
part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a
nondebtor without the consent of affected claimants." *Id.* at 227. A critical implication of this
ruling is that a third-party release provision is not just another plan provision that can bind non-
objecting creditors and equity holders under Section 1141(a). *See at* 214-222 (explaining that,
under Section 1123(b), a third-party release is not an "appropriate provision" in a Chapter 11
plan).

---

[6] In response to the SEC Staff's informal comment letter, GLAI has included in the Amended Plan the SEC's
standard language carving the SEC out from any third-party releases contained in such plan. Amended Plan at Art.
IX. H.

10. Thus, the only basis for approving a nondebtor release after *Purdue* is an adequate showing by the plan proponent that the releasing party consents. The *Purdue* court did not express a specific view about what qualifies as a "consensual" release. *Id.* at 225-227. But the Court did cite to *In re Specialty Equipment Cos.*, 3 F.3d 1043 (7th Cir. 1993). *Id.* at 226. In *Specialty Equipment*, the Court found that the release was consensual because "[i]t binds only those creditors voting in favor of the plan of reorganization." 3 F.3d at 1047. Thus, "consent" required an affirmative act, *e.g.*, voting to accept the plan, and the *Specialty Equipment* court noted that "a creditor who votes to reject the Plan or abstains from voting may still pursue any claims against third-party nondebtors." *Id.*

11. Prior to *Purdue*, bankruptcy courts have held that an opt out mechanism is not sufficient to render a third party release "consensual." *See, e.g.*, *In re Chassix Holdings*, 533 B.R. 64, 80, 81 (Bankr. S.D.N.Y. 2015) ("Charging all inactive creditors with full knowledge of the scope and implications of the proposed third party releases and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point"); *see also In re SunEdison, Inc.*, 576 B.R. 453, 458-59 (Bankr. S.D.N.Y. 2017) (applying contract principles to determine whether releases were consensual, court held that silence or inaction could not be deemed to be consent to a third party release); *Emerge Energy Servs. LP*, No. 19-11563 (Bankr. D. Del.) (KBO), 2019 WL 7634308, at *18 ("The Court cannot on the record before it find that the failure of a creditor or equity holder to return a ballot or Opt-Out Form manifested their intent to provide a release. Carelessness, inattentiveness, or mistake are three reasonable alternative explanations"); *In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2001) ("Failing to return a ballot is not a sufficient manifestation of consent to a third party release"); *In re Zenith Electronics Corp.*,

241 B.R. 92, 111 (Bankr. D. Del. 1999) (releases of third-party claims cannot be accomplished without the affirmative agreement of the affected creditor); *see also Patterson v. Mahwah Bergen Retail Group, Inc.,* 636 B.R. 641, 684-86 (E.D. Va. 2022).

12.     After *Purdue,* it is clear that a failure to opt-out of a release is insufficient proof of consent.  This issue was recently addressed by Judge Goldblatt in *In re Smallhold, Inc.*, 2024 Bankr. LEXIS 2332 at *32 (Bankr. D. Del., Sept. 25, 2024). The Court found that the "affirmative step" of voting on the plan "coupled with conspicuous notice of the opt out mechanism," "suffices as consent to the third-party releases under general contract principles." *Id.* at *40. But creditors who were not solicited to vote on the plan (because they were being paid in full) lacked an affirmative expression of consent, and thus, their silence in failing to object to the release was insufficient to bind them. *Id.* at **38-39.[7]

13.     Because no provision of the Bankruptcy Code authorizes third-party releases, *Purdue,* 603 U.S. 204, 227*,* "any such consensual agreement would be governed instead by state law." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (finding that "a failure to opt out will not suffice to bind a creditor").

14.     To support their claim of consent by nonresponsive creditors and equity holders, the Debtors must "show under basic contract principles that the Court may construe silence as acceptance because (1) the creditors and equity holders accepted a benefit knowing that the Debtors, as offerors, expected compensation; (2) the Debtors gave the creditors and equity holders reason to understand that assent may be manifested by silence or inaction, and the creditors and equity holders remained silent and inactive intending to accept the offer; or (3)

---

[7] Contrary to the holding in *Smallhold,* in the SEC's view, returning a ballot but not affirmatively opting out of the Release on the ballot is not sufficient evidence of consent. *Chassix Holdings*, 533 B.R. at 81 (creditors who rejected the plan would not be bound by the release unless they opted in to the release).

