Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                                                :
In re:                                                          :    Chapter 11
                                                                :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                            :    Case No. 24-10118 (MG)
*et al.*,[1]                                                    :
                                                                :
                                   Debtors.                     :    (Jointly Administered)
                                                                :
----------------------------------------------------------------x

### DEBTORS' REPLY BRIEF IN SUPPORT OF
### THE RELEASES AND EXCULPATION PROVISIONS OF
### THE DEBTORS' DISCLOSURE STATEMENT AND CHAPTER 11 PLAN

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

REPLY ..................................................................................................................................... 2

    I.    Consensual Third-Party Releases Are Appropriate Provisions of
        Chapter 11 Plans ............................................................................................ 2

    II.    Federal Law, Not Contract Law, Should Govern Whether Third-Party Releases
        Are Consensual ............................................................................................. 4

    III.    Consent May Be Procured Through an Opt-Out Mechanism...................................... 8

        a.    The Supreme Court Instructs that Opt-Out Mechanisms Enable Parties to
            Demonstrate Consent ............................................................................. 9

        b.    Even if Analyzed Through a Contractual Framework, Opt-Out Releases
            Give Rise to a Duty to Speak and Bind Absent Creditors .................................. 10

        c.    The Majority View that Opt-Out Releases Are Consensual Continues to
            Be Endorsed Post-Harrington ............................................................... 14

    IV.    Creditors Affirmatively Voting in Favor of the Plan Should Be Deemed to
        Consent to Third-Party Releases................................................................... 15

    V.    The Plan's Exculpation Provisions Are Warranted and Appropriately Tailored ....... 16

CONCLUSION...................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) .....................................................................7

*AXA Glob. Risks U.S. Ins. Co. v. Sweet Assocs.*,
  755 N.Y.S.2d 759 (App. Div. 2003) .....................................................................12

*In re CareMax, Inc.*,
  No. 24-80093 (MVL) (Bankr. N.D. Tex. Jan. 28, 2025) .........................................14

*In re Chassix Holdings, Inc.*,
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ................................................................10, 11

*Como v. Com. Oil Co.*,
  607 F. Supp. 335 (S.D.N.Y. 1985) .........................................................................7

*In re Digital Media Solutions, Inc.*,
  No. 24-90468 (ARP) (Bankr. S.D. Tex. Jan. 15, 2025) ..........................................14

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204 (2024) .................................................................................. *passim*

*"Indus. Am.," Inc. v. Fulton Indus., Inc.*,
  285 A.2d 412 (Del. 1971) ...................................................................................12

*In re Mallinckrodt PLC*,
  639 B.R. 837 (Bankr. D. Del. 2022) ...................................................................6, 8

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513 (1984) ............................................................................................3

*In re Number Holdings, Inc.*,
  ECF No. 1733, No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) .......................14

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ...............................................................................9, 10, 13

*In re Serta Simmons Bedding, L.L.C.*,
  125 F.4th 555 (5th Cir. 2025), *as revised* (Jan. 21, 2025) ........................................6

*In re Stein Mart, Inc.*,
  629 B.R. 516 (Bankr. M.D. Fla. 2021) ............................................................13, 14

*In re SunEdison, Inc.*,
　576 B.R. 453 (Bankr. S.D.N.Y. 2017) ...................................................11, 12, 13, 15

*Tatko v. Sheldon Slate Prods. Co.*,
　769 N.Y.S.2d 626 (App. Div. 2003) ......................................................................12

*In re Teligent, Inc.*,
　282 B.R. 765 (Bankr. S.D.N.Y. 2002) ....................................................................7

*In re The Container Store Grp., Inc.*,
　No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) ..........................................14

*United States v. Energy Res. Co.*,
　495 U.S. 545 (1990) ...............................................................................................3

*Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*,
　419 F.3d 83 (2d Cir. 2005) .....................................................................................5

*Weiss v. Macy's Retail Holdings Inc.*,
　265 F. Supp. 3d 358 (S.D.N.Y. 2017), *vacated*, 741 F. App'x 24 (2d Cir.
　2018) ..............................................................................................................12, 13

**Statutes**

11 U.S.C. § 1123(b)(6) ...............................................................................3, 4, 15

11 U.S.C. § 1125 ...............................................................................................7

11 U.S.C. §1129(a)(7)(A)(i) ...........................................................................16

11 U.S.C. § 1141(a) ..........................................................................................5

**Other Authorities**

U.S. Const., art. I, § 8, cl. 4 .............................................................................5

Fed. R. Bankr. P. 3017(d) .................................................................................7

Fed. R. Civ. P. 12(h) .........................................................................................7

Fed. R. Civ. P. 23 ..............................................................................................9

Fed. R. Civ. P. 55(a) .........................................................................................7

Restatement of the Law of Contracts § 55 (Am. Law Inst. 1932) ...................12

Restatement (Second) of Contracts § 55 (Am. Law Inst. 1964)....................................................12

Restatement (Second) of Contracts § 17 (Am. Law Inst. 1981).......................................................6

Restatement (Second) of Contracts § 19 (Am. Law Inst. 1981).............................................11, 12

THOMAS H. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW
    (Beard Books 2001) (1986) ......................................................................................................5

The above-captioned debtors and debtors in possession (collectively, "GOL" or the "Debtors")[1] submit this reply brief (the "Reply") in response to the limited objection of the Securities and Exchange Commission (the "SEC") [ECF No. 1251] (the "SEC Objection") and the objection of the United States Trustee (the "UST" and, together with the SEC, the "Objectors") [ECF No. 1253] (the "UST Objection" and, together with the SEC Objection, the "Objections"), and in further support of the Debtors' opening brief [ECF No. 1229] (the "Opening Brief"), submitted in accordance with the Court's December 16, 2024 order [ECF No. 1158] regarding the releases and exculpation provisions set forth in the Plan.

