Andrew K. Glenn
Shai Schmidt
Naznen Rahman
**GLENN AGRE BERGMAN & FUENTES LLP**
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
Telephone: (212) 970-1600

*Counsel to Two Seas Global (Master) Fund LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 24-10118 (MG) |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*, | |
| | (Jointly Administered) |
| Debtors.[1] | |

**OBJECTION OF TWO SEAS GLOBAL (MASTER) FUND LP TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT; (II) APPROVING SOLICITATION AND VOTING PROCEDURES; (III) APPROVING FORMS OF BALLOTS; (IV) ESTABLISHING PROCEDURES FOR ALLOWING CERTAIN CLAIMS FOR VOTING PURPOSES; (V) SCHEDULING A CONFIRMATION HEARING; AND (VI) ESTABLISHING NOTICE AND OBJECTION PROCEDURES**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ................................................................................................... 2

    I.    The Disclosure Statement .................................................................................................. 2

    II.    The Abra Debt Exchange .................................................................................................. 4

    III.    Investigation and Settlement of Potential Estate Claims .................................................. 6

OBJECTION ................................................................................................................................ 7

RESERVATION OF RIGHTS ................................................................................................... 10

CONCLUSION ........................................................................................................................... 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie Des Monnaies, Ltd.)*,
   55 B.R. 253 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986), and *aff'd*, No. 86 Civ. 397 (JMW), 1986 WL 6230 (S.D.N.Y. May 27, 1986) ...................................................... 7

*In re Crowthers McCall Pattern, Inc.*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) ........................................................................................ 8

*In re Divine Ripe, L.L.C.*,
   554 B.R. 395 (Bankr. S.D. Tex. 2016) ....................................................................................... 9

*In re Ionosphere Clubs, Inc.*,
   179 B.R. 24 (S.D.N.Y. 1995) ..................................................................................................... 8

*In re PC Liquidation Corp.*,
   383 B.R. 856 (E.D.N.Y. 2008) ................................................................................................... 9

*In re Prudential Energy Co.*,
   59 B.R. 765 (Bankr. S.D.N.Y. 1986) ....................................................................................... 10

*In re Worldcom, Inc.*,
   Case No. M-47 HB, 2003 WL 21498904 (S.D.N.Y. June 30, 2003) ......................................... 8

*Kunica v. St. Jean Fin., Inc.*,
   233 B.R. 46 (S.D.N.Y. 1999) ..................................................................................................... 7

**Statutes**

11 U.S.C. § 547(b) ........................................................................................................................ 9

11 U.S.C. § 548(a)(1)(B) .............................................................................................................. 8

11 U.S.C. § 1125 ..................................................................................................................... 8, 10

11 U.S.C. § 1125(a)(1) .................................................................................................................. 7

11 U.S.C. § 1125(b) ...................................................................................................................... 7

Two Seas Global (Master) Fund LP ("Two Seas"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures; (Iii) Approving Forms of Ballots; (IV) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI) Establishing Notice and Objection Procedures* [Dkt. No. 1143] (the "Motion" and "Disclosure Statement," respectively).[2] In support of the Objection, Two Seas respectfully states as follows:

## PRELIMINARY STATEMENT[3]

The Court should not approve the Disclosure Statement because it does not contain adequate information that would allow a hypothetical investor holding a General Unsecured Claim, or any other class of claim, to make an informed judgment about the Plan.

The Disclosure Statement fails to provide adequate information in connection with at least two critical issues. *First*, it fails to disclose many important details concerning the investigation and settlement of potential estate claims, including potential claims against Abra, the Debtors' controlling shareholder and largest secured creditor, in connection with a pre-petition debt exchange that may give rise to estate fraudulent transfer and preference claims against Abra. The Disclosure Statement says nothing about the likelihood of success in litigating the claims, or the consideration paid by Abra in exchange for releases it would receive under the settlement. Nor does the Disclosure Statement provide information regarding the investigations of the

---

[2] On January 24, 2025, the Debtors filed the current versions of the *Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Dkt. No. 1239] (the "Plan") and the Disclosure Statement. [Dkt. No. 1240].

