Brett H. Miller
Todd M. Goren
Craig A. Damast
James H. Burbage
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*, | : Case No. 24-10118 (MG) |
| | : |
| Debtors.[1] | : (Jointly Administered) |
| | : **Re: Docket No. 1143** |

**STATEMENT OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS
IN SUPPORT OF THE DEBTORS' DISCLOSURE STATEMENT MOTION**

The Official Committee of Unsecured Creditors (the "Committee") of GOL Linhas Aéreas Inteligentes S.A. and its debtor affiliates in the above-captioned cases (collectively, the "Debtors"), by and through its undersigned counsel, hereby submits this statement in support of the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures; (III) Approving Forms of Ballots; (IV) Establishing Procedures for*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

*Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI) Establishing Notice and Objection Procedures* [Docket No. 1143] (the "<u>Disclosure Statement Motion</u>").[2]

1. The Plan and the accompanying disclosure statement are the product of a months-long negotiation process among the Debtors, the Committee, and Abra. That process ultimately resulted in a settlement agreement embodied in the Plan (the "<u>Plan Settlement</u>") that, among other things, provides Class 10 general unsecured creditors with between $210 million and $310 million of New Equity. In the absence of the good faith negotiations undertaken by the parties and the resulting Plan Settlement, these chapter 11 cases could have easily gone off the rails and threatened the Debtors' successful reorganization.

2. Only a small handful of parties have objected to the Debtors' disclosure statement, largely asserting parochial issues or otherwise previewing potential confirmation objections.[3] A common theme among many of the Objections is the request for additional disclosure concerning the Abra Transaction and the Committee's investigation into potential causes of action arising therefrom. The Committee has worked closely with the Debtors to supplement the disclosures around the Committee's investigation into the Abra Transaction and the allocation of settlement

---

[2] Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Disclosure Statement Motion or the *Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and its Affiliated Debtors* [Docket No. 1336] (the "<u>Plan</u>"), as applicable.

[3] These objections include the following: *The GOL 2026 Senior Secured Notes Ad Hoc Group's Preliminary Objection to Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization of Gol Linhas Aéreas Inteligentes S.A. and its Affiliated Debtors* [Docket No. 1302]; *Objection of Whitebox Advisors LLC to the Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures; (III) Approving Forms of Ballots; (IV) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI) Establishing Notice and Objection Procedures* [Docket No. 1303]; *Objection of Two Seas Global (Master) Fund LP to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures; (III) Approving Forms of Ballots; (IV) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI) Establishing Notice and Objection Procedures* [Docket No. 1307] (collectively, the "<u>Objections</u>", and the filers thereof, the "<u>Objectors</u>").

2

proceeds in the revised disclosure statement recently filed by the Debtors [Docket No. 1337] (the "Revised Disclosure Statement").

3. As detailed in Article V.A of the Revised Disclosure Statement, shortly after its formation in February 2024, the Committee undertook a months-long investigation into the Debtors' prepetition transactions, including the Abra Transaction. In July 2024, the Committee produced a list of claims describing potential claims and causes of action arising from the Abra Transaction (the "List of Claims"). Notably, despite the existence of sophisticated counsel and advisors across the Debtors' capital structure, no other party preserved claims against Abra prior to the expiration of the Challenge Period.

4. As set forth in the Revised Disclosure Statement, the Committee concluded that prosecution of the claims and causes of action set forth in the List of Claims was uncertain and threatened the Debtors' going concern value, and that entry into the Plan Settlement was in the best interests of unsecured creditors. Put simply, the Committee believes that the substantial pot of New Equity to be distributed to unsecured creditors as a result of the Plan Settlement is a far superior result to what may have been achieved through costly and uncertain litigation.

