**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10118 (MG)<br><br>Jointly Administered |

**ABRA'S STATEMENT IN SUPPORT OF**
**DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE DISCLOSURE STATEMENT**

Abra Group Limited and Abra Global Finance (together, "Abra") hereby submit this statement in support of the relief requested by the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures; (III) Approving Form of Ballots; (IV) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (IV) Establishing Notice and Objection Procedures* (Docket No. 1143) (the "Disclosure Statement Motion").

**PRELIMINARY STATEMENT**

1. The Debtors have demonstrated that the Disclosure Statement[2] contains "adequate information" as contemplated in section 1125 of the Bankruptcy Code and otherwise meets all

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (N/A); Gol Finance Inc. (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2] *See Notice of Filing of Disclosure Statement for Third Amended Joint Chapter 11 Plan of GOL Linhas Aéreas Inteligentes S.A. and its Affiliated Debtors* (Docket 1337) at Ex. 1 (Second Amended Disclosure Statement).

applicable legal criteria for approval. Abra supports the Debtors' motion for the reasons set forth in the Disclosure Statement Motion and in the Debtors' reply brief.[3]

2. Abra submits this statement to briefly respond to certain inaccurate and/or misleading allegations made by objectors to the Disclosure Statement regarding Abra, in particular Abra's role in GOL's 2023 refinancing transaction and these bankruptcy cases, and to provide the Court with an accurate explanation of the events leading up to and during GOL's chapter 11 cases.

3. In particular, the objectors' efforts to paint Abra as the insider-beneficiary of a sweetheart deal in GOL's 2023 refinancing transaction and these cases are both unsupported and unsupportable. In actual fact, as part of the 2023 refinancing transaction, Abra took on massive liabilities to outside investors in order to effectuate GOL's refinancing, and thereby became GOL's largest creditor. The objecting creditors' story, that Abra took on nearly $2 billion in debt as part of a scheme to control GOL, of which it already owned a majority share, simply makes no sense. And with GOL's inability to repay its debt to Abra, and the filing of these chapter 11 cases, Abra has not landed on either side of some purported "win-win" wager; in reality, Abra has lost much more than any other investor.

## BACKGROUND

### I.    The 2023 Refinancing Transaction

4. In 2023, GOL entered into a strategic transaction designed to effectuate a business combination with Avianca Holdings S.A. ("Avianca"), a complementary South American airline, through which GOL could realize significant commercial and operational synergies (the "2023

---

[3] *See Debtors' Omnibus Reply to Objections to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures; (III) Approving Forms of Ballots; (IV) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI) Establishing Notice and Objection Procedures* (Docket No. 1339) (the "Debtors' reply brief").

2

Transaction"). In order to effect that combination, the majority equityholders of GOL[4] and Avianca each contributed their interests in those airlines to a newly created holding company—Abra—in exchange for equity in Abra.

5. In order to shore up GOL's financial outlook, which was essential to facilitating the broader business combination, GOL and its stakeholders determined to restructure its balance sheet, which had been badly impacted by the pandemic. Accordingly, GOL, GOL's creditors, and Abra implemented a transaction to meaningfully reduce GOL's debt burden, extend the maturity on a significant portion of its debt, and provide GOL with approximately $400 million in additional liquidity, giving it much-needed runway to address its pressing obligations.

6. In order to accomplish this, the parties engaged in a multi-step transaction with the following components:

7. *First*, Abra purchased GOL's outstanding bonds from international bond investors at agreed prices, in exchange for new notes issued by Abra (the "Abra CSSNs" and the "Abra SSENs," collectively the "Abra SSNs"). In total, Abra purchased nearly $1.1 billion in GOL bonds with maturities in 2024, 2025 and 2026 (with the 2024 and 2025 notes being unsecured, and the 2026 notes being secured by certain GOL collateral), as well as some of GOL's outstanding perpetual notes, at an average price of 71 cents on the dollar.

8. Abra also issued additional Abra SSNs to certain of the GOL noteholders who chose to provide approximately $450 million in new money. This new money was largely earmarked for use at GOL to support its liquidity and further deleveraging.

