**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                          :
In re:                                                    :        Chapter 11
                                                          :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                      :        Case No. 24-10118 (MG)
*et al.*,[1]                                               :
                                                          :
                            Debtors.                      :        (Jointly Administered)
                                                          :
-----------------------------------------------------------------x

## NOTICE OF ENTRY INTO WORK LETTER

On March 26, 2025, the Bankruptcy Court for the Southern District of New York (the "Court") entered the *Order (I) Approving Terms of, and Authorizing Debtors' Entry into and Performance Under, the Exit Financing Commitment Letter and Fee Letter, (II) Authorizing Debtors to Enter into Additional Fee Letters with Additional Commitment Parties, and (III) Authorizing Incurrence, Payment and Allowance of Obligations Thereunder as Administrative Expenses* [Docket No. 1414] (the "Exit Financing Order"),[2] (i) authorizing the Debtors to enter into and perform under the Commitment Documents, (ii) authorizing the Debtors to enter into Additional Commitment Letters consistent with the terms set forth in the Commitment Documents, each with the Backstop Commitment Parties, and (iii) approving the incurrence, payment, and allowance of the Commitment Obligations as administrative expenses of the Financing Parties. Paragraph 9 of the Exit Financing Order authorizes the Debtors to take all actions necessary to effectuate the relief granted therein.

Pursuant to the Exit Financing Order, the Debtors have entered into a work letter with BNP Paribas Securities Corp. (the "BNPP Work Letter") to act as bookrunner in connection with the Exit Financing and provide other services in connection thereto as requested by the Debtors. A copy of the BNPP Work Letter is attached hereto as **Exhibit A**.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Order.

Dated:  New York, New York          **MILBANK LLP**
        May 12, 2025

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:   (212) 530-5219

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

## **<u>Exhibit A</u>**

**BNPP Work Letter**

*Execution Version*

**BNP Paribas Securities Corp.**
787 Seventh Avenue
New York, NY 10019
United States

*PRIVATE AND CONFIDENTIAL*

May 11, 2025

**GOL Linhas Aéreas Inteligentes S.A.**
Praça Comandante Linneu Gomes, S/N, Portaria 3
Jardim Aeroporto
04626-020 São Paulo, São Paulo
Federative Republic of Brazil

Attention: Joseph Wilfred Bliley IV

**High Yield Bond Engagement Letter**

Ladies and Gentlemen,

The purpose of this letter (the "**Engagement Letter**") is to confirm the appointment by GOL Linhas Aéreas Inteligentes S.A. (the "**Company**") of BNP Paribas Securities Corp. ("**BNPP**") to act as placement agent and bookrunner in connection with the contemplated offering (the "**Offering**") by certain of the Company's subsidiaries of one or more tranches of USD-denominated senior secured high yield debt securities (the "**Notes**"). The Notes will be distributed and issued to certain "accredited investors" within the meaning of Rule 501(a) of Regulation D under the U.S. Securities Act ("**Accredited Investors**") in reliance on the exemption from registration provided by Section 4(a)(2) and Regulation D of the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**") or sold only to persons reasonably believed to be qualified institutional buyers in reliance on Rule 144A under the U.S. Securities Act or to certain non-U.S. persons in transactions outside the United States in reliance on Regulation S under the U.S. Securities Act.

The Offering is being conducted in connection with the Company's proposed chapter 11 plan of reorganization filed at Docket No. 1389 (as may be amended from time to time, the "**POR**") and as part of the chapter 11 cases of the Company and its affiliated debtors (the "**Chapter 11 Cases**"), currently pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

BNPP will not be acting as placement agent and bookrunner with respect to Notes purchased by (i) certain existing backstop commitment parties, (ii) any Accredited Investor or (iii) certain members of an ad hoc group of holders of Company's 2026 senior secured notes with existing purchase commitments (collectively the "**Excluded Purchasers**"), but it may act as placement agent and bookrunner to such Excluded Purchasers that are unable to take direct delivery of such Notes from the Company provided that any such Excluded Purchasers are identified at least ten (10) days prior to the Closing Date and are qualified institutional buyers or non-U.S. persons outside the United States. The duties and obligations of BNPP to perform settlement, billing or delivery for the Notes (in such capacity, the "**Settlement Bank**") as set forth in this

Engagement Letter shall be in connection with investors in the Offering other than the Excluded Purchasers.

By signing and returning a copy of this Engagement Letter, the Company formally and exclusively appoints BNPP to the role as contemplated above and to perform the duties as set forth in this Engagement Letter.

## 1.   ENGAGEMENT AND SCOPE OF WORK

Subject to the terms and conditions of this Engagement Letter, BNPP agrees to perform the duties and exercise the authority customarily performed and exercised by it, as determined by BNPP in its sole discretion with consultation and coordination as practicable with the Company and Seabury Securities LLC ("**Seabury**"), in the role of bookrunner, if appropriate and required with any additional assistance as may be agreed in writing between the Company and BNPP.

