Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,[1] | : | Case No. 24-10118 (MG) |
| | : | |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

**DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE THIRD MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF GOL LINHAS AÉREAS INTELIGENTES S.A. AND ITS AFFILIATED DEBTORS AND (II) RESPONSE TO OBJECTIONS THERETO**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

ARGUMENT .......................................................................................................................... 7

I.    THE PLAN SETTLEMENT IS FAIR AND EQUITABLE AND SHOULD BE
      APPROVED. .................................................................................................................. 7

      A.    OVERVIEW OF PLAN SETTLEMENT ............................................................. 8

            1.    THE PLAN SUPPORT AGREEMENT ...................................................... 8

            2.    2026 AD HOC GROUP AND WHITEBOX JOINDERS TO PLAN
                  SUPPORT AGREEMENT ....................................................................... 10

      B.    EACH COMPONENT OF THE PLAN SETTLEMENT IS FAIR AND
            EQUITABLE AND SHOULD BE APPROVED. ................................................ 13

II.   THE PLAN SATISFIES THE REQUIREMENTS FOR CONFIRMATION AND
      SHOULD BE APPROVED. .......................................................................................... 20

      A.    SECTION 1129(A)(1): THE PLAN COMPLIES WITH ALL APPLICABLE
            PROVISIONS OF THE BANKRUPTCY CODE. ............................................... 20

      B.    SECTION 1122: THE PLAN'S CLASSIFICATION STRUCTURE IS
            PROPER. .............................................................................................................. 20

      C.    SECTION 1123(A): THE PLAN'S CONTENTS COMPLY WITH THE
            MANDATORY BANKRUPTCY CODE REQUIREMENTS............................. 24

      D.    SECTION 1123(B): THE PLAN'S CONTENTS COMPLY WITH THE
            PERMISSIVE BANKRUPTCY CODE REQUIREMENTS. .............................. 25

            1.    THE PLAN RELEASES, EXCULPATION PROVISION, AND
                  INJUNCTION SHOULD BE APPROVED. ............................................. 26

                  A.    THE DEBTOR RELEASES ARE APPROPRIATE AND
                        SHOULD BE APPROVED. ......................................................... 28

                  B.    THE THIRD-PARTY RELEASES ARE CONSENSUAL
                        AND SHOULD BE APPROVED. ................................................ 29

                  C.    THE EXCULPATION PROVISION SHOULD BE
                        APPROVED. ............................................................................... 33

D.    THE INJUNCTION IS APPROPRIATE AND SHOULD BE
APPROVED. ................................................................................... 37

E.    SECTION 1129(A)(2): THE DEBTORS HAVE COMPLIED WITH THE
BANKRUPTCY CODE ........................................................................ 43

1.    SECTION 1125: DISCLOSURE STATEMENT AND
SOLICITATION. .................................................................... 43

2.    SECTION 1126: ACCEPTANCE OF THE PLAN. ................. 44

F.    SECTION 1129(A)(3): THE PLAN HAS BEEN PROPOSED IN GOOD
FAITH. ................................................................................................ 46

G.    SECTION 1129(A)(4): THE PLAN PROVIDES THAT FEE CLAIMS ARE
SUBJECT TO COURT APPROVAL ..................................................... 48

H.    SECTION 1129(A)(5): THE DEBTORS HAVE DISCLOSED OR WILL
DISCLOSE ALL NECESSARY INFORMATION REGARDING
DIRECTORS, OFFICERS, AND INSIDERS TO THE EXTENT KNOWN. ...... 49

I.    SECTION 1129(A)(6): THE PLAN DOES NOT CONTAIN ANY RATE
CHANGES. .......................................................................................... 50

J.    SECTION 1129(A)(7): THE PLAN IS IN THE BEST INTERESTS OF ALL
CREDITORS AND INTEREST HOLDERS. ......................................... 50

K.    SECTION 1129(A)(8): THE PLAN HAS NOT BEEN ACCEPTED BY ALL
IMPAIRED CLASSES BUT IT IS NEVERTHELESS CONFIRMABLE. ......... 52

L.    SECTION 1129(A)(9): THE PLAN PROVIDES FOR PAYMENT IN FULL
OF ALL ALLOWED PRIORITY CLAIMS. .......................................... 53

M.    SECTION 1129(A)(10): THE PLAN HAS BEEN ACCEPTED BY AT
LEAST ONE IMPAIRED CLASS OF CLAIMS ................................... 54

N.    SECTION 1129(A)(11): THE PLAN IS FEASIBLE. ........................... 54

O.    SECTION 1129(A)(12): ALL STATUTORY FEES HAVE BEEN OR WILL
BE PAID. ............................................................................................. 56

P.    SECTION 1129(A)(13): RETIREE BENEFITS WILL BE CONTINUED. ......... 56

Q.    SECTION 1129(A)(14), 1129(A)(15), 1129(A)(16): INAPPLICABLE
PROVISIONS. ..................................................................................... 57

R.    SECTION 1129(B): THE PLAN SATISFIES THE "CRAM DOWN"
REQUIREMENTS WITH RESPECT TO NON-ACCEPTING CLASSES. ....... 57

1.    THE PLAN DOES NOT DISCRIMINATE UNFAIRLY. ....................... 58

2.    THE PLAN IS FAIR AND EQUITABLE. ................................................ 59

S.    SECTIONS 1121(A), 1129(C), 1129(D), AND 1129(E) AND
BANKRUPTCY RULE 3016. .............................................................. 59

T.    PROCEDURES RELATING TO ASSUMPTION AND REJECTION OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES ARE
APPROPRIATE. ........................................................................................... 60

U.    SECTION 1127: MODIFICATION OF THE PLAN. ......................................... 62

III.    CAUSE EXISTS TO WAIVE ANY STAY UNDER THE BANKRUPTCY RULES .... 63

A.    COURTS ROUTINELY GRANT RULE 3020(E) WAIVERS IN SIMILAR
CASES. .................................................................................................. 64

B.    WAIVER IS NECESSARY TO MEET IMMINENT DIP AND EXIT
FINANCING DEADLINES. ............................................................... 65

C.    ONGOING CHAPTER 11 COSTS FURTHER JUSTIFY IMMEDIATE
EFFECTIVENESS. ............................................................................ 67

D.    STRONG CREDITOR SUPPORT AND A LARGELY CONSENSUAL
PLAN WEIGH IN FAVOR OF WAIVER. ......................................... 68

E.    THE UST OBJECTION'S CONCERNS ARE MISPLACED AND FAIL TO
JUSTIFY A STAY IN THE FACE OF THE DEBTORS' GOOD CAUSE. ....... 69

IV.    CONCLUSION. .......................................................................................... 72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2U, Inc.*,
No. 24-11279 (MEW) (Bankr. S.D.N.Y. Sept. 9, 2024) .............................................42, 68, 69

*In re Acorda Therapeutics, Inc.*,
No. 24-22284 (DSJ) (Bankr. S.D.N.Y. Aug. 7, 2024)............................................................42

*In re Adelphia Commc'ns Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y. 2005).................................................................................15

*In re Adelphia Comm's Corp.*,
368 B.R. 140, 261 (Bankr. S.D.N.Y. 2007) ...............................................................28, 46, 50

*In re AOV Indus., Inc.*,
792 F.2d 1140 (D.C. Cir. 1986).........................................................................................40

*In re Aralez Pharm. US Inc.*,
No. 18-12425 (MG) (Bankr. S.D.N.Y. May 7, 2019).............................................................32

*In re Avianca Holdings S.A.*,
632 B.R. 124 (Bankr. S.D.N.Y. 2021).................................................................................32

*In re Avianca Holdings S.A.*,
No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021).....................................................36, 64

*In re Campbell*,
89 B.R. 187 (Bankr. N.D. Fla. 1988) ..................................................................................46

*In re Charter Commc'ns*,
2010 WL 502764 (Bankr. S.D.N.Y. Feb. 8, 2010) ................................................................39

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................................................................28

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010)............................................................................47, 48

*In re Chemtura Corp.*,
No. 09-11233, 2010 WL 4607822 (Bankr. S.D.N.Y. Nov. 3, 2010)........................................68

*In re Cumulus Media Inc.*,
No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) [Docket No. 769] ............................37

*In re Cumulus Media Inc.*,
No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 2, 2018) ...........................................32

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ...................................................................46

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ..............................................................28, 46

*In re Diamond Sports Grp., LLC*,
No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) .......................................38

*In re Ditech Holding Corp.*,
606 B.R. 544 (Bankr. S.D.N.Y. 2019)...............................................................14, 32

*DJS Props., L.P. v. Simplot*,
397 B.R. 493 (D. Idaho 2008)...........................................................................60, 61

*In re Endo Int'l plc*,
No. 22-22549 (Bankr. S.D.N.Y. Mar. 18, 2024, Mar. 22, 2024)..................36, 37, 42

*In re Extraction Oil & Gas, Inc.*,
No. 20-11548 (CSS) (Bankr. D. Del. Dec. 10, 2020) ............................................38

*In re First Mode Holdings, Inc.*,
No. 24-12794 (Bankr. D. Del. Mar. 26, 2025)..................................................64, 66

*In re Franco's Paving LLC*,
654 B.R. 107 (Bankr. S.D. Tex. 2023) ...................................................................46

*In re Friese*,
103 B.R. 90 (Bankr. S.D.N.Y. 1989) .....................................................................46

*In re Gritstone Bio, Inc.*,
No. 24-12305 (Bankr. D. Del. Mar. 21, 2025).......................................................64

*In re Grupo Aeroméxico, S.A.B. de C.V.*,
No. 20-11563 (SCC) (Bankr. S.D.N.Y. Feb. 4, 2022)......................................36, 64

*In re Hermitage Offshore Servs. Ltd.*,
No. 20-11850 (MG) (Bankr. S.D.N.Y.) .......................................................67, 68, 69

*In re Hot'z Power Wash*,
655 B.R. 107 (Bankr. S.D. Tex. 2023) ...................................................................46

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007)...................................................................................15

*In re JER Investors Trust, Inc.*,
   No. 23-12109 (Bankr. D. Del. Mar. 26, 2025) .......................................................64

*In re Jevois Texas, LLC*,
   No. 25-90002 (Bankr. S.D. Tex. March 4, 2025) ...................................................67

*In re LaVie Care Centers, LLC*,
   2024 WL 4988600 (Bankr. N.D. Ga. Dec. 5, 2024) ..............................................33

*In re Lumio Holdings, Inc.*,
   No. 24-11916 (JKS) (Bankr. D. Del. Dec. 30, 2024) ............................................38

*Lynch v. Lapidem Ltd.* (*In re Kirwan Offices S.a.r.l.*),
   592 B.R. 489 (S.D.N.Y. 2018), *aff'd*, 792 F. App'x 99 (2d Cir. 2019)................40

*In re Nine West Holdings, Inc.*,
   No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019)....................................32, 64

*In re M. Long Arabians*,
   103 B.R. 211 (B.A.P. 9th Cir. 1989) .....................................................................46

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005).................................................................................29

*In re M.V.J. Auto World, Inc.*,
   661 B.R. 186 (Bankr. S.D. Fla. 2024) ..................................................................46

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984) .............................................................................................33

*In re Number Holdings, Inc.*,
   No. 24-10719 (Bankr. D. Del.) ..................................................................38, 64, 66

*In re Oldco Tire Distributors, Inc.*,
   No. 24-12391 (Bankr. D. Del. Mar. 28, 2025)......................................................65

*In re OYA Renewables Dev. LLC*,
   No. 24-12574 (Bankr. D. Del. Apr. 22, 2025) [Docket No. 541] ..........................65

*In re Petrie Retail, Inc.*,
   304 F.3d 223 (2d Cir. 2002).................................................................................39

*In re Res. Cap., LLC*,
   497 B.R. 720 (Bankr. S.D.N.Y. 2013) ..................................................................15

*In re Res. Cap., LLC*,
   508 B.R. 838 (Bankr. S.D.N.Y. 2014)...................................................................39

*In re Revlon, Inc.*,
No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Apr. 3, 2023) ..........................................36

*In re Robertshaw US Holding Corp.*,
662 B.R. 300 (Bankr. S.D. Tex. 2024) ...............................................................33

*In re Ruti-Sweetwater, Inc.*,
836 F.2d 1263 (10th Cir. 1988) ...........................................................................46

*In re S B Bldg. Assocs. Ltd.*,
621 B.R. 330 (Bankr. D.N.J. 2020) .....................................................................46

*In re SAS AB*,
No. 22-10925 (MEW) (Bankr. S.D.N.Y. Mar. 22, 2024).....................................36

*In re Spirit Airlines, Inc.*,
2025 WL 737068 (Bankr. S.D.N.Y. Mar. 7, 2025) .............................30, 33, 39, 41

*In re Stearns Holdings, LLC*,
607 B.R. 781 (Bankr. S.D.N.Y. 2019).................................................................39

*In re Stearns Holdings, LLC*,
No. 19-12226 (SCC) (Bankr. S.D.N.Y. Nov. 13, 2019)...................................32, 42

*In re SVB Fin. Grp.*,
No. 23-10367 (MG) (Bankr. S.D.N.Y. Aug. 2, 2024)...........................................42

*In re Syncora Guarantee Inc.*,
757 F.3d 511 (6th Cir. 2014) ...............................................................................71

*In re Texaco Inc.*,
182 B.R. 937 (Bankr. S.D.N.Y. 1995)..................................................................39

*In re TLC Vision (USA) Corp.*,
No. 09-14473 (Bankr. D. Del. May 19, 2010)......................................................66

*In re Tops Holding II Corp.*,
No. 18-22279 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018).........................................32

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009).......................................................................................30, 39

*In re Triangle USA Petroleum Corp.*,
No. 16-11566 (MFW) (Bankr. D. Del. Mar. 10, 2017) .........................................61

*In re Trib. Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ....................................................................46

*In re Westwood Plaza Apartments, Ltd.*,
  192 B.R. 693 (E.D. Tex. 1996) ............................................................. 46

*In re Wheel Pros, LLC*,
  No. 24-11939 (JTD) (Bankr. D. Del. Oct. 10, 2024) ............................... 38

**Statutes**

11 U.S.C. § 1129(a)(13) ....................................................................... 56, 57

11 U.S.C. §§ 701-784 ................................................................................ 49

11 U.S.C. §§101-1532 ..................................................................... *passim*

11 U.S.C. § 365(d)(2) ........................................................................... 60, 61

11 U.S.C. § 1183(b)(7) ............................................................................. 46

11 U.S.C. § 1122 .......................................................... 20, 23, 43, 62

11 U.S.C. § 1122(b) .................................................................................. 23

11 U.S.C. § 1123(a) .................................................................................. 24

11 U.S.C. § 1123(a)(1) .......................................................................... 21, 24

11 U.S.C. § 1123(a)(8) .............................................................................. 24

11 U.S.C. § 1123(b) .................................................................................. 25

11 U.S.C. § 1123(c) .................................................................................. 20

11 U.S.C. § 1125(b) .............................................................................. 43, 44

11 U.S.C. § 1125(e) .............................................................................. 27, 34

11 U.S.C. § 1126 ...................................................................................... 44

11 U.S.C. § 1126(c) .............................................................................. 45, 46

11 U.S.C. § 1127 ...................................................................................... 62

11 U.S.C. § 1129(a)(1) ......................................................................... 20, 43

11 U.S.C. § 1129(a)(2) ......................................................................... 43, 46

11 U.S.C. § 1129(a)(3) ...................................................................... 46, 47, 48

11 U.S.C. § 1129(a)(4) ......................................................................... 48, 49

11 U.S.C. § 1129(a)(5).................................................................................................49, 50

11 U.S.C. § 1129(a)(6).......................................................................................................50

11 U.S.C. § 1129(a)(7).................................................................................................50, 52

11 U.S.C. § 1129(a)(8).......................................................................................................52

11 U.S.C. § 1129(a)(9).................................................................................................53, 54

11 U.S.C. § 1129(a)(10)...............................................................................................54, 57

11 U.S.C. § 1129(a)(11).........................................................................................54, 55, 56

11 U.S.C. § 1129(b).............................................................................................52, 57, 58, 59

**Other Authorities**

Fed. R. Bankr. P. 3020(e) ..................................................................................... *passim*

Fed. R. Bankr. P. 9019........................................................................................7, 14, 15

H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368 ....................20

S. Rep. No. 95-989, at 126 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5913 ....................20

GOL Linhas Aéreas Inteligentes S.A. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby submit this memorandum of law in support of confirmation of the *Third Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* filed on May 13, 2025 [Docket No. 1592] (as may be modified, amended, or supplemented from time to time, the "Plan")[1] and respectfully represent as follows:

## **PRELIMINARY STATEMENT**

1.       The Plan, which is the product of extensive good-faith, arm's-length negotiations and represents the culmination of the Debtors' restructuring efforts, enjoys widespread creditor support—including from the Debtors' largest economic stakeholders.  The Plan also enjoys the support of the Committee, the fiduciary representing the interests of the Debtors' unsecured creditors.

2.       The Plan is a remarkable achievement for the Debtors and their stakeholders.  As a result of the settlements embodied in the Plan, the Plan provides significant recoveries to holders of General Unsecured Claims that otherwise would likely not have been available.  Further, the Plan allows the Debtors to achieve their key restructuring goals:  a comprehensive restructuring of their balance sheet to support the significant restructuring of their operations, which was completed over the course of these Chapter 11 Cases.

---

[1]     Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan, the *Disclosure Statement for Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1390] (the "Disclosure Statement"), or the *Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting Procedures; (III) Approving Forms of Ballots; (IV) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI) Establishing Notice and Objection Procedures* [Docket No. 1388] (the "Disclosure Statement Order"), as applicable.

3.      Of the approximately 210,000 parties who received the Confirmation Hearing Notice, only the U.S. Trustee filed an objection to confirmation of the Plan.[2]  This is largely a reflection of not only the significant amount of work the Debtors did leading up to filing their Plan and Disclosure Statement to formulate a Plan that maximized value for all of their stakeholders, but also, as the Court is aware, the significant amount of work undertaken by the Debtors following approval of the Disclosure Statement to resolve threatened objections to confirmation of the Plan. As previewed with the Court, the Debtors also worked with the U.S. Trustee to narrow the issues in dispute before the filing of the UST Objection; the Debtors and the U.S. Trustee have continued to work diligently following the filing of the UST Objection to further narrow the open items. However, the U.S. Trustee continues to object to the Plan on a number of grounds, each of which is addressed herein.

