Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

*Counsel for Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
In re:                                                          :    Chapter 11
:
GOL LINHAS AÉREAS INTELIGENTES S.A.,                            :    Case No. 24-10118 (MG)
*et al.*,[1]                                                    :
:
                                          Debtors.             :    (Jointly Administered)
:
-----------------------------------------------------------------x

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A).  The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

## NOTICE OF FILING OF
## REVISED PROPOSED ORDER (I) CONFIRMING FOURTH MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF GOL LINHAS AÉREAS INTELIGENTES S.A. AND ITS AFFILIATED DEBTORS AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on May 13, 2025, the Debtors filed the *Third Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1592].

**PLEASE TAKE FURTHER NOTICE** that on May 13, 2025, the Debtors filed a proposed *Order (I) Confirming Third Modified Third Amended Joint Chapter 11 Plan of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors and (II) Granting Related Relief* as Exhibit A to the *Notice of Filing of Proposed Order (I) Confirming Third Modified Third Amended Joint Chapter 11 Plan of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors and (II) Granting Related Relief* [Docket No. 1600] (the "First Proposed Order").

**PLEASE TAKE FURTHER NOTICE** that on May 17, 2025, the Debtors filed the *Fourth Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1630] (the "Plan").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a proposed revised *Order (I) Confirming Fourth Modified Third Amended Joint Chapter 11 Plan of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors and (II) Granting Related Relief* (the "Revised Proposed Order"), attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a blackline comparison of the Revised Proposed Order marked against the First Proposed Order, attached hereto as **Exhibit B**.

*[Remainder of page intentionally left blank]*

**PLEASE TAKE FURTHER NOTICE** that copies of the Revised Proposed Order can be viewed and/or obtained by: (i) accessing the Court's website at http://www.nysb.uscourts.gov, (ii) from the Debtors' claims and noticing agent, Kroll, at https://cases.ra.kroll.com/GOL, or by calling 844.553.2247 (U.S./Canada) (toll free) or +1.646.777.2315 (International) or by e-mail via GOLInfo@ra.kroll.com.  Note that a PACER password is needed to access documents on the Court's website.

Dated:  New York, New York
       May 18, 2025

**MILBANK LLP**

*/s/ Evan R. Fleck*
Evan R. Fleck
Lauren C. Doyle
Bryan V. Uelk
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc
Erin E. Dexter (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

-and-

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

## EXHIBIT A

**Revised Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re:                                       :       Chapter 11
                                             :
GOL LINHAS AÉREAS INTELIGENTES S.A.,         :       Case No. 24-10118 (MG)
*et al.*,[1]                                 :
                                             :       (Jointly Administered)
                         Debtors.            :
                                             :

-----------------------------------------------------------------x

### ORDER (I) CONFIRMING FOURTH MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF GOL LINHAS AÉREAS INTELIGENTES S.A. AND ITS AFFILIATED DEBTORS AND (II) GRANTING RELATED RELIEF

The Debtors having filed the *Fourth Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1630], which is attached hereto as **Exhibit A** (as it may be altered, amended, supplemented, or otherwise modified from time to time in accordance therewith, the "Plan") and the *Disclosure Statement for Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1390] (including all appendices, exhibits, schedules, and supplements thereto, and as it may be altered, amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"),[2] each of which is incorporated herein by reference; and upon the Debtors' *(I) Memorandum of Law in Support of Confirmation of the Third Modified Third*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2] Capitalized terms used in this Order but not otherwise defined shall have the meaning ascribed to them in the Plan.

*Amended Joint Chapter 11 Plan of Reorganization of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors and (II) Response Objections Thereto* [Docket No. 1596], the *Declaration of John E. Luth in Support of Confirmation of Joint Chapter 11 Plan of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1595], the *Supplemental Declaration of John E. Luth in Support of Confirmation of Joint Chapter 11 Plan of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1625], the *Declaration of Joseph W. Bliley in Support of Confirmation of Joint Chapter 11 Plan of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1594], and the *Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1603]; and the Court having jurisdiction to consider the relief requested pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Court having found that it may enter a final order consistent with Article III of the United States Constitution, and the Court having found that venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested having been provided, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed or otherwise taken judicial notice of the record; and the Court having held a hearing on notice to consider confirmation of the Plan (the "Confirmation Hearing"); and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, ORDERED, ADJUDGED, AND DETERMINED THAT:**

1.    **Confirmation.**  The facts and legal arguments set forth in the record, including the evidence and argument at the Confirmation Hearing, demonstrate that the requirements for confirmation of the Plan have been satisfied.  Further, each witness who testified or submitted a declaration on behalf of the Debtors in support of confirmation of the Plan was qualified to testify as to the topics addressed in their testimony.  The Debtors have met their burden of proving that the Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code and applicable Bankruptcy Rules by a preponderance of the evidence.  Accordingly, the Plan, in its entirety, is **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.  Each term of the Plan, all of which are incorporated by reference herein (and any amendments, modifications, and supplements thereto), is an integral part thereof.  The failure to specifically describe or include herein any particular provision of the Plan shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be confirmed in its entirety.  Subject to the occurrence of the Effective Date, the provisions of the Plan shall be binding on the Reorganized Debtors and all parties in interest, enforceable in accordance with its terms and the terms of this Order.

2.    **Objections.**  All objections, responses, statements, reservations of rights, and comments in opposition to the confirmation of the Plan that have not been withdrawn with prejudice, waived, settled, or resolved prior to or on the record of the Confirmation Hearing are overruled on their merits with prejudice.  The record of the Confirmation Hearing is closed.

3.    **Notice.**  As reflected in the *Affidavit of Service of Solicitation Materials* [Docket No. 1567] (the "Solicitation Affidavit"), adequate and sufficient notice of the Confirmation Hearing and of the other requirements, deadlines, hearings, and matters described in the *Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting*

*Procedures; (III) Approving Forms of Ballots; (IV) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI) Establishing Notice and Objection Procedures* [Docket No. 1388] (the "Disclosure Statement Order") was timely and properly provided to the parties in interest in compliance with the Disclosure Statement Order and, to the extent applicable, with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Due process, including an opportunity to appear and to be heard at the Confirmation Hearing, as well as to litigate all objections and issues raised, has been provided to all parties in interest. No other or further notice is or shall be required.

4.      **Solicitation.** As reflected in the Solicitation Affidavit, the Debtors have served the Solicitation Packages on the holders of Claims in the Voting Classes and conducted solicitation of votes on the Plan in accordance with the Disclosure Statement Order.

5.      **Plan Modifications.** Any modifications to the Plan since the commencement of solicitation and prior to the entry of this Order comply with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and Article XI of the Plan. Such modifications do not constitute material modifications and do not adversely affect or change the treatment of any Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require either (a) any additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code or (b) that the holders of Claims or Interests be afforded an opportunity to (i) change previously cast acceptances or rejections of the Plan or (ii) withdraw or submit previously submitted or withheld Release Opt-Out Forms. The filing of the revised Plan has provided adequate and appropriate notice of these modifications under the facts and circumstances of the Chapter 11 Cases. Accordingly, the Plan is properly before the Court, and all votes cast with respect to the Plan prior

to any such modifications shall be binding and shall apply to the Plan.  Subject to the terms of the Plan, the Debtors may amend, update, supplement, or otherwise modify the Plan prior to the Effective Date.

6.    **Plan Supplement.**  The contents and filing of the compilation of documents that constitute the Plan Supplement are proper and comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and other applicable laws, and no other or further notice is or shall be required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into, the Plan and are approved by the Bankruptcy Court. Subject to the terms of the Plan, the Debtors may amend, update, supplement, or otherwise modify the documents in the Plan Supplement at any time before the Effective Date.

7.    **Compromise and Settlement of Claims, Interests, and Controversies.**  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, the provisions of the Plan shall constitute an arms'-length and good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims and Allowed Interests in accordance with the Plan are intended to be, and shall be, final.  The entry of this Order shall constitute the Court's approval of the settlements embodied in the Plan, including, but not limited to (i) the settlement among the Debtors, the Committee, and Abra, which provides for, among other things, Abra's agreement to limit its recovery and equitize a significant portion of its secured Claims resulting in meaningful distributions to general unsecured creditors (the "Abra Settlement"); (ii) the settlement resolving all disputes between the Debtors and the 2026 Ad Hoc Group, as described in the Notice of Settlement with 2026 Senior Secured Notes Ad Hoc Group and Amendments to Exit Financing

Commitment Letter, attached as Exhibit J to the *Notice of Filing of Second Plan Supplement* [Docket No. 1558], and as amended by the 2026 AHG A&R Joinder attached as Exhibit J to the *Notice of Filing of Sixth Plan Supplement* [Docket No. 1631] (collectively, the "2026 Settlement"); and (iii) the settlement resolving all disputes between the Debtors and Whitebox Advisors LLC on behalf of its managed funds and accounts that hold 2024 Senior Exchangeable Notes Claims, as described in the Notice of Settlement with Whitebox Advisors LLC, attached as Exhibit K to the *Notice of Filing of Third Plan Supplement* [Docket No. 1571] (the "Whitebox Settlement" and, together with the Abra Settlement and the 2026 Settlement, the "Plan Settlements").  The entry of this Order shall constitute the Court's approval of the Plan Settlements, as well as a finding that the Plan Settlements are in the best interests of the Debtors, their Estates, and holders of Claims and Interests, and are fair, equitable, and reasonable.  The Plan Settlements are binding upon all holders of Claims and Interests and all other parties in interest pursuant to section 1141(a) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may compromise and settle Claims and Interests without notice to or action, order, or approval of the Court.

8.    **Exit Financing**.  The Exit Notes, the Incremental New Money Exit Debt, the Take-Back Notes, and any other form of exit financing contemplated by the Plan (collectively, the "Exit Financing Facilities") and all related agreements and documents are approved and authorized in all respects.  The Debtors or Reorganized Debtors, as applicable, are authorized, without further approval of the Court and subject to the terms of the Plan, to take all actions necessary or desirable to consummate and perform under each of the Exit Financing Facilities, including the payment or reimbursement of any fees, indemnities, and expenses thereunder and to grant liens to secure such indebtedness.  In accordance with section 1142 of the Bankruptcy Code and applicable non-bankruptcy law, such actions may be taken without further

action by stockholders, members, partners, managers, or directors.  The financial accommodations to be extended pursuant to the Exit Financing Facilities are being extended in good faith, for legitimate business purposes, are reasonable, and the incurrence of obligations, granting of liens and other security interests and credit support for the benefit of the parties to the Exit Financing Facilities, and payment of fees, interests, costs, and other amounts arising under or associated with the Exit Financing Facilities shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination), and shall not constitute a preferential transfer, fraudulent conveyance or other voidable transfer under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, the Exit Financing Facilities documents, including any documents required in connection with the creation or perfection of liens in connection therewith, shall constitute legal, valid, binding, and authorized indebtedness and obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms, and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, this Order, or on account of the confirmation or Consummation of the Plan (including the injunction, release, and exculpation provisions of the Plan and this Order).

9. **Additional Financing Commitments.**  The Court approves (i) the Amended and Restated Exit Financing Commitment Letter dated as of April 30, 2025, attached as Annex 3 to the 2026 AHG Joinder filed at Docket No. 1558 (as amended by Amendment No. 1 to the Amended and Restated Exit Financing Commitment Letter, attached as Exhibit B to Exhibit J to the *Notice of Filing of Sixth Plan Supplement* [Docket No. 1631]); (ii) the 2026 Senior Secured Ad Hoc Group fee letter, attached as Exhibit C to Exhibit J to the *Notice of Filing of Second Plan Supplement* [Docket No. 1558], and (iii) the Amended and Restated Existing Backstop Parties fee

letter, attached as Exhibit D to Exhibit J to the *Notice of Filing of Second Plan Supplement* [Docket No. 1558].  These documents are each an essential element of the Plan, are necessary for confirmation and Consummation of the Plan, and are critical to the overall success and feasibility of the Plan.  The Debtors are authorized to enter into, execute, deliver, and perform their obligations under these documents, including through payment of the AHG Work Fee.

10.    **New Equity.**  The issuance of New Equity by New GOL Parent and the distribution of such New Equity to the applicable holders of Claims in accordance with the terms of the Plan and the Transaction Steps, as well as the General Unsecured Creditor Power of Attorney (as defined below) for the purposes thereof, are authorized and approved.  All provisions of the Plan relating to New Equity, including but not limited to the exemption from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code, procedures and actions for assignment or contribution of Claims to New GOL Parent in exchange for New Equity, procedures for distribution through DTC facilities, and mandatory redemption, exchange, and offer to purchase provisions, are approved and shall be binding on all applicable parties.  Holders of Claims entitled to receive the New Equity shall be deemed to have consented to the New Organizational Documents, including any contribution or assignment of the Claims and any contribution and subscription agreement, including by way of the General Unsecured Creditor Power of Attorney (as defined below) as a condition to receipt of their distribution of the New Equity under the Plan.

11.    **Contribution of Subject Claims.**  On the Effective Date, in order to implement the Transaction Steps and to effectuate the distributions under the Plan to holders of Allowed General Unsecured Claims, each holder of a Subject Claim (as defined in the Transaction Steps) shall be deemed to have, either directly or indirectly, and irrevocably, contributed, transferred,

8

and/or assigned as applicable such Allowed Claim to New GOL Parent or any other person appointed, selected, or designated and/or entity selected, designated, or formed for the purposes of accepting such contribution, transfer and/or assignment that subsequently contributes, transfers, and assigns such Allowed Claim to New GOL Parent in exchange for such holder's distribution of New Equity under the Plan which may be issued directly by New GOL Parent or such other person and/or entity (the "Contribution"). This Contribution shall be deemed to occur automatically without the need for execution of any further documentation by such holder and have the same effect as if each holder had executed and delivered all instruments and documents necessary to effectuate the Contribution, it being understood that the Agent (as defined below) may execute and deliver in the name and on behalf of the relevant holders any instrument and documents useful or necessary under Luxembourg law. This provision is binding on all holders of Subject Claims and constitutes an integral part of the implementation of the Plan.

12.     Notwithstanding the foregoing, all holders of Allowed General Unsecured Claims may be required, to the extent required by applicable law and reasonably determined by the Reorganized Debtors to be reasonable and appropriate under the circumstances, to execute certain documentation, including a contribution and subscription agreement, in order to receive such holder's distribution of New Equity. Under such circumstances, the Reorganized Debtors and New GOL Parent are authorized to withhold any applicable distribution until such documentation has been executed and received by New GOL Parent. To the extent that any holder of an Allowed General Unsecured Claim fails to return such documentation within one year of the Effective Date

of the Plan, such holder's distribution shall be treated as an in accordance with Section VIII.D.9. of the Plan titled "Undeliverable Distribution and Unclaimed Property."

13.     To the extent the Debtors or the Reorganized Debtors determine that in order to comply with applicable law, and in order to best effectuate the transactions contemplated by the Plan, including the Transaction Steps and to effectuate the distributions of New Equity to the holders of Subject Claims, the Reorganized Debtors, with the consent of the Committee (or, if after the Effective Date, with the consent of the General Unsecured Claim Observer), may in their discretion appoint a representative, agent, or similar person on behalf of all holders of Allowed General Unsecured Claims, which representative, agent, or similar person shall be determined by the Debtors, the Committee, and Abra and identified in a notice filed on or prior to the Effective Date, and which notice shall be deemed an exhibit hereto, to execute any documents required under applicable law to allow for the distribution of the New Equity to the holders of Allowed General Unsecured Claims, including any contribution and subscription agreement, and so long as such documents are consistent with the terms of the Plan, including the Plan Supplement Documents and does not otherwise alter the rights and benefits of such holders under the Plan.  In the event such representative, agent, or similar person (the "Agent") is appointed, such Agent shall be granted pursuant to this Order all powers and authorizations in the name and on behalf of the holders of Allowed General Unsecured Claims to do any things or acts, take any actions and execute and deliver any documents, necessary or useful in order to implement, or in connection with, the Contribution, including but not limited to the execution of any contribution and subscription agreement for the purposes of the issuance of the New Equity by the board of directors of New GOL Parent under its authorized share capital and to be recorded before a Luxembourg civil law notary in a deed of acknowledgment of share capital increase (*constat d'augmentation*

10

*de capital*), in accordance with article 420-22 *et seq.* of the Luxembourg law of 10 August 1915 on commercial companies, as amended (the "General Unsecured Creditor Power of Attorney"). The Agent shall have no liability whatsoever arising from, relating to, or in connection with this Order or the execution of any documentation consistent with this paragraph or any other action taken in connection with this Order.

14.     Cede & Co. ("Cede"), as nominee of The Depository Trust Company ("DTC"), The Bank of New York Mellon, in its capacity as trustee for the 2024 Senior Exchangeable Notes, the 2025 Senior Notes and the Perpetual Notes, or any nominee or agent duly authorized to act on behalf of the holders of Subject Claims, is authorized to (i) take all actions necessary to effectuate the issuance of New Equity to the holders of Subject Claims, including the underlying beneficial holders (collectively, the "DTC Holders") of the DTC Holders' Subject Claims,[3] as contemplated by the Plan, including to contribute the DTC Holders' Subject Claims to New GOL Parent, (ii) execute the Contribution and Subscription Agreement between with New GOL Parent as recipient  (the "Contribution and Subscription Agreement"),[4] and  (iii) execute any instruction letters and/or powers of attorney in order to authorize The Bank of New York Melon to sign the Contribution and Subscription Agreement on behalf of DTC, the DTC Holders or their respective

---

[3]     The "DTC Holders' Subject Claims" mean the following Allowed Claims in Classes 10(a)-(e): (i) in Class 10(a), for the 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8; for the 2025 Senior Notes Claims, securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; for the Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3 and 38045UAA8; (ii) in Class 10(b), for 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8; for 2025 Senior Notes Claims, securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; for Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3, and 38045UAA8; (iii) in Class 10(c), for 2025 Senior Notes Claims securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; (iv) in Class 10(d), for Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3 and 38045UAA8; and (v) in Class 10(e), for 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8.

[4]     The Contribution and Subscription Agreement provides the mechanism through which the New Equity will be distributed to the DTC Holders and the DTC Holders' Subject Claims will be contributed to New GOL Parent.

nominees.  The Cede & CO., DTC, The Bank of New York Mellon, any nominee or agent of the

DTC Holders, or any representative thereof, shall have no liability whatsoever arising from,

relating to, or in connection with this Order or the execution of the Contribution and Subscription

Agreement or any other action taken in connection with this Order.

15.    **GLAI Preemptive Rights Offering.**  The GLAI Preemptive Rights Offering, as

described in the Transaction Steps, and required to give effect to the terms of the Plan, is approved

in all respects.  The Debtors and Reorganized Debtors, as applicable, as well as all other applicable

parties,  are authorized to take all actions necessary or appropriate to implement and effectuate the

GLAI Preemptive Rights Offering, including approving the capitalization of the Subject Claims,

the issuance of the applicable shares of GLAI in consideration thereof, and providing notice to

Eligible Existing GLAI Equity Interest Holders of their right to participate in the GLAI Preemptive

Rights Offering during the GLAI Preemptive Rights Offering Period in accordance with applicable

Brazilian law.

16.    **Good Faith.**  The Plan, the Plan Settlements, and the Restructuring Transactions,

including the Transaction Steps, the New Organizational Documents, the New Equity Documents,

the Exit Financing Facilities, the New Debt Documents, and all other agreements and transactions

contemplated by the Plan (i) have been negotiated in good faith and at arm's length, without the

intent to hinder, delay, or defraud any of the Debtors' creditors; (ii) are fair and reasonable;

(iii) represent a valid exercise of the Debtors' business judgment; (iv) are supported by reasonably

equivalent value and fair consideration; and (v) are in the best interests of the Debtors, their Estates,

and their stakeholders.

17.  **Injunction, Exculpation, Release, Indemnification, Discharge, Settlement, and Compromise.**

a.  The Court has jurisdiction under 28 U.S.C. § 1334, and authority under 28 U.S.C. § 157, to approve the injunctions, exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan (including Articles IX.D, IX.E, IX.F, and IX.G). Sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 permit issuance of the injunctions and approval of the exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan.

b.  The Released Parties and Exculpated Parties have played a meaningful role in, and significantly and tangibly contributed to, the Chapter 11 Cases and their resolution, have participated in the Chapter 11 Cases and the Debtors' restructuring in good faith, and have acted in compliance with provisions of the Bankruptcy Code, including in connection with the negotiation, preparation, and pursuit of confirmation of the Plan and compromises implemented therein. Each of the Released Parties and Exculpated Parties that owed fiduciary duties to the Debtors and their Estates fulfilled such fiduciary duties at all times.

c.  The Debtors and their management, directors, employees, professionals, attorneys, advisors, and other Related Parties have worked diligently in connection with the Debtors' restructuring efforts. Throughout the Chapter 11 Cases, the Debtors and their Related Parties (to the extent applicable) have fulfilled their respective fiduciary duties to the Estates and protected the interests of all the case constituents with an even hand. The Debtors and their Related Parties fairly and reasonably negotiated the DIP Facility, Plan Support Agreement, the Plan, the Plan Settlements, and the documents included in the Plan Supplement.

d.  The non-Debtor Released Parties and non-Debtor Exculpated Parties have made substantial contributions to these Chapter 11 Cases and assisted the Debtors with negotiating and developing the Plan and the transactions and settlements contemplated thereby. The Released Parties have agreed to forgo certain rights, make certain concessions, and/or incur certain obligations to permit recoveries for the Estates' creditors set forth in the Plan which might not otherwise have been achievable.

e.  Based on the record before the Court, each of the injunction, exculpation, release, indemnification, discharge, settlement, and compromise provisions set forth in the Plan (including Articles IX.D, IX.E, IX.F, and IX.G) (i) is the product of extensive good-faith and arm's length negotiations, (ii) is fair, equitable, reasonable, and appropriate under the circumstances, (iii) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors, (iv) is an essential, integral, and non-severable components of the Plan, Consummation, and resolution of the Chapter 11 Cases, (v) is appropriately and narrowly tailored, (vi) is supported by good and valuable consideration (including the Released Parties' contributions

to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), (vii) is granted after due notice and opportunity for hearing, (viii) is consistent with the Bankruptcy Code and applicable law, (ix) is intended to promote finality and prevent parties from circumventing or attempting to circumvent the Plan, (x) is supported by the Debtors and their key stakeholders, including Abra, the Committee, and the other Consenting Stakeholders, (xi) constitutes a good-faith compromises and settlements of the matters covered thereby, (xii) is, with respect to the Third-Party Releases, consensual based on the opt-out mechanism provided in the Ballots and Release Opt-Out Forms and meets the requirements for third-party releases under applicable law, (xiii) with respect to the injunction provision, is necessary to preserve and enforce the Plan's discharge, release, and exculpation provisions, and (xiv) is the result of a fair exercise of the Debtors' sound business judgment.

18.     **Assumption.**   Pursuant to sections 365 and 1123 of the Bankruptcy Code, all rejections, assumptions, and assumptions and assignments of Executory Contracts and Unexpired Leases under the Plan are approved.  The Debtors' determinations regarding the appropriate Cure Costs for assumed contracts are approved, subject to the resolution of any timely-filed objections in accordance with Article VI.D of the Plan.  Any Assumption Disputes that have not been resolved prior to the Confirmation Hearing shall be heard on a later date, and the Reorganized Debtors shall file any replies to such objections at least seven (7) days before such hearing.  During the pendency of any Assumption Dispute, the applicable counterparty shall continue to perform under the applicable Executory Contract or Unexpired Lease.  To the extent of any Assumption Dispute, the deadline to remove such Executory Contract or Unexpired Lease from the Assumption Schedule shall be extended to a date that no less than 10 days after the resolution of such Assumption Dispute.

19.     **Rejection Damages Claims.**   Pursuant to Section VI.E of the Plan, any counterparty to an Executory Contract or Unexpired Lease that is rejected by the Debtors pursuant to the Plan must file and serve a Proof of Claim against the applicable Debtor that is party to the rejected Executory Contract or Unexpired Lease no later than thirty (30) days after the later of

14

(i) the Confirmation Date or (ii) the effective date of rejection of such Executory Contract or Unexpired Lease.

20.     **Administrative Claims.**  Unless previously filed or as otherwise governed by an order of the Court or an agreement with the Debtors, requests for payment of Administrative Expenses (other than Professional Fees and the DIP Fees and Expenses) that accrued on or before the Effective Date but remained unpaid as of such date must be filed with the Court and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Expense Bar Date or such other date as specified in an order of the Court or agreement with the Debtors. Holders of Allowed Administrative Expenses that are required to file and serve a request for payment and that do not timely file and serve such a request shall be barred from receiving any distributions under the Plan on account of such Administrative Expense; provided, however, that any parties may seek relief from the Court for authority to file a late Administrative Expense request, and all rights to object to any such request are preserved.  No provider of Exit Financing shall be required to file a request for Administrative Expense Claim on account of the Exit Financing documents or related commitment documents, and any amounts due by the Debtors thereunder shall be entitled to administrative expense priority.  Objections to requests for payment of Administrative Expenses must be filed with the Court and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party no later than the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be set by an order of the Court.

21.     **Lufthansa Technik AG Settlement.**  Lufthansa Technik AG ("LHT") asserted a $651,142.42 claim against debtor Gol Linhas Aéreas S.A. (*see* Claim No. 1087, the "LHT Claim") in connection with a prepetition maintenance services agreement (the "LHT MSA").  After the

Petition Date, LHT and the Debtors (i) entered into a new Framework Agreement which provided new terms and conditions for the Debtors to obtain services from LHT (the "LHT Framework Agreement") and (ii) agreed to compromise the amount of the LHT Claim to $470,000.00, which the Debtors paid in accordance with the various orders authorizing the payment of certain prepetition claims and in the ordinary course of Debtor's business operations (the "LHT Vendor Payment"). Notwithstanding any other provision of this Order, on the Effective Date the Debtors will (a) be deemed to, and shall, assume the LHT Framework Agreement, and (b) agree not to seek avoidance, recovery, or clawback of the LHT Vendor Payment or any other payment made to LHT on account of the LHT MSA or the LHT Framework Agreement.

22. **Honeywell.** As of the Petition Date, Honeywell International Inc. ("Honeywell") is owed $5,163,278.71 by Debtor GLAI. As of the Petition Date, GLAI has a credit on the books and records of Honeywell of $6,786,564.98. As of the Petition Date, Honeywell International SARL ("Honeywell SARL") was owed $165,484.86 by GLAI. The books and records of Honeywell SARL reflect a credit to GLAI of $325,964.83 as of the Petition Date. If the claims of Honeywell and Honeywell SARL are completely offset, GLAI would be entitled to a credit of $1,783,766.24 against the purchase of goods and services from Honeywell International Inc. and Honeywell International SARL. Upon the Effective Date, Honeywell International Inc., Honeywell International SARL, and Debtors, will effectuate a setoff such that all prepetition claims of either Honeywell or Honeywell SARL will be paid in full and Honeywell will make available to Debtors $1,783,766.24 as an additional credit for the purchase of good and services from Honeywell.

23. **BNP Paribas.** The work letter dated May 11, 2025, between GLAI and BNP Paribas Securities Corp. (the "BNPP Work Letter") [Docket No. 1582] is approved in its entirety

and the Debtors are authorized to perform their obligations thereunder.  The BNPP Work Letter shall be effective *nunc pro tunc* to May 11, 2025.

24.    **Preservation of Liens.**  For the avoidance of doubt, notwithstanding Article IX.C of the Plan or any other provision in the Plan, this Order, or any other document entered into in connection with the Plan, including the New Debt Documents (other than the Amended Glide Notes Documents, the documents governing the Amended Safra Notes, and the Amended Debentures, respectively) and any documents in connection with the Exit Notes, Incremental New Money Exit Debt, and Take-Back Notes, the Glide Notes Collateral Agent, Safra, and the Debenture Banks shall retain their respective first-priority liens and security interests (including through any "fiduciary assignment" granted under Brazilian law) in any collateral securing the (i) Amended Glide Notes, (ii) Amended Safra Notes, and (iii) Amended Debentures, BdoB Letters of Credit, Santander Letters of Credit, and Bradesco Letters of Credit, respectively, which liens shall be senior to any liens on collateral granted in connection with the Plan, including in connection with the Exit Notes, Incremental New Money Exit Debt, and Take-Back Notes.

25.    **Amended Glide Notes.**  On or about the Effective Date, each of the Amended Glide Notes Trustee and TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent, shall be authorized and permitted to execute, deliver and enter into the Amended Glide Notes Documents to which it is a party, including, as applicable, (i) the Second Supplemental Indenture to the Glide Notes Indenture and (ii) the Fifth Amendment to the Credit Rights Fiduciary Assignment Agreement, in each case (a) without further consent or direction of the holders of the Glide Notes or the Amended Glide Notes or, as applicable, the trustee under the Glide Notes Indenture or the Amended Glide Notes Indenture and (b) without the receipt of any opinion, certificate, resolutions or other documents required under the Glide Notes Indenture or the

Amended Glide Notes Indenture (including, without limitation, any documents required by Article 9 or Section 11.03 thereof).

26.    **U.S. Specialty Insurance Company.**  Notwithstanding anything to the contrary in the Plan (including Articles V.G (Cancellation of Loans, Securities, and Agreements), VII.D (Estimation of Claims), VII.E (Adjustment to Claims Register without Objection), IX.C (Releases of Liens), IX.E (Releases by holders of Claims or Interests), IX.G (Injunction), and XIII.H (Term of Injunctions or Stays)), the Plan Supplement, the Disclosure Statement, this Order, or the New Debt Documents (including any documents relating the foregoing that is preemptory or supervening, grants an injunction, discharge, or release) (collectively, the "Plan Documents"), the Plan Documents shall not in any way prime, discharge, impair, modify, or subordinate the rights of U.S. Specialty Insurance Company (together with any and all of its surety affiliates, "Surety") as to: (i) the customs bond 23C00097Q in favor of the U.S. Bureau of Customs and Border Protection ("CBP") (the "Customs Bond"); (ii) the General Indemnity Agreement dated February 25, 2025 (the "Indemnity Agreement"); and (iii) any cash collateral or other collateral of the Surety.  Notwithstanding any provision in the Plan Documents to the contrary: (a) all set-off, recoupment, trust and lien rights, and all security interests, of the Surety and any obligee and/or beneficiary under the Customs Bond are preserved and shall not be primed against the Debtors and/or Reorganized Debtors; (b) the Customs Bond and the Indemnity Agreement are deemed and treated as executory contracts and will be assumed (but not assigned) by the Debtors pursuant to the Plan without the need or requirement of any Surety to file or serve any objection to a proposed cure amount or fee application; (c) the Surety reserves all of its rights to modify, extend and/or cancel the Customs Bond in accordance with the terms thereof but without regard to these Chapter 11 Cases; (d) the Surety has no obligation under the Plan Documents to issue or execute any new

bond on behalf of any entity, and the Surety has no obligation to extend, modify or increase the amount of the Customs Bond; (e) the Surety has elected to opt out of the Third-Party Release and said election shall be effective on the Effective Date; (f) the Surety's Allowed Claim, which covers fees and costs incurred through April 30, 2025 of $6,092.50, but excludes any bond losses and additional fees and costs incurred after such date through the Effective Date of the Plan, shall be paid by the Debtors in accordance with the Plan; and (g) the Debtors' and the Surety's respective rights pursuant to Section 502(j) of the Bankruptcy Code are preserved.

27.     **General Unsecured Claim Observer.**  In accordance with Article VII.C of the Plan, the Court approves the appointment of Alton Aviation Consultancy LLC as the General Unsecured Claim Observer effective as of the Effective Date.  The General Unsecured Claim Observer shall have all of the rights, powers, and duties set forth in the Plan, including those specified in Article VII.C.

28.     **Reporting.**  Prior to the Effective Date, the Debtors shall continue to file monthly operating reports for all periods prior to the Effective Date.  Following the Effective Date, the Reorganized Debtors shall have no obligation to continue filing or serving any reports that the Debtors were obligated to file during the pendency of the Chapter 11 Cases, including monthly operating reports (including for those periods for which a monthly operating report was not filed prior to the Effective Date); *provided*, however, that the Reorganized Debtors shall comply with the U.S. Trustee's quarterly reporting requirements.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1.

29.     **Post-Effective Date Notice Procedures.**  After the Effective Date, notice of filings in the Chapter 11 Cases shall only be required to be served on: (i) the Reorganized Debtors and

their counsel; (ii) the U.S. Trustee; (iii) Abra's counsel; (iv) any party directly affected by the relief sought; and (v) any party that specifically requests continued notice by filing a request for notice with the Clerk of the Court.  All other parties shall be removed from the Court's electronic notification list for these Chapter 11 Cases.

30.  **Notice of Confirmation Order and Occurrence of the Effective Date.**  The Debtors shall cause a notice of the entry of this Order and occurrence of the Effective Date (the "Notice of the Effective Date"), to be served upon (i) all parties listed in the creditor matrix maintained by Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent in the Chapter 11 Cases), (ii) all parties that filed proofs of claim in the Chapter 11 Cases, and (iii) such additional Persons and Entities as deemed appropriate by the Reorganized Debtors as soon as reasonably practicable after the Effective Date the Reorganized Debtors shall use commercially reasonable efforts to publish the Notice of the Effective Date (or a notice substantially similar thereto) in the Wall Street Journal and the Folha de São Paulo within ten (10) business days after the Effective Date, or as soon as practicable thereafter (allowing reasonable time for translation and other administrative and logistical issues).  No other or further notice of the entry of this Order and occurrence of the Effective Date shall be necessary.

31.  **Retention of Jurisdiction.**  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, notwithstanding the entry of this Order and the occurrence of the Effective Date, the Court retains jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including those specified in Article XII of the Plan.

32.    **Final Order.**  This Order is a final order and the period in which an appeal thereof must be filed shall commence upon its entry.

33.    **Receipt of Plan Treatment.**  Each holder of a Claim or Interest's receipt of treatment set forth in the Plan shall be a full and final satisfaction of the valid obligations arising out of the relevant prepetition document.  Each holder shall be deemed to have received their Plan treatment in good faith for valid cause, fair consideration and reasonably equivalent value under all applicable law, and such receipt and application shall not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to challenge, cause of action, or defense, including impairment, set-off, right of recoupment, avoidance, attachments, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, contest, defense, counterclaims, cross-claims or "claim" (as defined in the Bankruptcy Code) under the Bankruptcy Code or applicable nonbankruptcy law.

34.    **Binding Effect.**  Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e) and 6004), the Local Rules, or rule 62(a) of the Federal Rules of Civil Procedure to the contrary, as of the date hereof, this Order shall be binding upon and inure to the benefit of the Debtors, Reorganized Debtors, all holders of Claims and Interests (whether or not such holders shall receive or retain any property or interest in property under the Plan and irrespective of whether such holders have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, or injunctions set forth in the Plan, each Entity acquiring property under the Plan, all non-Debtor parties to Executory Contracts and Unexpired Leases, all other parties in interest in the Chapter 11 Cases, and the respective Related Parties of all of the foregoing. The Debtors and the Reorganized Debtors, as applicable, are authorized to take all such actions as are deemed necessary or appropriate to adjust and update

21

the Claims register consistent with the Plan and this Order (including by directing Kroll Restructuring Administration LLC, their claims, noticing, and solicitation agent in the Chapter 11 Cases).  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim has voted on the Plan.

35.    **Conflicts.**  The provisions of the Plan and this Order shall be construed in a manner consistent with each other so as to effect the purpose of each; provided, however, that if there is any inconsistency between any terms and provisions of this Order and any terms and provisions of the Plan that cannot be so reconciled, then solely to the extent of such inconsistency, the provisions of this Order shall govern, and any provision of this Order shall be deemed a modification of the Plan and shall control and take precedence.

