**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>GOL LINHAS AÉREAS INTELIGENTES S.A., *et al.*,<br><br><div align="right">Debtors.</div> | **FOR PUBLICATION**<br><br>Case No. 24-10118 (MG)<br><br>(Jointly Administered) |

**MEMORANDUM OPINION CONFIRMING DEBTORS' CHAPTER 11 PLAN AND OVERRULING OBJECTIONS**

*A P P E A R A N C E S :*

MILBANK LLP
*Attorneys to the Debtors*
55 Hudson Yards
New York, NY 10001
By:     Evan R. Fleck, Esq.
        Lauren C. Doyle, Esq.
        Bryan V. Uelk, Esq.

1850 K St. NW, Suite 1100
Washington, DC 20006
By:     Andrew M. Leblanc, Esq.
        Erin E. Dexter, Esq.

2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
By:     Gregory A. Bray, Esq.


OFFICE OF THE UNITED STATES TRUSTEE
*William K. Harrington, United States Trustee, Region 2*
1 Bowling Green, Room 534
New York, NY 10004
By:     Annie Wells, Esq.

WILLKIE FARR & GALLAGHER LLP
*Attorneys to the Official Committee of Unsecured Creditors*
787 Seventh Avenue
New York, New York 10019
By:    Brett H. Miller, Esq.
         Todd M. Goren, Esq.
         James H. Burbage, Esq.
         Craig A. Damast, Esq.

DECHERT LLP
*Attorneys to the Ad Hoc Group of Abra Noteholders and DIP Lenders*
1095 Avenue of the Americas
New York, NY 10036-6797
By:    Allan S. Brilliant, Esq.
         Eric Hilmo, Esq.

THE MAGNOZZI LAW FIRM, P.C.
*Attorneys to Oracle do Brasil Sistemas Ltda. and Oracle America, Inc.*
23 Green Street, Suite 302
Huntington, NY 11743
By:    Mark F. Magnozzi, Esq.
         Benjamin Rachelson, Esq

BUCHALTER, P.C.
*Attorneys to Oracle do Brasil Sistemas Ltda. and Oracle America, Inc.*
425 Market Street, Suite 2900
San Francisco, CA 94105
By:    Shawn M. Christianson, Esq.

TOGUT, SEGAL & SEGAL LLP
*Attorneys to TAM Linhas Aéreas S.A.*
One Penn Plaza, Suite 3335
New York, New York 10119
By:    Kyle J. Ortiz, Esq.
         Jared C. Borriello, Esq.
         Amanda C. Glaubach, Esq.

MOORE & VAN ALLEN PLLC
*Attorneys to Wilmington Trust, National Association*
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
By:    Glenn E. Siegel, Esq.
         William D. Curtis, Esq.
         Halee M. Smith, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

This opinion provides a detailed overview of the above-captioned debtors' ("Debtors" or "GOL") chapter 11 plan.  The Court has already entered an order confirming GOL's plan (*see* ECF Doc. # 1646) and writes separately to address the objection to confirmation raised by the United States Trustee.  Specifically, this opinion focuses on the standard for consent to a third-party release, and whether third-party releases can be procured through opt-outs.  The Court determines that opt-outs can be used to obtain creditors' consent to third-party releases, for the reasons discussed *infra*.  The Court also rules that the injunction provision that provides an enforcement mechanism for the releases is appropriate.

Pending before the Court is confirmation of the Debtors' *Fifth Modified Third Amended Joint Chapter 11 Plan of Reorganization of GOL Linhas Aereas Inteligentes S.A. and Its Affiliated Debtors*[1] (confirmed version at ECF Doc. # 1646, and, together with the First Plan Supplement (ECF Doc. # 1539), the Second Plan Supplement (ECF Doc. # 1558), the Third Plan Supplement (ECF Doc. # 1571), the Fourth Plan Supplement (ECF Doc. # 1604), the Fifth Plan Supplement (ECF Doc. # 1629), the Sixth Plan Supplement (ECF Doc. # 1631), and the Seventh Plan Supplement (ECF Doc. # 1633) the "Plan").  In connection with the Plan, the Debtors also filed a memorandum of law in support of confirmation ("Motion," ECF Doc. # 1596), plan supplements (listed above), a declaration by Joseph W. Bliley, GOL's Chief Restructuring Officer, in support of the Plan ("Bliley Decl.," ECF Doc. # 1594), two declarations by John E. Luth, the Executive Chairman of the Debtors' investment banker, in support of the Plan ("Luth Decl. 1," ECF Doc. # 1595, and "Luth Decl. 2," ECF Doc. # 1625), and a declaration by a

---

[1]    This is the ninth iteration of the Plan.  For earlier versions, see ECF Doc. ## 1141, 1239, 1317, 1336, 1364, 1389, 1592, and 1630.

representative of Kroll Restructuring Administration LLC regarding the tabulation of ballots cast ("Kroll Decl.," ECF Doc. # 1603).

Previously, this Court entered an order ("Disclosure Statement Order," ECF Doc. # 1388) approving the Debtors' disclosure statement ("Disclosure Statement" or "DS," ECF Doc. # 1390), which was filed in connection with the present iteration of the Plan.

By the time of the May 20, 2025 confirmation hearing, only one objection to the Plan was left outstanding: that filed by the United States Trustee ("UST Objection,"[2] ECF Doc. # 1577).[3] The Official Committee of Unsecured Creditors ("UCC") filed a statement in support of the Plan ("UCC Statement," ECF Doc. # 1597), and the Ad Hoc Group of Abra Noteholders and DIP Lenders filed a reservation of rights (ECF Doc. # 1586).

For the following reasons, the Court **CONFIRMS** the Plan and **OVERRULES** the UST's objection.  A separate order confirming the Plan has been entered (ECF Doc. # 1646).

## I.    BACKGROUND

### A.  Case history

On January 25, 2024 (the "Petition Date"), GOL Linhas Aereas Inteligentes S.A. and its affiliated debtors and debtors in possession filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code ("Code").  (ECF Doc. # 1.)  The Debtors continues to manage their properties and affairs as debtors in possession under sections 1107(a) and 1108 of the Code.  (Disclosure Statement at 40.)  No trustee or examiner has been appointed in this case.

---

[2]    The UST's objection applied to the Second Modified Third Amended Joint Chapter 11 Plan (ECF Doc. # 1389).  To the extent the UST's objections (and other parties') have been addressed by the operative version of the Plan, it is so noted in this Opinion.

[3]    Oracle do Brasil Sistemas Ltda., together with Oracle America, Inc., filed an objection (ECF Doc. # 1583) as well, which they have since withdrawn (ECF Doc. # 1634).  TAM Linhas Aereas S.A. also filed an objection (ECF Doc. # 1598), which it has since withdrawn (ECF Doc. # 1602).  The objection filed by Wilmington Trust N.A. ("Wilmington Objection," ECF Doc. # 1587, amended at ECF Doc. # 1588) was also resolved prior to the confirmation hearing.

### B.  Overview of Debtors' Business

The Debtors provide an extensive overview of their business in their circulated disclosure statement.  GOL was founded in 2000 and commenced operations in 2001 as a low-cost airline, and it grew into one of Brazil's three largest domestic airlines by market share.  (DS at 25.)  The Debtors' woes were brought about by the COVID pandemic, the temporary grounding of the Boeing Max 737 aircraft in 2019, and climbing interest rates in Brazil and the U.S.  (*Id.* at 22–23.)

The corporate structure is as follows: GLAI is a holding company that directly or indirectly owns shares of nine subsidiaries.  (DS at 15.)  Four of GLAI's subsidiaries are incorporated in Brazil: Debtors GLA, Smiles Viagens e Turismo S.A., Smiles Fidelidade S.A., and GTX S.A.  (*Id.*)  Five other subsidiaries are incorporated elsewhere: Debtors GFC (Cayman Islands), GAC, Inc. (Cayman Islands), GFL (Luxembourg), Smiles Fidelidade Argentina S.A. (Argentina), and Smiles Viajes y Turismo S.A (Argentina).  Debtor GEF is owned by Stichting Holding GOL Equity Finance, a Dutch foundation.  (*Id.*)  GLAI's operating subsidiary is GLA, which conducts the Company's air transportation business.  (*Id.* at 16.)  GFC, GAC, Inc., and GFL facilitate cross-border general financing and aircraft financing transactions; Smiles Fidelidade S.A. and Smiles Fidelidade Argentina S.A. serve the company's loyalty program; Smiles Viagens e Turismo S.A. and Smiles Viajes y Turismo S.A. are travel agencies; and GTX S.A. is a holding company (with currently no equity holdings).  (*Id.*)  GEF is a special purpose vehicle and the issuer of certain of the Company's convertible bonds.  (*Id.*)  GLAI is the direct and indirect parent company of the entire corporate enterprise except for GEF.  (*Id.*)

Abra Group Limited is an airline group that partners with GOL and Avianca, a Colombia-based international airline.  (*Id.* at 23.)  It holds an approximately 53% interest in

GLAI.  (*Id.* at 16.)  In March 2023, Abra concurrently closed a private placement with Abra investors and a private debt investment in the Company (the "Abra Transaction").  (*Id.*) Pursuant to the Abra Transaction, Abra issued certain "Abra Notes" to international bond investors, in exchange for which the investors provided cash and tendered their holdings of 2024 Senior Exchangeable Notes, 2025 Senior Notes, 2026 Senior Secured Notes, and Perpetual Notes at substantial discounts, which notes were tendered to the Company in exchange for the Company's private placement of certain 2028 Senior Secured Notes with Abra.  (*Id.* at 24.) Approximately $1.2 billion of the 2028 Senior Secured Notes, issued by GFL, were subsequently redeemed by GFL at Abra's election.  (*Id.*)  Abra then purchased an equivalent amount of 2028 Senior Secured Exchangeable Notes issued by GEF (which carried substantially identical interest and security terms as the 2028 Senior Secured Notes).  (*Id.*)  The Abra Transaction enabled the Company to retire nearly $1.1 billion in near-term obligations at an average price of seventy-one cents on the dollar and provided the Company with approximately $400 million in liquidity, in exchange for which the Company took on approximately $1.458 billion in new debt at a net higher interest rate, secured by substantially more collateral as compared to the Company's retired secured debt.  (*Id.*)

As its capital structure as of the Petition Date, the Debtors had approximately $4.1 billion of outstanding funded indebtedness and lease obligations, of which approximately $2.2 billion was secured by a substantial portion of the Debtors' assets.  (*Id.*)  An overview of the Debtors' secured and unsecured debt is provided below.

- **Secured Debt**
  - 2028 Notes: On March 2, 2023, GFL issued to Abra an aggregate principal amount of $896,664,000 of senior secured notes maturing in 2028 that accrue interest at the rate of 18.00%, consisting of 4.50% cash interest and 13.50% PIK interest. From March 2023 to September 2023, the principal amount of these 2028 Senior Secured Notes was increased by cash disbursements from Abra to the Company and accrued interest for a total of $1,292,879,000 of the 2028 Senior Secured Notes effectively issued. In September 2023, as contemplated and permitted by the terms of the 2028 Senior Secured Notes Documents, GFL redeemed $1,180,442,000 in principal amount of the 2028 Senior Secured Notes from Abra, and Abra concurrently purchased the same principal amount of 2028 Senior Secured Exchangeable Notes from GEF. The 2028 Senior Secured Exchangeable Notes carry substantially identical interest and security terms as the 2028 Senior Secured Notes and are exchangeable into preferred shares of GLAI subject to certain conditions. All 2028 Senior Secured Notes and 2028 Senior Secured Exchangeable Notes are held by Abra Group Limited and Abra Global Finance. As of the Petition Date, the aggregate outstanding principal amount of 2028 Senior Secured Notes and 2028 Senior Secured Exchangeable Notes was $270 million and $1.207 billion, respectively. (*Id.* at 17.)
  - 2026 Senior Secured Notes: On December 23, 2020, GFL issued $200 million in aggregate principal amount of 8.00% senior secured notes maturing June 30, 2026. On May 11, 2021, and September 28, 2021, GFL issued $300 million and $150 million in aggregate principal amount of additional 2026 Senior Secured Notes, respectively. Certain 2026 Senior Secured Notes were tendered in connection with the Abra Transaction. As of the Petition Date, the aggregate outstanding principal amount of the 2026 Senior Secured Notes was $251.17 million. (*Id.*)
  - Glide Notes: On December 30, 2022, GFL issued $125,699,947.99 in aggregate principal amount of 5.00% senior secured amortizing notes due 2026 and $70,077,902.47 in aggregate principal amount of 3.00% subordinated secured amortizing notes due 2025. The Glide Notes due 2026 amortize in ten equal quarterly installments ending on June 30, 2026; the Glide Notes due 2025 amortize in nine equal quarterly installments ending on June 30, 2025. The Glide Notes due 2025 are contractually subordinated to the Glide Notes due 2026. On January 27, 2023, and July 19, 2023, GFL issued additional Glide Notes due 2026 in aggregate principal amounts of $6,992,575.20 and $8,969,737.96, respectively. On April 20, 2023, and June 7, 2023, GFL issued additional Glide Notes due 2025 in aggregate principal amounts of $19,976,057.79 and $9,000,000.00, respectively. As of the Petition Date, the aggregate principal amount of Glide Notes due 2026 and Glide Notes due 2025 outstanding was $141.66 million and $66.04 million, respectively. (*Id.* at 17–18.)