6

acceptance by the creditors and equity holders can be presumed due to previous dealings between the parties." *In re Emerge Energy Services, LP*, Case No. 19-11563, 2019 WL 7634308 at *18 (citations omitted); *In re SunEdison, lnc.*, 576 B.R. at 458 (citing *In re Washington Mutual, Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011))("Courts generally apply contract principles in deciding whether a creditor consents to a third party release."); *see also*, Restat. 2d of Contracts, § 69 (setting forth limited circumstances under which acceptance may be inferred by silence).

15.     The record in this case fails to support a finding under principles of contract law that any Public Noteholder who fails to vote on the Plan or who votes and fails to opt out of the Release, consents to the Release. Critically, any such noteholder would not receive any consideration for the Release over and above what the noteholder is entitled to under the Plan. None of the contract law criteria for implied acceptance exist here, and thus only an opt-in would demonstrate consent under these circumstances.[8] Anything else is mere speculation. The Debtors' claim that any failure to opt out equals consent is particularly suspect as to a noteholder who votes to reject the Amended Plan but fails to opt out of the Release.

16.     In the SEC's view, to be consensual a release must require the releasing party to affirmatively opt-in to the release. Accordingly, the SEC urges this court not to follow the recent decision in *In re Lavie Care Ctrs.*, 2024 Bankr. LEXIS 2900 (Bankr. N.D. Ga, Dec. 5, 2024), which held that there is a rebuttable presumption that creditors entitled to vote on the plan who abstained from mailing in a ballot consented to the third-party release. There, the Court held that

---

[8] The case *In re Roman Catholic Diocese of Syracuse*, 2024 Bankr. LEXIS 2807 (Bankr. N.D.N.Y., Nov. 14, 2024), where the Court approved an opt-out for survivors of sexual abuse, is distinguishable on its facts. There, the Court found that "the vast majority of survivors are represented by counsel that have actively participated in th[e] case who can explain the process and legal implications to them," and that failure of many of the survivors to vote was due to "the emotionally difficult nature of the case mean[t] that they simply do not wish to engage with the case." Finally, requiring an opt-in to the release could have resulted in nondebtors who contributed $50 million to the Plan to withdraw their contribution if insufficient numbers failed to opt in. *Id.* at **13-15.

"an opportunity for those people and entities to make a case to this Court sometime after confirmation that they should not be bound, that they should not be 'deemed' to have consented [to the release], must be provided in the Order confirming the Plan." *Id.* at *39. Conditionally binding an abstaining creditor to a third-party release contradicts our view that affirmative consent is required to demonstrate consent.  By imposing a rebuttable presumption, the *Lavie Care* Court essentially made the opt-out requirement more onerous and burdensome, by requiring an abstaining creditor to appear before the bankruptcy court to make the case that the creditor did not intend to consent to a release in order to not be bound by the release, even if, for example, the creditor was not aware of the bankruptcy and was not served with the confirmation order.

### Debtors' Argument that Federal Law Applies Does Not Support use of the Opt-Out Mechanism for Third-Party Releases

17.    The Debtors incorrectly argue that federal law governs whether third-party releases are consensual and make several inapposite analogies to situations where courts have found implied or inferred consent.

18.    First, Debtors cite to the Supreme Court decision *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015), for the proposition that consent to a third-party release need not be "express." (Debtors' Brief in Support of Releases ("Debtors' Brief"), at 6-7.)  In *Wellness*, the issue presented was whether a party's participation in an adversary proceeding without affirmatively objecting to the bankruptcy court's jurisdiction was sufficient evidence that the party consented to the court's jurisdiction.  The Supreme Court stated that "[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express." *Wellness Intl'l Network, Ltd.,* 575 U.S. at 683–84, (citing, *Roell v. Withrow,* 538 U.S. 580, 589-90 (2003)) ("[t]he Article III right is substantially honored' by permitting waiver based on 'actions rather

8

than words.")  The Supreme Court held in *Roell* that consent to trial before a magistrate could be inferred from the party's participation in trial before the magistrate and failure to object when the magistrate repeatedly stated that the parties consented to her jurisdiction. *Roell*, 538 U.S. at 591.