## PRELIMINARY STATEMENT

1.      Longstanding and well-reasoned authority left undisturbed by the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) ("*Harrington*") counsels in favor of approving the release and exculpation provisions of the Plan. While *Harrington* held that non-consensual releases may not be included in a chapter 11 plan, it did not change the standards under which consensual releases or exculpation provisions are evaluated.

2.      Each of the UST and the SEC contend that the opt-out release mechanism within the Plan is not a consensual release, notwithstanding the fact that the overwhelming weight of precedent from within this District and elsewhere is to the contrary. The Objectors premise their objections to the consensual nature of the Plan's third-party releases on principles of contract interpretation. The Debtors contend that federal law, rather than state contract law, is the appropriate framework under which to evaluate whether a release is consensual—but even within

---

[1] Capitalized terms not defined herein have the meanings given them in the *Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and its Affiliated Debtor*, ECF No. 1239 (the "Plan") or the *Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and its Affiliated Debtors*, ECF No. 1240 (the "Disclosure Statement"), as appropriate.

the framework of contract law, the releases here enable affected parties to manifest assent. The Plan's opt-out release mechanism is consensual.

3.  Perhaps appreciating the infirmities in these arguments, the Objectors go further—they contend that even a *consensual* third-party release is not a permissible plan provision, and that this Court lacks the power to confirm a plan including a consensual third-party release. This position should be rejected. Not only would it call into question decades of settled law, it flatly contradicts the Supreme Court's endorsement of the inclusion of consensual third-party releases in chapter 11 plans in *Harrington*.

4.  The UST also objects to the exculpation provisions of the Plan, arguing that their application should be limited only to estate fiduciaries and contending that additional carve-outs are warranted. But guiding precedent from this District counsels in favor of extending exculpation to non-fiduciaries where such parties have made significant contributions to the cases, as here, and supports the carve-outs from exculpation already present in the Plan.

5.  For these reasons, and as discussed more fully herein, the Debtors respectfully request that the Objections be overruled.

## <u>REPLY</u>

## I.  CONSENSUAL THIRD-PARTY RELEASES ARE APPROPRIATE PROVISIONS OF CHAPTER 11 PLANS

6.  The Objectors contend, incredibly, that *consensual* third-party releases are not appropriate provisions to include in a chapter 11 plan.[2] This is not the case. The Bankruptcy Code and federal law permit the inclusion of a wide variety of appropriate provisions in chapter 11 plans, and *Harrington* affirms the propriety of consensual releases within such a plan.

---

[2] *See, e.g.*, UST Obj. at 2 (a bankruptcy court "'can acknowledge the parties' agreement' to a third-party release, but the authority for consensual releases is the agreement itself, not the Bankruptcy Code" (quoting the UST's colloquy at oral argument in *Harrington*)).

7.      In its objection, the UST observes that "there is no definition in the Bankruptcy Code for a 'consensual third-party release'" and that "no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to deem a non-debtor to have consented to an agreement to release claims against other non-debtors." UST Obj. at 8.[3] Not so. The Bankruptcy Code authorizes plans to include "any . . . appropriate provision not inconsistent with the applicable provisions of this title," even if such power is not otherwise explicitly enumerated. 11 U.S.C. § 1123(b)(6); *see also United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

8.      True, section 1123 of the Bankruptcy Code does not explicitly state that chapter 11 plans may contain consensual third-party releases. But this does not end the analysis. Congress built significant flexibility into section 1123(b)(6) of the Bankruptcy Code, enabling chapter 11 plans to include "*any* other appropriate provision" not otherwise inconsistent with the applicable portions of the Bankruptcy Code. 11 U.S.C. § 1123(b)(6) (emphasis added). This works to promote the "policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525 (1984). Such broad, permissive authority is necessary to enable parties to a chapter 11 case to address myriad issues unique to specific debtors or otherwise not susceptible to easy enumeration. The Bankruptcy Code must be nimble enough to meet the restructuring needs of companies and individuals, massive conglomerates and single asset debtors, international airlines and mom-and-pop establishments. It is impossible (let alone impractical) to charge Congress with identifying every potential appropriate plan provision.

9.      *Harrington*'s discussion of section 1123(b)(6) of the Bankruptcy Code does not counsel differently. The Supreme Court found section 1123(b)(6) to be an insufficient textual basis

---

[3] The SEC makes a similar suggestion. *See* SEC Obj. ¶ 9 (suggesting "a third-party release is not an 'appropriate provision' in a Chapter 11 plan").

on which to find the Bankruptcy Code authorized **non-consensual** third-party releases. *Harrington*, 603 U.S. at 215-21. But it also endorsed the propriety of consensual third-party releases within chapter 11 plans—it was careful to note that its decision should not "call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan." *Id.* at 226 (emphasis in original). Because *Harrington* recognizes that consensual third-party releases may be included in chapter 11 plans and declines to disturb decades of case law so holding, it follows that such provisions are authorized by section 1123(b)(6).

10.    The only question appropriate for a bankruptcy court to consider is whether a particular third-party release is consensual; that issue with respect to this Plan is discussed herein. But there is no *per se* prohibition on inclusion of consensual releases in a chapter 11 plan.