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan and the Disclosure Statement.

Restructuring Committee and the Committee into such claims and the results of those investigations.

*Second*, the Disclosure Statement does not provide any basis for the Plan's disparate treatment of unsecured noteholders. The Disclosure Statement omits the rationale behind concluding that holders of General Unsecured Claims should receive varying allocations of the General Unsecured Claimholder Distribution, including the significantly lower allocation for holders of the Perpetual Notes relative to the 2025 Notes.

By omitting this critical information, the Disclosure Statement does not describe key material terms of the Plan and therefore cannot be deemed to provide adequate information. Accordingly, the Court should not approve the Disclosure Statement.

## RELEVANT BACKGROUND

**I.     The Disclosure Statement**

1. The Debtors are one of Brazil's largest domestic airlines by market share and one of the leading low-cost carriers globally. *See* Disclosure Statement § II.A.I. On January 25, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

2. As of the Petition Date, the Debtors had approximately $2.2 billion in total funded debt obligations. *See id.* § II.B.2.

3. The Debtors' secured funded debt includes: (i) approximately $1.207 billion in outstanding Senior Secured Exchangeable Notes due 2028 (the "2028 ESSNs"); (ii) approximately $270 million in outstanding Senior Secured Notes due 2028 (the "2028 SSNs"); and (iii) approximately $251.17 million in outstanding 8.00% Senior Secured Notes due 2026 (the "2026 Notes"). *See id.* §§ II.B.2.i.

4. The Debtors' unsecured funded debt includes: (i) approximately $354.1 million in outstanding 7.000% Senior Notes due 2025 (the "<u>2025 Notes</u>"); (ii) approximately $140.2 million in 8.75% Perpetual Notes (the "<u>Perpetual Notes</u>"); and (iii) approximately $42.5 million in outstanding 3.75% Exchangeable Senior Notes due 2024 (the "<u>2024 Notes</u>"). *See id.* §§ II.B.2.ii.

5. The Debtors' majority owner and largest secured creditor is Abra,[4] which holds all of the $1.477 billion in outstanding 2028 SSNs and 2028 ESSNs (collectively, the "<u>2028 Notes</u>") as a result of the March 2023 Abra Debt Exchange (defined and described below). *See id.* §§ I.B, II.B.1.

6. Two Seas holds approximately $53 million of the outstanding 2025 Notes, approximately $35 million of the outstanding Perpetual Notes, and approximately $200,000 of the 2024 Notes.

7. On January 24, 2025, the Debtors filed the Plan and Disclosure Statement.

8. The Plan is predicated upon a global settlement (the "<u>Settlement</u>") among the Debtors, Abra, and the official committee of unsecured creditors (the "<u>Committee</u>").[5] The Settlement constitutes "the settlement of potential Causes of Action." *See id.* § V.D.1. As part of the Settlement, the Debtors, Abra, and the Committee executed a plan support agreement (the "<u>Plan Support Agreement</u>"), which incorporates a term sheet describing the terms of the Plan (the "<u>Restructuring Term Sheet</u>").[6] Pursuant to the Restructuring Term Sheet, the Plan provides for a mutual "release of all claims, interests, and causes of action between the Debtors, Abra, the Committee, members of the Committee (solely in their capacities as such), agents/trustees, related

---

[4] "<u>Abra</u>" is defined as Abra Group Limited, Abra Global Finance, Abra Kingsland LLP, and Abra Mobi LLP (and their respective successors). *See* Plan, Art. I.A.33.

[5] On February 9, 2024, the Office of the United States Trustee for Region 2 appointed the Committee. *See Notice of Appointment of Official Committee of Unsecured Creditors* [Dkt. No. 114].

[6] The Plan Support Agreement and the Restructuring Term Sheet are attached as Exhibit E to the Disclosure Statement.

3

parties and other persons to be agreed." Restructuring Term Sheet at 8. However, the Disclosure Statement fails to explain which claims or causes of action are subject to the Settlement.