5. Certain of the Objectors also question the allocation of the Plan Settlement value among the Debtors' estates. A key aspect of the discussions among the parties to the Plan Settlement was allocation of value and determining whether creditors of a particular estate were uniquely harmed by the Abra Transaction. Ultimately, the Committee concluded, in the exercise of its fiduciary duty to all unsecured creditors, that no particular estate suffered outsized harm such that it should receive an additional allocation of settlement value. As a result, the basic premise of the Plan's allocation of value is that substantially all of the value should be allocated to GLA

(where all creditors have claims and where substantially all of the Debtors' valuable assets reside)[4] and that other entities should receive an allocation of value based on intercompany claims against GLA and other Debtor entities. It is unsurprising that certain Objectors question how the Committee and the Debtors allocated the settlement value extracted from Abra and seek an outsized recovery vis-à-vis other creditors. The assertions of those Objectors, however, should not preclude this Court from granting the Disclosure Statement Motion. Article V.D. of the Revised Disclosure Statement contains additional disclosures concerning the parties' allocation methodology. To the extent such additional disclosures do not satisfy the Objectors on this subject, the Committee submits that creditors have more than adequate information to cast an informed vote in favor of or against the Plan, and any remaining objections on the subject should be left for confirmation.

6. Certain Objectors have also raised questions about the terms of the New Equity, particularly in the context of a potential Azul S.A. ("Azul") transaction. The Committee has worked closely with the Debtors and Abra regarding the terms of the New Equity and on additional disclosures concerning the New Equity set forth in Article V.B and Article IX.F of the Revised Disclosure Statement. Certain of the terms of the New Equity are still being negotiated and will be included in the Plan Supplement.

7. The additional disclosures concerning the New Equity make clear that while the New Equity will not be publicly traded on any exchange, the equity will be distributed through DTC, will not carry any significant transfer restrictions, and will require the Debtors to make meaningful financial information publicly available to facilitate trading. In addition, the

---

[4] Material value also lies at the "Smiles" entities where the Debtors' frequent flier program resides, which are subsidiaries of GLA with no material claims against them. Creditors of the Smiles entities are projected to receive a 100% recovery under the Plan.

Committee, the Debtors, and Abra are negotiating a procedure whereby the Debtors will attempt to actively facilitate trades between shareholders, thereby improving liquidity for smaller holders. Moreover, the Committee and Abra have negotiated that in the event Abra Group Limited (or its successor) undergoes a Qualified Listing Event, the New Equity will be exchanged into Abra Group Limited shares, which would then be publicly listed. Finally, the Committee negotiated with Abra a requirement that Abra Group Limited (or its successor) make a mandatory offer to exchange or redeem shares held by creditors in the event of certain significant transactions with Azul that could be effectuated at a level above the New GOL Parent (and thereby deprive holders of the New Equity of the benefits of such an Azul transaction).[5] The Committee is still negotiating the exact terms of such an exchange/redemption offer (along with the terms of the other mandatory exchange/redemption provisions set forth in the Plan) and expects that such terms will be included in the Plan Supplement.[6] Nonetheless, the Committee believes that these provisions are protective of unsecured creditors and ensure that Abra cannot transact with Azul in a manner that disadvantages holders of the New Equity.

8. In conclusion, these chapter 11 cases have been pending for over fourteen months. That time has been used productively by the Committee, the Debtors, and Abra to settle what could have otherwise been highly contentious and expensive litigation, which could have significantly delayed the Debtors' emergence from bankruptcy (and would have unquestionably caused the cost of the cases to increase substantially). The time has now come to promptly move the cases toward

---

[5] Notably, the non-binding Memorandum of Understanding entered into between Abra Group Limited and Azul detailed in Article IV.N of the Revised Disclosure Statement (which neither the Committee nor the Debtors is party to or otherwise negotiated) proposes a transaction at New GOL Parent or at any of its subsidiaries and would not trigger the mandatory offer provisions if ultimately consummated.

[6] As further protection for unsecured creditors, the Plan also requires that the New Equity is subject to mandatory exchange/redemption in the event of a subsequent bankruptcy filing by New GOL Parent, Reorganized GLAI, or Reorganized GLA.

exit.  If the Debtors do not emerge by June 8, they will incur a $17.5 million DIP Facility extension fee, which would buy the Debtors a mere seven weeks before the DIP Facility matures.  In the background, the Debtors' advisors are actively soliciting exit financing, and are nearing agreement with a group of anchor investors for exit debt and in advanced discussions with other debt and equity providers.  That process will be aided by a confirmation hearing in the near term.  Put simply, time is not on the Debtors' side, and the Debtors should begin solicitation of acceptances of the Plan as soon as possible.  In that regard, attached hereto as **Exhibit A** is the Committee's letter recommending that holders of Allowed General Unsecured Claims in Classes 10 and 11 of the Plan vote in favor of the Plan.