9. *Second*, Abra and GOL exchanged the outstanding GOL bonds which Abra had purchased for new GOL debt, the 2028 Senior Secured Notes (the "2028 GOL SSNs"), which

---

[4] At this time, shares corresponding to approximately 47% of the value of GOL were publicly held and traded on the New York Stock Exchange.

3

were secured by substantially all of GOL's assets, and in particular by GOL's frequent flyer program, SMILES.  GOL's previously outstanding bonds purchased by Abra were cancelled in this process.  This resulted in a deleveraging of GOL's balance sheet, reducing its outstanding debt obligations by approximately $200 million.  It also substantially improved GOL's maturity and near-term liquidity profile:  GOL's near-term obligations were replaced with longer-dated obligations, and a substantial portion of GOL's go-forward cash-interest obligations were replaced with PIK-interest obligations.

10. From the outset, the intent was for Abra to receive convertible notes (the "2028 GOL ESSNs") from GOL, which could be converted into equity down the line, facilitating a further deleveraging of GOL's balance sheet.  However, under Brazilian law, companies must provide existing equityholders with an opportunity to exercise their pre-emptive rights over the issuance—*i.e.*, an opportunity to subscribe to new shares in proportion to the number of shares they already hold—in connection with any new equity issuance, including through a convertible debt instrument.  Accordingly, in order to comply with Brazilian law, the initial issuance could not be in the form of convertible debt securities.  The 2028 GOL SSNs were therefore issued with the option to convert into 2028 GOL ESSNs in order to let the pre-emptive rights process play out.  Accordingly, and as originally contemplated, a large portion of the 2028 GOL SSNs were substituted for 2028 GOL ESSNs in September 2023.

11. ***Third***, over the ensuing months, GOL received additional cash from Abra (provided in response to requests by GOL) in order to support its liquidity and operational needs, as well as to facilitate further debt buybacks and other smaller deleveraging transactions.  Abra ultimately provided approximately $370 million in new money to GOL in exchange for additional 2028 GOL SSNs after the 2023 refinancing transaction.

12. Indeed, despite the objecting creditors' ex-post allegations, the market did not perceive the 2023 refinancing transaction to be detrimental to GOL's financial outlook, and GOL's unsecured notes did not trade down upon its announcement. Indeed over the following months, those notes generally traded neutrally or up until GOL's financial position began to deteriorate in the summer of 2023.



*Trading data reflects the average of the bid and ask prices based on data pulled from Bloomberg on March 9, 2025. The dashed lines indicate the announcement of the transaction on February 7, 2023 and the subsequent closing of the transaction on March 3, 2023.

13. Unfortunately, over the following months, GOL's financial outlook continued to deteriorate, for the reasons set forth in the Disclosure Statement and in the *Declaration of Joseph W. Bliley in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (Docket No. 11). GOL filed these chapter 11 cases in January 2024.

II.     GOL'S CHAPTER 11 CASES

5

14. From the outset, GOL needed to raise significant additional financing in order to make it through these chapter 11 cases and successfully reorganize. Following a marketing process, GOL was only able to raise such financing on a super-secured basis. This required priming Abra's multi-billion dollar secured claim.

15. As a condition to Abra's consent to being primed, the Debtors entered into certain stipulations and admissions affirming the validity and perfection of Abra's secured claim (alongside those of other secured creditors), as well as the lack of estate claims or causes of action against Abra relating to the issuance of the 2028 GOL SSNs or 2028 GOL ESSNs.[5] The DIP Order preserved the ability of all parties-in-interest to seek to assert claims against Abra on behalf of the Debtors' estate for a period of 75 days; otherwise, those stipulations, admissions, agreements and releases would become binding upon such other parties in interest. The DIP Order also provided for a waiver and release of the Debtors' rights to challenge Abra's claims. *Id*.