The Company acknowledges that BNPP has been retained solely to provide the services contemplated above. In rendering such services, BNPP shall act as an independent contractor and any duties of BNPP arising out of its engagement by the Company in respect of the Offering shall be owed solely to the Company.

The services to be provided by BNPP hereunder do not include the giving of tax, legal, regulatory, accountancy, actuarial or other specialist or technical assistance or the giving of general financial or strategic advice as defined within the meaning ascribed by Article 38 of Commission Delegated Regulation (EU) No. 2017/565 of 25 April 2016 supplementing Directive 2014/65/EU of the European Parliament and of the Council as regards organizational requirements and operating conditions for investment firms and defined terms for the purposes of that Directive pursuant to Annex I, Section B, Item 3 of Directive 2014/65/EU on markets in financial instruments ("**MiFID II**"), or investment advice as defined in Article 4(1)(4) of MiFID II or any other services unless BNPP specifically agrees in writing to provide such services. BNPP's services are provided solely for the purposes of the Offering and to the Company and, without the prior written consent of BNPP, may not be used for any other purpose, or disclosed to any person other than the Company's advisers (who may not rely on such services). BNPP will have no liability in respect of any services or advice provided to the Company by persons other than BNPP (including accountants, legal advisers and other specialist advisers), notwithstanding that any information or advice from these advisers may be passed to BNPP or passed on by BNPP to the Company.

The Company acknowledges and agrees that BNPP, as applicable, is acting solely in the capacity of arm's-length contractual counterparties to the Company and not as an adviser, agent or fiduciary to the Company or any other person. The Company shall be responsible for making its own independent investigation and appraisal of the risks, benefits, appropriateness and suitability to and for it of the Offering contemplated by this Engagement Letter and BNPP, as applicable, is not making any recommendation (personal or otherwise) and will have no liability with respect thereto.

BNPP may perform all or any part of the services under this Engagement Letter through one or more of its subsidiaries, branches, divisions, affiliates or to any agent; however, BNPP shall not be relieved of its obligation to provide the services set forth above if BNPP delegates the actual performance of any such services to any of its subsidiaries, branches, divisions, affiliates or agent, except with the Company's prior written consent. BNPP may engage Cleary to assist it in connection with the services provided under this Engagement Letter, and any other

professional advisers with the Company's prior written consent not to be unreasonably withheld.

The Company confirms that it is acting as principal for its own account and not as agent or trustee in any capacity on behalf of any party in relation to the Offering.

## 2.    CONDITIONS PRECEDENT

This Engagement Letter is not a commitment, express or implied, on the part of BNPP or any of its affiliates to underwrite or purchase securities or to commit any capital, nor does it obligate BNPP to enter into any underwriting agreement, subscription agreement or similar commitment with respect to the Offering; provided, that it is understood that BNPP may, but has no obligation to, execute a definitive purchase agreement relating to the Offering consistent with the purchase agreement being entered into among the Company and other purchasers of the Notes, in addition to the delivery of customary negative assurance and comfort letters. Any commitment by BNPP will be subject to (without limitation):

a)      compliance at all times by the Company with its obligations under this Engagement Letter and applicable laws and regulations;

b)      receipt of internal and external approvals by BNPP, including the completion of satisfactory know-your-customer checks and due diligence, and satisfactory completion of all regulatory requirements including governmental, contractual or corporate authorizations, consents or waivers by the Company; and

c)      appropriate documentation for the Offering (including a disclosure document and a purchase agreement) satisfactory to BNPP, and appropriate legal opinions, 10b-5 letters, comfort letters and officer's certificates, dated as of the date on which the Notes are allocated and priced or the Closing Date, as applicable, satisfactory to BNPP having been finalized, signed, issued and (or) delivered in advance of such respective dates.

## 3.    PROVISION OF INFORMATION

The Company acknowledges that, although the Company will be required to take full responsibility for the accuracy and completeness of the offering documents (including any road show or other marketing materials), BNPP will conduct a due diligence investigation into the affairs of the Company. Accordingly, the Company will assist BNPP and, upon reasonable request of BNPP, will allow reasonable access to its legal advisers, auditors, employees, senior management and that of its subsidiaries for the purposes of, and will in a timely manner, with adequate advanced notice, provide BNPP or its advisers with or access to all documents, information and any other materials of whatever nature, including any opinions, projections, forecasts (whether oral, written or in any other form) or any unpublished financial results which, in each case, are, or may be, relevant for the performance by BNPP of the services in connection with this Engagement Letter and the Offering, including know your customer due diligence (including but not limited to representations on financial sanctions, anti-money laundering and corruption), and which is material to an understanding of the Company's business including the assets, liabilities, profitability and prospects of the Company and its subsidiaries (the "**Confidential Information**") subject as provided in Section 9 (*Confidentiality*) below.