---

[2]     *See United States Trustee's Objection to Confirmation of the Second Modified Third Amended Joint Chapter 11 Plan of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1577] (the "UST Objection"). Certain parties filed limited objections and/or reservations of rights regarding the Plan, as placeholders pending finalization of the Plan, Confirmation Order, and Plan Supplement documents, among other steps.  The Debtors anticipate that these limited objections and/or reservation of rights will be rendered moot and/or resolved prior to the Confirmation Hearing.  Specifically, the Ad Hoc Group of Abra Noteholders and DIP Lenders filed a brief reservation of rights to the extent any amendment to the Plan or provision of the Confirmation Order should adversely affect the treatment of DIP Facility Claims in a manner other than as provided in the Plan.  *See Reservation off Rights of the Ad Hoc Group of Abra Noteholders and DIP Lenders Regarding the Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. And Its Affiliated Debtors* [Docket No. 1586]. The Debtors do not believe any such amendments or provisions will adversely affect the treatment of DIP Facility Claims but, as the Debtors have done throughout these Chapter 11 Cases, will continue to work with the Ad Hoc Group of Abra Noteholders and DIP Lenders should concerns arise.  Additionally, Oracle America, Inc. filed *Oracle's Assumption and Cure Objection and Reservation of Rights Regarding Debtors' Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aereas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1583].  The Debtors were working with Oracle to resolve this objection before it was filed and will continue to do so in an effort to reach a resolution.  Finally, the indenture trustee for the 2026 Senior Secured Notes filed a provisional objection and reservation of rights.  *See Provisional Objection and Reservation of Rights of the Senior Notes Trustee to Confirmation of Joint Chapter 11 Plan of Reorganization* [Docket No. 1587]; *Amended Provisional Objection and Reservation of Rights of the Senior Notes Trustee to Confirmation of Joint Chapter 11 Plan of Reorganization* [Docket No. 1588].  The Debtors are not aware of any holders of 2026 Senior Secured Notes that did not join the Plan Support Agreement and that are ineligible holders as of today, and the Debtors therefore believe that the indenture trustee's objection will be mooted.

4.      *First*, the U.S. Trustee persists in arguing that the Third-Party Releases are not consensual and interposes several objections premised thereon.  For the reasons set forth in prior briefing and argued at the Disclosure Statement hearing, the Third-Party Releases are consensual, and this objection should be overruled.  *Second*, the U.S. Trustee seeks to further limit the Exculpation Provision.  But the Exculpation Provision is already narrowly tailored to cover the parties that made significant contributions to these cases, including by carrying out the Court's orders, and it covers actions in a temporal scope well within the bounds of existing precedent. *Third*, the U.S. Trustee raises a number of objections to the Injunction as it relates to the Third-Party Releases, including that the Court lacks jurisdiction or authority to enter such Injunction and that the relevant standards are not met.  But the U.S. Trustee fails to account for the consensual nature of the Third-Party Releases and misapprehends the relationship of the Third-Party Releases to the Plan of which they are an essential part.  The U.S. Trustee can cite ***no*** caselaw counseling against the Court's ability to issue an Injunction implementing and giving effect to a Plan that it has evaluated and found appropriate to confirm.  *Finally*, the U.S. Trustee objects to waiving the stay of the order confirming the Plan (the "Confirmation Order") provided in Bankruptcy Rule 3020(e).  This argument fails to recognize the truly exigent need to implement the Plan's transactions in an expeditious manner and is flatly inconsistent with the overwhelming weight of authority within and outside of this District.  The UST Objection should be overruled.

5.      The Debtors also received a number of informal objections to, and comments regarding, the Plan (such informal objections, together with the UST Objection, the "Objections"), which the Debtors believe have all been resolved.  The Debtors expect that only the UST Objection will go forward at the Confirmation Hearing.

6.      For the reasons set forth herein and in the Supporting Declarations,[3] the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. Accordingly, the Debtors respectfully request that the Court confirm the Plan.

## BACKGROUND[4]

7.      On January 25, 2024, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.      The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the *Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 58]. On February 9, 2024, the Office of the U.S. Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee"). *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 114]. On February 13, 2024, the U.S. Trustee filed a notice amending the composition of the Committee. *See Am. Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 134]. No trustee or examiner has been appointed in the Chapter 11 Cases.

---

[3]     *See* (i) *Declaration of Joseph W. Bliley in Support of Confirmation of Joint Chapter 11 Plan of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* (the "Bliley Declaration"), (ii) the *Declaration of John E. Luth in Support of Confirmation of Joint Chapter 11 Plan of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* (the "Luth Declaration"), and (iii) the *Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* (the "Voting Declaration" and, together with the Bliley Declaration and the Luth Declaration, the "Supporting Declarations"). The Bliley Declaration and Luth Declaration are each filed contemporaneously herewith, and the Voting Declaration will be filed on the date set forth in the Disclosure Statement Order.

[4]     Relevant facts in support of confirmation of the Plan are also set forth in the Disclosure Statement and the *Declaration of Joseph W. Bliley in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 11], the Supporting Declarations, and the record of the Chapter 11 Cases. Such facts are incorporated herein as if fully set forth herein.

9.     On March 20, 2025, the Debtors filed the solicitation versions of the Disclosure

Statement and the *Second Modified Third Amended Joint Chapter 11 Plan of GOL Linhas Aéreas*

*Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1389].

10.     On March 20, 2025, the Court entered the Disclosure Statement Order approving

the Disclosure Statement and authorizing the Debtors to solicit votes on the Plan.  Upon entry of

the Disclosure Statement Order, and in accordance with its terms, the Debtors, through their

solicitation agent, Kroll Restructuring Administration LLC, caused the applicable solicitation

packages to be transmitted to the holders of Claims in Class 3 (2028 Notes Claims), Class 4 (2026

Senior Secured Notes Claims), Class 5 (Glide Notes Claims), Class 6 (Debenture Banks Claims),

Class 7 (AerCap Secured Note Claims), Class 8 (Safra Claims), Class 10(a) (GLAI General

Unsecured Claims), Class 10(b) (GLA General Unsecured Claims), Class 10(c) (GFL General

Unsecured Claims), Class 10(d) (GFC General Unsecured Claims), Class 10(f) (GAC General

Unsecured Claims), Class 10(h) (Smiles Fidelidade General Unsecured Claims), Class 10(i)

(Smiles Viagens General Unsecured Claims), Class 10(j) (Smiles Argentina General Unsecured

Claims), Class 10(k) (Smiles Viajes General Unsecured Claims), Class 11 (General Unsecured

Convenience Class Claims) (all of the foregoing, the "Voting Classes").  *See Affidavit of Service*

*of Solicitation Materials* [Docket No. 1567].  In addition, the Debtors caused the notices of non-

voting status, substantially in the forms attached to the Disclosure Statement Order as Exhibits 9

and 10, to be transmitted to the holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2

(Other Secured Claims), and Class 9 (Non-U.S. General Unsecured Claims), as well as holders of

Claims that were subject to a pending objection as of the Voting Record Date.  *See id.*  Further,

the Debtors caused the Confirmation Hearing Notice to be transmitted to various parties in interest

and published the publication version of the Confirmation Hearing Notice in the *Wall Street Journal* and the *Folha de São Paulo*. *See id.*

11.    The deadline for all holders of Claims entitled to vote on the Plan was May 12, 2025 at 4:00 p.m. (prevailing Eastern time) (the "Voting Deadline"), unless extended by the Debtors in accordance with the Disclosure Statement Order.[5]  As will be set forth in the Voting Declaration and detailed below, the Plan has been accepted by 15 of the 16 Voting Classes.  The votes cast with respect to the Plan are summarized below:[6]

| Class | % Number Accepted | % Amount Accepted | % Number Rejected | % Amount Rejected | Accept / Reject |
|---|---|---|---|---|---|
| **Class 3** 2028 Notes Claims | 100% | 100% | 0% | 0% | Accept |
| **Class 4** 2026 Senior Secured Notes Claims | 100% | 100% | 0% | 0% | Accept |
| **Class 5** Glide Notes Claims | 100% | 100% | 0% | 0% | Accept |
| **Class 6** Debenture Banks Claims | 100% | 100% | 0% | 0% | Accept |
| **Class 7** AerCap Secured Note Claims | 100% | 100% | 0% | 0% | Accept |
| **Class 8** Safra Claims | 100% | 100% | 0% | 0% | Accept |
| **Class 10(a)** GLAI General Unsecured Claims | 85.07% | 97.53% | 14.93% | 2.47% | Accept |
| **Class 10(b)** GLA General Unsecured Claims | 86.78% | 98.47% | 13.22% | 1.53% | Accept |

---

[5]    The Voting Deadline for Abra was extended until 5:00 p.m. on Tuesday, May 13, 2025 (prevailing Eastern time).

[6]    The results summarized herein are preliminary and are subject to the final results that will be included in the Voting Declaration.

| Class | % Number Accepted | % Amount Accepted | % Number Rejected | % Amount Rejected | Accept / Reject |
|---|---|---|---|---|---|
| **Class 10(c)** <br> GFL General Unsecured Claims | 85.27% | 94.66% | 14.73% | 5.34% | Accept |
| **Class 10(d)** <br> GFC General Unsecured Claims | 73.08% | 83.75% | 26.92% | 16.25% | Accept |
| **Class 10(f)** <br> GAC General Unsecured Claims | 100% | 100% | 0% | 0% | Accept |
| **Class 10(h)** <br> Smiles Fidelidade General Unsecured Claims | 0% | 0% | 0% | 0% | Presumed to Accept (*see* Plan, Art. IV.C) |
| **Class 10(i)** <br> Smiles Viagens General Unsecured Claims | 0% | 0% | 0% | 0% | Presumed to Accept (*see* Plan, Art. IV.C) |
| **Class 10(j)** <br> Smiles Argentina General Unsecured Claims | 0% | 0% | 0% | 0% | Presumed to Accept (*see* Plan, Art. IV.C) |
| **Class 10(k)** <br> Smiles Viajes General Unsecured Claims | 0% | 0% | 0% | 0% | Presumed to Accept (*see* Plan, Art. IV.C) |
| **Class 11** <br> General Unsecured Convenience Class Claims | 0% | 0% | 100% | 100% | Reject |

## **ARGUMENT**

12.     As set forth herein and in the Supporting Declarations, the Plan Settlement is fair and equitable under Rule 9019, and the Plan satisfies all of the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

## I.    THE PLAN SETTLEMENT IS FAIR AND EQUITABLE AND SHOULD BE APPROVED.

13.     The Plan provides for the global settlement (the "<u>Plan Settlement</u>") of all Claims, Interests, and controversies among various constituents, including the settlements among the

Debtors, Abra, and the Committee embodied in the Restructuring Term Sheet attached to the Plan

Support Agreement, the 2026 Settlement, and the Whitebox Settlement (each as defined below).

The Plan Settlement is a critical component of the Plan.  *See* Bliley Decl. ¶ 5.  The result of

extensive, hard-fought, and good-faith negotiations, the Plan Settlement resolves many complex

issues in a manner that avoids lengthy and expensive litigation, makes significant value available

to unsecured creditors, and is supported by the Debtors' largest economic stakeholders and the

Committee—the fiduciary representing the interests of all holders of General Unsecured Claims.

*See id.*  As detailed below, the Plan Settlement is fair, equitable, and in the best interests of the

Debtors' estates and should be approved.

A.     **Overview of Plan Settlement**

1.     *The Plan Support Agreement*

14.    As described herein and in the Disclosure Statement, the Plan is predicated on a

global settlement among the Debtors, Abra, and the Committee, the reasonableness and fairness

of which are supported by the investigations of two independent fiduciaries:  the Restructuring

Committee and the Committee.  *See id.* ¶ 6.

15.    It was critical to the Debtors that, before they began to consider what would be

required to formulate a chapter 11 plan, the Restructuring Committee investigate certain

prepetition financing and other transactions that had been effectuated prepetition, including the

Abra Transaction, to determine whether there were any potential causes of action in connection

therewith that would maximize the value of the Estates for their stakeholders.  *See id.* ¶ 7.

Accordingly, as detailed in the Disclosure Statement, as part of the Restructuring Committee's

investigation, counsel to the Restructuring Committee performed a comprehensive and detailed

review of a wide range of potential claims against the parties involved in the transactions it

investigated, including, among other things, preference and fraudulent transfer claims,

contract-based claims, and conduct-based claims, including claims for breach of fiduciary duty. *Id.* This investigation and the conclusions thereof provided the support needed for the Debtors to formulate the proposed Plan and engage in negotiations among the Debtors, Abra, and the Committee that ultimately resulted in the Plan Support Agreement. *Id.*

16.    Similarly, before engaging in plan negotiations, the Committee conducted an extensive, months long investigation into certain of the Debtors' prepetition transactions, including the Abra Transaction. *Id.* ¶ 8. The Debtors and Abra worked cooperatively with the Committee to respond to its discovery requests in connection with this investigation, producing approximately 22,000 documents in the aggregate (comprising at least 121,000 pages), and spent numerous hours, together with their respective advisors, engaging in informal dialogue with the Committee to provide it with relevant background and contextual information. *Id.* On July 12, 2024, the Committee delivered a list of claims that the Committee believed could be asserted in connection with the Abra Transaction, among other potential claims and causes of action against various parties in interest, thereby extending the Challenge Period to October 11, 2024.[7] This list of claims identified numerous potential claims against various parties in interest, including claims for: (i) disallowance of the 2028 Notes make-whole claims; (ii) partial reduction of the 2028 Notes Claims on account of original issue discount; (iii) actual and/or constructive fraudulent transfer as to certain aspects of the Abra Transaction; (iv) preferential transfer as to certain aspects of the Abra Transaction; (v) equitable subordination of Abra's secured claims; (vi) unconscionability

---

[7]    As discussions progressed in the fall of 2024, the parties extended the Challenge Period to January 11, 2025 [Docket No. 1021] and then again to February 11, 2025 [Docket No. 1223]. Thereafter, the parties agreed to further extend the Challenge Period for the Committee solely with respect to claims included in the List of Claims other than those pertaining to the 2026 Senior Secured Notes, to the earlier of (i) the Effective Date and (ii) twenty-one (21) calendar days following the earliest of (x) the termination of the Plan Support Agreement (other than as a result of the occurrence of the Effective Date), (y) the Debtors' withdrawal of the Plan, and (z) the Court's entry of an order denying confirmation of the Plan [Docket No. 1276].

(and thus unenforceability) as to the 2028 Senior Secured Exchangeable Note Purchase Agreement and the 2028 Senior Secured Note Purchase Agreement; and (vii) disgorgement or recharacterization of the post-petition interest paid on the 2028 Notes, to name a few.[8]    The Committee's list of claims also included various potential claims relating to the Abra Noteholders' asserted claims against the Estates, including equitable subordination and avoidance of claims and liens under applicable bankruptcy and non-bankruptcy law.

17.    Thereafter, the Debtors, Abra, and the Committee engaged in months of extensive, productive negotiations, which ultimately culminated in an agreement on the terms of the Plan and the execution of the Plan Support Agreement.  Bliley Decl. ¶ 9.  Pursuant to this agreement, among other things: (i) Abra agreed to accept, in full satisfaction of its approximately $2.8 billion secured claim, New Equity with an approximate value of $950 million and take-back debt totaling $850 million; and (ii) holders of Allowed General Unsecured Claims would receive New Equity with a value of at least $235 million.  *Id.*

2.    *2026 Ad Hoc Group and Whitebox Joinders to Plan Support Agreement*

18.    The Plan Settlement also resolves objections to the Plan raised by the 2026 Ad Hoc Group and Whitebox Advisors LLC ("Whitebox") on behalf of its managed funds and accounts that hold 2024 Senior Exchangeable Notes.  In objecting to the Disclosure Statement, the 2026 Ad Hoc Group previewed certain objections to the Plan that included a dispute about the value the Debtors ascribed to the secured portion of the 2026 Senior Secured Notes Claims and the value of the New Equity.  Whitebox also previewed certain of its confirmation objections in objecting to the Disclosure Statement, arguing, among other things, that GEF may have been able to assert

---

[8]    While the list of claims prepared by the Committee did not contain breach of fiduciary duty or related claims, the Committee did consider such claims and other estate Causes of Action and believed that settlement of all such claims as part of the Plan settlement was reasonable.

claims against other Debtors, their directors, GEF's directors, Abra, and/or Abra's directors arising from certain components of the Abra Transaction. At the Disclosure Statement hearing, the Court overruled both objections as they pertained to approval of the Disclosure Statement and entered the *Plan Confirmation Hearing Management and Scheduling Order* [Docket. No. 1382], which set forth the procedures and schedule for confirmation-related discovery.

19. Thereafter, the Debtors, the 2026 Ad Hoc Group, Whitebox, and other parties engaged in extensive discovery efforts. *Bliley Decl.* ¶ 11. The Debtors responded to nearly 200 combined document requests and interrogatories (66 from the 2026 Ad Hoc Group, 107 from Whitebox, and 23 from other parties); served 40 document requests and interrogatories (16 to the 2026 Ad Hoc Group, 12 to Whitebox, and 12 to other parties); participated in numerous meet-and-confers; negotiated search parameters; collected, reviewed, and produced thousands of documents; and reviewed productions received. *Id.* The Debtors also prepared for, participated in, and defended or conducted the depositions of six fact witnesses—most of whom were deposed in multiple capacities, as both individual fact witnesses and corporate representatives—and prepared for additional fact depositions that were subsequently postponed and canceled in light of settlement discussions. *Id.* In addition, the Debtors, the 2026 Ad Hoc Group, and Whitebox undertook substantial efforts with respect to expert testimony, including reviewing expert disclosures and reports, preparing and serving opening and rebuttal expert reports, and preparing for and conducting related depositions. *Id.* Finally, the Debtors briefed discovery disputes before the Court and participated in a Court-scheduled discovery conference. *Id.*

20. On April 30, 2025, following this significant discovery and extensive negotiations among principals and advisors, the Debtors and the 2026 Ad Hoc Group reached an agreement (the "2026 Settlement"), supported by the Committee and Abra, that resolves the 2026 Ad Hoc

Group's objections to the Plan and assures the group's support for the Plan's confirmation.  *Id.* ¶ 12.  In connection with the 2026 Settlement, the members of the 2026 Ad Hoc Group each executed a joinder to the Plan Support Agreement (the "2026 Joinder"), pursuant to which the 2026 Ad Hoc Group agreed to cease all discovery and litigation relating to the Debtors or the Plan and to support the Plan as modified to reflect the terms set forth on Annex 2 to the 2026 Joinder. *See Notice of Filing of Second Plan Supplement* [Docket No. 1558].  Additionally, as part of the 2026 Settlement, the 2026 Ad Hoc Group members agreed to purchase $125 million of Exit Notes (which is in addition to the existing backstop commitments from Elliot Investment Management, L.P. and Castlelake, L.P.).  Further, holders of Allowed 2026 Senior Secured Notes Claims that are not members of the 2026 Ad Hoc Group were given the right, and provided the opportunity to, purchase an aggregate of $50 million of Exit Notes. Under the Plan, holders of Allowed 2026 Senior Secured Notes Claims who elect to purchase Exit Notes will receive additional Exit Notes and Non-Exchangeable Take-Back Notes, while those who choose to not participate will receive their *pro rata* share as compared to the principal amount of Allowed 2026 Senior Secured Notes Claims of $100 million of Non-Exchangeable Take-Back Notes.