36.    **Reversal; Liens Binding.**  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of the Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity or the enforceability of any act, obligations, indebtedness, liability, priority, or Lien incurred or undertaken by the Reorganized Debtors under or in connection with the Plan or this Order prior to the date that the Reorganized Debtors received actual written notice of the effective date of any such reversal, modification, or vacatur.  Notwithstanding any such reversal, modification, or vacatur of this Order, any act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Order, the Plan, and any amendments or modifications thereto.

37.    **Closure of Chapter 11 Cases.**  The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of this Court to close the Chapter 11 Cases. As of

the Effective Date, the Reorganized Debtors may submit separate orders to this Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly. Matters concerning Claims shall be heard and adjudicated in a Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1.

38. **Waiver of Stay.** The requirements of Bankruptcy Rules 3020(e), 6004(h) and 6006(d) regarding the stay of this Order or any of its provisions are waived, and this Order shall be effective and enforceable immediately upon its entry. Notwithstanding the waiver of stay provided in this paragraph, no waiver shall be granted with respect to the time period contained in Bankruptcy Rule 3020(e) with respect to the opt-out releases contained in Article IX.E, and the injunction in Article IX.G (solely to the extent it applies to the releases to the non-Debtor Released Parties), and solely to the extent such opt-out releases and injunction are challenged in the *United States Trustee's Objection to Confirmation of the Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A and Its Affiliated Debtors* [Docket No. 1577]. The Debtors are authorized to consummate the Plan immediately upon entry of this Order.

39. **Effectiveness; Scope.** This Order shall constitute, to the greatest extent permissible under applicable law, all authority, approvals and consents, if any, required by the laws, rules or regulations of any state or U.S. or foreign governmental authority or any contract with respect to the implementation or Consummation of the Plan, the Restructuring Transactions, and the Transaction Steps, and any act that may be necessary or appropriate for the implementation or

23

Consummation of the Plan or this Order, and the Transaction Steps. Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized and directed to accept for filing and/or recording any and all documents and instruments (including a copy of this Order) necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, this Order, and the Transaction Steps, to the maximum extent permitted under all applicable laws.

40.     **No Further Approvals.** Subject to the terms of the Plan, the Debtors and the Reorganized Debtors, as applicable, are authorized to take all actions necessary or appropriate to effectuate the Plan, including without limitation, the Restructuring Transactions, and each of the Transaction Steps, without the need for any approvals, authorizations or consents except those expressly required by the Plan. Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date pursuant to this Order, without further application to, or order of the Court, or further action by the Debtors and/or the Reorganized Debtors and their respective directors, officers, members, or stockholders, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

41.     **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such; to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Any requirement under the Bankruptcy Rules that the conclusions of law are stated separately from the findings of fact is waived.

42.    **Headings.**    The headings contained in this Order are used for the convenience of

the parties and shall not alter or affect the meaning of the text of this Order.


Dated: _____, 2025
New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
: 
In re:                              :     Chapter 11
: 
GOL LINHAS AÉREAS INTELIGENTES S.A.,   :     Case No. 24-10118 (MG)
*et al.*,[1]                          : 
: 
               Debtors.        :     (Jointly Administered)
: 
----------------------------------------------------------------x

**FOURTH MODIFIED THIRD AMENDED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**GOL LINHAS AÉREAS INTELIGENTES S.A. AND ITS AFFILIATED DEBTORS**

Evan R. Fleck                      Andrew M. Leblanc
Lauren C. Doyle                  Erin E. Dexter (admitted *pro hac vice*)
Bryan V. Uelk                    **MILBANK LLP**
**MILBANK LLP**               1850 K St. NW, Suite 1100
55 Hudson Yards                Washington, DC 20006
New York, NY 10001            Telephone: (202) 835-7500
Telephone: (212) 530-5000      Facsimile: (202) 263-7586
Facsimile: (212) 530-5219

Gregory A. Bray
**MILBANK LLP**
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for Debtors and Debtors-in-Possession*

Dated: May 17, 2025
New York, New York

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ........................................................................... 1

    A.     Definitions.............................................................................................. 1
    B.     Rules of Interpretation ......................................................................... 29
    C.     Computation of Time ........................................................................... 29
    D.     Governing Law ..................................................................................... 29
    E.     Reference to Monetary Figures and Exchange Rates ........................... 30
    F.     Plan Support Agreement ....................................................................... 30

ARTICLE II ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS .... 30

    A.     Administrative Expenses ...................................................................... 30
        1.     Treatment of Administrative Expenses.................................... 30
        2.     Administrative Expense Bar Date ............................................ 31
    B.     Professional Fees ................................................................................. 31
        1.     Final Fee Applications ............................................................. 31
        2.     Professional Fees Escrow Account............................................ 32
        3.     Post-Effective Date Fees and Expenses ................................... 32
    C.     DIP Facility Claims.............................................................................. 32
    D.     DIP Fees and Expenses ........................................................................ 33
    E.     Priority Tax Claims.............................................................................. 34

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 34

    A.     Classification of Claims and Interests.................................................. 34
    B.     Treatment of Claims and Interests ....................................................... 35
        1.     Class 1 – Priority Non-Tax Claims........................................... 35
        2.     Class 2 – Other Secured Claims............................................... 36
        3.     Class 3 – 2028 Notes Claims ................................................... 36
        4.     Class 4 – 2026 Senior Secured Notes Claims .......................... 37
        5.     Class 5 – Glide Notes Claims .................................................. 38
        6.     Class 6 – Debenture Banks Claims........................................... 38
        7.     Class 7 – AerCap Secured Note Claims ................................... 39
        8.     Class 8 – Safra Claims ............................................................. 39
        9.     Class 9 – Non-U.S. General Unsecured Claims ....................... 40
        10.    Class 10(a) – GLAI General Unsecured Claims....................... 40
        11.    Class 10(b) – GLA General Unsecured Claims ....................... 41
        12.    Class 10(c) – GFL General Unsecured Claims........................ 41
        13.    Class 10(d) – GFC General Unsecured Claims ....................... 41
        14.    Class 10(e) – GEF General Unsecured Claims ........................ 41
        15.    Class 10(f) – GAC General Unsecured Claims ....................... 42
        16.    Class 10(g) – GTX General Unsecured Claims ....................... 42
        17.    Class 10(h) – Smiles Fidelidade General Unsecured Claims ................. 42
        18.    Class 10(i) – Smiles Viagens General Unsecured Claims ....................... 43

|  |  | 19. | Class 10(j) – Smiles Argentina General Unsecured Claims | 43 |
|  |  | 20. | Class 10(k) – Smiles Viajes General Unsecured Claims | 43 |
|  |  | 21. | Class 10(*l*) – CAFI General Unsecured Claims | 44 |
|  |  | 22. | Class 10(m) – Sorriso General Unsecured Claims | 44 |
|  |  | 23. | Class 11 – General Unsecured Convenience Class Claims | 44 |
|  |  | 24. | Class 12 – Subordinated Claims | 45 |
|  |  | 25. | Class 13 – Intercompany Claims | 45 |
|  |  | 26. | Class 14 – Existing GLAI Equity Interests | 45 |
|  |  | 27. | Class 15 – Intercompany Interests | 46 |
|  | C. | Special Provision Governing Unimpaired Claims | | 46 |
|  | D. | Subordination of Claims | | 46 |
|  | E. | Third-Party Beneficiaries / Derivative Claimants | | 47 |
|  | F. | Abra Noteholder Claims | | 47 |
|  | G. | Banco Pine and Banco Rendimento Settlements | | 47 |
|  | H. | Tax Agreement | | 47 |
|  | I. | Boeing Agreement | | 48 |

ARTICLE IV ACCEPTANCE OR REJECTION OF PLAN ........................................................ 48

|  | A. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | | 48 |
|  | B. | Voting Classes | | 48 |
|  | C. | Presumed Acceptance by Non-Voting Classes | | 48 |
|  | D. | Presumed Acceptance by Unimpaired Classes | | 48 |
|  | E. | Deemed Rejection by Impaired Classes | | 49 |
|  | F. | Elimination of Vacant Classes | | 49 |
|  | G. | Controversy Concerning Impairment | | 49 |

ARTICLE V MEANS FOR IMPLEMENTATION OF PLAN ...................................................... 49

|  | A. | General Settlement of Claims and Interests | | 49 |
|  | B. | Restructuring Transactions | | 49 |
|  | C. | Sources of Consideration for Plan Distributions | | 50 |
|  |  | 1. | Cash | 50 |
|  |  | 2. | Exit Financing | 51 |
|  |  | 3. | Take-Back Notes | 51 |
|  |  | 4. | Execution of New Debt Documents | 53 |
|  |  | 5. | New Equity | 54 |
|  | D. | General Unsecured Claimholder Distribution | | 56 |
|  |  | 1. | General Unsecured Claimholder Distribution | 56 |
|  |  | 2. | Mandatory Redemption/Exchange & Offer to Purchase/Exchange | 56 |
|  | E. | Corporate Existence | | 57 |
|  | F. | Vesting of Assets in the Reorganized Debtors | | 57 |
|  | G. | Cancellation of Loans, Securities, and Agreements | | 57 |
|  | H. | Corporate and Other Entity Action | | 59 |
|  | I. | New Organizational Documents | | 60 |
|  | J. | Directors and Officers of Reorganized Debtors | | 60 |

|   | 1. | New GOL Parent Board | 60 |
|---|----|----------------------|----|
|   | 2. | Officers of Reorganized Debtors | 60 |
|   | 3. | New Subsidiary Boards | 61 |
| K. | | Management Incentive Plan | 61 |
| L. | | Effectuating Documents; Further Transactions | 61 |
| M. | | Section 1146 Exemption | 61 |
| N. | | Preservation of Causes of Action | 61 |

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................................................................................... 62

| A. | | Assumption and Rejection of Executory Contracts and Unexpired Leases | 62 |
|----|----|------------------------------------------------------------------------|----|
| B. | | Aircraft Leases | 63 |
|   | 1. | Assumption and Rejection of Prepetition Aircraft Leases | 63 |
|   | 2. | Aircraft Leases Entered into After the Petition Date | 65 |
| C. | | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed | 65 |
| D. | | Dispute Resolution | 65 |
| E. | | Rejection Damages Claims | 66 |
| F. | | Insurance Policies & Indemnification Obligations | 66 |
| G. | | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 68 |
| H. | | Reservation of Rights | 68 |
| I. | | Contracts and Leases (other than Aircraft Leases) Entered into After the Petition Date | 68 |
| J. | | Compensation and Benefits Plans | 68 |

ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ........................................................................ 69

| A. | Allowance of Claims and Interests | 69 |
|----|-----------------------------------|----|
| B. | Claims Administration Responsibilities | 69 |
| C. | General Unsecured Claim Observer | 69 |
| D. | Estimation of Claims | 70 |
| E. | Adjustment to Claims Register Without Objection | 71 |
| F. | Time to File Objections to Claims | 71 |
| G. | Disallowance of Claims | 71 |
| H. | Amendments to Claims | 71 |
| I. | No Distributions Pending Allowance | 71 |
| J. | Distributions After Allowance | 72 |
| K. | Disputed Claims Reserve | 72 |
| L. | Claims Resolution Procedures Cumulative | 73 |

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 73

| A. | | Timing and Calculation of Amounts to Be Distributed | 73 |
|----|----|-----------------------------------------------------|----|
| B. | | Disbursing Agent | 74 |
| C. | | Rights and Powers of Disbursing Agent | 74 |
|   | 1. | Powers of the Disbursing Agent | 74 |

   2. Incurred Expenses .................................................................. 74

 D. Delivery of Distributions and Undeliverable or Unclaimed Distributions .......... 74

   1. Delivery of Distributions in General.................................... 74
   2. Delivery of Distributions on 2028 Notes Claims.................... 75
   3. Delivery of Distributions on 2026 Senior Secured Notes Claims ........... 75
   4. Delivery of Distributions on 2025 Senior Notes.................... 75
   5. Delivery of Distributions on 2024 Senior Exchangeable Notes ............... 76
   6. Delivery of Distributions on Perpetual Notes ........................ 76
   7. Delivery of Distributions on Glide Notes .............................. 77
   8. Minimum Distributions......................................................... 78
   9. Undeliverable Distributions and Unclaimed Property .............. 78

 E. Exemption from Securities Laws .................................................... 78
 F. Compliance with Tax and Antitrust Requirements.............................. 82
 G. No Postpetition Interest on Claims and Interests ............................... 83
 H. Setoffs and Recoupment ................................................................ 83
 I. Claims Paid or Payable by Third Parties .......................................... 83

   1. Claims Paid by Third Parties ............................................... 83
   2. Claims Payable by Third Parties.......................................... 83
   3. Applicability of Insurance Contracts .................................... 84

 J. Allocation Between Principal and Accrued Interest ........................... 84

**ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .. 84**

 A. Compromise and Settlement .......................................................... 84
 B. Discharge of Claims and Termination of Interests ............................. 85
 C. Release of Liens........................................................................... 85
 D. Release by the Debtors.................................................................. 85
 E. Releases by Holders of Claims or Interests ...................................... 87
 F. Exculpation ................................................................................. 88
 G. Injunction ................................................................................... 89
 H. Additional Provisions Regarding SEC.............................................. 90

**ARTICLE X CONDITIONS TO EFFECTIVE DATE ......................................... 90**

 A. Conditions to Effective Date.......................................................... 90
 B. Waiver of Conditions .................................................................... 92

**ARTICLE XI MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN ................. 92**

 A. Modification and Amendments........................................................ 92
 B. Effect of Confirmation on Modifications .......................................... 92
 C. Revocation or Withdrawal of Plan................................................... 93

**ARTICLE XII RETENTION OF JURISDICTION ......................................... 93**

**ARTICLE XIII MISCELLANEOUS PROVISIONS ......................................... 95**

 A. Immediate Binding Effect .............................................................. 95

B.      Additional Documents ........................................................................................... 95
C.      Statutory Fees and Quarterly Reports ................................................................. 96
D.      Reservation of Rights........................................................................................... 96
E.      Successors and Assigns........................................................................................ 96
F.      Notices ................................................................................................................. 96
G.      Notice of Entry of Confirmation Order ............................................................... 98
H.      Term of Injunctions or Stays............................................................................... 98
I.      Entire Agreement ................................................................................................. 98
J.      Exhibits ............................................................................................................... 98
K.      Non-Severability of Plan Provisions.................................................................... 98
L.      Votes Solicited in Good Faith.............................................................................. 99
M.      Document Retention ............................................................................................ 99
N.      Conflicts............................................................................................................... 99
O.      Dissolution of Committee .................................................................................... 99
P.      Fees and Expenses of 2026 AHG Trustee and Advisors .................................. 100

## INTRODUCTION

GOL Linhas Aéreas Inteligentes S.A. ("GLAI") and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors"), jointly propose this chapter 11 plan of reorganization (the "Plan") pursuant to section 1121(a) of title 11 of the United States Code (the "Bankruptcy Code"). Although proposed jointly for administrative purposes and voting, the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.

**All holders of Claims and Interests are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.**

## ARTICLE I
## DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Definitions*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "*12(g) Obligations*" has the meaning specified in Article V.C.5.

2.    "*2017 FINIMP Note*" means that certain Import Financing Bank Credit Note FP-32044/17 (*Cédula de Crédito Bancário para Financiamento à Importação*) issued by GLA on December 4, 2017 to the Luxembourg branch of Safra.

*3.*    "*2018 FINIMP Note*" means that certain Import Financing Bank Credit Note FP-32108/17 (*Cédula de Crédito Bancário para Financiamento à Importação*) issued by GLA on January 29, 2018 to the Luxembourg branch of Safra.

4.    "*2020 Bank Credit Note*" means that certain Bank Credit Note n. 6383843 (*Cédula de Crédito Bancário*) issued by GLA on October 23, 2020 to Safra, guaranteed by Fundo Garantidor para Investimentos and managed by Banco Nacional de Desenvolvimento Econômico e Social – BNDES.

5.    "*2022 Bank Credit Note*" means that certain Bank Credit Note n. 6409150 (*Cédula de Crédito Bancário*) issued by GLA on August 30, 2022 to Safra.

6.    "*2024 Senior Exchangeable Notes*" means the 3.75% Exchangeable Senior Notes due 2024 issued pursuant to the 2024 Senior Exchangeable Notes Documents.

7.    "*2024 Senior Exchangeable Notes Claims*" means all Claims on account of, arising under, or related to the 2024 Senior Exchangeable Notes Documents, except any Indenture Trustee Fees.

8.      "*2024 Senior Exchangeable Notes Documents*" means the documents that govern the 2024 Senior Exchangeable Notes, including that certain Indenture, dated as of March 26, 2019, among GEF, as issuer, GLAI and GLA, as guarantors, and the 2024 Senior Exchangeable Notes Trustee, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time.

9.      "*2024 Senior Exchangeable Notes Trustee*" means The Bank of New York Mellon in its capacity as trustee, note registrar, paying agent, and exchange agent under the 2024 Senior Exchangeable Notes Documents.

10.      "*2025 Senior Notes*" means the 7.000% Senior Notes due 2025 issued pursuant to the 2025 Senior Notes Documents.

11.      "*2025 Senior Notes Claims*" means all Claims on account of, arising under, or related to the 2025 Senior Notes Documents, except any Indenture Trustee Fees.

12.      "*2025 Senior Notes Documents*" means the documents that govern the 2025 Senior Notes, including that certain Indenture, dated as of December 11, 2017, among GFL, as issuer, GLAI and GLA, as guarantors, and the 2025 Senior Notes Trustee, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time.

13.      "*2025 Senior Notes Trustee*" means The Bank of New York Mellon in its capacity as trustee, registrar, transfer agent, and paying agent under the 2025 Senior Notes Documents.

14.      "*2026 Ad Hoc Group*" means the ad hoc group of holders of 2026 Senior Secured Notes represented by the 2026 AHG Counsel.

15.      "*2026 AHG A&R Joinder*" means the Amended and Restated 2026 Notes Ad Hoc Group Joinder to Plan Support Agreement.

16.      "*2026 AHG Counsel*" means Cleary Gottlieb Steen & Hamilton LLP and Pinheiro Neto Advogados, solely in their capacities as counsel to the 2026 Ad Hoc Group.

17.      "*2026 AHG Financial Advisor*" means Moelis & Company, LLC, solely in its capacity as financial advisor to the 2026 Ad Hoc Group.

18.      "*2026 AHG Joinder*" means the 2026 Notes Ad Hoc Group Joinder to Plan Support Agreement.

19.      "*2026 AHG Trustee and Advisors*" means the 2026 AHG Counsel, the 2026 AHG Financial Advisor, the 2026 Indenture Trustee, and the 2026 Indenture Trustee Counsel.

20.      "*2026 Exit Financing Allocation*" means the AHG Member Financing Allocation and the Non-AHG Member Financing Allocation.

21.     "*2026 Indenture Trustee*" means The Bank of New York Mellon Trust Company, N.A. or Wilmington Trust, N.A., solely in their capacities as indenture trustee under the 2026 Senior Secured Notes Indenture.

22.     "*2026 Indenture Trustee Counsel*" means, at any relevant time, counsel to the 2026 Indenture Trustee, solely in its capacity as such.

23.     "*2026 Senior Secured Notes*" means the 8.00% Senior Secured Notes due 2026 issued pursuant to the 2026 Senior Secured Notes Documents.

24.     "*2026 Senior Secured Notes Claims*" means all Claims on account of, arising under, or related to the 2026 Senior Secured Notes Documents.

25.     "*2026 Senior Secured Notes Collateral Agent*" means TMF Brasil Administração e Gestão De Ativos Ltda. in its capacity as collateral agent under the 2026 Senior Secured Notes Documents.

26.     "*2026 Senior Secured Notes Documents*" means the documents that govern the 2026 Senior Secured Notes, including that certain Indenture, dated as of December 23, 2020, among GFL, as issuer, GLAI and GLA, as guarantors, the 2026 Senior Secured Notes Trustee, and the 2026 Senior Secured Notes Collateral Agent, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time.

27.     "*2026 Senior Secured Notes Trustee*" means Wilmington Trust, National Association, as successor to The Bank of New York Mellon, in its capacity as trustee, registrar, transfer agent, and paying agent under the 2026 Senior Secured Notes Documents.

28.     "*2028 Notes*" means the 2028 Senior Secured Notes and 2028 Senior Secured Exchangeable Notes.

29.     "*2028 Notes Claims*" means all Claims on account of, arising under, or related to the 2028 Notes Documents.

30.     "*2028 Notes Collateral Agent*" means TMF Brasil Administração e Gestão De Ativos Ltda as collateral agent under the 2028 Senior Secured Note Purchase Agreement and 2028 Senior Secured Exchangeable Note Purchase Agreement.

31.     "*2028 Notes Documents*" means the documents that govern 2028 Senior Secured Notes and the 2028 Senior Secured Exchangeable Notes, including the 2028 Senior Secured Note Purchase Agreement and the 2028 Senior Secured Exchangeable Note Purchase Agreement, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time.

32.     "*2028 Senior Secured Exchangeable Note Purchase Agreement*" means that certain Senior Secured Note Purchase Agreement, dated as of September 29, 2023, as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among GEF, as issuer, GLA, GLAI, and Smiles Fidelidade, as guarantors, Abra Group Limited and Abra Global Finance, as purchasers, and the 2028 Notes Collateral Agent.

3

33.    "*2028 Senior Secured Exchangeable Notes*" means the Senior Secured Exchangeable Notes due 2028 issued pursuant to the 2028 Senior Secured Exchangeable Note Purchase Agreement.

34.    "*2028 Senior Secured Note Purchase Agreement*" means that certain Senior Secured Note Purchase Agreement, dated as of March 2, 2023, as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among GFL, as issuer, GLA, GLAI, and Smiles Fidelidade, as guarantors, Abra Group Limited, as purchaser, and the 2028 Notes Collateral Agent.

35.    "*2028 Senior Secured Notes*" means the Senior Secured Notes due 2028 issued pursuant to the 2028 Senior Secured Note Purchase Agreement.

36.    "*4(a)(2) Securities*" has the meaning specified in <u>Article VIII.E.</u>

37.    "*7a Debentures*" means the seventh issuance of simple, non-convertible secured debentures issued by GLA, in three series, on October 28, 2018, April 16, 2020, and October 1, 2020.

38.    "*7a Debentures Claims*" means all Claims on account of, arising under, or related to the 7a Debentures.

39.    "*8a Debentures*" means the eighth issuance of simple, non-convertible secured debentures issued by GLA on October 27, 2021.

40.    "*8a Debentures Claims*" means all Claims on account of, arising under, or related to the 8a Debentures.

41.    "*A&R Joinder Effective Date*" has the meaning set forth in the 2026 AHG A&R Joinder.

42.    "*Abra*" means, collectively, Abra Group Limited, Abra Global Finance, Abra Kingsland LLP, and Abra Mobi LLP (and their respective successors).

43.    "*Abra Equity Distribution*" means 100% of the shares of New Equity, subject to dilution by (i) the General Unsecured Claimholder Distribution, (ii) any Incremental New Money Equity, and (iii) any New Equity issued after the Effective Date, including in connection with the Management Incentive Plan, upon exchange of the Exchangeable Take-Back Notes, and upon exchange of any Incremental New Money Exchangeable Debt.

44.    "*Abra Notes*" has the meaning specified in the DIP Order.

45.    "*Abra Notes Agents*" has the meaning specified in the DIP Order.

46.    "*Ad Hoc Group of Abra Noteholders*" has the meaning specified in the DIP Order.

47.    "*Adequate Protection*" has the meaning specified in the DIP Order.

48.    "*Adjusted Specified Value*" means an amount equal to (i) the Specified Value *plus* (ii) $250 million.

49.    "*Administrative Expense*" means any cost or expense of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' business that are incurred after the Petition Date and through the Effective Date; (ii) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the Professional Fees; and (iii) any administrative expense described in section 503(b)(9) of the Bankruptcy Code.

50.    "*Administrative Expense Bar Date*" means the deadline for filing requests for payment of Administrative Expenses (other than Professional Fees), which shall be the first Business Day that is thirty (30) days after the Effective Date.

51.    "*AerCap Secured Note Claims*" means the secured amounts due under the AerCap Secured Note Documents entered into pursuant to the AerCap Secured Note Order and the AerCap Settlement Order.

52.    "*AerCap Secured Note Documents*" means the Secured Promissory Note dated August 26, 2024, by and between GFL, GLA, GLAI, and Ballyfin Aviation II Limited, any security agreements or other documents, instruments, and agreements entered into in connection therewith, and the AerCap Secured Note Order.

53.    "*AerCap Secured Note Order*" means the *Order (I) Authorizing the Debtors to Amend Post-Petition Payment Obligation with AerCap Ireland Limited and (II) Granting Related Relief* [Docket No. 895].

54.    "*AerCap Settlement Order*" means the *Order (I) Approving the Global Restructuring Term Sheet with AerCap Ireland Limited, (II) Authorizing and Approving the Amendment and Assumption of Certain Aircraft and Engine Leases, (III) Authorizing Entry into the Definitive Documentation, (IV) Approving the Settlement, and (V) Granting Related Relief* [Docket No. 491].

55.    "*AerCap Term Sheet*" means the global restructuring term sheet (together with all exhibits, annexes, and schedules attached thereto) attached as Exhibit 1 to the AerCap Settlement Order.

56.    "*Affiliate*" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

57.    "*Agents/Trustees*" means, collectively, the Abra Notes Agents, the DIP Agent, the DIP Trustee, the 2024 Senior Exchangeable Notes Trustee, the 2025 Senior Notes Trustee, the

2026 Senior Secured Notes Collateral Agent, the 2026 Senior Secured Notes Trustee, the 2028 Notes Collateral Agent, the Glide Notes Trustee, the Glide Notes Collateral Agent, and the Perpetual Notes Trustee.

58.     "*AHG Member Exit Financing Allocation*" means $50 million in the aggregate principal amount of Exit Notes to be purchased by the Participating AHG Members.

59.     "*AHG Work Fee*" has the meaning specified in <u>Article V.C.2.b</u>.

60.     "*Aircraft Equipment Transaction*" has the meaning specified in the Solicitation and Voting Procedures.

61.     "*Aircraft Lease*" means an Unexpired Lease relating to the use or operation of an aircraft, aircraft engine, or other aircraft parts.

62.     "*Allowed*" means, with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date that has not been otherwise satisfied or extinguished before the Effective Date (a) as to which a Claim or an Interest was validly asserted during the Chapter 11 Cases and no objection to allowance has been interposed within the time period set forth in the Plan, (b) as to which any objection has been resolved by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (c) as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court and is not Disallowed, or (d) that has been compromised, settled, or otherwise resolved by the Debtors; (ii) any Claim or Interest expressly allowed under the Plan or a Final Order of the Bankruptcy Court; or (iii) any Claim that is listed in the Schedules as liquidated, noncontingent, and undisputed for which (a) no Proof of Claim has been filed or (b) a Proof of Claim has been filed in the same or lesser amount as such Claim is listed in the Schedules; <u>provided</u>, that the Reorganized Debtors (i) in their business judgment, and in consultation with the General Unsecured Claim Observer (to the extent applicable), may deem a Claim or an Interest "Allowed" following the Effective Date without further order of the Bankruptcy Court and (ii) notwithstanding anything to the contrary herein, shall retain all claims and defenses with respect to Allowed Claims or Interests that are Reinstated or otherwise Unimpaired pursuant to the Plan; <u>provided</u>, <u>further</u>, that an Allowed Claim (i) includes a previously Disputed Claim to the extent such Disputed Claim becomes Allowed and (ii) shall be net of any setoff amount that may be asserted by the applicable Debtor against such Claim, which shall be deemed to have been set off in accordance with the provisions of the Plan.  "*Allow*," "*Allowing*," and "*Allowance*" shall have correlative meanings.

63.     "*Amended Debentures*" means, collectively, the 7a Debentures and the 8a Debentures, each as amended in accordance with the Debenture Banks Stipulation.

64.     "*Amended Glide Notes*" means the Amended Glide Senior Notes and the Amended Glide Subordinated Notes.

65.     "*Amended Glide Notes Documents*" means the documents that will govern the Amended Glide Notes in accordance with the terms of the Lessor Agreements, including (i) the Amended Glide Notes Indenture and (ii) all other financing documents related to the Amended Glide Notes, such as intercreditor agreements, pledges, mortgages, and guarantees.

66.     "*Amended Glide Notes Indenture*" means the Glide Notes Indenture, as amended and supplemented by that certain second supplemental indenture to be entered into on the Effective Date with the Amended Glide Notes Trustee, and TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent.

67.     "*Amended Glide Notes Trustee*" means The Bank of New York Mellon, as trustee, registrar, transfer agent, and paying agent, under the Amended Glide Notes Indenture.

68.     "*Amended Glide Senior Notes*" means, in accordance with the Lessor Agreements, the new senior amortizing notes to be issued under the Plan pursuant to the Amended Glide Notes Documents in an aggregate principal amount of $141,662,259.

69.     "*Amended Glide Subordinated Notes*" means, in accordance with the Lessor Agreements, the new subordinated amortizing notes to be issued under the Plan pursuant to the Amended Glide Notes Documents in an aggregate principal amount of $66,035,974.

70.     "*Amended Safra Notes*" means, collectively, the 2017 FINIMP Note, the 2018 FINIMP Note, the 2020 Bank Credit Note, and the 2022 Bank Credit Note, each as amended pursuant to the Safra Stipulation.

71.     "*Applicable Premium*" has the meaning specified in the 2028 Senior Secured Note Purchase Agreement and the 2028 Senior Secured Exchangeable Note Purchase Agreement, as applicable.

72.     "*Assumption Dispute*" has the meaning specified in Article VI.D.

73.     "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property from, or an obligation incurred by, one or more of the Debtors, that arise under (i) chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 552, and 553, and section 724(a) of the Bankruptcy Code or (ii) similar foreign or state law.

74.     "*Bankruptcy Code*" has the meaning specified in the Introduction.

75.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Cases.

76.     "*Bankruptcy Rules*" means (i) the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075, and (ii) the general, local, and chambers rules of the Bankruptcy Court.

77.     "*BdoB Letters of Credit*" has the meaning specified in the Debenture Banks Order.

78.     "*Boeing Agreement*" means, collectively, those certain letter agreements entered into by certain of the Debtors and The Boeing Company, substantially in the forms attached as Exhibits B-E to the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Entry into the Letter Agreements with The Boeing Company, (II) Approving Assumption of Certain*

*Agreements with The Boeing Company, and (III) Granting Related Relief* [Docket No. 1387], and as approved by the Bankruptcy Court on April 7, 2025 [Docket No. 1470].

79.    "*Bradesco Letters of Credit*" has the meaning specified in the Debenture Banks Order.

80.    "*Brazil Business Day*" means any day other than a (i) Saturday or Sunday or (ii) day on which commercial banks in São Paulo, State of São Paulo, Brazil are required or authorized by law to remain closed.

81.    "*BRL Exchange Rate*" means the Real/U.S. dollar offered rate for U.S. dollars, expressed as the amount of Reais per one U.S. dollar reported by the Central Bank of Brazil on its website under transaction code PTAX (consulta de câmbio), on any applicable date.

82.    "*Business Combination*" means any merger, acquisition, consolidation, amalgamation or similar strategic business combination transaction, other than (i) any Material Joint Venture, (ii) any joint venture, including any arrangement of limited cooperation on specific routes (such as interlining, frequent flyer programs and lounge access, code sharing, and similar arrangements) and any agreement to expand cooperation between parties to develop joint networks, or (iii) any such transaction solely among a person and its subsidiaries or Affiliates.

83.    "*Business Day*" means any day other than a (i) Saturday or Sunday, (ii) "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or (iii) day on which commercial banks in New York are required or authorized by law to remain closed.

84.    "*CAFI*" means Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior.

85.    "*CAFI General Unsecured Claim*" means any General Unsecured Claim against CAFI.

86.    "*CAFI General Unsecured Claimholder Distribution*" means 0% of the General Unsecured Claimholder Distribution Pool.

87.    "*Cash*" means (i) cash and cash equivalents in U.S. dollars or (ii) where non-U.S. currency is specifically referred to, cash and cash equivalents in such non-U.S. currency.

88.    "*Cash Interest*" has the meaning specified in the 2028 Senior Secured Note Purchase Agreement and the 2028 Senior Secured Exchangeable Note Purchase Agreement.

89.    "*Cause of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, action, remedy, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in

equity, or pursuant to any other theory of law (including under any state or federal securities law). For the avoidance of doubt, "Cause of Action" includes: (i) any right of setoff or counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims; (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, including Avoidance Actions; (iv) any claim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Avoidance Action or foreign or state law fraudulent transfer or similar claim.

90.     "*Challenge Period*" has the meaning specified in the DIP Order.

91.     "*Chapter 11 Cases*" means the jointly administered cases of the Debtors under chapter 11 of the Bankruptcy Code.

92.     "*Claim*" means a "claim" as defined in section 101(5) of the Bankruptcy Code against a Debtor.

93.     "*Claims Bar Date*" means: (i) with respect to all Claims other than those specified in sub-clauses (ii) and (iii) of this definition, June 14, 2024 at 11:59 P.M. (prevailing Eastern time); (ii) solely with respect to Claims held by Governmental Units, July 23, 2024 at 11:59 P.M. (prevailing Eastern time); and (iii) solely with respect to Claims arising from the rejection of an Executory Contract or Unexpired Lease, the later of (x) June 14, 2024 at 11:59 P.M. (prevailing Eastern time) and (y) the Rejection Damages Deadline.

94.     "*Class*" means a class of Claims or Interests designated in <u>Article III</u>, pursuant to section 1122(a) of the Bankruptcy Code.

95.     "*Commitment Letter*" has the meaning specified in the *Debtors' Motion for Entry of an Order (I) Approving Terms of, and Authorizing Debtors' Entry into and Performance Under, the Exit Financing Commitment Letter and Fee Letter, (II) Authorizing Debtors to Enter into Additional Fee Letters with Additional Commitment Parties, and (III) Authorizing Incurrence, Payment and Allowance of Certain Obligations Thereunder as Administrative Expenses* [Docket No 1398] (as such Commitment Letter may be amended, modified, or supplemented from time to time).

96.     "*Committee*" means the official committee of unsecured creditors, as it may be constituted from time to time, appointed on February 9, 2024 by the U.S. Trustee in the Chapter 11 Cases [Docket No. 114] pursuant to section 1102 of the Bankruptcy Code, the composition of which was amended by the U.S. Trustee on February 13, 2024 [Docket No. 134].

97.     "*Committee Consent Right*" means the consent of the Committee but solely with respect to any provision that has a material effect on the economic recoveries or rights of holders of Allowed General Unsecured Claims (whether directly or indirectly).

98.     "*Confirmation Date*" means the date upon which the Confirmation Order is entered.

99.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

9

100.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

101.    "*Consenting Stakeholders*" has the meaning specified in the Plan Support Agreement.

102.    "*Consummation*" means the occurrence of the Effective Date.

103.    "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) on account of a Debtor's monetary defaults under an Executory Contract or Unexpired Lease assumed by such Debtor under section 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

104.    "*D&O Policy*" means any Insurance Contract, including tail insurance policies, for directors', members', trustees', and/or officers' liability.

105.    "*Debenture Banks*" means, collectively, Banco Santander S.A. (Brasil), Banco do Brasil S.A., and Banco Bradesco S.A.

106.    "*Debenture Banks Claims*" means all Claims held by the Debenture Banks against the Debtors, including the 7a Debentures Claims, the 8a Debentures Claims, and all Claims on account of, arising under, or related to the BdoB Letters of Credit, the Santander Letters of Credit, and the Bradesco Letters of Credit.