o <u>Debentures:</u> On October 28, 2018, April 16, 2020, and October 1, 2020, GLA issued, in three series, the 7a Debentures in the aggregate principal amount, as of the Petition Date, of approximately R$411,125,967.60 (equivalent to US$83,562,188.54). The 7a Debentures are held by Banco do Brasil S.A. and Banco Bradesco S.A. On October 27, 2021, GLA issued the 8a Debentures (together with the 7a Debentures, the "Debentures") in the aggregate principal amount, as of the Petition Date, of approximately R$445,340,923.24 (equivalent to US$90,516,447.81). The 8a Debentures are held by Banco Santander S.A. (Brasil) and Banco do Brasil S.A. On August 2, 2024, the Bankruptcy Court entered an order approving an agreement between GLAI, GLA, and the Debenture Banks amending the terms of the Debentures. Among other things, the Debtors agreed to amend the Debentures to provide for during the Chapter 11 Cases (i) payment of contractual interest at the CDI+5.25% (amended from 5.0% prepetition), (ii) an amortization payment of 10% of the outstanding balance amortizing from entry of the Debenture Banks Order, with the remaining 90% to amortize in equal monthly installments through December 2027 (as extended from June 2026), and (iii) a structuring fee of 1.0% of the outstanding balance of the Debentures. Subject to confirmation of a Plan, the Debtors agreed to provide the same treatment to the holders of the Debenture Claims on account of the Debentures under the Plan. In exchange, the Debenture Banks agreed to (i) provide for the factoring of receivables, including Visa Receivables (as defined in the Debenture Banks Order), up to a committed credit line of R$1.87 billion in receivables, subject to certain conditions, (ii) renew expiring standby letters of credit, and (iii) support a chapter 11 plan containing the terms set forth in the Debenture Banks Order. (*Id.*at 18–19.)

o <u>Safra Secured Claims:</u> From time to time, the Company issues credit lines with private banks using import spare parts and aeronautical equipment, or import financing (the "FINIMPs"). As of the Petition Date, GLA had approximately $4.1 million in FINIMPs held by Banco Safra S.A. (Luxembourg Branch) outstanding. In August 2022, GLA issued a secured bank credit note (Cédulas de Crédito Bancário) to Banco Safra S.A. in the principal amount of approximately $14 million. The 2022 Bank Credit Note accrues interest at the CDI rate plus 4.70%, amortizes in monthly installments ending on February 29, 2024, and is secured by a fiduciary assignment of American Express credit and debit card receivables. As of the Petition Date, the Debtors had approximately $985,000 outstanding under the 2022 Bank Credit Note. The Debtors and Banco Safra S.A. and Banco Safra S.A. (Luxembourg Branch) (collectively, "Safra") entered into a stipulation, as entered by the Bankruptcy Court on May 29, 2024, regarding, among other things, adequate protection of Safra's secured claims in exchange for agreements to factor certain credit and debit card receivables and

8

amendments to the secured notes held by Safra to reflect the terms of the Safra Stipulation. (*Id.* at 19.)

o  Pine Secured Claims: In September 2022, GLA issued a secured bank credit note (Cédulas de Crédito Bancário) to Banco Pine S.A. ("Pine") in the principal amount of approximately $8 million (the "Pine Credit Note"). The Pine Credit Note accrues interest at 18.53%, amortizes in monthly installments ending on September 20, 2024, and is secured by a bank deposit certificate. As of the Petition Date, the Debtors had $3.6 million outstanding under the Pine Credit Note. The Debtors and Pine entered into a settlement agreement, as authorized by the Bankruptcy Court on August 26, 2024, to, among other things, amend or enter into new agreements to evidence an obligation of approximately $2,199,963 in favor of Pine, which will be amortized over four years beginning in September 2024. The Debtors also agreed to make monthly interest payments to Pine on this amount at an annual interest rate of 15.8%. Pine agreed to provide the Debtors with a new credit line of approximately $3,046,798 to allow the Debtors to enter into derivative financial instruments related to currency or oil and its subproducts. Pine also agreed to dismiss the collection action it commenced against the Debtors in Brazil and not undertake any judicial or extrajudicial measures to collect any prepetition amounts from the Debtors. (*Id.* at 19–20.)

o  Rendimento Secured Claims: In September 2018, GLA entered into a Partnership and Cooperation Agreement (the "Partnership Agreement") with Banco Rendimento S.A. ("Rendimento"), pursuant to which Rendimento agreed to purchase up to approximately $6.1 million of GLA's trade payables directly from GLA's suppliers. Pursuant to the Partnership Agreement, as of the Petition Date, Rendimento had purchased approximately three receivables from Vibra Energia S.A., each in the amount of approximately $2 million. To secure approximately 50% of the first approximately $4 million of payables purchased by Rendimento, GLA granted Rendimento a fiduciary assignment of approximately $2 million of receivables related to short-term investment securities held by GLA at Rendimento. As detailed below, on August 29, 2024, the Bankruptcy Court entered an order approving a settlement agreement between the Debtors and Rendimento. Pursuant to the settlement agreement, the Debtors and Rendimento agreed to amend their existing agreements or enter into new agreements to evidence an obligation in favor of Rendimento in the amount of approximately $4,054,518. The Debtors agreed to make monthly principal payments to Rendimento of less than $100,000 over four years, with the first installment due on the later of August 23, 2024, or three (3) days after the execution of definitive documentation. The Debtors also agreed to make interest payments to Rendimento on this amount at an annual interest rate of 13.7%. Rendimento agreed to refrain from undertaking judicial or extrajudicial measures to collect on any

prepetition amounts from the Debtors or Reorganized Debtors.  (*Id.* at 20.)

- **Unsecured Debt**
  - 2024 Senior Exchangeable Notes: On March 26, 2019, GEF issued $300 million in aggregate principal amount of 3.75% unsecured 2024 senior exchangeable notes due July 15, 2024.  On April 17, 2019, and July 22, 2019, GEF issued an additional $45 million and $80 million, respectively, in aggregate principal amount of 2024 Senior Exchangeable Notes.  The 2024 Senior Exchangeable Notes are exchangeable into preferred shares of GLAI subject to certain conditions. Certain 2024 Senior Exchangeable Notes were tendered in connection with the Abra Transaction.  As a result, as of the Petition Date, the aggregate principal of the 2024 Senior Exchangeable Notes outstanding was $42.5 million.  (*Id.* at 20.)
  - 2025 Senior Secured Notes: On December 11, 2017, GFL issued $500 million in aggregate principal amount of 7.00% unsecured 2025 Senior Notes due January 31, 2025.  On February 2, 2018, GFL issued an additional $150 million in aggregate principal amount of 2025 Senior Notes.  Certain 2025 Senior Notes were tendered in connection with the Abra Transaction.  As of the Petition Date, the aggregate principal of the 2025 Senior Notes outstanding was $354.1 million.  (*Id.*)
  - Perpetual Notes: On April 5, 2006, GFC issued $200 million in aggregate principal amount of 8.75% unsecured Perpetual Notes. Certain Perpetual Notes were tendered in connection with the Abra Transaction.  As of the Petition Date, the aggregate principal of the Perpetual Notes outstanding was $140.2 million.  (*Id.* at 20–21.)
  - Safra Unsecured Claims: In October 2020, GLA issued an unsecured bank credit note (Cédulas de Crédito Bancário) to Safra in the principal amount of approximately $2 million.  The 2020 Bank Credit Note accrues interest at the CDI rate plus 4.907% and amortizes in monthly installments ending on October 23, 2025.  As of the Petition Date, approximately $1.396 million was outstanding under the 2020 Bank Credit Note.  Additionally, GLA owes certain unsecured trade payables to Safra in the amount of $15,046.00. (*Id.* at 21.)
  - Air France-KLM Unsecured Credit Facility: On November 2023, GLA obtained a $25 million credit facility with Air France-KLM (the "AF-KLM Credit Facility").  The AF-KLM Credit Facility carries no interest.  As of the Petition Date, approximately $20.2 million of the AF-KLM Credit Facility was outstanding, which has since been paid off pursuant to the Final Order (i) Authorizing the Debtors to (a) Assume Certain Critical Airline Agreements, (b) Honor Prepetition Obligations Related Thereto, and (c) Enter into New Critical Airline Agreements; (ii) Modifying the Automatic Stay; and (iii) Granting Related Relief.  (*Id.*)
  - Trade Payables: As of the Petition Date, the Debtors had approximately $185.4 million of unsecured trade payables outstanding.  (*Id.*)

o <u>Aircraft and Engine Leases:</u> As of the Petition Date, the Debtors operated 141 aircraft under lease agreements, pursuant to which they are required to make monthly lease payments and meet certain other obligations (which may include maintenance, servicing, and insurance expenses) and comply with specified return conditions of the leased aircraft. As of the Petition Date, the Debtors had sixty-four spare engines under lease agreements, pursuant to which they are required, subject to certain exceptions, to make lease rental payments and to bear the maintenance expenses and comply with the return conditions of each engine. As of the Petition Date, the Debtors' lease obligations aggregated approximately $1.92 billion, with approximately $353.6 million payable over the twelve months following the Petition Date. From time to time, the Company enters into letters of credit with lessors in support of their lease obligations. As of the Petition Date, these letters of credit totaled $84.7 million, of which $27.4 million were cash collateralized. (*Id.* at 21–22.)

o <u>Other Unsecured Debt</u>: The Debtors also have obligations arising from or related to certain litigation claims asserted by Brazilian plaintiffs and governmental authorities. (*Id.* at 22.)

## C. Overview of the Proposed Plan

As discussed in the Disclosure Statement, the Plan permits the Debtors to deleverage their balance sheet by converting into equity, or otherwise extinguishing, approximately $1.7 billion of prepetition funded debt and up to $850 million of other obligations. (DS at 2.) Abra, the Debtors' largest secured creditor and GLAI's majority prepetition economic interest holder, agreed to equitize a significant portion of its claims in exchange for new equity and exchangeable take-back debt. (*Id.* at 3.) The Debtors intended to raise up to $1.9 billion of new capital in the form of (i) exit notes to repay the DIP facility and (ii) incremental new money exit financing to provide incremental liquidity to support the reorganized Debtors' business strategy following their emergence from chapter 11. (*Id.*) The Debtors were able to raise this $1.9 billion of exit financing, consistent with the terms of the exit financing agreement previously approved by this Court. (Luth Decl. 2 ¶ 7.) Two anchor investors, Castlelake, L.P. and Elliot Investment Management, L.P., bought $1.25 billion of the exit notes, and an Ad Hoc Group of 2026

11

Noteholders bought $50 million (down from the originally-planned $125 million); the Debtors

also allowed 2026 Noteholders who were *not* part of the Ad Hoc Group to participate in a rights

offering, which resulted in the purchase of an additional $30 million, and other investors stepped

in to commit $570 million.[4]  (ECF Doc. # 1631.)  The rights offering wound up oversubscribed,

which allowed GOL to reduce the interest rate associated with the exit financing from 14.625%

to 14.375%.[5]  These $1.9 billion in commitments fully satisfied the minimum funding threshold

required under the exit financing commitment letter (*see* ECF Doc. # 1398-3) and the amended

and restated commitment letter (*see* ECF Doc. # 1558, Annex 3 to Joinder) and, as contemplated

in the Plan, will provide the funding necessary for the Debtors to emerge from these chapter 11

cases and support their ongoing and future operational and liquidity needs (Luth Decl. 2 ¶ 8).  In

addition, certain other secured obligations are being exchanged for take-back debt, and the

Debtors will assume their restructured Aircraft Leases.  (DS at 3.)

The Plan represents a settlement between the Debtors, the UCC, and Abra of various

claims that could have been asserted because of the Abra Transaction, as well as settlements with

the Ad Hoc Group of 2026 Noteholders and Whitebox (together, the "Plan Settlement").  (*Id.* at

3–4; *see also* Bliley Decl. ¶ 3.)  Two independent committees, the Debtors' restructuring

committee and the UCC, investigated the Abra Transaction (and other prepetition transactions

the Debtors entered into) and determined that litigating any potential claims would be too costly

and risky and that settlement was the value-maximizing path forward.  (Bliley Decl. ¶ 16.)

Pursuant to the Plan Settlement, among other things, Abra agreed to accept, in full satisfaction of

---

[4]      *See also GOL secures $1.9 billion of 5-year exit financing*, PR Newswire (May 16, 2025, 7:05 AM),
https://finance.yahoo.com/news/gol-secures-1-9-billion-
110500067.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuYmluZy5jb20v&guce_referrer_sig=AQAAA
Et3va9mKs3RU0nAeDKre9xZmivDFX1XiOSwWlwk_emKRMNTtY6y6Dgm5QkzUc0FaNniBnIQ6EkXFWk484
nqeIA_YU0hwydsdTrsnGn1609Bylkm23uaeQ75rTUl6zOXwmRMWTVtbcKaPXN_wWiwrUaVz2FqlteH-
klad7jbM9uy.

[5]      *See supra* n. 4.

12

its approximately $2.8 billion secured claim, new equity with an approximate value of $950

million and take-back debt totaling $850 million; it was Abra's settlement, at least in part, which

enabled holders of Allowed General Unsecured Claims to receive new equity with a value of at

least $235 million.  (Bliley Decl. ¶ 9.)  Initially, the 2026 Ad Hoc Group and Whitebox Advisors

were going to object to the settlement with Abra, but the Debtors resolved their objections as

well.  As part of their settlement, the 2026 Ad Hoc Group members agreed to purchase $125

million of exit notes (eventually lowered to $50 million, as noted above).  Further, holders of

Allowed 2026 Senior Secured Notes Claims that are not members of the 2026 Ad Hoc Group

were given the right to purchase an aggregate of $50 million of exit notes.  (*See supra*.)  As for

Whitebox, its settlement contemplates, among other things, that, in resolution of the disputes and

challenges raised by Whitebox to the allocation of the settlement value attributable to holders of

General Unsecured Claims, a portion of that settlement value will be allocated to Debtor GEF,

which previously was not receiving any of the Plan Settlement value.  (Motion at 10–13.)