19.    The SEC agrees that *Wellness* and *Roell* stand for the proposition that consent need not always be express.  However, in each of those cases the consent was inferred through the party's *action*—participating in a judicial proceeding as a party without objecting to the court's jurisdiction.

20.    Here, by contrast, the Debtors are asking the Court to find that a noteholder's *inaction* or *failure to act* is sufficient evidence to support a finding of consent.  This proposition, that consent may be inferred by a party's inaction, is not supported by the Supreme Court's holdings in *Wellness* and *Roell.  See Patterson*, 636 B.R. at 674 ("*Wellness* and *Roell* make clear that courts can discern the implication of consent to a non-Article III court based on a party's *actions.* However, they do not permit a finding of consent based on inaction.") (emphasis in original).

21.    Debtors also incorrectly analogize the opt-out mechanism to default judgments and disallowance of claims where a creditor failed to file a proof of claim.  (Debtor's Brief at 7.) However, unlike Debtors' non-statutory and non-rule-based analysis as to releases, default judgments and disallowance of claims are governed by rules—the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Civ. P. 55 (incorporated by reference by Fed. R. Bankr. P. 7055) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); Fed. R. Bankr. P. 3002(a) ("Unless Rule 1019(c), 3003, 3004, or 3005 provides otherwise, every creditor must file a proof of claim . . . for

the claim . . . to be allowed."); Fed. R. Bankr. P. 3003(c)(2) ("A creditor . . . whose claim . . . is

not scheduled--or is scheduled as disputed, contingent, or unliquidated—must file a proof of

claim . . . .  A creditor who fails to do so will not be treated as a creditor for that claim for voting

and distribution.").

22.    Finally, Debtors also argue that the Court can analogize the opt-out mechanism

for third-party releasees to the federal law governing class actions, which may bind a class

member who fails to opt-out to a class action settlement.  (Debtor's Brief at 8.)

*23.*    But analogizing an opt-out in bankruptcy to an opt-out in a federal class action

pursuant to Fed. R. Civ. P. 23 is similarly unpersuasive.  The law governing class actions

requires that: (a) the class be specifically defined to identify the class members and the class

claims; (b) the class must be represented by counsel that can best "represent the interests of the

class,"; (c) the Court must ensure compliance with all of these requirements; and (d) the class

action settlement must be approved by the presiding court as being "fair, reasonable, and

adequate." *Patterson*, 636 B.R. at 686-87; *see also In re Aegean Marine Petroleum Network Inc.,*

*599 B.R. 717, 724 (Bankr. S.D.N.Y. 2019)* ("exception for class actions is based on the unique

characteristics of class actions – one of the most important of which is the fact that the interests

of the absent class members are adequately protected by court-certified class representatives who

hold similar claims, who have incentives to pursue them").

24.    There is no similar rule governing opt-outs for third-party releases in the

bankruptcy context that affords the same protections to creditors and shareholders of a Chapter

11 debtor. And there is no class representative for the noteholders here.

25.    In the SEC's view, the only way to ensure that a release is voluntary, is to require

an affirmative opt-in to the release, which will promote the uniform development of the law

throughout the bankruptcy courts.  In the SEC's view, the opt-out mechanism for Public Noteholders in Class 9 does not survive the Supreme Court's holding in *Purdue*.

### **CONCLUSION**

For all of the foregoing reasons, the SEC requests that the Amended Plan be further amended to provide that any Class 9 Public Noteholders be carved out of the Release or be required to opt in to the Release in order to be bound by it.

Dated: January 30, 2025
      New York, NY

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

By:/s/ Alan Maza
   Alan Maza
100 Pearl Street
Suite 20-100
New York, NY 10004
(212) 336-1100
Email: Mazaa@sec.gov


Of Counsel: Alistaire Bambach
             Morgan Bradylyons
             Neal Jacobson