## II.    FEDERAL LAW, NOT CONTRACT LAW, SHOULD GOVERN WHETHER THIRD-PARTY RELEASES ARE CONSENSUAL

11.    Objectors contend that state contract law is the only appropriate framework through which to evaluate whether plan releases are consensual. But a contract law framework is unhelpful here. The UST contends that third-party releases contained within a chapter 11 plan are contracts separate and distinct from the plan itself, and therefore must be evaluated under state contract law. But this misunderstands the relationship between a third-party release and the chapter 11 plan of which it is a part.

12.    The Plan is an integrated package of bargained-for consideration of which the third-party releases form an essential piece. The Released Parties, including Abra, have agreed to significant compromises and settlements that enable other stakeholders to receive meaningful recoveries.[4] A key element of the global settlement embodied in the Plan is the releases among the

---

[4] The UST contends that the definition of Released Parties reaches too broadly. *See* UST Obj. at 6. The Opening Brief and this Reply provide the legal basis for the Plan's releases; the Debtors reserve the right to defend the factual basis for application of these provisions to specific, individual parties at the appropriate time.

parties supporting the Plan, and the opportunity for other parties to give those same releases (or to decline to do so). The releases are not individual contracts; they are one component of the carefully (and heavily) negotiated agreement embodied in the Plan.

13.    Nor is the Plan itself a contract. Though courts may call upon and incorporate state law contract interpretation canons to analyze the effect of confirmed chapter 11 plans, such plans carry the force of *law*. They are scrutinized, confirmed, and ordered by a federal court, and bind all affected parties whether or not they have accepted the plan.[5] The court issuing an order confirming the plan is imbued with authority flowing from the Constitution,[6] and places its imprimatur on the plan, in its entirety, in a duly-noticed proceeding based on well-defined standards. Chapter 11 plans should therefore be considered as a whole and evaluated similarly to other forms of judicial relief.

14.    Moreover, attempting to view a plan or individual provisions thereof through a contract law lens presents a number of difficulties. Start with contract formation. In a simple contract, parties are free to engage with other parties or to refrain from doing so. Not so in bankruptcy. Creditors are forced into the bankruptcy proceeding where their rights in connection with their relationship to the debtor are restructured. *See Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*, 419 F.3d 83, 96 (2d Cir. 2005) ("A primary goal of bankruptcy law is to centralize adjudication of a bankrupt's estate into a single court."); THOMAS H. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 12–13 (Beard Books 2001) (1986) ("Bankruptcy provides a way to make . . . diverse individuals act as one, by imposing a *collective* and *compulsory*

---

[5] *See* 11 U.S.C. § 1141(a).

[6] *See* U.S. Const., art. I, § 8, cl. 4.

proceeding on them.").[7] Creditors may forfeit their rights if they refuse to engage in these collective proceedings. *See In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022) ("Within the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim. Additionally, if a claim objection is filed and the claimant fails to respond, the claim is disallowed. There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization.").

15.     Similarly, when determining whether a contract has been formed, courts look to whether there was a binding offer, acceptance, and consideration to support it.[8] Not so in bankruptcy. Instead, the bankruptcy court determines whether all Congressionally-mandated confirmation requirements are met and then orders the appropriate relief.  *See Harrington*, 603 U.S. at 214 ("Under Chapter 11, the debtor can work with its creditors to develop a reorganization plan governing the distribution of the estate's assets; it must then present that plan to the bankruptcy court and win its approval." (citing 11 U.S.C. §§ 1121, 1123, 1129, 1141)). There is no offer that any single stakeholder may unilaterally reject or accept. Instead, a chapter 11 plan is either approved or rejected based on a class-wide vote, which binds minority creditors to a plan to which they did not consent. And often, a chapter 11 plan provides no consideration to the parties that it binds—this absence of consideration would be wholly insufficient to support a contract at common law. A chapter 11 plan might not be "binding" under a state contract law analysis at all.

---

[7] Further, a bankruptcy case may not be limited solely to matters between the debtor and its creditors. A court sitting in bankruptcy has jurisdiction over matters that are "related to" the debtor or "touch on the administration of the estate" (subject to enumerated exceptions), including disputes among non-debtors that relate to the debtors or their estates. *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 572 (5th Cir. 2025), *as revised* (Jan. 21, 2025) (vacating order dismissing claims brought by one creditor group against another creditor group for prepetition misconduct and remanding back to the bankruptcy court for further proceedings).

[8] Restatement (Second) of Contracts § 17 (1981) (formation of contract requires manifestation of mutual assent).

But it is beyond dispute that a court's confirmation order is binding on all parties in interest. Chapter 11 plans, and the provisions they are permitted to contain, should not be evaluated under a contract framework.

16.    While chapter 11 plans do not resemble common contracts, they share numerous features with other judicial proceedings that require parties to respond to process. For example, in a federal lawsuit, a plaintiff will serve a complaint on a defendant under Federal Rule of Civil Procedure 4. After being properly served, a defendant must answer or move to dismiss the complaint within the relevant period or risk consequences: if the defendant files nothing, the court may enter a default judgment for the plaintiff; if the defendant fails to timely raise certain defenses, it may be deemed to waive them. *See* Fed. R. Civ. P. 12(h), 55(a); *e.g.*, *Como v. Com. Oil Co.*, 607 F. Supp. 335, 342 (S.D.N.Y. 1985) (explaining that "if a party fails to raise a venue objection promptly, he waives it"). The authority for this result does not emanate from state contract law; it emanates from the authority and jurisdiction vested in the federal courts.