9. In accordance with the Settlement, the Plan provides for various levels of recovery among unsecured noteholders. All General Unsecured Claims are grouped into Classes 9(a)-(m). *See* Disclosure Statement § V.B.2.ix-xxi. Holders of General Unsecured Claims will receive their allocated share of the General Unsecured Claimholder Distribution, defined to include New Equity valued up to approximately $235 million. *See id.* §§ I.B, IV.M. As part of this distribution scheme, holders of the Perpetual Notes are projected to recover 3.4% – 3.8%, holders of the 2025 Notes are projected to recover 18.8% – 20.8%, and holders of the 2024 Notes are projected to recover 0%. *See id.* § I.C.

10. The Restructuring Term Sheet discloses that the Debtors, Abra, and the Committee worked together to determine how to allocate the General Unsecured Claimholder Distribution among Class 9 claimants. *See* Restructuring Term Sheet at 3. The Disclosure Statement, however, does not explain the basis for that allocation.

## II.     The Abra Debt Exchange

11. In March 2023, the Company entered into a highly leveraged financing transaction whereby the Company's controlling shareholder, Abra, also became its largest secured lender (the "Abra Debt Exchange"). *See* Disclosure Statement §§ I.B, II.B.1.

12. First, Abra purchased the 2024 Notes, 2025 Notes, Perpetual Notes, and 2026 Notes (collectively, the "Purchased Notes") principally from members of an ad hoc bondholder group formed in February 2023. *See id.* § III.E. The majority of the Purchased Notes—the 2024 Notes, the 2025 Notes, and the Perpetual Notes—are entirely unsecured. *See id.* § II.B.2.ii. The 2026

4

Notes are secured by certain spare parts and the intellectual property of the Company (the "2026 Notes Collateral"). *See id.* § II.B.2.i.b.

13. Next, the Company cancelled the Purchased Notes and, in their place, issued to Abra the 2028 SSNs, the majority of which notes were later substituted for the 2028 ESSNs (as described below). *See id.* § III.E.

14. The Abra Debt Exchange dramatically improved Abra's position. It received approximately $1.477 billion of newly issued, secured 2028 Notes in exchange for largely unsecured claims. *See id.* §§ I.B, II.B.2.i.a. Moreover, the 2028 Notes accrue interest at a rate of 18%, which is substantially higher than the Purchased Notes for which they were exchanged: (i) 3.75% for the 2024 Notes; (ii) 7% for the 2025 Notes; (iii) 8.75% for the Perpetual Notes; and (iv) 8% for the 2026 Notes. *See id.* § II.B.2.

15. The 2028 Notes are secured by (i) liens on Smiles, the Debtors' loyalty program (the "Smiles Collateral"), and (ii) *pari passu* liens on the 2026 Notes Collateral. *See id.* § II.B.2.i.a. The Smiles loyalty program was previously unencumbered. Thus, as a result of the Abra Debt Exchange, the Company pledged approximately $3.7 billion in additional assets as collateral for the benefit of Abra.[7]

16. In September 2023, the Company converted approximately $1.2 billion of the 2028 SSNs into the 2028 ESSNs. *See id.* While both of the 2028 Notes carry substantially the same interest rates and security terms, the 2028 ESSNs contain an additional feature: the 2028 ESSNs allow Abra to exchange its debt for preferred shares of GLAI. *See id.* Abra thus obtained the right to additional control over the Company's capital structure while maintaining its secured position.

---

[7] On February 7, 2023, the Debtors publicly announced the Abra Debt Exchange, asserting that the Smiles collateral was worth approximately $3.7 billion and that the 2026 Notes collateral was worth approximately $1.5 billion.

5

17. The Company continued to have difficulty meeting its financial obligations after the closing of the Abra Debt Exchange. And less than a year after the Abra Debt Exchange, the Company commenced the Chapter 11 Cases.

### III. Investigation and Settlement of Potential Estate Claims

18. The Disclosure Statement describes certain investigations of potential estate claims relating to certain prepetition transactions, including the Abra Debt Exchange, by both a restructuring committee of GLAI's board of directors (the "Restructuring Committee") and the Committee. *See id.* §§ I.B, IV.D, IV.M.