9. For the reasons set forth herein and in the Debtors' omnibus reply to the Objections [Docket No. 1339], the Committee respectfully requests that this Court grant the Disclosure Statement Motion.

[*Remainder of page intentionally left blank*]

| | |
|---|---|
| Dated: March 13, 2025<br>      New York, New York | **WILLKIE FARR & GALLAGHER LLP**<br><br>*Brett H. Miller*<br>Brett H. Miller<br>Todd M. Goren<br>Craig A. Damast<br>James H. Burbage<br>787 Seventh Avenue<br>New York, New York 10019<br>Telephone: (212) 728-8000<br>Facsimile: (212) 728-8111<br><br>*Counsel for the Official Committee of Unsecured Creditors* |

**Exhibit A**

March 13, 2025

**Official Committee of Unsecured Creditors: Letter in Support of the Plan**[1]

On February 9, 2024, the Office of the United States Trustee, a division of the United States Department of Justice, appointed the Official Committee of Unsecured Creditors (the "Committee") to serve as the statutory fiduciary representative of all unsecured creditors in the chapter 11 cases of GOL Linhas Aéreas Inteligentes S.A. and its affiliated debtors (collectively, the "Debtors") pending in the United States Bankruptcy Court for the Southern District of New York.[2]

**For the reasons below, the Committee believes that acceptance of the Plan is in the best interests of holders of Allowed General Unsecured Claims (Classes 10(a)-(m) and 11). The Committee urges you to vote to ACCEPT the Plan on or before the Voting Deadline of April 17, 2025 at 4:00 p.m. (ET).**

Over the course of these chapter 11 cases, the Committee has taken many steps to maximize the leverage of general unsecured creditors. Most importantly, the Committee conducted a thorough investigation of the Debtors' prepetition transactions, including the Abra Transaction, a liability management transaction that closed in March 2023. Through its investigation, the Committee identified numerous potential estate causes of action arising from the Abra Transaction, including potential claims against the Debtors' largest equity holder and senior secured lender, Abra Group Limited (collectively, with its affiliates, "Abra").

In July 2024, the Committee presented a list of claims on a confidential basis to various parties in interest, including the Debtors' Restructuring Committee and Abra (the "List of Claims"). Details regarding the Committee's investigation and the List of Claims are set forth in Article V.A of the Disclosure Statement. Following the distribution of the List of Claims, the Debtors, Abra, and the Committee engaged in several months of arm's-length, hard-fought negotiations. These negotiations proved fruitful and resulted in the proposed settlement set forth and detailed in the Plan and corresponding Disclosure Statement (the "Plan Settlement").

The Committee believes that the Plan Settlement represents fair treatment for all holders of General Unsecured Claims in Classes 10(a)-10(m) and Class 11 and therefore urges all such holders to vote in favor of the Plan. The key benefits of the Plan Settlement are detailed below:

- The Plan provides a minimum distribution of US$210 million in New Equity to holders of Allowed General Unsecured Claims in Class 10. The amount of New Equity distributable to holders of Allowed General Unsecured Claims in Class 10 can increase US$25 million if the Debtors reach a Boeing Agreement, and can separately increase up

---

[1] Unless otherwise defined, capitalized terms used herein have the meanings ascribed to them in the *Third Amended Joint Chapter 11 Plan of Reorganization for GOL Linhas Aéreas Inteligentes, S.A. and its Affiliated Debtors* [Docket No. 1336] (the "Plan").

[2] Willkie Farr & Gallagher LLP is restructuring counsel for the Committee. The Committee also retained Alvarez & Marsal North America, LLC as its financial advisor, Jefferies LLC as its investment banker, Alton Advisory Consultancy LLC as its special aviation advisor, and Stocche, Forbes, Filizzola, Clapis e Cursino de Moura Sociedade de Advogados as its Brazilian counsel.