16. The DIP Order was entered on February 28, 2024. Subsequently on April 9, 2024, seventy-five days after the petition date, the Debtors' stipulations, admissions, agreements and releases set forth in the DIP Order became binding on all parties-in-interest except for the Committee, which entered into a stipulation with Abra and others extending the time for the Committee to raise potential challenges.[6] No party other than the Committee pressed a challenge

---

[5] *See Final Order (A) Authorizing The Debtors To Obtain Postpetition Financing, (B) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (C) Granting Adequate Protection To The Prepetition Secured Parties, (D) Modifying The Automatic Stay, (E) Authorizing The Debtors To Use Cash Collateral, and (F) Granting Related Relief* (Docket No. 207) (the "DIP Order"), at ¶¶ F (p. 8-12), 25-26 (p. 70-75).

[6] *See Stipulation and Agreed Order Between the Debtors, the Official Committee of Unsecured Creditors, the Prepetition Agents, the DIP Lenders, and Abra Group Limited Further Extending the Challenge Period* (Docket No. 596) at 4-5; *Stipulation and Agreed Order Between the Debtors, the Official Committee of Unsecured Creditors, the Prepetition Agents, the DIP Lenders, and Abra Group Limited Further Extending the Challenge Period* (Docket No. 1005) at 3-4.

6

to Abra's claims during this time period or otherwise objected to these stipulations, admissions, agreements and releases becoming binding upon them.

17. During this period, the Committee and a special restructuring committee of the GOL board, consisting of three independent directors, commenced investigations into potential estate causes of action, including with respect to Abra and its secured claims. Following those investigations, Abra, the Debtors and the Committee began negotiations regarding a settlement and potential plan of reorganization. Those negotiations intensified over the summer of 2024.

18. Following several months of intensive negotiations, Abra, the Debtors and the Committee reached a settlement. This resulted in the Plan Support Agreement, the principle terms of which were agreed to on October 16 and which was executed on November 5, 2024. The Plan Support Agreement provided the foundation for GOL's plan of reorganization, which was subsequently filed on December 9, 2024, as was the accompanying Disclosure Statement.

## STATEMENT IN SUPPORT OF DEBTORS' MOTION FOR APPROVAL

19. In objecting to approval of GOL's disclosure statement, the objecting creditors have alleged that numerous claims exist against Abra as a result of some purported wrongdoing in connection with the 2023 refinancing transaction. These claims are both out of time and unfounded.

20. Initially, as a legal matter, the objecting creditors are unable to seek to prosecute any challenge to Abra's claims, as they are bound by the stipulations, admissions and releases in the DIP Order. Those creditors had the opportunity to seek authority to press claims within seventy-five days of the filing of these cases, but chose not to. The objecting creditors are now precluded by the DIP Order from making such a challenge. DIP Order at ¶¶ F (p. 8-12), 25 (p. 70-74), 26 (p. 74-75).

21. Instead of timely pressing any potential claims, the objecting creditors elected to lie in wait until the Committee had already negotiated and settled a resolution of any potential claims, presumably assuming they would later insist on a retrade. This should not be countenanced. Such belated assertion of claims is particularly egregious here, where most of the objecting creditors have been active participants in this case since its early days and thus cannot claim ignorance of the DIP Order. Whitebox, for example, actually lent money to GOL as part of the DIP facility and pursuant to the DIP Order.[7] And the Ad Hoc Group of 2026 noteholders not only touts that they have "been involved in these Chapter 11 Cases from the start," Ad Hoc Group Obj. at 8, but also signed a series of stipulations with Abra, the Debtors, and others recognizing that the time period for all parties in interest (other than the Committee) to bring challenges to Abra's claim had lapsed.[8]

22. And even if the assertion of these claims were not precluded, for the reasons set forth in the Disclosure Statement, both the Restructuring Committee and the Committee concluded, after lengthy investigations, that the settlement is a reasonable compromise of any potential claims against Abra. Abra has agreed to significant economic concessions, including a substantial haircut on the face amount of its secured claim and the equitization of much of its remaining claim. Neither law nor equity permits the objecting creditors to be heard now, in an effort to upset the proverbial apple cart by demanding that claims that they chose to forego, and that estate fiduciaries investigated and settled, should preclude confirmation of the Debtors' plan.