3

The Company agrees that BNPP will not be responsible for the verification of any such information and BNPP shall accept no responsibility for its accuracy or completeness. The Company will also ensure that all expressions of opinion, intention and expectation on the part of the Company contained in the Confidential Information or in the offering documents for the Offering will be honestly held and will be made only after due and careful enquiry and consideration.

The Company will ensure that all such information contained in the Confidential Information or in the offering documents for the Offering is true, accurate in all material respects, and not materially misleading when provided, and if such information becomes untrue, inaccurate or misleading in any material respect, it will notify BNPP of such as soon as reasonably practicable thereafter. The Company agrees to inform BNPP in advance of any significant steps which the Company or any of its agents or advisers propose to take in respect of the Company's business or any transaction relating to this Engagement Letter or the Offering and will ensure that BNPP is timely and fully informed of all material developments, strategies and discussions relevant to this Engagement Letter or the Offering and agrees in good faith to discuss the impact of any initiative that could have a material impact on the scope and terms of this Engagement Letter or the Offering.

## 4.    MARKETING

The Company agrees (i) to take all actions as BNPP may reasonably request for the purposes of marketing the Notes to potential investors, (ii) to procure the availability of its senior management and other representatives of the Company for investor meetings or calls at such times and places as BNPP may reasonably request, and (iii) to provide BNPP with all information BNPP reasonably requests to facilitate the performance of its services, including, without limitation, the placement of the Notes.

As the case may be, BNPP shall advise the Company of proposed appointments and schedules of the marketing phase for the Company's approval (such approval not to be unreasonably withheld or delayed). BNPP shall not provide or distribute any marketing materials to any investors or potential investors, except for the offering documents prepared by the Company and any other materials approved by the Company in writing for the purposes of the Offering.

For the avoidance of doubt, all marketing efforts of BNPP shall be subject to reasonable prior consultation and coordination, as practicable, with the Company and Seabury.

## 5.    [RESERVED]

## 6.    REGULATORY COMPLIANCE

The Company will comply with and, where necessary, will use its best efforts to assist BNPP in complying with, all applicable laws and regulations and the requirements of any stock exchange relevant to the Offering.

## 7.    FEES

On the date on which the settlement of the Notes occurs (the "**Closing Date**") under the Offering, the Company shall pay or cause to be paid to BNPP a fee equal to $2,500,000 (the "**Fee**"). Once paid, the Fee shall not be refundable under any circumstances.

## 8.    EXPENSES

Whether or not the Offering is consummated, the Company will be responsible for all of the following: (i) the fees and disbursements of its legal, accounting, tax and other advisers (including the cost of audit and accounting reports and the delivery of comfort letters as well as the fees and expenses of the trustee and principal paying agent's counsel) and rating agencies; (ii) the fees and expenses of any trustee or fiscal agent, common depository, paying agents, all stock exchange listing fees, listing agents and other agents in respect of the Offering; (iii) the cost of printing and distribution of the offering documents, as the case may be for the Offering; (iv) all fees and all of having the Notes eligible for clearing through The Depository Trust Company or such other clearing organization as may be agreed between BNPP and the Company; (v) all of the Company's road show related expenses, including the costs of publication and printing of the road show presentation and distribution and any other marketing material for the Notes; (vi) all reasonable out-of-pocket and documented expenses of BNPP incurred in connection with the Offering; and (vii) as the case may be, all costs associated with the translation of any document or agreement in relation to the Offering.

In addition, the Company will bear (and will pay or reimburse BNPP on demand) all reasonable and documented legal and other professional fees and out-of-pocket expenses (plus VAT and disbursements), including the legal fees of BNPP's counsel (which, for the avoidance of doubt, shall include any VAT on services provided from legal counsel where BNPP is required to self-assess and account for VAT in its role as recipient of such services) in connection with the Offering and all reasonable travel-related costs and expenses (including road show travel) and all other road show-related expenses (including electronic road show presentations, if applicable), it being understood that any privately chartered aircraft shall not be reimbursed. For avoidance of doubt, all costs and expenses will be paid irrespective of whether the Offering is completed and if completed, such costs and expenses will be paid to BNPP either by deducting the total amount from the gross proceeds of the Notes on the Closing Date or upon receipt of the relevant invoice by the Company in its sole discretion. Any of the advisors included in this Section 8, including BNPP's counsel, Cleary Gottlieb Steen & Hamilton LLP ("**Cleary**"), may submit invoices directly to the Company or to BNPP (without the need to comply with the United States Trustee fee guidelines), and the Company shall pay such invoices upon receipt of the relevant invoice; *provided* that the Company shall only be required to pay the reasonable and documented fees and out-of-pocket expenses of Cleary, in its capacity as counsel to BNPP, in an amount to be agreed.