21.     On May 7, 2025, also following significant discovery and negotiations, the Debtors and Whitebox reached an agreement (the "Whitebox Settlement"), which is supported by the Committee and Abra.  In connection with this settlement, Whitebox also executed a joinder to the Plan Support Agreement (the "Whitebox Joinder").  *See Notice of Filing of Third Plan Supplement* [Docket No. 1751], pursuant to which Whitebox agreed, among other things, to cease all discovery and litigation relating to the Debtors or the Plan and to support the Plan as modified to reflect the terms set forth on Annex 2 to the Whitebox Joinder.  The Whitebox Settlement contemplates, among other things, that, in resolution of the disputes and challenges raised by Whitebox to the

allocation of the settlement value attributable to holders of General Unsecured Claims, a portion of that settlement value will be allocated to Debtor GEF, which previously was not receiving any of the Plan Settlement value.

22.     The 2026 Settlement and Whitebox Settlement are critical components of the Plan. *See* Bliley Decl. ¶ 13.  Not only do these settlements result in an increased recovery for all holders of General Unsecured Claims, but they enable a significantly streamlined and nearly fully consensual Confirmation Hearing by resolving various complex issues that, if litigated, could have delayed the Debtors' successful emergence from chapter 11 and imposed significant costs on the Debtors' estates, potentially jeopardizing recoveries of the holders of Allowed General Unsecured Claims.  *Id.*

**B.    Each Component of the Plan Settlement Is Fair and Equitable and Should Be Approved.**

23.     The Plan Settlement is the product of extensive, good faith negotiations among sophisticated parties, is supported by robust, independent investigations of each of the Restructuring Committee and the Committee, and resolves numerous complex issues that, absent the Plan Settlement, would have resulted in costly and protracted litigation that would have eroded the value the Debtors are able to make available to their stakeholders.  *See id.* ¶ 14.  In determining that the Plan Settlement was reasonable and in the best interests of their estates, the Debtors carefully considered each component of the Plan Settlement, including (i) whether the Abra Transaction or specific elements thereof gave rise to estate causes of action that were worth pursuing, (ii) the risks associated with complex and protracted litigation, (iii) the value of the New Equity, and (iv) the proper allocation of value among general unsecured creditors of different Debtors.  *See id.*  The Debtors believe that, taken as a whole, the Plan Settlement provides greater value to the Debtors' stakeholders than could have been achieved absent the significant

13

compromises contained in the Plan Settlement. *See id.* For these reasons, and those set forth below, the Plan Settlement satisfies the standards of Bankruptcy Rule 9019 and should be approved.

24.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a "plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" and "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. §§ 1123(b)(3)(A), (b)(6). "Courts analyze settlements under section 1123 by applying the same standard applied under [Bankruptcy] Rule 9019"—which requires that a settlement be fair and equitable and in the best interests of the estate. *In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123 by applying the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'"); *Fixed Income Shares: Series M v. Citibank N.A.*, 314 F. Supp. 3d 552, 560 (S.D.N.Y. 2018) (quoting *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994)); *Fjord v. AMR Corp.* (*In re AMR Corp.)*, 502 B.R. 23, 42–43 (Bankr. S.D.N.Y. 2013). "The decision to approve a particular settlement lies within the sound discretion of the Court," *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256-57 (Bankr. S.D.N.Y. 2016), which must be exercised "in light of the general public policy favoring settlements," *In re Republic Airways Holdings Inc.*, No. 16–10429 (SHL), 2016 WL 2616717, at *3 (Bankr. S.D.N.Y. May 3, 2016); *see also In re NII Holdings, Inc.*, 536 B.R. at 100; *In re Ditech Holding Corp.*, 606 B.R. 544, 623 (Bankr. S.D.N.Y. 2019).

25.     The Supreme Court has held that, in the plan confirmation context, the court must "determine that a proposed compromise forming part of a reorganization plan is fair and equitable." *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390

U.S. 414, 424 (1968). In determining whether a settlement is fair and equitable, courts in the Second Circuit consider the following seven *Iridium* factors: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (iii) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (iv) whether other parties in interest support the settlement; (v) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (vi) "the nature and breadth of releases to be obtained by officers and directors"; and (vii) "the extent to which the settlement is the product of arm's length bargaining." *In re Res. Cap., LLC*, 497 B.R. 720, 750 (Bankr. S.D.N.Y. 2013) (citing *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007)).

26. In analyzing a settlement under Bankruptcy Rule 9019, "the court need not conduct a 'mini-trial' to determine the merits of the underlying litigation." *In re Purofied Down Prods.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). Rather, the court "must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Res. Cap., LLC*, 497 B.R. at 749 (quoting *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)). "The lenient standards concerning approval of settlements . . . reflect the considered judgment that little would be saved by the settlement process if bankruptcy courts could approve settlements only after an exhaustive investigation and determination of the underlying claims. The applicable standards encourage courts to approve settlements in bankruptcy proceedings and related actions." *In re Purofied Down Prods.*, 150 B.R. at 522–23.

27.    Here, the Plan Settlement is a fair and equitable resolution of numerous complex disputes, is in the best interests of creditors, is the result of arm's-length negotiations among the Debtors, Abra, the Committee, the 2026 Ad Hoc Group, and Whitebox, and represents a reasonable settlement of the relevant issues.  Each *Iridium* factor weighs in favor of approving the Plan Settlement.

28.    ***First***, the balance between the litigation's possibility of success and the settlement's benefits weighs in favor of the Plan Settlement.  As noted, the Plan Settlement resolves a number of highly complex issues.  These include not only litigation regarding fraudulent transfers, preferences, and the enforceability of certain contractual provisions, but also contested valuation issues and potential claims arising under foreign law.  Litigating these claims to resolution likely would have significantly delayed the Debtors' emergence or jeopardized their ability to consummate a successful restructuring at all, and it would have unnecessarily depleted the Estates in the process.  That the Plan Settlement, rather than litigation, is the value-maximizing path is supported by the fact that each of the Restructuring Committee and the Committee conducted a thorough investigation into whether the Abra Transaction or specific elements thereof gave rise to legally cognizable causes of action.  Bliley Decl. ¶ 16.  As part of these investigations, each of these fiduciaries, having considered potential estate claims and the probability of their success in litigation, concluded, in their informed business judgment, that the probability of success of each such claim, and the most likely remedies and outcomes even if the claims were successful, was highly uncertain, while litigation would cause significant costs and extensive delays, potentially jeopardizing the Debtors' successful emergence from chapter 11.  *Id.*  These same fiduciaries also support the 2026 Settlement and the Whitebox Settlement, having worked closely with the Debtors in monitoring the progress of each such settlement.  The informed support of these estate

fiduciaries informed and bolstered the Debtors' determination to enter into the Plan Settlement. *Id.* ¶ 17.

29.    In addition to enabling the Estates to avoid the significant costs of litigation, the Debtors and their Estates are receiving significant value from the Plan Settlement.  *Id.* ¶ 18. Significantly, Abra has agreed to equitize much of its non-DIP Facility debt totaling over $1.4 billion, reinstate certain other secured debt, and provide over $275 million of value to holders of General Unsecured Claims.  Further, through the 2026 Settlement and the Whitebox Settlement, the Debtors have successfully resolved the 2026 Ad Hoc Group's and Whitebox's objections to the Plan, preserving value that would have otherwise been spent litigating those objections while creating equitable resolutions acceptable to the objectors and the estate fiduciaries.  As a result, the Plan Settlement allows the Debtors to substantially deleverage their balance sheet and provide a meaningful recovery to unsecured creditors.  *Id.*  Additionally, the Plan Settlement allows the Debtors to present the Court with a largely consensual Plan that charts a clear path to their successful emergence.  *Id.*  Accordingly, "given the sizable costs of litigation, the risk of damage to the Debtors' business, and the depletion of asset value which would likely result from remaining in chapter 11 during any such protracted litigation . . . the benefits of the [Plan] Settlement strongly outweigh the likelihood of success and any rewards of litigation."  *In re Sabine Oil & Gas Corp.*, 555 B.R. at 309-310.

30.    ***Second***, the risk of complex and protracted litigation, with its attendant expense and delay, weighs in favor of the Plan Settlement.  The Committee's and Restructuring Committee's investigations confirmed that any litigation relating to the highly complex Abra Transaction would be expensive, time-consuming, and uncertain in outcome, especially considering that case law relating to certain aspects of similar transactions is relatively new and

developing, with few reported decisions. Bliley Decl. ¶ 16. Additionally, by resolving the 2026

Ad Hoc Group's and Whitebox's objections to the Plan, the Debtors have eliminated the risk of a

contested confirmation that would otherwise have included highly contested valuation issues,

required extensive expert testimony, and/or presented issues regarding the application of foreign

law that may have required the Court to take advice from foreign law experts. *Id.* ¶ 17. Litigating

these objections would have significantly increased the length of the Confirmation Hearing and

likely delayed its start by several weeks. *Id.* The Plan Settlement thus saves the Estates significant

costs that would have been spent litigating numerous complex issues and likely could have

jeopardized the Debtors' timely emergence from chapter 11. *Id.* ¶ 18.

31.     **Third**, the Plan Settlement serves the paramount interests of the Debtors'

stakeholders. The Plan Settlement, which is the foundation of the Plan, provides substantial

benefits to all stakeholders, maximizes distributions to unsecured creditors, and assures certainty

of prompt emergence. *Id.* ¶ 19. Indeed, given the magnitude of the secured claims resolved

pursuant to the Plan Settlement, it is likely that, absent such settlement, there would have been no

distributable value left for the holders of General Unsecured Claims. *Id.* Under the Plan

Settlement, however, holders of General Unsecured Claims will receive over $275 million in

value. *Id.* The Plan Settlement has made a consensual, confirmable Plan possible and cleared a

direct path for the Debtors to emerge from chapter 11, which benefits all stakeholders. *Id.*

32.     **Fourth**, the Plan Settlement is supported by all key stakeholders in these Chapter

11 Cases: Abra, the Committee, the 2026 Ad Hoc Group, and Whitebox. Indeed, "the support of

the Creditors' Committee . . . weighs heavily in favor of approval of the proposed settlement." *In

re Ambac Fin. Grp., Inc.*, 457 B.R. 299, 306 (Bankr. S.D.N.Y. 2011), *aff'd*, No. 10-B-15973 SCC,

2011 WL 6844533 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 F. App'x 663 (2d Cir. 2012). And the

support of all other key constituents—and the lack of objections to the Plan Settlement from any economic stakeholder—is further evidence that the Plan Settlement is in the best interest of the Debtors' estates.

33.    *Fifth*, the Debtors, the Committee, Abra, the 2026 Ad Hoc Group, and Whitebox are each represented by competent and experienced professionals who were involved throughout the negotiation processes.

34.    *Sixth*, the nature and breadth of releases to be obtained by officers and directors are reasonable, and such releases are necessary components of the Plan.  The Plan's release provisions are discussed in further detail below.

35.    *Finally*, the Plan Settlement is the product of good faith and arm's length negotiations among sophisticated parties, represented by experienced and highly competent attorneys, financial advisors, and investment bankers.  *See* Bliley Decl. ¶ 5.  Courts generally approve settlements where "[t]he parties expended significant time and effort debating the merits" of the potential estate causes of action that were settled, "multiple parties gave concessions, and agreement ultimately was reached by parties with distinct fiduciary obligations — the Debtors [and] the Committee . . . — each of whom decided to support the [Plan] Settlement after undertaking an independent review of its terms."  *In re NII Holdings*, 536 B.R. at 121 (considering the seventh *Iridium* factor and placing "great weight upon the Committee's support of the Settlement").

36.    Thus, each of the *Iridium* factors establishes that the Plan Settlement is a sound exercise of the Debtors' business judgment, is fair and equitable, and is squarely in the best interests of the Debtors, their Estates, and their creditors.  The Plan Settlement should be approved.

## II.    THE PLAN SATISFIES THE REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED.

37.    The Plan satisfies the requirements for confirmation set forth in the applicable subsections of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

### A.    Section 1129(a)(1): The Plan Complies with All Applicable Provisions of the Bankruptcy Code.

38.    Pursuant to section 1129(a)(1) of the Bankruptcy Code, a chapter 11 plan must comply with all applicable provisions of the Bankruptcy Code. The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which, respectively, govern the classification of claims and the contents of a plan.  *See* H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5913; *accord Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648–49 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

39.    As demonstrated below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code,[9] as well as all other applicable provisions of the Bankruptcy Code, and therefore satisfies section 1129(a)(1) of the Bankruptcy Code.

### B.    Section 1122: The Plan's Classification Structure Is Proper.

40.    Bankruptcy Code section 1122 provides that:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

---

[9]    The Debtors are not individuals, and thus, section 1123(c) of the Bankruptcy Code is inapplicable.

11 U.S.C. § 1122(a).

41.    The Plan provides for fifteen Classes of Claims and Interests, which are summarized as follows:[10]

- Class 1 (Priority Non-Tax Claims) includes all Claims entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Administrative Expenses, DIP Facility Claims, and Priority Tax Claims.

- Class 2 (Other Secured Claims) includes all Secured Claims other than Priority Tax Claims (except as set forth in Article II.E of the Plan), DIP Facility Claims, 2028 Notes Claims, 2026 Senior Secured Notes Secured Claims, Glide Notes Claims, Debenture Banks Claims, and Safra Claims.

- Class 3 (2028 Notes Claims) includes all Claims on account of, arising under, or related to the 2028 Notes Documents.

- Class 4 (2026 Senior Secured Notes Claims) includes all Claims on account of, arising under, or related to the 2026 Senior Secured Notes Documents.

- Class 5 (Glide Notes Claims) includes all Claims on account of, arising under, or related to the (i) 5.00% Senior Secured Notes due 2026 issued pursuant to the Glide Notes Documents and (ii) 3.00% Subordinated Secured Notes due 2025 issued pursuant to the Glide Notes Documents.

- Class 6 (Debenture Banks Claims) includes all Claims held by the Debenture Banks, including the 7a Debentures Claims, the 8a Debentures Claims, and all Claims on account of, arising under, or related to the BdoB Letters of Credit, the Santander Letters of Credit, and the Bradesco Letters of Credit.

- Class 7 (AerCap Secured Notes Claims) includes the Secured Claims on account of, arising under, or related to the AerCap Secured Note Documents entered into pursuant to the AerCap Secured Note Order and the AerCap Settlement Order.

- Class 8 (Safra Claims) includes all Claims held by Safra, including all Claims on account of, arising under, or related to the 2017 FINIMP Note, the 2018 FINIMP Note, the 2020 Bank Credit Note, the 2022 Bank Credit Note, and the Safra Trade Payables.

- Class 9 (Non-U.S. General Unsecured Claims) includes all Unsecured Claims (i) arising from or related to a Brazilian Litigation Claim, (ii) held by Brazilian trade vendors or service providers that provide, or will provide, goods or services necessary to the operation of the Reorganized Debtors and over which the Court

---

[10]    DIP Facility Claims, Administrative Expenses, and Priority Tax Claims are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code.

does not have personal jurisdiction (in each case as determined by the Debtors or the Reorganized Debtors, as applicable), or (iii) with the consent of Abra and in consultation with the General Unsecured Claim Observer (to the extent applicable), any other Claim held by a person or entity over which the Court does not have personal jurisdiction, as determined by the Debtors or the Reorganized Debtors, as applicable.

- Class 10(a) (GLAI General Unsecured Claims) includes all General Unsecured Claims against GLAI.

- Class 10(b) (GLA General Unsecured Claims) includes all General Unsecured Claims against GLA.

- Class 10(c) (GFL General Unsecured Claims) includes all General Unsecured Claims against GFL.

- Class 10(d) (GFC General Unsecured Claims) includes all General Unsecured Claims against GFC.

- Class 10(e) (GEF General Unsecured Claims) includes all General Unsecured Claims against GEF.

- Class 10(f) (GAC General Unsecured Claims) includes all General Unsecured Claims against GAC.

- Class 10(g) (GTX General Unsecured Claims) include all General Unsecured Claims against GTX.

- Class 10(h) (Smiles Fidelidade General Unsecured Claims) includes all General Unsecured Claims against Smiles Fidelidade.

- Class 10(i) (Smiles Viagens General Unsecured Claims) includes all General Unsecured Claims against Smiles Viagens.

- Class 10(j) (Smiles Argentina General Unsecured Claims) includes all General Unsecured Claims against Smiles Argentina.

- Class 10(k) (Smiles Viajes General Unsecured Claims) includes all General Unsecured Claims against Smiles Viajes.

- Class 10(l) (CAFI General Unsecured Claims) includes all General Unsecured Claim against CAFI.

- Class 10(m) (Sorriso General Unsecured Claims) includes any General Unsecured Claims against Sorriso.

- <u>Class 11</u> (General Unsecured Convenience Class Claims) includes General Unsecured Claims (other than a Smiles General Unsecured Claim, 2024 Senior Exchangeable Notes Claim, 2025 Senior Notes Claim, or Perpetual Notes Claim) in an Allowed amount of $200,000 or less.

- <u>Class 12</u> (Subordinated Claims) includes all Claims that are subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

- <u>Class 13</u> (Intercompany Claims) includes all Claims against a Debtor held by another Debtor.

- <u>Class 14</u> (Existing GLAI Equity Interests) includes all existing Interests in GLAI.

- <u>Class 15</u> (Intercompany Interests) includes all Interests in a Debtor held by (i) another Debtor or (ii) a non-Debtor that is a wholly owned direct or indirect subsidiary of a Debtor.

42.     Generally, the Plan incorporates a "waterfall" classification scheme that follows the statutory priorities prescribed by the Bankruptcy Code.  All Claims and Interests within a Class have the same or similar rights against the applicable Debtor(s).

43.     In accordance with section 1122(b) of the Bankruptcy Code, for administrative convenience, the Debtors separately classified General Unsecured Convenience Class Claims (Class 11), *i.e.*, General Unsecured Claims (other than Smiles General Unsecured Claims, 2024 Senior Exchangeable Notes Claims, 2025 Senior Notes Claims, or Perpetual Notes Claims) in an Allowed amount of $200,000 or less.  Section 1122(b) specifically permits a debtor to "designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b).

44.     Therefore, the Plan classifies Claims and Interests based upon the differences in their legal nature and/or priority or upon valid business reasons.  *See* Bliley Decl. ¶ 23.  Such classification scheme is rational and complies with the Bankruptcy Code.  Accordingly, the classification scheme of the Plan complies with section 1122 of the Bankruptcy Code.

C.     **Section 1123(a): The Plan's Contents Comply with the Mandatory Bankruptcy Code Requirements.**

45.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements that a chapter 11 plan must satisfy.[11]  *See* 11 U.S.C. § 1123(a).  The Plan fully complies with each such requirement.