107.    "*Debenture Banks Order*" means the *Order Approving Stipulation and (I) Authorizing the Debtors to (A) Use Collateral, Including Cash Collateral, and Grant Adequate Protection in Connection with Certain Prepetition Debentures; (B) Amend Terms of Certain Prepetition Debentures; (C) Establish Procedures for Extending the Expiration Date of, and Reimbursing the Issuing Banks for Drawn, Existing Prepetition Letters of Credit; and (D) Enter into a New Factoring Agreement; (II) Approving the Consensual Assumption of Certain Prepetition Factoring Agreements, as Amended; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 844].

108.    "*Debenture Banks Stipulation*" means the stipulation, dated July 9, 2024, between GLAI, GLA, and the Debenture Banks, which is attached as Exhibit A to the Debenture Banks Order.

109.    "*Debtor*" or "*Debtors*" has the meaning specified in the Introduction.

110.    "*Definitive Documents*" has the meaning specified in the Plan Support Agreement.

111.    "*DIP Agent*" means TMF Group New York, LLC as collateral agent under the DIP Indenture.

112.    "*DIP Facility*" means the superpriority senior secured priming debtor-in-possession financing facility provided to the Debtors pursuant to the DIP Facility Documents.

113. "*DIP Facility Claims*" means all Claims held by the DIP Agent, the DIP Noteholders, and the DIP Trustee on account of, arising under, or related to the DIP Facility or DIP Facility Documents, including any outstanding principal, accrued and unpaid interest and premiums, fees, reimbursement obligations, and all other amounts that are outstanding obligations under the DIP Facility Documents, including the DIP Fees and Expenses.

114. "*DIP Facility Documents*" means the DIP Indenture, the DIP Note Purchase Agreement, the DIP Order, and any amendments, modifications, supplements thereto, as well as any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Indenture, DIP Note Purchase Agreement, and the DIP Order.

115. "*DIP Fees and Expenses*" has the meaning specified in the DIP Order.

116. "*DIP Guarantors*" means all Debtors other than CAFI and Sorriso.

117. "*DIP Indenture*" means that certain indenture, dated as of February 21, 2024, as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among GFL, as issuer, the DIP Guarantors, the DIP Trustee, and the DIP Agent.

118. "*DIP Note Purchase Agreement*" means that certain Superpriority Senior Secured Priming Debtor-in-Possession Note Purchase Agreement, dated as of February 21, 2024, as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among GFL, as issuer, the DIP Guarantors, GLAS Trust Company LLC, as settlement agent, and the initial DIP Noteholders.

119. "*DIP Noteholders*" means the holders from time to time of the Notes issued under, and as defined in, the DIP Indenture.

120. "*DIP Order*" means the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B), Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Granting Adequate Protection to the Prepetition Secured Parties, (D) Modifying the Automatic Stay, (E) Authorizing the Debtors to Use Cash Collateral and (F) Granting Related Relief* [Docket No. 207].

121. "*DIP Trustee*" means GLAS Trust Company LLC, as trustee, registrar, transfer agent and paying agent under the DIP Indenture.

122. "*Disallowed*" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the *Order (I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving Proof of Claim Forms, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* [Docket No. 691]; or (iii) is not scheduled on the Schedules

and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the *Order (I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving Proof of Claim Forms, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* [Docket No. 691]. "*Disallow*" and "*Disallowance*" shall have correlative meanings.

123.    "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Person or Entity that the Debtors or Reorganized Debtors select to make or facilitate distributions in accordance with the Plan, including each of the Agents/Trustees, as applicable.

124.    "*Disclosure Statement*" means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, together with all exhibits, schedules, supplements, annexes, and attachments to such Disclosure Statement, each as may be modified or supplemented from time to time.

125.    "*Disputed*" means, with respect to a Claim, any Claim that is not yet Allowed or Disallowed.

126.    "*Disputed Claims Reserve*" means the reserve established in accordance with Article VII.K to provide for distributions to holders of Disputed Claims in the event such Disputed Claims become Allowed Claims.

127.    "*Distribution Date*" means any of the Initial Distribution Date and each Interim Distribution Date.

128.    "*Distribution Record Date*" means, other than with respect to publicly held Securities, the Confirmation Date or such other date prior to the Effective Date that is selected by the Debtors.

129.    "*DTC*" means the Depository Trust Company.

130.    "*Effective Date*" means the date that is a Business Day selected by the Debtor(s) on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent specified in Article X.A have been satisfied or waived in accordance with the Plan.

131.    "*Eligible Existing GLAI Equity Interest Holders*" means all holders of Existing GLAI Equity Interests registered on GLAI's shareholders' registry as of no earlier than the date of the shareholders' meeting of GLAI that approves the relevant capital increase and capitalization of indebtedness contemplated hereby, which record date shall be established at such shareholders' meeting.

132.    "*Elliott*" has the meaning specified in the DIP Order.

133.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

134.    "*Estate*" means, with respect to a Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

135.    "*Estates*" means, collectively, each Debtor's Estate.

136.    "*Exchange Act*" has the meaning specified in Article VII.E.

137.    "*Exchangeable Take-Back Notes*" means new exchangeable debt in an aggregate principal amount of $250 million to be issued by the Take-Back Notes Issuers on the Effective Date on the terms set forth herein and such other terms set forth in the Exchangeable Take-Back Notes Documents.

138.    "*Exchangeable Take-Back Notes Documents*" means the documents that will govern the Exchangeable Take-Back Notes, including any financing documents related to the Exchangeable Take-Back Notes and any related term sheets, indentures, note purchase agreements, intercreditor agreements, pledges, mortgages, guarantees, and any similar documents, in each case which shall be in form and substance reasonably acceptable to the Debtors and Abra and subject to the Committee Consent Right.

139.    "*Exculpated Parties*" means, collectively, and in each case in their capacities as such: (i)(a) the Debtors, (b) the Reorganized Debtors, (c) the Committee and its members, (d) the General Unsecured Claim Observer, (e) the Ad Hoc Group of Abra Noteholders and Elliott, (f) the Abra Notes Agents, (g) the DIP Agent and the DIP Trustee, (h) the 2024 Senior Exchangeable Notes Trustee, the 2025 Senior Notes Trustee, and the Perpetual Notes Trustee, and (i) Abra; (ii) with respect to each of the Entities and Persons in clause (i), all of such Entities' and Persons' Related Parties, solely to the extent such Related Parties are fiduciaries of the Estates or otherwise to the fullest extent provided for pursuant to section 1125(e) of the Bankruptcy Code and with respect to each of the preceding Entities and Persons in clauses (b) through (g), solely with respect to work performed on behalf of the applicable Entity or Person in connection with the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases; and (iii) each other Consenting Stakeholder, its Affiliates, and each of its and their respective Related Parties; provided, that with respect to the Entities and Persons in clause (iii), any exculpations provided under the Plan or the Confirmation Order shall be granted only to the extent provided in section 1125(e) of the Bankruptcy Code.

140.    "*Executory Contract*" means a contract to which one or more Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

141.    "*Existing GLAI Equity Interests*" means existing Interests in GLAI.

142.    "*Existing Letters of Credit*" means all outstanding wholly or partially undrawn prepetition and postpetition letters of credit issued to, or at the request of, any Debtor, in each case as amended, restated, renewed, modified, supplemented, extended, or confirmed from time to time.

143.    "*Exit Notes*" means the new first Lien secured notes in an aggregate principal amount not to exceed the amount required to satisfy all Allowed DIP Facility Claims, to be issued by the Exit Notes Issuer on the Effective Date on the terms set forth herein and such other terms set forth in the Exit Notes Documents.

13

144. "*Exit Notes Agent/Trustee*" means [Wilmington Savings Fund Society, FSB,] in its capacity as [collateral agent and trustee, registrar, transfer agent, and paying agent] under the Exit Notes (or such other persons or entities as may be agreed among the parties to the Exit Notes Documents, with the consent of Abra and subject to the Committee Consent Right in accordance with the terms of the Plan Support Agreement).

145. "*Exit Notes Documents*" means the documents that will govern the Exit Notes, including any financing documents related to the Exit Notes and any related term sheets, indentures, note purchase agreements, intercreditor agreements, pledges, mortgages, guarantees, and any similar documents, in each case which shall be in form and substance acceptable to the Debtors and Abra and subject to the Committee Consent Right.

146. "*Exit Notes Issuer*" means one or more of Reorganized GFL and Reorganized GEF and/or such other Reorganized Debtor or entity owned directly or indirectly by the Reorganized Debtors and/or New GOL Parent as determined by the Debtors, with the consent of Abra and subject to the Committee Consent Right, in accordance with the terms of the Plan Support Agreement.

147. "*Final Order*" means an order entered by the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, amended, or revoked, and as to which (a) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (b) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (ii) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (a) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (b) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending; provided, that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

148. "*GAC*" means GAC, Inc.

149. "*GAC General Unsecured Claim*" means any General Unsecured Claim against GAC.

150. "*GAC General Unsecured Claimholder Distribution*" means 0.005% of the General Unsecured Claimholder Distribution Pool.

151. "*GEF*" means Gol Equity Finance.

152. "*GEF General Unsecured Claim*" means any General Unsecured Claim against GEF.

153.    "*GEF General Unsecured Claimholder Distribution*" means a number of shares (based on the Specified Value) of New Equity having a value of $9.25 million, as such amount will be adjusted on or before the Effective Date with the consent of the applicable parties to the Plan Support Agreement in order to achieve the agreed upon aggregate distributable value to the holders of 2024 Senior Exchangeable Notes.

154.    "*General Unsecured Claim*" means any Claim that is not a Secured Claim, an Intercompany Claim, a Subordinated Claim, a Non-U.S. General Unsecured Claim, or a Claim entitled to priority under the Bankruptcy Code and includes, for the avoidance of doubt, the 2024 Senior Exchangeable Notes Claims, the 2025 Senior Notes Claims, the Perpetual Notes Claims, and any Unsecured Claim that may be asserted pursuant to a Lessor Agreement.  For the avoidance of doubt, holders of Allowed (i) General Unsecured Convenience Class Claims shall receive distributions only under Class 11 and not under any sub-Class of Class 10 and (ii) 2026 Senior Secured Notes Claims (in their capacity as such) shall receive distributions only under Class 4 and not under any sub-Class of Class 10.

155.    "*General Unsecured Claim Observer*" has the meaning specified in Article VII.C.

156.    "*General Unsecured Claimholder Distribution*" means (i) the General Unsecured Claimholder Distribution Pool, (ii) the GEF General Unsecured Claimholder Distribution, and (iii) any New Equity issued in respect of the Smiles General Unsecured Claims, in each case subject to dilution as set forth in Article V.D.1.

157.    "*General Unsecured Claimholder Distribution Pool*" means a number of shares of New Equity having a value (based on the Specified Value) equal to approximately $281 million; provided, that such value will be reduced by the aggregate value of Cash and New Equity paid in respect of the Smiles General Unsecured Claims and by the aggregate value of the GEF General Unsecured Claimholder Distribution (in each case, with such value based on Specified Value).

158.    "*General Unsecured Convenience Class Claim*" means a General Unsecured Claim (other than a Smiles General Unsecured Claim, 2024 Senior Exchangeable Notes Claim, 2025 Senior Notes Claim, or Perpetual Notes Claim) in an Allowed amount of $200,000 or less.

159.    "*General Unsecured Convenience Class Claim Fund*" means Cash in an amount not to exceed $1,000,000 for purposes of making distributions to holders of Allowed General Unsecured Convenience Class Claims.

160.    "*GFC*" means Gol Finance (Cayman).

161.    "*GFC General Unsecured Claim*" means any General Unsecured Claim against GFC.

162.    "*GFC General Unsecured Claimholder Distribution*" means 2.272% of the General Unsecured Claimholder Distribution Pool.

163.    "*GFL*" means Gol Finance (Luxembourg).

164.    "*GFL General Unsecured Claim*" means any General Unsecured Claim against GFL.

165.    "*GFL General Unsecured Claimholder Distribution*" means 32.156% of the General Unsecured Claimholder Distribution Pool.

166.    "*GLA*" means GOL Linhas Aéreas S.A.

167.    "*GLA General Unsecured Claim*" means any General Unsecured Claim against GLA.

168.    "*GLA General Unsecured Claimholder Distribution*" means 59.684% of the General Unsecured Claimholder Distribution Pool.

169.    "*GLAI*" has the meaning specified in the Introduction.

170.    "*GLAI General Unsecured Claim*" means any General Unsecured Claim against GLAI.

171.    "*GLAI General Unsecured Claimholder Distribution*" means 5.883% of the General Unsecured Claimholder Distribution Pool.

172.    "*GLAI Preemptive Rights Offering*" means the preemptive rights offering with respect to equity interests in Reorganized GLAI to be made available to Eligible Existing GLAI Equity Interest Holders in accordance with the Transaction Steps and Brazilian law.

173.    "*GLAI Preemptive Rights Offering Period*" means, with respect to the GLAI Preemptive Rights Offering, the period during which Eligible Existing GLAI Equity Interest Holders are entitled to exercise their preemptive rights, in accordance with Brazilian law, which period may commence prior to, on, or after the Effective Date, as set forth in the Transaction Steps.

174.    "*Glide Notes*" means, collectively, the 5.00% Senior Secured Notes due 2026 and 3.00% Subordinated Secured Notes due 2025 issued pursuant to the Glide Notes Documents.

175.    "*Glide Notes Claims*" means the Glide Senior Notes Claims and the Glide Subordinated Notes Claims.

176.    "*Glide Notes Collateral Agent*" means TMF Brasil Administração e Gestão De Ativos Ltda., in its capacity as collateral agent under the Glide Notes Indenture.

177.    "*Glide Notes Documents*" means the documents that govern the Glide Notes, including the Glide Notes Indenture, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time.

178.    "*Glide Notes Indenture*" means that certain Indenture dated as of December 30, 2022, as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among GFL, as issuer, GLAI and GLA, as guarantors, the Glide Notes Trustee, and the Glide Notes Collateral Agent.

16

179.    "*Glide Notes Trustee*" means Computershare Trust Company, N.A., as successor to The Bank of New York Mellon, in its capacity as trustee, registrar, transfer agent, and paying agent under the Glide Notes Indenture.

180.    "*Glide Senior Notes Claims*" means all Claims on account of, arising under, or related to the 5.00% Senior Secured Notes due 2026 issued pursuant to the Glide Notes Documents.

181.    "*Glide Subordinated Notes Claims*" means all Claims on account of, arising under, or related to the 3.00% Subordinated Secured Notes due 2025 issued pursuant to the Glide Notes Documents.

182.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

183.    "*GTX*" means GTX S.A.

184.    "*GTX General Unsecured Claim*" means any General Unsecured Claim against GTX.

185.    "*GTX General Unsecured Claimholder Distribution*" means 0% of the General Unsecured Claimholder Distribution Pool.

186.    "*Impaired*" means, with respect to a Claim, an Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

187.    "*Incremental New Money Equity*" means New Equity in an aggregate amount that, together with the amount of any Incremental New Money Exchangeable Debt, does not exceed $330 million and on such other terms set forth in the Incremental New Money Equity Documents.

188.    "*Incremental New Money Equity Documents*" means any documents that will govern the Incremental New Money Equity, including any financing documents related to the Incremental New Money Equity and any related term sheets, subscription agreements, investor rights agreements, instruments defining the rights of security holders, and any similar documents, in each case, which shall be in form and substance acceptable to the Debtor and Abra and subject to the Committee Consent Right.

189.    "*Incremental New Money Exchangeable Debt*" means exchangeable debt in an aggregate principal amount that, together with the amount of any Incremental New Money Equity, does not exceed $330 million and on such other terms set forth in the applicable Incremental New Money Exit Debt Documents.

190.    "*Incremental New Money Exit Debt*" means non-convertible, non-exchangeable secured debt in an aggregate principal amount that, together with the amount of any Incremental New Money Equity and/or Incremental New Money Exchangeable Debt, does not exceed $550 million and on such other terms set forth in the applicable Incremental New Money Exit Debt Documents.

191.    "*Incremental New Money Exit Debt Documents*" means the documents that will govern any Incremental New Money Exchangeable Debt and/or Incremental New Money Exit Debt, including any financing documents related to the Incremental New Money Exchangeable Debt and/or Incremental New Money Exit Debt and any related term sheets, indentures, note purchase agreements, intercreditor agreements, pledges, mortgages, guarantees, and any similar documents, in each case, which shall be in form and substance acceptable to the Debtors and Abra and subject to the Committee Consent Right.

192.    "*Incremental New Money Exit Financing*" means new money exit financing in an aggregate amount of up to $550 million consisting of the issuance of Incremental New Money Exit Debt, Incremental New Money Equity, and/or Incremental New Money Exchangeable Debt.

193.    "*Indemnification Obligation*" means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, sponsors, agents, or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, letters, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

194.    "*Indenture Trustee Charging Lien*" means any Lien, indemnification, and priority of payment rights in favor of an indenture trustee under the 2026 Senior Secured Notes Documents, the Glide Notes Documents, the 2024 Senior Exchangeable Notes Documents, the 2025 Senior Notes Documents, and the Perpetual Notes Documents, on or with respect to distributions to be made on account of the 2026 Senior Secured Notes Claims, the Glide Notes Claims, the 2024 Senior Exchangeable Notes Claims, the 2025 Senior Notes Claims, and the Perpetual Notes Claims, as applicable.

195.    "*Indenture Trustee Fees*" means the compensation, fees, expenses, disbursements, and indemnity claims of (i) the applicable indenture trustee required to be paid under the 2024 Senior Exchangeable Notes Documents, the 2025 Senior Notes Documents, and the Perpetual Notes Documents and (ii) the Amended Glide Notes Trustee incurred in connection with the Amended Glide Notes Documents in connection with the Plan, in each case including any fees, expenses, and disbursements of attorneys, advisors, or agents retained or utilized by such indenture trustee, whether prior to or after the Petition Date and whether prior to or after the Effective Date.

196.    "*Initial Distribution Date*" means the Effective Date or a date selected by the Reorganized Debtors, in consultation with the General Unsecured Claim Observer (to the extent applicable) and Abra, that is as soon as reasonably practicable thereafter.

197.    "*Insurance Contracts*" means all insurance policies whose term of coverage includes the Effective Date issued to any of the Debtors (or their predecessors) and all agreements, documents, or instruments relating thereto, including but not limited to any agreement with a third party administrator for claims handling.  Insurance Contracts shall not include surety bonds, surety guaranties, or surety-related products.

18

198.    "*Insurers*" means any Entities or Persons (other than the Debtors) that issued or entered into Insurance Contracts (including any third-party administrator for any Insurance Contracts) and any respective predecessors and/or affiliates of any of the foregoing.

199.    "*Intercompany Claim*" means a Claim against a Debtor held by another Debtor.

200.    "*Intercompany Interest*" means any Interest in a Debtor held (i) by another Debtor or (ii) by a non-Debtor that is a wholly owned direct or indirect subsidiary of a Debtor.

201.    "*Intercreditor Agreement*" has the meaning specified in <u>Article V.C.2</u>.

202.    "*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Debtor, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Debtor, whether or not transferable, issued or unissued, authorized, or outstanding.  For the avoidance of doubt, "Interest" includes American depositary receipts that are linked to other Interests.

203.    "*Interim Distribution Date*" means any date that is after the Initial Distribution Date on which the Reorganized Debtors, in consultation with the General Unsecured Claim Observer (to the extent applicable) and Abra, determine that an interim distribution should be made to holders of Allowed Claims, in light of, among other things, resolutions of Disputed Claims and the administrative costs of such a distribution.

204.    "*Investment Exchange*" shall be defined in the Plan Supplement.

205.    "*Joinder Effective Date*" means April 30, 2025.

206.    "*Lessor Agreement*" means any agreement or summary of terms approved by the Bankruptcy Court between the Debtors and one or more Aircraft Lease lessors related to the restructuring of any prepetition Aircraft Lease.

207.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

208.    "*Management Incentive Plan*" means the post-Effective Date management equity incentive plan at New GOL Parent, to be determined and allocated by the New GOL Parent Board.

209.    "*Material Joint Venture*" means a commercial collaboration that is material to each of the participants, as determined in good faith by the Board of Directors of Abra Group Limited; provided that it is expressly understood that arrangements of limited cooperation on specific routes (such as interlining, frequent flyer programs and lounge access, code sharing, and similar arrangements) and agreements to expand cooperation between parties to develop joint networks shall not constitute a Material Joint Venture.

210.    "*New Boards*" means the New GOL Parent Board and New Subsidiary Boards.

211.     "*New Debt Documents*" means, collectively, the Exit Notes Documents, the Take-Back Notes Documents, the Amended Glide Notes Documents, the documents governing the Amended Debentures, the documents governing the Amended Safra Notes, and, if applicable, the Incremental New Money Exit Debt Documents.

212.     "*New Equity*" means equity interests in New GOL Parent to be issued under the Plan on the terms set forth in Article V.C.5, which may include shares of common and preferred equity as determined by the Debtors, Abra, and the Committee, subject to compliance with the laws of Brazil and/or such other applicable jurisdiction, the rules, regulations, or requirements of any applicable stock exchange, and the terms of any New GOL Parent Organizational Documents, including any relevant shareholders' agreements, if applicable.

213.     "*New Equity Documents*" means documents that will govern the New Equity, including any financing documents related to the New Equity and any related term sheets, subscription agreements, investor rights agreements, instruments defining the rights of security holders, and any similar documents, in each case, which shall be in form and substance acceptable to the Debtor and Abra and subject to the Committee Consent Right.

214.     "*New GOL Parent*" means a new entity to be formed or acquired on or prior to the Effective Date to hold, directly or indirectly through one or more entities, 100% of the equity interests of Reorganized GLAI (excluding the Existing GLAI Equity Interests and any equity issued through the GLAI Preemptive Rights Offering).

215.     "*New GOL Parent Board*" means the initial board of directors of New GOL Parent.

216.     "*New Organizational Documents*" means, collectively, the New GOL Parent Organizational Documents and the New Reorganized Subsidiary Debtor Organizational Documents.

217.     "*New GOL Parent Organizational Documents*" means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, shareholder agreements, investor rights agreements, instruments defining the rights of security holders, or such other organizational documents of New GOL Parent included in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Debtors, Abra, and the Committee.

218.     "*New Money Securities*" has the meaning specified in Article VIII.E.

219.     "*New Reorganized Subsidiary Debtor Organizational Documents*" means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, shareholder agreements, investor rights agreements, instruments defining the rights of security holders, or such other organizational documents of the Reorganized Debtors included in the Plan Supplement.

220.     "*New Subsidiary Boards*" means the initial boards of directors or managers (as applicable) of the Reorganized Debtors.

221.    "*Non-AHG Member Exit Financing Allocation*" means the Exit Notes purchased by the Participating Non-AHG Members.

222.    "*Non-Exchangeable Take-Back Notes*" means new non-exchangeable debt to be issued by the Take-Back Notes Issuers on the Effective Date, in the aggregate principal amount of up to $700 million, on the terms set forth herein and such other terms set forth in the Non-Exchangeable Take-Back Notes Documents.

223.    "*Non-Exchangeable Take-Back Notes Documents*" means the documents that will govern the Non-Exchangeable Take-Back Notes, including any financing documents related to the Non-Exchangeable Take-Back Notes and any related term sheets, indentures, note purchase agreements, intercreditor agreements, pledges, mortgages, guarantees, and any similar documents, in each case which shall be in form and substance reasonably acceptable to the Debtors and Abra and subject to the Committee Consent Right.

224.    "*Non-Participating 2026 Senior Secured Notes Claims*" means any 2026 Senior Secured Notes Claims that are not Participating 2026 Senior Secured Notes Claims.

225.    "*Non-Participating 2026 Senior Secured Notes Claims Recovery*" shall have the meaning specified in Article III.B.4.b.i.

226.    "*Non-U.S. General Unsecured Claim*" means any Unsecured Claim (i) arising from or related to a Brazilian Litigation Claim (as such term is used in the *Final Order (I) Authorizing the Debtors to Pay Certain Lien Claimants and (II) Granting Related Relief* [Docket No. 194]), (ii) held by Brazilian trade vendors or service providers that provide, or will provide, goods or services necessary to the operation of the Reorganized Debtors and over which the Bankruptcy Court does not have personal jurisdiction (in each case as determined by the Debtors or the Reorganized Debtors, as applicable; provided, that the amount of such Claims, in the aggregate, shall be consistent with the Debtors' five-year business plan (as most recently provided to Abra as of the date of the Plan Support Agreement)), or (iii) with the consent of Abra, which shall not be unreasonably withheld, conditioned, or delayed, and in consultation with the General Unsecured Claim Observer (to the extent applicable), any other Claim held by a person or entity over which the Bankruptcy Court does not have personal jurisdiction, as determined by the Debtors or the Reorganized Debtors, as applicable.

227.    "*Other Secured Claim*" means any Secured Claim other than a Priority Tax Claim (except as set forth in Article II.E), a DIP Facility Claim, a 2028 Notes Claim, a 2026 Senior Secured Notes Secured Claim, a Glide Notes Claim, a Debenture Banks Claim, and a Safra Claim.

228.    "*Participating 2026 Senior Secured Noteholders*" means the Participating AHG Members and the Participating Non-AHG Members.

229.    "*Participating 2026 Senior Secured Notes Claims*" means (i) the Allowed 2026 Senior Secured Notes Claims held by the Participating AHG Members, and (ii) the portion of the Allowed 2026 Senior Secured Notes Claims held by the Participating Non-AHG Members that corresponds to the pro rata portion of the Non-AHG Member Exit Financing Allocation purchased by such Participating Non-AHG Members.

230.    "*Participating AHG Members*" means the members of the 2026 Ad Hoc Group which shall elect to purchase $50 million in the aggregate principal amount of Exit Notes, pro rata based on the amount of Allowed 2026 Senior Secured Notes Claims held by each such member as of the applicable record date as compared to the amount of Allowed 2026 Senior Secured Notes Claims held by all members of the 2026 Ad Hoc Group as of such date.

231.    "*Participating Non-AHG Members*" means those holders of Allowed 2026 Senior Secured Notes Claims who are not members of the 2026 Ad Hoc Group who elect to purchase up to $50 million in aggregate principal amount of Exit Notes (in the amount of $1.04113898749506 in Exit Notes for every $1.00 of Allowed 2026 Senior Secured Notes Claims held by such holders) pro rata based on the amount of Allowed 2026 Senior Secured Notes Claims held by each such holder as of the applicable record date as compared to the amount of Allowed 2026 Senior Secured Notes Claims held by all holders of Allowed 2026 Senior Secured Notes Claims that are not members of the 2026 Ad Hoc Group as of such date.

232.    "*Perpetual Notes*" means the 8.75% Perpetual Notes issued pursuant to the Perpetual Notes Documents.

233.    "*Perpetual Notes Claims*" means all Claims on account of, arising under, or related to the Perpetual Notes Documents, except any Indenture Trustee Fees.

234.    "*Perpetual Notes Documents*" means the documents that govern the Perpetual Notes, including the Perpetual Notes Indenture, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time.

235.    "*Perpetual Notes Indenture*" means that certain Indenture, dated as of April 5, 2006, as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, among GFC, as issuer, GLAI and GLA, as guarantors, and the Perpetual Notes Trustee.

236.    "*Perpetual Notes Trustee*" means, collectively, The Bank of New York Mellon in its capacity as trustee, registrar, transfer agent, and principal paying agent under the Perpetual Notes Indenture and The Bank of New York Mellon (Luxembourg), S.A., as Luxembourg paying agent and transfer agent under the Perpetual Notes Indenture.

237.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

238.    "*Petition Date*" means January 25, 2024.

239.    "*Plan*" has the meaning specified in the Introduction.

240.    "*Plan Supplement*" means the compilation of documents (or forms or term sheets thereof), schedules, and exhibits to the Plan, as each may be amended, supplemented, or modified from time to time in accordance with the Plan and the Plan Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules, to be filed with the Bankruptcy Court no later than fourteen (14) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, which may include, as applicable: (i) the New Organizational Documents; (ii) the Schedule of Assumed Contracts (as amended, supplemented, or modified); (iii) the Schedule of Retained

Causes of Action; (iv) a list of the members of the New Boards (to the extent known); (v) any amendments, modifications, or supplements to the Transaction Steps; (vi) the Exit Notes Documents; (vii) the Take-Back Notes Documents; (viii) the Amended Glide Notes Documents; (ix) the Incremental New Money Exit Debt Documents and Incremental New Money Equity Documents (in each case, if applicable); (x) the New Equity Documents; (xi) the definitive instruments evidencing the terms of the mandatory redemption or exchange of New Equity issued on account of the General Unsecured Claimholder Distribution into equity of Abra Group Limited (or any successor) pursuant to Article V.D.2; (xii) documents evidencing the procedures for the issuance of equity of Reorganized GLAI (as applicable pursuant to Article V.C.5); and (xiii) such other documents as are necessary or advisable to implement the Restructuring Transactions. For the avoidance of doubt, the Debtors shall have the right to amend, supplement, or modify the Plan Supplement (including, for the avoidance of doubt, the Transaction Steps) through the Effective Date in accordance with the terms of the Plan and the Plan Support Agreement.

241.    "*Plan Support Agreement*" means that certain Plan Support Agreement, dated as of November 5, 2024, including the Restructuring Term Sheet, and any other exhibits, schedules, and annexes thereto, by and among the Debtors, the Committee, Abra, and any other Entity that may become a party thereto, as attached to the Disclosure Statement as Exhibit E, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms.

242.    "*Pre-Dilution Specified Value*" means an amount equal to (i) $950 million, *plus* (ii) the amount of accrued and unpaid PIK interest, if any, on the 2028 Notes from and after April 30, 2025, to but excluding the Effective Date, *plus* (iii) the value of the General Unsecured Claimholder Distribution, *plus* (iv) the aggregate amount of Cash paid in respect of the General Unsecured Convenience Class Claims.

243.    "*Preference Actions*" means Avoidance Actions arising under section 547 of the Bankruptcy Code.

244.    "*Prepetition Debtor Abra Notes Pledged Liens*" has the meaning specified in the DIP Order.

245.    "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

246.    "*Priority Non-Tax Claim*" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense, DIP Facility Claim, or Priority Tax Claim.

247.    "*Priority Tax Claim*" means any Claim of a Governmental Unit that is entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

248.    "*Professional*" means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.  "Professional" does not include any professional-service Entity that the Debtors are authorized to employ, compensate, and reimburse in the ordinary course of business.

249.    "*Professional Fees*" means the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement of expenses incurred, by Professionals, that: (i) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date; (ii) have not been denied by the Bankruptcy Court by Final Order; (iii) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (iv) remain outstanding after applying any retainer that has been provided to such Professional.  To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order, such amount shall no longer constitute Allowed Professional Fees.

250.    "*Professional Fees Escrow Account*" means the account established on the Effective Date pursuant to Article II.B.2.

251.    "*Pro Rata*" means, for the holder of an Allowed Claim in a particular Class, proportional to the ratio of the amount of such Allowed Claim to the aggregate amount of all Allowed Claims in the same Class or, as applicable and as specifically set forth in the Plan, sub-Classes.

252.    "*Proof of Claim*" means a proof of Claim and/or Interest filed in the Chapter 11 Cases.

253.    "*Qualified Listing Event*" means (i) the admission (including by way of direct listing) of all or any of the Abra Group Limited ordinary shares to trading on any Investment Exchange, (ii) a merger or other business combination transaction by Abra Group Limited with a "special purpose acquisition company" (or similar entity without an operating business incorporated, formed or otherwise organized for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, contribution, consolidation or similar business combination with one or more businesses or entities) whose equity interests have been admitted to trading on any Investment Exchange as a result of which the shareholders (or other relevant equity securities holders) of Abra Group Limited hold, following completion of the relevant transaction, any of the publicly listed equity interests of the "special purpose acquisition company" (or similar entity or surviving entity in respect of such transaction), or (iii) a Business Combination or other reorganization that results in Abra Group Limited ordinary shares being admitted for trading on any Investment Exchange.

254.    "*Quarterly Fees*" has the meaning specified in Article XIII.C.

255.    "*Reimbursement Agreement*" has the meaning specified in the Debenture Banks Order.

256.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means leaving a Claim Unimpaired under the Plan under section 1124(2) of the Bankruptcy Code.

257.    "*Rejection Damages Deadline*" means the deadline by which a Proof of Claim on account of damages resulting from rejection of an Executory Contract or Unexpired Lease must be filed, which shall be thirty (30) days after the date of entry of an order of the Bankruptcy Court authorizing such rejection.

258.    "*Related Parties*" means, with respect to any Entity or Person, in each case in its capacity as such with respect to such Entity or Person, such Entity's or Person's current and former, in each case as applicable, directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

259.    "*Released Parties*" means, collectively, each of the following, in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Committee and its members; (iv) the other Consenting Stakeholders; (v) the DIP Noteholders, (vi) the Agents/Trustees; (vii) the Ad Hoc Group of Abra Noteholders and Elliott; and (viii) with respect to each of the foregoing Entities and Persons set forth in clause (i) through (vii), each of such Entities' and Persons' Affiliates and its and their respective Related Parties.  Notwithstanding the foregoing, (i) any Entity or Person that opts out of the releases set forth in Article IX.E shall not be deemed a Released Party and (ii) any Entity or Person that would otherwise be a Released Party hereunder but is party to one or more Retained Causes of Action shall not be deemed a Released Party with respect to such Retained Causes of Action.

260.    "*Releasing Parties*" means, collectively, each of the following, in each case in its capacity as such:  (i) each of the Released Parties; (ii) all holders of Claims that vote to accept the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; (iii) all holders of Claims or Interests that are Unimpaired under the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable notice; (iv) all holders of Claims in Classes that are entitled to vote under the Plan but that (a) vote to reject the Plan or do not vote either to accept or reject the Plan and (b) do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; and (v) with respect to each of the foregoing Entities and Persons set forth in clauses (ii) through (iv), all of such Entities' and Persons' respective Related Parties.  For the avoidance of doubt, holders of Claims or Interests in Classes that are deemed to reject the Plan and therefore are not entitled to vote under the Plan are not Releasing Parties in their capacities as holders of such Claims or Interests.

261.    "*Reorganized*" means, as to any Debtor, such Debtor as reorganized pursuant to and under the Plan or any successor thereto on or after the Effective Date.

262.    "*Reorganized Debtors*" means, collectively, the Debtors as reorganized pursuant to and under the Plan or any successor thereto on or after the Effective Date.

263.    "*Restructuring Term Sheet*" has the meaning specified in the Plan Support Agreement.

264.    "*Restructuring Transactions*" has the meaning specified in Article V.B.

265.    "*Retained Causes of Action*" means all Causes of Action held by the Debtors that are not expressly settled or released by the Debtors under the Plan, which shall include any actions specifically enumerated in the Schedule of Retained Causes of Action.

266.    "*Safra*" means, collectively, Banco Safra S.A. and Banco Safra S.A. (Luxembourg Branch).

267.    "*Safra Claims*" means all Claims held by Safra against the Debtors, including all Claims on account of, arising under, or related to the 2017 FINIMP Note, the 2018 FINIMP Note, the 2020 Bank Credit Note, the 2022 Bank Credit Note, and the Safra Trade Payables.

268.    "*Safra Stipulation*" means the *Stipulation and Agreed Order Between the Debtors, Banco Safra S.A., and Banco Safra S.A. (Luxembourg Branch) Authorizing Post-Petition Interest Payments to Banco Safra in Exchange for Agreement to Factor Receivables* [Docket No. 648].