The new equity issued in accordance with the Plan will be issued at the level of the "New

GOL Parent," a new entity formed to hold 100% of the equity interests in the reorganized GLAI

(with some exceptions).  (DS at 4.)  The new equity will not be traded on any public listing

exchange on the effective date, and New GOL Parent is to be structured as a company organized

under the laws of Luxembourg, with a subsidiary intermediate holding company organized under

the laws of Brazil, for tax and other corporate reasons.  (*Id*.)  At least once following the

Effective Date, at a time to be set forth in the Plan Supplement and subject to applicable law,

New GOL Parent will send a notice to its shareholders inquiring whether certain shareholders

desire to purchase or dispose any of their equity interests of New GOL Parent, and the desired

terms for such transactions.  To the extent that any shareholders offer to buy shares at a price that

exceeds the price that any shareholders offer to sell their shares, New GOL Parent will facilitate a possible transaction, thereby allowing such shareholders to transact with one another, subject to certain procedures and conditions. (*Id.* at 4.)

The Plan includes a release by holders of claims or interests (with the opportunity to opt out[6]), an exculpation provision, a debtor release, and an injunction in support of the releases, each of which is reproduced below:

> Third-party release: Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party[7] shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties[8] from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance

---

[6]    *See infra* n. 7.

[7]    "Releasing Parties" is defined in the Plan as, "collectively, each of the following, in each case in its capacity as such: (i) each of the Released Parties; (ii) all holders of Claims that vote to accept the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; (iii) all holders of Claims or Interests that are Unimpaired under the Plan and do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable notice; (iv) all holders of Claims in Classes that are entitled to vote under the Plan but that (a) vote to reject the Plan or do not vote either to accept or reject the Plan and (b) do not affirmatively opt out of granting the releases in Article IX.E by checking the box on the applicable ballot; and (v) with respect to each of the foregoing Entities and Persons set forth in clauses (ii) through (iv), all of such Entities' and Persons' respective Related Parties. For the avoidance of doubt, holders of Claims or Interests in Classes that are deemed to reject the Plan and therefore are not entitled to vote under the Plan are not Releasing Parties in their capacities as holders of such Claims or Interests." (Plan Art. I.A.260.) The propriety of the opt-out mechanism employed by the Debtors is discussed further below.

[8]    "'Released Parties' means, collectively, each of the following, in each case in its capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) the Committee and its members; (iv) the other Consenting Stakeholders; (v) the DIP Noteholders; (vi) the Agents/Trustees; (vii) the Ad Hoc Group of Abra Noteholders and Elliott; and (viii) with respect to each of the foregoing Entities and Persons set forth in clause (i) through (vii), each of such Entities' and Persons' Affiliates and its and their respective Related Parties. Notwithstanding the foregoing, (i) any Entity or Person that opts out of the releases set forth in Article IX.E shall not be deemed a Released Party and (ii) any Entity or Person that would otherwise be a Released Party hereunder but is party to one or more Retained Causes of Action shall not be deemed a Released Party with respect to such Retained Causes of Action." (Plan Art. I.A.259.)

In turn, "Related Parties" means, "with respect to any Entity or Person, in each case in its capacity as such with respect to such Entity or Person, such Entity's or Person's current and former, in each case as applicable, directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees." (*Id.* Art. I.A.258.)

14

Actions), remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of a Claim or Interest, including any derivative claims or Causes of Action assertable on behalf of any Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Chapter 11 Cases, the DIP Facility, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security or other debt instrument of the Debtors or Reorganized Debtors, the assumption, rejection, or amendment of any Executory Contract or Unexpired Lease, the subject matter of, or the transactions or events giving rise to, any Claim or Interest dealt with in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, and the negotiation, formulation, preparation, entry into, consummation, or dissemination of (i) the DIP Facility Documents, (ii) the Plan Support Agreement, (iii) the Disclosure Statement, (iv) the Plan (including, for the avoidance of doubt, the Plan Supplement), (v) the Transaction Steps, (vi) the Restructuring Transactions, (vii) the New Debt Documents, (viii) the Incremental New Money Equity Documents, (ix) the New Equity Documents, or (x) any related agreements, instruments, or other documents, in each case, in connection with or relating to any act or omission, transaction, event, or other occurrence taking place on or before the Effective Date, other than claims unknown to such Releasing Party as of the Effective Date arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases granted in this Article IX.E do not release any post-Effective Date obligations or liabilities of any Person or Entity under the Plan, any assumed Executory Contract or Unexpired Lease, or agreement or document that is created, amended, ratified, entered into, or Reinstated pursuant to the Plan (including the New Debt Documents, the Incremental New Money Equity Documents, and the New Equity Documents).

(Plan Art. IX.E.)  As the Plan's definition of "Releasing Parties" suggests, creditors are only bound by the third-party releases if they (1) voted to accept the Plan (or if their vote was designated as an acceptance because they were unimpaired under the Plan), voted to reject the Plan, or abstained from voting on the Plan *and* (2) did *not* opt out of the third-

party release by checking the appropriate box on the ballot sent to them.  (DS at 8.)
Creditors who could not vote because they are impaired under the Plan and were deemed
to have rejected the Plan are not bound by the third-party release (and so do not have opt-
out rights).  (*Id.*)

The Plan also includes an exculpation provision.  The UST objected to the
exculpation provision as originally proposed, but the objection was resolved and
withdrawn when the provision was revised.  Other than quoting the provision as
approved, in light of the resolution of the UST's objection, the Court will not address the
legal principles applicable to exculpation.  The exculpation provision as approved as part
of the Plan provides as follows:

> Exculpation: Without affecting or limiting the releases set forth in Article
> IX.D and Article IX.E, and notwithstanding anything herein to the contrary
> effective as of the Effective Date, to the fullest extent permitted by law, no
> Exculpated Party[9] shall have or incur, and each Exculpated Party shall be
> exculpated from, any Claim, claim or Cause of Action in connection with
> or arising out of the administration of the Chapter 11 Cases, the negotiation
> and pursuit of the DIP Facility Documents, the Plan Support Agreement,
> the Disclosure Statement, the solicitation of votes on, or confirmation of,
> the Plan, the New Debt Documents, the Incremental New Money Equity
> Documents, the New Equity Documents, any settlement or compromise
> reflected in the Plan, the Transaction Steps, the Restructuring Transactions,
> and the Plan (including, for the avoidance of doubt, the Plan Supplement),
> the funding of the Plan, the occurrence of the Effective Date, the
> administration and implementation of the Plan or the property to be
> distributed under the Plan, the issuance or distribution of securities under or

---

[9]    Defined as, "collectively, and in each case in their capacities as such: (i)(a) the Debtors, (b) the
Reorganized Debtors, (c) the Committee and its members, (d) the General Unsecured Claim Observer, (e) the Ad
Hoc Group of Abra Noteholders and Elliott, (f) the Abra Notes Agents, (g) the DIP Agent and the DIP Trustee, (h)
the 2024 Senior Exchangeable Notes Trustee, the 2025 Senior Notes Trustee, and the Perpetual Notes Trustee, and
(i) Abra; (ii) with respect to each of the Entities and Persons in clause (i), all of such Entities' and Persons' Related
Parties, solely to the extent such Related Parties are fiduciaries of the Estates or otherwise to the fullest extent
provided for pursuant to section 1125(e) of the Bankruptcy Code and with respect to each of the preceding Entities
and Persons in clauses (b) through (g), solely with respect to work performed on behalf of the applicable Entity or
Person in connection with the negotiation, execution, and implementation of any transactions approved by the
Bankruptcy Court in the Chapter 11 Cases; and (iii) each other Consenting Stakeholder, its Affiliates, and each of its
and their respective Related Parties; provided, that with respect to the Entities and Persons in clause (iii), any
exculpations provided under the Plan or the Confirmation Order shall be granted only to the extent provided in
section 1125(e) of the Bankruptcy Code."  (Plan Art. I.A.139.)

in connection with the Plan, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors under or in connection with the Plan, or the transactions in furtherance of any of the foregoing, in each case, other than claims or liabilities arising out of or relating to any act or omission of an Exculpated Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence; provided, that, notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not apply to any (i) liability that cannot be exculpated pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.P.R. § 1200), and (ii) cause of action, liability or claim arising out of or relating to any police, regulatory, criminal, or other enforcement action by a governmental agency. The Exculpated Parties have, and upon implementation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on the Plan and, therefore, are not liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any applicable laws, rules, or regulations protecting the Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any pre-Petition Date or post-Effective Date conduct, omitted acts, 89 obligations, or liabilities of any Person or Entity except those related to the administration and implementation of the Plan or the property to be distributed under the Plan, the issuance or distribution of securities under or in connection with the Plan, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors under or in connection with the Plan, or the transactions in furtherance of any of the foregoing.

(Plan Art. IX.F.)

The Plan also includes the following injunction:

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD

CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE IX.F WITH RESPECT TO THE EXCULPATED PARTIES), IN EACH CASE TO THE EXTENT THE CLAIMS OR INTERESTS ARE EXTINGUISHED, DISCHARGED, RELEASED, SETTLED, COMPROMISED, OR EXCULPATED PURSUANT TO THE PLAN: (I) COMMENCING OR CONTINUING ANY ACTION OR PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS OR ANY OTHER CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR OTHER ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OF SUCH ENTITIES OR THEIR ESTATES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) ASSERTING THE RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS NOTWITHSTANDING AN INDICATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY SUCH RIGHT.. BY ACCEPTING DISTRIBUTIONS UNDER THE PLAN, EACH HOLDER OF A CLAIM OR INTEREST EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN SHALL BE DEEMED TO HAVE AFFIRMATIVELY AND SPECIFICALLY CONSENTED TO BE BOUND BY THE PLAN, INCLUDING THE INJUNCTIONS SET FORTH IN THIS ARTICLE IX.G. THE INJUNCTIONS IN THIS ARTICLE IX.G SHALL INURE TO THE BENEFIT OF THE DEBTORS, ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

(*Id.* Art. IX.G.)

The debtor release reads as follows:

> Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, to the maximum extent permitted by applicable law, the Debtors, the Reorganized Debtors, and the Estates (in each case on behalf of themselves and their respective successors, assigns, and representatives) are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Estates (and in each case their respective successors, assigns, and representatives) would have been legally entitled to assert (whether individually or collectively), including any derivative claims or Causes of Action assertable on behalf of any Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Chapter 11 Cases, the DIP Facility, the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security or other debt instrument of the Debtors or Reorganized Debtors, the assumption, rejection, or amendment of any Executory Contract or Unexpired Lease, the subject matter of, or the transactions or events giving rise to, any Claim or Interest dealt with in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, and the negotiation, formulation, preparation, entry into, consummation, or dissemination of (i) the DIP Facility Documents, (ii) the Plan Support Agreement, (iii) the Disclosure Statement, (iv) the Plan (including, for the avoidance of doubt, the Plan Supplement), (v) the Transaction Steps, (vi) the Restructuring Transactions, (vii) the New Debt Documents, (viii) the Incremental New Money Equity Documents, (ix) the New Equity Documents, or (x) any related agreements, instruments, or other documents, in each case, in connection with or relating to any act or omission, transaction, event, or other occurrence taking place on or before the Effective Date, other than claims unknown to the Debtors as of the Effective Date arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release granted in this Article IX.D does not release any post-Effective Date obligations or liabilities of

any Person or Entity under the Plan, any assumed Executory Contract or Unexpired Lease, or agreement or document that is created, amended, ratified, entered into, or Reinstated pursuant to the Plan (including the New Debt Documents, the Incremental New Money Equity Documents, and the New Equity Documents).

(Plan Art. IX.D.)  No party contests the inclusion of the Debtors' release.  The propriety of this release is discussed below.

### D.  Proposed Classes and Class Treatment Under the Plan

The Plan creates 15 separate classes, summarized in the following table:

| Class | Status / Voting Rights | Proposed Treatment |
|---|---|---|
| 1 – Priority Non-Tax Claims | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | Except to the extent previously paid or the holder of a Priority Non-Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Non-Tax Claim shall (i) receive from the applicable Reorganized Debtor, in full and final satisfaction of its Priority Non-Tax Claim, payment, in Cash, equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its Priority Non-Tax Claim becomes due and payable in the ordinary course or (ii) be otherwise rendered Unimpaired. |
| 2 – Other Secured Claims | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim, at the option of the Debtors or Reorganized Debtors, as applicable, shall, subject to applicable law and any applicable Lessor Agreement, (i) receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date such Claim becomes an Allowed Claim; (ii) have its Allowed Other Secured Claim Reinstated on the Effective Date; (iii) receive such other treatment sufficient to render its Allowed Other Secured Claim Unimpaired on the Effective Date; or (iv) on the Effective Date, receive delivery of, or retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim. |
| 3 – 2028 Notes Claims | Impaired<br><br>Entitled to Vote | Allowance: The 2028 Notes Claims shall be Allowed Secured Claims in the aggregate principal amount of $1,477,538,000, plus accrued and unpaid interest, the premiums (including each Applicable Premium), and all other applicable fees, costs, expenses, and other amounts due under the terms of the 2028 Notes Documents, subject to reduction for payments made by |