17.    The same is true for chapter 11 plans. Creditors must be served with a solicitation package containing adequate information to enable them to evaluate the proposed plan. *See* 11 U.S.C. § 1125; Fed. R. Bankr. P. 3017(d). Upon adequate service, creditors are obligated to act based on the solicitation materials or risk consequences: the court may confirm the plan in a creditor's absence, and a creditor may be deemed to waive any objection to the solicited plan. *See In re Teligent, Inc.*, 282 B.R. 765, 772 (Bankr. S.D.N.Y. 2002) (in discussing failure to object to treatment of administrative claims, observing that "one's general right to remain silent in the face of an offer should be subject to question and reconsideration where passivity will threaten the fundamental goals of bankruptcy—rehabilitation, saving jobs and equality of distribution."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 259-63 (Bankr. S.D.N.Y. 2007) (in a large chapter 11

7

case, classes where no creditors voted could be deemed to accept the plan where the plan expressly

so provided). Failure to act may extinguish a creditor's claim against the debtor or may reduce the

amount the creditor will recover on its claim. Similarly, that failure to act may release debtor-

related claims the creditor might hold against third parties. Just as in a federal civil action, the

creditor may act to preserve its rights (including by opting out of a third-party release), but failing

to respond at all carries consequences. *See Mallinckrodt*, 639 B.R. at 879 (likening failure to

respond to bar date notice to failure to respond to properly-noticed releases).

18.    Objectors argue that, notwithstanding these obvious similarities with other judicial

proceedings, a bankruptcy court has no power to confirm a plan containing an opt-out release

because this kind of relief—the release of a claim between non-debtors—is not justified on the

face of the pleadings, as it would be in an ordinary default judgment context. *See* UST Obj. at 19.

Again, this is not the case. Like default judgments issued in other judicial proceedings, the basis

for this relief is evident from the materials provided to affected parties. Consensual third-party

releases are bargained-for provisions of a plan that are fully disclosed (and the justifications for

which are described) in the solicitation package.

19.    As chapter 11 plans bear a strong resemblance to judicial proceedings and little

resemblance to state law contracts, such plans should be evaluated under federal law, rather than

contract law, principles.[9] As a permissible and widely-utilized feature of chapter 11 plans, a third-

party release contained within such a plan should, too, be evaluated under federal law.

## III.    CONSENT MAY BE PROCURED THROUGH AN OPT-OUT MECHANSIM

20.    An opt-out mechanism enables affected parties to demonstrate consent to third-

party releases. Objectors attempt to distinguish directly applicable Supreme Court guidance and

---

[9] The Debtors' Opening Brief set forth a number of further reasons to apply federal, rather than state, law to this
question, which the Debtors will not repeat here. *See* Opening Br. ¶¶ 9-17.

cite cases endorsing the minority view, which insist that a contractual framework compels a different result. Each argument fails; the opt-out mechanism proposed here ensures that the Plan's third-party releases are consensual.

### a. The Supreme Court Instructs that Opt-Out Mechanisms Enable Parties to Demonstrate Consent

21.    The Supreme Court has spoken directly to what constitutes consent in the context of a judicial proceeding. In determining whether absent plaintiffs consented to the jurisdiction of a Kansas state court, the Supreme Court addressed "the essential question" of "how stringent the requirement for a showing of consent will be." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  The Supreme Court rejected the exact argument Objectors raise here—that to consent to the state court's jurisdiction, each plaintiff must have "affirmatively" opted *in*—and held instead that consent is demonstrated "where a fully descriptive notice is sent first-class mail to each class member, with an explanation of the right to 'opt *out*.'" *Id.* at 812 (emphasis added).

22.    Objectors ignore *Shutts*. Instead of engaging with the high court's express holding, the UST notes in passing that "class action theories have no application here." UST Obj. at 11 n.11. This misunderstands *Shutts*. Although the case arrived at the Court as an appeal from a judgment affirming a class action settlement, its holding has little to do with the class nature of the proceeding.[10] The holding concerns whether a state court may exercise jurisdiction over absent, out-of-state plaintiffs *based on such parties' consent* to the court's jurisdiction.[11] Because the

---

[10] The UST lists a number of cases holding that class action proceedings are required to comply with Rule 23. *See* UST Obj. at 11-13. But the Debtors are neither prosecuting a class action nor asking the Court to approve a class action settlement. These cases are irrelevant to whether the Plan's releases are *consensual* third-party releases.

The UST also suggests that class action procedures include important due process safeguards to protect absent class members. But the UST does not object to the consensual third-party releases in the Plan on due process grounds, and argues only that the releases are not authorized under state contract law. *See* UST Obj. at 7-11.

[11] *Shutts*, 472 U.S. at 806, 812 ("Reduced to its essentials, petitioner's argument is that unless out-of-state plaintiffs affirmatively consent, the Kansas courts may not exert jurisdiction over their claims. . . . Any plaintiff may consent to jurisdiction. The essential question, then, is how stringent the requirement for a showing of consent will be.").

Supreme Court found that opt-out procedures procured the absent parties' consent, it held that the state court properly exercised jurisdiction over consenting parties. *Id.* at 814. The holding turned directly on whether an opt-out mechanism procured the consent of affected parties—precisely the issue here. The Court should reject the UST's attempt to distinguish this directly applicable guidance.