19. The Debtors describe the Restructuring Committee's investigation as including a review of "potential estate claims," which "provided the support needed for the Restructuring Committee to formulate the proposed Plan and engage in negotiations among the Debtors, Abra, and the Committee that ultimately resulted in the Plan Support Agreement." *See id.* § IV.D.

20. The Disclosure Statement also describes an investigation conducted by the Committee concerning the Debtors' prepetition transactions. On July 12, 2024, the Committee provided the Debtors and Abra with "its list of potential claims," "***which the Committee believed could be asserted in connection with the Abra Debt Exchange among other potential claims and causes of action***." *See id.* §§ I.B, IV.M (emphasis added). The Committee's list is not attached to the Disclosure Statement.

21. Thereafter, the Debtors (led by the Restructuring Committee), Abra, and the Committee engaged in negotiations and determined that a settlement of such potential claims "would be in the best interest of the Debtors' stakeholders." *See id.* § IV.M.

22. The Disclosure Statement provides no information regarding the substance of the investigations by the Restructuring Committee and the Committee, including the information that

was made available, the nature of the claims that were investigated, and the conclusions that were reached. It also provides no insight into the negotiations between the parties to the Plan Support Agreement, much less the role played by Abra.

## **OBJECTION**

23. Section 1125(b) of the Bankruptcy Code requires that a plan proponent furnish stakeholders with "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" in order to solicit acceptances or rejections of a proposed chapter 11 plan. *See* 11 U.S.C. § 1125(b). "Adequate information" is defined in the Bankruptcy Code as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor [typical of the holders of claims or interests] of the relevant class to make an informed judgment about the plan[.]" 11 U.S.C. § 1125(a)(1).

24. Critical to the reorganization process is meaningful disclosure sufficient to enable stakeholders to make an informed decision about whether to accept or reject a proposed plan of reorganization. *See Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court."); *Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie Des Monnaies, Ltd.)*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985), *aff'd*, 62 B.R. 224 (S.D.N.Y. 1986), and *aff'd*, No. 86 Civ. 397 (JMW), 1986 WL 6230 (S.D.N.Y. May 27, 1986) ("The preparing and filing of a disclosure statement is a most important step in the reorganization of a Chapter 11 debtor. It is relied on by both the creditors of the debtor before they vote on the plan of reorganization, and by the bankruptcy court before approving it.") (citation omitted).

25. The provision of adequate information is at the very heart of the reorganization process. *See In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ("Given the necessity for adequate information in the Disclosure Statement and the paramount position section 1125 occupies in the Chapter 11 process, there is little, if any, room for harmless error."). A court should examine each disclosure individually to discern whether the Bankruptcy Code's "adequate information" requirement is satisfied. *See In re Worldcom, Inc.,* Case No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) ("[T]he approval of a disclosure statement . . . involves a fact-specific inquiry into the particular plan to determine whether it possesses 'adequate information' under § 1125.") (*quoting In re Ionosphere Clubs, Inc.,* 179 B.R. 24, 28 (S.D.N.Y. 1995).

26. Here, the Disclosure Statement fails to provide adequate information in two ways: (i) it excludes critical information with respect to the investigation and settlement of potential estate claims; and (ii) it fails to explain the basis for allocating recoveries between noteholders.

27. First, the Debtors do not specify the "potential estate claims" that were investigated and settled. The Disclosure Statement merely indicates that the Committee investigated claims that could be asserted in connection with the Abra Debt Exchange and other transactions. *See* Disclosure Statement §§ I.B, IV.M. Beyond this bare admission, the potential claims against Abra and other possible defendants remain undisclosed. That is insufficient.

28. The Abra Debt Exchange may be challengeable as a fraudulent transfer under Section 548(a)(1)(B) of the Bankruptcy Code. The Debtors transferred value to Abra in the form of (i) the secured 2028 Notes that accrued interest at significantly higher rates than the substantially unsecured Purchased Notes; and (ii) the previously unencumbered Smiles Collateral. After doing

8

so, the Debtors clearly continued to face difficulties in meeting their financial obligations which caused them to commence the Chapter 11 Cases only ten months thereafter.