> to US$75 million based on the resolution of the treatment of the 2026 Senior Secured Notes Claims. Accordingly, the Plan provides holders of Allowed General Unsecured Claims in Class 10 with up to $310 million in New Equity.

- The New Equity distributed to holders of Allowed General Unsecured Claims in Class 10 will benefit from several highly negotiated provisions. *First*, the New Equity shall be mandatorily redeemed in cash or exchanged for shares of Abra Group Limited upon certain events, such as (a) a "Qualified Listing Event" (*i.e.*, if Abra Group Limited becomes publicly traded) or (b) a subsequent bankruptcy filing by Reorganized GLAI or Reorganized GLA. In addition, holders of New Equity will have the option to redeem their shares for Abra equity in the event of certain transactions between Abra and Azul S.A., as more fully detailed in the Disclosure Statement. *Second*, the New Equity will be held through the Depository Trust Company, is not anticipated to contain any meaningful restrictions on transfer, and will be accompanied by meaningful public disclosures by the Debtors, which the Committee believes will improve the liquidity of the New Equity.

- Holders of Allowed General Unsecured Convenience Class Claims will receive Cash in an amount equal to 15% of their Allowed Claims; *provided that*, to the extent the aggregate amount of distributions would exceed the General Unsecured Convenience Class Claim Fund, holders of Allowed General Unsecured Convenience Class Claims will receive their Pro Rata share of the General Unsecured Convenience Class Claim Fund.

In addition to providing meaningful distributable value to holders of Allowed General Unsecured Claims in Classes 10 and 11, the Plan will also deleverage the Debtors' balance sheet by equitizing or otherwise eliminating over $1 billion in funded debt obligations. Moreover, the Plan contemplates raising up to $1.9 billion of new capital to pay off the DIP Facility incurred at the outset of these cases and provide incremental liquidity to support the Debtors' business strategy following emergence from chapter 11.

Finally, the Plan also gives creditors the option of entering into consensual releases of the Debtors and certain third parties (the "Third-Party Releases"). These provisions release the Debtors, the Reorganized Debtors, and other enumerated parties that played an important role in the Debtors' reorganization from liability arising from certain claims and causes of action. As part of the voting process, creditors are given the opportunity to opt out of the Third-Party Releases on their Ballots or consent to the Third-Party Releases by not opting out. A creditor's decision with regard to the Third-Party Releases does not impact its distribution under the Plan.

In concluding that the Plan and the Plan Settlement represent fair treatment for holders of Allowed Claims in Classes 10 and 11, the Committee evaluated the benefits of pursuing other potential sources of recovery during these chapter 11 cases. As mentioned above, the Committee investigated the Debtors' prepetition transactions (including the Abra Transaction) and whether such actions could give rise to colorable and valuable causes of action. Ultimately, the Committee determined that pursuing those claims through litigation was not the most value-maximizing path for unsecured creditors given (a) the significant value provided through the Plan Settlement to holders of General Unsecured Claims, (b) the uncertainties attendant to litigation, (c) that the costs would be borne by the Debtors' estates to the detriment of unsecured creditor recoveries if the

2

claims and causes of action were fully litigated, and (d) litigation of those claims would have likely prolonged the Debtors' chapter 11 cases for several months, thereby increasing the administrative cost of the cases and the likelihood of liquidation.

**Taking all of the above into consideration, the Committee has concluded that the Plan and the Plan Settlement are in the best interests of holders of General Unsecured Claims. Accordingly, the Committee recommends that all members of Classes 10 and 11 both (a) vote in favor of the Plan and (b) in accordance with the Plan Support Agreement to which the Debtors and the Committee, among others, are parties, not opt out of the Third-Party Releases.**

**WILLKIE FARR & GALLAGHER LLP**

*/s/ Official Committee of Unsecured Creditors*

Brett H. Miller
Todd M. Goren
Craig A. Damast
James H. Burbage
787 Seventh Avenue
New York, New York 10019
Telephone: 212-728-8000
Facsimile: 212-728-8111

*Counsel for the Official Committee of Unsecured Creditors*

3