---

[7] *See Amended Third Verified Statement of the Ad Hoc Group of Abra Noteholders Pursuant to Bankruptcy Rule 2019* (Docket No. 388) at Exhibit A.

[8] *See Stipulation and Agreed Order Between the Debtors, the Official Committee of Unsecured Creditors, the Prepetition Agents, the DIP Lenders, and Abra Group Limited Further Extending the Challenge Period* (Docket No. 596) at 4-5*; Stipulation and Agreed Order Between the Debtors, the Official Committee of Unsecured Creditors, the Prepetition Agents, the DIP Lenders, and Abra Group Limited Further Extending the Challenge Period* (Docket No. 1005) at 3-4.

23. Moreover, as a factual matter, the objecting creditors' allegations against Abra have no merit. The objectors portray Abra as having, through a self-dealing transaction, put itself in a win-win position at the expense of GOL or its creditors. In actual fact, Abra is the single biggest loser of the 2023 financing transaction and GOL's chapter 11 cases.

24. Prior to the 2023 refinancing transaction, certain of the persons who became Abra's shareholders held a majority economic interest in the equity of GOL. Those interests were contributed to Abra, which was a new entity formed for the purpose of combining GOL and Avianca's operations, and thus had no financial debt of its own. If GOL's plan of reorganization is approved, Abra will still hold a majority economic interest in the equity of GOL and approximately $850 million in GOL debt, but will also have assumed debt obligations to the former GOL noteholders in the 2023 transaction which are currently in excess of $1.8 billion.[9] Plainly, Abra did not "win" by gaining a $850 million debt position at GOL at the cost of taking on a new $1.8 billion obligation to third-party lenders. And these facts should be well understood by the objecting creditors, some of which in fact participated in the very transaction they are now challenging.

25. Nor are the objecting creditors' complaints regarding plan negotiations—and in particular, the Ad Hoc Group's allegation that the Plan is an "attempt by Abra to extract value from the holders of 2026 Senior Secured Notes Claims"[10]—well-founded.

26. The Ad Hoc Group's complaint regarding the treatment of their claims primarily relates to valuation issues that will be addressed by the Debtors in connection with plan confirmation. However, Abra vigorously disputes the allegation that the Plan is somehow a

---

[9] Moreover, GOL's bankruptcy constituted a default on Abra's own debt obligations, which required it to seek forbearance and ultimately pursue a significant and costly refinancing of its own.
[10] Ad Hoc Group Objection at 1.

9

"sweetheart deal" for Abra. The Plan was negotiated in good faith by the Debtors, in consultation with the restructuring committee, the Committee and Abra, and the treatment of the 2026 secured notes claim is justified in light of the actual collateral available to those noteholders, as will be shown in connection with plan confirmation.

27. Moreover, while the Ad Hoc Group contends that the 2026 notes are fully secured and thus entitled to a par recovery, even Abra's own claims—which are backed not only by the same collateral as the 2026 notes claims, but also *additional* collateral appraised at several times the value of the 2026 notes collateral—are not receiving a par recovery (in addition to being equitized in substantial part). The argument that the 2026 noteholders are entitled to a par recovery or more on their claims, while Abra's better-secured claims are entitled to inferior treatment, does not cohere.

## CONCLUSION

28. The Debtors' plan of reorganization embodies a set of significant compromises by Abra and other stakeholders. These compromises pave a path toward a successful reorganization, which will inure to the benefit of the Debtors and all their stakeholders. Accordingly, Abra respectfully requests that the Court approve the Debtors' Disclosure Statement.

Dated: New York, New York
March 13, 2025

                            WACHTELL, LIPTON, ROSEN & KATZ

By:   */s/ Amy R. Wolf*
       Richard G. Mason
       Amy R. Wolf
       Benjamin S. Arfa
       Angela K. Herring
       Mitchell S. Levy

       51 West 52nd Street
       New York, New York 10019
       Tel: (212) 403-1000
       Fax: (212) 403-2000

       *Attorneys for Abra Group Limited*
       *and Abra Global Finance*