All payments due under this Engagement Letter are to be made in U.S. dollars free and clear of any set-off, condition, restriction, deduction, withholding, claim or applicable taxes (with appropriate gross-up for any taxes deducted or withheld). All payments made by the Company to BNPP under this Engagement Letter are exclusive of value-added tax that might be chargeable in connection with the payment. If any value-added tax is so chargeable, it shall be paid by the Company at the same time as it makes the relevant payment. All amounts payable under this Engagement Letter shall be made in accordance with the payment instructions of BNPP on the due date for payment.

## 9.    CONFIDENTIALITY

In consideration of the Company making available to BNPP, whether directly or via its advisers, the Confidential Information, BNPP undertakes to the Company that, except as provided below, it will: (a) keep the Confidential Information confidential and not disclose it in whole or in part to any person except as provided below, (b) not make use of the Confidential

Information for any purpose other than for the purposes of this Engagement Letter and the Offering, (c) ensure that the Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information of a similar nature and (d) direct its employees, agents, officers, directors, affiliates and professional advisers to comply with the foregoing.

However, the following shall not constitute Confidential Information: (a) information which is publicly available, other than as a result of a breach of this Engagement Letter by BNPP or its agents or advisers, (b) information which was lawfully in BNPP's possession prior to disclosure of such Confidential Information and which was not acquired directly or indirectly from the Company, its advisers, agents, directors or employees for the purpose of the Offering or otherwise subject to a confidentiality obligation, (c) information which lawfully comes into BNPP's possession from a third party on a non-confidential basis, other than as a result of a breach of this Engagement Letter by BNPP or its agents or advisers or as a result of a breach of an obligation of confidentiality by any other person where BNPP or its agents or advisers know that an obligation of confidentiality exists in respect of such information and/or (d) information which is independently developed or arrived at by BNPP or its affiliates. BNPP is entitled to disclose Confidential Information: (a) if requested or required, in connection with any legal or arbitration proceedings, if and to the extent so ordered by a competent court or arbitral tribunal (after giving the Company notice to the extent legally possible), (b) if requested or required to do so under any law or regulation with which BNPP is required or accustomed to act, (c) if requested or required, to a governmental, banking, taxation or other regulatory authority or similar body or any stock exchange, (d) to BNPP's or the Company's professional advisers for the purpose of this Engagement Letter and the Offering provided that they are bound by the confidentiality obligations contained herein, (e) to its (and its affiliates) directors, officers, employees, agents and representatives who need to know the Confidential Information (or any part of it) in connection with the Offering or any other services provided by BNPP or its affiliates to the Company or its affiliates; provided that BNPP informs such persons of the confidential nature of the information., or (f) with the prior written consent of the Company. The confidentiality obligations of this Section 9 shall terminate twenty-four (24) months from the date hereof.

For the avoidance of doubt, nothing in this Engagement Letter shall restrict the ability of BNPP or its affiliates to consider information for due diligence purposes.

## 10.    COMMUNICATIONS

Except as required by law or regulation or by any legal or regulatory authority, the Company agrees that:

(a)    neither it nor any of its subsidiaries, will make any public announcement relating to this Engagement Letter, or prior to settlement of the Notes, concerning the Offering, without consulting with BNPP; it being understood that this provision shall in no way limit any announcement related to the Chapter 11 Cases;

(b)    it will not refer to the name (which for the avoidance of doubt also includes the brand, advertising, marketing or trading name) of BNPP or any of its affiliates in any report, document, press release, public statement, prospectus or other communication by the Company without BNPP's prior written consent; and

6

(c)     BNPP may, at its own expense and following the successful closing of the Offering, issue statements or place advertisements in financial and other newspapers and other journals describing its role and services in the Offering, including customary "tombstone" advertisements in publications of BNPP's choice, with the prior written consent of the Company.

BNPP reserves the right to refuse to issue or approve any such announcement and to prevent its distribution or publication, unless such distribution or publication is due to comply with applicable laws or regulators' orders.

## 11.    CONFLICTS

The Company understands that BNPP and/or its respective affiliates are involved in a wide range of commercial and investment banking and other activities (including asset management, corporate finance and securities, derivative and loan issuing, trading (including for customers, proprietary and hedging) and research) out of which conflicting interests or duties may arise with respect to the matters contemplated herein. Furthermore, in the course of its activities, BNPP and/or its affiliates may hold long or short positions and may trade or otherwise effect transactions for the account of any entity within BNPP or the accounts of customers in debt or equity securities or senior debt of the other parties of other companies which may be participants in the Offering.