- The Plan designates Classes of Claims and Interests as required by section 1123(a)(1) of the Bankruptcy Code.  *See* Plan, Art. III.

- The Plan specifies which Class of Claims and Interests is Impaired or Unimpaired under the Plan, as well as the treatment of each Impaired Class, as required by sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, respectively.  *See* Plan, Art. III.

- Except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4) of the Bankruptcy Code.  *See* Plan, Art. III.B.

- The Plan provides adequate means for its implementation as required by section 1123(a)(5) of the Bankruptcy Code by, among other things: (i) setting forth the sources of consideration to be distributed under the Plan (*see id.*, Art. V.C); (ii) effectuating the global settlement embodied in the Plan (*see id.*, Art. V.A); (iii) authorizing the Debtors to consummate the Restructuring Transactions and take such other actions as necessary to effectuate the Plan (*see id.*, Art. V.B); (iv) providing for the cancellation of certain prepetition loans, securities, and other obligations (*see id.*, Art. V.G); and (v) setting forth the terms of future governance and the manner of selection of officers and directors for the Reorganized Debtors and New GOL Parent (*see id.*, Arts. V.I-J).

- In accordance with section 1123(a)(6) of the Bankruptcy Code, and to the extent permitted by applicable law, the New Organizational Documents have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities and set forth an appropriate distribution of voting power among classes of equity securities possessing voting power to the extent required by such section. *See, e.g.*, *id.*, Art. V.I.

- The Plan provisions governing the manner of selection of any officer, director, or manager are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.  Article V.J of the Plan provides that, except as otherwise set forth in the Plan Supplement, the officers of the Debtors immediately before the Effective Date will

---

[11]    Section 1123(a)(8) of the Bankruptcy Code is inapplicable because the Debtors are not individuals.

serve as the initial officers of the respective Reorganized Debtors on and after the
Effective Date and that the Debtors will disclose, or have disclosed in the Plan
Supplement, to the extent known, the identity and affiliations of all individuals
proposed to serve as directors of the Reorganized Debtors in accordance with
section 1129(a)(5) of the Bankruptcy Code.

**D.      Section 1123(b): The Plan's Contents Comply with the Permissive Bankruptcy
Code Requirements.**

46.      Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may

be incorporated into a chapter 11 plan, and the Plan incorporates certain of such provisions:

- Article III.B of the Plan describes the treatment of Unimpaired Classes and
Impaired Classes.

- Article VI of the Plan provides for the rejection, assumption, or assumption and
assignment of Executory Contracts and Unexpired Leases.

- Article IX.A of the Plan provides for a good-faith compromise and settlement of
Claims, Interests, and controversies relating to the contractual, legal, and
subordination rights that a holder of a Claim or Interest may have, or any
distribution to be made on account of Allowed Claims or Interests.

- Article V.N of the Plan preserves the Retained Causes of Action and states that the
Reorganized Debtors will have the right to commence, prosecute, or settle such
Retained Causes of Action.

- The Plan modifies the rights of holders of Impaired Claims and Interests in Classes
3, 4, 5, 6, 7, 8, 10(a)-(m), 11, 12, and 14 and, in the event Intercompany Claims are
not Reinstated, Classes 13 and 15, and leaves Unimpaired the rights of holders of
Claims and Interests in Classes 1, 2, and 9 and, in the event Intercompany Claims
are Reinstated, Classes 13 and 15.

- The Plan contains certain release, exculpation, and injunction provisions, which are
discussed below. As explained below, in accordance with section 1123(b)(6) of the
Bankruptcy Code, these (and all other) provisions of the Plan are consistent with
the applicable provisions of the Bankruptcy Code and case law in the Second
Circuit.

25

1.    *The Plan Releases, Exculpation Provision, and Injunction Should Be Approved.*

47.    Article IX of the Plan provides for: (i) the release of claims and Causes of Action against the Released Parties[12] by the (a) Debtors and their Estates (Art. IX.D) (the "Debtor Releases"), and (b) other Releasing Parties,[13] (Art. IX.E) (the "Third-Party Releases" and, together with the Debtor Releases, the "Plan Releases"); (ii) the exculpation of the Exculpated Parties[14] (Art. IX.F) (the "Exculpation Provision"); and (iii) an injunction (Art. IX.G) (the "Injunction").

---

[12]    As defined in the Plan, "Released Parties" means "collectively, each of the following, in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Committee and its members; (iv) the other Consenting Stakeholders; (v) the DIP Noteholders, (vi) the Agents/Trustees; (vii) the Ad Hoc Group of Abra Noteholders and Elliott; and (viii) with respect to each of the foregoing Entities and Persons set forth in clause (i) through (vii), each of such Entities' and Persons' Affiliates and its and their respective Related Parties." Further, the Plan provides that, "[n]otwithstanding the foregoing, (i) any Entity or Person that opts out of the releases set forth in Article IX.E shall not be deemed a Released Party and (ii) any Entity or Person that would otherwise be a Released Party hereunder but is party to one or more Retained Causes of Action shall not be deemed a Released."

[13]    As defined in the Plan, "Releasing Parties" means "collectively, each of the following in each case in its capacity as such:  (i) each of the Released Parties (other than the Debtors and the Reorganized Debtors); (ii) all holders of Claims that vote to accept the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; (iii) all holders of Claims or Interests that are Unimpaired under the Plan and do not opt out of granting the releases in Article IX.E by checking the box on the applicable notice; and (iv) all holders of Claims in Classes that are entitled to vote under the Plan but that (a) vote to reject the Plan or do not vote either to accept or reject the Plan and (b) do not opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; and (v) with respect to each of the foregoing Entities and Persons set forth in clauses (ii) through (iv), all of such Entities' and Persons' respective Related Parties." Further, the Plan provides that, "[f]or the avoidance of doubt, holders of Claims or Interests in Classes that are deemed to reject the Plan and therefore are not entitled to vote under the Plan are not Releasing Parties in their capacities as holders of such Claims or Interests."

As defined in the Plan, "Related Parties" means "with respect to any Entity or Person, in each case in its capacity as such with respect to such Entity or Person, such Entity's or Person's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees."

[14]    As defined in the Plan, "Exculpated Parties" means, "collectively, and in each case in their capacities as such: (i)(a) the Debtors, (b) the Reorganized Debtors, (c) the Committee and its members, (d) the General Unsecured Claim Observer, (e) the Ad Hoc Group of Abra Noteholders and Elliott, (f) the Abra Notes Agents, (g) the DIP Agent and the DIP Trustee, (h) the 2024 Senior Exchangeable Notes Trustee, the 2025 Senior Notes Trustee, and the Perpetual Notes Trustee, and (i) Abra; (ii) with respect to each of the Entities and Persons in clause (i), all of such Entities' and Persons' Related Parties, solely to the extent such Related Parties are fiduciaries of the Estates

26

48.     In connection with approval of the Disclosure Statement, the Court entered an order directing the Debtors to file a brief "addressing all issues regarding the granting of third-party releases and exculpation . . ., including whether . . . consent to third-party releases may be shown by including . . . opt-out provisions in the ballots" and whether "exculpation provisions may protect non-estate fiduciaries." *Oder Establishing Briefing Schedule Regarding Granting of Third-Party Releases and Exculpation* [Docket No. 1158]. On January 16, 2025, the Debtors filed the *Debtors' Opening Brief in Support of the Releases and Exculpation Provisions of the Debtors' Disclosure Statement and Chapter 11 Plan* [Docket No. 1229] (the "Opening Release and Exculpation Brief" and, together with the (i) *Debtors' Reply Brief in Support of the Releases and Exculpation Provisions of the Debtors' Disclosure Statement and Chapter 11 Plan* [Docket No. 1270] (the "Reply Release and Exculpation Brief") and (ii) *Letter Notice of Supplemental Authority* [Docket No. 1340], collectively, the "Release and Exculpation Briefs"). The U.S. Trustee and Securities and Exchange Commission filed responses and sur-replies to the Debtors' Release Brief. *See* Docket Nos. 1253, 1324 (U.S. Trustee) and Docket No. 1251 (SEC).

49.     As explained in the Release and Exculpation Briefs (which are fully incorporated herein) and in the Disclosure Statement, the Plan Releases, Exculpation Provision, and Injunction are integral components of the Plan and the transactions contemplated therein, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable law. Accordingly, each should be approved.

---

or otherwise to the fullest extent provided for pursuant to section 1125(e) of the Bankruptcy Code; and (iii) each other Consenting Stakeholder, its Affiliates, and each of its and their respective Related Parties; provided, that with respect to the Entities and Persons in clause (iii), any exculpations provided under the Plan or the Confirmation Order shall be granted only to the extent provided in section 1125(e) of the Bankruptcy Code."

a.    The Debtor Releases Are Appropriate and Should Be Approved.

50.    When considering releases by a debtor pursuant to section 1123(b)(3)(A), the appropriate standard is whether the release is a valid exercise of the debtor's business judgment and is fair, reasonable, and in the best interests of the estate.  *See In re Motors Liquidation Co*., 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Releases by estates involve a give-up of potential rights that are owned by the estate, and are perfectly permissible in a plan, either as parts of plan settlements or otherwise, though the court must satisfy itself (at least if anyone raises the issue) that the give-up is an appropriate exercise of business judgment, and, possibly, in the best interests of the estate."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (approving plan provision that released and discharged claims and causes of action by the debtors on the basis that such releases and discharges "represent a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate"), *aff'd*, No. 09 Civ. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part and rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010); *JPMorgan Chase Bank N.A. v. Charter Commc'ns Operating, LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 257–60 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate").  Further, a debtor's decision to release claims under a plan is afforded deference as a matter of business judgment.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own . . . .").

51.    Here, the Debtor Releases represent a sound exercise of the Debtors' business judgment and are supported by the investigations conducted by the Restructuring Committee and the Committee, as explained in the Disclosure Statement.  As detailed below, the Released Parties have provided significant consideration to the Estates during the course of these Chapter 11 Cases.

Without these contributions from the Released Parties, the Debtors likely would not be poised to emerge from chapter 11 on a consensual basis. *See* Bliley Decl. ¶ 28. Further, the Debtors do not believe that, absent the Debtor Releases, they would have been able to secure the substantial benefits provided by the Plan, including a deleveraged balance sheet and the opportunity to emerge from chapter 11 as a stronger and more efficient airline. *Id.* ¶ 29.

52.     The Debtor Releases are also appropriate because the value of the released claims and Causes of Action, if any, is outweighed significantly by the value and benefits provided by the Plan. *Id.* ¶ 30. Courts have found that a debtor's release of claims is often in the best interests of the estate when "the costs involved [in pursuing the released claims] likely would outweigh any potential benefit from pursuing such claims." *In re Lear Corp.*, No. 09-14326 (ALG), 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009); *accord In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 4565223, at *9-10 (Bankr. S.D.N.Y. Dec. 19, 2007).

53.     Accordingly, for the reasons set forth above, the Debtor Releases reflect a reasonable exercise of the Debtors' business judgment and should be approved.

b.      The Third-Party Releases Are Consensual and Should Be Approved.

54.     Article IX.E of the Plan provides for consensual Third-Party Releases by the following persons and entities (and their respective Related Parties):

- the Debtors, the Reorganized Debtors, the Committee and its members, the other Consenting Stakeholders, the DIP Noteholders, the Agents/Trustees, and the Ad Hoc Group of Abra Noteholders and Elliott;

- all holders of Claims entitled to vote on the Plan that do not affirmatively opt out of granting the Third-Party Releases; and

- all holders of Claims and Interests that are Unimpaired and do not affirmatively opt out of granting the Third-Party Releases.

55.     Courts may approve consensual third-party releases such as the Third-Party Releases here. *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). While

29

*Harrington v. Purdue Pharma L.P.* precludes nonconsensual third-party releases, it does not go beyond this. 603 U.S. 204 (2024). Nor does it opine in any way on what constitutes a consensual release, and instead expressly declines to do so. *Id.* at 226. As discussed in the Release and Exculpation Briefs, the Plan's Third-Party Releases are consensual: every party in interest in these cases is either (i) able to opt out of providing the Third-Party Releases or (ii) not giving a Third-Party Release. The ability of every affected party to opt out of a release—particularly when coupled with rigorous process, conspicuous notice, a high degree of consensus in the plan, and the support of estate fiduciaries—renders such a release consensual. *See, e.g.*, *In re Spirit Airlines, Inc.*, 2025 WL 737068, at *8 (Bankr. S.D.N.Y. Mar. 7, 2025) (approving third-party releases as consensual where parties could opt out of the releases).

56.     Moreover, the Third-Party Releases (like the Debtor Releases) are carefully tailored to relate to matters concerning the Debtors and their business affairs prior to the Effective Date, including their restructuring efforts during the Chapter 11 Cases. Claims subject to these releases accordingly have a direct nexus to the Debtors and the Estates. As such, the Third-Party Releases affect the *res* of the Debtors' Estates, and the Court may appropriately exercise jurisdiction over them. *See In re Quigley Co.*, 676 F.3d 45, 53 (2d Cir. 2012) ("Bankruptcy jurisdiction is appropriate over 'third-party non-debtor claims that directly affect the *res* of the bankruptcy estate.'") (quoting *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d. Cir. 2008), *rev'd on other grounds sub nom. Travelers Indem Co. v. Bailey*, 557 U.S. 137 (2009)).

57.     In addition, the Released Parties have made substantial contributions to the Chapter 11 Cases and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of an overwhelmingly consensual Plan. Specifically:

- The Committee and its members served as estate fiduciaries and represented the interests of all holders of General Unsecured Claims during the Chapter 11 Cases, successfully negotiated significant recoveries for those creditors as part of the Plan Settlement, and investigated the Debtors' prepetition transactions, including potential claims against the other Released Parties, which informed that settlement. *See* Bliley Decl. ¶ 28.

- Abra has agreed to, among other things, limit its recovery and equitize a significant portion of its Secured Claim, resulting in the Plan Settlement that provides meaningful distributions to holders of the General Unsecured Claims. *Id.* In addition, the Debtors believe that absent Abra's agreement to equitize a portion of the Allowed 2028 Notes Claims, they likely would not be unable to raise new capital, which is necessary to satisfy the Debtors' existing obligations and provide working capital to the Reorganized Debtors. *Id.*

- The DIP Noteholders, including the members of the Ad Hoc Group of Abra Noteholders and Elliott, provided the capital that was critical for the Debtors' ability to continue operating during the Chapter 11 Cases and have made valuable concessions throughout these cases, including agreeing to extend the DIP Facility maturity date without charging a fee and to extend the challenge period on several occasions to facilitate negotiations. *Id.* In addition, the members of the Ad Hoc Group of Abra Noteholders and Elliot, in their capacities as Abra Noteholders, agreed to release certain asserted liens that could have otherwise frustrated the Debtors' attempts to raise new capital and have agreed not to receive any distributions under the Plan. *Id.*

- The Agents/Trustees representing the interests of diverse noteholders agreed to extend the challenge period on several occasions to facilitate the negotiation of the Plan Settlement and will facilitate distributions to noteholders and perform all actions necessary to release any Liens securing the noteholders' Claims. *Id.*

- For the same reasons that the Debtors and the Committee determined to settle any potential claims and Causes of Action against Abra, they also determined that claims and Causes of Action by one Debtor against another Debtor relating to the same potential claims and Cause of Action and the costs of litigation associated therewith were not likely to yield greater recoveries for the Debtors' estates and holders of General Unsecured Claims than the Plan Settlement. In addition, the settlement of potential claims and Causes of Action among the Debtors facilitates the allocation of settlement value to the holders of General Unsecured Claims against different Debtors. *Id.*

- Each of the Releasing Parties, including the Debtors, are releasing potential claims and Causes of Action against the Reorganized Debtors as the successors in interest to the Debtors to avoid unnecessary and nuisance claims that have been settled under the Plan. *Id.* Releasing the Reorganized Debtors will increase their value for the benefit of their future debt and equity holders—which are the Debtors' current creditors. *Id.*

- The release of the Related Parties of each of the foregoing (solely in their capacities as parties with a specified relationship to the applicable Released Party and not in their individual capacities) will ensure that the releases of the applicable Released Parties are not circumvented through the assertion of claims against their Related Parties. *Id.* The Released Parties act, and therefore provide the valuable consideration described above, through their employees and/or agents (*i.e.*, the Related Parties). Without a release of the Related Parties, the other Released Parties are exposed to an end-run around the releases with respect to the liabilities for essentially the same causes of action that have been released. *Id.* Absent release of the Related Parties, the releases of the Released Parties may be rendered meaningless. It is thus not surprising that these Released Parties required a release of their respective Related Parties as a condition to agreeing to the terms of the Plan. Courts routinely approve releases of parties related to the parties being released.[15]

58. The U.S. Trustee disagrees, and, in the UST Objection, renews its objection to the Third-Party Releases that the Court overruled at the Disclosure Statement hearing. *See* Hr'g Tr. 170:20–22, Mar. 17, 2025 [Docket No. 1425]. The Debtors similarly incorporate by reference herein the arguments set forth in the previously filed Release and Exculpation Briefs. In particular, in response to the UST Objection, the Debtors continue to assert, in line with the Court's rulings at the Disclosure Statement hearing, that federal law, rather than state law, governs whether the Third-Party Releases are consensual.[16] The U.S. Trustee argues that the Court has not yet determined "which 'federal law'" applies (*see* UST Objection at 10); it is the Debtors' position, and that of a number of recent opinions, that federal bankruptcy law governs whether a third-party

---

[15] *See, e.g.*, *In re Avianca Holdings S.A.*, 632 B.R. 124, 136–38 (Bankr. S.D.N.Y. 2021); *In re Aralez Pharm. US Inc.*, No. 18-12425 (MG) (Bankr. S.D.N.Y. May 7, 2019) [Docket No. 677]; *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019); *In re Stearns Holdings, LLC*, No. 19-12226 (SCC) (Bankr. S.D.N.Y. Nov. 13, 2019) [Docket No. 459]; *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) [Docket No. 1308]; *In re Tops Holding II Corp.*, No. 18-22279 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018) [Docket No. 765]; Confirmation Hr'g Tr. 195:6–21, *In re Cumulus Media Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 2, 2018) [Docket No. 749].