269.    "*Safra Trade Payables*" means certain unsecured trade payables owed by GLA to Safra in the amount of $15,046.00.

270.    "*Santander Letters of Credit*" has the meaning specified in the Debenture Banks Order.

271.    "*Schedule of Assumed Contracts*" means the schedule of Executory Contracts and Unexpired Leases that shall be assumed by the applicable Debtors as of the Effective Date (or such other date as designated in such schedule) filed as part of the Plan Supplement, including the Cure Claim (if any) for each such assumed Executory Contract and Unexpired Lease; provided, however, that any such Executory Contract or Unexpired Lease may be subject to amendment, modification or rejection in accordance with the terms of the Plan.

272.    "*Schedule of Retained Causes of Action*" means the schedule of certain of the Retained Causes of Action, filed as part of the Plan Supplement, which shall be reasonably acceptable to the Committee; provided, that the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, regardless of whether such Retained Causes of Action are specifically enumerated in the Schedule of Retained Causes of Action.

273.    "*Schedules*" means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

274.    "*SEC*" means the United States Securities and Exchange Commission.

275.    "*Section 1145 Securities*" has the meaning specified in Article VIII.E.

276.    "*Secured Claim*" means any Claim that is (i) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or (ii) subject to setoff pursuant to section 553 of the Bankruptcy Code, in either case, to the extent of the value of the creditor's interest in the

Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

277.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

278.    "*Servicer*" means any Person or Entity that has been empowered to act in the capacity of the Disbursing Agent with respect to a particular Class of Claims.

279.    "*Smiles Argentina*" means Smiles Fidelidade Argentina S.A.

280.    "*Smiles Argentina General Unsecured Claim*" means any General Unsecured Claim against Smiles Argentina.

281.    "*Smiles Fidelidade"* means Smiles Fidelidade S.A.

282.    "*Smiles Fidelidade General Unsecured Claim"* means any General Unsecured Claim against Smiles Fidelidade.

283.    "*Smiles General Unsecured Claims*" means, collectively, the Smiles Argentina General Unsecured Claims, the Smiles Fidelidade General Unsecured Claims, the Smiles Viagens General Unsecured Claims, and the Smiles Viajes General Unsecured Claims.

284.    "*Smiles General Unsecured Claims Cap*" means Cash and/or New Equity in an aggregate amount not to exceed $4 million.

285.    "*Smiles Viagens*" means Smiles Viagens e Turismo S.A.

286.    "*Smiles Viagens General Unsecured Claim*" means any General Unsecured Claim against Smiles Viagens.

287.    "*Smiles Viajes*" means Smiles Viajes y Turismo S.A.

288.    "*Smiles Viajes General Unsecured Claim*" means any General Unsecured Claim against Smiles Viajes.

289.    "*Solicitation and Voting Procedures*" has the meaning specified in the Disclosure Statement.

290.    "*Sorriso*" means Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior.

291.    "*Sorriso General Unsecured Claim*" means any General Unsecured Claim against Sorriso.

292.    "*Sorriso General Unsecured Claimholder Distribution*" means 0% of the General Unsecured Claimholder Distribution Pool.

293.   "*Specified Value*" means an amount equal to (i) the Pre-Dilution Specified Value *plus* (ii) the Incremental New Money Equity, if applicable.

294.   "*Subordinated Claims*" means Claims that are subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

295.   "*Take-Back Notes*" means, collectively, the Exchangeable Take-Back Notes and Non-Exchangeable Take-Back Notes.

296.   "*Take-Back Notes Documents*" means, collectively, the Exchangeable Take-Back Notes Documents and Non-Exchangeable Take-Back Notes Documents.

297.   "*Take-Back Notes Issuers*" means one or more of Reorganized GFL and Reorganized GEF and/or such other Reorganized Debtors or entities owned directly or indirectly by the Reorganized Debtors and/or New GOL Parent as determined by the Debtors, with the consent of Abra and subject to the Committee Consent Right, in accordance with the terms of the Plan Support Agreement.

298.   "*Tax Agreement*" means that certain settlement agreement entered into by the Debtors, the Brazilian Federal Revenue Service, and the General Counsel for the National Treasury, substantially in the form attached as Exhibit B to the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into a Settlement Agreement with the Brazilian Government Parties* [Docket No. 1126] and as approved by the Bankruptcy Court on December 18, 2024 [Docket No. 1164].

299.   "*Transaction Steps*" means certain actions or steps to be taken by the Debtors to implement the Restructuring Transactions, which is attached to the *Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1389] as **Exhibit 1**, as amended on April 28, 2025 [Docket No. 1539], and as may be further amended, supplemented, or modified from time to time by the Debtors through the Effective Date with the consent of Abra and the Committee.

300.   "*Underwriter Securities*" has the meaning specified in Article VIII.E.

301.   "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

302.   "*Unimpaired*" means, with respect to a Class, Claim, or Interest, that such Class, Claim, or Interest is not Impaired.

303.   "*Unsecured*" means, with respect to a Claim, a Claim that is not a Secured Claim.

304.   "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

305.   "*Voting Deadline*" means May 12, 2025, or such other date and time as may be set by the Bankruptcy Court.

306.   "*Voting Record Date*" means March 12, 2025.

B.    *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (i) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (ii) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (iii) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (iv) the words "include," "includes," and "including" are by way of example and not limitation; (v) all references to articles or Articles are references to the Articles hereof; (vi) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, the Plan; (vii) any reference to an Entity as a holder of a Claim or an Interest includes that Entity's successors and assigns; (viii) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (ix) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (x) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; (xi) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (xii) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (xiii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (xiv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate or entity governance matters relating

to the Debtors or the Reorganized Debtors shall be governed by the laws of the state or country of incorporation or organization of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures and Exchange Rates*

All references in the Plan to monetary figures, "dollars," or "$" refer to the currency of the United States of America, unless otherwise expressly provided.  Except as otherwise noted herein, with respect to any Claim filed in these Chapter 11 Cases in a currency other that the currency of the United States of America, the amount of such Claim shall be converted to the currency of the United States of America using an exchange rate as of closing on the Petition Date of 1 USD: 4.92 BRL for purposes of determining the value and percentage of any recovery of Cash or equity distributed under the Plan.  Notwithstanding the foregoing, for purposes of determining the total amount in BRL of the equity interests to be issued by Reorganized GLAI pursuant to the applicable Transaction Steps and Brazilian law, the dollar amount of the relevant Claims will be converted into BRL using the BRL Exchange Rate as of closing on the Brazil Business Day immediately preceding the Effective Date.

F.      *Plan Support Agreement*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Plan Support Agreement as set forth in the Plan Support Agreement with respect to the form and substance of the Plan, any Definitive Documents, all exhibits to the Plan, the Plan Supplement and/or any other agreement or matter contemplated thereby, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A) and be fully enforceable as if stated in full herein.

## ARTICLE II
## ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Expenses*

1.      Treatment of Administrative Expenses

Each holder of an Allowed Administrative Expense (other than Professional Fees), to the extent such Allowed Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full and final satisfaction of its Administrative Expense, Cash equal to the Allowed amount of such Administrative Expense on the Effective Date (or, if payment is not then due, when such payment becomes due in the applicable Reorganized Debtor's ordinary course of business without further notice to, or order of, the Bankruptcy Court), unless otherwise agreed by the holder of such Administrative Expense and the applicable Debtor or Reorganized Debtor.

2.    Administrative Expense Bar Date

Unless previously filed or as otherwise governed by an order of the Bankruptcy Court or an agreement with the Debtors, requests for payment of Administrative Expenses (other than Professional Fees and the DIP Fees and Expenses) that accrued on or before the Effective Date but remained unpaid as of such date must be filed with the Bankruptcy Court and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Expense Bar Date or such date specified in an order of the Bankruptcy Court or agreement with the Debtors.  Holders of Allowed Administrative Expenses that are required to file and serve a request for payment and that do not timely file and serve such a request shall be barred from receiving any distributions under the Plan on account of such Administrative Expense; provided, however, that any parties may seek relief from the Bankruptcy Court for authority to file a late Administrative Expense request, and all rights to object to any such request are preserved.  Objections to requests for payment of Administrative Expenses must be filed with the Bankruptcy Court and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party no later than the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be set by an order of the Bankruptcy Court.

**HOLDERS OF ADMINISTRATIVE EXPENSES THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSES BY THE ADMINISTRATIVE EXPENSE BAR DATE SHALL BE BARRED, ESTOPPED, AND ENJOINED FROM RECEIVING ANY DISTRIBUTIONS UNDER THE PLAN ON ACCOUNT OF SUCH ADMINISTRATIVE EXPENSES.**

B.    *Professional Fees*

1.    Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors, the U.S. Trustee, counsel to the Committee, and all other parties that have requested notice in the Chapter 11 Cases by no later than forty-five (45) days after the Effective Date, unless the Reorganized Debtors agree otherwise in writing; provided, that, with respect to any professionals who are engaged by the Debtors after the Confirmation Date and who were not previously retained by order of the Bankruptcy Court pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, the Debtors (i) shall not be subject to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code and (ii) may, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay, without further approval, the reasonable and documented fees and expenses of such professionals.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the applicable final fee application.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of all Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be paid in full in Cash from the Professional Fees Escrow Account as promptly as practicable; provided, however, that if the funds in the Professional Fees

31

Escrow Account are insufficient to pay the full Allowed aggregate amount of the Professional Fees, the Reorganized Debtors shall promptly pay any remaining Allowed amounts from their Cash on hand.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that the Debtors are permitted to pay without seeking authority from the Bankruptcy Court in the ordinary course of the Debtors' business (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding entry of the Confirmation Order and the Effective Date.

2.      Professional Fees Escrow Account

Professionals shall estimate their unpaid Professional Fees incurred in rendering services to the Debtors, their Estates, or the Committee, as applicable, as of the Effective Date and shall deliver such estimate to counsel for the Debtors no later than five (5) Business Days before the anticipated Effective Date; provided, that such estimate shall not be deemed to limit the Allowed Professional Fees of any Professional.  If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for the purposes of funding the Professional Fees Escrow Account.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fees Escrow Account in an amount equal to all Professional Fees incurred but unpaid as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts provided prior to the Effective Date).  The Professional Fees Escrow Account may be an interest-bearing account.  Amounts held in the Professional Fees Escrow Account shall not constitute property of the Reorganized Debtors; provided, however, that, in the event there is a remaining balance in the Professional Fees Escrow Account following payment of all Allowed Professional Fees, any such balance shall be promptly returned to, and constitute property of, the Reorganized Debtors.

3.      Post-Effective Date Fees and Expenses

From and after the Effective Date, the Reorganized Debtors may, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Reorganized Debtors, or the Committee in accordance with Article XIII.O, on and after the Effective Date.  On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

C.      *DIP Facility Claims*

On the Effective Date, the DIP Facility Claims shall be Allowed in the amount of the aggregate principal amount outstanding on such date (inclusive of any previously capitalized interest and fees) *plus* the aggregate amount of (i) accrued and unpaid interest to but excluding such date and (ii) accrued and unpaid fees, expenses, and noncontingent indemnification

obligations arising and payable under and pursuant to the DIP Indenture as of such date. For the avoidance of doubt, the DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection, or any challenges under applicable law or regulation.

Subject to <u>Article II.D</u>, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for (if applicable), the Allowed DIP Facility Claims, each holder of an Allowed DIP Facility Claim shall receive either (i) payment in full in Cash or (ii) at the mutual election of such holder and the Debtors, an aggregate principal amount of Exit Notes equal to the amount of such holder's Allowed DIP Facility Claim.

Upon the satisfaction in full of the Allowed DIP Facility Claims in accordance with the terms of the preceding paragraph, all Liens and security interests granted to secure the DIP Facility Claims shall be automatically terminated and of no further force and effect, without any further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity. In connection with confirmation of the Plan, unless and until the Allowed DIP Facility Claims are satisfied, (i) the DIP Facility Claims shall not be discharged, satisfied, or released or otherwise affected in whole or in part, and each of the DIP Facility Claims shall remain outstanding, and (ii) the Liens securing the DIP Facility Claims shall not be deemed to have been waived, released, satisfied, subordinated, or discharged.

Notwithstanding anything to the contrary herein, on the Effective Date, the DIP Agent and its sub-agents shall be relieved of all further duties and responsibilities under the DIP Facility Documents and shall be deemed to have resigned, pursuant to section 12.03 of the DIP Indenture, as of the Effective Date; <u>provided</u>, that any provisions of the DIP Facility Documents that by their terms survive the termination of the DIP Facility Documents (including any applicable surviving indemnities) shall survive in accordance with the terms of the DIP Facility Documents as obligations of the Reorganized Debtors; <u>provided</u>, <u>further</u>, that the DIP Agent and its sub-agents shall take all steps and/or execute and/or deliver all instruments or documents, in each case reasonably requested by the Reorganized Debtors to effect the release, transfer, or assignment (as applicable) of the Liens granted pursuant to the DIP Documents and/or reflect on the public record the consummation of the payoff, releases, terminations, transfers, and assignments (as applicable) contemplated thereby.

Notwithstanding anything in the Plan or Confirmation Order to the contrary, on the Effective Date, the Challenge Period shall expire for all parties in interest and the Debtors' stipulations, admissions, agreements, and releases contained in the DIP Order shall be binding upon the Debtors and any successor thereto.

D.    *DIP Fees and Expenses*

To the extent not previously paid during the course of the Chapter 11 Cases, the DIP Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the DIP Facility Documents, without (i) any requirement to file a fee application with the Bankruptcy Court, (ii) the need for itemized time detail, and (iii) any requirement for Bankruptcy Court's

review or approval.  All DIP Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided, that such estimates shall not be considered an admission or limitation with respect to such DIP Fees and Expenses.  On the Effective Date, final invoices for all DIP Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Reorganized Debtors.

E.      *Priority Tax Claims*

Except to the extent that an Allowed Priority Tax Claim has not been previously paid in full or the holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction of each Priority Tax Claim, each Allowed Priority Tax Claim shall be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim is Allowed as a Secured Claim, it shall be classified and treated as an Allowed Other Secured Claim.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expenses, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in another Class to the extent that any portion of the Claim or Interest qualifies within the description of such other Class.  To the extent there are no Allowed Claims or Allowed Interests, as applicable, in a Class, such Class shall be deemed not to exist.

The Plan constitutes a separate chapter 11 plan for each Debtor.  Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Priority Non-Tax Claims | Unimpaired | Presumed to accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to accept |
| 3 | 2028 Notes Claims | Impaired | Entitled to vote |
| 4 | 2026 Senior Secured Notes Claims | Impaired | Entitled to vote |
| 5 | Glide Notes Claims | Impaired | Entitled to vote |
| 6 | Debenture Banks Claims | Impaired | Entitled to vote |
| 7 | AerCap Secured Note Claims | Impaired | Entitled to vote |
| 8 | Safra Claims | Impaired | Entitled to vote |
| 9 | Non-U.S. General Unsecured Claims | Unimpaired | Presumed to accept |

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 10(a) | GLAI General Unsecured Claims | Impaired | Entitled to vote |
| 10(b) | GLA General Unsecured Claims | Impaired | Entitled to vote |
| 10(c) | GFL General Unsecured Claims | Impaired | Entitled to vote |
| 10(d) | GFC General Unsecured Claims | Impaired | Entitled to vote |
| 10(e) | GEF General Unsecured Claims | Impaired | Deemed to reject |
| 10(f) | GAC General Unsecured Claims | Impaired | Entitled to vote |
| 10(g) | GTX General Unsecured Claims | Impaired | Deemed to reject |
| 10(h) | Smiles Fidelidade General Unsecured Claims | Impaired | Entitled to vote |
| 10(i) | Smiles Viagens General Unsecured Claims | Impaired | Entitled to vote |
| 10(j) | Smiles Argentina General Unsecured Claims | Impaired | Entitled to vote |
| 10(k) | Smiles Viajes General Unsecured Claims | Impaired | Entitled to vote |
| 10(*l*) | CAFI General Unsecured Claims | Impaired | Deemed to reject |
| 10(m) | Sorriso General Unsecured Claims | Impaired | Deemed to reject |
| 11 | General Unsecured Convenience Class Claims | Impaired | Entitled to vote |
| 12 | Subordinated Claims | Impaired | Deemed to reject |
| 13 | Intercompany Claims | Impaired/ Unimpaired | Deemed to reject/ presumed to accept |
| 14 | Existing GLAI Equity Interests | Impaired | Deemed to reject |
| 15 | Intercompany Interests | Impaired/ Unimpaired | Deemed to reject/ presumed to accept |

B.    *Treatment of Claims and Interests*

    1.    Class 1 – Priority Non-Tax Claims

        a.    *Classification*:  Class 1 consists of all Priority Non-Tax Claims.

        b.    *Treatment*:  Except to the extent previously paid or the holder of a Priority Non-Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall (i) receive from the applicable Reorganized Debtor, in full and final satisfaction of its Priority Non-Tax Claim, payment, in Cash, equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its Priority Non-Tax Claim becomes due and payable in the ordinary course or (ii) be otherwise rendered Unimpaired.

c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

a.    *Classification*:  Class 2 consists of all Other Secured Claims.

b.    *Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim, at the option of the Debtors or Reorganized Debtors, as applicable, shall, subject to applicable law and any applicable Lessor Agreement, (i) receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date such Claim becomes an Allowed Claim; (ii) have its Allowed Other Secured Claim Reinstated on the Effective Date; (iii) receive such other treatment sufficient to render its Allowed Other Secured Claim Unimpaired on the Effective Date; or (iv) on the Effective Date, receive delivery of, or retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim.

c.    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.    Class 3 – 2028 Notes Claims

a.    *Classification*:  Class 3 consists of all 2028 Notes Claims.

b.    *Allowance*:  The 2028 Notes Claims shall be Allowed Secured Claims in the aggregate principal amount of $1,477,538,000, plus accrued and unpaid interest, the premiums (including each Applicable Premium), and all other applicable fees, costs, expenses, and other amounts due under the terms of the 2028 Notes Documents, subject to reduction for payments made by the Debtors.

c.    *Treatment*:  On the Effective Date, each holder of an Allowed 2028 Notes Claim shall receive, in full and final satisfaction of its Allowed 2028 Notes Claim, its Pro Rata share of: (i) $600 million in aggregate principal amount of Non-Exchangeable Take-Back Notes, (ii) $250 million in aggregate principal amount of Exchangeable Take-Back Notes, (iii) the Abra Equity Distribution, and (iv) Cash in an amount equal to accrued and unpaid Cash Interest to but excluding the Effective Date.  In no event shall any holder of

36

a 2028 Notes Claims (in its capacity as such) be entitled to any recovery from the General Unsecured Claimholder Distribution on account of any unsecured or deficiency Claims.

d.    *Voting*: Class 3 is Impaired under the Plan.  Holders of 2028 Notes Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 – 2026 Senior Secured Notes Claims

a.    *Classification:*  Class 4 consists of all 2026 Senior Secured Notes Claims.

b.    *Allowance*: The 2026 Senior Secured Notes Claims shall be Allowed in the aggregate amount of $252,565,388.91.

c.    *Treatment:*

i.    On the Effective Date, (x) each member of the 2026 Ad Hoc Group shall purchase its Participating AHG Members' share of the AHG Member Exit Financing Allocation and (y) each Participating Non-AHG Member shall purchase its share of the Non-AHG Exit Financing Allocation.

ii.   Each Participating 2026 Senior Secured Noteholder shall receive, on account of each such Participating 2026 Senior Secured Noteholder's Participating 2026 Senior Secured Notes Claims, and in exchange for its participation in the 2026 Exit Financing Allocation:

A. Exit Notes with a principal value equal to 44% of such Participating 2026 Senior Secured Notes Claims; and

B. Non-Exchangeable Take-Back Notes with a principal value equal to 22% of such Participating 2026 Senior Secured Notes Claims.

iii.  Holders of any Non-Participating 2026 Senior Secured Notes Claims shall receive, in full and final satisfaction of such Non-Participating 2026 Senior Secured Notes Claims, their pro rata share of $100,000,000 of Non-Exchangeable Take-Back Notes (the "Non-Participating 2026 Senior Secured Notes Claims Recovery"), which pro rata share shall be based on the amount of such holder's Allowed 2026 Senior Secured Notes Claim as of the applicable record date as compared to the aggregate Allowed 2026 Senior Secured Notes Claims of $252,565,388.89 and not subject to adjustment based on the amount of Participating 2026 Senior Secured Notes Claims.

For the avoidance of doubt (a) Participating 2026 Senior Secured Noteholders will not receive the Non-Participating 2026 Senior Secured Notes Claims Recovery on account of its Participating 2026 Senior Secured

Notes Claims and (b) each Participating 2026 Senior Secured Noteholder shall receive its pro rata share of the Non-Participating 2026 Senior Secured Notes Claims Recovery on account of its Non-Participating 2026 Senior Secured Notes Claims.

d.    *Voting:*  Class 4 is Impaired under the Plan.  Holders of 2026 Senior Secured Notes Secured Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 – Glide Notes Claims

a.    *Classification:*  Class 5 consists of all Glide Notes Claims.

b.    *Allowance:*  The Glide Senior Notes Claims shall be Allowed in the aggregate principal amount of $141,662,259, and the Glide Subordinated Notes Claims shall be Allowed in the aggregate principal amount of $66,035,974, in each case, plus accrued and unpaid interest to but excluding the Effective Date and all applicable fees, costs, expenses, and other amounts due under the terms of the Glide Notes Documents, subject to reduction for payments made by the Debtors.

c.    *Treatment:*  Pursuant to the Lessor Agreements, on the Effective Date, in full and final satisfaction of their respective Claims, (i) each holder of an Allowed Glide Senior Notes Claim shall receive its Pro Rata share of the Amended Glide Senior Notes and Cash in an amount equal to accrued and unpaid interest under the Glide Notes Documents in respect of such holder's 5.00% Senior Secured Notes due 2026, and (ii) each holder of an Allowed Glide Subordinated Notes Claim shall receive its Pro Rata share of the Amended Glide Subordinated Notes and Cash in an amount equal to accrued and unpaid interest under the Glide Notes Documents in respect of such holder's 3.00% Subordinated Secured Notes due 2025.

d.    *Voting:*  Class 5 is Impaired under the Plan.  Holders of Glide Notes Claims are entitled to vote to accept or reject the Plan.

6.    Class 6 – Debenture Banks Claims

a.    *Classification:*  Class 6 consists of all Debenture Banks Claims.

b.    *Allowance:*  Pursuant to the Debenture Banks Order, the Debenture Banks shall each have an Allowed Secured Claim in accordance with the Debenture Banks Order.

c.    *Treatment:*  Pursuant to the Debenture Banks Stipulation and Debenture Banks Order, on the Effective Date, in full and final satisfaction of its Allowed Debenture Banks Claim, each holder of an Allowed Debenture Banks Claim shall receive the treatment set forth in the Debenture Banks Stipulation and Debenture Banks Order, and the Amended Debentures shall become binding on, and vest with, the applicable Reorganized Debtors, in

each case as agreed to by the Debenture Banks in the Debenture Banks Stipulation and Debenture Banks Order. On the Effective Date, the outstanding BdoB Letters of Credit, Santander Letters of Credit, and Bradesco Letters of Credit, and the Reimbursement Agreement applicable to each of the foregoing, shall be Reinstated and, following the Effective Date, shall continue in full force and effect and continue to be renewed subject to the terms and conditions of the Debenture Banks Stipulation and Debenture Banks Order. Any amounts due and owing to a Debenture Bank as of the Effective Date under any such Reimbursement Agreement shall be paid to the applicable Debenture Bank on the later of the (x) Effective Date and (y) date such amounts are due under the Reimbursement Agreement, and the Debenture Banks shall not be obligated to file a request for payment of any Administrative Expense arising under any Reimbursement Agreement on or before the Administrative Expense Bar Date. For the avoidance of doubt, any BdoB Letters of Credit, Santander Letters of Credit, or Bradesco Letters of Credit that are drawn on or after the Effective Date shall be repaid in the ordinary course of the Reorganized Debtors' business.

    d.    *Voting:* Class 6 is Impaired under the Plan. Holders of Debenture Banks Claims are entitled to vote to accept or reject the Plan.

7.    Class 7 – AerCap Secured Note Claims

    a.    *Classification:* Class 7 consists of the AerCap Secured Note Claims.

    b.    *Allowance:* Pursuant to the AerCap Settlement Order, the AerCap Term Sheet, and the AerCap Secured Note Order, the AerCap Secured Note Claims shall be Allowed in accordance with, and on the terms set forth in, the AerCap Settlement Order, the AerCap Secured Note Order, and the AerCap Secured Note Documents entered into in connection with the AerCap Secured Note Order.

    c.    *Treatment:* The Allowed AerCap Secured Note Claims shall be entitled to the treatment set forth in the AerCap Secured Note Order and the AerCap Secured Note Documents, and the obligations, security interests, and guarantees provided for in the AerCap Secured Note Documents shall become binding on, and vest with, the applicable Reorganized Debtors on the Effective Date.

    d.    *Voting:* Class 7 is Impaired under the Plan. Holders of AerCap Secured Note Claims are entitled to vote to accept or reject the Plan.

8.    Class 8 – Safra Claims

    a.    *Classification:* Class 8 consists of all Safra Claims.

    b.    *Allowance:* Pursuant to the Safra Stipulation, Safra shall have an (i) Allowed Secured Claim in the amount of (A) of $2,344,452.34 on

account of 2017 FINIMP Notes, (B) $1,726,696.68 on account of the 2018 FINIMP Notes, (C) $1,396,333.33 on account of the 2020 Bank Credit Note, and (D) $985,054.96 on account of the 2022 Bank Credit Note, and (ii) Allowed Unsecured Claim in the amount of $15,046.00 on account of the Safra Trade Payables.

c.    *Treatment:*  Pursuant to the Safra Stipulation, on the Effective Date, in full and final satisfaction of the Allowed Safra Claims, (i) each holder of an Allowed Safra Claim shall receive its Pro Rata share of the Amended Safra Notes and (ii) the Safra Trade Payables shall be Reinstated and paid in the ordinary course of the Reorganized Debtors' business.

d.    *Voting:*  Class 8 is Impaired under the Plan.  Holders of Safra Claims are entitled to vote to accept or reject the Plan.

9.    Class 9 – Non-U.S. General Unsecured Claims

a.    *Classification:*  Class 9 consists of all Non-U.S. General Unsecured Claims.

b.    *Treatment:*  On the Effective Date, except to the extent that a holder of an Allowed Non-U.S. General Unsecured Claim agrees to less favorable treatment, each Non-U.S. General Unsecured Claim shall continue in effect and, to the extent Allowed, be paid in the ordinary course of the Reorganized Debtors' business.  For the avoidance of doubt, this treatment shall be without prejudice to the rights, claims, and defenses of the Debtors and/or the Reorganized Debtors, as applicable, under all applicable non-bankruptcy law.

c.    *Voting:*  Class 9 is Unimpaired under the Plan.  Holders of Non-U.S. General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

10.    Class 10(a) – GLAI General Unsecured Claims

a.    *Classification:*  Class 10(a) consists of all GLAI General Unsecured Claims.

b.    *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GLAI General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GLAI General Unsecured Claim, its Pro Rata share of the GLAI General Unsecured Claimholder Distribution.

c.    *Voting:*  Class 10(a) is Impaired under the Plan.  Holders of GLAI General Unsecured Claims are entitled to vote to accept or reject the Plan.

11.     Class 10(b) – GLA General Unsecured Claims

    a.     *Classification:* Class 10(b) consists of all GLA General Unsecured Claims.

    b.     *Treatment:* Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GLA General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GLA General Unsecured Claim, its Pro Rata share of the GLA General Unsecured Claimholder Distribution.

    c.     *Voting:* Class 10(b) is Impaired under the Plan. Holders of GLA General Unsecured Claims are entitled to vote to accept or reject the Plan.

12.     Class 10(c) – GFL General Unsecured Claims

    a.     *Classification:* Class 10(c) consists of all GFL General Unsecured Claims.

    b.     *Treatment:* Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GFL General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GFL General Unsecured Claim, its Pro Rata share of the GFL General Unsecured Claimholder Distribution.

    c.     *Voting:* Class 10(c) is Impaired under the Plan. Holders of GFL General Unsecured Claims are entitled to vote to accept or reject the Plan.

13.     Class 10(d) – GFC General Unsecured Claims

    a.     *Classification:* Class 10(d) consists of all GFC General Unsecured Clams.

    b.     *Treatment:* Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GFC General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GFC General Unsecured Claim, its Pro Rata share of the GFC General Unsecured Claimholder Distribution.

    c.     *Voting:* Class 10(d) is Impaired under the Plan. Holders of GFC General Unsecured Claims are entitled to vote to accept or reject the Plan.

14.     Class 10(e) – GEF General Unsecured Claims

    a.     *Classification:* Class 10(e) consists of all GEF General Unsecured Claims.

    b.     *Treatment:* Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GEF General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GEF General Unsecured Claim, its Pro Rata share of the GEF General Unsecured Claimholder Distribution.

    c.    *Voting:*  Class 10(e) is Impaired under the Plan.  Holders of GEF General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

15.    Class 10(f) – GAC General Unsecured Claims

    a.    *Classification:*  Class 10(f) consists of all GAC General Unsecured Claims.

    b.    *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GAC General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GAC General Unsecured Claim, its Pro Rata share of the GAC General Unsecured Claimholder Distribution.

    c.    *Voting:*  Class 10(f) is Impaired under the Plan.  Holders of GAC General Unsecured Claims are entitled to vote to accept or reject the Plan.

16.    Class 10(g) – GTX General Unsecured Claims

    a.    *Classification:*  Class 10(g) consists of all GTX General Unsecured Claims.

    b.    *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GTX General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GTX General Unsecured Claim, its Pro Rata share of the GTX General Unsecured Claimholder Distribution.

    c.    *Voting:*  Class 10(g) is Impaired under the Plan.  Holders of GTX General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

17.    Class 10(h) – Smiles Fidelidade General Unsecured Claims

    a.    *Classification:*   Class 10(h) consists of all Smiles Fidelidade General Unsecured Claims.

    b.    *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Fidelidade General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Fidelidade General Unsecured Claim, subject to the Smiles General Unsecured Claims Cap, payment in an amount equal to the Allowed amount of such Claim, either in Cash or in New Equity at the Debtors' election, in consultation with Abra and the Committee.

    c.     *Voting:*  Class 10(h) is Impaired under the Plan.  Holders of Smiles Fidelidade General Unsecured Claims are entitled to vote to accept or reject the Plan.

18.    Class 10(i) – Smiles Viagens General Unsecured Claims

    a.     *Classification*:  Class 10(i) consists of all Smiles Viagens General Unsecured Claims.

    b.     *Treatment*:  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Viagens General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Viagens General Unsecured Claim, subject to the Smiles General Unsecured Claims Cap, payment in an amount equal to the Allowed amount of such Claim, either in Cash or in New Equity at the Debtors' election, in consultation with Abra and the Committee.

    c.     *Voting*:  Class 10(i) is Impaired under the Plan.  Holders of Smiles Viagens General Unsecured Claims are entitled to vote to accept or reject the Plan.

19.    Class 10(j) – Smiles Argentina General Unsecured Claims

    a.     *Classification:*  Class 10(j) consists of all Smiles Argentina General Unsecured Claims.

    b.     *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Argentina General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Argentina General Unsecured Claim, subject to the Smiles General Unsecured Claims Cap, payment in an amount equal to the Allowed amount of such Claim, either in Cash or in New Equity at the Debtors' election, in consultation with Abra and the Committee.

    c.     *Voting:*  Class 10(j) is Impaired under the Plan.  Holders of Smiles Argentina General Unsecured Claims are entitled to vote to accept or reject the Plan.

20.    Class 10(k) – Smiles Viajes General Unsecured Claims

    a.     *Classification:*  Class 10(k) consists of all Smiles Viajes General Unsecured Claims.

    b.     *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Viajes General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Viajes General Unsecured Claim, subject to the Smiles General Unsecured Claims Cap, payment in an amount equal

to the Allowed amount of such Claim, either in Cash or in New Equity at the Debtors' election, in consultation with Abra and the Committee.

c.   *Voting:*  Class 10(k) is Impaired under the Plan.  Holders of Smiles Viajes General Unsecured Claims are entitled to vote to accept or reject the Plan.

21.   Class 10(*l*) – CAFI General Unsecured Claims

a.   *Classification:*  Class 10(*l*) consists of all CAFI General Unsecured Claims.

b.   *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed CAFI General Unsecured Claim shall receive, in full and final satisfaction of its Allowed CAFI General Unsecured Claim, its Pro Rata share of the CAFI General Unsecured Claimholder Distribution.

c.   *Voting:*  Class 10(*l*) is Impaired under the Plan.  Holders of CAFI General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

22.   Class 10(m) – Sorriso General Unsecured Claims

a.   *Classification:*   Class 10(m) consists of all Sorriso General Unsecured Claims.

b.   *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Sorriso General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Sorriso General Unsecured Claim, its Pro Rata share of the Sorriso General Unsecured Claimholder Distribution.

c.   *Voting:*  Class 10(m) is Impaired under the Plan.  Holders of Sorriso General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

23.   Class 11 – General Unsecured Convenience Class Claims

a.   *Classification:*   Class 11 consists of all General Unsecured Convenience Class Claims.

b.   *Treatment:*  Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed General Unsecured Convenience Class Claim shall receive, in full and final satisfaction of its Allowed General Unsecured Convenience Class Claim, Cash in an amount equal to 15% of the amount of such Allowed General Unsecured Convenience Class Claim; provided, however, if the aggregate

44

amount of distributions to holders of Allowed General Unsecured Convenience Class Claims would otherwise exceed the General Unsecured Convenience Class Claim Fund, holders of such Claims shall receive their Pro Rata share of the General Unsecured Convenience Class Claim Fund. For the avoidance of doubt, holders of Allowed General Unsecured Convenience Class Claims shall receive distributions solely under this Class 11 and not under Class 10.

c.    *Voting:*  Class 11 is Impaired under the Plan.  Holders of General Unsecured Convenience Class Claims are entitled to vote to accept or reject the Plan.

24.    Class 12 – Subordinated Claims

a.    *Classification:*  Class 12 consists of all Subordinated Claims, if any.

b.    *Treatment:*  All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and the holders of Subordinated Claims shall not receive any distribution or retain any property on account of such Subordinated Claims.

c.    *Voting:*  Class 12 is Impaired under the Plan.  Holders of Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

25.    Class 13 – Intercompany Claims

a.    *Classification:*  Class 13 consists of all Intercompany Claims.

b.    *Treatment:*  Without effecting the settlements embodied herein, each Intercompany Claim shall be either Reinstated or released and cancelled, as determined by the Debtors or Reorganized Debtors, as applicable, in consultation with Abra, or as required by Brazilian law.  No property will be distributed to the holders of Intercompany Claims.

c.    *Voting:*  Depending on the treatment accorded, Class 13 is either Unimpaired or Impaired under the Plan.  Holders of Intercompany Claims are either conclusively presumed to have accepted or deemed to have rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, and, in either case, are not entitled to vote to accept or reject the Plan.