| | | the Debtors.  Treatment: On the Effective Date, each holder of an Allowed 2028 Notes Claim shall receive, in full and final satisfaction of its Allowed 2028 Notes Claim, its Pro Rata share of: (i) $600 million in aggregate principal amount of Non-Exchangeable Take-Back Notes, (ii) $250 million in aggregate principal amount of Exchangeable Take-Back Notes, (iii) the Abra Equity Distribution, and (iv) Cash in an amount equal to accrued and unpaid Cash Interest to but excluding the Effective Date.  In no event shall any holder of a 2028 Notes Claims (in its capacity as such) be entitled to any recovery from the General Unsecured Claimholder Distribution on account of any unsecured or deficiency Claims. |
|---|---|---|
| **4 – 2026 Senior Secured Notes Claims** | Impaired<br><br>Entitled to Vote | Allowance: The 2026 Senior Secured Notes Claims shall be Allowed in the aggregate amount of $252,565,388.91. Treatment: On the Effective Date, (x) each member of the 2026 Ad Hoc Group shall purchase its Participating AHG Members' share of the AHG Member Exit Financing Allocation and (y) each Participating Non-AHG Member shall purchase its share of the Non-AHG Exit Financing Allocation. Each Participating 2026 Senior Secured Noteholder shall receive, on account of each such Participating 2026 Senior Secured Noteholder's Participating 2026 Senior Secured Notes Claims, and in exchange for its participation in the 2026 Exit Financing Allocation: (A) Exit Notes with a principal value equal to 44% of such Participating 2026 Senior Secured Notes Claims; and (B) Non-Exchangeable Take-Back Notes with a principal value equal to 22% of such Participating 2026 Senior Secured Notes Claims. Holders of any Non-Participating 2026 Senior Secured Notes Claims shall receive, in full and final satisfaction of such Non-Participating 2026 Senior Secured Notes Claims, their pro rata share of $100,000,000 of Non-Exchangeable Take-Back Notes (the "Non-Participating 2026 Senior Secured Notes Claims Recovery"), which pro rata share shall be based on the amount of such holder's Allowed 2026 Senior Secured Notes Claim as of the applicable record date as compared to the aggregate Allowed 2026 Senior Secured Notes Claims of $252,565,388.89 and not subject to adjustment based on the amount of Participating 2026 Senior Secured Notes Claims. |
| **5 – Glide Notes Claims** | Impaired<br><br>Entitled to Vote | Allowance: The Glide Senior Notes Claims shall be Allowed in the aggregate principal amount of $141,662,259, and the Glide Subordinated Notes Claims shall be Allowed in the aggregate principal amount of $66,035,974, in each case, plus accrued and unpaid interest to but excluding the Effective Date and all applicable fees, costs, expenses, and other amounts due under the terms of the Glide Notes Documents, subject to reduction for payments made by the Debtors. Treatment: Pursuant to the Lessor Agreements, on the Effective Date, in full and final satisfaction of their respective |

| | | Claims, (i) each holder of an Allowed Glide Senior Notes Claim shall receive its Pro Rata share of the Amended Glide Senior Notes and Cash in an amount equal to accrued and unpaid interest under the Glide Notes Documents in respect of such holder's 5.00% Senior Secured Notes due 2026, and (ii) each holder of an Allowed Glide Subordinated Notes Claim shall receive its Pro Rata share of the Amended Glide Subordinated Notes and Cash in an amount equal to accrued and unpaid interest under the Glide Notes Documents in respect of such holder's 3.00% Subordinated Secured Notes due 2025. |
|---|---|---|
| **6 – Debenture Banks Claims** | Impaired<br><br>Entitled to Vote | <u>Allowance</u>: Pursuant to the Debenture Banks Order, the Debenture Banks shall each have an Allowed Secured Claim in accordance with the Debenture Banks Order.  <u>Treatment</u>: Pursuant to the Debenture Banks Stipulation and Debenture Banks Order, on the Effective Date, in full and final satisfaction of its Allowed Debenture Banks Claim, each holder of an Allowed Debenture Banks Claim shall receive the treatment set forth in the Debenture Banks Stipulation and Debenture Banks Order, and the Amended Debentures shall become binding on, and vest with, the applicable Reorganized Debtors, in each case as agreed to by the Debenture Banks in the Debenture Banks Stipulation and Debenture Banks Order. On the Effective Date, the outstanding BdoB Letters of Credit, Santander Letters of Credit, and Bradesco Letters of Credit, and the Reimbursement Agreement applicable to each of the foregoing, shall be Reinstated and, following the Effective Date, shall continue in full force and effect and continue to be renewed subject to the terms and conditions of the Debenture Banks Stipulation and Debenture Banks Order. Any amounts due and owing to a Debenture Bank as of the Effective Date under any such Reimbursement Agreement shall be paid to the applicable Debenture Bank on the later of the (x) Effective Date and (y) date such amounts are due under the Reimbursement Agreement, and the Debenture Banks shall not be obligated to file a request for payment of any Administrative Expense arising under any Reimbursement Agreement on or before the Administrative Expense Bar Date. For the avoidance of doubt, any BdoB Letters of Credit, Santander Letters of Credit, or Bradesco Letters of Credit that are drawn on or after the Effective Date shall be repaid in the ordinary course of the Reorganized Debtors' business. |
| **7 – AerCap Secured Note Claims** | Impaired<br><br>Entitled to Vote | <u>Allowance</u>: Pursuant to the AerCap Settlement Order, the AerCap Term Sheet, and the AerCap Secured Note Order, the AerCap Secured Note Claims shall be Allowed in accordance with, and on the terms set forth in, the AerCap Settlement Order, the AerCap Secured Note Order, and the AerCap Secured Note Documents entered into in connection with the AerCap Secured Note Order.  <u>Treatment</u>: The Allowed AerCap Secured Note Claims shall be entitled to the treatment |

| | | set forth in the AerCap Secured Note Order and the AerCap Secured Note Documents, and the obligations, security interests, and guarantees provided for in the AerCap Secured Note Documents shall become binding on, and vest with, the applicable Reorganized Debtors on the Effective Date. |
|---|---|---|
| **8 – Safra Claims** | Impaired<br><br>Entitled to Vote | <u>Allowance</u>: Pursuant to the Safra Stipulation, Safra shall have an (i) Allowed Secured Claim in the amount of (A) of $2,344,452.34 on account of 2017 FINIMP Notes, (B) $1,726,696.68 on account of the 2018 FINIMP Notes, (C) $1,396,333.33 on account of the 2020 Bank Credit Note, and (D) $985,054.96 on account of the 2022 Bank Credit Note, and (ii) Allowed Unsecured Claim in the amount of $15,046.00 on account of the Safra Trade Payables.<br><u>Treatment</u>: Pursuant to the Safra Stipulation, on the Effective Date, in full and final satisfaction of the Allowed Safra Claims, (i) each holder of an Allowed Safra Claim shall receive its Pro Rata share of the Amended Safra Notes and (ii) the Safra Trade Payables shall be Reinstated and paid in the ordinary course of the Reorganized Debtors' business. |
| **9 – Non-U.S. General Unsecured Claims** | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | On the Effective Date, except to the extent that a holder of an Allowed Non-U.S. General Unsecured Claim agrees to less favorable treatment, each Non-U.S. General Unsecured Claim shall continue in effect and, to the extent Allowed, be paid in the ordinary course of the Reorganized Debtors' business. For the avoidance of doubt, this treatment shall be without prejudice to the rights, claims, and defenses of the Debtors and/or the Reorganized Debtors, as applicable, under all applicable non-bankruptcy law. |
| **10(a) - GLAI General Unsecured Claims** | Impaired<br><br>Entitled to Vote | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GLAI General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GLAI General Unsecured Claim, its Pro Rata share of the GLAI General Unsecured Claimholder Distribution. |
| **10(b) - GLA General Unsecured Claims** | Impaired<br><br>Entitled to Vote | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GLA General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GLA General Unsecured Claim, its Pro Rata share of the GLA General Unsecured Claimholder Distribution. |
| **10(c) - GFL General Unsecured Claims** | Impaired<br><br>Entitled to Vote | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GFL General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GFL General Unsecured Claim, its Pro Rata share of the GFL General Unsecured Claimholder Distribution. |
| **10(d) - GFC General** | Impaired | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of |

| Unsecured Claims | Entitled to Vote | an Allowed GFC General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GFC General Unsecured Claim, its Pro Rata share of the GFC General Unsecured Claimholder Distribution. |
|---|---|---|
| **10(e)** - **GEF General Unsecured Claims** | Impaired<br><br>Deemed to Reject | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GEF General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GEF General Unsecured Claim, its Pro Rata share of the GEF General Unsecured Claimholder Distribution. |
| **10(f)** - **GAC General Unsecured Claims** | Impaired<br><br>Entitled to Vote | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GAC General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GAC General Unsecured Claim, its Pro Rata share of the GAC General Unsecured Claimholder Distribution. |
| **10(g)** - **GTX General Unsecured Claims** | Impaired<br><br>Deemed to Reject | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed GTX General Unsecured Claim shall receive, in full and final satisfaction of its Allowed GTX General Unsecured Claim, its Pro Rata share of the GTX General Unsecured Claimholder Distribution. |
| **10(h)**[10] - **Smiles Fidelidade General Unsecured Claims** | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Fidelidade General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Fidelidade General Unsecured Claim, payment, in Cash, in an amount equal to the Allowed amount of such Claim. |
| **10(i)** - **Smiles Viagens General Unsecured Claims** | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Viagens General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Viagens General Unsecured Claim, payment, in Cash, in an amount equal to the Allowed amount of such Claim. |

---

[10] Previous versions of the Plan provided that Classes 10(h)–(k) were impaired, as the claims of creditors in those classes were formerly to be compensated in either cash or new equity, at the Debtors' election. (*See, e.g.*, ECF Doc. # 1630 at 42–44.) Creditors in these classes therefore received ballots and were allowed to vote on the Plan. No creditors in these classes voted on the Plan, however, which created a potential problem: were Classes 10(h)–(k) deemed to have accepted the Plan pursuant to Article IV.C of the Plan, which provides that the Plan is to be "presumed accepted . . . to the fullest extent permitted by law" by impaired classes of claims in which not a single creditor voted either in favor of or against the Plan? While the Debtors initially argued for application of the Tenth Circuit's decision in *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263, 1267–68 (10th Cir. 1988) (holding that a class in which no class members either voted on or objected to a chapter 11 plan is presumed to have accepted the plan), the correctness of that decisions has increasingly been challenged by some courts outside the Tenth Circuit. (Motion at 46 n.31.) During the confirmation hearing on May 20, 2025, the Debtors decided to avoid this issue by amending the Plan to provide that creditors in Classes 10(h)–(k) would be paid in full in cash the allowed amount of their claims. Thus, members of these classes are unimpaired and that absence of votes in these classes is ignored in analyzing the standards for confirmation.

| 10(j) - **Smiles Argentina General Unsecured Claims** | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Argentina General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Argentina General Unsecured Claim, payment, in Cash, in an amount equal to the Allowed amount of such Claim. |
|---|---|---|
| 10(k) - **Smiles Viajes General Unsecured Claims** | Unimpaired<br><br>Not Entitled to Vote (Presumed to Accept) | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Smiles Viajes General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Smiles Viajes General Unsecured Claim, payment, in Cash, in an amount equal to the Allowed amount of such Claim |
| 10(l) - **CAFI General Unsecured Claims** | Impaired<br><br>Deemed to Reject | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed CAFI General Unsecured Claim shall receive, in full and final satisfaction of its Allowed CAFI General Unsecured Claim, its Pro Rata share of the CAFI General Unsecured Claimholder Distribution. |
| 10(m) - **Sorriso General Unsecured Claims** | Impaired<br><br>Deemed to Reject | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Sorriso General Unsecured Claim shall receive, in full and final satisfaction of its Allowed Sorriso General Unsecured Claim, its Pro Rata share of the Sorriso General Unsecured Claimholder Distribution. |
| 11 - **General Unsecured Convenience Class Claims** | Impaired<br><br>Entitled to Vote | Except to the extent previously paid or the holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed General Unsecured Convenience Class Claim shall receive, in full and final satisfaction of its Allowed General Unsecured Convenience Class Claim, Cash in an amount equal to 15% of the amount of such Allowed General Unsecured Convenience Class Claim; provided, however, if the aggregate amount of distributions to holders of Allowed General Unsecured Convenience Class Claims would otherwise exceed the General Unsecured Convenience Class Claim Fund, holders of such Claims shall receive their Pro Rata share of the General Unsecured Convenience Class Claim Fund. For the avoidance of doubt, holders of Allowed General Unsecured Convenience Class Claims shall receive distributions solely under this Class 11 and not under Class 10. |
| 12 - **Subordinated Claims** | Impaired<br><br>Deemed to Reject | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and the holders of Subordinated Claims shall not receive any distribution or retain any property on account of such Subordinated Claims. |
| 13 - **Intercompany Claims** | Impaired/unimpaired<br><br>Deemed to reject/ | Without effecting the settlements embodied herein, each Intercompany Claim shall be either Reinstated or released and cancelled, as determined by the Debtors or Reorganized Debtors, as applicable, in consultation with Abra, or as |

| | Presumed to accept | required by Brazilian law. No property will be distributed to the holders of Intercompany Claims. |
|---|---|---|
| **14 - Existing GLAI Equity Interests** | Impaired<br><br>Deemed to Reject | On the Effective Date, Existing GLAI Equity Interests shall be Reinstated, subject to dilution by the transactions contemplated by the Plan and the Transaction Steps (including any equity interest in Reorganized GLAI that is purchased through the GLAI Preemptive Rights Offering). The Existing GLAI Equity Interests have no value, and retained Existing GLAI Equity Interests will have de minimis value, if any, following the implementation of the Plan and the Transaction Steps. |
| **15 - Intercompany Interests** | Impaired/unimpaired<br><br>Deemed to reject/<br><br>Presumed to accept | Intercompany Interests shall be Reinstated solely to the extent necessary to maintain the Reorganized Debtors' corporate structure. No property will be distributed to the holders of Intercompany Interests. |

(Plan Art. III.)