> **b. Even if Analyzed Through a Contractual Framework, Opt-Out Releases Give Rise to a Duty to Speak and Bind Absent Creditors**

23.    Objectors rely on cases endorsing what has become the minority view on this issue: that opt-out releases are not consensual when viewed under principles of state contract law. As discussed above, a contractual law framework is ill-fitted to the bankruptcy context; for that reason, these cases rest on infirm grounds and should not be followed. But even if viewed within a contractual framework, an opt-out mechanism may indeed procure the consent of affected parties to a third-party release—for even under contract law, a failure to act may indeed imply consent when a party has a duty to act.

24.    One case on which Objectors rely heavily is *In re Chassix Holdings, Inc.*, 533 B.R. 64 (Bankr. S.D.N.Y. 2015).[12] There, Judge Wiles observed that consent through negative notice, when it is commonly understood that many parties never read solicitation materials sent to them, is largely a "legal fiction." *Id.* at 81.  Accordingly, imputing consent to those parties deemed to reject "would stretch the meaning of 'consent' beyond the breaking point." *Id.*

---

[12] In *Chassix*, the initial proposed plan was structured such that claimants who rejected the plan were deemed to consent to the releases unless they affirmatively checked a box to opt out. *See id.* at 77. Claimants that were not entitled to vote on the plan (either because they were unimpaired or deemed to reject the plan) were also deemed to consent to the releases and did not receive an opt-out form. *See id.* Claimants that were deemed to reject the plan could opt in to the releases but were not otherwise deemed bound by them. *See id.* at 79. Judge Wiles found that the releases were consensual with respect to (i) parties that voted to accept the plan and (ii) those that rejected the plan but opted in to the releases; however, Judge Wiles found that regardless of whether the parties were impaired under the plan, they could not be deemed to consent to releases absent some affirmative action. *See id.* at 82.

25.    There is a host of case law disagreeing with this approach; at best, *Chassix* should be viewed as an outlier on this issue. *See* Opening Br. ¶¶ 22-23. But even Judge Wiles agrees that there is no categorical bar to opt-out releases. *See Chassix*, 533 B.R. at 79 ("Circumstances may justify a different approach in different cases."). Further, he did not consider state law in determining the question of consent, and expressly limited his concerns to the case before him based on circumstances not present here that render *Chassix* distinguishable. There, most unsecured creditors stood to receive only a *de minimis* recovery, and the remaining creditors largely supported the plan (meaning its confirmation was a virtual certainty). The court believed that these factors would prompt an "even higher-than-usual degree of inattentiveness or inaction among affected creditors." *Id.* at 80. This case is markedly different. Meaningful recoveries are available through the Plan, even for unsecured creditors, and stakeholders have reason to be (and in fact have been) attentive and active parties. The risk of inattentiveness present in *Chassix* is thus significantly mitigated here.[13]

26.    The other case from this District most frequently cited throughout the Objections is *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017). The *SunEdison* plan offered *no* opportunity to opt out, and its releases were markedly different than those here for that reason alone. *See id.* at 460 n.8 ("the Plan does not allow creditors to opt out of the Release"). Even setting this significant distinction aside, there are further reasons to disagree with *SunEdison*'s reasoning. *SunEdison* correctly recites the contractual principle that "[a]bsent a duty to speak, silence does not constitute consent," and further correctly cites section 19 of the Restatement of Contracts as stating that consent "may be express or manifested by conduct." *Id.* at 548. But it fails to note that

---

[13] The *Chassix* plan also provided that if a class of unsecured creditors did not approve the plan, all distributions to unsecured creditors would be cancelled. Accordingly, there was a risk that a party voting for the plan, and thereby consenting to the releases, would receive no consideration at all based on dynamics unknowable to the creditor at the time of voting. *See id.* Not so here; no creditor is at risk of forfeiting its distribution if its class votes to reject the Plan.

the very same section of the Restatement also counsels that a "*failure to act*" may manifest assent. Restatement (Second) of Contracts § 19(1) ("The manifestation of assent may be made wholly or partly by written or spoken words or by other acts *or by failure to act*.") (emphasis added).[14] A "failure to act" is therefore not mere silence—instead, a party's failure to act when it has been compelled to do so in order to protect its rights may imply (or a court may infer) consent.[15]

27.    The *SunEdison* court acknowledged three exceptions to the purported maxim that silence is not consent: (i) where supported by the parties' course of conduct; (ii) where the offeree accepts the benefits of the offer despite a reasonable opportunity to reject them and understands that the offeror expects compensation; and (iii) where the offeror has given the offeree reason to understand that silence will constitute acceptance and the offeree in remaining silent intends to accept. *See SunEdison*, 576 B.R. at 459.[16] *SunEdison* found that the Debtors had not established

---

[14] The Restatement is not binding law. *See* Opening Br. ¶ 15. To the extent the Restatement is instructive, it should be noted that the Restatement's development reflects a shift away from requiring an offeree to manifest an intent to accept an offer through action, and towards requiring the offeree to manifest an intent not to accept an offer through action. *See "Indus. Am.," Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415-16 (Del. 1971) ("The clear trend and development of the law in this connection is demonstrated by a proposed change in the status of Section 55 of the Restatement of Contracts (1932). A comparison of the 1932 and the 1964 versions of Section 55 indicates that under the currently developing rule of law, an offer that invites an acceptance by performance will be deemed accepted by such performance unless there is a manifestation of intention to the contrary. . . . [I]n the establishment of a contractual obligation, the *favored rule shifts the emphasis away from a manifestation of intent to accept to a manifestation of intent not to accept*." (footnotes and citations omitted)) (emphasis added). That shift is consistent with rejecting an opt-in mechanism as a necessary condition for determining consent to be bound to a third-party release in a chapter 11 plan in favor of an opt-out mechanism.