29. Additionally, the Abra Debt Exchange may be challengeable as a preference under Section 547(b) of the Bankruptcy Code because the Debtors' conversion of the 2028 SSNs into the 2028 ESSNs was, among other reasons: (i) plainly for the benefit of an insider (*i.e.,* its majority shareholder); and (ii) made on account of an antecedent debt (*i.e.,* the outstanding 2028 SSNs).

30. To the extent the Settlement released the foregoing claims, the Disclosure Statement must set forth, among other things: (i) the likelihood of success in litigating the claims, and (ii) the consideration paid by Abra (or other potential defendants) in exchange for releases. *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401 (Bankr. S.D. Tex. 2016) (factors often utilized to determine the adequacy of information in a disclosure statement include the presence or absence of "the actual or projected realizable value from recovery of preferential or otherwise voidable transfers"); *cf. In re PC Liquidation Corp.*, 383 B.R. 856, 860, 865 (E.D.N.Y. 2008) (disclosure statement contained adequate information where it fairly communicated "the specifics" of the debtor's settlements for potential fraudulent conveyance and lender liability claims, including the "reasons" behind the settlements and "the merits of the potential litigation" behind such settlements). Without such information, stakeholders cannot properly assess whether litigation would have yielded better recoveries than the Settlement

31. Moreover, the Disclosure Statement fails to provide even bare minimum information – let alone "adequate information" – regarding the investigations of the Restructuring Committee and the Committee. While the Debtors set forth the quantity of documents reviewed and individuals interviewed during the Restructuring Committee's investigation (*see* Disclosure Statement § IV.D), they provide no insight into the substance of the investigation. The Disclosure

9

Statement does not describe: (i) the information that was made available; (ii) the nature of the claims that were investigated; or (iii) the conclusions that were reached, including whether the conclusions of the Restructuring Committee and the Committee differed.  Instead, the Debtors' conclusory statement that a settlement of the claims "would be in the best interest of the Debtors' stakeholders" is the epitome of inadequate information.  *See In re Prudential Energy Co.,* 59 B.R. 765, 768 (Bankr. S.D.N.Y. 1986) ("[T]he concept of adequate information under § 1125 of the Code does not contemplate revelation by inference.  Creditors are not required or expected to rely on inferences. Disclosure of material facts is what is required.").

32. Nor does the Disclosure Statement provide any basis for the Plan's treatment of unsecured noteholders.  It is imperative that the Disclosure Statement describe the Settlement parties' rationale behind, among other things, the specific allocation amounts for holders of the Perpetual Notes, the 2025 Notes, and the 2024 Notes.  Most glaringly, distributions to holders of the Perpetual Notes (3.4% – 3.8%) are much lower than the distributions on account of the 2025 Notes (18.8% – 20.8%).  The Disclosure Statement's failure to explain the basis for this disparity is the antithesis of "adequate information," which the Bankruptcy Code explicitly requires.

33. Accordingly, the Court should not approve the Disclosure Statement.

### RESERVATION OF RIGHTS

34. Two Seas reserves the right to submit other and further objections to approval of the Disclosure Statement at or before the hearing if it is supplemented or amended at a later date.

### CONCLUSION

WHEREFORE, Two Seas respectfully requests that the Court deny the Motion and grant such other and further relief as may be just and proper.

Dated: February 25, 2025
      New York, New York

           */s/ Andrew K. Glenn*
           Andrew K. Glenn
           Shai Schmidt
           Naznen Rahman
           **GLENN AGRE BERGMAN & FUENTES LLP**
           1185 Avenue of the Americas
           22nd Floor
           New York, New York 10036
           Telephone: (212) 970-1600
           Email: aglenn@glennagre.com
                   sschmidt@glennagre.com
                   nrahman@glennagre.com

           *Counsel to Two Seas Global (Master) Fund LP*