The Company agrees that BNPP may, in the ordinary course of business, engage in any kind of commercial or investment banking or other business with other companies and may act with respect to such business in the same manner as if the Offering did not exist, regardless of whether any such action might have an adverse effect on the Notes, or the position of a party to the Offering or otherwise. Practices and procedures, including those commonly known as "Disclosure Walls", are maintained to restrict the flow of information and thereby manage or assist in managing such potential conflicts of interests or duties as may arise.

In relation to the Offering, information which is held by BNPP or any of its affiliates but of which none of the individual executives or employees of BNPP or of any of its affiliates involved in the Offering actually has knowledge (or could, without breach of internal procedures, properly obtain) will not for any purpose (unless so provided by general law or the rules of the Securities and Exchange Commission, *Autorité de Contrôle Prudentiel et de Résolution* ("**ACPR**"), the Financial Conduct Authority, the Prudential Regulation Authority, Germany's Federal Financial Supervisory Authority ("**BaFin**") or any regulatory body to which BNPP is subject) be taken into account in determining BNPP's responsibilities to the Company and such responsibilities will (subject as above) be entirely determined by the legal and regulatory rules and principles and the contractual terms applicable to the Company. In particular, the Company agrees that (subject as set out above) BNPP's will not be under a duty to use, to account for or disclose to the Company any non-public information acquired from, or during the course of carrying on business for, any other person.

The Company acknowledges that BNPP is not an adviser as to legal, tax, accounting, financial, regulatory or any other matter in any jurisdiction. The Company shall consult with its own advisers concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and BNPP shall not have any responsibility or liability to the Company with respect thereto.

7

## 12.    INDEMNITY AND LIMITATION

The Company hereby agrees to indemnify and hold harmless BNPP and its affiliates and its and their respective directors, officers, agents, employees, and control persons (collectively, the "**Indemnified Persons**") from and against any losses, claims, damages, liabilities or reasonable expenses incurred and documented by them (including without limitation reasonable fees and disbursements of counsel) which are related to or arise out of or in connection with, in each case, the proposed transactions giving rise to or contemplated by this Engagement Letter, including modifications or future additions to the Engagement Letter or BNPP's engagement thereunder or the implementation of such engagement (including, without limitation, the implementation of the Offering), or execution of letter agreements or other related activities, and to promptly reimburse BNPP and any other Indemnified Person for all reasonable expenses incurred and documented by any such Indemnified Person (including without limitation reasonable fees and disbursements of one counsel for each applicable jurisdiction) in connection with investigating, disputing, preparing to defend or defending any action or claim, whether or not in connection with pending or threatened litigation in which the Company, any of the Company's affiliates or an Indemnified Person is a party.

If any claim, action, suit, proceeding or investigation ("**Proceedings**") is commenced, as to which an Indemnified Person proposes to demand indemnification, it shall notify the Company with reasonable promptness; *provided, however*, that any failure by such Indemnified Person to notify the Company shall not relieve the Company from the Company's obligations hereunder, except to the extent the Company are materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure.

The Company shall not be liable for any settlement of any such action effected without the written consent of the Company, but if settled with the written consent of the Company, the Company agrees to indemnify and hold harmless any Indemnified Party from and against any loss or liability by reason of such settlement. The Company will not, however, be responsible for any losses, claims, damages, liabilities or expenses of any Indemnified Person to the extent a court of competent jurisdiction holds in a final non-appealable judgment (i) that the same have resulted primarily from the fraud, gross negligence or willful misconduct of such Indemnified Person, (ii) that arises out of a material breach by an Indemnified Person of its obligations under this Engagement Letter as determined by a court of competent jurisdiction in a final and non-appealable judgment or (iii) or that relates to any dispute solely between Indemnified Persons and not directly or indirectly arising out of any act or omission of the Company. The Company also agrees that if any indemnification sought by any Indemnified Person pursuant to this Engagement Letter is for any reason held to be unavailable, then (whether or not BNPP is the Indemnified Person) the Company and BNPP will contribute to the losses, claims, damages and expenses for which such indemnification is held unavailable in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and by the Indemnified Person on the other hand from the actual or proposed transactions contemplated by this Engagement Letter, and also the relative fault of the Company, on the one hand, and of the Indemnified Person, on the other, subject to the limitation that in any event BNPP's aggregate contribution to all losses, claims, damages, liabilities and expenses with respect to which contributions are available hereunder will not exceed the amount of fees actually received by BNPP from the Company pursuant to the proposed transactions giving rise to this Engagement Letter. For purposes of determining the relative benefits to the Company on the one hand, and the Indemnified Persons on the other hand of the transactions contemplated by this Engagement Letter, such benefits shall be deemed to be in the same proportion as (i) the total proceeds received or proposed to be received by the

Company pursuant to the transactions, whether or not consummated, for which BNPP is providing services as provided in the Engagement Letter bears to (ii) the fees paid or proposed to be paid by the Company or on the Company's behalf to BNPP in connection with the transactions contemplated by this Engagement Letter. No person found liable for a fraudulent misrepresentation (within the meaning of Section 11(f) of the U.S. Securities Act) shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation. The indemnity, reimbursement and contribution obligations of the Company under this Engagement Letter shall be in addition to any rights that any Indemnified Person may have at common law or otherwise and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and any Indemnified Person.