[16] *See* Opening Release and Exculpation Brief ¶¶ 9-17; Reply Release and Exculpation Brief ¶¶ 11-19; Hr'g Tr. 148:19-149:17, Mar. 17, 2025 [Docket No. 1425] ("[O]n the issue of . . . what's consent, I determine that it's determined by federal law, not state law. . .. [T]his is not only national; this is international. We're not going to play the game that the law of every jurisdiction in which a creditor is located has to be examined carefully to determine whether the consent is effective or not. I'm determining, as Judge Lane did, and as others have, Judge Perez, Judge Lopez, this is a question that's controlled by federal law.").

release is consensual.[17]  The U.S. Trustee also persists in contending that a consensual third-party

release is not an appropriate plan provision because it is not explicitly identified in the Bankruptcy

Code.  *See* UST Objection at 12.  But given the flexibility built into section 1123(b)(6) of the

Bankruptcy Code, which authorizes "***any*** other appropriate provision ***not inconsistent***" with the

remainder of the title (11 U.S.C. § 1123(b)(6) (emphasis added)), it is the absence of a prohibition

that is relevant here—the Bankruptcy Code is necessarily flexible, to enable debtors and their

constituents to reach optimal results in each individual case.[18]  Finally, the U.S. Trustee continues

to insist that opt-out mechanisms are insufficient to procure consent.  As the Court held at the

Disclosure Statement hearing, an opt-out mechanism enables affected creditors to consent (or to

decline to consent) to releases;[19] accordingly, the Plan's opt-out mechanism here has enabled its

creditors to consent (or to decline to consent) to the Third-Party Releases.

59.    Accordingly, the Debtors submit that the Third-Party Releases are consensual,

reasonable, and in the best interests of their Estates and should therefore be approved.

### c.    The Exculpation Provision Should Be Approved.

60.    In addition to the Plan Releases, the Exculpation Provision exculpates the

Exculpated Parties for claims arising out of or relating to the Debtors' restructuring process, the

Chapter 11 Cases, solicitation of the Plan, and the negotiations and agreements made in connection

---

[17]  *See Spirit*, 2025 WL 737068, at *22 (Bankr. S.D.N.Y Mar. 7, 2025) (concluding that "consent [to third-party releases] exists as to these creditors under applicable federal bankruptcy law"); *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (finding consensual third-party releases to be appropriate under long-settled law unaffected by *Harrington*); *see also In re LaVie Care Centers, LLC*, 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024) (noting that "finding consent is what is necessary" to make a third-party release consensual, and may be found under "federal law regarding 'necessary or appropriate' plan provisions").

[18]  *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525 (1984) (recognizing the "policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code").

[19]  *See* Opening Release and Exculpation Brief ¶¶ 18-25, 28-31; Reply Release and Exculpation Brief ¶¶ 20-29; Hr'g Tr. 170:20–22, Mar. 17, 2025 [Docket No. 1425] ("With respect to the U.S. Trustee's objection . . . to the opt-in versus opt-out, their objection to the opt-out is overruled.").

therewith. The Exculpated Parties are: (i) estate fiduciaries (the Debtors, Reorganized Debtors, the Committee and its members, and the General Unsecured Claim Observer), (ii) certain prepetition trustees and agents, (iii) the Ad Hoc Group of Abra Noteholders and Elliott, (iv) the DIP Agent and DIP Trustee, (v) Related Parties of the foregoing to the extent provided in section 1125(e) of the Bankruptcy Code, and (vi) each other Consenting Stakeholder under the Plan Support Agreement and their Related Parties to the extent provided in section 1125(e). The Exculpation Provision covers actions directly related to the Debtors' restructuring and excludes claims arising from (i) post-Effective Date obligations or liabilities other than in connection with implementation of the Plan, and (ii) any acts or omissions conclusively determined to constitute willful misconduct, fraud, or gross negligence.

61.     As discussed in the Disclosure Statement, the Exculpation Provision provides necessary and customary protections to those parties in interest (whether estate fiduciaries or otherwise) whose efforts were and continue to be vital to these Chapter 11 Cases and formulating and implementing the Plan. Indeed, the Exculpation Provision represents an integral piece of the Plan and is the product of good-faith, arm's-length negotiations and significant involvement in the Chapter 11 Cases by non-Debtor Exculpated Parties. These Chapter 11 Cases could not have progressed as quickly and as productively absent the significant contributions of the Exculpated Parties.

62.     Moreover, the Exculpation Provision is appropriate because it is necessary to protect the Exculpated Parties, who have participated in the Chapter 11 Cases in good faith, from collateral attacks related to any good-faith acts or omissions. Accordingly, the Debtors believe that the Exculpation Provision is consistent with applicable law and should be approved. *See, e.g.*, *In re Res. Cap. LLC*, No. 12-12020 (MG), 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11,

2013) (approving exculpation for parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors").

63.    As explained in the Release and Exculpation Briefs, courts within this District routinely approve chapter 11 plans containing exculpation provisions of non-fiduciaries for activities in the course of chapter 11 cases. *See, e.g.*, *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022) (noting that "Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision" that covers "the negotiation, execution, and implementation of agreements and transactions that were approved by the Court" because such non-fiduciaries were "actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases"); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation for non-fiduciaries "for acts or omissions in connection with the Plan and the bankruptcy cases"); *In re Voyager Dig. Holdings, Inc.*, 649 B.R. 111, 133 (Bankr. S.D.N.Y. 2023) (exculpating non-fiduciaries for "any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases"); *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) (exculpating non-fiduciaries for acts related to the cases, the restructuring support agreement, the disclosure statement, the plan, and transactions and documents entered into in connection with the plan).  And because the non-fiduciaries that are exculpated here made the significant and vital contributions to these cases described above, it is reasonable and appropriate to provide them with the limited and tailored protection that the Exculpation Provision provides.

64.    While the U.S. Trustee renews its objection to the exculpation of parties that are not estate fiduciaries, the Debtors submit that for the reasons set forth above, and as provided in the Release and Exculpation Briefs,[20] the exculpation of all Exculpated Parties, including those who are not estate fiduciaries, is warranted here.

65.    The U.S. Trustee also objects to the Exculpation Provision's inclusion of certain "Related Parties" to the Exculpated Parties, arguing that the definitions sweep too broadly.  But as with including Related Parties within the scope of Released Parties (*see supra* ¶ 57), the inclusion of these Related Parties is necessary to ensure that the scope of the Exculpation Provision appropriately includes parties acting at the direction and on behalf of the Exculpated Parties and to prevent an end-run around the Exculpation Provision.  Absent inclusion of the Related Parties, the effect of the Exculpation Provision could be nullified.  The Debtors are hopeful discussions may continue with the U.S. Trustee in order to resolve this concern, but the Debtors believe the Exculpation Provision is squarely in line with those approved by the Court and courts within this District.[21]

66.    Finally, the U.S. Trustee contends that the temporal scope of the Exculpation Provision is "impermissibl[e]" in that it would operate to exculpate certain conduct outside the period between the Petition Date and the Effective Date.  *See* UST Objection at 13.  While the Debtors continue to engage with the U.S. Trustee on this point, the Debtors submit that it is indeed

---

[20]    *See* Opening Release and Exculpation Brief ¶¶ 34-41; Reply Release and Exculpation Brief ¶¶ 38-39; *see also* Hr'g Tr. 65:23-24, Mar. 17, 2025 [Docket No. 1425] ("I've uniformly held that exculpation is not limited to estate fiduciaries.").

[21]    *See, e.g.*, *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Mar. 18, 2024, Mar. 22, 2024) [Docket Nos. 3849, 3960] (approving exculpation and release of various related parties); *In re SAS AB*, No. 22-10925 (MEW) (Bankr. S.D.N.Y. Mar. 22, 2024) [Docket No. 2347] (same); *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. Apr. 3, 2023) [Docket No. 1746] (same); *In re Grupo Aeroméxico, S.A.B. de C.V.*, No. 20-11563 (SCC) (Bankr. S.D.N.Y. Feb. 4, 2022) [Docket No. 2668] (same); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) [Docket No. 2300] (same).

permissible and appropriate to provide targeted exculpation for acts outside of that temporal boundary that appropriately relate to parties' efforts in connection with these cases, as cases within this District and elsewhere have held. *See In re Voyager Dig. Holdings, Inc.*, 649 B.R. at 136 (exculpating relevant parties from "any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases," without limiting such exculpation to acts taken before the plan effective date); *In re Astria Health*, 623 B.R. 793, 798–99 (Bankr. E.D. Wash. 2021) (approving exculpation of "any postpetition act" within the scope of the provision, including acts beyond the plan effective date).

67.     For these reasons, the Debtors submit that the Exculpation Provision should be approved.

d.     <u>The Injunction Is Appropriate and Should Be Approved.</u>

68.     The Injunction is necessary to, among other things, enforce the Plan Releases and the Exculpation Provision by permanently enjoining all persons and entities from commencing or continuing in any manner any claim or Cause of Action that are released or exculpated pursuant to such provisions. The Injunction is narrowly tailored to achieve that purpose and therefore should be approved. *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992) (holding court may approve injunction provision in settlement contained in plan of reorganization where such provision "plays an important part in the debtor's reorganization plan"). Injunction provisions within chapter 11 plans are commonly utilized to grant force and effect to release and exculpation provisions contained therein, and are routinely approved and ordered.[22]

---

[22]     *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Mar. 22, 2024) [Docket No. 3960], Confirmation Order § S & ¶ 29 (finding that injunctions "are necessary to preserve and enforce the Releases, the exculpation provisions" and are "approved and authorized in all respects"); *In re Cumulus Media Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) [Docket No. 769], Confirmation Order ¶ 52 (finding injunction provisions

69.     The U.S. Trustee contends that the Injunction cannot be approved to the extent it would enforce a non-consensual release.  *See* UST Objection at 14-17.  This objection—which is premised on the U.S. Trustee's continued argument that the releases are non-consensual, despite being overruled—rises and falls with the propriety of the Third-Party Releases.  If the Third-Party Releases are consensual and are therefore appropriate provisions of the Plan, the Injunction enforcing such releases, too, is appropriate.  *See, e.g.*, *In re Number Holdings, Inc.*, No. 24-10719 (Bankr. D. Del. Jan. 24, 2025) [Docket No. 1756], Conf. Hr'g Tr. at 27:15-20 ("The third party releases are consensual, so I will overrule the United States Trustee's objection. And I also will overrule the United States Trustee's objection with respect to the injunction argument, as the injunction being consistent with the release provisions. I see that as a belt-and-suspenders, so to speak.").[23]

---

"necessary to preserve and enforce the releases" and "narrowly tailored to achieve that purpose"); *In re Lumio Holdings, Inc.*, No. 24-11916 (JKS) (Bankr. D. Del. Dec. 30, 2024) [Docket No. 397], U.S. Trustee's Obj. to Confirmation ¶¶ 79-80 (arguing court "may not approve the injunction enforcing the release by barring claims against non-debtors" because "there is no Code provision that authorizes" such injunctions), *rejected by id.* (Bankr. D. Del. Feb. 3, 2025) [Docket No. 496], Confirmation Order ¶ QQ(d) (finding injunction "necessary to implement, preserve and enforce the releases and exculpations"); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 10, 2024) [Docket No. 192], U.S. Trustee's Obj. to Confirmation ¶ 34 (arguing "there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce" third-party releases), *rejected by id.* [Docket No. 255], Confirmation Order ¶¶ 32, 111; *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 10, 2020) [Docket No. 1303], U.S. Trustee's Obj. to Confirmation ¶ 49 (arguing that "Debtors . . . should not be allowed the unfettered discretion to force public shareholders and the general unsecured creditors to release non-debtors from liability, because a permanent injunction limiting the liability of non-debtor parties is a rarity"), *rejected by id.* [Docket No. 1509], Confirmation Order ¶ 100.d; *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) [Docket No. 2671], Confirmation Order ¶¶ 31, 41 (finding injunction "essential to the Plan and necessary to implement, preserve, and enforce the discharge, Debtor Release, Third-Party Release, and Exculpation provisions" and "appropriately tailored to achieve those purposes").

[23]   The U.S. Trustee's assertion that a "*permanent* injunction barring claims between non-debtors" is inappropriate also fails for a similar reason.  *See* UST Objection at 15 (emphasis in original).  The U.S. Trustee appears to analogize the Injunction's effect on released third-party claims to the automatic stay that operates to bar certain claims during the pendency of the cases, and argues that, post-confirmation, there is no jurisdiction, or indeed any need, to continue that bar.  But the U.S. Trustee again forgets that, unlike the automatic stay's bar of claims, which arises by operation of law, the Third-Party Releases are consensual and arise instead from the consent of the affected parties (and indeed none of the cases the U.S. Trustee cites on this point relate to consensual third-party releases).  The Injunction itself does not operate to permanently bar claims; it is merely the mechanism through which the consensual releases are enforced.  Because the Third-Party Releases are consensual, it is appropriate for the Injunction to give those releases permanent effect.

70.     The U.S. Trustee also argues that it is inappropriate for the Injunction to enforce even the consensual releases because the Court lacks jurisdiction to do so.  That is not the case. The Court's post-confirmation jurisdiction over its enforcement of the appropriate provisions of a confirmed chapter 11 plan, including third-party releases, is well-recognized.[24]  As discussed in the Release and Exculpation Briefs, the consensual Third-Party Releases are appropriate Plan provisions.[25] The Plan is incorporated by reference into the proposed Confirmation Order (*see* Ex. A ¶ 1) and, thus, all legally appropriate provisions of the Plan will be part of that order once it is entered.  There is no doubt that the Court has the ability to enforce its own Order.[26]  Moreover, the U.S. Trustee's flat assertion that the Third-Party Releases do not "relate to" the Chapter 11 Cases is nonsensical.  *See* UST Objection at 15.  The Plan's inclusion of Third-Party Releases is an essential part of the bargain struck in the Plan Settlement and, therefore, forms a key underpinning of the Plan itself.  *See* Bliley Decl. ¶ 27.[27]  And while the U.S. Trustee notes, correctly, that the

---

[24]  *See, e.g.*, *In re Res. Cap., LLC*, 508 B.R. 838, 849 (Bankr. S.D.N.Y. 2014) (finding bankruptcy court had post-confirmation jurisdiction to enforce the third party release and plan injunction, noting that where a "motion seeks to prevent the prosecution of causes of action expressly prohibited by the confirmation order, it would be difficult to identify judicial acts that are any more critical to the orderly functioning of the bankruptcy process or more closely tethered to core bankruptcy jurisdiction") (internal quotations and citations omitted); *In re Charter Commc'ns*, 2010 WL 502764, at *4 (Bankr. S.D.N.Y. Feb. 8, 2010) (finding bankruptcy court had post-confirmation jurisdiction to enforce third party release and plan injunction because "[a]ll courts retain the jurisdiction to interpret and enforce their own orders").

[25]  *See* Reply Release and Exculpation Brief ¶¶ 6-10.

[26]  *See, e.g., In re Petrie Retail, Inc.*, 304 F.3d 223, 230 (2d Cir. 2002) ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization."); *In re Texaco Inc.*, 182 B.R. 937, 947 (Bankr. S.D.N.Y. 1995) ("A bankruptcy court is undoubtedly the best qualified to interpret its own orders including those providing for discharge and injunction[.]"); *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (finding that bankruptcy courts "plainly ha[ve] jurisdiction to interpret and enforce [their] own prior orders").

[27]  In *Spirit*, Judge Lane found this close relationship between the third-party releases and the plan to give rise to the court's jurisdiction over third-party claims.  *See Spirit,* 2025 WL 737068, at *17 (finding jurisdiction over third-party releases that are "anchored in the agreement with the Consenting Stakeholders that forms the foundation of the reorganization accomplished by the Plan and that provides the basis for the robust recovery of the affected creditors").  That same relationship exists here:  the Third-Party Releases are a critical piece of the Plan Settlement that is the tentpole of the Plan and enables recoveries for creditors that likely would otherwise receive nothing. *See also, e.g., In re Stearns Holdings, LLC*, 607 B.R. 781, 786-90 (Bankr. S.D.N.Y. 2019) (overruling U.S. Trustee's objection and confirming plan providing third-party releases because (1) "the Court's subject matter jurisdiction extends to approval of third-party releases if the releases are included in a chapter 11 plan" and (2)

Court's post-confirmation jurisdiction must "affect some aspect of the plan," such jurisdiction plainly exists here, where the Third-Party Releases are not only an express part of the Plan, but an integral and essential part of the bargain underlying the Plan Settlement, without which the Plan would not have been possible. *See* UST Objection at 15-16 (citing *In re Park Ave. Radiologists, P.C.*, 450 B.R. 461 (Bankr. S.D.N.Y. 2011) (finding no post-confirmation jurisdiction existed over a disputed release, but where (i) such release did not arise from or form part of the chapter 11 plan and would not "require the Court to consult the Plan or interpret any provisions contained therein" and (ii) the plan failed to "provide for the retention of jurisdiction over the dispute")). Not one of the cases cited in the UST Objection finds that a bankruptcy court has no post-confirmation jurisdiction over third-party releases within a confirmation order—the U.S. Trustee can offer no support for this position. The U.S. Trustee's objection to the Injunction as it relates to the Third-Party Releases founded on lack of jurisdiction therefore fails.

71. Similarly unpersuasive is the U.S. Trustee's argument that because non-Debtors are agreeing to adjust their rights vis-à-vis one another through the Third-Party Releases, the Court has no power to enforce that agreement. *See* UST Objection at 15. As do the U.S. Trustee's arguments regarding whether the Third-Party Releases are consensual, the U.S. Trustee's position regarding the Injunction provisions fails to grasp that the Third-Party Releases were not offered or obtained in a vacuum. Instead, they were offered to creditors through the formal, judicially authorized solicitation of the Plan and the creditors' consent will receive the imprimatur of the

---

the third-party releases were "integral to the Debtors' reorganization efforts"); *Lynch v. Lapidem Ltd.* (*In re Kirwan Offices S.a.r.l.*), 592 B.R. 489, 507-08 (S.D.N.Y. 2018), *aff'd*, 792 F. App'x 99 (2d Cir. 2019) (affirming bankruptcy court's jurisdiction to enter exculpation and injunction provision releasing third-party claims because the related claims were "not merely related to the matters encompassed within the confirmed reorganization plan [but also] … necessary to the plan's operation"); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1145-46 (D.C. Cir. 1986) (affirming bankruptcy court's jurisdiction to approve a plan which include third-party releases because the "approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law").

Court's confirmation of the Plan. The Third-Party Releases cannot be divorced from the Plan. Judge Lane's recent decision in *Spirit* recognized just this, looking to "the larger context for the Third-Party Releases contained in [a] Plan," and observing that a chapter 11 plan is

> the crucible by which the parties' claims and rights in property dealt with by the plan are transformed and governed post-confirmation— a 'super-contract'—not because it is signed by all the parties with claims against the debtor and holders of interests affected by the plan who participated in the case, but because of applicable provisions of the Bankruptcy Code and principles of *res judicata*.

*Spirit*, 2025 WL 737068, at *8 (quoting *Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018) (Drain, J.), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2018)). As the Third-Party Releases are a term of this "super-contract" and enforceable because the Plan has the force of a Court order, the Court has not only jurisdiction but authority to enforce the provisions of its own order through the Injunction.