26.    Class 14 – Existing GLAI Equity Interests

a.    *Classification:*  Class 14 consists of all Existing GLAI Equity Interests.

b.    *Treatment:*  On the Effective Date, Existing GLAI Equity Interests shall be Reinstated, subject to dilution by the transactions contemplated by the Plan

and the Transaction Steps (including any equity interest in Reorganized GLAI that is purchased through the GLAI Preemptive Rights Offering). The Existing GLAI Equity Interests have no value, and retained Existing GLAI Equity Interests will have de minimis value, if any, following the implementation of the Plan and the Transaction Steps.

    c.    *Voting:* Class 14 is Impaired under the Plan. Holders of Existing GLAI Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

27.    Class 15 – Intercompany Interests

    a.    *Classification:* Class 15 consists of all Intercompany Interests.

    b.    *Treatment:* Intercompany Interests shall be Reinstated solely to the extent necessary to maintain the Reorganized Debtors' corporate structure. No property will be distributed to the holders of Intercompany Interests.

    c.    *Voting:* Depending on the treatment accorded, Class 15 is either Unimpaired or Impaired under the Plan. Holders of Intercompany Interests are either conclusively presumed to have accepted or deemed to have rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, and, in either case, are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan or by Final Order of the Bankruptcy Court, nothing in the Plan shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Unimpaired Claims, and, except as otherwise specifically provided in the Plan or by Final Order of the Bankruptcy Court, nothing herein shall be deemed to constitute a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and Reorganized Debtors' legal and equitable rights with respect to any Claim that is Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D.    *Subordination of Claims*

Except as expressly provided herein, the Allowance, classification, and treatment of all Claims and Interests and the respective treatments thereof under the Plan take into account and

46

conform to the relative priority and rights of all Claims and Interests and comply with any contractual, legal, or equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.

E.    *Third-Party Beneficiaries / Derivative Claimants*

Any Claims asserted against the Debtors that are not direct obligations of any of the Debtors but are derivative of other Claims asserted against the Debtors shall not receive any recoveries under the Plan and shall be deemed satisfied by virtue of the treatment of the applicable direct obligation of the Debtors.

F.    *Abra Noteholder Claims*

Without affecting any right to Adequate Protection payments under the DIP Order, any Claims asserted against the Debtors by the Abra Notes Agents and any holders of the Abra Notes (in their capacities as such) shall not receive any recovery under the Plan, and all Prepetition Debtor Abra Notes Pledged Liens asserted in connection therewith have been previously released consensually.

G.    *Banco Pine and Banco Rendimento Settlements*

On the Effective Date, the Reorganized Debtors shall reaffirm their obligations under (i) that certain Bank Credit Note-Loan No. 0651/22 (*Cédulas de Crédito Bancário*) issued by GLA to Banco Pine S.A. on September 21, 2022 and (ii) the *Order Authorizing the Debtors to Enter into a Settlement with Banco Pine S.A.* [Docket No. 903]. Accordingly, such obligations shall survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, subject to, and except as such terms may have been modified by, an order of the Bankruptcy Court.

On the Effective Date, the Reorganized Debtors shall reaffirm their obligations under (i) that certain Partnership and Cooperation Agreement, as amended from time to time, between Banco Rendimento S.A. and GLA, pursuant to which Banco Rendimento S.A. agreed to purchase GLA's trade payables directly from GLA's suppliers, and (ii) the *Order Authorizing the Debtors to Enter into a Settlement with Banco Rendimento S.A.* [Docket No. 904]. Accordingly, such obligations shall survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, subject to, and except as such terms may have been modified by, an order of the Bankruptcy Court.

H.    *Tax Agreement*

On the Effective Date, the Reorganized Debtors shall reaffirm their obligations under the Tax Agreement and all ancillary documents executed by the Debtors related thereto, including any fiduciary lien agreements or other similar security agreements executed by the Debtors. Accordingly, such obligations under all such agreements shall survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable

by and against the applicable Reorganized Debtor in accordance with its terms and the applicable order of the Bankruptcy Court.

I.      *Boeing Agreement*

On the Effective Date, the Reorganized Debtors shall reaffirm their obligations under the Boeing Agreement.  Accordingly, such obligations shall survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, subject to, and except as such terms may have been modified by, an order of the Bankruptcy Court.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF PLAN

A.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation of the Plan by acceptance thereof by any Impaired Class of Claims.  The Debtors shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

B.      *Voting Classes*

Holders of Claims as of the Voting Record Date in the following Classes are entitled to vote to accept or reject the Plan:  Classes 3, 4, 5, 6, 7, 8, 10(a), 10(b), 10(c), 10(d), 10(f), 10(h), 10(i), 10(j), 10(k), and 11.

The Bankruptcy Code defines "acceptance" of a plan by a Class of (i) Impaired Claims as acceptance by creditors in that class that hold at least two-thirds (⅔) in amount and more than one-half (½) in number of the Claims in such Class that cast ballots to accept or reject the Plan and (ii) Impaired Interests as acceptance by the holders of Interests that hold at least two-thirds (⅔) in amount of the Interests in that Class that cast ballots to accept or reject the Plan.

C.      *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by such Class to the fullest extent permitted by law.

D.      *Presumed Acceptance by Unimpaired Classes*

Classes 1, 2, and 9, and, depending on their respective treatment, Classes 13 and 15, are Unimpaired under the Plan.  Holders of Claims and Interests, as applicable, in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

E.    *Deemed Rejection by Impaired Classes*

Classes 10(e), 10(g), 10(*l*), 10(m), 12, and 14, and, depending on their respective treatment, Classes 13 and 15 are Impaired under the Plan.  Holders of Claims and Interests, as applicable, in such Classes are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

F.    *Elimination of Vacant Classes*

Any Class that does not have a holder of a Claim or an Interest shall be deemed eliminated from the Plan for all purposes.

G.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF PLAN

A.    *General Settlement of Claims and Interests*

The Plan is predicated on a global settlement between the Debtors, the Committee, Abra, and various other stakeholders regarding various issues, including, among others, the settlement of potential Causes of Action, the Plan value, and the allocation of value amongst creditors, and the allocation of value amongst the Debtors' estates.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims, Interests, and controversies, which provides substantial value to the Estates, and all distributions made to holders of Allowed Claims and Interests in any Class in accordance with the Plan are intended to be, and shall be, final.

B.    *Restructuring Transactions*

Prior to, on, or after the Effective Date, subject to and consistent with the terms of the Plan and Plan Support Agreement (and subject to the applicable consent and approval rights thereunder), the Debtors and the Reorganized Debtors, as applicable, shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect the transactions described in, contemplated by, or necessary to effectuate, the Plan, which transactions may include one or more mergers, consolidations, dispositions, transfers, assignments, contributions, conversions, liquidations, dissolutions, or other transactions, as may be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties, and obligations of the Debtors vesting in one or more surviving, resulting, or acquiring entities, and the other Transaction Steps (collectively, the "Restructuring Transactions").  Subject to the terms of the Plan, in each case in which the surviving, resulting, or acquiring Entity is a

successor to a Debtor, such surviving, resulting, or acquiring Entity shall perform the obligations of such Debtor under the Plan, except as provided in any contract, instrument, or other agreement or document effecting a disposition to such surviving, resulting, or acquiring Entity, which may provide that another Debtor will perform such obligations.

In effecting the Restructuring Transactions, the Debtors and Reorganized Debtors, as applicable, shall implement the Transaction Steps and be permitted to: (i) execute and deliver any appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, dissolution, or other transaction containing terms consistent with the Plan and that satisfy the requirements of applicable non-bankruptcy law, rule, or regulation; (ii) form new Entities and issue equity interests in such newly formed Entities, execute and deliver appropriate documents in connection therewith containing terms that are consistent with the Plan and that satisfy the requirements of applicable non-bankruptcy law, rule, or regulation; (iii) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the Plan and having such other terms to which the applicable Entities may agree and effectuate such transfers, assignments, assumptions, or delegations, including to any new Entities formed in accordance with the Restructuring Transactions; (iv) file appropriate certificates or articles of merger, consolidation, dissolution, or other documents pursuant to applicable non-bankruptcy law, rule, or regulation; and (v) take all other actions that the applicable Entities determine to be necessary or appropriate, including any filings or recordings, or withdrawing previously made filings or recordings, as may be required by applicable non-bankruptcy law, rule, or regulation.  All of the Debtors' agents and all other Persons authorized to make filings or recordings on the Debtors' behalf are directed to cooperate with and to take direction from the Debtors and the Reorganized Debtors, as applicable, with respect to the foregoing.  To the extent known, the actions or steps to be taken by the Debtors to implement the Restructuring Transactions will be set forth in the Transaction Steps.  In all cases, such transactions shall be subject to the terms and conditions of the Plan and the Plan Support Agreement and any consents or approvals required under the Plan and the Plan Support Agreement.

The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

C.    *Sources of Consideration for Plan Distributions*

1.    Cash

The Reorganized Debtors shall fund distributions under the Plan required to be paid in Cash, if any, with Cash on hand (including Cash from operations and Cash received under the DIP Facility and refinanced pursuant to the Exit Notes) and from the Cash proceeds from the issuance of any Incremental New Money Exit Financing.

2.    Exit Financing

    a.    *Exit Notes*

On the Effective Date, the Exit Notes Issuer shall issue the Exit Notes on the terms herein and such other terms set forth in the Exit Notes Documents.  The initial obligors in respect of the Exit Notes will be the Exit Notes Issuer and the applicable guarantors set forth in the Exit Notes Documents.

The Liens on any shared collateral securing the Exit Notes, the Incremental New Money Exit Debt, the Incremental New Money Exchangeable Debt (to the extent issued), and/or the Take Back Notes, and the priorities of such Liens shall be set forth in, and subject to, one or more intercreditor agreements consistent with the terms set forth herein and otherwise in form and substance reasonably satisfactory to Abra, the Debtors, and the applicable purchasers and/or holders (or agents) thereof (each, an "Intercreditor Agreement").

The maturity date for the Exit Notes shall be the date that is five (5) years after the Effective Date.  The Exit Notes will accrue interest at a rate of 14.375% per annum.

    b.    *2026 Exit Financing Allocation Commitment*

In accordance with Article III.B.4 of the Plan, each holder of an Allowed 2026 Senior Secured Notes Claim shall have the right to participate in the 2026 Exit Financing Allocation of the Exit Notes. In exchange for entry into the Plan Support Agreement and the terms and commitments reflected therein, each Participating AHG Member shall receive a work fee in the aggregate amount of 8% of the lesser of (x) the aggregate principal amount of Exit Notes that such member purchases (in an aggregate amount not to exceed $50 million of Exit Notes for all such members) and (y) such member's commitment to purchase Exit Notes pursuant to the Commitment Letter as of the A&R Joinder Effective Date (the "AHG Work Fee"), which AHG Work Fee shall be payable in kind on (and subject to the occurrence of) the Effective Date as additional Exit Notes.

    c.    *Incremental New Money Exit Financing*

In addition to the Exit Notes, the Debtors may issue Incremental New Money Exit Debt, Incremental New Money Equity, and/or Incremental New Money Exchangeable Debt on the terms set forth herein and in the applicable Incremental New Money Exit Debt Documents and Incremental New Money Equity Documents, as applicable.  Notwithstanding anything to the contrary herein, the aggregate amount of Incremental New Money Exit Debt, Incremental New Money Equity, and/or Incremental New Money Exchangeable Debt that may be issued is subject to adjustment as agreed by the Debtors and Abra and subject to the Committee Consent Right in accordance with the terms of the Plan Support Agreement.

3.    Take-Back Notes

    a.    *Non-Exchangeable Take-Back Notes*

On the Effective Date, the Take-Back Notes Issuers shall issue the Non-Exchangeable Take-Back Notes in the aggregate principal amount of up to $700 million on the terms set forth

herein and such other terms set forth in the Non-Exchangeable Take-Back Notes Documents.  The initial obligors in respect of the Non-Exchangeable Take-Back Notes will be the Take-Back Notes Issuers and the applicable guarantors set forth in the Non-Exchangeable Take-Back Notes Documents.

The Non-Exchangeable Take-Back Notes shall be secured by a Lien on the terms set forth in the Non-Exchangeable Take-Back Notes Documents and subject to the terms of the applicable Intercreditor Agreement.

The maturity date for the Non-Exchangeable Take-Back Notes shall be six (6) months after the maturity date of the Exit Notes.  The Non-Exchangeable Take-Back Notes will accrue interest at nine and one-half (9.5) percent per annum, which shall be payable quarterly in Cash; provided, that notwithstanding the foregoing, from and after the second anniversary of the Effective Date, the Reorganized Debtors shall have the option to pay-in-kind up to one hundred (100) percent of the interest accruing from and after such date.  The Non-Exchangeable Take-Back Notes will amortize (or be mandatorily redeemable) quarterly with principal payments amounting to $25 million per annum (or, from and after the date on which the Exchangeable Take-Back Notes are no longer outstanding, $50 million per annum), commencing with the first interest payment date occurring on or after the date that is three (3) months after the Effective Date

b.    *Exchangeable Take-Back Notes*

On the Effective Date, the Take-Back Notes Issuers shall issue the Exchangeable Take-Back Notes in the aggregate principal amount of $250 million that will be exchangeable into New Equity on the terms set forth herein and such other terms set forth in the Exchangeable Take-Back Notes Documents.  The initial obligors in respect of the Exchangeable Take-Back Notes will be the Take-Back Notes Issuers and the applicable guarantors set forth in the Exchangeable Take-Back Notes Documents.

The Exchangeable Take-Back Notes shall be secured by a Lien on the terms set forth in the Exchangeable Take-Back Notes Documents and subject to the terms of the applicable Intercreditor Agreement.

The maturity date for the Exchangeable Take-Back Notes shall be six (6) months after the maturity date of the Exit Notes.  The Exchangeable Take-Back Notes will accrue interest at nine and one-half (9.5) percent per annum, which shall be payable quarterly in Cash; provided, that notwithstanding the foregoing, from and after the second anniversary of the Effective Date, the Reorganized Debtors shall have the option to pay-in-kind up to one hundred (100) percent of the interest accruing from and after such date.

The Exchangeable Take-Back Notes may be exchanged into a fixed number of shares of New Equity to be specified in the Exchangeable Take-Back Notes Documents (with exchange into common and/or preferred equity to be agreed between Abra and the Debtors) resulting in equity splits between Abra, on the one hand, and recipients of the General Unsecured Claimholder Distribution, on the other, that would have resulted on the Effective Date if the number of shares constituting the General Unsecured Claimholder Distribution had been determined based on

Adjusted Specified Value rather than Specified Value, subject to customary anti-dilution protection, if:

(i) a majority of the holders of the Exchangeable Take-Back Notes provide the Reorganized Debtors and the trustee or agent, as applicable, with fifteen (15) days' written notice of their intention to seek exchange of the Exchangeable Take-Back Notes (or such shorter period as reasonably comports with the applicable notice period following a notice of prepayment or redemption, as applicable, of the Exchangeable Take-Back Notes); or

(ii) on or after the later of 30 months after the Effective Date and October 31, 2027, (x) the Reorganized Debtors provide the holders of Exchangeable Take-Back Notes with fifteen (15) days' written notice of their intention to seek exchange of the Exchangeable Take-Back Notes and (y) the value of the New Equity issued in respect of such exchange, measured based upon the then most recent applicable four calendar quarters using a total enterprise value to LTM EBITDAR multiple of 4.25x (with LTM EBITDAR and net debt determined in accordance with Abra's debt arrangements), is greater than or equal to one-hundred and five (105) percent of the then-outstanding principal amount (for the avoidance of doubt, excluding any previously capitalized interest) under the Exchangeable Take-Back Notes, in each case on and subject to the terms and conditions to be set forth in the Exchangeable Take-Back Notes Documents.

For the avoidance of doubt, all Exchangeable Take-Back Notes must be exchanged at the same time. Any previously capitalized interest on the Exchangeable Take-Back Notes as of, and accrued and unpaid interest on the Exchangeable Take-Back Notes up to but excluding, the date that the Exchangeable Take-Back Notes are exchanged into New Equity, shall be paid in full in Cash by the Reorganized Debtors on such exchange date.

4.      Execution of New Debt Documents

Except as otherwise noted herein, on the Effective Date, the applicable Reorganized Debtors shall be authorized to execute, deliver, and enter into the New Debt Documents, without further (i) notice to or order of the Bankruptcy Court, (ii) vote, consent, authorization, or approval of any Person or Entity, or (iii) action by the holders of Claims or Interests.

The New Debt Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purpose whatsoever under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The financial accommodations to be extended pursuant to the New Debt Documents shall be deemed reasonable and having been extended in good faith and for legitimate business purposes.

Notwithstanding anything to the contrary herein, the Exit Notes, Take-Back Notes and/or Incremental New Money Exit Debt may be structured as loans rather than notes as agreed among the respective parties to the Exit Notes Documents, Take-Back Notes Documents, and Incremental

New Money Exit Debt Documents, respectively, with the reasonable consent of Abra and subject to the Committee Consent Right.

On the Effective Date, to the fullest extent permitted by applicable law, all of the Liens to be granted or continued in accordance with the New Debt Documents shall (i) be deemed to be approved; (ii) be legal, binding, and enforceable Liens on the property and assets granted under the New Debt Documents in accordance with the terms thereof; (iii) be deemed perfected on the Effective Date or, if necessary, after the fulfillment of any legal formality required by Brazilian law, and have the priorities as set forth in the New Debt Documents, subject only to such Liens as may be permitted under such documents; and (iv) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purpose whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.   For the avoidance of doubt, notwithstanding Article IX.C of the Plan or any other provision in the Plan, the Confirmation Order, or any other document entered into in connection with the Plan, including the New Debt Documents (other than the Amended Glide Notes Documents, the documents governing the Amended Safra Notes, and the Amended Debentures, respectively) and any documents in connection with the Exit Notes, Incremental New Money Exit Debt, and Take-Back Notes, the Glide Notes Collateral Agent, Safra, and the Debenture Banks shall retain their respective first-priority liens and security interests (including through any "fiduciary assignment" granted under Brazilian law) in any collateral securing the (i) Amended Glide Notes, (ii) Amended Safra Notes, and (iii) Amended Debentures, BdoB Letters of Credit, Santander Letters of Credit, and Bradesco Letters of Credit, respectively, which liens shall be senior to any liens on collateral granted in connection with the Plan, including in connection with the Exit Notes, Incremental New Money Exit Debt, and Take-Back Notes.

The Reorganized Debtors and the secured parties (and their designees and agents) under the New Debt Documents are hereby authorized to make all filings and recordings and to obtain all governmental approvals and consents to create (or continue) and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that creation (or continuation) and perfection of the Liens granted under the New Debt Documents shall occur automatically (to the fullest extent permitted by applicable law) by virtue of the entry of the Confirmation Order or, if necessary, after the fulfillment of any legal formality required by Brazilian law (subject to the occurrence of the Effective Date), and any such filings, recordings, approvals, and consents shall not be necessary or required), and the Reorganized Debtors and the secured parties (and their designees and agents) under such New Debt Documents shall nevertheless cooperate to make all filings and recordings that otherwise would be necessary under applicable law to give effect to such creation (or continuation) and perfection and to give notice of such Liens to third parties, in each case to the extent required under the New Debt Documents.

5.    New Equity

On or prior to the Effective Date, there shall be a shareholders' meeting to take the appropriate and necessary steps at GLAI, in accordance with the Transaction Steps and Brazilian law, to effectuate a capital increase at Reorganized GLAI, to give effect to the (i) capitalization of the 2028 Notes Claims, the General Unsecured Claims, and, if applicable, the 2026 Senior Secured

Notes Claims and (ii) corresponding GLAI Preemptive Rights Offering, in accordance with the Transaction Steps.  As a result thereof, prior to, on, or after the Effective Date, GLAI shall provide notice, as required under applicable Brazilian law, of Eligible Existing GLAI Equity Interest Holders' right to participate in the GLAI Preemptive Rights Offering during the GLAI Preemptive Rights Offering Period in accordance with the Transaction Steps and applicable Brazilian law requirements.  Any proceeds of the GLAI Preemptive Rights Offering shall be applied in accordance with the Transaction Steps, subject to requirements under Brazilian law.

On the Effective Date, New GOL Parent shall issue the New Equity in accordance with the terms of the Transaction Steps and the Plan without (i) further notice to, or order of, the Bankruptcy Court, (ii) act or action under any applicable law, regulation, order, or rule, or (iii) the vote, consent, authorization, or approval of any Person or Entity.  It is currently contemplated that New GOL Parent will be organized under the laws of Luxembourg, as set forth in the Transaction Steps, and that the New Equity will not be traded on any public listing exchange on the Effective Date; provided, that the jurisdiction of New GOL Parent, its capitalization, and whether New Equity is publicly traded is subject to change as agreed among the Debtors, Abra, and the Committee in a manner designed to maximize the liquidity of New Equity and minimize cost.  Such terms shall be disclosed in the Plan Supplement, including the New Organizational Documents.

The New Equity shall be distributed through the facilities of DTC, and applicable holders of Allowed Claims entitled to receive a distribution of New Equity under the Plan shall, unless otherwise agreed by the Debtors or Reorganized Debtors, as applicable, with the consent of Abra and the Committee, be required to hold New Equity through the facilities of DTC regardless of whether they held their Claims through the facilities of DTC prior to the Effective Date; provided, however, that, with respect to holders of Claims who are legally or contractually restricted from holding the New Equity through the facilities of DTC, the Debtors or Reorganized Debtors, as applicable, and Abra may, at their mutual election in their respective sole discretion, make accommodations for any such holder (including, without limitation, by selling the New Equity to which any such holder is otherwise entitled on the open market, provided the purchaser thereof holds such New Equity through the facilities of DTC, and distributing Cash to the Claim holder in an amount equal to the proceeds from such sale less any transaction expenses related to such sale).

Transfers of New Equity will require the prior written consent of New GOL Parent if such transfer could cause New GOL Parent or Abra to be required to, or could reasonably be expected to create the risk of New GOL Parent or Abra being required in the reasonably near future to, have Exchange Act Section 12(g) registration obligations (in each case as determined in good faith by New GOL Parent or Abra, as applicable) ("12(g) Obligations").  Abra ordinary shares received in exchange for New Equity may also be subject to restrictions on transfer designed to avoid triggering 12(g) Obligations.

The New Equity issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and fully paid and non-assessable.  Each distribution and issuance of the New Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance.  The pre-money value of any Incremental New

Money Equity shall be set at not less than the Pre-Dilution Specified Value and the terms thereof shall otherwise be satisfactory to the Debtors and Abra.

As a result of the exchange of debt for New Equity and the GLAI Preemptive Rights Offering contemplated under the Plan, Existing GLAI Equity Interests will be significantly diluted. The Debtors expect the resulting equity holdings of Existing GLAI Equity Interest holders to be de minimis.

D.    *General Unsecured Claimholder Distribution*

1.    General Unsecured Claimholder Distribution

The percentage of the New Equity to be held by holders of General Unsecured Claims as a result of the General Unsecured Claimholder Distribution shall be subject to dilution by (i) any Incremental New Money Equity, and (ii) any New Equity issued after the Effective Date, including in connection with the Management Incentive Plan, upon exchange of the Exchangeable Take-Back Notes, and upon exchange of any Incremental New Money Exchangeable Debt.

2.    Mandatory Redemption/Exchange & Offer to Purchase/Exchange

Upon the earliest to occur of (i) any Qualified Listing Event and (ii) a future bankruptcy filing by New GOL Parent, Reorganized GLAI, or Reorganized GLA, the New Equity issued on account of the General Unsecured Claimholder Distribution shall be (x) in the case of <u>clause (i)</u> above, exchanged for ordinary shares of Abra Group Limited (or any successor) (subject to, if agreed among the Debtors, Abra, and the Committee as set forth in the Plan Supplement, Abra's right to instead mandatorily redeem such New Equity for cash), and (y) in the case of <u>clause (ii)</u> above, mandatorily redeemed in cash or (at Abra Group Limited's sole discretion) exchanged for ordinary shares of Abra Group Limited (or any successor). The definitive instruments evidencing the terms of such mandatory redemption or exchange shall specify an exchange ratio, the methodology for determining the redemption price, and other terms to be agreed and shall be filed as part of the Plan Supplement.

In addition, Abra Group Limited (or its successor) shall make an offer to purchase or exchange New Equity issued on account of the General Unsecured Claimholder Distribution for cash or (at Abra Group Limited's sole discretion) ordinary shares of Abra Group Limited (or any successor) upon the earliest to occur of any of the following events: (i) any Business Combination (other than a Business Combination that is a Qualified Listing Event) between Abra Group Limited (or any successor) and Azul S.A. or (ii) any Material Joint Venture between Abra Group Limited (or any successor) and Azul S.A. or any of their material Affiliates, excluding any joint venture between New GOL Parent or any of its subsidiaries and Azul S.A. and any of its Affiliates. For the avoidance of doubt, the events referenced in the foregoing sentence do not include any Business Combination or joint venture between New GOL Parent and/or any of its subsidiaries and Azul S.A. and/or any of its Affiliates. The definitive instruments evidencing the terms of such mandatory offer to purchase such New Equity or exchange such New Equity for ordinary shares of Abra Group Limited (or any successor) shall specify an exchange ratio, the methodology for determining the cash purchase price, and other terms to be agreed and shall be filed as part of the Plan Supplement.

E.    *Corporate Existence*

Except as otherwise provided in the Plan, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law of the jurisdiction in which the applicable Debtor is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement, or other formation documents in effect on the Effective Date, except to the extent such formation documents are amended pursuant to the Plan, which amendment shall require no further action or approval (other than any requisite filings required under applicable law).

F.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, and any property acquired by the Debtors pursuant to the Plan shall vest in the applicable Reorganized Debtors or, if applicable, any Entities formed pursuant to the Restructuring Transactions, free and clear of all Liens, Claims, Interests, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

The Plan shall be conclusively deemed to be adequate notice that Liens, Claims, Interests, charges, or other encumbrances are being extinguished.  Any Person having a Lien, Claim, Interest, charge, or other encumbrance against any of the property vested in accordance with the foregoing paragraph shall (i) be conclusively deemed to have consented to the transfer, assignment, and vesting of such property to or in the applicable Reorganized Debtor (or, if applicable, any Entities formed pursuant to the Restructuring Transactions) free and clear of all Liens, Claims, Interests, charges, or other encumbrances by failing to object to the confirmation of the Plan and (ii) provide any written consents as required under applicable law to the extent requested by the Debtors or Reorganized Debtors, as applicable.

G.    *Cancellation of Loans, Securities, and Agreements*

Except for the Existing GLAI Equity Interests, the Existing Letters of Credit, and the Glide Notes Indenture (as amended), and except as otherwise provided in the Plan, on the Effective Date: (i) the DIP Documents, 2028 Notes Documents, 2026 Senior Secured Notes Documents, 2024 Senior Exchangeable Notes Documents, Glide Notes, 2025 Senior Notes Documents, Perpetual Notes Documents, and any other certificate, security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or other obligation of, or ownership interest in, a Debtor (except such certificates, securities, shares, notes, purchase rights, options, warrants, or other instruments or documents evidencing a Claim or an Interest that is Reinstated or otherwise retained by the holders thereof pursuant to the Plan), shall, to the fullest extent permitted by applicable law, be deemed cancelled, released, surrendered,

extinguished, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other Person or Entity, and the Reorganized Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes, or other instruments evidencing a Claim or an Interest that is Reinstated pursuant to the Plan or otherwise retained by the holders thereof pursuant to the Plan) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other Person or Entity.

Notwithstanding such cancellation and discharge, the DIP Documents, 2028 Notes Documents, 2026 Senior Secured Notes Documents, Glide Notes, 2024 Senior Exchangeable Notes Documents, 2025 Senior Notes Documents, and Perpetual Notes Documents shall continue in effect solely to the extent necessary to allow (i) the holders of Claims thereunder to receive distributions under the Plan; (ii) the Reorganized Debtors and the applicable Agents/Trustees to take other actions pursuant to the Plan on account of such Claims; (iii) holders of such Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to such documents; (iv) the applicable Agents/Trustees to enforce their rights and claims under such documents against Persons and Entities other than the Debtors or Reorganized Debtors, including any rights to payment of fees, expenses, indemnification obligations, and any Indenture Trustee Charging Lien; (v) the Agents/Trustees to enforce any obligations owed to them under the Plan; (vi) the Agents/Trustees to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the such documents; provided, that nothing in this Article V.G shall affect the discharge of Claims pursuant to the Plan.  The Agents/Trustees shall take all steps and/or execute and/or deliver all instruments or documents, in each case, reasonably requested by the Debtors or Reorganized Debtors, as applicable, to effect the release of the Liens granted pursuant to the DIP Documents, the 2028 Notes Documents, the 2026 Senior Secured Notes Documents, the 2024 Senior Exchangeable Notes Documents, the 2025 Senior Notes Documents, and the Perpetual Notes Documents and/or reflect on the public record the consummation of the payoff, releases, and terminations contemplated thereby.

Except for the foregoing, on the Effective Date, the Agents/Trustees shall be automatically and fully discharged and relieved of all further duties and responsibilities related to such documents; provided, that any provisions of such documents that by their terms survive their termination shall survive in accordance with their terms.

All Indenture Trustee Fees incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with the Plan, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval; provided, that the fees and expenses of Cleary Gottlieb Steen & Hamilton LLP, in its capacity as counsel to the 2024 Senior Exchangeable Notes Trustee, shall be limited in an amount of up to $2,500,000 in the aggregate. The Debtors shall provide the applicable Agents/Trustees notice of the anticipated Effective Date at least seven (7) calendar days in advance thereof.  At least three (3) Business Days before the

anticipated Effective Date, summary invoices for all Indenture Trustee Fees incurred, and an estimate of Indenture Trustee Fees to be incurred (including the cost of providing notice of the Effective Date), up to and including the Effective Date shall be submitted to the Debtors and the Committee; provided, that such estimates shall not be considered an admission or limitation with respect to such Indenture Trustee Fees. From and after the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall pay, upon receipt of summary invoices, all reasonable and documented Indenture Trustee Fees solely to the extent incurred in connection with taking any action required by the Indenture Trustee to implement the Plan or requested by the Debtors or Reorganized Debtors, as applicable.

On and after the final distribution on account of the 2026 Senior Secured Notes Claims, the Glide Notes Claims, the 2024 Senior Exchangeable Notes Claims, the 2025 Senior Notes Claims, and the Perpetual Notes Claims, the 2026 Senior Secured Notes, the Glide Notes, the 2024 Senior Exchangeable Notes, the 2025 Senior Notes, and the Perpetual Notes, as applicable, shall be deemed to be null, void, and worthless, and DTC shall take down the relevant positions at the request of the applicable Agent/Trustee (and such Agent/Trustee shall make such request at the request of the Debtors or Reorganized Debtors, as applicable) without any requirement of indemnification or security on the part of the Agent/Trustee, the Debtors, or the Reorganized Debtors (as applicable).

Upon the payment or other satisfaction of an Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall deliver to the Reorganized Debtors any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests that may be reasonably requested by the Reorganized Debtors to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, *lis pendens*, or similar interests or documents and take all other steps reasonably requested by the Reorganized Debtors that are necessary to cancel and/or extinguish Liens securing such holder's Allowed Other Secured Claim.

H.      *Corporate and Other Entity Action*

On the Effective Date, to the fullest extent permitted by applicable law, all actions contemplated under the Plan (including, for the avoidance of doubt, the documents in the Plan Supplement) shall be deemed authorized and approved in all respects, including: (i) the appointment of the New Boards and any other managers, directors, or officers for the Reorganized Debtors; (ii) the issuance and distribution of the New Equity by New GOL Parent; (iii) the adoption of the New Organizational Documents; (iv) entry into the New Equity Documents; (v) entry into the New Debt Documents; (vii) implementation of the Restructuring Transactions (which may be implemented before, on, or after the Effective Date); and (viii) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for in the Plan involving the corporate or other Entity structure of the Debtors or the Reorganized Debtors, and any corporate or other Entity action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of the Debtors or Reorganized Debtors. On or before the Effective Date, the appropriate officers of the Debtors or Reorganized Debtors, as applicable, shall be authorized and directed to

issue, execute, and deliver the agreements, documents, securities, and instruments and documents contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of the Reorganized Debtors.  The authorizations and approvals contemplated by this Article V.G shall be effective notwithstanding any requirements of any otherwise applicable non-bankruptcy law.

I.      *New Organizational Documents*

On or prior to the Effective Date, the applicable Reorganized Debtors shall, if so required under applicable non-bankruptcy law, file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable persons in their respective states or jurisdictions of organization in accordance with the laws, rules, and regulations of such jurisdictions.  Pursuant to (and only to the extent required by) section 1123(a)(6) of the Bankruptcy Code, the New GOL Parent Organizational Documents shall prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states or jurisdictions of organization or formation and their respective New Organizational Documents without further order of the Bankruptcy Court.

J.      *Directors and Officers of Reorganized Debtors*

1.      New GOL Parent Board

On the Effective Date, the New GOL Parent Board shall consist of a maximum of nine (9) directors, at least one of whom shall be independent and shall serve a minimum term of two (2) years (subject to applicable law), and whose identities will, to the extent known, be disclosed in the Plan Supplement.  The Committee shall be entitled to appoint, in consultation with Abra, an independent director to the initial New GOL Parent Board.  All the other members of the New GOL Parent Board shall be selected by Abra in consultation with the Debtors and the Committee.

Except to the extent that a member of a Debtor's board of directors or managers, as applicable, continues to serve as a director or manager of the corresponding Reorganized Debtor after the Effective Date, such Persons shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date in their capacities as such, and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors or managers, as applicable, of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents and may be replaced or removed in accordance with such documents.

2.      Officers of Reorganized Debtors

Except as otherwise provided in the Plan Supplement, the officers of the Debtors immediately before the Effective Date shall serve as the initial officers of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be in accordance with the Reorganized Debtors' respective organizational documents.

3.    New Subsidiary Boards

On the Effective Date, the applicable New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

K.    *Management Incentive Plan*

The New GOL Parent Board shall determine the percentage of New Equity to allocate to the Management Incentive Plan.

L.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the applicable Reorganized Debtors and their respective officers and members of the boards are authorized to and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of the applicable Reorganized Debtors, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan, or the New Organizational Documents.

M.    *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, (i) the issuance, transfer, or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust, or other security interest, (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated by the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (iv) the grant of collateral under the New Debt Documents, and (v) the issuance, renewal, modification, or securing of indebtedness, and the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument related to the foregoing is to be recorded shall be directed to accept such instrument without requiring the payment of any recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.

N.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to <u>Article IX.D</u>, the Reorganized Debtors shall retain and may enforce, in their discretion and in

accordance with the best interests of the Reorganized Debtors, all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; <u>provided</u>, <u>however</u>, that the Reorganized Debtors waive their rights to assert Preference Actions against holders of General Unsecured Claims (but reserve the right to assert any such Preference Actions solely as counterclaims or defenses to Claims asserted against the Debtors; provided, further, that any such assertion may solely be defensive, without any right to seek or obtain an affirmative recovery on account of any such counterclaim).

**No Person or Entity may rely on the absence of a specific reference in the Plan (including, for the avoidance of doubt, the Plan Supplement) or the Disclosure Statement to any Retained Cause of Action against them as an indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly provided in the Plan, including Causes of Action that are not expressly identified in the Schedule of Retained Causes of Action**.   Unless any Retained Cause of Action is expressly waived, relinquished, exculpated, released, compromised, or settled by the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all available Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of, the confirmation of the Plan or the occurrence of the Effective Date.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed rejected, without the need for any further notice to, or action, order, or approval of, the Bankruptcy Court, as of the Effective Date, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected; (ii) previously expired or terminated pursuant to its own terms; (iii) is the subject of a motion or notice to reject, assume, or assume and assign filed on or before the Confirmation Date; or (iv) is listed on the Schedule of Assumed Contracts.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of such contracts to the Debtors' Affiliates.  Unless previously approved by the Bankruptcy Court, the Confirmation Order will constitute an order approving the above-described rejections, assumptions, and assumptions and assignments, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code, effective on the occurrence of the Effective Date.