As set forth in the Third Plan Supplement (ECF Doc. # 1571), holders of Allowed

General Unsecured Claims are expected to recover the following amounts:

| Type of General Unsecured Claim | Debtor(s) Against Which General Unsecured Claim is Allowed | Estimated Recovery (%) |
|---|---|---|
| Aircraft Lessor Claims (with guarantee) | GOL Linhas Aéreas Inteligentes S.A. ("GLAI") (Class 10(a)); GOL Linhas Aéreas S.A. ("GLA") (Class 10(b)) | 12.4–14.8% |
| Aircraft Lessor Claims (without guarantee) | GLA (Class 10(b)) | 10.9–13.1% |
| 2024 Senior Exchangeable Notes Claims | GLAI (Class 10(a)); GLA (Class 10(b)); GOL Equity Finance ("GEF") (Class 10(e)) | 35.6% |
| 2025 Senior Notes Claims | GLAI (Class 10(a)); GLA (Class 10(b)); GOL Finance (Luxembourg) ("GFL") (Class 10(c)) | 36.5–38.9% |
| Perpetual Notes Claims | GLAI (Class 10(a)); GLA (Class 10(b)); GOL Finance (Cayman) ("GFC") (Class 10(d)) | 16.7–19.1% |
| Trade & Other Claims | GLAI (Class 10(a)) | 1.5–1.7% |
| | GLA (Class 10(b)) | 10.9–13.1% |
| | GFL (Class 10(c)) | 24.1% |
| | GFC (Class 10(d)) | 4.3% |
| | GEF (Class 10(e)) | 20.7%–23.1% |
| | GAC, Inc. (Class 10(f)) | 6.1% |
| Smiles General Unsecured Claims | Smiles Fidelidade (Class 10(h)) | 100% |
| | Smiles Viagens (Class 10(i)) | 100% |
| | Smiles Argentina (Class 10(j)) | 100% |
| | Smiles Viajes (Class 10(k)) | 100% |

(UCC Statement at 3–4.)

The UCC explains that these recoveries were enabled by the settlement between the

Debtor, Abra, and other parties, which increased unsecured creditors' projected recoveries. (*Id.*

at 2–4.)  The Plan also includes some minority shareholder protections and go-forward

requirements that the UCC negotiated into the Plan.  (*Id.* at 4–5.)

### E.  Solicitation and Voting Results

The voting classes were Classes 3, 4, 5, 6, 7, 8, 10(a), 10(b), 10(c), 10(d), 10(f), 10(h), 10(i), 10(j), 10(k), and 11.[11]  (Plan Art. IV.B.)  The Code provides that a "class of [impaired] claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan."  11 U.S.C. § 1126(c).

Kroll provided the results of the solicitation and voting process.  The votes are summarized in the following table:

| Plan Class | Votes Counted | | | |
| --- | --- | --- | --- | --- |
| | Votes to Accept | | Votes to Reject | |
| | Number[6] | Amount[7] | Number | Amount |
| Class 3 | 1 | $8,830,444,535.00[8] | 0 | $0.00 |
| Class 4 | 50 | $119,403,431.20 | 0 | $0.00 |
| Class 5 | 7 | $98,954,927.03 | 0 | $0.00 |
| Class 6 | 3 | $365,736,451.72 | 0 | $0.00 |
| Class 7 | 1 | $52,148,676.00 | 0 | $0.00 |
| Class 8 | 1 | $6,452,537.31 | 0 | $0.00 |
| Class 10(a) | 286 | $736,573,025.93 | 53 | $18,897,488.81 |
| Class 10(b) | 309 | $1,198,536,042.41 | 53 | $18,897,488.81 |
| Class 10(c) | 220 | $157,153,089.21 | 38 | $8,883,948.92 |
| Class 10(d) | 37 | $51,505,156.09 | 12 | $9,413,538.89 |
| Class 10(f) | 1 | $3.00 | 0 | $0.00 |
| Class 10(h) | 0 | $0.00 | 0 | $0.00 |
| Class 10(i) | 0 | $0.00 | 0 | $0.00 |
| Class 10(j) | 0 | $0.00 | 0 | $0.00 |
| Class 10(k) | 0 | $0.00 | 0 | $0.00 |
| Class 11 | 0 | $0.00 | 1 | $103,217.72 |

(Kroll Decl. at 6.)  The Plan has been accepted by at least two thirds in amount and one half in number of Claims in each Voting Class other than Classes 10(h), 10(i), 10(j), 10(k), and 11.  (*Id.*)  As noted above, no creditors in Classes 10(h)–(k) voted, and at the May 20, 2025 confirmation

---

[11]    *See supra* n. 10 (explaining that Classes 10(h)–(k) are no longer impaired).

hearing, the Debtors agreed to amend the Plan to pay creditors in these classes 100% of the allowed amounts of their claims in cash, to render them unimpaired. Certain votes were excluded, and a minimal number of ballots were undeliverable. (*Id.* at 6–8.)

The ballots provided for opt-outs which would allow claimants to preserve their claims against third parties which would otherwise be released by the Plan. The following table sets forth the number of opt-out elections received on ballots (not Master Ballots[12]):

| Plan Class | Number of Opt-Out Elections Received on Ballots |
|---|---|
| Class 3 | 0 |
| Class 4 | 0 |
| Class 5 | 8 |
| Class 6 | 6 |
| Class 7 | 1 |
| Class 8 | 4 |
| Class 10(a) | 47 |
| Class 10(b) | 93 |
| Class 10(c) | 0 |
| Class 10(d) | 0 |
| Class 10(f) | 3 |
| Class 10(h) | 0 |
| Class 10(i) | 0 |
| Class 10(j) | 0 |
| Class 10(k) | 0 |
| Class 11 | 4 |

(*Id.* ¶ 18.) Additionally, a total of 157 opt-outs were received on Master Ballots returned to Kroll—four in Class 4 and 153 in Class 10 (cutting across sub-classes). (*Id.* ¶ 19.) Some non-

---

[12]     These Master Ballots were sent to so-called "Nominees," or record holders of claims for one or more beneficial holders. (DS at 109.) The Nominees who received Master Ballots collected voting information from their beneficial holder clients and then filled out Master Ballots to reflect their clients' votes (and opt-out decisions). (*Id.* at 110.)

voting creditors (unimpaired creditors) were also given the opportunity to opt out of the third-party releases; the following table sets out information about those classes' opt-outs:

| Plan Class | Number of Opportunity to Opt-Out of the Third-Party Release Forms Sent Out | Approximate Number of Undeliverable Notices of Non-Voting Status Returned to Kroll | Number of Opt-Out Elections Received that Included a Checked Box in Item 1 on Exhibit A, Indicating an Opt-Out Election | Number of Non-Voting Notices Received by Kroll that Did Not Include a Checked Box in Item 1 on Exhibit A, Indicating an Opt-Out Election |
|---|---|---|---|---|
| Classes 1, 2, and 9 | 2,603 | 69 | 11 | 3 |
| Other Disputed Claims | 543 | 9 | 24 | 15 |

(*Id.* ¶ 20.) Creditors were fairly responsive in returning their ballots, and the fact that a not-insignificant number of creditors opted out of the third-party releases indicates that they were effective in preserving creditors' consent to the releases. (*See id.* ¶ 15; *see also infra* for a discussion of the legal basis for opt-outs.)

The following table summarizes the votes on the Plan (excluding Classes 10(h), 10(i), 10(j), and 10(k), which are no longer impaired):

| Class | Number accepting (%) | Number rejecting (%) | Amount accepting (%) | Amount rejecting (%) | Class voting result |
|---|---|---|---|---|---|
| 3 | 1 (100%) | 0 (0%) | $8,830,444,535.00 (100%) | $0 (0%) | ACCEPT |
| 4 | 50 (100%) | 0 (0%) | $119,403,431.20 (100%) | $0 (0%) | ACCEPT |
| 5 | 7 (100%) | 0 (0%) | $98,954,927.03 (100%) | $0 (0%) | ACCEPT |
| 6 | 3 (100%) | 0 (0%) | $365,736,451.72 (100%) | $0 (0%) | ACCEPT |
| 7 | 1 (100%) | 0 (0%) | $52,148,676.00 (100%) | $0 (0%) | ACCEPT |
| 8 | 1 (100%) | 0 (0%) | $6,452,537.31 (100%) | $0 (0%) | ACCEPT |
| 10(a) | 286 (84.37%) | 53 (15.63%) | $736,573,025.93 (97.50%) | $18,897,488.81 (2.50%) | ACCEPT |
| 10(b) | 309 | 53 | $1,198,536,042.41 | $18,897,488.81 | ACCEPT |

| | (85.36%) | (14.64%) | (98.45%) | (1.55%) | |
|---|---|---|---|---|---|
| 10(c) | 220 (85.27%) | 38 (14.73%) | $157,153,089.21 (94.65%) | $8,883,948.92 (5.35%) | ACCEPT |
| 10(d) | 37 (75.51%) | 12 (24.49%) | $51,505,156.09 (84.55%) | $9,413,538.89 (15.45%) | ACCEPT |
| 10(f) | 1 (100%) | 0 (0%) | $3.00 (100%) | $0 (0%) | ACCEPT |
| 11 | 0 (0%) | 1 (100%) | $0 (0%) | $103,217.72 (100%) | REJECT |

(*Id.* Ex. A.)  These numbers show that a large majority of creditors (about 75%–100% by number

and 84%–100% by amount) voted in favor of the Plan.

### F.  Plan Support Agreement

The Plan is predicated on a global settlement ("Plan Settlement") among the Debtors,

Abra, and the UCC of claims between them, as reflected in the Plan Support Agreement

("PSA").  (Bliley Decl. ¶ 6; PSA at ECF Doc. # 1390, Ex. E.)  Per the Debtors, the Plan

Settlement resolves many complex issues in a manner that avoids lengthy and expensive

litigation, makes significant value available to unsecured creditors, and is supported by the

Debtors' largest economic stakeholders and the UCC.  As discussed during the disclosure

statement hearing, two separate independent committees investigated claims against Abra arising

out of the Abra Transaction and recommended settling such claims.  (*See* Bliley Decl. ¶¶ 7–8;

Motion at 9–10.)  As noted above, two creditors (or creditor groups), Whitebox Advisors LLC

and the 2026 Ad Hoc Group of Noteholders, were going to object to this settlement, but the

Debtors settled with them as well.  (Bliley Decl. ¶ 10.)

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a "plan may provide for the

settlement or adjustment of any claim or interest belonging to the debtor or to the estate" and

"include any other appropriate provision not inconsistent with the applicable provisions of [the

Bankruptcy Code]."  11 U.S.C. §§ 1123(b)(3)(A), (b)(6).  "Courts analyze settlements under

31

section 1123 by applying the same standard applied under [Bankruptcy] Rule 9019"—which

requires that a settlement be fair and equitable and in the best interests of the estate.  *In re NII*

*Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under

section 1123 by applying the same standard applied under Rule 9019 of the Bankruptcy Rules,

which permits a court to 'approve a compromise or settlement.'").  In determining whether a

settlement is fair and equitable, courts in the Second Circuit consider the following seven so-

called *Iridium* factors: (i) the balance between the litigation's possibility of success and the

settlement's future benefits; (ii) the likelihood of complex and protracted litigation, "with its

attendant expense, inconvenience, and delay," including the difficulty in collecting on the

judgment; (iii) "the paramount interests of the creditors," including each affected class's relative

benefits "and the degree to which creditors either do not object to or affirmatively support the

proposed settlement"; (iv) whether other parties in interest support the settlement; (v) the

"competency and experience of counsel" supporting, and "[t]he experience and knowledge of the

bankruptcy court judge" reviewing, the settlement; (vi) "the nature and breadth of releases to be

obtained by officers and directors"; and (vii) "the extent to which the settlement is the product of

arm's length bargaining."  *In re Res. Cap., LLC*, 497 B.R. 720, 750 (Bankr. S.D.N.Y. 2013)

(citing *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007)).  In analyzing a

settlement under Bankruptcy Rule 9019, "the court need not conduct a 'mini-trial' to determine

the merits of the underlying litigation."  *In re Purofied Down Prods.*, 150 B.R. 519, 522

(S.D.N.Y. 1993).  Rather, the court "must only 'canvass the issues and see whether the

settlement falls below the lowest point in the range of reasonableness.'"  *In re Res. Cap., LLC*,

497 B.R. at 749 (quoting *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y.

2005)).

The Debtors explain, and provide testimony in support of their argument, that the various

settlements embodied by the Plan are fair and equitable and that each *Iridium* factor weighs in

favor of plan approval.  (Motion at 13–19.)  No party contests this.  Specifically, GOL showed

that (1) it would be much riskier and costlier to the Debtors' estates to pursue litigation rather

than settle, (2) the settled litigation would have otherwise been protracted and complex, (3)

creditors are benefited from this set of settlements (among other reasons, the Debtors point out

that the settlements increase recoveries, including to unsecured creditors), (4) all the key

stakeholders (the UCC, Abra, the 2026 Ad Hoc Group, Whitebox) support the settlement, (5) all

sides have competent and experienced counsel, (6) the releases of officers and directors are

reasonable, and (7) the Plan Settlement is the product of good faith and arm's length negotiations

among sophisticated parties, represented by experienced and highly competent attorneys,

financial advisors, and investment bankers.  (*See id*.)  Each *Iridium* factor cuts in favor of

approving the settlements embodied by the Plan.

## II.    ANALYSIS

### A. UST's Objection to Plan Confirmation

The US Trustee is the only entity which filed a non-provisional objection to the Plan, and

the only entity whose objection remained by the time of the confirmation hearing.  The UST's

objection was based on the solicitation version of the Plan (ECF Doc. # 1389) and incorporated

its arguments at the disclosure statement phase of this litigation (*see* ECF Doc. ## 1253 and 1324

for the UST's earlier briefs on the question of consent to third-party releases, and ECF Doc. ##

1229 and 1270 for the Debtors' briefs).  The Plan has been updated since then and, following

negotiations between the Debtors and the UST, the scope of the UST's objection was cut down

until only two issues remained[13]: (1) whether the Plan improperly imposes non-consensual third-party releases, and (2) whether the plan support injunction is overbroad and expands the scope of the allegedly improper third-party releases.  (UST Objection at 1–2.)  Specifically, the UST repeats its earlier argument that there is no federal bankruptcy law to determine what consent is, state law must apply, and that under state law, opt-outs are impermissible and do not manifest consent.  (*Id.* at 10–12.)  The UST also argues that this Court may not approve the plan support injunction that implements the third-party releases because the releases are non-consensual and thus illegal; and, even if the third-party releases were consensual, that does not mean that this Court would have authority to impose a *permanent* injunction barring claims between non-debtors.  (*Id.* at 14–17.)  The UST argues that claims between non-debtors do not "relate to" GOL's chapter 11 case and hence are outside the scope of a bankruptcy court's jurisdiction, at least after confirmation, when bankruptcy courts' jurisdiction shrinks.  (*Id.* at 15–16.)  The UST also argues that there is no authority in the Code for an injunction barring claims between non-debtors.  (*Id.* at 16.)  Finally, the UST argues that the usual standard for injunctive relief has not been met.  (*Id.* at 16–17.)