[15] This is certainly true under New York law (which the UST here suggests may be the governing law, *see* UST Obj. at 15 n.16). For example, the New York Supreme Court, Appellate Division has found that a shareholder-plaintiff waived its contractual rights to bonuses authorized by defendants through a failure to act to claim them. *Tatko v. Sheldon Slate Prods. Co.*, 769 N.Y.S.2d 626, 628 (App. Div. 2003). There, the court reasoned that because the plaintiff knew or had notice of its rights and failed to act on them, the plaintiff manifested an intent not to claim those rights, and waived them. *Id.* at 629 ("While waiver requires the voluntary and intentional abandonment of known rights, it is established here by a failure to act that evinces an intent not to claim those rights." (citing *AXA Glob. Risks U.S. Ins. Co. v. Sweet Assocs.*, 755 N.Y.S.2d 759 (2003)); *see also AXA*, 755 N.Y.S.2d at 760 (holding a party's failure to object to a shortened cure period may result in a waiver of its right to the longer cure period in the original contract).

[16] The case *SunEdison* relies on for these three exceptions was subsequently overturned. *See id.* (citing *Weiss v. Macy's Retail Holdings Inc.*, 265 F. Supp. 3d 358 (S.D.N.Y. 2017), *vacated*, 741 F. App'x 24 (2d Cir. 2018). *Weiss* addressed whether an employee was bound to an arbitration contract by failing to sign and return an opt-out form. After discussing the Restatement's rules, the district court found that the employee's "silence and inaction upon receipt of the Election Form did not operate as acceptance," and that nothing in the employer's information "stated or otherwise

that any of these exceptions applied, and further noted that "there are other plausible inferences that support" silence not signifying intent—namely, the meager recoveries certain creditors could expect. *Id.* But even assuming none of the aforementioned exceptions applied (which is not the case here),[17] the *SunEdison* court failed to grapple with yet another well-recognized exception: that there may be a duty to act in a ***duly-noticed judicial proceeding***. This is a context in which there is a long history of treating inaction as sufficient to deem consent to a litigation outcome. *See* Opening Br. ¶¶ 21 n.21, 22-23. As the Supreme Court instructs, when parties fail to respond to legal notices that disclose how their silence will be interpreted for purposes of litigation, it is reasonable to take their silence as acceptance of the specified outcome. *See Shutts*, 472 U.S. at 813; Opening Br. ¶ 21; *supra* III.A. *SunEdison* thus erred in failing to distinguish a third-party release in a  properly noticed and solicited chapter 11 plan from a contract among strangers. *Cf. SunEdison*, 576 B.R. at 458 ("[T]he offeror cannot ordinarily force the other party into a contract by saying, 'If I do not hear from you by next Tuesday, I shall assume you accept.'").

28.     Even a contractual analysis, therefore, should result in the conclusion that opt-out releases are consensual. For example, in *Stein Mart*, the UST and the SEC alleged that the opt-out third-party releases in a proposed plan were non-consensual. *See In re Stein Mart, Inc.*, 629 B.R. 516 (Bankr. M.D. Fla. 2021). The court disagreed. Applying state contract law, the court held that "the decision to return or not return the Opt-Out Form is an absolute and unconditional acceptance

---

implied that agreeing to arbitrate employment-related disputes was mandatory or a condition of continued employment." *Weiss*, 265 F. Supp. at 360, 365. The Second Circuit disagreed, finding that the employee's "failure to send back the opt-out form and his continued working for [the employer], bound him to arbitrate his dispute." *Weiss*, 741 F. App'x at 27. Thus, *SunEdison*'s reliance on the district court's *Weiss* decision finding silence in the face of an opt-out provision to be an insufficient manifestation of assent should be given no weight.

[17] There is certainly reason to find that at least *SunEdison*'s third exception (where the offeror has given the offeree reason to understand that silence will constitute acceptance) is applicable in the context of a conspicuously-noticed third-party release disclosed in a duly-solicited plan of reorganization. Indeed, this degree of notice is designed for the express purpose of giving the recipients reason to understand that their inaction will have consequences.

or rejection of the offered release. The non-return of the form indicates acceptance of the terms offered, in the mode and manner prescribed in the Third-Party Release." *Id.* at 523. The court then noted that "this mode and manner of acceptance essentially mimics the bankruptcy court's own negative-notice procedure" and that the third-party release was "fundamentally consensual in nature." *Id.* at 523-24. Even when analyzing an opt-out release mechanism under contract law, opt-out releases have indeed been found to be consensual.

### c. The Majority View that Opt-Out Releases Are Consensual Continues to Be Endorsed Post-*Harrington*

29.     It bears repeating that the overwhelming weight of authority counsels in favor of finding that an opt-out mechanism for third-party releases in a chapter 11 plan renders such releases consensual. The Opening Brief identified legions of cases so holding, both before and after *Harrington. See* Opening Br. ¶¶ 19 n.15, 20 n. 16-17. Even following the filing of that brief, several additional cases have so found. Confirmation Hr'g Tr. 93:17-23, ECF No. 572, *In re CareMax, Inc.*, No. 24-80093 (MVL) (Bankr. N.D. Tex. Jan. 28, 2025) (attached hereto as **Exhibit A**) (explaining ballots and opt-outs were designed to admonish recipients of "a duty to act"); Confirmation Hr'g Tr. 17:15-16, *In re Number Holdings, Inc.*, ECF No. 1733, No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) (attached hereto as **Exhibit B**) (holding opt-out releases were "consensual"); Confirmation Hr'g Tr. 43:3-7, ECF No. 181, *In re The Container Store Grp., Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) (attached hereto as **Exhibit C**) (same); *see also* Confirmation Hr'g Tr. 20:17-21, *In re Digital Media Solutions, Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Jan. 15, 2025) (attached hereto as **Exhibit D**) (same). It continues to be well-settled law that an opt-out third-party release is a consensual release, appropriate for inclusion in a chapter 11 plan.