The Company further agrees that the Company will not, without the prior written consent of BNPP (and if different, the relevant Indemnified Persons) settle or compromise or consent to the entry of judgment in any pending or threatened Proceedings in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is an actual or potential party to such Proceedings), unless such settlement, compromise or consent (x) includes an unconditional release of such Indemnified Person, in form and substance reasonably satisfactory to such Indemnified Person, and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person (including, without limitation, BNPP). The Company shall not be liable for any settlement of any proceeding effected without its consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Company agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing, if at any time an Indemnified Person shall have requested the Company to reimburse such Indemnified Person for legal or other expenses in connection with investigating, responding to or defending any Proceedings as contemplated by this Engagement Letter, the Company shall be liable for any settlement of any Proceedings effected without the Company's written consent if (i) such settlement is entered into more than 60 days after receipt by the Company of such request for reimbursement and (ii) the Company shall not have reimbursed such Indemnified Person in accordance with such request and this Engagement Letter prior to the date of such settlement.

Neither BNPP nor any other Indemnified Person will be responsible or liable to the Company or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged as a result of the Offering, this Engagement Letter or any related transaction contemplated hereby or thereby or any use or intended use of the proceeds of any Notes.

In the case of Proceedings to which the indemnity in this Engagement Letter applies, such indemnity shall be effective whether or not such Proceedings are brought by the Company, the Company's equity holders or creditors or an Indemnified Person, whether or not an Indemnified Person is otherwise a party thereto and whether or not any aspect of the Offering is consummated.

The Company's indemnity, reimbursement and contribution obligations hereunder shall be in addition to any rights that BNPP may have under applicable law or otherwise.

This Section 12 will terminate upon the execution of a definitive purchase agreement relating to the Offering.

13.   **TERMINATION**

This Engagement Letter shall terminate upon the earliest of: (a) the date on which the settlement of the Notes occurs (*i.e.*, the Closing Date), (b) 10 days' written notice being given by (i) BNPP to the Company or (ii) the Company to BNPP, or (c) the date that is 12 months after the date hereof; *provided*, *however*, that the provisions of Sections 7 (*Fees*) through 12 (*Indemnity and Limitation*) (inclusive), Section 14 (*Special Resolution Regimes*), Section 16 (*Governing Law and Jurisdiction*), Section 17 (*Notices*), Section 18 (*Effectiveness*) and this Section 13 shall survive such termination in accordance with the terms of this Engagement Letter.

## 14.   SPECIAL RESOLUTION REGIMES

(A) <u>EU BRRD</u>

Notwithstanding and to the exclusion of any other term of this Engagement Letter or any other agreements, arrangements or understanding between BNPP and the Company (each, a "**Party**"), each Party acknowledges and accepts that a BRRD Liability arising under this Engagement Letter may be subject to the exercise of Bail-In Powers by the Relevant Resolution Authority, and acknowledges, accepts and agrees to be bound by:

(i)     the effect of the exercise of Bail-In Powers by the Relevant Resolution Authority in relation to any BRRD Liability of BNPP to the Company under this Engagement Letter, that (without limitation) may include and result in any of the following, or some combination thereof:

(A)     the reduction of all, or a portion, of the BRRD Liability or outstanding amounts due thereon;

(B)     the conversion of all, or a portion of, the BRRD Liability into shares, other securities or other obligations of BNPP or another person, and the issue to or conferral on the Company of such shares, securities or obligations;

(C)     a cancellation of the BRRD Liability;

(D)     the amendment or alteration of any interest, if applicable, thereon, the maturity or the dates on which any payments are due, including by suspending payment for a temporary period; and

(ii)     the variation of the terms of this Engagement Letter, as deemed necessary by the Relevant Resolution Authority, to give effect to the exercise of Bail-in Powers by the Relevant Resolution Authority.