72. The U.S. Trustee then attempts to bootstrap its argument that there is no statutory authority for including consensual third-party releases in a bankruptcy plan (which the Court already heard and overruled at the Disclosure Statement Hearing[28]) to an argument that no provision of the Bankruptcy Code authorizes an injunction enforcing consensual releases. *See* UST Objection at 16 ("[T]here is no authority in the Bankruptcy Code for the injunction barring claims between non-debtors, and the Debtors cite none."). Again, as with including a third-party release in a chapter 11 plan, it is not the case that if the Bankruptcy Code does not explicitly contemplate a particular plan term, a plan may not include it. Were this so, there would be no need for the permissive language in 11 U.S.C. § 1123(b)(6): rather than permitting plans to include "any other appropriate provision ***not inconsistent with*** the applicable provisions of this title," the

---

[28] *See* Hr'g Tr. 127:14-25, Mar. 17, 2025 [Docket No. 1425] ("You agree there's no section of the Code . . . that prohibits consensual releases? . . . . There's no provisions of the Code that say that consensual releases are not permitted?").

statute instead could have permitted plans to include only provisions "contemplated within," the Bankruptcy Code.  But this is not what the statute in fact says.  The argument that a provision not expressly mentioned in the Bankruptcy Code is *per se* an inappropriate plan provision is insufficient to overcome the significant weight of precedent—and legions of confirmed plans containing an injunction enforcing consensual third-party releases[29]—recognizing that the flexibility of the Bankruptcy Code's permission for what may be included in a bankruptcy plan is broad enough to encompass allowing the Court to issue an injunction carrying out its own order.

73.    Finally, the U.S. Trustee asserts that the traditional standards for an injunction are not met here.  *See* UST Objection at 15-16.  As an initial matter, not one of the U.S. Trustee's cited cases discussing the injunction standards arises from or concerns a chapter 11 plan.  By contrast, an overwhelming number of cases approve injunction provisions within chapter 11 plans remarkably similar, if not identical, to the Injunction here.[30]  The U.S. Trustee also argues that there is no need for the Injunction because there is no "imminent threat" of a party bringing a released or exculpated claim.  UST Objection at 17.  This misstates the appropriate standard for securing an injunction, which typically requires a showing of irreparable (not imminent) harm.  Irreparable harm would indeed result to the Debtors and their estates if these elements of the Plan— that were foundational to the agreements reflected therein—were not enforced.  *See* Bliley Decl.

---

[29]    *See, e.g.*, *supra* n.23.  *See also, e.g.*, *In re 2U, Inc.*, No. 24-11279 (MEW) (Bankr. S.D.N.Y. Sept. 9, 2024) [Docket No. 176] (Confirmation Order); *In re SVB Fin. Grp.*, No. 23-10367 (MG) (Bankr. S.D.N.Y. Aug. 2, 2024) [Docket No. 1379] (Confirmation Order); *In re Acorda Therapeutics, Inc.*, No. 24-22284 (DSJ) (Bankr. S.D.N.Y. Aug. 7, 2024) [Docket No. 428] (Confirmation Order); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Mar. 18, 2024) [Docket No. 3960] (Confirmation Order); *In re Stearns Holdings, LLC*, No. 19-12226 (SCC) (Bankr. S.D.N.Y. Oct. 24, 2019) [Docket No. 432] (Confirmation Order).

[30]    *See In re 2U, Inc.*, No. 24-11279 (MEW) (Bankr. S.D.N.Y. Sept. 9, 2024) [Docket No. 176] (Confirmation Order); *In re SVB Fin. Grp.*, No. 23-10367 (MG) (Bankr. S.D.N.Y. Aug. 2, 2024) [Docket No. 1379] (Confirmation Order); *In re Acorda Therapeutics, Inc.*, No. 24-22284 (DSJ) (Bankr. S.D.N.Y. Aug. 7, 2024) [Docket No. 428] (Confirmation Order); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Mar. 18, 2024) [Docket No. 3960] (Confirmation Order); *In re Stearns Holdings, LLC*, No. 19-12226 (SCC) (Bankr. S.D.N.Y. Oct. 24, 2019) [Docket No. 432] (Confirmation Order).

¶¶ 27-29.  The U.S. Trustee last contends that the Injunction will preclude parties from challenging the enforceability of the Third-Party Releases based on mistake or lack of capacity.  *Id.*  This, too, is in error.  Every creditor is entitled to due process; if such process were lacking, a creditor could argue that its release of third-party claims was not in fact consensual, and the Injunction does not bar them from doing so.  Consistent with the overwhelming weight of authority, the Court has authority and jurisdiction to order the Injunction, and such relief is appropriate and warranted here.

*          *          *

74.    Based upon the foregoing, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Therefore, the Plan satisfies the requirement of section 1129(a)(1) of the Bankruptcy Code.

### E.    Section 1129(a)(2): The Debtors Have Complied with the Bankruptcy Code.

75.    Section 1129(a)(2) of the Bankruptcy Code requires plan proponents to comply with the applicable provisions of the Bankruptcy Code. The Debtors have complied with such requirement.

76.    The legislative history of section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95–595 at 412 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *accord Drexel Burnham Lambert Grp.*, 138 B.R. at 759.   The Debtors submit that, as demonstrated below, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

    1.    *Section 1125: Disclosure Statement and Solicitation.*

77.    Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

> An acceptance or rejection of a plan may not be solicited after the
> commencement of [a] case under [the Bankruptcy Code] from a
> holder of a claim or interest with respect to such claim or interest,
> unless, at the time of or before such solicitation, there is transmitted
> to such holder the plan or a summary of the plan, and a written
> disclosure statement approved, after notice and a hearing, by the
> court as containing adequate information.

11 U.S.C. § 1125(b).

78.    By approving the Disclosure Statement in the Disclosure Statement Order, the

Court has determined that the Disclosure Statement contains "adequate information" within

contemplation of section 1125(b) of the Bankruptcy Code.  As will be set forth in the Voting

Declaration, the Debtors solicited votes on the Plan from the holders of Claims in the Voting

Classes in a manner consistent with the provisions of the Disclosure Statement Order.   In

accordance with section 1125(b) of the Bankruptcy Code, the Debtors did not solicit votes from

any holder of a Claim or Interest prior to the entry of the Disclosure Statement Order. *Id.*  Thus,

the Debtors have complied with section 1125(b) of the Bankruptcy Code.

> 2.    *Section 1126: Acceptance of the Plan.*

79.    Section 1126 of the Bankruptcy Code sets forth the procedures for determining

acceptance of a chapter 11 plan.  Pursuant to section 1126 of the Bankruptcy Code, only holders

of Allowed Claims or Interests that are Impaired and will receive or retain property under the Plan

on account of such Claims or Interests may vote to accept or reject the plan. *See* 11 U.S.C. § 1126.

As noted above, the Debtors solicited acceptances of the Plan only from the holders of Claims in

the Voting Classes, as these are the only Classes of Claims that are Impaired and will receive or

retain property under the Plan.

80.    In accordance with section 1126(f) of the Bankruptcy Code, the Debtors did not

solicit acceptances of the Plan from holders of Claims in Class 1 (Priority Non-Tax Claims), Class

2 (Other Secured Claims), and Class 9 (Non-U.S. General Unsecured Claims) because such Claims are Unimpaired and thus their holders are conclusively presumed to have accepted the Plan.

81.     In accordance with section 1126(g) of the Bankruptcy Code, the Debtors did not solicit acceptances of the Plan from the holders of Claims and Interests, as applicable, in Class 10(g) (GTX General Unsecured Claims), Class 10(l) (CAFI General Unsecured Claims), Class 10(m) (Sorriso General Unsecured Claims), Class 12 (Subordinated Claims), and Class 14 (Existing GLAI Equity Interests) because the holders of such Claims and Interests will neither receive nor retain any property on account of their Claims or Interests, as applicable, and thus are deemed to have rejected the Plan.  In addition, Class 10(e) (GEF General Unsecured Claims) is deemed to reject the Plan and, as such, the Debtors did not solicit votes from holders of GEF General Unsecured Claims.

82.     In accordance with sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors did not solicit acceptances of the Plan from the holders of Claims and Interests, as applicable, in Class 13 (Intercompany Claims) and Class 15 (Intercompany Interests) because either (i) such Claims or Interests, as applicable, are Unimpaired and thus their holders are conclusively presumed to have accepted the Plan or (ii) the holders of such Claims and Interests will neither receive nor retain any property on account of their Claims or Interests, as applicable, and thus are deemed to have rejected the Plan.

83.     Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

84.    As will be set forth in the Voting Declaration, the Plan has been accepted by at least

two-thirds in amount and one-half in number of Claims in each Voting Class other than Class 11.[31]

85.    Based upon the foregoing, the Debtors submit that the requirements of section

1129(a)(2) of the Bankruptcy Code have been satisfied.

### F.    Section 1129(a)(3): The Plan Has Been Proposed in Good Faith.

86.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law."

87.    To demonstrate that a plan was proposed in good faith, a debtor must "show[] that

the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a

---

[31]    Because no holders of Claims in Classes 10(h), 10(i), 10(j), and 10(k) voted to accept or reject the Plan, these classes are presumed to accept the Plan for voting purposes pursuant to Article IV.C.3 of the Plan.  Following the Court's request at the Disclosure Statement hearing, the Debtors revised the Plan to provide that such class shall be presumed to accept "*to the fullest extent permitted by law.*"  *See* Plan, Art. IV.C (emphasis added).  The Debtors submit that presumed acceptance is appropriate in these Chapter 11 Cases where no creditor has voted in a class where there were creditors entitled to vote under *In re Ruti-Sweetwater, Inc.* 836 F.2d 1263, 1267–68 (10th Cir. 1988) (holding that a class in which no class members either voted on or objected to a chapter 11 plan is presumed to have accepted the plan); *see also In re Adelphia Comm's Corp.*, 368 B.R. at 261 (following *Ruti–Sweetwater* in large, complex chapter 11 case, noting that it "is rightly decided, especially in a situation . . . where dozens of classes vote, where the effect of not voting is announced in advance, and everyone else's will would be burdened by those who simply don't vote at all"); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 206–07 (Bankr. S.D.N.Y. 2009) (stating that a class with a single member whose vote was designated must be disregarded, but if the class must be considered, then *Ruti-Sweetwater* should apply); *In re Trib. Co.*, 464 B.R. 126, 183–84 (Bankr. D. Del. 2011) (adopting *Ruti-Sweetwater*); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 430 (Bankr. S.D. Tex. 2009) (same); *In re Campbell*, 89 B.R. 187, 188 (Bankr. N.D. Fla. 1988) (same); *cf. In re Friese*, 103 B.R. 90, 91–92 (Bankr. S.D.N.Y. 1989) (declining to follow *Ruti-Sweetwater* in a small case where no impaired classes voted on the plan at all).  Courts that have declined to follow *Ruti-Sweetwater* have done so in circumstances not present in these Chapter 11 Cases, such as (1) where a creditor did not vote in the applicable class and subsequently objected to confirmation (*see, e.g., In re M. Long Arabians*, 103 B.R. 211, 215–16 (B.A.P. 9th Cir. 1989); *In re Westwood Plaza Apartments, Ltd)*, 192 B.R. 693, 696 (E.D. Tex. 1996); *In re S B Bldg. Assocs. Ltd.*, 621 B.R. 330, 374–75 (Bankr. D.N.J. 2020); *In re Alfaro*, 501 B.R. 292, 294–95 (Bankr. E.D. Pa. 2013)) and (2) cases filed under subchapter V of the Bankruptcy Code, where the statutory direction to subchapter V trustees to "facilitate the development of a consensual plan" (11 U.S.C. § 1183(b)(7)), not present in chapter 11 cases, led those courts to focus on affirmatively demonstrated consent from each class.  *See, e.g., In re Franco's Paving LLC*, 654 B.R. 107, 110 (Bankr. S.D. Tex. 2023) (recognizing the "unique" duty of a subchapter V trustee to facilitate a consensual plan); *In re Hot'z Power Wash*, 655 B.R. 107, 118–19, n. 98 (Bankr. S.D. Tex. 2023) (same); *see also In re M.V.J. Auto World, Inc.*, 661 B.R. 186, 189 (Bankr. S.D. Fla. 2024) (confirming subchapter V plan with two impaired classes, one of which voted for the plan and one of which did not vote).  Moreover, the Classes presumed to accept under Article IV.C of the Plan in these cases are expected to receive a 100% recovery under the Plan.

reorganization can be effected.'"  *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2d Cir. 1935)).  "Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)).  "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of plan development than to the content of the plan." *Id.*  (internal quotation marks omitted).

88.    The Plan pursues a result consistent with the Bankruptcy Code's fundamental objectives:  reorganization and value maximization. *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship (In re LaSalle)*, 526 U.S. 434, 453 (1999) (holding that the "two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors").  The Plan will enable the Debtors to restructure their balance sheet, improve liquidity, and strengthen operations—positioning the Reorganized Debtors' business for long-term success.

89.    Moreover, as discussed above, the Plan is the result of months of good faith, arms'-length negotiations among the Debtors the Committee, Abra, the 2026 Ad Hoc Group, Whitebox, as well as holders of other series of funded debt, the lessors, and various other parties in interest in the Chapter 11 Cases.  The Plan provides holders of General Unsecured Claims with recoveries that would not have been available absent the Plan Settlement.  Accordingly, the "good faith" requirement of section 1129(a)(3) is satisfied. *See In re The Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the

debtors is strong evidence that the plan is proposed in good faith."); *Chemtura*, 439 B.R. at 608–09 (finding that the good faith requirement was met because, among other things, the debtor negotiated and reached agreements with several parties in interest to put forward a chapter 11 plan that, "in the aggregate[,] demonstrate[d] a good faith effort on the part of the debtor to consider the needs and concerns of all major constituencies in this case").

90.     Furthermore, the Plan has not been proposed "by any means forbidden by law" and is in full compliance with all applicable non-bankruptcy law.  The U.S. Trustee argues that the Third-Party Releases are "forbidden under the Supreme Court's decision in *Harrington*" because they are nonconsensual.  UST Objection at 9.  But, as discussed above in Section II.D.1.b, the Third-Party Releases are consensual and, therefore, consistent with *Harrington*.

91.     Accordingly, the Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**G.     Section 1129(a)(4): The Plan Provides that Fee Claims Are Subject to Court Approval.**

92.     Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."

93.     Section 1129(a)(4) has been construed to require that all payments of professional fees to be made from estate assets are subject to review and approval as to their reasonableness by the court.  *See In re J. Reg. Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y 2009); *accord In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *In re Texaco Inc.*, 84 B.R. 893, 907–08 (Bankr. S.D.N.Y. 1988).

94.     Pursuant to the Plan, all payments for professional services provided to the Debtors and the Committee during the Chapter 11 Cases will be subject to approval by the Court as reasonable in compliance with section 1129(a)(4) of the Bankruptcy Code.  Specifically, Article II.B of the Plan provides that all final applications for the payment of Professional Fees must be approved by the Court as reasonable.  Further, Article XII.2 of the Plan provides that the Court will retain jurisdiction to "decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for Allowance of compensation or reimbursement of expenses to Professionals."  Therefore, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**H.      Section 1129(a)(5): The Debtors Have Disclosed or Will Disclose All Necessary Information Regarding Directors, Officers, and Insiders to the Extent Known.**

95.     Section 1129(a)(5) of the Bankruptcy Code requires that (i) the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor(s); (ii) the appointment or the continued appointment of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and (iii) to the extent any insiders will be retained or employed by the reorganized debtors, the identity and nature of compensation of any such insiders be disclosed.  *See* 11 U.S.C. § 1129(a)(5).

96.     Article V.J of the Plan describes the manner in which the members of the board of New GOL Parent will be selected.  In the Plan Supplement, the Debtors have disclosed the identity and affiliations of all individuals proposed to serve as directors of the Reorganized Debtors to the extent determined.  Further, Article V.J.2 of the Plan provides that, except as otherwise set forth in the Plan Supplement, the officers of the Debtors immediately before the Effective Date will serve as the initial officers of the respective Reorganized Debtors on and after the Effective Date. The appointment to, or continuance in, such positions of such persons is consistent with the

interests of the holders of Claims and Interests and public policy.  Accordingly, section 1129(a)(5) of the Bankruptcy Code is satisfied.

**I.       Section 1129(a)(6): The Plan Does Not Contain Any Rate Changes.**

97.       Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."   The Plan does not provide for any rate changes, and, therefore, section 1129(a)(6) is inapplicable.

**J.       Section 1129(a)(7): The Plan Is in the Best Interests of All Creditors and Interest Holders.**

98.       Section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest in each impaired class either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.   11 U.S.C. § 1129(a)(7).   This requirement is commonly referred to as the "best interests" test.

99.       The best interests test focuses on individual dissenting creditors, rather than on classes.  *See 203 N. LaSalle,* 526 U.S. at 441 n.13; *Drexel Burnham Lambert Grp.*, 138 B.R. at 761 ("[T]he liquidation analysis applies only to non-accepting impaired claims or interests."). "The court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7.  In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."  *Adelphia Commc'ns*, 368 B.R. at 252. When determining compliance with the best interests test, courts take into account the fact that

"[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (quoting *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997)); *accord In re W.R. Grace & Co.*, 475 B.R. 34, 142 (D. Del. 2012) ("[T]he court need only make a well-reasoned estimate of the liquidation value that is supported by the evidence on the record. It is not necessary to itemize or specifically determine precise values during this estimation procedure. Requiring such precision would be entirely unrealistic because exact values could only be found if the debtor actually underwent Chapter 7 liquidation.").

100.    As set forth in the Luth Declaration and demonstrated by the liquidation analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis"), the best interests test is satisfied with respect to every holder of a Claim or Interest in Class 3 (2028 Notes Claims), Class 4 (2026 Senior Secured Notes Claims), Class 5 (Glide Notes Claims), Class 6 (Debenture Banks Claims), Class 7 (AerCap Secured Note Claims), Class 8 (Safra Claims), Class 10(a) (GLAI General Unsecured Claims), Class 10(b) (GLA General Unsecured Claims), Class 10(c) (GFL General Unsecured Claims), Class 10(d) (GFC General Unsecured Claims), Class 10(e) (GEF General Unsecured Claims), Class 10(f) (GAC General Unsecured Claims), Class10(g) (GTX General Unsecured Claims), Class 10(h) (Smiles Fidelidade General Unsecured Claims), Class 10(i) (Smiles Viagens General Unsecured Claims), Class 10(j) (Smiles Argentina General Unsecured Claims), Class 10(k) (Smiles Viajes General Unsecured Claims), Class 10(*l*) (CAFI General Unsecured Claims), Class 10(m) (Sorriso General Unsecured Claims), Class 11 (General Unsecured Convenience Class Claims), Class 12 (Subordinated Claims), Class 13 (Intercompany Claims) (in the event that Intercompany Claims are not Reinstated), Class 14 (Existing GLAI

Equity Interests), and Class 15 (Intercompany Interests) (in the event that Intercompany Interests are not Reinstated).