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts, which may be amended, supplemented, or otherwise modified through the Effective Date.  Any

objection to the assumption of an Executory Contract or Unexpired Lease under the Plan (other than those Executory Contracts and Unexpired Leases that were previously assumed by the Debtors or are the subject of a motion or notice to assume or assume and assign filed on or before the Confirmation Date) must be filed, served, and actually received by the Debtors no later than seven (7) days prior to the Confirmation Hearing; provided, that, if the Debtors file an amended Schedule of Assumed Contracts prior to the Confirmation Hearing, then, with respect to any lessor or counterparty affected by such amended Schedule of Assumed Contracts, objections to the assumption of the relevant Executory Contract or Unexpired Lease must be filed by the later of (i) ten (10) days from the date the amended Schedule of Assumed Contracts has been filed and served upon the applicable counterparties via electronic mail or overnight courier and (ii) the Confirmation Hearing; provided, further, that if the Debtors file an amended Schedule of Assumed Contracts after the Confirmation Hearing, but prior to the Effective Date, then, with respect to any lessor or counterparty affected by such amended Schedule of Assumed Contracts, objections to the assumption of the relevant Executory Contract or Unexpired Lease must be filed by ten (10) days from the date the amended Schedule of Assumed Contracts is filed and served upon the applicable counterparties via electronic mail or overnight courier; provided, further, that the Debtors may file an amended Schedule of Assumed Contracts after the Effective Date with the consent of the lessors or counterparties affected by such amended Schedule of Assumed Contracts.

To the extent any provision in any Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan restricts, limits or prevents, or purports to restrict, limit or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), any such anti-assignment provision shall be unenforceable pursuant to section 365(f) of the Bankruptcy Code. To the maximum extent permitted by law, such provision shall be deemed modified or stricken such that the transactions contemplated by the Plan shall not entitle the non-Debtor counterparty to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Confirmation of the Plan and consummation of the transactions contemplated by the Plan shall not constitute a change of control under any Executory Contract or Unexpired Lease assumed by the Debtors on or prior to the Effective Date.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each Executory Contract and Unexpired Lease assumed pursuant to this Article VI.A or by any order of the Bankruptcy Court, that has not been assigned to a third party prior to the Effective Date, shall revest in, be fully enforceable by, and constitute binding obligations of the applicable Reorganized Debtor in accordance with its terms (including any amendments entered into after the Petition Date), except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court.

B.    *Aircraft Leases*

1.    Assumption and Rejection of Prepetition Aircraft Leases

With respect to Aircraft Leases entered into before the Petition Date that were not already assumed pursuant to an order of the Bankruptcy Court, that have not previously expired or terminated pursuant to their terms, or that are not subject to a pending motion to assume or pending stipulation providing for assumption filed on or before the Confirmation Date, the Debtors shall

assume only those Aircraft Leases that are designated on the Schedule of Assumed Contracts, which may be amended, supplemented, or otherwise modified through the Effective Date; provided, however, that any Aircraft Lease that has not previously been assumed but is subject to a Lessor Agreement that has been approved by an order of the Bankruptcy Court shall be assumed, on the later of the Effective Date and the date on which the applicable definitive documentation is executed, and, notwithstanding anything to the contrary herein, subject to the terms of the applicable Bankruptcy Court order or Lessor Agreement, without any further action by the Debtors or the Reorganized Debtors, as applicable.

Any agreements or documents by the Debtors that are ancillary to Aircraft Leases that have been previously assumed or are being assumed under the Plan shall be, and shall be deemed, assumed with the applicable Aircraft Lease. To the extent that certain of the Aircraft Leases identified on the Schedule of Assumed Contracts include finance leases of the Debtors that were amended during the course of the Chapter 11 Cases, the debt associated with such leases shall be provided the treatment agreed between the Debtors and other parties in the applicable governing amendment documents. To the extent that contracts of the Debtors that are subject to Lessor Agreements (in each case including documents that are ancillary to such contracts) are not subject to section 365 of the Bankruptcy Code (including so-called finance leases and guarantees by the Debtors), such contracts shall be deemed assumed to the extent necessary to effectuate terms of the Lessor Agreements, and the debt and obligations associated with such contracts, documents and guarantees shall be provided the treatment agreed between the Debtors and other parties in the applicable Lessor Agreements.

Subject to the terms of any Lessor Agreement, to the extent any provision in any Aircraft Lease to be assumed or assumed and assigned pursuant to the Plan restricts, limits or prevents, or purports to restrict, limit or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), any such anti-assignment provision shall be unenforceable pursuant to section 365(f) of the Bankruptcy Code. Subject to the terms of any Lessor Agreement, such provision shall be deemed modified or stricken such that the transactions contemplated by the Plan shall not entitle the non-Debtor counterparty to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. As provided in the applicable Aircraft Lease, confirmation of the Plan and consummation of the transactions contemplated by the Plan shall not constitute a change of control under any Aircraft Lease assumed by the Debtors on or prior to the Effective Date.

With respect to Aircraft Leases not assumed pursuant to the terms hereof, such Aircraft Leases shall be rejected and the property subject to such lease shall be deemed abandoned subject to agreement by the parties or order of the Bankruptcy Court providing for alternative treatment of such Aircraft Lease and/or property.

With respect to any property subject to an Aircraft Lease that has been returned or redelivered to the applicable party, such Aircraft Lease shall be deemed rejected as of the date of such return or redelivery, subject to any agreement of the parties or an order of the Bankruptcy Court providing otherwise.

2.      Aircraft Leases Entered into After the Petition Date

Aircraft Leases entered into after the Petition Date by the Debtors, together with any other agreements or documents by the Debtors that are ancillary to such Aircraft Leases, will be reaffirmed and performed by the applicable Debtor or Reorganized Debtor, as the case may be, in the ordinary course of its business or as authorized by the Bankruptcy Court. Accordingly, such Aircraft Leases, agreements, and documents shall survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable by and against the applicable Reorganized Debtor in accordance with its terms, subject to, and except as such terms may have been modified by, an order of the Bankruptcy Court.

C.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Except as set forth below, Cure Claims shall be satisfied by payment in Cash, on the Effective Date, of the respective amounts set forth on the Schedule of Assumed Contracts or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Subject to satisfaction of any applicable Cure Claims and the terms of any applicable Lessor Agreement, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Subject to the terms of any applicable Lessor Agreement, the resolution of any timely objections in accordance with <u>Article VI.D</u> below, and the satisfaction of any applicable Cure Claims, any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to, or action, order, or approval of, the Bankruptcy Court.

D.      *Dispute Resolution*

To the extent there is a dispute with respect to (i) the amount of a Cure Claim, (ii) the ability of the Reorganized Debtors or the applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code (each, an "<u>Assumption Dispute</u>"), the Debtors or Reorganized Debtors, as applicable, may settle any such Assumption Dispute without any further notice to, or action, order, or approval of, the Bankruptcy Court.

Subject to the terms of any applicable Lessor Agreement, in the event that an Assumption Dispute cannot be resolved consensually and a timely objection is filed by a counterparty, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order). Subject to the terms of any applicable Lessor Agreement, during the pendency of an Assumption Dispute, the applicable counterparty shall continue to perform under the applicable Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that, pending resolution of the Assumption Dispute, the Debtors reserve Cash in an amount sufficient to pay the Cure Claim asserted by the counterparty. Subject to the terms of any applicable Lessor Agreement, to the extent that the Assumption Dispute is resolved unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such resolution.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing; provided, that the Reorganized Debtors may settle any such dispute after the Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

E.    *Rejection Damages Claims*

Any counterparty to an Executory Contract or Unexpired Lease that is rejected by the Debtors pursuant to the Plan must file and serve a Proof of Claim on the applicable Debtor that is party to the Executory Contract or Unexpired Lease to be rejected no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall be Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, as applicable, or any property thereof, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity.**

Claims arising from the rejection of the Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and subject to the provisions of Article VI.D and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

F.    *Insurance Policies & Indemnification Obligations*

Notwithstanding anything to the contrary in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Plan Support Agreement, the New Debt Documents, the Incremental New Money Equity Documents, the New Equity Documents, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including any provision that purports to be preemptory or supervening; grants an injunction, discharge, or release; confers Bankruptcy Court jurisdiction; or requires a party to opt out of any releases):

(i)    each of the Insurance Contracts, including all D&O Policies, shall be deemed to have been assumed such that the applicable Reorganized Debtors shall become and remain liable in full for all of their and the applicable Debtors' obligations under the Insurance Contracts, regardless of whether such obligations arise on, before, or after the Effective Date, without the requirement or need for any Insurer to file a Proof of Claim or a request for payment of an Administrative Expense; provided, that the Reorganized Debtors shall not indemnify their

respective officers, directors, equity holders, agents, or employees for any claims or Causes of Action arising out of or relating to any act or omission that constitutes a criminal act, intentional fraud, gross negligence, or willful misconduct;

(ii)    nothing shall alter, modify, amend, waive, release, discharge, prejudice, or impair in any respect (a) the terms and conditions of any Insurance Contract, (b) any rights or obligations of the Debtors or the Reorganized Debtors, as applicable, or Insurers thereunder, whether arising before or after the Effective Date, or (c) the duty, if any, of Insurers to pay claims covered by the Insurance Contracts or the right to seek payment or reimbursement from the Debtors or the Reorganized Debtors, as applicable, or to draw on any collateral or security therefor; and

(iii)    the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article IX.G, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; and (b) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article IX.G to proceed with its claim, and (3) all costs in relation to each of the foregoing.

In addition, after the Effective Date, all current and former officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, solely to the extent set forth in such D&O Policies and subject to any terms and conditions thereof.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy in effect as of the Petition Date; provided, that, for the avoidance of doubt, any Insurance Contract, including tail insurance policies, for directors', members', trustees', and officers' liability to be purchased or maintained by the Reorganized Debtors after the Effective Date shall be subject to the ordinary-course corporate governance of the Reorganized Debtors.

Notwithstanding anything in the Plan, any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, sponsors, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan (including, for the avoidance of doubt, the Plan Supplement) or the Confirmation Order, (iii) not be limited, reduced, or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on, or after the Petition Date; provided, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation.  All such obligations shall be deemed and treated as Executory Contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the

Reorganized Debtors, and, if necessary to effectuate such assumption under local law, New GOL Parent shall contractually assume such obligations.  Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed and, if applicable, assigned to the Reorganized Debtors, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of such Executory Contracts or Unexpired Leases, or the validity, priority, or amount of any Claim that may arise in connection therewith, unless expressly noted therein.

H.    *Reservation of Rights*

Nothing contained in the Plan shall constitute an admission by the Debtors that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that any Debtor or the Reorganized Debtor has any liability thereunder.

I.    *Contracts and Leases (other than Aircraft Leases) Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor, as the case may be, in the ordinary course of its business or as authorized by the Bankruptcy Court.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

J.    *Compensation and Benefits Plans*

All employment, confidentiality, and non-competition agreements, collective bargaining agreements, offer letters (including any severance set forth therein), bonus, gainshare and incentive programs, additional pay required by Brazilian and other local law, vacation pay, holiday pay, severance, retirement, supplemental retirement, indemnity, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs, agreements, and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations (including, for the avoidance of doubt, letter agreements with respect to certain employees' rights and obligations in the event of certain terminations of their employment in connection with and following the implementation of the Restructuring Transactions) are deemed to be, and shall be

treated as, Executory Contracts under the Plan and, on the Effective Date, shall be deemed assumed (or, in the event that GLAI is party to such agreements or arrangements, assumed and assigned to New GOL Parent) pursuant to sections 365 and 1123 of the Bankruptcy Code (in each case, as amended prior to or on the Effective Date).

# ARTICLE VII
## PROCEDURES FOR RESOLVING
## CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims and Interests*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order (including the Confirmation Order) Allowing such Claim.  On and after the Effective Date, each of the Reorganized Debtors shall have, and retain any and all rights and defenses the corresponding Debtor had, with respect to any Claim immediately before the Effective Date.

B.    *Claims Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim without any further notice to, or action, order, or approval of, the Bankruptcy Court; and (iii) to administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein or by an order of the Bankruptcy Court, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim, including the Retained Causes of Action.

C.    *General Unsecured Claim Observer*

The Committee may appoint, as of the Effective Date, a Person or Entity with duties limited in all respects as set forth herein to consult with the Reorganized Debtors with respect to the Allowance of any General Unsecured Claims in excess of $5 million (the "General Unsecured Claim Observer"); provided, that the General Unsecured Claim Observer shall have standing to appear before the Bankruptcy Court with respect to matters arising out of or related to reconciliation, Allowance, and settlement of any General Unsecured Claims, as well as any objections thereto.

The General Unsecured Claim Observer may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties described in this Article VII.C, and the reasonable and documented costs of the General Unsecured Claim Observer, including reasonable and documented external professionals' fees and expenses, shall be reimbursed by the Reorganized Debtors in the ordinary course of business in an aggregate amount not to exceed $250,000 as soon as reasonably practicable after invoiced.  In addition, subject to the fee cap in

the preceding sentence, the General Unsecured Claim Observer may review and respond to inquiries from holders of Claims regarding distributions and implementation of the Plan and consult with the Reorganized Debtors with respect to the selection of the Distribution Dates.

The General Unsecured Claim Observer will be selected by a majority of the members of the Committee in accordance with the Committee's by-laws and will be identified prior to the Confirmation Hearing. The General Unsecured Claim Observer's role is to represent the interests of all holders of General Unsecured Claims. The General Unsecured Claim Observer will work with the Reorganized Debtors to ensure that Claims are reconciled, and distributions are made, in a fair and equitable manner. The General Unsecured Claim Observer minimizes the risk that the Reorganized Debtors reconcile General Unsecured Claims in a way that leads to Claims being Allowed at too high of an amount (which would otherwise harm all holders of General Unsecured Claims). The Debtors will be free to reconcile claims below $5,000,000 without oversight by the General Unsecured Claim Observer because the costs of such oversight would outweigh the benefits to all holders of General Unsecured Claims, whose claims in the aggregate are in excess of $1,000,000,000. Any Distribution Date selected in consultation with the General Unsecured Claim Observer will apply to all holders of General Unsecured Claims regardless of the size of any such holder's Claim.

Upon the death, resignation, or removal of the General Unsecured Claim Observer, the Reorganized Debtors shall appoint a successor General Unsecured Claim Observer with approval of the Bankruptcy Court. Upon the resolution of all Disputed General Unsecured Claims, the General Unsecured Claim Observer shall be released and discharged of and from further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Cases.

D.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may at any time request the Bankruptcy Court to estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to the ultimate Allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another.

E.    *Adjustment to Claims Register Without Objection*

Any duplicate Claim or any Claim that has been paid or otherwise satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims register by the Debtors or Reorganized Debtors, as applicable, upon stipulation between the parties without an objection to such Claim having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

F.    *Time to File Objections to Claims*

The Debtors and Reorganized Debtors, as applicable, shall be entitled to object to Claims. After the Effective Date, except as expressly provided herein to the contrary, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim, except with respect to any Claim that is Allowed.  Any objections to Proofs of Claim shall be served and filed on or before the later of (i) 180 days after the Effective Date, and (ii) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors filed before the date that is 180 days after the Effective Date.  Any Claims for which the Debtors do not timely file an objection to Proof of Claim pursuant to this section shall be Allowed.  The expiration of such period shall not limit or affect the Debtors' rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

G.    *Disallowance of Claims*

Any Claims held by a Person or Entity from whom property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, or 549 of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims shall not receive any distributions on account of such Claims until such time as the applicable Cause of Action against that Person or Entity has been settled or a Bankruptcy Court order with respect thereto has been entered, and, if such Cause of Action has been resolved in favor of the applicable Debtor, all sums due from that Person or Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable.  All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and may be expunged from the Claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

H.    *Amendments to Claims*

On and after the Effective Date, a Claim may not be amended without the prior authorization of the Reorganized Debtors or order of the Bankruptcy Court.

I.    *No Distributions Pending Allowance*

If an objection, motion to estimate, or other challenge to a Claim is filed, or if the time to object to a Claim has not elapsed and the Claim has not been Allowed by the Plan or by Final

Order, then no distribution shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

J.      *Distributions After Allowance*

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction Allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable non-bankruptcy law.

K.      *Disputed Claims Reserve*

The Disputed Claims Reserve shall be established and funded on or about the Effective Date.  Any property that would be distributable in respect of any Disputed General Unsecured Claim had such Disputed General Unsecured Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), as applicable, shall be deposited in the Disputed Claims Reserve.  The amount of, or the amount of property constituting, the Disputed Claims Reserve shall be determined prior to the Confirmation Hearing, based on the Debtors' good faith estimates or an order of the Bankruptcy Court estimating such Disputed Claims.

The Disputed Claims Reserve shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

To the extent that a Disputed General Unsecured Claim becomes an Allowed Claim after the Initial Distribution Date, the Disbursing Agent shall distribute to the holder thereof out of the Disputed Claims Reserve any property to which such holder is entitled hereunder (net of any allocable taxes imposed thereon or otherwise incurred or payable by the Disputed Claims Reserve, including in connection with such distribution) in accordance with Article VIII.A.

The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Claims Reserve for all taxable periods through the date on which final distributions are made.

In the event the assets of the Disputed Claims Reserve are insufficient to satisfy all the Disputed General Unsecured Claims that have become Allowed, such Allowed General Unsecured Claims shall be satisfied Pro Rata from any remaining assets.  After all assets in the Disputed Claims Reserve have been distributed, no further distributions shall be made in respect of Disputed General Unsecured Claims.  At such time as all Disputed General Unsecured Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed Pro Rata to all holders of Allowed General Unsecured Claims.

On or before the Effective Date, in accordance with the terms of the Transaction Steps, a number of shares of New Equity equal to the General Unsecured Claimholder Distribution will be authorized and issued. On, or as soon as reasonably practicable after, the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will determine the number of shares of New Equity that can be distributed to holders of Allowed General Unsecured Claims, while reserving a sufficient number of shares of New Equity (the "Reserved Shares") to provide an equal percentage of recovery to holders of Disputed General Unsecured Claims should such Disputed General Unsecured Claims be Allowed in full. The Reserved Shares will be held in the Disputed Claims Reserve. Holders of Allowed General Unsecured Claims on the Effective Date, or if such claim is Allowed thereafter, will have the right to receive shares of New Equity that are deposited in the Disputed Claim Reserve but ultimately not distributed to holders of Disputed Claims that are ultimately Disallowed. At the time of the General Unsecured Claimholder Distribution, or at each such later date as a Disputed General Unsecured Claims becomes an Allowed General Unsecured Claim and a distribution is paid thereon, New GOL Parent will keep a register of distributions and obtain an escrow CUSIP which corresponds to the holder's right to receive a pro rata portion of the Reserved Shares that are not distributed to Disputed Claims that are ultimately Disallowed. Holders of Allowed General Unsecured Claims who hold their Allowed General Unsecured Claims through DTC will receive their escrow CUSIP through DTC at the time their distribution of New Equity is issued. All holders of Allowed General Unsecured Claims who hold their Allowed General Unsecured Claims outside of DTC will be tracked on a separate register maintained by New GOL Parent. The escrow CUSIP number and any interest related thereto will be non-transferable whether it is held in DTC or separately on the register maintained by New GOL Parent. Upon resolution of all Disputed General Unsecured Claims, the remaining Reserved Shares (if any) will be released and distributed Pro Rata to the holders of Allowed General Unsecured Claims with the escrow CUSIP number through DTC (to the extent that the escrow CUSIP is held in DTC) or to New GOL Parent's register.

L.    *Claims Resolution Procedures Cumulative*

All of the objection, estimation, and resolution procedures with respect to Disputed Claims are cumulative and not exclusive of one another. Claims may be, with the consent of the holders of the Claims, estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

## ARTICLE VIII
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, and subject to any reserves or holdbacks established pursuant to the Plan, on the applicable Distribution Date or as soon as reasonably practicable thereafter, each holder of an Allowed Claim shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class as of such date. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day.

If and to the extent there are Disputed Claims as of the applicable Distribution Date, distributions on account of such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in the Plan on or as soon as reasonably practicable after the next Distribution Date that is after the Allowance of each such Claim.  No interest shall be paid on any Disputed Claim that becomes an Allowed Claim after the Initial Distribution Date.

For the avoidance of doubt, the Reorganized Debtors shall retain the ability to pay Claims pursuant to a prior Bankruptcy Court order after the Effective Date.  The Debtors and Reorganized Debtors shall be entitled to withhold distributions on any Claim that they intend to pay pursuant to such an order.

B.    *Disbursing Agent*

Unless otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on the applicable Distribution Date.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.    *Rights and Powers of Disbursing Agent*

1.    Powers of the Disbursing Agent

Without further order of the Bankruptcy Court, the Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes and reasonable attorney fees and expenses) in connection with making distributions shall be paid in Cash by the Reorganized Debtors.

D.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions in General

Except as otherwise provided in the Plan or Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the applicable Proofs of Claim (or, if no Proof of Claim has been filed, the Debtors' records as of the date of any such distribution); provided, however, that the manner of such distributions shall be determined at the reasonable discretion of

the Disbursing Agent.  For the avoidance of doubt, the Distribution Record Date shall not apply to holders of public Securities.

2.    Delivery of Distributions on 2028 Notes Claims

Except as otherwise reasonably requested by holders of Allowed 2028 Notes Claims, all distributions to holders of Allowed 2028 Notes Claims shall be deemed completed when made to such holders.

3.    Delivery of Distributions on 2026 Senior Secured Notes Claims

Except as otherwise reasonably requested by the 2026 Senior Secured Notes Trustee, all distributions to holders of Allowed 2026 Senior Secured Notes Claims shall be deemed completed when made to the 2026 Senior Secured Notes Trustee.  The 2026 Senior Secured Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed 2026 Senior Secured Notes Claims.  As soon as practicable following the Effective Date, the 2026 Senior Secured Notes Trustee shall arrange to deliver such distributions to or on behalf of its holders in accordance with the terms of the applicable 2026 Senior Secured Notes Documents and the Plan.

Notwithstanding anything in the Plan to the contrary, the 2026 Senior Secured Notes Trustee shall not have any liability to any Person or Entity with respect to distributions made or directed to be made by the 2026 Senior Secured Notes Trustee in accordance with the Plan, nor shall the 2026 Senior Secured Notes Trustee have any obligation to make any distribution that is not delivered to it in a form that is distributable through the facilities of the DTC.  The 2026 Senior Secured Notes Trustee shall be deemed a "Servicer" for purposes of the Plan.

4.    Delivery of Distributions on 2025 Senior Notes

Except as otherwise reasonably requested by the 2025 Senior Notes Trustee, all distributions to holders of Allowed 2025 Senior Notes Claims shall be deemed completed when made to the 2025 Senior Notes Trustee.  The 2025 Senior Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed 2025 Senior Notes Claims.  As soon as practicable following the Effective Date, the 2025 Senior Notes Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the holders of Allowed 2025 Senior Notes Claims in accordance with the terms of the applicable 2025 Senior Notes Documents, the Plan, and the Confirmation Order.  Subject to the applicable Indenture Trustee Charging Lien, the 2025 Senior Notes Trustee (at its election) may transfer, direct the transfer of, or facilitate such distributions (and may rely upon information received from the Debtors or the Disbursing Agent for purposes of such transfer) directly through the facilities of DTC in accordance with DTC's customary practices.  Additionally, the 2025 Senior Notes Trustee may (but is not required to) establish its own record date for distributions to holders of Allowed 2025 Senior Notes Claims.  DTC shall be considered a single holder of all 2025 Senior Notes Claims for purposes of distributions hereunder.

Notwithstanding anything in the Plan to the contrary, the 2025 Senior Notes Trustee shall not have any liability to any Person or Entity with respect to distributions made or directed to be made by the 2025 Senior Notes Trustee in accordance with the Plan, nor shall the 2025 Senior Notes Trustee have any duty, obligation, or responsibility to make, or liability whatsoever with

respect to, any distribution that is not delivered to it in a form that is distributable through the facilities of the DTC, and the Debtors or the Reorganized Debtors, as applicable, shall make such distributions (subject to the applicable Indenture Trustee Charging Lien). The 2025 Senior Notes Trustee shall be deemed a "Servicer" for purposes of the Plan.

5.      Delivery of Distributions on 2024 Senior Exchangeable Notes

Except as otherwise reasonably requested by the 2024 Senior Exchangeable Notes Trustee, all distributions to holders of Allowed 2024 Senior Exchangeable Notes Claims shall be deemed completed when made to the 2024 Senior Exchangeable Notes Trustee. The 2024 Senior Exchangeable Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed 2024 Senior Exchangeable Notes Claims. As soon as practicable following the Effective Date, the 2024 Senior Exchangeable Notes Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the holders of Allowed 2024 Senior Exchangeable Notes Claims in accordance with the terms of the applicable 2024 Senior Exchangeable Notes Documents, the Plan, and the Confirmation Order. Subject to the applicable Indenture Trustee Charging Lien, the 2024 Senior Exchangeable Notes Trustee (at its election) may transfer, direct the transfer of, or facilitate such distributions (and may rely upon information received from the Debtors or the Disbursing Agent for purposes of such transfer) directly through the facilities of DTC in accordance with DTC's customary practices. Additionally, the 2024 Senior Exchangeable Notes Trustee may (but is not required to) establish its own record date for distributions to holders of Allowed 2024 Senior Exchangeable Notes Claims. DTC shall be considered a single holder of all 2024 Senior Exchangeable Notes Claims for purposes of distributions hereunder.

Notwithstanding anything in the Plan to the contrary, the 2024 Senior Exchangeable Notes Trustee shall not have any liability to any Person or Entity with respect to distributions made or directed to be made by the 2024 Senior Exchangeable Notes Trustee in accordance with the Plan, nor shall the 2024 Senior Exchangeable Notes Trustee have any duty, obligation, or responsibility to make, or liability whatsoever with respect to, any distribution that is not delivered to it in a form that is distributable through the facilities of the DTC, and the Debtors or the Reorganized Debtors, as applicable, shall make such distributions (subject to the applicable Indenture Trustee Charging Lien). The 2024 Senior Exchangeable Notes Trustee shall be deemed a "Servicer" for purposes of the Plan.

6.      Delivery of Distributions on Perpetual Notes

Except as otherwise reasonably requested by the Perpetual Notes Trustee, all distributions to holders of Allowed Perpetual Notes Claims shall be deemed completed when made to the Perpetual Notes Trustee. The Perpetual Notes Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Perpetual Notes Claims. As soon as practicable following the Effective Date, the Perpetual Notes Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the holders of Allowed Perpetual Notes Claims in accordance with the terms of the applicable Perpetual Notes Documents, the Plan, and the Confirmation Order. Subject to the applicable Indenture Trustee Charging Lien, the Perpetual Notes Trustee (at its election) may transfer, direct the transfer of, or facilitate such distributions (and may rely upon information received from the Debtors or the Disbursing Agent for purposes of such transfer) directly through the facilities of DTC in accordance with DTC's customary practices.

Additionally, the Perpetual Notes Trustee may (but is not required to) establish its own record date for distributions to holders of Allowed Perpetual Notes Claims. DTC shall be considered a single holder of all Perpetual Notes Claims for purposes of distributions hereunder.

Notwithstanding anything in the Plan to the contrary, the Perpetual Notes Trustee shall not have any liability to any Person or Entity with respect to distributions made or directed to be made by the Perpetual Notes Trustee in accordance with the Plan, nor shall the Perpetual Notes Trustee have any duty, obligation, or responsibility to make, or liability whatsoever with respect to, any distribution that is not delivered to it in a form that is distributable through the facilities of the DTC, and the Debtors or the Reorganized Debtors, as applicable, shall make such distributions (subject to the applicable Indenture Trustee Charging Lien). The Perpetual Notes Trustee shall be deemed a "Servicer" for purposes of the Plan.

       7.      Delivery of Distributions on Glide Notes

On or about the Effective Date, Reorganized GFL shall issue, and the Amended Glide Notes Trustee shall authenticate, the Amended Glide Notes. As soon as practicable following the Effective Date, the Amended Glide Notes Trustee shall distribute, (i) to each Person or Entity in whose name a 5.00% Senior Secured Note due 2026 is registered in the Register (as defined in the Amended Glide Notes Indenture) as of the Effective Date, such holder's Pro Rata share of the Amended Glide Senior Notes, and (ii) to each Person in whose name a 3.00% Subordinated Secured Note due 2025 is registered in the Register (as defined in the Amended Glide Notes Indenture) as of the Effective Date, such holder's Pro Rata share of the Amended Glide Subordinated Notes. Except as otherwise reasonably requested by the Glide Notes Trustee, all Cash distributions to holders of Allowed Glide Notes Claims shall be deemed completed when made to the Glide Notes Trustee on the Effective Date. The Glide Notes Trustee shall direct such Cash distributions for the benefit of the holders of Allowed Glide Notes Claims. As soon as practicable following the Effective Date, the Glide Notes Trustee shall arrange to deliver or direct the delivery of such Cash distributions to or on behalf of the holders of Allowed Glide Notes Claims in accordance with the terms of the applicable Glide Notes Documents, the Plan, and the Confirmation Order; provided, however, notwithstanding anything to the contrary contained in the Glide Notes Documents, the record date and the payment date for Cash distributions to holders of Allowed Glide Notes Claims shall be the Effective Date. Between the Confirmation Date and the date that all Cash distributions to holders of Allowed Glide Notes Claims have been made under the Plan, the Glide Notes Trustee and the Amended Glide Notes Trustee shall not be required to recognize any transfers of the Glide Notes. In connection with all distributions to holders of Allowed Glide Notes Claims, the Glide Notes Trustee and the Amended Glide Notes Trustee may rely upon information received from the Debtors or the Disbursing Agent for purposes of such distribution.

Notwithstanding anything in the Plan to the contrary, the Glide Notes Trustee and the Amended Glide Notes Trustee shall not have any liability to any Person or Entity with respect to distributions made or directed to be made by the Glide Notes Trustee, the Amended Glide Notes Trustee, or the Debtors in accordance with the Plan. Each of the Glide Notes Trustee and the Amended Glide Notes Trustee shall be deemed a "Servicer" for purposes of the Plan.

8.      Minimum Distributions

No (i) fractional shares of New Equity or (ii) Cash payments of less than $50 shall be distributed to any holder of an Allowed Claim on account of such Allowed Claim.  When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of such New Equity shall be rounded as follows: (i) fractions of greater than one-half (½) shares of New Equity shall be rounded to the next higher whole number and (ii) fractions of one-half (½) or less of New Equity shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Equity to be distributed to the holders of Allowed Claims may be adjusted as necessary to account for the foregoing rounding.

9.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, that any distribution that remains undeliverable for one year from the date on which such distribution was attempted to be made shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.  After such date, all unclaimed property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property shall be discharged and forever barred. The Reorganized Debtors shall use reasonable efforts in light of anticipated costs to redeliver any such unclaimed property to the intended recipient.

E.      *Exemption from Securities Laws*

No registration statement will be filed under the Securities Act, or pursuant to any state, local, or other applicable securities laws, with respect to the offer and distribution of securities under the Plan.  The offer, issuance, and distribution under the Plan of (i) the New Equity other than any (x) Incremental New Money Equity and (y) New Equity issued upon exchange of the Incremental New Money Exchangeable Debt and (ii) to the extent the Exchangeable Take-Back Notes, Non-Exchangeable Take-Back Notes, Amended Glide Notes, or Amended Safra Notes are issued in the form of notes or other securities under the Plan (collectively, the "Section 1145 Securities") shall be exempt, without further act or actions by any Person or Entity, from registration under the Securities Act and any state, local, or other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code, subject to certain exceptions, including those described below.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act and state and local securities laws the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security

through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right.

In reliance upon this exemption, the Section 1145 Securities will be exempt from the registration requirements of the Securities Act and state and local securities laws. Subject to the restrictions on transfer, if any, and other applicable provisions set forth in the New Organizational Documents, the Section 1145 Securities will, upon initial issuance under the Plan, be freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, and (iii) is not an Entity that is an "underwriter" as that term is defined in section 1145(b) of the Bankruptcy Code, and may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act. In addition, subject to the restrictions on transfer, if any, and other applicable provisions set forth in the New Organizational Documents, such Section 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. Notwithstanding anything to the contrary set forth herein, the Debtors, Abra and the Committee agree that the terms of the Section 1145 Securities and the New Organizational Documents shall contain restrictions on transfer and such other terms and conditions as are necessary to ensure that none of the Section 1145 Securities are required by Section 12 of the Exchange Act to be registered thereunder at the Effective Time or thereafter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (i) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or an interest; (ii) offers to sell securities offered or sold under a plan for the holders of such securities; (iii) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an "issuer" of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities (*i.e.*, "affiliates"). The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent

79

(10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act, as described below.

Whether or not any particular Person would be deemed to be an underwriter with respect to the Section 1145 Securities or other security to be issued pursuant to the Plan and the Confirmation Order would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving the Section 1145 Securities or other securities under the Plan and the Confirmation Order would be an underwriter with respect to such Section 1145 Securities or other securities, whether such Person may freely resell such securities or the circumstances under which they may resell such securities. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act.

The offer, sale, issuance, and distribution under the Plan of any category of securities that would constitute Section 1145 Securities but are issued to a Person or Entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code (the "Underwriter Securities"), shall be exempt from registration under the Securities Act and any other applicable securities laws in reliance on the exemption from registration set forth in section 4(a)(2) under the Securities Act and/or Regulation D promulgated thereunder or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act or equivalent state law registration exemptions. In addition, the offer, sale, issuance and distribution under the Plan of the Exit Notes, any Incremental New Money Exit Financing, and New Equity issued upon exchange of any Incremental New Money Exchangeable Debt, in each case to the extent issued in the form of notes or other securities under the Plan (the "New Money Securities"), will be issued without registration under the Securities Act in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act, Regulation S or Regulation D promulgated thereunder, and similar registration exemptions applicable outside of the United States. The Underwriter Securities and the New Money Securities are collectively referred to herein as the "4(a)(2) Securities."

The 4(a)(2) Securities will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities, such as the 4(a)(2) Securities, if certain conditions are met. Generally, Rule 144 would permit the public

sale of securities received by such Person if, at the time of the sale, certain current public information regarding the issuer is available, and only if such Person also complies with the volume, manner of sale, and notice requirements of Rule 144. If the issuer is not subject to the reporting requirements of section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), adequate current public information as specified under Rule 144 is available if certain company information is made publicly available, as specified in section (c)(2) of Rule 144.

These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the ninety days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, such holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

While GLAI is currently a public reporting company under section 12(g) of the Exchange Act, it is currently contemplated, and accordingly holders of Claims should assume, that Reorganized GLAI will not be subject to the reporting requirements of section 13 or 15(d) of the

Exchange Act; however, there may be a period after emergence from chapter 11 during which Reorganized GLAI is subject to the reporting requirements of section 13 or 15(d). As described above, if Reorganized GLAI is not subject to the reporting requirements of section 13 or 15(d) after emergence, the holding period will be one year. However, such holding period will decrease from one year to six months if Reorganized GLAI is subject to the reporting requirements of section 13 or 15(d) after emergence from chapter 11.

F.    *Compliance with Tax and Antitrust Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. Notwithstanding the above, each holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations. The Reorganized Debtors may require, as a condition to making a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9 or a similar form applicable to such holder.