The Debtors argue that the releases are consensual and that the opt-out structure is sufficient to allow for the manifestation of consent to a release, while pointing out that all of the Released Parties have made significant contributions to the Plan.  (Motion at 29–32.)  They maintain that federal, not state, law applies to determine whether creditors have consented to releases.  As for the UST's concerns about the injunction, the Debtors insist that it is narrowly tailored for the purpose of enforcing the Plan's releases and exculpation.  (*Id.* at 37.)  Since the releases are consensual and since the UST's objection is that the injunction cannot be approved

---

[13]    The UST previously objected to the scope of the exculpation provision.  As explained above, the objection to the exculpation provisions was resolved.

to the extent it would enforce a non-consensual release, the UST's argument to the injunction

falls along with its argument that the third-party releases are nonconsensual. (*Id.* at 38.)  And

bankruptcy courts' jurisdiction to enforce appropriate plan provisions after the effective date is

well-recognized. (*Id.* at 39.)

For the following reasons, the Court **OVERRULES** the UST's objection.

### 1.  Federal Law Controls

The state-versus-federal-law issue is the threshold one which ultimately decides whether

opt-outs are appropriate in these circumstances.  The first question that must be asked here is

whether releases between creditors and third parties can be included in a chapter 11 plan.  If

third-party releases *cannot* be parts of chapter 11 plans, they *must* be separate contracts, which

would *necessarily* be governed by state law.  The Court concludes that consensual releases *can*,

though need not necessarily, be parts of plans—they can validly comprise parts of plans pursuant

to section 1123(b)(6) of the Code, even after *Purdue*.  This conclusion is supported by a close

reading of *Purdue* and caselaw from the Fifth Circuit.

Section 1123 of the Code governs plan provisions.  That section of the Code does not

expressly provide for third-party releases.  Rather, section 1123(b) outlines what *may* be

included in a Plan, and states in subsection (6) that a plan may "include any other appropriate

provision not inconsistent with the applicable provisions of this title."  The Supreme Court in

*Purdue*, in ruling that *nonconsensual* third-party releases cannot be included in chapter 11 plans,

relied on its interpretation of section 1123(b) to reach its conclusion; it is thus necessary to look

first at *Purdue*'s analysis of 1123(b) to determine whether the Court narrowed subsection (b) to

such an extent that it cannot encompass *consensual* third-party releases.  The Court did *not* so

narrow the statute.

35

Per the *Purdue* majority, section 1123(b)(6) is a "catchall phrase tacked on at the end of a long and detailed list of specific directions." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 217 (2024) ("*Purdue*").  The Court then interpreted the catchall "in light of its surrounding context," applying the canon of *ejusdem generis*. *Id.* at 217–18.  The Court found that the broad language of subsection (6) could not be stretched to include the "'radically different power' [of] discharg[ing] the debts of a nondebtor without the consent of affected nondebtor claimants." *Id.* at 205.  In so deciding, the Court pointed out that the preceding five subsections all "concern *the debtor*—its rights and responsibilities, and its relationship with its creditors." *Id.* at 218.  The Court reads "appropriate" in subsection (6) as an instruction to look at the "context" around subsection (6), *i.e.*, the preceding five subsections, each of which (in the majority's view) "authorizes a bankruptcy court to adjust claims without consent only to the extent such claims concern the debtor"; so, the Court reasons, "it follows that an 'appropriate provision' adopted pursuant to the catchall that purports to extinguish claims *without consent* should be similarly constrained." *Id.* at 219 (emphasis added).  At first blush, this analysis would appear to cabin subsection (6) to permit only those plan provisions which concern relationships between *the debtor* and another entity (not between two third parties).  But, as explained below, this would be too cramped a reading of *Purdue*.

Importantly, the Supreme Court expressly stated that "[n]othing in what we have said [in the majority opinion] should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at

issue here."[14]  *Id.* at 226.  And when opining on the scope of 1123(b)(6), the Court cited *United*

*States v. Energy Resources Co.*, 495 U.S. 545 (1990), for the proposition that subsection (6)

"doubtless . . . operates to confer additional authorities on a bankruptcy court."[15]  *Id.* at 218.

*Energy Resources* dealt with a plan provision which affected claims between *non-debtor entities*.

That case concerned so-called "trust fund taxes," which are withholdings from employees'

paychecks representing their income and Social Security taxes which employers must hold in

funds "in trust for the United States."  If employers fail to pay such taxes, the government may

collect an equivalent sum directly *from the officers and employees responsible* for collecting

taxes.  In other words, the economic relationship at issue was between the IRS, on the one hand,

and the *ultimately-liable officers and employees* on the other (*i.e.*, *not* the debtor), with the

property at issue arguably falling outside the debtor's estate altogether (since it was money taken

out of employees' paychecks and held in trust for a specific payment).  The proposed plan

provisions at issue in *Energy Resources* expressly provided that some of the debtor's money was

to be treated as "trust fund" money, which would extinguish all trust fund tax debts.  The IRS

objected to this provision.  The Seventh Circuit held that chapter 11 plans can, under what used

---

[14]        The case the Court cites for this proposition—*In re Specialty Equipment Cos.*, 3 F. 3d 1043, 1047 (CA7 1993)—does not discuss the source of bankruptcy courts' authority to approve consensual third-party releases in or related to chapter 11 plans.  The Seventh Circuit instead merely held that section 524(e) of the Code "provides only that a discharge does not affect the liability of third parties" and "does not purport to limit or restrain the power of the bankruptcy court to otherwise grant a release to a third party . . . . [A] per se rule disfavoring all releases in a reorganization plan would be . . . unwarranted, if not a misreading of the statute . . . . Although these releases in their various forms do pose a rather knotty problem, it is not one that we need to unravel completely inasmuch as the Releases granted in the Debtors' reorganization are consensual."  Given this vague language, the Supreme Court's citation to *Specialty Equipment* here is not particularly enlightening.

[15]        In light of this line from *Purdue*, the UST's argument that, since the Code does not expressly confer upon courts the authority to impose releases that would be invalid under state law, no federal law can apply to third-party releases, falls flat.  The Bankruptcy Code does not specifically enumerate every power which bankruptcy courts possess.  *See Sears, Roebuck & Co. v. Spivey*, 265 B.R. 357, 370 (E.D.N.Y. 2001) ("Sears' argument is really only tenable if, as a general matter, bankruptcy courts may act only when the Bankruptcy Code or Rules authorize them to do so.  The Second Circuit, however, has taken the opposite view, construing the express provisions of the Bankruptcy Code not as authority to act but as *limits on otherwise broad discretion* . . . .  This does not mean that bankruptcy courts may depart from established rules at whim.  They may act only when not in contravention of the Bankruptcy Code and Rules . . . .  Within the prescribed parameters, however, courts have wielded their inherent power with considerable force.") (emphasis added, collecting cases).

to be section 1123(b)(5) and is now (b)(6), include provisions requiring the IRS to treat tax payments made by debtor corporations in a certain way (here, as trust fund payments) when a court determines that this designation is necessary for the success of a reorganization plan, despite there being no express power in the Code granting bankruptcy courts this power. *Id.* at 548. True, the Seventh Circuit did not expressly point out that this portion of the plans at issue affected the relationship between the IRS and the ultimately-liable officers and employees. And the circuit court did base its ruling on the finding that sections 1123(b)(6) (then (b)(5)) and 105(a) are "statutory directives" granting bankruptcy courts "broad authority to modify *debtor-creditor* relationships." *Id.* at 549 (emphasis added). But the economic reality of the *Energy Resources* case is that the plan provision approved by the Seventh Circuit as appropriate under section 1123(b)(6) (then (b)(5)) affected the liability of *third parties* (the ultimately-liable officers and employees) to a creditor (the IRS). The dissent in *Purdue* pointed out just this fact, writing: "The plan provision in *Energy Resources* operated akin to a non-debtor release: It reduced the potential liability of a non-debtor (the non-debtor's officers) to another non-debtor (the IRS). *Energy Resources* therefore further demonstrates that plan provisions under §1123(b)(6) can affect creditor–non-debtor relationships." *Purdue*, 603 U.S. at 265–66 (dissent). *See also In re CJ Holding Co.*, 597 B.R. 597, 607 (S.D. Tex. 2019) (citing *Energy Resources* for the proposition that a "bankruptcy court may confirm a plan that modifies a relationship between a creditor and a nondebtor third-party").

Did *Purdue* overturn *Energy Resources* to the extent that *Energy Resources* held that a plan can affect "creditor-non-debtor relationships" pursuant to section 1123(b)(6)? No. Indeed, despite the dissent's reading of *Energy Resources*, the majority *cited Energy Resources* for the proposition that 1123(b)(6) "confer[s] *additional authorities* on a bankruptcy court." *Purdue*,

603 U.S. at 218.  And the majority did nothing to counter the dissent's interpretation of *Energy Resources*, declining to advance its own alternative reading of that case.  Aware, because of the dissent, of the tension between *Energy Resources* and its holding, the *Purdue* majority could have overruled *Energy Resources* entirely.  The fact that it did not, but instead let stand a case that is best read as permitting chapter 11 plans to affect creditor-non-debtor relationships, suggests that the majority at the Supreme Court would permit plans to feature consensual releases pursuant to section 1123(b)(6)—*i.e.*, that a consensual third-party release can be *part of a chapter 11 plan* and need not be a standalone contract.

Moreover, the majority in *Purdue* repeatedly and explicitly cabined its own holding to *nonconsensual* releases.  It was careful to state that it did not wish its ruling to affect the propriety of *consensual* releases.  *See Purdue*, 603 U.S. at 226 ("Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan.").  It emphasized that nonconsensual releases are a "novel and extraordinary power," *id.* at 222 n.5, granted by Congress to bankruptcy courts under highly specific circumstances (asbestos cases, *see* section 524(g) of the Code).  And the *Purdue* majority walked through several other reasons why the structure and language of the Code cannot support the inclusion of nonconsensual third-party releases in plans outside of the asbestos context, none of which apply to consensual releases.  The majority was concerned about the application of discharges to non-debtor entities when discharges are reserved for debtors, but discharges are "*involuntary* release[s] by operation of law of creditor claims against an entity" and consensual releases are *voluntary*, so are not discharges.  *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503 (Bankr. D.N.J. 1997); *see also id.* at 506 ("A voluntary, consensual release is not a discharge in bankruptcy.").  The majority in *Purdue* pointed out that Congress only mentioned

nonconsensual releases in a single place in the Code and limited their applicability, which suggested that the "extraordinary" power to grant nonconsensual third-party releases *does not exist* outside of the context of asbestos cases; by contrast, Congress did not address *consensual* releases in the Code at all, but did add a number of provisions which, by the Court's own acknowledgment, grant broad powers to bankruptcy courts, including 1123(b)(6). *Purdue*, 603 U.S. at 222. In light of these additional reasons to ban nonconsensual third-party releases, *Purdue* can be read as holding that nonconsensual releases are "inconsistent with the applicable provisions of" title 11 and/or are not "appropriate" plan provisions, and thereby are outside of the scope of section 1123(b)(6), though the Supreme Court does not say so expressly. But none of the above problems plague *consensual* releases. In short, *Purdue* narrowly, surgically eliminated nonconsensual releases from non-asbestos chapter 11 plans, and should not be read to significantly curtail the scope of bankruptcy courts' powers under section 1123(b)(6).

The UST argues that "the plain text of section 1123(b)(6) . . . renders [the Code] inapplicable here because the Plan's Third-Party Releases are *not* appropriate (as they are not consensual) and are entirely *inconsistent* with title 11, because the Bankruptcy Code is intended to address and adjudicate the rights and debtors creditors vis-à-vis debtors, not the rights and claims of creditors against parties that are not debtors themselves." (ECF Doc. # 1324 at 11, attached to the UST Objection.) The UST again reads the Code too narrowly. First, the Code, and bankruptcy courts operating under it, have long been recognized to (have the power to) affect relationships between non-debtor third parties. *See, e.g.*, *Energy Resources*, 495 U.S. at 549; *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 572 (5th Cir. 2025), *as revised* (Jan. 21, 2025) (concerning dispute between creditor groups and finding that bankruptcy court had jurisdiction based on consent over the dispute). Second, assuming *arguendo* that the releases *are*

consensual, the UST's argument fails in the face of the plain language of the statute. So long as

there is no problem with the "appropriateness" of the provisions (i.e., so long as the releases are

consensual), then including releases which do not comply with a *state law* theory of consent does

*not* make the plan provision "inconsistent with the applicable provisions of" *title 11*. Nothing in

title 11 bars the inclusion of consensual releases.

The approach taken by the Southern District of Texas in *In re Wesco Aircraft Holdings,
Inc.* is informative. There, the court found that section 1129 *required* it to confirm a plan that

did not include a provision "forbidden by law": since consensual releases "in a bankruptcy case

are not forbidden by law, nor are they forbidden by state law" (because, while opt-outs "might

not be enforceable under state law," they were not "*forbidden* by state law"), there was "no

requirement [the bankruptcy court] comply with state law," and finding "nothing non-compliant

with the applicable provisions of" title 11 in a plan which included opt-outs, the court confirmed

the plan. Transcript of Oral Argument at 104:14–106:24, *In re Wesco Aircraft Holdings, Inc.*,

No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024) (No. 1229-1) (emphasis added). This

Court follows similar logic.