## IV.   CREDITORS AFFIRMATIVELY VOTING IN FAVOR OF THE PLAN SHOULD BE DEEMED TO CONSENT TO THIRD-PARTY RELEASES

30.    The UST Objection also contends that an affirmative vote for the Plan, without more, may not constitute consent to the Plan's third-party releases—even if the consequence of such a vote is (as will be here) unambiguously and conspicuously disclosed. The UST contends that the "mere act of voting on the chapter 11 plan does not manifest an intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors, and that "a person cannot be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan." UST Obj. at 21, 23.  This is not the case.

31.    First, as discussed above, section 1123(b)(6) of the Bankruptcy Code governs what provisions may be included in a chapter 11 plan and takes a flexible and permissive view on what may appropriately be included. Contrary to the UST's contention that "nothing in the Bankruptcy Code . . . authorizes" this provision (UST Obj. at 20), it is the absence of a prohibition that is relevant here. Any provision that complies with Section 1123(b) may be included in a chapter 11 plan; a court must confirm a plan that complies with the requirements of Section 1129, including a conspicuously-disclosed provision that describes the consequences of voting in favor of the plan.

32.    Second, the "mere act of voting on the chapter 11 plan" (UST Obj. at 20), when performed in the face of conspicuous, judicially-sanctioned disclosure of the consequences of doing so, *is precisely the kind of act* that manifests consent to the consequences of that act. A vote for the plan in these circumstances constitutes unambiguous, affirmative consent to the plan and all of its provisions. Even decisions adopting the minority view and applying contract law principles to this analysis agree. *See SunEdison,* 576 B.R. at 458 ("Courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to the release." (collecting cases)).

33.     The UST puts it perfectly: "a plan is a package deal." UST Obj. at 23. A creditor cannot vote in favor of the provisions it likes and vote to reject the others that it does not. If creditors do not like the plan, they are free to vote to reject it (and to opt-out of the third-party releases). But creditors are not permitted to accept the plan's benefits while rejecting any terms they dislike.

34.     Finally, the UST argues (without citation) that requiring a creditor to accept a non-debtor release if it votes in favor of the Plan is inconsistent with section 1129's instruction that a chapter 11 plan must provide impaired creditors with at least as much value as they would receive in a chapter 7 liquidation. This requirement, however, only applies to creditors that do not vote to accept the Plan. *See* 11 U.S.C. § 1129(a)(7)(A)(i). Moreover, the Debtors' liquidation analysis demonstrates that each class is receiving at least as much value as it would through a chapter 7 liquidation.[18]

## V.     THE PLAN'S EXCULPATION PROVISIONS ARE WARRANTED AND APPROPRIATELY TAILORED

35.     Finally, the Plan's exculpation provisions are comfortably within the bounds of similar provisions approved by courts in this District and are warranted in the circumstances present here. The Plan's exculpation provision covers actions directly related to the Debtors' restructuring and excludes claims arising from (i) post-Effective Date obligations or liabilities other than in connection with implementation of the Plan, and (ii) any acts or omissions conclusively determined to constitute willful misconduct, intentional fraud, or gross negligence. *See* Plan IX.F. It covers estate fiduciaries and certain prepetition note trustees; at present, it also

---

[18] *See* Disclosure Statement, Ex. C (Liquidation Analysis). This argument also presupposes that the third-party claims creditors are agreeing to release through the Plan are necessarily worth more than the incremental value those same creditors will receive under the Plan. This position is, at very best, highly speculative.

applies, to the extent provided in section 1125(e) of the Bankruptcy Code, to Abra and to related parties of all of the foregoing. *See id.* at 1.A.111 ("Exculpated Parties").[19]

36.    The UST would modify the Plan's exculpation provisions in two ways: (i) by limiting exculpation to estate fiduciaries, and (ii) by adding carve-outs for constructive fraud, bad faith, breach of fiduciary duty, and legal malpractice. Yet the UST's argument in favor of these additional limitations—that section 1125 of the Bankruptcy Code contemplates only a very narrow exculpation—would also prohibit exculpation of ***any*** person (including estate fiduciaries) for ***any*** action taken in connection with chapter 11 cases other than those expressly enumerated in section 1125(e) (*i.e.*, soliciting votes on a plan or issuing securities in connection with a plan). The UST acknowledges this, "assuming," without agreeing, that exculpation may "properly be imposed beyond the narrow circumstances contemplated by 11 U.S.C. § 1125." UST Obj. at 24.

37.    This broad position—that exculpation is never appropriate, for anyone, except in exceedingly narrow circumstances—cannot support the further tailoring of the Plan's exculpation provisions the UST requests here. Taken to its logical conclusion, the UST's position is that the exculpation provisions approved in scores of bankruptcy cases—even those cited in the UST Objection[20]—are inappropriate. As courts almost unanimously extend exculpation beyond only

---

[19] Negotiations regarding the Plan continue; given the significant contributions that Abra and certain other parties have made and continue to make to these cases, the Debtors may determine to amend the Plan to include these parties as "Exculpated Parties" to the full extent of the exculpation provision (*i.e.*, not limited to the extent provided in section 1125(e)). As discussed herein, parties making significant contributions to chapter 11 cases—particularly parties that perform under court orders (DIP financing, plan transactions, etc.)—are entitled to exculpation in connection with conduct related to the chapter 11 cases.