For the purposes of this Section 14(A),

"**Bail-in Legislation**" means in relation to a member state of the European Economic Area which has implemented, or which at any time implements, the BRRD, the relevant implementing law, regulation, rule or requirement as described in the EU Bail-in Legislation Schedule from time to time;

"**Bail-in Powers**" means any Write-down and Conversion Powers as defined in the EU Bail-in Legislation Schedule, in relation to the relevant Bail-in Legislation;

"**BRRD**" means Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms;

"**BRRD Liability**" means a liability in respect of which the relevant Write Down and Conversion Powers in the applicable Bail-in Legislation may be exercised;

"**EU Bail-in Legislation Schedule**" means the document described as such, then in effect, and published by the Loan Market Association (or any successor person) from time to time at http://www.lma.eu.com/; and

"**Relevant Resolution Authority**" means the resolution authority with the ability to exercise any Bail-in Powers in relation to BNPP.

(B) U.S. Special Resolution Regimes

(a) In the event that BNPP is a Covered Entity becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from BNPP of this Engagement Letter, and any interest and obligation in or under this Engagement Letter, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if this Engagement Letter, and any such interest and obligation, were governed by the laws of the United States or a state of the United States.

(b) In the event that BNPP is a Covered Entity or a BHC Act Affiliate of BNPP becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Engagement Letter that may be exercised against BNPP are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if this Engagement Letter were governed by the laws of the United States or a state of the United States.

"**BHC Act Affiliate**" has the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 USC. § 1841(k).

"**Covered Entity**" means any of the following:

(a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R § 252.82(b);

(b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Default Right**" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**U.S. Special Resolution Regime**" means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

## 15.    MISCELLANEOUS

This Engagement Letter contains the entire agreement among the parties relating to the subject matter hereof and supersedes and cancels all oral statements and prior writings with respect thereto. Section headings herein are for convenience only and are not part of this Engagement Letter. This Engagement Letter may not be amended or modified except by the parties hereto jointly in writing in a subsequent agreement executed and delivered by the Company and BNPP. The engagement contemplated hereby and this Engagement Letter are solely for the benefit of the Company, BNPP and the Indemnified Persons under the indemnification provisions as set out in Section 12 (*Indemnity and Limitation*) above and its successors, assignees (as the case may be) and representatives, and no other person or entity shall acquire or have any right under or by virtue hereof.

No party is permitted to assign or novate any rights and/or obligations arising under this Engagement Letter without the express written consent of the other parties. For the avoidance of doubt, BNPP shall be entitled to transfer all of its rights and obligations under this Engagement Letter to any current affiliate and, from the date of such transfer, references to BNPP shall be read as references to such affiliate.

The Company's obligations hereunder, including but not limited to its obligations under Sections 7, 8, and 12 shall be entitled to administrative priority under section 503(b)(2) of the Bankruptcy Code, solely to the extent such obligations are incurred and become due and owing prior to the effective date of the Company's chapter 11 plan of reorganization filed in the Chapter 11 Cases.

## 16.    GOVERNING LAW AND JURISDICTION

This Engagement Letter shall be governed by and construed in accordance with the laws of the State of New York. The Company and BNPP irrevocably agree to waive trial by jury in any action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Engagement Letter or the performance of services hereunder.

Each of the parties hereto irrevocably agrees that, except as otherwise set forth in this paragraph, any state or federal court sitting in the State of New York shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute arising out of or relating to this Engagement Letter and, for such purposes, irrevocably submits to the jurisdiction of such courts; *provided* that, so long as the Chapter 11 Cases are pending, any such suit, action or proceeding shall be heard by the Bankruptcy Court. The Company irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. The Company agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon the Company and may be enforced in any other court to whose jurisdiction the Company is or may in the future be subject, by suit upon judgment. The Company has appointed Cogency Global, Inc. as its agent for service of process in the State of New York and agrees that service of any process, summons, notice or document by hand delivery or registered mail upon such agent shall be effective service of process for any suit, action or proceeding brought in any such court. The Company further agrees that nothing herein shall affect BNPP's right to effect service of process in any manner permitted by law or to bring a suit, action or proceeding (including a proceeding for enforcement of a judgment) in any other court or jurisdiction in accordance with applicable law.

## 17.   NOTICES

Notice given pursuant to any of the provisions of this Engagement Letter shall be in writing and shall be mailed or delivered or emailed to the Company and BNPP at its address listed at the beginning of this Engagement Letter, with a copy to: Milbank LLP, 55 Hudson Yards, New York, NY 10001; Attention: Tobias Stirnberg and Paul Denaro; E-Mail: TStirnberg@milbank.com; PDenaro@milbank.com.

We are delighted to accept this engagement and look forward to working with you on this transaction. Please confirm your acceptance of the foregoing by signing and returning to us the enclosed duplicate of this Engagement Letter.

## 18.   EFFECTIVENESS

This Engagement Letter shall become effective on the later of: (i) receipt of Bankruptcy Court approval of this Engagement Letter to the extent such approval is necessary; provided, that, in the case of this clause (i), if this Engagement Letter has previously been executed, while such approval is pending, the Company and BNPP agree to comply with the terms of this Engagement Letter as if it was in full force and effect, and (ii) execution of this Engagement Letter by the Company and BNPP. For the avoidance of doubt, BNPP shall not be liable under this Engagement Letter until it has become effective pursuant to this Section 18.