101.    As the Liquidation Analysis demonstrates, holders of Claims and Interests in the above Classes would either receive substantially reduced recoveries or no recoveries in a hypothetical chapter 7 liquidation, which is equal to or less than the recoveries that such holders will receive under the Plan.  *See* Luth Decl. ¶ 12.[32]  Therefore, the Plan satisfies the best interests test under section 1129(a)(7).

**K.    Section 1129(a)(8): The Plan Has Not Been Accepted by All Impaired Classes but it Is Nevertheless Confirmable.**

102.    Section 1129(a)(8) of the Bankruptcy Code requires that the plan must be accepted by each impaired class.  As will be set forth in the Voting Declaration, Class 11 voted to reject the Plan.  Additionally, Classes 10(e), 10(g), 10(*l*), 10(m), 12, and 14 and, in the event that Intercompany Claims and Interests are not Reinstated, Classes 13 and 15 are Impaired and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, the Plan does not comply with section 1129(a)(8) of the Bankruptcy Code.

103.    The Plan is nonetheless confirmable because, as discussed in Section I.R below, the Plan satisfies the "cram down" provisions of section 1129(b) of the Bankruptcy Code with respect to each of the rejecting Classes.

---

[32]  The Claims or Interests, as applicable, in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 9 (Non-U.S. General Unsecured Claims), Class 13 (Intercompany Claims) (in the event that Intercompany Claims are Reinstated), and Class 15 (Intercompany Interests) (in the event that Intercompany Interests are Reinstated) are Unimpaired under the Plan.  Accordingly, the best interests test is inapplicable to such Classes.

**L.     Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Priority Claims.**

104.    Section 1129(a)(9) of the Bankruptcy Code requires that, unless a holder of a claim entitled to priority under section 507(a) of the Bankruptcy Code agrees to alternative treatment of such priority claim, the holders of such claims must receive specified cash payments under a plan.

105.    The Plan complies with section 1129(a)(9) of the Bankruptcy Code. The Plan provides that, each holder of an Allowed Administrative Expense (other than a Claim on account of Professional Fees), "to the extent such Allowed Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full and final satisfaction of its Administrative Expense, Cash equal to the Allowed amount of such Administrative Expense on the Effective Date (or, if payment is not then due, when such payment becomes due in the applicable Reorganized Debtor's ordinary course of business without further notice to, or order of, the Bankruptcy Court), unless otherwise agreed by the holder of such Administrative Expense and the applicable Debtor or Reorganized Debtor." Plan, Art. II.A.1. Moreover, the Plan provides that, except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of such Claim, each such holder will (i) receive from the applicable Reorganized Debtor, in full and final satisfaction of its Priority Non-Tax Claim, payment, Cash equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its Priority Non-Tax Claim becomes due and payable in the ordinary course or (ii) be otherwise rendered Unimpaired. *See id.*, Art. III.B.1. Thus, the Plan satisfies the requirements of sections 1129(a)(9)(A) and (B).

106.    The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code in respect of the treatment of Priority Tax Claims. Pursuant to the Plan, except to the extent that an Allowed Priority Tax Claim has not been previously paid in full or its holder agrees to a

less favorable treatment, in full and final satisfaction of each Priority Tax Claim, each Allowed

Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C)

of the Bankruptcy Code.  *See* Plan, Art. II.E.

107.    Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the

Bankruptcy Code.

### M.    Section 1129(a)(10): The Plan Has Been Accepted by at Least One Impaired Class of Claims

108.    Section 1129(a)(10) of the Bankruptcy Code requires that at least one impaired

class of claims accepts the plan, determined without including any acceptance of the plan by any

insider.  without counting votes cast by any insider.  As will be set forth in the Voting Declaration,

the Plan has been accepted by 15 of 16 Impaired Voting Classes, determined without counting

votes cast by any insider, thereby satisfying the requirements of section 1129(a)(10) of the

Bankruptcy Code.

### N.    Section 1129(a)(11): The Plan Is Feasible.

109.    Section 1129(a)(11) of the Bankruptcy Code requires the debtor to demonstrate that

confirmation of the plan is not likely to be followed by liquidation, or the need for further

reorganization, of the debtor or any successor of the debtor under the plan, unless such liquidation

or reorganization is proposed in the plan.

110.    This "feasibility" requirement is satisfied where, as here, a chapter 11 plan "offers

a reasonable assurance of success." *Johns-Manville Corp.*, 843 F.2d at 649.  "Success need not be

guaranteed" for a debtor to satisfy the feasibility requirement under section 1129(a)(11) of the

Bankruptcy Code; rather, the appropriate inquiry is whether a plan offers a reasonable probability

of success.  *Id.*

111.    In assessing feasibility, courts have identified the following non-exclusive probative factors:

- the prospective earnings of the business or its earning power;

- the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation;

- the prospective availability of credit;

- whether the debtor will have the ability to meet its requirements for capital expenditures;

- economic and market conditions;

- the ability of management and the likelihood that the same management will continue; and

- any other related factors which would materially reflect on the company's ability to operate successfully and implement its plan.

*In re Prudential Energy Co.*, 58 B.R. 857, 86263 (Bankr. S.D.N.Y. 1986); *accord In re Finlay Enters., Inc.*, No. 09-14873 (JMP), 2010 WL 6580629, at *2–6 (Bankr. S.D.N.Y. May 18, 2010); *In re J. Register Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y 2009) (explaining that the feasibility test amounts to "whether the things which are to be done after confirmation can be done as a practical matter under the facts").  As discussed below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

112.    The Debtors, with the assistance of their advisors, have prepared financial projections for fiscal years 2025 through 2029 (the "Financial Projections"), which are set forth in Exhibit D to the Disclosure Statement.  Pursuant to the Financial Projections, the Debtors project that the Reorganized Debtors will generate substantial cashflow over the projection period.  Bliley Decl. ¶ 36.  In particular, the Reorganized Debtors are expected to begin generating positive net income during fiscal year 2026, and the net income generated by the Reorganized Debtors is projected to materially increase on a year-over-year basis thereafter.  *Id.*  This improved financial

performance post-emergence is projected to result in net income of approximately BRL$960 million in fiscal year 2026, which will increase to BRL$2.977 billion by fiscal year 2029. *Id.* Based on the Financial Projections, the Reorganized Debtors will have the ability to make all payments required pursuant to the Plan. *Id.*

113.    Therefore, the Plan is not likely to be followed by liquidation of the Reorganized Debtors or the need for their further reorganization and, accordingly, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

### O.    Section 1129(a)(12): All Statutory Fees Have Been or Will Be Paid.

114.    Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan." Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. In accordance with sections 1129(a)(12) and 507 of the Bankruptcy Code, Article XIII.C of the Plan provides that on the Effective Date, such fees will be paid by the Debtors and thereafter, as may be required, by the Reorganized Debtors.

### P.    Section 1129(a)(13): Retiree Benefits Will Be Continued.

115.    Section 1129(a)(13) requires that:

> The plan provide[] for the continuation after its effective date of payment of all retiree benefits . . . at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).

116.    In accordance with section 1129(a)(13) of the Bankruptcy Code, Article VI.J of the Plan provides that all retirement and supplemental retirement plans, programs, arrangements, and

agreements will be assumed by the Reorganized Debtors.  Accordingly, the Plan satisfies the requirements of section 1129(a)(13).

**Q.      Section 1129(a)(14), 1129(a)(15), 1129(a)(16): Inapplicable Provisions.**

117.    Sections 1129(a)(14) and 1129(a)(15) of the Bankruptcy Code apply solely to individuals, and section 1129(a)(16) of the Bankruptcy Code applies to a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  As none of the Debtors is either an individual nor a corporation or trust that is not a moneyed, business, or commercial corporation or trust, these sub-sections are inapplicable to the Debtors.

**R.      Section 1129(b): The Plan Satisfies the "Cram Down" Requirements with Respect to Non-Accepting Classes.**

118.    As discussed above, the holders of Claims and Interests, as applicable, in Classes 10(e), 10(g)  10(*l*), 10(m), 11, 12, and 14 and, in the event Intercompany Claims and Interests are not Reinstated, Classes 13 and 15 are not receiving or retaining any property on account of their Claims or Interests, as applicable, and, thus, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The Debtors submit that the Plan is nonetheless confirmable with respect to each such Class pursuant to section 1129(b) of the Bankruptcy Code.

119.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as a "cram down") for confirmation of a chapter 11 plan where the plan is not accepted by all impaired classes of claims (provided that the requirements of section 1129(a)(10) are satisfied, as they are here).

120.    Under section 1129(b) of the Bankruptcy Code, the court may confirm a plan over the dissenting vote of an impaired class(es) so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

1.    *The Plan Does Not Discriminate Unfairly.*

121.    Section 1129(b)(1) of the Bankruptcy Code does not prohibit discrimination between classes as long as such discrimination is not *unfair*. Under section 1129(b), a plan unfairly discriminates where similarly situated claims or interests are treated differently without a reasonable basis for the disparate treatment. *In re Sabine Oil & Gas Corp.*, 555 at 310–11 ("Courts generally will approve placement of similar claims in different classes provided there is a 'rational' or 'reasonable' basis for doing so.").  As between two classes of claims or equity interests, a plan does not unfairly discriminate if (i) the classes are comprised of dissimilar claims or interests, *see In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir.1988), or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment, *see, e.g.*, *In re Lightsquared Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014) ("[T]he separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification.").

122.    Under the foregoing standards, the Plan does not "discriminate unfairly" with respect to Classes 10(e), 10(g), 10(*l*), 10(m), 11, 12, 13, 14, and 15.  The Claims and Interests in each such Classes are legally distinct in nature from the Claims and Interests in any other Class.

123.    Therefore, because the Plan does not provide any distributions on account of any similarly situated Claims or Interests, the Plan does not discriminate unfairly with respect to Classes 10(e), 10(g), 10(*l*), 10(m), 11, 12, 13, 14, and 15.  Accordingly, the Plan does not unfairly discriminate with respect to any Class.

2.      *The Plan Is Fair and Equitable.*

124.    Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a rejecting class of impaired unsecured claims or interests if no holder of any junior claim or interest, as applicable, will receive or retain property under the plan on account of such junior claim or interest.

125.    Distributions under the Plan will be made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule.  The "fair and equitable" test is satisfied as to the holders of Claims and Interests, as applicable, in Classes 10(e), 10(g), 10(*l*), 10(m), 11, 12, 13, 14, and 15 because no Claim or Interest, as applicable, junior to the Claims and Interests in such Classes will receive or retain any property under the Plan on account of such junior Claim or Interest.  *See In re Finlay Enters. Inc.*, No. 09-14873 (JMP), 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (finding that the "fair and equitable" test is satisfied where no interest junior to interests of a rejecting class receives any property under a plan).  Accordingly, the Plan is "fair and equitable" with respect to the rejecting Classes and, thus, the Plan may be confirmed under section 1129(b) of the Bankruptcy Code.

**S.      Sections 1121(a), 1129(c), 1129(d), and 1129(e) and Bankruptcy Rule 3016.**

126.    The Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper plan proponents under section 1121(a) of the Bankruptcy Code.  The Plan is the only plan filed in these cases and thus section 1129(c) of the Bankruptcy Code is not implicated.  The principal purpose of the Plan is not the avoidance of taxes or of the application of section 5 of the Securities Act of 1933, as amended, and thus the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.  The Chapter 11 Cases are not "small business case[s]," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.  The Plan satisfies Bankruptcy Rules 3016(a) and (c) because it is dated and identifies

the proponents of the Plan, and Article IX.G of the Plan describes in specific and conspicuous bold language all acts to be enjoined under the Plan and identifies the entities that would be subject to such injunction.

> **T.    Procedures Relating to Assumption and Rejection of Executory Contracts and Unexpired Leases Are Appropriate.**

127.    Article VI.A of the Plan sets forth the procedures with respect to the assumption, assumption and assignment, and rejection of Executory Contracts and Unexpired Leases (the "Assumption and Rejection Procedures"), including the Debtors' right to designate Executory Contracts and Unexpired Leases for assumption through the Effective Date by amending the Schedule of Assumed Contracts through such date.  The Debtors submit that these procedures comply with the Bankruptcy Code and are appropriate under the circumstances.

128.    Although section 365(d)(2) of the Bankruptcy Code provides that a chapter 11 debtor may assume or reject an executory contract or an unexpired lease "at any time before the confirmation of a plan," courts and commentators have found this language not to constitute a temporal limitation.  *See* 3 COLLIER ON BANKRUPTCY ¶ 365.05[2] (Alan N. Resnick & Henry J. Sommer, 16th ed. 2016) ("Assumption or rejection is permitted postconfirmation.")  This is confirmed by similarly permissive language in section 1123(b)(2), which states that a chapter 11 plan "*may* . . . subject to section 365 . . . *provide for* the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected."  11. U.S.C. § 1123(b)(2) (emphasis added).  Interpreting section 365(d)(2) together with section 1123(b)(2), courts have observed that "two fundamental points emerge:  (i) a trustee may, but is not required to, assume or reject an executory contract before plan confirmation; and (ii) if a contract is not assumed or rejected pre-confirmation, the plan itself may provide for assumption or rejection." *DJS Props., L.P. v. Simplot*, 397 B.R. 493, 498 (D. Idaho 2008); *see also* Hr'g Tr. at 111:23–24,

*In re Triangle USA Petroleum Corp.*, No. 16-11566 (MFW) (Bankr. D. Del. Mar. 10, 2017)

[Docket No. 834] (finding that sections "365(d)(2) and 1123 both use permissive language").

Because sections 365(d)(2) and 1123(b)(2) are permissive, "nothing expressly prohibits a plan

from 'providing' for assumption or rejection by selecting a post-confirmation date for that action."

*DJS Props.*, 397 B.R. at 498; *accord* Hr'g Tr. at 111:24–112:1, *Triangle USA* ("Congress knows

when to set an absolute deadline, and I don't think the language used by Congress in these two

provisions is that.").

129.    Thus, the Assumption and Rejection Procedures conform with the applicable

provisions of the Bankruptcy Code.

130.    Additionally, a debtor may place conditions on the assumption of an executory

contract or an unexpired lease, including a condition based on a future event. *See* Hr'g Tr. at

112:14–15, *Triangle USA* ("[T]he absolute decision made by the debtor to assume or reject can be

conditioned on a future event."). A debtor may, for example, condition assumption of an executory

contract or unexpired lease on the execution of definitive documentation amending such contract

or lease. *See* Ex. 2 to Plan Supplement, *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr.

D. Del. Sept. 21, 2018) [Docket No. 1032-2] (providing for the assumption of unexpired leases

"[u]pon the successful execution of lease amendments and other documentation satisfactory to the

Debtors" and providing for the rejection of such unexpired leases "to the extent the Debtors are

unable to agree to satisfactory amendments"). The Assumption and Rejection Procedures contain

a similar conditionality with respect to certain Aircraft Leases, which are subject to ongoing

negotiations with respect to amendments and/or definitive documentation. This conditionality is

critical to the Debtors achieving their restructuring goals and emerging from chapter 11 on the

proposed timeline. *See In re J.M. Fields, Inc.*, 26 B.R. 852, 856 (Bankr. S.D.N.Y. 1983)

("Requiring final determination prior to confirmation of all applications to reject a lease . . . would postpone confirmation of a debtor's plan of arrangement, thus impeding the debtor's rehabilitation and return to the marketplace[, which] thwarts the very aim of reorganization proceedings.").

131.    Accordingly, the Debtors submit that the Assumption and Rejection Procedures are appropriate and comply with section 1123(b)(2) of the Bankruptcy Code.

**U.    Section 1127: Modification of the Plan.**

132.    Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the modification complies with section 1125 of the Bankruptcy Code.   11 U.S.C § 1127.   In addition, with respect to modifications made after acceptance but prior to confirmation of the plan, Bankruptcy Rule 3019 provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

133.    The Debtors have made certain modifications to the Plan since filing the solicitation version to, among other things, resolve certain informal comments received from various parties in interest, to clarify certain provisions of the Plan, and to reflect the 2026 Settlement and Whitebox Settlement.   As discussed above, the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code in soliciting votes.   Thus, the requirements of section 1127 have been satisfied.   Further, given that

the Plan modifications made after soliciting votes thereon do not "adversely change the treatment

of the claim of any creditor or the interest of any equity security holder who has not accepted in

writing the modification," the Plan should be deemed accepted by all creditors and equity security

holders who have previously accepted the plan before the modifications were made. *Id.*

## III.    CAUSE EXISTS TO WAIVE ANY STAY UNDER THE BANKRUPTCY RULES

134.    Bankruptcy Rule 3020(e) provides that "*[u]nless the court orders otherwise*, a

confirmation order is stayed for 14 days after its entry." *Id.* 3020(e) (emphasis added).  As such,

and as the Advisory Committee Notes to Bankruptcy Rule 3020(e) confirm, "the court may, in its

discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and

distributions made immediately." *Id.*, Adv. Comm. Notes, 1999 Amend.

135.    Courts have consistently emphasized that Rule 3020(e)'s application is

discretionary and must be guided by pragmatic, case-specific considerations. The Debtors

respectfully submit that, under the circumstances of these cases, good cause exists for the Court to

waive the 14-day stay imposed by Bankruptcy Rule 3020(e) and to direct that the Confirmation

Order be effective immediately upon entry. *First*, the Debtors face fast-approaching deadlines tied

to their DIP maturity and exit financing commitments.  Courts regularly waive this stay where a

plan's prompt effectiveness is critical to avoid the harmful consequences of failing to meet

deadlines or milestones.  *Second*, every additional day in chapter 11 imposes substantial

administrative and professional costs that directly diminish creditor recoveries, further supporting

waiver of the Bankruptcy Rule 3020(e) stay.  *Third*, the Plan enjoys broad stakeholder support and

reflects months of good-faith, arm's-length negotiations, making delay both unnecessary and

inequitable.  *Finally*, a court directing the immediate effectiveness of a plan in similar contexts is

not considered extraordinary relief, and the U.S. Trustee offers no reason to depart from this

well-grounded and oft-utilized practice, and certainly no reason that would justify the substantial

risks that failing to waive the Bankruptcy Rule 3020(e) stay would impose here.  By contrast, the

U.S. Trustee would suffer no meaningful harm if the waiver were granted—such waiver poses no

meaningful risk to its appellate rights.  For all of these reasons, waiver is warranted here.

### A.    Courts Routinely Grant Rule 3020(e) Waivers in Similar Cases.

136.    Waiver of the Rule 3020(e) stay is a well-established and frequently granted form

of relief, particularly in complex airline chapter 11 cases, which—like these cases—involve cross-

border operations, regulatory oversight and deadlines, and urgent financing needs that require

prompt emergence.  Indeed, courts in this District and others routinely grant waivers of Bankruptcy

Rule 3020(e).  *See, e.g.*, *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov.

2, 2021) [Docket No. 2300] (holding that the confirmation order "shall be immediately effective

and shall not be stayed"); *In re CGG Holdings (U.S.) Inc.*, No. 17-11637 (MG) (Bankr. S.D.N.Y.