The Debtors, Reorganized Debtors, and the Disbursing Agent are authorized to take all actions necessary or appropriate to ensure that any distribution under the Plan complies with, and would not violate, applicable Brazilian law, including any relevant antitrust laws. In order to comply with applicable law, the Debtors, the Reorganized Debtors, and the Disbursing Agent may, prior to making any distribution of New Equity under the Plan to any claimant holding Allowed Claims in excess of $500 million, require that such claimant provide the Debtors, Reorganized Debtors, or Disbursing Agent, as applicable, with additional disclosures reasonably necessary for the Debtors or Reorganized Debtors, as applicable, to comply with applicable law. Failure to provide any such requested information may result in the holdback of any distribution pending receipt of such information. To the extent that failure to disclose any required information, including failure to make any required representation as set forth in the Transaction Steps, results in violation of any applicable law, such claimant may have their distribution forfeited or, if the claimant has already received a distribution, be held directly liable for violation of such laws as well as be held liable for any damages incurred by the Reorganized Debtors, including any fines and/or penalties imposed on the Reorganized Debtors.

G.    *No Postpetition Interest on Claims and Interests*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Bankruptcy Court order, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest on such Claim accruing on or after the Petition Date.

H.    *Setoffs and Recoupment*

Except for Claims that are expressly Allowed hereunder or pursuant to a Final Order, the Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the applicable Debtors or the Reorganized Debtors may have against the holder of such Claim; provided, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.

I.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

A Claim shall be Disallowed without an objection having to be filed and without any further notice to, or action, order, or approval of, the Bankruptcy Court, to the extent and in the amount that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor or Reorganized Debtor; provided, however, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to the party that is not a Debtor or Reorganized Debtor, and such holder in fact repays all or a portion of the Claim to such third party, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and subject to the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.  To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the applicable portion of the distribution to the applicable Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each day after the 10-day grace period specified above until such amount is repaid.

2.    Claims Payable by Third Parties

To the extent that one or more of the Debtors' Insurers, in its role as an insurer (but not in any role as the issuer of surety bonds or similar instruments or as a guarantor of payment), agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then, immediately upon such Insurers' payment thereof, the applicable portion of such Claim may be expunged without an objection having to be filed and

without any further notice to, or action, order, or approval of, the Bankruptcy Court; provided, however, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to the Insurer, and such holder in fact repays all or a portion of the Claim to such Insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and subject to the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.

3.     Applicability of Insurance Contracts

Except as otherwise provided in the Plan, distributions to holders of Claims covered by Insurance Contracts shall be in accordance with the provisions of any applicable Insurance Contract.  Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including any holders of Claims, may hold against any other Entity under any Insurance Contract, including against Insurers or any insured, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

J.     *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to the holders of Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION,
## AND RELATED PROVISIONS

A.     *Compromise and Settlement*

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that all compromises and settlements reflected in the Plan are (i) fair, equitable, and reasonable, and (ii) in the best interests of the Debtors, their Estates, and their creditors.  The Confirmation Order shall authorize and approve the compromises, settlements, and releases of all contractual, legal, and equitable rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto except as specified on the Schedule of Retained Causes of Action. Notwithstanding anything herein to the contrary, nothing in the Plan shall compromise or settle any (i) Causes of Action that the Debtors or Reorganized Debtors, as applicable, may have against any Person or Entity that is not a Released Party, (ii) Causes of Action that are preserved pursuant to Article V.N, (iii) Causes of Action included on the Schedule of Retained Causes of Action, or (iv) Unimpaired Claims or Interests.

The allowance, classification, and treatment of Allowed Claims of any Released Party take into account any Causes of Action, whether under the Bankruptcy Code or under applicable non-bankruptcy law, that the Debtors may have against such Released Party as of the Effective Date, and all such Causes of Action are settled, compromised, and released as set forth in the Plan except as specified on the Schedule of Retained Causes of Action.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, after the Effective Date, the applicable Reorganized Debtors may, in their sole and absolute discretion, compromise and settle (i) Claims (including Causes of Action) not previously Allowed (if any) and (ii) claims (including Causes of Action) against other Persons or Entities.

B.      *Discharge of Claims and Termination of Interests*

Except as otherwise provided in the Plan, effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of such Claims and Interests, including any interest accrued on Claims from and after the Petition Date; (ii) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holder failed to vote to accept or reject the Plan or voted to reject the Plan; and (iii) all Persons and Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, the successors and assigns of the foregoing, and their respective assets and properties any Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.

C.      *Release of Liens*

**Except as otherwise expressly provided in the Plan or in any contract, instrument, release, or other agreement or document that is created, amended, ratified, entered into, or Reinstated pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, and any other security interests with respect to any property of the Estates, subject to the consummation of the applicable distributions contemplated in the Plan, shall be released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors. The Agents/Trustees shall be directed to release any mortgages, deeds of trust, Liens, pledges, or other security interests they hold and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, or other security interests, including the execution, delivery, and filing or recording of any documents or instruments that may be required to effectuate the foregoing, in each case, at the Reorganized Debtors' sole cost and expense. On and after the Effective Date, the Reorganized Debtors (and any of their agents, attorneys, or designees) shall be authorized to execute and file on behalf of the applicable creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases, or such other forms or release documents in any jurisdiction as may be necessary or appropriate to evidence such releases and implement the provisions of this Article IX.C.**

D.      *Release by the Debtors*

**Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, to the maximum extent permitted by applicable law, the Debtors, the Reorganized Debtors, and the Estates (in each case on behalf of themselves and their respective successors, assigns, and representatives) are deemed to have conclusively, absolutely, unconditionally,**

irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Estates (and in each case their respective successors, assigns, and representatives) would have been legally entitled to assert (whether individually or collectively), including any derivative claims or Causes of Action assertable on behalf of any Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Chapter 11 Cases, the DIP Facility, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security or other debt instrument of the Debtors or Reorganized Debtors, the assumption, rejection, or amendment of any Executory Contract or Unexpired Lease, the subject matter of, or the transactions or events giving rise to, any Claim or Interest dealt with in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, and the negotiation, formulation, preparation, entry into, consummation, or dissemination of (i) the DIP Facility Documents, (ii) the Plan Support Agreement, (iii) the Disclosure Statement, (iv) the Plan (including, for the avoidance of doubt, the Plan Supplement), (v) the Transaction Steps, (vi) the Restructuring Transactions, (vii) the New Debt Documents, (viii) the Incremental New Money Equity Documents, (ix) the New Equity Documents, or (x) any related agreements, instruments, or other documents, in each case, in connection with or relating to any act or omission, transaction, event, or other occurrence taking place on or before the Effective Date, other than claims unknown to the Debtors as of the Effective Date arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence.    Notwithstanding anything to the contrary in the foregoing, the release granted in this <u>Article IX.D</u> does not release any post-Effective Date obligations or liabilities of any Person or Entity under the Plan, any assumed Executory Contract or Unexpired Lease, or agreement or document that is created, amended, ratified, entered into, or Reinstated pursuant to the Plan (including the New Debt Documents, the Incremental New Money Equity Documents, and the New Equity Documents).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the release described in this <u>Article IX.D</u> and shall constitute the Bankruptcy Court's finding that such release (i) is an essential means of implementing the Plan; (ii) is an integral and non-severable element of the Plan and the transactions incorporated herein; (iii) confers substantial benefits on the Estates; (iv) is given in exchange for good and valuable consideration provided by the Released Parties; (v) constitutes a good-faith settlement and compromise of the claims and Causes of Action released by this <u>Article IX.D</u>; (vi) is in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (vii) is fair, equitable, and reasonable; and (viii) is given after due notice and opportunity for hearing.   The release described in this <u>Article IX.D</u> shall, on the Effective Date, have the effect of *res judicata* to the fullest extent permissible under applicable laws of Brazil and any other jurisdiction in which the Debtors operate.

E.    *Releases by Holders of Claims or Interests*

Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of a Claim or Interest, including any derivative claims or Causes of Action assertable on behalf of any Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Chapter 11 Cases, the DIP Facility, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security or other debt instrument of the Debtors or Reorganized Debtors, the assumption, rejection, or amendment of any Executory Contract or Unexpired Lease, the subject matter of, or the transactions or events giving rise to, any Claim or Interest dealt with in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, and the negotiation, formulation, preparation, entry into, consummation, or dissemination of (i) the DIP Facility Documents, (ii) the Plan Support Agreement, (iii) the Disclosure Statement, (iv) the Plan (including, for the avoidance of doubt, the Plan Supplement), (v) the Transaction Steps, (vi) the Restructuring Transactions, (vii) the New Debt Documents, (viii) the Incremental New Money Equity Documents, (ix) the New Equity Documents, or (x) any related agreements, instruments, or other documents, in each case, in connection with or relating to any act or omission, transaction, event, or other occurrence taking place on or before the Effective Date, other than claims unknown to such Releasing Party as of the Effective Date arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence.    Notwithstanding anything to the contrary in the foregoing, the releases granted in this <u>Article IX.E</u> do not release any post-Effective Date obligations or liabilities of any Person or Entity under the Plan, any assumed Executory Contract or Unexpired Lease, or agreement or document that is created, amended, ratified, entered into, or Reinstated pursuant to the Plan (including the New Debt Documents, the Incremental New Money Equity Documents, and the New Equity Documents).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases described in this <u>Article IX.E</u> and shall constitute the Bankruptcy Court's finding that such releases (i) are an essential means of implementing the Plan; (ii) are an integral and non-severable element of the Plan and the transactions incorporated herein; (iii) confer substantial benefits on the Estates; (iv) are in exchange for good and valuable consideration provided by the Released Parties; (v) constitute a good-faith settlement and compromise of the claims and Causes of Action released by this <u>Article IX.E</u>; (vi) are in the

**best interests of the Debtors, their Estates, and all holders of Claims and Interests; (vii) are fair, equitable, and reasonable; (viii) are given after due notice and opportunity for hearing; and (ix) are a bar to any of the Releasing Parties asserting any claim or Cause of Action released by this <u>Article IX.E</u>.  The releases described in this <u>Article IX.E</u> shall on the Effective Date, have the effect of *res judicata* to the fullest extent permissible under applicable laws of Brazil and any other jurisdiction in which the Debtors operate.**

Pursuant to section IV.B of the Solicitation and Voting Procedures, claimants that have submitted a proof of claim with respect to a particular Aircraft Equipment Transaction that are not receiving ballots in accordance with Annex 1 of the Solicitation and Voting Procedures shall be deemed to have given or not given the releases in this <u>Article IX.E</u> in connection with their non-voting Claims to the same extent and in accordance with whether the voting claimant for such Aircraft Equipment Transaction grants or does not grant such releases.

F.      *Exculpation*

**Without affecting or limiting the releases set forth in <u>Article IX.D</u> and <u>Article IX.E</u>, and notwithstanding anything herein to the contrary effective as of the Effective Date, to the fullest extent permitted by law, no Exculpated Party shall have or incur, and each Exculpated Party shall be exculpated from, any Claim, claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the DIP Facility Documents, the Plan Support Agreement, the Disclosure Statement, the solicitation of votes on, or confirmation of, the Plan, the New Debt Documents, the Incremental New Money Equity Documents, the New Equity Documents, any settlement or compromise reflected in the Plan, the Transaction Steps, the Restructuring Transactions, and the Plan (including, for the avoidance of doubt, the Plan Supplement), the funding of the Plan, the occurrence of the Effective Date, the administration and implementation of the Plan or the property to be distributed under the Plan, the issuance or distribution of securities under or in connection with the Plan, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors under or in connection with the Plan, or the transactions in furtherance of any of the foregoing, in each case, other than claims or liabilities arising out of or relating to any act or omission of an Exculpated Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence; <u>provided</u>, that, notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not apply to any (i) liability that cannot be exculpated pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.P.R. § 1200), and (ii) cause of action, liability or claim arising out of or relating to any police, regulatory, criminal, or other enforcement action by a governmental agency.  The Exculpated Parties have, and upon implementation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on the Plan and, therefore, are not liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any applicable laws, rules, or regulations protecting the Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any pre-Petition Date or post-Effective Date conduct, omitted acts,**

obligations, or liabilities of any Person or Entity except those related to the administration and implementation of the Plan or the property to be distributed under the Plan, the issuance or distribution of securities under or in connection with the Plan, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors under or in connection with the Plan, or the transactions in furtherance of any of the foregoing.

G.    *Injunction*

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE IX.F</u> WITH RESPECT TO THE EXCULPATED PARTIES), IN EACH CASE TO THE EXTENT THE CLAIMS OR INTERESTS ARE EXTINGUISHED, DISCHARGED, RELEASED, SETTLED, COMPROMISED, OR EXCULPATED PURSUANT TO THE PLAN: (I) COMMENCING OR CONTINUING ANY ACTION OR PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS OR ANY OTHER CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR OTHER ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OF SUCH ENTITIES OR THEIR ESTATES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) ASSERTING THE RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS NOTWITHSTANDING AN INDICATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY SUCH RIGHT.

**BY ACCEPTING DISTRIBUTIONS UNDER THE PLAN, EACH HOLDER OF A CLAIM OR INTEREST EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN SHALL BE DEEMED TO HAVE AFFIRMATIVELY AND SPECIFICALLY CONSENTED TO BE BOUND BY THE PLAN, INCLUDING THE INJUNCTIONS SET FORTH IN THIS <u>ARTICLE IX.G</u>.**

**THE INJUNCTIONS IN THIS <u>ARTICLE IX.G</u> SHALL INURE TO THE BENEFIT OF THE DEBTORS, ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.**

H.      *Additional Provisions Regarding SEC*

Notwithstanding any language to the contrary in the Disclosure Statement, the Plan, or the Confirmation Order, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-Debtor Person or Entity in any forum.

**ARTICLE X**
**CONDITIONS TO EFFECTIVE DATE**

A.      *Conditions to Effective Date*

The following are conditions to the Effective Date, each of which must be satisfied or, if applicable, waived in accordance with <u>Article X.B</u>:

1.      the Plan Support Agreement shall remain in full force and effect and shall not have been terminated (and no termination notice has been validly delivered by any party thereto);

2.      the DIP Order shall remain in full force and effect;

3.      the Plan (and all supplements thereto) and all other Definitive Documents, and all of the schedules, documents, and exhibits contained therein, and the transactions to be implemented thereby, are consistent with the rights set forth in Sections 3.02 and 11(c) of the Plan Support Agreement, and such documents shall have been filed in a manner consistent with such Sections in the Plan Support Agreement;

4.      all conditions precedent to the effectiveness of the documents governing the Exit Notes, any Incremental New Money Exit Financing, the Non-Exchangeable Take-Back Notes, and the Exchangeable Take-Back Notes, consistent with the rights set forth in Sections 3.02 and 11(c) of the Plan Support Agreement, shall have been satisfied or duly waived;

5.      the Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with the rights set forth in Sections 3.02 and 11(c) of the Plan Support Agreement, and such order shall not have been reversed, stayed, or vacated;

6.       all authorizations, consents, regulatory approvals, rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of permits and licenses held by the applicable Debtor, unless such permits or licenses are abandoned, shall have been obtained from any appropriate regulatory agencies and not subject to any appeal;

7.       the Debtors shall have obtained all governmental and regulatory approvals, consents, authorizations, rulings, or other documents that are legally required for the consummation of the Restructuring, the foregoing shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended) or applicable review periods under non-U.S. antitrust law shall have expired;

8.       except as otherwise expressly provided herein, (i) all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation shall have been (x) executed, delivered, assumed, or performed, as the case may be, and (y) to the extent required, filed with the applicable Governmental Units in accordance with applicable law, and (ii) any conditions contained in such documents (other than Consummation or notice of Consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement;

9.       contemporaneously with the Effective Date, all fees and expenses of the Consenting Stakeholders incurred in connection with the Restructuring Transactions (as defined herein and in the Plan Support Agreement) or as a result of the Chapter 11 Cases shall have been paid in full or reimbursed in accordance with the terms of the DIP Order or the Confirmation Order, as applicable;

10.      contemporaneously with the Effective Date, all accrued and unpaid interest in respect of the 2028 Notes Claims shall have been paid in full in Cash;

11.      contemporaneously with the Effective Date, all accrued and unpaid Indenture Trustee Fees shall have been paid in full in Cash;

12.      there shall not be in effect any order, opinion, ruling, or other decision entered by any court or a Governmental Unit under U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan, the Restructuring Transactions (as defined herein and in the Plan Support Agreement), the transactions contemplated by the Plan Support Agreement, or any of the Definitive Documents contemplated by the Plan Support Agreement;

13.      all conditions precedent to the issuance of the New Equity shall have occurred;

14.      to the extent that the Debtors, in their sole discretion, seek recognition of the Plan in Brazil, the Plan shall have been granted recognition or its equivalent status in Brazil; provided, however, that if the Debtors seek such recognition or equivalent status, any failure or delay in obtaining such recognition or equivalent status shall not be a condition precedent to the extent the recognition of the Plan in Brazil is not necessary for the Restructuring Transactions in Brazil by the Effective Date;

15.    each of the Professional Fees Escrow Account and the Disputed Claims Reserve shall have been established and funded in accordance with, and in the amounts required by, the Plan; and

16.    substantially contemporaneously with the Effective Date, the AHG Work Fee shall have been paid.

B.    *Waiver of Conditions*

The conditions to the Effective Date set forth in <u>Article X.A</u> (except the condition set forth in <u>Article X.A.11</u>) may be waived by the Debtors, with the consent of (i) Abra and (ii) to the extent the waiver impacts the right of holders of General Unsecured Claims or is required by the Plan Support Agreement, the Committee, without notice to, leave of, or order of, the Bankruptcy Court. If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any Court.  If the Plan is confirmed for fewer than all of the Debtors, the Debtors may, with the reasonable consent of Abra and the Committee, proceed with implementing the Plan and the occurrence of the Effective Date with respect to those Debtors for which the Plan is confirmed and, in such circumstances, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur with respect to such Debtor or Debtors.

## ARTICLE XI
## MODIFICATION, REVOCATION OR
## WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Subject to the rights of Abra and the Committee in the Plan Support Agreement, the Debtors shall have the right to modify the Plan, whether such modification is material or immaterial, and seek confirmation of the Plan consistent with the requirements of the Bankruptcy Code.  After entry of the Confirmation Order, the Debtors or Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, reconcile any inconsistency in the Plan (including, for the avoidance of doubt, with respect to <u>Article VI.A</u> and the schedules referenced therein) in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms of the Restructuring Transactions, or withdraw or revoke the Plan, in each case subject to the rights of Abra and the Committee in the Plan Support Agreement.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan effected after the solicitation of votes thereon are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule

3019; provided, that any such modifications or amendments to the Plan shall be in form and substance reasonably acceptable to Abra and the Committee.

C.      *Revocation or Withdrawal of Plan*

Subject to the rights of Abra and the Committee in the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all of the Debtors prior to the Confirmation Date and to file other chapter 11 plans.  If the Debtors revoke or withdraw the Plan or confirmation of the Plan does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise memorialized in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), the assumption of Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claim or Interest; (b) prejudice in any manner the rights of any Debtor or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Person or Entity.

# ARTICLE XII
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including (i) the resolution of any request for payment of any Administrative Expense and (ii) the resolution of any objection relating to the foregoing;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for Allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or Cure Claims; (ii) any contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to the holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested matters, and applications pending in the Chapter 11 Cases on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Person's or Entity's obligations under or in connection with the Plan;

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, exculpation, injunctions, and other provisions contained in Article IX, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, exculpation, and other provisions;

12.     resolve any controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by holders of Claims not timely repaid pursuant to Article VIII.I.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

16.     consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any prior order, including the Confirmation Order;

17.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

18.     hear and determine matters concerning state, local, and federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.     hear and determine all disputes involving the existence, nature, scope, and enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under <u>Article IX</u>, regardless of whether such dispute occurred before or after the Effective Date;

20.     recover all assets of the Debtors and property of the Estates, wherever located;

21.     resolve any disputes concerning whether a Person or an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a Cure Claim, in each case, for the purpose of determining whether a Claim or an Interest is discharged hereunder or for any other purpose;

22.     hear and determine any rights, claims, or Causes of Action held by, or accruing to, any Debtor pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including those set forth on the Schedule of Retained Causes of Action;

23.     enforce all orders previously entered by the Bankruptcy Court;

24.     enter an order or final decree closing the Chapter 11 Cases; and

25.     hear any other matter as to which the Bankruptcy Court has jurisdiction;

<u>provided</u>, <u>however</u>, that documents contained in the Plan Supplement shall be governed in accordance with applicable jurisdictional, forum selection, or dispute resolution clauses in such documents.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to <u>Article X.A</u> and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective, enforceable, and binding upon the Debtors, the Reorganized Debtors, all holders of Claims and Interests (irrespective of whether the holders of such Claims or Interests have accepted the Plan), all Persons and Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Person or Entity acquiring property under the Plan, and all of the Debtors' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, all holders of Claims or Interests receiving distributions under the Plan, and all other parties in interest may,

from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Statutory Fees and Quarterly Reports*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code (the "Quarterly Fees") prior to the Effective Date shall be paid by the applicable Debtors on the Effective Date. Each Debtor and each Reorganized Debtor shall remain obligated to pay all Quarterly Fees payable to the U.S. Trustee until the earliest of the particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding the foregoing, nothing herein shall prohibit the Reorganized Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors) from paying any Quarterly Fees.

After the Effective Date, the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the applicable Reorganized Debtors shall file the quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect as to a Debtor if the Effective Date does not occur as to such Debtor. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests before Consummation.

E.    *Successors and Assigns*

The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Person or Entity.

F.    *Notices*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Committee shall be served on:

If to the Debtors, to:

     GOL Linhas Aéreas Inteligentes S.A.
     Praça Comandante Linneu Gomes, S/N, Portaria 3
     Jardim Aeroporto 04626-020 São Paulo, São Paulo, Federative Republic of Brazil
     Attention:     Joseph W. Bliley
     Email:     jwbliley@voegol.com.br

with copies to (which shall not constitute notice):

     Milbank LLP
     55 Hudson Yards
     New York, NY 10001
     Attention:     Evan R. Fleck, Esq.
                 Lauren C. Doyle, Esq.
                 Bryan V. Uelk, Esq.
     Email:     efleck@milbank.com
                 ldoyle@milbank.com
                 buelk@milbank.com

     -and-

     Milbank LLP
     2029 Century Park East, 33rd Floor
     Los Angeles, CA 90067
     Attention:     Gregory A. Bray, Esq.
     Email:     gbray@milbank.com

     -and-

     Milbank LLP
     1850 K St. NW, Suite 1100
     Washington, DC 2006
     Attention:     Andrew M. Leblanc, Esq.
                 Erin E. Dexter, Esq.
     Email:     aleblanc@milbank.com
                 edexter@milbank.com

If to the Committee:

     Willkie Farr & Gallagher LLP
     787 Seventh Avenue
     New York, NY 10019
     Attention:     Brett Miller, Esq.
                 Todd Goren, Esq.
                 Craig A. Damast, Esq.
                 James H. Burbage, Esq.

Email:        bmiller@willkie.com
              tgoren@willkie.com
              cdamast@willkie.com
              jburbage@willkie.com

G.      *Notice of Entry of Confirmation Order*

In the notice to be sent to creditors by the Debtors following entry of the Confirmation Order informing creditors that the Bankruptcy Court has confirmed the Plan and providing such other information as required by the Confirmation Order, the Debtors shall notify all Persons and Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Person or Entity (excluding the U.S. Trustee) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After service of such notice and the occurrence of the Effective Date, the Reorganized Debtors shall be authorized to limit the list of Persons and Entities receiving documents pursuant to Bankruptcy Rule 2002 to the Reorganized Debtors, the U.S. Trustee, and those Persons and Entities who have filed such renewed requests.

H.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases on the Confirmation Date pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. For the avoidance of doubt, (i) upon the Effective Date, the automatic stay pursuant to section 362 of the Bankruptcy Code of any litigation proceedings against or involving the Debtors shall terminate and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations, all of which have become merged and integrated into the Plan.

J.      *Exhibits*

All exhibits, schedules, supplements, and appendices to the Plan (including any documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless stated otherwise herein or ordered by the Bankruptcy Court, the Plan shall control.

K.      *Non-Severability of Plan Provisions*

Before Confirmation, if any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable,

consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be enforceable as so altered or interpreted. Notwithstanding any such alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.  Confirmation shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent of the Debtors; and (iii) non-severable and mutually dependent.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code.  Upon entry of the Confirmation Order, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, none of the Reorganized Debtors or such Persons or Entities shall have any liability for the violation of any law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

M.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with the Debtors' current document retention policy, as it may be altered, amended, modified, or supplemented by the Reorganized Debtors.

N.      *Conflicts*

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of a conflict between the Plan and any document in the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order); provided, that, in the event any such conflict is a material conflict of the type that would require the Debtors to re-solicit the votes on the Plan under section 1127 of the Bankruptcy Code, the Plan shall control solely with respect to such provision giving rise to such material conflict.  In the event of a conflict between the Confirmation Order and the Plan or Plan Supplement, the Confirmation Order shall control.  In the event of a conflict between the description or summary of any Definitive Document (including the New Debt Documents, the Incremental New Money Equity Documents, and the New Equity Documents) set forth herein and such Definitive Document, the terms of the relevant Definitive Document shall control in all respects.

O.      *Dissolution of Committee*

On the Effective Date, the Committee (and any other statutory committees that may have been appointed in the Chapter 11 Cases) shall be deemed to have been dissolved, and the members thereof, and their respective officers, employees, counsel, advisors and agents, shall be released

99

and discharged of and from all further authority, duties, responsibilities, and obligations related to, arising from, and in connection with the Chapter 11 Cases, except with respect to any continuing confidentiality obligations, prosecuting requests for Allowance of compensation and reimbursement of expenses incurred prior to the Effective Date, appointment of the General Unsecured Claim Observer, and, in the event that the Bankruptcy Court's entry of the Confirmation Order is appealed, participating in such appeal.  Subject to <u>Article VII.C</u>, from and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Committee's professionals solely to the extent arising out of or related to the foregoing without further order of the Bankruptcy Court.

P.      *Fees and Expenses of 2026 AHG Trustee and Advisors*

On the Effective Date, the Debtors shall pay the outstanding reasonable and documented fees, costs, and out-of-pocket expenses of the 2026 Notes AHG incurred by the 2026 AHG Counsel, the 2026 Indenture Trustee, and the 2026 Indenture Trustee Counsel accrued through the Joinder Effective Date.

In addition, on the Effective Date, the Debtors shall pay the 2026 AHG Financial Advisor a total amount of $4 million in respect of its reasonable and documented fees and out-of-pocket expenses in connection with services rendered to the 2026 Ad Hoc Group.

Furthermore, the Debtors shall pay the reasonable and documented fees and out-of-pocket expenses that accrue after the Joinder Effective Date in the amounts of up to (i) $325,000.00 in the aggregate for the 2026 AHG Counsel, (ii) $10,000.00 in the aggregate for the 2026 Indenture Trustee, and (iii) $50,000.00 in the aggregate for the 2026 Indenture Trustee Counsel, in each case, where such fees and expenses shall relate solely to professional services related to confirmation and implementation of the Plan as it relates to the treatment of the Allowed 2026 Senior Secured Notes Claims. At any time that any of the 2026 AHG Trustee and Advisors seeks payment of fees and expenses from the Debtors pursuant to this Joinder, such 2026 AHG Trustee and Advisor shall provide a summary copy of its invoice with a summary description of the services performed (which shall not be required to contain time entries) to the Debtors and the Committee. Furthermore, in the event that the Court does not enter an order confirming the Plan by June 8, 2025, the Debtors, the 2026 Ad Hoc Group, Abra, and the Committee agree to discuss in good faith the extent, if any, of any additional amount to be paid by the Debtors in respect of the reasonable and documented fees and out-of-pocket expenses of the 2026 AHG Trustee and Advisors (it being understood and agreed that the foregoing shall not require agreement to pay any such amount).

Dated: May 17, 2025

GOL Linhas Aéreas Inteligentes S.A., on behalf of
itself and its Debtor affiliates


By:  _/s/ Joseph W. Bliley_____

Name: Joseph W. Bliley
Title:   Chief Restructuring Officer

## **EXHIBIT B**

**Blackline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re:                                                      :    Chapter 11
                                                            :
GOL LINHAS AÉREAS INTELIGENTES S.A.,                        :    Case No. 24-10118 (MG)
*et al.*,[1]                                                :
                                                            :    (Jointly Administered)
                        Debtors.                            :
                                                            :
                                                            :
------------------------------------------------------------x

**ORDER (I) CONFIRMING ~~THIRD~~FOURTH MODIFIED THIRD AMENDED JOINT**
**CHAPTER 11 PLAN OF GOL LINHAS AÉREAS INTELIGENTES S.A. AND**
**ITS AFFILIATED DEBTORS AND (II) GRANTING RELATED RELIEF**

The Debtors having filed the *~~Third~~**Fourth** Modified Third Amended Joint Chapter 11*

*Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors*

[Docket No. ~~1592~~**1630**], which is attached hereto as **Exhibit A** (as it may be altered, amended,

supplemented, or otherwise modified from time to time in accordance therewith, the "Plan") and

the *Disclosure Statement for Second Modified Third Amended Joint Chapter 11 Plan of*

*Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors*

[Docket No. 1390] (including all appendices, exhibits, schedules, and supplements thereto, and

as it may be altered, amended, supplemented, or otherwise modified from time to time, the

"Disclosure Statement"),[2] each of which is incorporated herein by reference; and upon the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: GOL Linhas Aéreas Inteligentes S.A. (N/A); GOL Linhas Aéreas S.A. (0124); GTX S.A. (N/A); GAC, Inc. (N/A); Gol Finance (Luxembourg) (N/A); Gol Finance (Cayman) (N/A); Smiles Fidelidade S.A. (N/A); Smiles Viagens e Turismo S.A. (N/A); Smiles Fidelidade Argentina S.A. (N/A); Smiles Viajes y Turismo S.A. (N/A); Capitânia Air Fundo de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); Sorriso Fundo de Investimento em Cotas de Fundos de Investimento Multimercado Crédito Privado Investimento no Exterior (N/A); and Gol Equity Finance (N/A). The Debtors' service address is Praça Comandante Linneu Gomes, S/N, Portaria 3, Jardim Aeroporto, 04626-020 São Paulo, São Paulo, Federative Republic of Brazil.

[2]    Capitalized terms used in this Order but not otherwise defined shall have the meaning ascribed to them in the Plan.

Debtors' *(I)* Memorandum of Law in Support of ~~*Final Approval*~~*Confirmation* of the Third Modified Third Amended Joint Chapter 11 Plan *of Reorganization of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors and (II) Response Objections Thereto* [Docket No. 1596] ~~(, the "Confirmation Brief") and the declarations~~*Declaration* of John E. Luth in Support of Confirmation of Joint Chapter 11 Plan of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors [Docket No. 1595], **the *Supplemental Declaration of John E. Luth in Support of Confirmation of Joint Chapter 11 Plan of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors* [Docket No. 1625], the *Declaration of*** Joseph W. Bliley in Support of Confirmation of Joint Chapter 11 Plan of Gol Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors [Docket No. 1594], and **the *Declaration of*** Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A. and Its Affiliated Debtors **[Docket No. 1603]**; and the Court having jurisdiction to consider the relief requested pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and the Court having found that it may enter a final order consistent with Article III of the United States Constitution, and the Court having found that venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested having been provided, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed or otherwise taken judicial notice of the record; and the Court having held a hearing on notice to consider confirmation of the Plan (the "Confirmation Hearing"); and upon

all of the proceedings had before the Court; and after due deliberation and sufficient cause

appearing therefor,

**IT IS HEREBY FOUND, ORDERED, ADJUDGED, AND DETERMINED THAT:**

1.    **Confirmation.**  The facts and legal arguments set forth in the record, including the evidence and argument at the Confirmation Hearing, demonstrate that the requirements for ~~Confirmation~~**confirmation** of the Plan have been satisfied.  Further, each witness who testified or submitted a declaration on behalf of the Debtors in support of confirmation of the Plan was qualified to testify as to the topics addressed in their testimony.  The Debtors have met their burden of proving that the Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code and applicable Bankruptcy Rules by a preponderance of the evidence.  Accordingly, the Plan, in its entirety, is **CONFIRMED** pursuant to section 1129 of the Bankruptcy Code.  Each term of the Plan, all of which are incorporated by reference herein (and any amendments, modifications, and supplements thereto), is an integral part thereof.  The failure to specifically describe or include herein any particular provision of the Plan shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be confirmed in its entirety.  Subject to the occurrence of the Effective Date, the provisions of the Plan shall be binding on the Reorganized Debtors and all parties in interest, enforceable in accordance with its terms and the terms of this Order.

2.    **Objections.**  All objections, responses, statements, reservations of rights, and comments in opposition to the ~~Confirmation~~**confirmation** of the Plan that have not been withdrawn with prejudice, waived, settled, or resolved prior to or on the record of the Confirmation Hearing are overruled on their merits with prejudice.  The record of the Confirmation Hearing is closed.

3.    **Notice.**  As reflected in the *Affidavit of Service of Solicitation Materials* [Docket No. 1567] (the "Solicitation Affidavit"), adequate and sufficient notice of the

4

Confirmation Hearing and of the other requirements, deadlines, hearings, and matters described

in the *Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Voting*

*Procedures; (III) Approving Forms of Ballots; (IV) Establishing Procedures for Allowing*

*Certain Claims for Voting Purposes; (V) Scheduling a Confirmation Hearing; and (VI)*

*Establishing       Notice       and       Objection       Procedures*       [Docket       No. 1388]

(the "<u>Disclosure Statement Order</u>") was timely and properly provided to the parties in interest in

compliance with the Disclosure Statement Order and, to the extent applicable, with the

Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.   Due process, including an

opportunity to appear and to be heard at the Confirmation Hearing, as well as to litigate all

objections and issues raised, has been provided to all parties in interest.   No other or further

notice is or shall be required.

4.       **Solicitation.**   As reflected in the Solicitation Affidavit, the Debtors have served

the Solicitation Packages on the holders of Claims ~~and Interests~~<u>**in the Voting Classes**</u> and

conducted solicitation of votes on the Plan in accordance with the Disclosure Statement Order.

5.       **Plan Modifications.**   Any modifications to the Plan since the commencement of

solicitation and prior to the entry of this Order comply with the applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and

Article XI of the Plan.   Such modifications do not constitute material modifications and do not

adversely affect or change the treatment of any Claims or Interests.   Pursuant to Bankruptcy Rule

3019, these modifications do not require either (a) any additional disclosure under section 1125

of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code or

(b) that the holders of Claims or Interests be afforded an opportunity to (i) change previously cast

acceptances or rejections of the Plan or (ii) withdraw or submit previously submitted or withheld

Release Opt-Out Forms.  The filing of the revised Plan has provided adequate and appropriate notice of these modifications under the facts and circumstances of the Chapter 11 Cases. Accordingly, the Plan is properly before the Court, and all votes cast with respect to the Plan prior to any such modifications shall be binding and shall apply to the Plan.  Subject to the terms of the Plan, the Debtors may amend, update, supplement, or otherwise modify the Plan prior to the Effective Date.