Caselaw from the Fifth Circuit supports the view that section 1123(b)(6) accommodates

plan provisions allowing consensual third-party releases. The Fifth Circuit was one of three

circuits, along with the Ninth and Tenth, which barred nonconsensual releases from plans even

before *Purdue*. This suggests that those circuits had an appropriately narrow view of what plan

provisions are permissible under section 1123(b)(6).

Courts in the Fifth Circuit approve plans featuring "[c]onsensual nondebtor releases that

are specific in language, integral to the plan, a condition of the settlement, and given for

consideration." *In re CJ Holding Co.*, 597 B.R. at 608 (internal citation omitted, collecting

cases); *see also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701–02 (Bankr. W.D. Tex. 2011)

("The Fifth Circuit does allow permanent injunctions so long as there is consent," and "[w]ithout

an objection, [the bankruptcy court] was entitled to rely on [the creditor's] silence to infer

consent at the confirmation hearing.").[16]  Courts in the Fifth Circuit have long allowed releases

via opt-outs, and they continue to do so post-*Purdue*.  *See, e.g.*, *In re Robertshaw US Holding

Corp.*, 662 BR 300, 323 (Bankr. S.D. Tex. 2024) ("There is nothing improper with an opt-out

feature for consensual third-party releases in a chapter 11 plan . . . .  And what constitutes

consent, including opt-out features and deemed consent for not opting out, has long been settled

in this District . . . .  Hundreds of chapter 11 cases have been confirmed in this District with

consensual third-party releases with an opt-out.  And, again, *Purdue* did not change the law in

this Circuit.").  None of these Fifth Circuit cases have focused on *state law* in deciding whether

opt-outs are permissible.  Texas contract law, like state contract laws across the country, does not

recognize silence as consent to a contract in most situations.[17]  *See Redmond v. Graham*, No. CV

4:21-MC-00004, 2022 WL 3141866, at *8 (E.D. Tex. Aug. 5, 2022) (citing the Restatement

(Second) of Contracts for the claim that "[i]t is a fundamental principle of contract law that

silence does not constitute acceptance of a contract").  If Fifth Circuit courts relied on a state-

contract-law theory of third-party releases, one would expect to see some analysis of whether

silence can constitute acceptance *under state contract law* when those federal courts analyze opt-

outs.  Instead, when assessing whether there is consent, Fifth Circuit courts look to whether all

---

[16]    While this standard for approval of consensual third-party releases seems to draw language from contract law, including "consideration," this is not because Fifth Circuit courts assess the validity of releases under contract law.  Rather, it appears that these are actually *jurisdictional* requirements and have nothing to do with contract law. *See In re CJ Holding Co.*, 597 B.R. at 611 (setting out bankruptcy courts' jurisdiction over claims subject to third-party releases: "A third party's financial contribution to the debtors' plan can be relevant in showing that releasing the third party from liability is 'related to' the bankruptcy administration" such that they become non-core claims over which the bankruptcy court can exercise jurisdiction (with consent).).

[17]    Of course, there are other states in the Fifth Circuit; Texas is merely a representative state.

42

parties were provided with sufficient notice of the chapter 11 case, the plan, the deadline to

object to plan confirmation, and the releases and their effect on third parties' rights. *See, e.g.*, *In

re Higgins AG, LLC*, No. 23-30032-SGJ, 2023 WL 3745100, at *4 (Bankr. N.D. Tex. May 31,

2023) ("The Third-Party Releases are fully consensual because all parties in interest, including

all Releasing Parties, were provided with extensive and sufficient notice of the Chapter 11 Case,

the Plan, the deadline to object to confirmation of the Plan, and the process for opting-out of

giving the Third-Party Releases, and all such parties were properly informed that the Plan

contained release provisions that could affect such parties' rights.  The Third-Party Releases are

conspicuous and emphasized with boldface type in the Plan, and the Ballots."); *In re CJ Holding

Co.*, 596 B.R. at 609–10 (assessing whether there was constitutionally adequate notice from a

due process perspective to determine whether silence could constitute consent; finding that there

was adequate notice and holding that silence constituted consent to a release).  In short, the

caselaw strongly indicates that court in the Fifth Circuit find that bankruptcy courts have

authority under *federal* law, most likely section 1123(b)(6), to grant consensual third-party

releases, as they assess the validity of those releases under a federal, not state, law rubric.[18]  This

logic existed prior to *Purdue* and survives it.

There is a more fundamental reason why federal, not state, law applies to releases.  It is

because of the nature of the right at stake.  The right which creditors are giving up by

consensually releasing claims against third parties *in a bankruptcy court* is the right to have their

claims heard by an Article III court, which, when they submit to releases, the creditors are

---

[18]    The UST cites two Fifth Circuit cases for the proposition that settlements which debtors enter into are
governed by state contract law, not federal law.  (ECF Doc. # 1253 at 13, attached to the Objection.).  However,
because these two cases concern debtor *settlements*, not releases, they are distinguishable.  *See Houston v. Holder
(In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995); *De La Fuente v. Wells Fargo Bank N.A. (In re De La
Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009).

waiving.  This is a *personal constitutional right* which is protected by *federal* Constitutional law,

and which is therefore subject to waiver.  *See Commodity Futures Trading Comm'n v. Schor*,

478 U.S. 833, 848–49 (1986) ("[A]s a personal right, Article III's guarantee of an impartial and

independent federal adjudication is subject to waiver, just as are other personal constitutional

right that dictate the procedures by which civil and criminal matters must be tried."); *Wellness

Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678 (2015) ("The entitlement to an Article III

adjudicator is 'a personal right' and thus ordinarily 'subject to waiver.'")  Bankruptcy courts, by

approving opt-outs, are not creating substantive rights or doing equity in impermissible ways, as

the UST puts it—they are following longstanding constitutional doctrines.  (ECF Doc. # 1253 at

8.)  In at least one case, the District Court for the Southern District of New York conducted a

similar analysis, concluding that the bankruptcy court could release third-party claims on the

grounds that such claims were within the court's non-core jurisdiction because the releasing

party consented to the bankruptcy court's jurisdiction.  *See Lynch v. Lapidem Ltd. (In re Kirwan

Offs. S.a.r.l.)*, 592 B.R. 489, 508 (S.D.N.Y. 2018), *aff'd sub nom. In re Kirwan Offs. S.a.R.L.*,

792 F. App'x 99 (2d Cir. 2019) ("Assuming *arguendo* that the only jurisdictional basis for the

Bankruptcy Court to consider the release of [creditor's] related claims were through an exercise

of non-core jurisdiction, the Bankruptcy Court was permitted to enter a final order releasing

those claims, because all parties to the proceeding, including [creditor], consented to the court's

jurisdiction.") (citing *Wellness*).

Finally, as Judge Lane recently recognized in his *Spirit Airlines* decision, the weight of

the caselaw in this district has found that federal bankruptcy law applies.  *In re Spirit Airlines,

Inc.*, No. 24-11988 (SHL), 2025 WL 737068, at *9 (Bankr. S.D.N.Y. Mar. 7, 2025) ("Decisions

in this District generally permit use of an opt-out mechanism if the affected parties receive clear

44

and prominent notice and explanation of the releases and are provided an opportunity to decline

to grant them.") (collecting cases).  Both the UST and GOL agree that one cannot not determine

*ex ante* which state law applies to a given creditor's release, nor could one apply the choice-of-

law provision in the Plan to every contract between a creditor and a third party.  Applying state

contract law would lead to chaos.  As the Bankruptcy Court for the Northern District of Georgia

commented in *Lavie*, "there is no answer to the question 'which state's law should be applied?'

The law of the state where the bankruptcy court sits?  The law where the debtor is

headquartered?  Some other state's law?"  *In re Lavie Care Centers, LLC*, No. 24-55507- PMB,

2024 WL 4988600, at \*14 (Bankr. N.D. Ga. Dec. 5, 2024).  The potential need to engage in

untold numbers of individualized choice-of-law analyses cuts in favor of applying federal law,

for the sake of both judicial efficiency and the Code's goal of creating a centralized bankruptcy

law.  As Judge Lane recently noted in the *Spirit Airlines* decision, "the UST's position would

result in a multitude of different outcomes for each of the creditors at issue—including creditors

in the same class—based upon which law was applicable to their circumstances."  *In re Spirit

Airlines*, 2025 WL 737068, at \*18 n.31.  This would in no way "facilitate the uniform

development of bankruptcy law in the United States," *id.*, and would be extremely difficult,

costly, and time-consuming to determine and apply.

> 2. <u>The Court Disagrees With Decisions That Have Determined That State
> Law Controls</u>

Some decisions in the Southern District of New York, the District of Delaware, the Ninth

Circuit, and elsewhere have taken a different approach and found that third-party releases must

be standalone contracts, separate from the chapter 11 plans, and thus draw their power from state

contract law, not federal law.  *See, e.g.*, *In re Smallhold, Inc*., 665 B.R. 704, 722 (Bankr. D. Del.

2024) (finding no authority in the Bankruptcy Code or the Federal Rules of Bankruptcy

Procedure to impose a third-party release and hence requiring opt-ins, based on principles of contract law); *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) ("[A]ny proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent [and] such consensual agreement would be governed [] by state law."); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release.") (collecting cases); *In re Digital Impact, Inc.*, 223 B.R. 1, 14–15 (Bankr. N.D. Okla. 1998) ("[T]he validity of a release" of a third party by a creditor" "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order.") (internal citation and quotation marks omitted); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503 (Bankr. D.N.J. 1997) (similar); *In re Hotel Mt. Lassen, Inc*., 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("In the Ninth Circuit and other jurisdictions that prohibit compelled third-party releases, any third-party release associated with a plan of reorganization draws its vitality from its status as a voluntary contractual agreement between the releasing and the released parties, rather than by virtue of the court's order confirming the plan.").  Each opinion which turns to state law to fill a perceived void in federal authority to consensually release claims misses that (1) section 1123(b)(6) provides bankruptcy courts with such authority and (2) federal waiver doctrines also provide the background and applicable federal law.  For example, the bankruptcy court for the District of New Jersey has held that consensual third-party releases are settlements which "arise by agreement of the parties and not by operation of law . . . .  In the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the creditor agrees to do so.  Thus the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed.  Accordingly, it is not enough for a creditor to

abstain from voting for a plan, or even to simply vote 'yes' as to a plan . . . . Rather the 'validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order.'" *In re Arrowmill Dev. Corp.*, 211 B.R. at 507 (internal citations omitted). There is nothing stopping parties from creating separate contracts which stand apart from the chapter 11 plan and operate pursuant to state law. However, as explained above, the best reading of *Energy Resources* and *Purdue* is that third parties *can* be released from creditors' claims *by operation of law*—by entry of a chapter 11 plan by a bankruptcy court—pursuant to section 1123(b)(6), so long as there is *consent to the bankruptcy court's jurisdiction over the claim*. The *Arrowmill* court, and other courts which take the same approach, failed to see this option. *See also In re SunEdison, Inc.*, 576 B.R. at 458 (applying contract law principles in assessing consent to third-party releases and collecting cases).

At least two post-*Purdue* cases which turn to state instead of federal law to determine the validity of consent rely on slightly different rationales. The court in *In re Tonawanda Coke Corp.* ruled that opt-outs are not authorized under the Code after *Purdue*: "In its decision in *Harrington v. Purdue Pharma*, the Supreme Court declined 'to express a view on what qualifies as a consensual release.' . . . Nonetheless, the Court observed that 'nothing in the bankruptcy code contemplates (much less authorizes) it.' . . . Hence, any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent. Not authorized by any provision of the Bankruptcy Code, any such consensual agreement would be governed instead by state law." 662 B.R. at 222. This is a misreading of *Purdue*. The line, "nothing in the bankruptcy code contemplates (much less authorizes) it" refers to "the relief the Sacklers

seek"[19]—*nonconsensual* releases—not consensual releases, and not opt-outs. *Purdue*, as explained above, says, at minimum, nothing about consensual releases, and can reasonably be read to approve the inclusion of consensual releases in chapter 11 plans pursuant to section 1123(b)(6) of the Code.

Judge Goldblatt in his opinion in *In re Smallhold* changed his prior view whether opt-outs suffice to evidence consent after *Purdue*.[20]  He explained that he had previously relied on a "default" theory to approve opt-out releases, against a background of *legal* nonconsensual third-party releases: "The *possibility* that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."  665 B.R. at 709.  Since pre-*Purdue*, courts could impose releases without a creditor's consent and include a nonconsensual release as a standard plan provision "not fundamentally different from any other," creditors were under a "compulsory obligation" to speak up "as any other party on whom a motion, plan, or other pleading had been served," as enforcement of a plan could result in the loss of their rights. *Id.* at 708, 719.  Per Judge Goldblatt, it was the legality of nonconsensual releases which rendered them indistinguishable from other plan provisions, such as the schedule of executory contracts and cure amounts.  But after *Purdue*, in Judge Goldblatt's view, "the third-party release is no longer a potentially permissible plan provision.  Accordingly, it is no longer appropriate to require creditors to object or else be subject to . . . such a third-party release." *Id.* at 716.  This sentence is missing a single, critical word—*nonconsensual*.  *Purdue* eliminated plan provisions that provided *nonconsensual releases*.  But it expressly declined to eliminate *consensual* releases from plans as well (despite

---

[19]     The full quotation reads as follows: "Describe the relief the Sacklers seek how you will, nothing in the bankruptcy code contemplates (much less authorizes) it." *Purdue*, 603 U.S. at 223.

[20]     Notably, Judge Goldblatt did *not* determine whether state or federal law governs the issue of consent. *In re Smallhold*, 665 B.R. at 722 n.57.

the UST arguing during the *Purdue* oral argument that a consensual release is a "separately

enforceable" "contractual agreement" which "doesn't need to be part of [a] plan," and thus

giving the Court an opportunity to so rule, *see* Transcript of Oral Argument at 33:3–34:5,

*Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) (No. 23-124).

<div align="center">3.   <u>Third-Party Releases: Federal Standard for Consent</u></div>

If the creditor has consented to the bankruptcy court's jurisdiction over non-core claims,

the court can issue a final order and thereby release the claim.  *See Wellness Int'l Network, Ltd.*,

575 U.S. at 665; *see also In re Kirwan Offs. S.a.r.l.*, 592 B.R. at 508 ("Assuming *arguendo* that

the only jurisdictional basis for the Bankruptcy Court to consider the release of [creditor's]

related claims were through an exercise of non-core jurisdiction, the Bankruptcy Court was

permitted to enter a final order releasing those claims, because all parties to the proceeding,

including [the creditor], consented to the court's jurisdiction.").

The only difference between a creditor agreeing to have a non-core claim heard by a

bankruptcy court in an adversary proceeding and in the context of third-party releases is that in

the latter context, the outcome and final order is predetermined—a release, in the form of a final

order confirming a chapter 11 plan.

The standard for consent to jurisdiction is drawn from *Wellness International*.  Because

consenting to jurisdiction *is* consenting to the bankruptcy court's entering a final order on the

claim—and because the form the final order here is a *release*—consenting to jurisdiction

necessarily means consenting to a release, so *Wellness* also provides the standard for *consent to*

*releases.*  Put differently, a creditor's voluntary release of a claim against a non-debtor via the

operation of a chapter 11 plan is really the creditor's waiver of its right to bring that claim

against the non-debtor in an Article III court.  To know whether the creditor has waived this

<div align="center">49</div>

personal constitutional right, one turns to *Wellness International*.  *See also* Transcript of Oral

Argument at 81:8–16, *In re Extraction Oil & Gas, Inc.*, 200-11548 (CSS) (Bankr. D. Del. Dec.

22, 2020) (No. 1229-2) ("[T]he Supreme Court recently, in the context of whether someone is

consenting to the Article III jurisdiction of an Article I court, specifically held that you could

imply consent by failure to preserve the right to argue that I don't have Article III powers.  This

is no different.  This is a court who set up a mechanism to confirm a plan that contains releases

and has provided a noticing mechanism under which, if it's complied with, consent can be

implied.").

As the UST points out, *Wellness* does not actually provide the standard for consent to a

bankruptcy court's jurisdiction.  Rather, that standard comes from *Roell v. Withrow*, 538 U.S.

580 (2003), which assessed the meaning of "consent" in the statute authorizing magistrate judges

to conduct proceedings "[u]pon consent of the parties"—specifically, whether the "consent"

required had to be express.  *Id.* at 582.  The Supreme Court established an implied consent

standard in *Roell*, holding that waiver based on "actions rather than words" was sufficient.  *Id.* at

589.  Critical to the Court's decision that implied consent was acceptable was that "the litigant or

counsel was made aware of the need for consent and the right to refuse it, and still voluntarily

appeared to try the case before [a] Magistrate Judge," thus waiving the right to have the claim

heard by an Article III judge.  *Id.* at 590.  Per the Court, "[i]nferring consent in these

circumstances checks the risk of gamesmanship," serves "[j]udicial efficiency," and

"substantially honor[s]" the Article III right.  *Id.*  In *Wellness*, the Court applied the holding in

*Roell* to 28 U.S.C. 157(c)(2), the statute which allows district courts, "with the consent of all the

parties to the proceeding," to "refer a proceeding related to a case under title 11 to a bankruptcy

judge to hear and determine and to enter appropriate orders and judgments."  As with the

jurisdiction of magistrate judges, "[n]othing in the Constitution requires that consent to adjudication by a bankruptcy court be express.  Nor does the relevant statute, 28 U.S.C. 157, mandate express consent . . . .  The implied consent standard articulated in *Roell* supplies the appropriate rule for adjudications by bankruptcy courts under section 157."  *Wellness*, 575 U.S at 684.  While *Wellness* did not articulate the standard for consent as applied in the specific case at bar, the Supreme Court did find it worth "emphasizing . . . that a litigant's consent—whether express or implied—must still be knowing and voluntary."[21]  *Id.* at 685.

Courts in the Second Circuit have elaborated on the *Roell/Wellness* standard for consent, and have identified when silence can constitute consent, i.e., a waiver of a constitutional right. "Courts generally hold that a litigant impliedly consents to the bankruptcy court's entry of final judgment by appearing before the bankruptcy court and failing to raise a constitutional objection to its jurisdiction."  *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 1:20-CV-04767-MKV, 2023 WL 6122905, at *4 (S.D.N.Y. Sept. 18, 2023).  This Court has previously held that a defendant's failure to appear, despite a valid service of process, constituted voluntary and knowing consent to the bankruptcy court's issuance of a final judgment by default.  *See Kravitz v. Deacons (In re Advance Watch Co. Ltd.)*, 587 B.R. 598, 601 (Bankr. S.D.N.Y. 2018) ("Where a summons and complaint have been properly served and the defendant has failed to respond, the Court concludes that the defendant's actions, or lack thereof, . . . constitute implied consent to the entry of a default judgment by a bankruptcy judge."); *see also Executive Sounding Bd. Assocs. v. Advanced Mach. & Eng'g Co. (In re Oldco M. Corp.)*, 484 B.R. 598, 610–15 (Bankr. S.D.N.Y. 2012) ("[I]mplied consent is a proper basis for upholding the exercise of

---

[21]    The UST improperly adds a word to the holding in *Wellness*, claiming that it stands for the proposition that "Consent requires *knowing and voluntary actions*." (ECF Doc. # 1253 at 17, emphasis added.)  The Supreme Court does not require there to be *action*, only evidence that consent was *knowing and voluntary*; this may take the form of action, but, as caselaw in this Circuit shows, *inaction* can also suffice to evidence consent. *See infra.*

authority of a bankruptcy judge to enter a final order or judgment," but "implied consent should

not be lightly inferred; indeed, 'a waiver of important rights should only be found where it is

fully knowing." The implied consent was premised on the summons providing "clear[ ]

language warning of the consequences of failing to respond to the adversary complaint."). If

summons is served upon a defendant with clear and highly visible language and the defendant

declines to appear, bankruptcy courts in this district regularly find implied consent to jurisdiction

and enter final default judgments against those defendants. *See, e.g.*, *In re Old DDUS, Inc.*, 659

B.R. 810, 834 (Bankr. S.D.N.Y. 2024). However, if a litigant "explicit[ly] object[s]" to the

court's exercise of jurisdiction early enough, that objection "weighs against a finding of implied

consent." *Bernard L Madoff,* 2023 WL 6122905, at \*4. And the importance of proper service

cannot be overstated: courts have recognized that constitutional (due process) concerns arise

when creditors' rights are deemed waived without evidence of their knowledge. *See In re Helios*

*& Matheson Analytics, Inc.*, No. 20-10242 (DSJ), 2021 WL 2105800 (Bankr. S.D.N.Y. May 25,

2021) (extending bar date for creditor who was not listed in schedules and who therefore did not

receive notice of claims bar date, noting that due process concerns would arise if the bar date

applied to an unknowing creditor).

### 4. Third-Party Releases: Jurisdiction to Grant

One more limitation on releases must be examined before turning to the facts of this case.

Settled caselaw in this Circuit, as Judge Lane recognized in his recent *Spirit Airlines* decision,

holds that bankruptcy courts can only release third-party claims which affect the *res* of the

debtor's estate, regardless of whether the claims are released on a consensual basis. *In re Spirit*

*Airlines, Inc.*, 2025 WL 737068, at \*17 ("[T]his Court has jurisdiction over consensual releases

only where—as here—they affect the *res* of the estate."); *see also In re Quigley Co.*, 676 F.3d

45, 53 (2d Cir. 2012) ("Bankruptcy jurisdiction is appropriate over 'third-party non-debtor claims that directly affect the *res* of the bankruptcy estate.'") (quoting *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d. Cir. 2008) ("*Manville III*")).[22]  The releases must be tailored to meet this requirement—and are so tailored here.  The Debtors have demonstrated that the third-party releases are an essential component of the Plan— that without the releases, the PSA would collapse, and so would the Plan—that the third-party releases thus directly affect the *res* of the Debtors' estates, and that this Court therefore has related-to jurisdiction over the releases.  (*See supra*; *see also* ECF Doc. # 1654 (confirmation hearing transcript) at 84:16–87:6 (Bliley testifying that the PSA hinges on the third-party releases).)  *See also In re Spirit Airlines*, 2025 WL 737068, at *17 (finding that the court had jurisdiction over consensual third-party releases because "the Third-Party Releases here are anchored in the agreement with the Consenting Stakeholders that forms the foundation of the reorganization accomplished by the Plan and that provides the basis for the robust recovery of the affected creditors").

### 5.  Third-Party Releases: Opt-Outs in This Case

Consent must be knowing and voluntary and can be inferred from inaction *if* there has been constitutionally adequate service of process; however, deemed consent (via language in an opt-out) without evidence of, at least, adequate service would pose due process problems. Whether opt-outs are sufficient to manifest consent must be determined on a case-by-case basis. "Circumstances may justify . . . different approach[es] in different cases."  *In re Chassix Holdings, Inc.*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015); *see also In re Spirit Airlines, Inc.*, 2025 WL 737068, at *16 (describing the "need to evaluate third-party releases based on the unique

---

[22]    As discussed above, this Court has jurisdiction to release core and non-core claims, *but* can only release those third-party claims which affect the debtor's *res*.

facts and circumstances of the case at issue including the clarity of the language used, the history

of the case, and the incentive for the affected creditors to engage in the bankruptcy case").  Judge

Lane in *Spirit* (where he applied federal law to the question of consent) identified several factual

inquiries which could shed light on whether opt-outs are appropriate in a given case: the "clarity

and prominence of the language used for the release," the "circumstances of the proposed

releasing parties in the bankruptcy case, including whether these creditors have any economic

disincentive to follow the bankruptcy case," and "the procedural history of the bankruptcy case

and whether the requested release has been clearly and consistently presented to the affected

creditors."  *In re Spirit Airlines*, 2025 WL 737068, at *11.  In approving the opt-out releases in

that case, Judge Lane pointed to several facts, including that the releases were "clearly worded

and prominently presented in all of the Plan materials, including the ballots and the Opt-Out

Form itself," "the history of these cases as to the proposed release has been clear and consistent .

. . and there have been no changes to the proposed releases that might serve to confuse any

party," and "these cases are not a situation where the affected parties have little or no economic

incentive to pay attention to the bankruptcy, such as where a creditor is receiving no recovery or

a *de minimus* [sic] one."  *Id.* at *12.

   The fact that in this case a significant number of creditors both voted and chose to opt out

of releases here indicates that there has been adequate service of process.  This Court ensured, at

the disclosure statement stage, that the releases were prominently displayed on ballots and the

rest of the plan materials.  There have been no changes in the releases since the disclosure

statement hearing; indeed, even the first version of the Plan included releases, and the only

changes made to the releases since then have made them more favorable to the affected creditors.

(ECF Doc. # 1654 at 97:6–12.)  And as for the economic incentives, none of the impaired

nonvoting creditors (who will receive nothing from the Plan and were deemed to reject the Plan) are subject to releases, so there is no concern that creditors with no financial "skin in the game" will be surprised by releases.

### 6.    The Injunction Is Necessary to Effectuate the Plan

The confirmed Plan includes the injunction provision to which the UST objected.  The injunction is appropriate and this Court had the authority to enter it.  The UST's first argument, that this Court lacks the authority to enforce non-consensual releases via an injunction, fails because, as discussed above, the third-party releases in the Plan *are* consensual.  (UST Objection at 14.)  The UST also argues that this Court lacks jurisdiction over the third-party releases because "any claims or actions between non-debtor third parties are not property of the Debtors, do not bear on the execution of the Plan, and will not impact the GOL estates.  Nor would the post-confirmation pursuit of such claims against non-debtors have any impact on the Debtors' bankruptcy estates, which will cease to exist at confirmation."  (*Id.* at 16.)  Not so.  As explained above, this Court has related-to jurisdiction over the third-party releases because they affect the *res* of the Debtors' estates.  A long line of precedent in this district supports the issuance of an injunction to enforce the third-party releases.  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan."); *In re Res. Cap., LLC*, 508 B.R. 838, 849 (Bankr. S.D.N.Y. 2014) (finding that bankruptcy court had post-confirmation jurisdiction to enforce third-party release and plan injunction); *see also In re Charter Commc'ns*, No. 09–11435, 2010 WL 502764, at *4 (Bankr. S.D.N.Y. Feb. 8, 2010) ("All courts retain the jurisdiction to interpret and enforce their own orders . . . .  [Movant] returns to the bankruptcy court to prevent the prosecution of causes of

action expressly prohibited by the confirmation order. It is difficult to identify judicial acts that

are any more critical to the orderly functioning of the bankruptcy process or more closely

tethered to core bankruptcy jurisdiction."). Precedent in this district squarely supports the

issuance of an injunction where, as here, the Court has jurisdiction over the third-party releases

which the injunction effectuates.

For the foregoing reasons, the UST's Objection is **OVERRULED** in full.

### G.  Plan Confirmation Requirements

To obtain confirmation of a plan of reorganization, a plan proponent must establish by a

preponderance of the evidence that the plan has satisfied the requirements set forth under section

1129 of the Bankruptcy Code. *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns*

*Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 244 (Bankr. S.D.N.Y. 2009)

(finding that the plan proponent bears the burden of establishing compliance with the factors set

forth in section 1129 by a preponderance of the evidence); *see also In re Young Broad. Inc.*, 430

B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (same). Apart from the United States Trustee, whose

objections are overruled above, no parties object to the Plan. The Court has closely examined

the Plan and considered the requirements of section 1129, as applicable, and finds that each of

the Code's requirements for confirmation have been met.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Plan is **CONFIRMED.**  The UST's Objection is

**OVERRULED.**  A separate Order has already been entered. (ECF Doc. # 1646.)


Dated:   May 22, 2025
         New York, New York


<div style="text-align: center">

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge

</div>