[20] All of the cases cited in the UST Objection extend exculpation beyond the narrow limits of section 1125(e). *See, e.g.*, *In re Highland Capital Mgmt., L.P.*, 48 F.4th 419, 427 (5th Cir. 2022) (exculpating acts in connection with, *inter alia*, "the filing and administration of the case," "the consummation, implementation, and funding of the Plan," and "any related negotiations, transactions, and documentation"); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (exculpating "any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan"); *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 702 (E.D. Va. 2022) (noting exculpation would be appropriate where "limited to acts and omissions taken in connection with the bankruptcy case").

17

what is expressly enumerated in section 1125, the Court should give this ill-supported argument little weight.

38.    The UST correctly notes that certain courts require plan exculpation provisions to apply only to estate fiduciaries. *See* UST Obj. at 25-26. But the UST also acknowledges that other courts (including within this District) hold differently and extend the protections of plan exculpation to other "essential participants in the plan process." *Id.* at 25 (citing *In re Aegean Marine Petroleum Network Inc.,* 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019) (extending exculpation protections beyond estate fiduciaries); *Blixseth v. Credit Suisse,* 961 F.3d 1074, 1082 (9th Cir. 2020) (same)). The Court should follow the well-reasoned precedent from within this District and elsewhere finding that where appropriately tailored, as here, plan exculpation provisions may properly extend beyond estate fiduciaries.

39.    The parties exculpated under the Plan have engaged in the robust negotiations resulting in the Plan and are entitled to the limited protection the Plan's exculpation provision creates. Bankruptcy is contentious and litigious. Absent true wrongdoing or misconduct, disappointed parties should be discouraged from bringing retributive lawsuits against fellow participants in the bankruptcy process, particularly where those participants have made significant contributions to the cases. *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ("Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case."). While redress will be available for true wrongdoing, the Exculpated Parties should enjoy the protection that the Plan's exculpation provides for acts taken in connection with the Chapter 11 Cases. *See* Memorandum Decision on Confirmation of Plan, ECF No. 5900-1, at 112, *In re LATAM Airlines*

*Group S.A.*, No. 20-11124 (JLG) (Bankr. S.D.N.Y. June 7, 2022) ("In the absence of gross negligence or intentional wrongdoing on their parts, the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries, to bar claims against them as set forth in the Exculpation clause, and based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").[21]

40.     The UST would also amend the exculpation provision to carve out claims for "constructive fraud, bad faith, breach of fiduciary duty, and legal malpractice."[22] The UST does not offer support for this additional carveout; the carveouts within the Plan are in line with those approved by other courts and are appropriate here. *See Aegean*, 599 B.R. at 721 (approving exculpation provision containing a carve-out for "claims that are determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence"); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (confirming plan with an exculpation provision "exclud[ing] gross negligence and intentional misconduct").[23] Moreover, carving out claims for

---

[21] The UST also takes issue with the definition of "Exculpated Parties," finding it to be "overly broad." UST Obj. at 25. The Opening Brief and this Reply provide the legal basis for the Plan's exculpation provisions; the Debtors reserve the right to defend the factual basis for application of these provisions to specific, individual parties at the appropriate time.

[22] With respect to the UST's assertion that release of certain malpractice claims is prohibited under the New York Rules of Professional Conduct (*see* UST Obj. at 26), the Debtors recognize the truism that claims for future malpractice may not be exculpated, and do not contend that the exculpation provision here operates to do so. *See* 22 N.Y.C.R.R. § 1200 Rule 1.8(h).

[23] Several recent cases within this District confirmed plans with similar carve-outs over the UST's objection. *See, e.g.*, Order Confirming Amended Plan at 92, ECF No. 1736, *In re Genesis Global Holdco, LLC*, No. 23-20063 (SHL) (Bankr. S.D.N.Y. May 31, 2024) (confirming plan with exculpation provisions carving out "fraud, willful misconduct, or gross negligence" but providing that parties "shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan"); Order Confirming Plan at 90, ECF No. 5754, *In re LATAM Airlines Group S.A.*, No. 20-11154 (JLG) (Bankr. S.D.N.Y. June 7, 2022) (confirming plan with exculpation provisions carving out "willful misconduct, gross negligence, fraud or criminal acts" but providing that parties "shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, this Plan"); *see also* Order Confirming Plan at 78, 81, ECF No. 2300, *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) (confirming plan with exculpation provisions carving out "willful misconduct, intentional fraud, or gross negligence" but providing that parties "shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities") (UST's objection limited to the plan's releases, and did not address the plan's exculpation provisions).

bad faith and breach of fiduciary duty is inconsistent with the purpose of exculpation. Where parties have performed statutory or court-ordered duties, many of which have been accompanied by judicial findings of good faith and the proper exercise of business judgment, it makes little sense (and invites frivolous litigation) to preserve claims that would challenge the good faith that the court expressly found. *See Aegean*, 599 B.R. at 721 ("In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.").

## CONCLUSION

For the foregoing reasons, the Debtors respectfully submit that the release and exculpation provisions within the Plan are appropriate, particularly in light of the substantial weight of case law approving both the use of an opt-out release mechanism in similar circumstances and tailored exculpation provisions consistent with what is presented here.

[*Remainder of page intentionally left blank*]

Dated:  New York, New York
        February 6, 2025

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*