*(Signature pages follow)*

Yours faithfully,

**BNP PARIBAS SECURITIES CORP.**

By: _____

Name: Angela Barbieri

Title: Director

By: _____

Name: Alexis Venouil

Title: Vice President

*(Signature page to GOL Engagement Letter)*

The undersigned confirms its agreement and acceptance of the arrangements and terms and conditions set out in this Engagement Letter as of the date first above written.

**GOL Linhas Aéreas Inteligentes S.A.**

By: _Celso Guimaraes Ferrer Junior_
03E9C83680634BB...

Name: Celso Guimaraes Ferrer Junior

Title: CEO

By: RENATA DOMINGUES DA FONSECA GUINESI
A6F0094C2668440...

Name: RENATA DOMINGUES DA FONSECA GUINESI

Title: CLO

**GOL Finance**

By: _Celso Guimaraes Ferrer Junior_
03E9C83680634BB...

Name: Celso Guimaraes Ferrer Junior

Title: CEO

By: RENATA DOMINGUES DA FONSECA GUINESI
A6F0094C2668440...

Name: RENATA DOMINGUES DA FONSECA GUINESI

Title: CLO

*(Signature page to GOL Engagement Letter)*

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 34539FB3-4889-4453-96DB-0AFD650DAD81 | | Status: Completed |
| Subject: Docusign: GOL - Engagement Letter | | |
| Source Envelope: | | |
| Document Pages: 15 | Signatures: 4 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Alessandra Garcia |
| AutoNav: Enabled | | 55 Hudson Yards |
| EnvelopeId Stamping: Disabled | | New York, NY  10001 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | agarcia@milbank.com |
| | | IP Address: 20.231.206.121 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Alessandra Garcia | Location: DocuSign |
|     5/12/2025 7:15:23 AM |     agarcia@milbank.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Celso Guimaraes Ferrer Junior<br>cgfjunior@voegol.com.br<br>CEO<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Celso Guimaraes Ferrer Junior*<br>—03E9C83680634BB...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 163.116.233.49 | Sent: 5/12/2025 7:18:31 AM<br>Resent: 5/12/2025 7:47:43 AM<br>Viewed: 5/12/2025 7:54:30 AM<br>Signed: 5/12/2025 7:56:40 AM |
| Electronic Record and Signature Disclosure:<br>   Accepted: 5/12/2025 7:54:30 AM<br>   ID: ea28a239-aa28-4bcc-9945-880b2027f7fd | | |
| RENATA DOMINGUES DA FONSECA GUINESI<br>rddfonseca@voegol.com.br<br>CLO<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*RENATA DOMINGUES DA FONSECA GUINESI*<br>—A6F0004C2668440...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 201.158.101.25<br>Signed using mobile | Sent: 5/12/2025 7:18:31 AM<br>Viewed: 5/12/2025 7:19:16 AM<br>Signed: 5/12/2025 7:19:39 AM |
| Electronic Record and Signature Disclosure:<br>   Accepted: 5/12/2025 7:19:16 AM<br>   ID: 390fa800-7be5-4850-8a36-7c05e3b819e0 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Maria Rafaela Nunes<br>mnunes@milbank.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 5/12/2025 7:18:32 AM<br>Viewed: 5/12/2025 8:01:28 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via Docusign | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Marina Carvalho Rodriguez<br>mcrodriguez@milbank.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 5/12/2025 7:18:32 AM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via Docusign | | |
| Tobias Stirnberg<br>tstirnberg@milbank.com<br>Partner<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 5/12/2025 7:18:32 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 9/24/2024 8:57:35 AM<br>  ID: 3ac823c9-13cc-4828-a552-19eb4a2735b1 | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/12/2025 7:18:32 AM |
| Certified Delivered | Security Checked | 5/12/2025 7:19:16 AM |
| Signing Complete | Security Checked | 5/12/2025 7:19:39 AM |
| Completed | Security Checked | 5/12/2025 7:56:40 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 1/6/2020 1:12:32 PM
Parties agreed to: Celso Guimaraes Ferrer Junior, RENATA DOMINGUES DA FONSECA GUINESI, Tobias Stirnberg

24-10118-mg    Doc 1582    Filed 05/12/25    Entered 05/12/25 13:59:57    Main Document
Pg 21 of 23

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Milbank (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Milbank:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: erosario@milbank.com

**To advise Milbank of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at erosario@milbank.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Milbank**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to erosario@milbank.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Milbank**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to erosario@milbank.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

## Acknowledging your access and consent to receive and sign documents electronically

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Milbank as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Milbank during the course of your relationship with Milbank.