Oct. 16, 2017) [Docket No. 337] (concluding the confirmation order "shall be immediately

effective and enforceable and deemed binding"); *In re Frontier Commc'ns Corp.*, No. 20-22476

(MG) (Bankr. S.D.N.Y. Aug. 27, 2020) [Docket No. 1005] (ordering confirmation order "effective

immediately and not subject to any stay"); *In re Grupo Aeroméxico, S.A.B. de C.V.*, No. 20-11563

(JPM) (Bankr. S.D.N.Y. Feb. 4, 2022) [Docket No. 2668] (ordering confirmation order "shall be

immediately effective and shall not be stayed"); *In re LATAM Airlines Grp. S.A.*, No. 20-12254

(JLG) (Bankr. S.D.N.Y. June 18, 2022) [Docket No. 5754] (ordering confirmation order "shall be

immediately effective and shall not be stayed"); *In re Voyager Aviation Holdings, LLC,* No. 23-

11177 (JPM) (Bankr. S.D.N.Y. Mar. 22, 2024) [Docket No. 838] (ordering confirmation order

"shall take effect immediately and shall not be stayed").[33]  The relief requested here is no different

in kind or justification, and it is both appropriate and consistent with this District's routine practice.

---

[33]    *See also In re Nine West Holdings, Inc.,* No. 18-10947 (Bankr. S.D.N.Y. Feb. 27, 2019) [Docket No. 1308]; *In re First Mode Holdings, Inc.*, No. 24-12794 (Bankr. D. Del. Mar. 26, 2025) [Docket No. 375]; *In re Gritstone Bio,*

### B.    Waiver Is Necessary to Meet Imminent DIP and Exit Financing Deadlines.

137.    Waiver of the 14-day stay under Bankruptcy Rule 3020(e) is necessary to preserve the Debtors' ability to meet critical deadlines under both their DIP Facility and their Court-approved exit financing commitments.  As the Debtors have informed the Court, the Debtors' emergence timeline is largely driven by the maturity of their DIP Facility on June 8, 2025.[34]  If the Debtors are forced to further extend the maturity date, they would be required to pay a $17.5 million extension fee—which would erode value otherwise available to stakeholders.[35]  Importantly, the amended DIP indenture requires that the Debtors notify lenders of any need to extend the DIP Facility by May 22, 2025[36]—creating an urgent need to proceed with implementation of the Plan without unnecessary delay.

138.    Additionally, timely entry and effectiveness of the Confirmation Order are required to comply with the Debtors' exit financing commitments, which the Court approved on March 26, 2025 [Docket No. 1414].  The exit facility commitment letter expressly provides that the exit

---

*Inc.*, No. 24-12305 (Bankr. D. Del. Mar. 21, 2025) [Docket No. 601]; *In re JER Investors Trust, Inc.*, No. 23-12109 (Bankr. D. Del. Mar. 26, 2025) [Docket No. 316]; *In re Number Holdings Inc.*, No. 24-10719 (Bankr. D. Del. Jan. 24, 2025) [Docket No. 1733]; *In re Oldco Tire Distributors, Inc.*, No. 24-12391 (Bankr. D. Del. Mar. 28, 2025) [Docket No. 968]; *In re OYA Renewables Dev. LLC*, No. 24-12574 (Bankr. D. Del. Apr. 22, 2025) [Docket No. 541].

[34]    *See* May 1, 2025 Hr'g Tr. at 26:18-20 (Debtors' counsel: "In order to -- in order to emerge and go effective and pay the fees and pay off the DIP by June 8th. We do need to come before Your Honor, obviously, for confirmation hearing."); *see also* March 17, 2025 Hr'g Tr. at 40:20-24 (Debtors' counsel: "And most importantly, I think of all those reasons it comes down to the DIP maturity having enough time to be able to go from confirmation to be able to get to effectiveness without blowing the deadline for the DIP maturity.").

[35]    *See* March 17, 2025 Hr'g Tr. at 40:24-41:3 (Debtors' counsel: "And I'll just note because I think it's good for context, a DIP extension comes at a heft seventeen-and-a-half million-dollar price tag for the debtors. That's nearly half of the total outstanding obligations of the holders of the unsecured 2024 notes, of which the Whitebox group is a holder.").

[36]    *See* Bliley Decl. ¶ 42; *see also* May 1, 2025 Hr'g Tr. at 30:17-21 (Debtors' counsel: "We do have currently a May 22nd deadline by which we need to advise the DIP lenders irrevocably whether we intend to extend the DIP loan. That comes at a very significant cost to the estates. We would like to avoid that cost.").

lenders may refuse to fund the exit financing if the Confirmation Order is stayed. [37]  Thus, a delay

in the Plan's effectiveness threatens not only the Debtors' ability to repay their DIP loans but also

the funding necessary to emerge.  To protect this critical funding source, the Debtors must remain

able to go effective without delay.

139.    Courts routinely grant waivers of Rule 3020(e) in similarly exigent circumstances,

where critical deadlines or milestones require immediate plan effectiveness to avoid harm to the

estate.  For example:

- In *In re TLC Vision (USA) Corp.*, the court overruled an objection to the debtors'
assumption of an LLC operating agreement, prompting the counterparty to make
an oral motion to stay the confirmation order with respect to the assumption of the
agreement.[38]  The debtors contended that maintaining the 14-day stay would likely
interfere with their ability to comply with the deadline for closing the plan sponsor
agreement.  Specifically, "the inability to close, to fund, and to move on and pay
off the pre-petition lenders and the DIP lender and establish the general unsecured
creditor pool and all the other aspects of the plan does hinge in part on [the debtors']
ability to assume" the contract at issue.[39]  The court denied the oral motion for stay
of the confirmation order, explaining that there was not "any evidence before me
relating to irreparable harm" and that there was "ample time under these
circumstances to seek a stay from the district court."[40]

- In *In re First Mode Holdings, Inc.*, the debtors requested a waiver of the 14-day
stay, citing good cause based on, among other things, the restructuring support
agreement's "milestone that the Plan become effective no later than seven calendar
days after entry of the Confirmation Order[.]"[41]  The court credited this argument
and granted the waiver of the Bankruptcy Rule 3020(e) stay.[42]

- In *In re Number Holdings, Inc.*, the debtors sought a waiver of the 14-day stay,
arguing that failure to go effective by the end of their fiscal year would cause

---

[37]    *See* Commitment Letter [Docket No. 1398-3] § 15 (providing that the Commitment Party's commitment may
terminate if "any order confirming the Plan (or any amended or modified version thereof) is reversed, ***stayed*** or
dismissed") (emphasis added).  *See also* Bliley Decl. ¶ 43.

[38]    Hr'g Tr. at 113:8-12, 134:1-7, *In re TLC Vision (USA) Corp.*, No. 09-14473 (Bankr. D. Del. May 19, 2010)
[Docket No. 597].

[39]    *Id.* at 134:19-135:8.

[40]    *Id.* at 135:23-136:5.

[41]    *In re First Mode Holdings, Inc.*, No. 24-12794 (Bankr. D. Del. Mar. 21, 2025) [Docket No. 360].

[42]    *Id.* [Docket No. 375] (ordering confirmation order "shall be effective and enforceable immediately upon its
entry").

negative financial and tax consequences, harming stakeholders.[43] The U.S. Trustee objected to the waiver, explaining that no exigencies justified "impeding [its] ability to obtain appellate review."[44] The court rejected the U.S. Trustee's objection and granted the requested waiver.[45]

- In *In re Jervois Texas LLC*, the debtors explained that good cause existed to waive the 14-day stay because, among other things, the requested waiver would allow the debtors to finalize the processes required for certain restructuring transactions prior to the commencement of related Australian proceedings, the timely commencement of which would reduce disruption and incremental costs to the debtors' business caused by the chapter 11 cases.[46] The court rejected the U.S. Trustee's objection and granted the requested waiver.[47]

140. Accordingly, as with other cases, ample good cause supports waiver of the Rule 3020(e) stay of the Confirmation Order in these cases. Doing so is not only appropriate, but essential to avoid a $17.5 million DIP extension fee, preserve critical exit financing, and enable the Debtors' successful emergence from chapter 11.

### C.    Ongoing Chapter 11 Costs Further Justify Immediate Effectiveness.

141. Additional good cause exists to grant the requested waiver under Bankruptcy Rule 3020(e), as every additional day the Debtors remain in chapter 11 imposes substantial and compounding administrative expenses, professional costs, and DIP interest obligations paid by the estates, which directly erode the value available for distribution.[48] These expenses average approximately $870,000 per day,[49] meaning that even short delays can translate into millions of dollars in diminished estate value and impaired recoveries.

---

[43]    *In re Number Holdings, Inc.*, No. 24-10719 (Bankr. D. Del. Jan. 21, 2025) [Docket No. 1688].

[44]    *Id.* [Docket No. 1679].

[45]    *Id.* [Docket No. 1733].

[46]    *In re Jevois Texas, LLC*, No. 25-90002 (Bankr. S.D. Tex. March 4, 2025) [Docket No. 146].

[47]    *Id.* [Docket No. 169].

[48]    Bliley Decl. ¶ 44.

[49]    *Id.*

142.    Courts in this district have consistently recognized this as a compelling basis for waiver. *See In re Hermitage Offshore Servs. Ltd.*, No. 20-11850 (MG) (Bankr. S.D.N.Y. May 7, 2021) [Docket No. 272] (granting the Rule 3020(e) waiver);[50] *In re 2U, Inc.*, No. 24-11279 (Bankr. S.D.N.Y. Sept. 9, 2024) [Docket No. 176] (same);[51] *see also In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. Nov. 3, 2010) [Docket No. 4410] (stating that the debtors' argument that the stay would create significant costs to the debtors' estates, including interest on allowed claims that would cost the estate approximately $230,000 per day, was the "most persuasive" and "ultimately inform[ed] the exercise of [his] discretion" to shorten the fourteen-day stay).  And such a basis is compelling here.  Given these cases' significant and ongoing administrative and professional costs, prompt Plan effectiveness is essential to protect estate value.

### D.    Strong Creditor Support and a Largely Consensual Plan Weigh in Favor of Waiver.

143.    Good cause also exists for the Court to direct that the Confirmation Order be effective immediately because, as further explained above, the Plan is the result of months of hard-fought, good-faith negotiations among sophisticated parties and enjoys the support of the Debtors' key stakeholders.[52]  Where, as here, the Plan is largely consensual and positioned for swift implementation, there is no benefit to imposing delay—and ample justification to waive the Bankruptcy Rule 3020(e) stay in the exercise of the Court's discretion.

---

[50]    In *Hermitage Offshore*, the debtors asserted that good cause existed for waiver of Rule 3020(e) because "prompt consummation of the Plan will enable the Debtors to conduct a prompt wind down of the Debtors' estates, while avoiding the incurrence of additional administrative expenses and professional costs." *In re Hermitage Offshore Servs. Ltd.*, No. 20-11850 (MG) (Bankr. S.D.N.Y. May 7, 2021) [Docket No. 272] (the "Hermitage Motion") at 31.

[51]    In *2U, Inc.*, the debtors asserted that good cause existed for eliminating the stay because "each day the Debtors remain in chapter 11, they incur significant administrative and professional costs—expenses that are unnecessary in light of the overwhelming support for the Plan."  No. 24-11279 (Bankr. S.D.N.Y. Sept. 4, 2024) [Docket No. 148] (the "2U Motion") at 103.

[52]    Bliley Decl. ¶ 45.

144.    Courts in this district have routinely granted Bankruptcy Rule 3020(e) waivers in cases where strong creditor support and good-faith negotiations were presented as part of the justification, underscoring the weight such factors can carry in the court's exercise of discretion. *See In re Hermitage Offshore Services Ltd.*, No. 20-11850 (MG) (Bankr. S.D.N.Y. June 23, 2021) [Docket No. 310] (waiving Bankruptcy Rule 3020(e) stay);[53] *In re 2U, Inc.*, No. 24-11279 [Docket No. 176] (same);[54] *see also In re Oldco M. Corp.*, No. 09-13412 (Bankr. S.D.N.Y. Feb. 23, 2010) (J. Glenn) [Docket No. 1384] (finding good cause to support waiver of stay "in light of the lack of objections to the Plan by all but one creditor").    Accordingly, the Plan's broad support and arm's-length development provide an additional, independent basis for waiving the Bankruptcy Rule 3020(e) stay.

### E.    The UST Objection's Concerns are Misplaced and Fail to Justify a Stay in the Face of the Debtors' Good Cause.

145.    The U.S. Trustee objects to the waiver of the Rule 3020(e) stay on the sole ground that it may negatively affect its appellate rights. *See* UST Objection at 18.  That argument reflects a misunderstanding of both the legal function of Bankruptcy Rule 3020(e) and the circumstances of these cases.

146.    As the U.S. Trustee acknowledged, Bankruptcy Rule 3020(e) merely affords a short procedural window to seek a stay pending appeal. *See id.* ("The purpose of the rule is "to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan . . ..") (citation omitted).   Importantly, Bankruptcy Rule 3020(e) does not confer any substantive appellate right, guarantee that a stay will be granted, nor affect the time-period for filing an appeal,

---

[53]    In *Hermitage Offshore*, the debtors also pointed out that good cause existed for waiver of Rule 3020(e) because the debtors and their lenders took "collaborative efforts in achieving a fully consensual Plan."  Hermitage Motion at 32.

[54]    In *2U, Inc.*, the debtors sought waiver of Rule 3020(e), citing the plan's broad support and the fact that it had been "vigorously negotiated among sophisticated parties."  2U Motion at 103.

which runs from entry of the Confirmation Order regardless of whether Bankruptcy Rule 3020(e) is waived. *See* Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend. (stating "subdivision (e) does not affect the time for filing a notice of appeal from the confirmation order in accordance with Rule 8002"); *id.* 8002(a) ("[A] notice of appeal must be filed with the bankruptcy clerk within 14 days after the judgment, order, or decree to be appealed is entered."). The U.S. Trustee's further concern that "it is not clear when the Effective Date will occur" (*see* UST Objection at 18) is beside the point. The time in which the U.S. Trustee may seek an appeal of the Confirmation Order is tied *solely* to the entry of the Confirmation Order, not the Effective Date. *See* Fed. R. Bankr. P. 3020(e) ("[A] confirmation order is stayed for 14 days ***after its entry***") (emphasis added). The U.S. Trustee's objection thus rests on a fundamental misunderstanding of Bankruptcy Rule 3020(e)'s limited procedural function.

147. In any event, any concern the U.S. Trustee may have regarding its appellate rights is undermined by the ample notice it has had on the likely outcome of the confirmation issues it now raises. The U.S. Trustee's primary objections—such as the Plan's opt-out mechanism with respect to third-party releases—were thoroughly addressed at the Disclosure Statement hearing, where the Court made initial decisions and disclosed its preliminary views.[55] Accordingly, the U.S. Trustee—the sole Plan objector—has known for ***months*** how the confirmation issues are likely to be resolved and has had every opportunity to prepare any appellate or stay-related arguments or filings. There is thus no practical risk that waiver of Bankruptcy Rule 3020(e) would

---

[55] *See, e.g.*, Mar. 17, 2025 Disclosure Statement Hr'g Tr. at 120:13-14 (the Court: "Determining what has to be shown in order to approve the release, I think, is a federal-law issue"); *id.* at 124:18-19 ("But *Purdue* didn't say that it prohibits third-party nondebtor releases."); *id.* at 65:23-24 ("I've uniformly held that exculpation is not limited to estate fiduciaries."); *id*. at 170:20-171:1 (the Court: "With respect to the U.S. Trustee's objection to the scope of the -- to the opt-in versus opt-out, their objection to the opt-out is overruled. First, I've determined, as I've stated on the record, that the issue is controlled by federal law and not state law. To the extent of any dispute about what the meaning of the releases are, those would be state law issues").

"imped[e] the ability to obtain appellate review." *See* UST Objection at 18.  By contrast, any theoretical harm to the U.S. Trustee's appellate rights must be weighed—under the Court's discretion—against the concrete and immediate prejudice to the Estates if a stay is imposed, including the risk of forfeiting Court-approved exit financing and incurring a $17.5 million DIP extension fee.  On balance, the equities overwhelmingly support waiver.

148.    The U.S. Trustee's reliance on *Chemtura* and *Adelphia* to support its argument is unavailing.[56]  In *Chemtura Corp.*, the court only sustained an objection to the stay waiver **in part**, shortening the duration of the stay to five days as opposed to upholding the complete fourteen-day stay.  *In re Chemtura Corp.*, No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  While the court recognized a stay's cost to the estates, it used its discretion to settle on five days for the shortened stay based on its belief that a short stay was "not likely to have a material adverse effect on the estate."  *Id.* at *2.  Here, the stakes (and costs) are materially higher.  In *Adelphia*, the debtors did not seek a waiver, but the court declined to **extend** the stay in effect under Bankruptcy Rule 3020(e) upon an objector's request, emphasizing that fairness, overwhelming creditor support, and the substantial cost of delay all weighed against further postponement of plan effectiveness.  *See In re Adelphia Commc'ns Corp.*, 368 at 282–84.  Appropriately, these decisions demonstrate how courts exercise case-specific discretion under Rule 3020(e), and, in fact, underscore that the equities here—a highly supported Plan, imminent financing deadlines, and massive cost risk—strongly favor waiver.

---

[56]    The U.S. Trustee also cites *Syncora* for the generic proposition that "[a]n orderly bankruptcy process depends on a concomitantly efficient appeals process." UST Objection at 18.  While the Debtors do not dispute that principle, *Syncora* is inapposite; it concerned whether the district court erred in staying an appeal of Detroit's chapter 9 eligibility—an issue wholly unrelated to Rule 3020(e) waivers.  *In re Syncora Guarantee Inc.*, 757 F.3d 511, 515 (6th Cir. 2014).

149.    In sum, there is no real risk that waiver of Bankruptcy Rule 3020(e) in this case would impede the U.S. Trustee's ability to obtain review of the Confirmation Order.  Rather, the Debtors seek only to preserve their flexibility to implement the Plan in accordance with pre-negotiated deadlines, financing commitments, and stakeholders' expectations, while also ensuring the Estates do not incur avoidable administrative costs.  That is precisely the kind of circumstance where courts routinely exercise discretion to waive Bankruptcy Rule 3020(e).

150.    Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order is effective immediately upon its entry.

## IV.    CONCLUSION.

151.    Based upon the foregoing, the Plan complies with all applicable requirements of the Bankruptcy Code and all Objections to confirmation of the Plan should be overruled and the Plan should be confirmed. Accordingly, the Debtors respectfully request that the Court enter the Confirmation Order and grant the Debtors such other and further relief as the Court may deem just and appropriate.

*[Remainder of page intentionally left blank]*

Dated:  New York, New York
   May 13, 2025

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:   (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*