6.      **Plan Supplement.**  The contents and filing of the compilation of documents that constitute the Plan Supplement is**are** proper and complies**comply** with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and other applicable laws, and no other or further notice is or shall be required.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into, the Plan and are approved by the Bankruptcy Court.  Subject to the terms of the Plan, the Debtors and the Reorganized Debtors, as applicable, are authorized to take all actions necessary or appropriate to effectuate the Plan, including without limitation, the Restructuring Transactions, and each of the Transaction Steps, without the need for any approvals, authorizations or consents except those expressly required by the Plan.  Subject to the terms of the Plan, the Debtors may amend, update, supplement, or otherwise modify the documents in the Plan Supplement at any time before the Effective Date.  Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date pursuant to this Confirmation Order, without further application to, or order of the Court, or further action by the Debtors and/or the Reorganized Debtors and their respective directors, officers, members, or stockholders, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

6

7.    **Compromise and Settlement of Claims, Interests, and Controversies.**    In
accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and
in consideration for the classification, distributions, releases, and other benefits provided under
the Plan, the provisions of the Plan shall constitute an arms'-length and good-faith compromise
and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan, and all
distributions made to holders of Allowed Claims and Allowed Interests in accordance with the
Plan are intended to be, and shall be, final.  The entry of this Order shall constitute the Court's
approval of the settlements embodied in the Plan, including, but not limited to (i) the settlement
among the Debtors, the Committee, and Abra, which provides for, among other things, Abra's
agreement to limit its recovery and equitize a significant portion of its secured Claims resulting
in meaningful distributions to general unsecured creditors (the "Abra Settlement");  (ii) the
settlement resolving all disputes between the Debtors and the ~~ad hoc group of holders of~~ 2026
~~Senior Secured Notes Claims~~**Ad Hoc Group**, as described in the Notice of Settlement with 2026
Senior Secured Notes Ad Hoc Group and Amendments to Exit Financing Commitment Letter,
attached as Exhibit J to the ***Notice of Filing of*** Second Plan Supplement (**[Docket No. 1558],
and as amended by the 2026 AHG A&R Joinder attached as Exhibit J to the *Notice of
Filing of Sixth Plan Supplement* [Docket No. 1631] (collectively,** the "2026 Settlement"); and
(iii) the settlement resolving all disputes between the Debtors and Whitebox Advisors LLC on
behalf of its managed funds and accounts that hold 2024 Senior Exchangeable Notes Claims, as
described in the Notice of Settlement with Whitebox Advisors LLC, attached as Exhibit K to the
***Notice of Filing of*** Third Plan Supplement **[Docket No. 1571]** (the "Whitebox Settlement" and,
together with the Abra Settlement and the 2026 Settlement, the "Plan Settlements").  The entry
of this Order shall constitute the Court's approval of the Plan Settlements, as well as a finding

that the Plan Settlements are in the best interests of the Debtors, their Estates, and ~~Holders~~**holders** of Claims and Interests, and are fair, equitable, and reasonable.  The Plan Settlements are binding upon all holders of Claims and Interests and all other parties in interest pursuant to section 1141(a) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors may compromise and settle Claims and Interests without notice to or action, order, or approval of the Court.

8. **Exit Financing**.  The Exit Notes, the Incremental New Money Exit Debt, the Take-Back Notes, and any other form of exit financing contemplated by the Plan (collectively, the "Exit Financing Facilities") and all related agreements and documents are approved and authorized in all respects.  The Debtors or Reorganized Debtors, as applicable, are authorized, without further approval of the Court and subject to the terms of the Plan, to take all actions necessary or desirable to consummate and perform under each of the Exit Financing Facilities, including the payment or reimbursement of any fees, indemnities, and expenses thereunder and to grant liens to secure such indebtedness.  In accordance with section 1142 of the Bankruptcy Code and applicable non-bankruptcy law, such actions may be taken without further action by stockholders, members, partners, managers, or directors.  The financial accommodations to be extended pursuant to the Exit Financing Facilities are being extended in good faith, for legitimate business purposes, are reasonable, and the incurrence of obligations, granting of liens and other security interests and credit support for the benefit of the parties to the Exit Financing Facilities, and payment of fees, interests, costs, and other amounts arising under or associated with the Exit Financing Facilities shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination), and shall not constitute a preferential transfer, fraudulent conveyance or other voidable transfer under the Bankruptcy

Code or any other applicable non-bankruptcy law.  On the Effective Date, the Exit Financing Facilities documents, including any documents required in connection with the creation or perfection of liens in connection therewith, shall constitute legal, valid, binding, and authorized indebtedness and obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms, and such indebtedness and obligations shall not be, and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, ~~the Confirmation~~**this** Order, or on account of the ~~Confirmation~~**confirmation** or Consummation of the Plan (including the injunction, release, and exculpation provisions of the Plan and this ~~Confirmation~~ Order).

9.    **Additional Financing Commitments.**  The Court approves (i) the Amended and Restated Exit Financing Commitment Letter dated as of April 30, 2025, attached as Annex 3 to the 2026 AHG Joinder filed ~~with the Second~~**at Docket No. 1558 (as amended by Amendment No. 1 to the Amended and Restated Exit Financing Commitment Letter, attached as Exhibit B to Exhibit J to the *Notice of Filing of Sixth*** Plan Supplement~~,~~ **[Docket No. 1631]);** (ii) the 2026 Senior Secured Ad Hoc Group fee letter**,** attached as Exhibit C to ~~the 2026 Settlement~~**Exhibit J to the *Notice of Filing of Second Plan Supplement* [Docket No. 1558]**, and (iii) the Amended and Restated Existing Backstop Parties fee letter**,** attached as Exhibit D to ~~the 2026 Settlement~~**Exhibit J to the *Notice of Filing of Second Plan Supplement* [Docket No. 1558]**.    These documents are each an essential element of the Plan, are necessary for ~~Confirmation~~**confirmation** and Consummation of the Plan, and are critical to the overall success and feasibility of the Plan.  The Debtors are authorized to enter into, execute, deliver, and perform their obligations under these documents, including through payment of the AHG Work Fee ~~as provided in the 2026 Notes Treatment Term Sheet~~.

9

10.    **New Equity.**    The issuance of New Equity by New GOL Parent and the distribution of such New Equity to the applicable ~~Holders~~**holders** of Claims in accordance with the terms of the Plan and the Transaction Steps, ~~attached as Exhibit 1 to the Plan (the "Transaction Steps")~~**as well as the General Unsecured Creditor Power of Attorney (as defined below) for the purposes thereof**, are authorized and approved.  All provisions of the Plan relating to New Equity, including but not limited to the exemption from registration under applicable securities laws pursuant to section 1145 of the Bankruptcy Code**, procedures and actions for assignment or contribution of Claims to New GOL Parent in exchange for New Equity**, procedures for distribution through DTC facilities, and mandatory redemption, exchange, and offer to purchase provisions, are approved and shall be binding on all applicable parties.  Holders of Claims entitled to receive the New Equity shall be deemed to have consented to the New Organizational Documents, including any contribution **or assignment of the Claims and any contribution** and subscription agreement, **including by way of the General Unsecured Creditor Power of Attorney (as defined below)** as a condition to receipt of their distribution of the New Equity under the Plan.

**11.** **Contribution of Subject Claims.** On the Effective Date, in order to implement the Transaction Steps and to effectuate the distributions under the Plan to holders of Allowed General Unsecured Claims, each holder of a Subject Claim (as defined in the Transaction Steps) shall be deemed to have, either directly or indirectly, and irrevocably, contributed, transferred, and/or assigned as applicable such Allowed Claim to New GOL Parent or any other person appointed, selected, or designated and/or entity selected, designated, or formed for the purposes of accepting such contribution, transfer and/or assignment that subsequently contributes, transfers, and assigns such Allowed Claim to New GOL Parent in exchange for such holder's distribution of New Equity under the Plan which may be issued directly by New GOL Parent or such other person and/or entity (the "Contribution"). This Contribution shall be deemed to occur automatically without the need for execution of any further documentation by such holder and have the same effect as if each holder had executed and delivered all instruments and documents necessary to effectuate the Contribution, it being understood that the Agent (as defined below) may execute and deliver in the name and on behalf of the relevant holders any instrument and documents useful or necessary under Luxembourg law. This provision is binding on all holders of Subject Claims and constitutes an integral part of the implementation of the Plan.

12.     Notwithstanding the foregoing, all holders of Allowed General Unsecured Claims may be required, to the extent required by applicable law and reasonably determined by the Reorganized Debtors to be reasonable and appropriate under the circumstances, to execute certain documentation, including a contribution and subscription agreement, in order to receive such holder's distribution of New Equity.  Under such circumstances, the Reorganized Debtors and New GOL Parent are authorized to withhold any applicable distribution until such documentation has been executed and received by New GOL Parent.  To the extent that any holder of an Allowed General Unsecured Claim fails to return such documentation within one year of the Effective Date of the Plan, such holder's distribution shall be treated as an in accordance with Section VIII.D.9. of the Plan titled "Undeliverable Distribution and Unclaimed Property."

**13.** **To the extent the Debtors or the Reorganized Debtors determine that in order to comply with applicable law, and in order to best effectuate the transactions contemplated by the Plan, including the Transaction Steps and to effectuate the distributions of New Equity to the holders of Subject Claims, the Reorganized Debtors, with the consent of the Committee (or, if after the Effective Date, with the consent of the General Unsecured Claim Observer), may in their discretion appoint a representative, agent, or similar person on behalf of all holders of Allowed General Unsecured Claims, which representative, agent, or similar person shall be determined by the Debtors, the Committee, and Abra and identified in a notice filed on or prior to the Effective Date, and which notice shall be deemed an exhibit hereto, to execute any documents required under applicable law to allow for the distribution of the New Equity to the holders of Allowed General Unsecured Claims, including any contribution and subscription agreement, and so long as such documents are consistent with the terms of the Plan, including the Plan Supplement Documents and does not otherwise alter the rights and benefits of such holders under the Plan.  In the event such representative, agent, or similar person (the "Agent") is appointed, such Agent shall be granted pursuant to this Order all powers and authorizations in the name and on behalf of the holders of Allowed General Unsecured Claims to do any things or acts, take any actions and execute and deliver any documents, necessary or useful in order to implement, or in connection with, the Contribution, including but not limited to the execution of any contribution and subscription agreement for the purposes of the issuance of the New Equity by the board of directors of New GOL Parent under its authorized share capital and to be recorded before a Luxembourg civil law notary in a deed of acknowledgment of share capital increase (*constat d'augmentation***

*de capital*), in accordance with article 420-22 *et seq.* of the Luxembourg law of 10 August 1915 on commercial companies, as amended (the "General Unsecured Creditor Power of Attorney").  The Agent shall have no liability whatsoever arising from, relating to, or in connection with this Order or the execution of any documentation consistent with this paragraph or any other action taken in connection with this Order.

14.    Cede & Co. ("Cede"), as nominee of The Depository Trust Company ("DTC"), The Bank of New York Mellon, in its capacity as trustee for the 2024 Senior Exchangeable Notes, the 2025 Senior Notes and the Perpetual Notes, or any nominee or agent duly authorized to act on behalf of the holders of Subject Claims, is authorized to (i) take all actions necessary to effectuate the issuance of New Equity to the holders of Subject Claims, including the underlying beneficial holders (collectively, the "DTC Holders") of the DTC Holders' Subject Claims,[3] as contemplated by the Plan, including to contribute the DTC Holders' Subject Claims to New GOL Parent, (ii) execute the Contribution and Subscription Agreement between with New GOL Parent as recipient (the "Contribution and Subscription Agreement"),[4] and (iii) execute any instruction letters and/or powers of attorney in order to authorize The Bank of New York Melon to sign the Contribution and Subscription Agreement on behalf of DTC, the DTC Holders or their respective nominees.  The Cede & CO., DTC, The Bank of New York Mellon, any nominee or agent of the DTC Holders, or any representative thereof, shall have no liability whatsoever arising from, relating to, or in connection with this Order or the execution of the Contribution and Subscription Agreement or any other action taken in connection with this Order.

---

[3]    The "DTC Holders' Subject Claims" mean the following Allowed Claims in Classes 10(a)-(e): (i) in Class 10(a), for the 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8; for the 2025 Senior Notes Claims, securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; for the Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3 and 38045UAA8; (ii) in Class 10(b), for 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8; for 2025 Senior Notes Claims, securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; for Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3, and 38045UAA8; (iii) in Class 10(c), for 2025 Senior Notes Claims securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; (iv) in Class 10(d), for Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3 and 38045UAA8; and (v) in Class 10(e), for 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8.

[4]    The Contribution and Subscription Agreement provides the mechanism through which the New Equity will be distributed to the DTC Holders and the DTC Holders' Subject Claims will be contributed to New GOL Parent.

**15.**    ~~11.~~ **GLAI Preemptive Rights Offering.**  The GLAI Preemptive Rights Offering, as described in the Transaction Steps, **and required to give effect to the terms of the Plan,** is approved in all respects.  The Debtors and Reorganized Debtors**, as applicable, as well as all other applicable parties,** are authorized to take all actions necessary or appropriate to implement and effectuate the GLAI Preemptive Rights Offering, including **approving the capitalization of the Subject Claims, the issuance of the applicable shares of GLAI in consideration thereof, and** providing notice to Eligible Existing GLAI Equity Interest Holders of their right to participate in the GLAI Preemptive Rights Offering during the GLAI Preemptive Rights Offering Period in accordance with applicable Brazilian law.

**16.**    ~~12.~~ **Good Faith.**   The Plan, the Plan Settlements, and the Restructuring Transactions, including the Transaction Steps, the New Organizational Documents, the New Equity Documents, the Exit ~~Facility~~**Financing Facilities**, the New Debt Documents, and all other agreements and transactions contemplated by the Plan (i) have been negotiated in good faith and at arm's length, without the intent to hinder, delay, or defraud any of the Debtors' creditors; (ii) are fair and reasonable; (iii) represent a valid exercise of the Debtors' business judgment; (iv) are supported by reasonably equivalent value and fair consideration; and (v) are in the best interests of the Debtors, their Estates, and their stakeholders.

**17.**    ~~13.~~ **Injunction, Exculpation, Release, Indemnification, Discharge, Settlement, and Compromise.**

      a.   The Court has jurisdiction under 28 U.S.C. § 1334, and authority under 28 U.S.C. § 157, to approve the injunctions, exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan (including Articles IX.D, IX.E, IX.F, and IX.G).  Sections 105(a), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and Bankruptcy Rule 9019 permit issuance of the injunctions and approval of the exculpations, releases, indemnifications, discharges, settlements, and compromises set forth in the Plan.

b.  The Released Parties and Exculpated Parties have played a meaningful role in, and significantly and tangibly contributed to, the Chapter 11 Cases and their resolution, have participated in the Chapter 11 Cases and the Debtors' restructuring in good faith, and have acted in compliance with provisions of the Bankruptcy Code, including in connection with the negotiation, preparation, and pursuit of ~~Confirmation~~**confirmation** of the Plan and compromises implemented therein.  Each of the Released Parties and Exculpated Parties that owed fiduciary duties to the Debtors and their Estates fulfilled such fiduciary duties at all times.

c.  The Debtors and their management, directors, employees, professionals, attorneys, advisors, and other Related Parties have worked diligently in connection with the Debtors' restructuring efforts.  Throughout the Chapter 11 Cases, the Debtors and their Related Parties (to the extent applicable) have fulfilled their respective fiduciary duties to the Estates and protected the interests of all the case constituents with an even hand.  The Debtors and their Related Parties fairly and reasonably negotiated the DIP Facility, Plan Support Agreement, the Plan, the Plan Settlements, and the documents included in the Plan Supplement.

d.  The non-Debtor Released Parties and non-Debtor Exculpated Parties have made substantial contributions to these Chapter 11 Cases and assisted the Debtors with negotiating and developing the Plan and the transactions and settlements contemplated thereby.  The Released Parties have agreed to forgo certain rights, make certain concessions, and/or incur certain obligations to permit recoveries for the Estates' creditors set forth in the Plan which might not otherwise have been achievable.

e.  Based on the record before the Court, each of the injunction, exculpation, release, indemnification, discharge, settlement, and compromise provisions set forth in the Plan (including Articles IX.D, IX.E, IX.F, and IX.G) (i) is the product of extensive good-faith and arm's length negotiations, (ii) is fair, equitable, reasonable, and appropriate under the circumstances, (iii) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors, (iv) is an essential, integral, and non-severable components of the Plan, Consummation, and resolution of the Chapter 11 Cases, (v) is appropriately and narrowly tailored, (vi) is supported by good and valuable consideration (including the Released Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), (vii) is granted after due notice and opportunity for hearing, (viii) is consistent with the Bankruptcy Code and applicable law, (ix) is intended to promote finality and prevent parties from circumventing or attempting to circumvent the Plan, (x) is supported by the Debtors and their key stakeholders, including Abra, the Committee, and the other Consenting Stakeholders, (xi) constitutes a good-faith compromises and settlements of the matters covered thereby, (xii) is, with respect to the Third-Party Releases, consensual based on the opt-out mechanism provided in the Ballots and Release Opt-Out Forms and meets the requirements for third-party releases under applicable law, (xiii) with respect to the injunction provision, is necessary to

17

preserve and enforce the Plan's discharge, release, and exculpation provisions, and (xiv) is the result of a fair exercise of the Debtors' sound business judgment.

**18.**   ~~14.~~ **Assumption.**  Pursuant to sections 365 and 1123 of the Bankruptcy Code, all rejections, assumptions, and assumptions and assignments of Executory Contracts and Unexpired Leases under the Plan are approved.  The Debtors' determinations regarding the appropriate Cure Costs for assumed contracts are approved, subject to the resolution of any timely-filed objections in accordance with Article VI.D of the Plan.  Any Assumption Disputes that have not been resolved prior to the Confirmation Hearing shall be heard on ~~at~~ a later date, and the Reorganized Debtors shall file any replies to such objections at least seven (7) days before such hearing.   During the pendency of any Assumption Dispute, the applicable counterparty shall continue to perform under the applicable Executory Contract or Unexpired Lease.   To the extent of any Assumption Dispute, the deadline to remove such Executory Contract or Unexpired Lease from the Assumption Schedule shall be extended to a date that no less than 10 days after the resolution of such Assumption Dispute.

**19.**   ~~15.~~ **Rejection Damages Claims.**  Pursuant to Section VI.E~~.~~ of the Plan, any counterparty to an Executory Contract or Unexpired Lease that is rejected by the Debtors pursuant to the Plan must file and serve a Proof of Claim against the applicable Debtor that is party to the rejected Executory Contract or Unexpired Lease no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of rejection of such Executory Contract or Unexpired Lease.

**20.**    ~~16.~~ **Administrative Claims.**    ~~Requests~~**Unless previously filed or as otherwise governed by an order of the Court or an agreement with the Debtors, requests** for payment of Administrative Expenses (other than Professional Fees **and the DIP Fees and Expenses**) that accrued on or before the Effective Date but remained unpaid as of such date must be filed with the Court and served on the Debtors or the Reorganized Debtors, as applicable, no later than the Administrative Expense Bar Date or such other date as specified in an order of the Court or agreement with the Debtors.  Holders of Allowed Administrative Expenses that are required to file and serve a request for payment and that do not timely file and serve such a request shall be ~~forever~~ barred from ~~asserting such Administrative Expenses against the Debtors, the Reorganized Debtors, or their respective property, and such~~**receiving any distributions under the Plan on account of such** Administrative Expense ~~shall be automatically discharged as of the Effective Date~~**; provided, however, that any parties may seek relief from the Court for authority to file a late Administrative Expense request, and all rights to object to any such request are preserved**.  No provider of Exit Financing shall be required to file a request for Administrative Expense Claim on account of the Exit Financing documents or related commitment documents, and any amounts due by the Debtors thereunder shall be entitled to administrative expense priority.  Objections to requests for payment of Administrative Expenses must be filed with the Court and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party no later than the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be set by an order of the Court.

**21.** ~~17.~~ **Lufthansa Technik AG Settlement.** Lufthansa Technik AG ("LHT") asserted a $651,142.42 claim against debtor Gol Linhas Aéreas S.A. (*see* Claim No. 1087, the "LHT Claim") in connection with a prepetition maintenance services agreement (the "LHT MSA"). After the Petition Date, LHT and the Debtors (i) entered into a new Framework Agreement which provided new terms and conditions for the Debtors to obtain services from LHT (the "LHT Framework Agreement") and (ii) agreed to compromise the amount of the LHT Claim to $470,000.00, which the Debtors paid in accordance with the various orders authorizing the payment of certain prepetition claims and in the ordinary course of Debtor's business operations (the "LHT Vendor Payment"). Notwithstanding any other provision of this Order, on the Effective Date the Debtors will (a) be deemed to, and shall, assume the LHT Framework Agreement, and (b) agree not to seek avoidance, recovery, or clawback of the LHT Vendor Payment or any other payment made to LHT on account of the LHT MSA or the LHT Framework Agreement.

**22.**    ~~18.~~ **Honeywell.**    As of the Petition Date, Honeywell International Inc. ("Honeywell") is owed $5,163,278.71 by Debtor GLAI.  As of the Petition Date, GLAI has a credit on the books and records of Honeywell of $6,786,564.98.  As of the Petition Date, Honeywell International SARL ("Honeywell SARL") was owed $165,484.86 by GLAI.  The books and records of Honeywell SARL reflect a credit to GLAI of $325,964.83 as of the Petition Date.  If the claims of Honeywell and Honeywell SARL are completely offset, GLAI would be entitled to a credit of $1,783,766.24 against the purchase of goods and services from Honeywell International Inc. and Honeywell International SARL.  Upon the Effective Date, Honeywell International Inc., Honeywell International SARL, and Debtors, will effectuate a setoff such that all prepetition claims of either Honeywell or Honeywell SARL will be paid in full and Honeywell will make available to Debtors $1,783,766.24 as an additional credit for the purchase of good and services from Honeywell.

**23.**    ~~19.~~ **BNP Paribas.**  The work letter dated May 11, 2025, between GLAI and BNP Paribas Securities Corp. (the "BNPP Work Letter") [Docket No. 1582] is approved in its entirety and the Debtors are authorized to perform their obligations thereunder.  The BNPP Work Letter shall be effective *nunc pro tunc* to May 11, 2025.

**24.**    20. ~~Debenture Banks' Lien~~ **Preservation** ~~of Liens~~.  For the avoidance of doubt, notwithstanding Article IX.C of the Plan or any other provision in the Plan, this Order, or any other document entered into in connection with the Plan, including the New Debt Documents (other than the **Amended Glide Notes Documents, the** documents governing the Amended Safra Notes**,** and the Amended Debentures**,** respectively) and any documents in connection with the Exit Notes, Incremental New Money Exit Debt, ~~Take-Back~~**and Take-Back** Notes, ~~and 2026 Alternative~~**the Glide** Notes **Collateral Agent**, Safra**,** and the Debenture Banks shall retain their respective first-priority liens ~~on~~ and security interests ~~in~~ (including through any "fiduciary assignment" granted under Brazilian law) **in** any collateral securing the **(i) Amended Glide Notes, (ii)** Amended Safra Notes**,** and **(iii)** Amended Debentures, BdoB Letters of Credit, Santander Letters of Credit, and Bradesco Letters of Credit, respectively, which liens shall be senior to any liens **on collateral** granted **in connection with the Plan, including** in connection with the Exit Notes, Incremental New Money Exit Debt, **and** Take-Back Notes~~, and 2026 Alternative Notes~~.

21. **The Depository Trust Company.**   Cede & Co. ("Cede"), as nominee of The Depository Trust Company ("DTC"), is authorized and directed to (i) take all actions necessary to effectuate the issuance of New Equity to the underlying beneficial holders (collectively, the "DTC Holders") of the DTC Holders' Subject Claims[3] as contemplated by the Plan, including to contribute the DTC Holders' Subject Claims to New GOL Parent and (ii) execute the Contribution and Subscription Agreement between Cede as contributor and New GOL Parent as recipient (the "Contribution and Subscription Agreement").[4] Cede and DTC shall have no liability whatsoever arising from, relating to, or in connection with this Order or the execution of the Contribution and Subscription Agreement or any other action taken in connection with this Order.

---

[3]   The "DTC Holders' Subject Claims" mean the following Allowed Claims in Classes 10(a)-(e): (i) in Class 10(a), for the 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8; for the 2025 Senior Notes Claims, securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; for the Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3 and 38045UAA8; (ii) in Class 10(b), for 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8; for 2025 Senior Notes Claims, securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; for Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3, and 38045UAA8; (iii) in Class 10(c), for 2025 Senior Notes Claims securities bearing CUSIP numbers 36254VAA6, L4441RAA4, and L4441RAB2; (iv) in Class 10(d), for Perpetual Notes Claims, securities bearing CUSIP numbers G3980PAA3 and 38045UAA8; and (v) in Class 10(e), for 2024 Senior Exchangeable Notes Claims, securities bearing CUSIP numbers 36256KAA8 and L4441GAA8.

[4]   The Contribution and Subscription Agreement provides the mechanism through which the New Equity will be distributed to the DTC Holders and the DTC Holders' Subject Claims will be contributed to New GOL Parent.

25.    22. **Amended Glide Notes.**  On or about the Effective Date, each of the Amended Glide Notes Trustee and TMF Brasil Administração e Gestão De Ativos Ltda., as collateral agent, shall be authorized and permitted to execute, deliver and enter into the Amended Glide Notes Documents to which it is a party, including, as applicable, (i) the Second Supplemental Indenture to the Glide Notes Indenture and (ii) the Fifth Amendment to the Credit Rights Fiduciary Assignment Agreement, in each case (a) without further consent or direction of the holders of the Glide Notes or the Amended Glide Notes or, as applicable, the trustee under the Glide Notes Indenture or the Amended Glide Notes Indenture and (b) without the receipt of any opinion, certificate, resolutions or other documents required under the Glide Notes Indenture or the Amended Glide Notes Indenture (including, without limitation, any documents required by Article 9 or Section 11.03 thereof).

**26.**    23.  **U.S. Specialty Insurance Company.**   Notwithstanding anything to the contrary in the Plan (including Articles V.G (Cancellation of Loans, Securities, and Agreements), VII.D (Estimation of Claims), VII.E (Adjustment to Claims Register without Objection), IX.C (Releases of Liens), IX.E (Releases by Holders**holders** of Claims or Interests), IX.G (Injunction), and XIII.H (Term of Injunctions or Stays)), the Plan Supplement, the Disclosure Statement, the Confirmation**this** Order, or the Exit Notes (**New Debt Documents (**including any documents relating the foregoing that is preemptory or supervening, grants an injunction, discharge, or release) (collectively, the "Plan Documents"), the Plan Documents shall not in any way prime, discharge, impair, modify, or subordinate the rights of U.S. Specialty Insurance Company (together with any and all of its surety affiliates, "Surety") as to: (i) the customs bond 23C00097Q in favor of the U.S. Bureau of Customs and Border Protection ("CBP") (the "Customs Bond"); (ii) the General Indemnity Agreement dated February 25, 2025 (the "Indemnity Agreement"); and (iii) any cash collateral or other collateral of the Surety. Notwithstanding any provision in the Plan Documents to the contrary: (a) all set-off, recoupment, trust and lien rights, and all security interests, of the Surety and any obligee and/or beneficiary under the Customs Bond are preserved and shall not be primed against the Debtors and/or Reorganized Debtors; (b) the Customs Bond and the Indemnity Agreement are deemed and treated as executory contracts and will be assumed (but not assigned) by the Debtors pursuant to the Plan without the need or requirement of any Surety to file or serve any objection to a proposed cure amount or fee application; (c) the Surety reserves all of its rights to modify, extend and/or cancel the Customs Bond in accordance with the terms thereof but without regard to these Chapter 11 Cases; (d) the Surety has no obligation under the Plan Documents to issue or execute any new bond on behalf of any entity, and the Surety has no obligation to extend, modify or

increase the amount of the Customs Bond; (e) the Surety has elected to opt out of the Third-Party Release and said election shall be effective on the Effective Date; (f) the Surety's Allowed Claim, which covers fees and costs incurred through April 30, 2025 of $6,092.50, but excludes any bond losses and additional fees and costs incurred after such date through the Effective Date of the Plan, shall be paid by the Debtors in accordance with the Plan; and (g) the Debtors' and the Surety's respective rights pursuant to Section 502(j) of the Bankruptcy Code are preserved.

**27.** ~~24.~~ **General Unsecured Claim Observer.**  In accordance with Article VII.C of the Plan, the Court approves the appointment of Alton Aviation Consultancy LLC as the General Unsecured Claim Observer effective as of the Effective Date.  The General Unsecured Claim Observer shall have all of the rights, powers, and duties set forth in the Plan, including those specified in Article VII.C.

**28.** ~~25.~~ **Reporting.**  Prior to the Effective Date, the Debtors shall continue to file monthly operating reports for all periods prior to the Effective Date.  Following the Effective Date, the Reorganized Debtors shall have no obligation to continue filing or serving any reports that the Debtors were obligated to file during the pendency of the Chapter 11 Cases, including monthly operating reports (including for those periods for which a monthly operating report was not filed prior to the Effective Date); *provided*, however, that the Reorganized Debtors shall comply with the U.S. Trustee's quarterly reporting requirements.  Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1.

**29.**    26.  **Post-Effective Date Notice Procedures.**  After the Effective Date, notice of filings in the Chapter 11 Cases shall only be required to be served on: (i) the Reorganized Debtors and their counsel; (ii) the U.S. Trustee; (iii) Abra's counsel; (iv) any party directly affected by the relief sought; and (v) any party that specifically requests continued notice by filing a request for notice with the Clerk of the Court.  All other parties shall be removed from the Court's electronic notification list for these Chapter 11 Cases.

**30.**    16.  **Notice of Confirmation Order and Occurrence of the Effective Date.**  The Debtors shall cause a notice of the entry of this Order and occurrence of the Effective Date (the "Notice of the Effective Date"), to be served upon (i) all parties listed in the creditor matrix maintained by Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent in the Chapter 11 Cases), (ii) all parties that filed proofs of claim in the Chapter 11 Cases, and (iii) such additional Persons and Entities as deemed appropriate by the Reorganized Debtors as soon as reasonably practicable after the Effective Date the Reorganized Debtors shall use commercially reasonable efforts to publish the Notice of the Effective Date (or a notice substantially similar thereto) in the Wall Street Journal and the Folha de São Paulo within ten (10) business days after the Effective Date, or as soon as practicable thereafter (allowing reasonable time for translation and other administrative and logistical issues).  No other or further notice of the entry of this Order and occurrence of the Effective Date shall be necessary.

**31.**    27.  **Retention of Jurisdiction.**  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, notwithstanding the entry of this Order and the occurrence of the Effective Date, the Court retains jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including those specified in Article XII of the Plan.

**32.** ~~28.~~ **Final Order.**  This Order is a final order and the period in which an appeal thereof must be filed shall commence upon its entry.

**33.** ~~29.~~ **Receipt of Plan Treatment.**  Each holder of a Claim or Interest's receipt of treatment set forth in the Plan shall be ~~treated as a repayment in~~**a** full **and final satisfaction** of the valid obligations arising out of the relevant prepetition document.  Each ~~Holder~~**holder** shall be deemed to have received their Plan treatment in good faith for valid cause, fair consideration and reasonably equivalent value under all applicable law, and such receipt and application shall not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to challenge, cause of action, or defense, including impairment, set-off, right of recoupment, avoidance, attachments, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, contest, defense, counterclaims, cross-claims or "claim" (as defined in the Bankruptcy Code) under the Bankruptcy Code or applicable nonbankruptcy law.

**34.** ~~30.~~ **Binding Effect.** Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e) and 6004), the Local Rules, or rule 62(a) of the Federal Rules of Civil Procedure to the contrary, as of the date hereof, this Order shall be binding upon and inure to the benefit of the Debtors, Reorganized Debtors, all holders of Claims and Interests (whether or not such holders shall receive or retain any property or interest in property under the Plan and irrespective of whether such holders have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, or injunctions set forth in the Plan, each Entity acquiring property under the Plan, all non-Debtor parties to Executory Contracts and Unexpired Leases, all other parties in interest in the Chapter 11 Cases, and the respective Related Parties of all of the foregoing. The Debtors and the Reorganized Debtors, as applicable, are authorized to take all such actions as are deemed necessary or appropriate to adjust and update the Claims register consistent with the Plan and this Order (including by directing Kroll Restructuring Administration LLC, their claims, noticing, and solicitation agent in the Chapter 11 Cases).  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any ~~Holder~~**holder** of a Claim has voted on the Plan.

**35.** ~~31.~~ **Conflicts.**  The provisions of the Plan and this ~~Confirmation~~ Order shall be construed in a manner consistent with each other so as to effect the purpose of each; provided, however, that if there is any inconsistency between any terms and provisions of this Order and any terms and provisions of the Plan that cannot be so reconciled, then solely to the extent of such inconsistency, the provisions of this Order shall govern, and any provision of this Order shall be deemed a modification of the Plan and shall control and take precedence.

**36.**    32. **Reversal; Liens Binding.**  If any or all of the provisions of this Order are hereafter reversed, modified, or vacated by subsequent order of the Court or any other court of competent jurisdiction, such reversal, modification, or vacatur shall not affect the validity or the enforceability of any act, obligations, indebtedness, liability, priority, or Lien incurred or undertaken by the Reorganized Debtors under or in connection with the Plan or this Order prior to the date that the Reorganized Debtors received actual written notice of the effective date of any such reversal, modification, or vacatur.  Notwithstanding any such reversal, modification, or vacatur of this Order, any act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Order, the Plan, and any amendments or modifications thereto.

**37.**    33. **Closure of Chapter 11 Cases.** The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of this Court to close the Chapter 11 Cases. As of the Effective Date, the Reorganized Debtors may submit separate orders to this Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly. Matters concerning Claims shall be heard and adjudicated in a Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1.

**38.**    ~~34.~~ **Waiver of Stay.**  The requirements of Bankruptcy Rules 3020(e), 6004(h) and 6006(d) regarding the stay of this Order or any of its provisions are waived, and this Order shall be effective and enforceable immediately upon its entry.  **Notwithstanding the waiver of stay provided in this paragraph, no waiver shall be granted with respect to the time period contained in Bankruptcy Rule 3020(e) with respect to the opt-out releases contained in Article IX.E, and the injunction in Article IX.G (solely to the extent it applies to the releases to the non-Debtor Released Parties), and solely to the extent such opt-out releases and injunction are challenged in the** *United States Trustee's Objection to Confirmation of the Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aéreas Inteligentes S.A and Its Affiliated Debtors* **[Docket No. 1577].  The Debtors are authorized to consummate the Plan immediately upon entry of this Order.**

**39.**    ~~35.~~ **Effectiveness; Scope.**    This ~~Confirmation~~ Order shall constitute, to the greatest extent permissible under applicable law, all authority, approvals and consents, if any, required by the laws, rules or regulations of any state or U.S. or foreign governmental authority or any contract with respect to the implementation or ~~consummation~~**Consummation** of the Plan, the Restructuring Transactions, and the Transaction Steps, and any act that may be necessary or appropriate for the implementation or ~~consummation~~**Consummation** of the Plan or this ~~Confirmation~~ Order, and the Transaction Steps.  Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized and directed to accept for filing and/or recording any and all documents and instruments (including a copy of this ~~Confirmation~~ Order) necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, this ~~Confirmation~~ Order, and the Transaction Steps, to the maximum extent permitted under all applicable laws.

**40.**    **No Further Approvals.  Subject to the terms of the Plan, the Debtors** and the Reorganized Debtors, as applicable, are authorized to take all actions necessary or appropriate to effectuate the Plan, including without limitation, the Restructuring Transactions, and each of the Transaction Steps, without the need for any approvals, authorizations or consents except those expressly required by the Plan.  Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date pursuant to this Order, without further application to, or order of the Court, or further action by the Debtors and/or the Reorganized Debtors and their respective directors, officers, members, or stockholders, and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders.

**41.**    ~~36.~~ **Findings of Fact and Conclusions of Law.**  The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 7052 and 9014.  To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such; to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.  Any requirement under the Bankruptcy Rules that the conclusions of law are stated separately from the findings of fact is waived.

**42.**    ~~37.~~ **Headings.**  The headings contained in this Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Order.

Dated: _____, 2025
New York, New York

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE